## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### Holding a Criminal Term
### Grand Jury Sworn in on May 3, 2018

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| **GREGORY B. CRAIG,** | : | |
| | : | **Count 1:  18 U.S.C. § 1001(a)(1)** |
| **Defendant.** | : | **(False Statements Scheme)** |
| | : | |
| | : | **Count 2:  22 U.S.C. §§ 612 and 618** |
| | : | **(False and Misleading Statements)** |
| | : | |
| | : | |

## INDICTMENT

The Grand Jury charges that:

1.      At all times material to this indictment:

### Introduction

2.      The defendant, GREGORY B. CRAIG, was an attorney and partner at an international law firm ("Law Firm").  Immediately before joining the Law Firm and at other points in his legal career, CRAIG had held positions in the executive branch of the federal government.

3.      The Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611-621, was and is a disclosure statute that requires any person acting as "an agent of a foreign principal" to register with the Attorney General in connection with certain types of activities, such as political or public relations efforts on behalf of the foreign principal.  Such registrations are made to the U.S. Department of Justice, National Security Division's Foreign Agents Registration Act Unit ("FARA Unit").  It is a crime to knowingly and willfully fail to register, and to make false and misleading

statements or material omissions in documents submitted to the FARA Unit under the law's provisions.

4.     The purpose of FARA is to prevent covert influence by foreign principals. Proper registration under the statute allows the U.S. government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals. Among other things, a FARA registration reveals the identity of the foreign principal on whose behalf a registrant performs services, the type of services the registrant provides the foreign principal, and the source and amount of compensation the registrant receives from the foreign principal.

5.     The Government of Ukraine, a country in Eastern Europe, was and is a foreign principal under FARA.

6.     In or about October 2011, the Prosecutor General's Office of the Government of Ukraine prosecuted former Ukrainian Prime Minister Yulia Tymoshenko for abusing her official powers in office.  Tymoshenko was convicted and sentenced to seven years in prison.  Her prosecution was widely criticized by Western governments and media as politically motivated and unfair.

**CRAIG and the Law Firm's Work for Ukraine**

7.     In or about early 2012, in the face of the international criticism regarding Tymoshenko's trial, Ukraine engaged the Law Firm and CRAIG, as lead partner, to conduct an independent inquiry into whether, under Western standards of justice, Tymoshenko had received a fair trial, and to prepare a report based on that inquiry ("Report").   Ukraine planned to deploy the Report as part of a strategy headed by an American lobbyist ("Lobbyist") whom Ukraine had employed to, among other things, improve Ukraine's international public image.  In connection

with the engagement, and throughout the preparation of the Report, CRAIG coordinated closely with the Lobbyist.

8.      From the outset of the Ukraine project, CRAIG was aware of FARA's registration requirements.  CRAIG did not want to register as an agent for the Government of Ukraine, however, at least in part because he believed doing so could prevent him or others at the Law Firm from taking positions in the federal government in the future.  Moreover, as described in more detail below, registration would have required CRAIG to disclose that a third party had paid the Law Firm more than $4 million for the Report, and that the Law Firm had a parallel engagement with Ukraine to assist in the prosecution of Tymoshenko on additional charges.  These disclosures, as well as the fact of registration itself, would have undermined the Report and CRAIG's perceived independence.

9.      On or about February 13, 2012, Craig emailed a Law Firm partner and co-author ("Co-Author") of the Report, writing, "I don't want to register as a foreign agent under FARA.  I think we don't have to with this assignment, yes?"  CRAIG and other Law Firm attorneys thereafter exchanged emails discussing the FARA statute.

10.     On or about February 20, 2012, CRAIG drafted a retainer agreement for a "Preliminary Engagement" period during which CRAIG and Co-Author would travel to Kiev, Ukraine and discuss the proposed retention of the Law Firm for the Report.  In order to enter into the Preliminary Engagement, CRAIG required an advance of $150,000.  The retainer agreement for the Preliminary Engagement stated that the "fee for the Engagement itself will be determined after the Preliminary Engagement has been completed."

11.     On or about March 19, 2012, CRAIG postponed the trip to Kiev for the Preliminary Engagement because the Law Firm had not received the $150,000 advance.  When, the following

day, CRAIG was assured that the funding had been sent and would arrive in U.S. accounts the next day, CRAIG immediately rescheduled the trip.

12.     On or about April 6, 2012, while in Kiev, CRAIG met with a wealthy private Ukrainian ("Private Ukrainian").  Soon thereafter, the Private Ukrainian agreed to fully fund the Report, committing to provide the Law Firm with $4 million for its work, in addition to the $150,000 retainer that he had previously provided.

13.     In or around April 2012, CRAIG prepared and signed a formal engagement letter for the Ministry of Justice of Ukraine.  The letter specifically stated that CRAIG and the Law Firm would not perform work requiring them to register under FARA.  The engagement letter omitted any mention of the amount of money CRAIG would be paid or the source of that money; CRAIG'S letter did not disclose that he and the Law Firm would be paid $4 million for their services and that the money would be paid by the Private Ukrainian.  In turn, the Ukrainian Ministry of Justice executed a contract for CRAIG's services, which falsely set out a total fee for the work to be completed of 95,000 Ukrainian hryvnyas, or approximately $12,000 U.S. dollars.

14.     After entering into the formal engagement with Ukraine, on or about April 13, 2012, CRAIG told his Co-Author, "We really need advice very soon on FARA.  Specifically, they have asked for PR advice. Can we designate one person on the team to be the FARA registrar without requiring all of us to register?"  On or about April 16, 2012, CRAIG again raised FARA with Co-Author, and Co-Author suggested consulting a Law Firm partner who had experience with FARA. CRAIG responded, "I don't really care who you ask but we need an answer from someone who we can rely on with a straight face."

15.     On or about April 17, 2012, a Law Firm associate relayed the advice from the partner with FARA experience to CRAIG by email, writing that "if we were to perform public relations

work aimed at the US, if our London lawyers were to do so, or if we were to subcontract with a PR firm to do so, then we would be obligated to register under FARA." CRAIG's Co-Author shared this advice with CRAIG, and told CRAIG that the Law Firm should not engage in PR services. CRAIG agreed with his Co-Author and proclaimed it "[g]ood advice."

16.     Concurrently with work on the Report, the Law Firm undertook a second project on behalf of Ukraine, to consult on Tymoshenko's upcoming second trial ("Consulting Project"). On or about April 5, 2012, CRAIG wrote in an email to his Co-Author that the second project would "help make it go better and look better vis a vis the West."

17.     On or about April 30, 2012, CRAIG forwarded the Lobbyist a list of four suggested public relations organizations that could craft messaging and strategy regarding the release of the Report, including a particular firm with which CRAIG had previously worked ("PR Firm").

18.     On or about May 7, 2012, CRAIG generated talking points stating that PR Firm was the right choice for Ukraine because "they will be with us in the battle." In addition, he wrote, "Ukraine is taking a public relations hit every day in every Western publication – and there has been no effective response. The damage may be irreversible." The Government of Ukraine, with the Lobbyist's assistance, engaged the PR Firm that CRAIG had recommended to perform public relations work in Europe related to the Law Firm's Report.

19.     On or about May 22, 2012, CRAIG emailed the Lobbyist to warn him that Tymoshenko's counsel might speak to newspapers about the Law Firm's efforts to interview her in connection with the Report. CRAIG wrote, "In any event, you should have a heads up that our project might be in the newspapers tomorrow. Our [PR Firm] people are working with the Justice Ministry people to prepare a statement."

20.     On or about May 29, 2012, when a PR Firm executive proposed that the PR Firm subcontract to the Law Firm, CRAIG rejected the idea, admitting, "I have been clear that we cannot run close to the FARA line and if we were seen as hiring and directing [PR Firm] we would be doing much more than just lawyering."

21.     On or about July 30, 2012, CRAIG and the Lobbyist exchanged emails about their fear that the draft Report would be leaked, and the need for messaging about the Report to be nuanced to ensure that it be perceived as independent. CRAIG wrote, "The worst thing that could happen to the project, to this law firm, to your guy and to me would be to have someone on your side falsely leak a story that '[Law Firm] Finds Tymoshenko Guilty' '[Law Firm] Report Exonerates Ukraine.' That kind of story would be a disaster. We have to join arms to get something just a little more nuanced. Yes?"

22.     As the Report neared completion in or around August 2012, CRAIG halted work on the Consulting Project for fear that the Law Firm's involvement would become public. CRAIG wrote to his Co-Author and other Law Firm attorneys on or about August 30, 2012: "I am concerned that [Law Firm's] activity in [the Consulting Project] might surface before the report comes out, and that would do enormous damage to the credibility of [the Report]." Later in the email conversation, he continued, "[E]verything would be better, I think, if [the Report] could be released and absorbed and discussed before [the Consulting Project] truly got underway."

23.     Throughout the spring and summer of 2012, as CRAIG and others prepared the Report, the Law Firm received in excess of $4 million dollars from the Private Ukrainian, as promised. The payments were passed from the Private Ukrainian to the Law Firm through a third-party nominee bank account in Cyprus controlled by the Lobbyist. The Private Ukrainian's role in

paying CRAIG and the Law Firm on Ukraine's behalf was not publicly disclosed, leading to criticism by Ukrainian media concerning the engagement's lack of transparency.

24.     For instance, on or about August 9, 2012, a Ukrainian newspaper ran an editorial titled "[Law Firm] Stink," alleging that the publicly-disclosed figure of $12,000 could not seriously have been the total amount that Ukraine was paying the Law Firm. The editorial continued, "These facts fuel speculation that [Law Firm] is being paid by someone on the side. No one knows who is paying [Law Firm], and it's a question the company is ignoring. So the public may never know of conflicts of interest, or worse things, that may lurk behind this arrangement. We hope that [Law Firm] will address these serious concerns."

25.     On or about August 9, 2012, CRAIG's Co-Author forwarded the Ukrainian newspaper's editorial to CRAIG and wrote, "We really need to get them to disclose the funding." CRAIG replied that he had already told the Lobbyist that he needed to get the Private Ukrainian "out whether voluntarily or non voluntarily." Co-Author again raised the disclosure issue on or about August 10, 2012, following up on a phone conversation with CRAIG the previous evening, writing, "You were mentioning the Ukraine payment situation last night . . . . I really think we need to get it out there as soon as we can" and that a failure to do so could "put us in a very deep hole in the western press." The Lobbyist, however, advised CRAIG on or about August 14, 2012, that the Private Ukrainian objected to being publicly identified.

26.     On or about August 15, 2012, CRAIG confirmed to the Lobbyist that the Private Ukrainian's answer to whether his identity and role could be disclosed was "a firm and unqualified 'No.'" The Lobbyist then emailed CRAIG about discussing a "payment mechanism." On or about August 16, 2012, the Lobbyist wrote to CRAIG, "Is the number $1,300,000 good for official

submission?" CRAIG responded, "My thought is $250,000 per month which is either $1.25 million or $1.5 million." The Lobbyist replied, "Ok I will tell them 1.250."

27.     The next week, between on or about August 20, 2012, and on or about August 22, 2012, CRAIG and the Lobbyist exchanged emails and documents to create a backdated letter and false invoice from the Law Firm to the Ukrainian Ministry of Justice, which lent the appearance that CRAIG and the Law Firm's work was paid for by the Ukrainian government, not the Private Ukrainian:

      a.  On or about August 20, 2012, the Lobbyist directed CRAIG to provide him with a letter addressed to the Ministry of Justice, back-dated to July 18, 2012, and an invoice for $1,250,000 for services rendered.

      b.  Two days later, on or about August 22, 2012, CRAIG sent the Lobbyist a letter on Law Firm letterhead—dated the same day, August 22—claiming, as the Lobbyist had asked, that "[f]or services rendered during the months of April, May, June, July and August, there is an outstanding balance due of $250,000 per month for a total of $1.25 million."

      c.  On or about August 23, 2012, the Lobbyist responded to CRAIG and attached a draft letter for CRAIG's signature; the Lobbyist asked CRAIG to back-date it to July 18, 2012, and to send it back to the Lobbyist so the Lobbyist had what he "needed for administrative purposes."

      d.  That same day, on or about August 23, 2012, CRAIG edited the letter that the Lobbyist had provided to him, set it on Law Firm letterhead with a date of July 16, 2012, and signed it.

e. Neither the letter nor any corresponding invoice was entered into the Law Firm's accounting system. In fact, at the point CRAIG prepared the invoice and back-dated the letter at the Lobbyist's request, the Law Firm still had unused funds from the Private Ukrainian's advance payments of $4,150,000.

A truthful and complete FARA registration by CRAIG would have made a public record of the Private Ukrainian's role in funding the report, and the amounts he paid to the Law Firm.

28.    On or about August 28, 2012, the PR Firm's public relations strategy documents were forwarded to CRAIG. Despite including a statement that "[the Law Firm] cannot proactively lead in communications, given their restrictions by FARA registration and disclosure," the documents included a spreadsheet titled "Master Control Grid," which stated that on the day before the Report's public release, CRAIG would provide "[m]edia briefings" to select journalists to be later identified.

29.    In or about late August 2012, CRAIG and the Law Firm completed a draft of their Report evaluating Tymoshenko's trial.

30.    On or about September 13, 2012, the Lobbyist emailed CRAIG a draft public relations plan in preparation for the Report's release, which at the time was planned for September 2012 before it was subsequently delayed until December 2012. The Lobbyist wrote, "I wanted to get this document to you to bring your thinking into the process." The attachment stated that the Report's public release would "provide an opportunity for the independent endorsement of the Government message that the trial of Yulia Tymoshenko (YT) was not politically motivated and that her conviction was based on evidence before the court." It proposed leaking the Report to a selected media outlet before its public release, having a former Congressman ("former Congressman") of a U.S.-based lobbying firm working for the Government of Ukraine pre-brief

the selected journalist on the Report, and then ensuring that the journalist would be "given an off-the record briefing call with [CRAIG]."

31.     On or about September 23, 2012, the Lobbyist, a senior executive of the PR Firm, and others met with CRAIG in New York City.  At the meeting, CRAIG agreed to provide a copy of the Report and to brief a selected reporter in connection with its public release, and CRAIG suggested the name of a specific reporter, from a major U.S. newspaper, whom CRAIG knew ("Reporter 1").  In addition, CRAIG agreed that he and others would "background" reporters by speaking with them off the record in connection with the Report's release.

32.     The following day, on or about September 24, 2012, CRAIG emailed the Lobbyist and PR Firm to inform them that CRAIG had learned that neither he nor anyone else from his team could "background" journalists, as he had agreed to do during the meeting, because it was against the Law Firm's policy.

33.     Despite this, however, on or about October 2, 2012, CRAIG emailed Reporter 1 and asked if him if he would take a call from the former Congressman regarding CRAIG's Report. Reporter 1 replied affirmatively.  On or about October 3, 2012, CRAIG sent Reporter 1's contact information to the former Congressman and directed CRAIG's assistant to have a hard copy of the draft Report delivered to the former Congressman's office.  The final release of the Report was then delayed from its planned date of on or about October 9, 2012, however, and Reporter 1 did not receive the Report from the former Congressman.

34.     CRAIG incorporated additional comments from Ukraine on the draft of the Report in or about November 2012.  The final Report that Ukraine accepted in or about November 2012 disclosed neither the fact of CRAIG's parallel engagement with Ukraine, nor the source or amount of funding that the Private Ukrainian had paid the Law Firm for the Report.

35.     On or about November 26, 2012, CRAIG drafted a "Memorandum to File" in which he discussed his personal opinion on "the strengths and weaknesses of Tymoshenko's case in the European Court of Human Rights." CRAIG listed several reasons a court in the United States would grant Tymoshenko a new trial. And, CRAIG wrote of Tymoshenko, "[t]he evidence of criminal intent – i.e., that she intended to commit a crime – is virtually non-existent." CRAIG did not include this conclusion in the Report.

36.     In or about early December 2012, the Government of Ukraine determined that it was ready to release the Report, and the PR Firm proceeded to finalize plans for the media strategy surrounding the Report's publication. The PR Firm's plans, updated on or about December 6, 2012, specified that the PR Firm and CRAIG would provide an exclusive advance copy of the Report to Reporter 1, and that CRAIG would then give Reporter 1 an on-the-record interview. The PR Firm plan also specified that as a condition of the exclusive access provided, Reporter 1's newspaper would publish an article before the official release of the Report by the Government of Ukraine. In addition, CRAIG's contact at the PR Firm ("PR Firm Manager") contemplated that CRAIG would provide an interview to a reporter for a newspaper in the United Kingdom.

37.     On or about December 10, 2012, three days before the Report's December 13, 2012, planned public release, the PR Firm Manager emailed Reporter 1, writing,

> I'm working with Greg Craig of [the Law Firm] (who I understand you know well) and his client, the Ukrainian Ministry of Justice, on a report Greg has written on the Tymoshenko prosecution. We were wondering whether you'd be interested in receiving the report and a briefing with Greg on an exclusive basis in the States. If so, I could email you the report ahead of tomorrow morning your time, and arrange for a call with Greg towards the end of the day, if that works for you.

When Reporter 1 replied with confusion, because he had been told about the Report in October 2012 when CRAIG had connected him with the former Congressman, but had not ultimately

received the draft or any follow-up, the PR Firm Manager forwarded the email exchange to CRAIG

and wrote, among other things, "Many thanks for your efforts."

38.     The following day, on or about December 11, 2012, CRAIG renewed contact with

Reporter 1, writing:

> I just learned that the Ukrainians intend to release our report about the Tymoshenko
> case on Thursday – finally – and that the Ukrainians have determined that you should
> be given first look at it. . . . [I]f you are interested, I would be happy to get you a
> copy (all 186 pages of it) and even happier to talk to you about it.

CRAIG then forwarded this message to the PR Firm Manager, who responded, "Thank you very

much for this. If you don't hear back from him by 1500, it might be best to speak to your [other

major U.S. newspaper] contact as time is short. Is that ok with you?" CRAIG responded, "We

are on it." The PR Firm Manager replied, "Thank you. They are pressing me for reassurance here

so any update would be very welcome. I hope the chat goes well."

39.     Also on or about December 11, 2012, CRAIG spoke to Reporter 1 about the Report,

attempted to email him an electronic copy, and personally hand-delivered a hard copy of the Report

to Reporter 1's home in Washington, D.C.  CRAIG also exchanged emails with the PR Firm

Manager to inform him that CRAIG had connected with Reporter 1. He wrote, "We told [Reporter

1] that it was his if he wanted to use it.  He agreed to get back to us with an answer tomorrow.

Tomorrow is not too late for [another U.S. reporter] or for [another major U.S. newspaper].

40.     On or about December 12, 2012, CRAIG received an emailed list of six questions

in advance of a scheduled telephone interview of CRAIG by Reporter 1's colleague and co-writer

based in Moscow ("Reporter 2"). CRAIG provided an interview to Reporter 2 and emailed an on-

the-record quotation to Reporter 1 in Washington: "We leave to others the question of whether this

prosecution was politically motivated. Our assignment was to look at the evidence in the record

and determine whether the trial was fair." Later that evening, in advance of the Report's public

release by Ukraine, Reporter 1 and Reporter 2's newspaper published their article about the Report. The article included CRAIG's prepared quotation and stated that the Report would be publicly released the following day. It also described that the Report "concluded that important legal rights of the jailed former prime minister, Yulia V. Tymoshenko, were violated during her trial last year" but that "the lawyers, from [the Law Firm], seemed to side heavily with the government of President Viktor F. Yanukovich, which commissioned their report."

41.     Also on or about December 12, 2012, consistent with the PR Firm's media plan, CRAIG gave an interview to the U.K. newspaper reporter who had been identified in the media plan.

42.     As a result of these acts in furtherance of Ukraine's public relations strategy regarding the Report, CRAIG had an obligation under FARA to register as an agent of Ukraine.

43.     The Government of Ukraine made the Report public shortly thereafter, on or about December 13, 2012.

44.     After the Report's release, the Law Firm responded to inquiries from two other U.S. publications.

45.     On or about December 13, 2012, the Lobbyist sent CRAIG an email bearing the subject line, "Well Done." The Lobbyist wrote: "The pro has emerged again. The initial rollout has been very effective and your backgrounding has been key to it all. At least today, everyone in Kyiv is quite happy. They liked the Report and are especially happy with the way the media is playing it." CRAIG responded, "I thought the piece in the [Ukrainian newspaper] was terrific. I am glad it went so well."

46.     On or about December 15, 2012, the Lobbyist sent CRAIG a list of media coverage regarding the Report, and wrote, "You are back in the headlines internationally . . . People in Kiev are very happy.  You are 'THE MAN.'"

## COUNT ONE
### (False Statements Scheme)

47. The allegations set forth in paragraphs 1 through 46 of this indictment are realleged and incorporated by reference.

48. From on or about June 3, 2013, to on or about January 16, 2014, in the District of Columbia and elsewhere, the defendant,

### GREGORY B. CRAIG,

did unlawfully, knowingly and willfully falsify, conceal and cover up by a trick, scheme, and device material facts in a matter within the jurisdiction of the FARA Unit, a section of the National Security Division of the Department of Justice, an agency of the executive branch of the government of the United States.

### PURPOSE OF THE SCHEME

49. The purpose of the scheme was for CRAIG to avoid registration as an agent of Ukraine. Registration would require disclosure of the fact that Private Ukrainian had paid CRAIG and the Law Firm more than $4 million for the Report and the Law Firm's parallel engagement with Ukraine (*i.e.*, the Consulting Project); undermine the Report and CRAIG's perceived independence; and impair the ability of CRAIG and others at the Law Firm to later return to government positions.

### MANNER AND MEANS

50. The manner and means included the following:

    a. CRAIG withheld information regarding his contacts with Reporter 1 and Reporter 2 from a number of attorneys at the Law Firm;

b. CRAIG drafted false and misleading descriptions of his media contacts, in particular his contacts with Reporter 1 and Reporter 2, for distribution within the Law Firm and to the FARA Unit; and

c. CRAIG omitted material facts regarding his acts in furtherance of Ukraine's media plan and CRAIG's contacts with Reporter 1 and Reporter 2 in his communications with the FARA Unit.

## EXECUTION OF THE SCHEME

51.     On or about December 18, 2012, less than one week after CRAIG provided an interview and quotation to Reporter 1 and Reporter 2, and gave an interview to the U.K. newspaper, the FARA Unit sent a letter to the Law Firm advising that the Law Firm's work on behalf of Ukraine may require it to register as an agent, and requesting additional information in order to make an informed determination.

52.     Under FARA, when responding to the FARA Unit's inquiries, CRAIG had a duty to provide material information and not to willfully make misleading statements or omit material facts.

53.     On or about February 6, 2013, the Law Firm submitted to the FARA Unit its initial response, bearing CRAIG's signature.  The response described the provision of the April 2012 engagement letter that specified that the Law Firm would not perform activities that required it to register under FARA.  It made no reference to CRAIG's contacts with the U.S. media surrounding the release of the Report or Craig's involvement in the PR Firm's media plan.

54.     On or about April 9, 2013, the FARA Unit sent a follow-up letter, addressed to CRAIG, requesting additional information about his activity on behalf of Ukraine.  In particular, the letter asked, among other things, "To whom, if anyone, did your firm release or distribute the

report and when?"; what had been the Law Firm's understanding of "what would happen to the report when it was released to the Ukrainian Ministry of Justice?"; and "Did you or anyone in your firm have any media interviews or comments to the media, public, or government officials about the report and the findings of your firm?" The letter also asked for information about the amount of money paid to the Law Firm by the private citizen of Ukraine, and his identity.

55.     Throughout in or about April and May 2013, CRAIG worked with his Co-Author to respond to the FARA Unit. Craig drafted the letter's substantive content regarding his own contacts with the media and the timing and intent of those contacts.

56.     On or about June 3, 2013, CRAIG sent his and the Law Firm's formal response to the FARA Unit. CRAIG's letter contained the following material false and misleading statements and omissions:

- The letter stated that "the law firm on December 12-13, 2012 provided a copy of the report to (1) [Tymoshenko's legal team]; (2) [a representative of the Private Ukrainian]; (3) [Reporter 1]" and the two publications with which the Law Firm had communicated after the Report's release.

- CRAIG claimed that "[t]he law firm viewed the distribution of the report as a matter that would be decided by the Ukraine Government in its sole discretion. The law firm did not advise the Ministry on that issue."

- The letter also stated that the Law Firm "issued no statements and made no comments to the media, the public or government officials about the report. Gregory Craig provided brief clarifying statements about the report to [Reporter 1]" and the other reporters to whom the firm had responded after the report's public release. The letter continued, "One purpose of the statements was to correct misinformation that the media

17

had received – and was reporting – from the Ministry of Justice and from the Tymoshenko legal team in Ukraine."

57.     Based on CRAIG's claim that his and the Law Firm's activities did not require registration under FARA, the June 3, 2013, letter to the FARA Unit also declined to identify the Private Ukrainian who had funded the Report, or state how much the Law Firm had been paid for the Report.

58.     On or about September 5, 2013, the FARA Unit sent the Law Firm and Craig a letter advising that it had determined that the Law Firm had acted as Ukraine's agent through the dissemination of the Report and communication with the media, and that the Law Firm would thus need to register under FARA.  CRAIG forwarded the letter to the Law Firm's General Counsel and its Head of Litigation and wrote, "DOJ has concluded that we should register under FARA.  I am looking at what options are available, if any."

59.     On or about September 19, 2013, CRAIG spoke to the Law Firm's General Counsel and advocated that the Law Firm resist registering under FARA.  Also on or about September 19, 2013, CRAIG sent the Law Firm's General Counsel the following email, bearing the subject line "FARA," in which CRAIG provided false and misleading information about CRAIG's media contacts:

Just for the record:

(1) [The Law Firm] did not "disseminate the report to the news media."  Three media outlets who were not able to obtain a copy of the report from the Ministry in Kiev, contacted us and asked us to provide them with a copy.  The report was a public document.

(2) At no time did [the Law Firm] "contact the media."  Quite to the contrary, we were approached by the media – asked for interviews, asked for background commentary, etc. – and we did not respond.  The only time we responded was to correct misinformation.

(3) To the best of my recollection, our statements to the press were not about Ukraine. They were to correct misinformation. The statements were about our report and us.

60.     On or about September 20, 2013, CRAIG sent to the Law Firm's General Counsel a draft response letter to the FARA Unit that repeated these same false and misleading statements, including that:

- When CRAIG gave the Report to Reporter 1 and the two publications with which the Law Firm had communicated after the Report's public release, it was because Ukrainian authorities had already publicly released it "much earlier in that day, but these three outlets – for some reason – had not been able to obtain copies of the report. They approached the firm, asked us if we could provide them with a copy, and we did so."

- "No one in this law firm initiated any contacts with the media."

- "[M]y contact with [the three journalists] was for the sole purpose of defending my law firm and correcting misinformation."

Instead of sending any version of this letter, however, CRAIG and the Law Firm made plans to meet in person with the FARA Unit. The Law Firm's internal document tracking system showed that CRAIG edited the September 20, 2013 draft on or about September 24, 2013, and accessed the electronic version of the document on or about September 26, October 4, and October 9, 2013.

61.     On or about October 9, 2013, CRAIG, the Law Firm's General Counsel, and the partner with FARA experience met with the Chief of the FARA Unit and other FARA Unit staff. In that meeting, CRAIG made false and misleading statements to the FARA Unit that were consistent with the misleading statements he had made to the Law Firm's General Counsel orally and in writing on or about September 19 and 20, 2013. In particular, CRAIG claimed that his media contacts were solely reactive and for the purpose of correcting misinformation.

19

62.     On or about October 11, 2013, at the FARA Unit's request, CRAIG sent a formal written response to the FARA Unit, which reiterated some of CRAIG's false and misleading statements from the meeting on October 9, 2013. In the response, CRAIG claimed:

- that the Law Firm "provided a copy of the Tymoshenko Report ('the Report') to certain U.S. media outlets. This was done in response to requests from the media."

- "In responding to inaccuracies in U.S. news reports – some of which were directly attributable to Ukraine – [the Law Firm] did not consult with Ukraine, did not inform Ukraine, did not act under instruction from Ukraine and was in no way serving as an agent for Ukraine."

63.     At no time, either in writing or in person, did CRAIG inform the FARA Unit of various facts material to the FARA Unit's inquiry, including:

- that CRAIG generated the report, knowing and intending that the Lobbyist and his client, the Government of Ukraine, planned to release it publicly to influence U.S. public opinion and policy, and that such influence was the purpose for which Ukraine commissioned the Report;

- that CRAIG had recommended and facilitated Ukraine's hiring of the PR Firm;

- that CRAIG had been informed of the PR Firm's evolving media strategy throughout the fall of 2012;

- that CRAIG had met with the Lobbyist, a senior executive of the PR Firm, and others on September 23, 2012, in New York City and discussed the PR Firm's plans, and that CRAIG had suggested that Reporter 1 receive a copy of the Report in connection with the Report's rollout;

- that CRAIG had, consistent with the media strategy, connected Reporter 1 and the former Congressman in or about October 2012;

- that CRAIG had, consistent with the media strategy, contacted Reporter 1 on or about December 11, 2012, spoken with him about the Report, and hand-delivered an exclusive advance copy of the Report to Reporter 1's home;

- that CRAIG also had contact with, and provided an interview to, Reporter 2 on or about December 12, 2012, before the Report's public release;

- that CRAIG had, in coordination with representatives of Ukraine, communicated with Reporter 1 in an effort to ensure that Reporter 1's newspaper would publish an article before the official release of the Report;

- that CRAIG had, consistent with the media strategy, provided an interview to the reporter from the U.K. newspaper on or about December 12, 2012, before the Report's public release; and,

- that CRAIG kept the PR Firm Manager informed of CRAIG's acts consistent with the media strategy.

64.     On or about January 16, 2014, in reliance on CRAIG's representations, and having been misled by CRAIG, the FARA Unit determined that the Law Firm and CRAIG did not need to register as agents of Ukraine.

65.     On or about October 19, 2017, during an interview conducted by the Special Counsel's Office, CRAIG repeated certain of the false and misleading statements he had made to the FARA Unit concerning the timing and nature his contacts with journalists about the Report.

**(False Statements, in violation of Title 18, United States Code, 1001)**

## COUNT TWO
### (False and Misleading FARA Statements)

66.    The allegations set forth in paragraphs 1 through 46 and 51 through 65 of this indictment are realleged and incorporated by reference.

67.    On or about October 11, 2013, in the District of Columbia and elsewhere, the defendant, GREGORY B. CRAIG, knowingly and willfully caused to be made false statements of material fact in documents filed with and furnished to the Attorney General under the provisions of FARA, and omitted material facts necessary to make the statements therein not misleading, to wit, CRAIG made the material false statements and omissions regarding the nature and extent of his media contacts alleged herein in paragraphs 62 and 63.

**(False and Misleading FARA Statements, in violation of Title 22,
United States Code, 612 and 618(a)(2))**

A TRUE BILL:

FOREPERSON

Attorney of the United States in
and for the District of Columbia

22