**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*v.*<br><br>**GREGORY B. CRAIG**,<br><br>    *Defendant.* | **Case No. 1:19-cr-0125 (ABJ)** |

**<u>DEFENDANT'S MOTION TO DISMISS COUNT ONE</u>**

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ................................................................................................ ii

**INTRODUCTION** ............................................................................................................... 1

**COUNT ONE OF THE INDICTMENT** ........................................................................... 3

    A. Factual Allegations Incorporated In Count One ........................................................ 3

        *The Skadden Report and its Public Release* ....................................................... 3

        *Skadden's FARA Unit Communications* ............................................................ 7

    B. The "Scheme" Offense Charged in Count One ........................................................ 11

    C. The Grand Jury Proceedings .................................................................................... 13

**ARGUMENT** ..................................................................................................................... 19

**I.**      **Count One must be dismissed because Mr. Craig had no duty to disclose the facts he is alleged to have withheld.** .......................................................... 19

    A. It is not a crime under § 1001(a)(1) to omit or conceal material facts absent a specific legal duty to disclose them. ...................................................................... 20

    B. Mr. Craig had no legal duty to disclose the facts that the government faults him for omitting. ...................................................................................................... 22

    C. The grand jury was erroneously instructed on the guilt-by-omission theory, and there is grave doubt that its decision to indict was free from substantial influence caused by the error. ...................................................................................... 25

**II.**     **In the alternative, Count One must be dismissed as to statements made or conduct occurring prior to October 3, 2013.** ........................................... 27

    A. Any conduct that could have been prosecuted as a completed "scheme" before October 3, 2013 is now time-barred. .......................................................... 28

    B. The D.C. Circuit's 1956 decision in *Bramblett* did not permit a scheme to be prosecuted based on time-barred conduct, and to the extent it could be read to do so, *Bramblett* has been overruled by the Supreme Court's subsequent decision in *Toussie*. ...................................................................................................... 31

**CONCLUSION** .................................................................................................................. 35

# TABLE OF AUTHORITIES

## **CASES**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988) ................................................................................. 2, 25

*Bramblett v. United States*,
    231 F.2d 489 (D.C. Cir. 1956) ........................................... 28, 31, 32, 33

*Bronston v. United States*,
    409 U.S. 352 (1973) ......................................................................... 23

*Cannon v. District of Columbia*,
    717 F.3d 200 (D.C. Cir. 2013) ............................................................ 5

*Cf. Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ............................................................ 4

*Pendergast v. United States*,
    317 U.S. 412 (1943) ......................................................................... 28

*Toussie v. United States*,
    397 U.S. 112 (1970) ..................................................................... 28, 33

*United States v. Blackley*,
    167 F.3d 543 (D.C. Cir. 1999) ......................................................... 20

*United States v. Class*,
    38 F. Supp. 3d 19 (D.D.C. 2014) ....................................................... 5

*United States v. Crop Growers Corp.*,
    954 F. Supp. 335 (D.D.C. 1997) ................................................... 20, 21

*United States v. Dunne*,
    324 F.3d 1158 (10th Cir. 2003) ............................................. 28, 29, 30

*United States v. Gremillion-Stovall*,
    397 F. Supp. 2d 798 (M.D. La. 2005) ..................................... 29, 30, 33

*United States v. Grenier*,
    513 F.3d 632 (6th Cir. 2008) ........................................................... 30

*United States v. Heacock*,
    31 F.3d 249 (5th Cir. 1994) ............................................................ 30

*United States v. Hillie*,
    289 F. Supp. 3d 188 (D.D.C. 2018) ................................................... 3

*United States v. Hubbell*,
　177 F.3d 11 (D.C. Cir. 1999) ................................................................ 33

*United States v. Kanchanalak*,
　192 F.3d 1037 (D.C. Cir. 1999) ............................................................ 21

*United States v. London*,
　550 F.2d 206 (5th Cir. 1977) ................................................................ 27

*United States v. McGoff*,
　831 F.2d 1071 (D.C. Cir. 1987) ............................................................ 28

*United States v. Menendez*,
　137 F. Supp. 3d 688 (D.N.J. 2015) ....................................................... 29

*United States v. Milton*,
　8 F.3d 39 (D.C. Cir. 1993) .................................................................... 23

*United States v. Mubayyid*,
　567 F. Supp. 2d 223 (D. Mass. 2008) ......................................... 29, 30, 33

*United States v. Murphy*,
　809 F.2d 1427 (9th Cir. 1987) .............................................................. 21

*United States v. Peralta*,
　763 F. Supp. 14 (S.D.N.Y. 1991) .................................................... 25, 26

*United States v. Safavian*,
　528 F.3d 957 (D.C. Cir. 2008) ....................................................... *passim*

*United States v. Singhal*,
　876 F. Supp. 2d 82 (D.D.C. 2012) .............................................. 20, 21, 25

*United States v. Stevens*,
　771 F. Supp. 2d 556 (D. Md. 2011) ................................................. 25, 26

*United States v. Sunia*,
　643 F. Supp. 2d 51 (D.D.C. 2009) ................................................... 33, 34

*United States v. Treacy*,
　Criminal Action No. 5:13cr00018, 2014 WL 12698499,
　(W.D. Va. Jan. 28, 2014) ............................................................ 29, 30, 33

*United States v. Woodward*,
　469 U.S. 105 (1985) ............................................................................ 27

**STATUTES**

18 U.S.C. § 1001 ................................................................................................. 19, 23, 31

18 U.S.C. § 1001(a)(1) .......................................................................................... *passim*

18 U.S.C. § 1001(a)(2) ............................................................................................. 12, 27

18 U.S.C. § 3282 ..................................................................................................... 27, 28

22 U.S.C. § 612 ............................................................................................................. 21

22 U.S.C. § 618(a)(2) ................................................................................................... 21

**FEDERAL RULES  OF CRIMINAL PROCEDURE**

Rule 6(e)(2)(A) ............................................................................................................. 13

Rule 12(b)(3)(A)(v) ....................................................................................... 1, 2, 25, 27, 35

Rule 12(b)(3)(B)(v) ........................................................................................ 1, 2, 20, 35

**OTHER AUTHORITIES**

David M. Herzenhorn & David E. Sanger, *Failings Found in Trial of Ukrainian Ex-Premier*, THE NEW YORK TIMES (Dec. 12, 2012), https://www.nytimes.com/2012/12/13/world/ europe/failings-found-in-trial-of-ukrainian-ex-premier.html .................................................. 6, 9

Olivia N. Marshall *et al.*, *BLOG: Updates on Congressional Action on FARA Reform*, CAPLIN & DRYSDALE, (Feb. 20, 2019), http://www.caplindrysdale.com/blog-updates-on-congressional-action-on-fara-reform?utm_source=Mondaq&utm_medium=syndication&utm_campaign=View-Original ........................................................................................ 24

Tom Parfitt, *Trial of Ukraine's Tymoshenko flawed says government-commissioned report*, THE TELEGRAPH (Dec. 13, 2012), https://www.telegraph.co.uk/news/worldnews/europe/ ukraine/ 9741037/Trial-of-Ukraines-Tymoshenko-flawed-says-government-commissioned-report.html................................................................................................................... 7

U.S. Dep't of Justice, Office of the Inspector General, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act* (Sept. 2016), https://oig.justice. gov/reports/2016/a1624.pdf .................................................................................. 7, 8, 24

**INTRODUCTION**

Pursuant to Rule 12(b)(3)(A)(v) and (B)(v) of the Federal Rules of Criminal Procedure, Defendant Gregory B. Craig moves for dismissal of Count One of the Indictment on multiple grounds:  (1) Count One is defective as a matter of law because it depends on a legal duty to disclose information to the Justice Department's "FARA Unit" that does not exist; (2) Count One is defective because it was returned by a grand jury that had been erroneously instructed about that nonexistent legal duty; and (3) Count One is based in part on events outside of the applicable period of limitations.  The first and third grounds are straightforward legal flaws evident on the face of the indictment.  The second addresses prejudicial error in the instructions that the grand jury received about the controlling law; that error is also clear on the face of the Indictment.

In *United States v. Safavian*, 528 F.3d 957 (D.C. Cir 2008), the Court of Appeals left no doubt that a prosecution under 18 U.S.C. §1001(a)(1) cannot be based upon omissions by a defendant of facts that he had no specific obligation to disclose.  This prosecution asks the Court to ignore that holding and the principles upon which it is based.  Count One asserts that Mr. Craig violated § 1001(a)(1) by withholding information from the FARA Unit in response to questions it posed to him regarding a report he had co-authored for the Ukraine Ministry of Justice.  Indictment, ECF No. 1, ¶¶ 47–65.  Specifically, "in his communications with the FARA Unit," Mr. Craig is alleged to have "omitted material facts regarding his acts in furtherance of Ukraine's media plan and [his] contacts with [two reporters from *The New York Times*]."  *Id.* ¶ 50.c.  Count One contains a list of ten allegedly material facts that the government faults Mr. Craig for failing to mention during his communications with the FARA Unit, "either in writing or in person."  *Id.* ¶ 63.

It is not a crime to omit material facts in response to questions from a government official absent a specific legal duty to disclose those facts.  *Safavian*, 528 F.3d at 964.  In an

apparent nod to *Safavian,* the government posited such a duty on the face of the Indictment: "Under FARA, when responding to the FARA Unit's inquiries, [Mr. Craig] had a duty to provide material information and not to willfully make misleading statements or omit material facts." Indictment ¶ 52. That allegation cannot save this defective prosecution. It is simply wrong as a matter of law.

No provision of FARA, or any other applicable law, imposes such a duty upon an individual voluntarily communicating with the FARA Unit about a potential obligation to register. There is nothing in FARA that requires an individual who is voluntarily answering questions from the FARA Unit to "choose between saying everything and saying nothing." *Safavian*, 528 F.3d at 965. Because the government has accused Mr. Craig of omitting material facts that he was under no legal duty to disclose, Count One must be dismissed for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v).[1]

The same legal error infected the grand jury proceedings and requires dismissal of Count One even if it were not deficient for failing to state an offense. Fed. R. Crim. P. 12(b)(3)(A)(v). ██████████████████████████████████████████████████████████████ ████████████████████████, and there is grave doubt that the grand jury's decision to indict was free from substantial influence caused by that error. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988).

Finally, Count One relies in part on time-barred conduct. The charged offense is alleged to have occurred "[f]rom on or about June 3, 3013, to on or about January 16, 2014," Indictment

---

[1] The resolution of this motion does not depend in any way on a determination of willfulness, although § 1001 requires that a defendant acted "knowingly and willfully" by concealing or omitting to state material facts to the FARA Unit by a "trick, scheme, or device." Absent proof that Mr. Craig was informed about the alleged duty of full disclosure that the government now asserts, it is difficult to conceive how the prosecution will prove that his actions were "knowing and willful," as alleged generally in Paragraph 48 of the Indictment.

¶ 48, but even accounting for tolling agreements, the relevant date for limitations purposes is October 3, 2013.  Because § 1001(a)(1) does not codify a continuing offense, conduct outside the statute of limitations cannot be charged as part of Count One.

COUNT ONE OF THE INDICTMENT

Before turning to the legal defects that require dismissal, we describe (A) the factual allegations incorporated in Count One, (B) the "scheme" offense that Count One charges, and (C) the proceedings that resulted in the grand jury's decision to indict Mr. Craig on Count One.

**A.     Factual Allegations Incorporated in Count One**

The evidence in this case would not establish any crime, and if a trial occurred, would require a judgment of acquittal.  In this Motion, we address the Indictment as written and assume, as we must, that its allegations are true.  *See United States v. Hillie*, 289 F. Supp. 3d 188, 193 (D.D.C. 2018).

<u>The Skadden Report and its Public Release</u>

In 2011, former Ukrainian Prime Minister Yulia Tymoshenko was prosecuted and convicted for abusing her official powers while in office.  Indictment ¶ 6.  The prosecution was widely criticized by Western governments and media as "politically motivated and unfair."  *Id.* In early 2012, the Ukrainian Ministry of Justice engaged the law firm Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to conduct an inquiry and write a report on the question of "whether, under Western standards of justice, Tymoshenko had received a fair trial." *Id.* ¶ 7.  An express condition of the engagement was that Skadden's inquiry and report would be "independent." *Id.*

At Mr. Craig's direction, Skadden lawyers researched the question of whether their work for Ukraine would require registering under FARA, especially since Ukraine had "asked for PR [public relations] advice." *Id.* ¶ 14; *see also id.* ¶¶ 9, 15.  On April 17, 2012, a Skadden associate

3

relayed a message from Kenneth Gross, a Skadden partner with FARA expertise, in the following email to Mr. Craig (the bolded portions of which are misleadingly omitted from the Indictment):

> **In [Mr. Gross's] view, our work writing a report evaluating the Ukraine proceedings would not trigger FARA obligations. However**, if we were to perform public relations work aimed at the US, if our London lawyers were to do so, or if we were to subcontract a PR firm to do so, then we would be obligated to register under FARA. **(If the Ukrainian Government were to hire the PR firm directly, then FARA would not come into play for us.)**

*Id.* ¶ 15 (un-bolded portions only); Ex. 1 (complete email).[2]   Shortly thereafter, Mr. Craig encouraged Ukraine to hire a public relations firm directly, without Skadden being placed in the middle of that contractual relationship, and Ukraine did so.   Indictment ¶¶ 18, 20.   When an executive at the public relations firm asked whether his firm could subcontract through Skadden, Mr. Craig "rejected the idea," explaining that such an arrangement could be "seen as hiring and directing" the public relations firm, and reiterating that he "ha[d] been clear that we cannot run close to the FARA line." *Id.* ¶ 20.

Skadden conducted its investigation and prepared its report through the spring and summer of 2012, completing a draft in August. *Id.* ¶¶ 23, 29.   The report assessed eight issues raised by Ms. Tymoshenko during the course of her trial and appeal, and as to several of them, the report identified significant violations of Ms. Tymoshenko's rights when viewed from the perspective of Western standards of due process. *See* Ex. 2 at i, 1–5.[3]   For example, the report

---

[2] We have attached the full email as Exhibit 1, which the Court may consider because it has been incorporated in the Indictment. *Cf. Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013).

[3] Exhibit 2 is comprised of the Skadden report's cover page, table of contents, executive summary, and introduction. Exhibit 2 is drawn from the complete copy of the report that is publicly available on the FARA Unit's website. https://efile.fara.gov/docs/6617-Informational-Materials-20190118-2.pdf. This Court may take judicial notice of the contents of a document that is publicly available on a government website. *Cannon v. District of Columbia*, 717 F.3d

concluded that, "[u]nder Western standards, the continued examination of witnesses without representation by counsel would almost certainly be viewed as a violation of the right to assistance of counsel." *Id.* at 4. The report also concluded that, "[u]nder Western standards of fairness, . . . the Court's decision not to call certain defense witnesses compromised Tymoshenko's ability to present a defense." *Id.*

The report expressly declined to take a position on Ms. Tymoshenko's guilt or innocence. *Id.* at 5. As for whether the prosecution was politically motivated, the report noted that "[t]he prosecution of a former head of government, unsuccessful presidential candidate, and leader of the opposition merits close scrutiny in all respects." *Id.* The report made clear, however, that it did not address that issue: "In this report, we do not opine about whether the prosecution was politically motivated or driven by an improper political objective." *Id.* For several months after Skadden sent a completed version of the report to Ukraine, Ukraine delayed releasing it to the public. *See* Indictment ¶¶ 29, 33, 36, 43.

During the course of the project, Mr. Craig learned that the Ukrainian government was unhappy with the report's conclusions, and he became concerned that someone working with the Ukrainian government or its lobbyists would "falsely leak a story" to the press that mischaracterized the report's findings so as to make them appear more favorable to Ukraine. Indictment ¶ 21. On July 30, 2012, around the time that Skadden completed a draft of the report, Mr. Craig wrote to Paul Manafort, a political consultant engaged by Ukraine's President Victor Yanukovych, and told him that "[t]he worst thing that could happen to the project, to this law firm, to your guy and to me would be to have someone on your side falsely leak a story that

---

200, 205 n.2 (D.C. Cir. 2013); *see also United States v. Class*, 38 F. Supp. 3d 19, 25 (D.D.C. 2014) (considering facts subject to judicial notice on a motion to dismiss an indictment).

'[Skadden] Finds Tymoshenko Guilty' [or] '[Skadden] Report Exonerates Ukraine.'  That kind of story would be a disaster." *Id.*

In September 2012 Mr. Craig received a draft public relations plan, compiled by Ukraine's public relations firm, which stated that the Report's public release would "provide an opportunity for the ***independent endorsement*** of the Government message that the trial of Yulia Tymoshenko (YT) ***was not politically motivated*.**" *Id.* ¶ 30 (emphasis added).  This public relations plan, and several related documents that Mr. Craig received during September 2012, confirmed his worst fears that the "disaster" he had anticipated about Ukraine distorting the findings of the report to serve its own interests, was likely to occur.[4]

On December 11 and 12, 2012, the days immediately before the report was scheduled to be released to the public, Mr. Craig provided a copy of the report to a *New York Times* reporter, *id.* ¶ 39, and gave an on-the-record quotation to a second *Times* reporter: "We leave to others the question of whether this prosecution was politically motivated.  Our assignment was to look at the evidence in the record and determine whether the trial was fair." *Id.* ¶ 40.  The *Times* article, headlined *Failings Found in Trial of Ukrainian Ex-Premier*, observed that the report "concluded that important legal rights of the jailed former prime minister, Yulia V. Tymoshenko, were violated during her trial." *Id.*[5]

---

[4] Mr. Craig's email correspondence with his colleagues at Skadden, with Mr. Manafort, and with the Ukraine's  public relations firm, dated in late September, 2012, was sharply critical of the false "spin" being placed on the report's conclusions by Ukraine and its consultants.  That email traffic explains why Mr. Craig thereafter was not included as a recipient of any of the later iterations of the media plans.  But these emails have been completely omitted from the Indictment.

[5] *See also* David M. Herzenhorn & David E. Sanger, *Failings Found in Trial of Ukrainian Ex-Premier*, THE NEW YORK TIMES (Dec. 12, 2012), https://www.nytimes.com/2012/12/13/world/europe/failings-found-in-trial-of-ukrainian-ex-premier.html.

Also on December 12, 2012, Mr. Craig gave a telephone interview to a reporter with *The Daily Telegraph*, a London newspaper.  *Id.* ¶ 41.  Following that interview, Mr. Craig was quoted on the record in *The Telegraph*, and he corrected false statements attributed to the Ukraine Ministry of Justice about the report's conclusions.[6]  The Indictment alleges that Mr. Craig's contacts with *The New York Times* and *The Daily Telegraph* were "in furtherance of Ukraine's public relations strategy regarding the report."  *Id.* ¶ 42; *see also id.* ¶ 63.

Ukraine released the report to the public on December 13, 2012.  Soon thereafter, Skadden communicated with reporters from *The Los Angeles Times* and *The National Law Journal*, and provided copies of the report to them.  *Id.* ¶ 44.

Skadden's FARA Unit Communications

On December 18, 2012, a few days after Ukraine released Skadden's report to the public, the FARA Unit sent a letter to Skadden indicating that it might be required to register as a foreign agent under FARA, and "requesting additional information" about Skadden's work for Ukraine.  Indictment ¶ 51.[7]  The FARA Unit regularly issues letters seeking information from individuals and entities who might be obligated to register as foreign agents under FARA.  *See* Ex. 11 ("OIG Audit").[8]  Such letters are not referenced anywhere in the statute, and as the Chief

---

[6] *See* Tom Parfitt, *Trial of Ukraine's Tymoshenko flawed says government-commissioned report*, THE TELEGRAPH (Dec. 13, 2012), https://www.telegraph.co.uk/news/worldnews/europe/ukraine/9741037/Trial-of-Ukraines-Tymoshenko-flawed-says-government-commissioned-report.html.

[7] The entire written correspondence between the FARA Unit and Skadden is enclosed as Exhibits 3 through 10.  The letters are incorporated by reference in the Indictment, *see* ¶¶ 51, 53–58, 62, 64, but the Court need not consult them to decide this Motion.

[8] A 2016 report by the Office of Inspector General explained, "When a potential obligation to register is found, the unit issues a letter of inquiry to the potential registrant advising of FARA requirements, and requests additional information relevant to registration status. . . .  The FARA Unit stated it has issued approximately 130 letters of inquiry over the past ten years.  Thirty-eight of the recipients were found to have an obligation to register under FARA, and subsequently did so.  The remaining recipients were found to either have no obligation to register, or the FARA Unit is continuing to seek additional information to make a determination."  U.S. Dep't of

of the FARA Unit explained in 2018, "[n]othing in the FARA statute compels the potential registrant to respond."  Ex. 12 at 2 (Form FD-302a, Interview of Heather Hunt (May 23, 2018)); *see also* OIG Audit at ii (noting that the FARA Unit "lack[s ]authority to compel the production of information from persons who may be agents").

On February 6, 2013, Mr. Craig, acting on Skadden's behalf, signed a letter responding to the questions in the letter from the FARA Unit, and described Skadden's work on the report.  *Id.* ¶ 53.  Skadden's engagement agreement with the Ukraine Ministry of Justice was attached, and in Skadden's response letter, Mr. Craig described the provision of the engagement agreement that specified that Skadden would **not** perform any activities that would require it to register under FARA.  *Id.*

The Skadden report was funded in large part by a "private Ukrainian" third-party payor, *id.* ¶ 12, and in Skadden's February 6, 2013 letter to the FARA Unit, Mr. Craig disclosed that a "private citizen of Ukraine" had helped to fund Skadden's work.  *Id.* ¶ 54.  The contract between Skadden and the Ukraine Ministry of Justice, which Skadden attached to the letter, did not identify the third-party payor.  *Id.* ¶ 13.  When the FARA Unit subsequently asked Skadden to identify that individual, *id.* ¶ 54, Mr. Craig respectfully declined to do so in light of Skadden's position that the firm was not required to register under FARA, and the private Ukrainian's strong preference for continued anonymity.  *Id.* ¶¶ 25–26, 57.

The FARA Unit wrote back to Mr. Craig on April 9, 2013.  *Id.* ¶ 54.  In addition to reiterating its request for the identity of the third-party payor, the FARA Unit also requested answers to several specific questions, including: "'To whom, if anyone, did your firm release or

_____

Justice, Office of the Inspector General, *Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act* 13 (Sept. 2016), https://oig.justice.gov/reports/2016/a1624.pdf (excerpt attached as Exhibit 11).

distribute the report and when?'; what had been [Skadden's] understanding of 'what would happen to the report when it was released to the Ukraine Ministry of Justice?'; and 'Did you or anyone in your firm have any media interviews or comments to the media, public, or government officials about the report and the findings of your firm?'" *Id.* ¶ 54.

Mr. Craig responded to the FARA Unit again, on behalf of Skadden, in a letter dated June 3, 2013, answering each of the questions it had asked. *Id.* ¶ 56. As to Skadden's release or distribution of the report, Mr. Craig wrote, *inter alia*, "that 'the law firm on December 12–13, 2012 provided a copy of the report to (1) [Tymoshenko's legal team]; (2) [a representative of the private Ukrainian]; (3) [Reporter 1 of *The New York Times*]' and the two publications with which [Skadden] had communicated after the Report's release." *Id.* ¶ 56 (first and second brackets in Indictment). The December 12, 2012 article in *The New York Times* had itself "stated that the Report would be publicly released the following day," *id.*, ¶ 40, thus making clear that its reporters had spoken with Mr. Craig and reviewed a copy of the report before its public release.

In answering the question about Skadden's expectation of what would happen to the report once it was in the hands of the Ukraine Ministry of Justice, Mr. Craig wrote that "the law firm viewed the distribution of the report as a matter that would be decided by the Ukraine Government in its sole discretion. The law firm did not advise the Ministry on that issue." *Id.* ¶ 56. And as for comments to the media, the letter stated that "[Skadden] issued no statements and made no comments to the media, the public or government officials about the report. Gregory Craig provided brief clarifying statements about the report to [Reporter 1 of *The New York Times* and to reporters at *The Los Angeles Times* and *The National Law Journal*]." The letter continued, "One purpose of the statements was to correct misinformation that the media

had received – and was reporting – from the Ministry of Justice and from the Tymoshenko legal team in Ukraine." *Id.*

On September 5, 2013, the FARA Unit wrote to Mr. Craig stating that Skadden was obligated to register as a foreign agent because of its communications with the media and because it had "disseminated" the report. *Id.* ¶ 58. After speaking with Skadden's general counsel by phone on September 19, 2013, Mr. Craig wrote him two messages—an email on September 19 and a draft letter on September 20—disputing several conclusions in the FARA Unit's letter, including that Skadden had "disseminate[d] the report to the news media." *Id.* ¶¶ 59–60. The Indictment alleges that certain statements in the email and draft letter were "false and misleading." *Id.* At the time, Mr. Craig had not reviewed the email records of his media contacts from December, 2012. *See id.* ¶ 59 ("To the best of my recollection . . ."). Neither Skadden nor Mr. Craig ever sent any version of the email or draft letter to the FARA Unit. *See id.* ¶ 60.

Rather than respond in writing to the FARA Unit's September 5, 2013 letter, Mr. Craig and Skadden arranged to meet with the Chief of the FARA Unit, and three of her colleagues, in person. *Id.* The meeting occurred on October 9, 2013, and Mr. Craig attended along with Lawrence Spiegel, Skadden's general counsel, and Kenneth Gross, the partner with prior FARA expertise who had given FARA advice at the beginning of the Ukraine project in April 2012. *Id.* ¶ 61; *see also id.* ¶ 15. At the end of the meeting, the FARA Unit Chief requested that Skadden send a follow-up letter summarizing the main points from the meeting. We have since learned, ███████████████████████, that the notes from the meeting prepared by a member of the FARA Unit cannot be found, and that no other notes or memoranda exist recording what was said at the meeting. Mr. Craig wrote the requested letter summarizing Skadden's position that it

had no duty to register the following day, and the letter was sent to the FARA Unit on October 11, 2013. *Id.* ¶ 62.  In the follow-up letter, Mr. Craig wrote that the law firm had provided copies of the report to certain media outlets "in response to requests from the media," and that "[i]n responding to inaccuracies in U.S. news reports – some of which were directly attributable to Ukraine – [Skadden] did not consult with Ukraine, did not inform Ukraine, did not act under instruction from Ukraine and was in no way serving as an agent for Ukraine." *Id.*  On January 16, 2014, the FARA Unit wrote to Skadden agreeing with its position that it did not need to register under FARA as an agent of Ukraine. *Id.* ¶ 64.

The Indictment does not allege that the FARA Unit asked – at any point, either orally or in writing – whether Ukraine had engaged a public relations firm in connection with the release of the report, and if so, whether Skadden had had any interaction with the public relations firm. *See id.* ¶¶ 51, 54, 58, 61.

### B.      The "Scheme" Offense Charged in Count One

Count One charges that Mr. Craig "did unlawfully, knowingly and willfully falsify, conceal and cover up by a trick, scheme and device material facts in a matter within the jurisdiction of the FARA Unit" in violation of 18 U.S.C. § 1001(a)(1). *Id.* ¶ 48.  As the "manner and means" of the scheme, Mr. Craig is alleged to have: (1) withheld information about his contacts with *The New York Times* from other Skadden lawyers, *id.* ¶ 50.a; (2) "drafted" false and misleading descriptions of his contacts with *The New York Times* for distribution within Skadden and to the FARA Unit, *id.* ¶ 50.b; and (3) "*omitted material facts* regarding his acts in furtherance of Ukraine's media plan and [his] contacts with [*The New York Times*] *in his communications with the FARA Unit*," *id.* ¶ 50.c (emphasis added).   These specifications thus do not focus upon allegations concerning material false statements made to the FARA Unit; instead,

they make clear that the charged offense is based on material facts *withheld* from that government agency.  The Indictment does not charge a violation of subsection (a)(2) of § 1001, which criminalizes making false statements to a government agency.

The essence of the charged offense is in Paragraph 63 – a bullet-point list of ten "material facts" that, allegedly, (1) Mr. Craig did not disclose, "either in writing or in person," at any time during his communications with the FARA Unit, and (2) the omission of which was knowing and willful.  The Indictment asserts that, "[u]nder FARA," Mr. Craig "had a duty" to disclose these facts "when responding to the FARA Unit's inquiries."  *Id.* ¶ 52.  The ten omitted facts all relate to Ukraine's public relations strategy, its hiring of a public relations firm, the media strategy developed by that public relations firm, and actions that Mr. Craig undertook that are alleged to have been "consistent with the media strategy."  *Id.* ¶ 63.

Although the Indictment alleges that certain false and misleading statements were included in some of Mr. Craig's written communications with the FARA Unit, those statements are encompassed within the charged "concealment" of the material facts listed in Paragraph 63.  *See Safavian*, 528 F.3d at 962 (referencing a concealment scheme comprised of both "statements and omissions").  For example, Paragraph 56 of the Indictment lists several statements in Mr. Craig's letter of June 3, 2013, characterizing all of them collectively as "material false and misleading statements and omissions."  To understand what the government believes is wrong with the listed statements, one must read them in tandem with the omitted facts listed in Paragraph 63.  The government appears to fault the statement that Skadden provided copies of the report to various recipients "on December 12-13, 2012," *see id.* ¶ 56, because it **omits** the allegedly material fact that Mr. Craig also provided a copy of the report to a *New York Times* reporter on December 11, *see id.* ¶ 63.  Similarly, the government appears to fault the statement

12

that Skadden "did not advise" Ukraine regarding "the distribution of the report," *see id.* ¶ 56, because it ***omits*** the allegedly material facts that Mr. Craig "recommended and facilitated Ukraine's hiring of the PR firm" and "suggested [to the PR firm] that Reporter 1 receive a copy of the Report in connection with the Report's rollout," *id.* ¶ 63.

The allegations in Paragraph 61 (regarding the in-person meeting on October 9, 2013) and Paragraph 62 (regarding the follow-up letter dated October 10, 2013) follow the same pattern. The omitted "material facts" in Paragraph 63 explain what the Indictment alleges is misleading about Mr. Craig's alleged oral statement that his media contacts "were solely reactive and for the purpose of correcting misinformation," *id.* ¶ 61, his written statement that he provided copies of the report "in response to requests from the media," *id.* ¶ 62, and his written statement that Skadden "did not consult with Ukraine, did not inform Ukraine, [and] did not act under instruction from Ukraine" when "responding to inaccuracies in U.S. news reports – some of which were directly attributable to Ukraine." *Id.*

### C.    The Grand Jury Proceedings[9]

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

---

[9] The material included in this portion of the Motion is based on grand jury transcripts that the government made available to the defense in discovery with the Court's permission. Those transcripts support a showing that the grand jury received erroneous instructions concerning the elements of the charged offense under §1001(a)(1). *See* Part I.C, *infra*. We are redacting these materials because, at the scheduling conference on April 15, 2019, the government only sought the Court's permission to disclose them to the defense. We believe that these grand jury transcripts are no longer subject to any requirement of confidentiality under Rule 6(e), *see* Fed. R. Crim. P. 6(e)(2)(A), and we intend to seek leave from the Court to file an unredacted version of this Motion on the public docket.







███████████████████████████████ ██ ████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████

On April 11, 2019, the grand jury returned the Indictment, charging a violation of the "scheme" provision of 18 U.S.C. § 1001, but no violation of the false statement provision. Indictment, ECF No. 1.  The Indictment contains the erroneous assertion that, in responding to inquiries from the FARA Unit, Mr. Craig was subject to a legal duty to provide material information **and not to willfully omit material facts**. *Id.* ¶ 52.

## ARGUMENT

**I.     Count One must be dismissed because Mr. Craig had no duty to disclose the facts he is alleged to have withheld.**

Count One unmistakably charges a withholding of material facts.  It alleges that Mr. Craig withheld facts to avoid being ordered to register. *Id.* ¶¶ 48–49.  Paragraph 63 could not be clearer on this point: "At no time, either in writing or in person, did CRAIG inform the FARA Unit of various facts material to the FARA Unit's inquiry"—specifically, a list of ten omitted facts. *Id.* ¶ 63; *see supra* at 12–13 (showing relationship of Paragraph 63 to Count One as a whole).  The legal question, therefore, is whether the failure to disclose these "material facts" violated §1001(a)(1).



Count One is fatally defective because omitting facts in a communication with the government is not a crime unless there is a specific legal duty to disclose the omitted facts. *Safavian*, 528 F.3d at 964. The government appears to acknowledge that it must establish such a legal duty in order to state the offense described in Count One. It attempts to assert a disclosure duty in the Indictment itself, alleging that, "[u]nder FARA, when responding to the FARA Unit's inquiries, CRAIG had a duty to provide material information and not to willfully make misleading statements or omit material facts." Indictment ¶ 52.

There is no duty "under FARA" to volunteer all potentially relevant information in response to questions from the FARA Unit, and the government's assertion of such a duty is wrong as a matter of law. Count One rests on an erroneous guilt-by-omission theory, and it must therefore be dismissed. Fed. R. Crim. P. 12(b)(3)(B)(v).

### A. It is not a crime under § 1001(a)(1) to omit or conceal material facts absent a specific legal duty to disclose them.

"Section 1001 proscribes two different types of conduct: concealment of material facts and false representations." *United States v. Singhal*, 876 F. Supp. 2d 82, 93 (D.D.C. 2012) (citation omitted). The prohibition on concealment of material facts is much narrower, because it is not generally a crime to omit relevant information in response to an inquiry from the government. *See Safavian*, 528 F.3d at 964. A prosecution for an omission must rest on "a legal duty to disclose" the omitted information. *Id.*; *see also United States v. Blackley*, 167 F.3d 543, 550 (D.C. Cir. 1999). Whether omitted information was subject to a legal duty to disclose is a question that "the Court must first decide, as a matter of law." *United States v. Crop Growers Corp.*, 954 F. Supp. 335, 345 (D.D.C. 1997); *see also Singhal*, 876 F. Supp. 2d at 93–96 (granting pretrial motion to dismiss indictment after finding no duty to disclose).

Limiting omission prosecutions to situations in which there was a specific affirmative disclosure duty protects the defendant's right to due process under the Fifth Amendment. *See Safavian*, 528 F.3d at 964; *Singhal*, 876 F. Supp. 2d at 95. There can be no crime for failing to disclose information absent a pre-existing legal duty to do so because a "defendant must have 'fair notice of what conduct is forbidden.'" *Singhal*, 876 F. Supp. 2d at 95 (quoting *United States v. Kanchanalak*, 192 F.3d 1037, 1046 (D.C. Cir. 1999)).

For that reason, any prosecution for omissions under § 1001(a)(1) must be rooted in "*specific* requirements for disclosure of *specific* information." *Safavian*, 528 F.3d at 964 (emphasis added); *see also id.* (explaining that the requirement of fair notice under the Fifth Amendment provides "good reason for demanding such specificity"). Due process also demands that some legal authority—*e.g.*, a statute, regulation, or government disclosure form—must have "unambiguously" required disclosure of the omitted information. *Crop Growers Corp.*, 954 F. Supp at 347; *see also id.* at 345 (echoing Ninth Circuit's view that "where the statute and its implementing regulations were ambiguous as to whether they required disclosure, . . . imposition of criminal liability would offend due process considerations" (citing *United States v. Murphy*, 809 F.2d 1427 (9th Cir. 1987)).[12]

---

[12] In cryptically and erroneously asserting that Mr. Craig had a duty to disclose material information "[u]nder FARA," Indictment ¶ 52, the government has failed to identify any specific provision that supposedly created the duty. In fact, no provision of FARA creates such a duty. As described in more detail in the Motion to Dismiss Count Two, all of FARA's affirmative disclosure provisions prescribe pieces of information that must be disclosed in registration statements, supplements, and accompanying documents—not in voluntary responses to inquiries from the FARA Unit. *See* 22 U.S.C. § 612(a)–(b). FARA's false statement provision is likewise limited to statutorily required documents, *id.* § 618(a)(2).

In the context of a "voluntary" communication to the government, there is no disclosure duty, and a prosecution under § 1001(a)(1) for omitting relevant information cannot stand. *Safavian*, 528 F.3d at 964.  That includes voluntary responses to questions from a government official.   In *Safavian*, the government tried to advance the position that "once one begins speaking when seeking government action or in response to questioning, one must disclose all relevant facts." *Id.* at 965.  The court flatly rejected it:

> Attorneys commonly advise their clients to answer questions truthfully but not to volunteer information.  Are we to suppose that ***once the client starts answering a government agent's questions***, in a deposition or during an investigation, the client must disregard his attorney's advice or risk prosecution under § 1001(a)(1)? The government essentially asks us to hold that once an individual starts talking, he cannot stop.  ***We do not think § 1001 demands that individuals choose between saying everything and saying nothing.  No case stands for that proposition.***

*Id.* (emphasis added).   As in this case, the indictment in *Safavian* charged the defendant with "'falsifying, concealing and covering up by a trick, scheme and device material facts' in violation of 18 U.S.C. § 1001(a)(1)." 528 F.3d at 962.  Because the jury's guilty verdict relied on concealment of material facts that the defendant had no legal duty to disclose, the Court of Appeals reversed the conviction.  *Id.* at 959, 965.

### B. Mr. Craig had no legal duty to disclose the facts that the government faults him for omitting.

The Indictment recounts a series of communications between Mr. Craig and the FARA Unit, with each of Mr. Craig's communications responding to *requests* from the FARA Unit. Indictment ¶¶ 51, 53 (letter of February 6, 2013, responding to FARA Unit letter "requesting" information); *id.* ¶¶ 54–56 (letter of June 3, 2013, responding to FARA Unit letter "requesting" information); *id.* ¶ 62 (letter of October 11, 2013, sent "at the FARA Unit's request").  It is clear on the face of the Indictment that Mr. Craig's communications to the FARA Unit were voluntary; he had no duty to respond *at all*, let alone to volunteer all possibly relevant facts.

22

Paragraph 52 of the Indictment states: "Under FARA, when responding to the FARA Unit's inquiries, CRAIG had a duty to provide material information and not to willfully . . . omit material facts."  That is simply wrong as a matter of law and cannot save the Indictment.

First, Mr. Craig did not have a legal duty to disclose all relevant information by virtue of the fact that he was "responding to the FARA Unit's inquiries," *id.*, and the government's assertion of such a duty flies in the face of both the binding precedent in *Safavian*, and the FARA statute.  *See* note 12 *supra*.  *Safavian* held in no uncertain terms that an individual has no freestanding obligation to "disclose all relevant facts" "in response to questioning" from a government official.  528 F.3d at 965.  That principle carries the day here.

Most of the information that the government faults Mr. Craig for omitting—and that it claims would have been relevant to the FARA Unit's registration inquiry—was not responsive to the specific questions that the FARA Unit actually asked.  *Compare* Indictment ¶ 54 (FARA Unit questions), *with id.* ¶ 63 (list of omitted facts).  But no legal duty was violated even if Mr. Craig omitted *responsive* information, *Safavian*, 528 F.3d at 965, and that is so even if he gave answers that, by virtue of being non-responsive or incomplete, were "misleading by negative implication." *Bronston v. United States*, 409 U.S. 352, 353 (1973).[13]

Second, there is no special legal duty to supply all relevant information in response to government inquiries "[u]nder FARA," as the government asserts.  Indictment ¶ 52.  The FARA Unit regularly issues letters seeking information from individuals and entities who may be obligated to register.  As set out above, and in the Motion to Dismiss Count Two, also filed today, such letters are not referenced anywhere in the statute, and as the Chief of the FARA Unit

---

[13] *Bronston* was a perjury case, *see* 409 U.S. at 353, but the D.C. Circuit has stated that *Bronston*'s holding applies to prosecutions under 18 U.S.C. § 1001.  *See United States v. Milton*, 8 F.3d 39, 45 & n.7 (D.C. Cir. 1993).

explained in 2018, "[n]othing in the FARA statute compels the potential registrant to respond." Ex. 12 (Form FD-302a, Interview of Heather Hunt at 2 (May 23, 2018)); *see also* Ex. 11, OIG Audit at ii (noting that the FARA Unit "lack[s] authority to compel the production of information from persons who may be agents"). The Justice Department has repeatedly sought legislation that would authorize the FARA Unit to issue civil investigative demands to possible foreign agents so as to compel them to produce information, but those efforts have all failed. *See* OIG Audit at 18–19.[14] If there were truly already a duty "[u]nder FARA" to disclose all relevant information in response to inquiries from the FARA Unit, Indictment ¶ 52, the Justice Department would not need the additional statutory authority that has been denied by Congress.

The letters at issue in this case exemplify the precatory nature of the FARA Unit's requests for information. *See id.* ¶ 51 (FARA Unit's letter of December 18, 2013 "request[ed]" information); *id.* ¶ 54 (FARA Unit's letter of April 9, 2013 "request[ed] additional information"); *id.* ¶ 62 (Mr. Craig sent final follow-up letter "at the FARA Unit's request"). The letters that the FARA Unit sent to Mr. Craig stand in stark contrast to the forms that the FARA Unit has prescribed for disclosures that are *actually* required "under FARA." *See* Ex. 21 at 1 (form for FARA registration statements providing that "Provision of the information requested is mandatory, and failure to provide the information is subject to the penalty and enforcement provisions [of FARA]."). *See* Motion to Dismiss Count Two, at pages 14–16.

In voluntarily responding to the FARA Unit's inquiries, Mr. Craig was not subject to any legal duty to supply all relevant information, and certainly not one imposed by the statute itself.

---

[14] *See also* Olivia N. Marshall *et al.*, *BLOG: Updates on Congressional Action on FARA Reform*, Caplin & Drysdale, (Feb. 20, 2019), http://www.caplindrysdale.com/blog-updates-on-congressional-action-on-fara-reform?utm_source=Mondaq&utm_medium=syndication&utm_campaign=View-Original (listing several bills that would authorize the FARA Unit to issue civil investigative demands but noting that, as of February 2019, "efforts to update FARA have stalled in Congress").

But the theory of this prosecution depends on the existence of such a duty, a duty which as a matter of law does not exist.  The government cannot simply create a legal duty by asserting that one existed.  Count One does not charge a crime and must be dismissed.

### C. The grand jury was erroneously instructed on the guilt-by-omission theory, and there is grave doubt that its decision to indict was free from substantial influence caused by the error.

Count One must be dismissed in its entirety for the additional reason that the grand jury proceedings were infected by legal error.  Fed. R. Crim. P. 12(b)(3)(A)(v).  When a defendant demonstrates that legal error occurred in the grand jury proceedings, "dismissal of the indictment is appropriate. . . if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."  *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988) (citation omitted).  Under this standard, an indictment must be dismissed where the grand jury receives erroneous legal instructions that may have "substantially influenced" its decision to indict.  *See United States v. Stevens*, 771 F. Supp. 2d 556, 566–68 (D. Md. 2011) (dismissing indictment based on erroneous legal instructions to grand jury); *United States v. Peralta*, 763 F. Supp. 14, 19–21 (S.D.N.Y. 1991) (same).  That is the case here.[15]

It is plain from both the face of the Indictment and ███████████████████████████ ███████████████████ that the grand jury received erroneous legal instructions causing it to indict Mr. Craig on the legally incorrect omission theory described above.[16]  The grand jury was

---

[15]  If this standard is met, then dismissal is appropriate "even in the absence of willful prosecutorial misconduct."  *Stevens*, 771 F. Supp. 2d at 568.

[16]  We submit that there is no doubt that the grand jury was given this erroneous instruction of law, but if the Court has any doubt, we encourage the Court to order the government to produce the grand jury charging instructions.  The erroneous assertion of a legal duty in Paragraph 52 of the Indictment supports a "particularized need" for the grand jury charging instructions in this case.  *Cf. Singhal*, 876 F. Supp. 2d at 99 (finding no "particularized need" for disclosure of grand jury charging instructions because "Defendants are unable to identify any portion of the Indictment that suggests that any charge to the grand jury was legally erroneous").

erroneously instructed that Mr. Craig was subject to a legal disclosure duty when responding to inquiries from the FARA Unit.  That erroneous instruction is reflected in paragraph 52 of the Indictment itself, and there is thus no doubt that the erroneous advice to that effect was presented to the grand jury.

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████

Given ██████████████████████████████, there is "grave doubt" that the grand jury's decision to indict Mr. Craig was free from substantial influence caused by the erroneous guilt-by-omission instructions. █████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ *see also Stevens*, 771 F. Supp. 2d at 564, 568 (focusing on question from juror in concluding that grand jury's decision to indict had likely been influenced by erroneous legal instruction). █████████████████████████████████████

████████████████████████████████████████████████████████████, which is further reason to doubt that the grand jury made its decision to indict Mr. Craig free from substantial influence caused by the erroneous omission theory.  *Cf. Peralta*, 763 F. Supp. at 19–21 (dismissing indictment upon discovering erroneous grand jury instructions about the elements of "constructive possession," even though there had been evidence presented at trial "sufficient to support a theory of *actual* possession," because constructive possession was "the legal theory

26

at the core of the government's case").  Finally, the grand jury *did not* indict Mr. Craig for

making false statements under § 1001(a)(2), ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████

      Given ████████████████████████████████████████████████████████

███████████████████████, it is overwhelmingly likely that the erroneous guilt-by-omission

instructions substantially influenced the grand jury's decision to indict Mr. Craig.  If Count One

is not dismissed on its face, then it should be dismissed for grand jury error under Rule

12(b)(3)(A)(v).

## II.  In the alternative, Count One must be dismissed as to statements made or conduct occurring prior to October 3, 2013.

Even if one were to accept for the sake of argument that the government has properly

alleged that Mr. Craig falsified, concealed, or covered up material facts by scheme in violation of

18 U.S.C. § 1001(a)(1), which it has not,[17] Count One must be dismissed for the independent

reason that it would permit the jury to return a guilty verdict based on time-barred conduct.

Under the applicable statute of limitations, 18 U.S.C. § 3282(a), any offense must be

charged within five years of being "complete."  *Toussie v. United States*, 397 U.S. 112, 114

---

[17] For the avoidance of doubt, the allegations in Count One *do not* state an offense under 18 U.S.C. § 1001(a)(1).  Aside from resting on a non-existent disclosure duty, as discussed in Part I above, Count One *at most* alleges a series of isolated false statements and omissions.  Courts have held that "something more" than such isolated statements or omissions is required in order to state a "scheme" offense under § 1001(a)(1).  *United States v. London*, 550 F.2d 206, 214 (5th Cir. 1977). S*ee also United States v. Woodward*, 469 U.S. 105, 108 & n.5 (1985) (explaining that the element of a "trick, scheme, or device" under § 1001(a)(1) requires some "affirmative act" of concealment (citation omitted)); *Safavian*, 528 F.3d at 967 n.12 ("[A] false statement alone cannot constitute a 'trick, scheme, or device'" under § 1001(a)(1).).  For this reason as well, the allegations in Count One do not state a "scheme" offense.  But to the extent that the Court deems the allegations sufficient to support a "scheme," it is clear from the face of the Indictment that the alleged offense was completed before October 3, 2013.

(1970). The Supreme Court has carved out a limited exception for "continuing offenses," *id.* at 115, but courts are nearly unanimous that *Toussie*'s "continuing offense" exception does not apply to "schemes" alleged under § 1001(a)(1). *See, e.g.*, *United States v. Dunne*, 324 F.3d 1158, 1164–66 (10th Cir. 2003). The "scheme" provision of § 1001(a)(1) allows the government to group several acts of falsification or concealment together in a single count for purposes of avoiding duplicity, *see Bramblett v. United States*, 231 F.2d 489, 491 (D.C. Cir. 1956), but the government cannot do so in a way that would permit the petit jury to convict based on time-barred conduct. Because the offense alleged in Count One was complete before October 3, 2013, Count One must be dismissed to the extent that it relies on statements made or other alleged conduct occurring before that date.[18]

### A. Any conduct that could have been prosecuted as a completed "scheme" before October 3, 2013 is now time-barred.

"[S]tatutes of limitations normally begin to run when the crime is complete." *Toussie*, 397 U.S. at 115 (quoting *Pendergast v. United States*, 317 U.S. 412, 418 (1943)). A crime is "complete" for purposes of the statute of limitations "as soon as each element of the crime has occurred." *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987). There is a narrow class of crimes for which the limitations period does not begin to run until later under the "doctrine of continuing offenses." *Toussie*, 397 U.S. at 115. "The classic example of a continuing offense is a conspiracy," *McGoff*, 831 F.2d at 1078, which continues, even after the elements are satisfied, "as long as the conspirators engage in overt acts in furtherance of their

---

[18] The grand jury returned the Indictment on April 11, 2019, *see* ECF No. 1, and absent any period of tolling, the statute of limitations would bar prosecution for any offense committed more than five years earlier − *i.e.*, prior to April 11, 2014. See 18 U.S.C. § 3282. The government and Mr. Craig entered into a series of tolling agreements in this case that excluded a total of 190 days from any calculation of time under the statute of limitations. The statute of limitations therefore bars prosecution for alleged offenses committed prior to October 3, 2013. The tolling agreements had no effect on defense arguments based on periods of limitation that already had expired before the "tolled period." *See, e.g.*, Ex. 22 ¶ 1 (first tolling agreement).

plot." *Toussie*, 397 U.S. at 122.   But the Supreme Court has cautioned that "the doctrine of continuing offenses should be applied in only limited circumstances." *Toussie*, 397 U.S. at 115. Specifically, a crime is not a continuing offense "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id.*

Almost every court to consider whether 18 U.S.C. § 1001(a)(1) falls within *Toussie*'s "continuing offense" exception has concluded that it does not.  *See Dunne*, 324 F.3d at 1164–66; *United States v. Treacy*, Criminal Action No. 5:13cr00018, 2014 WL 12698499, at *2–6 (W.D. Va. Jan. 28, 2014); *United States v. Mubayyid*, 567 F. Supp. 2d 223, 239–42 (D. Mass. 2008), *aff'd in part, rev'd in part on other grounds,* 658 F.3d 35 (1st Cir. 2011); *United States v. Gremillion-Stovall*, 397 F. Supp. 2d 798, 800–02 (M.D. La. 2005).[19]   These cases correctly explain that § 1001(a)(1) does not fall within either of the two narrowly circumscribed categories of continuing offenses that *Toussie* described.   First, "[n]othing in the explicit language of § 1001 'compels' the conclusion that an offense committed thereunder is to be considered a continuing one." *Dunne*, 324 F.3d at 1164.   Second, none of the three separate crimes defined in § 1001 "clearly contemplate[s] a prolonged course of conduct."  *Id.* at 1165 (quoting *Toussie*, 397 U.S. at 120).   While scheme offenses under § 1001(a)(1) can continue over time as a factual matter in particular cases, "there is nothing about the nature of the crime itself to indicate that Congress 'assuredly intended' to make the 'scheme' component of § 1001 a continuing offense."

---

[19] We are aware of one exception: *United States v. Menendez*, 137 F. Supp. 3d 688, 698–700 (D.N.J. 2015), *aff'd* 831 F.3d 155 (3d Cir. 2016).   In that case, although the court did not expressly determine that 18 U.S.C. § 1001(a)(1) contemplates a continuing offense, it allowed a prosecution to proceed under § 1001(a)(1) and for otherwise time-barred conduct to be presented as evidence because the charged scheme encompassed acts within the limitations period.  *Id.* at 699–700.   The *Menendez* court did not discuss *Toussie* or engage in the statutory analysis that *Toussie* requires.

*Mubayyid*, 567 F. Supp. 2d at 241.  Moreover, § 1001(a)(1) refers not only to falsification or concealment by "scheme," but rather "by trick, scheme, or device," and those terms, grouped together by Congress, do not suggest a continuing offense.[20]

Because § 1001(a)(1) is not a continuing offense, the statute of limitations begins to run as soon as a prosecution based on the charged scheme "could have been 'brought and proved.'" *Gremillion-Stovall*, 397 F. Supp. 2d at 802; *Treacy*, 2014 WL 12698499, at *3 (same); *see also United States v. Grenier*, 513 F.3d 632, 639 (6th Cir. 2008) (explaining that a scheme prosecution can be brought once acts "constituting" the scheme have occurred); *United States v. Heacock*, 31 F.3d 249, 256 (5th Cir. 1994) (same).  When conduct that could have been prosecuted before the limitations date is charged as part of a "scheme" count under § 1001(a)(1), courts dismiss the count to the extent that it relies on the pre-limitations conduct.  *See Grenier*, 513 F.3d at 639 (dismissing in full); *Dunne*, 324 F.3d at 1164 (same); *Treacy*, 2014 WL 12698499, at *8 (same); *Gremillion-Stovall*, 397 F. Supp. 2d at 802 (dismissing in part); *cf. United States v. Mubayyid*, 567 F. Supp. 2d at 242 ("[T]he government must prove that [the defendant] committed the crime charged under § 1001(a)(1) at some point after [the limitations date].").

---

[20] The statutory history of § 1001(a)(1) also precludes reading it to codify a continuing offense. Congress amended § 1001 as a whole in 1996 specifically to override certain judicial limitations with which it disagreed. *See* The False Statements Accountability Act of 1996, Pub. L. No. 104-292, H.R. 3166 (Oct. 11, 1996).  Congress was legislating against the backdrop of the Supreme Court's decision in *Toussie*, and if it had intended to satisfy *Toussie*'s clear-statement rule for continuing offenses, it could have enacted language to that effect in § 1001.  It did not do so.  In *Toussie* itself, the Court noted that Congress "ha[d] legislated several times" to amend the crime at issue without addressing whether it was a continuing offense, "and since we are reluctant to imply a continuing offense except in limited circumstances, we conclude that any argument based on congressional silence is stronger in favor of not construing this Act as incorporating a continuing offense theory."  397 U.S. at 119–20.

In this case, all of the alleged conduct that precedes the limitations date of October 3, 2013, could have been charged as a scheme prior to that date, and therefore it is now time-barred. Count One charges a scheme that straddles the limitations date, spanning "[f]rom on or about June 3, 2013, to on or about January 16, 2014."  Indictment ¶ 48.  But the conduct between June 3, 2013, and October 3, 2013, could just as easily have been charged as a completed scheme offense, with the exact same alleged purpose ("to avoid registration as an agent of Ukraine," *id.* ¶ 49), and the exact same alleged manner and means (withholding information from other Skadden lawyers, *id.* ¶ 50.a, drafting false and misleading descriptions of media contacts for distribution within Skadden and to the FARA Unit, *id.* ¶ 50.b, and omitting material facts in communications with the FARA Unit, *id.* ¶ 50.c).  Therefore, accepting for the sake of argument that Count One states a scheme offense at all, *see* note 17 *supra*, every essential element of that scheme could have been charged based on conduct that occurred prior to October 3, 2013.

Because the scheme charged in Count One could have been "brought and proved" before the limitations date based only on conduct preceding that date, the statute of limitations began to run, and all of the pre-limitations conduct is time-barred.  Count One must be dismissed to the extent that it relies on statements made or other conduct that occurred before October 3, 2013.

**B.  The D.C. Circuit's 1956 decision in *Bramblett* did not permit a scheme to be prosecuted based on time-barred conduct, and to the extent it could be read to do so, *Bramblett* has been overruled by the Supreme Court's subsequent decision in *Toussie*.**

In *Bramblett v. United States,* 231 F.2d 489 (D.C. Cir. 1956), the Court of Appeals affirmed a scheme conviction under 18 U.S.C. § 1001.  The scheme involved a member of Congress who falsely stated to the Disbursing Office of the House of Representatives that a clerk was to be employed in his office, and then collected monthly payments issued to the phantom clerk for seven months, converting the payments to his own use.  *Id*. at 490–93.  The indictment

charged seven counts, one reflecting each of the seven months, with each count alleging that the defendant falsified the "material fact" that the clerk was eligible for payment in the relevant month. *Id.* at 491. Although the seven months in which the defendant collected payments all fell within the limitations period, the form that he had previously submitted to the Disbursing Office did not. *Id.* at 490–91. The defendant argued that "the crime was complete" at the time he submitted the form, and that the charged offenses were therefore time-barred. *Id.* The court rejected that argument, reasoning that, because the falsified "material facts" in each of the counts related to the clerk's eligibility for payment during specific months, the charged offenses could not have been complete until the months at issue. *Id.* at 491; *see also id.* at 493 (identifying "the use made of the form after it was filed" as an essential component of the crime).

Although *Bramblett* referred to the "continuing crime of falsification by a scheme," *id.* at 491, it did not hold that schemes under § 1001(a)(1) are true "continuing offenses" in the sense that they can be based on otherwise time-barred conduct that constituted a completed offense so long as the defendant committed additional acts in furtherance of the alleged scheme within the limitations period. *See id.* An essential premise of *Bramblett* was that "the particular crime charged" was *not* complete when the false form was submitted, but only later when the defendant collected payment. *See id.* Indeed, each of the seven counts in *Bramblett* was confined *only* to times within the limitations period, as is clear in the indictment in that case (which was appended to the defendant's brief on appeal). *See* Ex. 23 at 2–3 (charging, for example, that the offense in count one was committed "on or about June 30, 1950"—the date of the first monthly payment). The indictment referenced the submission of the false form as a background allegation, but it did not assert that the submission of the form was a basis on which the jury could return a guilty verdict on any of the seven charged offenses. *See id.* at 2–6.

To the extent that *Bramblett* might be read to hold that a scheme alleged under § 1001(a)(1) is a continuing offense, it has been overruled by *Toussie* and overtaken by the substantive amendments to 18 U.S.C. § 1001 that did not redefine §1001(a)(1) as a continuing offense under the standard laid out in *Toussie*. *See Treacy*, 2014 WL 12698499, at *3 n.3 ("Without the benefit of [*Toussie*], *Bramblett* is of little persuasive value" in determining whether a falsification by scheme under § 1001(a)(1) is a continuing offense); *Mubayyid*, 567 F. Supp. 2d at 242 ("*Bramblett* was decided long before the Supreme Court's decision in *Toussie*, and is hardly persuasive authority as to the interpretation of § 1001 under that case."); *Gremillion-Stovall*, 397 F. Supp. 2d at 802 ("*Bramblett* was decided before *Toussie* and, therefore, does not contain the analysis mandated by the Court in that case" for identifying continuing offenses.).

The court in *Bramblett* separately held that the "scheme" clause of 18 U.S.C. § 1001 contemplates multiple acts of falsification and concealment being charged in a single count, 231 F.2d at 491, a holding that doubtless remains good law. *See United States v. Hubbell*, 177 F.3d 11, 14 (D.C. Cir. 1999) (invoking *Bramblett* to reject argument that indictment was "duplicitous" by virtue of "includ[ing] too many allegations of falsifications and concealments" in a single count). But the fact that multiple acts can be charged together in a single count as a "scheme" does not mean that the government can use § 1001(a)(1) to revive conduct that constituted a completed offense before the end of the applicable limitations period. *See United States v. Sunia*, 643 F. Supp. 2d 51, 72 (D.D.C. 2009) (granting motion to dismiss count to the extent that it relied on time-barred conduct and "reject[ing] the government's contention that offenses committed outside the five-year statute of limitations should be deemed to have occurred within

the permitted time period so long as they are part of a larger pattern or scheme that straddles the statutory deadline.").

This case involves a "scheme" charge based in part on alleged conduct that occurred before the expiration of the limitations period and that could have been prosecuted at an earlier time.  Because the statute of limitations began to run with respect to that conduct before October 3, 2013, the conduct is time-barred, and it cannot be the basis for the jury's verdict on Count One.  This Court should therefore dismiss Count One because it relies on alleged statements made or conduct occurring before October 3, 2013.[21]  Such a ruling would force the government to rely solely on the oral statements made during the October 9, 2013 meeting (for which it no longer has any notes, and has no witness who recalls with precision what Mr. Craig said) and the written statements contained in the October 11, 2013 letter summarizing that meeting (that the evidence will show were all true).

---

[21] The government may be able to introduce *evidence* of conduct that precedes the limitations period, but such conduct cannot be charged as part of the offense itself.  *See Sunia*, 643 F. Supp. 2d at 72 & n.4 ("[E]vidence of prior acts . . . by the defendants might be admissible into evidence against the defendants, but . . . the alleged prior acts are not indictable offenses (or components of a consolidated charge in the indictment) in their own right.").

# CONCLUSION

Count One of the Indictment should be dismissed under Federal Rule of Criminal Procedure 12(b)(3)(A)(v) and (B)(v).  For all of the reasons stated herein, Count One is flawed on multiple grounds, and it fails to state an offense as a matter of law.

Dated: May 10, 2019                                  Respectfully submitted,

*/s/ William W. Taylor, III*

William W. Taylor, III (D.C. Bar No. 84194)
Ezra B. Marcus (D.C. Bar No. 252685)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W. Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
Email: wtaylor@zuckerman.com
Email: emarcus@zuckerman.com

William J. Murphy (D.C. Bar No. 350371)
Adam B. Abelson (D.C. Bar No. 1011291)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
Email: wmurphy@zuckerman.com
Email: aabelson@zuckerman.com

*Attorneys for Defendant Gregory B. Craig*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on May 10, 2019, the foregoing was served on counsel of record via the Court's CM/ECF Service.

*/s/ Ezra B. Marcus*
Ezra B. Marcus