# Exhibit 2

This material is distributed by Skadden, Arps, Slate, Meagher & Flom LLP on behalf of the Ministry of Justice of Ukraine. Additional information is available at the Department of Justice, Washington, DC. (January 2019)

# THE TYMOSHENKO CASE

SKADDEN ARPS SLATE MEAGHER & FLOM LLP

SEPTEMBER 2012

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Executive Summary | | 1 |
| Introduction | | 6 |
| I. | Background on the Russia-Ukraine Gas Conflict | 10 |
| II. | The 2008-2009 Gas Dispute | 14 |
| | A. Negotiations in 2008 | 16 |
| | B. December 31, 2008: Discussions Break Down | 18 |
| | C. January 1-17, 2009: Russian Shutdown of Gas to Ukraine | 21 |
| | D. January 17-19, 2009: A Deal is Reached | 25 |
| | E. January 19, 2009: Tymoshenko Meets with Yushchenko | 26 |
| | F. January 19, 2009: Cabinet of Ministers Meeting | 26 |
| | G. January 19, 2009: Tymoshenko and Dubyna in Moscow | 27 |
| | H. January 21, 2009: Cabinet of Ministers Meeting | 30 |
| | I. The Contracts | 31 |
| | J. The Investigation and Indictment | 33 |
| | K. Conviction and Appeals | 37 |
| III. | The Dispute | 40 |
| | A. The Offense | 40 |
| | B. The Judge's Opinion | 45 |
| IV. | Due Process Issues | 82 |
| | A. Opportunity to Prepare a Defense | 82 |
| | B. Selection of the Judge | 94 |
| | C. Jury Request | 106 |
| | D. Removal from the Courtroom | 109 |
| | E. Detention | 122 |
| | F. Representation by Counsel | 143 |
| | G. Presentation of Defense | 161 |
| | H. Selective Prosecution | 175 |
| V. | Conclusion | 185 |

Appendix .................................................................................................................. 187

    Appendix 1:        Participating Attorneys
    Appendix 2:        Cast of Characters
    Appendix 3:        Key Entities
    Appendix 4:        Individuals Interviewed by Skadden
    Appendix 5:        Judgment in the Name of Ukraine (Oct. 11, 2011)
    Appendix 6:        The Directives (Jan. 19, 2009) *(from case file)*
    Appendix 7:        The Directives (Jan. 19, 2009) *(translation)*
    Appendix 8:        Cabinet of Ministers Agenda (Jan. 19, 2009)
    Appendix 9:        Cabinet of Ministers Transcript (Jan. 19, 2009)
    Appendix 10:      Cabinet of Ministers Order (Jan. 19, 2009)
    Appendix 11:      Cabinet of Ministers Transcript (Jan. 21, 2009)

## Executive Summary

In 2011, former Ukrainian Prime Minister Yulia Tymoshenko was tried and convicted of abusing her official powers and causing grave damage. This Report examines the events leading up to and including her prosecution and trial, and analyzes those events applying Western standards of due process and the rule of law. The Report identifies and discusses the major factual and legal disputes involved in the case. The Report has been written based on a review of original documents, trial transcripts, and interviews with those who participated in the process, which reflect the following conclusions:

Factual Conclusions

- The economy of Ukraine is deeply dependent on natural gas, most of which it purchases from Russia. At the same time, Russia relies on Ukraine to facilitate the transit of its gas to Europe. The two nations have a long history of disputes over the purchase price for gas (paid to Russia) and the transit price (paid to Ukraine). *Pgs. 10-13.*

- In late 2008, Tymoshenko and other members of the Ukrainian government negotiated with their Russian counterparts over a market-based approach to pricing. The parties failed to reach an agreement before their prior contract expired on December 31. *Pgs. 14-20.*

- Beginning in early January 2009, Russia cut off the flow of gas into Ukraine, which threatened the Ukrainian economy, as well as European nations dependent on the flow of Russian gas across Ukraine. *Pgs. 21-24.*

- On January 17, 2009, Tymoshenko met with Vladimir Putin (then Russia's Prime Minister), after which they announced that a deal to end the standoff had been reached. The precise terms of the agreement between Tymoshenko and Putin were not disclosed at that time. *Pgs. 25, 47-48.*

- Tymoshenko arranged for the preparation of a document—entitled "The Directives"—which she signed and which set forth the major elements of her agreement with Putin. *Pgs. 28-30.*

- On January 19, Tymoshenko's deputy (Oleksandr Turchinov) convened a meeting of Ukraine's Cabinet of Ministers to provide information and seek support for the terms that Tymoshenko had negotiated with Putin as they appeared in the Directives. Whether Tymoshenko and Turchinov intended to obtain a vote of approval from the Cabinet, or whether instead they sought merely to inform the Cabinet about the progress of negotiations and to ask generally for the Cabinet's support, is a subject of dispute. It is clear, however, that the Cabinet of Ministers did not vote on the proposal. *Pgs. 26-27, 50-57.*

- Also on January 19, Tymoshenko traveled to Moscow where she met Oleh Dubyna, the head of Naftogaz, Ukraine's state-owned energy company. In the House of the Government of the Russian Federation in the Kremlin, Tymoshenko again met with Putin one-on-one. She emerged from that meeting and informed

1

Dubyna that he would participate in a press conference at which the parties would sign an agreement that embodied the terms that she had negotiated with Putin. Dubyna insisted on receiving a writing from the Prime Minister before he would sign the agreement. *Pgs. 27-29, 57-59.*

- Tymoshenko produced an official looking document with her signature. The official seal of the Cabinet of Ministers appeared on the document. The document discussed the deal and laid out some of the terms of the proposed agreement that she had negotiated with Putin. Several facets of this incident are in dispute, including to whom Tymoshenko handed the document, what she did or did not say, and the legal effect of the document. What is clear is that Tymoshenko used the document to facilitate Naftogaz's agreement with Gazprom according to the terms that she had negotiated. *Pgs. 28-30, 62-66.*

- Following receipt of the document, Dubyna and his deputy signed 10-year agreements on behalf of Naftogaz with Gazprom, Russia's state-owned energy company. These contracts included:

    - *Gas Price*: For the first quarter of 2009, Naftogaz agreed to pay Gazprom $360 per thousand cubic meters (kcm) of gas purchased. Thereafter, the price was set by a formula, one input of which was the average market price paid by other European nations. During the first-year of the contract (*i.e.*, 2009), the formula price included a 20 percent discount. *Pgs. 31-32.*

    - *Transit Price*: For 2009, Gazprom agreed to pay Naftogaz $1.7/kcm for every 100 kilometers of gas transported across Ukraine. After that, the price was to be determined by a formula that adjusts the current year's transit price based on (among other things) the prior year's price and inflation. *Pg. 32-33.*

- The average price paid by Naftogaz in 2009 for the purchase of gas was $232.98/kcm. The prior year, Ukraine had paid $179.50/kcm. The 2009 transit price of $1.7 was the same as the prior year's transit price. *Pgs. 33, 72.*

- In 2009, Naftogaz used 3.639 billion cubic meters of gas to facilitate the transit of Russian gas to Europe. The prosecution contends that the increase in price between 2008 and 2009 made this gas $194,625,386.70 more expensive. *Pgs. 72-74.*

- Tymoshenko was tried and convicted for her role in bringing about the January 19 agreement. The Court concluded that Tymoshenko had exceeded her authority by approving an agreement that violated existing Ukrainian law; by directing Dubyna to sign the agreement without the approval of Ukraine's Cabinet of Ministers; and by deceiving Dubyna into thinking that the Cabinet had already approved the agreement when in reality it had not. The Court also concluded that her conduct caused grave damage to the State of Ukraine. *Pgs. 37, 45-46, 67-81.*

Conclusions Regarding Tymoshenko's Trial

- *The Court's Opinion:* Although many facts were in sharp dispute at the trial and conflicting evidence was offered on many issues, the Court, as the finder of fact,

2

based its findings on evidence before the court and, in some instances, on inferences that the Court drew from that evidence. Among other things, the Court found that Tymoshenko overstepped her authority by drafting Directives that set forth the terms that she and Putin had agreed to; by ordering the head of Naftogaz to sign an agreement with Gazprom in the absence of approval from the Cabinet of Ministers; by threatening to fire the head of Naftogaz if he did not sign the agreement; and by deceiving him into believing that the Cabinet had approved the agreement. *Pgs. 45-81.*

- *Opportunity to Prepare a Defense:* Tymoshenko raises concerns about the opportunity she and her attorney had to prepare adequately for her defense. She claims (1) she had insufficient time to review the 4000-page case file; and (2) she had insufficient time to prepare for trial. On both issues, the facts are in dispute. In the United States, trial courts have considerable discretion to manage criminal proceedings. We believe that, looking at this case, most American trial courts would have given the defendant more time to prepare her defense. It is unlikely, however, that based on this record, an American appellate court would find a due process violation and reverse the conviction—unless there were evidence to support Tymoshenko's allegation that the prosecution intentionally disrupted her preparations and distracted her during the time immediately preceding the trial. Other than her allegations, we are unaware of any such evidence. *Pgs. 82-94.*

- *Selection of the Judge:* Tymoshenko claims that Judge Kireyev's selection as trial judge compromised her right to an independent and impartial trial. She alleges that Judge Kireyev was deliberately selected by President Yanukovych, that he lacked adequate experience and impartiality, and that he improperly ruled on motions for his own disqualification. Tymoshenko's objections fail to raise significant fairness concerns on the record in this case, and the evidentiary record does not support her claim of personal bias. She has not established that Judge Kireyev's experience, tenure, or selection violated Western standards of fairness. *Pgs. 94-106.*

- *Jury Request:* Prior to trial, Tymoshenko requested to be tried in front of a jury. Her request was denied, and she was tried instead by a judge. We do not find that the lack of a jury trial violated due process. Under Western standards, juries are not necessarily essential to a fair trial. They have yet to be used in Ukraine, and Tymoshenko was treated no differently in this regard from other defendants. It should be noted, however, that the implementation of jury trials, as promised in the Ukrainian Constitution, will greatly contribute to the protection of liberty and to the promotion of fairness in Ukraine. Such a reform would go far to improve the quality of justice in Ukraine. *Pgs. 106-09.*

- *Tymoshenko's Courtroom Behavior:* From the very start, Tymoshenko and her defense team challenged the legitimacy of the criminal proceedings against her, alleging that the prosecution was motivated by politics, corruption, and greed. Throughout the trial, the defendant refused to acknowledge the Court's legitimacy and engaged in conduct that was disrespectful to the Court. Such conduct included insulting the Judge and repeatedly accusing him of improper motives;

3

failing to stand when addressing the Judge (as required under Ukrainian law); harassing adverse witnesses; filing duplicative motions; and making frivolous arguments. These tactics made management of the trial substantially more difficult. *Pgs. 109-12.*

- *Removal from the Courtroom:* Judge Kireyev ordered Tymoshenko removed from the courtroom during the trial on two occasions—July 6 and July 15, 2011. The July 6 removal does not raise serious fairness concerns: Tymoshenko was repeatedly warned that her actions were disruptive and violated the Criminal Procedure Code; no witnesses testified in her absence; and her defense counsel remained present in her absence. Tymoshenko's July 15 removal is more troubling, because no member of her defense team was present in her absence. However, the only evidence admitted during that period was a document to which an objection could later have been made. Neither she nor her counsel raised any objection to the admission of the document, and it does not appear that she suffered any prejudice as a result of the absence. *Pgs. 109-22.*

- *Detention:* Tymoshenko claims that the Court's decision to incarcerate her in a detention facility—beginning on August 5 and continuing through her sentencing—was an open-ended detention unjustified by the facts. Tymoshenko's courtroom behavior would likely have merited a summary contempt finding under Western standards. The Court's separate suggestion that she presented a flight risk is problematic, however, on the record of this case. Taking steps to maintain order in the Courtroom is justifiable. Using detention to achieve that objective, as the Court did in this case, is an accepted but rarely used practice in Western courts. Under Western standards, we find that the decision to detain Tymoshenko for the entire balance of her trial and after the trial had concluded—until sentencing—without adequate justification or review raises concerns about whether she was inappropriately deprived of her liberty prior to her conviction. *Pgs. 122-43.*

- *Representation by Counsel:* Tymoshenko argues that the Court violated her right to adequate representation by examining witnesses in the absence of defense counsel and by failing to adjourn the proceedings to allow her to acquire new legal representation. Ukrainian law, as well as Western legal standards, requires that a defendant who wishes to be represented by counsel during trial must be able to exercise that right. Under Western standards, the continued examination of witnesses without representation by counsel would almost certainly be viewed as a violation of the right to assistance of counsel. *Pgs. 143-61.*

- *Presentation of Defense:* During the investigation stage of the proceeding, Tymoshenko identified a large number of witnesses that she asked to be interviewed. Her request was found to be untimely, and the Chief Investigator denied her request. During the trial, she identified other witnesses and asked that they be permitted to testify. Judge Kireyev refused to permit all but two of these witnesses to testify. Tymoshenko argues that Judge Kireyev's refusal undermined her ability to present her defense. Under Western standards of fairness, we believe that the Court's decision not to call certain defense witnesses compromised Tymoshenko's ability to present a defense. *Pgs. 161-75.*

4

- *Selective Prosecution*: Tymoshenko has alleged that her prosecution was a politically motivated reprisal undertaken in order to silence a political opponent of the ruling regime. The prosecution of a former head of government, unsuccessful presidential candidate, and leader of the opposition merits close scrutiny in all respects. In this report, we do not opine about whether the prosecution was politically motivated or driven by an improper political objective—*i.e.*, to remove her from political life in Ukraine in the future. Instead, based on the record of the case and established precedent, we do address the narrow doctrine of "selective prosecution." Based on our review of the record, we do not believe that Tymoshenko has provided specific evidence of political motivation that would be sufficient to overturn her conviction under American standards. *Pgs. 175-84.*

- *Adequacy of Charges under Ukrainian Law*: The parties dispute whether the facts found by the Court establish Tymoshenko's guilt regarding the offense as a matter of Ukrainian law. This issue of Ukrainian law—the requirements necessary to satisfy the elements of the statutory offense—is beyond the scope of our assignment and beyond our expertise.