# Exhibit 11



Office of the Inspector General
U.S. Department of Justice

# Audit of the National Security Division's Enforcement and Administration of the Foreign Agents Registration Act

Audit Division 16-24                                          September 2016

# AUDIT OF THE NATIONAL SECURITY DIVISION'S ENFORCEMENT AND ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT

## EXECUTIVE SUMMARY

The Foreign Agents Registration Act of 1938 (FARA), 22 U.S.C § 611 *et seq.*, as amended, is a disclosure statute that requires persons acting as agents of foreign principals in a political or quasi-political capacity to make periodic public disclosure of their relationship with the foreign principal, as well as activities, receipts, and disbursements in support of those activities. According to the Department of Justice (Department), this disclosure facilitates evaluation by the government and the American people of the statements and activities of such persons in light of their function as foreign agents. The FARA Registration Unit (FARA Unit) of the Counterintelligence and Export Control Section (CES) within the Department's National Security Division (NSD) is responsible for the administration and enforcement of the Act. A willful failure to register as an agent of a foreign principal may result in criminal prosecution and a sentence of a fine and up to 5 years in prison. There also is a civil enforcement provision that permits the Department to seek to enjoin a party from acting as an agent of a foreign principal in violation of FARA.

This review was initiated in response to a requirement by the U.S. House of Representatives Committee on Appropriations that the OIG review the Department's enforcement of FARA. Based on this direction, our audit objectives were to review and evaluate the monitoring and enforcement actions taken by the Department to ensure appropriate registration, and to identify areas for the Department to consider seeking legislative or administrative improvements.

During our audit, we found that the number of active FARA registrations peaked in the 1980s, with a high of 916 active registrations in 1987, and began to fall sharply in the mid-1990s. The Department has not performed an analysis on the decline, but NSD officials speculated that the imposition of FARA registration fees in 1993 and the passage of the Lobbying Disclosure Act (LDA), which carved out a significant exemption to FARA in 1995, were likely factors. In addition to the declining trend in registrations, we also found that there historically have been very few FARA prosecutions. Between 1966 and 2015 the Department only brought seven criminal FARA cases – one resulted in a conviction at trial for conspiracy to violate FARA and other statutes, two pleaded guilty to violating FARA, two others pleaded guilty to non-FARA charges, and the remaining two cases were dismissed. We were also told by NSD that the Department has not sought civil injunctive relief under FARA since 1991.

In discussions with several Federal Bureau of Investigation (FBI) counterintelligence agents and Assistant United States Attorneys (AUSA), as well as NSD officials, we found differing understandings between field agents and prosecutors and NSD officials about the intent of FARA as well as what constitutes a

"FARA case."  The primary difference stemmed from the belief of investigators that investigations conducted pursuant to a separate criminal provision, 18 U.S.C. § 951 (Section 951), were FARA cases.  However, NSD officials stated that unlike FARA and the LDA, Section 951 can be aimed at political or non-political activities of agents under the control of foreign governments.  Although registration under FARA can serve as the required notification to the Attorney General under Section 951, the criminal activity targeted is different.  According to NSD officials, who must approve both FARA and Section 951 cases, a true FARA case can only be brought pursuant to 22 U.S.C. § 611, *et seq.*, and these officials stated that NSD currently is engaged in ongoing outreach activities that will help better educate investigators about FARA.  We believe these differing understandings are indicative of the lack of a comprehensive Department enforcement strategy on FARA, which the Department should develop and integrate with its overall national security efforts.

Further, the majority of those agents interviewed believed that NSD's review of what they believed to be FARA cases was generally slow and that NSD is reluctant to approve these charges.  Some investigators believed that NSD has a clear preference toward pursuing registration for alleged FARA violators rather than seeking prosecution, which in their opinion, leaves an important counterintelligence tool underutilized.  NSD officials told us that they believed that even though criminal penalties are available under FARA, the primary goal of FARA is in fact to ensure appropriate registration and public disclosure.  These NSD officials also disputed that there is any reluctance on their part to approve either true FARA or Section 951 cases, and stated that they approve charges when the evidence presented leads them to judge that a provable willful violation exists.

Timely submission of required documentation is essential for full and complete public disclosure.  However, we found in our testing that 62 percent of initial registrations were untimely, and that 50 percent of registrants filed at least one supplemental statement late.  We also found that NSD needs to improve its controls and oversight of FARA registrations, particularly involving its inspections of registered foreign agents and enforcing the complete and timely submission of required documentation.  Agents of foreign principals are required to maintain records of activities on behalf of their principal for the duration of the agreement and 3 years thereafter.  These records are subject to inspection by the NSD's FARA Unit.  If an inspection identifies deficiencies in an agent's disclosures, the FARA Unit advises the registrant of the deficiencies and actions required for resolution.  We noted, however, that several inspection recommendations issued by the FARA unit still remained unresolved and believe that NSD can further improve its monitoring efforts by developing a policy to ensure appropriate resolution of recommendations identified in its inspection reports.  NSD stressed to us that because the FARA Unit has limited staff and considerable responsibilities follow-up can be difficult.  We understand this challenge but believe improvements can still be made.

With regard to potential legislative improvements, NSD officials stated that a major difficulty is a lack of authority to compel the production of information from persons who may be agents.  As a result, NSD is currently pursuing civil investigative demand (CID) authority from Congress in order to enhance its ability

to assess the need for potential agents to register.  While we concur that CID could be a useful tool for NSD, there are important competing considerations at stake, and we believe that any expansion of such authority must also include appropriate controls and oversight to ensure it is used appropriately.  Another difficulty NSD cited relates to the breadth and scope of existing exemptions to the FARA registration requirement and determining whether activities performed by certain groups, such as think tanks, non-governmental organizations, university and college campus groups, foreign media entities, and grassroots organizations that may receive funding and direction from foreign governments fall within or outside those exemptions.  According to the FARA Unit, these types of organizations generally claim that they act independently of foreign control or are not serving a foreign interest and are not required to register.

NSD officials also told us that the enactment of the LDA in 1995 may have contributed to the recent decline in FARA registrations.  The LDA focuses on those engaged in lobbying activities on behalf of domestic and foreign interests and those agents of foreign principals who engage in lobbying activities and who register under the LDA, and, as a result, are exempt from registration under FARA.  However, NSD believes that because FARA disclosure requirements are more rigorous than those of the LDA, those lobbying on behalf of foreign commercial interests should not be exempt from FARA registration.  We believe that the development of an enforcement strategy for FARA cases should include an assessment of the LDA exemption and its impact to determine if legislative changes should be sought.

In this report we make 14 recommendations to help improve NSD's enforcement and administration of FARA.  We found that several of these recommendations were similar to those made over the years in reports by the Government Accountability Office, and its predecessor the General Accounting Office, and by public interest organizations, and that these recommendations should be seriously considered if the purposes of FARA are to be fully realized.

# AUDIT OF THE NATIONAL SECURITY DIVISION'S ENFORCEMENT AND ADMINISTRATION OF THE FOREIGN AGENTS REGISTRATION ACT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

    History of FARA ................................................................................... 2

    NSD's Administration and Enforcement of FARA ....................................... 3

    FARA Registration Trends ...................................................................... 5

    OIG Audit Approach .............................................................................. 6

    Prior Reports ....................................................................................... 7

FINDINGS AND RECOMMENDATIONS ............................................................... 8

    Efforts to Enforce FARA ......................................................................... 8

    Administration and Monitoring of FARA Registrations ............................. 13

    Other Possible Legislative Improvements that the Department Might Seek  17

    Conclusion ........................................................................................ 21

    Recommendations ............................................................................. 21

STATEMENT ON INTERNAL CONTROLS ........................................................... 23

STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS ........................ 24

APPENDIX 1:   OBJECTIVES, SCOPE, AND METHODOLOGY ................................ 25

APPENDIX 2:   PRIOR REPORTS INVOLVING FARA ............................................ 27

APPENDIX 3:   NATIONAL SECURITY DIVISION'S RESPONSE TO
                     THE DRAFT REPORT ............................................................. 29

APPENDIX 4:   OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND SUMMARY
                     OF ACTIONS NECESSARY TO CLOSE THE REPORT ....................... 37

number of cases submitted for review, the amount of time such review takes, and the final determination made on the case. We believe this will enable the Department to assess and improve its handling of FARA cases. In particular, trends could be determined regarding what case information has been used to move forward with prosecutions, or whether NSD is making determinations on a timely basis.

*Civil Enforcement of FARA*

In addition to criminal penalties, FARA allows the Department to seek civil injunctive relief when it identifies a foreign agent it believes to be in violation of the statute. In order to seek injunctive relief, the Attorney General may petition the appropriate U.S. District Court for an order temporarily or permanently disallowing the alleged foreign agent from acting as an agent of a foreign principal. This type of remedy could be sought in instances where an alleged agent failed to register or was delinquent in filing their supplemental statements. It could also be used in instances where a registered foreign agent fails to address recommendations stemming from an inspection by the FARA Unit.

When we inquired about the Department's use of injunctive relief, we were told that it has not made use of the remedy since 1991, for several reasons. First, according to FARA Unit staff, in order to pursue a petition seeking to enforce registration, the Department must have specific evidence of foreign direction and control to be successful. According to these staff members, it is rare that such evidence exists. In addition, we were told that, as a matter of practice, before the unit would seek injunctive relief that will require registration or remedying delinquent filings, it would have to have sought voluntary registration and received a direct refusal. According to the FARA Unit, they do not typically encounter such scenarios.

FARA Unit staff also told us that the unit sought authority to impose civil fines for delinquencies twice in the 1990s, without success. However, current staff added that they would be reluctant to seek civil fines at present because it would be counterproductive in that it could serve as a deterrent to disclosure to seek fines for lateness against a registrant who is otherwise in compliance with FARA, and it would add administrative costs to the unit's work.

Nevertheless, based on the widespread delinquencies we found, we believe that there may be circumstances in which an injunctive remedy or other penalty is merited. For instance, as discussed later in this report, when we reviewed FARA Unit inspection reports from 2008 to 2014, we found instances where the unit issued recommendations to the registrant requesting submission of late supplemental statements; however, the requested supplemental statements do not appear in the FARA database, and appear to remain delinquent despite the inspection and notification of the deficiencies. Although we are not questioning that NSD needs to have the ability to use its discretion when deciding whether to pursue criminal penalties or an injunctive remedy against an alleged violator of FARA, we

believe NSD should ensure that it appropriately utilizes all of the enforcement tools available to it.

**Administration and Monitoring of FARA Registrations**

The FARA Unit is responsible for the monitoring of new and existing FARA registrations on an ongoing basis. This includes receiving, reviewing and processing documentation and payments, and addressing late or inaccurate submissions. As of the end of calendar year 2014, the FARA Unit was responsible for a foreign agent registrant pool of 360 agents representing 561 foreign principals. We tested documentation dating back to 2013 from a judgmentally selected risk-based sample of 78 FARA registrants, representing approximately 22 percent of the total, to evaluate the effectiveness of the FARA Unit's monitoring efforts. Generally, we found that the required documents were complete. However, we also found that documents were routinely submitted late, and in some instances registrants had ceased submitting required documentation entirely. These findings are further detailed in the sections below.

*Identifying Potential Registrants*

The FARA Unit attempts to identify and make contact with individuals or entities that may have an obligation to register under FARA. Identification is made primarily through review of a range of publications, web sites, and LDA filings for indications of a connection between a potential agent and a foreign principal. Potential registrants may also be identified through review of existing registrant information, or through referral from other government offices or agencies, or from the public.

When a potential obligation to register is found, the unit issues a letter of inquiry to the potential registrant advising of FARA requirements, and requests additional information relevant to registration status. The FARA Unit has found that most of the recipients of such letters responded within what it has considered to be a reasonable amount of time and either register or offer what the unit finds to be sufficient explanation that FARA requirements do not apply to them. If there is no response to the letter, a seemingly false response, or another reason to believe a significant FARA offense has been committed, FARA personnel will refer the matter to the FBI.

The FARA Unit stated it has issued approximately 130 letters of inquiry over the past ten years. Thirty-eight of the recipients were found to have an obligation to register under FARA, and subsequently did so. The remaining recipients were found to either have no obligation to register, or the FARA Unit is continuing to seek additional information to make a determination.

*New Registrations*

Thirteen of the 78 agent files from 2013 to 2015 that we reviewed had registrations that were initiated after January 1, 2013. We considered these to be

Unit has limited staff and considerable responsibilities follow-up on inspection reports can be difficult. We understand this challenge but believe improvements can still be made. We recommend that NSD further improve its overall monitoring efforts by developing a policy and practices that ensure appropriate and timely follow-up and resolution of findings identified in its inspection reports.

**Other Possible Legislative Improvements that the Department Might Seek**

Throughout this audit we discussed with NSD and FBI officials whether there were any legislative improvements that the Department might seek to FARA that would help in its efforts to administer and enforce the law. The FBI did not have any suggestions but the NSD officials indicated that in recent years they have pursued some key legislative changes to FARA, but these efforts have largely been unsuccessful.

One area that was identified as a possible subject for such amendments is the statutory exemptions to FARA's registration requirement. There are a number of statutory exemptions to FARA registration requirements, which were summarized on the NSD website as of January 2016 as follows:

- Diplomats and officials of foreign governments, and their staffs, if properly recognized by the U.S. State Department.

- Persons whose activities are of a purely commercial nature or solely of a religious, scholastic, academic, scientific or fine arts nature.

- Certain soliciting or collecting of funds to be used for medical aid, or for food and clothing to relieve human suffering.

- Lawyers engaged in legal representation of foreign principals in the courts or similar type proceedings, so long as the attorney does not try to influence policy at the behest of their client.

- Any agent who is engaged in lobbying activities and is registered under the Lobbying Disclosure Act if the representation is on behalf of a foreign commercial interest rather than a foreign government or foreign political party.

NSD officials indicated to us that broadly worded exemptions make criminal or civil enforcement difficult, though they did not propose any specific changes to these categories. We believe that this is an area that the Department should examine to determine if additional refinement of these categories is warranted.

*The Lobbying Disclosure Act and FARA*

FARA Unit staff believed that the passage of the Lobbying Disclosure Act (LDA) in 1995 contributed to the steep decline in FARA registrations in the years that followed. We were told that because the LDA allowed agents representing foreign commercial interests to register as lobbyists under LDA, rather than as

17

foreign agents under FARA, FARA is now largely limited to those who represent foreign governmental and political party interests.

In the FARA Unit's judgment, registration and disclosure requirements under the LDA are less stringent and result in less transparency than FARA, specifically with respect to funds transacted and activities performed. In addition, unlike FARA, lobbyists with income or expenses below certain thresholds are not required to register under LDA. If a lobbyist representing a foreign commercial interest does not meet LDA thresholds, that lobbyist may have no obligation to register under either statute, because the activity serves a commercial rather than foreign governmental or political interest. Moreover, the LDA is administered by the Congress and, according to the FARA Unit, the LDA staffs who reside in the U.S. Senate and U.S. House of Representatives do not perform inspections of registrants, as the FARA Unit does for FARA registrants. FARA Unit staff also expressed concern that because of the LDA amendments to FARA, foreign governmental and commercial interests, which are not always as distinct from one another as in the United States, could use LDA as a loophole to avoid FARA registration and disclosure, even though they are acting under the direction and control of a foreign government.

NSD officials believe that Congress should act and once again require those who lobby for foreign commercial interests to register under FARA. We agree with the concern that foreign governmental and commercial interests overseas may not always be distinct and we recommend that NSD perform a formal assessment of the LDA exemption, along with the other current FARA exemptions and determine whether a formal effort to seek legislative change is warranted.

*Civil Investigative Demand Authority*

As discussed above, one of the tasks for the FARA Unit is to locate foreign agents who may have an obligation under FARA but either knowingly or unknowingly fail to register. The FARA Unit told us that, when it successfully identifies a potential agent, it can sometimes be difficult to obtain the necessary information the FARA Unit needs to determine whether registration is required. Civil investigative demand authority (CID) allows the Department to compel the production of records, or response to written interrogatories or oral testimony concerning such records. The Department submitted legislative proposals seeking CID authority for the FARA Unit in 1991, and again in 1999. A GAO report in 2008 also recommended CID authority for the FARA Unit.[19] However, the Department's attempts to obtain this authority in 1991 and 1999 were unsuccessful. Neither NSD officials nor the Department's Office of Legislative Affairs could offer an opinion as to why these efforts were unsuccessful; however, FARA Unit staff did provide some insight as to how this authority could help it better determine when FARA violations are occurring, specifically identifying think tanks, non-governmental and grass roots

---

[19] U.S. Government Accountability Office, *Post-Government Employment Restrictions and Foreign Agent Registration,* GAO-08-855 (July 30, 2008).

organizations, organizations operating on college or university campuses, and foreign media outlets operating in the United States as potential registrants as to which it can be difficult to obtain information for a variety of reasons.  Such organizations may receive funding from foreign governments and subsequently take public political positions that are favorable to those governments.  According to the FARA Unit, these types of organizations generally claim that they act independently of foreign control or are not serving a predominantly foreign interest and are not required to register.

The FARA Unit has identified the above as its primary enforcement challenge, and believes CID is vital in determining whether FARA violations are occurring.  We do not dispute that CID authority would provide FARA Unit staff with a very useful additional tool in in its efforts to administer and enforce FARA.  However, we believe CID authority is a powerful authority that can be subject to overreach and abuse if left unchecked, and which cannot be allowed to be used to overcome legitimate and important legal protections and interests.  Therefore, we believe that any such expansion of CID authority would have to include rigorous controls and oversight to ensure that it is being used appropriately.

*Process for Filing Informational Materials*

As discussed earlier in this report, FARA requires registrants who transmit informational materials on behalf of their foreign principal to appropriately mark that material and file it with the Department of Justice within 48 hours of the beginning of transmittal.  The FARA Unit told us that the term "informational materials," which replaced the term "propaganda" in 1995, is not formally defined in the Act or its implementing regulation.  As a result, the FARA Unit has developed its own working definition of what constitutes informational materials in order to fairly advise registrants of the requirements.  However, without a statutory definition of the term "informational materials," the FARA Unit cannot be certain it is satisfying Congressional intent for FARA.

Additionally, the FARA Unit believes that advances in information technology have made the 48-hour rule outdated.  Registered foreign agents now send out informational materials via Twitter and other social media on a near-continuous basis.  Trying to enforce the requirement for them to submit all of these materials in hard copy within 48 hours of dissemination creates a constant and unrealistic burden on registrants to submit materials, and on FARA personnel to police their submissions.  Allocating resources to enforcing the 48 hour rule also would consume a disproportionate amount of time on the part of FARA unit, often to the detriment of other crucial aspects of their work.  FARA Unit staff also told us that informational materials mailed via the U.S. Postal Service in hard copy must pass through screening prior to delivery.  This often results in submissions being delayed for weeks or longer before arriving at the FARA Unit's office.  The FARA Unit believes that the statute should be amended to allow registrants to compile informational materials and submit them semi-annually with each supplemental statement.