# Exhibit 12

FD-302 (Rev. 5-8-10)



**UNCLASSIFIED//FOUO**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry     05/23/2018

On May 15, 2018, HEATHER HUNT (HUNT), Chief of the Foreign Agents
Registration Act (FARA) Unit of the U.S. Department of Justice (DOJ), was
interviewed at her place of employment by Assistant United States
Attorneys Jane Kim and Kristy Greenberg from the Southern District of New
York (SDNY); Trial Attorney Jason McCullough from DOJ's
Counterintelligence and Export Control Section; and Special Agents Spencer
Lucas and Daniel Kegl from the New York Office of the Federal Bureau of
Investigation.

At the beginning of the interview, HUNT was provided with a binder of
tabbed exhibits prepared by SDNY. The interviewers referenced the exhibits
throughout the interview, and the corresponding tab and Bates numbers are
noted below where applicable. A copy of the binder is attached hereto as a
physical 1A package.

HUNT also produced printed materials related to the FARA unit's
correspondence with Skadden, Arps, Slate, Meagher & Flom LLP (Skadden).
Although these materials were duplicative of the Bates-stamped exhibits
referenced above, HUNT's print-outs are also included in the physical 1A
package.

After being advised of the identities of the interviewing attorneys and
agents and the nature of the interview, HUNT provided the following
information:

<u>FARA Unit Responsibilities and Procedures</u>

HUNT first joined the FARA unit as a clerk/typist in February 1984; she
later became a paralegal before attending law school and continuing with
the unit as an attorney. HUNT was promoted to Chief in 2002.

The FARA unit currently employs three attorneys and six professional staff
members, including program specialists and analysts. In 2012 and 2013,
there were only two attorneys in the unit: HUNT and KEVIN CONNOLLY, who
has since retired.

**UNCLASSIFIED//FOUO**

Investigation on   05/15/2018   at   Washington, District Of Columbia, United States (In Person)

File #   ██████████████████

Date drafted   05/17/2018

by   LUCAS SPENCER J, KEGL DANIEL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of (U) Interview of Heather Hunt _____, On 05/15/2018 , Page 2 of 9

The unit is responsible for the administrative enforcement of the FARA statute. This includes processing FARA registrations and subsequent filings; responding to written "Rule 2" requests submitted by potential registrants; reviewing public source materials and contacting individuals or entities that might be required to register; conducting approximately 14 inspections of current registrants each year; and providing semi-annual reports to Congress. At present, the FARA unit oversees 425 active registrants, some of which are registered as agents for multiple foreign principals.

In addition to these responsibilities, the FARA unit frequently receives and responds to informal calls and emails from what HUNT described as the "FARA bar" - attorneys and firms with established expertise in the field who represent multiple registrants. The FARA bar includes law firms such as Perkins Coie, Covington & Burling, Wiley Rein, and Akin Gump, as well as individuals such as KEN GROSS at Skadden Arps.

HUNT receives a call almost every day from someone seeking guidance about a possible obligation to register; HUNT essentially recites the FARA statute to potential registrants and might advise them to register if it sounds like a "slam dunk" case, but she would never tell someone that they didn't have to register over the phone. HUNT does not like responding definitively to hypothetical scenarios, and she generally insists that the attorneys submit formal "Rule 2" requests instead. The unit has received ten "Rule 2" requests in 2018.

When the program specialists or attorneys in the unit discover information that suggests an individual or entity might be required to register under the statute, the unit generates a "Possible Obligation Letter" (POL) seeking additional information about the activities at issue. The information that triggers a POL might come from publicly available media reports, the registration statements of other registrants, or complaints from the public. HUNT reviews all POLs and estimated the unit had already sent out twenty POLs in 2018.

Nothing in the FARA statute compels the potential registrant to respond to a POL, but HUNT said "ten out of ten" POLs receive a reply. The FARA unit reviews the information provided by the potential registrant and determines whether registration is required. The process often involves additional correspondence between the unit and the potential registrant and sometimes requires an in-person meeting with the potential registrant's representatives. If the unit does not develop sufficient

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

████████████████████████

Continuation of FD-302 of  (U) Interview of Heather Hunt         , On  05/15/2018  , Page   3 of 9

information to reach a determination either way, it might let an inquiry
"simmer" until new information justifies re-contacting the potential
registrant.

If the unit concludes that registration is required under the statute,
HUNT sends a "Must Register" letter that explains the legal basis of the
decision. No one has ever ignored a "Must Register" letter and failed to
register, but, once or twice a year, a potential registrant will request a
follow-up meeting to dispute the unit's conclusion. Such a meeting might
convince the FARA unit that registration is not required, or the potential
registrant may ultimately decide to cease the activity at issue to avoid
the obligation to register.

There is no penalty under the statute for late or retroactive
registration, but the FARA unit could seek injunctive relief if someone
refused to register, and "willful failure" to register is a criminal
violation that has been prosecuted four or five times since 2007. Short of
seeking injunctive relief, HUNT once asked an Assistant Attorney General
to send a "Must Register" letter to a recalcitrant potential registrant.

HUNT's goal, throughout these exchanges, is to get people registered - she
is not looking for "gotcha" moments.

Tab 1 - SDNY_00030-33

HUNT reviewed a series of emails exchanged on 12/14/12 between herself,
KEVIN CONNOLLY, TIMOTHY PUGH, and ALEX MUDD with the subject line
"Tymoshenko - Skadden (Possible Obligation?)".

HUNT described this email chain as illustrative of the unit's deliberative
process. In this case, MUDD found and forwarded an article about Skadden's
report on the Yulia Tymoshenko case (the SA Report). Because the SA Report
was written at the request of the Government of Ukraine and disseminated
in the United States, it appeared to HUNT that it might constitute
registrable activity under the FARA statute.

In HUNT's reply to MUDD, she wrote that she was "[t]empted to call them
today" because she spoke to KEN GROSS so frequently. HUNT is sure she
didn't actually call because she had no voice, but it would not have been
unusual for her to mention the article to GROSS, let him know that a POL
was being prepared, and hear his initial reaction.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

███████████████████████████

Continuation of FD-302 of <u>(U) Interview of Heather Hunt</u>           ,On <u>05/15/2018</u> ,Page <u>4 of 9</u>


HUNT reviewed the full SA Report around the time of this email chain. The most important factor to consider was who was directing or controlling the activities at issue, and the purpose of the POL was to determine who sponsored the publication of the SA Report.

Tab 2 - SDNY_00017

HUNT reviewed the POL dated 12/18/12, which was signed by her and addressed to Skadden's managing director in New York.

HUNT said POLs are form letters that have looked generally the same for 33 years. Two of the four information requests (regarding ownership of the firm and the nature of the firm's business) were not relevant here because the unit was very familiar with Skadden, but the final two requests were critical to establishing whether an agency relationship existed between Ukraine and Skadden (a description of the firm's activities on behalf of the Government of Ukraine or any other foreign entity, and information regarding the terms and conditions of any written or oral agreement).

Tab 3 - SDNY_00550-551

HUNT reviewed an email from MUDD dated 01/03/13 with the subject line "FYI-Skadden Response expected next week (Tymoshenko)", in which MUDD noted that LAWRENCE SPIEGEL from Skadden had left a voicemail regarding the POL.

HUNT does not believe anyone returned SPIEGEL's call; there would have been no reason to call him back, the unit was more interested in receiving the response to the POL. HUNT does not recall dealing with SPIEGEL much, if at all, prior to this matter.

Tab 4 - SDNY_00552-553

HUNT reviewed an email from MUDD dated 01/16/13 with the subject line "UPDATE: Tymoshenko Case - Skadden Report", in which MUDD noted the 01/13/13 registrations of Arnall Golden Gregory and Tauzin Consultants.

E-filed FARA registrations are reviewed by case managers for sufficiency as a matter of routine. When reviewing the Arnall Golden Gregory and Tauzin Consultants filings, MUDD noticed a reference to the SA Report and brought it to HUNT's attention. HUNT does not recall whether any additional information regarding the SA Report was included in the Arnall Golden Gregory and Tauzin Consultants files, but volunteered to look into it and follow-up with the interviewing attorneys.

Tab 5 - SDNY_00679-713

**UNCLASSIFIED//FOUO**

USA-0007553

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

████████████████████████

Continuation of FD-302 of  (U) Interview of Heather Hunt _____ , On  05/15/2018 , Page  5 of 9

HUNT reviewed Skadden's 02/06/13 response to the POL, which was addressed to "Helen Hunt" [sic] and signed by GREGORY CRAIG. HUNT said she and KEVIN CONNOLLY would have both reviewed the letter upon receipt in 2013.

HUNT was directed to CRAIG's response to question three, in which he stated, "The Firm insisted on complete independence...". HUNT said the question of independence was relevant to her analysis because if Skadden had simply written the report and given the finished product to the government, there would be no obligation to register under FARA.

HUNT was asked whether it would affect her view on the question of independence if Skadden had disclosed that the firm was also assisting the Ukrainian Ministry of Justice with preparations for another trial of Tymoshenko. HUNT said that was something that should have been disclosed in response to the POL's question regarding "the activities the firm has engaged in or the services it has rendered" to Ukraine. The question was phrased in general terms for a reason; Skadden, however, limited its response specifically to the SA Report.

HUNT's unit does not have the resources to investigate questions like the independence of the SA Report on its own; the FARA unit relies on potential registrants' responses to its POLs, and more information is always better than the alternative.

The reference to the "private citizen" who contributed funding for the SA Report (page 3 of CRAIG's letter) made HUNT curious to learn more. Compensation is one of several factors relevant to determining who is calling the shots, so this response left open the question as to who was directing the activities at issue.

Tab 6 - SDNY_00561-562

HUNT reviewed an email with the subject line "Fw: Yulia Tymoshenko: Ukrainian authorities must be held responsible for corrupt deals", which she forwarded to THOMAS REILLY and STEVEN PELAK on 02/25/13.

HUNT forwarded the article regarding Tymoshenko's allegation that Skadden received $1.5-2 million for the SA Report to the Acting Chiefs of the DOJ's Counterintelligence and Export Control Section for their information. HUNT was more interested in Skadden's activities on behalf of Ukraine than the accusations of corruption in the payment process, because Skadden had already admitted that it was hired by Ukraine. But if Skadden and Ukraine were attempting to hide the source of the funding, it could be relevant to the analysis.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

███████████████████████

Continuation of FD-302 of  (U) Interview of Heather Hunt _____ , On  05/15/2018 , Page  6 of 9

The FARA unit's primary focus is whether an agency relationship existed
and whether Skadden performed any political activities as defined by the
statute. In that regard, the FARA statute is content-neutral because any
type of report, whether independent or not, could have been intended to
influence the U.S. public. The question is what Skadden did with the
report.

HUNT was asked whether it would change her analysis if the Government of
Ukraine had written its own report and paid Skadden for the use of its
name and credibility. HUNT said that could constitute political activity.

Tab 7 - SDNY_00576-577

HUNT did not remember the call between KEN GROSS and KEVIN CONNOLLY
referenced in the 04/03/13 - 04/04/13 emails.

Tab 8 - SDNY_00012-14

HUNT reviewed the 04/09/13 letter, which was signed by her and addressed
to CRAIG; the letter included seven additional requests for information,
which were discussed in the context of CRAIG's subsequent reply.

HUNT pointed to the paragraphs inquiring about Skadden's fee arrangement
with the Ministry of Justice and the unspecified amounts received from the
"private citizen". HUNT said she wouldn't have included all of that if the
question of funding hadn't been relevant to her analysis.

Tab 9 - SDNY_00044-53

HUNT reviewed Skadden's 06/03/13 response letter, which was signed by
CRAIG.

HUNT was directed to CRAIG's statement on page 2 that the private citizen
who funded the SA Report "had no connection to the project whatsoever",
and thus his identity would not be disclosed. HUNT was asked whether the
FARA unit would have wanted to know if that individual met with Skadden
and directed their activities related to the release of the SA Report.
HUNT said of course that would be relevant; maybe the individual was a
foreign principal himself, or maybe he was being directed by the
Government of Ukraine. Coordinating the release of the SA Report would be
public relations activity under the statute.

Skadden did not provide any information like that, but HUNT still produced
a "Must Register" letter based on the information contained in Skadden's 06
/03/13 response. The FARA statute has several facets, and only one has to

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

████████████████████████

Continuation of FD-302 of  (U) Interview of Heather Hunt _____ , On  05/15/2018 , Page  7 of 9

be satisfied to trigger registration. The unit concluded that registration
was necessary because Skadden disseminated the report to three
journalists; if the unit had been aware of other facts, it might have
concluded that Skadden was engaged in a different kind of political
activity and required registration on those grounds.

HUNT expects potential registrants to be truthful and complete in their
responses to POLs, because that's all the unit has to go on. Sometimes
other information comes out later in the media, but the FARA unit doesn't
always have the full picture when it makes its determinations.

If Skadden had disclosed that it was involved in U.S. media strategy, HUNT
said it would have been a slam dunk case. HUNT would have told Skadden to
register if they had advised or made any recommendations with respect to
the roll-out of the SA Report in the U.S. media.

Skadden represented that it made no statements or comments to the media
other than to correct errors, but if the firm had been "backgrounding"
reporters in the U.S. about the SA Report, that would have been
registrable activity.

HUNT was directed to Skadden's response to the first question ("To whom,
if anyone, did your firm release or distribute the report and when?") and
asked whether Skadden should have disclosed any lobbying or public
relations firms to which it might have provided the SA Report. HUNT wanted
to know everyone Skadden provided the SA Report to, if that had happened,
and that's why the question was posed broadly.

Tabs 10 and 11 - SDNY_00598-624

HUNT reviewed several drafts of the "Must Register" letter that were
prepared in July and August 2013. HUNT believed that the drafting process
of this letter was very typical and she did not recall any additional
contact with Skadden during that period.

Tab 12 - SDNY_ 00015-16

HUNT reviewed the final version of the "Must Register" letter that was
transmitted to Skadden on 09/05/13.

HUNT and KEVIN CONNOLLY drafted the "Must Register" letter, and they based
their decision on the facts provided by Skadden during their
correspondence with the FARA unit, as well as public source information.
The key fact requiring registration was Skadden's dissemination of the SA
Report to the media.

**UNCLASSIFIED//FOUO**

USA-0007556

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

███████████████████████████

Continuation of FD-302 of _(U) Interview of Heather Hunt_____ , On _05/15/2018_ , Page _8 of 9_

HUNT was asked what changed in the FARA unit's analysis between the issuance of the "Must Register" letter in September 2013 and the "No Obligation" letter produced by the unit in January 2014. As of September 2013, HUNT believed that Skadden had affirmatively disseminated the SA Report to the New York Times and other publications, and then contacted the media to address errors in their reporting. At the October 2013 meeting with CRAIG, GROSS, and SPIEGEL, HUNT was told that Skadden only sent the SA Report to the media after the articles were written, and the purpose of sending the report was to correct the inaccuracies in the published articles.

Tab 13 - SDNY_00625-629

HUNT did not recall the communications with SHAYLA PARKER, another Skadden employee, referenced in the 09/17/13 - 09/18/13 emails.

Tab 14 - SDNY_00630-631

HUNT did not recall returning CRAIG's 09/20/13 call acknowledging receipt of the "Must Register" letter.

Tabs 15 (SDNY_00054), 16 (00008-9), and 17 (00650-651)

HUNT reviewed CRAIG's 09/26/13 letter notifying her that LAWRENCE SPIEGEL would be calling to request a meeting to discuss the "Must Register" letter, as well as a subsequent series of internal FARA unit emails regarding the scheduling of the meeting.

HUNT had nothing to add regarding the scheduling of the meeting and did not remember the significance of Skadden partner CLIFF SLOAN's potential attendance. HUNT likely forwarded the information to THOMAS REILLY due to SLOAN's media and publishing background.

Tab 18 - SDNY_00002

HUNT reviewed CRAIG's letter dated 10/10/13, which was transmitted to the FARA unit the day after the 10/09/13 meeting with CRAIG, GROSS, and SPIEGEL.

HUNT was joined at the meeting by KEVIN CONNOLLY, TIM PUGH, and ALEX MUDD from the FARA unit. HUNT had met with KEN GROSS many times in connection with various registrants, but believes this was likely the only time she met with GREG CRAIG and LAWRENCE SPIEGEL.

At the meeting, Skadden represented that their only contact with the media was correcting errors in response to requests from the media. Skadden was

**UNCLASSIFIED//FOUO**

USA-0007557

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of   (U)  Interview of Heather Hunt                              , On   05/15/2018   , Page    9 of 9

adamant that there had been no proactive outreach; because this point was the crux of their discussion, HUNT asked Skadden to put it in writing. Skadden did so in the 10/10/13 letter signed by CRAIG.

HUNT was asked if it would have been relevant to know whether Skadden affirmatively sent the SA Report to the newspapers, or if Skadden had reached out to the press to comment on the SA Report. HUNT said both facts would have been relevant - that's the gist of FARA. However, if Skadden's assignment on behalf of the Government of Ukraine had included dissemination of the report, then it might not matter whether Skadden contacted reporters or the reporters contacted Skadden - it would still be registrable activity, because the goal would be getting the SA Report in front of the U.S. public.

Skadden denied that distribution of the SA Report was part of their mandate. CRAIG made it clear that the only reason he contacted the media was to correct errors in reporting. HUNT agreed that if this was the only contact, then no registration would be required.

Tab 21 - SDNY_00672

HUNT reviewed a series of internal emails dated 02/28/14 and 03/04/14 that referenced a call between HUNT and CRAIG. HUNT believed the call was related to a different issue.

Tab 22 - SDNY_00675

HUNT reviewed an email from JEFFREY GILDAY (Research Specialist at the FARA unit) dated 12/12/14 with the subject line "Gregory Craig - Skadden Arps." HUNT believed this call was also unrelated to the SA Report.

HUNT said the question of Skadden's obligation to register in connection with its work on the SA Report never came up again after Skadden got the answer they wanted.

**UNCLASSIFIED//FOUO**

USA-0007558