**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| *v.* | **Case No. 1:19-cr-0125 (ABJ)** |
| **GREGORY B. CRAIG**, | |
| *Defendant.* | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S NOTICE OF INTENT
TO INTRODUCE 404(b) EVIDENCE AND MOTION IN LIMINE TO EXCLUDE THAT
EVIDENCE UNDER RULES 403 AND 404(b)**

## I.    INTRODUCTION

The government claims a right to introduce "other acts" evidence under Rule 404(b) to show that Mr. Craig had a motive to make false statements and material omissions to the Department of Justice's FARA Unit as part of an alleged scheme to avoid having to register under the Foreign Agents Registration Act. The "other acts" at issue involve Mr. Craig's participation in his law firm's hiring of Paul Manafort's daughter as a full-time associate in June 2012, after her offer from Dewey & LeBoeuf, LLP evaporated when the firm collapsed.[1] The government's argument boils down to an assertion that Mr. Craig's efforts to obtain an interview for Ms. Manafort and to recommend that she be hired by Skadden in the spring of 2012 are evidence of Mr. Craig's desire to please Mr. Manafort. The government claims that a similar "motive" prompted Mr. Craig to mislead the FARA Unit in written communications and during a

---

[1] The government half-heartedly "protect[s]" the immediate relative from adverse publicity by not providing her actual name. *See* Notice at 2. That protection was illusory, however, because it has been widely reported in previous press stories that Andrea Manafort worked as a Skadden associate for several years before joining a local business as an in-house attorney. Several news organizations identified the "immediate relative" within hours of the government's filing.

meeting in the fall of 2013. The government's presentation of the facts is misleading and incomplete; the logic of its "motive" argument is untenable; and the mini-trial that would result if this spurious evidence is admitted would be a massive distraction from the issues the jury will be asked to decide. For these reasons, the Court should exclude the government's proffered Rule 404(b) evidence as far more prejudicial than probative.

## II.    STATEMENT OF THE PERTINENT FACTS

On April 30, 2012, the global law firm Dewey & LeBoeuf, LLP, with offices in 26 countries and over 1,000 attorneys, announced to its partners that they should seek employment elsewhere; a month later the firm filed for bankruptcy.[2] Among those most devastated by Dewey's collapse, and least prepared to deal with it, were the dozens of third year law students who had worked at Dewey as summer associates, and had accepted permanent job offers to commence their legal careers in the fall of 2012. Paul Manafort's daughter Andrea was one such promising third year law student. When Dewey's collapse seemed imminent, she began urgent efforts to find a suitable position with another law firm.

On April 30, 2012, Mr. Manafort wrote to Mr. Craig with a request that he meet with Andrea and help determine whether she might be able to arrange interviews at Skadden for a first-year associate's position. *See* Ex. 1 (April 30, 2012 email from Manafort to Craig). Ms. Manafort was a *magna cum laude* graduate of the University of South Carolina, and a May 2012 candidate for a J.D. degree from the Georgetown University Law Center. She had been a summer associate with Dewey's New York City office and had received an offer of permanent employment with the firm. She had done well in law school and had served as an editor on the

---

[2] *See* Peter Lattman, *Dewey & LeBoeuf Said to Encourage Partners to Leave*, N.Y. Times (April 30, 2012), https://dealbook.nytimes.com/2012/04/30/dewey-leboeuf-said-to-encourage-partners-to-leave; Peter Lattman, *Dewey & LeBoeuf Files for Bankruptcy*, N.Y. Times (May 28, 2012), https://dealbook.nytimes.com/2012/05/28/dewey-leboeuf-files-for-bankruptcy.

Georgetown International Environmental Law Review. *Id.* (attached resume redacted to remove protected identifying information).

Mr. Craig met with Ms. Manafort as requested. *See* Ex. 2 (May 8, 2012 email from Manafort to Craig). The following day, Mr. Craig told Mr. Manafort that he had discussed Andrea's situation with Mitchell Ettinger, the head of Skadden's litigation group in the D.C. office. Mr. Ettinger said he would invite Andrea for a meeting to "give her some counseling," not only about prospects at Skadden but also about a potential opportunity with another large firm that Mr. Ettinger believed might need new associates in the fall. *See* Ex. 3 (May 9, 2012 email from Craig to Manafort).

Unbeknown to Mr. Craig, Mr. Ettinger, or Mr. Manafort, Ms. Manafort's resume had already been forwarded to the attorney recruiting staff in Skadden's New York office by the recruiting director at Dewey. Dewey's recruiting staff was attempting to assist those third year law students who had been offered permanent positions at Dewey to find other jobs. On May 11, 2012, a supervisor in Skadden's recruiting department, who was unaware of Ms. Manafort's scheduled interview with Mr. Ettinger, sent Ms. Manafort a form letter indicating that Skadden was "not in a position to invite you to interview with us." Mr. Manafort complained to Mr. Craig, *see* Ex. 4 (May 29, 2012 email from Manafort to Craig attaching May 11, 2012 rejection letter), who was genuinely perplexed by the rejection letter. Mr. Craig contacted Mr. Ettinger, stating "I thought someone from the firm would at least talk to her." *See* Ex. 5 (May 30, 2012 email from Craig to Ettinger). Mr. Craig also responded to Mr. Manafort, stating that he "had no idea," about the rejection letter and that he had thought Ms. Manafort was "coming in again for another interview." *See* Ex. 6 (May 30, 2012 email from Craig to Manafort).

Mr. Ettinger was also puzzled by the rejection letter because Ms. Manafort was on his "radar to talk to but [I] have been on the road." He added that this was an administrative "screw up," *see* Ex. 7 (May 30, 2012 email from Ettinger to Craig), and later mentioned that he had not been aware that Skadden's recruiting staff had received a copy of her resume. *See* Ex. 8 (May 30, 2012 email from Ettinger to Craig). Mr. Ettinger got in touch with Ms. Manafort and scheduled an interview for the following week. *See* Ex. 9 (email string between Jen Spaziano, Ettinger, Craig and Manafort, dated May 31 and June 1, 2012). Following that interview on June 5, Mr. Ettinger told Mr. Craig that "[i]f all goes well, she will be returning for more formal interviews." *See* Ex. 10 (June 5, 2012 email from Ettinger to Craig); Ex. 11 (email string between Manafort and Craig, dated June 6, 2012).

On June 12, 2012, Andrea Manafort was interviewed by three Skadden partners and three associates. Mr. Manafort was pleased and told Mr. Craig that Andrea's employment would have potential business benefits for the firm. *See* Ex. 12 (June 12, 2012 email from Manafort to Craig). On June 21, 2012, Mr. Ettinger asked Mr. Craig to prepare a memorandum to Skadden's New York office explaining that the D.C. office was recommending that Skadden should make Ms. Manafort an offer of employment. *See* Ex. 13 (June 21, 2012 email string between Ettinger and Craig). Mr. Craig drafted a memo and forwarded it to Mr. Ettinger, and later revised it, at Mr. Ettinger's suggestion, to focus on the "business front." *See* Ex. 14 (June 23, 2012 email from Ettinger to Craig).

Mr. Craig's initial draft memo to Mr. Ettinger described many reasons why Ms. Manafort should be extended an offer of employment. They included the fact that five of the six lawyers who had interviewed her "concluded that she should either 'definitely receive an offer,' or that she should be given 'strong consideration.'" *See* Ex. 15 (June 23, 2012 email from Craig to

4

Ettinger, attaching draft memo). He noted that she was "out of step with others in her class through no fault of her own," and that "Dewey's collapse has pulled the rug out from under her personally and professionally." *Id.* He explained that her father had been working closely with Mr. Craig on a large matter, and that Mr. Manafort had asked Mr. Craig to meet with his daughter for career advice. *Id.* "It was a perfectly natural request, and I agreed to talk to her." *Id.* Mr. Craig noted that after meeting with Ms. Manafort he came away with four thoughts:

> (1) Andrea is very personable and engaging, an agreeable and charming young woman. She would be a strong member of any team. (2) Andrea is also very smart and, more than that, she has extraordinary people/communication skills . . . . (3) She is also one ambitious young lady. She will work hard to succeed here. (4) If she had come to Skadden as a summer associate, I feel pretty confident that she would have been offered a job here.

*Id.* As a "final factor," Mr. Craig noted that Mr. Manafort was "thrilled with the firm's performance for him and his clients, and he will likely refer significant business to us in the future," a "likelihood [that] becomes a certainty if we have Andrea working here." *Id.* In summary, Mr. Craig predicted that Andrea "will do very well here, . . . she will be a fast learner and . . . she will be well-liked. I think there is virtually no chance that she will disappoint." *Id.*

After Mr. Ettinger's comment about giving greater emphasis to the business reasons to hire Ms. Manafort, Mr. Craig revised his memo, adding further details concerning the billings to date on the Tymoshenko matter, and Mr. Manafort's potential to generate significant future business for Skadden. He noted that Mr. Manafort was "one of the top Republican lobbyists in Washington, D.C.," that he "has been working in Republican politics for almost forty years," and had been involved "in every presidential campaign since [the election of Ronald Reagan in] 1980." *See* Ex. 16 (June 25, 2012 email from Craig to Ettinger, and revised memo). Mr. Craig noted that while Mr. Manafort, through his political and business connections, "is likely to throw a lot of work our way if Andrea comes to Skadden," he also noted "I honestly have no idea,

concretely, what that work could amount to on an annual basis, but it has the potential to be significant." *Id.* The following day, Mr. Ettinger told Mr. Craig that he had revised his memo slightly, and that Mr. Ettinger planned to submit it to the New York office, along with his own recommendation that "we make an offer [to Ms. Manafort], which I understand will be approved." *See* Ex. 17 (June 26, 2012 email from Ettinger to Craig, and attached revised memo).

On June 27, 2012, Mr. Ettinger forwarded Mr. Craig's memo about Andrea Manafort's application to David Zornow, the global head of Skadden's litigation practice and a member of the law firm's Policy Committee. Mr. Zornow said that he was "supportive." *See* Ex. 18 (June 27, 2012, email exchange between Zornow and Ettinger). The next day, Mr. Ettinger forwarded Mr. Craig's memo to a partner on the hiring committee, Howard Ellin in New York, and several other members of Skadden's management. Mr. Ettinger noted that Skadden's litigation group in D.C. sought authorization to make an offer to Ms. Manafort, and explained the circumstances of her lost opportunity at Dewey. Mr. Ettinger wrote that he and Mr. Craig "believe that extending an offer to Andrea is a win-win situation." *See* Ex. 19 (June 28, 2012 email exchange between Ettinger, Ellin, and Craig). Mr. Ettinger went on:

> First, although her grades were a little lower than we would like, she is smart and interviewed well. We think she will be an asset to the Group and be well liked. Second, her presence increases our chances of securing additional business through Mr. Manafort. He has expressed his gratitude to Greg for entertaining Andrea's application. Lastly, given this young lady's predicament, we feel that Skadden would be providing her with an opportunity to salvage the start of her career.

*Id.* Mr. Ettinger noted that Mr. Zornow had reviewed the situation and was supportive of the decision to hire Ms. Manafort. Mr. Ettinger opined that he believed that Eric Friedman, the firm's Executive Partner, "also will be supportive." *Id.* Skadden in fact made an offer to Ms.

Manafort on June 28, 2012. *See* Ex. 20 (email exchange between Manafort and Craig on June 28 and 29, 2012).

In the fall of 2012, Andrea Manafort began work for Skadden in the D.C. office, assigned as an associate in the litigation department. She did not work on the Tymoshenko Project. To the best of our knowledge, Mr. Manafort referred no additional matters of significance to Skadden in the years following Skadden's completion of the Tymoshenko Report. Ms. Manafort performed well at Skadden, and left the firm voluntarily in 2016 to take a position in the general counsel's office of a local business.

## III.   **ARGUMENT**

### A.   **The proffered acts are not admissible under Rule 404(b) because they are not probative of Mr. Craig's motive.**

Under Rule 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Under subsection (b)(2), the evidence may be admissible for another purpose, and the sole admissible purpose cited by the government here is motive. Motive is "a state of mind that is shown by proving the emotion that brings it into being . . . as a circumstance of showing the probability of appropriate ensuing action . . . ." *United States* v. *Day*, 591 F.2d 861, 874 (D.C. Cir. 1978) (citations and internal quotations omitted). Motive is not a "consequential fact," however; "'motive' must be an intermediate inference in route to some ultimate fact." 22B C.A. Wright, et al., Federal Practice and Procedure § 5248, at 179 (2d ed. 2017). The government has the burden of proving the relevance of "other act" evidence for an admissible purpose. *United States* v. *Hernandez*, 780 F.2d 113, 118 (D.C. Cir. 1986). And even if the evidence is relevant to something other than character, the Court may exclude the

evidence under Rule 403 if "the probative value of that evidence [is] outweighed [by] its prejudicial effect under Federal Rule of Evidence 403." *Id.* at 118.

The government's 404(b) notice, although procedurally defective,[3] states that the proffered evidence will be offered to show Mr. Craig's "motive to curry favor with Manafort, as well as his motive and intent in his dealings with the FARA Unit in 2013." ECF No. 22, at 4. But the question for the jury is whether Mr. Craig made material misrepresentations or omissions to the FARA Unit in 2013. The government makes no claim that Mr. Manafort urged Mr. Craig to make misrepresentations or omissions to the FARA Unit, or in any way suggested that he would send business to Skadden if Mr. Craig avoided FARA registration. The government's chain of inferences is much more strained: that Mr. Craig had a business motive to please Mr. Manafort; that Mr. Craig knew Mr. Manafort would be pleased if Mr. Craig reached out to reporters to support Ukraine's public relations efforts; that Mr. Manafort would not be pleased if his reaching out to reporters caused Mr. Craig to register under FARA; and that Mr. Craig acted in conformance with his business motive by reaching out to reporters to support public relations efforts and thereafter making false and material omissions to the FARA Unit about why he did so. This is too much weight for the chain to bear.

---

[3] In 1991 Rule 404(b) was amended to require the prosecution, upon request from the defendant in a criminal case, to "provide reasonable notice of the general nature of any such [crimes or other acts] evidence that the prosecutor intends to offer at trial." In this case, the Court required that the Notice be filed by May 10, 2019. The Advisory Committee Notes to the 1991 Amendments suggest that this Notice should inform the defense "how it intends to use the extrinsic act evidence at trial, *i.e.*, during its case-in-chief, for impeachment, or for possible rebuttal." Adv. Comm. Note, Fed. R. Civ. P. 404(b), 1991 Amendments. The Notes also suggest that the trial court may choose to review the evidence to be offered under Rule 404(b) in limine, and to require the government to "disclose to it the specifics of such evidence which the court must consider in determining admissibility." *Id.*

The government's chain of inferences breaks right at the outset with the improbable postulate that one who does a benign and lawful favor for another betrays a willingness to commit a crime to benefit the other. No one can dispute that, by introducing Andrea Manafort to his law firm's management, Mr. Craig performed a favor for Mr. Manafort. But in performing that favor, Mr. Craig was not acting alone or in secret, nor did he violate some firm policy or practice. The law firm as a whole became engaged in reviewing Ms. Manafort's credentials and her prospects for success as an associate. The favor performed by Mr. Craig was unremarkable and benign; he crossed no lines in taking actions that benefitted not only Ms. Manafort but the law firm as well. The favor that Mr. Craig performed was the type of action that any partner at any law firm might have taken on behalf of a client or a professional colleague. With this evidence, however, the government implies that, to curry favor with Mr. Manafort and thereby potentially bring in new business for Skadden, Mr. Craig was willing to cross *some* line – ethical, moral, procedural – to assist Ms. Manafort. The government hopes that jurors, who are not familiar with law firm hiring practices and protocols, will find something improper or tawdry in Mr. Craig's acts, and thereby be more apt to find that he did something unlawful in his interaction with FARA. That is prototypical character evidence inadmissible under Rule 404(b).

Mr. Craig's only rational response to the government's proffered evidence would be to show that his conduct was perfectly appropriate, well-intended, and accepted in law firm culture, and that he crossed no legal, ethical, moral, or procedural line in anything he did with respect to helping Mr. Manafort's daughter find permanent employment at Skadden. As explained below, Mr. Craig is quite confident that he will "win" this mini-trial, but the distraction of a mini-trial on law firm employment practices is not in anyone's interest. And even if Mr. Craig were to "lose" the mini-trial, the government's evidence still would not be probative of an essential

element of the charged offenses. The ultimate fact the government is trying to prove is that a business motive to please Mr. Manafort caused Mr. Craig to knowingly and willfully misled the FARA Unit. Yet even in the civil context, with a lower burden of proof and where the stakes are not as high, it is well-recognized that a motive to retain a professional client is not probative of fraud. "[I]t is economically irrational to risk your professional reputation, license, and the possibility of legal liability simply in return for a professional services fee." *Stephenson* v. *Citco Group Ltd.*, 700 F. Supp. 2d 599, 621 (S.D.N.Y. 2010); *see also In re Lyman Good Dietary Supplements Litig.*, No. 17-cv-8047 (WEC), 2018 U.S. Dist. Lexis 131668, at *9 (S.D.N.Y. Aug. 6, 2018) (collecting cases for the proposition that general motives to earn a profit are not sufficient to show scienter for fraud).

The proffered "other acts" evidence should be excluded because the government has not carried its burden to prove that it is probative of some fact other than Mr. Craig's character.

**B.      The evidence should be excluded under Rule 403.**

Even if the "other act" evidence meets the standard for admissibility under Rule 404(b)(2), the Court may exclude it "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. As the Supreme Court recognized in *Huddleston* v. *United States*, 485 U.S. 681 (1988), trial courts are directed by Rule 404(b) to exercise their discretion in assessing proffered "other crimes or acts" evidence under the familiar balancing test of probative value versus prejudice concerns under Rule 403. *Id*. at 688 (quoting S. Rep. No. 93-1277, at page 25 (1974)).

**1.      The probative value of the evidence is minimal.**

As explained above, the fact that Mr. Craig passed along to others at Skadden Mr. Manafort's suggestion of the prospect of future business as a reason to consider interviewing his

daughter is not probative of a motive by Mr. Craig to commit any criminal act. It is banal. It occurs daily in private law firms, as well as private corporations, universities, nonprofits, and virtually every other private institution in America that has employees. The conduct might be probative of a material issue if Mr. Craig crossed some line in assisting Ms. Manafort, but the government makes no argument that he did. And the evidence (described in more detail in the next section) establishes the contrary. Mr. Craig and especially Mr. Ettinger thought that business prospects were among the appropriate points of emphasis to be made in explaining to Skadden's senior management why the firm should consider Ms. Manafort's late application to join a recruiting class that already had been filled. The government's documents do not support its contention that Mr. Craig went out of his way to secure a position for her in order to "curry favor" with her father, or that she was unqualified for the position. The evidence actually reflects that Mr. Craig met with Ms. Manafort because of unfortunate circumstances that left her in the spring of her third year without a permanent job prospect when Dewey collapsed, and that he recommended that Skadden should hire her because he, along with many others at Skadden, were favorably impressed when they met her. Mr. Craig did not make the decision to hire Ms. Manafort; the firm made the decision through appropriate channels. The probative value of the government's "other act" evidence, if any, is scant.

## 2. Admitting the government's evidence will lead to a prejudicial mini-trial.

Most of the Rule 403 "dangers" will be implicated if the government is permitted to pursue its "other act" evidence. The government apparently wants to present the "other act" through a few e-mails that would leave the jury with a misleading impression that Mr. Craig somehow bent internal firm procedures or coerced the firm into making an offer to an unqualified candidate who had been previously rejected. But this is not a classic "prior bad acts"

case where simple proof of a criminal conviction establishes both the prior bad act and its meaning without further explication. *E.g.*, *United States* v. *McCarson*, 527 F.3d 170 (D.C. Cir. 2008) (prior convictions for gun possession and distribution of crack cocaine probative of current charges of intent to distribute crack cocaine and constructive possession of gun and drugs). In this case, the "other act" is not remotely criminal, and the jury will need context to understand its significance, including the facts demonstrating that Skadden had not in fact previously considered and rejected Ms. Manafort's application.

Mr. Craig will be required to respond to the government's evidence with more e-mails and documents, as well as six to ten live witnesses from Skadden who were involved in the decision to hire Ms. Manafort, to show that his motive was not to sabotage his firm's hiring procedures to curry favor with Mr. Manafort. Rather, he acted to assist his firm in hiring a qualified candidate who had suffered a bad break. He will show that he did not use any undue influence or engage in improper, unusual, or exceptional conduct of any kind. This will require a mini-trial on law firm practices and procedures that assuredly will cause undue delay and waste of time, and likely will confuse the issues and mislead the jury. Among other things, the evidence is likely to be confused with another of the government's theories – that Mr. Craig misled his law firm in responding to the FARA inquiries. The entire sideshow will be unfairly prejudicial to Mr. Craig given the insignificance of the proffered Rule 404(b) evidence to the material issues in the case.

Because the government's summary of the "other act" evidence is misleading in important respects, we have attached copies of the relevant documents as exhibits referenced above. That evidence demonstrates that although Mr. Manafort wanted his daughter to interview at Skadden and Mr. Craig wanted to help, nothing Mr. Craig did was out of the ordinary for

private law firms like Skadden. As it turns out, both Mr. Craig and Mr. Ettinger were impressed with Ms. Manafort's credentials and her potential to perform well at Skadden. Mr. Ettinger then arranged for her to be interviewed by six other Skadden attorneys, and they were favorably impressed as well. Other senior attorneys in the firm ultimately agreed that Ms. Manafort should be given an opportunity to join the firm's entering class of associates.

Despite the suggestions in the government's Notice, Mr. Manafort never requested that Skadden not register under FARA; neither did Mr. Pinchuk or any officials in the Ukraine government (who presumably had little, if any, knowledge of FARA's disclosure requirements). The decisions that Skadden reached about its potential FARA obligations were based on its own research and analysis of the legal issues involved, a process the firm repeated on several occasions throughout the course of the project, without any pressure being applied by Mr. Manafort. *See, e.g.*, Indictment, ECF No. 1, ¶¶ 9, 13-15. No evidence of pressure from Mr. Manafort for Skadden not to register under FARA is presented in the Indictment, and no such evidence appears in the tens of thousands of documents that the government has produced in discovery. Even if it were true that Mr. Craig spoke to reporters at the *New York Times* on December 12, 2012 about the release of the report because Mr. Manafort wanted him to – which it is not – the evidence will demonstrate that Mr. Manafort was fully aware that Skadden had determined that it would not engage in actions that the firm believed would require FARA registration. Mr. Craig never believed that his limited contacts with the *New York Times* and a few other media outlets to ensure that Skadden's report was fairly characterized in the press required him to register under FARA. The notion that Mr. Craig declined to register in order to curry favor with Mr. Manafort "and continue to bring in his high-paying business," Notice, at 4, is totally devoid of evidentiary support. Since the government has obtained and reviewed reams

of documents from Manafort, his colleague Rick Gates, FTI Consulting, Skadden, and others involved in Ukraine's release of the Skadden report, the government knows full well that it has no such evidence. Its suggestion to the contrary is baseless.

Finally, the evidence will show that the supposed Manafort business motive is a canard. After the Tymoshenko report was published, Skadden ceased performing any work for Ukraine. To our knowledge, Mr. Manafort never was a continuing source of referral business for Skadden. There is not a shred of evidence to support the notion that Mr. Craig was motivated to lie to the FARA Unit in the fall of 2013 in order to advance the interests of Mr. Manafort, Mr. Pinchuk, or Ukraine. The government's assertion that "Craig's desire to keep Manafort's business – as demonstrated in detail in his efforts on behalf of Manafort's relative – is probative of his motive and intent to mislead the FARA Unit and avoid registering under FARA," ECF No. 22 at 5, is completely devoid of temporal logic or supporting documentation. A full account of the evidence surrounding Mr. Craig's efforts to assist Andrea Manafort demonstrates chiefly that Mr. Craig had a motive to assist a young lawyer at the start of a promising career. That evidence also will show that Ms. Manafort impressed many lawyers at Skadden who interviewed her and considered her circumstances. Although the government contends that the potential prejudicial impact of its proffered Rule 404(b) evidence on Mr. Craig is diminished because his actions were not "criminal or even [a] 'bad' act," ECF No. 22 at 6, there is a very real potential for this evidence to engage the Court in a wasteful mini-trial, involving the testimony of numerous witnesses who will counter the government's theories that Mr. Craig's actions in helping Ms. Manafort somehow contravened Skadden's hiring policies and that Mr. Craig convinced Skadden to hire a well-qualified associate simply to "curry favor" with her father.

Where, as here, the probative value of the evidence the government proffers is slight – and perhaps evanescent – and where the potential for confusion in the minds of the jury, for prejudice to the defendant, and for a colossal waste of time is high, the Court has ample discretion to deny the government an opportunity to unfairly seek to smear Mr. Craig (and to cause further damage to Andrea Manafort) through the introduction of Mr. Craig's understandable efforts to help a business client's daughter obtain an interview for a job. Accordingly, the Court should reject the government's "other act" evidence as more prejudicial than probative under Rule 403 of the Federal Rules of Evidence.

## IV.   <u>CONCLUSION</u>

The Court should exercise its discretion and grant defendant's motion in limine, precluding the government from offering any evidence concerning Skadden's hiring of Andrea Manafort as an associate. That evidence, whether it is to be offered as part of the government's case in chief, or for impeachment purposes, or on rebuttal, has no place in the trial of this case.

Dated: May 17, 2019

Respectfully submitted,

/s/ William W. Taylor, III

William W. Taylor, III (D.C. Bar No. 84194)
Ezra B. Marcus (D.C. Bar No. 252685)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W. Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
Email: wtaylor@zuckerman.com
Email: emarcus@zuckerman.com

William J. Murphy (D.C. Bar No. 350371)
Adam B. Abelson (D.C. Bar No. 1011291)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
Email: wmurphy@zuckerman.com
Email: aabelson@zuckerman.com

*Attorneys for Defendant Gregory B. Craig*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on May 17, 2019, the foregoing was served on counsel of record via the Court's CM/ECF Service.

*/s/ Ezra B. Marcus*
Ezra B. Marcus

# Exhibit 1

**From:** Paul Manafort [pmanafort@dmpint.com]
**Sent:** Monday, April 30, 2012 8:33 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**CC:** Andrea Manafort [amanafort@gmail.com]
**Subject:** Andrea Manafort Resume
**Attachments:** Andrea Manafort Resume.doc

Greg
I really appreciate your meeting with Andrea and helping her to interview for a first year associate position at SA.
As I told you this is my #1 priority.
While Andrea prefers the Washington office of Skadden, Arps, she would be eagerly receptive to either DC or NY.
Anything you can do to assist her will be forever appreciated.
I have attached her resume and told her to call your office today to arrange a time to meet with you this week. Other than an exam that she is taking on Thursday morning, she said she could accommodate your schedule.
I am moving on the other topics we discussed and will be in touch with you later this week.
Best
Paul

SAU 157919

# Andrea L. Manafort

## EDUCATION

**Georgetown University Law Center**                                      Washington, D.C.
Candidate for Juris Doctor                                               Expected May 2012
GPA: ▇▇▇
    Transnational Legal Studies: Georgetown Law London at Kings College      July 2010 – Aug. 2010
    Journal: Georgetown International Environmental Law Review, *Administrative Editor*
    Activities: Student Ambassador, International and Corporate Law societies

**University of South Carolina**                                         Columbia, SC
Bachelor of Arts in Journalism and Mass Communication                    May 2007
GPA: ▇▇ – *Magna Cum Laude*
    Honors: USC Dean's List and National Dean's List all four years, National Scholars Honor Society,
    Golden Key International Honor Society
    Activities: International Association of Business Communicators, Public Relations Student Society
    of America, National Society of Collegiate Scholars, Gamma Beta Phi Honor Fraternity

## RELATED EXPERIENCE

**Dewey & LeBoeuf, LLP**                                                  New York, NY
*Summer Associate, Offer of Permanent Employment Extended*               May 2011 – July 2011
- Conducted legal research, drafted memoranda, and assisted in drafting motions for matters, including a class action lawsuit, a private equity contract, and a sports CBA dispute
- Attended pre-deposition interviews and created reports summarizing key elements
- Drafted documents and provided legal service as part of pro bono partnership with inMotion
- Participated in professional development training on legal writing, cost-effective research strategies, and presentation skills

**American Society of Composers, Authors and Publishers (ASCAP)**        New York, NY
*Legal Intern*                                                           May 2010 – July 2010
- Researched and drafted memoranda regarding matters concerning new media royalty rate disputes, public performance copyright infringement, and licensing of digital media
- Drafted documents directed to international affiliate Performance Rights Organizations
- Created a database organizing ASCAP's closed copyright infringement cases
- Attended international seminar on innovation in intellectual property rights protection and enforcement with hosts from several Southeast Asian countries

**Dan Klores Communications (DKC)**                                      New York, NY
*Public Relations Assistant Account Executive*                           March 2008 – May 2009
- Managed client relationships on accounts including Delta Airlines, FTD.com, Hard Rock Hotels
- Interacted and communicated daily with print and broadcast media professionals
- Participated in team strategic planning and conducted large amounts of associated research
- Independently created comprehensive status reports and environmental analysis
- Authored various publicity materials such as press releases and media alerts

**Mirror Cube Films**                                                    New York, NY
*Marketing/Public Relations Assistant*                                   Aug. 2007 – Feb. 2008
- Communicated with print and electronic media to create press attention on films
- Assisted in logistical preparation and on-site launch of a full-length feature film's premiere

Confidential Treatment Subject to Rule 6(e)                                    SAU 157920

# Exhibit 2

**From:** Paul Manafort [pmanafort@dmpint.com]
**Sent:** Tuesday, May 8, 2012 10:39 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Andrea Manafort

Greg
Did you have you meeting the other day?
What are the next steps?
Is there anything for me to do?
For Andrea to do ?
Any information that you can provide would be appreciated.
Thank you again for your help on this matter.
Paul

# Exhibit

# 3

**From:** Craig, Gregory B (WAS) [/O=SKADDEN/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GCRAIG]
**Sent:** Wednesday, May 9, 2012 3:32 PM
**To:** 'Paul Manafort' [pmanafort@dmpint.com]
**Subject:** T talked to Mitch Ettinger about Andrea

Mitch is the head of our litigation group here in DC. He will invite Andrea to come in and talk with him Monday or Tueday
next week. He will scope out the situation with her and give her some counseling. That may include Skadden. It may be a
recommendation to go somewhere else. Mitch knows that Paul Hasting (a really good firm) is feeling in need of young
lawyers, and he may decided to send her there. Or he may say something about Skadden. I don't know. But on the whole,
I had an entirely positive conversation about Andrea with Mitch. Ettinger should be in touch with Andrea by the end of the
week. If she still hasn't heard anything by Friday, tell me.

Confidential Treatment Subject to Rule 6(e)

# Exhibit 4

**From:** Paul Manafort [pmanafort@dmpint.com]
**Sent:** Tuesday, May 29, 2012 11:50 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** thanks for your help
**Attachments:** skadden letter.pdf


I see Skadden knows how to show appreciation for a $4MILLION gift account.

Confidential Treatment Subject to Rule 6(e)

SAU 192671

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111
———
TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

May 11, 2012

Ms. Andrea L. Manafort



Dear Andrea:

Thank you for your interest in Skadden, Arps, Slate, Meagher & Flom's Washington, D.C. office.  Unfortunately, we are not in a position to invite you to interview with us.

We sincerely appreciate your interest in the Firm and extend our best wishes for you throughout your employment pursuits.

Sincerely,

DeAnna Bumstead-Yeary
Attorney Recruiting & Development Supervisor

Confidential Treatment Subject to Rule 6(e)

# Exhibit 5

**From:** Craig, Gregory B (WAS) [/O=SKADDEN/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GCRAIG]
**Sent:** Wednesday, May 30, 2012 4:34 AM
**To:** 'mettinger@skadden.com' [mettinger@skadden.com]
**Subject:** Fw: thanks for your help
**Attachments:** skadden letter.pdf

Mitch:

I thought someone from the firm would at least talk to her. Do you know if that happened? This could not have come at a worse time for our case. I wish someone had told me about this before sending out the letter. Not a good way to run this railroad.

Greg

---

**From:** Paul Manafort [mailto:pmanafort@dmpint.com]
**Sent:** Tuesday, May 29, 2012 06:50 PM
**To:** Craig, Gregory B (WAS)
**Subject:** thanks for your help

I see Skadden knows how to show appreciation for a $4MILLION gift account.

Confidential Treatment Subject to Rule 6(e)

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE. N.W.

WASHINGTON, D.C. 20005-2111

———

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

May 11, 2012

Ms. Andrea L. Manafort



Dear Andrea:

      Thank you for your interest in Skadden, Arps, Slate, Meagher & Flom's Washington, D.C. office.  Unfortunately, we are not in a position to invite you to interview with us.

      We sincerely appreciate your interest in the Firm and extend our best wishes for you throughout your employment pursuits.

Sincerely,

DeAnna Bumstead-Yeary
Attorney Recruiting & Development Supervisor

Confidential Treatment Subject to Rule 6(e)

Exhibit

6

**From:** Craig, Gregory B (WAS) [/O=SKADDEN/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GCRAIG]
**Sent:** Wednesday, May 30, 2012 4:36 AM
**To:** 'pmanafort@dmpint.com' [pmanafort@dmpint.com]
**Subject:** Re: thanks for your help

I had no idea. I thought she was coming in again for another interview. So I am pissed. Let me find out what the true status is and get back to you.

---

**From:** Paul Manafort [mailto:pmanafort@dmpint.com]
**Sent:** Tuesday, May 29, 2012 06:50 PM
**To:** Craig, Gregory B (WAS)
**Subject:** thanks for your help

I see Skadden knows how to show appreciation for a $4MILLION gift account.

Confidential Treatment Subject to Rule 6(e)

# Exhibit 7

**From:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Sent:** Wednesday, May 30, 2012 11:49 AM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Re: thanks for your help

Greg, I do not know how this happened I have her in my radar to talk to but have been on the road. This is a screw up administratively and I will check into it. I apologize personally for this and will try to make it right. Quite frankly, I am embarrassed.

Sent from my iPhone

On May 29, 2012, at 11:48 PM, "Craig, Gregory B (WAS)" <Gregory.Craig@skadden.com> wrote:

>
>
> From: Craig, Gregory B (WAS)
> Sent: Tuesday, May 29, 2012 11:34 PM
> To: 'mettinger@skadden.com' <mettinger@skadden.com>
> Subject: Fw: thanks for your help
>
> Mitch:
>
> I thought someone from the firm would at least talk to her. Do you know if that happened? This could not have come at a worse time for our case. I wish someone had told me about this before sending out the letter. Not a good way to run this railroad.
>
> Greg
>
> From: Paul Manafort [mailto:pmanafort@dmpint.com]
> Sent: Tuesday, May 29, 2012 06:50 PM
> To: Craig, Gregory B (WAS)
> Subject: thanks for your help
>
>
> I see Skadden knows how to show appreciation for a $4MILLION gift account.
> <skadden letter.pdf>

Confidential Treatment Subject to Rule 6(e)

# Exhibit 8

**From:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Sent:** Wednesday, May 30, 2012 12:00 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Re: thanks for your help

Please tell Paul that this was sent in error and that I personally committed to speaking with his daughter. I will call her tonight or tomorrow when I return to DC. Again, this simply was not coordinated as I did not realize that Deanna and company had her resume. Did she send it to attorney recruiting separately from you?

Sent from my iPhone

On May 29, 2012, at 11:48 PM, "Craig, Gregory B (WAS)" <Gregory.Craig@skadden.com> wrote:

>
>
> From: Craig, Gregory B (WAS)
> Sent: Tuesday, May 29, 2012 11:34 PM
> To: 'mettinger@skadden.com' <mettinger@skadden.com>
> Subject: Fw: thanks for your help
>
> Mitch:
>
> I thought someone from the firm would at least talk to her. Do you know if that happened? This could not have come at a worse time for our case. I wish someone had told me about this before sending out the letter. Not a good way to run this railroad.
>
> Greg
>
> From: Paul Manafort [mailto:pmanafort@dmpint.com]
> Sent: Tuesday, May 29, 2012 06:50 PM
> To: Craig, Gregory B (WAS)
> Subject: thanks for your help
>
>
> I see Skadden knows how to show appreciation for a $4MILLION gift account.
> <skadden letter.pdf>

Confidential Treatment Subject to Rule 6(e)

# Exhibit 9

**From:** Craig, Gregory B (WAS) [/O=SKADDEN/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GCRAIG]
**Sent:** Friday, June 1, 2012 3:47 PM
**To:** 'pmanafort@dmpint.com' [pmanafort@dmpint.com]
**Subject:** Re: Andrea Manafort

I arrive mid-afternoon at Dulles on Saturday. We are in full swing with Tymo's people, and have a complete agenda of topics, meetings, documents and issues. Any way to advance the cause of them signing our contract? I signed theirs. They have a copy. They want original. I am no inclined to help them out on that without getting satisfaction on our issue.

---

**From:** Paul Manafort [mailto:pmanafort@dmpint.com]
**Sent:** Thursday, May 31, 2012 09:45 PM
**To:** Craig, Gregory B (WAS)
**Subject:** Re: Andrea Manafort

Greg
Thank you for clarifying this matter and repairing it. Ettinger has been in contact with Andrea and I believe they are scheduled to meet next week.
Are you back in the US this weekend? I would like to discuss the reporting timeframe with you.
Paul
PS I have confirmed that your package is en route. You will have it Monday or Tuesday at latest.

---

**From:** "Craig, Gregory B" <Gregory.Craig@skadden.com>
**Date:** Thu, 31 May 2012 16:05:03 -0500
**To:** Paul Manafort <pmanafort@dmpint.com>
**Subject:** Fw: Andrea Manafort

Paul: See below from Mitch Ettinger, head of litigation in DC. I had talked to Mitch about Andrea, told him her situation, and told him I had met and liked her. He told me that he too would talk to her. Then she got the letter. Needless to say I was angry and embarrassed. Read below and see how it happened. Greg (from Kyiv)

---

**From:** Ettinger, Mitchell S (WAS)
**Sent:** Thursday, May 31, 2012 04:38 PM
**To:** Craig, Gregory B (WAS)
**Subject:** FW: Andrea Manafort

Here is what happened. Completely beyond our control.

---

**From:** Spaziano, Jen
**Sent:** Thursday, May 31, 2012 4:32 PM
**To:** Ettinger, Mitchell S (WAS)
**Subject:** Andrea Manafort

Mitch -
As you requested, I checked with recruiting to determine why Ms. Manafort received a standard rejection letter. Unfortunately, it looks like her resume also came to the firm through a different channel. The recruiting director at Dewey forwarded the resume to Carol Sprague in New York with the note: "We have one Georgetown Law student graduating in May who would like to stay in DC." Carol forwarded the resume to Amy Fredenburg with the note: "I assume no, just passing it on." We received only the resume and transcript -- no cover letter. Because our incoming class is full, Amy treated Ms. Manafort's resume in the same manner that we treat other inquiries from recent grads -- with the standard rejection letter. Please let me know if you have any questions.
- Jen

---------------------------------------------------------------- *************************************************************

Confidential Treatment Subject to Rule 6(e)

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
****************************************************
****************************************************

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
****************************************************
============================================================================

Confidential Treatment Subject to Rule 6(e)

# Exhibit 10

**From:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Sent:** Tuesday, June 5, 2012 2:27 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** RE: Are you seeing Andrea Manafort today?

I met with her at 8:30 am and she just left. If all goes well, she will be returning for more formal interviews and we can get you on that schedule. Sorry, I did not know you were in the office today. I will call you after my I conclude a conference call (on now).

---

**From:** Craig, Gregory B (WAS)
**Sent:** Tuesday, June 05, 2012 9:25 AM
**To:** Ettinger, Mitchell S (WAS)
**Subject:** Are you seeing Andrea Manafort today?

Is she seeing anyone else? Do you think she should? Can I come say hello?

Confidential Treatment Subject to Rule 6(e)

# Exhibit 11

**From:** Paul Manafort [pmanafort@dmpint.com]
**Sent:** Wednesday, June 06, 2012 2:13 PM
**To:** Craig, Gregory B (WAS)
**Subject:** Re: getting together

Ok, first the good news. You have the third package in your account. So all is current.
Second, I have prepped everyone here that the schedule is the one that you gave to me. Given the breakthrough and co-operation, everyone understands and the pressure on me for early completion has ceased for now.
Third, I do want to catch up with you but don't want to do it while I am in Kyiv. Friday does work, preferably in the morning. Give me a time and a number and I will call you. It will take about 15 minutes to cover the items.
Fourth, on Andrea, she understands. I appreciate what has been done and am very grateful for your help.

---

**From:** "Craig, Gregory B" <Gregory.Craig@skadden.com>
**Date:** Wed, 6 Jun 2012 08:06:31 -0500
**To:** Paul Manafort <pmanafort@dmpint.com>
**Subject:** RE: getting together

Friday in NYC just doesn't work for me.  I am traveling to British Columbia on Thursday, working on Friday and through the week-end, flying from Vancouver to Kyiv -- via Amsterdam -- on Monday-Tuesday.   This should be our last fact-gathering mission to Ukraine . . .  if all goes according to plan.  The writing has already begun, but we have yet to complete the Tymoshenko side of things so we can't pretend to complete even a draft until we have explored the other side adequately.

We had two important meetings -- too early to say a break-through but maybe -- with counsel for the other side -- Sergiy Vlasenko -- last Thursday-Friday, and he says he will cooperate with us. We have asked for very specific things from their side by way of cooperation -- e.g. interviews documents, etc. -- and the body language is all good.  We have yet to see anything concrete, however, other than  a collection of CDs that purport to be tape recordings of the entire trial. This coming week will be the true test for them.

If you give me a time and a number in NYC, I can call you from Vancouver on Friday.

On the Andrea front, Mitch liked her as well.  This is an excellent development, something that is -- as we say in the law -- absolutely necessary but not sufficient.  I understand she is coming back for more interviews.  Keep fingers crossed.

---

**From:** Paul Manafort [mailto:pmanafort@dmpint.com]
**Sent:** Wednesday, June 06, 2012 2:45 AM
**To:** Craig, Gregory B (WAS)
**Subject:** getting together

Greg
My evening was out of control. Did not get back to my room until 100am.
Is it possible for us to have lunch in NY on Friday to finalize the last month?
BTW, the package arrived today. It is being forwarded to you this afternoon kyiv time.
Paul

PSS Andrea had a great meeting with your partner. She really liked him and his approach. Thank you for this. Words cannot

Confidential Treatment Subject to Rule 6(e)

properly express my appreciation.

---

-------------------------------------------------------------------- ****************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
****************************************************
****************************************************

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
****************************************************
==========================================================================

Confidential Treatment Subject to Rule 6(e)

# Exhibit 12

**From:** Paul Manafort [pmanafort@dmpint.com]
**Sent:** Tuesday, June 12, 2012 11:28 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Andrea Manafort Interviews

Greg
My daughter met with the several of your partners and associates today. I have listed their names below. She was impressed with the seriousness of the interviews and the treatment she received.
I do appreciate you getting this re-started.
Andrea was told that she will hear back from Skadden in the next week to 10 days.
Being a "pushy " father, I would appreciate anything more that can be done at this point.
As you have seen, Andrea is a very bright person who will generate quality work and be a productive associate for the firm. In addition, there is her ability to generate new clients.It goes without saying that I will push all future business to wherever Andrea lands. So, the four million dollar contract can be viewed as just the beginning. If you could impress this upon your partners in an appropriate way I would be grateful. I do believe Andrea can generate business from her network. I know that I will generate seven figure annual fees over the next several years, not only from Ukraine but from other business ventures of mine.
Finally, I want to emphasize that Andrea is not looking to start the new job now. She can start after the Bar results are published, or in January. Thus, she won't be that much "out of cycle".
If there is anything more I can do to help generate an offer to join Skadden, please let me know.
Again, thank you for getting Andrea into the process. You are a true friend.
Best
Paul

---

**From:** Andrea Manafort <amanafort@gmail.com>
**Date:** Tue, 12 Jun 2012 17:11:20 -0500
**To:** Paul Manafort <pmanafort@dmpint.com>
**Subject:** Skadden names

Met with Greg Craig and Mitch Ettinger previously.

TODAY I met with the following people (in this order)

SKADDEN PARTNERS
Jen Spaziano
Joe Barloon
Chuck Walker

ASSOCIATES
Geoffrey Wyatt
Colin Ram
Maya Florence
--

**Andrea Manafort**
Georgetown University Law Center, J.D. 2012

# Exhibit 13

**From:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Sent:** Thursday, June 21, 2012 9:28 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Re: Manafort

Correct.

Sent from my iPhone

On Jun 21, 2012, at 10:26 PM, "Craig, Gregory B (WAS)" <Gregory.Craig@skadden.com> wrote:

> Just to confirm: This is the memo to NYC explaining how and why we should give her an offer?
>
> **From:** Ettinger, Mitchell S (WAS)
> **Sent:** Thursday, June 21, 2012 4:25 PM
> **To:** Craig, Gregory B (WAS)
> **Subject:** Re: Manafort
>
> Ok. Write the memo.
>
> Sent from my iPhone
>
> On Jun 21, 2012, at 10:24 PM, "Craig, Gregory B (WAS)" <Gregory.Craig@skadden.com> wrote:
>
>> I would like us to make her an offer. She doesn't have to begin in September. She is willing to start, I think, in January. Start date would be up to you. But I think we can keep her busy.
>>
>> **From:** Ettinger, Mitchell S (WAS)
>> **Sent:** Thursday, June 21, 2012 4:44 AM
>> **To:** Craig, Gregory B (WAS)
>> **Subject:** Manafort
>>
>> Have you decided what you would like us to do?
>> Mitch

Confidential Treatment Subject to Rule 6(e)

# Exhibit 14

**From:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Sent:** Saturday, June 23, 2012 3:48 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Re: manafort memo

Thanks.

Sent from my iPhone

On Jun 23, 2012, at 4:16 PM, "Craig, Gregory B (WAS)" <Gregory.Craig@skadden.com> wrote:

> I will do it Monday.
>
> ---
>
> **From**: Ettinger, Mitchell S (WAS)
> **Sent**: Saturday, June 23, 2012 08:28 AM
> **To**: Craig, Gregory B (WAS)
> **Subject**: RE: manafort memo
>
> Greg, your memo is fine, but it needs a little more on the business front, which is the only factor that will matter to New York under these circumstances. What matters, how much has been billed, what is the expected duration of the matters and what is the liklihood of future business and what kind -- (e.g., what does position Paul holds and how is in position to direct business our way). If you send me a paragraph on these topics, I will finalize and get it done.
>
> ---
>
> **From:** Craig, Gregory B (WAS)
> **Sent:** Friday, June 22, 2012 7:12 PM
> **To:** Ettinger, Mitchell S (WAS)
> **Subject:** manafort memo

Confidential Treatment Subject to Rule 6(e)

# Exhibit 15

**From:** Craig, Gregory B (WAS) [/O=SKADDEN/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GCRAIG]
**Sent:** Saturday, June 23, 2012 12:12 AM
**To:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Subject:** manafort memo
**Attachments:** was1-1195424-1.doc

Confidential Treatment Subject to Rule 6(e)

MEMORANDUM

To:        Mitch Ettinger
From:      Greg Craig
Subject:   Andrea Manafort
Date:      June 21, 2012

You have asked me to draft a memorandum setting forth the reasons why I recommend offering Andrea Manafort a position as Associate in the Litigation Group of the Washington, D.C. office. I myself would make her an offer for reasons that I outline below, but a group of six partners and associates also interviewed Andrea. Five of the six concluded that she should either "definitely receive an offer, or that she should be given "strong consideration."

Andrea just graduated from Georgetown Law School. Her transcript is attached. She is spending this summer preparing for and taking the D.C. Bar. She would be available to start work either in the Fall or in January 2013, if that is more convenient for the firm.

In the ordinary recruiting cycle -- interviews, summer associate status, offer of employment, *etc.* -- she is out of step with others in her class through no fault of her own. Last Summer, she worked for Dewey LeBeouf in New York City. Dewey gave her an offer of employment, to begin work as an associate this coming Fall. She accepted and made plans accordingly. Needless to say, Dewey's collapse has pulled the rug out from under her personally and professionally. She now wants to practice in DC, and she very much wants to work at Skadden.

How did Andrea Manafort come to my attention? In recent months, her father and I have been working very closely on a large matter that he brought to the firm. (His project has been keeping four partners and four associates busy for the past three months.) He explained Andrea's situation to me and asked if his daughter could come to me for advice. It was a perfectly natural request, and I agreed to talk to her.

I did interview Andrea and came away thinking four things: (1) Andrea is very personable and engaging, an agreeable and charming young woman. She would be a strong member of any team. (2) Andrea is also very smart and, more than that, she has extraordinary people/communication

1

Confidential Treatment Subject to Rule 6(e)

skills.  (All six of the Skadden interviewers gave her a grade of "Very Good" in the "Communication Skills" category.)  (3)  She is also one ambitious young lady.  She will work hard to succeed here.  (4)  If she had come to Skadden as a summer associate, I feel pretty confident that she would have been offered a job here.

It was my idea to bring her into the firm for interviews, and I cautioned her not to get her hopes up.  The interviewers found her to be "an easy-going personality . . . very mature and capable . . . very motivated . . . a good fit . . . personable  . . . and with good experience."  Some of the interviewers worried about her grades being "a little lower than we like."  One of her most enthusiastic supporters wrote, "[H]er transcript doesn't blow me away . . . That's my basis for 'strong consideration' rather than 'definite offer'."

My own thoughts on this point are these:  (1) Her third year at Georgetown is what brings down her GPA; and (2) Andrea may have let down a bit in that year thinking (understandably) that her career was secure and she could take it easy.

I guess the final factor here involves future business.  Her father, Paul Manafort, is thrilled with the firm's performance for him and his clients, and he will likely refer significant business to us in the future.  That likelihood becomes a certainty if we have Andrea working here.

In sum, I recommend that we give Andrea an offer.  My prediction is that she will do very well here, that she will be a fast learner and that she will be well-liked.  I think there is virtually no chance that she will disappoint, but if she does -- for whatever reason -- there is nothing to prevent us from giving her a very early warning.

Thank you for the chance to make the case.

Confidential Treatment Subject to Rule 6(e)

SAU 158270
USA-REL-0158474

3

Confidential Treatment Subject to Rule 6(e)

# Exhibit 16

**From:** Craig, Gregory B (WAS) [/O=SKADDEN/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GCRAIG]
**Sent:** Monday, June 25, 2012 10:23 PM
**To:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Subject:** Andrea Manafort
**Attachments:** was1-1195424-1.doc

I leave for Ukraine tomorrow, but am available on email at any time.

Confidential Treatment Subject to Rule 6(e)

MEMORANDUM

To:        Mitch Ettinger
From:      Greg Craig
Subject:   Andrea Manafort
Date:      June 21, 2012

You have asked me to draft a memorandum setting forth the reasons why I recommend offering
Andrea Manafort a position as Associate in the Litigation Group of the Washington, D.C. office.
I myself would make her an offer for reasons that I outline below, but a group of six partners and
associates also interviewed Andrea.  Five of the six concluded that she should either "definitely
receive an offer, or that she should be given "strong consideration."

Andrea just graduated from Georgetown Law School.  Her transcript is attached.  She is
spending this summer preparing for and taking the D.C. Bar. She would be available to start
work either in the Fall or in January 2013, after the results of the bar examination are known, if
that is more convenient for the firm.

When it comes to the ordinary recruiting cycle, Andrea is out of step with others in her cohort.
This is through no fault of her own.  Last Summer, she worked for Dewey LeBeouf in New York
City.  Dewey was pleased with her performance and gave her an offer of employment -- to begin
work as an Associate in Dewey's New York office this coming Fall.  She accepted and made
plans accordingly.  Needless to say, Dewey's collapse has pulled the rug out from under her
personally and professionally.  She now wants to practice in DC, and she very much wants to
work at Skadden.

How did Andrea Manafort come to my attention?  In recent months, her father and I have been
working very closely on a large matter that he helped bring to the firm.  (His project has been
keeping four partners and five associates busy for the past three months.  The firm has been paid
an advance retainer of $3 million for this project – against which we have already charged $1.6
million in time and expenses – and we will receive another $1 million on June 29, 2012, making
the total enterprise a $4 million project over a four month period.)  He explained Andrea's

1

situation to me and asked if his daughter could come to me for advice.  It was a perfectly natural request, and I agreed to talk to her.

I did interview Andrea and came away thinking four things:  (1) Andrea is very personable and engaging, an agreeable and charming young woman.  She would be a strong member of any team.  (2)  Andrea is also very smart and, more than that, she has extraordinary people/communication skills.  (All six of the Skadden interviewers gave her a grade of "Very Good" in the "Communication Skills" category.)  (3)  She is also one ambitious young lady.  She will work hard to succeed here, and she has the potential – given her father's network – to bring in a lot of business.  (4)  If she had come to Skadden as a summer associate, I feel pretty confident that she would have been offered a job here.

It was my idea to bring her into the firm for interviews, and I cautioned her not to get her hopes up.  The interviewers found her to be "an easy-going personality . . . very mature and capable . . . very motivated . . . a good fit . . . personable  . . . and with good experience."  Some of the interviewers worried about her grades being "a little lower than we like."  One of her most enthusiastic supporters wrote, "[H]er transcript doesn't blow me away . . . That's my basis for 'strong consideration' rather than 'definite offer'."

My own thoughts on this point are these:  (1) Her third year at Georgetown is what brings down her GPA; and (2) Andrea may have let down a bit in her final year thinking (understandably) that her near-term future was secure and she could take it easy.

I guess a final factor here – but perhaps one of the most important – is the potential for significant future business.  Andrea's father is Paul Manafort, one of the top Republican lobbyists in Washington, D.C.  He has been working in Republican politics for almost forty years.  He has very close connections with Republican contributors arising from his own involvement in every presidential campaign since 1980.  With that history and those connections, Paul built one of the most successful lobbying operations in D.C. history – Black, Manafort, Stone and Kelly – which merged with another firm in 1996.  Paul has said that he would like to strengthen his relationship with Skadden, and he is likely to throw a lot of work our way if Andrea comes to

2

Confidential Treatment Subject to Rule 6(e)

Skadden.  (I honestly have no idea, concretely, what that work could amount to on an annual basis, but it has the potential to be significant.)  Paul is thrilled with the firm's performance for him and his clients to date, and, as I say, he will likely refer significant business to us in the future.  That likelihood becomes a certainty if we have Andrea working here.  More than that, I think, is Andrea's own ability to generate business.  She has real ambition herself, and because of her last name, she (by herself and through her father's network) will likely attract more significant new business for the firm than the ordinary first year associate.

In sum, I recommend that we give Andrea an offer.  My prediction is that she will do very well here, that she will be a fast learner and that she will be well-liked.  I think there is virtually no chance that she will disappoint, but if she does -- for whatever reason -- there is nothing to prevent us from giving her a very early warning.

Thank you for the chance to make the case.

Confidential Treatment Subject to Rule 6(e)

SAU 158275
USA-REL-0158479

# Exhibit 17

**From:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Sent:** Tuesday, June 26, 2012 2:08 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Firm Confidential (Andrea Manafort)

**Importance:** High

Greg,
Thank you for the memo. I placed it in a memo format and made some changes, keeping your substance (see below). If this is ok with you, I will submit it today with a recommendation that we make an offer, which I understand will be approved.

<u>CONFIDENTIAL</u>

M E M O R A N D U M

June 26, 2012

TO: DC Litigation File
FROM: Greg Craig

Re: <u>Associate Offer to Andrea Manafort (Class of 2012)</u>

In response to your request, this memorandum sets forth the reasons why I recommend offering Andrea Manafort a position as an associate in the Litigation Group of the Washington, D.C. office.

Andrea graduated from Georgetown Law School in May 2012. Her resume and transcript are attached. She is spending this summer preparing for the bar examination. She would be available to start work either in the Fall or in January 2013, whichever is more convenient for the Firm.

Andrea comes to us out of the ordinary recruiting cycle through no fault of her own. Last Summer, she worked for Dewey LeBeouf in New York City. Dewey was pleased with her performance and gave her an offer of employment -- to begin work as an associate in Dewey's New York office this coming Fall. She accepted and made plans accordingly. Needless to say, Dewey's collapse has pulled the rug out from under her personally and professionally. She now wants to practice in D.C., and very much wants to work at Skadden.

I learned of Andrea's predicament from her father, Paul Manafort. In recent months, her father and I have been working very closely on a large matter that he helped bring to Skadden (155710/0001). This engagement has kept four partners and five associates busy for the past three months. The Firm was paid an advance retainer of $3 million for the engagement – against which we already have charged $1.6 million in time and expenses. We will receive an additional $1 million on June 29, 2012, making this a $4 million engagement that will be completed in just four months. He explained Andrea's situation to me and asked if his daughter could come to me for advice. It was a perfectly natural request, and I agreed to talk to her.

By way of further background, Andrea's father is one of the top Republican lobbyists in Washington, D.C. Paul has been working in Republican politics for almost forty years. He has very close connections with Republican contributors arising from his own involvement in every presidential campaign since 1980. With that history and his connections, Paul has established one of the most successful lobbying operations in D.C. history – Black, Manafort, Stone and Kelly – which merged with another firm in 1996. Paul has said that he would like to strengthen his relationship with Skadden, and he is likely to direct a lot of work our way if Andrea comes to Skadden.

I met with Andrea and came away thinking four things: (1) Andrea is very personable and engaging, an agreeable and charming young woman. She would be a strong member of any team; (2) Andrea is very smart

and, more than that, she has extraordinary people/communication skills. (All those who subsequently interviewed Andrea agree with this assessment); (3) Andrea is an ambitious young lady. She will work hard to succeed here, and she has the potential – given her father's network – to generate business; and (4) If she had been afforded an opportunity to be a summer associate at Skadden, she would have excelled and been given an offer to join the firm.

After meeting Andrea, I raised the prospect within the DC Litigation group of bringing her in for formal interviews. Before raising this prospect with the group, I asked Mitch Ettinger to meet with her, which he did. Thereafter, Mitch set up interviews with six individuals in our group, partners, counsel and associates. Five of the six recommended either that she "definitely receive an offer, or be given "strong consideration." My colleagues found her to be "an easy-going personality . . . very mature and capable . . . very motivated . . . a good fit . . . personable . . . and with good experience."

In sum, I recommend that the Firm extend an offer to Andrea. My prediction is that she will do very well here, that she will be a fast learner and that she will be well-liked. I think there virtually is no chance that she will disappoint. As explained above, from a business perspective, the upsides are considerable. I honestly cannot state concretely the amount of work I would anticipate on an annual basis, but it has the potential to be significant. Paul is thrilled with the firm's performance to date and is likely to refer significant additional business to us in the future. That likelihood becomes a certainty if we have Andrea working here. More than that, I truly believe that Andrea, due to her surname and her father's connections, will be able to assist us in obtaining new matters as well.

Thank you for the chance to make the case.

Confidential Treatment Subject to Rule 6(e)

Exhibit 18

**From:** Zornow, David M (NYC) [David.Zornow@skadden.com]
**Sent:** Wednesday, June 27, 2012 11:04 PM
**To:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**CC:** Mahoney, Colleen P (WAS) [Colleen.Mahoney@skadden.com]; Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Re: Andrea Manafort

You can tell Howard Ellin when you pursue those channels that I'm supportive.


On Jun 27, 2012, at 5:36 PM, "Ettinger, Mitchell S (WAS)" <Mitchell.Ettinger@skadden.com> wrote:

> David,
> As discussed at the DC Lit review meeting, attached is a memo from Greg Craig recommending that the Firm offer Andrea Manafort an associate position in our group. For the reasons articulated by Greg, we support the proposal and seek the Firm's approval to extend an offer to Andrea. Your assistance in pushing this forward is greatly appreciated.
> With warm regards from Germany.
> Mitch

Confidential Treatment Subject to Rule 6(e)

# Exhibit 19

**From:** Ettinger, Mitchell S (WAS) [Mitchell.Ettinger@skadden.com]
**Sent:** Thursday, June 28, 2012 5:05 PM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Re: Andrea Manafort

I will take care of it.

Sent from my iPhone

On Jun 28, 2012, at 6:04 PM, "Craig, Gregory B (WAS)" <Gregory.Craig@skadden.com> wrote:

> If someone could give her a call today or tomorrow, that would be really great.

> **From:** Ettinger, Mitchell S (WAS)
> **Sent:** Thursday, June 28, 2012 01:47 AM
> **To:** Ellin, Howard L (NYC)
> **Cc:** Fredenburg, Amy (WAS); Sprague, Carol Lee H (NYC); Zornow, David M (NYC); Mahoney, Colleen P (WAS); Craig, Gregory B (WAS)
> **Subject:** FW: Andrea Manafort

> Howard,
> The DC Lit Department seeks authorization to make an offer to Andrea Manafort to join our fall class of associates. Andrea is a 2012 graduate from Georgetown, who had intended to join Dewey in New York before its collapse. Her father, Paul Manafort, has directed business to the Firm through Greg Craig. As you will see from the attached memo from Greg, he (and we) believe that extending an offer to Andrea is a win-win situation. First, although her grades were a little lower than we would like, she is smart and interviewed well. We think she will be an asset to the Group and be well liked. Second, her presence increases our chances of securing additional business through Mr. Manafort. He has expressed his gratitude to Greg for entertaining Andrea's application. Lastly, given this young lady's predicament, we feel that Skadden would be providing her with an opportunity to salvage the start of her career. Greg spells out our thinking in the memo. Colleen and I raised this issue with Eric Friedman and David Zornow during the recent semi-annual review. David has reviewed the attachments and supports this effort. We believe that Eric also will be supportive. Although I am in Germany for the next few days at a client site, I am available to speak at your convenience if you have any questions.
> Please let us know whether the Firm will authorize us to proceed.
> With warm regards.
> Mitch

Confidential Treatment Subject to Rule 6(e)

# Exhibit 20

**From:** Paul Manafort [pmanafort@dmpint.com]
**Sent:** Friday, June 29, 2012 10:56 AM
**To:** Craig, Gregory B (WAS) [Gregory.Craig@skadden.com]
**Subject:** Re: You are the MAN

Works for me. Either number at that time will work.
Btw, Andrea was still sky high at 1000pm last night. Thank you so much

---

**From:** , Gregory B <Gregory.Craig@skadden.com>
**To:** Paul Manafort <pmanafort@dmpint.com>
**Subject:** Re: You are the MAN

How about Sunday afternoon around 5 pm?

---

**From:** Paul Manafort [mailto:pmanafort@dmpint.com]
**Sent:** Friday, June 29, 2012 05:50 AM
**To:** Craig, Gregory B (WAS)
**Subject:** Re: You are the MAN

Have a safe trip home. I am available over the weekend. Can be reached on my cell ███████ or my summer home ███████. As you figure your schedule out, drop me a note as to the time that is convenient to call and I will be available.
P

---

**From:** , Gregory B <Gregory.Craig@skadden.com>
**To:** Paul Manafort <pmanafort@dmpint.com>
**Subject:** Re: You are the MAN

I am very glad this worked out for Andrea. Skadden is a classy place, I think. She will enjoy working with us, and we are lucky to have her.

I am leaving Kyiv in three hours, back to NYC and a funeral in Maine on Saturday morning. Can I call you over the weekend? If so, tell me which, number to use and when. I will be traveling in New England.

---

**From:** Paul Manafort [mailto:pmanafort@dmpint.com]
**Sent:** Thursday, June 28, 2012 01:02 PM
**To:** Craig, Gregory B (WAS)
**Subject:** You are the MAN

Greg
Andrea received a call from Skadden today offering her employment as part of the associate class beginning in October.
I cannot thank you enough for helping andrea get this fantastic opportunity. You are the best.
Call me when you are out of ukraine so we can catch up. I have a number of things to update you on.
Paul

PS I assume you are a bit numb right now from your activity today. I am certain you had a day like no other in your life.

--------------------------------------------------------------------------   ********************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
********************************************************
********************************************************

   SAU 158398

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
**************************************************
========================================================================

--------------------------------------------------------------- ******************************************************

To ensure compliance with Treasury Department regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this message was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matters addressed herein.
**************************************************
**************************************************

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.
**************************************************
========================================================================

Confidential Treatment Subject to Rule 6(e)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**UNITED STATES OF AMERICA**

*v.*

**GREGORY B. CRAIG**,

      *Defendant.*

</td><td>

**Case No. 1:19-cr-0125 (ABJ)**

</td></tr>
</table>

**[PROPOSED]**
**ORDER**

Upon consideration of Defendant Gregory B. Craig's Motion In Limine to Exclude 404(b) Evidence, it is hereby

**ORDERED** that the Motion is **GRANTED**.  It is further

**ORDERED** that, at trial, the Government is precluded from offering evidence related to Skadden's hiring of Andrea Manafort.


Dated: _____          _____

AMY BERMAN JACKSON
United States District Judge