## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| | : |
| | : |
| **UNITED STATES OF AMERICA** | : |
| | : |
| **v.** | : **Case No. 1:19-CR-00125 (ABJ)** |
| | : |
| **GREGORY B. CRAIG,** | : |
| | : |
| **Defendant.** | : |
| | : |
| | : |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS COUNT ONE

In 2012, Defendant Gregory B. Craig acted as an agent of Ukraine, but failed to register as such under the Foreign Agents Registration Act, 22 U.S.C. § 611 et seq. (FARA).  In December 2012, the Department of Justice, National Security Division's FARA Unit, which enforces and administers the law, began an inquiry into whether Defendant and his law firm were obligated to register.  In response to the FARA Unit's official inquiry, Defendant made a series of carefully crafted false and misleading affirmative statements, along with a series of material omissions, specifically designed to conceal his registrable activity, under the FARA statute, from the FARA Unit.  For these acts, on April 11, 2019, a federal grand jury in the District of Columbia returned a two-count indictment.  Count One of the indictment, which is the subject of Defendant's motion, charges Defendant with a false statements scheme in violation of 18 U.S.C. § 1001(a)(1).

Defendant contends that Count One should be dismissed because he had no duty to be truthful and complete when responding to the FARA Unit's inquiry, and because some of the acts in his six-month-long scheme occurred outside the applicable statute of limitations.  These contentions are meritless, and his motion should be denied.

## SUMMARY

The indictment alleges that Defendant and his law firm engaged in activity in 2012 on behalf of Ukraine that triggered an obligation under FARA that they register as agents of Ukraine. In December 2012, the FARA Unit initiated an official inquiry to determine whether Defendant and his law firm had acted as Ukraine's agents. The FARA Unit addressed a letter to Defendant's law firm requesting that it provide information "[i]n order that we may determine whether your organization is required to register under FARA." Indictment, ECF No. 1, ¶ 51. Defendant was not required to respond to the FARA Unit's inquiry and could have accepted the consequences thereof—including that the FARA Unit could summarily determine that Defendant was obligated to register as an agent of Ukraine and take legal steps to require him to do so. But when Defendant chose to respond to the FARA Unit's targeted questions about his activities regarding Ukraine— which called for the very information that would be determinative of whether Defendant was in compliance with his statutory obligations under FARA—the statute imposed upon him a duty "to provide material information and not to willfully make misleading statements or omit material facts" necessary to determining whether Defendant and his firm were obligated to register. Indictment ¶ 52. The indictment alleges that, over a six-month period spanning to early 2014, Defendant violated that duty by knowingly and willfully falsifying and concealing material facts from the FARA Unit in an effort to avoid being forced to register as a foreign agent of Ukraine.

Defendant's first argument—that he had no duty to disclose material information to the FARA Unit upon responding to its inquiry—incorrectly rests on *United States v. Safavian*, 528 F.3d 957 (D.C.C. 2008), an inapposite case in which the defendant was charged with concealing information from an agency ethics official from whom he voluntarily sought an ethics opinion, and from a GSA agent, and in which the government was not able to articulate any duty to disclose

other than "standards of conduct for government employees" and general principles of behavior. *Id*. at 964-965.  In contrast, Defendant's duty—explicitly alleged in the indictment at Paragraph 52—arose from FARA and the FARA Unit's inquiry, and required him to disclose all responsive facts material to the FARA Unit's targeted review when he elected to respond.  Significantly, Defendant's motion completely fails to acknowledge that the scheme with which he is charged involved not only concealment, but also affirmative false statements.  Because the government need not establish a duty with respect to false statements in a § 1001(a)(1) scheme, Count One stands irrespective of whether Defendant had a duty not to omit material information responsive to the FARA Unit's inquiry.

Defendant's alternative argument—that some or all of Count One of the indictment is time barred—also fails.  The law does not absolve Defendant from being held criminally accountable for violating his duty of truthful disclosure by virtue of the fact that his false statements and material omissions occurred over several months, both outside and within the applicable limitations period.

Count One of the indictment clearly, properly, and timely charges Defendant with a scheme to make false statements to and conceal material information from the FARA Unit.  Defendant's motion should be denied.

## THE INDICTMENT

I.   **The Factual Allegations Establishing Craig's Scheme to Make False Statements to and Conceal Facts from the FARA Unit**

A.   **The Skadden Report**

In early 2012, Ukraine faced extensive international criticism that its 2011 prosecution of former Ukrainian Prime Minister Yulia Tymoshenko had been politically motivated and unfair. Indictment, ECF No. 1, ¶ 6.  As part of a public relations strategy headed by Paul Manafort, Jr.,

3

Ukraine commissioned a report (the Report) by Defendant and his law firm, Skadden, Arps, Slate, Meagher & Flom (Skadden), to conduct an "independent" inquiry into whether, under Western standards of justice, Tymoshenko had received a fair trial.  *Id.* ¶ 7.

Defendant, a Skadden partner who had previously held government positions, was adamant from the outset that he did not want to register under FARA as an agent of Ukraine.  *Id.* ¶¶ 1, 8, 14-15.  For instance, in February 2012, before he had agreed to undertake the project, Defendant wrote to his fellow Skadden partner, Cliff Sloan, and stated, "I don't want to register as a foreign agent under FARA.  I think we don't have to with this assignment, yes?"  *Id.* ¶ 8.  Defendant was also aware, from very early in the project, that the Report was part of Ukraine's public relations strategy; indeed, on April 13, 2012, Defendant again raised FARA with Sloan, this time focusing in particular on its public relations implications: "We really need advice very soon on FARA. Specifically, they have asked for PR advice.  Can we designate one person on the team to be the FARA registrar without requiring all of us to register?"  *Id.* ¶ 14.  Sloan suggested consulting Kenneth Gross, a Skadden partner who had experience with FARA, and Defendant replied, "I don't really care who you ask but we need an answer from someone who we can rely on with a straight face."  *Id.*  The following day, a Skadden associate relayed Gross's advice to Craig and Sloan, writing that "if we were to perform public relations work aimed at the US, if our London lawyers were to do so, or if we were to subcontract with a PR firm to do so, then we would be obligated to register under FARA."  *Id.* ¶ 15.

The principal funding for the Report came not from Ukraine's government, but from a private citizen of Ukraine who first provided a $150,000 preliminary retainer, and then agreed to pay an additional $4 million for the complete project after meeting with Defendant in Kiev, Ukraine in April 2012.  *Id.* ¶¶ 11-12.  None of the official documents exchanged between Skadden

and Ukraine revealed this, however.  The formal engagement letter that Defendant signed for the Ministry of Justice of Ukraine was silent on the issue, and the Ukrainian Ministry of Justice drafted a contract that gave the false impression that the total fee for Defendant and Skadden's work would be the equivalent of $12,000 U.S. Dollars.  *Id.* ¶ 13.  The private Ukrainian citizen made the initial $150,000 payment in March 2012.  *Id.* ¶ 11.  He routed the additional $4 million dollars to Skadden and Defendant though a shell account in Cyprus that Manafort controlled.  *Id.* ¶ 23.

Defendant was sensitive about Ukraine's public image, and in April and May of 2012, he advocated that Ukraine hire a particular public relations firm, FTI Consulting (FTI), which Defendant stated in a set of talking points on May 7, 2012, would "be with us in the battle" in which Ukraine was "taking a public relations hit every day in every Western publication…." *Id.* ¶ 18.  Ukraine did hire FTI, and though Defendant worked in concert with the public relations firm, he rejected the suggestion that FTI subcontract to Skadden because he understood that doing so might require registration under FARA.  As he explained in a May 29, 2012 email to an FTI executive, "I have been clear that we cannot run close to the FARA line and if we were seen as hiring and directing FTI we would be doing much more than just lawyering." *Id.* ¶¶ 18-20.

It was not just Ukraine's public image that concerned Defendant—he was also worried that the Report would not be perceived as independent, and he understood that the Report's value to Ukraine was that it appear independent.  For instance, at the end of July 2012, Defendant exchanged emails with Manafort about a feared leak of the draft Report.  Defendant wrote, "the worst thing that could happen to the project, to this law firm, to your guy and to me would be to have someone on your side falsely leak a story that 'Skadden Finds Tymoshenko Guilty' 'Skadden Report Exonerates Ukraine.'  That kind of story would be a disaster.  We have to join arms to get something just a little more nuanced.  Yes?" *Id.* ¶ 21.  As the initial planned release of the Report

neared in August 2012, Defendant put on hold another project for which Ukraine had retained Skadden—consulting on Tymoshenko's second trial—because he was concerned that if the consulting project became public before the Report was released, it "would do enormous damage to the credibility of [the Report]." *Id*. ¶ 22.

The obscure nature of the funding for the Report became a topic of controversy in Ukraine in the summer of 2012. On August 9, 2012, the *Kyiv Post* ran an editorial titled "Skadden Stink," in which it noted that the only publicly available figure for the project was the $12,000 contemplated in the Ministry of Justice contract, and stated, "These facts fuel speculation that Skadden is being paid by someone on the side. No one knows who is paying Skadden, and it's a question the company is ignoring. So the public may never know of the conflicts of interest, or worse things, that may lurk behind this arrangement." *Id*. ¶ 24. Sloan forwarded the editorial to Defendant and wrote, "We really need to get them to disclose the funding." *Id*. ¶ 25. Defendant responded that he had told Manafort as much, and Sloan reiterated the concern to Defendant the following day. *Id*.

On August 15, 2012, Defendant notified Manafort that the private Ukrainian's citizen's answer to whether his role in funding the Report could be made public was a "firm and unqualified 'No.'" *Id*. ¶ 26. As a result, Manafort and Defendant immediately began to discuss a "payment mechanism" designed to create the false appearance that Ukraine was paying a reasonable fee for the Report. *Id*. First, Manafort asked, "Is the number $1,300,000 good for official submission?" *Id*. Defendant responded by suggesting "$250,000 per month which is either $1.25 million or $1.5 million." *Id*. Manafort said he would tell "them 1.250." *Id*. Next, at Manafort's direction, on August 22, 2012, Defendant drafted a letter on Skadden letterhead that falsely claimed an outstanding balance for work on the Report from April-August amounting to $1.25 million; this

was despite the fact that Skadden had not used all of the $4,150,000 provided by the private Ukrainian funder, and that the Report was nearly complete. *Id*. ¶¶ 27, 29.  The following day, Manafort sent Defendant a letter drafted by Ukraine that purported to justify the additional cost of the project and directed Defendant to back-date it. *Id*. ¶ 27.  Defendant did as Manafort instructed, back-dating the purported justification letter more than four weeks to July 16, 2012, and signing it personally.  *Id*.  None of these documents were entered into Skadden's formal accounting system. *Id*.

In late August, in connection with the planned imminent release of the Report (which was subsequently delayed until December), Defendant started to receive public relations materials concerning the rollout of the Report.  On August 28, 2012, he received a package of FTI documents that contemplated that the day before the Report's release, Defendant would provide "[m]edia briefings" to journalists. *Id*. ¶ 28.  On September 13, 2012, Manafort sent Defendant another draft public relations plan, stating that he wanted to "bring [Defendant's] thinking into the process." *Id*. ¶ 30.  The plan Manafort sent to Defendant stated that the Report would "provide an opportunity for the independent endorsement of the Government message" that Tymoshenko's trial was not politically motivated.  *Id*.  The plan proposed leaking the Report to a select media publication, having Vin Weber, a lobbyist working for Ukraine, pre-brief the selected journalist on the Report, and then ensuring that the selected journalist receive an off-record briefing call with Defendant. *Id*. ¶ 30.  On September 23, 2012, Defendant met with Manafort, an FTI executive, and others in New York City. *Id*. ¶ 31.  At the meeting, consistent with the public relations plan Manafort had sent him ten days earlier, Defendant agreed to provide a copy of the Report and a briefing to a selected reporter; he then suggested that the selected reporter be David Sanger of the *New York Times*, whom Defendant knew.  *Id*.  Defendant also agreed to provide background, off-the-record

briefings to other reporters in connection with the Report's release. *Id.* The following day, Defendant sent an email to Manafort and FTI suggesting that Skadden policy prevented him from "backgrounding" journalists.[1] *Id.* ¶ 32. Nonetheless, Defendant then began to take some of the public relations steps to which he agreed at the September 23, 2012 meeting. On October 2, 2012, Defendant emailed Sanger and asked him if he would take a call from Weber regarding the Report. *Id.* ¶ 33. When Sanger replied affirmatively, on October 3, 2012, Defendant sent Sanger's contact information to Weber and directed his assistant to have a copy of the draft Report delivered to Weber's office. *Id.*

The release of the Report was then delayed until December 2012, but when its rollout preparations resumed several weeks later, Defendant also resumed his efforts in furtherance of Ukraine's public relations strategy. *Id.* ¶¶ 36-41. Consistent with Defendant's agreement at the September 23, 2012 meeting in New York, FTI's media plan envisioned a role for Defendant in providing an exclusive advance copy of the Report and an interview to Sanger. *Id.* ¶ 36. It also contemplated that Defendant would provide an interview to a reporter for the *Telegraph*, a newspaper in the United Kingdom. *Id.*

Consistent with this public relations plan, on December 10, 2012, David Hawker of FTI emailed Sanger, stating, "I'm working with Greg Craig of Skadden (who I understand you know well) and his client, the Ukrainian Ministry of Justice, on a report Greg has written on the Tymoshenko prosecution." *Id.* ¶ 37. Hawker then offered an exclusive copy of the Report and briefing with Defendant. *Id.* Hawker forwarded his email to Sanger to Defendant, and Defendant

---

[1]     Defendant's emails with Manafort on this topic reflect Manafort pushing the boundaries of this policy. Defendant's motive and intent to do as directed by Manafort is a central aspect of this case, as discussed further in the government's notice of its intention to introduce evidence under Rule 404(b), ECF No. 22, and Reply and Response in Opposition to Defendant's Response and Motion *in Limine* to Exclude Government's Proposed 404(b) Evidence, which is being filed today.

followed up with an email of his own to Sanger on December 11, 2012, writing that Ukraine planned to release the Report later that week, and "that the Ukrainians have determined that you should be given first look at it." *Id*. ¶ 38.  Defendant then told Sanger that he would "be happy to get you a copy . . . and even happier to talk to you about it." *Id*.  Defendant apprised Hawker of his efforts with Sanger, and Hawker responded, "Thank you.  They are pressing me for reassurance here so any update would be very welcome.  I hope the chat goes well." *Id*.

Defendant then spoke to Sanger about the Report and personally hand-delivered a copy to Sanger's home in Washington, D.C. *Id*. ¶ 39.  He also reassured Hawker that if Sanger decided not to write an article on the report, there would be additional time before the Report's public release to reach out to other U.S. media outlets. *Id*. ¶ 39.  On December 12, 2012, Defendant provided an interview to Sanger's *New York Times* colleague, David Herszenhorn, and sent Sanger an on-the-record quotation to be included in the article. *Id*. ¶ 40.  In addition, consistent with FTI's media plan, Defendant gave an interview to a reporter from the *Telegraph*. *Id*. ¶ 41.  Shortly before the Report's public release by Ukraine, the *New York Times* published Sanger and Herszenhorn's article on December 12, 2012.  It included Defendant's quotation and stated that the Report's authors "seemed to side heavily with the government of President Viktor F. Yanukovich, which commissioned their report." *Id*. ¶ 41.  After the Report's release on December 13, 2012, Skadden separately responded to inquiries from reporters at the *Los Angeles Times* and the *National Law Journal*. *Id*. ¶¶ 43-44.

On December 13, 2012, Manafort sent Defendant a congratulatory email, stating that the Report's "initial rollout has been very effective and your backgrounding has been key to it all.  At least today, everyone in Kyiv is quite happy.  They liked the Report and are especially happy with the way the media is playing it." *Id*. ¶ 45.  On the same day, in her daily press briefing, State

Department spokesperson Victoria Nuland criticized the Report and its conclusions, stating that "Skadden Arps lawyers were obviously not going to find political motivation if they weren't looking for it.  The report also fails to consider the selective nature of the trials . . . . whoever commissioned this study, whatever the mandate for the study was, it was incomplete and doesn't give an accurate picture."[2]

## B.  Defendant's False and Misleading Statements and Material Omissions

On December 18, 2012, the FARA Unit sent a letter to Skadden advising that the firm's work on behalf of Ukraine may require it to register as an agent.  *Id.* ¶ 51.  The letter was titled "Possible Obligation to Register Pursuant to the Foreign Agents Registration Act" and clearly cited the FARA statute by title and code, asking Skadden to provide it with four categories of information "[i]n order that we may determine whether your organization is required to register under FARA".  *Id.* (incorporating letter, Exhibit 1, by reference).[3]  The FARA Unit also indicated that it was enclosing with its letter a copy of the FARA statute and concluded that it expected a "prompt and thorough response to our inquiry."  *Id.*

On February 6, 2013, Defendant responded on behalf of Skadden to the FARA Unit's initial letter, describing, among other things, that Skadden's April 2012 engagement letter for the Report had specified that the firm would not perform activities that required it to register under FARA.  *Id.* at 53; *see also* Exhibit 2.

---

[2]     Transcribed remarks posted on the U.S. Department of State website: https://2009-2017. state.gov/r/pa/prs/dpb/2012/12/202021.htm.  The Court may take judicial notice of material posted on official public websites of government agencies.  *See Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013).

[3]     The government is attaching the correspondence between Defendant and the FARA Unit as Exhibits 1-6.

In response, on April 9, 2013, the FARA Unit sent Defendant a follow-up letter, again titled "Possible Obligation to Register Pursuant to the Foreign Agents Registration Act."  *Id*. ¶ 54 (incorporating letter, Exhibit 3, by reference).  This correspondence advised Defendant that the Unit had reviewed his previous submission and needed "additional information to determine whether your firm is obligated to register under the Act."  *Id*.  The letter then asked a series of questions designed to determine this possible obligation, including, "To whom, if anyone, did your firm release or distribute the report and when?"; what had been Skadden's understanding of "what would happen to the report when it was released to the Ukrainian Ministry of Justice?"; and "Did you or anyone in your firm have any media interviews or comments to the media, public, or government officials about the report and the findings of your firm?"  *Id*.  The letter also asked for the identity of the private Ukrainian who had provided funding for the project, and what amount he had paid Skadden.  *Id*.

On June 3, 2013, Defendant responded with a letter containing several affirmative false and misleading statements and material omissions.  *Id*. ¶ 56 (incorporating letter, Exhibit 4, by reference).  These included:

- Regarding his distribution of the Report, Defendant misleadingly claimed that in addition to giving the report to "representatives of the Government of Ukraine," the firm had on December 12-13, 2012, "provided a copy of the report to (1) [Tymoshenko's legal team]; (2) [a representative of the private Ukrainian funder]; (3) David Sanger of the New York Times" and the two publications with which Skadden had communicated after the Report's public release.  *Id*. (incorporating entire letter by reference).

- Regarding the firm's understanding of what would happen to the Report when it was released to the Ukrainian Ministry of Justice, Defendant falsely claimed that the firm had not advised the Ministry on that issue.  *Id*.

- Regarding media interviews or comments about the report, Defendant misleadingly claimed that he had only "provided brief clarifying statements about the report to David Sanger of the New York Times" and the other journalists who inquired after the Report's release.  He wrote that "[o]ne purpose of the statements was to correct misinformation that

11

the media had received – and was reporting – from the Ministry of Justice and from the Tymoshenko legal team in Ukraine." *Id.*

The letter also declined to provide any additional information about the private Ukrainian or his funding of the Report. *Id.*

Based on the information provided in Defendant's June 3, 2013, letter—misleading and incomplete though it was—the FARA Unit determined that Defendant's actions required Skadden to register as Ukraine's agent, and informed him by letter on September 5, 2013. *Id.* ¶ 58. In particular, the letter pointed out that Ukraine had paid for the Report, which the firm had then distributed to the media, and about which Defendant spoke to journalists. *Id.* (incorporating letter, Exhibit 5, by reference). The letter concluded that "[t]he dissemination of the report to the media and your communications with the media were political activities as defined in 22 U.S.C. § 611(o) of FARA" and that the firm had acted as a "public relations counsel, publicity agent, and information-service employee as defined in Section 611 of the Act." *Id.*

Defendant shared the letter within the firm, and then on September 19, 2013, spoke with Skadden's General Counsel, Lawrence Spiegel, and advocated that Skadden resist registering under FARA. *Id.* ¶ 59. Defendant then sent Spiegel the following email in which he made multiple false and misleading statements about his own media contacts regarding the Report:

Just for the record:

(1) [The Law Firm] did not "disseminate the report to the news media." Three media outlets who were not able to obtain a copy of the report from the Ministry in Kiev, contacted us and asked us to provide them with a copy. The report was a public document.

(2) At no time did [the Law Firm] "contact the media." Quite to the contrary, we were approached by the media – asked for interviews, asked for background commentary, etc. – and we did not respond. The only time we responded was to correct misinformation.

12

(3) To the best of my recollection, our statements to the press were not about Ukraine. They were to correct misinformation. The statements were about our report and us.

*Id.*

On September 20, 2013, Defendant sent Spiegel a draft response to the FARA Unit's letter that repeated these false and misleading statements. *Id.* ¶ 60. Instead of sending it, Skadden sought an in-person meeting with staff of the FARA Unit. *Id.* Firm records, however, demonstrate that Defendant continued to edit or review the September 20 letter several times, including on the morning of the meeting with the FARA Unit on October 9, 2013. *Id.*

Defendant, Spiegel, and Gross attended the meeting on October 9, 2013, at the FARA Unit, which included Heather Hunt, the Unit's Chief and the signatory on all of the correspondence between Defendant and the Unit. *Id.* ¶ 61. During the meeting, Defendant made false and misleading statements to, and concealed material information from, Hunt, to the effect that his media contacts regarding the report had been solely reactive and for the purpose of collecting misinformation. *Id.* ¶ 61.[4] On October 11, 2013, Defendant sent Hunt a letter reiterating some of his statements during the meeting. *Id.* ¶ 62 (incorporating letter, Exhibit 6, by reference). It included his false claims that he provided a copy of the Report to the media "in response to requests from the media" and that "[i]n responding to inaccuracies in U.S. news reports – some of which were directly attributable to Ukraine – Skadden did not consult with Ukraine, did not inform Ukraine, did not act under instruction from Ukraine and was in no way serving as an agent of Ukraine." *Id.*

---

[4]     In its Bill of Particulars (ECF No. 31 at 1-4), the government provided additional information about Defendant's false and misleading statements in the FARA Unit meeting on October 9, 2013.

On January 16, 2014, as a result of Defendant's false and misleading statements on October 9 and in writing on October 11, 2013, and his material omissions throughout his communications with the FARA Unit, the FARA Unit reversed its determination that Skadden had to register under FARA. *Id*. ¶ 64. On October 19, 2017, Defendant was interviewed by the Special Counsel's Office. *Id.* ¶ 65. In that interview, he repeated certain of the false and misleading statements he had made to the FARA Unit in 2013, specifically with respect to the timing and nature of his contacts with the media regarding the Report. *Id*.[5]

### C.     Count One

Count One of the indictment charges that, in violation of 18 U.S.C. § 1001(a)(1), from June 3, 2013, to January 16, 2014, Defendant "did unlawfully, knowingly and willfully falsify, conceal and cover up by trick, scheme and device material facts in a matter within the jurisdiction of the FARA Unit, a section of the National Security Division of the Department of Justice, an agency of the executive branch of the government of the United States." Indictment ¶ 48. The indictment alleges that Defendant did this by withholding information from others at Skadden, by drafting false and misleading descriptions of his media contacts within Skadden and to the FARA Unit, and by omitting material facts regarding his communications with Sanger and Herszenhorn in his communications with the FARA Unit. *Id.* ¶ 50. The indictment then details Defendant's continuous and consistent false and misleading statements throughout the scheme, first to the FARA Unit in his June 2, 2013 letter (¶ 56), within Skadden in September 2013 (¶¶ 59, 60), during the FARA Unit meeting on October 9, 2013 (¶ 61), and in Defendant's October 11, 2013 letter to

---

[5]     In its Bill of Particulars (ECF No. 31 at 4-5), the government provided additional information about Defendant's false and misleading statements to the Special Counsel's Office. The government is separately responding to Defendant's motion to strike this paragraph from the indictment (ECF No. 21).

the FARA Unit (¶ 62). Finally, the indictment describes the material information that Defendant intentionally concealed throughout his communications in response to the FARA Unit's inquiries—all focused on information responsive to the FARA Unit's questions regarding Defendant's knowledge of Ukraine's plans for the Report, his distribution of the Report, and his contacts with the media regarding it—all of which was material to the FARA Unit's inquiry regarding whether Defendant and Skadden were required to register under the statute. *Id.* ¶ 63.

## ARGUMENT

Federal Rule of Criminal Procedure 12 permits a motion to dismiss the indictment based on "a defect in instituting the prosecution, including: . . . an error in the grand-jury proceeding . . .;" Fed. R. Crim. P. 12(b)(3)(A)(v), or "a defect in the indictment or information, including: . . . failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(v). In ruling on a motion to dismiss on either ground, the court must assume the truth of the indictment's factual allegations. *United States v. Knowles*, 197 F. Supp. 3d 143, 149 (D.D.C. 2016).

Defendant raises two substantive grounds on which to dismiss Count One.

First, he contends that the indictment fails to plead a concealment scheme under 18 U.S.C. § 1001(a)(1), because he had no duty to be truthful and complete—and to not omit material facts— from the FARA Unit when responding to its inquiry as to whether he and Skadden had an obligation to register as foreign agents of Ukraine. He relatedly contends that the indictment is defective, because the grand jury was presented with evidence of his duty of disclosure. As explained below, and as pled in the indictment, the FARA statute itself imposes a duty of truthful disclosure in response to such an inquiry. Defendant's narrow interpretation of the duty of truthful disclosure is inconsistent with applicable caselaw applying § 1001(a)(1) and would lead to the untenable conclusion that persons to whom federal agencies affirmatively address inquiries aimed

at ascertaining legal compliance with a disclosure statute have license to manipulate the inquiry's outcome by offering half-truths and knowingly omitting material information. Because the FARA statute and the FARA Unit's inquiry impose the applicable duty of truthful disclosure, Count One does in fact state an offense and there is no defect in the grand jury proceeding. This alleged ground for dismissing Count One is meritless.

Second, defendant contends that Count One should be dismissed as time barred, because some of the acts he is alleged to have taken in furtherance of the concealment scheme occurred prior to the expiration of the limitations period. This contention relies on a misapplication of the continuing offense doctrine and contravenes black-letter law holding that schemes, including concealment schemes under § 1001(a)(1), are not time barred so long as one of the acts in furtherance of the scheme occurred within the limitations period. Because the indictment pleads that Defendant took steps to further his falsification and concealment of material facts from the FARA Unit within the applicable limitations period, this ground for dismissing Count One is also meritless.

## II.    The Indictment Properly Alleges that Defendant had a Duty to Disclose Material Information that he Concealed

### A.    FARA Imposed a Duty of Truthful Disclosure on Defendant

In order for there to be a scheme to conceal material information under 18 U.S.C. § 1001(a)(1), there must be a duty to disclose. *United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008); *United States v. Blackley*, 167 F.3d 543, 550 (D.C. Cir. 1999). The duty can come from a statute, regulation, or form. *United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir. 1996) ("Falsity through concealment exists where disclosure of the concealed information is required by a statute, government regulation, or form."). It can also arise "when a defendant responds to specific questions on a particular topic." *United States v. White Eagle*, 721 F.3d 1108, 1117 (9th

Cir. 2013) (citing *United States v. Stewart*, 433 F.3d 273, 318 (2d Cir. 2006), for its holding "that SEC investigator's specific questions regarding another individual's stock trades created a duty to disclose information about those trades"). The requirement of such a duty is to ensure that a defendant has fair notice of what conduct is criminal. *United States v. Kanchanalak*, 192 F.3d 1037, 1046 (D.C. Cir. 1999).

In Defendant's case, his duty to provide material information when responding to the FARA Unit flowed from the statute itself and the FARA Unit's inquiry. The indictment clearly pleads this duty: "Under FARA, when responding to the FARA Unit's inquiries, CRAIG had a duty to provide material information and not to willfully make misleading statements or omit material facts." Indictment ¶ 52. As described in the indictment, "FARA is a disclosure statute that requires any person acting as 'an agent of a foreign principal' to register with the Attorney General in connection with certain activities, such as political or public relations efforts on behalf of the foreign principal." *Id.* ¶ 3. The Attorney General has delegated the authority to enforce and administer FARA to the National Security Division, and specifically to the FARA Unit. *See* Grand Jury Testimony of Heather Hunt (Hunt 3/21/2019 GJ Tr.) at 19. Two particular provisions of FARA imposed a duty on Defendant: first, because Defendant may have engaged in political activities and public relations work on behalf of Ukraine, Section 611 of FARA may have obligated him to register under the Act; and second, Section 618(a)(2) of FARA expressly forbade Defendant from making a false statement or material omission in writing to the FARA Unit.

Defendant's duty to disclose under Section 618(a)(2) of FARA could not be more clear.[6] Section 618(a)(2) makes it a crime to, in any document filed with or furnished to the Department

---

[6]     In his Motion to Dismiss Count Two of the Indictment, ECF No. 20, Defendant challenges this commonsense, plain reading of the statute. We address that challenge in our Response to Defendant's Motion to Dismiss Count Two. Nonetheless, because Section 611 of FARA

of Justice, "willfully make[] a false statement of a material fact or willfully omit[] any material fact required to be stated therein or willfully omit[] a material fact or a copy of a material document necessary to make the statements therein and the copies of documents furnished therewith not misleading". 22 U.S.C. § 618(a)(2). The FARA Unit cited the statute and enclosed it in correspondence with Skadden and Defendant as early as December 2012. And in the face of this duty, Defendant made false and misleading statements and willfully omitted material facts in letters furnished to the FARA Unit on June 3 and October 11, 2012.

But Section 618 is not the only provision of FARA from which Defendant's duty to disclose arose. The fact that Defendant chose to engage with the FARA Unit—a U.S. Department of Justice law enforcement agency—on the question of whether he was obligated to register obligated him to do so truthfully, including disclosing material facts responsive to the FARA unit's inquiry; that is, as described in the next section below, the caselaw establishes that the duty to disclose can arise from a statute and related law enforcement inquiry. In this case, Defendant's duty arose from the FARA Unit's inquiry pursuant to FARA's registration requirements. In particular, that statute provides that registration is required of any person who acts "at the order, request, or under the direction or control of a foreign principal" or its agent, and who engages in "political activities for or in the interests of such foreign principal" or acts within the United States as "public relations counsel, publicity agent, information-service employee or political consultant" for or in the interests of the foreign principal. 22 U.S.C. § 611. It is a crime to willfully fail to register under FARA. *Id*. §§ 612, 618. Because the FARA Unit made Defendant aware of his possible obligation to register under the statute, cited and enclosed it, and then asked specific and

separately imposed a duty on Defendant to provide material information, as described further herein, that duty does not rest solely on Section 618(a)(2).

targeted questions designed to determine Defendant's registration obligation, Defendant had a duty not to mislead and conceal material information when responding to the inquiry.

### B.  *Safavian* and Other Cases Applying § 1001(a)(1) Do Not Support Defendant's Contention That He Had No Duty of Truthful Disclosure.

Defendant implies throughout his motion that a duty of truthful disclosure must be explicit. Not so. While the duty to disclose must derive from a statute, government regulation, form, or related course of inquiry, the fact of the duty does not need to have been explicitly stated to Defendant prior to the concealment of material information. In *United States v. Moore*, 446 F.3d 671 (7th Cir. 2006), the court found that defendant Moore's duty to disclose her conflict of interest flowed from a Department of Housing and Urban Development (HUD) regulation against conflicts of interest, as well as Moore's communications with investigators. After Moore's mother, Cameron, became an alderwoman in the City of Milwaukee, Moore continued to work for WH, an organization receiving HUD grants through the City. *Id*. at 675. HUD's regulation on conflicts of interest was incorporated in WH contracts that Moore signed. *Id*. at 674-675. At some point, the City became suspicious that another of WH's employees, Allen, was Cameron's daughter and began an inquiry. *Id*. at 676. In response, Moore not only lied about her sister, but remained silent and concealed from investigators the fact that Moore was Cameron's daughter. *Id*. The court found that Moore's duty to disclose under § 1001(a)(1) arose from the contracts incorporating HUD regulations and "in the course of her communications with City officials who were investigating the conflict-of-interest problem." *Id*. at 678. The court further stated:

> Indeed, even if Moore did not—as she argues—read the contract and thus was ignorant for a time of her legal obligation, the continued inquiries from City officials about the relationships between WH, Cameron, and Allen and the concerns expressed by City officials about conflicts of interest repeatedly triggered a duty to disclose.

*Id*.   That is, Moore's duty derived from the regulation and the inquiry flowing from that regulation—and even if she had not read the regulation, she should have understood her duty when investigators made continued inquiries about the specific issue of conflicts of interest.   *See also United States v. Stewart*, 433 F.3d 273, 318-19 (2d. Cir. 2006) (rejecting defendant's arguments that he had no duty to disclose information of another's stock trades because he voluntarily agreed to speak to SEC investigators, and that there was insufficient evidence of the investigators' specific questions:   "[I]t was plausible for the jury to conclude that the SEC's questioning had triggered [defendant's] duty to disclose and that ample evidence existed that his concealment was material to the investigation.").

As support for his claim that he had no duty to disclose material information to the FARA Unit, Defendant repeatedly cites *Safavian*.   Notably, however, Defendant does not recount the facts of *Safavian*—perhaps because other than for the general and uncontested principle that one must have a duty to disclose facts in order to establish a § 1001(a)(1) violation by omission, *Safavian* is inapposite here.   In *Safavian*, the defendant was a General Services Administration official who was charged with various offenses related to his contact with lobbyist Jack Abramoff.   *Id.* at 959. He was charged with concealing information when he sought an ethics opinion from GSA's general counsel regarding a trip he took with Abramoff, and when he spoke to a GSA OIG agent. *Id*. at 960-961.   The court overturned Safavian's concealment convictions because the government failed to articulate any source of a duty to disclose material information in connection with the ethics opinion other than "reference to vague standards of conduct for government employees." *Id*. at 964.   These ethical principles, the court pointed out, gave "no indication of the particular facts or information an executive employee must disclose.   *Id*. at 965.   In contrast, in this case, Defendant did not contact the FARA Unit for an opinion as to his registration obligation.   Rather,

the FARA Unit contacted Defendant to gather the information necessary to determine whether he had a registration obligation. Defendant chose to respond, and provided false information and concealed the facts necessary for the FARA Unit to make that determination.

As described in the indictment, the purpose and focus of the FARA Unit's inquiry was clear. From the very outset, in its December 18, 2012, letter, the FARA Unit made clear that its objective was to "determine whether your organization is required to register under FARA." Indictment ¶ 51. The letter further put Defendant on notice of Skadden's and his own possible obligation to register by citing and enclosing the statute. And, as is standard protocol for the FARA Unit in the course of its inquiries into a possible registration obligation, the FARA Unit asked a set of four specific questions. *See* Hunt 3/21/2019 GJ Tr. at 14 ("Yes, these are very standard questions . . . . [W]e basically ask that question to, to everyone."). As its inquiry continued on April 9, 2013, the FARA Unit posed additional specific and targeted questions about Skadden and Defendant's dissemination of the Report, media contacts, and Defendant's knowledge of Ukraine's plans for the Report, stating that it needed "additional information to determine whether your firm is obligated to register under the Act." Indictment ¶ 54. And in its June 3, 2013, letter, the FARA Unit stated unequivocally which of Defendant's actions required him to register under FARA—his dissemination of the Report and his media contacts—and which provision required it:  22 U.S.C. § 611. *Id.* ¶ 56. *Safavian* thus does not support Defendant's contention.

As in *Moore* and *Stewart*, Defendant's duty in this case arose not just from the underlying FARA statute—of which he was repeatedly and clearly notified—but also through his course of communications with the FARA Unit as it inquired into his obligation to register under the statute. The focus of the Unit's inquiry was clear:  Defendant's dissemination of the Report, his contacts with the media about it, and his knowledge of Ukraine's plans for the Report. *See* Indictment ¶

54; Hunt 3/21/2019 GJ Tr. at 20-26 (April 9, 2012 letter's targeted questions about dissemination of Report, media contacts, and knowledge of Ukraine's plans were geared toward determining obligation to register).  The FARA Unit's continued and focused inquiries on these specific topics rebut any claim by Defendant that he lacked notice or was ignorant of his obligation—rather, they "triggered a duty to disclose," *Moore*, 446 F.3d at 678, and advised Defendant that the FARA Unit was in search of the facts material to determining whether he and his law firm had a registration obligation.

Defendant's argument (at 23-25) that no such duty exists because he voluntarily chose to respond to the FARA Unit's inquiry, and because the Unit lacks authority to compel a response, is unavailing.  In *United States v. Bowser*, 318 F.Supp.3d 154 (D.D.C. 2018), the defendant moved for judgment of acquittal of his § 1001(a)(1) convictions, contending that he had no duty to disclose material information in response to an inquiry by the Office of Congressional Ethics, with which the defendant did not have to cooperate and whose questions and document requests he could simply have ignored.  *Id*. at 168.  The court denied the defendant's motion, finding that because he had voluntarily begun to respond to the investigation, and then signed a certification that he was providing any information he had responsive to the inquiry, he had a duty.  *Id*. at 169 (also finding *Safavian* inapposite); *see also Stewart*, 433 F.3d at 318 ("Defendant's legal duty to be truthful under section 1001 included a duty to disclose the information he had . . . even though he voluntarily agreed to speak with investigators.").  In Defendant's case, like Bowser, he simply could have ignored the FARA Unit's inquiries, at which point the FARA Unit could have chosen to use the tools available to it to force Defendant and Skadden to register.  But Defendant elected to engage with the FARA Unit for the very purpose of heading off that outcome and avoiding his

obligation to register—and in the face of the duty created by FARA, he could not then provide false and misleading information to avoid that registration obligation.

Similarly, Defendant argues (at 22) that the government is taking a position that was rejected in *Safavian*—that is, that once an individual begins speaking voluntarily with the government, he cannot stop. But that is not what the government maintains or what *Safavian* stands for. Rather, the government's position, as *Safavian* supports, is that where there exists a duty to disclose like the one established by FARA, a person who elects to respond to a voluntary inquiry, as Defendant did here, may not omit material facts. *See* 528 F.3d at 965 n.7 (stating that in *Moore* and *Cisneros*, which stand for this proposition, there had been a duty arising from a statute, regulation, or form); *see also United States v. Cisneros*, 26 F.Supp.2d 24, 42 (D.D.C. 1998) ("Since Cisneros responded to the questions, he had a duty to include all information necessary to make his statements truthful); *Moore*, supra, at 679 ("Even if she had the right to remain silent, she did not have the right to affirmatively mislead City officials"). *Cisneros* and *Moore* enunciate the unremarkable distinction between refusing to answer an inquiry or withdrawing from an inquiry on the one hand, and endeavoring to mislead an inquiry through half-truths and omissions on the other hand.

Defendant's situation is analogous to that of the defendant in *Calhoon*, 97 F.3d 518 (11th Cir. 1996), in which the court found that the defendant, a hospital employee, had a duty to disclose created by a Medicare form, and his technically true submissions violated that duty:

> While it is true that a provider may submit claims for costs it knows to be presumptively nonreimbursable, it must do so openly and honestly, describing them accurately while challenging the presumption and seeking reimbursement. Nothing less is required if the Medicare reimbursement system is not to be turned into a cat and mouse game in which clever providers could, with impunity, practice fraud upon the government.

*Id.* at 529; *see also United States v. Stephenson*, 895 F.2d 867, 874 (2d. Cir. 1990) (defendant who contacted Commerce Department agent and stated that he had been offered a bribe, without disclosing that he himself had initiated bribery scheme "was actively seeking to mislead" the agent and jury could reasonably find criminal concealment).   To the extent that Defendant provided technically true but knowingly incomplete responses to the FARA Unit—though notably, some of his statements were false—he did so in service of his concealment scheme.   That is, like Calhoon, rather than openly and honestly describing Defendant's actions with respect to the media, and allowing the FARA Unit to make an informed determination regarding his obligation to register, Defendant turned the inquiry into the very cat and mouse game the court in *Calhoon* rejected.

Finally, the due process concerns that arose in *Safavian*—that "the ethical principles give no indication of the particular facts or information an executive employee must disclose"—do not arise in Defendant's case.   528 F.3d at 965.   Defendant cannot credibly assert that he did not have fair notice of his obligations under FARA or a clear understanding of the information the FARA Unit required to make a determination whether he was required to register:   the Unit gave Defendant clear notice of the statute it was enforcing and asked repeated, targeted questions to elicit the information it needed about Defendant's activities for Ukraine.   Indeed, Defendant's scheme involved a series of carefully crafted, highly misleading statements and material omissions designed to conceal this exact information—the information that would have required him to register—when sought by the FARA Unit.   Defendant also incorrectly asserts (at 23) that the information he is charged with omitting from the FARA Unit was not responsive to the specific questions the Unit asked.   To the contrary, Defendant's omissions, as alleged in paragraph 63 of the indictment, consist of information about Defendant's knowledge of Ukraine's plan for the Report, his dissemination of the Report, and his media contacts—that is, the information requested

24

by the FARA Unit in its April 9, 2013 letter, as alleged in paragraph 54 of the indictment.  In any event, that factual contention is one Defendant is free to assert at trial before a jury, but is one which will not absolve him of a trial on the properly pled allegations in the indictment by way of a Rule 12 motion.

When responding to the FARA Unit's inquiry into Defendant's obligation to register under the Act, Defendant had a duty, arising out of FARA, not to omit material information.  That duty was unmistakable and properly pled in the indictment.  As a consequence, Defendant's motion to dismiss Count One on the ground that he had no duty to disclose material facts to the FARA Unit in the first place should be denied.

### C.      **Defendant's Claims of Error in the Grand Jury are Meritless**

Defendant argues (at 25-27) that because witnesses presented before the grand jury discussed his duty to disclose information to the FARA Unit, there was legal error in the grand jury proceedings.  This argument rests entirely on Defendant's claim that he had no such duty, and accordingly, it is meritless.

As an initial matter, Defendant's motion presents selected excerpts of the grand jury proceedings leading to his indictment in an attempt to insinuate error and claims, without basis, that grand jurors were "skeptical" simply because they were inquisitive.  A plain reading even of Defendant's cherry-picked transcripts, however, reveals nothing more than a thorough grand jury presentation in which the government provided extensive evidence of Defendant's false statements and material omissions, resulting in an indictment.

In any event, Defendant's argument of legal error before the grand jury is inextricable from his claim that he had no duty to provide material information to the FARA Unit, because the error he claims is that the grand jury was instructed on this duty by virtue of the government's

presentation, through witnesses, of Defendant's material omissions.  *See* Defendant's Motion at 25-26.  If the Court finds that, under FARA, when responding to the FARA Unit's inquiries, Defendant had a duty to provide material information and not to willfully make misleading statements or omit material facts, Defendant's claim of error in the grand jury should likewise be denied.

### III.   Even if Defendant Had No Duty to Disclose Material Information, Count One Stands Because Defendant's Scheme Included False Statements

The charge in Count One alleges not only that Defendant concealed material information from the FARA Unit; it also clearly states that Defendant's scheme included affirmative false statements.  *See* Indictment ¶ 56 (listing "material false and misleading statements and omissions" in Defendant's June 3, 2013 letter to FARA Unit); ¶¶ 59-60 (describing Defendant's false and misleading statements within Skadden); ¶ 61 (describing Defendant's false and misleading statements in October 9, 2013 FARA Unit meeting); and ¶ 62 (listing Defendant's false and misleading statement in October 11, 2013 letter to FARA Unit).  Defendant is thus mistaken when he claims that the scheme with which he is charged "do not focus upon allegations concerning material false statements made to the FARA Unit; instead, they make clear that the charged offense is based on material facts *withheld* from that government agency."  Defendant's Motion at 11-12 (emphasis in original).[7]

With respect to false statements as part of a scheme in violation of § 1001(a)(1), the government does not need to prove a duty as it does regarding material omissions.  In *Safavian*,

---

[7]     Defendant has otherwise recognized that Count One alleges that the scheme included false statements by Defendant—indeed, Defendant demanded additional information about his alleged false statements in his Motion for a Bill of Particulars (ECF No. 17); the Court in fact ordered the government to provide limited additional information about false statements (ECF No. 30 at 3-4); and the government provided that information (ECF No. 31).

for instance, the court was clear that the duty to disclose was tied to concealment, but not falsification, under § 1001(a)(1).  528 F.3d at 964 ("there must be a duty to disclose in order for there to be a *concealment* offense in violation of § 1001(a)(1)") (emphasis added); *see also United States v. Singhal*, 876 F.Supp.2d 82, 95 (D.D.C. 2012) (in indictment "based on a concealment theory only" there must be a duty to disclose).  Indeed, each of the § 1001(a)(1) charges against defendant Safavian included both material omissions and false statements.  *See* Exhibit 7 (Safavian Indictment).  Count Two charged Safavian with a § 1001(a)(1) scheme to conceal information and make false statements when seeking a GSA ethics opinion.  *Id*. ¶ 29.  And though the court found that the concealment portion of Count Two against Safavian could not stand because he had no duty to disclose material information, the false statements portion of the charge survived because it required no such duty.  *See Safavian*, 528 F.3d at 693 n.4 (stating that jury found that on Count Two, Safavian violated false statement provision of § 1001(a)(1)), 695 (stating that the false statement charge in Count Two remained despite the court's ruling with respect to duty to disclose).

In this case, Defendant had a duty to disclose material information to the FARA Unit.  But even if he did not, Count One of the indictment stands because it includes Defendant's affirmative false statements as part of the § 1001(a)(1) scheme.

## IV.    Count One is Timely

Count One of the Indictment properly charges Defendant with a single scheme to conceal that involved Defendant's consistent false statements, omissions, and other acts, some of which occurred within the applicable statute of limitations period.  The charge is thus timely, and the cases on which Defendant relies to argue otherwise are inapposite.  His motion to dismiss Count One on the basis of the statute of limitations should be denied.

A.      **A Scheme is Complete Only Once a Final Act in Furtherance of it is Taken**

Count One charges Defendant under the subsection of § 1001 that specifically applies to a "scheme," or when a defendant "falsifies, conceals, or covers up by any trick, scheme, or device a material fact."  18 U.S.C. § 1001(a)(1); *see United States v. Hubbell*, 177 F.3d 11, 13 (D.C. Cir. 199) ("[T]he plain language of § 1001 permits the charging of scheme crimes.").  A "scheme" is not complete for statute of limitations purposes until the last affirmative act in furtherance of the scheme is undertaken.  *See United States v. Mubbayid*, 567 F.Supp.2d 223, 242 (D. Mass. 2008), *aff'd in part, rev'd in part on other grounds* (stating that a § 1001(a)(1) crime is committed "when the defendant commits an affirmative act of concealment in furtherance of the scheme.  Each new affirmative act of concealment is a new criminal act, triggering a new limitations period."); *United States v. Heacock*, 31 F.3d 249, 256 (5th Cir. 1994) (holding that in a § 1001(a)(1) scheme, as in a conspiracy, "[t]he statute of limitations does not begin to run on a 'scheme' crime . . . until each overt act constituting the scheme has occurred").   Accordingly, when some of the acts taken in furtherance of the § 1001(a)(1) scheme fall within the applicable statute of limitations, the entire scheme is timely.  *See Bramblett v. United States*, 231 F.2d 489, 491 (D.C. Cir. 1956) (holding that because the defendant repeated a false representation to the disbursement office of the House of Representatives, it was a "continuing scheme" and "the period of limitations did not begin to run until the scheme ended").

Indeed, in *United States v. Menendez*, 137 F.Supp.3d 688 (D.N.J. 2015), the court confronted this very issue and found the entire scheme count to be timely.  There, the defendant, a United States Senator, was charged with a scheme to conceal facts on his annual Senate financial disclosure reports; of the five reports, only the last two fell within the statute of limitations.  *Id*. at 699.  After considering many of the cases cited by Defendant in his motion, the court, relying upon

*Heacock* and *Bramblett*, held that all of the allegations in the scheme count were timely.   *Id.* at 700 ("As charged, Senator Menendez's affirmative acts of concealment were part of a single, extended effort to hide the bribery conspiracy, and the scheme did not end, at the earliest, until Menendez filed his last financial disclosure form in 2012.")

### B.   Because Defendant Committed Acts in Furtherance of the Scheme Within Five Years of Indictment, the Charge is Timely

Because Defendant committed acts of falsification and concealment within the statute of limitations period, all of Count One is timely.  In particular, the indictment properly alleges that Defendant engaged in a single, extended effort to falsify and conceal material facts from the FARA Unit, beginning on or about June 3, 2013 (in his misleading letter to the FARA Unit), and continuing until January 2014, when the FARA Unit reversed its determination that Skadden and Defendant had acted as agents of Ukraine who needed to register under the Act.  Indictment ¶ 48. Even assuming that, as Defendant claims (at 28 n.18), the statute of limitations bars prosecution for offenses preceding October 3, 2013, the indictment specifically alleges that Defendant committed acts in furtherance of the scheme after that date—including on October 9, 2013, during the FARA Unit meeting, and on October 11, 2013, when he sent another letter containing material misrepresentations and omissions to the FARA Unit.  *Id.* ¶¶ 61-63.  Consistent with *Menendez*, *Heacock*, and *Bramblett*, Defendant's scheme was not complete until at least when he committed these acts, and thus all of Count One is properly within the statute of limitations.

In his motion, Defendant offers protracted argument that § 1001(a)(1) is not "continuing offense" under the doctrine of *Toussie v. United States*, 397 U.S. 112 (1970).  But the Court need not tackle that question, because the continuing offense doctrine does not apply where, as in Defendant's case, a scheme crime includes conduct falling within the applicable statute of limitations period.  *See, e.g., United States v. Morales*, 11 F.3d 915, 918 (9th Cir. 1993) (continuing

offense doctrine does not apply "where the charged criminal conduct itself extends over a period of time.  The doctrine comes into play where it is contended the actual conduct of the defendant ended but the crime continued past that time."); *Mubbayid*, 567 F.Supp.2d at 241 n.34 (noting that when affirmative acts of concealment have occurred within the limitations period, a ruling on the continuing offense question is unnecessary).  This is not a case in which the government is attempting to revive an expired statute of limitations period, more than five years after Defendant's last act, by claiming that his offense was a continuing one.  Rather, the government's contention— as clearly charged in the indictment—is that Defendant's scheme continued into the applicable limitations period as Defendant performed additional acts of falsification and concealment. Notably, most of the cases that Defendant cites regarding the "continuing offense" doctrine are cases in which the defendants had completed all of their conduct (and thus, had ended the scheme) prior to the expiration of the statute of limitations—and they are thus inapposite.  *See* Defendant's Motion at 29-30 (citing *United States v. Dunne*, 324 F.3d 1158, 1160 (10th Cir. 2003) (defendant's last act of concealment was a little more than five years before indictment); *United States v. Treacy*, 2014 WL 12698499 at *1 (W.D.Va. Jan. 28, 2014) (defendant's last act of concealment was more than seven years before indictment); *Mubayyid*, 567 F.Supp.2d at 223 (defendants' last act of concealment was far outside the statute of limitations period); *United States v. Grenier*. 513 F.3d 632 (6th Cir. 2008) (indictment returned five years and one day after defendant's last act of concealment)).

Relying on some of these same inapposite cases and *United States v. Sunia*, 643 F.Supp.2d 51 (D.D.C. 2009), Defendant claims that the Court should arbitrarily dismiss the portions of the scheme in Count One that occurred before October 3, 2013.  This argument is incorrect.  In *Sunia*, the government had aggregated into one count multiple bribes in violation of 18 U.S.C. § 666; the

court dismissed the portion of that count that consisted of bribes occurring outside of the statute of limitations period, finding that such aggregation could not be an end-run of either the *Toussie* doctrine or the applicable statute of limitations period. *Id.* at 72. In Defendant's case, by contrast, the government is not using a course of conduct theory to justify aggregation; instead, the indictment clearly charges Defendant with a concealment scheme, and the statute of limitations for that scheme did not begin to run until his last act of concealment in furtherance of it—after October 11, 2013, at the earliest. *See, e.g., Menendez*, 137 F.Supp.3d at 688 (contrasting a proper concealment scheme, which is complete with the last act of concealment, from a string of aggregated, unrelated loan applications in another case on which Defendant relies, *United States v. Gremillion-Stovall*, 397 F. Supp. 2d 798, 800 (M.D. La. 2005)).

In furtherance of the charged scheme to conceal material facts from the FARA Unit, Defendant's acts of falsification and concealment continued within the applicable statute of limitations period. Count One is thus timely, and the Court need not reach the question of whether 18 U.S.C. § 1001(a)(1) is a continuing offense.

## CONCLUSION

The indictment returned against Defendant properly alleges in Count One that, in violation of 18 U.S.C. § 1001(a)(1), Defendant engaged in a scheme to falsify and conceal material information from the FARA Unit. In the course of responding to the FARA Unit, Defendant had a duty to disclose truthful information, and it was not error to instruct the grand jury on that duty and present evidence of Defendant's material omissions. Even if Defendant had no such duty, however, his scheme included material false statements and Count One thus stands. Finally, Count One properly alleges a scheme that was not complete until Defendant's last act in furtherance of

the scheme, which occurred within the statute of limitations period; accordingly, the entire count

is timely.  Defendant's Motion to Dismiss Count One of the Indictment should be denied.

> Respectfully submitted,
> JESSIE K. LIU
> UNITED STATES ATTORNEY
> D.C. Bar Number 472845
>
>
> By:  /s/ Molly Gaston
> FERNANDO CAMPOAMOR-SÁNCHEZ (DC 451210)
> MOLLY GASTON (VA 78506)
> Assistant United States Attorneys
> United States Attorney's Office
> 555 Fourth Street, N.W.
> Washington, D.C.  20530
> Telephone: 202-252-7698/202-252-7803
> Fernando.Campoamor-Sanchez@usdoj.gov
> Molly.Gaston@usdoj.gov
>
> JOHN C. DEMERS
> ASSISTANT ATTORNEY GENERAL
>
>
> By:  /s/ Jason B.A. McCullough
> JASON B.A. MCCULLOUGH (DC 998006; NY 4544953)
> Trial Attorney
> Department of Justice
> National Security Division
> 950 Pennsylvania Ave NW
> Washington, D.C.  20530
> Telephone: 202-616-1051
> Jason.McCullough@usdoj.gov

Dated:   May 31, 2019

**Certificate of Service**

I certify that, by virtue of the Court's ECF system, a copy of the foregoing Government's Opposition to Defendant's Motion to Dismiss Count One has been sent to counsel for the defendant on May 31, 2019.


/s/ Molly Gaston
Molly Gaston
Assistant United States Attorney

# EXHIBIT 1



**U.S. Department of Justice**

**National Security Division**

_Washington, DC 20530_

CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

DEC 18 2012

Earle Yaffa, Managing Director
Skadden, Arps, Slate, Meagher & Flom LLP
4 Times Square
New York, NY 10036

      Re:  Possible Obligation to Register Pursuant to the
            Foreign Agents Registration Act

Dear Mr. Yaffa:

      It has come to our attention from a December 13, 2012 Los Angeles Times article, http://www.latimes.com/news/world/worldnow/la-fg-wn-trial-ukraine-tymoshenko-20121213,0,3141156.story, titled "Ukraine lawmakers brawl; report finds Tymoshenko trial flawed" that your firm may be engaged in activities on behalf of the Ministry of Justice of the Government of Ukraine, which may require registration pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 _et seq._ (FARA or the Act).

      In order that we may determine whether your organization is required to register under FARA, please provide this office with (1) a complete statement of the ownership and control of the firm, (2) a description of the nature of the firm's regular business and/or activity, (3) a description of the activities the firm has engaged in or the services it has rendered to the Ministry of Justice of the Government of Ukraine or any other foreign entity and (4) a copy of the existing or proposed written agreement, if any, or a full description of the terms and conditions of each existing or proposed oral agreement, if any, the firm may have with the Ministry of Justice of the Government of Ukraine or any other foreign entity.

      Enclosed is a copy of the Act and the rules thereunder. If you have any questions, please contact Alex Mudd at 202-233-2271. We look forward to your prompt and thorough response to our inquiry.

                Sincerely

                Heather H. Hunt
                Registration Unit
                Counterespionage Section
                National Security Division

Enclosures

cc:  Poss Obligation          HHH:SAM:sam
     Records 149-
     Chron   105320
     AMudd              Typed: 12/14/12
                      Poss_Obl_Skadden

EXHIBIT 2

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

———

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

DIRECT DIAL
(202) 371-7400
DIRECT FAX
(202) 661-9100
EMAIL ADDRESS
GREGORY.CRAIG@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

February 6, 2013

Ms. Helen Hunt
United States Department of Justice
National Security Division
Washington, DC 20530

Dear Ms. Hunt:

I am writing to respond to your letter to Earle Yaffa, dated December 18, 2012, as follows:

1.  <u>A complete statement of the ownership and control of the Firm.</u>
Skadden is a Delaware limited liability partnership that is owned and controlled by its 415 partners worldwide.

2.  <u>A description of the Firm's regular business and/or activity.</u> With 23 offices, approximately 1,800 attorneys and more than 40 distinct areas of practice, Skadden and affiliates serves clients in every major international financial center, providing legal advice to companies across a spectrum of industries.

Affiliated entities include:
Skadden, Arps, Slate, Meagher & Flom (UK) LLP (London office)
Skadden, Arps, Slate, Meagher & Flom (Europe) LLP (Vienna office)
Thurcom Limited (related to the London office practice of law)
Skadden, Arps, Slate, Meagher & Flom Limited (related to the London office practice of law)
Skadden, Arps, Slate, Meagher & Flom (Hong Kong, Sydney and Singapore offices)
Skadden, Arps, Slate, Meagher & Flom Consultoria Empresarial Ltda. (Brazil Office)

Ms. Helen Hunt
February 6, 2013
Page 2

Skadden, Arps, Slate, Meagher & Flom Estrangeiro/Direito Norte Americano (Brazil office)
SABR Holdings LLC ( Brazil Office)
Skadden Arps Law Office (Tokyo office)
BECS Holding Company LLC (100% owned by Skadden, Arps, Slate, Meagher & Flom LLP)
JSBB Holding Company LLC (100% owned by Skadden, Arps, Slate, Meagher & Flom LLP

      3.     <u>A description of the activities the Firm has engaged in or the services it has rendered to the Ministry of Justice of the Government of Ukraine or any other foreign entity relating to such services.</u>  In April 2012, the Ministry of Justice for the Government of Ukraine asked the Firm to serve as consultant on rule of law issues and to provide advice about the question of Ukraine's criminal justice system as viewed through the prism of western standards of due process, and, in particular, to advise the Ministry about rule-of-law issues that might arise before the European Court for Human Rights.  A major focus of the assignment was to conduct an independent inquiry into the facts and circumstances surrounding the prosecution, trial, conviction and sentencing of former Prime Minister Yulia Tymoshenko and to write a report of the Firm's findings in light of western standards of due process.  The Firm insisted on complete independence and total access to relevant individuals and evidence in connection with our work.  As an explicit component of our assignment from the very beginning, Skadden's work was conditioned on the understanding with the client that the Firm would not provide any services that would be covered by the Foreign Agent Registration Act ("FARA") or would require registration under FARA.  The Firm completed its investigative work in September 2012, and delivered its report to the Ministry in December 2012.

      4.     Attached you will find (a) a written agreement in Ukrainian and English dated April 10, 2012; and (b) a proposed written agreement in English dated April 10, 2012.  In the  proposed English language written agreement described in (b), the parties addressed the issue of FARA activity directly:  "It is understood that the Firm is not being retained to engage in any 'political activities' – and will not engage in any such activities – as defined in the Foreign Agent Registration Act (FARA)."  Both Skadden and the client understood and accepted this explicit limitation on the scope of the Firm's engagement.  The client declined to sign the proposed English agreement because of concerns about the confidentiality clause.  The fact that the Firm's work for the client would not include any activities within the scope of FARA remained nonetheless an explicit condition of the Firm's engagement.

Ms. Helen Hunt
February 6, 2013
Page 3


In addition to these agreements, there have been discussions with the Government of Ukraine about the possibility of Skadden receiving additional compensation from the Government for the Firm's work. The most recent correspondence on this subject is attached as (c) and (d)

Lastly, there was an oral agreement with a private citizen of Ukraine in which that individual agreed to contribute funds to help pay for the work described above. There was nothing in the oral agreement with the private citizen that was inconsistent with the terms of the other agreements. To the contrary, the private citizen clearly understood that the Firm would conduct an independent inquiry and write a report, and that the Firm would not engage in any 'political activities' as defined in the Foreign Agent Registration Act.

Please let us know if you have any questions or we can be of further assistance.

Sincerely yours,

Gregory B. Craig

# ATTACHMENT A

## Agreement in Ukrainian and English dated April 10, 2012

| ДОГОВІР | CONTRACT |
|---|---|

м. Київ

«\_10\_» \_April\_ 2012р.

Kyiv

«\_10\_» \_April\_ 2012р.

Міністерство юстиції України в особі заступника Міністра юстиції – керівника апарату Сєдова Андрія Юрійовича, що діє на підставі Положення про Міністерство юстиції України, затвердженого Указом Президента України від 6 квітня 2011 року № 395/2011 (далі – Замовник), з однієї сторони,

The Ministry of Justice of Ukraine acting on the basis of the Regulation on the Ministry of Justice of Ukraine approved by the Decree of the President of Ukraine of April 6, 2011 No 396/2011, represented by Andriy Yuriyovych Sedov (hereinafter referred to as the Employer), on one hand

та

and

Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates (далі – Виконавець), з іншої сторони, разом – Сторони,

Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates (hereinafter referred to as the Executor), on the other hand,

hereinafter jointly referred to as the Parties,

уклали цей договір про таке (далі – Договір):

have concluded the following Contract (hereinafter referred to as the Contract):

## 1. Предмет Договору

## 1. Subject of the Contract

1.1. Виконавець зобов'язується у 2012 році надати Замовникові послуги з дослідження у галузі права (ДК 016:97 - 73.20.13), а саме експертного дослідження щодо дотримання принципу верховенства права (далі – Послуги), (далі – Послуги), а Замовник – прийняти і оплатити такі Послуги.

1.1. In 2012, the Executor shall deliver services on legal studies (ДК 016:97 - 73.20.13) to the Employer that include providing advice on the rule of law (hereinafter referred to as the Services), and the Employer shall accept and pay for such Services.

1.2. Обсяги закупівлі послуг здійснюються залежно від реального фінансування видатків та потреб замовника.

1.2. The scope of procurement of the Services shall be made depending on actual funding of the Employer's expenses and needs.

## 2. Якість послуг

## 2. Quality of the Services

2.1. Виконавець повинен надати Замовнику послуги, якість яких відповідає умовам:

2.1. The Executor shall provide the Employer with the Services whose quality is to meet the following conditions:

- результат дослідження повинен у повному обсязі та об'єктивно відображати Європейські та Американські стандарти та практику щодо дотримання принципу Верховенства права;

- findings of the study must fully and objectively reflect European and American standards and practice with respect to rule of law;

- дослідження здійснюється з урахуванням особливостей конкретної справи, яка розглядається Європейським судом з прав людини.

- the study is to be carried out with regard to specific features of the particular case considered before the European Court of Human Rights.

## 3. Ціна Договору

## 3. Price of the Contract

3.1. Ціна цього Договору становить

3.1. The price of the present Contract shall

95 000,00 грн. (дев'яносто п'ять тисяч грн. 00 коп.) без ПДВ.

3.2. Ціна послуг становить **100,00 грн.** (сто грн. 00 коп.) без ПДВ за одну годину дослідження. Загальна кількість годин дослідження не може перевищувати 950 (дев'ятсот п'ятдесят) годин.

3.3. Виконавець веде облік витраченого часу для здійснення дослідження. На основі цих даних Виконавець складає Звіт та направляє його Замовнику. Звіт має містити детальний опис послуг, на які витрачено час.

3.4. Ціна цього Договору може бути зменшена за взаємною згодою Сторін.

## 4. Порядок здійснення оплати

4.1. Розрахунки проводяться шляхом перерахування Замовником коштів на розрахунковий рахунок Виконавця після пред'явлення Виконавцем рахунка на оплату послуг (далі – рахунок) за наявності коштів на розрахунковому рахунку Замовника.

4.2. Оплата за виконані послуги здійснюється після підписання акта прийому-передачі наданих послуг з відстрочкою платежу до 30 банківських днів.

4.3. Якщо Замовник порушує умови оплати, зазначені у п. 4.2., з причин затримки бюджетного фінансування, така затримка вважається викликаною форс-мажорними обставинами і не тягне за собою будь-якої відповідальності.

## 5. Надання послуг

5.1. Строк надання послуг за цим Договором починається з ___ травня 2012 р. і має бути завершено до 31 грудня 2012 року згідно з порядком, наведеним нижче.

5.2. Замовник передає Виконавцеві копії матеріалів справи стосовно якої необхідно провести дослідження та яка знаходить на розгляді Європейського суду із переліком питань, які підлягають дослідженню.

5.3. Виконавець здійснює дослідження прецедентної практики Європейського суду з прав людини у справах щодо дотримання вимог Конвенції

be 95,000.00 (ninety five thousand) Ukrainian hryvnyas, VAT excluded.

3.2. The price of the Services shall be **100.00** (one hundred.) Ukrainian hryvnyas, VAT excluded, per one hour of study. Total hours shall not exceed 950 (nine hundred fifty) hours.

3.3. The Executor shall keep accounting of hours expended to carry out the study. Based on those data, the Executor shall draw up the Report and submit it to the Employer. The Report shall contain the detailed description of the services time had been expended in.

3.4. The price of the present Contract may be reduced by mutual consent of the Parties.

## 4. Payment procedure

4.1. The payment shall be made by the Employer by way of bank transfer to the bank account of the Executor upon presentation by the Executor of the bill for services (hereinafter referred to as **the bill**) subject to availability of the funds on the bank account of the Employer.

4.2. Payment for services shall be made after signing the statement of transfer and acceptance of the services delivered, with delay of payment up to 30 bank days.

4.3. In the case the Employer violates the payment conditions as referred to in § 4.2. due to delays in budget funding, such a delay shall be considered as one caused by force majeure circumstances and shall not entail liability of any kind.

## 5. Provision of services

5.1. The period of provision of services under the present Contract shall start from 22 May 2012 and shall end by 31 December 2012, in accordance with the procedure set out below.

5.2. The Employer shall submit to the Executor the copy of the case-file which is to be analysed and which is being considered before the European Court of Human Rights, together with the list of questions to be studied.

5.3. The Executor shall carry out the study of the case-law of the European Court of Human Rights concerning compliance with the requirements of the Convention for the Protection of Human Rights and Fundamental Freedoms as

про захист прав людини і основоположних свобод, а також документів органів Ради Європи з урахування особливостей конкретної справи, яка знаходиться на розгляді Європейського суду.

5.4. За результатами дослідження Виконавець готує меморандум, в якому відображаються позиція Європейського суду чи органів Ради Європи щодо питань, які є предметом дослідження, а також висновки щодо можливості їх застосування для підготовки позиції Уряду України з огляду на обставини конкретної справи.

5.5. Передача Виконавцеві копій матеріалів справи, а також перелік питань, які необхідно дослідити оформлюється протоколом.

5.6. Виконавець здійснює дослідження упродовж строку, що не перевищує 1 (одного) місяця.

5.7. Замовник нараховує Виконавцеві штрафні санкції у розмірі вартості однієї години здійснення дослідження за кожен день порушення строку проведення дослідження, визначеного пунктом 5.6. Договору.

5.8. Місце надання послуг Міністерство юстиції України, м. Київ, вул. Городецького, 13.

## 6. Права та обов'язки сторін

6.1. Замовник зобов'язаний:

6.1.1. Надати Виконавцеві копії матеріалів справи, а також перелік питань, які необхідно дослідити.

6.1.2. Приймати надані послуги згідно з актом прийому-передачі наданих послуг (якщо надані послуги відповідають умовам цього Договору).

6.1.3. Своєчасно та в повному обсязі сплачувати за надані послуги;

6.2. Замовник має право:

6.2.1. Контролювати надання послуг у строки, встановлені цим Договором. Здійснювати перевірку якості дослідження та відповідності дослідження вимогам, встановленим у п. 2.1.

6.2.2. Достроково розірвати Договір та вимагати відшкодування збитків у разі, якщо надання Виконавцем послуг у строк, передбачений цим договором, стає явно неможливим, або ж якщо під час надання послуг стане очевидним, що вони не будуть ⋯⋯⋯⋯, ⋯⋯⋯⋯ або на

well as of the documents of the institutions of the Council of Europe with regard to specific features of the particular case being considered before the European Court of Human Rights.

5.4. In accordance with the findings, the Executor shall prepare the memorandum that is to reflect the position of the European Court of Human Rights or the institutions of the Council of Europe on issues studied; the Executor shall also draw up the conclusions on possibilities of their application in the process of drawing up the position of the Ukrainian Government taking into account circumstances of the particular case..

5.5. The submission of the copies of the case-file and of the list of questions to be studied to the Executor shall be formalised by means of the relevant record.

5.6. The Executor shall carry out the study within the period that is not to exceed 1 (one) month.

5.7. In the case of failure to meet a date, the Employer shall fine the Executor in the amount of cost of one hour per each day outside the time-limit for the study set out in § 5.6. of the Contract.

5.8. The Service location shall be the Ministry of Justice of Ukraine, City of Kyiv, 13 Horodetskogo St..

## 6. Rights and obligations of the Parties

6.1. The Employer shall:

6.1.1. Submit copies of case-files together with the list of questions to be studied to the Executor.

6.1.2. Accept the services made according to the statement of transfer and acceptance of the services delivered (if the services delivered comply with the conditions of the present Contract).

6.1.3. Pay for services delivered timely and in full;

6.2. The Employer shall have the right to:

6.2.1. Check that the services are provided within the time-limits established by the present Contract, verify the quality of the study and its compliance with the requirements set out in § 2.1.

6.2.2. Terminate ahead of schedule the present Contract and require payment of damage in the case if provision of services by the Executor within the time-limits established by the present Contract becomes clearly impossible or if during provision of the services it becomes quite clear that they are not going to be provided

відповідному рівні.

6.2.3. Зменшувати обсяг закупівлі надання послуг та загальну вартість цього Договору залежно від реального фінансування видатків. У такому разі Сторони вносять відповідні зміни до цього Договору;

6.2.4. Повернути рахунок Виконавцю без здійснення оплати в разі неналежного оформлення документів (відсутність печатки, підписів тощо).

6.3. Виконавець зобов'язаний:

6.3.1. Забезпечити надання послуг у строки, встановлені цим Договором;

6.3.2. Забезпечити надання послуг, якість яких відповідає умовам, встановленим розділом 2 цього Договору.

6.3.3. Надати Замовнику результат дослідження в електронному та друкованому вигляді, а також повернути копії матеріалів справи.

6.3.4. Не розголошувати відомості, що містяться у матеріалах справи, які йому було передано для здійснення дослідження.

6.3.5. Дотримуватися умов цього Договору і нести відповідальність за їх невиконання.

6.4. Виконавець має право:

6.4.1. Своєчасно та в повному обсязі отримувати плату за надані послуги;

6.4.2. На дострокове надання послуг за письмовим погодженням Замовника.

## 7. Відповідальність сторін

7.1. У разі невиконання або неналежного виконання своїх зобов'язань за Договором Сторони несуть відповідальність, передбачену цим Договором та чинним законодавством України.

## 8. Обставини непереборної сили

8.1. Сторони звільняються від відповідальності за невиконання або неналежне виконання зобов'язань за цим Договором у разі виникнення обставин непереборної сили, які не існували під час укладання Договору та виникли поза волею Сторін (аварія, катастрофа, стихійне лихо, епідемія, епізоотія, війна тощо).

8.2. Сторона, що не може виконувати зобов'язання за цим Договором внаслідок дії обставин непереборної сили, повинна не

properly or at the adequate level.

6.2.3. Reduce the scope of procurement of services and the price of the present Contract depending on actual funding of the expenses. In such an event the Parties shall make relevant amendments to the Contract;

6.2.4. Return the bill to the Executor without making payment in the case of improper drawing up of documents (absence of the seal, signatures etc.).

6.3. The Executor shall:

6.3.1. Provide services within the time-limits established by the present Contract;

6.3.2. Provide services whose quality complies with the requirements set out in Section 2 of the present Contract.

6.3.3. Provide the Employer with the findings of the study both in electronic and printed form and return the copies of the case-files.

6.3.4. Not make public information contained in the case-file submitted for the study.

6.3.5. Comply with the provisions of the present Contract and bear responsibility for failure to comply with them.

6.4. The Executor shall have the right to:

6.4.1. Receive payment for the services provided timely and in full;

6.4.2. Provide services ahead of time, upon the written consent of the Employer.

## 7. Responsibility of the Parties

7.1. In the case of failure to meet their obligations or in case of improper execution of their obligations under the present Contract, the Parties shall be held liable as provided for by the present Contract and by the Ukrainian legislation in force.

## 8. Force majeure

8.1. The Parties shall not be held liable for failure to meet their obligations or in the case of improper execution of their obligations under the present Contract in the case of emergence of force majeure circumstances that did not exist at the time of conclusion of the present Contract and have arisen beyond the control of the Parties (accident, crash, natural disaster, epidemics, epizootic outbreak, war etc.).

8.2. The Party that is unable to meet its obligations under the present Contract as result of force majeure circumstances, shall no later than

пізніше ніж протягом семи днів з моменту їх виникнення повідомити про це іншу Сторону у письмовій формі.

8.3. Доказом виникнення обставин непереборної сили та строку їх дії є відповідні документи, що видані ТПП України, а також іншими уповноваженими державними органами.

8.4. У разі коли строк дії обставин непереборної сили продовжується більше ніж тридцять днів, кожна із Сторін в установленному порядку має право розірвати цей Договір.

## 9. Вирішення спорів

9.1. У випадку виникнення спорів або розбіжностей Сторони зобов'язуються вирішувати їх шляхом взаємних переговорів та консультацій.

## 10. Строк дії Договору

10.1. Цей Договір набирає чинності з моменту його підписання і скріплення печатками Сторін та діє до повного виконання Сторонами своїх зобов'язань, але не пізніше 31 грудня 2012 року.

10.2. Закінчення строку Договору не звільняє Сторони від відповідальності за його порушення, яке мало місце під час дії Договору.

## 11. Інші умови Договору

11.1. Будь-які зміни та доповнення до цього Договору набирають чинності з моменту належного оформлення Сторонами відповідної Додаткової угоди до цього Договору.

11.2. Одностороння відмова від виконання Сторонами своїх зобов'язань, які передбачені цим Договором, не допускається, крім випадків, передбачених цим Договором та чинним законодавством України.

11.3. У випадках, не передбачених цим Договором, Сторони керуються чинним законодавством України.

11.4. Цей Договір укладається у двох примірниках, що мають однакову юридичну силу, по одному для кожної Сторони.

within seven days from the moment of emergence thereof, notify the other Party in written form.

8.3. Relevant documents issued by the Ukrainian Chamber of Commerce and by the other competent bodies shall be the proof of force majeure circumstances and of the period they would persist.

8.4. In the case when force majeure circumstances continue over thirty days, any of the Parties may terminate the present Contract in accordance with the established procedure.

## 9. Dispute settlement

9.1. In the case of disputes or clash of opinions, the Parties shall undertake to resolve them by way of negotiations and consultations.

## 10. Duration of the Contract

10.1. The present Contract shall come into effect from the moment of its signature and sealing by the Parties and shall remain in effect until full execution by the Parties of their obligations but not later than 31 December 2012.

10.2. The expiry of Contract's duration shall not spare the Parties of responsibility for its violation that took place during the period of its being in effect.

## 11. Other provisions

11.1. Any amendments or supplements to the present Contract shall come into effect from the moment of proper formalisation by the Parties of any additional Agreement to the present Contract.

11.2. Unilateral refusal by any of the Parties to execute its obligations provided for in the present Contract shall not be allowed unless in case provided for in the present Contract or in the Ukrainian legislation in force.

11.3. In the cases not provided for in the present Contract, the Parties shall act pursuant to the Ukrainian legislation in force.

11.4. The present Contract is drawn up in two copies, each copy for each Party, that have equal legal force.

| | |
|---|---|
| **12. Місцезнаходження та банківські реквізити сторін** | **12. Legal addresses and bank data of the Parties** |

**ЗАМОВНИК:**

Міністерство юстиції України
Юридична адреса: 01001, м. Київ,
вул. Городецького, 13
Фізична адреса: м. Київ,
пров. Рильський, 10
Тел.: 271-15-72
код за ЄДРПОУ 00015622
Р/рахунок 35213036000030
в Державному Казначействі України
МФО 820172

Заступник Міністра юстиції –
керівник апарату

А.Ю.Сєдов

**ВИКОНАВЕЦЬ:**

**Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates**
68, rue du Faubourg Saint-Honoré
75008 Paris, France
T: 331.55.27.11.00
F: 331.55.27.21.99
**Partner**

_____ **Gregory B. Craig**
Seal

*Gregory B. Craig* AVP2

**THE EMPLOYER:**

Ministry of Justice of Ukraine
Legal address: 13, Horodetskogo St., Kyiv,
01001, Ukraine
Physical address: 10, Rylskiy Lane, Kyiv
Tel.: 380-44-279-48-56
Fax: 380-44-279-38-74
C/a 35213036000030
in the DKU
MFO 820172
Identification code 00015622

Deputy Minister - Head of Apparat
of the Ministry of Justice

Mr. Sedov A.Y.

**THE EXECUTOR:**

**Skadden, Arps, Slate, Meagher & Flom LLP and Affiliates**
68, rue du Faubourg Saint-Honoré
75008 Paris, France
T: 331.55.27.11.00
F: 331.55.27.21.99
**Partner**

_____ **Gregory B. Craig**
Seal

*Gregory B. Craig* AVP2

# ATTACHMENT B

## Proposed Agreement in English dated April 10, 2012

2013 FEB -6  AM 8: 4

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

FIRM/AFFILIATE OFFICES
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

<u>CONFIDENTIAL</u>

April 10, 2012

To:        The Ministry of Justice
           The Government of Ukraine

From:      Gregory B. Craig, Partner

Subject:   Retainer Memorandum

Re:        Terms and Conditions

We are pleased that you are retaining Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps" or the "Firm") in connection with the assignment described below ("the Engagement"). It is agreed that the terms of this Retainer Memorandum will be incorporated by reference into the Agreement between the Firm and the Ministry of Justice of the Government of Ukraine ("the Ministry") to which this Retainer Memorandum has been attached.

### Scope of Engagement

The Engagement involves serving as a rule of law consultant to the Ministry and advising the Ministry on a variety of rule of law issues, including those that may arise before the European Court for Human Rights. The services to be provided by the Firm in connection with the Engagement will encompass those legal services normally and reasonably associated with this type of engagement which the Firm has been requested to provide and which are consistent with its ethical obligations. It is understood that the Firm's client is the Ministry, which is a department of the Government of Ukraine. The Firm is willing to take on this project with the clear understanding that the Firm will have access to all relevant materials and information that the Firm deems necessary to do its job, and that the Firm will be free to reach its own conclusions based on its own independent work. It is understood that the Firm is not being retained to engage in any "political activities" – and will not engage in any such activities – as defined in the Foreign Agent Registration Act (FARA).

### Engagement Personnel

Gregory Craig will be responsible for and actively involved in the Engagement. Other lawyers involved in the Engagement will include Clifford Sloan, Mike Loucks and Matthew Cowie. Additional lawyers will be added on an as-needed basis.

The Ministry of Justice
April 10, 2012
Page 2

## Fees and Expenses

Our fees will be based on the time that the Firm's lawyers spend on the Engagement along with our out of pocket expenses. In addition to the terms for payment set forth in the Agreement to which this memorandum is attached, we have agreed to offset our fees for time – charged at our normal hourly rates – and reimbursement of our out-of-pocket expenses against a retainer that has been paid in advance.

As for out-of pocket expenses, see Annex A attached. This may be periodically updated.

## Waivers and Related Matters

The Firm represents a broad base of clients on a variety of legal matters. Accordingly, absent an effective conflicts waiver, conflicts of interest may arise that could adversely affect your ability and the ability of other clients of the Firm to choose the Firm as its counsel and preclude the Firm from representing you or other clients of our Firm in pending or future matters. Given that possibility, we wish to be fair not only to you, but to our other clients as well. Accordingly, this letter will confirm our mutual agreement that the Firm may represent other present or future parties on matters other than those for which it had been or then is engaged by the Government, whether or not on a basis adverse to the Ministry or any of its present or future affiliates, including in litigation, legal or other proceedings or matters, which are referred to as "Permitted Adverse Representation."

In furtherance of this mutual agreement, the Ministry agrees that it will not for itself or any other party assert the Firm's representation of the Ministry or any of its present or future affiliates, including any other organs of the Government of Ukraine, either in its representation in the Engagement or in any other matter in which the Ministry retains the Firm, as a basis for disqualifying the Firm from representing another party in any Permitted Adverse Representation and agrees that any Permitted Adverse Representation does not constitute a breach of any duty owed by the Firm. The waiver provided for in this and the preceding paragraph includes the Firm's ongoing representation of OAO Gazprom and any of its present or future affiliates or subsidiaries. The Ministry agrees that this paragraph and the preceding one do not expand the scope of the Engagement to encompass affiliates of the Ministry unless expressly agreed to by the Firm.

## Duty of Confidentiality

Our representation in this Engagement is premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit without the Ministry's consent. Such obligations are subject to certain exceptions, including the laws, rules and regulations of certain jurisdictions relating to money laundering and terrorist financing. Provided that the Firm acts in the manner set forth in the first sentence of this paragraph and subject to the exceptions noted above, the Ministry will not for itself or any other

The Ministry of Justice
April 10, 2012
Page 3

party assert that the Firm's possession of such confidential information, even though it may relate to a matter for which the Firm is representing another client or may be known to someone at the Firm working on the matter (a) is a basis for disqualifying the Firm from representing another of its clients in any matter in which the Ministry or any other party has an interest; or (b) constitutes a breach of any duty owed by the Firm. In addition, the Firm's failure to share with the Ministry any confidential information received from another client will not be asserted by the Ministry as constituting a breach of any duty owed to the Ministry by the Firm, including any duty regarding information disclosure.

If the Firm receives from any person or entity a subpoena or request for information that is within our custody or control or the custody or control of our agents or representatives, we will, to the extent permitted by applicable law, advise the Ministry before responding so that the Ministry has the opportunity to intervene or interpose any objections. Should the Ministry object to the provision of such information, the Firm may thereafter provide such information only to the extent authorized by the Ministry or required by a court or other governmental body of competent jurisdiction. The Ministry agrees to pay the Firm for any services rendered and charges and disbursements incurred in responding to any such request at the Firm's customary billing rates and pursuant to the Firm's charges and disbursements policies.

The Ministry agrees that the Firm may disclose the fact of this Engagement and related general information to the extent that such disclosure does not convey any confidential or non-public information and it is not adverse to the Ministry's interests.

<u>Client Files and Retention</u>

In the course of our work on this matter, we shall maintain a physical file relating to the matter. In the file we may place materials received from you with respect to the matter and other materials, including correspondence, memos, filings, drafts, closing sets, pleadings, deposition transcripts, exhibits, physical evidence, expert's reports, and other items reasonably necessary to your representation (the "Client File"). The Client File shall be and will remain your property. We may also place in the file documents containing our attorney work product, mental impressions or notes, and drafts of documents ("Work Product"). You agree that Work Product shall be and remain our property. In addition, electronic records (except those to be proffered to you at the conclusion of a matter as described below) such as e-mail and documents prepared on our word processing system shall not be considered part of your Client File unless it has been printed in hard copy and placed in your physical file, and does not constitute Work Product. You agree that we may adopt and implement reasonable retention policies for such electronic records and that we may store or delete such records in our discretion.

At the conclusion of a matter (which shall be defined as the time that our work on any matter subject to this letter has been completed), you shall have the right to take possession of the original of your Client File (but not including the Work Product). We will be entitled to make physical or electronic copies if we choose. You also agree, upon our proffer, at the conclusion of

The Ministry of Justice
April 10, 2012
Page 4

a matter (whether or not you take possession of the Client File), to take possession of any and all original contracts, stock certificates, deeds and other such important documents or instruments that may be in the Client File, without regard to format, and we shall have no further responsibility with regard to such documents or instruments.  If you do not take possession of the Client File at the conclusion of a matter, we will store such file in accordance with our standard retention procedures for a period of at least seven (7) years (the "Retention Period").  Such retention (or maintenance of accounting or other records related to our representation) shall not constitute or be deemed to indicate the presence of a continuing attorney-client relationship. During the time that we store the Client File, you shall have the right to take possession of it at any time that you choose.  Subject to the foregoing, we may dispose of the Client File without further notice or obligation to you.

\*         \*         \*

The provisions of this Retainer Memorandum will continue in effect, including if the Firm's representation is ended at your election (which, of course, the Ministry is free to do at any time) or by the Firm (which would be subject to ethical requirements).  In addition, the provisions of this Retainer Memorandum will apply to future engagements of the Firm by the Ministry unless we mutually agree otherwise.

This agreement and any claim, controversy or dispute arising under or relating to this agreement, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties shall be governed by, and construed in accordance with, the laws of the State of New York.  For purposes of this letter, references to Skadden Arps or the Firm include our affiliated law practice entities.

In the event there is found to be any inconsistency between the terms of this Retainer Memorandum and the Agreement between the Ministry and the Firm to which this Memorandum is attached, the terms of this Retainer Memorandum will take precedence.

The Ministry of Justice
April 10, 2012
Page 5


If this letter is satisfactory, please sign a copy and return it to me.

We appreciate the opportunity to work on this project and look forward to doing so.

          With best regards.

                           Sincerely,

                           Gregory B. Craig

By: _____
    Name:
    Title:

Dated:  As of

Enclosures

### SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES
#### Policy Statement Concerning Charges and Disbursements
#### Effective April 1, 2010

*Skadden Arps bills clients for reasonable charges and disbursements incurred in connection with an engagement. Clients are billed for disbursements based on the actual cost billed by the vendor or in a few cases noted below, at rates derived from internal cost analyses or at rates below or approximating comparable outside vendor charges.*

---

*I. Research Services.* Charges for LexisNexis and Westlaw are billed at levels below that which would be charged for individual usage on a particular engagement. Clients are billed at rates calculated from an aggregate discounted amount charged to and paid by the Firm to LexisNexis and Westlaw. Thomson Research services are charged based on client usage allocated from actual vendor charges. Charges for other services outside research services are billed at the actual amounts charged by vendors.

The State of Delaware Database provides computer access to a corporations database in Dover, Delaware. The charge for this service is $50 per transaction, which is the average amount charged by outside services.

*II. Travel-Related Expenses.* Out-of-town travel expenses are billed at actual cost and include air or rail travel, lodging, car rental, taxi or car service, tips and other reasonable miscellaneous costs associated with travel. Corporate and/or negotiated discounted rates are passed on to the client. Specific Firm policies for expenditures relating to out-of-town travel include:

- *Air Travel.* Coach class is the standard on most U.S. domestic flights. However, for flights with scheduled flight times longer than 5 hours and international flights business class is generally used.

- *Lodging.* We strive to book overnight accommodations at hotels with which the Firm or the Client has preferred corporate rates.

Local travel charges include commercial transportation and, when a private car is used, mileage, tolls and parking. Specific policies govern how and when a client is charged for these expenses; these include:

- Fares for commercial transportation (e.g., car service, taxi, rail) are charged at the actual vendor invoice amount. The charge for private car usage is the IRS rate allowance per mile (or the equivalent outside the United States) plus the actual cost of tolls and parking.

- Round-trip transportation to the office is charged for attorneys who work weekends or holidays. Transportation home may be charged on business days when an attorney works past a certain hour (typically 8:30 p.m.) and has worked a minimum of ten hours that day.

- Local travel for support staff is charged when a staff member works past a certain hour (typically 8:30 p.m.). Charges are limited by Firm policy and depend on form of transportation and distance traveled.

*III. Word Processing, Secretarial and other Special Task-Related Services.* Routine secretarial tasks (correspondence, filing, travel and/or meeting arrangements, etc.) are not charged to clients. Word processing services associated with preparing legal documents are charged at $50 (£25/€35) per hour.

Specialized tasks (such as EDGAR filings or legal assistant services) are recorded in the appropriate billing category (for example, legal assistant services are recorded as fees in "Legal Assistant Support" on bills)

**IV.  _Reproduction and Electronic Document Management_.**  Photocopying services (including copying, collating, tabbing and velo binding) performed in-house are charged at $0.15 (£0.07/€0.11) per page, which represents the average internal cost per page.  Color photocopies are charged at $0.80 (£0.40/€0.55) per page (based on outside vendor rates).  Photocopying projects performed by outside vendors are billed at the actual invoice amount.  Special arrangements can be made for unusually large projects.

Electronic Data Management services (e.g., scanning, OCR processing, data and image loading/exporting, CD/DVD creation, printing from scanned files, and conversions) performed by outside vendors are billed at the actual invoice amount and those performed in-house are billed at rates comparable to those charged by outside vendors.

**V.  _Electronic Communications_.**  Clients are charged for communications services as follow:

_Telephone Charges_.  There is no charge for local telephone calls or internal long distance telephone calls. External telephone calls such as collect, cellular calls, credit card, hotel telephone charges and vendor-hosted conference calls are charged at the vendor rate plus applicable taxes and are assigned to the specific matter for which such charges were incurred.

_Facsimile Charges_.  There is no charge for facsimile usage

**VI.  _Postage and Courier Services_.**  Outside messenger and express carrier services are charged at the actual vendor invoice amount which frequently involves discounts negotiated by the Firm.  Postage is charged at actual mail rates.  On certain occasions, internal staff may be required to act as messengers in which case the staff's applicable hourly rate is charged.

**VII.  _UCC Filing and Searches_.**  Charges for filings and searches, in most instances, are billed at the flat fee charged by the vendor.  Unusual filings and searches will be charged based on vendor invoice.

**VIII.  _Meals_.**  Business meals are charged at actual cost. Luncheon and dinner meetings at the Firm are charged based on the costs developed by our food service vendor. Breakfast, beverage and snack services at the Firm's offices are not charged, except in unusual circumstances.

When overtime, weekend or holiday work is required, clients are charged for the actual, reasonable cost of an attorney's meal and, for non-attorneys, a standard amount determined by Firm policy.

**IX.  _Direct Payment by Clients of Other Disbursements_.**  Other major disbursements incurred in connection with an engagement will be paid directly by the client.  (Those which are incurred and paid by the Firm will be charged to the client at the actual vendor's invoice amount).  Examples of such major disbursements that clients will pay directly include:

Professional Fees (including disbursements for local counsel, accountants, witnesses and other professionals)

Filing/Court Fees (including disbursements for agency fees for filing documents, standard witness fees, juror fees)

Transcription Fees (including disbursements for outside transcribing agencies and courtroom stenographer transcripts)

Other Disbursements (including any other required out-of-pocket expenses incurred for the successful completion of a matter)

\* \* \* \* \*

\*  Fees incurred for attorney and Firm personnel in connection with the Engagement are not covered by this policy.

# ATTACHMENT C

Letter from Ministry of Justice dated
December 20, 2012

*Unofficial translation*

**Date: 20 of December, 2012**

Skadden, Arps, Slate,
Meagher & Flom LLP and
Affiliates
For Gregory Craig

1440 New York Avenue NW
Washington DC 20005

### Dear Mr. Craig!

In addition to the letter of 28 August, 2012 please, be informed that the Ministry of Justice of Ukraine according to the legislation of Ukraine has started the procedure of legal service procurement on expert research of the compliance of the principle of the rule of law in the case of *«Tymoshenko v. Ukraine»*, which will allow us to conclude agreement in the nearest future, which will cover the need to increase the cost of services and compensate the firm's expenses.

To comply with the Law of Ukraine On Public Procurement, we request to provide the Ministry of Justice of Ukraine the following list of mentioned below documents or those with similar information:

- Confirmation that the Firm has employees with respective qualifications that have adequate knowledge and experience;
- Confirmation that the Firm has documental proof of execution of similar contracts or copies of respective contracts;
- Documents that confirm financial standing: firm's balance, report on financial performance, report on cash flow in corporate accounts as of the last reporting date and confirmation from your bank whether or not you have outstanding payments on your corporate loans.

Sincerely,

**Deputy Minister-
Head of personnel**

A.Y. Sedov



**МІНІСТЕРСТВО
ЮСТИЦІЇ
УКРАЇНИ**

Україна, 01001, м.Київ
вул. Городецького, 13
Тел./факс: +380 44 278-37-23

**MINISTRY
OF JUSTICE
OF UKRAINE**

13, Horodetskogo St.
Kyiv 01001, Ukraine
Tel/fax: +380 44 278-37-23

20.12.2012 № _____

На № _____

**Skadden, Arps, Slate, Meagher &
Flom LLP and Affiliates
Грегорі Крейгу**

1440 New York Avenue N.W,
Washington D.C. 2005

## Шановний пане Крейг!

На додаток до листа від 28 серпня 2012 року інформуємо, що Міністерством юстиції України відповідно до вимог законодавства України розпочато процедуру закупівлі послуг з експертного дослідження щодо дотримання принципу верховенства права у справі «Тимошенко проти України», яка дозволить найближчим часом укласти угоду в якій будуть врегульовані питання необхідності збільшення вартості послуг та відшкодування витрат Виконавця.

На виконання вимог закону України «Про здійснення державних закупівель» просимо надати Міністерству юстиції нижченаведені документи або такі, що містять аналогічну інформацію:

-   довідку у довільній формі про наявність працівників відповідної кваліфікації, які мають необхідні знання та досвід;
-   довідку у довільній формі про наявність документально підтвердженого досвіду виконання аналогічних договорів або копії відповідних договорів;
-   документи, підтверджуючі фінансову спроможність: баланс, звіт про фінансові результати, звіт про рух грошових коштів на останню звітну дату та довідку з обслуговуючого банку про відсутність (наявність) заборгованості за кредитами.

**З повагою**

**Заступник Міністра –
керівник апарату**

А.Ю. Сєдов

# ATTACHMENT D

Reply from Skadden dated February 4, 2013

2013 FEB -6  AM 8:55

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

TEL: (202) 371-7000
FAX: (202) 393-5760
www.skadden.com

FIRM/AFFILIATE OFFICES
—
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON
-
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

February 4, 2013

The Honorable A.Y. Sedov
Deputy Minister – Head of Personnel
Ministry of Justice of Ukraine
13 Horodetskogo Street
Kiev 01001, Ukraine

Dear Deputy Minister Sedov:

In your letter of 20 December 2012, you asked me, on behalf of Skadden, Arps, Slate, Meagher & Flom ("the Firm"), to provide the Ministry of Justice of Ukraine with certain information about the Firm's capacities, qualifications, record of performance in the past and financial standing.

You have asked for this information in connection with the Ministry's desire to reach a new and additional agreement with the Firm – consistent with Ukraine's procurement requirements – that will cover the increase in the cost of services and expenses associated with the Firm's work as special counsel to the Ministry on the rule of law.

You have asked for information about the following topics:

(1) Whether the lawyers working on this project are qualified and have adequate knowledge and experience;

(2) Whether the Firm has performed similar services for and signed similar agreements with other clients; and

(3) Whether the Firm is in good financial standing.

I am attaching materials to this letter that should address and answer each of these concerns.

As I understand it, the Ministry is not proposing any change in the Firm's assignment. To be even more specific, the Ministry understands and accepts that the Firm will not be required to – and will not – engage in any activities covered by the United States Foreign Agent Registration Act (FARA).

The Honorable A.Y. Sedov
February 4, 2013
Page Two


Thank you for the opportunity to be of service to the Ministry of Justice of Ukraine.

Very truly yours,

Gregory B. Craig

# Attachment 1

Record of capacities and qualifications of Skadden lawyers working on assignment for the Ministry of Justice of Ukraine.

2013 FEB -6 AM 8:46



2013 FEB -6  AM 8:4

# Biography



## Gregory B. Craig

*Partner*
*Skadden, Arps, Slate, Meagher & Flom LLP*
*Litigation*

A trial lawyer with extensive experience in a wide variety of cases, Greg Craig has successfully defended individuals and entities in a number of high-profile criminal and civil proceedings.

***Civil Litigation:*** Examples of Mr. Craig's civil litigation experience include the following:

In 2000, Mr. Craig successfully represented Elian Gonzalez's father, Juan Miguel Gonzalez, in administrative and court proceedings involving Mr. Gonzalez's effort to regain custody of his son. Also in 2000, Mr. Craig helped lead the trial team representing Warnaco in contract/license litigation with Calvin Klein and his company. In 1999, Mr. Craig represented a major corporation in a trial in which a senior executive brought suit against the company alleging age discrimination. Mr. Craig represented former U.N. Secretary General Kofi Annan in connection with the Volcker Commission's investigation of the Oil-for-Food Programme at the U.N.

During the last 15 years, Mr. Craig has represented a variety of foreign individuals and entities that have required advice and assistance with various U.S. government agencies, including the Consular Bureau in the State Department, the Immigration and Naturalization Service, the Office of Foreign Asset Control in the Treasury Department and the Securities and Exchange Commission. For example, Mr. Craig represented two Chicago policemen in extradition proceedings in federal court in Chicago and brought a declaratory judgment action on their behalf in federal court in Washington, D.C., which resulted in a federal judge finding the U.S. extradition statute of 1848 unconstitutional.

From 1978 to 1979, Mr. Craig represented Alexander Solzhenitsyn in a libel case in federal court in San Francisco and advised him on other matters up through 1983. In 1977, he brought suit on behalf of one of the first (and lead) plaintiffs in the swine flu litigation that was subsequently consolidated by the Judicial Panel on Multidistrict Litigation. From 1973 to 1975, working with Edward Bennett Williams, Mr. Craig represented the clubs of the National Hockey League in antitrust litigation involving the World Hockey Association. From 1972 to 1974, working with Joseph A. Califano, Jr., Mr. Craig represented the Washington Post Company and various reporters in connection with the Watergate scandal and the grand jury investigation of Vice President Spiro Agnew.

Washington, D.C. Office

T: 202.371.7400
F: 202.661.9100

E: gregory.craig@skadden.com

### Education

J.D., Yale Law School, 1972

Diploma in Historical Studies, Cambridge University, 1968

The Lionel DeJersey Harvard Fellowship ("The John Harvard Fellow"), 1968

A.B., Harvard College, 1967 (*magna cum laude*; Phi Beta Kappa)

### Bar Admissions

District of Columbia

U.S. Supreme Court

U.S. Courts of Appeals for the District of Columbia, Second, Third, Fourth, Sixth, Seventh and Eleventh Circuits

U.S. District Courts for the District of Columbia, Central and Northern Districts of California, District of Connecticut, Southern District of New York, District of Maryland, Eastern District of Virginia, Central and Eastern Districts of Michigan, Southern District of Florida, and Central District of Alabama

### Associations

Member, Board of Trustees, German Marshall Fund of the United States

(continued)

# Biography

## Gregory B. Craig

*Criminal Litigation:* Examples of Mr. Craig's criminal litigation experience include the following:

Mr. Craig has been an active participant in the American criminal justice system for more than 35 years. His career as a criminal defense lawyer began in 1974 when he became the assistant federal public defender for the District of Connecticut. He served in that capacity until September of 1976. Since then, Mr. Craig has represented numerous American corporations and corporate executives who have been the subjects of grand jury investigations and/or who also have been charged with criminal offenses.

In 1975, he represented an individual charged with arson in a six-week trial in federal court in Connecticut. In 1977, working with Edward Bennett Williams, Mr. Craig represented Mr. Richard Helms, a former director of Central Intelligence, who was under grand jury investigation for perjury. That same year, he represented the first FBI agent ever to be indicted, who was accused of illegal wiretapping, breaking and entering, and mail opening in connection with the FBI investigation of the Weather Underground. In 1978 to 1980, also with Edward Bennett Williams, Mr. Craig represented a prominent local businessman charged with bribing a D.C. government official. In 1981 to 1982, working with Vince Fuller, Mr. Craig represented John Hinckley, who was charged with the attempted assassination of President Reagan. In 1983 to 1984, working with Edward Bennett Williams, Mr. Craig represented a prominent businessman who was charged with tax evasion in federal court in Miami. In 1990, Mr. Craig represented Senator Edward M. Kennedy in connection with the trial of his nephew, William Kennedy Smith, in Palm Beach, Florida.

### Other Experience:

For five years (1984-1988), he served as Senator Edward M. Kennedy's senior adviser on defense, foreign policy and national security issues.

In 1997, Secretary of State Madeleine Albright appointed Mr. Craig to be one of her senior advisers, and he served the Secretary as her Director of Policy Planning during the years 1997 to 1998.

In September 1998, President Clinton appointed Mr. Craig to be Assistant to the President and Special Counsel in the White House, where Mr. Craig led the team that was assembled to defend against impeachment. Mr. Craig also was a member of President Clinton's trial team in the United States Senate and presented the defense with respect to Count One during that trial.

From January 2009 to January 2010, Mr. Craig served as President Obama's White House Counsel.

Mr. Craig also has taught trial practice at both Yale Law School (1975-1976) and Harvard Law School (1981-1984).

In addition, Mr. Craig has served on the boards of many non-governmental organizations and foundations, including The Carnegie Endowment for International Peace (vice chair); the International Human Rights Law Group (chair); the Robert F. Kennedy Memorial; and the American Security Project. He repeatedly has been selected for inclusion in *The Best Lawyers in America*.

### Government Service

White House Counsel (2009-2010)

Assistant to the President and Special Counsel, The White House (1998-1999)

Director of Policy Planning, United States State Department (1997-1998)

Senior Adviser on Defense, Foreign Policy and National Security, Senator Edward Kennedy (1984-1988)



# Biography

## Cliff Sloan

*Partner*
*Skadden, Arps, Slate, Meagher & Flom LLP*
*Litigation, Intellectual Property, Media and Entertainment*

An experienced litigator, Mr. Sloan has litigated cases at all levels of federal and state courts, including six U.S. Supreme Court arguments, numerous arguments in the U.S. Courts of Appeals, and matters in trial and district courts across the country.

Mr. Sloan's practice focuses on a wide range of litigation and appeals, including cases involving intellectual property, administrative law, commercial disputes, securities law, tax controversies and constitutional issues. He also regularly advises clients on copyright, trademark, new media and First Amendment matters.

His litigation experience includes:

* a U.S. Supreme Court argument in February 2012, in a case about the scope of the Double Jeopardy Clause (*Blueford v. Arkansas*);

* a reversal of a summary judgment order dismissing Rosetta Stone's trademark infringement claims against Google, in a case he argued, in the U.S. Court of Appeals for the Fourth Circuit (*Rosetta Stone v. Google*);

* an *en banc* victory, in a case he argued, in the U.S. Court of Appeals for the First Circuit in an SEC case on the scope of Section 10b-5 liability (*SEC v. Tambone*);

* a victory in a music copyright infringement lawsuit in which he was lead counsel for the Bon Jovi band, as well as more than a dozen media and entertainment defendants, in the U.S. Court of Appeals for the First Circuit and the U.S. District Court for the District of Massachusetts (*Steele v. Turner Broadcasting*);

* a victory in a constitutional challenge to a Hawaii statute targeting an out-of-state company in which he was lead counsel for the company (*HRPT v. Lingle*); and

* a dismissal on sovereign immunity grounds for the Principality of Monaco in the U.S. District Court for the Central District of California (*Eringer v. Principality of Monaco*).

Mr. Sloan has served in high-ranking positions in all three branches of the federal government, including experience as Associate Counsel to the President and Assistant to the Solicitor General. He also has served on the U.S. Court of Appeals for the District of Columbia Circuit's Advisory Committee on Procedures.

(continued)

Washington, D.C. Office

T: 202.371.7040
F: 202.661.8340

E: cliff.sloan@skadden.com

### Education

J.D., Harvard Law School (*magna cum laude*), 1984

B.A., Harvard College (*magna cum laude*), 1979

### Bar Admissions

District of Columbia

Illinois

### Government Experience

Associate Counsel to the President of the United States (1993-1995)

Assistant to the Solicitor General, United States Department of Justice (1989-1991)

Associate Counsel, Office of Independent Counsel, Iran-Contra (1987-1988)

Law Clerk to Justice John Paul Stevens, United States Supreme Court (1985-1986)

Law Clerk to Judge J. Skelly Wright, United States Court of Appeals for the District of Columbia (1984-1985)

Executive Assistant, Congressman Sidney R. Yates (1979-1981)

### Media and Internet Experience

General Counsel, Washingtonpost. Newsweek Interactive (2000-2008)

Publisher, *Slate Magazine* (2005-2008)

Vice President, Business Development, Washingtonpost.Newsweek Interactive (2002-2005)

# Biography

## Cliff Sloan

Among his other activities, Mr. Sloan has been a leader in Internet litigation. *The National Law Journal* has described him as "an expert on cyberspace," and *The New York Times* singled out his *amicus curiae* brief in a landmark Supreme Court Internet case as "very likely" having a significant impact on the Justices.

From 2000 to 2008, Mr. Sloan served as General Counsel of Washingtonpost.Newsweek Interactive, *The Washington Post Company*'s online subsidiary. He was active in the in-house bar, serving on the board of directors of the Association of Corporate Counsel and on the Advisory Board of *Corporate Pro Bono*. From 2005 to 2008, he also served as Publisher of *Slate Magazine*, which was acquired by The Washington Post Company in 2005. He has taught the law of cyberspace as an adjunct law professor at Georgetown University Law Center, George Washington University Law School and American University's Washington College of Law.

Mr. Sloan was selected for inclusion in *The Best Lawyers in America 2013*. He also has received numerous awards, including being named "Appellate Lawyer of the Week" by *The National Law Journal* in 2012 for his representation in a case before the U.S. Supreme Court; and one of *Min Magazine*'s "21 Most Intriguing People in Publishing" in 2007. He is a member of the Legal Services Corp.'s *Pro Bono* Task Force. Mr. Sloan is the co-author of *The Great Decision*, a book about the historic Supreme Court case *Marbury v. Madison* (Public Affairs, 2009), and comments regularly on Supreme Court developments.

### Selected Publications

"Second Circuit Reverses Troubling Federal District Court Decision Affecting the Rights of Copyright Owners to Combat Online Piracy," *Media Law Resource Center*, April 2012

"Supreme Court's *Mayo Foundation* Opinion Grants Chevron Deference to Treasury Regulations," *The Tax Executive*, Spring 2011

"Goodbye to the 'Rule of Law' Justice," *The Washington Post*, April 10, 2010

"Why Marbury v. Madison Still Matters" *Newsweek*, March 2, 2009

# ALLON KEDEM

## EDUCATION

| | |
|---|---|
| 2002-2005 | **Yale Law School,** New Haven, CT |
| | J.D., June 2005 |

| | | |
|---|---|---|
| | Honors: | Soros Fellowship for New Americans (2004) |
| | Publications: | *Commodification and Contract Formation,* 73 U. CHI. L. REV. 1299 (2006) (with David Gamage) |
| | | Comment, *Can Attorneys and Clients Conspire?,* 114 YALE L.J. 1819 (2005) |
| | Activities: | Articles Editor – *Yale Law Journal* |
| | | Harlan Fiske Stone Prize – Morris Tyler Moot Court of Appeals |

| | |
|---|---|
| 1998-2002 | **Harvard College,** Cambridge, MA |
| | A.B., *magna cum laude,* Social Studies, June 2002 |

| | | |
|---|---|---|
| | Honors: | Phi Beta Kappa, John Harvard Academic Scholarship |
| | | Greenman Debating Award, Coolidge Debating Prize |
| | Activities: | President – Harvard Speech and Parliamentary Debate Society |

## WORK EXPERIENCE

| | |
|---|---|
| 2011-Present | **Skadden, Arps, Slate, Meagher & Flom,** Washington DC |
| | *Associate* |

| | |
|---|---|
| 2010-2011 | **Hon. Elena Kagan, Associate Justice, U.S. Supreme Court,** Washington, DC |
| | *Law Clerk* |
| | Preparation of memoranda on petitions for certiorari, merits cases, and emergency motions; assistance with drafting of case opinions. |

| | |
|---|---|
| 2009-2010 | **Hon. Anthony M. Kennedy, Associate Justice, U.S. Supreme Court,** Washington, DC |
| | *Law Clerk* |
| | Prepared memoranda on petitions for certiorari, merits cases, and emergency motions; assisted with drafting of case opinions. |

| | |
|---|---|
| 2007-2009 | **Office of Legal Counsel, U.S. Department of Justice,** Washington, DC |
| | *Attorney-Adviser* |
| | Researched and drafted opinions on constitutional, statutory, and administrative law issues on behalf of the Attorney General. |

| | |
|---|---|
| 2006-2007 | **Hon. Pierre N. Leval, U.S. Court of Appeals for the Second Circuit,** New York, NY |
| | *Law Clerk* |
| | Drafted opinions, orders, and memoranda; edited articles and speeches. |

| | |
|---|---|
| 2005-2006 | **Hon. Mark R. Kravitz, U.S. District Court for the District of Connecticut,** New Haven, CT |
| | *Law Clerk* |
| | Provided legal research; drafted opinions and orders; managed court docket. |

# ALEX T. HASKELL

1735 Johnson Ave. NW, Unit H • Washington, DC 20009 • 202.371.7332 • alex.haskell@skadden.com

## EDUCATION

**THE GEORGE WASHINGTON UNIVERSITY LAW SCHOOL**                    Washington, DC
Juris Doctor; with honors                                                    May 2011
*Activities:*      Member, *The George Washington Law Review*
                   Member, Alternative Dispute Resolution Skills Board
                   Vice Magister, Phi Delta Phi International Legal Fraternity
                   Vice President, GW Law Democrats

**UNIVERSITY OF PENNSYLVANIA**                                     Philadelphia, PA
Bachelor of Arts in International Relations, *cum laude*                     May 2008
*Honors:*      Mortar Board Senior Honors Society, Pi Gamma Mu Honors Society in the Social Sciences
*Activities:*  Theos Fraternity (Vice President), Kite and Key Society (Tour Guide and Ambassador)
*Thesis:*      "Of Markets and Humans: The Failure of Neo-Liberal Globalization in Latin America."

## EXPERIENCE

**SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP**                        Washington, DC
*Associate*                                                       October 2011 – present

**SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP**                        Washington, DC
*Summer Associate*                                               May 2010 – July 2010

**WASHINGTON NATIONALS BASEBALL CLUB , OFFICE OF CLUB COUNSEL**   Washington, DC
*Legal Intern*                                                  May 2009 – April 2010
- Drafted and reviewed sponsorship, employment, leasehold and other agreements entered into by the Club
- Conducted legal research and drafted memoranda regarding issues of compliance with State and Federal laws, along with the mandates and bylaws of Major League Baseball

**SCHNUR ASSOCIATES, INC.**                                         New York, NY
*Political and Legislative Consulting Intern*                   May 2007 – August 2007
- Researched and analyzed proposed New York City, New York State, and Federal Legislation to determine the affects of the potential laws on our client's constituents
- Produced memoranda and led presentations on legislative and campaign strategies for elected officials

**FOX SPORTS TELEVISION LATIN AMERICA – TORNEOS Y COMPETENCIAS**   Buenos Aires, Argentina
*Sports Television Intern and Translator*                         2007 – December 2007
- Served as lead translator of programming, converting English programs into Spanish and vice versa

**PANISH, SHEA AND BOYLE LLP**                                      Los Angeles, CA
*Legal Intern*                                                      Summer 2005
- Researched case law, analyzed statutes, and drafted internal memoranda regarding issues related to personal injury and product liability law suits
- Analyzed depositions, reviewed documents, and catalogued exhibits in preparation for civil litigation cases

## BAR ADMISSION

- California State Bar (2011)

## LANGUAGE SKILLS & INTERESTS

- Spanish (fluent)
- Organized Voter Protection and canvassing efforts for several national and state political campaigns
- Traveled extensively and participated in community service efforts throughout Europe and Latin America

## Attachment 2

Confirmation of past performance and financial
standing of Skadden.



**Skadden**

Skadden, Arps, Slate, Meagher & Flom LLP
& Affiliates

# Skadden Overview

### The Skadden, Arps Philosophy

Skadden, Arps, Slate, Meagher & Flom LLP and affiliates ("Skadden, Arps" or
"Skadden") was founded in 1948 by Marshall H. Skadden, Leslie H. Arps and
John H. Slate. These three attorneys, quite different in personality and tempera-
ment, shared a vision of the firm that continues and thrives today — a commitment
to professionalism and excellence in an atmosphere emphasizing teamwork, flexi-
bility and responsiveness. Our primary goal is to provide high-quality and cost-effec-
tive legal service through careful attention to client relationships, practice diversity,
global resources and investment in people and technology. Client needs always come
first at Skadden. We work hard to instill this attitude in all of our attorneys and staff,
recognizing that capable and dedicated people are the firm's most valuable asset



Corporate                          2        Regulatory Legislative      11

Litigation                         3

                                            Industry-Related Practices  13

Corporate Restructuring            5        Employment Issues and
                                            Advice to Individuals        15
Privatizations                     6

Finance                            7
                                            *Pro Bono* Matters and
                                            Fellowship Program           16

International                      9

# EXHIBIT 3



**U.S. Department of Justice**

**National Security Division**

_Washington, DC 20530_

Gregory B. Craig, Esq.                        APR - 9 2013
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue N.W.
Washington, D.C. 20005-2111

   Re: Possible Obligation to Register Pursuant to the
     Foreign Agents Registration Act

Dear Mr. Craig:

  This will acknowledge receipt of your letter of February 6, 2013, and enclosures responding to our letter of December 18, 2012, concerning your firm's possible obligation to register pursuant to the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 _et seq._ (FARA or the Act). We have reviewed the materials, and need additional information to determine whether your firm is obligated to register under the Act.

  As you know, Judge Kireyev of the Pechersky District Court of Kyiv convicted Yulia Tymoshenko of exceeding her authority and violating Ukrainian law. She was a popular political figure for many years and had campaigned unsuccessfully against Victor Yanukovich for President of the Ukraine. After he won the election, she was charged criminally with exceeding her authority while negotiating a gas deal with Russia. The agreement in issue was reached with Gazprom, owned by the Russian Government and also a client of your firm. After her conviction, Tymoshenko was sentenced to prison for seven years. She is appealing her conviction to the European Court of Human Rights. She maintains, among other things, that her prosecution was motivated by politics to silence her as a principal opponent of the Yanukovich regime. Recently, she was charged with tax evasion and embezzlement, and she has been named as a suspect in a murder case. She currently awaits further court proceedings in the Ukraine.

  On April 10, 2012, your firm signed a contract with the Ministry of Justice of Ukraine to study the Tymoshenko criminal case and "the events leading up to and including her prosecution and trial..."[1] The contract indicates that the study "must fully and objectively reflect European and American standards and practice with respect to rule of law,"[2] and must include "specific features of the particular case considered before the European Court of Human Rights."[3] Under the contract your firm will bill the Ukraine at 100.00 Ukrainian hryvnas per hour. The time spent on this contract by your firm is not to exceed 950 hours, and the fee for your firm's work will be 95,000 Ukrainian hrynyas. This is equivalent to $11,675.02 U.S. dollars.

cc: Poss Obligation    HHH:KPC:kpc
  Records 149-
  Chron        Typed: 04/09/2013
  KConnolly _105320_  Response_Skadden_040913

---

[1] The Tymoshenko Case, Skadden Arps Slate Meagher § Flom LLP, Executive Summary, at 1.
[2] Contract of April 10, 2012, between the Ukrainian Ministry of Justice and Skadden Arps Slate Meagher & Flom LLP, at § 2.1.
[3] Id.

It is unclear to us from the contract and supporting documentation how much additional money your firm charged the Ukrainian Government to perform this work. In addition to the April 10, 2012, contract for 95,000 Ukrainian hryvnas to be paid by the Ukrainian Ministry of Justice, your firm signed a Retainer Memorandum with the Government of Ukraine's Ministry of Justice on the same date. The agreement was incorporated by reference into the original contract. The fees and out of pocket expenses of the firm were to be charged by the firm to the Ministry of Justice. These would offset against a retainer which had been paid to the firm.[4] No mention is made of how much money the retainer amounted to and who paid it. A February 4, 2013, letter from the firm to the Ukrainian Ministry of Justice mentioned the increased cost of services and expenses owed to your firm for this project. Furthermore, with respect to the financing of the study please advise this office of the amount of money paid by the private citizen to your firm as mentioned in your letter of February 6, 2012, the name of the individual, as well as the individual's connection to your work for the Ukrainian Ministry of Justice. In addition, please list any other sources of money for the Tymoshenko work.

On January 14, 2013, Arnall Golden Gregory and Tauzin Consultants LLP registered as foreign agents for foreign principal, Dmitry Shpenov, a member of the Ukrainian parliament and the Party of Regions. Both of these foreign agents claimed in Attachment A that they will be "[a]dvocating for and advising the foreign principal with respect to advocacy efforts and alerting Congress and the Administration about economically disadvantageous policies, which detrimentally affected the State of Ukraine and the Ukrainian people as the result of the former Ukrainian government ..." Accompanying the FARA registration were informational materials, which included a copy of an indictment from the Northern District of California against Pavel Ivanovich Lazarenko, a former Ukrainian Prime Minister who is allegedly connected to Yulia Tymoshenko, and the executive summary of your firm's Tymoshenko report. The agents state they will contact "Members of Congress, congressional staff, and Obama Administration officials and employees."

We would appreciate your firm addressing the following questions relating to the report to assist this office in determining your firm's possible obligation under FARA. (1) To whom, if anyone, did your firm release or distribute the report and when? (2) When was the report released to the Ukrainian Ministry of Justice? (3) Did your firm give the report to the Los Angeles Times? (4) Did your firm know that Arnall Golden Gregory or Tauzin Consultants would be agents of Dmitry Shpenov in advocating in the United States for the Ukraine? (4) Because your firm was aware of the requirements of FARA and mentioned that it would not engage in any political activity in connection with the Tymoshenko case, what safeguards or agreements, if any, did your firm have with the Ukrainian Ministry of Justice about limiting the use of this report in the United States? (5) What was your firm's understanding of what would happen to the report when it was released to the Ukrainian Ministry of Justice? (6) Did you or anyone in your firm have any media interviews or comments to the media, public, or government officials about the report and the findings of your firm?

---

[4]Retainer Memorandum of April 10, 2012, at 2.

-3-

If you have any questions, please call me at (202) 233-0776.

Sincerely,


Heather H. Hunt, Chief
Registration Unit
Counterespionage Section
National Security Division

# EXHIBIT 4

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111
——
TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

June 3, 2013

Heather H. Hunt, Chief
Registration Unit
Counterespionage Section
National Security Division
U.S. Department of Justice
600 E Street, NW
Washington, DC 20530

**Re:    Response to April 9, 2013 Letter from National Security Division, US
Department of Justice**

Dear Ms. Hunt:

The purpose of this letter is to reply to the questions in your letter of April 9, 2013.

Let me just say at the outset that, throughout the period of our work for the Ministry, our assignment was to provide legal services to the Ministry by conducting an independent examination of the Tymoshenko matter applying western legal standards. We performed this function in our capacity as experienced lawyers and independent experts on the rule of law. At no time were we serving as the Ministry's agent in the United States.

You should also know that, throughout the period of our work for the Ministry, we were in this respect completely transparent, *i.e.*, we told everyone who was involved in the project that we had been retained by and were working for the Ministry of Justice of Ukraine in conducting this independent examination of the events that occurred in Ukraine. As you know from reading the report, the report is sharply critical of many aspects of the prosecution and concludes that, on various grounds, Ms. Tymoshenko's conviction likely would be reversed under western legal standards.

In the first paragraph on page two of your letter, you ask us to tell you the amount of money paid by the private citizen to Skadden, the name of the individual and the individual's connection to your work for the Ukrainian Ministry of Justice. The Ministry has asked that we not disclose the name of this individual or the amount of his contribution if possible. The private citizen's strong preference is the same, *i.e.*, to remain anonymous and not to disclose the amount of his funding. We do not believe that we engaged in conduct requiring us to register under FARA, and, respectfully, we therefore do not believe that you are entitled to such information. If you

conclude that we are required to register, or if, for some reason, you believe that such information is material to your inquiry, please let us know so that we may consider and understand your request in the context of your analysis of this issue. As to this individual's "connection to our work," other than providing financial assistance to help fund the project, this individual had no connection to the project whatsoever, either professionally or personally, and to our knowledge was not involved in any way with the work that we did.

In the following numbered paragraphs, we respond to your other questions as they appear in paragraph 3 of page two of your letter.

**(1)     To whom, if anyone, did your firm release or distribute the report and when?**

In addition to giving the report to representatives of the Government of Ukraine, the law firm on December 12-13, 2012 provided a copy of the report (1) to Ms. Tymoshenko's legal team in Ukraine, and to a member of her legal team in the United States, James Slattery (in response to his request); (2) to a representative of the individual in Ukraine who helped fund the project (the representative was Doug Schoen); (3) to David Sanger of the New York Times; (4) to Matthew Huisman of the National Law Journal; and (5) to Emily Alpert of the Los Angeles Times.

**(2)     When was the report released to the Ukrainian Ministry of Justice?**

The law firm completed the report and provided the final draft of the report to the Government of Ukraine in September 2012. The Ministry of Justice released the report on December 12-13, 2012.

**(3)     Did your firm give the report to the Los Angeles Times?**

Yes.

**(4)     Did your firm know that Arnall Golden Gregory or Tauzin Consultants would be agents of Dimitry Shpenov in advocating in the United States for the Ukraine?**

No. We have never heard of these individuals. To our knowledge, we have never met these individuals, never communicated with them or had any contact with them. We were – and are – unaware of their existence and had nothing to do with them.

**(4)[*sic*]Because your firm was aware of the requirements of FARA and mentioned that it would not engage in any political activity in connection with the Tymoshenko case, what safeguards or agreements, if any, did your firm have with the Ukrainian Ministry of Justice about limiting the use of this report in the United States?**

The law firm had no agreement with the Ministry of Justice of Ukraine about limiting distribution of this report. There was a clear understanding, however, that the law firm would not be involved in any activities that would require us to register as a foreign

agent.  Again, we understood our role to be that of lawyers conducting an independent examination of the events in Ukraine.  See also the answer to Question 5.

**(5)*[sic]* What was your firm's understanding of what would happen to the report when it was released to the Ukrainian Ministry of Justice?**

The law firm was aware that the Ministry of Justice was considering various ideas about what to do with the report.  It was the law firm's understanding that the Ministry's decision about how to handle the report would not be made until after the report was completed and after the Ministry had seen it.  The law firm viewed the distribution of the report as a matter that would be decided by the Ukraine Government in its sole discretion.  The law firm did not advise the Ministry on that issue.

**(6)*[sic]* Did you or anyone in your firm have any media interviews or comments to the media, public, or government officials about the report and the findings of your firm?**

The law firm issued no statements and made no comments to the media, the public or government officials about the report.  Gregory Craig provided brief clarifying statements about the report to David Sanger of the New York Times, to Emily Alpert of the Los Angeles Times and to Matthew Huisman of the National Law Journal.  One purpose of the statements was to correct misinformation that the media had received – and was reporting – from the Ministry of Justice and from the Tymoshenko legal team in Ukraine.  Neither the law firm nor its lawyers sought to influence American public opinion or US government policy.

To supplement our response to your earlier inquiry about agreements with Ukraine, I am attaching a signed copy of the English language version of our initial agreement with Ukraine and the copy of a more recent agreement – in English and in Russian – reflecting Ukraine's undertaking with respect to final payment.

Very truly yours,

Gregory B. Craig

Encls.

3

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

TEL: (202) 371-7000
FAX: (202) 393-5760
www.skadden.com

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

NSD/CES/REGISTRATION UNIT
20 JUN -5 AM 9: 06

CONFIDENTIAL

April 5, 2012

To:      The Ministry of Justice
         The Government of Ukraine

From:    Gregory B. Craig, Partner

Subject: Retainer Memorandum

Re:      Terms and Conditions

We are pleased that you are retaining Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden Arps" or the "Firm") in connection with the assignment described below ("the Engagement"). It is agreed that the terms of this Retainer Memorandum will be incorporated by reference into the Agreement between the Firm and the Ministry of Justice of the Government of Ukraine ("the Ministry") to which this Retainer Memorandum has been attached.

## Scope of Engagement

The Engagement involves conducting an inquiry and writing an independent report on the evidence and procedures used during the prosecution and trial of former Prime Minister Yulia Tymoshenko, applying Western standards of due process and rule of law. The services to be provided by the Firm in connection with the Engagement will encompass those legal services normally and reasonably associated with this type of engagement which the Firm has been requested to provide and which are consistent with its ethical obligations. It is understood that the Firm's client is the Ministry, which is a department of the Government of Ukraine. The Firm is willing to take on this project with the clear understanding that the Firm will have access to all relevant materials and information that the Firm deems necessary to do its job, and that the Firm will be free to reach its own conclusions based on its own independent work. It is understood that the Firm is not being retained to engage in any "political activities" – and will not engage in any such activities – as defined in the Foreign Agent Registration Act (FARA).

## Engagement Personnel

Gregory Craig will be responsible for and actively involved in the Engagement. Other lawyers involved in the Engagement will include Clifford Sloan. Additional lawyers will be added on an as-needed basis.

The Ministry of Justice
April 5, 2012
Page 2

### Fees and Expenses

Our fees will be based on the time that the Firm's lawyers spend on the Engagement along with our out of pocket expenses. In addition to the terms for payment set forth in the Agreement to which this memorandum is attached, we have agreed to offset our fees for time – charged at our normal hourly rates – and reimbursement of our out-of-pocket expenses against a retainer that has been paid in advance.

As for out-of pocket expenses, see Annex A attached. This may be periodically updated.

### Waivers and Related Matters

The Firm represents a broad base of clients on a variety of legal matters. Accordingly, absent an effective conflicts waiver, conflicts of interest may arise that could adversely affect your ability and the ability of other clients of the Firm to choose the Firm as its counsel and preclude the Firm from representing you or other clients of our Firm in pending or future matters. Given that possibility, we wish to be fair not only to you, but to our other clients as well. Accordingly, this letter will confirm our mutual agreement that the Firm may represent other present or future parties on matters other than those for which it had been or then is engaged by the Government, whether or not on a basis adverse to the Ministry or any of its present or future affiliates, including in litigation, legal or other proceedings or matters, which are referred to as "Permitted Adverse Representation."

In furtherance of this mutual agreement, the Ministry agrees that it will not for itself or any other party assert the Firm's representation of the Ministry or any of its present or future affiliates, including any other organs of the Government of Ukraine, either in its representation in the Engagement or in any other matter in which the Ministry retains the Firm, as a basis for disqualifying the Firm from representing another party in any Permitted Adverse Representation and agrees that any Permitted Adverse Representation does not constitute a breach of any duty owed by the Firm. The waiver provided for in this and the preceding paragraph includes the Firm's ongoing representation of OAO Gazprom and any of its present or future affiliates or subsidiaries. The Ministry agrees that this paragraph and the preceding one do not expand the scope of the Engagement to encompass affiliates of the Ministry unless expressly agreed to by the Firm.

### Duty of Confidentiality

Our representation in this Engagement is premised on the Firm's adherence to its professional obligation not to disclose any confidential information or to use it for another party's benefit without the Ministry's consent. Such obligations are subject to certain exceptions, including the laws, rules and regulations of certain jurisdictions relating to money laundering and terrorist financing. Provided that the Firm acts in the manner set forth in the first sentence of this paragraph and subject to the exceptions noted above, the Ministry will not for itself or any other

The Ministry of Justice
April 5, 2012
Page 3

party assert that the Firm's possession of such confidential information, even though it may relate
to a matter for which the Firm is representing another client or may be known to someone at the
Firm working on the matter (a) is a basis for disqualifying the Firm from representing another of
its clients in any matter in which the Ministry or any other party has an interest; or (b) constitutes
a breach of any duty owed by the Firm. In addition, the Firm's failure to share with the Ministry
any confidential information received from another client will not be asserted by the Ministry as
constituting a breach of any duty owed to the Ministry by the Firm, including any duty regarding
information disclosure.

If the Firm receives from any person or entity a subpoena or request for information that is
within our custody or control or the custody or control of our agents or representatives, we will,
to the extent permitted by applicable law, advise the Ministry before responding so that the
Ministry has the opportunity to intervene or interpose any objections. Should the Ministry object
to the provision of such information, the Firm may thereafter provide such information only to
the extent authorized by the Ministry or required by a court or other governmental body of
competent jurisdiction. The Ministry agrees to pay the Firm for any services rendered and
charges and disbursements incurred in responding to any such request at the Firm's customary
billing rates and pursuant to the Firm's charges and disbursements policies.

The Ministry agrees that the Firm may disclose the fact of this Engagement and related general
information to the extent that such disclosure does not convey any confidential or non-public
information and it is not adverse to the Ministry's interests.

### Client Files and Retention

In the course of our work on this matter, we shall maintain a physical file relating to the matter.
In the file we may place materials received from you with respect to the matter and other
materials, including correspondence, memos, filings, drafts, closing sets, pleadings, deposition
transcripts, exhibits, physical evidence, expert's reports, and other items reasonably necessary to
your representation (the "Client File"). The Client File shall be and will remain your property.
We may also place in the file documents containing our attorney work product, mental
impressions or notes, and drafts of documents ("Work Product"). You agree that Work Product
shall be and remain our property. In addition, electronic records (except those to be proffered to
you at the conclusion of a matter as described below) such as e-mail and documents prepared on
our word processing system shall not be considered part of your Client File unless it has been
printed in hard copy and placed in your physical file, and does not constitute Work Product. You
agree that we may adopt and implement reasonable retention policies for such electronic records
and that we may store or delete such records in our discretion.

At the conclusion of a matter (which shall be defined as the time that our work on any matter
subject to this letter has been completed), you shall have the right to take possession of the
original of your Client File (but not including the Work Product). We will be entitled to make
physical or electronic copies if we choose. You also agree, upon our proffer, at the conclusion of

The Ministry of Justice
April 5, 2012
Page 4

a matter (whether or not you take possession of the Client File), to take possession of any and all original contracts, stock certificates, deeds and other such important documents or instruments that may be in the Client File, without regard to format, and we shall have no further responsibility with regard to such documents or instruments. If you do not take possession of the Client File at the conclusion of a matter, we will store such file in accordance with our standard retention procedures for a period of at least seven (7) years (the "Retention Period"). Such retention (or maintenance of accounting or other records related to our representation) shall not constitute or be deemed to indicate the presence of a continuing attorney-client relationship. During the time that we store the Client File, you shall have the right to take possession of it at any time that you choose. Subject to the foregoing, we may dispose of the Client File without further notice or obligation to you.

\*     \*     \*

The provisions of this Retainer Memorandum will continue in effect, including if the Firm's representation is ended at your election (which, of course, the Ministry is free to do at any time) or by the Firm (which would be subject to ethical requirements). In addition, the provisions of this Retainer Memorandum will apply to future engagements of the Firm by the Ministry unless we mutually agree otherwise.

This agreement and any claim, controversy or dispute arising under or relating to this agreement, the relationship of the parties, and/or the interpretation and enforcement of the rights and duties of the parties shall be governed by, and construed in accordance with, the laws of the State of New York. For purposes of this letter, references to Skadden Arps or the Firm include our affiliated law practice entities.

In the event there is found to be any inconsistency between the terms of this Retainer Memorandum and the Agreement between the Ministry and the Firm to which this Memorandum is attached, the terms of this Retainer Memorandum will take precedence.

The Ministry of Justice
April 5, 2012
Page 5

If this letter is satisfactory, please sign a copy and return it to me.

We appreciate the opportunity to work on this project and look forward to doing so.

    With best regards.

           Sincerely,

           Gregory B. Craig

            Skadden, Arps, Slate, Meagher & Flom LLP

By: _____
  Name: Andriy S_____
  Title: Deputy Minister of
    Justice
Dated: As of

Enclosures

### SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND AFFILIATES
#### Policy Statement Concerning Charges and Disbursements
#### Effective April 1, 2010

*Skadden Arps bills clients for reasonable charges and disbursements incurred in connection with an engagement. Clients are billed for disbursements based on the actual cost billed by the vendor or in a few cases noted below, at rates derived from internal cost analyses or at rates below or approximating comparable outside vendor charges.*

---

**I. Research Services.** Charges for LexisNexis and Westlaw are billed at levels below that which would be charged for individual usage on a particular engagement. Clients are billed at rates calculated from an aggregate discounted amount charged to and paid by the Firm to LexisNexis and Westlaw. Thomson Research services are charged based on client usage allocated from actual vendor charges. Charges for other services outside research services are billed at the actual amounts charged by vendors.

The State of Delaware Database provides computer access to a corporations database in Dover, Delaware. The charge for this service is $50 per transaction, which is the average amount charged by outside services.

**II. Travel-Related Expenses.** Out-of-town travel expenses are billed at actual cost and include air or rail travel, lodging, car rental, taxi or car service, tips and other reasonable miscellaneous costs associated with travel. Corporate and/or negotiated discounted rates are passed on to the client. Specific Firm policies for expenditures relating to out-of-town travel include:

- *Air Travel.* Coach class is the standard on most U.S. domestic flights. However, for flights with scheduled flight times longer than 5 hours and international flights business class is generally used.

- *Lodging.* We strive to book overnight accommodations at hotels with which the Firm or the Client has preferred corporate rates.

Local travel charges include commercial transportation and, when a private car is used, mileage, tolls and parking. Specific policies govern how and when a client is charged for these expenses; these include:

- Fares for commercial transportation (e.g., car service, taxi, rail) are charged at the actual vendor invoice amount. The charge for private car usage is the IRS rate allowance per mile (or the equivalent outside the United States) plus the actual cost of tolls and parking.

- Round-trip transportation to the office is charged for attorneys who work weekends or holidays. Transportation home may be charged on business days when an attorney works past a certain hour (typically 8:30 p.m.) and has worked a minimum of ten hours that day.

- Local travel for support staff is charged when a staff member works past a certain hour (typically 8:30 p.m.). Charges are limited by Firm policy and depend on form of transportation and distance traveled.

**III. Word Processing, Secretarial and other Special Task-Related Services.** Routine secretarial tasks (correspondence, filing, travel and/or meeting arrangements, etc.) are not charged to clients. Word processing services associated with preparing legal documents are charged at $50 (£25/€35) per hour.

Specialized tasks (such as EDGAR filings or legal assistant services) are recorded in the appropriate billing category (for example, legal assistant services are recorded as fees in "Legal Assistant Support" on bills)

*IV.  Reproduction and Electronic Document Management.*  Photocopying services (including copying, collating, tabbing and velo binding) performed in-house are charged at $0.15 (£0.07/€0.11) per page, which represents the average internal cost per page.  Color photocopies are charged at $0.80 (£0.40/€0.55) per page (based on outside vendor rates).  Photocopying projects performed by outside vendors are billed at the actual invoice amount.  Special arrangements can be made for unusually large projects.

Electronic Data Management services (e.g., scanning, OCR processing, data and image loading/exporting, CD/DVD creation, printing from scanned files, and conversions) performed by outside vendors are billed at the actual invoice amount and those performed in-house are billed at rates comparable to those charged by outside vendors.

*V.  Electronic Communications.*  Clients are charged for communications services as follow:

*Telephone Charges.*  There is no charge for local telephone calls or internal long distance telephone calls. External telephone calls such as collect, cellular calls, credit card, hotel telephone charges and vendor-hosted conference calls are charged at the vendor rate plus applicable taxes and are assigned to the specific matter for which such charges were incurred.

*Facsimile Charges.*  There is no charge for facsimile usage

*VI.  Postage and Courier Services.*  Outside messenger and express carrier services are charged at the actual vendor invoice amount which frequently involves discounts negotiated by the Firm.  Postage is charged at actual mail rates. On certain occasions, internal staff may be required to act as messengers in which case the staff's applicable hourly rate is charged.

*VII.  UCC Filing and Searches.*  Charges for filings and searches, in most instances, are billed at the flat fee charged by the vendor.  Unusual filings and searches will be charged based on vendor invoice.

*VIII.  Meals.*  Business meals are charged at actual cost. Luncheon and dinner meetings at the Firm are charged based on the costs developed by our food service vendor. Breakfast, beverage and snack services at the Firm's offices are not charged, except in unusual circumstances.

When overtime, weekend or holiday work is required, clients are charged for the actual, reasonable cost of an attorney's meal and, for non-attorneys, a standard amount determined by Firm policy.

*IX.  Direct Payment by Clients of Other Disbursements.*  Other major disbursements incurred in connection with an engagement will be paid directly by the client.  (Those which are incurred and paid by the Firm will be charged to the client at the actual vendor's invoice amount).  Examples of such major disbursements that clients will pay directly include:

Professional Fees (including disbursements for local counsel, accountants, witnesses and other professionals)

Filing/Court Fees (including disbursements for agency fees for filing documents, standard witness fees, juror fees)

Transcription Fees (including disbursements for outside transcribing agencies and courtroom stenographer transcripts)

Other Disbursements (including any other required out-of-pocket expenses incurred for the successful completion of a matter)

\* \* \* \* \*

\*  Fees incurred for attorney and Firm personnel in connection with the Engagement are not covered by this policy.

# EXHIBIT 5



**U.S. Department of Justice**

National Security Division

_Washington, DC 20530_

SEP  5 2013

Gregory B. Craig, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, NW
Washington, DC  20005-2111

      Re:  Possible Obligation to Register Pursuant to the
             Foreign Agents Registration Act

Dear Mr. Craig:

      This is in reference to your letters and enclosures of February 6, 2013, and June 3, 2013, responding to our inquiries of December 18, 2012, and April 9, 2013, regarding your firm's possible obligation to register under the Foreign Agents Registration Act of 1938, as amended, 22 U.S.C. § 611 _et seq._ (FARA or the Act) for its work on behalf of the Ministry of Justice of the Government of Ukraine (the Ministry).

      Your Retainer Memorandum states your firm was hired by the Ministry to conduct an inquiry and to write "an independent report on the evidence and procedures used during the prosecution and trial of former Prime Minister Yulia Tymoshenko, applying Western standards of due process and rule of law." Your firm completed the report and provided it to the Ministry. According to your June 3, 2013 letter, in December 2012, your firm disseminated a copy of the report to representatives of the New York Times, National Law Journal, and Los Angeles Times. Following distribution, you spoke with these representatives "to correct misinformation that the media had received - and was reporting - from the Ministry of Justice and from the Tymoshenko legal team in Ukraine."

      In your correspondence with this office, you assert that Skadden neither served as the Ministry's agent in the United States, nor provided any services to the Ministry covered by FARA or requiring registration under FARA. Our review of the documentation concludes that Skadden was an agent of the Ministry and was engaged in political activities in the United States for the Ministry. You indicate that your firm was paid by the Ukraine to produce an independent report on the Tymoshenko prosecution, and that the report was disseminated to news media by your firm. You further state that you spoke with representatives of the media to correct misinformation regarding the report. The dissemination of the report to the media and your communications with the media were political activities as defined in 22 U.S.C. § 611 (o) of FARA. Furthermore, by engaging in these activities for the Ministry, Skadden acted as a public relations counsel, publicity agent, and information-service employee as defined in Section 611 of the Act. We have determined that your actions in contacting the media were activities meant to influence the U.S. public with reference to the political or public interests, policies or relations of Ukraine. Accordingly, Skadden must register under FARA as an agent of the Ministry.

cc:     Records 149-             HHH:SAM:sam
         Chrono                 Typed: 9/5/13
         KConnolly           Skadden_Response_5REV_090513

If you have any questions, please contact me at (202) 233-0776.

Sincerely,


Heather H. Hunt, Chief
Registration Unit
Counterespionage Section
National Security Division

# EXHIBIT 6

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

DIRECT DIAL
202-371-7400
DIRECT FAX
202-661-9100
EMAIL ADDRESS
GCRAIG@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

October 10, 2013

Ms. Helen Hunt, Chief
Registration Unit, Counterespionage Section
National Security Division
United States Department of Justice
Washington, DC 20530

Re:         FARA Registration

Dear Ms. Hunt:

In further consideration of the issues raised in your letter of September 5, 2013, I would like to make you aware of the following additional information:

As reported in earlier correspondence, this law firm provided a copy of the Tymoshenko Report ("the Report") to certain U.S. media outlets. This was done in response to requests from the media. The firm did not provide copies of the Report to any other media outlets in the United States.

With respect to statements appearing in the *National Law Journal* and the *New York Times,* those statements were intended to correct mischaracterizations of the Report, some of which were attributable to Ukraine.

The *Los Angeles Times* reported, for example: "The Ukrainian Ministry of Justice praised the report in a public statement . . . trumpeting that it found Tymoshenko's claims of political persecution 'groundless.'" That characterization of the Report is – and was – inaccurate. The firm's response was aimed at correcting this mischaracterization.[1]

---

[1] "Mr. Craig . . . said his team was not able to judge the local politics that brought Ms. Tymoshenko to trial on charges of abusing her authority . . . 'We leave to others the question of whether this prosecution was politically motived,' he said. 'Our assignment was to look at the evidence in the record and determine whether the trial was fair.'" *New York Times*, December 12, 2012.

105320

In its initial online coverage of the Report, the *National Law Journal* said: "[T]he trial was not politically motivated, and the problems weren't enough to undermine her conviction, the team said." That characterization of the Report is – and was – inaccurate. The firm's response was aimed at correcting this mischaracterization.[2]

In responding to inaccuracies in U.S. news reports – some of which were directly attributable to Ukraine – the law firm did not consult with Ukraine, did not inform Ukraine, did not act under instruction from Ukraine and was in no way serving as an agent for Ukraine.

Very truly yours,

Gregory B. Craig

---

[2]  "As we say in the report, with regard to some of Tymoshenko's claims, we found very serious problems in the conduct of her trial," Skadden partner Gregory Craig, one of the lead attorneys on the team, said.  With regard to other claims, we found insufficient evidence in the record to support the objection." *National Law Journal*, December 13, 2012.

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term
Grand Jury Sworn in on April 29, 2005

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. |
| | ) | |
| | ) | GRAND JURY ORIGINAL |
| | ) | |
| | ) | Counts 1 and 4: Obstruction |
| | ) | 18, U.S.C. § § 1505, 2 |
| v. | ) | |
| | ) | |
| | ) | Counts 2, 3, and 5: False |
| | ) | Statements, 18 U.S.C. § 1001 |
| DAVID HOSSEIN SAFAVIAN | ) | |

## **INDICTMENT**

THE GRAND JURY CHARGES:

Unless specified otherwise, at all times relevant to this Indictment:

### **Background**

1.  From on or about May 16, 2002 to in or about January 2004, defendant **DAVID HOSSEIN SAFAVIAN** was the Chief of Staff for the Administrator of the General Services Administration ("GSA").  The GSA Administrator is the highest ranking official in the GSA. From in or about November 2004 to September 2005, defendant **SAFAVIAN** served as the Administrator of the Office of Federal Procurement Policy, Office of Management and Budget, Executive Office of the President.  Defendant **SAFAVIAN** was an attorney admitted in Michigan, Missouri, and the District of Columbia.

2.  "Lobbyist A" was a Washington D.C. lobbyist whose clients included Native

American tribes.  Defendant **SAFAVIAN** and Lobbyist A worked together at a law firm in Washington, D.C. beginning in or about 1995.

    3.  Entity A was a private school established and supported by Lobbyist A.

### The General Services Administration

    4.  GSA is an agency of the Executive Branch of the United States Government.  Among other things, GSA is responsible for the development and management of property owned or leased by the Government and the disposition of property no longer used by the Government.

    5.  The Old Post Office ("OPO") was a building in Washington, D.C. that was managed by GSA.  The OPO, built in 1899, once served as the Post Office for Washington D.C.  During the summer of 2002, GSA was considering ways to develop the OPO.

    6.  The Naval Surface Warfare Center-White Oak ("NSWC-White Oak") was a property consisting of approximately 600 acres in Silver Spring, Maryland that was managed by GSA. During the summer of 2002, GSA was considering ways to develop NSWC-White Oak.

### Lobbyist A's Business Before GSA

    7.  Beginning shortly after defendant **SAFAVIAN** became the Chief of Staff of GSA in May 2002, Lobbyist A repeatedly contacted defendant **SAFAVIAN** about the possibility of leasing the OPO for his clients and the possibility of acquiring or leasing a portion of NSWC-White Oak for Entity A.

    8.  On or about July 2, 2002, defendant **SAFAVIAN** in an email to Lobbyist A stated in substance and in part that GSA was still determining how to develop NSWC-White Oak.  In the same email, defendant **SAFAVIAN** also stated in substance and in part that Lobbyist A "should know" that Native American tribes have "'hub-zone' status, which provides for enterprise zone-

2

like status." Defendant **SAFAVIAN** suggested in the email that he and Lobbyist A continue discussing these matters.

9. On or about July 22, 2002, Lobbyist A sent defendant **SAFAVIAN** an email requesting defendant **SAFAVIAN**'s comments on a draft letter, which supposedly would be sent by two Members of the United States House of Representatives urging the GSA Administrator to consider providing certain organizations with preferential contracting opportunities in developing the OPO.

10. On or about July 25, 2002, defendant **SAFAVIAN** forwarded by email to Lobbyist A an internal GSA email entitled "Old Post Office and leases" discussing internal GSA strategy on proposed changes in regulations for leasing the OPO.

11. On or about July 26, 2002, Lobbyist A sent an email to defendant **SAFAVIAN**'s home email address seeking defendant **SAFAVIAN**'s advice on a draft letter ostensibly from the Headmaster of Entity A to the GSA Commissioner of Public Buildings requesting a lease of NSWC-White Oak to Entity A.

12. On or about July 26, 2002, defendant **SAFAVIAN** forwarded to Lobbyist A internal GSA emails discussing problems with disposing of land at NSWC-White Oak to Entity A.

13. On or about July 28, 2002, defendant **SAFAVIAN** sent an email from his home email address to Lobbyist A making suggestions about how to draft the proposed letter ostensibly from Entity A's Headmaster to GSA.

14. On or about July 30, 2002, defendant **SAFAVIAN** forwarded to Lobbyist A an internal GSA email that outlined GSA land use requirements and indicated that Entity A's lease of any land at NSWC-White Oak would be problematic.

3

15. On or about July 30, 2002, defendant **SAFAVIAN** sent to various GSA officials an email with the subject line, "[Entity A] & White Oak" in which he stated in part "Per our conversation, how do you folks look for a meeting on this issue and possibly a quick trip to White Oak on Friday morning?"

16. On or about August 2, 2002, defendant **SAFAVIAN** attended a meeting he had arranged in the GSA Administrator's office with other GSA officials, two Entity A representatives, Lobbyist A's lobbying colleague and Lobbyist A's wife to discuss the possibility of Entity A leasing from GSA portions of the NSWC–White Oak property.

## The August 3 to August 11, 2002 Scotland Golf Trip

17. Throughout June and July 2002, defendant **SAFAVIAN** and Lobbyist A were in contact with each other regarding a golf trip they planned to take with a member of Congress, Congressional staff and others to Scotland in August 2002.

18. On or about July 25, 2002, defendant **SAFAVIAN** sought an opinion from a GSA ethics officer about whether he could attend the golf trip when Lobbyist A was fully funding the cost of a chartered jet to Scotland. In the email in which he sought this opinion, defendant **SAFAVIAN** stated in part that Lobbyist A "is a lawyer and lobbyist, but one that has no business before GSA (he does all of his work on Capitol Hill)."

19. A GSA ethics officer responded with an ethics opinion in an email to defendant **SAFAVIAN** on or about July 26, 2002. The ethics opinion noted that the Standards of Ethical Conduct for Employees of the Executive Branch prohibited an employee from accepting a gift from a "prohibited source," which was defined as one who was seeking official action by the employee's agency or did business, or was seeking to do business, with the employee's agency.

4

The ethics opinion further stated that "[y]ou stated that neither [Lobbyist A] nor his firm does

business with or is seeking to do business with GSA.  Based upon the information you have

provided, you may accept the gift of free transportation from your friend."

20.  On or about July 26, 2002, defendant **SAFAVIAN** forwarded the ethics opinion

directly to Lobbyist A and stated in part "[Lobbyist A] - fyi.  It looks like Scotland is a go."

21.  On or about August 3, 2002, defendant **SAFAVIAN**, Lobbyist A, and seven others

boarded a chartered jet and flew to Scotland where they played golf on multiple well-known and

historic golf courses, including the Old Course at St. Andrews.  On or about August 8, defendant

**SAFAVIAN**, Lobbyist A, and others continued on to London, England.  On or about August 11,

defendant **SAFAVIAN**, Lobbyist A, and others returned from London to the United States

aboard the chartered jet.  The total cost of the trip for nine people exceeded $130,000.

## COUNT ONE

### (Obstruction)

22.  The Grand Jury realleges paragraphs 1 through 21 as though fully stated herein.

23.  The GSA Office of Inspector General ("GSA-OIG") is responsible for the

investigation of illegal or improper activities involving GSA programs, operations, and

personnel.  GSA-OIG has authority to investigate allegations of illegal gratuities and bribes

provided to GSA officials by persons with business before GSA.  GSA-OIG also has authority to

investigate allegations of improper or unethical conduct by GSA employees.

24.  On or about March 26, 2003, GSA-OIG opened an administrative investigation

pursuant to an anonymous hotline complaint regarding defendant **SAFAVIAN**'s participation in

an "international golfing trip provided by lobbyists."

5

25.  In Washington, D.C., on or about March 27, 2003 and again on or about April 25, 2003, the GSA-OIG Regional Inspector General for Investigations interviewed defendant **SAFAVIAN** as part of this GSA-OIG investigation.  During these interviews, defendant **SAFAVIAN** falsely stated in substance and in part that Lobbyist A had no business with GSA. Defendant **SAFAVIAN** further stated in substance that he had paid Lobbyist A for the total cost of the trip including airfare, hotels and golf green fees.  Defendant **SAFAVIAN** provided to GSA-OIG a $3,100 check to Lobbyist A dated August 3, 2002, which is the date defendant **SAFAVIAN** boarded the chartered jet to Scotland

26.  Based in part on defendant **SAFAVIAN**'s statement that Lobbyist A had no business with GSA at the time of the golf trip and that defendant **SAFAVIAN** had fully paid for his cost of the trip, GSA-OIG closed its investigation.

27.  From on or about March 27, 2003 to in or about May 2003, in the District of Columbia and elsewhere, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law in a proceeding that he knew was then pending before a department and agency of the United States, that is the official investigation being conducted by the GSA-OIG into defendant **SAFAVIAN**'s participation in an "international golfing trip provided by lobbyists."

In violation of Title 18, United States Code, Sections 1505 and 2.

6

## COUNT TWO

### (False Statement)

28. The Grand Jury realleges paragraphs 1 through 21 as though fully stated herein.

29. From in or about May 2002 to in or about August 2002, in the District of Columbia and elsewhere, in a matter within the jurisdiction of the executive branch of the Government of the United States, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device material facts, that is in connection with seeking and obtaining a GSA ethics opinion regarding his travel, defendant **SAFAVIAN** (A) concealed his assistance to Lobbyist A in GSA-related activities; (B) concealed Lobbyist A's business relationships with GSA; and (C) falsely stated to the GSA ethics officer that Lobbyist A did not have any business with and was not seeking to do business with GSA and that Lobbyist A did all his work on Capitol Hill, when in truth and in fact, as defendant **SAFAVIAN** well knew, prior to the August 2002 Scotland trip Lobbyist A was seeking to lease or purchase GSA-controlled property.

In violation of Title 18, United States Code, Section 1001(a)(1).

## COUNT THREE

### (False Statement)

30.  The Grand Jury realleges paragraphs 1 through 21 and 23 through 26 as though fully stated herein.

31.  From on or about March 27, 2003 to in or about May 2003, in the District of Columbia, in a matter within the jurisdiction of the executive branch of the Government of the United States, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device material facts; that is, during the course of an official investigation being conducted by the GSA-OIG, defendant **SAFAVIAN** (A) concealed his assistance to Lobbyist A in official GSA-related activities; (B) concealed Lobbyist A's business relationships with GSA; and (C) falsely stated to the GSA-OIG Regional Inspector General for Investigations that Lobbyist A did not have any business with GSA; when in truth and in fact, as defendant **SAFAVIAN** well knew, prior to the August 2002 Scotland trip Lobbyist A was seeking to lease or purchase GSA-controlled property.

In violation of Title 18, United States Code, Section 1001(a)(1).

8

## COUNT FOUR

### (Obstruction)

32.  The Grand Jury realleges paragraphs 1 through 21 and 23 through 26 as though fully stated herein.

33.  In or about March 2004, the Committee on Indian Affairs of the United States Senate (the "Committee") began an investigation into allegations of misconduct by Lobbyist A and others that had been made by several Native American tribes.  As a member of the Committee, Senator John McCain and his staff had the responsibility to gather materials related to those allegations.

34.  The Committee held public hearings on this matter on or about September 29, 2004 and November 17, 2004.   Testimony and documents revealed that tribal funds were used by Lobbyist A to pay for a portion of the August 2002 Scotland trip.

35.  On or about February 23, 2005, acting in his capacity as Chairman of the Committee, Senator McCain caused to be sent to defendant **SAFAVIAN** a letter requesting information about the August 2002 Scotland trip with Lobbyist A.

36.  In or about March 2005, defendant **SAFAVIAN** spoke with an investigator from the Committee and represented in substance and in part that he had received approval for the Scotland golf trip in a GSA ethics opinion and that he had fully disclosed all relevant facts to the GSA ethics officer who prepared the opinion.

37.  On or about March 17, 2005, defendant **SAFAVIAN** responded to Chairman McCain's request for information with a letter in which he stated in part

> [w]hen the invitation was made, I was the chief of staff to the U.S.

9

General Services Administration ("GSA"). [Lobbyist A] did not

have any business before the agency at that time.  Prior to

departure, I consulted with the GSA Office of General Counsel to

obtain guidance on the propriety of this trip.  Counsel determined

that I could accept the value of the trip *gratis*; it did not meet the

definition of a 'gift from a prohibited source' under the applicable

regulations, nor was it considered a gift given because of my

official position.

Defendant **SAFAVIAN** enclosed with his letter to the Committee his July 25, 2002 email to the

GSA ethics officer, the GSA ethics opinion regarding the August 2002 Scotland trip and a copy

of his $3100 check to Lobbyist A dated August 3, 2002.

38.  From in or about February 2005 to in or about March 2005, in the District of

Columbia and elsewhere, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and corruptly influence, obstruct, impede, and endeavor to influence, obstruct, and

impede the due and proper exercise of the power of inquiry under which an investigation and

review was being had by the United States Senate and a Committee of the United States Senate;

that is, the inquiry by Senator John McCain, as Chairman of the Senate Committee on Indian

Affairs, into allegations of misconduct by lobbyists for Native American tribes.

In violation of Title 18, United States Code, Sections 1505 and 2.

10

## COUNT FIVE

### (False Statement)

39. The Grand Jury realleges paragraphs 1 through 21, 23 through 26, and 33 through 37 as though fully stated herein.

40. From in or about February 2005 to in or about March 2005, in the District of Columbia, in a matter within the jurisdiction of the legislative branch of the Government of the United States, defendant,

### DAVID HOSSEIN SAFAVIAN,

did knowingly and willfully falsify, conceal, and cover up by a trick, scheme, and device material facts; that is, during the course of an official investigation and review conducted pursuant to the authority of a Committee of the United States Senate, consistent with applicable rules of the Senate, defendant **SAFAVIAN** (A) concealed his assistance to Lobbyist A in GSA-related activities; (B) concealed Lobbyist A's business relationships with GSA; (C) falsely stated in a letter to the Committee that Lobbyist A did not have any business with GSA at the time defendant **SAFAVIAN** was invited on the trip to Scotland; and (D) provided documentation in which defendant **SAFAVIAN** stated in substance and in part that Lobbyist A did all of his work on Capitol Hill, when in truth and in fact, as defendant **SAFAVIAN** well knew, prior to the August 2002 Scotland trip Lobbyist A was seeking to lease or purchase GSA-controlled property.

In violation of Title 18, United States Code, Section 1001(a)(1).

A TRUE BILL

_____

FOREPERSON

PAUL E. PELLETIER
Acting Chief, Fraud Section
Criminal Division
United States Department of Justice

NOEL L. HILLMAN
Chief, Public Integrity Section
Criminal Division
United States Department of Justice

NATHANIEL B. EDMONDS
Trial Attorney, Fraud Section
Criminal Division
United States Department of Justice

PETER R. ZEIDENBERG
Trial Attorney, Public Integrity Section
Criminal Division
United States Department of Justice