**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*v.*<br><br>**GREGORY B. CRAIG**,<br>*Defendant.* | Case No. 1:19-cr-0125 (ABJ) |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION IN LIMINE
TO EXCLUDE ANDREA MANAFORT EVIDENCE**

The government claims that Mr. Craig's assistance to Andrea Manafort's effort to find employment at Skadden, while lawful and even routine, is probative of Mr. Craig's "motive and intent when undertaking media contacts in December 2012," and his "motive to provide false and misleading statements and omissions to the FARA Unit in 2013." Gov't's Reply & Resp. In Opp'n to Def.'s Resp. & Mot. *In Limine* To Exclude Gov't's Proposed 404(b) Evid., ECF No. 34 (May 31, 2019) ("Opp."), at 4, 5. The chain of inferences underlying these motive theories is long and convoluted, and is dissected below. The theory seems to be that Mr. Craig had an incentive to succumb to pressure from Mr. Manafort, which sheds light on Mr. Craig's motive in connection with his media contacts and communications with the FARA Unit. *See, e.g.*, *id.* at 4. But as discussed below, that theory fails because, among other reasons, there is no evidentiary basis to suggest that Mr. Craig ever succumbed to any coercion from Mr. Manafort, let alone that Mr. Manafort ever exerted any pressure on Mr. Craig to mislead the FARA Unit.

Alternatively, the government suggests that Mr. Craig was motivated to curry favor with Mr. Manafort because of a "potential for future lucrative business," which it also argues supports its theories with respect to the media contacts and FARA Unit. *See, e.g.*, Opp. 4. But as to this

"currying" theory, a general motive to help a client through a lawful and routine courtesy is self-evident and can be established simply by showing that Mr. Manafort was a client.

Thus, there must be some other reason the government wants to introduce the Andrea Manafort evidence. Despite its protestations to the contrary, the government's motion clearly insinuates that Mr. Craig's assistance to Andrea Manafort was *improper* in some way, and it can be expected to intimate that to the jury, accompanied by the suggestion that he was therefore more likely to commit a criminal act to assist Mr. Manafort. That is a classic example of inadmissible character evidence, and it is far more prejudicial than its *de minimis* probative value. If the evidence is admitted, Mr. Craig will show the jury, among other things, that there was nothing improper or unlawful about Mr. Craig's assistance, which would lead to a distracting and wasteful mini-trial over a completely tangential issue. Mr. Craig's motion should be granted.

## ARGUMENT

I. **The Andrea Manafort Evidence Is Not Probative of Mr. Craig's "Motive."**

    A. **The evidence has no probative value to Mr. Craig's purpose in his contacts with *The New York Times*.**

The government first suggests that the evidence of Mr. Craig's assistance to Andrea Manafort in April-May 2012 will make a jury more likely to conclude that his "motive and intent" seven months later, when speaking with reporters from the *New York Times*, was to advance the media strategy developed by the Ukraine Ministry of Justice ("MOJ") and its public relations consultants. The chain of inferences the government proposes is that (1) in April/May 2012, Mr. Manafort pressured Mr. Craig to recommend that Skadden hire his daughter (and/or Mr. Craig desired to ingratiate himself with Mr. Manafort by hiring his daughter); (2) that episode evidences that Mr. Craig was willing to capitulate to Mr. Manafort in an effort to please

him; (3) Mr. Manafort also leaned on Mr. Craig to "carry out a portion of Ukraine's media plan," and specifically "to provide the Report to the *New York Times* and speak with its reporter"; (4) when Mr. Craig spoke with the *Times* reporters, he did so because he gave in to Mr. Manafort or was hoping for future business, and not because he was concerned that FTI would mischaracterize the Report's conclusions, as FTI had made clear it planned to do; (5) Mr. Craig's purpose in speaking with the *Times* reporters was in fact to advance Ukraine's interests through execution of the FTI media plan, a conclusion made more plausible because of the alleged arm-twisting by Mr. Manafort and/or Mr. Craig's own interest in satisfying Mr. Manafort; and (6) Mr. Craig knew that speaking with the reporters meant that he was acting as a foreign agent. Opp. 4-5.

For the underlying Rule 404(b) evidence to be admissible, there must be actual evidence to support each of the inferences the government seeks permission to urge upon the jury. *See, e.g.*, David P. Leonard, *New Wigmore, A Treatise on Evid.: Evid. of Other Misconduct & Similar Events* ("*New Wigmore*") § 8.4.2 (2018), at 510 ("[E]vidence of the motive [must] be more than speculative."). The government's brittle chain of inferences breaks at the slightest touch.

To be clear, Mr. Craig's purpose in speaking with the *New York Times* reporters, and providing a copy of the Skadden Report to them, is a critical issue, as the government concedes. Opp. 4 (calling it "central to the dispute in this case"). In fact, it is dispositive of whether Mr. Craig was required to register under FARA. Under FARA a person can only be found to be acting as an "agent" of a foreign principal if the ***purpose*** of his activities is to advance "the interests of such foreign principal." Every operative phrase of the definitional provisions of 22 U.S.C. § 611(c) makes clear that an "agent of a foreign principal" means one who engages or acts "for or in the interests of such foreign principal." *See Attorney General v. Irish N. Aid*

*Comm.*, 668 F.2d 159, 161 n.6 (2d Cir. 1982) (rejecting the view that FARA covers a person who, even after being urged to advance a policy by a foreign government, takes "independent action" in the United States in support of that policy in a manner "that incidentally benefits [the] foreign government."). *See also, e.g.*, S. Rep. No. 89-143, at 8 (1966) (explaining that the "basic point of reference" for whether a person acts as an "agent" is the "end objective" of the person's "activities."); *Hr'gs Before the Comm. on Foreign Rel., U. S. S.., on S. 2136 To Amend the Foreign Agents Registration Act of 1938, As Amended*, 88th Cong. 6, 12 (Nov. 19-21, 1963) (statement and testimony of Nicholas Katzenbach, Deputy Att'y Gen. of the United States) (explaining that "for or in the interest of" as a limitation on the definition of "agent" requires the government to prove beyond a reasonable doubt that the activities in question were "done on behalf of the foreign principal and as part of that arrangement" and not "on [the person's] own behalf"). Simply put, if Mr. Craig's purpose in speaking with the reporters was to prevent the MOJ's media consultants from mischaracterizing the Skadden Report's conclusions, he was not acting as an "agent" within the meaning of FARA. That is precisely why Heather Hunt, the Chief of the FARA Unit, correctly concluded in January 2014, after meeting with Mr. Craig and his colleagues on October 9, 2013, that Skadden had no obligation to register as an agent of Ukraine based on Mr. Craig's contacts with the media.

It is obvious from the article in which he was quoted that the statements Mr. Craig made to the *New York Times* were in direct conflict with the MOJ/FTI/Manafort media strategy. For example, the MOJ and its representatives, including Mr. Manafort, wanted reporters to believe that the Report absolved the MOJ of accusations that the prosecution had been politically motivated. *See, e.g.*, Ex. 1 (MOJ press release) ("This report . . . concludes as groundless Yulia Tymoshenko's claims that her prosecution was politically motivated."). As reflected in the *Times*

article, Mr. Craig made sure the *Times* and its readers understood that the Report did *not* opine on the question "whether this prosecution was politically motivated." David M. Herzenhorn & David E. Sanger, *Failings Found in Trial of Ukrainian Ex-Premier*, N.Y. TIMES (Dec. 12, 2012), https://www.nytimes.com/2012/12/13/world/europe/failings-found-in-trial-of-ukrainian-ex-premier.html. Because of Mr. Craig's contact with the *Times* reporters, the article accurately reported that "[Mr. Craig's] team was not able to judge the local politics that brought Ms. Tymoshenko to trial on charges of abusing her authority in agreeing to a natural gas deal with Russia when she was prime minister." *Id.* Similarly, the MOJ wanted to emphasize parts of the Report that found that certain due process violations asserted by Ms. Tymoshenko's lawyers would not have required a new trial under Western standards. Mr. Craig did the opposite, by directing the reporters to the report's conclusion that the prosecution violated Western standards of due process in significant ways. The article started with the headline: "***Failings Found*** in Trial of Ukrainian Ex-Premier." *Id.* (emphasis added).

Andrea Manafort's hiring has no direct relevance to the issues in this case, and the chain of inferences underlying the government's theory of indirect relevance is attenuated and weak. Some of the reasons why are set forth in Mr. Craig's motion and need not be repeated here. In addition:

**First**, there is a fundamental difference between asking colleagues to consider hiring a client representative's highly qualified daughter, and committing a crime. The government belittles this distinction, arguing that the "other act" evidence "need not be bad or criminal; it can be 'entirely lawful.'" Opp. 4 (quoting *United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003)). That is true as far as it goes, but the fact that the "other act" at issue here was not only entirely legal, but was customary to the point of being banal, renders the government's burden of

establishing probative value substantially heavier. "[T]he distinction between character-based propensity and motive-based propensity is theoretically valid but supremely subtle as applied in some situations." *New Wigmore* § 8.3 at 506. "The more difficult it is to distinguish motive and character, the greater the danger of jury misuse, and the more cautious the trial judge must be in deciding on admission or exclusion." *Id.* at 504.

This principle is not challenged by the case the government cites, *United States v Long*, 328 F.3d at 655. There, the defendant was charged with sex trafficking of minors and possession of child pornography. *Id.* at 658. The "other act" evidence was testimony from other victims of his sexual predations and explicit sexual photography, who were over age 18. The government offered the evidence primarily to show intent and a pattern of behavior, rather than motive. The connection between the charged and the uncharged conduct was immediate and obvious, and did not depend on a string of speculative inferences as the government posits here.

**Second**, the government has identified no evidence that Mr. Manafort asked Mr. Craig to do anything with the *New York Times*, let alone did anything to pressure him to "provide the Report to the *New York Times* and speak with its reporter." *See* Opp. 5.

**Third**, the government's theory requires proof not only that Mr. Manafort urged Mr. Craig to speak with the *Times* but that in doing so Mr. Manafort was specifically pressuring Mr. Craig to "carry out a portion of Ukraine's media plan." *See* Opp. 6. The government has identified no evidence for this either.

**Fourth**, even if Mr. Manafort's requests for help to his daughter could be construed as pressuring Mr. Craig to arrange for her hiring, and even if Mr. Manafort had pushed Mr. Craig to speak to the *Times* about the Report – which he did not – the proposed link between the two is tenuous at best. The government would have to prove, and the jury would have to conclude, not

6

only that Mr. Manafort did in fact encourage Mr. Craig to speak with the reporters, but also that Mr. Craig did so *because* Mr. Manafort wanted him to do so. Furthermore, the Andrea Manafort evidence would be probative only if it demonstrated that Mr. Craig succumbed to pressure from Mr. Manafort on that occasion, making it more likely that he did not speak to the *Times* reporters for his own reasons.

Because none of these inferences is supported by the evidence, the government should not be permitted to argue, and the jury should not be encouraged to speculate, that Mr. Craig's motive in communicating with the *Times* had any connection whatsoever with the assistance he provided to Andrea Manafort.

### B. The Evidence Is Not Probative Of Mr. Craig's Motive To Lie To The Department of Justice.

Of course, Mr. Craig is not charged with having acted as an unregistered foreign agent. Therefore, even if the Andrea Manafort evidence were probative of Mr. Craig's purpose for speaking with the *Times*, the government must go further, and establish that the evidence is relevant to the charges in this case – that is, whether Mr. Craig lied to the FARA Unit in 2013.

The government argues that the evidence is probative of a purported "motive to provide false and misleading statements and omissions" because "the FARA Unit's inquiry" put Mr. Craig's supposed "desire to grant Manafort's request to carry out a portion of Ukraine's media plan . . . at odds with [his] desire not to register under FARA." Opp. 5-6. That is, the government seeks to add additional links to the inferential chain described above, namely that: (7) Mr. Manafort pressured Mr. Craig not only to *act* as an unregistered foreign agent, but also to lie to government officials about his actions; and (8) the fact of Mr. Manafort's purported pressure provided a motive for Mr. Craig to lie to government officials.

These proposed inferences fail for all the reasons set forth above – and several more:

7

**First**, this aspect of the government's theory is built upon a false dichotomy between Skadden's "desire not to register under FARA" and the fact that Ukraine had a "media plan" for the release of the report. Mr. Craig has never denied that he desired not to register, not least because registering as a foreign agent of Ukraine would have been incompatible with Skadden's assignment to prepare an independent report on the Tymoshenko prosecution. Nor has Mr. Craig ever denied that he was aware that FTI had developed a media plan, and that he and his Skadden colleagues took steps months before the Report was released in an unsuccessful effort to eliminate false spin from FTI's proposed talking points – an effort he ultimately concluded was fruitless. When the Report was finally about to be released, Mr. Craig opted instead to effectively sabotage the media plan by speaking with the *Times* reporters himself and highlighting the very aspects of the Report that the MOJ and its media consultants were trying to falsify or bury. But the existence of that media plan, and Mr. Craig's desire not to register, were not at "odds" – precisely because Mr. Craig never considered himself to be part of Ukraine's media plan. He did not believe that FTI's activities or his limited communications with FTI required Skadden to register. And he did not view information about activities by others – including FTI, Manafort and Rick Gates – to be responsive to the questions posed to him by the FARA Unit. Those questions focused instead entirely on what Mr. Craig and Skadden did on behalf of Ukraine, not on the actions of others. *See, e.g.*, ECF No. 19-5 (two-page April 9, 2013 FARA Unit letter, using the phrase "you" or "your firm" or "the firm" no fewer than twenty-one times).

**Second**, the government identifies no evidence that Mr. Manafort ever pressured Mr. Craig to "provide false and misleading statements and omissions" to the FARA Unit, or communicated *at all* with Mr. Craig about the FARA Unit's inquiries of Skadden. The government avoids supporting this link in the inferential chain with facts because, it alleges, Mr.

Craig somehow "realized" that Mr. Manafort would not want Skadden to register under FARA. Opp. 6. But Mr. Craig did not believe that anything he or his colleagues at Skadden did required FARA registration. So, to maintain a theory of admissibility for Mr. Manafort's alleged "pressure" on Mr. Craig to hire his daughter in 2012, there must be actual evidence from which a jury could infer that Mr. Manafort put "pressure" on Mr. Craig to lie or to provide false and misleading statements to the FARA Unit. There is no such evidence.

**Third**, the government constructs its brittle chain of inferences starting from the notion that the reason Mr. Craig helped Ms. Manafort was because of the "potential for future lucrative business with Manafort." Opp. 4. But by the time of the October 9, 2013 meeting between Skadden and the FARA Unit, over a year had passed since Skadden had finished its Report, and ten months since the Report was released. Yet no such additional business had materialized – and none ever would. If the notion that Mr. Craig sought to curry favor with Mr. Manafort because of future business prospects had any vitality in May 2012, it had surely evaporated by the time Mr. Craig was answering the FARA Unit's questions about the Ukraine engagement. Indeed, the evidence will show that Mr. Craig was willing to forego the entire Ukraine engagement from the beginning if it required FARA registration, so the idea that he was motivated to lie to government representatives just for the hope of attracting future work strains credulity.

In short, if Andrea Manafort's hiring has any probative value at all on whether Mr. Craig lied to the FARA Unit in 2013, a completely dubious proposition, such value is trivial.

**II.     Any Probative Value Is Substantially Outweighed By Dangers Of Unfair Prejudice, Jury Confusion, And Wasteful Delay.**

Of course, even if the Andrea Manafort evidence has some probative value to a "fact . . . of consequence in determining the action," Fed. R. Evid. 401(b), it should only be admitted if its

probative value is not "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, [or] wasting time." Fed. R. Evid. 403.

### A. Admitting the evidence will result in confusion and/or a wasteful mini-trial.

Any probative value of the Andrea Manafort evidence is substantially outweighed by the confusion, delay and waste of time that will result from its admission. The government seems to envision simply throwing a handful of emails into evidence, through an unidentified witness, without permitting Mr. Craig to rebut the government's proffered convoluted chain of inferences. But without rebuttal, the jury is surely going to be confused, particularly if the government also presents evidence of its completely unrelated theory that Mr. Craig misled some of his partners in September 2013 about the particulars of his media contacts ten months earlier.[1] Juries cannot be expected to know that major law firms like Skadden routinely rely on a network of referrals in hiring lawyers, and often consider the prospect that the lawyer could bring business to the firm through family connections. Mr. Craig will be entitled to put on evidence explaining how law firms operate, and explaining the specific hiring decision that was made here.

Even the most efficient presentation of the Andrea Manafort story will require witnesses – at least the managing partner of Skadden's D.C. office, Mitch Ettinger, who urged Mr. Craig to revise his recommendation memorandum to include "more on the business front," ECF No. 27-14, and David Zornow, the global head of Skadden's litigation practice who was "supportive" of the hire, ECF No. 27-18; potentially some of the three other partners (Jennifer Spaziano, Joseph

---

[1] As will become clear at trial, although Mr. Craig's September 19 and 20, 2013 internal emails conflated the chronologies of his contacts with the *New York Times*, the *Los Angeles Times* and the *National Law Journal*, those inaccuracies were the product of an innocent failure of recollection, and a jury will be unable to find that Mr. Craig in fact conveyed inaccurate facts about his interactions with the *New York Times* to the FARA Unit during the October 9, 2013 meeting – certainly not willfully, and certainly not beyond a reasonable doubt. As the government has been forced to acknowledge, even in the Indictment, at ¶ 40, the critical fact that Mr. Craig was interviewed by the *Times* before the Skadden Report was released to the public by the MOJ is revealed in the article itself.

Barloon and Charles Walker) and three associates (Geoffrey Wyatt, Colin Ram and Maya Florence) who interviewed Ms. Manafort and recommended that she be hired; and perhaps others as well, including Eric Friedman, the chairman of Skadden who also weighed in, other members of the firm's policy and/or hiring committees, and perhaps even Ms. Manafort herself. Permitting an Andrea Manafort sideshow would also require additional direct and cross examination of other witnesses that otherwise would never occupy trial time.

  **B.**  **There is also a substantial risk of unfair prejudice.**

In addition to confusion, delay and waste of time, the probative value of the evidence is also substantially outweighed by the danger of unfair prejudice. Although in 2012 Paul Manafort was known as a long-time Republican lobbyist and political strategist who had served several Presidents, he has since become *persona non grata* for reasons of which this Court is well aware. He is particularly well known in the District of Columbia. Even if jurors assure the Court they can be unbiased, the chances of seating a jury unfamiliar with the crimes with which Mr. Manafort has been convicted is small. Mr. Manafort's name obviously cannot be purged from this trial. But the government's effort to suggest that Mr. Manafort was the kind of person who could successfully strong-arm Mr. Craig, and that Mr. Craig's integrity could be bought by a client who was dishonest in other matters, is an effort to smear Mr. Craig with guilt by association.

## CONCLUSION

The government tries to suggest that the events surrounding Ms. Manafort's hiring support its theories that Mr. Craig had a motive to violate FARA or lie to the FARA Unit. But its interlocking theories, each based on long and convoluted chains of inferences, fail as a matter of logic and evidence and thus have no probative value. And if the evidence has any *de minimis* value, it is substantially outweighed by dangers of confusion, delay, waste of time, and unfair

prejudice. The Court is already committing weeks of jury time, if this case survives the pending motions, to a trial in August. There is no reason to add even a day of testimony from several witnesses on an issue of such vanishing probative value.

Dated: June 7, 2019

Respectfully submitted,

*/s/ William W. Taylor, III*

William W. Taylor, III (D.C. Bar No. 84194)
Ezra B. Marcus (D.C. Bar No. 252685)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W. Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
Email: wtaylor@zuckerman.com
Email: emarcus@zuckerman.com

William J. Murphy (D.C. Bar No. 350371)
Adam B. Abelson (D.C. Bar No. 1011291)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
Email: wmurphy@zuckerman.com
Email: aabelson@zuckerman.com

*Attorneys for Defendant Gregory B. Craig*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on June 7, 2019, the foregoing was served on counsel of record via the Court's CM/ECF Service.

                                          */s/ Ezra B. Marcus*
                                          Ezra B. Marcus

# Exhibit 1



# Leading International Law Firm Skadden, Arps, Slate, Meagher & Flom LLP did not find evidence of political motivation in judgement of Tymoshenko

The Ministry of Justice has received the independent report of the law firm Skadden, Arps, Slate, Meagher & Flom LLP, following its investigation of the Yulia Tymoshenko prosecution for exceeding her official powers at the conclusion of contracts between Russian Gazprom and Naftogaz Ukraine.

In accordance with the signed agreement, Skadden Arps has delivered an independent report that clearly documents the events that were the subject of the trial and the trial itself. Through detailed analysis and a focus on the evidence, the report addresses critics, who have challenged the legal process and also the conviction, based on Yulia Tymoshenko's claims that the prosecution was politically motivated and that her human rights have been abused. For this reason, the Ministry of Justice asked the leading international law firm to investigate the matter, taking into account all legal documents and opinions of all parties.

This report, published today on the Ministry's website without amendment, concludes as groundless Yulia Tymoshenko's claims that her prosecution was politically motivated and states that she has provided no factual evidence that would be sufficient to overturn her conviction under European or American standards.

The report also points out that Yulia Tymoshenko's conduct in court would have been unacceptable in other countries and would likely have resulted in a contempt of court finding.

The Skadden Arps report shows how Yulia Tymoshenko overstepped her authority and committed this crime:

1. by drafting Directives that set forth the terms that she and Prime Minister of the Russian Federation had agreed to;
2. by ordering the head of NAK Naftogaz Ukraine to sign an agreement with Gazprom in the absence of approval from the Cabinet of Ministers;
3. by threatening to fire the head of NAK Naftogaz Ukraine if he did not sign the agreement;
4. and by deceiving the head of NAK Naftogaz Ukraine into believing that the Cabinet of Ministers had approved the agreement after producing an official looking document bearing her signature and the seal of Ukraine's Cabinet of Ministers, despite the fact no such approval had been given for the document named "Directives".

Even where the Skadden Arps Report questions certain procedural decisions by the court, it concludes that these decisions were based on actions by Tymoshenko designed to disrupt the court's work.

The court concluded that Yulia Tymoshenko's actions caused grave damage to Ukraine, since citizens of Ukraine continue to pay the highest prices in Europe for their gas due to Tymoshenko's deal with Russia. In this sense, every citizen of this country is a victim of this crime.

Confidential Treatment Subject to Rule 6(e)

SAU 154026

USA-REL-0154223

The Ministry of Justice is grateful to Skadden Arps for this professional analysis that unconditionally lays out the facts of this matter.

---

**Contact:   Press Office - Ministry of Justice**
Telephone:  +38 044 271 17 33
Email:      press@minjust.gov.ua

The Skadden Arps Report can be downloaded from the Ministry of Justice website at this address:

http://www.minjust.gov.ua/42565

**13.12.2012**

Confidential Treatment Subject to Rule 6(e)

SAU 154027
USA-REL-0154224