**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| *v.* | **Case No. 1:19-cr-0125 (ABJ)** |
| **GREGORY B. CRAIG**, | |
| *Defendant.* | |

## NOTICE OF INTENT TO FILE MOTION IN LIMINE TO EXCLUDE HEARSAY TESTIMONY FROM RICHARD GATES AND JONATHAN HAWKER

The government has provided discovery material related to interviews of Richard Gates and Jonathan Hawker – two likely government trial witnesses – that contain numerous communications to Messrs. Gates and Hawker from hearsay declarants, including each other, Paul Manafort, and Alex Van Der Zwaan.  Other discovery material includes emails written by absent declarants and not addressed to or received by Mr. Craig.  This glut of hearsay evidence raises extraordinary questions of admissibility, not to mention reliability, in this case where the credibility of both the witnesses themselves and the hearsay declarants is suspect, to say the least.

FBI 302s memorializing interviews of Mr. Gates reveal that most of his testimony about Mr. Craig consists of statements made to him by Mr. Manafort and Mr. Van Der Zwaan.  For example, "Gates said Manafort told him Craig contacted people identified on the list of [U.S. legislative] contacts."  Ex. 1 at 2 (FD-302, Interview of Richard Gates (Sept. 11, 2018)).  "Gates recalled Manafort telling him Skadden was going to look into whether they needed to file under FARA."  *Id.*  Mr. Gates stated that, as for "what or what not [Mr. Craig] would be willing to do[,] [t]hose discussions were primarily between Manafort and Craig and Gates would

subsequently be briefed down by Manafort." *Id.* at 3.  Mr. Gates "recalled Manafort telling him [that Mr. Manafort] helped arrange meetings between Craig and [a] few Ukrainian oligarchs" in connection with additional opportunities for work in Ukraine. *Id.* at 10.  Mr. Gates also understood from Mr. Van Der Zwaan that Mr. Van Der Zwaan was sharing updates of the media plan with Mr. Craig. *Id.* at 4.  He said that Mr. Van Der Zwaan had told him in December 2012 that Mr. Craig had "received the assignments" in the media plan. *Id.* at 9.  The FBI 302s show that Mr. Gates had little direct contact with Mr. Craig, and no involvement whatsoever with Skadden's 2013 responses to the FARA Unit's inquiry, the context for the actual charges.

Similarly, the FBI 302s summarizing interviews with Jonathan Hawker show that while Mr. Hawker's recollections of the events of 2012 have changed over time, much of his recollection of what Mr. Craig was willing to do to support the FTI/Ukraine media plan were based on what he was told by Mr. Gates, and that much of Mr. Gates's information came from Mr. Manafort.  For example, "Later RG [Rick Gates] informed HAWKER that GC [Greg Craig] has said he has a trusted relationship with David Sanger (DS) of the New York Times and that he would seed him." Ex. 2 at 8 (FD-302, Interview of Jonathan Hawker (July 10, 2018)).  "It was clear from RG that GC wanted to do the briefing [of David Sanger], GC did not want HAWKER doing it.  HAWKER thought this was weird as he was supposed to have done the briefing and GC give quotes, but then GC [according to Gates] wanted to do more." *Id*. at 9.  During his most recent interview, Mr. Hawker stated that he "was pretty sure he learned from Gates that Manafort had sorted out Craig.  Hawker reasoned Manafort must have solved it because Manafort said he would talk to Craig and then Craig [according to Mr. Gates] was agreeing to have contact with journalists despite his earlier reversal." Ex. 3 at 10 (FD-302, Interview of Jonathan Hawker (Jan. 23, 2019)).  And Mr. Hawker further explained "that on the back of Manafort's conversation

with Craig, the New York Times emerged over Bloomberg [News] . . . .  It was communicated beforehand to Hawker [by Gates] that Sanger would be available." *Id.* at 12.

The trial will demonstrate that both Hawker's and Gates' versions of what Mr. Craig agreed to do are false, but the first question will be their admissibility.  We have asked the government to advise us whether it intends to elicit hearsay testimony along these lines, and of any exceptions to the rule against hearsay that it contends might apply. *See* Exs. 4–5 (email correspondence). The government has advised that it is "not in a position to answer" because it does not know "all of the exhibits or statements that [it] may wish to introduce into evidence." Ex. 5 at 1–2.

If the government does decide to offer evidence along these lines, we will object. The hearsay issues with testimony from Messrs. Gates and Hawker are global and foreseeable, and an orderly pretrial process is necessary to resolve them. The government's general assurance that it "will follow the Federal Rules of Evidence," *id.* at 1, is cold comfort.  But absent an indication from the government as to whether it will try to introduce these types of hearsay statements into evidence, and on what theory, the issues are not ripe, and we cannot specify our objections sufficiently to include them in a motion *in limine* at this time.  Because the Court's scheduling order requires motions *in limine* to be filed on or before June 24, we respectfully file this Notice and request leave to file the appropriate objection or motion *in limine* if and when the issues are ripe.

Dated: June 24, 2019                    Respectfully submitted,


                                        /s/ William W. Taylor, III
                                        William W. Taylor, III (D.C. Bar No. 84194)
                                        Ezra B. Marcus (D.C. Bar No. 252685)
                                        ZUCKERMAN SPAEDER LLP
                                        1800 M Street N.W. Suite 1000
                                        Washington, D.C. 20036
                                        Tel: (202) 778-1800
                                        Fax: (202) 822-8106
                                        Email: wtaylor@zuckerman.com
                                        Email: emarcus@zuckerman.com

                                        William J. Murphy (D.C. Bar No. 350371)
                                        Adam B. Abelson (D.C. Bar No. 1011291)
                                        ZUCKERMAN SPAEDER LLP
                                        100 East Pratt Street, Suite 2440
                                        Baltimore, MD 21202
                                        Tel: (410) 332-0444
                                        Fax: (410) 659-0436
                                        Email: wmurphy@zuckerman.com
                                        Email: aabelson@zuckerman.com

                                        *Attorneys for Defendant Gregory B. Craig*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that, on June 24, 2019, the foregoing was served on counsel of record via the Court's CM/ECF Service.

*/s/ Ezra B. Marcus*
Ezra B. Marcus

Exhibit
1

FD-302 (Rev. 5-8-10)



**UNCLASSIFIED//LES**

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    10/16/2018

On Tuesday, September 11, 2018, Richard Gates was interviewed at the law offices of Sidely Austin, 1501 K Street N.W., Washington, DC 2005. Gates was being interviewed pursuant to an ongoing cooperation agreement entered into with the Office of the Special Counsel. Present for the interview were DOJ Senior Financial Investigator Kevin D. Constantine; FBI Special Agent Daniel Kegl; Assistant United States Attorneys Kristy Greenberg, Jane Kim and George Turner from the Southern District of New York; and Assistant United States Attorney Jason McCullough, DOJ National Security Division. Also present was Gates' attorney, Thomas Green. After being advised the identity of the interviewing parties and the purpose of the interview, Gates furnished the following information:

Note: Prior to the interview commencing, AUSA Greenberg reminded Gates that he had to be truthful with the interviewing parties and at anytime he wished to consult with his attorney (Thomas Green) he could do so. Gates verbally acknowledged that he understood.

**Skadden Report Background:**

Gates' initial involvement with Skadden Arps and the subsequent Skadden Report was when Paul Manafort (Manafort) contacted Gates about using one of their (Davis Manafort Partners) Ukrainian funded bank accounts in Cyprus to pay for an independent review of the imprisonment of former Ukrainian Prime Minister Yulia Tymoshenko. To the best of Gates' recollection, Manafort was put in contact with Greg Craig of Skadden Arps after speaking with Doug Schoen. Gates was unsure why Schoen referred Craig to Manafort.

**Skadden Report Media Strategy:**

Gates recalled Craig initially agreed to be involved in the overall media strategy, but FTI Consultants was subsequently hired to handle it. FTI was referred to Manafort via Craig.

Craig went back and forth on his role with the overall media strategy, but eventually agreed to talk with David Sanger of the New York Times. It was

**UNCLASSIFIED//LES**

| | | |
|---|---|---|
| Investigation on | 09/11/2018 | at Washington, District Of Columbia, United States (In Person) |
| File # | ▮▮▮▮▮▮▮▮▮▮▮ | Date drafted 09/17/2018 |
| by | CONSTANTINE KEVIN D, KEGL DANIEL | |

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//LES

(U//LES) Richard Gates - September 11, 2018

Continuation of FD-302 of _____, On  09/11/2018 , Page  2 of 12

Gates' recollection that Craig mentioned having a good relationship with Sanger while at a meeting in DC. Craig believed his relationship with Sanger would give them a shot at a fair interview.

When FTI ultimately drafted their initial media strategy/plan, it had Craig playing a more active role. Craig pushed back, but compromised to reach out to a few media and political contacts.

Gates recalled that a few United States Legislators were contacted prior to the release of the Skadden Report; however, he could not recall who they were. Initially Craig was willing and felt comfortable reaching out to these elected officials, but Gates was unsure if he ever ended up doing so. However, Gates said Manafort told him Craig contacted people identified on the list of contacts.

Alex Van Der Zwaan was a Skadden Associate based in London and was brought on board because Skadden needed a Russian speaker. Van Der Zwaan ultimately became Craig's right-hand man in Ukraine and reported directly to Craig.

Gates was unsure why Skadden didn't file under FARA, but recalled they hired FTI because Craig and Skadden didn't want to be involved in a full blown media strategy. Gates recalled Manafort telling him Skadden was going to look into whether they needed to file under FARA.

Gates recalled having approximately two one-on-one meetings with Craig. He also attended meetings with Craig, Manafort and others in NYC once or twice. Manafort had more direct/regular interaction with Craig; however, Gates would regularly receive downloads from Manafort.

**Emails/Documents Shown to Gates:**

Tab 11 - Gates was shown an email chain with Bates stamps SAU 020823 - 020825 which was a conversation between Gates and Van Der Zwaan on May 1, 2012 with the subject "Re: Call". Gates was unsure the origin of the PR information; however, he believed this was around the time FTI was hired.

Tab 21 - Gates was shown an email chain and attachments with Bates stamps SAU 021116 - 021130 which was a conversation between Gates and Van Der Zwaan on July 17, 2012 with the subject "Project Veritas - Communications Strategy". Jon Aarons was Gates' initial contact at FTI; however, he was replaced by Jonathan Hawker because he (Aarons) was difficult to deal with.

Gates was questioned about the Skadden Report Strategy Section starting on page 5 of the attachment. Although the Report was not yet finalized, Gates

USA-0008080

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//LES**

▮▮▮▮▮▮

Continuation of FD-302 of   (U//LES) Richard Gates - September 11, 2018   , On   09/11/2018   , Page   3 of 12

said Craig provided an outline of the project to Manafort. It was around this time Manafort was pressuring Hawker to finalize the Media Plan.

Gates said it was "aspirational" the Skadden Report would conclude the trial of Tymoshenko was valid. In fact, the Skadden Report did not conclude the trial was valid.

The journalists identified on pages 9-10 came from Hawker and FTI. It wasn't until later on that Craig advised he had a better contact at the NY Times (Sanger).

Tab 22 - Gates was shown an email chain with Bates stamps SAU 021132 - 021133 which was a conversation between Gates and Van Der Zwaan on July 18, 2012 with the subject "Project Veritas - Communications Strategy". Gates said the reference from Van Der Zwaan that Greg and Pshonka wanted him to speak with Gates urgently involved two separate conversations Van Der Zwaan had with each.

As it related to his conversation with Craig, Van Der Zwaan told Gates that he sat down with Craig to discuss the plan and he (Craig) had concerns with the overall intensity of the plan.

As it related to his conversation with Pshonka, Van Der Zwaan told Gates Pshonka wanted additional people added.

Tab 24 - Gates was shown an email chain with Bates stamp SAU 030158 which was a conversation between Gates, Aarons, Hawker and Van Der Zwaan on July 29, 2012 with the subject "Re: Media Plan". Van Der Zwaan requested all discussions about the media plan be sent via private email. Van Der Zwaan indicated that after speaking with Craig about this arrangement he felt more comfortable with it.

Gates was also shown an attachment to Tab 24, a Memorandum from SL to PJM, dated July 27, 2012 with the subject "SA Report - Media Plan (Bates stamps SAU 030154 - 030157). Item number 6 in the Report Release section referenced briefing a small number of international journalists in advance of the publication of the Skadden Report. Gates said at this stage they were still having discussions with Craig on what or what not he would be willing to do. Those discussions were primarily between Manafort and Craig and Gates would subsequently be briefed down by Manafort.

As previously mentioned, on occasion Gates communicated with Van Der Zwaan and Hawker via private email. They also communicated via telephone and in-person. Gates said they would use private emails to send draft sections of the Skadden Report to the Ministry of Justice (MOJ) and to also highlight

**UNCLASSIFIED//LES**

FD-302a (Rev. 05-08-10)

(U//LES) Richard Gates - September 11, 2018

Continuation of FD-302 of _____, On 09/11/2018 , Page 4 of 12

changes to the Media Plan and Report. It was Gates' understanding that Van Der Zwaan was sharing all changes and updates with Craig. The private emails were used more as an intermediary so the conversations weren't sent through a Skadden server. Skadden wanted to maintain the perception of independence.

Gates never had a conversation with Craig about the use of private emails.

Tab 25 - Gates was shown an email from Gates to Van Der Zwaan with Bates stamp SAU 021141 on July 30, 2012 with the subject "Call". Gates assumed this was in reference to the revised Media Plan. When asked if Craig would have approved Van Der Zwaan furnishing an advance/draft copy of the Skadden Report, Gates said absolutely.

Tab 34 - Gates was shown an email from Gates to Van Der Zwaan with an attachment with Bates stamps SAU 147989 - 147994 on September 19, 2012 with the subject "Here". Gates said the attachment was a memo written by Manafort for Craig following up on suggested changes to the Skadden Report.

Gates was questioned about the Harvard Club (NYC) meeting between Manafort, Gates, Hawker and Craig. It was his recollection the purpose of the meeting was to push for the finalization of the Report and to discuss what Craig would be willing to do as part of the GR (Government Relations) and PR (Public Relations) rollout. Prior to the meeting, Manafort and Craig met alone to discuss Craig's assistance in the rollout. Manafort told Gates and Hawker he would be able to get Craig to agree to do a few things.

The actual meeting at the Harvard Club lasted approximately two hours, of which 45 minutes was spent discussing the Media Plan. In the end, although they were unable to get as much assistance from Craig on the Media Plan rollout, Craig agreed to provide an advance copy of the report and brief it to Sanger (NY Times). Gates said it was critical to have what was perceived to be a neutral article written by a prominent media outlet like the NY Times.

Sanger's name came up during both at the pre-meeting and the actual meeting. Gates said the reason for Sanger and the NY Times was for perception right out the box. Gates recalled Craig saying if he used Sanger he could help guide the story and set the stage. While Craig never expected the article to be 100% positive, he wanted the Report to be taken seriously and to not be considered a whitewash.

Tab 95 - Gates was shown an email and attachments which was a conversation between Hawker, Manafort, Gates, Konstantin Kilimnik, Craig and Van Der

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//LES**

███████████████

(U//LES) Richard Gates - September 11, 2018

Continuation of FD-302 of _____ ,On  09/11/2018  , Page  5 of 12

Zwaan with Bates stamps FTI 005805 - 005834 on September 23, 2012 with the subject "Documents". The documents referenced included an agenda for the Harvard Club meeting to discuss the proposed media plan. Gates confirmed a copy of the agenda was distributed to everyone in attendance at the meeting. Gates recalled they went through every item on the agenda to include the role of Craig. It was Gates' understanding Craig felt more comfortable talking with politicos (GR) on the background of the Skadden Report more than he did with the media (PR).

Action number 7 on the Master Control Grid called for the "Engagement with Bloomberg". Gates believed Craig volunteered to contact Bloomberg and it was on his list of items to do; however, he doesn't think he did.

Action Number 6 on the Master Control Grid called for Craig to meet with Cox and Kwaniewski. Gates did not believe these meetings ever took place.

The SA Report Media Plan Overview proposed leaking a copy of the Skadden Report to the Bloomberg Bureau in Washington, DC. As previously stated, Gates believed Craig volunteered to contact Bloomberg and while it was on his list of items to do, he doesn't think he did. That being said, Gates said if anyone would have leaked the Skadden Report to Bloomberg it would have been Craig.

Action Number 21 Master Control Grid called for Craig to brief the Ukrainian Commissioner for Human Rights. Gates did not recall Craig agreeing to do this.

Action Number 22 Master Control Grid called for Craig to Brief Cox and Kwaniewski. Gates recalled Craig agreed to do this prior to the Harvard Club meeting. As previously stated, Gates did not believe these meetings took place.

Action Number 24 Master Control Grid called for Craig to engage with US Media. Besides the NY Times (Sanger), Gates did not recall any other US Media contacted by Craig.

Action Numbers 25-30 Master Control Grid called for Craig travel to Brussels and Moscow for roundtable discussions. Gates believed Craig agreed to do this prior to the Harvard Club meeting; however, he said it never took place.

Action Number 21 Master Control Grid called for Craig to engage with US Political Stakeholders and the UK Ambassador to the US. Gates could not recall if Craig ever did this.

**UNCLASSIFIED//LES**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//LES**

Continuation of FD-302 of ___(U//LES) Richard Gates - September 11, 2018___ , On __09/11/2018__ , Page __6 of 12__

One of the documents attached by Hawker was the Project Veritas - Master Questions and Answer Document. Gates said this document was prepared by Hawker for the MOJ and would have been discussed at the meeting. Gates could not recall if Craig raised any concerns it.

Tab 40 - Gates was shown an email which was a conversation between Hawker, Gates and Van Der Zwaan with Bates stamps SAU 026067 dated September 24, 2012 with the subject "Problem". Gates did not recall what the problem was.

Tab 41 - Gates was shown an email and attachments which was a conversation between Hawker, Craig, Manafort and Gates with Bates stamps SAU 026698 and SAU 026701 - 026710 dated September 24, 2012 with the subject "Draft Messaging". Gates said this email and documents were shared post (after) the Harvard Club meeting in an effort to shore up the Media Plan.

Gates was shown an email chain with Bates stamps FTI 004504 - 004505 dated September 24-25, 2012 which was a conversation between Hawker, Craig, Manafort and Gates with the subject "Draft Messaging". Gates believed Craig had a follow-up call with Hawker and he (Hawker) then sent out a revised Media Plan.

Tab 96 - Gates was shown an email chain with Bates stamp FTI 002246 dated September 25, 2012 which was a conversation between Gates and Hawker. Gates recalled one of the issues Hawker needed to discuss with Craig was the validity of the Tymoshenko Trial. The MOJ wanted the Skadden Report to say the trial was valid.

Tab 42 - Gates was shown an email chain with Bates stamp PDG 00045001 which was sent by Gates to Mercury and Podesta on September 26, 2012 with the subject "Meeting Agenda". The body of the email referenced a meeting agenda for the DC Consultants (Mercury and Podesta). Gates said Mercury and Podesta had better connections for outreach to US Politicians and that Mercury would provide their recommendations for media outreach.

Tab 98 - Gates was shown an email chain and attachments between Gates and Hawker with Bates stamps SAU FTI 001385 - 001395 dated September 24, 2012 with the subject "Document". The documents attached were the Project Veritas Media Plan as modified after review by Mercury and Podesta. Al Hunt, Bloomberg, was identified as a US journalist to receive a background brief by FTI and Skadden. Gates believed Hunt's name was furnished by Vin Weber, but that it might have also come from Craig. Gates said there was no reference to the NY Times because it was already in the works and they didn't want anyone to know about the NY Times, to include Mercury and Podesta. Gates recalled having discussions about this matter with Manafort and Hawker.

**UNCLASSIFIED//LES**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//LES**

(U//LES) Richard Gates - September 11, 2018

Continuation of FD-302 of _____ , On 09/11/2018 , Page 7 of 12

Gates was questioned about the names of US contacts identified to be
briefed (Bates stamp FTI 001392). Gates believed Harry Reid and Richard
Durbin were included because Craig had a past relationship with them.
Gates recalled Craig saying he would reach out to them. The other contacts
came from Mercury and/or Podesta and Gates was unsure if they were ever
briefed.

Tab 45 - Gates was shown an email and attachment which was a conversation
between Hawker, Manafort, Gates and Kilimnik with Bates stamps FTI 003739
- 003743 dated October 2, 2012 with the subject "Master Grid". Gates
stated the attachment was the European media rollout. According to Gates,
the messaging would say the Skadden Report was independent and determined
the Ukrainian Government did some things right and some things wrong.
However, the Skadden Report would not state the Government was totally in
the right.

The Domestic Strategy as referenced on Bates stamp 0037742 was a reference
to the Ukrainian Domestic Strategy.

Tab 97 - Tab 45 - Gates was shown an email and attachment from Gates to
Hawker with Bates stamps FTI 007384 dated October 2, 2012 with the subject
"Matrix - Actions". Gates identified the attached document as the DC
Consultant (Mercury and Podesta) Media Plan. Gates recalled at some point
Mercury and/or Podesta expressed some hesitancy to use the NY Times
because they did not think it would be a positive article.

Tab 48 - Gates was shown an email chain which was a conversation between
Manafort, Gates, Hawker and Kilimnik with Bates stamp FTI 003135 dated
October 5, 2012 with the subject "update". In the email Manafort requested
a copy of the most recent Media Plan and referenced that GC (Craig) was
coming back from the Middle East that day. Gates recalled Craig and Weber
shared a client in the Middle East and were there together.

When questioned about the delay in releasing the Skadden Report, Gates
recalled Craig asked them to hold-off so he could attempt to interview
Tymoshenko again. Gates also recalled the MOJ had some concerns with the
Skadden Report and there was talk about them not releasing it. Podesta
also had concerns with how the Skadden Report would be perceived in the US.

It was also around this time Mercury was looking into reaching out to the
media, to include Vin Weber speaking with Al Hunt.

Tab 99 - Tab 42 - Gates was shown an email chain and attachments between
Gates and Hawker with Bates stamps FTI 025794 - 025807 on November 26,
2012 with the subject "Report". The Master Control Grid had a noted task

**UNCLASSIFIED//LES**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//LES

Continuation of FD-302 of (U//LES) Richard Gates - September 11, 2018 ,On 09/11/2018 ,Page 8 of 12

at 1700 for GC to provide background briefing at the request of the US Journalist on Tuesday at 1700. Gates said this was a reference to Craig reaching out to Sanger (NY Times).

The Master Control Grid also had a noted task at 2200 for Bloomberg to release story for print on Tuesday morning. To the best of his recollection this was going to be handled by Weber (Mercury).

Gates said it was around this time, or maybe even in October, Manafort had him tell Weber about Craig and the NY Times. Weber pushed back and asked why not the Washington Post.

Gates recalled the closer they got to the release of the Skadden Report it became clear Craig was going to be less involved in the overall Media Plan rollout.

Gates was unsure who put the reference to John Kerry on Bates stamp 025798 although they were aware Craig was close with him.

Gates could not identify anyone referenced from the USA Section (Bates stamps 025804 - 025807) that Craig agreed to reach out to.

Gates said it was Hawker's idea for a possible Vanity Fair article on Craig as referenced at 1900 on Bates stamp 025808. It was never pursued as far as Gates was aware.

Tab 100 - Gates was shown an email chain and attachment which was a conversation between Gates, Kilimnik, Manafort and Hawker with Bates stamps FTI 026136 on December 5, 2012 with the subject "Updated Docs". The attached Master Control Grid called for courtesy calls on December 12th. One of the individuals identified to call was Obama. Gates did not recall any discussions about reaching out to President Obama and opined it was most likely a reference to the Obama Administration.

Gates did not recall if Craig or anyone reached out to (Harry) Reid. It was also his understanding Mercury was going to reach out (John) Boehner.

The attached Master Control Grid called for the Report to be given to David Sanger of the NY Times who would then have an exclusive on the material for 24 hours. Gates recalled being aware of the date of this email that Craig had already reached out to Sanger. A copy of this Master Control Grid would have been sent/shared with Craig, Gates, Manafort and Kilimnik. Kilimnik would have then had it translated to share with the Ukrainian Governement.

UNCLASSIFIED//LES

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//LES

███████████████

Continuation of FD-302 of ___(U//LES) Richard Gates - September 11, 2018_____ , On _09/11/2018_ , Page _9 of 12_

Gates opined that individuals might have been added to the distribution list to help bolster the Media Plan to the MOJ.

It was the idea that either the Ministry of Foreign Affairs or Craig would reach out to the key stakeholders. However, Gates was unaware if anyone was actually contacted.

Steve Brown, Dan Flynn and an UNSUB were also hired by Manafort to conduct outreach during the rollout.

TAB 101 - Gates was shown an email from Hawker to Gates with Bates stamps FTI 026230 December 6, 2012 with the subject "Docs". Hawker informed Gates everything has gone to Alex's (Van Der Zwaan) gmail, but that he can't get a hold of Greg (Craig). Gates was unsure why Hawker was unable to get a hold of Craig. Gates said he can't say for sure that Craig saw the attached Master Control Grid; however, he recalled being told by Van Der Zwaan around the time of this email that Craig received the assignments.

Gates never heard Craig didn't want to talk with the NY Times.

Tab 55 - Gates was shown an email chain and attachment which was a conversation between Gates, Eckart Sager, Hawker, Kilimnik and Van Der Zwaan with Bates stamps SAU 030582 - 030592 on December 10, 2012 with the subject "Master Control Grid consult - SA Report.xlsx". Gates did not know if Craig saw the attached Master Control Grid, but said he sent it to Van Der Zwaan and opined he forwarded it to Craig.

Hawker was tasked to organize Craig's schedule to start (implement) the Media Plan rollout.

Tab 56 - Gates was shown an email chain which was a conversation between Gates, Sager, Van Der Zwaan and Alan Friedman with Bates stamps SAU 038013 on December 11, 2012 with the subject "Warsaw". It was Gates' understanding Craig was going to travel to Europe to brief a select group of European leaders, but had an issue with his flight. Sager wanted Van Der Zwaan to meet with members of the media, but Craig would not approve it. Gates said it was his speculation, and speculation only, Craig did not want anyone from Skadden besides himself doing any media outreach.

Gates did not know what happened regarding the off the record briefing request by ANSA.

It was Gates' understanding that Craig took a middle of the road approach when speaking with the NY Times (Sanger). Per a debrief by Manafort, he (Manafort) pushed Craig to be on record when speaking with the NY Times.

UNCLASSIFIED//LES

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//LES**

███████████████

Continuation of FD-302 of   (U//LES) Richard Gates - September 11, 2018   , On   09/11/2018   , Page   10 of 12

Craig's willingness to engage the media showed a level of credibility for the Report and for the overall public perception of the findings. Manafort knew it was critical for Craig do it. Gates recalled there was a lot of give and take leading up to what Craig finally agreed to do. According to Gates, Craig was not only trying to please the client, but he also didn't want to damage his reputation.

Gates said Craig approached Manafort during the Summer (2012) to discuss additional work opportunities in the Ukraine. Those discussions continued into early 2013 and centered more on the business side and not GR. Van Der Zwaan was going to be Skadden's point person. Gates recalled Manafort telling him he helped arrange meetings between Craig and few Ukrainian Oligarchs.

Tab 102 - Gates was shown an email from Hawker to Gates with Bates stamp FTI 026366 on December 11, 2012 with the subject "In reception". Gates did not recall this email or what it was about.

Tab 103 - Gates was shown an email chain and attachment between Gates, Hawker and Van Der Zwaan with Bates stamps FTI 025218 - 025223 on December 11, 2012 with the subject "Contact List". To the best of his knowledge, no one from this list was contacted.

Tab 57 - Gates was shown an email from Gates to Van Der Zwaan with Bates stamps SAU 247167 on December 11, 2012 with the subject "Report". After reviewing this email and the last tab reviewed (Tab 103), Gates recalled instructing Van Der Zwaan to send a copy of the Skadden Report to those contacts identified. Gates opined that Mercury and Podesta would have done the advanced outreach.

Tab 58 - Gates was shown an email chain and attachment which was a conversation between Gates, Kilimnik, Van Der Zwaan, Sager and Hawker with Bates stamps SAU 007652 - 019858 on December 12, 2012 with the subject "Report - Information. Gates recalled being told by Van Der Zwaan that Cliff Sloan (Skadden) didn't want Van Der Zwaan meeting with any reporters. Gates also recalled there was concern about Manafort's and MOJ's input to the Skadden Report.

Tab 104 - Gates was shown an email chain and attachment which was a conversation between Gates, Kilimnik, Manafort, Sager and Hawker with Bates stamps FTI 027120 - 027124 on December 13, 2012 with the subject "Report Coverage".  Gates recalled Manafort was a little upset with the NY Times article because it started off by saying Skadden concluded

**UNCLASSIFIED//LES**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//LES

███████████████

(U//LES) Richard Gates - September 11, 2018

Continuation of FD-302 of _____ , On  09/11/2018  , Page  11 of 12

Tymoshenko's legal rights were violated and that she was wrongly imprisoned. The compromise was the article stated the prosecution wasn't politically motivated.

While Manafort wasn't happy with Craig's quote about leaving it to others the question whether the prosecution was politically motivated, the news article(s) would have been a lot worse if not for Craig speaking to Sanger (NY Times). According to Gates, this was the strategy and it was worth the risk.

Gates could not recall if Craig was upset about the article published in the Telegraph.

Gates was shown an email chain which was a conversation between Gates, Manafort and Sager with Bates stamps ES 00012 - 00015 on September 19, 2012 with the subject "an urgent request ON IT". Gates recalled this involved a pending US Senate Resolution re: Tymoshenko. Initially Gates could not recall having any discussions with Craig about reaching out to Durbin; however, it's possible during one of his one on one meetings with Craig he brought up the topic. Gates recalled Craig might have told him he would look into it and that he knew the people in the State Department. Although his take was Craig was reluctant to help at all, Gates still believed Craig was going to make the call.

Tab 35 - Gates was shown an email chain between Gates and Tony Podesta with Bates stamp PDG 00045091 on December 19, 2012 with the subject "URGENT". Gates acknowledged reaching out to Podesta and briefing him on the pending resolution and asking for his assistance. Gates recalled Podesta expressed a willingness to assist, but was unsure if he contacted anyone. However, Gates believed Podesta attempted to contact (John) Kerry.

**FARA:**

As previously stated, Gates recalled Skadden was looking into whether or not they needed to file under FARA and that they might have spoken with Ken Gross.

(Note: It was agreed to meet with Gates at a later date to further discuss FARA.)

**Miscellaneous:**

UNCLASSIFIED//LES

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//LES**

Continuation of FD-302 of ___(U//LES) Richard Gates - September 11, 2018_____ , On ___09/11/2018___ , Page ___12 of 12___

As mentioned in previous interviews, Gates used several encrypted email applications to include Viber. Gates would often use Viber to talk with Van Der Zwaan. He never used Viber or any encrypted application to communicate with Craig.

Gates identified the following two telephone numbers he had saved in his cell phone for Craig : ████████ (Work) and ██████████ (Cell).

**UNCLASSIFIED//LES**

Exhibit
2

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

FEDERAL BUREAU OF INVESTIGATION

Date of entry    07/20/2018

   On July 10, 2018 JONATHAN HAWKER (HAWKER), was interviewed at the
United States Attorneys Office for the Southern District of New York
located at 1 St. Andrews Plaza, New York, New York 10007.  Present for the
interview were FBI Special Agents Russell Beverly and Daniel Kegl;
Assistant U.S. Attorneys (AUSA) George Turner, Jane Kim, and Kristy
Greenberg; U.S. Department of Justice Attorney Jason McCullough from the
Counterintelligence and Export Control Section; and Senior Assistant
Special Counsel Andrew Weissman. Also present were HAWKER'S Attorneys
Timothy Heaphy, and Kevin Gaunt, Hunton, Andrews, Kurth LLP, 2200
Pennsylvania Avenue, NW, Washington D.C. 20037.  After being advised of
the identity of the interviewing parties and the nature of the interview,
HAWKER provided the following information:

   AUSA George Turner advised HAWKER that his participation in the
interview was voluntary, and also advised HAWKER that he needed to be
truthful in his answers because lying to a federal agent could constitute
a crime.  HAWKER verbally acknowledged that he understood both of these
points.

   HAWKER was provided with a binder of tabbed exhibits prepared by the
United States Attorney's Office for the Southern District of New York. The
interviewers referenced the exhibits throughout the interview. A copy of
the binder is attached hereto as a physical 1A package.

HAWKER BACKGROUND

   HAWKER received his undergraduate degree in London with a focus on
languages, and then received a post-graduate degree in Journalism in
Cardiff.  In 1991 he became a television reporter working for the BBC,
before leaving there to work in Brussels. His reporting career included
extensive international work before contracting malaria in Sierra Leone.

   Following a six month period of not working due to his illness, HAWKER
dabbled in the Public Relations (PR) work of his wife, helping advise her

UNCLASSIFIED//FOUO

Investigation on   07/10/2018   at   New York, New York, United States (In Person)

File #   ████████████████                                      Date drafted   07/11/2018

by   Russell Beverly, KEGL DANIEL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U) Interview of Jonathan HAWKER _____ , On _07/10/2018_ , Page _2 of 13_

on a client's crisis.  Following that experience HAWKER went to work for Fleishman Hillard (FH) London around the year 2000 specializing in crisis litigation.

After one to one-and-a-half years at FH, which HAWKER characterized as dysfunctional, HAWKER set up his own firm named Partner PR. This was later sold to Financial Dynamics, which was itself later sold to FTI Consulting (FTI).

Following the events in Ukraine HAWKER left FTI in 2014 because he was embarrassed and "tainted" for never getting FTI reimbursed for its expenses in Ukraine. This led to his being sidelined.  In effect, he "saw the writing on the wall." Since then he has worked for himself.

INTRODUCTION TO SKADDEN, ARPS, SLATE, MEAGHER, and FLOM LLP AND BEGINNING OF THE UKRAINE JOB

HAWKER was originally introduced to Skadden, Arps, Slate, Meagher, and Flom LLP (SA) while he was working PR for an internal FTI employee issue. SA was brought in as legal counsel on the issue and HAWKER met Matthew Cowie (MC) of SA.  HAWKER was unfamiliar with SA prior to working with them on the internal FTI issue.

Later after the issue that had introduced them was resolved, MC reached out to HAWKER about an opportunity to work for the Government of Ukraine.  As FTI employees are pressured to bring in business and income, HAWKER jumped on the chance due to "needing work."

He originally understood the scope of the work to be helping Ukraine to recoup state money lost by Yuliya Tymoshenko.  He understood the money to be located in Switzerland and the United States.

EVOLUTION OF WORK

After the initial contact MC introduced HAWKER to Alex van der Zwaan (VDZ). It was VDZ who ultimately introduced HAWKER to Rick Gates (RG).

HAWKER explained that FTI was required to go to Ukraine and make a pitch to the Prosecutor General (PG) of Ukraine. FTI presented a basic PR litigation strategy to them. HAWKER recalled that the PG liked them and the presentation, but he was not particularly interested in buying or paying for FTI's services.  Following the pitch there was a back and forth over whether FTI was contracted or not.

USA-0007934

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of (U) Interview of Jonathan HAWKER ,On 07/10/2018 , Page 3 of 13

Eventually RG told HAWKER that FTI was indeed contracted. HAWKER viewed RG as the true client because instructions came from him. The PG was also the client in that they worked in the PG's building. HAWKER viewed Ukraine as the ultimate client because RG was working for the Ukrainian President and providing their instructions to FTI.

It was also RG with whom HAWKER and Jon Aarons (JA) dealt with payment issues. HAWKER explained that payment first came once they were already well into the job. HAWKER asked RG whose money it was and RG said it was an oligarch's, that when Ukraine has to pay for something like this, the President asks whichever oligarch whose turn it is to cover the costs. HAWKER described RG as Paul Manafort's (PM) fixer. HAWKER described PM as the puppet master and RG would be stressed if PM was unhappy.

HAWKER explained that he and his team, JA, Grace Reynolds, Sean Galvin, and Ross Hall, would stay at the Fairmont hotel, where the SA team was also staying. RG told them their role was to help the PG, but RG had instructed them to room far away from the PG offices and the Fairmont was suitably far away. For work, they would be picked up in a van and snuck in a side door to the basement of the PG offices. HAWKER commented that the SA employees were better treated, having drivers from the airport, and not being snuck around.

The Skadden Arps Report (SAR)

HAWKER recalled RG telling him that the SA report (SAR) was a PR tool. He explained to HAWKER that the West's perception that Yuliya Tymoshenko had been unfairly tried and convicted was preventing Ukraine from developing closer ties to the West. If the SAR was successful, it would appear as an independent endorsement of the Tymoshenko conviction. This would help push back against the perception of corruption in the government and allow Ukraine to draw closer to the West and the money that could offer.

According to HAWKER, MC and VDZ were the two SA employees who spent the most time in Ukraine. They stayed in the same hotel, but did not interact with the FTI team very much. VDZ was more talkative than MC though, sometimes giving away some gossip. HAWKER stated that VDZ and MC were there doing interviews, but didn't seem to do that many and played a lot of tennis. HAWKER never discussed the purpose of the SAR with them.

HAWKER first met Greg Craig (GC) when GC was in Ukraine, long before the SAR was actually published. HAWKER did not know of GC before the

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of (U) Interview of Jonathan HAWKER  , On 07/10/2018  , Page 4 of 13

Ukraine work, but VDZ had said he was important.  HAWKER also learned early in the process that GC had a friendly relationship with Ed Reilly (ER), head of FTI's Strategic Communications division.

   HAWKER ended up meeting GC a total of three to four times in Ukraine, and once in New York, New York.  Their initial relationship was not good. They met the first time for a meeting in the business lounge at the Fairmont hotel and GC wanted nothing to do with FTI. HAWKER determined that GC wanted to write his "academic report," take the money, and leave. HAWKER perceived he was a "pain in the backside" for GC. GC also did not like the way talking points on the SAR were done. GC's attitude changed at the Harvard Club meeting when GC agreed to be more active regarding the report.  GC never gave HAWKER an opinion on the Tymoshenko case, he didn't entertain HAWKER in that sense. It was HAWKER's opinion that the report was "rubbish," and did not help the client like RG said it would.

DOCUMENTS

   When presented with documents FTI-011623, FTI-011624, and FTI-011628 HAWKER described it as his work and that it was a normal PR litigation proposal that is provided after a pitch explaining what services could be provided to the client. When asked what a litigation PR program entailed, HAWKER said it was really just media relations which may include indirect contact to reporters and "seeding." HAWKER explained that at the time of this document the geographic scope of the job, as well as the actual aim, was unclear. Due to the FTI structure, it was beneficial for him to try and set up inclusions of other divisions including Brian Maddox and the U. S. team.

   HAWKER explained document FTI-5273 demonstrated he was not exactly sure what the client wanted, what resources would be available, or even who would be involved.  He did think it odd that VDZ was negotiating, and he was unsure how the scope had changed to not include U.S. He theorized that more effort was wanted in the EU as that was the way he understood PM wanted to move Ukraine.

   He also described document FTI-5270 as a "fairly standard negotiating email." The third party loaning referred to his not knowing who the client was going to be, possibly the Prosecutor General of Ukraine, Skadden Arps, one of Paul Manafort's entities, or an oligarch.  He definitely wanted a contract to try and ensure fees would be covered. He was not sure how the mentioned option of third party contracting came to be, but did recall that RG was involved.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U) Interview of Jonathan HAWKER ,On 07/10/2018 , Page 5 of 13

 Regarding Option 2 in the email, HAWKER described the front group as
something like the European Center for a Modern Ukraine (ECFMU), about
which RG had told HAWKER. HAWKER called the ECFMU a classic front group,
something that was not the independent NGO it purported to be, but was run
by two PR firms and the Ukrainian government. HAWKER claimed this was a
common tactic in the PR world.

 Document FTI-8072 prompted a vague recollection of there being some
sort of second Tymoshenko trial in Kharkiv. HAWKER thought that he helped
prepare some of the prosecutors regarding the media aspect of the
trial.  He also recalled that the Deputy Prosecutor General (DPG) Renat
Kuzmin hated media training and Konstantin Kilimnik (KK) told HAWKER that
Kuzmin wanted Prosecutor General Pshonka's job.

 Document FTI-8071 was setting up a meeting that HAWKER had with the SA
employees including GC. At that meeting the "firm views" the email
mentioned were basically this: SA leads, FTI follows. Though unclear of
the specifics, HAWKER's take away was that FTI would stay out of the way,
when SA was done with the SAR, then FTI would come in. HAWKER felt there
was no ambiguity about the purpose of FTI doing PR with the SAR, but that
he was to stay out of the content of it.

 HAWKER explained that GC was fiercely independent to the point of being
difficult and that RG intervened to try and influence the report some
after HAWKER told him it was not fit for the PR purpose. HAWKER added that
from a PR perspective, the appearance of independence was what gave the
document any credibility.

 Documents FTI-8042 and FTI-8043 were prepared by HAWKER and outlined
what he thought they should do on the job. They were based on information
provided by the PG from which HAWKER drew the conclusion the trial was
valid and a crime was committed. HAWKER drew this conclusion based only on
the PG's assurances that they were investing in the SAR because they were
so confident things were done correctly. Only FTI people were at this
meeting, RG never came to the PG offices while FTI was there. RG
separately told him the report will find X and this is what needs to be
done.

 Document FTI-8043 features several bullet points HAWKER discussed. One
bullet point mentions criticisms which HAWKER said were included because
RG had indicated to him that the SAR would not be a total
"whitewash."  The bullet point mentioning FARA registration pertains to

USA-0007937

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U) Interview of Jonathan HAWKER ,On 07/10/2018 ,Page 6 of 13

HAWKER having asked VDZ about FARA and SA's position on it.  VDZ told him
they would not do anything implicating FARA. When HAWKER asked what that
meant for FTI, VDZ told him to speak to their own lawyer.

HAWKER also complained to RG about the bad position it put FTI in
because he could not really do his job without a spokesperson from SA.  RG
told him not to worry about it, that PM would deal with it.

HAWKER relayed that document FTI-8044 pertained to three to four
advance briefings, or what he called seeding. This is where the story is
provided early to a few selected journalists in the hope they will write
exactly what the client wants, have the first story out, and that it will
influence other journalists writing on the topic. HAWKER stated that SA
was the most compelling source to do this reaching out, followed by the
Ministry of Justice, and finally FTI itself. HAWKER hoped at the time of
this document that SA would become involved, and RG wanted SA to step up
its involvement too. RG could not believe it was realistic for them to
think they could do the report with no media aspect.  This process,
labeled as point "3." in document FTI-8048, had been approved by someone
at SA, but HAWKER was unsure who did this.

HAWKER denied that document FTI-8783 was prepared by him, and did not
know who had prepared it. It did prompt HAWKER to discuss the ECFMU and he
believed Ukraine had other NGOs in Brussels.  Based on what he had seen
and heard, HAWKER thought the ECFMU was a front group. HAWKER believed
that the ECFMU was run by Burston Marstellar (BM) and Fleishman Hillard
(FH). On one occasion HAWKER had met with these firms and RG regarding
coordination. HAWKER added that RG had discussed his dissatisfaction with
their performance as lobbyists and PR representatives for ECFMU, at one
point threatening to pull the contract on one of the firms.  RG also
mentioned that he controlled the ECFMU but had some sort of conflict with
Ina LNU, the person who allegedly ran it.

When shown documents FTI-8786 to FTI-8789 which included information on
U.S. outreach HAWKER explained that this information came from RG, who
told HAWKER not to worry about the U.S., that he had that covered. HAWKER
therefore never had any contact with the listed individuals. HAWKER said
RG dangled the possibility of U.S. work for FTI, but it never
materialized.

Regarding documents FTI-4190 and FTI-4191 HAWKER said that he thought
the referenced Rob Mack (RM) was a BM guy, but he never met him, at most
they had both been on the same conference call.  HAWKER had no idea what
JA was talking about when trying to keep from having their numbers show up
if they spoke with RM.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of (U) Interview of Jonathan HAWKER , On 07/10/2018 , Page 7 of 13

The "PR Agency Washington" referenced in documents FTI-9998 to FTI-010005 was unknown to HAWKER, again he was told by RG that they had the U.S. covered and to essentially "butt out" on that.

Regarding the listed journalists in document FTI-10006 HAWKER stated that journalists were selected in the following way: Ukrainian journalists were selected by the PG office, Moscow journalists were chosen by FTI Moscow personnel, U.K. journalists were chosen by HAWKER, and the U.S. journalists were provided by RG.

Document FTI-148025 showed HAWKER using partnerpr@me.com for an email address. When questioned about this he explained it was from his old PR company and that he had a few different emails linked to his Apple account. He explained that he used different email addresses a few times at the behest of RG who liked using other accounts. He would also use it sometimes when the FTI system was slow. HAWKER added that RG made him use Viber as well.

HAWKER said that this email specifically resulted from KK asking for a followup after KK had informed him that the Ukrainians had listened in to HAWKER's phone call and heard him complaining about the report. KK asked for a summary of what he had said on the phone so they could see why the Ukrainians were mad about it. HAWKER did not recall the contents of the GC call the next day.

Document FTI-9699 referenced GC's "plan," but HAWKER had no recollection of any real plan affiliated with that email, more that it was related to scheduling when the SAR would come out. However, HAWKER did not really care when the SAR came out, just how it did.

For documents FTI-8014 to FTI-8017 HAWKER stated that this was not his document, but that he had contributed to its creation. In regards to the highlighting in paragraph 6 of document FTI-8015 HAWKER was unsure, but thought it was referring to having FTI do outreach on behalf of SA.

HAWKER had no recollection of document FTI-1805.

In document FTI-7445 HAWKER stated that the Bloomberg part came from RG.

HAWKER next discussed the Harvard Club meeting, confirmed in document FTI-3488, which he broke into two parts, a pre-meeting and the actual meeting. This took place as they were getting closer to release of the SAR and the purpose was to get GC to do anything media related. HAWKER recalled the pre-meeting was attended by PM, RG, VDZ, and HAWKER at Manafort's Trump Tower apartment.

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U) Interview of Jonathan HAWKER _____ , On 07/10/2018 , Page 8 of 13

   This pre-meeting was a short discussion, with PM saying to leave it to him to handle GC. PM asked what exactly it was HAWKER wanted GC to do.  HAWKER's answer was that GC had to meet with journalists. HAWKER explained that SA not commenting on the SAR would be damaging to both SA and Ukraine. VDZ was in favor of whatever DM wanted to do. There was general agreement that everyone at the pre-meet was supportive of getting GC on board; however there was no elaboration on how GC would be prompted. At this pre-meeting the Foreign Agents Registration Act (FARA) never came up.

   At the pre-meeting it was still the plan that Al Hunt from Bloomberg would be the person approached to seed the SAR in the U.S. HAWKER had no recollection of a Senator Durbin.  He also had no recollection of a dinner meeting at Monkey Bar.

   HAWKER did recall RG saying Senator John Kerry had a different perspective than Hillary Clinton. RG also always claimed to have White House contacts, but none of it ever meant anything to HAWKER.

   At the actual Harvard Club meeting HAWKER remembered the same people from the pre-meeting were present, plus GC and Alex Haskell (AH). HAWKER recalled that GC was in a really good mood, and friendly. He seemed very happy to be talking about Harvard and HAWKER was surprised by the amicability. Though he does not recall how long the meeting lasted, he knew GC budged and said he would speak with some journalists. HAWKER stated that the agenda attached to document FTI-5805 probably was not even used. HAWKER's takeaway was that GC would do some outreach. Document FTI-5807 which was a copy of the "Master Control Grid" included a spot for "Project Team-Bloomberg GC/SKA" which would have been added to the grid under RG's instruction when it was still the plan to contact Bloomberg. Later RG informed HAWKER that GC had said he had a trusted relationship with David Sanger (DS) of the New York Times (NYT) and that he would seed him.  It was after this when documents were updated further.

   Document FTI-5811 included one talking point claiming the Ministry of Justice had not been provided a draft.  HAWKER understood drafts went out, so it was inaccurate to say it would not have been independent if they had requested a draft, but HAWKER denied knowing if the Ministry of Justice ever got a draft.

   In document FTI-5816 RG mentioned Mercury Clark Weinstock and another group run by Glen Selig that HAWKER thought functioned like a PR Newswire, but Selig's role was not really told to HAWKER.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

████████████████████

Continuation of FD-302 of __(U) Interview of Jonathan HAWKER_____ , On __07/10/2018__ , Page __9 of 13__

In the attachment to document FTI-26136 HAWKER stated he had heard of
Podesta Group because they were both in Kiev during the Ukrainian
Elections. HAWKER was there in hopes of getting election related business
for FTI.

When questioned about the part calling for President Obama to be
contacted, HAWKER did not recall whether it happened. He stated that the
assignments on document FTI-26136 were all coordinated by RG and PM. RG
was running the show in many respects at this point.

HAWKER said that somewhat unexpectedly RG told him he would have to
speak with DS and tell DS that GC would give him a copy of the SAR. This
took place at a meeting with PM, RG, VDZ, HAWKER, Alan Friedman, and
Eckhart Sager. HAWKER had to arrange the actual mechanics of reaching out
though. HAWKER thought he coordinated this with GC. He also recalled GC
only agreed to do outreach to a few media outlets.

Document FTI-26230 was, according to HAWKER, regarding his reaching out
to GC about coordination.  The plan was for HAWKER and GC to coordinate
with DS. Document FTI-26230 showed HAWKER's name by DS and the NYT because
he was supposed to reach out to DS before GC.

Document FTI-24281 is an email in which HAWKER emailed DS, only to find
out that someone, presumably GC, had already spoken with DS a month or so
prior. HAWKER did not know for sure who had already reached out, but
suspected it was GC.

HAWKER complained to RG about someone having already reached out,
because it made him look silly for doing so. RG was unconcerned as the
outcome seemed to have been getting what they wanted. HAWKER never briefed
DS on the SAR. It was clear from RG that GC wanted to do the briefing, GC
did not want HAWKER doing it. HAWKER thought this was weird as he was
supposed to have done the briefing and GC give quotes, but then GC wanted
to do more.

In document FTI-24283 HAWKER again thought he would be doing the
briefing, but he spoke to GC and GC said to leave it to him. GC was
calming to HAWKER who was getting upset with the uncertainty going on,
especially while being pressed for updates by RG and KK.

This document also mentioned a Washington Post contact.  HAWKER did not
know who it was, but GC had said if DS was uninterested in the story he
had a guy at the Washington Post who would do it.  GC raised this
possibility himself.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of <u>(U)  Interview of Jonathan HAWKER</u>, On <u>07/10/2018</u>, Page <u>10 of 13</u>

As mentioned in document FTI-24279 the hand delivery of the report was GC's idea, according to HAWKER, nobody asked him to do that. Because the NYT took the article, they never had to reach out to the Washington Post or Al Hunt.  HAWKER stated that the NYT piece had GC's hands all over it. HAWKER stated that at SA only GC would have spoken with media because of his familiarity with the SAR.

HAWKER stated that he did not have contact with other U.S. based journalists, but qualified that statement when shown documents FTI-25400 and FTI-25401. Here HAWKER admitted that the writer was U.S. based for Radio Free Europe. However, his statement about no other contact was meant as far as seeding, this was "reactive" after being contacted. HAWKER admitted that he "made an error" by saying they were not representing the Ministry of Justice. He stated they did not have a contract with the Ministry of Justice, but that he "fudged it incorrectly." He stated that he did not take that tact with other journalists. His motivations for this were that he was worried FTI was going to be the story, rather than the SAR, which would have been bad.  HAWKER maintained that he did not like the question asking about the retainer and did not feel comfortable with Radio Free Europe who he did not know, compared to a publication like the Telegraph, where he responded differently. He also maintained that his response was not about U.S. vs. U.K., but that radio vs. print media differences factored into his decision to give different responses.  He reiterated that his representation in the email was not true, he was only thinking of FTI being the story and ruining the whole release.

In document FTI-26790 GC had provided some quotes to the Telegraph, and HAWKER had "tightened" it but did not feel as though he had changed it. Later in document FTI-27120 where HAWKER says to RG that he changed GC's quotes to the Telegraph, HAWKER claims he was just boasting and showing off to exaggerate his role.  HAWKER had no recollection of GC reacting to this or discussing it with him, though GC did send him an email the next day, document FTI-25418, saying to call right away. HAWKER did not recall the conversation though he admits he probably would have called in response to such an email.

HAWKER described the Robert Amsterdam from document FTI-27125 as a third party commentator/media operator that can be brought in "to add value" by saying something supportive.  He was a previous contact of HAWKER who HAWKER introduced to RG, but HAWKER has no recollection of their having met and did not think Amsterdam was engaged on the matter.

HAWKER explained that prior to engagement on this project his FARA experience was nil.  His only experience was having read an article on it in PR Weekly which he thought was interesting since it had arisen out of

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Nazi efforts in the U.S. in World War II.  He had never worked a FARA issue before, but it was on his radar as it was his first job working for an actual government.  He did no FARA research beforehand though.

When shown document FTI-588 which showed him raising FARA, he reiterated that he had that concern at the outset since it involved a government, politics, and might be in the U.S.  He also raised the issue in the context of whether FTI was willing to do the job as he was trying to broaden the job to include other parts of FTI business in the U. S.  Once told that they were ok, but might have to reconsider if they used anyone in the U.S., he let it be. HAWKER stated that the impact of registering was never discussed; however, JA and ER may have discussed it further.

In response to questions on document FTI-3566 HAWKER stated that Washington, D.C. was not dropped from the list due to discussion of FARA.  HAWKER said he spoke to VDZ about FARA. VDZ said HAWKER could consult his own lawyer, but since their work was focused in the EU, there was not a FARA issue. Afterwards, HAWKER did not worry about FARA. HAWKER understood at that point that if work expanded to the U.S. the FARA analysis would change, but HAWKER admitted in hindsight he should have gotten further advice on FARA.

HAWKER also stated that ER gave him the idea that U.S. resources being used would trigger FARA, but that U.S. resources were not used.  He only tried to get the U.S. media arm involved, but he thought FARA required political involvement to be triggered.

Documents FTI-579 and FTI-687 prompted HAWKER to explain that he had agreed to apprise management if work expanded to the U.S., but when it expanded to DS/the NYT it did not strike him as the sort of change needing him to follow up. Just speaking to a U.S. based journalist from Kiev to set up a meeting did not alert him.

HAWKER said he never had any FARA discussions with GC and GC did not raise FARA concerns when they agreed to approach the U.S. journalists, so it did not really cross HAWKER's mind to worry. He felt if GC was doing something that it could not be wrong. HAWKER later reiterated that he just did not think contacting DS in the U.S. was an issue due to his flawed understanding of FARA. He only learned that FARA applied to this type of PR when he initially met with the Special Counsel's Office (SCO).

Document FTI-3744 included a mention of FARA in June, but it was in the context of the DPG potentially going to the U.S. and wanted FTI to help set up the trip. HAWKER explained that he and FTI wanted no part of that

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U) Interview of Jonathan HAWKER                  ,On 07/10/2018 ,Page 12 of 13

trip because he did not like the DPG and felt there was a political aspect to the trip. He was looking for a good excuse not to be involved.

HAWKER could not recall the reason for wanting to speak with ER in document FTI-624, but guessed it might have been FARA, resources, or discussion of what the Ukraine engagement was asking him to do. HAWKER did not recall ever raising or discussing FARA issues after the few early instances. He never discussed FARA with PM. Early on he once asked RG if they had registered under FARA and was given a flaky, dismissive answer. He did not consider it his business what DM was doing and did not pursue it further.

Document FTI-28086 referenced Ukraine 1 and Ukraine 2. HAWKER explained that Ukraine 1 was "Project Veritas" a meaningless name assigned to the PR related to the SAR.  Ukraine 2, which never materialized, would have been Litigation PR and asset recovery.

Document FTI-554 also related to some potential further work that did not work out.

When asked about his last contact with individuals related to the SAR, HAWKER relayed the following:

HAWKER thought his last contact with GC would have been prior to 2014. HAWKER felt he had ruined the relationship between FTI and SA, so HAWKER forwarded GC some business from a client who needed some public policy work and they never spoke again.

HAWKER said he had coffee with VDZ now and again and that VDZ had given HAWKER some work that only amounted to one day of PR for a court case. Sometime before the SCO's investigation into FARA-related activities regarding Ukraine became public HAWKER had lunch or coffee with VDZ and the Ukraine came up in the context of what a "loony" job it was.

Since the fallout of the Ukraine job HAWKER has had no contact with anyone at SA.  Since his last interview by SCO he had received a text from a Stephen Brown that he described as a weird text.

Since his first SCO interview HAWKER stated he had no contact with "big players." He did see JA a few weeks ago whom he told not to worry, that this problem was HAWKER's creation and he was owning it as his problem. He added that JA would be the sort to get anxious and he was trying to assuage his concerns.  FARA did not come up between them. HAWKER was presented with document FTI-1144 where he had emailed with JA. He did this because a former colleague had reached out to HAWKER asking about Ukraine

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of (U) Interview of Jonathan HAWKER _____ , On 07/10/2018 , Page 13 of 13

and FTI's involvement there. In the email HAWKER mentioned telling JA what
"line" he had took, but explained all that really meant was to tell JA how
he was contacted, that he knew the person who had contacted him, that he
had pushed it off, etc. HAWKER added that the NYT had also contacted him
about a story they were working on.

**UNCLASSIFIED//FOUO**

# Exhibit

# 3

FD-302 (Rev. 5-8-10)



UNCLASSIFIED//FOUO

**FEDERAL BUREAU OF INVESTIGATION**

Date of entry    02/11/2019

**FEDERAL GRAND JURY INFORMATION**

This document contains information pertaining to a federal grand jury proceeding. The information may not be disseminated within or outside the FBI, except as provided for under Federal Rule of Criminal Procedure 6(e)(3), wherein disclosure may be made to: (1) an attorney for the government for use in performing that attorney's official duties; or (2) any government personnel that an attorney for the government considers necessary to assist in performing that attorney's official duties.

     Jonathan Hawker was interviewed at the United States Attorney's Office for the District of Columbia located at 555 4th St. NW, Washington, D.C. 20530. This interview transpired over a two day period from 1/23/2019 to 1/24/2019. This FD-302 captures both days. Present for the interview were FBI Special Agents Russell Beverly and Daniel Kegl; Assistant U.S. Attorneys (AUSA) Fernando Campoamor-Sanchez and Michael DiLorenzo [Agent Note: DiLorenzo was only present for parts of the interveiw]; and U.S. Department of Justice Attorney Jason McCullough from the Counterintelligence and Export Control Section of the National Security Division. Also present were Hawker's Attorneys Laura Marshall and Kevin Gaunt from Hunton, Andrews, Kurth LLP, located at 2200 Pennsylvania Avenue NW, Washington D.C. 20037.

     Hawker was thanked for his voluntary participation in the interview. At the beginning of the interview Hawker and his attorneys raised concerns about whether he was viewed as a subject or a witness, and Hawker worried that his information would be harmful to his FTI colleagues. AUSA Campoamor-Sanchez and McCullough explained that, based on Hawker's previous statements and careful review of the documents, Hawker was being viewed as a witness. McCullough further explained that it was the position of the government that both FTI and Hawker would need to retroactively file under the Foreign Agents Registration Act (FARA), but no fine would be sought. Hawker inquired what it meant to register and whether this was an admission of guilt that would result in a criminal record. It was explained to him that a FARA registration did not constitute a criminal record and suggested that his lawyers could further explain this to him later, with which his lawyers concurred.

UNCLASSIFIED//FOUO

Investigation on  01/23/2019  at  Washington, District Of Columbia, United States (In Person)

File #  ███████████████████████████████████         Date drafted  01/26/2019

by  Russell Beverly, KEGL DANIEL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

█████████████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER   , On  01/23/2019   , Page   2 of 17

    Hawker was provided with Bates stamped exhibits prepared by the United States Attorney's Office for the District of Columbia. The interviewers referenced the exhibits throughout the interview. Copies of the documents are attached hereto as a physical 1A package.

    Hawker provided the following information:

## FTI-587--FTI-589

    When asked why he had mentioned FARA in his email Hawker explained he  read an article in "PR Week" which mentioned FARA, so he knew it was a thing, but really had little understanding of what it was. In mentioning it he felt he was "asking the question" as he did not know if it was something that mattered in this case and wanted someone to tell him. He added that at this point he really did not even understand the job because he thought it was going to involve litigation Public Relations (PR) and asset recovery, but this was not the case.

## FTI-11623--FTI-11628

    Hawker explained this was a standard litigation PR proposal. Hawker stated that, at this point, he was not sure who Alex van der Zwaan (VDZ) was. He had not been properly introduced and Hawker was unsure exactly who VDZ worked for, at that point thinking VDZ was connected to the Ukrainian government.

## FTI-504--FTI-508

    When asked why he had written "Hope so-I need the work!!" Hawker explained there were economic difficulties in Great Britain at the time and work was hard to come by. There had been talk of layoffs at FTI and this seemed to be an attractive opportunity that could keep him and his team employed.

    Regarding the pitch they had done to the Ukrainians, Hawker explained  it had ended up being a pitch to the Ukrainian Prosecutor General (PG) and he was pretty sure Skadden Arps (SA) personnel had not been present. He stated the presentation went well, but the PG made clear they were not going to be paying for their services.

## FTI-3566

    The pitch meeting, which Hawker described as a "credentials meeting"  more than a strategy meeting, had included FTI, the PG, the

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER ,On 01/23/2019 , Page 3 of 17

Deputy PG, a woman who worked in communications for the PG, a Chief of
Staff who also worked with SA, and an interpreter.

Hawker stated at this point SA was already appointed and were staying
at the Fairmont Hotel. He stated that probably VDZ or possibly Matthew
Cowie arranged the paragraph in his email regarding payment.

When asked who would have told him about SA's view that FARA
registration was not needed, Hawker stated that this would have been VDZ.

When asked how his early perspective on the job evolved Hawker
explained it was formed by Matthew Cowie, then VDZ, then by speaking with
who he thinks was Rick Gates, though he did not identify himself at the
time.

**FTI-579--FTI-580**

Hawker added context to Ed Reilly's mention of SA, and Greg Craig,
explaining that FTI worked with SA before and Reilly knew Craig well. There
had been some opposition within the firm from taking on the Ukraine work. H
e stated had FTI not been working with SA, his team likely would not have
been allowed to do the job. This email served as a call for people to help
out.

Hawker was unsure if he knew about the SA Report (the Report) at this
point, just that he was going to be supporting SA.

**FTI-8071--FTI-8072**

Hawker did not think the second trial ever took place. He said the PG's
office had shown him a Powerpoint with all the "evidence" against
Tymoshenko for this case. FTI's work ended up including efforts to
"professionalize" the PG's office.

When asked about Craig's "firm" views mentioned by Cowie, Hawker
explained that both teams were staying at the Fairmont Hotel in Kiev.
Despite being in the same hotel, SA was on an executive floor that had
access to the Fairmont Lounge, which FTI could not normally access. Though
Hawker does not drink often, he and his team were always happy to go to
this lounge.

In this lounge they met with Craig and other SA employees. It was
Hawker's perception that Craig viewed SA as independent from FTI. Craig
informed them that SA would not be providing them with things and once SA
was done with the Report they would then sit and talk with FTI. Craig

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

████████████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER  , On  01/23/2019  , Page  4 of 17

seemed to be creating space between SA and FTI, which Hawker interpreted as an attempt to prevent PR dictating the Report.

## FTI-894

Hawker explained they were meeting up with SA every night in the lounge, largely just to have access to it. He said they did not get much information on the Report though VDZ and Cowie would sometimes drop a few details. He did not recall Craig expressing his view on the case and thought this would have been out of character for Craig.

Hawker did not get a feeling as to the direction of the case from meetings in the lounge, but he did know that VDZ and Cowie would go and do interviews. It was Hawker's belief that at these interviews Cowie did the bulk of the questioning with VDZ functioning as a translator.

## FTI-786--FTI-789

This email resulted from FTI's going to every entity trying to get paid. Hawker explained he did more of the client handling including the PG and Gates, while Jon Aarons did more of the administrative work which is not Hawker's strength.

When asked who the client was, Hawker stated it was the Government of Ukraine and Prosecutor General's Office. That said, directions for the client came from Gates who was directed by Paul Manafort. He reiterated  his day to day instructions were handled by Gates.

Regarding their payment, Hawker stated it eventually came from Cyprus. He assumed it was a Gates or Manafort account, not an oligarch's account as was claimed. He stated they got their fee, but not the expenses.

Hawker did not really understand what Craig meant by steering clear of FARA, nor did he dwell on why Craig said a PR team was vital to the project.

Hawker said his FARA conversations were with VDZ, and he once asked Gates about FARA and whether Gates and Manafort were registered. Gates told him that they were not registered as they were not personally doing the work.

## FTI-3744

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER , On 01/23/2019 , Page 5 of 17

Hawker explained the Deputy PG, who Hawker described as a "loony," was trying to drag them into this trip and they were trying to avoid it as it was not their gig. FARA was an excuse to avoid it.

**FTI-8042--FTI-8050**

Hawker stated he prepared this document and it was consistent with his formatting style. He said they were already expecting some criticisms in the Report which would make it look more legitimate. When asked why this was, Hawker explained he understood the whole point of the Report as purely a PR program, there was no other point.

Where Hawker used the word disclosure, he meant from a media perspective rather than a legal one.

Hawker stated leaking and seeding the Report was always part of the plan, from the very beginning. He explained that "seeding" with a small number of journalists allows their perspectives to emerge earliest in the hope that their reporting informs the discourse of others.

Hawker did not think this plan was shared with SA at this point, the draft media strategy had been drawn up for Gates.

**FTI-8763--FTI-8989**

Hawker stated this list was probably part of an early plan and was an aspirational list.

**FTI-9998--FTI-10011**

Hawker said this document was primarily for Gates at this point. The part about SA being asked difficult questions about how much it was paid was because the "ridiculous sum" had been raised at some point.

The part about what the Report would conclude was informed by the opinions of the PG's office.

Hawker explained Ukraine was employing a "third-party endorsement strategy" with the Report. For the Report to be valuable as a PR piece, it had to be perceived as independent, and in order to be independent it could not be a "whitewash." It never changed that the strategy would include seeding.

The information pertaining to the U.S. in the plan must have come from Gates as Hawker did not work with any journalists in the U.S.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER , On 01/23/2019 , Page 6 of 17

Hawker stated SA was also advising the PG's office on the second trial, in addition to doing the Report.

**FTI-8013--FTI-8017**

Hawker stated these draft media plans were going to Gates, who sent them to Manafort, who then gave them to Sergei Lyovochkin.

Hawker thought, at some point, he had gotten a draft Report from Gates who had gotten it from VDZ. He said that VDZ came to be seen as part of Gates's team as well.

Hawker stated this document was a manipulation of something he had written. According to Hawker, Manafort would have made these changes.

When shown this document Hawker could not remember what "AC team" meant. In a later document he figured out that it was Anti-Crisis Team.

Hawker stated the idea for Craig to do outreach came from Hawker. He assumed that Craig knew the Report to be a PR piece and knew he would have to contribute.

When asked who Cox was, Hawker said he did not know, he thought Cox was an American United Nations Rapporteur. The names in this document were not provided by Hawker. He made the framework and Gates's assets were filled in by him.

**FTI-10581--FTI-10628**

Hawker stated Gates had told him Manafort wanted a more comprehensive plan.

The draft assumes Craig "will play." Hawker explained his thought process was "why wouldn't they?" The Report does not achieve its "strategic purpose" if SA writes it, then disappears. Without Craig the Report had no function, to not defend it would look like they were hiding.

Hawker stated the name "Charlie" was a name code and he did not know who this was, it would have been added by Gates.

Hawker stated he had never discussed with Craig his taking the "European tour" they planned for him.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER , On 01/23/2019 , Page 7 of 17

Hawker explained he understood the U.S. was added to the plan because, he was told, Hillary Clinton represented a barrier to Ukraine being added to E.U. because of her friendship with Yulia Tymoshenko.

**FTI-7932--FTI-7934**

Hawker recalled he had been told by Gates to speak with Craig about getting the Report. He did not recall if he had the Report at this point.

**SAU-148025**

Hawker recalled this exchange distinctly. He told Gates by phone the draft of the Report he saw was going to play poorly with the media. He then got a call from Konstantin Kilimnik saying the President's office was very angry and concerned about the doubts he had expressed regarding the Report. This indicated the government had been listening in on his phone call. From Hawker's perspective that draft of the document was not what Ukraine had expected.

**FTI-7445**

Hawker clarified this document by stating that Gates was asking who they were leaking to in the E.U., and reminding Hawker that he had the U.S. covered.

**FTI-4966**

When asked why the word infamous was used regarding the Report, Hawker explained it had nothing to do with the actual Report or its content. Instead, he was referring to the fact they had been waiting for it for so long, that everyone was mad and sick of the job, and they hated Gates.

**FTI-10184, FTI-3486--FTI-3488, FTI-5805, FTI-4867-FTI-4868, SAU-6810, FTI-5816-FTI-5817, FTI-2246, FTI-4931**

Hawker explained the purpose of the Harvard Club meeting was purely PR, to go through the plan, to get Craig on board, and make sure he delivered his side of the bargain as the whole plan hinged on Craig participating. They also planned to go over the messaging in this meeting.

Based on the documents, Hawker came to understand his previous statement that they had a pre-meeting at Manafort's Trump Tower apartment

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER , On 01/23/2019 , Page 8 of 17

along with the Harvard Club meeting could not be correct as the documents indicated him arriving late the night before the meeting at the Harvard Club.

After further review of the documents and thinking about the sequence Hawker started the second day of the interview by explaining he had conflated two meetings that were similar in nature and personnel. There had in fact been a meeting at Trump Tower, but it had actually been a few days after the September 23, 2012 Harvard Club meeting. He stated there was in fact a pre-meeting, but it was at Manafort's room in the Grand Hyatt in Kiev on September 18.

At the pre-meeting in Kiev, Hawker, Manafort, VDZ, and Kilimnik were present, while Gates was absent. This meeting was about the PR strategy in general. Hawker believed getting Craig on board was discussed because he was such an integral part of the plan, but it was the U.S. meetings where Manafort definitely said he would handle getting Craig on board. Hawker reiterated that without Craig participating, there was no plan. Based on his comments in FTI-4931, Kilimnik had not come to the U.S. for the actual Harvard Club meeting.

Hawker then explained at the Harvard Club he and VDZ had arrived first and had a drink at a tall table, the others then arrived and they had a meal. As he said before, Craig was in a surprisingly good mood and less hostile than expected. He recalled Craig also had a meeting room booked.

Hawker said the result of the Harvard Club meeting was Craig was okay doing "backgrounding" with media, but not politicians. Hawker explained that in Craig's mind there was a difference between proactively and reactively engaging with the media. Hawker thought this distinction was introduced at the Harvard Club.

**FTI-3733--FTI-3734, SAU-29525, FTI-4965**

The day after the Harvard Club meeting Hawker and VDZ had a meeting with the SA in-house PR team.  Hawker explained that at the SA meeting the SA PR people were fine passing things to him as they did not generally comment.

As the documents indicate Hawker was reworking the plan, so the meeting with the SA PR team was mostly a general discussion of the plan while he reworked the documents. Hawker suspected either he or VDZ may have jokingly mentioned paying Ukrainian journalists. Hawker said it was normal for the Ukrainian government to do this, but he had not planned on it.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER   , On   01/23/2019   , Page   9 of 17

Craig emailed Hawker later that day and said his report from the SA PR team had included a concern about the paid journalists. The two then had a phone call in which Hawker recalled Craig being aggressive.

That same day Craig emailed everyone reversing course from his agreement to participate in the PR aspect of the project. It had been planned that both Craig and VDZ would speak to journalists.

Hawker then said this reversal from Craig's Harvard Club agreement to participate in the PR aspect is what prompted the group to have the meeting at Manafort's Trump Tower apartment shortly after. Hawker was sure Manafort said he would handle getting Craig on board at the Trump Tower meeting.

**FTI-4504--FTI-4505, FTI-8139-FTI-8148**

Hawker felt he was diplomatic in his response to Craig and added he was not intending to misrepresent or get stuff wrong, and he would have expected to just fix any issues.

**FTI-6292--FTI-6294**

Hawker was pretty sure all changes were made. He knew there was a back and forth with Craig on comments and what could be permitted. He remembered Craig was really just being pedantic, but he was okay with that if it kept Craig happy and engaged.

**FTI-6184--FTI-6187**

Hawker stated this chain of emails documented working on comments.

**FTI-4522**

Hawker explained this was them trying to get another third-party endorsement strategy going. They were hoping that Craig could recommend a lawyer for them. It was a backup if Craig did not play along.

Hawker knew Bob Amsterdam, so he reached out to him as a potential person for this role. During this time frame Hawker knew Manafort worked on getting Craig on board.

**FTI-1385--FTI-1395**

Hawker explained Gates claimed to know Al Hunt, but Hawker did not believe Gates did.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Hawker said Craig was back on board by this point due to his
conversation with Manafort. Hawker felt Manafort was equivalent to Craig
in seniority so Manafort dealt with Craig. Hawker was pretty sure he
learned from Gates that Manafort had sorted out Craig. Hawker reasoned
Manafort must have solved it because Manafort said he would talk to Craig
and then Craig was agreeing to have contact with journalists despite his
earlier reversal.

**FTI-3739--FTI-3743**

Hawker stated he was in phone contact with Craig. By saying Craig would
"speak to the Report" he meant Craig was going to say what he wanted to
say, rather than use Hawker's materials, because Craig wanted control.

Hawker stated Craig was defensive about his work product, while
admitting he was defensive about his own. That said, Craig speaking to the
Report was a huge boon, even if he did not use the talking points. Hawker
again stated SA had to speak to the Report, so it was ok if Craig did not
use Hawker's talking points.

**FTI-7384 (and attached un-numbered document)**

Hawker stated MCW meant Mercury/Clark & Weinstock, and VW meant Vin
Weber.

Hawker believed the U.S. arm was added later than the E.U. aspect, but
did not know how they had appointed these other firms. He did not discuss
MCW or Weber with Gates.

Hawker knew Glenn Selig ran a social media arm in the U.S.

Hawker said he was sent the attached un-numbered document to add to the
Master Control Grid (MCG).

**FTI-3479--FTI-3483**

Hawker stated this document showed that to accomodate Craig's wishes,
Hawker would contact the journalist who would then contact Craig who would
be "conveniently available." This is why it said "at request of the U.S.
journalist." These publications were provided by someone else.

**FTI-3700--FTI-3702**

Hawker said these were notes from an update meeting. He explained that
Kilimnik was engaging with Lyovochkin and that there was concern over the

UNCLASSIFIED//FOUO

USA-0008109

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████████

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER ,On 01/23/2019 , Page 11 of 17

delays, questions of the legal stragegy, and Hawker's earlier PR concerns. With all this Kilimnik was in a meltdown.

SA was not discussed here as that issue had seemingly been resolved.

**FTI-5604**

Hawker did not recall what the mentioned "next steps" were.

**FTI-5883--FTI-5884**

Hawker said FTI did not do social media work, so they had tried to pass it off. He added it to the MCG for Gates.

**FTI-624**

Hawker stated these emails were in regards to him setting up a meeting for the U.S. arm of FTI as Gates and Manafort were possibly looking to hire them for U.S. work. He is unsure whether the meeting ever happened.

**FTI-7357**

Hawker explained the Project Veritas Second Phase campaign was unrelated to any U.S. outreach. It was part of a broader campaign and would have focused on helping identify and seize Yulia Tymoshenko's assets and further vilify her.

**FTI-25738**

This document showed that at this point they still had no idea when the Report was going to be released.

**FTI-4200--FTI-4202**

Hawker wrote to Jack Dunn because Gates claimed to know him, though Hawker doubted this.

When asked why he said Manafort was the real client, Hawker reiterated that Manafort was the conduit to the Ukrainian Government and he, often through Gates, provided all instructions.

**FTI-25783--FTI-25784**

This call pertained to a different client and was unrelated.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER ,On 01/23/2019 ,Page 12 of 17

**SAU-29572-SAU-29573/FTI-26136--FTI-26232 (SAU-29572 and FTI-26136 are the same email, the rest are the noted attachments)**

Where it says "A-Day" by December 13 in the MCG Hawker explained this was a new document. He said he did not do this, it was probably Manafort's people.

Hawker explained that on the back of Manafort's conversation with Craig, the New York Times emerged over Bloomberg.

The plan became Hawker calling David Sanger and offering that Craig would be available to talk about his "totally independent report."

Hawker was happy to do this as Craig had moved from not being willing to contact journalists to doing this as long as his proactive versus reactive structure remained. It was communicated beforehand to Hawker that Sanger would be available. Hawker called this whole setup a "total sham," but he was happy to do it to keep Craig happy.

In this document AC meant Anti-Crisis team, a sort of rebuttal team.

Where it says GC/MFA Hawker explained that the Ministry of Foreign Affairs was Alan Friedman's department. He could not say if the contacts happened, but suspected they did. As evidence that it happened he thought VDZ met Kwasniewski.

When asked why these documents were sent to VDZ's Gmail account rather than his work one, Hawker was unsure, but stated it was "very Gates" to be told to be sent to a different address. He thought it would have been Gates who told him to send the documents to VDZ and to that account.

**FTI-26230**

Hawker was unsure why he was trying to reach Craig around this time, but the only reason would have been regarding execution of the plan.

**FTI-26321--FTI-26232**

Hawker stated that he did engage with the people listed on this page. He did not deal with Corriera dela Serra though as they ended up not using them.

Hawker confirmed that he did have contact with Sanger and the New York Times, though someone had already contacted Sanger based on his response.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER ,On 01/23/2019 ,Page 13 of 17

## FTI-25187

Hawker explained Grace Reynolds was a former assistant who became a consultant. This email was just her pulling Sanger's information for him because Hawker did not know him.

It was Hawker's position they reached out to Sanger at Craig's suggestion.

## FTI-24281--FTI-24282

Hawker stated he would not have offered an interview unless Craig had already agreed to it, stating it would have been "absolute madness" to offer it and then be unable to deliver. In addition to the embarrassment in front of the journalist, Craig would have been irate if Hawker had offered such an interview without his approval.

Hawker added it would have been "fanciful" to suggest he would contact Sangre without Craig's approval. Hawker did not even know Sanger so he would not have contacted him. Hawker was told by Gates that Craig had suggested Sanger.

Hawker believed he had a conversation with Craig where Hawker confirmed he would reach out to Sanger and then turn it over to Craig.

Hawker was embarrassed when Sanger responded that someone had already spoken to him about a month ago. Hawker had not been included in that communication.

Hawker confirmed he must have spoken to Craig in the lead-up to the email as he knew Craig was in Washington to meet. Additionally Hawker believed he and Craig must have had another conversation because otherwise his saying "here's the exchange" makes no sense.

Hawker did not recall expressing to Craig he was upset by being cut out and embarrassing himself to the journalist, but thought that he probably would have done so.

## FTI-24283--FTI-24285

Hawker stated Craig's claim that he just learned of their intent to release the report was inaccurate. Craig must have known.

Hawker believed the decision for Craig to give Sanger the report himself, in addition to the statements, came out of a discussion where Hawker was mad about his embarrassing exchange with Sanger and Craig

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER         , On  01/23/2019  , Page  14 of 17

offered to just do it himself. Otherwise Hawker would have stuck to the plan of him sending the report.

Hawker explained it was totally unnecessary for him to send the introductory email since Craig and Sanger knew each other.

Hawker mentioned the Post contact because Craig had mentioned in a conversation that he knew another journalist at the Washington Post if Sanger fell through. Hawker brought it up because he was under pressure to get the Report seeded before the release.

**FTI-24279--FTI-24280**

Hawker recalled Craig mentioning in a call he and Sanger would have a glass of wine when he went by.

Hawker's concern for the timing was because the journalists have to get approval from editors and he was worried about the time frame, and he was being prompted by Gates.

**SAU-38000--SAU-38004**

Hawker stated none of these contacts came from him. He thought it might have come from the European Center for a Modern Ukraine.

**FTI-26444**

Hawker stated he was just trying to get the government's perspective out there, that he was not aiming for a whitewash. He added that in the inevitable assault on the report just having their perspective out there with some good and bad points was valuable.

Hawker said he thought the criticisms were valid but that they could be addressed.

**FTI-26753**

Hawker stated he had discussed Craig's availability for comment with Tom Parfitt before this email and Craig was aware the contact was coming.

**FTI-25307**

Hawker explained he has no contacts in Italy, but Alan Friedman had a journalist contact there and provided "this Claudio guy." This contact of

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

| | | | | |
|---|---|---|---|---|
| Continuation of FD-302 of | (U//FOUO) Interview of Jonathan HAWKER | ,On | 01/23/2019 | ,Page 15 of 17 |

Friedman's was why they did not go with Correira dela Serra as was in the earlier document. Hawker added Claudio had poor English and would have written whatever Hawker wanted.

**FTI-26364**

   Hawker stated this document showed no changes to the Craig aspect. He added that the document did not seem to have many differences at all.

   Hawker said he obviously must have spoken to Craig as he knew when Craig would be available.

   It was pointed out this was still sent to VDZ's Gmail account, but Hawker did not know why.

**FTI-27120--FTI-27124**

   Hawker explained there was a perception Craig had went a bit off message and been verbose.

   For context Hawker explained Ukraine kept expecting a whitewash and were angry about the criticisms, but later they considered it a success.

   Hawker maintained he did not change the meaning of any of the Telegraph quotes Craig provided, but tightened them up a little.

   On the whole Hawker felt Craig was more helpful than expected in that he did the calls with journalists. His comments were unstrategic because he did not want instruction from PR, but it was helpful he did the job. Hawker felt Craig had said what he was going to say.

**FTI-28087**

   Hawker stated at times SA felt it was expedient to overlook that he worked for Ukraine rather than them. He did need them to handle this, but he was trying to slow Danilova down. It would have been disastrous for the Report for it to come out that such a poor country had spent over $4 million dollars on the Report. Both the modus of payment, along with the amount, would have undermined the objective. Hawker suspected he discussed this issue with Gates and Craig. As evidence he pointed to the fees being discussed in the Q&A Talking Points showing worry over the payment.

**Awards Ceremony**

   Despite their early concern, Hawker said the Ukrainian government came around fairly quickly and considered the Report a huge PR triumph.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER ,On 01/23/2019 ,Page 16 of 17

The PG threw a celebration dinner, which Hawker compared to a medieval feast, honoring Hawker, Craig, and VDZ where they were thanked for their service to Ukraine. Hawker felt it was a real thank you, they were told they had gained traction on the Tymoshenko case that Ukraine had failed to manage.

Following dinner there was traditional music played, then music with everyone singing, including the PG and Craig. Hawker thought he might have sung the Welsh national anthem.

Finally Hawker was presented a golden orb with a sort of plaque and a clock inside it. He and Craig were laughing about it when Craig was presented with an award that had two golden orbs and looked even more like "bollocks." The PG said the two equal orbs were supposed to represent the equity of prosecution and defense.  Hawker joked to Craig that he was surprised it was not lopsided and Craig agreed.

Manafort and Kilimnik did not attend this event as they never went to the PG's office. Hawker said the party was for FTI and SA to celebrate their unified effort to promote Ukraine's view of the Tymoshenko case.

## Post-Engagement

In the new year there was supposed to be a turnover for Ukraine 2 with Gates, Manafort, and other consultants. At one of these meetings Hawker raised the issue of their unpaid expenses, but received only promises. They never got their outstanding expenses.

Later, on one occasion Hawker went to Ukraine with Zev First and Alessandro Benedetti for investigations on Ukraine 2 and did not get paid for that either.

When asked why he had been held responsible for not collecting the expenses after higher management had approved the work, Hawker explained  when FTI took over Financial Dynamics (FD) profit and loss was his responsibility. He took the blame, and ended up leaving the firm as soon as he could afford to in a negotiated exit. Hawker was unhappy with how he was treated by FTI though. He now works for himself, though the current Brexit troubles have hurt his business.

Since leaving FTI, Hawker has met Gates a few times. Gates was in London once a quarter and would vaguely promise work at times, but nothing ever came of it. Hawker did a few free PR Newswire releases for Gates.

**UNCLASSIFIED//FOUO**

USA-0008115

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER      , On  01/23/2019  , Page  17 of 17

Hawker stated Craig never reached out to Hawker after the FARA Unit inquiries. Hawker has had no contact with Craig that he can recall. He did meet VDZ for lunch a few times.

When asked if Hawker's actual work had contributed to his departure from FTI, Hawker said no. He said there was no real scrutiny of the work he had done, just the issue of the unrecovered money.

Hawker was invited by Gates to work on the Trump campaign in Arizona, but declined.

## Additional Statements

When asked, Hawker stated Craig agreed to do limited PR because of Manafort. He added Craig understood the importance of his participation, he could not see Craig believing in any reason for the Report besides PR.

Craig never told Hawker his rationale for the odd construct of reactive /proactive contact was because of FARA concerns. Hawker thought it was due to Craig's internal firm politics.

Hawker felt VDZ giving Gates a draft report would have been done on VDZ's own accord.

Hawker was unsure if the VDZ meeting with Kwasniewski was cleared with Craig because his doing so as not in the MCG.

UNCLASSIFIED//FOUO

# Exhibit

# 4

**Marcus, Ezra**

| | |
|---|---|
| **From:** | Taylor, William W. |
| **Sent:** | Saturday, June 15, 2019 1:01 PM |
| **To:** | Fernando Campoamor-Sanchez; Molly Gaston (USADC); Jason (NSD) McCullough (JMD) |
| **Cc:** | Murphy, Bill; Abelson, Adam; Marcus, Ezra |
| **Subject:** | Motions in Limine |

Can u advise if you intend to attempt to introduce hearsay through the testimony of Gates or others or emails reflecting communications of others under some theory of conspiracy.  If so we intend to file a motion in limine...If not, we will not burden the court.

# Exhibit 5

**Marcus, Ezra**

| | |
|---|---|
| **From:** | Campoamor-Sanchez, Fernando (USADC) <Fernando.Campoamor-Sanchez@usdoj.gov> |
| **Sent:** | Tuesday, June 18, 2019 3:22 PM |
| **To:** | Taylor, William W.; Gaston, Molly (USADC) |
| **Cc:** | McCullough, Jason (NSD) (JMD); Reiser, David A.; Murphy, Bill; Junghans, Paula; Marcus, Ezra |
| **Subject:** | RE: Hearsay |

Bill, without specifics--at this stage--we are not in a position to answer. Sorry.

-----Original Message-----
From: Taylor, William W. <wtaylor@zuckerman.com>
Sent: Tuesday, June 18, 2019 3:19 PM
To: Campoamor-Sanchez, Fernando (USADC) <FCampoamor-Sanchez@usa.doj.gov>; Gaston, Molly (USADC)
<MGaston2@usa.doj.gov>
Cc: McCullough, Jason (NSD) (JMD) <Jason.McCullough@usdoj.gov>; Reiser, David A. <DReiser@zuckerman.com>;
Murphy, Bill <wmurphy@zuckerman.com>; Junghans, Paula <pjunghans@zuckerman.com>; Marcus, Ezra
<EMarcus@zuckerman.com>
Subject: RE: Hearsay

I am not asking for a stipulation, only for your intention.

<https://urldefense.proofpoint.com/v2/url?u=http-3A__mm1.lettermark.net_zuckerman_card_HHTG-5F29.map&d=DwIFAg&c=kWwxgxBGq8MXL6t_SoviyQ&r=X2Scyuw-1ISnRWe6EjSxA0cf0P00oYzrkcVcHp366vg&m=DAEZUC_B7EBViW2VbvEm-UvfL5N07h1ThhDx-I20_bI&s=6zp_phWuc7fbaeGUKF5HbriCqBVz6aEjFrVR1nGzAiY&e= >
[William W. Taylor   202.778.1810  wtaylor@zuckerman.com]<https://urldefense.proofpoint.com/v2/url?u=http-3A__mm1.lettermark.net_zuckerman_card_HHTG-5F29.map&d=DwIFAg&c=kWwxgxBGq8MXL6t_SoviyQ&r=X2Scyuw-1ISnRWe6EjSxA0cf0P00oYzrkcVcHp366vg&m=DAEZUC_B7EBViW2VbvEm-UvfL5N07h1ThhDx-I20_bI&s=6zp_phWuc7fbaeGUKF5HbriCqBVz6aEjFrVR1nGzAiY&e= >

-----Original Message-----
From: Campoamor-Sanchez, Fernando (USADC) [Fernando.Campoamor-Sanchez@usdoj.gov<mailto:Fernando.Campoamor-Sanchez@usdoj.gov>]
Sent: Tuesday, June 18, 2019 3:17 PM
To: Taylor, William W.; Gaston, Molly (USADC)
Cc: McCullough, Jason (NSD) (JMD); Reiser, David A.; Murphy, Bill; Junghans, Paula; Marcus, Ezra
Subject: RE: Hearsay

Bill,

We will follow the Federal Rules of Evidence.  While some of the topics you mention below could be hearsay, there are
potential applicable exceptions to the admissibility of those statements.  As you know, some statements might not even
be offered for the truth of the matter asserted.

It is difficult to even attempt to answer your question without a specific document or testimony that you are concerned about and that we can evaluate.  This is particularly difficult to do now, when we have not even prepared our direct examinations for the witnesses and do not even know all of the exhibits or statements that we may wish to introduce into evidence.  For that reason, we are not in a position to enter into a stipulation based on the broad categories you outlined below.

Regards,

Fernando


-----Original Message-----
From: Taylor, William W. <wtaylor@zuckerman.com>
Sent: Tuesday, June 18, 2019 11:28 AM
To: Gaston, Molly (USADC) <MGaston2@usa.doj.gov>
Cc: Campoamor-Sanchez, Fernando (USADC) <FCampoamor-Sanchez@usa.doj.gov>; McCullough, Jason (NSD) (JMD) <Jason.McCullough@usdoj.gov>; Reiser, David A. <DReiser@zuckerman.com>; Murphy, Bill <wmurphy@zuckerman.com>; Junghans, Paula <pjunghans@zuckerman.com>; Marcus, Ezra <EMarcus@zuckerman.com>
Subject: Re: Hearsay

The question actually is what u intend to include.
In what you have provided us, Mr Gates described learning things about Mr Craig from Mr Manafort and Mr Van Der Zwaan. Mr Hawker likewise apparently relies upon things told him by Gates , Van Der Zwaan and others. There are also emails which contain hearsay from various other absent declarants.  Any of this will be inadmissible in the trial.

We hope you intend to stay within Rule 802 but if you do not intend to,we ought to know that so we can alert Judge Jackson

Thanks

Sent from my iPhone

> On Jun 18, 2019, at 11:15 AM, Gaston, Molly (USADC) <Molly.Gaston@usdoj.gov> wrote:
>
> I think we need more information from you on the evidence that you're concerned about.  If you can be more specific about what you wish to exclude, we would be in a better position to more definitively respond.  Thanks.
>
> -----Original Message-----
> From: Taylor, William W. <wtaylor@zuckerman.com>
> Sent: Tuesday, June 18, 2019 10:55 AM
> To: Campoamor-Sanchez, Fernando (USADC)
> <FCampoamor-Sanchez@usa.doj.gov>; Gaston, Molly (USADC)
> <MGaston2@usa.doj.gov>; McCullough, Jason (NSD) (JMD)
> <Jason.McCullough@usdoj.gov>
> Cc: Reiser, David A. <DReiser@zuckerman.com>; Murphy, Bill
> <wmurphy@zuckerman.com>; Junghans, Paula <pjunghans@zuckerman.com>;
> Marcus, Ezra <EMarcus@zuckerman.com>
> Subject: Hearsay
>
> Do u expect to respond to our question about hearsay? If so, please advise?

&gt;
&gt; Sent from my iPhone