# Exhibit 1

Serial 240

FD-302 (Rev. 5-8-10)

-1 of 16-



## FEDERAL BUREAU OF INVESTIGATION

Date of entry      12/06/2017

GREG CRAIG was interviewed at the office of the Special Counsel in
Washington, D.C.  Present for the interview was FBI Supervisory Special
Agent Omer J. Meisel Special Counsel Attorneys Andrew Weissmann and Brian
Richardson. Also present were CRAIG's attorneys Lawrence S. Spiegel and
Julie A. Turner.  After being advised of the identity of the interviewing
Agent and the nature of the interview, CRAIG provided the following
information:

Special Counsel Attorney Andrew Weissmann advised CRAIG that his
participation in the interview was voluntary.  CRAIG was also advised that
he needed to be truthful in his answers and lying to a Federal agent could
constitute a Federal crime.  CRAIG acknowledged that he understood.

CRAIG received an email from Doug Schoen, who he previously knew from his
work at the White House, inquiring whether CRAIG would be interested in
taking on a project related to Yulia Tymoshenko in Ukraine. Subsequently,
CRAIG and Schoen spoke via telephone while CRAIG was on the Acela train to
New York and Schoen described the proposed project. The Ukrainian
government was looking for a major U.S. law firm to conduct an
investigation of Tymoshenko's trial and provide an opinion as to the
fairness of the trial as well as determine whether there were any human
rights violations. The Ukrainian government wanted the U.S. law firm to
conduct a review utilizing western standards of due process. Western
standards did not necessarily mean applying U.S. standards; rather, the
review should utilize general western standards. Specifically, they wanted
CRAIG's experience as a U.S. lawyer applying western standards. To clarify
the difference to Special Counsel, CRAIG provided an example stating that
not all western countries have jury trials. However, CRAIG conceded that
he did not research any other western country legal standards when
conducting his review and he relied on his knowledge of U.S. legal
standards.

CRAIG stated the people in Ukraine wanted to have a document which would
articulate what facts and procedures were used during the Tymoshenko
trial, they wanted the report to be unbiased and they wanted the report to
provide a credible assessment of the fairness of Tymoshenko's trial. The
initial conversation with Schoen on the Acela was the most substantive

Investigation on   10/19/2017   at   Washington, District Of Columbia, United States (In Person)

File #                                                                                    Date drafted   10/20/2017

by   Omer J Meisel

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

███████████████   Serial 240

██████████████████

Continuation of FD-302 of (U) Greg Craig _____ , On 10/19/2017 , Page 2 of 16

conversation he had about the scope of the project during the entire engagement. CRAIG's main concern regarding whether to accept the project was that he wanted assurances that he would have complete independence in conducting his investigation and writing his report. CRAIG does not recall having any conversation about how the Ukrainian government would view the report or that they wanted the report to conclude specific things.

During the initial meeting, CRAIG stated that he thought the client was the government of Ukraine but he was not sure who or what agency within the government was the client. Subsequently, CRAIG concluded that the client was the Ministry of Justice (MOJ). Paul Manafort's name may have come up during this initial conversation with Schoen but CRAIG is not sure. CRAIG was aware of who Manafort was and that he used to be at the firm of Back, Manafort, and Stone. CRAIG was aware that Manafort represented U.S. Republican candidates. CRAIG had heard that Manafort was an advisor to the president of Ukraine since approximately 2010 and that he was still the president's advisor. However, CRAIG had never previously met Manafort. CRAIG stated that his friend Bruce Jackson initially recommended CRAIG to Manafort.

Schoen told CRAIG that Victor Pinchuk was going to pay Skadden for his work. Pinchuk was a Ukrainian oligarch who was close to the Clintons. Schoen told CRAIG to estimate how much he wanted to charge for the engagement and Pinchuk would pay the price, but CRAIG would not be able to go back and ask for more money if the project went over this agreed upon price. Schoen told CRAIG that if he thought the project would cost three million dollars then he should ask for four million dollars. CRAIG followed Schoen's recommendation and charged four million dollars for the project. Schoen stated that Manafort worked with the Ukrainian government and that Manafort would call CRAIG to finalize the project.

CRAIG stated the Ukrainian government was supportive of the project but he does not know why Pinchuk was willing to pay for the project. CRAIG surmised that the Ukrainian president had something to do with it and that Pinchuk was paying on his behalf, but CRAIG did not know what if anything Pinchuk would receive as a benefit for paying for the project.

CRAIG told Schoen that he required complete control and independence over the project and that he needed complete access to prosecutors, witnesses, and judges. Access was critical and the Ukrainian government needed to be committed to help to the extent possible. Moreover, CRAIG stated that he would not do anything that would affect U.S. policy or trigger any FARA requirements.

CRAIG could not immediately commit to accept the proposed project because he needed to run a conflicts check within Skadden. CRAIG needed to obtain

Serial 240

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  (U) Greg Craig _____ , On 10/19/2017 , Page 3 of 16

Skadden's concurrence because Skadden had an office in Russia and also had Russian clients.

After the initial telephone call with Schoen, CRAIG met Manafort in Washington, D.C. to discuss the potential project. Manafort and CRAIG discussed whether this was something that could actually be accomplished based on CRAIG's complete independence requirement. CRAIG understood that Manafort's role was the U.S. advisor to the Ukrainian president. CRAIG based this understanding on previous information he had that Manafort was responsible for suggested to the Ukrainian president to hire Skadden to work on a different project in 2011. Skadden was never retained to work on this other project.

CRAIG told Manafort that he would not engage in any political activities as defined in the FARA statute. CRAIG did not want to have to register under FARA because he did not want to be considered a foreign agent because it could prevent him from working for the U.S. government. CRAIG stated this was the rule when he was in the Clinton administration. CRAIG also did not think Skadden would want him to engage in work that would require him to register under FARA. CRAIG speculated that he probably provided Manafort with a list of things we would not do such as lobbying U.S. government officials about the report since this would trigger a FARA registration. CRAIG's understanding of FARA was anytime you represent foreign individuals, foreign governments, foreign parties or foreign corporations you need to be careful not to trigger the FARA requirements under the statute. Accordingly, CRAIG told Manafort he was only going to engage in legal work as it related to this project. CRAIG stated that it was clear that Manafort was fully aware of the FARA requirements during this conversation.

Schoen wanted CRAIG to meet with his principal, Pinchuk, and CRAIG wanted Manafort to set up meetings with representatives from the Ukrainian government so CRAIG would be satisfied that they understood and meet his requirements. However, CRAIG /Skadden needed to be paid before he would expend any resources on the project. Moreover, this would also demonstrate whether or not the Ukrainian government/Pinchuk were serious about the project. Initially, a date was set for CRAIG to travel to Ukraine to meet with the government and Pinchuk but it was subsequently postponed because he had not received any payment.

Eventually, Skadden was paid $150,000 via third party payment, and CRAIG traveled to Ukraine. CRAIG stated that in the U.S. it was probably not allowed for a private third party to pay for a government contract. Initially, CRAIG provided Schoen with wire transfer instructions for payment. However, the third party payment was not made via wire transfer

FD-302a (Rev. 05-08-10)                                    ██████████ Serial 240

Continuation of FD-302 of  (U) Greg Craig _____ , On _10/19/2017_ , Page _4 of 16_

but a check from Schoen LLC. CRAIG did not think that Schoen was using his
own money to pay for the project. Rather, Pinchuk provided Schoen the
money and then Schoen wrote a check. CRAIG did not know why Pinchuk did
not pay directly but he assumed that Schoen ended up writing the check
because Pinchuk was not being responsive to requests for payment.

CRAIG met with Pinchuk twice during his first trip to Ukraine. CRAIG and
Pinchuk discussed how payments would be made for the engagement and
Pinchuk agreed to initially pay $1.5 million USD. CRAIG was angry because
his understanding was that he would receive two different payments of $2
million USD for a total of $4 million USD. CRAIG did not voice his
objections to Pinchuk but did to Schoen. CRAIG believed that Pinchuk's
involvement on the project, i.e. paying for the project, was on behalf of
the Ukrainian president. Therefore, whenever payments for CRAIG's work was
late, he would contact Manafort because Manafort was the conduit to the
Ukrainian president.

After the first payment was made via check, subsequent payments were via
wire transfers from offshore accounts. The first wire transfer was for $2
million USD which came from a Cypriot account not in Pinchuk's name. CRAIG
called Schoen who stated that Pinchuk advised that the money was coming
from a Pinchuk entity called Black Seaview Limited. Manafort also told
CRAIG the same thing. CRAIG was not surprised that the money came from
Cyprus because he knew a lot of oligarchs used Cyprus banks but he did not
know why they used Cyprus banks.

CRAIG was shown document bates stamped SAU 000001-02 dated 05/02/2012
which was an invoice for professional services rendered to the Ukrainian
MOJ c/o Schoen for $13,760. CRAIG stated these payments were related to
work CRAIG and his staff did in preparing for the initial trip to Ukraine.
CRAIG was asked why if Pinchuk was paying for the Tymoshenko project did
CRAIG/Skadden provide an invoice the MOJ. CRAIG stated that the MOJ was
the client and Pinchuk was paying their bill.

Skadden received additional money from the Ukrainian government in 2013
after the project was completed. CRAIG stated that by the time the
Ukrainian government approved the money for the project it was 2013 and
CRAIG wanted to make sure the Ukrainian government understood that the
payment was for work in 2012, and not work performed in 2013. CRAIG also
wanted to make sure there was not a double billing issue, i.e. that there
was a third party payer (Pinchuk) who paid Skadden's fees on behalf of the
MOJ and then the MOJ also independently paid the same fee.

FD-302a (Rev. 05-08-10)

██████████████  Serial 240

Continuation of FD-302 of  (U) Greg Craig _____ , On 10/19/2017 , Page 5 of 16

CRAIG was shown document bates stamped SAU 000004 which was an invoice for professional services rendered and expenses through April 30, 2012 in the amount of $738,071.30. CRAIG stated that Schoen was the third party payer representing Pinchuk on behalf of the MOJ.

CRAIG was shown document bates stamped SAU 007795, an email dated 03/25/2013 from CRAIG to Manafort. This email is a reference to the amount of money Pinchuk already paid and CRAIG suggested to Manafort to go back to Pinchuk to see if he wanted to make a claim for reimbursement for money received by Skadden that they did not utilize for the project. CRAIG spoke to Schoen who stated that Pinchuk did not want the money back. Accordingly, Skadden had an excess of $500,000 in their escrow account.

CRAIG was shown document bates stamped SAU 000399-401, an email dated 04/12/2012 from Manafort to CRAIG. CRAIG stated he met with Pinchuk who stated that he was told by the Ukrainian president's chief of staff to transfer $1.5 million USD.   CRAIG was upset because the agreement was for two transfers of four million USD. Accordingly, CRAIG sent the email expressing his displeasure to Manafort because he was the conduit to the Ukraine president and his chief of staff. CRAIG explained that if he had issues he needed to resolve with Pinchuk, his conduit was Schoen. Conversely, if he had issues he needed to resolve with the Ukrainian president and/or his chief of staff, his conduit was Manafort.

CRAIG stated that Pinchuk did not want the "world" to know about his involvement in the project and expected and was promised confidentiality. However, CRAIG is not sure he made the same promise to Pinchuk. Subsequently, Tymoshenko's attorney, Mr. Slattery, demanded to know how CRAIG/Skadden was being payed before he would grant CRAIG an interview with Tymoshenko. CRAIG recommended they tell Mr. Slattery that Pinchuk was paying Skadden but because Pinchuk was promised confidentiality, CRAIG told Mr. Slattery that they were paid by a third party and that he was not authorized to disclose who the third party was or how much they were being paid. Mr. Slattery wanted to know who paid for Skadden's services and raised the possibility that Tymoshenko would not cooperate with CRAIG's investigation unless he was provided the identity of the third party.

CRAIG was shown document bates stamped SAU 000653, an email chain from June 2012. CRAIG stated that the email refreshed his recollection and that Manafort told him that the Ukrainian government had no issue with CRAIG releasing Pinchuk's name in the final report.

FD-302a (Rev. 05-08-10)                                                    Serial 240

Continuation of FD-302 of  (U) Greg Craig                         , On  10/19/2017 , Page  6 of 16

In the final report CRAIG drafted he did not provide the amount of money Skadden was paid. CRAIG never spoke to anyone outside of Skadden about the decision not to put in how much they were paid nor was this discussed at any time with the Ukrainian government representatives or their conduits.

CRAIG was asked if people in Ukraine were asking how it was possible that Skadden was only being paid approximately $13,000 for this project. CRAIG stated the issue was not a government contract procurement issue; rather the issue was who was actually paying Skadden. CRAIG was not concerned about a public perception problem that he might have within the Ukraine and did not recall speaking to anyone within the Ukraine government or Manafort about any government contract procurement issue.

CRAIG was shown document bates stamped SAU 000649, an email chain dated 06/22/2012. CRAIG was asked by Special Counsel whether he was aware of or did he have any discussions about the legal limit for payment by the Ukrainian government. CRAIG stated that the email is from Tymoshenko's lawyer. Subsequently, CRAIG called Manafort about this email; however, he does not recall any discussions about any legal limitations on payment by the Ukrainian government. Nevertheless, CRAIG stated that he was aware of the Ukrainian government procurement limits (agent note: CRAIG's face turned red during this part of the interview, he pushed himself away from the table in his seat, and crossed his arms).

CRAIG stated that in his mind the client was the MOJ. Regarding any privilege issues, CRAIG did not give it much thought because he was conducting an investigation and interviewing prosecutors and witnesses, and the legal advice he was providing was the actual report he would eventually draft. CRAIG stated that his notes from the interviews would have been privileged because they were work product. CRAIG stated that the attorney-client privilege extended more broadly than just to the MOJ but he was not sure if Manafort would have been covered by the privilege. At the time, CRAIG was not thinking or discussing a common privilege between all the parties involved in the engagement.

Prior to working on the project, CRAIG had a limited understanding of Tymoshenko's prosecution. CRAIG did not know the details associated with the charges against her or the legal issues related to the Ukraine energy and gas prices. CRAIG stated that Ukraine was a highly politicized country and that one of the biggest issues within Ukraine was the Tymoshenko's prosecution. Within Skadden, some people viewed this project as a very exciting prospect and others thought that no matter what CRAIG's report concluded it would negatively impact Skadden's business prospects; especially in Russia. The people who viewed this engagement negatively felt that Skadden was in a no win situation because either they will be

FD-302a (Rev. 05-08-10)

████████████████  Serial 240

████████████

Continuation of FD-302 of  (U) Greg Craig _____ , On  10/19/2017 , Page  7 of 16

seen as pro-Tymoshenko or pro-Russia based on the results of the
investigation. Skadden's Russia office held the latter view. CRAIG was not
sure what the Russian government's view was on the Tymoshenko prosecution.
CRAIG did not know what the U.S. Department of State or Hilary Clinton's
view was on the Tymoshenko prosecution. Later, CRAIG found out that the U.
S. Ambassador was pro-Tymoshenko.

There were four Ukrainian prosecutors who assisted CRAIG with the
investigation and Manafort was the conduit between the Ukrainian
government and CRAIG.

CRAIG had very little direct contact with Manafort during the
investigation but once the investigation was concluded and the draft of
the report was being written he had significantly more contact with
Manafort.

Draft Report

Various people from the Ukrainian government provided comments to the
draft report. However, CRAIG could not discern any specific motives the
Ukrainian government had based on their comments. Generally, Manafort
delivered the comments CRAIG received from the Ukrainian government
including the MOJ. However, CRAIG did get some comments directly from
Ukrainian government employees through email. Richard Gates and Konstantin
Kilimnik did not play any role in providing comments.

CRAIG was shown document bates stamped SAU 000642, an email chain dated 06
/22/2012 regarding a "draft statement". CRAIG stated that he was concerned
that people would say that Manafort was responsible for the Skadden report
and because Manafort worked for the Ukrainian president this would taint
the report and potentially be viewed negatively.

CRAIG was shown document bates stamped SAU 000147, Skadden preliminary
engagement letter dated 02/20/2012. CRAIG was asked why the engagement
letter stated "To Whom it May Concern". CRAIG stated that it was not
specifically decided yet who the specific client was but it was generally
understood that it was some part of the Ukrainian government. The scope
portion of the letter was drafted based on information provided to CRAIG
by Schoen and Manafort. The purpose of this engagement letter was to
memorialize the preliminary engagement agreement and define the scope of
the engagement. Nobody other than CRAIG signed the letter. "Third party
payor" language in the engagement letter was the standard language Skadden
used in their engagement letters.

USA-0007346

FD-302a (Rev. 05-08-10)                    ██████████  Serial 240

██████████

Continuation of FD-302 of  (U) Greg Craig _____ , On  10/19/2017  , Page  8 of 16

CRAIG stated there was no further efforts by him or Skadden to draft or
execute another engagement letter between April 2012 and the next written
engagement letter.

CRAIG was shown a letter drafted by Skadden to Helen Hunt, DOJ/NSD, dated
02/06/2013 (there were no bates numbers on this document) and CRAIG was
directed to Attachment B which was the "Proposed Agreement in English
dated April 10, 2012". CRAIG stated that this was the signed executed
engagement letter. CRAIG did not recall why his "client declined to sign
proposed English agreement because of concerns about confidentiality
clause." Instead there was a fully signed engagement letter in Ukrainian
and English signed by the MOJ (Attachment A in the Helen Hunt production).
CRAIG did not include the language regarding third party payor because
they already had it in the previous letter. CRAIG stated it was difficult
to get the Ukrainian government to sign the English version of the
engagement letter. CRAIG was not concerned about the client not signing
the Attachment B engagement letter because he was requiring them to pay
before he would start work on the project. CRAIG was not worried about
utilizing the Attachment B engagement letter as a way to force the client
to pay because he would not engage in any work on their behalf until he
was paid.

CRAIG was referred to Attachment A "Ministry of Justice" and the reference
to the cap on payments in the amount of 95,000 Ukrainian hryvnas. CRAIG
stated that according to Skadden attorney Andrew Van der Swaan, who was
the contact with the MOJ, this is the amount MOJ set aside for the project
and to obtain additional funding would take additional time to obtain
approval. CRAIG was not expecting to get paid by the MOJ; rather, he was
getting paid by Pinchuk. CRAIG stated that Skadden did not enter into a
written contract with Pinchuk or any other third party because Skadden
would not perform any work until they were paid. CRAIG stated he never
really thought of drafting a written contract with the third party,
Pinchuk, who was was paying for the report. CRAIG felt comfortable with
this arrangement because he was already paid $2 million plus and extra
$150,000 by Pinchuk.

CRAIG was shown document bates stamped SAU 000399 which is an email chain
where Manafort advised CRAIG that CRAIG will get $2 million. CRAIG stated
he asked Manafort to get involved because the relationship with the
president's chief of staff and Pinchuk was strained and Manafort was the
conduit to the president.

FD-302a (Rev. 05-08-10)

█████████████████  Serial 240

Continuation of FD-302 of ___(U) Greg Craig_____ , On __10/19/2017_ , Page __9 of 16__

CRAIG was shown document bates stamped SAU 000398 which was an email chain between Manafort and CRAIG where Manafort advised that the $2 million was wire transferred. CRAIG did not know what "VP picture was not full picture" meant.

CRAIG had virtually no contact with Gates while he was in the Ukraine. Regarding Kilimnik, CRAIG stated that during the 04/04/2012 trip to Ukraine, Kilimnik was "deputized" by Manafort to assist CRAIG and Skadden with their logistics in Ukraine. Initially, Manafort was going to take CRAIG to appointments with Ukrainian government officials. However, Kilimnik ended up escorting them. Kilimnik was very connected to Ukrainian government officials and CRAIG was very impressed with him. After the CRAIG's first trip to Ukraine where he laid out his plan for what they were going to do while in Ukraine on the project, Kilimnik no longer escorted them.

While in the Ukraine, CRAIG only saw Manafort a couple of times. During the time period CRAIG was in Ukraine, approximately 04/2012 - 08/2012, Manafort did not attend any of their meetings with Ukrainian government official or anyone else Skadden interviewed. CRAIG was operating on his own. Oleg (LNU) at the MOJ was the point of contact and assisted with setting up meetings and interviews. The only people who attended any witness interviews were CRAIG, Skadden employees, and the translator. CRAIG did meet Manafort in his hotel room at the Intercontinental in Kiev. Manafort's hotel room had an impressive computer system set up.

CRAIG was asked what considerations were taken into account to decide whether he would interview President Yanukovych. CRAIG stated that one of the provisions in the engagement letter stated that Skadden was not going to investigate whether Tymoshenko's prosecution was politically motivated. Skadden was only investigating whether there was selective prosecution. They looked to see if other similar cases were brought against politicians and if there was any precedence for such a prosecution. Skadden's investigation revealed that there were approximately 10-15 similar prosecutions previously brought against local politicians but not against a high ranking federal politician. Nobody outside of Skadden was consulted on whether they should interview the president. CRAIG did not have any conversations or input from MANAFORT about interviewing the president. Ultimately CRAIG concluded that there was no need to interview the president because he did not play a role in her imprisonment.

In August 2012, CRAIG had begun to finalize the report. CRAIG did not provide any insight to Manfort or Gates about what the report would say prior to the draft report being written. CRAIG was shown an email bates stamped SAU 000581-582. After reviewing the email, CRAIG stated that he

FD-302a (Rev. 05-08-10)

███████████████   Serial 240

███████████████

Continuation of FD-302 of  (U) Greg Craig_____ , On  10/19/2017 , Page  10 of 16

did not write the first paragraph on SAU 000582 and that the statement in
the first paragraph did not happen. However, Skadden did accept comments
from the Ukrainian government. Skadden did provide the Ukrainian
government and Manafort with a draft of the report to provide their
comments prior to finalizing the report. CRAIG stated that he received
comments from both the Ukrainian government and Manafort. CRAIG utilized
Manafort because he spoke English. This was a lengthy process.

CRAIG was shown an email bates stamped SAU 005723-5725. CRAIG was asked
why comments would go to Gates. CRAIG stated that Gates and Kilimnik
worked for Manafort and that they were conduits to provide Manafort with
the material. CRAIG believed the comments provided to him were either from
Manafort, someone acting on behalf of Manafort, or comments on behalf of
President Yanukovych because Manafort was the conduit to the president.

CRAIG was shown an email bates stamped SAU 005750. CRAIG stated that
initially the draft was sent to Manafort prior to the MOJ receiving a copy
of the draft.

CRAIG stated that the attorney-client privilege did not extend to FTI. FTI
wanted Skadden to retain them as a client but Skadden declined because
Skadden wanted to keep their role very clean and not promoting their
report. They wanted to insure the report was viewed as an independent
unbiased investigation/report.

CRAIG was shown an email chain bates stamped SAU 005757—5759 and directed
to the sentence "I didn't get Hawker's comments." on SAU 005757. CRAIG
stated that Hawkers worked for FTI. FTI was retained by the MOJ to develop
a world-wide media strategy related to the release of the Skadden report.
Manafort set up a meeting in New York, New York with FTI and other
stakeholders. Skadden's London office recommended four media strategy
companies to Manafort, including FTI, who had offices with Europe. CRAIG
stated he had never previously worked with or dealt with Hawker before
this project. CRAIG stated that during this meeting Manafort was
disappointed that Hawker viewed the Skadden report as validating
Tymoshenko's position and Manafort was initially hopeful that the report
would come out differently than it did. CRAIG did not recall what Manafort
specifically said at this meeting. CRAIG's objective was to get everyone
to read the report.

CRAIG was shown an email between Kilimnik and Van Der Swaan bates stamped
SAU 05765. CRAIG thought he had previously seen this email. CRAIG stated
there were a lot of comments being sent into Skadden attempting to get
them to alter the report. CRAIG was directed to the statement "friends in
Kiev" which CRAIG stated he took that to be a reference to the President
Yanukovych. Regarding the comments Skadden received to the draft report,

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of  (U) Greg Craig _____ , On  10/19/2017 , Page  11 of 16

their process was for the Skadden attorneys involved in the project to meet in CRAIG's office and obtain a consensus before making any suggested changes to the report.

CRAIG was shown an email chain dated 09/13/2012 bates stamped SAU 005786. CRAIG did not recall that he had a deadline he was trying to make. CRAIG stated that he wanted to get the report finalized and released as soon as possible because the longer the process took the greater potential the delay would negatively impact the report. CRAIG had conversations with Manafort about changes he wanted made to the report, but Manafort's changes were limited to a small number of issues.

CRAIG was shown an email chain bates stamped SAU 005786-5787 and directed to number 3 on SAU005787 which was written by Manafrot and stated "It is important to have your report submitted to MoJ on Friday. . . The President told SL directly to tell me it must be done this week." CRAIG stated SL is a reference to the president's chief of staff. CRAIG stated that he did not have any verbal conversations with Manafot about this email. CRAIG stated he wanted to get the report issued as fast as possible.

CRAIG was shown documents stamped SAU 005854 and SAU027337. CRAIG stated that Tymoshenko's argument on selective prosecution was different than the MOJ prosecutor's office.

CRAIG was shown documents bates stamped SAU 027329-27335. CRAIG stated that the hand written notes on the document are his. Regarding "August 3, 2012" on SAU 027329, CRAIG stated that the August 3rd date seemed too early to him for sending out the final draft report to Manafort. CRAIG thought he sent the final draft at the end of August 2012. CRAIG stated that his hand written notes were contemporaneous notes of what Manafort was saying and that Manafort was expressing the views of the MOJ prosecutor's office. CRAIG stated the notes are about factual conclusions but that Manafort would not know those details. CRAIG stated that it was his practice to put the name of the person he was talking to when writing down notes. CRAIG stated that based on a review of his notes, Manafort was providing comments to CRAIG on behalf of the MOJ's prosecutor's office.

CRAIG was shown an email from Gates to CRAIG bates stamped SAU 006811. CRAIG stated Gates was providing him with additional comments and "BG" was a reference to the president and short for "Big Guy". Manafort also referred to the president as "BG". CRAIG stated that the statement "positive meeting today with the principal" had to be a reference to the president. CRAIG stated that the comments provided by Gates were on behalf of the president.

FD-302a (Rev. 05-08-10)

█████████████████████ `Serial 240`

Continuation of FD-302 of  (U) Greg Craig _____ , On  10/19/2017 , Page  12 of 16

CRAIG was shown an email bates stamped SAU 006827. CRAIG stated he was reporting back to Manafort what changes Skadden was willing to make to the report.

CRAIG was shown an email bates stamped SAU 006828. CRAIG stated "Hawker" was a reference to a meeting that was going to happen in New York, New York.

CRAIG was shown emails bates stamped SAU 006865-6889.  CRAIG stated he probably has seen this email before but he has no specific recollection.

CRAIG was shown an email bates stamped SAU 007296. CRAIG stated this is an email between Kilimnik and Van Der Swaan.

CRAIG was shown an email string bates stamped SAU 007321-7323. CRAIG stated that these emails discuss additional comments to the report sent by Manafort.

CRAIG was shown an email sting bates stamped SAU 007324-7325. CRAIG stated this is an email between CRAIG and Manafort. CRAIG stated that in these emails, CRAIG was asking Manafort what was the problem with the report that led to the MOJ not accepting the report. CRAIG did not believe that the reasons provided by Manafort were persuasive enough to delay the release of the report. CRAIG was surprised that the "client" would not accept the report. CRAIG thought it was juvenile that the client would say they never received the report.

CRAIG could not remember who he communicated through when he wanted to communicate with the MOJ but he believes it was Van der Swaan.

CRAIG did not recall anyone at the Podesta Group calling to ask about the report. CRAIG stated that he had known Tony Podesta for a long time but he had never spoken to him about the report. CRAIG stated he knew Vin Weber. CRAIG previously worked on a project with Weber related to Egypt in 2012. During that time period, Weber told CRAIG that he was working with a Ukrainian client. Weber never asked CRAIG about the report.

CRAIG stated that the night before the Harvard Club meeting he had dinner with Hawker from FTI, but he does not recall much about what was discussed. The purpose of the Harvard Club meeting was to discuss with Manafort any last minute issues with the Skadden report prior to delivering it to the president's chief of staff in New York the next day. CRAIG remembered that the meeting took place but he did not remember the details of what was discussed. CRAIG was asked if he remembered seeing a document from FTI. CRAIG stated he did not remember spending a lot of time reading any document at the meeting or even seeing a document. CRAIG was

FD-302a (Rev. 05-08-10)

██████████████████   Serial 240

Continuation of FD-302 of (U) Greg Craig _____ , On 10/19/2017 , Page 13 of 16

shown documents bates stamped SAU 006865-6889. CRAIG stated that now that he looks at the document, the first paragraph on SAU 006869 is a mischaracterization of Skadden's findings in the report. Regarding the assignments enumerated in 23 - 40 (SAU 006867), CRAIG stated he did not do any of those assignments.

CRAIG was shown documents labeled "Media Plan" bates stamped SAU 006797-6801. CRAIG stated he was concerned about this plan because how they categorized certain aspects of the plan. CRAIG stated that Hawker asked if he could help CRAIG get the report to David Sanger at the New York Times and CRAIG told him yes. CRAIG stated that two media outlets were reporting erroneous facts about the Skadden reports findings. CRAIG stated the only thing he did was deliver the Skadden report to Sanger and that all the other things the "Media Plan" states CRAIG would do were never done by CRAIG.

Regarding the release of the report in Ukraine, CRAIG stated he found out that there were erroneous press articles about the Skadden report. CRAIG did not have any knowledge or insight into how the Skadden report was rolled out by the Ukrainian government or what FTI did with respect to the Ukrainian roll out.

CRAIG was shown documents bates stamped SAU 007232-7233. Manafort and Hawker asked CRAIG if Skadden would be willing to provide one or two journalists with background on the Skadden report. Initially, CRAIG told it may be possible but then he reversed his decision and said he could not. CRAIG also told them that Van Der Swaan could not do it out of his Moscow office. CRAIG was directed to a portion of the email dated 09/24/2012 between Manafort and CRAIG (SAU 007233) which stated "briefing people like Fule and Durbin". CRAIG stated that Fule is a European politician and that briefing either Fule or Durbin would not be prohibited or constitute a trigger for FARA, but that he never spoke to either individual. CRAIG stated that Durbin called CRAIG once early in the Skadden's investigation and asked him about their investigation. CRAIG told Durbin it was too early to talk to him about his findings. Durbin asked CRAIG if he could call him back later to talk about the results of the report and CRAIG stated yes. However, Durbin never called CRAIG back.

CRAIG does not recall having any discussion with Manafort, Gates or Kilimnik about registering under FARA. CRAIG stated that his general understanding of FARA is that if you have a foreign government as a client and if you do any PR work in the U.S. or engage with any U.S. government representatives on behalf of the foreign government then that you would have to register under FARA. CRAIG stated that when he first discussed with Manafort the possibility of working on the project he told Manafort that

he would not conduct any work that would trigger any FARA requirements. Manafort told CRAIG that he understood FARA requirements. CRAIG stated that when he provided Manafort the reference list of four potential firms to conduct PR work, he advised Manafort that any PR work conducted in the U.S. would require the firm to register under FARA.

CRAIG stated that he had a conversation with Gates where he told Gates that he was meeting with DOJ about the work he did on the report and that he was going to provide DOJ Skadden's view on FARA. CRAIG did not have a clear independent recollection of this; rather, it was based on a review of his Skadden billing records. CRAIG did not recall if he had a conversation with Gates about whether he or Skadden had to register under FARA.

CRAIG stated that he responded to three different newspaper articles which inaccurately reported the results of the Skadden report. CRAIG spoke to the journalists to correct their inaccurate reporting. CRAIG stated that when he corrected some of the inaccurate press he did not view that as conducting press relations on behalf of a foreign government. CRAIG was correcting the journalists on behalf of Skadden and not the Ukrainian government. CRAIG stated that Skadden's client would definitely meet the foreign government requirement for FARA but Skadden did not meet the lobbying element. CRAIG did not recall having any conversations with the DOJ's FARA unit unrelated to the Skadden report and he does not recall DOJ asking any questions about Manafort, Gates, Kilimnik or FTI.

CRAIG stated he did not know if anyone at FTI had any communications with any U.S. reporters about the inaccuracies about the results Skadden report. CRAIG did not know if anyone at FTI was speaking to U.S. government officials about the Skadden report. CRAIG stated he was not aware if Manafort, Gates, or Kilimnik conducted any lobbying to U.S. government representatives or U.S. press related to the Skadden report.

CRAIG was asked why FTI was hired when Mercury was already doing work on behalf of the ECFMU. CRAIG stated that FTI had a specific assignment regarding the release of the Skadden report. In 2016, when CRAIG became aware of the fact that Skadden was conducting work for Mercury on behalf of the Ukrainian government/ECFMU, he was surprised.

CRAIG's impression of Manafort was that Manafort had a different world view than CRAIG and did not think they could become friends. Manafort's understanding of Ukraine and Russian relations was "primitive". Manafort was always very focused on completing the assignment and CRAIG understood why someone would hire him to accomplish a tasking. Manafort was a "tough guy, a man's man". Manafort did not share a lot of information about himself. The last time CRAIG communicated with Manafort was via email in

FD-302a (Rev. 05-08-10)

Continuation of FD-302 of (U) Greg Craig _____ , On 10/19/2017 , Page 15 of 16

2013. CRAIG has not communicated with Gates or Kilimnik since the Skadden report was issued.

CRAIG received an email from someone believed to be a hacker that stated Manafort had $5 million dollars in a bank in Cyprus and that CRAIG should call him back. CRAIG viewed this email as a threat. CRAIG referred the email to Skadden's General Counsel and then called Manafort to tell him about it.

CRAIG was involved in one meeting related to the ECFMU. Ken Gross at Skadden asked CRAIG if he would discuss FARA issues with him. CRAIG billed this conversation to the ECFMU which was reflected in CRAIG's billing records. This was the first time CRAIG had heard about the ECFMU and he never had any conversations with Manafort or Gates about ECFMU. CRAIG understood that Skadden's client was Mercury. CRAIG had never previously conducted any work for Mercury.

In 2016, CRAIG had three conversations with Gross about FARA. They discussed both legal issues and facts (Agent note: Based on the attorney-client privilege, no questions were asked by SCO regarding these conversations.) CRAIG believed Tyler Rosen, a Skadden associate, was also involved in these FARA conversations.

Early in CRAIG's career he registered under FARA and that is how he became familiar with the registration requirements. Throughout his career, FARA issues surfaced because he enjoyed working with international clients. When CRAIG worked at the White House, they would discuss FARA related to vetting candidates for positions at the White House.

CRAIG was shown a document bates stamped SAU 007243. CRAIG did not believe he reviewed this document prior to the Harvard Club meeting. Gates was not listed in this document as being an attendee but CRAIG was told that Gates was in fact act the meeting. CRAIG did not remember Gates being at the meeting.

CRAIG was shown a document bates stamped SAU 0000034. This was a billing reference to a call with Senator Durbin on 06/12/2012. CRAIG stated Senator Durbin called him.

CRAIG was shown a document bates stamped SAU 000055. This was a billing reference to a call with Senator Durbin on 07/31/201. CRAIG did not recall this communication.

CRAIG was shown a document bates stamped SAU 0000073. This was a billing reference to Durbin on 08/01/2012. CRAIG did not recall this communication. CRAIG recalled that Senator Durbin was interested in the

FD-302a (Rev. 05-08-10)

███████████ Serial 240

███████████

Continuation of FD-302 of  (U) Greg Craig _____ , On 10/19/2017 , Page 16 of 16

results of the Skadden report and when CRAIG was going to issue the
report. Senator Durbin asked CRAIG if there was any chance the Skadden
report would result in Tymoshenko's release. CRAIG told Senator Durbin
that he did not know. CRAIG interpreted this exchange as Senator Durbin's
theory that Skadden was brought in to write a report by the Ukrainian
government as a way to either justify her release by the Ukrainian
government or result in a new trial. CRAIG did not provide Senator Durbin
any information about their investigation. This is potentially what the
Durbin call and billing reference on 08/01/2012 was related to. Senator
Durbin never contacted CRAIG again about the report and CRAIG never spoke
to him after the Skadden report was released. CRAIG advised that he dealt
with Senator Durbin during President Clinton's impeachment.

CRAIG stated that Manafort, as a representative of the Ukrainian
president, was at a dinner party attended by U.S. government officials on
02/15/2011.