UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*v.*<br><br>**GREGORY B. CRAIG**,<br><br>*Defendant.* | **Case No. 1:19-cr-0125 (ABJ)** |

**DEFENDANT'S MOTION IN LIMINE TO EXCLUDE
EVIDENCE RELATED TO PAYMENTS TO SKADDEN**

In connection with its work investigating and preparing its independent report on the Tymoshenko trial, Skadden's attorneys and paralegals spent nearly 6,500 hours, totaling approximately $4 million in fees. The firm also incurred nearly $650,000 in expenses, including hundreds of thousands of dollars in translation and interpretation fees. The bulk of those fees and expenses ($4.15 million) was paid by Victor Pinchuk, a prominent and progressive Ukrainian businessman. The rest ($507,568) was paid by Ukraine's Ministry of Justice ("MOJ").

Although a trial in this case, if there is one, will be about whether Mr. Craig knowingly and willfully concealed from the Department of Justice material facts concerning whether he and his firm were required to register as agents of Ukraine's Ministry of Justice, the government apparently intends to elicit evidence related to how Skadden was paid for its services. None of that evidence is relevant to any fact "of consequence in determining th[is] action," Fed. R. Evid. 401(b). We do not intend to object to evidence concerning the amount of the fees, and the amount paid by each payor. However, the government has indicated that it intends to offer into evidence the voluminous correspondence related to the MOJ's payment of its portion of the fees and expenses, thereby inviting a separate mini-trial on issues related to those fees. Such a

diversion will confuse the issues and mislead the jury, and create a significant and undue waste of time and unfair prejudice. Mr. Craig hereby moves *in limine* to preclude the admission of evidence concerning the fees paid to Skadden by the MOJ.

I.  **BACKGROUND**

When Doug Schoen first approached Skadden, on behalf of Victor Pinchuk, about conducting an independent investigation into the prosecution of Ms. Tymoshenko, Mr. Craig was intrigued. He knew a great deal about the region from his high-level foreign policy positions, including as Secretary of State Madelaine Albright's Director of Policy Planning, and as Senator Edward M. Kennedy's senior advisor on defense, foreign policy and national security issues. He also understood, after learning more about the scope of the investigation of Ms. Tymoshenko, the length of her trial (more than three months), and the need to review original documents and conduct many interviews on the ground in Ukraine, that the assignment would be extensive and expensive. After receiving $150,000 to cover the firm's initial trip to Kyiv and evaluation of the engagement, Mr. Craig estimated a budget of $4 million, which Mr. Craig was told was acceptable to Mr. Pinchuk, and which Skadden received in three installments, between April and July 2012.

By July, however, it had become apparent that those funds would be exhausted before Skadden was able to complete the Report. Mr. Craig emailed his colleague Cliff Sloan on July 27, noting that by the end of the month, nearly 90 percent of the funding from Mr. Pinchuk would be exhausted. Ex. 1. By that point, although the bulk of the investigation was done, the team of attorneys and paralegals still had many hours of work ahead before the report would be finalized. The team also was in the midst of attempting to arrange another interview of Ms. Tymoshenko herself, which would have required another group of attorneys to travel to Kyiv, as well as the expenses for interpretation, translation, travel and lodging that such a trip would

require. *See, e.g.*, Ex. 2. In addition, the MOJ continued to send requests for revisions to the Report, and although Skadden rebuffed any comments that the firm did not independently verify and agree with, responding to those comments frequently required translation and group meetings among the attorneys working on the report and were yet another source of anticipated time and expenses.

Thus, Mr. Craig explained to Mr. Schoen (Mr. Pinchuk's representative), and Mr. Manafort (Ukraine's representative), that Skadden would need an additional deposit of $1 million to ensure full funding through the completion of the engagement, committing to returning any of the funds that were not used. Mr. Schoen reported that Mr. Pinchuk's "answer" to whether he would contribute additional funding was a "firm and unqualified 'No.'" Ex. 3.[1] Mr. Manafort then confirmed that the Ukrainian government would contribute additional funds to cover the shortfall. In a series of emails, Mr. Manafort laid out the instructions from Serhiy Lyovochkin, President Yanukovych's chief of staff, about the steps that would be needed to satisfy Ukraine's elaborate and confusing procurement process for authorizing the payment as

---

[1] The government has completely misread this email. The indictment alleges that the "answer" from "Schoen/Pinchuk" related to "whether [Mr. Pinchuk's] identity and role could be disclosed" as the private party funding the report. *See* Indictment ¶ 26. In fact the "answer" was a response to the question whether Mr. Pinchuk would be willing to contribute additional funding in light of the anticipated shortfall. The string begins with Mr. Manafort asking Mr. Craig on August 15, "Any news from Schoen? I need to get back to SL [Serhiy Lyovochkin] if we are pursuing his approach." Ex. 3. As reflected in the subsequent emails in the chain, the "approach" from Mr. Lyovochkin refers to the way MOJ would fund the report, if funding from MOJ was necessary. Mr. Craig had been trying to reach Mr. Schoen for several days to determine if Mr. Pinchuk was willing to provide the additional funding – which would have obviated the need to "pursu[e] [Lyovochkin's] approach." *See* Ex. 4. Mr. Manafort wrote again, "[d]id you reach Schoen? Kyiv wants to move ASAP and is pressing me for an answer." Ex. 5. After Mr. Craig finally reached Mr. Schoen, Mr. Craig wrote to Mr. Manafort, "The answer from Schoen/ Pinchuk is a firm and unqualified 'No.' Can you put into a sentence how Ukraine wants to handle this so I can clear it with the team?" Ex. 3. In context, therefore, that "answer" was to the question whether Mr. Pinchuk would contribute additional funding – not whether he would consent to disclosure of his identity as the funder of the project.

3

part of the MOJ's 2013 budget. *See, e.g.*, Ex. 3 (email from Mr. Craig to Mr. Manafort on August 15, requesting to "discuss . . . again what [Serhiy Lyovochkin] proposes").

The procurement procedure that was reflected in the August 2012 correspondence, and that followed – which the government wishes to inject into this trial, as reflected in paragraphs 26 and 27 of the indictment – was elaborate and confusing. *See, e.g.*, Ex. 6 (August 15, 2012 email from Mr. Manafort describing the "Procedure for Supplemental Payments" in "accordance with the law of Ukraine," as "sent to [Mr. Manafort] by MOJ"). Skadden provided the Ukrainian representatives the documentation that Mr. Lyovochkin and Mr. Manafort explained was necessary for purposes of Skadden's compliance with Ukrainian budgetary processes. Ten months later, in June 2013, after another intervening and protracted set of bureaucratic hurdles, the MOJ transmitted the supplemental payment that it had agreed to pay the previous August: $1,075,381. The additional funds were used to cover fees and expenses that Skadden had incurred beyond what the Pinchuk funds had covered; the balance left after all remaining bills had been paid, $567,813, was later returned to the Ukrainian government.

## II.  ARGUMENT

The government apparently seeks to offer evidence at trial related to the byzantine process in August 2012 and the following months surrounding the MOJ's approval of funding Skadden's shortfall. *See* Indictment ¶¶ 26-27. For the reasons set forth below, whether analyzed under Rule 401, 403 or 404(b), this evidence should be excluded.

### A.  The MOJ Payment evidence is not probative of any fact of consequence.

The government's burden in this case will be to prove, among other things, that Mr. Craig knowingly and willfully concealed material facts from the Department of Justice in two letters and one meeting. The government will also apparently seek to prove that Mr. Craig not only was required to register under the Foreign Agents Registration Act (FARA), but *knew* that he was

required to register. *See, e.g.*, Indictment ¶¶ 48-49 (alleging that Mr. Craig "knowingly and willfully" concealed information for the "purpose" of "avoid[ing] registration as an agent of Ukraine"). The circumstances of the payments to Skadden for its work are not relevant to any of those issues.

The government seems to have foreseen the need to justify its desire to inject into the case the August 2012 correspondence related to the MOJ payment. Paragraph 27 of the indictment ends with this: "A truthful and complete FARA registration by CRAIG would have made a public record of [Mr. Pinchuk's] role in funding the report, and the amounts he paid to the Law Firm." As an initial matter, the evidence shows that Mr. Craig and his colleagues *wanted* to disclose Mr. Pinchuk's name once a media report in Ukraine raised questions about who was paying Skadden's fees, but had agreed at the outset that so long as Skadden did not have to register, Mr. Pinchuk's financial contribution to the project would remain confidential.² But even setting aside whether Mr. Craig preferred to disclose Mr. Pinchuk's name, the matters described in paragraphs 26 and 27, other than the first sentence (related to the fact that Mr. Pinchuk would not contribute more funds, the admission of which we do not oppose), have nothing to do with Mr. Pinchuk's "role in funding the report, and the amounts he paid." *See* Indictment ¶ 27. Instead, they relate exclusively to the mechanism by which Mr. Craig was told that the *other* payor for the Skadden report – the MOJ – would procure the additional funds needed to cover the shortfall.

That leaves only one theory set forth in the indictment for why the MOJ procurement correspondence is relevant: that it somehow bears on Mr. Craig's truthfulness. Paragraph 27

---

² Obviously it is commonplace for lawyers to be compensated by someone other than the client; only in unusual circumstances would the lawyer be required, or even permitted, to disclose such client secrets to third parties. *See, e.g.*, D.C. Rule Prof'l Conduct 1.6(a) & (b).

describes two communications related to the procurement process as a "backdated letter" and a "false invoice." First, as a factual matter, those letters and the surrounding correspondence have no probative value to Mr. Craig's truthfulness – but demonstrating that will require a confusing and wasteful mini-trial, as discussed below. *See* pp. 6-8, *infra*. Second, even if hypothetically the letters were false or misleading – which they were not – the government would have to satisfy the requirements of Rule 404(b), which it has not even attempted to do. The core allegation in this case is that Mr. Craig's written and oral statements to the FARA Unit were false and misleading and concealed material facts. Evidence related to allegations that Mr. Craig made false or misleading statements to someone else, *i.e.*, the MOJ, can only be admissible if it tends to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" *with respect to the charged offense*. Fed. R. Evid. 404(b)(2). Here the government has not identified, and cannot identify, any permissible purpose to be served by offering this evidence. Thus, the only purpose is to "prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1).

For these reasons, the evidence related to the means and mechanisms by which MOJ provided additional funding for the project has no probative value.

**B.     Alternatively, the evidence should be excluded under Rule 403.**

Even if the government is able to articulate a theory of relevance, any probative value is outweighed by dangers of confusion, delay and waste of time. As noted, the government characterizes as a "false invoice" a letter from Mr. Craig to the Minister of Justice dated August 22, 2012. *See* Indictment ¶ 27. It is nothing of the sort – for reasons that would require hours of testimony and dozens of additional documents to explain, because that letter was only a snippet of a broader set of correspondence and conversations about the process for Ukraine to procure

the additional funding. In brief, as noted above, on August 15 Mr. Schoen reported that his client, Mr. Pinchuk, was unwilling to contribute additional funding to the completion of the report. Mr. Craig then spoke with Mr. Manafort, who followed up with an email memorandum, as "sent to [him] by MOJ," describing the "procedure" that the Ministry of Justice had laid out as necessary to comply with "the law of Ukraine 'On State Purchases.'" Ex. 6. The MOJ in its memorandum explained that the procedure it intended to follow "ha[d] been implemented extensively during Euro-2012," referring to the major European soccer tournament that Ukraine and Poland had hosted the previous two months, June-July 2012. *Id.* Similarly, although the government focuses on the fact that one aspect of the paperwork requested by MOJ was a letter dated July 16 that Mr. Craig edited and sent sometime on or after August 23, *see* Indictment ¶ 27.d, again that was a requirement that Mr. Craig was told was required under Ukraine procedures "for administrative purposes." Ex. 7. Throughout this process Mr. Craig was following the directions he had received from his client, the Ukraine MOJ, along with the Ukrainian president's chief of staff, on precisely what documentation that government agency required in order to pay the shortfall. *See also* Ex. 8. His participation in the process dictated by Ukraine was an accommodation to a client, not an effort to deceive a client.

Thus, insofar as the government seeks to rely on this evidence as relevant to Mr. Craig's truthfulness, the jury would also have to be educated about the entire context, including Ukraine's "State Purchases" law; the nature of the procurement procedure that MOJ used; and each of the documents Skadden prepared to comply with MOJ's requests so that it could comply with Ukrainian law. Because the non-existent or *de minimis* probative value of this evidence is outweighed by dangers of confusion, delay and waste of time, it should be excluded under Rule 403.

## III. <u>CONCLUSION</u>

For these reasons, the government should be precluded from presenting evidence related to the circumstances and correspondence surrounding the process for arranging the MOJ's procurement of funding for a portion of Skadden's fees and expenses.

Dated: June 24, 2019                                    Respectfully submitted,

*/s/ William W. Taylor, III*
William W. Taylor, III (D.C. Bar No. 84194)
Ezra B. Marcus (D.C. Bar No. 252685)
ZUCKERMAN SPAEDER LLP
1800 M Street N.W. Suite 1000
Washington, D.C. 20036
Tel: (202) 778-1800
Fax: (202) 822-8106
Email: wtaylor@zuckerman.com
Email: emarcus@zuckerman.com

William J. Murphy (D.C. Bar No. 350371)
Adam B. Abelson (D.C. Bar No. 1011291)
ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
Email: wmurphy@zuckerman.com
Email: aabelson@zuckerman.com

*Attorneys for Defendant Gregory B. Craig*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on June 24, 2019, the foregoing was served on counsel of record via the Court's CM/ECF Service.

*/s/ Ezra B. Marcus*
Ezra B. Marcus