**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*v.*<br><br>**GREGORY B. CRAIG**,<br><br>*Defendant.* | **Case No. 1:19-cr-0125 (ABJ)** |

**OPPOSITION TO GOVERNMENT'S MOTION *IN
LIMINE* TO EXCLUDE CLAIMS OF SELECTIVE PROSECUTION
OR ENFORCEMENT, OR SEEKING JURY NULLIFICATION**

The government has filed a motion *in limine* at ECF 44, "to preclude the defense from eliciting testimony, admitting evidence, or making any arguments regarding selective prosecution or enforcement, or otherwise seeking jury nullification" (the "Jury Nullification Motion"). But the government has never inquired whether Mr. Craig intends to offer such evidence or make such arguments.

Mr. Craig, through counsel, made presentations to more than one government office prior to the return of the Indictment, urging that there should be no prosecution. However, once the Indictment was returned, Mr. Craig did not file a selective prosecution motion, and he does not intend to raise a claim of selective prosecution at trial. Defense counsel are also cognizant of their ethical obligations with respect to urging jury nullification. *See, e.g.*, D.C. Ethics Opinion 320, *Jury Nullification Arguments by Criminal Defense Counsel* (May 2003).

That does not mean that the non-prosecution of other individuals is irrelevant to the issues in this case. On that score, the government likely intends to call Jonathan Hawker of FTI as a witness against Mr. Craig. Mr. Hawker, along with Paul Manafort and his colleague Rick Gates, were the principal architects of an elaborate media plan created on behalf of Ukraine

surrounding the release of the Skadden Report. Aspects of their plan included efforts to publicize the Report through media sources in Western Europe and the United States, and to present the report to political leaders on both sides of the Atlantic. Mr. Craig declined to participate in the FTI media plan; he declined to participate in press conferences about the Report; and he bluntly refused to present the Report to any political leaders in Europe or this country. It is significant that, to date, neither Mr. Hawker nor FTI has filed a registration statement under FARA based on their preparation and implementation of the media plan, even though Mr. Hawker personally contacted David Sanger of the *New York Times* about receiving an advance copy of the Report, provided advance copies of it to other media outlets and opinion leaders in Europe, and coordinated with Messrs. Manafort and Gates on their efforts to "spin" the Report's conclusions to politicians in Europe and the United States in ways that were false.

At the outset of his third interview with the prosecutors and agents handling this matter, on January 23, 2019, Mr. Hawker was specifically advised "that it was the position of the government that both FTI and Hawker would need to retroactively file under [FARA], but no fine would be sought." Exhibit 1 (FD-302, two day interview dated January 23-24, 2019, at 1). The defense is not aware whether the absence of charges filed against FTI and Mr. Hawker was the result of an agreement, express or implied, between the government and these parties – though any information in that regard must be disclosed under *Brady*, *Jencks* and/or *Giglio*.[1]

In any event, whether or not there is some agreement in place between the government and Mr. Hawker, or his former employer FTI, Mr. Craig has every right to explore these issues if

---

[1] *See In re Sealed Case No. 99-3096 (Brady Obligations)*, 185 F.3d 887, 893 (D.C. Cir. 1999) (explaining that the existence of a cooperation or similar agreement between a potential government witness and the government must be disclosed as *Brady* material); *United States v. Cuffie*, 80 F.3d 514, 517 (D.C. Cir. 1996) (even though government witness "was thoroughly impeached at trial," vacating conviction and remanding for a new trial because there was additional impeachment material that had not been disclosed in discovery).

Mr. Hawker testifies. The government's motion *in limine* should not be read to suggest that cross examination about these matters is out of bounds, since they represent classic and permissible grounds for impeachment. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) ("[T]he exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.").

Moreover, with respect to both willfulness and materiality, Mr. Craig may argue that a reasonable practitioner would not have understood his minimal media contacts to require registration under FARA. In that context, the absence of criminal or civil enforcement actions is relevant. The government suggests that because selective prosecution arguments should be barred, the Court should also preclude Mr. Craig from "introducing evidence" related to "[t]he facts, nature, or number of other prosecutions brought under any section of [FARA]." Jury Nullification Motion at 5. Insofar as the government seeks to preclude evidence that is relevant to willfulness and materiality, that request should be denied as well.

For these reasons, the government's Jury Nullification Motion should be denied.

Dated: July 11, 2019                                  Respectfully submitted,


                                                     */s/ William W. Taylor, III*
                                                     William W. Taylor, III (D.C. Bar No. 84194)
                                                     Paula M. Junghans (D.C. Bar No. 474419)
                                                     Ezra B. Marcus (D.C. Bar No. 252685)
                                                     ZUCKERMAN SPAEDER LLP
                                                     1800 M Street N.W. Suite 1000
                                                     Washington, D.C. 20036
                                                     Tel: (202) 778-1800
                                                     Fax: (202) 822-8106
                                                     wtaylor@zuckerman.com
                                                     pjunghans@zuckerman.com
                                                     emarcus@zuckerman.com

                                                     William J. Murphy (D.C. Bar No. 350371)
                                                     Adam B. Abelson (D.C. Bar No. 1011291)

ZUCKERMAN SPAEDER LLP
100 East Pratt Street, Suite 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
wmurphy@zuckerman.com
aabelson@zuckerman.com

*Attorneys for Defendant Gregory B. Craig*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that, on July 11, 2019, the foregoing was served on counsel of record via the Court's CM/ECF Service.

*/s/ Ezra B. Marcus*
Ezra B. Marcus

Exhibit

1

FD-302 (Rev. 5-8-10)



OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

UNCLASSIFIED//FOUO

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    02/11/2019

### FEDERAL GRAND JURY INFORMATION

This document contains information pertaining to a federal grand jury proceeding. The information may not be disseminated within or outside the FBI, except as provided for under Federal Rule of Criminal Procedure 6(e)(3), wherein disclosure may be made to: (1) an attorney for the government for use in performing that attorney's official duties; or (2) any government personnel that an attorney for the government considers necessary to assist in performing that attorney's official duties.


    Jonathan Hawker was interviewed at the United States Attorney's Office for the District of Columbia located at 555 4th St. NW, Washington, D.C. 20530. This interview transpired over a two day period from 1/23/2019 to 1/24/2019. This FD-302 captures both days. Present for the interview were FBI Special Agents Russell Beverly and Daniel Kegl; Assistant U.S. Attorneys (AUSA) Fernando Campoamor-Sanchez and Michael DiLorenzo [Agent Note: DiLorenzo was only present for parts of the interveiw]; and U.S. Department of Justice Attorney Jason McCullough from the Counterintelligence and Export Control Section of the National Security Division. Also present were Hawker's Attorneys Laura Marshall and Kevin Gaunt from Hunton, Andrews, Kurth LLP, located at 2200 Pennsylvania Avenue NW, Washington D.C. 20037.

    Hawker was thanked for his voluntary participation in the interview. At the beginning of the interview Hawker and his attorneys raised concerns about whether he was viewed as a subject or a witness, and Hawker worried that his information would be harmful to his FTI colleagues. AUSA Campoamor-Sanchez and McCullough explained that, based on Hawker's previous statements and careful review of the documents, Hawker was being viewed as a witness. McCullough further explained that it was the position of the government that both FTI and Hawker would need to retroactively file under the Foreign Agents Registration Act (FARA), but no fine would be sought. Hawker inquired what it meant to register and whether this was an admission of guilt that would result in a criminal record. It was explained to him that a FARA registration did not constitute a criminal record and suggested that his lawyers could further explain this to him later, with which his lawyers concurred.

UNCLASSIFIED//FOUO

Investigation on   01/23/2019   at   Washington, District Of Columbia, United States (In Person)

File #   ███████████████████████████                                    Date drafted   01/26/2019

by   Russell Beverly, KEGL DANIEL

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

████████████████████

Continuation of FD-302 of   (U//FOUO) Interview of Jonathan HAWKER   , On   01/23/2019   , Page   2 of 17

   Hawker was provided with Bates stamped exhibits prepared by the United States Attorney's Office for the District of Columbia. The interviewers referenced the exhibits throughout the interview. Copies of the documents are attached hereto as a physical 1A package.

   Hawker provided the following information:

**FTI-587--FTI-589**

   When asked why he had mentioned FARA in his email Hawker explained he  read an article in "PR Week" which mentioned FARA, so he knew it was a thing, but really had little understanding of what it was. In mentioning it he felt he was "asking the question" as he did not know if it was something that mattered in this case and wanted someone to tell him. He added that at this point he really did not even understand the job because he thought it was going to involve litigation Public Relations (PR) and asset recovery, but this was not the case.

**FTI-11623--FTI-11628**

   Hawker explained this was a standard litigation PR proposal. Hawker stated that, at this point, he was not sure who Alex van der Zwaan (VDZ) was. He had not been properly introduced and Hawker was unsure exactly who VDZ worked for, at that point thinking VDZ was connected to the Ukrainian government.

**FTI-504--FTI-508**

   When asked why he had written "Hope so-I need the work!!" Hawker explained there were economic difficulties in Great Britain at the time and work was hard to come by. There had been talk of layoffs at FTI and this seemed to be an attractive opportunity that could keep him and his team employed.

   Regarding the pitch they had done to the Ukrainians, Hawker explained  it had ended up being a pitch to the Ukrainian Prosecutor General (PG) and he was pretty sure Skadden Arps (SA) personnel had not been present. He stated the presentation went well, but the PG made clear they were not going to be paying for their services.

**FTI-3566**

   The pitch meeting, which Hawker described as a "credentials meeting"  more than a strategy meeting, had included FTI, the PG, the

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER   ,On  01/23/2019  , Page  3 of 17

Deputy PG, a woman who worked in communications for the PG, a Chief of Staff who also worked with SA, and an interpreter.

Hawker stated at this point SA was already appointed and were staying at the Fairmont Hotel. He stated that probably VDZ or possibly Matthew Cowie arranged the paragraph in his email regarding payment.

When asked who would have told him about SA's view that FARA registration was not needed, Hawker stated that this would have been VDZ.

When asked how his early perspective on the job evolved Hawker explained it was formed by Matthew Cowie, then VDZ, then by speaking with who he thinks was Rick Gates, though he did not identify himself at the time.

**FTI-579--FTI-580**

Hawker added context to Ed Reilly's mention of SA, and Greg Craig, explaining that FTI worked with SA before and Reilly knew Craig well. There had been some opposition within the firm from taking on the Ukraine work. He stated had FTI not been working with SA, his team likely would not have been allowed to do the job. This email served as a call for people to help out.

Hawker was unsure if he knew about the SA Report (the Report) at this point, just that he was going to be supporting SA.

**FTI-8071--FTI-8072**

Hawker did not think the second trial ever took place. He said the PG's office had shown him a Powerpoint with all the "evidence" against Tymoshenko for this case. FTI's work ended up including efforts to "professionalize" the PG's office.

When asked about Craig's "firm" views mentioned by Cowie, Hawker explained that both teams were staying at the Fairmont Hotel in Kiev. Despite being in the same hotel, SA was on an executive floor that had access to the Fairmont Lounge, which FTI could not normally access. Though Hawker does not drink often, he and his team were always happy to go to this lounge.

In this lounge they met with Craig and other SA employees. It was Hawker's perception that Craig viewed SA as independent from FTI. Craig informed them that SA would not be providing them with things and once SA was done with the Report they would then sit and talk with FTI. Craig

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER ,On 01/23/2019 ,Page 4 of 17

seemed to be creating space between SA and FTI, which Hawker interpreted as an attempt to prevent PR dictating the Report.

## FTI-894

Hawker explained they were meeting up with SA every night in the lounge, largely just to have access to it. He said they did not get much information on the Report though VDZ and Cowie would sometimes drop a few details. He did not recall Craig expressing his view on the case and thought this would have been out of character for Craig.

Hawker did not get a feeling as to the direction of the case from meetings in the lounge, but he did know that VDZ and Cowie would go and do interviews. It was Hawker's belief that at these interviews Cowie did the bulk of the questioning with VDZ functioning as a translator.

## FTI-786--FTI-789

This email resulted from FTI's going to every entity trying to get paid. Hawker explained he did more of the client handling including the PG and Gates, while Jon Aarons did more of the administrative work which is not Hawker's strength.

When asked who the client was, Hawker stated it was the Government of Ukraine and Prosecutor General's Office. That said, directions for the client came from Gates who was directed by Paul Manafort. He reiterated his day to day instructions were handled by Gates.

Regarding their payment, Hawker stated it eventually came from Cyprus. He assumed it was a Gates or Manafort account, not an oligarch's account as was claimed. He stated they got their fee, but not the expenses.

Hawker did not really understand what Craig meant by steering clear of FARA, nor did he dwell on why Craig said a PR team was vital to the project.

Hawker said his FARA conversations were with VDZ, and he once asked Gates about FARA and whether Gates and Manafort were registered. Gates told him that they were not registered as they were not personally doing the work.

## FTI-3744

USA-0008103

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER  , On  01/23/2019  , Page  5 of 17

Hawker explained the Deputy PG, who Hawker described as a "loony," was trying to drag them into this trip and they were trying to avoid it as it was not their gig. FARA was an excuse to avoid it.

## FTI-8042--FTI-8050

Hawker stated he prepared this document and it was consistent with his formatting style. He said they were already expecting some criticisms in the Report which would make it look more legitimate. When asked why this was, Hawker explained he understood the whole point of the Report as purely a PR program, there was no other point.

Where Hawker used the word disclosure, he meant from a media perspective rather than a legal one.

Hawker stated leaking and seeding the Report was always part of the plan, from the very beginning. He explained that "seeding" with a small number of journalists allows their perspectives to emerge earliest in the hope that their reporting informs the discourse of others.

Hawker did not think this plan was shared with SA at this point, the draft media strategy had been drawn up for Gates.

## FTI-8763--FTI-8989

Hawker stated this list was probably part of an early plan and was an aspirational list.

## FTI-9998--FTI-10011

Hawker said this document was primarily for Gates at this point. The part about SA being asked difficult questions about how much it was paid was because the "ridiculous sum" had been raised at some point.

The part about what the Report would conclude was informed by the opinions of the PG's office.

Hawker explained Ukraine was employing a "third-party endorsement strategy" with the Report. For the Report to be valuable as a PR piece, it had to be perceived as independent, and in order to be independent it could not be a "whitewash." It never changed that the strategy would include seeding.

The information pertaining to the U.S. in the plan must have come from Gates as Hawker did not work with any journalists in the U.S.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER    , On  01/23/2019   , Page   6 of 17

Hawker stated SA was also advising the PG's office on the second trial, in addition to doing the Report.

**FTI-8013--FTI-8017**

Hawker stated these draft media plans were going to Gates, who sent them to Manafort, who then gave them to Sergei Lyovochkin.

Hawker thought, at some point, he had gotten a draft Report from Gates who had gotten it from VDZ. He said that VDZ came to be seen as part of Gates's team as well.

Hawker stated this document was a manipulation of something he had written. According to Hawker, Manafort would have made these changes.

When shown this document Hawker could not remember what "AC team" meant. In a later document he figured out that it was Anti-Crisis Team.

Hawker stated the idea for Craig to do outreach came from Hawker. He assumed that Craig knew the Report to be a PR piece and knew he would have to contribute.

When asked who Cox was, Hawker said he did not know, he thought Cox was an American United Nations Rapporteur. The names in this document were not provided by Hawker. He made the framework and Gates's assets were filled in by him.

**FTI-10581--FTI-10628**

Hawker stated Gates had told him Manafort wanted a more comprehensive plan.

The draft assumes Craig "will play." Hawker explained his thought process was "why wouldn't they?" The Report does not achieve its "strategic purpose" if SA writes it, then disappears. Without Craig the Report had no function, to not defend it would look like they were hiding.

Hawker stated the name "Charlie" was a name code and he did not know who this was, it would have been added by Gates.

Hawker stated he had never discussed with Craig his taking the "European tour" they planned for him.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER                    , On  01/23/2019 , Page  7 of 17

Hawker explained he understood the U.S. was added to the plan because, he was told, Hillary Clinton represented a barrier to Ukraine being added to E.U. because of her friendship with Yulia Tymoshenko.

**FTI-7932--FTI-7934**

Hawker recalled he had been told by Gates to speak with Craig about getting the Report. He did not recall if he had the Report at this point.

**SAU-148025**

Hawker recalled this exchange distinctly. He told Gates by phone the draft of the Report he saw was going to play poorly with the media. He then got a call from Konstantin Kilimnik saying the President's office was very angry and concerned about the doubts he had expressed regarding the Report. This indicated the government had been listening in on his phone call. From Hawker's perspective that draft of the document was not what Ukraine had expected.

**FTI-7445**

Hawker clarified this document by stating that Gates was asking who they were leaking to in the E.U., and reminding Hawker that he had the U.S. covered.

**FTI-4966**

When asked why the word infamous was used regarding the Report, Hawker explained it had nothing to do with the actual Report or its content. Instead, he was referring to the fact they had been waiting for it for so long, that everyone was mad and sick of the job, and they hated Gates.

**FTI-10184, FTI-3486--FTI-3488, FTI-5805, FTI-4867-FTI-4868, SAU-6810, FTI-5816-FTI-5817, FTI-2246, FTI-4931**

Hawker explained the purpose of the Harvard Club meeting was purely PR, to go through the plan, to get Craig on board, and make sure he delivered his side of the bargain as the whole plan hinged on Craig participating. They also planned to go over the messaging in this meeting.

Based on the documents, Hawker came to understand his previous statement that they had a pre-meeting at Manafort's Trump Tower apartment

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER  , On  01/23/2019  , Page  8 of 17

along with the Harvard Club meeting could not be correct as the documents
indicated him arriving late the night before the meeting at the Harvard
Club.

After further review of the documents and thinking about the sequence
Hawker started the second day of the interview by explaining he had
conflated two meetings that were similar in nature and personnel. There
had in fact been a meeting at Trump Tower, but it had actually been a few
days after the September 23, 2012 Harvard Club meeting. He stated there
was in fact a pre-meeting, but it was at Manafort's room in the Grand
Hyatt in Kiev on September 18.

At the pre-meeting in Kiev, Hawker, Manafort, VDZ, and Kilimnik were
present, while Gates was absent. This meeting was about the PR strategy in
general. Hawker believed getting Craig on board was discussed because he
was such an integral part of the plan, but it was the U.S. meetings where
Manafort definitely said he would handle getting Craig on board. Hawker
reiterated that without Craig participating, there was no plan. Based on
his comments in FTI-4931, Kilimnik had not come to the U.S. for the actual
Harvard Club meeting.

Hawker then explained at the Harvard Club he and VDZ had arrived first
and had a drink at a tall table, the others then arrived and they had a
meal. As he said before, Craig was in a surprisingly good mood and less
hostile than expected. He recalled Craig also had a meeting room booked.

Hawker said the result of the Harvard Club meeting was Craig was okay
doing "backgrounding" with media, but not politicians. Hawker explained
that in Craig's mind there was a difference between proactively and
reactively engaging with the media. Hawker thought this distinction was
introduced at the Harvard Club.

### FTI-3733--FTI-3734, SAU-29525, FTI-4965

The day after the Harvard Club meeting Hawker and VDZ had a meeting
with the SA in-house PR team.  Hawker explained that at the SA meeting the
SA PR people were fine passing things to him as they did not generally
comment.

As the documents indicate Hawker was reworking the plan, so the meeting
with the SA PR team was mostly a general discussion of the plan while he
reworked the documents. Hawker suspected either he or VDZ may have
jokingly mentioned paying Ukrainian journalists. Hawker said it was normal
for the Ukrainian government to do this, but he had not planned on it.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

███████████████████

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER , On 01/23/2019 , Page 9 of 17

Craig emailed Hawker later that day and said his report from the SA PR team had included a concern about the paid journalists. The two then had a phone call in which Hawker recalled Craig being aggressive.

That same day Craig emailed everyone reversing course from his agreement to participate in the PR aspect of the project. It had been planned that both Craig and VDZ would speak to journalists.

Hawker then said this reversal from Craig's Harvard Club agreement to participate in the PR aspect is what prompted the group to have the meeting at Manafort's Trump Tower apartment shortly after. Hawker was sure Manafort said he would handle getting Craig on board at the Trump Tower meeting.

**FTI-4504--FTI-4505, FTI-8139-FTI-8148**

Hawker felt he was diplomatic in his response to Craig and added he was not intending to misrepresent or get stuff wrong, and he would have expected to just fix any issues.

**FTI-6292--FTI-6294**

Hawker was pretty sure all changes were made. He knew there was a back and forth with Craig on comments and what could be permitted. He remembered Craig was really just being pedantic, but he was okay with that if it kept Craig happy and engaged.

**FTI-6184--FTI-6187**

Hawker stated this chain of emails documented working on comments.

**FTI-4522**

Hawker explained this was them trying to get another third-party endorsement strategy going. They were hoping that Craig could recommend a lawyer for them. It was a backup if Craig did not play along.

Hawker knew Bob Amsterdam, so he reached out to him as a potential person for this role. During this time frame Hawker knew Manafort worked on getting Craig on board.

**FTI-1385--FTI-1395**

Hawker explained Gates claimed to know Al Hunt, but Hawker did not believe Gates did.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER  , On  01/23/2019  , Page  10 of 17

    Hawker said Craig was back on board by this point due to his conversation with Manafort. Hawker felt Manafort was equivalent to Craig in seniority so Manafort dealt with Craig. Hawker was pretty sure he learned from Gates that Manafort had sorted out Craig. Hawker reasoned Manafort must have solved it because Manafort said he would talk to Craig and then Craig was agreeing to have contact with journalists despite his earlier reversal.

## FTI-3739--FTI-3743

    Hawker stated he was in phone contact with Craig. By saying Craig would "speak to the Report" he meant Craig was going to say what he wanted to say, rather than use Hawker's materials, because Craig wanted control.

    Hawker stated Craig was defensive about his work product, while admitting he was defensive about his own. That said, Craig speaking to the Report was a huge boon, even if he did not use the talking points. Hawker again stated SA had to speak to the Report, so it was ok if Craig did not use Hawker's talking points.

## FTI-7384 (and attached un-numbered document)

    Hawker stated MCW meant Mercury/Clark & Weinstock, and VW meant Vin Weber.

    Hawker believed the U.S. arm was added later than the E.U. aspect, but did not know how they had appointed these other firms. He did not discuss MCW or Weber with Gates.

    Hawker knew Glenn Selig ran a social media arm in the U.S.

    Hawker said he was sent the attached un-numbered document to add to the Master Control Grid (MCG).

## FTI-3479--FTI-3483

    Hawker stated this document showed that to accomodate Craig's wishes, Hawker would contact the journalist who would then contact Craig who would be "conveniently available." This is why it said "at request of the U.S. journalist." These publications were provided by someone else.

## FTI-3700--FTI-3702

    Hawker said these were notes from an update meeting. He explained that Kilimnik was engaging with Lyovochkin and that there was concern over the

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER  , On  01/23/2019  , Page  11 of 17

delays, questions of the legal stragegy, and Hawker's earlier PR concerns. With all this Kilimnik was in a meltdown.

SA was not discussed here as that issue had seemingly been resolved.

**FTI-5604**

Hawker did not recall what the mentioned "next steps" were.

**FTI-5883--FTI-5884**

Hawker said FTI did not do social media work, so they had tried to pass it off. He added it to the MCG for Gates.

**FTI-624**

Hawker stated these emails were in regards to him setting up a meeting for the U.S. arm of FTI as Gates and Manafort were possibly looking to hire them for U.S. work. He is unsure whether the meeting ever happened.

**FTI-7357**

Hawker explained the Project Veritas Second Phase campaign was unrelated to any U.S. outreach. It was part of a broader campaign and would have focused on helping identify and seize Yulia Tymoshenko's assets and further vilify her.

**FTI-25738**

This document showed that at this point they still had no idea when the Report was going to be released.

**FTI-4200--FTI-4202**

Hawker wrote to Jack Dunn because Gates claimed to know him, though Hawker doubted this.

When asked why he said Manafort was the real client, Hawker reiterated that Manafort was the conduit to the Ukrainian Government and he, often through Gates, provided all instructions.

**FTI-25783--FTI-25784**

This call pertained to a different client and was unrelated.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

**SAU-29572-SAU-29573/FTI-26136--FTI-26232 (SAU-29572 and FTI-26136 are the same email, the rest are the noted attachments)**

   Where it says "A-Day" by December 13 in the MCG Hawker explained this was a new document. He said he did not do this, it was probably Manafort's people.

   Hawker explained that on the back of Manafort's conversation with Craig, the New York Times emerged over Bloomberg.

   The plan became Hawker calling David Sanger and offering that Craig would be available to talk about his "totally independent report."

   Hawker was happy to do this as Craig had moved from not being willing to contact journalists to doing this as long as his proactive versus reactive structure remained. It was communicated beforehand to Hawker that Sanger would be available. Hawker called this whole setup a "total sham," but he was happy to do it to keep Craig happy.

   In this document AC meant Anti-Crisis team, a sort of rebuttal team.

   Where it says GC/MFA Hawker explained that the Ministry of Foreign Affairs was Alan Friedman's department. He could not say if the contacts happened, but suspected they did. As evidence that it happened he thought VDZ met Kwasniewski.

   When asked why these documents were sent to VDZ's Gmail account rather than his work one, Hawker was unsure, but stated it was "very Gates" to be told to be sent to a different address. He thought it would have been Gates who told him to send the documents to VDZ and to that account.

**FTI-26230**

   Hawker was unsure why he was trying to reach Craig around this time, but the only reason would have been regarding execution of the plan.

**FTI-26321--FTI-26232**

   Hawker stated that he did engage with the people listed on this page. He did not deal with Corriera dela Serra though as they ended up not using them.

   Hawker confirmed that he did have contact with Sanger and the New York Times, though someone had already contacted Sanger based on his response.

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

Continuation of FD-302 of (U//FOUO) Interview of Jonathan HAWKER ,On 01/23/2019 ,Page 13 of 17

**FTI-25187**

Hawker explained Grace Reynolds was a former assistant who became a consultant. This email was just her pulling Sanger's information for him because Hawker did not know him.

It was Hawker's position they reached out to Sanger at Craig's suggestion.

**FTI-24281--FTI-24282**

Hawker stated he would not have offered an interview unless Craig had already agreed to it, stating it would have been "absolute madness" to offer it and then be unable to deliver. In addition to the embarrassment in front of the journalist, Craig would have been irate if Hawker had offered such an interview without his approval.

Hawker added it would have been "fanciful" to suggest he would contact Sangre without Craig's approval. Hawker did not even know Sanger so he would not have contacted him. Hawker was told by Gates that Craig had suggested Sanger.

Hawker believed he had a conversation with Craig where Hawker confirmed he would reach out to Sanger and then turn it over to Craig.

Hawker was embarrassed when Sanger responded that someone had already spoken to him about a month ago. Hawker had not been included in that communication.

Hawker confirmed he must have spoken to Craig in the lead-up to the email as he knew Craig was in Washington to meet. Additionally Hawker believed he and Craig must have had another conversation because otherwise his saying "here's the exchange" makes no sense.

Hawker did not recall expressing to Craig he was upset by being cut out and embarrassing himself to the journalist, but thought that he probably would have done so.

**FTI-24283--FTI-24285**

Hawker stated Craig's claim that he just learned of their intent to release the report was inaccurate. Craig must have known.

Hawker believed the decision for Craig to give Sanger the report himself, in addition to the statements, came out of a discussion where Hawker was mad about his embarrassing exchange with Sanger and Craig

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

UNCLASSIFIED//FOUO

███████████████████████

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER                    , On  01/23/2019 , Page  14 of 17

offered to just do it himself. Otherwise Hawker would have stuck to the plan of him sending the report.

Hawker explained it was totally unnecessary for him to send the introductory email since Craig and Sanger knew each other.

Hawker mentioned the Post contact because Craig had mentioned in a conversation that he knew another journalist at the Washington Post if Sanger fell through. Hawker brought it up because he was under pressure to get the Report seeded before the release.

**FTI-24279--FTI-24280**

Hawker recalled Craig mentioning in a call he and Sanger would have a glass of wine when he went by.

Hawker's concern for the timing was because the journalists have to get approval from editors and he was worried about the time frame, and he was being prompted by Gates.

**SAU-38000--SAU-38004**

Hawker stated none of these contacts came from him. He thought it might have come from the European Center for a Modern Ukraine.

**FTI-26444**

Hawker stated he was just trying to get the government's perspective out there, that he was not aiming for a whitewash. He added that in the inevitable assault on the report just having their perspective out there with some good and bad points was valuable.

Hawker said he thought the criticisms were valid but that they could be addressed.

**FTI-26753**

Hawker stated he had discussed Craig's availability for comment with Tom Parfitt before this email and Craig was aware the contact was coming.

**FTI-25307**

Hawker explained he has no contacts in Italy, but Alan Friedman had a journalist contact there and provided "this Claudio guy." This contact of

UNCLASSIFIED//FOUO

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER  , On  01/23/2019  , Page  15 of 17

Friedman's was why they did not go with Correira dela Serra as was in the earlier document. Hawker added Claudio had poor English and would have written whatever Hawker wanted.

## FTI-26364

Hawker stated this document showed no changes to the Craig aspect. He added that the document did not seem to have many differences at all.

Hawker said he obviously must have spoken to Craig as he knew when Craig would be available.

It was pointed out this was still sent to VDZ's Gmail account, but Hawker did not know why.

## FTI-27120--FTI-27124

Hawker explained there was a perception Craig had went a bit off message and been verbose.

For context Hawker explained Ukraine kept expecting a whitewash and were angry about the criticisms, but later they considered it a success.

Hawker maintained he did not change the meaning of any of the Telegraph quotes Craig provided, but tightened them up a little.

On the whole Hawker felt Craig was more helpful than expected in that he did the calls with journalists. His comments were unstrategic because he did not want instruction from PR, but it was helpful he did the job. Hawker felt Craig had said what he was going to say.

## FTI-28087

Hawker stated at times SA felt it was expedient to overlook that he worked for Ukraine rather than them. He did need them to handle this, but he was trying to slow Danilova down. It would have been disastrous for the Report for it to come out that such a poor country had spent over $4 million dollars on the Report. Both the modus of payment, along with the amount, would have undermined the objective. Hawker suspected he discussed this issue with Gates and Craig. As evidence he pointed to the fees being discussed in the Q&A Talking Points showing worry over the payment.

## Awards Ceremony

Despite their early concern, Hawker said the Ukrainian government came around fairly quickly and considered the Report a huge PR triumph.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of ___(U//FOUO) Interview of Jonathan HAWKER___ , On _01/23/2019_ , Page _16 of 17_

    The PG threw a celebration dinner, which Hawker compared to a medieval feast, honoring Hawker, Craig, and VDZ where they were thanked for their service to Ukraine. Hawker felt it was a real thank you, they were told they had gained traction on the Tymoshenko case that Ukraine had failed to manage.

    Following dinner there was traditional music played, then music with everyone singing, including the PG and Craig. Hawker thought he might have sung the Welsh national anthem.

    Finally Hawker was presented a golden orb with a sort of plaque and a clock inside it. He and Craig were laughing about it when Craig was presented with an award that had two golden orbs and looked even more like "bollocks." The PG said the two equal orbs were supposed to represent the equity of prosecution and defense.  Hawker joked to Craig that he was surprised it was not lopsided and Craig agreed.

    Manafort and Kilimnik did not attend this event as they never went to the PG's office. Hawker said the party was for FTI and SA to celebrate their unified effort to promote Ukraine's view of the Tymoshenko case.

**Post-Engagement**

    In the new year there was supposed to be a turnover for Ukraine 2 with Gates, Manafort, and other consultants. At one of these meetings Hawker raised the issue of their unpaid expenses, but received only promises. They never got their outstanding expenses.

    Later, on one occasion Hawker went to Ukraine with Zev First and Alessandro Benedetti for investigations on Ukraine 2 and did not get paid for that either.

    When asked why he had been held responsible for not collecting the expenses after higher management had approved the work, Hawker explained  when FTI took over Financial Dynamics (FD) profit and loss was his responsibility. He took the blame, and ended up leaving the firm as soon as he could afford to in a negotiated exit. Hawker was unhappy with how he was treated by FTI though. He now works for himself, though the current Brexit troubles have hurt his business.

    Since leaving FTI, Hawker has met Gates a few times. Gates was in London once a quarter and would vaguely promise work at times, but nothing ever came of it. Hawker did a few free PR Newswire releases for Gates.

**UNCLASSIFIED//FOUO**

FD-302a (Rev. 05-08-10)

**UNCLASSIFIED//FOUO**

Continuation of FD-302 of  (U//FOUO) Interview of Jonathan HAWKER  , On  01/23/2019  , Page  17 of 17

    Hawker stated Craig never reached out to Hawker after the FARA Unit inquiries. Hawker has had no contact with Craig that he can recall. He did meet VDZ for lunch a few times.

    When asked if Hawker's actual work had contributed to his departure from FTI, Hawker said no. He said there was no real scrutiny of the work he had done, just the issue of the unrecovered money.

    Hawker was invited by Gates to work on the Trump campaign in Arizona, but declined.

## Additional Statements

    When asked, Hawker stated Craig agreed to do limited PR because of Manafort. He added Craig understood the importance of his participation, he could not see Craig believing in any reason for the Report besides PR.

    Craig never told Hawker his rationale for the odd construct of reactive /proactive contact was because of FARA concerns. Hawker thought it was due to Craig's internal firm politics.

    Hawker felt VDZ giving Gates a draft report would have been done on VDZ's own accord.

    Hawker was unsure if the VDZ meeting with Kwasniewski was cleared with Craig because his doing so as not in the MCG.

**UNCLASSIFIED//FOUO**