## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| **v.** : | **Case No. 1:19-CR-00125 (ABJ)** |
| : | |
| **GREGORY B CRAIG,** : | |
| : | |
| **Defendant.** : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE EVIDENCE RELATED TO PAYMENTS TO SKADDEN

Defendant, Gregory B. Craig, has filed a motion *in limine* to exclude evidence of payments the Government of Ukraine made to the Skadden Arps law firm, which includes evidence that Defendant, at Paul Manafort's request, falsified an invoice to the Government of Ukraine.  (ECF No. 47).  These facts are expressly alleged in the Indictment.  (ECF No. 1 ¶ 27).

The government has charged Defendant with making a series of false and misleading statements to the FARA Unit about his work on behalf of the Government of Ukraine ("Ukraine") and, in particular, false and misleading statements and omissions about his role in executing a media strategy to publicly release the report that Defendant had written that assessed the 2011 trial of Yulia Tymoshenko (the "Report").  In a case in which Defendant intends to argue, among other things, that he defied Manafort and Ukraine's request for him to participate in the media rollout plan, and thus did not lie to the FARA Unit about his work on behalf of Ukraine, the challenged evidence is central to the government's burden.  Even more so, the challenged evidence shows Defendant's coordination with Manafort and Ukraine to hide from the public the true facts as to who was really funding the Report and how much was being paid.  Had Defendant been required

to register under FARA, the resulting disclosure would have exposed Ukraine's cover story about payment for the Report—a cover story Defendant had participated in effecting.  Indictment, ECF *Id*. ¶ 8.[1]  Indeed, the FARA Unit sought information about the third party payor and Defendant refused to provide it on the basis that Defendant was not required to register.  *Id.*  ¶¶ 54, 57.  For the reasons set forth herein, the evidence of payments is intrinsic to the charges at issue in this case.  But even if it constitutes "other acts" evidence under Rule 404(b), Fed. R. Evid., the nature of the funding of the Report and Defendant's desire to conceal it are highly probative of Defendant's motive and intent when making false and misleading statements to the FARA Unit in 2013.  Accordingly, Defendant's Motion *in Limine* to exclude this evidence should be denied.

## I.   Background

The Report prepared by Defendant and his law firm was funded almost entirely by a Ukrainian businessman, Victor Pinchuk, who did not want his role made public. (*Id*. ¶¶ 12, 25-26).  At the same time, Ukraine initially told the public that Defendant and his firm, Skadden, were researching and writing the Report for a mere $12,000.  *Id.* ¶ 13.

From May through August 2012, Skadden and Ukraine faced repeated inquiries about how much Skadden was truly being paid and who was really funding its work on the Report—details that were not publicly known.  Many of these questions appear to have originated from Tymoshenko's legal team, which repeatedly raised questions as to Skadden's mandate.  For example, on or about May 22, 2012, the Skadden team presented Tymoshenko's lawyer with a formal request to interview Tymoshenko.  Tymoshenko's lawyer raised a question as to whether the hiring of Skadden had been a violation of Ukraine's tender laws.  (Ex. 1).  Defendant

---

[1] Registration under FARA would have also required Defendant to disclose the full scope of Skadden's engagement for Ukraine, which would have included disclosure that Skadden had a parallel engagement with Ukraine to assist in the prosecution of Tymoshenko on additional charges. *Id.*

immediately alerted Manafort that the project might be in the papers and that "[o]ur FTI people are working with the Justice Ministry people to prepare a statement." *Id.* Shortly thereafter, on May 26, 2012, Tymoshenko's lawyer emailed Defendant and asked several questions about the circumstances of Skadden's hiring and its mandate, including when the contract was signed and whether Skadden participated in any tender. (Ex. 2).

On June 22, 2012, a representative of the Ukrainian Ministry of Justice publicly announced that Skadden had entered into a contract for 100,000 Ukrainian hryvnas—approximately $12,500—and that the contract had been awarded in accordance with Ukrainian law. (Ex. 3). Defendant forwarded the article to Manafort and separately emailed Manafort and Doug Schoen, Pinchuk's American representative, with a heads-up that Ukrainian officials had been "talking publicly" about the project. Defendant explained that "[n]o one believes that Skadden is doing this job for only HRV 100,000," and Defendant added that "we should think about a way to deal openly with the way it is being financed." (Ex. 4). Also on June 22, 2012, Skadden received multiple emails from Tymoshenko's lawyer, who cited statements made in various articles about Skadden's puzzlingly low fees and asked Defendant whether it was true that Skadden was being paid no more than 95,000 hryvnas. (Exs. 5 - 6).

On or about August 9, 2012, an editorial entitled "Skadden Stink" appeared in the *Kyiv Post*. (Ex. 7). The editorial stated that the public did not know who was really paying Skadden and, accordingly, that "the public may never know of conflicts of interest, or worse things, that may lurk behind [the] arrangement." The editorial called on Skadden to "disclose to the public the details of this suspicious contract and who is footing the bill." This editorial was circulated among the Skadden lawyers who were working on the project and set in motion an internal discussion at Skadden as to how to deal with the negative press. Defendant's co-author of the

Report noted that, "[w]e really need to get them to disclose the funding," and later added that "[t]he issue was about to explode, including in the American press." *Id.*

On August 14, 2012, Manafort emailed Defendant with the subject line "VP or MOJ" [Victor Pinchuk or Ministry of Justice of Ukraine] and asked whether Defendant had reached Pinchuk's American representative, Doug Schoen. (Ex. 8). Defendant responded that he was "still working the Schoen avenue" and asked whether anyone "promised Pinchuk anonymity." *Id*. Manafort responded that he did not know, but "that is what he is saying he wants now." *Id*. In a new email chain the following day, August 15, Manafort asked if there was any news from Schoen. (Ex. 9). Defendant responded that the answer from "Schoen/Pinchuk" was a "firm and unqualified no." *Id*.[2] After discussing the matter with Manafort, Defendant received an email from Manafort that set forth the procedure that Ukraine would use to increase the fees to be paid to Skadden. (Ex. 10). Manafort wrote that Skadden would need to provide a letter—a backdated letter, as described *infra* herein—in which Skadden explained that the engagement required the "involvement of experts of [a] higher level and pay grade" and that the "amount of materials to be researched [was] much higher than expected." *Id.* Then, after describing the procedures that made the process legal under Ukrainian law, the email indicated that the "issue" was to determine the amount "considered to be sufficient to cover travel and lodging of Skadden as noted by [Tymoshenko's lawyer] and other opposition people with whom Skadden has met, and some minimal legal fee." *Id*. The following day, August 16, Manafort contacted Defendant by email and asked whether the "number $1,300,000 [was] good for official submission." (Ex. 11). Defendant proposed $250,000 per month, which was "either $1.25 million or $1.5 million." Id.

---

[2] Defendant asserts that the government has misinterpreted this email. ECF No. 47 at 3, FN 1. The facts and evidence described in this memorandum provide significant proof that the government has correctly interpreted this email.

On August 20, 2012, Skadden generated an actual invoice for the firm's work for Ukraine through July 31, 2012. (Ex. 12). The total billed for Skadden's work was approximately $3.6 million, which left over $500,000 in Skadden's escrow account. (Ex. 15).[3] On the same day, August 20, 2012, Manafort emailed Defendant and asked Defendant to issue an invoice for $1,250,000 "for services rendered" along with a letter backdated to July 18, 2012—the same letter previously requested by Manafort on August 15 in which Skadden would substantiate the need for more money based on the realization that the engagement required "involvement of experts of [a] higher level and pay grade" and that the "amount of materials to be researched [was] much higher than expected." (Ex. 16; *see also* Ex. 10). On August 22, 2012, Defendant issued an invoice addressed to the Ministry of Justice of Ukraine. Despite the fact that the retainer had been applied to fully compensate Skadden for all work through the end of July and a real invoice had been issued by Skadden (Ex. 12), Defendant wrote that "[f]or services rendered during the months of April, May, June, July and August, there is an outstanding balance due of $250,000 per month for a total of $1.25 million." (Ex. 17). On August 23, 2012, at Manafort's direction (Ex. 18), Defendant prepared and signed the backdated letter requested by Manafort, which set forth Skadden's "explanation" for the increase in payments, as requested by Manafort (*See* Exs. 10; 16), that "[d]ue to the complexity of the case," the execution of the engagement would "require specialists of a higher class and greater training than was originally planned when the initial contract was concluded." (Ex. 19).

---

[3] Even by the end of August 2012, Skadden had not exhausted the retainer. Skadden's invoice for services through August 31, 2012, was issued on November 2, 2012, in the amount of $315,321. (Ex. 13). It was not until November 2, 2012, long after the Report was to have been completed, that Defendant emailed other attorneys on the project to communicate that Skadden had exhausted the retainer. (Ex. 14).

When Ukraine released the Report on December 13, 2012, questions arose again about Skadden's fees, and efforts were renewed to increase Ukraine's contract price for Skadden's work. (Exs. 20-21).

On April 23, 2013, Defendant approved the issuance of an invoice for 8,595,523.65 Ukrainian hryvnias ($1,075,381.41) to the Ministry of Justice for services rendered from August 2012 to March 2013.  (Ex. 22)  This amount was not based on a particular "shortfall" that was owed to Skadden, but rather, was based on legal fees for services rendered between August 1, 2012 and March 19, 2013, and expenses dating back to July 1, 2013—more than half of such fees and expenses Defendant understood to have been actually billed (i.e., through genuine Skadden invoices) and already satisfied by the escrow account with the $4.15 million originally paid by Victor Pinchuk.  (Ex. 23).  In fact, after receiving $1,075,381.41 from the Government of Ukraine on June 6, 2013, and settling all outstanding amounts as of July 6, 2013, including time spent in 2013 to obtain payment under the new agreement with Ukraine, Skadden maintained a balance of over $600,000.  (Ex. 24).  The balance of the escrow account was not returned to Ukraine until June 2017.

Defendant's narrative of events—that the additional payment was to address a "shortfall" (ECF No. 47 at 3)—is thus at odds with the weight of the evidence that demonstrates a different purpose for Ukraine's additional payment.  In fact, the evidence shows that Defendant coordinated with Manafort and Ukraine to further a false public narrative about who was paying Skadden and how much it was being paid in order to address mounting questions that were being raised about the integrity of the Report.  These questions threatened to undermine the legitimacy of the Report because the credibility of Skadden's conclusions were tied, in part, to the Report and its authors being perceived as independent.

## II.   <u>Argument</u>

The evidence that Defendant seeks to exclude is alleged in the indictment, and the defense does not contend it is surplusage. It is intrinsic to the false statements and concealment scheme with which Defendant is charged. But even if it constitutes "other acts" evidence under Federal Rule of Evidence 404(b), the nature of the payment for the Report and Defendant's desire to conceal it are highly probative of his motive and intent and should be presented to the jury.

Evidence is "intrinsic" if it demonstrates "acts performed contemporaneously with the charged crime" that "facilitate the commission of the charged crime." *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000). In a conspiracy case—analogous to the scheme offense with which Defendant is charged here—intrinsic evidence can include evidence closely related to the charged conduct and its goals, as described in an indictment. *See United States v. Khanu*, 664 F.Supp.2d 80, 83 (D.D.C. 2009) (in conspiracy, "evidence closely related to the conspiracy alleged in the indictment is admissible as intrinsic evidence"); *United States v. Sitzmann*, 856 F.Supp.2d 55, 59-60 (D.D.C. 2012) (conversations between Defendant and soon-to-be co-conspirators were intrinsic evidence).

Even if evidence is extrinsic, however, if it is relevant, it is still presumed to be admissible under Court's two-part analysis under Rule 404(b). First, the Court examines whether the evidence is "probative of some material issue other than character." *United States v. Clarke*, 24 F.3d 257, 264 (D.C. Cir. 1994). Because the federal rule is one of inclusion, not exclusion, evidence can properly be offered for any purpose other than solely to prove character. *See United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (*en banc*); *United States v. Johnson*, 802 F.2d 1459 (D.C. Cir. 1986). Second, if the Court deems evidence to have met the first part of this analysis, the Court should exclude it only if its probative value is "substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403; *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir.

1978); *Huddleston v. United States*, 485 U.S. 681, 686 (1988); *see also Johnson*, 802 F.2d at 1463-64 ("the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged") (quoting *Day*, 591 F.2d at 878).

### a. <u>The evidence is intrinsic</u>

In this case, evidence of Defendant's involvement in affirmative steps to conceal the funding for the Report is intrinsic to the charges.  In particular, the evidence is "closely related to the charged conduct and its goals." *Khanu*, 664 F.Supp.2d at 83.  The evidence provides the jury with a direct view of the relationship between Defendant and Manafort in the development of the Report and their common understanding of the importance of its public relations value, in particular, who was funding the Report.  In a case in which Defendant intends to argue, among other things, that he defied Manafort and Ukraine's request that he participate in the media rollout plan, such evidence of their course of conduct in preparing the Report and preparing for its rollout is intrinsic to the case.  This motive and intent evidence is inextricable from the charges because it bears directly on at least one of Defendant's principal reasons to convince the FARA officials that he was not required to register as an agent of Ukraine.

Even more so, Defendant, through his actions in creating a false invoice, was assisting Manafort, Ukraine, and Pinchuk in concealing the source and amount of the funding for the Report.  Indeed, Defendant expressly declined to provide the source and amount of funding to the FARA Unit in 2013.  Indictment, ECF No. 1 ¶¶ 54, 57.  The timing of this activity was essentially contemporaneous—within months—with when the FARA Unit began its inquiry into Defendant's possible obligation to register, which included questions about the source and amount of funding for the engagement.  The Court should admit the evidence as intrinsic to the charged conduct.

**b.  In any event, the evidence is relevant and probative of central issues before the jury, and is more probative than unfairly prejudicial.**

Even if the Court determines that the evidence is extrinsic, however, the Court still should admit because the government is offering it for a proper purpose, and its probative value is not substantially outweighed by the danger of unfair prejudice.  In this case, the jury will be asked to determine whether Defendant made a series of false and misleading statements and omissions in his correspondence and during his in-person meeting with the FARA Unit.  Among other things, Defendant stated that he provided a copy of the Report to media outlets "in response to requests from the media" and not as part of Ukraine's media strategy to seed the Report with the *New York Times*.  Indictment, ECF No. 1 ¶ 62.  Defendant also stated that in speaking with the media, he "did not consult with Ukraine, did not inform Ukraine, did not act under instruction from Ukraine and was in no way serving as an agent for Ukraine."  *Id*.

The challenged evidence is probative of the falsity of Defendant's statements to the FARA Unit.  Defendant intends to argue that he was being literally truthful when he told the FARA Unit that he was not acting at the request of Ukraine when he contacted the media regarding the Report in December 2012.  *See*, e.g., MTD Count Two at 1 ("The evidence will show that the letter contains no material false statements or omissions[.]")  This means central issues at trial will be Defendant's motive and intent, in December 2012, when he reached out to the *New York Times* in connection with the release of the Report.  Because the evidence at issue here provides an example of Defendant agreeing to a request from Manafort to carry out Ukraine's request, and to protect the integrity of Skadden's Report, it is probative of Defendant's motive and intent when executing Ukraine's media strategy in December 2012.  Defendant's willingness to engage in the manufacturing of invoices and backdating of paperwork show Defendant's willingness to act in a way that would enhance the value of the Report just as he did when backgrounding the *New York*

*Times* during the rollout of the Report. It is thus highly relevant to the jury's assessment of why Defendant made the statements that he did to the FARA Unit and his motive to lie to the FARA Unit.

In addition, the evidence is highly probative of Defendant's motive and intent when answering questions from the FARA Unit, which is the question before the jury.  As pled in the Indictment, registration would have required Defendant to reveal the details as to who had financed Skadden's work and how much Skadden had been paid.  The evidence related to the false invoice shows that Defendant took steps to aid Ukraine in creating a false narrative to quell public controversy about the financing of Skadden's work.  The evidence shows that Defendant understood the importance of keeping the full amount of the Skadden's fees, and Pinchuk's funding of the Report, a secret, and it shows that Defendant was willing to participate in a process that allowed Ukraine to mislead its public about the amount it paid Skadden for the Report.[4]  It is not a leap for the jury to conclude that Defendant had strong reasons to mislead the FARA Unit so as to prevent it from concluding that he and his firm had an obligation to register.

Furthermore, the probative value of the challenged evidence substantially outweighs any risk of unfair prejudice or the dangers of confusion, delay, and waste of time.  Fed. R. Evid. 403. In a case involving a large amount of documents and issues, a handful of additional emails and Defendant's memoranda establishing the challenged proof will not lead to jury confusion. *See e.g.*, *United States v. Bikundi*, No. 14-CR-030 (BAH), 2015 WL 591481, at *6 (D.D.C. Oct. 7, 2015) (in Medicaid fraud case, "other crimes" evidence consisting of four additional documents would not cause confusion or prejudicial mini-trial).

---

[4] It is also worth noting that had the public known that Skadden had been paid $4 million for its work for Ukraine, Ukraine and Skadden would have faced additional questions about the independence of the Report given the large sum of money paid to Skadden.

Defendant argues that the jury will have to be educated about the entire context of the payments, including the details of Ukraine's "State Purchases" law. The government has not alleged or suggested, nor will it allege or suggest in this trial, that Defendant's coordination with Manafort resulted in a violation of Ukrainian public tender laws. The government intends to present the evidence to show Defendant's willingness to coordinate with Manafort to create a false narrative to help the Government of Ukraine handle the public controversy over how much it was paying Skadden. The conformance of Defendant's actions with Ukraine's "State Purchases" law is not at issue—the fact remains that Defendant did what Manafort asked of him in order to assist Ukraine and protect the purported independence of the Report. Defendant cannot threaten to stage a "mini-trial" on a tertiary issue that does little to alter the probative value of the evidence. Of course, as happens anytime evidence comes in under Rule 404(b), the Court would instruct the jury to consider such proof only for Defendant's motive and intent, and not for any improper purpose.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion *in Limine* to exclude evidence related to payments to Skadden.


Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845


By:  /s/ Fernando Campoamor-Sánchez
FERNANDO CAMPOAMOR-SÁNCHEZ (DC 451210)
MOLLY GASTON (VA 78506)
Assistant United States Attorneys
United States Attorney's Office

555 Fourth Street, N.W.
Washington, D.C.  20530
Telephone: 202-252-7698/202-252-7803
Fernando.Campoamor-Sanchez@usdoj.gov
Molly.Gaston@usdoj.gov


JOHN C. DEMERS
ASSISTANT ATTORNEY GENERAL


By: _/s/ Jason B.A. McCullough_____
JASON B.A. MCCULLOUGH (DC 998006; NY 4544953)
Trial Attorney
Department of Justice
National Security Division
950 Pennsylvania Ave NW
Washington, D.C.  20530
Telephone: 202-616-1051
Jason.McCullough@usdoj.gov

Dated:   July 11, 2019

**<u>Certificate of Service</u>**

I certify that, by virtue of the Court's ECF system, a copy of the foregoing motion has been sent to counsel for the Defendant on July 11, 2019.


<u>/s/ Molly Gaston</u>
Molly Gaston
Assistant United States Attorney