**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. Action No. 19-0125 (ABJ) |
| | ) | |
| GREGORY B. CRAIG, | ) | |
| | ) | |
| Defendant. | ) | |

---

## MEMORANDUM OPINION AND ORDER

On April 11, 2019, a grand jury indicted defendant Gregory Craig for two offenses arising out of statements he made to the National Security Division of the United States Department of Justice in 2013.  Indictment ("Ind.")  [Dkt. # 1].  The statements related to his possible obligation to register under the Foreign Agents Registration Act, 22 U.S.C. §§ 611–621 ("FARA" or "the Act"), in connection with work he performed for the government of Ukraine.  *Id.*  Craig and his law firm were engaged to prepare a report, and the alleged false statements and omissions set forth in the indictment concern the extent of his participation in any public relations effort within the United States associated with the December 2012 release of the report.  Ind. ¶¶ 7–46.  Count One alleges that Craig engaged in a scheme to "knowingly and willfully falsify, conceal, and cover up . . . material facts" in his communications with the Division's Foreign Agents Registration Act Unit ("the FARA Unit" or "the Unit") in violation of 18 U.S.C. § 1001(a)(1), and that he did so to avoid registering as a foreign agent and making the disclosures required under the Act.  Ind. ¶¶ 47–48.  Count Two alleges that he made false statements of material fact in an October 11, 2013 letter furnished to the FARA Unit under the provisions of the Act, and that he omitted material facts necessary to make those statements not misleading in violation of sections 612 and 618 of FARA, 22 U.S.C. §§ 612 and 618(a)(2).  Ind. ¶¶ 66–67.

The indictment sets forth the defendant's alleged "manner and means" of carrying out the scheme to conceal charged in Count One:  (1) withholding information from attorneys within his law firm; (2) drafting false and misleading descriptions of his media contacts to be distributed within the law firm and also provided to the FARA Unit; and (3) omitting material facts "regarding his acts in furtherance of Ukraine's media plan" and his own contacts with reporters in his communications with the FARA Unit.  Ind. ¶ 50.  In a section entitled, "Execution of the Scheme," the indictment sets forth the specific false statements and omissions allegedly made by the defendant to his firm's general counsel and in letters to, and a meeting with, the Unit.  Ind. ¶¶ 51–65.

The defendant has filed two motions to dismiss, one for each count in the indictment.  Def.'s Mot. to Dismiss Count One [Dkt. # 19] ("Def. Count One Mot."); Def.'s Mot. to Dismiss Count Two [Dkt. # 20] ("Def. Count Two Mot.").[1]  This opinion concludes that Count Two must be dismissed, but Count One will proceed to trial.

With respect to Count Two, while the Court can fairly square the plain language of 22 U.S.C. § 618, FARA's false statement provision, with the government's application of that provision to the October 11, 2013 letter the defendant submitted to the Department of Justice FARA Unit "Re: FARA Registration," it finds, after application of the full range of tools of statutory construction, including an analysis of the statute as a whole, that the legislature's clear

---

1       A sealed, unredacted version of Defendant's Motion to Dismiss Count One appears on the docket as well.  [Dkt. # 23].  Defendant filed his motions to dismiss on May 10, 2019.  On May 31, 2019, the government opposed both motions.  *See* Gov't Opp. to Mot. to Dismiss Count One [Dkt. # 32] ("Gov't Opp. to Count One Mot."); Gov't Opp. to Mot. to Dismiss Count Two [Dkt. # 35] ("Gov't Opp. to Count Two Mot.").  And on June 7, 2019, defendant filed his reply briefs.  Reply in Supp. of Mot. to Dismiss Count One [Dkt. # 36] ("Def. Reply for Count One Mot."); Reply in Supp. of Mot. to Dismiss Count Two [Dkt. # 37] ("Def. Reply for Count Two Mot.").  The Court heard oral argument on the motions on July 10, 2019.  *See* Tr. of Proceedings, July 10, 2019 [Dkt. # 83] ("Tr.").

intent cannot be discerned. Given this ambiguity concerning the breadth of the provision and the documents to which it was intended to apply, the rule of lenity requires the dismissal of the count.

With respect to Count One, the question posed in the motion to dismiss is whether the indictment alleges a scheme to conceal something that Craig would have had a legal duty to reveal. The answer is yes:  the Foreign Agents Registration Act creates the duty and puts individuals on notice of their specific disclosure obligations.  The statute applies to anyone acting as a "foreign agent," and that term is statutorily defined to include individuals who are engaged not in just political advocacy, but also, certain public relations activities in the United States in the interests of foreign entities or individuals.  22 U.S.C. § 611(c).  Foreign "agents" are not spies – what they do is legal.  But they are required to register, which simply means they must disclose their activities and who paid for them.  *Id.* § 612(a).  Registration entails the completion of a government form that asks specific questions about the registrant's own public relations activities and any participation of public relations firms, in addition to other information.  *Id.*  Thus, this indictment, which alleges that Craig carried out a scheme to conceal his potential status as a foreign agent, by making a series of false or misleading statements and omissions allegedly obscuring the true timing and full nature of his public relations activities on behalf of Ukraine, states an offense under 18 U.S.C. § 1001(a)(1) that comports with Circuit precedent and the Constitution's due process clause.  FARA places individuals on notice of a duty, arising out of both a federal statute and the government forms used to implement it, to reveal the very information Craig is charged with concealing.

Also, the statute is not the sole source of the duty.  In this case, the government agency charged with implementing FARA initiated an inquiry, and it asked focused questions, probing Craig's role in the public relations effort surrounding the release of a report that Craig and his law

firm prepared for the government of Ukraine.  The legal work – the creation of the report – was not the issue; the FARA Unit asked about statements made to the press about the report.  The questions were posed for the stated purpose of enabling the agency to ascertain whether Craig or the firm was obliged to register as a foreign agent as a result of those activities, and Craig responded to these inquiries for the stated purpose of persuading the FARA Unit that he was not.  Moreover, after the Unit informed Craig of its decision that he and his firm were bound to register, he embarked on an active effort to persuade the agency to change its position.  Thus, this case is not *United States v. Safavian*, 528 F.3d 957 (D.C. Cir. 2008), the appellate decision that forms the foundation of Craig's motion.  Unlike the defendant in that case, Craig is not charged with failing to volunteer information based on some undefined set of obligations.  And he was not answering questions without any guideposts about what was or was not important:  they are in the statute, they are in the registration form, and the FARA Unit laid out what it needed to know.

The indictment alleges that Craig was engaged in ongoing communications with a law enforcement agency for the specific purpose of determining whether he was subject to a clearly defined statutory requirement to disclose public relations activities and identify their sponsor.  Once he chose to answer the Unit's questions about facts directly related to that inquiry and the underlying duty, and then again when he took up the banner of persuading the agency that its decision was wrong, he was obliged to be both truthful *and* complete.  The facts the indictment alleges he omitted were the facts necessary to make the registration determination; the indictment sets forth sufficient facts to allege that they were – contrary to the defendant's argument – the very sort of facts he was being asked about, and they were the facts that a foreign agent would ultimately have to disclose.  Finally, it was the omission of those facts that allegedly made what he *did* say false or misleading, so they are appropriately included in the indictment for that reason alone.  For

these reasons, set forth in more detail below, Count One will not be dismissed as a matter of law for lack of a duty to disclose.

The Court also concludes, based on the D.C. Circuit's decisions in *Bramblett v. United States*, 231 F.2d 489 (D.C. Cir. 1956), and *United States v. Hubbell*, 177 F.3d 11 (D.C. Cir. 1999), that Count One is not barred by the statute of limitations.

## STATUTORY BACKGROUND

The Foreign Agents Registration Act is a disclosure statute. It requires anyone engaged in political or public relations activities in the United States on behalf of a "foreign principal" to register with the Attorney General to disclose the agency relationship. Ind. ¶ 3, citing 22 U.S.C. §§ 611–12. Section 612 of the Act requires any person acting as an "agent of a foreign principal" to file a registration statement, 22 U.S.C. § 612, and "agent of a foreign principal" is defined to mean anyone "who directly or through any other person . . . engages within the United States in political activities for or in the interests of such foreign principal" or "acts within the United States as a public relations counsel . . . for or in the interests of such foreign principal." *Id.* § 611(c)(1)(i), (ii). The Act defines "political activities" to mean

> any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting, or changing the domestic or foreign policies of the United States or with reference to the political or public interests, policies, or relations of a government of a foreign country or a foreign political party.

*Id.* § 611(o). And it defines "public-relations counsel" as

> includ[ing] any person who engages directly or indirectly in informing, advising, or in any way representing a principal in any public relations matter pertaining to political or public interests, policies, or relations of such principal.

*Id.* § 611(g).

The purpose of the Act is to prevent covert influence over U.S. policy by foreign principals. Ind. ¶¶ 3–4, citing 22 U.S.C. §§ 611–12.  Simply put, the statute ensures that the public is informed of the true source or sponsor behind the information being disseminated for its consideration. Agents are required to submit a registration form to the FARA Unit, which is part of the National Security Division within the Department of Justice, and to file regular supplements.  Ind. ¶ 3, citing 22 U.S.C § 612.

## THE INDICTMENT

For purposes of a motion to dismiss, the Court is required to accept the facts alleged in the indictment as true.[2]  The recitation of alleged facts that follows supplies the backdrop for the assessment of defendant's legal challenges of the charges against him, but it should not be read to signal the Court's point of view about the accuracy of the allegations or the defendant's guilt or innocence in this case.  The facts have yet to be proved, and the defendant is presumed to be innocent unless and until the government proves his guilt beyond a reasonable doubt.

In early 2012, the government of Ukraine, a foreign principal under FARA, engaged defendant and his law firm to prepare a report concerning the 2011 trial of former Ukrainian Prime Minister Yulia Tymoshenko.  Ind. ¶¶ 5–7.  Tymoshenko's trial and conviction in Ukraine garnered

---

2    "'In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes.'  *United States v. Sharpe*, 438 F.3d 1257, 1263 (11th Cir. 2006) (emphasis in original). 'Adherence to the language of the indictment is essential because the Fifth Amendment requires that criminal prosecutions be limited to the unique allegations of the indictments returned by the grand jury.'  *United States v. Hitt*, 249 F.3d 1010, 1016 (D.C. Cir. 2001)."  *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009).  Notwithstanding this legal principle, defendant chose to support his pleadings with numerous exhibits, *see* Exs. 1–12 and 21–23 to Def. Count One Mot. [Dkt. ## 19-1–19-15] and Sealed Exs. 13–20 [Dkt. ## 23-1–23-8], and the government responded in kind.  *See* Gov't Exs. 1–7 [Dkt. ## 32-1–32-7].  This decision is based solely on the facts alleged on the face of the indictment, and the factual background section of the opinion refers to documents provided to the Court by the defendant in support of his motion only when those documents were specifically referenced in the indictment.

criticism from Western governments and the media, and the firm was retained to conduct an independent inquiry into whether Tymoshenko had received a fair trial in accordance with Western standards of justice and prepare a report with its findings. Ind. ¶¶ 6–7. The indictment alleges that with the help of an American lobbyist, Ukraine planned to utilize the report as part of a larger strategy to improve its international public image. Ind. ¶ 7.

From the start of the project, Craig was aware of FARA's requirements. Ind. ¶ 8. On or about February 13, 2012, he emailed the co-author of the report, also a partner at the firm, saying, "I don't want to register as a foreign agent under FARA. I think we don't have to with this assignment, yes?" Ind. ¶ 9. According to the indictment, Craig was concerned that registration as an agent of Ukraine could affect efforts by the lawyers involved to obtain government employment in the future. Ind. ¶ 8. Also, registration would have required the firm to disclose that a private Ukrainian citizen had paid more than $4 million for the firm's services on the report, and that the firm had also been hired by Ukraine to assist in a second prosecution of Tymoshenko for other charges. *Id.* The indictment alleges that Craig feared these revelations would undermine the perceived independence of the report. *Id.*

Neither the amount of the fee nor the source of the funding for the report was a matter of public record at that time, and the indictment details Craig's involvement in keeping it secret. In April of 2012, he prepared and signed a formal engagement letter with the Ukrainian Ministry of Justice that falsely stated that the total fee for the work would only amount to approximately $12,000 U.S. dollars and made no mention of the $4 million from the private individual. Ind. ¶ 13.

After completing the formal engagement letter, Craig continued to discuss the registration question with other lawyers in the firm, focusing particularly on Ukraine's interest in public

relations.  On or around April 17, 2012, an associate within the firm relayed advice from a partner

with FARA experience:

> In his view, our work writing a report evaluating the Ukrainian proceedings
> would not trigger FARA obligations.  However, if we were to perform
> public relations work aimed at the US, if our London lawyers were to do so,
> or if we were to subcontract with a PR firm to do so, then we would be
> obligated to register under FARA.

Email of Apr. 17, 2012, Ex. 1 to Def. Count One Mot. [Dkt. # 19-1] at 1; Ind. ¶ 15.  In response to

this advice, the firm attorney who co-authored the report told defendant:

> I think our engagement should not include PR advice. . . . [S]omebody else
> can hire the PR team and manage that.  I say this for two reasons.  First, it
> will create a FARA problem.  Second, I actually think it's much better for
> our representation to be "rule of law" advisers, not "rule of law"-and-PR
> advisers.  Including a PR component as part of our representation has the
> potential to undermine our work.  We're in this representation as lawyers,
> not spin doctors, and I think it's important that we are able to say that.  In
> any event, the FARA issue looks insurmountable.

Email of Apr. 17, 2012 at 1; Ind. ¶ 15.  Defendant responded:  "Good advice."  Email of Apr. 17,

2012 at 1; Ind. ¶ 15.

The indictment goes on to allege that on or around April 30, 2012, defendant gave the

Ukraine's American lobbyist the names of four public relations firms that he thought could handle

media messaging and strategy for the report's release, including a PR firm he had worked with

previously.  Ind. ¶ 17.  Defendant advocated for Ukraine to retain that firm,[3] and Ukraine did with

the help of the American lobbyist.  Ind. ¶ 18.

Defendant also communicated with the American lobbyist about the message to be

communicated at the time of the report's release, discussing concerns that a draft of the report

---

[3]     According to the indictment, on or about May 7, 2012, defendant prepared talking points
stating that the PR firm was the right choice for Ukraine because "they will be with us in the
battle."  Ind. ¶ 18.

might be leaked and the need to ensure that the report would be viewed as independent: "The worst thing that could happen to the project, to this law firm, to your guy and to me would be to have someone on your side falsely leak a story that '[Law Firm] Finds Tymoshenko Guilty' '[Law Firm] Report Exonerates Ukraine.' That kind of story would be a disaster. We have to join arms to get something just a little more nuanced. Yes?" Ind. ¶ 21.

With respect to the funding for the report, the indictment alleges that a bank account in Cyprus controlled by the lobbyist was used to pass the more than $4 million in payments from the private Ukrainian to defendant's law firm – facts the defendant did not disclose publicly. Ind. ¶ 23. When the media began to question the publicly reported $12,000 fee for the report, defendant communicated with others at his firm and worked with the lobbyist to create a backdated letter and false invoice from defendant's firm to the Ukrainian Ministry of Justice for $1,250,000, allegedly so that it would appear that the Ministry, and not the private Ukrainian, had paid for the report. Ind. ¶¶ 24–27.

In late August, the public relations firm's strategy documents for the release of the report were forwarded to defendant. Ind. ¶ 28. The documents included a statement that "[the Law Firm] cannot proactively lead in communications, given their restrictions by FARA registration and disclosure." *Id.* They also included "a spreadsheet titled 'Master Control Grid,' which stated that on the day before the Report's public release, Craig would provide '[m]edia briefings' to select journalists to be later identified." *Id.*

In September of 2012, as defendant and his firm finalized the report, the lobbyist sent defendant a draft PR plan in preparation for the report's release, writing, "I wanted to get this document to you to bring your thinking into the process." Ind. ¶ 30. The draft plan stated that the release would "provide an opportunity for the independent endorsement of the Government

message that the trial of Yulia Tymoshenko (YT) was not politically motivated and that her conviction was based on evidence before the court." *Id.* And it proposed taking several steps before the public release of the report: leaking the report to a media outlet, having a former Congressman at a U.S.-based lobbying firm retained by Ukraine brief a selected journalist, and arranging for Craig to brief the journalist as well. *Id.*

On or around September 23, 2012, defendant met with the lobbyist, a senior executive of the PR firm, and others in New York to discuss the report's release. Ind. ¶¶ 31–32. At the meeting, defendant agreed to provide a copy of the report and a briefing to a selected reporter, and he suggested the name of a particular reporter he knew. Craig also agreed that he and others would "background," or speak off the record to reporters concerning the report's release, Ind. ¶ 31, but he emailed the lobbyist and the PR firm the next day to tell them that providing background to reporters was against firm policy. Ind. ¶ 32.

About a week later, on or around October 2, 2012, defendant contacted a reporter he knew ("Reporter 1") to ask whether the reporter would be willing to discuss the report with a former Congressman who was working on behalf of Ukraine. Ind. ¶ 33. The two did not talk at that time because the release of the report was delayed. *Id.*

Two months later, the report was finalized and scheduled to be released on December 13, 2012. At that point, the manager of the PR firm emailed Reporter 1 to ask if he would be interested in receiving a copy of the report and an exclusive briefing with defendant Craig prior to its official release. Ind. ¶ 37. Defendant also sent an email: "I just learned that the Ukrainians intend to release our report . . . on Thursday . . . and that [they] have determined that you should be given first look at it. . . . [I]f you are interested, I would be happy to get you a copy . . . and even happier to talk to you about it." Ind. ¶ 38. Defendant then spoke with Reporter 1 on or around December

11, 2012, he personally hand-delivered a copy of the report to Reporter 1's home in Washington, D.C., and he reported in an email to the PR firm: "[w]e told [Reporter l] that it was his if he wanted to use it. He agreed to get back to us with an answer tomorrow. Tomorrow is not too late for [another U.S. reporter] or for [another major U.S. newspaper]." Ind. ¶ 39.

On or around December 12, 2012, defendant received an email containing six questions in advance of a scheduled telephone interview with Reporter 2, a Moscow-based colleague of Reporter 1, and he sent an on-the-record quote to Reporter 1 in Washington to use in an article. Ind. ¶ 40. The quote read: "We leave to others the question of whether this prosecution was politically motivated. Our assignment was to look at the evidence in the record and determine whether the trial was fair." *Id.* Later that evening, an article written by Reporter 1 and Reporter 2 was published. *Id.* It included the quote defendant emailed to Reporter 1 and stated that the report would be released the following day. *Id.*

On or about December 12, 2012, defendant also gave an interview to a newspaper reporter from the United Kingdom who had been identified in the media plan prepared by the PR firm. Ind. ¶ 41. Paragraph 42 of the indictment alleges that "[a]s a result of these acts in furtherance of Ukraine's public relations strategy regarding the Report, Craig had an obligation under FARA to register as an agent of Ukraine." Ind. ¶ 42.

On December 13, 2012, the government of Ukraine officially released the report, and defendant's law firm then responded to inquiries from two other media publications. Ind. ¶¶ 43–44. That day, the American lobbyist congratulated Craig with an email with the subject line: "Well Done." Ind. ¶ 45. He wrote, "The pro has emerged again. The initial rollout has been very effective and your backgrounding has been key to it all." *Id.*

Less than a week after these events, the Managing Director of the law firm heard from the FARA Unit.   *See* Ind. ¶ 51.   In a letter dated December 18, 2012, "Re: Possible Obligation to Register Pursuant to the Foreign Agents Registration Act," the Chief of the Unit drew the firm's attention to a newspaper article and wrote:   "[i]t has come to our attention . . . that your firm may be engaged in activities on behalf of the Ministry of Justice of the Government of Ukraine, which may require registration pursuant to the Foreign Agents Registration Act."   Letter of Dec. 18, 2012, Ex. 3 to Def. Count One Mot. [Dkt. # 19-3]; *see* Ind. ¶ 51.   She asked the firm to provide the Unit with several categories of information "[i]n order that we may determine whether your organization is required to register," including "a description of the activities the firm has engaged in or the services it has rendered to the Ministry of Justice of the Government of Ukraine."   Letter of Dec. 18, 2012; *see* Ind. ¶ 51.

It was defendant who answered on behalf of the firm.   Writing on or about February 6, 2013, "to respond to your letter . . . dated December 18, 2012," Craig described the engagement and emphasized that it was an explicit component of the assignment that the firm would not provide any services that would be covered under FARA or would require registration.   Ind. ¶ 53; *see* Letter of Feb. 6, 2013, Ex. 4 to Def. Count One Mot. [Dkt. # 19-4] at 2.   The indictment notes that the letter made no reference to defendant's contacts with U.S. media surrounding the release of the report or his involvement in the PR firm's media plan.   Ind. ¶ 53.

On April 9, 2013, the FARA Unit acknowledged receipt of defendant's February 6 letter and its enclosures "responding to our letter of December 18, 2012, concerning your firm's possible obligation to register pursuant to the Foreign Agents Registration Act."   Letter of Apr. 9, 2013, Ex. 5 to Def. Count One Mot. [Dkt. # 19-5] at 1; *see* Ind. ¶ 54.   Its letter of April 9 advised the defendant: "[w]e have reviewed the materials, and need additional information to determine

whether your firm is obligated to register under the Act."  Letter of Apr. 9, 2013 at 1.  The Unit

posed a number of questions related to any funding the firm received beyond the $12,000 and the

existence and identity of any additional funding sources, and the letter included a series of

questions concerning public relations:

> (1)  To whom, if anyone, did your firm release or distribute the report and when? . . .
>
> (5)  What [had been the law] firm's understanding of what would happen to the report when it was released to the Ukrainian Ministry of Justice?
>
> (6)  Did you or anyone in your firm have any media interviews or comments to the media, public, or government officials about the report and the findings of your firm?

Letter of Apr. 9, 2013 at 2; Ind. ¶ 54.

Throughout April and May 2013, defendant and the co-author of the report prepared a

response to the FARA Unit's questions, with defendant drafting that portion of the response

describing his contacts with the media and the timing and intent of those contacts.  Ind. ¶ 55.

Defendant signed a letter dated June 3, 2013 that responded to the FARA Unit.  Ind. ¶ 56;

Letter of June 3, 2013, Ex. 6 to Def. Count One Mot. [Dkt. # 19-6] at 1 ("The purpose of this letter

is to reply to the questions in your letter of April 9, 2013.").  He answered question 1:

> In addition to giving the report to representatives of the Government of Ukraine, the law firm on December 12–13, 2012 provided a copy of the report (1) to Ms. Tymoshenko's legal team in Ukraine, and to a member of her legal team in the United States . . . (in response to his request); (2) to a representative of the individual in Ukraine who helped fund the project . . . ; (3) to [Reporter 1]; [and the other reporters with whom the firm communicated after the report's public release].

Letter of June 3, 2013 at 2.  He answered question 5 by stating:  "[t]he law firm viewed the

distribution of the report as a matter that would be decided by the Ukraine Government in its sole

discretion.  The law firm did not advise the Ministry on that issue."  Letter of June 3, 2013 at 3.

In response to question 6, he wrote:

> The law firm issued no statements and made no comments to the media, the public or government officials about the report.  Gregory Craig provided brief clarifying statements about the report to [Reporter 1] and [the other reporters with whom the firm communicated after the report's public release].  One purpose of the statements was to correct misinformation that the media had received – and was reporting – from the Ministry of Justice and from the Tymoshenko legal team in Ukraine.  Neither the law firm nor its lawyers sought to influence American public opinion or US government policy.

Letter of June 3, 2013 at 3.  The letter did not identify the private Ukrainian or state how much the firm had been paid for the report.  *See* Letter of June 3, 2013; Ind. ¶ 57.

On or around September 5, 2013, the FARA Unit notified defendant and the firm that it had determined the dissemination of the report required registration.

> Our review of the documentation concludes that [the law firm] was an agent of the Ministry and was engaged in political activities in the United States for the Ministry.  You indicate that your firm was paid by the Ukraine to produce an independent report on the Tymoshenko prosecution, and that the report was disseminated to news media by your firm.  You further state that you spoke with representatives of the media to correct misinformation regarding the report.  The dissemination of the report to the media and your communications with the media were political activities as defined in 22 U.S.C. § 611(o) of FARA.  Furthermore, by engaging in these activities for the Ministry, [the law firm] acted as a public relations counsel, publicity agent, and information-service employee as defined in Section 611 of the Act.  We have determined that your actions in contacting the media were activities meant to influence the U.S. public with reference to the political or public interests, policies or relations of Ukraine.  Accordingly, [the law firm] must register under FARA as an agent of the Ministry.

Letter of Sept. 5, 2013, Ex. 7 to Def. Count One Mot. [Dkt. # 19-7] at 1; *see* Ind. ¶ 58.

On or around September 19, 2013, defendant spoke to the law firm's General Counsel and advanced the position that the firm should resist registering under FARA.  Ind. ¶ 59.  He also sent an email to the General Counsel containing the following statements, which the indictment alleges are false and misleading:

Just for the record:

(1)  [The Law Firm] did not "disseminate the report to the news media." Three media outlets who were not able to obtain a copy of the report from the Ministry in Kiev, contacted us and asked us to provide them with a copy.  The report was a public document.

(2)  At no time did [the Law Firm] "contact the media." Quite to the contrary, we were approached by the media – asked for interviews, asked for background commentary, etc. – and we did not respond.  The only time we responded was to correct misinformation.

(3)  To the best of my recollection, our statements to the press were not about Ukraine.  They were to correct misinformation.  The statements were about our report and us.

*Id.*

The following day, on September 20, 2013, defendant transmitted a draft of a letter responding to the FARA Unit to the General Counsel.  It included statements that:

- When Craig gave the report to Reporter 1 and the two publications with which the law firm had communicated after the report's public release, it was because Ukrainian authorities had already publicly released it "much earlier in that day, but these three outlets - for some reason - had not been able to obtain copies of the report.  They approached the firm, asked us if we could provide them with a copy, and we did so."

- "No one in this law firm initiated any contacts with the media."

- "[M]y contact with [the three journalists] was for the sole purpose of defending my law firm and correcting misinformation."

Ind. ¶ 60.

The letter was not sent.  Ind. ¶ 60.  Instead, defendant and the firm's General Counsel met in person with the FARA Unit Chief and members of the staff on October 9, 2013.  Ind. ¶ 61.  The indictment alleges that in that meeting, Craig made false and misleading statements that were consistent with the statements made to the General Counsel, in particular, "that his media contacts were solely reactive and for the purpose of correcting misinformation."  *Id.*

15

Two days later, at the request of the FARA Unit, defendant put his position in writing.  He

sent a letter "Re: FARA Registration" setting out information "[i]n further consideration of the

issues raised in your letter of September 5, 2013."  Letter of Oct. 10, 2013, Ex. 9 to Def. Count

One Mot. [Dkt. # 19-9] at 1; Ind. ¶ 62.  According to the indictment, the letter reiterated some of

what defendant said at the October 9 meeting, and it included the following statements:

> [T]his law firm provided a copy of the Tymoshenko Report ("the Report")
> to certain U.S. media outlets.  This was done in response to requests from
> the media.  The firm did not provide copies of the Report to any other media
> outlets in the United States.
>
> With respect to statements appearing in [two publications], those statements
> were intended to correct mischaracterizations of the Report, some of which
> were attributable to Ukraine. . . .
>
> In responding to inaccuracies in U.S. news reports – some of which were
> directly attributable to Ukraine – the law firm did not consult with Ukraine,
> did not inform Ukraine, did not act under instruction from Ukraine and was
> in no way serving as an agent for Ukraine.

Letter of Oct. 10, 2013 at 1–2; Ind. ¶ 62.

Thereafter, the FARA Unit informed Craig in a letter dated January 16, 2014 of its revised

conclusion that defendant and his firm did not need to register as agents of Ukraine based on the

information that Craig had provided.  "[Y]ou indicated that your comments to the [three media

outlets] were not political activities, but were meant to correct mischaracterization of the Report

attributable to the Ukrainian Ministry of Justice and Tymoshenko's Ukrainian lawyers . . . ."  Letter

of Jan. 16, 2014, Ex. 10 to Def. Count One Mot. [Dkt. # 19-10] at 1; Ind. ¶ 64.

The indictment posits that "[u]nder FARA, when responding to the FARA Unit's inquiries,

Craig had a duty to provide material information and not to willfully make misleading statements

or omit material facts." Ind. ¶ 52. It alleges that the letters of June 3, 2013 and October 11, 2013[4]

contained statements that were false or misleading, Ind. ¶¶ 56, 62, that the statements made orally

at the October 9, 2013 meeting were false and misleading, Ind. ¶61, and that in his written and oral

communications, the defendant omitted a number of material facts:

- that Craig generated the report, knowing and intending that the Lobbyist and his client, the Government of Ukraine, planned to release it publicly to influence U.S. public opinion and policy, and that such influence was the purpose for which Ukraine commissioned the Report;

- that Craig had recommended and facilitated Ukraine's hiring of the PR Firm;

- that Craig had been informed of the PR Firm's evolving media strategy throughout the fall of 2012;

- that Craig had met with the Lobbyist, a senior executive of the PR Firm, and others on September 23, 2012, in New York City and discussed the PR Firm's plans, and that Craig had suggested that Reporter 1 receive a copy of the Report in connection with the Report's rollout;

- that Craig had, consistent with the media strategy, connected Reporter 1 and the former Congressman in or about October 2012;

- that Craig had, consistent with the media strategy, contacted Reporter 1 on or about December 11, 2012, spoken with him about the Report, and hand-delivered an exclusive advance copy of the Report to Reporter 1's home;

- that Craig also had contact with, and provided an interview to, Reporter 2 on or about December 12, 2012, before the Report's public release;

- that Craig had, in coordination with representatives of Ukraine, communicated with Reporter 1 in an effort to ensure that Reporter 1's newspaper would publish an article before the official release of the Report;

---

4       The letter was dated October 10, 2013, Letter of Oct. 10, 2013, Ex. 9 to Def. Count One Mot., and sent on October 11, 2013. Ind. ¶ 62; *see also* Def. Count One Mot. at 15.

- that Craig had, consistent with the media strategy, provided an interview to the reporter from the U.K. newspaper on or about December 12, 2012, before the Report's public release; and,

- that Craig kept the PR Firm Manager informed of Craig's acts consistent with the media strategy.

Ind. ¶ 63.

The indictment also alleges that defendant repeated certain of these false and misleading statements to the Office of Special Counsel in an October 19, 2017 interview.  Ind. ¶ 65.

## STANDARD OF REVIEW

A criminal defendant may move to dismiss an indictment before trial based on a "defect in the indictment," Fed. R. Crim. P. 12(b)(3)(B), including constitutional challenges.  *See United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated in part on reh'g on other grounds*, 898 F.3d 36 (D.C. Cir. 2018); *United States v. Seuss*, 474 F.2d 385, 387 n.2 (1st Cir. 1973).  "When considering a motion to dismiss an indictment, a court assumes the truth of [the indictment's] factual allegations."  *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015).

## ANALYSIS

I.     **Motion to Dismiss Count One**

A.     **The indictment alleges an offense under 18 U.S.C. § 1001(a)(1).**

Count One incorporates the factual allegations set forth in the first forty-six paragraphs of the indictment and alleges that the defendant engaged in a scheme to knowingly and willfully falsify, conceal, and cover up material facts within the jurisdiction of the Department of Justice FARA Unit for the purpose of avoiding registration as an agent of Ukraine – that is, to avoid making the disclosures that are statutorily required under FARA if one is acting as a foreign agent. Ind. ¶¶ 48–49.   The indictment then alleges in paragraph 50 that the manner and means of executing the scheme included: defendant's withholding of information concerning his contacts

with Reporters 1 and 2 from attorneys within his own law firm; his drafting false and misleading descriptions of his media contacts for distribution within the law firm and to the FARA unit; and his omitting "material facts regarding his acts in furtherance of Ukraine's media plan and [his] contacts with Reporter 1 and Reporter 2 in his communications with the FARA unit."  Ind. ¶ 50. Paragraphs 51 through 64 detail the steps allegedly undertaken in the "execution of the scheme," including:  making material false and misleading statements and omissions in the June 3, 2013 letter to the FARA Unit, Ind. ¶ 56;  providing false and misleading information to the law firm's General Counsel on September 19, 2013, Ind. ¶ 59; incorporating the false and misleading statements in a September 20, 2013 draft of a letter to the FARA Unit responding to its determination that Craig should register, Ind. ¶ 60; making false and misleading statements that were material to the FARA Unit's determination during the October 9, 2013 meeting, Ind. ¶ 61; making false and misleading statements in the October 11, 2013 written submission to the FARA Unit after the meeting, Ind. ¶ 62; and omitting facts material to the FARA Unit's inquiry in these written and oral communications with the Unit.  Ind. ¶ 63.

The false statements statute, 18 U.S.C. § 1001, can be violated in three ways.  Section 1001(a)(1) subjects someone who, in a matter within the jurisdiction of any of the three branches of the U.S. government, knowingly and willfully, "falsifies, conceals, or covers up by any trick, scheme, or device a material fact."  18 U.S.C. § 1001(a)(1).  Subsection (a)(2) prohibits the making of "any materially false, fictitious, or fraudulent statement or representation," and subsection (a)(3)

covers the making or use of "any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."  18 U.S.C. § 1001(a)(2), (3).[5]

The elements of a scheme to conceal facts from an executive agency under subsection (a)(1) are that: "(1) the defendant had a duty to disclose material information, (2) the defendant falsified, concealed, or covered up such a fact by trick, scheme, or fraud, (3) the falsified, concealed, or covered up fact was material, (4) the falsification and/or concealment was knowing and willful, and (5) the material fact was within the jurisdiction of the Executive Branch." *United States v. White Eagle,* 721 F.3d 1108, 1116 (9th Cir. 2013); *see also United States v. Dale*, 782 F. Supp. 615, 626 (D.D.C. 1991), quoting *United States v. Swain*, 757 F.2d 1530, 1533 (5th Cir.), *cert. denied*, 474 U.S. 825 (1985) ("The elements of an offense under the concealment portion of the statute are:  (1) knowingly and willfully; (2) concealing and covering up by trick, scheme, or device; (3) a material fact; (4) in any matter within the jurisdiction of a department or agency of the United States.").

While there is case law that indicates that "[t]he different types of fraudulent conduct proscribed by section 1001 are not separate  offenses . . . rather they describe different means by which the statute is violated," *United States v. Stewart,* 433 F.3d 273, 319 (2d Cir. 2006), the differentiating characteristic of a violation specifically charged under subsection (a)(1) is the scheme.  As the court explained in *United States v. London,* 550 F.2d 206 (5th Cir. 1977), courts

---

5       The previous version of the statute was not broken out into separate subsections: "[w]hoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, will be fined not more than $10,000 or imprisoned not more than five years, or both." *See United States v. St. Michael's Credit Union*, 880 F.2d 579, 588 (1st Cir. 1989), quoting 18 U.S.C. § 1001.

must give full effect to the "trick, scheme, or device" language in that prong of section 1001, and the language "implies the requirement of an affirmative act by which means a material fact is concealed." *Id.* at 213. Thus, the government bears the burden of demonstrating more than a mere passive failure to disclose something; it must show that the defendant "committed affirmative acts constituting a trick, scheme, or device." *Id.; see also Safavian,* 528 F.3d at 965 n.8, citing *United States v. Woodward,* 469 U.S. 105, 108 (1985) and *London,* 550 F.2d at 213 ("[C]oncealment must be accomplished in a particular way:  by a 'trick, scheme, or device.'"). Section (a)(1) prohibits employing a scheme to "falsif[y], conceal[ ], *or* cover[ ] up" material facts, 18 U.S.C. § 1001(a)(1) (emphasis added), and the law is clear that both the making of false statements and the deliberate withholding of material facts in the face of a duty to disclose them can be among the necessary affirmative acts for scheme purposes.  *See United States v. Hubbell,* 177 F.3d at 13 (indictment including acts of falsification and concealment properly charged a scheme offense); *see also London,* 550 F.2d at 213, citing *United States v. Markham,* 537 F.2d 187, 192–93 (5th Cir. 1976);[6] *see also Dale*, 782 F. Supp. at 615 ("[A] person's deliberate failure to disclose to the government material facts, in the face of a duty to disclose such facts, constitutes an 'affirmative act' within the contemplation of the statute."), *aff'd* 991 F.2d. 819 (D.C. Cir. 1993).

Defendant has moved to dismiss Count One based on the fundamental principle recognized in *United States v. Safavian* and other cases that there must be a legal duty to disclose in order for there to be a concealment offense in violation of section 1001(a)(1).  Def. Count One Mot. at 1, citing 528 F.3d at 964.  "Falsity through concealment exists where disclosure of the concealed

---

6       In *Markham,* the Fifth Circuit upheld the sufficiency of a section 1001 indictment that listed a set of separate falsifications by the defendant to conceal the material facts at issue; the scheme included the defendant's causing a patent application to be filed in the names of two individuals who were not the true inventors and his filing a series of misleading statements with the Patent Office.  537 F.2d at 193.

information is required by a statute, government regulation, or form." *United States v. Calhoon,* 97 F.3d 518, 526 (11th Cir. 1996), citing *United States v. Tobon-Builes,* 706 F.2d 1092, 1096 (11th Cir. 1983); *see also White Eagle,* 721 F.3d at 1117 ("[A] conviction under § 1001(a)(1) is proper where a statute or government regulation requires the defendant to disclose specific information to a particular person or entity.").

This requirement arises out of the constitutional prerogative that an individual charged with a crime must have been on notice that his conduct could violate the law.  *Safavian,* 528 F.3d at 964, quoting *United States v. Kanchanalak,* 192 F.3d 1037, 1046 (D.C. Cir. 1999) ("[T]o comply with Fifth Amendment due process, the defendant must have 'fair notice . . . of what conduct is forbidden. . . . [T]his 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal."); *see also United States v. Crop Growers Corp.*, 954 F. Supp. 335, 344–48 (D.D.C. 1997) (holding that absent an unambiguous requirement to disclose, a prosecution for failure to disclose would offend due process considerations).

While defendant is correct that these legal principles apply to a prosecution under section 1001(a)(1), his case can be distinguished from *Safavian*, and neither that decision, nor *Crop Growers,* nor the other authorities set forth in defendant's motion require the dismissal of the indictment in this case.  First, the disclosure obligations underlying the alleged scheme to conceal by defendant arise directly out of the FARA statute and are referenced in the FARA registration form.  And second, once the defendant undertook to respond to, and attempt to influence the outcome of, the FARA Unit's assessment of his potential obligation to register, and again when he chose to attempt to persuade the agency to revisit its determination that registration was required,

he was bound to be truthful and not to misstate or leave out facts material to the determination or necessary to ensure that his statements were not misleading.

Given the primacy of the *Safavian* opinion to defendant's attack on the indictment, it is helpful to include a detailed discussion of that decision here.  In *Safavian,* the defendant was convicted at trial of three counts of violating 18 U.S.C. § 1001(a)(1) and one count of obstructing justice in violation of 18 U.S.C. § 1505.  528 F.3d at 959.  The charges arose out of statements the defendant made on three separate occasions concerning a golf trip to Scotland with lobbyist Jack Abramoff in August of 2002. *Id.* at 959–62.  At that time, Safavian was chief of staff of the General Services Administration, and Abramoff was asking him for information concerning two GSA-controlled properties in which he or his clients might potentially have an interest.  *Id.* at 959.  In July of 2002, in advance of the trip, Safavian requested an ethics opinion from the general counsel of the agency concerning whether he could accept the privately chartered air transportation Abramoff planned to provide.  *Id.* at 960.  In March of 2003, the GSA Office of Inspector General began investigating the trip, and Safavian was interviewed twice by a GSA agent who eventually closed the investigation.  *Id.* at 961.  And a year later, in March of 2004, the Senate Committee on Indian Affairs began investigating Abramoff.  *Id.*  In the course of that broader investigation, the Committee asked Safavian to produce records relating to the 2002 trip, and Safavian responded in writing.  *Id.* at 961–96.

Counts One and Four of the indictment alleged obstruction of justice, and Counts Two, Three, and Five of the indictment charged Safavian with violations of section 1001(a)(1).  528 F.3d at 962–63.  Counts One and Three were based on his interviews with the GSA inspector, Count Two was based on his request for an ethics opinion, and Counts Four and Five were based on his letter to the Senate Committee.  *Id.* at 962.  The jury acquitted the defendant of the charge of

obstructing the Senate inquiry in Count Four. *Id.* Safavian was convicted of the other counts, and

he appealed. *Id.* The portion of the opinion that is relevant to this motion addresses the charges

brought under section 1001(a)(1).

In the false statements counts in *Safavian*, the indictment charged that the defendant had

committed each offense by concealing or misrepresenting more than one category of information,[7]

and the jury was asked to indicate whether it had reached a verdict with respect to each individual

specification. Thus, with respect to Count Two, the violation of section 1001(a)(1) in connection

with seeking a GSA ethics opinion, the verdict form called for the jurors to specify:

> If we have found the defendant GUILTY of COUNT II, it is because we
> have agreed unanimously and beyond a reasonable doubt that the defendant:
>
> A.   concealed his assistance to Mr. Abramoff in GSA-related activities; or
>
> B.   concealed Mr. Abramoff's business relationships with GSA; or
>
> C.   falsely stated to the GSA ethics officer that Mr. Abramoff did all of his
>      work on Capitol Hill, when in truth and in fact, Mr. Safavian well
>      knew, prior to the August 2002 Scotland trip, that Mr. Abramoff was
>      seeking to lease or purchase GSA-controlled property.

---

7       Count Two alleged that Safavian

> did knowingly and willfully falsify, conceal, and cover up by a trick,
> scheme, and device material facts, that is in connection with seeking and
> obtaining a GSA ethics opinion regarding his travel, defendant Safavian
> (A) concealed his assistance to Lobbyist A in GSA-related activities;
> (B) concealed Lobbyist A's business relationships with GSA; and
> (C) falsely stated to the GSA ethics officer that Lobbyist A did not have any
> business with and was not seeking to do business with GSA and that
> Lobbyist A did all his work on Capitol Hill, when in truth and in fact, as
> defendant Safavian well knew, prior to the August 2002 Scotland trip
> Lobbyist A was seeking to lease or purchase GSA-controlled property

in violation of 18 U.S.C. § 1001(a)(1). *United States v. Safavian*, No. 1:05-cr-0370 (D.D.C. 2005),
Indictment [Dkt. # 6] ¶ 29. Count Three alleged that he concealed or misrepresented the same
facts during the investigation being conducted by the GSA-OIG. *See id.* ¶ 31.

*See United States v. Safavian*, No. 1:05-cr-0370 (D.D.C. 2005), Verdict Form [Dkt. # 119] at 2. Similar questions were posed with respect to Count Three. *See* Verdict Form at 3. The jury indicated that for Count Two, it found the defendant guilty of both Specification A – concealing his assistance to Mr. Abramoff in GSA-related activities, and Specification C – the false statement about Abramoff's activities. Verdict Form at 2; *see also* 528 F.3d at 962. For Count Three, it selected only the concealment offense described in Specification A. Verdict Form at 3; *see also* 528 F.3d at 962.

Safavian contended on appeal that his concealment convictions should be overturned because the government had failed to establish the necessary duty to disclose the particular facts and circumstances specified in the counts. 528 F.3d at 964. The D.C. Circuit agreed. *Id.* at 965. With respect to Count Two, which arose out of Savafian's decision to avail himself of the opportunity to seek ethics advice from the appropriate official within his agency, the Court emphasized the value and voluntary nature of communications with ethics committees available throughout the government: "[i]t is not apparent how this voluntary system . . . imposes a duty on those seeking ethical advice to disclose – in the government's words – 'all relevant information' upon pain of prosecution for violating § 1001(a)(1)." *Id.* at 964. Furthermore, the Court found that while the government agreed that there must be a legal duty to disclose underlying a concealment offense in violation of section 1001(a)(1), it "failed to identify a legal duty except by reference to vague standards of conduct for government employees." *Id.* The Court complained that the standards of conduct identified by the prosecution "range from the exceedingly vague . . . to somewhat more descriptive[,]" and that "[o]nly one has anything to do with disclosure." *Id.*

> These strictures are of no more help to the government's argument than the regulation on seeking ethics advice. Their relationship to Safavian's duty under § 1001(a)(1) is tenuous at best. If an employee violates a standard of conduct, he may be subject to disciplinary action. § 2635.106(a). We cannot see how this translates into criminal liability under 18 U.S.C. § 1001(a)(1) whenever someone seeking ethical advice or being interviewed by a GSA investigator omits "relevant information."

*Id.* As the Court put it, "[t]he ethical principles give no indication of the particular facts or information an executive employee must disclose. Nor do they suggest that they have any bearing on conduct during a GSA investigation or a request for an ethics opinion." *Id.* at 965.

The Court was less expansive about the reasoning underlying its decision to dismiss Count Three, which alleged that the same material facts were omitted and misrepresented in the interview with the GSA investigator. *See Safavian* Indictment ¶ 31. It found, as noted above, that the general ethical standards for government employees were unhelpful, and it also rejected the prosecution's argument that the concealment convictions for both Counts Two and Three should be upheld based on a "principle that once one begins speaking when seeking government action or in response to questioning, one must disclose all relevant facts." 528 F.3d at 965; *see id.* ("The government essentially asks us to hold that once an individual starts talking, he cannot stop. We do not think § 1001 demands that individuals choose between saying everything and saying nothing."). For these reasons, the Court of Appeals reversed Safavian's convictions for concealment. *Id.*[8]

Defendant points to paragraph 63 of the indictment, which sets out the list of ten facts Craig allegedly omitted from his oral and written statements to the FARA Unit, and he contends that in the absence of a legal duty to disclose those facts, Count One cannot stand. *See* Def. Count One

---

[8]     Safavian's conviction on Specification C of Count Two, the affirmative false statement made to the ethics official, was reversed on other grounds, and therefore, the Court was not required to rule on whether that specification would have been sufficient alone to sustain the conviction. 528 F.3d at 965–67.

Mot. at 19 ("The legal question, therefore, is whether the failure to disclose these 'material facts' violated § 1001(a)(1)."); *see also* Def. Count One Mot. at 22 ("Mr. Craig had no legal duty to disclose the facts that the government faults him for omitting."); Tr. at 17, 21, 34.

Defendant is correct that in accordance with the decisions in *Safavian* and *Crop Growers,* a defendant must have had a legal duty to disclose something before he can be held criminally liable for its concealment. As *Safavian* stated, "[c]oncealment cases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for disclosure of specific information." 528 F.3d at 964 (collecting cases). Those requirements can be found in statutes, regulations, or government forms. *United States v. Calhoon*, 97 F.3d at 526; *see also United States v. Moore,* 446 F.3d 671, 678 (7th Cir. 2006) (duty to disclose conflicts of interest in connection with government contracts arose in part from the applicable federal regulations and the clear language in the contract documents implementing those regulations); *Kanchanalak,* 192 F.3d at 1046 (duty found in agency's interpretation of its regulations). But those principles do not require the dismissal of the indictment in this case. The fact that the indictment is premised upon a specific statutory regime, with standard disclosure forms, as well as a law enforcement inquiry into a determination that the defendant allegedly took steps to influence, differentiates Count One from the charges arising out of vague ethical standards that troubled the Court in *Safavian*.

Paragraph 49 alleges what the scheme was designed to conceal: "[t]he purpose of the scheme was for Craig to avoid registration as an agent of the Ukraine. Registration would require disclosure of the fact that [a wealthy private individual in Ukraine] had paid Craig and the Law Firm more than $4 million for the Report and the Law Firm's parallel engagement with Ukraine." Ind. ¶ 49. Thus, looking at the indictment in its entirety, and accepting the allegations as true as the Court is required to do at this time, Count One alleges a scheme to conceal something that

Craig would have been statutorily required to disclose under section 612(a) of FARA: that he was an "agent of a foreign principal" – that is, 1) that he engaged within the United States in "political activities," 22 U.S.C. § 611(c)(1)(i), which are statutorily defined to include "any activity . . . that the person intends to, in any way influence . . . any section of the public," *id.* § 611(o); and/or 2) that he acted within the United States "as a public relations counsel, publicity agent, information-service employee, or political consultant." *Id.* § 611(c)(1)(ii). Thus, it is FARA that provides the source of the statutory duty to disclose the particular information that the government goes on to allege in paragraph 63 that he withheld: his alleged involvement in the public relations effort surrounding the report on behalf of his foreign client. Ind. ¶ 63.

Moreover, the FARA registration form contains specific questions about whether the registrant was involved in disseminating information, the manner in which information was disseminated, and the involvement of any public relations firm, in addition to who funded the effort. *See* Section V-Informational Materials, Registration Statement Pursuant to the Foreign Agents Registration Act of 1938, as amended, https://www.justice.gov/file/991281/download.[9] And FARA is a statute that specifically provides for the imposition of criminal sanctions for a failure to register or disclose. *See* 22 U.S.C. § 618(a).

These clear provisions and forms align with circumstances found sufficient in *Moore,* 446 F.3d at 678–79,[10] and differentiate the case from both *Safavian,* 528 F.3d 957, and *White Eagle,* 721 F.3d 1108. *See* Def. Count One Reply at 5. In *White Eagle,* a general federal regulation

---

9       The form was also submitted as Exhibit 21 to defendant's motion to dismiss. Ex. 21 to Def. Count One Mot. [Dkt. # 19-13].

10      As counsel for the defense put it, "*Moore* is easy. The duty of Moore to disclose her relationship with her relative . . . comes right out of the regulations and the contracts themselves." Tr. at 18.

encouraging reporting of wrongdoing was not enough to create the necessary duty to disclose.

721 F.3d at 1117.  The court found that it could not conclude the that defendant's mere silence in

the face of a broad rule could be interpreted as an affirmative misrepresentation:

> [a]lthough the regulation discusses reporting "fraud" and "corruption," . . .
> it does not provide specifics on what kind of information should be reported
> or to whom.  Nor does it discuss criminal liability for failure to abide by its
> provisions. . . . Nothing in § 1001(a)(1) or the regulation indicates that a
> failure to report could effectively be read as a statement that no fraud was
> taking place.

*Id.* at 1118, citing *Safavian,* 528 F.3d at 964.  As another court in this district explained while

summarizing the available precedents:

> "[w]hile the concealment of a fact that no one has a legal duty to disclose
> may not be a violation of [section 1001], such is not the case where a
> regulation or form requires disclosure." *United States v. Perlmutter*,
> 656 F. Supp. 782, 789 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 1430 (2d Cir. 1987).
> A defendant's nondisclosure in such a circumstance is "distinguishable
> from a 'passive failure to disclose' or 'mere silence in the face of an unasked
> question.'" *United States v. Dale*, 782 F. Supp. 615, 627 (D.D.C. 1991).

*United States v. Bowser*, 318 F. Supp. 3d 154, 170 (D.D.C. 2018).

For these reasons, the circumstances surrounding defendant's statements to the government

cannot be compared to the vague, ill-defined situation that prompted the decision in *Safavian.*  In

*Safavian,* the Court was chagrined that the government could only point to broad ethical standards,

and not to any requirement to reveal anything.  528 F.3d at 965.  But FARA presents an entirely

different situation – it is a *disclosure* statute.  It specifically requires people to reveal when they

are engaged in political or public relations activities on behalf of foreign clients.  *See* 22 U.S.C. §

611(c)(1)(i), (ii).  The statute itself, including the definitions section, placed defendant on notice

of his obligations, which were enforceable with criminal sanctions.  *See* 22 U.S.C. §§ 611, 618.

So while Safavian did not have a duty to volunteer that he may have violated ethical precepts, and

the executives of the Crop Growers Corporation – particularly in light of the Fifth Amendment –

did not have a duty to disclose to the Securities and Exchange Commission that they may have violated unrelated campaign finance laws, *see Crop Growers Corp.*, 954 F. Supp. at 346–48, there was a specific statutory source of a duty that would have required Craig to disclose if, as alleged, he engaged in public relations efforts on behalf of Ukraine.[11]

Defendant insists that since the case turns upon his responses to the Unit's inquiries, it is on all fours with that portion of the *Safavian* opinion that dealt with Count Three, the interview with the investigator from the office of the GSA inspector general.  *See* Def. Count One Mot. at 23 ("*Safavian* held in no uncertain terms that an individual has no freestanding obligation to 'disclose all relevant facts' 'in response to questioning' from a government official.").  With respect to that count, the Court of Appeals made two points:  it noted, as discussed above, that the standards the government identified were too vague, and it rejected a government argument it paraphrased as, "once an individual starts talking, he cannot stop."  528 F.3d at 965; *id.* ("We do not think § 1001 demands that individuals choose between saying everything and saying nothing.").  But that is not the government's theory here.  The prosecution is not premising criminal liability on the mere fact that Craig engaged in some conversation with the Unit and for that reason alone, he was obligated to keep going.  In contrast to *Safavian*, the prosecution's theory is that defendant's duty to provide

---

11      The defendant submits that he had no duty under FARA section 612 because it only applies to "registrants," and he was not a registrant.  Tr. at 50.  This is not quite accurate; the duty to disclose the information detailed in section 612 is imposed on anyone who acts as an "agent of a foreign principal."  22 U.S.C. § 612(a).  More important, "registration" *is* disclosure, so all defendant is saying is:  I didn't have a duty to disclose because I didn't have a duty to disclose.  And that circular reasoning begs the question.  The legal question posed by this motion is whether there is a source in a statute, regulation, or form for the duty to disclose allegedly violated here that places individuals on notice of their obligations, and that legal question has been answered.  The question of *whether* Craig violated that duty is the question for the jury.  And the Court does not have to decide whether Craig was required to register because the indictment is based on Craig's alleged concealment of facts that were material to the agency's attempt to figure that out, not the absence of a FARA registration statement.

full answers to the questions was a duty arising out of the specific statutory disclosure requirements that formed the sole predicate for both the written and the oral communications.  Tr. at 40–43.

When one reviews the particular omissions alleged in paragraph 63 to be among the acts undertaken in execution of the scheme, they all relate to alleged participation in the public relations effort preceding and surrounding the release of the report and thus, they flow directly from the disclosure obligations in FARA.  The indictment alleges that from the start of the representation, Craig was specifically aware of the connection between public relations and the potential need to register, that he explicitly addressed the issue in the engagement letter, and that he sought, received, and approved advice on FARA obligations from other lawyers in the firm.  Ind. ¶¶ 13–15.  Therefore, the situation can be distinguished from Safavian's need to navigate uncharted waters.

Furthermore, the government correctly argues here that Craig's deliberate engagement with the FARA Unit as it wrestled with the FARA determination was an additional source of a duty, and that conclusion does not contravene the *Safavian* opinion.  Gov't Opp. to Count One Mot. at 18.  The FARA Unit informed the law firm and Craig in two different letters that it was engaged in a specific inquiry concerning the firm's and Craig's potential obligations to register under the statute.  *See* Ind. ¶¶ 51, 54; Letter of Dec. 18, 2012; Letter of Apr. 9, 2013 at 1.  Craig responded to each of those letters.  Ind. ¶¶ 53, 56.  In September 2013, the agency informed Craig "that *it had determined* that the Law Firm had acted as Ukraine's agent through the dissemination of the Report and communication with the media, and that the Law Firm would thus need to register under FARA."  Ind. ¶ 58 (emphasis added).  Craig then sat down with the FARA Unit in person and submitted another letter, setting forth facts to support his contention that the firm "was in no way serving as an agent for Ukraine."  Ind. ¶¶ 61–62.  Thus, all of the alleged communications with the

agency, written and oral, were for the express purpose of influencing the agency's determination concerning the applicability of statutory disclosure obligations.  Defendant has pointed to no case that suggests that telling half-truths would be acceptable in that situation.  Indeed, the applicable precedent specifically differentiate a passive failure to volunteer information from making misleading omissions in an interview in the context of an underlying legal duty to disclose.

In *United States v. Moore*, 446 F.3d at 671, cited with approval in *Safavian*, 328 F.3d at 964, the court found that the duty to disclose conflicts of interest arose not only from the applicable regulations incorporated in the government contracts the defendant had signed, but also in the course of her communications with city officials who were investigating the conflicts of interest problem.

> The evidence before the jury easily permitted it to conclude that Moore, who signed this contact to obtain HUD block grant funds, knew what the standards were and deliberately avoided disclosing the conflict to the City even when she was asked directly about it. Indeed, even if she did not, . . . the repeated inquiries from City officials about conflicts of interest repeatedly triggered a duty to disclose.  Once the City explicitly asked for information, the failure to respond honestly is something far greater than a failure to volunteer information.

466 F.3d at 678.  "Even if she had the right to remain silent, she did not have the right affirmatively to mislead City officials or to lie . . . ."  *Id.* at 679.

In footnote 7 of the *Safavian* opinion, the Court made a point of distinguishing the *Moore* case because Moore's duty to disclose arose from requirements in federal statutes, regulations, or government forms.   528 F.3d at 965 n.7.   It also distinguished *United States v. Cisneros*, 26 F. Supp. 2d 24 (D.D.C. 1998), because the questions posed by the government agent in that case were "rooted in a government form that the defendant had filled out."  *Id*.  Craig insists that he is more similar to Safavian because he had no statutory duty to respond to the Unit's inquiries at all, much less, to provide the omitted information.  *See* Def. Count One Mot. at 24 (emphasizing

that DOJ "requested" the information but there was no obligation to supply it, and pointing to the agency's lack of authority to issue Civil Investigative Demands ("CIDs")).  But the absence of CID authority relates to the scope of the Unit's power to *investigate* a failure to disclose; it does not define the duty to disclose.  Defendant Craig is blurring the critical distinction between the underlying statutory duty to disclose certain facts and a hypothetical duty, not alleged to have been violated here, to volunteer information to an unsuspecting agency or to respond to polite requests for information instead of remaining silent as he had the right to do.  Thus, this case more closely resembles *Moore* and *Cisneros* than *Safavian*, and footnote 7 supplies grounds to conclude that the D.C. Circuit would rule differently in this situation.

Also, in *United States v. Stewart,* 433 F.3d 273, 318 (2d Cir. 2006), cited in *White Eagle*, 721 F.3d at 1117, the court found the evidence sufficient to convict a defendant on a concealment theory because an SEC investigator's specific questions regarding another individual's stock trades created a duty to disclose information about those trades.  *Id.; see also* 433 F.3d at 318 ("The 'essential issue' is whether [d]efendant knowingly and willingly falsified, concealed, or covered up information relevant to the investigation . . . . Defendant's legal duty to be truthful under section 1001 included a duty to disclose the information he had regarding the circumstances . . . even

though he voluntarily agreed to meet with investigators."), quoting *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990).[12]

The defense protested at the hearing that the ten alleged omissions should not be held against Craig; he had no way of knowing he was obligated to talk about the particular facts listed in paragraph 63 of the indictment. *See* Ind. ¶ 63;[13] Tr. at 18 ("You can't prosecute somebody for not saying something they're not asked."); Tr. at 51 ("[N]one of the questions asked would have

---

12      The defendant does not actually dispute that an individual would have a legal obligation to be not only truthful, but complete when asked specific questions.   He simply argues – unpersuasively – that the indictment does not allege those circumstances, and it simply alleges a failure to volunteer information. *See* Tr. at 16–17.

> MR. TAYLOR:   I think what they said was that when you are being interviewed by – when you are – let's put it this way:   When you are speaking to a government agent – so the context is in 1001, you're speaking to someone within the context of 1001 – and you are alleged to have failed to say things in that conversation, things which you were not asked to say, but which you were supposed to guess at because they were later determined to be material or relevant or interesting.   You're supposed – you cannot be prosecuted for not saying those things, unless there is a specific duty to say specific things.
>
> THE COURT:   But if you are specifically told:   We want to talk to you about X, and these are the particular facts that are important to us, are you then on notice that you have to be truthful and –
>
> MR. TAYLOR:   That would be a different case from this one.

*Id.*

13      That is:   that defendant wrote the report knowing that its purpose was for the American lobbyist and the government of Ukraine to use it to influence U.S. public opinion and policy; that Craig had recommended and facilitated Ukraine's hiring of the PR firm, been informed of its media plan, met with the lobbyist and an executive of the PR firm about the plan, and suggested that Reporter 1 receive a copy of the report with the report's release; that he had connected Reporter 1 and the former Congressman, spoke with Reporter 1 on December 11, 2012 about the report, hand-delivered an exclusive advance copy of it to Reporter 1's home, gave an interview to Reporter 2 before the report was released to the public; that he had provided an interview to a reporter from a U.K. newspaper before the report's release; and that he had kept the PR firm apprised of his efforts consistent with the media plan.   Ind. ¶ 63.

required the disclosure of . . . what is alleged to be not disclosed in Paragraph 63.").  But this argument falls flat in light of the specific focus of the government's inquiry.  Counsel for the defendant agreed at the hearing that the agency's letters gave rise to a duty to be truthful in any response, Tr. at 52, and the December 18, 2012 and April 9, 2013 letters from the FARA Unit put the defendant on notice of exactly what was of interest to the questioners.

> [P]lease provide this office with (1) a complete statement of the ownership and control of the firm, (2) a description of the nature of the firm's regular business and/or activity, (3) a description of the activities the firm has engaged in or the services it has rendered to the Ministry of Justice of the Government of Ukraine or any other foreign entity and (4) a copy of the existing or proposed written agreement, if any, or a full description of the terms and conditions of each existing or proposed oral agreement, if any, the firm may have with the Ministry of Justice of the Government of Ukraine or any other foreign entity .

Letter of Dec. 18, 2012 at 1.

> (1)  To whom, if anyone, did your firm release or distribute the report and when? . . .
>
> (5)  What [had been the law] firm's understanding of what would happen to the report when it was released to the Ukrainian Ministry of Justice?
>
> (6)  Did you or anyone in your firm have any media interviews or comments to the media, public, or government officials about the report and the findings of your firm?

Letter of Apr. 9, 2013 at 2; *see also* Ind. ¶ 54.

The subsequent September 5, 2013 letter from the agency, in which it announced its determination, specifically predicated the determination on defendant's dissemination of the report to, and communications with, the media.  Ind. ¶ 58; *see* Letter of Sept. 5, 2013.  Defendant then briefed the Unit Chief in person and followed up with a written submission, supplying facts about that issue in an effort to refute the agency's finding.  Ind. ¶¶ 61–62.  The defendant was not groping in the dark; the indictment alleges that each of the facts enumerated in paragraph 63 that the defendant knowingly omitted bears directly on the only issue that was on the table.

Moreover, the facts in paragraph 63 were properly included in this indictment for another reason: they are the very facts that allegedly render the statements in paragraphs 56 and 62 to be false or misleading. *See* Tr. at 96 ("[GOVERNMENT COUNSEL]: . . . [T]he substantive count, which appears in Paragraph 48, alleges between June 3rd, 2013, and January 16, 2014, a scheme to make false statements and conceal material information. And incorporates by reference the false statements that the defendant made in Paragraph 56, the false statements that the defendant made in . . . Paragraph 61, the false statements in Paragraph 62, and the material omissions in Paragraph 63."). Defendant seems to acknowledge this. *See* Def. Count One Mot. at 12–13 (stating the "omitted 'material facts' in Paragraph 63 explain what the Indictment alleges is misleading" about the alleged false or misleading statements). Notwithstanding defendant's attempts to characterize the indictment as one charging nothing more than concealment, the indictment tracks the statutory language and alleges that defendant did "falsify, conceal *and* cover up." Ind. ¶ 48. The alleged "manner and means" of the scheme to conceal include both false statements and omissions, *see* Ind. ¶ 50, and the alleged false or misleading statements are as much a part of the execution of the alleged scheme as the omissions itemized in paragraph 63. Ind. ¶ 56 (alleging false statements in the June 3, 2013 letter to the FARA Unit); Ind. ¶ 62 (alleging false statements in the October 11, 2013 letter); *see also* Gov't Opp. to Count One Mot. at 3 ("Significantly, defendant's motion completely fails to acknowledge that the scheme with which he is charged involved not only concealment, but also affirmative false statements.").

Here, the government's inclusion of alleged omissions in the set of acts alleged to have been committed in execution of the scheme do not present a risk of the harm the rule applied in *Safavian* was meant to prevent. As in *Bowser*, 318 F. Supp. 3d at 170, and *Dale*, 782 F. Supp. at 626, there is no "passive" failure to disclose because the omission allegations are part and parcel

of the false statement allegations.  And there is no concern about "silence in the face of an unasked question," *Bowser,* 318 F. Supp. 3d at 170, quoting *Dale*, 782 F. Supp. at 627, because the issues were raised in the written inquiries from the agency.  And notwithstanding defendant's contention that "[t]here is no duty 'under FARA' to volunteer all potentially relevant information in response to questions from the FARA unit," Def. Count One Mot. at 20, this case, unlike Count Two in the *Safavian* case, is not based on a failure to "volunteer" anything.

For all of these reasons, the Court concludes that the allegations set forth in the indictment are sufficient to allege that defendant knowingly and willfully falsified, concealed, or covered up information he had a duty to disclose in violation of 18 U.S.C. § 1001(a)(1).[14]  The Court underscores that the burden remains with the government to prove this allegation beyond a reasonable doubt.

While this was not one of the grounds identified for the motion to dismiss, defendant argues in a footnote at the end of his pleading that the indictment does not state a scheme offense.  Def. Count One Mot. at 27 n.17, citing *London*, 550 F.2d at 214, *Woodward*, 469 U.S. at108 n.5 (which quotes the statement in *London* that section 1001 requires an "affirmative act"), and *Safavian,* 528 F.3d at 967 n.12.  The Court will therefore address this contention as well, and it finds that the allegations in the indictment suffice to set forth the affirmative conduct required to allege a "scheme" under section 1001(a)(1).

---

14    Defendant also moved to dismiss Count One on the basis that the grand jury was "erroneously instructed about [a] nonexistent legal duty" to disclose information to the FARA Unit.  Def. Count One Mot. at 1, 25–27, citing Fed. R. Crim. P. 12(b)(3)(A)(v).  Because the Court finds that Craig did have a legal duty to disclose, it need not go behind the face of the indictment to reach defendant's claim of legal error before the grand jury.

The primary thrust of defendant's motion is that since there was no duty to provide the information that was allegedly omitted, those allegations must be excised from the indictment. *See* Def. Count One Reply at 10–12. At that point, he submits, the indictment would not allege the scheme needed for a violation of section 1001(a)(1) – as opposed to (a)(2) – because a scheme cannot be predicated on false statements. *Id.* He points to a footnote in the *Safavian* decision for that proposition. Def. Count One Mot. at 27 n.17, citing 528 F.3d at 967 n.12; *see also* Tr. at 37–38. But he also asserts that the unedited indictment is just a collection of isolated statements and omissions that do not add up to a scheme. Def. Count One Mot. at 27 n.17.

Since the Court has found that the duty exists, paragraph 63 will remain in the indictment. But the Court notes that the *Safavian* footnote says only – in dicta – that Safavian was correct when he argued that "*a false statement alone* cannot constitute a . . . scheme." 528 F.3d at 967 n.12, citing *Woodward,* 469 U.S. at 108 n.4 (emphasis added). And in the cited footnote in *Woodward,* the Supreme Court simply observed that in that case, the government did not have to prove a scheme at all because Woodward was only charged with making a false statement. 469 U.S. at 108 n.4 ("This type of affirmative misrepresentation is proscribed . . . even if not accompanied by a . . . scheme.").

In *London,* the Fifth Court did not indicate that a *series* of alleged false or misleading statements – with or without omissions – could not state an offense; indeed, it specifically highlighted its previous opinion in *Markham* where those circumstances were deemed to be sufficient. *London*, 550 F.2d at 213, discussing *Markham*, 537 F.2d at 192–93. Moreover, the *London* court's particular concern was avoiding the prospect of a 1001(a)(1) prosecution based solely on an "exculpatory no," when a similar prosecution would have been barred in that circuit under subsection (a)(2). *Id.* at 213–13.

The upshot of all of these cases is that a scheme offense must be based on *active* falsification or concealment, and not merely passivity or silence.  This conclusion is consistent with *United States v. St. Michael's Credit Union*, 880 F.2d 579, 589–90 (1st Cir. 1989), which was also cited in *Safavian* footnote 12, 528 F.3d at 967 n.12, and by the defense at the hearing.  Tr. at 10.  The case involved a financial institution's failure to file currency transaction reports.  880 F.2d at 581.  The court agreed with the defense that for the section 1001 count, the trial court should have instructed the jury that the government was required to establish some affirmative act of concealment beyond the mere failure to file the reports, and it rejected the notion that the fact that a bank had "passively failed to file" the reports could support a conviction "[a]bsent other acts that might form part of a scheme to affirmatively conceal facts from a federal agency."  *Id.* at 589–91.

Craig is correct when he points out that the First Circuit rejected the government's attempt to uphold the conviction by arguing the individual defendants' misrepresentations could provide the necessary evidence of a "scheme."  The *St. Michael's* court did conclude that "misrepresentations alone" would not be sufficient to constitute a scheme to conceal because section 1001 criminalizes falsification or concealment through a trick or scheme "*or*" the making of a false or misleading statement.  880 F.2d at 590 (emphasis added) ("Section 1001 is written in the disjunctive; the offenses are separated by the word 'or.'").  But the decision is not binding on this Court.

More important, the question is not presented in this case. The indictment is not based on a mere failure to file a registration statement or a mere false statement in a letter. And it is not based on an "isolated" omission.  It alleges a set of related false statements, omissions, and actions, all with the same objective.  Moreover, the indictment alleges, among other things, that after the Unit announced its determination that Craig would have to disclose his activities on behalf of a

foreign principal, Craig did not merely passively fail to comply.  He allegedly encouraged his law firm to resist and took steps to advance the effort.  Ind. ¶¶ 59–62.  He drafted proposed submissions to submit to the government to persuade it to change its position, and he attended a meeting in an effort to do so in person, at which and after which it is alleged that he misstated the facts and declined to mention material information.  Ind. ¶¶ 60–62.

As in *United States v. Hubbell* then, "the indictment sets forth the acts of falsification and concealment; the nature of the scheme by which these material facts were falsified and concealed; and the material facts that [the defendant] concealed." 177 F.3d at 13.  Therefore, the Court does not need to speculate about whether a narrower indictment would have survived a motion to dismiss, and it concludes that the indictment as written is sufficient to allege a scheme.

### B.      Count One is not barred by the statute of limitations.

Defendant also moves to dismiss Count One on statute of limitations grounds.  Def. Count One Mot. at 27–34.  Because the indictment charges defendant with a single "scheme," rather than individual false statements, and the scheme ended within the limitations period, the Court finds that Count One is timely.

It is well-established that "[s]tatutes of limitations normally begin to run when the crime is complete." *Toussie v. United States*, 397 U.S. 112, 115 (1970), quoting *Pendergast v. United States*, 317 U.S. 412, 418 (1943).  This typically means that the statute of limitations begins to run "as soon as each element of the crime has occurred." *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987).

In this case the applicable statute of limitations is five years. *See* 18 U.S.C. § 3282(a).  The indictment was returned by a grand jury on April 11, 2019. *See* Ind.  Thus, any criminal conduct prior to April 11, 2014 would typically be time-barred.  But here, defendant entered into a series of tolling agreements with the government to exclude 190 days from the statute of limitations

calculation.  Def. Count One Mot. at 28 n.18.  Therefore, the operative date for the statute of limitations is October 3, 2013, and the government could prosecute an offense that took place after that date.  *Id.* at 28 n.18.

The parties' dispute centers on when the offense was "complete," and thus when the statute of limitations began to run.  Defendant argues that the offense was "complete" prior to October 3, 2013, so "Count One must be dismissed to the extent it relies on statements made or other alleged conduct occurring before that date."  Def. Count One Mot. at 28–31.  The government contends that the crime was not "complete" until October 11, 2013, at the earliest, when defendant committed the last act in furtherance of the charged scheme, and thus Count One is timely.  Gov't Opp. to Count One Mot. at 27–31.

This case is squarely governed by the D.C. Circuit's opinion in *Bramblett v. United States*, 231 F.2d 489 (D.C. Cir. 1956).  In that case, a U.S. Congressman was convicted of engaging in a scheme to conceal material facts under 18 U.S.C. § 1001 by falsely representing to the Disbursing Office of the House of Representatives that he had hired a clerk, in order to draw an extra pay check.  *Id.* at 490.  The defendant argued that the prosecution was time-barred because the crime was "complete" when he filed the initial false designation form to the Disbursing Office, an act that fell outside of the statute of limitations period.  *Id.* at 490–91.  The Court of Appeals rejected that position, noting that the indictment alleged that the defendant repeated the false statement each time he subsequently drew the fake clerk's paycheck, and those subsequent acts in furtherance of his "scheme" squarely fell within the limitations period.  *Id.* at 491.  Central to the Court's holding was its finding that "the indictment [did] not merely charge the making of a false statement," but rather a "continuing crime of falsification by a scheme."  *Id*.  Based on that key distinction, the Court rejected the defendant's argument that the crime was complete when he

originally submitted the false form, and instead held that "the period of limitations did not begin to run until the scheme ended." *Id*.

Similarly, here, as the defendant himself emphasizes, the indictment plainly charges defendant with a single "scheme" under section 1001(a)(1), rather than individual false statements under (a)(2), *see* Def. Reply for Count One Mot. at 2 ("There is no question that this indictment charges a concealment scheme under 18 U.S.C. § 1001(a)(1) and not willful false statements under subsection (a)(2).") (emphasis omitted),[15] and that scheme ended within the limitations period. According to the indictment, the alleged scheme lasted from "June 3, 2013, to on or about January 16, 2014," when the FARA unit reversed its decision requiring defendant to register in reliance of the defendant's representations. Ind. ¶¶ 48–49, 64. More important, the indictment accuses defendant of committing the last two acts in furtherance of the scheme within the limitations period. *Id*. ¶¶ 61–62. Specifically, defendant is charged with making false and misleading statements during the October 9, 2013 meeting with the FARA unit, and in his October 11, 2013 letter to FARA. *Id*. Accordingly, the Court finds that the limitations period did not begin to run on the charged scheme until October 11, 2013, at the earliest, and Count One is timely.

Defendant argues that the Court should not apply the rule in *Bramblett* because the case was overruled by the Supreme Court's subsequent decision in *Toussie*, 397 U.S. at 114–15. Def. Count One Mot. at 31, 33. *Toussie* held that the statute of limitations begins to run when a crime is complete "unless the explicit language of the substantive criminal statute . . . or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing

---

15    It is difficult to square defendant's argument that the scheme crime was complete once he sent the letters of February 6 or June 3, 2012, *see* Def. Count One Mot. at 31, with his insistence that those actions could not constitute the crime charged since 18 U.S.C. § 1001(a)(1) requires proof of something more:  a scheme.  *See* Def. Count One Mot. at 27 n.17.

one." 397 U.S. at 115.  This narrow exception is known as the "continuing offense doctrine," and

it applies to statutes that contemplate a "prolonged course of conduct."  *Id.* at 120.  Defendant

insists that 18 U.S.C. § 1001(a)(1) is not a "continuing offense," and that the charged offense was

complete prior to October 3, 2013.  Def. Count One Mot. at 30–31.

The Court need not decide whether section 1001(a)(1) is a continuing offense because it is

still bound by the D.C. Circuit's decision in *Bramblett*, which held that a scheme offense is not

complete until the scheme ends.  231 F.2d at 491.[16]  That ruling was re-affirmed and applied by

the D.C. Circuit well after *Toussie*; in *United States v. Hubbell,* the D.C. Circuit held that "the

plain language of § 1001 permits the charging of scheme crimes," and it reversed a district court

that had dismissed a section 1001 count for vagueness.  177 F.3d 11, 13 (D.C. Cir. 1999).  The

Court relied on *Bramblett*, noting that in that case it had rejected the defendant's argument that a

prosecution under section 1001 was time-barred because

> "the indictment [did] not merely charge the making of a false statement,"
> but instead alleged a falsification by scheme.  By "falsifying a material fact,
> and in leaving it on file, thereby continuing the falsification in order
> repeatedly to partake of the fruits of the scheme," the defendant committed
> a continuing crime of falsification by scheme that "fairly falls within the
> terms of section 1001."

---

16    Other circuits have observed that the continuing offense doctrine is not applicable when
some of the charged conduct falls within the limitations period.  Both the Ninth and Tenth Circuits
have observed that "[the continuing offense] doctrine applies only where it is contended that the
actual conduct of the defendant ended but the crime continued past that time, not where . . . the
charged criminal conduct itself extends over a period of time."  *United States v. Reitmeyer*,
356 F.3d 1313, 1321 (10th Cir. 2004), *quoting United States v. Jaynes*, 75 F.3d 1493, 1506–07
(10th Cir. 1996); *United States v. Morales*, 11 F.3d 915, 918 (9th Cir. 1993) (same).

*Id.*, quoting *Bramblett*, 231 F.2d at 491.[17]   Therefore, *Bramblett* has not been overruled, as the defendant argues, and since it remains binding on this Court, Count One will proceed.[18]

## II.      Motion to Dismiss Count Two

In a separate motion, defendant has also moved to dismiss Count Two of the indictment for failure to state an offense.  Def. Count Two Mot. at 1.  Count Two alleges that in the letter sent to the FARA Unit on October 11, 2013, defendant Craig knowingly and willfully made false statements of material fact and omitted material facts in violation of 22 U.S.C. § 612 and § 618(a)(2).  Ind. ¶¶ 66–67.

---

17      While the *Bramblett* Court used the phrase "continuing crime of falsification by a scheme," 231 F.2d at 491, the Court has not officially characterized section 1001(a)(1) as a "continuing offense" which is a "term of art" that carries a different meaning than the ordinary usage of those words.  *McGoff*, 831 F.2d at 1078.

18      Other courts have applied the same principle after the *Toussie* decision.  *See United States v. Heacock*, 31 F.3d 249, 256 (5th Cir. 1994) (holding that in an 18 U.S.C. § 1001(a)(1) scheme, as in a conspiracy, "the statute of limitations does not begin to run on a 'scheme' crime . . . until each overt act constituting the scheme has occurred"); *United States v. Menendez*, 137 F. Supp. 3d 688, 688–700 (D.N.J. 2015), *aff'd*, 831 F.3d 155 (3d Cir. 2016) (relying on *Bramblett* to hold that defendant's 1001(a)(1) prosecution was not time-barred even though some of the conduct fell outside of the limitations period because he was charged with a single, extended "scheme" and "the scheme did not end, at the earliest, until [defendant] filed his last financial disclosure form" which fell within the limitations period).

Defendant cites *United States v. Sunia*, 643 F. Supp. 2d 51 (D.D.C. 2009), but the relevant portion of that case concerned three counts brought under a different statute, 18 U.S.C. § 666, which prohibits theft, embezzlement, and bribery in connection with programs receiving federal funds.  The court rejected the government's argument that the counts could reach those acts that took place outside the statute of limitations on the basis that the indictment charged a "continuing offense," but it took great pains to specifically differentiate such offenses from those that involve a scheme or pattern of illegal conduct.  *Id.* at 70–71.  Here, the indictment charges defendant with the "scheme" specifically proscribed in section 1001(a)(1) and specifically addressed in *Bramblett,* so the case is inapposite.  Ind. ¶¶ 48–49.

The "False Statements and Willful Omissions" provision of FARA states:

> (a)  Any person who . . .
>
>> (2) in any registration statement or supplement thereto or in any other document filed with or furnished to the Attorney General under the provisions of this subchapter willfully makes a false statement of a material fact or willfully omits any material fact required to be stated therein or willfully omits a material fact or a copy of a material document necessary to make the statements therein and the copies of documents furnished therewith not misleading, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, . . . .

22 U.S.C. § 618(a)(2).

The motion to dismiss argues that the October 11, 2013 letter does not fall under this provision of the Act because it was not a registration statement or supplement, nor was it a document "filed with or furnished to the Attorney General under the provisions of" the Act.  Def. Count Two Mot. at 1, quoting 22 U.S.C. § 618(a)(2).

According to defendant, section 618(a)(2) applies only to submissions mandated by the statute, and the letter that forms the basis for this count was sent voluntarily and not pursuant to any legal obligation.  Def. Count Two Mot. at 1–2.  Thus, he maintains, it was subject to the general prohibition against making false statements to the government found in 18 U.S.C. § 1001, but not the specific FARA-related prohibition in 22 U.S.C. § 618(a)(2).  *Id.*  Defendant points out that all of his responses to the FARA Unit's requests for information were voluntary, and that he was not obligated to respond to the agency's letters at all, and he notes that the indictment specifically alleges that he provided the October 11 letter "at the FARA Unit's Request."  Ind. ¶ 62; Def. Count Two Mot. at 4.

In its opposition, the government contends that defendant's interpretation essentially writes the words "or in any other document" out of the statute, and that the Court is bound to reject that

argument and give effect to every word included in the provision by the legislature.  Gov't Opp. to Count Two Mot. at 12–13, citing *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) ("It is a cardinal principal of statutory construction [] to save and not to destroy[,] that is, to give effect, if possible, to every clause and word of a statute.").

This is a close question.  The Court is required to begin with the language of the statute itself, and the plain language of the statute certainly supports the government's view that the October letter from Craig to the FARA Unit Chief, concerning the "obligation under FARA to register," Ind. ¶ 42; Letter of Oct. 10, 2013, Ex. 9 to Def. Count One Mot., and responding directly to the Unit's determination that the law firm did have to register, was a document "furnished" to the FARA Unit "under the provisions" of FARA, and that a false statement in that document would be actionable under section 618.  But the Court is required to use all the tools of statutory construction at its disposal.

The Court finds much of defendant's analysis of the text of section 618 to be strained and unpersuasive, and it cannot conclude that the plain language of the provision standing alone requires the Court to adopt defendant's reading of the statute.  But application of the case law the defendant cites could support either reading, a review of the statute as a whole supports the defendant's interpretation, and the legislative history does not unequivocally support the

46

government's position.  Given those ambiguities, the rule of lenity requires the dismissal of the

charge.[19]

Defendant makes several arguments in support of his position.  First, he submits that if one

applies the canon of statutory construction *ejusdem generis*, the phrase "or in any other document

filed with or furnished to the Attorney General under the provisions of this subchapter" must be

interpreted to refer to a "registration statement" or "supplement thereto."  Def. Count Two Mot. at

6–7. The doctrine of *ejusdem generis* deals with the interpretation of a residual catchall phrase at

the end of a series or enumerated list, and it requires courts to interpret such catchall phrases by

reference to the preceding, more specific, items in the list.  *Circuit City Stores, Inc. v. Adams*,

532 U.S. 105, 114–15 (2001) (explaining that *ejusdem generis* is a statutory canon "[w]here

general words follow specific words in a statutory enumeration, the general words are construed

to embrace only objects similar in nature to those objects enumerated by the preceding specific

words.") (internal citation omitted).  The government questions whether the doctrine applies given

the lack of commas separating the items in the list preceding the general term.  Gov't Opp. to

Count Two Mot. at 2, 10–13, citing *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 224–25 (2008)

---

19      Defendant suggested at the hearing on the motions to dismiss that Count One must fall with
Count Two, Tr. at 30–33, but that is not correct.  The government did not rely solely on section
618 – the FARA false statements provision – as the source of the duty to disclose for purposes of
section 1001; it pointed to the FARA statute as a whole, including sections 611 and 612.  Gov't
Opp. to Count One Mot. at 18–19.  Defendant scoffed at the suggestion that section 611 – a
definitions section – would be of value.  *See* Def. Reply for Count One at 3–4.  But it is in the
definitions section that Congress specifically defined political activities to include public relations,
thereby establishing the parameters of the statutory disclosure obligation in section 612 and putting
defendant and others on clear notice of their obligations.  The fact that the FARA false statements
provision may be limited to registration statements, and one cannot prosecute false statements or
omissions in other communications with the Unit under that narrow provision, does not mean that
they are not illegal; as counsel for the defendant arguing Count Two pointed out:  "[t]o be sure, 18
U.S.C. Section 1001 applies to any statement that Mr. Craig or anyone else makes to a government
agency, including the FARA unit."  Tr. at 71.

(declining to apply *ejusdem generis* where the structure of the phrase defined two categories in the disjunctive rather than listing specific items separated by commas).

But the problem with defendant's argument does not turn on the presence or absence of the punctuation that is sorely needed here. The Court finds *ejusdem generis* to be of little assistance because the provision does not contain a list or series at all. It says, "*in* any registration statement or supplement . . . or *in* any other document," 22 U.S.C. § 618(a)(2), not "in any registration statement, supplement, or other document." So the provision simply sets out two separate categories of documents – separated by the conjunction – in which the false statement could be found; it is not a list with a general catch-all at the end.

Second, the defendant highlights the words, "or willfully omits any material fact required to be stated therein," and suggests that the use of the word "required" in the middle of the provision modifies the earlier term, "any other document filed or furnished" and indicates that the "document" must be one that was "required" to be filed. Def. Reply for Count Two Mot. at 5. But this completely ignores the structure of the provision. The statute warns that whoever, "in a registration statement or supplement . . . or in any other document" does one of three things – "willfully makes a false statement of material fact *or* willfully omits any material fact required to be stated therein *or* willfully omits a material fact . . . necessary to make the statements therein . . . not misleading" – will be subject to criminal sanctions. 22 U.S.C. § 618(a) (emphasis added). In other words, it lists, as does 18 U.S.C. § 1001, the three ways in which an individual could commit a false statement offense, and the word "required" in the second prong specifies the type of omission that could be actionable under that prong. So while it narrows the scope of the omissions clause, it has no bearing on the nature of the documents in which the three types of false statements or omissions could be found.

However, at the hearing on this motion, the defense also honed in on the phase "filed with or furnished to the Attorney General *under the provisions of this subchapter.*" Tr. at 66–68; Def. Reply for Count Two Mot. at 1. Defendant argues that "under the provisions of" is limiting language that has been accorded particular significance by the Supreme Court and the D.C. Circuit, and he points to the discussions of the meaning of the word "under" in *Ardestani v. INS*, 502 U.S. 129 (1991), *D.C. Hosp. Ass'n v. District of Columbia*, 224 F.3d 776 (D.C. Cir. 2000), and *Blackman v. District of Columbia*, 456 F.3d 167 (D.C. Cir. 2006). Tr. at 69–71; Def. Count Two Mot. at 4.

*Ardestani* addressed the availability of attorneys' fees under the Equal Access to Justice Act, 5 U.S.C. § 504(a) ("EAJA"). 502 U.S. at 131. The petitioner had prevailed in an administrative deportation proceeding brought by INS, and he sought fees under the EAJA. *Id.* That statute provides that an agency that conducts an "adversary proceeding" must award fees to the prevailing party; an "adversary proceeding" is defined in section 504(b)(1)(C) as "an adjudication under section 554 of this title," and section 554 is the provision that "delineates the scope" of the proceedings governed by the formal adjudication requirements set forth in the Administrative Procedure Act. *Id.* at 132–33.

The Court explained that while immigration proceedings were at one time subject to the Administrative Procedure Act ("APA"), Congress had passed a separate statute – the Immigration and Naturalization Act – that lays out the exclusive procedural requirements. *Id.* at 133–34. Since, therefore, the deportation proceeding was not subject to or "under" the APA, it followed that the EAJA was not applicable. *Id.* at 134. Ardestani argued that since the new deportation requirements resembled the formalities available under the APA, the fee provision still applied, but the Court disagreed, reading "under" as a restrictive term.

> "The starting point in statutory interpretation is 'the language [of the statute] itself.'" . . . The word "under" has many dictionary definitions and must draw its meaning from its context. In this case, the most natural reading of the EAJA's applicability to adjudications "under section 554" is that those proceedings must be "subject to" or "governed by" § 554. Indeed, in addition to the court below, six United States Courts of Appeals have determined that the plain and ordinary meaning of "under" as it appears in the EAJA is that proceedings must be governed by the procedures mandated by the APA. . . . As one court has observed, the word "under" appears several times in the EAJA itself, and "[i]n other locations, no creative reading is possible – 'under' means 'subject [or pursuant] to' or 'by reason of the authority of.'" *St. Louis Fuel & Supply Co. v. Fed. Energy Regulatory Comm.*, 890 F.2d 446, 450 (D.C. Cir. 1989).

*Id.* at 135 (other internal citations omitted).

In *D.C. Hospital Association*, the issue was whether payments made by managed care organizations to hospitals for inpatient care provided to low income patients should have been included when calculating the hospitals' operating costs for Medicare purposes. 224 F.3d at 778. The statutory provision in question included the words "the amount paid under the State plan to the hospital for operating costs for inpatient hospital services." *Id.* at 779, quoting 42 U.S.C. § 1396r-4(c)(1). Once again, the Court began with the language of the statute itself.

> The Supreme Court has observed that "[t]he word 'under' has many dictionary definitions and must draw its meaning from its context." We see nothing in the context of the Medicaid statute, however, that would require us to give the word other than its ordinary meaning. "Under" is defined as "required by[,] in accordance with[, or] bound by." Webster's Third New International Dictionary 2487 (1981).

*Id.* (internal citations omitted). With that, it concluded that the operating costs incurred by hospitals serving low income patients may not be excluded. *Id.* at 780.

In *Blackman*, the D.C. Circuit was called upon to interpret an attorneys' fee provision in the Individuals with Disabilities Education Act ("IDEA") that capped the fees available for an "action or proceeding . . . under the [IDEA]." 456 F.3d at 176–77. The action in the case was not an IDEA proceeding, but the party seeking fees – in this case, the defendant – had prevailed in a

civil rights action brought against the District under 42 U.S.C. § 1983 to enforce rights afforded by the IDEA.  *Id.* at 169.  While the Court recited the holdings in *Ardestani* and the *D.C. Hospital Association* case, it used that guidance to read the word "under" more broadly:

> [T]he word "under" has many dictionary definitions and we draw its meaning from the context of the statute before us.  Both the High Court and this court have interpreted a provision analogous to the one before us.  In *Ardestani*, the Court interpreted the attorney's fees provision of the Equal Access to Justice Act (EAJA).  The EAJA requires a court to award fees to a party prevailing in "an adjudication *under* section 554" of the APA.  The Court decided that "the most natural reading of the EAJA's applicability to adjudications 'under section 554' is that those proceedings must be 'subject to' or 'governed by' § 554."  The Court also approvingly cited this court's decision interpreting the same phrase.  Our decision in *St. Louis Fuel & Supply Co. v. FERC*, 890 F.2d 446 (D.C. Cir. 1989), held that the term "under," as used in the EAJA's attorney's fees provision, "means 'subject [or pursuant] to' or 'by reason of the authority of.'"  *Id.* at 450 (alteration in original); *see also D.C. Hosp. Ass'n v. District of Columbia*, 224 F.3d 776, 779 (D.C. Cir. 2000) ("'Under' is defined as 'required by[,] in accordance with [, or] bound by.'" (quoting *Webster's Third New International Dictionary* 2487 (1981) (alteration in original)).

*Id.* at 176–77 (internal citations omitted).

The upshot of the *Blackman* ruling was restrictive; it imposed a ceiling on the District's obligation to pay attorneys' fees.  *See id.* at 178.  But the reasoning behind the decision appears to indicate that the words "under the provisions of" need not be strictly construed to mean "required by" since there is no way that a section 1983 action could be considered to be "required by" the IDEA.  And the cases and dictionary entries the Circuit relies upon list "required by" as only one of the available definitions.

It is something of a struggle to square these decisions with each other, much less to figure out how they apply to the instant situation.  As in *D.C. Hospital Association*, there is nothing in the FARA statute that would require this Court to give the word "under" anything other than its ordinary meaning.  All three opinions seem to point the reader in the direction of the dictionary when a "natural reading" is indicated, but there is more than one synonym in the dictionary.

If the Court were to simply give the word "under" its "ordinary meaning," as these precedents require it to do, it could easily find that the letter Craig sent to press his case with the agency was submitted "under" – as in, under the auspices of – FARA. The October 11 letter was a letter objecting to, and providing more information to refute, a registration decision the agency had already made based on its application of specific provisions of the statute. The October 9 meeting, and Craig's letter summarizing the meeting, were intended to influence a determination made under FARA. All of the communications to and from the Department of Justice arose in the context of nothing but FARA, they were in furtherance of the Unit's implementation of FARA, and they could be appropriately characterized as filed "subject to," "governed by," or "by reason of authority of" FARA. *See Ardestani*, 502 U.S. at 135. This reading of the statute would be consistent with *Blackman*, which was cited by defendant even though it did not apply a strict interpretation to the requirement that an action be filed "under" the IDEA at all. Def. Reply for Count Two Mot. at 4.[20]

---

20      *See Blackman*, 456 F.3d at 177 (internal citation omitted).

> The appellees maintain that the district court correctly determined that section 140(a)'s applicability to actions "under the [IDEA]" means that attorney's fees are subject to the cap *only if* the IDEA is the explicit statutory basis of the plaintiff's cause of action. . . . We agree that such an action is plainly brought "under the [IDEA]." But we do not agree that the plain meaning of "under" precludes the applicability of section 140(a) to an action using section 1983 to enforce the IDEA's [free appropriate public education] right. Section 1983 is not the source of substantive rights but rather "a method for vindicating federal rights elsewhere conferred." The [ ] appellees' section 1983 action sought to vindicate rights conferred by the IDEA. Their action is "governed by" and "subject to" the IDEA because, in the absence of the IDEA, the appellees would have no federal right to vindicate. At the very least, . . . their action was brought "pursuant to" or "by reason of the authority of" the IDEA.

However, the fact that the FARA provision says "filed *under the provisions of* this subchapter" as opposed to just "filed under" the statute tends to support defendant's interpretation since there is no "provision of" FARA pursuant to which the letter was filed or furnished.[21]  Thus, using other choices from the collection of definitions the Court is bound to bring to this analysis, it can plainly be said that Craig's submission was not "required by" or "bound by" any statutory provision.  *See D.C. Hosp. Ass'n*, 224 F.3d at 779.  The letter was transmitted in connection with, under the auspices of, and regarding FARA; it was filed at the request of the agency; and it ultimately influenced the outcome of the determination made pursuant to or "under" the statute.  But the application of circuit precedent leaves some lingering doubt as to whether it was filed "under the provisions of" FARA.  Since the Court can read the language either way, this points in the direction of the rule of lenity.

The rule is a tool of last resort, though, and a court is supposed to exhaust all other means of statutory construction before throwing up its hands.  *See Lockhart v. United States*, 136 S. Ct. 958, 968 (2016), quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961) (the rule of lenity should be employed "only 'at the end of the process of construing what Congress has expressed' when the ordinary canons of statutory construction have revealed no satisfactory construction").

---

21      While there is a regulation that enables potential registrants to pose inquiries to the agency and seek FARA advice, *see* 28 C.F.R. § 5.2, neither the statute nor the regulations specifically call for or address the exchange of information initiated by the agency that took place in this case, or the submission of a letter disputing a registration determination or summarizing an oral presentation such as the one transmitted by Craig on October 11.  It is notable that the regulations concerning inquiries made by potential registrants require that "[a]ny information furnished orally shall be confirmed promptly in writing," and that those writings must be certified as true.  *Id.* § 5.2(g).  But this does not clear up the ambiguity; while it suggests, contrary to defendant's assertion, that there may be documents other than registration statements or supplements that are "furnished" to the agency, it does not clarify the meaning of "under the provisions of."

Defendant points the Court to the legislative history of the statute, and while, as is often the case, it is not definitive, it offers some grounds to support his position.  Def. Count Two Mot. at 11–14.

Defendant notes that the original statute made it unlawful to make false statements "in complying with the provisions of this Act."  Def. Count Two Mot. at 12 (emphasis omitted), quoting Pub. L. No. 75-583, § 5, 52 Stat. 631, 633 (1938).  When Congress amended the Act in 1942 to reflect its current text, the false statement provision was revised to reflect amendments elsewhere in the statute that required registrants to "furnish" supporting documents to the Attorney General.  *Id.*, citing Pub. L. No. 77-532 § 8(a)(2), 56 Stat. 248, 257 (1942).  So, according to defendant, documents "furnished" to the Attorney General in section 618(a)(2) refers to the expanded filing requirements under FARA, not an expansion of false statements provision itself. Def. Count Two Mot. at 12–13.

The defense also points to the Voorhis Act, 18 U.S.C. § 2386, a statute which requires organizations acting under foreign control with the purpose of overthrowing the government to register with the Attorney General.  Def. Count Two Mot. at 13.  According to defendant, that statute was parallel to FARA and also had a false statement provision applicable only to statements that were required to be filed by the Voorhis Act.  *Id.*, citing 18 U.S.C. § 17 (1940) (applying to "[w]hoever in a statement filed pursuant to section 15").  Defendant contends that Congress intended FARA to mirror the Voorhis Act, supporting his reading of section 618(a)(2) as applying only to statements that were required to be filed by FARA.  Def. Count Two Mot. at 13–14.

The government emphasizes that the legislative history of the 1942 amendment of FARA shows Congress transferred the Act's administration from the State Department to the Justice Department because it had "the machinery to enforce" the statute.  Gov't Opp. to Count Two Mot. at 16–17, quoting "Amending Act Requiring Registration of Foreign Agents," Hearings before the

Subcommittee No. 4 of the Committee on the Judiciary on H.R. 6045, 77th Cong., 1st Sess. 28 (Nov. 28, 1941) (statement of Hon. Adolf A. Berle, Jr., Ass't Sec'y of State).   The Department shortly thereafter promulgated regulations that invited potential registrants to submit information to the Department to determine whether they were required to register, and told Congress that it relied on voluntary submissions of information from potential registrants and from separate investigations of the FBI to enforce the Act.   Gov't Opp. to Count Two Mot. at 17–19.   According to the government, this legislative history shows that interpreting FARA's false statement provision as applying only to documents submitted pursuant to a specific FARA provision would frustrate Congress's purpose in amending the Act to strengthen its enforcement.   Gov't Opp. to Count Two Mot. at 19–20.   Thus, while both sides are able to point to aspects of the legislative history a supporting their position, it is not clearly not determinative.

The Supreme Court has explained that the rule of lenity is to be invoked if after a court has considered the text, structure, history and purpose of the statute, "there remains a grievous ambiguity or uncertainty . . . such that the Court must simply guess as to what Congress intended." *United States v. Castlemen*, 572 U.S. 157, 172–73 (2014), quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010).   The structure of the statute as a whole also gives the Court reason to pause.

Section 611 specifies what acting as an agent consists of, making it clear what types of activities are of interest to the Department of Justice and what activities need to be disclosed.   *Id.* § 611.   Thus, it defines the boundaries of the registration obligation that appears in section 612:

> No person shall act as an agent of a foreign principal unless he has filed with the Attorney General a true and complete registration statement and supplements thereto as required by subsections (a) and (b) of this section . . . .

22 U.S.C. § 612(a).   Section 612(a) goes on to require that "the registration statement shall *include*" the items listed in subsections (1) through (11).   *Id.* (emphasis added).   This lends support to the

government's argument that the words "any *other* document filed or furnished to the Attorney General" cannot, as the defense contends, Tr. at 68, refer to the eleven categories of documents listed in section 612(a) because those are "included" in the registration statement.  Tr. at 92.

But section 612 goes on.  Subsection (d) warns that the mere filing of a timely registration statement will not necessarily preclude prosecution "as provided for in this subchapter, for willful failure to file a registration statement or supplement thereto" or:

> for a willful false statement of a material fact *therein* or the willful omission of a material fact required to be stated *therein* or the willful omission of a material fact or copy of a material document necessary to make the statements *made in a registration statement and supplements thereto*, and the copies of documents furnished therewith, not misleading

*Id.* § 612(d).  This characterization of the false statement provision found in section 618 suggests that Congress understood the provision to apply only to false statements or omissions *in* registration statements.  While the government argues, with some force, that section 612(d) also reveals that Congress knew how to draft a more limited provision, and the fact that it used these words in section 612(d) and *not* section 618, coupled with the "or any other document" language, signifies that Congress had something broader in mind in section 618.  Gov't Suppl. Mem. Regarding Count Two [Dkt. # 74] at 4–5.  At the end of the day, one ends up with two equally plausible and supportable textual interpretations.

Given all of those circumstances, the Court cannot overlook the fact that the Supreme Court has been steadfast in insisting upon clarity in the language of criminal statutes.  "The rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008).  "[T]he tie must go to the defendant."  *Id.*; *see also United States v. Davis*, 139 S. Ct. 2319, 2333 (2019) (stating that the rule of lenity "teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's

favor"); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 513–18 (1992) (applying the rule of lenity after noting the Court was "left with an ambiguous statute" after analyzing the language, structure, purpose, and history of the statute); *United States v. Nofziger*, 878 F.2d 442, 450, 452 (D.C. Cir. 1989) (applying the rule of lenity after finding that the statute contained "language that is as amenable to one interpretation as the other," with no clear legislative history or official interpretation).

For this reason, the motion to dismiss Count Two will be granted.

## CONCLUSION

For the reasons stated above, Defendant's Motion to Dismiss Count One [Dkt. # 19] is **DENIED**, and Defendant's Motion to Dismiss Count Two [Dkt. # 20] is **GRANTED**.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  August 6, 2019