```
1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      ) Criminal Action
                                    ) No. 19-CR-125
4                    Plaintiff,     )
                                    ) STATUS CONFERENCE
5    vs.                            )
                                    ) Washington, DC
6    Gregory B. Craig,              ) July 16, 2019
                                    ) Time:  3:00 p.m.
7                    Defendant.     )
     _____
8
                    TRANSCRIPT OF STATUS CONFERENCE
9                           HELD BEFORE
           THE HONORABLE JUDGE AMY BERMAN JACKSON
10                   UNITED STATES DISTRICT JUDGE
     _____
11
                     A P P E A R A N C E S
12
     For the Plaintiff: Fernando Campoamor-Sanchez
13                      Molly Gulland Gaston
                        U.S. ATTORNEY'S OFFICE FOR THE
14                        DISTRICT OF COLUMBIA
                        555 Fourth Street, NW
15                      Washington, DC 20530
                        (202) 252-7698
16                      Email: Fernando.campoamor-sanchez@usdoj.gov
                        Email: Molly.gaston@usdoj.gov
17                      Jason Bradley Adam McCullough
                        U.S. Department of Justice
18                      950 Pennsylvania Avenue, NW
                        Washington, DC 20530
19                      (202) 233-0986
                        Email: Jason.mccullough@usdoj.gov
20
     For the Defendant: William James Murphy
21                      William W. Taylor, III
                        ZUCKERMAN SPAEDER, LLP
22                      100 East Pratt Street
                        Suite 2440
23                      Baltimore, MD 21202
                        (410) 949-1146
24                      Email: Wmurphy@zuckerman.com
                        Email: Wtaylor@zuckerman.com
25
```

1
**Paula M. Junghans**
ZUCKERMAN SPAEDER, LLP
2
1800 M Street, NW
Suite 1000
3
Washington, DC 20036
(202) 778-1814
4
Email: Pjunghans@zuckerman.com

5
_____

6   Court Reporter:          Janice E. Dickman, RMR, CRR, CRC
Official Court Reporter
7
United States Courthouse, Room 6523
333 Constitution Avenue, NW
8
Washington, DC  20001
202-354-3267
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

2    This is a sealed proceeding and the courtroom has been locked.

3           We have criminal case number 19-125, the United

4    States of America v. Gregory B. Craig.  Mr. Craig is present in

5    the courtroom, Your Honor.

6           Will counsel for the parties please approach the

7    lectern, identify yourself for the record.

8           MR. CAMPOAMOR-SANCHEZ:  Good afternoon, Your Honor.

9    Molly Gaston, Jason McCullough, Fernando Campoamor-Sanchez for

10   the United States.  And also with us is our paralegal Amanda

11   Rohde.

12          THE COURT:  Good afternoon.

13          MR. MURPHY:  Good afternoon, Your Honor.  William

14   Murphy for the defendant, Mr. Craig.  Mr. Taylor is with me,

15   Ms. Junghans is with me.  And Mr. Craig is here, as well.

16          THE COURT:  All right.  All of you know more about

17   why we're here than I do.  This hearing got called because

18   Mr. Haley was receiving emails seeking guidance about a

19   potential in camera filing and wanted some guidance from

20   chambers, which I appreciate the fact that everyone was asking

21   for.  But I'm hesitant to have conversations, even if both

22   sides are present, off the record.  What sometimes happens is

23   that later there is a difference of recollection about what

24   took place, and it's just easier for me to do things on the

25   record for everybody's protection.

1          Since I didn't know what it was you wanted to talk to

2     me about, in an abundance of caution I sealed today's

3     proceeding, as well.  But the first thing I'll ask when we are

4     done is whether this transcript needs to remain sealed.

5          So I guess -- and then I thought while you're here, I

6     have a few other things we can talk about.  But I want to start

7     with what's on your mind.

8          MR. MURPHY:  Thank you, Your Honor.  William Murphy

9     for Mr. Craig.  And I appreciate the Court making these

10    arrangements for us to raise this issue.

11         As you indicated, Your Honor, we have talked to the

12    government about this a little bit.  On Sunday we raised the

13    issue with the government in a conference call.

14         The issue that concerns us is related to our

15    development of potential testimony and evidence related to

16    other matters in which law firms in Washington, or elsewhere,

17    did work, comparable to the work that was done by Skadden on

18    the Tymoshenko Report, and did not register under FARA.  And we

19    thought that this potential evidence could be useful both in

20    the cross-examination of Heather Hunt, the head of the FARA

21    unit, if she testifies -- and we think she will -- and also in

22    the opinion testimony that we plan to offer from Amy Jeffress,

23    who is our designated expert, as you know.

24         And back, late in April, one of my colleagues

25    discovered newspaper references to a report that had been done

1      by the Trout Cacheris firm, and Plato Cacheris in particular,

2      and the Akin Gump firm and Mark MacDougall and Kroll

3      Associates.  And the report showed that between May of 2000 and

4      October of 2000 those firms were retained by the government of

5      Ukraine, Mr. Yanukovych's administration, to do a report on

6      financial improprieties.

7                MS. JUNGHANS:  2010.

8                MR. MURPHY:  I'm sorry, 2010.  Financial

9      improprieties by Miss Tymoshenko and her administration.  And

10     that report was completed in October of 2010.

11               There were a couple of press conferences that

12     Mr. Cacheris and Mr. MacDougall participated in in Kiev.  And

13     there was a fair amount of press coverage about the work they

14     had done, some of which found its way into the American media.

15               Then in the spring of -- 2001?  June 2001.

16               THE DEFENDANT:  '11.

17               MR. MURPHY:  I'm sorry.  I have my dates mixed up.

18     The older I get, the decades get mixed up.  In 2011, in June, a

19     rebuttal report had been prepared by Covington and Burling, and

20     Bruce Baird in particular, working with the accounting firm of

21     BDO Seidman, and they were retained by Yulia Tymoshenko and her

22     political party in the Ukraine.  And they gave a press

23     conference at the National Press Club, in Washington, D.C., and

24     reported on their findings, which were really a rebuttal to the

25     report that had been done by Trout Cacheris and Akin Gump and

1    Kroll.  And, in fact, in the press conference, which is

2    available on YouTube still, Mr. Baird says that the other

3    report, the earlier report was not worth the paper that it was

4    written on.

5            This also found its way into the media.  And there's

6    quite a few American commentaries about Mr. Baird and his

7    report, the press conference and the statements that he made.

8            Neither -- none of the firms that were involved, in

9    either report, filed a FARA registration.

10           Then, this weekend --

11           THE COURT:  There was some matter in which Trout

12   Cacheris did file a FARA.

13           MR. MURPHY:  I think for another country, I think for

14   the Congo maybe.

15           THE COURT:  Yes.

16           MR. MURPHY:  We did look at the FARA registrations

17   when this was all uncovered.  Covington, at that time, had

18   several FARA registrations on file.  One of the lawyers who was

19   with Mr. Baird during the press conference was one of the

20   lawyers who had a FARA registration on file.  But there were no

21   filings with respect to the representation with respect to the

22   Ukraine Minister of Finance or Miss Tymoshenko and her

23   political party.

24           And then, I actually -- I spoke to Bob Trout shortly

25   after discovering this and Mr. Trout told me that he had not

1    worked on this matter and that he did not believe that you had

2    worked on this matter.

3            The -- and I've since had discussion with

4    Mr. MacDougall, who recalls the same thing, that, Your Honor,

5    you had not worked on the matter.

6            In the document review that we've been going

7    through --

8            THE COURT:  When was the report dated again?

9            MR. MURPHY:  Report was dated October the 14th, 2010.

10           THE COURT:  Okay.

11           MR. MURPHY:  I believe that --

12           THE COURT:  It was after I was nominated, I think,

13   but before I was confirmed.

14           MR. MURPHY:  Yes, I think that's right.  In the

15   document review that we've done -- and it's been very intense

16   in the last week or so -- there are a number of sources of

17   documents that the government obtained, that we have obtained

18   through the government, through the discovery process.  I think

19   we now have the Trout Cacheris report, or references to it, in

20   five different sets of document production that we've been

21   reviewing.  The -- ███████████, who was an attorney at

22   Skadden, obtained the Trout Cacheris report from Kroll and

23   Associates in May of 2010 and sent it to Jonathan Hawker of

24   FTI.  Mr. Hawker is going to be a witness in this case.

25           We discovered, just, I think, on Monday, that

1      █████████ also circulated the entire report -- and it's 176

2      pages, it's a pretty thick report -- to everybody on the

3      Skadden team, including Mr. Craig.  That was in -- May the 29th

4      of 2012.

5            In addition, we have document productions from a

6      person by the name of ███████████, and another person by the

7      name of ███████████.  They are persons who I think you're

8      familiar with from prior matters.  Both of them received copies

9      of the report, or references to the report or summaries of the

10     report; one of them was prepared by Mr. Manafort and he sent it

11     to ███████████, I think.

12           In addition to that, the ██████████████ was also

13     working on the dissemination of the Skadden report in the

14     United States.  And in the lead-up to that, they also received

15     a copy of the report done by Trout Cacheris and Akin, Gump.

16     And it's among the materials that we received in the discovery

17     related to the ███████████.

18           Then, on last Thursday, we received from the

19     government meeting notes of a meeting that was conducted on May

20     the 21st of this year between representatives of FTI, their

21     outside counsel and their outside compliance -- I'm sorry,

22     their inside counsel, inside compliance officer and outside

23     counsel with representatives of the FARA unit, including Miss

24     Hunt and Mr. VanGrack.  And during that meeting they were --

25     the meeting notes reflect that there was a discussion about why

1    FTI needed to register retroactively, even though the events

2    that they were involved in occurred something like seven years

3    ago.

4              Mr. VanGrack made a strong argument that everybody

5    was aware of FTI's role and because of that public awareness,

6    there was a requirement that they should register

7    retroactively.

8              Your Honor knows that just last week we filed our

9    response to the government's motion in limine on what they

10   called selective prosecution --

11             THE COURT:  I read your notice that you filed

12   yesterday.

13             MR. MURPHY:  On Friday FTI did indeed register

14   retroactively.

15             I became very concerned, and I shared it with my

16   colleagues over the weekend, that we did not want to be in a

17   position where we were cross-examining Heather Hunt, for

18   example, and wanted to ask her about the Trout Cacheris report

19   or the Covington Burling report and why they didn't register,

20   and what, if anything, they knew about it, and if they didn't

21   know about, why didn't they know about it, since each of them

22   received fairly broad press coverage.  Or, that we would call

23   Amy Jeffress to the stand and ask her to opine about what

24   reasonable practitioners with knowledge of FARA were doing at

25   the time.  And Mr. Baird is a highly respected attorney at

1    Covington.  Of course, Plato Cacheris and Mark MacDougall are

2    highly respected attorneys at their firms.  They're all

3    somewhat familiar with FARA.  I know that Mr. MacDougall is, I

4    suspect Mr. Baird and his colleagues were, and yet they didn't

5    register.  And I did not want to be in a position of having

6    this come up, given your prior involvement as a partner of

7    Trout Cacheris, and have the Court be totally surprised by this

8    fact.

9         THE COURT:  I appreciate that.  And I think it was

10   completely appropriate to bring it up.  I have another

11   question, and that is:  Is the government aware of any witness

12   or entity involved in any of this -- the PR associated with

13   Ukrainian work Mr. Manafort was involved in that is represented

14   by Trout Cacheris, or Trout Cacheris and Solomon now.

15        MR. CAMPOAMOR-SANCHEZ:  Not to our knowledge, Your

16   Honor.

17        THE COURT:  Okay.

18        MR. CAMPOAMOR-SANCHEZ:  Now, I want to be clear, I

19   haven't tried to ascertain or do a search, but I do not expect

20   that to be the case because we do have evidence of who was

21   involved with the Skadden report.  So I have no expectation

22   that there's going to be any witness that the government is

23   going to present that is going to be mentioning or referring to

24   the Court's old firm.

25        THE COURT:  Well, it's not so much that they're going

1    to mention them, I -- I thought there was somebody who may have

2    been associated with some of the Manafort activities, possibly

3    a PR firm, that in its dealing as a witness had been

4    represented by that law firm.  And I'm not a factfinder in this

5    case, but if you were aware of that, that would be another fact

6    that we need to throw into the hopper right now.

7              MR. CAMPOAMOR-SANCHEZ:  So I will certainly try to

8    inquire from others.  I can --

9              THE COURT:  And I will, too.  I know who to call.

10   Mr. Trout is in trial, but his partner is not, so --

11             MR. CAMPOAMOR-SANCHEZ:  I can tell the Court that --

12             THE COURT:  You're not aware right now of witnesses

13   represented by them?

14             MR. CAMPOAMOR-SANCHEZ:  Correct.  And so for my

15   focus, as opposed to the Manafort trial, has been this case and

16   the Skadden report.  I'm not aware of anybody associated with

17   this case and this report that would --

18             THE COURT:  It may have been related to the Hapsburg

19   Group stuff.

20             MR. CAMPOAMOR-SANCHEZ:  Maybe.

21             THE COURT:  Which isn't directly implicated in the

22   indictment.

23             MR. CAMPOAMOR-SANCHEZ:  Correct.

24             THE COURT:  Okay.  So even if that person was

25   involved, they may not be a witness in this case.

```
 1          MR. CAMPOAMOR-SANCHEZ:  Yes.  So any witness that the
 2     government expects to call, as far as --
 3          THE COURT:  As far as you know.
 4          MR. CAMPOAMOR-SANCHEZ:  As far as I know has no
 5     knowledge of that.
 6          THE COURT:  Okay.  All right.  All right.
 7          MR. MURPHY:  Your Honor?
 8          THE COURT:  Yes.
 9          MR. MURPHY:  Your Honor, if I may, you may know this
10     already, but Bob Trout represents ███████, and ███████ is a
11     person who may not be called in this case; probably won't be,
12     but he's involved in this case.  He's mentioned --
13          THE COURT:  I don't know because I've assiduously
14     worked with Miss Solomon and Mr. Trout to not talk about
15     anything that touched on anything, so I don't know the name.
16     But I thought somewhere along the line we decided we couldn't
17     even say, How is the Manafort case going? because they had some
18     affiliation.  So if you're aware of who the witness is, you
19     know more than I do at this moment.
20          MR. MURPHY:  ████████████████████████████████████
21     ████████████████████████████████████████████████████████████
22     ███████████████████████████████████████████ I don't
23     know if it will.  I do know that --
24          THE COURT:  Is that a PR person?
25          MR. MURPHY:  Yes.  He worked for the ███████████.
```

1    ████████████████████████████ I believe,

2    who became a lobbyist after leaving congress.  And he is

3    involved in some of the --

4           THE COURT:  I think the ██████████ was Entity 1,

5    2, and 3, or A, B, or C, possibly, in a prior case and --

6           MR. MURPHY:  I'm sure they were.

7           THE COURT:  Okay.  That case didn't go to trial.  And

8    that issue didn't come up.

9           All right.  I can tell you the following things, and

10    then I want to hear what, if anything, the parties think any of

11    this requires.

12           When the whole concept of the Ukraine and Tymoshenko

13    and looking at it thereafter became a part of the other case

14    that was before me, I inquired of the law firm -- because it

15    was my recollection that I had never participated in its

16    representation -- if I had ever participated in representation.

17    And it is my understanding that the recollection of everyone

18    that I didn't is correct, and that we -- I actually asked the

19    billing records be checked.

20           So I don't believe I've ever billed any time to their

21    representation, nor do I even know -- could not tell you right

22    now which side they were on, and which side they came out in

23    favor of.

24           There was a point, once I was nominated, where I was

25    working exclusively on a pro bono matter where we represented

1   the D.C. City Council and I was doing nothing else.  So, I know

2   I didn't work on the case.

3          That being said, I don't want to do anything or

4   preside over any trial where any party to the trial, on either

5   side, has any concern about my impartiality or my appearance of

6   impartiality, or if the name of the law firm gets mentioned and

7   there's a juror who knows that's the law firm I came from, and

8   you don't know what that's going to do in their minds, if

9   they've decided they like me or they don't like me.  That's all

10  issues people have to think about.

11         I certainly can't tell you right now, because we

12  haven't briefed it all up, whether -- what other law firms were

13  doing, if Mr. Craig didn't know whether they were doing it or

14  not, is relevant or not to his intent in this case.  I don't

15  know whether other firms registered or didn't register is

16  relevant, since he's not charged with failing to register.

17         So, those are all questions that whoever presides

18  over this matter is going to have to deal with, that we don't

19  have to deal with today.  I'm pretty confident that if you all

20  want me to think about something, you will tell me to think

21  about it.

22         And so, I guess the question is, now that you've told

23  me what you wanted to tell me, was it your intention to just

24  file a notice of this, or was it your intention to seek my

25  recusal?  And I wouldn't be insulted if anybody says that's

1   their intention.  As interesting as this matter is and what a

2   pleasure it is to have all of you in front of me, everybody's

3   right to a fair trial is more important than that.

4        So, do you have a point of view, or did you just want

5   to bring this information to my attention?

6        MR. MURPHY:  I think, for the present, Your Honor, we

7   just wanted to bring it to your attention.  Because the thing

8   that we feared collectively was that not having raised it at

9   all with the Court and to find ourselves in -- either in open

10  court arguing about the scope of what our expert could testify

11  to, or not testify to, or to be in the course of cross-

12  examining Heather Hunt about the Trout Cacheris report, we just

13  didn't want to have that be the first time that the Court ever

14  heard that this was a potential issue and have to deal with it

15  on the fly.

16       So I think we would like to think about it.  And we

17  haven't come to any fixed conclusions about it at this point.

18       THE COURT:  Well, I would like everybody to think

19  about it.  Off the top of my head, hearing this for the first

20  time, I doubt that I have a legal obligation to recuse.  But,

21  the question of what could give rise to an appearance of

22  impropriety is a broader question.

23       And I assure you that I would not be insulted or

24  offended or think ill of any party on either side of this

25  courtroom, or any lawyer or the defendant, if any of you decide

1    that under all the circumstances, you don't want to be using

2    the words "Trout Cacheris" in my courtroom.  They are a law

3    firm from which I am officially recused.  I don't -- I won't

4    handle anything that either one of them has anything to do

5    with.

6           It hasn't come up, but there are firms, like my old

7    firm, Venable, that I left long before I went on the bench,

8    where I do it on a lawyer-by-lawyer, matter-by-matter basis.  I

9    do what I did in your case with Miss Junghans, if there's a

10   partner that I formerly worked with as a partner.  But, Trout

11   Cacheris is a different matter.

12          So, do you have a point of view?

13          MR. CAMPOAMOR-SANCHEZ:  Just very briefly, Your

14   Honor.  I just want to tell the Court that, certainly, from

15   what we know, we are perfectly comfortable with this Court

16   handling this trial.  We -- we expect, believe and know that we

17   will get a fair trial with this Court, and so we don't have

18   concerns.

19          I think that, certainly, we appreciate that this

20   matter was brought up, so that everybody knew about it, and

21   they told us about it on Sunday.  I think that, frankly, the

22   way we thought it was appropriate to deal with this is there's

23   now's responsive motions in limine, as Mr. Murphy indicated.

24   Their intent to now attempt to use this evidence implicates at

25   least three pending motions; one certainly being the selective

1    prosecution motion that we filed, as well as the motion related

2    to Miss Jeffress' opinions, and the motion in limine dealing

3    with Miss Hunt's testimony.  And that's how we intended to

4    address, legally, those issues.

5            But as the Court also mentioned, frankly, we do not

6    see this as relevant, and we'll be making those points in our

7    motions.  He is not charged for failing to register or with

8    failing to register, he's charged with what he told or failed

9    to tell the FARA unit.

10           THE COURT:  I'm certainly not going to rule on that

11   now, and I'm not going to rule on the motions in limine until I

12   finish ruling on the motions to dismiss.  So there's a lot

13   piling up in front of me, but if another judge needed to get in

14   the saddle, it would only be fair to that court to have that

15   happen sooner rather than later.

16           MR. CAMPOAMOR-SANCHEZ:  Right.  So from our

17   perspective, Your Honor, to get to the question, we have no

18   concerns, we are not going to seek to recuse the Court.  And

19   so, I guess it will depend what the defendant wants to do.

20           THE COURT:  This is what I would like to do:  I think

21   that whether judges are acting appropriately is a matter of

22   public concern, and so I don't think this proceeding should

23   remain sealed.  Because if I make a decision -- if I'm asked to

24   recuse myself and I make a decision that people object to or

25   people -- one way or the other, I don't think that should be

1   all sealed up.

2          So, if no one disagrees, I would unseal this

3   proceeding.  And I'm going to -- I think I need to set a date

4   by which you need to inform me whether you would seek my

5   recusal or you would not seek my recusal.  And I don't believe

6   that's something I would let dangle out there.  And, frankly,

7   if you thought it was appropriate, I would do it.  But if you

8   don't think it's appropriate, I don't see that it's something

9   that I need to do.  And the last time that happened someone

10  stood up in court and said we move to recuse you, right then.

11         And -- but I'm happy also give you time to think

12  about it, but I think it has to be relatively prompt for the --

13  if you want your trial date.  And I can't promise you, you

14  know, who's available and who's not.  And we've got a number of

15  judges that this could end up going to that would have to

16  recuse themselves for more significant reasons, but there's

17  plenty left, all of whom are quite good.

18         So, it is July 16.  Can we say that you will let me

19  know by Monday, the 22nd?

20         MR. MURPHY:  Yes, Your Honor.

21         MR. TAYLOR:  Yes, Your Honor.

22         THE COURT:  You can just file something letting me

23  know either way.  That would be helpful.

24         MR. MURPHY:  We'll file those.

25         THE COURT:  While I've got you here, with respect to

1    motion to dismiss Count 2, I wanted to invite the parties to

2    address two questions that I have in a brief submission -- the

3    briefer the better.  It may not exceed five pages.  And I

4    assure you, you don't need to repeat anything you've said

5    before.

6            The first question is whether 28 CFR 5.2(g), which

7    relates to inquiries by potential registrants and their

8    furnishing of additional information to the department,

9    suggests that Section 618 could be broader than merely

10   registration statements and supplements and attachments

11   thereto, as was argued.

12           Secondly, I want you to take a look at section 612(d)

13   of the statute, which characterizes 618, and let me know if you

14   believe that the words used there suggest that congress did

15   mean it to cover only registration statements and supplements

16   and attachments thereto.

17           So, I've been looking at this very hard, but I don't

18   believe those precise issues have been touched in either

19   pleading, and I wanted to give you the chance -- you quoted

20   them, but you didn't quote them to make those arguments, I

21   think.  At any rate, it would be helpful to have that.

22           I also think, because this was mentioned and I think

23   it's going to inform a lot of what happens next at the pretrial

24   conference and moving forward -- again, without the need for a

25   lot of introduction, there's no need to summarize the

1   indictment, the indictment says what the indictment says -- I

2   would like you to file a separate submission -- and you can

3   have more time on this one than the last one, which I haven't

4   given you a date for yet -- on what is going to be presented or

5   should be presented to the jury for its decision if Count 1

6   survives.

7           Mr. Taylor argued that there's not going to be

8   individual specifications, it should just be up or down;

9   guilty/not guilty on Count 1, the scheme to defraud.  But I

10  would like to hear from the parties about whether we need

11  special interrogatories or some sort of way to explore it, or

12  something to ascertain whether or not the jury is unanimous on

13  the manner and means, and whether they have to be unanimous on

14  the manner and means.  And if you don't want anything other

15  than the guilty/not guilty, are you waiving your right to argue

16  later that you didn't get a unanimous verdict on the manner and

17  means?

18          So, I would like to know what you both think about

19  that.  And you might as well get that in writing and not start

20  talking about it for the first time at the pretrial conference.

21          So with respect to the very narrow question about

22  these two provisions and how they relate to or don't relate to

23  your respective arguments on Count 1, can we have the same

24  date, July 22nd?  Or I can give you a week, until July 23rd.

25  But I have to tell you, I'm really struggling to rule on these

1   things.  And I know that you all have a lot to do, but you

2   picked this trial schedule.  And then, the other matter, the

3   week after that, the 29th.

4            MR. MURPHY:  July 23rd would be preferable, Your

5   Honor.

6            THE COURT:  All right, 23rd for the supplemental

7   memoranda with respect to the motion to dismiss Count 2, and

8   July 29 with respect to the briefs I've requested on how the

9   jury would have to decide Count 1.

10           MR. TAYLOR:  William Taylor, Your Honor.  May I ask a

11  clarifying question?

12           THE COURT:  Yes.

13           MR. TAYLOR:  Your question is -- if Count 1 survives,

14  prompts me to ask:  Do you mean if it survives without the

15  concealment allegations, or if it -- in other words, if you

16  were to find -- and we obviously don't know which way you're

17  going to rule -- if you were to find there is no duty, the

18  government has argued, nevertheless, the count survives because

19  of allegations of misstatements and misrepresentations.  Is

20  that your question, or is it --

21           THE COURT:  My question is broader than that, which

22  is:  How would Count 1, as it is currently written, or if it

23  ends up being truncated -- do the individual manner and means

24  need to be presented to the jury for its decision?  Does it

25  have to agree -- if in a conspiracy count the jury has to agree

```
1    on an overt act, are they going have to agree, well, the

2    affirmative act that furthered the scheme was the one in

3    paragraph -- well, this one?  Or was it that one?  Or was it

4    none of them?  Was it all of them?  Or do you just want yes or

5    no, did he engage in a scheme to falsify, conceal or cover up?

6              MR. TAYLOR:  The manner and means I think are in

7    paragraph 49, the three manner and means which are identified

8    there.  I take it your question is a little broader.

9              THE COURT:  Well, then it says execution of the

10   scheme, and then you have all the rest of the paragraphs.  So

11   the question is, do they have to agree -- I want to know what

12   you have to say.

13             MR. TAYLOR:  And if so, on what.

14             THE COURT:  Well, I think it's important.  We have

15   the way that it was done in Safavian, and in oral argument I

16   believe you indicated to me that you didn't think that's what

17   you -- you don't want to happen in this case.  I think you were

18   quite clear about that.

19             MR. TAYLOR:  That's right.

20             THE COURT:  So I want to know, is there a law that

21   says it has to happen that way, or that it can happen your way?

22   And do we run afoul of some other provision that you would use

23   in, say, a conspiracy case?  Does that apply to a scheme to

24   defraud case?  I haven't done the research.  I think it would

25   be helpful.
```

1          MR. TAYLOR:  It's a very difficult question, which I

2     think points out --

3          THE COURT:  That's why I want you all to brief it.

4          MR. TAYLOR:  Thank you, Your Honor.

5          THE COURT:  All right.  That's everything I have

6     right now.  Once again, I want to say that I do appreciate your

7     coming in with this as soon as you knew it existed.  And I'm

8     going to continue to think about it, no matter which way I hear

9     from you, or even before I hear from you.  But clearly hearing

10    from you is a very significant piece of this.

11         And if the government is also -- I understand you've

12    given me an answer, but if you want to think about it between

13    now and Monday and tell me something else on Monday, you're

14    entitled to do that, too.

15         MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

16         MR. MURPHY:  Thank you, Your Honor.

17         THE COURT:  Thank you.

18         And this transcript will be unsealed.  The hearing

19    and everything on it.

20                        *   *   *

21

22

23

24

25

```
1

2                   CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5            I, JANICE DICKMAN, do hereby certify that the above

6       and foregoing constitutes a true and accurate transcript of my

7       stenograph notes and is a full, true and complete transcript of

8       the proceedings to the best of my ability.

9                         Dated this 17th day of July, 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25
```