```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3     United States of America,      ) Criminal Action
                                      ) No. 19-CR-125
 4                    Plaintiff,      )
                                      ) PRETRIAL CONFERENCE
 5     vs.                            )
                                      ) Washington, DC
 6     Gregory B. Craig,              ) August 6, 2019
                                      ) Time:  10:00 a.m.
 7                    Defendant.      )
       _____
 8
                     TRANSCRIPT OF PRETRIAL CONFERENCE
 9                          HELD BEFORE
               THE HONORABLE JUDGE AMY BERMAN JACKSON
10                  UNITED STATES DISTRICT JUDGE
       _____
11
                        A P P E A R A N C E S
12
       For Plaintiff:      Fernando Campoamor-Sanchez
13                         Molly Gulland Gaston
                           U.S. ATTORNEY'S OFFICE FOR THE
14                            DISTRICT OF COLUMBIA
                           555 Fourth Street, NW
15                         Washington, DC 20530
                           (202) 252-7698
16                         Email: Fernando.campoamor-sanchez@usdoj.gov
                           Email: Molly.gaston@usdoj.gov
17                         Jason Bradley Adam McCullough
                           U.S. Department of Justice
18                         950 Pennsylvania Avenue, NW
                           Washington, DC 20530
19                         (202) 233-0986
                           Email: Jason.mccullough@usdoj.gov
20
       For Defendant:      William James Murphy
21                         William W. Taylor, III
                           Adam B. Abelson
22                         ZUCKERMAN SPAEDER, LLP
                           100 East Pratt Street
23                         Suite 2440
                           Baltimore, MD 21202
24                         (410) 949-1146
                           Email: Wmurphy@zuckerman.com
25                         Email: Wtaylor@zuckerman.com
                           Email: Aabelson@zuckerman.com
```

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

---

Court Reporter:   Janice E. Dickman, RMR, CRR, CRC
                  Official Court Reporter
                  United States Courthouse, Room 6523
                  333 Constitution Avenue, NW
                  Washington, DC  20001
                  202-354-3267

```
 1              THE COURTROOM DEPUTY:  Good morning, Your Honor.

 2   This morning we have Criminal Case Number 19-125; the United

 3   States of America v. Gregory B. Craig.  Mr. Craig is present in

 4   the courtroom, Your Honor.

 5              Will counsel for the parties please approach the

 6   lectern and identify yourself for the record.

 7              MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.

 8   Molly Gaston and Jason McCullough and Fernando

 9   Campoamor-Sanchez for the United States.

10              THE COURT:  Good morning.

11              MR. TAYLOR:  Good morning, Your Honor.  Bill Taylor,

12   William Murphy, Erza Marcus, Paula Junghans and Adam Abelson

13   for the Defendant.

14              THE COURT:  All right.  Good morning.  I know the

15   defendant is present.

16              This is, I guess, what I'm going to call the first

17   half of our pretrial conference.  I would like to cover a

18   number of issues this morning.  I think I'm prepared to rule on

19   them, but I at least want to talk about them.  And what I think

20   I'm going to do is after we've completed talking about all the

21   motions in limine, adjourn until tomorrow afternoon for the

22   exhibits, now that I have the -- the newer lists.  I'm glad

23   that I didn't spend last night going through all the exhibits.

24   But, I think that's all we'll have left at that point.

25              I do think that you will get the ruling on the motion
```

1    to dismiss, if not today, then certainly by first thing

2    tomorrow.  My problem with it at this point, it seems to be

3    characterized by that famous adage, if I had more time, I would

4    have written a shorter letter.  And so the question is:  How

5    much more time do I want to spend making it shorter?  And the

6    answer to that question is probably not much.  So, it may be

7    longer than you would like, but I'd rather get it in your hands

8    sooner rather than later.

9         With respect to the matters that we need to take up

10   before we begin our trial and our jury selection on Monday,

11   just moving in chronological order as how one would conduct a

12   trial, I'll start with the voir dire.

13        Right now I think that's pretty straightforward.

14   There's very little in dispute, and I appreciate the parties

15   working together on the questions.  What I'm going to do is

16   revise them slightly and then circulate what the final list

17   will be this week.

18        There were only a few issues where you seemed to have

19   differences of opinion.  One was whether there should be some

20   information regarding the defendant's biography or work

21   history.  I understand the government's concern about having it

22   be too fulsome, but I do think that some basics are needed so

23   that we don't start the trial and have someone say, "Oh, that

24   guy."  I think I'm going to add some information about where

25   he's been before today to the question.

1          There were also dueling questions about how to

2     receive the testimony of a law enforcement witness, but they

3     are sufficiently similar that I think I can come up with

4     something.

5          There was a joint question about anyone who has

6     opinions about the involvement of the Special Counsel's office.

7          One thing -- and there was a question about the

8     Ukraine, all of which I think is appropriate.  One thing that I

9     did not see -- and I'm wondering if people want me to ask a

10    question -- is that there may be testimony about work on a

11    project with Paul Manafort and Richard Gates.

12         Do we want to ask if anyone has any strong feelings

13    about that fact alone that could make it difficult to be fair

14    and impartial and reach a verdict based solely on the evidence

15    in this case?

16              MS. JUNGHANS:  Yes, Your Honor.

17              MR. TAYLOR:  Yes.

18              THE COURT:  The government doesn't have any

19    objection?

20              MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

21              THE COURT:  Okay.  So I'm going to ask that question.

22         And finally, there was a question into which I was

23    supposed to insert a list of names of individuals or entities,

24    but unless I never clicked on the right thing, I didn't find

25    the list as an attachment to the pretrial statement.  So I need

1     that.

2               MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  We

3     understood there was a minute order entered yesterday for that.

4               THE COURT:  Right.  And that was for the witness

5     list, which I guess is the same.  And I'm not going to say --

6     I'm happy to put it in this format, but I'm going to say that

7     they'll either hear about or there will be witnesses.  And then

8     I need those lists, so --

9               MR. CAMPOAMOR-SANCHEZ:  Yes.  And one question we had

10    is whether it would be possible to submit that to chambers

11    versus filing the lists publicly.  Obviously, we'll do whatever

12    the Court instructs, but --

13              THE COURT:  Well, I mean, the trial is Monday.  It's

14    going to be read aloud on Monday.  So I'm not sure that there's

15    much need for a seal.  You're not going to be specifying which

16    ones are witnesses.  You're not going to be committing to

17    calling them.  And I'm going to blend the two lists into one.

18    So, I don't really see why we need to be secretive about it.

19              Mr. Taylor?

20              MR. TAYLOR:  Bill Taylor, Your Honor.  I think we

21    were prepared to give you a list of entities and persons who

22    are likely to be named or referred to in the testimony, in

23    addition to witnesses.

24              THE COURT:  All right.

25              MR. TAYLOR:  That, we would be prepared to submit.

1          THE COURT:  Right.  So if we have all that, I don't

2     think it will be apparent to anyone reading this, if it's

3     docketed, who is going to be called and who is not going to be

4     called.  And in any event, if they're sitting here Monday, they

5     would hear the lists.  Okay.  So I appreciate that.  As soon as

6     I get that, I can paste it in.

7          All right.  That's all I have to say about voir dire.

8          We have, I think by my calculation, eight motions in

9     limine to talk about, some of which are easier than the other.

10          Government's motion in limine, Docket 43, was the

11     character testimony motion in limine.  The defendant opposed it

12     at Docket 54, and there was a reply at 66.  The government's

13     position was it should be limited to the reputation for

14     truthfulness, and it should be limited to two.  The defense

15     said, Well, we'll have to see what the government's case is

16     before we know what character traits are pertinent.  And it

17     would be arbitrary to limit the number of character witnesses.

18          So, I guess I could defer this to the end of the

19     government's case.  But, can you give me any more specificity

20     about what you're thinking about?  I mean, are you planning to

21     bring in 20?  Are you planning to bring in five?  Are you

22     planning to bring in none?

23          MR. TAYLOR:  We do plan to call character witnesses,

24     Your Honor.  The exact identity and number we'll make decisions

25     about -- or, we would like to make decisions about after the

1    trial starts.

2         But we have witnesses from, as you know,

3    Mr. Craig's -- the phases of his life from the time he was in

4    Mississippi to his work for the State Department, for the White

5    House, his work on the Carnegie Endowment, the various features

6    of his life and character, which a jury would be entitled to

7    know about in terms of his integrity, his honesty and his law

8    abidingness.  So I would be -- I would rather not be -- be

9    forced to say how many today, but I understand the Court's

10   discretion in this -- in this area.  And one thing we -- you

11   know, we're going to be making decisions, to some extent,

12   depending upon your ruling.  So, I don't know whether it would

13   be improper for me to ask you whether or not you expect to go

14   forward on one count or two.

15        THE COURT:  I would -- I'm very reluctant to publicly

16   state something that's going to be in an opinion, that I'm

17   going to proofread one more time.

18        MR. TAYLOR:  I thoroughly respect that, but I

19   think --

20        THE COURT:  And I understand that.

21        MR. TAYLOR:  Yeah.

22        THE COURT:  But, frankly, I believe that, while the

23   two have different statutory basis, they're pretty much similar

24   about whether he made a false statement or didn't make a false

25   statement.  They raise the same factual and character issues,

1    largely.

2              And so I think I will defer this to the government's

3    Motion 43 at the conclusion of the government's case.  But I do

4    believe that there is some point where that testimony can be

5    cumulative and even range to the point of not being relevant if

6    we stretch too far back into his entire career.  And so I ask

7    you to be focused and think about what would be the most

8    persuasive and --

9              MR. TAYLOR:  We intend to be, Your Honor.  There is a

10   point at which it becomes tedious --

11             THE COURT:  All right.

12             MR. TAYLOR:  -- and we know that.

13             MR. CAMPOAMOR-SANCHEZ:  Your Honor, just for the

14   government seeking clarification.  Are those potential

15   character witnesses going to be included in the witness list

16   that's going to be filed today?  Because, obviously --

17             THE COURT:  Mr. Murphy is nodding.

18             MR. TAYLOR:  Okay.

19             THE COURT:  All right.

20             MR. TAYLOR:  Thank you.

21             MS. GASTON:  If I may briefly, Your Honor.  There was

22   one other aspect of the government's motion, which was to seek

23   to prevent the defense from cross-examining the government's

24   witnesses to elicit character testimony, and we would ask that

25   the Court do that at this time.

```
1              THE COURT:  Well, I don't see how that would be
2    within the scope of the direct --
3              MS. GASTON:  Okay.
4              THE COURT:  -- so -- unless I'm wrong about that.
5              MS. GASTON:  Okay.
6              MR. MURPHY:  Your Honor, with respect to a couple of
7    the witnesses who worked on the report very closely with
8    Mr. Craig, who helped investigate it and prepare it, they will
9    be asked questions about the report.  Part of, I think, within
10   the scope of their direct would be whether Mr. Craig was
11   someone that they viewed as a person who went about this report
12   cognizant of his personal integrity, the firm's integrity, his
13   honesty, whether the conclusions that were reached were honest
14   conclusions reached by the Skadden lawyers, as opposed to what
15   the government has alleged, which is that there was some effort
16   being made by the Ukraine and its other representatives to spin
17   the report in a certain way, to steer its conclusions, and that
18   Mr. Craig resisted all that.
19             THE COURT:  Are we putting on evidence about the
20   conclusions in this report?
21             MS. GASTON:  No, Your Honor, we're not.
22             THE COURT:  We're not trying the report in this
23   courtroom.  I can tell you that.
24             MR. MURPHY:  That's good.
25             THE COURT:  Neither side is going to get to try the
```

1    report.

2              MR. MURPHY:  I think that that's generally good, Your

3    Honor.  But, the government has introduced an awful lot of

4    exhibits that have to do with the efforts being made by others

5    to shape the conclusions that the Skadden lawyers reached about

6    the report.  So then I don't really understand why all those

7    exhibits -- there's scores of them -- have been produced.

8              THE COURT:  If they ask witness questions designed to

9    elicit, you know, "Were you under pressure to spin the report?"

10   You can certainly ask on cross "And did Mr. Craig resist that

11   pressure?"  But, I think if they just say, "I worked on the

12   report with them," I don't think you can come in on cross and

13   say, "And while he did that, he did that with the reputation of

14   honesty and integrity that, you know, he built up through his

15   many years of work on the State Department and White House,"

16   et cetera.  That's your character testimony.

17             MR. MURPHY:  Well, okay.  I also think it's fair

18   game, Your Honor, to ask particularly -- of three lawyers, in

19   particular, who were most closely involved with Mr. Craig on

20   the report, one of whom worked with Mr. Craig and knew

21   Mr. Craig for 30 years or more, and two of whom came to the

22   firm and worked with Mr. Craig because they wanted to come to a

23   firm where Mr. Craig was.  They had met with him when they

24   interviewed.  They were interested in working with him and

25   sought him out for reasons that had to do with his reputation.

1          THE COURT:  Ordinarily, you can't ask one fact

2     witness to bolster the credibility of another fact witness.

3     And that seems to me what you're trying to do here.  I think

4     you need to stick to the scope of the direct.

5          MR. MURPHY:  Then do we need to call these witnesses

6     back in our case?  I mean, that's -- one of the witnesses has

7     written a letter both to the government -- his counsel has

8     written a letter to both the government and to us saying he

9     would like to be away on a vacation that he's planned with his

10    family during the time that the defense would be presenting its

11    case.  We would like to be able to ask him complete questions

12    and to have him give his testimony and -- and be excused from

13    the courtroom.

14         THE COURT:  Well, at this point you all know so much

15    more than I do.  I don't know who he is.  I don't know what

16    he's going to testify about.  At the conclusion of his

17    testimony, if you want to take this up, about whether that you

18    would otherwise recall him to do X and can you do it during

19    their case, we can talk about it.  But I'm not going to rule on

20    it without any information about who we're talking about or

21    what we're talking about.

22         MR. MURPHY:  Okay.

23         THE COURT:  All right.

24         MR. MURPHY:  All right.  Thank you, Your Honor.

25         THE COURT:  So that motion will be deferred.

1           MR. TAYLOR:  Your Honor?

2           THE COURT:  Yes.  Okay.  And I -- I think we are

3    going to have to pick and choose who does which motion or we

4    will be here until Friday.  So -- but, go ahead.

5           MR. TAYLOR:  All right.  I apologize.

6           THE COURT:  All right.

7           MR. TAYLOR:  Your Honor said something that prompted

8    me to think I should explain to you something about the

9    relevance of the report.  You said we're not going to try the

10   report.

11          The case is about whether Mr. Craig believed the

12   report and its content was being misrepresented.  We're going

13   to have to discuss the content and the conclusions of the

14   report in order to address the questions of why he did what he

15   did.

16          THE COURT:  The case is about whether, when he spoke

17   to reporters, it was for that purpose --

18          MR. TAYLOR:  Yes.

19          THE COURT:  -- or whether he actually spoke to the

20   reporters before the report was issued and it had been

21   mischaracterized or not.

22          MR. TAYLOR:  Correct.

23          THE COURT:  It doesn't have anything to do with the

24   content of the report.  It has to do with chronology.

25          MR. TAYLOR:  Well, it has to do with why -- what

1    about the report was being mischaracterized.  The particular

2    conclusion in the report that was being mischaracterized by the

3    Ukraine will require us to explain what that was.  It was the

4    due process violations which were found, as well as the

5    Ukraine's pronouncing that the report did not find political

6    motivation.

7            THE COURT:  All right.  As I said, I think you all

8    understand the general proposition that whether this was a good

9    report or a bad report and whether -- and criticism it received

10   or it didn't receive is not the scope of this trial.

11           MR. TAYLOR:  I think this will be clearer when you

12   hear the testimony.

13           THE COURT:  All right.  All right.

14           The next motion in limine I wanted to take up, I

15   issued a minute order on July 2nd, deeming Docket Number 45

16   filed by the defendant to be a motion in limine.  It was

17   opposed with Docket 56, and there was a reply at Docket 63.

18   And that related to whether statements contained in interviews

19   of Richard Gates and Jonathan Hawker attributing other

20   statements to Paul Manafort and Mr. van der Zwaan are hearsay.

21   The defendant identified nine statements, said he couldn't

22   specify which ones exactly because he doesn't know which ones

23   the government is going to introduce.

24           The government, helpfully, suggested that I should

25   deny the motion and reserve my rulings on the admissibility of

1    testimony once it's offered and the defendant raises an

2    objection.  And then it indicated that the nine are not

3    impermissible hearsay and should be admitted.

4           It is possible that I may need to hear some testimony

5    to determine their admissibility, but it is my goal to try to

6    streamline things and not put the jury back in the jury room

7    and spend a long time arguing about whether we have a

8    conspiracy or we don't have a conspiracy, whether these are in

9    furtherance of the conspiracy, whether they're hearsay or not

10   hearsay.

11          And so I was wondering if the government could

12   specify for me which ones it knows it's planning to introduce

13   and which ones it's not.

14          MR. CAMPOAMOR-SANCHEZ:  Your Honor, on the nine, we

15   did identify some that we for sure were not going to introduce.

16          THE COURT:  Okay.

17          MR. CAMPOAMOR-SANCHEZ:  So, we went one by one and we

18   actually stated -- so, for example, as to the first one, we

19   said we did not intend to ask Mr. Gates about the particular

20   statement about -- that he heard from Mr. Manafort, that the

21   defendant had contacted Durbin or other congressmen.  So we do

22   not intend to elicit that, and we stated that.  We -- we

23   caution, however, that depending on what the cross is, it

24   might -- it might become relevant.

25          As to the second issue --

1          THE COURT:  Well, becoming relevant and having

2     somebody just offer it up are two different things, so -- okay.

3          MR. CAMPOAMOR-SANCHEZ:  Right.  Right.  And we said

4     we were not going to intend to ask Mr. Gates on direct about

5     that.

6          THE COURT:  All right.

7          MR. CAMPOAMOR-SANCHEZ:  As to the second objection

8     about Manafort telling him that Skadden was going to look into

9     whether they needed to file under FARA, again, we said we did

10    not intend to ask about that on direct examination.

11          The third issue they raised, we stated -- their

12    objection is about discussions as to what the defendant would

13    be willing to do or not do regarding the media plan that were

14    conducted primarily between the defendant and Mr. Manafort.

15          So I do expect Mr. Gates to testify that he was

16    engaged and he was tasked by Mr. Manafort to essentially carry

17    out and help to manage the media rollout.  I do expect him to

18    also testify that he would have -- he knew that Manafort and

19    defendant were having conversations and then he would be

20    briefed.  I'm not intending to ask what the briefing was, to

21    have Mr. Gates recount --

22          THE COURT:  So he can say what he was tasked to do,

23    but he can't say that Manafort told me that Craig told Manafort

24    X, Y, and Z; that Manafort would have to testify to that?

25          MR. CAMPOAMOR-SANCHEZ:  Correct.  And that's --

1     that's what we intend -- how we intend to handle it.

2              Now, I also made it clear in our filing that

3     Mr. Gates did have a few personal conversations with Mr. --

4              THE COURT:  That's fine.  If Mr. Craig spoke to

5     Mr. Gates personally, that's a whole other matter.

6              MR. CAMPOAMOR-SANCHEZ:  Correct.  Then the fourth

7     issue was whether he would testify on direct that Manafort told

8     him that he had helped arrange meetings between the defendant

9     and the Ukrainian oligarchs for additional work opportunities.

10    And again, we stated we did not intend to ask about that on

11    direct examination.  But again, it may become relevant.  And we

12    may have separate evidence, apart from Gates' testimony, that

13    we may introduce about those conversations between Mr. Manafort

14    and the defendant.

15             THE COURT:  Who would testify to them?

16             MR. CAMPOAMOR-SANCHEZ:  Well, so we have emails

17    between Mr. Manafort and the defendant.

18             The fifth objection that they raised related to

19    testifying on direct examination that Mr. van der Zwaan told

20    Mr. Gates that the media plans were being shared with the

21    defendant.  And we do intend to ask Mr. Gates whether his plan

22    for executing the media strategy included his expectations or

23    his direction that Mr. van der Zwaan would be sharing that with

24    Mr. Craig.  Now, Mr. Gates --

25             THE COURT:  Hold on one second.  You will get a

```
1    chance to talk, but you can't talk while he's talking.

2              All right.  Go ahead.

3              MS. JUNGHANS:  I'm not saying a word.

4              THE COURT:  All right.

5              MR. CAMPOAMOR-SANCHEZ:  And so --

6              THE COURT:  All right.  Tell me -- walk me through

7    five again.  Van der Zwaan is not testifying --

8              MR. CAMPOAMOR-SANCHEZ:  Van der Zwaan is not

9    testifying.  The government is not calling Mr. van der Zwaan.

10             THE COURT:  So, then I don't think you can

11   introduce -- are you planning to introduce statements from

12   Mr. van der Zwaan to Gates, or just, You spoke to

13   Mr. van der Zwaan and then you did X?

14             MR. CAMPOAMOR-SANCHEZ:  Right.  So I'm -- it's more

15   like the latter.  In other words, What did you instruct

16   Mr. van der Zwaan to do?  What was Mr. van der Zwaan supposed

17   to do based upon your conversation with him?

18             But, Mr. Gates will say -- and this was clear in the

19   302s.  Mr. Gates does not know if Mr. van der Zwaan delivered

20   the plan to the defendant.

21             THE COURT:  So he can say, I directed van der Zwaan

22   to do X, Y, and Z, but he is not going to say,

23   Mr. van der Zwaan told me Mr. Craig said X, Y, and Z.

24             MR. CAMPOAMOR-SANCHEZ:  Correct.  We're not eliciting

25   that.
```

1          THE COURT:  Okay.  All right.

2          MR. CAMPOAMOR-SANCHEZ:  Then -- and I think that was

3      the last one they raised as to Mr. Gates' testimony.  Then we

4      move on to Mr. Hawker.

5          THE COURT:  All right.  Well, let's just stop right

6      there for a second.  It sounds like with respect to all five

7      statements, that basically I can grant the motion as conceded.

8      Talking about whether it might come in or the door might open

9      is another situation.  But you're saying you're not planning to

10     introduce out-of-court statements made by Manafort,

11     van der Zwaan --

12         MR. CAMPOAMOR-SANCHEZ:  So I -- I don't think the

13     Court should grant it as conceded because there was still some

14     disagreements about -- the government said, as to one, we're

15     not -- we're offering it.  So that -- that could be conceded.

16     As to number two, we're not offering.  As to Mr. -- three, the

17     way they phrased it, we don't think that that is in itself

18     hearsay, and that's what we argued as to point three.

19         THE COURT:  But you're not seeking to introduce it,

20     so it's moot?  You're saying you're not going to put in what

21     Mr. Craig said to Mr. Manafort?

22         MR. CAMPOAMOR-SANCHEZ:  Correct.

23         THE COURT:  Okay.  So, putting aside whether you

24     agree whether it's hearsay or not, you're not seeking to

25     introduce it.  The motion in limine just says, Can we keep it

1    out?

2              MR. CAMPOAMOR-SANCHEZ:  Right.

3              THE COURT:  And you're saying you're not putting it

4    in.

5              MR. CAMPOAMOR-SANCHEZ:  Right.  It's just the way

6    they phrased it in their motion, what they pointed the Court

7    to, I did not agree that that, in and of itself, was hearsay.

8              THE COURT:  Okay.  That's not what I'm suggesting

9    you're conceding.  I'm just saying you're not planning -- all

10   right.  We'll call it moot, not conceded.

11             All right.  Let's go on to four.

12             MR. CAMPOAMOR-SANCHEZ:  Okay.  Four.  Yes, we do not

13   intend to ask Mr. Gates about the specific statements.  And

14   then five, I -- I explained why we disagreed, that what they

15   pointed to was not -- we disagree that it was hearsay.  And I

16   explained to the Court what we intended to do about that.

17             THE COURT:  Okay.  But it's not coming -- you're not

18   introducing it?

19             MR. CAMPOAMOR-SANCHEZ:  I'm not introducing a

20   van der Zwaan statement.

21             THE COURT:  Okay.  All right.  So, with respect to

22   those five, the motion in limine is -- I don't know whether

23   that makes it either granted or denied as moot, but it's moot

24   and you're not going to introduce them.

25             So let's go on to, now, the statements of Mr. Hawker.

```
 1              MR. CAMPOAMOR-SANCHEZ:  Right.  So first, the
 2     defendant objected to Mr. Hawker testifying on direct that
 3     Gates told him that defendant had stated that he had a trusted
 4     relationship with a New York Times reporter, Mr. Sanger, and
 5     that the defendant would cede the report with Mr. Sanger.  And
 6     we do intend to introduce that not for the truth, but to
 7     explain why Mr. Hawker included that in the plan.
 8              THE COURT:  Say this again.  Mr. Hawker is going to
 9     say that Gates told him that or that Mr. Craig told him that?
10              MR. CAMPOAMOR-SANCHEZ:  No, that -- first, he's going
11     to -- well, a couple of things, so that the Court knows.
12     Mr. Hawker himself heard the defendant suggest Sanger at one
13     point.  So that's one --
14              THE COURT:  Okay.  So that's a statement by the
15     defendant.
16              MR. CAMPOAMOR-SANCHEZ:  That's a statement by the
17     defendant.
18              THE COURT:  Okay.
19              MR. CAMPOAMOR-SANCHEZ:  But what they were
20     specifically objecting to is Mr. Gates did, in a 302, specify
21     that he informed -- that the defendant had told him that he had
22     a trusted relationship with the New York Times and that he told
23     that to Mr. Hawker.
24              THE COURT:  But Mr. Gates is going to testify --
25              MR. CAMPOAMOR-SANCHEZ:  Mr. Gates can testify.
```

1           THE COURT:  -- and be available for cross-examination

2    on that?

3           MR. CAMPOAMOR-SANCHEZ:  Correct.  But I -- the point

4    I was making, trying to make --

5           THE COURT:  Hawker -- because Gates said it to Hawker

6    is why Hawker wrote it in the report?

7           MR. CAMPOAMOR-SANCHEZ:  Right.  That's part of the

8    reason that Hawker includes it in the report.

9           THE COURT:  Okay.  All right.  I understand that one.

10          MR. CAMPOAMOR-SANCHEZ:  Okay.  Number two, the

11   objection was they objected to Mr. Hawker testifying on direct

12   that from conversation with Gates, Hawker understood Gates

13   believed the defendant wanted to do the briefing with Sanger

14   and that the defendant did not want to do the job.  And we

15   stated we do not intend to ask Mr. Hawker what he thinks Gates

16   believed regarding Mr. Craig's intention, but we do intend to

17   ask Mr. Hawker to explain the reason why he, as a public

18   relations specialist on the project, did not brief Sanger.

19          So, he's the public relations guy and he did not

20   brief Sanger.  And there's a reason for that.  And that is that

21   the defendant ultimately said that he wanted to do it himself.

22          THE COURT:  Was that ever communicated to him by the

23   defendant?

24          MR. CAMPOAMOR-SANCHEZ:  So, Mr. Hawker, I think, can

25   testify that he had a conversation with the defendant, but he

1    cannot say he has a specific recollection of that specifically

2    being communicated, but that was his understanding.  I believe

3    that's what Mr. Hawker will testify.

4              THE COURT:  So, he learned from somewhere, or is he

5    going to say from Gates that --

6              MR. CAMPOAMOR-SANCHEZ:  I believe he's going to say

7    that Gates said that, and I believe he's going to say he thinks

8    he had a conversation with the defendant.  But I don't think he

9    has a specific recollection of those words being uttered, but

10   that was his understanding.

11             THE COURT:  Okay.

12             MR. CAMPOAMOR-SANCHEZ:  And then the third objection

13   was, they objected to Mr. Hawker testifying on direct that from

14   a conversation with Gates, Hawker understood that Manafort had

15   sought out Craig because Craig ultimately agreed to have

16   contacts with a journalist, despite his prior refusal.

17             THE COURT:  So that one, I have a problem.

18             MR. CAMPOAMOR-SANCHEZ:  Right.  And we -- we do not

19   intend to ask Mr. Hawker, to say, Why do you think?  You know,

20   Why did this happen?  All we intend to ask is -- so, for

21   example, when there was a reversal --

22             THE COURT:  What I'm saying is I think you have to

23   leave Manafort out of the chain, what Manafort said to

24   somebody.  Gates will be here to testify and be cross-examined

25   about anything he said to Hawker.

1           MR. CAMPOAMOR-SANCHEZ:  Right.

2           THE COURT:  Hawker will be here to be cross-examined

3     about anything Mr. Craig said to him.

4           MR. CAMPOAMOR-SANCHEZ:  Right.

5           THE COURT:  Um --

6           MR. CAMPOAMOR-SANCHEZ:  But there is -- there is --

7           THE COURT:  I mean, if they can say -- I mean, what

8     is the -- what is the precise --

9           MR. CAMPOAMOR-SANCHEZ:  So what -- the way we -- we

10    present it to the Court is, Hawker is expected to testify and

11    explain that while he worked on a potential backup plan -- that

12    being because it was a state of reversal by the defendant -- he

13    did not abandon the idea of using the defendant to speak with

14    journalists, despite the reversal, because he was told that

15    Manafort planned to speak with the defendant about it.

16          THE COURT:  Because he was told that Manafort planned

17    to --

18          MR. CAMPOAMOR-SANCHEZ:  Correct.

19          THE COURT:  -- but not that he had been told of the

20    outcome of that conversation?

21          MR. CAMPOAMOR-SANCHEZ:  Correct.  And I'm not going

22    to ask about any outcome, but I do intend -- so, at some other

23    date, now he's back sort of on track.  He's back, part of the

24    plan.

25          THE COURT:  All right.

1          MR. CAMPOAMOR-SANCHEZ:  And then the final objection

2     they had for Mr. Hawker's testimony was that, as a result of

3     Manafort's conversation with defendant, the *New York Times*

4     emerged as a leading candidate over *Bloomberg* for a media

5     rollout plan.  And the government does not intend to ask

6     Mr. Hawker to testify or opine that the *New York Times* was

7     selected over *Bloomberg* based upon what was said during a

8     conversation that only happened between Manafort and the

9     defendant.  So we do not intend to elicit that from Mr. Hawker.

10          THE COURT:  Okay.  All right.  Ms. Junghans, I think

11     we've taken care of 1 through 5; 6 through 9, as I'm hearing

12     them, they're not going to elicit statements made by anybody

13     other than Gates or Mr. Craig.  So, with those provisos and

14     carve-outs and explanations, do you object to any of them?

15          MS. JUNGHANS:  Yes, Your Honor, because I think, as

16     will likely become obvious when the questions are asked, Gates

17     practically never spoke to Mr. Craig.  Everything he knows he

18     learned from Paul Manafort.  And so, to say Gates told Hawker

19     this, that and the other about Craig is an indirect way of

20     saying what did Manafort tell Gates and Gates, in turn,

21     repeated to Hawker?  And, you know, we'll have to see when the

22     questions are asked, but Mr. Gates --

23          THE COURT:  Well, but if Hawker is taking his orders

24     from Gates, even if Gates is a black box and we don't know how

25     the input got in --

```
1              MS. JUNGHANS:  Well, we do know.

2              THE COURT:  -- or why he said what he said, if he

3      said to Hawker, Do X, and what Hawker did is relevant and

4      Hawker is going to say I did it because Gates told me to, and

5      Gates is going to be here to say, I told him that --

6              MS. JUNGHANS:  Your Honor, I'm not -- I'm not

7      quibbling about Gates advising Hawker to do thus and so.  The

8      question is:  Why?  And so when he says, for example, because

9      Hawker understood or Hawker had learned or learned from Gates

10     that Craig had a, quote/unquote, trusted relationship with

11     Sanger, the only way for Gates to learn that was by talking to

12     Paul Manafort.

13             And so if you -- if the question is, What did Gates

14     tell you to do? full stop, that, obviously, does not elicit a

15     hearsay response.  If it is why, then it does.

16             And I think what Mr. Campoamor has just said is it's

17     the why that they're interested in, not the fact that Hawker

18     suggested -- or, that Gates suggested that Hawker do something.

19             THE COURT:  Well, are there emails between Manafort

20     and Gates that say --

21             MS. JUNGHANS:  That's why -- that's why -- I

22     respectfully submit that's why this testimony, the government

23     has to try to get it out orally because this is not the subject

24     of written communications, the why part.  And Your Honor may

25     have to wait to actually hear the question in context.  But I'm
```

1      suggesting to you that that's really what this is about.  And

2      to just say -- you know, I mean, as I said, if it's Gates asked

3      Hawker to do something, fine.  But that's not what the

4      government is really focused on.  It's the why part, because

5      there was a trusted relationship.

6              THE COURT:  Right.  I get it.

7              MS. JUNGHANS:  And I would also just make a point,

8      Your Honor, just so we're clear, the Court asked at the

9      beginning of this discussion about the co-conspirator

10     exception.  The government isn't relying on that.  And,

11     obviously, the case doesn't involve a conspiracy.  But even the

12     government isn't even relying on the co-conspirator rule under

13     801, so we don't have to worry about that.

14             THE COURT:  All right.

15             What would the government's theory be for why

16     Mr. Hawker can say, Gates told me to do X, and Gates can also

17     say, I told Hawker to do X.  How do you get the why out of

18     Gates without getting hearsay from Mr. Manafort?

19             MR. CAMPOAMOR-SANCHEZ:  So, Your Honor, it is correct

20     that there were a few meetings, but Mr. Gates did participate

21     in a number of meetings with the defendant.  And I believe

22     Mr. Gates has personal knowledge about the defendant suggesting

23     Mr. Sanger to -- as a reporter that this matter would be leaked

24     to.  So I have slightly factual disagreement with what you

25     heard.

1          Now, in terms of the why, if -- and I want to make

2     sure that we're clear about which is the part that we're

3     talking about, because I think that, if I'm hearing correctly,

4     there's a disagreement as to whether we're trying to elicit

5     something for the truth versus to explain why Mr. Hawker or

6     Mr. Gates took an action, which would not be hearsay.

7          So which is -- which is -- yes, ma'am.

8          MS. JUNGHANS:  Well, I don't want to interrupt you.

9     If you ask me a question, I'll answer it.

10          MR. CAMPOAMOR-SANCHEZ:  So the question -- I just

11     want to make sure I focus on whether it was number 1, 2, 3 or

12     4, so that I know exactly what we're talking about and I can

13     answer that.

14          THE COURT:  I think she was talking about the fourth

15     one, number 6, Gates telling Hawker --

16          MR. CAMPOAMOR-SANCHEZ:  Yes.  So, we -- as we stated,

17     we do not intend to ask Hawker to testify or opine about the

18     *New York Times* or how the *New York Times* was selected over

19     *Bloomberg* based upon a conversation.  So we don't intend to ask

20     that.

21          MS. JUNGHANS:  Excuse me.  I'm looking at the last

22     line under the fourth item on page 9.

23          MR. CAMPOAMOR-SANCHEZ:  Yes.

24          THE COURT:  Ms. Junghans, you're talking to me, not

25     him.

1          MS. JUNGHANS:  Yes, Your Honor.  Hawker is expected

2     to testify that the reason the media rollout plan was changed

3     from *Bloomberg* to *The Times* was because Gates told him that

4     defendant had a trusted relationship with Sanger.  That's the

5     why.  And so to say, you know, it's only for the -- and that's

6     key, obviously, to the subject matter of this case.  So, you

7     know, to say it's not for the truth I think is really

8     disingenuous.  It's just clearly for the truth.  If -- if the

9     Why did Hawker do something, he can simply say, Because Gates

10    told me to.  He doesn't have to get into this other stuff.

11         MR. CAMPOAMOR-SANCHEZ:  Okay.  If that's -- if that's

12    a concern, I'm happy to limit Mr. Hawker's testimony to why did

13    he change it and say, Gates told me to change it, and I can

14    address it with Hawker -- I mean, with Gates, if need be.

15         THE COURT:  All right.

16         MS. JUNGHANS:  Your Honor, I'll just make one other

17    point.  You know, we, obviously, identified the statements that

18    were available to us in the 302s.  Mr. Gates, in particular, is

19    not a model of consistency.  And so it's entirely possible

20    there are going to be additional objections.

21         THE COURT:  I'm not saying you can't stand up and

22    object to a question.

23         MS. JUNGHANS:  No, I know.  But I think this is going

24    to be tricky, and we may just have to take it step by step as

25    it comes.

```
 1              THE COURT:  It won't be the first time.

 2              MS. JUNGHANS:  No.

 3              THE COURT:  I think that this has helped focus

 4    everybody's understanding.  I think there's an appreciation on

 5    the part of the government of not asking Gates or Hawker to say

 6    what Manafort said and to leave it to, you know, What did you

 7    do?  What did you say?  Who did you direct?  So while -- I

 8    think with respect to issues six through nine, we need to wait

 9    and hear how they unfold.  I believe that largely the concerns

10    have been met by what the government has explained it's

11    planning to do.  But, your objection is not precluded once we

12    hear what actually comes up.

13              So, I think in this one it's kind of granted in part

14    and deferred in part.  But, I believe that we've pretty much

15    solved the concerns.

16              Number 46, defendant moved to exclude false

17    statements allegedly made during the interview with the Special

18    Counsel.  The opposition is 58.  The reply is 64.  And the

19    question is whether it's unduly prejudicial and should be

20    excluded since he's not actually being charged with making

21    false statements during that interview.

22              It seems to me that the repetition of the information

23    asserted in 2012, again during the interviews, is relevant to

24    whether the statements were knowing and willful.

25              And, so, I'm inclined to deny the motion, but I'll
```

1      give the defendant an opportunity to address it briefly.

2           MR. MARCUS:  Good morning, Your Honor.  I think that

3      where the concern really arises is what the government says

4      that it wants to argue to the jury, which is he repeated the

5      false statements in 2017 that he made in 2013.  And, you know,

6      as to 2013, there are going to be major factual disputes as to

7      what was said.

8           The same is true at least with respect to the

9      statements the government alleges were false and repeated in

10     2017.  And we've read the 302.  As to the statements that we

11     think the government is focused on, that -- that may be a

12     subject of dispute, and we really will have no choice but to

13     fight it.  And if that happens, there's a real risk of

14     substituting a dispute about 2017 for a dispute about 2013.

15     That's the major concern.

16          THE COURT:  All right.  Does the government want to

17     say anything about it?

18          MR. CAMPOAMOR-SANCHEZ:  No, Your Honor, I think we

19     said it all in our pleadings.  I'm happy to answer any

20     questions.  But I think it is certainly relevant.  And we're

21     not intending to get anybody on the stand to say that he lied

22     in 2017.

23          THE COURT:  All right.  I'm going to hold that one,

24     and I will let you know tomorrow with respect to my ruling on

25     that.

```
1            Defendant also moved in Docket 47 to exclude certain

2     evidence related to the mechanism of the payments flowing from

3     the Ukraine to Skadden.  There are aspects of it that they're

4     not objecting to, but there are aspects of the process and

5     certain details about it, and I think I need a little more

6     clarification.  Someone help me through what -- what you're

7     fine with and what you're not fine with and why.

8            MR. ABELSON:  Sure, Your Honor.  So the bulk of the

9     payments that went to Skadden for this report came from Victor

10    Pinchuk and were paid at the outset of the engagement.  It was

11    the 4,150,000.  What ended up being about 500,000 was paid

12    later by the Ministry of Justice.  The -- the funding -- the

13    money itself came in in June of 2013.

14           The process that resulted in that supplemental

15    payment by the Ministry of Justice was prolonged, in fits and

16    starts, over the course of, essentially, August 2012, then into

17    February and March of 2013.  And then the money came in in June

18    of 2013.

19           Ukraine is not the United States.  It has an

20    elaborate procurement process.  Its law and state payments --

21           THE COURT:  As opposed to our efficient government

22    process.

23           MR. ABELSON:  Well, fair enough.

24           THE COURT:  Okay.

25           MR. ABELSON:  But the main point is it's not the
```

1    same.  And so, what happened was, as soon -- when it became

2    clear to Mr. Craig and the others at Skadden that the money

3    that had been paid upfront was not going to be sufficient --

4    there was still more work to be done.  This happens.  There was

5    going to be a shortfall.  There's a dispute over exactly when

6    it became clear and how clear it was.  But, sometime in at

7    least July or August, it became clear there was going to be a

8    shortfall.

9            So there were discussions beginning at that point

10   between Mr. Craig, Mr. Manafort, Mr. van der Zwaan and then a

11   number of Ukrainian Government officials -- it's an alphabet

12   soup of the officials who were involved in this process --

13   about what the Ukrainians would need from Skadden to be able to

14   put into whatever budget needed to have something put into --

15           THE COURT:  Tell me the bookends for the timing of

16   this.

17           MR. ABELSON:  Sure.  So August of 2012.

18           THE COURT:  Okay.

19           MR. ABELSON:  So this was four months before the

20   report was released.

21           THE COURT:  Okay.

22           MR. ABELSON:  That's when there was the back and

23   forth with -- mainly with Mr. Manafort because it was his

24   office who had the contacts with the Ukrainians.

25           And Mr. Craig essentially said -- well, first the

1    question was whether Mr. Pinchuk was going to put up more

2    money, and the answer there was no.  So then the question

3    became, Well, the client, Ministry of Justice, has to pay for

4    this work.  So, what client do you need from us to secure those

5    funds?  And the answer turned out to be various documents.  The

6    answers changed over time.  But, it was all --

7              THE COURT:  Let me just get the answer to the

8    question I asked you.

9              MR. ABELSON:  Sure.  Sorry.

10             THE COURT:  The time for when this conversation

11   started is August 2012, and when the money landed was --

12             MR. ABELSON:  June 2013.

13             THE COURT:  Okay.  Thank you.  All right.

14             Okay.  So you object to what?  The fact that there

15   was any conversation about payment during that period or just

16   all the back and forth?

17             MR. ABELSON:  No.  So we don't object to evidence

18   that the Ministry of Justice put up additional funding.  We

19   don't object to the total amount of the payments from

20   Mr. Pinchuk or from the Ministry, or even the timing, the fact

21   that there was going to be a shortfall and the additional

22   funding from the Ministry was requested in August, and it came

23   in later.  Where we get into problems and would have an entire

24   sub-trial over this is the back and forth between -- with --

25   between Skadden and Mr. van der Zwaan and Mr. Manafort and the

1   Ukrainians.

2          The government points to a number of documents.  They

3   put a bunch of stuff on their exhibit list about this, and they

4   think there's something suspicious about that process and the

5   payments.  They go so far as to call a letter that Mr. Craig

6   sent to the Ministry a false invoice.  It's not a false

7   invoice.  But to -- to get a jury to understand why, in light

8   of the Ukrainian procurement requirements, this was not a false

9   invoice and it is not -- does not bear on anything related to

10  this case, will require us, even if we're as efficient and

11  targeted as possible, to explain the context and the back and

12  forth.  And so the government has --

13          THE COURT:  I thought the reference to the false

14  invoice was talking about invoicing Ukraine to make it look

15  like they were paying more than the small amount they had

16  originally agreed to pay, when actually that amount was covered

17  by the private individual.  I thought that was the false

18  invoice talked about in the complaint.

19          MR. ABELSON:  So the false invoice that they are --

20  my understanding of what they were referring to is this

21  August -- letter dated August 22nd, 2012.  And what the letter

22  says is, essentially, there's been a shortfall, estimating that

23  it will be 1.25 million because -- but the reason that it was

24  set out this way is because Mr. Pinchuk had paid about

25  4 million.  Mr. Craig and the others at Skadden estimated that

1    they needed about another million to make sure that they

2    wouldn't run out of money by the end of the project.

3            And one of the examples of the way that the

4    Ukrainians wanted this presented was, Well, okay, let's say the

5    project took X number of months and we're paying a fifth.  How

6    much does that work out per month?  And so they say -- they say

7    this letter was false.  It wasn't false.  It was just the way

8    the Ukrainians needed this information presented for their own

9    purposes.

10           THE COURT:  I thought they were alleging that it was

11   created, and all I'm basing this on is the indictment, and I

12   don't know and I'm not suggesting what's true, is that there

13   was a public -- questioning of the fee that was being publicly

14   stated as to what Skadden was charging for the writing of the

15   report and that that seemed low, and so they then created an

16   invoice to say, No.  We're actually charging a million.  We're

17   not charging 12,000, or whatever it was.  I thought that was --

18           MR. ABELSON:  So that is in the indictment.  But that

19   is part of the problem.

20           THE COURT:  Okay.

21           MR. ABELSON:  And there is -- that's just the start

22   of this process, and there is a vigorous dispute about the

23   purpose and context for that letter.  So, from our perspective,

24   and we believe the evidence is perfectly clear -- the

25   government disagreed, but we think it's perfectly clear that

1    there were -- there were two things going on at the same time.

2    There was this article and public pressure about -- in Ukraine

3    fomented by Miss Tymoshenko's legal team about who was paying

4    for this.

5            Meanwhile, Skadden was running out of money.  They

6    want to link those things.  They're really not linked.  The

7    fact of the matter is, and it's undisputed, that Skadden was

8    running out of money and was going to need additional funds.

9    And so just that one document, because they do dispute that, is

10   going to turn into this whole sub-dispute.  And that's not even

11   getting into the dozens of other exhibits related to the

12   procurement process that they've put on their exhibit list.  We

13   think it's a sideshow, a distraction, and just shouldn't be

14   part of this case.

15           THE COURT:  All right.  Thank you.

16           MR. McCULLOUGH:  Thank you, Your Honor.  As

17   Mr. Abelson just said, we have just a stark dispute as to the

18   very premise of this entire payment process.  And I will just

19   tell you that the whole idea that this was done because Skadden

20   was running out of money, we dispute that, and we think that

21   the evidence is certainly enough to put to the jury that there

22   was a reason for this effort to get more money, and that was to

23   create a plausible explanation for how much money Skadden was

24   receiving from the Ukraine.  The Ukraine was publicly stating

25   that it was only paying Skadden $12,000.  That became a point

1    of -- a public question as to the integrity of the report.  And

2    when that question arose, Mr. Craig took actions to bolster the

3    integrity of the report.

4            THE COURT:  Okay.  Well, let's -- you know, that's

5    your allegation.  It's disputed.  What issue in the case about

6    whether he knowingly and willfully made false or misleading

7    statements concerning the time and nature of his media contacts

8    does that make more or less true?

9            MR. McCULLOUGH:  So, Your Honor, it goes directly to

10   motive.  And the --

11           THE COURT:  To what?

12           MR. McCULLOUGH:  It goes directly to motive --

13           THE COURT:  Okay.

14           MR. McCULLOUGH:  -- in that Mr. Craig understood that

15   were he to be forced to register under FARA, he would be forced

16   to disclose the full amount of money that Skadden had been paid

17   and the full scope of work that Skadden had done for Ukraine.

18   And Mr. Craig had taken action to assist Ukraine in creating a

19   plausible explanation, a plausible explanation for how much

20   money it had been paid.  And after doing that, after taking

21   those steps, Mr. Craig was interested in concealing that

22   information.  Mr. Craig had a motive to avoid registering under

23   FARA because registering under FARA would have exposed the fact

24   that Mr. Pinchuk, who had insisted on anonymity, would be

25   exposed publicly.

1         It would have exposed that Ukraine, which was saying

2    We paid Skadden $1 million, and not indicating that anyone else

3    was involved, it would have exposed that fact as well.  And

4    those issues were -- they went --

5         THE COURT:  Was the invoice, whatever its purpose,

6    that was for a-million-two paid, or was only 500,000 paid?

7         MR. McCULLOUGH:  Your Honor, we -- we understand that

8    over $1 million was paid in June of 2013.  And what's -- what's

9    interesting about -- if I may, Your Honor.

10         THE COURT:  I guess my point is that whatever the

11    purpose of the invoice was, ultimately, even if -- they did --

12    that money was paid by the Ukraine.  It's just the extra that

13    was being paid by the private individual that isn't captured by

14    either the original 12,000 or that invoice; is that correct?

15         MR. McCULLOUGH:  That is correct, Your Honor.  So

16    the --

17         THE COURT:  So if his goal was to hide the four, why

18    does this change that?  You can still argue that, right?  Why

19    do we need this whole sideshow into the allegedly dummy

20    invoice, if they actually did pay what's in the invoice?  So,

21    you've got they paid $12,000.  Then they paid $1 million.  But

22    what he was really trying to hide was the four-plus paid by

23    somebody else.  Why do we need this whole debate about the

24    legitimacy of the August invoice for you to prove the motive

25    that you want to prove?

1          MR. McCULLOUGH:  Well, because there's a -- there's a

2    second component here, and that is the fact that -- Mr. Craig

3    is arguing, and part of his argument that he was not lying to

4    the FARA unit about why he was engaging in media contacts was

5    that he was not acting at the request of Ukraine.  He was not

6    acting at the request of Manafort to contact David Sanger and

7    execute the media rollout.  And this is the same -- it is the

8    same issue, whether Mr. Craig -- when questions arose about the

9    integrity of the report, whether Mr. Craig would act at the

10   direction of Mr. Manafort and Ukraine to bolster the integrity

11   of the report.

12          And that action, the action of sending a letter in

13   August of 2012 that says, We are owed, it's not -- this idea

14   that it -- that it talks about, you know, kind of, we're

15   running out of money -- the letter says, We have an outstanding

16   balance due of $1.25 million.  And it's two hundred and fifty

17   per month.  Mr. Craig is coming up with a plausible explanation

18   at the direction of Manafort.  And it is the same issue.  It is

19   the same issue, that Mr. Manafort is asking Mr. Craig to take

20   action in order to address public controversy.

21          THE COURT:  Can you tell me, putting aside any

22   evidence of payments made between August 2012 and June 2013,

23   the money the Ukraine actually paid, which I think probably

24   could be stipulated to -- incoming money from the Ukraine,

25   that's not really your problem here -- what exhibits are we

1    talking about that are in dispute?  It's the, quote/unquote,

2    fake invoice?  It's the communications from Manafort -- to and

3    from Manafort about the creation of the invoice?  Can you just

4    tick those out for me, so I can look at them specifically with

5    these explanations in mind?

6          MR. McCULLOUGH:  Yes, Your Honor.  I think

7    predominantly they are -- they are the exhibits that we

8    identified in our filing, which largely relate back and forth

9    between Mr. Manafort and Mr. Craig during August --

10          THE COURT:  So they're listed specifically?  You've

11    got the exhibit numbers in there?

12          MR. McCULLOUGH:  Correct.  Correct.  They do.

13          THE COURT:  Okay.

14          MR. McCULLOUGH:  And then in addition to that, we --

15    obviously, we have the -- the invoice, which is also listed

16    there, but it is our Government Exhibit 586 on our exhibit

17    list.

18          THE COURT:  All right.

19          MR. McCULLOUGH:  And the issue, Your Honor, is that

20    Mr. Manafort is requesting Mr. Craig to take an action to

21    bolster the integrity of the report.  And that is the same

22    thing that later happens when they go to roll out the report.

23    And that is -- that's --

24          THE COURT:  All right.

25          MR. McCULLOUGH:  That is a question as to what

1     Mr. Craig's motive was, what Mr. Craig's intent was when he

2     reached out to the *New York Times*.  Mr. Craig was taking

3     another action to bolster the integrity of the report, to

4     bolster the independence of the report, and that was for

5     Ukraine's purposes.

6              THE COURT:  All right.  It's your motion.  So if you

7     want to respond to that briefly.

8              MR. ABELSON:  Yes, please, briefly.  Just a few

9     points.

10             So, first of all, in terms of the exhibits implicated

11    by this, I think the best place to look is the government's

12    exhibit list.  One of the objections was specifically which

13    ones are tied to this motion, and so -- I've -- I've got them

14    here.  It's -- it's dozens.  I think it was 35 or 36 when I

15    counted.  And that is then -- and on top of that are the

16    exhibits that we have conditionally designated, that if this

17    motion is denied, we need these additional exhibits.  We think

18    they're not relevant, but we've included them in a conditional

19    list.  That's number one.

20             Number two, the idea that this August 22nd letter was

21    part of a cover-up in Ukraine, there is no evidence that this

22    was used for that purpose.

23             THE COURT:  I think they're saying it was used as a

24    cover-up in the United States, but okay.

25             MR. ABELSON:  Well, there's certainly no evidence of

1        that.  And so, a whole sideshow with all of these exhibits, if

2        that is the nexus, they have nothing.

3               Next, all of this was fully disclosed to the FARA

4        unit, the fact that there was a third-party payer, the

5        supplemental contract with Ukraine.  This was all -- that was

6        happening in 2013, contemporaneous with the back and forth.

7        And when the contract was finalized, Skadden sent it to the

8        FARA unit.

9               In terms of this motive, motive to hide anything, the

10       evidence shows -- we've laid this out -- that Mr. Craig wanted

11       to disclose this.  They were getting this criticism that was

12       impugning the integrity of Mr. Craig, of Skadden, of his

13       colleagues in Ukraine because of the speculation about this

14       third-party payment.  And they wanted to disclose it and urged

15       the client to do so.  But absent the client consent -- I mean,

16       this is basic Rule 1.6 -- Skadden couldn't disclose that

17       information.

18               And if -- of course, an exception to 1.6 is if the

19       law requires it be disclosed.  If he had had to register, it

20       would have been disclosed.  But there's no evidence that he was

21       actively trying to hide, wanted to hide or assisting others in

22       hiding the third-party payment.

23               THE COURT:  Well, I guess that's really -- that's one

24       of the issues.  I mean, it may or may not -- you don't even

25       think it's relevant, but that's certainly a disputed issue.  I

1    mean, they're saying that is part of the motive for not wanting

2    to register.  I think they're saying that's the primary motive

3    for not wanting to register, and you're saying that that wasn't

4    his motive.

5           MR. ABELSON:  There is a dispute certainly about why

6    Mr. Craig didn't want to register.

7           And just one last point, which is the last point

8    Mr. McCullough made about Mr. Craig's willingness to act at the

9    request of Mr. Manafort.  I mean, this is the same issue that

10   was presented with respect to the hiring of Mr. Manafort's

11   relative.

12          THE COURT:  Well, that one was a little more farther

13   afield, and I did grant your motion.

14          MR. ABELSON:  Well, and what I would -- what I would

15   suggest is that -- that a jury can understand what it means to

16   hire somebody and what it would mean -- so it's not hard -- it

17   would have required testimony, an explanation, for the jury to

18   understand the context of that issue.

19          THE COURT:  Well, you said it was going to be a whole

20   mini-trial.

21          MR. ABELSON:  It was.  It was, but that's the

22   mini-trial, this is --

23          THE COURT:  A maxi-trial.

24          MR. ABELSON:  Not a mini-trial, a large sub-trial.

25          THE COURT:  All right.  I'm concerned about the

1    collateral, the volume, the amount of time it will take.  I

2    also hear what the defense has to say about relevance.  I think

3    that issue will be better ruled upon with the benefit of your

4    arguments and the exhibits in front of me.

5         So, I appreciate what everybody has had to say, and

6    I'm going to take this one under advisement as well.  Which

7    brings me to a set of related motions, starting with the

8    Government Docket 42, which is the motion in limine in response

9    to the Docket 40, the notice of expert testimony.  The

10   government's motion was opposed at Docket 53, and there was a

11   reply at Docket 67.  That relates to the proffered expert

12   witness, but it's somewhat related to the simultaneously filed

13   motions in limine concerning the admissibility of activity by

14   other law firms that didn't register, which is Defendant's

15   Docket 76 and Government's 77, and the motion regarding the

16   testimony of the FARA unit chief, Heather Hunt, which is

17   Defendant's 48, opposed at 59, and reply at 65.  They are all

18   related.

19        Federal Rule of Evidence 702, testimony by expert

20   witnesses, says:  A witness who is qualified as an expert by

21   knowledge, skill, experience, training, or education may

22   testify in the form of an opinion if the expert's scientific,

23   technical or other specialized knowledge will help the trier of

24   fact to understand the evidence or to determine a fact in

25   issue.

1           It also has to be -- the testimony has to be based on

2      sufficient facts or data.  The testimony has to be the product

3      of reliable principles and methods, and the expert has to have

4      reliably applied those principles and methods to the facts of

5      the case.

6           Federal Rule of Evidence 704 points out that it is

7      generally not automatically objectionable just because the

8      opinion embraces an ultimate issue in the case.  However,

9      704(b) says, "In a criminal case, an expert witness must not

10     state an opinion about whether the defendant did or did not

11     have a mental state or condition that constitutes an element of

12     the crime...those matters are for the trier of fact alone."

13          The legal background for this discussion, besides

14     those two rules, in *Daubert*, or *Daubert*, depending on who is

15     standing in front of me at the time, *versus Merrell Dow*

16     *Pharmaceuticals*, the Supreme Court held that Rule 702 requires

17     courts to ensure that expert testimony is not only relevant,

18     but reliable.  That's *Heller versus District of Columbia*, 801

19     F.3d 264, at 271, from the D.C. Circuit in 2015, quoting

20     *Daubert*, at 509 U.S. 579, at page 589.  "Thus, when determining

21     admissibility under Rule 702, the district court must ensure

22     that the proffered testimony is both relevant and reliable and

23     that its evidentiary reliability is based upon," in some cases,

24     "scientific validity."  That's *United States versus Hite*,

25     H-I-T-E, 769 F.3d 1154 at 1168-69, quoting *Daubert* at 590 and

1    at note 9.

2           The Supreme Court has emphasized that "Daubert's

3    general principles apply not just to scientific testimony but

4    to all the expert matters described in Rule 702."  That's *Kumho*

5    *Tire Company versus Carmichael*, 526 U.S. 137, at 149.  "The

6    trial judge has considerable leeway in deciding in a particular

7    case how to go about determining whether particular expert

8    testimony is reliable."  That's *Heller* again at page 271,

9    quoting the *Kumho Tire* case at 152.

10          So, I think everybody knows that's the structure

11    we're dealing with.  The analysis starts with Rule 702.

12    Putting aside the question of whether this witness is qualified

13    as an expert by knowledge, skill, experience, training or

14    education, the rules would permit such a person -- such a

15    qualified person to testify in the form of an opinion if her

16    specialized knowledge would help the trier of fact to

17    understand the evidence or to determine a fact in issue.

18          Therefore, to deal with the first question, which is

19    the relevance of the proposed evidence, I need to break the

20    notice down opinion by opinion.

21          The first opinion that the defendant proposes to

22    introduce on page 1 of Docket 40 is that it would have been

23    reasonable for a knowledgeable practitioner in the field --

24    talking about, I guess, the FARA field, though it's not

25    specified -- in or around 2012 and 2013 to believe that a

1    lawyer or law firm engaged by a foreign government to perform

2    an independent analysis and to complete a report on the

3    procedures utilized in a criminal prosecution in that foreign

4    country was not required to register as an agent of the foreign

5    principal under FARA.

6            I guess I have some questions, though.  I don't know

7    that I need to get them answered right now about what we mean

8    by knowledgeable practitioner in the field, and what field?

9    But, my primary concern is whether it was reasonable to believe

10   that a firm engaged to write a report had to register or not,

11   is not a fact in issue.  Whether completing a report triggered

12   registration requirements is not an issue in the case.  And,

13   therefore, what reasonable FARA practitioners believed or

14   whether defendant's thoughts on that question would have met

15   some reasonable standard is irrelevant.  This case is not about

16   preparing a report without registering.

17           There's no allegation that the completion of the

18   report or even how the Ukraine planned to use it triggered a

19   registration obligation or bears on the alleged falsity of any

20   statement or the unlawfulness of any omission.

21           Therefore, because I don't think it's relevant, I

22   don't need to get into the reliability of her opinion about

23   what practitioners thought in 2012 to 2013.  So I hold that

24   that opinion is not admissible because it's not relevant.

25           Also, the defendant's argument that non-registration

1     evidence is important to or admissible in connection with this

2     issue is similarly unpersuasive, and it can't be used for that

3     purpose.  And what I mean is other law firms prepared reports,

4     and they did not register.  I don't think we're talking about

5     preparing reports in this case.

6              That's different from -- Opinion Number 2 is to

7     further opine that it would have been reasonable for a

8     knowledgeable practitioner to believe that providing a copy of

9     the report to a few media outlets and speaking about the

10    conclusions contained in it in order to ensure that those

11    conclusions were accurately reported in the U.S. media would

12    not require registration as long as those contacts were not

13    made under the direction and control of a foreign principal,

14    even if the client had an interest in the reports getting

15    public attention, not can you get into the question of whether

16    ultimately the facts will establish all the elements of that

17    hypothetical.  The question is:  Is an opinion on that issue

18    relevant?

19             So, I have a few questions for each of you and a few

20    comments.

21             Let me start with the government.  I think we can all

22    agree that he's not charged with failing to register or even

23    for making false statements when he asserted that the firm did

24    not have to register.  Those are legal conclusions.  They are

25    not facts.  But is the question of whether the facts allegedly

1     concealed or falsified triggered a registration obligation and

2     whether it was reasonable for him to believe, assuming he did,

3     that they did not, is that relevant, given the overall

4     allegation in this case that this was a scheme designed to

5     conceal a need to register?

6                MR. CAMPOAMOR-SANCHEZ:  We don't believe so.  And,

7     Your Honor, I mean, this is, I think, as close as you can get,

8     essentially, as to the state of mind, the 704 problem that

9     we've identified.

10               THE COURT:  I'm going to talk about that.  Right now

11    I'm just talking about relevance.  So, you know, I think you've

12    made the point that he's charged with omitting this fact and

13    that fact, and those facts were relevant to the FARA analysis.

14    But this is a different question.  The overall scheme is a

15    scheme to conceal, as you put it in the indictment, a

16    registration obligation.

17               So, is whether it would have been reasonable to

18    believe, whatever the facts were, that they didn't trigger a

19    registration obligation, is that a relevant issue in this case?

20               MR. CAMPOAMOR-SANCHEZ:  No.  No, it's not, because at

21    the end of the day, as the Court has been pointing out, the

22    issue really is, When the questions were asked by the FARA

23    unit, did you tell him?  So whether he believed he had to

24    register or not, or that providing the report would trigger

25    obligations or not, doesn't answer the question of, you know,

1    Why didn't you, when asked by the FARA unit, if you agreed to

2    talk to them, tell them that that's what you believed?

3            So it doesn't really answer the charges or the

4    scheme.  This is -- and that's why we see this as really an

5    attempt to really provide an opinion as to his alleged state of

6    mind, to make him look good in front of the jury.

7            THE COURT:  All right.  Let me ask the defendant.

8    The parties may disagree about what the test is for state of

9    mind, but you both clearly indicate that the defendant's actual

10   state of mind is relevant.  Why is what the reasonable man

11   might think relevant?

12           MR. MURPHY:  Your Honor, can I go back to your first

13   ruling, because I think --

14           THE COURT:  Okay.

15           MR. MURPHY:  -- I think that you've missed something

16   that is in her disclosure -- in our disclosure of Ms. Jeffress'

17   opinion.

18           You read the first item, and you stopped at the

19   words, "Under the Foreign Registration Act, 22 U.S.C. § 611,

20   et seq."  There was a comma there.  And the rest of it was,

21   "Regardless of how the foreign entity intended to use the

22   report or did in fact use the report."

23           And that is, I think, at issue in our case, that

24   Mr. Craig reasonably believed, or should he have reasonably

25   believed that he had some obligation to tell the FARA unit

1       about whatever he thought about how the foreign entity intended

2       to use the report.

3                   THE COURT:  I think it's about how he intended to

4       participate in those efforts, is what this is all about.  I

5       don't think there's a dispute about that portion of it either.

6       I think this is -- this is an effort to focus the jury on the

7       wrong thing.

8                   MR. MURPHY:  Well, Your Honor, the government alleges

9       in the indictment that Mr. Craig, because of a variety of

10      actions and things that happened, had an obligation to

11      register, and he knew it.  Our position is that he did not have

12      an obligation to register based on those things.

13                  Our expert will testify that a reasonable

14      practitioner in the field during this time period, in 2012 and

15      2013, would have believed that if he did an independent report,

16      or his firm did, and they presented it to the Ukraine, which

17      happened, he was not obliged to register, notwithstanding the

18      fact that he knew that the Ukraine might intend to publicize

19      that report.  That is what our expert will testify to.

20                  The second point, as Your Honor mentioned and as you

21      understand, this is clearly a case where Mr. Craig had a few

22      media contacts.  He told the FARA unit about the media

23      contacts.

24                  THE COURT:  The whole issue is whether he told them

25      in a truthful way or misleading way, whether he wordsmithed

1     them or whether he ultimately actually misstated them when he

2     said they were all reactive.

3                MR. MURPHY:  Yeah, they were reactive.  Our evidence

4     will show that they were reactive.

5                THE COURT:  Their argument is going to be that you

6     can't react to something that hasn't happened yet.  The first

7     ones weren't reacted.

8                MR. MURPHY:  If I see a draft of a press release that

9     says, Here's what we're going to say about your report when

10    it's released, and I know what they're going to say and then I

11    see them take steps to implement that plan, I am reacting to

12    that when I take a step to say to the *New York Times* in this

13    case, Don't buy what they're telling you about the report.  I'm

14    going to tell you what the report says.

15               THE COURT:  Don't buy what they haven't told you yet?

16               MR. MURPHY:  No, but they did tell them, because the

17    email that Mr. Hawker sent to Mr. Sanger on December the 10th

18    said that the report made conclusions about the political

19    nature of the prosecution of Ms. Tymoshenko.  And, in fact, it

20    did not.  And when Mr. Craig saw that, that's when he took

21    steps to contact David Sanger himself, because then he knew

22    that Mr. Hawker was going to continue to purvey the same bill

23    of goods that Mr. Craig had seen and reacted angrily to back in

24    September.  There had been no contact between --

25               THE COURT:  What I'm focusing on is what the trial is

1    going to focus on, which is, is what he told the agency true or

2    not?  Not whether did he say, Based on all these facts, I

3    didn't have to register; but was he correct when he said what

4    the facts were?  That's all this is about.

5              MR. MURPHY:  It also depends on what the questions

6    were.  I mean, Mr. Campoamor-Sanchez suggested --

7              THE COURT:  Yes.  Fine.

8              MR. MURPHY:  -- he was required to answer more

9    because of the questions.  Well, if you read the questions,

10   they never asked him about the media plan that was concocted by

11   the Ukraine.  They never asked him those questions.  And our

12   expert will testify that a person in Mr. Craig's position would

13   not think that because he had a few media contacts at the

14   time -- but he was not acting under the control or direction of

15   the foreign entity when he had those contacts, which he clearly

16   was not -- he would not think that he had an obligation to

17   register, nor would he think that he should tell them about

18   that if they haven't asked about it.  There are a lot of things

19   that could have happened that he didn't tell them about, but

20   they never asked him about.  So this -- we have to focus in on

21   what the pertinent state of facts are in Mr. Craig's mind --

22             THE COURT:  How can I determine whether evidence

23   about the reasonableness of his belief is relevant if I don't

24   know yet whether there's going to be testimony about his

25   belief?

1          MR. MURPHY:  I -- well, I don't know what you're --

2     are you asking whether --

3          THE COURT:  When it comes to the end of the day and

4     we have to determine whether something is willing and --

5     willful and knowing, that's not an objective standard.  That's

6     a subjective standard:  What did he think?  What did he know?

7          MR. MURPHY:  Right.  True.

8          THE COURT:  So how can we bolster the reasonableness

9     of what he thought and what he knew -- how can we know if

10    that's even relevant -- put aside admissible -- if we don't

11    know yet if he's going to take the stand and say what he

12    thought?

13         MR. MURPHY:  Well, Your Honor, then are we going to

14    say if Mr. Craig takes the stand, then we should have allowed

15    Ms. Jeffress to testify?  But -- but more importantly --

16         THE COURT:  We might.  We might very well do that

17    because he doesn't have to be the last witness.

18         MR. MURPHY:  He doesn't have to be, but usually the

19    defense gets to decide how to present the case, and usually the

20    defendant, as you know, would be the last witness that the

21    defense would call.

22         THE COURT:  Right.  But if you get Ms. Jeffress up on

23    the stand and she talks about his state of mind and it's all

24    relevant and it's all reasonable, and they say, Oh, well, that

25    went really well, we don't have to have him testify.  And then

1    I say, Well, then now that's excluded.  We're not doing that.

2            MR. MURPHY:  She's not going to be testifying about

3    his state of mind.  She's going to be testifying about what's

4    reasonable --

5            THE COURT:  Well, this comes about as close as it

6    could possibly come.  And you are arguing the two of them as if

7    they are one and the same.

8            MR. MURPHY:  No, Your Honor.  It's all about -- this

9    holding in *Safavian* with respect to expert testimony --

10           THE COURT:  You don't need to -- I've read it, so you

11   don't to have to tell me about it.  Go ahead.

12           MR. MURPHY:  All right.  But in *Safavian* -- I mean,

13   that was the government's position, this man, this expert, was

14   attempting to talk about what was in the defendant's state of

15   mind.  And the answer was -- the Court of Appeals held that,

16   no, he was testifying about what reasonable people believe.

17           THE COURT:  Answer my question.  Putting aside the

18   defendant's right to put on its case in its own way, in its own

19   manner and its own order, how can I determine whether the

20   reasonableness of his belief is relevant without knowing what

21   he's going to say his belief was?

22           MR. MURPHY:  The jury is going to have evidence --

23   whether Mr. Craig testifies or not, the jury is going to have

24   evidence about what occurred.  They're going to have the facts,

25   that there were limited media contacts that Mr. Craig described

1     to the FARA unit.  They're going to have the facts that -- I

2     think, from other witnesses that he was not acting pursuant to

3     a media plan; that there was no effort by the media planners to

4     engage Mr. Craig between September the 25th, when he

5     essentially told them, This plan that you've concocted is so

6     wrong, I don't want to be any -- have any part of it.  You are

7     misstating the conclusions in our report.  I'm done.

8          There were no contacts with him about the media plan

9     after that date, September the 25th of 2013.  The -- I'm sorry,

10    '12, 2012.  The jury will know that.  And so they'll know that

11    what he's really being asked to have imagined is that the FARA

12    unit wanted to know about a media plan that he had nothing to

13    do with and that when he talked about his limited media

14    contacts for the purpose of straightening out the *New York

15    Times*, to make sure they got it right, was that something he

16    was doing on behalf of the foreign entity?  And the answer --

17    the testimony, I think, will be that that was not considered by

18    anyone at Skadden to be something that was being done pursuant

19    to or acting under the control or direction of the Ukraine.

20    That just wasn't the case.

21          Your Honor, I'd also point out that in this

22    indictment, paragraph 63 identifies a number of things that

23    Mr. Craig is alleged to have misled the FARA unit about by

24    failing to tell them this, that and the other thing.  There's

25    ten separate items.  Ms. Jeffress will testify that with

1    respect to many of those items, a reasonable practitioner in

2    the field at the time would not have thought that those things

3    triggered a FARA obligation.

4              THE COURT:  Where is that in the notice?

5              MR. MURPHY:  Pardon?

6              THE COURT:  Where is that in the notice?

7              MR. MURPHY:  Well, it's -- it's -- it is part of the

8    notice that -- regardless of how the foreign entity intended to

9    use the report and did in fact use the report.  That's part of

10   the first disclosure, the first opinion.  That has much to do

11   with the allegations in paragraph 63.  And that the minimal

12   contacts with the media outlets would not require registration

13   as long as they're not made under the direction and control of

14   the foreign principal.  That's also in conflict with some of

15   the allegations of paragraph 63.

16             THE COURT:  But you put them all together in one,

17   like one hypothetical.

18             MR. MURPHY:  There are two disclosures with respect

19   to two opinions.

20             THE COURT:  Okay.

21             MR. MURPHY:  Those are the opinions that we expect

22   Ms. Jeffress to offer.

23             THE COURT:  Okay.  All right.  Well, that's a

24   different opinion, then.  Nothing in -- in number 3 was --

25   would have been, in his mind, relevant to a registration

1    requirement.  That's news.

2             MR. MURPHY:  Your Honor, she's not testifying about

3    what was in or not in Mr. Craig's mind.

4             THE COURT:  Would have been in a reasonable

5    practitioner's mind?

6             MR. MURPHY:  Right.  Right.  And that's relevant --

7             THE COURT:  Okay.  I'm saying that's a new piece of

8    opinion.

9             MR. MURPHY:  That's relevant to the jury's

10   consideration in this case, whether --

11            THE COURT:  There's lots of things that are relevant.

12   The question is, have you put us on notice about part of your

13   opinion prior to this second about paragraph 63?

14            MR. MURPHY:  Well, we don't particularly say, you

15   know, paragraph 63 says this and she's going to say some of

16   these factors are not relevant.  We do say what she says is

17   relevant and what is not relevant.  And some of the things that

18   she's talking about -- that we've talked about for her in this

19   disclosure are inconsistent with some of the allegations in

20   paragraph 63.

21            THE COURT:  All right.  Anything else you want to say

22   about Ms. Jeffress?

23            MR. MURPHY:  No.

24            THE COURT:  Okay.

25            MR. CAMPOAMOR-SANCHEZ:  Very briefly.  I know the

1    Court has heard a lot about this.  But as to your original

2    question regarding the second opinion, the other thing the

3    Court should keep in mind is that -- in terms of the relevancy,

4    the FARA unit told Mr. Craig, You have to register.  So there

5    is -- and it is, as part of that conversation, that he either,

6    as we allege, falsifies, conceals or gets as a scheme.  It's

7    not about what he allegedly believed or didn't believe when he

8    was handing the report to Mr. Sanger's home at night and then

9    emailing it and doing the interview with Hurst and Horne and

10   Sanger by phone.

11        Although we certainly believe that should have

12   triggered it, that's not what this is about.  This is about

13   what he told the FARA unit.  And the FARA unit told him, You

14   have to register.

15        And then it's his responses and his actions that are

16   at issue in this trial.

17        As to the other facts about what happened in

18   September and December, we completely disagree with what

19   Mr. Murphy said, but we'll be happy to either address that or

20   prove it at trial, if allowed.

21        THE COURT:  All right.  I do agree with the

22   government that the defendant is trying to blur the line

23   between the question of whether he should or shouldn't have

24   registered in light of his activities, or even whether he

25   reasonably thought he had to or he didn't have to, and the only

1        question presented in the case, which is whether he made false

2        statements or obscured the truth by omission when he

3        communicated with the agency at two points.

4              First, when it was trying to determine what its

5        position on registration was, and, then, after it told the

6        defendant what its position was, and he tried to get it to

7        change its mind.

8              As I said earlier, in other words, he's not charged

9        with making false or misleading statements when he said, Given

10       what happened, I didn't have to register.  He's charged with

11       making false or misleading statements or omissions when he

12       said, This is what happened.

13             So the indictment is about his representation

14       concerning the facts.  And that is why I believe the case is

15       distinguishable from the *United States versus Safavian*, which,

16       for the umpteenth time, I'll actually put the cite in the

17       record, although I bet the court report knows it by now, 528

18       F.3d 957, at pages 965 to -68, from 2008, D.C. Circuit, which,

19       if anything, I believe, supports the exclusion of the evidence.

20             The point there was that the expert testimony went

21       directly to the defendant's statements of fact.  The portion of

22       the opinion that we're dealing with in connection with this

23       motion deals not with the omissions and duty to disclose

24       issues, but specifically with his conviction on two counts of

25       making false statements and the false statement that was one of

1    the circumstances underlying the obstruction of justice

2    conviction.

3              On page 965, the Court explains that the statement in

4    issue was an affirmative statement by the defendant, the GSA

5    official, that Jack Abramoff had no business with the GSA at

6    the time he treated *Safavian* to a golf trip.  The defense was,

7    well, he meant did no business within the common understanding

8    of government contracts professionals at that time.

9              The doing business with the agency means contracting

10   with the agency and not just looking to potentially buy or

11   lease property owned by the agency.

12             So the proposed expert was going to essentially

13   translate how government contracting professionals viewed

14   having business with and working with the GSA at that time.  It

15   supported the defendant's testimony that he had that meaning --

16   in essence, a term of art in the government contracting

17   world -- in mind when he spoke.  And, therefore, it would have

18   made the statements literally true and not a violation of

19   § 1001.  And, therefore, the Court said it was erroneous for

20   the trial court to exclude the testimony.

21             That is distinct from this case and the stated

22   purpose of the expert testimony.  It's not being offered to

23   explain that something Mr. Craig said that is alleged to have

24   been false had another specific meaning and, therefore, was not

25   false.

1            Another distinction is that the government's concern

2    in *Safavian* was that the words "does business, seeks to do

3    business" appear in the regulations concerning prohibited

4    sources of gifts.  And so they were concerned that this would

5    mean that the expert would be opining on the meaning and

6    applicability of the regulation.  And the Court -- the D.C.

7    Circuit, on page 967, said, Don't worry about that problem.

8    The question for the jury was what Safavian meant when he

9    communicated with government officials.  The expert would not

10   have expounded on how the regulation operates or should

11   operate, but, rather, on the common usage of the terms in the

12   government contract industry.

13           Here, the proffered testimony either is or comes

14   dangerously close to expounding on how the law operates or

15   should operate.  And that's exactly what we're trying to get in

16   through this witness.  Nobody would have thought he had to

17   register back then.  And, therefore, I'm inclined to conclude

18   at this point in the proceedings that's a proffered opinion.

19           Number two is also not relevant.  It's not governed

20   by *Safavian*.  And I don't have to go on to assess reliability.

21           But, there is -- there are two other issues, though;

22   the question of defendant's intent.  Intent is an element of

23   this offense.  His position is, There's no way I knew that

24   these facts were important.

25           The government may argue that if the jury agrees that

1      he knowingly misstated or misrepresented the facts, that gives

2      rise to an inference that he did know the facts were important.

3      The defense seems to be proffering an expert to say its

4      certainly reasonable to conclude that he didn't think they were

5      important.

6            But I'm not sure about the admissibility of a

7      reasonable man standard in this context.  The indictment

8      doesn't allege that his statements and actions were based on

9      some general understanding of what was generally done or what

10     he should have known, but, rather, the guidance he sought

11     within his own law firm at the time and his own statements on

12     the matter.

13           So there's a question about why it would matter what

14     Ms. Jeffress tells her partners and her clients now.  And I'll

15     give you the chance to answer that.  But, the first thing I

16     want to point out is that the two opinions I just read are the

17     only two opinions detailed in the notice.  And there was no

18     specific attempt to tie these issues to materiality or

19     willfulness in the notice, other than this sentence:  We expect

20     that the government will seek to obtain testimony from one or

21     more lay expert witnesses as to facts material to a

22     determination of whether Mr. Craig and Skadden were required to

23     register and the significance of omitted facts to that

24     question.  In that event, we expect Ms. Jeffress to respond to

25     that testimony consistent with her previously described

1     opinions.

2               It's not clear what that means.  It's a little vague.

3               But, in his opposition to the motion in limine, the

4     defendant acts if those two issues, willfulness and

5     materiality, were the focus of the notice all along.

6               Paragraph 5 of the defendant's opposition says

7     there's two issues central to the case.  First, was the

8     information allegedly concealed material to a decision or

9     action by the FARA unit, i.e., would it have tended to

10    influence a reasonable agency decision-maker?  And that, they

11    are correct, is an objective standard.  And, yes, there is some

12    case law to indicate that it could be a proper subject for

13    expert testimony.  But it relates to the state of mind of the

14    decision-maker, not the state of mind of the speaker.  And the

15    defendant did not detail any proposed testimony in this notice

16    about a reasonable FARA unit decision-maker.  The proposed

17    testimony relates solely to the state of mind of the reasonable

18    practitioner.

19              The defendant also does not lay out any

20    qualifications for the proffered expert as an expert on that

21    issue either.  So it's not clear what testimony the defendant's

22    even trying to introduce through this witness when you suggest

23    that she's going to respond to what Heather Hunt has to say

24    about materiality consistent with her previously described

25    opinions.

1          The law cited in the memorandum concerning experts in

2     materiality on page 5 of Docket 53, the opposition to the

3     motion in limine, relates to expert testimony on the impact of

4     the alleged false statements on the hearer, on the listener,

5     within that industry.  She hasn't been proffered for that, even

6     though you knew exactly what the government was seeking to

7     introduce through Heather Hunt, either as a lay opinion or, in

8     your view, an expert opinion on that subject.

9          So, the question for the defendant is:  Assuming you

10    want her to testify to materiality, where does this statement

11    lay out what she could say that's relevant to the materiality

12    analysis or why she's qualified to do that?

13         And we'll talk about willfulness next, but I just

14    want to talk about materiality right now.

15         MR. MURPHY:  Your Honor, it's our position that her

16    primary opinion about what reasonable practitioners were doing

17    at the time is also relevant to materiality, because her

18    testimony would be that the completion of the report, without

19    regard to what the foreign entity intended to use it for or how

20    they used it, those facts about the -- what the foreign entity

21    intended to do with the report or how they used the report were

22    not material to the decision that would be made as to the

23    registration question, in similar fashion with the second

24    disclosure.

25         THE COURT:  Wait.  Where does it say that?  It says

1    that a reasonable practitioner wouldn't have thought they had

2    to register.

3              MR. MURPHY:  Where it says it, Your Honor, is in the

4    paragraph that you read, that we did not know at the time

5    exactly what Ms. Hunt was going to be proffered to say.  We

6    filed this --

7              THE COURT:  Well, you did because you filed a motion

8    in limine that went sentence by sentence by sentence.

9              MR. MURPHY:  We -- we guessed what she might say

10   based on what the government had provided to us in 302s and

11   grand jury testimony.  But, we also filed a motion in limine

12   that day to say -- the same day as this, their motion was

13   filed -- to say that Ms. Hunt should not be permitted to

14   testify beyond certain points.  When we did the disclosure on

15   June the 10th, we did not know exactly what Ms. Hunt was going

16   to be proffered to say.

17             So the disclosure says to the extent that she talks

18   about materiality, Ms. Jeffress will counter those facts.

19             THE COURT:  Right.  But all Ms. Jeffress has been

20   proffered as an expert as, is how practitioners in the field

21   understand -- reasonably understand their obligations.  And you

22   base that on, you know, to some extent her stint in the U.S.

23   Attorney's Office and then largely her role at Arnold and

24   Porter.  Where have you proffered her as an expert or laid out

25   experience to talk about what would have influenced --

1    reasonably influenced the FARA unit?

2           MR. MURPHY:  She did -- we did provide information

3    about her role as a supervisor in the U.S. Attorney's Office

4    who supervised -- to the extent that there were FARA-related

5    prosecutions, she was the person in charge of those.  And the

6    one particular case, *Cabelly*, the government says, Well, it

7    doesn't allege in the indictment that the person violated the

8    FARA statute.  But the indictment in that case is -- amply

9    discusses the FARA registration issues that were involved --

10          THE COURT:  So you're standing on her involvement in

11   prosecuting a case that got sent to her unit in the U.S.

12   Attorney's Office, which handled a number of national security

13   matters?

14          MR. MURPHY:  Right.

15          THE COURT:  I'm not saying she only did one case

16   while she was there.  But that makes her an expert as to what

17   people in the FARA -- was material to FARA unit officials?

18          MR. MURPHY:  That, coupled with the fact that for

19   five years at Arnold and Porter she has been actively involved

20   in advising clients with respect to FARA filings.  She has made

21   most filings --

22          THE COURT:  But where did you ever say here that she

23   can say anything about the impact on FARA unit officials?  It's

24   not in your notice.  You didn't identify her as somebody who

25   was going to testify about materiality.

1              MR. MURPHY:  I think it's in our -- in our letter

2      that we sent in response to the government's question.  We

3      described her role and her experience with FARA.  And it's an

4      ample experience.  She has filed -- I think she said 50

5      registrations over the course of five years.  She has,

6      obviously, interacted with the FARA unit.  She knows from that

7      experience what's important.  She's written on the topic.

8      She's written articles about FARA interpretations.  She's

9      participated in seminars about what FARA means and how it is to

10     be interpreted.

11             So all of that experience was identified both in the

12     initial disclosure and in the supplemental letter.  And I think

13     it's ample to say that she has the ability to say what is or is

14     not considered to be material.

15             THE COURT:  All right.  A second issue that you

16     identified -- you talked about materiality and willfulness in

17     your memorandum.

18             MR. MURPHY:  Yes.

19             THE COURT:  And I haven't yet ruled on the parties'

20     differing views about the proper definition of willfulness, but

21     I don't think it matters for this discussion.  The point for

22     right now is, where is the fact that she shed light on that

23     laid out in the notice?  Is that what a reasonable man would

24     have believed?

25             MR. MURPHY:  Well, yes, Your Honor.  If a -- if a

1    reasonable person who had done the things that Mr. Craig had

2    done in the same context would not think that he was required

3    to register under FARA, that certainly is relevant to the

4    question of whether he acted willfully when he said whatever he

5    said to the FARA unit and in response to the questions that

6    they asked.

7              If he never thought that he was required to register

8    because he never thought, for example, that there was a media

9    plan out there that he rejected and that he was not a part of,

10   if that would not have been material, then he certainly didn't

11   act willfully when he, according to the government, failed to

12   tell the government enough information about that.

13             THE COURT:  All right.  It looks like the prosecutor

14   wanted to say something.  Do you have something else you want

15   to say?

16             MR. MURPHY:  No, Your Honor, if you don't have any

17   questions.

18             THE COURT:  Okay.  Thank you.

19             MR. CAMPOAMOR-SANCHEZ:  Going to the question of

20   materiality and the notice, and more specifically, the lack

21   thereof, I just wanted to point the Court to, as an attachment

22   to our initial motion, 42-5, at page 3, it's our letter to the

23   defense at the time, and we specifically asked Mr. Murphy and

24   Mr. Taylor whether Ms. Jeffress had any dealings with or

25   consultations with the FARA unit during 2012 and 2013 or any

1    other time to support her proffered opinion.  That was a bullet

2    point of the things we were asking them to tell us.

3            And similarly, in the paragraph below, we again said,

4    as with the prior offer opinion, What are the bases and

5    reasons?  Are there any cases, articles, surveys or actual

6    dealings or consultations with the FARA unit that Ms. Jeffress

7    relied upon and believe support her proffered opinion?

8            And we were trying to get at, has she had any contact

9    and had, therefore, a basis of knowledge as to how the FARA

10   unit operates?

11           THE COURT:  But that was even -- you were taking the

12   position that even with respect to what reasonable

13   practitioners had in their head, she didn't have 2012 to 2013

14   experience.

15           MR. CAMPOAMOR-SANCHEZ:  Correct.

16           THE COURT:  So my question is:  Is there even any

17   discussion back and forth about what her knowledge of

18   experience would be about what FARA unit was thinking in 2012?

19           MR. CAMPOAMOR-SANCHEZ:  No, there isn't, and there's

20   no notice.  And, in fact, as the Court pointed out, we were

21   surprised by hearing Mr. Murphy say what allegedly Ms. Jeffress

22   would opine about paragraph 63.  We never heard that.

23           But all I'm pointing this out to is that certainly

24   they never gave us notice of materiality, that she would opine

25   the materiality, but we have specifically asked about what

1    consultations happened with the FARA unit to the extent that an

2    argument could be made that that was the basis for her to opine

3    about materiality, and we know of none.  There were no FARA

4    prosecutions that she provided, as far as we know, and there

5    were no dealings that she had with the FARA unit, as far as we

6    know.  Certainly, the defense has not identified any.  So we do

7    not see -- there is no notice, and we do not see how she can

8    testify about it.

9         THE COURT:  The defense says that expert testimony on

10   willfulness is admissible, particularly in the context of

11   complex statutory requirements, and it pointed me to

12   *United States versus Leo*, 941 F.2d 181, at 196 to -97, out of

13   the Third Circuit in 1991.  I'm not sure that case is helpful.

14   The passage cited related to the government's introduction of

15   testimony concerning custom and practice in the government

16   contracting field.  And it noted that it was within the court's

17   discretion to admit expert testimony, but it emphasized, "It is

18   not permissible for a witness to testify as to the governing

19   law," and, "testimony concerning custom and practice was proper

20   so long as the expert did not give his opinion as to legal

21   duties that arose under the law."

22        Again, it seems like we're trying to use this witness

23   to talk about what the legal duty was, not what just people

24   were out there doing.  And so, the court held that it was

25   relevant to explain what someone with defendant's background in

1    the industry would know.  Here, they want to ask her what

2    someone in the legal community would reasonably believe the law

3    required.

4          And so I'm not sure that's proper.  And once again,

5    he's not charged with willfully violating the FARA statute.

6    He's charged with willfully misstating and withholding facts.

7          And you can't read the notice without concluding that

8    we're trying to put on a witness here to testify as to what was

9    in his head.

10          So, now, with respect to willfully, I do want to talk

11   about Rule 704 and why it's not a problem.  If the rule says an

12   expert witness must not state an opinion about whether the

13   defendant did or did not have a mental state or condition, and

14   they're saying it wouldn't have been willful and it wouldn't

15   have been knowing because reasonable practitioners -- and we

16   assume he is one -- wouldn't have known that, it seems to me

17   they're talking about what he knew and what he was willful

18   about.  And it's even more so if the defendant is correct that

19   willfulness embodies almost a specific intent requirement,

20   specific knowledge, specific statutory requirements, then

21   you're asking her to say that a reasonable person wouldn't have

22   thought there were any such requirements.  So we're getting

23   even closer to Rule 704.  Why isn't it a problem?

24          Mr. Murphy?

25          MR. MURPHY:  Your Honor, we -- we would rely on

1    the -- on the cases that are cited on page 8 of our opposition

2    briefs that deal with situations in which experts can testify

3    about various facts that might have something to do with the

4    jury's determination of whether or not someone acted willfully

5    or didn't act willfully.  But the expert is not testifying

6    about what is in the defendant's mind.  The expert is

7    testifying about the facts.

8            THE COURT:  Right.  And, you know, that's kind of

9    where *Safavian* came in, this fact -- the words meaning this,

10   they mean that.  But here, she's saying a knowledgeable

11   practitioner in the field would have thought this or that.

12           MR. MURPHY:  Right.

13           THE COURT:  Why isn't she saying what's in his head?

14           MR. MURPHY:  Well, because she doesn't know what's in

15   his head.  She's testifying about what knowledgeable

16   practitioners, herself included, would have thought about

17   certain facts that are at issue in this case.

18           THE COURT:  If she doesn't know what's in his head

19   and she can't testify to what's in his head, then we get back

20   to relevance.  Because doesn't it only matter what was in his

21   head, not whether what was in his head was reasonable?  I mean,

22   maybe if he said X, Y, Z was it, and then it comes back to

23   where I was before, which is why is it even relevant if she,

24   number one, doesn't know what he was thinking and, number two,

25   can't testify to what he was thinking anyway?

1          MR. MURPHY:  Your Honor, the jury can't get inside

2     Mr. Craig's head to know what he was thinking.  So that in a

3     case involving willfulness, the jury is entitled to consider

4     facts.  One of the facts that we intend to offer through this

5     expert is what reasonable people engaged in the same field

6     would have thought about some of the factors that the

7     government alleges to be indicia of Mr. Craig's wrongfully,

8     knowingly failing to say something that he should have said.

9     And if that person says, you know, most people in the field

10    would have not have thought that that thing that the government

11    alleges is important was in fact important, they would have

12    thought that it wasn't important, they would have thought that

13    it was a side issue, not significant, then that can help the

14    jury determine whether or not Mr. Craig did not act willfully

15    when he failed to say those things.

16          THE COURT:  But the case is not just based on

17    omissions.  It's based on making false or misleading

18    statements.  So the misleading statements -- the omissions

19    rendered the statements to be misleading in terms of specifying

20    when the meeting took place.

21          MR. MURPHY:  I think at the end of the day, Your

22    Honor, you're going to find, when you hear the facts of this

23    case, that there really are not any false statements that the

24    government can point to in the letters.  And we know that

25    there's a meeting that occurred, and we know that there are no

1     notes that anyone took of what was said at the meeting, and we

2     know that no one has a clear recollection of what was said.

3          We know what Mr. Craig said that his primary purpose

4     in going to the meeting was, and that he stated that his

5     purpose was to make corrections to the way in which his report

6     was being mischaracterized or was going to be mischaracterized,

7     and that was his main purpose.  And we know that the FARA unit

8     accepted what he said and changed their conclusion and wrote a

9     letter in January of 2014 saying, If that was your purpose, you

10    were not required to register.

11         Now, five years later, the government is alleging,

12    Oh, there were a lot of other things that the FARA unit didn't

13    know, and those things should have been told --

14         THE COURT:  The indictment doesn't allege the

15    scenario that you allege, that he went there knowing what the

16    Ukraine was about to say.  And I'm not saying you're making

17    those representations in bad faith.  All I know is what the

18    indictment alleges, which is that he went there before the

19    report came out.  Ukraine holds a press conference the next

20    day, says what it says, and then he tells the government, All

21    of my meetings with the press, all of them, were reactive to

22    that.

23         And now you're saying, well, actually, he was

24    reacting to what he anticipated that was going to be.  So even

25    a meeting that occurred before it happened was actually

1    reactive, so that was technically true.  And maybe that's true;

2    maybe it's not.  That's --

3            MR. MURPHY:  Your Honor, I don't think that you can

4    judge our ability to put on an expert for the defense based on

5    what the indictment says, right?

6            THE COURT:  Well, it got it to this point about

7    trying to figure out relevance.

8            MR. MURPHY:  What's relevant to our defense is

9    what -- the hypothetical situation, the hypothetical questions

10   that we're going to ask Ms. Jeffress.  Now, if it turns out

11   that our hypothetical has no basis in fact, the jury will make

12   that determination, that it's a bad hypothetical.  But if our

13   hypothetical questions to her are things that resonate with the

14   jury about the facts as Mr. Craig described them, then they can

15   take that into account and say, you know, if this reasonable

16   practitioner, this knowledgeable person, Ms. Jeffress, who was

17   among the most highly regarded national security lawyers in

18   this area, if she were to say that that's what a reasonable

19   person would have been thinking, then they can certainly

20   conclude, well, then that helps us to decide what Mr. Craig was

21   probably thinking, and that he wasn't acting willfully when he

22   failed to say this, that, or the other thing.

23           That's what we're trying to do.  We're trying to have

24   our expert testify about the set of facts that we believe we

25   will be able to present to the jury as the facts that occurred,

1    and to have her say, if those were the facts, a reasonable

2    practitioner would not have thought there was an obligation to

3    register under FARA, would not have thought that these other

4    factors were material to the decision.  That's -- that's the

5    position that we're in.  That's all we're trying to do.

6         THE COURT:  What cases do you have where an expert

7    gets to come in on willfulness where we don't have any

8    testimony about what was actually in the person's head, like if

9    he doesn't testify, but you get to establish his willfulness

10   through her?

11        MR. MURPHY:  Your Honor, I think, and then sort of --

12   it's a little bizarre, but if you think about it, in the cases

13   where the government offers an expert witness on practices in

14   the drug conspiracy trade, the defendant is not taking the

15   stand, but the issue is:  Did this defendant have an intent to

16   distribute large quantities of drugs?  And the government puts

17   on an expert to say there's a large quantity of drug

18   paraphernalia found in the defendant's home, and based on my

19   experience in other cases as an expert in the field, I can tell

20   you that when this kind of drug paraphernalia is present,

21   there's a distribution ring.

22        Now, the defendant is never taking the stand.  His

23   intent, though, is at issue.  And the jury is entitled to

24   consider that evidence, to say, you know, that sounds like --

25   given the facts that we've heard about what paraphernalia were

1    in his home, then probably he did intend to willfully

2    distribute, he had an intent to distribute large quantities of

3    drugs.  I mean, it's an -- it's an odd paradigm, but it's a

4    useful paradigm, I think.

5          Our case is -- is -- you know, it's the reverse

6    situation.  We're putting on -- we're putting on the expert for

7    the defense.  But the facts that she's going to testify would

8    or would not have been significant in a FARA determination go

9    both to materiality and to willfulness.

10         THE COURT:  Well, see, now you've got her on both

11   sides of the equation.  And we are so far beyond the scope of

12   your notice that I think that's problematical.  But, you want

13   her to testify to both what was in, basically, Ms. Hunt's mind

14   and what was in Mr. Craig's mind --

15         MR. MURPHY:  I think she --

16         THE COURT:  -- but she's never going to testify as to

17   the law; she's only going to testify about the facts?

18         MR. MURPHY:  She is not going to testify to what was

19   in Mr. Craig's mind, and she is not -- she's going to testify

20   about materiality to the extent that it's an objective test.

21   It's not about what is in Ms. Hunt's mind.  It's the reasonable

22   decision-maker, who is making decisions on -- on behalf of

23   that -- that unit.

24         THE COURT:  It is more susceptible to expert

25   testimony, I believe, than even willfulness.  I don't disagree

1    with the concept.  The materiality could be an issue for expert

2    testimony.  What I quibble with is whether you have a notice

3    that says she's going to testify to that or whether you laid

4    out her qualifications to do that.

5          All of the opinions that you put in here were what a

6    reasonable and knowledgeable practitioner of the field would

7    have thought about their obligations.  A clear upshot of this

8    is what the private side thinks when they're running around

9    trying to figure out what they have to do, what their

10   obligations are.

11         MR. MURPHY:  The private practitioners file

12   registration statements.  They have meetings with the FARA

13   unit.  And so those private practitioners have an understanding

14   of what's material to the FARA unit.

15         Ms. Jeffress has had five years of experience in

16   dealing with FARA questions.  She's been on the phone with FARA

17   people.  She's -- as I said, she's given lectures and seminars

18   and written articles.

19         THE COURT:  So, are you now proffering her as an

20   expert on what would have influenced --

21         MR. MURPHY:  -- a reasonable decisionmaker.

22         THE COURT:  -- a FARA unit person having a

23   conversation, as alleged here?

24         MR. MURPHY:  Yes, Your Honor, and with respect to the

25   same two opinions.

1            THE COURT:  Can you read me the sentence where you

2      have that in -- I know it's not in this.  Can you tell me where

3      it is in the letter that you sent the government?

4            MR. MURPHY:  Your Honor, I think it is in that

5      paragraph that you read.  We said that if materiality becomes

6      an issue and Ms. Hunt is testifying about what is material, she

7      will offer contrary testimony along the same lines as the first

8      two opinions.  Those same lines are that --

9            THE COURT:  Right.  And they're saying that that

10     doesn't really put us on notice of much.  I certainly can't

11     tell from that.

12           MR. MURPHY:  I think, Your Honor, what we're saying

13     is, if he did a report for a foreign entity and that report was

14     publicized by that entity, that fact of publicity by the

15     foreign entity does not create an obligation on his part to

16     register.

17           THE COURT:  There's no -- it's not -- this case isn't

18     about the publication by the foreign entity.

19           MR. MURPHY:  Yes, it is, Your Honor.  I think it is.

20     There are many allegations -- there are many allegations in the

21     indictment about what the Ukraine intended to do.  And there

22     were questions asked of Mr. Craig in one of the letters about

23     what the Ukraine intended to do.  And his answer was:  We

24     didn't really know what they intended to do.  We hadn't

25     finished our report.  When we finished it, they would decide

1    what to do with it.

2           Her opinion is that whether or not they intended to

3    publicize it is not a question that the reasonable practitioner

4    would have thought was material to the question of

5    registration.  In similar fashion, talking to a couple of

6    newspaper reporters about the report, if you're not acting

7    under the direction or control of the foreign entity, is not

8    something that would require you to register.  It would not be

9    material to the determination.  So those materiality issues,

10   they are -- I mean, the facts are the same facts.  They happen

11   to apply both to the willfulness standard and the materiality

12   standard.

13          THE COURT:  All right.  I'm going to reread your

14   letter before I rule on this.  I am inclined to believe that if

15   it's relevant in some way to his state of mind, I would have to

16   address the question after I determine what your case is about

17   his state of mind.

18          What do you want to say?

19          MR. CAMPOAMOR-SANCHEZ:  Your Honor, we've had no

20   notice of any such opinion about materiality or willfulness as

21   it relates to his communications with the FARA unit.

22          As the Court read, the proffered opinions are about

23   what a reasonable practitioner would have believed about

24   registration obligations, marrying the alleged facts as the

25   defense presents them in December of 2012.  We asked repeatedly

1    for the basis and opinions and further explanations as to -- I

2    mean, if the Court looks at the letter, it is Docket 40:

3    Ms. Jeffress may also offer more detailed testimony -- may

4    respond to testimony consistent with the previously described

5    opinions and may offer more detailed testimony about these

6    matters based on hypothetical assumptions presented to her or

7    based on the documents to be offered.

8             And the idea that Mr. Murphy did not know what

9    Ms. Hunt was going to say, when he has her grand jury

10   transcript, the FBI 302s, it is -- I don't understand it.

11            So there's absolutely no notice.  We're supposed to

12   be going to trial on Monday, and now we may be faced with

13   additional opinions that Ms. Jeffress may offer.

14            And, Your Honor, we're really in 704(b) territory.

15   They're trying to get evidence -- trying to get a -- as they

16   like to say, a very excellent attorney, who is also a

17   prosecutor, to essentially vouch for his state of mind.  She

18   has nothing to offer about willfulness or materiality as it

19   relates to what we allege are his false statements and

20   omissions to the FARA unit.  And we urge the Court to exclude

21   the testimony.

22            THE COURT:  All right.  Thank you.  This overlapped

23   substantially in some important ways with the motion in limine

24   concerning the testimony of Heather Hunt, Docket 48.  In its

25   opposition at page 3, Docket 49, the government said it doesn't

84

1    intend to ask her whether, based on certain facts, the

2    defendant hadn't -- whether the defendant had an obligation to

3    register, and it's not going to elicit testimony that he had

4    any duty to supplement.

5          Therefore, to the extent they're moving to exclude

6    testimony to that effect, the motion is granted, essentially,

7    as moot because they're not planning to do it.

8          I also agree that whether we're talking about

9    Ms. Jeffress or Ms. Hunt, any information provided to this jury

10   about what the statute says or what it means is supposed to

11   come from me, and no one else.  So, the defendant is pretty

12   good at pointing out why this shouldn't come out of Ms. Hunt's

13   mouth, but it seems that you're trying really hard to get it to

14   come out of Ms. Jeffress' mouth, and that's not happening in

15   either situation because it would be as incorrect for Ms. Hunt

16   to do it as it would be for Ms. Jeffress to do it.  Nobody is

17   going to intrude on -- if we have to have 20 jury instructions

18   about FARA, then we'll have 20 jury instructions about FARA,

19   but nobody else gets to teach this jury about FARA.

20         And if you want to do some sort of judicial notice

21   where it happens during the trial, as opposed to a jury

22   instruction at the end of the trial, that's fine too.  But I'm

23   the only one who can say what the registration requirements

24   are, what -- public relations, how it's defined, what

25   dissemination is; not them.

1            But, Ms. Hunt was a government official making a

2    determination in this case, and, therefore, what did you ask

3    and why did you ask it?  What did he say?  What impact did his

4    statements have on your decision making is highly relevant.

5    That is a different question from the ultimate legal

6    determination of whether he did or didn't have to register.  It

7    doesn't depend on whether -- what the defendant put in his --

8    its motion.  It's -- on page 7:  Well, she couldn't compel him

9    to register.  She couldn't impose sanctions for his failure to

10   register.  That's all irrelevant.

11           She said, when she sent the letters, We are trying to

12   figure this out.  We are making a determination, and we need

13   some information.  And he chose to reply to the letter.  She

14   then said, We've made a decision.  We think -- even with a

15   relatively broad and not specific understanding of the facts,

16   she said, Well, we think he is obligated to register.

17           And then he met with her and wrote her, Re:  The

18   obligation to register.  And then she reversed her position,

19   laying out the very facts he allegedly emphasized with her.

20           So that's all laid out in the letters.  The defendant

21   says, well, it's an objective standard, so she can't say how it

22   affected her.  I don't think that's consistent with the case

23   law.  If you look at *United States versus Kingston*, 971 F.2d

24   481, out the 10th Circuit, page 486, cited by the government in

25   its brief, they said that appellant is correct.  And you both

1    are correct, that lay witnesses and even expert witnesses are

2    not permitted to give opinions as to what the law is.

3            Government witnesses are permitted, however, to

4    testify as to whether certain truths, if known, would have

5    emphasized their -- would have influenced their decision making

6    for purposes 18 U.S.C. § 1001.  The government witnesses in

7    this case were not testifying as to the law, rather, they were

8    testifying as to the materiality of the false statements.  That

9    makes sense to me.

10           If it is an objective standard, the impact on the

11   person the statements were made to influence is certainly

12   relevant for Rule 401 purposes as to whether it would have been

13   objectively important.

14           Indeed, the defendant cited a pleading -- cited a

15   case in his pleading regarding Ms. Jeffress that cites

16   *United States versus Litvak,* 808 F.3d 160, at 183, that says,

17   "Because materiality is an objective standard, defendant could

18   not be left only with the testimony of the victims of his

19   conduct."  That seems to plainly indicate that the person to

20   whom the statements were made can obviously testify on the

21   issue.  The question there was, who else can testify?

22           And I agree with the defendant, that she can't say, I

23   needed this information because the statute says dissemination,

24   and dissemination means X.  But I can't understand why she

25   can't say, Dissemination was an issue.  I was trying to figure

1    it out, and this fact was important to me in trying to figure

2    it out.

3           But I also agree with the defendant that the

4    testimony is subject to cross-examination.  I agree with the

5    assertion in the defendant's motion in limine about the

6    non-registration evidence, that she could be asked if she knew

7    about press conferences another law firm held and whether that

8    circumstance would be of importance to her in considering

9    whether that firm should have registered.  That is different

10   from introducing the fact that Covington wrote a report and it

11   didn't register, which is not relevant.

12          Now, the motion in limine only talks about Covington.

13   Are there PR activities regarding any other firm that you want

14   to ask her about?

15          MR. MURPHY:  Yes, Your Honor.  There are some other

16   circumstances.  We talked in the papers that we filed about the

17   *New York Times* article regarding think tanks.  And there was a

18   long, I think, ten-page *New York Times* article about think

19   tanks and their operations.  The article was written in 2014,

20   and it goes back to talk about some of the think-tank efforts

21   on behalf of foreign entities where there were no

22   registrations.

23          I think we should be able to ask Ms. Hunt, for

24   example, about the FARA unit's analysis of that situation,

25   which was, again, reported in the New York Times.

```
1              There is also, most recently --

2              THE COURT:  Again, I don't think you can get into the

3    legitimacy of whether anybody registered or didn't register and

4    whether they decided to bring an enforcement action or didn't

5    bring an enforcement action.  Those depend on a whole panoply

6    of factors, and we don't even know if we're talking about

7    similarities.  I think you can probe other known public-

8    relations activities and whether those are material to her too,

9    but not the ultimate -- the question that you're trying to get

10   is:  Well, they didn't register, was that wrong?  I don't think

11   you're going to have enough facts in the record to ask that

12   question.

13             MR. MURPHY:  I think --

14             THE COURT:  And I don't think it's relevant.

15             MR. MURPHY:  Okay.  But I think we ought to be

16   entitled to ask about the activities of other law firms,

17   so-called think tanks.  There's some investigative firms that

18   have done work, for example, in connection with the

19   Saudi Arabian Government and the alleged murder of

20   Mr. Khashoggi.  Some reports were done, publicized pretty

21   widely in the press about those reports and whether -- you

22   know, any of those entities, you know, registered under FARA,

23   whether they looked at it, how they looked at it.

24             THE COURT:  I -- first of all, I don't think that

25   what they've done subsequently bears on her state of mind back
```

1   then.  But, I also think we are not going to get into whether

2   anybody else should have registered or not.  You're basically

3   asking for the legal determination that you've just said that

4   you're not allowed to make.  And there's no way that we have

5   all the facts in front of us, and we're not going to have a

6   mini-trial on everybody that did that.  I think if -- if you

7   want to talk about what's relevant and what's not, Did you know

8   about this?  Did you ask questions about this?  Did you know

9   about that?  Did you ask questions about that?  That's a

10  different situation.

11          MR. MURPHY:  Okay.

12          THE COURT:  But all of this raises the question of

13  whether Ms. Hunt is testifying to facts or she's testifying as

14  an expert.  I'm a little concerned that when the government

15  says her opinion about what was important to her when she was

16  sitting down with Skadden is based upon her particularized

17  knowledge after her decades, I think you said, of work in the

18  FARA unit, that we're kind of headed into expert testimony

19  territory.  What's your view about that?

20          MS. GASTON:  Your Honor, she won't be testifying as

21  an expert because we're not going to be asking her to opine

22  about whether the defendant had a registration obligation.

23  She's going to be testifying as a fact witness about her

24  inquiry, why she asked certain questions and how she understood

25  the answers and why they're important.  There's -- we're not

1    going to be relying on her -- her legal experience or her

2    description or evaluation of the law.

3             THE COURT:  All right.  Well, let me ask the

4    defendant.  Do you think, now that they've taken out -- we're

5    not going to say he had an obligation to supplement, we're not

6    going to say he had an obligation to register, whether she's

7    testifying as an expert or a fact witness?  And I guess, to me,

8    the closest analogy that I could come up with is sort of like

9    the treating physician, who can say, I made this assessment, I

10   made this diagnosis, I made this prescription.  And that's all

11   based on the person's, obviously, professional expertise and

12   use of experience, but they can't then give the ultimate "was

13   caused by this" or "it's going to be the following future

14   injuries and future harm" because then that crosses into expert

15   testimony.

16            So, is she testifying as an expert or not?

17            MR. MURPHY:  If she's testifying based on her -- what

18   the government describes as particular knowledge or

19   particularized knowledge based on her years of experience in

20   handling FARA registration experts, then she's an expert.

21            THE COURT:  Well, she's going to say:  I've been in

22   this unit for blah, blah, blah years.  I have to analyze the

23   statute.  I have to analyze the facts.  I was doing that in

24   this case, and so I asked these questions, and the answers were

25   important to me.

1          And I've already said she can say that.  That doesn't

2     rule out the possibility that some expert could testify as to

3     materiality, but she's not testifying as an expert on

4     materiality.  She's testifying as this is why it was reasonably

5     going to influence me.  So --

6          MR. MURPHY:  I think that when the advisory committee

7     rules -- I'm sorry -- the advisory committee on the amendment

8     to the rules talks about specialized testimony from a lay --

9     so-called lay witness and saying that that's subject to the

10    expert witness rules, I think that the government is really

11    evading that requirement.  I think they are proffering her as

12    someone who has what they described as particularized

13    knowledge.  It's specialized knowledge.  She's an expert.

14         THE COURT:  Okay.  So let's say they are.  You've

15    been on notice of what she was going to say because you've read

16    all of her prior testimony.  You filed a motion in limine about

17    it.  If they're going to ask her an opinion -- and they're

18    saying they're not even going to ask for an opinion.  But if

19    they ask for an opinion or if they ask for something that you

20    think is an opinion, they're going to have to lay the

21    foundation of her experience, which maybe you claim she doesn't

22    have.  But I don't think you would probably dispute the fact

23    that she has experience of what someone might, in the FARA

24    unit, would find important.  She probably has at least as much

25    experience about what someone in the FARA unit might find

1      important as the person you would elect to proffer as an expert

2      on the subject.

3              But in any event, if they laid the foundation and you

4      didn't think it was proper and they proffered her as an expert,

5      you could then object and say the foundation was insufficient.

6      You could voir dire her, all that.

7              So, whether it's expert testimony or not, does it

8      make any difference?

9              MR. MURPHY:  If we have the right to voir dire her

10     and to question her, you know, about her expertise, then I

11     think it makes little difference.

12             THE COURT:  All right.  If it is expert testimony, it

13     certainly seems to fall within Rule 702(a), relevance, because

14     it does go directly to a fact that this jury has to determine,

15     which is materiality.

16             It's hard to know -- I mean, yes, obviously, if you

17     said:  In your opinion, was the date he met with David Sanger

18     important to your determination about whether he had to

19     register or not? you would be eliciting an opinion.  But if you

20     say to her:  Was it important to you?  Is that an opinion or is

21     that a fact? especially since you know that you're going to

22     start her direct by asking her to talk about how many years

23     she's been in the FARA unit.

24             MS. GASTON:  So, Your Honor, our position is that it

25     is fact testimony when she is talking about what was important

1    to her in the course of the inquiry.  For instance, why she

2    made the determination in the September 5th letter and then why

3    she reversed that determination.

4            It would, arguably, be lay opinion testimony if we

5    ask her a hypothetical:  Would X fact have been important to

6    you?  But that would be lay testimony, fact testimony,

7    consistent with *Kingston*.

8            THE COURT:  I feel like if you ask her consistent

9    with *Kingston*, what you started with, What did you ask was

10   important to you? you're in the lay world.  But if you start

11   saying, Would this other thing have been important to the

12   reasonable FARA person? you really are basing that on who she

13   is and what her experience is.

14           MS. GASTON:  So I would point the Court to

15   *United States versus Matsumaru*, which is another -- a Ninth

16   Circuit case that the government put in its brief.  It's on

17   page 4.  And in that, consistent with the Seventh Circuit case,

18   the court said asking hypotheticals of a fact or lay witness

19   about whether a fact would have been material to them or

20   relevant to them, that is not crossing over into expert

21   testimony.

22           THE COURT:  Because you're just asking, again, as to

23   whether it would be relevant to her?

24           MS. GASTON:  Yes.

25           THE COURT:  Does it make sense, out of an abundance

1    of caution, to just qualify her as an expert anyway at the

2    beginning of the testimony and let them voir dire to see if she

3    can be qualified as an expert?  And then if anything you ask

4    ultimately turns out to have been an opinion -- I mean, is it

5    prudent to treat her as an expert from -- from my perspective,

6    from your perspective -- I mean, I will look at this case and

7    see if we don't have to.

8              I feel like we're getting -- we're getting really

9    close to the line.  And I do think the treating physician is

10   kind of the best analogy because they're clearly making medical

11   diagnoses.  They can't make those -- they're not lay diagnoses.

12   But it's not deemed to be expert testimony if they stay within

13   the boundaries of, I applied my expertise to this patient.  And

14   she's basically saying, I applied my expertise to this patient.

15             But once you start saying, well, would this have

16   mattered and would that have mattered, then she's applying her

17   judgment a little more broadly, and it starts to make me a

18   little more nervous.  And if all we're talking about is the

19   difference between their opportunity to weigh in on her

20   expertise -- they're not arguing that this is like a

21   last-minute expert flying in and they haven't had the

22   opportunity to consider it.  We should think about that.

23             MS. GASTON:  We can certainly think about that, Your

24   Honor.  Perhaps one thing we could suggest, and we would like

25   to think about it a little more, too, is for her to provide her

1    fact testimony and then to qualify her and then to ask her the

2    hypotheticals, just to sort of make sure that the difference

3    between the hypotheticals and her fact testimony is clear.

4          THE COURT:  All right.  Well, I don't think that's

5    objectionable from any point of view.  And I'm not saying you

6    have to do it.  I think you should consider whether you have to

7    do it in light of this discussion, and I should consider

8    whether you have to do it in light of this discussion.  And if

9    you do break it up into two pieces, it will be clearer in terms

10   of the record and when the defendant can object or not object

11   as to whether it should come in or not.

12         Mr. Murphy, do you want to say anything else about

13   this narrow issue?

14         MR. MURPHY:  Yes, Your Honor.  I think all I want to

15   say is I think that the Court will have to be very mindful of

16   the line that you drew, which is that the judge in the trial is

17   the one who is going to instruct on the law and what the law

18   is.  And to the extent that Ms. Hunt were to be asked questions

19   about why she thought something was important or why something

20   else was not important, that's going to get into what the law

21   requires.  And I think that those questions ought to be not

22   asked.

23         THE COURT:  At all?

24         MR. MURPHY:  At all.

25         THE COURT:  Then why do we get to ask them to

1    Ms. Jeffress?

2              MR. MURPHY:  She won't answer those questions either

3    about why.  She'll talk about what reasonable practitioners in

4    the field considered, but not why they considered it.

5              THE COURT:  I think we've pretty much covered

6    whatever was at issue with respect to the motion in limine with

7    Ms. Hunt.  There are aspects of the motion in limine with

8    respect to Ms. Jeffress that I have not yet ruled on.

9              I do have a question in the defendant's reply to the

10   motion in limine related to Ms. Hunt, Docket 48, at page 15.

11   You said, "We filed a motion to dismiss on the duty to

12   disclose.  If that's denied, the source and nature of the duty

13   to disclose remains a legal issue that may not be addressed by

14   lay witnesses."  That's kind of what we were talking about in

15   the omissions and whether she would want to know, which is

16   different than whether he had to tell her, but they're related.

17             So, if you're saying that that can't be addressed by

18   Ms. Hunt, are you also saying it can't be addressed by

19   Ms. Jeffress either?

20             MR. MURPHY:  The duty issue, Your Honor?

21             THE COURT:  Yes, the source and nature of the duty to

22   disclose.  You said she wanted to go through -- paragraph 63 --

23   and say, Well, a reasonable person practicing in the area,

24   based on my extensive experience as a lawyer who is an expert

25   in that area, wouldn't think they would have to say that.  Is

1    that addressing the nature and source of the duty to disclose

2    that's a legal issue?

3            MR. MURPHY:  I don't think so, Your Honor.  I mean, I

4    think that the duty issue --

5            THE COURT:  Are you saying that an expert can address

6    it?  Is it that no one can address it other than the judge or

7    only a lay witness?

8            MR. MURPHY:  Our position has been that the duty

9    issue is an issue of law for the Court.

10           THE COURT:  Then that cuts both ways.

11           MR. MURPHY:  It does.  But that's our position.

12           THE COURT:  Related to all this also are Dockets 76

13   and 77, the non-registration evidence.  I've already said that

14   Ms. Jeffress cannot testify about what a reasonable person

15   believed about registration was required because it's not

16   relevant.  So just the fact that somebody wrote a report for a

17   foreign country and didn't register is not relevant, and it's

18   not going to be introduced into evidence.

19           I agree, as we discussed earlier, that public-

20   relations activities of a similar firm in similar circumstances

21   could be relevant to the allegation that he willfully concealed

22   facts, but only if it's similar and, frankly, as far as I'm

23   concerned, only if he knew about it.  Otherwise, it doesn't

24   have anything to do with whether what he did was knowing and

25   willful.

1          So far, all the defendant has sought to put into

2     evidence is that a press conference and non-registration

3     happened.  It doesn't bear on his intent if he didn't know.

4     And if he knew, it would depend on what he knew.  So, it could

5     be admissible, depending on what his case consists of.  Though,

6     I agree that, as I said earlier, you can cross-examine Ms. Hunt

7     on materiality of such things as a press conference.

8          With respect to the rest of the exhibits, I'm

9     planning to reconvene tomorrow at 2 p.m.  The jury instructions

10    I have under advisement and will finalize them at a jury

11    instruction conference.

12         With respect to the general trial procedure, I want

13    to give you some pointers.  I know you'll be here tomorrow, but

14    I thought I'd tell you a few things.

15         First of all, I believe that lawyers should not be

16    tied to lecterns.  Therefore, if you wish to give your opening

17    statement from the well of the court or your closing argument

18    from the well of the Court, we have body mics, and you can have

19    them, and you can give your openings and closing from the well.

20         During trial, you do not need to ask my permission to

21    approach the witness.  If you want to approach the bench and

22    have a conference, you might have to raise that before you

23    start walking up here.  But if you have something you want to

24    show a witness, just go.

25         Once we determine -- and a huge number of the

1    exhibits are actually not objected to.  Once they are admitted

2    in evidence -- which I'm praying that I'm able to do by close

3    of business tomorrow -- then you don't have to mark it or

4    wander around the courtroom with it.  You just approach the

5    witness or draw his attention on the screen, or in a binder or

6    however you're planning to show them to the witness, to

7    Government's Exhibit X.  You don't have to lay the foundation

8    or any of that.

9         I would like to say -- and I've had to say this in

10   other trials before -- that Mr. Murphy, in particular, you are

11   a very expressive human being.  And that is a -- an asset to a

12   trial lawyer in many ways.  And some of the others of you have

13   joined in a little bit.  But you can tell by your face exactly

14   what you feel about what the government is saying, and

15   particularly if you find it to be incorrect.

16        You're not going to do that in front of the jury.  I

17   know you're all experienced, but there has been so much of that

18   in here that I felt the need to just say please, remember, once

19   there's a jury in that box, that that's out.

20        Generally, I tend to tell the jury to be here at

21   about ten after nine or 9:15 and take the bench at 9:30.  I

22   give them a midmorning break.  I have an hour for lunch; that,

23   depending on where we are in the testimony, could be at 12:30

24   or it could be at 1:00.  There's a midafternoon break, and I

25   try to stop somewhere between 4:30 and 5:00, again, depending

1    on where we are in the testimony.  So, you can assume that

2    that's sort of -- kind of the schedule that we're going to have

3    moving forward.  That's what I will tell them during voir dire.

4           Are there any other housekeeping, procedural, "how do

5    you handle this in your courtroom" questions that anybody has

6    for me?

7           MR. CAMPOAMOR-SANCHEZ:  One question we had, Your

8    Honor.  We, I think, briefly discussed it, was your practice

9    about sitting on Fridays or not.  And we were actually hoping

10   that at least for the first Friday, the 16th, that we would not

11   sit on that Friday.  But, we wanted to know if the Court had

12   made a decision about that or not, and at least put the request

13   in that if we could not sit that Friday, that would be helpful

14   to the government.

15          THE COURT:  Mr. Taylor, do you have a position about

16   Fridays?

17          MR. TAYLOR:  Well, I'm reluctant to inconvenience

18   Mr. Campoamor.  This is a short trial, and I don't see any

19   reason why we shouldn't go all the way through.  If there are

20   matters of personal concern, of course.  But it's everybody's

21   desire to have this case go from beginning to end as quickly as

22   possible.  So we don't join the request to take off Fridays.

23          THE COURT:  I really think I need to reserve on that

24   a question, unless you're asking me because there's some issue

25   about what day witnesses can be here and who can be here.  I

1     think that, from a practitioner's standpoint, from a jury

2     standpoint, everybody likes the time to clear their head and do

3     things.  I like to take pleas and hear motions and do things in

4     other cases.

5             But, especially the first week, depending on how long

6     it takes us to get a jury and how far we've gotten, I might

7     want to just keep going.  If we're pretty far along and we're

8     really being efficient and everybody is being efficient, then

9     maybe we can say okay.  But I think I would assume right now

10    that we will sit for some portion of the day on Friday, no

11    matter how inconvenient it is for me, as everybody else.  But

12    my goal is to try to get this done in a compact way.

13            Do you have any other questions, Mr. Taylor?

14            MR. TAYLOR:  I do, Your Honor.  On my list of things

15    today was jury instructions.  I know you said you would take

16    that all up by a charge conference.  I take it by that you mean

17    at the close of the evidence?

18            THE COURT:  Yes.  I mean, I think if I have ruled on

19    the question of that additional tweak that you want to give the

20    willfulness instruction, I've read some of the cases.  I really

21    need to think about it.  I don't know if I'll be able to tell

22    you before you give your opening.  Obviously, you'll all know

23    before you give your closings.  But I think even the standard

24    definition of willfulness gives you plenty to work with in your

25    opening.

1              So, you know, part of the expedition of this trial,

2      combined with the volume and quality of your advocacy, is that

3      I have a lot of things to rule on in a very, very short period

4      of time.  And so I think it's important for everybody to give

5      me the jury instructions early so I can start working on them,

6      but I can't say that tomorrow we'll be able to cover exhibits

7      and jury instructions.

8              MR. TAYLOR:  I wasn't expecting that.  I did want to

9      highlight that there are a number of instructions to which the

10     sides are in general agreement, there are others to which they

11     are not.  And we have --

12             THE COURT:  You can assume that if you're in

13     agreement as to them, I'm going to give them.

14             MR. TAYLOR:  I've assumed that before, sometimes.

15             THE COURT:  Okay.

16             MR. TAYLOR:  We've also presented instructions on

17     FARA, the legal issues which we would like you to instruct the

18     jury on about the meaning of that statute.

19             THE COURT:  And are those disputed?

20             MR. TAYLOR:  They are.

21             THE COURT:  Okay.  I'll look at all of them.  I have

22     been trying to focus on what you need to know to open.  And so

23     I started with voir dire and then I started with the motions in

24     limine.  Anything that I didn't specifically reserve until the

25     end of the case, I will let you know tomorrow one way or the

```
 1    other, so that you know what you can say in opening.  And then
 2    we'll have the exhibits so you'll know what the government's
 3    case is going to consist of, and then we'll get to jury
 4    instructions.  So I understand the constraints we're under
 5    time-wise and what you need to know.
 6              MR. TAYLOR:  You said 2 o'clock tomorrow.
 7              THE COURT:  Yes, please.
 8              Any other questions on behalf of the government?
 9              All right.  Thank you very much, everybody.
10                          *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5            I, JANICE DICKMAN, do hereby certify that the above

6       and foregoing constitutes a true and accurate transcript of my

7       stenograph notes and is a full, true and complete transcript of

8       the proceedings to the best of my ability.

9                            Dated this 6th day of August, 2019.

10

11

12                           /s/_____

13                           Janice E. Dickman, CRR, RMR, CRC
                             Official Court Reporter
14                           Room 6523
                             333 Constitution Avenue NW
15                           Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25