```
1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,     ) Criminal Action
                                   ) No. 19-CR-125
4                    Plaintiff,    )
                                   ) PRETRIAL CONFERENCE
5    vs.                           ) DAY 2
                                   )
6    Gregory B. Craig,             ) Washington, DC
                                   ) August 7, 2019
7                    Defendant.    ) Time:  2:00 p.m.
     _____
8
                    TRANSCRIPT OF PRETRIAL CONFERENCE
9                           HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                  UNITED STATES DISTRICT JUDGE
     _____
11
                       A P P E A R A N C E S
12

13   For Plaintiff:     Fernando Campoamor-Sanchez
                        Molly Gulland Gaston
14                      U.S. ATTORNEY'S OFFICE FOR THE
                          DISTRICT OF COLUMBIA
15                      555 Fourth Street, NW
                        Washington, DC 20530
16                      (202) 252-7698
                        Email: Fernando.campoamor-sanchez@usdoj.gov
17                      Email: Molly.gaston@usdoj.gov
                        Jason Bradley Adam McCullough
18                      U.S. Department of Justice
                        950 Pennsylvania Avenue, NW
19                      Washington, DC 20530
                        (202) 233-0986
20                      Email: Jason.mccullough@usdoj.gov

     For Defendant:     William James Murphy
21                      William W. Taylor, III
                        Adam B. Abelson
22                      ZUCKERMAN SPAEDER, LLP
                        100 East Pratt Street
23                      Suite 2440
                        Baltimore, MD 21202
24                      (410) 949-1146
                        Email: Wmurphy@zuckerman.com
25                      Email: Wtaylor@zuckerman.com
                        Email: Aabelson@zuckerman.com
```

1      Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                              Official Court Reporter
2                             United States Courthouse, Room 6523
                              333 Constitution Avenue, NW
3                             Washington, DC  20001
                              202-354-3267
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURTROOM DEPUTY:  Your Honor, this afternoon we

2    have case No. 19-125, the United States of America v. Gregory

3    B. Craig.  Mr. Craig is present in the courtroom, Your Honor.

4           Will counsel for the parties please approach the

5    lectern and identify yourself for the record.

6           MR. CAMPOAMOR-SANCHEZ:  Good afternoon again, Your

7    Honor.  Molly Gaston, Jason McCullough, and Fernando Campoamor

8    for the United States.

9           THE COURT:  All right.  Good afternoon.

10          MR. TAYLOR:  William Taylor, William Murphy, and Adam

11   Abelson for Mr. Craig.

12          THE COURT:  All right.  Good afternoon.  I want to

13   get the exhibits up on the screen.  One moment.

14          MR. TAYLOR:  I'm sorry, Your Honor?

15          THE COURT:  I was just asking you to all give me a

16   moment for me to pull up on my screen what I need to have.

17          Before I start, is there anything that Mr. Taylor

18   would like to raise?  Then we'll turn to the government.

19          MR. TAYLOR:  I'm not sure why you looked at me.

20          THE COURT:  Because you were already walking.

21          MR. TAYLOR:  Well, I was.  Your Honor, you gave us a

22   lot to read yesterday, which we have done.  It raises at least

23   one important question, and that is whether the government

24   intend to appeal.

25          THE COURT:  The question occurred to me.

1          MR. TAYLOR:  And we earnestly believe we should know

2     that now, the Court should know that now.  I don't need to

3     explain what predicament that puts us in if we're going forward

4     on this trial and there is an issue litigated on appeal.  So

5     that is the matter that I wanted to bring to your attention and

6     see if we can get an answer to it.

7          THE COURT:  All right.  Now maybe a little demanding,

8     but I would like to know if the government knows at this time

9     and if it doesn't, when it thinks it would know.

10          MR. CAMPOAMOR-SANCHEZ:  Your Honor, we briefly

11    discussed this matter with Mr. Taylor yesterday afternoon.  We

12    certainly raised it within our office.  As the Court may know,

13    it is ultimately the Solicitor General's Office that makes

14    decisions as to whether the government is going to appeal a

15    court order of this type.  Obviously everybody understands that

16    there is a trial date set for Monday.  But I unfortunately

17    don't have -- I've communicated that to my supervisors, they

18    have communicated it up the chain, and I know people are

19    working on it.  But I, unfortunately, cannot provide any

20    further information to the Court or to the defense.  That's all

21    I know as of now.

22          THE COURT:  I realize it puts the defense in a bind,

23    it puts the Court in a bind, it puts the government in a bind

24    because you have to summon all your witnesses and we have to

25    have enough jurors here to select on Monday morning.

1              It would be my strong recommendation that we know by

2    noon on Friday, at the latest, because we need to know.  And

3    then we need to figure out what we're going to do about it.  It

4    would also be my strong recommendation that if the government

5    appeals, which it has a perfect right to do, that it seek

6    expedited consideration of any appeal, so that we're not

7    waiting the ordinary amount of time that such a thing would

8    take.

9              I understand that the decision is not solely the

10   decision of the trial team, or even the U.S. Attorney's

11   Office's appellate section.  And I understand Mr. Taylor's

12   desire for expedition.  And all I can underscore is that we all

13   need to know as soon as possible, as do you.

14             MR. CAMPOAMOR-SANCHEZ:  Right.

15             THE COURT:  So what I think, if we don't have any

16   further hearing scheduled after we're finished today -- which

17   would be my great hope, but, who knows -- that perhaps we

18   schedule a phone conference or something, we get them for

19   tomorrow midday or something, or if you can notify -- I mean,

20   clearly, as soon as you notify anyone, you notify Mr. Haley,

21   you can notify the other side at the same time and then we can

22   figure out, get together to talk about it.

23             But, Mr. Taylor, is there any other specifics you

24   wanted to add to your desire to know now?

25             MR. TAYLOR:  Um --

1          THE COURT:  I don't feel like I have any authority to

2    demand to know now.

3          MR. TAYLOR:  Couple of exclamation points is all.

4          THE COURT:  Okay.  Now.

5          MR. CAMPOAMOR-SANCHEZ:  And, Your Honor, to be clear,

6    we continue to be preparing as if this case is going to trial

7    Monday.  We're not delaying any witnesses.  We're all hoping,

8    certainly, that we're going to trial on Monday; certainly I can

9    speak for the trial team.  I just -- obviously, as the Court

10   knows, I've communicated the urgency.  We cannot control the

11   Solicitor General's Office, but I will again repeat what the

12   Court has suggested.

13          As to timing, my suggestion would be that if we don't

14   have notice before, that we can schedule a telephone conference

15   for Friday afternoon.  I'm trying to give the government as

16   much time as possible to try to be able to answer the Court's

17   question, but --

18          THE COURT:  As I said, if we're finished by the end

19   of today, then I think we ought to set up one, maybe, for

20   tomorrow afternoon, to try to keep the pressure on a little

21   bit, and to see if we can get any inclination one way or the

22   other.  And, obviously, if you decide to do it, the filing of a

23   notice of appeal would give everybody immediate notice.

24          All right.  I don't think there's anything more we

25   can say about the subject.  We all know what the schedule is.

1          MR. CAMPOAMOR-SANCHEZ:  Right.

2          THE COURT:  All right.  Is there anything else I need

3    to take up before we start?  Yes?

4          MR. MURPHY:  Yes, Your Honor.  Mr. Murphy for the

5    defense.  Yesterday, I don't think we talked in court about

6    the -- what the government called its selective prosecution

7    motion in limine, but the court issued a ruling on it

8    yesterday.  One of the things that was briefed in connection

9    with that was the potential for the defense to use the

10   registration that was filed by FTI and Mr. Hawker quite

11   recently.  And we just wanted to be sure that that -- we still

12   have the ability to offer that registration document, either

13   through cross-examination of Miss Hunt or potentially in

14   connection with the cross-examination of Mr. Hawker.

15         THE COURT:  Well, I understood how you thought it

16   would come up in terms of cross-examination with Mr. Hawker.

17   Why does it come up with Miss Hunt?

18         MR. MURPHY:  It is an example of what would be filed

19   if a registration had been filed.  It's, I think, illustrative.

20   And, you know, I think if we introduce it, it will inform the

21   jury about what a registration statement says, what's in it,

22   what's not in it.  And in this case Miss Hunt was actively

23   involved in the discussions that led to the filing of the

24   registration statement because there was a meeting between her

25   and Mr. VanGrack and representatives of FTI, which I think

1    we've alluded to in past filings.

2           We have her handwritten notes, that are quite

3    extensive, in terms of why the government was asking FTI to

4    file a late registration, and what exactly it would entail and

5    some of the questions that arose during that, which I think are

6    proper subjects of cross for Miss Hunt.

7           THE COURT:  Can I hear from the government on that?

8    I mean, I guess there's two questions; one is whether it's

9    appropriate during the testimony of the FTI individuals, and

10   then Miss Hunt.

11          MR. CAMPOAMOR-SANCHEZ:  So I'll take it one witness

12   at a time, Your Honor.  I think it's definitely up to defense,

13   if they wanted to question Mr. Hawker, perhaps, under their

14   theory that that affects his testimony at trial in some way.  I

15   wanted to highlight, not only for the court, for the defense,

16   though, that we had negotiated, months ago, an agreement where

17   the government -- in fact, neither side was going to talk

18   about -- and we specifically limited in that agreement as to

19   Skadden's registration and all the individuals that register

20   for Skadden, many of whom are witnesses in this case, all of

21   whom have registered.

22          So, in fact, the defense was very concerned about

23   that at the time and we agreed that was not part of the case,

24   we were not going to ask about it.  But both sides reserve the

25   ability to bring it up to the Court, if it became relevant in

1    light of what the other side did.

2            And frankly, I'm concerned that if that's really what

3    they intend, then they are really going to open up the fact

4    that it was not just Mr. Hawker who registered, but it was

5    Skadden, and Skadden's other members, all of whom are

6    witnesses, so I'm not understanding why they are trying to

7    treat the Skadden witnesses differently than Hawker.

8            Now, as to Miss Hunt, I want to clarify a couple of

9    things for the Court.  One is, what Mr. Murphy is referring to,

10   is Miss Hunt was a participant.  She was attending a meeting

11   where this issue was discussed.  The meeting was being led by

12   Mr. VanGrack.  And so she took notes of that meeting.  So it

13   was not a meeting where she was, herself, asserting the

14   government's position.  But she took notes about what was said.

15   And because it related to FTI, of course, and to Miss Hunt, we

16   produced it.

17           But I would argue that whatever was said at that

18   meeting, which happened in May of 2019, doesn't have anything

19   to do or bearing on what she's going to be testifying about.

20   So that part I don't believe is relevant at all.

21           As to Mr. Hawker, I think the defense needs to make a

22   decision, but we want to know whether -- then, really, it's

23   open season in terms of whether people that are testifying have

24   registered or not.

25           THE COURT:  With respect to it might come in because

1    it shows what's in a registration statement, I noticed when I

2    went through the exhibits that you all actually objected to

3    blank ones.  So, but now what's in a registration statement you

4    think is relevant?

5            MR. MURPHY:  I think the completed registration

6    statement is relevant, Your Honor.  It's -- it was done by FTI,

7    it was done under the clear direction of Mr. VanGrack and Miss

8    Hunt, who was at the meeting.  I don't know what role she

9    played, other than note-taker.  But she was previously the

10   senior officer of that unit.

11           It's a very sparse statement.  FTI filed something

12   that said that in connection with the report, Mr. Hawker went

13   to New York for a meeting and he was involved in releasing the

14   report and disseminating the report to some media outlets in

15   the U.S.  It does not reveal the role of Mr. Manafort,

16   Mr. Gates, the Mercury firm, the Podesta Group, all of which

17   people were involved in the media rollout that Mr. Hawker

18   helped to orchestrate.  But yet, the registration statement did

19   not ask those questions and those answers weren't provided.

20   And I think that's all pertinent.

21           THE COURT:  Well, I don't know what it's pertinent

22   to.  They may have agreed that he had to correct the record as

23   to himself and indicate -- I mean, you left out the main thing

24   that it revealed, which is at whose behest he was doing the

25   work, which is the point of a registration, the fundamental

1     registration statement.  So he said that.

2              MR. MURPHY:  It said the Ukraine Ministry of Justice.

3              THE COURT:  What fact in issue in this case does that

4     make more likely than not, and then how would you differentiate

5     that from all the other after-the-fact registration statements

6     that are not coming in?

7              MR. MURPHY:  Your Honor, I think it reveals what the

8     nature of the registration obligation is.  In your opinion

9     yesterday you spent quite a bit of time on the Count 1 issue

10    with respect to the FARA regime.  But, I think that this

11    document shows that what was required to be registered was very

12    little.  And I think that's important.  I think it's important

13    to judge Mr. Craig's reasonable belief that what he was telling

14    the FARA unit was what was pertinent.

15             THE COURT:  How does that affect his reasonable

16    belief?  Because Mr. Craig didn't see that at the time.  It's

17    come out now.  How does it have any bearing on what he was

18    thinking in 2012, and how could it possibly have less bearing

19    than what Skadden put in its?  Which I haven't even seen.

20             MR. MURPHY:  Pardon?

21             THE COURT:  How could, if that shows what he

22    reasonably believed he might have to say, bear on the issue and

23    be relevant, yet what Skadden actually wrote and other Skadden

24    partners said isn't?

25             MR. MURPHY:  Your Honor, the Skadden issues are

 1    totally separate and apart from this issue.  The agreement that

 2    we've reached is limited to the Skadden settlement agreement

 3    and the Skadden registration.  It could not be clearer.  That's

 4    what it related to.

 5            THE COURT:  I'm not suggesting there's anything wrong

 6    with that agreement --

 7            MR. MURPHY:  The reasons for that agreement have

 8    everything to do with the hearing that was conducted with Judge

 9    Howell.  And the reasons for it I don't want to go into now,

10    but they have -- they have to do with the representation of

11    Mr. Craig prior to our firm's representation of him.

12            The FTI registration statement, we think should come

13    in for multiple reasons.  One, which we've talked about before,

14    is that up until June -- July?  July of this year, they had not

15    registered for things that occurred in 2012.  Mr. Hawker and

16    FTI, the entity, were pressured by the government to do a

17    registration retroactively.  The reason that they were

18    pressured was, frankly, we think, because of this trial.

19            They didn't want to have a situation -- the

20    government did not want to have a situation in which

21    Mr. Hawker, who really was the person who created the media

22    plan, had not registered, and yet Mr. Craig is being brought to

23    the bar of justice for failing to give a full disclosure about

24    what he did in connection with that same media plan.  The

25    document itself shows that the focus of the FARA unit was what

1    FTI did.  The actions that FTI took, not the actions that other

2    people took.

3              THE COURT:  No.  It shows that with respect to

4    whatever FTI had to file, what FTI did was the focus.  How does

5    it -- what does it say --

6              MR. MURPHY:  When Mr. Craig was answering questions

7    from the FARA unit and the letters that were sent to him --

8              THE COURT:  They weren't asking did FTI have to

9    register.  They were asking did you have to register.

10             MR. MURPHY:  They're asking what you did and what

11   your firm did.  That was the focus.  That was his entire focus

12   throughout the process.  And yet, now the government is saying,

13   well, you failed to disclose to the FARA unit what other people

14   did.  You failed to disclose that FTI, for example, had a media

15   plan and that they gave you a copy of it at one point.  They

16   failed to disclose that he -- he failed to disclose, according

17   to the government, that Mr. Manafort was behind that plan and

18   that it was part of an overall public relations effort he was

19   undertaking on behalf of the Yanukovych regime.

20             Now, if those are the things that Mr. Craig is

21   alleged to have omitted, then why is it that FTI has filed a

22   registration statement that doesn't talk about any of those

23   things?  Their registration statement, if you read it, does not

24   reveal that Mr. Manafort was involved for the Yanukovych

25   regime, it doesn't reveal that there were other public

1   relations firm involved and the effort.  It doesn't mention

2   anything other than the fact that Mr. Hawker had a meeting in

3   New York with Mr. Craig and some others, and he had a few

4   isolated contacts with the media.  We think it's a relevant and

5   admissible document.

6            THE COURT:  Yes?

7            MR. CAMPOAMOR-SANCHEZ:  Your Honor, very briefly.

8   But Mr. Hawker was not questioned by the FARA unit in 2012 or

9   2013 or anything like that.

10            Second, the suggestion that Mr. Hawker registered

11   because we wanted him to register is simply false.  And

12   Mr. Murphy knows that when we first interviewed Mr. Hawker in

13   this case, in January of 2019, and the 302 reflects, that the

14   government at that time informed him that we have been told

15   that the government was going to be seeking for him to

16   register, but it had nothing to do with the trial team or this

17   trial.

18            In fact, the government agreed with the defense that

19   it would not seek to introduce evidence of the Skadden

20   settlement or of the registration of those parties because we

21   did not believe it relevant to the issues for the jury to

22   decide.

23            But, I want to be clear that if that is the position

24   of the defense, then we are going to be asking the Court to be

25   asking us to elicit that evidence.  They claim that what is in

1    the registration is relevant.  Okay, well, then what is in the

2    registration of the Skadden partners is relevant, what is in

3    the Skadden settlement about Paul Manafort and Mr. Pinchuk and

4    how this thing was set up is relevant, as well as those

5    registrations.

6         And I -- my colleague corrected me.  Not every single

7    Skadden witness registered; most of them.  That was a

8    misstatement I made earlier.

9         So I want to be clear that if that is what the

10   defense intends to do, then under the agreement we're going to

11   be asking the Court permission to elicit that evidence in the

12   government's case-in-chief.

13        THE COURT:  All right.  I'm not going to rule on this

14   right now.  It seems to me that you can -- you can ask Miss

15   Hunt whether she asked him those questions that you're saying

16   if she didn't ask him, then he didn't have any obligation to

17   volunteer it.  But I don't see that kind of a negotiated

18   post hoc registration of somebody else sheds light on what

19   would have had to have been disclosed and what was important to

20   the agency at the time.  And particularly with respect to the

21   law firm or Mr. Craig.

22        And if you're going to argue that, I really do think

23   a better piece of evidence of what they expect a registration

24   statement to say, if he had to file one, would be the one that

25   the firm filed.  And, so, I don't see how you can open the door

1      a little bit and then close the door back.

2              So, I'm troubled about all that.  And I don't

3      actually think it bears on any -- you've said several different

4      things that you think it bears upon, and I'm not sure it bears

5      on any of them.  And I'm also not sure I disagree that if

6      that's what you're putting it in for, that it wouldn't open the

7      door.

8              Yes?

9              MR. MURPHY:  Your Honor, I think it also bears on

10     Mr. Hawker's credibility.  He was not interviewed for the very

11     first time in the recent January of --

12             THE COURT:  I don't have a problem with it if there's

13     some bias or some cross-examination that they made you feel --

14     you're a witness, because otherwise they would have prosecuted

15     you, that kind of thing; they made you a promise if you just

16     registered and you testified against him, that kind of, sort of

17     *Giglio* cross is different than look at the four corners of

18     this, and this is all I had to say, and that shows that that's

19     all Mr. Craig would have had to say and it bears on what his

20     intention was at the time.  That's a different story.

21             I think if they twisted his arm and said here's your

22     choice, you go -- you know, we're going to bring a criminal

23     prosecution against you for failure to register, versus you get

24     to play on team U.S. Attorney's Office and be a witness and

25     just do this little civil registration, that's -- I'm not

1    precluding that.

2           MR. MURPHY:  Okay.  Thank you, Your Honor.  We'll

3    play it as it goes.

4           THE COURT:  All right.

5           MR. MURPHY:  Thank you.

6           THE COURT:  All right.  Is there anything else

7    anybody else wants to bring up before we get to my list of

8    things to do?

9           All right.  Yesterday, for the reasons stated on the

10   record, the government's motion in limine No. 42 to exclude the

11   expert testimony was heard and it was granted in part with

12   respect to the first opinion set forth in the defendant's

13   notice.  The second opinion remained under advisement.  And

14   there's several arguments as to why it might be admissible and

15   as to why it might be inadmissible.  And one question is

16   whether it is relevant.  And one theory advanced by the defense

17   is that it bears on willfulness.

18          I have some problems with what the relevance would be

19   of what a reasonable FARA practitioner would have believed

20   warranted registration.  But, I understand that there is some

21   potential relevance, since the allegation is that the purpose

22   of the scheme was to avoid registration.  However, it isn't

23   necessarily dispositive on the issue of whether the falsehoods

24   or the admissions were knowing and willful, since there is an

25   entirely separate obligation to be truthful when you talk to

1    the government under Section 1001, and that doesn't all arise

2    under FARA.  And since I've ruled that the source of the duty

3    to disclose wasn't just what FARA required, but the duty to be

4    truthful and complete when you're being asked questions by law

5    enforcement officials in connection with the set of

6    obligations, and also that there was a further duty to state

7    facts that would make statements you made not misleading, at

8    the end of the day the reasonable practitioner FARA argument

9    might have some relevance, but it doesn't get you all the way

10   there.

11           A more serious problem, even if you grant that there

12   could be some relevance, is the issue of having a witness

13   instruct the jury as to what the law is.  I don't have to

14   summarize the law on that issue, it's set out not only in the

15   government's motion in limine, but quite thoroughly by the

16   defendant on pages 4 to 5 of docket 48, his motion in limine

17   regarding Heather Hunt.  And I'm not going to belabor that

18   point, but my ruling here and my thoughts about this issue are

19   informed by that very precedent, including the D.C. Circuit

20   case *Burkhart versus WMATA*, 12 F.3d 1207, at page 1213, D.C.

21   Circuit case out of 1997.

22           I don't believe that this situation is analogous to

23   the cases the defendant has cited to me about custom and

24   practice in the industry.  But those cases turn on a clear

25   distinction between testimony about a fact and testimony about

1      how a law is interpreted or enforced.  I was very clear in the

2      language I cited and quoted from extensively yesterday, which

3      are cases that the defense is relying on, *Leo* and *Safavian*.

4      I'm not going to repeat those chunks of opinions that are in

5      the record, but I am specifically relying on those excerpts in

6      connection with today's thoughts and rulings, as well.

7             I don't believe that the testimony that's being

8      proffered in the second opinion is consistent with *Safavian* and

9      *Leo*, much less clearly permitted by those cases, to have a

10     lawyer saying this is what reasonable lawyers believed based

11     upon how she, a lawyer, advises other lawyers on the law they

12     have to comply with.  Certainly sounds more like law than a

13     fact.  And I'm not sure it becomes a question of fact just

14     because she says as a matter of fact, this is what we all think

15     the law is, if the thinkers are lawyer.

16             We've all already agreed that there's only one person

17     that can explain the law to the jury, and that's going to be me

18     in this trial.  The defendant cited *United States versus*

19     *Bradley*, 2006 Westlaw 8429691, which had a pretty good

20     discussion of the subtleties involved.  And it specifically

21     relied on *Leo* and the same paragraphs that I talked about

22     yesterday to differentiate testimony about what the law

23     requires, from testimony about industry custom and practice.

24     And at the end of the day, it excluded a considerable portion

25     of what the defendants were seeking to introduce in that case

1    on just that basis.

2         At page 4 of the opinion the court said:  Generally

3    then, an expert's legal analysis of the facts of the case and

4    his conclusions are inadmissible.  An expert or nonexpert

5    opinion that amounts to a conclusion of law cannot properly be

6    received in evidence because the determination of such

7    questions is exclusively within the province of the court.

8         Hence, a court may admit expert testimony of business

9    customs and practices where it will aid the trier of fact in

10   understanding the business in which the claims at issue arose,

11   but not about how a particular statute has come about, nor the

12   source and application of law.

13        The hypothetical in the second opinion stated in the

14   notice seems to come perilously close to, if it doesn't run

15   right over that line.  The defense wants to ask her a

16   hypothetical that adds up all the facts in the case and then

17   asks her to apply the law to them.  So I don't think I can rule

18   on the admissibility of this testimony without a significantly

19   more detailed proffer and probably a hearing outside of the

20   presence of the jury.

21        But even that is not the only problem.  We also have

22   the problem of Rule 74 and having a witness testify as to the

23   defendant's state of mind.  The government cited *United States*

24   *versus Libby*, 475 F.Supp.2d 75, at page 89, out of this

25   District in 2007.  It's not exactly on point, but -- about

1    experts, but it does touch on the problem of trying to get at a

2    defendant's state of mind with information provided by someone

3    else.

4         The defendant wanted to introduce the testimony of

5    the people who provided the defendant with regular national

6    intelligence briefings, the point being that he was so

7    preoccupied with that very important stuff, that he wasn't

8    thinking about the matters at issue in the case.  And the court

9    excluded most of it and noted, in the absence of the

10   defendant's testimony or other evidence that could be

11   substituted for the defendant's testimony, allowing the

12   briefer's testimony to convey to the jury that the defendant

13   was more concerned about the issues in which they briefed him

14   than about the events and issues in this case, would have left

15   the government with no avenue to challenge that suggestion

16   through cross-examination.

17        So it pointed out one of the problems of having a

18   witness talk about what's in the defendant's head when there's

19   no other reference to evidence about what's in the defendant's

20   head.

21        But even more helpful to me, in thinking through this

22   issue, was, again, the case cited by the defendant.

23   *United States versus Banki*, B-A-N-K-I, 2010 Westlaw 1875690 out

24   of the Southern District in New York.  It involved two experts.

25   It was cited in the defendant's pleadings as showing the

1    testimony was permitted for both willfulness and materiality.

2    But I don't think that was the holding and I don't think it

3    really helps that position.  And it strongly supports adopting

4    the very course I indicated I was considering yesterday.

5         The defendant was charged with conspiracy to violate

6    the Iranian transaction regulations and the indictment included

7    a charge of making a material false statement to the Office of

8    Foreign Asset Control, OFAC, regarding the alleged monetary

9    transactions.  It involved transfers to what the government was

10   referring to as hawala, H-A-W-A-L-A, to family members.  The

11   defendant claimed the family remittances were lawful under the

12   regulations; the government charged that he lied about the

13   source of the money and his role during interviews.

14        The first proposed expert was the former director of

15   OFAC and that witness was proffered for both willfulness and

16   materiality, but he was not permitted to testify as to both.

17   With respect to the defendant's willfulness on the ITR charge,

18   they wanted to put in evidence that at that time the OFAC

19   policy was not to regulate family transactions, that the law

20   was being under enforced.  And the combination of the

21   under-enforcement and the customary nature of the transactions

22   could have led the defendant to reasonably conclude that the

23   transactions were okay.  It sounds almost exactly like the

24   opinion being proffered in this case.  And the court said, at

25   page 2, "Mr. Newcomb's testimony that OFAC ignored aspects of

1    the very law it was tasked with enforcing, standing alone,

2    sheds no light on defendant's subjective knowledge of the

3    legality of his alleged money transfers, absent defendant's own

4    testimony or other direct evidence that he believed his conduct

5    to be lawful, there is no basis on which the jury could

6    properly infer anything about the defendant's state of mind

7    from the opinion of this third-party expert witness who's

8    likely never communicated with the defendant.

9         "Thus, if, but only if, there is prior evidence in

10    the record to establish a factual link between defendant's

11    state of mind and OFAC's under-enforcement policy, then

12    Mr. Newcomb may testify that, based on his specialized

13    knowledge of the inner workings of the agency and the relevant

14    expertise he gained in shaping and implementing the ITR, at the

15    time of his service, OFAC chose not to regulate noncommercial

16    family transfers involving Iran.  That testimony would be

17    relevant in that it may aid the jury in weighing the

18    credibility of defendant's alleged lack of knowledge regarding

19    the legality of his conduct."

20         To be clear, Mr. Newcomb may not testify about the

21    legal requirements of the ITR or any other OFAC regulations.

22    This lack of a factual link between what Miss Jeffress is being

23    proffered to say and what is at issue is exactly what I was

24    talking about yesterday.

25         Also, that court emphasized the critical importance

1    of not letting the expert's testimony stray into law.  Page 3,

2    "Although the defense claims that this testimony relates to

3    OFAC's policies, it may more accurately be characterized as

4    Mr. Newcomb's construal of the law that OFAC enforces.  The

5    proper interpretation of the regulation, the family remittance

6    exception and its application to this case is a hotly contested

7    legal matter to be decided only by the court.

8         "While Mr. Newcomb's opinion of the law as written

9    did not require action by a United States depository

10   institution may be relevant to the court's charge of law, it

11   can have no bearing on any factual matter before the jury.

12   It's not for the jury to decide what the ITR means, and whether

13   its language requires or simply permits transfers by U.S.

14   banks.  Instead, the jury's task is only to determine whether

15   defendant's alleged conduct violates the law as laid out by the

16   court."

17        This is a case that was provided to me by the

18   defendant.  What the witness was permitted to testify about,

19   given his prior experience, was materiality.  So it's not a

20   good case on the willfulness issue.

21        The second expert was an FBI agent familiar with the

22   workings of hawala and he was going to differentiate the facts

23   in this case from the criminal organizations he had already

24   investigated in his career.  And the court specifically

25   distinguished what he was planning to testify to and permitted

1    it because it was not going to deal with the defendant's state

2    of mind.

3           Here, defense has made it clear that what Craig must

4    have been thinking at that time is what they want the jury to

5    glean from the expert's testimony.  And it also acknowledges

6    that she has no personal knowledge of what he did or didn't

7    know and what he did or didn't think.  So the relevant

8    question, a fact in issue in this case, is his subjective

9    knowledge and his subjective state of mind, and there's no

10   indication that her opinion is relevant to that at this point.

11          The issue is what he thought, not whether what he

12   thought was reasonable.  What other reasonable practitioners

13   thought about the registration obligations is not the issue,

14   particularly in this case where there is considerable evidence

15   that the defendant was attuned to and concerned specifically

16   about FARA.  And in particular, FARA obligation that could

17   arise out of PR activities.  And that he turned to others

18   within his own firm for advice.  That advice was given and he

19   set out some of his own thoughts in emails.

20          This evidence could, as in the *Banki* case, possibly

21   become relevant if, at the close of the defendant's case, it is

22   clear that the defendant's knowing and willful argument turns

23   upon his knowledge of what, in fact, other FARA practitioners

24   were doing in similar circumstances, assuming they were

25   similar.  At that point, what the expert has to say could be

1   relevant to the credibility of what he was saying he understood

2   people thought at the time.

3           I'm not saying he necessarily has to testify, there

4   may be other witnesses or exhibits that reflect what he knew or

5   relied upon.  So, since I can't tell, I have to defer ruling on

6   the admissibility of an opinion of this nature.

7           Also, at that point, if it's possibly relevant, which

8   it isn't yet, its admissibility is going to turn on whether the

9   opinion steers clear of the line between law and custom and

10  practice, and it will depend on whether I conclude that the

11  defendant has established her credentials to speak to industry

12  practice in 2012 and 2013.

13          So, therefore, the -- any mention of the expert

14  testimony is excluded at this time, the testimony is excluded

15  at this time, and if you want to proffer her as an expert, then

16  you're going to have to do a detailed proffer and we will take

17  it up at the close of the defense case.

18          There is one other issue that you indicated yesterday

19  you would like her to be able to testify to, and that is

20  materiality.  And as I said yesterday, there is case law that

21  suggests this could be a subject of expert testimony in a false

22  statement case because it is an objective standard.  It is an

23  objective standard concerning what would be reasonable for the

24  decision-maker to be thinking about.  It doesn't deal with the

25  state of mind of the speaker.

1          But the concern that was raised at yesterday's

2    hearing was, has she ever been proffered as a witness on this

3    subject, much less been qualified as a witness on this subject.

4    And I was asked to please consider not just the docket 40, the

5    notice of her proposed testimony, but also the exchange of

6    correspondence between the two sides.  So I spent some time

7    with that.

8          Exhibit E to the government's motion in limine,

9    docket 42-5 page 3, the U.S. Attorney's Office had written a

10   letter to the defense team, dated June 11th, 2019, after the

11   notice was docketed.  And it said, "Your disclosure included

12   two other areas of expert testimony by Ms. Jeffress as follows:

13   Responding to the expected testimony of government witnesses at

14   trial," and talked about more detailed testimony based on other

15   documents.  In other words, it talked about that carry-over

16   paragraph on the second page of the notice that we talked about

17   yesterday.

18         They said, "Please identify with specificity what

19   additional opinions Ms. Jeffress may provide."  And then they

20   also asked you to provide her qualifications to offer such

21   opinions.

22         And Mr. Murphy wrote a letter in response, it's

23   Exhibit F, docket 42-6 it's dated June 17, 2019, he said,

24   quote, We reserve the right to have Miss Jeffress offer

25   testimony that would respond to the testimony of Heather Hunt

1    period, close quote.

2          That is the entire extent of any description of the

3    nature and content of any opinion on the materiality of the

4    alleged false statements or omissions in the letter sent on

5    June 17th, 2019.

6          Moreover, the description of her qualifications

7    begins, You have questions about her qualifications to offer

8    the opinions described in the disclosure.  What were the

9    opinions described in the disclosure?  What a reasonable

10   practitioner would have believed about registration

11   obligations.

12         And then you went on to say that she was unaware of

13   any significant developments that would have changed the

14   approach of FARA practitioners with respect to their advice

15   concerning the registration obligations created by the statute.

16         The next paragraph, The materials that Miss Jeffress

17   may rely upon for the opinions described in the disclosure

18   statement about what a reasonable practitioner would have

19   believed about the scope of the FARA registration requirements

20   include.  In other words, neither the notice, nor the

21   description, or this more detailed response about the inquiry

22   into her qualifications put the defendant on notice that she

23   was being proffered as an expert about what facts had a natural

24   tendency to influence, or were capable of influencing, or were

25   reasonably likely to influence the decision-makers in making a

1    determination.

2           The upshot of the notice and the supplementary email

3    was to underscore her qualifications and her reliability as an

4    expert on what a reasonable practitioner would think about

5    whether or not registration was required, not what a reasonable

6    FARA unit decision-maker would want to know.

7           The witness was never a FARA-compliance regulatory

8    person.  Yes, at the U.S. Attorney's Office she handled a few

9    cases with FARA implications from the criminal enforcement

10   side.  And that's different.  And the experience set forth,

11   while it demonstrates that she became quite well-versed in FARA

12   after 2014, doesn't address what the basis would be for an

13   opinion concerning what the regulators did or did not find

14   influential at that time.

15          I'm not saying she couldn't qualify.  It could be

16   that she has significant basis to opine on the question of what

17   regulators find influential from her experience trying to

18   influence them, and that the lack of personal experience on

19   that side of that table would go to the weight and not the

20   admissibility of such an opinion.  But I don't have to decide

21   and I don't have to have a *Daubert* hearing to decide either

22   because the defense did not put the government on notice that

23   they planned to introduce her as an expert on what people think

24   and find influential on that side of the table in general, or

25   what her opinion was on the materiality of even one, much less

1    all ten of the facts in paragraph 63, or what experience she

2    would be drawing upon in reaching that conclusion.

3            Therefore, there has been no compliance with Rule

4    16(b)(1)(C) in connection with any opinion that would bear on

5    materiality.  The rule says:  Upon the government request

6    defense must give a written summary of any testimony that the

7    defendant intends to use under Rule 702, -3 or -5.  There's no

8    question it was requested.

9            The rule then says, "This summary must describe the

10   witness's opinion, the bases and reasons for those opinions,

11   and the witnesses qualifications."  Why?  Not only because it

12   would be nice to know, because people like to write out their

13   cross-examinations in advance, but because with respect to an

14   expert, the opposing party needs time to consider whether it

15   wants to refute that person's opinion with the opinion of their

16   own expert, and to identify and secure their own expert.

17           Putting aside whether all that was provided in full

18   with respect to other opinions, it was absolutely not provided

19   regarding materiality and, therefore, she cannot opine on that

20   subject.

21           And so, therefore, with all of that, I believe I've

22   ruled on all of the open issues with respect to the motion in

23   limine to exclude the expert's testimony.  Opinion No. 1 is

24   excluded, materiality is excluded.  Opinion No. 2 is excluded

25   at this point, but I will reconsider, at the conclusion of the

1    defense case, if there's been a predicate for its admissibility

2    and then we'll determine at that point what more is needed;

3    whether we need to hear her outside of the presence of the jury

4    so I can find out if she's going to testify to a law or fact,

5    and whether we need a voir dire on this subject.

6              That also bears on that portion of the

7    non-registration evidence, dockets 76 and 77, and also a little

8    bit docket 44, the selective prosecution issues that still have

9    been left behind.  Based on the ruling in limine to exclude the

10   expert, there's no basis to use the fact that other firms did

11   not register in her testimony, so it won't be permitted for

12   that purpose.

13             Regarding the defendant's intent, it would only come

14   in if it turns out there's evidence that he knew about it.  And

15   again, it wouldn't be just because somebody didn't register who

16   prepared a report, they would have to tie it to defendant's

17   subjective understanding and the PR aspects of the activities.

18             So those are also still -- I believe the ruling was

19   made yesterday, granted in part and denied in part, and I think

20   that's the way it stands.

21             Defendant's motion in limine No. 46 seeking to

22   exclude testimony concerning alleged false statements made to

23   the Office of Special Counsel was also heard yesterday.  I

24   find, pursuant to Rule 401, Rule 404(b)(2) that the evidence

25   that defendant allegedly repeated false and misleading

1    information in an interview with the Special Counsel's Office

2    is relevant to an issue to be determined by the jury, and that

3    is whether the defendant knowingly and willfully made the false

4    or misleading statements and omissions in 2012.

5         I don't find, under Rule 403, that this probative

6    value is substantially outweighed by a danger of unfair

7    prejudice, confusing or misleading the jury, or undue delay.

8    So, therefore, I'm going to permit the testimony.  And so that

9    motion in limine is denied.

10        Defendant's motion in limine 47 seeking to exclude

11   evidence related to payments to the law firm by the Ukrainian

12   Ministry of Justice, including a number of exhibits, the

13   related emails and invoices, was also heard.  While the

14   decision to head down this path gives rise to serious concerns

15   about lengthening and overcomplicating this trial -- and I

16   strongly encourage the government to think about how best to

17   streamline its presentation, even if it wants to get into this

18   issue to some extent, particularly in its case-in-chief -- the

19   streamlining would be beneficial.

20        I think the government has proffered sufficient

21   grounds to find that the allegation, as yet unproven, to be

22   relevant to the alleged purpose and motivation underlying the

23   alleged scheme to defraud.  That is, to avoid the requirement

24   to unmask the individual private donor funding the firm's work.

25   It's an integral part of the story of this representation and

1    whether the defendant sought to keep any aspects of it secret.

2            And what we really have, what was explained to me

3    yesterday, is not so much a relevance dispute about the

4    evidence, but a factual dispute between the parties concerning

5    what actually happened and what prompted the creation of the

6    invoice in August of 2012.  It's true that the evidence

7    wouldn't be relevant if it was simply what the defense

8    described it to me to be; a bill for outstanding time that

9    hadn't yet been paid for.

10            But to exclude it as irrelevant would mean that I

11    would have to make the factual determination and draw

12    inferences from the cold paper record, without the benefit of

13    the testimony of witnesses, the opportunity to observe their

14    demeanor or hear their cross-examination, and I would be making

15    a factual determination, and that's not my role in this case.

16            Since I can't and shouldn't be making my own

17    determination based on the record before me, I believe the

18    government has established the relevance of the evidence under

19    Rule 401 and I don't believe that the relevance has been

20    substantially outweighed by the risk of confusion or wasting

21    time under Rule 403.  And so the motion to exclude the evidence

22    will be denied.

23            In light of that ruling, all the exhibits objected to

24    on the basis of this motion in limine, which I think the

25    objection is noted in the exhibit list as MIL procurement, for

1     any exhibit for which that was the sole objection -- those

2     involving hearsay it will be considered separately -- they're

3     admitted.  All exhibits to which there was no other

4     objection -- all government exhibits to which there was no

5     other objection noted are admitted.  All defense exhibits to

6     which there was no objection noted are admitted.

7             That doesn't mean, by a long shot, that I think it

8     makes sense for either side to use them all.  I believe that

9     even for issues that you believe are important to your case,

10    there's a certain amount of getting into the weeds and overkill

11    and going down tangents and paths that may or may not make

12    strategic sense.  But again, that's not my call.  They are

13    admitted because they are not objected to.

14            And so what I want to do now is talk about the

15    remainder of the exhibits that are in dispute.  Sadly, one by

16    one.

17            Yes, Mr. Taylor.

18            MR. TAYLOR:  Your Honor, may I address your recent

19    remarks about the admission of exhibits?

20            THE COURT:  Yes.

21            MR. TAYLOR:  I'm always worried about waiver and not

22    making clear what our legal position is.  I want to make clear

23    that our -- that the absence of objection to any of these

24    exhibits is without any concession on the legal arguments which

25    we had put to the Court, and which you have, in some part,

1    overruled.

2           Secondly, while you correctly note the absence of

3    objection to certain exhibits and you may or may not overrule

4    objections to others here, it does not seem to me that that

5    authorizes either lawyers for either side to simply walk around

6    with and hold a document and say, Here, I want to show it to

7    the jury.  It seems to me that that -- there has to be a

8    foundation established for such a document.

9           THE COURT:  The exhibits to which you said that they

10   hadn't -- there was no foundation, you objected on that basis.

11   My pretrial order specifically said if you don't object to the

12   admissibility, if you don't object to the foundation, if you

13   don't object to the authenticity, it's going to be in evidence.

14   And I told you the whole purpose of this exercise --

15          MR. TAYLOR:  I understand.

16          THE COURT:  -- is to say what's in and what's out,

17   and not to spend the trial doing it.

18          MR. TAYLOR:  Nor am I suggesting that you should.

19   Just seems to me that the --

20          THE COURT:  I haven't ruled on anything to which you

21   said no foundation, hearsay, irrelevant, incomplete.  I've only

22   ruled on the ones that you said no objection.

23          MR. TAYLOR:  Understand.

24          THE COURT:  So you're bound by that.

25          MR. TAYLOR:  Understand.

1          THE COURT:  And it's now in evidence and he can say,

2    Miss Hunt, I'm slowing you Exhibit 3.

3          MR. TAYLOR:  That's -- that's fine.  That's fine.

4          THE COURT:  Okay.  And you can, too.

5          MR. TAYLOR:  And we probably will.

6          THE COURT:  All right.

7          MR. TAYLOR:  But I think he needs to show it to

8    Ms. Hunt, rather than simply stand up and show it to the jury.

9          THE COURT:  Are you going to be using screens to show

10   your -- show the witness -- if you want to say, Ms. Hunt, I'm

11   showing you what's been admitted in evidence as Government's

12   Exhibit 3, and put it on -- are you saying we have to go

13   through a little exercise, if he puts it on --

14         MR. TAYLOR:  No.

15         THE COURT:  Okay.  Well, if he puts them in binders,

16   he can say, Jury, you can open your binder -- which I hope

17   you're not doing, given the number of binders -- to No. 3 and

18   turn to Tab 3, and they can look at it because it's in

19   evidence.  And you can do that in your case-in-chief, too.  And

20   you can do it in your cross-examination of their witnesses

21   also.  So, we're not going to be passing things down the jury

22   box.

23         MR. TAYLOR:  I'm not suggesting that, Your Honor.

24         THE COURT:  Okay.

25         MR. TAYLOR:  All I'm saying is if these things for

1    which there's no objection with the witness on the stand asking

2    what is this, you know, testify about, that's one thing.  What

3    I'm worried about is that a case which appears to be a heavy

4    document case, that without any explanation for an exhibit, it

5    would --

6              THE COURT:  No, they're not going to the jury room at

7    the close of the trial if they haven't been used in some way

8    during the trial.

9              MR. TAYLOR:  That's the point --

10             THE COURT:  Okay.  Everybody understands that.

11             MR. CAMPOAMOR-SANCHEZ:  Yes, yes.

12             THE COURT:  At the end of the day, before anything

13   goes to the jury room, we're going to go through this list with

14   Mr. Haley, and if Exhibit 3, which has been admitted without

15   objection, was not used in the trial, it's not going to the

16   jury room.

17             MR. TAYLOR:  All right.  Thank you.

18             THE COURT:  I did not understand what you were

19   saying.

20             MR. TAYLOR:  Absolutely.

21             THE COURT:  No problem.  Glad we straightened that.

22             MR. CAMPOAMOR-SANCHEZ:  Before we get to the exhibit,

23   I had a clarifying question about the order, about the motions.

24   On the motion to exclude Miss Jeffress, I know that the Court

25   has -- words are failing me.  It's not going to rule on that

1     one piece.  The Court makes --

2           THE COURT:  For now I'm excluding it, so they know

3     they can't talk about it in their opening.  But that's without

4     prejudice.  If it becomes relevant during -- by the close of

5     the defense case, they can raise it and we'll talk about it

6     again fresh.

7           MR. CAMPOAMOR-SANCHEZ:  Thank you.  That's what I

8     understood.

9           One question is, I believe I heard the Court, as I

10    have in my notes, that they have to make a proffer.  Is there

11    going to be a deadline by which -- so before we reach the end

12    of the defense case, we all know what she's going to

13    potentially say, if the Court were to find that it could indeed

14    become relevant.  In other words --

15          THE COURT:  I'm not going -- we're not going to even

16    talk about it until the defense case is over.  Then, I'm not

17    going to say that before the defense case is over, they'll have

18    no put something in writing.  It may not have to be in writing.

19    It may be they stand up and say what opinion it is they want to

20    elicit and we can determine from that right then and there what

21    the answer is, or we have to put her on outside of the presence

22    of the jury and do it --

23          MR. CAMPOAMOR-SANCHEZ:  It's just as the Court

24    correctly noted --

25          THE COURT:  We have a proffer, a written proffer that

1    she would say, essentially, if you would do a hypothetical of

2    the facts of what happened, that a reasonable practitioner

3    would not believe that they had to register.

4            MR. CAMPOAMOR-SANCHEZ:  Okay.  Very well.

5            THE COURT:  Right now that's the proffer that we're

6    working with.

7            MR. CAMPOAMOR-SANCHEZ:  Okay.  Thank you.

8            THE COURT:  All right.  I have one question before we

9    get into this discussion about the exhibits, and that is that

10   there was a tremendous number of objections on both sides that

11   the basis was completeness.  I certainly understand Rule 106,

12   that a party can introduce any other part of a writing or

13   another writing that ought, in fairness, to be considered, if

14   something would be incomplete without it.

15           But, with respect to every time somebody said

16   "completeness," unless I missed it somewhere, there doesn't

17   seem to be a reference to what, if anything, would make it

18   complete.  And, so, I'm not sure what I'm supposed to do with

19   all of those.

20           MR. ABELSON:  Yeah.  Fair questions, Your Honor.

21           THE COURT:  Can you explain them?

22           MR. ABELSON:  So, a few points.  First of all, when

23   we communicated our completeness objections to the government,

24   we explained what would cure the completeness objection.  In

25   other words, Government Exhibit X is the more complete version,

1    or something like that.  For whatever reason they didn't

2    include it, which is fine, in the list that was submitted.  But

3    we have communicated that to the government.  That's number

4    one.

5         Number two is we did go back through all of our

6    completeness objections again, and we have kept some of them

7    because we think that a version of an email string, for

8    example, if it's shown to a witness, if that version is shown,

9    it is incomplete in the sense that they're cutting off the

10   conversation mid-conversation.  There are others that we've

11   withdrawn.  And so I can run down those now, or as we get to

12   them, I can let you know.

13        THE COURT:  No.  Tell me the ones you withdraw now,

14   because that will make me happy.

15        MR. ABELSON:  Yes.  I'm happy to do so.  And I

16   apologize that we didn't do this earlier.

17        THE COURT:  Is the same going to happen in the other

18   direction?  Have you withdrawn any?  You didn't have very many

19   completes, to tell you the truth.

20        MR. CAMPOAMOR-SANCHEZ:  Your Honor, we did not.

21        MR. McCULLOUGH:  Your Honor, we had three, and I

22   would be happy to address those.

23        THE COURT:  All right.  Go ahead.

24        MR. ABELSON:  8.  They're all, obviously, all

25   government exhibit numbers.  8, 33.

```
1                THE COURT:  No, 33 is withdrawn.

2                MR. ABELSON:  Withdrawn.  I apologize.

3                34.  35.  Thank you.

4                So 34, 35.  106.

5                THE COURT:  Okay.

6                MR. ABELSON:  115, 117, 128 -- no.  I'm sorry.  I'm

7      sorry, Your Honor.  Court's indulgence.  I need to make sure

8      I'm looking at the right list.

9                130.

10               THE COURT:  Is 128 in or out?

11               MR. ABELSON:  128, we've withdrawn that completeness

12     objection.

13               THE COURT:  130.  Okay.

14               MR. ABELSON:  133, 149, 151.  Our completeness

15     objection to 168, 201, 209, 251.  Our completeness objection to

16     256.

17               THE COURT:  All right.  Well, we have to talk about

18     it anyway.

19               MR. ABELSON:  Yeah.  260, 265, 273, 567.

20               THE COURT:  Let me get to that page.  Okay.

21               MR. ABELSON:  599, 603, and 609.

22               THE COURT:  All right.  So with respect to all of

23     those exhibits, with the exception of the two that had some

24     other basis for the objection, one of which was 168 and the

25     other was, I believe, 256, they now are admitted because the
```

1   only basis for the objection has been --

2           MR. ABELSON:  Miss Gaston helpfully caught 115, to

3   which we object on relevance grounds.

4           THE COURT:  And 115.  Otherwise all the ones you just

5   mentioned are now included in the pile that is admitted.

6           If the government wants to tell me about any

7   objections that have been withdrawn, you can do that, too.

8           MR. CAMPOAMOR-SANCHEZ:  Your Honor, we did not

9   withdraw any new ones that we just did from the other day.

10          THE COURT:  Okay.  All right.

11          Well, then, my question is, what are we doing about

12  the ones with respect to the completeness objections?  No one

13  has given me the thing that you're saying is necessary for it

14  to be complete.  Or did you mark them as exhibits in your own

15  case?  Or are they also already marked as exhibits in this

16  case?  And how am I supposed to rule on a completeness

17  objection?

18          MR. ABELSON:  I'm happy to run through those.

19          THE COURT:  Just tell me in general, where is the

20  information that I need to rule on the completeness objection?

21  I just have an email string and the word "completeness" on the

22  piece of paper.

23          MR. ABELSON:  Right.  So, with the exception of, I

24  think, three, all of the more complete versions that would cure

25  this objection are -- have been marked as government or defense

1    exhibits.  So I can -- if it would -- do you want to run

2    through those --

3         THE COURT:  I'm not going to sit here and have you

4    rule a list to me.  I'm not going to rule on any completeness

5    objections right now.  What you need to do, both sides, if

6    there's any outstanding completeness objections from your point

7    of view, you need to file a document saying we object to this

8    on a completeness basis and we believe that government's

9    exhibit X or defense exhibit Y needs to be substituted for it

10   so I can rule.  Which, I feel like might have even been in the

11   pretrial order, but it might be something that I do in civil

12   cases that I didn't do here because it's usually depositions

13   where this comes up.

14        But there's no point in my trying to put them side by

15   side while you watch me read.  And I don't think I really need

16   to hear argument on whether an extra email belonged to be in

17   there because it's part of the chain, or not.  I'll look.

18        I mean, I did see there were some places where you

19   made a completeness objection because somebody wasn't in the

20   chain, and then the next exhibit had the next one on the chain.

21   So I think I'll be able to follow it just from what you've

22   given to me.  And I'll put aside the completeness ones for now

23   because I haven't had a chance to look at any of it.

24        MR. ABELSON:  Understood, thank you.

25        THE COURT:  Yes.

1        MR. McCULLOUGH:  Your Honor, we will submit the

2   pleading as you addressed.  I did want to address the two

3   completeness objections at the beginning of ours because I

4   think there is some confusion over it, just because of the

5   dating of those documents.  And I think it may be more

6   helpful -- it may be productive to have a very brief dialogue,

7   and we'll happily submit a pleading, as well.

8        THE COURT:  Which of the ones -- 19 and 23?

9        MR. McCULLOUGH:  Defense Exhibits 19 and 23.

10       THE COURT:  Okay.  Yes I found that confusing.

11       MR. McCULLOUGH:  The completeness objection as to

12   these is that Defense Exhibit 19, which is dated April -- it's

13   a letter dated April 5th, 2012.  That letter was not created

14   until 2013.  It was not signed until 2013.  And I can point you

15   to -- this is Government Exhibit 607 that's coming up.

16       THE COURT:  That's the one that's the subject of the

17   issue we talked about earlier.

18       MR. McCULLOUGH:  It is part of the payment motion in

19   limine.  But this -- the issue is that the April 5th, letter,

20   April 5th 2012, was not completed until 2013.  And that's shown

21   in exhibit --

22       MR. CAMPOAMOR-SANCHEZ:  The monitor is on, but you

23   can't see it.

24       THE COURT:  I know what you're talking about.

25       MR. McCULLOUGH:  Okay.  And, Your Honor, so it's

1    Government's Exhibit 607, which is the first time that we see

2    that letter completed.  That letter is then later submitted to

3    the FARA unit by letter of June 3rd, 2013, and that's

4    Government Exhibit 004.  So, the issue is that this, as it

5    appears in defense --

6              THE COURT:  004.

7              MR. McCULLOUGH:  Government Exhibit 004, that's the

8    letter that --

9              THE COURT:  Probably should just call that 4.

10             MR. McCULLOUGH:  4.  Sorry.  That letter was then

11   submitted to the FARA unit on June 3rd, 2013.  And here's the

12   issue, here's why it becomes so confusing, Your Honor, it's

13   because then Defense Exhibit 23, which is dated -- is a letter

14   dated April 10th, 2012, that document was actually -- was

15   actually created in 2012.  It appears that it was sent by email

16   to the government of Ukraine on -- I believe it's March 25th.

17   And I've got that --

18             MR. CAMPOAMOR-SANCHEZ:  May.

19             MR. McCULLOUGH:  Sorry, May 25th.  I've got that

20   document here, as well.

21             THE COURT:  But it wasn't signed and sent back.

22             MR. McCULLOUGH:  It was not signed and sent back.

23             THE COURT:  All right.  So I think --

24             MR. McCULLOUGH:  So we have both of these letters

25   attached to other things.  We have them attached to --

1          THE COURT:  So aren't we really talking more about

2     relevance than completeness?

3          MR. McCULLOUGH:  Well, I think it is completeness to

4     the extent that it is misleading to have the letter appear in

5     the defense exhibit binder in the chronology at April 5th, 2012

6     when, for instance, defendant -- Defense Exhibit 19 was not

7     actually created until March of 2013.  So I think to represent

8     when that document was created, it should be attached to the

9     emails in which it's first found.

10          THE COURT:  All right.  We can take that up when we

11     get to your objections here.  I don't think these are quite

12     subject to the same issue I was talking about before, which is

13     more garden variety rule -- I want to say completeness -- that

14     I can't rule on without what the proposed complete document

15     would be.  So it looks as if it's only the defense that needs

16     to give me that, and that -- I'm not going to talk then, right

17     now, about anything for which completeness was the only

18     objection on your list.

19          MR. McCULLOUGH:  Understood, Your Honor.  And just --

20          THE COURT:  Thank you.

21          MR. McCULLOUGH:  Knowing the confusion that arose

22     from those, we just wanted to broach it.

23          THE COURT:  Somebody -- you both look -- are you just

24     leaning in, or are you about to get up?

25          MR. TAYLOR:  No.

 1                    THE COURT:  All right.  I'm going to see if this will

 2          cooperate.  It keeps turning itself off.

 3                    And there is perhaps a similar sort of objection, but

 4          the first exhibit to which there's an objection is Government's

 5          Exhibit 8.

 6                    MR. ABELSON:  Your Honor, that was one that was --

 7                    THE COURT:  Was withdrawn.

 8                    MR. ABELSON:  Completeness objection that was

 9          withdrawn.

10                    THE COURT:  I put a cross through it, but it ran into

11          a note that I wrote in the margin and I didn't realize that's

12          what it was.  Okay.  Never mind.

13                    Okay.  Government's 9 and 10 also seem to be kind of

14          similar to 452 through 457.  They're identified as document

15          history reports.  I don't know what they are, and I'm not sure

16          I understand the nature of the objection, but lacks foundation

17          seems like a good start.  So, can you tell me what they are and

18          then maybe I can find out why they're admissible or

19          inadmissible?

20                    MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  So the

21          Government's Exhibit 9 and 10 are document history reports for

22          the draft letter that Mr. Craig was working on and modifying.

23          And that being the draft letter that was ultimately not

24          submitted to the FARA unit.  I don't know if the Court may

25          recall from the indictment --

 1          THE COURT:  I know which one you're talking about.

 2          MR. CAMPOAMOR-SANCHEZ:  And so, in terms of the

 3   foundation, we have a witness from Skadden that can

 4   authenticate and lay the foundation for this document; that is,

 5   that it is a true and accurate summary of -- that demonstrates

 6   and shows when Mr. Craig opened or edited that document that

 7   was never sent, and how many times and when it happened.

 8          The parties, so that the Court knows, are actually

 9   working on a stipulation about all these document histories.

10   So there may ultimately be agreement as to that.

11          THE COURT:  All right.  But if not, then those

12   exhibits would require that kind of authentication and

13   foundation before I can rule them in evidence.

14          MR. CAMPOAMOR-SANCHEZ:  Correct.  And we have the

15   witness to do that.

16          THE COURT:  Okay.  All right.  What would be the

17   hearsay objection to them?

18          MR. ABELSON:  Well, Your Honor, first of all --

19   should I come up here or --

20          THE COURT:  I think so.  I mean, actually, if you've

21   got all your exhibits in front of you and you want to sit there

22   with the microphone, if both of you want to do that for this

23   part of this exercise, that's fine with me.  But I don't know

24   that you're near a mic -- okay.

25          MR. ABELSON:  Yeah.  That's fine.  And also just to

1    explain, I'll be handling some of the exhibits on the defense

2    side and Mr. Murphy will be handling some.

3          So, as Mr. Campoamor-Sanchez said, the parties are

4    working out and I think are very close to finalizing a

5    stipulation about the editing of some of the documents on

6    Skadden's document management system.

7          The relevant facts from any of those document history

8    metadata charts, which are what these are, is reflected in the

9    stipulation.  And our position is, if there's a fact in these

10   documents that is not in that stipulation, it is not relevant.

11   So that is number -- so as to relevance, we think that the

12   stipulation will obviate the relevance of any of these

13   documents.

14         As to -- similar as to foundation, what we're

15   stipulating as to what these are in the stipulation, assuming

16   we reach agreement on that -- so again, you don't need the

17   document, and they don't need to lay foundation for a document

18   as to which -- as the relevant facts from which we have -- will

19   have reached, I expect, an agreement.

20         THE COURT:  All right.  My question actually was what

21   was the -- what was the hearsay objection that you had in

22   there?  But I think -- and is it fair to say that this

23   conversation also covers 452, 453, 454, all the way up to 457.

24         MR. CAMPOAMOR-SANCHEZ:  It does, Your Honor.

25   Although that relates to a different document.  So that's

1    actually the letter that was sent by Mr. Craig in June of 2013.

2    So those other documents in the later series that the Court has

3    just quoted are about the letter that Mr. Craig worked on and

4    ultimately did send, the June letter, of 2013.  So again, shows

5    the same kind of information for that different document.

6              THE COURT:  Okay.  So with respect to all of those

7    exhibits, I'm going to defer ruling on their admissibility,

8    whether they'll become admissible or unnecessary based on

9    whatever you stipulate to.  Or if you have to move them in

10   without a stipulation, then you'll have to lay a foundation and

11   we'll take it up at that time.

12             MR. CAMPOAMOR-SANCHEZ:  And, Your Honor, so we might

13   reach a stipulation, but I think we still have a difference of

14   opinion of the parties.  As the Court heard, the way we have

15   drafted the stipulation is that explaining what this means, but

16   then making reference to the government exhibits where the jury

17   can find that information that the parties are explaining.  And

18   so we would want these documents in evidence so the jury could

19   have the stipulation, but also if they wanted, they could look

20   at the document.

21             THE COURT:  The metadata document.

22             MR. CAMPOAMOR-SANCHEZ:  Correct.

23             THE COURT:  All right.  Well, you're looking at him

24   and he's looking at you, and so I don't know that I need to be

25   part of this three-way conversation until we know what you've

1     stipulated to and what you haven't.  And if you still haven't

2     gotten to the point of whether these come in evidence or not,

3     then I'll take it up at the time you try to use them.

4            MR. CAMPOAMOR-SANCHEZ:  Very well.

5            THE COURT:  Because I don't want to rule on issues

6     that I don't even know are in issue at this point.

7            All right.  Exhibits 14 through 19 are blank forms,

8     to be submitted in connection with FARA registration.  Why are

9     they irrelevant?

10            MR. ABELSON:  Your Honor, it depends on the purpose

11     for which they're offering them.  Our position, as you know, is

12     that these forms don't pose a duty for purposes of this case.

13     So, we think they would be irrelevant, if that's the purpose

14     for which they're offered.  If there's some other purpose that

15     they've identified, we can talk about that.

16            THE COURT:  Well, I just want to make sure that now

17     I've ruled on the duty, that you still think it's a question of

18     law and you're not going to ask -- you don't want the jury to

19     decide it.

20            MR. TAYLOR:  May I?

21            MR. ABELSON:  I'll let Mr. Taylor handle that.

22            THE COURT:  I just want to make sure you hadn't

23     changed your mind on that issue as we go forward.

24            MR. TAYLOR:  Well, Your Honor, the critical question

25     in this case is whether Mr. Craig believed the law required him

1    to register.

2              THE COURT:  No, it's not.

3              MR. TAYLOR:  May I?

4              THE COURT:  Okay.  But I think we've pretty clearly

5    established that that's not.

6              MR. TAYLOR:  If he believed the law did not require

7    him to register, then his motive is quite a different thing

8    from if he believed the law did require him to register.

9              And, I believe what you held yesterday is that the

10   duty from Section 612 arises if you are a foreign agent.  So,

11   his knowledge of whether he has such a duty, which is an

12   element, depends upon whether he believed the law required him

13   to register.

14             THE COURT:  I think I found that circular.

15             MR. TAYLOR:  Am I wrong?

16             THE COURT:  I'm not going to sit here right now and

17   paraphrase a 50-page opinion.

18             MR. TAYLOR:  I beg your pardon.  I beg your pardon.

19             THE COURT:  And I really just wanted to know if --

20   well, I don't even need to ask.  I think the defense has made

21   it quite clear that the jury should not be deciding whether he

22   had a duty to disclose.  That was a legal question underlying

23   the legitimacy of having an omissions count in the first place.

24             MR. TAYLOR:  That's correct.

25             THE COURT:  And the question is, for the jury, is did

1    he violate a legal duty, that I get to tell them what it was,

2    or not?  And even more importantly, was what he said true or

3    what he said false, or was it misleading because he omitted

4    information?  And did he omit information and -- but all of

5    that is only to answer the one question, and the one question

6    that you have on your verdict form, which is, have they proved

7    beyond a reasonable doubt that he knowingly and willfully

8    engaged in a scheme to defraud by doing all those things?

9         MR. TAYLOR:  I just don't see how you can get to the

10   question of whether he lied about his purpose in speaking to

11   the reporters without getting to the question of whether he

12   believed that the law required him to register.  And the

13   instructions that both parties have submitted seem to me to be

14   largely in sync with each other, that you will instruct the

15   jury that it must find beyond a reasonable doubt that he

16   knowingly and willfully violated a duty --

17        THE COURT:  Let me try a simpler explanation.

18        MR. TAYLOR:  -- violated a duty.

19        THE COURT:  Let's say the light was yellow, person

20   drove through it.  And he's asked about it later and he says it

21   was green, but he legitimately believes if it was yellow, he

22   was allowed to go through it, that that wasn't a violation of

23   law, because it wasn't red, it was just yellow.  If the issue

24   is, did you tell the truth when you said it was green and

25   omitted the fact that it was yellow, why does it matter if he

1    reasonably believed he didn't have to stop if it was yellow?

2          MR. TAYLOR:  That's -- I apologize at what you may

3    consider to be a little stubbornness.  The -- this case

4    involves FARA.  FARA -- he's not charged with willfully failing

5    to register under FARA.  But I don't think I'm exaggerating

6    when I tell you that the government intends to prove that he

7    was required, legally, to register under FARA, he knew it and,

8    therefore -- and therefore that's why he misled the FARA unit

9    and that's why he left out what's in paragraph 63.

10         So, I don't see -- I really don't see how we can get

11   to the mens rea question in this case without addressing the

12   question whether he believed that the law required him to

13   register.  And he will -- he will have to be permitted to

14   testify that he did not believe the law required him to

15   register, and for good reason.

16         Now, so the duty which you have found to exist in

17   Section 612, as I understand it, arises from the fact that he

18   had a duty to register.  So, whether --

19         THE COURT:  I'm saying that the duty to answer the

20   questions that were posed and not admit the fact arises out of

21   the existence of the set of duties set forth in FARA, and that

22   they're sufficiently specific to not give rise to the *Safavian*

23   problem that you said existed in this case.  That is a

24   different question than the ultimate legal question about

25   whether he had to register or not.  It is a question about

1    whether he had a duty to answer the questions he was being

2    asked truthfully because they illuminated the applicability of

3    a clear statutory duty to him.  Which is different than saying

4    what you're trying to get me to say, which I specifically

5    rejected, because you have to decide whether he had a duty to

6    register, and if he didn't, then he didn't have a duty to

7    speak.  And I said that you were saying that that just begs

8    that question, that's just a circle; he didn't have a duty to

9    disclose, so he didn't have a duty to disclose.  That doesn't

10   work.

11          What I said, what I found was that there was a

12   sufficiently clear statutory structure of what gets disclosed

13   and what doesn't, that he knew what needed to be discussed and

14   what didn't.  And that is different than whether, at the end of

15   the day, meeting with David Sanger triggered an obligation or

16   not.  That is what the FARA unit was trying to figure out.

17          MR. TAYLOR:  That's right.

18          THE COURT:  And it ultimately, before it even knew

19   all the facts, said we think just the fact that you gave him a

20   quote at some point on the 12th or 13th is enough.  He came in

21   and said, No, it was just responsive, it was this and that.

22   And then he said, Well, based on the fact of what you just told

23   us, he didn't have an obligation.  We're not going to rule and

24   the jury is not going to rule on legitimacy of any of those

25   conclusions.  The jury is going to figure out when he said the

1      facts about what he did, was that true.

2              MR. TAYLOR:  Yes, Your Honor.  There is, however, the

3      matter of paragraph 63.  And that includes failing to disclose

4      certain things, some of which are not true, but others of which

5      relate to events which happened in 2012.  And Mr. Craig's view

6      that the law, that those things which occurred or didn't occur,

7      did not require him to register, go directly to his intention

8      in whether or not to disclose them.

9              THE COURT:  I haven't said, at this point, if he

10     talks about that interview he can't talk about whether he

11     thought he had to say those things or not.

12             MR. TAYLOR:  And we will be on those interviews like

13     a laser.  That's what we think the case is about.

14             THE COURT:  I'm looking forward to laser focus here.

15     Let's go back to the laser focus question I asked, which is

16     what is your objection to the admissibility of Exhibits 14

17     through 19?  Because we can't get to your case until the

18     government puts on his case, and he can't put on his --

19             MR. TAYLOR:  That's for sure.  And we may never get

20     to our case.  I don't know the answer to the question.  I

21     thought you were asking about duty.

22             THE COURT:  I was just asking -- and maybe it was an

23     unnecessary detour and my fault, and I'll take credit for the

24     fact that we've spent 20 minutes talking about duty or

25     responsibility -- probably not credit -- but point was that

1    it's still a question of law, I believe even in your view.

2            MR. TAYLOR:  It certainly is a question of law.  And

3    the question to be put to the jury, I think, is illuminated in

4    the instructions that both we and the government have

5    submitted.

6            THE COURT:  Right.  But the duty that is the question

7    of law is the duty to disclose.

8            MR. TAYLOR:  Yes.

9            THE COURT:  The duty to register is a different duty.

10           MR. TAYLOR:  That's right.  The duty to disclose, the

11   jury must find beyond a reasonable doubt that --

12           THE COURT:  That he violated the duty to disclose

13   that I'm going to tell them whether he had or not.  Which I've

14   already gone through that.

15           MR. TAYLOR:  Well, we'll have that discussion at the

16   time.  What you tell them about what that duty was in fact --

17           THE COURT:  It's going to be a long discussion, I'll

18   bet.

19           MR. TAYLOR:  It's probably going to be a discussion,

20   but I don't think we want to have it right now.

21           THE COURT:  Okay.

22           MR. TAYLOR:  Or at least I don't think you do.

23           THE COURT:  I don't.

24           MR. TAYLOR:  I didn't think so.

25           THE COURT:  All right.  So what is the purpose of the

1    admission of these exhibits?

2              MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  They're

3    relevant for a number of reasons, but it -- it's relevant to

4    the question of why Ms. Hunt was asking the questions she was

5    asking, because these were the forms that were in effect at the

6    time if somebody were to register.  And it's also relevant that

7    it shows the type of information that a registrant would be

8    required to provide were they forced to register or decided

9    they had to register.

10              THE COURT:  All right.  I think they're relevant.

11   And I'm going to admit Exhibits 14 through 19.

12              Exhibit 26.  There is, I believe, a hearsay.

13              MR. MURPHY:  Your Honor, that one is mine, in terms

14   of the objection.  And it's a hearsay objection.

15              THE COURT:  That's not coming up.

16              MR. CAMPOAMOR-SANCHEZ:  Your Honor, I can put it on

17   the Elmo, if it helps the Court.

18              THE COURT:  I have it set up here now.

19              So, I don't even know who --

20              MR. MURPHY:  So Mr. Riley is a senior person at FTI.

21   And this actually relates to an effort, I think, by

22   Mr. Manafort to hire Mr. Riley and FTI at an earlier time,

23   before Skadden got retained to do the report.  And it's some

24   observations that he's making to his colleagues about

25   Mr. Manafort and Mr. Manafort's history and career.  It's

1    hearsay.  And frankly, I don't think it's particularly relevant

2    to anything in our case, as it predates Skadden --

3              THE COURT:  That was my question.  You objected on

4    hearsay grounds and I wanted to know, who are these people and

5    what is the relevance of this?

6              MR. MURPHY:  So we don't think it's relevant.

7              THE COURT:  That's why I'm asking him what it is.

8    And you can also -- if we've got a lot of these, you can do

9    these from the table, if you prefer.

10             MR. MURPHY:  I'm happier up here.

11             THE COURT:  All right.

12             MR. CAMPOAMOR-SANCHEZ:  Mr. Riley is a potential

13   witness in the case who might be available to testify.  And

14   this will come into play because he indeed passed on working on

15   Ukraine's behalf in February, at the same time that Mr.

16   Manafort was also reaching out to Mr. Craig, but ultimately

17   allow Mr. Hawker, who is going to be one of our main witnesses,

18   to testify.

19             Mr. Riley, I believe, if called to testify will say

20   and explain that the only reason he, in fact, allowed this

21   project to go forward, even though he had concerns about FTI

22   being involved with Ukraine, was because Mr. Craig was part of

23   this representation.  And this just illustrates and

24   corroborates the testimony that before he was not willing to do

25   it; only because Mr. Craig was involved was he willing to allow

1     the project to go forward.

2          THE COURT:  All right.  The -- so if he's going to be

3     here, to the extent the email contains his statements -- I

4     mean, there's just a lot in here that I'm not sure bears on

5     this, a lot of his musing, statements about what's going on in

6     the world.  Why can't he just testify that they came to me

7     first?

8          MR. CAMPOAMOR-SANCHEZ:  He can.  He can.  We'll do it

9     that way.

10          THE COURT:  So we're not going to use Exhibit 26.

11          Okay.  29 was completeness.  We don't need to talk

12     about that.

13          All right.  63.

14          MR. ABELSON:  Your Honor, this was a question raised

15     in April 2012 by Mr. Craig.  Essentially a hypothetical, about

16     whether if -- the email at the top says if we give PR case to

17     Ukraine, can a Skadden lawyer from the London office give the

18     advice of supporting the obligation to register.  And we think

19     this would be very confusing for the jury because this wasn't

20     the basis for a decision that he didn't need to register.  This

21     was a side hypothetical question about if we were to do X, Y,

22     or Z.  So that's our, essentially, 403 objection.

23          MR. CAMPOAMOR-SANCHEZ:  So, Your Honor, if I may.

24     This goes directly to his state of mind in terms of what he

25     told the FARA unit.  He essentially claimed in those letters

1    that he had no idea what Ukraine was going to do.  These are

2    his own words.  He knows that the client, that being Ukraine,

3    wants PR advice.  And because he doesn't want to register, he's

4    asking Mr. Sloan, Hey, can we get Mr. van der Zwaan in London

5    to register so we don't have to register.  And Mr. Sloan will

6    be available to testify that that's what Mr. Craig asked him.

7         THE COURT:  I think it goes directly to the notion

8    that he had FARA on his mind and he understood the connection

9    between PR activities and FARA.  And so I think it's admissible.

10        But I will note that the next document, 64, I think,

11   is the same email chain, without an objection, but it has the

12   subsequent -- it has the response to it; is that correct?

13        MR. ABELSON:  I would have to look at it, but that --

14        THE COURT:  I think I might have looked at it and

15   discovered that.  And if that's the case --

16        MR. CAMPOAMOR-SANCHEZ:  Your Honor, you're correct.

17   It's Mr. Sloan responding.  And again, he will also testify

18   about that.

19        THE COURT:  Right.  But what I'm saying is I don't

20   know that we need 63 if we've got 64, because Mr. Sloan

21   responds, Do you want me to ask Ken Gross?  And Mr. Craig says,

22   I don't care who you ask, we need an answer from someone we can

23   rely on with a straight face.  Does FARA cover me?  Do I have

24   to register?  You know, so --

25        MR. CAMPOAMOR-SANCHEZ:  Right.

1          THE COURT:  All I'm saying is I think they are

2     duplicative, so you may -- I'm overruling the objection to 63.

3     So I don't know how you're planning to do this, if you're going

4     to put in the first questions through one and then the answer

5     through somebody else.  But -- all right.  And I also -- there

6     is no objection to 64, so I don't know if you were just --

7          MR. ABELSON:  Yeah, that's fine.

8          THE COURT:  So there's a little inconsistency there.

9     But they're in evidence.

10          The next one that's not a completeness objection --

11          MR. ABELSON:  I think it's 109, Your Honor.

12          THE COURT:  Yes.  Don't start talking until I have

13     it.

14          MR. ABELSON:  Sure.  And --

15          THE COURT:  And I might not have --

16          MR. ABELSON:  I'm happy to give Your Honor a chance

17     to look at it.  But what this is --

18          THE COURT:  But you're still talking.

19          MR. ABELSON:  I apologize.  I thought you wanted me

20     to start.

21          THE COURT:  All right.  Thank you.  I would like to

22     know what the relevance of this is, from the government's

23     perspective first.

24          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  So this

25     again goes to the idea that Mr. Craig was very much aware that

1    there was a PR need and that he wanted -- as the Court may

2    recall, there is a Project Two that is also ongoing, that he's

3    working on with Mr. Cowie and Mr. Loucks and others, and this

4    all relates to how FTI was -- the reason that FTI was hired,

5    the fact that Mr. Craig was willing to work on PR matters for

6    the government of Ukraine, and certainly for the fact that he

7    disclosed none of this to the FARA unit.  He actually wanted

8    his teams to figure out a way and give advice to the government

9    in Ukraine, as to how their own internal investigation about

10   what happened to Tymoshenko could be presented in a way that

11   was credible and authoritative.

12          THE COURT:  All right.  And what's the objection?

13          MR. ABELSON:  So, Your Honor, this document doesn't

14   have anything to do with PR or Project Two.  This was a

15   separate question.  So, Miss Tymoshenko was incarcerated at the

16   time and raised questions about her prison conditions.  This is

17   a memo about her prison conditions.  It really has nothing to

18   do with either Skadden's work or PR.

19          THE COURT:  Well, there's the issue about the prison

20   condition, but there's an attachment.  Now without the

21   attachment -- the attachment is called Presentation of

22   Findings.  And then at the end he says what steps might we

23   recommend to ensure that the findings will be viewed as

24   credible and authoritative.  Are we talking about the findings

25   in the report that the people who are identified, Loucks,

1    Cowie, van der Zwaan, Craig, are working on?  Or is there some

2    other set of findings that are going to be presented that need

3    to be credible and authoritative?

4            MR. CAMPOAMOR-SANCHEZ:  No.  It's different, Your

5    Honor.  So what's going on is the government of Ukraine has

6    sent another group of people to actually investigate the

7    allegations.

8            THE COURT:  On the beating.

9            MR. CAMPOAMOR-SANCHEZ:  On the beating of Miss

10   Tymoshenko.  And Mr. Manafort, if the Court looks at the very

11   top of the attachment, writes this memo, sends it to Greg

12   Craig.  And the top of the thing says, The treatment of Tymo as

13   a prisoner is the latest chapter in an overall team of PR gain.

14   And then there is -- this is the first email.  There's

15   subsequent emails between the team members.

16           So the very response by Mr. Cowie to this email by

17   Mr. Craig is how they're going to engage with PR and how they

18   need to get FTI on board so FTI can help with making sure the

19   findings will be viewed as credible and authoritative.  They

20   are involved in PR, despite what Mr. -- the defense just argued

21   to you.

22           THE COURT:  The findings of what?  The findings in

23   the report about what happened to her in jail, or the findings

24   in the report that they're writing?

25           MR. CAMPOAMOR-SANCHEZ:  No, the findings about Miss

1     Tymoshenko's beating, alleged beating in the jail.  But the

2     point that we're trying to make, Your Honor, with these and

3     other documents is that Mr. Craig knew about the need for PR,

4     was involved with PR, asked his people to help with PR, and

5     this is the memo that leads -- I mean, just after this one, if

6     the Court looks at the next few sets of exhibits, leads into a

7     discussion about the hiring of FTI, precisely to provide PR for

8     the government of Ukraine.

9          For example, that's Government's Exhibit 110, is the

10    response from Mr. Cowie.  And it reads:  I see.  If we are able

11    to sort out PR overnight, we can begin to brief them tomorrow

12    and make arrangements in the working day for their attendance

13    on the ground and begin to think through work products which

14    they can begin working on.  Is there anything else we can do on

15    this end?

16         And then Mr. van der Zwaan responds to that.  And

17    he's asking, we need FTI's pitch because they need the PR

18    machine to help present these beatings in the best possible

19    light to the PR public.  And Mr. Craig is helping and assisting

20    with that and he knows about it and he's telling his team to

21    help him with it.

22         MR. ABELSON:  Your Honor, I just want to point out

23    the discussion was about PR, as the government noted, in

24    Ukraine.  So if the relevance that they're talking about is

25    public relations in the United States, the only relevance would

1   be public relations that implicates FARA.  I don't see any

2   nexus there either.

3           MR. CAMPOAMOR-SANCHEZ:  He's asked by the FARA unit

4   what he did for Ukraine and omitted all of this.  In fact, he

5   claimed he knew nothing about the PR part of it.  He's knee-

6   deep in it.

7           MR. ABELSON:  But what does it mean, is what I would

8   like to point out.  This is a side report that he received, did

9   not write, about prison conditions.  There are going to be lots

10  of references to report, among other things.  Or, in addition,

11  this would be very confusing to have yet another report they're

12  claiming relates to this PR.

13          MR. CAMPOAMOR-SANCHEZ:  We're going to have

14  witnesses, like, for example, Mr. Loucks, who is going to be

15  able to explain exactly what this means.

16          THE COURT:  I'm concerned that these give rise to

17  confusion about which report we're talking about.  It was

18  certainly confusing to me.  I don't think, when we're talking

19  about -- when you see the attached memo and it talks about how

20  it's all going to be viewed in the West, that you can quite say

21  it only relates to PR in Ukraine.

22          MR. CAMPOAMOR-SANCHEZ:  Your Honor, I think --

23          THE COURT:  When FTI gets retained, what does it get

24  retained to do?

25          MR. CAMPOAMOR-SANCHEZ:  So, it expanded.  So it got

1   retained initially to provide advice as it related to the

2   Skadden report, but then that mission expanded.  They started

3   also providing training to prosecutors and prosecutor general's

4   office in how to handle media and all sorts of other issues.

5   As the Court saw from Government's Exhibit 110, Matthew Cowie

6   and Mr. Loucks were working on Project Two and also assisting

7   the prosecutors with making sure that the upcoming trail of

8   Tymoshenko would be viewed better in the press.

9        THE COURT:  But wait.  I thought you told me that

10  this is what prompted the hiring of FTI.  Now you're saying

11  they're already in and this just happened once they were

12  already in for the Skadden report; they're using them for other

13  things.

14       MR. CAMPOAMOR-SANCHEZ:  No.  To be clear then, the

15  idea of using FTI started in late April.  What I was trying to

16  explain to the Court -- obviously I did not do a good job --

17  was that this leads to a renewed urgency to get FTI on board.

18  So they already had contacted FTI by April 26 of 2012.  This is

19  now May 3rd.  Mr. Craig is asking his team for help about this

20  issue, and then the response is, yet we have to get the PR

21  people involved.  And that's where the urgency to get them

22  hired happens.

23       Now as to their mission, they had -- they originally

24  were supposed to be hired primarily to help with the Skadden

25  Report.  But I was explaining that their role expanded.  They

1    also helped, for example, with Project Two.  They helped with

2    training prosecutors on media stuff.  So they -- FTI did a lot

3    of other things, not just the Skadden Report.

4            MR. ABELSON:  And, Your Honor, just to focus on this

5    exhibit, and this is -- this is a report about prison

6    conditions.  And the FTI may have done a lot of things, but the

7    question here is what Skadden did.  And if the relevance -- if

8    the government's proffer as to this is Skadden's participation

9    in a PR campaign, it's just not there.

10           MR. TAYLOR:  Your Honor, may I --

11           THE COURT:  Yes.

12           MR. TAYLOR:  -- add something.

13           THE COURT:  Yes.

14           MR. TAYLOR:  I know this protocol is -- I'm breaching

15   it.

16           FTI is hired, first, to do litigation PR.  That's

17   what you're going to find out.  It then moves into its role in

18   the report.  Now we could have a fight about that, but

19   Mr. Campoamor knows that the initial engagements and the

20   initial concerns about FTI relate to the upcoming trial and the

21   criticism that Ukraine is taking about her conditions.  We'll

22   see what the evidence shows.  I'm just telling you that the

23   engagement of FTI at the beginning, there's a contract in which

24   they say we're going to do PR for litigation.  Okay?

25           So, you know, I don't know that you can rule on this

1    until you have a good sense of what the relevance is.  But it's

2    not true that FTI is hired initially to do PR for the report.

3    That's just not true, Your Honor.

4         MR. CAMPOAMOR-SANCHEZ:  Your Honor, may the Court

5    please look at Government's Exhibit 113, just a few days after

6    this, where Mr. Craig lays out the talking points about why FTI

7    should be hired, which they're also objecting to.

8         MR. ABELSON:  On completeness grounds.

9         MR. CAMPOAMOR-SANCHEZ:  Yes.  But this relates

10   exactly to what Mr. Craig is arguing, the talking points as to

11   why FTI needs to be hired.

12        THE COURT:  All right.  I am not going to rule on all

13   these factual issues.  Clearly there are documents that show

14   some relationship with Mr. Craig and the hiring of FTI.  This

15   document that you've got up right now, 113, there's no

16   objection to its relevance, it's only to completeness.  Part of

17   the confusion arises out of the fact that Skadden was involved

18   in multiple battles for the Ukraine at the same time, and

19   that's not the government's fault here and there may not be

20   anything wrong with it.  But that is what the facts are.

21        And it's virtually impossible to talk about one

22   without the other because they inform.  There's a lot of emails

23   that talk about more than one; can we go interview her while

24   we're doing Project Two, at the same time as we're doing

25   Project One.  So it runs throughout both side's exhibits in the

 1    case.

 2              I think, based on what I'm hearing, that 109 and 110

 3    are admissible.  But if you show them to anyone and if you ask

 4    anyone about them, you have to make it abundantly clear that

 5    you're not talking about the Skadden Report here.

 6              MR. CAMPOAMOR-SANCHEZ:  Yes.  Understood.

 7              THE COURT:  With that proviso, and if I even have to

 8    turn and instruct the jury that this report that they're

 9    talking about is not The Report, then I will, if it's not

10    clear.

11              All right.  I think 125 had a -- 115 had a

12    completeness issue, but also a relevance issue.

13              MR. ABELSON:  Right, 115.

14              MR. MURPHY:  115 is mine.  Do you want to hear from

15    me?

16              THE COURT:  I don't know yet.  I'm pulling it up.

17              MR. MURPHY:  Okay.

18              THE COURT:  What is -- what's the relevance

19    objection?

20              MR. MURPHY:  It's really a similar objection to the

21    one we just dealt with, Your Honor.  It really is about FTI's

22    thoughts about the proper way to address Miss Tymoshenko's

23    complaints about her prison conditions and whether she's fit to

24    be put on trial a second time.

25              THE COURT:  Well, I think their point is, it's

1     Mr. Van der Zwaan asking Mr. Hawker for his comments.  And, so,

2     it relates to the firm's insertion of itself in the

3     conversation, or its participation in the conversation.  Am I

4     correct?

5          MR. MURPHY:  It's not -- I guess.  It's not copied to

6     Mr. Craig.

7          THE COURT:  Well, Mr. Craig, when he was originally

8     contacted by the FARA unit, it wasn't just about whether he

9     personally had to register.  The letter went to the firm.  He

10    answered on behalf of the firm.  So, I don't think he was just

11    communicating about himself personally.

12         So, again, I think we have to be very careful about

13    what these are and what they aren't.  But to the extent -- and

14    if it's just internal within FTI, talking about PR, about some

15    other report -- there had been PR about the Skadden Report --

16    that's a different situation.  But having Skadden on the chain,

17    I think it's relevant to what they're trying to prove and it's

18    admissible.

19         125, there's a hearsay objection.

20         MR. ABELSON:  And relevance, Your Honor.

21         THE COURT:  Okay.  All right.  So this is internal,

22    within the consulting firm's -- I mean, with the PR firm's

23    talking about the reaction to an article.  But it also -- one

24    FTI person is commenting to another about Skadden's reaction.

25    And doesn't say I talk to so-and-so at Skadden and he said, but

1    it clearly purports to transmit information transmitted to him

2    from Skadden.

3            So, I take it that's the hearsay objection?

4            MR. ABELSON:  That is the hearsay objection in part.

5    It's also to the --

6            THE COURT:  Why is that not -- the objection not well

7    taken?

8            MR. CAMPOAMOR-SANCHEZ:  Your Honor, Mr. Hawker would

9    be available to testify.  And as the Court will see, what he's

10   relating here and the subsequent emails will show, is that he

11   was specifically asked by Skadden to help with a press release,

12   not only for the government of the Ukraine, but for Skadden

13   itself.  And the Court will see in the subsequent documents how

14   Mr. Hawker then, as a result, he's reporting on what he was

15   asked and then Mr. Hawker sends an email with a draft press

16   release that includes a draft press release for Ukraine and it

17   includes a draft press release for Skadden.

18           We are happy to also redact this.  And if the Court

19   is still not satisfied, I can ask Mr. Hawker directly.  But it

20   is corroborating that he says, look, Skadden came to me, they

21   had this PR problem now, and I'm helping them with this PR

22   problem; them and Ukraine.  That's what this -- and this is, by

23   the way, about the Skadden Report.

24           THE COURT:  So this -- you can show the article to

25   him and ask him, As a result of your article, did Skadden reach

 1    out to him, and what did he have to do?

 2              MR. CAMPOAMOR-SANCHEZ:  Yeah.  To be clear, the

 3    article is not what prompted it.  He just happened to be

 4    responding to that thread and informing Mr. Aarons that Skadden

 5    now was coming to him for PR help as it related to the report,

 6    for itself and Ukraine.

 7              THE COURT:  All right.  So the article is irrelevant?

 8              MR. CAMPOAMOR-SANCHEZ:  Yeah.

 9              THE COURT:  So the article comes out.

10              MR. CAMPOAMOR-SANCHEZ:  We can redact the article.

11              THE COURT:  And the email, if he's going to be here

12    to be cross-examined about what was said to him --

13              MR. CAMPOAMOR-SANCHEZ:  Correct.

14              THE COURT:  But who is -- who is he going to say said

15    it?

16              MR. CAMPOAMOR-SANCHEZ:  It was Mr. van der Zwaan who

17    came to him, asking for the assistance.  And then he sends the

18    email back to Mr. van der Zwaan.  And as the Court will see,

19    then everybody gets involved; Mr. Craig gets a copy of

20    Mr. Hawker's email with the draft press releases, he makes

21    suggested changes to it, and then it goes to other people at

22    Skadden and elsewhere.

23              THE COURT:  Well, I think he can say that he had a

24    conversation with Mr. van der Zwaan and as a result of that

25    conversation, you know, he was asked to develop a plan.  I

1    don't think that's -- that's a direction, that's not a fact --

2    a matter being asserted as true.  But, I think other things

3    that Mr. van der Zwaan said to him, you're going to run into

4    hearsay problems.

5              So, I think the better way to do this is to do this

6    through testimony and not through the use of this exhibit.

7              MR. CAMPOAMOR-SANCHEZ:  Very well.

8              THE COURT:  So it will be excluded.  What number was

9    it?  125?

10             MR. CAMPOAMOR-SANCHEZ:  That was 125.

11             MR. ABELSON:  125.

12             THE COURT:  Okay.  All right.  I think we're up to

13   162.

14             MR. ABELSON:  Your Honor, I can provide a little

15   context for our objection, if that would be helpful.

16             THE COURT:  Just give me a second.

17             MR. ABELSON:  Sure.

18             THE COURT:  All right.  There were -- I mean, there's

19   other things that are a problem with this, such as the kind of

20   flippant way it refers to the defendant.  But --

21             MR. CAMPOAMOR-SANCHEZ:  Which I think he would say it

22   was in a joking manner.

23             THE COURT:  Yes.  But --

24             MR. CAMPOAMOR-SANCHEZ:  Right.

25             THE COURT:  But you just don't know how that is going

1    to hit -- this Greg Craig character is going to hit a jury.

2            But putting that aside, can we just talk generally

3    about what you're planning to do about Project Two, how far

4    down the road we're going with Project Two.

5            MR. CAMPOAMOR-SANCHEZ:  Not very far, Your Honor.  I

6    think that from some of the early witnesses, they're going

7    to -- either Mr. Loucks -- or, Mr. Loucks and perhaps later

8    Mr. Cowie, but they're going to hear that the project started

9    being primarily about the Skadden Report, and that then the

10   project expanded, and then that several members of the team

11   were then sort of moved from the Skadden Report to working

12   primarily on Project Two.

13           And what ends up happening here, by June, is that a

14   concern is raised about the appearance that Project Two could

15   have, particularly if the Tymoshenko camp learns that Skadden

16   is advising another set of prosecutors in how to prosecute her

17   better in an upcoming trial.

18           And so --

19           THE COURT:  You mean, what could happen to Project

20   One.

21           MR. CAMPOAMOR-SANCHEZ:  Correct.  Correct.  What

22   impact would that have on Project One.  And so, it's going to

23   be very brief, actually, the testimony.  But it's going to be

24   that -- what kind of work was it doing?  What did it entail?

25   When did it start?  And ultimately, how long it lasted and when

1    it ended.  And there's two sort of pivotal points.  One is this

2    time, which is the Tymoshenko interview.  So now they're now

3    getting ready for the Tymoshenko interview, and then Mr. Loucks

4    and Mr. Cowie are excluded from that interview because

5    Mr. Craig doesn't want to explain what else they're working on.

6         Despite that though, they do continue working on

7    Project Two after they interview Tymoshenko, without Mr. Loucks

8    or Mr. Cowie present.  They work on it in July, and then August

9    is the next pivot point, where they're close to getting Project

10   One released, the report.  And again Mr. Craig raises a concern

11   about I don't want this out there until the report is at least

12   digested.  But then essentially Project Two dies, in August of

13   2012.  So not a lot.  But we do want to talk about --

14        THE COURT:  How does it bear on the charges in the

15   indictment?

16        MR. CAMPOAMOR-SANCHEZ:  Oh, because, again, he's

17   asked to describe what -- what his firm and he were involved

18   with.  And Mr. Craig was supervising Project Two, which

19   included, as part of his component, of course, better PR for

20   the government of Ukraine.  He says nothing about Project Two

21   at all to the FARA unit, even though Skadden worked on it for

22   months.  And even though he knew -- and perhaps because he knew

23   it could have a negative impact on the Skadden Report, he

24   ultimately excluded those lawyers from continuing to work on

25   Project One.

1          For example, Mr. Loucks was one of the primary

2     interviewers on Skadden Project One, on the Tymoshenko report

3     until he started working on Project Two, and then Mr. Craig

4     asked him to step aside.

5          So all of this is stuff that he should have told the

6     FARA unit about the work he did, but failed to tell them.

7          THE COURT:  But, if he gets simultaneously engaged to

8     do this other matter, and you think it bears on his motive or

9     intentions or his omissions, why do we need every email and

10    every detail about Project Two and her state of when they

11    interviewed her and who was going to go and who wasn't going to

12    go and the appearances?  I mean, it starts to look like you're

13    really trying to get at whether they had a conflict.  You know,

14    all sorts of other issues that --

15          MR. CAMPOAMOR-SANCHEZ:  Yeah, just so the Court

16    knows.  We're not.  And in fact, Mr. Loucks I think would very

17    credibly -- has very credibly explained to us that he did not

18    see it as a conflict, that in fact what he understood to be a

19    Chinese wall, that he did not see any problem with it, and that

20    this happened, sort of, all the time.

21          So, but to answer the Court's question, we actually

22    do not have that many emails that we intend to introduce about

23    Project Two, but we do think it's important for --

24          THE COURT:  Well, there are emails that address the

25    very question about whether a Chinese wall was or was not

1    adequate, they were internally considering all that.  So it

2    seems to me that that seems to suggest that you want to give

3    rise to some concern in the juror's mind that it wasn't.

4            MR. CAMPOAMOR-SANCHEZ:  No, we're not.  And if the

5    Court wants us to redact that part out, we can.  What I do

6    think is important, from a state of mind perspective, right, so

7    when they're evaluating whether Mr. Craig either forgot or

8    didn't really have reason to mention this, the jury needs to

9    have an understanding of how important this was at the time.

10   And this was an issue Mr. Craig thought about and was careful

11   enough about to say, You know what?  We cannot have this affect

12   Project One, and yet Project Two is never mentioned to the FARA

13   unit.

14           So he has the presence of mind to know how important

15   this issue is to the Skadden Report, and yet doesn't mention

16   it.  So if the Court is concerned that parts of these emails

17   could be misunderstood, we're happy to redact them, as the

18   court directs.  But I -- but we believe it is very important

19   for the jury to understand that Mr. Craig knew and understood

20   this to be important.

21           THE COURT:  All right.  What does the defense have to

22   say?

23           MR. MURPHY:  Your Honor, with respect to Project Two

24   in general, first of all, it's our position that Mr. Craig

25   informed the FARA unit, in response to the very first

1    question -- set of questions that he received, that the firm

2    was retained to engage in a number of rule-of-law issues for

3    the Ukraine Ministry of Justice, and that those issues included

4    a particular focus on the Skadden Report that was done on the

5    first trial of Yulia Tymoshenko.  But I don't think he did

6    anything to hide the fact that the firm was engaged more

7    generally on other rule-of-law issues, which included the

8    so-called Project Two involving the trial.

9         Secondly, those were rule-of-law issues.  I think

10   that witness will testify that they viewed the role of Skadden

11   not as prosecutors who were assisting in the prosecution of

12   Miss Tymoshenko, but as lawyers from the western perspective,

13   due process concerns, who were going to make sure that any

14   mistakes that had been made in the first trial would not be

15   repeated in the second trial, if the Ukraine decided to go

16   ahead and have a second trial.

17        They were going to ensure that the second trial was

18   conducted in a way that would not give rise to the same sort of

19   criticisms that had accompanied the first trial.  They were

20   rule-of-law consultants with respect to that second trial.

21        Thirdly, the second trial never happened.  And we

22   believe that, in part, it never happened because the Skadden

23   folks, the two prosecutors, former prosecutors who were

24   involved, one Mr. Loucks, who was in Massachusetts and had been

25   in the U.S. Attorney's Office in Boston, and Mr. Cowie, who was

1    with the British, what they call the serious fraud office.

2    They had advised the Ukraine prosecutors about the weakness of

3    the case and eventually the case was dropped.

4         So, we think, number one, it's really a sideshow,

5    this whole episode about Project Two.  And the premise, the

6    essential premise that the government asserts, is that it was

7    not described to the FARA unit.  Our position is yes, it was.

8    He described a broad -- you know, a broader range than just the

9    Tymoshenko report project, and he was never asked any further

10   questions about it.

11        The focus of Miss Hunt and her colleagues was the *LA*

12   *Times* article about the Skadden Report on the Tymoshenko trial,

13   the first trial.  He mentions what else -- they ask, What did

14   you do for the Ukraine?  He says, We provided rule-of-law

15   consultation, in general, to the Ukraine Ministry of Justice.

16   We had a particular focus on this report, which ended up being

17   talked about in the *LA Times* article.  But he was never asked

18   any other questions about what else did you do for the Ukraine

19   Ministry of Justice?  That question was never asked.

20        MR. CAMPOAMOR-SANCHEZ:  Your Honor, so the Court has

21   a background, there is an email in black and white, in April of

22   2012, where Mr. van der Zwaan says, and it's communicated to

23   everybody on the team, We understand that from Ukraine's

24   perspective, there is an interest in improved PR for both

25   Project One and Project Two.  This was discussed amongst the

1    team and the team knew it.  And all we're doing is trying to

2    establish all these things and prove that he did not tell that.

3    And, you know, we disagree as to what the letters say, the

4    import of it.  But, to prove what he knew and how carefully he

5    knew about it and why, therefore, it's important that he

6    omitted it and did not tell the FARA unit about it.

7              THE COURT:  I think some mention of Project Two is

8    relevant.  If there's a dispute about whether what he said was

9    truthful or whether it was somewhat misleading, is it one of

10   the omissions in paragraphs 63?

11             MR. CAMPOAMOR-SANCHEZ:  One moment, Your Honor.  Just

12   want to double check.

13             Your Honor, I think it is included as part of the

14   purpose of the scheme in paragraph 49.

15             THE COURT:  Right.  I thought it was part of the

16   alleged motive to not register.

17             MR. CAMPOAMOR-SANCHEZ:  I know we -- yeah, it's

18   listed as the purpose of the scheme in terms of non-disclosure

19   of the parallel engagement in the consulting project with

20   Ukraine.

21             It is in paragraph 49, where it is explained that

22   part of the scheme was avoiding, essentially, mentioning of the

23   parallel engagement with Ukraine; what it is referred to in the

24   indictment as the consulting project.

25             THE COURT:  All right.  So if you're saying that the

1    Chinese wall of business and improprieties and that sort of

2    thing are not your goal here --

3              MR. CAMPOAMOR-SANCHEZ:  Yes.

4              THE COURT:  -- couldn't we just redact, Were I -- per

5    defense counsel, I would feel sandbagged, I would scream to

6    high heaven, and what it would look like and the perceptions,

7    and what Greg and I discussed.  And just leave it to say, I

8    concur that we should not be the interview of Tymoshenko, and

9    Craig says, I had a talk and he agreed.  And leave out this

10   whole thing about how Skadden would be perceived, or is that

11   part -- is that part of your case or is it not part of your

12   case?

13             MR. CAMPOAMOR-SANCHEZ:  No.  So, I think the

14   perception, the concern about the perception is part of the

15   case.  That's what Mr. Craig knew, that perception was

16   important.

17             Your Honor, can we -- to save time, we can do a

18   redaction and submit it to the Court and defense and see if

19   that's -- in concrete, so that the Court can rule on that, and

20   maybe they'll agree.

21             THE COURT:  Let me look at 163 and just see what it

22   is.

23             I mean, this seems to be more about trying to keep

24   Project Two secret.

25             MR. CAMPOAMOR-SANCHEZ:  Correct.

1          THE COURT:  The fact that it was Skadden doing

2    Project Two secret.

3          MR. CAMPOAMOR-SANCHEZ:  Correct.

4          THE COURT:  And are you saying that that's part of

5    the not wanting to register, because it would have been in the

6    registration statement?

7          MR. CAMPOAMOR-SANCHEZ:  I'm saying that it relates to

8    the public relations work that Mr. Craig did and did not

9    disclose.  And also, it relates to the fact that had this

10   project become known, which could potentially have -- if he had

11   disclosed it to the FARA unit and had to register and had to

12   disclose everything that he did, it would have impacted the

13   credibility and been a negative hit on Project One, the Skadden

14   Report.  And that's why he did not want to talk about it.

15         MR. MURPHY:  Your Honor, may I be heard about this?

16         THE COURT:  Yes.  Yes.

17         MR. MURPHY:  Thank you.  I thought the other day you

18   said we were not going to be trying the report.  But much of

19   what I hear Mr. Campoamor saying is that this has to do with

20   the report and whether it was an independent report, because

21   there is this problem that he posits with respect to Project

22   Two.

23         You have made it very clear that what this case is

24   really about is the truth or the falsity or the omissions that

25   Mr. Craig made or allegedly made with respect to some letters

1    that were exchanged with the FARA unit.  In the very first

2    letter, and the response thereto, which I mentioned, which I

3    think the response is Government Exhibit 2, he was asked to

4    describe the activities the firm engaged in related to the

5    Ministry of Justice.  And he said, in April of '12, the

6    Ministry of Justice for the government of Ukraine asked the

7    firm to serve as consultants on rule-of-law issues and to

8    provide advice about the question of Ukraine's criminal justice

9    system as viewed through the prism of Western standards of due

10   process and, in particular, to advise the Ministry about

11   rule-of-law issues that might arise before the European Court

12   of Human Rights.

13        A major focus of this assignment was to conduct an

14   independent inquiry into the facts and circumstances

15   surrounding the prosecution and conviction of former Prime

16   Minister Tymoshenko.

17        He provided that information, a broad description of

18   the rule-of-law assignments that they had in the very first

19   letter that he sent to the FARA unit.  I think it's totally

20   irrelevant to the case --

21        THE COURT:  Well, we could quibble forever about

22   whether that sentence puts anyone reading it on notice that

23   while they were advising them on these issues, that that meant

24   that they were also going to be helping get the prosecutors

25   ready to retry her.

```
 1                    MR. MURPHY:  But, Your Honor --

 2                    THE COURT:  And did that come up even in April?  I

 3        mean, when he says in April we were engaged, I thought that

 4        came up later, right?

 5                    MR. CAMPOAMOR-SANCHEZ:  No, the Project Two came up

 6        in April.

 7                    MR. MURPHY:  April.

 8                    MR. CAMPOAMOR-SANCHEZ:  It did.

 9                    MR. MURPHY:  It did, Your Honor.  Mr. Craig went over

10        there --

11                    THE COURT:  The question is, is that alleged to be an

12        omission that we're even worried about?

13                    MR. CAMPOAMOR-SANCHEZ:  Yes.  We just --

14                    THE COURT:  You read me the scheme allegation, that

15        part of the scheme was to keep the fact that they're doing

16        Project Two quiet, to bolster the credibility of the report.

17                    MR. CAMPOAMOR-SANCHEZ:  Right.

18                    THE COURT:  To hide the existence of the private

19        donor, that's why they wanted to not register, allegedly.

20                    MR. CAMPOAMOR-SANCHEZ:  Right.

21                    THE COURT:  But then when you say, and that scheme

22        was executed by making the following false statements and

23        omissions, is there any alleged false statement and omission

24        related to not being forthcoming about Project Two?

25                    MR. CAMPOAMOR-SANCHEZ:  I'm looking at it, Your
```

1    Honor.

2           THE COURT:  And if not, then I think these documents

3    need to be -- and this testimony needs to be truncated

4    substantially, just to indicate that there was this other side

5    of the project, that they wanted to look independent for

6    purposes of that project, and so being on record as

7    representing the Ukraine, you know, hurt them on both sides of

8    the equation in looking -- as looking independent.

9           MR. MURPHY:  May I just --

10          THE COURT:  I mean, you have marked a lot of

11   exhibits, also, about the public reaction to the report and

12   whether it was perceived to be -- it's great because it showed

13   that they did comply with some standards of justice and it

14   wasn't a completely terrible prosecution, or whether it was

15   perceived as being a whitewash by the firm.  And I don't know

16   why you all --

17          MR. MURPHY:  We marked those, Your Honor, because

18   what we're trying to show is that the other people who were

19   actually involved in the media campaign for the Ukraine -- not

20   Mr. Craig and his colleagues, the others -- attempted to

21   characterize the report as saying things that it did not say.

22   And that that -- that began in the summer and persisted until

23   the report was delivered and released finally in December.  And

24   because of that, that's what motivated Mr. Craig to tap the

25   very limited media contacts that he did have.  He did it for

1   the purpose of defending the integrity of the report and

2   dispelling what he knew was coming and what he had seen to be

3   coming.

4          THE COURT:  A lot of the documents are after that, so

5   I don't see how they would have been in his mind.

6          MR. MURPHY:  Oh, no.  The documents that we're

7   talking about all predate December the 11th, 2012 when he first

8   reaches out to Mr. Sanger.  That's the documents that I'm

9   talking about.

10          And with respect to Project Two, Your Honor, just to

11   finish this up, Skadden didn't do any public relations work on

12   Project Two; they didn't do any.  FTI was hired, FTI took on

13   that assignment of doing some public relations work for Project

14   Two.  Skadden never did any of it.  They trained the

15   prosecutors on how to better handle media questions, if they

16   got them, that Mr. Hawker will testify about all that.

17          And by the way, these are among the things that are

18   not in the FTI registration that they just filed a couple weeks

19   ago.  There is nothing about Project Two in that.  It's totally

20   irrelevant, Your Honor.

21          MR. CAMPOAMOR-SANCHEZ:  Your Honor, we're happy to

22   submit a revised exhibit with redactions.

23          THE COURT:  I think with respect to all the Project

24   Two exhibits, they need to be pared down and you need to think

25   about what you're putting Project Two on for.  I don't think

1     it's entirely irrelevant and not one single Project Two

2     document should come in.  And indeed, there are many Project

3     Two documents to which there are no objections.  I think the

4     existence of it, the parallel nature of the representation, the

5     fact that they were concerned about the mutual impact on each

6     other and the mutual impact of PR on one or the other on the

7     other is relevant.

8              But I think you need to figure out which documents

9     and which facts relating to that tie to the allegations in the

10    complaint -- I mean, the indictment.  Because while you do talk

11    about that as part of the underlying motivation and purpose for

12    the scheme, you don't really talk about those omissions as

13    being what he's on trial for.  And I don't want to dwell on

14    them too much.  And I do want to be very careful to not be

15    seeing -- seeming to be putting him on trial for accepting

16    these simultaneous representations, if that's not your position

17    and it's not -- you're not bar counsel anyway, and it's not --

18    you don't want the jury to trouble its little head about it,

19    then I wouldn't stir it up.

20             MR. CAMPOAMOR-SANCHEZ:  Right.  It's definitely not

21    our position that it was a problem with having more projects.

22    It's not.

23             THE COURT:  Well, I can't tell at the moment which of

24    all these documents relate to Project Two.  But, certainly with

25    respect to these two --

1          MR. CAMPOAMOR-SANCHEZ:  162 and 163.

2          THE COURT:  I think some of it goes into a little bit

3    too much detail about internally within the firm, how they're

4    trying to structure this.  And so I think you should try to

5    pare them down and see whether the defense relevance objections

6    can be overcome, and if not, I'll have to rule on it when we

7    get there.

8          MR. CAMPOAMOR-SANCHEZ:  Very well.

9          THE COURT:  So I'm reserving on those.

10          165.

11          All right.  We're going to take a ten-minute break,

12    and then we'll be back.

13          Thank you.  You don't have to get up.

14          (Recess.)

15          THE COURT:  We are not going to stay here all night,

16    but let's see if we can get some more done.

17          I think I reserved on 162 and 163 in the hope that

18    things are going to get narrowed down.

19          What is the relevance of 165?  And I really want, if

20    we can do this, kind of one- or two-sentence answers to these

21    questions.  It's not that they're not all important and your

22    objections aren't well-noted, but we have to be done with this

23    before the trial starts.

24          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  So the

25    relevancy of 165 is that it shows that Mr. Craig knew and

1    understood the importance of the payment issue and the tender

2    law issue, that is, public perception out there that Ukraine

3    was only paying $12,000, allegedly, for his work.

4           THE COURT:  All right.  So this gets into the whole

5    procurement issue.  It's kind of an entrée into this, or not

6    really?

7           MR. CAMPOAMOR-SANCHEZ:  Correct.  Well, that's how

8    the defense characterizes it.  But, yes, this is -- they reach

9    out to Mrs. Tymoshenko's lawyer, who is asking them how can it

10   be possible that they're only working for $12,000.

11          THE COURT:  Who is the person reaching out?

12          MR. CAMPOAMOR-SANCHEZ:  That is Tymoshenko's lawyer.

13   And then Mr. Craig is discussing that with Mr. Manafort.

14          THE COURT:  Well, he just says, Can you call me and,

15   Are you free now?  We don't really know what happened at that

16   point.  Are there other documents where this gets discussed,

17   where there's a little bit more that shows something other than

18   just can we talk about this?

19          MR. CAMPOAMOR-SANCHEZ:  Yes.  Yes.

20          THE COURT:  All right.  So can we skip this one?

21          I mean, this issue and the fact that they had to do

22   something about it gets dealt with.  But all this is, is saying

23   to someone who's not going to testify, Can you give me a call

24   about this?  And, Are you free now?

25          MR. CAMPOAMOR-SANCHEZ:  Correct.  But he's forwarding

1    to Mr. Manafort that question from the -- from Mr. Tymoshenko's

2    lawyer -- Ms. Tymoshenko's lawyer, I'm sorry, I should say.

3            THE COURT:  But I guess what I'm saying is you're

4    reading into this -- all he says is, Can you give me a call

5    about this?  The response is, Are you free now?

6            MR. CAMPOAMOR-SANCHEZ:  Right.

7            THE COURT:  It's not like we have to come together

8    and come up with a strategy.  It's just kind of vague, it

9    doesn't say much.  We're going to have a million other

10   documents that deal with this issue.

11           MR. CAMPOAMOR-SANCHEZ:  So, I guess the most

12   important part for us is the fact that that is communicated to

13   Mr. Craig directly from Tymoshenko's lawyer, and that's

14   reflected down there.

15           THE COURT:  And who's going to say that?

16           MR. CAMPOAMOR-SANCHEZ:  So, for example, Mr. Haskell,

17   who's also copied here, can say that, that this was an issue

18   that Mr. Tymoshenko's lawyer raised to him and to Mr. Craig,

19   the importance of that issue.

20           THE COURT:  All right.  So this is going to come in

21   through Mr. Haskell, that we received this and this is the

22   first time they became aware that the public was talking about

23   the fee?

24           MR. CAMPOAMOR-SANCHEZ:  I think this is when the

25   Tymoshenko's lawyer first raised it directly.  I think there

1    was some mention of this earlier, in another press release that

2    they worked on, earlier that month.

3              MR. ABELSON:  Your Honor, if I may.

4              THE COURT:  Yes.

5              MR. ABELSON:  Mr. Vlasenko, who represented

6    Tymoshenko, made accusations in these emails and elsewhere that

7    Skadden was violating Ukrainian procurement laws, it's these

8    tender laws, the law on state purchases, you'll see in some

9    other documents they're referenced here.  We are very concerned

10   that if those documents come in, the jury will think that

11   Skadden was violating Ukrainian law.  And the government is not

12   suggesting that there was any such violation.  And so --

13             THE COURT:  Well, maybe this is the better document

14   because it raises the issue without all those extraneous

15   concerns.  But, the point is that it became an issue within the

16   team, that there was a public questioning of the amount, then

17   I'm not sure that this causes any particular harm.  And I do

18   think the ones about violating -- I think, way back when, I --

19   haven't we already talked about saying that -- no, it was in a

20   different trial.  Violating the Ukrainian procurement

21   regulation would not be admissible.  But I will be consistent

22   on that point.

23             All right, so this one is admitted.

24             Let's go on to -- there was one that had a

25   completeness issue but also a relevance issue.  I think that

```
 1    one maybe does get into --
 2              MR. ABELSON:  Absolutely.
 3              THE COURT:  Okay.  So 168.
 4              MR. CAMPOAMOR-SANCHEZ:  Your Honor, so this is the
 5    follow-up on how Skadden doing its due diligence about, sort
 6    of, the allegations.  So, frankly, this is, I must admit, not
 7    the most helpful document.  So we can withdraw this one.
 8              THE COURT:  All right.  Withdrawn.
 9              172 I think gets back into who gets to be at the
10    interview and the overlap between Project Two and Project One.
11              MR. ABELSON:  This is another project, among the many
12    of Project Two documents in their list.
13              THE COURT:  All right.  I want to put that in the
14    same pile with 162 and 163 and let you try to come through and
15    narrow them down and --
16              MR. CAMPOAMOR-SANCHEZ:  Will do, Your Honor.  I just
17    want to point out that this is after the Tymoshenko meeting,
18    this is just them talking about meeting with prosecutors on
19    Project Two in July.  So this was, I think, a much different
20    document than the 162 and 163 in terms of raising concerns
21    about --
22              THE COURT:  Right.  But just the whole -- I think
23    there's some relevance to the overlap with the concerns that
24    have alleged to be motivating, the alleged omissions and false
25    statements for the purposes of avoiding the disclosures
```

1    involved in registration.

2            MR. CAMPOAMOR-SANCHEZ:  Right.

3            THE COURT:  And the fact that there was a Project Two

4    and who was paying for all of it, could bear on those issues.

5    I think it's relevant.  I think every email related to meetings

6    related to Project Two and who's going to go and who's not

7    going to go with, can be trimmed down substantially, in light

8    of this conversation.

9            MR. CAMPOAMOR-SANCHEZ:  Yes.

10           THE COURT:  So 172 will go in the same box as 162 and

11   163, as the Project Two documents that we're reserving on until

12   they've been narrowed.

13           173, I know there's no objection to but it reminds me

14   that I wanted to ask you a question today.  Is it certain that

15   Vin Weber is not going to be a witness in this trial?

16           MR. CAMPOAMOR-SANCHEZ:  Yeah.  I don't -- not for the

17   government.  I don't know if the defense --

18           MR. MURPHY:  We have no intention of calling

19   Mr. Weber, Your Honor.  He's under investigation in the

20   Southern District of New York, that seems to go on forever.

21           THE COURT:  Well, that's neither here nor there.

22   Just poses a recusal issue for me.  So I want everybody to know

23   that.

24           MR. CAMPOAMOR-SANCHEZ:  Yeah, he's not --

25           THE COURT:  I've never represented him, but people

```
 1      from whom I usually recuse do.  So, not that it's ever come up.
 2                 All right.  175.
 3                 MR. CAMPOAMOR-SANCHEZ:  Your Honor, we'll withdraw
 4      it.
 5                 THE COURT:  Okay.
 6                 MR. ABELSON:  I'm sorry.  That was 175?
 7                 MR. CAMPOAMOR-SANCHEZ:  Yes.
 8                 THE COURT:  So is the trick to do this after 4:30,
 9      then exhibits start to fall by the wayside?  I'll have to try
10      to remember that in the future.
11                 The next one is related to the motion in limine.
12                 222, I think is our next one.
13                 MR. MURPHY:  Your Honor, it's in my bucket.  It's one
14      of these, Are you free for a phone call?  Here's my number.
15      Nothing of substance is said.  I don't know why it's relevant.
16                 MR. CAMPOAMOR-SANCHEZ:  I'd be happy to explain, Your
17      Honor.  As the Court has already heard, there's a lot of
18      allegations by the defense that Mr. Hawker really did not have
19      any contact with Mr. Craig about the report.  And this is one
20      of those emails that actually tends to show that in fact there
21      was contact because they were arranging to have conversation.
22      Of course, Mr. Hawker will be available to testify about it.
23                 THE COURT:  All right.  As long as he's able to
24      testify about what this is, what he's going to talk about.  All
25      right, it's admitted.
```

1          253, though, raises some hearsay concerns.

2          MR. CAMPOAMOR-SANCHEZ:  Mr. Kilimnik is not going to

3     be a witness.

4          THE COURT:  He's not coming to this courtroom?

5          MR. CAMPOAMOR-SANCHEZ:  He's not coming.  This is

6     for -- the only reason it would be offered is for the

7     non-hearsay purpose that Mr. Hawker, who can testify, said

8     these are the instructions I received in preparation for the

9     Harvard Club meeting, as to what I was supposed to do.  That is

10    it.  It's not really for the truth of the matter, but this

11    corroborates the fact that he was getting instructions, who he

12    was getting them from, and what he was supposed to do to

13    prepare for that meeting with Mr. Craig.

14         THE COURT:  Well, and part of it is Kilimnik is

15    saying that Manafort is asking him to do these things, and

16    Kilimnik isn't going to say that he talked to Manafort about

17    it.  On the other hand, I don't have any problems with --

18         MR. MURPHY:  Your Honor, to make this faster --

19         THE COURT:  Yes.

20         MR. MURPHY:  If there's an appropriate kind of

21    hearsay instruction, that this is not being offered for the

22    truth.  But, you know, we don't object.

23         THE COURT:  All right.  Well, I'm not even sure there

24    is a matter asserted in it, I'm even trying to figure that out.

25    But to the extent it is, it's not being offered for the truth.

1   Okay.

2           MR. CAMPOAMOR-SANCHEZ:  This same email appears in

3   Defendant's 141, by the way.  It's just a further chain.  So

4   the defense also has it on their list.

5           THE COURT:  Okay.  So you can admit it.  And if it

6   requires some sort of instruction to go with it -- it's hard to

7   figure out what the matter is that's being asserted that we're

8   worried about, other than that Paul wants this.  But again,

9   that seems to me, it was said, so it's relevant to why Hawker

10  did what he did.

11          256.  Okay.  This is from van der Zwaan, who is also

12  not going to testify.

13          MR. CAMPOAMOR-SANCHEZ:  Your Honor, if -- this, I

14  thought, was one of the completeness ones, because the defense

15  did not object to 257.

16          THE COURT:  It was completeness and hearsay, and they

17  took away the completeness, but they left the hearsay, so we

18  didn't rule on it in that pile.

19          MR. CAMPOAMOR-SANCHEZ:  Okay.  So they did not object

20  to 257, which includes the exact same email chain.  And the

21  reason we were separating it into two was so Miss Weiss, who's

22  the recipient about this and can testify about this, was not

23  part of the chain in 257, where it's just Mr. Hawker and

24  Mr. van der Zwaan talking.  So if the Court looks at 257, it's

25  the exact same email at the bottom, but then it morphs into a

1    conversation between Mr. Hawker and Mr. van der Zwaan.  And

2    there was no objection to 257.

3              MR. ABELSON:  Your Honor, we'll withdraw this

4    objection.

5              THE COURT:  All right.  Okay.  So it's admitted.

6              There's a hearsay objection, 274.

7              MR. CAMPOAMOR-SANCHEZ:  274, Your Honor?

8              THE COURT:  I think so, I think that's the next one.

9              MR. CAMPOAMOR-SANCHEZ:  I thought it was 264A.

10             THE COURT:  Sorry.  I skipped one.  I did.  Sorry.

11             Now, this gets into when he's saying he's not going

12   to do backgrounding with journalists.  And as far as I can see,

13   the difference between 264 and 264A was kind of who responded

14   at the top.

15             MR. CAMPOAMOR-SANCHEZ:  Um-hum.

16             THE COURT:  So just let me ask the defendant, what's

17   the hearsay in 264A that's missing from 264 that's

18   problematical?

19             MR. MURPHY:  Your Honor, Mr. Manafort's statement,

20   Okay, we can make this work, if offered for the truth is

21   hearsay.

22             THE COURT:  Truth of what?

23             MR. MURPHY:  That we can make this work.

24             THE COURT:  All right.  So it just comes in for the

25   fact that he said it, is that why you want it?

1          MR. CAMPOAMOR-SANCHEZ:  Yeah, it's really for the

2     fact that the conversation continued.  So despite, you know,

3     this reversal -- you know, we allege it's a reversal to the

4     reversal, but this is just a fact that the conversation

5     continued, not for the truth of what's asserted.

6          THE COURT:  All right.  And if one of these documents

7     comes up and I said I would give that instruction, and I don't

8     say anything immediately, you can just say, you know, Your

9     Honor, can you give the instruction? and I will.

10          MR. MURPHY:  Thank you.

11          THE COURT:  All right.  Now we're 274.  You're

12     actually going to be using the Elmo and not, like, some

13     computer that puts these onto screens when you're doing the

14     trial?

15          MR. CAMPOAMOR-SANCHEZ:  No, we're using the computer

16     Your Honor, yes.  This was for today.

17          THE COURT:  Okay.  When you said it, I thought, it

18     will be a long trial.

19          All right.  So, I don't see this as hearsay because I

20     don't see a matter being asserted, the truth of any matter

21     being asserted.  It's just here's an outline, what it should

22     be, I'm transmitting it to you, Jonathan Hawker and Rick Gates

23     are going to say we got it.

24          MR. MURPHY:  There's a false statement by

25     Mr. Manafort, which is that the outline presents the top two

1    findings to exonerate the president of any bribe or activity.

2    I mean, if he's actually purporting to characterize what the

3    report says, it's directly false.

4            MR. CAMPOAMOR-SANCHEZ:  Your Honor, this is simply

5    for the fact of what Mr. Hawker received.

6            THE COURT:  All right.  It will come in for the fact

7    it was received, and not for any characterization of the report

8    by Mr. Manafort.

9            306 is just sort of a standalone Skadden Report,

10   rollout plan.  Who's going to lay the foundation for this,

11   explain what it is?  How does this come in evidence?  It

12   certainly doesn't walk in on its own.

13           MR. CAMPOAMOR-SANCHEZ:  Yeah, it's Miss Lucy-Claire

14   Saunders.  If the Court looks at page 3, we have the metadata

15   for the document.  She's the author of this document and she's

16   the one that can lay the foundation and authenticate it, and

17   she'll be available to testify.

18           THE COURT:  But what happened to it?  This is her

19   plan that she's proposing, is -- was it then -- is she going to

20   say that it was reviewed with anybody, that --

21           MR. CAMPOAMOR-SANCHEZ:  These were instructions she

22   received to prepare their plan.  So it was not her decision to

23   put both Mr. Sanger and Al Hunt of *Bloomberg*.  But who this is

24   being received from is going to tie with other evidence.

25           So, essentially, this is where Mr. Weber works.  And

1    she received the instructions to prepare this plan.  And this

2    is also going to tie into other evidence where Mr. Craig was

3    having the report, a draft of the report delivered to Mr. Weber

4    at the same time, while both of them were in Egypt together.

5    So this all matches what we assert, which is he in fact

6    provided the report to Mr. Weber, contacted Mr. Sanger in

7    October, and this was the plan at that time, as we allege,

8    which is Mr. Sanger is going to be one of those journalists

9    that's going to be backgrounding on this.

10             THE COURT:  But is there something that says he got

11   this plan?

12             MR. CAMPOAMOR-SANCHEZ:  No.  No, we have other

13   evidence that together we will make that argument, that he knew

14   about the case.  But what this part of the case is, Miss

15   Lucy-Claire Saunders, who worked at Weber and for Mr. Weber,

16   got the instructions to put this together.  And this is at the

17   same time that Mr. Craig is personally emailing Mr. Sanger and

18   putting him in contact with Mr. Weber, and also sends Mr. Weber

19   a copy of the Skadden Report.

20             So, this is Miss Saunders, who understood she was

21   supposed to be helping out with the Skadden rollout plan, these

22   are the instructions she got as to what to include.

23             THE COURT:  From whom?

24             MR. CAMPOAMOR-SANCHEZ:  From Mr. Weber, her

25   supervisors at Mercury.

```
 1                THE COURT:  All right.  So she is going to say I was
 2       told to prepare this plan, I prepared this plan.
 3                MR. CAMPOAMOR-SANCHEZ:  Correct.  And when she
 4       prepared --
 5                THE COURT:  It's a plan, at this point, in Weber's
 6       head.  And --
 7                MR. CAMPOAMOR-SANCHEZ:  Yes, she obviously can't say
 8       where that came from, right.
 9                THE COURT:  So it's a plan that has been now
10       transferred from Weber's head to a piece of paper by --
11                MR. CAMPOAMOR-SANCHEZ:  Miss Saunders.
12                THE COURT:  Miss Saunders.  So --
13                MR. CAMPOAMOR-SANCHEZ:  And the date of it is
14       important, which is October 3rd of 2012.
15                THE COURT:  Okay.  And then -- but does this plan
16       ever end up in a Skadden email?
17                MR. CAMPOAMOR-SANCHEZ:  We do not have evidence that
18       this ended up in a Skadden email.  What we have is evidence
19       that Mr. Craig was in contact at this very time with Mr. Weber
20       and Mr. Sanger and providing the report to Mr. Weber.  We have
21       that.
22                I am reminded by my colleagues that Mr. Craig had
23       previously received a plan that identified Mercury as a
24       designated party, somebody that would be involved with the
25       media plan.  So that's also something we --
```

 1          THE COURT:  That's different.

 2          MR. CAMPOAMOR-SANCHEZ:  Right.

 3          THE COURT:  I mean, I think your point is that his

 4   activities were consistent with this plan.

 5          MR. CAMPOAMOR-SANCHEZ:  Right.

 6          THE COURT:  But, I don't see how you're tying the

 7   plan to him.  You're just tying the activities to him.

 8          MR. CAMPOAMOR-SANCHEZ:  Right.  So I'm tying the plan

 9   to him through testimony.  So, for example, there will be

10   testimony that at the Harvard Club meeting Mr. Craig himself

11   suggested Mr. Sanger ask the journalist that would be seeded or

12   provide the background.

13          THE COURT:  Before this was --

14          MR. CAMPOAMOR-SANCHEZ:  Correct.  This is in

15   September 23rd, if I'm right from memory.  And that's -- a lot

16   of this, what the Court will hear at trial, is about what

17   happened at that Harvard Club meeting, the discussion and the

18   alleged reversal by Mr. Craig is his agreement to do the

19   backgrounding, and then what we believe is his reversal to the

20   reversal, where he is now taking action.  And we do have the

21   emails where he contacts Sanger on October 3rd, or thereabouts,

22   sending -- you know, putting him in contact with Mr. Weber to

23   carry out what we believe is the media plan.

24          THE COURT:  So there's going to be testimony about

25   the meeting.

1          MR. CAMPOAMOR-SANCHEZ:  Correct.  The Harvard Club

2     meeting.

3          THE COURT:  Weber was at the meeting?

4          MR. CAMPOAMOR-SANCHEZ:  I'm sorry?

5          THE COURT:  Weber was at the meeting?

6          MR. CAMPOAMOR-SANCHEZ:  No.  That was Manafort,

7     Gates, Hawker, Craig, van der Zwaan.  I think I'm not missing

8     anybody.

9          THE COURT:  So someone will say they had a plan.

10          MR. CAMPOAMOR-SANCHEZ:  Correct.

11          THE COURT:  And you're suggesting that this document

12     is consistent with the plan.  But what ties this document to

13     the meeting, if Weber wasn't there?  Who told Weber what to do,

14     we don't know.

15          MR. CAMPOAMOR-SANCHEZ:  Gates.

16          THE COURT:  Will Gates say that?

17          MR. CAMPOAMOR-SANCHEZ:  Yes.  Gates was -- in fact,

18     there's documents where Gates is sending the media, the D.C.

19     media consultant's plans to Weber and Podesta.

20          THE COURT:  Well, subject to doing this in

21     chronological order, there's a meeting at which a plan is

22     developed and Mercury has a role.  And you can establish that

23     that gets told to Weber.  And she can say Weber told me to

24     write this on a piece of paper and she writes it on a piece of

25     paper, then I think it's -- we have a foundation for its

1    relevance --

2             MR. CAMPOAMOR-SANCHEZ:  But I want to make it clear

3    that we don't think it's a coincidence that Mr. Weber and

4    Mr. Craig are on this trip together in Egypt, that Mr. Craig --

5    and we have the emails for this -- asked his assistant to reach

6    out to Mr. Sanger, get the information.  He reaches out to

7    Mr. Sanger, puts him in contact with Mr. Weber, and then has

8    his assistant give a draft report directly to Weber's office at

9    the same time that Mr. Weber is telling Miss Saunders to put

10    this together.

11             THE COURT:  I understand that.  I'm saying it had to

12    sort of precede or follow something to be relevant.  You've

13    established its relevance.  I think, though, what it doesn't

14    show doesn't mean it's not admissible as a link in a chain.

15    You can't argue that it's more than what it is.  You can't

16    suggest that he saw it, he didn't see it, just because it's

17    called Skadden rollout plan -- Skadden Report.

18             MR. CAMPOAMOR-SANCHEZ:  Right.  And Miss Saunders

19    cannot say that and I don't have a witness that will say that.

20             THE COURT:  Subject to coming in in that chronology

21    and her laying the foundation and the meeting happening

22    first --

23             MR. MURPHY:  Your Honor, may I be heard before you

24    indicate a ruling on this?

25             THE COURT:  Yes.

1            MR. MURPHY:  Miss Saunders, we have her 302.  She has

2      no idea whether anybody talked to Mr. Craig about this.  She

3      never talked to Mr. Craig about this.

4            MR. CAMPOAMOR-SANCHEZ:  We're not saying that.

5            THE COURT:  They're not saying anybody talked to

6      Mr. Craig about it.

7            MR. MURPHY:  Okay.  At the meeting on September the

8      23rd, there was a discussion about backgrounding journalists,

9      we would concede that.  Mr. Craig later said I'm not going to

10     do that.  That was two days later.  And then the people who

11     were at the meeting, the FTI people, Hawker, he continued to

12     create media plans.  He doesn't have Mr. Sanger's name on any

13     of the media plans that he created after September the 23rd,

14     until December the 6th.  Okay.  So three months go by before he

15     puts David Sanger's name on the plan.

16            We do know that Mr. Craig and Mr. Weber were on a

17     Middle East trip together with -- in connection with an

18     international institute --

19            THE DEFENDANT:  Washington Institute.

20            MR. CAMPOAMOR-SANCHEZ:  The Washington Institute that

21     was engaged in the Middle East peace process.  In the course of

22     that trip Mr. Weber asked Mr. Craig about the Ukraine.

23     Mr. Craig described what he was doing.  Mr. Weber asked

24     Mr. Craig, Can you put me in touch with David Sanger?

25     Mr. Craig said, Yes, I can.  He sent an email to Mr. Sanger

1    saying Mr. Weber may be contacting you, and Mr. Weber

2    thereafter contacted Mr. Sanger.

3          That's the chronology of what happened.  This plan, I

4    don't know why it was created by Mr. Weber.  I don't know why

5    Miss Saunders put it on paper.  And she doesn't know why

6    either.  So I don't think the document should come in.

7          THE COURT:  Well, I want to at least hear her

8    testimony.  I think it sounds like, from the meeting and from

9    her testimony, there will be sufficient foundation for I wrote

10   this based on Mr. Weber's instructions, and that's all it is.

11   It's not trying to be more.

12         MR. MURPHY:  But she wasn't at the meeting.

13         THE COURT:  I understand that.

14         All right.  What happened between Mr. Craig and

15   Mr. Weber -- well, Mr. Weber, you're not calling Mr. Weber, so

16   that will be in evidence if it comes in evidence.

17         MR. MURPHY:  Well, Your Honor, can you just reserve

18   ruling on it until you hear more about the September 23rd

19   meeting?  Because without the foundation that Mr. Campoamor

20   suggests will be created by the September 23rd meeting, then

21   this document loses its relevance.

22         THE COURT:  I said, assuming that foundation is laid,

23   I would admit it.  Obviously, if we get to they're starting to

24   ask her about it and you don't think it's been made, you can

25   come to the bench.

1              MR. MURPHY:  Thank you, Your Honor.

2              THE COURT:  All right.  All right.  I think we're

3      talking about 324.  Okay.  I don't think its hearsay.  But,

4      what is it?

5              MR. ABELSON:  It's a question raised by Mr.

6      van der Zwaan.  We don't see any relevance to this, Your Honor.

7              THE COURT:  I'm sorry.  When I meant what is it, I

8      was asking the government.

9              Your objection is relevance and hearsay.  I don't

10     think it's hearsay.  Why is it relevant?

11             MR. CAMPOAMOR-SANCHEZ:  It's relevant, Your Honor

12     because, as we understand the defense, they're going to try to

13     claim that Mr. van der Zwaan was acting on his own and that he

14     was not -- or, that he was keeping Mr. Craig excluded from

15     things.  And Mr. Gates will be available to testify that,

16     indeed, as they were getting ready to roll out the media plan,

17     Mr. van der Zwaan had a number of activities he had to engage

18     in, but he wanted to make sure that Mr. Gates had cleared that

19     directly with Mr. Craig.

20             And the following, I believe, email that you'll see,

21     or -- yes, email, is confirmation or corroboration with

22     Mr. Gates' testimony that he was in fact trying to reach and

23     ultimately, I believe, did talk to Mr. Craig about these

24     things.

25             THE COURT:  Well, what -- I mean --

```
1              MR. CAMPOAMOR-SANCHEZ:  I can certainly get
2      testimony --
3              THE COURT:  -- the things, there may have been some
4      things that they discussed with each other.  There may have
5      been some things they didn't discuss with each other.  I think
6      it may be a matter of public record that there were some things
7      that they didn't discuss with each other.  That doesn't mean
8      they didn't discuss anything with each other.  So --
9              MR. CAMPOAMOR-SANCHEZ:  Your Honor, we --
10             THE COURT:  The only thing that matters here is what
11     Mr. Gates is going to say Mr. Craig said.
12             MR. CAMPOAMOR-SANCHEZ:  Okay.  And we'll -- I will
13     withdraw the exhibit, Your Honor.
14             THE COURT:  All right.  324 and -26.  I mean, if you
15     need them to just -- to get to the chronology.
16             MR. CAMPOAMOR-SANCHEZ:  Right.
17             THE COURT:  But, they independently don't really
18     establish what they discussed.  And you can use them with
19     Gates, I guess, but that's it, just to say did you talk to him
20     after you -- did you talk to him during this time period and
21     what did you discuss?
22             MR. CAMPOAMOR-SANCHEZ:  Right.  So -- and I should --
23     my colleagues have pointed out that actually 326 is different
24     because it is actually an email to Mr. Craig --
25             THE COURT:  Right.  Okay.
```

1      MR. CAMPOAMOR-SANCHEZ:  -- where now his assistant is

2   indeed reaching out and asking him whether Mr. Gates -- again,

3   I'll -- this is corroboration, really, what I expect Mr. Gates'

4   testimony to be, but it's slightly different than 324.

5      THE COURT:  It seems to me if he forgets the dates

6   and times, you can use these.  But otherwise, they don't really

7   say anything.  I don't think they're hearsay, but I don't think

8   they're necessary either.  I agree with you.

9      365.  All right.  Tell me what ANSA stands for.

10      MR. CAMPOAMOR-SANCHEZ:  It's an Italian publication.

11      MR. MURPHY:  It's an Italian news service.

12      THE COURT:  Why is that relevant?

13      MR. CAMPOAMOR-SANCHEZ:  That was part of the media

14   rollout plan.  So this is to corroborate that, in fact,

15   Mr. Craig was participating in Ukraine's media rollout plan.

16   Mr. Gates is, of course, available to testify.  And, you know,

17   he is instructing those two individuals about what the plan is,

18   which is Greg has asked that Jonathan -- that being

19   Mr. Hawker -- provide preliminary background to reporters so

20   Greg's time can be used for specific questions.

21      Following the call with Jonathan, Claudia will call

22   Greg, and Greg is free until a particular time to take the call

23   from the journalist.

24      THE COURT:  If he provided background information or

25   answered specific questions from Italian reporters --

1       MR. CAMPOAMOR-SANCHEZ:  Right.  So the key here is,

2  and the Court was getting to this yesterday, his whole premise

3  to the FARA was that he was just reacting to misinformation

4  that happened, as there was reporting about his report.

5       This is corroborating evidence to what Mr. Gates will

6  say, that in fact Mr. Craig was participating in the Ukraine's

7  media rollout plan --

8       THE COURT:  On the front end.

9       MR. CAMPOAMOR-SANCHEZ:  Right.

10      THE COURT:  But this wouldn't have been something

11  that he would have had to disclose because it wouldn't have

12  been within the United States?

13      MR. CAMPOAMOR-SANCHEZ:  Well, it's not something that

14  would make him register, but it's certainly not disclosing the

15  fact that he was part of the Ukraine's media rollout plan.  In

16  fact, Mr. Craig told the FARA unit that he didn't know what

17  Ukraine was going to do with this report after he handed it.

18  When he is, you know, copied on all these things and agrees to

19  participate in the media rollout for his report, that's what

20  this goes to.

21      THE COURT:  Mr. Murphy?

22      MR. MURPHY:  Your Honor, first of all, as

23  Mr. Campoamor knows --

24      THE COURT:  Okay.  Everybody keeps saying that, and I

25  said to you from the beginning, just tell me what you want to

 1      tell me about the facts, without casting aspersions about the

 2      credibility of your opposing counsel.

 3              MR. MURPHY:  Mr. Craig never spoke to Claudio

 4      Salvalaggio, who is the reporter from ANSA.  No one ever

 5      contacted Mr. Craig to talk to Mr. Salvalaggio about the

 6      report.  In fact, other people who Mr. Craig had no knowledge

 7      of contacted Mr. Salvalaggio of ANSA, and ANSA wrote a story

 8      that is the most ridiculous story about the Tymoshenko report

 9      that you can imagine.  And the people that put that together

10      were Allen Friedman and Eckhart Sager and a person named Andrea

11      Gianotti, I believe, who was working with those two folks over

12      in Kiev.  The fact that Mr. Gates is purporting to say, Contact

13      Mr. Greg -- Mr. Hawker to talk to Mr. Craig.  None of that is

14      true and none of it happened.

15              We have spoken to Mr. Salvalaggio, the government has

16      spoken to Mr. Salvalaggio.  He says that he had other sources

17      for this story, he never heard of Greg Craig, and this whole

18      thing is a fiction.

19              THE COURT:  Well, it doesn't say anything happened,

20      it says it's supposed to happen.  I think Mr. Gates can testify

21      to it.  Let's leave it there.  If this document becomes

22      important in rebuttal, or in cross-examination of someone, then

23      we can talk about it.  But for now let's exclude it.  But the

24      fact of what Mr. Craig was saying he would do or wouldn't do as

25      part of the overall rollout, I think Mr. Gates did testify to.

1     But -- so let's just leave it there.

2              I think we're at 393.  This the one of the well-done

3     emails.  Two of them.

4              All right.  What is the fact that we think this is

5     being introduced for the truth of -- what fact is being

6     asserted here that gives rise to the hearsay?  Read me the

7     hearsay.

8              MR. MURPHY:  Your Honor, this is Mr. Manafort

9     reporting to Mr. Greg Craig that the initial rollout has been

10    very effective and your backgrounding has been key to it all.

11    The fact of the matter is, that the things that Mr. Manafort is

12    talking about here, Mr. Craig had actually nothing to do with.

13    It's the ANSA report, it's the Ukraine Ministry of Justice

14    press release, neither of which Mr. Craig had anything to do

15    with.  They are both contrary to the opinions that were reached

16    in the Skadden Report.  The articles that were written were

17    false spins.

18             And, you know, I don't know exactly why Mr. Manafort

19    wrote this, but he's not going to be here to testify about it,

20    we're not going to be able to cross-examine him about the truth

21    of the fact.  And the true fact is that the report that was --

22    the way it was characterized in the European press was directly

23    contrary to the conclusions that Skadden had reached.  And why

24    Mr. Manafort said this to Mr. Craig, I don't know.  But he's

25    not going to be around for me to cross-examine him to find out

1    why he said this.

2              THE COURT:  Well, some of it is focused on the

3    European, some of it isn't.  Everyone in Kiev is happy, they

4    like the report, they're especially happy with the way the

5    media is playing it.  The next sentence, certainly, European

6    reaction has been positive.  All right.  Mr. --

7              MR. CAMPOAMOR-SANCHEZ:  Campoamor.

8              THE COURT:  Tell me why, if we don't have Paul

9    Manafort to say what he meant by all this -- I certainly

10   understand why the government thinks it's important, and I

11   think there may be -- clearly it reflects Mr. Manafort's state

12   of mind, that Mr. Craig played a role.

13             MR. CAMPOAMOR-SANCHEZ:  And, Your Honor, Mr. Craig

14   responded to this email, and Mr. Craig, in his own words, you

15   know --

16             THE COURT:  Well, where's that one?

17             MR. CAMPOAMOR-SANCHEZ:  396.

18             THE COURT:  Let's look at that one.

19             All right.  Well, what he says is really nothing in

20   response to that.

21             MR. CAMPOAMOR-SANCHEZ:  Right.  Which is actually

22   important.  I mean, Mr. Manafort is congratulating him because

23   of his backgrounding and Mr. Craig doesn't say, No, I didn't

24   background anybody; what are you talking about?  I didn't

25   understand.  He just says, No, this was terrific.  I'm glad it

1     went to so well.  And then he goes on to talk about perhaps

2     having meetings with the President of Ukraine about this.

3     That's important.  This is -- whether what Manafort said is

4     true or not, his reaction to this says a lot about the fact

5     that he was knowledgeable about and participated in Ukraine's

6     media rollout plan.

7                MR. MURPHY:  Your Honor?

8                THE COURT:  Yes.

9                MR. MURPHY:  With respect to this document, to

10    understand it one has to have the *Kyiv Post*, because the *Kyiv*

11    *Post* wrote an article that was a scathing critique of the

12    Ukraine's actions in the trial of Yulia Tymoshenko.  And the

13    *Kyiv Post* quoted the Skadden Report and then quoted the

14    statements that were being promulgated by the Ukraine and FTI,

15    and said the Ukraine is trying to say that this report

16    exonerates the Yanukovych regime.

17               In fact, this report excoriates the Yanukovych

18    regime.  She should be released because the report says this,

19    this, and this.  So when Mr. Craig responds, he is responding

20    to Mr. Manafort, he's saying, I thought the piece in the *Kyiv*

21    *Post* was terrific, Mr. Manafort, not the pile of garbage that

22    was reported in the European press that you're talking about.

23               So there's a lot of context to this but, nonetheless,

24    we're not going to have Mr. Manafort here to explain what he

25    meant and what he understood what Mr. Craig meant when

1    Mr. Craig said, Read the *Kyiv Post*, Paul, that's the true story

2    of our report.

3            MR. CAMPOAMOR-SANCHEZ:  This is a statement of a

4    party opponent that's responding to what's below.  And if

5    Mr. Craig decides to testify, and that's his right, great.  If

6    he doesn't, that's also fine.  And I'm sure Mr. Murphy or

7    Mr. Taylor would make great arguments about how to put this in

8    context to the jury.  But I get to make the arguments, too, and

9    I think it has a much different meaning, when you put it all in

10   context, as to what really is going on here.

11           THE COURT:  All right.

12           MR. MURPHY:  Your Honor, if I just may.  Defendant's

13   Exhibit 248 includes this chain with the *Kyiv Post* article,

14   which makes it a complete statement, at least.  I think the

15   *Kyiv Post* article --

16           MR. ABELSON:  Different chain.

17           MR. MURPHY:  I'm sorry.  Different chain, but it's

18   the *Kyiv Post* article that I think has to be attached to this.

19           MR. CAMPOAMOR-SANCHEZ:  It wasn't attached to the

20   email.

21           MR. MURPHY:  And for some reason the government is

22   not introducing it.

23           THE COURT:  Well, if it wasn't attached to the email,

24   I don't know that they have to attach it.  All right.  I'm -- I

25   don't think we need 393 and 396.  If it comes in, it will be

 1    396.  What's the defense document that you say is useful for

 2    completeness?

 3              MR. ABELSON:  248, Your Honor.

 4              THE COURT:  All right.  So, I'm going to take 396

 5    under advisement.  And 393, I don't think we need if 396 is

 6    going to come in.

 7              MR. MURPHY:  With an instruction, Your Honor, with

 8    respect to Mr. Manafort's statements?

 9              THE COURT:  I haven't decided whether it is coming in

10    or not at all.

11              MR. MURPHY:  I'm sorry.

12              THE COURT:  Yes, if it does --

13              MR. MURPHY:  I misheard.

14              THE COURT:  -- I understand you want me to say that

15    it would not come in for the truth of any matter asserted.  So

16    if it does come in, that would be the instruction.

17              I think we're up to 402.  I would like to at least,

18    if we can, finish the government exhibits.  There aren't that

19    many more that we haven't talked about that aren't completeness

20    or aren't photographs or related to the motion in limine.

21    Let's try to do --

22              MR. ABELSON:  That's right.  I think 402 is the next

23    one.

24              THE COURT:  Yes, I'm on it.

25              All right.  Now, this, he's just pasting in headlines

1    of what's all over and saying here's the coverage, you're the

2    man.  He's happy.  People in Kiev are happy.  It's not sure I

3    see the hearsay there.

4              MR. ABELSON:  So --

5              THE COURT:  Go ahead.

6              MR. ABELSON:  Sure seems to us that the only relevant

7    purpose for this document is for the truth of what Mr. Manafort

8    is saying.  So what he's forwarding here, a number of articles,

9    none of which are publications Mr. Craig spoke with.  Leads

10   with the ANSA article that Mr. Murphy referred to and that is

11   parroting in the Ministry of Justice's press release which says

12   that Skadden has found that there was no political persecution

13   motivation here.

14             What Mr. Manafort is saying here is the people in

15   Kiev are happy, meaning your participation -- alleged

16   participation in this rollout scheme -- in the rollout is what

17   they were looking for, that you participated, and that this

18   coverage resulted from your media contacts.

19             THE COURT:  It doesn't even necessarily say that.  I

20   mean, to this, it could be that he wrote a great report, you're

21   the man.

22             MR. ABELSON:  I don't think that's the purpose and

23   the meaning that the government will say was meant by Paul

24   Manafort, who, again, will not be here to be cross-examined.

25             THE COURT:  Right.  And given the fact -- I mean, the

1    other one did say your background is the key to it all.  This

2    just says, Here's the coverage, you're a star in the headlines.

3    But if he's in the headlines, he's in the headlines for writing

4    the report, obviously, right?

5           MR. CAMPOAMOR-SANCHEZ:  Um-hum.

6           THE COURT:  So.  What are -- what -- ladies and

7    gentlemen of the jury, please take a look at Exhibit 402 and

8    draw the following inference.  What are you going to say?

9           MR. CAMPOAMOR-SANCHEZ:  What I say, Your Honor, is

10   that this is relevant for the fact that it was sent to

11   Mr. Craig.  Mr. Craig is going to be claiming that he knew

12   nothing about the media rollout plan, that he did not

13   participate in the media rollout plan.  And yet, Mr. Manafort,

14   who clearly is behind the media rollout plan, keeps sending him

15   these emails.  It has relevance just because it was sent to

16   Mr. Craig.

17         THE COURT:  But do you understand that it doesn't

18   necessarily congratulate him for that, and we don't have

19   anybody to explain the ambiguity.

20         MR. CAMPOAMOR-SANCHEZ:  No, I understand, but --

21         THE COURT:  The other one was very much tied to, this

22   is getting great coverage; thanks for your help with the

23   coverage.  This is, the report's all over the place --

24         MR. CAMPOAMOR-SANCHEZ:  Right.  And he is sending all

25   these clips of the media updates.  And this is the fact that

 1    he's sending it to Mr. Craig, we would argue, is consistent

 2    with the fact that Mr. Craig knew about the plan, had

 3    participated in the plan, and Mr. Manafort is letting him know

 4    the outcome of that plan.

 5          MR. ABELSON:  Just to make one other point, Your

 6    Honor, which is Mr. Craig is not going to claim that he didn't

 7    receive this email and wasn't aware that there was press

 8    coverage of the report and the fact that it was rolled-out.

 9    The government refers to the plan, but this has nothing to do

10    with the plan because Mr. Craig had nothing to do with these

11    publications.  So your point is exactly on point, which is this

12    has no relevance, and the purpose for which the --

13          THE COURT:  I think the purpose for which it's said

14    is ambiguous.  And absent Mr. Manafort to explain it, I think

15    that --

16          MR. ABELSON:  Right.

17          THE COURT:  -- the relevance is not clear enough.

18          MR. CAMPOAMOR-SANCHEZ:  All right.  Obviously --

19          THE COURT:  The other one, I get it.  This one I

20    think is a little unfair to ask the jury to draw some inference

21    from words that aren't in it, a person who won't be here to

22    explain it and who played a role in the whole exercise, not

23    just the PR.  But in the fact that there was a law firm doing

24    this, that was all --

25          MR. CAMPOAMOR-SANCHEZ:  Well, I guess the Court has

1    not yet ruled on 396.  I think that if the Court --

2             THE COURT:  I have not yet ruled on 396, that is

3    correct.

4             MR. CAMPOAMOR-SANCHEZ:  So if the Court were to rule

5    that we could at least use 396, then I guess --

6             THE COURT:  I understand that.  But I'm saying of the

7    two, that one at least bears some indication of its relevance

8    on its face.  This one -- I mean, I really can't -- I don't

9    know what he's saying.  And I understand why you're saying he's

10   saying, Look at this great press.  But he could just be saying,

11   Look at the great press about a great report -- you know, your

12   job; you did what you need to do.  You have -- what we always

13   hoped this report would do, it's doing.

14             And so, that goes to maybe why Ukraine wanted Skadden

15   to write a positive report.  But that's different than saying

16   he was involved in the FARA part.

17             MR. CAMPOAMOR-SANCHEZ:  Understood, Your Honor.

18   And -- but please keep in mind that the defense has argued and

19   will continue to argue that Mr. Craig was essentially

20   sabotaging the plan, that what he said was terrible for

21   Ukraine.  How can -- you know, how could he possibly do this?

22   And this is -- goes to the fact that -- showing Mr. Manafort

23   keeps congratulating him for the press's use of the report.

24             THE COURT:  Well, if he testifies that it was

25   actually a very disappointing plan because I was so harsh on

1    the Ukraine, and so that's how you know whatever it is you need

2    to know about my intent.  I don't see why you couldn't

3    cross-examine him with the fact that the members of his own

4    team were ecstatic.  But that's different.

5              MR. CAMPOAMOR-SANCHEZ:  I think, from opening, the

6    Court will hear that that's the argument that's going to be

7    made.

8              THE COURT:  Well, at that point if you want to say to

9    me they've opened the door, then I'll hear you.  But for right

10   now I think it's excluded because I think it's ambivalent,

11   ambiguous, and I don't know what it relates to.

12             All right.  Now, I also couldn't quite understand

13   this one --

14             MR. TAYLOR:  What number?

15             THE COURT:  I'm on 421.  And we've talked about the

16   procurement aspect of it.  But where's the hearsay part that

17   you're worried about in addition to that?

18             MR. ABELSON:  Your Honor, the chain starts with a

19   news article.  It's pasted in by Alex van der Zwaan that

20   contained a lot of statements about the -- well, about the

21   payment matters.  We understand you've ruled on the motion in

22   limine, but the article itself contains hearsay statements.

23   And so --

24             THE COURT:  Okay.

25             MR. ABELSON:  So at minimum, the article should be

1    redacted, and probably the additional email where

2    Mr. van der Zwaan is pasting in additional internet links.

3           MR. CAMPOAMOR-SANCHEZ:  So, Your Honor, it just goes

4    to show that Mr. Craig is very well aware that the issue is

5    very much alive, and that while he is writing letters to the

6    FARA unit, the issue of payment from Ukraine is still very much

7    at issue.

8           THE COURT:  All right.  Well, to the extent we can

9    redact statements out of the content of the article beyond the

10   point where he's putting them on notice that it's -- that the

11   fee is in issue, I think we might be able to solve the problem.

12          MR. MURPHY:  Your Honor, again, with respect to

13   relevance, when the FARA unit asked for copies of the

14   engagements and the agreements, Mr. Craig sent a copy of the

15   most recent, at that time, draft correspondence with the

16   Ukraine about this additional payment.  And when the payment

17   was finalized and the contract was completed, in the next

18   letter he sent the completed contract to the FARA unit.  So I

19   really don't understand the relevance.  This is, again, getting

20   into the second payment issues.

21          THE COURT:  Okay.  I've already ruled on that.  I

22   think they're allowed to get into it.  I think this can be

23   truncated in some way to leave out statements of fact.  The

24   fact that it was an issue in the press is different from

25   statements of fact being made in what purports to be a news

1    article of facts.  So, I think that one can be redacted

2    somewhat, and otherwise admitted.

3              All right.  The next one, 449.  This is another one

4    of those, Call me tomorrow, Manafort to Craig.  Do we need this

5    for anything?

6              MR. CAMPOAMOR-SANCHEZ:  So this is -- it's to show,

7    Your Honor, that Mr. Craig was in communication with

8    Mr. Manafort shortly before he sent the June 3rd letter to the

9    FARA unit.  That is very much at issue in this case.

10             THE COURT:  About whether they were still in

11   communication?

12             MR. CAMPOAMOR-SANCHEZ:  Um-hum.

13             THE COURT:  It's an issue in your case-in-chief?

14             MR. CAMPOAMOR-SANCHEZ:  Well, it might be more of a

15   cross-examination, should defendant wish to testify.  But

16   that's why we included this.  That's the point that's being

17   made here.

18             THE COURT:  All right.  Well, this is one of these

19   documents that -- you can't just walk around with.  At some

20   point it has to be moved in by -- it has to come in somehow.

21             MR. CAMPOAMOR-SANCHEZ:  Yes.

22             THE COURT:  And if the fact that they're speaking on

23   May 29th is relevant, fine, and it's not hearsay, it's not

24   prejudicial.  But it doesn't give any indication what they're

25   speaking about.  So it really only comes in if there's some

1     suggestion that they weren't talking anymore.

2              MR. CAMPOAMOR-SANCHEZ:  Right.  I got it.

3              MR. ABELSON:  Just to be clear, Your Honor, I

4     don't -- they're not going to suggest that that -- they were

5     discussing the FARA context or the letter, because this

6     document doesn't provide any of that evidence.

7              MR. CAMPOAMOR-SANCHEZ:  Right.  I just said that.

8     It's just that they were in contact at that time.

9              THE COURT:  Okay.  We went through the document

10    history.

11              We've got travel itinerary, document 526.

12              MR. CAMPOAMOR-SANCHEZ:  Your Honor, this is one of

13    those documents that -- it just helps to set when the meeting

14    with Mr. Pinchuk took place, or was supposed to take place.

15    But, so we would really only need it if there is a need to

16    establish that.  But we should be able to get that without this

17    document, I believe.

18              THE COURT:  All right.  So you're withdrawing it at

19    this point?

20              MR. CAMPOAMOR-SANCHEZ:  Yes, if --

21              THE COURT:  If it comes up and you need to use it,

22    let us know.

23              MR. CAMPOAMOR-SANCHEZ:  Thank you.

24              THE COURT:  528.

25              MR. ABELSON:  Your Honor, this letter itself is a

1    different exhibit.

2              THE COURT:  The sticky is the --

3              MR. ABELSON:  Right.  The sticky is the only thing

4    that makes this different, and we don't know what the relevance

5    of that sticky is.

6              THE COURT:  We don't know who wrote it.

7              MR. CAMPOAMOR-SANCHEZ:  We do know who wrote it, Your

8    Honor.  It's actually written by Mr. Craig's assistant.  And

9    she would testify that essentially she would print this out and

10   provide it to Mr. Craig, and when this was done, which matches

11   up to other emails in evidence that we would have about this --

12   this letter that is dated April 10th, it was really not

13   executed on April 10th.  It was sent to the government of

14   Ukraine, as best as we can establish from the emails, sometime

15   in May.  In fact, May 24th, which is the day after Miss Whitney

16   gave this to Mr. Craig.

17             THE COURT:  All right.  So she's going to say that

18   she wrote that?

19             MR. CAMPOAMOR-SANCHEZ:  Yeah.  And this is part of

20   hard copy documents that were in Mr. Craig's files.

21             THE COURT:  All right.

22             MR. ABELSON:  Your Honor, we still don't see any

23   relevance of this.  Just to maybe give a quick background on

24   the engagement letter.  So, the -- this -- the version dated

25   April 10th was the original version that was sent to the

1    Ministry.  It never got signed.  We've all had experience, the

2    client takes a while to sign the engagement letter.  The

3    ultimate one was dated April 5th.  That was the effective date

4    of the engagement letter.  Okay.  The engagement letter says

5    what it says.  Among other things, it makes clear that Skadden

6    wasn't going to take on any activities that would require it to

7    register under FARA.

8              The fact that the letter was sent to Mr. Craig on May

9    23rd and that his secretary put a Post-it note on it, I don't

10   know what it has to do with anything.

11             MR. CAMPOAMOR-SANCHEZ:  So this letter of engagement

12   is not that it was negotiated and agreed to and just was sent

13   later.  It was not negotiated or agreed to anywhere near April

14   10th, 2012, and that's the point that we're making.

15             THE COURT:  I thought you were saying it was the --

16   early on when we talked about this, when there were two, that

17   it had two different dates --

18             MR. CAMPOAMOR-SANCHEZ:  Correct, correct.

19             THE COURT:  -- that the first one never went, and the

20   second one went but never got sent back.  When is the one that

21   you allege was backdated and not real?  Is this the one that

22   you're saying was backdated?

23             MR. CAMPOAMOR-SANCHEZ:  I believe the one that we've

24   been referring to as being backdated is the one that's dated

25   April 5th, because it was -- it's dated April 5th, 2012 and it

1       was sent in middle of 2013.

2                   THE COURT:  All right.  So --

3                   MR. CAMPOAMOR-SANCHEZ:  But even this letter that has

4       been essentially represented as the engagement and what they

5       had agreed to and told Ukraine, this does not happen on April

6       10th.  It happened well after Mr. Craig knew about the whole

7       PR, well after he had gotten the PR advice, and it did not get

8       sent to Ukraine until late May of 2012.

9                   MR. ABELSON:  Your Honor, I don't have the exhibit

10      numbers in front of me, unfortunately, but I don't think that's

11      correct; that several versions of this were sent to

12      representatives of Ukraine, I believe as early as February.  I

13      would have to check that.

14                  MR. CAMPOAMOR-SANCHEZ:  There's a different letter

15      that was sent to Mr. Manafort and Mr. Schoen on February 20th,

16      had no mention of FARA or not doing any FARA work.  This letter

17      that includes this FARA language did not come into existence

18      until well after April 10th.

19                  THE COURT:  All right.  Are you planning to move --

20      you're planning to move this in?

21                  MR. CAMPOAMOR-SANCHEZ:  So there's two ways, Your

22      Honor.  There's Miss Whitney that can get this in.  There's

23      also a Skadden custodian of records that's available to get

24      this in, if indeed it becomes necessary to get it in.

25                  THE COURT:  Is somebody going to testify as to when

1     it was ever mailed to Ukraine?

2              MR. CAMPOAMOR-SANCHEZ:  Yes.  So one of the emails

3     that, in fact, we went over, I believe, previously, which is

4     Government's Exhibit 149, is the email from van der Zwaan.  So

5     the date after this Post-it note.  So May 24th is when we have

6     Mr. van der Zwaan emailing the form to a Ukrainian official.

7              THE COURT:  The actual one?

8              MR. CAMPOAMOR-SANCHEZ:  The actual letter that was

9     dated at that point.

10             THE COURT:  April 10th.

11             MR. CAMPOAMOR-SANCHEZ:  April 10th, correct.

12             THE COURT:  So she can say she sent it to him and

13    then --

14             MR. CAMPOAMOR-SANCHEZ:  There's this email that shows

15    Mr. van der Zwaan forwarding to the Ukraine official the next

16    day.

17             THE COURT:  All right.  I think everybody can argue

18    about what it signifies, but I think there's somebody that can

19    explain what it is, and it's certainly relevant.  You're both

20    talking about what's in it as being relevant.  So, it will be

21    admitted.

22             Some day someone is going to give me a list of

23    exhibits in chronological order and it's going to make my life

24    so much easier.  Because I bet you guys both have chrons

25    somewhere.

1          MR. CAMPOAMOR-SANCHEZ:  So, Your Honor, what's

2     happening, so the Court knows, this is our hard copy files,

3     that's why they're out of -- so we had it in chron the first

4     part of the exhibit list and this is just the hard copy files,

5     that's why they're not in chron.

6          THE COURT:  Okay.  What about the -- so, why is the

7     phone call, May 12, with another sticky -- who wrote the

8     message on the sticky?

9          MR. CAMPOAMOR-SANCHEZ:  So the phone number and the

10    sticky below is Miss Whitney.  The FARA language is Mr. Craig.

11    And we believe this is the first time that, essentially,

12    amongst the team for this phone call, is that FARA was being

13    discussed and the language that should be included in the

14    engagement letter is being discussed.

15         My colleague says it might not have been the first

16    time, but this is the around the time.

17         THE COURT:  Didn't you have emails from the beginning

18    of the representation, where they were talking about it?

19         MR. CAMPOAMOR-SANCHEZ:  Right.  I'm sorry, I'm not

20    speaking clearly.  That including FARA language in the

21    engagement letter is being discussed.

22         THE COURT:  Is anybody on the call going to say that

23    happened during that call?

24         MR. CAMPOAMOR-SANCHEZ:  There is an agenda item that

25    is also an exhibit that I believe includes -- their meeting

1   minutes, does it mention FARA?

2            MR. McCULLOUGH:  It does mention FARA.

3            MR. CAMPOAMOR-SANCHEZ:  There's meeting minutes of

4   this phone call that I believe mention FARA.

5            THE COURT:  So why wouldn't -- why wouldn't that be

6   more important than this?

7            MR. ABELSON:  Right.  Your Honor, we think without

8   any context, foundation, then there's no way to know what the

9   relevance of this document is.

10            THE COURT:  We know he's having a call, there is a

11   call, and he wrote, she recognizes the handwriting, the words

12   FARA language on a sticky that went in the file with the title

13   and details.  But, there's participants in the meeting who are

14   going to say that this is when we talked -- that we talked

15   about it?

16            MR. CAMPOAMOR-SANCHEZ:  Frankly, I believe the

17   testimony from Mr. Haskell, who I believe is the author of the

18   meeting notes, is going to say he doesn't have a specific

19   recollection, but he was very careful about including all the

20   items that was discussed, and that is one of the items that is

21   reflected in the meeting minutes.

22            THE COURT:  All right.  So this supports the notion

23   that they were talking about -- that the words FARA language

24   had something to do with this phone call.  I feel like it still

25   seems to be more rebuttal cross.

1          MR. CAMPOAMOR-SANCHEZ:  Yes.  And we were trying to

2     be expansive in our potential exhibits.  But -- yes.

3          THE COURT:  So I'm not -- you won't use it for your

4     case-in-chief.  And you can use it if it comes up --

5          MR. CAMPOAMOR-SANCHEZ:  Very well.

6          THE COURT:  And you need to show intent or someone

7     else was there.  Him.  You can't show it to anybody else

8     because they didn't write it.

9          MR. CAMPOAMOR-SANCHEZ:  Correct.

10          THE COURT:  All right.  What about the bank record,

11     547?

12          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  So this is

13     evidence of the first $2 million payment to Skadden.  And he

14     happened to have this in his hard copy files.

15          MR. ABELSON:  Your Honor, we entered a stip --

16     submitted a stipulation to the Court on when -- on the payments

17     that were received and when.  That's the fact.  They have the

18     stipulation.  I don't know whether a document that includes

19     foreign language on it has any relevance.

20          THE COURT:  Why, if the payments are not disputed?

21          MR. CAMPOAMOR-SANCHEZ:  Well, it's just relevant that

22     he had -- this is something that he had in the file.  He was

23     aware of the money and he was tracking where it was coming

24     from.  That's it.

25          THE COURT:  Well, again, I think you can use this on

 1    cross-examination, if he somehow suggests that he didn't care

 2    about the money or didn't know about the money, wasn't paying

 3    attention to the money.  But I think the fact that they were

 4    paid, and when they were paid, is coming in evidence.  So, I'm

 5    going to exclude this standing by itself.

 6              Rule -- oh, my goodness.

 7              MR. ABELSON:  Your Honor, I think there are only

 8    three more.

 9              THE COURT:  Okay.  Good.  569.  All right.  Well,

10    this is the same sort of thing, where the attorney is writing

11    and saying there's news accounts about this, that, and the

12    other.

13              MR. CAMPOAMOR-SANCHEZ:  Right.  And again, this is

14    just that he had a printed-out copy of this on his hard copy

15    files.

16              MR. ABELSON:  I'm sorry.  What exhibit are we talking

17    about?

18              MR. CAMPOAMOR-SANCHEZ:  I'm sorry, I misspoke.  This

19    is an additional email.

20              THE COURT:  It's a different article.  And this puts

21    in the name of the person, as opposed to Ukraine.  But, I feel

22    like we have the emails to and from him to show he's alerted to

23    these issues, the firm as a whole, or the team as a whole is

24    reacting to these issues.  And to just say, And there was a

25    piece of paper in his own file about the very same thing --

1          MR. CAMPOAMOR-SANCHEZ:  And I apologize, Your Honor,

2     I've been corrected, that now we're out of the range of

3     exhibits about his hard copy file.  So this is just an email.

4          THE COURT:  All right.  I mean, I understand that

5     you're saying it's relevant because it prompted them to take

6     action with respect to the other issue that I've said is

7     relevant.  But again, with that I think you need to streamline

8     how many documents you need to make that point.

9          MR. CAMPOAMOR-SANCHEZ:  Okay.

10         THE COURT:  And the same one is the next -- 570 is

11    the same sort of thing?

12         MR. CAMPOAMOR-SANCHEZ:  I'm sorry.  Is 570 next?

13         Yes, Your Honor.  So this is similar to the one we

14    saw earlier where --

15         THE COURT:  He just forwards it to Manafort.  I mean,

16    I think if the point we're trying to make -- and it's not the

17    main point in the case -- is that they jiggered around with the

18    engagement to deal with this perception problem arising out of

19    the small fee, we don't need every single document in his files

20    or Skadden's files that mention it.

21         So, I think you can reduce them.  We don't need 569

22    and 570 and the ones we talked about before.  We probably don't

23    need -- this one isn't in English, 572.

24         MR. CAMPOAMOR-SANCHEZ:  This is a continuation, Your

25    Honor, of the one we had.

```
 1                    THE COURT:  This is the one from way back when.

 2                    MR. CAMPOAMOR-SANCHEZ:  Right.  It has an additional

 3       thing at the top.

 4                    THE COURT:  It covers everything, so maybe that's the

 5       one that accomplishes all the others in one fell swoop and we

 6       don't need all the others.  But I don't think we need all of

 7       them, so --

 8                    MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

 9                    THE COURT:  So pick one and that's it.

10                    All right.  I've ruled on the procurement issues.

11                    Are we down to the photographs at this point?

12                    MR. CAMPOAMOR-SANCHEZ:  Apparently so, Your Honor.

13                    THE COURT:  All right.  So, I understand there's

14       going to be a lot of names thrown around in this case, and it

15       helps to have jurors understand who's being talked about at any

16       particular time.  The foundation objection, is there any

17       suggestion on the part of the defense that any of these

18       pictures are not of the people?

19                    MR. MURPHY:  I don't think so.

20                    THE COURT:  So when's the problem?

21                    MR. MURPHY:  What's the point, I guess, is my issue.

22       It's not a -- this is not a bank robbery and an identification

23       case.  I mean, why do we need pictures of all these various

24       people?

25                    THE COURT:  Well, I'm not sure why we need a map of
```

1    the Ukraine.  But go ahead.  Why do we need the pictures of all

2    the people?  What are you planning to do with them?

3              MR. CAMPOAMOR-SANCHEZ:  So, Your Honor.  I think it's

4    helpful to the jurors to, later on, you know, when they're

5    thinking, okay, who was this person that was testifying about,

6    have a picture of that person.  There will be some people, of

7    course, that will not be witnesses but will be talked about.

8    And they can -- the jurors can now have a picture of who that

9    person is that's being talked about.  So that's it.

10             It's not -- I don't know why they think it's not

11   relevant or it's objectionable simply to have the pictures of

12   the people that are either testifying or being talked about.

13   Similarly, as to the maps of Ukraine, some jurors may not know

14   where Ukraine is.  It's --

15             THE COURT:  Most jurors don't know where Ukraine is.

16             MR. CAMPOAMOR-SANCHEZ:  So it's to give an

17   orientation to the jurors where that is, put something in their

18   minds so they have a frame of reference.

19             THE COURT:  All right.  Mr. Taylor?

20             MR. TAYLOR:  The definition of relevance is something

21   that makes a fact at issue in the case more or less probable or

22   true.  A photograph doesn't do that, doesn't even come close.

23   It's just a graphic, it's an illustration.

24             THE COURT:  That's what it is.  I think these are

25   basically almost like demonstratives, like they're going to be

```
1    talking about people and they're going to hold it up.  I don't
2    think it's objectionable.  I don't think we want to spend a lot
3    of time on it.
4            Are you going to do one of these big boards, where
5    they're constantly pointing to it, like you would in a drug
6    conspiracy?  Because I don't like the implication of that.
7            MR. CAMPOAMOR-SANCHEZ:  Right.  No, I'm not
8    anticipating a board --
9            MR. TAYLOR:  That's what we're worried about, they're
10   going to put up a bunch of photographs of people who, you know,
11   for better or worse, have negative connotations.  You don't
12   need the photos --
13           THE COURT:  Most of them don't.
14           MR. TAYLOR:  There will be people who testify in this
15   case and the jury will be able to see who they are.  But we
16   don't need photographs.
17           MR. ABELSON:  By the way, Your Honor, I don't think
18   we objected to the maps.
19           THE COURT:  I know you didn't.  I'm just saying they
20   seem to sort of serve the same purpose.
21           MR. CAMPOAMOR-SANCHEZ:  We're just trying to give the
22   jury a frame of reference.  And I, in my experience, trying a
23   number of cases, I find it useful to have that.
24           THE COURT:  I'm going to let you do it.  They're
25   not -- they're just demonstrative aids.  They're not even
```

 1    coming in evidence, I don't think.  Somebody is talking about

 2    so and so.  Is this a picture of so and so?  That's it.  Just

 3    so they don't confuse them with somebody else later.  There's

 4    multiple Alexes.  It gets confusing.  I don't think it conveys

 5    anything negative about any of them.  We're not going to do a

 6    big chart with circles and these are these people and these are

 7    those people, you know, this is the conspiracy.  So if it's

 8    just going to be what you're saying, that during their

 9    testimony they can show them, then that's fine.  Yes.

10              MR. TAYLOR:  This sounds like opening statement, is

11    that what we're talking about?  These are going to be used in

12    opening?

13              MR. CAMPOAMOR-SANCHEZ:  We would like to be able to

14    use them in opening or closing.  And, for example, if we have a

15    slide that says, you know, remind the jury, this is Alex

16    Haskell, and this is what Alex Haskell said during the trial.

17    And that's what we're trying to use these for.

18              MR. TAYLOR:  I'm always -- sorry.

19              MR. CAMPOAMOR-SANCHEZ:  So to give --

20              THE COURT:  And your problem with their clicking on a

21    picture while they're talking is?

22              MR. TAYLOR:  No, but I don't believe these are

23    exhibits to be offered in this trial.  They're demonstratives

24    to be used in opening statement, so that we're clear about

25    that.

1        THE COURT:  You can use a demonstrative during a

2    trial, too.  I said they're not exhibits.

3        MR. TAYLOR:  Okay.  Of course.  But they're not

4    evidence.

5        THE COURT:  Right.

6        MR. TAYLOR:  They're not going to the jury.

7        THE COURT:  Okay.  They're demonstrative aids.

8        MR. CAMPOAMOR-SANCHEZ:  Right.  So none of the

9    pictures are in evidence, is what the Court says.

10        THE COURT:  Correct.  They're not in evidence.

11        MR. CAMPOAMOR-SANCHEZ:  Then the question I have is,

12    do they have any objection or the Court have any objection to

13    me using them in a slide in either opening or closing?

14        THE COURT:  No.  And then we'll figure out what

15    happens with them after that.

16        Yes, Mr. --

17        MR. MURPHY:  Your Honor, may I be heard?  In the

18    grand jury they presented a PowerPoint to the grand jury and

19    they had a lot of these pictures, and they had Associate of

20    Mr. Craig, and people that were not associated.

21        THE COURT:  No descriptions, no words, no grand jury

22    Exhibit Number 27.  Just a picture.

23        MS. GASTON:  We put their names under the picture;

24    just their names.

25        THE COURT:  That's it.  Fine.

 1          All right.  I'm not going to put people through the

 2     debates about the defendant's exhibits at this moment.  I'm not

 3     saying ever.  But, you all deserve to have this have as much

 4     attention as everything else, and I'm not going to do it at ten

 5     of six this evening.

 6          So since we would like to chat tomorrow anyway about

 7     the government's intentions, we can try to have a very

 8     efficient hearing on the not-too-many exhibits that are

 9     objected to of the defendants.  I mean, there are some that are

10     probably going to take some discussion, like the judgment

11     against Mr. Manafort, or the van der Zwaan plea, or the audit

12     of the National Security Division's Enforcement and

13     Administration.  But, let's do it tomorrow.

14          Let me remind myself what else -- or, we could

15     possibly do it Friday, if people have a strong preference.  I

16     know you have other things to do to get ready for trial, and so

17     do I.

18          MR. MURPHY:  I think Friday is better for the

19     defense, Your Honor.

20          MR. CAMPOAMOR-SANCHEZ:  Unfortunately for us,

21     Thursday afternoon, or tomorrow afternoon, would be better.

22     But obviously, we'll do whatever the Court requires.

23          THE COURT:  Let's see.  What do you want to say?

24          MR. TAYLOR:  I just wanted to say, I actually have to

25     be in this court tomorrow afternoon at 2 o'clock for a

1    sentencing, which is going to take awhile.  So I'm unavailable

2    two to four.

3              THE COURT:  Well, that's a significant conflict that

4    we have to take into consideration.

5              All right.  Well, how about 2 o'clock on Friday then?

6    And I think that's about when I was saying that we should

7    really know what the government's plans are anyway.  So,

8    tomorrow -- and can somebody from your team make it Friday?

9              MR. CAMPOAMOR-SANCHEZ:  Yes.  Yes.  No, we --

10             THE COURT:  It's hard on everybody, but --

11             MR. CAMPOAMOR-SANCHEZ:  We'll make it on Friday, too.

12             THE COURT:  We're all trying to get a lot done in a

13   very short period of time.  So let's do that.  And tomorrow

14   we'll just all have to make it through the day without getting

15   together.  And I think we'll make it.

16             Please tell me that there's nothing further I need to

17   take up at this point.

18             MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

19             MR. TAYLOR:  Did I hear you correctly, that you're

20   not going to have a call tomorrow?

21             THE COURT:  I don't think so, unless they have

22   something to tell us.  If you have something to tell us, please

23   notify Mr. Haley and we will try to get everyone together, at

24   least one member of your team together here in the courtroom.

25             But, Mr. Haley knows how to reach all of you on short

1     notice.  So if you have anything definitive one way or the

2     other, don't wait until Friday to tell us.

3               MR. CAMPOAMOR-SANCHEZ:  We will not.

4               THE COURT:  Okay.  All right.  Thank you.

5                         *   *   *

1

2                CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5          I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                    Dated this 9th day of August, 2018.

10

11

12                    /s/_____

13                    Janice E. Dickman, CRR, RMR
                       Official Court Reporter
14                    Room 6523
                       333 Constitution Avenue NW
15                    Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25