```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3   United States of America,      )  Criminal Action
                                    )  No. 19-CR-125
 4                   Plaintiff,     )
                                    )  PRETRIAL CONFERENCE
 5   vs.                            )  Day 3
                                    )
 6   Gregory B. Craig,              )  Washington, DC
                                    )  August 9, 2019
 7                   Defendant.     )  Time:  2:00 p.m.
     _____
 8
                TRANSCRIPT OF PRETRIAL CONFERENCE
 9                       HELD BEFORE
           THE HONORABLE JUDGE AMY BERMAN JACKSON
10              UNITED STATES DISTRICT JUDGE
     _____
11
                     A P P E A R A N C E S
12
13   For Plaintiff:      Fernando Campoamor-Sanchez
                         Molly Gulland Gaston
14                       U.S. ATTORNEY'S OFFICE FOR THE
                            DISTRICT OF COLUMBIA
15                       555 Fourth Street, NW
                         Washington, DC 20530
16                       (202) 252-7698
                         Email: Fernando.campoamor-sanchez@usdoj.gov
17                       Email: Molly.gaston@usdoj.gov
                         Jason Bradley Adam McCullough
18                       U.S. Department of Justice
                         950 Pennsylvania Avenue, NW
19                       Washington, DC 20530
                         (202) 233-0986
20                       Email: Jason.mccullough@usdoj.gov

21   For Defendant:      William James Murphy
                         William W. Taylor, III
22                       Adam B. Abelson
                         ZUCKERMAN SPAEDER, LLP
23                       100 East Pratt Street
                         Suite 2440
24                       Baltimore, MD 21202
                         (410) 949-1146
25                       Email: Wmurphy@zuckerman.com
                         Email: Wtaylor@zuckerman.com
                         Email: Aabelson@zuckerman.com
```

```
 1      Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                            Official Court Reporter
 2                          United States Courthouse, Room 6523
                            333 Constitution Avenue, NW
 3                          Washington, DC  20001
                            202-354-3267
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1              THE COURTROOM DEPUTY:  Your Honor, this afternoon we
2     have criminal case No. 19-125, the United States of America
3     versus Gregory B. Craig.  Mr. Craig is present in the
4     courtroom.
5              Counsel, please approach the lectern and identify
6     yourself for the record.
7              MR. CAMPOAMOR-SANCHEZ:  Good afternoon, Your Honor.
8     Molly Gaston, Jason McCullough, and Fernando Campoamor for the
9     United States.
10             THE COURT:  Good afternoon.
11             Mr. Taylor is ready to talk.
12             MR. TAYLOR:  No, Your Honor.
13             THE COURT:  You're the first one up.
14             MR. TAYLOR:  I was just going to introduce
15     Mr. Murphy, Mr. Abelson, and myself and then sit down.
16             THE COURT:  All right.  Well, I guess we ought to
17     start with the issue concerning the appeal.
18             MR. CAMPOAMOR-SANCHEZ:  Would you like me to explain?
19             THE COURT:  Yes.  I am the only one in the room who
20     doesn't know what's going on.  So, feel free to enlighten me as
21     to what, if anything, has occurred with respect to the appeal.
22             MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  And we just
23     reached agreement at about 1 p.m. today, and that's why
24     we're -- had not informed the court prior to that.
25             But essentially, as the Court may imagine, nobody
```

1    wanted to try this case twice.  I'm sure the Court did not want

2    to either.  So what we're prepared to do is -- and I have some

3    authority to waive certain appellate rights of the

4    United States, while also maintaining some, with the agreement

5    of the defense.  Let me explain.

6            If there is a -- in this case, if there is an

7    acquittal, then that's it.  There will not be an appeal on

8    Count 2.  The case will be over, there will be nothing left.

9    In the event that there is a conviction or, perhaps, a

10   mistrial, then in those circumstances, the government would

11   like to still have the entirety of its 30 days to decide

12   whether an appeal on Count 2 will go forward.

13           For example, should there be a conviction, there

14   could be a potential for a cross appeal on Count 2.  But what

15   we have also told the defense is that if there is never a trial

16   again on Count 1, there will never be a trial on Count 2.

17           So one of the issues they raised was, for example, if

18   there was a reversal of the conviction, maybe there was an

19   insufficiency of the evidence and, therefore, there will never

20   be a trial on Count 1 because that's been decided by the Court

21   of Appeals, and, again, the government agrees there will not be

22   a trial on Count 2.

23           So we are doing a very limited reservation of rights,

24   to the extent there are some things that happen in the next two

25   weeks that could still make a potential appeal of Count 2

1    possible.  My understanding, the defense is in agreement with

2    that.  And assuming the Court is, we're ready for trial on

3    Monday.

4              THE COURT:  Why wouldn't the Court of Appeals

5    consider it to be moot?

6              MR. CAMPOAMOR-SANCHEZ:  Which one of the scenarios,

7    Your Honor?

8              THE COURT:  We've tried the case, you said you're not

9    going to retry him.

10             MR. CAMPOAMOR-SANCHEZ:  Right.  We're not going to --

11             THE COURT:  In the event he's convicted and he

12   appeals.

13             MR. CAMPOAMOR-SANCHEZ:  Right.

14             THE COURT:  It would only reach Count 2 if they

15   overturn the conviction on Count 1.  If they uphold the

16   conviction on Count 1, then they would not need to reach the

17   conviction on the other.

18             MR. CAMPOAMOR-SANCHEZ:  Correct.  And so the only

19   hypothetical -- and again, there's not been a decision by the

20   SG that they would even want to seek an appeal of Count 2.  But

21   if there was -- the only situation this would come up, if there

22   was going to be a retrial of Count 1 and the government had

23   appealed on Count 2, then that would be the only possibility

24   that it would come back for a trial.  Otherwise, if Count 1

25   resolves everything, there will never be a trial on Count 2.

1          THE COURT:  All right.  Does defendant want to say

2     anything, just to make sure that it's all been explained to me?

3          MR. TAYLOR:  Uncharacteristically, not very much,

4     Your Honor.  It seems to me, in light of those representations,

5     we will not move for a stay.

6          THE COURT:  You will not move for a stay?

7          MR. TAYLOR:  Yeah.

8          THE COURT:  Okay.  Were you -- I thought they were

9     going to be the ones moving for a stay.  Now I'm completely

10    confused.

11         MR. CAMPOAMOR-SANCHEZ:  I think he means to postpone

12    the trial.

13         MR. TAYLOR:  To postpone the trial.

14         THE COURT:  Right.  But I thought the party that

15    would have been seeking to postpone the trial would be the

16    government, because they wanted more time to consider the

17    appeal.  I thought you didn't want to postpone the trial under

18    any circumstances.

19         MR. TAYLOR:  That's right.  If they had said today

20    they are going to appeal, then -- and they didn't want a stay,

21    then we would be in a funny position.  But, his representations

22    are satisfactory to us.

23         THE COURT:  All right.  Well, all of you understand

24    what rights you're giving up or not giving up as the basis of

25    that ruling.  And I don't think it's up to me to tell you

1    whether you can or you can't.  And whether the Court of Appeals

2    thinks there's anything to consider by the time this reaches

3    them is not my problem either.  If both of you think all of

4    this works in terms of mootness and ripeness and all those

5    issues -- which I haven't really thought through because it's

6    not -- I think that -- is your agreement between each other

7    embodied in writing in some way?

8         MR. TAYLOR:  No.

9         MR. CAMPOAMOR-SANCHEZ:  It's not, but I can certainly

10   restate for the record, and if the Court deems it necessary, we

11   can certainly reduce it to writing.  But again, if there is an

12   acquittal, there will not be an appeal, there will not be

13   anything on Count 2.  The only thing we're reserving is a right

14   to potentially appeal -- and again, that has not been

15   authorized -- should there be a finding of guilt, presumably

16   because the defendant would appeal and we could then

17   potentially cross appeal, or in the case of a mistrial, if the

18   30 days have not run, the SG would still have the opportunity

19   to decide whether they would -- before there would be a

20   potential retrial, decide if they wanted to appeal or not.

21        THE COURT:  I guess the bigger point that I need to

22   establish on the record is notwithstanding that I have

23   dismissed Count 2, you are not asking that I delay this trial

24   to give you the opportunity to determine whether you wish to

25   appeal or not; you're prepared to go forward, even if that

1    means losing your right to proceed on Count 2?

2              MR. CAMPOAMOR-SANCHEZ:  Yes.  And in addition to

3    that, as I've indicated, we made assurances that I've been

4    authorized to give, about our not going forward with -- in this

5    situation, as I've outlined, with ever a trial on Count 2.

6              THE COURT:  And you're not going to take the

7    position, if he's convicted of Count 1, and that's upheld on

8    appeal, that somehow that suffices for a conviction on Count 2?

9    You're only going to look at Count 2 if there's a retrial on

10   Count 1?

11             MR. CAMPOAMOR-SANCHEZ:  Correct.

12             THE COURT:  All right.

13             MR. TAYLOR:  They would have to persuade the Court of

14   Appeals to reverse your order in order to do that.

15             MR. CAMPOAMOR-SANCHEZ:  Right.

16             MR. TAYLOR:  But they're preserving that right.

17             MR. CAMPOAMOR-SANCHEZ:  Again, there hadn't been a

18   decision that the government would ever decide to appeal Count

19   2.

20             THE COURT:  All right.  Okay.  The next thing I want

21   to talk about briefly, I circulated the voir dire yesterday.  I

22   included the names of the witnesses that have been provided to

23   me.  It appears to be, but I just wanted to clarify, to the

24   extent that there may be potential defense character witnesses,

25   they have been included in that list.  So the names seem, to

1    me, to be there for that reason.

2           MR. TAYLOR:  That's true.

3           THE COURT:  So there's nobody else that's left out, I

4    guess is my point.

5           MR. ABELSON:  Your Honor, I think there were a few

6    names, if I may, that we thought should be included.  I -- in

7    retrospect, we should have prepared a categorized list, as the

8    government did.  We put that in writing, the names and the

9    categories that we think should be included.  I can do it that

10   way or I could go through them orally.

11          THE COURT:  Well, you don't have to give them to me

12   orally, but you need to give them to us so we can redo what we

13   have so we'll be ready to go on Monday.

14          MR. ABELSON:  Sure.

15          THE COURT:  Do you have a copy right now?

16          MR. ABELSON:  I do.

17          THE COURT:  You can give it to Mr. Haley.

18          (Off-the-record discussion between counsel.)

19          THE COURT:  All right.  Some of these names are

20   already on the list, aren't they?

21          MR. ABELSON:  I don't have --

22          MR. MURPHY:  There were names, Your Honor -- couple

23   people were on the list twice, and then there were some people

24   that we think would be better categorized as being part of a

25   group.  So if you put them in under a group, then you can

1    strike them from the other individuals.

2              THE COURT:  They may have been there because one of

3    you characterized your list and the other didn't, and we didn't

4    know who they were.

5              MR. MURPHY:  Right.

6              THE COURT:  All right.

7              MR. MURPHY:  And I think -- do you want Lauren's

8    name twice?

9              MR. TAYLOR:  I think it should be.

10             MR. MURPHY:  And there's one person who has a maiden

11   name, so she was on there twice, in two different places.  But

12   she belongs in the Skadden group.

13             THE COURT:  Should we just say all three names; first

14   name, maiden name, last name?  Because a lot of the emails have

15   her other name.

16             MR. MURPHY:  Sure.  Or you could say --

17             THE COURT:  I'll list her once as A, B, C.  Okay.

18   Thank you.

19             The next thing that will happen, after voir dire,

20   selection of a jury, is my preliminary instructions to the

21   jury.  The one that I usually use, which is substantially

22   similar to the Redbook instruction that both of you want me to

23   use, gives you an option as to whether to lay out the elements

24   of the offense or not.  You had a description in there that

25   says he is charged with knowingly and willfully; you know,

1    tracking the statutory language.  So do you have a position on

2    whether you want me to give the elements, or not?

3              MR. MURPHY:  No, Your Honor.  I think the summary

4    description of the statute is fine.

5              THE COURT:  All right.

6              MR. CAMPOAMOR-SANCHEZ:  We agree.

7              THE COURT:  Okay.  All right.  Then that -- we'll be

8    able to edit the voir dire, we'll be able to get that to

9    everyone, and we'll be ready to begin.

10             With respect to completeness, I appreciate the fact

11   that everyone has now told me what it is that they think is

12   necessary to make the things to which they've objected on

13   completeness grounds, no longer incomplete.  But it may come as

14   no surprise to you that I haven't actually reviewed any of this

15   in the moments since they've been filed.  And one thing that

16   would be helpful to know is, do I have to or have you had the

17   opportunity to look at them and indicate if there are any that

18   you agree that what they want read and admitted instead is

19   satisfactory?

20             MR. CAMPOAMOR-SANCHEZ:  Your Honor, we also have not

21   had a chance to see what they just filed.  We're happy, for the

22   government's part, as soon as we're finished today, take a

23   look, see if there's a way to reach agreement, and we can

24   inform the Court, perhaps by email later this evening.

25             THE COURT:  That would be fine, or you can just --

1   you know, docket a notice that we agree with the suggestions

2   for completeness for exhibits dah, dah -- you know, whatever,

3   both sides, as soon as possible.

4          MR. CAMPOAMOR-SANCHEZ:  We will docket it.  And ours,

5   Your Honor, we just wanted it in writing.  But frankly, I don't

6   understand.  We thought we might not need to file one because

7   there were just two issues of completeness that we discussed

8   yesterday.

9          THE COURT:  Well, I have to say, I haven't even read

10  yours -- no.  Yes.  I have not read yours, it just came in.

11         MR. CAMPOAMOR-SANCHEZ:  It's just restating what I

12  thought the Court already knew and had the information

13  necessary, but we just wanted to put it in writing, as well.

14         There was one left.  Actually, the Court had only, I

15  thought, ruled on two.  So there's just one more.

16         THE COURT:  I'll read it and if there's nothing that

17  the defense has to respond to, then you don't need to respond.

18  But you need to respond to the defendant's, and just let me

19  know if there's any of these that are fine with you.

20         We still have the defendant's exhibits to go through.

21  I don't think there were that many objections.  There's a

22  couple issues related to the law that's going to apply to this

23  case that I just want to talk about.  I don't want to hear

24  argument about it, I'm not going to rule on it, but I think

25  there are things that have been briefed in part that I'm going

1    to need more assistance with and it goes to the heart of

2    everything we've been talking about since we got here.

3           First, the defense has requested an instruction to

4    the effect that, quote, Making a statement while omitting other

5    information is not a trick, scheme, or device if the statement

6    the defendant made is literally true, close quote.  Citing

7    United States versus -- you guessed it -- *Safavian*, at 528 F.3d

8    957, page 967.  The defendant's footnote, on page 14 of the

9    jury instructions, is footnote No. 1.  I can't tell if it's

10   purporting to quote *Safavian* or not.  There's a sentence that

11   has a quotation mark at the beginning, but there wasn't one at

12   the end.  And so, I don't know if it was meant to tell me it

13   was a quote.

14          But it says:  Citing *Safavian*, a willful omission of

15   material fact that renders a statement misleading would not

16   constitute a violation of Section 1001 as well, if the

17   statement were literally true.  I couldn't actually find that

18   sentence in the opinion.  The portion of the opinion that was

19   talking about literal truth was the part of the opinion --

20   we're still talking about a conviction under 1001(a)(1) because

21   that's what *Safavian* is about.

22          But I think you have to remember that the counts in

23   this case were broken up into separate specifications, which we

24   are not doing here.  At that point in the opinion, the Court

25   was talking about the specification in Count Two, specification

1    C, for making a false statement to the ethics officer, and

2    Count Five, the only guilty verdict there was also

3    specification C, and that was a false statement to the

4    committee.

5           So at that point in the opinion, the Court wasn't

6    talking about omissions and it wasn't talking about the

7    elements of a scheme.  The discussion was part of the same part

8    of the ruling that we discussed earlier this week, the ruling

9    on the expert.  It was about the defendant's claim that

10   Abramoff said -- that the defendant had said Abramoff wasn't

11   doing business with the agency, and there was a concern whether

12   the jury should have been able to hear from the expert what

13   doing business means.

14          After the court ruled with the portion of the ruling

15   that we've been discussing this week about whether the

16   testimony should have been admissible, the court then went on

17   to say the exclusion wasn't harmless because with respect to

18   Counts Two and Five, which charged violations of 1001(a)(1),

19   literal truth would have been a complete defense.

20          So while the court said 1001(a)(1), it was only

21   discussing the false statements specifications that were part

22   of the 1001 counts.  And it cited *United States versus Milton*,

23   8 F.3d 39, D.C. Circuit 1993, for the proposition that literal

24   truth is a defense, but that was a 1001 case for making a false

25   statement and it didn't really address schemes and omissions.

1          Now, it is also true that later in the opinion, when

2     the court was trying to figure out if the obstruction of

3     justice count had to fall for the same reason, on page 968 it

4     made a big point of differentiating the elements of obstruction

5     of justice, noting that that has an element of corrupt purpose

6     which could include being misleading in its definition.  And in

7     the course of that, it said, quote, Even a literally true

8     statement may be misleading and so, unlike 1001(a)(1), literal

9     truth may not be a complete defense to obstruction.

10          I'm still not sure whether that aside amounts to

11     binding precedent that says literal truth of an individual

12     false statement is a complete defense to a scheme charge, or

13     even that it can't be an act in furtherance of a scheme to

14     falsify, conceal or cover up because literal truth is a

15     defense.  I don't know if it is a correct statement of the law

16     that one could carefully wordsmith a string of literally true

17     statements that, in combination with omissions, tend to

18     falsify, conceal and cover up material facts because they are

19     misleading and not run afoul of 1001.

20          I don't want to hear argument about it now.  But I

21     would like more briefing by both sides on the question of how

22     the literal truth is a defense doctrine -- which clearly is a

23     doctrine in the false statement context -- applies to Count

24     One.  Does it simply apply to which statements -- which acts

25     can be deemed to be acts in furtherance thereof?  Does it

1    torpedo the whole count?  How does it work?  I'm not sure that

2    the proffered jury instruction is or isn't a statement of the

3    law with respect to scheme liability.  And so, I think it's

4    tricky and we don't have much to go on, but I don't think what

5    I have is enough.

6         So, until that issue has been decided, I think the

7    defendant's opening statement, if they're giving one, can

8    include something along the lines of the evidence will show

9    that his statements were true and they were not false.  But

10   not, the judge will instruct you at the end of this case that

11   literal truth is a defense.  Because it's not exactly clear how

12   that's going to come out, and opening statement isn't about

13   what the law is anyway.

14        Also, while I've received briefing from the defendant

15   on his proposed higher, sort of, specific intent-like standard

16   for knowing and willful in a case involving a complex

17   regulatory scheme, based on *United States versus Trie*, 21

18   F.Supp.2d 7, at page 15, out of the District Court in 1998, the

19   government hasn't briefed that and I would like to know what it

20   thinks.

21        The defendant is also welcome to submit anything else

22   he would like to submit, because that was really very brief,

23   directing me to the cases involved.  You don't have to repeat

24   any of the cases you put in footnote 3, but it would be helpful

25   to know -- to have more on the question of whether it's a

1  recognized principle in the Supreme Court or this circuit or

2  anywhere else beyond the district court case cited and that

3  court's repetition of it in other of its own opinions, whether

4  that's the principle and whether, even if it is a thoughtful

5  and salutary principle, it applies in this case.

6          So even if there's something to a higher standard in

7  a regulatory false statement case or a tax case, does this case

8  present a situation that's analogous to the confluence of the

9  federal election laws and the particular violation of a section

10  1001 that was charged in the *Trie* case.

11          So, I'm thinking about that, but I shouldn't have to

12  be the only one thinking about that.

13          Finally, I think we're still going to need more

14  focused thought on what I'm going to need to say to the jury

15  about FARA and duties to disclose, and that's all going to be

16  very important and helpful.  The government's brief on the fact

17  that the duty to disclose is sort of a mixed question that has

18  to go to the jury is helpful, and it may be more consistent

19  with the case law than the defendant's position that it's

20  purely a legal question.  But, the government also didn't

21  really want me instructing the jury on what it is that FARA

22  requires.  So I'm not sure how we square those.

23          The government says I'm supposed to instruct the jury

24  that it must find that the defendant falsified, concealed or

25  covered up a fact for which there was a legal duty to disclose.

1      If that's a mixed question of law and fact and we all agree

2      that Heather Hunt, and even an expert, can only weigh in on the

3      fact side, what, if anything, do you expect me to tell them

4      about the law part that's in the mix?

5             The defendant, for its part, says -- his part, says,

6      well, it's a question of law through and through.  So, does

7      that mean he's waiving any objection to not putting it to the

8      jury?  And does that cure the problem and the government

9      doesn't have to worry about it?  But if I don't put it to the

10     jury, what does the defendant want me to tell them about the

11     existence of a duty that I have found existed as a matter of

12     law?

13            What I seem to be thinking the way we would go, is if

14     the jury must find under either scenario that the covering up

15     of any fact was in violation of a legal duty -- we differ about

16     the rest of the sentence, but everybody has got that part of

17     the sentence -- there may be some need for an instruction where

18     I say something like, The letters and the meeting in question

19     arose in the context of FARA.  And then I would say, As a

20     matter of law, FARA says that people who do X, using the

21     statutory language in definitions for political activities and

22     public relations, have to register, with any glosses on those

23     statutory definitions that are contained in any regulations,

24     although I haven't seen any.

25            If you register, you have to fill out a form that

```
 1    includes these specific questions.  And there's going to be a

 2    form in evidence.  If the agency contacts an individual or

 3    entity for information in connection with a determination of

 4    whether they have to register, they're not legally required to

 5    answer at all; but if they answer, they have to be truthful and

 6    complete.

 7              Now, the defendant proposed an instruction that

 8    wasn't too different from the government's, but it said that

 9    the jury would have to find that he had concealed a fact that

10    he had a legal duty to disclose, imposed by statute,

11    regulation, or form.  And, I guess the problem is, that's not

12    the only source of the duty I found in this case.  I found that

13    a duty arose out of the decision to sit down with law

14    enforcement and talk about how the statute is to be applied to

15    him.

16              And it seems to me that then all the circumstances --

17    not just what the statute says and what the forms say, but also

18    what the agency asked and what the defendant chose to emphasize

19    after the agency made its decision -- all bear on the question

20    of whether any statement or omission was a knowing violation of

21    a legal duty.

22              So, with all that having been said, I think everybody

23    needs to think about what it is you want me to say about FARA.

24              The defense did give me some proposed instructions

25    about specific aspects of FARA, all of which end up with my
```

267

1    telling the jury that if X happened, he did not have to

2    register.  I'm having some trouble with the ongoing effort by

3    the defense to equate the ultimate legal obligation to

4    register, or even his belief concerning his ultimate legal

5    obligation to register, with his obligation to be truthful when

6    he spoke to the regulators.

7          Whether you have to register is a legal question,

8    it's not a facts question.  It's not a question for the jury

9    and I don't think it's an issue in the trial.  Whether he had a

10   sincere belief he didn't have to may have some bearing on

11   whether he lied knowingly, but it doesn't negate the

12   possibility.  It's somewhat tangential.  He's not charged with

13   lying when he expressed his legal determination that he didn't

14   have to register.

15         So the reasonableness of that contention, made by a

16   reasonable practitioner in the field -- we're talking about

17   lawyers -- is not an issue.

18         The case arose out of letters and a meeting advancing

19   the legal contention that there was no obligation to register

20   because of facts A, B, and C.  The issue is whether he

21   intentionally made statements of fact that he knew were false,

22   or he omitted material facts when he set forth the fact the

23   agency asked for so that it could make its determination.  His

24   obligation to be truthful in that situation does not rise and

25   fall with, and is not bounded by, the registration obligation

1    because facts A, B, and C can't be false or misleading.

2         If the defendant did, as alleged -- and the

3    government still has to prove it -- as part of a scheme to

4    avoid being found to be a foreign agent, as part of a scheme to

5    avoid disclosing what the statute would have required of a

6    foreign agent or registrant, it's not a defense to say, Oh, I

7    wasn't a registrant, so I never had any duty to disclose

8    anything and any false statement or omission can't be willful.

9    That could be true if he was charged with willfully failing to

10   register.

11        But there's a difference between the alleged purpose

12   of the scheme to avoid having to disclose what a registrant

13   would have to disclose, and the alleged false statements or

14   omissions alleged to have been made in furtherance of that

15   scheme, allegedly being untruthful or misleading as to the

16   facts necessary to the determination of whether he had to

17   register or not.  You can't just say because I didn't have to

18   register, wouldn't have had to disclose anything about the

19   Ukrainians, the money or the PR or anything, so I had no

20   obligation to be truthful or complete when I took it upon

21   myself to persuade the agency not to conclude that I had to

22   register.

23        There was an inquiry that was being made in

24   accordance with the statutory regime that I found, in response

25   to your motion to dismiss Count One, was specifically

1   sufficient and clear to provide the guideposts that were absent

2   in *Safavian*.  FARA was the statutory regime that makes the

3   facts important, but the duty to be truthful once you agree to

4   participate in the inquiry isn't coextensive with the

5   registration obligation, it doesn't have the same boundaries.

6           How a person reasonably thought it should turn out --

7   and even if he was correct as a legal matter about

8   registration -- doesn't immunize the person from misleading the

9   agency that's charged with making its own decision about

10  registration along the way.  And I'm pretty sure that there

11  were many points in oral argument where you said:  We agree,

12  you can't mislead the government when you sit down and talk

13  with them; what we're saying is that's not this case.

14          But, I think that is what this case is about.  And so

15  duty to disclose, FARA, the scheme, willfulness, it all has to

16  be laid out for the jury, and I'm not sure everybody has given

17  me everything that's going to be necessary for that.  And so,

18  I'm looking for some additional briefing on the literal truth

19  and the standard for willfulness, and then some thoughts, if

20  you have them, about what I'm supposed to say about FARA, in

21  addition to, or instead of, what you've asked me to say about

22  FARA.

23          I realize that your main goal over the weekend is

24  going to be your opening statements and your first sets of

25  directs and crosses, if they're not already written.  But it's

 1   not clear to me how long it will take to get to the end of the

 2   government's case and the jury instruction conference, and I

 3   don't want this -- I don't want to ask you to do it the night

 4   before the jury instruction conference, that's not enough time

 5   for you, and I don't want to get it then because it's not

 6   enough time for me, especially since we'll be in court all day.

 7   If we're going to go forward on Monday with jury selection,

 8   then I think what I would like is further submissions on all

 9   these subjects from you on Thursday.

10          MR. TAYLOR:  Thursday?

11          THE COURT:  Thursday.

12          MR. TAYLOR:  That's fine.

13          THE COURT:  Okay.  Thank you.  And I guess, just in

14   connection with that, I just want to make sure, the government

15   gave me a proposed instructions for Count One, it's on page 11

16   of the proposed jury instructions.  It's got the elements.  And

17   as I said, there's not a lot of daylight between your elements

18   and theirs, except the gloss they've added for willfulness --

19   or, the duty to disclose.

20          It says:  Elements of the offense charged.  And we're

21   now talking about Count One.  The defendant can be found guilty

22   of this crime only if the government has proven all of the

23   following elements beyond a reasonable doubt:  One, that on at

24   least one occasion after October 3rd, 2013; two, the defendant

25   concealed or covered up a fact for which there was a legal duty

1    to disclose imposed by statute, regulation, or government form,

2    or the defendant falsified a fact.

3            In subparagraph 2, is the facts you're talking about

4    there the facts that you're saying it was his scheme to conceal

5    in paragraph 49?  Or are you talking about the paragraph 63

6    facts?

7            MS. GASTON:  I'm sorry, Your Honor.

8            THE COURT:  This is very confusing, but I think it

9    has to do with the way they see this case, the way I see this

10   case, the way you see this case.  And it may be that nobody is

11   right or wrong here as a matter of law, but it's like we're all

12   looking at the elephant from a different angle.

13           So the way the indictment is set forth, and paragraph

14   49 is, you say -- before you get to 49, you say -- we charged

15   that he was perpetrating a scheme to conceal or falsify facts.

16   The purpose of the scheme was because he didn't want people to

17   find out who paid for the engagement, various things about the

18   engagement.  And then, basically, you argue, he wrote a lot of

19   letters, he had a meeting, and in the course of those things he

20   said X that was false and he omitted Y, and those things made

21   what he did say misleading, and they're also omissions because

22   he had a duty to say those things.

23           So, is the fact that you referred to an element of

24   the offense charged in your second paragraph and your sixth

25   paragraph, the material fact that was disclosed, you're talking

1    about the ones in paragraph 63?  Or are you talking about

2    initially he had a scheme to cover up the 49 facts, and the way

3    he went about it was by lying or omitting.  Do you understand

4    now what I'm asking you?

5          MS. GASTON:  I think so, Your Honor.  And to simply

6    add to the confusion, we also submitted a revised instruction

7    when we provided our pleading about the verdict form.

8          THE COURT:  Okay.  All right.  So this one is no

9    longer operative?

10         MS. GASTON:  Correct.

11         THE COURT:  All right.  Well, then, unless it's very

12   similar and it would be helpful for you to answer the question,

13   then maybe you don't have the answer.  Is it more clear in the

14   revised one?

15         MS. GASTON:  It might be more clear.  And let me just

16   say this, which is in the revised one we revised the elements

17   to say basically that on one -- one occasion after October 3rd,

18   the second element is that the defendant either concealed or

19   covered up a fact for which there was a legal duty to disclose,

20   or the defendant falsified a fact.  And then the third is the

21   fact was material.  And so that breaks out the false statements

22   of the scheme from the material omissions in the scheme.

23         THE COURT:  All right.  And I know that everyone

24   agrees that the jury needs to be instructed they must be

25   unanimous about some act of falsification that he did, but no

```
1    one wants special interrogatories to find -- to establish that.

2    No one feels that's necessary.

3              MS. GASTON:  Correct, as long as they are unanimous.

4              THE COURT:  Well, and we assume they're unanimous

5    because we told them they had to be.

6              MS. GASTON:  Correct.  Exactly.

7              THE COURT:  But if they say they're unanimous and we

8    don't know whether it was based on something they deemed to be

9    an affirmative false statement or something that they deemed to

10   be an omission of something that they had a duty to disclose,

11   how would anyone get at those issues on appeal, if one wanted

12   to?  I mean --

13             Mr. Taylor, what is the thought process --

14             MR. TAYLOR:  Your Honor, may I?

15             THE COURT:  Yes.  It would be helpful to me.

16             MR. TAYLOR:  I'm not sure I heard an answer to your

17   question.  Miss Gaston read the revised instruction, but it's

18   the same as the question that you asked her about.

19             THE COURT:  Well, I want to look at it, and I don't

20   have it in front of me.  And I can still ask her the question

21   again, if I need to.

22             MR. TAYLOR:  But I think the question was:  Is the

23   fact that the last word in the second subsection, is that a

24   material fact or -- or is it one of the -- one of the 63 --

25   paragraph 63 facts, or is it something else?  And I'd very much
```

1    like to know that.

2              THE COURT:  Well, that's fine, and you can ask her

3    anything you want.  When do you want to ask her?  That wasn't

4    quite what I asked her, but now I'm on to the question of, if

5    we don't ask the jury to specify and we don't have special

6    interrogatories because he's charged with one offense, in a

7    scheme, where you knowingly and willfully in a scheme, and you

8    tell the jury you can't find that he did that unless he did

9    something affirmative to advance the scheme, and you can't find

10   that he did that unless you're unanimous about the thing that

11   he did to advance the scheme, but we never go behind the

12   curtain to know what it is, you're satisfied that that -- with

13   that?  That's what you wanted today?

14             MR. TAYLOR:  Yes.  With one slight modification, and

15   I don't think -- I think this is just a stylistic issue.  They

16   have to be unanimous on the material fact that he concealed or

17   falsified, not just on the method.  They have to be

18   unanimous -- the crime is to falsify or conceal a material

19   fact.

20             So, in our instruction -- and I think the

21   government's too, they have to -- they will be told, if you

22   agree, that they must be unanimous under these conditions --

23   the dates and so forth -- on the material fact that was

24   concealed or falsified.  And that's the way we would like to

25   leave it.

1          THE COURT:  All right.  Now, are you thinking that

2    that means one of the ten in paragraph 64?  Or are you thinking

3    that's something that would have been in a registration

4    statement?

5          MR. TAYLOR:  I'm not thinking that's something that

6    would have been in the registration statement.  I think the

7    letter -- the two letters at issue, the June letter and the

8    October letter, contain, according to the government,

9    falsifications.  False statements.  So, we're prepared to

10   defend those on the grounds that those statements are not

11   false.  So, there will be an argument, a litigation over

12   whether the statements in those letters are false.

13          The next question is, what about the concealment,

14   which is said to be caused by a duty, which is created by duty,

15   imposed by statute, regulation or form, and as you have now

16   described that.  I don't know where we are on that.  I think

17   that means the omissions in paragraph 63.  I think the

18   government intends to say those things omitted were -- there

19   was a duty to disclose them imposed by the Court's definition

20   of the duty, and no others.  Because that's -- those are the

21   only ones the grand jury found to be material.  I think if you

22   went beyond those, you would be amending the indictment, if the

23   grand jury found those ten things to be material.  So --

24          THE COURT:  But the jury could conceivably find

25   either that a sentence in one of the letters or the absence of

1    one of those things from one of the letters essentially

2    falsified or concealed a material fact.

3              MR. TAYLOR:  But you're going to tell them --

4              THE COURT:  And they have to be consistent that it's

5    the same event --

6              MR. TAYLOR:  That's right.

7              THE COURT:  -- and the same fact.

8              MR. TAYLOR:  You're going to tell them they have to

9    be unanimous on what it is.

10             THE COURT:  Correct.  I guess what I'm saying is,

11   then let's say they say they do, we do, I do, I do, yes, and

12   you feel that the evidence doesn't support that or you want to

13   have the Court of Appeals look at my ruling that there was a

14   duty to disclose, how would the Court of Appeals know, without

15   special interrogatories, whether they said he made an

16   out-and-out false statement and so the concealment -- the duty

17   isn't an issue?

18             MR. TAYLOR:  I'm hoping never to have to answer that

19   question.  But, the reason that I think courts and parties

20   request a general verdict is because that's what's commonly

21   done and commonly understood.  We are asking for a general

22   verdict with minor modification.  You've got to tell them

23   they've got to be unanimous on this or that.

24             THE COURT:  I absolutely have to do that.  I don't

25   think anybody disputes that.

1          MR. TAYLOR:  So if, you know, we're in that position

2     and we have a sufficiency argument, that there was an

3     insufficient evidence to justify conviction as to X, then

4     we're -- we'll have to persuade Court of Appeals that we're

5     right and that that requires reversal.

6          THE COURT:  All right.  But, the idea that your

7     rights are sufficiently protected by the verdict form that

8     you're requesting, you're satisfied with that?  It's kind of

9     the same question I asked the government about if you're not

10    appealing, you're giving -- you understand that you can't argue

11    later there shouldn't have been a better verdict form?

12         MR. TAYLOR:  As of today, that's 100 percent correct.

13    I can't say that when we get to the end of this trial, some one

14    of us might not think that something, some instruction or

15    verdict form ought not to be suggested or requested to the

16    Court.

17         THE COURT:  All right.  I'm not saying you're bound

18    by it, I'm just saying if you stick by this through the jury

19    instruction conference, then I don't think that you can say I

20    should have done it differently.

21         MR. TAYLOR:  I don't think we can either.

22         THE COURT:  All right.  Okay.

23         Mr. Campoamor-Sanchez, did you need to say something?

24    You look like you were about to get up.

25         MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

```
1              THE COURT:  You just want out?  Okay.

2              The Defendant Exhibit 2, there's a hearsay objection.

3    It seemed to be a long email chain within the firm.  There were

4    some statements of the defendant.  But I'm not sure what the

5    hearsay --

6              MR. McCULLOUGH:  So there's a hearsay objection as to

7    the first and third emails on the first page of the chain,

8    where Mr. Sloan is recounting statements that had been made by

9    defendant on various phone calls.

10             THE COURT:  Mr. Sloan can't recount statements the

11   defendant made?  Are you saying these are out-of-court

12   statements?

13             MR. McCULLOUGH:  This is an out-of-court -- so,

14   taking the first, for instance:  I've been on one call with

15   Greg and shown him what Greg said, and then it lists what Greg

16   said.  So this is a statement for the truth of what --

17             THE COURT:  All right.  I'm having to shift gears

18   between who's introducing.  Now I'm with you.  Why is it that

19   the defendant can introduce his own statements?

20             MR. ABELSON:  So, first of all, Mr. Sloan will be a

21   witness, so he'll be able to testify here.  But also, the

22   statements --

23             THE COURT:  I don't think there's a problem that

24   Mr. Sloan didn't say this.

25             MR. TAYLOR:  It's a defense exhibit.
```

1          THE COURT:  It's a defense exhibit that includes

2     statements by the defendant, and defendant's statements are

3     only admitted against a party, not by the party.  He's trying

4     to put his own statements in evidence.  I believe that is the

5     objection, it's kind of a hearsay -- Sloan is saying what

6     Mr. Craig said.  Why can what Mr. Craig said come into evidence

7     when Mr. Craig is trying to introduce it?  The hearsay rules

8     are not balanced in that.

9          MR. TAYLOR:  No.  But they are when the question is

10    the defendant's state of mind.  If there's evidence of an

11    exculpatory state of mind based upon what a defendant said to

12    another party, that's admissible.

13         MR. McCULLOUGH:  Your Honor, the hearsay exception

14    for state of mind relates to whether --

15         THE COURT:  Present intention to do something or

16    another, mental or physical condition.  So --

17         MR. TAYLOR:  An exculpatory state of mind expressed

18    to a third party is admissible through the mouth of the third

19    party.

20         THE COURT:  Well, you're going to have to give me

21    some case law on that.

22         MR. TAYLOR:  All right.

23         THE COURT:  So I'll reserve on that one.  We have

24    some time.

25         MR. McCULLOUGH:  Your Honor, just because I foresee

 1    this coming up multiple times, it is the state of mind at issue

 2    in the case.  And that is *U.S. v. Day*, 591 F.2d 861, citing

 3    *U.S. v. Brown*.

 4          THE COURT:  All right.  You can also put that in

 5    writing for me, it would be great.

 6          MR. McCULLOUGH:  Will do.

 7          MR. TAYLOR:  Your Honor, the state --

 8          THE COURT:  And there were others where I saw hearsay

 9    objections that it was statements by the defendant.  If they're

10    all covered by this same legal issue, you can do a submission

11    that covers them all, and they can do a submission that covers

12    them all, and when we get to the next one, we can say that's a

13    defendant's state of mind issue and we don't need to talk about

14    it, I'll just reserve.

15          MR. TAYLOR:  Well, the defendant's state of mind is

16    very much of an issue --

17          THE COURT:  I know state of mind is an issue.

18          MR. TAYLOR:  -- under Mr. McCullough's definition.

19          THE COURT:  There's no question it's an issue.

20          Can you -- are you going to be doing these

21    objections?

22          MR. TAYLOR:  I --

23          THE COURT:  It's fine, but I can't see you because of

24    the little monitor.  So can we just turn it slightly?  Thank

25    you.

1          You can remain seated.  There we go.  Thank you.

2          MR. TAYLOR:  Mostly Mr. Abelson and Mr. Murphy.

3          THE COURT:  I heard this voice, but it doesn't sound

4   like his voice.

5          MR. TAYLOR:  I'm going to restrain myself.

6          THE COURT:  All right.  All right.  19 and 23, I

7   think we've already had some conversation about these were

8   completeness, and these were issues about which is the real one

9   and which is the right date.  And is that what's in the

10  submission that I got earlier today?

11         MR. McCULLOUGH:  Yes, Your Honor, that's been

12  addressed in the submission.

13         THE COURT:  All right.  Has the defendant already

14  told me what it needs me to know with respect to those?

15         MR. ABELSON:  Your Honor, we haven't had a chance to

16  see what they filed right before this.  I'll just add, these

17  are the engagement letter.  We don't think you need a cover

18  email to make this document complete.  One was the version that

19  was submitted to the client signed by Skadden -- by Mr. Craig

20  on behalf of Skadden.  Contemporaneously, in April 2012, that's

21  the one dated -- that is Exhibit 23.  It's the version that the

22  Ministry ended up signing.  It's the one that's dated April 5th

23  that -- over the course of the rest of 2012 and into 2013, the

24  Ministry didn't sign it.  And when Skadden got to the stage of

25  negotiating the second contract with the Ministry of Justice,

1    Skadden -- Mr. Craig said we need our April 2012 engagement

2    letter signed as well, and they did, with a version that was

3    passed around and didn't have a date.  April 5th was the date

4    that they were in Kiev at the time.

5         So that's the explanation for the date.  For what

6    it's -- if the Court considers that relevant.  But the point

7    is, for completeness purposes, this is the engagement letter;

8    it is the contract and the proposed contract governing the

9    engagement.  And whether it was attached to an email or not we

10   don't think is necessary.

11        MR. McCULLOUGH:  Your Honor, we have addressed this

12   in our submission and we took much of the Court's time

13   yesterday, so I will not waste it here.  The one thing I will

14   say is the April 2nd, 2012 exhibit, Defense Exhibit 23 --

15   sorry, April 10th, 2012, Defense Exhibit 23, was not signed

16   until May of 2012.  And we've addressed that in our

17   submissions.

18        THE COURT:  All right.  So your primary objection is

19   that there's essentially a matter being asserted by the date on

20   each letter, the truth of which you object to.

21        MR. McCULLOUGH:  Correct, Your Honor.  And it's also,

22   in the way that it appears in the defense exhibit list, it has

23   a date of April 5th and a date of April 10th, both of which are

24   misleading without the complete record of when these documents

25   were -- actually came into effect.

1          THE COURT:  And the chronology that you're seeking to

2     establish, you're going to -- it's all coming in through your

3     case anyway?

4          MR. McCULLOUGH:  Correct, Your Honor.

5          THE COURT:  So I think maybe, then, when we get to

6     the defense case, we can determine if you're going to

7     reintroduce them, and if you are, whether there needs to be

8     some cautionary instruction with respect to the question of the

9     date is in dispute and they can't just take the fact that it

10    has a date on the piece of paper as the date the document was

11    mailed, absent some testimony of that.

12          I mean, I think sometimes there are presumptions that

13    arise from these things, and what they're saying is we object.

14    Essentially, it's not so much its completeness as its

15    authenticity, that it isn't what it purports to be, or kind of

16    a hearsay objection to the date.  But --

17          MR. ABELSON:  So a few things, Your Honor, if I may.

18    First of all, they have not objected to authenticity.  The

19    document is what it is.  And it was in fact sent in April.  If

20    they -- they're welcome to submit a different version that was

21    attached to an email, but I -- if they think that makes this

22    more complete.  But I don't think this document should be

23    excluded, and I certainly don't think that any cautionary

24    instruction is necessary for this.  They're free to argue

25    whatever they want from the evidence they submit.

1          THE COURT:  Well, I'm not excluding it.  I'm -- until

2     we sort of hear how these are coming in and what we're trying

3     to do with them and who's going to move it in -- I mean, as we

4     talked before, the documents aren't going to walk themselves

5     into the jury room.  It may be fine, it may not be fine.

6          So, I think I just want to reserve on these two as

7     well.  If it turns out that we've already learned, by the time

8     you're up, that the letter dated 4-10 was transmitted in May

9     and it's in evidence already, it's in evidence already.  So you

10     may not need to move it in evidence again and we may not need

11     to have this conversation.

12          So I'm trying to rule on as many objections in

13     advance as possible, but I think I can't with respect to 19 and

14     23, and it may be obviated by then.

15          MR. ABELSON:  One request for a clarification, Your

16     Honor.  And these may be documents we would want to use during

17     cross-examination.  In other words, not necessarily waiting

18     until our case-in-chief.

19          THE COURT:  Well, at that point the witness you're

20     talking -- showing it to is going to have to have some personal

21     knowledge of what it is.

22          MR. ABELSON:  Of course.

23          THE COURT:  I don't have problems with your showing

24     things to people and seeing what they say about them.  But, I

25     think you have to refer to it as I'm showing you document 19,

1    has a date on it, as opposed to this was the document that was

2    sent on -- you know, you can't sort of put the fact in

3    evidence, since that's what's in dispute in this document.  So,

4    a witness is going to have to say that, not you.

5            MR. ABELSON:  Okay.

6            THE COURT:  So it's the document -- right now the

7    objection is that it doesn't speak for itself.

8            MR. McCULLOUGH:  And, Your Honor, the government

9    would expect that the evidence would come in to establish when

10   these documents were actually transmitted, and we would like an

11   instruction to the jury as to when these documents were

12   actually transmitted.

13           THE COURT:  Well, I'm not going to instruct the jury

14   when they're transmitted.  The witnesses -- I don't know.  The

15   witnesses will testify to that, and it will either be in

16   evidence or it won't.  But it's not up to me to tell anybody,

17   unless you both agree, in which case I can tell you about the

18   stipulated facts.  But I don't tell the jury what the facts

19   are.

20           Exhibit 34 was a hearsay exhibit with statements made

21   by the defendant.  Being moved in for his exculpatory state of

22   mind.  Is that the objection?  The objection to 34 is the fact

23   that the defendant's in the hearsay chain, is that correct?

24           MR. McCULLOUGH:  Well, the defendant is in the

25   hearsay chain, and there's also an individual who is not a

1    witness, Mr. van der Zwaan, who is making statements for the

2    truth of the matter asserted in the first email in the chain,

3    so the lowest one in the chain, which is:  We are not taking

4    part in any PR activity directly, just helping with logistics,

5    the choice of firm, and getting things up and running.

6            In addition that, there are, as you note, statements

7    of the defendant that are coming in in the email just above

8    that.

9            THE COURT:  All right.  What's your response to the

10   van der Zwaan statement?  Why isn't that something that you're

11   seeking to introduce for the truth of the matter asserted?

12           MR. ABELSON:  It's not for that purpose, Your Honor.

13   This is -- this is for Mr. Craig's state of mind.  So this is

14   Mr. van der Zwaan explaining what his role is, which is not

15   taking part in any PR activity directly, just helping with

16   logistics, the choice of firm, and getting things up and

17   running.  This is Mr. Craig's understanding of what his role

18   was, not for the truth of whether that was in fact his role.

19           THE COURT:  Mr. Craig's associate is telling him what

20   his understanding of the role is?

21           MR. ABELSON:  I'm sorry, Your Honor?

22           THE COURT:  The partner in the matter is learning his

23   role from the associate on the matter?

24           MR. ABELSON:  No, he's understand -- he is hearing

25   what Mr. van der Zwaan understands his role to be.

```
1            THE COURT:  All right.  It seems to me that --

2            MR. McCULLOUGH:  Your Honor --

3            THE COURT:  It seems to me that with respect to

4    Mr. van der Zwaan's statement, that you're seeking to put it in

5    for the fact that it was made and it was said to Mr. Craig, as

6    opposed to -- I think, the jury has to be instructed that it's

7    not coming in for any other purpose.

8            MR. ABELSON:  Your Honor, we're happy to address this

9    in our briefing, because these are also reflecting statements

10   of Mr. Craig.

11           THE COURT:  Well, the ones with respect to Mr. Craig,

12   I was going to just lump in with the other and say I'm going to

13   reserve.  If you want to talk about Mr. van der Zwaan in that

14   as well, fine.  So we're going to put this one in the pile with

15   the ones you're going to write about.

16           47 is another law firm email chain.  In that one are

17   you objecting to statements by Mr. van der Zwaan or Mr. Craig,

18   or both?

19           MR. McCULLOUGH:  The statements by Mr. van der Zwaan

20   we're objecting to because they -- not only do they -- are they

21   explaining what has actually happened, but also explaining that

22   the thing attached to that email is what it purports to be,

23   which is an English translation of a press release by the

24   Ministry of Justice.

25           MR. ABELSON:  Your Honor, this -- we're not offering
```

1       this exhibit, which is -- for the truth.  This is the Ministry

2       of Justice's press release, issued on May 24th, 2012.  Your

3       Honor will hear during trial that Skadden gave input on how its

4       engagement should be characterized by the Ministry.  The

5       Ministry completely disregarded the way that Skadden wanted to

6       make clear its -- discarded what Skadden was explaining.  It

7       wanted to be made clear about what it was doing.  And it

8       totally butchered this.  And this is -- part of the relevance

9       of this document is for Mr. Craig's state of mind and

10      understanding, as early as May 2012, that the Ministry was

11      prone to doing this, which is mischaracterizing what Skadden's

12      role was, what it was doing.

13              THE COURT:  My problem is, you're trying to put

14      Mr. van der Zwaan, it seems to me, in the witness chair, when

15      he's not going to be here.  He's offering his opinion, his

16      thoughts.  It's not because he said it's butchered that led

17      Mr. Craig to decide whatever he decided.  Mr. Craig read it and

18      decided on his own whether he was upset with the Ukraine.

19              It's just -- you're trying to get this in for the

20      fact that this isn't what it was supposed to be without

21      Mr. Craig having to say it.  Can't any of these other people

22      who are going to be testifying, testify to the firm's reaction

23      to the release by the Ministry of Justice?

24              MR. ABELSON:  A number of people on this chain we

25      expect will be witnesses.

1              MR. TAYLOR:  Including Mr. Craig.

2              MR. ABELSON:  Including Mr. Craig.  I mean,

3      Mr. Haskell, Weiss, Porter, they all received this and were

4      involved in that process.

5              THE COURT:  Receiving hearsay didn't make it

6      admissible.

7              MR. ABELSON:  No, but my -- I'm sorry, Your Honor.

8      The point is, we're not offering the -- this press release for

9      the truth.

10             THE COURT:  No, I'm talking about the, "They have

11     butchered it a little, to say the least."  He wasn't talking

12     about the translation, he was talking about the content,

13     correct?

14             MR. ABELSON:  He's referring to the fact that, in

15     context, they have -- Skadden has explained what this press

16     release should say, and they got it wrong.

17             THE COURT:  Right.  And you want to admit this

18     document for the fact that Mr. van der Zwaan observed --

19             MR. ABELSON:  A number of other witnesses, Your

20     Honor, will explain that that was their reaction to this as

21     well.  So if the concern is just that sentence, "They have

22     butchered it a little, to say the least," we can consider

23     whether to redact that statement.

24             THE COURT:  I think it should be redacted.  If it's

25     redacted, then I think it comes in.  It's just the fact that he

1     transmitted it.

2               MR. ABELSON:  Okay.

3               THE COURT:  So it will be admitted with that

4     redaction.

5               I think 51 has more issues about Mr. van der Zwaan.

6               MR. ABELSON:  Your Honor, this is an email chain

7     between Mr. van der Zwaan and Mr. Craig about the letter

8     agreement here and -- this is not being offered for the truth

9     of any of the statements herein, although it does include

10    Mr. Craig's statements, which they covered here.  It's exhibit

11    51.

12              But, the point is that this is not -- this is

13    admissible for -- even if not for the truth, then for

14    whether -- this is not -- we're not offering this for whether,

15    for example, in No. 2 in Mr. van der Zwaan's emails, whether

16    the activity did or not constitute political activities for the

17    purpose of FARA.  It's the point that the first firm -- this

18    was one of the many steps that the firm was taking to make sure

19    that the Ministry of Justice knew and understood that Skadden

20    would not take actions that would require it to register under

21    FARA.  It's not for statements offered for the truth, it's for

22    that other purpose.

23              MR. McCULLOUGH:  Your Honor, this email includes

24    statements of the defendant that are attempting to come in for

25    the truth of the matter asserted in the second email, as well

1    as Mr. van der Zwaan's statements in the top email.  It's

2    hearsay at every point in the chain.

3            THE COURT:  The bottom one is trying to use the

4    document to establish the actual content of a conversation

5    between Rick Gates and van der Zwaan.  And van der Zwaan isn't

6    here to be cross-examined about whether he said any of these

7    things or what he meant by them or what it means.

8            MR. TAYLOR:  May I, Your Honor?

9            THE COURT:  Sure.

10           MR. TAYLOR:  The interaction among these people is

11   very much a part of the proof in this case; the interactions

12   among Craig, van der Zwaan, Gates, others.  There are going to

13   be a lot of empty chairs in the courtroom.  But, this letter,

14   this email from van der Zwaan to Craig gives Craig information,

15   it gives Craig information which relates to his state of mind

16   and to his understanding of what's going on and his -- his

17   knowledge of and understanding of what's going on with regard

18   to this press release matter is quite relevant to the issues in

19   this case.

20           So no matter how Mr. Craig gets it, the fact that he

21   has the understanding is very relevant.  And when he says I'm

22   enraged by what they did, it's obviously in response to the

23   previous email.  So the two -- the context for the "I am

24   enraged," is the previous email.  You can't sort of -- I don't

25   think the law of evidence requires that you delete or redact

1    what Mr. van der Zwaan says to Mr. Craig when the response by

2    Mr. Craig directly related to what van der Zwaan says to him --

3              THE COURT:  Well, actually, it doesn't.  It relates

4    to the other email we were talking about.  And it does seem to

5    be more of a statement of emotion that falls within the

6    hearsay.  "I am enraged" --

7              MR. TAYLOR:  I'm sorry?

8              THE COURT:  "I am enraged by what they did to the

9    press release" actually seems to fall within the scope of the

10   hearsay exception of his present state of mind.  But it's not

11   responsive in the least to the email about, I sat down with

12   Rick Gates and emphasized what needs to be in the engagement

13   letter.  It's responsive to the one we were just talking about,

14   about the bad press release.

15             MR. TAYLOR:  Well, I don't know.  It seems to me very

16   difficult to rule on these things in the abstract and based

17   upon the representations of counsel of what the evidence is

18   going to be.  You know, that's --

19             THE COURT:  Well, look, I'm trying to give you

20   guideposts.  I'm reserving some things.  The middle email from

21   van der Zwaan appears to me to be hearsay.

22             MR. TAYLOR:  Of course it is.

23             THE COURT:  Okay.  And I don't think --

24             MR. TAYLOR:  But it's an exception.

25             THE COURT:  I don't think it is.  With respect to the

1    one at the bottom, he's conveying information.  I think it's

2    more the fact that it was said --

3              MR. TAYLOR:  That Mr. --

4              THE COURT:  -- the Ministry's refusing to sign our

5    letter agreement.  Craig had to do something about, he had to

6    be informed of that.  It's the fact that he's informed of that.

7              The second one, though, is kind of hearsay within

8    hearsay.  I had a conversation with Rick and this is my summary

9    of what I said.  I don't --

10             MR. TAYLOR:  Mr. Craig needs to know that.  It's sent

11   to him.  The first -- at least on mine, the bottom email is

12   van der Zwaan to Craig.

13             THE COURT:  Yes, but not everything that is said to

14   someone comes in just because it was said to them.  Especially

15   since the thing that you're -- his response doesn't have a word

16   to do with it.  You're trying to bolster the notion that

17   van der Zwaan was talking to Rick Gates about the limits on the

18   representation, or at least that they be recorded, and that

19   that's why, in May, they want to sign the letter that you want

20   to move in evidence that's dated in April.

21             MR. TAYLOR:  I just don't -- with respect -- I just

22   don't think we can draw those conclusions.  Mr. Craig is likely

23   to be the person who can explain this interaction and what it

24   means and what he understood it to mean.  You know, he says,

25   I'm enraged, what they did to the press release, it's in pidgin

```
 1   English.
 2             THE COURT:  I don't have a problem with, "I'm
 3   enraged."
 4             MR. TAYLOR:  I know, but --
 5             THE COURT:  I'm having a problem with the May 24th,
 6   2012 email from van der Zwaan to Mr. Craig, which I think is
 7   barred by the hearsay rule.  If we get there and you can
 8   persuade me otherwise, that's fine.  But Mr. van der Zwaan is
 9   not going to be there, that's a problem for the government and
10   a problem for you on some issues.
11             MR. TAYLOR:  Yes, it is.  But I think -- all I'm
12   saying, Your Honor, is what this means to Mr. Craig is probably
13   impossible for you to make a decision on until we're at that
14   point in the trial.  He probably has testimony that's relevant
15   to admissibility.
16             THE COURT:  Well, I'll reserve on it then, or I can
17   review --
18             MR. TAYLOR:  That's all we can ask.
19             THE COURT:  -- it again.
20             I want you to understand that you can't, until we've
21   talked about it, show him Document 51 with the middle email in
22   there.  That's the one that I have the problem with.
23             Mr. Craig can say I told Mr. van der Zwaan that it is
24   very important that we get an engagement letter because I
25   wanted it written down that we weren't doing this, that, and
```

1    the other, and I stressed that.  That's different than

2    van der Zwaan telling Mr. Craig I -- I told them to --

3              MR. TAYLOR:  I think if Mr. van der Zwaan said,

4    Mr. Craig, we don't have an engagement letter, and Mr. Craig

5    responds, We need an engagement letter, then the van der Zwaan

6    to Craig communication would have to be admissible to establish

7    Craig's state of mind about the state of the engagement letter.

8    So the fact --

9              THE COURT:  Whether it's signed or whether it's not

10    is different than why it says what it says.  Why it says what

11    it says, it seems to me, if Mr. Craig wants to talk about that,

12    he'll talk about that.  If at that point this is no longer an

13    out-of-court statement sought to be admitted for the truth of

14    the facts asserted, then we'll talk about it.  But you can't

15    use the center piece of it unless and until we've talked about

16    it.

17              MR. TAYLOR:  Understood.

18              THE COURT:  All right.  But I am fine with

19    Mr. Craig's email on the 24th, that he's enraged.  And I think

20    we had previously agreed that you could admit the letter that

21    transmitted the press release, taking out van der Zwaan's

22    emotions.  But now he gets that and now he says, "I'm enraged,"

23    so that's -- that's in.

24              What's --

25              MR. TAYLOR:  We understand.

1              THE COURT:  60.

2              MR. McCULLOUGH:  Your Honor, we do not see the

3      relevance of this document.  There's no probative value to what

4      a third-party -- what a third-party's press release had to say

5      about the Skadden Report or anything to that effect.  And so

6      there's a statement in the second paragraph from the bottom

7      about the Centre welcomes the recent announcement from

8      Yanukovych's admission that it's retained former White House

9      counsel Greg Craig.  We just do not see the relevance of this

10     and there's no foundation for introduction of this email -- or,

11     rather, this press release.

12             THE COURT:  Well is Lucy-Claire Saunders going to be

13     a witness?

14             MR. McCULLOUGH:  She will be.

15             THE COURT:  All right.  So is this marked because

16     this is something that you want to show her in her cross-

17     examination?

18             MR. MURPHY:  Absolutely, Your Honor.

19             THE COURT:  Because she prepared it?

20             MR. MURPHY:  Yes, she did.  It's her name on the

21     bottom of it.

22             THE COURT:  Well, just asking.

23             MR. MURPHY:  Dated in June.  And it shows that there

24     was a more elaborate media release plan underway as early as

25     June.  And Miss Saunders, I believe, will testify that although

1    she heard about the report, she never had any contact with

2    Mr. Craig and, to her knowledge, the people that she was

3    working with didn't either.  We think it's very relevant.

4              THE COURT:  So there's this parallel -- they would

5    say parallel, you're saying solo, PR effort going on?  All

6    right.

7              MR. MURPHY:  Separate and apart.

8              THE COURT:  You can show this to Miss Saunders if

9    she's on the stand.  I don't have a problem with that.

10             MR. MURPHY:  Okay.

11             THE COURT:  61.

12             MR. McCULLOUGH:  Your Honor, this is a hearsay

13   objection as to what Jon Arrons, who is not a witness in this

14   trial, is making -- he's making statements about what Gates has

15   done, and they are attempting to use that -- I believe that

16   they're attempting to use that for the truth of the matter

17   asserted, that Gates has not responded to messages, he's not

18   allowed them access to any other channel of communication with

19   the client, and that he's otherwise being an obstructionist.

20   That is -- that's from Jon Aarons, who is not a witness.

21             MR. MURPHY:  Your Honor, this is really not -- it's a

22   document we intend to use in cross-examination of Mr. Gates and

23   also Mr. Hawker.  Mr. Hawker and Mr. Aarons were colleagues,

24   they shared the duties with respect to the preparation of plans

25   for the release of the Skadden Report.  What the email reveals

1      is that there was a whole nother team, yet another team at

2      Burston-Marsteller, led by a Mr. Mack.  Again, these are people

3      that -- folks that were doing the media plan, had relations

4      with Mr. Craig and the Skadden team, had no knowledge of

5      Burson-Marsteller.  And I want to establish that through

6      Mr. Gates and/or Mr. Hawker.  This media -- the media plan was

7      a plan that Skadden was really not a part of.

8                  THE COURT:  Well, this email has tons of other

9      factual representations in it.  So, if Rick Gates is on the

10     stand, or Jonathan Hawker is on the stand and you ask them, on

11     cross-examination, isn't it true that Burson-Marsteller was

12     working on this and they weren't at any meetings with Skadden.

13     As far as you know, you don't need this document, is that

14     correct?

15                 MR. MURPHY:  If he acknowledges it, I won't need the

16     document.  But I don't know what he's going to say.

17                 THE COURT:  All right.  Well, even if it does get

18     used for cross-examination, it seems to me it could be

19     truncated to include the parts that are relevant and not all

20     the stuff about what Gates is doing and what he isn't doing.

21                 So let's wait and see what happens when you use it.

22     But I don't think it's going to come in, because I don't think

23     it's going to be necessary.  And if it does, then I think it

24     needs to be redacted.

25                 62.  There's other emails that refer to B-M, so I

1    don't think -- and I don't know whose -- I think they're both

2    people's documents.  So I don't know that anybody is going to

3    deny that there wasn't another firm.

4              MR. CAMPOAMOR-SANCHEZ:  We expect there will be

5    evidence.  We expect there will be evidence introduced in the

6    government's case-in-chief that there were all sorts of firms

7    involved in the media plan.

8              MR. MURPHY:  And our point, in response, will be that

9    Mr. Craig and Skadden had no contact with most of them.

10             MR. McCULLOUGH:  I think, Your Honor, they attempt to

11   use the document to prove that other -- the fact that other

12   entities were involved, that's just hearsay.  I mean, that's

13   the -- that's the issue.

14             THE COURT:  Well, what he's saying is, if he denies

15   that other entities were involved, they're going to show him

16   the document, weren't you emailing about Burson-Marsteller;

17   yes, I was.

18             62 is, to me, an attempt to take what van der Zwaan

19   is saying, to try to pretend that you don't want it in for the

20   truth of the matter asserted, to get to what the Skadden

21   intention was.  And I don't think -- I think what

22   Mr. van der Zwaan says is hearsay.  And what Mr. Craig said,

23   Mr. Craig can say.  But we can't -- I don't see how we get in

24   everything -- his emails on these subjects under a

25   state-of-mind exception.

1          MR. MURPHY:  Your Honor, Mr. Craig is directing, at

2     this point, Mr. van der Zwaan to adhere to the requirement that

3     had been earlier stated by the firm, that we're going to stay

4     out of the public relations; we insist that FTI, Hawker's firm,

5     deal with Manafort's people.  We have nothing to do with it.

6     Mr. Craig is going to testify that that's what he told

7     Mr. van der Zwaan, that's what he told others, and that's what

8     he did.

9          THE COURT:  Well, I think that's the way it comes in

10    evidence.  If he's on the stand and he's being cross-examined

11    about it, then that may be a different issue.  I didn't know

12    that we've committed to whether he's testifying or not.

13          But, his hearsay can't come in unless he's here,

14    unless he's on the stand and they can ask him about it.

15          MR. MURPHY:  Okay.  Then we'll reserve on that one.

16          THE COURT:  All right.  What number am I up to?

17          MR. TAYLOR:  72.

18          THE COURT:  73 is the next hearsay objection.

19          MR. McCULLOUGH:  Once you have it, Your Honor, the

20    article itself is, of course, hearsay, and then the --

21          THE COURT:  The article is for the fact that it was

22    said.  I think anytime somebody is putting in a newspaper

23    article, it always only comes in for the fact that this article

24    happened and then something else happened.  So, go on.

25          MR. McCULLOUGH:  And we then don't know whether any

1    of these people would be witnesses, Antelo, Griffis, or

2    Kauders, or Zoeller, who was copied, who are making statements

3    about what Greg Craig's report would be about and whether they

4    would be able to bury it.  Their state of mind is not at issue.

5              THE COURT:  What is this coming in for?

6              MR. MURPHY:  Your Honor, I expect Mr. Griffis to

7    testify in this trial as a defense witness, and I think it will

8    come in through him.

9              MR. McCULLOUGH:  Your Honor, the effect on Griffis is

10   not relevant.  And Christina Antelo's statements as to status

11   of the Skadden Report and what it might say are not relevant.

12             THE COURT:  I don't quite understand how this comes

13   in through him.

14             MR. MURPHY:  He's the one that saw the article,

15   right, about the fact that Skadden had been hired.

16             THE COURT:  Right.  And he sent it to somebody and

17   she reacts.

18             MR. MURPHY:  And they're all people that work

19   together at the Podesta Group.  And the reaction is, basically,

20   if Greg Craig does a report that concludes that there were

21   violations of Yulia Tymoshenko's rights in connection with this

22   trial, our inclination would be that that report hurts the

23   Ukraine Ministry of Justice and ECFMU's media plans, and how

24   are we ever going to stop it, if it gets out?

25             And early on they recognized that Greg Craig might

1   take a position, publicly, that was in conflict with the

2   Ukraine's media plan.  And this will get repeated throughout

3   the period that leads up to the release of the report.

4   Mr. Griffis I expect to testify about a number of documents

5   that he wrote to the Podesta Group and to Gates, describing, in

6   effect, what a disaster Mr. Craig's report was for the media

7   plan that Manafort, Gates, and FTI at the time.

8        MR. McCULLOUGH:  And, Your Honor, as Mr. Murphy is

9   just suggesting, he wants to bring in Miss Antelo's statements

10  to prove that they believe that this was a disaster, a

11  potential disaster for Ukraine.  If Mr. Griffis wants to take

12  the stand and address that issue, that seems appropriate.  But

13  to bring in Miss Antelo's statements for that truth, that is

14  hearsay.

15       THE COURT:  I don't see how the document comes in.

16  He can talk about what he did and what he was concerned about.

17       And, again, the report, from all the emails that both

18  sides have presented, depended on who is looking at it and from

19  what angle, whether it was seen as good for Ukraine, or bad for

20  the Ukraine.  Both sides seem to have given me media that went

21  both ways; that in some ways it satisfied Western standards, in

22  some ways it fell short; in some ways the evidence was

23  sufficient and in some ways it wasn't.  And so, to try to say,

24  well, here's one article and so that's how the world saw it --

25       MR. MURPHY:  No, that's not the issue, Your Honor.

1           THE COURT:  What I don't want to do is turn this

2     trial into the merits of was it a good report or not a good

3     report?  Was it compromised or not compromised?  Was it

4     hard-hitting, was it not hard-hitting?  Was it a whitewash?  It

5     was not a whitewash, it actually hurt them.  All that has

6     nothing to do with when they sat across the table and they

7     asked questions that really -- they didn't say, did you pull

8     your punches?  None of that was even part of the conversation.

9           MR. MURPHY:  No, Your Honor.  What this is about is

10    whether or not Mr. Craig and Skadden was part of the media

11    plan.  That's what it's about.  And what we intend to show

12    through this evidence is that there was indeed a media plan and

13    Mr. Craig was an impediment to it.  He obstructed it.  He

14    detoured it.  He took it on his own, and for his own reasons he

15    made statements to the press that were completely in conflict

16    with the media plan that FTI, Manafort, Gates and Ukraine had

17    concocted.

18          He was never a part of the media plan.  And that was

19    his state of mind at the time that he talked to David Sanger

20    and that was his state of mind when he spoke to the FARA unit.

21          THE COURT:  Well, I don't have a problem with your

22    presenting facts to that effect.  I think Kevin Griffis can

23    talk about that.  That's different from a statement written by

24    some other person that isn't going to be here.

25          MR. MURPHY:  This just gives Mr. Griffis a point of

1   reference in terms of when it began.

2          THE COURT:  You can have the article.  You can say,

3   Mr. Griffis, was there an article that prompted you to -- I

4   don't have a problem with the email from him --

5          MR. MURPHY:  Okay.

6          THE COURT:  -- what was concerning you.  But it's her

7   response that has to be taken out of it.

8          MR. MURPHY:  That's fine, Your Honor, we'll redact

9   it.

10         THE COURT:  74.  Okay.  This is the interview with

11  Tymoshenko.

12         MR. ABELSON:  That's right.  This is Mr. Haskell's

13  description of their interview of Miss Tymoshenko in the

14  hospital room in the prison.  Mr. Haskell will be a witness.

15  Their objection is to relevance.  The -- as much as we agree

16  that this shouldn't be a trial about the report, we do expect

17  that they are going to be presenting evidence and argument and

18  suggestion that the report was not balanced, was not

19  independent.

20         And so one way in which to counter that, to the

21  extent that that is evidence that is presented, we want to be

22  able to explain the lengths to which Skadden went to make sure

23  that they did hear both sides of the story, even going as far

24  as interviewing her at her bedside in the prison.  So that

25  is -- this is certainly a relevant document.

1          THE COURT:  Well, I don't want the government either,

2     because it's hard enough to address the dispute we have before

3     us, but to get into the dispute between Yanukovych and

4     Tymoshenko and whose story was true and whose was false, and

5     who was right and who was wrong, and who was helped by the

6     report and who was not helped by the report, and did he say

7     everything he should have said in the report or did he -- we

8     can't try that here.  That's just not what you've indicted him

9     for, and I don't think it's a defense to what you've indicted

10    him for.

11          And so, I think, you know, with respect to the whole

12    issue about interviewing her and Project Two, my only point

13    about that is if you were saying part of why he didn't want to

14    register is he didn't want them to know that there was this

15    other representation, I want that as vanilla as possible and

16    anything that suggests there's some problems within the firm,

17    how it's handled ethically, structured, we're not even going

18    close to that.

19          And so I don't think we're going to get close to it

20    because I don't want them to, what you're saying the purported

21    relevance of this is.  But, if anything, Haskell will be on the

22    stand -- he'll either be their witness or your witness -- to

23    talk about factually what happened.

24          But I think this is really irrelevant.

25          MR. ABELSON:  Your Honor, if the government is

1    willing to commit to not making any insinuation, suggestion

2    that the report was anything other than balanced, independent,

3    etcetera, then that's fine.

4         THE COURT:  I don't think they're going to say

5    anything other than the report was prepared.  Am I correct?

6         MR. McCULLOUGH:  Your Honor, we are going to describe

7    the preparation of the report.  Our focus is on Mr. Craig's

8    media contacts and why he was engaged in those contacts.  Now

9    we have to tell the entire story because there is PR that is

10   kind of woven throughout the entire chronology and we need to

11   tell that entire story.  But we are not litigating the report

12   and the independence of the report.

13        THE COURT:  All right.  So, if you think they opened

14   the door to the admissibility of this, then you'll let me know.

15   But right now I think it's irrelevant.

16        All right.  Similarly, this seems to be all internal,

17   who struck Jon within the firm, are you spending too much money

18   on this thing.  Why is this marked as an exhibit?

19        MR. ABELSON:  Your Honor, the -- the government

20   has -- this relates to the question of the shortfall.  The

21   government has -- we believe will be suggesting that there was

22   nowhere near a shortfall in August.  This is even in July,

23   early July, people within the firm raising concerns about

24   expenses.  And --

25        THE COURT:  Well, but you could be concerned about

1    the cost of translations, whether there's a shortfall or not.

2    I don't think this is relevant.

3             MR. ABELSON:  The point -- the timing, Your Honor.

4    The -- you're right.  Standing alone, just somebody at an

5    unidentified time complaining about the cost of translations

6    may not be relevant.  But the point is this --

7             THE COURT:  Again, Mr. Haskell is going to testify.

8    So if he's going to say that we were short on cash and had to

9    start shutting everything down, including translations because

10   they were just too expensive, in July, then he can say that.

11   And the bottom part of the email may be relevant to verify that

12   he actually said that in July.  But van der Zwaan's response is

13   not.  I'm going to stay there for now.

14             All right.  84.

15             MR. ABELSON:  Your Honor, I think this probably falls

16   in the same category as before, Mr. Craig's state of mind.

17   There is an email from Mr. Craig about his, again, his concerns

18   about the Ministry and what it would do about the report.  The

19   context here, Your Honor, is that this is right around when

20   Skadden was prepared to deliver the first draft of the report

21   to the Ministry.  The English version was prepared and Skadden

22   insisted, and Mr. Manafort agreed that this made sense, to wait

23   to deliver the English version until there was a translated

24   version that was approved by Skadden.

25             THE COURT:  I'm not sure that I find all this

1    terribly relevant.  But I'm not sure -- it's not really so much

2    the truth of the matter asserted.  I don't see facts being

3    asserted.  It's the fact that it was said; we want it in

4    English, we don't want Ukrainian, we want to make sure our

5    report is our report.  So what?

6          MR. McCULLOUGH:  Your Honor, I think it's there to

7    use so that they can demonstrate that Mr. Craig was concerned

8    about translations and how this was going to be used by

9    Ukraine.

10         THE COURT:  Well, I'm going to let them use 84.  I

11   think, if you find something in there that supports your

12   theory, then you'll use it for that, too.  But I think they can

13   move it in.

14         MR. CAMPOAMOR-SANCHEZ:  Your Honor, is that absent

15   Mr. Craig testifying?

16         THE COURT:  Well, we're not having Manafort, we're

17   not having van der Zwaan.  I don't even have a problem if it

18   comes in through Sloan or Craig.  I just don't think it's

19   hearsay.  I think it's just the fact that he's saying we should

20   have an accurate translation, and I'm not troubled by that.  So

21   to the extent it has probative value, it's not outweighed by

22   any harm, and I don't think there's any hearsay in it, which

23   takes it out of the profer of being a statement by the

24   defendant.

25         MR. CAMPOAMOR-SANCHEZ:  But he's saying what he's

1    concerned about.  Isn't that --

2              THE COURT:  I'm admitting it.  I just -- I think

3    it's -- they're putting it in for the fact that it was said.

4    To the extent it's also his intention, I think it's admissible.

5    And I don't think it's particularly prejudicial.

6              One of the reasons we're doing this now is because if

7    we're doing this during the trial, anyone's suggestion that

8    this is going to be a two-week trial, it's going to fall by the

9    wayside.  So I'm trying to have everybody know what's going to

10   happen when we get there.

11             99.   There's some hearsay in here, too, I guess, or

12   there was a hearsay objection.

13             MR. MURPHY:  Your Honor --

14             THE COURT:  Hold on.

15             Tell me why it's okay.  Maybe I don't think it's not.

16             MR. MURPHY:  It starts with an email from Rick Gates.

17             THE COURT:  I see it.

18             MR. MURPHY:  And we'll be cross-examining him.  He is

19   asking -- actually, what this will show is that he had a habit

20   of sending emails to himself and then he would blast them out

21   to others.  This one is the one that went to the Podesta Group.

22   He's looking for names of reporters that they can reach out to

23   to plug in the Skadden team.

24             One of the people that doesn't get this is Mr. Craig,

25   or anyone else at Skadden.  That's point one.  And then

1    Mr. Griffis, on August the 24th, is communicating with his

2    boss, Mr. Podesta, and providing -- he said we've already

3    provided a list of these reporters to Mr. Gates.

4            Again, it's relevant to the way in which this report

5    was actually put out there by the people that were doing the

6    media.  Skadden was not involved in that effort.

7            THE COURT:  Who's Gregory?

8            MR. MURPHY:  It's a person that works at the Podesta

9    Group.

10           THE DEFENDANT:  Not me.

11           MR. MURPHY:  Not Gregory Craig.

12           MR. McCULLOUGH:  Your Honor, it's Mr. Griffis' and

13   Mr. Gates' statements as to what they were doing and when they

14   did it.  I mean, if they want to address these with Mr. Gates

15   and Mr. Griffis when they're on the stand, that seems

16   appropriate.  This, otherwise, seems like inadmissible hearsay

17   as to what they said.  If they said something that's

18   inconsistent with this, it seems like an appropriate document

19   to cross-examine them on.

20           THE COURT:  If Gates is going to be here and Griffis

21   is going to be here, then I don't really have a problem with

22   it.

23           MR. MURPHY:  Thank you.

24           MR. ABELSON:  Your Honor, some context --

25           THE COURT:  I keep asking to let me look at them

1    before you talk about them.  I looked at them three days ago.

2    Amazingly, I don't have them on the front of my brain.

3              All right.  So, this is, you know, a significant

4    amount of strategic conversation between Mr. Craig and

5    Mr. van der Zwaan.  So how does it come in evidence?

6              MR. ABELSON:  This is Mr. van der Zwaan lying to

7    Mr. Craig.  He says, among other things, I would never give

8    Jonathan a copy of the report without your prior approval.

9    We're not offering this for the truth.  The fact of the matter

10   is that Mr. van der Zwaan took many activities against the

11   instruction of Mr. Craig, contrary to his instructions, that

12   is, on his own, and then, at least in this example, lied to

13   Mr. Craig about it.  That's why this is not being offered for

14   the truth.  And in any event Mr. Craig -- ends with an email

15   from Mr. Craig.  There are emails from Mr. Craig in it, so he

16   can testify about it.

17             MR. McCULLOUGH:  Your Honor --

18             THE COURT:  What's the part that gives you --

19             MR. McCULLOUGH:  So, Your Honor, the top two emails

20   are what Mr. Abelson is discussing in the exchange between

21   Mr. van der Zwaan and Mr. Craig as to whether Mr. van der Zwaan

22   provided Mr. Hawker with a copy of the report.  Now -- I mean,

23   that is, I think, a disputed fact.  But it's an irrelevant fact

24   as to whether Mr. van der Zwaan gave Mr. Hawker a copy of the

25   report.  They want to use -- improperly use -- character

1    evidence of an incident that they allege happened with

2    Mr. Hawker -- rather, Mr. van der Zwaan, where

3    Mr. van der Zwaan allegedly gave a copy of the report to

4    Mr. Hawker, and argue that that is some sort of propensity

5    evidence that Mr. van der Zwaan later misled Mr. Craig during

6    the media rollout.  It's just improper character evidence, if

7    this is -- I mean, that is the central purpose for this email.

8            MR. ABELSON:  Your Honor, the government has made

9    admissions, these are some of the later exhibits, about exactly

10   these facts.  The fact that Mr. van der Zwaan took these

11   actions against the instructions, without authority, and then

12   lied to Mr. Craig about it.  So they're bound by those, number

13   one.

14           THE COURT:  Well, it was a relatively limited set of

15   actions.  I believe that they were part of his proffer at the

16   time of his plea.

17           MR. ABELSON:  Yes.

18           THE COURT:  And I think where they're concerned, is

19   that you're trying to say that then everything he did was

20   outside of the scope of Mr. Craig's direction.

21           MR. ABELSON:  No, Your Honor, we're not saying that.

22   The point is, this is one of those statements and this is -- I

23   mean, and it's not just the top two emails.  I mean, this is,

24   Mr. van der Zwaan says, Does anyone have any objections to

25   showing FTI a copy of the report now?  That's at the top of the

1    second page.

2            Mr. Craig, in the email, in the middle of the first

3    page says, No --

4            THE COURT:  I'm talking directly to Jonathan Hawker

5    about giving them early access.  I share your view that they

6    should have it, but don't jump the gun quite yet.  So, the

7    government is now nodding its head as if that proves something

8    they want to prove.

9            MR. McCULLOUGH:  So the discussion about whether

10   Mr. van der Zwaan gave the copy of the report to Mr. Hawker is

11   not relevant because it is -- it is an impermissible use of

12   character evidence.  They're trying to use a specific bad act

13   by Mr. van der Zwaan, which has nothing to do with the actual

14   media rollout that later happens in December.  They want to use

15   a specific bad act in August of 2012 as propensity evidence to

16   demonstrate that Mr. van der Zwaan was misleading Mr. Craig

17   throughout the life span of the engagement, including through

18   the media rollout.  That's impermissible character evidence,

19   Your Honor.  They're using specific bad acts to prove

20   propensity of another actor in this case.

21           THE COURT:  Are you planning to argue that he lied

22   other times?

23           MR. ABELSON:  Maybe other --

24           THE COURT:  Is this the incident that was part of the

25   plea proffer?

 1          MR. ABELSON:  Yes.  And -- the point here is, Your

 2    Honor, Mr. Craig wanted to make sure that FTI, frankly, like

 3    the Ministry, did not have the report until it was final or

 4    near final, and that's the context here.  And in any event,

 5    Your Honor, their only objection to this was hearsay.  I hear

 6    lots of other objections being raised now that they did not

 7    raise before.  This is not hearsay for all the reasons we've

 8    said.

 9          THE COURT:  If Mr. Craig is on the stand to talk

10    about it, then we can talk about it at that time, whether you

11    need to show it to him or whether he can just tell the story.

12    But --

13          MR. ABELSON:  Okay.

14          THE COURT:  When we get later to the documents that

15    you want to move in about van der Zwaan, we have to talk about

16    what you want to do with it and how you're planning to use it.

17          MR. ABELSON:  Your Honor, it may help --

18          THE COURT:  There's a lot of statements made out of

19    court in other matters about what happened in this case and

20    what's true and what's false and that are out of bounds.  And I

21    just think we have to be very careful about saying, well, X

22    happened and that's it, whether you're going to open the door

23    to other statements, whether they're going to open -- I mean, I

24    think everybody needs to thread the needle very carefully here.

25          MR. ABELSON:  Yeah.  And perhaps this is just

1    premature, because I think whether we would need this for this

2    purpose depends in large part on what evidence they present,

3    what arguments they make, for example, about what Mr.

4    van der Zwaan did.

5            THE COURT:  Well, one concern is when you mark it as

6    an exhibit, it's not clear if you want to move it in through

7    Cliff Sloan.  You cannot move in Gregory Craig's statements

8    through Mr. Sloan.  If Mr. Craig is on the stand and he wants

9    to tell the story and he can be cross-examined about all this,

10   that's another matter.

11           So, I'm happy to reserve on this until you try to use

12   it with him.

13           MR. ABELSON:  Understood.

14           THE COURT:  But I don't see how it comes in

15   otherwise.

16           Yes?

17           MR. McCULLOUGH:  Your Honor, if they are eliciting

18   evidence of Mr. van der Zwaan's bad -- an isolated bad act of

19   Mr. van der Zwaan in August of 2012 as to whether he gave the

20   report to Mr. Hawker, at which point any number of people on

21   the Manafort, Gates, Ukraine team had copies, had draft copies

22   of the report, if they are using that isolated incident as

23   evidence, as propensity evidence that Mr. van der Zwaan later

24   misled --

25           THE COURT:  It's not propensity evidence of anything.

1    But I believe it is a fact that he did it, isn't it?

2            MR. McCULLOUGH:  I think it is.  It has been stated

3    by Mr. Weissman, yes.

4            THE COURT:  All right.  It was at least the

5    government's understanding at that time that it was that fact

6    that he did it, and Mr. van der Zwaan did not deny it.  It was

7    part of what he admitted, I believe, under oath, here.

8            MR. ABELSON:  Yes.  Yes.

9            MR. McCULLOUGH:  I don't see how it's relevant.

10           THE COURT:  It may not be relevant to anything other

11   than that.  I don't think you can argue from that that he was a

12   renegade, but I'm not hearing that they're trying to do that.

13   If they are, they're going to have to do a little more because

14   he isn't here to testify about what he did or to answer it.

15           So I don't think we can just use his emails to build

16   a picture about him when nobody is here to testify about them.

17   But I believe that one fact, it may be hard at this point for

18   the government to say that that's -- that's not correct.

19           But that isn't what he pled guilty to, and what he

20   pled guilty to isn't going to come in evidence; he's not going

21   to testify.  So we'll get there when we get there.  But there's

22   a lot of references to criminal proceedings that I'm not sure

23   about.

24           111.  Seem to be facts asserted in this hearsay as

25   well.  All right.  So now we have Kilimnik -- who's not coming,

1     Paul Manafort is not coming, van der Zwaan is not coming --

2     speaking to the defendant, whose statements he may not

3     introduce.  So how does this come in?

4               MR. ABELSON:  Your Honor, this is the same point.

5     You see at the top of the second page is an email from

6     Mr. van der Zwaan to Mr. Craig.  It says, among other things,

7     regarding FTI:  I don't know what Jonathan has said or what

8     he's been quoting.  I would imagine he's had sight of a copy

9     of -- a copy from one of the persons outside Skadden who have

10    had early drafts since July.  In fact, Mr. van der Zwaan

11    himself has provided that copy.  This is another lie.

12              THE COURT:  I mean, I say -- I would have to go back

13    and look at the entire plea colloquy.  The entire thing hasn't

14    actually been marked as an exhibit.  I have to remember if he

15    just admitted taking some action in connection with the rollout

16    that he wasn't supposed to take, or actually given the report.

17    Now that I think about it, I don't recall.  So, to the extent I

18    said what happened, I don't know.  What happened is known

19    because there's a transcript.

20              But I just don't think we can take emails of

21    out-of-court communications by a lot of people who aren't going

22    to be here, can't be cross-examined about it, assert facts in

23    issue, and try to use and approve a chain of events.

24              MR. TAYLOR:  May I respond?

25              THE COURT:  Yes.

1          MR. TAYLOR:  I don't think that's what we're doing,

2     although our intentions continue to be represented by the other

3     side of the room as to why we're trying to do something.

4     Mr. Craig is charged with lying about the fact that he was a

5     part of the media plan.  Mr. Craig is charged with misleading

6     FARA when he said I was not part of a media plan.  So evidence

7     which establishes that he is not part of a media plan is

8     directly relevant to his innocence.  It's -- this case is very

9     simple.

10          THE COURT:  But that evidence has to be admissible.

11          MR. TAYLOR:  Of course it does.

12          THE COURT:  It can't be hearsay.  It has to come in

13     through people who can be cross-examined at that point.

14          MR. TAYLOR:  Of course.  But I don't think, Your

15     Honor, we are asking you to violate the hearsay rule.

16     Sometimes we have had a disagreement about whether, if

17     Mr. Craig is told something by somebody else, that is

18     excludable because it comes from somebody else.

19          All I want to say is that anything that establishes

20     Mr. Craig's state of mind as to what the people at FTI intended

21     to do with this report when it was released, anything which

22     establishes his fear and suspicion of how they were going to

23     spin it is directly relevant to his *mens rea*, his state of

24     mind, his guilt or innocence.  That's why we are -- most of

25     what we're talking about here, seems to me, to be only -- you

1    can only really rule on it when you hear it in context, as much

2    as we would all like to get all of this decided.  If Mr. Craig

3    testifies, a lot of what we're talking about now is just going

4    to be irrelevant.

5              THE COURT:  That's my point.  If he's going to talk

6    about this happened and that happened and that made me think X

7    and I was concerned about that.

8              MR. TAYLOR:  That's right.

9              THE COURT:  That's a different story.

10             MR. TAYLOR:  Yes, indeed.

11             THE COURT:  But I'm alerting you now that we can't

12   have some other Skadden partner or lawyer that happens to be on

13   the chain suddenly move in communications from van der Zwaan to

14   Craig, and back and forth, just because it might shed light on

15   Mr. Craig's intent --

16             MR. TAYLOR:  But if --

17             THE COURT:  -- if embedded in there are statements

18   that you're not seeking to move in just for the fact that they

19   were said, but for the truth of the matter asserted.

20             MR. TAYLOR:  I think that's always true when you have

21   a communication, some of which may be directly relevant to the

22   issue and some of it may not be, and then you redact.  But the

23   fact that if we have a witness who proves I said to Mr. Craig

24   that they were trying to mislead -- they're misleading us about

25   this report, that has to come in -- it doesn't have to, unless

1    you admit it -- but it seems to me that it's so directly

2    relevant to his -- the reason why he spoke to the media and the

3    reason why he told FARA that he spoke to the media, that it is

4    inextricably entwined with the central issue in this case, is

5    whether he told the truth.

6              THE COURT:  That doesn't answer the question of

7    whether the email comes in.  I'll reserve on whether you can

8    use it during Mr. Craig's testimony, if Mr. Craig testifies.

9    But doesn't come in otherwise.

10             Yes?

11             MR. McCULLOUGH:  Your Honor, I think it would be

12   improper to use the email to bolster Mr. Craig's testimony.  If

13   he's testifying to it and he's challenged on it, then this

14   would be something that they could rehabilitate him on.

15             THE COURT:  I'll see what they want to do with it, if

16   and when he's on the stand, and if and when they say, Your

17   Honor, we would like to use the exhibit that we reserved on

18   earlier.

19             All right.  So, I understand that you're trying to

20   show that the Podesta Group has got a whole different strategy

21   going on and he has nothing to do with it, but there's not even

22   any allegation in this case that has anything to do with

23   communicating with senators.  So why is this relevant?

24             MR. MURPHY:  Well, I'm not entirely sure about what

25   you just said, Your Honor.  And certainly the FTI media plan

1        that Mr. Craig is alleged to have been part of and that he's

2        alleged not to have revealed certain actions that he took

3        consistent with that plan, that plan called for an outreach to

4        U.S. congressmen.  Mr. Craig had made it clear that he's not

5        going to be doing lobbying for Ukraine; other people were.

6        This is an email from Rick Gates to Mr. Podesta, Mr. Weber, and

7        numerous other employees of Podesta Group and Mercury about the

8        fact that the media plan included outreach to senators and

9        congressmen.  But it's got nothing to do with Mr. Craig.

10               MR. McCULLOUGH:  Your Honor, I believe it's an email

11       from Miss Antelo who is describing what the Podesta plans were,

12       and it's an email to Mr. Gates.  I think what -- whatever Miss

13       Antelo was planning is not relevant.  And, frankly, whatever

14       other entities were doing with respect to political outreach is

15       not relevant.  It's just -- this is a -- absolutely no bearing

16       on any issue before this Court.

17               THE COURT:  I don't really see how we're going to get

18       to this.  I mean, Mr. Gates is going to be here, you can ask

19       him.  To the extent there were plans dealing with the Hill,

20       Mr. Craig wasn't a part of those plans, was he?

21               MR. MURPHY:  What if he says he was?

22               THE COURT:  Well, that's a different question, then

23       you might need to cross-examine him.

24               MR. MURPHY:  That's why we marked this, in an

25       abundance of caution, Your Honor, because, quite frankly, we

1     don't know what Mr. Gates is likely to say.

2              MR. McCULLOUGH:  This just doesn't answer the

3     question as to what Mr. Gates is going to do.  This is simply a

4     statement by Miss Antelo that the pending Skadden Report has,

5     thus far, been seen as an insufficient reason to persuade

6     senators that additional time is needed.  I mean, this is --

7              THE COURT:  This is all after, isn't it?

8              MR. MURPHY:  No.  September 18th, Your Honor.

9              THE COURT:  All right.  I'm going to wait and see

10    what they want to use it for.  I don't see the relevance.  If

11    there's a point where you think it's relevant, you'll let me

12    know.

13             MR. CAMPOAMOR-SANCHEZ:  Your Honor, if I may.  I want

14    to tie this in about a discussion we had about the motions in

15    limine related to hearsay.  As -- defense filed the motion,

16    they wanted to make sure that Mr. Gates was not going to

17    testify about efforts that Mr. Craig took regarding contacting

18    senators in the United States about this report.  We agreed.

19    As we said, we're not going to try to elicit that from

20    Mr. Gates.

21             But I also said that if they asked him questions

22    about that, they're going to open a door because, as stated in

23    the 302, which the defense has, Mr. Gates would say I was

24    tasked by Mr. Manafort to have Mr. Craig engage in this.  I did

25    have a conversation with Mr. Craig about it, I don't know

1    whether he did that or not.  He may not have.  He never

2    contacted me.

3            I just want to be clear that, first of all, this

4    document is not something that Mr. Gates wrote, it's somebody

5    else who's not a witness.  But if they actually intend to get

6    into this, they're going to open the door to exactly what they

7    did not, allegedly, want Mr. Gates to testify about.

8            THE COURT:  All right.  I don't see, if someone from

9    the Podesta Group isn't going to be talking about what the

10   Podesta Group was doing, how Mr. Gates can opine on what this

11   document means or doesn't mean.  I also think it's irrelevant.

12   And you've now heard what the government believes going down

13   that road would open the door for them to do.  I'm not going to

14   rule on that one way or the other.  But, if we're trying to

15   keep senators out of it, then maybe we should keep senators out

16   of it.

17           MR. MURPHY:  Your Honor, let me just say that if

18   Mr. Gates tells a big fat whopper --

19           THE COURT:  You told me yesterday Mr. Gates was a

20   liar.  You're going to cross-examine him and it will be up to

21   the jury whether they find him credible or not.

22           MR. MURPHY:  We have no idea what he's going to say.

23           MR. CAMPOAMOR-SANCHEZ:  There is a 302 that has --

24           THE COURT:  We are not debating Rick Gates'

25   credibility here.  And I might as well talk about this now:

```
1       Does anybody have any intention of cross-examining Rick Gates
2       about his marital infidelity?
3               MR. MURPHY:  No, Your Honor.
4               THE COURT:  All right.  Good.
5               143.
6               MR. ABELSON:  Your Honor, it's probably premature to
7       rule on this.  If they suggest that the report was biased or
8       unbalanced or not independent, this is relevant to Mr. Craig's
9       state of mind.
10              MR. McCULLOUGH:  Your Honor, this is -- this is
11      nearly textbook impermissible hearsay.  It is Mr. van der Zwaan
12      making a statement, which they want to assert for the truth,
13      that Greg's final change is the below, right, he says --
14              THE COURT:  And he's not here.
15              MR. McCULLOUGH:  He says it makes it worse.  And we
16      don't know who he is.
17              THE COURT:  Okay.  Okay.  Mr. van der Zwaan is making
18      an assertion, a fact, he can't be cross-examined about it, they
19      don't know if they're even going to try to introduce it or not.
20      Seems like hearsay to me.  So it seems like it is unlikely it
21      is coming in to show Mr. Craig's state of mind because we can't
22      cross-examine the person who is reporting on something that
23      Mr. Craig said that you believe reveals his state of mind.
24              All right.  145.
25              MR. McCULLOUGH:  Your Honor, this is a statement by
```

1    a --

2              THE COURT:  Just wait for me.  Okay?

3              MR. McCULLOUGH:  Yes, Your Honor.

4              THE COURT:  Well, it's kind of a strange email chain

5    also, because Mr. Kilimnik is passing along to van der Zwaan,

6    assuming I know who to and from are.  Just from where the words

7    are, it looks like it's from Kilimnik, and then Kilimnik also

8    is sending it to --

9              MR. MURPHY:  Hawker.

10             THE COURT:  -- Hawker.

11             MR. MURPHY:  Right.

12             THE COURT:  So, it's a statement by Kilimnik to

13   Hawker:  Here's what I sent to Alex and Paul, comments.  Here's

14   my thought about it.  Don't tell anybody.  So, I don't know how

15   this comes in, if it meant something to Mr. Hawker and affected

16   his state of mind and his state of mind is relevant and he's

17   going to be on the stand, that's one thing.  But, what do you

18   have to say about it?

19             MR. MURPHY:  So this is for cross-examination of

20   Mr. Hawker.  This is the lead-up to the Harvard Club meeting.

21   These are changes that Manafort and Kilimnik want to have made

22   to the Skadden Report that are attached to this email.  None of

23   these changes get made.  And what Mr. Kilimnik is telling

24   Mr. Hawker is if this document, these changes are not taken

25   into account, our folks may make a decision to keep the report

1    confidential.  I want to establish that Mr. Hawker knew that on

2    September the 23rd.

3                THE COURT:  Knew that fact?

4                MR. MURPHY:  Knew that Kilimnik and Manafort were

5    saying if these changes aren't made, we may just keep this

6    report on the shelf and never have it see the light of day.

7                MR. McCULLOUGH:  Why is Mr. Hawker's state of mind as

8    to -- on September 23rd, as to whether the report would be

9    released of any relevance to this case?  The fact is, that they

10   had a meeting at the Harvard Club and discussed a rollout plan.

11   This is not relevant -- I mean, if that's the purpose, that is

12   absolutely not relevant.

13               THE COURT:  Is Mr. Hawker going to testify that there

14   were conversations at the Harvard Club meeting about these

15   changes?  Does he know what Mr. Craig did or didn't do?

16               MR. MURPHY:  He knows about the discussion of the

17   changes.  He was at the meeting.

18               THE COURT:  Well, then he can discuss what happened

19   at the meeting.

20               MR. MURPHY:  The point is, Your Honor, and what will

21   become clear, I think, as we establish the evidence, is that

22   because Skadden would not change some of the conclusions in the

23   report, Manafort, Gates, and Hawker developed an alternative

24   plan, a media spin plan that was designed to have the report

25   released and to say things that were not in the report.  And

1    they began to do that even before this.  But when the Skadden

2    folks refused to make the changes they requested, they adopted

3    a new plan, a plan that Skadden and Craig were not part of.

4              THE COURT:  One of them is going to be in the

5    courtroom and can testify and be cross-examined about it --

6              MR. MURPHY:  That's Mr. Hawker.

7              THE COURT:  -- may do so.  But that's not

8    Mr. Kilimnik.

9              MR. MURPHY:  No, it's Mr. Hawker.

10              THE COURT:  Correct.  So what Mr. Kilimnik had to say

11    is hearsay.  And Mr. Hawker can testify about what happened.

12    And actually, when I wrote about this, I wrote only if

13    Mr. Hawker testifies.  He can talk about what happened.

14              MR. MURPHY:  Yes.

15              THE COURT:  But this didn't come in --

16              MR. MURPHY:  Your Honor, but part of what happened is

17    he had the -- he had the document --

18              THE COURT:  But those changes were sent to him by

19    Mr. Kilimnik.

20              MR. MURPHY:  Right.  Right.

21              THE COURT:  And he went to a meeting and said you

22    should do this for A, B, C reason and Mr. Craig said I will or

23    I won't.

24              MR. MURPHY:  Right.  And the answer was, We won't.

25              THE COURT:  All right.  All right.

1          MR. McCULLOUGH:  Your Honor, that exhibit is not

2     admitted, is that correct?

3          THE COURT:  If -- what I'm saying is that Mr. Hawker

4     can talk about receiving the attachment, but the Kilimnik email

5     part of it is not admissible.  He can talk about the

6     circumstances.

7          156.  Alex says that Cliff says.

8          All right.  It's from Mr. Hawker.  Mr. Hawker is

9     going to testify.

10         MR. MURPHY:  Yes.  And it's to Mr. Gates, and he's

11    going to testify.

12         THE COURT:  All right.

13         MR. McCULLOUGH:  But, what -- the impermissible use

14    would be the first sentence, which is what Alex said Cliff is

15    saying about the magnitude of the changes that are coming back.

16         MR. MURPHY:  Your Honor, what I really want to

17    introduce it for is the document that's attached, which is the

18    beginning of the alternative spin plan that Hawker and Gates

19    begin to develop.  And remember, Your Honor, that in this

20    case --

21         THE COURT:  Please.  I actually did hear when you

22    told me the story before.  And I just really want to try to be

23    focused in on the exhibit and not the entire case, and not

24    everything that happened with the report.

25         Is your problem solved without the word

1     "substantial"?

2              MR. McCULLOUGH:  I would propose that they redact the

3     first sentence.  I think the fact that this document was

4     transmitted, that's fine.

5              MR. MURPHY:  I'll happily redact the first sentence.

6              THE COURT:  All right.  There we go.  It's not that I

7     don't want to hear what you have to say, Mr. Murphy, but

8     sometimes I don't need to.

9              MR. MURPHY:  I'm sorry, Your Honor, I didn't hear

10    what you said.

11             THE COURT:  It's not that I don't want to hear what

12    you have to say, but it's just that I don't need to hear what

13    you have to say because we can just cut to the chase.

14             All right.  163.  I asked if I'd seen this email

15    anyway.  Was it a government exhibit?

16             MR. McCULLOUGH:  Your Honor, the first email in the

17    chain from Rick Gates, which appears at the bottom of page 2,

18    that email is a government exhibit.  I think the hearsay --

19             THE COURT:  Sending the clippings for the meeting

20    agenda.  Okay.  And so what are the new parts?

21             MR. McCULLOUGH:  The new parts are discussion among

22    Podesta employees which are describing, for the truth of the

23    matter, what Rick Gates said on the call and what his beliefs

24    were in particular.  If one would look at the second -- Your

25    Honor would look at the second email, top of the first page,

1    describing Miss Antelo, a non-witness describing what Rick

2    Gates believed about the effectiveness of the rollout strategy,

3    that's hearsay.

4              THE COURT:  I don't think we can put in emails from

5    people who aren't going to testify about what somebody else

6    said.

7              MR. MURPHY:  Mr. Griffis is a recipient of these

8    emails.

9              THE COURT:  A recipient of an email can't add any

10   color to or be cross-examined about what Miss Antelo said that

11   Gates said.

12             MR. MURPHY:  I don't need this one, Your Honor.  I'll

13   withdraw it.

14             THE COURT:  All right.  Is this part of the

15   state-of-mind exception that's being briefed otherwise?

16             MR. ABELSON:  I think they have two objections, Your

17   Honor, hearsay and relevance.  To the extent -- as to the

18   relevance objection, this is September 28th, five days after

19   the Harvard Club meeting.  I'll just direct Your Honor's

20   attention to the last line in Mr. van der Zwaan's email to

21   Mr. Craig:  If you want the report delivered prior to

22   Wednesday, I suggest I deliver it by -- excuse me, that I

23   deliver it Monday by dumping it on the doorstep of the MoJ.

24   I.e., having someone at MoJ accept delivery of it, as I did a

25   while back with our initial letters to Vlasenko.

1    The point is here, the Ministry wouldn't -- kept not

2    wanting to accept the final report because, Your Honor, they

3    didn't like it.  And so the -- that's the relevance.  As to

4    hearsay, I think the question is what particular statements

5    they think are objectionable.

6         MR. McCULLOUGH:  But I think, as Mr. Abelson just

7    described, they want to use this to prove what Mr. -- that

8    Mr. van der Zwaan's statements about what he did in attempting

9    to deliver the report are true, and that they tried to deliver

10   the report and these facts happened.  I think that would be

11   impermissible hearsay.

12        And as to relevance, the discussion about the ins and

13   outs of an effort to deliver this to the Ministry of Justice is

14   just not relevant here.

15        MR. ABELSON:  It all goes to the state of mind, Your

16   Honor.  We're happy to include it in that submission.

17        THE COURT:  That's fine, because -- but I think it's

18   important when you say state of mind, people say that a lot,

19   but there isn't actually a hearsay exception for state of mind

20   in general.  It's a little more specific.  So you need to be a

21   little more specific.

22        177.  All right.  So why does -- is this part of the

23   same thing, that you want to move it in because it shows

24   Mr. Craig's state of mind?  Are you going to make that part of

25   your brief?

 1          MR. ABELSON:  I think this really goes to the

 2    independence of the report, Your Honor.  If they make that an

 3    issue, this -- the fact that they continue to have to press for

 4    delivery is relevant to that story.

 5          THE COURT:  Okay.  So you're not going to -- if they

 6    don't argue that the report is not independent, you're not even

 7    going to try to put it in?  Or it goes to the affirmative story

 8    that you want to tell about the independence of the report?

 9    Either way, he wrote it and so -- well, Manafort is not going

10    to be here to admit it.  So the question is are you planning to

11    use it in your testimony with him?  And I guess that depends on

12    whether he testifies.

13          MR. ABELSON:  I'm really sorry, Your Honor.  I think

14    I may be looking at a different exhibit.  Which number?

15          THE COURT:  177.

16          MR. ABELSON:  Oh.  I was on 172.

17          THE COURT:  Okay.  They didn't object to that.

18          MR. MURPHY:  You did not?

19          MS. GASTON:  We didn't ob --

20          MR. MURPHY:  We had it marked down as a hearsay

21    objection.

22          MR. ABELSON:  I'm sorry, Your Honor, about 172.  I'm

23    now on 177.

24          And the point is this is -- the objection is hearsay.

25    But again, it goes to this independence question.  These are

1      all Mr. Craig's statements about responding to the --

2              THE COURT:  Well, you're going to have to explain to

3      me why you get to move Mr. Craig's statements in through an

4      out-of-court statement of Mr. Craig.

5              MR. TAYLOR:  Only if Mr. Craig testifies.

6              THE COURT:  All right.  If Mr. Craig testifies -- he

7      said it will come in only if Mr. Craig testifies.  So, if

8      Mr. Craig testifies and you want to use it in connection with

9      his testimony, again, we'll have to figure out if it's

10     relevant, and then if it's relevant, he can be cross-examined

11     about it.  So we'll reserve until then.

12              182, 183, they seem to possibly be hearsay to me.

13              MR. MURPHY:  Your Honor, I have 182.

14              THE COURT:  I said 182 and 183.  Just getting ahead

15     of myself.  But 182, yes, there was a hearsay objection.

16     Again, I guess, we've got one of the consultants summarizing a

17     meeting.

18              MR. MURPHY:  Well, Your Honor, may I explain the

19     context?

20              THE COURT:  Yes.

21              MR. MURPHY:  So Mr. Galvin is an associate of FTI, he

22     worked with Mr. Hawker.  He and Mr. Hawker had a meeting with

23     Mr. Manafort and Mr. Kilimnik in Kiev on the 4th of October

24     2012.  This is after the Harvard Club meeting, after Mr. Craig

25     rejects the changes, after Mr. Craig tells Mr. Mana -- I'm

1    sorry, Mr. Manafort and Mr. Hawker that he's not going to do

2    backgrounding of journalists, after he tells Mr. Hawker that

3    his draft of the media plan is all so wrong, that we have real

4    problems if you don't understand what our report says.  And now

5    we have Mr. Hawker participating in a meeting where Manafort is

6    saying, among other things, and Kilimnik is saying, the

7    Tymoshenko camp are waiting for the Skadden Report so --

8              THE COURT:  Mr. Hawker can testify about a meeting --

9              MR. MURPHY:  Yes.

10             THE COURT:  -- and what was said, not for the truth

11   of the fact that any facts were asserted, the fact that it was

12   said to him and, therefore, he took some action.

13             MR. MURPHY:  Right.

14             THE COURT:  So we're not going to elicit Manafort

15   hearsay through Hawker.  But I don't see why we need Sean

16   Galvin's report.  This is hearsay, Manafort said X on that

17   date.  If Hawker is going to testify about the meeting, then

18   he'll testify about the meeting.

19             MR. MURPHY:  I may need this document to refresh his

20   recollection about the meeting.

21             THE COURT:  Well, we'll find that out, but after he's

22   revealed a failure of recollection.

23             MR. MURPHY:  Okay.

24             MR. McCULLOUGH:  Your Honor, even if this were used

25   to refresh recollection, it could not come in as evidence

 1    itself.  This is hearsay as to what Sean Galvin believes was

 2    said at the meeting -- Sean Galvin is stating that at the

 3    meeting --

 4           THE COURT:  I don't think the statement does -- I

 5    think it is hearsay.

 6           Is he going to testify?

 7           MR. MURPHY:  Pardon?

 8           THE COURT:  I think this is just one of those things

 9    that comes in in connection with his testimony.  If he's

10    reacting to information, whether it's true or not, if

11    van der Zwaan had been instructed not to deliver the report and

12    now he's telling Paul we need to do X, Y, and Z, if he's going

13    to testify about that, that's fine.  But it doesn't come in by

14    itself.

15           MR. ABELSON:  This is exhibit 183, Your Honor?

16           THE COURT:  Yes.

17           MR. CAMPOAMOR-SANCHEZ:  Your Honor, I mean, just to

18    be clear, our position is even if Mr. Craig testifies, it

19    doesn't mean the document itself it coming in as an exhibit.

20           THE COURT:  I said, he can testify to the

21    circumstances.

22           MR. CAMPOAMOR-SANCHEZ:  Okay.

23           MR. ABELSON:  Part of the -- it's also the --

24    relevant for the fact of what Mr. Craig said here.  He ends

25    this by saying, What is the problem here?  He doesn't know what

1    Ukraine is doing.

2         THE COURT:  Well, he can say that I had a problem and

3    I asked Paul Manafort what's going on.  That's different than

4    moving in a document that recounts what people said to each

5    other outside of the courtroom.

6         MR. TAYLOR:  Again, Your Honor, may I?

7         THE COURT:  Yes.

8         MR. TAYLOR:  If someone decides to do something and

9    he tells somebody something and the corroboration of that is he

10   sent them a message, I do think a message is admissible because

11   it corroborates the testimony.  The fact that -- the fact that

12   it is Mr. Craig's saying something to Mr. Manafort is not --

13   it's not inadmissible because Craig said it to Manafort.  It

14   may very well corroborate what Craig says he did.

15        MS. GASTON:  But then, Your Honor, it would only come

16   in if he's challenged on the truthfulness of that assertion and

17   it's a prior inconsistent statement.

18        MR. TAYLOR:  I've seen the government lots of times.

19   Lots of times.

20        THE COURT:  Okay.  It doesn't mean it's right.  I'm

21   sure you objected.  So now that you know it's a problem --

22   Mr. Craig is going to tell his story.  I don't think that we

23   need a document that says Alex said that you said that Rick

24   said.  He'll just say, After I talked to -- I talked to

25   Mr. van der Zwaan.  As a result of your conversation with Mr.

1    van der Zwaan, what did you do?  I called Paul Manafort.  I was

2    very upset.  How are we going to get this thing delivered?  I

3    want it delivered.  I told him get it delivered.

4            MR. TAYLOR:  It is an important piece in the proof of

5    why Mr. Craig understood that the Ukraine didn't want to

6    receive his report.

7            THE COURT:  The link in the chain that's missing is

8    the hearsay.

9            MR. TAYLOR:  Not at all.  It proves that this is what

10   Mr. Craig said to Mr. Manafort.

11           MS. GASTON:  Then, Your Honor, they are introducing

12   it for the truth of the matter and it's hearsay.  We're not

13   going to contest that Mr. Craig was upset about the delivery of

14   the report.  And so --

15           THE COURT:  If it sits there, I don't think you get

16   to bolster everything you say with out-of-court statements that

17   said the same thing.  That's the point.

18           MR. TAYLOR:  Not everything, but I want to --

19           THE COURT:  Well, let's see how his testimony goes.

20   I don't see how this -- seems to me to be hearsay.

21           What number was that?  Was that -84 or -83 that we

22   just did?

23           MR. McCULLOUGH:  That was -83, Your Honor.  183.

24           THE COURT:  I don't actually have a problem with the

25   Tuesday, October 16 statement to Mr. Craig.  It does seem to

1    reveal his emotional state at the time.  It doesn't really

2    assert facts.  It's his feelings.  Emailed from van der Zwaan

3    to him, it's just asking for instructions.  It doesn't seem to

4    really assert any fact one way or the other.

5         The top one, however, as I told you, the following

6    facts occurred, is hearsay.  So that one has to go.

7         MR. TAYLOR:  Your Honor?

8         THE COURT:  Yes.

9         MR. TAYLOR:  How does Mr. Craig know that they were

10   messing around about receipt of the report unless he -- unless

11   Mr. van der Zwaan told him?  His state of mind, his knowledge

12   that the Ukraine is refusing to accept this report is -- that's

13   directly relevant to his state of mind.  And so the fact that

14   Mr. van der Zwaan tells him, that doesn't make that an

15   out-of-court statement that's inadmissible.  It shows why

16   Mr. Craig thinks they're not receiving the report.

17        THE COURT:  Well, Mr. Craig thought it at 11:20, so

18   he didn't need an email at 11:28 to cause him to think that, he

19   already thought that.  So the document is admissible with the

20   top email excluded.

21        MR. TAYLOR:  Well, the email about delivery is the

22   one -- is 183.  If you're referring to the middle of the page,

23   I sent him an email about delivery.  That's the previous one,

24   that you ruled that, I think, at least, tentatively, that we

25   wouldn't be able to put in evidence.

1          THE COURT:  Some of these are procedural and some of

2     these are substantive, and they're different.  I think what I

3     said on 183 is that he can tell the whole story.

4          MR. McCULLOUGH:  Your Honor, I believe 183 is a

5     different email.

6          THE COURT:  Right.  What he's saying is that is the

7     email that Manafort -- that Craig is referring to when he says

8     I sent him an email yesterday.

9          MR. TAYLOR:  Right.

10          THE COURT:  I don't know that we need that email if

11     he's going to be sitting here telling the story, I told Paul to

12     deliver it, van der Zwaan said to me, What's going on?  I told

13     him -- I was angry, and see, look how angry I was, I wrote I

14     was angry in an email.

15          I'm on to 186.  All right.  So that's the one, at the

16     bottom is the one that I had hearsay problems with.  Now

17     Manafort is writing him back.  I did this, I did that, they

18     said this, they said that, this happened, that happened.  Fair

19     to say there's some hearsay in there.  And then Mr. Craig just

20     passes it on to other people.

21          So, how do we get Mr. Manafort's long explanation

22     about all these facts and why --

23          MR. ABELSON:  The relevance -- I'm sorry, Your Honor.

24     The relevant and non-truth purpose of this is the fact that

25     during this period Mr. Craig was just not in the loop.  There

1    were others deciding what to do with the report, whether to

2    release it, if not to release it, why not to release it.  And

3    he doesn't -- he asked, as we saw before, Mr. Manafort, What's

4    going on here?  Mr. Manafort eventually, on October 18th, gives

5    him some update.

6         But the relevance of this document is the fact that

7    until this time Mr. Craig didn't know what was going on, to

8    know what the Ukrainians were doing.  He needed -- he needed an

9    update.

10        MR. McCULLOUGH:  Your Honor, it's just -- just simply

11   not relevant.  What Mr. Manafort is telling him -- I mean,

12   Mr. Manafort is giving him a long update about things that are

13   completely not relevant and tertiary to this issue.  And it

14   certainly has no bearing on what Mr. Craig was thinking or

15   doing at the time.  And I think that the inference that

16   Mr. Abelson is making is fairly thin.

17        THE COURT:  Well, he says, What's going on,

18   Mr. Manafort?  Why hasn't it been delivered?  Why can't this

19   email just be -- Greg, I thought Rick briefed you on the

20   matter, dah, dah, dah, skip down to, I made the decision.

21        But, he's --

22        MR. McCULLOUGH:  We're unable to cross-examine

23   Mr. Manafort about whether any of these statements are true.

24        THE COURT:  You know, it's all about -- there's just

25   a ton of hearsay in here.  I don't think -- I mean, I think the

 1     fact that -- the part that we've already gotten in, which is

 2     Mr. Craig is sitting in his office with smoke coming out of his

 3     ears because the report hadn't been delivered, is relevant to

 4     his state of mind.

 5          Mr. Manafort's statements, which may or may not be

 6     true and which he can't be cross-examined about, any statements

 7     about what he told Alex, who Alex can't be cross-examined

 8     about, just seem to be classic hearsay.  He's justifying the

 9     fact that something has happened.  We already know that

10     Mr. Craig is mad about it.  He's admitting -- he's saying, I

11     did it.  Why do we need all the back and forth about why and

12     who said what to whom?

13          MR. TAYLOR:  Again, Your Honor, this is Bill Taylor.

14     The -- you will hear on Monday that the defense will rely very

15     heavily on what Mr. Craig knew about Ukraine's intentions and

16     its attitude towards the report.

17          So anything that he is told or learns about Ukraine's

18     intentions, happiness about the report, goes to -- is directly

19     relevant to whether he's telling the truth or lying to FARA.

20     So the fact that Alex van der Zwaan is running around trying to

21     give the report to the MoJ and they won't take it, and that

22     Greg has been trying to give it to the Ministry of Justice for

23     three months and they won't take it, directly proves that Craig

24     knows they don't want it.

25          So that's -- that's the piece that we ask the Court

1      to permit us to -- to address and to admit.  Why does Mr. Craig

2      know that the Ministry won't take the report?  The answer is,

3      because people -- because van der Zwaan tells him.  So --

4              THE COURT:  This is so much -- he's got a million

5      reasons in here that are about other things.  The timing, that

6      there's an election going on, it's not necessarily the

7      substance of it, as the timing of it.

8              MR. TAYLOR:  But it does prove, it does prove why he

9      thinks the Ukrainian government doesn't like the report.

10             MR. CAMPOAMOR-SANCHEZ:  Then he can testify about it,

11     Your Honor, he can testify that that's what he thought.

12             MR. TAYLOR:  But he's got to be able to say why.

13             MR. CAMPOAMOR-SANCHEZ:  But he can testify about his

14     knowledge about why he believed that, if that's what he chooses

15     to do, but this is hearsay.  And, frankly, I don't think that's

16     a defense to the charges that are being brought.

17             THE COURT:  Well, that's a whole nother issue,

18     whether any of that goes to the question of when he says I was

19     talking to the -- when I talked, it was all reactive to what

20     the Ukraine had said.

21             MR. TAYLOR:  That's not what he said.

22             THE COURT:  Whether what he exactly said is exactly

23     true is, seems to me, a different question than what you just

24     said the facts will illuminate.  I'm not going to tell you you

25     can't put on your defense.  I think this document is full of

1    hearsay.  And if Mr. Craig wants to tell his story about what's

2    going on and how frustrated he was, he is going to tell that

3    story.

4              MR. TAYLOR:  That's certainly true about this

5    document.

6              THE COURT:  All right.  Well, that's the only one

7    we're talking about.

8              So for right now it's excluded.

9              But I like your confidence that you're going to be

10   opening on Monday.

11             MR. TAYLOR:  Everything within my power, Your Honor.

12             THE COURT:  That means you guys are going to be quick

13   and to the point and you're not going to ask every single juror

14   here a million questions and we're going to go right through.

15   That's terrific.

16             MR. TAYLOR:  I suspect you're going to get a lot of

17   answers on those questions.

18             THE COURT:  That's why we're asking them.  That's the

19   goal.

20             Why -- what is 187.

21             MR. MURPHY:  187, Your Honor, is a communication

22   between Griffis and Hawker.

23             THE COURT:  I apologize.  It took a long time for

24   that to pop up on my screen.  All right.  So, this is showing

25   that the Podesta Group and Hawker are doing lots of press

1    things and Mr. Craig is not.

2              MR. MURPHY:  That's correct.

3              THE COURT:  And Mr. Griffis and Mr. Hawker are going

4    to talk about this document?

5              MR. MURPHY:  They're both going to testify.

6              THE COURT:  All right.  Fine.  It's admitted.

7              What number was that?  187.  So what are we up to?

8    188.

9              Okay.  Now, I had some problems with these.  I think

10   there's a couple of chats, Gchats with this person.  And I

11   don't understand how these --

12             MR. MURPHY:  Your Honor, Ms. Saunders is going to

13   testify.  The government intends to call her.  I may ask her

14   about some of her Gmail chats with her colleague, Mr. Wright,

15   they both worked for the Podesta Group.  I don't think I'm

16   going to use Exhibit 188.

17             MR. CAMPOAMOR-SANCHEZ:  I'm sorry.  You're not going

18   to what?

19             THE COURT:  188.  So you're withdrawing.

20             MR. MURPHY:  I'm going to withdraw 188.

21             THE COURT:  All right.  We got another one, 195.

22             MR. MURPHY:  Yeah.  So 195, what I'm really

23   interested in, Your Honor, is the last page.  These were

24   produced to us this way by the government.  You know,

25   apparently Mr. Wright had, you know, I guess -- wherever his

 1    Gmail was kept, must have been produced in some form.  And so

 2    we get them, you know, they came to us --

 3              THE COURT:  I'm not complaining that you have it.

 4    I'm trying to figure out why and how these chats that have just

 5    tons of internal hearsay within hearsay and commentary and

 6    everything are going to be used in evidence.  If you're saying

 7    I'm not planning to introduce it in my case-in-chief but I

 8    might have to ask her something about it in cross that falls

 9    within the scope of the direct, what is it here that's of

10    interest to you?

11              MR. MURPHY:  What's of interest is that Miss Saunders

12    and Mr. Wright, who are familiar with -- this is now December

13    the 7th, they are familiar with the Skadden Report that's been

14    provided to them -- not by Skadden -- and Miss Saunders says

15    that the folks at -- I'm sorry, she's at Mercury.  She says the

16    folks at the Podesta Group have just gotten it and they're

17    reading it for the first time, and that's Mr. Griffis.

18              THE COURT:  What page are you on?

19              MR. MURPHY:  I'm on page 5; 195-5.  So Kevin Griffis

20    is Skyping me, he's freaking out, he just read the Skadden

21    Report for the first time.  Mr. Wright responds, Ha, ha, ha.

22    Miss Saunders says they have a call on 15.  Wright says, With

23    Rick -- and that's Rick Gates -- or internally, to discuss how

24    blank it is.  And then Mr. --

25              THE COURT:  I think you might as well put that in the

1   record.

2          MR. MURPHY:  Pardon?

3          THE COURT:  You can just put the word in the record,

4   otherwise this isn't going to make any sense, if there's

5   ever --

6          MR. MURPHY:  I don't know how I would phrase it with

7   her, but, you know, how lousy it is, how shitty it is.

8          THE COURT:  How shitty it is.  Okay.

9          MR. MURPHY:  She says, Discussing with Rick to

10  discuss how to roll it out; he's recommending that they eat it.

11  So this is Mr. Griffis telling the folks at Mercury that the

12  Podesta Group thinks they ought to just eat the report.  Then

13  she goes on and has some other discussion about the things that

14  are in the report that will reveal that it's not going to be at

15  all helpful to the Ukraine and it's really a big mistake to

16  release it.

17         THE COURT:  Okay.  She cannot, she cannot say what

18  Kevin said.  She cannot.

19         MR. MURPHY:  She shared the view that --

20         THE COURT:  No.

21         MR. MURPHY:  Your Honor, I can ask her, I think, if

22  she shared the view that this report was, in her words, shitty.

23         MR. CAMPOAMOR-SANCHEZ:  He's trying to get into

24  hearsay by putting the question, Do you share the view that

25  these other people, that we can't testify -- that won't

1    testify, and we won't cross-examine, express to her in a Gmail

2    chat.  How is -- this is hearsay.

3              MR. MURPHY:  If she says, Yeah, I agreed that from

4    the Ukraine's perspective this was a shitty report,

5    Mr. Fernando Campoamor-Sanchez can ask her, you know, Did you

6    share that view?  Or, What did you really think?

7              MR. CAMPOAMOR-SANCHEZ:  Her view of the report is

8    irrelevant.  If she did something to facilitate the media plan

9    or not, that's fine.  But whatever, her view of the report is

10   irrelevant.  This case is not about the content of the report.

11             MR. MURPHY:  Your Honor, the case is --

12             THE COURT:  Okay.

13             MR. MURPHY:  I know I'm trying the Court's patience,

14   but this case --

15             THE COURT:  No, the "okay" would be, yes, it is

16   coming from that.

17             MR. MURPHY:  The indictment alleges that from the

18   start Mr. Craig knew that the report he was working on was

19   really done to advance a Ukrainian press relations offensive,

20   and that he knew that from the very beginning, and he never

21   told the FARA unit that.  And these documents show that in fact

22   that is not so.

23             MR. CAMPOAMOR-SANCHEZ:  That has nothing to do with

24   it.  Whether he knew that that was the plan from the beginning

25   or not, has nothing to do with the Podesta team's view of how

1    they could use the report or not use the report and whatever

2    internally they told somebody else about their own personal

3    views of it.  This is about what he knew and what he failed to

4    tell the FARA unit, not what somebody else thought about it.

5           And this is clear hearsay, that he's trying to do a

6    set-up then with Miss Saunders when she testifies about

7    something that is not related to the Gchats, but is related

8    about the fact that she put, at Mr. Vin Weber's orders, David

9    Sanger's name in the media rollout plan, which she did back in

10   October.  This has nothing to do with that.

11          THE COURT:  I don't see how the internal reaction to

12   the report, when they finally got it, and particularly her

13   account of other people's reactions -- certainly what other

14   people said to her about what they thought about it is not

15   relevant.  What she did is relevant.  And I don't know, until I

16   hear the direct, whether her reaction when she saw it and

17   thinking that at the end of the day it didn't advance Ukraine's

18   goals, is relevant or not relevant.  And that it was bad for

19   the client that she was trying to help.  Whether you can ask

20   about that will depend on what happens on direct.

21          But I don't see how all this stuff comes in unless

22   she says, No, I loved it.  I thought it was a piece of art.  I

23   thought it was fabulous, I couldn't wait to do the PR

24   associated with it.  Then I think you can say, Oh, wait a

25   minute.  Didn't you say it was shitty?  But --

1          MR. MURPHY:  Your Honor, there's another way of

2     looking at this.  And the way that I look at this, and that we

3     look at this, is that FTI and Manafort and Gates put out a

4     phony spin on this report, and the professionals who were part

5     of their same team at Podesta and Mercury said you can't do

6     that with this report; this report does not allow for that kind

7     of a press release to be issued.  This report is contrary to

8     the Ukraine's goals, if their goals are to convince the world

9     that Tymoshenko got a fair trial, and this report should not be

10    part of a media plan.  And Mr. Craig was not part of a media

11    plan.  That is part of our case.

12          THE COURT:  You have two groups of media

13    professionals reviewing the same report, some as a disaster and

14    some as something positive.  So not only is its reaction by the

15    time it hits Ukraine and the world different, but even within

16    the teams one firm is saying we can spin this positively and

17    the other is saying bury it.  Is that what you just told me?

18          MR. MURPHY:  No, Your Honor.  Everybody thought that

19    this report was a disaster for the Ukraine media plan.

20    Everybody thought it is a disaster, and that's why FTI,

21    Manafort, and Gates had to lie about the report, in order to

22    convince their client, Mr. Yanukovych, that they had done a

23    great job.  That's what a lot of this is all about.

24          It's all about Manafort and Gates trying to tell

25    Yanukovych, you spent a lot of money, you've gotten a good

1    result.  We're going to put out a false spin.  They did a false

2    spin.  They got a false spin in Europe because they relied on

3    that article that was in the ANSA group that Mr. Salvalaggio

4    wrote for them.  Mr. Craig has nothing to do with that.  And

5    we're going to show Mr. Craig's report was not part of the

6    media plan from the start or at the finish or any time in

7    between, that's our defense to this case.

8              MR. CAMPOAMOR-SANCHEZ:  The issue is --

9              THE COURT:  Yes, the question isn't whether his

10   report was a part of the media plan, the question is whether

11   his communications with the media were part of the other media

12   plan.

13             MR. MURPHY:  But the allegation in the indictment is

14   that from the start he knew his report was part of a media

15   plan.  That's one of the things that he's alleged not to have

16   told the FARA unit.

17             MR. CAMPOAMOR-SANCHEZ:  Right.  And this document has

18   no bearing on this question whether somebody else thought the

19   document would work or not work --

20             THE COURT:  This is later.

21             MR. CAMPOAMOR-SANCHEZ:  Right.

22             THE COURT:  In any event, this document isn't coming

23   in as an exhibit in your case-in-chief.  It doesn't come in in

24   cross-examination either.  If there's something -- her cross-

25   examination opens the door to the fact that later, when the

1    report was received, she was disappointed by it and wasn't

2    going to be able to market it and thought they were really

3    tearing their hair out at that point, then you'll ask her those

4    questions.

5            MR. MURPHY:  This is before the release, Your Honor.

6    Just so you have the chronology.  This is before the report was

7    released by Ukraine.

8            THE COURT:  Then how does she knows it's shitty?

9            MR. MURPHY:  She's seen it.

10           THE COURT:  That's what I just said.  You're talking

11   about after she saw the report, she didn't like it, it's a PR

12   disaster; how is she going to do what she was originally

13   supposed to do?  And I'm not saying you can't ask her about

14   that, if that turns out to fall within the scope of her direct

15   testimony, but that doesn't necessarily move the chat in.

16           The chat may be useful if she testifies

17   inconsistently with something you know to be true about her

18   state of mind from the chat.

19           MR. McCULLOUGH:  Your Honor, just -- it is not

20   Lucy-Claire Saunders' statement about the shitty report.

21           THE COURT:  She's quoting somebody else?

22           MR. McCULLOUGH:  Well, that's -- the media is Andrew

23   Wright.

24           MR. MURPHY:  No, actually, it's Mr. Griffis, I think,

25   who thinks its shitty.

1          THE COURT:  Well, she can't quote anybody.  You can't

2     use that with her, then, if she's saying somebody else said it.

3          MR. MURPHY:  They all agreed, Your Honor.

4          THE COURT:  That doesn't mean you get to have her say

5     Griffis said this, this person said that.  That's hearsay.

6     That's what hearsay is.

7          What number was that?  195.  Let's go on.  197.

8          All right.  I can't see.  It's from Paul Manafort.

9          MR. MURPHY:  It's from Paul Manafort at the top.  For

10    some reason this document gets cut off every time we try to

11    print it.

12         THE COURT:  All right.  So it wasn't me.  All right.

13         MR. MURPHY:  So it's from Manafort to Kilimnik,

14    Hawker, and Gates.  Alan Katzman, which I think was a mistake

15    by Mr. Manafort.  I think Alan Katzman is his tailor.  He

16    really meant to send it to Alan Friedman, and Eckhart Sager.

17         This is -- this is the false spin being generated by

18    Mr. Manafort.  He's now telling Mr. Hawker, I've edited the

19    package of documents for the Office of the Proctor General to

20    release.

21         THE COURT:  I think these are just instructions.  I

22    don't really see it as hearsay with truth of the matter

23    asserted in it.  If Hawker or Gates say they got it and they

24    did X, Y, and Z on the basis of it, I don't see why it wouldn't

25    come in.

```
 1                MR. MURPHY:  And then -- I'm sorry.  Attached to it
 2        are the Manafort --
 3                THE COURT:  Quit while you're ahead.
 4                MR. MURPHY:  Thank you, Your Honor.
 5                THE COURT:  All right.  All right.  Let's go on to
 6        the next one.
 7                MR. ABELSON:  I'm sorry, 197 was admitted, Your
 8        Honor?
 9                THE COURT:  Yes.
10                Now, this -- all right.
11                MR. MURPHY:  Your Honor, I can withdraw 205.
12                THE COURT:  205 is withdrawn.  Okay.
13                There were some documents where we get to, kind of, a
14        post-report strategy that I'm not sure is relevant.  We haven't
15        gotten there yet.
16                All right.  206.
17                MR. MURPHY:  206, Your Honor, is Mr. Griffis' email
18        to Mr. Podesta.  After he has done a careful reading of the
19        Skadden Report before its release, he recommends to Podesta and
20        the team at Podesta Group that the report not be released, and
21        he gives all the reasons why.  Among other things he says, A
22        reporter would ask the author, Greg Craig, the question, and
23        ask whether -- how a Western appellate court would not overturn
24        the conviction?  And if that's the conclusion, that's the
25        headline.  And we should, at the very least, discuss this with
```

1    Mr. Craig.

2            The evidence will be that Mr. Griffis and others

3    never did discuss it with Mr. Craig, but they knew from the

4    report that the conclusion would be that the -- her rights had

5    been violated.

6            MR. McCULLOUGH:  Your Honor, Mr. Griffis can testify

7    to any of those things when he takes the stand.  And if he's

8    cross-examined on it and there's some question as to whether he

9    had those beliefs, then they could bring this email in to

10   rehabilitate his statements.  But this is, otherwise, an

11   out-of-court statement that -- by Kevin Griffis; he can

12   testify.

13           MR. MURPHY:  It's not been offered --

14           THE COURT:  And also, I guess part of the problem I

15   have is where he says, Here are the most important conclusions

16   in the report.  Other people glommed onto other things as the

17   most important conclusions to the report, the things that were

18   less condemning.

19           I think he's just going to have to testify.  And we

20   can get in his reaction and what he thought was necessary and

21   whether he involved Mr. Craig in it.  Those are facts that he

22   can testify to.  But a detailed written description of what he

23   thought, and what the report says, do assert facts that -- and

24   I think he can just tell his story.

25           MR. MURPHY:  All right.

1                    THE COURT:  Okay.  213.

2                    MR. MURPHY:  213 is the result of the call that the

3      folks at the Podesta group made to Rick Gates.

4                    THE COURT:  Hold on.  Hold on.

5                    MR. MURPHY:  I'm sorry.

6                    THE COURT:  Let me pull it up.  Well, it's hearsay.

7      Rick says this, Rick is looking for that, Rick doesn't want

8      this, Rick wants that.

9                    MR. MURPHY:  And we want to cross-examine Rick about

10     all those things, Your Honor.

11                   THE COURT:  You're welcome to say:  Rick, isn't it

12     true that you were looking for X and that you were looking for

13     that?  But -- and he'll either say yes or no.  But then you

14     can't hand him this document because he didn't write it.  Then

15     if someone else, when you put your case on, wants to say, No,

16     Rick said those very things, I was there; that's fine.

17                   MR. MURPHY:  Okay.

18                   THE COURT:  All right.  So, it's a pretty long chain.

19     What's the part -- what are you objecting to in particular?

20                   MR. McCULLOUGH:  In particular, Your Honor, the top

21     email in the exchange Eckhart Sager is stating what Alex is or

22     is not allowed to do.  And it says, Yes, Alex is not allowed to

23     speak to any media on or off the record, sadly.

24                   As far as we understand, Mr. Sager is not a witness

25     in this case.  And he's stating what instructions Alex

1   van der Zwaan has received; it's unclear from who.  So it's

2   double hearsay.

3            THE COURT:  How does that statement come in, if

4   Mr. Sager is not here and Alex is not here?

5            MR. MURPHY:  So it was copied to Mr. Gates and

6   Mr. Hawker.  Mr. Gates and Mr. Hawker I'm going to

7   cross-examine, or someone is going to cross-examine about the

8   fact they knew Mr. van der Zwaan had been instructed not to

9   talk to journalists, and he had been instructed not to talk to

10  journalists by Mr. Craig.  They knew that.

11           MR. McCULLOUGH:  And --

12           THE COURT:  Well, if someone says that, it still

13  sounds like -- the question that you ask, even at the time,

14  could be hearsay.  But then I don't think that Mr. Eckhart

15  Sager saying that in writing comes in evidence.  So is that --

16  that's the reason you want the whole thing in, is for that?

17           MR. MURPHY:  I want to be able to show Mr. Hawker and

18  Mr. Gates that they had a desire for Mr. van der Zwaan to speak

19  to journalists in Europe, and that Mr. van der Zwaan was

20  precluded from doing that by Mr. Craig.

21           THE COURT:  And they know that how?

22           MR. MURPHY:  Because they got this email, among other

23  reasons, and they --

24           THE COURT:  That's hearsay.  They have no personal

25  knowledge.  And they're going to testify I got an email from

1    someone who made an out-of-court statement that you are seeking

2    to admit for the truth of the matter asserted who's not here.

3              MR. MURPHY:  They were trying to direct

4    Mr. van der Zwaan to go off to Vilnius, Lithuania -- Latvia --

5    whichever country that is.

6              THE COURT:  Well, you can say, Did you ask

7    van der Zwaan to do this?  Did you want van der Zwaan to do

8    this?  Did he do it?  No, you can't say, Why not?  They don't

9    have personal knowledge.  They only know what they heard

10   through the grapevine, which would be hearsay.

11             Mr. Craig can say the reason he wasn't talking is

12   because I told him he couldn't.

13             MR. MURPHY:  Okay.

14             THE COURT:  All right.  Okay.  It's somebody's red

15   line.

16             MR. MURPHY:  It's Mr. Griffis' red line, Your Honor.

17             THE COURT:  Is Mr. Griffis going to testify?

18             MR. MURPHY:  Yes, he is.

19             THE COURT:  It's his red line of what?

20             MR. MURPHY:  So what happened --

21             THE COURT:  Just -- let's try to keep this as narrow

22   as possible.

23             MR. MURPHY:  Mr. Gates sent Mr. Griffis the outline,

24   the talking points that Hawker had created.

25             THE COURT:  Okay.  And this is his red line?

```
 1                    MR. MURPHY:  And Mr. Griffis looked at them and made

 2       comments in the margin about what an unprofessional piece of

 3       work this was, etcetera.

 4                    THE COURT:  And it's coming in through the person who

 5       created it?

 6                    MR. MURPHY:  Yes.

 7                    THE COURT:  And it's relevant because?

 8                    MR. MURPHY:  It's his reaction to the false spin

 9       being put out by FTI.

10                    THE COURT:  It's Mr. Griffis' reaction to the false

11       spins?

12                    MR. MURPHY:  Yes.  And among other things, he says,

13       We don't want to be on the other side of these things with Greg

14       Craig, the author of the report.

15                    THE COURT:  When did he express these points of view?

16       When is he doing this?

17                    MR. MURPHY:  Right before the report was released.

18                    THE COURT:  So what he's editing is something FTI is

19       planning to release?

20                    MR. MURPHY:  And did.

21                    THE COURT:  Did not?

22                    MR. MURPHY:  Did.  Oh, FTI released it in the form

23       before he edited it, they didn't take the edits.

24                    THE COURT:  All right.  Yes?

25                    MR. McCULLOUGH:  It's not clear why Mr. Griffis'
```

1     reaction, mental state to Mr. Hawker's statements has any

2     bearing on what Mr. Craig's state of mind was.  This is -- I

3     mean, this is -- it's kind of slight of hand.  I mean, it's

4     Mr. Griffis.  If Mr. Griffis has an impression of Mr. Hawker,

5     Mr. Griffis can get up and state his impression of Mr. Hawker

6     and what he thought Mr. Hawker was doing to the report.  And if

7     that is -- I think we would object as to relevance, as to

8     whether Mr. Griffis' impression of the report is relevant in

9     any way to what Mr. Craig's state of mind was.  What other

10    people thought or didn't think of the report, what other people

11    thought or didn't think of Mr. Hawker's efforts to roll out the

12    report, that's not relevant.  The question is --

13              THE COURT:  How are you going to tie this to what

14    it's supposed to relate to, which is what Mr. Craig either was

15    doing when he met with the *New York Times* or was thinking when

16    he met with the FARA unit?

17              MR. MURPHY:  Well, this spin document that Hawker

18    created and had been circulating is one of the reasons why

19    Mr. Craig acted as he did, to speak to the *New York Times*

20    himself.

21              THE COURT:  Where is the indication that Mr. Craig

22    got it?

23              MR. MURPHY:  He didn't get this version, he got the

24    earlier version, back in September.  But he knew --

25              THE COURT:  Where is that?  Have I seen that

1    document?

2              MR. MURPHY:  I don't know which exhibit it is, Your

3    Honor, but it's June the -- I'm sorry, September the 25th.

4              THE COURT:  All right.  Well, then that's how it

5    comes in then.

6              MR. MURPHY:  But the fact that Hawker continues to

7    try to put this out in this way, that other people on the team

8    at the Mercury group and the Podesta Group think that it's an

9    unprofessional spin that should not be issued --

10             THE COURT:  Unless they called him up, and they

11   picked up the phone and he's going to say I got a call from

12   Tony Podesta and that made me really concerned.  The fact that

13   Griffis is sitting at his desk being concerned does not relate

14   to Mr. Craig's state of mind, I agree.

15             MR. MURPHY:  I think what the facts will show is

16   Mr. Gates tried to keep the professionals at Podesta and

17   Mercury away from Mr. Hawker.  Mr. Hawker did not have

18   interaction with them, at the end of the day.  And the other

19   people --

20             THE COURT:  The further you move them out of this

21   whole conversation, out of Mr. Craig's head, doesn't have

22   anything to do with Mr. Craig's head.

23             MR. McCULLOUGH:  Your Honor, and Wednesday's version

24   of this description was that Mr. Craig reacted when he saw

25   Mr. Hawker's email to Mr. Sanger.  So I don't know how we're

1    now talking about what Mr. Griffis thought about Mr. Hawker's

2    spin of the report.  It's so far afield it is preposterous.

3              THE COURT:  Okay.  I don't see -- this has not been

4    connected up, to me, as to the issues in the trial, or even to

5    Mr. Craig's state of mind.  So I'll exclude it.

6              242.  Okay.  So, is this the actual -- is there any

7    dispute about whether this was a press release that came out

8    from the Ministry of Justice?  Do we have a date?  There's a

9    phone number.

10             MR. ABELSON:  I don't think there's any dispute that

11   this is what it purports to be.

12             THE COURT:  I'm just trying to figure out what it

13   purports to be.

14             MR. ABELSON:  The Ministry of Justice press release

15   on December 13th.

16             THE COURT:  All right.  On the 13th, when they --

17             MR. McCULLOUGH:  I don't know which witness is

18   testifying that this is the final statement of the Ministry of

19   Justice that was published on December 13th.  I mean, yes, this

20   is a two-page document that has 13.12.2012 at the bottom of it,

21   but I don't know if this is a draft, I don't know if this is a

22   final.

23             THE COURT:  All right.  Who -- who is going to say

24   that this is the one that they saw that day?

25             MR. TAYLOR:  This is the one that Mr. Craig saw.

1           THE COURT:  Is Mr. Craig going to say this is the one

2     that Mr. Craig saw?

3           MR. TAYLOR:  He is.

4           THE COURT:  All right.

5           MR. McCULLOUGH:  And, Your Honor, the question would

6     be whether Mr. Craig saw this before he spoke to the *New York*

7     *Times*.

8           THE COURT:  All right.  I don't have to ask him that

9     right now.

10          But he's going to testify that he was reacting to

11    this.

12          MR. TAYLOR:  Among other things, this included.  Not

13    only that, but this is a document that is quoted in the *New*

14    *York Times* article and in the *LA Times* article, the very

15    document which the Ministry put out which demonstrates the

16    falsity of their description of the report, and which made him

17    convinced that he had to speak to the press.

18          THE COURT:  The document that came out on the 13th is

19    the one that convinced him we need to speak to the press on the

20    12th?

21          MR. TAYLOR:  I didn't say that.

22          THE COURT:  Okay.

23          MR. TAYLOR:  But it is evidence of why he believed,

24    correctly, that the Ukraine intended to misrepresent the

25    content of the report.

```
 1                    THE COURT:  So does this one -- do we know, does this
 2       one come from his files, or it just comes from the internet?
 3                    MR. TAYLOR:  It was sent to him by another person
 4       named Bruce Jackson.
 5                    THE COURT:  But this one that we happen to have
 6       that's marked is the one that he had?
 7                    MR. TAYLOR:  Yes.
 8                    THE COURT:  So he'll say, I think this is -- I had
 9       it.
10                    MR. McCULLOUGH:  Your Honor, I think then if the --
11       if this document was sent to Mr. Craig, I think that this
12       document should be admitted into evidence and the email in
13       which it was sent to him.  So if he received this on December
14       13th at 5 o'clock p.m., then I think that would be fairly
15       probative of the value of this evidence.  And I think that
16       absent that --
17                    THE COURT:  Do you have a transmittal email?
18                    MR. TAYLOR:  I do.  I think so.  Does the government
19       seriously contend that this is not --
20                    THE COURT:  No.  They're making a completeness
21       argument.
22                    MR. MURPHY:  The government produced this document to
23       us, Your Honor.
24                    MR. McCULLOUGH:  That doesn't mean we know what it
25       is.  That doesn't mean we know what it is.
```

1          MR. CAMPOAMOR-SANCHEZ:  The document was produced by

2     Skadden to the government, so --

3          THE COURT:  No one is saying they don't have it.

4     You're saying that the relevance of it is responding to it.

5     And they're saying that, therefore, for completeness

6     purposes --

7          MR. TAYLOR:  Two points.

8          THE COURT:  Yes.

9          MR. TAYLOR:  It proves the reasonableness of

10    Mr. Craig's fear of what they were going to say, because that's

11    what they said.  And, in some respects, it is a document which

12    was quoted in the *National Law Journal*, which carried an

13    erroneous article that Mr. Craig had to correct.

14         THE COURT:  All right.  I think that for completeness

15    purposes, their point that the transmittal email goes with it

16    is fair.  And I don't think it detracts from anything you just

17    said.

18         MR. TAYLOR:  That's fine.

19         THE COURT:  All right.

20         MR. TAYLOR:  But I don't -- I don't understand them

21    to be agreeing or not, that this is in fact the press release

22    that the Ministry issued.  Are we going to need to prove that?

23         THE COURT:  It doesn't -- I think, given all the

24    indicia of reliability that is on it, given the quotes in all

25    the newspaper articles, given the fact that it's now going to

1    have a transmittal email that says have you seen this yet, or

2    whatever it says, I'm admitting it in evidence.

3            MR. TAYLOR:  We'll attach the transmittal.

4            THE COURT:  249.  All right.  So, he's sending

5    another letter -- he's forwarding an article to somebody else

6    later in the day.  What does this have to do with anything?

7            MR. ABELSON:  This is directly relevant, Your Honor,

8    to Mr. Craig's state of mind at the time of the rollout.  He's

9    describing the *Kyiv Post* article as the best story about the

10    report.  This was the most thorough article about the report's

11    actual conclusions.  One of the few reporters who actually read

12    the report and then accurately reported all of the due process

13    violations that had -- that Skadden had found were committed in

14    connection with the prosecution and trial of Miss Tymoshenko.

15            THE COURT:  And it's relevant to his state of mind

16    about what?

17            MR. ABELSON:  About what -- about the coverage of the

18    report.  So he was -- he was reacting to and in anticipation of

19    coverage that he knew would be not this.  If -- if he were

20    participating --

21            THE COURT:  I understand your point.  The objection

22    is hearsay.  The *Kyiv Post* article is being admitted for the

23    fact that it was posted.  He's going to testify that it made

24    him happy because it was accurate.  It either does or doesn't

25    prove what goes to the issues that are disputed here, but I

 1    don't see the objection to it.  And so --

 2                MR. CAMPOAMOR-SANCHEZ:  That's if he testifies.

 3                THE COURT:  Yes.

 4                MR. ABELSON:  Your Honor, I'd just add that it goes

 5    directly to the question of whether Mr. Craig was participating

 6    in the media plan.  If he was --

 7                THE COURT:  Right.  Yes.  So that means you get to

 8    stop talking.  It's the quit-while-you're-ahead rule of

 9    litigation, which is an important rule.

10                All right.  Now, but now we've got somebody else

11    sending around an article from December 13, in April.  So --

12                MR. ABELSON:  Your Honor, I think their only

13    objection was the date that we put on the exhibit list.

14                THE COURT:  Well, why is it relevant then, if she --

15    that Lauren at Skadden is sending this to Craig?  What does it

16    have to do with anything?

17                MR. ABELSON:  This is connection with the FARA unit's

18    inquiries about the statements that Mr. Craig made, that --

19                THE COURT:  So she's just reminding him what Emily

20    said back in December, after she spoke to him?

21                MR. ABELSON:  Your Honor, if you look at the second

22    page, Mr. Craig is asking Miss -- then Weiss, now Miss Mallet,

23    news article -- subject --

24                THE COURT:  So he gets the letter from the FARA unit

25    and he's trying to figure out, well, how do I answer?  They

367

 1   raised the *LA Times* article.  Can I see the *LA Times* article?
 2   And that is it.  Is that all this is?
 3              MR. ABELSON:  Yes.
 4              THE COURT:  What's the problem with that?
 5              MR. McCULLOUGH:  There's not.  The government does
 6   not dispute the relevance of this document.  The question is
 7   whether the document -- it's dated December 13th.
 8              THE COURT:  They'll fix the date before any exhibit
 9   list goes to the jury.  Usually the exhibit lists don't go
10   anyway.
11              All right.  What is it, 260?
12              MR. MURPHY:  So Exhibit 260, Your Honor, is an email
13   from folks that were part of the Eckhart Sager, Alan Friedman
14   organization, about the *New York Times* article in which
15   Mr. Craig was quoted.  Mr. Sager says, What happened with that
16   *New York Times* piece on Skadden, not a good start.  And then
17   the response is --
18              THE COURT:  Well, no, Demetrius Kuleba sends it to
19   Sager and says that.
20              MR. MURPHY:  Right.  And Sager says, Not at all, nor
21   the one in the telegraph.  But our coverage on ANSA was superb.
22              THE COURT:  Okay.  So are either one of those people
23   testifying?
24              MR. MURPHY:  I don't think so, Your Honor.
25              THE COURT:  All right.  Well, that's a little bit of

1    a problem.  I understand what you're trying to show.  The

2    people on the team didn't really like the way it happened, they

3    liked the story they put out there better.  But I just don't

4    think we can just let these emails --

5            MR. MURPHY:  I want to be able to ask, or someone

6    wants to be able to ask Mr. Gates about it and Mr. Hawker about

7    it, because all these folks are together in Kiev, sitting

8    around --

9            THE COURT:  You can say to Mr. Gates and Mr. Hawker,

10   What happened when the *New York Times* article came out?  But

11   that's different than, Why don't you take a look at what

12   Mr. Kuleba said to Mr. Sager.

13           MR. MURPHY:  Okay.

14           THE COURT:  261.

15           MR. MURPHY:  261 establishes that Andrea Gianotti was

16   the one that placed the article with ANSA.

17           THE COURT:  Again, people can testify about what they

18   did.  We're not just putting in emails of people who aren't

19   here and can't talk about it.

20           262 seemed to have a lot of hearsay in it, too.

21           MR. MURPHY:  262 is something we want to ask

22   Mr. Gates about.  Mr. Gates insisted that someone at the

23   Podesta Group get the people at the State Department during

24   their briefing to talk about the Skadden Report.  And it turned

25   out to be an unmitigated disaster for the Ukraine and for

1    Gates.

2                 MR. CAMPOAMOR-SANCHEZ:  How is that relevant?

3                 THE COURT:  So what does it have to do with anything?

4                 MR. MURPHY:  It was because the report was viewed as

5    one that vindicated, in the eyes of the U.S. State Department,

6    the fact that Tymoshenko had been unfairly tried.

7                 MR. CAMPOAMOR-SANCHEZ:  Your Honor, this is not what

8    this case is about.  And this has no relevance to whether

9    Mr. Craig, as we contend, was part of the media plan and

10   contacted the *New York Times* at the request of the Ukrainian

11   government through Manafort, Gates, Hawker, etcetera.  Whether

12   Gates succeeded or not in doing something else after the fact

13   is irrelevant.

14                THE COURT:  Isn't this the opposite of --

15                MR. MURPHY:  Your Honor, this is really the

16   vindication of the views by Mercury and Podesta, that the

17   Skadden Report would not be viewed favorably in the West, that

18   they ought not to release it, that they ought not to be asking

19   the State Department to comment on it.  But Gates stubbornly

20   refuses and tries to present the spin and he ends up with egg

21   on his face.

22                Mr. Craig was not part of the media plan.  The media

23   plan was going off in another direction and he was not part of

24   it.

25                THE COURT:  I don't think this shows anything about

1    whether Mr. Craig was part of the media plan.  This may show

2    that Mr. Craig said what he believed about -- he put his true

3    views in the report, or it doesn't show that he put his true

4    views in the report, it shows that it wasn't necessarily a big

5    score for the Ukraine in the West, or it was.  But, it doesn't

6    have anything to do with what he was doing when he was talking

7    to the reporters.

8              MR. MURPHY:  I think, Your Honor, we should wait

9    until Mr. Gates testifies, because I think this document could

10   become relevant for his cross-examination.

11             THE COURT:  All right.  We'll see.  But you can't

12   move it in until we've talked to Gates about that.

13             MR. McCULLOUGH:  Your Honor, I think -- we would say

14   that the top email would still be hearsay and should be

15   redacted.

16             THE COURT:  Yes.  I just don't think that we can put

17   in a piece of paper about what the State Department said to

18   Chang and Chang said to Gates.

19             All right.  Now, 268, is this the same *Kyiv Post*

20   article but with the picture?

21             MR. ABELSON:  No, this is the *Kyiv Post* article.  The

22   other was just a link.

23             THE COURT:  A link to it.

24             MR. ABELSON:  So I suppose it's mostly a completeness

25   issue.  But a number of emails among the various people who

1    will be witnesses referring to the *Kyiv Post* article.  So we

2    need the article to explain what they're talking about.

3              THE COURT:  Well, do we?  I mean, isn't that the

4    point, that --

5              MR. ABELSON:  Your Honor, if I may.  We definitely

6    do.  The content of this article is absolutely critical to the

7    evidence of Mr. Craig's state of mind at the time of the

8    rollout.  It may not be apparent now, but it certainly will be

9    when Mr. Craig testifies.

10             THE COURT:  I thought you were saying that he said

11   what he said to the reporters because he knew what the

12   government of Ukraine was going to say when they stood outside

13   and waived the report around.

14             MR. ABELSON:  Your Honor, if Mr. Craig was an active

15   participant in this media strategy, he would not be telling all

16   these people that the *Kyiv Post* article was the great article.

17   This was -- this was the worst article for Ukraine.  It was the

18   one that was truthful to the report.

19             MR. CAMPOAMOR-SANCHEZ:  Your Honor, what somebody

20   ultimately decides to write, and Mr. Craig's views, or lack

21   thereof, about whether somebody tracked his report or presented

22   it in the best way or not, is not what this case is about.

23   It's whether he agreed to contact the *New York Times* and others

24   at the request of Ukraine, regardless of what the outcome is,

25   and then not telling the government about it when they asked

1    him.

2          They're trying to make this case about the report and

3    whether his report was independent or not, and whether one

4    article was more closely related to his conclusions in the

5    report as stated, or not.  And that's not what the government's

6    case is about, that's not what he's been charged with.

7          MR. ABELSON:  Your Honor, they believe that when

8    Mr. Craig said he was not part of a media plan, a media

9    strategy, a media team, that he was lying.  He was not part of

10   that media strategy, and this is evidence of it.  And in fact,

11   the email that we've discussed on Wednesday, when Mr. Manafort

12   makes a statement that is offered by the government for the

13   truth, that your backgrounding has been the key to it all.

14   Mr. Craig's response was, The *Kyiv Post* article was great; not

15   any of the articles that Mr. Manafort was saying this is great

16   coverage for Ukraine.

17         He was saying the *Kyiv Post* article got it right and

18   showed the world, or at least people who read English, the *Kyiv*

19   *Post*, which is widely read, at least in Ukraine among English

20   speakers, that this is the coverage.  Mr. -- Mr. Craig was not

21   part of this media plan and this is important evidence of that.

22         MR. CAMPOAMOR-SANCHEZ:  So the content of the article

23   is not important to establish whether he agreed to talk to

24   Sanger and the *New York Times* and others at the request of

25   Ukraine.  It does not.  No matter what it says.

 1          MR. TAYLOR:  If that is the case, what is the

 2    relevance of Mr. Manafort sending him a note that says, You're

 3    the man?  If what Mr. Sanchez -- Campoamor just said is true,

 4    then what is the relevance of putting -- of an exhibit in which

 5    Manafort says to Craig, You're the man?

 6          MR. CAMPOAMOR-SANCHEZ:  Because he's telling him that

 7    he backgrounded journalists according to the media plan.  And

 8    he's not responding with a negative to that, right?  He's

 9    responding, Oh, yeah, this was great, they're saying those bad

10    things, that's not good for her.  He didn't deny it.  That's

11    how he reacted to that email.  That is relevant as to his

12    actual state of mind.

13          MR. TAYLOR:  The content of the *Kyiv Post* article

14    demonstrates that Mr. Craig saw the difference between media in

15    which he participated and media in which he didn't.  And the

16    *Kyiv Post* proves his point, and that's why he sent it to

17    Manafort with his tongue in his cheek.  That's what's relevant.

18          MR. CAMPOAMOR-SANCHEZ:  If he wants to testify to

19    that fact, then he can testify and I can cross-examine him

20    about it.

21          MR. TAYLOR:  We just need the article.

22          THE COURT:  The article can come in, it's in emails

23    offered by both sides.  I don't think there's ever been any

24    allegation, though, that he was supposed to be part of a

25    foreign media rollout.  And I take it there were other

1    articles -- I mean, I just don't want to get in a situation

2    where we're sitting there with a *New York Times* article, the *LA*

3    *Times*, the *National Law Journal*, the *Kyiv Post*, the ANSA, all

4    the articles that he might say, from the Ukraine, that got it

5    wrong, the press release, and trying to figure out which is

6    more or less true to the report, then we really are trying the

7    report, or the press, as opposed to the interview with the FARA

8    people.

9            MR. MURPHY:  Your Honor, this gets to the next

10   exhibit.  But we're really trying whether or not Mr. Greg Craig

11   was part of the media plan and whether he took actions

12   consistent with the media plan, as referenced in the

13   allegations in the indictment, paragraph 63, or not.  Our view

14   is that he was not.  The media reports that accurately describe

15   what the report says on the one hand are few and far between.

16   It's basically the *New York Times*, the *Kyiv Post* that got it

17   right on their own, without Mr. Craig talking to them.  The

18   United Kingdom article, the *Daily Telegraph* article, which got

19   it right because they talked to Mr. Craig.  The National Law

20   Journal got it right after Mr. Craig talked to them and they

21   corrected the earlier article.

22           The rest of the press, and the stuff that

23   Mr. Manafort sends to Mr. Craig saying your backgrounding has

24   been the key to it all, it's all in Exhibit 277.  It was the

25   press that was generated by Eckhart Sager, Andrea Gianotti,

1    that came from the Ukraine's newswire, which they reference in

2    Exhibit 277.  And that's where the favorable pro-Ukraine media

3    message came from, and Greg Craig was no part of it.

4           THE COURT:  All right.  Let's say that the

5    combination of their exhibits and your exhibits definitively

6    show that he was not a part of the media plan.  The indictment

7    says that when he said X about what he did, it was false or

8    misleading.

9           MR. MURPHY:  Right.

10          THE COURT:  So, that could be true whether or not --

11          MR. MURPHY:  It's not true that he took actions

12   consistent with the media plan, which is what indictment

13   paragraph 63 says five separate times.  That's not true.  We're

14   entitled to show that, that it was not -- what he did was not

15   consistent with the media plan.  And, Your Honor, the key

16   question under FARA is whether he acted at the direction of the

17   Ukraine and for the benefit of Ukraine.  And the evidence will

18   be that he did not, because he took action that fairly

19   characterized the summary of his report, which was contrary to

20   the Ukraine media plan concocted by Manafort, Gates, and FTI.

21   That's our case.

22          MR. CAMPOAMOR-SANCHEZ:  He did not talk to the *Kyiv*

23   *Post*, and yet -- and the Court has ruled it's coming in, that's

24   fine.  But it's not the content, it's not the message, it's not

25   ultimately how it's portrayed; it's the fact that he agreed to

 1    talk, regardless of the outcome.  Even if Ukraine and Manafort

 2    made a bad bet and what they hoped would happen when he talked

 3    to the press was not as good as they hoped, the fact that he

 4    agreed to do so and then carried it out is what is at stake,

 5    because that's what he did not tell to the FARA unit.

 6            It's not the content.  We are not, despite what they

 7    say, we're not trying the report.  We really are not.  It's

 8    what he ultimately did --

 9            THE COURT:  Well, I think what we're really talking

10    about now is the arguments that you both would make at the end

11    about what the jury should or shouldn't make of this evidence.

12            MR. CAMPOAMOR-SANCHEZ:  Right.

13            THE COURT:  And that's different than the

14    admissibility of the evidence.

15            MR. CAMPOAMOR-SANCHEZ:  Right.

16            THE COURT:  So, I think what we just did was admit

17    the *Kyiv Post* article.  And now we're on to 277.

18            MR. MURPHY:  277, Your Honor, is a --

19            THE COURT:  Wait.  Wait.

20            MR. MURPHY:  I'm sorry.

21            THE COURT:  Your electronics might be more impressive

22    than mine.

23            I don't know that we can finish.  I would really like

24    to finish.  What's the court reporter's point of view about

25    whether we can finish?  How much more can I impose on you?

```
1                    (Off-the-record discussion.)

2            THE COURT:  There's a lot of things that we're going

3    to argue about whether they're relevant, for the next page or

4    two.  Then we get to, really, the stuff that goes to

5    enforcement, goes more to the duty to disclose and the legal

6    issues, the audit of NARA, the reasonableness of thinking he

7    was going to have to register or not, those kinds of issues.

8    And then we get to van der Zwaan and Manafort's convictions.

9            MR. TAYLOR:  We're not going to say anything about

10   those.

11           THE COURT:  All right.  I think that -- let's do the

12   next few that relate to the press rollout and then break and we

13   can find a moment at some point between jury selection, or even

14   before the beginning of the defendant's case, to finish this.

15   But, I think everybody has had a long week and there's only so

16   long we can keep doing this.

17           All right.  Talk about 277 briefly.  This is about

18   the article in ANSA that everybody is all excited about.  And

19   what you're saying is these are the emails that show they're

20   the ones that were busy making this happen.  Is there any human

21   being related to this chain who's going to be on the witness

22   stand?

23           MR. MURPHY:  No, Your Honor.  But I want to ask

24   Mr. Gates about it because I think he's knowledgeable about it.

25           THE COURT:  Well, then you can ask him about the
```

1    facts, but not emails that he didn't get.

2              MR. MURPHY:  Okay.

3              THE COURT:  Okay.  278.

4              MR. MURPHY:  278 is email from Mr. Podesta to

5    Mr. Gates.  It's the day after the report is released.  And

6    Mr. Podesta tells Mr. Gates, The more we push on the Skadden

7    Report, the more bad press we will get.  The report has a lot

8    of negative stuff in it.  The more attention we pay, the more

9    we will get more calls for Tymoshenko's release.  I want to ask

10   Mr. Gates about that on cross.

11             MR. CAMPOAMOR-SANCHEZ:  How is that relevant, Your

12   Honor?  If this is Podesta's own statement, how is that

13   relevant?

14             THE COURT:  When Mr. Gates is on the stand, you're

15   going to cross-examine him about the fact that when the report

16   came out, the Ukraine PR team felt that it hurt their cause,

17   and they should -- less is more and they should stop talking

18   about it.  You can ask him about it.  That's not moving in Tony

19   Podesta's statements to Mr. Gates.  If Mr. Gates denies ever

20   hearing that, Tony Podesta is going to be here, right?

21             MR. MURPHY:  No.  No.

22             THE COURT:  Somebody from Podesta is going to be

23   here?

24             MR. MURPHY:  Griffis.

25             THE COURT:  I think, the farther and farther we get

1    from what was in his mind on the 12th and 13th, the less and

2    less relevant this gets.

3              All right.  This is similar.  These are just

4    out-of-court statements by Ben Chang about what he's trying to

5    do at the State Department.  Again, I just --

6              MR. MURPHY:  I would like to ask Mr. Griffis about

7    it.  He's a recipient of all this.  And the recommendation to

8    Gates and company was, the smart thing to do was to bury the

9    Skadden Report.

10             MR. McCULLOUGH:  That is the view of a non-witness,

11   Mark Tavlarides.  That is complete hearsay.

12             THE COURT:  But these are more, Did you read the

13   Skadden Report?  Did you discuss it among the team?  Was there

14   a consensus among the team about whether they wanted to

15   continue to keep pushing it or whether they wanted to stop

16   talking about it?  And as a result of those discussions, what

17   did you do?  We decided to stop talking about it.  So Sammy

18   said that Sammy went to the State Department and Joe at the

19   State Department said he didn't like it; that's not coming in.

20             MR. MURPHY:  280 and 281 go together, Your Honor.

21   They show that as of the day of the release of the Skadden

22   Report, Mercury was sending to Mr. Gates a strategy for the

23   upcoming period of time.  And there's not a single mention of

24   the Skadden Report in it.

25             MR. McCULLOUGH:  Your Honor, I think that

1     demonstrates the lack of relevance here.

2          THE COURT:  I think you can ask Mr. Gates, if they

3     moved forward after that, were they going to continue to use

4     the Skadden strategy -- the Skadden Report, or was this done

5     for?  If he says, No, we were going to use it, then you might

6     have to cross-examine him, but otherwise --

7          MR. MURPHY:  Thank you, Your Honor.

8          THE COURT:  Okay.  Is that the --

9          MR. MURPHY:  282 is sort of coupled with that big

10    compendium of articles emanating from Sager and company.  This

11    one goes to Gates.  And basically the message is, all of these

12    articles that are so favorable to the Ukraine are all our work,

13    the work of Alan Friedman and Eckhart Sager.

14          THE COURT:  That is an out-of-court statement.  And I

15    know he's taking credit for it, but he's not here.

16          MR. McCULLOUGH:  And that top email does not go to

17    Mr. Gates.

18          THE COURT:  So, you know, part of the problem with

19    all these guys is they're all PR guys and so they take credit

20    for the good stuff.  You know, Manafort always takes credit for

21    the good stuff, he doesn't take credit for the bad stuff.  Who

22    knows, is any -- you know, if you want people's statements to

23    come in evidence, somebody has to be able to cross-examine them

24    about it.  And I think you've already shown, and you've gotten

25    Gates -- you're going to get Gates to agree that it was this

1    team and that team that was working with this paper and that

2    paper, and not Craig, and that's the point.

3              284.  I think I might have a different --

4              MR. MURPHY:  I'll withdraw it, Your Honor.

5              THE COURT:  And, you know, 284 is the same thing.

6    That just -- continued to see press that led them to believe

7    they shouldn't do anything more to promote the report.  I think

8    he'll agree with it.

9              MR. MURPHY:  I'll withdraw it, Your Honor.

10             THE COURT:  All right.

11             MR. ABELSON:  Your Honor, I think there's 283.

12             MS. GASTON:  I'm sorry.  Where are we?

13             MR. MURPHY:  283.

14             THE COURT:  I don't -- what is this?  This is just

15   transmitting the reports around, and what date it was.  What is

16   it?

17             MR. ABELSON:  This is relevant to Mr. Craig's state

18   of mind.

19             THE COURT:  What is it --

20             MR. ABELSON:  I'm sorry.

21             THE COURT:  -- first.

22             MR. ABELSON:  283 is an email chain, that the last

23   two emails in the chain of which are Alex Haskell, an associate

24   at Skadden, who will be a witness and worked on the report, is

25   commenting on the fact that the cover sheet on the report that

1    got released in December, said September 2012.  A reporter, I

2    think, asked, Why is it dated September 2012?  And Mr. Craig is

3    saying, Haskell is right, done in September, delivered and

4    released in December.  We believe that in their case they're

5    going to talk about input that was given to the report in, for

6    example, September, maybe later.  If they don't, this probably

7    isn't relevant.  But the point is, Skadden considered the

8    report done, and so any comments that were received later are

9    irrelevant.  I think we can wait and see, but that's the

10   relevance of this document.

11          MR. McCULLOUGH:  Your Honor --

12          THE COURT:  Let's just wait and see if they need to

13   use it for anything, and then we'll talk about it.  Because you

14   use September on both sides of that equation.  So, if they got

15   comments in September and they thought it was done in

16   September, we don't know whether that means they took in the

17   comments or they didn't take in the comments, because we don't

18   know the dates.

19          As I seem to understand it, you showed some documents

20   where they wouldn't make some changes.  I thought there were

21   some changes he did make, and some he didn't.  So that doesn't

22   really prove it one way or the other.

23          MR. ABELSON:  I may have misspoken.  I meant comments

24   after September.

25          THE COURT:  All right.  Well, I don't know if there's

 1    an allegation that he dealt with comments after September.  And

 2    if there are, then we'll figure it out.  But again, then it

 3    would just be an out-of-court statement by Mr. Craig.  So

 4    Mr. Craig would have to testify, not the email.

 5              Okay.  All right.  This just, you know, is a lot of

 6    sort of cute stuff back and forth a year later.

 7              MR. MURPHY:  Not a year later, Your Honor.

 8              THE COURT:  But, it's -- it's people other than

 9    Mr. Craig talking about what other people said, making little

10    snarky remark, like in-group jokes about it; our friends love

11    it, our friends don't love it.  Good times.  Why, why is this

12    relevant?  I think it's irrelevant.

13              MR. MURPHY:  So, the Podesta Group was part of the

14    media effort.  They had a different point of view than FTI and

15    Hawker and Gates.  And when the European court ruled that

16    Tymoshenko had been jailed in violation of her rights by the --

17    by the Yanukovych regime, Mr. Griffis, who is going to be a

18    witness, said, in fairness, they were just agreeing with the

19    Skadden Report.  It's a -- it's just a hearsay objection, but

20    Mr. Griffis is going to be here to testify about that.

21              THE COURT:  Well, we just don't need everybody else's

22    little remarks about it.  I also don't know why it matters what

23    the European court said eventually, or whether that's

24    consistent with the Skadden Report and whether Mr. Griffis

25    thinks it was.

1          So, the exhibit is excluded.  And if somehow April

2     becomes relevant to his testimony and you ask the question -- I

3     don't understand why the fact that ultimately the European

4     court agreed with Skadden is relevant.

5          MR. MURPHY:  What's relevant to us, Your Honor, is

6     that the media professionals from Mercury and Podesta

7     recognized Mr. Craig's report for what it was, an independent

8     report that found substantial violations of Miss Tymoshenko's

9     rights.  And as a result, they did not join in the phony media

10    plan put together by Hawker, Gates, and Manafort.  And Greg did

11    not participate in that.

12          THE COURT:  Well, that doesn't have anything to do

13    with April 2013.  And those -- all the people that you want to

14    ask these questions of have to be here and talk about it, in

15    any event.  So, I don't really see this coming in.

16          313.  All right.  So now we've got Alex van der Zwaan

17    and Alex Haskell talking to each other in January about the

18    response to the report.

19          MR. ABELSON:  This is specifically the response by

20    Miss Tymoshenko's legal team, that's -- that -- Mr. Vlasenko.

21    And they're seeing the coverage, including in the *New York*

22    *Times* and the *Telegraph*, the two publications Mr. Craig spoke

23    with, and thought this was great for them, and that they wanted

24    to use that.  Again, this goes directly to whether Mr. Craig,

25    when he spoke to these publications, was acting pursuant to a

1    media plan on behalf of Ukraine and in the Ukraine's interests.

2             MR. McCULLOUGH:  And, Your Honor, if Miss Skoda Karr

3    wants to come and testify that that was her view in whatever

4    time that she wrote this, then she can do so.  But otherwise

5    it's just hearsay as to what Miss Skoda Karr said, and it's

6    hearsay upon hearsay because then we get Alex Haskell

7    explaining what it is.

8             MR. ABELSON:  Your Honor, they did not object on

9    hearsay grounds, only relevance.  And in any event, it wouldn't

10   be the truth of those statements, how the coverage in those

11   publications was perceived by Tymoshenko's people.

12            MR. McCULLOUGH:  That's --

13            THE COURT:  All right.  So --

14            MR. McCULLOUGH:  If Miss --

15            THE COURT:  So van der Zwaan is passing along a link

16   to a site that has other people's emails, including an email

17   that is summarizing some of the newspaper articles.

18            MR. ABELSON:  Your Honor, I don't know who Skoda Karr

19   is, but I do know who Vlasenko was.  And so these are internal

20   emails that included Miss Tymoshenko's lawyer that somehow got

21   leaked.  And so now we're seeing what the Ukrainian

22   government's opponents, Tymoshenko's legal team, thought about

23   the release and the publications that Mr. Craig spoke with.

24   They saw them as not in Ukraine's interests.

25            MR. McCULLOUGH:  Your Honor, this is -- so, what is

1    happening here is that Mr. Haskell is repeating what's been

2    leaked onto the web.

3            THE COURT:  There is like a re-Tweet.

4            MR. McCULLOUGH:  This is ridiculous.

5            THE COURT:  I just think we're getting so far afield.

6    There will be human beings, with personal knowledge, who can

7    say people on this side of the Tymoshenko divide felt this way

8    and people on that side felt the other way.  And that's why we

9    let this go.  And it enables you to make the argument that you

10   all have made at least ten times today with respect to

11   documents, so I know you're going to be able to make it, that

12   what he was doing couldn't have been part of the plan because

13   it impeded the plan.

14           So, I don't think we need hearsay within hearsay

15   within hearsay to get there.  So this document is excluded.

16   And you can argue why that's not relevant either, but they can

17   at least make that case.

18           All right.  317, is still a little bit more

19   substantive.  So we'll do that one and then I'm going to cut it

20   off there, because some of that material may have been marked

21   to be part of the expert's testimony and, therefore, is not

22   happening.  My concern, and I need to look at the van der Zwaan

23   thing again, but I think it was Andrew Weissman says something

24   like, I think X, as opposed to van der Zwaan's actual statement

25   of offense, which he swore to in the courtroom, or an answer to

 1    a direct question put from me to him.  I need to look at it.

 2              MR. MURPHY:  My recollection, Your Honor, although

 3    not perfect, is that Mr. van der Zwaan was accused of both

 4    leaking a report to the Ukraine, or to Hawker, without

 5    Mr. Craig's permission and in contravention of his

 6    instructions, and also preparing talking points or helping to

 7    prepare talking points for Mr. Hawker, in contravention of

 8    Mr. Craig's instructions, and that Mr. van der Zwaan agreed to

 9    both those things, is my recollection.

10              THE COURT:  What he was accused of was lying to the

11    special counsel.

12              Yes?

13              MR. McCULLOUGH:  Your Honor, I --

14              THE COURT:  I need to look at it.  But all I'm saying

15    is I think it may have been unclear.  And I need to know what

16    you're trying to use it for; whether you're trying to put in

17    some out-of-court statement by Mr. van der Zwaan, and how it's

18    going to be used.  And I want to talk about what you're

19    planning to do with the Manafort judgment.  Is it just to

20    impeach his credibility?  But he's not testifying.  Or if

21    you're planning to use his statements against, is just when he

22    pled guilty?

23              MR. ABELSON:  So, Your Honor, to the extent it will

24    be helpful, I can point you to the pages in the van der Zwaan

25    materials.  So in Exhibit 320, it's on page 4.  We're not

1    trying to get in Mr. van der Zwaan's statements, we're getting

2    the government's statements about Mr. van der Zwaan's role and

3    what he did and what he said and what he lied about.

4         THE COURT:  How does that come in?

5         MR. ABELSON:  Oh, it's an admission of -- first of

6    all, they have only objected on relevance grounds.  It becomes

7    relevant if --

8         THE COURT:  I still get to figure out whether it came

9    in or not -- comes in properly or not.  I don't understand how

10   what Mr. Weissman said comes in evidence.  It may bar them from

11   arguing something contrary, if they get up and argue something

12   contrary.  But I don't see how it comes in evidence.

13        MR. ABELSON:  No, it does, Your Honor.  It's a party

14   admission.  And I'll direct Your Honor to a number of cases

15   that holds that statements of the government are party

16   admissions, like any other party.  So one is *United States*

17   *versus Morgan*, 581 F.2d 933, at 937 to -38, that's D.C. Circuit

18   1978; it's been settled.

19        THE COURT:  I just don't understand -- walk me

20   through how this thing is walking in evidence, what you're

21   going to do with it.  What does it prove?

22        MR. ABELSON:  The statements only come in if the

23   government suggests or presents evidence that, for example,

24   everything that Mr. van der Zwaan did was either at Mr. Craig's

25   direction or permission, etcetera.

```
 1                  THE COURT:  All right.  Well, if there comes a point
 2       where you need to introduce that for that reason, you let me
 3       know and then we'll talk about it.
 4                  MR. ABELSON:  Okay.
 5                  THE COURT:  I don't think you're going to be able to
 6       do that, in light of the van der Zwaan plea, that everything he
 7       did was at his direction.  That doesn't mean that anything he
 8       did was not at his direction.
 9                  All right.  Let's look at 317.  All right.  So this
10       is a memo that someone wrote Mr. Craig, describing his
11       conversation with Heather Hunt.  This is a telephone call.  I
12       don't see how the memo comes in.  Mr. Craig can testify that he
13       had a conversation with her and what he said and what she said
14       and why he did what he did.
15                  MR. TAYLOR:  And if he's attacked on the accuracy of
16       that, then the memo may come in as a recordation of his
17       recollection at the time.
18                  THE COURT:  All right.  We'll take it up at that
19       point.
20                  MR. McCULLOUGH:  If this -- if this -- if this
21       conversation with Miss Hunt in February of 2014 is to become
22       relevant.
23                  THE COURT:  All right.  So this is after the letters
24       that we were talking about?
25                  MR. McCULLOUGH:  Correct.
```

1          MR. CAMPOAMOR-SANCHEZ:  After the period of the

2    indictment, Your Honor.

3          THE COURT:  Well --

4          MR. MURPHY:  Your Honor, the notion --

5          THE COURT:  Do you want to go there?

6          MR. MURPHY:  The notion that Mr. Craig, having

7    successfully deceived and falsified and concealed from Miss

8    Hunt information that the government alleges he did, would

9    then, a month later, after she issues her January 2014 letter,

10   a month later he calls her up on the phone and says, I feel the

11   need to reach out to the *New York Times* to make a correction.

12   I just want to make sure that I can do that under FARA, is that

13   your interpretation?  She says, Is it for the purpose of making

14   corrections?  And he says, Yes, it is.  And she said, Fine.

15          It's the same analysis that we went through before.

16   He said, Will you send me a letter or do I need to send you a

17   letter?  And she says, No, it's fine.  You can do it,

18   Mr. Craig, there's no issue.

19          I think that that is very powerful evidence of

20   Mr. Craig's state of mind with respect to his dealings with

21   Miss Hunt.  If he had thought that he had successfully

22   bamboozled her and got a favorable report in January, he's not

23   going to pick up the phone a couple weeks later and call her

24   and ask her for advice again.  It's just not something that

25   someone who had a guilty frame of mind would ever do.

1          MR. CAMPOAMOR-SANCHEZ:  I don't know how that is.  If

2     he successfully convinced her that he's only contacting folks

3     to correct mischaracterizations that have already been

4     published, and now he's being extra careful and saying, Hey,

5     I'm just doing the same thing again.  That doesn't go to his

6     state of mind before.  This is outside of the indictment.  It

7     is irrelevant, what he ultimately later did.

8          If somehow this impeaches what Miss Hunt did in some

9     way -- which it doesn't because she's not going to testify

10    about after her letter, where she ends this matter.  I don't

11    see how it's relevant, how it goes to his state of mind before.

12    He's just trying to put himself in a good light.  Look what a

13    good lawyer and person I am, I am reaching out to FARA ahead of

14    time.

15         MR. MURPHY:  Your Honor, I think we can cross-examine

16    Miss Hunt about this.

17         THE COURT:  I knew that was going to be the next

18    thing.  So we need to decide whether it's relevant or not

19    before Miss Hunt testifies.  So I will think about it.

20         I think right now 318, the audit, is irrelevant.

21    Hickey's testimony to the Senate Judiciary Committee is

22    irrelevant.

23         The van der Zwaan government representations, you'll

24    let me know if you think there's a point where they need to

25    come in because they're acting inconsistent with them.  So that

1    would be 320 and 322 and 324.  So we'll defer that until that

2    happens.

3              You've got the two judgments; Manafort, the Virginia

4    conviction and the conviction here.  He's not a witness and

5    we're not impeaching his credibility.  What are we doing?

6              MR. ABELSON:  We're impeaching his credibility as an

7    out-of-court declarant.

8              THE COURT:  That works if their statements are being

9    moved in as, like, a co-conspirator.  But what other statements

10   of him are coming in?

11             MR. ABELSON:  I think it is closely tied to the

12   hearsay question.  If there are statements of Mr. Manafort that

13   they are trying to get in for the truth, then we're entitled to

14   impeach his credibility.  We think none of them should come in.

15   Your backgrounding has been the key to it all, is one statement

16   that comes to mind.  If any of Mr. Manafort's out-of-

17   court statements --

18             THE COURT:  Come in for the truth of the matter

19   asserted, then you're allowed to say -- I'm allowed to say,

20   ladies and gentlemen, you are instructed that the Paul Manafort

21   they're talking about is the same Paul Manafort who was

22   convicted of bank fraud on such and such a date, at such and

23   such a time, and conspiring to violation FARA and banking laws,

24   and everything he was convicted of in this court at such and

25   such a date and such and such a time, is that correct?

1           MR. ABELSON:  Yes.

2           THE COURT:  Okay.  I'm not sure I recall anything of

3    Mr. Manafort's being admitted for the truth of the matter

4    asserted, but there are rules that permit an out-of-court

5    declarant to be cross-examined with -- essentially, cross-

6    examined with a conviction.  So now I understand the purpose of

7    it.

8           MR. CAMPOAMOR-SANCHEZ:  Your Honor, I'm not aware of

9    any that's been introduced for the truth of the matter.

10          THE COURT:  So that's an if, and we'll take it up

11   when it comes.  But if that is actually the case, that is a

12   rule.

13          We're not going to admit Nicholas Katzenbach's

14   testimony to the Senate Foreign Relations Committee.  Document

15   330 is excluded.

16          334, you're going to want to put in these because I

17   did permit the procurement evidence.  So this is one of our

18   last -- is it the last one?  It may be the last one to look at.

19          MR. ABELSON:  So there's a handful of the ones we can

20   additionally designate, that they object to.

21          MS. GASTON:  We're almost finished.

22          THE COURT:  There are four of them, they're hearsay

23   objections.  Let's try really, really quickly.

24          334.

25          MR. McCULLOUGH:  Your Honor, we withdraw the

 1   objection to 334.

 2          THE COURT:  You withdraw the objection.  Okay.  It's

 3   in.

 4          Again, I don't think we'll need as many exhibits as

 5   have been marked on these issues.

 6          357.  You want this in evidence?

 7          MR. ABELSON:  So, we don't know exactly what they're

 8   planning to do about the March and April 2013 correspondence,

 9   frankly.  I think we may need this to provide some context for

10   the documents that were pulled together and, at Ukraine's

11   request, were provided to them in connection with the

12   negotiation of the second contract.

13          THE COURT:  Are any of these people going to be a

14   witness?

15          MR. ABELSON:  Not that we know of.

16          THE COURT:  Then --

17          MR. McCULLOUGH:  Your Honor, we -- it's possible that

18   Miss Whitney will be a witness.

19          THE COURT:  All right.  Well, if Miss Whitney is a

20   witness and they need to use these with her, he will.  Are you

21   basically saying the objection is withdrawn?  I'm not sure we

22   need everything about Mr. van der Zwaan's life.

23          All right.  So the same as with 358, if she

24   testifies, and 367, they can use these with her if they need

25   to?

```
 1                   MR. McCULLOUGH:  Yes, Your Honor.

 2                   THE COURT:  All right.  Okay.  I've reserved on a few

 3       issues that you're going to give me more information about,

 4       about Mr. Craig's state of mind, which will be helpful.  I

 5       haven't ruled on the completeness stuff because I'm waiting to

 6       see --

 7                   MR. CAMPOAMOR-SANCHEZ:  Your Honor, there was one

 8       more, 367.

 9                   THE COURT:  There was one more?  I was packing up.

10                   MR. McCULLOUGH:  Yes.  Truly apologize.

11                   THE COURT:  What number?

12                   MR. McCULLOUGH:  So 359, Exhibit 359, it's a

13       completeness objection.  It's addressed in our most recent

14       pleading.

15                   And then 367 is, mercifully, the last one.

16                   THE COURT:  All right.  I'm sorry.  I didn't see

17       "completeness."

18                   MR. CAMPOAMOR-SANCHEZ:  367 is the last one.

19                   THE COURT:  360 says no objection.

20                   MS. GASTON:  367.  The very last one.

21                   THE COURT:  That one -- but isn't that similar?  Miss

22       Whitney might be here?

23                   MS. GASTON:  Ms. Whitney is not on this one --

24                   MR. ABELSON:  Because she was -- well, all but the

25       top one.
```

```
 1            THE COURT:  One person talk at a time.

 2            Why doesn't counsel for the government explain what's

 3    happening, what you've brought to my attention again, from the

 4    beginning.

 5            MR. McCULLOUGH:  Exhibit 367, there is some

 6    correspondence between Mr. van der Zwaan and Miss Whitney

 7    towards the bottom of the chain.  But there are statements of

 8    Mr. van der Zwaan that could be made for the truth of the

 9    matter asserted.  So, Mr. van der Zwaan's statement on June

10    4th, 2013, at 5:50 a.m., the second from the bottom, Ministry

11    of Justice telling me that the payment that they owe us in

12    connection with our work has been made.  As well as the top

13    email on the chain where Mr. van der Zwaan tells Alicia

14    Prender -- and we have no witness here -- he says, We are going

15    to have to send them 20,000 back anyway, they overpaid.

16            MR. ABELSON:  Your Honor, we'll withdraw this exhibit

17    in light of the stipulation on the payments.

18            THE COURT:  Okay.  And then 359 I didn't rule on, and

19    that's in the completeness pile.  So the completeness ones have

20    not been dealt with yet.

21            I think we're ready for voir dire.  We'll add these

22    additional witness names.

23            Mr. Haley what time are we having jurors in this

24    courtroom Monday morning?

25            THE COURTROOM DEPUTY:  We're coming in here at 9:30.
```

1    If we're ready, we'll call the jurors.

2              THE COURT:  Mr. Murphy?

3              MR. MURPHY:  Your Honor, to the extent that you've

4    made rulings that are definitive and have excluded certain

5    defense exhibits as a result of those definitive rulings, we

6    would just want to note our objection.

7              THE COURT:  All right.  Noted.

8              MR. MURPHY:  So the record is preserved.

9              THE COURT:  The record.  And there are exhibit lists

10   that are docketed that show every exhibit that you've

11   proffered.  And with the exceptions of the ones that you've

12   withdrawn, your objection to their being excluded -- on both

13   sides -- is noted.

14             MR. MURPHY:  Thank you, Your Honor.

15             MR. CAMPOAMOR-SANCHEZ:  Your Honor, because of the

16   late hour, I don't want to keep us, but there's -- in terms of

17   preparing for opening, the government was hoping to use exhibit

18   396 and the Court had reserved on that.

19             THE COURT:  Is that the Manafort one?

20             MR. CAMPOAMOR-SANCHEZ:  Right.  The one that includes

21   Mr. Craig's --

22             THE COURT:  You'll know before you open, on the

23   government exhibit.

24             MR. CAMPOAMOR-SANCHEZ:  Yeah, the Government Exhibit

25   396.  That's the one that included Mr. Craig's response at the

1   top.

2                   THE COURT:  Yes.

3                   MR. CAMPOAMOR-SANCHEZ:  And again, I'm happy to

4   address it on Monday.  We got the minute order yesterday and I

5   was just -- I wanted to make sure I understood the Court's

6   instructions as to evidence concerning the potential violation

7   of any Ukrainian law or regulation.  And I can address it on

8   Monday.  I want to make sure we understand the scope of that.

9                   THE COURT:  We're not going to talk about -- and I

10  think everybody agreed here, that if there's discussion about,

11  oh, but if we did it this way, it would have violated Ukrainian

12  law, that's not coming in.

13                  MR. CAMPOAMOR-SANCHEZ:  Yeah.  And that's what I

14  wanted to clarify.  Actually, I don't think there's emails that

15  suggest there was any violation.  I wanted to preserve the

16  ability, that this was an issue that they were responding to,

17  that this was an issue in the press.  I can -- again, it's

18  late, I can talk about it on Monday on a break.

19                  THE COURT:  I think it's just an extraneous matter.

20                  MR. CAMPOAMOR-SANCHEZ:  Okay.  I just want to --

21                  THE COURT:  All right.  If there's more you want to

22  tell me, you'll tell --

23                  MR. CAMPOAMOR-SANCHEZ:  -- on Monday.

24                  THE COURT:  Yes.

25                  MR. CAMPOAMOR-SANCHEZ:  Thank you.

```
1              THE COURT:  Because I thought when we were sitting
2    here, everybody nodded that we weren't getting into that, and
3    so that's why I put it in the order.
4              MR. CAMPOAMOR-SANCHEZ:  Right.  And I understood it
5    to be any inference that there was an actual violation, that
6    there was an issue with the violation.  But just the thought
7    that it was brought up, I didn't understand it.  But I'll
8    address it on Monday.
9              MR. TAYLOR:  It is late.  I didn't quite understand.
10   Mr. Campoamor said that he wanted to use exhibit 296 --
11             MR. CAMPOAMOR-SANCHEZ:  396.
12             MR. TAYLOR:  -- 396, which you had reserved on.
13             THE COURT:  He was asking me if I had ruled so he
14   could know the answer.  And I told him he would know the answer
15   before he opened.
16             MR. TAYLOR:  We do object to it.
17             THE COURT:  I know.  All right.  That's everything I
18   have to do right now.  I know you have a lot to do over the
19   weekend.  I will see you on Monday at 9:30.
20                          *   *   *
21
22
23
24
25
```

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5            I, JANICE DICKMAN, do hereby certify that the above

6    and foregoing constitutes a true and accurate transcript of my

7    stenograph notes and is a full, true and complete transcript of

8    the proceedings to the best of my ability.

9                           Dated this 11th day of August, 2019.

10

11

12                        /s/_____

13                        Janice E. Dickman, CRR, RMR, CRC
                          Official Court Reporter
14                        Room 6523
                          333 Constitution Avenue NW
15                        Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25