```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2

 3   United States of America,     ) Criminal Action
                                   ) No. 19-CR-125
 4                  Plaintiff,     )
                                   ) JURY TRIAL - DAY 2
 5   vs.                           )
                                   ) Washington, DC
 6   Gregory B. Craig,             ) Date:  August 13, 2019
                                   ) Time:  9:30 a.m.
 7                  Defendant.     )
     _____
 8
                 TRANSCRIPT OF JURY TRIAL - DAY 2
 9                      HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                UNITED STATES DISTRICT JUDGE
     _____
11
                      A P P E A R A N C E S
12
13   For Plaintiff:     Fernando Campoamor-Sanchez
                        Molly Gulland Gaston
                        U.S. Attorney's Office FOR THE
14                       DISTRICT OF COLUMBIA
                        555 Fourth Street, NW
15                      Washington, DC 20530
                        (202) 252-7698
16                      Email: Fernando.campoamor-sanchez@usdoj.gov
                        Email: Molly.gaston@usdoj.gov
17                      Jason Bradley Adam McCullough
                        U.S. Department of Justice
18                      950 Pennsylvania Avenue, NW
                        Washington, DC 20530
19                      (202) 233-0986
                        Email: Jason.mccullough@usdoj.gov
20
     For Defendant:     William James Murphy
21                      William W. Taylor, III
                        Adam B. Abelson
22                      ZUCKERMAN SPAEDER, LLP
                        100 East Pratt Street
23                      Suite 2440
                        Baltimore, MD 21202
24                      (410) 949-1146
                        Email: Wmurphy@zuckerman.com
25                      Email: Wtaylor@zuckerman.com
                        Email: Aabelson@zuckerman.com
```

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

_____

Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                    Official Court Reporter
                    United States Courthouse, Room 6523
                    333 Constitution Avenue, NW
                    Washington, DC  20001
                    202-354-3267

 1          THE COURTROOM DEPUTY:  Your Honor, we have criminal

 2    case number 19-125, the United States of America v. Gregory B.

 3    Craig.  Mr. Craig is present and in the courtroom.

 4          Will counsel for the parties please approach the

 5    lectern and identify yourself for the record.

 6          MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.

 7    Molly Gaston, Jason McCullough, and Fernando Campoamor for the

 8    government.

 9          THE COURT:  Good morning.

10          MR. TAYLOR:  Your Honor, Bill Taylor, Bill Murphy,

11    Paula Junghans, and Adam Abelson for Mr. Craig.

12          THE COURT:  All right.  Good morning.  We have a few

13    preliminary matters to take up this morning.

14          Yesterday evening, the government brought to the

15    parties' attention, and the Court's attention, the precedent in

16    *Presley versus Georgia*, which was a case in which a conviction

17    was reversed because the trial court had excluded the public

18    from voir dire over the defendant's objection.  That was 588

19    U.S. 209, in 2010.  And so, the question is whether the

20    procedure we utilized yesterday, at the Court's instance,

21    violated this defendant's Sixth Amendment rights; and, if so,

22    what we need to do about it.

23          I want to start, first, by just setting out on the

24    record what took place yesterday and why.  The voir dire had

25    two components.  First, I asked the entire panel a series of 26

1    questions, and then we gave each juror the opportunity to give

2    their individual, detailed responses to any questions for which

3    they had an affirmative answer in the courtroom, outside the

4    presence of the other jurors, and also outside the presence of

5    the public.  However, the defendant, the trial teams from both

6    sides and the defendant's family and the defendant's jury

7    specialist were permitted to remain in the courtroom.

8            I note that the issue in *Presley* was that the

9    defendant's uncle was excused over the defendant's objection.

10           In the asking of the questions to the entire venire,

11   the venire was large and it took up the entire courtroom and,

12   therefore, we did not have room for the public to be seated.

13   But I permitted the entire first row of the well of the court

14   to be occupied by at least 10, if not 12, members of the press,

15   so that the public could be present for the general voir dire

16   portion of the procedure.  And so, that portion, I believe, was

17   open to the public.

18           Then, we removed the jurors from the courtroom, we

19   removed the press from the courtroom, and we started bringing

20   the jurors in one at a time.  I note that this procedure was

21   described before it took place, and there was no objection from

22   the defense to this procedure at any point.  Not the beginning,

23   not the middle, not the end.  And so it's arguable that any

24   objection was waived.

25           The reason I did this was twofold.  First of all, it

1    is standard practice in this court and many other courts to

2    permit the jurors to give their answers to the questions

3    outside the hearing of the other people in the courtroom, even

4    if the courtroom is open, by bringing them to the bench and

5    utilizing the husher.

6          Had we attempted to utilize that procedure -- we have

7    one, two, three prosecutors; one, two, three, four, five

8    members of the defense team.  And the defendant has an absolute

9    right to hear what's going on.  He could have worn headphones,

10   but then he wouldn't have had the opportunity to confer with

11   counsel throughout the proceeding, and the jury expert and the

12   family members would have been left in the dark as to

13   everything that was said.

14         So, this procedure, I think, made the process easier

15   for the parties and the lawyers.

16         I also note that I have had two trials now where,

17   when I asked the jurors afterwards about their experience, they

18   complained vociferously about the fact that there were people

19   sitting in the courtroom when I asked them the questions that I

20   told them were going to be answered in private.  They want to

21   know who those people were and why those people got to listen

22   to them.

23         And, so, given the fact that this case is a higher

24   profile case that was receiving more coverage and somewhat more

25   of an audience than the ordinary cases, I did something I have

1    never done before, and I actually closed the courtroom for that

2    portion of the voir dire.

3         In fact, it turns out, in the morning, the courtroom

4    was not locked, and people could open the door and come in.  In

5    the afternoon, the courtroom was not locked, and someone did

6    open the door and did come in, but he was asked to step out,

7    and then the courtroom was locked.

8         So for purposes of the legal analysis, I'm going to

9    assume that people were excluded, even though, technically, the

10   door was not locked.  The case law under which this can be done

11   is not absolute.

12        "Closing jury voir dire from the public in a criminal

13   case does implicate the constitutional rights of both the

14   defendant and the public.  The Sixth Amendment provides the

15   defendant, in all criminal prosecutions, the right to a speedy

16   and public trial."  That's *Presley v. Georgia,* at 212.

17        "And a party seeking to close a hearing must advance

18   an overriding interest that is likely to be prejudiced; the

19   closure must be no broader than necessary to protect that

20   interest; the trial court must consider reasonable alternatives

21   to closing the proceeding, and; it must make findings adequate

22   to support the closure."

23        That's *Presley* at 214, quoting *Waller v. Georgia, 467*

24   *U.S. 39 at 48.  Waller* involved a suppression hearing, but

25   *Presley* was voir dire.

1          So the first flaw in yesterday's procedure is that I

2     did not make the necessary finding under *Presley v. Georgia*.  I

3     believe and I find that I did close the courtroom to advance an

4     overriding interest that was likely to be prejudiced, which was

5     the need for juror privacy in a high-profile case, and the need

6     for the parties to have candid and complete answers so that the

7     voir dire and preemptory challenges and challenges for cause

8     could be made with the maximum amount of information available.

9          Also, it was entirely consistent and, really, just a

10    substitute for the proceedings at the bench that are a standard

11    practice in this court and elsewhere.

12          I note that in *United States v. Vaghari*,

13    V-A-G-H-A-R-I, 500 Fed.App'x 139, at 150, a Third Circuit case

14    out of 2012, the Third Circuit found, in a case where general

15    questions to the jury venire were open to the public, but

16    individual questions that were personal and private in nature

17    were done in the robing room, similar to a side bar; defense

18    counsel agreed to the procedure, but the defendant later

19    challenged his conviction on the grounds that the voir dire was

20    improper.

21          The Third Circuit found that although the questions

22    took place behind closed doors, it was functionally equivalent

23    to a side bar discussion, and no more improper than that

24    commonly accepted practice.

25          The circuit court noted that the portions of voir

1  dire that took place in the robing room were recorded,

2  transcribed, and not sealed, and made available for public

3  viewing.  And I would certainly intend, and I noted at many

4  points yesterday, that the proceedings were being transcribed,

5  and I'd be prepared to order that those transcripts be docketed

6  today.

7         The second finding I need to make is, the closure is

8  no broader than necessary to protect that interest.  I believe

9  that is true in this case, since I opened the courtroom for the

10 general voir dire, I made sure there was a transcript obtained,

11 and the courtroom is open now, and it will be open as people

12 exercise their preemptory strikes and as we move forward.

13        And, finally, I have to make findings adequate to

14 support the closure.  And I am, unfortunately, making them now

15 and did not make them yesterday.  So that is correct.

16        So my question, then, is, what is the defendant's

17 position?  If he is satisfied that he has either waived or he

18 is satisfied now that his Sixth Amendment rights were

19 adequately protected, we can move forward.

20        If he wishes to assert them now and claim that the

21 procedure was, in fact, in violation of his rights -- while I

22 believe that there's case law to support that it was not,

23 there's also case law to support that it was.  Unfortunately,

24 there's no binding precedent out of this circuit.  If he wishes

25 to start over and excuse this panel, he has a constitutional

 1     right to do that, and I will do that.  I will let you know that

 2     we do not have 70 jurors in the building at this moment.  We

 3     cannot start up again today.

 4             I'll also note that the 70 jurors we had were

 5     pre-qualified to be jurors who could sit through a two- to

 6     three-week trial.  We did that because, in my experience, the

 7     inability to be here for the entire trial is the number one

 8     reason why jurors get struck for cause.  And rather than waste

 9     everybody's time striking jurors for cause when they all heard,

10     oh, my God, it's going to be a two-week trial, we brought in

11     jurors who could sit.

12             I have been informed by the jury office that sending

13     out new summonses to secure a jury that meets that

14     qualification would take ten weeks.  That puts us to the end of

15     October.  And so that piece of information is something you

16     need to know.

17             So, how does the defendant wish to proceed?

18             MR. MURPHY:  Your Honor --

19             THE COURT:  You can come together, if you want, but

20     probably one of you should talk at a time.

21             MR. MURPHY:  Yeah.  Your Honor, we appreciate the

22     care that the Court took with this issue, and the reasons why

23     you did what you did.

24             On the other hand, I think -- and when the government

25     brought this to our attention last night, it actually took us a

1    little bit by surprise.  And we shouldn't have been surprised,

2    but we were.

3         We were particularly concerned about the case of

4    *Weaver v. Massachusetts*, which is a more recent case of the

5    Supreme Court, 137 S.Ct. 1899, a 2017 case in which the issue

6    came up.

7         The defendant in that case had never raised the issue

8    at trial.  He had never raised it on direct appeal.  He got new

9    counsel, and the new counsel argued that the prior counsel's

10   failure to object to the procedures constituted ineffective

11   assistance of counsel.  That led us to some concerns about the

12   fact that Mr. Craig might need separate counsel from us to

13   advise him about this issue.

14        The other issue that occurred, we did some additional

15   research, and that the Cable News case, *Cable News Network v.*

16   *United States*, is a case from the D.C. Circuit back in 1987,

17   actually.

18        THE COURT:  That's about the press right, more than

19   the defendant's right?

20        MR. MURPHY:  It is a press right case.  But the

21   Supreme Court has held in these cases that the rights of the

22   press and the rights of the defendant, vis-à-vis a public

23   trial, are basically equivalent rights.  That was the case

24   involving Michael Deaver, who was a prominent republican; I

25   think, advisor to President Regan.  His trial was widely

1    publicized.  The trial judge was Judge Thomas Penfield Jackson,

2    had done a closed voir dire proceeding because of all the same

3    kinds of concerns that Your Honor just talked about.

4         The D.C. Circuit ruled quite, I would say,

5    vociferously, that the procedures were not appropriate.  That

6    with respect to questions of jurors that might be sensitive or

7    confidential, that there has to be an individualized inquiry,

8    and that you can't just say, I'm going to have the jurors

9    answer all of those questions in a situation where they're in a

10   private room or under a husher, or as we did yesterday, in a

11   closed courtroom.  And the Court of Appeals said that just

12   doesn't fly under the Sixth Amendment, or the First Amendment.

13        And, I think, that in thinking about it all in

14   hindsight, obviously, there were members of the public that

15   were not present for the proceedings.  There were some members

16   of the press who were present, as Your Honor indicated.  There

17   were others, I'm told, who were not able to sit in that first

18   row.  And I don't think you can distinguish between the press

19   and the public in this setting.  I think that the public has

20   every bit as much right to be in a courtroom as the press does.

21        THE COURT:  I mean, I think all the case law

22   recognizes that space is a consideration.

23        MR. MURPHY:  Space can be.

24        THE COURT:  But we have, in other cases, had an

25   overflow room and video and a media room.  And because this

1    courtroom had not been particularly well attended through every

2    proceeding until this point, I didn't plan for all of that in

3    connection with this case.

4           And I hear what you're saying and I respect what

5    you're saying and I don't have any problem with your telling me

6    we made a mistake yesterday, and that mistake lies at my feet

7    since I was the one who instituted the proceedings.

8           I believe that there are law and facts that justify

9    it.  But I don't want to so error unnecessarily into a record,

10   and certainly don't want to do anything that would cause a

11   requirement for new counsel.  If anything, I believe you are

12   effective, and that he's entitled to the counsel of his

13   choosing.  And I think we need to do what we need to do to make

14   sure that his rights are protected.

15          MR. MURPHY:  Right.  So, Your Honor, for all those

16   reasons -- I don't need to belabor it -- we are not in a

17   position to waive Mr. Craig's Sixth Amendment rights.  In fact,

18   the procedure is not completed, we haven't selected a jury.

19   So, at this point, we object to the procedure that was followed

20   yesterday.

21          In addition, Your Honor, you raised a question that

22   has been also troubling me overnight about the communication

23   that was made to the potential jurors from the Commissioner's

24   office.  Apparently, they were told, as you've just mentioned,

25   that this would be a trial of at least two weeks duration, or

1    words to that effect; a special trial.

2         We heard from a couple of the jurors yesterday who

3    were questioned that they got that notice and began to look to

4    see what that case might be.  And a couple of them were clever

5    enough to figure out that it was Mr. Craig's case.

6         We think that that process of telling potential

7    jurors that this is a trial that may take two or more weeks, in

8    and of itself, violates the Jury Selection and Service Act of

9    1968.  It affects the random selection of jurors, which is the

10   primary purpose of that statute.

11        And as a result, we don't think that any jury that

12   received any -- group of jurors who received that notice, and

13   basically were able to self-select out of jury service by

14   saying, I have a vacation planned, or, Two weeks or more would

15   just interfere with my ability to, you know, make a living

16   because I work for myself.  I don't think that can be done in

17   the way it was done by the Jury Commissioner's Office,

18   apparently, in this case, consistent with the Jury Selection

19   and Service Act.

20        As Your Honor may know, a defendant has a right,

21   within seven days of discovering a potential violation of the

22   Jury Selection and Service Act, to make a motion to dismiss the

23   indictment.  The defendant has to engage in due diligence to

24   figure out if there is a potential violation of a statute.

25        And we haven't done the research, obviously.  But, I

1    do think that we have good cause to at least suggest that the

2    selection of this group of 70 in this manner violated the Jury

3    Selection and Service Act.  It's not something that's called

4    for in the plan of the district court, as far as I can tell,

5    for the way jurors are supposed to be selected.

6         And it does allow people, who otherwise would come

7    into court and explain their situation and we would be able to

8    evaluate whether they can serve, whether they ought to be

9    excused for some good reason, those people, a lot of them

10   weren't here.

11        THE COURT:  Well, that's an interesting issue.  I

12   know it's been done in this courthouse many times.  I would be

13   happy to hear from both parties about whether it should be done

14   the next time around.  Even if it is not done, that means we

15   would need to summon probably twice as many jurors and take

16   twice as much time for the voir dire; all of which, if that is

17   legally required, we will do.

18        MR. MURPHY:  All right.

19        THE COURT:  So --

20        MR. MURPHY:  Your Honor, there's a --

21        THE COURT:  Yes?

22        MR. MURPHY:  I'm sorry.

23        There's a very recent decision about this general --

24   this issue under the Jury Selection Act.  It's *U.S. v. Bagcho*,

25   B-A-G-C-H-O, it's Docket Number 123042.  It just was decided in

1      May 2019 by the D.C. Circuit.

2                  THE COURT:  Tell me the case citation again.

3                  MR. MURPHY:  B-A-G-C-H-O, and the docket number is

4      123042.  It was decided May 14th, 2019.  It involves the

5      defendant's right to have access to whatever it is that the

6      Jury Commissioner sent to the potential jurors in order to

7      investigate and, perhaps, file the motion that it would need to

8      file.  It was -- you know, the case was one that involved --

9      and some of these cases do -- whether the jury selection

10     process had the tendency to exclude members of a particular

11     race.

12                 That's not what we're dealing with.  But we do

13     have -- I know from -- the very first case I ever argued in the

14     Court of Appeals was a Jury Selection and Service Act case in

15     1981.  The principal purpose of that statute is to ensure

16     randomness, and a cross-section of the community is brought in.

17     And I do think --

18                 THE COURT:  Well, are you telling me -- I don't mean

19     to -- I want you to make your full record, but I also want to,

20     a little bit, get to your conclusion, which is, are you telling

21     me we need to start over?

22                 MR. MURPHY:  Yes.

23                 THE COURT:  All right.

24                 MR. MURPHY:  That's the conclusion, Your Honor,

25     unfortunately.  And, I -- I mean, it is unfortunate.  And we

1    understand that because of that, Mr. Craig will not have a

2    trial as quickly as he wanted to, and that that's very

3    unfortunate.  But we -- under all these circumstances, we just

4    cannot go forward.

5             THE COURT:  All right.  Can I hear from the

6    United States?  I don't think I really have a choice under

7    those circumstances.

8             MR. CAMPOAMOR-SANCHEZ:  No.  I agree with that,

9    unfortunately.  We were hoping that we were going to get to a

10   position today where the defendant would be willing to waive

11   and go forward.  Having heard that, we agree that that's not

12   possible.

13            But, Your Honor, we would recommend that although it

14   might take us longer to pick a jury, that we just summon jurors

15   tomorrow and we start.  That will mean that there's no issue

16   with the jury selection.  There will be no special questions.

17   It will be whatever the jurors are.  And we --

18            THE COURT:  I don't know if we have enough jurors on

19   the hook for tomorrow.

20            MR. CAMPOAMOR-SANCHEZ:  Okay.

21            THE COURT:  I asked the jury office a number of

22   questions, but I didn't ask that one.

23            So, we can pause for a few minutes and reconvene, and

24   I can find out the answer to that question, how long it would

25   take, if we didn't do a special sort, and just made sure we had

1    enough to cover all the people who were going to say that they

2    can't be here for two weeks in August.

3                MR. CAMPOAMOR-SANCHEZ:  Right.

4                THE COURT:  I don't know.  I think it may involve

5    some continuation of the trial, but I don't know how long.  So,

6    I think I should find out what the jury office can do and how

7    quickly they can do it and how many people we think we need, if

8    we're going to also be sorting for ability to be present.

9                And I would say, we would need probably double the

10   number we had, given my experience in even shorter trials with

11   people saying, I've got a doctor's appointment on Tuesday.

12   I've got to pick my kids up on Wednesday.  I've got a vacation

13   next week.  My cousin's wedding is the following week.  There's

14   always something.  The presentation, the training at work.  The

15   kinds of issues that one of the jurors raised yesterday are

16   probably the biggest impediment to picking a jury I have in

17   every case.

18               So I don't know the answer to how long this will

19   take, and so I should find out before we talk about it further.

20               MR. CAMPOAMOR-SANCHEZ:  May I suggest, Your Honor,

21   that as the Court is inquiring, whether we can get -- for

22   example, if we can get 70 tomorrow, we can get started with

23   those 70, as long as we can have another group the following

24   day.

25               THE COURT:  That means I have to read the 26

1    questions and go through the index cards.  I'm not going to do

2    it that way.

3              MR. CAMPOAMOR-SANCHEZ:  Understood.

4              THE COURT:  We're going to have one venire hear all

5    the questions.  Because I could read a question and skip a word

6    to one juror.  We're not going to do that.  We're going to do

7    this right.  And I think every single person in this room has

8    bent over backwards to meet an impossibly truncated trial

9    schedule --

10             MR. CAMPOAMOR-SANCHEZ:  Absolutely.

11             THE COURT:  -- given the number of motions we've

12   ruled on, the number of exhibits we've had to consider, the

13   number of issues we've taken care of, to accommodate the

14   defendant's preference to get this done as soon as possible.

15             But this is going to take time to do it right.  I

16   don't know if the parties want to research the issue further

17   about a pre-selected jury that can sit for a period of time,

18   but it sounds like the defense is objecting to that.  And, so,

19   again, I don't see the reason of doing something that could be

20   erroneous later.

21             MR. CAMPOAMOR-SANCHEZ:  No.  I --

22             THE COURT:  What I would like to do, if you don't

23   mind, unless anybody else has more to say, is get more

24   information before we make decisions about what we do next.  So

25   I would like to take a break and communicate with the jury

1    office and see what the situation is, and then we'll talk

2    again -- let's say, at 10:30.

3              In the meantime, I'll wait before we release the 35.

4              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

5              THE COURT:  And, again, I thank everybody for

6    thinking about it, being careful about it.

7              MR. CAMPOAMOR-SANCHEZ:  Well, we apologize --

8              THE COURT:  And I've actually researched this issue

9    before and felt comfortable, in light of making the findings,

10   that this could be done; but I didn't make the findings.  And

11   the defendant should have been not -- he should have been

12   actively involved in the decision-making process, as opposed to

13   right now, my making findings based on his passive failure to

14   say anything.  So --

15             MR. CAMPOAMOR-SANCHEZ:  We don't object to what the

16   Court has said, and we were going to urge the same, in light of

17   the position the defense has taken.  Our interest is to try to

18   go forward now.  We have witnesses that have traveled, and

19   everything is ready to go, witnesses waiting to go.  So, I --

20   it would be our preference, our strong preference, that if the

21   jury office can accommodate that, that we go forward now.

22             If not, obviously, we can't.  We agree, we need to do

23   this right.  But we would prefer to go forward now.

24             THE COURT:  Let me find out what our options are, and

25   then I'll be back.  All right?

1          Thank you, everybody.

2          MR. CAMPOAMOR-SANCHEZ:  Thank you.

3          (Recess.)

4          THE COURTROOM DEPUTY:  Your Honor, recalling case

5    number 19-125, the United States of America v. Gregory B.

6    Craig.

7          THE COURT:  All right.  Everyone, thank you for your

8    patience.  We had to have a lot of communications back and

9    forth with the jury office.  And what I have been able to

10   determine is that we have enough jurors on call, who are

11   supposed to check in every evening and find out if they are

12   supposed to report the next morning, to get the 120 or 125

13   jurors that I would like to have to feel comfortable that we're

14   going to get enough people who can sit tomorrow morning.

15        So, I would propose, if both parties want to go

16   forward without actually briefing and deciding the question of

17   whether it is actually improper to preselect a jury in advance,

18   given the defendant's objection and the government's desire to

19   accommodate that objection -- I'm not finding one way or the

20   other -- but we'll just move forward with a jury that hasn't

21   been preselected in any way, shape, or form.

22        I might, however, really benefit from that briefing

23   and might ask the parties to do it, but not right now when

24   you're briefing everything else.  But maybe when this trial is

25   over, we could see what you have to say about it.  Because this

1      issue is going to come up, and Mr. Murphy seems to have already

2      thought about it, and I would like the benefit of what you have

3      to say.

4              What we will do, because if we didn't have room for

5      70 people and the public in here yesterday, we most certainly

6      do not have room for 120 and the public here, so we've reserved

7      the ceremonial courtroom for the reading of the voir dire

8      questions and the filling out of the index cards.

9              So, tomorrow morning, at 9:30, in the ceremonial

10     courtroom, we will line up the jurors, and we will do exactly

11     what we did in here -- was it only yesterday? -- presenting

12     them with their pencils, their index cards, and reading the

13     exact same 26 questions that we read, and having them indicate

14     if they have an affirmative answer to any of those questions.

15             There will be a place for counsel for the government

16     to sit, counsel for the defendant, and the defendant to sit.

17     We will seat the jurors in the middle section of the ceremonial

18     courtroom.  Members of the public, family members, anyone

19     else's entourage can sit in the sides of the ceremonial

20     courtroom.  But we're going to reserve the center for the

21     jurors.

22             If that isn't enough, and we need to take a first row

23     or second row on the side, we will do that.  But there should

24     be plenty of room for everyone.  But I don't think we're going

25     to have press or family or anybody else in the well of the

1    court because that's where you're going to need to be when I

2    point to you and you stand up during voir dire.

3              Then, we will proceed in the same manner as we

4    proceeded yesterday with the individual follow-up questions,

5    with the exception that the courtroom is not going to be

6    locked.  If somebody wants to come in and watch it, they will

7    watch it.

8              The jurors will -- we'll probably excuse some of

9    them, given how long it generally takes.  We do about 15 jurors

10   an hour.  We're going to arrange them the way we arranged them

11   yesterday, with people up and ready to go in my jury room,

12   other people waiting in an adjacent courtroom, and get through

13   as many as we need to get through to end up exactly where we

14   ended up at the end of yesterday, which is, at least 32

15   qualified jurors.  Given attrition and people who get sick or

16   whatever, I'll probably, once again, go all the way to about 35

17   before we stop.

18             We still need a procedure to be available on a

19   question-by-question, juror-by-juror basis for someone who has

20   a privacy concern.  There was someone yesterday who was quite

21   candid about mental illness.  There was someone else who was

22   quite candid about a family member convicted of a -- an

23   egregious crime.  And those are the kinds of matters we've

24   always permitted jurors to speak to us at the bench.

25             So, my proposal would be that the jurors will be

1    instructed that when they come in for their individual

2    voir dire, they will be doing it outside the presence of the

3    rest of the jury panel, but there may be people observing in

4    the courtroom.  If there is a specific answer that they wish to

5    give in private, that we will do it at the bench.  There will

6    be one lawyer from each side at the bench.  Mr. Craig will have

7    the opportunity to hear it with headphones.  But between the

8    court reporter, the deputy clerk, the juror, and two lawyers, I

9    don't know that we have room for anybody else up here.

10          So, I want to know if anybody has a problem with that

11   procedure or thinks that violates the Constitution or any

12   statute?

13          MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

14          MR. MURPHY:  No, Your Honor.

15          THE COURT:  All right.  My next question is whether

16   we should ask the jury office not to summon, this evening, the

17   handful of jurors -- I guess only about four or five, who we

18   already struck for cause.  I think there may have been one, I

19   can't quite recall, where there was a difference of opinion.

20   Otherwise, you were agreed with respect to the others.  And I

21   don't know that it seems like an efficient use of time to put

22   into the pool people that we already know do not qualify to be

23   jurors in this case.

24          There was one who -- there were several who were

25   struck because of their opinions.  One because of a physical

1    pain situation that made it difficult to sit.  One because of

2    an association with a company that's going to be testified

3    about.  I don't have all of my other reasons noted.

4         But does anyone think that those people who were

5    struck for cause should be back to be voir dired and struck for

6    cause again and take up a seat?

7         MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

8         MR. MURPHY:  No, Your Honor.

9         But the question that you asked makes me ask another

10   question, which is:  The people who were not reached yesterday,

11   the approximately 30 -- I don't know, 30 or so --

12        THE COURT:  I don't see any reason why they can't

13   come back.

14        MR. MURPHY:  Well, the problem with it is, Your

15   Honor, if the process by which they received the notice that

16   said, this is a two-week-plus trial, and it's a specially set

17   trial, and if you have some reason why you can't be here,

18   please let us know, and there is a form --

19        THE COURT:  Okay.  And I actually thought this

20   through about the 35, and realized that they couldn't come back

21   for that reason.

22        MR. MURPHY:  They shouldn't be able to come back.

23        THE COURT:  But what I don't know now -- and we may

24   need to call the jury office, and you can just sit here while

25   we do it -- is whether -- I think there were 90 that were

1    summoned pursuant to the special summons.  Started with 1,000.

2    You get the ones who don't answer, the ones who weren't

3    qualified for other reasons, the ones who don't show up.  If

4    those 90 are -- would be included in the people we call

5    tomorrow, or if they have 179 waiting to be called in general.

6           Do you know the answer to that question?

7           (Off-the-record discussion between the Courtroom

8    Deputy and the Court.)

9           THE COURT:  Okay.  All right.  So there are two-week,

10   on-call jurors who are separate from our panel.  So, we will

11   only call those people, and the people who were summoned for

12   our trial will not be called again, whether we questioned them,

13   we didn't question them, we struck them, we didn't strike them.

14          MR. MURPHY:  I think that's the safest course, Your

15   Honor.

16          THE COURT:  All right.  That's what we'll do.  I

17   think we have enough.  If I learn in the next -- when we break

18   that we don't -- but I -- what the deputy clerk is telling me

19   is that what they have is the usual group of 100-and-some

20   people waiting, calling in every day.  That's not our people.

21   Those are the regular people.  All right.

22          MR. MURPHY:  We want the regular people.

23          THE COURT:  The regular people, not that the people

24   yesterday weren't the regular people.  They're all special and

25   they're all special right now.

```
 1              MR. MURPHY:  Everyone is special in their own way,
 2    Your Honor.
 3              THE COURT:  Okay.  All right.
 4              The jurors from yesterday, can we tell the jury
 5    office right now that they can be excused?
 6              MR. MURPHY:  Sure.  Absolutely.
 7              MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.
 8              THE COURT:  All right.  Let's just do that,
 9    Mr. Haley.  Thank you.  They're on the phone at the moment.
10              This brings up the question of scheduling and what I
11    should tell the jury the schedule is.  Assuming that it takes
12    us longer than one day to pick a jury -- I would love it if we
13    were as efficient as we were yesterday, and I would like
14    everyone to be exactly as focused and efficient as they were
15    yesterday -- it may take one day, it may take two to pick a
16    jury.  It's possible we'll be opening on Thursday, or more
17    likely that we're going to be opening on Friday.
18              If we tell them this is a two-week trial, it's a
19    different two weeks than we were talking about before, and we
20    run into such things as the Friday before Labor Day weekend,
21    which I seem to recall Mr. Murphy had a problem with.
22              MR. MURPHY:  I do, Your Honor.
23              THE COURT:  I don't know why I remember your vacation
24    schedule, but I do.
25              Do we want to tell all of them that we aren't going
```

1   to sit?  Because that might increase substantially the number

2   of people who could sit for two weeks, if we say we're not

3   going to sit on Friday, August 30th.

4          Does that make sense to everyone?

5          MR. MURPHY:  I think so.  It's a four -- I mean, for

6   me, it's a four-day weekend.

7          THE COURT:  Right.

8          MR. MURPHY:  So, Labor Day is Monday.

9          THE COURT:  Everyone else -- everyone else of these

10  special, regular people would also like a four-day weekend.

11  And I think we have -- as other people may have plans for that

12  weekend, it would alleviate their panic when we say it's a

13  two-week trial, if we tell them we're not going to sit.

14         MR. CAMPOAMOR-SANCHEZ:  Agreed.

15         THE COURT:  Now, everybody also needs to know that

16  for reasons related to the Court's schedule, if it extends

17  beyond Labor Day, we're not sitting Labor Day Monday, we are

18  not sitting September 5th or 6th and 9th.  So, we may have a

19  little break in the middle of the trial.  That happens.  That's

20  going to happen.

21         If everybody's efficient, as I really hope you'll use

22  today to be, in paring down who you're going to call, what

23  you're going ask, what you're going to move in evidence, and

24  think about having a focused, streamlined, clear presentation,

25  it is possible that this case could finish in two weeks, and

1    we're only talking about jury instructions after that.

2             But, you need to know right now that there's that

3    potential for an interruption that is definitely going to

4    happen, if that changes your view about whether we start

5    tomorrow or whether we start on some other day.

6             Yes, sir?

7             MR. TAYLOR:  Your Honor, so you would not be sitting

8    on the 5th or 6th?

9             THE COURT:  Correct.

10            MR. TAYLOR:  So that would leave only two days.

11            THE COURT:  Two days.

12            MR. TAYLOR:  Two days that week.

13            THE COURT:  Correct.  That means we are going to sit

14   Fridays, otherwise.

15            All right.  So, I still want the legal submissions

16   that I had asked for that, I think, were due Thursday.  I

17   don't -- I'm sure -- I haven't had a chance to look at it, but

18   I ruled on almost all the exhibits, and maybe I can use this

19   afternoon to rule on the ones I reserved on; though some of

20   them I think I reserved so that we could hear how they were

21   being used, and so that may not happen.

22            But, I've asked you to print out new exhibit lists

23   that don't have all the extraneous ones on there that have been

24   withdrawn or excluded, just so when I'm looking at the list, it

25   could be shorter.  So you all should have some time to do that.

1    Is there anything else we need to talk about right

2    now?

3    MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

4    THE COURT:  All right.  Anything else for the

5    defense?

6    MR. MURPHY:  No, Your Honor.

7    THE COURT:  All right.  I appreciate the government's

8    being on top of this issue.  Appreciate the fact that everybody

9    looked into it and thought about it seriously.  It's a little

10   bit of a setback, but, you know, I think it's going to delay

11   this, ultimately, by two or three days, and that's about all.

12   And I will -- you should gather -- you can put all

13   your things here, because this is where we're going to do the

14   individual voir dire.  But, you should be in the ceremonial

15   courtroom at 9:30 tomorrow morning for voir dire.  And

16   everybody is invited.

17   All right.  Thank you.

18                              *   *   *

19

20

21

22

23

24

25

1

2                     CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5            I, JANICE DICKMAN, do hereby certify that the above

6       and foregoing constitutes a true and accurate transcript of my

7       stenograph notes and is a full, true and complete transcript of

8       the proceedings to the best of my ability.

9                           Dated this 13th day of August, 2019.

10

11

12                           /s/_____

13                           Janice E. Dickman, CRR, RMR, CRC
                             Official Court Reporter
14                           Room 6523
                             333 Constitution Avenue NW
15                           Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25