```
1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2

3    United States of America,      )  Criminal Action
                                    )  No. 19-CR-125
4                    Plaintiff,     )
                                    )  JURY TRIAL - DAY 3
5    vs.                            )  Morning Session
                                    )
6    Gregory B. Craig,              )  Washington, DC
                                    )  August 14, 2019
7                    Defendant.     )  Time:  9:30 a.m.
     _____
8
           TRANSCRIPT OF JURY TRIAL - DAY 3 - MORNING SESSION
9                         HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                 UNITED STATES DISTRICT JUDGE
     _____
11
                      A P P E A R A N C E S
12
13   For Plaintiff:    Fernando Campoamor-Sanchez
                        Molly Gulland Gaston
14                      U.S. ATTORNEY'S OFFICE FOR THE
                          DISTRICT OF COLUMBIA
15                      555 Fourth Street, NW
                        Washington, DC 20530
16                      (202) 252-7698
                        Email: Fernando.campoamor-sanchez@usdoj.gov
17                      Email: Molly.gaston@usdoj.gov
                        Jason Bradley Adam McCullough
18                      U.S. Department of Justice
                        950 Pennsylvania Avenue, NW
19                      Washington, DC 20530
                        (202) 233-0986
20                      Email: Jason.mccullough@usdoj.gov

21   For Defendant:     William James Murphy
                        William W. Taylor, III
22                      Adam B. Abelson
                        ZUCKERMAN SPAEDER, LLP
23                      100 East Pratt Street
                        Suite 2440
24                      Baltimore, MD 21202
                        (410) 949-1146
25                      Email: Wmurphy@zuckerman.com
                        Email: Wtaylor@zuckerman.com
                        Email: Aabelson@zuckerman.com
```

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

_____

Court Reporter:    Janice E. Dickman, RMR, CRR, CRC
                   Official Court Reporter
                   United States Courthouse, Room 6523
                   333 Constitution Avenue, NW
                   Washington, DC  20001
                   202-354-3267

```
 1              THE COURT:  All right.  Good morning.
 2              PROSPECTIVE JURORS:  Good morning.
 3              THE COURTROOM DEPUTY:  Good morning, Your Honor.
 4              This morning we have Case Number 19-125, United
 5     States of America v. Gregory B. Craig.
 6              Ladies and gentlemen of the jury panel, as your jury
 7     number is called, please rise and say, Here or Present.
 8              Juror Number 1164.
 9              PROSPECTIVE JUROR:  Here.
10              THE COURTROOM DEPUTY:  Juror Number 0683.
11              PROSPECTIVE JUROR:  Here.
12              THE COURTROOM DEPUTY:  Juror Number 1297.
13              PROSPECTIVE JUROR:  Here.
14              THE COURTROOM DEPUTY:  Juror Number 1402.
15              PROSPECTIVE JUROR:  Here.
16              THE COURTROOM DEPUTY:  Juror Number 0413.
17              PROSPECTIVE JUROR:  Here.
18              THE COURTROOM DEPUTY:  Juror Number 0610.
19              PROSPECTIVE JUROR:  Here.
20              THE COURTROOM DEPUTY:  Juror Number 0397.
21              PROSPECTIVE JUROR:  Here.
22              THE COURTROOM DEPUTY:  Juror Number 1479.
23              PROSPECTIVE JUROR:  Here.
24              THE COURTROOM DEPUTY:  Juror Number 1549.
25              PROSPECTIVE JUROR:  Present.
```

```
 1                THE COURTROOM DEPUTY:  Juror Number 0968.

 2                PROSPECTIVE JUROR:  Here.

 3                THE COURTROOM DEPUTY:  Juror Number 0243.

 4                PROSPECTIVE JUROR:  Here.

 5                THE COURTROOM DEPUTY:  Juror Number 0236.

 6                PROSPECTIVE JUROR:  Here.

 7                THE COURTROOM DEPUTY:  Juror Number 1029.

 8                PROSPECTIVE JUROR:  Here.

 9                THE COURTROOM DEPUTY:  Juror Number 1151.

10                PROSPECTIVE JUROR:  Here.

11                THE COURTROOM DEPUTY:  Juror Number 1610.

12                PROSPECTIVE JUROR:  Here.

13                THE COURTROOM DEPUTY:  Juror Number 0548.

14                PROSPECTIVE JUROR:  Here.

15                THE COURTROOM DEPUTY:  Juror Number 1792.

16                PROSPECTIVE JUROR:  Here.

17                THE COURTROOM DEPUTY:  Juror Number 0517.

18                PROSPECTIVE JUROR:  Here.

19                THE COURTROOM DEPUTY:  Juror Number 1254.

20                PROSPECTIVE JUROR:  Here.

21                THE COURTROOM DEPUTY:  Juror Number 0717.

22                PROSPECTIVE JUROR:  Present.

23                THE COURTROOM DEPUTY:  Juror Number 0097.

24                PROSPECTIVE JUROR:  Here.

25                THE COURTROOM DEPUTY:  Juror Number 0578.
```

```
 1                PROSPECTIVE JUROR:  Here.

 2                THE COURTROOM DEPUTY:  Juror Number 0752.

 3                PROSPECTIVE JUROR:  Here.

 4                THE COURTROOM DEPUTY:  Juror Number 1215.

 5                PROSPECTIVE JUROR:  Here.

 6                THE COURTROOM DEPUTY:  Juror Number 1281.

 7                PROSPECTIVE JUROR:  Here.

 8                THE COURTROOM DEPUTY:  Juror Number 1714.

 9                PROSPECTIVE JUROR:  Here.

10                THE COURTROOM DEPUTY:  Juror Number 0316.

11                PROSPECTIVE JUROR:  Here.

12                THE COURTROOM DEPUTY:  Juror Number 0759.

13                PROSPECTIVE JUROR:  Here.

14                THE COURTROOM DEPUTY:  Juror Number 0980.

15                PROSPECTIVE JUROR:  Here.

16                THE COURTROOM DEPUTY:  Juror Number 1749.

17                PROSPECTIVE JUROR:  Here.

18                THE COURTROOM DEPUTY:  Juror Number 1393.

19                PROSPECTIVE JUROR:  Here.

20                THE COURTROOM DEPUTY:  Juror Number 0805.

21                PROSPECTIVE JUROR:  Present.

22                THE COURTROOM DEPUTY:  Juror Number 1136.

23                PROSPECTIVE JUROR:  Here.

24                THE COURTROOM DEPUTY:  Juror Number 1612.

25                PROSPECTIVE JUROR:  Here.
```

```
 1                    THE COURTROOM DEPUTY:  Juror Number 0351.

 2                    PROSPECTIVE JUROR:  Here.

 3                    THE COURTROOM DEPUTY:  Juror Number 1121.

 4                    PROSPECTIVE JUROR:  Here.

 5                    THE COURTROOM DEPUTY:  Juror Number 0893.

 6                    PROSPECTIVE JUROR:  Present.

 7                    THE COURTROOM DEPUTY:  Juror Number 0866.

 8                    PROSPECTIVE JUROR:  Here.

 9                    THE COURTROOM DEPUTY:  Juror Number 1114.

10                    PROSPECTIVE JUROR:  Here.

11                    THE COURTROOM DEPUTY:  Juror Number 1073.

12                    PROSPECTIVE JUROR:  Present.

13                    THE COURTROOM DEPUTY:  Juror Number 1333.

14                    PROSPECTIVE JUROR:  Here.

15                    THE COURTROOM DEPUTY:  Juror Number 1398.

16                    PROSPECTIVE JUROR:  Here.

17                    THE COURTROOM DEPUTY:  Juror Number 1688.

18                    PROSPECTIVE JUROR:  Present.

19                    THE COURTROOM DEPUTY:  Juror Number 1622.

20                    PROSPECTIVE JUROR:  Here.

21                    THE COURTROOM DEPUTY:  Juror Number 1323.

22                    PROSPECTIVE JUROR:  Here.

23                    THE COURTROOM DEPUTY:  Juror Number 0322.

24                    PROSPECTIVE JUROR:  Here.

25                    THE COURTROOM DEPUTY:  Juror Number 1207.
```

```
 1              PROSPECTIVE JUROR:  Here.

 2              THE COURTROOM DEPUTY:  Juror Number 0420.

 3              PROSPECTIVE JUROR:  Present.

 4              THE COURTROOM DEPUTY:  Juror Number 0655.

 5              PROSPECTIVE JUROR:  Present.

 6              THE COURTROOM DEPUTY:  Juror Number 0615.

 7              PROSPECTIVE JUROR:  Here.

 8              THE COURTROOM DEPUTY:  Juror Number 0564.

 9              PROSPECTIVE JUROR:  Here.

10              THE COURTROOM DEPUTY:  Juror Number 1748.

11              PROSPECTIVE JUROR:  Present.

12              THE COURTROOM DEPUTY:  Juror Number 0114.

13              PROSPECTIVE JUROR:  Here.

14              THE COURTROOM DEPUTY:  Juror Number 1515.

15              PROSPECTIVE JUROR:  Here.

16              THE COURTROOM DEPUTY:  Juror Number 0565.

17              PROSPECTIVE JUROR:  Here.

18              THE COURTROOM DEPUTY:  Juror Number 1199.

19              PROSPECTIVE JUROR:  Here.

20              THE COURTROOM DEPUTY:  Juror Number 0858.

21              PROSPECTIVE JUROR:  Here.

22              THE COURTROOM DEPUTY:  Juror Number 0192.

23              PROSPECTIVE JUROR:  Present.

24              THE COURTROOM DEPUTY:  Juror Number 1426.

25              PROSPECTIVE JUROR:  Here.
```

```
1              THE COURTROOM DEPUTY:  Juror Number 0577.

2              PROSPECTIVE JUROR:  Here.

3              THE COURTROOM DEPUTY:  Juror Number 1288.

4              PROSPECTIVE JUROR:  Here.

5              THE COURTROOM DEPUTY:  Juror Number 0719.

6              PROSPECTIVE JUROR:  Here.

7              THE COURTROOM DEPUTY:  Juror Number 1715.

8              PROSPECTIVE JUROR:  Present.

9              THE COURTROOM DEPUTY:  Juror Number 0747.

10             PROSPECTIVE JUROR:  Here.

11             THE COURTROOM DEPUTY:  Juror Number 0456.

12             PROSPECTIVE JUROR:  I'm here.

13             THE COURTROOM DEPUTY:  Juror Number 1469.

14             PROSPECTIVE JUROR:  Here.

15             THE COURTROOM DEPUTY:  Juror Number 1177.

16             PROSPECTIVE JUROR:  Here.

17             THE COURTROOM DEPUTY:  Juror Number 0328.

18             PROSPECTIVE JUROR:  Here.

19             THE COURTROOM DEPUTY:  Juror Number 1000.

20             PROSPECTIVE JUROR:  Here.

21             THE COURTROOM DEPUTY:  Juror Number 0247.

22             PROSPECTIVE JUROR:  Here.

23             THE COURTROOM DEPUTY:  Juror Number 0197.

24             PROSPECTIVE JUROR:  Here.

25             THE COURTROOM DEPUTY:  Juror Number 1179.
```

```
 1                PROSPECTIVE JUROR:  Here.

 2                THE COURTROOM DEPUTY:  Juror Number 0025.

 3                PROSPECTIVE JUROR:  Present.

 4                THE COURTROOM DEPUTY:  Juror Number 0724.

 5                PROSPECTIVE JUROR:  Here.

 6                THE COURTROOM DEPUTY:  Juror Number 0421.

 7                PROSPECTIVE JUROR:  Here.

 8                THE COURTROOM DEPUTY:  Juror Number 0011.

 9                PROSPECTIVE JUROR:  Here.

10                THE COURTROOM DEPUTY:  Juror Number 1076.

11                PROSPECTIVE JUROR:  Here.

12                THE COURTROOM DEPUTY:  Juror Number 0897.

13                PROSPECTIVE JUROR:  Here.

14                THE COURTROOM DEPUTY:  Juror Number 0641.

15                PROSPECTIVE JUROR:  Here.

16                THE COURTROOM DEPUTY:  Juror Number 1014.

17                PROSPECTIVE JUROR:  Present.

18                THE COURTROOM DEPUTY:  Juror Number 0196.

19                PROSPECTIVE JUROR:  Here.

20                THE COURTROOM DEPUTY:  Juror Number 1354.

21                PROSPECTIVE JUROR:  Here.

22                THE COURTROOM DEPUTY:  Juror Number 0414.

23                PROSPECTIVE JUROR:  Here.

24                THE COURTROOM DEPUTY:  Juror Number 1434.

25                PROSPECTIVE JUROR:  Here.
```

```
 1                    THE COURTROOM DEPUTY:  Juror Number 1338.

 2                    PROSPECTIVE JUROR:  Here.

 3                    THE COURTROOM DEPUTY:  Juror Number 1500.

 4                    PROSPECTIVE JUROR:  Here.

 5                    THE COURTROOM DEPUTY:  Juror Number 0879.

 6                    PROSPECTIVE JUROR:  Here.

 7                    THE COURTROOM DEPUTY:  Juror Number 0839.

 8                    PROSPECTIVE JUROR:  Here.

 9                    THE COURTROOM DEPUTY:  Juror Number 1459.

10                    PROSPECTIVE JUROR:  Here.

11                    THE COURTROOM DEPUTY:  Juror Number 1734.

12                    PROSPECTIVE JUROR:  Here.

13                    THE COURTROOM DEPUTY:  Juror Number 0096.

14                    PROSPECTIVE JUROR:  Here.

15                    THE COURTROOM DEPUTY:  Juror Number 1662.

16                    PROSPECTIVE JUROR:  Here.

17                    THE COURTROOM DEPUTY:  Juror Number 0524.

18                    PROSPECTIVE JUROR:  Here.

19                    THE COURTROOM DEPUTY:  Juror Number 0835.

20                    PROSPECTIVE JUROR:  Here.

21                    THE COURTROOM DEPUTY:  Juror Number 0299.

22                    PROSPECTIVE JUROR:  Here.

23                    THE COURTROOM DEPUTY:  Juror Number 1667.

24                    PROSPECTIVE JUROR:  Here.

25                    THE COURTROOM DEPUTY:  Juror Number 1347.
```

```
 1                  PROSPECTIVE JUROR:  Here.

 2                  THE COURTROOM DEPUTY:  Juror Number 0302.

 3                  PROSPECTIVE JUROR:  Here.

 4                  THE COURTROOM DEPUTY:  Juror Number 0100.

 5                  PROSPECTIVE JUROR:  Here.

 6                  THE COURTROOM DEPUTY:  Juror Number 1711.

 7                  PROSPECTIVE JUROR:  Here.

 8                  THE COURTROOM DEPUTY:  Juror Number 0824.

 9                  PROSPECTIVE JUROR:  Here.

10                  THE COURTROOM DEPUTY:  Juror Number 1173.

11                  PROSPECTIVE JUROR:  Here.

12                  THE COURTROOM DEPUTY:  Juror Number 0303.

13                  PROSPECTIVE JUROR:  Here.

14                  THE COURTROOM DEPUTY:  Juror Number 0520.

15                  PROSPECTIVE JUROR:  Here.

16                  THE COURTROOM DEPUTY:  Juror Number 0903.

17                  PROSPECTIVE JUROR:  Here.

18                  THE COURTROOM DEPUTY:  Juror Number 1516.

19                  PROSPECTIVE JUROR:  Here.

20                  THE COURTROOM DEPUTY:  Juror Number 1784.

21                  PROSPECTIVE JUROR:  Here.

22                  THE COURTROOM DEPUTY:  Juror Number 0040.

23                  PROSPECTIVE JUROR:  Here.

24                  THE COURTROOM DEPUTY:  Juror Number 0364.

25                  PROSPECTIVE JUROR:  Present.
```

```
 1                    THE COURTROOM DEPUTY:  Juror Number 1130.

 2                    PROSPECTIVE JUROR:  Here.

 3                    THE COURTROOM DEPUTY:  Juror Number 0957.

 4                    PROSPECTIVE JUROR:  Here.

 5                    THE COURTROOM DEPUTY:  Juror Number 1327.

 6                    PROSPECTIVE JUROR:  Present.

 7                    THE COURTROOM DEPUTY:  Juror Number 0473.

 8                    PROSPECTIVE JUROR:  Here.

 9                    THE COURTROOM DEPUTY:  Juror Number 0113.

10                    PROSPECTIVE JUROR:  Present.

11                    THE COURTROOM DEPUTY:  Juror Number 0534.

12                    PROSPECTIVE JUROR:  Present.

13                    THE COURTROOM DEPUTY:  Juror Number 1646.

14                    PROSPECTIVE JUROR:  Here.

15                    THE COURTROOM DEPUTY:  Juror Number 1383.

16                    PROSPECTIVE JUROR:  Here.

17                    THE COURTROOM DEPUTY:  Juror Number 1260.

18                    PROSPECTIVE JUROR:  Here.

19                    THE COURTROOM DEPUTY:  Juror Number 1310.

20                    PROSPECTIVE JUROR:  Here.

21                    THE COURTROOM DEPUTY:  Juror Number 1353.

22                    PROSPECTIVE JUROR:  Present.

23                    THE COURTROOM DEPUTY:  Juror Number 0984.

24                    PROSPECTIVE JUROR:  Here.

25                    THE COURTROOM DEPUTY:  Juror Number 1707.
```

1          PROSPECTIVE JUROR:  Here.

2          THE COURTROOM DEPUTY:  Juror Number 0174.

3          PROSPECTIVE JUROR:  Present.

4          THE COURTROOM DEPUTY:  Juror Number 0369.

5          PROSPECTIVE JUROR:  Here.

6          THE COURT:  All right.  Good morning.  As I said

7    earlier, my name is Judge Amy Jackson, and I want to welcome

8    you to the U.S. District Court for the District of Columbia.

9    This is our ceremonial courtroom.  This is where we swear in

10   new judges, where we swear in new lawyers, where we swear in

11   new citizens.

12         And there is a lot of history on these walls.  This

13   isn't every judge who's ever served on this court.  We don't

14   have room for all the pictures.  And it's only the judges who

15   have either retired or reached senior status, so I'm not up

16   there.

17         We are going to be, because there are so many of you,

18   starting this morning in this room, but this is not where the

19   trial is going to take place.  After the proceedings this

20   morning, we're going to be handling the rest of the case in my

21   courtroom on the second floor.

22         Before we start, I want to thank all of you very much

23   for taking time out of your busy schedules to assist the Court

24   and our entire system of justice by coming here today to

25   participate in this process.  We have a system in this country,

1      in civil trials and in criminal trials, that entitles people to

2      have their cases tried by juries.  And that simply wouldn't

3      work if we didn't have people who showed up to serve on those

4      juries.  So, you've already performed an important public

5      service, and I want to thank you for being a part of the

6      selection process, even if you don't ultimately get selected.

7              I also want to thank you in advance for the patience

8      that may be needed throughout today and possibly tomorrow.

9              When we pick a jury, our goal is to make sure that

10     we're picking a group of people who don't know anything about

11     the case or the people involved in the case and who can be

12     fair.  We're trying to pick people who can be completely open

13     and fair to both sides and base their verdict just on the

14     evidence and on the law that I'm going to tell you applies, and

15     not on any information or expertise or opinions that they

16     developed or obtained before they ever got to the courtroom.

17             To do that, we have a system where we ask prospective

18     jurors a series of questions.  Some of the questions may seem

19     personal.  But I want to assure you that you're not going to

20     have to give your answers in front of all the other jurors on

21     the panel.  We're going to use more than one courtroom later to

22     divide you into groups, and when it's time to hear from you

23     individually, we're going to bring you into my courtroom one at

24     a time.

25             Courtrooms are open to the public, though, and there

1    could be people seated there in addition to the lawyers or the

2    family members related to the case.  That's one reason we will

3    be referring to you by your jury number and not your name.

4            Also, you should know that if there's information

5    that you have to provide to answer a particular question that

6    is particularly personal, you may ask me for permission to give

7    us that answer at the bench, in private.

8            And it may turn out that we don't need to hear from

9    all of you, or we may end up excusing someone that we did talk

10   to.  If that happens to you, it's not because we don't like

11   you.  It's not because we think you said or did something

12   inappropriate or improper.  As you can easily tell, we have

13   more of you than we need, and there may be a reason why you

14   weren't one of the people who should be selected for this case,

15   or it may simply be that we didn't end up needing you.

16           Another way we make sure that the decision is fair

17   and based only on what happens on the record in the courtroom

18   is, the jurors will be told that they can't talk about the case

19   or any issues related to the case among themselves or with

20   anybody else until the trial is over and the case has been

21   submitted to them to decide.  And that rule goes into effect

22   right now.

23           There will be periods when you're seated together,

24   waiting for the next stage of the proceedings, either in the

25   courtroom or elsewhere, and you may not -- and you may talk

1    among yourselves about any subject whatsoever, but you may not

2    talk about what you're about to learn about the case or about

3    the issues raised in the questions I ask you as a part of the

4    jury selection process.

5           This also means, if you think you know somebody

6    involved in the case or something about the case or the legal

7    issues involved in the case, you should tell us that when we

8    talk to you individually.  So, please do not share what you

9    know with your fellow jurors while waiting for your turn.

10          This instruction also means that you shouldn't let

11   anybody else talk to you about the case while you're in the

12   building.  Not in the hallway.  Not in the cafeteria.  Not in

13   the elevators.  And you may not use the time while you're

14   waiting to be spoken to individually to go online and use your

15   phones and look up information about this case, about anyone

16   involved in it from this moment on, until you have been

17   officially excused.

18          And that includes tonight, if we're not finished with

19   jury selection yet.  You might end up getting information that

20   way that is inaccurate or won't be part of the trial or that

21   your fellow jurors won't have received, and that can make the

22   trial unfair.

23          The first thing I need to ask you to do right now, if

24   you haven't done it already, is to turn off your cell phones.

25   And I mean off.  I don't want them to vibrate or hum, and you

 1   shouldn't be consulting them in the courtroom.  I would like

 2   very much for you to be able to have access to your phones when

 3   you're not in the courtroom and during breaks, but you'll lose

 4   the privilege very quickly if we're interrupted here by the

 5   sound of your phones.

 6          The second thing I'm going do is to explain how we're

 7   going to proceed.  Each of you should have been provided with

 8   an index card and a pencil or pen.

 9          Does everybody have one?

10          THE PROSPECTIVE JURORS:  Yes.

11          THE COURT:  Yes.  Yes.  Yes.

12          THE PROSPECTIVE JURORS:  Yes.

13          THE COURT:  Okay.  If you have not done so already,

14   please write your juror number clearly and legibly on one side

15   of the card.

16          Has everybody done that?  Has everybody written their

17   juror number on one side of the card?

18          THE PROSPECTIVE JURORS:  Yes.

19          THE COURT:  At that point, you're going to turn it

20   over.  You're not writing anything else on that side of the

21   card.  Everything else we do is going to be on the back of the

22   card.

23          After you've been sworn, I'm going to ask you a

24   series of questions, and each question will have a number.  For

25   example -- I'm not going to ask you this actual question -- if

1    this was a case about doctors and medicine, I might say

2    something like, Question Number 1:  Are any of you or your

3    close friends or family members doctors?

4            If your answer to that question was yes, you would

5    write number 1 on the side of the card that's blank.  And I

6    would continue that process for every question.

7            Every time you have an answer -- a yes answer to a

8    question, you would write that number on the back of the card,

9    too.  Please write firmly, and please don't use teeny, tiny

10   little numbers because I'm the one who has to read them later,

11   and I'm older than I look.

12           So, when I am done asking questions, you will have an

13   index card with your juror number on one side and a series of

14   numbers, or maybe only one number or it maybe no numbers, if

15   you didn't have a yes answer to any question I asked on the

16   back of the card.

17           Does everybody understand this instruction?

18           THE PROSPECTIVE JURORS:  Yes.

19           THE COURT:  Does anybody have any questions they want

20   to ask me about those instructions?

21           All right.  This is our deputy courtroom clerk,

22   Mr. Haley.  He is going to administer the oath to you so that

23   you can begin, and you may either swear or affirm, as is

24   appropriate for you.

25           I also just want to say for the record, because I

 1    didn't do this at the beginning, that counsel for the

 2    United States is present in the courtroom, counsel for the

 3    defendants are present in the courtroom, and the defendant is

 4    present in the courtroom.

 5            So, Mr. Haley, can you proceed.

 6            (Whereupon, the prospective jurors were duly sworn.)

 7            THE COURT:  All right.  This is going to be a

 8    criminal case that relates to events that took place in 2012

 9    and 2013.  At that time, Gregory B. Craig was a partner at the

10    law firm of Skadden, Arps, Slate, Meagher & Flom, LLP -- which

11    I'll call Skadden from now on -- in Washington, D.C.

12            In early 2012, the government of Ukraine retained

13    Mr. Craig and Skadden to serve as rule of law consultants.  As

14    a part of the services provided to Ukraine, Mr. Craig led a

15    team of lawyers from his firm who prepared a written report

16    entitled, The Tymoshenko Case.  The report analyzed the trial

17    of former Ukrainian prime minister Yulia Tymoshenko, who had

18    been previously convicted and incarcerated in Ukraine in 2011

19    for allegedly abusing her official powers while in office.

20            Ukraine publicly released Skadden's Report at the end

21    of 2012.  The report attracted some media attention in the

22    United States and internationally.

23            There is a statute called the Foreign Agents

24    Registration Act, or FARA.  The FARA statute requires certain

25    United States agents of foreign principals, including foreign

1    governments, to register with the Department of Justice when

2    they engage in certain activities for or on behalf of a foreign

3    principal, and to disclose certain information regarding their

4    activities on behalf of the foreign principal.

5            There is an office within the National Security

6    Division at the United States Department of Justice, or DoJ,

7    charged with administering and enforcing FARA, and it is called

8    the FARA Unit.

9            After the public release of the report, the FARA Unit

10   contacted Skadden to obtain information regarding the firm's

11   work on Ukraine's behalf.  During the period covered by the

12   indictment, the FARA Unit exchanged letters with Mr. Skadden --

13   with Skadden and Mr. Craig, and they had one meeting in person

14   with Mr. Craig and Skadden.  The FARA Unit engaged in these

15   communications to obtain information to determine whether

16   Mr. Craig and Skadden were required to registered under FARA.

17           The grand jury has charged Mr. Craig in an

18   indictment.  Count 1 alleges that from about June 3rd, 2013

19   through January 16, 2014, Mr. Craig knowingly and willfully

20   engaged in a scheme to falsify, conceal, or cover up material

21   facts from the FARA Unit.  The indictment returned by the grand

22   jury is not evidence, but it is merely the way in which a

23   person is charged with a crime in order to bring them to a

24   trial.

25           Mr. Craig has pleaded not guilty, and he denies the

1    allegation.  Mr. Craig is presumed to be innocent of the

2    charges filed against him.  And throughout this trial, it is

3    the government's burden to prove that he committed the crime

4    with which he's charged beyond a reasonable doubt.  If it does

5    not do so, he cannot be convicted.

6         Question Number 1.  As I said earlier, my name is

7    Judge Amy Berman Jackson, and I'm going to preside over this

8    trial.  I will be assisted by my courtroom deputy, John Haley,

9    the most important and helpful person here, and who you will

10   come to know quite well as we move forward.

11        Do any of you believe that you know or have any

12   connection to or association with me or my courtroom staff?

13        If your answer to that question is yes, please put a

14   1 on the back of your card.

15        Question Number 2.  The lawyers representing the

16   United States during this trial -- and please stand when I say

17   your name -- will be Assistant United States Attorney Fernando

18   Campoamor-Sanchez, Molly Gaston, and Jason McCullough.

19   Assisting them at trial will also be Amanda Rohde.  These

20   lawyers and these individuals are employees of the U.S.

21   Attorney's Office for the District of Columbia and the National

22   Security Division of the Department of Justice.

23        Question Number 2 is:  Do any of you believe that you

24   know or have any connection to or association with these

25   people?  Or have you had any dealings or association with the

```
 1    U.S. Attorney's Office or the Department of Justice?

 2            If your answer to that question is yes, please put a

 3    2 on the back of your card.

 4            Thank you.  You can be seated.

 5            Question Number 3.  The lawyers representing the

 6    defendant during this trial, all from the law firm of Zuckerman

 7    Spaeder -- and please stand when I say your name -- will be

 8    William W. Taylor, William J. Murphy, Paula M. Junghans,

 9    Adam Abelson, and Ezra Marcus.

10            Question Number 3 is:  Do any of you believe that you

11    know or have any connection to or association with any of these

12    people or with the law firm of Zuckerman & Spaeder?

13            If the answer to that question is yes, please put a 3

14    on your card.

15            Thank you.  You can be seated.

16            The defendant in this case is Gregory B. Craig.

17            Mr. Craig, could you please stand.

18            Mr. Craig is a lawyer who lives in the District of

19    Columbia.  At various times during his career, he's worked at

20    the law firms of Williams & Connolly and Skadden, Arps, Meagher

21    & Flom.  He's also served as a lawyer for government agencies

22    or officials, working with, among others, Presidents

23    William Clinton and Barack Obama and Secretary of State

24    Madeleine Albright.

25            Question Number 4 is:  Do any of you believe that you
```

1     know or have any personal connection to or association with

2     Mr. Craig, or that you know anything about Mr. Craig?

3              If the answer to that question is yes, put a 4 on

4     your card.  Thank you.

5              Question Number 5:  Based on what you've heard so

6     far, do any of you believe that you have seen, read, or heard

7     anything at all about this case from any source, including word

8     of mouth, newspapers, magazines, radio, the internet,

9     television, or on social media, such as Facebook or YouTube?

10             If the answer to that question is yes, please put a 5

11    on the back of your card.

12             Question Number 6.  I'm about to read you a long list

13    of names of people and organizations and companies whose names

14    may come up in connection with this case, or who may be called

15    to testify in this case.  When I finish the long list, I'm

16    going to ask you if any of you know any these people or

17    organizations.

18             From the law firm of Skadden:  Bruce Buck, Matthew

19    Cowie, Eric Friedman, Kenneth Gross, Alex Haskell, Alon Kedem,

20    Paul Kerlin, Margaret -- I forget how to pronounce her name?

21             MR. ABELSON:  Krawiec.

22             THE COURT:  -- Krawiec, Peter Lesser, Michael Loucks,

23    Lauren Weiss-Malet, Melissa Porter, Noah Puntus, Kara Roseen,

24    Lillian Singer, Cliff Sloan, Lawrence "Larry" Spiegel, Julie

25    Turner, Alex van der Zwaan, Catherine Whitney, Earl Yaffa,

1    David Zornow.

2             From the Special Counsel's Office and the FBI:  Russ

3    Beverly, Kevin Constantine, Mike Dreeben, Brock Domin, Michael

4    Ficht, Daniel Kegl, Spencer Lucas, Omer Meisel, Robert Mueller,

5    III, Brian Richardson, Andrew Weissmann.

6             An organization called FTI Consulting.  And from

7    there:  Jon Aarons, Jonathan Hawker, Mark Malloch-Brown, Edward

8    Riley.

9             The FARA Unit and Kevin Connolly, Heather Hunt, Alex

10   Mudd, Timothy Pugh.

11            An organization called DMP International, including

12   Richard Gates, Konstantin Kilimnik, and Paul Manafort.

13            Ukrainian public officials and citizens, including

14   Oleksandr Lavrynovych, Serhiy Lyovochkin, Victor Pinchuk,

15   Viktor Pshonka, Yulia Tymoshenko, Serhiy Vlasenko, and Viktor

16   Yanukovych.

17            Mercury Public Affairs, and Lucy-Claire Saunders,

18   John Vincent "Vin" Weber, Andrew Wright.

19            The Podesta Group:  Ben Chang, Kendra Griffis, Andrew

20   Kauders, Anthony Podesta, Mark Tavlarides.

21            Other entities who might come up:  Arnold & Porter

22   Kay Scholer, LLP; Burson-Marsteller; Covington & Burling, LLP;

23   FleishmanHillard.  As I said earlier, FTI Consulting and

24   Mercury, Clark & Weinstock, and Mercury Public Affairs, the

25   Podesta Group, and Williams & Connolly, LLP.

1          Other individuals who may be mentioned or who may

2     appear:  Dave Herszenhorn, Al Hunt, Tom Parfitt, David Sanger,

3     Douglas Shoen, Jim Slattery, Emily Alpert, Gay Gioffi, Judge

4     Clinton Deveaux, Alan Friedman, Matthew Huisman, Amy Jeffress,

5     Victoria Reggie Kennedy, Jessica Tuchman Matthews, Cheryl

6     Mills, Derek Mitchell, Eckhart Sager, Tim Shriver, Brandon

7     Sullivan.

8          Question Number 6 is:  Do any of you believe that you

9     know or have any personal, family, or business connection of

10    any sort with any of these individuals or organizations?

11          If the answer to that question is yes, put a 6 on the

12    back of your card.

13          Question Number 7:  Have you or any close members of

14    your family been employed by any federal, state, or local law

15    enforcement agency?

16          So law enforcement is Question 7.

17          Question 8:  Have you or any close members of your

18    family worked for the federal government in any capacity?

19          If the answer is yes, put an 8 on your card.

20          Question 9:  Have you or any close friends or family

21    members worked in the legal profession in any way, including as

22    a lawyer, paralegal, or administrative assistant in any law

23    office, including not just private law firms, but also a

24    prosecutor's office or a public defender's office?

25          If the answer to that question is yes, put a 9 on

1     your card.

2                 Question 10:  Have you or any close friends or family

3     members worked in a firm engaged in lobbying?

4                 That's 10.

5                 Question Number 11:  Have you or any close friends or

6     family members worked in a firm engaged in public relations or

7     media consulting work?

8                 Question Number 12:  Have any of you, within the past

9     ten years, served as a juror before, either on a grand jury or

10    a petit jury in any court?

11                If you've served on a jury, put a 12 on the back of

12    your card.

13                Question Number 13:  Have you or any close friend or

14    family member, within the past ten years, been accused of, the

15    victim of, or a witness to a crime, whether or not that crime

16    was reported to law enforcement?

17                If your answer to whether you've been accused of, a

18    victim of, or a witness to a crime is yes, please put a 13 on

19    the back of your card.

20                Question Number -- yes, sir.

21                THE PROSPECTIVE JURORS:  Was there a time limit on

22    that?

23                THE COURT:  Ten years.  Thank you.

24                And I know some people can't remember exactly, so

25    just do the best you can with jury service and that issue.

```
1              Question Number 14:  You will hear testimony in this
2    case about work performed for the government of Ukraine.  Do
3    you or any close friend or family member have any connection to
4    or involvement with the country or the government of Ukraine,
5    or do any of you have any strong feelings about the government
6    of Ukraine or any current or former government officials in
7    Ukraine?
8              That's Question 14.
9              Question Number 15:  The indictment involves charges
10   of false statements and concealing information.  Is there
11   anything about just the nature of those charges that would make
12   it difficult for you to be a fair and impartial juror in this
13   case?
14             Question Number 16 -- did someone raise their hand?
15   Okay.
16             Question Number 16:  During this trial, one or more
17   law enforcement officers may testify as a witness.  I will
18   instruct you that you must not give either greater or lesser
19   weight to the testimony of law enforcement witnesses, and you
20   must treat them and evaluate their credibility as you would any
21   other witness.
22             Is there anyone who believes they would have
23   difficulty following that instruction?  If you would, please
24   put a 16 on the back of your card.
25             Question 17:  Some of the investigation leading to
```

1    this trial was conducted by Special Counsel Robert S.

2    Mueller, III, and his office.  Is there anything about just

3    that circumstance that would prevent you or hinder you in any

4    way from rendering a fair and impartial verdict in this case,

5    based solely on the evidence presented and on my instructions

6    of law?

7            That's Question 17.

8            Question 18:  There may be some testimony in this

9    case about work performed by the defendant and others in

10   connection with a project involving Paul Manafort and

11   Richard Gates.  Is there anything about that fact alone that

12   could make it difficult for you to be fair and impartial and

13   reach a verdict based solely on the evidence in this case?

14           If the answer to that question is yes, put an 18 on

15   your card.

16           Question 19:  Some of the witnesses in this case may

17   be people who are testifying as part of a guilty plea and an

18   agreement to cooperate with the government.  Is there anything

19   about that circumstance that will make it difficult for you to

20   evaluate their testimony fairly and impartially and in

21   accordance with my instructions?

22           That's Question 19.

23           Question 20:  As I already told you, and as already

24   in effect, one of the instructions you'll receive during the

25   pendency of this trial is that you may not watch, read, or

1    listen to any news or online postings related to this case,

2    including in newspapers, TV, radio, or the internet.  And

3    you'll be instructed that you may not blog or post or engage in

4    any social media communication or even personal conversations

5    about the case.

6          Would any of you have difficulty following that

7    instruction?  If you would, that's Question 20, and please put

8    a 20 on the back of your card.

9          21:  In every criminal case, the defendant is

10   presumed to be innocent throughout the trial, and he cannot be

11   found guilty of an offense unless and until the government has

12   proved each element of that offense beyond a reasonable doubt.

13         Question Number 21 is whether any of you would find

14   it difficult, for any reason, to obey that instruction.

15         If the answer is yes, put a 21 on the back of your

16   card.

17         Question Number 22:  At the end of the trial, I will

18   instruct you about the law to be applied to the case when you

19   make your decision.  Do any of you believe that if you were

20   selected as a juror in this case, it would be difficult for you

21   to disregard any notions, ideas, or beliefs about the law that

22   you may hold, or put aside what you may have understand or have

23   learned what the law is, and render a fair and impartial

24   verdict, based solely on the evidence presented and my

25   instructions on the law?

1        If that would be difficult for you, please put a 22

2    on the back of your card.

3        Question Number 23:  Once this trial gets underway,

4    it's expected to last for at least two weeks.  That would be,

5    basically, the last two weeks of August.

6        Those of you who are already thinking about your

7    calendar, I can tell you that we will not sit on Friday, August

8    30th, which is the Friday before Labor Day weekend; and, of

9    course, we will not sit on Labor Day, Monday, September 2nd.

10   So, even if you are selected as a juror in this case, you will

11   have a four-day weekend.

12       We will generally start at 9:30 in the morning, take

13   a midmorning break, take an hour break for lunch, take a

14   midafternoon break, and break for the evening at approximately

15   4:30 or 5 o'clock, or a little later in the afternoon,

16   depending on where we are in any witness's testimony.

17       Is there anyone who is taking any medication or has a

18   physical condition that can make it difficult for you to sit as

19   a juror with that schedule and give your full attention to the

20   trial and the evidence in this case?

21       If so, please answer Question 23 yes by putting a 23

22   on the back of your card.

23       Also, if you have a pressing conflict that cannot be

24   changed that would make it difficult for you to serve for a

25   trial of this length, please write number 23 on the back of

1      your card.

2              Question Number 24:  Do any of you have any

3      difficulties seeing or hearing, or any difficulty speaking,

4      understanding, reading, or writing the English language that

5      would make it difficult for you to follow or to receive the

6      evidence presented in this case?

7              That's Question Number 24.

8              Question Number 25:  Do any of you have any moral,

9      religious, or ethical beliefs that prevent you from sitting in

10     judgment of another person in a criminal trial?

11             If the answer to that question is yes, put a 25 on

12     your card.

13             Finally, Question Number 26:  Do any of you know of

14     any reason, even if I haven't specifically mentioned it this

15     morning, why you could not sit as a juror in this case and

16     judge the evidence fairly and impartially, for both sides, and

17     apply the law that I will give you in my instructions?

18             If your answer to that question is yes, please put a

19     26 on the back of your card.

20             I have now finished asking you the questions.  Please

21     hang on to your cards until Mr. Haley tells you what to do with

22     them.

23             At this point, he is going to bring most of you, a

24     large group of you, down to the second floor with me and the

25     lawyers to show you where we're going to be for the second

1    stage of the trial.

2              I'm going to confer with him.  But, some of you also

3    may be excused at this point until tomorrow morning.  And

4    anyone who gets that instruction from Mr. Haley needs to return

5    to the jury office first thing in the morning, as you did

6    today, unless you receive specific instructions not to between

7    now and then.

8              Mr. Haley, let's talk about the numbers.

9              (Off-the-record discussion.)

10             THE COURT:  All right.  This turned out to be easier

11   than I thought, based on where you're sitting.

12             Everyone who is seated on this side of the courtroom

13   (indicating) is -- we're not going to ask you more questions

14   today.  We're going to follow up with you tomorrow morning, if

15   we need you.

16             Everyone who is seated on this side of the

17   courtroom -- and that's to my left, for the record -- is

18   excused now to go back to the jury office.  Tell them, I have

19   been excused for the rest of the afternoon, and I'm due back

20   tomorrow morning.  And then, tomorrow morning, you will return

21   there, just like you did this morning.

22             And everyone in the center section -- and you're

23   going to go in the order of your rows -- is going to go with

24   Mr. Haley, and he's going to show you where we're going to be.

25   Once we get there, there will be a group of you who will be

1    excused to come back after lunch, because we can only do so

2    many of you before we break.  But we're going to start with the

3    individual questions as soon as we get you organized

4    downstairs, on the second floor.

5              Counsel and everyone else, once the jurors have been

6    escorted out, can also report to the courtroom, and we'll start

7    up as soon as we get everybody there.

8              THE COURTROOM DEPUTY:  Side door is open.

9              THE COURT:  I'm sorry?

10             THE COURTROOM DEPUTY:  Counsel can go out the side

11   door now, if they want.

12             THE COURT:  Okay.  All right.

13             And there's also a door right here (indicating) that

14   you can use at this time.

15             All right.  So thank you very much, everyone.  If we

16   end up not needing any of you -- yes, sir.

17             PROSPECTIVE JUROR:  Do we keep these or do we --

18             THE COURTROOM DEPUTY:  I'm going to come -- I

19   apologize.

20             THE COURT:  He is going to collect your index cards

21   before we go anywhere.  Mr. Haley is about to become the

22   custodian of the index cards.  Thank you for reminding us of

23   that.

24             If there are those of you who we don't see again

25   after this morning, I want to thank you, again, for being here

1    this morning and for your attention.  As I said, if jurors

2    didn't show up, we wouldn't be able to function.  So thank you

3    very much.  And I'll see some of you later.

4          (Recess.)

5          THE COURT:  All right.  Before we start bringing the

6    jurors in, why don't we just have counsel put their names on

7    the record, so we know who's here.

8          MR. CAMPOAMOR-SANCHEZ:  Good morning, again, Your

9    Honor.  Molly Gaston, Jason McCullough, and Fernando Campoamor

10   for the United States.

11         THE COURT:  All right.  Good morning.

12         MS. JUNGHANS:  Good morning, Your Honor.  Paula

13   Junghans, Bill Taylor, Bill Murphy, Adam Abelson for Mr. Craig.

14         And, Your Honor, I have a question before we proceed.

15         THE COURT:  All right.

16         MS. JUNGHANS:  Which is, if we could make sure that

17   we could test the earphones, because Mr. Craig already couldn't

18   hear the Court.  So I just want to make sure we aren't jumping

19   up and interrupting the people if we --

20         THE COURT:  You couldn't hear the Court when?

21         MS. JUNGHANS:  Just this moment.

22         THE COURT:  How about now?

23         THE DEFENDANT:  I can't see you, so...

24         THE COURT:  All right.  Can hear me now?

25         THE DEFENDANT:  Now I can.

```
 1                    THE COURT:  All right.  We'll give him a set of
 2          earphones to test.
 3                    All right.  Mr. Craig, can you hear what's going on
 4          up here?
 5                    THE DEFENDANT:  Yes.
 6                    THE COURT:  Okay.  Thank you.  Great.
 7                    MS. JUNGHANS:  Thank you so much, Your Honor.
 8                    THE COURTROOM DEPUTY:  I have to get Dianne one, if
 9          we go to the bench.
10                    THE COURT:  All right.  Well, I'm hoping we won't
11          have to do it very often.
12                    THE COURTROOM DEPUTY:  I'm going to need at least two
13          back, because if we go to the husher, I have to have one and
14          she has to have one, and Mr. Craig has to have one.  After
15          that --
16                    MR. TAYLOR:  Can you get one from them and one from
17          us?
18                    THE COURTROOM DEPUTY:  Yes.
19                    THE COURT:  Now you know why I like to do it the way
20          I do it.
21                    THE COURTROOM DEPUTY:  Are you ready for the first
22          juror, Your Honor?
23                    THE COURT:  Yes.
24                    (Prospective juror enters courtroom.)
25                    THE COURTROOM DEPUTY:  Your Honor, this is Juror
```

1   Number 1164.

2           THE COURT:  All right.  On the back of the card are

3   the numbers 1 with a question mark; 4, 5, 6, 7 with a question

4   mark; 8, 12 with a question mark; 13, 15 with a question mark;

5   17 with a question mark; 18, 20 with a question mark; and 23.

6   Let me start with Question Number 1.

7           Do you believe that you know me or some member of my

8   courtroom staff?

9           PROSPECTIVE JUROR:  Only what I've seen in the press.

10          THE COURT:  Okay.  But you don't know me personally?

11          PROSPECTIVE JUROR:  No, I do not.

12          THE COURT:  All right.

13          PROSPECTIVE JUROR:  So some of the questions, that's

14  from things that I've seen in the press.

15          THE COURT:  Okay.  Is there anything about anything

16  you've read about me in the press that would make it difficult

17  for you to be fair and impartial in this case, or gives you a

18  point of view, one way or the other, about the case?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  All right.  And you understand that if

21  during the trial you think that I have some point of view about

22  the case, that you're supposed to put that aside.  At the end

23  of the day, your decision is supposed to be based on what you

24  think, and not what you think that I might be thinking.

25          Do you understand that?

1          PROSPECTIVE JUROR:  That is correct.

2          THE COURT:  All right.  Question Number 4 was with

3    respect to whether you knew the defendant.

4          PROSPECTIVE JUROR:  Again, only what's in the press.

5          THE COURT:  All right.  And so that rolls right into

6    Question Number 5, which is:  What, if anything, have you heard

7    or read about the defendant or this case?

8          PROSPECTIVE JUROR:  Quite a bit.

9          THE COURT:  Can you tell me a little bit, with a

10   little more detail than that?

11         PROSPECTIVE JUROR:  So, I recognized the defendant

12   when I walked into the court this morning.  *Washington Post*,

13   *Politico*, you name it, this case has been all over the press.

14         THE COURT:  And you read those regularly?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  As of having consumed a lot of that

17   information, do you have an opinion, sitting here right now,

18   about this case?

19         PROSPECTIVE JUROR:  I don't know.

20         THE COURT:  You don't know if you have an opinion

21   about the case?

22         PROSPECTIVE JUROR:  Correct.

23         THE COURT:  I just want to make sure I heard you.

24         Well, do you think that you could put aside what

25   you've read and decide this case based solely on the evidence

1    in this case and not on anything you've read?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  When you say you don't know whether

4    you've had an opinion or not about the case, can you elaborate

5    on that a little bit?

6              PROSPECTIVE JUROR:  I have worked at State

7    Department.  So interacting with foreign governments is

8    something we do.  And, so, we're also cognizant of people who

9    may be working with -- or, governments who may be working

10   through others to influence whatever the government opinion

11   might be.

12             THE COURT:  So, do you have an opinion, sitting here

13   right now, about whether Mr. Craig or his firm had some

14   obligations under FARA?

15             PROSPECTIVE JUROR:  Yes.  But knowing the hubris in

16   D.C., not surprised.

17             THE COURT:  Okay.  Can you elaborate on that?  What

18   do you mean by -- what is your opinion and...

19             PROSPECTIVE JUROR:  I don't know how to articulate

20   it, other than, a lot of people have been advocating on behalf

21   of other governments and not necessarily disclosed that.

22             THE COURT:  All right.  Do you have an opinion about

23   whether he did or Skadden did that?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Question Number 6 was:  Were you at the

```
 1        State Department at any time that overlapped with Mr. Craig?
 2             PROSPECTIVE JUROR:  No.
 3             THE COURT:  And do you have any opinion about his
 4        reputation, based on interacting with people at the State
 5        Department?
 6             PROSPECTIVE JUROR:  No.
 7             THE COURT:  Question Number 6 was the list of names
 8        of individuals and entities that might be involved.
 9             PROSPECTIVE JUROR:  There are those that you see in
10        the press, and I think you also mentioned Cheryl Mills.
11             THE COURT:  Yes.
12             PROSPECTIVE JUROR:  I know a Cheryl Mills.  I don't
13        know if it's the same person.
14             THE COURT:  Who is the Cheryl Mills that you know?
15             PROSPECTIVE JUROR:  Someone from college that -- I
16        don't know if she's a -- I think she's a lawyer.  So, I don't
17        know who.
18             THE COURT:  Do you stay in touch with her?
19             PROSPECTIVE JUROR:  Only at reunions.
20             THE COURT:  Is it someone that lives in the
21        Washington, D.C. area and may have worked as a lawyer for a
22        president?
23             PROSPECTIVE JUROR:  I don't know.
24             THE COURT:  Okay.  Question Number 7 was about
25        working in law enforcement.
```

```
 1            Have you or a close friend or family member ever

 2     worked in law enforcement?

 3            PROSPECTIVE JUROR:  Can I go off mic?  I would rather

 4     not answer this.

 5            THE COURT:  Okay.  What were the -- were there other

 6     issues that you want to answer in private?  And then we'll take

 7     them all together.  Or is that the only one that you want to be

 8     private about?

 9            PROSPECTIVE JUROR:  There may be one or two others.

10            THE COURT:  All right.  But that question really just

11     called for whether you or a close friend or family member had

12     ever worked in law enforcement.  And you feel like you need to

13     answer that privately?

14            PROSPECTIVE JUROR:  Yes.

15            THE COURT:  All right.  Question Number 8 was working

16     for the federal government.

17            You work at the State Department?

18            PROSPECTIVE JUROR:  No.  Food and Drug Administration.

19            THE COURT:  What do you do there?

20            PROSPECTIVE JUROR:  I am currently a policy maker

21     there.  But, I've also dealt with -- worked with law

22     enforcement at FDA.

23            THE COURT:  Is there anything about your association

24     with the federal government and law enforcement that leads you

25     to favor one side or the other in this case?
```

```
 1                    PROSPECTIVE JUROR:  No.

 2                    THE COURT:  Question Number 12 was whether you'd ever

 3       served as a juror before, in the past ten years.

 4                    PROSPECTIVE JUROR:  Yes.  I get called, like, every

 5       year or every other year.

 6                    THE COURT:  And in that -- we all do.

 7                    PROSPECTIVE JUROR:  Yes.

 8                    THE COURT:  But having been called, did you ever

 9       actually have to serve?

10                    PROSPECTIVE JUROR:  No.

11                    THE COURT:  So you never sat in the box, heard a

12       trial, and reached a verdict?

13                    PROSPECTIVE JUROR:  Correct.

14                    THE COURT:  All right.  Question Number 13 was the

15       one whether you'd ever been accused of, a victim of, or a

16       witness to a crime, you or a close friend or family member.

17                    PROSPECTIVE JUROR:  Yes.  Identity theft.

18                    THE COURT:  Okay.  And when did that happen?

19                    PROSPECTIVE JUROR:  2015.

20                    THE COURT:  Was that investigated to your

21       satisfaction?

22                    PROSPECTIVE JUROR:  No.  But, there wasn't much that

23       law enforcement can do.

24                    THE COURT:  Is there anything about that experience

25       that would lead you to favor one side or the other in this
```

1    case?

2            PROSPECTIVE JUROR:  No.  And I can elaborate, also,

3    on one aspect off mic.

4            THE COURT:  All right.  Well, it will be recorded,

5    what you say, it just won't be heard throughout the whole

6    courtroom.

7            PROSPECTIVE JUROR:  That's fine.

8            THE COURT:  Question Number 15, when I asked whether

9    you thought you would have any difficulty being fair and

10   impartial, just based on the nature of the charges.

11           PROSPECTIVE JUROR:  I -- based on the information, I

12   can be fair -- fair and impartial.

13           THE COURT:  All right.  Well, the question was

14   whether you thought you would have any difficulty, and you put

15   the number and a question mark.

16           So, are you concerned about your ability to be fair

17   and impartial?

18           PROSPECTIVE JUROR:  It depends on the witnesses.

19           THE COURT:  Well, everybody is going to base their

20   verdict on the evidence, which includes what the witnesses say

21   and what the evidence is.

22           But is there anything, sitting here right now,

23   knowing what the charges are, without having heard the

24   witnesses, that leads you to feel, one way or the other, that

25   you couldn't be fair in this case?

1          PROSPECTIVE JUROR:  No.  I can be fair.

2          THE COURT:  There was a similar question about just

3     the fact that the Special Counsel's Office was involved, would

4     affect your ability to be fair and impartial, and that one,

5     also, you wrote the number and a question mark.

6          So what did you mean by that?

7          PROSPECTIVE JUROR:  I think anyone who has followed

8     that case very carefully probably has an opinion.  That said, I

9     am not privy to all the details or all of the evidence, so that

10    is why I put the question mark.

11         THE COURT:  When you say "that case," do you mean

12    everything the special counsel was investigating, or to the

13    extent his investigation touched upon this case?

14         PROSPECTIVE JUROR:  Overall, not just this case.

15         THE COURT:  All right.  And can you set aside your

16    overall opinion about the Mueller investigation and judge this

17    one based on the evidence you hear in the courtroom?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Question Number 18 mentioned Mr. Manafort

20    and Mr. Gates.

21         Is there something about that that gives rise to a

22    difficulty, in your mind?

23         PROSPECTIVE JUROR:  I would say, I'm very biased

24    against him.

25         THE COURT:  About Mr. Manafort?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  If you heard in this case that the work

3     that's involved in this case was work done in connection with

4     or as part of a team led by Mr. Manafort, would your feelings

5     about Mr. Manafort affect your feelings about Mr. Craig and the

6     work he did?

7          PROSPECTIVE JUROR:  It could.

8          THE COURT:  Question Number 20 was asking you whether

9     you could abide by the instruction to not read about this case

10    and not blog and talk about it.

11         And that would be a problem for you?

12         PROSPECTIVE JUROR:  I will need to talk about it

13    offline.

14         THE COURT:  I'm sorry?

15         PROSPECTIVE JUROR:  I will explain.

16         THE COURT:  Okay.  All right.

17         And Question Number 23 was the schedule.

18         PROSPECTIVE JUROR:  Yes.  This -- I know everyone is

19    very busy.  I have a daughter in daycare who works out at

20    FDA -- comes out to FDA with me.  The burden to -- I would have

21    to figure out some logistical issues to make this work.

22         THE COURT:  Is there someone else in your family that

23    could take care of the daycare situation for that period of

24    time, or a babysitter, or is there -- do you have an option to

25    solve this problem?

```
 1              PROSPECTIVE JUROR:  Not consistently.  But, if forced

 2     to, we could make it work, but at great cost.

 3              THE COURT:  If you were forced to make it work, would

 4     you hold that against anybody sitting here at trial?  Or would

 5     you be able to sit however long the trial is and treat

 6     everybody fairly?

 7              PROSPECTIVE JUROR:  I think I could sit here and

 8     treat everybody fairly.  But, I would be thinking about how

 9     much I would be racking up in car services and things like

10     that.

11              THE COURT:  Okay.  All right.

12              All right.  I would like one lawyer from each side

13     and the juror to just come here, and I want to take your

14     answers that you weren't able to provide us before.

15              (Bench discussion:)

16              THE COURT:  I'm just going to turn a little button

17     that makes it so that people can't hear me.  I can't do it.

18              Can I do it?

19              Okay.  All right.  So the one question was about law

20     enforcement experience, and then a little bit about your

21     blogging interests or not following the case.  And I think

22     those were primarily the ones.

23              PROSPECTIVE JUROR:  Okay.  So, I may have, in the

24     past, worked with law enforcement.  I wouldn't necessarily be

25     able to disclose that.
```

1          THE COURT:  All right.

2          PROSPECTIVE JUROR:  That is also the nature of my

3     husband's job.  I don't entirely know what he does.

4          THE COURT:  Okay.  So anything about those

5     associations and those roles that would lead you to favor one

6     side or the other?

7          PROSPECTIVE JUROR:  My husband and I talk a lot about

8     geopolitics at home.  I would have to disclose something --

9     like, he would know -- for example, if I said, we can't talk

10    about this or we can't talk about anything international right

11    now, he would have a good sense of what I'm sitting on.

12         THE COURT:  Okay.  Well, that would be okay, as long

13    as, then, you didn't talk about it.

14         Have, through your work or through his work, either

15    one of you ever been involved, focused particularly on Ukraine?

16         PROSPECTIVE JUROR:  My husband may have.

17         THE COURT:  Has he discussed with you feelings or

18    points of view about one side or the other?

19         PROSPECTIVE JUROR:  I wouldn't be able to disclose

20    that.

21         THE COURT:  All right.  Do you have opinions, sitting

22    here right now, about one side or the other in the various

23    Ukrainian's government turnover?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  And then, in terms of Question 20 and not

1    blogging or talking about the case, is that what you were

2    talking about?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  All right.

5              PROSPECTIVE JUROR:  And it happens.  Like, most

6    people don't talk about geopolitical at the table, but it comes

7    up on phone calls.  And due to the sensitive nature of his

8    work, we sometimes talk in code, as well.  So, we could get

9    into conversations, and then I would have to, Oh, wait, we

10   can't.

11             THE COURT:  Okay.  Well, basically, you wouldn't be

12   able to talk about this case, and probably what went on in the

13   Ukraine in the time period that we're talking about in this

14   case.  But, there's -- there would be no prohibition on talking

15   about many other geopolitical matters that are available to

16   discuss at the moment.

17             PROSPECTIVE JUROR:  He covered this part of the

18   world --

19             THE COURT:  Okay.

20             PROSPECTIVE JUROR:  -- at some point.  I don't know

21   the time.

22             THE COURT:  All right.  Do either of you want to ask

23   any follow-up with respect to that?  The rest of the follow-up

24   we're going to take from the well.

25             MS. JUNGHANS:  Are you able to say what agency your

 1    husband works for?

 2                PROSPECTIVE JUROR:  State Department.

 3                MR. CAMPOAMOR-SANCHEZ:  No, not for the government.

 4                THE COURT:  Okay.  All right.  Everybody can go back.

 5    You can go back to your seat.

 6                MS. JUNGHANS:  I have some follow-up.

 7                THE COURT:  Oh, yes.  I said, we'll take that from

 8    the well of the court.

 9                So I need you back in the witness stand.

10                PROSPECTIVE JUROR:  Okay.

11                THE COURT:  The rest is going to be public.

12                (Open court:)

13                THE COURT:  All right.  Any follow-up questions by

14    the government?

15                MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

16                THE COURT:  Anything for the defense?

17                MS. JUNGHANS:  Yes, Your Honor.

18                Ma'am, you said, at some point, you had worked at the

19    Department of State.  Can you tell us what you did and when you

20    did it?

21                PROSPECTIVE JUROR:  Yes.  I worked at the Department

22    of State from 2004 to 2009.  My first job was in

23    counter-bioterrorism and emerging health threats in East Asia

24    and Pacific Rim.  And my last year was in the Office of the

25    Global AIDS Coordinator.  And I covered Africa and the World

1    Health Organization.

2              MS. JUNGHANS:  And you also said that you have some

3    opinions about -- that there are a lot of people who -- if I

4    wrote it down correctly, that there are a lot of people who do

5    jobs that require registration when they're representing

6    foreign governments, and they don't register.  And I believe

7    you said you have some opinions.

8              Can you tell us what those opinions are?

9              PROSPECTIVE JUROR:  Well, so, some of this is based

10   on the papers.  But, also, I guess because of my training, I

11   always assume that I'm not getting all the full disclosures.

12   This happens not -- I'm not saying necessarily in this.  But,

13   in my experience at FDA, you don't get the full story.  So, as

14   these -- as people are registering to avoid being in conflict

15   with the FARA regulation, I'm not surprised.

16             I guess I didn't know, but I also wasn't surprised to

17   see that cases were popping up now, in retrospect, because

18   people were registering retrospectively.

19             MS. JUNGHANS:  Okay.  Do you have opinions, either

20   pro or con, about people who are in that situation?

21             PROSPECTIVE JUROR:  I don't know.  But, I -- I know

22   that there are people who, for example, work at State

23   Department, who are very cognizant of things like that, and are

24   very careful of veering into another lane.

25             MS. JUNGHANS:  You -- you said -- if I could, you

1    also said that your ability to be fair depends on the

2    witnesses.

3              Could you elaborate on that a little bit more?

4              PROSPECTIVE JUROR:  I have to say, Paul Manafort,

5    just reading the articles and everything that's come out, it's

6    very hard to not be biased against him.

7              MS. JUNGHANS:  Well, I think I can say, Mr. Manafort

8    is not going to be a witness in the case.

9              PROSPECTIVE JUROR:  Okay.

10             MS. JUNGHANS:  But, as Judge Jackson explained to

11   you, there will be evidence that Mr. Craig worked on a project

12   in which Mr. Manafort was involved.

13             PROSPECTIVE JUROR:  Correct.

14             MS. JUNGHANS:  So would that fact, standing alone,

15   make it difficult for you to be fair towards Mr. Craig?

16             PROSPECTIVE JUROR:  I would hope not.

17             MS. JUNGHANS:  Are you sure?

18             PROSPECTIVE JUROR:  I -- I don't know.

19             MS. JUNGHANS:  All right.  And you also said that

20   anybody who had followed the special counsel investigation

21   would have an opinion about it, if I wrote down correctly what

22   you said.

23             Could you tell us what your opinion is?

24             PROSPECTIVE JUROR:  Morbid curiosity.  And also, I'm

25   not surprised.  But, I can't explain it further than that.

1    I -- yeah, I don't know how to articulate it.

2            MS. JUNGHANS:  Well, I don't want to press you, but

3    when you say you're not surprised, what do you mean?

4            PROSPECTIVE JUROR:  I'll go back to the point I just

5    made about people don't always disclose, and I'll -- I'll give

6    an analogy.

7            When kids go to talk to their parents, they tell the

8    parents not the entire story, just the best parts of the story.

9    And as you start delving into the story, you realize that

10   there's more to the story, and that the kids may have withheld

11   their parts of the story so as not to get into as much trouble

12   as they really may have been.

13           MS. JUNGHANS:  Okay.  So is the analogy, then, that

14   people who have been witnesses in the special counsel

15   investigation may not have told the full story to special

16   counsel?

17           PROSPECTIVE JUROR:  No, I'm not saying that.

18           MS. JUNGHANS:  Okay.  Do you have the same opinion

19   about witnesses who would be testifying in a trial?

20           PROSPECTIVE JUROR:  No.  I -- I have been trained

21   to -- even if I have a firm opinion, to keep an open mind.  And

22   I'm always open to changing that opinion, if I have a firm

23   opinion already established.

24           MS. JUNGHANS:  Okay.  But --

25           THE COURT:  I don't want -- please, I don't want you

1     to press her or argue with her.  I think she's --

2              MS. JUNGHANS:  No.  I'm not trying to, Your Honor.

3              THE COURT:  I think she's given a significant amount

4     of information to make a decision.  So ask any other specific

5     follow up on any specific question that you think you need.

6              MS. JUNGHANS:  Right.  I don't think I have any other

7     questions.

8              Thank you so much.

9              THE COURT:  All right.  Thank you.

10             Okay.  You can step back into the jury room.

11             (Prospective juror exits courtroom.)

12             THE COURT:  Does anyone have a motion with respect to

13    this juror?

14             MS. JUNGHANS:  Yes, Your Honor.

15             THE COURT:  And it is?

16             MS. JUNGHANS:  It's to strike for cause.

17             THE COURT:  Absolutely.

18             Does anybody disagree with that?

19             MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

20             THE COURT:  Okay.  Let's call the next one.

21             MR. TAYLOR:  Your Honor, may I impose upon your

22    patience for one second?

23             THE COURT:  I don't know.  A second.

24             MR. TAYLOR:  When you described Mr. Manafort's role,

25    it concerns me.  Mr. Manafort did not lead the project that

1    Mr. Craig was involved in.

2              THE COURT:  I didn't say he led the project.

3              MR. TAYLOR:  I thought I heard you say -- I think

4    it's accurate to say he's involved and represented the

5    government of the Ukraine.  He did not lead the project that

6    Mr. Craig was involved.  If I misheard, I apologize.

7              THE COURT:  All right.

8              MR. CAMPOAMOR-SANCHEZ:  I think we're going to have a

9    disagreement about what the facts are going to show about that,

10   but --

11             THE COURT:  Okay.

12             MR. TAYLOR:  He's involved.

13             THE COURT:  I think it's a little more than that.

14   And I think it's important that if they have a problem with

15   Mr. Manafort, that they understand that they may hear evidence,

16   whether you dispute it or not, of working together.  Because I

17   want to make sure that we're probing any possible taint that

18   could travel from Mr. Manafort to your client.

19             MR. TAYLOR:  And we're very grateful for that.

20             THE COURT:  All right.

21             Let's bring in the next juror.  And then you need to

22   tell each one, individually, the way you've been instructed.

23             (Prospective juror enters courtroom.)

24             THE COURTROOM DEPUTY:  Your Honor, this is Juror

25   Number 0683.

1          THE COURT:  Good morning.  Back of this card has the

2     numbers 4, 5, 9, 10, 12, 15, 18, 19, 20, 22, and 23.  Let me

3     start with Number 4, whether you know the defendant.

4          PROSPECTIVE JUROR:  I do not know Mr. Craig

5     personally; I've just read about him.

6          THE COURT:  I'm going to need you to lean in a little

7     closer to the microphone.  Okay.

8          So, she just said she doesn't know him personally;

9     she just read about him.  Which brings us directly to Question

10    Number 5.

11         So, can you tell us a little bit about what you've

12    read and heard about Mr. Craig?

13         PROSPECTIVE JUROR:  Sure.  Just yesterday there -- I

14    read *Law360* over the course of my job, and just yesterday there

15    was an article about jury selection for this case.  Last week

16    there was an article about Your Honor dismissing a count from

17    the indictment.  I've also read the indictment itself, some of

18    the pleadings in the case.  I've skimmed through the docket

19    sheet.

20         THE COURT:  And what prompted you to read the

21    pleadings and skim the docket sheet?

22         PROSPECTIVE JUROR:  One would be curiosity about the

23    case.  The second -- if I may refer to Question Number 23, I've

24    had a trip -- a two-week trip to Asia planned since October

25    2018.  And when I received this summons, I was worried that I

1     would be assigned to a case that could last -- that could

2     interfere with my trip.

3          THE COURT:  All right.  So in connection with your

4     jury services, and you looked into that case because you saw it

5     was on the Court's calendar?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  All right.  Tell me when your trip is

8     scheduled.

9          PROSPECTIVE JUROR:  I leave Washington, D.C. on

10    Tuesday, August.

11         27th, and I return on Sunday night, September 8th.

12         THE COURT:  Okay.  And is this a trip you've already

13    paid for?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  In connection with your review of the

16    things you've read in the press and the things you've read on

17    the docket, do you have an opinion at this point, one way or

18    the other, about how this case should come out?

19         PROSPECTIVE JUROR:  I did not read the pleadings

20    carefully.  To be perfectly frank, my general opinion is just

21    that I don't want to be part of this case because I -- I'm

22    really looking forward to my trip.

23         THE COURT:  So, I --

24         PROSPECTIVE JUROR:  I mean, I would be a very unhappy

25    juror.  So do I have a -- sort of a -- a gut instinct about

1    this, having skimmed through what I skimmed?  Yes.  I'm

2    probably not -- I mean, but if I read things thoroughly or

3    heard more of a story, could that change?  Yes.

4              THE COURT:  If you were told you can't read any more,

5    and you only get to decide based on the evidence that's entered

6    in this courtroom, can you put aside what you've already read

7    and base the case --

8              PROSPECTIVE JUROR:  If I were told that this trial

9    would end this Friday, and there would be no -- no chance that

10   my trip was in jeopardy, yes.

11             THE COURT:  Before we go on to your other numbers, I

12   just want to confer with counsel briefly.  So, if you can just

13   step back into the hallway.

14             (Prospective juror exits courtroom.)

15             MR. CAMPOAMOR-SANCHEZ:  Oh, sorry.  I thought you

16   were bringing us to the bench.

17             THE COURT:  No.  I just thought it would be easier to

18   have her step out.

19             Do we need to go through all of the questions, or is

20   somebody going to move to -- or do we agree we should excuse

21   her?

22             MS. JUNGHANS:  We agree.

23             MR. CAMPOAMOR-SANCHEZ:  We agree.

24             THE COURT:  Okay.  All right.  There may be

25   situations where I try to do that, so we don't have to do

1    everything, and we can move along.  All right.  She'll be

2    excused.

3              (Prospective juror enters courtroom.)

4              THE COURTROOM DEPUTY:  This is Juror 1297, Your

5    Honor.

6              THE COURT:  Good morning, sir.

7              PROSPECTIVE JUROR:  Good morning.

8              THE COURT:  Your card has numbers 8, 10, and 12.  And

9    Question Number 8 was whether you or a close friend or family

10   member worked for the federal government.

11             PROSPECTIVE JUROR:  I used to work for the Post

12   Office.

13             THE COURT:  All right.  And what did you do there?

14             PROSPECTIVE JUROR:  A clerk and a carrier.

15             THE COURT:  And Question Number 10 was about lobbying

16   work.

17             PROSPECTIVE JUROR:  I used to work for Goodyear Tire

18   and Rubber Company's lobbying office here in DC.

19             THE COURT:  Okay.

20             PROSPECTIVE JUROR:  I was just the receptionist,

21   though.

22             THE COURT:  All right.

23             PROSPECTIVE JUROR:  I wasn't a lobbyist.

24             THE COURT:  Okay.  And Question Number 12 was prior

25   jury service.

```
 1              PROSPECTIVE JUROR:  Here in D.C., we get called every

 2      year.  And then you show them your card and they say, Okay, you

 3      can wait until next year.

 4              So I've had, like, four in the last ten years.

 5              THE COURT:  Four times you've showed up.  But, have

 6      you ever had to sit in the box and hear the evidence and reach

 7      a verdict?

 8              PROSPECTIVE JUROR:  I've had three trials out of the

 9      four.

10              THE COURT:  And do you remember if the jury was able

11      to reach a verdict in those cases?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  And what was it, if you recall?

14              PROSPECTIVE JUROR:  I think on one occasion it was a

15      not guilty and one occasion it was a guilty, and I can't

16      remember the third.  It's been a long time.

17              THE COURT:  All right.  Were they all criminal cases,

18      as far as you know?

19              PROSPECTIVE JUROR:  Yes.

20              THE COURT:  Is there anything about any of that

21      experience, working for the Postal Service or having sat

22      through trials before where verdicts were reached, that you

23      bring with you to the courtroom today that makes you feel you

24      couldn't be fair and impartial to both sides in this case?

25              PROSPECTIVE JUROR:  No.  I can't think of a reason to
```

1   get out of jury service.

2           THE COURT:  Are you eager to come up with a reason to

3   get out of jury service?

4           PROSPECTIVE JUROR:  I've gotten tired of it after a

5   while.

6           THE COURT:  All right.

7           PROSPECTIVE JUROR:  Because I've lived here for 20

8   years.  And in the previous ten years, I served three or four

9   times.

10          THE COURT:  All right.  Well, all I can tell you is,

11  everyone very much appreciates your service.

12          Any questions for the government?

13          MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

14          THE COURT:  Any for the defense?

15          MS. JUNGHANS:  Sir, you said that you used to work

16  for the Postal Service, but on our sheet, it doesn't list any

17  current occupation for you.

18          Do you work now, or are you retired?

19          PROSPECTIVE JUROR:  I'm currently unemployed.

20          MS. JUNGHANS:  Okay.  And how long have you been --

21  how long has it been since you worked at the Postal Service?

22          PROSPECTIVE JUROR:  I quit in '96, I believe.

23          THE COURT:  Okay.  '96?

24          PROSPECTIVE JUROR:  Oh, no.  Wait a minute.  That's

25  not right.  '91.

```
 1                    MS. JUNGHANS:  Okay.  And so --
 2                    THE COURT:  And then you worked for Goodyear after
 3       that?
 4                    PROSPECTIVE JUROR:  Yeah.
 5                    THE COURT:  Okay.
 6                    MS. JUNGHANS:  So your most recent employment was
 7       with Goodyear.
 8                    PROSPECTIVE JUROR:  No.  No.  I was a schoolteacher
 9       before I -- before they quit hiring me.
10                    MS. JUNGHANS:  Okay.  And when did you stop doing
11       that?
12                    PROSPECTIVE JUROR:  It's been three or four years.
13                    MS. JUNGHANS:  Okay.  And you -- you resigned or you
14       were terminated?
15                    PROSPECTIVE JUROR:  I resigned.
16                    MS. JUNGHANS:  Okay.  Thank you.
17                    THE COURT:  All right.  Thank you, sir.  You can step
18       back into the jury room.
19                    (Prospective juror exits courtroom.)
20                    THE COURT:  Any motions with respect to that juror?
21                    MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.
22                    THE COURT:  Okay.  All right.  Let's go on to the
23       next one.
24                    MS. JUNGHANS:  No, Your Honor.
25                    (Prospective juror enters courtroom.)
```

```
1            THE COURTROOM DEPUTY:  Your Honor, this is Juror
2     Number 1402.
3            THE COURT:  All right.  Good morning, sir.
4            You've got the number 13 on the back of your card.
5     And that was my question where I asked if you or a close friend
6     or family member had ever been accused of, a victim of, or a
7     witness to a crime.
8            PROSPECTIVE JUROR:  Yes.
9            THE COURT:  Can you tell us about your answer to that
10    question?
11           PROSPECTIVE JUROR:  16 years -- I'm 23.  So, 16
12    years --
13           MS. JUNGHANS:  I'm sorry.  I can't hear.
14           THE COURT:  Okay.  You just need to lean into the
15    microphone.
16           PROSPECTIVE JUROR:  Oh, okay.
17           THE COURT:  Thank you.
18           PROSPECTIVE JUROR:  I'm 23.  So, at 16 years old, I
19    was robbed at gunpoint.
20           THE COURT:  Did the police respond?
21           PROSPECTIVE JUROR:  We did not contact the police.
22           THE COURT:  You didn't contact the police?
23           PROSPECTIVE JUROR:  Correct.
24           THE COURT:  All right.  Is there anything about that
25    experience of having been a victim of a crime that makes you
```

```
 1    feel you can't be fair and impartial in this case?

 2              PROSPECTIVE JUROR:  No.

 3              THE COURT:  Was there anything about your feeling

 4    about law enforcement in general that led you not to call the

 5    police at that time?

 6              PROSPECTIVE JUROR:  No.

 7              THE COURT:  Any questions?

 8              MR. CAMPOAMOR-SANCHEZ:  Good morning, sir.  Just very

 9    briefly.  We understand you work for Phone2Action.

10              What do you do?

11              PROSPECTIVE JUROR:  I'm a software engineer.

12              MR. CAMPOAMOR-SANCHEZ:  You actually --

13              PROSPECTIVE JUROR:  Yes.

14              MR. CAMPOAMOR-SANCHEZ:  -- do the code for that?

15              And what is -- what's Phone2Action?

16              PROSPECTIVE JUROR:  It's an action-specific tech

17    company.  We build software so individuals can contact their

18    legislators.

19              MR. CAMPOAMOR-SANCHEZ:  Oh, okay.

20              Thank you.

21              MS. JUNGHANS:  I cannot hear the witness.  I can't

22    hear.

23              THE COURT:  Okay.  He said that he works for a

24    company that creates software so individuals can contact their

25    legislators.
```

```
 1                    Is that correct?

 2            PROSPECTIVE JUROR:  Correct.

 3            THE COURT:  And he's a software engineer, so he does

 4     the coding.

 5            MS. JUNGHANS:  Thank you.

 6            THE COURT:  Okay.  All right.  Sir, you can step back

 7     into the jury room.

 8            (Prospective juror exits courtroom.)

 9            THE COURT:  All right.  I'm going to try to ask each

10     person to lean into the microphone.

11            (Prospective juror enters courtroom.)

12            THE COURTROOM DEPUTY:  Your Honor, this is Juror

13     Number 0413.

14            THE COURT:  All right.  Good morning, sir.

15            PROSPECTIVE JUROR:  Good morning.

16            THE COURT:  We need you to try to speak into the

17     microphone as best you can, because it's hard to hear everybody

18     up here.

19            My first question to you is, you have numbers 5, 8,

20     11, and --

21            PROSPECTIVE JUROR:  Maybe 20.

22            THE COURT:  -- maybe 20, with a question mark.  This

23     is one of those ones that tests me.

24            PROSPECTIVE JUROR:  Yes.

25            THE COURT:  So, Question Number 5 was whether you'd
```

1   read or heard anything about the case.

2          Can you tell us what you've read or heard about this

3   case?

4          PROSPECTIVE JUROR:  Well, I read the article in this

5   morning's paper about the -- I guess the declared mistrial.

6   And now that -- now you're hearing the -- well, we're here,

7   again, for -- to seat a new jury.

8          THE COURT:  All right.  And we didn't actually

9   declare a mistrial because we didn't actually start.  We just

10  started picking a jury, and now, we've started again.

11         Have you learned anything through that article or any

12  other article about the subject matter of the case?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  So, just based on what you read

15  yesterday, can you still be fair and impartial to both sides

16  and -- if you were selected in this case?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Question Number 8 was about work in the

19  federal government, you or a close friend or family member.

20         PROSPECTIVE JUROR:  I worked for the Federal Energy

21  Regulatory Commission for 34 years and now retired.  My wife

22  worked for the House of Representatives and the Senate for

23  almost 30 years.

24         THE COURT:  Okay.  And what did she do there?

25         PROSPECTIVE JUROR:  Budget analyst.

1           THE COURT:  And what did you do at FERC?

2           PROSPECTIVE JUROR:  I was a policy and technical

3      advisor to the Commission.

4           THE COURT:  Is there anything about your work in the

5      government and her involvement on the Hill that would lead you

6      to favor one side or the other in this case?

7           PROSPECTIVE JUROR:  No.

8           THE COURT:  Question Number 11 was about work in

9      public relations and media.

10           Do you have a friend or family member that does that?

11           PROSPECTIVE JUROR:  Certainly, in public relations,

12      not so much in media.  I mean, a lot of the folks that I've met

13      over the years were in public relations, whether it was -- you

14      know, mostly for the companies that -- that did work before the

15      Commission.

16           THE COURT:  But do you -- you personally, you don't

17      have a close friend or family member whose job it is to issue

18      press releases or --

19           PROSPECTIVE JUROR:  Actually, I guess one of my

20      neighbors worked for -- wrote editorials for *USA Today*, but he

21      doesn't do that anymore, but...

22           THE COURT:  All right.  And Question 20, with a

23      question mark, was when I asked if you could feel free to read

24      and talk about anything else in the universe, but not this

25      case, during the pendency of this case.

```
1              Do you think you could --
2              PROSPECTIVE JUROR:  I think -- I couldn't remember
3   the Question 5, and that's about reading about this case this
4   morning, before I came.  That's --
5              THE COURT:  That's it?
6              PROSPECTIVE JUROR:  That's it.
7              THE COURT:  All right.  But if I say to you,
8   whatever -- that's fine.  But, from now on, if you see the
9   Gregory Craig trial in the headline, you can't -- you have to
10  put it aside, can you do that?
11             PROSPECTIVE JUROR:  Yes.
12             THE COURT:  Okay.  Any questions?
13             MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.
14             THE COURT:  Any for the defense?
15             MS. JUNGHANS:  No, Your Honor.
16             THE COURT:  Okay.  Thank you very much, sir.  You can
17  step out.
18             (Prospective juror exits courtroom.)
19             (Prospective juror enters courtroom.)
20             THE COURTROOM DEPUTY:  Your Honor, this is Juror
21  Number 0610.
22             THE COURT:  All right.  Good morning, ma'am.
23             PROSPECTIVE JUROR:  Good morning.
24             THE COURT:  You've got a number 8 on the back of your
25  card, which was my question about whether you or a close friend
```

```
 1    or family member had worked for the federal government.

 2             PROSPECTIVE JUROR:  Yes.

 3             THE COURT:  Who would that be?

 4             PROSPECTIVE JUROR:  That would be me.

 5             THE COURT:  What did you do?

 6             PROSPECTIVE JUROR:  What did I do?  I was a computer

 7    analyst for the Navy Department.

 8             THE COURT:  And how long did you work for the Navy?

 9             PROSPECTIVE JUROR:  33 years.

10             THE COURT:  Are you retired now?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Congratulations.

13             PROSPECTIVE JUROR:  Thank you.

14             THE COURT:  And is there anything about the fact that

15    you used to work for the government, and worked for the Navy in

16    particular, that would lead you to feel that you couldn't be

17    fair to both the government and the defendant in this case?

18             PROSPECTIVE JUROR:  No.

19             THE COURT:  Any follow up?

20             MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

21             THE COURT:  Anything for the defendant?

22             MS. JUNGHANS:  No, Your Honor.

23             THE COURT:  Okay.  Thank you very much.  You can step

24    back out into the jury room.

25             (Prospective juror exits courtroom.)
```

```
 1              (Prospective juror enters courtroom.)

 2              THE COURTROOM DEPUTY:  Your Honor, this is Juror

 3    0397.

 4              PROSPECTIVE JUROR:  Good morning.

 5              THE COURT:  Good morning.  Your card has numbers 2

 6    and 8 on the back.  And Question Number 2 was whether you knew

 7    anyone on the government's trial team or connection or

 8    association with U.S. Attorney's Office or the Department of

 9    Justice.

10              So, what was your answer there?

11              PROSPECTIVE JUROR:  No connection.  And I may have

12    misheard.  I work for the federal government, so some of the

13    work that I do, we work with DoJ.

14              THE COURT:  Okay.

15              PROSPECTIVE JUROR:  But no, you know, relation to

16    this case or anything like that.  Just being transparent.

17              THE COURT:  Okay.  Okay.  And you gave me 8, also,

18    which was the specific question about working for the

19    government.  Tell me where you work in the federal government.

20              PROSPECTIVE JUROR:  General Services Administration.

21              THE COURT:  And what do you there?

22              PROSPECTIVE JUROR:  I'm a project manager --

23    acquisition project manager.

24              THE COURT:  Is there anything about the fact that you

25    work for the government, and maybe have had to do work with the
```

```
1    Department of Justice, that would lead you to favor the

2    Department of Justice over the defendant, or vice versa, in

3    this case?

4              PROSPECTIVE JUROR:  Nothing as it relates to DoJ, no.

5              THE COURT:  All right.  Any further questions?

6              MR. CAMPOAMOR-SANCHEZ:  Hi.

7              PROSPECTIVE JUROR:  Hi.

8              MR. CAMPOAMOR-SANCHEZ:  Can you tell us, a project

9    manager, what do you do on a day-to-day basis?

10             PROSPECTIVE JUROR:  Well, essentially, I'm GSA.

11   We're a servicing agency -- or, the section that I work for,

12   we're a servicing agency.  So, we buy for the federal

13   government.  And we buy for all of the federal government,

14   including the military, as well.  So we're a buying,

15   servicing agency, if you will.

16             MR. CAMPOAMOR-SANCHEZ:  Thank you.

17             PROSPECTIVE JUROR:  You're welcome.

18             MS. JUNGHANS:  Nothing further.

19             THE COURT:  Okay.  Thank you very much.

20             PROSPECTIVE JUROR:  Thank you.

21             THE COURT:  You can step back into the jury room.

22             PROSPECTIVE JUROR:  Thank you.

23             (Prospective juror exits courtroom.)

24             THE COURT:  All right.

25             (Prospective juror enters courtroom.)
```

1        THE COURTROOM DEPUTY:  Your Honor, this is Juror

2    Number 1479.

3        THE COURT:  All right.  Good morning, sir.  The back

4    of this card has numbers 4, 5, 6, 7, 8, 9, 11, 12, 14, and 23.

5        Let me start with Number 4, which was the question of

6    whether you knew the defendant in this case.

7        PROSPECTIVE JUROR:  I served in the Clinton

8    administration for eight years.  I knew of Mr. Craig.  I served

9    as a speech writer to President Clinton, and came to admire him

10   during the impeachment proceedings.  I did not know him

11   personally.

12       THE COURT:  Okay.  And do you think, given your

13   opinion about Mr. Craig, that you could judge this case fairly

14   and impartially, based solely on the evidence in the case, or

15   would you bring that to the table in this case?

16       PROSPECTIVE JUROR:  I believe I could be fair and

17   impartial.

18       THE COURT:  Question Number 5 asked whether you'd

19   read or heard anything about the case.

20       So can you tell me what you've read or heard about

21   the case?

22       PROSPECTIVE JUROR:  I've followed the Manafort

23   investigation and came across information about this case.  Not

24   a detailed knowledge of it, just that it was connected to

25   Ukraine and the FARA law.

1          THE COURT:  Does the fact that the case could be

2     connected to or involve Mr. Manafort or the FARA law or the

3     Ukraine, does any of that affect your ability to be fair and

4     impartial in this case?

5          PROSPECTIVE JUROR:  I don't think it would.

6          THE COURT:  Have you read enough about the case to

7     know what the charges are here?

8          PROSPECTIVE JUROR:  I was under the impression it was

9     for failure to register under FARA.

10          THE COURT:  Let me just go -- Question Number 23 was

11     the one that related to the ability to sit during this trial.

12          So can you address why you answered that question

13     yes, before we go on to the other questions?

14          PROSPECTIVE JUROR:  Since I received my summons,

15     there have been other people at my company that have been on

16     vacation.  And also, a major initiative started at my company,

17     directly in my responsibility, and the next two weeks are

18     critical during that time.

19          THE COURT:  And what is your company, sir?

20          PROSPECTIVE JUROR:  Fannie Mae.

21          THE COURT:  And, so, what would happen if you weren't

22     there?  Would there be people who could cover for you or things

23     that could be postponed?

24          PROSPECTIVE JUROR:  There's nothing that can be

25     postponed.  There's very, very few people that could

 1   substitute.  Because, as I said, after I received the summons,

 2   other people went on vacation.

 3            THE COURT:  And, so, if you were selected as a juror

 4   in this case, and you were asked to sit here for the next two

 5   weeks, would you be able to focus on the evidence, or would you

 6   be thinking about the issues that it's created at your job?

 7            PROSPECTIVE JUROR:  I would do my job here, but I

 8   would be stressed, yeah.

 9            THE COURT:  All right.  Let me just go through the

10   rest of the questions.

11            Question Number 6 was knowing any individuals or

12   entities in the case from that long list of names.

13            Who was it that you knew there?

14            PROSPECTIVE JUROR:  I went to law school with

15   Cheryl Mills.  I did not know her closely.

16            THE COURT:  Anybody else that you knew?

17            PROSPECTIVE JUROR:  No.

18            THE COURT:  Question Number 7 is worked in law

19   enforcement.

20            PROSPECTIVE JUROR:  I had a brother, a sister, and a

21   brother-in-law who both worked in the Nebraska penal systems as

22   guards and counselors.

23            THE COURT:  Is there anything about that that would

24   lead you to favor the government over the defense, or vice

25   versa?

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Have you formed an opinion about

3    Ms. Mills, from your knowledge of her from law school, about

4    her credibility or her integrity or anything like that?

5           PROSPECTIVE JUROR:  I had an impression that she was

6    incredibly capable and a person of integrity.

7           THE COURT:  Question Number 8 was work for the

8    federal government.

9           You've been involved in the government other than

10   your work in the White House?

11          PROSPECTIVE JUROR:  I also worked at the Pentagon for

12   a number of years.

13          THE COURT:  And what were your duties when you were

14   at the White House?

15          PROSPECTIVE JUROR:  I served in two different roles:

16   One as counsel to the White House Climate Change task force,

17   and one is a speech writer on the National Security Council.

18          THE COURT:  In connection with that work, did you

19   ever do work related to Ukraine?

20          PROSPECTIVE JUROR:  So, I accompanied the secretary

21   of defense on at least one trip to Ukraine and wrote speeches

22   in connection to that trip.

23          THE COURT:  So, jumping ahead a little bit, to

24   Question Number 14 that you also gave a yes answer, have you

25   formed opinions about the Tymoshenko regime, the Yanukovych

1    regime, any faction or party or the government of Ukraine, in

2    general?

3              PROSPECTIVE JUROR:  I've not followed it closely.

4    But, I was a great admirer of the immediate post-Soviet

5    governments there and have a very dim view of the more recent

6    governments there.

7              THE COURT:  Question Number 9 related to work in the

8    legal profession.

9              Are you an attorney?

10             PROSPECTIVE JUROR:  I am.

11             THE COURT:  Have you ever practiced in private

12   practice, in addition to the work you've described?

13             PROSPECTIVE JUROR:  Not in connection to the work I

14   described.  I was in private practice from 1987 to 1993.

15             THE COURT:  And where were you in private practice?

16             PROSPECTIVE JUROR:  At a firm called Shea & Gardner.

17             THE COURT:  And what kind of law did you practice

18   there?

19             PROSPECTIVE JUROR:  Mostly appellate litigation.

20             THE COURT:  Question Number 11 involved public

21   relations and media consulting.

22             PROSPECTIVE JUROR:  Yes.  My wife works at a media

23   consulting firm in town.

24             THE COURT:  And which one does she work at?

25             PROSPECTIVE JUROR:  SKDKnickerbocker.

 1              THE COURT:  And Question Number 12 is jury service.

 2              PROSPECTIVE JUROR:  Yes.  I've served on four juries,

 3     including a grand jury service two years ago.

 4              THE COURT:  And you understand that in connection

 5     with the grand jury, that they're making a decision just based

 6     on the government's side of the case, and whether there's

 7     probable cause to believe a crime was committed, and there's a

 8     much higher standard in this trial.

 9              Can you put aside that experience, if you were

10     sitting as a juror, and apply the law that I tell you in this

11     case?

12              PROSPECTIVE JUROR:  Yes.  Previous to that, I served

13     on three regular juries, not a grand jury.  So I understand

14     that.

15              THE COURT:  And in those cases, did those juries

16     reach a verdict?

17              PROSPECTIVE JUROR:  Two of them did.  One did not.

18              THE COURT:  Do you remember what the verdicts were?

19              PROSPECTIVE JUROR:  Guilty, guilty, and then a hung

20     jury.  Guilty on some -- it wasn't guilty on all charges.  And

21     the two that had some guilty verdicts, there were also

22     acquittals entered.

23              THE COURT:  All right.  Any questions for the

24     United States?

25              MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

1        THE COURT:  Anything from the defense?

2        MS. JUNGHANS:  No, Your Honor.

3        THE COURT:  Okay.  All right.  You can step back into

4    the jury room.  Thank you, sir.

5            (Prospective juror exits courtroom.)

6        THE COURT:  You can wait a minute, Mr. Haley.

7        MR. CAMPOAMOR-SANCHEZ:  Your Honor, we would move to

8    strike for cause.

9        THE COURT:  Mr. Haley, I'm not quite ready yet.

10   That's okay.  Thank you.

11       MR. CAMPOAMOR-SANCHEZ:  We move to strike for cause.

12   One of the first answers he gave was that he admired Mr. Craig,

13   and they worked at the White House together -- not personally

14   together, but, he admired what he did, specifically during the

15   impeachment proceedings of President Clinton.

16           In addition to that, he knows Cheryl Mills and has,

17   obviously, a high opinion of her.

18           And he also added that he's going to be stressed

19   about this upcoming job situation.

20           But -- and particularly, we think that although he

21   said that he would try to be fair, and he considered he could

22   be fair, in light of the connections that exist, we think he

23   should be stricken for cause.

24           THE COURT:  All right.  What's the defendant's point

25   of view?

1          MS. JUNGHANS:  To the contrary, Your Honor.

2          I realize the man has the connections that he has,

3     but he also struck me as an inordinately conscientious person

4     who understands what it means to put your opinions aside.

5          And although he said he had some stress level

6     associated with his work, if I understood correctly, he said

7     the project could be deferred a little bit.  We're only talking

8     about two weeks.

9          So I don't think his previous associations are

10    sufficient to override his understanding of the obligation to

11    be fair.

12         THE COURT:  Well, I do believe that he would do his

13    best to be fair.  I also believe that the entire point of this

14    exercise is to put together a group of people who don't already

15    have opinions about the people involved in this case, including

16    the prosecution, the prosecution's witnesses, the other

17    participants in the project or who are involved in the project,

18    and the defendant.

19         And, so, we have someone who has an opinion about the

20    defendant.  And, so, that, coupled with his honesty about where

21    his brain is going to be if this case occupies his time, I'm

22    going to grant the motion.

23         Yeah.  Bring in the next.

24         (Prospective juror enters courtroom.)

25         THE COURTROOM DEPUTY:  Your Honor, this is Juror

1    Number 1549.

2          THE COURT:  All right.  Good morning.

3          PROSPECTIVE JUROR:  Good morning.

4          THE COURT:  You wrote 7, 8, and 9 on the back of your

5    card.  Seven was the question about whether you or a close

6    friend or family member worked in law enforcement.

7          Can you tell us about that?

8          PROSPECTIVE JUROR:  I have a lot of friends and

9    relatives that work in law enforcement.

10         THE COURT:  Okay.  Are they police officers?

11         PROSPECTIVE JUROR:  Yes.  A couple of them are

12    sheriffs.  Some are police officers, as far as, like, street --

13    on the streets and stuff.

14         THE COURT:  Okay.  So is there anything about knowing

15    friends and family members who do that work that would make you

16    favor the government over someone that's been charged with a

17    crime in this case?

18         PROSPECTIVE JUROR:  Make me favor?

19         THE COURT:  Can you be fair to the defendant --

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  -- and fair to the government --

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  -- or do you kind of lean on the

24    government's side because you've got friends in law

25    enforcement?

```
 1              PROSPECTIVE JUROR:  No.

 2              THE COURT:  Okay.  Question Number 8 was you or a

 3    close friend or family member work for the federal government.

 4              PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  And who would that be?

 6              PROSPECTIVE JUROR:  They used to work for the

 7    Treasury Department.

 8              THE COURT:  And what relatives of yours would that

 9    be?

10              PROSPECTIVE JUROR:  My mother used to work for them

11    and some folks that I grew up with.

12              THE COURT:  So do you know what your mom did for the

13    Department of Treasury?

14              PROSPECTIVE JUROR:  She worked for personal security.

15              THE COURT:  I'm sorry?

16              PROSPECTIVE JUROR:  Personal -- personnel security.

17              THE COURT:  Okay.  Question Number 9 was whether you

18    or someone close to you worked in the legal profession.

19              What was the yes answer to that?

20              PROSPECTIVE JUROR:  I have a couple of friends that

21    are lawyers.

22              THE COURT:  Okay.  Do you know if they're criminal

23    lawyers?

24              PROSPECTIVE JUROR:  I don't know if they're criminal

25    lawyers or not.
```

1              THE COURT:  Okay.  So is there anything because of

2       your mom's experience or your relatives' experience or your

3       friends' experience that you bring to the courtroom today that

4       would make it difficult for you to be fair to both sides in

5       this case?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Any questions?

8              MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

9              THE COURT:  Anything?

10             MS. JUNGHANS:  Yes.  Yes, ma'am.

11             The information that we have says you work at the

12      help desk, but it doesn't say where.

13             Can you tell us where you're employed?

14             PROSPECTIVE JUROR:  I'm laid off right now.

15             MS. JUNGHANS:  I'm sorry.  So, you're not --

16             PROSPECTIVE JUROR:  I'm not working right now.

17             THE COURT:  You're not currently employed?

18             PROSPECTIVE JUROR:  Right.

19             THE COURT:  How long -- how long has that situation

20      been?

21             PROSPECTIVE JUROR:  A little over a year.

22             THE COURT:  Okay.  And previous to that, where did

23      you work?

24             PROSPECTIVE JUROR:  Library of Congress.

25             THE COURT:  And when you say the "help desk," what

```
 1    kind of help were you giving people?

 2              PROSPECTIVE JUROR:  IT.

 3              THE COURT:  Oh, okay.  And how long had you held that

 4    job?

 5              PROSPECTIVE JUROR:  From '15 to '18.

 6              THE COURT:  2015 to 2018.  And, if you don't mind,

 7    where did you work for before that?

 8              PROSPECTIVE JUROR:  OJP.  Department of Justice, OJP.

 9              MS. JUNGHANS:  I'm sorry.  I'm having a hard time

10    hearing you.

11              PROSPECTIVE JUROR:  OJP, Department of Justice.

12              MS. JUNGHANS:  Okay.  And what --

13              PROSPECTIVE JUROR:  OJP on Seventh Street.

14              MS. JUNGHANS:  OJP is Office of Justice Programs, if

15    I remember.

16              PROSPECTIVE JUROR:  Yes.

17              MS. JUNGHANS:  What did you do there?

18              PROSPECTIVE JUROR:  Same thing.

19              MS. JUNGHANS:  Okay.  And how long did you hold that

20    job?

21              PROSPECTIVE JUROR:  I was there from 2011 to '15.

22              MS. JUNGHANS:  Okay.  And has that always been the

23    kind of work you've done?

24              PROSPECTIVE JUROR:  Mostly.  We do that and

25    administrative, executive assistant.
```

```
 1                  MS. JUNGHANS:  Okay.  Thank you.

 2                  THE COURT:  If this case involves charges that

 3       someone made false statements to the Department of Justice,

 4       would that fact affect your ability to be fair in this case?

 5                  PROSPECTIVE JUROR:  No, it wouldn't affect it.

 6                  THE COURT:  All right.  Thank you.  You can step back

 7       into the jury room.

 8                  (Prospective juror exits courtroom.)

 9                  (Prospective juror enters courtroom.)

10                  THE COURTROOM DEPUTY:  Your Honor, this is Juror

11       Number 0968.

12                  THE COURT:  Okay.  Good morning.

13                  PROSPECTIVE JUROR:  Good morning.

14                  THE COURT:  There's an 8 and a 23 on the back of your

15       card.  Question Number 8 is whether you or a close friend or

16       family member work for the federal government.

17                  PROSPECTIVE JUROR:  Yes.  So, my mother --

18                  THE COURT:  Can you lean into the microphone a little

19       bit?

20                  PROSPECTIVE JUROR:  My mother worked for the DEA

21       about 20 year ago, the Drug Enforcement Administration.

22                  THE COURT:  What did she do there?

23                  PROSPECTIVE JUROR:  She was a clerk.  I think a

24       secretary, I believe.

25                  THE COURT:  And, so, does the fact that your mother
```

1    had some law enforcement association, does that affect your

2    ability to be fair to the government and the defendant in this

3    case?

4              PROSPECTIVE JUROR:  Does it affect my ability?  No.

5    No, it doesn't.

6              THE COURT:  All right.  So, Question Number 23 asked

7    you about your ability to sit in the case.

8              And, so, what was your answer to that?

9              PROSPECTIVE JUROR:  That was the time?

10             THE COURT:  Yes.

11             PROSPECTIVE JUROR:  So I have travel plans the day

12   after Labor Day, Monday, September 3rd, I believe.

13             THE COURT:  Okay.  Labor Day is the 2nd.  So, you're

14   planning to leave town on the 3rd?

15             PROSPECTIVE JUROR:  Um-hum.

16             THE COURT:  Okay.

17             That's just a yes, for the record.

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  And are those -- is that already booked

20   and paid for?

21             PROSPECTIVE JUROR:  Correct.

22             THE COURT:  And how long are you planning to be gone?

23             PROSPECTIVE JUROR:  That week.

24             THE COURT:  When would you come back?

25             PROSPECTIVE JUROR:  The 7th.

```
 1                THE COURT:  Okay.  So that Saturday.  So, you're

 2     gone, basically, Tuesday, Wednesday, Thursday, Friday of that

 3     week?

 4                PROSPECTIVE JUROR:  Correct.

 5                THE COURT:  Okay.  All right.

 6                Any further questions?

 7                MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

 8                MS. JUNGHANS:  Do you mind if I ask you where you're

 9     going?

10                PROSPECTIVE JUROR:  To Cape Cod, Massachusetts.

11                MS. JUNGHANS:  And may I also ask you, what you do in

12     the public health position at the D.C. government?

13                PROSPECTIVE JUROR:  So, I am a program manager for

14     highly infection disease --

15                MS. JUNGHANS:  I'm sorry, ma'am.  I'm having a hard

16     time hearing you.

17                PROSPECTIVE JUROR:  A program manager for a highly

18     infectious disease prevention program.

19                MS. JUNGHANS:  Okay.  Thank you.

20                PROSPECTIVE JUROR:  Um-hum.

21                THE COURT:  If you were otherwise qualified and

22     selected to be a juror in this case, would that be a vacation

23     that you could take -- that you could put off, or are you going

24     with other people, or could you take some other time?

25                PROSPECTIVE JUROR:  I could move it.
```

1          THE COURT:  Okay.  All right.  Thank you very much.

2          PROSPECTIVE JUROR:  Um-hum.

3          (Prospective juror exits courtroom.)

4          THE COURT:  All right.  Yeah, I need you to wait.

5     Just let me give a signal.

6          All right.  I take it no one is asking to strike this

7     person?

8          MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

9          MS. JUNGHANS:  No, Your Honor.

10         THE COURT:  Okay.  All right.

11         Let's bring in the next one.

12         Thank you, John.

13         (Prospective juror enters courtroom.)

14         THE COURTROOM DEPUTY:  Your Honor, this is Juror

15     Number 0243.

16         THE COURT:  All right.  Good morning.

17         PROSPECTIVE JUROR:  Good morning.

18         THE COURT:  Your card has a 5 and an 8 on the back of

19     it.  And Question Number 5 was when I'd asked if you'd heard or

20     read anything about that case.

21         Can you tell me what you've heard?

22         PROSPECTIVE JUROR:  I have heard on the news, or on

23     MSNBC, that -- well, Manafort was convicted, and now they're

24     bringing a case against Gregory Craig.  So, I'd heard that it

25     was coming up, the trial was going to happen, that it was a --

1       the two cases were connected.  But not much beyond that.

2              THE COURT:  Okay.  So do you know, sitting right

3       here, what he's even charged with?

4              PROSPECTIVE JUROR:  He is charged -- yes.  I know

5       he's charged with not revealing foreign connections to the

6       government.

7              THE COURT:  And if I -- if you're instructed at some

8       point that that's not actually the charge, would you be able to

9       follow my instructions about what the charges are in this case?

10             PROSPECTIVE JUROR:  Yes.  Yes.

11             THE COURT:  And do you have an opinion, based on

12      what's been said, about his guilt or innocence at this point,

13      just based on what you've heard on TV?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Can you put aside any information you got

16      from the news and judge this case fairly, just based on the

17      evidence you hear in this courtroom and the law that I tell

18      you?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Okay.  And Number 8 was, I asked if you

21      or a close friend or family member had worked for the federal

22      government.

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  And who would that be?

25             PROSPECTIVE JUROR:  Me.

1           THE COURT:  Where do you work?

2           PROSPECTIVE JUROR:  I work for the Department of

3    Transportation, the Office of Inspector General.

4           THE COURT:  What do you do there?

5           PROSPECTIVE JUROR:  I'm a writer/editor.

6           THE COURT:  So, what gets written for the Office of

7    Inspector General?

8           PROSPECTIVE JUROR:  They do audits of Department of

9    Transportation programs and write reports, and I edit those

10   reports.

11          THE COURT:  So you try to translate them into

12   English?

13          PROSPECTIVE JUROR:  Yes, to make them -- to make them

14   understandable.  As I say, understandable by normal people who

15   aren't auditors.

16          THE COURT:  Now, you mentioned, I think, when you

17   talked about the news stories that you had heard, is that there

18   was news about the Manafort trial and some connection to this

19   trial.

20          If you hear that Mr. Manafort was involved in work

21   that is related to this case, is that going to affect your view

22   of Mr. Craig, one way or the other, before we even get started?

23          PROSPECTIVE JUROR:  No.  No.  I just -- I only meant

24   that I'd heard about this case because I was watching stuff

25   about the Manafort case and they'd mentioned them, not that I

1    was connecting them.  But that's how I had heard about them.

2              THE COURT:  All right.  Any questions?

3              MR. CAMPOAMOR-SANCHEZ:  And the Judge would instruct

4    you this, but if you were to be selected, would you not watch

5    MSNBC while --

6              PROSPECTIVE JUROR:  Yes.

7              MR. CAMPOAMOR-SANCHEZ:  -- while you're --

8              PROSPECTIVE JUROR:  It would be hard, but I would not

9    watch it.

10             MR. CAMPOAMOR-SANCHEZ:  Okay.  Thank you.

11             THE COURT:  All right.

12             MS. JUNGHANS:  You said, I believe, that you had the

13   information you have from MSNBC?

14             PROSPECTIVE JUROR:  Yeah.  And also newspapers, but

15   mostly from MSNBC.

16             MS. JUNGHANS:  And is that what you regularly tune in

17   to?

18             PROSPECTIVE JUROR:  I tend to watch that, yes.

19             MS. JUNGHANS:  Okay.  And in your job with the

20   Department of Transportation, do you participate in the

21   investigations that are being conducted?

22             PROSPECTIVE JUROR:  No.  No.  I only -- once they're

23   conducted and somebody has written a report, that's when I get

24   involved.

25             MS. JUNGHANS:  So you don't make judgments about the

1    case?

2              PROSPECTIVE JUROR:  No, not at all.

3              MS. JUNGHANS:  Nothing further.

4              THE COURT:  All right.  Okay.

5         Thank you.  You can step back into the jury room.

6              (Prospective juror exits courtroom.)

7              THE COURT:  Are there any motions with respect to

8    this juror?

9              MS. JUNGHANS:  No, Your Honor.

10             MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

11             THE COURT:  Okay.  Bring in the next one.

12             (Prospective juror enters courtroom.)

13             THE COURTROOM DEPUTY:  Your Honor, this is Juror

14   Number 0236.

15             THE COURT:  All right.  Good afternoon.  You've got

16   on the back of the card, numbers 8, 9, 10, 11, 12, 14, 15 with

17   a question mark, 16 with a question mark, 17, 18, 19, 20 with a

18   question mark, 23 and 26.

19             I think I'm going to start at the bottom and ask

20   you -- Question Number 23 was about the schedule of the trial.

21   And, so, perhaps you could tell us why you answered that

22   question yes.

23             PROSPECTIVE JUROR:  I'll be out of town for Labor

24   Day, starting on Thursday, and returning Wednesday of the

25   following week.

1          THE COURT:  Okay.  And is that a trip that can't be

2     changed?

3          PROSPECTIVE JUROR:  Correct.

4          THE COURT:  And you've already paid for it, I take

5     it?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  All right.  Is this a work-related trip

8     or a vacation?

9          PROSPECTIVE JUROR:  It's a family vacation.

10         THE COURT:  Okay.  And so other people are going,

11    besides you?

12         PROSPECTIVE JUROR:  Yes.

13         THE COURT:  And what was Question Number 26, which

14    was, were there any other reasons, other than all the others

15    that I asked you, that you wanted to bring to our attention?

16         PROSPECTIVE JUROR:  And so I don't know if they were

17    hinted at, the other questions, but I did read the

18    Robert Mueller report cover to cover.  And I am in the

19    cybersecurity field.  So, I wanted to make that --

20         THE COURT:  Okay.  Well, having read the report cover

21    to cover, did you learn anything about this defendant or this

22    case?

23         PROSPECTIVE JUROR:  Not that I can recall.  There

24    were -- there were lots of names in that -- in that report.

25         THE COURT:  Was there anything about your interest in

1    the report that leads you to an opinion, one way or the other,

2    about the defendant's guilt or innocence in this case?

3                    PROSPECTIVE JUROR:  I would say, it's more that I

4    have a high regard for Robert Mueller and the integrity of that

5    office, and not so much for the administration -- for the --

6    for, like, Paul Manafort and Richard Gates.

7                    THE COURT:  All right.  So, if you heard that they

8    were involved in the same -- in this case, in the activities

9    described in this case, and they may have worked with or talked

10   to Mr. Craig about his work, would that affect your view of

11   Mr. Craig?

12                   PROSPECTIVE JUROR:  I'm not sure, if Richard Gates or

13   Paul Manafort testified, how I would view what they said, if

14   whether they were -- if whether that was honest or not.  I know

15   I listen to lots of podcasts and read articles, and I know that

16   there was an instance where Paul Manafort was caught lying.  I

17   don't know under oath or -- there was something about that.  So

18   I'm not sure about the testimony that they would provide.

19                   THE COURT:  So -- but, I guess my question is:  Could

20   you decide -- Mr. Manafort is not going to testify.  Mr. Gates

21   may testify.  Could you decide whether you think he's telling

22   the truth or not based on his testimony in this courtroom, or

23   do you already have a point of view?

24                   PROSPECTIVE JUROR:  I already have a point of view on

25   Gates and Manafort.

1          THE COURT:  And can you just be as specific as

2     possible about what your point of view is about them?

3          PROSPECTIVE JUROR:  Based on reading of the report, I

4     don't hold them in high regard.  And I don't necessarily

5     believe that what they would state would be true, just based on

6     what the report described of the actions that they'd taken --

7     not in relation to this case, because I actually have never

8     heard of the defendant's name before, but, just in general.

9          THE COURT:  Okay.  Just to round out the rest of the

10    information, the question was asked about close friend or

11    family member or you working for the federal government.  Is

12    that you?

13         PROSPECTIVE JUROR:  I do not work for the federal

14    government.  I do have friends that work for the federal

15    government.

16         THE COURT:  Is there anything about that fact that

17    would lead you to favor the government over the defendant in

18    this case?

19         PROSPECTIVE JUROR:  I have friends that work at DHS.

20    So -- but I can't be think of -- I think the Mueller report is

21    probably the most.

22         THE COURT:  Okay.  So, does the fact that I mentioned

23    that this case arose out of investigation and kind of was

24    started by the Special Counsel's Office and they may be part of

25    this case, does that lead you to favor the prosecution over the

```
 1    defendant in this case?
 2              PROSPECTIVE JUROR:  Yes.
 3              THE COURT:  Do you think you could set aside your
 4    point of view about the Special Counsel's Office and just base
 5    this case on the evidence you hear in the courtroom?
 6              PROSPECTIVE JUROR:  I -- I -- no, I don't think so.
 7    I...
 8              THE COURT:  All right.  We may need to ask you more
 9    questions.  But, before we do, I'm going ask you to just step
10    out.
11              PROSPECTIVE JUROR:  Okay.
12              (Prospective juror exits courtroom.)
13              MS. JUNGHANS:  I'll let Mr. Campoamor-Sanchez make
14    the motion.
15              MR. CAMPOAMOR-SANCHEZ:  We feel that she should be
16    excused for cause.
17              THE COURT:  Do you agree?
18              MS. JUNGHANS:  Yes.
19              THE COURT:  All right.
20              All right.  Let's bring in the next person.
21              (Prospective juror enters courtroom.)
22              THE COURTROOM DEPUTY:  Your Honor, this is Juror
23    Number 1029.
24              THE COURT:  All right.  Good afternoon, sir.
25              PROSPECTIVE JUROR:  Good afternoon.
```

```
 1              THE COURT:  You've got numbers 7, 8, and 23 with a
 2     question mark on the back of your card.  Question Number 23 was
 3     about the trial schedule.
 4              PROSPECTIVE JUROR:  Correct.
 5              THE COURT:  Can you tell me why you wrote that down?
 6              PROSPECTIVE JUROR:  I will be out of town and not
 7     returning until Tuesday.
 8              THE COURT:  So, when do you leave?
 9              PROSPECTIVE JUROR:  I leave on Friday, the 30th, and
10     come back the evening of -- I think that's the 3rd.
11              THE COURT:  Oh, you're talking about Labor Day
12     weekend?
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  Okay.  I was -- when you said, I'm
15     leaving Friday till Tuesday, I was thinking about this Friday.
16              PROSPECTIVE JUROR:  Oh, sorry.  I wasn't specific.
17              THE COURT:  Okay.  So you leave Friday, the 30th,
18     you're gone Saturday, Sunday, Monday, Labor Day, but you're not
19     coming back until sometime on Tuesday?
20              PROSPECTIVE JUROR:  Correct.
21              THE COURT:  Okay.  And could that schedule be changed
22     at all?  If you ended up being part of a jury in this case,
23     could you be here on Tuesday, if we needed you on Tuesday?
24              PROSPECTIVE JUROR:  I've already bought my plane
25     ticket and travel has already been secured.
```

1          THE COURT:  All right.  Okay.  Let's talk about

2     Question Number 7, which was whether you or a close friend or

3     family member work in law enforcement.

4          And is that you?

5          PROSPECTIVE JUROR:  Me.  I thought it also mentions

6     being a lawyer.  Wasn't that part of --

7          THE COURT:  That was the next question.

8          PROSPECTIVE JUROR:  Oh, okay.

9          THE COURT:  They're both there, yes.

10          PROSPECTIVE JUROR:  I got -- that's my error.  You

11     can disregard 7, and it's really 8.

12          THE COURT:  Okay.  All right.  8, I think, was the

13     federal government, and 9 was being a lawyer.  So just tell me

14     what the connection was that you wanted us to know about.

15          PROSPECTIVE JUROR:  Well, I have several close

16     friends that are lawyers.

17          THE COURT:  Okay.

18          PROSPECTIVE JUROR:  And my partner works -- is a fed

19     and works for the Department of Justice.

20          THE COURT:  Okay.  And do you know what he or she

21     does at the Department of Justice?

22          PROSPECTIVE JUROR:  In the Bureau of Prisons, and

23     deals with purchasing and such, acquisitions.

24          THE COURT:  All right.  Is there anything about the

25     association with the Department of Justice that would make you

```
1    favor the Department of Justice in this case against the

2    defendant?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Okay.  Any questions?

5              MR. CAMPOAMOR-SANCHEZ:  Very briefly.

6              Sir, our information says you work at the Atlas

7    Performing Arts Center.

8              PROSPECTIVE JUROR:  Yes.

9              MR. CAMPOAMOR-SANCHEZ:  What do you there?

10             PROSPECTIVE JUROR:  I do front of house and

11   concierge.

12             MR. CAMPOAMOR-SANCHEZ:  And then, if I can get back

13   to your trip very quickly.  I know you're coming back the

14   Tuesday after Labor Day.

15             Are you coming back in the morning or, like, at the

16   end of the day, or --

17             PROSPECTIVE JUROR:  At the end of the day.

18             MR. CAMPOAMOR-SANCHEZ:  At the end of the day.  So

19   you'll be gone all of Tuesday.

20             All right.  Thank you, sir.

21             PROSPECTIVE JUROR:  Um-hum.

22             MS. JUNGHANS:  Sir, how long have you been at the

23   Performing Arts Center?

24             PROSPECTIVE JUROR:  I've been there for about two and

25   a half years.
```

```
1              MS. JUNGHANS:  And did you work somewhere else before

2      that?

3              PROSPECTIVE JUROR:  Yes, I did.

4              MS. JUNGHANS:  Could you tell me what you did,

5      please.

6              PROSPECTIVE JUROR:  I was a office manager and

7      meeting planner for the National Council for Science and the

8      Environment.

9              MS. JUNGHANS:  Okay.  And how long did you do that?

10             PROSPECTIVE JUROR:  For 13 years.

11             MS. JUNGHANS:  Okay.  Nothing further.

12             Thank you.

13             THE COURT:  All right.  Thank you very much.  You can

14     step back out into the jury room.

15             PROSPECTIVE JUROR:  Thank you.

16             (Prospective juror exits courtroom.)

17             THE COURT:  All right.  Does anyone have a thought

18     about what we should do with this juror?

19             MR. CAMPOAMOR-SANCHEZ:  I was hoping he was going to

20     say that -- maybe we would not sit in the morning of the

21     Tuesday, and he would still make it back.  But -- unless we all

22     agree that we were also not sitting on that Tuesday.

23             THE COURT:  Well, that would give us one day that

24     week.

25             MR. CAMPOAMOR-SANCHEZ:  Oh, that's right.  That would
```

```
 1    give us one day.
 2                THE COURT:  So, that starts to be a problem.
 3                MR. CAMPOAMOR-SANCHEZ:  Yeah.  And I don't think the
 4    schedule -- his schedule will work.
 5                THE COURT:  Yeah.  If all goes well, the evidence
 6    will be in by then.  But, it is certainly possible that the
 7    jury is going to be deliberating.  And heads are shaking over
 8    there, but I don't know what that means.
 9                So does the defense have a point of view?
10                MS. JUNGHANS:  May I have just a moment?
11                (Off-the-record discussion between defense counsel.)
12                MS. JUNGHANS:  No objection to his being excused.
13                THE COURT:  All right.  Then I'm just going to excuse
14    him, so he's not stressed out about it.
15                All righty.  Thank you.
16                Let's bring in the next juror.
17                (Prospective juror enters courtroom.)
18                THE COURTROOM DEPUTY:  Your Honor, this is Juror
19    Number 1151.
20                THE COURT:  All right.  Good afternoon, sir.
21                PROSPECTIVE JUROR:  Hi.
22                THE COURT:  You've got the numbers 5, 8, 12, 14, and
23    18 on the back of the card.  Question Number 5 was whether
24    you'd read or heard anything about the case.
25                Can you tell me about that?
```

1          PROSPECTIVE JUROR:  So, when you -- when the name of

2     the case was first announced, I didn't recognize the name.

3     But, when you -- later on, after we'd been sworn in, you read

4     the details of it, I actually -- I remember that I had seen an

5     article a few weeks ago, I believe on washingtonpost.com.

6          So, I have followed the Special Counsel's

7     investigation with some interest, and I was surprised that a

8     person who had worked for President Obama was implicated in the

9     matter.  And, so, I -- so I -- I read the first paragraph of

10     the thing.  And then, when I saw that it was a FARA thing, it

11     didn't really interest me, and I just went on.

12          So, that's the only thing I've read about it.

13          THE COURT:  All right.  Well, based on your foray

14     into the first paragraph of the article, did you form an

15     opinion about whether the defendant is guilty of the offense

16     with which he's charged?

17          PROSPECTIVE JUROR:  No, ma'am.

18          THE COURT:  Do you have an opinion, one way or the

19     other, about the case?

20          PROSPECTIVE JUROR:  No, ma'am.

21          THE COURT:  Can you listen to this case and listen to

22     the evidence in the case and base your decision solely on the

23     evidence presented in this courtroom, and not any thoughts

24     about what you think about the special counsel or what you

25     think about President Obama or what you read in the article?

1          PROSPECTIVE JUROR:  Yes, ma'am.

2          THE COURT:  Question Number 8 was whether you or a

3     close friend or family member worked for the federal

4     government.

5          PROSPECTIVE JUROR:  So, I've -- well, I -- we live in

6     Washington, D.C., so -- and I've been a federal contractor for

7     my entire life -- my entire adult life.  So I erred on the side

8     of caution to answer broadly.  I've work for federal agencies

9     as a federal contractor.

10         THE COURT:  And what kind of work do you do for them?

11         PROSPECTIVE JUROR:  So, I work in areas of Health and

12    Human Services.

13         THE COURT:  In that capacity, have you ever

14    contracted with the Department of Justice?

15         PROSPECTIVE JUROR:  I was the project director for a

16    project that was going to enumerate the -- the courts that are

17    in Indian country.  I worked for a government contractor that

18    did work in Indian country.

19         THE COURT:  And that was under the umbrella of the

20    Department of Justice?

21         PROSPECTIVE JUROR:  That was for the Department of

22    Justice, yes -- or, the Bureau of Justice Statistics.

23         THE COURT:  Is there anything about the fact that you

24    did some work for the Bureau of Justice Statistics that would

25    make you favor the Department of Justice against someone they

1   were prosecuting?

2           PROSPECTIVE JUROR:  No, ma'am.

3           THE COURT:  All right.  Question Number 12 was about

4   prior jury service.

5           PROSPECTIVE JUROR:  I was -- I was empaneled on a

6   grand jury in the District of Columbia that was hearing cases

7   on murder and assault in 2011.

8           THE COURT:  And that was over in Superior Court?

9           PROSPECTIVE JUROR:  Yes, ma'am.

10          THE COURT:  So, do you understand that they probably

11  told you at that time that you were only hearing the

12  government's side of the case, and you had to decide if there

13  was probable cause to believe a crime had been committed?

14          In this case, the jury is going to be told they can't

15  reach a verdict of guilty unless the government has proved its

16  case beyond a reasonable doubt.

17          Do you understand there's going to be a whole

18  different standard to apply?

19          PROSPECTIVE JUROR:  I understand the distinction,

20  ma'am.

21          THE COURT:  Question Number 14 related to the Ukraine

22  and whether you had a personal opinion or connection to that

23  country.

24          PROSPECTIVE JUROR:  So, I have no connection to the

25  country, but, you are including Mr. Manafort in the question, I

354

1   believe.

2           THE COURT:  I think he came up in a question.  I

3   think that was Number 18.

4           So, what -- what do you want to tell us about that?

5           PROSPECTIVE JUROR:  I just -- I mean, I hold his work

6   in contempt, that's all.

7           THE COURT:  His work for the Ukraine, in particular?

8           PROSPECTIVE JUROR:  His general political work, yes,

9   ma'am.

10          THE COURT:  If you heard that Mr. Manafort was

11  involved in this case and may have been involved in working

12  with Ukraine and this defendant was working with the Ukraine

13  and may have had communications with Mr. Manafort, would that

14  affect your opinion about the defendant?

15          PROSPECTIVE JUROR:  So, I'm -- you know, I'm an older

16  guy, as you can see just by looking at my hair, and I have been

17  associated with many people in my life.  Some of them have been

18  better people than others.  And, so, I shouldn't be judged by

19  my associations.  So, it would depend on the circumstances.

20          THE COURT:  Right.  So I think what you're trying to

21  tell me is...

22          PROSPECTIVE JUROR:  Did you want a yes or no, ma'am?

23          THE COURT:  Yes, I do.  Well, it would be helpful.  I

24  mean, I guess I'm trying to find -- I think what you're saying

25  is that just because you have an opinion about Mr. Manafort

1    doesn't mean that you have an opinion about Mr. Craig, even if

2    they may have been involved in some work at the same time; is

3    that correct?

4            PROSPECTIVE JUROR:  That's correct.

5            THE COURT:  All right.  And can you put aside

6    whatever points of view you have about the legitimacy of

7    Mr. Manafort's work and base this case just on the evidence

8    that you hear in this courtroom?

9            PROSPECTIVE JUROR:  Yes, ma'am.

10           THE COURT:  All right.  Any questions?

11           MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

12           THE COURT:  Anything from the defense?

13           MS. JUNGHANS:  Yes.

14           Sir, our list says that you are a writer for

15    something called ICON GPHS.  Can you tell me what that is

16    please.

17           PROSPECTIVE JUROR:  ICON GPHS does federal contract

18    work.  It's a contract research organization.  It supports

19    different vaccine programs and therapeutics.  It does a great

20    deal of work with the U.S. Department of Defense, for the

21    Walter Reed Army Institute of Research, and so on.

22           So I -- in my work as a federal contractor, I've been

23    both a direct bill, where I did work for different agencies as,

24    you know, contract work, and I've also been on the business

25    development side, which has made me kind of employable,

```
1    actually.

2              MS. JUNGHANS:  Right.

3              PROSPECTIVE JUROR:  So at the moment, at this point

4    in my career, I'm working on the business development side.

5              MS. JUNGHANS:  Thank you.

6              THE COURT:  All right.  Thank you, sir.  You can step

7    back into the jury room.

8              PROSPECTIVE JUROR:  Thank you.

9              (Prospective juror exits courtroom.)

10             THE COURT:  All right.  Is anyone making a motion

11   with respect to this gentleman?

12             MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

13             MS. JUNGHANS:  Oh, I'm sorry, Your Honor.  I didn't

14   hear.

15             THE COURT:  Are you making a motion with respect to

16   this gentleman?

17             MS. JUNGHANS:  Oh, no, Your Honor.

18             THE COURT:  By my count, we have nine so far who have

19   been qualified.  I believe we're at the end of the first row of

20   individuals.  I personally would like to bring in the second

21   row and get through as many of them as the court reporter will

22   permit me to get through.  And then we'll take a break before

23   we bring in the next row.

24             And I think -- are you being relieved by another

25   court reporter for the afternoon?
```

1          THE COURT REPORTER:  I am.

2          THE COURT:  So we may not need to take a full hour

3    for the break.  So as quickly as possible -- yes, let's bring

4    the next row in.  And I think these people can go to lunch and

5    be next door -- let's say, by 2:00.

6          All right.  Thank you.

7          (Pause.)

8          (Prospective juror enters courtroom.)

9          THE COURTROOM DEPUTY:  Your Honor, this is Juror

10    Number 1610.

11          THE COURT:  All right.  Good afternoon.

12          PROSPECTIVE JUROR:  Good afternoon.

13          THE COURT:  There are two numbers on the back of your

14    card, 8 and 23.  Question Number 8 was about whether you or a

15    close friend or family member worked for the federal

16    government?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Is that you?

19          PROSPECTIVE JUROR:  No.  A family member.

20          THE COURT:  Okay.  What does that family member do?

21          PROSPECTIVE JUROR:  She's a secretary for the -- I

22    think it's Department of Defense.

23          THE COURT:  Defense, maybe?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Okay.  You're going to need to just keep

 1    your voice up and talk into the microphone.

 2            PROSPECTIVE JUROR:  Okay.

 3            THE COURT:  And Question Number 23 was when I asked

 4    about your ability to sit through the trial, whether there was

 5    any medical issue or scheduling issue, and you answered that

 6    question yes.

 7            So, is there a problem that you would have?

 8            PROSPECTIVE JUROR:  Sometimes, when I take my meds,

 9    like, if I take my noon meds, I get a little sleepy, because I

10    take Metformin.

11            THE COURT:  Okay.

12            PROSPECTIVE JUROR:  So, it makes me a little sleepy

13    and drowsy.

14            THE COURT:  What time do you take it?

15            PROSPECTIVE JUROR:  Between 12:00 and 1:00.

16            THE COURT:  And, so, do you have to take it every

17    day?

18            PROSPECTIVE JUROR:  Every day.

19            THE COURT:  And then what happens to you?  Like, you

20    have to take a nap?

21            PROSPECTIVE JUROR:  I get a little sleepy with it.

22    It makes me a little drowsy.

23            THE COURT:  All right.  So, would that -- do you

24    think that would make it difficult for you to sit here in the

25    afternoon?  We're going to take a break for lunch and come

 1     back.

 2                  Would you have trouble, do you think, sitting here in

 3     the afternoon and -- and doing the work of listening and paying

 4     attention?

 5                  PROSPECTIVE JUROR:  No, not in the afternoon.

 6                  THE COURT:  You would not be able to do it in the

 7     afternoon or you --

 8                  PROSPECTIVE JUROR:  No.

 9                  THE COURT:  -- wouldn't have trouble?

10                  PROSPECTIVE JUROR:  I wouldn't have trouble,

11     probably.  I just get a little drowsy sometimes, if I take it.

12     Maybe for about a half an hour, it makes me a little drowsy.

13     So, if I take it at 12:00, by 12:30, quarter to 1:00, I'm okay.

14                  THE COURT:  Okay.  If we didn't break for lunch till

15     1:00, you have to take it at 12:00?

16                  PROSPECTIVE JUROR:  No.  I can take it at 1:00.

17                  THE COURT:  Okay.  Do you work now?

18                  PROSPECTIVE JUROR:  No.

19                  THE COURT:  What do you do, then, at home in the

20     afternoon, like, after you take your medicine?  Do you just sit

21     on the couch?  Do you read?  Do you watch TV?  How do you get

22     through that period?

23                  PROSPECTIVE JUROR:  I watch TV.

24                  THE COURT:  Okay.  Do you feel like you're

25     understanding what's going on on the shows or --

```
1                   PROSPECTIVE JUROR:  Yes.

2                   THE COURT:  Do you have any questions?

3                   MR. CAMPOAMOR-SANCHEZ:  Ma'am, I know you're not

4       working now.  Did you used to work, before?

5                   PROSPECTIVE JUROR:  Yes.

6                   MR. CAMPOAMOR-SANCHEZ:  What did you used to do,

7       before?

8                   PROSPECTIVE JUROR:  I was a secretary at one point, I

9       worked in my cousin's store, and I've worked for private

10      industry, being a receptionist.

11                  MR. CAMPOAMOR-SANCHEZ:  Okay.  Thank you, ma'am.

12                  PROSPECTIVE JUROR:  Um-hum.

13                  MS. JUNGHANS:  How long has it been since you worked

14      outside?

15                  PROSPECTIVE JUROR:  Three years.

16                  MS. JUNGHANS:  And the last, most recent job was

17      which of the ones that you described?

18                  PROSPECTIVE JUROR:  Receptionist.

19                  MS. JUNGHANS:  And how long did you do that job?

20                  PROSPECTIVE JUROR:  Five years.

21                  MS. JUNGHANS:  Okay.  And are you not working now by

22      choice or because you just haven't been able to find another

23      situation?

24                  PROSPECTIVE JUROR:  I'm on disability.

25                  MS. JUNGHANS:  Do you -- and I don't want to intrude,
```

 1    but, do you mind telling us what your disability is?

 2              PROSPECTIVE JUROR:  I have a hard time sitting down

 3    for long periods of time.  I have to get up, sit down, get up,

 4    sit down.  I have arthritis real bad in my right -- my right

 5    leg.

 6              MS. JUNGHANS:  Okay.  I see.  So if you had to sit

 7    during the court day, for long stretches of time, would that be

 8    a problem?

 9              PROSPECTIVE JUROR:  Yes.  Probably, yes.

10              MS. JUNGHANS:  Okay.

11              THE COURT:  All right.  Why don't you step back out

12    into the jury room.  Thank you very much.

13              (Prospective juror exits courtroom.)

14              THE COURT:  Everyone agree that we should probably

15    excuse this juror?

16              MS. JUNGHANS:  Yes, Your Honor.

17              MR. CAMPOAMOR-SANCHEZ:  We agree.

18              THE COURT:  All right.

19              (Prospective juror enters courtroom.)

20              THE COURTROOM DEPUTY:  Your Honor, this is Juror

21    0548.

22              THE COURT:  All right.  Good afternoon.

23              PROSPECTIVE JUROR:  Hello.

24              THE COURT:  We have one number on the back of your

25    card.

1        PROSPECTIVE JUROR:  Yes.

2        THE COURT:  And that's the magic Number 23, which

3   related to the trial schedule.

4        Can you tell me why you answered that question yes?

5        PROSPECTIVE JUROR:  Yes.  I have a trip that was

6   booked ahead of time for later in August.

7        .  You mentioned that it could go for a couple weeks.

8   And just with the dates that you had said it could last, that

9   conflicts with the trip that I have planned.

10        THE COURT:  Okay.  Can you tell me a little bit more

11   specifically what the dates of your trip are and where you're

12   going, whether it's been paid for, those sorts of things?

13        PROSPECTIVE JUROR:  Yep.  It's all paid for.  It's

14   the 28th and 29th, to New York City -- of August.

15             .

16        THE COURT:  So two days in the middle of the week

17   before Labor Day weekend?

18        PROSPECTIVE JUROR:  Yes.

19        THE COURT:  And, so, does that also continue into

20   Labor Day weekend?

21        PROSPECTIVE JUROR:  I'll be back to D.C. after the

22   29th, prior to the holiday weekend.

23        THE COURT:  Okay.  Is that a trip that you could

24   reschedule, if we found you otherwise qualified to sit as a

25   juror in this case?

```
 1                    PROSPECTIVE JUROR:  Highly unlikely.

 2                    THE COURT:  And that's because of the accommodations

 3        or because of the time you're taking -- you've arranged to take

 4        the time off?

 5                    PROSPECTIVE JUROR:  Yeah.  It's kind of a combination

 6        of things.  The timing of it and the time that we were able to

 7        book the trip is for that specific window of time, so...

 8                    THE COURT:  And are there other people involved in

 9        this trip with you?

10                    PROSPECTIVE JUROR:  My wife, yeah.

11                    THE COURT:  Anybody else have more questions?

12                    MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

13                    MS. JUNGHANS:  No, Your Honor.

14                    THE COURT:  Okay.  All right.  You can step back into

15        the jury room.

16                    PROSPECTIVE JUROR:  Thank you.

17                    (Prospective juror exits courtroom.)

18                    MR. CAMPOAMOR-SANCHEZ:  We believe he should be

19        excused.

20                    MS. JUNGHANS:  No objection.

21                    THE COURT:  Okay.  Let's bring the next juror.

22                    (Prospective juror enters courtroom.)

23                    THE COURTROOM DEPUTY:  Your Honor, this is Juror

24        Number 1792.

25                    THE COURT:  All right.  Good afternoon.
```

1          PROSPECTIVE JUROR:  Hi.

2          THE COURT:  This card has numbers 9, 10, and 12 on

3     the back of it.  Question Number 9 was whether you or a close

4     friend or family member work in the legal profession.

5          PROSPECTIVE JUROR:  I'm a lawyer.

6          THE COURT:  What kind of law do you practice?

7          PROSPECTIVE JUROR:  Tax.

8          THE COURT:  I need you to just raise that up a little

9     bit.  Okay.

10          And what -- in what capacity?  Do you work in a law

11    firm?

12          PROSPECTIVE JUROR:  I work in a law firm.

13          THE COURT:  And have you ever done criminal tax work?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  Question Number 10 related to lobbying.

16          PROSPECTIVE JUROR:  My firm does lobbying work, as

17    well.

18          THE COURT:  Okay.  And which firm do you work for?

19          PROSPECTIVE JUROR:  Greenberg Traurig.

20          THE COURT:  And, so, are you involved in the lobbying

21    side of what they do?

22          PROSPECTIVE JUROR:  I am not.

23          THE COURT:  Is there anything about your work as a

24    tax lawyer or the fact that your firm has been involved in some

25    lobbying activities that makes you feel that you couldn't be

1      fair and impartial to both sides in this case?

2                    PROSPECTIVE JUROR:  Not as a tax lawyer, no.

3                    THE COURT:  Do you know if your firm has ever been

4      involved in matters where questions came up about registering

5      under the Foreign Agent Registrations Act?

6                    PROSPECTIVE JUROR:  Not that I'm aware of.

7                    THE COURT:  Question Number 12 was about prior jury

8      service.

9                    PROSPECTIVE JUROR:  I served on a jury twice in the

10     past ten years.

11                   THE COURT:  Okay.  Do you remember if they were civil

12     or criminal cases?

13                   PROSPECTIVE JUROR:  They were criminal case.

14                   THE COURT:  Do you remember if you reached a verdict?

15                   PROSPECTIVE JUROR:  Yes, we did.

16                   THE COURT:  What were they?

17                   PROSPECTIVE JUROR:  Not guilty both times.

18                   THE COURT:  And was that in this building or over in

19     Superior Court?

20                   PROSPECTIVE JUROR:  Superior Court.

21                   THE COURT:  Okay.  All right.

22                   Any questions from the government?

23                   MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

24                   THE COURT:  Anything for the defense?

25                   MS. JUNGHANS:  Can you just tell me what kind of tax

```
1    lawyer you are?

2              PROSPECTIVE JUROR:  Employee benefits and --

3              MS. JUNGHANS:  I can't hear you.  I'm sorry.

4              PROSPECTIVE JUROR:  Employee benefits and executive

5    compensation.

6              Sorry.  I didn't realize that it was -- that mic was

7    that loud.

8              MS. JUNGHANS:  I think it's partly me.

9              But -- okay.  Thank you.

10             THE COURT:  Thank you.  You can step back into the

11   jury room.

12             (Prospective juror exits courtroom.)

13             THE COURT:  Let's bring in the next.

14             (Prospective juror enters courtroom.)

15             THE COURTROOM DEPUTY:  Your Honor, this is Juror

16   Number 0517.

17             THE COURT:  All right.  Good afternoon, sir.

18             PROSPECTIVE JUROR:  Good afternoon.

19             Oh, it's cold in here.

20             THE COURT:  Your card says 7, 18, 19, and 23.  Number

21   7 was whether you or a close friend or family member worked in

22   law enforcement.

23             Can you tell me the answer to that question?

24             PROSPECTIVE JUROR:  Yes.  My cousin, Peter Laboy,

25   Officer Peter Laboy, in Alexandria, Virginia, was the officer
```

```
 1    shot in the head.

 2              THE COURT:  I'm very sorry for your loss.

 3              Is there anything about that experience, having a

 4    family member in law enforcement and having that tragedy take

 5    place, that makes you feel that you could not sit and be fair

 6    and impartial as a juror in this case?

 7              PROSPECTIVE JUROR:  No.  I don't believe so, no.

 8              THE COURT:  Question Number 18 was the question where

 9    I mentioned that Paul Manafort and Richard Gates are involved

10    in this case.

11              And, so, what about that would make it difficult for

12    you to be fair and impartial?

13              PROSPECTIVE JUROR:  Is it the same Paul Manafort

14    that's...

15              THE COURT:  That was in the news.

16              PROSPECTIVE JUROR:  Yeah.  Um-hum.

17              THE COURT:  Yes.

18              PROSPECTIVE JUROR:  It may make it a little bit

19    difficult.

20              THE COURT:  Well, let me say this:  You may hear that

21    they communicated with the defendant, they were involved in the

22    matters that we're going to be talking about in this case.

23              But -- so, do you have an opinion about Mr. Gates or

24    Mr. Manafort?

25              PROSPECTIVE JUROR:  I would have to -- I could not
```

1    say that I would believe what he says.  But, I would have to

2    hear it first.  I don't know how to --

3                THE COURT:  All right.  Well, let me tell you,

4    Mr. Manafort is not going to testify as a witness, but

5    Mr. Gates might.

6                PROSPECTIVE JUROR:  Okay.

7                THE COURT:  And I guess my question is, can you

8    decide whether he's telling the truth, whether the government

9    has proved its case, whether the defendant is guilty based just

10   on the evidence in this courtroom and not thoughts about the

11   credibility or the reliability of Mr. Manafort or Mr. Gates

12   that you learned beforehand?

13               PROSPECTIVE JUROR:  Yes.

14               THE COURT:  And is there anything about the fact if I

15   tell you, oh, well, they communicated or they may have worked

16   on things, that would -- that that association would rub off,

17   in your mind, on Mr. Craig, and you couldn't be fair to

18   Mr. Craig if you heard that Mr. Manafort was involved?

19               PROSPECTIVE JUROR:  No.  I could be fair.

20               THE COURT:  Okay.  Question Number 23, though, was

21   about your ability to sit through the trial.  So, tell me about

22   that.

23               PROSPECTIVE JUROR:  Oh, that was -- I have back

24   problems.  And sitting for long periods of time can be

25   challenging.  You know, I take Naproxen, different things when

```
 1        I have to sit for a long time --
 2                  THE COURT:  Does --
 3                  PROSPECTIVE JUROR:  -- airplanes and stuff.
 4                  THE COURT:  So, does the medicine make you sleepy?
 5                  PROSPECTIVE JUROR:  No.  No, ma'am.
 6                  THE COURT:  If I told you if you needed to stand up,
 7        you could stand up in between the breaks, if you just let me
 8        know you need to stand up --
 9                  PROSPECTIVE JUROR:  Oh --
10                  THE COURT:  -- would that solve the problem?
11                  PROSPECTIVE JUROR:  I think so.
12                  THE COURT:  All right.  Any questions?
13                  MR. CAMPOAMOR-SANCHEZ:  Very briefly, Your Honor.
14                  Sir, we did not get any information about your
15        employment or past employment history.
16                  Are you currently working?
17                  PROSPECTIVE JUROR:  Retired.
18                  MR. CAMPOAMOR-SANCHEZ:  You're retired.
19        Congratulations.
20                  What did you used to do, before?
21                  PROSPECTIVE JUROR:  I was in the automobile business.
22                  MR. CAMPOAMOR-SANCHEZ:  And what did you do in that?
23                  PROSPECTIVE JUROR:  Service.  Service manager,
24        service director.
25                  MR. CAMPOAMOR-SANCHEZ:  Great.  Thank you, sir.
```

 1           MS. JUNGHANS:  No questions.

 2           THE COURT:  All right.  Thank you very much, sir.

 3  You can step back into the jury room.

 4           PROSPECTIVE JUROR:  Yeah.

 5           (Prospective juror exits courtroom.)

 6           THE COURTROOM DEPUTY:  Next?

 7           THE COURT:  Yes.

 8           (Prospective juror enters courtroom.)

 9           THE COURTROOM DEPUTY:  Your Honor, this is Juror

10  1254.

11           THE COURT:  All right.  Good afternoon, sir.

12           PROSPECTIVE JUROR:  Good afternoon.

13           THE COURT:  Question number -- your card has numbers

14  5, 7, maybe, 18, and 23 on the back.

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  And, so, let me start with Question

17  Number 5, which was whether you'd heard or read anything about

18  this case.

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  Tell us a little bit about what you've

21  heard.

22           PROSPECTIVE JUROR:  I've read Special Counsel

23  Mueller's report.  And then last night, on the news, I did see

24  that the jury was dismissed for a number of associations with

25  the accused.

1          THE COURT:  I'm sorry.  That's why the jury was

2    dismissed?

3          PROSPECTIVE JUROR:  Or the -- they were doing jury

4    selection again because there were a number of conflicts of

5    associations with the accused.

6          THE COURT:  All right.  Let me just tell you, that's

7    not what happened.

8          PROSPECTIVE JUROR:  Okay.

9          THE COURT:  But --

10         PROSPECTIVE JUROR:  That's what was on the news.

11         THE COURT:  There you go.

12         PROSPECTIVE JUROR:  Full disclosure.

13         THE COURT:  But, did any -- did they tell you

14   anything about the subject matter of the trial or what the case

15   was going to be all about?

16         PROSPECTIVE JUROR:  The FARA statute and the

17   potential wrongdoing and the conflict.

18         THE COURT:  Do you have any opinion right now, based

19   on what you've heard, about whether the government can prove

20   its case beyond a reasonable doubt or whether the defendant's

21   guilty or innocent?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  All right.  Question Number 7, I asked if

24   you or a close friend or family member worked in law

25   enforcement --

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  -- state, federal, or local.

3          PROSPECTIVE JUROR:  My best friend and the mother of

4     my goddaughter is an AUSA in the Southern District of West

5     Virginia.

6          THE COURT:  Okay.  And do you know what kind of cases

7     she works on?

8          PROSPECTIVE JUROR:  Variety of cases.  Drug related,

9     mostly.  There's been some political corruption cases, as well.

10         THE COURT:  Does the fact that you have a good friend

11    who's an AUSA tend you to favor the prosecution in this case

12    over the defense?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Question Number 18, I mentioned the names

15    Paul Manafort and Richard Gates, and asked if the fact that you

16    may hear about them in this case, if that affected you one way

17    or the other.

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Tell me about that.

20         PROSPECTIVE JUROR:  Oh, I mean --

21         THE COURT:  You put the number down, though.

22         PROSPECTIVE JUROR:  I may have written that down

23    for -- I am aware of those individuals and the cases that were

24    either -- that were brought before them.

25         THE COURT:  All right.  Based on what you know about

1    anything they -- you've read about them, does that give you any

2    information about this defendant?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  And if you heard that he may have

5    communicated with them or they may have been involved in some

6    way in this case, does that affect your ability to be fair in

7    this case?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  All right.  Question Number 23 was the

10   question about your ability to sit for the trial.  So, tell me

11   about that.

12             PROSPECTIVE JUROR:  I am -- I work for KPMG, which is

13   a public accounting firm, and I directly support the Department

14   of Defense on a number of contracts, and we have a number of

15   deliverables due over the next month.

16             THE COURT:  So, what does that mean in terms of could

17   you sit?  Can you get people to cover you, or would it be a

18   hardship on you or your company?

19             PROSPECTIVE JUROR:  It would be a potential hardship

20   at the company.  I'm the point -- I'm the subject matter

21   expert, and I'm the point person on the papers that we're

22   writing.

23             THE COURT:  And if we thought you were otherwise

24   qualified and picked you to sit on this jury, would you be

25   sitting there thinking about your deliverables, or would you be

1    able to sit and listen to this case and focus on this case?

2              PROSPECTIVE JUROR:  I would certainly try my best to

3    focus on the case, but I would probably be thinking about how

4    much work I have to do during the night to cover our position.

5              THE COURT:  If that happened, would you hold that

6    against one side or the other?

7              PROSPECTIVE JUROR:  Certainly not.

8              THE COURT:  If you knew -- if you knew promptly

9    whether you were or weren't on the jury, would that enable you

10   to get some other people in place or get some things lined up?

11             PROSPECTIVE JUROR:  If I were to be selected for the

12   jury, I would certainly need to realign some resources within

13   the firm to support the work.

14             THE COURT:  All right.  Any questions from the

15   government?

16             MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

17             THE COURT:  Anything from the defense?

18             MS. JUNGHANS:  No, Your Honor.

19             THE COURT:  Okay.  Sir, you can step back out into

20   the jury room.

21             PROSPECTIVE JUROR:  Thank you.

22             (Prospective juror exits courtroom.)

23             THE COURT:  Would you wait a minute, Mr. Haley,

24   before you bring in the next person?

25             MR. CAMPOAMOR-SANCHEZ:  We do have some concerns

1     about his ability to be able to focus on the trial.  I mean,

2     maybe we could put him at the end.  I don't know what the

3     defense position is on that.  But, obviously, we want jurors

4     that are paying attention.

5            THE COURT:  All right.  What's the defendant's

6     perspective, even though I can read it all over your face?

7            And I want to warn you, as I have Mr. Taylor and

8     everybody -- I'm sorry -- Mr. Murphy was the most expressive --

9     but there's a fair number of expressive individuals -- which

10    may have something to do with the fact that you're all trial

11    lawyers -- over on this side of the courtroom.  And you just

12    can't react that way when the prosecution says something when

13    there's a jury in the box.

14           MS. JUNGHANS:  Understood, Your Honor.  I understand

15    that.

16           THE COURT:  So, for the record, what is your point of

17    view about this?

18           MS. JUNGHANS:  KPMG is an enormous company, and I'm

19    sure this gentleman, while he's conscientious, can -- the

20    company and he can deal with this, if it comes to be that he is

21    selected.  I don't think there's an adequate reason to excuse

22    him.  I mean, everybody worries about what's going to happen to

23    their job when they're not there.

24           THE COURT:  Right.  I mean, I think he's

25    problematical, but I also don't think he went all the way to

1    say something that would get him stricken for cause.  And, so,

2    I'm not going to do that.

3              All right.  He may not be happy about that.  But

4    that's what -- we'll keep him for now.

5              Okay.  Thank you.  Let's go on to the next.

6              (Prospective juror enters courtroom.)

7              THE COURTROOM DEPUTY:  Your Honor, we have Juror

8    Number 0717.

9              THE COURT:  All right.  Good afternoon.

10             PROSPECTIVE JUROR:  Good afternoon.

11             THE COURT:  This juror's card says, on the back, 2,

12   5, 10, 11, 13, 14, 18, and 23.  I'm going to start at the end.

13   Question number 23 was the question about your ability to sit

14   for the trial.

15             So, can you tell me why you answered that question

16   yes?

17             PROSPECTIVE JUROR:  I already had plans to be out of

18   town next week to take my mother to some appointments.

19             THE COURT:  And, so, you're talking about the week of

20   August.

21             19th?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  And so you were taking the whole -- do

24   you work?

25             PROSPECTIVE JUROR:  I do work, yes.

```
 1                    THE COURT:  So, you were taking the whole week off?
 2                    PROSPECTIVE JUROR:  I am going to be out of town,
 3      so...
 4                    THE COURT:  Okay.
 5                    PROSPECTIVE JUROR:  Yeah.  So I'm traveling out of
 6      town to visit with my mother.
 7                    THE COURT:  Oh, she lives somewhere else, and you
 8      have to be with her to take her to these appointments?
 9                    PROSPECTIVE JUROR:  Yes.
10                    THE COURT:  Okay.  Are these related to medical
11      issues?
12                    PROSPECTIVE JUROR:  Medical issues, yes.
13                    THE COURT:  Is there anybody else that can take her
14      to these appointments, if you couldn't go?
15                    PROSPECTIVE JUROR:  Nobody that I trust.  But, I
16      guess, if I have to, I could make accommodations.
17                    THE COURT:  If you had to and you were sitting here
18      in trial next week, how would you feel about that?  Would you
19      be able to focus on the trial?
20                    PROSPECTIVE JUROR:  I would find it hard to focus.  I
21      would be worried, yes.
22                    THE COURT:  So are these appointments that she needs
23      next week or could they be deferred?
24                    PROSPECTIVE JUROR:  They could not be deferred, yeah.
25                    THE COURT:  Are you willing to share with us what
```

1    condition your mother is dealing with right now that you're

2    going to be helping her with?

3                PROSPECTIVE JUROR:  Yeah.  She suffers from chronic

4    advanced diabetes and other mental health issues.  And, so, she

5    regularly goes to the doctor every two months, and I schedule

6    my time so I can be with her to do that.  And next week was the

7    week that that was scheduled.  So, if it had to be changed, it

8    could be, but it would -- but I would be worried that I

9    couldn't be there and visit with her next week.

10               THE COURT:  All right.  Before we ask you more

11   questions, I want to confer.  And we'll either bring you back

12   in for more questions or we won't.  So, if you could just step

13   out for a moment.  Thank you.

14               (Prospective juror exits courtroom.)

15               THE COURT:  Does anyone have a point of view about

16   whether we want to put her through this?

17               MR. CAMPOAMOR-SANCHEZ:  No objection to excusing her,

18   Your Honor.

19               THE COURT:  What's your point of view?

20               MS. JUNGHANS:  Your Honor, I don't want to

21   inconvenience her, but I would like to know where she has to

22   go, how far away she has to go.  And I would also like to

23   understand some more about her employment with The Sentencing

24   Project.

25               THE COURT:  Well, what does her employment -- I mean,

1    I'm not saying you can't.  If we keep going, you can ask her

2    questions about everything.  We have many other numbers on

3    here.  But, my -- what does that have to do with the question

4    about whether --

5                   MS. JUNGHANS:  I take your point.  I take your point.

6                   THE COURT:  Okay.  All right.

7                   MS. JUNGHANS:  I just appreciate her situation.  But,

8    I would like to know whether this is something she only has to

9    go to Philadelphia, or something, and it would be easier to

10   reschedule, or not.

11                  THE COURT:  All right.  I think the point is that she

12   goes every two months, and her mother has chronic conditions

13   and she would be worried about it, more than the ability to

14   reschedule.  I think she seemed to indicate she could

15   reschedule it.  I'm worried about having someone sit on our

16   jury who is focused on some other matter.

17                  And I'm feeling a little better than I felt earlier

18   about our ability to come up with 32 people.  And so I'm

19   inclined to excuse this person.

20                  So, unless I hear -- well, I think I would overrule

21   the objection.  But, I guess I should know whether there's any

22   objection.  The government does not?

23                  MR. CAMPOAMOR-SANCHEZ:  No.

24                  THE COURT:  What's your position?

25                  MS. JUNGHANS:  No, Your Honor.

1              THE COURT:  Okay.  All right.  We're going to excuse

2       her, and we're going to go on to the next juror.

3              (Prospective juror enters courtroom.)

4              THE COURTROOM DEPUTY:  Your Honor, this is Juror

5       Number 0097.

6              THE COURT:  All right.  Go afternoon, sir.

7              PROSPECTIVE JUROR:  Good afternoon.

8              THE COURT:  There is the number 9 on the back of your

9       card, and that question was whether you or a close friend or

10      family member is a lawyer.

11             And so what was your answer to that question?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  And is that you?

14             PROSPECTIVE JUROR:  No.  My brother is an attorney.

15             THE COURT:  What kind of law does he practice?

16             PROSPECTIVE JUROR:  Mostly medical malpractice.

17             THE COURT:  Okay.  And you didn't have any other

18      positive answers to any of the other questions.

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  All right.  Any questions?

21             MR. CAMPOAMOR-SANCHEZ:  Can you tell us a little

22      about what you do for work?

23             PROSPECTIVE JUROR:  Sure.  I work in international

24      development, implementing USAID projects.  I work for a private

25      company.

1          MR. CAMPOAMOR-SANCHEZ:  So, you're not with the

2     government, but you help with government --

3          PROSPECTIVE JUROR:  Correct.  My company is a

4     government contractor.

5          MR. CAMPOAMOR-SANCHEZ:  And, I'm sorry.  What kind of

6     projects are these oversees?

7          PROSPECTIVE JUROR:  International development

8     projects.  So, they can be in health.  They can be in economic

9     growth.  They can be environment, democracy, and governance.

10          MR. CAMPOAMOR-SANCHEZ:  Are there any of those

11     project in Eastern Europe?

12          PROSPECTIVE JUROR:  Yes.

13          MR. CAMPOAMOR-SANCHEZ:  Where in Eastern Europe?

14          PROSPECTIVE JUROR:  We have offices in 70 countries,

15     and we implement all over the world.

16          MR. CAMPOAMOR-SANCHEZ:  Okay.

17          THE COURT:  Have you personally done any work related

18     to the Ukraine?

19          PROSPECTIVE JUROR:  No.

20          MR. CAMPOAMOR-SANCHEZ:  Thank you, sir.

21          MS. JUNGHANS:  No questions.  Thank you.

22          THE COURT:  All righty.  Thank you very much.  You

23     can step back into the jury room.

24          (Prospective juror exits courtroom.)

25          THE COURTROOM DEPUTY:  Next juror?

```
1                      THE COURT:  Yes.

2                      (Prospective juror enters courtroom.)

3                      THE COURTROOM DEPUTY:  This is Juror Number 0578.

4                      THE COURT:  All right.  Good afternoon.

5                      PROSPECTIVE JUROR:  Good afternoon.

6                      Cold in here.

7                      THE COURT:  You've written numbers 7, 8, 9, 16, 22,

8       23, and 26.  I think I would like to start with Question Number

9       23, which was your ability to sit -- either physically sit

10      during the trial, or also the schedule.

11                      Can you tell me why you answered that question yes?

12                      I said how long the trial was going to last and then

13      I said what my schedule was going to be every day and asked if

14      anybody had a reason why they thought they couldn't.

15                      PROSPECTIVE JUROR:  No.  It was the medication,

16      the --

17                      THE COURT:  Okay.

18                      PROSPECTIVE JUROR:  The -- evidently, I got that

19      mixed up.  It was, I take physical therapy and medication, and

20      daily, and that's --

21                      THE COURT:  Okay.  And would the medication interfere

22      with your ability to sit and listen to the trial?

23                      PROSPECTIVE JUROR:  No.  I have to go to physical

24      therapist.

25                      THE COURT:  Every day?
```

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  And --

3           PROSPECTIVE JUROR:  Just about -- just about every

4    day.  That would -- that allows me to -- at this point, I

5    haven't gotten to the point where I can just, like, forgo

6    physical therapy and just sit.  So, I have to -- I have to keep

7    working on it right now.

8           THE COURT:  Okay.  And where do you go for physical

9    therapy?

10          PROSPECTIVE JUROR:  At GW Circle, George Washington

11   Circle.

12          THE COURT:  What time of day do you usually go?

13          PROSPECTIVE JUROR:  I go when they have an

14   appointment available.  I -- I've been trying lately for the --

15   at 8:00 o'clock.

16          THE COURT:  In the morning?

17          PROSPECTIVE JUROR:  Um-hum.

18          THE COURT:  Could you get here by 9:30 in the

19   morning, if you got 8:00 o'clock appointments?

20          PROSPECTIVE JUROR:  Yeah, I believe so.

21          THE COURT:  Are you -- are you working a job now?

22          PROSPECTIVE JUROR:  Yes, I am.

23          THE COURT:  So you've been able to work the

24   appointments around your job?

25          PROSPECTIVE JUROR:  Yes.

```
1              THE COURT:  Question Number 26, my last question, was

2     whether there was any reason that I hadn't asked why you

3     couldn't be a fair and impartial juror in this case.

4              PROSPECTIVE JUROR:  Well, practically all my life

5     I've always -- since my father was a policeman, I've always

6     assumed that given -- that anybody that creates -- commits a

7     crime is automatically guilty.

8              THE COURT:  You think that?

9              PROSPECTIVE JUROR:  Yes.  I thought I would grow out

10    of it, but I haven't.

11             THE COURT:  And you bring that position with you in

12    the courtroom today?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  And so you could not listen to the

15    evidence in this case and decide it, just based on the

16    evidence?

17             PROSPECTIVE JUROR:  I have tried it once before.  I

18    said to people -- I asked.  But, I said, no, I don't want to --

19    I don't want to -- I think they're guilty.

20             THE COURT:  All right.  Let me ask you to step out,

21    and then we'll see if there's other questions we need to ask

22    you.

23             PROSPECTIVE JUROR:  Okay.

24             (Prospective juror exits courtroom.)

25             THE COURT:  All right.  Well, she did actually write
```

1    down 7 for working in law enforcement.  I think she needs to be

2    excused.  Whether she's just trying to get off or that is her

3    opinion, either way, she's not going to be helpful or an

4    appropriate juror in this case.  So, let's go on to the next

5    person.

6              MR. CAMPOAMOR-SANCHEZ:  Agree.

7              MS. JUNGHANS:  We agree.

8              THE COURT:  All right.

9              (Prospective juror enters courtroom.)

10             THE COURTROOM DEPUTY:  Your Honor, this is Juror

11   0752.

12             THE COURT:  All right.  Good afternoon.

13             PROSPECTIVE JUROR:  Good afternoon.

14             THE COURT:  I think I see a number 23 on the back of

15   your card.  And that was the question that I asked about if

16   there's some reason why you would find it difficult to sit and

17   pay attention in this case or serve on the schedule that we

18   had.

19             Can you tell me why you answered that question yes?

20             PROSPECTIVE JUROR:  I answered that question yes

21   because I recently just started a temporary job assignment.

22   So, I don't have, like, the leisure of taking off.  So, that's

23   the most likely reason why.

24             THE COURT:  Okay.  So, this job, is it through a temp

25   agency or somebody just hired you temporarily?

1          PROSPECTIVE JUROR:  Someone just hired me

2     temporarily.

3          THE COURT:  And when do you need to be there?

4          PROSPECTIVE JUROR:  From 7:30 to 4:30.

5          THE COURT:  Every day?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  So, are you missing work today?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  And you don't have any -- how long have

10    you worked there?

11          PROSPECTIVE JUROR:  I just started this week.

12          THE COURT:  And, so, if you didn't show up for two

13    weeks, would you lose your job?

14          PROSPECTIVE JUROR:  Yes, potentially.

15          THE COURT:  And I take it that would be in the back

16    of your mind while you were sitting here?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  All right.  I'm going to ask you to step

19    out briefly, and I'll -- we'll figure out if we need to bring

20    you back in for more questions, or not.

21          (Prospective juror exits courtroom.)

22          MR. CAMPOAMOR-SANCHEZ:  No objection.

23          MS. JUNGHANS:  He should be excused.

24          THE COURT:  I'm going to excuse him.

25          All right.  Let's go on to the next person.

1            (Prospective juror enters courtroom.)

2            THE COURTROOM DEPUTY:  Your Honor, this is Juror

3     1215.

4            THE COURT:  All right.  Good afternoon, sir.  Have a

5     seat.

6            You wrote the number 23 on the back of your card.

7     And that was the question where I asked if there was something

8     that would interfere with your ability to sit and hear this

9     case.

10           So, if you could explain why you answered yes, that

11    would be helpful.

12           PROSPECTIVE JUROR:  Well, if that's a two-week case,

13    I'm getting some dental work done, and I do have appointments

14    in between that time.  As well as with work, too.  I'm the only

15    one that reviews architectural plans for hospitals here.  And

16    if it's a two-week trial or longer, it would just put me way

17    behind.

18           THE COURT:  All right.  I think some of that was hard

19    to hear, and I'm going ask to you lean closer into the

20    microphone.  Let's start with the appointments.

21           Did you say you had medical appointments --

22           PROSPECTIVE JUROR:  No.  Dental appointments.

23           THE COURT:  Dental appointments.

24           PROSPECTIVE JUROR:  Um-hum.

25           THE COURT:  And are these dealing with an emergency

1    or could they be put off?

2          PROSPECTIVE JUROR:  Well, it's not an emergency.

3    Um-hum.

4          THE COURT:  All right.  And then you said something

5    about your work and how it could put you behind.  But, if you

6    could explain a little bit about what you do and what your

7    concern is, that would be helpful.

8          PROSPECTIVE JUROR:  Okay.  Well, I'm an inspector for

9    the District, a hospital inspector, and I do all the

10   walkthroughs for construction -- any new construction that

11   takes place.  And it would put me behind if I missed two weeks

12   on a particular case --

13         THE COURT:  All right.

14         PROSPECTIVE JUROR:  -- with that amount of time.

15         THE COURT:  All right.  But you work for the D.C.

16   government; is that correct?

17         PROSPECTIVE JUROR:  That's correct, yes, ma'am.

18         THE COURT:  Would they assign some other inspector to

19   do your inspections, if you were out?

20         PROSPECTIVE JUROR:  Well, with the architectural

21   drawings, I'm the only one that does them.

22         THE COURT:  You're the only one that inspects

23   architectural drawings?

24         PROSPECTIVE JUROR:  No.  No.  I'm the only one that

25   reviews the architectural drawings for hospitals.

 1              THE COURT:  Okay.  And are there hospitals right now

 2     in the process of having their plans reviewed?

 3              PROSPECTIVE JUROR:  Yes, ma'am.

 4              THE COURT:  If you were otherwise qualified and you

 5     were selected to serve in this case, could you put aside your

 6     frustration about these concerns and listen to the case and be

 7     fair to both sides?

 8              PROSPECTIVE JUROR:  I think so, yes.

 9              THE COURT:  Any questions?

10              MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

11              THE COURT:  Any questions?

12              MS. JUNGHANS:  No questions, Your Honor.

13              THE COURT:  Okay.  Thank you.  You can step back into

14     the jury room.

15              (Prospective juror exits courtroom.)

16              MR. CAMPOAMOR-SANCHEZ:  May we approach, Your Honor?

17              THE COURT:  Yes.

18              MS. JUNGHANS:  No, Your Honor, no questions.

19              THE COURT:  He asked you to approach the bench.  Why

20     don't you come.

21              MS. JUNGHANS:  I apologize, Your Honor.

22              THE COURT:  All right.

23              MS. JUNGHANS:  I've got a lot of input coming in.

24              (Bench discussion:)

25              MR. CAMPOAMOR-SANCHEZ:  I believe that at his age, he

 1   can opt out of jury service.

 2            THE COURT:  His age?

 3            MR. CAMPOAMOR-SANCHEZ:  Yeah.  He's 79.

 4            MS. JUNGHANS:  He's not the first one we've had

 5   that's been over 79.

 6            MR. CAMPOAMOR-SANCHEZ:  I know, but he's the first

 7   one that seemed that could potentially be -- I was reading him

 8   at not wanting to serve.  And, so, I didn't know the Court had

 9   a practice of advising them, or just only if they raised it.

10            THE COURT:  Well, are we going to -- if we both think

11   he should be exc -- if everyone would excuse him otherwise,

12   then I would excuse him.  But, if we wouldn't, then I think it

13   would be fair to tell him.

14            MS. JUNGHANS:  You're saying it would or would not?

15            THE COURT:  It would.  In which case, he would

16   probably excuse himself.

17            MS. JUNGHANS:  I think, and I'm not 100 percent sure,

18   but we would -- because of everything that happened yesterday,

19   we looked at the D.C. plan, and it does say if you're over 70,

20   you can be excused.  And I think that the notices the jurors

21   get tell them that.

22            THE COURT:  Well, I don't know that, sitting here,

23   because I don't have the notice in front of me.

24            MR. CAMPOAMOR-SANCHEZ:  The only reason I mention it

25   is, the last trials I did last year, Judge Lamberth advised

```
 1    them, even before they started, we're happy to have you serve,

 2    but you're over the age.  So, if you want to, great, we'll go

 3    over the questions.  If not --

 4              THE COURT:  I think, since he's particularly

 5    expressed a concern --

 6              MR. CAMPOAMOR-SANCHEZ:  Right.

 7              THE COURT:  -- that it seems unfair not to tell him

 8    that it's not even -- that it could be up to him.  He might

 9    decide to --

10              MS. JUNGHANS:  Right.  He's not the first person

11    we've had in that age group.  Maybe the first one to express a

12    concern.

13              MR. CAMPOAMOR-SANCHEZ:  That's right.

14              THE COURT:  All right.  Well, I...

15              MS. JUNGHANS:  Your Honor, I'll defer to you.  I

16    would just leave things as they are.  I hate -- I mean, I think

17    that the notice says it, but I don't have a copy of it here in

18    front of me.

19              MR. CAMPOAMOR-SANCHEZ:  I don't know if the -- I

20    mean, the -- I don't know where it says this.  But, even if it

21    does, he might not have read it and might not know.  So I

22    feel -- I just felt that he clearly did not want to serve.

23    Because he's 79, I figured that I should bring it to the

24    Court's attention for that reason.

25              THE COURT:  All right.  Thank you.
```

```
 1                    (Open court:)

 2              THE COURT:  Bring him back in.

 3              Over the age of 70 is -- or is it 75?

 4              MR. CAMPOAMOR-SANCHEZ:  I believe it's 70 --

 5              MS. JUNGHANS:  I'm sorry.  What's the question?

 6              MR. CAMPOAMOR-SANCHEZ:  The age, I believe --

 7              THE COURT:  Just tell me what the cutoff is.

 8              MS. JUNGHANS:  Oh, over 70.

 9              THE COURT:  All right.

10              MS. JUNGHANS:  And he's well over -- excuse me.

11              THE COURT:  All right.

12              THE COURTROOM DEPUTY:  This is Juror 1215.

13              (Prospective juror returns to the courtroom.)

14              THE COURT:  All right.

15              MS. JUNGHANS:  Your Honor, we don't think it's

16      necessary.

17              THE COURT:  I hear you.  But, of course, a minute ago

18      you deferred to me.

19              But I just want to let you know that the law in the

20      District of Columbia permits people who are 70 and older to

21      excuse themselves from jury service.  I don't know if you were

22      made aware of that when you received your jury notice, but,

23      have you -- I wanted to advise you that you have the right to

24      do that.

25              PROSPECTIVE JUROR:  Um-hum.
```

 1          THE COURT:  And I don't know if you've already

 2    informed the jury office -- have you informed the jury office,

 3    one way or another, about whether you're willing to serve?

 4          PROSPECTIVE JUROR:  No, I haven't.

 5          THE COURT:  Are you still willing to serve?

 6          PROSPECTIVE JUROR:  I'm willing to serve.  But, I

 7    just, you know, have these appointments in between that

 8    two-week period.

 9          THE COURT:  All right.  Okay.

10          Any other questions?

11          MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

12          THE COURT:  Okay.  Thank you very much.  You can step

13    back out.

14          (Prospective juror exits courtroom.)

15          THE COURT:  All right.  I don't believe I have a

16    basis to strike him for cause.  I think we'll let someone make

17    the decision whether they want to choose him or not as we move

18    forward.

19          Or you're not moving to strike him for cause, I take

20    it?

21          MS. JUNGHANS:  No, we're not.

22          THE COURT:  All righty.  We'll go on to the next.

23          (Prospective juror enters courtroom.)

24          THE COURTROOM DEPUTY:  Your Honor, this is Juror

25    Number 1281.

```
 1              THE COURT:  All right.  Okay.

 2              Good afternoon.  This card has numbers 8, 9, 10, 11,

 3      13, 16, 17, 18, maybe 22 with a question mark, 23, 24, and 25

 4      on the back.

 5              Let me start, do you work for the federal government

 6      or you --

 7              PROSPECTIVE JUROR:  My brother does.

 8              THE COURT:  And where does your brother work?

 9              PROSPECTIVE JUROR:  CIA.

10              THE COURT:  And do you know if in connection with

11      that, he's ever had any affiliation with the Ukraine?

12              PROSPECTIVE JUROR:  I don't think so.  Well, he's --

13      he does work in foreign stuff, but I don't think -- I don't

14      know.

15              THE COURT:  Okay.  Question Number 9 was a close

16      friend or family member in the legal profession.

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  And who is that?

19              PROSPECTIVE JUROR:  Cousin, best friend, and another

20      cousin.

21              THE COURT:  What kind of law do they practice?

22              PROSPECTIVE JUROR:  My best friend is a paralegal.

23      One cousin is insurance law.  One cousin was a DA, and then he

24      got disbarred, and now he's trying to get back in.

25              THE COURT:  All right.  I asked a question about
```

1    whether you had an association with someone who was involved in

2    lobbying, close friend or family member.

3                PROSPECTIVE JUROR:  Lobbying?  Oh, I didn't -- I

4    thought it was marketing.  We can skip that one.

5                THE COURT:  Okay.  Well, I have that, too.  That was

6    the next one.

7                So, what about that?

8                PROSPECTIVE JUROR:  No.

9                THE COURT:  You don't know anybody in lobbying or

10   marketing?

11               PROSPECTIVE JUROR:  Oh, I did lobbying.  That's

12   right.  But that was some time back.

13               THE COURT:  Okay.  What kind of lobbying did you do?

14               PROSPECTIVE JUROR:  I worked for AT&T.

15               THE COURT:  Okay.  And Question Number 13 was whether

16   you or a close friend or family member in the last ten years

17   was a victim or a witness to or accused of a crime.

18               PROSPECTIVE JUROR:  We've had a few crimes at the

19   house; break-ins with the car, things taken out of the yard,

20   that sort of thing.

21               THE COURT:  Did the police respond?

22               PROSPECTIVE JUROR:  Um-hum.  Yes.

23               THE COURT:  And were you satisfied with the way

24   things were handled?

25               PROSPECTIVE JUROR:  I mean, sure.  I mean...

1          THE COURT:  Well, I guess, is there anything about

2     the way it was handled that would make you feel --

3          PROSPECTIVE JUROR:  Cheated?  No.  I mean, by the

4     cops?  No.

5          THE COURT:  All right.  Where am I?

6          Question Number 16 was about giving testimony of law

7     enforcement officers kind of the same consideration that you

8     would give to other people.

9          PROSPECTIVE JUROR:  I mean, I have some apprehensions

10    about the police in the current climate, that's true.

11         THE COURT:  All right.  Well, is there -- is there

12    anything about that that you think you would bring to the

13    courtroom here?  And would you be able to listen to the

14    testimony of FBI agents or other law enforcement personnel and

15    decide, based on how they strike you in the courtroom and what

16    they had to say, whether they're telling you the truth or not?

17    Or are you coming in with a --

18         PROSPECTIVE JUROR:  I would sure give it my best

19    bet -- I mean, my best effort.

20         THE COURT:  Question Number 17 was whether the fact

21    that the case arose out of the Special Counsel's Office,

22    whether that would give you some pause or make it difficult to

23    be fair.

24         PROSPECTIVE JUROR:  I mean, I -- you know, I just

25    thought in fairness, I should say that, you know, I have

1   followed the Robert Mueller investigations and everything, and

2   I feel like I have an opinion of him.  But, that's all.

3              THE COURT:  All right.  And, so, what is your general

4   opinion about the Mueller investigation?

5              PROSPECTIVE JUROR:  I think he did a good -- I mean,

6   I'm in favor of the work that he's done, and I hope it comes to

7   some fruition.

8              THE COURT:  If you heard that this case arose out of

9   that office, would that make you feel -- that give you an

10  opinion about the strength of this case before you've heard the

11  evidence in this case?

12             PROSPECTIVE JUROR:  I guess I would be kind of

13  impressed that it came through that office, but I don't think

14  so.  I don't think I would jump to any conclusion.

15             THE COURT:  What about the fact that Paul Manafort or

16  Richard Gates might be involved in this case or in some of the

17  activities described in this case?

18             PROSPECTIVE JUROR:  I'm going to go with, no.  I

19  think I'm fine with that.  I mean -- nnnuuhh --

20             THE COURT:  All right.  Well, I have no idea how the

21  reporter is going to spell that.

22             PROSPECTIVE JUROR:  I mean, I just -- you know, I

23  have some, you know, preconceived opinions of Paul Manafort.

24             THE COURT:  All right.  So, are they positive

25  opinions or negative?

```
1          PROSPECTIVE JUROR:  Not positive.

2          THE COURT:  Okay.  So, if this defendant did some

3   work with Paul Manafort or communicated with Paul Manafort in

4   connection with the activities being discussed in this case,

5   can you look at him fairly?  Or is your feeling about

6   Mr. Manafort going to rub off on him?

7          PROSPECTIVE JUROR:  I would -- it would be a struggle

8   to not have an opinion of a person who worked with

9   Paul Manafort.  But, I -- I would try to be fair, but I -- I

10  would definitely would have to work to quell biases.

11         THE COURT:  All right.

12         PROSPECTIVE JUROR:  You know, to leave them at the

13  door.

14         THE COURT:  And, obviously, you're going to be told

15  that that's the whole point of the jury, is leaving their

16  biases at the door.

17         PROSPECTIVE JUROR:  Um-hum.  Sure.

18         THE COURT:  And so far, having read about the Mueller

19  report and being informed in general, have you learned anything

20  about this case at all?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Do you have any point of view about this

23  case at all?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Question Number 22, I think, asked about
```

1    can you follow the law that I tell you what the law is.

2              PROSPECTIVE JUROR:  Oh, I think so, yeah.

3              THE COURT:  Question Number 23 was about the trial

4    schedule.

5              PROSPECTIVE JUROR:  That's my concern.  Well, I think

6    there was a different one.  I just --

7              THE COURT:  There are a couple.  We haven't even

8    gotten to 24 and 25.

9              PROSPECTIVE JUROR:  Yeah.

10             THE COURT:  But, let's start with 23.

11             PROSPECTIVE JUROR:  So, just the schedule.  It's that

12   this week is the only week my son is home from college, and we

13   had scheduled to go down to Louisiana to visit my mom's grave

14   for the first time.  And he's on a flight, and I'm not -- so, I

15   mean, I wish I was there.

16             THE COURT:  Well, when were you planning to come

17   back?

18             PROSPECTIVE JUROR:  20th.

19             THE COURT:  What day is that?

20             Oh, so you were going to be there for a bit.  It

21   wasn't like --

22             PROSPECTIVE JUROR:  Yeah.  We were going to

23   Louisiana.  He's on a flight to Louisiana.

24             THE COURT:  Okay.  And it's fair to say, if I told

25   you you had to be here Friday, Monday, Tuesday, you would feel

1    as sad as you are looking right now?

2           PROSPECTIVE JUROR:  (Crying.)

3           THE COURT:  It's okay.  I just -- all right.

4           And let me just finish up, if that's okay.

5           I asked about moral, religious, or ethical beliefs,

6    and sitting in judgment of another person.

7           PROSPECTIVE JUROR:  It's not an easy thing to do.  I

8    could do that.

9           THE COURT:  And then I think I asked if you had any

10   difficulty hearing or speaking or understanding or reading or

11   writing English.

12          PROSPECTIVE JUROR:  Well, I don't hear that well,

13   especially if it's, like, an accent.

14          THE COURT:  Okay.  All right.  All right.  Before we

15   ask you any more questions, if we're going to ask you any more

16   questions, I'm going to ask you to step out, and then we'll

17   decide if we need to ask you any more questions.

18          PROSPECTIVE JUROR:  Okay.  I thought there was one

19   more.  And the one that I just wanted to address was just that

20   I'm kind of in a fight for my life right now.  My mom was in a

21   lengthy illness, and I was her primary caregiver.  She passed.

22   My husband of 27 years left, just got divorced in June, and he

23   straddled me with a ton of debt, and I'm a freelance editor.

24   So, if I don't work, I don't eat.

25          And so I -- I really -- you know, he's threatening to

```
1    take the house.  I mean, I'm really struggling financially
2    right now.  I am a rule follower.  I believe in the court
3    system.  I have served on juries before.  I -- I don't know who
4    I am right now.  I don't have a real presence of mind right
5    now.
6              That's all.
7              THE COURT:  We really appreciate your honesty and
8    your candor.  And, you know, to have to walk in a room full of
9    people you don't know and talk about your life is very
10   difficult.  And I just want to thank you for doing that.
11             And I'm just going to ask you to step out right now
12   for a moment.
13             PROSPECTIVE JUROR:  You're a warm and personable
14   judge, and it was -- you made it easy.  So, thank you.
15             THE COURT:  Okay.  All right.
16             (Prospective juror exits courtroom.)
17             THE COURT:  Can we excuse this lady, please?
18             MR. CAMPOAMOR-SANCHEZ:  Absolutely.
19             MS. JUNGHANS:  Yes.
20             THE COURT:  All right.  Thank you.
21             (Prospective juror enters courtroom.)
22             THE COURTROOM DEPUTY:  Your Honor, this is Juror
23   Number 1714.
24             THE COURT:  All right.  Good afternoon, sir.
25             PROSPECTIVE JUROR:  Good afternoon.
```

1          THE COURT:  This card says numbers 4, 9, 10, 18, and

2     23.  And number 4 was whether you knew Mr. Craig.

3          PROSPECTIVE JUROR:  I was peripherally aware of the

4     case through, maybe, a headline that I had read somewhere, but

5     I'm not really super involved in the details.

6          THE COURT:  Okay.  But, you don't know him

7     personally?

8          PROSPECTIVE JUROR:  No.  No.  I'm sorry.  No.

9          THE COURT:  And have you read enough about the case

10    to have any opinion, one way or the other, about this?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Okay.  And if I told you the only details

13    you get from this moment forward are in this courtroom, can you

14    resist reading and finding out more later?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Okay.  Question Number 9 was the legal

17    profession.

18         Are you or a close friend a lawyer, or family member?

19         PROSPECTIVE JUROR:  Yes.  I have several friends that

20    are lawyers and that work for -- work on the Hill in some

21    Senate offices.

22         THE COURT:  Are any of them criminal lawyers, to your

23    knowledge?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Question Number 10 was about lobbying.

1          Have you worked in that field or have friends that

2     work in that field?

3          PROSPECTIVE JUROR:  So, I have friends that work in

4     the field, but I also have done lobbying myself on behalf of a

5     couple of nonprofit organizations.

6          THE COURT:  And what was the issue that you were

7     working on?

8          PROSPECTIVE JUROR:  Cancer care.

9          THE COURT:  Question Number 18 related to, I

10    mentioned the names Paul Manafort and Richard Gates, and that

11    there could be some involvement in this case.  So -- and asked

12    if that would make it difficult for you to be fair in this

13    case.

14         PROSPECTIVE JUROR:  Yes.  I do not have a favorable

15    opinion of Paul Manafort.

16         THE COURT:  All right.  So, you've read about some

17    articles about him or you've heard about him on TV?

18         PROSPECTIVE JUROR:  Several articles, just, of

19    course, following along with the Mueller investigation.  Just

20    the stuff that's kind of come out of that does not leave me

21    with a favorable opinion of Paul Manafort.

22         THE COURT:  Okay.  Well, if you found out that there

23    were communications with Mr. Manafort related to the work in

24    this case or that he's involved in the activities, some of

25    which will be discussed in this case in some way, would any

1    association with Mr. Manafort rub off, in your mind, against

2    the defendant or any other witness in this case?

3              PROSPECTIVE JUROR:  Potentially.  I feel like it

4    could be compromising, but at the same time, I can keep an open

5    mind and --

6              THE COURT:  Well, the open mind is really what we're

7    looking for here.  So, the goal is, if you're in this trial and

8    you hear all the evidence and I tell you, you can only base

9    your opinion on the four corners of the evidence you heard in

10   this courtroom and not what you might have read or heard or saw

11   on TV, can you do that?

12             PROSPECTIVE JUROR:  Right.  Yes, I can do that.

13             THE COURT:  And then the question is, I guess, can

14   you do that.

15             Question Number 23 was about your ability to sit

16   through the trial and be here when we need you to be here.

17             So, what was your answer to that question?

18             PROSPECTIVE JUROR:  There were just some pressing

19   deadlines in my daily job that might be difficult to adjust and

20   move.  But, that was the only consideration.

21             THE COURT:  And can you -- what is your daily job?

22             PROSPECTIVE JUROR:  So I work for the Prevent Cancer

23   Foundation.  I'm their director of policy and advocacy.  And,

24   so, I have to pull together several reports that will be due in

25   the next couple days.

1          THE COURT:  If it turned out that you did have to

2     serve on a jury in this case, could you get things arranged so

3     that you could do it?

4          PROSPECTIVE JUROR:  I think so.  I think so.  It

5     might be -- might be challenging, but, I mean, I could probably

6     do it.

7          THE COURT:  Okay.  And could you put that challenge

8     out of your mind when you're here and pay attention to the

9     case?

10          PROSPECTIVE JUROR:  Oh, yeah.  For sure.

11          THE COURT:  All right.  Any questions?

12          MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

13          THE COURT:  Anything for the defense?

14          MS. JUNGHANS:  Yes.

15          Sir, if I heard you correctly, you said that you had

16     followed the special counsel investigation?

17          PROSPECTIVE JUROR:  Yes.

18          MS. JUNGHANS:  How closely did you follow it?

19          PROSPECTIVE JUROR:  I mean, I read a lot of the

20     summaries of the investigations and listened to some of the

21     hearings about the case.  So, extensively.  But, I wouldn't

22     necessarily say that I'm an expert on it by any means.

23          MS. JUNGHANS:  Okay.  And do you have any opinions

24     about the special counsel investigation?

25          PROSPECTIVE JUROR:  I would say, yes.  I feel that

1     some of the conclusions are accurate and can --

2               MS. JUNGHANS:  I'm sorry, sir.  Are what?

3               PROSPECTIVE JUROR:  Are accurate and could probably

4     go a little further in terms of the case.

5               MS. JUNGHANS:  I'm sorry.  If you could just finish

6     the sentence.

7               PROSPECTIVE JUROR:  Yeah.  So, I -- in terms of the

8     outcome of the report, I agree with kind of what he came up

9     with, and I feel that there could probably be more to be done

10    with the case.  But --

11              MS. JUNGHANS:  Okay.  And would the fact that this

12    case may have originated with special counsel, would that

13    affect your view of the evidence?

14              PROSPECTIVE JUROR:  No.  No.

15              THE COURT:  All right.  Thank you very much.  You can

16    step back out.

17              PROSPECTIVE JUROR:  Great.

18              THE COURT:  Thank you.

19              (Prospective juror exits courtroom.)

20              THE COURT:  All right.  Is anybody making a motion

21    with respect to this juror?

22              MS. JUNGHANS:  No, Your Honor.

23              MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

24              THE COURT:  Okay.  All right.  Bring in the next

25    juror.  We're close to lunch.

1           MS. JUNGHANS:  Your Honor, before we bring the next

2   juror in --

3           THE COURT:  Please come to the microphone so we can

4   hear you.  Come to the microphone so we can hear you.

5           MS. JUNGHANS:  Yes.

6           Well, I noticed that the next juror has listed --

7           THE COURT:  Wait, Mr. Haley.  We're going to -- one

8   second.  Sorry.  Didn't know this was coming.

9           Yes?

10          MS. JUNGHANS:  -- has listed her age at 75.  So I

11  just want to understand what we're doing with this.

12          Are we telling every person over that -- over the age

13  of 70 that they can opt out, or are we only doing it if they

14  express a reservation?

15          THE COURT:  I don't have a problem with telling

16  anyone.  Over the lunch break, perhaps I can read what they

17  received and decide whether it's necessary.  But, I'm happy to

18  ask her and do the exact same thing before we hear whether she

19  wants to sit or not.

20          MS. JUNGHANS:  No, I'm not suggesting that we should.

21  I just --

22          THE COURT:  Well, what is your position?

23          MS. JUNGHANS:  My view is that if somebody -- and we

24  can dig up the notice.  I believe the notice tells people this

25  already.  And, so, if a person has -- is willing to show up and

1    is, you know, capable of serving, the mere age factor, to me,

2    should not be emphasized.

3              THE COURT:  Do you have a point of view?  I mean --

4              MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

5              I think that it is good to advise people that.  And

6    the way I've seen it done on the other side of the bench is

7    that judges have said, look, you should know that because of

8    your age, you are not required to serve.  Of course, we'll be

9    happy to have you to serve.  And then have them know that.

10             I understand -- I don't know whether it's in the

11   notice or not, maybe it is, but that doesn't mean that people

12   don't know -- or, that people actually know about it.  And I

13   think that -- I feel that it's a good thing to do.

14             MS. JUNGHANS:  We have --

15             MR. CAMPOAMOR-SANCHEZ:  We have one other person, I

16   believe, so far that is over the age of 70 that has not been

17   advised of that.

18             MS. JUNGHANS:  Well, and we have this one and --

19             THE COURT:  Please step to the microphone,

20   Ms. Junghans.

21             MS. JUNGHANS:  We have this one and several others

22   coming up imminently.

23             THE COURT:  All right.  Are there any others in the

24   next three or four?

25             MS. JUNGHANS:  No.  No, Your Honor.

```
1              THE COURT:  All right.  Well, I'm going to tell her
2      before we hear about her so I won't sound like I'm saying it
3      based on what she has said to me.  And I'll look at the notice
4      over lunch.  And if I think it's clear, and they're here
5      anyway, then I won't continue.
6              MS. JUNGHANS:  All right.  Thank you.
7              THE COURT:  All right.
8              THE COURTROOM DEPUTY:  Juror?
9              THE COURT:  Yes.
10             (Prospective juror enters courtroom.)
11             THE COURTROOM DEPUTY:  Your Honor, this is Juror
12     0316.
13             THE COURT:  All right.  Good afternoon.
14             You have one number on the back of your card, and
15     it's number 8.  Before I ask you about that, I wanted to ask
16     you and let you know that there is a statute in the District of
17     Columbia that people who are 70 and older have the opportunity
18     to serve, or to say, I think I would like to be excused from
19     service.  And we are happy to have your service, but I wanted
20     to make sure that you knew you had that option.
21             PROSPECTIVE JUROR:  I do know.
22             THE COURT:  All right.
23             PROSPECTIVE JUROR:  Yeah.
24             THE COURT:  Question Number 8, then, asked whether
25     you or a close friend or family member worked for the federal
```

1    government.

2                PROSPECTIVE JUROR:  Yes.

3                THE COURT:  Can you tell us about that?

4                PROSPECTIVE JUROR:  Yes.  I worked for the federal

5    government when I was a young woman, when I was 19, 20.

6                THE COURT:  You may still be.

7                PROSPECTIVE JUROR:  Thank you.

8                THE COURT:  And where did you work?

9                PROSPECTIVE JUROR:  I worked at the Central

10   Intelligence Agency.

11               THE COURT:  In connection with that work, did you do

12   any work related to the Ukraine?

13               PROSPECTIVE JUROR:  No.

14               THE COURT:  Is there anything about the fact that, at

15   one time, you worked for the federal government that makes you

16   feel that you can't be fair and impartial to both sides in this

17   case?

18               PROSPECTIVE JUROR:  No.

19               THE COURT:  Any questions?

20               MR. CAMPOAMOR-SANCHEZ:  Very briefly.

21               Our information says that you're a filmmaker.

22               PROSPECTIVE JUROR:  That's correct.

23               THE COURT:  Can you tell us a little bit about what

24   you do?

25               PROSPECTIVE JUROR:  Yes.  I've been making

1    documentary films for -- I don't know, much of my adult career.

2    So, I worked at National Geographic for a long time, as an

3    editor.  And then I started my own little company, and I mostly

4    like to make socially -- social justice documentaries.

5            But, I'm actually not -- I'm kind of downscaling

6    right now, not doing a lot.  I just -- my last film was

7    following a Georgetown architect who revitalized the old

8    Georgetown movie theater.

9            MR. CAMPOAMOR-SANCHEZ:  Okay.  Great.  Thank you.

10            PROSPECTIVE JUROR:  You're welcome.

11            MS. JUNGHANS:  No questions, Your Honor.

12            THE COURT:  All right.  Thank you.  You can step back

13    into the jury room.

14            (Prospective juror exits courtroom.)

15            THE COURT:  All right.  You can bring in the next

16    juror.

17            (Prospective juror enters courtroom.)

18            THE COURTROOM DEPUTY:  Your Honor, this is Juror

19    Number 0759.

20            THE COURT:  All right.  Good afternoon, sir.

21            On the back of your card are two numbers, 8 and 23.

22    Question Number 8 was when I asked whether you or a close

23    friend or family member worked for the federal government.

24            PROSPECTIVE JUROR:  Yes.

25            THE COURT:  Can you tell me about that?

412

```
1          PROSPECTIVE JUROR:  I'm a deputy secretary at the
2     Health and Human Services Department.
3          THE COURT:  And what is your -- what are you
4     responsible for there?
5          PROSPECTIVE JUROR:  There's an agency called the
6     Administration for Children and Families, which runs Head
7     Start, Welfare, and I'm the -- I'm the chief management
8     officer.
9          THE COURT:  Okay.  And is there anything about the
10    fact that you work for the federal government that leads you to
11    believe that you would favor or disfavor one side or the other
12    in this case?
13         PROSPECTIVE JUROR:  No.
14         THE COURT:  You did also answer Question 23, which
15    was about the length of the trial and your ability to
16    physically sit on our schedule.
17         Can you tell me why you answered that question yes?
18         PROSPECTIVE JUROR:  My wife is being induced on the
19    31st.
20         THE COURT:  That's a good answer.
21         Does anybody have any further questions that they
22    would like to ask this gentleman?
23         MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.
24         THE COURT:  Okay.
25         MS. JUNGHANS:  No, Your Honor.
```

1          THE COURT:  All righty.  Thank you very much.  You

2     can step out.

3               (Prospective juror exits courtroom.)

4          THE COURT:  All right.  Are we excusing him?

5          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

6          THE COURT:  All right.  I don't think that can be put

7     off.

8          All right.  Let's bring -- this is the last one of

9     this pile.

10         Thank you.

11              (Prospective juror enters courtroom.)

12         THE COURTROOM DEPUTY:  This is Juror 0980.

13         THE COURT:  All right.  Good afternoon.

14         PROSPECTIVE JUROR:  Good afternoon.

15         THE COURT:  Question -- she has a 7 and an 8 on the

16    back of her card.  Question Number 7 was whether you or a close

17    friend or family member work in law enforcement.

18         PROSPECTIVE JUROR:  Yes.  I currently work for Court

19    Services and Offender Supervision Agency.

20         THE COURT:  Over in Superior Court?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Okay.  Where do you work?

23         PROSPECTIVE JUROR:  CSOSA.

24         THE COURT:  Okay.

25         PROSPECTIVE JUROR:  I work at 300 Indiana Avenue.

1          THE COURT:  Okay.  But, your work is with Superior

2     Court defendants and probationers; isn't that correct?

3          PROSPECTIVE JUROR:  People that's on parole and

4     probation and supervised release, yes.

5          THE COURT:  Correct?  And, so, is there anything

6     about that -- what do you do for them?

7          PROSPECTIVE JUROR:  I currently in management, a

8     program analyst.  I actually collect intel on clients who

9     commit crimes and write recommendations to the probation

10    officers.

11         THE COURT:  So is your work on -- in the law

12    enforcement field, does that make you feel that you would favor

13    the government in this case and U.S. Attorney's Office in this

14    case against the defendant, or do you think you can be fair to

15    both sides?

16         PROSPECTIVE JUROR:  Yes, I can be fair.

17         THE COURT:  Question Number 8 was working for the

18    federal government.

19         You or a close friend or family member do that?

20         PROSPECTIVE JUROR:  I currently work for the federal

21    government.  We're considered federal, too.

22         THE COURT:  Okay.  All right.

23         Any questions?

24         MR. CAMPOAMOR-SANCHEZ:  Just, how long have you been

25    working at CSOSA?

```
 1              PROSPECTIVE JUROR:  Almost eight years.

 2              MR. CAMPOAMOR-SANCHEZ:  Thank you.

 3              MS. JUNGHANS:  Ma'am, in your job, do you regularly

 4     deal with the U.S. Attorney's Office?

 5              PROSPECTIVE JUROR:  No, we do not.

 6              MS. JUNGHANS:  So the information that you collect,

 7     you collect from outside sources?

 8              PROSPECTIVE JUROR:  Yes.  One report we do is the

 9     re-arrest report.  So, the courts will send us the re-arrest

10     report and whatever the findings is.  But, I do not contact any

11     lawyers.  We don't have any contact with any lawyers or

12     anything like that.

13              MS. JUNGHANS:  I see.  Thank you.

14              PROSPECTIVE JUROR:  Um-hum.

15              THE COURT:  All right.  You can step back out.

16     Thank you.

17              (Prospective juror exits courtroom.)

18              THE COURT:  All right.  Well, I'm proud to say that I

19     believe we have 17 people, which means that we are exactly

20     halfway there.  And that my great hope of being exactly all the

21     way there by the end of the day could possibly be achieved,

22     although, it is already quarter of two.

23              So, what I would like to do is break and have all of

24     us, minus the court reporter, return at 2:15, when we'll get

25     someone new.  And I think -- I don't know where you all go for
```

1    lunch, but does that give you enough time to get there and get

2    back?

3              MS. JUNGHANS:  I imagine -- we'll just go to the

4    cafeteria, Your Honor.

5              THE COURT:  Okay.

6              MS. JUNGHANS:  Perhaps if we could have 45 minutes.

7    I don't know how quickly they can do all of this, but --

8              THE COURT:  All right.  Well, you better run, because

9    I think they close at two.  So -- all right.  We will resume at

10   2:30.

11             You can tell the jurors who we've already been

12   through, they can go for lunch, and they really don't need to

13   be back next door until, say, 3 o'clock.  And the ones who have

14   been excused, are excused.  And then we'll start in with the

15   next group when we get back here at 2:30.

16             THE COURTROOM DEPUTY:  One thing before they go.

17             THE COURT:  Yes?

18             (Off-the-record discussion between the Courtroom

19   Deputy and Court.)

20             THE COURT:  One of the jurors, the one who said that

21   she's going to Cape Cod but she could change her plans, asked

22   Mr. Haley how she could let me know that she could do that, but

23   it would cost her money.  So, I think we should bring her back

24   in to find out what else she wants to tell us about that before

25   we complete the rest of the group.  Because right now we've

1     qualified her, but that may change the situation.

2               So I'll see everybody at 2:30.

3               Thank you.  And thank you for pushing through this

4     morning.

5               THE COURTROOM DEPUTY:  I know you're going to hate

6     it, but you have to leave your panel sheets here in the

7     courtroom.

8               MR. CAMPOAMOR-SANCHEZ:  Is that a new thing,

9     Mr. Haley?

10              THE COURTROOM DEPUTY:  No.  I've been here nine years

11    and they haven't taken them out.  I'm sorry.  I just have to

12    have them.

13              THE COURT:  You do what you got to do.

14              THE COURTROOM DEPUTY:  Okay.

15              THE COURT:  All right.

16              THE COURTROOM DEPUTY:  Just drop them there.  I'll

17    get them in a second.  I'll get rid of these jurors real quick.

18              (Noon recess.)

19                          *   *   *

20

21

22

23

24

25

1

2                 CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5           I, JANICE DICKMAN, do hereby certify that the above

6      and foregoing constitutes a true and accurate transcript of my

7      stenograph notes and is a full, true and complete transcript of

8      the proceedings to the best of my ability.

9                       Dated this 14th day of August, 2019.

10

11

12                       /s/_____

13                       Janice E. Dickman, CRR, RMR, CRC
                         Official Court Reporter
14                       Room 6523
                         333 Constitution Avenue NW
15                       Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25