```
               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,   :
                            :       Criminal Action
          Plaintiff,        :       No. 19-CR-125
                            :
                            :       JURY TRIAL - DAY 4
                            :       Afternoon Session
       vs.                  :
                            :       Washington, D.C.
                            :       August 15, 2019
GREGORY B. CRAIG,           :       Time: 2:05 p.m.
                            :
          Defendant.        :
_____

          TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
                         HELD BEFORE
              THE HONORABLE AMY BERMAN JACKSON
                  UNITED STATES DISTRICT JUDGE
_____
```

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:   **Fernando Campoamor-Sanchez**
                     **Molly Gulland Gaston**
                     U.S. Attorney's Office
                     For the District of Columbia
                     555 Fourth Street, NW
                     Washington, DC  20530
                     (202) 252-7698
                     Email: Fernando.campoamor-sanchez@usdoj.gov
                     Email: Molly.gaston@usdoj.gov

                     **Jason Bradley Adam Mccullough**
                     U.S. Department of Justice
                     950 Pennsylvania Avenue, NW
                     Washington, DC  20530
                     (202) 233-0986
                     Email:  Jason.mccullough@usdoj.gov

For the Defendant:   **William James Murphy**
                     **William W. Taylor, III**
                     **Adam B. Abelson**
                     Zuckerman Spaeder, LLP
                     100 East Pratt Street
                     Suite 2440
                     Baltimore, MD  21202

```
 1   Appearances continued:

 2   For the Defendant:   ZUCKERMAN SPAEDER, LLP
                          (410) 949-1146
 3                        Email:  Wmurphy@zuckerman.com
                          Email:  Wtaylor@zuckerman.com
 4                        Email:  Aabelson@zuckerman.com
                          Email:  Emarcus@zuckerman.com

 5
                          Paula M. Junghans
 6                        Ezra B. Marcus
                          ZUCKERMAN SPAEDER, LLP
 7                        1800 M Street, NW
                          Suite 1000
 8                        Washington, DC  20035
                          Email:  Pjunghans@zuckerman.com
 9                        Email:  Emarcus@zuckerman.com

10   _____

11   Court Reporter:      Crystal M. Pilgrim, RPR, FCRR
                          Official Court Reporter
12                        United States District Court
                          District of Columbia
13                        333 Constitution Avenue, NW
                          Room 4700-F
14                        Washington, DC  20001

15

16

17

18

19

20

21

22

23

24

25
```

```
1

2

3                            I-N-D-E-X

4     OPENING STATEMENT

5      By Mr. Taylor                            601

6                                   Direct      Cross

7   On behalf of the Government

8      Michael Loucks

9         By Mr. Campoamor-Sanchez

10

11

12

13                            EXHIBITS

14                                   Marked     Received

15  On behalf of the Government:

16     Exhibit No. 100                           682

17     Exhibit No. 163                           705

18

19

20

21

22

23

24

25
```

1

2

3                    P-R-O-C-E-E-D-I-N-G-S

4          THE DEPUTY CLERK:  Your Honor, recalling case number

5  19-125, The United States of America v. Gregory B. Craig.

6      Mr. Craig is present in the courtroom.

7          THE COURT:  All right, are we ready to bring the jury

8  in?

9          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

10         THE COURT:  Let's do that.

11         MS. JUNGHANS:  Yes, Your Honor.

12         MR. MURPHY:  Yes, Your Honor.

13         MR. CAMPOAMOR-SANCHEZ:  Your Honor, while Mr. Haley

14 is bringing the jury in, at some point before the first witness

15 we just need a brief conference with Your Honor.

16         THE COURT:  All right.

17         MR. CAMPOAMOR-SANCHEZ:  And defense about the tender

18 issue so that I know what questions to ask the first witness or

19 not.

20         THE COURT:  All right, we'll do that later.

21         THE DEPUTY CLERK:  Jury panel, Your Honor.

22      (Jury present.)

23         THE DEPUTY CLERK:  All present, Your Honor.

24         THE COURT:  All right, I trust that everyone was able

25 to resist the temptation to discuss the case or to do any

1    research during your lunch break.  Probably took a lot of time

2    just to get through the line.

3        Mr. Taylor, you may proceed.

4            MR. TAYLOR:  The first question is can you hear me?

5            THE JUROR:  Barely.

6            THE DEPUTY CLERK:  Can she hear you.

7            MR. TAYLOR:  Can she hear me.

8                    OPENING STATEMENT BY MR. TAYLOR

9            MR. TAYLOR:  May it please the Court, ladies and

10   gentlemen of the jury.  My name is Bill Taylor.

11       As you can probably tell, I've been doing this for quite a

12   long time.  It's a great privilege to do it because it gives me

13   the opportunity to talk to people who are doing what you're

14   doing.  Exercising and responding to the civic duty to sit in

15   judgment on a fellow citizen.

16       Our Constitution and trusts question guilt or innocence to

17   juries of people like you, not the prosecutors, not even the

18   Judge.  The question of guilt or innocence of a citizen of the

19   United States is to be determined by his fellow citizens,

20   that's you.

21       It's a serious, maybe even an awesome responsibility.  I'm

22   sure you understand that.

23       My friends and I at this table represent Gregory Craig,

24   the defendant in this case.  We also have an awesome

25   responsibility.  You will probably hear from all of us before

1  it's over.

2      But right now my job is to tell you what we believe the

3  evidence in this case is going to be.  It's called an opening

4  statement.  Opening statements are important because it gives

5  us a chance to give you a road map, a prediction of what the

6  evidence is going to be but also to tell you what things we

7  want you to think about and remember and pay attention to when

8  you hear the evidence.

9      I'm going to use some visuals, not too many I hope, some

10  of which you may have already seen and some of which you

11  probably haven't.  And I'm going to try to tell you about the

12  important things to come but I certainly won't be able to tell

13  you every detail.  But maybe if I tell you the important things

14  that the evidence is going to show when they happen you'll say

15  oh, yeah, I remember Mr. Taylor told me in his opening

16  statement about that.

17      First thing I want to tell you, ladies and gentlemen, is

18  that the evidence will show that Gregory Craig is entirely

19  innocent of the charges in this case.  He's an honorable man

20  who has lived his entire life with honesty and integrity.

21  Served his country in two administrations who did not lie to

22  the FARA Unit about talking to reporters, about why he talked

23  to them and what he said.

24      This crime that's charged is a crime in which the

25  government must prove that the defendant knows that he is

1   concealing, he knows and he intends to conceal facts.  He knows

2   that he is lying and intends to do it anyway.

3       You'll find that the evidence proves exactly the opposite.

4   Mr. Craig did not lie or mislead the FARA Unit about facts or

5   about his contacts with reporters in a four day period in

6   December 2012.

7       He told them the truth about his conversations with

8   reporters including some they didn't even know about.  If

9   there's one thing I want to be sure you understand right now,

10  the report that you've heard about, the Tymoshenko report

11  concluded that Yulia Tymoshenko did not get a fair trial.

12      That conclusion was enormously damaging to Ukraine.  The

13  way Ukraine chose to deal with that conclusion was to try to

14  prevent it from being honestly reported.

15      When he spoke to Mr., to the reporters Mr. Craig knew that

16  Ukraine and it's PR team were making false statements about his

17  report.  And he decided that he had to make sure that the press

18  got it right.

19      Nothing in the Foreign Agent Registration Act says that if

20  do you that you have to register.  That's what he told the FARA

21  Unit and that's what the evidence will show and that's why

22  you'll find that he's not guilty.

23      In summary, in early 2012 Greg Craig and his firm were

24  asked by a man named Doug Schoen, someone he knew from the

25  past, if they would consider doing an independent report on the

1    trial of the former Prime Minister Yulia Tymoshenko which had

2    occurred a year earlier.

3         They agreed to do it, they did it and they delivered it to

4    Ukraine in September in 2005.  Ukraine released it to the

5    public in December 2005.  And as Ms. Gaston has told you, this

6    case is not about lobbing the government of the United States

7    for Ukraine, not about working for a foreign government and not

8    disclosing it.

9         The report itself says who wrote it, what the law firm was

10   and who the client was.  There's no secret, there was no secret

11   about Mr. Craig's role in directing the investigation and

12   writing the report.  This case is not about someone who

13   represents a foreign government in this country and hides it.

14   It's about what he said to three newspapers on four days in

15   December 2012.

16        The Tymoshenko case was as the prosecutor said

17   controversial.  She had been arrested and put on trial by her

18   former rival, then the president of the country Viktor

19   Yanukovych.  Yanukovych had a bad reputation.  The trial had

20   gotten heavy criticism, accusations that he had engineered her

21   prosecution.

22        People on the other side yelled that she had brought it on

23   herself.  It was a sensitive assignment that Mr. Craig was

24   asked to take.  And as Ms. Gaston told you he was ideally

25   qualified.

1        There was a reason why Mr. Scheon picked Mr. Craig.  He

2   had worked for Senator Kennedy as his foreign policy adviser;

3   for Secretary of State Madeleine Albright when she was, as her

4   director of policy and planning.  He had been special counsel

5   for President Clinton and White House counsel to President

6   Obama.

7        He advised candidate Obama in the campaign on foreign

8   policy issues, helped him prepare for the debates, and when he

9   was elected, he became President Obama's first White House

10  counsel.

11       In addition to that, he had spent a large part of his life

12  on international human rights and rule of law issues.  By rule

13  of law issues, I mean the functioning and fairness of court

14  systems particularly in emerging countries.

15       He was not only deeply concerned professionally and

16  personally about those issues, but he was an authority.

17  Someone that people looked to.  In the private sector, he had

18  given his time to the Board of the Carnegie Endowment for

19  International Peace, Truman National Security Project, the

20  German Marshal Fund, the International Human Rights Law Group,

21  and he was cofounder of the Committee to Expand NATO.

22       But there's another thing about Mr. Craig that you'll

23  hear.  Greg Craig was a real lawyer.  Not somebody who went in

24  and out of the administrations to make a buck in the private

25  sector.  He was a trial lawyer.  He had handled high profile

1  cases.

2      He started his career as a public defender in New Haven,

3  Connecticut.  He had taught trial practice at distinguished law

4  schools.  He was in fact one of the country's best known

5  criminal defense lawyers.  He knew criminal trials.

6      He understood and cared about criminal justice system in

7  the United States and as I said, and in emerging countries like

8  the Ukraine.  His reputation, prosecutors are right about that.

9  His reputation was important to him.  He cared about it.  And

10  he cared that the report that he and his team of lawyers did be

11  thorough, independent, fair, and credible.  And that the people

12  who read it would think that it was.

13      He was not siding up to do some kind of a whitewash.

14      When he learned that Ukraine finally decided to release

15  the report to the public in December, and that it was lying

16  about what it said, he talked to three media outlets in the

17  United States.  He talked to them about the report's

18  conclusions, what did conclude and what it didn't conclude.  He

19  did it precisely because he was concerned about his own

20  reputation and the quality of his work.

21      I can't possibly tell you everything that's in that

22  report, you'll see it.  It's about 300 pages with appendices.

23  But what is important to this case are its conclusions.  I want

24  you to be clear about three of those conclusions.

25      John, could you please put up Government Exhibit 387.

1            THE DEPUTY CLERK:  It's already in evidence?

2            MR. TAYLOR:  Yes.

3            THE DEPUTY CLERK:  Thank you.

4            MR. TAYLOR:  Now, blow out 189 of the PDF, please.

5       The first conclusion, the first conclusion is found here

6    in the last few pages of the report.  Mrs. Tymoshenko did not

7    get a fair trial.  I'm sure you can see that.

8       The Court's decisions not to permit her to call witnesses

9    and to have witnesses called and examined without her lawyers

10   present was, constitute violations of due process in western

11   courts.

12      Second conclusion, his report did not examine or make any

13   conclusion about whether the prosecution was motivated by

14   politics.  It's very important.  Not only what the report did

15   say but you will see what it didn't say.

16      Third, the report drew no conclusions about her guilt or

17   innocence.

18      This is another excerpt from the report.  As you will see

19   he wrote the parties dispute whether the facts establish her

20   guilt.  This issue is beyond the scope of evidence.  Another

21   important description of what the report does not say because

22   as you will see, the people who were spinning the report wanted

23   the public to believe that it did say something about these

24   questions.

25      Ukraine when it saw the report it was stuck with it.  It

1   had to figure out what to do with it.  Probably wished

2   Mr. Craig had never done it.  And how do we know this?  The

3   Ministry of Justice issued a press release at the time it

4   released the report.  It's in evidence.  You'll see it.

5       I want to show you certain segments of it right now.  So

6   you will see what Ukraine wanted the public to believe about

7   the report.  This, three things:  Skadden found no evidence of

8   political motivation.  Showed how she overstepped her authority

9   and concludes that the decisions were designed to disrupt the

10  Court's work.

11      When Ukraine realized that that's what they had to deal

12  with, they decided the only way to deal with it was to try to

13  persuade the public that it said something it didn't.

14      This is issued in December of 2012 about the time of the

15  release of the report.  But Mr. Craig knew well before December

16  2012 what Ukraine, the Ministry of Justice and Jonathan Hawker

17  were intent on doing.

18      They were intent on lying to the public about what he

19  said.  How did he know that?  How did he know in December that

20  Ukraine was going to lie about the report when it was released?

21  The answer is because they had told him so.  Because they had

22  tried to get him to help them do that.

23      You'll hear a lot of evidence about the communications

24  between Mr. Craig and others, but I want to tell you about one

25  exchange between him and Jonathan Hawker that just about

1  explains everything.

2      In late September, 2012 Mr. Hawker would see the final

3  draft of the report showed Mr. Craig talking points he intended

4  to use.  You know what talking points are.  They're things that

5  people put on a list of things they want to remember to say or

6  the points they want to make called talking points.

7      He sent them to Mr. Craig.  And this is an excerpt from

8  Mr. Hawker's talking points that he sent to Mr. Craig.

9      John, if you could also put up the email that accompanied

10  the talking points, please.

11      I wanted you to see this.  This is going to be Defendant's

12  Exhibit 149.  This is the email that Mr. Hawker sent to

13  Mr. Craig and others in which he says I've finished going

14  through the report again and attaching a messaging document for

15  you to review.  That's the email to which he attached his

16  talking points.

17      It's probably not an exaggeration to say that when

18  Mr. Craig saw the talking points he basically erupted.  And on

19  September 25, he sent this email to Mr. Hawker.

20      I understand your desire to spin this in a report in a way

21  that supports Ukraine's view of this trial.  Actually, if I

22  read this or heard this I would think that Skadden had been

23  bought and paid for and the report was a total whitewash.

24      When you're asking yourself what did Mr. Craig believe

25  Ukraine was going to try to persuade the media about this

1    report when it was released?  Remember this, that's what

2    Mr. Craig believed.

3         From that day September 25 until the report was released,

4    Mr. Hawker stayed clear of Mr. Craig.  No communication.  No

5    communication, but Mr. Craig didn't forget.  What did he do?

6         Well, I'm going to give you some detail about what he did

7    with regard to the media.  I want you to understand exactly

8    what his contacts were or what evidence will show his contacts

9    were with these three newspapers.

10        First, let's start with the National Law Journal, that's a

11   national newspaper for lawyers.  On the morning of the day

12   Ukraine released the report to the public and put it on its

13   website December 13th, Matthew Huisman, H-U-I-S-M-A-N, a

14   reporter for the National Law Journal, learned about it, got a

15   copy of it and talked to Mr. Hawker.

16        Then he wrote a story with the Ukraine spin.  The headline

17   was report finds Tymoshenko trial flawed but failed.

18   Mr. Craig's partner Cliff Sloan saw it.  Mr. Sloan is deeply

19   involved in the report and he knew most of what Mr. Craig knew

20   about the spin that was going to take place.

21        Mr. Sloan got Mr. Craig's attention and they called the

22   reporter, Mr. Huisman, and they told him that his story was

23   wrong and they got him to print a correction, no question about

24   that.

25        Now John, could you put up the corrected version.

1     This is the article that was written in the National Law

2  Journal after Mr. Craig and Mr. Sloan spoke to Huisman.

3     In contacting Huisman demanding a correction and giving

4  him this quote Mr. Craig did not consult with Ukraine, did not

5  inform Ukraine, did not act under instruction from Ukraine and

6  was no way serving as an agent for Ukraine.

7     He didn't tell Ukraine what he had done, what he had said

8  or why he'd done it.  I think you will conclude from the

9  evidence that the last thing Ukraine would have thought was

10 that Mr. Craig was acting as its agent when he talked to the

11 National Law Journal.

12     The Los Angeles Times -- you can take that down.  On the

13 same day, the same morning after the Ministry of Justice had

14 released the report in the early hours of the morning, Los

15 Angeles Times reporter named Emily Albert called Mr. Craig,

16 asked for a copy -- she had seen, heard about the report but

17 she didn't have it even though it was on the web.

18     She asked for a copy and an interview.  She said there

19 were conflicting stories going around about whether the report

20 concluded anything about Ms. Tymoshenko's guilt or innocence.

21     Mr. Craig didn't speak to her but he asked one of his

22 colleagues Alex Haskell to talk to her and tell her that the

23 report did not make a finding on Ms. Tymoshenko's guilt or

24 innocence.  This is the article she wrote after reading the

25 report and talking to Haskell.

1      We'll let the statements, let that stay up a little

2  longer, John.

3      The excerpts that I want you to see, the headline report

4  finds Tymoshenko trial flawed.  The first paragraph you can

5  read this.  Disputed trial fell short of western standards.

6  And it goes on to say -- John, can you pull up the next

7  paragraph, please.

8      The newly released report found that Tymoshenko had been

9  barred from bringing forward some witnesses undercutting her

10 defense.  Other witnesses were examined without defense counsel

11 which almost surely would be viewed as a violation of the right

12 to counsel on the western standard.  Just think about how the

13 Ukraine must have felt when it wrote that.

14     In dealing with the Los Angeles Times Mr. Craig did not

15 consult with Ukraine, did not inform Ukraine, did not act under

16 instruction with Ukraine and was in no way serving as an agent

17 of Ukraine.  In fact, I think you will conclude that Ukraine

18 would have thought he was doing exactly the opposite.

19     So we have the National Law Journal who talked to Hawker

20 and got it wrong and the Los Angeles Times which talked to

21 Mr. Craig and his team and got it right.  Critical difference

22 from Mr. Hawker.

23     So what about the New York Times that the prosecutor

24 talked some about?  Well, here's what the evidence is going to

25 show.  On December the 11th, Mr. Craig learned that Jonathan

1  Hawker was reaching out to the New York Times before the

2  report was released and offering an advanced copy and an

3  exclusive.  He learned it because Mr. Hawker, not Mr. Craig,

4  sent an email to the reporter David Sanger and forwarded Mr.

5  Craig a copy of his email to Sanger.  Here's the email.

6      I want to call your attention to the last three lines of

7  the email.  The report reviews the prosecution of Tymoshenko

8  and considers some of the international concerns about the

9  prosecution, whether it complied with international standards

10 and whether the prosecution was politically motivated.  Could

11 you let me know if this is of interest to you?

12     This last statement told Mr. Craig all he needed to know

13 about Mr. Hawker's intentions with the New York Times.  He says

14 the report considers whether the prosecution was politically

15 motivated.  That statement was and is false.

16     I want to take you back to an exhibit that the prosecutor

17 showed you this morning, Government Exhibit 250, the so-called

18 media plan.

19     John, can you put that up for us.

20     The showed prosecutor you this, an example of one of these

21 so-called media plans which came to Mr. Craig's attention.

22 Look at the first line.

23     In order to ensure the government message that Skadden

24 apps had found no evidence of political motivation is conveyed

25 at the outset of the release.  That's the government's message.

1   That's what he's worried about.

2        Remember, the report specifically did not consider whether

3   the prosecution was quote politically motivated.

4        But in Mr. Craig's head when he took one look at

5   Mr. Hawker's email to Sanger, he said if anybody is going to

6   talk to David Sanger about this report, it's going to be me.  I

7   ought to be the one to find out if the New York Times is

8   interested and if it is, I should be the one to talk to them

9   about what the report concludes.  That's what he did.

10       Mr. Craig spoke to two reporters, one named David Sanger

11  and his colleague in Moscow David Herszenhorn that day and the

12  next.  It is certainly true that he dropped a copy of the

13  report inside of Mr. Sanger's screen door.  Mr. Sanger happens

14  to live near Mr. Craig.  Mr. Craig dropped it by on his way

15  home, they've known each other for years.

16       Sanger sent the report to his colleague Herszenhorn who is

17  in the Moscow bureau and he asked Mr. Craig to talk directly to

18  Herszenhorn the next day.  You'll see some of the articles that

19  it's by David Sanger and David Herszenhorn.

20       But something happened in between that really matters.

21  I'm just going to show that in between his first conversation

22  with Mr. Sanger and in his conversation with Mr. Herszenhorn

23  the next day, Mr. Craig got a call from a reporter from the

24  British paper, the Daily Telegraph, early on December 12.  The

25  reporter's name is Tom Parfitt.  He learned from Parfitt on the

1   early morning of December the 12th what Hawker and the Ministry

2   of Justice was saying.

3        Parfitt told him what the press release was saying and

4   what Ministry of Justice of Ukraine whose name was

5   Mr. Lavrynovych was saying about the report.  It's all the same

6   stuff.

7        The evidence will show that Mr. Craig got even more upset

8   and went further than he had gone before.  He gave Parfitt some

9   choice quotes which he used in the article.  Here is

10  Mr. Parfitt's email to Mr. Craig confirming his quotes.

11       Can you pull out the quotes one by one, John.

12       This is the reporter sending to Mr. Craig quotes that he

13  wants to use from Mr. Craig.  He is confirming the accuracy of

14  what he's going to write.

15       I'm not going to talk while you're reading.

16       You'll notice at the end of it he refers to an anonymous

17  quote.  The anonymous source was Mr. Craig who allowed

18  Mr. Parfitt to write a source close to the report said that the

19  failure to allow Ms. Tymoshenko to call witnesses and so forth

20  would have probably led to a mistrial.  A western appellate

21  court reviewing this record would likely have reversed the

22  conviction and called for a new trial.

23       What's so important about that anonymous quote?  It shows

24  just how provoked Mr. Craig was.  You know, when you look back

25  at events they often telescope together and it looks like

1   everything happens at the same time.

2       It's our job when we're presenting evidence to a jury to

3   try to get you to understand what the world looked like at the

4   time people were experiencing it.  Understand that people

5   didn't know everything at that time that they know now.

6       But the important thing about this was that later that day

7   when Mr. Craig talked to the New York Times reporter

8   Herszenhorn he knew not only that Hawker had misled Sanger but

9   you also knew from talking to Parfitt that the Ministry of

10  Justice of Ukraine was putting out false information about the

11  report and the lies were being disseminated all over the world.

12      He knew the evidence will show that he could not trust FTI

13  to put out the truth and he was even more determined to make

14  sure The New York Times got it right.

15      Here's The New York Times article again, although the

16  prosecution showed it to you.  Defense 235.  See the headline,

17  the second paragraph.  That's the headline second paragraph.

18  And the sixth and seventh paragraphs.

19      When he talked to the New York Times he wasn't consulting

20  with the Ukraine, he didn't inform the Ukraine, he did not act

21  under instruction from the Ukraine and he was in no way serving

22  as an agent for the Ukraine.

23      It's true that Mr. Craig told Mr. Hawker that he had

24  spoken to David Sanger.  The government may contend that that

25  is his crime.  I don't think you will agree with that.  Ukraine

1   had no idea what he was saying to the New York Times.

2       Mr. Craig didn't think that defending the integrity of the

3   report or correcting the fake news was working to advance the

4   Ukraine's interest.  So that's the preview of what the evidence

5   will show about the media contacts.

6       Next part of the evidence as you've heard is what did he

7   say to the FARA Unit.  So let's be clear on what we're talking

8   about.  The allegations against him relate to two letters and a

9   meeting.  A letter on June 3rd, a meeting on October 9 and a

10  letter written the next day on October the 10th.  I have a

11  little timeline here to illustrate that.

12      You will see exactly what the letter said.  What we may

13  not be so well informed about the meeting since nobody has any

14  notes of it, and nobody can tell us a single word that came out

15  of Mr. Craig's mouth at that meeting.

16      But in any event, Judge Jackson is going to tell you that

17  you must find that Mr. Craig knowingly and willfully made a

18  false statement or concealed material fact after October the

19  3rd.  So your focus is really going to be on the September

20  period, the October 9 meeting and the October 10 letter.  I'll

21  talk about them in a minute but let's start at the beginning.

22      Seeing this correspondence in context is going to help you

23  understand I think why the notion that he lied or concealed

24  anything is so untrue.  We want you to see all of the

25  correspondence.  We want to you understand it's sequence.

1        The first one is a letter from Ms. Hunt to the law firm,

2    not to Mr. Craig.  And it refers to the Los Angeles Times

3    article.  And you'll see at the top of it, it's come to our

4    attention from a Los Angeles Times article.

5        That landed on Mrs. Hunt's desk.  She had been at the FARA

6    Unit for many years.  She had lots of experience with people

7    and companies.  Those who registered and those that didn't.

8    And it was her job and her assistant's jobs to ask questions.

9    To compose letters with questions like the ones she sent to

10   Skadden.  She had certainly done it many times.

11       She wrote this first letter not because the Los Angeles

12   Times article suggested that Mr. Craig or his firm were acting

13   as agents for the Ukraine.  It's because it's what she does

14   routinely when it came to her attention that someone was

15   working for a foreign government.

16       We expect that she will say in no uncertain terms that

17   nobody who receives such a letter has any obligation to respond

18   to it.  But of course the firm did.  She sent that letter on

19   December 18 and it asked four questions.

20       Ownership and control of the firm.  The description of the

21   nature of the firm's business, although she was familiar with

22   Skadden at the time from having dealt with them.  The

23   description of the activities that the firm has engaged in or

24   the services rendered to the Ministry of Justice and a copy of

25   the contract.

1       The letter has to get to Mr. Craig's attention and he

2   coordinates the firm's response to it.  The letter that he

3   writes back is here and you'll see it and be able to read it

4   and take your time.

5       They answer the first two questions and then he gives a

6   description of his and the firm's work for the Ukraine.  It

7   says in 2012 the Ministry of Justice engaged Skadden to consult

8   and provide advice on rule of law issues.

9       And he explained that the major focus of the firm's work

10  was investigation of the Tymoshenko trial and write a report.

11  There's no contention in this case that that description was

12  false or misleading.

13      He included copies of the contract and he also told her

14  that the fees had been paid by a third party.  He mistakenly

15  identified her as Helen Hunt probably because of the actress.

16  It wasn't the only time he did that.

17      So Ms. Hunt gets the response around February the 6th.  We

18  don't know exactly what happened inside her unit between

19  getting the letter and writing back on April the 9th.  But at

20  some point she and her staff got together and thought about the

21  matter and the evidence will include some of the internal

22  communications that went on in the FARA Unit.

23      We know that they thought about what questions to ask.  So

24  we want you to pay attention to the questions.

25      You will see that the FARA Unit never asked Mr. Craig or

1    anyone at Skadden questions which would have elicited the

2    information the government contends that he concealed.

3         So you like anybody will want to know well, in responding

4    to the FARA Unit what questions did he ask.  There are

5    questions about what Skadden did and what it knew except for

6    one question about a firm that nobody had ever heard about that

7    was registered to the Ukraine.

8         She had a great deal of experience.  And they could have

9    asked any number of questions to Mr. Craig and his firm.  But

10   you may find it interesting when you think about what Mr. Craig

11   and his partners did not say, what questions she thought about

12   asking but didn't.  There's some evidence about that.

13        They could have asked any question they wanted and they

14   chose the ones they asked.  But we know for example, that she

15   drafted a question, did Skadden disseminate the report and if

16   they didn't, who did?  They didn't put that question in the

17   letter.

18        Might be a good question if you want to know how the

19   report got released to the public.  It may remain something of

20   a mystery in the evidence, why if they wanted information about

21   how the report was made public, they thought about it and

22   decided not to ask.  You may consider that evidence in

23   evaluating the truthfulness and completeness of Mr. Craig's

24   responses.

25        So anyway, on April 9, two months later, she sends a

1    letter with seven questions.  The prosecutor asked you to focus

2    on three of the questions and I will do the same.  So we don't

3    need to put back up her letter to Mr. Craig.  But we will have

4    you look at the response.

5          You will see question 1.  To whom, if anyone, did your

6    firm release or distribute the report?

7          Question 5, what was the firm's understanding of what

8    would happen when it was released?

9          And question 6, did you or anyone at your firm have any

10   media interviews?

11         The letter also asked for the identity of the party who

12   made the payment of the fees.  Mr. Craig and his partner Cliff

13   Sloan who had himself helped conduct the investigation and

14   write the report as well as others, worked on the firm's

15   response.

16         Other partners at the firm including it's counsel reviewed

17   it and Mr. Craig asked his firm's communications department to

18   search for all relevant news articles that had appeared at the

19   time of the release of the report.  They sent their response on

20   June 3rd.

21         Could you put question 1 back up again, John.

22         The government will point out that there are two errors in

23   Skadden's answer to the first question.

24         The first is a date.  Mr. Craig in fact initially provided

25   the report to the New York Times on December the 11th, not the

1  12th.  Apparently the government says that error concealed the

2  fact that Craig talked to Sanger before the report was

3  released.  That was in error.  Errors are not criminal.  All

4  statements are criminal when they are intentionally false as

5  the Judge will tell you.

6      But when you think about whether this is a willful, false

7  statement or intent to conceal something, you will also notice

8  that The New York Times article itself says the reporter spoke

9  to Mr. Craig before the report was released.

10     It was no secret that Mr. Craig had spoken to the reporter

11 before the report was released because all you had to do was

12 read The New York Times article and it said so.  Everybody who

13 read the article knew that.

14     The other error is Mr. Craig forgot about this

15 conversation with Tom Parfitt.  The researches at Skadden had

16 not come up with the Daily Telegraph article and neither Mr.

17 Craig or Mr. Sloan remembered.

18     The 5th question.  Prosecutors contend that it was false

19 for Mr. Craig to say that he believed distribution of the

20 report was a matter to be decided by the Ukrainian government.

21     Ladies and gentlemen, that statement is entirely true as

22 you will see.  When he undertook the project, he had no idea

23 what Ukraine would do with it.  At that time when he took it,

24 he didn't even know what his conclusions would be and certainly

25 not what Ukraine would do with it once it was done.

 1          That uncertainty continued throughout the summer and fall

 2     of 2003.  The evidence will show, ladies and gentlemen, that as

 3     the report developed it was so critical of the trial that

 4     Mr. Craig and others believed it possible, in fact likely, that

 5     the Ukraine would not release it at all.

 6          Skadden had tried to deliver the report to the Ministry of

 7     the Justice of Ukraine on at least three occasions.  First in

 8     August, then September, and then in October.  And the Ministry

 9     of Justice had refused to take it.

10          Some professionals not associated with FTI saw the report

11     as harmful to Ukraine and recommended that it not be released

12     at all and that it be buried.  So when he said he believed the

13     distribution of the report was a matter to be decided by the

14     Ministry of Justice in Ukraine, he was being entirely honest.

15          The 6th question about media, prosecutors apparently say

16     it was false to say that one purpose of the statements was to

17     correct misinformation.

18          As I've already described, the evidence will show in great

19     detail that this description of his purpose was true.  I spent

20     a lot of time telling you what the evidence would show his

21     purpose to be, and you'll hear it again in detail so I don't

22     need to repeat myself now.

23          Greg Craig had seen what Jonathan Hawker intended to say

24     and what he, he wanted Sanger to believe it said.  He saw the

25     press release.  So when he says one of his purposes was to

1    correct mischaracterization it was entirely true.

2         But there's another thing I hope you will notice about

3    this letter.  The letter is the first time that Ms. Hunt and

4    people of FARA Unit had learned about the New York Times

5    article.  The very article which the government contends is a

6    reason for the crime.

7         He told her about it in his response to question 1.  The

8    evidence is clear that she never asked anything about the facts

9    and the circumstance of his speaking with the reporters at the

10   New York Times or speaking with any other reporter.

11        When you look at the article you may find it difficult to

12   understand how anybody looking at that article might come to

13   the conclusion that he made his contact with the papers to

14   advance the public relations agenda with the Ukraine.

15        As you have seen the importance of these articles as

16   evidence in this case is the input Mr. Craig had into them,

17   their content.  You'll also see in this same letter this same

18   response in June that Mr. Craig declined to reveal the identity

19   of the person who made the payment.  This is the important

20   part.

21        If you go to the next page, John, please.

22        We do not believe we engaged in conduct requiring us to

23   register and do not believe you're entitled to that

24   information.  But if you conclude we're required to register or

25   if for some reason you believe that information is material to

1   your inquiry, please let us know so we may consider.

2        It's undisputed Mrs. Hunt never responded to that

3   invitation, never asked anymore questions about the third party

4   payment or the money.

5        The government predicts that it will show that Mr. Craig

6   decided to leave things out of what he said in this letter in

7   order to deceive Mrs. Hunt.

8        There's certainly a lot of information about the

9   investigation and the writing of the report which is not

10  misleading.  The history of the writing of the report, it's

11  released, the comments span a period of about ten months.

12  There are events in 2012 in which Hawker and Manafort try to

13  persuade Mr. Craig to take part in the media plan.

14       There are extensive efforts to get him to make changes in

15  the report.  The answers that he wrote to her letter, her 7

16  questions do not discuss many things which today she may say

17  she would have liked to know or that she wishes she had asked

18  about.

19       But the question today is not what she might have liked to

20  know or what she would like to know today or wished she had

21  asked.

22       The question is whether Mr. Craig left anything out of his

23  responses knowing he had a duty to include it in order to

24  deceive her.

25       Are we answering her questions?  That was the issue for

1   him and Mr. Sloan.

2       The people who drafted this response thought about it very

3   carefully.  They didn't try to conceal anything.  If Mrs. Hunt

4   had asked other questions they would have gladly answered.

5       You will not hear testimony from any witness that

6   Mr. Craig or Mr. Schoen thought about what they would not

7   include so that he could throw Mrs. Hunt off the track.

8       You will not hear testimony, I predict, from anyone of any

9   motivation held by Mr. Craig to prevent disclosure of things

10  which had happened in 2012.

11      You will not hear a shred of evidence I predict in this

12  case that would lead you to believe that the reason Mr. Craig

13  drafted this letter the way he did was to avoid having to

14  disclose the things that the government says was the reason why

15  he didn't want to register.

16      Three months go by and on September the 5th, Mrs. Hunt

17  sends a letter to Mr. Craig.  I don't remember the prosecutor

18  showed it to you, but I'll show it to you again.

19      It says according to your letter, your firm disseminated a

20  copy of the report to the New York Times, National Law Journal

21  and the Los Angeles Times and you spoke with them to correct

22  misinformation.  And then she concludes a little further down,

23  by engaging in these activities for the Ministry your actions

24  and contacting the media were meant to influence the U.S.

25  public.

1          Because he gave it to the New York Times, the National Law

2     Journal and LA Times and because he spoke to the newspaper and

3     he did it she says for the Ministry.

4          These are important points in this letter.  Because

5     Mr. Craig was to say the least upset.  He completely disagreed

6     with her conclusion and he thought she didn't fully understand

7     what he had said.

8          His June letter, the one I just talked about, did not say

9     that his contacts with the media were for the Ministry.  They

10    were exactly the opposite.  He told his partners that Ms. Hunt

11    was wrong, told his partners he was going to try to change her

12    mind.

13         He talked to Mr. Spiegel as you've heard and drafted a hot

14    email for the record.  And there are some things in that email

15    that weren't factually accurate that reflect an imperfect

16    memory on his part.  But it was not something that was sent to

17    FARA.

18         He drafted a letter to FARA to be sent with a request that

19    the attorney general review the entire matter.  He was serious.

20    That draft letter didn't go to FARA either.  His partners

21    persuaded him that the better course was to have a meeting.

22         So what is the evidence going to show about the meeting on

23    October the 9th?

24         Well, ladies and gentlemen, nobody is quite sure.  The

25    evidence will be that nobody at FARA Unit has any notes about

1   that meeting.  This was in Ms. Hunt's words a very informal

2   meeting.  It may be that someone who was there took notes, but

3   he's long gone and so are his notes.  Nobody can say any words

4   that came out of Mr. Craig's mouth or that were spoken to him

5   at that meeting.

6       So you'll be asked to base your conclusion about whether

7   he committed a crime in that meeting on what Ms. Hunt will

8   describe six years after the fact as the gist of what he said

9   or the general things.

10      She will say we believe that the gist of the meeting was

11  to persuade her that she was wrong, that Mr. Craig had not

12  acted as a foreign agent when he spoke to the three papers and

13  that he was not required to register.

14      He argued the case to her.  He told them about Ukraine and

15  that it's Ministry of Justice was lying about the report and

16  that he took it upon himself to make sure they didn't persuade

17  important newspapers that his report was a whitewash.

18      When the meeting ended Ms. Hunt asked him to put his case

19  in writing.  That's why he wrote the letter of October 10 and

20  why he wrote, he wrote it the way he did.  It's a one page

21  letter, maybe one and a quarter, a 45 minute meeting.  I don't

22  think anybody will say that it's a full account of what was

23  said at that meeting.  It summarizes his argument.

24      Second paragraph.  John, can you -- yes, thank you.

25      He provided the report to media outlets in response to

1  requests.  The government contends this is a lie.  Because

2  Mr. Craig sent Sanger an email and asked him if he was

3  interested in the report and Sanger asked him to send him a

4  copy.  That's a request.

5       The government apparently contends that the statement is

6  true as to the Los Angeles Times and National Law Journal, so

7  the case turns on whether Mr. Craig gave the report to

8  Mr. Sanger in response to a request or sent it to him without

9  his asking.  That's it, folks.  You're going to hear a lot of

10 argument about whether using the word request made him a

11 criminal.

12      I've told you what the evidence is going to show about

13 that but this is a good time to point out to you that the

14 accusations against Mr. Craig are about words, about the words

15 he used.

16      This is not a case about stealing or assault or even

17 bribery.  It's about whether he chose certain words in this

18 letter and the government thinks the evidence proves he should

19 have used other ones.

20      I think you will find the words he used are not false or

21 misleading at all.  But whatever you think about them, the

22 charge against him is that he chose the words that knowing they

23 were intended and would mislead the government.

24      The third paragraph, with respect to statements in the

25 National Law Journal and The New York Times, we have already

1    talked about the evidence.  They were intended to correct

2    mischaracterizations of the report.  Entirely true.  But

3    apparently the government says they are false because the

4    statements were to further Ukraine's propaganda program.  I've

5    told you what the evidence will show about that and I'm not

6    going to go back through it.

7        The last paragraph in responding to inaccuracy in U.S.

8    news reports, the law firm did not consult with Ukraine, did

9    not inform Ukraine, did not act under instruction from Ukraine

10   and was in no way serving as an agent for Ukraine.

11       You are going to want to look at the common sense meaning

12   of those words.  It's true Mr. Craig told Mr. Hawker that he

13   had contacted Sanger, but it's also true that Mr. Craig did not

14   consult with Hawker about what to say to Sanger, or when to say

15   it or how to say it or what he said to any other reporter.  He

16   didn't tell him what he said and he certainly didn't get his

17   permission to do it.

18       As I said, the Judge will tell you at the end of the case

19   that the government must prove a willful and intentional

20   concealment in either the October 9 meeting or the October 10

21   letter.

22       But we want you to read every word in his correspondence,

23   and listen to every piece of testimony.  Mr. Craig is not

24   embarrassed or defensive about any of it.

25       Three months later as the government has told you

1  Mrs. Hunt wrote him back and said quote, you conclude that in

2  response to these inquiries your firm did not act as an agent

3  of the Ukraine and we agree.  She was right then, she's right

4  now, and he was right.

5      I've spent a significant amount of time telling you what

6  the evidence will show about what he's charged with and why

7  this establishes his innocence.  I hope you will keep those

8  questions in mind.

9      I haven't talked about the report and how it was done, who

10 did it and when or about Mr. Manafort, Mr. Gates, about the

11 request from Ukraine to make changes or about the hiring of the

12 FTI.

13     I'm not saying that these things are irrelevant.  We

14 expect to have a full airing of them and other things that

15 happened before the report was released but remember, he's not

16 charged with anything in 2012.  It's important to us certainly

17 that you pay the closest attention to what he did or did not

18 say to Mrs. Hunt and her colleague in 2013 about what he said

19 to the reporters in those four days of December.

20     The case is not about as the prosecutors said whether his

21 report was independent.  It certainly was.  Or whether he

22 should or should not have accepted the responsibility.  The

23 evidence shows it was an entirely proper thing for him to do or

24 whether the fees and expenses for 4.5 million dollars was

25 reasonable.

1       He's not charged with failure to register.  You won't be

2   asked to render a verdict on whether he was or was not required

3   to register as a foreign agent.

4       The prosecution suggests the evidence will show that he

5   was afraid, he didn't want to register because he was afraid of

6   disclosure are some of the things they are going to put

7   evidence on.

8       I hope you will weight attentively by any evidence that he

9   was motivated by any such thing.

10      So why did he do it?  Why did he do the project?  Well,

11  Mr. Schoen requested him to do it and introduced him to

12  Mr. Pinchuk.  Greg knew it would probably be controversial.  He

13  had an interest in expertise and rule of law issues especially

14  as related to countries emerging from the old Soviet Union.

15      Mr. Pinchuk was paying the bill.  Mr. Craig met with

16  Mr. Pinchuk in Kiev, shook hands.  His client would be the

17  Ministry of Justice, not Mr. Pinchuk.

18      Mr. Craig also learned pretty quickly that he would be

19  dealing with Paul Manafort.  Paul Manafort was the principle

20  adviser I guess you would say to the President Yanukovych.

21  Manafort was someone he didn't know but who was a prominent

22  figure in Washington.

23      I think it's important to say to you what the evidence

24  will show.  In 2012, people didn't know things about Paul

25  Manafort, Mr. Craig didn't know things about Paul Manafort that

1    people know now.  That's why I say it's our job to present this

2    case to you as it happened.  Not looking back on it as if it

3    all happened at the same time.

4         What was, why was it so expensive?  Well, all the work had

5    to be done in Ukraine.  They had to translate all of the Court

6    proceedings, lots of memos.  They had to pay for interpreters,

7    they had to travel.  Took a number of lawyers in addition to

8    Mr. Craig and it had to be done in a short time.

9         The out-of-pocket expenses were about $600,000.  Mr. Craig

10   was told by Mr. Schoen to estimate the fee first and then add

11   an amount to make sure it would be sufficient.  He estimated

12   four million dollars.  Mr. Pinchuk made those payments.

13        There's no question that in the summer of 2012 Mr. Craig

14   thought the amount paid by Mr. Pinchuk would not be sufficient

15   to finish the job.

16        He asked for an additional deposit.  Additional monies

17   from the Ministry of Justice, a little over a million dollars

18   which the Ministry -- this is in August -- Ministry of Justice

19   ultimately paid the next year.

20        It was not to help Ukraine solve a media problem.  It was

21   because and the evidence will show that the funds in deposit on

22   his account were about to run out and there was more work to

23   do.

24        Mr. Manafort told Mr. Craig that both the Ministry of

25   Justice in Ukraine would pay the shortfall but it needed

1   Mr. Craig to send letters to the Ministry of Justice in a form

2   dictated by the President's chief of staff and transmitted to

3   Mr. Craig by Manafort.  The letter he had asked him to send

4   exaggerated the reasons for the additional funds.

5       Mr. Craig signed it, and at the Ukraine's request dated

6   one of them a month before it was actually sent.  Mr. Craig

7   will be the first to tell you that looking at that letter today

8   he could rightly be criticized for signing it.

9       It was a letter his client asked him to send and the

10  language his client asked him to use, but it was not entirely

11  accurate.  But he knew that the people who were agreeing to pay

12  the money wanted the documents in the way they had asked him to

13  sign for their own reasons.  And that there was no doubt that

14  they knew exactly what the purposes of the funds were and why.

15      And of course in his letter his response to Mrs. Hunt it

16  included both contracts, both the Ukraine contract the first

17  one as well as the second one.

18      There were two conditions Mr. Craig insisted on to do the

19  work.  One was total independence.  That's not what lawyers

20  usually have when they represent clients.  They usually have a

21  duty to advance the interest of the client.

22      But when you have, take on the job to do an independent

23  report you have no duty to the client.  That was essential to

24  his agreeing to do this work, the client would not have any

25  control over conclusions.

1          And second, that he would not take any action that would

2     require him to register as a foreign agent.  He did know about

3     that.  He had registered before.  He didn't want to register.

4     He knew that he and his team could do the project without being

5     an agent.

6          He didn't respect Yanukovych and he didn't want to be seen

7     as an agent of Yanukovych or his government.  He wouldn't agree

8     to be under the direction of Yanukovych.  Registering as an

9     agent was inconsistent with doing an independent report and he

10    knew that registration could effect the careers of people on

11    his team and possibly himself.

12         He did get clear advice on what he could and he couldn't

13    do and he concluded that he couldn't engage in public

14    relations.  He considered doing an independent report for the

15    government of the Ukraine was not something that required him

16    to register and he was clear from the beginning that he was not

17    going to do public relations and he certainly was not going to

18    render any advice to the Ukraine or act as its publicity agent.

19         Project took a lot of work.  You're going to hear a lot of

20    testimony about how it was done.  About the team that was put

21    together, about the witnesses they interviewed, the time they

22    spent drafting the report and its conclusions.

23         It is entirely true that Mr. Craig recommended that

24    Ukraine hire a Western public relations firm.  It's handling of

25    criticism you saw of Krimilin ckckck.  He had no doubt that

 1   there would be public attention paid when the Ukraine announced

 2   that he was being hired and that there would be public

 3   attention when the report was done, whatever the conclusions

 4   and he and his firm were not going to do it.

 5       He asked his partners in London to recommend a PR firm.

 6   They recommended FTI.  He didn't know anybody at FTI who was

 7   going to work on the project but he did know someone in the

 8   U.S. Ed Riley and he thought well of.

 9       You will hear that FTI came on board first to provide PR

10   services in connection with the second trial of Ms. Tymoshenko

11   and that Skadden was asked to do work on that second trial and

12   that Mr. Craig and Mr. Schoen concluded that working on a

13   second trial of Mrs. Tymoshenko might undermine the credibility

14   of the report in the eyes of the public.  So they terminated

15   the work.

16       So there was nothing for FTI to do.  So what will the

17   evidence show that Mr. Hawker got up to?  Before he ever seen

18   the report or drafted it, he began to create what PR people do

19   for managing the release of some news.  Some people refer to

20   these as media plans.  I think you will conclude that what they

21   are are PR agent's busy work, wish lists.

22       You'll see these so-called media plans.  It's a big thick

23   document with time lines and assignments for a lot of different

24   people to do things including communicating.

25       One of the people who is given assignments in the

1   intermediary reports is Greg Craig.  It's truly bizarre I think

2   you will find.  It has Mr. Craig making a world wind tour of

3   Brussels, Moscow talking to European and American officials and

4   journalists.

5        Nobody in their right mind would think Greg Craig agreed

6   to do those things.  And Mr. Hawker sent the plan to Manafort

7   and Manafort sent it to the President's chief of staff.

8        The only problem is that nobody sent it to Mr. Craig.

9   Mr. Craig saw a version of it at the end of August, discussed

10  the version with Mr. Schoen and never responded.  Hawker was

11  clearly frustrated that he really had no contact with

12  Mr. Craig.  And when he did Craig treated him poorly.

13       But as you've heard he will testify about a meeting in New

14  York City at something called the Harvard Club on September

15  23rd with Manafort, Gates and Craig.  This is one of the few

16  times where Hawker actually talks to Craig.

17       The meeting was convened on the 23rd of September because

18  Mr. Manafort and others believed that the report should be

19  delivered to the Ministry of Justice three days later at the

20  opening of the general assembly in New York on the 27th of

21  September.

22       The meeting was convened by Mr. Manafort with Mr. Craig to

23  go over final comments to the report.  This was a big hurry up

24  meeting.  Sort out final issues in the report.

25       Mr. Craig understood this would be the last event in his

1   work on this report.  Manafort invited Hawker and he told Craig

2   that Mr. Hawker is there so can you brief him on what the

3   report actually said.  That made some sense but Mr. Craig's

4   understanding of why Mr. Hawker was there and Mr. Hawker's

5   understanding of why Mr. Hawker was there were different.  You

6   may conclude that Mr. Manafort misled Mr. Craig.  I guess that

7   wouldn't be the first time.

8        Hawker showed up with his big thick document.  He had

9   e-mailed it to everybody in the middle of the previous night,

10  his so-called media plan.  Nobody had read it, certainly not

11  Mr. Craig.

12       The meeting was essentially between Craig and Manafort and

13  it was about getting final comments on the report.  Craig took

14  the comments about the substance of the report back to

15  Washington and got the team to focus on them the next day.

16       Hawker and Gates will apparently testify that the people

17  at that meeting pushed Mr. Craig to help with the media when

18  the report was released and he refused.

19       At the Harvard Club Mr. Craig indicated he might consider

20  answering some questions from reporters about the report after

21  it was released.  But the next day he sent them an email saying

22  that Skadden policy prevented him from backgrounding the

23  reporter.  There is no Skadden policy.  Mr. Craig used the

24  pretext of there being a firm policy to tell Manafort he wasn't

25  going to participate in PR.

1        Mr. Craig does not even remember reading the document.  He

2   does remember two days later getting the talking points that

3   Hawker had written and sending Mr. Hawker the email that I've

4   showed you.

5        So what happened between Craig and Hawker after the hot

6   email exchange?  Basically nothing.  From the end of September

7   until December the 11th, Mr. Hawker steered clear of Mr. Craig,

8   and the two of them, Hawker and Gates spent a lot of time

9   writing media plans back and forth to each other including

10  things for Mr. Craig to do.  Only they never sent them to

11  Mr. Craig.

12       The one person who does not get a copy of the media plan

13  that goes out on December the 6th, a week before the release,

14  Gates sending it to Hawker, the one person who is not included

15  on that is Mr. Craig.

16       We all wait with great interest to hear what Mr. Hawker

17  will have to say about persuading Mr. Craig to get on his PR

18  team.  We expect Mr. Hawker's version of these as well as other

19  events will demonstrate that he has a very bad memory on the

20  arm's length relationship with the truth.

21       You may conclude Mr. Hawker's memory has something to do

22  with the pressure put on him by the United States Government.

23  That will be up to you.  But he's certainly going to be front

24  and center in this trial.

25       Who else is going to be front and center?  Why Rick Gates,

1   Manafort's assistant who is apparently going to testify about

2   some conversations he had with Mr. Craig.  We think what

3   Mr. Gates will say is consistent with everything we have been

4   telling you but can't be sure because as Ms. Gaston says,

5   Mr. Gates has pleaded guilty to crimes including conspiracy,

6   fraud and other forms of dishonesty.  And his sentence will be

7   determined after he testifies in this case.

8        What you're going to see is that he, Gates and Hawker are

9   the reads on which the case against Mr. Craig depends.

10       I want to leave you with a handful of highlights to look

11  out for in the summer of 2012.  First, in August Hawker got his

12  hands on a leaked draft of the report.  And he figured out that

13  it's conclusions were going to be bad for Ukraine.

14       He learned that it would conclude that Ms. Tymoshenko was

15  denied a fair trial.  That was bad news.  He and some of his

16  colleagues described the conclusions as a potential

17  catastrophe.

18       Mr. Craig knew that Ukraine did not like the report.  He

19  began to be more and more suspicious about what Ukraine was

20  going to do even though it was still a draft.  You will see

21  specific expressions of this.

22       One of them in particular is he feared that if they gave

23  the report in English to the Ukraine, Ukraine would play games

24  with the translation of it.  So they had the report translated

25  from English to Ukraine before they sent it.

1        Second, Ukraine tried to get changes made in the report.

2   You'll see written communications mostly emails between

3   Manafort and others requesting changes.  Mr. Craig and his team

4   considered any change suggested and they refused to make any

5   changes they didn't consider were supported by the facts.

6        As you will see the changes they made were for the most

7   part stylistic.  But it wasn't just one set of requests or

8   comments.  The Ministry of Justice and the chief prosecutor

9   sent the same changes more than once.

10       And one time Mr. Craig heard that if he didn't make the

11  changes Ukraine would not accept the report.  Finally, he lost

12  his patience.  He wrote to his team on October the 8th this

13  email.

14       You don't need to read all of it.  You can just read the

15  last two lines.  I ask you to remember this, ladies and

16  gentlemen, when you listen to evidence that Mr. Gregory Craig

17  became a part of the PR team for the Ukraine.

18       Third, in one of the more humorous aspects of this story,

19  Mr. Craig kept trying to deliver the report to the Ministry of

20  Justice and they kept refusing to accept it.

21       August, September, I told you about, they were suppose to

22  deliver it three days after the Harvard Club meeting, October,

23  they wouldn't take it.  On October the 16th Mr. Craig said to

24  Manafort, Paul, the report has been done since September 17th.

25  We tried to deliver it to the chief of staff in New York City

1  as well as to the Ministry of Justice during the general

2  assembly.  They declined to accept it.

3      We have offered to have it hand delivered in hard copy to

4  J T F ckck but you and Gates said not to do it.  What's the

5  problem here?

6      Mr. Craig suspected that the Ministry of Justice didn't

7  want to accept it because it would have to release it and that

8  wouldn't be good.

9      Finally, Mr. Craig and Mr. Schoen went on to numerous

10  other matters.  Both of them were extremely busy.  Their falls

11  and winters were filled to the brim with other

12  responsibilities.

13      Did Greg Craig mention David Sanger?  Probably.  Mr. Craig

14  had known David Sanger for years.  He met him when their sons

15  were playing in Little League.

16      In September of that year they had run into each other in

17  Colorado Springs where their sons were both entering the same

18  college.

19      Mr. Craig did trust Sanger, but he didn't trust Hawker.

20  He may have very well told Hawker and others that Sanger was a

21  reliable and influential reporter.  That's not the question.

22      The question is when he spoke to Sanger and later

23  Herszenhorn to make sure that the New York Times got it right,

24  was he doing so to help Mr. Hawker pursue his public relations

25  agenda or because he wanted to prevent Hawker from misleading

1    in New York Times?

2        Ladies and gentlemen, as I've been talking longer than

3    that I intended to.  I appreciate your patience.

4        I want to come back to where I started.  These are the

5    questions that you are going to think about and be asked to

6    decide.

7        Thank you, thank you, John.

8        The indictment charges Mr. Craig with being dishonest, did

9    knowingly and deliberately deceiving Mrs. Hunt and others about

10   why he talked to reporters in the New York Times, the National

11   Law Journal and the Los Angeles Times.

12       You'll know what he said and what he didn't say except for

13   the meeting for which there are no notes.  You'll have the

14   evidence of why he did what he did and why it was not at the

15   direction and control of Ukraine, exactly the opposite.  You'll

16   have the articles themselves.

17       You will have the questions he was asked and the answers he

18   gave to help you decide whether he concealed a fact or lied

19   about them.

20       This case is about whether Greg Craig was honest when he

21   wrote to and he spoke to Ms. Hunt and the FARA Unit.

22   Ms. Gaston is right.  Mr. Craig had a long career.  He was 67

23   years old at this time.  He had achieved what many of us envy,

24   credibility, respect from others for his honesty and his

25   integrity.

1          We will present to you the testimony of people who know him

2     well from his past and his present, from his work registering

3     voters in Mississippi in the 1960s to his work in the world

4     peace and the rule of law, work on the Board of Carnegie

5     Endowment and from the head of the pre-school that his children

6     attended.

7          They're going to tell you the same thing.  Greg Craig has

8     lived an exemplary life in public service and the private

9     practice of law.  If there's one person in the world whose

10    honesty you would put your faith in, it's Gregory Craig.

11         I'm confident when you hear the evidence in the case, you

12    will come to the same conclusion.  Thank you.

13         Thank you, Your Honor.

14              THE COURT:  I think we need to consult with counsel

15    before we put on our first witness and you have been seated for

16    a long time so I think it's an appropriate time for the jury to

17    take a break.

18         So why don't we do that and I instruct you that to leave

19    your notebooks in the chair.  You still have yet to hear any

20    evidence in this case.  It has not been submitted to you and

21    you may not discuss it among yourselves or with anyone else.

22         I'll bring you back in the courtroom probably in about ten

23    minutes or you may discover that when I make those estimates

24    sometimes it takes longer than I said.  But you'll discover

25    that soon enough.  So if it happens today, I apologize already,

1    but you can step out with Mr. Haley right now.

2          (Jury excused at 2:35 p.m.)

3               THE COURT:  All right, Mr. Campoamor, what did you

4    want to bring to my attention?  Then I think I will have

5    something to say briefly before I also give you all a break.

6          You want to break?

7               MR. TAYLOR:  No, I couldn't hear you.

8               THE COURT:  I'm sorry.  I was just summoning Mr.

9    Campoamor-Sanchez because I thought he had something to discuss

10   before we started.

11              MR. CAMPOAMOR-SANCHEZ:  I do, Your Honor, and I'm

12   happy to take the break and then do it or do it now.

13              THE COURT:  No, I think we should talk about what we

14   need to talk about so that we're ready when we come back to

15   have you call your first witness.

16              MR. CAMPOAMOR-SANCHEZ:  Very well.  I'll try to do it

17   very quickly, Your Honor.

18         So the Court's order as it was entered reads the

19   government may not introduce evidence concerning the potential

20   violation of any Ukrainian law or regulation governing the

21   contracting or procurement process.

22         And that we understood the way this drafted to be a little

23   broader than what we discussed at the hearing.  I just wanted

24   to give the Court some background to make sure that I instruct

25   the witnesses therefore appropriately as to what they can say

1    and cannot say.

2         The reason this is important is so to be clear, we're not

3    contending that there was any violation by Skadden, Mr. Craig

4    or anybody else about Ukraine tender laws.  In fact, we would

5    welcome if there's any concern that the Court instruct the jury

6    that that is not a government allegation and that we're not

7    claiming that.  We're not trying to prove that or anything of

8    the sort.

9         What is important for the Court to understand though is

10   that the fees issue, so Skadden's fees issues get brought up

11   and there's a need then to consult with FTI for advice about

12   how to handle this issue and it is phrased in terms of a tender

13   law violation.  That's what Mr. Vlasenko, Ms. Tymoshenko's

14   lawyer alleged and that's why he was threatening to publish the

15   letter which led to all sorts of action, some of it being

16   Mr. Craig for example, correct the press releases that the

17   Ministry of Ukraine was going to issue about that very issue.

18        Similarly to give the Court a flavor, this is Government's

19   Exhibit 376 when Mr. Herszenhorn was going to interview

20   Mr. Craig in December of 2012 in the very first question that

21   he is asked and that's what they're going to be discussing, he

22   asked Mr. Craig in point a again, government has insisted that

23   the contract for legal services was for less than $12,000 in

24   order to avoid a tender process required under Ukrainian law.

25        So that issue, the allegation that there was allegedly a

1   violation leads to a number of actions by Mr. Craig as it

2   relates to the PR piece.  So that led for example to that first

3   press release that was issued in May of 2012 that Mr. Craig

4   revived.

5        It is part of the reason that leads to this sort of

6   Skadden stink press article which the Court knows about in

7   August which then leads to Mr. Craig and Mr. Manafort

8   discussing how they were going to issue this, this letter for

9   this alleged contract for services that have already been

10  rendered.

11       It is actually included in the media plans.  It is

12  something that the parties will have to address with the media

13  once the report is released.

14       So to summarize, we are not alleging that he violated it

15  and we don't want to suggest that and we would welcome an

16  instruction from the Court to that effect to the jury.

17       But the fact that the issue was raised leads to all of

18  these things happening that we do want to introduce into

19  evidence.

20       So that's what I wanted to clarify and get direction from

21  the Court because so for example, the first witness that we

22  have, Mr. Loucks, this is one of the issues he reacts to and in

23  fact, it suggests how the PR issue should be handled and that

24  goes to Mr. Craig and Mr. Craig suggests let's let FTI do it.

25       So that's why we see it as different between us alleging

1    that they did that and just the fact that the issue was raised.

2              THE COURT:  All right, so what are you proposing?

3              MR. CAMPOAMOR-SANCHEZ:  I'm proposing that we make it

4    very clear and I'm proposing the Court instruct the jury that

5    the government is not alleging that Mr. Craig or Skadden

6    violated any Ukrainian tender laws.

7         The only reason for this evidence is that they understand

8    why other things happened.  Would the Court -- I can draft

9    something now if that is what the Court is asking me to do.  Or

10   obviously, we can hear from the defense.

11             THE COURT:  What's the defendant's point of view?  I

12   do think it sounds as if, I mean, I hope that it is much of

13   this as possible that we don't need to come out of the

14   documents.

15        But if this is what's appearing in the press and they're

16   talking about how do we deal with the PR situation, I am happy

17   the first time this comes up to say ladies and gentlemen of the

18   jury, you are hereby instructed that this case does not involve

19   and there's no allegation that anyone associated with this case

20   violated the law of the Ukraine concerning government

21   contracting and they're not allowed to consider the possibility

22   that it does but I thought we were trying to steer a little bit

23   clearer of it.  So.

24             MR. CAMPOAMOR-SANCHEZ:  We're trying to limit, but

25   that's why it was so hard for us and that's why I needed

1   direction.  Because it does, it is germane to why things

2   happened.

3               THE COURT:  All right.  Mr. Murphy.

4               MR. MURPHY:  Your Honor, several of us are involved

5   in this issue as we've divided up witnesses, but I think I may

6   have an overarching view.

7        So the press release that Mr. Campoamor is speaking about

8   in May was a press release that was put together when it became

9   apparent that Mr. Vlasenko, who was Ms. Tymoshenko's lawyer was

10  reached out to by the Skadden team, they wanted to interview

11  her, they had interviewed him and he said something about the

12  tender laws and he said I'm going to go to the press with this

13  which he did, he went to the press with it.

14       The press release that was issued, it was in response was

15  a press release from the Ukraine Minister of Justice said we

16  hired Skadden and that press release gets issued.

17       I don't think you need to talk about the tender laws.  I'm

18  not even sure why that press release is relevant, it's not a

19  press release about the report.  It's a press release about the

20  fact that the Ministry had hired Skadden to do an

21  investigation.

22              THE COURT:  Well, if you're not concerned that the

23  evidence as you understand it is going to raise a concern that

24  you think would be detrimental to your client, then I'm not

25  going to raise an issue that isn't raised.

1           But I certainly think that at any point that you feel like

2    someone is going too far as to suggest that perhaps Skadden

3    colluded with Ukraine or Mr. Manafort --

4           MR. MURPHY:  Right.

5           THE COURT:  -- to help the Ukrainians avoid their

6    process, then I will instruct to the jury that's not part of

7    the case.  And I won't do it sua sponte if you don't want me

8    to.

9           MR. MURPHY:  We don't think that should come in at

10   all for the reasons that we've argued, but the first press

11   release in May really has nothing to do with that issue and I

12   don't know why they need to make any reference to what

13   Mr. Vlasenko was saying about a tender law issue.  They're

14   throwing it in there for --

15          THE COURT:  Well, I'm not even sure if his email is

16   in evidence at this moment.

17      Is it?

18          MR. MURPHY:  Vlasenko's?

19          THE COURT:  Yes.

20          MR. CAMPOAMOR-SANCHEZ:  So it is, 124, I believe it's

21   124.  We have redacted it to take any reference to the tender

22   laws out because we were awaiting the Court's instruction.  But

23   that email has been redacted I believe is in evidence.

24          THE COURT:  But I was assuming that some pieces, it

25   was going to be somewhat --

1          MR. MURPHY:  As redacted, that's fine.

2          THE COURT:  All right.

3          MR. MURPHY:  So then I don't understand why we need

4   to have Mr. Loucks talking about the concern that Mr. Vlasenko

5   had raised?  What's the point of that?

6          MR. CAMPOAMOR-SANCHEZ:  So what Mr. Loucks will

7   testify is that when Mr. Van Der Zwann reported that Mr.

8   Vlasenko was going to go public because he had been approached

9   and that part of the reason he was going to go public was that

10  he thought the Ukrainian tender laws had been violated.

11     Mr. Loucks then himself directs the team to start

12  preparing press releases, wanted to alert the client, wanting

13  to take all of these actions.

14     In response to that Mr. Craig says I agree we need to do

15  something.  Well, let's have FTI do it.  FTI, then Mr. van der

16  Zwann reaches out to FTI.  FTI submits a draft press release

17  which then Mr. Craig corrects for the Ministry of Ukraine.  So

18  it is just --

19          THE COURT:  Can't we do that with just saying

20  Mr. Vlasenko is going to raise a public stink, the team figures

21  out we need to deal with this.  FTI should deal with it and

22  Mr. Craig either participated in what they did or he didn't

23  participate in what they did and people can draw whatever

24  inferences you are going to ask them to draw but can we leave

25  out the violation of Ukrainian law piece of it.  You can tell

1    that whole story piece seems to me.

2         MR. CAMPOAMOR-SANCHEZ:  That story we can and say we

3    redacted the documents and I will instruct Mr. Loucks not to

4    mention that issue.

5         But I wanted to alert the Court that it is the motivation,

6    that is just one example.  It is the motivation for why a lot

7    of the things happened or questions get raised and Mr. Craig

8    has to deal with.

9         We were concerned how the Court drafted this order, it was

10   so broad that there could be other pieces of evidence that we

11   may not be able to get in.

12        THE COURT:  I'm trying to do the best I can to keep

13   this case about the, the few factual matters that we've spent

14   two and a half hours describing and would prefer to be actually

15   relatively focused, to keep the trial as focused as to, as

16   opening statements were, even though they took a long time to

17   deliver.

18        And so I'm not like to get off on a frolicking detour

19   about whether they violated Ukrainian law if we can help it.

20        I think what you would like to say is somebody was raising

21   a stink that required a PR response and who was involved in

22   figuring out what it was going to be.  That's your point more

23   than the substance of the thing.

24        MR. CAMPOAMOR-SANCHEZ:  Okay, and I think that some

25   of what Mr. Loucks, we can do it as discussed but I'm concerned

1   that as we start getting to the documents for example about the

2   conversations between Mr. Craig and Mr. Manafort after the

3   Skadden stink article in August of 2012, that is also as a

4   response of the allegations in the report which have to do with

5   the tender laws.

6       Again, if the Court or defense feels there's any concern

7   that we are trying to allege that there was an actual violation

8   by Mr. Craig or the Skadden, we are happy to have the Judge

9   give a charge.

10      THE COURT:  If there's a point that you can redact

11  something and it does come in and someone wants me to instruct

12  the jury that that's not part of the case, I will and I think

13  we'll just take it a step at a time.

14      MR. CAMPOAMOR-SANCHEZ:  Thank you.

15      THE COURT:  Before we break, I just wanted to say two

16  things about the defense opening.  The first is the government

17  filed a motion specifically to deal with the nature and number

18  of character witnesses and the defense specifically said to me

19  we don't know who they're going to be, we don't want to tell

20  you who they're going to be, we want to wait until the

21  beginning of our case.

22      And so then I said all right, in opening statements you

23  can say you are going to hear but you can't say who it is you

24  are going to hear from.  And I'm not sure that your argument

25  was entirely consistent with that.

```
1         I'm not sure it's worth saying anything about, but I do

2    think if I make a direction about what's going to happen and

3    what's not going to happen, I trust everybody in good faith to

4    adhere to it because we were trying to exceed to the

5    defendant's desire not to list them early and to save their

6    decision making for later, but you ticked off a number of parts

7    of this like with quite a lot of specificity indicating who

8    might be here and I thought that was exactly what we said we

9    were going to defer.

10        MR. TAYLOR:  I apologize, Your Honor.  Certainly did

11   not mean to do that.  My intent was to be general to say that

12   we were going to call character witnesses.  I didn't name

13   anybody.

14        THE COURT:  You didn't name their names but you kind

15   of went into some detail about -- I'm not sanctioning you, I'm

16   just saying I noticed that and I didn't think you quite

17   adhered.

18        MR. TAYLOR:  Then I deeply apologize.  I had no

19   intention.

20        THE COURT:  All right.  The other thing is there was

21   an argument, can't be described as anything other than an

22   argument partially through the opening statement that all of

23   these accusations are only about words.  He's not charged with

24   stealing, he's not charged with assault, he's not charged with

25   bribery.
```

1        And I think there was a government motion, motion in

2    limine early to preclude arguments based on jury notification

3    that this isn't important, it's not really a big deal, and I

4    was told we're not going to make any kind of jury notification

5    argument.  And this is just about words, it's not about

6    stealing, assault or bribery seemed to me to be trying to

7    suggest to the jury that this is not worth their attention.

8        And false statement obviously is a crime and whether it

9    should be punished or not and how severely is a matter for the

10   Court and not for the jury, but I thought that was a little

11   inconsistent with your promise to the Court that you weren't

12   going to go anywhere near that sort of argument.  So that's

13   what I wanted to say about that.

14       Yes.

15       MR. TAYLOR:  Again, Your Honor, in response, I

16   thought what I was saying was in order to determine whether

17   Mr. Craig is guilty or innocent we have to interpret words.

18       It's not a kind of a case as the kind I mentioned whether

19   he thinks it's concrete.  That had nothing to do and certainly

20   was not intended to suggest that it was true.

21       THE COURT:  Well, if you want to say as you did, I

22   don't have any problem when you said the accusations are about

23   words and the question is whether those words mislead and

24   whether the purpose behind choosing those words was to mislead,

25   that's one thing.

```
 1        But I don't want to hear in closing argument he's only

 2   charged with words, it's not about stealing, it's not about

 3   assault, it's not about bribery, it's not about murder, I think

 4   that really is an invitation to discount the offense and not

 5   what you just said.

 6        MR. TAYLOR:  I can see how you would see it that way.

 7   That was not the point I was trying to make and/nor did I

 8   intend to suggest in any respect any sort of mollification.  I

 9   was trying to draw the jury to understand that this is about

10   how you interpret words.

11        THE COURT:  Well, let's talk about the crime he is

12   charged with.  You can talk about that in your closing, but you

13   are not going to name crimes he's not charged with in your

14   closing other than he's not charged with failure to register

15   which everybody has talked about.

16        But other crimes that people might consider more egregious

17   put aside whether they consider it more concrete, we're not

18   going to list again.  All right.

19        We'll take a ten minute break and when we be back, you'll

20   be prepared to call your first witness.

21        Thank you.

22        (Recess at 2:50 p.m.)

23        (Proceedings resumed at 3:09 p.m.)

24        MR. CAMPOAMOR-SANCHEZ:  Your Honor, our first witness

25   is already in the courtroom.
```

```
 1              THE DEPUTY CLERK:  Jury panel, Your Honor.

 2              THE COURT:  All right, the government can call it's

 3   first witness.

 4              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.  The

 5   government calls Michael Loucks to the stand.

 6              THE COURT:  Are there any other witnesses in the

 7   courtroom?

 8              MR. CAMPOAMOR-SANCHEZ:  I don't believe so.

 9              THE COURT:  All right, okay.

10              MR. CAMPOAMOR-SANCHEZ:  May I proceed?

11              THE COURT:  Yes.

12           GOVERNMENT WITNESS MICHAEL LOUCKS SWORN

13                       DIRECT EXAMINATION

14   BY MR. CAMPOAMOR-SANCHEZ:

15   Q.   Good afternoon sir?

16   A.   Good afternoon.

17   Q.   Can you please tell us your name and spell it for the

18   record.

19   A.   Sure, my name is Michael Loucks.  Last named spelled

20   L-O-U-C-K-S.

21   Q.   Mr. Loucks, without telling us your address where do you

22   live?

23   A.   I live in downtown Boston.

24   Q.   Are you married?

25   A.   I am.
```

1  Q.   Kids?

2  A.   Two.

3  Q.   Can you briefly tell us about your educational background?

4  A.   So I graduated from high school in Ponca City Oklahoma in

5  1973.  From college, Harvard college in 1977, and Virginia Law

6  School in 1980.

7  Q.   So leads to my next question.  So what do you do for a

8  living?

9  A.   I'm an attorney.

10  Q.   Where do you work?

11  A.   I work at Skadden, Arps. I'm a partner.

12  Q.   How long have you been a partner at Skadden, Arps?

13  A.   I joined Skadden on July 1, 2010.

14  Q.   So just over nine years now?

15  A.   Just over nine.

16  Q.   All right, what is your practice area there?

17  A.   My practice area is representing people under government

18  investigation.  Principally in health care arena, but not only

19  in the health care arena.

20  Q.   Prior to becoming a partner in Skadden in July of 2010,

21  what did you do before that?

22  A.   For 24 and a half years I was an Assistant U.S. Attorney

23  in the U.S. Attorneys office in Boston.  I started off in the

24  what's called the general crimes group, doing your basic

25  federal crimes, bank robberies and the like.  Then I was in the

1  terrorism group, public corruption group, economic crimes

2  group.  I started the health care group, then got promoted to

3  head of all white collar, then I became first Assistant, then I

4  was Acting U.S. Attorney in 2009 between the administrations.

5          THE COURT:  Excuse me one second Mr. Loucks.  You're

6  sitting back which is what the chair invites you to do.

7          THE WITNESS:  It does.

8          THE COURT:  But the microphone does not and there are

9  a number of people that cannot quite hear you if you're not

10 speaking into the mic.

11         THE WITNESS:  Sorry.

12         THE COURT:  Thank you.

13 BY MR. CAMPOAMOR-SANCHEZ:

14 Q.  When you said you were acting U.S. Attorney, what does

15 that me?

16 A.  I was in charge of the U.S. Attorneys office in Boston,

17 there were a 130 prosecutors.  The U.S. Attorneys office has a

18 civil case and a criminal case.  The U.S. Attorney has the

19 power within some restrictions to make all charging decisions

20 for crimes that occur in Massachusetts.  So I was in charge of

21 the office from roughly April through November.

22 Q.  Mr. Loucks, let me now direct your attention to the early

23 part of 2012, okay.  Obviously you were working at Skadden

24 then?

25 A.  I was.

1  Q.   Did you become part of a team representing the government

2  of Ukraine at or around that time?

3  A.   I did.

4  Q.   Can you please tell the ladies and gentlemen of the jury,

5  the first thing you remember as to how you got involved in that

6  project?

7  A.   So the first thing I remember is I was sitting in an

8  airport.  I think it was LaGuardia.  I was waiting to catch a

9  plane I think to Puerto Rico.  I had a case in Puerto Rico at

10 the time.  Up popped on my phone a travel email with a ticket

11 for me to go to the Ukraine that day.

12     I had had a previous email exchange with Mr. Craig about

13 working with him on a matter in Europe.  I don't remember him

14 ever having told me before I saw the email about the plane

15 ticket to the Ukraine, but that's my first memory of I have a

16 project in the Ukraine.

17 Q.   So literally you got a ticket notification on your email

18 that you're going to Ukraine?

19 A.   Yes, I was sitting in the airport about to board a flight

20 to Puerto Rico.

21 Q.   Did you try to investigate what this email alert was all

22 about?

23 A.   Yes, I did.

24 Q.   What did you do?

25 A.   I don't remember whether it was before I got on the plane

1   or after I got off the plane.  But I had a conversation with

2   Mr. Craig.  He explained to me what the engagement was, that it

3   was in the Ukraine.  That it involved evaluating the past, that

4   country's prosecution of the past Prime Minister by the name of

5   Yulia Tymoshenko.  We'd been retained to do an independent

6   evaluation of whether the prosecution was comported with due

7   process standards and was fair.

8   Q.   Had you worked with Mr. Craig previous to this time in

9   2012?

10  A.   I think we had.  I think we'd worked on another matter for

11  another client who was facing federal charges.

12  Q.   Sir, so at that point you had known Mr. Craig

13  approximately how long?

14  A.   So he joined Skadden in March of 2010 and I joined in July

15  of 2010.  And I don't know whether we met before -- Skadden has

16  a partner meeting every April, and I think we met for the first

17  time at the partner meeting in April of 2011.

18  Q.   Sir, the person that you know as Mr. Craig do you see him

19  in the courtroom today?

20  A.   I do.  He's sitting there with white hair, glasses, at the

21  end of the defense table.

22        THE COURT:  Let the record reflect that the witness

23  has identified the defendant.

24        MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

25  BY MR. CAMPOAMOR-SANCHEZ:

1   Q.   You were just telling us about the conversation you had

2   with Mr. Craig about what the report entail.  When you say you

3   were tasked with creating an independent report, what does that

4   mean?

5   A.   Well, whenever you do an investigation you have a goal.

6   You have an issue that you're investigating; whether it's did

7   somebody steal money, did somebody rob a bank, was somebody

8   fairly prosecuted.  You figure out the landscape of potential

9   witnesses.  You figure out who might know something about it.

10  And then you make up that list and then you go start

11  interviewing the people.

12      You collect all of the documents you can, but the documents

13  don't tell the whole story.  You have to talk to people.

14  Q.   So primarily you're trying to gather the facts by either

15  talking to people or collecting documents or both?

16  A.   Yes, much like I have been doing throughout my entire

17  career.

18  Q.   As a prosecutor?

19  A.   As a prosecutor and then as a defense counsel.

20  Q.   What was your understanding as to why a report would be

21  necessary about the trial of that former Prime Minister

22  Ms. Tymoshenko?

23  A.   So I don't know if I know at the outset that was there was

24  going to be a report.  It was pretty clear to me pretty quickly

25  that there was going to be a report.  There was a lot of press

1   at the time in Europe and in particular, but some in the United

2   States about the prosecution of Yulia Tymoshenko, whether it

3   was fair or not.  At the time when I started working in the

4   engagement, Europe's EuroCup for soccer championship was

5   scheduled to be in Ukraine in late June or early July.  There

6   were charges pending against her already on a second matter.

7        So we were being asked to look at the first matter.  And I

8   always expected that we could provide the advice in one of two

9   ways on whether it was fair or not orally to the client or in

10  writing.  I always expected that there would be a writing.

11  Q.   To your knowledge was Ms. Tymoshenko's support as using

12  the press, the negative press that was going on against the

13  then current government in Ukraine?

14  A.   It seemed like it was the lead story in the news every

15  time I was over there, whether it was -- she had a pending

16  petition before the European Commission on Human Rights.  There

17  was an issue with her custody in which she alleged she got hurt

18  while being transported.  That occurred I think in between my

19  first trip and on the eve of my second trip to the Ukraine.  So

20  I think by the time I arrived on the second trip in the Ukraine

21  it was the lead story on the English speaking stations that

22  were available at the hotel in Kyiv and there was the internet

23  and it was on the BBC and other news stories as well.

24  Q.   Let me ask you who did you understand the client to be for

25  this project?

1  A.    Ministry of Justice.

2  Q.    Of Ukraine?

3  A.    Of the Ukraine.

4  Q.    Was a man by the maim of Paul Manafort involved in this

5  project?

6  A.    I never met him.  I saw -- at one point in time Mr. Craig

7  circulated a memo written by Mr. Manafort about how to, what to

8  ask and how to do an investigation concerning the injuries that

9  Ms. Tymoshenko allegedly suffered while being transported.

10  Q.    We're going to get to that, but let me ask you this.  Do

11  you understand, so you did not meet him personally?

12  A.    Never.

13  Q.    Did you understand him to have some kind of role in this

14  project?

15  A.    Yes.

16  Q.    What was your understanding about that?

17  A.    I don't remember whether this comes from just working on

18  the matter or from comments Mr. Craig made.  But it was my

19  understanding that he was the point of introduction for the

20  engagement.

21      Whether he was the principal; in other words, whether he

22  had the direct contact with the Ministry of Justice or whether

23  he went through somebody else that I don't know.

24  Q.    Okay.

25  A.    But he had a relationship with the Ministry of Justice

1  that was apparent in the emails that I saw and in his

2  forwarding of that report that he had -- I don't know what the

3  best way describing is, but he had influence with the Ministry

4  of Justice.

5  Q.   In addition to having influence, do you know if he

6  facilitated meetings, that meetings could take place or

7  anything like that?

8  A.   I believe so.

9  Q.   You don't recall specifically?

10  A.   I don't recall specifically.

11  Q.   And sir, did you know who was actually paying for

12  Skadden's work on the project?

13  A.   I did not.

14  Q.   Did you ask?

15  A.   I did not.

16  Q.   Was that something of concern to you at that point?

17  A.   No, when you work in a big law firm and when you do my

18  area, which is representing people under government

19  investigation.  You very often -- it's somebody else's client

20  who comes under investigation and they reach out to me saying I

21  need some help.  I don't ever ask that partner regardless of

22  who the client is, have they paid us?  Are they paying us?

23  Who's paying us?  I do know from the processes at Skadden that

24  nothing happens without there being an engagement and an

25  engagement letter.  And when a partner calls you up and says

1  can you help?  The culture at Skadden is you say yes and you

2  help.

3  Q.   Understood.  So what was your role suppose to be for the

4  project?  What function were you going to serve?

5  A.   So in the beginning I was I would say my principal role

6  was interviewing people who were involved in the prosecution,

7  the past prosecution of Yulia Tymoshenko, including the

8  prosecutors, the judge, the Prime Minister of Ukraine, the past

9  Prime Minister of Ukraine, numerous other various witnesses.

10  But within a week or so after the start of the project,

11  Mr. Craig told me about a second project.  And my role

12  continued to be to collect evidence on the issues for the first

13  project was the past prosecution fair, but then I became the

14  leader on the second project.

15  Q.   And for the first project did you help to lead and conduct

16  interviews?

17  A.   Yes.

18  Q.   What was your role then for the second project?

19  A.   So the second project concerned ongoing or pending

20  prosecution of Yulia Tymoshenko.  The government of Ukraine had

21  charged her with, as I recall, value added tax violations.  And

22  so my role in that was along with another member or two of the

23  team was to give them essentially due process advice on how to

24  conduct the trial if they were going do the trial in a fair

25  fashion; designed to make it fair for the defense to defend the

1  charges.  And so we met with Ukrainian prosecutors at least

2  five times.  Five different days I think.  All day long

3  meetings.  We asked them for their evidence.  We reviewed the

4  evidence.  We saw issues.  We raised issues.  Ultimately gave

5  them a request for information and then made some

6  recommendations.

7  Q.  We're going to get -- let me ask you did that become known

8  as project two?

9  A.   Yes.

10  Q.  So we're going to go back to project two in a second.  But

11  let me go back for a minute.  First of all, how many times did

12  you travel to Ukraine?

13  A.   So I was there five different times.  On one of the weeks

14  I was there I left Kyiv to go give a speech in Budapest then I

15  flew back.

16  Q.  So would it be fair to say you became familiar with where

17  Ukraine is in terms of Eastern Europe?

18  A.   Yes, it's a long way from Boston.

19  Q.  A long way from Boston.

20     Let me show you Jury Exhibit 676.  You should have it on

21  hopefully also on your screen in addition to the binder that I

22  put in front of you.

23         THE DEPUTY CLERK:  This is already in?

24         MR. CAMPOAMOR-SANCHEZ:  Yes.  I'm sorry, Your Honor,

25  this exhibit is already in as a demonstrative.

```
 1              THE COURT:  You can use it.

 2              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

 3  BY MR. CAMPOAMOR-SANCHEZ:

 4  Q.   Do you recognize this map?

 5  A.   I do.

 6  Q.   Does it is indeed show the location of Lou u Ukraine

 7  vis-a-vis sort of the rest of Europe?

 8  A.   Yes, it does.

 9  Q.   Sir, where did you spend your time when you were in

10  Ukraine?

11  A.   Only in Kyiv.

12  Q.   Is that the capital of Ukraine?

13  A.   Yes.

14  Q.   Is that depicted on the map?

15  A.   Yes, it's right in the middle with the red dot.

16  Q.   And similarly another demonstrative that we have is 678.

17  Does that show more specifically just Central Eastern Europe

18  and Ukraine's location of that area of the world?

19  A.   Yes.

20  Q.   All right, thank you.

21       What I would like to do next is have you describe who the

22  members of the team were, but to help us do that I want to show

23  you some photographs and if they were members of the team have

24  you describe who they were and what were they responsible for

25  in either Project One or Project Two?
```

1   A.    Okay.

2   Q.    If we could first take a look at 651 again for

3   demonstrative purposes.   Sir, do you recognize that?

4   A.    Yes, that's a picture of Mr. Craig.

5   Q.    What was his role in this project?

6   A.    He was the leader.

7   Q.    He was in charge of it?

8   A.    Yes.

9   Q.    And what does that mean in terms of this project in

10  particular to have been in charge of it.

11  A.    Well, he would set the agenda.   He would have the

12  principal contacts with the client.   He would at any time in

13  one of these kinds of things when you're doing an

14  investigation, issues arise whether you want to do this or do

15  that, he would make the decision which course to take.

16        If we if there was a -- we had discussions about who to be

17  interviewed, ultimately it was his call.   It was a

18  collaborative decision making process, but ultimately he was in

19  charge.

20  Q.    Would you look at 652.   Do you recognize that photograph?

21  A.    I do, that's a picture of Cliff Sloan.

22  Q.    Who was Mr. Sloan?

23  A.    Mr. Sloan was a partner at Skadden until recently.   I

24  think he retired this summer.

25  Q.    What was Mr. Sloan's role in this project?

1  A.   So he was working on it and was already working on it when

2  Mr. Craig reached out to me.  He and I did not ever overlap in

3  the Ukraine.  So he did not participate in any witness

4  interviews with me.  Mr. Craig and I were there several times

5  together.

6       It was my impression that Mr. Sloan who is a very smart

7  guy was in part on the project because of that because of his

8  appellate work in the United States.  And I assume, but I don't

9  know, that he was on the project as well to work on the report.

10 Q.   To actually help write it?

11 A.   Yes, but I don't know that.

12 Q.   I'm sorry?

13 A.   I don't know that for sure.

14 Q.   You don't know that for sure, that was your assumption?

15 A.   Yes.

16 Q.   But you do know he was part of the project?

17 A.   He was.

18 Q.   653 see if you can you recognize this one?

19 A.   That's me.

20 Q.   Can you describe your role?

21 A.   Two years ago.

22 Q.   654?

23 A.   That's a picture of Matthew Cowie.

24 Q.   Who is Mr. Cowie?

25 A.   He was a, we call it counsel.  It he was a counsel in our

1    London office.  I had met Mr. Cowie before meeting him in

2    Ukraine the first trip over.  He had previously been a

3    prosecutor in the British I think serious frauds office I think

4    they call it.  And his role was to assist Mr. Craig and me

5    doing the interviews.

6    Q.   Did Mr. Cowie have a role in both Project One and Project

7    Two?

8    A.   His role in Project One was like mine.  I don't know -- I

9    did not play any role in the drafting of the report ultimately.

10   And I don't know whether Matthew Cowie played a role in the

11   drafting report, but he worked on project two with me and

12   attended all of the meetings with the Ukrainian prosecutors

13   that we had.

14   Q.   Would it be fair to say that Mr. Cowie was working with

15   you on project two?

16   A.   Yes.

17   Q.   We'll get into describe it a little more later, but let's

18   look at 655.  Do you recognize 655?

19   A.   Yes, that's a picture of Alex Van Der Zwaan.  He was an

20   associate in the London office.  He spoke fluent Ukrainian.  I

21   don't remember, he might have spoken Russian as well.  He was

22   the principal point of contact with the client because he spoke

23   the language.  And he would set up all of the meetings.  He

24   would be a go between at meetings when there was a language

25   barrier.  We sometimes had translators as well, but Alex was

1   very fluent in Ukrainian and served the role in part as both go

2   between and scheduler and logistic person.  He attended I think

3   every interview I conducted he was present.

4   Q.   Was Mr. Van Der Zwaan also helping out with project two?

5   A.   Yes, well I think his principal role with helping with

6   project two was setting up the meetings.  I don't remember him

7   being present at all of the meetings.

8   Q.   But he helped to set them up?

9   A.   Yes.

10  Q.   He certainly was part of Project One?

11  A.   Yes.

12  Q.   And finally 656.  Do you recognize this photo?

13  A.   He was a young associate.  I don't remember when I first

14  met him.  I don't believe he was in the Ukraine when I was

15  there.  He might have been on one of the trips.  It's Alex

16  Haskell.  He was in the Washington D.C. office.

17  Q.   What was his role as you understood it?

18  A.   He was either first or second year associate.  He did a

19  lot of research.  He did principally a lot of research.

20  Q.   So let me come back to project two.  When do you recall

21  sort of project two becoming something you were aware of that

22  you were going to also be responsible for?

23  A.   I think on the second trip there.

24  Q.   Do you recall approximately when the second trip was?

25  A.   April 16ish of 2012.

1    Q.   Sometime around mid April, 2012?

2    A.   Yes.

3    Q.   Okay.  You already described what you were suppose to do

4    for that and you in fact met with prosecutors a number of

5    times?

6    A.   Yes.

7    Q.   And did Mr. Cowie meet with them as well?

8    A.   Yes.

9    Q.   Were for example draft strategy documents sort of proposed

10   or provided to the Ukraine prosecutors?

11            MS. JUNGHANS:  Objection leading.

12            THE COURT:  Let's finish the question, then we'll

13   see.  Go ahead.

14            MR. CAMPOAMOR-SANCHEZ:  I think that was the end of

15   the question.

16            THE COURT:  I thought you said where those -- you

17   were saying were they?

18            MR. CAMPOAMOR-SANCHEZ:  Yeah, were documents, things

19   like that provided to the prosecutors?

20            THE COURT:  All right, overruled.

21            THE WITNESS:  Yes.

22   BY MR. CAMPOAMOR-SANCHEZ:

23   Q.   Can you describe what kind of things were being provided?

24   A.   So after a discussion with Mr. Craig, we prepared a memo

25   after I think it was after the first or second meeting we had

1   with the prosecutors on issues that we saw with the first

2   prosecution that we wanted to make sure didn't happen in the

3   second prosecution.  Then we also asked for -- we had them do a

4   presentation to us.  They had charts.

5       We had interpreters so we could understand what they were

6   saying, but they had charts that described the flow of money

7   and what taxes were evaded by Yulia Tymoshenko's company and

8   then we walked through with them the proof that they had or

9   didn't have with respect to some of the elements of the pending

10  case.  We wrote a memo recommending that they take, they do

11  certain things.  Among other things we recommended that they

12  put off the prosecution by at least a month.

13      I think when we wrote that memo, Ms. Tymoshenko was in the

14  middle of the issues of her injury from her transportation and

15  there was a battle going on between whether she would be

16  examined by Ukrainian doctors or German doctors and so one of

17  the recommendations we made was that they postpone the trial.

18  We recommended that they set up a room in the courthouse for

19  the defense team to use so that the defense team had a secure

20  and close place to be able to prepare.

21      We recommended that they have a jury.  I can't remember the

22  other specific recommendations.

23  Q.  Putting aside the specific recommendations for a second. I

24  think you mentioned that you sort of looked at trial one to

25  inform about trial two.  Why were you doing that?

A.    Well I'm not a Ukrainian lawyer and I didn't go to
Ukrainian law school.  As a part of this assignment, I read
their constitution and their criminal statutes.  But to
understand what were the issues with the first prosecution and
to make a recommendation, essentially don't make those mistakes
or don't do that again whether it's a mistake or not, I had to
know what happened in the first prosecution.

Q.    Obviously you've identified how you were focused on the
due process issues to help the Ukraine in that regard.  Was
better public relations part of that sort of project or concern
in terms of helping with the due process part?

A.    I think it's, you can't separate it.  There was so much
bad press or negative press going on with the first prosecution
while we were there and they were ongoing with the second
prosecution that there's no way that they couldn't expect that
there was going to be an intense spotlight on the second case.

      I don't remember ever seeing or being aware of her first
prosecution, but because I was there I was acutely aware of all
of the articles, the newspaper stories, the TV stories about
what happened in the first prosecution and about the ongoing
prosecution that clearly dealing with the public relations
aspect was going to be important for the government of Ukraine.

Q.    So you understood that Ukraine need public relations
advice as part of this engagement that you were involved with?

        MS. JUNGHANS:  Objection, leading.

1          THE COURT:  Sustained.  You don't need to summarize

2   what he says.  If he has said it, then you can ask your next

3   question.  It if you have a further question you can ask a more

4   open ended question.  That one was a little leading.

5          MR. CAMPOAMOR-SANCHEZ:  Very well.  I will rephrase,

6   Your Honor.

7   BY MR. CAMPOAMOR-SANCHEZ:

8   Q.   Why was it that you thought that these two issues were so

9   intertwined?

10  A.   Well part of our prosecution is to try to achieve

11  deterrent effect if your prosecution is tainted, lacks due

12  process, is being effectively criticized in the media you're

13  not achieving one of the goals of a prosecution.

14         So we were also -- Project One was designed to do an

15  independent evaluation of the past prosecution.  There was

16  ultimately at some point going to be media regarding that

17  because there was going to be an opinion or a review of what

18  happened in the past.  And then I never, I was not a part of

19  the drafting of the report.  But there was going to be some

20  review of it and that was going to get press.

21  Q.   Let me ask you in your experience is it unusual for a

22  client and many of the things that you do unusual for them to

23  need PR advice in addition to whatever legal counsel you're

24  providing?

25  A.   So in my world with, in the world of representing people

1   under government investigation, people are concerned what

2   happens if they are if charges are brought against the company

3   or a charge is brought against individuals.  How that plays out

4   in the press; how that impacts business; how that impacts

5   political relations.  That doesn't mean that I will advise them

6   on -- well I'm often asked to draft press releases for clients.

7   I'm asked to do proposed Q and A in the event of an

8   announcement of a government settlement with the client.  I'm

9   sometimes asked to give advice to a client on what to say to

10  employees about a case.

11      So in the world of government investigations where a

12  government can choose to prosecute someone or a company or a

13  company may reach a settlement with the government because of

14  past conduct, it's often a part of it dealing with the fallout.

15  Q.   Let me ask you in this case to you knowledge did Ukraine

16  actually seek or ask for PR advice from Skadden as part of this

17  engagement?

18  A.   So during the period of the time when Ms. Tymoshenko was

19  raising allegations about her being hurt during transportation,

20  and during the period of I would say pretty intense media

21  scrutiny, my recollection is at least one of the European

22  leaders had announced, I think it was the leader of Germany she

23  was not going to attend the EuroCup because of the issues

24  surrounding the Yulia Tymoshenko that there were discussions

25  among the team members.  I don't know whether it started  with

1  Ukraine or not.  My memory is that there were discussions among

2  the team members about the Ukraine needing help.

3  Q.   All right, you do remember as part of that the team

4  discussing that issue?

5  A.   Yes.

6         MR. CAMPOAMOR-SANCHEZ:  Your Honor, I think it's

7  already in evidence number 68, but before I present the first

8  email with the Court's permission could I just read one of the

9  brief stipulations we have about the timing of e-mails?

10        THE COURT:  The timing of emails, of anticipated

11  emails?

12        MR. CAMPOAMOR-SANCHEZ:  Yes, so have reached a

13  stipulation.

14        THE COURT:  Yes, you can read a stipulation.

15     A stipulation is something that both sides have agreed to

16  as a fact and, therefore, you can receive it in evidence and

17  consider it as evidence in the case.

18        MR. CAMPOAMOR-SANCHEZ:  It's very brief, thank you

19  Your Honor.

20     The parties stipulate to the following facts:  Many

21  exhibits presented at this trial are emails.  Due to the manner

22  in which the emails were processed, in emails bearing an SAU

23  document number at the bottom right hand corner, the email that

24  appears at the top of the email on the first chain, on an email

25  chain, i.e. the top part of the first page of an email exhibit

1   will include a time stamp that unless specifically marked

2   either EST or ETD is actually five hours later than the actual

3   time was in D.C.  Except for some brief periods of times which

4   part of the stipulation which are and I should say when the

5   time stamp will be four hours later instead of five.  Those

6   periods are March 11 thru 24th, 2012 that would be four hours

7   instead of five.  October 28th thru November 3rd, 2012; again

8   four hours instead of five.  March 10 thru 30th, 2013, four

9   hours instead of five and October 27, November 2nd, thru

10  November 2nd of 2013 also four hours instead of five.  Thank

11  you, Your Honor.

12              THE COURT:  All right.

13              MR. CAMPOAMOR-SANCHEZ:  So we can have first Exhibit

14  number 68.

15              THE DEPUTY CLERK:  Previously admitted?

16              MR. CAMPOAMOR-SANCHEZ:  Yes, it's previously

17  admitted, Your Honor, I believe.

18              THE COURT:  Yes.

19  BY MR. CAMPOAMOR-SANCHEZ:

20  Q.   If we can place, Ms. Rohde, zero in first on the bottom

21  email.  Sir, are you copied on this email from April 16th,

22  2012?

23  A.   I am.

24              THE COURT:  Can you get rid of the little

25  highlighting.  Thank you.

```
1                    MR. CAMPOAMOR-SANCHEZ:  Yes.

2                    THE WITNESS:  Thank you.

3    BY MR. CAMPOAMOR-SANCHEZ:

4    Q.   Sir, you were -- let me ask you this, you were copied on

5    this email?

6    A.   Yes.

7    Q.   That was Mr. Van Der Zwaan sending it to the team?

8    A.   Yes.

9    Q.   The email reads starting on the second sentence, I am

10   mindful that the client's view one of the aims of both project

11   1 and 2 as improved PR on the issue of Ukraine's conduct in

12   relation to Yulia Tymoshenko and her trial.

13      Does this actually refresh your memory that in fact this

14   issue of PR was important for both Project One and Two?

15   A.   Yes, I mean we were only there because there was a lot of

16   bad press about it.

17   Q.   That's why you were there in the first place?

18   A.   Right.

19   Q.   Okay.  And do you understand that that was as part of both

20   projects that was at issue that the client was concerned about?

21                   MS. JUNGHANS:  Objection, leading and repetitive.

22                   THE COURT:  All right, I think you have to try to

23   keep your questions more open ended.  You are tending to repeat

24   his testimony and it is direct.

25                   MR. CAMPOAMOR-SANCHEZ:  I will, I will try to do that
```

1   Your Honor, thank you.

2   BY MR. CAMPOAMOR-SANCHEZ:

3   Q.   All right, so why don't we look at Government Exhibit 100.

4            MS. JUNGHANS:   Objection, before you do that.   Can

5   you shut that down please.   Your Honor, I believe this is one

6   the Court has reserved.

7   BY MR. CAMPOAMOR-SANCHEZ:

8   Q.   All right, can you take a look at Government's Exhibit

9   100.   Which would be on your --

10  A.   I see it.

11  Q.   Okay, and sir were you copied on this email?

12  A.   Yes.

13  Q.   Is the email dated April 26 of 2012?

14  A.   Yes.

15  Q.   Does it in fact also relate to the PR issues we've been

16  discussing?

17  A.   Yes.

18           MR. CAMPOAMOR-SANCHEZ:   Your Honor, we would ask to

19  Government's Exhibit 100.

20           MS. JUNGHANS:   The objection is to the portion of it,

21  the lower portion which is hearsay.

22           THE COURT:   Do you have a copy you can hand me?   I'm

23  not seeing it with all of these exhibits in front of me at this

24  point.

25           All right, the exhibit will be admitted.   This witness

 1   is here, can talk about can be examined about anything that he

 2   wrote in the lower email.

 3        The exhibit will be admitted, the entire email that PC is

 4   the author of the lower email and he can answer any questions

 5   about it, so it will be admitted.

 6             MS. JUNGHANS:  No, Your Honor, he's not the author.

 7             THE COURT:  I'm sorry, you're correct.

 8        I don't see that it's about -- there's a matter being

 9   asserted the truth of which is an issue. I think the fact that

10   this email was sent and how it was reacted to and so therefore

11   I'll admit it.  But I'm admitting it solely for the fact that

12   it was said and you'll hear this from me sometimes with respect

13   to other emails.  Not because something someone said in the

14   lower email was true, but just the fact that they sent the

15   email to the people who are named and then what happened

16   thereafter, all right.

17             MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.  Can

18   we publish now 100?

19             THE COURT:  Yes.

20        (Government's Exhibit No. 100 received into evidence.)

21   BY MR. CAMPOAMOR-SANCHEZ:

22   Q.   Let's start at the bottom part of the email.  Did you and

23   other members of the team receive this email from Mr. Cowie?

24   A.   Yes.

25   Q.   And as we can read here it was inquiring about the PR

1   issue on April 19th?

2   A.   Yes, right.

3   Q.   Can you explain to us what is the issue that was going on

4   at this time that Mr. Cowie is making reference to, if you

5   know?

6   A.   So this is at the end of the first week where I'm there

7   with Matthew.   I don't believe Mr. Craig was there the first

8   week I was there.   And the press was, there was a lot of it.

9   We come back from interviewing people all day long and we turn

10  on the TV.   Basically there were two or three stations in

11  English, one was BBC, broadcasting it's like CBS but a Ukraine

12  one.   There was another one I think CNN Worldwide.   The

13  European CNN and BBC would have articles about what was going

14  on with Yulia Tymoshenko and her custody and her European

15  Commission on Human Rights challenge.

16     I remember Matthew had times expressing concerns about if

17  they're going to deal with this PR, they have to do something

18  about it.

19            MS. JUNGHANS:   Excuse me, objection.

20            THE COURT:   All right, I think he's saying what he

21  said.   Again he can say what he said to him in the event that

22  prompted him to do something.   He's trying to explain the

23  context of this email, all right.   I think you may have been

24  interrupted there.

25            So you were asked -- you said there were many articles and

1  then what were you all doing as a result of that?  What was the

2  issue at that time that prompted this email?

3           THE WITNESS:  Your Honor, I think this was before the

4  injuries she allegedly sustained in transport.  So I think the

5  articles were just articles about the past prosecution at this

6  point.

7  BY MR. CAMPOAMOR-SANCHEZ:

8  Q.   Was the team doing something about those articles at or

9  around this time?

10 A.   Well Matthew was recommending that we get started with

11 helping them on their PR.  He expressed --

12          THE COURT:  All right, that's just what he was

13 recommending.  Next question.

14 BY MR. CAMPOAMOR-SANCHEZ:

15 Q.   Did Mr. Craig respond to that suggestion by Mr. Cowie?

16 A.   Well he responded by email.  It's the email right above.

17 Q.   The middle email?

18 A.   Again, I don't think he was physically in the Ukraine at

19 this point.

20 Q.   So when we read I talked to Pshonka about this very

21 subject at the end of the day today.  Who is Mr. Pshonka?

22 A.   He was the Attorney General for Ukraine.

23 Q.   So he's the Attorney General for Ukraine?

24 A.   Yes.

25 Q.   So you don't know whether he was; for example, in Ukraine

1   could do it personally or by phone?

2   A.   I don't know.

3   Q.   Did you know if there was a decision reached between

4   Ukraine and Skadden specifically Mr. Craig as to whether PR

5   would in fact would be part of the help?

6   A.   Not at this point.  I think that was a couple of weeks

7   later.

8   Q.   That was later on?

9   A.   Yes.

10  Q.   Thank you, you can take that down.

11      Let me ask you, did Mr. Craig ask you to review materials

12  and make suggestions to sort of improve Ukraine's PR regarding

13  the injuries that Ms. Tymoshenko had alleged that I believe you

14  made reference to?

15              MS. JUNGHANS:  Objection leading.

16              THE COURT:  I think he's setting up the next set of

17  questions.

18      Were you asked to review documents related to that issue?

19              THE WITNESS:  So I was asked to review a memo by Paul

20  Manafort whether it was precisely on that issue, Your Honor,

21  I'm not sure.

22              THE COURT:  All right.

23  BY MR. CAMPOAMOR-SANCHEZ:

24  Q.   Let's look at the document, it's 109.

25              THE DEPUTY CLERK:  Previously admitted as well?

```
 1                 MR. CAMPOAMOR-SANCHEZ:  Yes.

 2                 THE DEPUTY CLERK:  Thank you.

 3                 THE WITNESS:  I see it.

 4     BY MR. CAMPOAMOR-SANCHEZ:

 5     Q.    Is this the email you were referring to?

 6     A.    Yes.

 7     Q.    Can you zoom in please.  Here's an email from Mr. Craig to

 8     you and others?

 9     A.    Yes.

10     Q.    Now it's making reference to an attachment memorandum from

11     Paul Manafort?

12     A.    Yes.

13     Q.    To be clear and you can look at, you have I believe the

14     document in front of you. This memo is not about the Skadden

15     report?

16     A.    That's right.  This is about her injury and doing -- Mr.

17     Manafort was proposing steps for how to do, conduct an

18     investigation about how she got injured or not while being,

19     while in prison custody.

20     Q.    What was Mr. Craig asking you to do as a result of that

21     memo that Mr. Manafort had sent?

22     A.    Well I think much like he says, I was one of the two

23     prosecutors on the team.  I had been involved in this kind of

24     stuff for 24 plus years as a prosecutor.  He was asking me to

25     take a look at this memo written by Mr. Manafort to evaluate a
```

1    specific way to do it.  As he writes, is there a better way to

2    do it?  Is there something else that should be done?

3    Q.   If you know, is the email from Manafort, as stated in that

4    memo, related to the fact that this needed to be part of the

5    PR?

6            MS. JUNGHANS:  Objection, leading.

7            THE COURT:  Sustained.

8            MR. CAMPOAMOR-SANCHEZ:  I'll rephrase.

9    BY MR. CAMPOAMOR-SANCHEZ:

10   Q.   Do you know what the purpose was of taking the steps in

11   the memorandum that was attached to this email?

12   A.   Yes.

13   Q.   What was it?

14   A.   She alleged she got hurt.  There were questions about

15   whether that was true.  The Skadden group were not situated to

16   do an investigation of what happened in the prison.  Mr.

17   Manafort was per Mr. Craig's email proposing various steps on

18   how to handle this investigation and her injuries and the need

19   for an investigation to get to the bottom of it was very

20   prominent in the media.

21       It was like the lead story again as I've said a few times.

22   There were German doctors who flew in to evaluate her.  She was

23   making a claim, as I recall, and looking at her petition to the

24   European Commission on Human Rights that she couldn't trust

25   Ukrainian doctors.  So there was a lot of press about this.

1      Mr. Manafort was, as I read the memo, what I took away

2   from the memo was making recommendations on how to conduct an

3   investigation to get to the bottom of what happened so that the

4   government of Ukraine could then explain what happened.  You've

5   got to know what the facts are before you go talk to the press

6   about it.

7   Q.   When Mr. Craig asked you as one of two prosecutors what

8   steps might we recommend to ensure that the findings will be

9   viewed as credible and authoritative, what did you understand

10  that to mean?

11  A.   Well, I understood he is credible in the public opinion.

12  Q.   To your knowledge did this issue of Ms. Tymoshenko what

13  happened, the allegations that were being made have any

14  influence on whether a particular PR firm was hired or not in

15  this case.

16  A.   So after this there were recommendations made by Matthew

17  and others on the team of two PR firms.  I remember the name of

18  the one, I don't remember the name of the other.

19  Q.   In fact, if I can refer you now to 110.  This is a

20  response that original email from Mr. Craig; is that right?

21  A.   Yes.

22  Q.   What does Mr. Cowie make in reference to here in the

23  middle email, what is going on?

24  A.   Well, I think I mean my recollection is that he's

25  responding to the Manafort memo and also to figuring out who's

1  going to handle the PR.  Who's going to do the, make the

2  recommendations on the public relations to the government of

3  the Ukraine.  It's a complicated thing to do, if you decide

4  that there's a statement you can make to the press, do you

5  issue it in writing?  Do you hold a press conference?  If you

6  hold a press conference, do you take questions?  Do you not

7  take questions.  And the public relations firm is, that's their

8  expertise.

9  Q.   If you look at the top email, is there a response also

10 from Mr. Van Der Zwaan about what actions the team was taking

11 at that time?

12 A.   Yeah, he mentioned somebody Manafort's group, also someone

13 I never met.  And he references FTI and he also references

14 another company called Powerscourt.  I ultimately think I saw

15 both pictures by these two companies, but I don't think I had

16 seen them at this point.

17 Q.   When you say you saw both pictures, what does that mean?

18 A.   They presented something in writing as a way to get the

19 business.

20 Q.   Did Mr. Craig sort of advocate for one particular PR

21 company to be hired for the project?

22         MS. JUNGHANS:  Objection, leading.

23         THE COURT:  Did he have an opinion about one or the

24 other to be hired that was expressed.

25         THE WITNESS:  At some point he did yes.

1  Q    (By Mr. Campoamor-Sanchez) Which one was that?

2  A.   I believe it was FTI.

3  Q.   Your Honor, we can look at 113, which I also believe is in

4  evidence.

5       Can you look at the top email?

6  A.   I see it.

7  Q.   Is that an email from Mr. Craig to you and others on the

8  team?

9  A.   Yes.

10          MS. JUNGHANS:  Your Honor, may I have just a moment?

11          THE COURT:  Yes.

12          MS. JUNGHANS:  I believe this an exhibit on which you

13  had also reserved.

14          MR. CAMPOAMOR-SANCHEZ:  I believe it is an exhibit

15  that in another part of the chain was also admitted it could

16  come in, but did not have to come in at the same time.

17          THE COURT:  What number is it?

18          MR. CAMPOAMOR-SANCHEZ:  113, Your Honor.  It's part

19  of the Court's order I believe.

20          THE COURT:  I'm looking at the order.  It's not in

21  the list on page five where I said it's one of the ones I

22  reserved.  Where is it listed?

23          MR. CAMPOAMOR-SANCHEZ:  One moment, Your Honor.

24          THE COURT:  I think I had asked the parties for a new

25  exhibit list.

1          MR. CAMPOAMOR-SANCHEZ:  We did provide the Court with

2   a new exhibit list.  Our understanding is at the hearing on May

3   7th, we agreed to also introduce Government's 114, but we're

4   not required to introduce them at the same time as 113.

5          THE COURT:  All right, for completeness.  Part of

6   your agreement.

7          MR. CAMPOAMOR-SANCHEZ:  May we approach?

8          THE COURT:  Yes.  Maybe what we need to do is go on

9   and come back to this so we don't interrupt your presentation

10  for the witness discussion.

11          (Bench conference.)

12          MR. CAMPOAMOR-SANCHEZ:  What happened is the next

13  email 113 is a conversation just between Mr. Craig and Mr. Van

14  Der Zwaan.  When Mr. Van Der Zwaan expressing concerns as to

15  whether he can make those representations and Mr. Loucks says

16  it's not part of the conversation.  So he was never part of

17  that email.  So we agreed that we're happy to put -- but it

18  doesn't make sense to put it in.

19          THE COURT:  Is that their only objection?

20          MR. CAMPOAMOR-SANCHEZ:  Yes, that was the only

21  objection.

22          MS. JUNGHANS:  For purposes of this trial don't you

23  only have to stay which firm did Mr. Craig favor?

24          THE COURT:  Well, that's not the point.  The point is

25  the admissibility is the peacemaker and you said the only thing

1   that was the problem was you felt they wanted it to be

2   considered and submitted in its entirety by another exhibit

3   which will be admitted later.  So I'm going to let him proceed.

4   Okay, thank you.

5           MS. JUNGHANS:  Thank you, Your Honor.

6           (Open court.)

7           THE COURT:  All right, you can proceed.

8           MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

9       Can we put 113 up?

10  BY MR. CAMPOAMOR-SANCHEZ:

11  Q.   I think I was asking you is this an email that Mr. Craig

12  sent to you and other members of the team related to FTI?

13  A.   Yes.

14  Q.   Sir, do you know why it was that Mr. Craig was sending

15  that email to the team at that point?

16          MS. JUNGHANS:  Objection.

17  A.   I do know or I think I know.

18          THE COURT:  What was --

19          MR. CAMPOAMOR-SANCHEZ:  I'm trying to streamline

20  this.  The email below shows Mr. Van Der Zwaan's communication

21  which leads to this response from Mr. Craig.

22          THE COURT:  All right, so in response to a

23  communication from Mr. Van Der Zwaan, did you receive this

24  email?

25          THE WITNESS:  Yes.

```
 1              THE COURT:  All right, so let's talk about what the

 2   email says.

 3              MR. CAMPOAMOR-SANCHEZ:  Okay.

 4   BY MR. CAMPOAMOR-SANCHEZ:

 5   Q.   So what does Mr. Craig say here on point one where he says

 6   as talking points, we have spent some time trying to find a PR

 7   firm that we can recommend to him with confidence that they

 8   will beat us in the battle.  Who is he talking about to make

 9   that pitch or the talking point to?

10   A.   By this point I think he's talking about FTI.  By this

11   point we had evaluated written presentations from two

12   companies.  I had recommended a third to look at, but there

13   wasn't apparently time to do that.  And I think Matthew knew

14   the FTI person pretty well.

15        On one of my trips there I met briefly the leader from

16   FTI.  And Alex had just in the previous email told the team

17   that he was meeting with the attorney general on public

18   relations the next day, and these are the talking points that

19   Mr. Craig wanted Alex to cover.

20   Q.   To cover with whom?

21   A.   The attorney general of --

22   Q.   Ukraine?

23   A.   Of Ukraine.

24   Q.   I'll come back to those if we can zoom out for a second.

25   You're referring to an e-mail just below this one?
```

1  A.   Yes.

2  Q.   Can we expand that?  Is that what you were referring to?

3  A.   Yes, Alex wrote FYI, meeting Pshonka re PR tomorrow at

4  3ish.

5  Q.   He's asking and it reads let me know if there are any

6  specific points you would like me to cover with him and then

7  Mr. Craig responds?

8  A.   Yes.

9  Q.   You can look back at the top of the email?

10 A.   Yes.

11 Q.   Mr. Craig also says at the bottom speed is absolutely

12 vital.  Ukraine is taking a public relations hit every day in

13 the Western Publication and there's been no effective response.

14 The damage may be irreversible.  We have to move very quickly.

15 What was that related to?

16 A.   That relates precisely to what I've been saying which is

17 that there was a lot of press every day that it was nearly all

18 negative.  It was concerning the existing, the current, pending

19 prosecution the value added tax prosecution.

20      And her injuries while being transported and there was a

21 perception at least certainly on my part and I expressed it

22 that if we're there to give them an independent evaluation of

23 the past prosecution, it may be moot whatever we said if

24 they're getting such bad public relations about everything else

25 that's going on, it may not matter at the end of the day what

1    our report says.

2    Q.   All right, and let me ask you when Mr. Craig said we have

3    concluded that FTI and Jonathan Hawker are the best we can do.

4    And we're willing to state the success of our coming project on

5    FTI's competence and his diligence and his hard work.

6         What did you understand to mean the success of our common

7    project?

8              MS. JUNGHANS:   Objection.

9              THE COURT:   What did he understand?   He's the

10   recipient of this email, so how did he understand it?   You

11   can't say what Mr. Craig said, but you received it, what did it

12   mean to you?

13             THE WITNESS:   What it meant to me is the project we

14   were working on which is the investigation of what happened in

15   the past.   I don't think I construed this as also covering

16   project two at that point.   I think I construed this as just

17   the evaluation of the past prosecution.

18   BY MR. CAMPOAMOR-SANCHEZ:

19   Q.   That being the Skadden report?

20   A.   Yes.

21   Q.   Let me ask you specifically do you have or do you remember

22   any discussions that you had with Mr. Craig about whether there

23   was a need to register under the Foreign Agents Registration

24   Act or not?

25   A.   Very early on it was either the first conversation I had

1   with Mr. Craig or a second one, the issue.

2           THE COURT:  Sir, can you lean up?

3           THE WITNESS:  Sorry.

4       Either the very first conversation or a second

5   conversation I had with Mr. Craig the topic of the Foreign

6   Agent Registration Act came up.

7       I knew about that law from my days as a federal

8   prosecutor.  I had never had a case under that law, but there's

9   an approvals table and if a U.S. Attorney wants to bring a

10  prosecution you're suppose to certain types of prosecution you

11  need attorney general permission to do them.  In other words,

12  the U.S. Attorney of Massachusetts can't do it on his or her

13  own accord.  You have to get permission from the Attorney

14  General in Washington.

15      I was looking at the approval's list in connection with an

16  issue that we were having on the prosecution this was about

17  2009.  I had to read the entire list to make sure what we were

18  looking for what we were going to do was not on the list.  I

19  remember reading the Foreign Agents Registration Act and I

20  remember reading the little squib. There's a thing called the

21  U.S. Attorney Manual and a little brief description of it.

22  That was the extent of my awareness of it.

23  Q    (By Mr. Campoamor-Sanchez) In other words, you just

24  described what awareness you had of FARA at the time?

25  A.   Yes.

1   Q.   Got it.  But how did the issue of FARA come up in your

2   discussions with Mr. Craig?

3   A.   He raised it and he told me that the engagement had been

4   structured in a way that didn't require us to register under

5   FARA.

6   Q.   Do you have any reason to doubt that?

7   A.   No.

8   Q.   After that conversation, do you recall any further

9   conversation with Mr. Craig about FARA?

10  A.   It would come up.  We've already seen it in one of the

11  emails where Matthew was wondering if someone from London could

12  do something, but the topic of FARA would come up.  I didn't

13  view it as a prohibition, it was a thing.  If you did something

14  that required you to register, you register.

15  Q.   Let me ask you, did you have a concern about registering

16  if you had to?

17  A.   I did not.

18  Q.   But did you in light of Mr. Craig's statement, were you

19  concerned about whether you had to register in this case or

20  not?

21  A.   No, I will say this I accepted what Mr. Craig told me that

22  it had been structured in a way that did not require us to

23  register.  It was clear from emails that Mr. Sloan and

24  Mr. Craig were looking at the issue, but we were working on an

25  engagement and in engagements you might say at the beginning

1   the engagement is going to fall within these four corners, but

2   sometimes they stray outside those four corners.  So it was

3   something that had to be kept an eye on.

4   Q.   Do you recall ever having any subsequent discussions with

5   Mr. Craig or having any further -- well let me ask you that

6   first.  Any other discussions that you had directly with him?

7   A.   No, I think all of my discussions on FARA were in April

8   time period maybe in May on the second trip when I went in May,

9   but nothing after that.

10  Q.   After you had those initial conversations with Mr. Craig

11  did you yourself have any concerns about FARA?

12  A.   I did not.

13  Q.   Let's move on from that topic.  As part of your work on

14  sort of Project One, did the team ultimately have to talk to

15  Mr. Tymoshenko and or her lawyer?

16  A.   The topic did come up in team discussions if you're going

17  to do an evaluation of the fairness of a past prosecution, it

18  would be a significant gap if you don't ask the defendant what

19  was their view or the defense team, what was their view.  So

20  the topic came up doing such an interview and then who should

21  do that interview.

22  Q.   Do you recall about when an approach was made by the

23  Skadden team to Ms. Tymoshenko's legal team?

24  A.   In the latter part of May.

25  Q.   Of 2012?

1  A.   Yep.

2  Q.   Generally do you recall what happened when that approach

3  was finally made?

4  A.   Well, how things work.  I remember vividly reading emails

5  about it. I was in, I had flown into Hawaii on I think a

6  Tuesday night.  I had a court appearance, a meeting at noon, a

7  court appearance at 3 then a flight out of the Hawaii at 6:30.

8  It was the first time I had ever been in Hawaii, so I stepped

9  out of the hotel for a few minutes to walk along the waterfront

10  and then I went back up to the hotel and opened up my email,

11  and there was an email from Alex Van Der Zwaan about his

12  approach to Ms. Tymoshenko's lawyer and a statement by Alex

13  quoting Ms. Tymoshenko's lawyer that he was going to take

14  concerns he had to the press.

15  Q.   And what did you do, if anything, in response to Mr. Van

16  Der Zwaan informing you and others about that?

17  A.   Well, I was concerned about that.  I mean if we're going

18  to do an independent report and we're going to be making our

19  recommendation to the client on what happened in the past

20  prosecution and I'm also advising them on the second

21  prosecution how they can change their process and make it

22  better.  I was concerned that Ms. Tymoshenko's team going to

23  the press first would poison the well, so to speak, that that

24  would be the lead story.  There was already a lot of press

25  about this.  That there would be a lead story triggered by them

1    and that we needed to tell our client about this development

2    that Ms. Tymoshenko's lawyers had threatened to go to the press

3    about Skadden's involvement.

4        And our client needed to have an opportunity to make a

5    decision do they want to go to the press first. So I wrote an

6    email basically that said that takes off a bunch of things I

7    asked people to do.  I was probably more direct then normal in

8    my email because I knew I was going to be heading this meeting

9    and then to court and going to the airport and hopping on a

10   plane.

11       I think the email says I was going to Chicago, but I think

12   my plan changed that day.  And I went from Hawaii to Puerto

13   Rico through Houston.  I was going to be up in the air for 16,

14   18 hours and that was going to be the next business day in

15   Ukraine and this event was going to play out in that next

16   business day.  So I viewed this as I had like a little tiny

17   short window to make my thoughts known to the team on this and

18   so I did a longer email than I normally do.

19   Q.   What did you recommend happen if you recall?

20   A.   I recommended that the client be told that

21   Ms. Tymoshenko's lawyers were asserting that they were going to

22   go to the press with Skadden's role; that we draft, we draft a

23   proposed press release for the client.

24       Sometimes if you're making a recommendation to the client

25   to do X, you've got to present them the X so that they can look

1   at it.  And so I recommended a draft press release that had

2   some description of the Skadden team.  I don't remember, there

3   were some other pieces of the recommendation, but those were

4   the main ones.

5        And that the client needed to be told and then have the

6   ability to make a judgment how it wants to, if it wants to make

7   the disclosure to the press ahead of Ms. Tymoshenko's team and

8   if so how.

9   Q.   Let's look at very briefly Government's Exhibit 124 which

10  I believe has been admitted.

11  A.   I think I also said FTI should be involved.

12       124?

13  Q.   Yes, please.  And if you first focus on the bottom part of

14  124.  The bottom email?

15  A.   Yep, that's my email.

16  Q.   That's the email that you're just referencing?

17  A.   Yes.

18  Q.   With your suggestions as to what should happen?

19            THE COURT:  Can you repeat the number?

20            MR. CAMPOAMOR-SANCHEZ:  124, Your Honor.

21            THE COURT:  124, okay, I'll get it.  All right,

22  thank you.

23            MR. CAMPOAMOR-SANCHEZ:  124.

24  BY MR. CAMPOAMOR-SANCHEZ:

25  Q.   Actually it goes on to the second page does it not, but

1  this generally outlines your recommendations of what you were

2  asking folks to do in response to this development?

3  A.   Yes, it does.

4  Q.   All right.  I think you were just saying you thought, you

5  had mentioned FTI too.  Is FTI mentioned here in this email?

6  A.   I think Mr. Craig says --

7  Q.   Well let me -- I'm talking first about your own email.

8  Here I'll direct your attention to the last sentence.

9  A.   Yeah, the FTI guys also need to weigh in.

10 Q.   So you --

11 A.   I said that and then Mr. Craig has a response that says

12 shouldn't we be asking FTI help handle this?

13 Q.   Thank you, that was going to be my next question.  What

14 did ultimately Mr. Craig respond?

15 A.   That was his response, shouldn't they help in this?

16 Q.   Does he further respond at the top?

17 A.   Yes, he wrote I agree with Mike that it makes for the

18 Ukrainians, but I would defer to FTI as to how best to put this

19 into the public domain.  Alex, did your new friend Mr. Vlasenko

20 tell you why he felt these two letters should be made public?

21 Mr. Vlasenko was Ms. Tymoshenko's lawyer.

22 Q.   Do you know whether ultimately FTI in fact put press

23 releases together?

24 A.   I think I saw that when I, by the time I got out of the

25 air.

1  Q.   So in other words, did you have any further involvement in

2  actually crafting those press releases?

3  A.   I don't believe I did.  I think I went to court, went to

4  the airport, got on a plane.  And my memory is I went to Puerto

5  Rico, even though the email says I went back to Boston.  And by

6  the time I did, I think it was a ten hour flight to Houston, 7

7  or 8 hour flight to San Juan.  The day had played out in the

8  Ukraine.  So I don't think I saw an email until I got to San

9  Juan.

10 Q.   So you're saying you saw the emails, but after the fact?

11 A.   After the fact.

12 Q.   Do you know if Mr. Craig ever sort of made comments or

13 suggestions to the draft press release for the Ministry of

14 Ukraine?

15 A.   I only know what I saw in the emails and the emails

16 included comments.

17 Q.   Thank you, you can take that down.

18     Putting that sort of press release issue aside.

19     Did an interview with Mr. Vlasenko ultimately take place?

20 A.   I wasn't there.  I was told it did.

21 Q.   That was going to be my next question. Were you able to

22 participate in that interview?

23 A.   I did not.

24 Q.   Why did you not participate in Mr. Mr. Vlasenko's

25 interview?

1   A.    So Mr. Craig and I had a discussion about whether given my

2   role on project two, I should participate in the interview of

3   Ms. Tymoshenko and Project One.  I agreed with him.  The view

4   that if I attended, then we needed to tell her and her team

5   about project two.  And mind you, I was helping, I was advising

6   the Ukrainian government on steps they could take to make

7   project two fair.  And that role hadn't been disclosed to

8   Ms. Tymoshenko.  And it was our mutual view that if I attended

9   and we didn't tell her that I was playing this other role that

10  she and her team would feel sandbagged by the fact that

11  somebody who's currently advising the Ukraine on how to

12  prosecute her had attended an interview of her.  Not something

13  that would be viewed very well in the United States without

14  disclosure.

15        So we decided and I think he expressed the view that he

16  didn't want to disclose at that point project two to

17  Ms. Tymoshenko's team.  So the decision was made that I would

18  play, I would not go.  And I would play no role in the drafting

19  of the report and I concurred, I agreed.

20  Q.    You agreed with what he said?

21  A.    Yes.

22  Q.    Without showing it to the ladies and gentlemen of the jury

23  yet.  If you look at Government's Exhibit 163, does this

24  include the email exchanges about this very issue of your

25  conversation with Mr. Craig about whether you should or should

1  not attend that interview?

2  A.   Yes.

3  Q.   Did you further sort of explain as it appears in the email

4  to Mr. Cowie all the reasons that you thought that was a good

5  idea?

6  A.   Yes.

7          MR. CAMPOAMOR-SANCHEZ:  Your Honor, we would move 163

8  which I believe the Court has reserved on.

9          THE COURT:  Any objection?

10          MS. JUNGHANS:  Well, Your Honor, I understood --

11          THE COURT:  Just tell me yes or no, whether you

12  object.

13          MS. JUNGHANS:  No objection.

14          THE COURT:  All right, that'll be admitted.

15     (Government's Exhibit No. 163 received in evidence.)

16  BY MR. CAMPOAMOR-SANCHEZ:

17  Q.   We can now look at the second page of 163, the bottom

18  tomorrow first.  If we can expand.  You're first responding to

19  or you're summarizing kind of your conversation with Mr. Craig

20  about the project two here?

21  A.   Yes.

22  Q.   As you were telling the jury it says here and I concur

23  that it makes sense that we project two not be at the interview

24  with Ms. Tymoshenko.

25  A.   Yeah, I wrote where I heard defense counsel I would feel

1    sandbagged and scream to high heaven if the Skadden team

2    advising the prosecution team for the pending case had a

3    meeting with the defendant.  Even if not true, it will look

4    like we did that in part to aide the prosecution of her in the

5    ongoing case and we may never shake such a perception.

6    Q.   But let me ask you, even though you did not go to the

7    Tymoshenko interview, did you and Mr. Cowie continue working on

8    project two?

9    A.   Yes.

10   Q.   And making plans about what other things you could do for

11   project 2?

12   A.   Yes.

13   Q.   We can go to the first page of the email at the top.  What

14   are you discussing in the first part of this email at the top

15   as it relates to Alex?

16   A.   Well so we decided that neither Matthew nor I would go to

17   the town called Kharkiv where Ms. Tymoshenko was imprisoned and

18   participate in the interview of her. That raised the question

19   what about Alex Van Der Zwaan.  He was the logistic guy.  He

20   was sitting in all of the interviews.  He was at least my

21   understanding was he was going to go to Kharkiv to participate

22   in the interview of Ms. Tymoshenko.  Should he also then

23   continue to work on project two?  So I was raising the issue

24   should we have him continue to work on it.

25   Q.   Were you also discussing the request by Ukrainian

1  prosecutors about you're continuing your work on Project Two?

2  A.   Yes, by this point in time I think we had two days of

3  meetings with the prosecutors about the value added tax

4  prosecution.  We asked for some additional documents.  We made

5  some recommendations.  It felt to me like they were listening

6  to us and paying attention to what we were saying.  And we were

7  expecting to come back and advise them additionally on aspects

8  of their case.

9       I think one of the issues we had raised was thinness of

10 evidence as to some elements of the value added tax prosecution

11 and we were expecting to come back and they were going to

12 address that.

13 Q.   And the day of June 21st, 2012 did your work continue to

14 at least July of 2012?

15 A.   Yes, I went back to Ukraine for one last time roughly the

16 middle of July, two days of meetings.

17 Q.   Was that the last time you traveled to Ukraine?

18 A.   Yes.

19 Q.   And do you recall when in July that was?

20 A.   16ish middle of the month.

21 Q.   Middle of the month, thereabouts?

22 A.   Yes.

23 Q.   Do you recall now in August of 2012, there being some

24 press about Skadden and Ukraine and elsewhere and the fees that

25 were being charged and not charged?

1    A.   I remember Lauren Weiss who's one of the press people for

2    Skadden circulated an e-mail with an article that was talking

3    about that.

4    Q.   And Your Honor we would like to now show the jury 209

5    which I believe is admitted.

6         Is this the email from Ms. Weiss to the team?

7    A.   It is.

8    Q.   And if we can first of all go to the third full paragraph.

9         I should ask you, do you recall sort of this issue coming

10   up around this time?

11   A.   I remember the title of the article.  How can I not?

12   Q.   Because it referred to your firm directly?

13   A.   Right.

14   Q.   Do you recall discussing with Mr. Craig whether there was

15   an issue about the government claiming that there were only

16   paying $12,000 for the project?

17   A.   I don't remember ever hearing that what the government was

18   paying or what anybody else was paying.  I didn't think we were

19   doing this for $12,000, But I don't remember discussions about

20   the amount.

21   Q.   If you look at the paragraph that starts these facts fuel

22   speculation at Skadden is being paid by someone on the side.

23   No one knows who's paying Skadden and it's a question the

24   government is ignoring.

25        Did you have any discussions with Mr. Craig around this

1   time about that?

2           THE COURT:  I just want to back up and establish that

3   the thing you're calling out quotes from is an editorial, an

4   opinion piece that appeared in the Kyiv Post?

5           MR. CAMPOAMOR-SANCHEZ:  Yes.

6           THE COURT:  And it was that piece that was circulated

7   to the partners working on the matter, employees working on the

8   matter by someone in the Skadden PR department?

9           THE WITNESS:  Yes.

10          THE COURT:  Go on.

11          THE WITNESS:  What I remember is the topic of who was

12  paying Skadden came up in that prior email where I was sitting

13  in Hawaii and what to do about that.  And whether there should

14  be some disclosure then.  When I landed either in Boston or

15  Puerto Rico and read through the emails, it was clear the team

16  was discussing -- I forget the guy's name, discussing a third

17  party.  And I inferred from all of those emails that that third

18  party was paying Skadden's bill and that that was a discussion

19  about whether as a part of recommending to the government of

20  Ukraine that they go public first or not with the fact that to

21  beat Yulia Tymoshenko's lawyer to the press whether also to

22  make a recommendation on the disclosure of who was paying.

23  Q    (By Mr. Campoamor-Sanchez) So around the time that you got

24  this email August 9th, 2012 from Ms. Weiss, do you recall any

25  discussion with Mr. Craig about it?

1  A.    No, I don't recall.  By this point in time I think I had

2  already concluded in myself hadn't said it to anybody, but I'd

3  already concluded I wasn't going to go back to the to the

4  Ukraine.  They weren't going to ask me to come back there, that

5  Project Two was over.  And you know, my concern was with this

6  was it was sort of an attack on Skadden.

7  Q.    Now that you bring up Project Two, did you get an email

8  from Mr. Craig officially ending Project Two later in August

9  following this sort of article that we were discussing?

10 A.    I think it was later in August, yes.

11 Q.    Let's look at 226 which I believe is also in evidence.

12       We can go to the second page please.  The bottom email is

13 an email from Mr. Craig, which includes you on the CC line; is

14 that correct?

15 A.    Yes.

16 Q.    And the email reads it's addressed to Alex and Matthew.

17 It says I just got off the phone with Jonathan Hawker FTI.  He

18 told me that you, Alex, and Matthew were planning to go over to

19 Ukraine next week, week of September 3rd for Project Two

20 activity.

21       Let me ask you first, you were just saying that you had

22 reached a conclusion earlier that the project got stopped.  Was

23 that just your own conclusion or part of the team?

24 A.    I think I had reached that conclusion before anybody else

25 had expressed it; that essentially our work on Project Two was

1    over.  It had been my impression from the meeting with the

2    Ukrainian prosecutors when we were there in July that they had

3    lost their fire in the belly, if you will, for doing the

4    prosecution.  And that I had felt like it was just going to

5    slip away.  I think that's in fact what happened.

6    Q.    And Mr. Craig continued I am concerned that Skadden's

7    activity in Project Two might surface before the report comes

8    out.  That would do enormous damage to the credibility of the

9    Project One.  First of all, did you agree with that assessment?

10            MS. JUNGHANS:  Objection, irrelevant.

11            THE COURT:  Overruled.

12            THE WITNESS:  I think it would have an impact.  I

13    don't know that I would agree that it would destroy the

14    credibility of Project One, but it would have an impact.

15    Q    (By Mr. Campoamor-Sanchez) Then if we can go down to page

16    one.  The second email from the top from Mr. Craig.  Mr. Craig

17    now is responding to an email below from Mr. Cowie that you

18    were copied on this as well.  Then Mr. Craig says, I am

19    extremely concerned that information about Skadden's

20    involvement in T2 has come to the attention of Tymoshenko's

21    lawyer and that he will use it to discredit the report at some

22    point.  We have some explanations and defenses e.g. as a rule

23    of consultants, we are assisting and advising Ukraine on how to

24    manage the second trial with an eye towards guaranteeing due

25    process of law and meeting Western standards.  That's what T2

1   is all about.

2        Did Project two sort of end this day on August 30th?

3   A.   Yes, I mean I can't say that that was that -- I mean, I

4   don't know what Matthew would say it was completely over.  I

5   thought it was over in July.  This was Greg.  Greg and I hadn't

6   really talked about my view, that these prosecutors had lost

7   interest in this.

8   Q.   You had not discussed it?

9   A.   I don't think I had mentioned that to him.  I know that

10  there were efforts by Matthew to start planning another trip

11  back, but I was of the view by this point in time that we

12  should wait for them to come asking if we wanted to go back

13  over there.  So I viewed this as sort of concurring with making

14  my unexpressed view that Two is done.  And in fact, I think

15  they dropped the value added tax case.

16  Q.   I assume later because August it was still alive at this

17  point?

18  A.   It got continued in June, then it got continued in July,

19  then it got continued in August.  Then it got continued in

20  September, then I had sort of moved on in my life and stopped

21  thinking about what was going on and the prosecution in the

22  Ukraine.

23  Q.   Let me ask you to your knowledge, sir, did you or

24  Mr. Cowie's work on Project Two ever become sort of publicly

25  known before the publication of the Skadden report?

1   A.    No, I don't think it became publicly known before today.

2   Q.    Moving you now very briefly to 2013.  Did you have a

3   chance at some point in 2013 to sort of discuss with Mr. Craig

4   things about generally about Tymoshenko and the cases in

5   Ukraine?

6   A.    Could you repeat the question.

7   Q.    Sure, that was not a very good question.

8         In early 2013, you happened to exchange some emails with

9   Mr. Craig about some of Tymoshenko's cases that were going on

10  in the Ukraine?

11  A.    Yes and I think I initiated it.

12  Q.    And my question, sir, is around 2013 at any point did

13  Mr. Craig tell you that the FARA Unit of the Department of

14  Justice had initiated inquiry into the work that you and others

15  have done?

16        MS. JUNGHANS:  Objection, irrelevant.  Move to

17  strike.

18        THE COURT:  Overruled, I'll permit it.

19        THE WITNESS:  No, he didn't.

20  Q    (By Mr. Campoamor-Sanchez) At any point in 2013 did

21  Mr. Craig ask you to collect materials related to the work that

22  had been done in Ukraine?

23        MS. JUNGHANS:  Objection.

24        THE WITNESS:  He did not.

25        THE COURT:  Overruled.

1   Q    (By Mr. Campoamor-Sanchez) No conversations about FARA at

2   all?

3   A.   No.

4           MS. JUNGHANS:  Objection.

5           THE COURT:  All right, you don't need to repeat the

6   testimony.  Just ask the questions.

7           MR. CAMPOAMOR-SANCHEZ:  I'm trying to cut it short

8   about the things because -- anyway.

9   Q    (By Mr. Campoamor-Sanchez) Any conversation about FARA,

10  nothing?

11  A.   I was not aware of any inquiry by FARA in 2013.

12          MR. CAMPOAMOR-SANCHEZ:  No further questions.

13          THE COURT:  All right, approximately how long do you

14  think the cross examination would take?

15          MS. JUNGHANS:  Your Honor, I would think not more

16  than 30 minutes; one never knows.

17          THE COURT:  Well I'm trying to figure out if it makes

18  sense given how long the day has been if we should break now or

19  if --

20          MS. JUNGHANS:  Your Honor, we're happy to recess now.

21          THE COURT:  All right, I'm sorry to you because that

22  means you have to come back tomorrow morning.

23          THE WITNESS:  I understand.

24          THE COURT:  But I think it will be better for

25  everybody.  So I'm going to excuse the jury for the evening.

1        Tomorrow morning there is a short matter scheduled before

2   we pick up again on this case also at 9:30 in the morning.  So

3   I'm going to ask you to be in the jury room by 9:10, 9:15 at

4   the latest.  Then we will start the trial as soon as that

5   matter is concluded.

6        I hope you all have a pleasant evening.  I'm instructing

7   you once again that while you may, as I told you, inform family

8   members and employers that you are now on a jury.  And that it

9   is a criminal case, but you may not discuss the subject matter

10  of the case.  You may not write or blog or post or email or

11  text about the case.  Can't read any news accounts about the

12  case and there may be some because people may report on the

13  opening statements.  So I would do my best if you come across

14  them to ignore them.  Otherwise please have a very pleasant

15  evening thinking about and talking about everything else.

16  Thank you.  You can leave your notebooks on the chair.

17             THE COURT:  All right, the witness can step down.

18             (Witness excused.)

19             THE COURT:  Tomorrow morning just for scheduling

20  purposes I think you should come in and set up.  I'll need you

21  to step into the well personally while we handle the short

22  matter in the morning, but I don't think, I don't want you to

23  have to wait until that's over before you do everything that

24  you normally do.  So you're welcome to come in and set up, do

25  everything you need to do.  We'll call the case as soon as that

1    one is ready and deal with it and then we'll pick right up

2    again with you.

3         The people in the audience can be seated.  Actually

4    everybody can be seated.

5         With respect to objections it's not because I stand on

6    certain money, but I will greatly appreciate it if you stand up

7    when object in addition to saying you object because if I'm

8    looking at the witness that will help me observe that an

9    objection is being made.  So if you would please that general

10   rule that people tend to follow anyway, it would be very

11   helpful.

12        You may have given Mr. Haley an updated exhibit list.

13   Do you have a copy of it for me?

14             MR. CAMPOAMOR-SANCHEZ:  Yes.

15             THE COURT:  Do you have two copies for me?  That

16   would be extremely helpful.  Thank you.

17        Is there anything else that we need take up this evening?

18   Yes, sir.

19             MR. MURPHY:  Your Honor, he was really difficult.  I

20   can usually be heard Your Honor from anywhere in the courtroom,

21   but this witness was very hard for me to hear and I'm not

22   sitting that far away.  About six times I raised my hand, but

23   you didn't see me.  I mean he really needs to be reminded to

24   just lean into the microphone.

25             THE COURT:  I will, maybe there's a way we can adjust

1    the chair.  We will check on that in the evening.  But he

2    clearly took full advantage of it and I will try to remind him

3    more of it or remind anyone else who sits in it similarly.  But

4    yes, I could see that was a problem and I'll try to do the best

5    I can.  Anything else?

6            MR. ABELSON:  Just very briefly, Your Honor, to

7    address some Government Exhibits on which we understood your

8    ruling to have been reserved.  I think there were a number of

9    documents related to Project Two.  During the pretrial

10   conference, it seemed like a lot and we understood your

11   direction to the government to streamline it and cut down and

12   offer a more limited number of Project Two documents.  We see

13   your order concluded that Project Two was relevant so I just

14   wanted clarity.

15      Does that mean that all of the Project Two evidence that

16   was on their list is admitted or something else?

17           THE COURT:  Let me ask a question, Is this the only

18   Project Two witness.  Are there going to be more Project Two

19   documents that you're even going to try to use because I think

20   what you've done has pretty much corresponded to my instruction

21   to focus it in as much as possible.

22           MR. CAMPOAMOR-SANCHEZ:  That's what I was trying to

23   do.  Frankly, I guess maybe Mr. Abelson can remind me. I really

24   thought we had --

25           THE COURT:  Just answer my question.

1        MR. CAMPOAMOR-SANCHEZ:  Yeah.

2        THE COURT:  Are there more?  Are there other

3   witnesses who are going to be pointing to more Project Two

4   documents or has the universe of them been exhausted?

5        MR. CAMPOAMOR-SANCHEZ:  There's a few more.  For

6   example, Mr. Haskell took notes of meetings that include

7   reference for Project Two, but we're not asking just about

8   Project Two.  It's about everything that's in the meeting

9   notes, but it just happens to also include Project Two.

10  There's a few more, but not a lot more.

11       THE COURT:  Would it be that difficult for you to

12  tell us right now what documents, if any, related to Project

13  Two may come up beyond the ones that have already come up and

14  been admitted and I thought were as focused as could be under

15  the circumstances?

16       MR. CAMPOAMOR-SANCHEZ:  So the ones I understand

17  because we're doing this now without me being ready for that.

18  I think I can tell the Court that we thought Project Two were

19  referenced in exhibits 153, 154, 160, 162, which I did not even

20  use today, that would have been with Mr. Loucks; 163, 172, 179

21  and there's mention or references to Project Two in exhibits

22  50, 54, 68 through 71 which they're all parts of a single email

23  chain 101, 107 and 226.

24       THE COURT:  My question was do you know at this

25  point, you just said one of them which I didn't even use.

1       Do you know right now, do you still intend to use all

2  these?

3           MR. CAMPOAMOR-SANCHEZ:  Not all.  For example, the

4  Court already crossed out 162, so I would have only introduced

5  that with Mr. Loucks and I did not.

6       It's just that I'm not handling Mr. Haskell so I don't

7  want to speak for my colleague.

8           THE COURT:  Okay, does Mr. McCullough planning to use

9  all of the onces he just mentioned or not?

10          MR. MCCULLOUGH:  I do not.

11          THE COURT:  The question I keep trying to ask because

12 I think things will go more smoothly if I've actually looked at

13 them again know that I know how this fits in the case.

14      Can you tell me which ones you would hope to use in your

15 direct examination Mr. Haskell?

16          MR. MCCULLOUGH:  Yes, Your Honor.

17          MR. CAMPOAMOR-SANCHEZ:  He's comparing the list, Your

18 Honor.

19          THE COURT:  That's fine.

20          MR. MCCULLOUGH: So I'm planning to use Exhibits 101

21 and 107, as well as possibly Exhibit 160.

22          THE COURT:  That's all?

23          MR. MCCULLOUGH:  Correct.

24          MR. CAMPOAMOR-SANCHEZ:  With Mr. Haskell?

25          MR. MCCULLOUGH:  With Mr. Haskell.

 1            THE COURT:  Okay, is there any other witness with

 2   whom Project Two will be important?

 3            MR. CAMPOAMOR-SANCHEZ:  I don't think so, Your Honor.

 4   If the Court would allows us to go back and double check.  I

 5   don't think so.

 6            THE COURT:  All right, I will look at the Haskell

 7   exhibits and let you know tomorrow if you can use them before

 8   he takes the stand so that everyone knows.  And with respect to

 9   the others you can let me know in the morning if there are

10   others that you anticipate using.  But I do feel like you did

11   what I asked you to do with respect to the ones we've seen so

12   far.

13            Okay, is there anything else I need to take up right

14   now?

15            MR. CAMPOAMOR-SANCHEZ:  Not for the government.

16            THE COURT:  All right, I think we got a lot done

17   today and so I appreciate everybody's cooperation and hard work

18   in pushing this forward.

19        That you can give back.  You're all excused.  You don't

20   need to stand up.  I have to ask Mr. Haley a question before I

21   leave the room.

22            (Proceedings adjourned at 4:41 p.m.)

23                            -oOo-

24

25

1

2

3                                    CERTIFICATE

4        I certify that the foregoing is a true and correct

5    transcript, to the best of my ability, of the above pages, of

6    the stenographic notes provided to me by the United States

7    District Court, of the proceedings taken on the date and time

8    previously stated in the above matter.

9        I further certify that I am neither counsel for, related

10   to, nor employed by any of the parties to the action in which

11   this hearing was taken, and further that I am not financially

12   nor otherwise interested in the outcome of the action.

13

     _____        _____
14   /s/ Crystal M. Pilgrim, RPR, FCRR      Date: August 16, 2019

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25