IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | Criminal Action |
| Plaintiff, | : | No. 19-CR-125 |
| | : | |
| | : | JURY TRIAL - DAY 5 |
| | : | Morning Session |
| vs. | : | |
| | : | Washington, D.C. |
| | : | August 16, 2019 |
| GREGORY B. CRAIG, | : | Time: 9:55 a.m. |
| | : | |
| Defendant. | : | |

_____


TRANSCRIPT OF JURY TRIAL - MORNING SESSION
HELD BEFORE
THE HONORABLE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

_____


A-P-P-E-A-R-A-N-C-E-S

For the Plaintiff:   **Fernando Campoamor-Sanchez**
                     **Molly Gulland Gaston**
                     U.S. Attorney's Office
                     For the District of Columbia
                     555 Fourth Street, NW
                     Washington, DC  20530
                     (202) 252-7698
                     Email: Fernando.campoamor-sanchez@usdoj.gov
                     Email: Molly.gaston@usdoj.gov

                     **Jason Bradley Adam McCullough**
                     U.S. Department of Justice
                     950 Pennsylvania Avenue, NW
                     Washington, DC  20530
                     (202) 233-0986
                     Email:  Jason.mccullough@usdoj.gov

For the Defendant:   **William James Murphy**
                     **William W. Taylor, III**
                     **Adam B. Abelson**
                     Zuckerman Spaeder, LLP
                     100 East Pratt Street
                     Suite 2440
                     Baltimore, MD  21202

```
 1   Appearances continued:

 2   For the Defendant:   ZUCKERMAN SPAEDER, LLP
                          (410) 949-1146
 3                        Email:  Wmurphy@zuckerman.com
                          Email:  Wtaylor@zuckerman.com
 4                        Email:  Aabelson@zuckerman.com
                          Email:  Emarcus@zuckerman.com

 5
                          Paula M. Junghans
 6                        Ezra B. Marcus
                          ZUCKERMAN SPAEDER, LLP
 7                        1800 M Street, NW
                          Suite 1000
 8                        Washington, DC  20035
                          Email:  Pjunghans@zuckerman.com
 9                        Email:  Emarcus@zuckerman.com

10   _____

11   Court Reporter:      Crystal M. Pilgrim, RPR, FCRR
                          Official Court Reporter
12                        United States District Court
                          District of Columbia
13                        333 Constitution Avenue, NW
                          Room 4700-F
14                        Washington, DC  20001

15

16

17

18

19

20

21

22

23

24

25
```

```
1                          I-N-D-E-X

2                              Direct   Cross   Redirect   Recross

3    On behalf of the Government:

4      Michael Loucks

5          By Ms. Junghans                  735

6          By Mr. Campoamor-Sanchez                   745

7      Douglas Schoen

8          By Mr. Campoamor-Sanchez  748              771

9          By Mr. Taylor                    766                 772

10     Alex Haskell

11         By Mr. McCullough         775

12

13                        E-X-H-I-B-I-T-S

14                                 Marked     Received

15   On behalf of the Government:

16   Exhibit No. 9, 10, 452 through 457             727

17   Exhibit No. 163                               730

18

19   On behalf of Defense:

20   Exhibit No. 329                   768       773

21

22

23

24

25
```

```
1                    P-R-O-C-E-E-D-I-N-G-S

2           THE DEPUTY CLERK:  Your Honor, we have case number

3   19-125, the United States of America versus Gregory B. Craig.

4      Mr. Craig is present here in the courtroom, Your Honor.

5      Counsel, please approach the lectern and identify yourself

6   and your colleagues for the record.

7           MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor,

8   Molly Gaston, Jason McCullough, Fernando Campoamor for the

9   United States and Amanda Rhode.

10          THE COURT:  Good morning.

11          MR. TAYLOR:  Good morning, Your Honor.  Bill Taylor

12  with Bill Murphy, Paula Junghans and Adam Abelson for

13  Mr. Craig.

14          THE COURT:  I've been informed that you have

15  something that you want to put on the record this morning.

16          MR. TAYLOR:  I do, Your Honor.

17      Yesterday when the Court adjourned it was about five

18  o'clock.  Most of us went out the Third and Constitution exit.

19  It was raining.  When I walked through the door Mr. Loucks and

20  Mr. Delary and Rosen and Mr. Rosen, his counsel were present.

21  I nodded to Mr. Delary and Mr. Rosen may have nodded to

22  Mr. Loucks as well.

23      Mr. Craig advised me shortly thereafter that he came out

24  the same door, that he saw Mr. Loucks with Mr. Delary and

25  Mr. Rosen shook his hand and said I know I'm not suppose to do
```

1    this, but I just wanted to say hello.  That occurred yesterday.

2     I wanted to put it on the record.  I don't believe there's any

3    significance to it in terms of the ongoing trial of the case,

4    but in an abundance of caution I wanted you to know.

5            THE COURT:  All right, I appreciate you bringing it

6    to my attention.

7        Mr. Craig, this witness was -- you can be seated.

8        This witness was in the middle of his testimony.  He is

9    still on the witness stand.  He is not to be interacted with,

10   nor are other witnesses in this case to be interacted with.

11       If you run into someone accidentally, that is one thing.

12   But I would like to caution you to not initiate conversation

13   with witnesses, jurors.

14       We've instructed every one to understand that if they walk

15   pass someone they know who ordinarily would engage in the

16   common civilities of day-to-day behavior and they don't, that

17   they should not hold it against that person.  But I don't think

18   it's appropriate as you apparently didn't either to go up to a

19   witness and even greet him in a friendly neutral way during the

20   middle of his testimony in your trial.

21       So I would encourage you to resist the temptation to

22   reconnect with colleagues during the pendency of the trial and

23   particularly during their testimony in the future.  All right.

24           THE DEFENDANT:  Yes, ma'am.  It was impulsive and it

25   won't happen again.

1          THE COURT:  All right, thank you.

2      I have a few preliminary matters to take up.  Does the

3  government have any?

4          MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

5          THE COURT:  All right.

6      I was asked to look at the exhibits on which the Court had

7  reserved to make sure we had more clarity as we move forward

8  this morning in the event any of them are going to be used.

9      And so I note if you look at the exhibits for which I

10  reserved a ruling during the pretrial conference, Government

11  Exhibits 9 through 10 and 452 through 457 I reserved.  Those

12  were computer printouts that there was a question about laying

13  the foundation for what they were and how they were generated

14  and so I still cannot rule until that foundation has been laid.

15      So unless there's been some subsequent agreement with

16  respect to them.

17          MR. ABELSON:  Your Honor, we have withdrawn our

18  objection and they may be admitted.

19          THE COURT:  Okay, so they're admitted.

20      So that will be Government's Exhibits 9 through 10 and 452

21  and 457.

22      (Government Exhibit Numbers 9, 10, 452 through 457

23  received into evidence.)

24      Government's Exhibit 162 and 163 were actually dealt with

25  during the witness's testimony.  162 was admitted with

1   redactions that were consistent with the instructions I had

2   given during the pretrial conference and 163 was a response to

3   that email.

4       And so it's just the top email that is being admitted and

5   not the recapitulation of the email chain below which has

6   already been admitted in connection with 162.

7       172 was also Government's Exhibit 172.  I reserved ruling

8   during the pretrial conference.  It's on the same subject

9   matter, but it wasn't used during the direct of Mr. Loucks and

10  it just seems to reflect the same sort of ongoing back and

11  forth that he testified about anyway.

12      And since you haven't used it, I don't think it's

13  necessary and I'll exclude it unless for some reason the

14  defense intends to use it to cross examine him about his

15  testimony.

16      That then brings us to I asked you to identify if any of

17  the others are project 2 documents you intended to use in

18  connection with the testimony of another witness, Mr. Haskell,

19  and Government's Exhibits 101, 107 and 160 were the ones that

20  Mr. McCullough indicated an intention to use are already

21  admitted without objection.  So I don't think we need to have

22  any further conversation about any of those.

23      So that's where we are with respect to the exhibits on

24  which I reserved.  There are a number of defense exhibits on

25  which I reserved.  I now do have a better understanding of what

1   the nature of the defense is and how they might fit in but I

2   only recently received the briefing on the hearsay issue and so

3   I don't have rulings on those this morning but I certainly will

4   before you try to introduce them in evidence.

5        Yesterday there was a point in the trial where the

6   government introduced a stipulation and I may have missed

7   something, but I had two stipulations.  One was the one about

8   email address so and so dot so and so dot whatever is actually

9   so and so's email address and the other was about the payments

10  received by Skadden.

11       I didn't even have the one you mentioned, so if there are

12  more stipulations that have been entered in this case, I would

13  appreciate it if somebody would docket them so that I can have

14  them in my little trial notebook.

15       I also think if they are as long and confusing as the one

16  you read aloud yesterday, you might want to have it on the

17  screen while you do that the next time.  I'm not sure it sunk

18  in.

19            MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor, we will do

20  that.  And my apologies.

21       One thing I wanted to clarify.  The exhibit I used with

22  Mr. Loucks yesterday was 163.  But I think I heard the Court,

23  maybe I misheard you, saying it was 162.  The one I used with

24  him was 163.

25            THE COURT:  With the redactions?

1              MR. CAMPOAMOR-SANCHEZ:  Yes, with the redactions.

2              THE COURT:  So 162 then we're not seeking to admit.

3              MR. CAMPOAMOR-SANCHEZ:  Correct.

4              THE COURT:  So the redacted version of 163 will be

5     admitted, 162 will be excluded and 172.

6         Are there more stipulations coming up that weren't

7     provided at the time of the joint pretrial statement?

8         (Government Exhibit Number 163 received into evidence.)

9              MS. GATSON:  Yes, Your Honor.

10        We've reached a couple more.  We will docket them at lunch

11    and make sure you have a copy of all of them.

12             THE COURT:  Thank you, that will be helpful.

13        Finally, I do this with some hesitation but I think it's

14    probably worth doing.  The background of this comment is that I

15    have the pleasure in this case of having some of the most

16    experienced and talented trial lawyers that I have been able to

17    have in my courtroom since I've taken the bench.  It's really a

18    pleasure to see people who know what they're doing and going

19    about it well.

20        So I'm well aware that this is a crowd on both sides of

21    the courtroom that does not need to be schooled in the basics

22    of trial advocacy.  But I feel the need to do so for a moment

23    if you will indulge me because I think what has happened is

24    that you all have lived with this case in your heads for a

25    considerable period of time.

1          And you know the documents backwards and forwards, you

2    know what they mean and what they say.  We spent a week in this

3    courtroom arguing about exhibits in the pretrial conference.

4    We spent another week almost trying to pick a jury and you have

5    finally been let out of the starting gate to talk about the

6    evidence.

7          And I believe in the rush to get started and get the facts

8    out, it may have, people have lost sight of the fact that this

9    is all news to everyone else.  And it is being presented to the

10   jury for the first time and the rules that apply to the

11   presentation of evidence have finally clicked into effect and I

12   think some of them got lost in the shuffle.

13         It is true that the exhibits that are in evidence are in

14   evidence and their contents may be published to the jury.  But

15   I think we will waste considerably less time on objections, the

16   case will be smoother, it will be more efficient and it will

17   certainly be more easily understood by the jurors if the

18   prosecution makes a more concerted effort to let the witnesses

19   do the talking.

20         This is direct.  A lot of questions came with a long

21   preface that ultimately made it to a yes or no question at the

22   end, but counsel should strive to eliminate the prefaces

23   especially those that tick off facts or recap the testimony,

24   you know, because you thought PR was an important aspect of

25   what was going on in the Ukraine, did you agree that PR would

1    be a part of what you would do.

2         Just when he says it was important, so what did you do in

3    light of that?  Try to cut off the predicate for the question.

4         Now I'm not saying you can't ask a transitional question I

5    would like to direct your attention to a meeting held on this

6    date, did you attend a meeting in New York City?  Yes.

7         But then it's got to be who was there, what did you

8    discuss and let the witness do the talking.

9         I think this also is going to work better for the emails

10   as well.  Documents were thrown up on the screen that were

11   being read aloud at a rapid clip by counsel.  And if the

12   testimony of the witnesses, I was going to be in the air for

13   three days so I wrote an email, I think if you put it up on the

14   screen you can say I'm showing you Exhibit 27, what is it?

15        Answer, it's my email.

16        When did you send it?  Let him give, let's have the date.

17   Let's have who it was sent to, then you can say what did you

18   say in the third paragraph as opposed to reading the third

19   paragraph to him.  Or even someone who received it can read it.

20   Because when you're reading it, you're rushing and it's kind of

21   merging the document in your question all in one.

22        I'm not saying you can never read it.  If the witness was

23   the recipient, while you can say what did the author mean when

24   they said X.  You can say I'm directing your attention to the

25   third sentence which says and you can read it, what did that

1    mean to you?  Or what, if anything, did you do in response.

2         But I think the goal is to shift the focus from the

3    lectern where we've been living for the past three weeks to the

4    witness stand and I think then we won't be dealing with so many

5    leading question, leading question, objections and not all of

6    the questions were technically leading but they were a little

7    long.

8         With respect to cross examination, yes, you may lead on

9    cross-examination but that doesn't necessarily mean there's

10   going to be an opportunity to paraphrase or summarize the

11   testimony with a long preface on this side of the courtroom

12   either.

13        This happened, we haven't cross examined anyone yet, but

14   it happened a good bit with the jurors with well, let me see if

15   I get this straight.  You said this, this and this.  And I

16   think when you get more than one clause to your question that's

17   going to draw an objection as to form.  It can be argumentative

18   and it's going to lead to unnecessary objections and arguments

19   about the accuracy of the recitation of what the witness has

20   just said.

21        So I encourage even on cross examination people to zero

22   in.  We've had a situation yesterday where the lawyers talked

23   for two and a half hours and so now, it's time for the people

24   who actually have the personal knowledge about the case to tell

25   the story.  So that's like what I would like to do for the rest

1   of the day if possible.

2       So is there anything further before we bring in the jury,

3   bring in your next, the witness and have him be cross examined?

4           MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

5           THE COURT:  Okay, thank you.

6           MR. CAMPOAMOR-SANCHEZ:  Would you like the witness to

7   be brought in?

8           THE COURT:  Yes, please.

9       Then wait for him to come back, then we'll bring in the

10  jury.

11      (Jury present.)

12          THE DEPUTY CLERK:  All present, Your Honor.

13          THE COURT:  All right.  Good morning.

14          THE JURY:  Good morning.

15          THE COURT:  I am glad to see and I very much

16  appreciate the fact that we have perfect attendance this

17  morning and that everyone was on time.

18      We have actually been working in this courtroom doing

19  other matters and apologize for delaying you but we had another

20  case to handle and some matters that we needed to take up in

21  this case.

22      I just want to confirm that everyone was able to abide by

23  the instructions to not discuss the case, not do the research

24  about the case, and not violate any of my instructions about

25  looking into the case further.

1        I do want to encourage you that people may be creative in

2   terms of trying to reach out to you, and if you do receive such

3   an inquiry, you should simply not respond at all.  And so I

4   will now remind you of that again when we take another break.

5        We're going to continue with the testimony of Mr. Loucks.

6        Mr. Loucks, I would like to remind you that you're still

7   under oath.  I would also like to remind you that I've been

8   encouraged to really underscore the importance of you

9   interacting with the microphone.

10            THE WITNESS:  Yes.

11            THE COURT:  There are people who are taking in this

12  case through the PA system as opposed to being close enough to

13  hear you and so we appreciate your attention to that.

14        All right, cross examination.

15        GOVERNMENT WITNESS MICHAEL LOUCKS PREVIOUSLY SWORN

16                CROSS EXAMINATION (cont'd)

17  BY MS. JUNGHANS:

18  Q.   Good morning, Mr. Loucks.

19  A.   Good morning.

20  Q.   Now project 1 that you talked about yesterday with the

21  Ukrainian project was a retrospective analysis, right?

22  A.   Yes.

23  Q.   Of the first trial of Ms. Tymoshenko?

24  A.   Yes.

25  Q.   And project 2 was to give advice to the Ukrainian

1   prosecutors about how to conduct a second trial if there was

2   going to be one in a more fair manner, right?

3   A.   Yes.

4   Q.   How to provide Ms. Tymoshenko more due process?

5   A.   I can't say yes or no.  It was due process.

6   Q.   Pardon me?

7   A.   I did evaluate the due process in the first trial, I

8   evaluate their plan for the second trial and then recommend

9   changes.

10  Q.   All right, thank you.

11           THE COURT:  I'm sorry.  Did you say you did or did

12  not evaluate the due process in the first trial?

13           THE WITNESS:  I did.

14           THE COURT:  You did.

15           THE WITNESS:  We had to evaluate the due process in

16  the first trial and then what they planned to do in the second

17  trial to evaluate what recommendations to make.

18           THE COURT:  Okay.

19  BY MS. JUNGHANS:

20  Q.   For example, one of the recommendations you made was that

21  she provided, be provided with a jury trial which had not

22  happened the first time, right?

23  A.   That's right.

24  Q.   Okay, and the Ukrainian Constitution provides for jury

25  trials but in fact, nobody has ever had one, correct?

1  A.    Well, I know that their Constitution provides for a jury

2  trial.   I was told by lawyers, their prosecutors that no one

3  had ever had a jury trial.

4  Q.    You did not have any investment in whether a second trial

5  of Ms. Tymoshenko went forward or not, did you?

6  A.    Did it matter to me whether it went forward?

7  Q.    Right?

8  A.    I wasn't in control of it.   My only ability was to make

9  recommendations that might effect the fairness of the process.

10 Q.    Right.   But it was up to the Ukrainians to decide whether

11 that was going to happen or not?

12 A.    That's correct.

13 Q.    And you didn't have a desire to see her convicted or a

14 desire to see her not convicted?

15 A.    No, I understand what you're asking.   No, I did not have a

16 dog in that hunt, if you will.

17 Q.    That's it exactly.

18    You didn't know if the Ukrainians were going to take

19 whatever advice you rendered to them, did you?

20 A.    I did not certainly in the first meeting.

21 Q.    Okay.   Did you by the time you finished working on the

22 project understand whether your advice was being accepted or

23 not?

24 A.    I think they were listening, yes.

25 Q.    But in fact, trial two never happened did it?

1    A.    Not to my knowledge.

2    Q.    Did the Ukrainians ever tell you what their prosecutorial

3    decision was about going forward or not?

4    A.    No.

5    Q.    As you described yesterday your participation in what was

6    called project 2 pretty much faded out by the middle to the end

7    of July of 2012, right?

8    A.    That's right.

9    Q.    Okay.  Now you also talked a little bit yesterday about

10   these public relations problems that were at work while you

11   were working on this matter, correct?

12   A.    Correct.

13   Q.    Okay, and they were not related to what we call the

14   Skadden report were they?

15   A.    Not.

16   Q.    The finished report?

17   A.    Not initially.

18   Q.    No.  In fact, the report was still in the works at this

19   time, right?

20   A.    Well, can you tell me what time you're talking about?

21   Q.    I'm talking about, I'm sorry.

22      You were talking yesterday about April and May of 2012?

23   A.    That's right.  I did testify about April and May of 2012,

24   yes.

25   Q.    So at that point it's correct isn't it, that the, let's

1  call it the field work related to project 1 was still underway?

2  A.   Yes.  We were still conducting interviews and looking at

3  materials, yes.

4  Q.   And the report was certainly not drafted at that point yet

5  was it?

6  A.   I'm not aware that anything had been drafted in April and

7  May.

8  Q.   Okay.  And the controversy that you described that was

9  swirling around had to do with Ms. Tymoshenko's detention and

10 the conditions under which she was held, correct?

11 A.   I think that's one of the controversies that were swirling

12 around.

13 Q.   Well, we'll get to some others but that was a controversy,

14 right?

15 A.   Yes.

16 Q.   In fact, she through her lawyer was stirring up a lot of

17 public opinion and publicity about that, correct?

18 A.   I don't know if I can say yes to she was using her lawyer

19 to stir up public opinion.

20 Q.   Well, okay?

21 A.   There were articles.  Her lawyers were speaking to the

22 press.  There were allegations her team was making about her,

23 what was happening to her in prison, but I don't know if I can

24 say yes she was using her lawyers to stir up the press.

25 Q.   Okay, fair enough.  But however she was doing it, her camp

1    let's call it that, was stirring up a lot of public attention

2    to the things she was unhappy about with the way she was being

3    detained?

4    A.   I just have to answer that the same way.

5    Q.   Okay.  There was a lot of discussion?

6    A.   There was a lot of discussion on that topic.

7    Q.   Okay.  And in fact --

8           THE COURT:  Do you have any personal knowledge as to

9    who was behind the --

10          THE WITNESS:  I have no personal knowledge, Your

11   Honor, of who was generating the press.

12   BY MS. JUNGHANS:

13   Q.   In fact, you described yesterday a memo that Mr. Manafort

14   had written suggesting how the conditions of her confinement

15   might be investigated, right?

16   A.   Yes.

17   Q.   Okay.  You and the rest of the project 2 team that you

18   were leading were not undertaking to investigate that subject,

19   were you?

20   A.   No.

21   Q.   Because that wasn't your expertise?

22   A.   It might have been in the United States, but it was not a

23   part of our engagement there.

24   Q.   Right.  Even if you were going to do it, you didn't need

25   Mr. Manafort to tell you how to do an investigation, did you?

1  A.   I think the answer to that is probably yeah, I did not

2  need someone I did not know.

3     Also I would say that if someone give me something to

4  review and ask me is there something in here of value, I will

5  do that.

6  Q.   But there was a general consensus that, among the Skadden

7  group, that Ukraine certainly needed public relations

8  assistance; is that correct?

9  A.   Yes.

10  Q.   And FTI ended up being selected, right?

11  A.   I think so.

12  Q.   Well, I think you said yesterday that you heard several

13  names being banded around and you understood that FTI was

14  selected, right?

15  A.   I have seen emails that make it clear that FTI was

16  selected.

17  Q.   Okay and you personally didn't interact were FTI, right?

18  A.   I did not.

19  Q.   Did you in fact ever even meet Jonathan Hawker?

20  A.   I did once in the hotel in the concierge's floor.

21  Q.   Did you have any substantive discussion with him?

22  A.   No.   It was a hi, how are you, I'm Mike Loucks.

23     He said it's Jonathan Hawker from FTI.  Said welcome to

24  Ukraine, something like that.

25  Q.   Well, let's look at --

1     Could you put up Government Exhibit 124, please.

2     If you could enlarge the lower email, please, Mr. Int-Hout.

3     Yesterday, Mr. Loucks, I believe you described the

4 circumstances under which you wrote this email which is that

5 you were traveling and you were going to be in the air for a

6 long time and you wanted to address a matter that had come up,

7 correct?

8 A.   Correct.

9 Q.   And the matter that had come up was that Ms. Tymoshenko's

10 lawyer, Mr. Vlasenko, correct?

11 A.   Uh-hmm.

12 Q.   Was saying that he was going to put out into the public

13 the fact that Skadden was working on a matter for the Ukraine?

14 A.   Yes, essentially.

15 Q.   And up until that point Skadden's engagement was not

16 public, right?

17 A.   Not to my knowledge.

18 Q.   Okay.  And so you were worried that you weren't going to

19 have time to weigh into it, weigh in on the issue while you

20 were in the air, so you wrote this lengthy memo, this lengthy

21 email?

22 A.   I was worried that the events were going to play out in

23 the next business day in the Ukraine and I was going to be up

24 in the air.

25 Q.   Right?

1  A.    And my opportunity to provide direction, guidance, advice,

2  comment was right there.

3  Q.    Okay, fair enough.

4      If you look at the third email, third paragraph on the page

5  that starts Greg and go to the end of the line, please,

6  Mr. Int-Hout, yes.

7      You say I think we should recommend to the client that they

8  hold a press conference tomorrow, right?

9  A.    I did.

10  Q.    That was your idea?

11  A.    It was.

12  Q.    Okay.  And if you scroll up to the second paragraph from

13  the top, you address Alex and Alex and was that Mr. Van Der

14  Zwaan and Mr. Haskell?

15  A.    Yes.

16  Q.    And you said could you two craft some potential questions

17  and answers, press questions and proposed answers, right?

18  A.    Yes.

19  Q.    And then if you go to the top paragraph in the second line

20  you asked Matthew and that's Mr. Cowie, right?

21  A.    That's right.

22  Q.    Can you draft a potential press release for the client and

23  it goes on.  Right?

24  A.    Right.

25  Q.    Okay, and all three of these ideas the press conference,

1  the Q and As and the press release were all your idea?

2  A.   They were.

3  Q.   Okay.  Now I think you told us that you didn't really have

4  any more interaction with this until you landed on the ground,

5  right?

6  A.   That's right.

7  Q.   And when you landed on the ground you saw what Mr. Craig's

8  answer was, right?

9  A.   I saw a whole bunch of emails.  And it clearly decided the

10  course of conduct.

11     I don't know what you mean by Mr. Craig's answer.

12  Q.   Jon, can you show us the top part of this exhibit, please.

13     His initial response was what?  Maybe you could read it for

14  us?

15  A.   Sure.  I agree with Mike, it makes sense for the

16  Ukrainians to make this announcement but I would defer to FTI

17  as to how best to put this into the public domain.

18     Alex, did your new friend Mr. Vlasenko tell you why he felt

19  that these two letters should be made public.

20  Q.   Okay.  But in terms of who was going to deal with the PR

21  aspects of this, Mr. Craig's suggestion was let FTI handle it,

22  correct?

23  A.   No.  I think he said both.  I would defer to FTI as to how

24  best to put this into the public domain.

25  Q.   You, after you finished -- excuse me -- after you landed,

1  I think you said you had no further discussion about this,

2  correct?

3  A.   I don't remember.  Well, I was physically incapable of

4  having any discussion about this because I was in a meeting in

5  court.  I just don't remember.  This says May 22, 9:22 p.m. on

6  it.  If that's greenwich mean time, I don't know what that

7  translates to to the time in Hawaii.

8  Q.   Right.  Prior if you could scroll drown, please,

9  Mr. Int-Hout.

10     Prior to the phrase you pointed out as to defer to FTI.

11  Didn't Mr. Craig also say FTI should be asked to help handle

12  this?

13  A.   Yes, he has an email that says shouldn't we be asking FTI

14  to help handle this.

15  Q.   Did you personally ever, I mean, these are internal

16  communications among the Skadden group, right?

17  A.   Correct.

18  Q.   You personally never discussed with the Ukrainians what

19  they should do vis-a-vis this press problem?

20  A.   I did not.

21          MS. JUNGHANS:  Nothing further.

22          THE COURT:  All right, any redirect?

23                    REDIRECT EXAMINATION

24  BY MR. CAMPOAMOR-SANCHEZ:

25  Q.   Sir, you were asked some questions about the Manafort

1  proposal that Mr. Craig forwarded to you?

2  A.   Yes.

3  Q.   Can you tell the ladies and gentlemen of the jury what did

4  Mr. Craig ask you to do about that proposal?

5  A.   He asked me to review it, to give views as a former

6  prosecutor on the methods and format of a proposed essentially

7  prison, what I would call prison conditions investigation, what

8  happened to her while she was in confinement and how did she

9  get hurt, if she got hurt.

10 Q.   Did you give any input?

11 A.   I think I did orally.  I don't think I did in writing.

12 Q.   Do you know if anybody else gave input?

13 A.   I think Matthew Cowie did as well.

14 Q.   Then you were just asked questions about Government's

15 Exhibit 124?

16 A.   Yes.

17 Q.   Do you recall looking at this?

18 A.   I do.

19 Q.   Sir, first of all, Exhibit 124 does it relate to project

20 1, project 2 or something else?

21 A.   Something else.

22 Q.   What does it relate to?

23 A.   Well, it relates to a part of project 1 and that part of

24 project 1 was the approach to Ms. Tymoshenko about interviewing

25 her in connection with project 1.

1          But the topic of my email related to Mr. Vlasenko's

2    reaction to Mr. Van Der Zwaan's meeting and delivery of the two

3    letters and his reaction was he was going to go to the press

4    with it.

5    Q.   And that's what I want to understand.  So what led to

6    Mr. Vlasenko's reaction was what part of the project that was

7    being worked on?

8               MS. JUNGHANS:  Objection, objection, leading.

9               THE COURT:  Overruled.

10              THE WITNESS:  Project 1.

11   BY MR. CAMPOAMOR-SANCHEZ:

12   Q.   Do you know if Ukraine for example held a press

13   conference?

14   A.   I don't remember that they did.

15   Q.   As you sit here today, I know you were telling us

16   yesterday about the travel.  That email, Government Exhibit

17   124, do you know or not whether you saw that before you got on

18   the plane?

19   A.   I don't think I saw that until I landed.

20   Q.   You don't think you saw it before?

21   A.   No.

22              MR. CAMPOAMOR-SANCHEZ:  No further questions, Your

23   Honor.

24              THE COURT:  All right, thank you.

25         This witness can be excused.

 1          Call your next witness.

 2          (Witness excused.)

 3               MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

 4          Your Honor, the Government calls Douglas Schoen to the

 5     stand.

 6               THE COURT:  All right.

 7               GOVERNMENT WITNESS DOUGLAS SCHOEN SWORN

 8                         DIRECT EXAMINATION

 9     BY MR. CAMPOAMOR-SANCHEZ:

10     Q.   Good morning, sir.

11     A.   Good morning.

12     Q.   Can you please tell us your name and spell it for the

13     record?

14     A.   Sure.  It's Douglas Schoen, S-C-H-O-E-N.

15     Q.   Sir, without telling your address, where do you live?

16     A.   I live in New York City.

17     Q.   Can you briefly describe your educational background?

18     A.   Sure.  I went to Harvard College, studied at Oxford, then

19     went to Harvard Law School.

20     Q.   Sir, are you a lawyer?

21     A.   I am a member of the Bar, but I am not a practicing

22     lawyer.

23     Q.   So what do you do for a living?

24     A.   I have a market research and opinion consulting business.

25     Q.   Sir, let me ask you, do you know Mr. Greg Craig?

1  A.    I do.

2  Q.    How did you get to know or meet Mr. Craig?

3  A.    In the Clinton White House.

4  Q.    Can you be a little more specific about how that

5  interaction happened?

6  A.    Sure.  He was a special counsel to President Clinton I

7  believe 1998 and 1999.  And I was a political adviser and we

8  were in many of the same meetings.

9  Q.    Sir, do you see Mr. Craig in the courtroom here today?

10 A.    I do.

11 Q.    Can you please identify him by what he's wearing and where

12 he's seated?

13 A.    Mr. Craig is right over there standing up now.

14         THE COURT:  All right, the record will reflect he's

15 identified the defendant.

16     I don't think it's necessary for you to stand up.  I think

17 they can see from there.

18     All right, go ahead.

19         MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

20 BY MR. CAMPOAMOR-SANCHEZ:

21 Q.    Let me direct your attention to the early part of 2012?

22 A.    Sure.

23 Q.    Did you have a conversation with Mr. Craig?

24 A.    I did.

25 Q.    Tell the ladies and gentlemen of the jury about that?

1   A.    Sure.  Well, I spoke to Mr. Craig.  I think it was early

2   February if I'm correct of 2012 about him potentially taking on

3   a representation in Ukraine involving an independent assessment

4   of the prosecution of former Prime Minister Yulia Tymoshenko.

5   Q.    Why was it that you approached Mr. Craig about this

6   potential project?

7   A.    Well, I had been impressed with Mr. Craig and his work in

8   the White House and he certainly has been a lawyer of

9   substantial reputation.

10  Q.    Did you have some instructions or was there a reason that

11  you were looking for somebody to fulfill this role?

12  A.    Yes.  My client in Ukraine Victor Pinchuk said that he

13  would like me to see if there was a high quality lawyer who

14  could potentially be engaged to do that project, the

15  independent assessment of the Tymoshenko prosecution.

16  Q.    And it was in response to that instruction that you

17  contacted Mr. Craig?

18  A.    Yes, that's right.

19  Q.    If we could look at Government's Exhibit 25 which has been

20  admitted.  You recognize this exhibit?

21  A.    Yes, I do.

22  Q.    Can you see it yourself on your screen?

23  A.    Yes, I can.

24  Q.    What is Government's Exhibit 25?

25  A.    It is I believe the initial note that I sent to Mr. Craig

1    suggesting that there was a piece of business for an unnamed

2    international client that I wanted to discuss with him if he

3    was so inclined.

4    Q.    Is that how you initially contacted Mr. Craig?

5    A.    I believe it is.

6    Q.    And as it says here in the email, if I could ask you to

7    call me regarding this piece of business.  Did Mr. Craig call

8    you?

9    A.    He did.

10   Q.    Did you have a conversation with him about it?

11   A.    I did.

12   Q.    Tell us about that conversation?

13   A.    I mentioned the issue of potentially doing an independent

14   assessment of the Tymoshenko prosecution and I said that I

15   thought that he would be a very good lawyer to recommend and

16   his law firm Skadden, Arps is the law firm to recommend.

17   Q.    What did Mr. Craig say in response?

18   A.    He was initially enthusiastic and said he had to do a

19   conflicts check.

20   Q.    Let me ask you.  Do you know a man by the name of Paul

21   Manafort?

22   A.    I do.

23   Q.    Briefly, how did you know of Mr. Manafort by 2012?

24   A.    I'm sorry, can you repeat your question?

25   Q.    Sure.  How did you know Mr. Manafort as of 2012?

```
1   A.    I have, I had some dealings, business dealings 35, 36

2   years before with Mr. Manafort and occasionally once every

3   three to five years our paths would cross, but and I also knew

4   he was working in Ukraine for the President.

5   Q.    He was working in Ukraine for the President?

6   A.    I'm sorry, I couldn't hear.

7   Q.    Yes.  He was working in Ukraine for the President, which

8   President?

9   A.    My understanding was that he was one of the top, if not

10  the top adviser to then President Viktor Yanukovych of Ukraine.

11  Q.    Did Mr. Manafort become involved in this potential

12  project?

13  A.    Yes, he did.

14  Q.    Can you explain to the ladies and gentlemen of the jury

15  how that happened?

16  A.    Sure.

17        MR. TAYLOR:  Objection, hearsay.

18        THE COURT:  I don't think he's asked for hearsay yet.

19        MR. TAYLOR:  May I respond?

20        THE COURT:  At the bench.

21    (Bench conference.)

22        THE COURT:  Yes.

23        MR. TAYLOR:  The only way he would know is because

24  somebody told him.  The only source of his information would be

25  what somebody else told him, so it is hearsay.  His knowledge
```

1   of what Manafort did or didn't do can only be hearsay.

2          THE COURT:  All right.

3          MR. CAMPOAMOR-SANCHEZ:  Your Honor, so that the Court

4   knows, I'm setting this up because he had a three way

5   conversation with Mr. Craig.

6          THE COURT:  Mr. Taylor, let him talk.

7          MR. TAYLOR:  Sorry.

8          MR. CAMPOAMOR-SANCHEZ:  He had a three way

9   conversation between Mr. Craig, Mr. Manafort and himself about

10  the project.  I was setting up how did he include him in this

11  because he just explained that he reached out to Mr. Craig.

12         THE COURT:  The question I think you asked was how

13  did he come to know that he was involved in the matter, so what

14  is the answer?

15         MR. CAMPOAMOR-SANCHEZ:  My expectation he is going to

16  say that his client Mr. Yanukovych put him in contact with Mr.

17  Manafort about this and the three of them had a conversation.

18         THE COURT:  Without saying what he said, you can just

19  say, you can say that his client put him in contact with Mr.

20  Manafort.  Then you can say, ask him about his communication

21  with Mr. Manafort.

22         MR. CAMPOAMOR-SANCHEZ:  Would you like me to lead him

23  so he doesn't say anything else about that?

24         MR. TAYLOR:  I'm not sure what I want makes any

25  difference at all.

```
 1              MR. CAMPOAMOR-SANCHEZ:  You objected.

 2              THE COURT:  All right, let's try to keep the

 3    conversations going through me rather than to each other.

 4         I think you can ask, why don't you just ask did your

 5    client, did he direct you to speak with him, did you have

 6    contact with anyone?

 7         Yes.  Who?  Mr. Manafort.  Then as a result of that, what

 8    did you do, and then we'll go from there.

 9         Thank you.

10         (Open court.)

11    BY MR. CAMPOAMOR-SANCHEZ:

12    Q.   Mr. Schoen, did your client, Mr. Pinchuk, put you in

13    contact or get in touch with anyone else?

14    A.   He asked me to get in touch with Paul Manafort.

15    Q.   And you in fact did that?

16    A.   I did.

17    Q.   Was there a conversation that you had with Mr. Manafort

18    and anybody else about this project?

19    A.   There was an initial conversation with Mr. Manafort where

20    I said --

21              MR. TAYLOR:  Objection.

22              THE COURT:  All right, let's not talk about the

23    content of that one.

24              THE WITNESS:  I'm sorry.

25              THE COURT:  All right.
```

1    BY MR. CAMPOAMOR-SANCHEZ:

2    Q.   Was there a conversation in which Mr. Craig participated?

3    A.   Yes, there was, there was a -- Yes.

4    Q.   Can you please tell us about that conversation?

5    A.   Yes.  We spoke about the prospective engagement of

6    Mr. Craig and Skadden, Arps to do the independent assessment of

7    the Tymoshenko prosecution.

8    Q.   If I can stop you there.  Who was part of this

9    conversation?

10   A.   The conversation was myself, Mr. Craig and Mr. Manafort.

11   Q.   So the three of you?

12   A.   Yes, that's right.

13   Q.   Please go on.  What was discussed during those

14   conversations?

15   A.   First, Mr. Manafort said that he would handle whole

16   details of the engagement should it go forward, the financing,

17   the logistics, operations, organization of the project.

18   Q.   What else was discussed during this conversation?

19   A.   It was also, if my recollection is correct, before the pre

20   engagement trip that Mr. Craig made, so there was some

21   discussion of that as well.

22   Q.   What do you recall Mr. Craig saying during this

23   conversation, if anything?

24   A.   Mr. Craig was enthusiastic about the engagement and made

25   it clear that there would be no issues with FARA registration

1  because as a lawyer that would not be an issue that he would

2  have to face.

3  Q.   Who brought up the issue of the FARA, the foreign agents

4  registration?

5  A.   Mr. Craig.

6  Q.   Did you prompt him or did anybody else prompt him?

7  A.   I did not.

8  Q.   Do you have any reason to doubt what he said about that?

9  A.   No.

10 Q.   Was money discussed during this conversation?

11 A.   I know there was a, the issue of the amount for the first

12 payment had been already discussed between myself and

13 Mr. Craig.  So that might have come up in the context of the

14 discussion.

15    Mr. Craig having been very clear that he would not travel

16 to Ukraine nor would his colleagues absent the payment of the

17 initial sum for the pre engagement trip.

18 Q.   What was the initial sum that was required for the pre

19 engagement trip?

20 A.   A hundred and fifty thousand dollars.

21 Q.   Who was suppose to pay a hundred and fifty thousand

22 dollars?

23 A.   I'm sorry, can you repeat that?

24 Q.   Who was suppose to pay the hundred and fifty thousand

25 dollars?

1  A.    Mr. Pinchuk and his foundation.

2  Q.    Did you yourself give any advice to Mr. Craig during that

3  call?

4  A.    I made it clear to him that in all dealings with Ukraine

5  to be very, very clear what the budget would be, to not exceed

6  what he had specified would be the cost of the project so that

7  he would find himself not having to go back for additional

8  sums.

9  Q.    And why did you give Mr. Craig this advice?

10 A.    Well, I had done business with Mr. Pinchuk in Ukraine for

11 many years and I knew that they valued certainty in their

12 financial dealings.

13 Q.    Mr. Pinchuk specifically or just Ukraine in general?

14 A.    Mr. Pinchuk, certainly Ukrainians from what I could see

15 more generally.

16 Q.    Let me direct your attention to Exhibit Number 34 which is

17 already admitted in evidence.

18     If you could zoom in on the --

19     You recognize, sir, this email?

20 A.    Yes, I do.

21 Q.    What is this email?

22 A.    This is an email from Mr. Craig to Mr. Manafort on which I

23 was copied saying that they prepared a preliminary agreement,

24 draft retainer for the preliminary trip for engagement to do

25 the independent assessment of the Tymoshenko prosecution.

1        He says in the note that he'll need the retainer before he

2    leaves and that he's also going to copy me on this letter in

3    case I get asked about it.

4    Q.   What date is this engagement letter sent to you and Mr.

5    Manafort?

6    A.   The date of the email is February 20.

7    Q.   If we can go to page 2 of this exhibit.  And in the

8    paragraph under scope of preliminary engagement.

9        If I can direct your attention to the middle of the

10   paragraph where it says we understand the general nature of the

11   assignment to be discussed is as follows.  If you could read

12   that next sentence to yourself?

13   A.   The government of Ukraine is interested in retaining and

14   authorizing the firm to conduct an independent inquiry of the

15   investigation, prosecution, trial, conviction and sentencing of

16   the former Prime Minister of Ukraine, Yulia Tymoshenko, and to

17   provide an opinion as to whether the handling of her case

18   violated the fundamental standards of substantive procedural

19   due process.

20   Q.   Was that consistent with the understanding that you had

21   about the reason you reached out to Mr. Craig?

22   A.   Yes, it is.

23   Q.   If I can then, you can go to the next paragraph where it

24   says the scope of the engagement and it reads under the terms

25   and conditions governing that engagement have not yet been

1    worked out.

2        Was that also correct from your understanding?

3    A.   Yes, that's right.

4    Q.   So what was the purpose of this trip for Ukraine that was

5    being planned then?

6    A.   I think the purpose of the trip as I understood it was to

7    see on both sides if there was a basis to go forward and do

8    that independent assessment of the Tymoshenko's prosecution.

9    Q.   And if you could go to page 3.  The middle of the page

10   where it says fees and expenses.

11       Is the amount listed here again in accord with what you

12   recall about the conversations related to the initial payment?

13   A.   Yes, it is.

14   Q.   All right.  Now was Mr. Craig or his firm ultimately paid

15   by Mr. Pinchuk the hundred and fifty thousand dollars?

16   A.   I received the funds from Mr. Pinchuk's foundation and

17   transferred them to Skadden, Arps, to Mr. Craig.

18   Q.   As you sit here today do you recall the date of when

19   approximately that was?

20   A.   I think it was in March of 2012.  I don't have the precise

21   date in my mind as we sit here.

22   Q.   If I can show you Government's Exhibit 41.  It's already

23   been admitted into evidence.

24       We can focus first on the bottom of the email.  Let us know

25   if that refreshes your recollection of approximately the time?

1  A.   Yes, it was March 19th and I'm alerting Mr. Craig to the

2  fact that funds have been transferred and that I expect they'll

3  arrive in the next day and that I will then transfer

4  immediately to him.

5  Q.   And did Mr. Craig respond in this very same chain to you?

6    If you can please explain to the ladies and gentlemen of

7  the jury what happened at this point?

8  A.   Sure.  Mr. Craig is saying that he was in touch with

9  Mr. Manafort.  That the trip is being rescheduled, that

10  Mr. Pinchuk had invited Mr. Craig to dinner at the end of what

11  was a now canceled -- I'm sorry -- a now postponed trip and

12  that Mr. Craig asked me to thank him for that invitation and

13  say hopefully in the future it would be something he could take

14  up.

15    And the note continues to say that they plan to, we use the

16  extra time to confirm the appointments, consult with Paul

17  Manafort about the process and do it right.  And he reiterates

18  they'll be looking for the funds.

19  Q.   Before you received this email that says that they're

20  rescheduling the trip, had you been consulting or know that the

21  trip had been rescheduled?

22  A.   I don't have any recollection that I was.

23  Q.   Do you know if, do you know if Mr. Craig ultimately did

24  travel to Ukraine?

25  A.   Yes, he did.

1  Q.   Did you help with any arrangements related to that first

2  trip?

3  A.   Only of facilitating a breakfast meeting with Mr. Pinchuk.

4  Q.   Why were you facilitating a breakfast meeting with

5  Mr. Pinchuk and Mr. Craig?

6  A.   Well, the dinner as we just saw had been canceled from the

7  earlier trip that did not come off on the earlier schedule and

8  this was an effort to reschedule that meeting.

9  Q.   If we can look at Government's Exhibit 54 already in

10  evidence.  If we can go to the second page beginning with the

11  first email.

12     Sir, do you see this email?

13  A.   Yes, I did.

14  Q.   Is this an email that you sent to Mr. Craig related to

15  those arrangements that you would have been discussing?

16  A.   Yes, that's right.

17  Q.   What's the date?

18  A.   The date was April 5th of 2012.

19  Q.   If we can go -- well, let me ask you.

20     Did Mr. Craig ultimately report to you the outcome of his

21  meeting with Mr. Pinchuk?

22  A.   He did.

23  Q.   Go to page 1 in the middle.  What did Mr. Craig tell you

24  about how the meeting with Mr. Pinchuk had gone?

25  A.   He said it went well.  And that he wanted to talk to me

1  about, as the email reports, about funding for the project.

2    Says as he had said consistently from the start that he

3  could not do anything without payment in advance and the note

4  says that he has two other projects potentially to undertake.

5  Q.   And related to those two projects, one being helping the

6  trial team in the second prosecution and two, advising Justice

7  Ministry about the Tymoshenko case and the European Human

8  Rights Court.

9    Were you aware of those two projects?

10 A.   Not really.  I was focused specifically on the independent

11 assessment of the Tymoshenko prosecution.

12 Q.   And when Mr. Craig tells you here I need to talk to you

13 about funding for this project.  Was that something that you

14 ultimately discussed with him?

15 A.   I believe we did.

16 Q.   Okay, what do you recall about that?

17 A.   I recall him reiterating what he had said consistently

18 which is he required advance payment before he and his team

19 would either travel to Ukraine or begin work.

20 Q.   Now do you recall discussing an amount what it would

21 ultimately take to --

22 A.   I don't.  Again, Mr. Manafort was handling the finances

23 from this point forward.

24 Q.   If we can look at the very top email of this chain.  What

25 is this top email?

A.    Top email says that I spoke to Victor, he told me he was

very impressed with Mr. Craig and I believe some of his

colleagues and I suggested directly to Mr. Craig that he give

Paul a similar briefing to the one he'd given me.

Q.    Can you explain to the ladies and gentlemen of the jury

why you suggested that Mr. Craig give a similar briefing to Mr.

Manafort?

A.    Again, Mr. Manafort had made it clear from the start that

he would be handling the finances, the logistics, the

operations, the organization of the project.

     What I was trying to suggest is that my own role was

limited to the pre engagement phase of the project and from

this point forward the project was Mr. Manafort's to supervise,

oversee and finance.

Q.    So do you have any role going forward after this as it

related to this issue?

A.    I'm sorry, could you repeat the question?

Q.    Sure.  Did you have any role going forward as it related

to this project?

A.    No, no formal at all.

Q.    Any informal role?

A.    I received a series of emails from Mr. Craig and I did

respond to most of them I believe, but that really was my only

role.

Q.    So did you supervise anything going forward?

1  A.    No.

2  Q.    Did you facilitate or help transfer funds going forward?

3  A.    No.

4  Q.    Did you take any actions with regard to the project going

5  forward?

6  A.    No.

7  Q.    Let me move you then to August of 2012.  Do you recall

8  having any conversation with Mr. Craig in August of 2012?

9  A.    I do.

10  Q.    Can you please tell the ladies and gentlemen of the jury

11  what you remember about that?

12  A.    Sure.  Mr. Craig called and I believe that he asked me

13  would Mr. Pinchuk or even myself be willing to be identified as

14  a client?

15      And I indicated that since this was not Mr. Pinchuk's

16  project, certainly not mine, we had no role in it, we're not

17  involved in any of the work, it would not be appropriate to

18  identify us in any way with the, with the independent

19  assessment he was working on.

20  Q.    Did Mr. Craig explain to you why he was interested in

21  either associating Mr. Pinchuk or you with this project?

22  A.    He didn't explain in any detail, but it was clear he

23  wanted to do that.

24  Q.    Why was it that you, for example, did not want your name

25  associated with it?

1  A.   I had no role in the project.  Not worked on it, not read

2  any documents.  Not drafted anything.  Not done any of the

3  interviews that Mr. Craig and his team did.  So it would be a

4  practical impossibility for me to put my name on work product

5  that I had nothing to do with.

6  Q.   Let me ask you without telling us any content.  Did you

7  have any conversations with Mr. Pinchuk about some of this

8  conversation that Mr. Craig had?

9  A.   I did ask Mr. Pinchuk the question and his answer was this

10  isn't my project.  I'm not involved, I am not their client.

11  Q.   And did you communicate that to Mr. Craig?

12  A.   I did.

13  Q.   In that conversation in August of 2012 at any point was

14  Mr. Craig asking for you to either provide money or get money

15  for the project?

16  A.   My best recollection is that he did not.

17  Q.   It was all about the naming of --

18  A.   That's my recollection.

19       MR. CAMPOAMOR-SANCHEZ:  No further questions, Your

20  Honor.

21       THE COURT:  All right.

22    All right, any cross examination?

23       THE WITNESS:  Excuse me.  May I get a glass of water,

24  please?

25       THE COURT:  Yes, it's right there.

```
 1              THE WITNESS:  Thank you very much.
 2                        CROSS EXAMINATION
 3  BY MR. TAYLOR:
 4  Q.   Mr. Schoen.
 5  A.   Yes, sir.
 6  Q.   Mr. Pinchuk asked you to recommend a lawyer?
 7  A.   He did.
 8  Q.   You recommended Mr. Craig; is that right?
 9  A.   I did.
10  Q.   It was not Mr. Manafort who recommended Craig?
11  A.   That is true.
12  Q.   So if someone suggested that Mr. Manafort picked Mr. Craig
13  to buy his reputation, that would not be correct would it?
14  A.   It's not my understanding.
15  Q.   You relayed your suggestion of Mr. Craig to Mr. Pinchuk I
16  take it?
17  A.   I did.
18  Q.   And did you tell Mr. Pinchuk why you believed Mr. Craig
19  was suited for the job?
20  A.   I did.
21  Q.   And what was, what did you tell Mr. Pinchuk?
22  A.   I told him that Mr. Craig was a very high quality lawyer,
23  that Skadden was a high quality law firm and that I had seen
24  Mr. Craig's work.  I believe it was then, it could be a little
25  off, but I think 13 or 14 years earlier in the White House when
```

1  he was a special counsel.

2  Q.   Did any of it have to do with his reputation?

3  A.   And I knew generally that Mr. Craig had a very good

4  reputation.

5  Q.   You set up a breakfast for Mr. Craig and Mr. Pinchuk in

6  Kyiv?

7  A.   I did.

8  Q.   And Mr. Craig went to Kyiv and met with Mr. Pinchuk you

9  were told?

10  A.   Can you --

11  Q.   Mr. Craig went to Kyiv you learned and met with

12  Mr. Pinchuk?

13  A.   Yes.

14  Q.   And both of them reported to you that the meeting went

15  well?

16  A.   Yes, they did.

17  Q.   Did you understand that Mr. Craig spoke to Mr. Pinchuk in

18  that meeting about the cost of the project?

19  A.   I did not.

20  Q.   Did you -- do you recall Mr. Craig asking you who the

21  client was going to be?

22  A.   I don't.

23  Q.   Do you recall asking whether or not the client was going

24  to be Mr. Pinchuk or the Ministry of Justice?

25  A.   Again, I don't have a clear recollection as we sit here

1  today.

2      (Defense Exhibit Number 329 marked for identification.)

3  Q.  May I show you Defense Exhibit marked for identification

4  329.  This is marked for identification.

5      Mr. Schoen, you see that exhibit marked for identification?

6  A.  I do.

7  Q.  Does that refresh your recollection as to whether

8  Mr. Craig asked you who his client was going to be?  I'll refer

9  you to the --

10          THE COURT:  Are you just using this to refresh his

11  recollection?

12          MR. TAYLOR:  Yes.

13          THE COURT:  He can turn it off the screen.

14          MR. TAYLOR:  It should not be on the screen.

15          THE COURT:  It's not on the screen.  It's only on my

16  screen?

17          THE DEPUTY CLERK:  It's not on their screens.

18          THE COURT:  Okay, thank you.  Sorry.

19  BY MR. TAYLOR:

20  Q.  I'm told that it's actually been admitted which reflects

21  --

22          THE COURT:  All right.  Well, I just thought you had

23  showed it to him.

24          MR. TAYLOR:  I did show it for purposes of refreshing

25  recollection.

1           THE COURT:  All right, at any rate does it in fact

2   refresh your recollection about the question he asked you that

3   you didn't recall which was whether Mr. Craig asked you who the

4   client would be?

5           THE WITNESS:  No, it doesn't.

6   BY MR. TAYLOR:

7   Q.   Do you see that this is a series of emails between you and

8   Mr. Craig, appears to be?

9   A.   Yes, I do.

10  Q.   Do you have any doubt that you received this?

11  A.   No.

12  Q.   Just don't recall any conversation with Mr. Craig about

13  who the client was going to be whether it was going to be

14  Mr. Pinchuk or the Ministry of Justice?

15  A.   I see an email where it says please talk to Paul to

16  clarify with him.

17  Q.   You didn't have much to do with the project after this

18  initial set of discussions between Mr. Craig, Mr. Pinchuk, you

19  and Mr. Manafort did you?

20  A.   No, I didn't.

21  Q.   Mr. Craig told you that he wanted to disclose Mr. Pinchuk

22  as the source of funds for the project did he not?

23  A.   He may well have said that.

24  Q.   And Mr. Pinchuk and you on his behalf told Mr. Craig that

25  Mr. Pinchuk did not agree to that; is that right?

1  A.   As I said, he was not part of the project, not involved,

2  and did not want to be the client.

3  Q.   You said that you had several conversations with Mr. Craig

4  during this period which you may or may not recall; is that

5  right?

6  A.   There were a number of them, yes.

7  Q.   Do you recall Mr. Craig calling you and telling you that

8  his firm had an overpayment and asking if Mr. Pinchuk would

9  like to have some of his money refunded?

10  A.   I remember that he did call me and said he had an

11  overpayment, yes.

12  Q.   And you, between that, the time things started and that

13  conversation, there may have been other conversations with

14  Mr. Craig that you don't remember?

15  A.   There were probably some, yes.

16            MR. TAYLOR:  No further questions, Your Honor.

17            THE COURT:  All right, any redirect?

18            MR. CAMPOAMOR-SANCHEZ:  Can we display for the

19  witness Defendant's Exhibit 329, please.

20            THE DEPUTY CLERK:  It is in evidence.

21            THE COURT:  He said for the witness.

22            MR. CAMPOAMOR-SANCHEZ:  I said for the witness.

23            THE COURT:  He's got it in front of him.

24                        REDIRECT EXAMINATION

25  BY MR. CAMPOAMOR-SANCHEZ:

1    Q.   Oh, you have it in front of you.

2    A.   Thank you.

3    Q.   You were being asked by defense counsel about your

4    recollection?

5    A.   Yes, that's correct.

6    Q.   As to whether Mr. Craig asked you who the client should

7    be?

8    A.   Uh-hmm.

9              THE COURT:  Is that yes for the Court Reporter?  You

10   said uh-hmm.

11             THE WITNESS:  I'm sorry?

12             THE COURT:  Is that a yes?

13             THE WITNESS:  Yes.

14   BY MR. CAMPOAMOR-SANCHEZ:

15   Q.   Can you please read the question that Mr. Craig actually

16   asked you on Wednesday, March 21st?

17   A.   Sure.  Which means your organization would be the third

18   party payee in the retainer letter?

19        Yes, if we ever get there.

20   Q.   Can you start from the beginning as I said?

21   A.   Sure, as I said, Paul wants me to identify the Ministry,

22   the Minister of Justice as the client which means your

23   organization would be the third party payee in the retainer

24   letter.  Yes, if we ever get there dot dot dot.

25   Q.   Is there any question here to you as to who the client

1    should be?

2    A.   Look to me like the client was the Minister of Justice.

3    Q.   Who according to Mr. Craig was identifying the Ministry of

4    Justice as the client?

5    A.   Paul Manafort.

6    Q.   And what did you respond to Mr. Craig when he sent you

7    that email?

8    A.   My response I believe it's in sequence says please talk to

9    Paul and clarify with him.

10   Q.   What did Mr. Craig say in response to that?

11   A.   I will.

12          MR. CAMPOAMOR-SANCHEZ:  No further questions.

13          THE COURT:  All right.

14          MR. TAYLOR:  Recross?

15          THE COURT:  Just on that?

16          MR. TAYLOR:  Just on this topic.

17          THE COURT:  Yes, all right.

18                      RECROSS EXAMINATION

19   BY MR. TAYLOR:

20   Q.   Calling your attention, Mr. Schoen, to this Exhibit 329

21   before the passage that Mr. Campoamor asked you to read, I'd

22   like you to read the one dated March 21, 2012 at 1437 from

23   Gregory Craig to you.

24      Can you read that out loud, please?

25   A.   I have to check out something with you, Doug.  Is our

1    client the Minister of Justice as Paul Manafort tells me or is

2    it something, someone else?

3        If it is the Minister of Justice I have to report it to our

4    firm as being a non resident alien.

5        Also, I need a W-9 form, I think, from you.  I am meeting

6    with Manafort on Friday.

7    Q.   You knew that Mr. Pinchuk was not the client, right?

8    A.   Yes.

9    Q.   All right.

10             MR. CAMPOAMOR-SANCHEZ:  Your Honor, can we move in

11   Defense Exhibit 329?

12             THE COURT:  Any objection?

13             MR. TAYLOR:  No.

14             THE COURT:  All right, it will being admitted.

15             MR. TAYLOR:  It was already.

16             THE COURT:  All right, not yet.

17       (Defense Exhibit Number 329 received into evidence.)

18             THE COURT:  All right, you can step down, sir.  Thank

19   you very much.

20       This witness can be excused?

21             MR. CAMPOAMOR-SANCHEZ:  Yes.

22       (Witness excused.)

23             THE COURT:  All right, how long will the next

24   witness's testimony be?

25             MR. MCCULLOUGH:  We anticipate it will be

1    approximately one hour, Your Honor.

2           THE COURT:  All right, then this will be a good time

3    to take a midmorning break.

4       The jurors may leave your notebooks on your chair.  Please

5    do not discuss the case among yourselves or with anyone else

6    while you're outside of the courtroom.

7       We'll resume in approximately ten minutes.

8       (Jury excused at 11:03 a.m.)

9           THE COURT:  All right, we'll all resume at

10   approximately 11:15.

11      Please have your witness in the courtroom ready to go.

12      Thank you everybody.

13      (Recess at 11:04 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Proceedings resumed at 11:19 a.m.)

 2          THE COURT:  All right, can we bring in the jury and

 3  the next witness?  Okay, let's do that.

 4          (Jury panel present.)

 5          THE COURT:  All right, everybody is back, great.

 6  Thank you for being back on time.  I take it no one has

 7  approached you to discuss the case and you haven't discussed

 8  the case.  All right, let's call your next witness.

 9          MR. MCCULLOUGH:  Your Honor, the government calls

10  Mr. Alex Haskell.

11          THE COURT:  Okay.

12              GOVERNMENT WITNESS ALEX HASKELL SWORN

13          THE COURT:  All right, can you proceed.

14                        DIRECT EXAMINATION

15  BY MR. MCCULLOUGH:

16  Q.   Good morning, Mr. Haskell.

17  A.   Good morning.

18  Q.   Can you please state your name and spell it for the

19  record?

20  A.   It's Alex Haskell, A-L-E-X H-A-S-K-E-L-L.

21  Q.   Without providing your specific address, can you please

22  tell us where you live?

23  A.   In Washington D.C.

24  Q.   What generally do you do for a living?

25  A.   I'm an attorney.

1   Q.   Did you go to law school?

2   A.   I did.

3   Q.   Where did you go to law school?

4   A.   GW here in D.C.

5   Q.   Did you have any legal jobs during your time at GW?

6   A.   Yeah, I did.  I interned for the Washington Nationals in

7   their General Counsel's office.

8   Q.   After GW, what was your first legal position?

9   A.   It was associate at Skadden, Arps.

10  Q.   How long were you at Skadden, Arps during that first time?

11  A.   About three and a half years.

12  Q.   So what years were those?

13  A.   Those were fall 2011 to January 2015.

14  Q.   What office did you work in?

15  A.   D.C.

16  Q.   Did you work with any partners more frequently than others

17  during your first time there?

18  A.   Yes, I did.

19  Q.   What partners were those?

20  A.   Greg Craig, Cliff Sloan, there were several others, but --

21  Q.   What were the factors that brought you to the D.C. office

22  of Skadden?

23  A.   I was living in D.C. and loved living here and was

24  attracted to the type of legal work that was happening here so

25  both personally and professionally it made sense.

1    Q.    Had you met with Mr. Craig before joining Skadden?

2    A.    I had not.

3    Q.    Can you describe the law firm?  Can you describe for the

4    jurors kind of law firm hierarchy, what does it mean to be an

5    associate at Skadden?

6    A.    An associate is the junior lawyer position, but it's a

7    position you can be in for, you know, eight, nine, ten years.

8         But everybody who, all the attorneys who start at the firm

9    start out as associates.

10   Q.    And then what happens as you progress in a law firm?

11   A.    Depends on the law firm.  Would you like me to speak to

12   Skadden?

13   Q.    Well, if you can just describe associate -- do associates

14   take direction from other lawyers of the firm?

15   A.    Yeah, the more senior positions are counsel and above that

16   partner.

17        They are, they are the, for example, the associates spend

18   the most time working for.

19   Q.    During your first year at the firm did you have

20   involvement in any work that Skadden was performing for the

21   government of Ukraine?

22   A.    I did.

23   Q.    Can you describe for the jury what that work was?

24   A.    I worked on an internal investigation related to the

25   prosecution of Yulia Tymoshenko who was a former Prime Minister

1    of Ukraine.

2    Q.   How did you first come to learn about that project or that

3    you would be involved in that project?

4    A.   I can recall having a, I can recall learning of it from

5    either Cliff Sloan or Greg Craig.

6       I'm not exactly sure what I knew at the outset but I was

7    asked to do some preliminary research projects that I worked on

8    prior to the firm formally taking on the representation.

9    Q.   Can you describe what those initial research projects

10   were?

11   A.   There were two that I can recall.  The one that I believe

12   you're interested in related to the Foreign Agent Registration

13   Act.

14   Q.   Just for the record, what was the other?

15   A.   The other involved another firm client.

16   Q.   Okay.

17            MR. MCCULLOUGH:  So Your Honor, just request

18   permission to lead very briefly?

19            THE COURT:  All right.

20   BY MR. MCCULLOUGH:

21   Q.   Mr. Haskell, that was just a conflicts check to make sure

22   that the firm could take on the representation; is that right?

23   A.   I don't recall exactly when it was, but I do recall it

24   involving something, having something to do with conflicts.

25   Q.   So focusing your attention on the research that you did on

1   the Foreign Agent Registration Act or the project that you did

2   on the Foreign Agent Registration Act, what were you asked to

3   do?

4   A.   I really don't recall.  I know that, I don't recall

5   exactly what sense I had of what the project would be at that

6   point, but generally, the project was taking a look at the

7   Foreign Agent Registration Act and seeing if it would be

8   applicable to the representation as I understood it to be at

9   the time.

10  Q.   At the time you were conducting this research did you have

11  any familiarity with the Foreign Agent Registration Act?

12  A.   I did not.

13  Q.   Do you recall who asked you to do this research?

14  A.   I don't recall precisely who it was.

15  Q.   Based on, based on your involvement in the project at the

16  outset, who could it have been?

17        THE COURT:  Well, he doesn't recall who asked him.

18  BY MR. MCCULLOUGH:

19  Q.   Showing you what's been previously admitted as

20  Government's Exhibit 32.  And asking you if you recognize this?

21  A.   I do.

22  Q.   What is this?

23  A.   It is the email that I sent summarizing that initial

24  research project.

25  Q.   If I can direct your attention to the first line of the

1   email.

2      Can you just read the first sentence, please?

3   A.   This email contains an analysis of the applicability of

4   the Foreign Agent Registration Act of 1938, FARA, to attorneys

5   representing the government of the foreign country i.e. Ukraine

6   in an internal investigation.

7   Q.   Is that consistent with your memory of how the project had

8   been described to you?

9   A.   Again, I just don't recall the, how it exactly was

10  described to me.  But I don't have any reason to doubt my

11  understanding as I put in that email.

12  Q.   Why was the Foreign Agent Registration Act even relevant

13  to this work?

14  A.   We would be working with a foreign government and the

15  Foreign Agent Registration Act is applicable to certain types

16  of work done on behalf of foreign Governments.

17  Q.   And without asking you to remember the details of your

18  research, can you describe for the jury what types of

19  activities might be relevant to the Foreign Agent Registration

20  Act analysis?

21  A.   Well, with the caveat that I'm not a foreign expert, I

22  think that there's a wide range of, wide range of activity

23  lobbying, public relations, certain types of legal

24  representation although some are carved out.

25      Yes, that's fair.

1  Q.   Focusing your attention on the last sentence of the

2  paragraph I've highlighted.  Can you tell us what your

3  conclusion was?

4  A.   The representation at issue would not involve any actions

5  discussed in the four subsections of Section 611 C.

6  Q.   So at the time that this was initially described to you,

7  did you understand that Skadden would be participating in any

8  public relations activities?

9  A.   I did not.

10 Q.   And what was your conclusion as to the applicability of

11 the Foreign Agent Registration Act to the internal

12 investigation that Skadden had been asked to perform?

13            MR. ABELSON:  Objection, Your Honor.

14       He is asking him to testify about the law.

15            THE COURT:  Can you approach the bench.

16       (Bench conference.)

17            THE COURT:  You are doing that and I don't know why

18 you're doing that.

19            MR. MCCULLOUGH:  I just wanted him to say that he,

20 based on his initial research.  This is in February.

21            THE COURT:  Why are we going down this road at all

22 about what he thought whether or not?

23            MR. MCCULLOUGH:  Because he provided this, he

24 provided FARA.  He provided the initial FARA advice and

25 informed Mr. Craig and Mr. Sloan that they did not think to

1    verify to this project.

2              THE COURT:  All right, if you're going to ask him

3    what his conclusion was, I think I need to tell the jury that

4    that is coming in for the fact that is what he said, not

5    whether it was or was not an accurate statement of the law.

6    And whether they were or not suppose to.

7              MR. ABELSON:  And the fact that they were looking at

8    it and diligent.

9              THE COURT:  It's for the fact that he was asked to do

10   it and he came to this conclusion, but not whether he thinks it

11   was correct.

12             MR. MCCULLOUGH:  Maybe it makes sense just to ask the

13   question did you inform Mr. Craig and Mr. Sloan.

14             THE COURT:  I don't think he can say whether or not,

15   what did he conclude and what did he tell his partners.  All

16   right.

17        (Open court.)

18             THE COURT:  All right, members of the jury, this

19   witness may be asked to testify did he in fact do research and

20   did he in fact come to a conclusion and did he in fact convey

21   his opinion to his partners.

22        But it's coming in just for the fact that he was asked to

23   do that and that he said what he said.  He can't testify to

24   what the law did or did not require as a matter of law.  He's

25   just testifying to what it was that he communicated to the

```
 1  team.  All right.

 2  BY MR. MCCULLOUGH:

 3  Q.   So Mr. Haskell, you had been asked to conduct research by

 4  Mr. Sloan and Mr. Craig as to the applicability of, that FARA

 5  may have to the project; is that right?

 6  A.   Yes, but just to put a slightly finer point on it.

 7      I don't recall as I said exactly who and when gave me that

 8  discussion.  So from my email I can see that it was likely

 9  Cliff or Greg but as I said before, I don't recall.

10  Q.   Did you communicate your view as to your assessment of

11  that question back to Mr. Craig and Mr. Sloan?

12  A.   I did.

13  Q.   Is that what is captured in this email?

14  A.   Yes.

15  Q.   And this took place prior to the firm taking on the

16  representation; is that right?

17  A.   That's what I recall, yes.

18  Q.   And so did the firm take on the representation?

19  A.   They did.

20  Q.   And did you ultimately travel to Ukraine in connection

21  with the project?

22  A.   I did.

23  Q.   Do you remember the first trip that you took?

24  A.   I do.

25  Q.   Can you tell us about that?  Who did you go with and when
```

1  did you go?

2  A.   I went with Greg from Dulles and we flew through Paris to

3  Kyiv.  An associate from our, the Skadden's London office met

4  us in Kyiv and we had a series of meetings over a couple of

5  days while there.

6  Q.   Do you recall who had assisted the Ukraine in arranging

7  the travel for those meetings?

8  A.   I recall that Paul Manafort was involved in some way, but

9  I don't know exactly how or who else might have been involved.

10  Q.   But you understood Mr. Manafort was involved at the time

11  in, in or around April of 2012; is that right?

12  A.   Yes.

13  Q.   So you said that Mr. Craig and a London based associate

14  traveled to Ukraine?

15  A.   Correct.

16  Q.   And who did you meet with in Ukraine?

17  A.   We met with the Minister of Justice, a guy named

18  Lavrynovych and some members of his staff.

19     We met with the prosecutor general, the chief prosecutor,

20  Pshonka, and we may have also met with some members of his

21  staff.

22  Q.   And so just focusing on those meetings, through the course

23  of those meetings did you obtain a better understanding of what

24  the project might entail?

25  A.   I can generally recall leaving Kyiv with a better

1  understanding of the internal investigation we were going to

2  do, but I don't recall the specific conversations that we had

3  with folks there.

4  Q.   Do you recall whether there were discussions of other

5  projects during the time that you were in Ukraine?

6  A.   I believe there were, but I don't recall the exact

7  discussions.

8  Q.   Can you describe without recalling the specific words, can

9  you describe the substance how you understood the, what you

10  understood the other projects to be upon leaving Ukraine?

11  A.   So I understood the primary project was to write a report,

12  to conduct an investigation and write a report for the client

13  on that investigation.

14    I recall another project that involved consulting with the

15  prosecutors who were prosecuting a second trial of Tymoshenko

16  on American standards of due process.  So basically to make

17  sure that they were trying her in a way that would be viewed as

18  fair in American court, whether or not Ukrainian law required

19  that.

20    And then I can recall another project that was general rule

21  of law consulting with the, with the Ukrainian justice system

22  along the lines of what I sort of just described making

23  recommendations that would make their system look more like

24  ours.

25  Q.   The first two projects that you described, the first

1  project writing a report on, about the past prior prosecution

2  of Ms. Tymoshenko, did that come to be known by a certain name?

3  A.   Project One.

4  Q.   And the second project that you described providing advise

5  on an upcoming prosecution of Yulia Tymoshenko, did that come

6  to be known by a certain name?

7  A.   Yes.

8  Q.   What was that?

9  A.   Project Two.

10  Q.   Setting apart from the meetings you may have had with

11  representatives of the government of Ukraine, did he meet with

12  anyone else during your time in Ukraine?

13  A.   Yes.

14  Q.   Who was that?

15  A.   Victor Pinchuk.

16  Q.   Who attended that meeting with Mr. Pinchuk?

17  A.   Greg Craig, myself and the London associate.

18  Q.   Can you just describe for us what you recall of traveling

19  to that meeting and the meeting itself?

20  A.   Yes.  I recall that it was on our last day in Ukraine in

21  the morning.  We were picked up from the hotel and drove, the

22  hotel we were staying at drove 30, 45 minutes I would say into

23  the suburbs of Kyiv and pulled up in sort of a beautiful wooded

24  area and beautiful home.  And then entered the home and met

25  with Mr. Pinchuk.

1  Q.   What was your understanding of the reason that you were

2  meeting Mr. Pinchuk?

3  A.   I can recall having some understanding that he might have

4  something to do with payment.  But I don't recall specifics,

5  but I do recall that general understanding.

6  Q.   Do you recall any discussions with Mr. Craig about

7  whether, about his impressions of Mr. Pinchuk?

8  A.   Aside from we had breakfast and I can recall discussing

9  how bad the eggs we were served was, we were but that's the

10 only specific I can recall.

11 Q.   It's tough to get a good omelet in Ukraine I believe.

12     So did you have any understanding as to whether

13 Mr. Pinchuk, Mr. Pinchuk's approval was necessary to continue

14 with the project?

15          MR. ABELSON:  Objection, Your Honor.

16          THE COURT:  Sustained.

17 BY MR. MCCULLOUGH:

18 Q.   What was your understanding of what Mr. Pinchuk's role, if

19 any, in approving the project?

20          MR. ABELSON:  Objection, Your Honor.

21          THE COURT:  Did Mr. Craig say anything to you

22 concerning Mr. Pinchuk's role in the project?

23          THE WITNESS:  Not that I can recall.

24 BY MR. MCCULLOUGH:

25 Q.   So after meeting with Mr. Pinchuk what happened next?

1  A.   I believe later that day we came back to D.C.

2  Q.   Did Skadden then take on the representation?

3  A.   The firm did, yeah.

4  Q.   Can you describe briefly who the members of the team were?

5  A.   Greg, myself, Cliff Sloan, he's a partner in the D.C.

6  office; Margaret Krawiec is a partner in the D.C. office; Mike

7  Loucks, partner in the Boston office.

8  Q.   Pause you there.  Are those people you just mentioned, are

9  those all partners at Skadden?

10  A.   Yes.

11  Q.   And Mr. --  who among those were working on Project One?

12  A.   I think things were a bit sort of muddled like everybody

13  was working on things at various points.  I don't know

14  specifically how I can answer that question.

15  Q.   Okay.  And then focusing on the associates who were

16  working on the project, which associates were working on the

17  project?

18  A.   Myself, Alex Van Der Zwaan who's the London associate I

19  mentioned; Paul Kerlin, a D.C. associate; Kara Roseen, a D.C.

20  associate; Allon Kedem, a D.C. associate.  There was also one

21  counsel in between positions, Matt Cowie, he's based in London.

22  Q.   Can you describe briefly just so that we all understand

23  how does one put together an internal investigation or write a

24  report on a past trial?  What type of activities do you engage

25  in?

1          MR. ABELSON:  Objection.

2          THE COURT:  What activities did you engage in in this

3     case?

4          THE WITNESS:  Interviewing witnesses, gathering

5     documents, seeking and gathering information; basically trying

6     to get the facts from all sides involved and determine, you

7     know, what we believe the facts were.

8     Q    (By Mr. Mccullough) What was your role as an associate on

9     this project?

10    A.   I sort of considered myself, considered my responsibility

11    to be a master of the facts which both meant logistical stuff,

12    like helping to obtain documents and get them translated

13    because often they were in Ukrainian and Russian; preparing for

14    interviews, attending the interviews, taking notes during the

15    interviews.  And maintaining all of the facts and docs and

16    interview notes we collected in a central place where they

17    would be available to everybody on the team.

18         THE COURT:  Did you have the all important and always

19    fun assignment of writing up the interview notes into a memo?

20         THE WITNESS:  Yes, although they were more of a rough

21    transcript than a memo, but that was part of my responsibility,

22    yeah.

23    Q    (By Mr. Mccullough) After the project began, do you recall

24    whether questions about FARA came up again through the course

25    of the project?

1  A.   My only recollection of FARA throughout the, you know, the

2  time we were working on the project was that at some point a

3  public relations firm was brought in by Ukraine and that FARA

4  was a part of the reason why the firm was brought in.

5      Aside from that, I don't recall ever thinking about it.

6  Q.   Do you recall approximately when those questions were

7  coming up?

8  A.   Sorry, can you --

9  Q.   Questions, when questions about FARA and the PR firm were

10 coming up?

11 A.   I don't recall any questions.  I just recall looking back

12 on it that FARA was part of the PR firm being brought in.

13 Q.   I'm showing you what's been previously admitted as

14 Government's Exhibit 101.

15     Do you recognize this Mr. Haskell?

16 A.   Yeah, I do.

17 Q.   And is this an email that you've sent?

18 A.   I don't recall sending this exact email, but it sure looks

19 like it.

20 Q.   Approximately when was this?

21 A.   April 23rd, 2012.

22 Q.   Can you just read the first sentence of your email,

23 please?

24 A.   Attached is Ukraine representation status report current

25 as of today.  Please feel free to enter the document and make

1    any necessary changes.  Also please let me know if you have any

2    questions.

3    Q.    Was it part of your responsibility to prepare status

4    reports as part of the project?

5    A.    I did, yeah.

6    Q.    What is a status report?

7    A.    There were a lot of, you know, a good amount of people

8    involved and a good amount of sort of work stream.

9        So it was just putting in one place for everybody all of

10   the things that we were working on and needed to do.

11   Q.    Turning to the first page of the status report, can you

12   read the second bullet that you have there under Project Two?

13       Sorry, rather the first bullet under Project Two?

14   A.    Provide prosecutor general's office with public relations

15   advice.

16   Q.    Turning to the last page of the status report, focusing on

17   the second bullet, can you read what you had identified there?

18   A.    Conclude analysis of FARA issues.

19   Q.    Do you recall discussion about the analysis of FARA issues

20   in and around April 2012?

21   A.    I don't.

22   Q.    And the second dark bullet from the bottom, can you read

23   what you have there?

24   A.    Identify critical newspapers, periodicals and journalists.

25   Q.    And there's a parenthetical after that, what does that

1  represent?

2  A.   The initials of the individuals who are responsible for

3  that task.

4  Q.   Which individuals were responsible for that?

5  A.   Greg Craig, Matt Cowie, Alex Haskell, Alex Van Der Zwaan.

6  Q.   What did you understand to be the project there?

7  A.   My recollection is -- do you mind if I see the whole

8  document?  I just don't know what title this is under.

9  Q.   Certainly?

10          THE COURT:  Did you give him the little binder?

11          MR. MCCULLOUGH:  He has the binders as well.

12  Q    (By Mr. Mccullough) It's tab 8.

13  A.   What tab, is this tap 8?  Thank you.

14      I would be speculating, I can't recall.

15  Q.   I think we can put that to the side.

16      What, if any, actions did Skadden or others on the team

17  take to identify a public relations firm?

18          MR. ABELSON:  Objection, Your Honor.

19          THE COURT:  Do you know whether Skadden took any

20  steps to identify a public relations firm?

21          THE WITNESS:  I know that, I know that people from

22  Skadden were involved in the, at the time the PR firm was

23  brought on, but I'm not sure about, like identifying.

24      I may need you to reask the question.

25          THE COURT:  Were you personally involved in any

1    conversations back and forth with anyone?  Do you have any

2    personal knowledge about what involvement, if any, Skadden had

3    in identifying a PR firm or who was involved?

4            THE WITNESS:  Yeah.  I can recall, I can recall in

5    particular attorneys in Skadden's London office being involved

6    in some way in identifying potential PR firms.

7            THE COURT:  All right.  Ask your next question.

8    Q    (By Mr. Mccullough) Showing you what's been previously

9    admitted as Government's Exhibit 102.

10       Is this an email that you received?

11   A.   It looks like it.

12   Q.   Approximately when was this email?

13   A.   Email is dated April 27, 2012.

14   Q.   Who is it from and who is it to?

15   A.   From Matt Cowie to Greg Craig and Mike Loucks and I was

16   copied.

17   Q.   Focusing on the second line in the email.  We are putting

18   together, can you read that?

19   A.   Yes.  We are putting together a list of three options for

20   PR firms for you to consider and to present to the client.

21   Q.   Do you recall any conversations that you had with

22   Mr. Craig about the three options for PR firms?

23   A.   I don't.

24   Q.   Showing you previously what has been marked as

25   Government's Exhibit 107.

1          What is this?

2    A.    It is an e-mail that attached notes from a phone call that

3    the team had.

4    Q.    So when you say notes from a phone call that the team had,

5    when was that phone call?

6    A.    I don't recall the exact call, but it looks like it was on

7    May 2nd, 2012 from the email.

8    Q.    Focusing your attention on the attachment to this email,

9    did you prepare this attachment?

10   A.    Again, I don't recall the specific, I don't recall

11   preparing it, but it was part of my job to do things like this

12   and it looks like something I did, yeah.

13   Q.    Focusing your attention on what's identified as item 3.

14   What is the header there?

15   A.    Public relations.

16   Q.    Can you read what is identified as B?

17   A.    FTI – awaiting pitch, appears that they will accept the

18   representation, Manafort's team prefers them.

19   Q.    Do you recall this discussion about public relations and

20   FTI?

21          MR. ABELSON:  Objection, Your Honor, he already said

22   he did not.

23          THE COURT:  Do you recall any discussion about FTI in

24   particular from the meeting?

25          From your own recollection, do you recall anything?

1            THE WITNESS:  I do not.

2   BY MR. MCCULLOUGH:

3   Q.   Turning to the second page.  Focusing on item number 7.

4   What is the header there?

5   A.   Opening statement in case 2.

6   Q.   Can you read for us what you wrote in item B?

7   A.   It is important to do all we can to help create a media

8   friendly first day of trial.

9   Q.   Do you have any recollection or discussion about that?

10           MR. ABELSON:  Objection.

11           THE COURT:  He can answer that.

12       Do you recall what made you write that down?

13           THE WITNESS:  I can recall, I can recall a discussion

14   of, as I said earlier this project 2 being about making their

15   trials look more like ours.

16       And that, that was important for fairness but also for

17   perception that people believed she was getting a fair trial.

18   So I believe that may be what it referenced, but.

19           THE COURT:  What was your process in creating memos

20   like this?

21           THE WITNESS:  I can recall taking the best notes I

22   possibly could based on what happened during a meeting.  And

23   then, and then typing them up and cleaning them up and trying

24   to make sure they made sense.

25           THE COURT:  Ask your next question.

1   BY MR. MCCULLOUGH:

2   Q.   Do you recall Mr. Craig, do you recall whether Mr. Craig

3   addressed the options that had been presented as to PR?

4   A.   I don't recall.

5   Q.   Showing you what's been marked as Government Exhibit 112

6   previously admitted.

7       Focusing on the second page first, email at the bottom.

8   Just read the first two sentences of that email?

9   A.   I have just come off the phone from Rick Gates for

10  Manafort's shop.  He now has the PR pitches from the two short

11  listed candidates, FTI and Powerscourt, both attached for

12  reference.

13  Q.   Turning to the first page of the document.  Focusing on

14  the third email.

15  A.   I am talking --

16  Q.   What is this?

17  A.   It looks like it's an email from Greg to Mike Loucks.

18  That's copied on May 7th, 2012.

19  Q.   What did Mr. Craig write?

20  A.   I'm talking to Paul Manafort this morning at 10:30 our

21  time.  Does anyone want to tell me where we are on the PR

22  front?

23  Q.   Do you recall any discussions with Mr. Craig about where

24  we are on the PR front?

25  A.   I don't.

1   Q.    Focusing your attention on the top email chain.

2        What is this?

3   A.    It is an email from Greg to members of the team and I was

4   copied on.

5   Q.    What did Mr. Craig write?

6   A.    But Alex, I take it that we like FTI better than the

7   competition; is that right?

8   Q.    Do you recall any discussion among Skadden personnel about

9   preferences for the PR firm?

10  A.    I don't recall.

11  Q.    Do you recall whether FTI, whether any, whether any public

12  relations firm was ever hired?

13  A.    Yes.

14  Q.    Which firm was that?

15  A.    FTI.

16  Q.    Do you recall whether they began to do any work for

17  Ukraine?

18  A.    Yes.

19  Q.    Were you present for any discussions concerning FTI's work

20  as it may relate to Skadden's project?

21            MR. ABELSON:  Objection.

22            THE COURT:  He can answer that question.

23       Were you present for any discussions regarding their work?

24            THE WITNESS:  Not that I can recall.

25  BY MR. MCCULLOUGH:

1    Q.    Do you recall receiving any emails as to FTI's potential

2    involvement in Skadden's work?

3    A.    I do, yes.

4    Q.    What do you recall?

5    A.    I can recall a specific FTI created document that I helped

6    to edit with Cliff Sloan near the end of the representation.

7    Q.    What did that document relate to?

8    A.    That document related to the report that we had written

9    which by that point was written.

10   Q.    I'm sorry.  So this was, you were looking at a document

11   that had been prepared by whom?

12   A.    My recollection is that it had been prepared by FTI.

13   Q.    And it was a document, what did the document relate to?

14   A.    The document related to the report which incapsulated the

15   investigation that we had done.  So the Skadden report.

16   Q.    Was that, what was the purpose of FTI creating that

17   document?

18              MR. ABELSON:  Objection.

19              THE COURT:  If you know.

20              THE WITNESS:  I would be speculating.

21   BY MR. MCCULLOUGH:

22   Q.    So you received the document from FTI and you reviewed it;

23   is that correct?

24   A.    Correct.

25   Q.    But you do not recall what the purpose of that document

1   was?

2   A.   As I said, I recall that it related to the report that we

3   were writing, but I never, I've never worked for FTI to know

4   what their purpose was.

5   Q.   Do you recall any discussion about FTI's role as it

6   related to the project that Skadden performed?

7   A.   I can recall that they were working, they were working for

8   Ukraine.  And that our report was, in doing work related to our

9   report was in the scope of what they were working on for

10  Ukraine.  I don't know if they were working on other things too

11  but, but that's my recollection.

12  Q.   Okay.  Showing you what's been previously admitted as

13  Government's Exhibit 157.  This is an email; is that correct?

14  A.   Yes.

15  Q.   What's the date of this email?

16  A.   June 7, 2012.

17  Q.   What is the subject line of this email?

18  A.   Tymo FTI call.

19  Q.   Focusing your attention on item 3.  What is the header

20  here?

21  A.   Skadden report.

22  Q.   Can you read the first sentence of this email?

23  A.   FTI are interested in having discussion with you about the

24  PR issues that surrounded any strategy you decide upon with

25  regard to the publication of the report.

1    Q.   Who is the you being addressed there?

2              MR. ABELSON:  Objection.

3              THE COURT:  Who is the email to?

4              THE WITNESS:  To Greg.

5    BY MR. MCCULLOUGH:

6    Q.   Do you recall any discussion about PR issues that

7    surrounded any strategy in connection with the role out of the

8    Skadden report?

9    A.   I don't recall.

10   Q.   Do you yourself recall participating in any discussion

11   with FTI about the role out of the report?

12   A.   Unless you would consider the editing of the document that

13   we discussed before our discussion, no.

14   Q.   I'm showing you what's been previously marked as

15   Government 158, previously admitted.

16       Focus your attention first on the bottom email in this

17   chain.

18   A.   Okay.

19   Q.   Is this an email that you wrote?

20   A.   Looks like it.

21   Q.   What is the date?

22   A.   June 11, 2012.

23   Q.   What is the subject line?

24   A.   Schedule for the week.

25   Q.   Where was the schedule for the week to take place, in what

1   country?

2   A.   In Kyiv, in Ukraine.

3   Q.   Focusing your attention on the second item under Tuesday,

4   June 12th.

5        Can you read what you had written there?

6   A.   Six, 6:30 p.m. meeting with general prosecutor's office

7   and FTI Consulting at general prosecutor's office.

8   Q.   Focusing your -- come back out.

9        Did Mr. Craig address that meeting in this email?

10  A.   Yes.

11  Q.   Where is that?

12  A.   In the top email.

13  Q.   What did Mr. Craig write?

14  A.   I thought Pshonka wanted FTI and Skadden to come and meet

15  with him at 6:30 p.m. tomorrow which we could do I think.

16  Q.   Do you recall whether that meeting took place?

17  A.   I don't.

18  Q.   Setting aside public relations for the moment.  Do you

19  recall any questions coming up about how much Skadden was being

20  paid in connection with its work on the report?

21  A.   I do.

22  Q.   What do you remember?

23  A.   I can recall news articles coming out at some point when,

24  I believe when we were physically in Kyiv about payment.  About

25  if I recall correctly, the articles were about us doing the

1  work that we were doing and had raised issues of payment.

2  Q.   Do you recall what the public reporting was as to how much

3  Skadden was being paid?

4            MR. ABELSON:  Objection.

5            THE COURT:  What were you reacting to?  You said

6  there were news articles.  Do you recall a specific one?

7            THE WITNESS:  I don't.

8            THE COURT:  Was there an issue about the amount of

9  the payment that was public while you were there?

10            THE WITNESS:  The issue I generally recall not from a

11  specific article but generally is that some sort of government

12  act, legislative act or government act was necessary to pay

13  Skadden a certain amount, something above a certain amount.

14            MR. ABELSON:  Objection, Your Honor.

15            THE COURT:  All right, let him finish and then I'll

16  instruct the jury.

17      Why don't you finish your answer.  All right, is that what

18  you recall was the question about that?

19            THE WITNESS:  Yeah.

20            THE COURT:  Ladies and gentlemen, there may be some

21  exhibits, there may be some discussion about what Ukrainian law

22  did or did not require.

23      I'm instructing you that it's not an issue in this case

24  that anyone violated Ukrainian law in connection with this.  It

25  provides the context for some discussions that happened later,

1  but the only reason this evidence is coming in is because it

2  was said and then people did or didn't take action.

3      But there's no issue in this case about anybody violating

4  the law in Ukraine and you shouldn't worry about that.

5  BY MR. MCCULLOUGH:

6  Q.  Show you what's been previously marked and admitted as

7  Government's Exhibit 568.  Focusing your attention on the

8  bottom email in this chain.

9      When was this email sent?

10 A.  June 22nd.

11 Q.  Who sent it?

12 A.  Serhiy Vlasenko.

13 Q.  Who is Serhiy Vlasenko?

14 A.  He was the Ukrainian politician and also Yulia

15 Tymoshenko's attorney.  Her main representative that we dealt

16 with.

17 Q.  And Yulia Tymoshenko was the subject of the report that

18 Skadden was writing, is that right?

19 A.  Correct.

20 Q.  Can you describe just generally what you remember about

21 any comments that Mr. Vlasenko had?

22 A.  I don't recall this exact email.  But I do recall Vlasenko

23 in addition to the articles I mentioned raising this payment

24 issue.

25 Q.  And the payment issue, if you'll read, if you read the

1  sentence that begins with answering on the questions of

2  Ukrainian MPs.

3  A.   Answering on the questions of Ukrainian MPs Minister of

4  Justice Lavrynovych told that when they hired Skadden because

5  the whole contract with your law firm is less than a hundred

6  thousand hrivnas.  For you to understand that is less than

7  13,000 U.S. dollars.

8  Q.   What did you understand to be the issue?

9  A.   As I said, I had a general recollection of the payment

10 being raised and it having something to do with the need for

11 some sort of government action in order to pay money above a

12 certain amount.  But I don't remember beyond that.

13 Q.   Do you recall discussions with Mr. Craig about how to

14 navigate this issue with Mr. Vlasenko?

15 A.   No, I don't.

16 Q.   I'm showing you what's been previously marked as

17 Government's Exhibit Number 167.

18            THE DEPUTY CLERK:  Admitted.

19            MR. MCCULLOUGH:  It has been admitted.

20 BY MR. MCCULLOUGH:

21 Q.   This is an e-mail you were copied on?

22 A.   Yeah.

23 Q.   Focusing your attention on the second email in the chain,

24 it's an email from Mr. Van Der Zwaan to Mr. Craig; is that

25 right?

1  A.    You mean the bottom email?

2  Q.    The bottom email?

3  A.    Yeah.

4  Q.    And what did Mr. Van Der Zwaan write in the first line?

5  A.    Just with Rick Gates, Alex Haskell mentioned that you

6  might say to Vlasenko that the report is paid for by a private

7  individual.

8  Q.    Do you recall having that conversation with Mr. Craig?

9  A.    I don't.

10 Q.    So what's happening here, if you recall?

11          MR. ABELSON:  Objection.

12          THE COURT:  Do you recall what was going on at this

13 point with these emails, what this email exchange is about?

14          THE WITNESS:  I can read the email, but I don't

15 recall.

16 BY MR. MCCULLOUGH:

17 Q.    Did Mr. Craig respond to the first email?

18 A.    He did.

19 Q.    What did Mr. Craig respond?

20 A.    He said Alex, Cliff and I just had a meeting with Tymo's

21 person in D.C., former Congressman Jim Slattery.  We got

22 through the meeting without disclosing whose idea it was, who

23 asked us to do it or who was paying for it.  We shall continue

24 that policy.

25 Q.    Do you recall having any discussion or conversations with

1   Mr. Craig about how to handle conversations with Mr. Slattery?

2   A.   No.

3   Q.   Did you get any further advice from anyone at Skadden as

4   to how to handle these issues?

5   A.   The issue of payment?  Not that I recall.

6   Q.   Okay.  Do you recall what efforts to finalize the report

7   that Skadden was ready to begin?

8   A.   My recollection is in July 2012.

9   Q.   In connection with that did you, do you recall any other

10  communications with FTI?

11  A.   Again, aside from the one that I had, I had mentioned

12  earlier.  I think that's the only thing I can recall.

13  Q.   Showing you what's been previously admitted as

14  Government's Exhibit 208.

15       What is this?

16  A.   It's an email from August 7 from Alex Van Der Zwaan to

17  Greg that I was copied on.

18  Q.   Focusing first on item 6.  Do you recall efforts, do you

19  recall any efforts to finalize the report?

20           MR. ABELSON:  May we approach, Your Honor?

21           THE COURT:  I'm sorry?  Yes.

22       Did you want to talk to me or to each other?

23           (Bench conference.)

24           MR. ABELSON:  Your Honor, this exhibit has phone

25  numbers that --

1          THE COURT:  That can be redacted.

2          MR. MCCULLOUGH:  Our version has been redacted, but

3   apparently the version on the screen is not.

4      So we can do that on the break.

5          THE COURT:  All right, just black them out for

6   privacy, all right.

7      (Open court.)

8          THE COURT:  Can we just fix that problem?

9          MR. MCCULLOUGH:  Yes.

10          THE COURT:  Can we take it off the screen while we're

11   solving the problem.  There we go.

12      Might as well do it down in the signature block too, all

13   right.

14      Basically there's nothing untoward going on here, but

15   people's phone numbers and addresses and things like that are

16   private.  When they pop up on an exhibit by mistake, we like to

17   make sure that they get taken off.

18      All right, you can proceed.

19   BY MR. MCCULLOUGH:

20   Q.   Focusing your attention on item number 6.  What's

21   happening, what's being discussed here?

22   A.   A discussion of delivering, delivering the report that we

23   had been working on to the client in Ukraine.

24   Q.   How long was that going to take from this point that this

25   email was being written?

1  A.   Alex Van Der Zwaam said August 27th, the email was on the

2  7th, so almost three weeks.

3  Q.   Focusing your attention on item one.  Can you read the

4  first sentence there?

5  A.   I have spoken to Jonathan at FTI who would like to speak

6  to you about the media plan for the release of the report.

7  Q.   Do you recall any discussions amongst Skadden about

8  Jonathan at FTI and the release of the report?

9  A.   Again, unless you characterize the one instance I

10 mentioned about that document in discussion, no.

11 Q.   Who is Jonathan at FTI?

12 A.   Jonathan Hawker.  He is, I'm not sure what his title is,

13 but in London's office.  In the London office of FTI.  He

14 worked on, worked on the representation for Ukraine.

15 Q.   You receive any, you receive any communications relating

16 to meetings among FTI and Skadden personnel in August or

17 September?

18 A.   I don't recall.

19 Q.   Showing you what's previously been admitted as

20 Government's Exhibit 255.

21    Focusing your attention on the second page.  The email in

22 the middle of the page from Mr. Van Der Zwaan, what was the

23 date of this email?

24 A.   September 23rd.

25 Q.   Can you read the first line of Mr. Van Der Zwaan's email?

1  A.   As you know, Greg and I attended a meeting today with FTI

2  and Manafort in which we discussed the report in detail for the

3  purposes of FTI's work on the PR aspect.

4  Q.   And zooming out the next email on the chain you're

5  offering some times, do you recall why you were doing that?

6  A.   I don't recall.

7  Q.   Do you recall any team discussions following this email

8  about this meeting?

9  A.   Not specifically.

10 Q.   Focusing just on the first page of the email.  And

11 focusing on the email, middle of the page.  Who wrote that

12 email?

13 A.   Greg.

14 Q.   And can you read the first sentence of that email?

15 A.   Guys, in the course of discussing the management of the

16 release these points came up after we resolved --

17 Q.   That's enough.

18    Do you recall any discussion among the team about the

19 management of the release?

20 A.   I don't, no.

21 Q.   Do you recall whether the report was ever released to the

22 public?

23 A.   Yeah, it was.

24 Q.   Do you recall approximately when?

25 A.   In December 2012.

1   Q.   Do you recall having any advance notice that the report

2   would be released?

3   A.   I can recall feeling for throughout the project that there

4   was a chance that it would be released publicly.

5        But it was, we were writing a report for the government of

6   Ukraine, it was their decision to make, and I think I can

7   recall feeling like I'd believe it when I saw it.

8   Q.   Showing you what's been previously marked and admitted as

9   Government's Exhibit 320.

10       There's an email from Katherine Whitney; is that right?

11  A.   Yes.

12  Q.   Who is Catherine Whitney?

13  A.   Greg's secretary.

14  Q.   What was the date of this email?

15  A.   December 6.

16  Q.   And what is the subject line of this email?

17  A.   Report of release date.

18  Q.   What did Ms. Whitney write?

19  A.   Greg is traveling but wanted me to let you know that the

20  report will be released next Wednesday, December 12th.

21  Q.   Did you have any discussions with Mr. Craig or Ms. Whitney

22  about how Mr. Craig had found out about the release of the

23  report?

24  A.   Not that I can recall.

25  Q.   At this point in time do you, did you have an

1  understanding of what it meant to release the report?

2  A.   I can recall that it meaning the Ministry of Justice of

3  Ukraine would put it out publicly probably on their website in

4  some way.

5      But again, I can recall feeling like maybe it was going to

6  happen, maybe it wasn't.

7  Q.   Do you recall being aware of any media plans that had been

8  created in connection with the roll out of the report, the

9  release of the report rather?

10  A.   Not that I can recall.

11  Q.   Did you personally have any contact with reporters or the

12  media in connection with the release of the report?

13  A.   I did.

14  Q.   Can you tell me what happened?

15  A.   I sent copies of the final report to two reporters.

16  Q.   Focusing your attention on Government's Exhibit 368.

17          THE DEPUTY CLERK:  Previously admitted.

18          MR. MCCULLOUGH:  Previously admitted.

19  BY MR. MCCULLOUGH:

20  Q.   It's an email that you received; is that right?

21  A.   Yes.

22  Q.   Just focusing on just the top date.  When did you receive

23  it?

24  A.   December 12th.

25  Q.   You were receiving an email from Mr. Craig; is that right?

1    A.    Yes.

2    Q.    What was he forwarding to you?

3    A.    He was forwarding an email from David Sanger requesting

4    that Greg send him a copy of the PDF of the report.

5    Q.    Focusing your attention on the bottom of the email chain.

6    Is this the first e-mail in the chain that you received?

7    A.    What tab is it?

8    Q.    Look at 32 if you like?

9    A.    I trust you that there's not -- I can only see the top

10   page.

11         THE COURT:  All right, can we just take this off the

12   screen and ask him to look at it in his book.  I think we need

13   to do a better job redacting personal information out of these

14   emails.  Probably people didn't focus on signature blocks and

15   all of them has a reference to an address.  And that probably

16   should be redacted before this is publicly displayed again.

17        So he can testify about it.  It will be in evidence.  The

18   jury will get it but I don't think that it should be on the

19   screen while we're talking about it.

20         MR. MCCULLOUGH:  Permission to use the Elmo, Your

21   Honor?  It is redacted.

22         THE COURT:  On yours?

23         MR. MCCULLOUGH:  Yeah.

24         THE COURT:  Sure.

25         THE DEPUTY CLERK:  You can't see.

1          THE COURT:  No, it's not being put into their system.

2          THE DEPUTY CLERK:  Right.  I have to turn that big

3    screen off and I have to show it to them.

4          THE COURT:  All right, maybe you can read it out

5    loud.  It's going to take him a while to turn around the

6    screen.

7       If you are going to ask about the body of the email, can

8    you just have the witness read it?

9          MR. MCCULLOUGH:  Yes.

10          THE COURT:  Because the jury unfortunately we've got

11    to input into their screens coming from counsel and not the

12    Elmo anymore.  The Elmo talks to that big screen over there,

13    but just to accomplish this much, it will be faster to just

14    have him read the email and they'll get to see it.

15          MR. MCCULLOUGH:  Certainly.

16          THE COURT:  Thank you.

17          MR. MCCULLOUGH:  Certainly.

18    BY MR. MCCULLOUGH:

19    Q.   So Mr. Haskell, the first email in the chain that was

20    forwarded to you, who sent that email?

21    A.   Greg.

22          MR. TAYLOR:  Is this 368?

23          THE COURT:  Yes.

24          MR. MCCULLOUGH:  Yes.

25

1  BY MR. MCCULLOUGH:

2  Q.   Who was he sending that email to?

3  A.   David E. Sanger at gmail.

4  Q.   Can you read the subject line of that email?

5  A.   Report on the Tymoshenko case.

6  Q.   What does, can you please read the entirety of Mr. Craig's

7  email to Mr. Sanger?

8  A.   On my way back to redacted, I will hand deliver a hard

9  copy of this report to your home tonight.

10 Q.   Did you have any conversations with Mr. Craig about

11 Mr. Sanger?

12 A.   Not that I can recall.

13 Q.   Did Mr. Craig indicate to you through his words or actions

14 how he came to be in contact with Mr. Sanger on December 11th?

15       MR. ABELSON:  Objection.

16       THE COURT:  Mr. Craig tell you anything about why he

17 was delivering -- did he discuss the delivery with you other

18 than copying you on this email?

19       THE WITNESS:  Not that I recall.

20 BY MR. MCCULLOUGH:

21 Q.   And Mr. Craig asked you to send a copy of the email to --

22 or sorry -- send a copy of the report to Mr. Sanger?

23 A.   Yeah.

24 Q.   Did you send the report to Mr. Sanger?

25 A.   I did.

1   Q.   Showing you what's been marked as Government's Exhibit 369

2   previously admitted.

3            THE COURT:  You can redact the other one on your

4   computer and if you want to put it back up you can.  I just

5   didn't think it should be up there the way it was.

6       If you want to publish Exhibit 368 to the jury so they can

7   see it you may, but she needs to fix it first.

8            MR. MCCULLOUGH:  Understood, Your Honor, thank you.

9            THE COURT:  You can do that right now just like we

10  did, but it needs to be off their screen while it's redacted

11  and then you can put it up and then we can see the one he just

12  read from.

13       (Pause.)

14            THE COURT:  All right, now you can show the jury's

15  screen and the public screen.

16            THE DEPUTY CLERK:  Somebody nod when it's on.

17            THE JUROR:  (Nodding)

18            THE DEPUTY CLERK:  Thank you.

19            THE COURT:  The bottom screen, that's the one we just

20  read out loud; is that correct?

21            MR. MCCULLOUGH:  Correct.

22            THE COURT:  Now you can ask your next question.

23            MR. MCCULLOUGH:  Your Honor, perhaps if I may just

24  ask Mr. Haskell to just identify this email again and I'll just

25  move on after that.

1          THE COURT:  I'm sorry.  If that's a question, I think

2    you need to ask that because I don't think that he realizes

3    it's a question.

4          MR. MCCULLOUGH:  I'd like to ask him to read this

5    email now that the jury can see it.

6          THE COURT:  All right.

7    BY MR. MCCULLOUGH:

8    Q.   Mr. Haskell, is this an e-mail that Mr. Craig sent to

9    Mr. Sanger on December 11th at 5:46 p.m. and what is he

10   offering to do?

11   A.   Hand deliver, quoting from the email, hand deliver a hard

12   copy of the report to your home tonight.

13   Q.   And you think you previously testified that you did as

14   Mr. Craig asked you send a copy of the report to Mr. Sanger?

15   A.    I emailed him a PDF.

16   Q.   Mr. Craig was in contact with Mr. Sanger on December 11th;

17   is that right?

18          MR. TAYLOR:  Objection, Your Honor?

19          THE COURT:  We have this email.

20   BY MR. MCCULLOUGH:

21   Q.   And did you have contact with any other reporters aside

22   from Mr. Sanger?

23   A.    Yes.

24   Q.   Who was that?

25   A.   Emily Alpert of the LA Times.

1   Q.   Do you recall when you had contact with Ms. Alpert of the

2   LA Times?

3   A.   I've had my, had to piece it together from looking at

4   documents, preparing it, but I believe it was December the

5   13th.

6   Q.   Was that after the report had been publicly released?

7   A.   Again, I don't recall from the time, but having looked at

8   the documents I believe it was, yeah.

9   Q.   Showing you what's been marked as a previous exhibit and

10  admitted as Government's Exhibit's Exhibit 389.

11      What is this?

12  A.   It's an email.  You are asking about the bottom email?

13  Q.   Let's focus on the bottom email.

14      Who sent the bottom one?

15  A.   Emily Alpert of the LA Times.

16  Q.   Who did she send it to?

17  A.   She sent it to Greg.

18  Q.   If you can read the first three sentences of the email,

19  please?

20  A.   Mr. Craig, I hope you're well.  My name is Emily Alpert.

21  I'm a writer with the Los Angeles Times and I would like to

22  obtain a copy of the report on the Tymoshenko trial that was

23  released today and if possible, interview you once I've had the

24  chance to read it.

25  Q.   Was it your understanding that Ms. Alpert was reaching out

1  after the report had been publicly released?

2  A.   I just don't recall the exact sequence of time but it

3  appears so.

4  Q.   What happened after receiving this, this email was

5  received by Mr. Craig?

6  A.   Greg forwarded it to me and I sent her the same PDF that I

7  had sent to Mr. Sanger.

8  Q.   So you were doing this on December 13th; is that right?

9  A.   Yes.

10 Q.   And after sending Ms. Alpert a copy of the report, did you

11 have any communications with her?

12 A.   I did.

13 Q.   Showing you what's been previously marked as Government's

14 Exhibit 394.  Focusing first on the first email in the chain on

15 the second page.

16     Is this your email to Ms. Alpert delivering the report?

17 A.   It is.

18 Q.   And what happened after delivering the report?

19 A.   My recollection is that Ms. Alpert responded with some

20 questions and then which I briefly discussed with Greg, and

21 Greg told me to give her a call back and deliver a, sort of

22 very short message which I did.

23 Q.   I'm sorry, you spoke with Ms. Alpert; is that right?

24 A.   On the phone, yeah.

25 Q.   And to your knowledge did Mr. Craig speak with Ms. Alpert?

1  A.   Not that I know of.

2  Q.   Focusing your attention on a third email chain on the

3  first page.  Is this a direction that you were receiving from

4  Mr. Craig that you were referring to?

5  A.   Yes.  I believe there might have been another, but this is

6  one of them.

7  Q.   During this time period between December 6th and December

8  13th, how much contact had you had, if any, with Ukraine's

9  public relations firm?

10  A.   Sorry, between what dates?

11  Q.   December 6th when you were advised that the report would

12  be released and December 13th, when you were in contact with

13  Ms. Alpert?

14  A.   None, none not that I'm aware of.

15  Q.   Did you have any discussion with Mr. Craig about his

16  contact with any, with Ukraine's public relations firm?

17  A.   Not that I recall.

18  Q.   Do you know sitting here today whether Mr. Craig was in

19  touch with Ukraine's public relations firm during December 6th

20  through December 13th?

21        MR. ABELSON:  Objection.

22        THE COURT:  He can ask do you know; mere personal

23  knowledge whether he was or not?

24        THE WITNESS:  I don't recall.  Not that I'm aware of.

25  BY MR. MCCULLOUGH:

1   Q.   Was Skadden ever contacted by the Foreign Agent

2   Registration Act unit of the Department of Justice?

3   A.   Yes.

4   Q.   When did you first learn of that contact?

5   A.   I don't know.

6   Q.   Showing you what's been marked Exhibit 461 previously

7   admitted.  Focusing on the first email in the chain.  Focusing

8   first on the date.

9      When is this in relation to the release of the report?

10  A.   The date is September 9th, 2013, so ten months after.

11  Q.   What's happening here?  This is an e-mail from Mr. Craig;

12  is that right?

13  A.   Yes.

14  Q.   What does he write?

15  A.   He wrote DOJ has concluded that we should register under

16  FARA.  I'm looking at what options are available, if any.

17  Q.   Was this then forwarded to you?

18  A.   Yeah.

19  Q.   And you recall having any knowledge of the FARA unit's

20  inquiry prior to September of 2013?

21  A.   I know that I had awareness at some point, but I can't

22  pinpoint it, so I don't know.

23  Q.   This top e-mail from Ms. Whitney; is that right?

24  A.   Yes.

25  Q.   Ms. Whitney offers in the second sentence if you need

1  copies of the other letters re: the FARA issue, just let me

2  know and I can get you copies of the letters leading up to this

3  most recent letter we received from DOJ.

4       Do you recall reviewing any of the prior letters from DOJ?

5  A.    I don't.

6  Q.    Turning to the attachment to this email.  Is this the

7  letter from the FARA Unit?

8       Do you understand this to be the letter from the FARA Unit?

9  A.    Yeah.  I can't remember if she had -- did she say that she

10 was attaching more than one or multiple communications?

11 Q.    I think she does, yes?

12 A.    Okay.  So I'm not sure.  Given the date it made sense it

13 would be that one.  I'm not familiar with all of the letters.

14 Q.    Well, focusing your attention on the date on this letter,

15 this letter is dated September 5th, 2013; is that right?

16 A.    Yeah.

17 Q.    Focusing your attention on the bottom line of this first

18 page, what does it say?

19      That bottom sentence on this page?

20 A.    Accordingly, Skadden must register under FARA as an agent

21 of foreign ministry.

22 Q.    Focusing a few lines above that where it says, the

23 dissemination of the report to the media and your

24 communications with the media were political activities as

25 defined in 22 U.S.C. 611(o) FARA.

1     Did you have any discussion with Mr. Craig about the

2    dissemination of the report to the media and your

3    communications with the media?  By your --

4              MR. ABELSON:  Objection.

5              THE COURT:  Wait.  In response to this letter, before

6    this letter, what's your question?

7    BY MR. MCCULLOUGH:

8    Q.   After receiving this letter, did you have any

9    conversations with Mr. Craig about dissemination of the report

10   to the media and communications with the media?

11             MR. ABELSON:  Objection, Your Honor.

12             THE COURT:  Well, I think he can answer that

13   question.

14     After this, you've got this letter sent to you, did you

15   have any further conversations after this letter with Mr. Craig

16   about the issue of the dissemination of the report to the

17   media?

18             MR. ABELSON:  Your Honor, may we approach?

19             THE COURT:  Yes.

20      (Bench conference.)

21             MR. ABELSON:  Dissemination is a very specific state

22   of art legal phrase.  It seems to me he's asking him to offer

23   testimony of the law.

24             THE COURT:  I don't think so, but he can rephrase the

25   question.  But I think he can ask -- where are you trying to

1   get at here?

2         MR. MCCULLOUGH:  Your Honor, the next email showed

3   that Mr. Haskell did have and refers to a conversation between

4   Mr. Haskell and Mr. Craig about media contacts.

5         THE COURT:  All right.  Just make your question, just

6   say after you received this letter, did you discuss media

7   contacts with Mr. Craig.  All right, take this off and keep

8   going.

9      Let me ask you a question, how close are we to the end of

10  your examination?

11        MR. MCCULLOUGH:  Very close.

12        THE COURT:  All right, I think we should probably do

13  cross after lunch.

14        MR. ABELSON:  Great.

15        THE COURT:  All right, thank you.

16     (Open court.)

17  BY MR. MCCULLOUGH:

18  Q.   This letter is referring to contact with the media; is

19  that right?

20        THE COURT:  After this letter was distributed around

21  the firm, did you have any conversation with Mr. Craig about

22  your contacts with the media?

23        THE WITNESS:  In preparing for today, I reviewed an

24  email that would qualify as that, but I don't know, remember

25  the date and I don't have the date straight.  So I don't know

1    if that email exchange was before this or after this.

2    Q      (By Mr. Mccullough) Showing you what's been marked

3    Government's Exhibit 475.   Turning to the first email in this

4    chain, second page.

5          Is this the email that we were previously looking at where

6    you had sent a copy of the report to Ms. Alpert?

7    A.   Yes, I believe so.   Again, I recall from reviewing today

8    that there were multiple, there were like multiple sets of

9    emails on this chain at one point.

10        So I'm not sure if this encapsulates everything that was on

11   the chain is the point that I'm making, but that's definitely

12   the email that I sent to Ms. Alpert.

13   Q.   Well, giving you a moment to look at all of the emails in

14   the chain up to the top email.   Are all of those emails in the

15   chain dated December 13, 2012?

16   A.   Can you give me the exhibit number and I'll flip to the

17   next page?

18   Q.   Forty-one?

19   A.   Yeah, in total, in total one at the top.

20   Q.   Then you forwarded -- and those communications all related

21   to your communications with Ms. Alpert on December 13th?

22   A.   Correct.

23   Q.   And you then forwarded that chain to Mr. Craig?

24   A.   On October 15th, yeah.

25   Q.   You forwarded it on October 15th, 2013?

1  A.   Correct.

2  Q.   This was after FARA had sent the letter that we were just

3  looking at in which it made a determination that Skadden needed

4  to register?

5  A.   Yes.

6  Q.   Just focusing on your first phrase there, following up on

7  our discussion regarding FARA.  Seeing that, do you recall this

8  discussion with Mr. Craig?

9  A.   I don't.

10  Q.   Go ahead and read the rest of that sentence?

11  A.   Please see the correspondence below regarding my

12  communication with LA Times reporter Emily Alpert.

13      In my initial email to Ms. Alpert I indicated that I was

14  sending the report to her per her request.

15  Q.   If you stop there.  I notice you put per her request in

16  quotes.  Do you recall why you did that?

17  A.   I was quoting the language in my December 13th email to

18  her.

19  Q.   So do you recall having any discussion with Mr. Craig

20  about whether you had sent it at her request?

21          MR. ABELSON:  Objection, Your Honor.  He already

22  asked this question.

23          THE COURT:  All right.  Does this trigger any more

24  recollection of what you discussed with Mr. Craig before you

25  sent him this email and said what you said?

1            THE WITNESS:  No, it doesn't.

2            THE COURT:  All right.

3   BY MR. MCCULLOUGH:

4   Q.   The last sentence of your email if you'll read that.

5   A.   The subsequent emails clearly support our position that

6   our comments about the report, at least with regard to the LA

7   Times, were limited to correcting mischaracterizations.

8   Q.   You cabin that to at least with regard to the LA Times.

9        Why did you do that?

10  A.   I don't recall sending this email exactly what I was

11  thinking at the time.

12  Q.   Showing you what's been marked as Government's Exhibit

13  476.  What is this?

14  A.   It's an email from Greg to Allon Kedem and myself on

15  October 15th.

16  Q.   What did he attach to this email?

17  A.   He attached a letter to Ms. Hunt of the FARA Unit.

18  Q.   What was the date of this letter?

19  A.   October 10th.

20  Q.   And what was the date of this?  This is dated prior to the

21  conversation, the email that we were just looking at?

22  A.   Yes.

23  Q.   And focusing your attention on the second paragraph of

24  this letter.

25       The second sentence says this was done in response to the

1    request from the media; is that right?

2    A.   Yes.

3    Q.   You had the answer to this with respect to the Los Angeles

4    Times; is that right?

5    A.   Yes.

6    Q.   Did you know whether Mr. Sanger had requested document

7    from Mr. Craig?

8    A.   I know that he had requested the PDF of the report in the

9    email that Greg had forwarded to me.

10   Q.   Do you know whether he had requested Mr. Craig hand

11   deliver a copy to his house?

12   A.   I don't know.

13              MR. MCCULLOUGH:  No further questions.

14              THE COURT:  All right.  Before we proceed to cross

15   examination, it would be an appropriate time for you to have

16   lunch.  So therefore, we're going to break.

17       As always during this break, please do not discuss the

18   case among yourselves or with any one else.

19       We'll resume at let's say -- was an hour enough time for

20   you to get lunch and get back yesterday?

21              THE JURY:  (Nodding.)

22              THE COURT:  So we'll resume at 1:45.  Leave your

23   notebooks.

24       (Jury excused at 12:44 p.m.)

25              THE COURT:  All right, Mr. Haskell, you're going to

1   be excused and you'll resume the stand in approximately an

2   hour.

3        If you see anyone you know during that hour associated

4   with this case, if they don't speak with you, they're not being

5   rude.  They're abiding by my instructions which are in place

6   for this lunch break.

7             THE WITNESS:  Thank you.

8             THE COURT:  All right, I'll see everybody back in an

9   hour.

10       (Witness excused.)

11       (Luncheon recess at 12:45 p.m.)

12                           -o0o-

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

1

2      I certify that the foregoing is a true and correct

3  transcript, to the best of my ability, of the above pages, of

4  the stenographic notes provided to me by the United States

5  District Court, of the proceedings taken on the date and time

6  previously stated in the above matter.

7      I further certify that I am neither counsel for, related

8  to, nor employed by any of the parties to the action in which

9  this hearing was taken, and further that I am not financially

10  nor otherwise interested in the outcome of the action.

11

12  _____          _____

13  /s/Crystal M. Pilgrim, RPR, FCRR        Date: August 17,2019

14

15

16

17

18

19

20

21

22

23

24

25