1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLUMBIA

2

3    United States of America,     ) Criminal Action
                                    ) No. 19-CR-125
4                   Plaintiff,      )
                                    ) JURY TRIAL
5    vs.                            ) Day 4 - Morning
                                    )
6    Gregory B. Craig,              ) Washington, DC
                                    ) August 15, 2019
7                   Defendant.      ) Time:  9:30 a.m.
     _____

8
          TRANSCRIPT OF JURY TRIAL - DAY 4 - MORNING
9                       HELD BEFORE
         THE HONORABLE JUDGE AMY BERMAN JACKSON
10             UNITED STATES DISTRICT JUDGE

11   _____

              A P P E A R A N C E S
12

13   For Plaintiff:     **Fernando Campoamor-Sanchez**
                        **Molly Gulland Gaston**
14                       U.S. Attorney's Office FOR THE
                            DISTRICT OF COLUMBIA
15                       555 Fourth Street, NW
                         Washington, DC 20530
16                       (202) 252-7698
                         Email: Fernando.campoamor-sanchez@usdoj.gov
17                       Email: Molly.gaston@usdoj.gov
                        **Jason Bradley Adam McCullough**
18                       U.S. Department of Justice
                         950 Pennsylvania Avenue, NW
19                       Washington, DC 20530
                         (202) 233-0986
20                       Email: Jason.mccullough@usdoj.gov

21   For Defendant:     **William James Murphy**
                        **William W. Taylor, III**
22                      **Adam B. Abelson**
                         ZUCKERMAN SPAEDER, LLP
23                       100 East Pratt Street
                         Suite 2440
24                       Baltimore, MD 21202
                         (410) 949-1146
25                       Email: Wmurphy@zuckerman.com
                         Email: Wtaylor@zuckerman.com
                         Email: Aabelson@zuckerman.com

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

---

Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                    Official Court Reporter
                    United States Courthouse, Room 6523
                    333 Constitution Avenue, NW
                    Washington, DC  20001
                    202-354-3267

 1              THE COURTROOM DEPUTY:  Your Honor, this morning we

 2    have Case Number 19-125, the United States of America v.

 3    Gregory B. Craig.  Mr. Craig is present and in the courtroom,

 4    Your Honor.

 5              Counsel, please approach the lectern and identify

 6    yourself and your colleagues for the record.

 7              MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.

 8              Molly Gaston, Jason McCullough, and Fernando

 9    Campoamor for the United States.  And also with us is paralegal

10    specialist Amanda Rohde.

11              MR. TAYLOR:  Good morning.  William Taylor for

12    Mr. Craig, with Paula Junghans, Bill Murphy, Adam Abelson.

13              THE COURT:  Good morning.

14              All right.  Are we ready to continue with the jury

15    selection process?

16              MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

17              MR. TAYLOR:  Yes.

18              THE COURT:  All right.  I think probably the first

19    thing we should do is have Mr. Haley just go through and call

20    the roll by jury number, so every knows who's here and who's

21    not here.  I think there may only be one person who is absent

22    this morning.  So, why don't we do that.

23              THE COURTROOM DEPUTY:  Ladies and gentlemen of the

24    jury pool, as I call your four-digit jury number, please rise

25    and say, here.

```
 1                    Juror Number 1297.

 2                    THE PROSPECTIVE JUROR:  Here.

 3                    THE COURTROOM DEPUTY:  Juror Number 1402.

 4                    PROSPECTIVE JUROR:  Here.

 5                    THE COURTROOM DEPUTY:  Juror number 0413.

 6                    PROSPECTIVE JUROR:  Here.

 7                    THE COURTROOM DEPUTY:  Juror Number 0610.

 8                    PROSPECTIVE JUROR:  Here.

 9                    THE COURTROOM DEPUTY:  Juror Number 0397.

10                    PROSPECTIVE JUROR:  Here.

11                    THE COURTROOM DEPUTY:  Juror Number 1549.

12                    PROSPECTIVE JUROR:  Here.

13                    THE COURTROOM DEPUTY:  Juror Number 0968.

14                    PROSPECTIVE JUROR:  Here.

15                    THE COURTROOM DEPUTY:  Juror Number 0243.

16                    PROSPECTIVE JUROR:  Here.

17                    THE COURTROOM DEPUTY:  Juror Number 1151.

18                    PROSPECTIVE JUROR:  Here.

19                    THE COURTROOM DEPUTY:  Juror Number 1792.

20                    PROSPECTIVE JUROR:  Here.

21                    THE COURTROOM DEPUTY:  Juror Number 0517.

22                    PROSPECTIVE JUROR:  Here.

23                    THE COURTROOM DEPUTY:  Juror Number 1254.

24                    PROSPECTIVE JUROR:  Here.

25                    THE COURTROOM DEPUTY:  Juror Number 0097.
```

```
 1                    PROSPECTIVE JUROR:  Here.

 2                    THE COURTROOM DEPUTY:  Juror Number 1215.

 3                    PROSPECTIVE JUROR:  Here.

 4                    THE COURTROOM DEPUTY:  Juror Number 1714.

 5                    PROSPECTIVE JUROR:  Here.

 6                    THE COURTROOM DEPUTY:  Juror Number 0316.

 7                    PROSPECTIVE JUROR:  Here.

 8                    THE COURTROOM DEPUTY:  Juror Number 0805.

 9                    PROSPECTIVE JUROR:  Here.

10                    THE COURTROOM DEPUTY:  Juror Number 1136.

11                    PROSPECTIVE JUROR:  Here.

12                    THE COURTROOM DEPUTY:  Juror Number 1612.

13                    PROSPECTIVE JUROR:  Here.

14                    THE COURTROOM DEPUTY:  Juror Number 0351.

15                    PROSPECTIVE JUROR:  Here.

16                    THE COURTROOM DEPUTY:  Juror Number 0866.

17                    PROSPECTIVE JUROR:  Here.

18                    THE COURTROOM DEPUTY:  Juror Number 1114.

19                    PROSPECTIVE JUROR:  Here.

20                    THE COURTROOM DEPUTY:  Juror Number 1333.

21                    PROSPECTIVE JUROR:  Here.

22                    THE COURTROOM DEPUTY:  Juror Number 1398.

23                    PROSPECTIVE JUROR:  Here.

24                    THE COURTROOM DEPUTY:  Juror Number 1688.

25                    PROSPECTIVE JUROR:  Here.
```

```
 1              THE COURTROOM DEPUTY:  Juror Number 1622.

 2              PROSPECTIVE JUROR:  Here.

 3              THE COURTROOM DEPUTY:  Juror Number 1323.

 4              PROSPECTIVE JUROR:  Here.

 5              THE COURTROOM DEPUTY:  Juror Number 0322.

 6              PROSPECTIVE JUROR:  Here.

 7              THE COURTROOM DEPUTY:  Juror Number 1207.

 8              PROSPECTIVE JUROR:  Here.

 9              THE COURTROOM DEPUTY:  Juror Number 0420.

10              PROSPECTIVE JUROR:  Here.

11              THE COURTROOM DEPUTY:  Juror Number 0655.

12              PROSPECTIVE JUROR:  Here.

13              THE COURTROOM DEPUTY:  Juror Number 0564.

14              PROSPECTIVE JUROR:  Here.

15              THE COURTROOM DEPUTY:  Juror Number 1748.

16              PROSPECTIVE JUROR:  Here.

17              THE COURTROOM DEPUTY:  Juror Number 0114.

18              PROSPECTIVE JUROR:  Here.

19              THE COURT:  All right.  Thank you, everyone, for

20     following the instructions to return, and returning on time.  I

21     know you've all been here for a while, and we very much

22     appreciate that.  As I said yesterday, you perform a valuable

23     public service by just showing up.

24              At the end of this proceeding this morning, some of

25     you will end up in the jury box, some of you will be excused,
```

1    but we are happy to have had all of you.  And if you were

2    excused, as I indicated, it isn't necessarily because you said

3    something that troubled anyone, it may just be because we have

4    more people than we need.

5            So, what's going to take place right now, is a

6    process of people writing down numbers and exchanging them and

7    handing them to me, and there won't be much said until the

8    process is complete.  So, right now, what you're going to watch

9    is people writing and thinking and conferring among themselves

10   and handing pieces of paper around the courtroom.  It's not

11   going to look like anything is happening, but I am going to

12   assure you that something very important is happening.

13           But, while it's happening, we're not going to have

14   you stand up, sit down, sit in the jury box, get out of the

15   jury box.  We're not doing any of that.  We're going to just

16   leave you where you are so we can -- does the government have

17   the piece of paper it needs to proceed?

18           MR. CAMPOAMOR-SANCHEZ:  We do, Your Honor.

19           THE COURT:  All right.  Let's begin.

20           (Pause.)

21           THE COURT:  All right.  Before we continue, can I see

22   counsel, or some subset of counsel, at the bench, briefly.

23           For those of you who haven't had the opportunity to

24   enjoy the husher that we use during these bench conferences,

25   now is your chance; and you'll why we use it as infrequently as

```
1    possible.
2              (Bench discussion:)
3              THE COURT:  All right.  I just to make sure that we
4    each have the same count.
5              Mr. Haley, we need you for this, as well.
6              Juror Number 0413, seat number 1.
7              0243, Seat Number 2.
8              1151 in Seat Number 3.
9              0517 in Seat Number 4.
10             0097 in Seat Number 5.
11             MS. JUNGHANS:  Right.
12             THE COURT:  0805 is Seat Number 6.
13             1136 is Seat Number 7.
14             1612 in Seat Number 8.
15             0351 in Seat Number 9.
16             0866 in Seat Number 10.
17             Number 1398 in Seat Number 11.
18             Everybody is nodding and saying, um-hum.
19             MR. TAYLOR:  Yes.
20             MS. JUNGHANS:  Yes.  Agreed.
21             THE COURT:  And 1323 in Seat Number 12.
22             MR. CAMPOAMOR-SANCHEZ:  Yes.
23             MS. JUNGHANS:  Yes.
24             THE COURT:  You will each now have an opportunity to
25    exercise one strike on the people who will be seated as
```

1    alternates, who will be seated in the order that they're

2    listed, unless they're struck.

3              And I have one question, which is, does anybody

4    recall -- I think it was Juror 0517, Juror Number 4, who said

5    he had back issues and sometimes likes to stand up.

6              MS. JUNGHANS:  I think that was he, yes.

7              THE COURT:  It would be my -- what I would choose to

8    do after we seat everyone is -- or, even when we seat someone,

9    switch them so that he gets to sit in the back row.  Just so if

10   he stands up, he's not going to disturb anybody.

11             MS. JUNGHANS:  Yes.  Yes.

12             THE COURT:  And then he doesn't have to ask for

13   permission.

14             MS. JUNGHANS:  I had the same thought this morning.

15   Yeah.

16             THE COURT:  Okay.  So, what I'll do, is I think I'll

17   just seat them in order, so it doesn't seem confusing to

18   anybody, and then just have the two of them switch.

19             MS. JUNGHANS:  That's fine.

20             THE COURT:  And then I thought I would like to have

21   Mr. Haley take them into the jury room.  And then that's when

22   you can get mic'd up for your openings and all that sort of

23   stuff, and then we'll come in and we'll do the preliminary

24   instructions and go right into the morning.

25             Does that make sense?

1          MS. JUNGHANS:  Yes.  And are you seating two

2     alternates?

3          THE COURT:  Two alternates.

4          MS. JUNGHANS:  Okay.  All right.  Very good.  Thank

5     you.

6          (Open court:)

7          THE COURT:  All right.  If I could have counsel one

8     more time, just to confirm the rest of what we've done.

9          (Bench discussion:)

10          THE COURT:  All right.  My records indicate that we

11     now have 0420 as Alternate Number 1, and 0564 as Alternate

12     Number 2, is that correct?

13          MR. CAMPOAMOR-SANCHEZ:  Yes.

14          MS. JUNGHANS:  Yes, Your Honor.

15          THE COURT:  All right.  So, I'm going to have

16     Mr. Haley seat them in the box, and then I'm going to seat

17     everybody else.  And then we'll do the switcheroo, and then

18     we'll take a break before we do anything further.

19          MS. JUNGHANS:  All right.  Thank you.

20          THE COURT:  Great.  Thank you.

21          (Open court:)

22          THE COURTROOM DEPUTY:  Ladies and gentlemen of the

23     jury, as I call your four-digit jury number, please bring all

24     your belongings and take your seat in the jury chair that I

25     assign to you.

1              In juror Seat Number 1, Juror Number 0413.

2              Juror Seat Number 2, Juror 0243.

3              In Juror Seat Number 3, Juror Number 1151.

4              In Juror Seat Number 4, number -- Juror Number 0517.

5              In Juror Seat Number 5, Juror Number 0097.

6              In Juror Seat Number 6, Juror Number 0805.

7              In Juror Seat Number 7, will be Juror Number 1136.

8              Back row, in Juror Seat Number 8, will be Juror 1612.

9              Juror Seat Number 9, Juror Number 0351.

10             In Juror Seat Number 10, will be Juror Number 0866.

11             In Juror Seat Number 11, will be Juror Number 1398.

12             In Juror Seat Number 12, will be Juror Number 1323.

13             In Juror Seat Number 13, will be Juror Number 0420.

14             In Juror Seat Number 14, will be Juror Number 0564.

15             THE COURT:  All right.  The members of the potential

16        jury panel who are seated in the courtroom, you are now

17        officially excused from this courtroom.  And we thank you very

18        much for your participation in this process.  That also means

19        that you are excused from the instructions I gave you yesterday

20        about not reading and talking about the case.  You are no

21        longer participants in the case.

22             You are asked to return to the jury office, and they

23        will give you further instructions from here.  But, we thank

24        you very much for your participation in the process.

25             And you all can be excused at this time.

1          (Pause.)

2          THE COURT:  The juror seated in Seat Number 4, which,

3   I believe, is you, sir, were you the juror who mentioned to us

4   yesterday, sometimes you need to stand up for your back?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  All right.  I'm going to ask to you

7   change places with the juror in Seat Number -- is it 8?

8          THE COURTROOM DEPUTY:  8.

9          THE COURT:  So that if you need to do that, you won't

10  be blocking anyone's view or disturbing anyone, and you can do

11  it without having to ask me on a regular basis.  So, if you two

12  would be kind enough to change seats.

13          And now, the seats you're sitting in will be your

14  official seats for the rest of the trial.

15          What we're going to do is have Mr. Haley take you

16  back to the jury room, briefly, while we take a break and get

17  ready for the next phase of the proceedings.  And, so, why

18  don't we do that now.

19          (Whereupon the jurors leave the courtroom.)

20          THE COURT:  I think we're going to have enough time

21  after the preliminary instructions to go straight into

22  openings.  So, if any counsel is planning to stray from the

23  lectern and use a body mic, this would be a good time to get

24  yourself wired for sound.  And you all can rearrange yourselves

25  however you choose to be seated in the courtroom now.

1           Are there any -- do you have a question?

2           MR. CAMPOAMOR-SANCHEZ:  No.  Just, if we could have

3   just a little more than just ten minutes, so we could also set

4   up the computer, in addition to the body mic.

5           THE COURT:  All right.  That will be fine.  Just let

6   Mr. Haley know when everybody is ready.

7           All righty.  Thank you.

8           (Recess.)

9           THE COURT:  Before we bring the jury back in, just a

10  couple of housekeeping matters that I think I may have

11  neglected to mention earlier.

12           I think we've talked about all of our courtroom rules

13  and procedures.  One thing we haven't discussed is, if you have

14  an objection, no speaking objections.  You stand, Objection.

15  If you want to give me one word, Objection, hearsay; Objection,

16  leading, that's fine.  But, not, Objection, he's trying to tell

17  the witness blah, blah, blah.  Or, Objection, we talked about

18  this, Your Honor.

19           If I need more to rule, I'll ask you to come to the

20  bench.  If I rule and you feel like there's more you need to

21  say, you can ask to come to the bench.  But I don't want it

22  done from the well of the courtroom.

23           Also, I think some people are going to be using the

24  headphones and some people aren't.  If a witness is testifying

25  and an attorney is having trouble hearing the witness, if you

1    just -- just raise your hand, and then I can ask the witness to

2    adjust the microphone.  Because I think what's been happening

3    is, people are talking over the witness, saying, I can't hear.

4    And then the court reporter is trying to type while two people

5    are talking at the same time.

6              So, you're not going to raise your hand for any other

7    reason throughout the trial, I don't think.  So, I will

8    interpret that as, Can you tell the witness to speak into the

9    microphone?

10             So, with that, are we ready to bring the jury in?

11             MS. JUNGHANS:  Yes.

12             MS. GASTON:  Yes.

13             THE COURT:  All right.  Let's do that.

14             (Whereupon the jurors enter the courtroom.)

15             THE COURTROOM DEPUTY:  Jurors all present, Your

16   Honor.

17             THE COURT:  All right.  I think the first thing we

18   need to do is have the courtroom deputy swear the jury.

19             You may swear or affirm when he administers the oath

20   to you.

21             THE COURTROOM DEPUTY:  Members of the jury, please

22   rise and raise your right hands.

23             (Whereupon the jurors were duly sworn.)

24             THE COURT:  All right.  Before we begin the trial,

25   I'm going to explain to you a little bit about how the trial

1    will work and what some of the legal rules are that are going

2    to be important in the trial.  I want to emphasize to you that

3    these rules are not a substitute for the detailed instructions

4    that I'm going to give at the end of the trial, before you

5    start the deliberations.  They're just intended to give you a

6    sense of what's going to happen in the courtroom and what your

7    responsibility as jurors will be.

8           As I said at the beginning of jury selection, this is

9    a criminal case that began when a grand jury returned an

10   indictment against the defendant, Gregory Craig.  The

11   indictment charges that Mr. Craig unlawfully, knowingly, and

12   willfully engaged in a scheme to falsify, conceal, or cover up

13   material facts from the FARA Unit, a section of the National

14   Security Division of the Department of Justice, and that he did

15   so in violation of 18 U.S. Code Section 1001(a)(1).

16          You should understand clearly that the indictment

17   that I just summarized is not evidence.  It's just a formal way

18   of charging a person with a crime in order to bring him to

19   trial.  You must not think of the indictment as any evidence of

20   the guilt of the defendant or draw any conclusions about his

21   guilt just because he was indicted.

22          At the end of the trial, you will have to decide

23   whether not the evidence -- whether or not the evidence

24   presented has convinced you beyond a reasonable doubt that the

25   defendant committed the offense with which he's been charged.

1         I'll provide you with more detailed instructions

2  about the legal elements of the charge at the end of the

3  evidence.

4         Every defendant in a criminal case is presumed to be

5  innocent.  This presumption of innocence remains with the

6  defendant throughout the trial, unless and until he's proven

7  guilty beyond a reasonable doubt.  The burden is on the

8  government to prove the defendant guilty beyond a reasonable

9  doubt, and that burden of proof never shifts throughout the

10  trial.  The law does not require the defendant to prove his

11  innocence or to produce any evidence.

12         If you find that the government has proved beyond a

13  reasonable doubt every element of the offense with which the

14  defendant is charged, it is your duty to find him guilty of

15  that offense.  On the other hand, if you find that the

16  government has failed to prove any element of a particular

17  offense beyond a reasonable doubt, you must find the defendant

18  not guilty of that offense.

19         I'm now going to talk about how the trial will

20  proceed, and at some points I may say -- talk about the

21  government or the defense or the defendant.  When I talk about

22  the government, I'm talking about assistant United States

23  attorneys Fernando Campoamor-Sanchez, Molly Gaston, and Jason

24  McCullough.

25         When I mention the defendant or the defense, I'm

1    referring either to the defendant, Gregory Craig, or to his

2    attorneys, William Taylor, William Murphy, Paula Junghans, Adam

3    Abelson, and Ezra Marcus.

4            As the first step in the trial, the government and

5    the defendant will have an opportunity to make opening

6    statements.  The defendant may make an opening statement

7    immediately after the government's opening statement, or he may

8    wait until the beginning of the defendant's case, or he may

9    choose not to make an opening statement at all.  You are to

10   understand that the opening statements are not evidence.  They

11   are only intended to help you understand the evidence that the

12   lawyers expect will be introduced.

13           After the opening statement or statements, the

14   government will put on what is called its case-in-chief.  That

15   means that the government lawyers will call witnesses to the

16   witness stand and ask them questions.  This is called direct

17   examination.

18           When the government is finished, the defense may ask

19   the same witness questions.  That's called cross-examination.

20           When the defense is finished, the government may have

21   brief redirect examination.

22           After the government presents all of its evidence,

23   the defense may present evidence, but he's not required to do

24   so.  As I said earlier, the law doesn't require a defendant to

25   prove his innocence or to produce any evidence in the case.

1          At the end of all of the evidence, each side will

2     have an opportunity to make a closing argument in support of

3     its case.  The lawyers' closing arguments, just like their

4     opening statements, are not evidence in the case.  They're only

5     intended to help you understand the evidence.

6          Finally, at the end of all of the evidence and after

7     both sides have finished closing arguments, I will tell you in

8     detail about the rules of law that you must follow when you

9     consider what your verdict shall be.  Your verdict must be

10    unanimous; that is, all 12 jurors must agree on the verdict.

11         I'm going to talk a little bit now about my

12    responsibilities as the judge and your responsibilities as the

13    jury.

14         My responsibility is to conduct this trial in an

15    orderly, fair, and efficient manner, to rule on legal questions

16    that come up in the course of the trial, and to instruct you

17    about the law that applies to this case.

18         It's your sworn duty as jurors to accept and apply

19    the law as I state it to you.  Your responsibility as jurors is

20    to determine the facts in the case.  You, and only you, are the

21    judges of the facts.  You, alone, determine the weight, the

22    effect, and the value of the evidence, as well as the

23    credibility or believability of the witnesses.  You must

24    consider and weigh the testimony of all witnesses who appear

25    before you.  You, alone, must decide the extent to which you

1    believe any witness.

2            You must pay very careful attention to the testimony

3    of all of the witnesses, because you will not have transcripts

4    or summaries of the testimony available do you during your

5    deliberations.  You're going to have to rely on your memory.

6            During this trial I may rule on motions and

7    objections by the lawyers, I may make comments to the lawyers,

8    I may ask a question or two to a witness, and I'm going to

9    instruct you on the law.  You should not take any of my

10   statements or actions as any indication of my opinion about how

11   you should decide the facts.  If you think that somehow I've

12   expressed or even hinted at any opinion as to the facts in this

13   case, you should disregard it.  The verdict in this case is

14   your sole and exclusive responsibility.

15           You may consider only the evidence properly admitted

16   in this case.  That evidence includes the sworn testimony of

17   witnesses and the exhibits or documents or pictures or pieces

18   of paper admitted into evidence.

19           Sometimes a lawyer's question might suggest the

20   existence of a fact, but the lawyer's question alone is not

21   evidence.  If the evidence includes anything other than the

22   testimony and exhibits, I'll instruct you about those other

23   types of evidence when they're admitted during the trial.

24           During the trial, if the Court or a lawyer makes a

25   statement or asks a question that refers to evidence or prior

1    testimony that you remember differently, you should rely on

2    your memory of the evidence during your deliberations.

3            As you probably know, lawyers may object when the

4    other side asks a question, makes an argument, or offers

5    evidence the objecting lawyer believes is not properly

6    admissible.  You must not hold such objections against the

7    lawyer who makes them or the party that he or she represents.

8    It's the lawyer's responsibility to object to evidence that

9    they believe is not admissible.

10           If I sustain an objection asked by the lawyer, that

11   means the question is withdrawn, and you may not guess or

12   speculate what the answer to that question would have been.

13           If a question is asked and answered, and I then rule

14   that the answer was inadmissible and is stricken from the

15   record, then you have to disregard both the question and the

16   answer in your deliberations.  And you should follow this same

17   rule if any exhibits are stricken.

18           Sometimes someone will object, and I'll need to

19   discuss the matter further with the lawyers.  And I'm going to

20   ask them to come up here, and we're going to turn on that

21   wonderful husher that you heard earlier.  It's my goal to do

22   that as little as possible.  But, if I do it, it's because

23   we're discussing matters of law or matters of evidence that you

24   might never get to hear.

25           And if the husher is on, it's a perfectly good time

1       for anybody to stand up and stretch who wants to stand up and

2       stretch, but your signal to sit back down would be when the

3       lawyers start making their way back to counsel table.

4               I'm going to talk a little bit about how you all are

5       going to have to conduct yourselves throughout the trial.  You

6       are not permitted to discuss this case with anyone until the

7       case is submitted to you for your decision at the end of my

8       final instruction.  That means that until the case is submitted

9       to you, you may not even talk about it with your fellow jurors.

10      That's because we don't want you making any decisions until

11      you've heard all the evidence and the instructions of law.

12              In addition, you may not talk about the case with

13      anyone else, including people at home or people at work.

14      That's because you must decide this case based on what happens

15      here in the courtroom, and not on what someone else may or may

16      not tell you outside the courtroom.

17              I'm sure that at some point, you may need to inform

18      people at home or people at work that you've been selected for

19      a jury.  They'll undoubtedly ask you what kind of case you're

20      sitting on.  They may tell those who need to know where you are

21      that you've been picked for a jury, that it's a criminal case,

22      and how long it's expected to take.

23              However, you must not give anyone any information

24      about the case itself or the people involved in the case.  You

25      must also warn people not to try to say anything to you or to

1    write to you about your jury service or the case.  When the

2    case is over, you may discuss any part of it with anyone you

3    wish, but until then, you may not do so.

4            And when I tell you that you cannot discuss the case,

5    that also means that you must not use electronic devices, such

6    as phones or computers to talk about this case.  You may not

7    send an email or instant message or text about it.  You may not

8    write or Tweet or speak about the case electronically through

9    any blog or posting, chat room, instant message, or other

10   communications, including social networking sites, such as

11   Facebook, Twitter, LinkedIn, Instagram, SnapChat, YouTube, or

12   something I haven't heard of yet, until you've delivered your

13   verdict and the case is over.  And you should not read anything

14   anybody else posts about this case on any of those sites.

15           Please do not send or accept any messages, including

16   email or text messages, about your jury service.  You must not

17   disclose your thoughts about jury service or ask for advice

18   about what to do or how to decide any case.

19           What about while you're in the courthouse?  Although

20   it is a natural human tendency to talk with people with whom

21   you may come into contact, you must not talk to any of the

22   parties, their attorneys, or any witnesses in this case during

23   the time that you serve on the jury.  If you encounter anyone

24   connected with the case outside the courtroom, you should avoid

25   having any conversation with them, overhearing their

1    conversation, or having any contact with them at all.

2          For example, if you find yourself in a courthouse

3    corridor or elevator or any other location where the case is

4    being discussed by attorneys, parties, witnesses, or anyone

5    else, you should immediately leave the area to try to avoid

6    hearing the discussions.  If you do overhear a discussion about

7    the case, you should report that to me by telling Mr. Haley

8    about it as soon as you can.

9          Finally, if you see any of the attorneys or witnesses

10   involved in the case and they turn and walk away from you,

11   they're not being rude.  Don't hold it against them.  They're

12   merely following the very same instruction that has been given

13   to them.

14         It is very unlikely, but if someone tries to talk to

15   you about this case, you should refuse to do so and immediately

16   let me know by letting Mr. Haley or the -- one of the security

17   guards know that this has taken place.  Please don't tell the

18   other jurors.  Just let me know, and we'll bring you into the

19   courtroom, like we did yesterday, one by one, to discuss it.

20         The whole point of this is that you must decide the

21   facts based on the evidence presented in court, and according

22   to the legal principles about which I instruct you.

23         And that also means you're not permitted, during the

24   course of the trial, to conduct any independent investigation

25   or research about the case on your own.  That means, for

1    example, you can't use the internet to do research about the

2    facts or the law or the people or the countries involved in the

3    case.

4            And research could include something that seems

5    simple and harmless, like using the internet to look up a legal

6    term.  You might want to search the web or recent newspapers to

7    get some background you might have missed, but I'm specifically

8    instructing you not to do that.

9            There's a reason why we have this rule.  All parties

10   have a right to have the case decided just based on the

11   evidence and the rules they know about and that they have a

12   chance to respond to.  Relying on information you get outside

13   of the courtroom is unfair, because the parties wouldn't have a

14   chance to refute or correct or explain it.

15           And, unfortunately, some information that we get over

16   the internet or from other sources may be incomplete, it may be

17   misleading, or it may just be wrong.  It's up to you to decide

18   whether to credit any evidence presented in court, and only the

19   evidence presented in court may be considered.  If evidence or

20   legal information hasn't been presented in court, you can't

21   rely on it.

22           Also, if any of you do your own research about the

23   facts or the law, this may result in different jurors having

24   different information to base their decision on.  And in this

25   trial, every juror must make his or her decision based on the

1    exact same body of evidence and under the exact same rules.

2            In some cases, there may be reports in the newspaper,

3    on the radio, internet, or TV concerning the case while the

4    trial is going on.  In the event there's any media coverage in

5    this case, you may be tempted to read it or listen to it or

6    watch it.  But, you must not read or listen to or watch such

7    reports because you must decide this case solely on the

8    evidence presented in this courtroom.

9            If any publicity about this trial comes inadvertently

10   to your attention during the trial, please don't click on it,

11   please turn the channel, please turn the page.  And if you end

12   up hearing or reading something, please do not discuss it with

13   any other jurors or with anyone else.  Just let me or Mr. Haley

14   know as soon as it happens, and we'll discuss it with you

15   individually.

16           You may have noticed when you took your seats, that

17   each of you had a notebook and pencil waiting for you.  That is

18   because I permit jurors to take notes during the trial if they

19   wish.  Whether you take notes or not is entirely up to you.

20   Many people find taking notes helps them remember testimony and

21   evidence; other people find it distracting from listening to

22   the witnesses.

23           You will be permitted to take your notebooks back

24   with you into the jury room during deliberations.  You should

25   remember, however, that your notes are only an aid to your own

1    memory.  They're not evidence in the case, and they shouldn't

2    replace your memory of the evidence.  Those jurors who do not

3    take notes should rely on their own memory of the evidence and

4    shouldn't be influenced by another juror's notes.

5            Other than during your deliberations, the notebooks

6    will remain locked in the courtroom during recess and

7    overnight.  You'll not be able to take the notebooks with you

8    as you come and go, and you'll not be permitted to take them

9    home with you overnight.

10           At the end of the trial, when you come back to the

11   courtroom to deliver your verdict, your notebooks will be

12   collected, the pages will be torn out and destroyed.  No one,

13   including me, will ever look at any notes you've taken.

14           You probably noticed that there are 14 of you sitting

15   in the jury box.  Only 12 of you will retire to deliberate in

16   this matter.  I will not disclose who the alternate jurors are

17   until the end of my final instructions, just before you begin

18   your deliberations.  Because any seat might turn out to be an

19   alternate or might turn out to be a juror, it's important that

20   each of you think of yourself as a regular juror throughout the

21   entire trial, and that all of you give this case your full and

22   serious attention.

23           At the beginning of the jury selection process, you

24   heard a pretty long list of names of individuals that may be

25   called to testify in this case.  If at any time during this

1    trial you suddenly realize that you do recognize or know any

2    witness or a lawyer or someone who's mentioned in the testimony

3    or the evidence or anyone connected with this case in any way,

4    you should raise your hand immediately and ask to have the

5    opportunity to speak with me privately -- or, to speak with us

6    privately, outside of the presence of the rest of the jury.

7         After I submit the case to you, you may discuss it

8    only when I instruct you to do so and only in the jury room and

9    only in the presence of all of your fellow jurors.  It's

10   important that you keep an open mind and not decide any issue

11   in the case until after I submit the entire case to you with my

12   final instructions.

13        Can I ask counsel to approach briefly.

14        (Bench discussion:)

15        THE COURT:  I'm going to finish up by telling the

16   jurors what the schedule is that we're going to follow every

17   day, but I want to know if there are any objections to the

18   preliminary instructions or anything else that you feel has

19   been left out?

20        MS. GASTON:  No, Your Honor.

21        MR. TAYLOR:  No, Your Honor.

22        THE COURT:  Okay.  Thank you.

23        (Open court:)

24        THE COURT:  All right.  The schedule that we're going

25   to follow -- to try to follow during the trial, is that we're

1    going to try to start promptly at 9:30 a.m.  You'll be asked to

2    arrive earlier, and I can let you know that there will be some

3    breakfast available for you in the jury room when you get here.

4    I would call it, loosely, continental breakfast.  There might

5    be a little Danish.  There will be some fruit.  There will be

6    coffee.  There will be juice.  There will not be an omelette

7    maker.

8            After we start, we always take a short break at

9    approximately 11:030 a.m., 10:30, sometime in the middle of the

10   morning.  There will be a lunch break sometime between 12:30

11   and 1:00 that will last about an hour.  We will take a

12   midafternoon break, ordinarily, and we try to end by

13   approximately 4:30 or 5:00 p.m.  Depending on how close we are

14   to the end of a witness's testimony, we might stop a little

15   earlier, we might stop a little later.  If you need a break at

16   any other time, please feel free to raise your hand or give me

17   some other signal, like the timeout signal, and we will take a

18   break, if somebody needs one.

19           As I told you before we started, we will definitely

20   not be sitting on Friday, August 30th, or Monday, September

21   2nd.  And if the trial is still going on by -- after Labor Day,

22   I can tell you now that we're not going to be sitting on

23   September 5th or 6th, the Thursday and Friday of that week.

24           You will spend most of your time during this trial

25   either in the courtroom or in the jury room.  I urge you not to

1    leave any valuables in the jury room.  Please don't leave your

2    purses or wallets or anything of value in there.  Keep your

3    valuables with you.  Please keep your phones turned off.  You

4    can certainly leave things like umbrellas in the jury room.

5    And for those of you who had water bottles, if you want to

6    bring water bottles into the courtroom with you, that's A-okay

7    with me.  We do not have cup holders, I do not think.

8            If you think it's cold in here, I can tell you, it's

9    always going to be cold in here.  So, if that's a problem, as

10   my mother used to tell me when I left the house, take a

11   sweater.

12           Thank you very much for your attention and your

13   patience.  We're now going to proceed with the government's

14   opening statement.

15           MS. GASTON:  In 2013, the defendant, Gregory B.

16   Craig, had a choice.  He could tell the truth and be

17   forthcoming when the Department of Justice --

18           In 2013, the defendant, Gregory B. Craig, had a

19   choice.  He could tell the truth and be forthcoming when the

20   Department of Justice asked him questions about his work for a

21   foreign government, or he could lie and conceal the true nature

22   of his activities.

23           And we are here today because the defendant chose to

24   lie and conceal.  And here's what the evidence will show about

25   what he did and why he did it.

1          In 2012, the defendant was at the height of his

2     career.  He was a prominent partner at Skadden Arps, a law firm

3     here in Washington.  And before joining Skadden, he had been

4     the White House counsel, President Obama's top lawyer.  He'd

5     previously had international law experience at the State

6     Department.  And he had a sterling reputation that he had built

7     over the course of a lifetime.

8          And it was precisely because of that reputation that

9     Ukraine hired him.  You see, in 2012, Ukraine, a country in

10    Eastern Europe, was trying to join the European Union and the

11    ranks of modern, fair democracies.  But a major barrier to

12    Ukraine's acceptance by the EU and the western world was the

13    fact that the government of Ukrainian, President

14    Viktor Yanukovych, had just prosecuted Yulia Tymoshenko,

15    Ukraine's former prime minister and President Yanukovych's

16    political rival.

17         And the Tymoshenko trial was criticized throughout

18    the world as politically motivated and unfair.  And that's

19    where the defendant came in.  Because a lobbyist to

20    President Yanukovych, Paul Manafort, conceived of a strategy to

21    improve Ukraine's image throughout the world.  And part of that

22    strategy was to hire a respected U.S. law firm to conduct an

23    independent review of the Tymoshenko trial.

24         And the evidence will show that after a former

25    colleague introduced the defendant to Manafort, the defendant

1     agreed to do this work for more than $4 million.

2          But when Manafort and Ukraine arranged to pay the

3     defendant's law firm more than $4 million, they wanted more

4     than just an independent report.  They wanted to leverage the

5     defendant's reputation to improve Ukraine's image throughout

6     the world.

7          And the evidence in this trial will show that after

8     accepting Ukraine's money, the defendant agreed to do more than

9     just write the report.  He agreed to help with the public

10    relations rollout of the report in the United States.

11         Now, the problem with that for the defendant was that

12    he had received advice that helping with the public relations

13    rollout in the United States would require him to register as

14    an agent of Ukraine under a U.S. law called the Foreign Agents

15    Registration Act.  You'll hear it called FARA, for short.  And

16    FARA is a disclosure statute that requires that when people do

17    certain work for foreign governments in the United States, like

18    public relations, they register with the Department of Justice

19    and provide public details about their work.

20         And when an agent registers with the Department of

21    Justice, they don't just say that they've worked for a foreign

22    government; they have to provide details, like what they've

23    done and how much they've been paid.  But the evidence in this

24    trial will show that the defendant did not want to register as

25    Ukraine's agent, and he did not want to have to disclose all of

1    the details that FARA registration would require.

2            But in December of 2012, when a public reporter in

3    the United States reported on the defendant's report for

4    Ukraine, the office in the Department of Justice that enforces

5    FARA took notice, as this their duty.  And the government

6    employees in that office, which is called the FARA Unit, opened

7    an inquiry into whether the defendant and his law firm were

8    required to register.

9            And the evidence will show that when the FARA Unit

10   asked the defendant specific questions about his media contacts

11   and his distribution of the report to journalists in the

12   United States, the defendant did what he had to do to ensure

13   that the FARA Unit did not find he had to register.  He lied.

14   He told the FARA Unit half truths, and he concealed the facts

15   of what he had done.

16           And that is why we are here today.  Over the course

17   of this trial, we are going to prove two key things to you.

18   First, we are going to prove to you that despite the fact that

19   the defendant did not want to register under FARA, and the fact

20   that he'd had advice that doing public relations in the

21   United States related to the report would require registration,

22   he agreed to help with the rollout of the report in the

23   United States.

24           And, second, we will prove that then, when the FARA

25   Unit asked him questions about his media contacts and

1      distribution of the report, he lied and concealed what he had

2      done.

3              The defendant is charged with one count in this case,

4      and that is that in 2013, the defendant schemed to falsify and

5      conceal important facts from the FARA Unit in order to avoid

6      registering.  And regardless whether the defendant was

7      obligated to register, it is a crime to lie and hide things

8      from the FARA Unit during it's law enforcement inquiry.

9              And to be clear, the defendant is not on trial for

10     his work for Ukraine or for failing to register.  And there is

11     nothing wrong with registering under FARA.  Many lawyers and

12     lobbyists and other people do it in the United States every

13     year.  All FARA requires is truthful disclosure to the

14     government and to the citizens of the United States.  Because

15     the idea behind FARA is that we know where messages are coming

16     from, and that we're able to take them in and understand how

17     much weight we should give them.

18             Now, we are going to present to you what happened in

19     this case in three different parts, and we think that it helps

20     to consider them as chapters.  Chapter 1 is the report; Chapter

21     2 is the public relations rollout of the report; and Chapter 3

22     is the FARA Unit inquiry.

23             And, as I said, the charge in this case relates to

24     Chapter 3, the FARA Unit inquiry.  The simple question for you

25     in this case, the core question, is whether the defendant lied

 1    and concealed to the FARA Unit in 2013.

 2          But in order to evaluate whether the defendant's

 3    representations to the FARA Unit were misleading and whether he

 4    hid important facts, you need to know some of the backstory

 5    from Chapter 1 and Chapter 2.  So I'm going to review the

 6    government's expected evidence with you now, starting with

 7    Chapter 1.

 8          There are two parts of Chapter 1, the report, that I

 9    want to talk to you about.  First, the defendant sought and

10    received specific advice about how FARA was implicated by the

11    report.  And, second, there were aspects of the defendant's

12    work on the report that were not public and that he did not

13    want to become public.  But, if the defendant were required to

14    register under FARA, he would have had to disclose these

15    things.

16          Now, let's review quickly why Ukraine wanted the

17    report.

18          This is Ukraine, a country in Eastern Europe.  And in

19    2011, the government, a President Viktor Yanukovych, prosecuted

20    Yulia Tymoshenko, Yanukovych's former political rival and the

21    government's former prime minister.

22          And you will hear that this was a hot topic in

23    international news, because it is not every day that the

24    president of a country prosecutes his former political

25    opponent.  And the criticism of this trial was hampering

1    Ukraine's ability to enter the European Union.

2            And, so, Paul Manafort, a lobbyist to President

3    Yanukovych, conceived of the strategy that I mentioned earlier,

4    the strategy that involved commissioning an independent report

5    from a respected U.S. law firm.  And in 2012, the defendant was

6    at Skadden Arps, a respected U.S. law firm here in Washington

7    and with offices throughout the world.  And the defendant,

8    despite reticence by some at Skadden, agreed to take on the

9    project and assembled a team of lawyers to do so.  And you'll

10   hear from many of those lawyers in the course of this trial.

11           You'll also hear, and the evidence will show, that

12   the defendant understood that Ukraine's goal for the report was

13   an improved public image.  For instance, when one of the other

14   attorneys at Skadden asked the defendant, at the beginning of

15   the project, what would happen if the report was ultimately

16   critical of the government of Ukraine, the defendant answered,

17   in substance:  Regardless of what the report concludes, it will

18   be better for Ukraine than the criticism that it's experiencing

19   now.

20           Now, the first part of Chapter 1 is FARA advice.

21   From the outset of the project, the defendant was clear that he

22   did not want to register under FARA.  In this email from the

23   defendant in February 2012, he writes to Cliff Sloan, another

24   Skadden partner who was helping him write the report, and said

25   that he didn't want to have to register as a foreign agent

1    under FARA, and he did not think he had to with this

2    assignment.  "This assignment" being the independent report.

3          But, very quickly, Ukraine started to ask for public

4    relations advice, and the defendant understood that that could

5    implicate FARA.  So the defendant asked Cliff Sloan, Who should

6    we -- who should we ask advice about how FARA is implicated by

7    this request?

8          And Sloan responded that, perhaps, they should

9    consult a lawyer at Skadden, a partner with FARA experience,

10   named Ken Gross.  And the defendant responded to Cliff Sloan, I

11   don't really care who you ask, but we need an answer from

12   someone who we can rely on with a straight face.

13         The defendant then asked if a lawyer in the London

14   office of Skadden could give public relations advice without

15   the defendant having to register.  And the following day, on

16   April 17th, the advice from Gross came back to the defendant

17   and to Sloan.  And Gross's advise, passed through another

18   Skadden lawyer, was as follows:

19         Simply writing a report evaluating the Ukrainian

20   proceedings would not trigger FARA obligations.  But, if

21   Skadden's lawyers performed public relations aimed at the

22   United States, if London lawyers were to do so, or if Skadden

23   were to subcontract with a public relations firm, then they

24   would be obligated to register under FARA.

25         And Sloan's reaction to this advice was

1    straightforward.  He said, then let's not give PR advice.

2    Let's just be rule-of-law advisors, the way that we planned.

3    First, because of FARA.  And, second, because providing PR

4    advice at the same time as we're writing the report could

5    compromise the appearance of independence of the report.

6          And the defendant responded, Good advice.

7          But the evidence will show that the defendant chose

8    not to follow that advice.

9          The second part of Chapter 1 that I want to talk to

10   you about are nonpublic aspects of the report.  There were some

11   nonpublic aspects about the report and the defendant's work on

12   it that he did not want to become public, and that he worked to

13   keep quiet.

14         The first one of these is something you'll hear

15   referred to as Project 2.  Almost as soon as the defendant

16   agreed to write the report for Ukraine, Ukraine also asked

17   Skadden to give advice to its government about an upcoming

18   trial of Tymoshenko, a second trial on different charges.  And

19   Skadden attorneys did work on that.

20         But, as the publication date of the report

21   approached, the defendant directed the lawyers working on

22   Project 2 to lay low, because if people understood that Skadden

23   was providing advice about a future trial to the government at

24   the same time as it was writing the independent report, it

25   could cause them to question the independence of the report.

1          And let me just say, as an aside, in the course of

2     this trial, you're going to hear from many of the lawyers who

3     worked on the report, and they will tell you that there is no

4     question in their minds that the report was independent.  And

5     that is not a question for you in this trial, and we do not

6     contest that assertion.

7          The second nonpublic fact that the defendant had to

8     contend with was the payment for the report.  Because even

9     though the government of Ukraine was technically the client for

10    the report, it was not footing the bill.  Instead, after

11    meeting with the defendant in April of 2012, a wealthy, private

12    Ukrainian named Viktor Pinchuk agreed to pay the more than

13    $4 million for the report.  But Pinchuk's funding did not come

14    through a check to Skadden.  It was routed through an account

15    in Cyprus, controlled by Paul Manafort, called Black Sea View,

16    Limited.  And this served to conceal Pinchuk's role as the

17    funder of the report.

18         But, at the same time, the Ukrainian contract that

19    Skadden entered disclosed only what the Ukranian government was

20    paying, which was roughly the equivalent of $12,000.  And so

21    this gave the misleading appearance, with the Ukraine, that

22    Skadden was doing its work practically for free.

23         And you'll learn that this issue came to a head in

24    Ukraine in the summer of 2012, when a newspaper in Ukraine

25    published an editorial titled *Skadden Stink*.  And it urged

1    Skadden to be transparent about who was funding the report and

2    how much they were paid.  And you'll see that privately the

3    defendant agreed, as did Cliff Sloan, the coauthor of the

4    report.

5            But, when Viktor Pinchuk insisted on anonymity, the

6    defendant and the firm did not disclose his role.  And this

7    meant that Ukraine still had a public relations problem.  And

8    the evidence will show that the defendant then took steps to

9    help Paul Manafort and Ukraine hide the actual payment system

10   for the report.

11           At Manafort's direction, the defendant created a

12   false invoice and backdated a letter to help Ukraine conceal

13   the payment for the report.

14           And, so, in summary of Chapter 1, you'll learn that

15   the defendant didn't want to register under FARA in the first

16   place.  And as the project went on, the pressure not to

17   register increased, because there were these nonpublic facts

18   that the defendant didn't want to come out, but that he would

19   have had to disclose if he were to register under FARA.

20           Chapter 2, the public relation rollout.

21           Now, you'll recall that in April of 2012, the

22   defendant received advice that he shouldn't participate in

23   public relations if he didn't want to register under FARA, and

24   that Skadden should not subcontract with a public relations

25   firm.  And so the defendant recommended that Ukraine hire the

1      public relations firm, and Ukraine did.  Ukraine hired a

2      company called FTI Consulting.  But, the evidence will show

3      that the defendant did not leave public relations solely to

4      FTI, and you will see many examples of that.

5           For instance, in July of 2012, the defendant and

6      Paul Manafort were exchanging emails about a draft of the

7      report and a concern that a draft could leak.  And the

8      defendant stated to Manafort, in an email, that the defendant's

9      interests and Ukraine's interests were aligned in terms of the

10     report landing properly when it was released.

11          He wrote, The worst thing that could happen to the

12     project, to this law firm, to your guy and to me, would be to

13     have someone on your side falsely leak a story that Skadden

14     finds Tymoshenko guilty, Skadden Report exonerates Ukraine.

15     That kind of story would be a disaster.  We have to join arms

16     to get something just a little more nuanced.  Yes?

17          And in this email, you can see that the defendant's

18     reputation is tied up in all of this.

19          Now, shortly after that email in September of 2012,

20     the defendant was exchanging drafts of the report with

21     Paul Manafort, and he asked Manafort what the communication

22     strategy for the release of the report was.  And you'll see

23     that on September 13th, Paul Manafort sent FTI's media plan,

24     Ukraine's median plan, to the defendant, and said that he

25     wanted to get -- wanted to bring the defendant's thinking into

1    the process.  And in particular, let's talk about the release

2    plan for the report.  Because FTI's plan was that an early copy

3    would be leaked to a trusted reporter before its public

4    release.

5           And you'll see here, it says that, We propose to leak

6    the report to the head of the Bloomberg Bureau in Washington

7    before the report is released by Ukraine.  And that the process

8    will be that the journalist from Bloomberg would be engaged by

9    the "designated party, MCW."  And then after that, they would

10   be given an off-of-the-record briefing call with GC.  That's

11   the defendant.

12          And then the journalist would have time with the

13   report to write an exclusive article which would "effectively

14   set the agenda for subsequent coverage."

15          Now, you'll hear from witnesses that MCW, this

16   reference, these initials, is a lobbying firm called Mercury.

17   And you'll hear from witnesses about Mercury's involvement in

18   the rollout of the report, and that one of the employees at

19   Mercury who was working on this was a former congressman named

20   Vin Weber.  And we'll come back to Weber in a minute.

21          But, you'll also hear testimony from Jonathan Hawker,

22   the FTI employee who wrote this media plan.  And he will

23   explain this strategy to you, this strategy of picking a

24   trusted reporter, making sure the reporter has an advance copy

25   of the report, and allowing the reporter to write the first

1    article.  And he'll explain this as -- this is a strategy

2    called seeding, and that the idea is that when that trusted

3    journalist writes the first article, if that article is

4    positive, or at least neutral, then other reporters will tend

5    to follow suit.

6            Witnesses will also tell you that the defendant's

7    personal involvement in the rollout of the report was important

8    to the plan because, otherwise, Ukraine wouldn't be getting the

9    benefit of the defendant's reputation and name.

10           And you will hear that shortly after Paul Manafort

11   sent this release plan to the defendant on September 13th,

12   there was a meeting at the Harvard Club of New York on

13   September 23rd.  And at that meeting was Paul Manafort and

14   Paul Manafort's employee, Rick Gates.  Jonathan Hawker of FTI

15   was at that meeting, and the defendant was there.  And you will

16   hear that at that meeting the defendant agreed to provide

17   background interviews to journalists.  The defendant agreed to

18   participate in the rollout of the report.

19           Now, the day after the Harvard Club meeting, which

20   was on September 23rd, you'll see that some at Skadden

21   expressed concerns about some of the things that were agreed to

22   at the Harvard Club meeting.  And that after those concerns

23   were raised, the defendant wrote an email to Paul Manafort and

24   Jonathan Hawker, and said that he would not be able to

25   background journalist after all.

1          But, despite that reversal, the defendant started to

2    take steps consistent with the media plan that Paul Manafort

3    had sent him on September 13th, and with what he had agreed to

4    at the Harvard Club meeting on September 23rd.  And you will

5    hear from Jonathan Hawker that this was because there was a

6    reversal to the reversal.  The defendant was back on board,

7    helping with the rollout of the report.

8          The witnesses will also tell you that the defendant

9    himself suggested a trusted journalist to be the one to

10   received the report.  He suggested a journalist that he knew

11   well, David Sanger of the *New York Times*.

12         And on October 2nd, when the report was going to be

13   released shortly, the defendant contacted David Sanger of the

14   *New York Times*, and asked him if he would talk to Vin Weber of

15   Mercury about the report.  He put David Sanger and Vin Weber in

16   contact, and he directed his assistant to have a copy of the

17   draft report delivered to Weber's office here in Washington.

18         Let's look back at the media plan that the defendant

19   had received from Paul Manafort on September 13th.  The media

20   plan called for a trusted reporter being engaged by Mercury in

21   advance of the report's release.  Vin Weber worked for Mercury.

22         Now, you'll hear that the report's release was then

23   delayed until December of 2012, and Skadden delivered a final

24   copy of the report to Ukraine in November.  And that brings us

25   to December of 2012, which is the most important part of

1    Chapter 2.

2              On December 6, 2012 the defendant received word that

3    the report would be released the following day -- the following

4    week.  And on that same day, Jonathan Hawker of FTI updated

5    Ukraine's media plan, and it was the same strategy of seeding

6    the report with a trusted reporter.  But, in this plan, the

7    trusted reporter was David Sanger of the *New York Times*, the

8    reporter that the defendant had suggested.

9              Now, you won't see an email delivering that plan to

10   the defendant.  But, you will hear testimony from Jonathan

11   Hawker and Rick Gates that the defendant knew the plan, that

12   the defendant discussed the plan.  And that testimony will be

13   corroborated by the defendant's own words and actions.  You

14   will see evidence in black and white, in emails, of the

15   defendant executing Ukraine's media plan.

16             On December 7th of 2012, the defendant spoke to

17   Vin Weber on the phone.  And on December 10th of 2012,

18   Jonathan Hawker sent an e-mail to David Sanger of the *New York*

19   *Times*.  He offered him a copy of the report and an interview

20   with the defendant the following day.  And when Sanger

21   responded to Hawker with confusion, because the last time he

22   had heard about the report had been back in October, Hawker

23   forwarded that email to the defendant and said, among other

24   things, many thanks for your efforts.

25             And that brings us to December 11th, 2012.  On

1    December 11th, 2012, the defendant sent an email to

2    David Sanger of the *New York Times*.  And he wrote, I just

3    learned that the Ukrainians intend to release our report about

4    the Tymoshenko case on Thursday.  Finally.  And that the

5    Ukrainians have determined that you should be given first look

6    at it.

7            The defendant offered to get him a copy of the report

8    and offered to talk to the journalist about it.

9            Now, let's pause and focus on this email for just a

10   moment.  Because in Chapter 3, when the FARA Unit asks the

11   defendant about his media contacts related to the report, he

12   does not disclose this email.  But, this email is one of the

13   very best pieces of evidence that you have about why the

14   defendant reached out to David Sanger, because, he says in his

15   own words, it's because the Ukrainians have determined that

16   Sanger should have first look at it.

17           Now, you'll hear and see that after this email, the

18   defendant spoke to Sanger, tried to email him a copy of the

19   report, and personally hand-delivered a copy of the report to

20   Sanger's home in Washington, D.C.  Let me repeat that.  The

21   defendant drove a copy of the draft report to Sanger's house

22   before the report was public.

23           And during all of this, the defendant updated Hawker,

24   who was very anxious about whether the plan was working.

25   You'll see this email, in which the defendant tells Hawker that

1    he's going to drop off a copy at Sanger's house.  And Hawker

2    says, You shared that with Rick -- meaning, Rick Gates -- and

3    they're happy about it, but they are concerned that if Sanger

4    and the *New York Times* decide not to write the article, the

5    exclusive article in advance of the release, there would be

6    little time to take the report to your contact at the *Post* or

7    Al Hunt -- Al Hunt at Bloomberg -- if the *Times* decides not to

8    write the report.

9           And the defendant's response was this:  We told

10   Sanger that it was his, if he wanted to use it.  He agreed to

11   get back to us with an answer tomorrow.  Tomorrow is not too

12   late for Al Hunt or the *Washington Post*.

13          December 12th.  On December 12th, Sanger looped in

14   another *New York Times* reporter named David Herzsenhorn.  And

15   the defendant spoke to David Herzsenhorn, made sure that an

16   electronic copy of the report made it to the reporters, and

17   emailed Sanger a quote, in which the defendant made clear that

18   the report did not decide the question of whether the trial had

19   been politically motivated.

20          And at the -- nearing the end of the day, when

21   Jonathan Hawker urged the defendant to make sure that the *New

22   York Times* knew when the report would be released by Ukraine,

23   at 3 a.m. the following day, the defendant did so.

24          And, indeed, late on the evening of December 12th,

25   the *New York Times* published an article about the report.

1    You'll see that David Herszenhorn and David Sanger were the

2    authors, and you'll also see that the headline is critical of

3    the government of Ukraine, and that there are other criticisms

4    of the Government of Ukraine within the article.  It also

5    included the defendant's quote that the report didn't reach the

6    question of whether the trial was politically motivated.

7            But at the same time, the article said, quote, The

8    lawyers from the law firm of Skadden, Arps, Slate, Meagher &

9    Flom seem to side heavily with the government of President

10   Viktor F. Yanukovych, which commissioned their report, end

11   quote.

12           In other words, the article was the kind of balanced

13   coverage that Ukraine had hoped for in its media plans to set

14   the scene for the rest of the coverage.

15           That brings us to December 13.  In lockstep with the

16   media plan, early in the morning on December 13th, Ukraine

17   released the report to the public.  And after the report was

18   public, two other U.S. media operations, the *National Law*

19   *Journal* and the *Los Angeles Times*, published articles about it.

20   And Skadden had some contact with those media outlets to

21   provide them with the report, and in some cases, to correct

22   some misinformation in those articles.

23           Also on December 13th, Paul Manafort sent the

24   defendant an email titled Well Done, and expressed his

25   satisfaction with the initial rollout of the report.  And that

1      brings us to the end of Chapter 2.

2                But, before we move on to Chapter 3, let's talk

3      briefly about the witnesses who you're going to hear from in

4      Chapter 1 and Chapter 2, because part of your job is to

5      evaluate the witnesses appearing before you when deciding how

6      to weigh their testimony.

7                One of these witnesses will be Rick Gates,

8      Paul Manafort's right-hand man.  And let me be clear,

9      Rick Gates has pled guilty to conspiring against the

10     United States and to lying to the Special Counsel's Office, and

11     he will be testifying here pursuant to a plea agreement in that

12     separate case.  And as part of that plea agreement, he has

13     admitted those and other crimes.

14                He'll be testifying here because as Paul Manafort's

15     right-hand man, he had direct involvement in the strategy that

16     depended on the defendant's contact with the *New York Times*

17     before the report was released.  And Judge Jackson will

18     instruct you on how to consider the testimony of a witness

19     who's testifying pursuant to a plea agreement, and that you

20     should do so with care.

21                You'll also hear that if Rick Gates lies in this

22     courtroom, his plea agreement goes up in smoke, and he could be

23     additionally prosecuted.

24                And you should also consider whether Gates's

25     testimony is consistent with and corroborated by the other

1     witnesses and evidence in this case.

2             You will also be hearing from many people from the

3     defendant's old law firm, Skadden.  And many of these people

4     are friends with the defendant.  Some of them have known him

5     for years, and others considered him a mentor.  And it will

6     likely be difficult for these witnesses to testify in this

7     trial.  And you should consider those relationships when you

8     weigh their testimony.

9             Now, on to Chapter 3, the FARA Unit inquiry.

10            On December 14th, 2012, just days after the defendant

11    offered a copy of the report to David Sanger of the *New York*

12    *Times*, an employee in the FARA Unit named Alex Mudd saw the *Los*

13    *Angeles Times* article about the report, and he called it to the

14    attention of his boss, Heather Hunt.  Hunt was the chief of the

15    FARA Unit, and she had worked there continuously since 1984,

16    when she started as a typist.  She had worked her way up as a

17    paralegal, and then, after night law school, as a lawyer.  And

18    by 2012, she had been the chief of the FARA Unit for a decade.

19            And after looking at the *New York Times* article, the

20    FARA Unit decided to open an inquiry into whether the defendant

21    and his law firm were required to register under FARA.  And on

22    December 18th, 2013, the FARA Unit sent Skadden a letter,

23    advising the firm that they were determining whether the firm

24    and its lawyers needed to register as agents of Ukraine, and

25    asking some questions in order to help them make that

1    determination.  They also attached the entire FARA law for

2    reference.

3            Approximately two months later, the defendant wrote

4    back to the FARA Unit, and he disclosed the contract, the

5    Ukrainian contract that stated that the firm had been paid

6    approximately $12,000 for its work.  And he also disclosed that

7    there was a third-party payer for the report, but he did not

8    say who or how much that person had paid.  And he also stated

9    that the law firm had made clear that it would not engage in

10   any activities that would require FARA registration.

11           But Heather Hunt and the FARA Unit still did not have

12   enough information to make the determination about whether the

13   defendant and his firm had to register, and so they wrote the

14   defendant and Skadden another letter.

15           And of particular importance to you in this letter on

16   April 9th, 2013, the FARA Unit asked a list of specific and

17   targeted questions, including, to whom, if anyone, did the firm

18   release or distribute the report and when; what was the firm's

19   understanding of what would happen to the report when it was

20   released to the Ukrainian Ministry of Justice; and, finally,

21   did you, Mr. Craig, or anyone in your firm have any media

22   interviews or comments to the media, public, or government

23   officials about the report and the findings of your firm?

24           And it was this letter that put the choice squarely

25   to the defendant:  Disclose the information or hide the

1    information.  Tell the truth or lie.  And it was in response to

2    this letter that the defendant's scheme to lie to and conceal

3    from the FARA Unit launched.  Because if the defendant risked

4    the FARA Unit finding that he had to register under FARA, it

5    would have required disclosures and actions that would have

6    harmed his reputation.

7         First, it would have required him to register as a

8    paid agent of Ukraine, which you will learn the defendant was

9    concerned would prevent him and others from taking high-level

10   government positions.

11        And, second, it would require disclosure that at the

12   same time that it was writing the independent report, Skadden

13   had also advised the government of Ukraine on a future

14   prosecution of Tymoshenko.  And it also would have required the

15   disclosure of Pinchuk's role and the amount of his funding,

16   which the defendant had helped Manafort and Ukraine hide.

17        So, over the next two months, the defendant worked on

18   a response to this letter.  And we will show you some of the

19   drafts in which he very carefully words the response to provide

20   only half truths and to conceal other information.

21        And on June 3rd, 2013, the defendant sent back this

22   response.  And you will be able to see the false and misleading

23   statements in this letter because you will know what happened

24   in Chapter 2, in the rollout of the report.

25        First, in response to question of to whom, if anyone,

1    did the firm release or distribute the report and when, the

2    defendant suggested, misleadingly, that David Sanger of the *New*

3    *York Times* received the report on the 12th to 13th of 2012, at

4    the same time as other journalists and other entities, when you

5    know that he received it on December 11th, directly from the

6    defendant.

7         And, second, in response to the question about the

8    firm's understanding of what Ukraine would do about the report,

9    the defendant wrote that the law firm did not advise the

10   Ministry of Justice on that issue, and did not know what

11   Ukraine was going to do.  But you will have seen the evidence

12   that the defendant participated in meetings about the media

13   plan and executed part of it.

14        And, finally, in response to the question about media

15   interviews and comments to the media, public, or government

16   officials, the defendant wrote that he provided brief

17   clarifying comments to David Sanger of the *New York Times*,

18   Emily Alpert of the *Los Angeles Times*, and Matthew Huisman of

19   the *National Law Journal*.  But, you know that he did more than

20   provide brief clarifying comments to David Sanger.  You'll also

21   see that he wrote, One purpose of the statements was to correct

22   misinformation that the media had received.

23        Now, Heather Hunt did not know anything about Chapter

24   2 and the media rollout of the report.  But, she did look at

25   this letter and see that the defendant had talked to the media

1    about the report, that he had distributed the report to

2    journalists.  And she also noticed that in response to Number

3    6, he had written that one purpose of his statements was to

4    correct misinformation, but that he didn't say what the other

5    purposes were.

6           And, so, on September 5th of 2013, she reached the

7    determination that Skadden and its lawyers had to register as

8    agents of the Ministry of Justice of Ukraine.  And you will

9    hear that when this letter came in to Skadden, the defendant

10   was upset and that he forwarded it to the firm leadership and

11   told them that he was going to look at what options were

12   available.

13          You'll also hear that the leadership of the firm,

14   when they discussed this without the defendant, decided that if

15   Skadden had to register, it would register.  But when the

16   defendant spoke to Lawrence Spiegel, the general counsel of the

17   firm, on September 19th, 2013, he argued forcefully that the

18   firm should resist registering.

19          And in support of that position, he sent Spiegel an

20   email.  It's this email from September 19th, 2013, and you will

21   see that this email continued the scheme.  The defendant

22   represented to Spiegel that he only provided the report to

23   journalists who could not get a copy after the report was

24   already public.

25          And, second, he represented to Spiegel that the only

1    media contacts that he had were in response, to correct

2    misinformation, misinformation that could not have happened yet

3    with David Sanger because the report was not public.

4            Now, you'll see that the following day, the defendant

5    drafted a response letter to the FARA Unit consistent with this

6    e-mail, and shared it with Spiegel.  But, when leadership of

7    the firm reviewed that draft response, they decided that it was

8    not appropriate to send to the FARA Unit because it was too

9    argumentative.  And so they decided that the best course would

10   be to have a meeting with the FARA Unit, and try to convince

11   them in that meeting to reverse the determination that Skadden

12   had to register.

13           And that meeting happened on October 9th, 2013.  And

14   you'll hear from many of the participants in that meeting.

15   You'll hear from Lawrence Spiegel, the general counsel of

16   Skadden.  You'll hear from Ken Gross, that Skadden partner with

17   FARA experience, he provided advice back in 2012, he went, as

18   well.  And you will hear from Heather Hunt, the chief of the

19   FARA Unit.

20           And you will hear that even though there are not

21   notes from that meeting, those three witnesses generally

22   remember the same thing about the meeting, which is that the

23   defendant did most of the talking, and that he represented that

24   his media contacts were reactive to reporters and corrective of

25   misinformation.

1          And Spiegel will also tell you that he did not hear

2     anything during that meeting that was inconsistent with the

3     email he'd received from the defendant, or the draft letter

4     that he'd received the day after.

5          But, most importantly, you will have the words of the

6     defendant himself summarizing the most important parts of that

7     meeting.  Because at the meeting's conclusion, Hunt asked him

8     to write her a letter, and put in it the most important points

9     he had made during the meeting.  And the defendant did as

10    requested.

11         And this letter continued the scheme.  You'll see, in

12    this first representation in the letter, he suggested that

13    media contacts about the report were, quote, done in response

14    to requests from the media, end quote.

15         You'll also hear that he suggested that his contacts

16    and statements with the *New York Times* were, quote, intended to

17    correct mischaracterizations of the report, end quote.

18    Mischaracterizations that could not have happened yet because

19    the report was not public when the defendant was talking to

20    Sanger.

21         And, finally, the defendant wrote, In responding to

22    inaccuracies in *U.S. News* reports, the law firm did not consult

23    with Ukraine, did not inform Ukraine, did not act under

24    instruction from Ukraine, and was in no way serving as an agent

25    of Ukraine.

591

1          But in Chapter 2, you will have seen the defendant's

2    emails to Jonathan Hawker, Ukraine's media agent, and Hawker

3    communicating messages from Rick Gates, Manafort's guy.  And

4    you will know that in executing part of Ukraine's media plan,

5    the defendant was consulting with Ukraine and informing

6    Ukraine.

7          But, the scheme worked.  Heather Hunt did what the

8    defendant had hoped.  And because of the statements that the

9    defendant had made to Heather Hunt, culminating in the meeting

10    on October 9th, and the letter that he wrote on October 10th,

11    she changed her determination.  And in January of 2014, she

12    wrote a letter to Skadden that said that based on the

13    information that the defendant had provided, he and the firm

14    did not have to register under FARA.

15          And that brings us to the end of Chapter 3.

16          And that is why we are here today, because of the

17    defendant's continued scheme throughout 2012 to lie to and

18    conceal from the FARA Unit in order to avoid registering under

19    FARA, and in order to avoid disclosing facts that he did not

20    want to become public.

21          Now, before I conclude in just a moment, let me talk

22    very briefly about what this case is not about.

23          This case is not, as I said before, about whether the

24    report was independent or the report's contents.  And it's not

25    about whether the defendant carried out every bit of Ukraine's

1    media plan, or what other people were doing to carry out the

2    media plan.  And it's not about whether the defendant was

3    obligated to register under FARA.  Because even if he weren't,

4    he could not lie to and conceal from the FARA Unit in the

5    course of its law enforcement inquiry.

6              In the course of this trial, we are going to prove to

7    you two key things:  That in 2012, the defendant helped carry

8    out Ukraine's media plan for the report in the United States,

9    even though he had been told that doing so would require FARA

10   registration.

11             And, second, because of this, when the FARA Unit

12   asked him questions about his media contacts and distribution

13   of the report, he intentionally falsified and concealed the

14   very facts that the FARA Unit was asking for.

15             And at the conclusion of the evidence, we will come

16   back to you and ask you to reach the only verdict consistent

17   with that proof, and find the defendant guilty.

18             THE COURT:  Defense?  Or, why don't we come to the

19   bench briefly to talk about scheduling.

20             (Bench discussion:)

21             THE COURT:  How long is your opening going to be

22   today?

23             MR. TAYLOR:  Your Honor, at least an hour.

24             THE COURT:  Do you want to do it right now?  Or do

25   you want to have lunch and then do it?

1          MR. TAYLOR:  I'm afraid they'll be hungry by the time

2     I get to the end of it.  So, we probably should break.

3          THE COURT:  All right.  Well, it's up to you.

4     There's an argument that you might want to come right now,

5     fresh with names.

6          MR. TAYLOR:  Let me consult with --

7          THE COURT:  Okay.

8          MR. TAYLOR:  If it ran to 1:00, 1:15 --

9          THE COURT:  They've been here -- we started at 9:30.

10    They were here earlier than this.  So, I think your instinct

11    might be good in terms of the state of their hunger.  But I

12    will let you confer with your team, if you want to.

13         MR. TAYLOR:  Let's break for lunch.

14         THE COURT:  All right.

15         (Open court:)

16         THE COURT:  All right.  Members of the jury, given

17    the likely length of the defense opening, which is going to be

18    given today, and the fact that you all have been here for a

19    long time today, rather than do the two openings back to back,

20    which has its benefits, we also thought that having you not be

21    hungry sitting there had more benefit.

22         So we are going to break for lunch for the first

23    time, and break for an hour, and then return at 1 p.m. to

24    resume the trial.

25         And, so, I'm going to give you some instructions now

1    that I'm going to give you every time we break.  And by the end

2    of the trial, perhaps you'll be able to recite them along with

3    me.

4          But, I want to remind you to please abide by all the

5    instructions that I gave you at the beginning of the trial.

6    You haven't heard any evidence yet and, most certainly, the

7    case has not been submitted to you to be decided.  So you are

8    not permitted at this point to discuss the case among

9    yourselves or with anyone else.  Don't let anyone else speak to

10   you about it, don't try to do any reading or writing about this

11   case or issues related to the case, and please refrain from any

12   internet research or any electronic communication about the

13   case.

14         We will return at 1 p.m.  Please be in the jury room

15   at that time.  If you use your cell phones during the break,

16   which you are certainly entitled to do.  Please be sure to have

17   them off when you return.

18         Mr. Haley will show you which way to go at this

19   point.  And leave your notebooks on your chairs.

20         Thank you.

21         (Jurors exit courtroom.)

22         THE COURT:  All right.  You all may be excused.  I

23   think you're all aware now that there will be jurors in the

24   same cafeteria where many of you are going.  So, I would urge

25   you to be discrete.  And members of the public, members of the

 1    press, members of the trial teams, members of families that

 2    might have lots of interesting things to say to each other

 3    about the case, to please be very careful when you're in the

 4    cafeteria lines.  I've had problems like this before.

 5                Yes, sir?

 6                MR. MURPHY:  Your Honor, would you occasionally

 7    remind the jurors that if we run into them, we're not being

 8    rude by just sort of brushing past them.

 9                THE COURT:  I will.  I think I told them that this

10    morning, and --

11                MR. MURPHY:  You did.

12                THE COURT:  -- I'm happy to bring it up periodically,

13    again, throughout.

14                MR. MURPHY:  Thank you, Your Honor.

15                THE COURT:  But I think they seem to grasp the

16    importance of that.  And everyone, not just the defense team,

17    is going to be brushing past them, I hope.

18                All right.  Thank you.

19                              *   *   *

20

21

22

23

24

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5              I, JANICE DICKMAN, do hereby certify that the above

6    and foregoing constitutes a true and accurate transcript of my

7    stenograph notes and is a full, true and complete transcript of

8    the proceedings to the best of my ability.

9                         Dated this 15th day of August, 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25