```
 1               IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3      United States of America,        )  Criminal Action
                                         )  No. 19-CR-125
 4                        Plaintiff,     )
                                         )  JURY TRIAL
 5      vs.                              )  DAY 5 - AFTERNOON
                                         )
 6      Gregory B. Craig,                )  Washington, DC
                                         )  August 16, 2019
 7                        Defendant.     )  Time:  1:45 p.m.
        _____
 8
                 TRANSCRIPT OF JURY TRIAL - DAY 5 - AFTERNOON
 9                          HELD BEFORE
              THE HONORABLE JUDGE AMY BERMAN JACKSON
10                  UNITED STATES DISTRICT JUDGE
        _____
11
                      A P P E A R A N C E S
12
        For Plaintiff:       Fernando Campoamor-Sanchez
13                           Molly Gulland Gaston
                             U.S. ATTORNEY'S OFFICE FOR THE
14                             DISTRICT OF COLUMBIA
                             555 Fourth Street, NW
15                           Washington, DC 20530
                             (202) 252-7698
16                           Email: Fernando.campoamor-sanchez@usdoj.gov
                             Email: Molly.gaston@usdoj.gov
17                           Jason Bradley Adam McCullough
                             U.S. Department of Justice
18                           950 Pennsylvania Avenue, NW
                             Washington, DC 20530
19                           (202) 233-0986
                             Email: Jason.mccullough@usdoj.gov
20
        For Defendant:       William James Murphy
21                           William W. Taylor, III
                             Adam B. Abelson
22                           ZUCKERMAN SPAEDER, LLP
                             100 East Pratt Street
23                           Suite 2440
                             Baltimore, MD 21202
24                           (410) 949-1146
                             Email: Wmurphy@zuckerman.com
25                           Email: Wtaylor@zuckerman.com
                             Email: Aabelson@zuckerman.com
```

```
1                        Paula M. Junghans
                         Ezra B. Marcus
2               ZUCKERMAN SPAEDER, LLP
                1800 M Street, NW
3               Suite 1000
                Washington, DC 20036
4               (202) 778-1814
                Email: Pjunghans@zuckerman.com
5               Email: Emarcus@zuckerman.com

6       _____

7    Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                         Official Court Reporter
8                        United States Courthouse, Room 6523
                         333 Constitution Avenue, NW
9                        Washington, DC  20001
                         202-354-3267

10

11

12

13                              INDEX

14   ALEX HASKELL

15          Cross-Examination By Mr. Abelson...............834
            Redirect Examination By Mr. McCullough.........885
16

17   ALEX HASKELL - DEFENSE CASE

18          Direct Examination By Mr. Abelson..............910
            Cross-Examination By Mr. McCullough............928
19

20                            EXHIBITS

21   Defense Exhibit 490 Received...........................839
     Defense Exhibit 493 Received...........................871
22   Defense Exhibit 494 Received...........................875

23                          *   *   *

24

25
```

```
 1        *   *   *   *   *   *   *   AFTERNOON SESSION *   *   *   *   *   *   *

 2                  THE COURTROOM DEPUTY:  Good afternoon, Your Honor.

 3                  Recalling Criminal Case Number 19-125, the United

 4        States of America v. Gregory B. Craig.

 5                  THE COURT:  All right.  Before we bring the jury back

 6        in for what I'm sure will be a very focused and targeted

 7        cross-examination, I wanted to bring up an issue.  We've gotten

 8        some press requests for access to exhibits that are used during

 9        the course of a trial day.  In other cases where there's been

10        that level of interest, we've usually made it the parties'

11        responsibility to provide those exhibits upon request.  We

12        don't really have a mechanism for the Court to do it.

13                  And, so, if I enter an order that would indicate that

14        upon request, the parties will provide the media with copies of

15        the exhibits used during the trial day, does that meet with

16        everyone's approval?

17                  MR. CAMPOAMOR-SANCHEZ:  We will comply, of course.

18                  THE COURT:  Well, I mean, you know, some other cases

19        have involved, I think, different prosecutorial offices that

20        were handling this.  But I don't know how else to handle it.

21        And I could say, You can come and sit here and take notes, but,

22        it seems to me that we might want to be a little bit more

23        facilitative.  So --

24                  MR. CAMPOAMOR-SANCHEZ:  I'm happy to try to

25        facilitate that in accordance with the Court's instructions, as
```

1    long as there's no expectation it will be immediately.  I mean,

2    we need to --

3            THE COURT:  No.  I would say that as of Monday, so

4    that you have some time to figure out who in your office would

5    be the person that would have the responsibilities to do it,

6    and where they could get them, and to whom they have the direct

7    requests.

8            What about the defense --

9            MR. TAYLOR:  Defense will as well, as long as it

10   doesn't become terribly burdensome.

11           THE COURT:  Well, if it becomes terribly burdensome,

12   you can let me know.  I hope it won't, but --

13           MR. TAYLOR:  We'll do it.

14           THE COURT:  All right.

15           MR. ABELSON:  And, Your Honor, I'll just lodge a

16   request that the versions, especially that are sent to the

17   media, are the redacted versions it?

18           THE COURT:  Yes.  I think we're going to have, maybe,

19   an opportunity over the weekend to scrub that.  I realize

20   everybody has worked very hard to get ready for this.  And,

21   so, we're going to make sure, before anything goes out the

22   door, that it has the appropriate redactions.

23           And it can all be done through emails so that

24   everybody sees a copy, or you can set up someplace where

25   they're posted.  I'll let you all figure out what the best way

 1    to do this is.

 2                All right.  Are we ready to bring in the jury?  We

 3    have our witness.

 4                Okay.  Thank you.

 5                (Jurors enter courtroom.)

 6                THE COURTROOM DEPUTY:  All present, Your Honor.

 7                THE COURT:  All right.  I want to remind you,

 8    Mr. Haskell, that you're still under oath.

 9                And all the jurors are back.  You can proceed.

10                          CROSS-EXAMINATION

11    BY MR. ABELSON:

12    Q.  Good afternoon, Mr. Haskell.

13    A.  Good afternoon.

14    Q.  I would like to start with Government Exhibit 368.

15                This is the email string we looked at earlier between

16    and you Mr. Craig that began with an email from Mr. Craig to

17    Mr. Sanger, right?

18    A.  Yes.

19    Q.  Now, the email string, as you saw, starts with Mr. Craig's

20    email saying that, On my way back to blank, I will hand-deliver

21    a hardcopy of this report to your home tonight, right?

22    A.  Correct.

23    Q.  Now, you don't know the circumstances of that delivery or

24    why Mr. Craig delivered the hardcopy to Mr. Sanger, right?

25    A.  That's correct, I do not.

1    Q.  Just like to direct your attention to the middle email from

2    Mr. Sanger, and just take a moment with this.

3              So, he says:  Greg, no one seems able to open that

4    thing -- I think there's a typo.  It comes in a format he can't

5    open.  Can you send, in PDF or regular doc, to both addresses

6    above?  Time of essence, given time difference with Russia.

7              Did I read that correctly?

8    A.  Yes, you did.

9              MR. McCULLOUGH:  Objection, Your Honor.

10             THE COURT:  What's your objection.

11             MR. McCULLOUGH:  Misstates the email.

12   BY MR. ABELSON:

13   Q.  Did I fairly paraphrase that email?

14             THE COURT:  Why don't you just read the email?

15             MR. ABELSON:  Okay.

16   BY MR. ABELSON:

17   Q.  Greg, no one seems able to open that thing which cons -- I

18   think we can assume means "came" -- in a string doc.drf form.

19   Can you send, in PDF or regular doc, to both addresses above?

20   Time of essence, given time difference with Russia.

21             Did I read that correctly?

22   A.  Yes.

23   Q.  Now, Mr. Craig then forwarded you that email exchange,

24   right?

25   A.  That's correct.

1    Q.  And Mr. Craig said, See below, and send directly, if you

2    can, right?

3    A.  Yes.

4    Q.  And then you respond, saying, Yes.  I'm on it now, right?

5    A.  Yes.

6    Q.  And you sent a PDF of the report to Mr. Sanger, right?

7    A.  Yes.

8    Q.  And as to that electronic version, you sent the report to

9    Mr. Sanger because Mr. Sanger had requested an electronic copy

10   of the report, right?

11   A.  Yes.

12   Q.  Now, let's go to Government Exhibit 476, which you saw

13   before as well.  Go to the second page.

14           This is the October 10th letter to the FARA Unit that

15   you looked at during direct examination, right?

16   A.  Yeah, that's correct.

17   Q.  Now, let's focus on the second paragraph which

18   Mr. McCullough looked as, as well.  And I'll just read it so

19   that we can focus on what the letter says.

20           As reported in earlier correspondence, this law firm

21   provided a copy of the Tymoshenko report, "the Report," to

22   certain U.S. media outlets.  This was done in response to

23   requests from the media.  The firm did not provide copies of

24   the report to any other media outlets in the United States.

25           Now, with respect to that second sentence, "this was

1   done in response to requests from the media," with respect to

2   the electronic version that you sent to Mr. Sanger, was that

3   sent by you in response to a request from Mr. Sanger?

4   A.  Yes, it was.

5   Q.  And, so, with respect to that electronic version that you

6   sent, that sentence in this letter is true and accurate, right?

7   A.  Yes.

8   Q.  You also discussed your contact with Emily Alpert of the

9   *Los Angeles Times*, right?

10  A.  Yes, I did.

11  Q.  Can you briefly explain what those circumstances were that

12  surrounded your contact with Ms. Alpert?

13  A.  Ms. Alpert emailed Greg, asking for a copy of the report,

14  because she had wanted to write a story about it.  And Greg

15  forwarded it to me, asking me to send -- send a copy at her

16  request.

17  Q.  And you did send a copy of the report to Ms. Alpert?

18  A.  Yes, I did.

19  Q.  And that was because Ms. Alpert had requested a copy of the

20  report, right?

21  A.  Correct.

22  Q.  Let's direct your attention, again, to Government Exhibit

23  389.

24          I'm sorry.  We'll bring up a binder so you can refer

25  to a hardcopy, if you prefer.

1    A.  Thank you.

2    Q.  Now, Ms. Alpert's email was sent on December 13th, at

3    11:14 a.m.

4         Do you see that?

5    A.  Yes, I do.

6    Q.  Thank you.

7         When she sent this request for a copy of the report

8    and an interview, the *Los Angeles Times* had not yet published

9    an article, right?

10   A.  That's my understanding, based on her email, yes.

11   Q.  So, what else happened after you sent the electronic copy

12   of the report that Ms. Alpert had requested?

13   A.  My recollection is that she responded to the email that I

14   had sent, and which I'd copied Greg on, asking a follow-up

15   question.  And then after that, Greg and I went back and forth

16   once or twice, and Greg gave me directions on -- to call her

17   and exactly, sort of, what precise thing to say.

18        And I made that phone call.  And then I sent an email

19   to Greg explaining that I'd made that phone call, and didn't go

20   beyond that sort of narrow point that I -- that he had asked me

21   to make with her.

22   Q.  Let's look at Government Exhibit 394.

23        Now, this is the email exchange that Mr. McCullough

24   went over with you, right?

25   A.  Yes.

1    Q.  And you explained that you thought there were other emails

2    in the string, right?

3    A.  That was my memory, yeah.

4    Q.  All right.  I'm showing you what's been marked for

5    identification as defense exhibit -- don't show yet -- 490.

6            What is this?

7    A.  It's, in part, the document that we had just looked at.

8    But, it includes the other email that I said before.  It's sort

9    of two -- there were two different strings at one point, and

10   this is the other string.

11            MR. ABELSON:  Your Honor, I'll move for admission of

12   Defence Exhibit 490.

13            MR. McCULLOUGH:  No objection.

14            THE COURT:  All right.  It will be received.

15   BY MR. ABELSON:

16   Q.  So, this began with the email from you to Ms. Alpert

17   forwarding the report, right?

18   A.  Yes.

19   Q.  Ms. Alpert responded, just above that, and she wrote,

20   Thanks so much for sending this along.  Can you clarify whether

21   the firm offered any opinion on the criminal allegations

22   against Tymoshenko themselves?  The executive summary makes it

23   appear that it did not.  But, I just wanted to clarify because

24   I've seen conflicting claims in other media reports.  Thanks,

25   and take care.

```
1                  Did I read that correctly?

2    A.  Yes, you did.

3    Q.  At the time that you received this email from Ms. Alpert,

4    were you aware of conflicting claims in media reports about the

5    Skadden Report?

6    A.  I believe I was.

7    Q.  What conflicting claims in media reports were you aware of?

8    A.  There may have been many, but my recollection is that there

9    were conflicting claims on two of the key, sort of, issues that

10   our report dealt with.  One was on the point of selective

11   prosecution, which is, basically, was Tymoshenko prosecuted

12   because she was a politician -- an opposition politician.

13                  And there were reports that were saying that we

14   concluded that, no, it wasn't a political prosecution.  But,

15   that is -- that's not what our report concluded.

16                  I think there were other reports that were reporting

17   accurately, that we didn't find -- she wasn't prosecuted

18   politically.  We found that she didn't put on evidence, and we

19   didn't identify enough evidence that would have caused, in an

20   American court, that allegation to be upheld; that the bar for

21   whether someone was prosecuted politically is really high, and

22   that we didn't -- we weren't shown and she didn't put on at

23   trial enough evidence to get over that bar.

24                  But that's a lot different from saying that she

25   wasn't prosecuted politically.  And we didn't come to that
```

1      conclusion.  And that was being reported.

2              The other issue was whether we said she should have

3      been convicted, and she should -- she was guilty, or whether we

4      said she was innocent of the charges she was brought.

5              And that's just -- and reports were saying that we

6      found that she was correctly convicted, that she was guilty.

7      And, again, that's not something we did.  And we explicitly,

8      from the outset, were not going to wade into territory of guilt

9      or innocence, because to take complex facts and apply them to

10     Ukraine laws is not something that we, as American lawyers,

11     were in a position to do.

12             So, we reached no conclusion.  And we were very clear

13     about that fact that we reached no conclusion on that issue.

14     There was some reporting that we found that she should have

15     been guilty.

16             And I -- my -- my, I guess, last recollection, I can

17     remember some articles, and I can also recall a press release

18     that was put out by the government of Ukraine in connection

19     with the release of the report, that mischaracterized those key

20     points.  Possibly some other points, but those are the two

21     points that I remember them mischaracterizing, which may have

22     led to some of the reporting.

23     Q.  Let's look at Defense Exhibit 241, the second page of that

24     exhibit.

25             MR. ABELSON:  This has been previously admitted.

1    BY MR. ABELSON:

2    Q.  Is this the press release you're referring to?

3    A.  Yes, I believe it is.

4    Q.  So, this is a press release issued by the Ministry of

5    Justice of Ukraine?

6    A.  That's correct.

7    Q.  The Ministry of Justice of Ukraine was Skadden's client in

8    the engagement you've been talking about, right?

9    A.  Correct.

10   Q.  And you testified that you recall seeing this press release

11   around the time that the report was released by the Ministry,

12   right?

13   A.  Yeah.

14   Q.  Let's focus on the third paragraph.  Why don't you read

15   that third paragraph, please?

16   A.  Okay.  This report, published today on the Ministry's

17   website, without amendment, concludes as groundless,

18   Yulia Tymoshenko claims that her prosecution was politically

19   motivated, and states that she has provided no factual evidence

20   that would be sufficient to overturn her conviction under

21   European or American standards.

22   Q.  Is that one of the matters on which -- to which you

23   referred before?

24   A.  Yes.  It's a misstatement of our -- what we found on the

25   point of whether she was prosecuted because of politics.

1    Q.  What about the statement is a misstatement?  Can you

2    explain?

3    A.  We -- no, I don't recall and can't imagine anywhere in the

4    report that we would have said that those claims were

5    groundless, nor do I believe that we said that she provided no

6    factual evidence.  We simply said there wasn't enough to get

7    over that very high bar.  But, we never would have used the

8    word "groundless," and we would have never said that there was

9    no factual evidence.

10   Q.  Let's look at that fifth paragraph, that's one just before

11   the numbered items.  It says, The Skadden Arps report shows how

12   Yulia Tymoshenko overstepped her authority and committed this

13   crime.

14          Does that refer to one of the other points that you

15   referred to before?

16   A.  Yes.  That would be the guilt or innocence piece.  It says

17   that she committed this crime, meaning she's guilty.  As I said

18   before, we, from the outset, were never going to address that

19   question, and so we certainly didn't come to that conclusion,

20   that she committed this crime.

21   Q.  Let's go back to Defense Exhibit 490 now.  This is back to

22   the email exchange with Ms. Alpert.

23          So, Ms. Alpert sent the email that we referred to,

24   where we just went over, where she said that she wanted to

25   clarify, because she had seen conflicting claims in other media

1    reports, right?

2    A.  Yes.

3    Q.  And then we just went through your testimony about --

4            THE COURT:  Well, ask one question.

5            MR. ABELSON:  Fair enough.  Fair enough.

6            THE COURT:  You don't know what she was referring to,

7    do you?  You just knew that there were some, correct?

8            THE WITNESS:  Yes.  I was aware that right at the

9    time the report was released, there were -- yes.

10           THE COURT:  All right.

11           Ask your next question.

12   BY MR. ABELSON:

13   Q.  Now, you then forwarded that email to Mr. Craig, right?

14   A.  Yes.  He was -- I believe he was copied on -- on that one.

15   So I was -- just sent an email about it directly about it him.

16   Q.  Sure.  So, if you could just read your e-mail to Mr. Craig?

17   A.  Yes.  Greg, I assume you will respond to Ms. Alpert's

18   request.  Please let me know if you would like me to do, say

19   anything.  Otherwise, I will fulfil the honorable duty of

20   keeping my mouth shut.

21           Thanks.

22   Q.  When you did you mean by the "Honorable duty" of keeping

23   your mouth shut?

24   A.  I was counseled from the beginning -- you know, at this

25   time, I'd been at the firm for a year, and I was counseled at

1    the outset, and all the way through, that we, as lawyers at

2    Skadden, and certainly not me as an associate, was going to

3    talk to press, you know, unless specifically directed do so.

4    But the general policy was not to.  And, I think, as a first

5    year -- or maybe I was a second year associate -- that time,

6    keeping your mouth shut was usually a wise practice.

7    Q.  In forwarding this email, you were -- to Mr. Craig, was the

8    reason that you said that because you were an associate, and

9    you were waiting to take guidance from Mr. Craig?

10   A.  Yes.  I think that -- I was not going to respond to that

11   email without talking to him.

12   Q.  The policy you referred to, that has nothing to do with

13   FARA, right?

14   A.  No.  Just general law firm policy.

15   Q.  Mr. Craig then responded to your email, right, at the top?

16   A.  Yes.

17   Q.  And he said, Could you call her and tell her that we're not

18   responding to questions from the press, that we are telling the

19   press to rely on the report itself?  But, yes, the firm

20   expressed no opinion as to her guilt or innocence.

21        Did I read that correctly?

22   A.  I believe you did, yes.

23   Q.  And is that what you did?

24   A.  That is what I did, yes.

25   Q.  Now, let's go to Government Exhibit 394, please.

1          This is the emails -- the other branch in the same

2    email string that Mr. McCullough showed you, right?

3    A.  Yeah, I believe so.

4    Q.  Okay.  So, now, let's go to Mr. Craig's email about

5    two-thirds of the way down the page.  He writes, She will ask

6    additional questions to try to get more out of you.  Keep it

7    simple, short, and sweet.  We did not express an opinion about

8    guilt or innocence.  You'll have to read the report and reach

9    your own conclusions.

10          Did I read that correctly?

11   A.  Yes, you did.

12   Q.  Did you then speak to Ms. Alpert?

13   A.  Yes, I spoke with her by phone.

14   Q.  And what was the message you conveyed?

15   A.  Precisely that.  I can -- I can recall saying those exact

16   words.  And I can recall her asking only one follow-up

17   question, which was, Can I -- can I -- can you be -- can I say

18   that you are a representative of the firm? to which I can

19   recall being really nervous.  Because I was prepared to say

20   that previous statement, but wasn't prepared to even answer a

21   simple question like that.  And I said, Yes, I'm an associate.

22          And that was the end of the conversation.

23   Q.  Does the top email in this string from you summarize that

24   conversation you just described?

25   A.  Yeah.

```
 1    Q.  Go to Defense Exhibit 267, which has been previously

 2    admitted.

 3              Is this the article that the Los Angeles Times

 4    published after you spoke to Ms. Alpert?

 5    A.  Yes.  I've reviewed it in preparation for today, and it is.

 6    Q.  Now, the headline reads:  Ukraine lawmakers brawl; report

 7    finds Tymoshenko trial flawed, right?

 8    A.  Yes.

 9    Q.  The first paragraph at the bottom of that page reads, The

10    disputed trial of former Ukraine leader Yulia Tymoshenko fell

11    short of Western standards of fairness by violating her rights

12    to a defense, a report commissioned by the government of

13    President Viktor F. Yanukovych has found.

14              Did that accurately characterize the Skadden Report

15    conclusions?

16    A.  Yes, it did.

17    Q.  Let's go to the next paragraph, at the top of page 2.

18              The newly released report by a U.S. law firm found

19    that Tymoshenko had been barred from bringing forward some

20    witnesses, undercutting her defense.  Other witnesses were

21    examined without a defense attorney in the courtroom, which,

22    "almost certainly would be viewed as a violation of the right

23    to assistance of counsel under Western standards," the

24    attorneys wrote.

25              Does that paragraph accurately characterize the
```

1     Skadden Report's conclusions?

2     A.  Yes.  The report had a bunch -- it's a long report with a

3     bunch of conclusions in it, but it's my recollection those were

4     two of them.

5     Q.  Was the question of Ms. Tymoshenko's detention during her

6     trial an issue on which the report rendered an opinion?

7     A.  Yeah, it was.

8     Q.  Direct your attention to the middle of page 2, where it

9     says, The Skadden Arps lawyers concluded that Tymoshenko was

10    jailed during her trial without adequate justification, raising

11    concerns about whether she was inappropriately deprived of her

12    liberty prior to her conviction.

13          Did that accurately characterize that aspect of the

14    Skadden's Report's conclusions?

15    A.  Yep.  I think it quotes it and -- yeah.

16    Q.  And the next paragraph.

17          The report also provided political grist for

18    opponents.  Although the law firm did not weigh in on whether

19    the trial was politically motivated or whether the facts

20    established that Tymoshenko was guilty under Ukrainian law, it

21    said Tymoshenko had failed to produce evidence to overturn her

22    conviction on those grounds, the heart of her allegations.

23          First, did I read that correctly?

24    A.  Yes, you did.

25    Q.  And is it accurate to say that the law firm did not weigh

1    in on whether the trial was politically motivated?

2    A.  Yes.

3    Q.  Is that different than what the Ministry of Justice was

4    saying in its press release?

5    A.  Yes.

6    Q.  Let's go to page 3, the top full paragraph on that page.

7            The defenders of Tymoshenko celebrated some of the

8    findings.  They questioned the independence of the legal

9    analysis because it was paid by the government.  A Skadden Arps

10   representative said the U.S. law firm was not responding to

11   media questions.

12           Is that Skadden Arps representative you?

13   A.  Yes.  I can -- yes.  The *LA Times* is my home paper.  I am

14   from LA.  And I can recall pointing that out to my parents,

15   that I was -- that their son was referenced in the *LA Times*.

16   Q.  And so this further refreshes your recollection that the

17   communications with Ms. Alpert were before this article was

18   published?

19   A.  Yes.

20   Q.  Let's go back, again, to Government Exhibit 476.  On the

21   second page, let's look at that same paragraph again, second

22   paragraph.  I'll read it again.

23           And now the question is, with respect to the

24   electronic version of the report that you sent to Ms. Alpert,

25   is this paragraph true and accurate?  The paragraph reads, as

1    reported in earlier correspondence, the law firm provided a

2    copy of the Tymoshenko report, "the Report," to certain U.S.

3    media outlets.  This was done in response to requests from the

4    media.

5         So with respect to the electronic version that you

6    sent to Ms. Alpert, is that statement true and accurate?

7    A.  Yes, it is.

8    Q.  Now, there's a third publication with which Skadden had

9    some contact during the rollout, *The National Law Journal*,

10   right?

11   A.  Yes.

12   Q.  Do you recall the circumstances of the contact with *The*

13   *National Law Journal*?

14   A.  My recollection is that they published an article that had

15   some of the mischaracterizations of the report that we

16   discussed, some of the ones that were in the Ministry of

17   Justice's press release, but certainly not in the report.  And

18   we identified that article and that article was ultimately

19   changed to accurately reflect what the report found.

20   Q.  Let's look at what's been previously admitted as

21   Government's Exhibit 398.

22        At the bottom of the second page is where this email

23   begins.  It begins with an email from Cliff Sloan to Gregory

24   Craig and you, right?  The first email in the string, the very

25   bottom.

1              MR. McCULLOUGH:  Objection, Your Honor.  It's beyond

2       the scope of direct.

3              MR. ABELSON:  Your Honor, if you --

4              THE COURT:  Why don't you come to the bench.

5              (Bench discussion:)

6              THE COURT:  Yes.  Why isn't it --

7              MR. ABELSON:  He talked about his media contacts, he

8       talked about the FARA research he did, suggested that it barred

9       PR contact.  His contact with each of these three letters that

10      are publications is directly within the scope of those

11      questions.  Plus, they went over this letter to the FARA Unit,

12      and the question of whether the statement is true with respect

13      to these three.  The article itself talks about *The National*

14      *Law Journal*.

15             THE COURT:  But in direct, the only thing he asked

16      him was about the *LA Times*.

17             MR. ABELSON:  *The New York Times*.

18             THE COURT:  Yes, the PDF.  And, I mean, can you ask

19      him one question that related to the Law Journal?  He certainly

20      did say, Please describe all of your interactions with the

21      press, because -- he didn't.  So, essentially, this witness

22      didn't profess to have any present recollection of anything

23      during most of his testimony.  But explain to me -- I don't see

24      how this is within the scope of the direct.

25             Now, I think there was a question about whether you

1  really need to go through the exercise of bringing him back to

2  ask him the same two questions all over again.  But, I don't

3  think -- do you -- do you agree that this is within the scope

4  of direct?  What question was he asked on direct that had to do

5  with *The National Law Journal*?

6          MR. MURPHY:  Wasn't he shown the letter to the FARA

7  Unit, the October the 10th letter, which makes reference to *The*

8  *National Law Journal*, among with *The New York Times* and the --

9          THE COURT:  He wasn't asked a single question about

10  it.

11          MR. MURPHY:  Well, whether he was asked about the

12  letter, Your Honor -- I mean, are we going to parse it that

13  narrowly, that if I ask about this paragraph of the letter,

14  then I can't ask you a question on cross about another

15  paragraph in the same letter that refers to the other article?

16  I mean, it would be a waste time, Your Honor, to bring

17  Mr. Haskell back.

18          THE COURT:  That's a different question.  *The*

19  *National Law Journal,* and his communications back and forth

20  with *The National Law Journal*, were simply not a subject of the

21  direct.  I think that's clear.

22          Now, the question is, do we go through the exercise

23  of bringing him back so this -- he can be asked -- how many

24  questions are you going to ask?

25          MR. ABELSON:  *The National Law Journal*, five minutes.

1              THE COURT:  Was he the one who told *The National Law*

2    *Journal*?

3              MR. ABELSON:  He had reacted to it and talked about

4    how troubling that article was to see.  And the letter that he

5    was asked about in direct asked about those corrections.

6              MR. McCULLOUGH:  It's just -- it's beyond the scope

7    of the direct.

8              THE COURT:  I don't think he's -- you can have your

9    witness to advance this part of your case.  I don't think it

10   fairly falls within the scope of direct, just because they

11   showed him a letter and they asked him, with respect to that

12   letter, is that what you were referring to in your email?  And

13   he simply characterized it correctly, with respect to the *LA*

14   *Times.*  That's all they asked him.

15             This is a whole line of events that happened on

16   another day that is part of your case, and I don't believe that

17   it's within the scope of the direct.  I think it's a fair

18   objection.  You absolutely have the right to bring him back.

19             MR. ABELSON:  Okay.  So he works for the Senate

20   Judiciary Committee.  His time is very limited.  And he's here,

21   he's taken the day off.  It doesn't seem to make sense to get

22   him back.

23             THE COURT:  The Senate Judiciary Committee, which I

24   believe is on recess right now, would understand if he's

25   required to testify in a criminal trial.

1          MR. MURPHY:  Your Honor, for the point of judicial

2     efficiency and judicial economy and the economy of all the

3     lawyers here, and the jurors, it just seems to me that it's a

4     colossal waste of time to have this witness come back on a

5     subsequent day when this will take five minutes to clarify it.

6          THE COURT:  All right.  If we declare that you're now

7     putting him on as your witness, you're not allowed to lead him

8     anymore.  You ask open-ended questions.  And he's allowed to

9     cross-examine him.  Then we can do that for the convenience of

10    the parties.

11         MR. ABELSON:  It's on *The National Law Journal*?

12         THE COURT:  You can't do it for cross-examination

13    because it's not fair cross-examination.

14         Do you have any objection to that journal?

15         MR. MURPHY:  No, Your Honor.

16         THE COURT:  All right.

17         MR. ABELSON:  To be clear, just on *The National Law*

18    *Journal*?

19         THE COURT:  Why don't you do the rest of your cross,

20    and then we'll come back to this.  All right?

21         MR. MURPHY:  Thank you, Your Honor.

22         THE COURT:  All right.

23         (Open court:)

24    BY MR. ABELSON:

25    Q.  Mr. Haskell, on direct examination you were asked about

1   your early involvement in the project, right?

2   A.  Yes.

3   Q.  And that was in the spring of 2013 -- sorry -- 2012?

4   A.  Yes.

5   Q.  How long had you been at the firm when you first got

6   involved?

7   A.  I think I started at the firm in October, and that first

8   assignment was -- I want to say February or maybe March.

9   Q.  Okay.  Just a couple months.

10         How did you come to end up working with Mr. Craig on

11   this matter?

12   A.  Well, I -- you know, I got to the firm.  There were a lot

13   of partners, but it was clear to me that Greg is someone that I

14   really wanted to work for, if I had the opportunity.  And I

15   tried to get to know him a bit and make that clear to him.  And

16   was sort of lucky enough that he took me up on that.

17   Q.  Had you worked with Mr. Craig on any other matters before

18   this one?

19   A.  I had not.  There was -- there was one matter that was

20   maybe going to happen, but that didn't -- that didn't happen.

21   Q.  And were you --

22         THE COURT:  So do you know how you got assigned to

23   this matter, or don't you?  I thought you didn't remember.

24         THE WITNESS:  I don't recall the initial conversation

25   in connection with the FARA research assignment.  But, I do

1    recall making clear to Greg that I would like to work for him,

2    and then I recall that original assignment.  I just don't know

3    if there was a conversation with Cliff or Greg that led to that

4    first research assignment.

5    BY MR. ABELSON:

6    Q.  Why did you want to work with Mr. Craig on this project?

7    A.  Well, I think --

8            MR. McCULLOUGH:  Objection, Your Honor.

9            THE COURT:  He said he spoke to him about working

10   with him in general.

11           MR. ABELSON:  Okay.  I'll ask it --

12   BY MR. ABELSON:

13   Q.  Were you interested in working with Mr. Craig on this

14   project?

15   A.  When I expressed my interest in working for Greg generally,

16   I didn't know this project existed.  But, I think I was -- I

17   was happy to get the opportunity to work with him on any

18   project.

19           You know, I think when I started at the firm, I --

20   again, I looked at all the partners and understood that he

21   worked on a lot of international things.  I was an

22   international relations major in college -- not that that

23   matters now -- but I definitely had an interest in doing that

24   type of work.

25           And I think I also recognized that he was one of the,

1   you know, few law firm partners that got to choose the cases

2   they worked on.  They didn't just, sort of, take whatever came

3   through the door.  And what that meant was, he was working on

4   cases that aligned with his values, which meant there was often

5   a public-good piece.

6              MR. McCULLOUGH:  Objection.

7              THE COURT:  Sustained.

8              Go on to your next question.

9   BY MR. ABELSON:

10  Q.  What was your understanding of what Skadden was hired to do

11  for this project?

12  A.  There were -- you know, primarily to write a report, to do

13  an independent investigation, write a report on the prosecution

14  of Yulia Tymoshenko.  But, as I discussed earlier, there were

15  other aspects of it, having to do with the second Tymoshenko

16  trial and sort of general rule-of-law consulting.

17  Q.  On direct examination you explained that this was an

18  independent assignment, right?  Or Skadden was hired to render

19  an independent report?

20  A.  Yeah, that's correct.

21  Q.  So, what does that mean?

22  A.  That means getting the facts.  And getting them right.

23  So -- and getting them from all sides.  So, you know, that -- I

24  guess that's really what it meant to me, being -- identifying

25  exactly what happened with the trial, what happened with the --

1    that led to her being charged, and accurately reporting it.

2    Q.   What does "independence" mean with respect to --

3              MR. McCULLOUGH:   Objection, Your Honor.

4              THE COURT:   I'm sorry.   Let him finish the question.

5              What does independence mean with respect to what it

6    meant to him?

7              MR. ABELSON:   Conclusions.

8    BY MR. ABELSON

9    Q.   We discussed the facts.   So with respect to the conclusions

10   in the report, if you can explain to the jury what that means?

11             THE COURT:   You asked him what does independence mean

12   to him with respect to the assignment, and he told you.

13             MR. ABELSON:   I wanted to make sure that was -- okay.

14             THE COURT:   All right.

15   BY MR. ABELSON:

16   Q.   Were there any other aspects of independence that were not

17   covered by your answer?

18   A.   We laid out facts, and then we reached conclusions applying

19   American standards of due process.   So, rendering those --

20   accurately understanding -- accurately presenting what the

21   American standards were and accurately applying the facts as we

22   learned them to those standards and coming to an accurate

23   conclusion.

24   Q.   I think on direct examination you explained that this

25   was -- strike that question.

1          I think you just explained -- or, you used the term

2    "rule of law" with respect to what Skadden was providing advice

3    on.  Did I hear you say it correctly?

4    A.  Yeah.

5    Q.  So what does "rule of law" mean in this context, with

6    respect to the Skadden Report?

7    A.  Rule of law means that Tymoshenko -- with respect to this

8    particular case, that Tymoshenko was treated fairly, that she

9    got a fair opportunity to present her case at trial.  Just

10   generally, that she was treated fairly by the Ukrainian justice

11   system.

12          THE COURT:  That means you were looking into whether

13   she was?

14          THE WITNESS:  Correct.

15          THE COURT:  Okay.

16   BY MR. ABELSON:

17   Q.  What steps did the law firm take in connection with its --

18   well, I'll start again.

19          So you explained your role -- on direct examination,

20   you described your role in connection with the investigation

21   that led to the report, right?

22   A.  Yes.

23   Q.  And that included helping with interviews, right?

24   A.  Yes.

25   Q.  Approximately how many people were interviewed in

1    connection with this independent report?

2              MR. McCULLOUGH:  Objection, Your Honor, as to

3    relevance.

4              THE COURT:  Overruled.

5    A.  Ballpark, somewhere in the 20s or low 30s.  Can't recall

6    the exact number.

7    BY MR. ABELSON

8    Q.  Twenty -- were there documents that were reviewed as part

9    of this project?

10   A.  Yes.

11   Q.  What kinds of documents?

12   A.  Wide range.  The transcript from the trial.  Key documents

13   that were presented at trial.  Key documents that help shed

14   light for us on, sort of, underlying facts.  It was -- without

15   getting into it, there is a gas crisis.  There was key

16   documents that explained to us what happened in that crisis.

17             That's about it.

18   Q.  How did Skadden select which witnesses to interview?

19   A.  We -- it was an ongoing process, it happened throughout the

20   investigation.  At the outset, there's just some obvious

21   people.  So, we were looking at her trial, the prosecutors in

22   the trial, her defense attorney in the trial, the judge in the

23   trial.

24             And then, as we generated a better understanding of,

25   sort of, the underlying facts -- again, this gas crisis -- it

1   was people who were involved and firsthand witnesses there,

2   many of whom were also witnesses at trial.  And, so, I think

3   people were just identified as we learned more, there -- we

4   learned that there were other people we should talk to.

5   Q.  On direct you testified that the Skadden team tried to get

6   facts from all sides.

7          What did you mean by that?

8   A.  I think a trial has two sides.  There's people that are

9   saying that she did something wrong and were witnesses -- or,

10  were witnesses to what she did, and there are people that are

11  saying she didn't do anything wrong.  And we wanted to make

12  sure to talk to everybody so we could, you know, accurately

13  report how we saw the facts to be, not sort of how anybody else

14  did.

15  Q.  And by the "other side," you're referring to

16  Ms. Tymoshenko?

17  A.  Yes.

18  Q.  And her lawyer was Serhiy Vlasenko, right?

19  A.  Yes.

20  Q.  And you are the person with primary contact with

21  Mr. Vlasenko?

22  A.  Yes, that became one of my responsibilities.

23  Q.  Okay.  And on direct, you were shown some emails with

24  Mr. Vlasenko, right?

25  A.  That's correct.

1    Q.  We'll come back to those.  But, when you say "hearing from

2    both sides," you're referring, in part, to your communications

3    with Mr. Vlasenko?

4    A.  Correct.  He was not only her attorney, so it was important

5    to present her side of the trial that happened, but also her

6    representative and how we got in touch with her.  So, yes.

7    Q.  At some point was a version -- was a draft of the report

8    provided to representatives of the Ministry of Justice?

9    A.  Yes.

10   Q.  And did the Ministry provide some comments on the report?

11   A.  They did.  We received a lot of comments and sometimes --

12         MR. McCULLOUGH:  Objection, Your Honor.  Relevance.

13   Beyond the scope.

14         THE COURT:  Come back to the bench, please.

15         (Bench discussion:)

16         THE COURT:  How is the response to the -- by the

17   Ministry of Justice, which you've not touched on directly, in

18   any way not exceeding the scope of direct?

19         MR. ABELSON:  I'm sorry, I didn't make it clear.

20   They spent a lot of time with the emails with Serhiy Vlasenko,

21   who was Ms. Tymoshenko's lawyer.

22         THE COURT:  We just talked about that.  We just

23   changed topics.

24         MR. ABELSON:  Trying to explain what he meant by, on

25   direct examination, by both sides.

 1           THE COURT:  You already asked him, What did you mean

 2     by both sides?  And he answered the question.  Getting a direct

 3     draft report to the Ministry of Justice, receiving the Ministry

 4     of Justice's comments is completely outside of the scope of the

 5     direct.

 6           If you want to put him on as a witness, you'll put

 7     him on as a witness.  But you cannot do your whole case under

 8     the guise of it's a cross-examination.  What this juror said is

 9     quite limited, as I recall.  This morning his memory was much --

10           MR. ABELSON:  On the subjects they wanted to talk

11     about.

12           THE COURT:  It's the same subjects.  What did you do?

13     He didn't do anything unless he had an email.

14           So, you're welcome to put him on, but you cannot open

15     this up as if it's cross --

16           MR. ABELSON:  Okay.

17           THE COURT:  -- it's not.

18           MR. ABELSON:  I'll set aside the comments on the

19     subject.

20           THE COURT:  All right.

21           (Open court:)

22     BY MR. ABELSON

23     Q.  So, on direct examination, you were also asked about the

24     other -- one of the other projects that Skadden was involved

25     with, Project 2, right?

```
1     A.  That's correct.

2     Q.  Was the purpose and objective of Project 2, consistent with

3     the purpose and objective of Project 1 --

4               MR. McCULLOUGH:  Your Honor, Your Honor.

5               THE COURT:  I'm not sure what the objection is.  But

6     I'm not sure I even understand the question.

7               MR. ABELSON:  I apologize.

8     BY MR. ABELSON

9     Q.  What was Project 2?

10    A.  Project 2 was consulting with the prosecutors on the second

11    Tymoshenko trial that was going to start soon, and trying to

12    help them, as I said earlier, try her like she would be tried

13    in an American court, even if the Ukrainian law didn't require

14    it.

15    Q.  Did you see the purposes of Skadden being engaged in that

16    as consistent with the purposes of Project 1?

17              THE COURT:  Do you know what the purpose of the two

18    engagements was?  You knew what the task was?

19              I'm not sure I understand your question.

20    BY MR. ABELSON:

21    Q.  Did you see Project 2 as providing rule of law advice and

22    advice on how to prosecute her more fairly?

23    A.  I -- I -- I recall viewing, sort of, the whole project as

24    consulting on rule of law.  Looking at the first trial and

25    seeing if -- you know, if rule of law as we view it was
```

1    followed, and consulting on the second trial to try to help

2    ensure that rule of law was followed.

3    Q.  On direct examination you were asked a number of times

4    about whether you had any communications with FTI, right?

5    A.  Correct.

6    Q.  And you mentioned that there was a document prepared by FTI

7    that you remember seeing and giving comments on, right?

8    A.  Yeah.  Near the end of the -- near the end of the project.

9    Q.  Now, you weren't shown that communication with FTI.

10          I'm going to show you what's been marked for

11   identification as Defense Exhibit 492.

12   A.  Thank you.

13   Q.  Is this the document you were referring to?

14   A.  This is the -- the FTI document, yes.

15          MR. ABELSON:  Your Honor, I'll move to admit Defense

16   Exhibit 492.

17          THE COURT:  Well, 492 is not just that, but there's

18   some emails about it.

19          MR. ABELSON:  If it helps, Defense Exhibit 152, which

20   has already been admitted, is everything but the top chain,

21   which is the forwarding of this document to Mr. Haskell.

22          THE COURT:  Is this an exhibit which is already

23   admitted?

24          MR. ABELSON:  No.  I'm sorry.  This version that

25   Mr. Haskell saw is not.

```
1              THE COURT:  Can you come to the bench?  I think there
2        may be an easier way to do this.
3              (Bench discussion:)
4              THE COURT:  He testified that he got a document he
5        was asked to comment on it.  And that is certainly within the
6        scope of the documents and his comments, and an email
7        transmitting it to him.  What you have handed me is a document
8        that has a statement by Mr. Craig, I need help, at the top,
9        which is clearly what you're trying to move in evidence.
10             MR. ABELSON:  I'm sorry.  It's actually his comments
11       on the body, is what I --
12             THE COURT:  I don't see his comments in the body.
13             MR. ABELSON:  I know.  I know.  It's the next email,
14       Your Honor.  I can get that if --
15             THE COURT:  Let's get that.
16             MR. ABELSON:  This is what he's commenting on.
17             THE COURT:  He's commenting on this.  So, if you'd
18       like to move in the rest of it, that's fine.  But, page 1, I
19       don't see how that -- I mean, you have the transmittal email,
20       but there's nothing here that's sent to this witness.  This was
21       just --
22             MR. ABELSON:  No.  I'm sorry.  The whole email is
23       forwarded to him.  So, he was asked about a bunch of
24       communications with FTI.
25             THE COURT:  So, what's your position?  What we didn't
```

1    talk about -- we didn't rule on this document, is my question.

2          Did we rule on this document?

3          MR. ABELSON:  No.

4          THE COURT:  We reserved on it for this reason,

5    because it's a statement by the defendant?

6          MR. ABELSON:  No.  I'm sorry.  The entire email

7    chain, including the attachment, is in evidence, except this.

8    And, so, I knew they would object if I used the same document

9    that wasn't transmitted --

10          THE COURT:  Okay.  I just wanted to know if this part

11    with the Craig statement is in evidence or it isn't?

12          MR. ABELSON:  Yes, 152.

13          MR. McCULLOUGH:  I'm looking at this for the first

14    time.  I would like to just look at 152.  But I have no reason

15    to believe it's not there, if you're telling me it's in.

16          MR. ABELSON:  It is.

17          THE COURT:  Okay.  Go ahead.  I mean, I can clarify

18    152 -- somebody can clarify.

19          MR. ABELSON:  Do you want to check?

20          MR. McCULLOUGH:  If you represent to me that it's in,

21    without objection, I --

22          THE COURT:  I can see if it's in because I have my

23    list.

24          So you're saying this exhibit -- we didn't talk about

25    this, 492.

```
 1                    MR. ABELSON:  There it is (indicating).  No, not 492.
 2     But 152 was.
 3                    THE COURT:  152 is in?
 4                    MR. ABELSON:  Yes.
 5                    THE COURT:  And 152 is this (indicating)?
 6                    MR. ABELSON:  Not the forwarding to him, but
 7     everything that's below it.
 8                    THE COURT:  All right.
 9                    MR. McCULLOUGH:  Your Honor, may we have a limiting
10     instruction?
11                    THE COURT:  Well, if it's in an exhibit that we've
12     already said is in, then the whole thing comes in.  But, if
13     you're willing to just check and make sure that 152 didn't have
14     that omitted, that's fine, also.
15                    MR. ABELSON:  That's fine.  Will do.
16                    THE COURT:  Just take a moment to do that before we
17     proceed.  All right.
18                    MR. McCULLOUGH:  Thank you, Your Honor.
19                    THE COURT:  All right.
20                    (Open court:)
21                    THE COURT:  All right.  I realize it is entirely
22     annoying to sit there while the husher is on.  Evidentiary
23     issues they have to discuss with me before they get discussed
24     with you.
25                    If it is annoying, please don't hold it against
```

1    either the party that objected or the party that's trying to

2    use the exhibit.  They're both doing what they think is right,

3    and sometimes it takes some time to talk it through.  And we

4    try not to excuse you and bring you back because that wastes a

5    lot of time.  Sometimes it takes more time than when we hoped

6    when we started.

7            So if you get annoyed with anybody, feel free to get

8    annoyed with me.  And the husher, whoever invented that.

9            (Pause.)

10           MR. ABELSON:  Apologize, Your Honor.

11           THE COURT:  All right.

12           (Pause.)

13           MR. ABELSON:  Should I go ahead, Your Honor?

14           THE COURT:  I don't know.  Is 492 the same as 152, or

15   the number that you were planning -- that is in evidence?  Have

16   we determined that?

17           MR. McCULLOUGH:  No objection to Defense Exhibit 492.

18           THE COURT:  Okay.  Thank you.

19           MR. McCULLOUGH:  Defense Exhibit 152 is in.

20           THE COURT:  All right.  Thank you.  That's what I was

21   waiting for.

22           You can proceed.

23           MR. ABELSON:  492 is in?

24           THE COURT:  Yes.

25           MR. ABELSON:  Thank you, Your Honor.

1    BY MR. ABELSON

2    Q.  Now, Mr. Haskell, did I hand you Defense Exhibit 492?

3    A.  You did.

4    Q.  Okay.  Thank you.

5            What is this email?

6    A.  The -- which one, exactly?

7    Q.  Well, let's look at the very top.  This is an email --

8            MR. ABELSON:  No.  Just the first page, very top.

9    BY MR. ABELSON:

10   Q.  This is an email --

11           MR. ABELSON:  Just leave the full page up.

12   BY MR. ABELSON:

13   Q.  -- from Mr. Sloan to you, right?

14   A.  Yes.

15   Q.  What is it that he is forwarding to you?

16   A.  He is forwarding to me a FTI document.

17   Q.  Is this the document that on direct examination you were --

18   you said that you had seen?

19   A.  Yes.

20   Q.  Do you recall receiving this document?

21   A.  I do.  I do.  I recall waking up to emails from Cliff and

22   rushing into the office to deal with it.

23   Q.  What did you -- could you just read -- explain to the jury

24   what it is that you remember -- what Defense Exhibit 429 is and

25   what you remember your reaction to it being.

1    A.  I can -- I can recall it being a document that summarized,

2    in some way, the report that we had written that was being

3    prepared, about the time, where the report was done, and

4    prepared by FTI, and that it severely mischaracterized and had

5    just some sloppy errors.  But just that there were a lot of

6    issues with the document, and they needed to be fixed.

7    Q.  Your Honor -- or, Mr. Haskell, I'm showing you what's been

8    marked for identification as Defense Exhibit 493.

9              What is this email?

10   A.  This is an email from myself to Cliff on September

11   25th, 2012.

12             MR. ABELSON:  Your Honor, I move this document into

13   evidence.

14             THE COURT:  Any objection?

15             MR. McCULLOUGH:  No objection.

16   BY MR. ABELSON:

17   Q.  So, can you explain to the jury what Defense Exhibit 493

18   is?

19   A.  It's a list of the issues in that FTI document and proposed

20   fixes.  I can recall going through the document, either on the

21   phone or in person, or potentially both, with Cliff.  I just

22   don't remember exactly how it happened.

23             So, I don't know if this is an email with just my

24   thoughts that I sent to Cliff before meeting with him, because

25   I write, "I will come to your office now to discuss," or if

872

1      there are issues that he and I had both discussed together and

2      I had memorialized in an email.

3              Thank you.

4      Q.  I'm showing you what's been marked for identification as

5      Defense Exhibit 494.

6              Does this refresh your recollection as to whether

7      Exhibit 493 were your own reactions, or also Mr. Sloan's?

8      A.  The one you just gave me, 494, I'm certain was after I'd

9      spoken with Cliff.  And it's very similar.  I think it has 13

10     recommendations and this one has 12 (indicating).  So, I

11     believe these included both my and Cliff's -- that the first

12     document you gave me was both my and Cliff's reactions.

13     Q.  Okay.

14     A.  And the same goes for the second.

15     Q.  Let's look at Defense Exhibit 493.  Direct your attention

16     to numbers 3, 4, and 5.

17              Can you read those items, starting with number 3.

18              Before you do that, sorry, Mr. Haskell.

19              This is an email from September 25th, 2012, right?

20     A.  Yes.

21     Q.  And this was an email that you wrote, having reviewed

22     Defense Exhibit 492, which was the document received from FTI,

23     right?

24     A.  Yes.

25     Q.  So going back to 493 and these -- these items.  Could you

```
 1    read these items, starting with Number 3?

 2    A.  Number 3, it says, page 3, and then it quotes from, I

 3    believe, the FTI document.

 4          "The Skadden Report has now been issued and reflects

 5    a legal analysis and answers the criticisms of those who have

 6    challenged the process and conviction."

 7          And then it says, "Mischaracterization."

 8    Q.  What did you mean by "mischaracterization"?

 9    A.  That my recollection is that we -- you know, we didn't set

10    out to answer any criticisms.  Like, we just set out to write a

11    report, independently, and analyze the trial.  So that that,

12    sort of, was just a mischaracterization of the project we took

13    on.

14    Q.  So that was the statement in the document FTI had created

15    that you're explaining in this email, was a mischaracterization

16    of the Skadden Report?

17    A.  Correct.

18    Q.  So on to Number 4.

19    A.  This is from page 3 of the FTI document:  "4, the record is

20    clear, Tymoshenko failed to produce any evidence to support her

21    allegations."

22          "Mischaracterization."

23    Q.  What do you mean by that?

24    A.  That -- I mean, that is certainly not what the report

25    found.  That's just a total mischaracterization of the report.
```

1   Q.  How is it a mischaracterization to say that the Skadden

2   Report concluded that Tymoshenko had failed to produce any

3   evidence?

4   A.  We -- that we didn't -- that we didn't come to that

5   conclusion.  That, if I recall correctly, we addressed a bunch

6   of different issues.  And some of -- you know, there were a

7   series of issues that Tymoshenko had raised that the report

8   addressed and found that there was merit.

9           So, reading this today, Tymoshenko failed to produce

10  any evidence to support her allegations.  It just is not at all

11  in line with the report.

12  Q.  How about Number 5?

13  A.  Again, from page 3 of the FTI document.  7, "Any country

14  has the right to prosecute those who break the law.

15  Politicians have been prosecuted in many countries, not just

16  here.  The report makes clear that this was not a political

17  prosecution, but the prosecution of a crime by a politician."

18          "Mischaracterization."

19  Q.  How is that statement from the FTI-produced document a

20  mischaracterization of the Skadden Report?

21  A.  As I said earlier, the report did not make clear that this

22  wasn't a political prosecution.  The report found that there

23  wasn't enough evidence -- that she didn't put on enough

24  evidence to get over that very high bar.  Just, sort of, one of

25  the key pieces of the report.  And you couldn't read the report

1    and then write that.  Just not -- it's a total

2    mischaracterization, again.

3    Q.  Turning to what you have in front of you but has not yet

4    been admitted, is Defendant's Exhibit 494.

5          Now, having gone through your items you flagged in

6    Defense Exhibit 493, what is Defendant's Exhibit 494?

7    A.  So, as I said, I can -- it is a -- it is an email from me

8    to Cliff, sending a draft email that he could send along to

9    Jonathan Hawker at FTI, pointing out all of the issues that we

10   had -- that him and I, when we had either met in person or

11   spoken on the phone, had identified in the FTI document.

12          MR. ABELSON:  Your Honor, I move for admission of

13   Defendant's Exhibit 494.

14          MR. McCULLOUGH:  No objection.

15          THE COURT:  All right.  It will be admitted.

16   BY MR. ABELSON:

17   Q.  On this exhibit, I'll direct your attention to items --

18   first of all, you see at the top this is from that same day,

19   September 25th?

20   A.  Yeah.

21   Q.  Okay.  I'll direct your attention to items 4, 5, and 6,

22   which I'll just represent correspond to the three items that we

23   just looked at.

24          So, now, the difference between what we looked at

25   before and what we're looking at now is, this is how you're

1    sayings those items would need to be -- those

2    mischaracterizations would need to be fixed to not be

3    mischaracterizations, right?

4    A.  Yeah.  In this email, we're sort of making specific

5    recommendation for what would need to be changed, not just

6    saying what it was.

7    Q.  Okay.  So let's walk through these now.

8             Could you explain Number 4 in this email?

9    A.  Would you like me to read?

10   Q.  Yes, please.

11   A.  All right.  From page 3 --

12            MR. McCULLOUGH:  Objection, Your Honor.  Could we

13   please approach?

14            THE COURT:  All right.

15            (Bench discussion:)

16            MR. CAMPOAMOR-SANCHEZ:  Your Honor, this is their

17   case.  Although it is true that he mentioned this issue on

18   direct, it was a nonresponsive answer to a question

19   Mr. McCullough asked, which was communications with FTI that

20   happened earlier.

21            He volunteered this issue of having a subsequent

22   discussion related to FTI in September.  Mr. McCullough never

23   asked him about it.  And he kept bringing up this issue, FTI,

24   on his own.

25            Frankly, if we're now doing this, I'm fine with it,

1    but he should not be leading.  And if this keeps happening,

2    witnesses from Skadden volunteer things in the case, and then

3    they get to put their case in, it's going to be much longer.

4    None of this was brought up on direct.

5              THE COURT:  All right.  Well, I can't remember which

6    question was asked on direct where he said what he did with FTI

7    was in the report.  I don't recall now that it was a

8    spontaneous remark.  And I've already ruled that asking about

9    that is within the scope of the direct, since you brought that

10   up then.  I might have to actually look back at my notes to

11   see -- because I try to get the question and answer, but I

12   don't always have it perfect.

13             I think at this point, we're this far down this road.

14   But, as far as I'm concerned, when you cross-examine him after

15   we have actually formally declared him to be their witness, you

16   may cross-examine him about all of this in a leading fashion

17   and not a non-leading fashion.

18             MR. ABELSON:  This is the last document on this.

19             THE COURT:  All right.

20             (Open court:)

21   BY MR. ABELSON:

22   Q.  Okay.  So we're looking at Defendant's Exhibit 494.  And

23   could you read and then explain Item 4?

24   A.  Page 3, referencing the FTI document.  And the quote is,

25   "The Skadden Report has now been issued and reflects a legal

1    analysis that answers the criticisms of those who have

2    challenged the process and conviction.  Change "answers" to

3    "examines."

4             THE COURT:  Let me ask you a question.  Your initial

5    email, you identified mischaracterizations.  This email is

6    sending back to Cliff what could be said instead.

7             Who wrote those?  Who came up with those suggested

8    cures?  Are those yours?  Or are you recording what Cliff told

9    you to put there?

10            THE WITNESS:  My recollection is that it's Cliff and

11   mine, jointly.  That we met or spoke on the phone and went

12   through the FTI doc, and this was me memorializing in an email

13   that he could send along the fixes that we had discussed.

14            THE COURT:  I think it's important when you're asking

15   questions about what this is and what that is, it has to be

16   based on his personal knowledge.  If he's going to say it's

17   what Cliff was thinking, he can't say what Cliff was thinking.

18            All right.  You can ask your next question.

19   BY MR. ABELSON:

20   Q.   So, Exhibit 494 is an email from you to Cliff, right?

21   A.   Yes.

22   Q.   And memorializing a discussion that you had with Mr. Sloan?

23            MR. McCULLOUGH:  Objection, Your Honor.  Leading.

24            THE COURT:  All right.  Well, I think we're still

25   technically in his cross-examination portion.

1            But, I think I just asked him these questions.  But,

2     go ahead.

3                MR. ABELSON:  Okay.

4                THE COURT:  Do you recall the question asked?

5                THE WITNESS:  Yeah.  I can answer, Your Honor.

6                THE COURT:  Go ahead.

7                THE WITNESS:  Yes.

8     BY MR. ABELSON:

9     Q.  So, can you read Number 4 and your e-mail to Mr. Sloan?

10    A.  "Page 3 to the Skadden Report has now been issued, and

11    reflects a legal analysis that answers the criticisms of those

12    who have challenged the process and conviction.  Change

13    'answer' to 'examines.'"

14    Q.  Why did you write change "answers" to "examines"?

15    A.  I recall viewing answers as coming back as a criticism.  So

16    somebody criticizes and somebody says, no, that's wrong.

17    Whereas, "examines" is neutral, which is what we did.

18    Q.  And that fixed the point that you had described as a

19    mischaracterization in your email to Mr. Sloan?

20    A.  That's my recollection, yes.

21    Q.  Read Number 5.

22    A.  Page 3.  4, "The record is clear.  Tymoshenko failed to

23    produce any evidence to support her allegations.  As Jonathan

24    discussed with Greg via email, this sentence does not

25    accurately reflect the content of the report."

1    Q.  And you explained earlier why that sentence was a

2    mischaracterization, right?

3    A.  Yes.

4    Q.  I won't make you repeat that.

5            If you could go on to Number 6?

6    A.  Page 3, again.  7, "Any country has the right to prosecute

7    those who break the law.  Politicians have been prosecuted in

8    many countries, not just here.  The report makes clear that

9    this was not just a political prosecution, but the prosecution

10   of a crime by a politician.  Delete 'the report makes clear.'"

11           Second sentence would read, "This was not a

12   politician prosecution, but the prosecution of a crime by a

13   politician."

14   Q.  To your knowledge, were these points transmitted to FTI?

15   A.  I believe that they were.

16   Q.  You weren't the one, as far as you know, to transmit them?

17   A.  No.  No.  And I don't -- I believe that they were, but it

18   was not me.

19   Q.  Okay.  Changing subject.

20           You testified on direct examination about

21   communications you had with Serhiy Vlasenko related to how

22   Skadden was being paid, right?

23   A.  Correct.

24   Q.  And that he had raised questions, he was wondering how

25   Skadden was being paid?

```
1    A.  Correct.

2    Q.  And Mr. Vlasenko, just to be clear, was Ms. Tymoshenko's

3    lawyer?

4    A.  Yes.

5    Q.  The questions that Mr. Vlasenko raised about how Skadden

6    was being paid were shortly after he learned that Skadden had

7    been hired for this engagement, right?

8    A.  I'm just -- I just don't recall the precise timing.

9            MR. ABELSON:  Could you pull up Government Exhibit

10   167?

11           Actually, we can do this without the documents, just

12   to make it quicker.

13   BY MR. ABELSON:

14   Q.  Mr. Vlasenko asked how Skadden was being paid because he

15   didn't know who was paying Skadden, right?

16           MR. McCULLOUGH:  Objection, Your Honor.

17           THE COURT:  He asked the question.

18           Ask your next question.

19   BY MR. ABELSON:

20   Q.  Mr. Vlasenko asked you why -- who was paying Skadden for

21   the report, right?

22   A.  My recollection is that he raised that issue in the email

23   to Greg and myself.

24   Q.  Right.  You knew that Viktor Pinchuk was paying for the

25   report?
```

1    A.  I understood that we met with Pinchuk because he was,

2    maybe, going to be involved in payment in somehow.  I don't

3    recall what my understanding was about how the payment

4    structure ended up being.  I think that was just above my --

5    above my pay grade.

6    Q.  Fair enough.

7              But the Ministry of Justice was Skadden's client, not

8    Mr. Vlasenko?

9              MR. MURPHY:  Mr. Pinchuk.

10             THE COURT:  Not Mr. Pinchuk.

11             MR. ABELSON:  Sorry.  Thank you.

12   BY MR. ABELSON:

13   Q.  Ministry of Justice was Skadden's client, not Mr. Pinchuk?

14   A.  Yes.

15   Q.  Right.  The Ministry -- when Mr. Vlasenko raised these

16   questions, you didn't tell him, oh, Mr. Pinchuk is paying,

17   right?

18   A.  I did not.

19   Q.  The Ministry of Justice was Skadden's client, right?

20   A.  Correct.

21             MR. McCULLOUGH:  Asked and answered.  Objection.

22             THE COURT:  All right.

23   BY MR. ABELSON:

24   Q.  And the Ministry did not want that information disclosed,

25   right?

 1    A.  I don't know.  I just -- I wasn't -- I don't know.

 2    Q.  You didn't feel like, that you could just disclose that

 3    information to Mr. Vlasenko --

 4          THE COURT:  He said he didn't even know the

 5    information.

 6          MR. ABELSON:  Okay.

 7          Your Honor, may I approach?

 8          THE COURT:  Yes.

 9          (Bench discussion:)

10          MR. ABELSON:  All right.  So on the subjects that

11    I'll agree are beyond the scope, should I do that now?  Let

12    them redirect on this first?

13          THE COURT:  I think, frankly, given the way this has

14    gone, that we should shift gears.  I'll explain to the jury

15    that we're shifting gears and let him be cross-examined.  And

16    if he wants to cross-examine with respect to these as well,

17    which, I think, also strays, to some extent, beyond the direct,

18    although I didn't stop you at the time, he should be able to do

19    that.

20          Did you have any redirect with respect to these

21    questions?

22          MR. McCULLOUGH:  I do, Your Honor.  On *The New York*

23    *Times* --

24          THE COURT:  All right.  Maybe we ought to let him do

25    that, his redirect based on the cross.  And then we'll say

 1   what's going on, that you're essentially now putting him on as

 2   your witness, for the witness's convenience, to complete his

 3   testimony now, and that he's going to be cross-examined as if

 4   it happened later.

 5        Why don't we do the redirect, and then we'll break

 6   for the afternoon break.  And then during the afternoon break,

 7   I want to think -- everybody should think about whether it

 8   really makes more sense to do your case right now.  You know,

 9   it depends on whether -- if you're not -- I can say you're

10   putting on a case -- I just think we need to think it through.

11        MR. ABELSON:  That's fine.

12        MR. McCULLOUGH:  Your Honor, just -- I don't want to

13   leave the jury with the impression that I am not addressing

14   these.  I would like to address these on redirect.

15        THE COURT:  All right.  Then you can address them,

16   and the questions should be focused.  And I'm not really going

17   to sustain the leading-question objections to this.

18        Why don't you do redirect on what we're going to call

19   the cross.  And then we'll have our afternoon break, and then

20   we'll figure out if you're calling him as your witness or not.

21        MR. ABELSON:  For the rest.

22        THE COURT:  All right.  Thank you.

23        (Open court:)

24        THE COURT:  All right.  We're going to try to

25   complete the redirect before our midafternoon break.

1          Counsel?

2                    REDIRECT EXAMINATION

3     BY MR. McCULLOUGH:

4     Q.   Thank you, Mr. Haskell.

5               Can we bring up Defense Exhibit 494, please.

6               Mr. Haskell, you explained to Mr. Abelson that this

7     document reflected an effort to correct severe

8     mischaracterizations of the report; that is your testimony,

9     right?

10    A.   Mischaracterizations in the FTI document.

11    Q.   Severe mischaracterizations -- that FTI had made severe

12    mischaracterizations of the Skadden Report; is that right?

13    A.   That's correct.

14    Q.   Okay.  So let's -- I really want to unpack this.

15              So when -- we went over questions 4, 5 and 6; is that

16    right?

17              MR. McCULLOUGH:  So Question 4, if we can bring that

18    up?

19    BY MR. McCULLOUGH:

20    Q.   That's a matter of whether it reflects a legal analysis

21    that answers the criticisms of those who have challenged the

22    process and conviction or examines the process; is that right?

23    A.   Yes.

24    Q.   That "answers" versus "examinations," in your opinion, is a

25    severe mischaracterization?

1    A.   I would not say about that specific issue that that was

2    severe.

3    Q.   Okay.

4              MR. McCULLOUGH:   Let's go to Number 6.

5    BY MR. McCULLOUGH:

6    Q.   So Number 6, it says, "The report makes clear, this was not

7    a political prosecution, but the prosecution of a crime by a

8    politician."

9              And that was the severe mischaracterization because

10   that -- it starts with "The report makes clear"; is that right?

11             MR. CAMPOAMOR-SANCHEZ:   The screens are not showing.

12             THE JURORS:   We don't see it.

13             THE COURT:   I'm sorry.   Thank you.

14             MR. CAMPOAMOR-SANCHEZ:   They didn't see the first one

15   either.

16             THE COURT:   Okay.   All right.   Well, I think he read

17   it out loud well enough.

18             So we have got them on now?

19             THE JURORS:   Yes.

20             THE COURT:   All right.   Thank you.

21             Yes.   If you can't see -- because sometimes I'm

22   looking over here -- just say, Judge, we can't see.   You all

23   are the most important people in the courtroom, you and

24   Mr. Haley.   So, if there's something you need, let me know.

25             All right.   Go ahead.

```
1    BY MR. McCULLOUGH:
2    Q.  So, Number 6.  Your suggestion there was to delete "The
3    report makes clear"; is that right?
4    A.  Yes.
5    Q.  So it's perfectly acceptable for FTI to say, This was not a
6    political prosecution, but the prosecution of a crime by a
7    politician.  That was the advice that you were giving to
8    Ukraine; is that right?
9    A.  Yes.
10             MR. ABELSON:  Objection.  Leading.
11             THE COURT:  What's your objection to the question?
12             MR. ABELSON:  If this is redirect, it's leading.
13             THE COURT:  Well, I believe I said I was going to
14   give him leeway, with respect to 493 and 494, to put his
15   questions in a leading fashion.
16             MR. ABELSON:  Okay.
17             THE COURT:  We'll try not to make them too
18   argumentative, but he is allowed to lead the witness with
19   respect to this issue.
20             Go ahead.
21             MR. ABELSON:  Apologize.
22             MR. McCULLOUGH:  Thank you, Your Honor.
23   BY MR. McCULLOUGH:
24   Q.  So the advice to Ukraine was that -- rather, strike that.
25             The advice back to FTI was that it was acceptable for
```

1    FTI to state, This was not a political prosecution, but the

2    prosecution of a crime by a politician.

3              Is that -- that was the advice back to FTI; is that

4    right?

5    A.   That is correct.

6    Q.   So we just couldn't say "The report makes clear," but we

7    could say the rest of that sentence, right?

8              THE COURT:   That would be argumentative.

9    A.   Because one was --

10   BY MR. McCULLOUGH:

11   Q.   Next question --

12   A.   It made it so the statement wasn't attributed to the

13   report, which is -- which was the issue --

14   Q.   Understood.

15   A.   -- is my recollection.

16   Q.   Understood.

17              We go down to Number 8.

18              "U.S. courts would have given the defendant more time

19   to prepare her defense.  It is likely, however, that based on

20   this record, an American appellate court would find a due

21   process violation and revere the conviction."

22              Do you see where it says that?

23   A.   Yes.

24   Q.   And your corrections there are "likely" to "unlikely" and

25   "revere" to "reverse;" is that right?

1    A.  Yes.

2    Q.  Is there a severe mischaracterization or is this a mistake?

3    A.  It was a mistake.

4    Q.  Let's go to Number 9.  Can we do 9(a) and 9(b) together?

5              "As Skadden Arps observed, Tymoshenko's behavior

6    would have been unacceptable in Western courtrooms, and would

7    have placed her in contempt.  Change 'would' to 'may.'"

8              Is that a severe mischaracterization?

9              MR. ABELSON:  Objection, Your Honor.

10   A.  Subjective.  I can recall that being an issue we spent a

11   lot of time thinking about, and that being -- it may be a

12   significant difference there.

13   BY MR. McCULLOUGH:

14   Q.  Do you recall whether the final report said "would likely"

15   or "would"?

16   A.  I don't recall exactly what the wording in the final report

17   was.

18   Q.  Let's go to Number 10.

19             THE COURT:  And with respect to the prior objection,

20   I'm overruling it.  He did testify, in response to your

21   questions, that the reason he was doing this is because the

22   report was filled with severe mischaracterize -- the planned

23   statement had many severe mischaracterizations.  So, I think

24   it's fair for him to go through and say, is this one severe?

25   Is that one severe?

```
 1              He can't argue with him about it, but he can ask him.
 2              Go on.
 3     BY MR. McCULLOUGH:
 4     Q.  Number 10.  Mr. Haskell, this looks -- it appears that you
 5     are identifying a quote that FTI had set forth in its media
 6     plan at the top; is that right?
 7     A.  This is Number 10?
 8     Q.  Yes.
 9     A.  Yes.
10     Q.  And then your response is the fourth conclusion on page 185
11     of, "The report now reads."
12              So had the report changed from the version that
13     Mr. Hawker had seen?
14     A.  I don't recall.  I just recall that being a misquote.
15     Q.  It's a misquote; is that correct?
16     A.  Yes.
17     Q.  Number 12 -- or, rather, 11.  Same thing, Number 11, is
18     that -- is that based on new information that
19     Alex van der Zwaan had received from Aleka Mikitenko the day
20     before?
21              MR. ABELSON:  Objection.
22              MR. McCULLOUGH:  Is the change that you're making
23     there attributable to a discussion that Mr. van der Zwaan had
24     with Mikitenko the day before?
25              MR. ABELSON:  Objection.
```

1          THE COURT:  What's the basis?

2          MR. ABELSON:  Foundation.  We don't even know who

3     Mikitenko is.

4          THE COURT:  Well, I think he's -- you can ask the

5     question.  You've asked him, did you transmit these changes?

6          And, so, he's just trying to find out if these are

7     significant changes or changes based on new circumstances.

8          So, do you recall whether the comments you're asking

9     to be changed in Number 11 was based on because something had

10    changed since the report -- the draft report had been provided

11    to FTI to create its draft press release?

12         THE WITNESS:  I -- I don't know the timing of the --

13    that you laid forth in terms of when -- you know, what the

14    draft report was or when they were given it.  But, I do recall

15    this edit being based on new information that had been

16    received.

17    BY MR. McCULLOUGH:

18    Q.  Same question as Number 12, was that comment being made

19    back to FTI based on new information that had been gathered or

20    a change that had been made to the report since FTI received

21    it?

22    A.  Yes.  It appears the answer is yes.

23    Q.  Same question as to Number 13.

24    A.  It looks like it was a misquote.

25    Q.  So, any of those that we've covered severe

1    mischaracterizations, or are they changes?

2    A.  I would say, attributing to the report, the finding on

3    political prosecution was severe.  And I --

4    Q.  So the one -- the one severe --

5              MR. ABELSON:  Objection.  He's --

6              THE COURT:  All right.  Let's try not to argue with

7    him.

8    BY MR. McCULLOUGH:

9    Q.  Mr. Haskell, is it your testimony that the one severe

10   mischaracterization that's being pointed out here is the one

11   that Mr. Craig raised directly with Mr. Hawker?

12             MR. ABELSON:  Objection, Your Honor.

13             THE COURT:  On what basis?

14             MR. ABELSON:  First of all, he interrupted the

15   witness when he was about to lay out his other point, and then

16   is now saying that was the only.

17             THE COURT:  All right.  Well, I think we've been

18   through every single one and whether they were severe and

19   whether they weren't.

20             But, is it -- is there anything other than the one

21   we've just talked about that you also thought was severe?

22             THE WITNESS:  Yes.  The one about no evidence.  I

23   can't remember exactly what one it was, but I know I went over

24   it with the other counsel.  It was 4, 5, or 6.  I can't see the

25   whole -- well, sorry.  I have it here.

1           MR. McCULLOUGH:  We can look at Number 5.  If you

2    could bring up Number 5 on the screen, please.

3           THE WITNESS:  Yeah.

4    BY MR. McCULLOUGH:

5    Q.  Is that the one you're referring to?

6    A.  Yes.

7    Q.  And that is one of the changes that Jonathan discussed with

8    Greg via email; is that right?

9    A.  Yes.  I don't know what those discussions were, but, yes,

10   that's what it says.

11   Q.  So apart from that, the others that you identified were not

12   severe mischaracterizations; is that right?

13          MR. ABELSON:  Objection, Your Honor.

14          THE COURT:  All right.  I think you keep summing up,

15   and summing up is where we're getting to argument and not

16   questions.

17          Do you have any other redirect on other issues of his

18   testimony?

19          MR. McCULLOUGH:  Yes, Your Honor.

20          THE COURT:  All right.

21   BY MR. McCULLOUGH:

22   Q.  I'm going to turn to some discussion about Government

23   Exhibit 368.

24          Mr. Haskell, the -- looking at the first e-mail in

25   the chain from Mr. Craig to Mr. Sanger.  Mr. Craig writes, "On

1   my way back to" -- redacted Craig's home -- "I will hand

2   deliver a hardcopy of this report to your home tonight."

3              Did I read that correctly?

4   A.  Yes.

5   Q.  When this email came to you, did you understand that

6   Mr. Craig had already delivered a hardcopy of the report to

7   Mr. Sanger?

8   A.  I -- I don't recall what I -- what I knew at that point.

9   Q.  Mr. Sanger's response.  Mr. Sanger says, "Greg, no one

10  seems to be able to open that thing which cons in a strange

11  doc.drf form.  Can you send in PDF or regular doc?"

12              Do you see where it says that?

13  A.  Yes, I do.

14  Q.  At the time, was it your understanding that Mr. Craig had

15  attempted to send an electronic copy to Mr. Sanger?

16              MR. ABELSON:  Objection.

17              MR. McCULLOUGH:  What was your understanding of

18  why --

19              THE COURT:  Do you know -- do you know what prompted

20  Mr. Sanger to complain to Mr. Craig about a strange electronic

21  format?

22              THE WITNESS:  I -- I don't know exactly.  My

23  recollection is that I was asked to send a PDF of the report.

24              THE COURT:  But you don't know why?

25              THE WITNESS:  I can recall this email.  And -- and

1    from what I remember, there some sort of issue with sending the

2    document, and so I was asked to send a PDF.

3    BY MR. McCULLOUGH:

4    Q.  And the issue that you refer to with sending a document,

5    was that an issue that had already happened?

6    A.  Yes.

7    Q.  And you testified as to the reason that you were sending

8    the electronic copy of the report to Mr. Sanger, but did you

9    know why Mr. Craig was sending an electronic copy to

10   Mr. Sanger?

11   A.  No.

12   Q.  Did you know why Mr. Craig was hand-delivering a copy to

13   Mr. Sanger's house?

14           MR. ABELSON:  Objection.  Asked and answered.

15           THE COURT:  You can answer.

16           THE WITNESS:  I don't recall being aware of that

17   aspect of things.

18   BY MR. McCULLOUGH:

19   Q.  Did you have any discussions with Mr. Craig about

20   Mr. Craig's delivery of the report to Mr. Sanger?

21   A.  Not that I recall.

22   Q.  Do you recall learning anything further about Mr. Craig's

23   delivery of the report to Mr. Sanger from anyone else at

24   Skadden?

25           MR. ABELSON:  Objection, Your Honor.

1          THE COURT:  Sustained.

2     BY MR. McCULLOUGH:

3     Q.  Do you recall whether Mr. Sanger had received the copy that

4     you had sent him?

5          THE COURT:  The PDF?

6     BY MR. McCULLOUGH:

7     Q.  The PDF that you sent him.

8     A.  In preparing for today, I'd seen an email from Katie

9     Whitney, Greg's secretary, letting me know that he did receive

10    it.

11    Q.  So, were there efforts to confirm that Mr. Sanger had

12    received the report?

13    A.  I -- all I know is, I got confirmation that he

14    received the -- that he received my email.

15    Q.  Do you have an understanding as to why Ms. Whitney reached

16    out directly to Mr. Sanger?

17          MR. ABELSON:  Objection.

18          THE COURT:  Do you have any personal knowledge?  Did

19    anybody tell you that she was going to do it or why she was

20    going to do it?

21          THE WITNESS:  No, I don't.

22          THE COURT:  Move on.

23          MR. McCULLOUGH:  So, if we can go to Government

24    Exhibit 475, focusing on the top email.

25    BY MR. McCULLOUGH:

1   Q.  The second sentence you write, in my initial email to

2   Ms. Alpert, I indicated that I was sending the report to her

3   "per her request."

4        And you put "per her request" in quotes.

5   A.  Correct.

6   Q.  Do you have any memory of why you put that in quotes?

7        MR. ABELSON:  Objection.  Asked and answered.

8        THE COURT:  Yeah.  Can we come to the bench?

9        (Bench discussion:)

10       THE COURT:  You asked every one of these questions on

11  direct.  That's not what redirect is all about.  It's

12  relatively undisturbed by cross, so I don't think we get to do

13  the whole thing again.

14       MR. McCULLOUGH:  Your Honor, I, like you, am struck

15  by his ability to remember, and I'm just interested if he's had

16  a --

17       MR. ABELSON:  It's my recollection --

18       THE COURT:  Okay.  All right.  Let's talk one at a

19  time.

20       I think you're just kind of redoing and re-nailing

21  down your redirect.  If, you know, they went back to the FARA

22  Unit, you want to go back to the letters, and either if he

23  doesn't have any knowledge, one way or the other, about whether

24  it was true with respect to anything Mr. Craig gave Mr. Sanger,

25  you're welcome to close that loop.  But, you don't get to redo

1    your whole direct.

2                MR. McCULLOUGH:  Understood.

3                MR. ABELSON:  I think he's been over that point

4    multiple times.

5                THE COURT:  You've already won.

6                You can start.

7                I've already ruled in your favor.

8                MR. McCULLOUGH:  Thank you, Your Honor.

9                THE COURT:  All right.

10               (Open court:)

11   BY MR. McCULLOUGH:

12   Q.  Mr. Haskell, you had answered Mr. Craig's -- you sent this

13   email to Mr. Craig on October 15th; is that right?

14   A.  Yes.

15   Q.  Okay.  Turning to Government Exhibit 476.

16               And you testified to this earlier.  This is a letter

17   that Mr. Craig had sent to you that had been sent to the FARA

18   Unit?

19   A.  Yes.

20   Q.  Turning to the attachment.  Focusing on the second

21   paragraph.  The letter states, "As reported in earlier

22   correspondence, this law firm provided a copy of the Tymoshenko

23   report to certain U.S. media outlets.  This was done in

24   response to requests from the media."

25               Do you see where it says that?

1    A.  Yes, I do.

2    Q.  You testified earlier as to the accuracy of this statement

3    as to the *Los Angeles Times*; is that correct?

4    A.  As to the electronic copy sent to the *LA Times*, correct.

5    Q.  To the *LA Times*?

6    A.  Yes.

7    Q.  Do you know whether this is an accurate statement with

8    respect to Mr. Craig's delivery of the report to Mr. Sanger?

9    A.  Again, I just don't know the circumstances of Mr. Craig's

10   delivery of the report to Sanger, unless you're referring to

11   him directing me to send the email.  I just don't know what

12   happened before.

13   Q.  And just to be clear, I am asking you about Mr. Craig's

14   hand delivery of the report to Mr. Sanger and Mr. Craig's

15   attempt to send an electronic copy to Mr. Sanger.

16           Do you know whether this is an accurate statement as

17   to those efforts?

18           MR. ABELSON:  Objection.  Asked and answered and

19   compound.

20           THE COURT:  Overruled.

21           Do you know?  That's what he wants to know.

22           THE WITNESS:  I'm unaware of those efforts, and I'm

23   not aware of the accuracy of that statement as to those efforts

24   which I don't know about.

25           MR. McCULLOUGH:  No further questions, Your Honor.

 1           THE COURT:  All right.  We're going to take our

 2    midafternoon break.  Please -- during the break, please leave

 3    your notebooks here.  Please don't discuss the case among

 4    yourselves or with anyone else.  And we'll try to resume in

 5    approximately ten minutes.

 6           Thank you.

 7           THE PROSPECTIVE JURORS:  How long?

 8           THE COURT:  Ten minutes, is the goal.

 9           (Jurors leave the courtroom.)

10           THE COURT:  All right.  Yes?

11           MR. CAMPOAMOR-SANCHEZ:  Sorry.

12           Your Honor, before you go --

13           THE COURT:  All right.

14           MR. CAMPOAMOR-SANCHEZ:  -- I want to inquire of the

15    defense, through the Court, because I've tried to raise this

16    issue, but I've not got an answer.

17           Our next witness has availability problems on Monday

18    and Tuesday, but he could be back on Wednesday.  And I've

19    inquired of the defense if it would be okay to start his

20    testimony and, perhaps, interrupt it and finalize it on

21    Wednesday.  He's a custodian from Skadden, so he's going to be

22    introducing documents of Mr. Craig and others.  And,

23    unfortunately, the current testimony is taking longer than we

24    anticipated, and he's got availability problems next week.

25           THE COURT:  All right.  Is there any reason why we

1    can't just do it all on Wednesday?  Is there --

2              MR. MURPHY:  That's my question.

3              MR. CAMPOAMOR-SANCHEZ:  Well, it's just -- that's the

4    witness that we have for this afternoon.

5              THE COURT:  He's the only one left?

6              MR. CAMPOAMOR-SANCHEZ:  Right.  I can try to see if

7    we can come up with another witness, but --

8              THE COURT:  All right.  All right.  Well, I don't

9    know that it's going to break anybody's heart to stop at 4-ish

10   on a Friday.  But, I think his testimony will make more sense

11   not interrupted by the directs and cross of other witnesses.

12   So, if you don't need to complete it -- if you're not going to

13   make objections to his -- their using documents because that

14   gentleman hasn't testified yet, then I think we ought to just

15   do him all in one fell swoop.

16             MR. CAMPOAMOR-SANCHEZ:  Okay.  I just did not want to

17   not have it --

18             THE COURT:  I appreciate that, because I'm definitely

19   a call-your-next-witness girl.  But, I would rather have

20   testimony of the witnesses be together.

21             MR. CAMPOAMOR-SANCHEZ:  Uninterrupted.

22             THE COURT:  All right.  And so -- and I think --

23   frankly, I don't believe there's any hardship that requires

24   what we're about to do.  I did say you could do it.  But, I

25   think we really need to think about the impact that has on how

1    they're supposed to receive this testimony at this part of the

2    trial, given that there's not an emergency requiring it.  But

3    I'll let you think, as a team, whether you want to do it or

4    not.

5            I can say that we discussed this somewhat during the

6    pretrial conference, about how Skadden witnesses could be used.

7    And now, having seen it in real life, I think it's confusing

8    and unwieldy and a little unfair.  And, so, I think your

9    cross-examinations of any witnesses you might want to recall on

10   your own case have to be strictly limited to the scope of the

11   direct.  And then you can recall anybody you want and put them

12   on as your witness and do a direct and they'll do a cross.

13           And so that's how we'll proceed.  But, I will permit

14   you to do what I said you could do, if you still choose to do

15   so, after the break.  Otherwise, we'll break for the day.

16           MR. MURPHY:  Your Honor, I do know, and Mr. Kedem's

17   counsel wrote a letter to Mr. Campoamor and to us saying that

18   he had travel plans.  And I don't know when they intend to call

19   Mr. Kedem, and I don't know exactly when his travel plans are.

20   But, I don't want to have a situation where he comes, we're not

21   allowed to ask him questions fully, and then he disappears to

22   foreign --

23           THE COURT:  Well, if we have a situation where

24   there's an exigency that's going to require this procedure, let

25   me know.  One reason that you know more about anything than I

1    do is, no one has given me a witness list.

2           So, I think when you get back, I would like to have

3    one, or at least as of Monday, because I have no idea right now

4    if I'm facing six more weeks of trial or two more weeks of

5    trial or what my schedule looks like or when the defense is

6    going to start.  And I think we're well past the point of where

7    people need to be coy.  I think they know who's coming because

8    their crosses are all ready to go.

9           MR. MURPHY:  I've been asking for days, Your Honor,

10   every day, who's your next witness?

11          MR. CAMPOAMOR-SANCHEZ:  Hold on.  No.  No.  No.  I

12   want the Court to know.  Because on Sunday, at midday, I sent

13   the list of the first six witnesses.  I haven't been trying to

14   hide any witnesses from the defense.  I just did not know the

15   entirety of my order.

16          THE COURT:  All right.  Can we --

17          MR. CAMPOAMOR-SANCHEZ:  And so I want the Court to

18   know that, that we haven't been hiding that.  We have been

19   sharing that information with the defense.  And although

20   Mr. Murphy likes to joke about it, we have been very

21   forthcoming.

22          THE COURT:  All right.  It's obvious from the level

23   of their preparation that they're prepared.  And I'm not saying

24   that anybody has done anything wrong.  I'm just saying that on

25   a going-forward basis, can we know, perhaps by Sunday, who the

1    witnesses are for next week?  And then at the end next week,

2    who the witnesses are the following week, if you're not done

3    with your case by then?

4              MR. CAMPOAMOR-SANCHEZ:  Well, I hope to be done next

5    week.

6              THE COURT:  Well, that would be good.

7              And then we're going to ask the same from the

8    defense.  You don't have to tell us right now who's coming, but

9    there's a point that you need to tell us who's coming and when.

10             MR. MURPHY:  Yes, your Honor.

11             THE COURT:  All right.

12             MR. MURPHY:  And while we're on the subject of

13   witnesses, Your Honor, there's another issue that occurs to me.

14             THE COURT:  All right.  Do we need to excuse this

15   witness?  Are we going to be talking about the subject matter

16   of any --

17             MR. MURPHY:  I have no problem with Mr. Haskell

18   leaving.

19             THE WITNESS:  Thank you.

20             THE COURT:  All right.  Well, I mean, not that

21   you're --

22             MR. MURPHY:  I think we're going to bring him back to

23   finish his direct, probably.  But, we'll consult about that.

24             THE COURT:  I'm saying, does he need to step out of

25   the room while we discuss other witnesses and what they might

1    say?

2              MR. MURPHY:  Yes.  Agreed.

3              THE COURT:  All right.  Sir, can you step out of the

4    room?  And we'll make sure someone brings you back at the

5    appropriate time.

6              (Witness leaves courtroom.)

7              MR. MURPHY:  So, we anticipate --

8              MR. CAMPOAMOR-SANCHEZ:  Oh, I'm sorry.

9              THE COURT:  No, he was waiting.

10             MR. MURPHY:  We anticipate that Mr. Hawker will be a

11   witness.  He is a resident of the United Kingdom.  He is not

12   within our subpoena power.  His lawyers have not agreed to

13   accept a subpoena for him from us.  I do not want to have a

14   situation in which the government calls Mr. Hawker, who

15   apparently is coming voluntarily, as far as I can tell, to

16   testify, and then to have him disappear.

17             And if Your Honor says I can't fully examine

18   Mr. Hawker because they limit the scope of his direct in a way

19   to prevent me from fully bringing out what I need to bring out

20   with Mr. Hawker, I do not want to have a disappearing witness

21   on my hands.

22             THE COURT:  What are you asking me to do?

23             MR. MURPHY:  Well, I want to know what the government

24   intends to do with Mr. Hawker.

25             THE COURT:  You want to know what the direct is going

1    to consist of?

2              MR. MURPHY:  No.  I want to know -- I guess I want to

3    know that I'll have the full opportunity to examine him,

4    whether it's on cross or whether it's --

5              THE COURT:  All right.  But, have you attempted to

6    invoke any mechanism that would involve my assistance to get

7    this gentlemen served or under subpoena or any -- I just want

8    to know if you've asked me -- done anything about this before

9    today.  There are procedures to subpoena international

10   witnesses, and I know they're cumbersome.

11             MR. MURPHY:  They take months, Your Honor.

12             THE COURT:  Okay.  I just want to know what you're

13   asking me to do and under what authority.

14             MR. MURPHY:  I would like to hand him a subpoena when

15   he gets here, so that he can't leave until he testifies for the

16   defense.

17             Alternatively, I'm happy to have him here,

18   cross-examine him, and when the cross is finished, as we're

19   contemplating doing with Mr. Haskell, bring him back on the

20   stand, and I'll take him through a direct.

21             THE COURT:  Well, I cannot, just on the fly, rule on

22   the question of whether you have the authority to hand him a

23   subpoena, anymore than you've had the authority to subpoena him

24   at this point, just because it happens in my courtroom.  So you

25   would have to give me some information about that.

```
 1              When is Mr. Hawker planning to testify?

 2              MR. CAMPOAMOR-SANCHEZ:  We're hoping to have him here

 3     on Monday.  And I will say that, unlike what happened today

 4     with Mr. Haskell, we are happy, because Mr. Hawker is coming

 5     from the UK, to have us stop and they can do a direct and then

 6     we can cross and get him done.  That's one witness, certainly,

 7     we would not object to completing, even if it's a defense case,

 8     at that point.

 9              THE COURT:  All right.  Well, if that solves your

10     problem, then that is how we will proceed.

11              MR. MURPHY:  Thank you.

12              MR. CAMPOAMOR-SANCHEZ:  You're welcome.

13              THE COURT:  Okay.  Okay.  Can we take a ten-minute

14     break?  Because we need it.

15              (Recess.)

16              THE COURTROOM DEPUTY:  Your Honor, recalling Criminal

17     Case Number 19-125, the United States v. Gregory B. Craig.

18              THE COURT:  All right.  Do you want to proceed with

19     calling this witness in your own case?

20              MR. ABELSON:  Yes, Your Honor.

21              THE COURT:  Do we anticipate that we will complete

22     the direct and cross this afternoon?

23              MR. ABELSON:  Yes.

24              THE COURT:  All right.  I'm going to tell the jury

25     that ordinarily, as I told them at the beginning of the case,
```

1   the government gets to put on its entire case, the defense

2   doesn't have to put on any evidence, and then if it chooses to

3   put on evidence, it can do so.

4            In this case, the defendant is choosing to call the

5   same witness who was here earlier as its own witness, in its

6   own case.  And, therefore, for the convenience of the witness,

7   we're going to take that testimony now.  So we're interrupting

8   the government's presentation of the case for the defense

9   presentation of the case.  And you're going to do the direct

10  and they're going to do the cross, and it's part of the

11  defendant's evidence in the case.  Okay?

12            MR. ABELSON:  (Nods head.)

13            THE COURT:  All right.

14            Let's bring in the witness.

15            THE COURTROOM DEPUTY:  Jury panel, Your Honor.

16            (Jurors enter courtroom and witness enters

17  courtroom.)

18            THE COURT:  All right.  Members of the jury, I take

19  it no one has discussed the case with you and you haven't

20  discussed it with each other while we were gone.

21            We're now going to kind of take a little bit of a

22  detour in the middle of the case.  As I told you at the

23  beginning, when I explained how trials work, I said it starts

24  with the government.  They get to put in all the evidence that

25  they want to put on.  It's at the end of that the defendant

1     decides whether they have any evidence they want to introduce.

2     They don't have to introduce any.

3          But we're going to vary from that because the defense

4     does want to call the gentleman who was just on the witness

5     stand as a defense witness.  And rather than have him come

6     back, we're going to try to complete that process today.

7          So what's about to happen is that the government's

8     case is essentially on hold.  It's been frozen.  The defense

9     case is essentially going to start by calling Mr. Haskell back

10    to the stand.  He will still be under oath.

11         The defense team will do his direct examination.  The

12    government will be allowed to cross-examine him and ask leading

13    questions, the way you do on cross-examination.  And then when

14    that's finished, there's not going to be any more government

15    witnesses today.

16         We'll be done with the presentation of the evidence

17    for today.  And then Monday, we'll be back with the government

18    calling the government's next witness.

19         So this is a little bit of an unusual arrangement.

20    It's hoped to be more efficient this way; we shall see.

21         All right.  Call your first witness.

22         MR. ABELSON:  Your Honor, we call Alex Haskell.

23         THE COURT:  All right.  Mr. Haskell, I just want to

24    remind you that you're still under oath.

25         THE WITNESS:  Thank you, Your Honor.

```
1                       DIRECT EXAMINATION

2    BY MR. ABELSON:

3    Q.  Mr. Haskell, did you receive a voicemail from Cliff Sloan

4    on the morning of September 25th, 2012?

5    A.  I believe, given the emails that we've seen about that

6    event today, that that was the date that, yes, I did wake up to

7    a voicemail from Cliff.

8    Q.  Can you tell the jury about that voicemail and what

9    happened next?

10   A.  I can recall being at home and Cliff leaving me a voicemail

11   that I woke up to, in addition to, I believe, emails from him,

12   asking me to --

13              MR. McCULLOUGH:  Objection, Your Honor.  Hearsay.

14              THE COURT:  I think he can say what he asked him to

15   do.

16   A.  -- asking me to call him back.  And I was aware, either

17   from the voicemail or from his emails, that it had to do with

18   the FTI document, and that I can -- Cliff is one of those

19   people who the email always finds you when you're not ready for

20   it.  So I can remember being sort of anxious and running into

21   the office as fast as I could to deal with the issue he had

22   emailed and called about.

23   BY MR. ABELSON:

24   Q.  Do you recall what Mr. Sloan said in his voicemail?

25              MR. McCULLOUGH:  Objection, Your Honor.
```

1          THE COURT: Yeah. You can ask what he had to do as a

2   result of what Mr. Sloan told him.

3          MR. ABELSON: Okay.

4   BY MR. ABELSON:

5   Q. So what did you do? What happened next?

6   A. I can recall getting to the office. And then, as I said

7   earlier, either speaking with Cliff on the phone or, I believe

8   more likely, meeting with him in person. And going through

9   this document that, you know, he was -- he and myself, after

10   reviewing it, were not -- were not happy about; we were

11   surprised by.

12   Q. What document are you referring to?

13   A. The FTI summary, or plan. I'm not sure exactly what the

14   right word is for it. But the FTI document that, at least in

15   part, characterized the report.

16   Q. Do you know whether it's fair to call them a messaging

17   document or talking points?

18          MR. McCULLOUGH: Objection, Your Honor. Leading.

19          THE COURT: Sustained.

20   BY MR. ABELSON:

21   Q. Do you recall what the FTI document was?

22   A. I recall it being a document to be used for FTI's PR

23   purposes. Related to the report.

24   Q. Let's look, again, at Defendant's Exhibit --

25          THE COURT: Did you or did you not -- do you or do

1    you not now recall the purpose of the document?

2              THE WITNESS:  For PR purposes.  For -- yeah.

3              MR. ABELSON:  So we'll look at Defendant's Exhibit

4    492.

5              Oh, Mr. Haley.

6              THE COURTROOM DEPUTY:  Sorry.

7    BY MR. ABELSON:

8    Q.  So, can you explain to the jury, starting with the first

9    email in the chain, what this document is?

10   A.  I believe that this is an email from Jonathan Hawker, who

11   is the lead person on the Ukraine matter for FTI, which

12   attached the PR document that we've been discussing.

13   Q.  Mr. Hawker sent that email on September 24th, 2012?

14   A.  That's correct.

15   Q.  Can you read his email?

16   A.  Yes.  Draft Messaging is the subject line.  And the body

17   is, "Dear all, I've finished going through the report again and

18   attach a messaging document for you to review.  Please let me

19   have" -- "please let me have any comments, corrections, or

20   amendments so that I can incorporate them in the revisions of

21   the Ministry packs tomorrow."

22   Q.  Now, this draft messaging document attached to Mr. Hawker's

23   e-mail is the one we went through earlier, right?

24   A.  That's correct.

25   Q.  Is there a response from this -- or, what's the next email

1   on this string?

2   A.  The next email is an email to Greg, who that document,

3   the -- we'll call it a messaging document, he called it a

4   messaging document -- was sent to.  And --

5   Q.  Was -- go ahead.

6   A.  -- Greg emailed Cliff on September 25th, at 7:38 a.m.,

7   saying, "I need help here.  The PR guys are over the top.  Can

8   you weigh in while I am traveling?"

9   Q.  What happened next in this email chain?

10          MR. ABELSON:  Keep up the whole top half of the

11  email.

12  A.  Cliff forwarded it to me and wrote, "I'll call you in a

13  while about this."

14          It was -- I can assure you I wasn't sleeping at 1:07

15  p.m.  I think the time is wrong on that email.  I believe that

16  was sent in that morning.

17  BY MR. ABELSON:

18  Q.  All right.  Just so you can see the top half of this email.

19  So, this is Mr. Craig forwarding, first to Mr. Sloan, the draft

20  messaging --

21          MR. McCULLOUGH:  Objection, Your Honor.

22          THE COURT:  I think you just said what it all was, so

23  you can ask him your next question.

24          MR. ABELSON:  Okay.

25  BY MR. ABELSON:

1    Q.  Do you remember receiving Mr. Craig's email that Mr. Sloan

2    forwarded to you, reading, "I need help here.  The PR guys are

3    over the top.  Can you weigh in while I'm traveling?"

4              MR. McCULLOUGH:  Objection, Your Honor.  It's asked

5    and answered.

6              THE COURT:  It is.  He read it.

7    BY MR. ABELSON:

8    Q.  Do you remember receiving this email?

9    A.  I can recall receiving the email from Cliff, and I'm

10   familiar with this.  But, I don't -- I don't recall that exact

11   email from Greg.

12   Q.  And what do you recall then doing after you saw this email

13   and received the voicemail from Mr. Sloan?

14   A.  I believe that I called Mr. Sloan back and told him that I

15   would be heading into the office.  I did that.  We either met

16   in person or spoke on the phone, went through the document.

17   And I ultimately produced the email that we had gone through

18   earlier with Mr. McCullough.

19   Q.  Switching topics now.

20             We just discussed before, two publications.  *The New*

21   *York Times* and the *Los Angeles Times*, right?

22             Was there a third publication that you recall

23   being -- knowing that Mr. Craig and/or Mr. Sloan were in touch

24   with around the time of the release?

25             MR. McCULLOUGH:  Objection, Your Honor.

1          THE COURT:  He can ask the predicate question.

2          All right.  Let's direct his attention to the third

3    publication and ask him about that.  Just go straight to it.

4    BY MR. ABELSON:

5    Q.  Do you recall contact with *The National Law Journal*?

6    A.  I didn't personally have contact with them, but I do recall

7    there was contact.

8    Q.  What do you recall about the circumstances of those

9    contacts?

10          THE COURT:  Well, you didn't have contact.  Did you

11   have any -- did you do anything with respect to *The National*

12   *Law Journal*?

13          THE WITNESS:  I did, Your Honor.  I -- I can recall

14   an article getting flagged that *The National Law Journal* had

15   written about the report.  And I can recall that article having

16   errors.  I believe the -- the two that I had mentioned earlier

17   about political prosecution and guilt or innocence, that were

18   critical.  And I can recall discussing it with Cliff and Greg,

19   and then a -- an amended article coming out at some later date.

20          THE COURT:  All right.  As a result of your

21   discussions with Cliff and Greg concerning the article with

22   errors, did you do anything?  You personally?

23          THE WITNESS:  I don't believe so.

24   BY MR. ABELSON:

25   Q.  What do you recall about the communications with Mr. Sloan

1    and Mr. Craig about *The National Law Journal*?

2    A.   I can recall --

3              MR. McCULLOUGH:  Objection, Your Honor.

4              THE COURT:  Sustained.

5              MR. ABELSON:  I'm happy to approach.

6              THE COURT:  Yes.

7              (Bench discussion:)

8              MR. ABELSON:  Your Honor, this is just the issue of

9    Mr. Craig's state of mind.  We filed a brief on it yesterday.

10   I -- I know you haven't had a chance to read it.  But,

11   Mr. Craig's state of mind and his -- what he was aware of as to

12   the mischaracterizations about the report is central to this

13   case.  I'm happy to do it just through the emails.  Mr. -- they

14   had the discussion, and some of that was reflected in emails.

15             THE COURT:  I asked you this morning, this morning,

16   is anybody planning to try to use these documents that I asked

17   you for a brief on today?  And everybody said, no.  I haven't

18   ruled on it.  I haven't read the memo.

19             MR. ABELSON:  That's fine.  I'll just use --

20             THE COURT:  I asked --

21             MR. ABELSON:  -- the emails in evidence.

22             THE COURT:  -- his state of mind.  The emails in

23   evidence about *The National Law Journal* that I've already

24   admitted, you can use those.

25             MR. ABELSON:  Okay.

1              THE COURT:  But, I -- you know, I'm trying to get

2     at -- because he has said they were flagged, the articles were

3     wrong, and that's fine.  If they dispatched him to call the

4     people, then he can say that.  But he can't say what they did

5     and said all about the issues.

6              MR. ABELSON:  That's fine.  It was just the emails.

7              THE COURT:  Okay.  All right.

8              (Open court:)

9              MR. ABELSON:  I would like to bring up Government

10    Exhibit 398.  Let's start with page 2, at the very bottom.

11    Very bottom.

12    BY MR. ABELSON:

13    Q.  What is this email?

14    A.  This is an email from Cliff to Greg, copying me, on

15    December 14th, flagging that -- I believe *The National Law*

16    *Journal* article.

17    Q.  What's the subject line of Mr. Sloan's email?

18    A.  Former Ukrainian leader's trial was fair but flawed,

19    Skadden Says.

20    Q.  What did Mr. Sloan write in the email?

21    A.  Beginning with the headline, this article misunderstands

22    our conclusions --

23              MR. McCULLOUGH:  Objection, Your Honor.

24              THE COURT:  Finish.

25    A.  -- I wonder if we should reach out to educate him?

1          THE COURT:  All right.  This is an email, and it

2     contains a statement of someone that was made out of court that

3     is being introduced simply for the fact that it was said.  It's

4     not a statement from which you can conclude that it is true,

5     that the article misunderstands our conclusions, because the

6     person who said it isn't here to talk about it.

7          So I need you all to come back up to the witness

8     stand to discuss what we -- up to the bench and just discuss

9     what we just discussed.

10          (Bench discussion:)

11          THE COURT:  All right.  Is this exhibit in evidence?

12          MR. ABELSON:  It's in evidence.

13          THE COURT:  Okay.  So, then, why are you objecting?

14          MR. McCULLOUGH:  He's going to use it for hearsay --

15          MR. ABELSON:  It's in -- sorry.

16          THE COURT:  It's in evidence, and it wasn't in

17     subject to any restrictions at that point?  Okay.  Well, then I

18     ruled on it.  If it's one we didn't rule on and didn't discuss,

19     it's one thing, but he's permitted to use it if it's already

20     been ruled on.

21          MR. McCULLOUGH:  Understood, Your Honor.  But, I just

22     don't want this to go to Mr. Haskell repeating some other

23     statements.

24          THE COURT:  All right.  Well, we're going to be

25     closely tied to the document.

1           Okay.  Thank you.

2           And you don't need to read each sentence twice; once

3    will do.

4           All right.

5           (Open court:)

6           MR. ABELSON:  Going back to Government Exhibit 398,

7    which has been admitted.  Let's go to the next email on this

8    string.

9    BY MR. ABELSON:

10   Q.  Did you respond to Mr. Sloan's email forwarding -- did you

11   respond to Mr. Sloan's email?

12   A.  I did.

13   Q.  Could you read your email to the jury?

14   A.  "I agree that the article misunderstands our conclusions.

15   This line is particularly troubling:  'However, the trial was

16   not politically motivated, and the problems weren't enough to

17   undermine her conviction, the team said.'

18           "Greg, the link below should take you to the article,

19   in case you've yet to see it."

20   Q.  What about that line that you quoted was particularly

21   troubling to you?

22   A.  The two pieces -- the same two pieces that I've discussed

23   previously, the political motivation piece that says the trial

24   was not politically motivated.  And, as I've described, that is

25   not what we found.

1                And the second piece is the guilt/innocence, and the

2       problems weren't enough to undermine her conviction.  We did

3       not conclude whether she was guilty or whether she was

4       innocent, which means, we didn't conclude whether her guilty

5       conviction was undermined.

6                So, those two pieces, again.

7       Q.  So those pieces were -- is it fair to say you're saying

8       that they were inaccurate?

9                THE COURT:  He said it.  He can say it.  You're going

10      to ask the next question.

11      BY MR. ABELSON:

12      Q.  Why were you troubled when you saw that?

13      A.  Because both of them were --

14                MR. McCULLOUGH:  Objection.

15                THE COURT:  Overruled.

16      A.  They were incorrect.  They were not -- it's not what our

17      report said.  And if you had just read the first two pages of

18      the report, which was an executive summary, you would have

19      known that those two things were not true.

20      BY MR. ABELSON:

21      Q.  If you go to the next email in the string, what's this

22      email?

23      A.  It's an email from Greg to Cliff and myself, I believe

24      following up on the email that I just read.

25      Q.  What did Mr. Craig say here?

1    A.  He said:  We have to do something about this story.  A

2    letter to the editor?  A phone call to the publisher?"

3    Q.  Now, do you know what happened next?

4    A.  I don't.

5    Q.  You weren't involved in any steps that were taken from

6    here, right?

7    A.  I don't recall being involved at all, no.

8    Q.  Do you recall whether corrections were made to the article?

9    A.  I do have a recollection that the article was changed,

10   yeah.

11        MR. ABELSON:  Can we pull up what's been previously

12   admitted as Defense Exhibit 269?  Okay.  Let's look at the

13   article itself.

14   BY MR. ABELSON:

15   Q.  Is this the article you're referring to?

16   A.  The corrected article, yes, I believe so.

17   Q.  Okay.  Let's look at the first paragraph.

18        Can you read that first paragraph that's in italics?

19   A.  Yes.  "Correction, this article has been changed to clarify

20   that Skadden attorneys were unable to determine, given the

21   evidence they reviewed, that there were political motivations

22   behind Yulia Tymoshenko's claim of selective prosecution.

23   Additionally, the article now contains comments by Skadden

24   attorney Greg Craig" -- "Gregory Craig."

25   Q.  What do you recall about this corrected article?

1   A.   I recall that those -- the two points, those -- the two

2   critical points that we've discussed a few times that I'd

3   pointed out in my email were misstatements, were corrected.  I

4   don't recall if there were other corrections, too, but I do

5   recall that those two issues were corrected.

6   Q.   Okay.

7           MR. ABELSON:  Now, let's move the headline up.  But,

8   also, next to it -- or below it, pull up what we looked at

9   before, which is Government Exhibit 398.

10          The bottom of the -- the bottom of the second page,

11   the subject line.

12   BY MR. ABELSON:

13   Q.   Subject line contained the original headline of *The*

14   *National Law Journal*, right?

15   A.   Yes.

16   Q.   What was that original headline?

17   A.   "Former Ukrainian leader's trial was fair but flawed,

18   Skadden says."

19   Q.   What's the headline in the new article?

20   A.   "Former Ukrainian leader's trial was flawed, Skadden says."

21   Q.   Can you explain to the jury what the change is here and

22   whether you consider it an important change?

23          THE COURT:  Sustained.

24   BY MR. ABELSON:

25   Q.   Can you explain what the difference --

```
 1                THE COURT:  We can see the difference.

 2    BY MR. ABELSON:

 3    Q.  So the new -- in the new --

 4                THE COURT:  And I think the jury can draw the

 5    inferences about what's important.  He doesn't know how it

 6    changed or who changed it.  He knows it was changed.  It's been

 7    pointed out that it was changed.

 8                So, ask your next question about a fact this witness

 9    can testify to.

10                MR. ABELSON:  Okay.

11    BY MR. ABELSON:

12    Q.  Now, in Exhibit 398, let's go back up to the line that you

13    found particularly troubling.

14                MR. ABELSON:  Yep, that middle email.

15                And let's hold that up against the correction in

16    italics on Defense Exhibit 369.

17    BY MR. ABELSON:

18    Q.  Did The National Law Journal correction address the concern

19    in your original email?

20    A.  It -- reading the italicized portion, the piece about

21    political motivation was corrected.  That is an accurate

22    statement -- the italicized is an accurate statement of what we

23    found.  The line I had quoted in my email is not.

24                MR. ABELSON:  Let's go to Defense Exhibit 248.

25    BY MR. ABELSON:
```

924

1   Q.  Before we get to this, do you recall having any reaction or
2   thoughts when *The National Law Journal* corrected their article?
3   A.  I can't recall.
4   Q.  Okay.  Defense Exhibit Number 248 begins with an email at
5   the bottom from you.
6        Can you explain what this email is?
7   A.  This is an email that I sent to Greg on December 13th.
8   Subject is, *Kyiv Post* article.  And it embeds the link to an
9   article in the *Kyiv Post,* which I -- if my memory serves me, is
10  a Ukraine-focused publication, but in English.  Maybe they
11  publish in Ukrainian or Russian, too.  But we used articles
12  from there to find facts during our fact gathering.  So I was
13  familiar with the publication.
14  Q.  Mr. Craig responds to your email, right?
15  A.  Yes.
16  Q.  He says, "This is the best article by far"?
17  A.  Yes.
18  Q.  And what did you say in response?
19  A.  "Yes, I agree.  Far and away the most comprehensive, and it
20  has the most direct quotes from the report, which is great."
21  Q.  So what do you recall, before we go to the article, about
22  the *Kyiv Post* article?
23  A.  I recall that it was long and it -- not to repeat what I
24  wrote in my email, but that it quoted from the report a lot,
25  and that it was accurate.  That it was -- you know, there were

1     a lot of articles coming out.  A lot of them were wrong.  This

2     was one that was right.

3     Q.  And let's look at the article.  The headline is at the very

4     top.  And it reads, "Skadden Report finds flaws in Tymoshenko

5     trial."

6              Did I read that correctly?

7     A.  Yes.

8     Q.  Now, it is a long article.  We won't go through it.  Just

9     like to draw your attention to a few points.

10             On page 3, near the top, could you read the sentence

11    that begins, "The consultant"?

12    A.  "The consultant, whose findings were made public on

13    December 13th, found that the court proceedings against

14    Tymoshenko violated Western standards for a fair trial."

15    Q.  And, I'm sorry.  The next sentence?

16    A.  "The firm found that, among other problems, the ex-premier

17    was not given enough time to study her case, was sometimes

18    deprived of adequate defense, and was denied the right to call

19    witnesses to properly represent her side."

20    Q.  Is that an accurate description of the Skadden Report's

21    conclusions?

22    A.  Yes.

23    Q.  In the middle of the page, where it starts, Ukraine --

24    "Ukraine's Justice Ministry," can you read that?  Begin reading

25    there?

1    A.  Yes.

2          "Ukraine's Justice Ministry, however, said that the

3    Skadden, Arps, Slate, Meagher & Flom report found no evidence

4    that Tymoshenko's case was politically motivated."

5    Q.  In the report, that article goes on with a quote.

6    A.  "This report concludes as groundless Yulia Tymoshenko's

7    claims that her prosecution was politically motived, and states

8    that she has provided no factual evidence that would be

9    sufficient to overturn her convictions under European or

10   American standards, the Ministry said."

11   Q.  Is that in a document that we looked at earlier today?

12   A.  Yes.  I believe it's from the Ministry of Justice press

13   release that accompanied their release of the report.

14   Q.  All right.  What's the next sentence in this article?

15   A.  However, the report says that the consultants do not take a

16   position on the political motivation of the charges" -- "fo the

17   charges."

18   Q.  Is that accurate?

19   A.  I don't think it's completely accurate.  It's fairly

20   accurate.  We didn't take a position, if you interpret that as

21   it was or it wasn't politically motivated.

22   Q.  Right.

23   A.  We did take a position related to that point about the

24   evidence that was presented.  Roughly, it's accurate, yeah.  I

25   apologize.

1   Q.   Do you recall the article going through other parts of the

2   report?

3   A.   I just recall it being thorough and taking on a lot.   I

4   don't recall what all of them were, though.

5   Q.   Thorough in describing conclusions of the report?

6   A.   Correct.

7   Q.   Okay.

8           MR. ABELSON:   Let's go back to the email on page 1.

9   BY MR. ABELSON:

10  Q.   When you wrote, "that far and away the most comprehensive,

11  and it has the most direct quotes from the report, which is

12  great," were you contrasting the *Kyiv Post* article with any

13  other publications?

14          MR. McCULLOUGH:   Objection, Your Honor.

15          THE COURT:   It's a little leading.   I mean, when you

16  say "it's the most comprehensive," you're comparing it to all

17  the ones you've seen before?

18          THE WITNESS:   I can't recall exactly which ones I had

19  and hadn't seen, but I was -- you know, we'd worked on the

20  report for a while.   I was keeping tabs, certainly, of stuff

21  that was coming out about it after it was released.   So, I'm

22  confident that when I said that, I was comparing it to some of

23  the other articles.

24          MR. ABELSON:   Thank you, Your Honor.   No further

25  questions.

1          THE COURT:  All right.  Any cross-examination with

2     respect to this portion of his testimony, which is now a

3     portion of the defense case?

4                         CROSS-EXAMINATION

5     BY MR. McCULLOUGH:

6     Q.  Mr. Haskell, directing your attention to Defense Exhibit

7     248.

8     A.  Yes.

9     Q.  The date of this publication is December 13th, 2012.

10          THE JURORS:  We can't see.

11          THE COURT:  I'm sorry.

12          John?

13          THE COURTROOM DEPUTY:  Yes.

14          THE JURORS:  Thank you, Your Honor.

15    A.  Yes, it's December 13th.

16    BY MR. McCULLOUGH:

17    Q.  This is after Mr. Craig's contacts with *The New York Times*

18    that we looked at previously?

19    A.  It was after the email exchange where I had sent the PDF;

20    that was December 12th.

21    Q.  And the contact between Mr. Craig and David Sanger of *The*

22    *New York Times* on Government Exhibit 368 was on December 11th;

23    is that right?  Would you like me to bring it up?

24    A.  Yeah, if you wouldn't mind.

25          MR. McCULLOUGH:  If we can look at Government Exhibit

1    368.

2    A.  So the question is, was this before the email I just looked

3    at?

4    BY MR. McCULLOUGH:

5    Q.  Was this -- Mr. Craig's contacts with *The New York Times*

6    were at least as early as December 11th; is that correct?  Is

7    that your understanding?

8    A.  Yes.

9    Q.  Okay.

10            MR. McCULLOUGH:  So turning back to Defense Exhibit

11   248.

12   BY MR. McCULLOUGH:

13   Q.  This article that comes out in the *Kyiv Post* is December

14   13th; is that right?

15   A.  That's correct.

16   Q.  Turning your attention to Defense Exhibit 241, and turning

17   to the second page of this, which defense referred you to

18   earlier.  You testified earlier that this is Ministry of

19   Justice statements.

20            Turning to the first page of this document, which is

21   an email --

22            MR. McCULLOUGH:  Go ahead and pull up the first.

23   BY MR. McCULLOUGH:

24   Q.  -- it appears that the Ministry of Justice statement was

25   sent to Mr. Craig on December 13th at 2:34 p.m --

1              MR. ABELSON:  Objection.

2    BY MR. McCULLOUGH:

3    Q.  -- do you see that?

4              THE COURT:  What basis?

5              MR. ABELSON:  It's the time zone correction.

6              THE COURT:  Do we know what time it was sent?

7              MR. McCULLOUGH:  Your Honor, yes.  I think, by

8    stipulation, we believe that this would be at 9:34 a.m.

9              THE COURT:  Correct.  Is that the nature of your

10   objection?

11             MR. ABELSON:  Yes.

12             THE COURT:  Okay.  So, the press release was sent out

13   on December 13th and provided to Mr. Craig at that time; is

14   that correct?

15             THE WITNESS:  In this email, yes.

16   BY MR. McCULLOUGH:

17   Q.  Do you have any reason to believe that you received the

18   press release prior to this time?

19   A.  I have no reason to believe that, no.  I don't recall

20   exactly when I received it.

21   Q.  Do you recall reviewing any draft press releases by the

22   Ministry of Justice?

23   A.  I don't recall.

24   Q.  Do you recall any -- do you recall speaking with Mr. Craig

25   about his review of any draft releases of the Ministry of

```
 1    Justice statements?

 2              MR. ABELSON:  Objection, Your Honor.

 3              THE COURT:  Overruled.

 4              THE WITNESS:  I don't recall any discussions like

 5    that.

 6              MR. MURPHY:  And let's just turn to Government

 7    Exhibit 398.

 8    BY MR. McCULLOUGH:

 9    Q.  This is the email chain related to The National Law

10    Journal; is that right?

11    A.  Yes.

12              MR. McCULLOUGH:  And turning to the first two emails

13    of the chain on the second page.

14    BY MR. McCULLOUGH:

15    Q.  Is it your understanding and your testimony that this New

16    York -- The National Law Journal article was published on or

17    about December 14th?

18              MR. ABELSON:  Objection.

19    BY MR. McCULLOUGH:

20    Q.  Is this when it came to your attention?

21    A.  Yes, as far as --

22    Q.  Do you have any reason to believe that it came to the

23    attention of Mr. Sloan or Mr. Craig prior to December 14th?

24    A.  I have no reason to believe, no.

25    Q.  And it's dated December 14th.  This is three days after the
```

1      email that we've seen between Mr. Craig and Mr. Sanger; is that

2      right?

3      A.   Yes.

4              MR. McCULLOUGH:   No further questions, Your Honor.

5              THE COURT:   All right.   Any redirect?

6              MR. ABELSON:   No, Your Honor.

7              THE COURT:   Okay.   Thank you.

8              This witness is now excused, and I don't believe

9      we're going to call any further witnesses this afternoon.

10             You can step off the witness stand.

11             THE WITNESS:   Thank you, Your Honor.

12             THE COURT:   Members of the jury, I think, if I'm not

13     mistaken, that it is Friday.   I'm not entirely sure about that,

14     but I believe it is actually Friday afternoon.   And, so, we are

15     going to release you, not only for the evening, but for the

16     entire weekend, to be back here on Monday morning.

17             I ask that you be back and in the jury room by

18     approximately ten minutes after nine, where, once again, you

19     will enjoy the breakfast courtesy of the United States District

20     Court, and we will be prepared to come in and resume the trial

21     in the morning.

22             I need to remind you, notwithstanding the fact that

23     I'm starting to sound like a nag, to abide by all the

24     instructions I gave you at the beginning of the trial.   Most

25     important, you are not permitted to discuss this case among

1     yourselves or with anyone else.  Do not let anyone else speak

2     to you about it.  If someone sends you an email or reaches out

3     to you on some sort of social media or electronic media or in

4     person that says, I think I saw you at the courthouse, can we

5     talk about the case?  Do not respond.

6          Do not let anyone speak to you about it.  Do not try

7     to do any reading or research about the case on the internet or

8     anywhere else.  And, so, please refrain from any -- not only

9     internet research, but also internet communications or posts

10    about the case.

11         Please enjoy your weekend.  I hope it's not terribly

12    hot, but I think it might be.  And I will see you on Monday

13    morning.

14         You guys have been paying very close attention to

15    everything, and everyone in the courtroom appreciates that very

16    much.

17         Thank you very much.  We'll see you Monday.

18         (Jurors leave courtroom.)

19         THE COURT:  I have one quick housekeeping matter to

20    take up with all of you before I let you go.

21         For your planning purposes, I have another bond

22    hearing in another case at 4 p.m. on Monday.  So, I will -- you

23    know, if somebody is finishing up a question or an answer, we

24    may not break it the second of 4 p.m., but you can anticipate

25    that on or around 4 p.m., we're going to stop tomorrow --

```
 1    Monday.  So, I thought you should have that in the back of your
 2    mind as you move forward.
 3              All right.  Is there anything else we need to take up
 4    right now?  I realize there's some open issues, and I have
 5    plenty of work to do.
 6              MR. TAYLOR:  No, Your Honor.
 7              MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.
 8              THE COURT:  All right.  Thank you.  Everybody have a
 9    good weekend.
10                                *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5          I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                         Dated this 16th day of August, 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25

**'**

**'answer'** [1] - 879:13
**'examines** [1] - 879:13
**'however'** [1] - 919:15
**'may** [1] - 889:7
**'the** [1] - 880:10
**'would'** [1] - 889:7

**/**

**/s** [1] - 935:12

**1**

**1** [4] - 864:3, 864:16, 866:18, 927:8
**10** [3] - 889:18, 890:4, 890:7
**100** [1] - 830:22
**1000** [1] - 831:3
**10th** [2] - 836:14, 852:7
**11** [3] - 890:17, 891:9
**11:14** [1] - 838:3
**11th** [2] - 928:22, 929:6
**12** [3] - 872:10, 890:17, 891:18
**12th** [1] - 928:20
**13** [2] - 872:9, 891:23
**13th** [8] - 838:2, 924:7, 925:13, 928:9, 928:15, 929:14, 929:25, 930:13
**14th** [4] - 917:15, 931:17, 931:23, 931:25
**152** [10] - 865:19, 867:12, 867:14, 867:18, 868:2, 868:3, 868:5, 868:13, 869:14, 869:19
**15th** [1] - 898:13
**16** [1] - 830:6
**167** [1] - 881:10
**16th** [1] - 935:9
**1800** [1] - 831:2
**185** [1] - 890:10
**19-125** [2] - 832:3, 907:17
**19-CR-125** [1] - 830:3
**1:07** [1] - 913:14
**1:45** [1] - 830:7

**2**

**2** [8] - 847:17, 848:8, 863:25, 864:2, 864:9, 864:10, 864:21, 917:10
**20001** [2] - 831:9, 935:15
**20036** [1] - 831:3
**2012** [6] - 855:3, 871:11, 872:19, 910:4, 912:13, 928:9
**2013** [1] - 855:3
**2019** [2] - 830:6, 935:9
**202** [3] - 830:15, 830:19, 831:4
**202-354-3267** [1] - 831:9
**20530** [2] - 830:15, 830:18

**20s** [1] - 860:5
**21202** [1] - 830:23
**233-0986** [1] - 830:19
**241** [2] - 841:23, 929:16
**2440** [1] - 830:23
**248** [4] - 923:24, 924:4, 928:7, 929:11
**24th** [1] - 912:13
**252-7698** [1] - 830:15
**25th** [5] - 871:11, 872:19, 875:19, 910:4, 913:6
**267** [1] - 847:1
**269** [1] - 921:12
**2:34** [1] - 929:25

**3**

**3** [14] - 849:6, 872:16, 872:17, 873:1, 873:2, 873:19, 874:13, 876:11, 877:24, 879:10, 879:22, 880:6, 925:10
**30s** [1] - 860:5
**333** [2] - 831:8, 935:14
**368** [4] - 834:14, 893:23, 928:22, 929:1
**369** [1] - 923:16
**389** [1] - 837:23
**394** [2] - 838:22, 845:25
**398** [6] - 850:21, 917:10, 919:6, 922:9, 923:12, 931:7

**4**

**4** [14] - 872:16, 873:18, 873:19, 875:21, 876:8, 877:23, 879:9, 879:22, 885:15, 885:17, 892:24, 933:22, 933:24, 933:25
**4-ish** [1] - 901:9
**410** [1] - 830:24
**429** [1] - 870:24
**475** [1] - 896:24
**476** [3] - 836:12, 849:20, 898:15
**490** [4] - 831:21, 839:5, 839:12, 843:21
**492** [11] - 865:11, 865:16, 865:17, 867:25, 868:1, 869:14, 869:17, 869:23, 870:2, 872:22, 912:4
**493** [8] - 831:21, 871:8, 871:17, 872:7, 872:15, 872:25, 875:6, 887:14
**494** [10] - 831:22, 872:5, 872:8, 875:4, 875:6, 875:13, 877:22, 878:20, 885:5, 887:14

**5**

**5** [10] - 830:5, 830:8, 872:16, 874:12, 875:21, 879:21, 885:15, 892:24, 893:1, 893:2

**555** [1] - 830:14

**6**

**6** [7] - 875:21, 880:5, 885:15, 886:4, 886:6, 887:2, 892:24
**6523** [2] - 831:8, 935:14

**7**

**7** [2] - 874:13, 880:6
**778-1814** [1] - 831:4
**7:38** [1] - 913:6

**8**

**8** [1] - 888:17

**9**

**9** [1] - 889:4
**9(a** [1] - 889:4
**9(b** [1] - 889:4
**949-1146** [1] - 830:24
**950** [1] - 830:18
**9:34** [1] - 930:8

**A**

**a.m** [3] - 838:3, 913:6, 930:8
**Aabelson@zuckerman.com** [1] - 830:25
**ABELSON** [156] - 833:15, 834:11, 835:12, 835:15, 835:16, 839:11, 839:15, 841:25, 842:1, 844:5, 844:12, 851:3, 851:7, 851:17, 852:25, 853:3, 853:19, 854:11, 854:17, 854:24, 856:5, 856:11, 856:12, 857:9, 858:7, 858:8, 858:13, 858:15, 859:16, 860:7, 862:19, 862:24, 863:10, 863:16, 863:18, 863:22, 864:7, 864:8, 864:20, 865:15, 865:19, 865:24, 866:10, 866:13, 866:16, 866:22, 867:3, 867:6, 867:12, 867:16, 867:19, 868:1, 868:4, 868:6, 868:15, 869:10, 869:13, 869:23, 869:25, 870:1, 870:8, 870:9, 870:11, 870:12, 871:12, 871:16, 875:12, 875:16, 877:18, 877:21, 878:19, 879:3, 879:8, 881:9, 881:13, 881:19, 882:11, 882:12, 882:23, 883:6, 883:10, 884:11, 884:21, 887:10, 887:12, 887:16, 887:21, 889:9, 890:21, 890:25, 891:2, 892:5, 892:12, 892:14, 893:13, 894:16, 895:14, 895:25, 896:17, 897:7, 897:17, 898:3, 899:18, 907:20, 907:23, 908:12, 909:22, 910:2, 910:23, 911:3, 911:4, 911:20, 912:3,

912:7, 913:10, 913:17, 913:24, 913:25, 914:7, 915:4, 915:24, 916:5, 916:8, 916:19, 916:21, 916:25, 917:6, 917:9, 917:12, 918:12, 918:15, 919:6, 919:9, 920:11, 920:20, 921:11, 921:14, 922:7, 922:12, 922:24, 923:2, 923:10, 923:11, 923:14, 923:17, 923:24, 923:25, 927:8, 927:9, 927:24, 930:1, 930:5, 930:11, 931:2, 931:18, 932:6

**Abelson** [4] - 830:21, 831:15, 831:18, 885:6

**abide** [1] - 932:23

**ability** [2] - 897:15, 935:8

**able** [4] - 835:3, 835:17, 883:18, 894:10

**absolutely** [1] - 853:18

**accept** [1] - 905:13

**acceptable** [2] - 887:5, 887:25

**access** [1] - 832:8

**accompanied** [1] - 926:13

**accordance** [1] - 832:25

**accuracy** [2] - 899:2, 899:23

**accurate** [16] - 837:6, 848:25, 849:25, 850:6, 858:22, 899:7, 899:16, 923:21, 923:22, 924:25, 925:20, 926:18, 926:19, 926:20, 926:24, 935:6

**accurately** [11] - 840:17, 847:14, 847:25, 848:13, 850:19, 858:1, 858:20, 858:21, 861:12, 879:25

**Action** [1] - 830:3

**Adam** [2] - 830:17, 830:21

**addition** [1] - 910:11

**additional** [1] - 846:6

**additionally** [1] - 921:23

**address** [4] - 843:18, 884:14, 884:15, 923:18

**addressed** [2] - 874:5, 874:8

**addresses** [2] - 835:5, 835:19

**addressing** [1] - 884:13

**adequate** [2] - 848:10, 925:18

**admission** [2] - 839:11, 875:12

**admit** [1] - 865:15

**admitted** [10] - 841:25, 847:2, 850:20, 865:20, 865:23, 875:4, 875:15, 916:24, 919:7, 921:12

**advance** [1] - 853:9

**advice** [7] - 859:2, 864:21, 864:22, 887:7, 887:24, 887:25, 888:3

**afternoon** [10] - 832:2, 834:12, 834:13, 884:6, 884:19, 901:4, 907:22, 932:9, 932:14

**AFTERNOON** [3] - 830:5, 830:8, 832:1

**agree** [4] - 852:3, 883:11, 919:14, 924:19

**agreed** [2] - 905:2, 905:12

**ahead** [8] - 867:17, 869:13, 879:2, 879:6, 886:25, 887:20, 913:5, 929:22

**Aleka** [1] - 890:19

**aLEX** [1] - 831:14

**Alex** [2] - 890:19, 909:22

**ALEX** [1] - 831:17

**aligned** [1] - 857:4

**allegation** [1] - 840:20

**allegations** [5] - 839:21, 848:22, 873:21, 874:10, 879:23

**allowed** [5] - 854:7, 854:8, 887:18, 902:21, 909:12

**almost** [1] - 847:22

**Alpert** [2] - 837:8, 897:2

**alpert** [15] - 837:12, 837:13, 837:17, 837:19, 838:12, 839:16, 839:19, 840:3, 843:22, 843:23, 846:12, 847:4, 849:17, 849:24, 850:6

**Alpert's** [1] - 844:17

**alpert's** [1] - 838:2

**alternatively** [1] - 906:17

**amended** [1] - 915:19

**amendment** [1] - 842:17

**amendments** [1] - 912:20

**America** [1] - 830:3, 832:4

**American** [8] - 840:20, 841:10, 842:21, 858:19, 858:21, 864:13, 888:20, 926:10

**AMY** [1] - 830:9

**analysis** [5] - 849:9, 873:5, 878:1, 879:11, 885:20

**analyze** [1] - 873:11

**Angeles** [5] - 837:9, 838:8, 847:3, 899:3, 914:21

**annoyed** [2] - 869:7, 869:8

**annoying** [2] - 868:22, 868:25

**answer** [10] - 846:20, 858:17, 873:10, 876:18, 877:11, 879:5, 891:22, 895:15, 900:16, 933:23

**answered** [7] - 863:2, 882:21, 895:14, 897:7, 898:12, 899:18, 914:5

**answers** [8] - 873:5, 878:1, 878:2, 879:11, 879:14, 879:15, 885:21, 885:24

**anticipate** [4] - 905:7, 905:10, 907:21, 933:24

**anticipated** [1] - 900:24

**anxious** [1] - 910:20

**apart** [1] - 893:11

**apologize** [4] - 864:7, 869:10, 887:21, 926:25

**appear** [1] - 839:23

**appellate** [1] - 888:20

**apply** [1] - 841:9

**applying** [2] - 858:18, 858:21

**appreciate** [1] - 901:18

**appreciates** [1] - 933:15

**approach** [3] - 876:13, 883:7, 916:5

**appropriate** [2] - 833:22, 905:5

**approval** [1] - 832:16

**argue** [2] - 890:1, 892:6

**argument** [1] - 893:15

**argumentative** [2] - 887:18, 888:8

**Arps** [6] - 843:11, 848:9, 849:9, 849:12, 889:5, 926:3

**arrangement** [1] - 909:19

**article** [41] - 838:9, 847:3, 849:17, 850:14, 850:18, 851:13, 852:15, 853:4, 915:14, 915:15, 915:19, 915:21, 917:16, 917:21, 918:5, 919:14, 919:18, 921:8, 921:9, 921:13, 921:15, 921:16, 921:19, 921:23, 921:25, 922:19, 924:2, 924:8, 924:9, 924:16, 924:21, 924:22, 925:3, 925:8, 926:5, 926:14, 927:1, 927:12, 929:13, 931:16

**articles** [5] - 841:17, 917:2, 924:11, 925:1, 927:23

**aside** [1] - 863:18

**aspect** [2] - 848:13, 895:17

**aspects** [2] - 857:15, 858:16

**assigned** [1] - 855:22

**assignment** [6] - 855:8, 855:25, 856:2, 856:4, 857:18, 858:12

**assistance** [2] - 847:23, 906:6

**associate** [4] - 845:2, 845:5, 845:8, 846:21

**assume** [2] - 835:18, 844:17

**assure** [1] - 913:14

**attach** [1] - 912:18

**attached** [2] - 912:12, 912:22

**attachment** [1] - 867:7, 898:20

**attempt** [1] - 899:15

**attempted** [2] - 894:15, 906:5

**attention** [13] - 835:1, 837:22, 848:8, 872:15, 875:17, 875:21, 915:2, 925:9, 928:6, 929:16, 931:20, 931:23, 933:14

**attorney** [4] - 847:21, 860:22, 862:4, 921:24

**ATTORNEY'S** [1] - 830:13

**attorneys** [2] - 847:24, 921:20

**attributable** [1] - 890:23

**attributed** [1] - 888:12

**attributing** [1] - 892:2

**August** [2] - 830:6, 935:9

**authority** [4] - 843:12, 906:13, 906:22, 906:23

**availability** [2] - 900:17, 900:24

**Avenue** [3] - 830:18, 831:8, 935:14

**aware** [7] - 840:4, 840:7, 844:8, 895:16, 899:23, 910:16, 916:11

# B

**ballpark** [1] - 860:5
**Baltimore** [1] - 830:23
**bar** [4] - 840:20, 840:23, 843:7, 874:24
**barred** [2] - 847:19, 851:8
**based** [9] - 838:10, 878:16, 883:25, 888:19, 890:18, 891:7, 891:9, 891:15, 891:19
**basis** [4] - 891:1, 892:13, 903:25, 930:4
**became** [1] - 861:22
**become** [1] - 833:10
**becomes** [1] - 833:11
**BEFORE** [1] - 830:9
**began** [2] - 834:16, 839:16
**begin** [1] - 925:24
**beginning** [5] - 844:24, 907:25, 908:23, 917:21, 932:24
**begins** [4] - 850:23, 924:4, 925:11
**behavior** [1] - 889:5
**behind** [1] - 921:22
**below** [4] - 836:1, 868:7, 919:18, 922:8
**bench** [13] - 851:4, 851:5, 862:14, 862:15, 866:1, 866:3, 876:15, 883:9, 897:8, 897:9, 916:7, 918:8, 918:10
**BERMAN** [1] - 830:9
**best** [3] - 833:25, 924:16, 935:8
**better** [1] - 860:24
**between** [4] - 834:15, 875:24, 928:21, 932:1
**beyond** [6] - 838:20, 851:1, 853:6, 862:13, 883:11, 883:17
**binder** [1] - 837:24
**bit** [4] - 832:22, 855:15, 908:21, 909:19
**blank** [1] - 834:20
**body** [3] - 866:11, 866:12, 912:16
**bond** [1] - 933:21
**bottom** [8] - 847:9, 850:22, 850:25, 917:10, 917:11, 922:10, 924:5
**Bradley** [1] - 830:17
**branch** [1] - 846:1
**brawl** [1] - 847:6
**break** [14] - 874:14, 880:7, 884:5, 884:6, 884:19, 884:25, 900:2, 901:9, 902:15, 907:14, 933:24
**breakfast** [1] - 932:19
**brief** [2] - 916:9, 916:17
**briefly** [1] - 837:11
**bring** [16] - 832:5, 832:7, 834:2, 837:24, 852:16, 853:18, 869:4, 885:5, 885:17, 893:2, 904:22,

905:19, 906:19, 908:14, 917:9, 928:23
**bringing** [5] - 847:19, 852:1, 852:23, 876:23, 905:19
**brings** [1] - 905:4
**brought** [3] - 841:4, 877:4, 877:9
**bunch** [4] - 848:2, 848:3, 866:23, 874:5
**burdensome** [2] - 833:10, 833:11
**BY** [77] - 834:11, 835:12, 835:16, 839:15, 842:1, 844:12, 854:24, 856:5, 856:12, 857:9, 858:8, 858:15, 859:16, 860:7, 863:22, 864:8, 864:20, 870:1, 870:9, 870:12, 871:16, 875:16, 877:21, 878:19, 879:8, 881:13, 881:19, 882:12, 882:23, 885:3, 885:19, 886:5, 887:1, 887:23, 889:13, 890:3, 891:17, 892:8, 893:4, 893:21, 895:3, 895:18, 896:2, 896:6, 896:25, 898:11, 910:2, 910:23, 911:4, 911:20, 912:7, 913:17, 913:25, 914:7, 915:4, 915:24, 917:12, 919:9, 920:11, 921:14, 922:12, 922:24, 923:2, 923:11, 923:17, 923:25, 927:9, 928:5, 928:16, 929:4, 929:12, 929:23, 930:2, 930:16, 931:8, 931:14, 931:19

# C

**call-your-next-witness** [1] - 901:19
**Campoamor** [2] - 830:12, 902:17
**CAMPOAMOR** [18] - 832:17, 832:24, 876:16, 886:11, 886:14, 900:11, 900:14, 901:3, 901:6, 901:16, 901:21, 903:11, 903:17, 904:4, 905:8, 907:2, 907:12, 934:7
**Campoamor-Sanchez** [1] - 830:12
**CAMPOAMOR-SANCHEZ** [18] - 832:17, 832:24, 876:16, 886:11, 886:14, 900:11, 900:14, 901:3, 901:6, 901:16, 901:21, 903:11, 903:17, 904:4, 905:8, 907:2, 907:12, 934:7
**cannot** [3] - 863:7, 863:14, 906:21
**care** [1] - 839:25
**CASE** [1] - 831:17
**case** [36] - 853:9, 853:16, 859:8, 859:9, 863:7, 876:17, 877:2, 877:3, 884:8, 884:10, 900:3, 902:10, 904:3, 907:7, 907:19,

907:25, 908:1, 908:4, 908:6, 908:8, 908:9, 908:11, 908:19, 908:22, 909:8, 909:9, 916:13, 919:19, 925:17, 926:4, 928:3, 932:25, 933:5, 933:7, 933:10, 933:22
**Case** [2] - 832:3, 907:17
**cases** [4] - 832:9, 832:18, 857:1, 857:4
**caused** [1] - 840:19
**celebrated** [1] - 849:7
**central** [1] - 916:12
**certain** [4] - 836:22, 850:2, 872:8, 898:23
**certainly** [9] - 843:19, 845:2, 847:22, 850:17, 851:19, 866:5, 873:24, 907:6, 927:20
**CERTIFICATE** [1] - 935:2
**certify** [1] - 935:5
**chain** [7] - 865:20, 867:7, 893:25, 912:9, 913:9, 931:9, 931:13
**challenged** [4] - 873:6, 878:2, 879:12, 885:21
**chance** [1] - 916:10
**change** [8] - 878:2, 879:12, 879:14, 889:7, 890:22, 891:20, 922:21, 922:22
**changed** [12] - 850:19, 862:23, 876:5, 890:12, 891:9, 891:10, 921:9, 921:19, 923:6, 923:7
**changes** [5] - 891:5, 891:7, 892:1, 893:7
**changing** [1] - 880:19
**characterize** [3] - 847:14, 847:25, 848:13
**characterized** [2] - 853:13, 911:15
**charged** [1] - 858:1
**charges** [3] - 841:4, 926:16, 926:17
**check** [2] - 867:19, 868:13
**choose** [2] - 857:1, 902:14
**chooses** [1] - 908:2
**choosing** [1] - 908:4
**circumstances** [6] - 834:23, 837:11, 850:12, 891:7, 899:9, 915:8
**claim** [1] - 921:22
**claims** [8] - 839:24, 840:4, 840:7, 840:9, 842:18, 843:4, 843:25, 926:7
**clarify** [7] - 839:20, 839:23, 843:25, 854:5, 867:17, 867:18, 921:19
**clear** [19] - 841:12, 852:21, 854:17, 855:13, 855:15, 856:1, 862:19, 873:20, 874:16, 874:21, 879:22, 880:8, 880:10, 881:2, 886:6, 886:10, 887:3, 888:6,

899:13

**clearly** [1] - 866:9
**client** [4] - 842:7, 882:7, 882:13, 882:19
**Cliff** [26] - 850:23, 856:3, 870:21, 871:10, 871:21, 871:24, 872:9, 875:8, 878:6, 878:8, 878:10, 878:17, 878:20, 910:3, 910:7, 910:10, 910:18, 911:7, 913:6, 913:12, 914:9, 915:18, 915:21, 917:14, 920:23
**Cliff's** [2] - 872:11, 872:12
**close** [2] - 897:25, 933:14
**closely** [1] - 918:25
**college** [1] - 856:22
**colossal** [1] - 854:4
**COLUMBIA** [2] - 830:1, 830:14
**coming** [10] - 858:22, 879:15, 903:7, 904:8, 904:9, 905:15, 907:4, 915:19, 925:1, 927:21
**comment** [2] - 866:5, 891:18
**commenting** [1] - 866:16, 866:17
**comments** [11] - 862:10, 862:11, 863:4, 863:18, 865:7, 866:6, 866:10, 866:12, 891:4, 912:19, 921:23
**commissioned** [1] - 847:12
**committed** [3] - 843:12, 843:17, 843:20
**Committee** [2] - 853:20, 853:23
**communication** [1] - 865:9
**communications** [9] - 849:17, 852:19, 862:2, 865:4, 866:24, 876:19, 880:21, 915:25, 933:9
**comparing** [2] - 927:16, 927:22
**complain** [1] - 894:20
**complete** [6] - 884:2, 884:25, 901:12, 907:21, 909:6, 935:7
**completely** [2] - 863:4, 926:19
**completing** [1] - 907:7
**complex** [1] - 841:9
**comply** [1] - 832:17
**compound** [1] - 899:19
**comprehensive** [3] - 924:19, 927:10, 927:16
**concern** [1] - 923:18
**concerned** [1] - 877:14
**concerning** [1] - 915:21
**concerns** [1] - 848:11
**conclude** [3] - 918:4, 920:3, 920:4
**concluded** [4] - 840:14, 840:15, 848:9, 874:2
**concludes** [2] - 842:17, 926:6
**conclusion** [7] - 841:1, 841:12, 841:13, 843:19, 858:23, 874:5, 890:10
**conclusions** [13] - 846:9, 847:15, 848:1, 848:3, 848:14,

858:7, 858:9, 858:18, 917:22, 918:5, 919:14, 925:21, 927:5
**conference** [1] - 902:6
**confident** [1] - 927:22
**confirm** [1] - 896:11
**confirmation** [1] - 896:13
**conflicting** [5] - 839:24, 840:4, 840:7, 840:9, 843:25
**confusing** [1] - 902:7
**connection** [5] - 841:18, 855:25, 859:17, 859:20, 860:1
**cons** [2] - 835:17, 894:10
**consider** [1] - 922:22
**consist** [1] - 906:1
**consistent** [2] - 864:2, 864:16
**constitutes** [1] - 935:6
**Constitution** [2] - 831:8, 935:14
**consult** [1] - 904:23
**consultant** [2] - 925:11, 925:12
**consultants** [1] - 926:15
**consulting** [4] - 857:16, 864:10, 864:24, 865:1
**contact** [12] - 837:8, 837:12, 850:9, 850:12, 851:9, 861:20, 915:5, 915:6, 915:7, 915:10, 928:21
**contacts** [4] - 851:7, 915:9, 928:17, 929:5
**contained** [1] - 922:13
**contains** [2] - 918:2, 921:23
**contemplating** [1] - 906:19
**contempt** [1] - 889:7
**content** [1] - 879:25
**context** [1] - 859:5
**contrasting** [1] - 927:12
**convenience** [3] - 854:9, 884:2, 908:6
**conversation** [4] - 846:22, 846:24, 855:24, 856:3
**conveyed** [1] - 846:14
**convicted** [2] - 841:3, 841:6
**conviction** [11] - 842:20, 848:12, 848:22, 873:6, 878:2, 879:12, 885:22, 888:21, 919:17, 920:2, 920:5
**convictions** [1] - 926:9
**copied** [2] - 838:14, 844:14
**copies** [2] - 832:14, 836:23
**copy** [18] - 833:24, 836:9, 836:21, 837:13, 837:15, 837:17, 837:19, 838:7, 838:11, 850:2, 894:15, 895:8, 895:9, 895:12, 896:3, 898:22, 899:4, 899:15
**copying** [1] - 917:14
**correct** [32] - 834:22, 834:25, 835:25, 836:16, 837:21, 842:6, 842:9, 844:7, 857:20, 859:14, 861:25, 862:4, 864:1, 865:5, 873:17, 880:23, 881:1, 882:20, 885:7, 885:13, 888:5, 890:15,

897:5, 899:3, 899:4, 912:14, 912:24, 927:6, 929:6, 929:15, 930:9, 930:14
**corrected** [6] - 921:16, 921:25, 922:3, 922:5, 923:21, 924:2
**correction** [4] - 921:19, 923:15, 923:18, 930:5
**corrections** [5] - 853:5, 888:24, 912:19, 921:8, 922:4
**correctly** [12] - 835:7, 835:21, 840:1, 841:6, 845:21, 846:10, 848:23, 853:13, 859:3, 874:5, 894:3, 925:6
**correspond** [1] - 875:22
**correspondence** [3] - 836:20, 850:1, 898:22
**counsel** [4] - 847:23, 885:1, 892:24, 902:17
**counseled** [2] - 844:24, 844:25
**countries** [2] - 874:15, 880:8
**country** [2] - 874:13, 880:6
**couple** [1] - 855:9
**course** [2] - 832:9, 832:17
**COURT** [191] - 830:1, 832:5, 832:18, 833:3, 833:11, 833:14, 833:18, 834:7, 835:10, 835:14, 839:14, 844:4, 844:6, 844:10, 851:4, 851:6, 851:15, 851:18, 852:9, 852:18, 853:1, 853:8, 853:23, 854:6, 854:12, 854:16, 854:19, 854:22, 855:22, 856:9, 857:7, 858:4, 858:11, 858:14, 859:12, 859:15, 860:4, 862:14, 862:16, 862:22, 863:1, 863:12, 863:17, 863:20, 864:5, 864:17, 865:17, 865:22, 866:1, 866:4, 866:12, 866:15, 866:17, 866:25, 867:4, 867:10, 867:17, 867:22, 868:3, 868:5, 868:8, 868:11, 868:16, 868:19, 868:21, 869:11, 869:14, 869:18, 869:20, 869:24, 871:14, 875:15, 876:14, 877:5, 877:19, 878:4, 878:14, 878:24, 879:4, 879:6, 881:17, 882:10, 882:22, 883:4, 883:8, 883:13, 883:24, 884:15, 884:22, 884:24, 886:13, 886:16, 886:20, 887:11, 887:13, 887:17, 888:8, 889:19, 891:1, 891:4, 892:6, 892:13, 892:17, 893:14, 893:20, 894:19, 894:24, 895:15, 896:1, 896:5, 896:18, 896:22, 897:8, 897:10, 897:18, 898:5, 898:9, 899:20, 900:1, 900:8, 900:10, 900:13, 900:25, 901:5, 901:8, 901:18, 901:22, 902:23, 903:16, 903:22, 904:6, 904:11, 904:14, 904:20, 904:24, 905:3, 905:9, 905:22, 905:25, 906:5, 906:12, 906:21, 907:9, 907:13, 907:18, 907:21,

907:24, 908:13, 908:18, 909:23,
910:14, 911:1, 911:19, 911:25,
913:22, 914:6, 915:1, 915:10,
915:20, 916:4, 916:6, 916:15,
916:20, 916:22, 917:1, 917:7,
917:24, 918:1, 918:11, 918:13,
918:16, 918:24, 920:9, 920:15,
922:23, 923:1, 923:4, 927:15,
928:1, 928:11, 930:4, 930:6,
930:9, 930:12, 931:3, 932:5,
932:7, 932:12, 933:19, 934:8,
935:2

**court** [13] - 840:20, 854:23,
863:21, 864:13, 868:20, 877:20,
884:23, 888:20, 898:10, 917:8,
918:2, 919:5, 925:13

**Court** [8] - 831:7, 831:7, 832:12,
900:15, 903:12, 903:17, 932:20,
935:13

**Court's** [1] - 832:25
**courtesy** [1] - 932:19
**Courthouse** [1] - 831:8
**courthouse** [1] - 933:4
**COURTROOM** [6] - 832:2,
834:6, 907:16, 908:15, 912:6,
928:13

**courtroom** [10] - 834:5, 847:21,
886:23, 900:9, 905:6, 906:24,
908:16, 908:17, 933:15, 933:18

**courtrooms** [1] - 889:6
**courts** [1] - 888:18
**covered** [2] - 858:17, 891:25
**coy** [1] - 903:7
**Craig** [46] - 830:6, 832:4,
834:16, 834:24, 835:23, 836:1,
844:13, 844:16, 845:7, 845:9,
845:15, 850:24, 855:10, 855:17,
856:6, 856:13, 866:8, 867:11,
892:11, 893:25, 894:6, 894:14,
894:20, 895:9, 895:12, 895:19,
897:24, 898:13, 898:17, 900:22,
907:17, 913:19, 914:23, 916:1,
920:25, 921:24, 924:14, 928:21,
929:25, 930:13, 930:24, 931:23,
932:1

**Craig's** [15] - 834:19, 846:4,
894:1, 895:20, 895:22, 898:12,
899:8, 899:9, 899:13, 899:14,
914:1, 916:9, 916:11, 928:17,
929:5

**CRC** [2] - 831:7, 935:13
**create** [1] - 891:11
**created** [1] - 873:14
**crime** [9] - 843:13, 843:17,
843:20, 874:17, 880:10, 880:12,
886:7, 887:6, 888:2

**Criminal** [3] - 830:3, 832:3,
907:16

**criminal** [2] - 839:21, 853:25
**crisis** [3] - 860:15, 860:16,

860:25

**critical** [2] - 915:18, 922:2
**criticism** [1] - 879:15
**criticisms** [5] - 873:5, 873:10,
878:1, 879:11, 885:21
**criticizes** [1] - 879:16
**Cross** [2] - 831:15, 831:18
**cross** [29] - 832:7, 852:14,
854:9, 854:12, 854:13, 854:19,
863:8, 863:15, 877:14, 877:16,
878:25, 883:15, 883:16, 883:25,
884:3, 884:19, 897:12, 901:11,
902:9, 902:12, 906:4, 906:18,
907:6, 907:22, 908:10, 909:12,
909:13, 928:1
**CROSS** [2] - 834:10, 928:4
**Cross-Examination** [2] -
831:15, 831:18
**CROSS-EXAMINATION** [2] -
834:10, 928:4
**cross-examination** [7] - 832:7,
854:12, 854:13, 863:8, 878:25,
909:13, 928:1
**cross-examinations** [1] - 902:9
**cross-examine** [6] - 854:9,
877:14, 877:16, 883:16, 906:18,
909:12
**cross-examined** [2] - 883:15,
884:3

**crosses** [1] - 903:8
**CRR** [2] - 831:7, 935:13
**cumbersome** [1] - 906:10
**cures** [1] - 878:8
**current** [1] - 900:23
**custodian** [1] - 900:21

# D

**D.C** [1] - 935:15
**date** [3] - 910:6, 915:19, 928:9
**dated** [1] - 931:25
**Dated** [1] - 935:9
**David** [1] - 928:21
**DAY** [2] - 830:5, 830:8
**days** [2] - 903:9, 931:25
**DC** [5] - 830:6, 830:15, 830:18,
831:3, 831:9
**deal** [2] - 870:22, 910:21
**dealt** [1] - 840:10
**Dear** [1] - 912:17
**December** [15] - 838:2, 917:15,
924:7, 925:13, 928:9, 928:15,
928:20, 928:22, 929:6, 929:13,
929:25, 930:13, 931:17, 931:23,
931:25
**decides** [1] - 909:1
**declare** [1] - 854:6
**declared** [1] - 877:15
**Defence** [1] - 839:12
**Defendant** [2] - 830:7, 830:20

**defendant** [4] - 867:5, 888:18,
908:4, 908:25
**defendant's** [1] - 908:11
**Defendant's** [6] - 875:4, 875:6,
875:13, 877:22, 911:24, 912:3
**defenders** [1] - 849:7
**DEFENSE** [1] - 831:17
**Defense** [27] - 831:21, 831:21,
833:9, 841:23, 843:21, 847:1,
865:11, 865:15, 865:19, 869:17,
869:19, 870:2, 870:24, 871:8,
871:17, 872:5, 872:15, 872:22,
875:6, 885:5, 921:12, 923:16,
923:24, 924:4, 928:6, 929:10,
929:16

**defense** [25] - 831:22, 833:8,
839:5, 847:12, 847:20, 847:21,
860:22, 888:19, 900:15, 900:19,
903:5, 903:14, 903:19, 904:8,
906:16, 907:7, 908:1, 908:8,
909:3, 909:5, 909:8, 909:11,
925:18, 928:3, 929:17
**definitely** [2] - 856:23, 901:18
**delete** [2] - 880:10, 887:2
**deliver** [2] - 834:20, 894:2
**delivered** [2] - 834:24, 894:6
**delivering** [1] - 895:12
**delivery** [6] - 834:23, 895:20,
895:23, 899:8, 899:10, 899:14
**denied** [1] - 925:18
**Department** [1] - 830:17
**deprived** [2] - 848:11, 925:18
**DEPUTY** [5] - 832:2, 834:6,
907:16, 908:15, 912:6, 928:13
**der** [2] - 890:19, 890:23
**describe** [1] - 851:20
**described** [4] - 846:24, 859:20,
879:18, 919:24
**describing** [1] - 927:5
**description** [1] - 925:20
**detention** [1] - 848:5
**determine** [1] - 921:20
**determined** [1] - 869:16
**detour** [1] - 908:22
**DICKMAN** [1] - 935:5
**Dickman** [2] - 831:7, 935:13
**difference** [6] - 835:6, 835:20,
875:24, 889:12, 922:25, 923:1
**different** [7] - 832:19, 839:9,
840:24, 849:3, 852:18, 874:6
**DIRECT** [1] - 910:1
**Direct** [1] - 831:18
**direct** [52] - 833:6, 835:1,
836:15, 837:22, 848:8, 851:2,
851:15, 851:24, 852:4, 852:21,
853:5, 853:7, 853:10, 853:17,
854:25, 857:17, 858:24, 859:19,
861:5, 861:23, 862:18, 862:25,
863:2, 863:5, 863:23, 865:3,
870:17, 872:15, 875:17, 875:21,

876:18, 877:4, 877:6, 877:9, 880:20, 883:17, 897:11, 898:1, 902:11, 902:12, 904:23, 905:18, 905:25, 906:20, 907:5, 907:22, 908:9, 909:11, 915:2, 924:20, 927:11

**directed** [1] - 845:3
**directing** [2] - 899:11, 928:6
**directions** [1] - 838:16
**directly** [6] - 836:1, 844:15, 851:10, 862:17, 892:11, 896:16
**directs** [1] - 901:11
**disappear** [1] - 905:16
**disappearing** [1] - 905:20
**disappears** [1] - 902:21
**disclose** [1] - 883:2
**disclosed** [1] - 882:24
**discuss** [8] - 868:23, 871:25, 900:3, 904:25, 918:8, 918:18, 932:25
**discussed** [16] - 837:8, 850:16, 857:14, 858:9, 868:23, 872:1, 878:13, 879:24, 893:7, 902:5, 908:19, 908:20, 914:20, 918:9, 919:22, 922:2
**discussing** [2] - 912:12, 915:18
**discussion** [13] - 851:5, 862:15, 866:3, 876:15, 876:22, 878:22, 883:9, 890:23, 893:22, 897:9, 916:7, 916:14, 918:10
**discussions** [4] - 893:9, 895:19, 915:21, 931:4
**dispatched** [1] - 917:3
**disputed** [1] - 847:10
**District** [1] - 932:19
**DISTRICT** [4] - 830:1, 830:1, 830:10, 830:14
**doc** [4] - 835:5, 835:19, 878:12, 894:11
**doc.drf** [2] - 835:18, 894:11
**document** [51] - 839:7, 865:6, 865:13, 865:14, 865:21, 866:4, 866:7, 867:1, 867:2, 867:8, 870:16, 870:17, 870:20, 871:1, 871:6, 871:12, 871:19, 871:20, 872:12, 872:22, 873:3, 873:14, 873:19, 874:13, 874:19, 875:11, 877:18, 877:24, 885:7, 885:10, 895:2, 895:4, 910:18, 911:9, 911:12, 911:14, 911:17, 911:21, 911:22, 912:1, 912:9, 912:12, 912:18, 912:22, 913:2, 913:3, 913:4, 914:16, 918:25, 926:11, 929:20
**documents** [10] - 860:8, 860:11, 860:12, 860:13, 860:16, 866:6, 881:11, 900:22, 901:13, 916:16
**done** [12] - 833:23, 836:22, 837:1, 850:3, 871:3, 898:23,

903:24, 904:2, 904:4, 906:8, 907:6, 909:16
**door** [2] - 833:22, 857:3
**down** [4] - 846:5, 877:13, 888:17, 897:21
**draft** [11] - 862:7, 863:3, 875:8, 891:10, 891:11, 891:14, 912:16, 912:22, 913:19, 930:21, 930:25
**draw** [2] - 923:4, 925:9
**due** [2] - 858:19, 888:20
**during** [12] - 832:8, 832:15, 836:15, 848:5, 848:10, 850:9, 851:23, 884:6, 900:2, 902:5, 924:12
**duty** [2] - 844:19, 844:22

**E**

**e-mail** [4] - 844:16, 879:9, 893:24, 912:23
**early** [2] - 855:1, 929:6
**easier** [1] - 866:2
**East** [1] - 830:22
**economy** [2] - 854:2
**edit** [1] - 891:15
**editor** [1] - 921:2
**educate** [1] - 917:25
**efficiency** [1] - 854:2
**efficient** [1] - 909:20
**effort** [1] - 885:7
**efforts** [4] - 896:11, 899:17, 899:22, 899:23
**either** [8] - 869:1, 871:20, 875:10, 886:15, 897:22, 910:16, 911:7, 914:15
**electronic** [14] - 836:8, 836:9, 837:2, 837:5, 838:11, 849:24, 850:5, 894:15, 894:20, 895:8, 895:9, 899:4, 899:15, 933:3
**Email** [8] - 830:16, 830:16, 830:19, 830:24, 830:25, 830:25, 831:4, 831:5
**email** [115] - 834:15, 834:16, 834:19, 834:20, 835:1, 835:11, 835:13, 835:14, 835:23, 838:2, 838:10, 838:13, 838:18, 838:23, 839:8, 839:16, 840:3, 843:22, 843:23, 844:13, 844:15, 845:7, 845:11, 845:15, 846:2, 846:4, 846:23, 850:22, 850:23, 850:24, 853:12, 863:13, 866:6, 866:13, 866:19, 866:22, 867:6, 870:5, 870:7, 870:10, 871:9, 871:10, 871:23, 872:2, 872:19, 872:21, 873:15, 875:7, 875:8, 876:4, 876:8, 878:5, 878:12, 878:20, 879:19, 879:24, 881:22, 893:8, 894:5, 894:25, 896:8, 896:14, 896:24, 897:1, 898:13, 899:11, 910:19, 912:9, 912:10, 912:13,

912:15, 912:25, 913:2, 913:9, 913:11, 913:15, 913:18, 914:1, 914:8, 914:9, 914:11, 914:12, 914:17, 917:13, 917:14, 917:17, 917:20, 918:1, 919:7, 919:10, 919:11, 919:13, 920:21, 920:22, 920:23, 920:24, 922:3, 923:14, 923:19, 923:23, 924:4, 924:6, 924:7, 924:14, 924:24, 927:8, 928:19, 929:2, 929:21, 930:15, 931:9, 932:1, 933:2
**emailed** [3] - 837:13, 910:22, 913:6
**emails** [16] - 833:23, 839:1, 846:1, 861:23, 862:20, 865:18, 870:21, 910:5, 910:11, 910:17, 916:13, 916:14, 916:21, 916:22, 917:6, 931:12
**emarcus@zuckerman.com** [1] - 831:5
**embeds** [1] - 924:8
**emergency** [1] - 902:2
**Emily** [1] - 837:8
**end** [6] - 846:22, 855:10, 865:8, 904:1, 908:25
**ended** [2] - 854:8, 882:4
**engaged** [1] - 864:15
**engagement** [2] - 842:8, 881:7
**engagements** [1] - 864:18
**English** [1] - 924:10
**enjoy** [2] - 932:19, 933:11
**ensure** [1] - 865:2
**enter** [3] - 832:13, 834:5, 908:16
**enters** [1] - 908:16
**entire** [3] - 867:6, 908:1, 932:16
**entirely** [2] - 868:21, 932:13
**entirety** [1] - 903:15
**errors** [3] - 871:5, 915:16, 915:22
**especially** [1] - 833:16
**essence** [2] - 835:6, 835:20
**essentially** [4] - 851:21, 884:1, 909:8, 909:9
**established** [1] - 848:20
**European** [2] - 842:21, 926:9
**evening** [1] - 932:15
**event** [1] - 910:6
**events** [1] - 853:15
**evidence** [34] - 840:18, 840:19, 840:23, 842:19, 843:6, 843:9, 848:21, 866:9, 867:7, 867:11, 869:15, 871:13, 873:20, 874:3, 874:10, 874:23, 874:24, 879:23, 892:22, 908:2, 908:3, 908:11, 908:24, 909:1, 909:16, 916:21, 916:23, 918:11, 918:12, 918:16, 921:21, 926:3, 926:8, 926:24
**evidentiary** [1] - 868:22
**ex** [1] - 925:16

**ex-premier** [1] - 925:16
**exact** [3] - 846:15, 860:6, 914:10
**exactly** [11] - 838:17, 857:25, 870:6, 871:22, 889:16, 892:23, 894:22, 902:19, 911:13, 927:18, 930:20
**Examination** [4] - 831:15, 831:15, 831:18, 831:18
**EXAMINATION** [4] - 834:10, 885:2, 910:1, 928:4
**examination** [18] - 832:7, 836:15, 854:12, 854:13, 854:25, 857:17, 858:24, 859:19, 862:25, 863:8, 863:23, 865:3, 870:17, 878:25, 880:20, 909:11, 909:13, 928:1
**examinations** [2] - 885:24, 902:9
**examine** [8] - 854:9, 877:14, 877:16, 883:16, 905:17, 906:3, 906:18, 909:12
**examined** [3] - 847:21, 883:15, 884:3
**examines** [4] - 878:3, 879:14, 879:17, 885:22
**exceeding** [1] - 862:18
**except** [1] - 867:7
**exchange** [4] - 835:23, 838:23, 843:22, 928:19
**excuse** [2] - 869:4, 904:14
**excused** [1] - 932:8
**executive** [2] - 839:22, 920:18
**exercise** [2] - 852:1, 852:22
**Exhibit** [54] - 831:21, 831:21, 831:22, 834:14, 836:12, 837:22, 838:22, 839:12, 841:23, 843:21, 845:25, 847:1, 849:20, 850:21, 865:11, 865:16, 865:19, 869:17, 869:19, 870:2, 870:24, 871:8, 871:17, 872:5, 872:7, 872:15, 872:22, 875:4, 875:6, 875:13, 877:22, 878:20, 881:9, 885:5, 893:23, 896:24, 898:15, 911:24, 912:3, 917:10, 919:6, 921:12, 922:9, 923:12, 923:16, 923:24, 924:4, 928:6, 928:22, 928:25, 929:10, 929:16, 931:7
**exhibit** [8] - 839:5, 841:24, 865:22, 867:24, 868:11, 869:2, 875:17, 918:11
**EXHIBITS** [1] - 831:20
**exhibits** [3] - 832:8, 832:11, 832:15
**exigency** [1] - 902:24
**existed** [1] - 856:16
**expectation** [1] - 833:1
**explain** [14] - 837:11, 843:2, 851:23, 858:10, 862:24, 870:23, 871:17, 876:8, 877:23, 883:14,

912:8, 922:21, 922:25, 924:6
**explained** [9] - 839:1, 857:17, 858:24, 859:1, 859:19, 860:16, 880:1, 885:6, 908:23
**explaining** [2] - 838:19, 873:15
**explicitly** [1] - 841:7
**express** [1] - 846:7
**expressed** [2] - 845:20, 856:15
**extent** [1] - 883:17
**Ezra** [1] - 831:1

## F

**facilitate** [1] - 832:25
**facilitative** [1] - 832:23
**facing** [1] - 903:4
**fact** [5] - 841:13, 918:3, 923:8, 924:12, 932:22
**facts** [11] - 841:9, 848:19, 857:22, 858:9, 858:18, 858:21, 860:14, 860:25, 861:6, 861:13, 924:12
**factual** [4] - 842:19, 843:6, 843:9, 926:8
**failed** [5] - 848:21, 873:20, 874:2, 874:9, 879:22
**fair** [12] - 844:5, 853:17, 854:13, 859:9, 882:6, 889:24, 911:16, 917:18, 920:7, 922:17, 925:14
**fairly** [6] - 835:13, 853:10, 859:8, 859:10, 864:22, 926:19
**fairness** [1] - 847:11
**falls** [1] - 853:10
**familiar** [2] - 914:10, 924:13
**far** [8] - 877:13, 877:14, 880:16, 905:15, 924:16, 924:19, 927:10, 931:21
**FARA** [8] - 836:14, 845:13, 851:8, 851:11, 852:6, 855:25, 897:21, 898:17
**fashion** [3] - 877:16, 877:17, 887:15
**fast** [1] - 910:21
**favor** [1] - 898:7
**February** [1] - 855:8
**fell** [2] - 847:10, 901:15
**Fernando** [1] - 830:12
**fernando.campoamor** [1] - 830:16
**fernando.campoamor-sanchez@usdoj.gov** [1] - 830:16
**few** [3] - 857:1, 922:2, 925:9
**fifth** [1] - 843:10
**figure** [3] - 833:4, 833:25, 884:20
**filed** [1] - 916:9
**filled** [1] - 889:22
**final** [2] - 889:14, 889:16
**finalize** [1] - 900:20
**findings** [2] - 849:8, 925:12

**fine** [8] - 866:18, 868:14, 868:15, 876:25, 884:11, 916:19, 917:3, 917:6
**finish** [3] - 858:4, 904:23, 917:24
**finished** [3] - 906:18, 909:14, 912:17
**finishing** [1] - 933:23
**firm** [20] - 836:20, 836:23, 839:21, 844:25, 845:14, 845:19, 846:18, 847:18, 848:18, 848:25, 849:10, 850:1, 855:5, 855:7, 855:12, 856:19, 857:1, 859:17, 898:22, 925:16
**first** [26] - 845:4, 847:9, 848:23, 850:24, 855:5, 855:7, 856:4, 864:24, 867:13, 870:8, 872:11, 875:18, 883:12, 886:14, 892:14, 893:24, 903:13, 909:21, 912:8, 913:19, 920:17, 921:17, 921:18, 929:20, 929:22, 931:12
**firsthand** [1] - 861:1
**five** [2] - 852:25, 854:5
**fixed** [3] - 871:6, 876:2, 879:18
**fixes** [2] - 871:20, 878:13
**flagged** [3] - 875:5, 915:14, 917:2
**flagging** [1] - 917:15
**flawed** [4] - 847:7, 917:18, 922:17, 922:20
**flaws** [1] - 925:4
**Flom** [1] - 926:3
**fly** [1] - 906:21
**fo** [1] - 926:16
**focus** [3] - 836:17, 836:19, 842:14
**focused** [2] - 832:6, 884:16, 924:10
**focusing** [2] - 896:24, 898:20
**follow** [2] - 838:14, 846:16
**follow-up** [2] - 838:14, 846:16
**followed** [2] - 865:1, 865:2
**following** [2] - 904:2, 920:24
**FOR** [2] - 830:1, 830:13
**foregoing** [1] - 935:6
**foreign** [1] - 902:22
**form** [2] - 835:18, 894:11
**formally** [1] - 877:15
**format** [2] - 835:4, 894:21
**former** [3] - 847:10, 922:17, 922:20
**Former** [1] - 917:18
**forth** [4] - 838:15, 852:19, 890:5, 891:13
**forthcoming** [1] - 903:21
**forward** [3] - 847:19, 903:25, 934:2
**forwarded** [6] - 835:23, 837:15, 844:13, 866:23, 913:12, 914:2
**forwarding** [8] - 839:17, 845:7,

865:21, 868:6, 870:15, 870:16,
913:19, 919:10
  **foundation** [1] - 891:2
  **Fourth** [1] - 830:14
  **fourth** [1] - 890:10
  **frankly** [3] - 876:25, 883:13,
901:23
  **free** [1] - 869:7
  **Friday** [3] - 901:10, 932:13,
932:14
  **front** [1] - 875:3
  **frozen** [1] - 909:8
  **FTI** [38] - 865:4, 865:6, 865:9,
865:14, 866:24, 870:16, 871:4,
871:19, 872:22, 873:3, 873:14,
873:19, 874:13, 874:19, 875:9,
875:11, 876:19, 876:22, 876:23,
877:6, 877:24, 878:12, 880:14,
885:10, 885:11, 887:5, 887:25,
888:1, 888:3, 890:5, 891:11,
891:19, 891:20, 910:18, 911:13,
911:14, 911:21, 912:11
  **FTI's** [1] - 911:22
  **FTI-produced** [1] - 874:19
  **fulfil** [1] - 844:19
  **full** [4] - 849:6, 870:11, 906:3,
935:7
  **fully** [3] - 902:21, 905:17,
905:19

## G

  **gas** [2] - 860:15, 860:25
  **Gaston** [1] - 830:13
  **gathered** [1] - 891:19
  **gathering** [1] - 924:12
  **gears** [2] - 883:14, 883:15
  **general** [4] - 845:4, 845:14,
856:10, 857:16
  **generally** [2] - 856:15, 859:10
  **generated** [1] - 860:24
  **gentleman** [2] - 901:14, 909:4
  **gentlemen** [1] - 906:7
  **girl** [1] - 901:19
  **given** [10] - 835:6, 835:20,
883:13, 888:18, 891:14, 902:2,
903:1, 910:5, 921:20, 925:17
  **goal** [1] - 900:8
  **going-forward** [1] - 903:25
  **government** [10] - 841:18,
847:12, 849:9, 905:14, 905:23,
908:1, 908:24, 909:12, 909:14,
909:17
  **Government** [16] - 834:14,
836:12, 837:22, 838:22, 845:25,
849:20, 881:9, 893:22, 896:23,
898:15, 917:9, 919:6, 922:9,
928:22, 928:25, 931:6
  **Government's** [1] - 850:21
  **government's** [3] - 908:8,

909:7, 909:18
  **grade** [1] - 882:5
  **great** [2] - 924:20, 927:12
  **Greg** [27] - 835:3, 835:17,
837:13, 837:14, 838:14, 838:15,
838:16, 838:19, 844:17, 855:13,
856:1, 856:3, 856:15, 879:24,
881:23, 893:8, 894:9, 913:2,
913:6, 914:11, 915:18, 915:21,
917:14, 919:18, 920:23, 921:24,
924:7
  **Greg's** [1] - 896:9
  **Gregory** [5] - 830:6, 832:4,
850:23, 907:17, 921:24
  **grist** [1] - 848:17
  **groundless** [4] - 842:17, 843:5,
843:8, 926:6
  **grounds** [1] - 848:22
  **guess** [3] - 841:16, 857:24,
906:2
  **guidance** [1] - 845:9
  **guilt** [5] - 841:8, 843:16, 845:20,
846:8, 915:17
  **guilt/innocence** [1] - 920:1
  **guilty** [7] - 841:3, 841:6, 841:15,
843:17, 848:20, 920:3, 920:4
  **guise** [1] - 863:8
  **Gulland** [1] - 830:13
  **guys** [3] - 913:7, 914:2, 933:14

## H

  **Haley** [2] - 886:24, 912:5
  **half** [2] - 913:10, 913:18
  **hand** [7] - 834:20, 870:2, 894:1,
895:12, 899:14, 906:14, 906:22
  **hand-deliver** [1] - 834:20
  **hand-delivering** [1] - 895:12
  **handed** [1] - 866:7
  **handle** [1] - 832:20
  **handling** [1] - 832:20
  **hands** [1] - 905:21
  **happy** [7] - 832:24, 856:17,
906:17, 907:4, 911:10, 916:5,
916:13
  **hard** [1] - 833:20
  **hardcopy** [5] - 834:21, 834:24,
837:25, 894:2, 894:6
  **hardship** [1] - 901:23
  **HASKELL** [2] - 831:14, 831:17
  **Haskell** [23] - 834:8, 834:12,
852:17, 854:25, 865:21, 865:25,
870:2, 871:7, 872:18, 885:4,
885:6, 890:4, 892:9, 893:24,
898:12, 904:17, 906:19, 907:4,
909:9, 909:22, 909:23, 910:3,
918:22
  **haskell** [1] - 928:6
  **Hawker** [12] - 875:9, 890:13,
892:11, 905:10, 905:14, 905:18,

905:20, 905:24, 907:1, 907:4,
912:10, 912:13
  **Hawker's** [1] - 912:22
  **head** [1] - 908:12
  **heading** [1] - 914:15
  **headline** [7] - 847:6, 917:21,
922:7, 922:13, 922:16, 922:19,
925:3
  **hear** [1] - 859:3
  **hearing** [2] - 862:1, 933:22
  **hearsay** [2] - 910:13, 918:14
  **heart** [2] - 848:22, 901:9
  **HELD** [1] - 830:9
  **help** [6] - 860:13, 864:12, 865:1,
866:8, 913:7, 914:2
  **helping** [1] - 859:23
  **helps** [1] - 865:19
  **hereby** [1] - 935:5
  **hide** [1] - 903:14
  **hiding** [1] - 903:18
  **high** [3] - 840:21, 843:7, 874:24
  **hired** [3] - 857:10, 857:18,
881:7
  **hold** [4] - 868:25, 903:11, 909:8,
923:15
  **home** [5] - 834:21, 849:13,
894:1, 894:2, 910:10
  **Honor** [78] - 832:2, 833:15,
834:6, 835:9, 839:11, 851:1,
851:3, 852:12, 852:16, 854:1,
854:15, 854:21, 856:8, 858:3,
860:2, 862:12, 864:4, 865:15,
866:14, 868:9, 868:18, 869:10,
869:13, 869:25, 871:7, 871:12,
875:12, 876:12, 876:16, 878:23,
879:5, 881:16, 883:7, 883:22,
884:12, 887:22, 889:9, 892:12,
893:13, 893:19, 895:25, 897:14,
898:8, 899:25, 900:12, 902:16,
903:9, 904:10, 904:13, 905:17,
906:11, 907:16, 907:20, 908:15,
909:22, 909:25, 910:13, 910:25,
911:18, 913:21, 914:4, 914:25,
915:13, 916:3, 916:8, 917:23,
918:21, 927:14, 927:24, 928:14,
930:7, 931:2, 932:4, 932:6,
932:11, 934:6, 934:7
  **honorable** [1] - 844:19
  **HONORABLE** [1] - 830:9
  **Honorable** [1] - 844:22
  **hope** [3] - 833:12, 904:4, 933:11
  **hoped** [1] - 869:5, 909:20
  **hoping** [1] - 907:2
  **hot** [1] - 933:12
  **house** [1] - 895:13
  **housekeeping** [1] - 933:19
  **husher** [2] - 868:22, 869:8

## I

**idea** [1] - 903:3
**identification** [4] - 839:5, 865:11, 871:8, 872:4
**identified** [5] - 850:18, 861:3, 875:11, 878:5, 893:11
**identify** [1] - 840:19
**identifying** [2] - 857:24, 890:5
**III** [1] - 830:21
**imagine** [1] - 843:3
**immediately** [1] - 833:1
**impact** [1] - 901:25
**important** [6] - 862:4, 878:14, 886:23, 922:22, 923:5, 932:25
**impression** [1] - 884:13
**IN** [1] - 830:1
**inaccurate** [1] - 920:8
**inappropriately** [1] - 848:11
**included** [2] - 859:23, 872:11
**includes** [1] - 839:8
**including** [1] - 867:7
**incorporate** [1] - 912:20
**incorrect** [1] - 920:16
**independence** [5] - 849:8, 858:2, 858:5, 858:11, 858:16
**independent** [4] - 857:13, 857:18, 857:19, 860:1
**independently** [1] - 873:11
**iNDEX** [1] - 831:13
**indicate** [1] - 832:13
**indicated** [1] - 897:2
**indicating** [1] - 868:5
**indicating)** [2] - 868:1, 872:10
**inferences** [1] - 923:5
**information** [8] - 882:24, 883:3, 883:5, 890:18, 891:15, 891:19, 903:19, 906:25
**initial** [3] - 855:24, 878:4, 897:1
**innocence** [5] - 841:9, 843:16, 845:20, 846:8, 915:17
**innocent** [2] - 841:4, 920:4
**inquire** [1] - 900:14
**inquired** [1] - 900:19
**instead** [1] - 878:6
**instruction** [1] - 868:10
**instructions** [2] - 832:25, 932:24
**intend** [1] - 902:18
**intends** [1] - 905:24
**interactions** [1] - 851:20
**interest** [3] - 832:10, 856:15, 856:23
**interested** [2] - 856:13, 897:15
**international** [3] - 856:21, 856:22, 906:9
**internet** [1] - 933:7, 933:9
**interpret** [1] - 926:20
**interrupt** [1] - 900:20

**interrupted** [2] - 892:14, 901:11
**interrupting** [1] - 908:7
**interview** [2] - 838:8, 860:18
**interviewed** [1] - 859:25
**interviews** [1] - 859:23
**introduce** [2] - 909:1, 909:2
**introduced** [1] - 918:3
**introducing** [1] - 900:22
**invented** [1] - 869:8
**investigation** [3] - 857:13, 859:20, 860:20
**invoke** [1] - 906:6
**involve** [1] - 906:6
**involved** [7] - 832:19, 855:6, 861:1, 863:24, 882:2, 921:5, 921:7
**involvement** [1] - 855:1
**issue** [19] - 832:7, 841:2, 841:13, 848:6, 876:17, 876:21, 876:23, 881:22, 886:1, 887:19, 888:13, 889:10, 895:1, 895:4, 895:5, 900:16, 904:13, 910:21, 916:8
**issued** [4] - 842:4, 873:4, 877:25, 879:10
**issues** [12] - 840:9, 868:23, 871:6, 871:19, 872:1, 874:6, 874:7, 875:9, 893:17, 917:5, 922:5, 934:4
**italicized** [2] - 923:20, 923:22
**italics** [2] - 921:18, 923:16
**Item** [1] - 877:23
**items** [9] - 843:11, 872:17, 872:25, 873:1, 875:5, 875:17, 875:21, 875:22, 876:1
**itself** [3] - 845:19, 851:13, 921:13

## J

**JACKSON** [1] - 830:9
**jailed** [1] - 848:10
**James** [1] - 830:20
**JANICE** [1] - 935:5
**Janice** [2] - 831:7, 935:13
**Jason** [1] - 830:17
**jason.mccullough@usdoj.
gov** [1] - 830:19
**John** [1] - 928:12
**jointly** [1] - 878:11
**joke** [1] - 903:20
**Jonathan** [4] - 875:9, 879:23, 893:7, 912:10
**Journal** [23] - 850:9, 850:13, 851:14, 851:19, 852:5, 852:8, 852:19, 852:20, 852:25, 853:2, 854:11, 854:18, 915:5, 915:12, 915:14, 916:1, 916:23, 917:16, 922:14, 923:18, 924:2, 931:10, 931:16

**journal** [1] - 854:14
**JUDGE** [2] - 830:9, 830:10
**judge** [1] - 860:22
**Judge** [1] - 886:22
**judicial** [2] - 854:1, 854:2
**Judiciary** [2] - 853:20, 853:23
**Junghans** [1] - 831:1
**juror** [1] - 863:8
**jurors** [6] - 834:5, 834:9, 854:3, 900:9, 908:16, 933:18
**JURORS** [5] - 886:12, 886:19, 900:7, 928:10, 928:14
**JURY** [2] - 830:4, 830:8
**jury** [17] - 832:5, 834:2, 858:10, 870:23, 871:17, 883:14, 884:13, 907:24, 908:15, 908:18, 910:8, 912:8, 919:13, 922:21, 923:4, 932:12, 932:17
**Justice** [17] - 830:17, 842:5, 842:7, 849:3, 862:8, 862:17, 863:3, 882:7, 882:13, 882:19, 925:24, 926:2, 926:12, 929:19, 929:24, 930:22, 931:1
**justice** [1] - 859:10
**Justice's** [2] - 850:17, 863:4
**justification** [1] - 848:10

## K

**Katie** [1] - 896:8
**Kedem** [1] - 902:19
**Kedem's** [1] - 902:16
**keep** [3] - 846:6, 893:14, 913:10
**keeping** [4] - 844:20, 844:22, 845:6, 927:20
**keeps** [1] - 877:1
**kept** [1] - 876:23
**key** [6] - 840:9, 841:19, 860:12, 860:13, 860:15, 874:25
**kind** [2] - 897:20, 908:21
**kinds** [1] - 860:11
**Kingdom** [1] - 905:11
**knowing** [1] - 914:23
**knowledge** [4] - 878:16, 880:14, 896:18, 897:23
**known** [1] - 920:19
**knows** [1] - 923:6
**Kyiv** [5] - 924:8, 924:9, 924:22, 927:12, 929:13

## L

**LA** [7] - 849:13, 849:14, 849:15, 851:16, 853:13, 899:4, 899:5
**laid** [2] - 858:18, 891:13
**last** [2] - 841:16, 877:18
**Law** [23] - 850:9, 850:13, 851:14, 851:19, 852:5, 852:8, 852:19, 852:20, 852:25, 853:1, 854:11, 854:17, 915:5, 915:12,

915:14, 916:1, 916:23, 917:15, 922:14, 923:18, 924:2, 931:9, 931:16

**law** [22] - 836:20, 845:14, 847:18, 848:18, 848:20, 848:25, 849:10, 850:1, 857:1, 857:16, 859:2, 859:5, 859:7, 859:17, 864:13, 864:21, 864:24, 864:25, 865:2, 874:14, 880:7, 898:22

**lawmakers** [1] - 847:6

**laws** [1] - 841:10

**lawyer** [3] - 861:18, 862:21, 881:3

**lawyers** [5] - 841:10, 845:1, 848:9, 854:3, 905:12

**lay** [1] - 892:15

**lead** [3] - 854:7, 887:18, 912:11

**leader** [1] - 847:10

**leader's** [3] - 917:18, 922:17, 922:20

**leading** [11] - 877:1, 877:16, 877:17, 878:23, 884:17, 887:10, 887:12, 887:15, 909:12, 911:18, 927:15

**leading-question** [1] - 884:17

**learned** [4] - 858:22, 861:3, 861:4, 881:6

**learning** [1] - 895:22

**least** [3] - 903:3, 911:14, 929:6

**leave** [6] - 870:11, 884:13, 900:2, 900:9, 906:15, 933:18

**leaves** [1] - 905:6

**leaving** [2] - 904:18, 910:10

**led** [4] - 841:22, 856:3, 858:1, 859:21

**leeway** [1] - 887:14

**left** [1] - 901:5

**legal** [5] - 849:8, 873:5, 877:25, 879:11, 885:20

**letter** [16] - 836:14, 836:19, 837:6, 851:11, 852:6, 852:7, 852:12, 852:13, 852:15, 853:4, 853:11, 853:12, 898:16, 898:21, 902:17, 921:2

**letters** [2] - 851:9, 897:22

**letting** [1] - 896:9

**level** [2] - 832:10, 903:22

**liberty** [1] - 848:12

**life** [1] - 902:7

**light** [1] - 860:14

**likely** [4] - 888:19, 888:24, 889:14, 911:8

**limit** [1] - 905:18

**limited** [3] - 853:20, 863:9, 902:10

**limiting** [1] - 868:9

**line** [10] - 853:15, 874:11, 912:16, 917:17, 919:15, 919:20, 922:11, 922:13, 923:12, 923:23

**link** [2] - 919:18, 924:8

**list** [4] - 867:23, 871:19, 903:1, 903:13

**LLP** [2] - 830:22, 831:2

**lodge** [1] - 833:15

**look** [16] - 838:22, 841:23, 843:10, 849:21, 850:20, 867:14, 870:7, 872:15, 877:10, 893:1, 911:24, 912:3, 921:12, 921:17, 925:3, 928:25

**looked** [11] - 834:15, 836:15, 836:18, 839:7, 856:20, 875:23, 875:24, 922:8, 926:11, 928:18, 929:2

**looking** [8] - 859:12, 860:21, 864:24, 867:13, 875:25, 877:22, 886:22, 893:24

**looks** [3] - 890:4, 891:24, 903:5

**loop** [1] - 897:25

**Los** [5] - 837:9, 838:8, 847:3, 899:3, 914:21

**loud** [1] - 886:17

**low** [1] - 860:5

**lucky** [1] - 855:16

## M

**mail** [4] - 844:16, 879:9, 893:24, 912:23

**major** [1] - 856:22

**March** [1] - 855:8

**Marcus** [1] - 831:1

**marked** [4] - 839:4, 865:10, 871:8, 872:4

**matter** [7] - 855:11, 855:19, 855:23, 885:20, 904:15, 912:11, 933:19

**matters** [3] - 842:22, 855:17, 856:23

**McCullough** [92] - 830:17, 831:15, 831:18, 835:9, 835:11, 836:18, 838:23, 839:13, 846:2, 851:1, 853:6, 856:8, 857:6, 858:3, 860:2, 862:12, 864:4, 867:13, 867:20, 868:9, 868:18, 869:17, 869:19, 871:15, 875:14, 876:12, 876:19, 876:22, 878:23, 881:16, 882:21, 883:22, 884:12, 885:3, 885:17, 885:19, 886:4, 886:5, 887:1, 887:22, 887:23, 888:10, 889:13, 890:3, 890:22, 891:17, 892:8, 893:1, 893:4, 893:19, 893:21, 894:17, 895:3, 895:18, 896:2, 896:6, 896:23, 896:25, 897:14, 898:2, 898:8, 898:11, 899:25, 910:13, 910:25, 911:18, 913:21, 914:4, 914:18, 914:25, 916:3, 917:23, 918:14, 918:21, 920:14, 927:14, 928:5, 928:16, 928:25, 929:4, 929:10, 929:12, 929:22, 929:23, 930:2,

930:7, 930:16, 931:8, 931:12, 931:14, 931:19, 932:4

**MD** [1] - 830:23

**Meagher** [1] - 926:3

**mean** [20] - 832:18, 833:1, 844:22, 851:18, 852:12, 852:16, 857:21, 858:2, 858:5, 858:11, 859:5, 861:7, 863:1, 866:19, 867:17, 873:8, 873:23, 873:24, 904:20, 927:15

**meaning** [1] - 843:17

**means** [6] - 835:18, 857:22, 858:10, 859:7, 859:12, 920:4

**meant** [5] - 857:3, 857:4, 857:24, 858:6, 862:24

**mechanism** [2] - 832:12, 906:6

**media** [19] - 832:14, 833:17, 836:22, 836:23, 836:24, 837:1, 839:24, 840:4, 840:7, 843:25, 849:11, 850:3, 850:4, 851:7, 890:5, 898:23, 898:24, 933:3

**meet** [1] - 832:15

**meeting** [2] - 871:24, 911:8

**members** [2] - 908:18, 932:12

**memo** [1] - 916:18

**memorialized** [1] - 872:2

**memorializing** [2] - 878:12, 878:22

**memory** [4] - 839:3, 863:9, 897:6, 924:9

**mentioned** [2] - 865:6, 876:17, 915:16

**merit** [1] - 874:8

**message** [1] - 846:14

**messaging** [6] - 911:16, 912:18, 912:22, 913:3, 913:4, 913:20

**Messaging** [1] - 912:16

**met** [4] - 875:10, 878:11, 882:1, 914:15

**midafternoon** [2] - 884:25, 900:2

**midday** [1] - 903:12

**middle** [5] - 835:1, 848:8, 908:22, 923:14, 925:23

**might** [5] - 832:22, 877:10, 902:9, 904:25, 933:12

**Mikitenko** [3] - 890:19, 890:24, 891:3

**mind** [5] - 916:9, 916:11, 916:22, 928:24, 934:2

**mine** [1] - 878:11

**Ministry** [24] - 842:4, 842:7, 842:11, 849:3, 850:16, 862:8, 862:10, 862:17, 863:3, 882:7, 882:13, 882:15, 882:19, 882:24, 912:21, 925:24, 926:2, 926:10, 926:12, 929:18, 929:24, 930:22, 930:25

**Ministry's** [1] - 842:16

**minute** [1] - 907:13
**minutes** [5] - 852:25, 854:5, 900:5, 900:8, 932:18
**Mischaracterization** [1] - 873:7
**mischaracterization** [16] - 873:8, 873:12, 873:15, 873:22, 873:25, 874:1, 874:18, 874:20, 875:2, 879:19, 880:2, 885:25, 886:9, 889:2, 889:8, 892:10
**mischaracterizations** [12] - 850:15, 876:2, 876:3, 878:5, 885:8, 885:10, 885:11, 885:12, 889:23, 892:1, 893:12, 916:12
**mischaracterize** [1] - 889:22
**mischaracterized** [2] - 841:19, 871:4
**mischaracterizing** [1] - 841:21
**misquote** [3] - 890:14, 890:15, 891:24
**misstatement** [2] - 842:24, 843:1
**misstatements** [1] - 922:3
**misstates** [1] - 835:11
**mistake** [2] - 889:2, 889:3
**mistaken** [1] - 932:13
**misunderstands** [3] - 917:21, 918:5, 919:14
**Molly** [1] - 830:13
**molly.gaston@usdoj.gov** [1] - 830:16
**moment** [2] - 835:2, 868:16
**Monday** [10] - 833:3, 900:17, 903:3, 907:3, 909:17, 932:16, 933:12, 933:17, 933:22, 934:1
**months** [2] - 855:9, 906:11
**morning** [8] - 863:9, 910:4, 913:16, 916:15, 932:16, 932:21, 933:13
**most** [8] - 851:23, 886:23, 924:19, 924:20, 927:10, 927:11, 927:16, 932:24
**motivated** [7] - 842:19, 848:19, 849:1, 919:16, 919:24, 926:4, 926:21
**motivation** [3] - 919:23, 923:21, 926:16
**motivations** [1] - 921:21
**motived** [1] - 926:7
**mouth** [3] - 844:20, 844:23, 845:6
**move** [9] - 839:11, 865:15, 866:9, 866:18, 871:12, 875:12, 896:22, 922:7, 934:2
**MR** [282] - 832:17, 832:24, 833:9, 833:13, 833:15, 834:11, 835:9, 835:11, 835:12, 835:15, 835:16, 839:11, 839:13, 839:15, 841:25, 842:1, 844:5, 844:12, 851:1, 851:3, 851:7, 851:17, 852:6, 852:11, 852:25, 853:3,

853:6, 853:19, 854:1, 854:11, 854:15, 854:17, 854:21, 854:24, 856:5, 856:8, 856:11, 856:12, 857:6, 857:9, 858:3, 858:7, 858:8, 858:13, 858:15, 859:16, 860:2, 860:7, 862:12, 862:19, 862:24, 863:10, 863:16, 863:18, 863:22, 864:4, 864:7, 864:8, 864:20, 865:15, 865:19, 865:24, 866:10, 866:13, 866:16, 866:22, 867:3, 867:6, 867:12, 867:13, 867:16, 867:19, 867:20, 868:1, 868:4, 868:6, 868:9, 868:15, 868:18, 869:10, 869:13, 869:17, 869:19, 869:23, 869:25, 870:1, 870:8, 870:9, 870:11, 870:12, 871:12, 871:15, 871:16, 875:12, 875:14, 875:16, 876:12, 876:16, 877:18, 877:21, 878:19, 878:23, 879:3, 879:8, 881:9, 881:13, 881:16, 881:19, 882:9, 882:11, 882:12, 882:21, 882:23, 883:6, 883:10, 883:22, 884:11, 884:12, 884:21, 885:3, 885:17, 885:19, 886:4, 886:5, 886:11, 886:14, 887:1, 887:10, 887:12, 887:16, 887:21, 887:22, 887:23, 888:10, 889:9, 889:13, 890:3, 890:21, 890:22, 890:25, 891:2, 891:17, 892:5, 892:8, 892:12, 892:14, 893:1, 893:4, 893:13, 893:19, 893:21, 894:16, 894:17, 895:3, 895:14, 895:18, 895:25, 896:2, 896:6, 896:17, 896:23, 896:25, 897:7, 897:14, 897:17, 898:2, 898:3, 898:8, 898:11, 899:18, 899:25, 900:11, 900:14, 901:2, 901:3, 901:6, 901:16, 901:21, 902:16, 903:9, 903:11, 903:17, 904:4, 904:10, 904:12, 904:17, 904:22, 905:2, 905:7, 905:8, 905:10, 905:23, 906:2, 906:11, 906:14, 907:2, 907:11, 907:12, 907:20, 907:23, 908:12, 909:22, 910:2, 910:13, 910:23, 910:25, 911:3, 911:4, 911:18, 911:20, 912:3, 912:7, 913:10, 913:17, 913:21, 913:24, 913:25, 914:4, 914:7, 914:25, 915:4, 915:24, 916:3, 916:5, 916:8, 916:19, 916:21, 916:25, 917:6, 917:9, 917:12, 917:23, 918:12, 918:14, 918:15, 918:21, 919:6, 919:9, 920:11, 920:14, 920:20, 921:11, 921:14, 922:7, 922:12, 922:24, 923:2, 923:10, 923:11, 923:14, 923:22, 923:24, 923:25, 927:8, 927:9, 927:14, 927:24, 928:5, 928:16, 928:25, 929:4, 929:10, 929:12, 929:22, 929:23, 930:1, 930:2, 930:5, 930:7, 930:11,

930:16, 931:2, 931:6, 931:8, 931:12, 931:14, 931:18, 931:19, 932:4, 932:6, 934:6, 934:7
**multiple** [1] - 898:4
**MURPHY** [22] - 852:6, 852:11, 854:1, 854:15, 854:21, 882:9, 901:2, 902:16, 903:9, 904:10, 904:12, 904:17, 904:22, 905:2, 905:7, 905:10, 905:23, 906:2, 906:11, 906:14, 907:11, 931:6
**Murphy** [2] - 830:20, 903:20

## N

**nag** [1] - 932:23
**nailing** [1] - 897:20
**narrow** [1] - 838:20
**narrowly** [1] - 852:13
**National** [22] - 850:9, 850:13, 851:13, 852:5, 852:8, 852:19, 852:20, 852:25, 853:1, 854:11, 854:17, 915:5, 915:11, 915:14, 916:1, 916:23, 917:15, 922:14, 923:18, 924:2, 931:9, 931:16
**nature** [1] - 930:9
**near** [3] - 865:8, 925:10
**need** [22] - 833:2, 852:1, 866:8, 876:1, 876:2, 876:5, 884:10, 886:24, 901:12, 901:25, 903:7, 904:9, 904:14, 904:24, 905:19, 907:14, 913:7, 914:2, 918:7, 919:2, 932:22, 934:3
**needed** [1] - 871:6
**nervous** [1] - 846:19
**neutral** [1] - 879:17
**never** [4] - 843:7, 843:8, 843:18, 876:22
**New** [8] - 851:17, 852:8, 883:22, 914:20, 928:17, 928:22, 929:5, 931:15
**new** [7] - 890:18, 891:7, 891:15, 891:19, 922:19, 923:3
**newly** [1] - 847:18
**next** [30] - 844:11, 847:17, 848:16, 857:8, 866:13, 878:18, 881:18, 888:11, 900:17, 900:24, 901:19, 903:10, 904:1, 904:4, 909:18, 910:9, 911:5, 912:25, 913:2, 913:9, 913:23, 919:7, 920:10, 920:21, 921:3, 922:8, 923:8, 925:15, 926:14
**nine** [1] - 932:18
**non** [1] - 877:17
**non-leading** [1] - 877:17
**none** [1] - 877:4
**nonresponsive** [1] - 876:18
**notebooks** [1] - 900:3
**notes** [3] - 832:21, 877:10, 935:7
**nothing** [2] - 845:12, 866:20

**notwithstanding** [1] - 932:22
**number** [5] - 860:6, 865:3, 869:15, 872:17, 873:2
**Number** [25] - 832:3, 873:1, 873:18, 874:12, 876:8, 879:9, 879:21, 880:5, 886:4, 886:6, 887:2, 888:17, 889:4, 889:18, 890:4, 890:7, 890:17, 891:9, 891:18, 891:23, 893:1, 893:2, 907:17, 924:4
**numbered** [1] - 843:11
**numbers** [1] - 872:16
**NW** [5] - 830:14, 830:18, 831:2, 831:8, 935:14

# O

**oath** [3] - 834:8, 909:10, 909:24
**object** [2] - 867:8, 907:7
**objected** [1] - 869:1
**objecting** [1] - 918:13
**objection** [50] - 835:9, 835:10, 839:13, 851:1, 853:18, 854:14, 856:8, 857:6, 858:3, 860:2, 862:12, 864:5, 867:21, 869:17, 871:14, 871:15, 875:14, 876:12, 878:23, 881:16, 882:21, 887:10, 887:11, 889:9, 889:19, 890:21, 890:25, 892:5, 892:12, 893:13, 894:16, 895:14, 895:25, 896:17, 897:7, 899:18, 910:13, 910:25, 911:18, 913:21, 914:4, 914:25, 916:3, 917:23, 920:14, 927:14, 930:1, 930:10, 931:2, 931:18
**objections** [2] - 884:17, 901:13
**objective** [2] - 864:2, 864:3
**observed** [1] - 889:5
**obvious** [2] - 860:20, 903:22
**occurs** [1] - 904:13
**October** [4] - 836:14, 852:7, 855:7, 898:13
**OF** [4] - 830:1, 830:8, 830:14, 935:2
**offered** [1] - 839:21
**office** [6] - 833:4, 870:22, 871:25, 910:21, 911:6, 914:15
**OFFICE** [1] - 830:13
**offices** [1] - 832:19
**Official** [2] - 831:7, 935:13
**OFFICIAL** [1] - 935:2
**often** [1] - 857:4
**omitted** [1] - 868:14
**once** [3] - 838:16, 919:2, 932:18
**one** [53] - 835:3, 835:17, 839:9, 840:10, 842:22, 843:10, 843:14, 844:4, 844:14, 846:16, 851:19, 853:1, 855:18, 855:19, 856:25, 861:22, 863:24, 870:6, 872:8, 872:10, 874:24, 880:16, 886:14, 888:9, 889:24, 889:25, 892:4,

892:9, 892:10, 892:18, 892:20, 892:22, 892:23, 893:5, 893:7, 894:9, 897:10, 897:18, 897:23, 901:5, 901:15, 902:25, 903:1, 903:3, 907:6, 908:19, 910:18, 912:23, 918:18, 918:19, 925:2, 933:19
**ones** [2] - 850:16, 927:17, 927:18
**ongoing** [1] - 860:19
**open** [15] - 833:3, 835:5, 835:17, 854:8, 854:23, 863:14, 863:21, 868:20, 877:20, 884:23, 894:10, 898:10, 917:8, 919:5, 934:4
**open-ended** [1] - 854:8
**opinion** [5] - 839:21, 845:20, 846:7, 848:6, 885:24
**opponents** [1] - 848:18
**opportunity** [5] - 833:19, 855:14, 856:17, 859:9, 906:3
**opposition** [1] - 840:12
**order** [2] - 832:13, 903:15
**ordinarily** [1] - 907:25
**original** [4] - 856:2, 922:13, 922:16, 923:19
**otherwise** [2] - 844:19, 902:15
**ought** [2] - 883:24, 901:14
**outlets** [4] - 836:22, 836:24, 850:3, 898:23
**outset** [4] - 841:8, 843:18, 845:1, 860:20
**outside** [1] - 863:4
**overruled** [4] - 860:4, 899:20, 920:15, 931:3
**overruling** [1] - 889:20
**overstepped** [1] - 843:12
**overturn** [3] - 842:20, 848:21, 926:9
**own** [7] - 846:9, 872:7, 876:24, 902:10, 907:19, 908:5, 908:6

# P

**p.m** [6] - 837:0, 913:15, 929:25, 933:22, 933:24, 933:25
**packs** [1] - 912:21
**page** [30] - 836:13, 841:23, 846:5, 847:9, 847:17, 848:8, 849:6, 849:21, 850:22, 866:18, 870:8, 870:11, 873:2, 873:19, 874:13, 876:11, 877:24, 879:10, 879:22, 880:6, 890:10, 917:10, 922:10, 925:10, 925:23, 927:8, 929:17, 929:20, 931:13
**pages** [1] - 920:17
**paid** [5] - 849:9, 880:22, 880:25, 881:6, 881:14
**panel** [1] - 908:15
**paper** [1] - 849:13

**paragraph** [18] - 836:17, 842:14, 842:15, 843:10, 847:9, 847:17, 847:25, 848:16, 849:6, 849:21, 849:22, 849:25, 852:13, 852:15, 898:21, 921:17, 921:18
**paraphrase** [1] - 835:13
**parents** [1] - 849:14
**parse** [1] - 852:12
**part** [9] - 839:7, 853:9, 853:16, 860:8, 862:2, 867:10, 902:1, 908:10, 911:15
**particular** [1] - 859:8
**particularly** [3] - 919:15, 919:20, 923:13
**parties** [2] - 832:14, 854:10
**parties'** [1] - 832:10
**partners** [3] - 855:13, 856:20, 857:1
**parts** [1] - 927:1
**party** [2] - 869:1
**past** [1] - 903:6
**Paula** [1] - 831:1
**pause** [2] - 869:9, 869:12
**pay** [1] - 882:5
**paying** [5] - 881:15, 881:20, 881:24, 882:16, 933:14
**payment** [2] - 882:2, 882:3
**PDF** [10] - 835:5, 835:19, 836:6, 851:18, 894:11, 894:23, 895:2, 896:5, 896:7, 928:19
**Pennsylvania** [1] - 830:18
**people** [11] - 859:25, 860:21, 861:1, 861:3, 861:4, 861:8, 861:10, 886:23, 903:7, 910:19, 917:4
**per** [2] - 897:3, 897:4
**perfect** [1] - 877:12
**perfectly** [1] - 887:5
**perhaps** [2] - 900:20, 903:25
**permit** [1] - 902:13
**permitted** [2] - 918:19, 932:25
**person** [9] - 833:5, 861:20, 871:21, 875:10, 911:8, 912:11, 914:16, 918:6, 933:4
**personal** [2] - 878:16, 896:18
**personally** [2] - 915:6, 915:22
**phone** [9] - 838:18, 838:19, 846:13, 871:21, 875:11, 878:11, 911:7, 914:16, 921:2
**piece** [5] - 843:16, 857:5, 919:23, 920:1, 923:20
**pieces** [5] - 874:25, 919:22, 920:6, 920:7
**Pinchuk** [5] - 881:24, 882:1, 882:10, 882:13, 882:16
**pinchuk** [1] - 882:9
**pjunghans@zuckerman.com** [1] - 831:4
**placed** [1] - 889:7
**Plaintiff** [2] - 830:4, 830:12

**plan** [2] - 890:6, 911:13
**planned** [1] - 889:22
**planning** [4] - 869:15, 907:1, 916:16, 933:21
**plans** [2] - 902:18, 902:19
**plenty** [1] - 934:5
**plus** [1] - 851:11
**point** [17] - 838:20, 839:9, 840:10, 842:25, 854:1, 862:7, 877:13, 879:18, 892:15, 894:8, 898:3, 903:6, 904:9, 906:24, 907:8, 918:17, 926:23
**pointed** [3] - 892:10, 922:3, 923:7
**pointing** [2] - 849:14, 875:9
**points** [9] - 841:20, 841:21, 843:14, 880:14, 911:17, 922:1, 922:2, 925:9
**policy** [3] - 845:4, 845:12, 845:14
**political** [14] - 840:14, 848:17, 874:16, 874:22, 880:9, 886:7, 887:6, 888:1, 892:3, 915:17, 919:23, 921:21, 923:21, 926:16
**politically** [11] - 840:18, 840:21, 840:25, 842:18, 848:19, 849:1, 919:16, 919:24, 926:4, 926:7, 926:21
**politician** [9] - 840:12, 874:17, 880:10, 880:12, 880:13, 886:8, 887:7, 888:2
**politicians** [2] - 874:15, 880:7
**politics** [1] - 842:25
**portion** [4] - 878:25, 923:20, 928:2, 928:3
**position** [5] - 841:11, 866:25, 926:16, 926:20, 926:23
**possibly** [1] - 841:20
**Post** [5] - 924:8, 924:9, 924:22, 927:12, 929:13
**posted** [1] - 833:25
**posts** [1] - 933:9
**potentially** [1] - 871:21
**power** [1] - 905:12
**PR** [6] - 851:9, 911:22, 912:2, 912:12, 913:7, 914:2
**practice** [1] - 845:6
**Pratt** [1] - 830:22
**precise** [2] - 838:17, 881:8
**precisely** [1] - 846:15
**predicate** [1] - 915:1
**prefer** [1] - 837:25
**premier** [1] - 925:16
**preparation** [2] - 847:5, 903:23
**prepare** [1] - 888:19
**prepared** [7] - 846:19, 846:20, 865:6, 871:3, 871:4, 903:23, 932:20
**preparing** [1] - 896:8
**present** [4] - 834:6, 851:22,

859:9, 862:5
**presentation** [3] - 908:8, 908:9, 909:16
**presented** [2] - 860:13, 926:24
**presenting** [1] - 858:20
**President** [1] - 847:13
**press** [16] - 832:8, 841:17, 842:2, 842:4, 842:10, 845:3, 845:18, 845:19, 849:4, 850:17, 851:21, 891:11, 926:12, 930:12, 930:18, 930:21
**pretrial** [1] - 902:6
**prevent** [1] - 905:19
**previous** [1] - 846:20
**previously** [6] - 841:25, 847:1, 850:20, 919:23, 921:11, 928:18
**primarily** [1] - 857:12
**primary** [1] - 861:20
**problem** [2] - 904:17, 907:10
**problems** [5] - 900:17, 900:24, 919:16, 920:2, 925:16
**procedure** [1] - 902:24
**procedures** [1] - 906:9
**proceed** [6] - 834:9, 868:17, 869:22, 902:13, 907:10, 907:18
**proceedings** [2] - 925:13, 935:8
**process** [9] - 858:19, 860:19, 873:6, 878:2, 879:12, 885:22, 888:21, 909:6
**produce** [5] - 848:21, 873:20, 874:2, 874:9, 879:23
**produced** [2] - 874:19, 914:17
**profess** [1] - 851:22
**Project** [7] - 863:25, 864:2, 864:3, 864:9, 864:10, 864:16, 864:21
**project** [10] - 855:1, 856:6, 856:14, 856:16, 856:18, 857:11, 860:9, 864:23, 865:8, 873:12
**projects** [1] - 863:24
**prompted** [1] - 894:19
**properly** [1] - 925:19
**proposed** [1] - 871:19
**prosecute** [3] - 864:22, 874:14, 880:6
**prosecuted** [7] - 840:11, 840:17, 840:21, 840:25, 842:25, 874:15, 880:7
**prosecution** [21] - 840:11, 840:14, 842:18, 857:13, 874:17, 874:22, 880:9, 880:12, 886:7, 887:6, 888:1, 888:2, 892:3, 915:17, 921:22, 926:7
**prosecutorial** [1] - 832:19
**prosecutors** [2] - 860:21, 864:10
**PROSPECTIVE** [1] - 900:7
**provide** [2] - 832:11, 832:14, 836:23, 862:10
**provided** [10] - 836:21, 842:19,

843:5, 848:17, 850:1, 862:8, 891:10, 898:22, 926:8, 930:13
**providing** [2] - 859:2, 864:21
**public** [2] - 857:5, 925:12
**public-good** [1] - 857:5
**publication** [6] - 850:8, 914:22, 915:3, 924:10, 924:13, 928:9
**publications** [3] - 851:10, 914:20, 927:13
**publish** [1] - 924:11
**published** [6] - 838:8, 842:16, 847:4, 849:18, 850:14, 931:16
**publisher** [1] - 921:2
**pull** [4] - 881:9, 921:11, 922:8, 929:22
**purpose** [4] - 864:2, 864:3, 864:17, 912:1
**purposes** [5] - 864:15, 864:16, 911:23, 912:2, 933:21
**put** [18] - 840:18, 840:22, 841:18, 863:6, 863:14, 874:23, 877:3, 878:9, 887:14, 897:4, 897:6, 902:11, 908:1, 908:2, 908:3, 908:24, 908:25
**putting** [3] - 854:7, 884:1, 884:10

**Q**

**questioned** [1] - 849:8
**questions** [24] - 845:18, 846:6, 849:11, 851:11, 852:2, 852:24, 854:8, 878:15, 879:1, 880:24, 881:5, 882:16, 883:21, 884:16, 885:15, 887:15, 889:21, 893:16, 897:10, 899:25, 902:21, 909:13, 927:25, 932:4
**quick** [1] - 933:19
**quicker** [1] - 881:12
**quite** [1] - 863:9
**quote** [3] - 877:24, 890:5, 926:5
**quoted** [3] - 919:20, 923:23, 924:24
**quotes** [1] - 848:15, 873:2, 897:4, 897:6, 924:20, 927:11

**R**

**raise** [1] - 900:15
**raised** [6] - 874:7, 880:24, 881:5, 881:22, 882:15, 892:11
**raising** [1] - 848:10
**range** [1] - 860:12
**rather** [4] - 887:24, 890:17, 901:19, 909:5
**re** [1] - 897:20
**re-nailing** [1] - 897:20
**reach** [2] - 846:8, 917:25
**reached** [4] - 841:12, 841:13, 858:18, 896:15

**reaches** [1] - 933:2
**reacted** [1] - 853:3
**reaction** [2] - 870:25, 924:1
**reactions** [2] - 872:7, 872:12
**read** [35] - 835:7, 835:14, 835:21, 836:18, 840:1, 842:14, 844:16, 845:21, 846:8, 846:10, 848:23, 849:22, 870:23, 872:17, 873:1, 874:25, 876:9, 877:23, 879:9, 879:21, 880:11, 886:16, 894:3, 912:15, 914:6, 916:10, 916:18, 919:2, 919:13, 920:17, 920:24, 921:18, 925:6, 925:10, 925:24
**reading** [5] - 874:9, 914:2, 923:20, 925:24, 933:7
**reads** [5] - 847:6, 847:9, 849:25, 890:11, 925:4
**ready** [4] - 833:20, 834:2, 903:8, 910:19
**real** [1] - 902:7
**realize** [3] - 833:19, 868:21, 934:4
**really** [10] - 832:12, 840:21, 846:19, 852:1, 855:14, 857:24, 884:8, 884:16, 885:14, 901:25
**reason** [11] - 845:8, 867:4, 867:14, 889:21, 895:7, 900:25, 902:25, 930:17, 930:19, 931:22, 931:24
**recalling** [2] - 832:3, 907:16
**receive** [3] - 896:9, 902:1, 910:3
**received** [14] - 839:14, 840:3, 862:11, 872:22, 890:19, 891:16, 891:20, 896:3, 896:12, 896:14, 914:13, 930:17, 930:20
**Received** [3] - 831:21, 831:21, 831:22
**receiving** [5] - 863:3, 870:20, 914:1, 914:8, 914:9
**recess** [2] - 853:24, 907:15
**recognized** [1] - 856:25
**recollection** [16] - 838:13, 840:8, 841:16, 848:3, 849:16, 850:14, 851:22, 872:6, 873:9, 878:10, 879:20, 881:22, 888:15, 894:23, 897:17, 921:9
**recommendation** [1] - 876:5
**recommendations** [1] - 872:10
**record** [3] - 873:19, 879:22, 888:20
**recording** [1] - 878:8
**redacted** [2] - 833:17, 894:1
**redactions** [1] - 833:22
**redirect** [12] - 883:12, 883:20, 883:25, 884:5, 884:14, 884:18, 884:25, 887:12, 893:17, 897:11, 897:21, 932:5
**Redirect** [1] - 831:15
**REDIRECT** [1] - 885:2

**redo** [1] - 897:25
**redoing** [1] - 897:20
**refer** [3] - 837:24, 843:14, 895:4
**reference** [1] - 852:7
**referenced** [1] - 849:15
**referencing** [1] - 877:24
**referred** [5] - 842:23, 843:15, 843:23, 845:12, 929:17
**referring** [10] - 842:2, 844:6, 853:12, 861:15, 862:2, 865:13, 893:5, 899:10, 911:12, 921:15
**refers** [1] - 852:15
**reflect** [2] - 850:19, 879:25
**reflected** [2] - 885:7, 916:14
**reflects** [4] - 873:4, 877:25, 879:11, 885:20
**refrain** [1] - 933:8
**refresh** [1] - 872:6
**refreshes** [1] - 849:16
**regular** [3] - 835:5, 835:19, 894:11
**related** [6] - 851:19, 876:22, 880:21, 911:23, 926:23, 931:9
**relations** [1] - 856:22
**relatively** [1] - 897:12
**release** [14] - 841:17, 841:19, 842:2, 842:4, 842:10, 849:4, 850:17, 891:11, 914:24, 926:13, 930:12, 930:18, 932:15
**released** [4] - 842:11, 844:9, 847:18, 927:21
**releases** [2] - 930:21, 930:25
**relevance** [2] - 860:3, 862:12
**rely** [1] - 845:19
**remark** [1] - 877:8
**remember** [14] - 841:17, 841:21, 855:23, 865:7, 870:24, 870:25, 871:22, 877:5, 892:23, 895:1, 897:15, 910:20, 914:1, 914:8
**remind** [3] - 834:7, 909:24, 932:22
**render** [1] - 857:18
**rendered** [1] - 848:6
**rendering** [1] - 858:19
**repeat** [2] - 880:4, 924:23
**repeating** [1] - 918:22
**Report** [13] - 836:21, 840:5, 847:14, 850:2, 859:6, 873:4, 873:16, 874:2, 874:20, 877:25, 879:10, 885:12, 925:4
**report** [108] - 834:21, 836:6, 836:8, 836:10, 836:21, 836:24, 837:13, 837:17, 837:20, 838:7, 838:12, 839:17, 840:10, 840:15, 841:19, 842:11, 842:16, 843:4, 843:11, 844:9, 845:19, 846:8, 847:6, 847:12, 847:18, 848:2, 848:6, 848:17, 849:24, 850:2, 850:15, 850:17, 850:19, 857:12,

857:13, 857:19, 858:10, 859:21, 860:1, 861:13, 862:7, 862:10, 863:3, 871:2, 871:3, 873:11, 873:24, 873:25, 874:7, 874:11, 874:16, 874:21, 874:22, 874:25, 877:7, 879:25, 880:8, 880:10, 881:21, 881:25, 885:8, 886:6, 886:10, 887:3, 888:6, 888:13, 889:14, 889:16, 889:22, 890:11, 890:12, 891:10, 891:14, 891:20, 892:2, 894:2, 894:6, 894:23, 895:8, 895:20, 895:23, 896:12, 897:2, 898:23, 899:8, 899:10, 899:14, 911:15, 911:23, 912:17, 915:15, 916:12, 920:17, 920:18, 924:20, 924:24, 926:3, 926:5, 926:6, 926:13, 926:15, 927:2, 927:5, 927:11, 927:20
**Report's** [3] - 848:1, 848:14, 925:20
**reported** [4] - 836:20, 841:1, 850:1, 898:21
**REPORTER** [1] - 935:2
**Reporter** [3] - 831:7, 831:7, 935:13
**reporting** [4] - 840:16, 841:14, 841:22, 858:1
**reports** [7] - 839:24, 840:4, 840:7, 840:13, 840:16, 841:5, 844:1
**represent** [3] - 867:20, 875:22, 925:19
**representative** [4] - 846:18, 849:10, 849:12, 862:6
**representatives** [1] - 862:8
**request** [9] - 832:11, 832:14, 833:16, 837:3, 837:16, 838:7, 844:18, 897:3, 897:4
**requested** [3] - 836:9, 837:19, 838:12
**requests** [6] - 832:8, 833:7, 836:23, 837:1, 850:3, 898:24
**require** [2] - 864:13, 902:24
**required** [1] - 853:25
**requires** [1] - 901:23
**requiring** [1] - 902:2
**research** [5] - 851:8, 855:25, 856:4, 933:7, 933:9
**reserved** [1] - 867:4
**resident** [1] - 905:11
**respect** [24] - 836:25, 837:1, 837:5, 849:23, 850:5, 851:12, 853:11, 853:13, 858:2, 858:5, 858:9, 858:12, 859:2, 859:6, 859:7, 883:16, 883:20, 887:14, 887:19, 889:19, 897:24, 899:8, 915:11, 928:2
**respond** [6] - 836:4, 844:17, 845:10, 919:10, 919:11, 933:5
**responded** [3] - 838:13, 839:19,

845:15
  **responding** [2] - 845:18, 849:10
  **responds** [1] - 924:14
  **response** [11] - 836:22, 837:1,
837:3, 850:3, 862:16, 889:20,
890:10, 894:9, 898:24, 912:25,
924:18
  **responsibilities** [2] - 833:5,
861:22
  **responsibility** [1] - 832:11
  **rest** [4] - 854:19, 866:18,
884:21, 888:7
  **restrictions** [1] - 918:17
  **result** [2] - 911:2, 915:20
  **resume** [2] - 900:4, 932:20
  **revere** [2] - 888:21, 888:25
  **reverse** [1] - 888:25
  **review** [2] - 912:18, 930:25
  **reviewed** [4] - 847:5, 860:8,
872:21, 921:21
  **reviewing** [2] - 911:10, 930:21
  **revisions** [1] - 912:20
  **rights** [1] - 847:11
  **RMR** [2] - 831:7, 935:13
  **road** [1] - 877:13
  **role** [2] - 859:19, 859:20
  **rollout** [1] - 850:9
  **room** [3] - 904:25, 905:4,
932:17
  **Room** [2] - 831:8, 935:14
  **roughly** [1] - 926:24
  **rule** [12] - 857:16, 859:2, 859:5,
859:7, 864:21, 864:24, 864:25,
865:2, 867:1, 867:2, 906:21,
918:18
  **rule-of-law** [1] - 857:16
  **ruled** [5] - 877:8, 898:7, 916:18,
918:18, 918:20
  **running** [1] - 910:20
  **rushing** [1] - 870:22
  **Russia** [2] - 835:6, 835:20
  **Russian** [1] - 924:11

# S

  **SANCHEZ** [18] - 832:17,
832:24, 876:16, 886:11, 886:14,
900:11, 900:14, 901:3, 901:6,
901:16, 901:21, 903:11, 903:17,
904:4, 905:8, 907:2, 907:12,
934:7
  **Sanchez** [1] - 830:12
  **sanchez@usdoj.gov** [1] -
830:16
  **Sanger** [27] - 834:17, 834:24,
835:2, 836:6, 836:9, 837:2,
837:3, 893:25, 894:7, 894:9,
894:15, 894:20, 895:8, 895:10,
895:20, 895:23, 896:3, 896:11,
896:16, 897:24, 899:8, 899:10,

899:14, 899:15, 928:21, 932:1
  **Sanger's** [2] - 894:9, 895:13
  **saw** [7] - 834:19, 836:12,
861:13, 865:25, 914:12, 920:12,
933:4
  **sayings** [1] - 876:1
  **schedule** [1] - 903:5
  **scope** [15] - 851:2, 851:10,
851:24, 852:3, 853:6, 853:10,
853:17, 862:13, 862:18, 863:4,
866:6, 877:9, 883:11, 902:10,
905:18
  **screen** [1] - 893:2
  **screens** [1] - 886:11
  **scrub** [1] - 833:19
  **second** [20] - 836:13, 836:17,
836:25, 841:23, 845:5, 849:21,
850:22, 857:15, 864:10, 865:1,
872:14, 880:11, 897:1, 898:20,
920:1, 922:10, 929:17, 931:13,
933:24
  **secretary** [1] - 896:9
  **See** [1] - 836:1
  **see** [27] - 838:4, 851:23, 853:4,
864:15, 864:21, 866:12, 866:19,
867:22, 875:18, 877:11, 886:12,
886:14, 886:21, 886:22, 888:22,
892:24, 894:12, 898:25, 901:6,
909:20, 913:18, 919:19, 923:1,
928:10, 930:3, 933:12, 933:17
  **seeing** [3] - 842:10, 864:25,
865:7
  **seem** [1] - 853:21
  **sees** [1] - 833:24
  **select** [1] - 860:18
  **selective** [2] - 840:10, 921:22
  **Senate** [2] - 853:19, 853:23
  **send** [14] - 835:5, 835:19,
836:1, 837:15, 837:17, 875:8,
878:13, 894:11, 894:15, 894:23,
895:2, 899:11, 899:15
  **sending** [8] - 839:20, 875:8,
878:6, 895:1, 895:4, 895:7,
895:9, 897:2
  **sends** [1] - 933:2
  **sense** [3] - 853:21, 884:8,
901:10
  **sent** [32] - 833:16, 836:6, 836:8,
837:2, 837:3, 837:6, 838:2,
838:7, 838:11, 838:14, 838:18,
843:23, 844:15, 849:24, 850:6,
866:20, 871:24, 896:4, 896:7,
898:12, 898:17, 899:4, 903:12,
912:13, 913:4, 913:16, 924:7,
928:19, 929:25, 930:6, 930:12
  **sentence** [11] - 836:25, 837:6,
879:24, 880:1, 880:11, 888:7,
897:1, 919:2, 925:10, 925:15,
926:14
  **September** [7] - 871:10, 872:19,

875:19, 876:22, 910:4, 912:13,
913:6
  **Serhiy** [3] - 861:18, 862:20,
880:21
  **series** [1] - 874:7
  **served** [1] - 906:7
  **serves** [1] - 924:9
  **SESSION** [1] - 832:1
  **set** [5] - 833:24, 863:18, 873:9,
873:10, 890:5
  **severe** [19] - 885:7, 885:11,
885:25, 886:2, 886:9, 889:2,
889:8, 889:22, 889:23, 889:24,
889:25, 891:25, 892:3, 892:4,
892:9, 892:18, 892:21, 893:12
  **severely** [1] - 871:4
  **shall** [1] - 909:20
  **sharing** [1] - 903:19
  **shed** [1] - 860:13
  **shift** [1] - 883:14
  **shifting** [1] - 883:15
  **short** [2] - 846:7, 847:11
  **shortly** [1] - 881:6
  **show** [2] - 839:5, 865:10
  **showed** [2] - 846:2, 853:11
  **showing** [4] - 839:4, 871:7,
872:4, 886:11
  **shown** [4] - 840:22, 852:6,
861:23, 865:9
  **shows** [1] - 843:11
  **shut** [3] - 844:20, 844:23, 845:6
  **side** [3] - 861:15, 862:5, 925:19
  **sides** [6] - 857:23, 861:6, 861:8,
862:2, 862:25, 863:2
  **significant** [2] - 889:12, 891:7
  **similar** [1] - 872:9
  **simple** [2] - 846:7, 846:21
  **simply** [4] - 843:6, 852:20,
853:13, 918:3
  **single** [2] - 852:9, 892:18
  **sit** [2] - 832:21, 868:22
  **situation** [3] - 902:20, 902:23,
905:14
  **six** [2] - 903:4, 903:13
  **Skadden** [44] - 840:5, 843:11,
845:2, 847:14, 848:1, 848:9,
849:9, 849:12, 850:8, 857:10,
857:18, 859:2, 859:6, 860:18,
861:5, 863:24, 864:15, 873:4,
873:16, 874:1, 874:20, 877:2,
877:25, 879:10, 880:22, 880:25,
881:5, 881:6, 881:14, 881:15,
881:20, 885:12, 889:5, 895:24,
900:21, 902:6, 917:19, 921:20,
921:23, 922:18, 922:20, 925:4,
925:20, 926:3
  **Skadden's** [5] - 842:7, 848:14,
882:7, 882:13, 882:19
  **Slate** [1] - 926:3
  **sleeping** [1] - 913:14

**Sloan** [16] - 850:23, 870:13, 878:22, 879:9, 879:19, 910:3, 910:24, 911:2, 913:19, 914:1, 914:13, 914:14, 914:23, 915:25, 917:20, 931:23
**Sloan's** [4] - 872:7, 917:17, 919:10, 919:11
**sloppy** [1] - 871:5
**social** [1] - 933:3
**solves** [1] - 907:9
**someone** [5] - 840:21, 855:13, 905:4, 918:2, 933:2
**someplace** [1] - 833:24
**sometimes** [5] - 862:11, 869:3, 869:5, 886:21, 925:17
**somewhat** [1] - 902:5
**somewhere** [1] - 860:5
**son** [1] - 849:15
**soon** [1] - 864:11
**sorry** [18] - 837:24, 855:3, 858:4, 862:19, 865:24, 866:10, 866:22, 867:6, 872:18, 882:11, 886:13, 892:25, 900:11, 905:8, 912:6, 918:15, 925:15, 928:11
**sort** [17] - 838:17, 838:20, 839:8, 840:9, 855:16, 857:2, 857:16, 860:14, 860:25, 861:13, 864:23, 873:12, 874:24, 876:4, 895:1, 910:20, 933:3
**sound** [1] - 932:23
**SPAEDER** [2] - 830:22, 831:2
**speaking** [2] - 911:7, 930:24
**specific** [2] - 876:4, 886:1
**specifically** [1] - 845:3
**spent** [2] - 862:20, 889:10
**spoken** [2] - 872:9, 875:11
**spontaneous** [1] - 877:8
**spring** [1] - 855:3
**stand** [5] - 906:20, 909:5, 909:10, 918:8, 932:10
**standards** [8] - 842:21, 847:11, 847:23, 858:19, 858:21, 858:22, 925:14, 926:10
**start** [8] - 834:14, 859:18, 864:11, 898:6, 900:19, 903:6, 909:9, 917:10
**started** [3] - 855:7, 856:19, 869:6
**starting** [4] - 872:17, 873:1, 912:8, 932:23
**starts** [4] - 834:19, 886:10, 908:23, 925:23
**state** [4] - 888:1, 916:9, 916:11, 916:22
**statement** [20] - 843:1, 846:20, 850:6, 851:12, 866:8, 867:5, 867:11, 873:14, 874:19, 888:12, 889:23, 899:2, 899:7, 899:16, 899:23, 918:2, 918:4, 923:22, 929:24

**statements** [3] - 918:23, 929:19, 931:1
**states** [3] - 842:19, 898:21, 926:7
**STATES** [2] - 830:1, 830:10
**States** [6] - 830:3, 831:8, 832:4, 836:24, 907:17, 932:19
**stenograph** [1] - 935:7
**step** [3] - 904:24, 905:3, 932:10
**steps** [2] - 859:17, 921:5
**still** [5] - 834:8, 878:24, 902:14, 909:10, 909:24
**stipulation** [1] - 930:8
**stop** [4] - 883:18, 901:9, 907:5, 933:25
**story** [2] - 837:14, 921:1
**straight** [1] - 915:3
**strange** [2] - 894:10, 894:20
**strays** [1] - 883:17
**Street** [3] - 830:14, 830:22, 831:2
**strictly** [1] - 902:10
**strike** [2] - 858:25, 887:24
**string** [11] - 834:15, 834:19, 835:18, 839:2, 839:10, 846:2, 846:23, 850:24, 913:1, 919:8, 920:21
**strings** [1] - 839:9
**struck** [1] - 897:14
**structure** [1] - 882:4
**study** [1] - 925:17
**stuff** [1] - 927:20
**subject** [11] - 852:20, 863:19, 880:19, 904:12, 904:15, 912:16, 917:17, 918:17, 922:11, 922:13, 924:8
**subjective** [1] - 889:10
**subjects** [3] - 863:10, 863:12, 883:10
**subpoena** [7] - 905:12, 905:13, 906:7, 906:9, 906:14, 906:23
**subsequent** [2] - 854:5, 876:21
**sufficient** [2] - 842:20, 926:9
**suggested** [2] - 851:8, 878:7
**suggestion** [1] - 887:2
**Suite** [2] - 830:23, 831:3
**summarize** [1] - 846:23
**summarized** [1] - 871:1
**summary** [3] - 839:22, 911:13, 920:18
**summing** [2] - 893:14, 893:15
**Sunday** [2] - 903:12, 903:25
**support** [3] - 873:20, 874:10, 879:23
**supposed** [1] - 902:1
**surprised** [1] - 911:11
**surrounded** [1] - 837:12
**sustain** [1] - 884:17
**sustained** [5] - 857:7, 896:1,

911:19, 916:4, 922:23
**sweet** [1] - 846:7
**switching** [1] - 914:19
**swoop** [1] - 901:15
**system** [1] - 859:11

**T**

**tabs** [1] - 927:20
**talks** [1] - 851:13
**targeted** [1] - 832:6
**task** [1] - 864:18
**Taylor** [1] - 830:21
**TAYLOR** [3] - 833:9, 833:13, 934:6
**team** [4] - 861:5, 902:3, 909:11, 919:17
**technically** [1] - 878:25
**ten** [4] - 900:5, 900:8, 907:13, 932:18
**ten-minute** [1] - 907:13
**term** [1] - 859:1
**terms** [1] - 891:13
**terribly** [3] - 833:10, 833:11, 933:11
**territory** [1] - 841:8
**testified** [9] - 842:10, 861:5, 866:4, 880:20, 895:7, 898:16, 899:2, 901:14, 929:18
**testifies** [1] - 906:15
**testify** [5] - 853:25, 889:20, 905:16, 907:1, 923:9
**testimony** [14] - 844:3, 851:23, 884:3, 885:8, 892:9, 893:18, 900:20, 900:23, 901:10, 901:20, 902:1, 908:7, 928:2, 931:15
**THE** [227] - 830:1, 830:1, 830:9, 830:13, 832:2, 832:5, 832:18, 833:3, 833:11, 833:14, 833:18, 834:6, 834:7, 835:10, 835:14, 839:14, 844:4, 844:6, 844:8, 844:10, 851:4, 851:6, 851:15, 851:18, 852:9, 852:18, 853:1, 853:8, 853:23, 854:6, 854:12, 854:16, 854:19, 854:22, 855:22, 855:24, 856:9, 857:7, 858:4, 858:11, 858:14, 859:12, 859:14, 859:15, 860:4, 862:14, 862:16, 862:22, 863:1, 863:12, 863:17, 863:20, 864:5, 864:17, 865:17, 865:22, 866:1, 866:4, 866:12, 866:15, 866:17, 866:25, 867:4, 867:10, 867:17, 867:22, 868:3, 868:5, 868:8, 868:11, 868:16, 868:19, 868:21, 869:11, 869:14, 869:18, 869:20, 869:24, 871:14, 875:15, 876:14, 877:5, 877:19, 878:4, 878:10, 878:14, 878:24, 879:4, 879:5, 879:6, 879:7, 881:17, 882:10, 882:22, 883:4,

883:8, 883:13, 883:24, 884:15, 884:22, 884:24, 886:12, 886:13, 886:16, 886:19, 886:20, 887:11, 887:13, 887:17, 888:8, 889:19, 891:1, 891:4, 891:12, 892:6, 892:13, 892:17, 892:22, 893:3, 893:14, 893:20, 894:19, 894:22, 894:24, 894:25, 895:15, 895:16, 896:1, 896:5, 896:18, 896:21, 896:22, 897:8, 897:10, 897:18, 898:5, 898:9, 899:20, 899:22, 900:1, 900:7, 900:8, 900:10, 900:13, 900:25, 901:5, 901:8, 901:18, 901:22, 902:23, 903:16, 903:22, 904:6, 904:11, 904:14, 904:19, 904:20, 904:24, 905:3, 905:9, 905:22, 905:25, 906:5, 906:12, 906:21, 907:9, 907:13, 907:16, 907:18, 907:21, 907:24, 908:13, 908:15, 908:18, 909:23, 909:25, 910:14, 911:1, 911:19, 911:25, 912:2, 912:6, 913:22, 914:6, 915:1, 915:10, 915:13, 915:20, 915:23, 916:4, 916:6, 916:15, 916:20, 916:22, 917:1, 917:7, 917:24, 918:1, 918:11, 918:13, 918:16, 918:24, 920:9, 920:15, 922:23, 923:1, 923:4, 927:15, 927:18, 928:1, 928:10, 928:11, 928:13, 928:14, 930:4, 930:6, 930:9, 930:12, 930:15, 931:3, 931:4, 932:5, 932:7, 932:11, 932:12, 933:19, 934:8

**themselves** [1] - 839:22

**therefore** [1] - 908:6

**thinking** [3] - 878:17, 889:11

**third** [5] - 842:14, 842:15, 850:8, 914:22, 915:2

**thirds** [1] - 846:5

**thorough** [2] - 927:3, 927:5

**thoughts** [2] - 871:24, 924:2

**three** [4] - 851:9, 851:13, 875:22, 931:25

**throughout** [1] - 860:19

**tied** [1] - 918:25

**timing** [2] - 881:8, 891:12

**today** [12] - 842:16, 847:5, 874:9, 896:8, 906:9, 907:3, 909:6, 909:15, 909:17, 910:6, 916:17, 926:11

**together** [3] - 872:1, 889:4, 901:20

**tomorrow** [2] - 912:21, 933:25

**tonight** [2] - 834:21, 894:2

**took** [2] - 855:16, 873:12

**top** [17] - 845:15, 846:23, 847:17, 849:6, 865:20, 866:8, 870:7, 870:8, 875:18, 890:6, 896:24, 913:7, 913:10, 913:18, 914:3, 925:4, 925:10

**topics** [2] - 862:23, 914:19

**total** [2] - 873:25, 875:1

**touch** [2] - 862:6, 914:23

**touched** [1] - 862:17

**TRANSCRIPT** [1] - 830:8

**transcript** [3] - 860:12, 935:6, 935:7

**transmit** [2] - 880:16, 891:5

**transmittal** [1] - 866:19

**transmitted** [2] - 867:9, 880:14

**transmitting** [1] - 866:7

**travel** [2] - 902:18, 902:19

**traveling** [2] - 913:8, 914:3

**treated** [2] - 859:8, 859:10

**TRIAL** [2] - 830:4, 830:8

**trial** [38] - 832:9, 832:15, 840:23, 847:7, 847:10, 848:6, 848:10, 848:19, 849:1, 853:25, 857:16, 857:25, 859:9, 860:12, 860:13, 860:21, 860:22, 860:23, 861:2, 861:8, 862:5, 864:11, 864:24, 865:1, 873:11, 902:2, 903:4, 903:5, 917:18, 919:15, 919:23, 922:17, 922:20, 925:5, 925:14, 932:20, 932:24

**trials** [1] - 908:23

**tried** [4] - 855:15, 861:5, 864:12, 900:15

**troubled** [1] - 920:12

**troubling** [4] - 853:4, 919:15, 919:21, 923:13

**true** [10] - 837:6, 849:25, 850:6, 851:12, 876:17, 897:24, 918:4, 920:19, 935:6, 935:7

**try** [14] - 832:24, 846:6, 846:12, 865:1, 869:4, 877:11, 884:24, 887:17, 892:6, 900:4, 901:6, 909:6, 916:16, 933:6

**trying** [6] - 864:11, 866:9, 869:1, 891:6, 903:13, 917:1

**Trying** [1] - 862:24

**Tuesday** [1] - 900:18

**turn** [2] - 893:22, 931:6

**turning** [8] - 875:3, 898:15, 898:20, 929:10, 929:16, 929:20, 931:12

**twenty** [1] - 860:8

**twice** [2] - 838:16, 919:2

**two** [21] - 839:9, 840:9, 841:20, 846:5, 848:4, 852:2, 861:8, 864:17, 903:4, 914:20, 915:16, 919:22, 920:6, 920:17, 920:19, 922:1, 922:5, 931:12

**two-thirds** [1] - 846:5

**Tymoshenko** [27] - 836:21, 839:22, 840:11, 842:18, 843:12, 847:7, 847:10, 847:19, 848:9, 848:20, 848:21, 849:7, 850:2, 857:14, 857:15, 859:7, 859:8, 861:16, 864:11, 873:20, 874:2,

874:7, 874:9, 879:22, 898:22, 925:4, 925:14

**Tymoshenko's** [7] - 848:5, 862:21, 881:2, 889:5, 921:22, 926:4, 926:6

**type** [1] - 856:24

**typo** [1] - 835:4

## U

**U.S** [8] - 830:13, 830:17, 836:22, 847:18, 849:10, 850:2, 888:18, 898:23

**UK** [1] - 907:5

**Ukraine** [11] - 841:10, 841:18, 842:5, 842:7, 847:6, 847:10, 887:8, 887:24, 912:11, 924:10, 925:23

**Ukraine's** [2] - 925:24, 926:2

**Ukraine-focused** [1] - 924:10

**Ukrainian** [7] - 848:20, 859:10, 864:13, 917:18, 922:17, 922:20, 924:11

**ultimately** [2] - 850:18, 914:17

**unable** [1] - 921:20

**unacceptable** [1] - 889:6

**unaware** [1] - 899:22

**under** [10] - 834:8, 842:20, 847:23, 848:20, 863:7, 906:7, 906:13, 909:10, 909:24, 926:9

**undercutting** [1] - 847:20

**underlying** [2] - 860:14, 860:25

**undermine** [2] - 919:17, 920:2

**undermined** [1] - 920:5

**understood** [6] - 856:20, 882:1, 888:14, 888:16, 898:2, 918:21

**undisturbed** [1] - 897:12

**unfair** [1] - 902:8

**unfortunately** [1] - 900:23

**uninterrupted** [1] - 901:21

**Unit** [5] - 836:14, 851:11, 852:7, 897:22, 898:18

**UNITED** [2] - 830:1, 830:10

**United** [7] - 830:3, 831:8, 832:3, 836:24, 905:11, 907:17, 932:19

**unless** [3] - 845:3, 863:13, 899:10

**unlike** [1] - 907:3

**unlikely** [1] - 888:24

**unpack** [1] - 885:14

**unusual** [1] - 909:19

**unwieldy** [1] - 902:8

**up** [39] - 832:7, 833:24, 837:24, 838:14, 846:16, 855:10, 855:16, 863:15, 870:11, 870:21, 876:23, 877:4, 877:10, 878:7, 881:9, 882:4, 885:5, 885:18, 893:2, 893:14, 893:15, 901:7, 910:6, 910:11, 913:10, 917:9, 918:7, 918:8, 920:24, 921:11, 922:7,

953

922:8, 923:12, 923:15, 928:23, 929:22, 933:20, 933:23, 934:3
**upheld** [1] - 840:20

## V

**values** [1] - 857:4
**van** [2] - 890:19, 890:23
**vary** [1] - 909:3
**version** [8] - 836:8, 837:2, 837:5, 849:24, 850:5, 862:7, 865:24, 890:12
**versions** [2] - 833:16, 833:17
**versus** [1] - 885:24
**via** [2] - 879:24, 893:8
**view** [1] - 864:25
**viewed** [1] - 847:22
**viewing** [2] - 864:23, 879:15
**Viktor** [2] - 847:13, 881:24
**violated** [1] - 925:14
**violating** [1] - 847:11
**violation** [2] - 847:22, 888:21
**Vlasenko** [12] - 861:18, 861:24, 862:3, 862:20, 880:21, 881:2, 881:5, 881:14, 881:20, 882:8, 882:15, 883:3
**vlasenko** [1] - 861:21
**voicemail** [7] - 910:3, 910:7, 910:8, 910:10, 910:17, 910:24, 914:13
**voluntarily** [1] - 905:15
**volunteer** [1] - 877:2
**volunteered** [1] - 876:21
**vs** [1] - 830:5

## W

**wade** [1] - 841:8
**waiting** [3] - 845:9, 869:21, 905:9
**wake** [1] - 910:6
**waking** [1] - 870:21
**walk** [1] - 876:7
**wants** [2] - 883:16, 899:21
**Washington** [6] - 830:6, 830:15, 830:18, 831:3, 831:9, 935:15
**waste** [2] - 852:16, 854:4
**wastes** [1] - 869:4
**website** [1] - 842:17
**Wednesday** [3] - 900:18, 900:21, 901:1
**week** [5] - 900:24, 904:1, 904:2, 904:5
**weekend** [4] - 833:19, 932:16, 933:11, 934:9
**weeks** [2] - 903:4
**weigh** [4] - 848:18, 848:25, 913:8, 914:3
**welcome** [3] - 863:14, 897:25,

907:12
**Western** [4] - 847:11, 847:23, 889:6, 925:14
**whereas** [1] - 879:17
**Whitney** [2] - 896:9, 896:15
**whole** [9] - 853:15, 863:7, 864:23, 866:22, 868:12, 892:25, 897:13, 898:1, 913:10
**wide** [1] - 860:12
**William** [2] - 830:20, 830:21
**willing** [1] - 868:13
**wise** [1] - 845:6
**witness** [39] - 834:3, 851:21, 853:9, 854:4, 854:7, 863:6, 863:7, 866:20, 877:15, 884:2, 884:20, 887:18, 892:15, 900:17, 901:4, 901:7, 901:19, 902:12, 903:1, 903:10, 904:15, 905:6, 905:11, 905:20, 907:6, 907:19, 908:5, 908:6, 908:14, 908:16, 909:4, 909:5, 909:18, 909:21, 918:7, 923:8, 932:8, 932:10
**WITNESS** [23] - 844:8, 855:24, 859:14, 878:10, 879:5, 879:7, 891:12, 892:22, 893:3, 894:22, 894:25, 895:16, 896:21, 899:22, 904:19, 909:25, 912:2, 915:13, 915:23, 927:18, 930:15, 931:4, 932:11
**witness's** [1] - 884:2
**witnesses** [22] - 847:20, 860:18, 861:1, 861:2, 861:9, 861:10, 877:2, 901:11, 901:20, 902:6, 902:9, 903:13, 903:14, 904:1, 904:2, 904:13, 904:25, 906:10, 906:15, 925:19, 932:9
**wmurphy@zuckerman.com** [1] - 830:24
**woke** [1] - 910:11
**won** [1] - 898:5
**wonder** [1] - 917:25
**wondering** [1] - 880:24
**word** [2] - 843:8, 911:14
**wording** [1] - 889:16
**words** [1] - 846:16
**works** [1] - 853:19
**write** [9] - 837:14, 857:12, 857:13, 871:25, 873:10, 875:1, 879:14, 897:1, 917:20
**writes** [2] - 846:5, 893:25
**written** [2] - 871:2, 915:15
**wrote** [8] - 839:19, 847:24, 872:21, 878:7, 902:17, 913:12, 924:24, 927:10
**wtaylor@zuckerman.com** [1] - 830:25

## Y

**Yanukovych** [1] - 847:13

**year** [3] - 844:25, 845:5
**yesterday** [1] - 916:9
**York** [8] - 851:17, 852:8, 883:22, 914:21, 928:17, 928:22, 929:5, 931:16
**yourselves** [2] - 900:4, 933:1
**Yulia** [6] - 842:18, 843:12, 847:10, 857:14, 921:22, 926:6

## Z

**zone** [1] - 930:5
**ZUCKERMAN** [2] - 830:22, 831:2
**Zwaan** [2] - 890:19, 890:23