```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      ) Criminal Action
                                     ) No. 19-CR-125
 4                     Plaintiff,    )
                                     ) JURY TRIAL
 5    vs.                            ) DAY 6 - MORNING
                                     )
 6    Gregory B. Craig,              ) Washington, DC
                                     ) August 19, 2019
 7                     Defendant.    ) Time:  9:30 a.m.
      _____
 8
                  TRANSCRIPT OF JURY TRIAL - MORNING
 9                         HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                UNITED STATES DISTRICT JUDGE
      _____
11
                      A P P E A R A N C E S
12
      For Plaintiff:     Fernando Campoamor-Sanchez
13                       Molly Gulland Gaston
                         U.S. Attorney's Office FOR THE
14                         DISTRICT OF COLUMBIA
                         555 Fourth Street, NW
15                       Washington, DC 20530
                         (202) 252-7698
16                       Email: Fernando.campoamor-sanchez@usdoj.gov
                         Email: Molly.gaston@usdoj.gov
17                       Jason Bradley Adam McCullough
                         U.S. Department of Justice
18                       950 Pennsylvania Avenue, NW
                         Washington, DC 20530
19                       (202) 233-0986
                         Email: Jason.mccullough@usdoj.gov
20
      For Defendant:     William James Murphy
21                       William W. Taylor, III
                         Adam B. Abelson
22                       ZUCKERMAN SPEADER, LLP
                         100 East Pratt Street
23                       Suite 2440
                         Baltimore, MD 21202
24                       (410) 949-1146
                         Email: Wmurphy@zuckerman.com
25                       Email: Wtaylor@zuckerman.com
                         Email: Aabelson@zuckerman.com
```

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

_____

Court Reporter:      Janice E. Dickman, RMR, CRR, CRC
                     Official Court Reporter
                     United States Courthouse, Room 6523
                     333 Constitution Avenue, NW
                     Washington, DC  20001
                     202-354-3267

INDEX

ALLON KEDEM

        Direct Examination by Ms. Gaston............... 992

        Cross-Examination by Mr. Murphy...............1021

        Redirect Examination By Ms. Gaston............1084

*   *   *

```
 1                THE COURTROOM DEPUTY:  Good morning, Your Honor.

 2                THE COURT:  Good morning.

 3                THE COURTROOM DEPUTY:  Your Honor, this morning we

 4    have Case Number 19-125, the United States of America v.

 5    Gregory B. Craig.  Mr. Craig is present in the courtroom.

 6                Will counsel for the parties please approach the

 7    lectern and identify yourself and your colleagues for the

 8    record.

 9                MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.

10                Molly Gaston, Jason McCullough, and

11    Fernando Campoamor for the United States.  And also,

12    Amanda Rohde with us.

13                MR. MURPHY:  Good morning, Your Honor.

14                William Murphy for the defendant, Mr. Craig, and with

15    me is Mr. Taylor, Mr. Abelson, and Ms. Junghans, and Mr.

16    Marcus.

17                THE COURT:  All right.  I have a few preliminary

18    matters of my own before we start.  But, does the government or

19    the defense have anything they want to raise before we bring

20    the jury in?

21                MR. CAMPOAMOR-SANCHEZ:  So, Your Honor, very briefly,

22    we have two witnesses that have difficult schedules.  One

23    witness, who is Mr. Hawker, has been here for a week.  He's

24    coming from the United Kingdom, and he has some pressing

25    matters to attend to.
```

1          And then we have Mr. Kedem, who has, I believe, a

2     second vacation that starts tomorrow.  We're trying to

3     accommodate both.  So what we told the defense last night was,

4     look, we're happy to start with Mr. Kedem because we expect our

5     direct to be short, and then get to Mr. Hawker and, hopefully,

6     finish him today.

7          But our only condition was that they would be limited

8     to what is brought on in our direct examination.  We do not

9     want to turn this into another Mr. Haskell examination; that

10    will take all day.  And I'm not sure that we have agreement yet

11    from the defense as to that.

12         THE COURT:  All right.  Well, I guess the only

13    question is, is this a witness that the defense is seeking to

14    call as a witness in their own case, out of order, as they did

15    with Mr. Haskell?

16         MR. MURPHY:  Your Honor, I don't think I have more

17    than an hour and a half with Mr. Kedem, under any

18    circumstances, whether within the scope or outside the scope.

19    He is a critical witness to various aspects of this matter.

20         With respect to Hawker, Mr. Hawker, we have,

21    probably, substantially more cross-examination than Mr. Kedem.

22    And, so, you know, I'll abide by whatever ruling the Court

23    makes with respect to what I can do.  But, it would not be

24    fair, I think, to Mr. Kedem, who has a vacation that everybody

25    has known about for a couple weeks, since his lawyer notified

1    us about that fact, to have him come back tomorrow, which I

2    don't understand that he would --

3                THE COURT:  I think they're just talking about the

4    order in which they call the witnesses.  So I think they should

5    call Mr. Kedem first.  But, I asked you, I thought, a

6    straight-up question:  Are you planning to ask me, at the close

7    of the government's testimony, assuming that it is focused, and

8    more focused than everything you want to cover, to call him as

9    your own witness, out of order?

10               MR. MURPHY:  I would ask to do that.

11               THE COURT:  All right.  Well, if you're going to do

12   that, then we need to make sure we have time to do that.

13               Mr. Campoamor-Sanchez?

14               MR. MURPHY:  I could do that, Your Honor, when he

15   comes back from vacation, which I understand is August; the

16   28th, I think.

17               MR. CAMPOAMOR-SANCHEZ:  I believe that's right.  If

18   they want to present him on August 28th, that's okay.  We can

19   get just the government's done and finished, and then we can

20   still get Hawker and try to finish him.  What we object to is

21   them trying to put in their case now, today, as they did with

22   Mr. Haskell.

23               THE COURT:  All right.  So, we anticipate that we're

24   still going to be in trial by August 28th, at that -- I mean,

25   the government has 14 witnesses.  Even assuming they are

1    successful in getting them all on this week, the defense is

2    going to have to put on its case.

3           So, if you're satisfied with calling him on the 28th,

4    then we'll get him in and out and out of -- we'll do the

5    government's case, you'll do whatever cross is appropriate.  It

6    may satisfy your needs; it may not.  And then we'll go on to

7    Mr. Hawker.

8           MR. MURPHY:  Yes, Your Honor.  It would be my hope

9    that we could do Mr. Kedem sufficiently today that we don't

10   need to call him back.  But I don't know to what extent the

11   government is going to -- I don't know what their direct

12   testimony with Mr. Kedem is going to be.  I don't know what the

13   scope of direct is going to be.  And I do think he -- you know,

14   he's somebody who was really instrumental in writing this

15   report.  He was at a critical event in the Ukraine that

16   occurred.  So...

17          THE COURT:  I'm not going to stop you asking him

18   anything you want to ask him as part of your case.  But, I do

19   think that we are going to stick by the general rules that the

20   cross is bounded by the scope of the direct, then everybody

21   knows what the rules are.  And if you need to call him, you'll

22   call him; and it sounds like he'll be back, and you'll be able

23   to do that.

24          MR. MURPHY:  Okay.

25          THE COURT:  All right.  Thank you.

1              The government filed a motion to introduce certain

2      out-of-court statements.  It was Docket 96.  It was a carryover

3      from the pretrial conference, and there were some exhibits that

4      I had reserved on.  I realized after I prepared a ruling on all

5      the documents related in Docket 96, that there are still some

6      other documents for which I reserved ruling, and I'm not

7      prepared to rule on all of them this minute.

8              But I can say the following:  I reviewed the cases

9      set forth in the memorandum, and I reviewed the government's

10     opposition, Docket 110, as well.  All of the cases that both

11     sides cited emphasize that the admission of out-of-court

12     statements is a matter that is well within the trial court's

13     discretion.

14             There's also a strain that runs through all the

15     cases, that the exhibits must be not only either not hearsay or

16     covered by hearsay exception, but they have to be relevant.

17             And this is the point of the government's opposition

18     as well:  Their point is, I think, that documents are not

19     admissible under the exception to the hearsay rule for

20     statements of someone's "then existing" state of mind, if the

21     state of mind at the time the statement was made is an issue --

22     in issue in the case.

23             The government pointed me to the *United States v.*

24     *Detrich*, D-E-T-R-I-C-H, 865 F.2d 17, out of the Second Circuit.

25     And that case included an important reminder that the problem

1    with the admission of out-of-court statements and the purpose

2    behind the hearsay rule in the first place is that those

3    statements don't necessarily come with guarantees of

4    trustworthiness, and, most important, they're not subject to

5    cross-examination.

6         So the jury has no opportunity to consider the

7    demeanor and credibility of the declarant when it makes its own

8    determination about how trustworthy or not the statement is.

9    Therefore, the application of the rule is appropriate if the

10   statements are being admitted for the truth of the matter

11   asserted.

12        One area where I thought the government memo was

13   incomplete is, it argued when the state of mind exception, Rule

14   803(3), is inapplicable, but you don't get to the state of mind

15   exception if the statement is not being admitted for the truth

16   of the matter asserted, and is not hearsay under Rule 801(d).

17        So, I've looked at all the statements, first of all,

18   in terms of whether they are hearsay at all, and then whether

19   they are admissible under any exception.  The cases certainly

20   do indicate that in some circumstances, out-of-court statements

21   made to or by defendants may be admissible as bearing on their

22   state of mind, even if they don't testify.

23        But, there is no case that even begins to lay down a

24   blanket per se rule that they must be admitted, as counsel

25   seemed to suggest at the pretrial conference.  When the

1    statements are made, by whom, and whether they actually bear

2    upon the issue for which they're being proffered is subject to

3    an individual case-by-case analysis.

4          The defendant cited the *Kokenis*, K-O-K-E-N-I-S case.

5    In that case, a trial court, in a tax case, excluded expert

6    testimony about a theory of how one might recognize expenses

7    for tax purposes because the defendant hadn't put on any

8    evidence that he relied on that theory.  And the Court of

9    Appeals specifically held that excluding the evidence, in light

10   of his failure to testify about that, was not punishing him for

11   exercising his Fifth Amendment rights.

12         It goes more to the grounds upon which I excluded the

13   expert in this case than the hearsay issue.  But, the case does

14   go on to discuss whether the trial court had erred in refusing

15   to give a good faith instruction.  And at that point, the Court

16   simply noted that out-of-court statements by a defendant could

17   be a source of evidence of good faith.  I'm not quibbling with

18   that.

19         The defense also cited *McCorkle*, which doesn't really

20   bear on the issues here.  In that case, the government

21   introduced statements made by the defendant to IRS agents in a

22   willful failure to file case.  A defendant sought to introduce

23   other statements made during the same interview, and the Court

24   ruled, essentially on completeness grounds, that once the

25   government put the interview into evidence, it couldn't very

1    well object to the rest of it coming in.

2              So, based on all of the authorities, what I need to

3    do is look at each statement individually, and figure out what

4    issues in this case are the statements supposed to eliminate.

5    The statements had been proffered as relevant to the state --

6    defendant's state of mind when he communicated with the FARA

7    Unit.  And, yes, his state of mind, at that point, is an issue,

8    because any false statement has to be knowing and willful;

9    that's an element of the government's case.

10             And defendant also says they're relevant to his state

11   of mind when he was communicating with the journalist, because

12   there is a question about whether he characterized the purpose

13   of those meetings accurately.  That's an issue, to some extent.

14   But the clear focus of the indictment is whether he

15   characterized the timing of those communications accurately,

16   and the hearsay statements don't really go to that.

17             But, with all of that as background, I've looked at

18   each one.  Defense Exhibit 2 was described in the memorandum as

19   an email relaying statements to and from Mr. Craig at the

20   outset of the project, and is -- now I'm quoting from the

21   defendant's memorandum -- it said, "that show his expectations

22   regarding whether the Skadden Report would be released.  As

23   relayed by Cliff Sloan, Mr. Craig was told that" -- and then

24   this is a quote within the defense memorandum -- "if we reached

25   a negative conclusion about the fairness of the trial, it would

1    be up to the client whether to release our report or to keep it

2    confidential."

3              So, the defense is asking to use this exhibit because

4    it shows that Mr. Craig was told that.

5              First problem with this is, the memorandum includes

6    an incomplete rendition of the email, and a, therefore,

7    slightly misleading rendition of the email.  And I don't know

8    why someone would do that in a pleading.  Maybe they thought I

9    would rule based on the quotation alone, without looking at

10   where it came from, but I don't appreciate it.

11             Defense Exhibit 2 was a email from Cliff Sloan to

12   another Skadden partner, describing in that email a call, a

13   call that occurred prior to the formal undertaking of the

14   engagement, and the call was between Mr. Craig, Mr. Sloan, and

15   Doug Schoen.

16             Sloan reports to the other Skadden partner that when

17   Mr. Craig asked Schoen questions to determine whether the firm

18   would have the independence that it needed, Schoen stated that

19   "he assumed if we reached a negative conclusion, it would be up

20   to the client whether to release the report."

21             Mr. Schoen was here, and he was on the witness stand.

22   If it was relevant, the defense had ample opportunity to ask

23   what he knew about the terms of the representation, whether his

24   assumption was based on anything, and what he told Craig,

25   either in that email or that phone call or at any other time,

1    about the terms of the representation.  But admitting the email

2    alone leaves his assumption unexamined.

3          Moreover, there's been testimony from both Schoen and

4    the Skadden lawyers that Schoen simply made the introduction,

5    and that Craig traveled to Kyiv to meet with Pinchuk, meet with

6    the Ministry of Justice, and meet with Paul Manafort to discuss

7    the potential representation and the terms of that

8    representation in person.

9          And, therefore, any speculation conveyed by Shoen in

10   February of 2012 is not relevant to Mr. Craig's actual state of

11   mind, even when he undertook the representation after meeting

12   with the client in person, much less when he was communicating

13   with the FARA Unit a year or more later.

14         So, Defense Exhibit 2 will be excluded.

15         The next document described in the memorandum is

16   Defense Exhibit 165.  That's a September 28th, 2012, email

17   string that begins with Konstantin Kilimnick sending comments

18   on a draft report to Mr. van der Zwaan.  Mr. van der Zwaan

19   agrees to have them translated to English and provide a copy of

20   the English translation to Mr. Manafort.  A subsequent e-mail

21   has Mr. van der Zwaan transmitting the English version to both

22   Mr. Manafort and to Mr. Craig.  The version itself is not

23   attached.

24         Mr. Craig says in response only, "We are done.  Final

25   draft should be delivered ASAP."

1          Mr. van der Zwaan then asks Craig for instructions

2     about what to do with the comments and makes some statements

3     about his efforts to deliver the report.  And there has been

4     testimony about that already by Mr. Loucks, who was available

5     for cross-examination.

6          Mr. Craig's only response to that was, "Work it out

7     with Paul and Rick, I guess."

8          The defendant's memorandum tells me that

9     Mr. van der Zwaan's email and other instances of Mr. Craig

10    being made aware of Ukraine's obvious dissatisfaction with the

11    report as written, and plans to mischaracterize it in a false

12    media rollout, are evidence that he was acting to correct

13    misinformation when he spoke to journalists around the time of

14    the Report's release, just as he told the FARA Unit.

15         But the problem is, the email doesn't really bear on

16    any of that.  Yes, it shows that additional comments were

17    transmitted on September 28th, and Mr. Craig took the position

18    that at that point the report was finished.  But, we have no

19    idea what the comments were, and so the characterization in the

20    memorandum of it reflecting obvious dissatisfaction isn't

21    supported.

22         Also, the document says nothing about what Ukraine

23    did or did not intend to do with the report.  Nor is it

24    contemporaneous with the report or indicative of Mr. Craig's

25    understanding of what the Ukraine's intentions were at the time

1    of the release of the report on December 13, or his

2    communications with journalists immediately before or after its

3    release.  So it's not admissible for that purpose.

4         Without the attachment or testimony by someone with

5    knowledge regarding the nature of the comments, what, if

6    anything, Skadden was being asked to do, they're not -- it's

7    not relevant for any purpose other than the mere fact that more

8    comments were transmitted at that time; Mr. Craig took the

9    position on that date that the report was finished, and that he

10   directed Mr. van der Zwaan to deal with Mr. Manafort.

11        If it turns out those facts are relevant, the

12   document could come in for that purpose alone.

13        The motion identifies Defense Exhibits 177, 183, 186,

14   and 283 in connection with the same assertion that other

15   instances of Mr. Craig being aware -- being made aware of

16   Ukraine's obvious dissatisfaction with the report and plans to

17   mischaracterize it in a false media rollout are evidence that

18   he was acting to correct misinformation when he spoke to

19   journalists.

20        The government questions the relevance and

21   application of any hearsay exception to these documents, since

22   they're not contemporaneous with any time in which his state of

23   mind is in issue.

24        In Defense Exhibit 177, he is responding to an

25   October 4th, 2012, email from Mr. Manafort transmitting

 1    comments, which was not attached to that particular -- to

 2    Document 177.

 3              Is the email from Mr. Manafort transmitting comments

 4    an exhibit?  Does anyone know?

 5              MR. TAYLOR:  I'm sorry?

 6              THE COURT:  Is the email -- Defense Exhibit 177 is a

 7    response to a Paul Manafort email dated October 4.  Is the

 8    Paul Manafort email transmitting comments an exhibit?

 9              MR. TAYLOR:  I believe so.

10              MR. MURPHY:  178, I think.

11              MR. TAYLOR:  October 8.

12              THE COURT:  What's the number?  It's 178?

13              MR. MURPHY:  I think it's 178.

14              THE COURT:  Is that one that I also reserved on or is

15    that one in evidence?

16              MR. MURPHY:  No, it's been admitted, I believe.

17              MR. TAYLOR:  It's in evidence.

18              THE COURT:  All right.  Docket 177 shows Mr. Craig

19    being receptive to some, disputing others, asking for more

20    information about others.  And he tells Mr. Manafort that if

21    the Ukraine wants to say the report is incomplete, they can do

22    so.

23              I felt that the document lacked any meaning without

24    the underlying email.  But, if that's in evidence, it is that

25    email and not Mr. Craig's characterization of it that sheds

 1    light on the defendant's knowledge of what the Ukraine planned

 2    to say at the time of the release, but it's not

 3    contemporaneous.  So, whether this email shows their obvious

 4    dissatisfaction with the report, again, isn't clear without

 5    178.

 6            So, if we have 178, which says what the Ukraine said

 7    as opposed to Mr. Craig's response to what the Ukraine said,

 8    why is it relevant?  Can someone tell me, briefly, why 177 is

 9    relevant?  I have less problem with it knowing that 178 is

10    already in.

11            MR. TAYLOR:  May I approach?

12            THE COURT:  Yes.

13            MR. TAYLOR:  As you've observed, Mr. Craig's

14    knowledge of the intent of Ukraine and of its PR apparatus goes

15    to the heart of why he spoke to the media and, therefore, the

16    truth of what he said to FARA.

17            THE COURT:  I said you said that.  I didn't even note

18    it, one way or the other.  But go ahead.

19            MR. TAYLOR:  I didn't mean to mischaracterize the

20    Court.

21            THE COURT:  All right.

22            MR. TAYLOR:  His exchange with FARA clearly is

23    directed to the reason why he contacted the media.  Because if

24    you'll recall, both his letter of October 10 and Ms. Hunt's

25    response of January 16th refer to the reason why.

1              THE COURT:  Right.  But they're a year later.  I want

2       to know -- I want you to be very focused here, because your

3       memorandum -- your prior arguments and your memorandum have

4       made it very clear to me what your general theory is.

5              MR. TAYLOR:  Correct.

6              THE COURT:  I just want to hear what the relevance

7       is --

8              MR. TAYLOR:  This establishes Mr. Craig's state of

9       mind, as of October the 8th, with regard to the Ukraine's

10      position and whether or not they will take it or not.  And that

11      establishes two things:  One, the truth of Mr. Craig's

12      statement that he did not know what the Ukraine intended to do

13      with it -- remember, he's accused of lying about not knowing

14      what the Ukraine would do with the report.  That is a

15      fundamental assertion in this case.

16             And with respect, Your Honor, to your earlier ruling,

17      anything that establishes his knowledge or even suspicion that

18      the Ukraine might not release the report or that he did not

19      know what it would do with it or that it would make its

20      decision, that establishes the truth of what he said in his

21      letter.  Therefore, it establishes, in his mind -- the

22      bona fide is the good faith of a representation to FARA that he

23      did not know what the FARA -- what Ukraine intended to do with

24      the report.

25             Secondly, you see the -- this particular exhibit,

1  which is in October, just two months before December,

2  demonstrates exactly what we said.

3           THE COURT:  How does it demonstrate what he knew in

4  December?

5           MR. TAYLOR:  Because if -- what you know in October

6  is also what you know in December.

7           THE COURT:  Things can't -- just -- so, you're saying

8  that nothing happened in between?

9           MR. TAYLOR:  I'm saying that it is relevant.  It

10  certainly goes to -- it is admissible, what he knew in October

11  is admissible to prove what he --

12           THE COURT:  What he knew, wouldn't that be -- what

13  could have affected his state of mind would be what

14  Mr. Manafort said in 178; isn't that correct?  So what does 177

15  show?

16           MR. TAYLOR:  The fact that Mr. Craig says it proves

17  that he thought it.  That's -- that's the -- the evidentiary

18  admissibility, you can prove what somebody believes by what

19  they said, and the fact that he says it proves that he thought

20  it.  And the fact that he says it in October and he believed it

21  in --

22           THE COURT:  Says what?  Tell me the exact words.

23           MR. TAYLOR:  Says they can take the position that

24  it's incomplete.

25           THE COURT:  He said if they want to, they can.

```
 1              MR. TAYLOR:  "If they want to."  Well, this is what's
 2    going on, you see, in October of 2012; they're refusing to take
 3    it.  He's being told that unless he makes changes, they're not
 4    going to take it.  And he's saying, they can do whatever they
 5    want to with it, we're not changing it.
 6              But it also tells him --
 7              THE COURT:  Well, he also said, Give me more
 8    information about this and that.  We can attach -- put this in
 9    the appendix.  So, some of it he's saying he won't change, some
10    of it he's still saying he will.
11              MR. TAYLOR:  Your Honor, I'm not saying it's
12    conclusive; I'm saying it's admissible.
13              THE COURT:  All right.  Let me hear from the
14    government why it's irrelevant if 178 is admitted.
15              MS. GASTON:  Your Honor, it's irrelevant -- well,
16    first of all, because it is plainly hearsay.  So the incoming
17    that is in 178, if admitted for the effect that it would have
18    on the defendant, is not hearsay.  But, this is plainly
19    hearsay.  These are the defendant's statements that Mr. Taylor
20    just said they're trying to admit for the truth of the matter
21    asserted.
22              THE COURT:  Well, I'm not sure about that.  To the
23    extent he was characterizing what had been said to him by
24    Mr. Manafort.  It can't come in for what Mr. Manafort said to
25    him.  But, we have -- I wouldn't permit it without the
```

1    underlying email.  But, if you consider them together, then

2    we're talking about his reaction, as opposed to an out-of-court

3    statement for the truth of the matter of what Mr. Manafort said

4    to him.

5         So I'm not sure, at this point --

6         MS. GASTON:  But they're offering what Mr. Craig said

7    for the truth of the matter of what he said.  And as offered by

8    the defense, that is hearsay.

9         In addition, it is irrelevant because it -- this is

10   not about --

11        THE COURT:  Well, they're offering it for the truth

12   of the fact that he said it.  If Ukraine wants to do X, they

13   can do X, isn't -- there's no matter asserted in that.  There's

14   no truth of the matter being asserted by that statement.  It

15   just says, I don't care.

16        MS. GASTON:  I mean, I think that his -- his comment

17   about, you know, we decline to change our assignment, those are

18   factual statements; we will do this, we will not do that.  They

19   are offering that for the truth.  But, it's also irrelevant.

20   This is not about media contacts.  These are comments from

21   Paul Manafort about the content of the report, which is not the

22   topic of this hearing, nor is the comment process back and

23   forth between Ukraine and Mr. Craig.

24        To the extent that he was then -- that he made media

25   contacts, that is relevant.  But, comments from Ukraine on the

 1    report are not relevant.

 2            THE COURT:  Well, I think it goes to the weight of

 3    it.  We have other exhibits that show comments being made on

 4    the report.  Exhibit 178 shows, again, some are being

 5    transmitted.  You can both argue about what Exhibit 177 shows,

 6    that he's receptive to some, he's rejecting others.  And he

 7    says what he says.  And I think whether it's relevant to

 8    anything is more of a matter of argument.  So, if 178 comes in,

 9    they can come in together.

10            Defense Exhibit 183, he's simply asking Mr. Manafort

11    to respond to whether the document can be delivered.

12            Document 186 is Mr. Manafort's detailed response

13    regarding the multiple considerations underlying the decision

14    of when to release.  It doesn't really matter if what he's

15    saying is true.  The fact that he said it can be relevant, but

16    the question is, relevant to what?

17            He goes on and on about the multiple political and

18    other strategic reasons that he thought the timing wasn't

19    right.  So, it seems to me, it has to come in if Defense

20    Exhibit 183 comes in.  But, if so, what fact would it show that

21    the defense is trying to show?  It doesn't seem to show they

22    are so offended by the content of your report, we want to sit

23    on it.  He's talking about a lot of other reasons why the

24    timing might not be right.

25            So, what is its relevance, from your point of view?

1          MR. TAYLOR:  Again, Your Honor, the question is

2     admissibility.  Does it bear on Mr. Craig's understanding of

3     what Ukraine was doing at this point in time?  It shows his

4     understanding and his knowledge, that they tried to deliver

5     this report to the Ukraine and they refused to take it.  It is

6     his statement.  And it is proof, I assure you, that he believed

7     that it was entirely likely that the Ukraine might never

8     release the report.

9          And that, as I said earlier, that's one of the things

10    the government says he was untruthful about.  So this proves

11    the truth.  This proves he --

12         THE COURT:  Well, I think it can come in for the fact

13    that he asked Mr. Manafort what's going on.

14         MR. TAYLOR:  That's all.

15         THE COURT:  But I don't think it comes in for the

16    fact that they actually refused to take it.  He's saying, I

17    hear that we're having problems delivering it.  What's going

18    on?

19         So, for that purpose alone, it comes in.

20         MR. TAYLOR:  May I, Your Honor?

21         THE COURT:  Okay.  Explain 186, though, why you want

22    Mr. Manafort's...

23         MR. TAYLOR:  I think this was a completeness.  It's

24    Manafort's response to him.  We'd happy not to -- we're happy

25    not to have it.  But, what we want is for Mr. Craig to show

1    that Mr. Craig knew, believed that Ukraine was not accepting

2    the report.  This is proof of that.

3              THE COURT:  Well, I think that 186 has to come in if

4    183 comes in.  It makes it complete.  It explains why

5    Mr. Manafort didn't want the report delivered, and he takes

6    responsibility for making the decision.

7              Are you seeking to introduce anything Mr. Manafort

8    says in this email for the truth of something he says or just

9    the fact that he said it?

10             MR. TAYLOR:  I'm not sure I'd introduce anything

11   Mr. Manafort said for the truth of it.  But, no.

12             THE COURT:  All right.  Well, because that bears on

13   other evidentiary rulings.  So, they'll be told that it comes

14   in just for the fact that it was said in response to the

15   question that was asked in 183.

16             MR. TAYLOR:  Yes, Your Honor.

17             THE COURT:  All right.  While you're still standing

18   there, what is the relevance of Defense Exhibit 283, where

19   Mr. Craig is just saying the report was finished in September?

20   Why isn't that being admitted for the truth of something, that

21   he's saying that, we finished it in September?

22             MR. TAYLOR:  It's being admitted to show that

23   Mr. Craig knew the report was completed in September and it was

24   not released, and it wasn't released until December.  Again,

25   all of this amounts to the sum total of what Mr. Craig knew in

1    early December.  And, so, what he knew in September, what he

2    knew in October, they are all admissible to prove that what he

3    knew in December, when he spoke to Sanger.

4              THE COURT:  All right.  You can be seated.

5              What's the government's objection to 283?

6              MS. GASTON:  Your Honor, this is pure hearsay.  They

7    are offering it for the truth of the matter asserted.  We also

8    question its reliability because we have an email, for

9    instance, of the defendant delivering a copy of the report in

10   November and stating that changes have been made.

11             So, this topic, it seems like we are admitting a lot

12   of potential hearsay material to establish a contested fact,

13   and that this could turn into a minitrial about when the report

14   was finalized and delivered.  And I'm concerned about the

15   potential for that to become a substantial distraction and

16   confusion for the jury.

17             THE COURT:  All right.  I think his statement is a

18   fact that is being asserted in an out-of-court statement.  I

19   think 283 is hearsay, and I'm going to exclude it.

20             Defense Exhibit 62.  There was no particular

21   explanation provided in the memorandum.  It's an email from

22   Mr. van der Zwaan to Mr. Craig in June of 2012, very early in

23   the representation, concerning something someone at FTI was up

24   to.  And he says in the email, "We should make it clear to

25   Manafort, as we have already, that we have nothing to do with

1    FTI."

2              So this is relevant to Mr. van der Zwaan's state of

3    mind, but Mr. van der Zwaan's state of mind isn't in issue, and

4    it asserts a fact, We have already made this clear to

5    Mr. Manafort.  And Mr. van der Zwaan is not available for

6    cross-examination concerning what he meant.  There's a response

7    to this by Mr. Craig, who says, "That is why we stayed out of

8    it and insisted that FTI deal directly with Manafort."

9              That is also an assertion of fact about what Skadden

10   did or did not insist upon.  Defense is certainly free to ask

11   Mr. Gates, who was at many of the meetings.  And if Mr. Craig

12   indeed insisted to him and to Mr. Manafort at a meeting that

13   that take place, that would not be hearsay.  It would be

14   admissible for the fact that Mr. Craig said it to the two of

15   them, and it would bear on Mr. Craig's intent, at least at the

16   time he made it, which is considerably before the time that's

17   relevant to the false statements.

18             But, Mr. Craig's statement to Mr. van der Zwaan that

19   he'd said it before is hearsay and not relevant to the time

20   period in issue.  So, the document will be excluded.

21             Defense Exhibit 104.  There was no -- yes, sir.

22             MR. TAYLOR:  Exhibit 62?

23             THE COURT:  He asked if I was referring to exhibit --

24   which one?  And that was 62.  Defense Exhibit 62 is excluded.

25             Defense Exhibit 104, again, there was no explanation

1     provided in the memorandum.  It begins with an August 30th

2     email from Mr. Manafort to a number of people concerning their

3     final steps, including some mention of FTI and the rollout.

4     Mr. Craig then asks the other members of the Skadden team -- he

5     had received the email -- any reaction?

6            Mr. Haskell weighs in.  Mr. van der Zwaan weighs in.

7     Mr. Haskell was called as a witness, not just by the

8     government, but by the defendant.  So the defense has certainly

9     had an opportunity to ask him anything they wanted to ask him

10    about this.  And he conveyed some thoughts, and

11    Mr. van der Zwaan did as well.  And Mr. van der Zwaan proposed

12    giving an early copy to FTI.

13           Mr. Craig responded, "I'm talking directly to Hawker

14    about that issue."

15           Mr. van der Zwaan says, "I went without your

16    permission."

17           Mr. Craig says, "okay."

18           I don't see the hearsay in that, but I also don't

19    understand what's relevant.  And if it is relevant, why wasn't

20    that information elicited from Mr. Haskell when he was here to

21    talk about it?

22           MR. TAYLOR:  Again, Your Honor, every one of these

23    relates to proof of Mr. Craig's knowledge and state of mind.

24    Whether other people are involved in these conversations is

25    interesting, it may even be relevant.  But every one of the

1        things that we're looking at relates to something that was said

2        to him, that goes into his base of knowledge, or something that

3        he said which shows his knowledge and intent.

4                THE COURT:  All right.  So what is the part of this

5        exchange -- Manafort sends an email saying this is a bunch of

6        things that are going to happen, and Mr. Craig asks his team,

7        "Any reaction?"  They have some thoughts, and then Mr. Craig

8        announces he's going to talk directly to Hawker about it.  So

9        that's a statement of future intention.

10               MR. TAYLOR:  It is.

11               THE COURT:  It's not an assertion of fact, so --

12               MR. TAYLOR:  But, it shows a discussion about when

13       Mr. Hawker is going to get a draft of the report.  And you will

14       learn later today that Mr. Hawker already had a draft of the

15       report because it had been leaked to him.  Shows Mr. Craig's

16       misunderstanding of whether Mr. Hawker had the report.  He's

17       saying here, I'm going to talk about giving them access to the

18       report.  What you're going to hear is that Hawker already had

19       it and was pretending that he didn't.

20               And, so, Mr. Craig's --

21               THE COURT:  But why is that important?

22               MR. TAYLOR:  It's important because it shows Hawker

23       is a liar, in Mr. Craig's mind.  It shows what I said

24       explicitly at the start of the case, Mr. Craig's suspicion of

25       Mr. Hawker's honesty and integrity.  It shows that they're

1    discussing -- in the evolution of the development of this

2    report, what you see happen is a souring of relationship

3    between Craig and FTI.

4              THE COURT:  Right.  Well, you're going to be able to

5    cross-examine Mr. Hawker.  He's going to be here, and I know

6    that you're planning to call him as your own witness to explore

7    all those issues.

8              MR. TAYLOR:  We're not calling Mr. Hawker, I don't

9    think so.

10             THE COURT:  I believe that we had a specific

11   conversation on Friday about the fact that given the fact that

12   Mr. Hawker had come here and he hadn't accepted a subpoena,

13   that you wanted me to make sure that he would be here for when

14   you called him.  And Mr. Murphy is nodding his head behind you,

15   told me that you were planning to call him, or you certainly

16   wanted to have the ability to call him while he was still in

17   the building.  And the government did not object to his being

18   called out of order during its case.

19             So, if you choose not to call him, you choose not to

20   call him.  But, right now, I'm operating on the assumption that

21   you were planning to call him.

22             MR. TAYLOR:  I think Mr. Hawker's testimony on direct

23   will be broad, and the scope of the cross, not going to be an

24   issue.

25             THE COURT:  All right.  So --

1          MR. TAYLOR:  But this is -- whether this is --

2    question your ruling on, is whether this is admissible as proof

3    of Mr. Craig's knowledge and state of mind, and it -- and it

4    does prove exactly that.  They can argue about the weight of

5    it, but it goes to what he knew and when he knew it.

6          THE COURT:  So, it's relevant to what?  That as of

7    August 30th he did not know that Hawker had the report?

8          MR. TAYLOR:  Not just that.  It's relevant to when

9    Mr. Craig starts to learn that Hawker and others are unhappy

10   and the Ukraine is unhappy --

11         THE COURT:  None of that is in this email.

12         MR. TAYLOR:  I know that.

13         THE COURT:  Okay.  So what is the relevance of this

14   email?  This is just, Should we give them the report?  I'm

15   going to talk to them about that.

16         So, somebody is lying, we don't know who at this

17   point.  If you're telling me that the -- I don't know the date

18   Mr. Hawker received the report.  I guess I'm going to find out.

19         Just tell me what this email is for.

20         MR. TAYLOR:  It shows that Mr. Craig is engaged in

21   talking to Mr. Hawker about the report in late August, or says

22   he's going to.

23         THE COURT:  Okay.  And it is relevant --

24         MR. TAYLOR:  It's -- it's not going to prove --

25         THE COURT:  All right.  Well, all right.  It shows

1      that Mr. Craig was planning to talk to Mr. Hawker --

2              MR. TAYLOR:  And that there was a topic of

3      conversation among the people who were involved in whether --

4      when, how, and under what circumstances FTI was going to get a

5      copy of the report and what it was going to do with it.  It's

6      part of the fact --

7              THE COURT:  This email does not talk about what it's

8      going to do with it.

9              MR. TAYLOR:  No, it doesn't.

10             THE COURT:  Okay.  Well, that's my problem.

11             MR. TAYLOR:  I know.  But, Your Honor, not every

12     exhibit is a complete story.

13             THE COURT:  Well, I know that.  It's just you said

14     that was the purpose of this exhibit.  What it does say doesn't

15     bother me.  It's not hearsay, and I don't have a problem with

16     Defense Exhibit 104 coming in.

17             Defense Exhibit 111, there's more back and forth

18     between Mr. van der Zwaan and Mr. Craig on the issue.  And in

19     Defense Exhibit 111, Mr. Craig reports on the substance of the

20     conversation which, apparently, he did have with Mr. Hawker.

21     His account of what, in fact, was said in a telephone call is

22     hearsay, it is being offered for the truth of what he said to

23     Mr. Hawker.  And you're welcome to ask Mr. Hawker what happened

24     in that phone call.  But, 111 will be excluded as hearsay.

25             MR. TAYLOR:  If Mr. Craig testifies that he wrote

1    111, is it still excluded?

2           THE COURT:  If Mr. Craig is here to testify about his

3    phone call with Mr. Hawker, he'll testify about his phone call

4    with Mr. Hawker and we may not need the email at all.  But, if

5    he's able to be cross-examined, that's a different story.

6           MR. TAYLOR:  Yes, Your Honor.

7           THE COURT:  Defense Exhibit 317 is the communication

8    with the FARA Unit initiated by the defendant in February 2014,

9    as described by the defendant himself.  The defense says it

10   bears on his -- I'm not going to ask you about this one.

11          It bears on his innocent state of mind in connection

12   with the communications at issue, the latest being October

13   2014 -- '13, four months earlier.  So, it lacks the

14   contemporaneous quality that the defendant's memorandum says is

15   important.  Because of that, the defendant's logic about why

16   it's relevant is strained because the inferences can be drawn

17   either way.

18          But, the biggest problem is that it contains

19   Mr. Craig's own self-serving, factual characterization, not

20   only of what took place in the more recent communications with

21   Ms. Hunt, but his intentions when he met with the press in

22   December 2012.

23          Given the limited relevance and the hearsay included

24   within the document, it will be excluded.

25          There's one additional issue I wanted to touch on.  I

1     guess I don't need to do it with respect to the Skadden witness

2     who's coming to testify today.  The defense, I just want to

3     bring back up that they've asked to delay any consideration of

4     the number of character witnesses until it's time for them to

5     choose what they want to do and who they want to put on, and I

6     thought that was entirely fair.

7              But, it is important that character has to be proved

8     in accordance with a specific set of rules.  Therefore, I don't

9     believe it's appropriate to -- until we've nailed this issue

10    down, to ask open-ended questions to Skadden witnesses and let

11    them expound upon the defendant's character.

12             If the government opens the door in its direct to why

13    the witnesses respected and admired Mr. Craig, then, yes, those

14    witnesses can be cross-examined about it, and I think

15    Mr. Schoen was.  But otherwise, it goes beyond the scope of the

16    direct, and it's not in accordance with the Federal Rules of

17    Evidence to get into everything anyone may have liked about

18    Mr. Craig during the government's case, and trying to use the

19    cross-examination of Skadden witnesses as a substitute for

20    character evidence in accordance with the Federal Rules of

21    Evidence.

22             So, I just think we need to be careful about that and

23    be attuned to that.  I think that evidence has to come in when

24    you put it in in an appropriate manner.

25             With respect to other documents, I reserved on

1    Defense Exhibit 34.  It is hearsay.  They're out-of-court

2    statements by Mr. Craig and Mr. van der Zwaan, and I'm going to

3    exclude it.

4          Document 61, I had some questions about its

5    relevance.  It's a document from June 2012 about getting FTI on

6    board and issues about that and, apparently, some

7    miscommunications or frustrations between Mr. Gates and

8    individuals at FTI.  But, if those issues are relevant,

9    individuals with personal knowledge of the events can testify

10   about them, and that may obviate the need for the exhibit.

11   But, going to have to take that up at that time.

12         Document 133 was an email from Mr. Gates.  It appears

13   to be largely irrelevant to this case.  It was about other

14   issues that he was working on, Mr. Manafort was working on on

15   behalf of the Ukraine with respect to the European Centre.  And

16   there is one sentence about the Skadden Report in there

17   indicating that they were trying to defer the timing of those

18   other efforts until after the Skadden Report had been issued.

19         But, I don't think it really says anything that's

20   relevant to this case.  It was on September 18th, which was

21   before the September 28th email that we have from Mr. Craig

22   where he said, "We are done."  It doesn't really relate to

23   anyone at Skadden's state of mind.  And, so, I think it's

24   irrelevant.

25         And the rest of them, 176, 195, 262, 301, 313, 320,

1     322, 324, and 330 I still haven't ruled on yet.

2               Mr. Murphy?

3               MR. MURPHY:  May I be heard for a moment, Your

4     Honor --

5               THE COURT:  Yes.

6               MR. MURPHY:  -- on Exhibit 317?

7               THE COURT:  Yes.

8               MR. MURPHY:  If Ms. Hunt is on the stand, I'll be

9     permitted to ask her about the conversations she had with

10    Mr. Craig in 2014?

11              THE COURT:  Not if it's not testified about on

12    direct.  If they open the door to further communications after

13    she makes her decision based on his letter, then, obviously, if

14    they open the door, you can ask her about it.  I don't think

15    it's relevant.

16              MR. MURPHY:  Well, Your Honor, as I think I

17    explained, or tried to explain once before, the reason that

18    it's relevant is because Mr. Craig, in conjunction with

19    Mr. Spiegel at Skadden, having just had a meeting with her in

20    the fall receiving her opinion, were concerned enough about a

21    future effort that they might make to reach out to *The New York*

22    *Times*, went back to her to ask, again, whether to reach out to

23    *The New York Times* to make a correction or a suggested

24    correction would implicate FARA in any way.

25              And she told them -- or, actually, she told

1    Mr. Craig, because Mr. Spiegel wasn't available when she called

2    them back -- she told Mr. Craig, No, you can do that.  And the

3    fact that they went through that process and spoke to her again

4    indicates to me a total absence of willfulness or an intent to

5    deceive her in any way.

6         And it's just logical that a person who -- if he had

7    successfully pulled the wool over her eyes, which is what the

8    government alleges, would then, having received the opinion, go

9    back to her and talk about it some more to make sure that

10   they're on solid ground in reaching out to *The New York Times*,

11   again, just a month after they got the opinion from her.  I

12   just think it is highly relevant, and I don't understand the

13   argument that it's not relevant.

14        THE COURT:  Well, I don't think his state of mind a

15   month later, after he has persuaded her of his point of view,

16   is relevant to his state of mind when he was trying to persuade

17   her of his point of view.

18        MR. MURPHY:  It shows that he has an innocent state

19   of mind throughout, Your Honor.  That's what I think it shows.

20   And I think it's a piece of the puzzle in terms of what

21   Mr. Craig's thought process was, and I think it's relevant.

22        THE COURT:  Well, you get to cross-examine her based

23   on the scope of her direct.

24        MR. MURPHY:  I hear you.  But, I think that her

25   reasoning for allowing Mr. Craig not to register and for

1      Skadden not to register is implicit, both when she makes the

2      decision in January, and when she reaffirms it in February.

3      It's the same decision, the same reasoning.  That's why I think

4      it's going to be within the scope of direct.

5              THE COURT:  All right.  Mr. Campoamor can't stand it.

6      He needs to talk.

7              MR. CAMPOAMOR-SANCHEZ:  We're not going to open the

8      door.  We're not going to be asking about any communications

9      that happened after she had made her decision.  That's number

10     one.

11              Number two, it is completely irrelevant, as the Court

12     has already found, even though Mr. Murphy has asked three times

13     for reconsideration, because it shows not -- it shows nothing

14     about his state of mind when he was trying to convince her.

15     And the document itself is completely self-serving, and it is

16     hearsay.

17              So, I completely disagree with what he said.  We're

18     not going to open the door, and we will object if there's any

19     attempt to ask her about that or to introduce that document.

20              MR. MURPHY:  And, so, Your Honor --

21              THE COURT:  Well, the document's been excluded.

22     That's clear.  This document not only discusses their

23     conversation and reports on it, but it reiterates -- it makes

24     assertions about the original communications with the press.

25     So, the document is out.

1          MR. MURPHY:  I understand, Your Honor.  But, if

2     Ms. Hunt has a different version of what occurred during that

3     conversation, she'll be on the stand, she can explain it.  I

4     don't think she will.

5          THE COURT:  Mr. Campoamor, you can sit down.

6          MR. MURPHY:  And, Your Honor, if this document is

7     irrelevant because it's at a different point in time, then why

8     has the government attempted to put in the 2017 statements that

9     Mr. Craig made, three years later, to the Special Counsel's

10    Office?  Isn't that equally irrelevant under that theory?

11         THE COURT:  Whether she gets cross-examined about

12    this -- which is different than the admissibility of the

13    document -- is going to turn on the direct.  If you want to

14    call her as a witness to talk about what happened later, that's

15    a different issue.  But, the document has been excluded.

16    That's all I've ruled on this morning.

17         MR. MURPHY:  Okay.  Thank you, Your Honor.

18         THE COURT:  And I do think that all the cases that

19    you've given me about statements by the defendant and the fact

20    that they bear on someone's intent, you use the word

21    "contemporaneous" three or four times in your memorandum,

22    emphasizing to me the importance of a closeness in time between

23    the statement being introduced in evidence and the time at

24    which the state of mind is relevant.  And that's a significant

25    problem with this evidence.

```
 1              All right.  Let's bring the jury in.

 2              (Whereupon the jury enters the courtroom.)

 3              THE COURT:  All right.  Good morning.  I note that

 4      all the jurors are present, and I very much appreciate that.  I

 5      just want to have you all assure me that over the weekend, you

 6      paid attention to the fabulous weather and the many Nats home

 7      runs and no one read or heard or discussed this case with

 8      anyone.

 9              People are nodding and looking at me, so, I'm going

10      to assume that you're all answering that question yes.

11              Also, I note that you all were here on time, and I

12      believe that you all at least saw me knock on this door an hour

13      ago.  And I do want to assure you that we were not in here

14      watching Oprah and eating bonbons.  We have been ruling on

15      evidentiary matters.  And the point of that lengthy discussion

16      was to interrupt the presentation less frequently, because now

17      there's some clarity about those issues.

18              So I apologize for the fact that you were cooling

19      your heels in the jury room.  Sometimes this happens.  But,

20      hopefully, you were in there with whatever breakfast has been

21      provided as well.

22              All right.  The government can call its next

23      witness.

24              MS. GASTON:  Thank you, Your Honor.

25              The government calls Allon Kedem.
```

1                          ALLON KEDEM,

2     was called as a witness and, having been first duly sworn, was

3     examined and testified as follows:

4                        DIRECT EXAMINATION

5     BY MS. GASTON:

6     Q.  Good morning, sir.

7     A.  Good morning.

8     Q.  Can you please introduce yourself to the jury and spell

9     your name for the court reporter.

10    A.  My name is Allon Kedem, A-L-L-O-N.  Last name is K-E-D-E-M.

11    Q.  And, Mr. Kedem, are you employed?

12    A.  I was recently employed at the Department of Justice, and

13    I'll soon be starting at a firm in private practice.

14    Q.  And before you worked at the Department of Justice, where

15    did you work?

16    A.  Do you want starting right before or --

17    Q.  Right before and working backward.

18    A.  So, right before working at the Department of Justice, I

19    was an associate at Skadden, a law firm in D.C.

20             Before that, I clerked for Justice Kagan at the U.S.

21    Supreme Court; before that, Justice Kennedy at the Supreme

22    Court; before that, I was an attorney advisor at the Office of

23    Legal Counsel at the Department of Justice; and before that, I

24    was a clerk for the Second Circuit, for Judge Leval; and before

25    that, for the District of Connecticut, for Judge Kravitz.

1   Q.  And what was the time period that you worked at Skadden?

2   A.  I started in the fall of 2011, and I continued until the

3   summer of 2014.

4   Q.  And which office were you in?

5   A.  The D.C. office.

6   Q.  Did you work on the Skadden Tymoshenko Report when you were

7   at Skadden?

8   A.  Yes.

9   Q.  And how did you first learn about that project?

10  A.  One of the partners in the D.C. office -- I think it was

11  either Greg Craig or Cliff Sloan -- came to me and mentioned

12  that there was a potential matter that Skadden might work on

13  relating to the government of Ukraine's prosecution of their

14  former prime minister.  And that Skadden would be potentially

15  working on an independent report, evaluating what had happened

16  and sort of judging whether it comported with western standards

17  of due process.

18  Q.  And so what was the goal of the project, as you understood

19  it?

20  A.  The goal of the project was to look at evidence, to talk to

21  people, to gather documents, and come to an independent

22  assessment of whether what had happened, in terms of her

23  prosecution by the government of Ukraine, was consistent with

24  due process, and whether they had given her the procedural

25  safeguards that they should have.

1    Q.  And due process according to western standards of justice?

2    A.  That's right.

3    Q.  Okay.  And who did you understand the client to be for the

4    project?

5    A.  Something like the government of Ukraine, or some part of

6    it.

7    Q.  So either the government at large or a portion of the

8    government?

9    A.  That's right.

10   Q.  Okay.  And who else at Skadden worked on the project?

11   A.  Along with me, in the D.C. office, there were partners

12   working on it:  Greg Craig, Cliff Sloan, Margaret Krawiec.

13   There were other associates as well, I think Kara Roseen, Paul

14   Kerlin.  And then Alex Haskell was another associate.

15   Q.  Did you consider what would happen if the Report's

16   conclusions were critical of the government of Ukraine?

17   A.  I had a conversation with someone about that.

18   Q.  Did you have a conversation with Mr. Craig about that?

19   A.  I think so.

20   Q.  Yes.  And what do you remember about that conversation?

21   A.  I remember just having a conversation in which someone -- I

22   think I brought up just a question about what would happen if,

23   since we were doing an independent assessment, we came to the

24   conclusion that due process had not been complied with and that

25   the trial had not been conducted properly.

1           And he said, you know, that would be the conclusion

2   we reached, and that as far as the government of Ukraine was

3   concerned, that the press had been critical of them.  So

4   critical of them that as long as -- you know, regardless of

5   what conclusion was reached, it was still probably better than

6   what people were saying about them.

7   Q.  And what role did you take in the report project?

8   A.  I was primarily concerned with helping to assemble and

9   draft the Report.

10  Q.  So the writing of the Report?

11  A.  That's correct.

12  Q.  Okay.  And in early 2012, before you began working on the

13  Report -- and do you remember approximately when you began

14  working on the Report?

15  A.  I remember.  I think it was -- well, I remember the

16  first -- you're asking when I began working on it or when I

17  became aware of it?

18  Q.  When you began working on it.

19  A.  I think maybe the late spring, early summer.

20  Q.  Okay.  Before you became involved with the project, were

21  you aware of the Foreign Agents Registration Act?

22  A.  I became aware of it at some point.

23  Q.  Okay.  And in the context of the Tymoshenko Report, did you

24  do some FARA research?

25  A.  Yes.

1    Q.  Do you remember who asked you to do that?

2    A.  I remember, again, it was either Cliff Sloan or Greg Craig

3    who contacted me and made me aware of the existence of the

4    Foreign Agents Registration Act, and asked me to take a quick

5    look to see whether the Act would apply to the scope of the

6    work as I understood it.

7    Q.  And I'm directing you to Government's Exhibit 67, which has

8    been previously admitted.  It should be on your screen, but it

9    should also be in the binder, in case you prefer looking at it

10   on paper.

11            THE COURT:  It's not on mine either.

12            MS. GASTON:  The fault was on our end.  Sorry.  Sorry

13   about that.

14            THE COURT:  All right.  It's still better than the

15   old days, when you all had binders in your laps.

16            MS. GASTON:  Yes.  If all else fails, we can just put

17   it on the Elmo.

18            THE COURT:  All right.

19            MS. GASTON:  Is it on now?

20            THE COURT:  All right.  Is it on the jurors' screens?

21   Not yet?

22            THE JURORS:  Yes.

23            MS. GASTON:  It's a long-awaited exhibit.

24            THE COURT:  Is it on the public screen?

25            Okay.  Thank you.

```
1              MS. GASTON:  Okay.  Exhibit 67.

2    BY MS. GASTON:

3    Q.  So, Mr. Kedem, could you please look at the top of this

4    email, and tell us who it is from and to and what the date is?

5    A.  It's from Cliff Sloan to me, and the date is Tuesday,

6    April 17th, 2012.

7    Q.  And then if you look at the email below that, does it

8    appear that Mr. Sloan is forwarding you an email that

9    Mr. Haskell had sent him on February 13th, 2012?

10   A.  Yes.

11   Q.  Okay.  And if you look down at the bottom of the first

12   page, does it appear that in that email Mr. Haskell had been

13   providing some FARA research?

14   A.  Yes.

15   Q.  Okay.  And then directing your attention to Government's

16   Exhibit 70, which had previously been admitted.

17              Is this an email chain that you come into on the same

18   day as that email we just looked at, on April 17th, 2012?

19   A.  Yes.

20   Q.  Okay.  So, let's look at the second page of that exhibit.

21   And can we start by looking at how the chain begins?

22              How does the chain begin?

23   A.  With an email from Alex van der Zwaan to -- what looks like

24   a Project Kyiv distribution list.

25   Q.  And who was Mr. van der Zwaan?
```

1   A.  He was an associate in the London office of Skadden.

2   Q.  And was Mr. van der Zwaan involved in the Report project?

3   A.  Yes.

4   Q.  Okay.  Could you please read what Mr. van der Zwaan

5   emailed.

6   A.  Starting with the subject or --

7   Q.  Yes.

8   A.  The subject says, "FARA Issues.  Dear Craig, dear Cliff,

9   have you been able to make any headway in relation to the FARA

10  analysis which we discussed last week?  I'm mindful that the

11  client's view, one of the arms of both Project One and Two, has

12  improved PR on the issue of Ukraine's conduct in relation to

13  Yulia Tymoshenko and her trial.  To the extent that is the

14  case, and we are able to help them with this from a FARA

15  perspective, we ought to consider getting appropriate PR

16  advisors engaged in this process as soon as possible in order

17  to maximize the effect of the suggestions we are making.

18          "Matt and I have thought of some companies which we

19  could use and could begin to reach out to these people subject

20  to your views on the FARA issues, as well as any other

21  clearance which we may need from Manafort or otherwise.

22          "Alex."

23  Q.  And then, if you go to the first page of the email, at the

24  very bottom.

25          Does Mr. Sloan forward Mr. van der Zwaan's email to

1    you?

2    A.   Yes.

3    Q.   And then what does Mr. Sloan say to you?

4    A.   Do you want me to read it or do you want me to describe it?

5    Q.   Could you please read it.

6    A.   The subject says -- it's forwarded.  It says, "FARA Issues.

7    Allon, Ken Gross may give you a call.  I left a message with

8    Ken because, I think, he's our resident FARA, Foreign Agent

9    Registration Act, guru.  As you may know, FARA requires

10   registration as a foreign agent if one works for a foreign

11   government by attempting to affect U.S. government policy.

12          "We want to be sure to structure our representation

13   of Ukraine so that we are not foreign agents.  One issue that

14   has come up, as noted below, is retention of a PR firm, which

15   presumably would reach out to western press, including both

16   U.S. and European press, and also our own efforts.  One point

17   Greg has asked is whether it matters if this is done by our

18   London lawyers rather than U.S. lawyers."

19   Q.   Thank you.

20          Do you remember receiving this email from Mr. Sloan?

21   A.   No.

22   Q.   Okay.  If you look at the email above it, are you replying

23   to Mr. Sloan and looping in Mr. Craig later that same day?

24   A.   That's correct.

25   Q.   Okay.  And the beginning of that email indicates that you

1    spoke with Ken, who, below, it appears from Mr. Sloan's email,

2    is Ken Gross.

3              Do you remember speaking to Mr. Gross?

4    A.  Yes.

5    Q.  And what do you remember about speaking to Mr. Gross?

6    A.  Well, I remember that someone, I think, again, either Greg

7    or Cliff, had asked me to speak to Ken because he had expertise

8    working with the FARA statute.  And that I discussed with him

9    the contours of the project, as it had been described to me,

10   and asked him whether he thought we would be required to

11   register under the Act.  And I remember that his conclusion is

12   that we would not be required to register.

13   Q.  Do you remember asking him about the public relations

14   issues that Mr. van der Zwaan and Mr. Sloan had emailed you

15   about?

16   A.  No.

17   Q.  Okay.  Would you mind reading Mr. Gross's conclusion that

18   you relayed to Mr. Sloan and Mr. Craig?

19   A.  So, reading from the body of the email.

20             "I spoke with Ken, who seems to have a lot of FARA

21   expertise.  In his view, our work writing a report evaluating

22   the Ukrainian proceedings would not trigger FARA obligations.

23   However, if we were to perform public relations work aimed at

24   the U.S., if our London lawyers were to do so, or if we were to

25   subcontract with a PR firm to do so, then we would be obligated

1   to register under FARA.  If the Ukranian government were to

2   hire the PR firm directly, then FARA would not come into play

3   for us.

4        "Ken also noted that registering under FARA requires

5   public disclosure of our engagement with the client.

6   Therefore, if we do intend to perform services that would

7   subject us to FARA, we should consider that fact when drafting

8   our engagement letter."

9   Q.  And did Mr. Sloan respond to your email?

10  A.  Yes.

11  Q.  And what did Mr. Sloan respond?

12  A.  Reading, again, from the body of the email, he said,

13  "Thanks very much, Allon.  Greg, I think our engagement should

14  not include PR advice.  Manafort or Schoen or somebody else can

15  hire the PR team and manage that.  I say this for two reasons:

16  First, it will create a FARA problem.

17       "Second, I actually think it's much better for our

18  representation to be rule of law advisors, not rule of law and

19  PR advisors.  Including a PR component as part of our

20  representation has the potential to undermine our work.  We are

21  in this representation as lawyers, not spin doctors, and I

22  think it's important that we be able to say that.

23       "In any event, the FARA issue looks insurmountable.

24  And, of course, we can provide information and answer questions

25  for the PR firm at the client's direction."

```
1    Q.  Thank you.

2              Mr. Kedem, did you travel to Ukraine as part of your

3    work on the project?

4    A.  Yes.

5    Q.  And do you recall traveling there in July of 2012?

6    A.  Yes.

7    Q.  I'm showing you what's previously been admitted as

8    Government's Exhibit 180.

9              MS. GASTON:  And if we could zoom in on this email.

10   BY MS. GASTON:

11   Q.  And the subject of this is, "PR on Project One."

12             And what do you ask Mr. van der Zwaan in this email?

13   A.  The email says, "Alex, could you forward me the PR document

14   on the Project One report that was being discussed at dinner

15   today?  Thanks.  See you tomorrow morning."

16   Q.  And do you remember the -- do you remember sending this

17   email?

18   A.  No.

19   Q.  Do you remember a dinner in which PR was discussed?

20   A.  No.

21   Q.  And do you remember, on this trip, meeting anyone from a

22   public relations firm?

23   A.  No.

24   Q.  Okay.  Now, I'm showing you what's been marked as

25   Government's Exhibit 182 and previously admitted.
```

```
 1              MS. GASTON:  And if we could zoom in on the top
 2    email.
 3    BY MS. GASTON:
 4    Q.  And is this a few days after the email that we just looked
 5    at that you had sent to Mr. van der Zwaan?
 6    A.  Yes.
 7    Q.  And the title of this -- the subject of this email is,
 8    "Kyiv Update," and it's to Mr. Sloan and Ms. Krawiec on July
 9    20th.
10              Is it your understanding that you were in Kyiv at the
11    time you sent this email?
12    A.  Yes.
13    Q.  And that Mr. Sloan and Ms. Krawiec were back in the
14    United States?
15    A.  I think so.
16    Q.  Thank you.
17              Could you read the first paragraph of your email to
18    them, please.
19    A.  "First, FYI, attached is a document created by the
20    communications firm hired by the government to handle press
21    relations on the two Tymoshenko trials.  The document discusses
22    PR strategy and, starting at page 5, talks specifically about
23    how to handle our report.  On page 6, it says the Report will
24    conclude that the trial was valid, that the crime was
25    committed, and that the sentence was appropriate.
```

1    "Note, however, that the communications firm
2    acknowledged that they had not yet read the Report or talked to
3    Skadden about it.  Greg spoke briefly with them on this trip
4    and gave them a heads-up that the Report does not take a
5    position on Tymoshenko's guilt, and also concludes that there
6    were several significant due process problems with the trial."
7    Q.  Thank you.  And could you read your second point as well?
8    A.  "Second, Greg has started easing the government into the
9    knowledge that the Report will not be 100 percent favorable,
10   but I think he plans to do additional work on that front during
11   the coming weeks.  The sense I got was that they are currently
12   unprepared."
13   Q.  Do you remember sending this email?
14   A.  No.
15   Q.  And do you remember having -- being there for discussions
16   between Mr. Craig and the communications firm?
17   A.  No.
18   Q.  Okay.  And do you remember knowing that Mr. Craig was
19   easing the government into the fact that the Report would not
20   be 100 percent favorable?
21   A.  Not really.
22   Q.  And if you look below the email that we just looked at.
23       Is the attachment something that you received -- oh,
24   sorry.
25       Is the attachment something that you received from

1    Mr. van der Zwaan?

2    A.  It looks that way.

3    Q.  So, if you reference the previous email that we had looked

4    at when you had asked Mr. van der Zwaan to send you a public

5    relations document, does it appear that that is what he was

6    doing when he sent you this?

7    A.  Yeah, that's what it looks like.

8    Q.  Okay.  Now, let's look at the attachment to this email, and

9    starting on the first page.

10           Do you remember receiving or reviewing this document?

11   A.  No.

12   Q.  Okay.  If you flip to the fifth page -- or, the seventh

13   page of the exhibit.

14           MS. GASTON:  Can we zoom in on the bottom half of the

15   page?

16   BY MS. GASTON:

17   Q.  Is this the beginning of the section of the Report that

18   you'd referenced in your email, a strategy regarding the

19   Skadden Report?

20   A.  I'm sorry.  The beginning of the section of the what?

21   Q.  Certainly.

22           So if you look at your cover email, you say, "The

23   document discusses PR strategy and, starting at page 5, talks

24   specifically about how to handle our report.

25           So, if you look at page 5, where it begins with

1   "Strategy and Skadden Report," is this the section that your

2   email references?

3   A.  Yes.

4   Q.  Okay.  And does it state that "Given the tight deadline for

5   publication, it is imperative that we have sight of an advance

6   draft early next week.  Although we have yet to see the

7   document and have not discussed its contents with Skadden, we

8   are operating on the following presumptions"?

9   A.  It does say that.

10  Q.  The first point reads, "The Report was commissioned by the

11  Ministry of Justice, and not the prosecutor general's

12  department.  It will have to explain why it was appropriate to

13  pay," parenthesis, "such a limited amount," end parenthesis,

14  "to an international law firm to investigate this matter."

15          Do you remember that being an issue at this time, the

16  payment issue of the firm?

17  A.  I don't remember the timing at which it was made an issue.

18  I do remember that being something that got some press.

19  Q.  And what was your understanding of the way the firm was

20  being paid?

21  A.  I think my understanding --

22          MR. MURPHY:  Objection, Your Honor.  Foundation.

23          THE COURT:  Do you know?  Do you have personal

24  knowledge about how the firm was being paid?

25          THE WITNESS:  I have knowledge of what people told

 1    me.

 2              THE COURT:  Are you going to go further with this

 3    witness on this?

 4              MS. GASTON:  No.

 5              THE COURT:  All right.

 6    BY MS. GASTON:

 7    Q.  All right.  We're moving to the second page.

 8              Is -- I believe the quote that you noted in your

 9    cover email, which is, "The Report will conclude that the trial

10    was valid, that the crime was committed, and that the sentence

11    was appropriate."

12              And you noted that in your email because they had not

13    received a copy of the Report yet, right?

14    A.  I mean, I don't remember writing the email, so I don't know

15    why I wrote it.

16    Q.  Right.

17    A.  But I -- that is the sentence that I referred to in my

18    email.

19    Q.  Right.  And at this point, was the Report complete?

20    A.  No.

21    Q.  And so had it reached this conclusion that is stated in

22    this document?

23    A.  I don't think it ever reached that conclusion.

24    Q.  Now, if you look at page 9 -- or, 11 of the exhibit, page 9

25    of the attachment.  Part of the plan involves, number one,

1    "Embargoed media outreach with selected journalists; briefing,

2    in general terms, about the Report; release of abstract of

3    Report to selected and agreed-to journalists."

4           Do you remember seeing this in this document?

5    A.  No.

6    Q.  Do you remember there being a discussion while you were in

7    Kyiv about embargoed media outreach?

8    A.  No.

9    Q.  Do you remember any discussion of media outreach?

10   A.  No.

11   Q.  Okay.  Do you remember when the Report was ultimately

12   released?

13   A.  I think it was made public in either late fall or winter of

14   that same year.

15   Q.  And do you remember when in late fall or early winter you

16   learned that the Report would be released?

17   A.  When more specifically than that, you mean?

18   Q.  Do you remember how you learned that the Report would be

19   released?

20   A.  No.

21   Q.  Showing you what's been admitted as Government's Exhibit

22   320.

23           MS. GASTON:  If we could zoom in on the top, please.

24   BY MS. GASTON:

25   Q.  And this is an email from Catherine Whitney on

1    December 6th, 2012; is that correct?

2    A.  Yes.

3    Q.  And what is the subject of the email?

4    A.  "Report release date."

5    Q.  And who is Ms. Whitney?

6    A.  She was Greg's secretary.

7    Q.  Okay.  And what did Ms. Whitney write?

8    A.  The text of the email is, "Greg is traveling but wanted me

9    to let you know that the Report will be released next

10   Wednesday, December 12th."

11   Q.  And did you participate in any media contacts before the

12   Report was made public by Ukraine?

13   A.  No.

14   Q.  Were you aware of anyone else at Skadden doing so before

15   the Report was made public?

16   A.  I don't think so.

17   Q.  And directing you to Government's Exhibit 395, which has

18   been previously admitted.  This is an email from you to some

19   other Skadden attorneys on December 13th, 2012; Is that

20   correct?

21   A.  Yes.

22   Q.  And what do you write to them?

23   A.  The subject of the email -- I'm sorry.

24        The text of the email is, "In case you guys haven't

25   seen, the coverage so far seems to have described our report as

1   being balanced, and the Ukrainian government has put it on the

2   web."

3   Q.  And below your signature block, do you paste in something

4   about an article?

5   A.  That's what it looks like.

6   Q.  And do you know where you got this paragraph that you

7   pasted?

8   A.  No, I don't remember.

9   Q.  Okay.  Were there, sort of, news lists that went around

10  Skadden?

11  A.  There were some, yes.

12  Q.  Does this look like it could have come from that?

13  A.  Yes.

14  Q.  Okay.  And this cites a *New York Times* article; is that

15  correct?

16  A.  That's correct.

17  Q.  Dated December 12th, 2012?

18  A.  Yes.

19  Q.  And do you recall reading *The New York Times* article?

20  A.  I don't remember this article in particular, but I remember

21  reading *The New York Times*, as well as other news sources.

22  Q.  Okay.  And you -- you state in your email that "The

23  coverage so far seems to have described our report as being

24  balanced."

25          So on December 13th, 2012, was that your general

```
 1    understanding of the media coverage of the Report?

 2    A.  I don't remember what my recollection was.  I don't

 3    remember what my take was on December 13th.

 4    Q.  And you don't remember sending this email?

 5    A.  No.

 6    Q.  Okay.  And after the Report was released, did you

 7    participate in any media contacts related to the release of the

 8    Report?

 9    A.  No.

10    Q.  And were you aware of any other Skadden attorneys doing so?

11    A.  I don't remember.

12    Q.  Okay.  And either before or after the Report was released,

13    did you provide the Report to any journalists in the

14    United States?

15    A.  Did I personally provide?

16    Q.  Yes.

17    A.  No.

18    Q.  And were you aware of any other Skadden attorneys doing so?

19    A.  Not that I remember.

20    Q.  Now, directing your attention to 2013.

21         At some point, did you become aware that Skadden had

22    received an inquiry of the Department of Justice's FARA Unit?

23    A.  Yes.

24    Q.  What do you remember about learning that?

25    A.  I don't remember the circumstances in which I was made
```

1    aware of that.  But, I just remember that the FARA Unit or the

2    Department of Justice got in touch with Skadden about the

3    question whether Skadden's work on the project required

4    registration.

5    Q.  And showing you what's been previously admitted as

6    Government's Exhibit 461.

7              MS. GASTON:  If we could zoom at the top part of it

8    first, please.

9    BY MS. GASTON:

10   Q.  And this is an email from Ms. Whitney on September 11,

11   2013; is that correct?

12   A.  Yes.

13   Q.  And what does she write to you?

14   A.  The text of the email says, "Hi, guys.  FYI, Greg asked

15   that I send you both a copy of this attached letter.  If you

16   need copies of the other letters re the FARA issue, just let me

17   know and I can get you copies of the letters leading up to this

18   most recent letter we received from DoJ.

19              "Alex, I'm also attaching some research that you did

20   long ago re this issue, just as a FYI.  Thanks, Catie."

21   Q.  There is to you and Mr. Haskell?

22   A.  That's correct.

23   Q.  And if you look at the email below it.

24              Is that -- had she forwarded an email from Mr. Craig?

25   A.  Yes.

1    Q.   And who had Mr. Craig written to?

2    A.   It seems to be sent to Larry Spiegel, CC to David Zornow.

3    Q.   And who is Mr. Spiegel and Mr. Zornow?

4    A.   They were partners at Skadden.  I think Larry Spiegel was

5    counsel for the firm -- or, I guess I don't know whether he was

6    at the time.  And then David Zornow was in the firm leadership.

7    Q.   What did Mr. Craig write to them?

8    A.   The text of the e-mail is, "DoJ has concluded that we

9    should register under FARA.  I am looking at what options are

10   available, if any."

11   Q.   If you look at the attachment to what Ms. Whitney sent you.

12            Is it a letter from the Department of Justice,

13   National Security Division?

14   A.   Yes.

15   Q.   And what is the date on this letter?

16   A.   It's dated September 5th, 2013.

17   Q.   And who is it addressed to?

18   A.   It's addressed to Greg.

19   Q.   Do you remember receiving this letter from Ms. Whitney?

20   A.   No.

21   Q.   And do you remember reviewing the letter?

22   A.   No.

23   Q.   And if we look at the last three lines of the letter on the

24   first page.

25            Do you remember reading that the Department of

1  Justice had concluded that Skadden must register under FARA as

2  an agent of the Ministry?

3  A.  I don't remember reading the letter.

4  Q.  Okay.  And do you remember discussing the letter with

5  anybody at Skadden?

6  A.  No.

7  Q.  Okay.  I'm directing you to Government's Exhibit 466, which

8  has previously been admitted, and looking at the top first.

9        And is this an email from Mr. Craig to you?

10 A.  Yes.

11 Q.  On September 19th?

12 A.  Yes.

13 Q.  And he's forwarding you an e-mail that --

14       MS. GASTON:  Let's look down upon it first.

15       Sorry.  I wasn't clear with Ms. Rohde.

16 BY MS. GASTON:

17 Q.  All right.  So is this the email that Mr. Craig forwarded

18 to you?

19 A.  Yes.

20 Q.  And who is it to?

21 A.  It's sent to Larry Spiegel.

22 Q.  And what's the subject line?

23 A.  "FARA."

24 Q.  And what did Mr. Craig write?

25 A.  The text of the email says, "Just for the record:  One,

1    Skadden did not disseminate the report to news media.  Three

2    media outlets who were not able to obtain a copy of the report

3    from the Ministry in Kyiv contacted us and asked us to provide

4    them with a copy.  The report was a public document.

5           "Two, at no time did Skadden contact the media.

6    Quite to the contrary.  We were approached by the media, asked

7    for interviews, asked for background commentary, etcetera, and

8    we did not respond.  The only time we responded was to correct

9    misinformation.

10          "Three, to the best of my recollection, our

11   statements to the press were not about Ukraine; they were to

12   correct misinformation.  The statements were about our report

13   and about us."

14   Q.  Do you know why Mr. Craig forwarded this to you?

15   A.  No.

16   Q.  Okay.  And looking, first, at the number one that he

17   enumerated.

18          When he wrote that "Three media outlets who were not

19   able to obtain a copy of the report from the Ministry in Kyiv

20   contacted us and asked us to provide them with a copy.  The

21   report was a public document," did you know if that was true?

22   A.  I know that Ukraine made -- made the report available, at

23   some point, over the web.  I remember that, at some point,

24   there was some issue with people being able to access the

25   report, and at some point that got resolved.  I don't remember

1    the specifics.

2    Q.   Okay.  But do you know if it was true that the reason that

3    Skadden provided the report to three media outlets is because

4    the reporters were not able to obtain copies of the report?

5    A.   No, I don't know.

6    Q.   And did you know whether the report was a public document

7    at the time that Skadden did so?

8    A.   So, I don't know about the first part, so I don't know when

9    that was.

10   Q.   Okay.  And then on the second point, when he wrote "At no

11   time did Skadden contact the media.  Quite to the contrary.  We

12   were approached by the media, asked for interviews, asked for

13   background commentary, etcetera, and we did not respond.  The

14   only time we responded was to correct misinformation."  Did you

15   know if that was true?

16   A.   No.

17   Q.   Okay.  And if we look at Mr. Craig's email to you.

18            Do you -- do you remember discussing with him

19   drafting a response to the incoming letter?

20   A.   No.

21   Q.   Do you remember responding to this email?

22   A.   No.

23   Q.   Okay.  Then showing you what's been admitted as

24   Government's Exhibit 7, which is the following day.

25            Mr. Craig sends a document to you and to Mr. Spiegel

1    and says, "Here is a first shot at it.  Perhaps we need to

2    include some legal research?"

3            Do you remember receiving this email from Mr. Craig?

4    A.  No.

5    Q.  And if we look at the attachment, it's titled Draft of

6    Letter to FARA Division and the Department of Justice,

7    September 20th, 2013.

8            Do you remember receiving the attachment or reviewing

9    it?

10   A.  No.

11   Q.  And if we look at the last paragraph on the first page.

12   Could you read that paragraph, please.

13   A.  It says, "Your question to us was to whom, if anyone, did

14   your firm release or distribute the report and when?  In our

15   answer, we told you that the firm provided a copy of the report

16   to a reporter from *The New York Times*, *The National Law

17   Journal*, and the *Los Angeles Times*.  Ukrainian authorities had

18   released the report to the general public much earlier in that

19   day, but these three outlets, for some reason, had not been

20   able to obtain copies of the report.  They approached the firm,

21   asked us if we could provide them with a copy, and we did so."

22   Q.  And does that point in the letter seem to coordinate with

23   the number one in the email that we had previously looked at?

24           You can go look back at it, if you want.

25           MR. MURPHY:  Objection, Your Honor.

```
 1              THE COURT:  He doesn't need to address the documents.
 2         Sustained.
 3              MS. GASTON:  Okay.  Okay.
 4    BY MS. GASTON:
 5    Q.  And, Mr. Kedem, did you know if that statement that we just
 6    read in the letter is true?
 7    A.  About the --
 8    Q.  Providing a copy of the report.
 9    A.  I don't know.
10    Q.  And then on the second page.  Could you please read,
11    beginning at "To my knowledge."
12    A.  It says, "To my knowledge, no one in this law firm
13    initiated any contacts with the media.  It is simply wrong to
14    say that Skadden took actions to contact the media.  The law
15    firm did not accept invitations from the media to appear or to
16    be interviewed.  The law firm declined the opportunity to
17    communicate with journalists on background.  The law firm
18    declined to discuss the report with government officials from
19    either the legislative or the executive branch, or with experts
20    from think tanks."
21    Q.  Now, as to the media piece of that, did you know whether
22    that was true?
23    A.  No.
24    Q.  And then could you read just the -- that next small
25    paragraph?
```

1    A.  "As I" -- it says, "As I told you in my letter of

2    June 3rd, 2013, I did communicate briefly with two print media

3    journalists.  Even with them, I took no action to contact them.

4    They initiated the contact."

5    Q.  Did you know whether that was true?

6    A.  No.

7    Q.  And do you know if that letter was sent?

8    A.  No.

9    Q.  And did you know anything about what happened within the

10   firm after receiving that September 5th, 2013 letter from the

11   FARA Unit?

12   A.  I just remember that there were further communications or

13   interactions with the department, and that -- the department's

14   conclusion, but that's it.

15   Q.  And what do you recall the department's conclusion being?

16   A.  I remember the conclusion being that registration was not

17   required.

18   Q.  Okay.  And directing you to previously admitted

19   Government's Exhibit 476.  This is in October 15th email from

20   Mr. Craig to you and Mr. Haskell.

21            And what does Mr. Craig write to you?

22   A.  The text of the e-mail says, "Final chapter, I hope."

23   Q.  And then, if you look at the attachment, is this a signed

24   and dated PDF of a letter?

25   A.  I mean, it is a letter.

1    Q.   Back to the FARA Unit?

2    A.   That's correct.

3    Q.   And what's the date of it?

4    A.   It's dated October 10, 2013.

5    Q.   And do you know if this letter was sent?

6    A.   No.

7    Q.   Okay.  And just looking briefly at the second paragraph.

8         What is the statement in that second paragraph?

9    A.   It says, "As reported in earlier correspondence, this law

10   firm provided a copy of the Tymoshenko Report, the Report, to

11   certain U.S. media outlets.  This was done in response to

12   requests from the media.  The firm did not provide copies of

13   the Report to any other media outlets in the United States."

14   Q.   Do you know whether that was true?

15   A.   No.

16   Q.   Okay.  And then the last paragraph of this letter.

17        Mr. Craig writes that "In responding to inaccuracies

18   in U.S. news reports, the law firm did not consult with

19   Ukraine, did not inform Ukraine, did not act under instruction

20   from Ukraine, and was in no way serving as an agent for

21   Ukraine."

22        And did know whether the law firm consulted with

23   Ukraine or informed Ukraine in responding to inaccuracies in

24   U.S. news reports?

25   A.   No.

```
 1              MS. GASTON:  Nothing further.

 2              THE COURT:  All right.  Any cross-examination?

 3              MR. MURPHY:  Yes, Your Honor.

 4                        CROSS-EXAMINATION

 5    BY MR. MURPHY:

 6    Q.  Good morning, Mr. Kedem.

 7    A.  Good morning.

 8    Q.  I wanted to ask you a little bit more about your

 9    background.

10              Did you graduate from law school?

11    A.  I did.

12    Q.  When was that and where?

13    A.  I graduated from Yale Law School in 2005.

14    Q.  And did you have an undergraduate degree?

15    A.  I did.

16    Q.  From Harvard?

17    A.  That's correct.

18    Q.  Now, after you graduated from law school, you indicated

19    that you had -- you were a law clerk for two different judges,

20    right?

21    A.  That's correct.

22    Q.  One was a federal trial judge in the District of

23    Connecticut?

24    A.  Yes.

25    Q.  And that's a comparable court to this court, a trial court
```

1    in the federal system, right?

2    A.   That's correct.

3    Q.   And you worked as a clerk for the judge?

4    A.   Yes.

5    Q.   And then after that, you were a law clerk, I think you

6    said, on the Second Circuit?

7    A.   That's correct.

8    Q.   Was that Judge Leval you mentioned?

9    A.   That's correct.

10   Q.   And that's the Court of Appeals that sits in New York, and

11   they handle appeals from the decisions of the trial courts in

12   that jurisdiction, right?

13   A.   That's right.

14   Q.   You were a law clerk for an appellate judge?

15   A.   That's right.

16   Q.   Then you mentioned, I think, that you worked for the Office

17   of Legal Counsel at the Department of Justice after that,

18   right?

19   A.   That's right.

20   Q.   Can you describe just briefly for the jury what the Office

21   of Legal Counsel is and what it does?

22   A.   The Office of Legal Counsel is a component of the

23   Department of Justice that renders opinions on behalf of the

24   attorney general on legal issues.  So, there will be questions

25   that are brought to the Office of Legal Counsel by other parts

1     of the Department of Justice or by other parts of the federal

2     government, different agencies, asking about whether they have

3     the authority to do something or the legality of something.

4     And they are given opinions from the Office of Legal Counsel

5     that answer their questions.

6     Q.  So this is a law firm, in effect, within the Department of

7     Justice that provides legal advice to agencies of the

8     government about what those agencies can and cannot do; is that

9     a summary?

10    A.  You could call it that.

11    Q.  And then after you had a tenure at the Office of Legal

12    Counsel, you were a law clerk for Supreme Court Justice

13    Anthony Kennedy; is that right?

14    A.  Yes.

15    Q.  And then you were also a law clerk, I guess the following

16    year, for Justice Elena Kagan; is that right?

17    A.  Yes.

18    Q.  There aren't too many folks that have been law clerks for

19    two Supreme Court justices, are there?

20    A.  Not that many.

21    Q.  Okay.  There's about 30 or 35 clerks each year, right?

22    A.  That's right.

23    Q.  And you're one of the very few people that I know that have

24    clerked for two justices; is that right?

25              THE COURT:  I don't think he knows what you know, but

1  he said there weren't very many.

2  BY MR. MURPHY:

3  Q.  It's quite a privilege to be a law clerk for a justice of

4  the Supreme Court, right?

5  A.  It is.

6  Q.  And then after you left your clerkship with Justice Kagan,

7  you came to join Skadden, correct?

8  A.  That's right.

9  Q.  And that was in, approximately, the fall of 2011?

10  A.  Yes.

11  Q.  Before you came to Skadden, you interviewed with partners

12  in the firm, right?

13  A.  That's correct.

14          MS. GASTON:  Objection, Your Honor.  Outside the

15  scope.

16          THE COURT:  You can ask your next question.

17  BY MR. MURPHY:

18  Q.  Did you interview with Mr. Craig before you came to the

19  firm?

20  A.  I did.

21  Q.  And when you came to the firm, you were there, I guess, for

22  about three years; is that right?

23  A.  That's right, until the summer or late summer of 2014.

24  Q.  And in addition to working on the Tymoshenko Report with

25  Mr. Craig and others, did you have other occasions to work with

1       Mr. Craig during the three years you were there?

2                   MS. GASTON:  Objection, Your Honor.  Relevance.

3                   THE COURT:  Sustained.

4       BY MR. MURPHY:

5       Q.  Let me ask you this question:  When you left Skadden in the

6       summer of 2014 -- is that right?

7       A.  That's right.

8       Q.  -- you said, I think, that you were working for the

9       Department of Justice, but I don't think you told us for whom.

10      A.  I joined the Office of the Solicitor General.

11      Q.  And the Solicitor General of the United States is the

12      agency or unit within the Department of Justice that, among

13      other things, argues all cases in the Supreme Court of the

14      United States on behalf of the federal government; is that

15      right?

16      A.  Yes.

17      Q.  And so you were one of the lawyers arguing for the

18      United States in the Supreme Court, correct?

19      A.  Yes.

20      Q.  And you argued 11 times?

21      A.  That's correct.

22      Q.  And you won eight of those cases?

23      A.  That's right.

24      Q.  Okay.  And then you've just recently decided to move on to

25      private practice; is that correct?

```
 1    A.  Yes.
 2    Q.  Okay.  Was Mr. Craig helpful to you when you obtained your
 3    job?
 4              MS. GASTON:  Objection, Your Honor.
 5              THE COURT:  Sustained.
 6              MR. MURPHY:  Okay.
 7    BY MR. MURPHY:
 8    Q.  When you took on the assignment of working on the
 9    Tymoshenko matter with Mr. Craig and Mr. Sloan, you described
10    that it had something to do with a review of the procedures
11    that were utilized by the government of the Ukraine in
12    prosecuting and convicting, eventually, a former prime
13    minister, Yulia Tymoshenko?
14    A.  Yes.
15    Q.  Can you just describe for the jury, in a couple of
16    sentences, what that trial was about?  I don't think they've
17    heard that yet from anyone.
18    A.  Tymoshenko was the prime minister of Ukraine.  And after
19    she was no longer the prime minister, she was prosecuted by the
20    regime that replaced her for abuses of power under a statute
21    that they had that criminalized misuse of government power.
22    And I think the allegation was that she had abused her power as
23    prime minister when she reached a deal with Russia concerning
24    the sale and transport of natural gas to and through Ukraine.
25    Q.  And was part of the story that she had negotiated that deal
```

1   with Vladimir Putin?

2   A.  That's correct.

3   Q.  And was there controversy about whether the deal was

4   properly authorized by the Council of Ministers of the Ukraine?

5   A.  That's correct.

6   Q.  And was there an allegation that she had falsified some

7   documents, called a directive, to convince the person who was

8   in charge of the natural gas company that the deal had been

9   authorized by the government?

10  A.  That's correct.

11  Q.  And, so, your assignment, among other things, was to

12  understand all of the facts involving that natural gas contract

13  and the controversy surrounding it; is that right?

14  A.  Yes.

15  Q.  Do you know how many hours you spent on the project?

16  A.  I don't know exactly.

17              MS. GASTON:  Objection as to scope.

18              THE COURT:  You can answer.

19              Do you remember?

20              THE WITNESS:  Not exactly.

21  BY MR. MURPHY:

22  Q.  If I told you that the billing records show that it's about

23  350 --

24              MS. GASTON:  Objection.

25              THE COURT:  He doesn't know.  If you're going to show

```
 1   him something, but you can't refresh his recollection with your

 2   recollection.

 3                 MR. MURPHY:  All right.

 4                 Let's take a look at Exhibit 575, Government Exhibit.

 5   It's in evidence.

 6                 MS. GASTON:  Objection.  Relevance and scope.

 7                 THE COURT:  All right.  Well, if he knows how many

 8   hours he spent on it, or if this will refresh his recollection.

 9                 Do you have some idea of the ballpark?  Are we

10   talking, you know, 20 hours?  3,000 hours?

11                 THE WITNESS:  It was, I would guess, well over 100

12   hours.

13   BY MR. MURPHY:

14   Q.  Would you disagree if I told you it was about 350 hours?

15   A.  That sounds, roughly, correct.

16   Q.  Do you know that you spent about 200 hours in one month

17   alone, basically, writing the Report?

18   A.  That seems generally correct.

19   Q.  That would have been the month of July, right?

20   A.  Probably.  I don't remember.

21   Q.  And you began the project of writing the Report in the

22   middle of June, right?

23   A.  I don't remember exactly when I began to.

24   Q.  Okay.  But, in any event, it was an extensive writing

25   project to put together the Report, correct?
```

1    A.   Yes.

2    Q.   And you were not the only draftsman, but you were the

3    principal draftsman of the Report; isn't that fair?

4    A.   I was the principal associate working on drafting the

5    Report.

6    Q.   You had other associates who were working on different

7    parts of the Report, and they would bring what they had written

8    to you, correct?

9    A.   That's right.

10   Q.   And you would sort of compile everything and try to get it

11   into a finished product?

12   A.   That's right.

13   Q.   And then the idea, as you mentioned in your direct

14   testimony, was that this was to be an independent report,

15   right?

16   A.   That's correct.

17   Q.   What did that mean to you, Mr. Kedem?

18   A.   My understanding was that the law firm had been hired to

19   look at what had happened, to speak with people who were

20   involved, to look at documents, to read transcripts, and gather

21   all the evidence that we could, and come to an independent

22   assessment.  Meaning, that it was the law firm's own conclusion

23   about what had happened and whether it was proper under western

24   standards of due process, and according to the rule of law.

25   Meaning, that it was supposed to be based on the facts as we

 1    saw them and understood them, and the opinions that the law

 2    firm generated from them.

 3    Q.  Was it your understanding that Skadden undertook this

 4    project on the condition that Skadden would be given full

 5    access to all of the people and all of the documents that you

 6    needed to review and interview and see in order to arrive at

 7    that independent conclusion?

 8              THE COURT:  All right.  Do you have personal

 9    knowledge?  I think there was a question on direct where that

10    might have been related to the payment.  I don't remember.

11              But, did you have personal knowledge about what

12    conditions under which Skadden undertook the representation,

13    one way or the other?

14              THE WITNESS:  Yes.

15              THE COURT:  Okay.  And where did that come from?

16              THE WITNESS:  It came -- where did my knowledge come

17    from?

18              THE COURT:  Yes.

19              THE WITNESS:  It came from reviewing the engagement

20    letter.

21              THE COURT:  So you can say what the engagement letter

22    said?

23              THE WITNESS:  That's correct.

24              THE COURT:  Okay.

25              He can testify to what the engagement letter said.

1           MR. MURPHY:  Okay.

2    BY MR. MURPHY:

3    Q.  And what did it say with respect to access to all of the

4    witnesses and access to all of the documents in evidence?

5    A.  My recollection was that the engagement letter said that

6    Skadden would have to have access to all of the evidence and

7    all of the witnesses that it wanted, and it had to be free to

8    speak to whomever the law firm wanted to speak to.

9    Q.  And as you worked on the Report and supervised others who

10   were working on the Report, was it true that Skadden got access

11   to all of the people and all of the exhibits and all of the

12   documents that were relevant?

13   A.  As far as I knew.

14   Q.  All right.  Was there also a condition in the engagement

15   letter that the opinions that Skadden would reach would be the

16   law firm's opinions and would not be influenced by what the

17   Ukraine Ministry of Justice or others might want those opinions

18   to be?

19   A.  My recollection of the engagement letter is that it said

20   that Skadden would reach its own opinions.

21   Q.  And in your discussions with Mr. Craig, was that an

22   important part of your common understanding with him about the

23   Report?

24           MS. GASTON:  Objection.

25           THE COURT:  Sustained.

1           If you want to ask him what Mr. Craig said, which, I

2    think, that question called for.  I think that was a fair

3    objection.  You can ask your next question.

4           MR. MURPHY:  All right.

5    BY MR. MURPHY:

6    Q.  Did you have an understanding -- let me ask you about

7    this -- that the unit of folks at Skadden who were working on

8    the Report, did you all share that view --

9           MS. GASTON:  Objection.

10   BY MR. MURPHY:

11   Q.  -- about the independence of the Report?

12          THE COURT:  Right.  I think he's testified to his

13   knowledge about the independence of the report.  I think

14   Mr. Loucks testified about his knowledge of the independence of

15   the Report, and Mr. Haskell testified about his knowledge.

16   But, I don't think you can ask him about what's in other

17   people's heads.

18   BY MR. MURPHY:

19   Q.  Did there come a time, Mr. Kedem, when the Ukraine, through

20   its various representatives in the government and through

21   Mr. Manafort, began to ask Skadden to modify, alter, or change

22   some of its conclusions?

23          MS. GASTON:  Objection.

24          THE COURT:  All right.  What's the basis for the

25   objection?

1      MS. GASTON:  Scope of the direct.

2      THE COURT:  All right.  Why don't you come to the

3  bench.

4      (Bench discussion:)

5      MR. MURPHY:  Part of independence, Your Honor.  It's

6  part of the independent nature of the report.

7      THE COURT:  Now you're getting into facts and events

8  that happened that are well beyond the scope of the direct.

9  And you're certainly entitled to bring them in in your case,

10  but I don't see they let the door open to this.

11      MR. MURPHY:  Your Honor, I think you are really

12  interpreting the scope of the direct very narrowly.

13      THE COURT:  Maybe.

14      MR. MURPHY:  In a criminal case, I don't think it's

15  appropriate.  I don't think it's the right thing to do.  But,

16  I'm cross-examining a witness.  But, I will abide by the

17  Court's ruling.

18      THE COURT:  In cross-examining the witness, who's

19  equally available for you to call as a friendly witness, and by

20  putting it all into your cross-examination, you're leading him

21  through issues that he wasn't asked on direct.  And I don't

22  think it has to -- the government has a right to have that not

23  come in during their case.  I think I've given you a lot of

24  leeway to bring out a lot of things.

25      Frankly, on direct, he didn't recall any specifics.

1    He only recalled what were in emails.  And, so, if you want to

2    walk him through all the emails related to this, it seems to

3    me, then that's your case.  And I'm not going to stop you to

4    putting on the case, and I'm not saying it has to come in

5    through Mr. Craig either.

6              MR. MURPHY:  I think it's within the scope of the

7    direct, Your Honor.  But I'll abide by your ruling.

8              THE COURT:  You've made your record.

9              Thank you.

10             MR. MURPHY:  Thank you.

11             (Open court:)

12   BY MR. MURPHY:

13   Q.  Mr. Kedem, do you recall that the report that you wrote was

14   about 186 pages long?

15   A.  Generally, yes.

16   Q.  You've had difficulty, on direct, remembering a lot of

17   conversations that occurred and a lot of emails that you either

18   sent or received, right?

19   A.  That's right.

20   Q.  Okay.  And these events took place seven years ago,

21   correct?

22   A.  That's right.

23   Q.  And I assume that in those intervening seven years, you've

24   probably received and sent several thousands emails?

25   A.  Many thousands.

```
1    Q.  Yeah.  Many thousands, right?  Okay.

2              One of the things that you did recall, though, was a

3    conversation that you described with Mr. Craig about the fact

4    that the press in the Ukraine had been so bad, that there was a

5    thought that whatever conclusions you might reach wouldn't be

6    any worse for the Ukraine than the current situation, in terms

7    of what kind of coverage they were getting over the Tymoshenko

8    trial, right?

9    A.  That's right.

10   Q.  Did you and Mr. Craig -- was that an early conversation,

11   early in the process, as you recall?

12   A.  I think it was during the first half of the process.

13   Q.  Okay.  Probably June?  That timeframe?

14   A.  It could be.

15   Q.  All right.  Do you remember also talking with Mr. Craig

16   about the fact that maybe the report would result in the

17   Ukraine deciding to release Ms. Tymoshenko?

18              MS. GASTON:  Objection.

19              THE COURT:  If you recall.

20              THE WITNESS:  I -- I have a general recollection

21   about that being one of the possibilities.

22   BY MR. MURPHY:

23   Q.  Okay.  And do you have a general recollection that one of

24   the things that you and Mr. Craig talked about was that --

25              MS. GASTON:  Objection.
```

1    THE COURT:  Sustained.

2    MR. MURPHY:  Your Honor, I'm asking about the same

3  conversation, the same conversation --

4    THE COURT:  I don't know that we are.

5    MR. MURPHY:  Well, I am.

6    THE COURT:  Do you remember more that took place

7  during the same conversation during the early half of the

8  process, where you talked about that the press had been so bad

9  that it couldn't get worse?  Do you remember other aspects of

10  that conversation?

11    THE WITNESS:  Maybe.  I guess I would have to know

12  what was being asked about.

13    MR. MURPHY:  Which is what I'm attempting to do, Your

14  Honor, is to ask him whether he remembers something else about

15  the conversation.

16    THE COURT:  Okay.  Well, I think he just said that he

17  didn't.  But, if -- you can ask a specific question.  If he

18  doesn't recall it, then that's the end of it.

19    MR. MURPHY:  All right.

20  BY MR. MURPHY:

21  Q.  Mr. Kedem, do you recall discussions about whether the

22  report that you all were working on might lead to reforms in

23  the Ukrainian criminal justice system?

24  A.  I have a general recollection about that.  I don't know

25  whether it was part of that same conversation or a different

1    one.

2    Q.  Okay.  But that was among the things that people working on

3    the report thought about, isn't it?

4              MS. GASTON:  Objection.

5              THE COURT:  You can answer.

6              THE WITNESS:  It is a thing that I remember being

7    discussed while I was around.

8    BY MR. MURPHY:

9    Q.  Now, you mentioned that among the people working on the --

10   drafting of the report were yourself, Mr. Kerlin, I think

11   Kara Roseen, and Margaret -- I always pronounce her name

12   wrong -- Krawiec?

13   A.  Krawiec.

14   Q.  Krawiec.

15             In terms of the people that were, kind of, ultimately

16   responsible for the final product, would that have included

17   you, Mr. Craig, Mr. Sloan, and Alex Haskell?

18   A.  I'm not sure what you mean by "responsible."

19   Q.  When it came time to take comments from the client and his

20   representatives or its representatives, and to review those

21   comments and decide which ones you might make, which ones you

22   might not, was the team that reviewed all of that, was that you

23   and Mr. Craig and Mr. Sloan and Mr. Haskell?

24   A.  We were involved in reviewing comments from Ukraine.

25   Q.  And in terms -- was it a collaborative process of reviewing

1   those comments?

2          THE COURT:  I think this gets back up to whether this

3   happened, to the extent it happened, and what we talked about

4   at the bench.

5          MR. MURPHY:  Okay.

6          THE COURT:  So you were part of the process?

7          THE WITNESS:  That's correct.

8          THE COURT:  All right.

9          Next question.

10          MR. MURPHY:  All right.

11   BY MR. MURPHY:

12   Q.  At the end of the day, when the report was completed, did

13   you believe that you had achieved your goal of creating an

14   independent report?

15   A.  Yes.

16   Q.  Were you proud of the work that you had done?

17   A.  Yes.

18   Q.  When the report was released to the media by the Ukraine in

19   mid-December of 2012, were you among the people that were

20   concerned that the --

21          MS. GASTON:  Objection.

22          THE COURT:  Let him ask the question first.  All

23   right.  No facial expressions.

24   BY MR. MURPHY:

25   Q.  Were you among the people that were concerned that the

 1    media, in general, was not understanding some of the

 2    conclusions reached in the report?

 3    A.  Yes.

 4              THE COURT:  Well, that -- okay.  That assumed a fact

 5    that had not yet been established.  But, okay.

 6              Next question.

 7              MR. MURPHY:  All right.

 8    BY MR. MURPHY:

 9    Q.  And did you and others at the firm talk about the fact that

10    it didn't seem like anyone in the media was actually reading

11    your report?

12    A.  Yes.

13    Q.  And, in fact, some of the conclusions that you had reached

14    in the Report were being misstated in various media outlets.

15    Do you recall that?

16    A.  Yes.

17    Q.  And, in fact, do you recall that you were concerned that

18    the United States Department of State and its

19    representatives --

20              MS. GASTON:  Objection.

21              THE COURT:  Sustained.  We're really --

22              MR. MURPHY:  All right.

23    BY MR. MURPHY:

24    Q.  Were you, as you think back on it, December of 2012,

25    disappointed --

```
 1              MS. GASTON:  Objection.
 2    BY MR. MURPHY:
 3    Q.  -- with the way in which the media was characterizing your
 4    report?
 5              THE COURT:  You can answer that question.
 6    A.  Yes.
 7    BY MR. MURPHY:
 8    Q.  Now, I want to ask you some general questions about some
 9    people that we've mentioned.
10              Did you have any contact with Paul Manafort during
11    the time you worked on this project?
12    A.  No.
13    Q.  Never met him?
14    A.  No.
15    Q.  Never spoke to him on the phone?
16    A.  No.
17    Q.  Any email exchanges that you had directly with him?
18    A.  Not directly.
19    Q.  Same question about Rick Gates.
20              Did you ever meet Rick Gates?
21    A.  No.
22    Q.  Ever talk to him on the phone?
23    A.  No.
24    Q.  Ever had any email communications with him?
25    A.  Not directly.
```

1    Q.  There's been a mention of Jonathan Hawker of FTI

2    Consulting.  Did you meet him?

3    A.  I don't recall meeting him.

4    Q.  There's some folks that were involved in the media rollout

5    of the Skadden Report of the Tymoshenko trial from the Podesta

6    Group.  Did you know anything about that?

7              THE COURT:  Did you deal with the Podesta Group at

8    all?

9              THE WITNESS:  I don't recall dealing with the Podesta

10   Group.

11   BY MR. MURPHY:

12   Q.  Mercury, or Vin Weber?

13   A.  I don't recall dealing with them.

14   Q.  A PR firm call Burson-Marsteller?

15   A.  I don't recall dealing with them.

16   Q.  Another PR firm called FleishmanHillard?

17   A.  I don't recall dealing with them.

18   Q.  During your direct testimony, you mentioned that you had

19   done some early FARA research.  Do you recall that?

20   A.  Yes.

21   Q.  And the government showed you Government Exhibit 67, in

22   which Mr. Haskell's research memo was forwarded to you by

23   Mr. Sloan.  Do you recall that?

24   A.  Do I recall being shown it?

25   Q.  Yes, this morning.

1    A.  This morning, yes.

2    Q.  Okay.

3         MR. MURPHY:  Why don't we bring up Government's

4    Exhibit 67 on the screen.

5    BY MR. MURPHY:

6    Q.  My question, though, before we get there, Mr. Kedem, do you

7    remember actually doing some research on FARA before April 17th

8    of 2012, when Mr. Sloan sent you Mr. Haskell's earlier email?

9    A.  So, I don't remember the exact timing, but I recall having

10   been asked to take a look at the statute.

11   Q.  And that was separate and apart from the communications

12   that you had with Ken Gross about the public relations aspect

13   of the project; isn't that right?

14   A.  That's my recollection.

15   Q.  So, sometime earlier on, in addition to the fact that

16   Mr. Haskell --

17        THE COURT:  He said he didn't recall the timing.

18   BY MR. MURPHY:

19   Q.  Well, do you recall --

20        THE COURT:  At some point, you did some research?

21        THE WITNESS:  Pardon?

22        THE COURT:  You did some research yourself into the

23   statute, but you don't know when?

24        THE WITNESS:  I remember that it was shortly after I

25   was made aware of the project.

1          THE COURT:  Okay.  And before you had to talk to

2    Mr. Gross on the phone?

3          THE WITNESS:  That's correct.

4          THE COURT:  Okay.

5          MR. MURPHY:  Okay.

6    BY MR. MURPHY:

7    Q.  You were made aware of the project back in the February

8    2012 timeframe, right?

9    A.  I think that's generally consistent with when I recall.

10   Q.  Okay.  Do you remember that there was some delay in the

11   project getting started, before it got started in earnest in

12   April?

13   A.  I don't recall.

14   Q.  Okay.  In any event, you remember doing some research.

15          Did you reduce that research to writing in any form,

16   or did you just give an oral report to Mr. Sloan or Mr. Craig?

17   A.  I don't recall reducing it to writing.

18   Q.  Do you remember talking to them about it?

19   A.  I remember reporting back to whichever of them it was that

20   got in touch with me and saying that I had looked at it.

21   Q.  And what did you tell them about what you had seen when you

22   looked at it?

23   A.  I told them that just from reading the statute, that it

24   didn't seem like it applied to the work that we were

25   anticipating.

1    Q.  Okay.  While you were working on the project, did you ever

2    consider yourself to be acting as an agent for the government

3    of Ukraine?

4    A.  No.

5    Q.  Did you consider Skadden --

6              THE COURT:  As an agent --

7              MR. MURPHY:  An agent.

8              THE COURT:  -- with respect to FARA --

9              MR. MURPHY:  On the FARA statute.

10             THE COURT:  -- or an agent as working for them --

11   BY MR. MURPHY:

12   Q.  With respect to the FARA statute, as defined in the

13   statute, did you consider yourself to be acting as an agent for

14   the government of Ukraine?

15             MS. GASTON:  Objection.

16             THE COURT:  Sustained.

17   BY MR. MURPHY:

18   Q.  Did you think that anybody at Skadden was acting as agents

19   for the government of Ukraine in connection with the Tymoshenko

20   Report?

21             MS. GASTON:  Objection.

22             THE COURT:  Sustained.

23             MR. MURPHY:  All right.  Let's look at Exhibit 67.

24   Can you turn to the second page of this exhibit, and blow up

25   the top half?

1    BY MR. MURPHY:

2    Q.  Now, is this all part of Mr. Haskell's analysis of how the

3    statute works?

4    A.  That's what it looks like.

5    Q.  Okay.

6              MR. MURPHY:  And if we turn to the fourth page of the

7    exhibit and blow up the top.

8    BY MR. MURPHY:

9    Q.  Did Mr. Haskell attach to his memorandum a copy of the

10   statute itself?

11   A.  Yes.

12   Q.  And that continues on for quite a few pages, doesn't it?

13             Do you have the document in front of you?

14   A.  I do.

15   Q.  Thank you.

16   A.  And it looks like it continues for several pages.

17   Q.  All right.  And then, if we turn to page 16 of this

18   exhibit.

19             MS. GASTON:  Objection.

20             THE COURT:  Let me hear the question.

21             MR. MURPHY:  And if we just blow up the bottom part

22   of that.  That's fine.

23   BY MR. MURPHY:

24   Q.  Are these the regulations that the Department of Justice

25   issues under FARA?

1    A.  That's what it look like.

2    Q.  And Mr. Haskell attached those to his memorandum as well,

3    didn't he?

4    A.  He did.

5    Q.  Now, let's look at Exhibit Number 71.

6              THE COURTROOM DEPUTY:  Government?

7              THE COURT:  Defense or government?

8              MR. MURPHY:  Government Exhibit 71.

9              THE COURT:  Thank you.

10             MR. MURPHY:  Which is in evidence.

11             THE COURT:  Okay.  Just wanted to know which one.

12             MS. GASTON:  Objection.

13             THE COURT:  Again, I think I want to hear the

14   question.

15             MS. GASTON:  I believe he --

16             THE COURT:  All right.  Let me -- let me -- go ahead.

17             MS. GASTON:  This exhibit includes an email that the

18   witness did not receive.

19             THE COURT:  All right.  Let's take it off the jurors'

20   screens, and you can approach.

21             MR. MURPHY:  Okay.

22             (Bench discussion:)

23             THE COURT:  I might need it on my screen.

24             He has a copy.  Never mind.

25             MR. MURPHY:  So, Government 70, Your Honor, was

1    everything on this page.

2              THE COURT:  Can you speak so that I can hear you and

3    not everybody in the room?

4              MR. MURPHY:  Sorry.

5              Government's Exhibit 70 included everything that's on

6    this page, except Mr. Craig's response to Mr. Sloan, "Good

7    advice."

8              THE COURT:  Okay.

9              MR. MURPHY:  All I want to do is ask him if he knew

10   that this advice was accepted by Mr. Sloan and Mr. Craig.

11   That's all.

12             MS. GASTON:  He received Mr. Sloan's assessment of

13   the advice.  Mr. Craig did not include him on the reply.

14             MR. MURPHY:  So, he might know that.

15             THE COURT:  Well, I think you can ask Mr. Sloan about

16   it.

17             MR. MURPHY:  I can.  Why can't I ask Mr. Kedem?

18             THE COURT:  Because there's no reason to believe he

19   knows about it.

20             MR. MURPHY:  Your Honor, the government has asked

21   Mr. Kedem many, many questions about exhibits he knows nothing

22   about.  They showed him every letter sent to the FARA Unit that

23   he had nothing to do with.

24             MS. GASTON:  All of which he received.

25             THE COURT:  All right.  Let's not talk at the same

```
1    time.
2              I don't think there's going to be any dispute that at
3    some point Mr. Craig responds to Mr. Sloan's email and said,
4    "Good advice."
5              MS. GASTON:  They can bring it in through Mr. Sloan,
6    who received it.
7              THE COURT:  All right.  Do you want to show it him
8    and say, Did you get this?  And he can say yes or no, and
9    that's it.
10             MR. MURPHY:  Okay.
11             THE COURT:  All right.
12             (Open court:)
13             THE COURT:  All right.  I think Ms. Gaston is coming
14   back, so you should come back, too.
15             (Bench discussion:)
16             MS. GASTON:  And put it on the jury screens while he
17   looks at it?
18             THE COURT:  Why do you get to do that?
19             MR. MURPHY:  It's in evidence, Your Honor.  It's been
20   admitted.
21             THE COURT:  No.  No.  No.  No.  You remember, we you
22   talked about how things aren't in evidence until a witness has
23   talked about them.  So it isn't in evidence yet.  I've ruled
24   that when they want to use it or when you want to use it with
25   the person, that it can come in.
```

 1          Why don't you just ask him if after he sent

 2    Mr. Gross's advice to Mr. Sloan and Mr. Craig, if Mr. Craig

 3    responded.

 4          MR. MURPHY:  I'll take it slow.

 5          THE COURT:  What does that mean?

 6          MR. MURPHY:  I'm going to show him Exhibit 70.

 7          THE COURT:  All right.

 8          MR. MURPHY:  And then I'll ask him.

 9          THE COURT:  All right.

10          (Open court:)

11          MR. MURPHY:  Your Honor, can we put Government

12    Exhibit 70 up on the screen?

13    BY MR. MURPHY:

14    Q.  Mr. Kedem, Exhibit Number 70 is the one that the government

15    showed you this morning, right?

16    A.  Yes.

17    Q.  And it recounts that Mr. van der Zwaan asked the team --

18    because he addressed his question to Project Kyiv DL, right?

19    His initial question on the second page of the exhibit.

20    A.  That's who the email is sent to.

21    Q.  And Project Kyiv DL, that stands for distribution list, DL?

22    A.  I think so.

23    Q.  And you were on that distribution list, right?

24    A.  At some point I became on it, yeah.

25    Q.  And he was asking for advice about whether or not Skadden

 1    could get involved in helping the Ukraine find some PR

 2    advisors, right?

 3    A.  That's one of the questions.

 4    Q.  And then Mr. Sloan -- if you look at the next email on the

 5    chain, Mr. Sloan said that Ken Gross might give you a call,

 6    right?

 7    A.  Yes.

 8    Q.  Okay.  And Mr. Sloan told you that Mr. Gross was the

 9    resident expert within the law firm with respect to FARA

10    issues, correct?

11    A.  Yes.

12    Q.  He referred to him as the "guru," right?

13    A.  That's right.

14    Q.  Okay.  And then you did go to speak to Mr. Gross about the

15    questions that you had received from Mr. Sloan and

16    Mr. van der Zwaan, right?

17    A.  I spoke to him.

18    Q.  Yeah.  And did you find out that Mr. Gross was, indeed,

19    someone who had had considerable experience in dealing with the

20    FARA statute?

21    A.  Yes.

22    Q.  And he told you that the law firm should not engage in

23    public relations work if it did not want to register under

24    FARA, correct?

25    A.  Yes.

1    Q.  And he told you that if the law firm were to hire the

2    public relations firm itself, under a subcontract basis, that

3    that also might require FARA registration, correct?

4    A.  Yes.

5    Q.  Okay.  And you conveyed that advice to Mr. Sloan?

6    A.  That's correct.

7    Q.  And also to Mr. Craig, right?

8    A.  That's right.

9    Q.  And that was in your email of April 17th at, I think,

10   12:26 p.m., right?

11   A.  That's right.

12            MR. MURPHY:  That would be the next one up, I think,

13   John.

14   BY MR. MURPHY:

15   Q.  And then after conveying that message to Mr. Sloan and

16   Mr. Craig, Mr. Sloan got back to you, right?  At the top of the

17   page.

18   A.  That's right.

19   Q.  Okay.  And he said to Greg -- that's Greg Craig, right?

20   A.  That's correct.

21   Q.  -- "I think our engagement should not include PR advice.

22   Manafort or Schoen or somebody else can hire the PR team and

23   manage that," right?

24   A.  That's what he said.

25   Q.  Okay.  And did you know at the time who Schoen was, even?

1     A.   No.

2     Q.   Okay.  You had heard of Manafort, I guess.

3     A.   At that time?

4     Q.   Not even sure?

5     A.   I don't know that I'd heard of him.

6     Q.   Okay.  But in any event, the suggestion was that someone

7     else should hire a PR firm for the Ukraine, correct?

8     A.   That's what it says.

9     Q.   And Mr. Sloan went on to say that it was not only a FARA

10    problem, but in terms of your role as independent rule of law

11    advisors, it might seem inconsistent if you were also

12    registered agents for the government of Ukraine, right?

13    A.   Yes, that's what it says.

14    Q.   Okay.  He said, "Of course, we can provide information and

15    answer questions for the PR firm at the client's direction,"

16    right?

17    A.   That's correct.

18    Q.   Okay.  And did you ever have any reason to doubt that that

19    was a correct statement by Mr. Sloan?

20    A.   Statement about the law, you mean?

21    Q.   Statement that "We can provide information and answer

22    questions for the PR firm at the client's direction."

23         Did you have any reason to question Mr. Sloan's

24    assessment of what the legal landscape was?

25    A.   I don't -- I don't recall having any reason to question it.

1    Q.   Okay.  I mean, you didn't say, that's not consistent with

2    what Ken Gross said, right?

3    A.   I don't recall saying that, no.

4    Q.   Okay.  You don't recall disagreeing with it in any way, do

5    you?

6    A.   No.

7    Q.   Okay.  And do you know whether Mr. Craig expressed his

8    agreement with Mr. Sloan's assessment?

9    A.   Are you asking whether I recall?

10   Q.   Yes.

11   A.   I don't remember this email chain.

12   Q.   Okay.  This is just one of the emails from seven years ago

13   that you don't really recall that well?

14   A.   That's right.

15   Q.   Okay.

16            Let me show you next, Government Exhibit 534.

17            THE COURTROOM DEPUTY:  Is this already in evidence?

18            MR. MURPHY:  It's in evidence, yes.

19            THE COURTROOM DEPUTY:  Thank you.

20            THE COURT:  Mr. Murphy, I was going to do the

21   midmorning break at the end of your cross, but I'm not sure --

22   it's already longer than I thought it was going to be.

23            So, can you tell me about how much you think you're

24   going to have, since they've been sitting here for a while?

25            MR. MURPHY:  I think it's going to be a half hour or

 1    more.

 2              THE COURT:  All right.  So, then we're going to take

 3    our midmorning break right now.  I want to caution everyone

 4    that you cannot discuss the case with each other or do any

 5    research or thinking about the case.  And you're excused, and

 6    we'll try to pick up again at noon.

 7              Thank you.

 8              (Whereupon the jury exits the courtroom.)

 9              THE COURT:  All right.  We'll resume at noon.

10              And I understand, Mr. Murphy, that you're chafing at

11    my rulings about the scope of the direct.  But, you informed me

12    specifically at the beginning this morning that this witness is

13    equally available to you when you want to call him in your

14    case, if you want to.  And, so, I don't see any reason to

15    depart from those basic rules.

16              MR. MURPHY:  Understood, Your Honor.  But you and I,

17    I think, have a little different understanding of what the

18    scope of direct is.

19              THE COURT:  Okay.  Well, I'm listening to it, and I'm

20    doing the best I can, based on my recollection of the

21    testimony.

22              MR. MURPHY:  And I'm doing the same, Your Honor.

23              Thank you.

24              THE COURT:  All right.

25              (Recess.)

1          THE COURT:  Let's bring in the jury.

2          (Whereupon the jury enters the courtroom.)

3          THE COURT:  All right.  Mr. Murphy, you can continue.

4          MR. MURPHY:  Thank you, Your Honor.

5    BY MR. MURPHY:

6    Q.  Mr. Kedem, you mentioned this morning, in response to some

7    questions from the government, that you, I think, had been to

8    the Ukraine, in connection with this project, one time; is that

9    right?

10   A.  That's right.

11   Q.  Okay.  And that trip that you took to the Ukraine was in

12   July of 2012?

13   A.  That's correct.

14   Q.  I would like to see if we can narrow down that a little bit

15   more closely.

16          MR. MURPHY:  And I would like to look at Exhibit 584

17   which is in evidence --

18          THE COURTROOM DEPUTY:  Government or defense?

19          MR. MURPHY:  Government 584, which is the Skadden

20   invoice dated August the 20th, which includes the time that was

21   spent by the various people in the month of July.

22          MS. GASTON:  Exhibit?

23          THE COURT:  Wait.

24          MR. MURPHY:  Sorry?

25          THE COURT:  I can't hear the prosecutor.  She's

 1   talking.

 2             MR. MURPHY:  Government Exhibit 584.

 3   BY MR. MURPHY:

 4   Q.  And while you were working on this project, did you record

 5   the time that you spent every day and what you were doing in

 6   some summary form and include it in the billing records for the

 7   firm?

 8   A.  Yes.

 9   Q.  And if we turn to page 9 of Exhibit 584.

10             MR. MURPHY:  And go to the bottom of the page and

11   blow that up, the very bottom of that page.

12   BY MR. MURPHY:

13   Q.  That looks like where your time entries begin for the month

14   of July, right?

15   A.  That's right.

16   Q.  Okay.  And you were working, at that time, on drafting the

17   report, mostly, right?

18   A.  Um --

19   Q.  Let's look at the next page, and it will help you, I think.

20             MR. MURPHY:  And blow up the top half of the page.

21   BY MR. MURPHY:

22   Q.  It looks like pretty much every day you were spending a

23   pretty full day, a lot of days, drafting the Project One report

24   and having communications about the report, drafting?

25   A.  That's what it looks like.

```
1   Q.  Okay.  And then, if you go down to July the 17th of 2012 --

2               MR. MURPHY:  And then you can blow up the bottom of

3   the page.

4   BY MR. MURPHY:

5   Q.  -- you can see that you had travel to Kyiv for Project One

6   report, right?

7   A.  I did.

8   Q.  Okay.  And that's the date you traveled to Kyiv?

9   A.  Probably.

10  Q.  Okay.

11  A.  I just want to be clear.  I didn't -- I don't know whether

12  I wrote this document or its just a recollection of someone

13  else about things that I did.

14  Q.  Okay.  Well, did you record your time?

15  A.  I did record my time, yeah.

16  Q.  All right.  And did you take part, on July the 18th, in an

17  interview with the judge in the case, Judge Kireyev?

18              MS. GASTON:  Objection, Your Honor.

19              THE COURT:  Are you just trying to determine whether

20  he was actually in Kyiv?

21              MR. MURPHY:  That's right, Your Honor.

22              THE COURT:  All right.

23              So do these time records refresh your recollection as

24  to whether you were in Kyiv during these activities during that

25  period of time?
```

```
 1                THE WITNESS:  I was in Kyiv, I think around this

 2      time, doing these activities, including interviewing

 3      Judge Kireyev.

 4                MR. MURPHY:  And then, if you turn the page, to the

 5      next page, and blow up the top.

 6      BY MR. MURPHY:

 7      Q.  On July the 20th, you had a -- you participated in a

 8      meeting with the prime minister and members of the Prosecutor

 9      General's Office, right?

10                MS. GASTON:  Objection.

11                THE COURT:  Are we getting to --

12                MR. MURPHY:  We are, Your Honor.

13                THE COURT:  All right.

14                So this is also something you did then?

15                THE WITNESS:  That is something I did, yeah.

16                THE COURT:  Okay.

17      BY MR. MURPHY:

18      Q.  And that prime minister, that wasn't Yulia Tymoshenko.

19      That was the current prime minster, whose name was Azarov; is

20      that right?

21      A.  I think that's right.

22      Q.  Okay.  The night before, there was testimony that there was

23      a dinner, that Ms. Gaston asked you about a dinner that you

24      attended.  Do you recall the testimony?

25      A.  I do.
```

1    Q.   Okay.  Was that the night before your interview with

2    Mr. Azarov?

3    A.   That's right.

4    Q.   And you remember that because this was a Ukrainian

5    celebratory dinner of some sort with a lot of shots of vodka

6    being consumed; is that right?

7    A.   It was a banquet of some sort, and there was a lot of

8    vodka.

9    Q.   Okay.  And you remember that when you interviewed the prime

10   minister the next day, you were feeling a little under the

11   weather?

12   A.   That's right.

13   Q.   Okay.  At the banquet, or dinner, did --

14           MS. GASTON:  Objection.

15           THE COURT:  Let him ask the question and then I'll

16   rule on the objection.

17   BY MR. MURPHY:

18   Q.   -- did you receive a gift and did others receive gifts from

19   the members of the procurator general's staff?

20           THE COURT:  All right.  Can you approach?

21           MR. MURPHY:  Sure.

22           (Bench discussion:)

23           THE COURT:  Your objection?

24           MS. GASTON:  It's outside of the scope of direct.

25   Mr. Murphy is trying to put his case in through Mr. Kedem right

1    now.  This is exactly what he said he would not do this

2    morning, when we agreed to put this witness on first.

3            THE COURT:  What is the relevance of the testimony

4    about the gift at the dinner?

5            MR. MURPHY:  Okay.  So, Mr. Hawker has stated in a

6    302 that this dinner, at which everyone received gifts of

7    clocks and things, took place after the Report was issued, and

8    it was a celebratory dinner given by the procurator general to

9    congratulate FTI and Skadden on a successful PR campaign that

10   had been successfully achieved.

11           That testimony, if he gives it, is false.  We know

12   it's false because Mr. Kedem was at the dinner.  He received

13   one of the clocks.  And the dinner was on July the 19th, long

14   before the Report was even finished, let alone that there was a

15   PR campaign.

16           So, I want to just establish, simply, that he got the

17   clock.  That's it.

18           THE COURT:  All right.  Anything further, again, we

19   are going well outside the scope of direct.  You can ask one

20   question, Was this the only dinner that you attended --

21           MS. GASTON:  It's not consistent.  He said the

22   dinner, today, that's July 18th.  Mr. Murphy is asking about a

23   different dinner so that he can get in his evidence that they

24   want to put in in their case.  We agreed to call this witness

25   today, out of order, the way that we wanted to, so that we

1    could get him done so that he can go on his vacation.  And

2    Mr. Murphy is exploiting it to put his case in first, and it is

3    not fair.

4              THE COURT:  All right.  My question is:  The

5    dinner --

6              MS. GASTON:  There is an email in which Mr. Kedem

7    said, Can you send me the PR document on the subject of my

8    report that was being discussed?  That's on July 18th.

9              MR. MURPHY:  It's a different dinner.

10             MS. GASTON:  Exactly.  So, he's talking about

11   something outside of the scope of direct.

12             MR. MURPHY:  Your Honor, no.  No, Your Honor.

13   Ms. Gaston asked him specifically if Mr. Hawker was at the

14   dinner, and he said he didn't remember --

15             MS. GASTON:  I asked no such thing.  I asked if he

16   met with Mr. Hawker at all during this trip.

17             MR. MURPHY:  At the dinner.

18             MS. GASTON:  I did not.

19             MR. MURPHY:  Oh, during the trip?

20             MS. GASTON:  If he recalled meeting with him during

21   the trip.

22             THE COURT:  He said he never met at all.

23             MS. GASTON:  He did not remember meeting him.

24             THE COURT:  All right.  I think --

25             MR. MURPHY:  Your Honor, there is one celebratory

1    dinner.  It took place on July the 19th.  Mr. Hawker was there.

2    But it was not to celebrate the end of the PR campaign, where

3    the Ukrainians were slapping them on the back saying, Great

4    job, which is the way Mr. Hawker described it in his most

5    recent 302.

6              MS. GASTON:  Well, Mr. Murphy can cross-examine him

7    about that.  He can bring his own witnesses in this case.

8              THE COURT:  I'm going to ask this gentleman one

9    question, and then we're moving on.

10             MR. MURPHY:  Okay.

11             MS. GASTON:  Your Honor, I would just like to say,

12   Mr. Murphy's cross has already gone for longer than the direct.

13             MR. MURPHY:  I'm almost finished, Your Honor.

14             THE COURT:  I think this is not consist with what you

15   told me at the beginning.  And it's not just that I'm being too

16   technical about the scope of direct.  There's a difference

17   between direct and cross.  There's a narrowing on cross, and

18   the lawyer get to do all the talking.  And on direct it's with

19   respect to his personal knowledge.

20             And, so, you're leading -- when you exceed the cross,

21   you're basically leading the witness to prove your theory,

22   which is what people like to do.  And, of course, always you're

23   entitled to ask questions on cross-examination that support

24   your theory.  But that is different from putting in aspects of

25   your case that are not part of the government's case that

1    otherwise you would have to do during direct examination.

2                And, you know, when you say this is a criminal case,

3    it's true.  But, this isn't the kind of case where you have a

4    lot of captive government witnesses here.  These are people who

5    are equally available to both sides, and you'll have ample

6    opportunity to ask him whatever you want to ask him if and when

7    you decide to call him.  And I think what you're trying to do

8    is to not have to do is that.  And I think this is the end of

9    the road for that.  I will ask one question about that --

10               MR. MURPHY:  All I want to know is whether he got the

11   gift.

12               THE COURT:  I know what you want.  Go ahead.

13               MS. GASTON:  I'm sorry.  Are we --

14               THE COURT:  I'm going to ask one question, and that's

15   it, on the subject, and then we're going to go on.

16               (Open court:)

17               THE COURT:  All right.  Mr. Kedem, did you attend

18   more than one banquet in Kyiv that was a celebration with vodka

19   and gifts?

20               THE WITNESS:  No.

21               THE COURT:  And, so, the one you attended, do you

22   specifically recall that it was when you traveled to Kyiv on

23   this trip?

24               THE WITNESS:  Yes.

25               THE COURT:  All right.  Ask your next question.

1  BY MR. MURPHY:

2  Q.  Did you receive a clock?

3       THE COURT:  I said I was going to ask the question.

4  We're done.  Ask your next question.  This was the dinner with

5  gifts.

6  BY MR. MURPHY:

7  Q.  At the time of the dinner, was the Report finished?

8  A.  No.

9  Q.  In fact, you continued to write the Report while you were

10  in Kyiv, and you stayed a few extra days in your hotel room

11  drafting your report, didn't you?

12  A.  I worked on it, yeah, for an additional couple days there.

13  Q.  Okay.  And, in fact, you finished the final draft on or

14  about the end of July; isn't that right?

15  A.  I don't remember exactly.  I think it was the end of the

16  summer, generally, when the Report was complete.

17  Q.  Okay.  Let me show you next what was -- has been admitted

18  as Government Exhibit 180.

19       MR. MURPHY:  And if you just blow that up, John.

20  BY MR. MURPHY:

21  Q.  This is an email that you sent to Mr. van der Zwaan on the

22  18th of July.  That's while you were in Kyiv, right?

23  A.  I think so.

24  Q.  And -- well, we just looked at your time records, right?

25  So, you were in Kyiv, right?

1    A.  I think so.  Yeah, that's right.

2    Q.  And you asked him to forward to you a PR document on the

3    Project One report that was being discussed at a dinner that

4    day, right?

5    A.  That's right.

6    Q.  Do you remember anything about the discussion of a PR

7    report?

8    A.  No.

9    Q.  Now, if we look at Exhibit 182, Government Exhibit 182.

10   And if you look at the second page first, the bottom email.

11          So, these email chains, they usually run -- the last

12   one in the chain is the first one that occurred.  And then as

13   people respond, they end up on top of the one before it, right?

14   A.  That's right.

15   Q.  Okay.  So the first email in the chain, by time, was an

16   email from Jon Aarons at FTI Consulting.

17          Did you know who he was?

18   A.  I don't think so.

19   Q.  And he sent it to Rick Gates at -- looks like four

20   different email addresses, and a copy to Jonathan Hawker.  Do

21   you see that?

22   A.  I do.

23   Q.  And he said -- Mr. Aarons said to Rick, "Here's the

24   promised document.  We look forward to your responses," right?

25   A.  That's right.

1    Q.  Okay.  And then, if you turn to the first page of the

2    exhibit, the next email in the chain, Rick Gates sent to

3    Alex van der Zwaan on July the 17th, "FYI, per our discussion,"

4    right?

5    A.  That's right.

6    Q.  And the subject was the "Project Veritas communication

7    strategies."

8            Do you see that?

9    A.  I do.

10   Q.  Did you know anything about what Project Veritas was?

11   A.  I don't think so.

12   Q.  It's a Latin word meaning truth, right?

13   A.  That's right.

14   Q.  Okay.

15           THE COURT:  You should know that if you went to

16   Harvard.

17           THE WITNESS:  Yeah.

18           MR. MURPHY:  I'm sorry.  I didn't hear that, Your

19   Honor.

20           THE COURT:  I said he should know that if he went to

21   Harvard.

22           MR. MURPHY:  Yes.  It's the symbol of Harvard.  It

23   says so right on the seal, right?

24           THE WITNESS:  Yes.

25           MR. MURPHY:  Okay.  I wonder if Mr. Hawker went to

1    Harvard?

2              MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.

3              THE COURT:  Just, you know, next question.

4              MR. MURPHY:  I'm sorry.

5    BY MR. MURPHY:

6    Q.  On the top email, Mr. Kedem, you wrote to Cliff Sloan and

7    Margaret on the 20th, attaching the document that Mr. Aarons

8    had sent to Mr. Gates and then Mr. Gates had sent to

9    Mr. van der Zwaan, right?

10   A.  Yes.

11   Q.  And you expressed some concerns about it, right?

12   A.  I'm sorry.  What are you referring to?

13   Q.  Well, the document discusses a PR strategy.  And starting

14   at page 5, specifically about how to handle our report.  On

15   page 6 it says, "The Report will conclude that the trial was

16   valid, that the crime was committed, and that the sentence was

17   appropriate."

18              Weren't you concerned about that?

19   A.  I mean, I don't remember this email.  But, I think the

20   email says that I, you know, noted that the firm acknowledged

21   they hadn't read the Report.

22   Q.  Right.  So FTI hadn't seen the Report but, apparently, had

23   produced a document describing the Report, right?

24   A.  That's correct.

25   Q.  And the description that they made, that the Report will

1  conclude that the trial was valid and the crime was committed,

2  was not something that you thought the Report was going to

3  conclude at that point, did you?

4  A.  I don't think so.

5  Q.  And, in fact, wasn't it true that from the outset, when

6  Skadden undertook the project, they said, We will not opine on

7  the ultimate question of guilt or innocence?  Wasn't that part

8  of the understanding from the start?

9  A.  That was part of the understanding.  I guess I don't recall

10  when it was made firm, but that was part of the understanding

11  of the project.

12  Q.  Okay.  You were drafting the Report in July, and you knew

13  that, at that point, the Report was not going to conclude that

14  the crime had been committed, were you?

15  A.  That's correct.

16  Q.  And you weren't going to conclude that the trial was valid

17  either, were you?

18  A.  I don't think so.

19  Q.  Okay.  Because by that time you had identified some due

20  process violations that had occurred in her trial; isn't that

21  true?

22  A.  We definitely identified due process violations.  I don't

23  recall the timing that we identified them.

24  Q.  Okay.  So, you indicate that Mr. Craig spoke briefly with

25  them on this trip.  And by "them," I assume you mean the people

1    from FTI?

2    A.   That's what it looks like, yes.

3    Q.   And gave them a heads-up.  "The Report will not take a

4    position on Tymoshenko's guilt, and it will conclude that there

5    were several significant due process problems with the trial,"

6    right?

7    A.   That's right.

8    Q.   That's what you wrote?

9    A.   That's correct.

10   Q.   Okay.  And in addition, you said that, "Greg" -- that's

11   referring to Mr. Craig -- "has also started easing the

12   government into the knowledge that the Report will not be 100

13   percent favorable," right?

14   A.   That's right.

15   Q.   Did you ever have a sense, Mr. Kedem, that the people at

16   the Ukrainian Ministry of Justice and the Procurator General's

17   Office did not share your view about what an independent report

18   was?

19   A.   Yes.

20   Q.   Now, I want to look at this Project Veritas communication

21   strategy a little bit.  Ms. Gaston showed you a couple

22   passages.  If we turn to page 7 of the exhibit.

23        Actually, if you -- you can glance through it.  But

24   there's a -- an overall communication strategy that begins on

25   the third page of the exhibit, right?

```
 1                    Sorry to bounce you around a little bit.
 2                    Page 3 of the exhibit, which is page 1 of the
 3     attachment.
 4     A.  I see.
 5     Q.  It says, "Project Veritas communication strategy"?
 6     A.  That's right.
 7     Q.  And then at the bottom says, "There's key lessons from our
 8     visit to the Ukraine," right?
 9     A.  That's what it says.
10     Q.  And then, if you turn in a few pages, there is a reference
11     to progress.  That's on page 4 of the memo, page 6 of the
12     exhibit.
13     A.  That's correct.
14     Q.  And then we get to strategy, which is on page 5 of the
15     memo, page 7 of the exhibit, right?
16     A.  That's right.
17     Q.  And under Strategy, the first headline is Skadden Report.
18     Do you see that?
19     A.  Yes.
20     Q.  All right.
21                    MR. MURPHY:  And let's just highlight that.  Okay.
22     BY MR. MURPHY:
23     Q.  And what the authors say is that "Before agreeing a
24     conclusive strategy, we would need to have time to review and
25     prepare appropriately.  Given the tight deadline for
```

1 publication, it is imperative that we have sight of an advanced

2 draft early next week.  Although we have yet to see the

3 document and have not discussed its contents with Skadden, we

4 are operating on the following presumptions."

5   Do you see that?

6 A.  I do.

7 Q.  Okay.  Were you aware, at the time, that there was an

8 imperative deadline to publish the Report?

9 A.  No.

10 Q.  Okay.  The next -- well, the first paragraph of the

11 presumption says that the Report was commissioned by the

12 Ministry of Justice and not the Prosecutor General's

13 Department.  Do you do see that?

14 A.  I see that.

15 Q.  Do you have any knowledge about that, one way or the other?

16 A.  I don't recall.

17 Q.  Okay.  The second item on the next page, at the top, is the

18 item that says, "The Report will conclude that the trial was

19 valid, that the crime was committed, and that the sentence was

20 appropriate," right?

21 A.  That's what it says, Yes.

22 Q.  And then the next one, the next bullet point, 3, says, "The

23 report will contain some criticism of the Prosecutor General's

24 Department based on procedure, etcetera.  They will want to

25 issue a lengthy statement defending themselves, and they may

1    make emotional statements if unrestrained."

2              That's what was said, right?

3    A.  That's right.

4    Q.  Then, Ms. Gaston asked you some questions about some of

5    these other aspects of this media plan.  But, starting at the

6    bottom of page 6 and going over to page 7, there are references

7    to a whole variety of entities and people.  Do you see that?

8    A.  Yes.

9    Q.  Okay.  So there's the president of the Ukraine, the prime

10   minister of the Ukraine.  And then on the next page, if you go

11   down, there's references to a whole lot of folks, including the

12   Skadden team; the Skadden press office; the FTI team in Kyiv,

13   in Moscow, in Berlin, in Paris; the Burson-Marsteller's firm

14   that I asked you about earlier, in Brussels; FleishmanHillard

15   in the United Kingdom, FleishmanHillard in Berlin,

16   FleishmanHillard in Paris; and a PR agency in Washington, D.C.

17             Do you see all that?

18   A.  I do.

19   Q.  Do you have any idea who any of those people were other

20   than Skadden or the Skadden press office?

21   A.  I don't recall ever coming into contact with them.

22   Q.  Okay.  Now, I want to show you next Exhibit 190, Government

23   190.

24             THE COURTROOM DEPUTY:  Admitted?

25             MR. MURPHY:  Yes, previously admitted.

1    BY MR. MURPHY:

2    Q.  Mr. Kedem, this is an email that you wrote to Mr. Craig and

3    Mr. Sloan, with copies to other members of the team, and it

4    looks like it was the attachment of your finished draft of the

5    Tymoshenko case report, right?

6    A.  That's correct.

7    Q.  And the date of that is July the 29th, right?

8    A.  That's right.

9    Q.  So, does that refresh your recollection that that's about

10   the time that you finished the draft?

11   A.  That sounds about right.

12   Q.  All right.  Now, there was a long period of time from the

13   time you finished that draft on July the 29th until the report

14   got released in December, right?

15   A.  That's right.

16   Q.  During that period of time, did you begin to wonder whether

17   the Ukraine was going to release the report?

18              MS. GASTON:  Objection.

19              THE COURT:  Sustained.

20   BY MR. MURPHY:

21   Q.  Did you have any explanation, were you ever given an

22   explanation for why the report wasn't released during that

23   period of time?

24              MS. GASTON:  Objection.

25              THE COURT:  Just answer.  Did you ever get an

```
 1    explanation?
 2             THE WITNESS:  Well, a number of things sort of
 3    happened, some of which I got an explanation for, some of which
 4    didn't, that led to the delay between when it was finished in
 5    December.
 6             THE COURT:  Do you have personal knowledge about why
 7    it got released in December, as opposed to in July?  Were you a
 8    part of those conversations with Ukraine?
 9             THE WITNESS:  So, I never had, to my recollection, a
10    direct conversation with them.  I was shown the contents of
11    communications with them.
12    BY MR. MURPHY:
13    Q.  Can I just ask you, there was a period of time when there
14    was a series of efforts -- and I'm not going to go into them
15    now -- but there was a series of efforts by the Ukraine to ask
16    you to alter your conclusions, wasn't there?
17             THE COURT:  All right.  Can you approach the bench?
18             (Bench discussion:)
19             THE COURT:  Mr. Murphy, I appreciate your right to
20    object to my rulings, but I also expect you to follow them.
21    And your objection to my saying you couldn't go down this road
22    was noted a couple of bench conferences ago.  And I don't like
23    to upbraid people in front of the jury, but we're not going
24    down this road.  This is your testimony.  If you want to do
25    it -- it's outside of the scope of the direct -- and you can
```

1    call him for that purpose.

2              MR. MURPHY:  Okay.

3              THE COURT:  But, I don't know that he has that much

4    personal knowledge anyway, and I ruled on this.  You asked

5    these exact questions about getting comments and getting drafts

6    and incorporating them.  And she objected that it was beyond

7    the scope, and I sustained it.

8              MR. MURPHY:  It's just that there's kind of a

9    mystery, Your Honor, in that the Report is, basically, finished

10   at the end of July.

11             THE COURT:  It's a mystery because you're trying to

12   create the mystery.  And you're welcome to create and/or

13   explain the mystery at some other point, but you cannot use

14   this witness to do it on cross-examination at this time.

15             MR. MURPHY:  Thank you.

16             (Open court:)

17   BY MR. MURPHY:

18   Q.  The Project Veritas media plan that I asked you about,

19   Mr. Kedem, that you received and circulated to the team, to

20   your knowledge, did anyone at Skadden have any role in

21   preparing that plan?

22   A.  Not that I know of.

23   Q.  Okay.  And when you saw it for the first time and

24   circulated it, was it sort of a surprise to you that that

25   document existed?

```
 1              MS. GASTON:  Objection.

 2              THE COURT:  Sustained.

 3              MR. MURPHY:  All right.

 4   BY MR. MURPHY:

 5   Q.  I think you told me that to the best of your recollection,

 6   you'd never met with Mr. Hawker or Mr. Aarons, right?

 7   A.  That's correct.

 8   Q.  Did you ever meet with anybody else that was working for

 9   FTI, as far as you know?

10   A.  Not on this project, as far as I know.

11   Q.  Let's jump ahead to December the 6th in Exhibit 320, which

12   the government introduced earlier today during your testimony.

13              On Thursday, December the 6th, Ms. Whitney, who was

14   Mr. Craig's assistant, sent a email to folks who were working

15   on -- who had been working on the project, including yourself,

16   saying that "Greg is traveling, but wanted me to let you know

17   that the Report will be released on next Wednesday, December

18   the 12th."

19              Do you see that?

20   A.  I do.

21   Q.  Okay.  Do you recall that, in fact, the report was not

22   released until Thursday, December the 13th?

23   A.  I don't remember exactly.

24   Q.  Okay.  When you got the message from Ms. Whitney, was it

25   something that you were expecting to receive, or was it sort of
```

1    coming to you out of the blue?

2    A.  I don't recall the message from Ms. Whitney.  I recall

3    expecting that the Report would be released at some point.

4    Q.  Okay.  Did you have any idea when?  In early December, did

5    you think, it's coming out soon?

6    A.  I don't think I knew when it was going to come out.

7    Q.  Okay.  Had there been prior occasions when it was announced

8    or indicated that they were going to release the Report and

9    then it didn't happen?

10   A.  I remember that there were occasions where I thought it was

11   going to come out a number of times and -- and then it didn't.

12   Q.  Okay.  Exhibit 395, Ms. Gaston showed you this morning, was

13   an email that you sent to the -- to members of the team on

14   December the 13th, right?

15   A.  That's correct.

16   Q.  And on that date you forwarded a snippet -- I'll call it --

17   of some summaries of press reports, right?

18   A.  That's right.

19   Q.  You don't remember where you got this thing, do you?

20   A.  No, not exactly.

21   Q.  Okay.  But what it includes is a reference.  It looks like

22   Item 3 was *The New York Times*, right?

23   A.  That's right.

24   Q.  So there must have been, maybe, some other items, but --

25   A.  That's what it looks like.

1    Q.   But you don't remember?

2    A.   Yeah.  But, I don't remember exactly.

3    Q.   Okay.  And *The New York Times* references to an article that

4    appeared on December the 12th, right?

5    A.   That's right.

6    Q.   So if the Report had been officially released on the 13th,

7    the *Times* article, apparently, appeared on the 12th?

8    A.   It's listed as, the *Times* article, as having come out on

9    the 12th, definitely.

10   Q.   And you quoted from the article in the *Times*, didn't you?

11   A.   That's right.

12   Q.   And the passage that you quoted said, "The lawyers, led by

13   President Obama's former White House Counsel Gregory B. Craig,

14   concluded, on behalf of the Ministry of Justice of Ukraine,

15   that Ms. Tymoshenko was denied legal counsel at critical stages

16   of her trial, and that other times her lawyers were wrongly

17   barred from calling relevant witnesses," right?

18   A.   That's correct.

19   Q.   And that was a partial but fair and correct summary of some

20   of your conclusions in your report, isn't it?

21   A.   That's correct.

22   Q.   And then you indicated coverage also appeared in *The

23   Telegraph*.  And you wrote -- or, I don't know if you wrote

24   this, but somebody wrote, "Gregory Craig, as quoted," right?

25   A.   That's correct.

1    Q.  And *The Telegraph* -- do you know what *The Telegraph* is?

2    A.  I assume it could be a British publication.  I think

3    there's one called *The Telegraph*.

4    Q.  Okay.  In London; is that correct?

5    A.  That's correct.

6    Q.  Okay.  And then it says the *Associated Press* and *Kyiv Post*.

7         You were familiar with the *Kyiv Post*, right?

8    A.  That's correct.

9    Q.  The *Kyiv Post* was an English-language newspaper that came

10   out in the Ukraine, right?

11   A.  It was something that I accessed on the web, so I don't

12   know where it came out.  But, it was an English-language source

13   covering Ukrainian news.

14   Q.  Do you remember how the *Kyiv Post* covered the release of

15   the Report?

16         MS. GASTON:  Objection.

17         THE COURT:  Do you have personal knowledge of how the

18   *Kyiv Post* -- do you remember?

19         THE WITNESS:  Yes.

20         THE COURT:  You can ask the question.

21   BY MR. MURPHY:

22   Q.  What do you remember about it?

23   A.  So, I read a number of articles from the *Kyiv Post*, and I

24   remember that their coverage was probably the most in depth and

25   balanced.  And they seemed like they were the most familiar

1    with the Report and what it actually said.

2    Q.  Okay.  And earlier you told me that at the time that the

3    Report was released, there was some consternation among the

4    Skadden attorneys who had worked on it that some of the press

5    coverage was not accurate, right?

6    A.  That's correct.

7    Q.  Okay.  But the *Kyiv Post* was fairly accurate?

8    A.  Comparatively, yes.

9    Q.  Okay.  Let's look at Government Exhibit 461.

10            You were shown this document earlier this morning.

11   This is another email from Ms. Whitney.  Now, this is in

12   September of 2013, right?

13   A.  That's right.

14   Q.  Okay.  So this is about nine months after the Report had

15   been released, correct?

16   A.  That's right.

17   Q.  And Ms. Whitney says, "Hi, guys.  FYI, Greg asked that I

18   send you both a copy of this attached letter."

19            And the attached letter was a letter from the FARA

20   Unit dated September 5th, 2013, correct?

21   A.  Yes.

22   Q.  All right.  And you and Alex Haskell both were recipients

23   on this email, right?

24   A.  That's right.

25   Q.  Now, at the bottom there's an email from Mr. Craig to

1    Mr. Spiegel and Mr. Zornow on September the 9th, 2013, in which

2    Mr. Craig wrote, "DoJ has concluded that we should register

3    under FARA.  I am looking at what options are available, if

4    any," right?

5    A.   That's what it says, yes.

6    Q.   Okay.  Now, there's sort of an implication, I think, in

7    this email that Ms. Whitney might be preparing you to do some

8    work on this response.

9         Do you recall whether you did any work in connection

10   with this?

11   A.   No.

12   Q.   Okay.  Best of your knowledge, you got these emails, but

13   nobody asked you to do anything?

14   A.   I just don't remember either receiving the emails or doing

15   any work in response to them.

16   Q.   Okay.  And I think you mentioned, but, Mr. Zornow was a

17   member of firm management, I think you said, right?

18   A.   That's right.

19   Q.   Was he the global head of litigation for Skadden?

20   A.   That sounds right.

21   Q.   And Skadden is a big global operation, right?

22   A.   That's correct.

23   Q.   Do you recall approximately how many offices Skadden had

24   around the world?

25   A.   Well over a dozen, I think.

1   Q.  And then Mr. Spiegel, you indicated, was the in-house, sort

2   of, counsel to the firm; is that right?

3   A.  I think so.

4   Q.  So he is the lawyer for the firm when the firm had some

5   legal issues?

6   A.  That's correct.

7   Q.  Okay.  All right.  Can I show you next the Government

8   Exhibit 466, which is in evidence.

9           And this was an email, I think, that Ms. Gaston also

10  showed you.  I want to look at the top, which was an email from

11  Mr. Craig to you on September the 19th regarding FARA, right?

12  A.  That's right.

13  Q.  And he said to you, "Maybe the way forward here is to draft

14  a strong response to the letter and to ask for a meeting with

15  other decision makers; for example, their supervisors in the

16  department," right?

17  A.  Yep.

18  Q.  Do you recall hearing that that meeting took place?

19  A.  No.

20  Q.  Although Mr. Greg -- I'm sorry -- Mr. Craig provided this

21  information to you, again, you don't remember him asking you to

22  do anything specific about it?

23  A.  That's right.

24  Q.  And let's look next at Government Exhibit 7, which

25  Ms. Gaston showed you.

1          This is a short email from Mr. Craig to you -- oh,

2     I'm sorry -- yeah, to you and to Mr. Spiegel, right?

3     A.   That's right.

4     Q.   And in it Mr. Craig says, "Here's a first shot at it.

5     Perhaps we need to include some legal research."

6          Do you see that?

7     A.   Yeah.

8     Q.   And I'm thinking that if legal research was to be done on

9     this issue, Mr. Craig might be turning to you to do it, right?

10    A.   He might have.

11    Q.   More likely that you would do it than Mr. Spiegel would do

12    it; is that fair?

13    A.   Probably, yes.

14    Q.   Okay.  But you don't remember whether he ever asked you to

15    do any legal research?

16    A.   That's correct.

17    Q.   Okay.  And to your knowledge, was the attached draft letter

18    ever sent by anyone at Skadden to the Department of Justice?

19    A.   Not that I know of.

20    Q.   And then Exhibit 476, which Ms. Gaston showed you.

21          That's another letter from Mr. Craig -- or, an email

22    from Mr. Craig to you and Mr. Haskell on Tuesday, October the

23    15th, 2013, right?

24    A.   That's correct.

25    Q.   And its subject matter is, "Final letter to H. Hunt, re

1    FARA," right?

2    A.  That's right.

3    Q.  And Mr. Craig said, "Final chapter, I hope," right?

4    A.  That's correct.

5    Q.  Okay.  And that -- do you know whether this letter was

6    sent?

7    A.  I don't.

8    Q.  Okay.  But, you do recall hearing that at some point after

9    October of 2013, that the FARA Unit changed its mind and

10   determined that the firm was not required to register under

11   FARA in connection with its activities for the Ukraine in

12   connection with the Tymoshenko Report, right?

13   A.  That's right.

14   Q.  Okay.

15              MR. MURPHY:  I have no further questions, Your Honor.

16              THE COURT:  All right.

17              MR. MURPHY:  Thank you, Mr. Kedem.

18              THE COURT:  Redirect?

19              MS. GASTON:  Very brief, Your Honor.

20                       REDIRECT EXAMINATION

21   BY MS. GASTON:

22   Q.  Mr. Kedem, Mr. Murphy asked you about the engagement letter

23   that you remembered seeing regarding the Ukraine matter.  Do

24   you know whether Ukraine ever signed that letter?

25   A.  I don't know.

1    Q.   Okay.   Then he asked you about your independent FARA

2    research that you conducted at sometime near the beginning of

3    the Report.   And you mentioned that you had concluded that the

4    Report would not require FARA registration; is that right?

5    A.   That's right.

6    Q.   That didn't take into account any public relations or media

7    contacts, did it?

8    A.   I don't think so.   I think what I recalled is that I was

9    asked about the writing of the Report, an independent report,

10   whether that would require registration under FARA, and that's

11   what I looked into.

12   Q.   So just the Report?

13   A.   That's right.

14   Q.   And then, finally, Mr. Murphy just asked you about a series

15   of documents.   First it was Exhibit 461, which was when

16   Ms. Whitney emailed a copy of the incoming letter from the FARA

17   Unit stating that Skadden had to register.

18           Do you remember that document?

19   A.   I remember seeing it just now, yes.

20   Q.   Right.   Not from the time?

21   A.   That's right.

22   Q.   And that email was to you and Mr. Haskell, correct?

23   A.   That's correct.

24   Q.   And then there are two emails that Mr. Craig sent only to

25   you and not to Mr. Haskell, correct?   Exhibit 466, which is

1    that "Just for the record" email?

2    A.  Well, the "Just for the record" email --

3    Q.  That he forwards --

4    A.  -- that he forwarded.

5    Q.  -- was just to you, and not to Mr. Haskell?

6    A.  That's right.  That's correct.

7    Q.  And then the draft letter that he sent the following day,

8    on September 20th, which is Exhibit 7, he sent that to you and

9    Mr. Spiegel, but not to Mr. Haskell; is that correct?

10   A.  Yes.

11   Q.  And then that final letter, Exhibit 476, which was in a PDF

12   and signed, Mr. Craig sent it to you and Mr. Haskell; is that

13   correct?

14   A.  That's correct.

15   Q.  Okay.

16               MS. GASTON:  Thank you.

17               THE COURT:  All right.  This witness can step down.

18               You're excused.  Thank you.

19               I think this would be the wrong time to ask the

20   government to bring in its next witness and the right time to

21   permit the jury to have lunch.  So, I'm going to go ahead and

22   do that.

23               Members of the jury, I ask you to leave your

24   notebooks here.  I ask you, once again, to refrain from

25   discussing this case with each other or with anyone else or

1   doing any research or communicating about the case.

2           We will attempt to resume at 1:45.  I hope you enjoy

3   your lunch.

4           Thank you.

5           (Whereupon the jury exits the courtroom.)

6           MR. CAMPOAMOR-SANCHEZ:  May I address the Court

7   briefly?

8           THE COURT:  Yes, you may.

9           MR. CAMPOAMOR-SANCHEZ:  First of all, Your Honor, I

10  just want to put a request in the record.

11          We have not been provided with *Jencks* for

12  Mr. Haskell.  The defense called him in their case, which the

13  Court allowed.  Over the weekend, I requested -- we were not

14  provided anything.  We know they met with him at least once, if

15  not more than once.  We have not received a response.

16          And we're making a formal request through the

17  Court --

18          THE COURT:  Mr. Haskell or Mr. Hawkins?

19          MR. CAMPOAMOR-SANCHEZ:  Mr. Haskell.

20          THE COURT:  Okay.  It's a little late now.

21          Mr. Haskell?

22          MR. CAMPOAMOR-SANCHEZ:  Yes, Mr. Haskell.  We were

23  not provided *Jencks*.

24          THE COURT:  Right.

25          MR. CAMPOAMOR-SANCHEZ:  That's my point.

1          THE COURT:  I know that, but what I'm saying is, your

2    cross-examination of him is finished, but you want it anyway?

3          MR. CAMPOAMOR-SANCHEZ:  I certainly want it.  We're

4    entitled to it.  And if there's something in there that we need

5    to get out, then maybe he can be recalled for that.  But, we

6    were entitled to it and we were not provided for that.  And

7    that's part of the problem with calling witnesses that are

8    really in the defense case in the middle of the government's

9    case.

10          Secondly, Your Honor, I want to put our -- I mean, I

11    don't know how to phrase it, but it's really our strong

12    objection on the record.  I mean, now they have, again, said

13    that we're not going to do this.  That's exactly what they did.

14    I would be very shocked if they ever called Mr. Kedem in their

15    case at all.  And now it's impacting our witnesses and

16    Mr. Hawker and their travel plans and what else they have to

17    do.

18          And I don't know if the hope is that he was going to

19    be overnight.  Certainly, he's not going to be finished now,

20    today.  And this is precisely what we did not want to happen,

21    what we asked, and what, I believe, Mr. Murphy told the Court.

22          And, so, we really would want to ask to, please, not

23    allow this to happen anymore.  Mr. Murphy likes to complain a

24    lot.  He likes to say that the Court is limiting his

25    cross-examination, but it's not.  It's well beyond the scope.

1    This direct examination lasted, if 40 minutes, on very limited

2    subjects.  His went on for more than twice that on topics that

3    had nothing to do with what happened in the direct.

4           So, we would request that the Court not allow that to

5    happen anymore with our witnesses.  It's really going to extend

6    the time that the government's case is going to take, and it

7    doesn't have to take that long.

8           THE COURT:  I do believe this cross-examination was

9    not consistent with what I was told the defendant's approach to

10   this witness was going to be before we put him on the stand,

11   and when we were making decisions about how to proceed.

12          I also think that there were several times when I

13   made rulings from the bench limiting where we were going, and

14   counsel went back and did something that was contrary to what I

15   said.  And as I've said earlier, you're absolutely entitled to

16   make your record, to note your objection to my rulings, but

17   that doesn't mean that you get to go back to the lectern and do

18   it anyway.

19          And anyone that the defense wants to put on as their

20   witness, defense has an opportunity to put on as their witness.

21   And they can ask non-leading, open-ended questions, and the

22   government can cross-examine them.  They can produce *Jencks*

23   materials.  They can do all the things that they would have to

24   do if they called those witnesses in their case.

25          And we accommodated the defense last week with

1    Mr. Haskell, even though I don't believe there was any

2    particular scheduling reason to do so.  And I thought it was

3    awkward and cumbersome, and it produced many unnecessary bench

4    conferences and arguments about whether we were inside the

5    scope or outside the scope, and it -- I announced I was very

6    disinclined to do it again.

7            And, so, this morning I was told that we weren't

8    going to do it again.  And, so, if other witnesses testify from

9    whom the defense wishes to elicit information that is outside

10   the scope of the direct, the defense can call those witnesses.

11   And I think I've made that very clear.

12           I understand the government's frustration.  I don't

13   believe there's any particular sanction to be imposed at this

14   time.  But, I think we're all alert to the issue, and I think

15   I've said a lot at the bench about this.  And as I said, I have

16   no problem with vigorous arguments.  I have no problem with you

17   telling me I'm wrong.  But, after I've heard you, if I overrule

18   you, then we have to go on, and you don't get to ignore what I

19   just said.

20           So, if because of Mr. Hawker's unavailability to the

21   defense and the government's agreement last week and the

22   logistical problems with bringing him back, if he is going to

23   testify as a defense witness after the direct and cross are

24   over, then what you want to bring out then, you'll bring out

25   then.

 1              If there's any *Jencks* related to that, you need to

 2      produce it.  If there's any *Jencks* related to Mr. Haskell, who

 3      has been put on as a witness in your case that you haven't

 4      produced, you need to produce it.

 5              And I think that's where we are right now.

 6              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

 7              THE COURT:  All righty.  Thank you.

 8              We'll probably resume more like 2 than quarter of, at

 9      this point.

10              (Recess.)

11                              *   *   *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                CERTIFICATE OF OFFICIAL COURT REPORTER

 3

 4

 5          I, JANICE DICKMAN, do hereby certify that the above

 6     and foregoing constitutes a true and accurate transcript of my

 7     stenograph notes and is a full, true and complete transcript of

 8     the proceedings to the best of my ability.

 9                      Dated this 19th day of August, 2019.

10

11

12                      /s/_____

13                      Janice E. Dickman, CRR, RMR, CRC
                        Official Court Reporter
14                      Room 6523
                        333 Constitution Avenue NW
15                      Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25
```

**'** 

**'13** [1] - 984:13

**/**

**/s** [1] - 1092:12

**1**

**1** [1] - 1070:2
**10** [2] - 969:24, 1020:4
**100** [5] - 954:22, 1004:9, 1004:20, 1028:11, 1069:12
**1000** [1] - 955:3
**104** [3] - 978:21, 978:25, 983:16
**11** [3] - 1007:24, 1012:10, 1025:20
**110** [1] - 960:10
**111** [4] - 983:17, 983:19, 983:24, 984:1
**12:26** [1] - 1051:10
**12th** [6] - 1009:10, 1010:17, 1076:18, 1078:4, 1078:7, 1078:9
**13** [1] - 967:1
**133** [1] - 986:12
**13th** [7] - 997:9, 1009:19, 1010:25, 1011:3, 1076:22, 1077:14, 1078:6
**14** [1] - 958:25
**15th** [2] - 1019:19, 1083:23
**16** [1] - 1045:17
**165** [1] - 965:16
**16th** [1] - 969:25
**17** [1] - 960:24
**176** [1] - 986:25
**177** [8] - 967:13, 967:24, 968:2, 968:6, 968:18, 969:8, 971:14, 974:5
**178** [11] - 968:10, 968:12, 968:13, 969:5, 969:6, 969:9, 971:14, 972:14, 972:17, 974:4, 974:8
**17th** [2] - 997:6, 997:18, 1042:7, 1051:9, 1057:1, 1066:3
**180** [2] - 1002:8, 1064:18
**1800** [1] - 955:2
**182** [3] - 1002:25, 1065:9
**183** [5] - 967:13, 974:10, 974:20, 976:4, 976:15
**186** [5] - 967:13, 974:12, 975:21, 976:3, 1034:14
**18th** [5] - 986:20, 1057:16, 1060:22, 1061:8, 1064:22
**19** [1] - 954:6
**19-125** [1] - 956:4
**19-CR-125** [1] - 954:3
**190** [2] - 1072:22, 1072:23
**195** [1] - 986:25
**19th** [5] - 1014:11, 1060:13,

1062:1, 1082:11, 1092:9
**1:45** [1] - 1087:2

**2**

**2** [4] - 963:18, 964:11, 965:14, 1091:8
**20** [1] - 1028:10
**200** [1] - 1028:16
**20001** [2] - 955:9, 1092:15
**20036** [1] - 955:3
**2005** [1] - 1021:13
**2011** [2] - 993:2, 1024:9
**2012** [22] - 965:10, 965:16, 967:25, 972:2, 977:22, 984:22, 986:5, 995:12, 997:6, 997:9, 997:18, 1002:5, 1009:1, 1009:19, 1010:17, 1010:25, 1038:19, 1039:24, 1042:8, 1043:8, 1055:12, 1057:1
**2013** [12] - 1011:20, 1012:11, 1013:16, 1017:7, 1019:2, 1019:10, 1020:4, 1080:12, 1080:20, 1081:1, 1083:23, 1084:9
**2014** [6] - 984:8, 984:13, 987:10, 993:3, 1024:23, 1025:6
**2017** [1] - 990:8
**2019** [2] - 954:6, 1092:9
**202** [3] - 954:15, 954:19, 955:4
**202-354-3267** [1] - 955:9
**20530** [2] - 954:15, 954:18
**20th** [6] - 1003:9, 1017:7, 1055:20, 1058:7, 1067:7, 1086:8
**21202** [1] - 954:23
**233-0986** [1] - 954:19
**2440** [1] - 954:23
**252-7698** [1] - 954:15
**262** [1] - 986:25
**283** [4] - 967:14, 976:18, 977:5, 977:19
**28th** [7] - 958:16, 958:18, 958:24, 959:3, 965:16, 966:17, 986:21
**29th** [1] - 1073:7, 1073:13

**3**

**3** [3] - 1070:2, 1071:22, 1077:22
**3,000** [1] - 1028:10
**30** [1] - 1023:21
**301** [1] - 986:25
**302** [2] - 1060:6, 1062:5
**30th** [2] - 979:1, 982:7
**313** [1] - 986:25
**317** [2] - 984:7, 987:6
**320** [3] - 986:25, 1008:22, 1076:11
**322** [1] - 987:1
**324** [1] - 987:1

**330** [1] - 987:1
**333** [2] - 955:8, 1092:14
**34** [1] - 986:1
**35** [1] - 1023:21
**350** [2] - 1027:23, 1028:14
**395** [2] - 1009:17, 1077:12
**3rd** [1] - 1019:2

**4**

**4** [2] - 968:7, 1070:11
**40** [1] - 1089:1
**410** [1] - 954:24
**461** [3] - 1012:6, 1080:9, 1085:15
**466** [3] - 1014:7, 1082:8, 1085:25
**476** [3] - 1019:19, 1083:20, 1086:11
**4th** [1] - 967:25

**5**

**5** [5] - 1003:22, 1005:23, 1005:25, 1067:14, 1070:14
**534** [1] - 1053:16
**555** [1] - 954:14
**575** [1] - 1028:4
**584** [4] - 1055:16, 1055:19, 1056:2, 1056:9
**5th** [3] - 1013:16, 1019:10, 1080:20

**6**

**6** [5] - 954:5, 1003:23, 1067:15, 1070:11, 1072:6
**61** [1] - 986:4
**62** [4] - 977:20, 978:22, 978:24
**6523** [2] - 955:8, 1092:14
**67** [5] - 996:7, 997:1, 1041:21, 1042:4, 1044:23
**6th** [3] - 1009:1, 1076:11, 1076:13

**7**

**7** [6] - 1016:24, 1069:22, 1070:15, 1072:6, 1082:24, 1086:8
**70** [6] - 997:16, 1046:25, 1047:5, 1049:6, 1049:12, 1049:14
**71** [2] - 1046:5, 1046:8
**778-1814** [1] - 955:4

**8**

**8** [1] - 968:11
**801(d)** [1] - 961:16

**803(3** [1] - 961:14
**865** [1] - 960:24
**8th** [1] - 970:9

## 9

**9** [3] - 1007:24, 1056:9
**949-1146** [1] - 954:24
**950** [1] - 954:18
**96** [2] - 960:2, 960:5
**9:30** [1] - 954:7
**9th** [1] - 1081:1

## A

**A-L-L-O-N** [1] - 992:10
**a.m** [1] - 954:7
**Aabelson@zuckerman.com** [1] - 954:25
**Aarons** [3] - 1065:16, 1067:7, 1076:6
**aarons** [1] - 1065:23
**Abelson** [2] - 954:21, 956:15
**abide** [3] - 957:22, 1033:16, 1034:7
**ability** [2] - 981:16, 1092:8
**able** [11] - 959:22, 981:4, 984:5, 998:9, 998:14, 1001:22, 1015:2, 1015:19, 1015:24, 1016:4, 1017:20
**absence** [1] - 988:4
**absolutely** [1] - 1089:15
**abstract** [1] - 1008:2
**abused** [1] - 1026:22
**abuses** [1] - 1026:20
**accept** [1] - 1018:15
**accepted** [2] - 981:12, 1047:10
**accepting** [1] - 976:1
**access** [7] - 980:17, 1015:24, 1030:5, 1031:3, 1031:4, 1031:6, 1031:10
**accessed** [1] - 1079:11
**accommodate** [1] - 957:3
**accommodated** [1] - 1089:25
**accordance** [3] - 985:8, 985:16, 985:20
**according** [2] - 994:1, 1029:24
**account** [2] - 983:21, 1085:6
**accurate** [3] - 1080:5, 1080:7, 1092:6
**accurately** [2] - 963:13, 963:15
**accused** [1] - 970:13
**achieved** [2] - 1038:13, 1060:10
**acknowledged** [1] - 1004:2, 1067:20
**act** [1] - 1020:19
**Act** [5] - 995:21, 996:4, 996:5, 999:9, 1000:11
**acting** [5] - 966:12, 967:18, 1044:2, 1044:13, 1044:18

**Action** [1] - 954:3
**action** [1] - 1019:3
**actions** [1] - 1018:14
**activities** [3] - 1057:24, 1058:2, 1084:11
**actual** [1] - 965:10
**Adam** [2] - 954:17, 954:21
**addition** [4] - 973:9, 1024:24, 1042:15, 1069:10
**additional** [4] - 966:16, 984:25, 1004:10, 1064:12
**address** [2] - 1018:1, 1087:6
**addressed** [3] - 1013:17, 1013:18, 1049:18
**addresses** [1] - 1065:20
**admired** [1] - 985:13
**admissibility** [3] - 971:18, 975:2, 990:12
**admissible** [10] - 960:19, 961:19, 961:21, 967:3, 971:10, 971:11, 972:12, 977:2, 978:14, 982:2
**admission** [2] - 960:11, 961:1
**admit** [1] - 972:20
**admitted** [22] - 961:10, 961:15, 961:24, 968:16, 972:14, 972:17, 976:20, 976:22, 996:8, 997:16, 1002:7, 1002:25, 1008:21, 1009:18, 1012:5, 1014:8, 1016:23, 1019:18, 1048:20, 1064:17, 1072:24, 1072:25
**admitting** [2] - 965:1, 977:11
**advance** [1] - 1006:5
**advanced** [1] - 1071:1
**advice** [10] - 1001:14, 1023:7, 1047:7, 1047:10, 1047:13, 1048:4, 1049:2, 1049:25, 1051:5, 1051:21
**advisor** [1] - 992:22
**advisors** [5] - 998:16, 1001:18, 1001:19, 1050:2, 1052:11
**affect** [1] - 999:11
**affected** [1] - 971:13
**agencies** [3] - 1023:2, 1023:7, 1023:8
**agency** [2] - 1025:12, 1072:16
**Agent** [1] - 999:8
**agent** [8] - 999:10, 1014:2, 1020:20, 1044:2, 1044:6, 1044:7, 1044:10, 1044:13
**Agents** [2] - 995:21, 996:4
**agents** [4] - 962:21, 999:13, 1044:18, 1052:12
**ago** [5] - 991:13, 1012:20, 1034:20, 1053:12, 1074:22
**agreed** [3] - 1008:3, 1060:2, 1060:24
**agreed-to** [1] - 1008:3
**agreeing** [1] - 1070:23
**agreement** [3] - 957:10, 1053:8,

1090:21
**agrees** [1] - 965:19
**ahead** [5] - 969:18, 1046:16, 1063:12, 1076:11, 1086:21
**aimed** [1] - 1000:23
**alert** [1] - 1090:14
**Alex** [8] - 994:14, 997:23, 998:22, 1002:13, 1012:19, 1037:17, 1066:3, 1080:22
**allegation** [2] - 1026:22, 1027:6
**alleges** [1] - 988:8
**Allon** [3] - 991:25, 992:10, 1001:13
**allon** [1] - 999:7
**ALLON** [1] - 992:1
**allow** [2] - 1088:23, 1089:4
**allowed** [1] - 1087:13
**allowing** [1] - 988:25
**almost** [1] - 1062:13
**alone** [6] - 964:9, 965:2, 967:12, 975:19, 1028:17, 1060:14
**alter** [2] - 1032:21, 1074:16
**Amanda** [1] - 956:12
**Amendment** [1] - 962:11
**America** [2] - 954:3, 956:4
**amount** [1] - 1006:13
**amounts** [1] - 976:25
**ample** [2] - 964:22, 1063:5
**AMY** [1] - 954:9
**analysis** [3] - 962:3, 998:10, 1045:2
**Angeles** [1] - 1017:17
**announced** [2] - 1077:7, 1090:5
**announces** [1] - 980:8
**answer** [9] - 1001:24, 1017:15, 1023:5, 1027:18, 1037:5, 1040:5, 1052:15, 1052:21, 1073:25
**answering** [1] - 991:10
**Anthony** [1] - 1023:13
**anticipate** [1] - 958:23
**anticipating** [1] - 1043:25
**anyway** [3] - 1075:4, 1088:2, 1089:18
**apart** [1] - 1042:11
**apologize** [1] - 991:18
**apparatus** [1] - 969:14
**Appeals** [2] - 962:9, 1022:10
**appeals** [1] - 1022:11
**appear** [4] - 997:8, 997:12, 1005:5, 1018:15
**appeared** [3] - 1078:4, 1078:7, 1078:22
**appellate** [1] - 1022:14
**appendix** [1] - 972:9
**application** [2] - 961:9, 967:21
**applied** [1] - 1043:24
**apply** [1] - 996:5
**appreciate** [3] - 964:10, 991:4,

1074:19
  **approach** [6] - 956:6, 969:11, 1046:20, 1059:20, 1074:17, 1089:9
  **approached** [3] - 1015:6, 1016:12, 1017:20
  **appropriate** [11] - 959:5, 961:9, 985:9, 985:24, 998:15, 1003:25, 1006:12, 1007:11, 1033:15, 1067:17, 1071:20
  **appropriately** [1] - 1070:25
  **April** [5] - 997:6, 997:18, 1042:7, 1043:12, 1051:9
  **area** [1] - 961:12
  **argue** [2] - 974:5, 982:4
  **argued** [2] - 961:13, 1025:20
  **argues** [1] - 1025:13
  **arguing** [1] - 1025:17
  **argument** [2] - 974:8, 988:13
  **arguments** [3] - 970:3, 1090:4, 1090:16
  **arms** [1] - 998:11
  **arrive** [1] - 1030:6
  **article** [8] - 1010:4, 1010:14, 1010:19, 1010:20, 1078:3, 1078:7, 1078:8, 1078:10
  **articles** [1] - 1079:23
  **ASAP** [1] - 965:25
  **aspect** [1] - 1042:12
  **aspects** [4] - 957:19, 1036:9, 1062:24, 1072:5
  **assemble** [1] - 995:8
  **asserted** [7] - 961:11, 961:16, 972:21, 973:13, 973:14, 977:7, 977:18
  **assertion** [4] - 967:14, 970:15, 978:9, 980:11
  **assertions** [1] - 989:24
  **asserts** [1] - 978:4
  **assessment** [6] - 993:22, 994:23, 1029:22, 1047:12, 1052:24, 1053:8
  **assignment** [3] - 973:17, 1026:8, 1027:11
  **assistant** [1] - 1076:14
  **associate** [4] - 992:19, 994:14, 998:1, 1029:4
  **Associated** [1] - 1079:6
  **associates** [2] - 994:13, 1029:6
  **assume** [4] - 991:10, 1034:23, 1068:25, 1079:2
  **assumed** [2] - 964:19, 1039:4
  **assuming** [2] - 958:7, 958:25
  **assumption** [3] - 964:24, 965:2, 981:20
  **assure** [3] - 975:6, 991:5, 991:13
  **attach** [2] - 972:8, 1045:9
  **attached** [8] - 965:23, 968:1, 1003:19, 1012:15, 1046:2,

1080:18, 1080:19, 1083:17
  **attaching** [2] - 1012:19, 1067:7
  **attachment** [11] - 967:4, 1004:23, 1004:25, 1005:8, 1007:25, 1013:11, 1017:5, 1017:8, 1019:23, 1070:3, 1073:4
  **attempt** [2] - 989:19, 1087:2
  **attempted** [1] - 990:8
  **attempting** [2] - 999:11, 1036:13
  **attend** [2] - 956:25, 1063:17
  **attended** [3] - 1058:24, 1060:20, 1063:21
  **attention** [3] - 991:6, 997:15, 1011:20
  **attorney** [2] - 992:22, 1022:24
  **Attorney's** [1] - 954:13
  **attorneys** [4] - 1009:19, 1011:10, 1011:18, 1080:4
  **attuned** [1] - 985:23
  **August** [9] - 954:6, 958:15, 958:18, 958:24, 979:1, 982:7, 982:21, 1055:20, 1092:9
  **authorities** [2] - 963:2, 1017:17
  **authority** [1] - 1023:3
  **authorized** [2] - 1027:4, 1027:9
  **authors** [1] - 1070:23
  **available** [9] - 966:4, 978:5, 988:1, 1013:10, 1015:22, 1033:19, 1054:13, 1063:5, 1081:3
  **Avenue** [3] - 954:18, 955:8, 1092:14
  **awaited** [1] - 996:23
  **aware** [15] - 966:10, 967:15, 995:17, 995:21, 995:22, 996:3, 1009:14, 1011:10, 1011:18, 1011:21, 1012:1, 1042:25, 1043:7, 1071:7
  **awkward** [1] - 1090:3
  **Azarov** [2] - 1058:19, 1059:2

## B

  **background** [5] - 963:17, 1015:7, 1016:13, 1018:17, 1021:9
  **backward** [1] - 992:17
  **bad** [2] - 1035:4, 1036:8
  **balanced** [3] - 1010:1, 1010:24, 1079:25
  **ballpark** [1] - 1028:9
  **Baltimore** [1] - 954:23
  **banquet** [3] - 1059:7, 1059:13, 1063:18
  **barred** [1] - 1078:17
  **base** [1] - 980:2
  **based** [8] - 963:2, 964:9, 964:24, 987:13, 988:22, 1029:25, 1054:20, 1071:24

  **basic** [1] - 1054:15
  **basis** [2] - 1032:24, 1051:2
  **bear** [6] - 962:1, 962:20, 966:15, 975:2, 978:15, 990:20
  **bearing** [1] - 961:21
  **bears** [3] - 976:12, 984:10, 984:11
  **became** [4] - 995:17, 995:20, 995:22, 1049:24
  **become** [2] - 977:15, 1011:21
  **BEFORE** [1] - 954:9
  **began** [7] - 995:12, 995:13, 995:16, 995:18, 1028:21, 1028:23, 1032:21
  **begin** [4] - 997:22, 998:19, 1056:13, 1073:16
  **beginning** [7] - 999:25, 1005:17, 1005:20, 1018:11, 1054:12, 1062:15, 1085:2
  **begins** [6] - 961:23, 965:17, 979:1, 997:21, 1005:25, 1069:24
  **behalf** [4] - 986:15, 1022:23, 1025:14, 1078:14
  **behind** [2] - 961:2, 981:14
  **believes** [1] - 971:18
  **below** [6] - 997:7, 999:14, 1000:1, 1004:22, 1010:3, 1012:23
  **bench** [12] - 1033:3, 1033:4, 1038:4, 1046:22, 1048:15, 1059:22, 1074:17, 1074:18, 1074:22, 1089:13, 1090:3, 1090:15
  **Berlin** [2] - 1072:13, 1072:15
  **BERMAN** [1] - 954:9
  **best** [5] - 1015:10, 1054:20, 1076:5, 1081:12, 1092:8
  **better** [3] - 995:5, 996:14, 1001:17
  **between** [10] - 964:14, 971:8, 973:23, 981:3, 983:18, 986:7, 990:22, 1004:16, 1062:17, 1074:4
  **beyond** [4] - 985:15, 1033:8, 1075:6, 1088:25
  **big** [1] - 1081:21
  **biggest** [1] - 984:18
  **billing** [2] - 1027:22, 1056:6
  **binder** [1] - 996:9
  **binders** [1] - 996:15
  **bit** [4] - 1021:8, 1055:14, 1069:21, 1070:1
  **blanket** [1] - 961:24
  **block** [1] - 1010:3
  **blow** [8] - 1044:24, 1045:7, 1045:21, 1056:11, 1056:20, 1057:2, 1058:5, 1064:19
  **blue** [1] - 1077:1
  **board** [1] - 986:6
  **body** [2] - 1000:19, 1001:12

**bona** [1] - 970:22
**bonbons** [1] - 991:14
**bother** [1] - 983:15
**bottom** [11] - 997:11, 998:24, 1005:14, 1045:21, 1056:10, 1056:11, 1057:2, 1065:10, 1070:7, 1072:6, 1080:25
**bounce** [1] - 1070:1
**bounded** [1] - 959:20
**Bradley** [1] - 954:17
**branch** [1] - 1018:19
**break** [2] - 1053:21, 1054:3
**breakfast** [1] - 991:20
**brief** [1] - 1084:19
**briefing** [1] - 1008:1
**briefly** [8] - 956:21, 969:8, 1004:3, 1019:2, 1020:7, 1022:20, 1068:24, 1087:7
**bring** [13] - 956:19, 985:3, 991:1, 1029:7, 1033:9, 1033:24, 1042:3, 1048:5, 1055:1, 1062:7, 1086:20, 1090:24
**bringing** [1] - 1090:22
**British** [1] - 1079:2
**broad** [1] - 981:23
**brought** [3] - 957:8, 994:22, 1022:25
**Brussels** [1] - 1072:14
**building** [1] - 981:17
**bullet** [1] - 1071:22
**bunch** [1] - 980:5
**Burson** [2] - 1041:14, 1072:13
**Burson-Marsteller** [1] - 1041:14
**Burson-Marsteller's** [1] - 1072:13
**BY** [62] - 992:5, 997:2, 1002:10, 1003:3, 1005:16, 1007:6, 1008:24, 1012:9, 1014:16, 1018:4, 1021:5, 1024:2, 1024:17, 1025:4, 1026:7, 1027:21, 1028:13, 1031:2, 1032:5, 1032:10, 1032:18, 1034:12, 1035:22, 1036:20, 1037:8, 1038:11, 1038:24, 1039:8, 1039:23, 1040:2, 1040:7, 1041:11, 1042:5, 1042:18, 1043:6, 1044:11, 1044:17, 1045:1, 1045:8, 1045:23, 1049:13, 1051:14, 1055:5, 1056:3, 1056:12, 1056:21, 1057:4, 1058:6, 1058:17, 1059:17, 1064:1, 1064:6, 1064:20, 1067:5, 1070:22, 1073:1, 1073:20, 1074:12, 1075:17, 1076:4, 1079:21, 1084:21

**C**

**campaign** [3] - 1060:9, 1060:15, 1062:2
**Campoamor** [5] - 954:12, 956:11, 958:13, 989:5, 990:5
**CAMPOAMOR** [12] - 956:9, 956:21, 958:17, 989:7, 1067:2, 1087:6, 1087:9, 1087:19, 1087:22, 1087:25, 1088:3, 1091:6
**Campoamor-Sanchez** [2] - 954:12, 958:13
**CAMPOAMOR-SANCHEZ** [12] - 956:9, 956:21, 958:17, 989:7, 1067:2, 1087:6, 1087:9, 1087:19, 1087:22, 1087:25, 1088:3, 1091:6
**cannot** [3] - 1023:8, 1054:4, 1075:13
**captive** [1] - 1063:4
**care** [1] - 973:15
**careful** [1] - 985:22
**carryover** [1] - 960:2
**case** [56] - 957:14, 958:21, 959:2, 959:5, 959:18, 960:22, 960:25, 961:23, 962:3, 962:4, 962:5, 962:13, 962:20, 962:22, 963:4, 963:9, 970:15, 980:24, 981:18, 985:18, 986:13, 986:20, 991:7, 996:9, 998:14, 1009:24, 1033:9, 1033:14, 1033:23, 1034:3, 1034:4, 1054:4, 1054:5, 1054:14, 1057:17, 1059:25, 1060:24, 1061:2, 1062:7, 1062:25, 1063:2, 1063:3, 1073:5, 1086:25, 1087:1, 1087:12, 1088:8, 1088:9, 1088:15, 1089:6, 1089:24, 1091:3
**Case** [1] - 956:4
**case-by-case** [1] - 962:3
**cases** [7] - 960:8, 960:10, 960:15, 961:19, 990:18, 1025:13, 1025:22
**Catherine** [1] - 1008:25
**Catie** [1] - 1012:20
**caution** [1] - 1054:3
**CC** [1] - 1013:2
**celebrate** [1] - 1062:2
**celebration** [1] - 1063:18
**celebratory** [3] - 1059:5, 1060:8, 1061:25
**Centre** [1] - 986:15
**certain** [2] - 960:1, 1020:11
**certainly** [9] - 961:19, 971:10, 978:10, 979:8, 981:15, 1005:21, 1033:9, 1088:3, 1088:19
**CERTIFICATE** [1] - 1092:2
**certify** [1] - 1092:5

**chafing** [1] - 1054:10
**chain** [8] - 997:17, 997:21, 997:22, 1050:5, 1053:11, 1065:12, 1065:15, 1066:2
**chains** [1] - 1065:11
**change** [3] - 972:9, 973:17, 1032:21
**changed** [1] - 1084:9
**changes** [2] - 972:3, 977:10
**changing** [1] - 972:5
**chapter** [2] - 1019:22, 1084:3
**character** [4] - 985:4, 985:7, 985:11, 985:20
**characterization** [3] - 966:19, 968:25, 984:19
**characterized** [2] - 963:12, 963:15
**characterizing** [2] - 972:23, 1040:3
**charge** [1] - 1027:8
**choose** [1] - 981:19, 985:5
**Circuit** [3] - 960:24, 992:24, 1022:6
**circulated** [2] - 1075:19, 1075:24
**circumstances** [4] - 957:18, 961:20, 983:4, 1011:25
**cited** [3] - 960:11, 962:4, 962:19
**cites** [1] - 1010:14
**clarity** [1] - 991:17
**clear** [9] - 963:14, 969:4, 970:4, 977:24, 978:4, 989:22, 1014:15, 1057:11, 1090:11
**clearance** [1] - 998:21
**clearly** [1] - 969:22
**clerk** [8] - 992:24, 1021:19, 1022:3, 1022:5, 1022:14, 1023:12, 1023:15, 1024:3
**clerked** [2] - 992:20, 1023:24
**clerks** [2] - 1023:18, 1023:21
**clerkship** [1] - 1024:6
**client** [6] - 964:1, 964:20, 965:12, 994:3, 1001:5, 1037:19
**client's** [4] - 998:11, 1001:25, 1052:15, 1052:22
**Cliff** [9] - 963:23, 964:11, 993:11, 994:12, 996:2, 997:5, 998:8, 1000:7, 1067:6
**clock** [2] - 1060:17, 1064:2
**clocks** [2] - 1060:7, 1060:13
**close** [1] - 958:6
**closely** [1] - 1055:15
**closeness** [1] - 990:22
**collaborative** [1] - 1037:25
**colleagues** [1] - 956:7
**COLUMBIA** [2] - 954:1, 954:14
**coming** [9] - 956:24, 963:1, 983:16, 985:2, 1004:11, 1048:13, 1072:21, 1077:1, 1077:5

**comment** [2] - 973:16, 973:22
**commentary** [2] - 1015:7, 1016:13
**comments** [17] - 965:17, 966:2, 966:16, 966:19, 967:5, 967:8, 968:1, 968:3, 968:8, 973:20, 973:25, 974:3, 1037:19, 1037:21, 1037:24, 1038:1, 1075:5
**commissioned** [2] - 1006:10, 1071:11
**committed** [6] - 1003:25, 1007:10, 1067:16, 1068:1, 1068:14, 1071:19
**common** [1] - 1031:22
**communicate** [2] - 1018:17, 1019:2
**communicated** [1] - 963:6
**communicating** [3] - 963:11, 965:12, 1087:1
**communication** [5] - 984:7, 1066:6, 1069:20, 1069:24, 1070:5
**communications** [15] - 963:15, 967:2, 984:12, 984:20, 987:12, 989:8, 989:24, 1003:20, 1004:1, 1004:16, 1019:12, 1040:24, 1042:11, 1056:24, 1074:11
**companies** [1] - 998:18
**company** [1] - 1027:8
**comparable** [1] - 1021:25
**comparatively** [1] - 1080:8
**compile** [1] - 1029:10
**complain** [1] - 1088:23
**complete** [5] - 976:4, 983:12, 1007:19, 1064:16, 1092:7
**completed** [2] - 976:23, 1038:12
**completely** [3] - 989:11, 989:15, 989:17
**completeness** [2] - 962:24, 975:23
**complied** [1] - 994:24
**component** [2] - 1001:19, 1022:22
**comported** [1] - 993:16
**concerned** [8] - 977:14, 987:20, 995:3, 995:8, 1038:20, 1038:25, 1039:17, 1067:18
**concerning** [4] - 977:23, 978:6, 979:2, 1026:23
**concerns** [1] - 1067:11
**conclude** [9] - 1003:24, 1007:9, 1067:15, 1068:1, 1068:3, 1068:13, 1068:16, 1069:4, 1071:18
**concluded** [5] - 1013:8, 1014:1, 1078:14, 1081:2, 1085:3
**concludes** [1] - 1004:5
**conclusion** [14] - 963:25,

964:19, 994:24, 995:1, 995:5, 1000:11, 1000:17, 1007:21, 1007:23, 1019:14, 1019:15, 1019:16, 1029:22, 1030:7
**conclusions** [7] - 994:16, 1032:22, 1035:5, 1039:2, 1039:13, 1074:16, 1078:20
**conclusive** [2] - 972:12, 1070:24
**condition** [3] - 957:7, 1030:4, 1031:14
**conditions** [1] - 1030:12
**conduct** [1] - 998:12
**conducted** [2] - 994:25, 1085:2
**conference** [2] - 960:3, 961:25
**conferences** [2] - 1074:22, 1090:4
**confidential** [1] - 964:2
**confusion** [1] - 977:16
**congratulate** [1] - 1060:9
**conjunction** [1] - 987:18
**Connecticut** [2] - 992:25, 1021:23
**connection** [7] - 967:14, 984:11, 1044:19, 1055:8, 1081:9, 1084:11, 1084:12
**consider** [8] - 961:6, 973:1, 994:15, 998:15, 1001:7, 1044:2, 1044:5, 1044:13
**considerable** [1] - 1050:19
**considerably** [1] - 978:16
**consideration** [1] - 985:3
**considerations** [1] - 974:13
**consist** [1] - 1062:14
**consistent** [5] - 993:23, 1043:9, 1053:1, 1060:21, 1089:9
**consternation** [1] - 1080:3
**constitutes** [1] - 1092:6
**Constitution** [2] - 955:8, 1092:14
**consult** [1] - 1020:18
**consulted** [1] - 1020:22
**Consulting** [2] - 1041:2, 1065:16
**consumed** [1] - 1059:6
**contact** [7] - 1015:5, 1016:11, 1018:14, 1019:3, 1019:4, 1040:10, 1072:21
**contacted** [4] - 969:23, 996:3, 1015:3, 1015:20
**contacts** [6] - 973:20, 973:25, 1009:11, 1011:7, 1018:13, 1085:7
**contain** [1] - 1071:23
**contains** [1] - 984:18
**contemporaneous** [5] - 966:24, 967:22, 969:3, 984:14, 990:21
**content** [2] - 973:21, 974:22
**contents** [3] - 1006:7, 1071:3, 1074:10

**contested** [1] - 977:12
**context** [1] - 995:23
**continue** [1] - 1055:3
**continued** [2] - 993:2, 1064:9
**continues** [2] - 1045:12, 1045:16
**contours** [1] - 1000:9
**contract** [1] - 1027:12
**contrary** [3] - 1015:6, 1016:11, 1089:14
**controversy** [2] - 1027:3, 1027:13
**conversation** [18] - 981:11, 983:3, 983:20, 989:23, 990:3, 994:17, 994:18, 994:20, 994:21, 1035:3, 1035:10, 1036:3, 1036:7, 1036:10, 1036:15, 1036:25, 1074:10
**conversations** [4] - 979:24, 987:9, 1034:17, 1074:8
**conveyed** [3] - 965:9, 979:10, 1051:5
**conveying** [1] - 1051:15
**convicting** [1] - 1026:12
**convince** [2] - 989:14, 1027:7
**cooling** [1] - 991:18
**coordinate** [1] - 1017:22
**copies** [6] - 1012:16, 1012:17, 1016:4, 1017:20, 1020:12, 1073:3
**copy** [19] - 965:19, 977:9, 979:12, 983:5, 1007:13, 1012:15, 1015:2, 1015:4, 1015:19, 1015:20, 1017:15, 1017:21, 1018:8, 1020:10, 1045:9, 1046:24, 1065:20, 1080:18, 1085:16
**correct** [76] - 966:12, 967:18, 970:5, 971:14, 995:11, 999:24, 1009:1, 1009:20, 1010:15, 1010:16, 1012:11, 1012:22, 1015:8, 1015:12, 1016:14, 1020:2, 1021:17, 1021:21, 1022:2, 1022:7, 1022:9, 1024:7, 1024:13, 1025:18, 1025:21, 1025:25, 1027:2, 1027:5, 1027:10, 1028:15, 1028:18, 1028:25, 1029:8, 1029:16, 1030:23, 1034:21, 1038:7, 1043:3, 1050:10, 1050:24, 1051:3, 1051:6, 1051:20, 1052:7, 1052:17, 1052:19, 1055:13, 1067:24, 1068:15, 1069:9, 1070:13, 1073:6, 1076:7, 1077:15, 1078:18, 1078:19, 1078:21, 1078:25, 1079:4, 1079:5, 1079:8, 1080:6, 1080:15, 1080:20, 1081:22, 1082:6, 1083:16, 1083:24, 1084:4, 1085:22, 1085:23,

1085:25, 1086:6, 1086:9,
1086:13, 1086:14
  **correction** [2] - 987:23, 987:24
  **correspondence** [1] - 1020:9
  **Council** [1] - 1027:4
  **counsel** [6] - 956:6, 961:24,
1013:5, 1078:15, 1082:2,
1089:14
  **Counsel** [8] - 992:23, 1022:17,
1022:21, 1022:22, 1022:25,
1023:4, 1023:12, 1078:13
  **Counsel's** [1] - 990:9
  **couple** [5] - 957:25, 1026:15,
1064:12, 1069:21, 1074:22
  **course** [3] - 1001:24, 1052:14,
1062:22
  **court** [19] - 960:2, 960:11,
961:1, 961:20, 962:5, 962:14,
962:16, 973:2, 977:18, 986:1,
992:9, 1021:25, 1034:11,
1048:12, 1049:10, 1063:16,
1075:16
  **Court** [23] - 955:7, 955:7,
957:22, 962:8, 962:15, 962:23,
969:20, 989:11, 992:21, 992:22,
1022:10, 1023:12, 1023:19,
1024:4, 1025:13, 1025:18,
1087:6, 1087:13, 1087:17,
1088:21, 1088:24, 1089:4,
1092:13
  **COURT** [193] - 954:1, 956:2,
956:17, 957:12, 958:3, 958:11,
958:23, 959:17, 959:25, 968:6,
968:12, 968:14, 968:18, 969:12,
969:17, 969:21, 970:1, 970:6,
971:3, 971:7, 971:12, 971:22,
971:25, 972:7, 972:13, 972:22,
973:11, 974:2, 975:12, 975:15,
975:21, 976:3, 976:12, 976:17,
977:4, 977:17, 978:23, 980:4,
980:11, 980:21, 981:4, 981:10,
981:25, 982:6, 982:11, 982:13,
982:23, 982:25, 983:7, 983:10,
983:13, 984:2, 984:7, 987:5,
987:7, 987:11, 988:14, 988:22,
989:5, 989:21, 990:5, 990:11,
990:18, 991:3, 996:11, 996:14,
996:18, 996:20, 996:24,
1006:23, 1007:2, 1007:5,
1018:1, 1021:2, 1023:25,
1024:16, 1025:3, 1026:5,
1027:18, 1027:25, 1028:7,
1030:8, 1030:15, 1030:18,
1030:21, 1030:24, 1031:25,
1032:12, 1032:24, 1033:2,
1033:7, 1033:13, 1033:18,
1034:8, 1035:19, 1036:1,
1036:4, 1036:6, 1036:16,
1037:5, 1038:2, 1038:6, 1038:8,
1038:22, 1039:4, 1039:21,

1040:5, 1041:7, 1042:17,
1042:20, 1042:22, 1043:1,
1043:4, 1044:6, 1044:8,
1044:10, 1044:16, 1044:22,
1045:20, 1046:7, 1046:9,
1046:11, 1046:13, 1046:16,
1046:19, 1046:23, 1047:2,
1047:8, 1047:15, 1047:18,
1047:25, 1048:7, 1048:11,
1048:13, 1048:18, 1048:21,
1049:5, 1049:7, 1049:9,
1053:20, 1054:2, 1054:9,
1054:19, 1054:24, 1055:1,
1055:3, 1055:23, 1055:25,
1057:19, 1057:22, 1058:11,
1058:13, 1058:16, 1059:15,
1059:20, 1059:23, 1060:3,
1060:18, 1061:4, 1061:22,
1061:24, 1062:8, 1062:14,
1063:12, 1063:14, 1063:17,
1063:21, 1063:25, 1064:3,
1066:15, 1066:20, 1067:3,
1073:19, 1073:25, 1074:6,
1074:17, 1074:19, 1075:3,
1075:11, 1076:2, 1079:17,
1079:20, 1084:16, 1084:18,
1086:17, 1087:8, 1087:18,
1087:20, 1087:24, 1088:1,
1089:8, 1091:7, 1092:2
  **Court's** [1] - 1033:17
  **court's** [1] - 960:12
  **Courthouse** [1] - 955:8
  **courtroom** [5] - 956:5, 991:2,
1054:8, 1055:2, 1087:5
  **COURTROOM** [7] - 956:1,
956:3, 1046:6, 1053:17,
1053:19, 1055:18, 1072:24
  **courts** [1] - 1022:11
  **cover** [3] - 958:8, 1005:22,
1007:9
  **coverage** [7] - 1009:25,
1010:23, 1011:1, 1035:7,
1078:22, 1079:24, 1080:5
  **covered** [2] - 960:16, 1079:14
  **covering** [1] - 1079:13
  **craig** [2] - 990:9, 1034:5
  **Craig** [114] - 954:6, 956:5,
956:14, 963:19, 963:23, 964:4,
964:14, 964:17, 964:24, 965:5,
965:22, 965:24, 966:1, 966:9,
966:17, 967:8, 967:15, 968:18,
971:16, 973:6, 973:23, 975:25,
976:1, 976:19, 976:23, 976:25,
977:22, 978:7, 978:11, 978:14,
979:4, 979:13, 979:17, 980:6,
980:7, 981:3, 982:9, 982:20,
983:1, 983:18, 983:19, 983:25,
984:2, 985:13, 985:18, 986:2,
986:21, 987:10, 987:18, 988:1,
988:2, 988:25, 993:11, 994:12,

994:18, 996:2, 998:8, 999:23,
1000:18, 1004:16, 1004:18,
1012:24, 1013:1, 1013:7,
1014:9, 1014:17, 1014:24,
1015:14, 1016:25, 1017:3,
1019:20, 1019:21, 1020:17,
1024:18, 1024:25, 1025:1,
1026:2, 1026:9, 1031:21,
1032:1, 1035:3, 1035:10,
1035:15, 1035:24, 1037:17,
1037:23, 1043:16, 1047:10,
1047:13, 1048:3, 1049:2,
1051:7, 1051:16, 1051:19,
1053:7, 1068:24, 1069:11,
1073:2, 1078:13, 1078:24,
1080:25, 1081:2, 1082:11,
1082:20, 1083:1, 1083:4,
1083:9, 1083:21, 1083:22,
1084:3, 1085:24, 1086:12
  **craig's** [1] - 980:23
  **Craig's** [21] - 965:10, 966:6,
966:24, 968:25, 969:7, 969:13,
970:8, 970:11, 975:2, 978:15,
978:18, 979:23, 980:15, 980:20,
980:24, 982:3, 984:19, 988:21,
1016:17, 1047:6, 1076:14
  **CRC** [2] - 955:7, 1092:13
  **create** [3] - 1001:16, 1075:12
  **created** [1] - 1003:19
  **creating** [1] - 1038:13
  **credibility** [1] - 961:7
  **crime** [6] - 1003:24, 1007:10,
1067:16, 1068:1, 1068:14,
1071:19
  **criminal** [3] - 1033:14, 1036:23,
1063:2
  **Criminal** [1] - 954:3
  **criminalized** [1] - 1026:21
  **critical** [6] - 957:19, 959:15,
994:16, 995:3, 995:4, 1078:15
  **criticism** [1] - 1071:23
  **CROSS** [1] - 1021:4
  **cross** [30] - 957:21, 959:5,
959:20, 961:5, 966:5, 978:6,
981:5, 981:23, 984:5, 985:14,
985:19, 988:22, 990:11, 1021:2,
1033:16, 1033:18, 1033:20,
1053:21, 1062:6, 1062:12,
1062:17, 1062:20, 1062:23,
1075:14, 1088:2, 1088:25,
1089:8, 1089:22, 1090:23
  **CROSS-EXAMINATION** [1] -
1021:4
  **cross-examination** [12] -
957:21, 961:5, 966:5, 978:6,
985:19, 1021:2, 1033:20,
1062:23, 1075:14, 1088:2,
1088:25, 1089:8
  **cross-examine** [4] - 981:5,
988:22, 1062:6, 1089:22

1099

**cross-examined** [3] - 984:5, 985:14, 990:11
**cross-examining** [2] - 1033:16, 1033:18
**CRR** [2] - 955:7, 1092:13
**cumbersome** [1] - 1090:3
**current** [2] - 1035:6, 1058:19

# D

**D.C** [6] - 992:19, 993:5, 993:10, 994:11, 1072:16, 1092:15
**date** [10] - 967:9, 982:17, 997:4, 997:5, 1009:4, 1013:15, 1020:3, 1057:8, 1073:7, 1077:16
**Dated** [1] - 1092:9
**dated** [7] - 968:7, 1010:17, 1013:16, 1019:24, 1020:4, 1055:20, 1080:20
**David** [2] - 1013:2, 1013:6
**DAY** [1] - 954:5
**days** [5] - 996:15, 1003:4, 1056:23, 1064:10, 1064:12
**DC** [5] - 954:6, 954:15, 954:18, 955:3, 955:9
**deadline** [3] - 1006:4, 1070:25, 1071:8
**deal** [7] - 967:10, 978:8, 1026:23, 1026:25, 1027:3, 1027:8, 1041:7
**dealing** [5] - 1041:9, 1041:13, 1041:15, 1041:17, 1050:19
**dear** [2] - 998:8
**deceive** [1] - 988:5
**December** [26] - 967:1, 971:1, 971:4, 971:6, 976:24, 977:1, 977:3, 984:22, 1009:1, 1009:10, 1009:19, 1010:17, 1010:25, 1011:3, 1038:19, 1039:24, 1073:14, 1074:5, 1074:7, 1076:11, 1076:13, 1076:17, 1076:22, 1077:4, 1077:14, 1078:4
**decide** [2] - 1037:21, 1063:7
**decided** [1] - 1025:24
**deciding** [1] - 1035:17
**decision** [8] - 970:20, 974:13, 976:6, 987:13, 989:2, 989:3, 989:9, 1082:15
**decisions** [2] - 1022:11, 1089:11
**declarant** [1] - 961:7
**decline** [1] - 973:17
**declined** [2] - 1018:16, 1018:18
**Defendant** [2] - 954:7, 954:20
**defendant** [11] - 956:14, 962:4, 962:7, 962:16, 962:21, 962:22, 963:10, 972:18, 977:9, 979:8, 984:8, 984:9, 990:19
**defendant's** [9] - 963:6, 963:21,

966:8, 969:1, 972:19, 984:14, 984:15, 985:11, 1089:9
**defendants** [1] - 961:21
**defending** [1] - 1071:25
**Defense** [19] - 963:18, 964:11, 965:14, 965:16, 967:13, 967:24, 968:6, 974:10, 974:19, 976:18, 977:20, 978:21, 978:24, 978:25, 983:16, 983:17, 983:19, 984:7, 986:1
**defense** [26] - 956:19, 957:3, 957:11, 957:13, 959:1, 962:19, 963:24, 964:3, 964:22, 973:8, 974:21, 978:10, 979:8, 984:9, 985:2, 1046:7, 1055:18, 1087:12, 1088:8, 1089:19, 1089:20, 1089:25, 1090:9, 1090:10, 1090:21, 1090:23
**defer** [1] - 986:17
**defined** [1] - 1044:12
**definitely** [2] - 1068:22, 1078:9
**degree** [1] - 1021:14
**delay** [3] - 985:3, 1043:10, 1074:4
**deliver** [2] - 966:3, 975:4
**delivered** [4] - 965:25, 974:11, 976:5, 977:14
**delivering** [2] - 975:17, 977:9
**demeanor** [1] - 961:7
**demonstrate** [1] - 971:3
**demonstrates** [1] - 971:2
**denied** [1] - 1078:15
**depart** [1] - 1054:15
**Department** [21] - 954:17, 992:12, 992:14, 992:18, 992:23, 1011:22, 1012:2, 1013:12, 1013:25, 1017:6, 1022:17, 1022:23, 1023:1, 1023:6, 1025:9, 1025:12, 1039:18, 1045:24, 1071:13, 1071:24, 1083:18
**department** [3] - 1006:12, 1019:13, 1082:16
**department's** [2] - 1019:13, 1019:15
**depth** [1] - 1079:24
**DEPUTY** [7] - 956:1, 956:3, 1046:6, 1053:17, 1053:19, 1055:18, 1072:24
**der** [32] - 965:18, 965:21, 966:1, 966:9, 967:10, 977:22, 978:2, 978:3, 978:5, 978:18, 979:6, 979:11, 979:15, 983:18, 986:2, 997:23, 997:25, 998:2, 998:4, 998:25, 1000:14, 1002:12, 1003:5, 1005:1, 1005:4, 1049:17, 1050:16, 1064:21, 1066:3, 1067:9
**describe** [3] - 999:4, 1022:20, 1026:15

**described** [9] - 963:18, 965:15, 984:9, 1000:9, 1009:25, 1010:23, 1026:9, 1035:3, 1062:4
**describing** [2] - 964:12, 1067:23
**description** [1] - 1067:25
**detailed** [1] - 974:12
**determination** [1] - 961:8
**determine** [2] - 964:17, 1057:19
**determined** [1] - 1084:10
**detrich** [1] - 960:24
**DETRICH** [1] - 960:24
**development** [1] - 981:1
**DICKMAN** [1] - 1092:5
**Dickman** [2] - 955:7, 1092:13
**difference** [1] - 1062:16
**different** [14] - 984:5, 990:2, 990:7, 990:12, 990:15, 1021:19, 1023:2, 1029:6, 1036:25, 1054:17, 1060:23, 1061:9, 1062:24, 1065:20
**difficult** [1] - 956:22
**difficulty** [1] - 1034:16
**dinner** [22] - 1002:14, 1002:19, 1058:23, 1059:5, 1059:13, 1060:4, 1060:6, 1060:8, 1060:12, 1060:13, 1060:20, 1060:22, 1060:23, 1061:5, 1061:9, 1061:14, 1061:17, 1062:1, 1064:4, 1064:7, 1065:3
**DIRECT** [1] - 992:4
**direct** [38] - 957:5, 957:8, 959:11, 959:13, 959:20, 981:22, 985:12, 985:16, 987:12, 988:23, 989:4, 990:13, 1029:13, 1030:9, 1033:1, 1033:8, 1033:12, 1033:21, 1033:25, 1034:7, 1034:16, 1041:18, 1054:11, 1054:18, 1059:24, 1060:19, 1061:11, 1062:12, 1062:16, 1062:17, 1062:18, 1063:1, 1074:10, 1074:25, 1089:1, 1089:3, 1090:10, 1090:23
**directed** [2] - 967:10, 969:23
**directing** [6] - 996:7, 997:15, 1009:17, 1011:20, 1014:7, 1019:18
**direction** [3] - 1001:25, 1052:15, 1052:22
**directive** [1] - 1027:7
**directly** [7] - 978:8, 979:13, 980:8, 1001:2, 1040:17, 1040:18, 1040:25
**disagree** [2] - 989:17, 1028:14
**disagreeing** [1] - 1053:4
**disappointed** [1] - 1039:25
**disclosure** [1] - 1001:5
**discretion** [1] - 960:13
**discuss** [4] - 962:14, 965:6, 1018:18, 1054:4

1100

**discussed** [10] - 991:7, 998:10, 1000:8, 1002:14, 1002:19, 1006:7, 1037:7, 1061:8, 1065:3, 1071:3

**discusses** [4] - 989:22, 1003:21, 1005:23, 1067:13

**discussing** [4] - 981:1, 1014:4, 1016:18, 1086:25

**discussion** [11] - 980:12, 991:15, 1008:6, 1008:9, 1033:4, 1046:22, 1048:15, 1059:22, 1065:6, 1066:3, 1074:18

**discussions** [3] - 1004:15, 1031:21, 1036:21

**disinclined** [1] - 1090:6

**dispute** [1] - 1048:2

**disputing** [1] - 968:19

**dissatisfaction** [4] - 966:10, 966:20, 967:16, 969:4

**disseminate** [1] - 1015:1

**distraction** [1] - 977:15

**distribute** [1] - 1017:14

**distribution** [3] - 997:24, 1049:21, 1049:23

**District** [2] - 992:25, 1021:22

**DISTRICT** [4] - 954:1, 954:1, 954:10, 954:14

**Division** [2] - 1013:13, 1017:6

**DL** [3] - 1049:18, 1049:21

**Docket** [3] - 960:2, 960:5, 960:10

**docket** [1] - 968:18

**doctors** [1] - 1001:21

**document** [43] - 965:15, 966:22, 967:12, 968:23, 974:11, 974:12, 978:20, 984:24, 986:4, 986:5, 986:12, 989:15, 989:19, 989:22, 989:25, 990:6, 990:13, 990:15, 1002:13, 1003:19, 1003:21, 1005:5, 1005:10, 1005:23, 1006:7, 1007:22, 1008:4, 1015:4, 1015:21, 1016:6, 1016:25, 1045:13, 1057:12, 1061:7, 1065:2, 1065:24, 1067:7, 1067:13, 1067:23, 1071:3, 1075:25, 1080:10, 1085:18

**Document** [1] - 968:2

**document's** [1] - 989:21

**documents** [13] - 960:5, 960:6, 960:18, 967:21, 985:25, 993:21, 1018:1, 1027:7, 1029:20, 1030:5, 1031:4, 1031:12, 1085:15

**DoJ** [3] - 1012:18, 1013:8, 1081:2

**done** [10] - 958:19, 965:24, 986:22, 999:17, 1020:11, 1038:16, 1041:19, 1061:1, 1064:4, 1083:8

**door** [7] - 985:12, 987:12, 987:14, 989:8, 989:18, 991:12, 1033:10

**doubt** [1] - 1052:18

**Doug** [1] - 964:15

**down** [11] - 961:23, 985:10, 990:5, 997:11, 1014:14, 1055:14, 1057:1, 1072:11, 1074:21, 1074:24, 1086:17

**dozen** [1] - 1081:25

**Draft** [1] - 1017:5

**draft** [14] - 965:18, 965:25, 980:13, 980:14, 995:9, 1006:6, 1064:13, 1071:2, 1073:4, 1073:10, 1073:13, 1082:13, 1083:17, 1086:7

**drafting** [9] - 1001:7, 1016:19, 1029:4, 1037:10, 1056:16, 1056:23, 1056:24, 1064:11, 1068:12

**drafts** [1] - 1075:5

**draftsman** [2] - 1029:2, 1029:3

**drawn** [1] - 984:16

**due** [9] - 993:17, 993:24, 994:1, 994:24, 1004:6, 1029:24, 1068:19, 1068:22, 1069:5

**duly** [1] - 992:2

**during** [21] - 962:23, 981:18, 985:18, 990:2, 1004:10, 1025:1, 1033:23, 1035:12, 1036:7, 1040:10, 1041:18, 1057:24, 1061:16, 1061:19, 1061:20, 1063:1, 1073:16, 1073:22, 1076:12

# E

**e-mail** [4] - 965:20, 1013:6, 1014:13, 1019:22

**early** [13] - 977:1, 977:22, 979:12, 995:12, 995:19, 1006:6, 1008:15, 1035:10, 1035:11, 1036:7, 1041:19, 1041:7, 1077:4

**earnest** [1] - 1043:11

**easing** [3] - 1004:8, 1004:19, 1069:11

**East** [1] - 954:22

**eating** [1] - 991:14

**effect** [3] - 972:17, 998:17, 1023:6

**effort** [1] - 987:21

**efforts** [5] - 966:3, 986:18, 999:16, 1074:14, 1074:15

**eight** [1] - 1025:22

**either** [15] - 960:15, 964:25, 984:17, 993:11, 994:7, 996:2, 996:11, 1000:6, 1008:13, 1011:12, 1018:19, 1034:5, 1034:17, 1068:17, 1081:14

**element** [1] - 963:9

**Elena** [1] - 1023:16

**elicit** [1] - 1090:9

**elicited** [1] - 979:20

**eliminate** [1] - 963:4

**Elmo** [1] - 996:17

**email** [123] - 963:19, 964:6, 964:7, 964:11, 964:12, 964:25, 965:1, 965:16, 966:9, 966:15, 967:25, 968:3, 968:6, 968:7, 968:8, 968:24, 968:25, 969:3, 973:1, 976:8, 977:8, 977:21, 977:24, 979:2, 979:5, 980:5, 982:11, 982:14, 982:19, 983:7, 984:4, 986:12, 986:21, 997:4, 997:7, 997:8, 997:12, 997:17, 997:18, 997:23, 998:23, 998:25, 999:20, 999:22, 999:25, 1000:1, 1000:19, 1001:9, 1001:12, 1002:9, 1002:12, 1002:13, 1002:17, 1003:2, 1003:4, 1003:7, 1003:11, 1003:17, 1004:13, 1004:22, 1005:3, 1005:8, 1005:18, 1005:22, 1006:2, 1007:9, 1007:12, 1007:14, 1007:18, 1008:25, 1009:3, 1009:8, 1009:18, 1009:23, 1009:24, 1010:22, 1011:4, 1012:10, 1012:14, 1012:23, 1012:24, 1014:9, 1014:17, 1014:25, 1016:17, 1016:21, 1017:3, 1017:23, 1019:19, 1040:17, 1040:24, 1042:8, 1046:17, 1048:3, 1049:20, 1050:4, 1051:9, 1053:11, 1061:6, 1064:21, 1065:10, 1065:11, 1065:15, 1065:16, 1065:20, 1066:2, 1067:6, 1067:19, 1067:20, 1073:2, 1076:14, 1077:13, 1080:11, 1080:23, 1080:25, 1081:7, 1082:9, 1082:10, 1083:1, 1083:21, 1085:22, 1086:1, 1086:2

**Email** [8] - 954:16, 954:16, 954:19, 954:24, 954:25, 954:25, 955:4, 955:5

**emailed** [3] - 998:5, 1000:14, 1085:16

**emails** [8] - 1034:1, 1034:2, 1034:17, 1034:24, 1053:12, 1081:12, 1081:14, 1085:24

**emarcus@zuckerman.com** [1] - 955:5

**Embargoed** [1] - 1008:1

**embargoed** [1] - 1008:7

**emotional** [1] - 1072:1

**emphasize** [1] - 960:11

**emphasizing** [1] - 990:22

**employed** [2] - 992:11, 992:12

**end** [11] - 996:12, 1006:13,

1036:18, 1038:12, 1053:21,
1062:2, 1063:8, 1064:14,
1064:15, 1065:13, 1075:10
**ended** [2] - 985:10, 1089:21
**engage** [1] - 1050:22
**engaged** [2] - 982:20, 998:16
**engagement** [12] - 964:14,
1001:5, 1001:8, 1001:13,
1030:19, 1030:21, 1030:25,
1031:5, 1031:14, 1031:19,
1051:21, 1084:22
**English** [5] - 965:19, 965:20,
965:21, 1079:9, 1079:12
**English-language** [2] - 1079:9,
1079:12
**enjoy** [1] - 1087:2
**enters** [2] - 991:2, 1055:2
**entirely** [2] - 975:7, 985:6
**entities** [1] - 1072:7
**entitled** [5] - 1033:9, 1062:23,
1088:4, 1088:6, 1089:15
**entries** [1] - 1056:13
**enumerated** [1] - 1015:17
**equally** [4] - 990:10, 1033:19,
1054:13, 1063:5
**erred** [1] - 962:14
**essentially** [1] - 962:24
**establish** [2] - 977:12, 1060:16
**established** [1] - 1039:5
**establishes** [5] - 970:8, 970:11,
970:17, 970:20, 970:24
**etcetera** [3] - 1015:7, 1016:13,
1071:24
**European** [2] - 986:15, 999:16
**evaluating** [2] - 993:15,
1000:21
**event** [5] - 959:15, 1001:23,
1028:24, 1043:14, 1052:6
**events** [3] - 986:9, 1033:7,
1034:20
**eventually** [1] - 1026:12
**evidence** [27] - 962:8, 962:9,
962:17, 962:25, 966:12, 967:17,
968:15, 968:17, 968:24, 985:20,
985:23, 990:23, 990:25, 993:20,
1028:5, 1029:21, 1031:4,
1031:6, 1046:10, 1048:19,
1048:22, 1048:23, 1053:17,
1053:18, 1055:17, 1060:23,
1082:8
**Evidence** [2] - 985:17, 985:21
**evidentiary** [3] - 971:17,
976:13, 991:15
**evolution** [1] - 981:1
**exact** [3] - 971:22, 1042:9,
1075:5
**exactly** [12] - 971:2, 982:4,
1027:16, 1027:20, 1028:23,
1060:1, 1061:10, 1064:15,
1076:23, 1077:20, 1078:2,

1088:13
**examination** [16] - 957:8, 957:9,
957:21, 961:5, 966:5, 978:6,
985:19, 1021:2, 1033:20,
1062:23, 1063:1, 1075:14,
1088:2, 1088:20, 1089:1, 1089:8
**EXAMINATION** [3] - 992:4,
1021:4, 1084:20
**examine** [4] - 981:5, 988:22,
1062:6, 1089:22
**examined** [4] - 984:5, 985:14,
990:11, 992:3
**examining** [2] - 1033:16,
1033:18
**example** [1] - 1082:15
**exceed** [1] - 1062:20
**except** [1] - 1047:6
**exception** [6] - 960:16, 960:19,
961:13, 961:15, 961:19, 967:21
**exchange** [2] - 969:22, 980:5
**exchanges** [1] - 1040:17
**exclude** [2] - 977:19, 986:3
**excluded** [10] - 962:5, 962:12,
965:14, 978:20, 978:24, 983:24,
984:1, 984:24, 989:21, 990:15
**excluding** [1] - 962:9
**excused** [2] - 1054:5, 1086:18
**executive** [1] - 1018:19
**exercising** [1] - 962:11
**Exhibit** [59] - 963:18, 964:11,
965:14, 965:16, 967:24, 968:6,
974:5, 974:10, 974:20, 976:18,
977:20, 978:21, 978:22, 978:24,
978:25, 983:16, 983:17, 983:19,
984:7, 986:1, 987:6, 996:7,
997:16, 1002:8, 1002:25,
1008:21, 1009:17, 1012:6,
1014:7, 1016:24, 1019:19,
1028:4, 1041:21, 1042:4,
1044:23, 1046:5, 1046:8,
1047:5, 1049:6, 1049:12,
1049:14, 1053:16, 1055:16,
1055:22, 1056:2, 1056:9,
1064:18, 1065:9, 1072:22,
1076:11, 1080:9, 1082:8,
1082:24, 1083:20, 1085:15,
1086:8, 1086:11
**exhibit** [27] - 964:3, 968:4,
968:8, 970:25, 974:4, 978:23,
983:12, 983:14, 986:10, 996:23,
997:1, 997:20, 1005:13,
1007:24, 1044:24, 1045:7,
1045:18, 1046:17, 1049:19,
1066:2, 1069:22, 1069:25,
1070:2, 1070:12, 1070:15,
1077:12, 1085:25
**exhibits** [5] - 960:3, 960:15,
974:3, 1031:11, 1047:21
**Exhibits** [1] - 967:13
**existed** [1] - 1075:25

**existence** [1] - 996:3
**existing** [1] - 960:20
**exits** [2] - 1054:8, 1087:5
**expect** [2] - 957:4, 1074:20
**expectations** [1] - 963:21
**expecting** [2] - 1076:25, 1077:3
**expenses** [1] - 962:6
**experience** [1] - 1050:19
**expert** [3] - 962:5, 962:13,
1050:9
**expertise** [2] - 1000:7, 1000:21
**experts** [1] - 1018:19
**explain** [5] - 975:21, 987:17,
990:3, 1006:12, 1075:13
**explained** [1] - 987:17
**explains** [1] - 976:4
**explanation** [6] - 977:21,
978:25, 1073:21, 1073:22,
1074:1, 1074:3
**explicitly** [1] - 980:24
**exploiting** [1] - 1061:2
**explore** [1] - 981:6
**expound** [1] - 985:11
**expressed** [2] - 1053:7,
1067:11
**expressions** [1] - 1038:23
**extend** [1] - 1089:5
**extensive** [1] - 1028:24
**extent** [6] - 959:10, 963:13,
972:23, 973:24, 998:13, 1038:3
**extra** [1] - 1064:10
**eyes** [1] - 988:7
**Ezra** [1] - 955:1

# F

**F.2d** [1] - 960:24
**fabulous** [1] - 991:6
**facial** [1] - 1038:23
**fact** [38] - 958:1, 967:7, 971:16,
971:19, 971:20, 973:12, 974:15,
974:20, 975:12, 975:16, 976:9,
976:14, 977:12, 977:18, 978:4,
978:9, 978:14, 980:11, 981:11,
983:6, 983:21, 988:3, 990:19,
991:18, 1001:7, 1004:19,
1035:3, 1035:16, 1039:4,
1039:9, 1039:13, 1039:17,
1042:15, 1064:9, 1064:13,
1068:5, 1076:21
**facts** [4] - 967:11, 1027:12,
1029:25, 1033:7
**factual** [2] - 973:18, 984:19
**fails** [1] - 996:16
**failure** [2] - 962:10, 962:22
**fair** [7] - 957:24, 985:6, 1029:3,
1032:2, 1061:3, 1078:19,
1083:12
**fairly** [1] - 1080:7
**fairness** [1] - 963:25

**faith** [3] - 962:15, 962:17, 970:22
**fall** [5] - 987:20, 993:2, 1008:13, 1008:15, 1024:9
**false** [6] - 963:8, 966:11, 967:17, 978:17, 1060:11, 1060:12
**falsified** [1] - 1027:6
**familiar** [2] - 1079:7, 1079:25
**far** [6] - 995:2, 1009:25, 1010:23, 1031:13, 1076:9, 1076:10
**FARA** [58] - 963:6, 965:13, 966:14, 969:16, 969:22, 970:22, 970:23, 984:8, 987:24, 995:24, 997:13, 998:8, 998:9, 998:14, 998:20, 999:6, 999:8, 999:9, 1000:8, 1000:20, 1000:22, 1001:1, 1001:2, 1001:4, 1001:7, 1001:16, 1001:23, 1011:22, 1012:1, 1012:16, 1013:9, 1014:1, 1014:23, 1017:6, 1019:11, 1020:1, 1041:19, 1042:7, 1044:8, 1044:9, 1044:12, 1045:25, 1047:22, 1050:9, 1050:20, 1050:24, 1051:3, 1052:9, 1080:19, 1081:3, 1082:11, 1084:1, 1084:9, 1084:11, 1085:1, 1085:4, 1085:10, 1085:16
**fault** [1] - 996:12
**favorable** [3] - 1004:9, 1004:20, 1069:13
**February** [5] - 965:10, 984:8, 989:2, 997:9, 1043:7
**Federal** [2] - 985:16, 985:20
**federal** [4] - 1021:22, 1022:1, 1023:1, 1025:14
**felt** [1] - 968:23
**Fernando** [2] - 954:12, 956:11
**fernando.campoamor** [1] - 954:16
**fernando.campoamor-sanchez@usdoj.gov** [1] - 954:16
**few** [6] - 956:17, 1003:4, 1023:23, 1045:12, 1064:10, 1070:10
**fide** [1] - 970:22
**Fifth** [1] - 962:11
**fifth** [1] - 1005:12
**figure** [1] - 963:3
**file** [1] - 962:22
**filed** [1] - 960:1
**Final** [3] - 1019:22, 1083:25, 1084:3
**final** [5] - 965:24, 979:3, 1037:16, 1064:13, 1086:11
**finalized** [1] - 977:14
**finally** [1] - 1085:14
**fine** [1] - 1045:22

**finish** [2] - 957:6, 958:20
**finished** [17] - 958:19, 966:18, 967:9, 976:19, 976:21, 1029:11, 1060:14, 1062:13, 1064:7, 1064:13, 1073:4, 1073:10, 1073:13, 1074:4, 1075:9, 1088:2, 1088:19
**firm** [55] - 964:17, 992:13, 992:19, 999:14, 1000:25, 1001:2, 1001:25, 1002:22, 1003:20, 1004:1, 1004:16, 1006:14, 1006:16, 1006:19, 1006:24, 1013:5, 1013:6, 1017:14, 1017:15, 1017:20, 1018:12, 1018:15, 1018:16, 1018:17, 1019:10, 1020:10, 1020:12, 1020:18, 1020:22, 1023:6, 1024:12, 1024:19, 1024:21, 1029:18, 1030:2, 1031:8, 1039:9, 1041:14, 1041:16, 1050:9, 1050:22, 1051:1, 1051:2, 1052:7, 1052:15, 1052:22, 1056:7, 1067:20, 1068:10, 1072:13, 1081:17, 1082:2, 1082:4, 1084:10
**firm's** [2] - 1029:22, 1031:16
**first** [37] - 958:5, 961:2, 961:17, 964:5, 972:16, 992:2, 993:9, 995:16, 997:11, 998:23, 1001:16, 1003:17, 1003:19, 1005:9, 1006:10, 1012:8, 1013:24, 1014:8, 1014:14, 1015:16, 1016:8, 1017:1, 1017:11, 1035:12, 1038:22, 1060:2, 1061:2, 1065:10, 1065:12, 1065:15, 1066:1, 1070:17, 1071:10, 1075:23, 1083:4, 1085:15, 1087:9
**FleishmanHillard** [4] - 1041:16, 1072:14, 1072:15, 1072:16
**flip** [1] - 1005:12
**focus** [1] - 963:14
**focused** [3] - 958:7, 958:8, 970:2
**folks** [5] - 1023:18, 1032:7, 1041:4, 1072:11, 1076:14
**follow** [1] - 1074:20
**following** [6] - 960:8, 1006:8, 1016:24, 1023:15, 1071:4, 1086:7
**follows** [1] - 992:3
**FOR** [2] - 954:1, 954:13
**foregoing** [1] - 1092:6
**foreign** [3] - 999:10, 999:13
**Foreign** [3] - 995:21, 996:4, 999:8
**form** [2] - 1043:15, 1056:6
**formal** [2] - 964:13, 1087:16
**former** [3] - 993:14, 1026:12,

1078:13
**forth** [3] - 960:9, 973:23, 983:17
**forward** [5] - 998:25, 1002:13, 1065:2, 1065:24, 1082:13
**forwarded** [7] - 999:6, 1012:24, 1014:17, 1015:14, 1041:22, 1077:16, 1086:4
**forwarding** [2] - 997:8, 1014:13
**forwards** [1] - 1086:3
**foundation** [1] - 1006:22
**four** [3] - 984:13, 990:21, 1065:19
**Fourth** [1] - 954:14
**fourth** [1] - 1045:6
**frankly** [1] - 1033:25
**free** [2] - 978:10, 1031:7
**frequently** [1] - 991:16
**Friday** [1] - 981:11
**friendly** [1] - 1033:19
**front** [3] - 1004:10, 1045:13, 1074:23
**frustration** [1] - 1090:12
**frustrations** [1] - 986:7
**FTI** [16] - 977:23, 978:1, 978:8, 979:3, 979:12, 981:3, 983:4, 986:5, 986:8, 1041:1, 1060:9, 1065:16, 1067:22, 1069:1, 1072:12, 1076:9
**full** [3] - 1030:4, 1056:23, 1092:7
**fundamental** [1] - 970:15
**future** [2] - 980:9, 987:21
**FYI** [5] - 1003:19, 1012:14, 1012:20, 1066:3, 1080:17

## G

**gas** [3] - 1026:24, 1027:8, 1027:12
**Gaston** [11] - 954:13, 956:10, 1048:13, 1058:23, 1061:13, 1069:21, 1072:4, 1077:12, 1082:9, 1082:25, 1083:20
**GASTON** [77] - 972:15, 973:6, 973:16, 977:6, 991:24, 992:5, 996:12, 996:16, 996:19, 996:23, 997:1, 997:2, 1002:9, 1002:10, 1003:1, 1003:3, 1005:14, 1005:16, 1007:4, 1007:6, 1008:23, 1008:24, 1012:7, 1012:9, 1014:14, 1014:16, 1018:3, 1018:4, 1021:1, 1024:14, 1025:2, 1026:4, 1027:17, 1027:24, 1028:6, 1031:24, 1032:9, 1032:23, 1033:1, 1035:18, 1035:25, 1037:4, 1038:21, 1039:20, 1040:1, 1044:15, 1044:21, 1045:19, 1046:12, 1046:15, 1046:17, 1047:12, 1047:24,

1048:5, 1048:16, 1055:22,
1057:18, 1058:10, 1059:14,
1059:24, 1060:21, 1061:6,
1061:10, 1061:15, 1061:18,
1061:20, 1061:23, 1062:6,
1062:11, 1063:13, 1073:18,
1073:24, 1076:1, 1079:16,
1084:19, 1084:21, 1086:16
 **Gates** [9] - 978:11, 986:7,
986:12, 1040:19, 1040:20,
1065:19, 1066:2, 1067:8
 **gather** [2] - 993:21, 1029:20
 **general** [12] - 959:19, 970:4,
1008:2, 1010:25, 1017:18,
1022:24, 1035:20, 1035:23,
1036:24, 1039:1, 1040:8, 1060:8
 **General** [2] - 1025:10, 1025:11
 **general's** [2] - 1006:11, 1059:19
 **General's** [4] - 1058:9, 1069:16,
1071:12, 1071:23
 **generally** [4] - 1028:18,
1034:15, 1043:9, 1064:16
 **generated** [1] - 1030:2
 **gentleman** [1] - 1062:8
 **gift** [3] - 1059:18, 1060:4,
1063:11
 **gifts** [4] - 1059:18, 1060:6,
1063:19, 1064:5
 **given** [10] - 981:11, 984:23,
990:19, 993:24, 1023:4, 1030:4,
1033:23, 1060:8, 1070:25,
1073:21
 **Given** [1] - 1006:4
 **glance** [1] - 1069:23
 **global** [2] - 1081:19, 1081:21
 **goal** [3] - 993:18, 993:20,
1038:13
 **Government** [13] - 1028:4,
1041:21, 1046:8, 1046:25,
1049:11, 1053:16, 1056:2,
1064:18, 1065:9, 1072:22,
1080:9, 1082:7, 1082:24
 **government** [58] - 956:18,
958:25, 959:11, 960:1, 960:23,
961:12, 962:20, 962:25, 967:20,
972:14, 975:10, 979:8, 981:17,
985:12, 988:8, 990:8, 991:22,
991:25, 993:13, 993:23, 994:5,
994:7, 994:8, 994:16, 995:2,
999:11, 1001:1, 1003:20,
1004:8, 1004:19, 1010:1,
1018:18, 1023:2, 1023:8,
1025:14, 1026:11, 1026:21,
1027:9, 1032:20, 1033:22,
1041:21, 1044:2, 1044:14,
1044:19, 1046:6, 1046:7,
1047:20, 1049:14, 1052:12,
1055:7, 1055:18, 1055:19,
1063:4, 1069:12, 1076:12,
1086:20, 1089:22

 **Government's** [12] - 996:7,
997:15, 1002:8, 1002:25,
1008:21, 1009:17, 1012:6,
1014:7, 1016:24, 1019:19,
1042:3, 1047:5
 **government's** [13] - 958:7,
958:19, 959:5, 960:9, 960:17,
963:9, 977:5, 985:18, 1062:25,
1088:8, 1089:6, 1090:12,
1090:21
 **graduate** [1] - 1021:10
 **graduated** [2] - 1021:13,
1021:18
 **Great** [1] - 1062:3
 **Greg** [17] - 993:11, 994:12,
996:2, 999:17, 1000:6, 1001:13,
1004:3, 1004:8, 1009:8,
1012:14, 1013:18, 1051:19,
1069:10, 1076:16, 1080:17,
1082:20
 **Greg's** [1] - 1009:6
 **Gregory** [4] - 954:6, 956:5,
1078:13, 1078:24
 **Gross** [6] - 999:7, 1000:2,
1042:12, 1043:2, 1050:5, 1053:2
 **gross** [5] - 1000:3, 1000:5,
1050:8, 1050:14, 1050:18
 **gross's** [2] - 1000:17, 1049:2
 **ground** [1] - 988:10
 **grounds** [2] - 962:12, 962:24
 **Group** [3] - 1041:6, 1041:7,
1041:10
 **guarantees** [1] - 961:3
 **guess** [11] - 957:12, 966:7,
982:18, 985:1, 1013:5, 1023:15,
1024:21, 1028:11, 1036:11,
1052:2, 1068:9
 **guilt** [2] - 1004:5, 1068:7,
1069:4
 **Gulland** [1] - 954:13
 **guru** [2] - 999:9, 1050:12
 **guys** [3] - 1009:24, 1012:14,
1080:17

## H

 **half** [7] - 957:17, 1005:14,
1035:12, 1036:7, 1044:25,
1053:25, 1056:20
 **handle** [5] - 1003:20, 1003:23,
1005:24, 1022:11, 1067:14
 **happy** [3] - 957:4, 975:24
 **Harvard** [5] - 1021:16, 1066:16,
1066:21, 1066:22, 1067:1
 **haskell** [3] - 957:15, 1042:16,
1087:18
 **Haskell** [28] - 957:9, 958:22,
979:6, 979:7, 979:20, 994:14,
997:9, 997:12, 1012:21,
1019:20, 1032:15, 1037:17,

1037:23, 1045:9, 1046:2,
1080:22, 1083:22, 1085:22,
1085:25, 1086:5, 1086:9,
1086:12, 1087:12, 1087:19,
1087:21, 1087:22, 1090:1,
1091:2
 **Haskell's** [3] - 1041:22, 1042:8,
1045:2
 **Hawker** [34] - 956:23, 957:20,
958:20, 959:7, 979:13, 980:8,
980:13, 980:14, 980:16, 980:18,
980:22, 981:5, 981:8, 981:12,
982:7, 982:9, 982:18, 982:21,
983:1, 983:20, 983:23, 984:3,
984:4, 1041:1, 1060:5, 1061:13,
1062:1, 1062:4, 1065:20,
1066:25, 1076:6, 1088:16
 **hawker** [2] - 957:5, 1061:16
 **Hawker's** [3] - 980:25, 981:22,
1090:20
 **Hawkins** [1] - 1087:18
 **head** [2] - 981:14, 1081:19
 **headline** [1] - 1070:17
 **heads** [1] - 1004:4, 1032:17,
1069:3
 **heads-up** [1] - 1004:4, 1069:3
 **headway** [1] - 998:9
 **hear** [10] - 970:6, 972:13,
975:17, 980:18, 988:24,
1045:20, 1046:13, 1047:2,
1055:25, 1066:18
 **heard** [6] - 987:3, 991:7,
1026:17, 1052:2, 1052:5,
1090:17
 **hearing** [3] - 973:22, 1082:18,
1084:8
 **hearsay** [25] - 960:15, 960:16,
960:19, 961:2, 961:16, 961:18,
962:13, 963:16, 967:21, 972:16,
972:18, 972:19, 973:8, 977:6,
977:12, 977:19, 978:13, 978:19,
979:18, 983:15, 983:22, 983:24,
984:23, 986:1, 989:16
 **heart** [1] - 969:15
 **heels** [1] - 991:19
 **held** [1] - 962:9
 **HELD** [1] - 954:9
 **help** [2] - 998:14, 1056:19
 **helpful** [1] - 1026:2
 **helping** [2] - 995:8, 1050:1
 **hereby** [1] - 1092:5
 **Hi** [2] - 1012:14, 1080:17
 **highlight** [1] - 1070:21
 **highly** [1] - 988:12
 **himself** [1] - 984:9
 **hire** [5] - 1001:2, 1001:15,
1051:1, 1051:22, 1052:7
 **hired** [2] - 1003:20, 1029:18
 **home** [1] - 991:6
 **honesty** [1] - 980:25

**Honor** [60] - 956:1, 956:3, 956:9, 956:13, 956:21, 957:16, 958:14, 959:8, 970:16, 972:11, 972:15, 975:1, 975:20, 976:16, 977:6, 979:22, 983:11, 984:6, 987:4, 987:16, 988:19, 989:20, 990:1, 990:6, 990:17, 991:24, 1006:22, 1017:25, 1021:3, 1024:14, 1025:2, 1026:4, 1033:5, 1033:11, 1034:7, 1036:2, 1036:14, 1046:25, 1047:20, 1048:19, 1049:11, 1054:16, 1054:22, 1055:4, 1057:18, 1057:21, 1058:12, 1061:12, 1061:25, 1062:11, 1062:13, 1066:19, 1067:2, 1075:9, 1084:15, 1084:19, 1087:9, 1088:10, 1091:6
**HONORABLE** [1] - 954:9
**hope** [5] - 959:8, 1019:22, 1084:3, 1087:2, 1088:18
**hopefully** [2] - 957:5, 991:20
**hotel** [1] - 1064:10
**hour** [3] - 957:17, 991:12, 1053:25
**hours** [7] - 1027:15, 1028:8, 1028:10, 1028:12, 1028:14, 1028:16
**House** [1] - 1078:13
**house** [1] - 1082:1
**hunt** [2] - 987:8, 990:2
**Hunt** [2] - 984:21, 1083:25
**Hunt's** [1] - 969:24

---

# I

**idea** [5] - 966:19, 1028:9, 1029:13, 1072:19, 1077:4
**identified** [3] - 1068:19, 1068:22, 1068:23
**identifies** [1] - 967:13
**identify** [1] - 956:7
**ignore** [1] - 1090:18
**Ill** [1] - 954:21
**immediately** [1] - 967:2
**impacting** [1] - 1088:15
**imperative** [3] - 1006:5, 1071:1, 1071:8
**implicate** [1] - 987:24
**implication** [1] - 1081:6
**implicit** [1] - 989:1
**importance** [1] - 990:22
**important** [8] - 960:25, 961:4, 980:21, 980:22, 984:15, 985:7, 1001:22, 1031:22
**imposed** [1] - 1090:13
**improved** [1] - 998:12
**IN** [1] - 954:1
**in-house** [1] - 1082:1
**inaccuracies** [2] - 1020:17, 1020:23
**inapplicable** [1] - 961:14
**include** [6] - 1001:14, 1017:2, 1047:13, 1051:21, 1056:6, 1083:5
**included** [4] - 960:25, 984:23, 1037:16, 1047:5
**includes** [4] - 964:5, 1046:17, 1055:20, 1077:21
**including** [6] - 979:3, 999:15, 1001:19, 1058:2, 1072:11, 1076:15
**incoming** [3] - 972:16, 1016:19, 1085:16
**incomplete** [4] - 961:13, 964:6, 968:21, 971:24
**inconsistent** [1] - 1052:11
**incorporating** [1] - 1075:6
**indeed** [2] - 978:12, 1050:18
**independence** [5] - 964:18, 1032:11, 1032:13, 1032:14, 1033:5
**independent** [12] - 993:15, 993:21, 994:23, 1029:14, 1029:21, 1030:7, 1033:6, 1038:14, 1052:10, 1069:17, 1085:1, 1085:9
**indicate** [2] - 961:20, 1068:24
**indicated** [4] - 1021:18, 1077:8, 1078:22, 1082:1
**indicates** [2] - 988:4, 999:25
**indicating** [1] - 986:17
**indicative** [1] - 966:24
**indictment** [1] - 963:14
**individual** [1] - 962:3
**individually** [1] - 963:3
**individuals** [2] - 986:8, 986:9
**inferences** [1] - 984:16
**influenced** [1] - 1031:16
**inform** [1] - 1020:19
**information** [8] - 968:20, 972:8, 979:20, 1001:24, 1052:14, 1052:21, 1082:21, 1090:9
**informed** [2] - 1020:23, 1054:11
**initial** [1] - 1049:19
**initiated** [3] - 984:8, 1018:13, 1019:4
**innocence** [1] - 1068:7
**innocent** [2] - 984:11, 988:18
**inquiry** [1] - 1011:22
**inside** [1] - 1090:4
**insist** [1] - 978:10
**insisted** [2] - 978:8, 978:12
**instance** [1] - 977:9
**instances** [2] - 966:9, 967:15
**instruction** [2] - 962:15, 1020:19
**instructions** [1] - 966:1
**instrumental** [1] - 959:14
**insurmountable** [1] - 1001:23
**integrity** [1] - 980:25
**intend** [2] - 966:23, 1001:6
**intended** [2] - 970:12, 970:23
**intent** [5] - 969:14, 978:15, 980:3, 988:4, 990:20
**intention** [1] - 980:9
**intentions** [2] - 966:25, 984:21
**interactions** [1] - 1019:13
**interesting** [1] - 979:25
**international** [1] - 1006:14
**interpreting** [1] - 1033:12
**interrupt** [1] - 991:16
**intervening** [1] - 1034:23
**interview** [6] - 962:23, 962:25, 1024:18, 1030:6, 1057:17, 1059:1
**interviewed** [3] - 1018:16, 1024:11, 1059:9
**interviewing** [1] - 1058:2
**interviews** [2] - 1015:7, 1016:12
**introduce** [6] - 960:1, 962:22, 976:7, 976:10, 989:19, 992:8
**introduced** [3] - 962:21, 990:23, 1076:12
**introduction** [1] - 965:4
**investigate** [1] - 1006:14
**invitations** [1] - 1018:15
**invoice** [1] - 1055:20
**involved** [8] - 979:24, 983:3, 995:20, 998:2, 1029:20, 1037:24, 1041:4, 1050:1
**involves** [1] - 1007:25
**involving** [1] - 1027:12
**irrelevant** [9] - 972:14, 972:15, 973:9, 973:19, 986:13, 986:24, 989:11, 990:7, 990:10
**IRS** [1] - 962:21
**issue** [28] - 960:21, 960:22, 962:2, 962:13, 963:7, 963:13, 967:23, 978:3, 978:20, 979:14, 981:24, 983:18, 984:12, 984:25, 985:9, 990:15, 998:12, 999:13, 1001:23, 1006:15, 1006:16, 1006:17, 1012:16, 1012:20, 1015:24, 1071:25, 1083:9, 1090:14
**issued** [2] - 986:18, 1060:7
**issues** [14] - 962:20, 963:4, 981:7, 986:6, 986:8, 986:14, 991:17, 998:20, 1000:14, 1022:24, 1033:21, 1045:25, 1050:10, 1082:5
**Issues** [2] - 998:8, 999:6
**Item** [1] - 1077:22
**item** [2] - 1071:17, 1071:18
**items** [1] - 1077:24
**itself** [4] - 965:22, 989:15, 1045:10, 1051:2

## J

**JACKSON** [1] - 954:9
**James** [1] - 954:20
**JANICE** [1] - 1092:5
**Janice** [2] - 955:7, 1092:13
**January** [2] - 969:25, 989:2
**Jason** [2] - 954:17, 956:10
**jason.mccullough@usdoj. gov** [1] - 954:19
**Jencks** [5] - 1087:11, 1087:23, 1089:22, 1091:1, 1091:2
**job** [2] - 1026:3, 1062:4
**John** [2] - 1051:13, 1064:19
**join** [1] - 1024:7
**joined** [1] - 1025:10
**Jon** [1] - 1065:16
**Jonathan** [2] - 1041:1, 1065:20
**Journal** [1] - 1017:17
**journalist** [1] - 963:11
**journalists** [8] - 966:13, 967:2, 967:19, 1008:1, 1008:3, 1011:13, 1018:17, 1019:3
**judge** [4] - 1021:22, 1022:3, 1022:14, 1057:17
**JUDGE** [2] - 954:9, 954:10
**Judge** [5] - 992:24, 992:25, 1022:8, 1057:17, 1058:3
**judges** [1] - 1021:19
**judging** [1] - 993:16
**July** [21] - 1002:5, 1003:8, 1028:19, 1055:12, 1055:21, 1056:14, 1057:1, 1057:16, 1058:7, 1060:13, 1060:22, 1061:8, 1062:1, 1064:14, 1064:22, 1066:3, 1068:12, 1073:7, 1073:13, 1074:7, 1075:10
**jump** [1] - 1076:11
**June** [5] - 977:22, 986:5, 1019:2, 1028:22, 1035:13
**Junghans** [2] - 955:1, 956:15
**jurisdiction** [1] - 1022:12
**JURORS** [1] - 996:22
**jurors** [1] - 991:4
**jurors'** [2] - 996:20, 1046:19
**jury** [17] - 956:20, 961:6, 977:16, 991:1, 991:2, 991:19, 992:8, 1022:20, 1026:15, 1048:16, 1054:8, 1055:1, 1055:2, 1074:23, 1086:21, 1086:23, 1087:5
**JURY** [2] - 954:4, 954:8
**justice** [3] - 994:1, 1024:3, 1036:23
**Justice** [28] - 954:17, 965:6, 992:12, 992:14, 992:18, 992:20, 992:21, 992:23, 1006:11, 1012:2, 1013:12, 1014:1, 1017:6, 1022:17, 1022:23,

1023:1, 1023:7, 1023:12, 1023:16, 1024:6, 1025:9, 1025:12, 1031:17, 1045:24, 1069:16, 1071:12, 1078:14, 1083:18
**Justice's** [1] - 1011:22
**justices** [2] - 1023:19, 1023:24

## K

**K-E-D-E-M** [1] - 992:10
**Kagan** [3] - 992:20, 1023:16, 1024:6
**Kara** [2] - 994:13, 1037:11
**kedem** [1] - 1061:6
**Kedem** [34] - 957:1, 957:4, 957:17, 957:21, 957:24, 958:5, 959:9, 959:12, 991:25, 992:10, 992:11, 997:3, 1002:2, 1018:5, 1021:6, 1029:17, 1032:19, 1034:13, 1036:21, 1042:6, 1047:17, 1047:21, 1049:14, 1055:6, 1059:25, 1060:12, 1063:17, 1067:6, 1069:15, 1073:2, 1075:19, 1084:17, 1084:22, 1088:14
**KEDEM** [1] - 992:1
**keep** [1] - 964:1
**Ken** [10] - 999:7, 999:8, 1000:1, 1000:2, 1000:7, 1000:20, 1001:4, 1042:12, 1050:5, 1053:2
**Kennedy** [2] - 992:21, 1023:13
**Kerlin** [2] - 994:14, 1037:10
**key** [1] - 1070:7
**Kilimnick** [1] - 965:17
**kind** [4] - 1035:7, 1037:15, 1063:3, 1075:8
**Kingdom** [2] - 956:24, 1072:15
**Kireyev** [2] - 1057:17, 1058:3
**knock** [1] - 991:12
**knowing** [4] - 963:8, 969:9, 970:13, 1004:18
**knowledge** [30] - 967:5, 969:1, 969:14, 970:17, 975:4, 979:23, 980:2, 980:3, 982:3, 986:9, 1004:9, 1006:24, 1006:25, 1018:11, 1018:12, 1030:9, 1030:11, 1030:16, 1032:13, 1032:14, 1032:15, 1062:19, 1069:12, 1071:15, 1074:6, 1075:4, 1075:20, 1079:17, 1081:12, 1083:17
**known** [1] - 957:25
**knows** [5] - 959:21, 1023:25, 1028:7, 1047:19, 1047:21
**Kokenis** [1] - 962:4
**KOKENIS** [1] - 962:4
**Konstantin** [1] - 965:17
**Kravitz** [1] - 992:25
**Krawiec** [2] - 994:12, 1003:8,

1003:13, 1037:12, 1037:14
**krawiec** [1] - 1037:13
**Kyiv** [27] - 965:5, 997:24, 1003:8, 1003:10, 1008:7, 1015:3, 1015:19, 1049:18, 1049:21, 1057:5, 1057:8, 1057:20, 1057:24, 1058:1, 1063:18, 1063:22, 1064:10, 1064:22, 1064:25, 1072:12, 1079:6, 1079:7, 1079:9, 1079:14, 1079:18, 1079:23, 1080:7

## L

**lacked** [1] - 968:23
**lacks** [1] - 984:13
**landscape** [1] - 1052:24
**language** [2] - 1079:9, 1079:12
**laps** [1] - 996:15
**large** [1] - 994:7
**largely** [1] - 986:13
**Larry** [3] - 1013:2, 1013:4, 1014:21
**last** [9] - 957:3, 992:10, 998:10, 1013:23, 1017:11, 1020:16, 1065:11, 1089:25, 1090:21
**lasted** [1] - 1089:1
**late** [6] - 982:21, 995:19, 1008:13, 1008:15, 1024:23, 1087:20
**latest** [1] - 984:12
**Latin** [1] - 1066:12
**law** [32] - 992:19, 1001:18, 1006:14, 1018:12, 1018:14, 1018:16, 1018:17, 1020:9, 1020:18, 1020:22, 1021:10, 1021:18, 1021:19, 1022:5, 1022:14, 1023:6, 1023:12, 1023:15, 1023:18, 1024:3, 1029:18, 1029:22, 1029:24, 1030:1, 1031:8, 1031:16, 1050:9, 1050:22, 1051:1, 1052:10, 1052:20
**Law** [2] - 1017:16, 1021:13
**lawyer** [3] - 957:25, 1062:18, 1082:4
**lawyers** [8] - 965:4, 999:18, 1000:24, 1001:21, 1025:17, 1078:12, 1078:16
**lay** [1] - 961:23
**lead** [1] - 1036:22
**leadership** [1] - 1013:6
**leading** [5] - 1012:17, 1033:20, 1062:20, 1062:21, 1089:21
**leaked** [1] - 980:15
**learn** [3] - 980:14, 982:9, 993:9
**learned** [2] - 1008:16, 1008:18
**learning** [1] - 1011:24
**least** [3] - 978:15, 991:12,

1087:14
**leave** [1] - 1086:23
**leaves** [1] - 965:2
**lectern** [2] - 956:7, 1089:17
**led** [2] - 1074:4, 1078:12
**leeway** [1] - 1033:24
**left** [3] - 999:7, 1024:6, 1025:5
**legal** [9] - 1017:2, 1022:24,
1023:7, 1052:24, 1078:15,
1082:5, 1083:5, 1083:8, 1083:15
**Legal** [7] - 992:23, 1022:17,
1022:21, 1022:22, 1022:25,
1023:4, 1023:11
**legality** [1] - 1023:3
**legislative** [1] - 1018:19
**lengthy** [2] - 991:15, 1071:25
**less** [3] - 965:12, 969:9, 991:16
**lessons** [1] - 1070:7
**Letter** [1] - 1017:6
**letter** [43] - 969:24, 970:21,
987:13, 1001:8, 1012:15,
1012:18, 1013:12, 1013:15,
1013:19, 1013:21, 1013:23,
1014:3, 1014:4, 1016:19,
1017:22, 1018:6, 1019:1,
1019:7, 1019:10, 1019:24,
1019:25, 1020:5, 1020:16,
1030:20, 1030:21, 1030:25,
1031:5, 1031:15, 1031:19,
1047:22, 1080:18, 1080:19,
1082:14, 1083:17, 1083:21,
1083:25, 1084:5, 1084:22,
1084:24, 1085:16, 1086:7,
1086:11
**letters** [2] - 1012:16, 1012:17
**Leval** [2] - 992:24, 1022:8
**liar** [1] - 980:23
**light** [2] - 962:9, 969:1
**likely** [2] - 975:7, 1083:11
**limited** [4] - 957:7, 984:23,
1006:13, 1089:1
**limiting** [2] - 1088:24, 1089:13
**line** [1] - 1014:22
**lines** [1] - 1013:23
**list** [3] - 997:24, 1049:21,
1049:23
**listed** [1] - 1078:8
**listening** [1] - 1054:19
**lists** [1] - 1010:9
**litigation** [1] - 1081:19
**LLP** [2] - 954:22, 955:2
**logic** [1] - 984:15
**logical** [1] - 988:6
**logistical** [1] - 1090:22
**London** [4] - 998:1, 999:18,
1000:24, 1079:4
**long-awaited** [1] - 996:23
**look** [41] - 957:4, 963:3, 993:20,
996:5, 997:3, 997:7, 997:11,
997:20, 999:22, 1004:22,

1005:8, 1005:22, 1005:25,
1007:24, 1010:12, 1012:23,
1013:11, 1013:23, 1014:14,
1016:17, 1017:5, 1017:11,
1017:24, 1019:23, 1028:4,
1029:19, 1029:20, 1042:10,
1044:23, 1046:1, 1046:5,
1050:4, 1055:16, 1056:19,
1065:9, 1065:10, 1065:24,
1069:20, 1080:9, 1082:10,
1082:24
**looked** [11] - 961:17, 963:17,
997:18, 1003:4, 1004:22,
1005:3, 1017:23, 1043:20,
1043:22, 1064:24, 1085:11
**looking** [10] - 964:9, 980:1,
991:9, 996:9, 997:21, 1013:9,
1014:8, 1015:16, 1020:7, 1081:3
**looks** [16] - 997:23, 1001:23,
1005:2, 1005:7, 1010:5, 1045:4,
1045:16, 1048:17, 1056:13,
1056:22, 1056:25, 1065:19,
1069:2, 1073:4, 1077:21,
1077:25
**looping** [1] - 999:23
**Los** [1] - 1017:17
**Loucks** [2] - 966:4, 1032:14
**lunch** [2] - 1086:21, 1087:3
**lying** [2] - 970:13, 982:16

# M

**mail** [4] - 965:20, 1013:8,
1014:13, 1019:22
**makers** [1] - 1082:15
**Manafort** [32] - 965:6, 965:20,
965:22, 967:10, 967:25, 968:3,
968:7, 968:8, 968:20, 971:14,
972:24, 973:3, 973:21, 974:10,
975:13, 976:5, 976:7, 976:11,
977:25, 978:5, 978:8, 978:12,
979:2, 980:5, 986:14, 998:21,
1001:14, 1032:21, 1040:10,
1051:22, 1052:2
**Manafort's** [2] - 974:12, 975:24
**Manafort's..** [1] - 975:22
**manage** [2] - 1001:15, 1051:23
**management** [1] - 1081:17
**manner** [1] - 985:24
**Marcus** [2] - 955:1, 956:16
**Margaret** [3] - 994:12, 1037:11,
1067:7
**marked** [1] - 1002:24
**Marsteller** [1] - 1041:14
**Marsteller's** [1] - 1072:13
**material** [1] - 977:12
**materials** [1] - 1089:23
**Matt** [1] - 998:18
**matter** [17] - 957:19, 960:12,
961:10, 961:16, 972:20, 973:3,

973:7, 973:13, 973:14, 974:8,
974:14, 977:7, 993:12, 1006:14,
1026:9, 1083:25, 1084:23
**matters** [4] - 956:18, 956:25,
991:15, 999:17
**maximize** [1] - 998:17
**McCorkle** [1] - 962:19
**McCullough** [2] - 954:17,
956:10
**MD** [1] - 954:23
**mean** [16] - 958:24, 969:19,
973:16, 1007:14, 1008:17,
1019:25, 1029:17, 1037:18,
1049:5, 1052:20, 1053:1,
1067:19, 1068:25, 1088:10,
1088:12, 1089:17
**meaning** [4] - 968:23, 1029:22,
1029:25, 1066:12
**meant** [1] - 978:6
**media** [37] - 966:12, 967:17,
969:15, 969:23, 973:20, 973:24,
1008:1, 1008:7, 1008:9,
1009:11, 1011:1, 1011:7,
1015:1, 1015:2, 1015:5, 1015:6,
1015:18, 1016:3, 1016:11,
1016:12, 1018:13, 1018:14,
1018:15, 1018:21, 1019:2,
1020:11, 1020:12, 1020:13,
1038:18, 1039:1, 1039:10,
1039:14, 1040:3, 1041:4,
1072:5, 1075:18, 1085:6
**meet** [6] - 965:5, 965:6,
1040:20, 1041:2, 1076:8
**meeting** [10] - 965:11, 978:12,
987:19, 1002:21, 1041:3,
1058:8, 1061:20, 1061:23,
1082:14, 1082:18
**meetings** [2] - 963:13, 978:11
**member** [1] - 1081:17
**members** [6] - 979:4, 1058:8,
1059:19, 1073:3, 1077:13,
1086:23
**memo** [4] - 961:12, 1041:22,
1070:11, 1070:15
**memorandum** [16] - 960:9,
963:18, 963:21, 963:24, 964:5,
965:15, 966:8, 966:20, 970:3,
977:21, 979:1, 984:14, 990:21,
1045:9, 1046:2
**mention** [2] - 979:3, 1041:1
**mentioned** [10] - 993:11,
1022:8, 1022:16, 1029:13,
1037:9, 1040:9, 1041:18,
1055:6, 1081:16, 1085:3
**Mercury** [1] - 1041:12
**mere** [1] - 967:7
**message** [4] - 999:7, 1051:15,
1076:24, 1077:2
**met** [6] - 984:21, 1040:13,
1061:16, 1061:22, 1076:6,

1087:14
**mid** [1] - 1038:19
**mid-December** [1] - 1038:19
**middle** [2] - 1028:22, 1088:8
**midmorning** [2] - 1053:21, 1054:3
**might** [20] - 962:6, 970:18, 974:24, 975:7, 987:21, 993:12, 1030:10, 1031:17, 1035:5, 1036:22, 1037:21, 1037:22, 1046:23, 1047:14, 1050:5, 1051:3, 1052:11, 1081:7, 1083:9, 1083:10
**mind** [28] - 960:20, 960:21, 961:13, 961:14, 961:22, 963:6, 963:7, 963:11, 965:11, 967:23, 970:9, 970:21, 971:13, 978:3, 979:23, 980:23, 982:3, 984:11, 986:23, 988:14, 988:16, 988:19, 989:14, 990:24, 1000:17, 1046:24, 1084:9
**mindful** [1] - 998:10
**mine** [1] - 996:11
**minister** [9] - 993:14, 1026:13, 1026:18, 1026:19, 1026:23, 1058:8, 1058:18, 1059:10, 1072:10
**Ministers** [1] - 1027:4
**Ministry** [9] - 965:6, 1006:11, 1014:2, 1015:3, 1015:19, 1031:17, 1069:16, 1071:12, 1078:14
**minitrial** [1] - 977:13
**minster** [1] - 1058:19
**minute** [1] - 960:7
**minutes** [1] - 1089:1
**mischaracterize** [3] - 966:11, 967:17, 969:19
**miscommunications** [1] - 986:7
**misinformation** [5] - 966:13, 967:18, 1015:9, 1015:12, 1016:14
**misleading** [1] - 964:7
**misstated** [1] - 1039:14
**misunderstanding** [1] - 980:16
**misuse** [1] - 1026:21
**modify** [1] - 1032:21
**Molly** [2] - 954:13, 956:10
**molly.gaston@usdoj.gov** [1] - 954:16
**moment** [1] - 987:3
**month** [6] - 988:11, 988:15, 1028:16, 1028:19, 1055:21, 1056:13
**months** [3] - 971:1, 984:13, 1080:14
**moreover** [1] - 965:3
**morning** [21] - 956:1, 956:2, 956:3, 956:9, 956:13, 990:16,

991:3, 992:6, 992:7, 1002:15, 1021:6, 1021:7, 1041:25, 1042:1, 1049:15, 1054:12, 1055:6, 1060:2, 1077:12, 1080:10, 1090:7
**MORNING** [2] - 954:5, 954:8
**Moscow** [1] - 1072:13
**most** [5] - 961:4, 1012:18, 1062:4, 1079:24, 1079:25
**mostly** [1] - 1056:17
**motion** [2] - 960:1, 967:13
**move** [1] - 1025:24
**moving** [2] - 1007:7, 1062:9
**MR** [203] - 956:9, 956:13, 956:21, 957:16, 958:10, 958:14, 958:17, 959:8, 959:24, 968:5, 968:9, 968:10, 968:11, 968:13, 968:16, 968:17, 969:11, 969:13, 969:19, 969:22, 970:5, 970:8, 971:5, 971:9, 971:16, 971:23, 972:1, 972:11, 975:1, 975:14, 975:20, 975:23, 976:10, 976:16, 976:22, 978:22, 979:22, 980:10, 980:12, 980:22, 981:8, 981:22, 982:1, 982:8, 982:12, 982:20, 982:24, 983:2, 983:9, 983:11, 983:25, 984:6, 987:3, 987:6, 987:8, 987:16, 988:18, 988:24, 989:7, 989:20, 990:1, 990:6, 990:17, 1006:22, 1017:25, 1021:3, 1021:5, 1024:2, 1024:17, 1025:4, 1026:6, 1026:7, 1027:21, 1028:3, 1028:13, 1031:1, 1031:2, 1032:4, 1032:5, 1032:10, 1032:18, 1033:5, 1033:11, 1033:14, 1034:6, 1034:10, 1034:12, 1035:22, 1036:2, 1036:5, 1036:13, 1036:19, 1036:20, 1037:8, 1038:5, 1038:10, 1038:11, 1038:24, 1039:7, 1039:8, 1039:22, 1039:23, 1040:2, 1040:7, 1041:11, 1042:3, 1042:5, 1042:18, 1043:5, 1043:6, 1044:7, 1044:9, 1044:11, 1044:17, 1044:23, 1045:1, 1045:6, 1045:8, 1045:21, 1045:23, 1046:8, 1046:10, 1046:21, 1046:25, 1047:4, 1047:9, 1047:14, 1047:17, 1047:20, 1048:10, 1048:19, 1049:4, 1049:6, 1049:8, 1049:11, 1049:13, 1051:12, 1051:14, 1053:18, 1053:25, 1054:16, 1054:22, 1055:4, 1055:5, 1055:16, 1055:19, 1055:24, 1056:2, 1056:3, 1056:10, 1056:12, 1056:20, 1056:21, 1057:2, 1057:4,

1057:21, 1058:4, 1058:6, 1058:12, 1058:17, 1059:17, 1059:21, 1060:5, 1061:9, 1061:12, 1061:17, 1061:19, 1061:25, 1062:10, 1062:13, 1063:10, 1064:1, 1064:6, 1064:19, 1064:20, 1066:18, 1066:22, 1066:25, 1067:2, 1067:4, 1067:5, 1070:21, 1070:22, 1072:25, 1073:1, 1073:20, 1074:12, 1075:2, 1075:8, 1075:15, 1075:17, 1076:3, 1076:4, 1079:21, 1084:15, 1084:17, 1087:6, 1087:9, 1087:19, 1087:22, 1087:25, 1088:3, 1091:6
**MS** [77] - 972:15, 973:6, 973:16, 977:6, 991:24, 992:5, 996:12, 996:16, 996:19, 996:23, 997:1, 997:2, 1002:9, 1002:10, 1003:1, 1003:3, 1005:14, 1005:16, 1007:4, 1007:6, 1008:23, 1008:24, 1012:7, 1012:9, 1014:14, 1014:16, 1018:3, 1018:4, 1021:1, 1024:14, 1025:2, 1026:4, 1027:17, 1027:24, 1028:6, 1031:24, 1032:9, 1032:23, 1033:1, 1035:18, 1035:25, 1037:4, 1038:21, 1039:20, 1040:1, 1044:15, 1044:21, 1045:19, 1046:12, 1046:15, 1046:17, 1047:12, 1047:24, 1048:5, 1048:16, 1055:22, 1057:18, 1058:10, 1059:14, 1059:24, 1060:21, 1061:6, 1061:10, 1061:15, 1061:18, 1061:20, 1061:23, 1062:6, 1062:11, 1063:13, 1073:18, 1073:24, 1076:1, 1079:16, 1084:19, 1084:21, 1086:16
**multiple** [2] - 974:13, 974:17
**Murphy** [16] - 954:20, 956:14, 981:14, 987:2, 989:12, 1053:20, 1054:10, 1055:3, 1059:25, 1061:2, 1062:6, 1074:19, 1084:22, 1085:14, 1088:21, 1088:23
**MURPHY** [151] - 956:13, 957:16, 958:10, 958:14, 959:8, 959:24, 968:10, 968:13, 968:16, 987:3, 987:6, 987:8, 987:16, 988:18, 988:24, 989:20, 990:1, 990:6, 990:17, 1006:22, 1017:25, 1021:3, 1021:5, 1024:2, 1024:17, 1025:4, 1026:6, 1026:7, 1027:21, 1028:3, 1028:13, 1031:1, 1031:2, 1032:4, 1032:5, 1032:10, 1032:18, 1033:5, 1033:11, 1033:14, 1034:6, 1034:10,

1034:12, 1035:22, 1036:2,
1036:5, 1036:13, 1036:19,
1036:20, 1037:8, 1038:5,
1038:10, 1038:11, 1038:24,
1039:7, 1039:8, 1039:22,
1039:23, 1040:2, 1040:7,
1041:11, 1042:3, 1042:5,
1042:18, 1043:5, 1043:6,
1044:7, 1044:9, 1044:11,
1044:17, 1044:23, 1045:1,
1045:6, 1045:8, 1045:21,
1045:23, 1046:8, 1046:10,
1046:21, 1046:25, 1047:4,
1047:9, 1047:14, 1047:17,
1047:20, 1048:10, 1048:19,
1049:4, 1049:6, 1049:8,
1049:11, 1049:13, 1051:12,
1051:14, 1053:18, 1053:25,
1054:16, 1054:22, 1055:4,
1055:5, 1055:16, 1055:19,
1055:24, 1056:2, 1056:3,
1056:10, 1056:12, 1056:20,
1056:21, 1057:2, 1057:4,
1057:21, 1058:4, 1058:6,
1058:12, 1058:17, 1059:17,
1059:21, 1060:5, 1061:9,
1061:12, 1061:17, 1061:19,
1061:25, 1062:10, 1062:13,
1063:10, 1064:1, 1064:6,
1064:19, 1064:20, 1066:18,
1066:22, 1066:25, 1067:4,
1067:5, 1070:21, 1070:22,
1072:25, 1073:1, 1073:20,
1074:12, 1075:2, 1075:8,
1075:15, 1075:17, 1076:3,
1076:4, 1079:21, 1084:15,
1084:17

**murphy** [1] - 1060:22
**Murphy's** [1] - 1062:12
**must** [4] - 960:15, 961:24,
1014:1, 1077:24
**mystery** [4] - 1075:9, 1075:11,
1075:12, 1075:13

## N

**nailed** [1] - 985:9
**name** [5] - 992:9, 992:10,
1037:11, 1058:19
**narrow** [1] - 1055:14
**narrowing** [1] - 1062:17
**narrowly** [1] - 1033:12
**National** [2] - 1013:13, 1017:16
**Nats** [1] - 991:6
**natural** [3] - 1026:24, 1027:8,
1027:12
**nature** [2] - 967:5, 1033:6
**near** [1] - 1085:2
**necessarily** [1] - 961:3
**need** [18] - 958:12, 959:10,

959:21, 963:2, 984:4, 985:1,
985:22, 986:10, 998:21,
1012:16, 1017:1, 1018:1,
1046:23, 1070:24, 1083:5,
1088:4, 1091:1, 1091:4
**needed** [2] - 964:18, 1030:6
**needs** [2] - 959:6, 989:6
**negative** [2] - 963:25, 964:19
**negotiated** [1] - 1026:25
**never** [7] - 975:7, 1040:13,
1040:15, 1046:24, 1061:22,
1074:9, 1076:6
**New** [10] - 987:21, 987:23,
988:10, 1010:14, 1010:19,
1010:21, 1017:16, 1022:10,
1077:22, 1078:3
**news** [6] - 1010:9, 1010:21,
1015:1, 1020:18, 1020:24,
1079:13
**newspaper** [1] - 1079:9
**next** [31] - 965:15, 991:22,
1006:6, 1009:9, 1018:24,
1024:16, 1032:3, 1038:9,
1039:6, 1050:4, 1051:12,
1053:16, 1056:19, 1058:5,
1059:10, 1063:25, 1064:4,
1064:17, 1066:2, 1067:3,
1071:2, 1071:10, 1071:17,
1071:22, 1072:10, 1072:22,
1076:17, 1082:7, 1082:24,
1086:20
**night** [3] - 957:3, 1058:22,
1059:1
**nine** [1] - 1080:14
**nobody** [1] - 1081:13
**non** [1] - 1089:21
**non-leading** [1] - 1089:21
**none** [1] - 982:11
**noon** [2] - 1054:6, 1054:9
**note** [5] - 969:17, 991:3, 991:11,
1004:1, 1089:16
**notebooks** [1] - 1086:24
**noted** [7] - 962:16, 999:14,
1001:4, 1007:8, 1007:12,
1067:20, 1074:22
**notes** [1] - 1092:7
**nothing** [8] - 966:22, 971:8,
977:25, 989:13, 1021:1,
1047:21, 1047:23, 1089:3
**notified** [1] - 957:25
**November** [1] - 977:10
**Number** [3] - 956:4, 1046:5,
1049:14
**number** [11] - 968:12, 979:2,
985:4, 989:9, 989:11, 1007:25,
1015:16, 1017:23, 1074:2,
1077:11, 1079:23
**NW** [3] - 954:14, 954:18, 955:2,
955:8, 1092:14

## O

**Obama's** [1] - 1078:13
**object** [5] - 958:20, 963:1,
981:17, 989:18, 1074:20
**objected** [1] - 1075:6
**objection** [37] - 977:5, 1006:22,
1017:25, 1024:14, 1025:2,
1026:4, 1027:17, 1027:24,
1028:6, 1031:24, 1032:3,
1032:9, 1032:23, 1032:25,
1035:18, 1035:25, 1037:4,
1038:21, 1039:20, 1040:1,
1044:15, 1044:21, 1045:19,
1046:12, 1057:18, 1058:10,
1059:14, 1059:16, 1059:23,
1067:2, 1073:18, 1073:24,
1074:21, 1076:1, 1079:16,
1088:12, 1089:16
**obligated** [1] - 1000:25
**obligations** [1] - 1000:22
**observed** [1] - 969:13
**obtain** [4] - 1015:2, 1015:19,
1016:4, 1017:20
**obtained** [1] - 1026:2
**obviate** [1] - 986:10
**obvious** [4] - 966:10, 966:20,
967:16, 969:3
**obviously** [1] - 987:13
**occasions** [3] - 1024:25,
1077:7, 1077:10
**occurred** [6] - 959:16, 964:13,
990:2, 1034:17, 1065:12,
1068:20
**October** [16] - 967:25, 968:7,
968:11, 969:24, 970:9, 971:1,
971:5, 971:10, 971:20, 972:2,
977:2, 984:12, 1019:19, 1020:4,
1083:22, 1084:9
**OF** [4] - 954:1, 954:8, 954:14,
1092:2
**offended** [1] - 974:22
**offered** [2] - 973:7, 983:22
**offering** [4] - 973:6, 973:11,
973:19, 977:7
**office** [7] - 993:4, 993:5, 993:10,
994:11, 998:1, 1072:12, 1072:20
**Office** [12] - 954:13, 990:10,
992:22, 1022:16, 1022:20,
1022:22, 1022:25, 1023:4,
1023:11, 1025:10, 1058:9,
1069:17
**offices** [1] - 1081:23
**OFFICIAL** [1] - 1092:2
**Official** [2] - 955:7, 1092:13
**officially** [1] - 1078:6
**officials** [1] - 1018:18
**old** [1] - 996:15
**once** [5] - 962:24, 987:17,
1086:24, 1087:14, 1087:15

**One** [6] - 998:11, 1002:11, 1002:14, 1056:23, 1057:5, 1065:3
**one** [56] - 956:22, 961:12, 962:6, 963:18, 968:14, 968:15, 969:18, 970:11, 975:9, 978:24, 979:22, 979:25, 984:10, 984:25, 986:16, 989:10, 991:7, 993:10, 998:11, 999:10, 999:13, 999:16, 1007:25, 1014:25, 1015:16, 1017:23, 1018:12, 1021:22, 1023:23, 1025:17, 1028:16, 1030:13, 1035:2, 1035:21, 1035:23, 1037:1, 1046:11, 1049:14, 1050:3, 1051:12, 1053:12, 1055:8, 1060:13, 1060:19, 1061:25, 1062:8, 1063:9, 1063:14, 1063:18, 1063:21, 1065:12, 1065:13, 1071:15, 1071:22, 1079:3
**ones** [2] - 1037:21
**open** [12] - 985:10, 987:12, 987:14, 989:7, 989:18, 1033:10, 1034:11, 1048:12, 1049:10, 1063:16, 1075:16, 1089:21
**open-ended** [2] - 985:10, 1089:21
**opens** [1] - 985:12
**operating** [3] - 981:20, 1006:8, 1071:4
**operation** [1] - 1081:21
**opine** [1] - 1068:6
**opinion** [3] - 987:20, 988:8, 988:11
**opinions** [7] - 1022:23, 1023:4, 1030:1, 1031:15, 1031:16, 1031:17, 1031:20
**opportunity** [6] - 961:6, 964:22, 979:9, 1018:16, 1063:6, 1089:20
**opposed** [3] - 969:7, 973:2, 1074:7
**opposition** [2] - 960:10, 960:17
**Oprah** [1] - 991:14
**options** [2] - 1013:9, 1081:3
**oral** [1] - 1043:16
**order** [7] - 957:14, 958:4, 958:9, 981:18, 998:16, 1030:6, 1060:25
**original** [1] - 989:24
**otherwise** [3] - 985:15, 998:21, 1063:1
**ought** [1] - 998:15
**out-of-court** [8] - 960:2, 960:11, 961:1, 961:20, 962:16, 973:2, 977:18, 986:1
**outlets** [7] - 1015:2, 1015:18, 1016:3, 1017:19, 1020:11, 1020:13, 1039:14
**outreach** [3] - 1008:1, 1008:7, 1008:9
**outset** [2] - 963:20, 1068:5

**outside** [8] - 957:18, 1024:14, 1059:24, 1060:19, 1061:11, 1074:25, 1090:5, 1090:9
**overall** [1] - 1069:24
**overnight** [1] - 1088:19
**overrule** [1] - 1090:17
**own** [10] - 956:18, 957:14, 958:9, 961:7, 981:6, 984:19, 999:16, 1029:22, 1031:20, 1062:7

# P

**p.m** [1] - 1051:10
**page** [48] - 997:12, 997:20, 998:23, 1003:22, 1003:23, 1005:9, 1005:12, 1005:13, 1005:15, 1005:23, 1005:25, 1007:7, 1007:24, 1013:24, 1017:11, 1018:10, 1044:24, 1045:6, 1045:17, 1047:1, 1047:6, 1049:19, 1051:17, 1056:9, 1056:10, 1056:11, 1056:19, 1056:20, 1057:3, 1058:4, 1058:5, 1065:10, 1066:1, 1067:14, 1067:15, 1069:22, 1069:25, 1070:2, 1070:11, 1070:14, 1070:15, 1071:17, 1072:6, 1072:10
**pages** [4] - 1034:14, 1045:12, 1045:16, 1070:10
**paid** [3] - 991:6, 1006:20, 1006:24
**paper** [1] - 996:10
**paragraph** [9] - 1003:17, 1010:6, 1017:11, 1017:12, 1018:25, 1020:7, 1020:8, 1020:16, 1071:10
**pardon** [1] - 1042:21
**parenthesis** [2] - 1006:13
**Paris** [2] - 1072:13, 1072:16
**part** [24] - 959:18, 980:4, 983:6, 994:5, 1001:19, 1002:2, 1007:25, 1012:7, 1016:8, 1026:25, 1031:22, 1033:5, 1033:6, 1036:25, 1038:6, 1045:2, 1045:21, 1057:16, 1062:25, 1068:7, 1068:9, 1068:10, 1074:8, 1088:7
**partial** [1] - 1078:19
**participate** [2] - 1009:11, 1011:7
**participated** [1] - 1058:7
**particular** [6] - 968:1, 970:25, 977:20, 1010:20, 1090:2, 1090:13
**parties** [1] - 956:6
**partner** [2] - 964:12, 964:16
**partners** [4] - 993:10, 994:11, 1013:4, 1024:11

**parts** [3] - 1022:25, 1023:1, 1029:7
**passage** [1] - 1078:12
**passages** [1] - 1069:22
**paste** [1] - 1010:3
**pasted** [1] - 1010:7
**Paul** [7] - 965:6, 966:7, 968:7, 968:8, 973:21, 994:13, 1040:10
**Paula** [1] - 955:1
**pay** [1] - 1006:13
**payment** [2] - 1006:16, 1030:10
**PDF** [2] - 1019:24, 1086:11
**Pennsylvania** [1] - 954:18
**people** [28] - 979:2, 979:24, 983:3, 991:9, 993:21, 995:6, 998:19, 1006:25, 1015:24, 1023:23, 1029:19, 1030:5, 1031:11, 1037:2, 1037:9, 1037:15, 1038:19, 1038:25, 1040:9, 1055:21, 1062:22, 1063:4, 1065:13, 1068:25, 1069:15, 1072:7, 1072:19, 1074:23
**people's** [1] - 1032:17
**per** [2] - 961:24, 1066:3
**percent** [3] - 1004:9, 1004:20, 1069:13
**perform** [2] - 1000:23, 1001:6
**perhaps** [2] - 1017:1, 1083:5
**period** [7] - 978:20, 993:1, 1057:25, 1073:12, 1073:16, 1073:23, 1074:13
**permission** [1] - 979:16
**permit** [2] - 972:25, 1086:21
**permitted** [1] - 987:9
**person** [5] - 965:8, 965:12, 988:6, 1027:7, 1048:25
**personal** [8] - 986:9, 1006:23, 1030:8, 1030:11, 1062:19, 1074:6, 1075:4, 1079:17
**personally** [1] - 1011:15
**perspective** [1] - 998:15
**persuade** [1] - 988:16
**persuaded** [1] - 988:15
**phone** [7] - 964:25, 983:24, 984:3, 1040:15, 1040:22, 1043:2
**phrase** [1] - 1088:11
**pick** [1] - 1054:6
**piece** [2] - 988:20, 1018:21
**Pinchuk** [1] - 965:5
**pjunghans@zuckerman.com** [1] - 955:4
**place** [8] - 961:2, 978:13, 984:20, 1034:20, 1036:6, 1060:7, 1062:1, 1082:18
**plainly** [2] - 972:16, 972:18
**Plaintiff** [2] - 954:4, 954:12
**plan** [4] - 1007:25, 1072:5, 1075:18, 1075:21
**planned** [1] - 969:1

**planning** [5] - 958:6, 981:6, 981:15, 981:21, 983:1
**plans** [4] - 966:11, 967:16, 1004:10, 1088:16
**play** [1] - 1001:2
**pleading** [1] - 964:8
**Podesta** [3] - 1041:5, 1041:7, 1041:9
**point** [35] - 960:17, 960:18, 962:15, 963:7, 966:18, 973:5, 974:25, 975:3, 982:17, 988:15, 988:17, 990:7, 991:15, 995:22, 999:16, 1004:7, 1006:10, 1007:19, 1011:21, 1015:23, 1015:25, 1016:10, 1017:22, 1042:20, 1048:3, 1049:24, 1068:3, 1068:13, 1071:22, 1075:13, 1077:3, 1084:8, 1087:25, 1091:9
**pointed** [1] - 960:23
**policy** [1] - 999:11
**political** [1] - 974:17
**portion** [1] - 994:7
**position** [6] - 966:17, 967:9, 970:10, 971:23, 1004:5, 1069:4
**possibilities** [1] - 1035:21
**possible** [1] - 998:16
**Post** [7] - 1079:6, 1079:7, 1079:9, 1079:14, 1079:18, 1079:23, 1080:7
**potential** [5] - 965:7, 977:12, 977:15, 993:12, 1001:20
**potentially** [1] - 993:14
**power** [3] - 1026:20, 1026:21, 1026:22
**PR** [32] - 969:14, 998:12, 998:15, 999:14, 1000:25, 1001:2, 1001:14, 1001:15, 1001:19, 1001:25, 1002:11, 1002:13, 1002:19, 1003:22, 1005:23, 1041:14, 1041:16, 1050:1, 1051:21, 1051:22, 1052:7, 1052:15, 1052:22, 1060:9, 1060:15, 1061:7, 1062:2, 1065:2, 1065:6, 1067:13, 1072:16
**practice** [2] - 992:13, 1025:25
**Pratt** [1] - 954:22
**precisely** [1] - 1088:20
**prefer** [1] - 996:9
**preliminary** [1] - 956:17
**prepare** [1] - 1070:25
**prepared** [2] - 960:4, 960:7
**preparing** [2] - 1075:21, 1081:7
**present** [3] - 956:5, 958:18, 991:4
**presentation** [1] - 991:16
**president** [1] - 1072:9
**President** [1] - 1078:13
**press** [14] - 984:21, 989:24,

995:3, 999:15, 999:16, 1003:20, 1006:18, 1015:11, 1035:4, 1036:8, 1072:12, 1072:20, 1077:17, 1080:4
**Press** [1] - 1079:6
**pressing** [1] - 956:24
**presumably** [1] - 999:15
**presumption** [1] - 1071:11
**presumptions** [2] - 1006:8, 1071:4
**pretending** [1] - 980:19
**pretrial** [2] - 960:3, 961:25
**pretty** [2] - 1056:22, 1056:23
**previous** [1] - 1005:3
**previously** [10] - 996:8, 997:16, 1002:7, 1002:25, 1009:18, 1012:5, 1014:8, 1017:23, 1019:18, 1072:25
**primarily** [1] - 995:8
**prime** [10] - 993:14, 1026:12, 1026:18, 1026:19, 1026:23, 1058:8, 1058:18, 1058:19, 1059:9, 1072:9
**principal** [2] - 1029:3, 1029:4
**print** [1] - 1019:2
**private** [2] - 992:13, 1025:25
**privilege** [1] - 1024:3
**problem** [13] - 960:25, 964:5, 966:15, 969:9, 983:10, 983:15, 984:18, 990:25, 1001:16, 1052:10, 1088:7, 1090:16
**problems** [4] - 975:17, 1004:6, 1069:5, 1090:22
**procedural** [1] - 993:24
**procedure** [1] - 1071:24
**procedures** [1] - 1026:10
**proceed** [1] - 1089:11
**proceedings** [2] - 1000:22, 1092:8
**process** [18] - 973:22, 988:3, 988:21, 993:17, 993:24, 994:1, 994:24, 998:16, 1004:6, 1029:24, 1035:11, 1035:12, 1036:8, 1037:25, 1038:6, 1068:20, 1068:22, 1069:5
**Procurator** [1] - 1069:16
**procurator** [2] - 1059:19, 1060:8
**produce** [3] - 1089:22, 1091:2, 1091:4
**produced** [3] - 1067:23, 1090:3, 1091:4
**product** [2] - 1029:11, 1037:16
**proffered** [2] - 962:2, 963:5
**progress** [1] - 1070:11
**project** [28] - 963:20, 993:9, 993:18, 993:20, 994:4, 994:10, 995:7, 995:20, 998:2, 1000:9, 1002:3, 1012:3, 1027:15, 1028:21, 1028:25, 1030:4,

1040:11, 1042:13, 1042:25, 1043:7, 1043:11, 1044:1, 1055:8, 1056:4, 1068:6, 1068:11, 1076:10, 1076:15
**Project** [14] - 997:24, 998:11, 1002:11, 1002:14, 1049:18, 1049:21, 1056:23, 1057:5, 1065:3, 1066:6, 1066:10, 1069:20, 1070:5, 1075:18
**promised** [1] - 1065:24
**pronounce** [1] - 1037:11
**proof** [4] - 975:6, 976:2, 979:23, 982:2
**proper** [1] - 1029:23
**properly** [2] - 994:25, 1027:4
**proposed** [1] - 979:11
**prosecuted** [1] - 1026:19
**prosecuting** [1] - 1026:12
**prosecution** [2] - 993:13, 993:23
**prosecutor** [2] - 1006:11, 1055:25
**Prosecutor** [3] - 1058:8, 1071:12, 1071:23
**proud** [1] - 1038:16
**prove** [6] - 971:11, 971:18, 977:2, 982:4, 982:24, 1062:21
**proved** [1] - 985:7
**proves** [4] - 971:16, 971:19, 975:10, 975:11
**provide** [10] - 965:19, 1001:24, 1011:13, 1011:15, 1015:3, 1015:20, 1017:21, 1020:12, 1052:14, 1052:21
**provided** [11] - 977:21, 979:1, 991:21, 1016:3, 1017:15, 1020:10, 1082:20, 1087:11, 1087:14, 1087:23, 1088:6
**provides** [1] - 1023:7
**providing** [2] - 997:13, 1018:8
**public** [17] - 996:24, 1000:13, 1000:23, 1001:5, 1002:22, 1005:4, 1008:13, 1009:12, 1009:15, 1015:4, 1015:21, 1016:6, 1017:18, 1042:12, 1050:23, 1051:2, 1085:6
**publication** [3] - 1006:5, 1071:1, 1079:2
**publish** [1] - 1071:8
**pulled** [1] - 988:7
**punishing** [1] - 962:10
**pure** [1] - 977:6
**purpose** [8] - 961:1, 963:12, 967:3, 967:7, 967:12, 975:19, 983:14, 1075:1
**purposes** [1] - 962:7
**put** [23] - 958:21, 959:2, 962:7, 962:25, 972:8, 985:5, 985:24, 990:8, 996:16, 1010:1, 1028:25, 1048:16, 1049:11, 1059:25,

1060:2, 1060:24, 1061:2,
1087:10, 1088:10, 1089:10,
1089:19, 1089:20, 1091:3
  **Putin** [1] - 1027:1
  **putting** [3] - 1033:20, 1034:4,
1062:24
  **puzzle** [1] - 988:20

## Q

  **quality** [1] - 984:14
  **quarter** [1] - 1091:8
  **questions** [19] - 964:17, 967:20,
985:10, 986:4, 1001:24,
1022:24, 1023:5, 1040:8,
1047:21, 1050:3, 1050:15,
1052:15, 1052:22, 1055:7,
1062:23, 1072:4, 1075:5,
1084:15, 1089:21
  **quibbling** [1] - 962:17
  **quick** [1] - 996:4
  **quite** [4] - 1015:6, 1016:11,
1024:3, 1045:12
  **quotation** [1] - 964:9
  **quote** [2] - 963:24, 1007:8
  **quoted** [3] - 1078:10, 1078:12,
1078:24
  **quoting** [1] - 963:20

## R

  **raise** [1] - 956:19
  **rather** [1] - 999:18
  **re** [3] - 1012:16, 1012:20,
1083:25
  **reach** [7] - 987:21, 987:22,
998:19, 999:15, 1031:15,
1031:20, 1035:5
  **reached** [9] - 963:24, 964:19,
995:2, 995:5, 1007:21, 1007:23,
1026:23, 1039:2, 1039:13
  **reaching** [1] - 988:10
  **reaction** [3] - 973:2, 979:5,
980:7
  **read** [14] - 991:7, 998:4, 999:4,
999:5, 1003:17, 1004:2, 1004:7,
1017:12, 1018:6, 1018:10,
1018:24, 1029:20, 1067:21,
1079:23
  **reading** [9] - 1000:17, 1000:19,
1001:12, 1010:19, 1010:21,
1013:25, 1014:3, 1039:10,
1043:23
  **reads** [1] - 1006:10
  **reaffirms** [1] - 989:2
  **realized** [1] - 960:4
  **really** [15] - 959:14, 962:19,
963:16, 966:15, 974:14, 986:19,
986:22, 1004:21, 1033:11,
1039:21, 1053:13, 1088:8,

1088:11, 1088:22, 1089:5
  **reason** [11] - 969:23, 969:25,
987:17, 1016:2, 1017:19,
1047:18, 1052:18, 1052:23,
1052:25, 1054:14, 1090:2
  **reasoning** [2] - 988:25, 989:3
  **reasons** [3] - 974:18, 974:23,
1001:15
  **recalled** [4] - 1034:1, 1061:20,
1085:8, 1088:5
  **receive** [5] - 1046:18, 1059:18,
1064:2, 1076:25
  **received** [18] - 979:5, 982:18,
988:8, 1004:23, 1004:25,
1007:13, 1011:22, 1012:18,
1034:18, 1034:24, 1047:12,
1047:24, 1048:6, 1050:15,
1060:6, 1060:12, 1075:19,
1087:15
  **receiving** [8] - 987:20, 999:20,
1005:10, 1013:19, 1017:3,
1017:8, 1019:10, 1081:14
  **recent** [3] - 984:20, 1012:18,
1062:5
  **recently** [2] - 992:12, 1025:24
  **receptive** [2] - 968:19, 974:6
  **recess** [2] - 1054:25, 1091:10
  **recipients** [1] - 1080:22
  **recognize** [1] - 962:6
  **recollection** [17] - 1011:2,
1015:10, 1028:1, 1028:2,
1028:8, 1031:5, 1031:19,
1035:20, 1035:23, 1036:24,
1042:14, 1054:20, 1057:12,
1057:23, 1073:9, 1074:9, 1076:5
  **reconsideration** [1] - 989:13
  **record** [11] - 956:8, 1014:25,
1034:8, 1056:4, 1057:14,
1057:15, 1086:1, 1086:2,
1087:10, 1088:12, 1089:16
  **records** [4] - 1027:22, 1056:6,
1057:23, 1064:24
  **recounts** [1] - 1049:17
  **redirect** [1] - 1084:18
  **REDIRECT** [1] - 1084:20
  **reduce** [1] - 1043:15
  **reducing** [1] - 1043:17
  **refer** [1] - 969:25
  **reference** [3] - 1005:3, 1070:10,
1077:21
  **referenced** [1] - 1005:18
  **references** [4] - 1006:2, 1072:6,
1072:11, 1078:3
  **referred** [2] - 1007:17, 1050:12
  **referring** [3] - 978:23, 1067:12,
1069:11
  **reflecting** [1] - 966:20
  **reforms** [1] - 1036:22
  **refrain** [1] - 1086:24
  **refresh** [4] - 1028:1, 1028:8,

1057:23, 1073:9
  **refused** [2] - 975:5, 975:16
  **refusing** [2] - 962:14, 972:2
  **regard** [1] - 970:9
  **regarding** [6] - 963:22, 967:5,
974:13, 1005:18, 1082:11,
1084:23
  **regardless** [1] - 995:4
  **regime** [1] - 1026:20
  **register** [11] - 988:25, 989:1,
1000:11, 1000:12, 1001:1,
1013:9, 1014:1, 1050:23,
1081:2, 1084:10, 1085:17
  **registered** [1] - 1052:12
  **registering** [1] - 1001:4
  **Registration** [3] - 995:21,
996:4, 999:9
  **registration** [6] - 999:10,
1012:4, 1019:16, 1051:3,
1085:4, 1085:10
  **regulations** [1] - 1045:24
  **reiterates** [1] - 989:23
  **rejecting** [1] - 974:6
  **relate** [1] - 986:22
  **related** [6] - 960:5, 1011:7,
1030:10, 1034:2, 1091:1, 1091:2
  **relates** [2] - 979:23, 980:1
  **relating** [1] - 993:13
  **relation** [2] - 998:9, 998:12
  **relations** [9] - 1000:13,
1000:23, 1002:22, 1003:21,
1005:5, 1042:12, 1050:23,
1051:2, 1085:6
  **relationship** [1] - 981:2
  **relayed** [2] - 963:23, 1000:18
  **relaying** [1] - 963:19
  **release** [17] - 964:1, 964:20,
966:14, 967:1, 967:3, 969:2,
970:18, 974:14, 975:8, 1008:2,
1009:4, 1011:7, 1017:14,
1035:17, 1073:17, 1077:8,
1079:14
  **released** [20] - 963:22, 976:24,
1008:12, 1008:16, 1008:19,
1009:9, 1011:6, 1011:12,
1017:18, 1038:18, 1073:14,
1073:22, 1074:7, 1076:17,
1076:22, 1077:3, 1078:6,
1080:3, 1080:15
  **relevance** [10] - 967:20, 970:6,
974:25, 976:18, 982:13, 984:23,
986:5, 1025:2, 1028:6, 1060:3
  **relevant** [36] - 960:16, 963:5,
963:10, 964:22, 965:10, 967:7,
967:11, 969:8, 969:9, 971:9,
973:25, 974:1, 974:7, 974:15,
974:16, 978:2, 978:17, 978:19,
979:19, 979:25, 982:6, 982:8,
982:23, 984:16, 986:8, 986:20,
987:15, 987:18, 988:12, 988:13,

988:16, 988:21, 990:24,
1031:12, 1078:17
  **reliability** [1] - 977:8
  **relied** [1] - 962:8
  **remember** [94] - 970:13,
994:20, 994:21, 995:13, 995:15,
996:1, 996:2, 999:20, 1000:3,
1000:5, 1000:6, 1000:11,
1000:13, 1002:16, 1002:19,
1002:21, 1004:13, 1004:15,
1004:18, 1005:10, 1006:15,
1006:17, 1006:18, 1007:14,
1008:4, 1008:6, 1008:9,
1008:11, 1008:15, 1008:18,
1010:8, 1010:20, 1011:2,
1011:3, 1011:4, 1011:11,
1011:19, 1011:24, 1011:25,
1012:1, 1013:19, 1013:21,
1013:25, 1014:3, 1014:4,
1015:23, 1015:25, 1016:18,
1016:21, 1017:3, 1017:8,
1019:12, 1019:16, 1027:19,
1028:20, 1028:23, 1030:10,
1035:15, 1036:6, 1036:9,
1037:6, 1042:7, 1042:9,
1042:24, 1043:10, 1043:14,
1043:18, 1043:19, 1048:21,
1053:11, 1059:4, 1059:9,
1061:14, 1061:23, 1064:15,
1065:6, 1067:19, 1076:23,
1077:10, 1077:19, 1078:1,
1078:2, 1079:14, 1079:18,
1079:22, 1079:24, 1081:14,
1082:21, 1083:14, 1085:18,
1085:19
  **remembered** [1] - 1084:23
  **remembering** [1] - 1034:16
  **remembers** [1] - 1036:14
  **reminder** [1] - 960:25
  **renders** [1] - 1022:23
  **rendition** [2] - 964:6, 964:7
  **replaced** [1] - 1026:20
  **reply** [1] - 1047:13
  **replying** [1] - 999:22
  **report** [98] - 959:15, 964:1,
964:20, 965:18, 966:3, 966:11,
966:18, 966:23, 966:24, 967:1,
967:9, 967:16, 968:21, 969:4,
970:14, 970:18, 970:24, 973:21,
974:1, 974:4, 974:22, 975:5,
975:8, 976:2, 976:5, 976:19,
976:23, 977:9, 977:13, 980:13,
980:15, 980:16, 980:18, 981:2,
982:7, 982:14, 982:18, 982:21,
983:5, 993:15, 995:7, 1000:21,
1002:14, 1003:23, 1005:24,
1009:4, 1009:25, 1010:23,
1015:1, 1015:2, 1015:4,
1015:12, 1015:19, 1015:21,
1015:22, 1015:25, 1016:3,

1016:4, 1016:6, 1017:14,
1017:15, 1017:18, 1017:20,
1018:8, 1018:18, 1029:14,
1032:13, 1033:6, 1034:13,
1035:16, 1036:22, 1037:3,
1037:10, 1038:12, 1038:14,
1038:18, 1039:2, 1039:11,
1040:4, 1043:16, 1056:17,
1056:23, 1056:24, 1057:6,
1061:8, 1064:11, 1065:3,
1065:7, 1067:14, 1069:17,
1071:23, 1073:5, 1073:13,
1073:17, 1073:22, 1076:21,
1078:20, 1085:9
  **Report** [87] - 963:22, 986:16,
986:18, 993:6, 995:9, 995:10,
995:13, 995:14, 995:23, 998:2,
1003:23, 1004:2, 1004:4,
1004:9, 1004:19, 1005:17,
1005:19, 1006:1, 1006:10,
1007:9, 1007:13, 1007:19,
1008:2, 1008:3, 1008:11,
1008:16, 1008:18, 1009:9,
1009:12, 1009:15, 1011:1,
1011:6, 1011:8, 1011:12,
1011:13, 1020:10, 1020:13,
1024:24, 1028:17, 1028:21,
1028:25, 1029:3, 1029:5,
1029:7, 1031:9, 1031:10,
1031:23, 1032:8, 1032:11,
1032:15, 1039:14, 1041:5,
1044:20, 1060:7, 1060:14,
1064:7, 1064:9, 1064:16,
1067:15, 1067:21, 1067:22,
1067:23, 1067:25, 1068:2,
1068:12, 1068:13, 1069:3,
1069:12, 1070:17, 1071:8,
1071:11, 1071:18, 1075:9,
1076:17, 1077:3, 1077:8,
1078:6, 1079:15, 1080:1,
1080:3, 1080:14, 1084:12,
1085:3, 1085:4, 1085:9, 1085:12
  **Report's** [2] - 966:14, 994:15
  **reported** [1] - 1020:9
  **Reporter** [3] - 955:7, 955:7,
1092:13
  **reporter** [2] - 992:9, 1017:16
  **REPORTER** [1] - 1092:2
  **reporters** [1] - 1016:4
  **reporting** [1] - 1043:19
  **reports** [6] - 964:16, 983:19,
989:23, 1020:18, 1020:24,
1077:17
  **representation** [12] - 964:23,
965:1, 965:7, 965:8, 965:11,
970:22, 977:23, 999:12,
1001:18, 1001:20, 1001:21,
1030:12
  **representatives** [4] - 1032:20,
1037:20, 1039:19

  **request** [3] - 1087:10, 1087:16,
1089:4
  **requested** [1] - 1087:13
  **requests** [1] - 1020:12
  **require** [3] - 1051:3, 1085:4,
1085:10
  **required** [5] - 1000:10, 1000:12,
1012:3, 1019:17, 1084:10
  **requires** [2] - 999:9, 1001:4
  **research** [17] - 995:24, 997:13,
1012:19, 1017:2, 1041:19,
1041:22, 1042:7, 1042:20,
1042:22, 1043:14, 1043:15,
1054:5, 1083:5, 1083:8,
1083:15, 1085:2, 1087:1
  **reserved** [4] - 960:4, 960:6,
968:14, 985:25
  **resident** [2] - 999:8, 1050:9
  **resolved** [1] - 1015:25
  **respect** [11] - 957:20, 957:23,
970:16, 985:1, 985:25, 986:15,
1031:3, 1044:8, 1044:12,
1050:9, 1062:19
  **respected** [1] - 985:13
  **respond** [6] - 974:11, 1001:9,
1001:11, 1015:8, 1016:13,
1065:13
  **responded** [4] - 979:13, 1015:8,
1016:14, 1049:3
  **responding** [4] - 967:24,
1016:21, 1020:17, 1020:23
  **responds** [1] - 1048:3
  **response** [17] - 965:24, 966:6,
968:7, 969:7, 969:25, 974:12,
975:24, 976:14, 978:6, 1016:19,
1020:11, 1047:6, 1055:6,
1081:8, 1081:15, 1082:14,
1087:15
  **responses** [1] - 1065:24
  **responsibility** [1] - 976:6
  **responsible** [2] - 1037:16,
1037:18
  **rest** [2] - 963:1, 986:25
  **result** [1] - 1035:16
  **resume** [3] - 1054:9, 1087:2,
1091:8
  **retention** [1] - 999:14
  **review** [4] - 1026:10, 1030:6,
1037:20, 1070:24
  **reviewed** [3] - 960:8, 960:9,
1037:22
  **reviewing** [6] - 1005:10,
1013:21, 1017:8, 1030:19,
1037:24, 1037:25
  **Rick** [6] - 966:7, 1040:19,
1040:20, 1065:19, 1065:23,
1066:2
  **rights** [1] - 962:11
  **righty** [1] - 1091:7
  **RMR** [2] - 955:7, 1092:13

**road** [3] - 1063:9, 1074:21, 1074:24
**Rohde** [2] - 956:12, 1014:15
**role** [3] - 995:7, 1052:10, 1075:20
**rollout** [4] - 966:12, 967:17, 979:3, 1041:4
**Room** [2] - 955:8, 1092:14
**room** [3] - 991:19, 1047:3, 1064:10
**Roseen** [2] - 994:13, 1037:11
**roughly** [1] - 1028:15
**Rule** [2] - 961:13, 961:16
**rule** [11] - 960:7, 960:19, 961:2, 961:9, 961:24, 964:9, 1001:18, 1029:24, 1052:10, 1059:16
**ruled** [5] - 962:24, 987:1, 990:16, 1048:23, 1075:4
**Rules** [2] - 985:16, 985:20
**rules** [4] - 959:19, 959:21, 985:8, 1054:15
**ruling** [8] - 957:22, 960:4, 960:6, 970:16, 982:2, 991:14, 1033:17, 1034:7
**rulings** [5] - 976:13, 1054:11, 1074:20, 1089:13, 1089:16
**run** [1] - 1065:11
**runs** [2] - 960:14, 991:7
**Russia** [1] - 1026:23

## S

**safeguards** [1] - 993:25
**sale** [1] - 1026:24
**Sanchez** [2] - 954:12, 958:13
**SANCHEZ** [12] - 956:9, 956:21, 958:17, 989:7, 1067:2, 1087:6, 1087:9, 1087:19, 1087:22, 1087:25, 1088:3, 1091:6
**sanchez@usdoj.gov** [1] - 954:16
**sanction** [1] - 1090:13
**Sanger** [1] - 977:3
**satisfied** [1] - 959:3
**satisfy** [1] - 959:6
**saw** [3] - 991:12, 1030:1, 1075:23
**schedules** [1] - 956:22
**scheduling** [1] - 1090:2
**Schoen** [10] - 964:15, 964:17, 964:18, 964:21, 965:3, 965:4, 985:15, 1001:14, 1051:22, 1051:25
**school** [2] - 1021:10, 1021:18
**School** [1] - 1021:13
**scope** [28] - 957:18, 959:13, 959:20, 981:23, 985:15, 988:23, 989:4, 996:5, 1024:15, 1027:17, 1028:6, 1033:1, 1033:8, 1033:12, 1034:6, 1054:11,

1054:18, 1059:24, 1060:19, 1061:11, 1062:16, 1074:25, 1075:7, 1088:25, 1090:5, 1090:10
**screen** [5] - 996:8, 996:24, 1042:4, 1046:23, 1049:12
**screens** [3] - 996:20, 1046:20, 1048:16
**se** [1] - 961:24
**seal** [1] - 1066:23
**seated** [1] - 977:4
**Second** [3] - 960:24, 992:24, 1022:6
**second** [14] - 957:2, 997:20, 1001:17, 1004:7, 1004:8, 1007:7, 1016:10, 1018:10, 1020:7, 1020:8, 1044:24, 1049:19, 1065:10, 1071:17
**secondly** [2] - 970:25, 1088:10
**secretary** [1] - 1009:6
**section** [3] - 1005:17, 1005:20, 1006:1
**Security** [1] - 1013:13
**see** [24] - 970:25, 972:2, 979:18, 981:2, 996:5, 1002:15, 1006:6, 1030:6, 1033:10, 1054:14, 1055:14, 1057:5, 1065:21, 1066:8, 1070:4, 1070:18, 1071:2, 1071:5, 1071:13, 1071:14, 1072:7, 1072:17, 1076:19, 1083:6
**seeing** [3] - 1008:4, 1084:23, 1085:19
**seeking** [2] - 957:13, 976:7
**seem** [5] - 974:21, 1017:22, 1039:10, 1043:24, 1052:11
**selected** [2] - 1008:1, 1008:3
**self** [2] - 984:19, 989:15
**self-serving** [2] - 984:19, 989:15
**send** [4] - 1005:4, 1012:15, 1061:7, 1080:18
**sending** [4] - 965:17, 1002:16, 1004:13, 1011:4
**sends** [2] - 980:5, 1016:25
**sense** [2] - 1004:11, 1069:15
**sent** [28] - 997:9, 1003:5, 1003:11, 1005:6, 1013:2, 1013:11, 1014:21, 1019:7, 1020:5, 1034:18, 1034:24, 1042:8, 1047:22, 1049:1, 1049:20, 1064:21, 1065:19, 1066:2, 1067:8, 1076:14, 1077:13, 1083:18, 1084:6, 1085:24, 1086:7, 1086:8, 1086:12
**sentence** [6] - 986:16, 1003:25, 1007:10, 1007:17, 1067:16, 1071:19
**sentences** [1] - 1026:16

**separate** [1] - 1042:11
**September** [18] - 965:16, 966:17, 976:19, 976:21, 976:23, 977:1, 986:20, 986:21, 1012:10, 1013:16, 1014:11, 1017:7, 1019:10, 1080:12, 1080:20, 1081:1, 1082:11, 1086:8
**series** [3] - 1074:14, 1074:15, 1085:14
**services** [1] - 1001:6
**serving** [3] - 984:19, 989:15, 1020:20
**set** [2] - 960:9, 985:8
**seven** [3] - 1034:20, 1034:23, 1053:12
**seventh** [1] - 1005:12
**several** [5] - 1004:6, 1034:24, 1045:16, 1069:5, 1089:12
**share** [2] - 1032:8, 1069:17
**sheds** [1] - 968:25
**shocked** [1] - 1088:14
**Shoen** [1] - 965:9
**short** [2] - 957:5, 1083:1
**shortly** [1] - 1042:24
**shot** [2] - 1017:1, 1083:4
**shots** [1] - 1059:5
**show** [16] - 963:21, 971:15, 974:3, 974:20, 974:21, 975:25, 976:22, 1027:22, 1027:25, 1048:7, 1049:6, 1053:16, 1064:17, 1072:22, 1082:7
**showed** [8] - 1041:21, 1047:22, 1049:15, 1069:21, 1077:12, 1082:10, 1082:25, 1083:20
**showing** [5] - 1002:7, 1002:24, 1008:21, 1012:5, 1016:23
**shown** [3] - 1041:24, 1074:10, 1080:10
**shows** [19] - 964:4, 966:16, 968:18, 969:3, 974:4, 974:5, 975:3, 980:3, 980:12, 980:15, 980:22, 980:23, 980:25, 982:20, 982:25, 988:18, 988:19, 988:13
**sides** [2] - 960:11, 1063:5
**sight** [2] - 1006:5, 1071:1
**signature** [1] - 1010:3
**signed** [3] - 1019:23, 1084:24, 1086:12
**significant** [3] - 990:24, 1004:6, 1069:5
**simply** [5] - 962:16, 965:4, 974:10, 1018:13, 1060:16
**sit** [2] - 974:22, 990:5
**sits** [1] - 1022:10
**sitting** [1] - 1053:24
**situation** [1] - 1035:6
**Skadden** [74] - 963:22, 964:12, 964:16, 965:4, 967:6, 978:9, 979:4, 985:1, 985:10, 985:19, 986:16, 986:18, 987:19, 989:1,

992:19, 993:1, 993:6, 993:7,
993:12, 993:14, 994:10, 998:1,
1004:3, 1005:19, 1006:1,
1006:7, 1009:14, 1009:19,
1010:10, 1011:10, 1011:18,
1011:21, 1012:2, 1013:4,
1014:1, 1014:5, 1015:1, 1015:5,
1016:3, 1016:7, 1016:11,
1018:14, 1024:7, 1024:11,
1025:5, 1030:3, 1030:4,
1030:12, 1031:6, 1031:10,
1031:15, 1031:20, 1032:7,
1032:21, 1041:5, 1044:5,
1044:18, 1049:25, 1055:19,
1060:9, 1068:6, 1070:17,
1071:3, 1072:12, 1072:20,
1075:20, 1080:4, 1081:19,
1081:21, 1081:23, 1083:18,
1085:17

**Skadden's** [2] - 986:23, 1012:3
**slapping** [1] - 1062:3
**slightly** [1] - 964:7
**Sloan** [40] - 963:23, 964:11,
964:14, 993:11, 994:12, 996:2,
997:5, 997:8, 998:25, 999:3,
999:20, 999:23, 1000:14,
1000:18, 1001:9, 1001:11,
1003:8, 1003:13, 1026:9,
1037:17, 1037:23, 1041:23,
1042:8, 1043:16, 1047:6,
1047:10, 1047:15, 1048:5,
1049:2, 1050:4, 1050:5, 1050:8,
1050:15, 1051:5, 1051:15,
1051:16, 1052:9, 1052:19,
1067:6, 1073:3
**sloan** [1] - 964:16
**Sloan's** [5] - 1000:1, 1047:12,
1048:3, 1052:23, 1053:8
**slow** [1] - 1049:4
**small** [1] - 1018:24
**snippet** [1] - 1077:16
**so..** [1] - 959:16
**Solicitor** [2] - 1025:10, 1025:11
**solid** [1] - 988:10
**someone** [10] - 964:8, 967:4,
969:8, 977:23, 994:17, 994:21,
1000:6, 1050:19, 1052:6,
1057:12
**sometime** [2] - 1042:15, 1085:2
**sometimes** [1] - 991:19
**soon** [3] - 992:13, 998:16,
1077:5
**sorry** [16] - 968:5, 996:12,
1004:24, 1005:20, 1009:23,
1014:15, 1047:4, 1055:24,
1063:13, 1066:18, 1067:4,
1067:12, 1070:1, 1082:20,
1083:2
**sort** [10] - 993:16, 1010:9,
1029:10, 1059:5, 1059:7,

1074:2, 1075:24, 1076:25,
1081:6, 1082:1
**sought** [1] - 962:22
**sounds** [4] - 959:22, 1028:15,
1073:11, 1081:20
**source** [2] - 962:17, 1079:12
**sources** [1] - 1010:21
**souring** [1] - 981:2
**SPAEDER** [2] - 954:22, 955:2
**speaking** [2] - 1000:3, 1000:5
**Special** [1] - 990:9
**specific** [4] - 981:10, 985:8,
1036:17, 1082:22
**specifically** [8] - 962:9,
1003:22, 1005:24, 1008:17,
1054:12, 1061:13, 1063:22,
1067:14
**specifics** [2] - 1016:1, 1033:25
**speculation** [1] - 965:9
**spell** [1] - 992:8
**spending** [1] - 1056:22
**spent** [5] - 1027:15, 1028:8,
1028:16, 1055:21, 1056:5
**Spiegel** [12] - 987:19, 988:1,
1013:2, 1013:3, 1013:4,
1014:21, 1016:25, 1081:1,
1082:1, 1083:2, 1083:11, 1086:9
**spin** [1] - 1001:21
**spring** [1] - 995:19
**staff** [1] - 1059:19
**stages** [1] - 1078:15
**stand** [5] - 964:21, 987:8, 989:5,
990:3, 1089:10
**standards** [3] - 993:16, 994:1,
1029:24
**standing** [1] - 976:17
**stands** [1] - 1049:21
**start** [5] - 956:18, 957:4,
980:24, 997:21, 1068:8
**started** [5] - 993:2, 1004:8,
1043:11, 1069:11
**starting** [8] - 992:13, 992:16,
998:6, 1003:22, 1005:9,
1005:23, 1067:13, 1072:5
**starts** [2] - 957:2, 982:9
**state** [26] - 960:20, 960:21,
961:13, 961:14, 961:22, 963:5,
963:6, 963:7, 963:10, 965:10,
967:22, 970:8, 971:13, 978:2,
978:3, 979:23, 982:3, 984:11,
986:23, 988:14, 988:16, 988:18,
989:14, 990:24, 1006:4, 1010:22
**State** [1] - 1039:18
**statement** [20] - 960:21, 961:8,
961:15, 963:3, 963:8, 970:12,
973:3, 973:14, 975:6, 977:17,
977:18, 978:18, 980:9, 990:23,
1018:5, 1020:8, 1052:19,
1052:20, 1052:21, 1071:25
**statements** [26] - 960:2, 960:12,

960:20, 961:1, 961:3, 961:10,
961:17, 961:20, 962:1, 962:16,
962:21, 962:23, 963:4, 963:5,
963:16, 963:19, 966:2, 972:19,
973:18, 978:17, 986:2, 990:8,
990:19, 1015:11, 1015:12,
1072:1
**STATES** [2] - 954:1, 954:10
**States** [12] - 954:3, 955:8,
956:4, 956:11, 960:23, 1003:14,
1011:14, 1020:13, 1025:11,
1025:14, 1025:18, 1039:18
**stating** [2] - 977:10, 1085:17
**statute** [11] - 1000:8, 1026:20,
1042:10, 1042:23, 1043:23,
1044:9, 1044:12, 1044:13,
1045:3, 1045:10, 1050:20
**stayed** [2] - 978:7, 1064:10
**stenograph** [1] - 1092:7
**step** [1] - 1086:17
**steps** [1] - 979:3
**stick** [1] - 959:19
**still** [10] - 958:20, 958:24,
960:5, 972:10, 976:17, 981:16,
984:1, 987:1, 995:5, 996:14
**stop** [2] - 959:17, 1034:3
**story** [3] - 983:12, 984:5,
1026:25
**straight** [1] - 958:6
**straight-up** [1] - 958:6
**strain** [1] - 960:14
**strained** [1] - 984:16
**strategic** [1] - 974:18
**strategies** [1] - 1066:7
**strategy** [9] - 1003:22, 1005:18,
1005:23, 1067:13, 1069:21,
1069:24, 1070:5, 1070:14,
1070:24
**Strategy** [2] - 1006:1, 1070:17
**Street** [3] - 954:14, 954:22,
955:2
**string** [1] - 965:17
**strong** [2] - 1082:14, 1088:11
**structure** [1] - 999:12
**subcontract** [2] - 1000:25,
1051:2
**subject** [16] - 961:4, 962:2,
998:6, 998:8, 998:19, 999:6,
1001:7, 1002:11, 1003:7,
1009:3, 1009:23, 1014:22,
1061:7, 1063:15, 1066:6,
1083:25
**subjects** [1] - 1089:2
**subpoena** [1] - 981:12
**subsequent** [1] - 965:20
**substance** [1] - 983:19
**substantial** [1] - 977:15
**substantially** [1] - 957:21
**substitute** [1] - 985:19
**successful** [2] - 959:1, 1060:9

**successfully** [2] - 988:7, 1060:10
**sufficiently** [1] - 959:9
**suggest** [1] - 961:25
**suggested** [1] - 987:23
**suggestion** [1] - 1052:6
**suggestions** [1] - 998:17
**Suite** [2] - 954:23, 955:3
**sum** [1] - 976:25
**summaries** [1] - 1077:17
**summary** [3] - 1023:9, 1056:6, 1078:19
**summer** [6] - 993:3, 995:19, 1024:23, 1025:6, 1064:16
**supervised** [1] - 1031:9
**supervisors** [1] - 1082:15
**support** [1] - 1062:23
**supported** [1] - 966:21
**supposed** [2] - 963:4, 1029:25
**Supreme** [7] - 992:21, 1023:12, 1023:19, 1024:4, 1025:13, 1025:18
**surprise** [1] - 1075:24
**surrounding** [1] - 1027:13
**suspicion** [2] - 970:17, 980:24
**sustained** [11] - 1018:2, 1025:3, 1026:5, 1031:25, 1036:1, 1039:21, 1044:16, 1044:22, 1073:19, 1075:7, 1076:2
**sworn** [1] - 992:2
**symbol** [1] - 1066:22
**system** [2] - 1022:1, 1036:23

## T

**talks** [2] - 1003:22, 1005:23
**tanks** [1] - 1018:20
**tax** [2] - 962:5, 962:7
**Taylor** [3] - 954:21, 956:15, 972:19
**TAYLOR** [40] - 968:5, 968:9, 968:11, 968:17, 969:11, 969:13, 969:19, 969:22, 970:5, 970:8, 971:5, 971:9, 971:16, 971:23, 972:1, 972:11, 975:1, 975:14, 975:20, 975:23, 976:10, 976:16, 976:22, 978:22, 979:22, 980:10, 980:12, 980:22, 981:8, 981:22, 982:1, 982:8, 982:12, 982:20, 982:24, 983:2, 983:9, 983:11, 983:25, 984:6
**team** [11] - 979:4, 980:6, 1001:15, 1037:22, 1049:17, 1051:22, 1072:12, 1073:3, 1075:19, 1077:13
**technical** [1] - 1062:16
**Telegraph** [4] - 1078:23, 1079:1, 1079:3
**telephone** [1] - 983:21
**tenure** [1] - 1023:11

**terms** [11] - 961:18, 964:23, 965:1, 965:7, 988:20, 993:22, 1008:2, 1035:6, 1037:15, 1037:25, 1052:10
**testified** [5] - 987:11, 992:3, 1032:12, 1032:14, 1032:15
**testifies** [1] - 983:25
**testify** [9] - 961:22, 962:10, 984:2, 984:3, 985:2, 986:9, 1030:25, 1090:8, 1090:23
**testimony** [16] - 958:7, 959:12, 962:6, 965:3, 966:4, 967:4, 981:22, 1029:14, 1041:18, 1054:21, 1058:22, 1058:24, 1060:3, 1060:11, 1074:24, 1076:12
**text** [6] - 1009:8, 1009:24, 1012:14, 1013:8, 1014:25, 1019:22
**THE** [227] - 954:1, 954:1, 954:9, 954:13, 956:1, 956:2, 956:3, 956:17, 957:12, 958:3, 958:11, 958:23, 959:17, 959:25, 968:6, 968:12, 968:14, 968:18, 969:12, 969:17, 969:21, 970:1, 970:6, 971:3, 971:7, 971:12, 971:22, 971:25, 972:7, 972:13, 972:22, 973:11, 974:2, 975:12, 975:15, 975:21, 976:3, 976:12, 976:17, 977:4, 977:17, 978:23, 980:4, 980:11, 980:21, 981:4, 981:10, 981:25, 982:6, 982:11, 982:13, 982:23, 982:25, 983:7, 983:10, 983:13, 984:2, 984:7, 987:5, 987:7, 987:11, 988:14, 988:22, 989:5, 989:21, 990:5, 990:11, 990:18, 991:3, 996:11, 996:14, 996:18, 996:20, 996:22, 996:24, 1006:23, 1006:25, 1007:2, 1007:5, 1018:1, 1021:2, 1023:25, 1024:16, 1025:3, 1026:5, 1027:18, 1027:20, 1027:25, 1028:7, 1028:11, 1030:8, 1030:14, 1030:15, 1030:16, 1030:18, 1030:19, 1030:21, 1030:23, 1030:24, 1031:25, 1032:12, 1032:24, 1033:2, 1033:7, 1033:13, 1033:18, 1034:8, 1035:19, 1035:20, 1036:1, 1036:4, 1036:6, 1036:11, 1036:16, 1037:5, 1037:6, 1038:2, 1038:6, 1038:7, 1038:8, 1038:22, 1039:4, 1039:21, 1040:5, 1041:7, 1041:9, 1042:17, 1042:20, 1042:21, 1042:22, 1042:24, 1043:1, 1043:3, 1043:4, 1044:6, 1044:8, 1044:10, 1044:16, 1044:22, 1045:20, 1046:6, 1046:7,

1046:9, 1046:11, 1046:13, 1046:16, 1046:19, 1046:23, 1047:2, 1047:8, 1047:15, 1047:18, 1047:25, 1048:7, 1048:11, 1048:13, 1048:18, 1048:21, 1049:5, 1049:7, 1049:9, 1053:17, 1053:19, 1053:20, 1054:2, 1054:9, 1054:19, 1054:24, 1055:1, 1055:3, 1055:18, 1055:23, 1055:25, 1057:19, 1057:22, 1058:1, 1058:11, 1058:13, 1058:15, 1058:16, 1059:15, 1059:20, 1059:23, 1060:3, 1060:18, 1061:4, 1061:22, 1061:24, 1062:8, 1062:14, 1063:12, 1063:14, 1063:17, 1063:20, 1063:21, 1063:24, 1063:25, 1064:3, 1066:15, 1066:17, 1066:20, 1066:24, 1067:3, 1072:24, 1073:19, 1073:25, 1074:2, 1074:6, 1074:9, 1074:17, 1074:19, 1075:3, 1075:11, 1076:2, 1079:17, 1079:19, 1079:20, 1084:16, 1084:18, 1086:17, 1087:8, 1087:18, 1087:20, 1087:24, 1088:1, 1089:8, 1091:7
**themselves** [1] - 1071:25
**theory** [6] - 962:6, 962:8, 970:4, 990:10, 1062:21, 1062:24
**therefore** [7] - 961:9, 964:6, 965:9, 969:15, 970:21, 985:8, 1001:6
**they've** [3] - 985:3, 1026:16, 1053:24
**thinking** [2] - 1054:5, 1083:8
**third** [1] - 1069:25
**thoughts** [2] - 979:10, 980:7
**thousands** [1] - 1034:24, 1034:25, 1035:1
**Three** [1] - 1015:18
**three** [10] - 989:12, 990:9, 990:21, 1013:23, 1015:1, 1015:10, 1016:3, 1017:19, 1024:22, 1025:1
**throughout** [1] - 988:19
**Thursday** [2] - 1076:13, 1076:22
**tight** [2] - 1006:4, 1070:25
**timeframe** [2] - 1035:13, 1043:8
**timing** [8] - 963:15, 974:18, 974:24, 986:17, 1006:17, 1042:9, 1042:17, 1068:23
**title** [1] - 1003:7
**titled** [1] - 1017:5
**today** [10] - 957:6, 958:21, 959:9, 980:14, 985:2, 1002:15, 1060:22, 1060:25, 1076:12, 1088:20

1116

**together** [3] - 973:1, 974:9, 1028:25

**tomorrow** [3] - 957:2, 958:1, 1002:15

**took** [12] - 966:17, 967:8, 984:20, 1018:14, 1019:3, 1026:8, 1034:20, 1036:6, 1055:11, 1060:7, 1062:1, 1082:18

**top** [14] - 997:3, 1003:1, 1008:23, 1012:7, 1014:8, 1044:25, 1045:7, 1051:16, 1056:20, 1058:5, 1065:13, 1067:6, 1071:17, 1082:10

**topic** [3] - 973:22, 977:11, 983:2

**topics** [1] - 1089:2

**total** [2] - 976:25, 988:4

**touch** [3] - 984:25, 1012:2, 1043:20

**TRANSCRIPT** [1] - 954:8

**transcript** [2] - 1092:6, 1092:7

**transcripts** [1] - 1029:20

**translated** [1] - 965:19

**translation** [1] - 965:20

**transmitted** [3] - 966:17, 967:8, 974:5

**transmitting** [4] - 965:21, 967:25, 968:3, 968:8

**transport** [1] - 1026:24

**travel** [3] - 1002:2, 1057:5, 1088:16

**traveled** [3] - 965:5, 1057:8, 1063:22

**traveling** [3] - 1002:5, 1009:8, 1076:16

**trial** [23] - 958:24, 960:12, 962:5, 962:14, 963:25, 994:25, 998:13, 1003:24, 1004:6, 1007:9, 1021:22, 1021:25, 1022:11, 1026:16, 1035:8, 1041:5, 1067:15, 1068:1, 1068:16, 1068:20, 1069:5, 1071:18, 1078:16

**TRIAL** [2] - 954:4, 954:8

**trials** [1] - 1003:21

**tried** [2] - 975:4, 987:17

**trigger** [1] - 1000:22

**trip** [8] - 1002:21, 1004:3, 1055:11, 1061:16, 1061:19, 1061:21, 1063:23, 1068:25

**true** [14] - 974:15, 1015:21, 1016:2, 1016:15, 1018:6, 1018:22, 1019:5, 1020:14, 1031:10, 1063:3, 1068:5, 1068:21, 1092:6, 1092:7

**trustworthiness** [1] - 961:4

**trustworthy** [1] - 961:8

**truth** [18] - 961:10, 961:15, 969:16, 970:11, 970:20, 972:20, 973:3, 973:7, 973:11, 973:14,

973:19, 975:11, 976:8, 976:11, 976:20, 977:7, 983:22, 1066:12

**try** [3] - 958:20, 1029:10, 1054:6

**trying** [12] - 957:2, 958:21, 972:20, 974:21, 985:18, 986:17, 988:16, 989:14, 1057:19, 1059:25, 1063:7, 1075:11

**Tuesday** [2] - 997:5, 1083:22

**turn** [11] - 957:9, 977:13, 990:13, 1044:24, 1045:6, 1045:17, 1056:9, 1058:4, 1066:1, 1069:22, 1070:10

**turning** [1] - 1083:9

**turns** [1] - 967:11

**twice** [1] - 1089:2

**Two** [1] - 998:11

**two** [13] - 956:22, 970:11, 971:1, 978:14, 989:11, 1001:15, 1003:21, 1015:5, 1019:2, 1021:19, 1023:19, 1023:24, 1085:24

**Tymoshenko** [17] - 993:6, 995:23, 998:13, 1003:21, 1020:10, 1024:24, 1026:9, 1026:13, 1026:18, 1035:7, 1035:17, 1041:5, 1044:19, 1058:18, 1073:5, 1078:15, 1084:12

**Tymoshenko's** [2] - 1004:5, 1069:4

---

# U

**U.S** [10] - 954:13, 954:17, 992:20, 999:11, 999:16, 999:18, 1000:24, 1020:11, 1020:18, 1020:24

**Ukraine** [65] - 959:15, 966:22, 968:21, 969:1, 969:6, 969:7, 969:14, 970:12, 970:14, 970:18, 970:23, 973:12, 973:23, 973:25, 975:3, 975:5, 975:7, 976:1, 982:10, 986:15, 993:23, 994:5, 994:16, 995:2, 999:13, 1002:2, 1009:12, 1015:11, 1015:22, 1020:19, 1020:20, 1020:21, 1020:23, 1026:11, 1026:18, 1026:24, 1027:4, 1031:17, 1032:19, 1035:4, 1035:6, 1035:17, 1037:24, 1038:18, 1044:3, 1044:14, 1044:19, 1050:1, 1052:7, 1052:12, 1055:8, 1055:11, 1070:8, 1072:9, 1072:10, 1073:17, 1074:8, 1074:15, 1078:14, 1079:10, 1084:11, 1084:23, 1084:24

**Ukraine's** [6] - 966:10, 966:25, 967:16, 970:9, 993:13, 998:12

**Ukrainian** [7] - 1000:22, 1010:1,

1017:17, 1036:23, 1059:4, 1069:16, 1079:13

**Ukrainians** [1] - 1062:3

**Ukranian** [1] - 1001:1

**ultimate** [1] - 1068:7

**ultimately** [2] - 1008:11, 1037:15

**unavailability** [1] - 1090:20

**under** [23] - 957:17, 960:19, 961:16, 961:19, 983:4, 990:10, 1000:11, 1001:1, 1001:4, 1013:9, 1014:1, 1020:19, 1026:20, 1029:23, 1030:12, 1045:25, 1050:23, 1051:2, 1059:10, 1070:17, 1081:3, 1084:10, 1085:10

**undergraduate** [1] - 1021:14

**underlying** [3] - 968:24, 973:1, 974:13

**undermine** [1] - 1001:20

**understood** [4] - 993:18, 996:6, 1030:1, 1054:16

**undertaking** [1] - 964:13

**undertook** [4] - 965:11, 1030:3, 1030:12, 1068:6

**unexamined** [1] - 965:2

**unhappy** [2] - 982:9, 982:10

**Unit** [12] - 963:7, 965:13, 966:14, 984:8, 1011:22, 1012:1, 1019:11, 1020:1, 1047:22, 1080:20, 1084:9, 1085:17

**unit** [2] - 1025:12, 1032:7

**UNITED** [2] - 954:1, 954:10

**United** [14] - 954:3, 955:8, 956:4, 956:11, 956:24, 960:23, 1003:14, 1011:14, 1020:13, 1025:11, 1025:14, 1025:18, 1039:18, 1072:15

**unless** [1] - 972:3

**unnecessary** [1] - 1090:3

**unprepared** [1] - 1004:12

**unrestrained** [1] - 1072:1

**untruthful** [1] - 975:10

**up** [25] - 958:6, 964:1, 964:19, 977:23, 985:3, 986:11, 994:22, 999:14, 1004:4, 1012:17, 1038:2, 1042:3, 1044:24, 1045:7, 1045:21, 1049:12, 1051:12, 1054:6, 1056:11, 1056:20, 1057:2, 1058:5, 1064:19, 1065:13, 1069:3

**upbraid** [1] - 1074:23

**Update** [1] - 1003:8

**utilized** [1] - 1026:11

---

# V

**vacation** [4] - 957:2, 957:24, 958:15, 1061:1

**valid** [6] - 1003:24, 1007:10,

1067:16, 1068:1, 1068:16, 1071:19

**van** [32] - 965:18, 965:21, 966:1, 966:9, 967:10, 977:22, 978:2, 978:3, 978:5, 978:18, 979:6, 979:11, 979:15, 983:18, 986:2, 997:23, 997:25, 998:2, 998:4, 998:25, 1000:14, 1002:12, 1003:5, 1005:1, 1005:4, 1049:17, 1050:16, 1064:21, 1066:3, 1067:9

**variety** [1] - 1072:7

**various** [4] - 957:19, 1032:20, 1039:14, 1055:21

**Veritas** [5] - 1066:6, 1066:10, 1069:20, 1070:5, 1075:18

**version** [2] - 965:21, 965:22, 990:2

**view** [7] - 974:25, 988:15, 988:17, 998:11, 1000:21, 1032:8, 1069:17

**views** [1] - 998:20

**vigorous** [1] - 1090:16

**Vin** [1] - 1041:12

**violations** [2] - 1068:20, 1068:22

**visit** [1] - 1070:8

**Vladimir** [1] - 1027:1

**vodka** [3] - 1059:5, 1059:8, 1063:18

**vs** [1] - 954:5

# W

**Wait** [1] - 1055:23

**walk** [1] - 1034:2

**wants** [3] - 968:21, 973:12, 1089:19

**Washington** [7] - 954:6, 954:15, 954:18, 955:3, 955:9, 1072:16, 1092:15

**watching** [1] - 991:14

**weather** [2] - 991:6, 1059:11

**web** [3] - 1010:2, 1015:23, 1079:11

**Weber** [1] - 1041:12

**Wednesday** [2] - 1009:10, 1076:17

**week** [7] - 956:23, 959:1, 998:10, 1006:6, 1071:2, 1089:25, 1090:21

**weekend** [2] - 991:5, 1087:13

**weeks** [2] - 957:25, 1004:11

**weighs** [2] - 979:6

**weight** [2] - 974:2, 982:4

**welcome** [2] - 983:23, 1075:12

**western** [4] - 993:16, 994:1, 999:15, 1029:23

**whichever** [1] - 1043:19

**White** [1] - 1078:13

**whitney** [1] - 1081:7

**Whitney** [12] - 1008:25, 1009:5, 1009:7, 1012:10, 1013:11, 1013:19, 1076:13, 1076:24, 1077:2, 1080:11, 1080:17, 1085:16

**whole** [2] - 1072:7, 1072:11

**willful** [2] - 962:22, 963:8

**willfulness** [1] - 988:4

**William** [3] - 954:20, 954:21, 956:14

**winter** [2] - 1008:13, 1008:15

**wishes** [1] - 1090:9

**witness** [30] - 956:23, 957:13, 957:14, 957:19, 958:9, 964:21, 979:7, 981:6, 985:1, 990:14, 991:23, 992:2, 1007:3, 1033:16, 1033:18, 1033:19, 1046:18, 1048:22, 1054:12, 1060:2, 1060:24, 1062:21, 1075:14, 1086:17, 1086:20, 1089:10, 1089:20, 1090:23, 1091:3

**WITNESS** [24] - 1006:25, 1027:20, 1028:11, 1030:14, 1030:16, 1030:19, 1030:23, 1035:20, 1036:11, 1037:6, 1038:7, 1041:9, 1042:21, 1042:24, 1043:3, 1058:1, 1058:15, 1063:20, 1063:24, 1066:17, 1066:24, 1074:2, 1074:9, 1079:19

**witnesses** [19] - 956:22, 958:4, 958:25, 985:4, 985:10, 985:13, 985:14, 985:19, 1031:4, 1031:7, 1062:7, 1063:4, 1078:17, 1088:7, 1088:15, 1089:5, 1089:24, 1090:8, 1090:10

**wmurphy@zuckerman.com** [1] - 954:24

**won** [1] - 1025:22

**wonder** [2] - 1066:25, 1073:16

**wool** [1] - 988:7

**word** [2] - 990:20, 1066:12

**words** [1] - 971:22

**works** [2] - 999:10, 1045:3

**world** [1] - 1081:24

**worse** [2] - 1035:6, 1036:9

**write** [7] - 1009:7, 1009:22, 1012:13, 1013:7, 1014:24, 1019:21, 1064:9

**writes** [1] - 1020:17

**writing** [10] - 959:14, 995:10, 1000:21, 1007:14, 1028:17, 1028:21, 1028:24, 1043:15, 1043:17, 1085:9

**written** [3] - 966:11, 1013:1, 1029:7

**wrongly** [1] - 1078:16

**wrote** [13] - 983:25, 1007:15, 1015:18, 1016:10, 1034:13,

1057:12, 1067:6, 1069:8, 1073:2, 1078:23, 1078:24, 1081:2

**wtaylor@zuckerman.com** [1] - 954:25

# Y

**Yale** [1] - 1021:13

**year** [5] - 965:13, 970:1, 1008:14, 1023:16, 1023:21

**years** [6] - 990:9, 1024:22, 1025:1, 1034:20, 1034:23, 1053:12

**York** [10] - 987:21, 987:23, 988:10, 1010:14, 1010:19, 1010:21, 1017:16, 1022:10, 1077:22, 1078:3

**yourself** [7] - 956:7, 992:8, 1037:10, 1042:22, 1044:2, 1044:13, 1076:15

**Yulia** [3] - 998:13, 1026:13, 1058:18

# Z

**zoom** [5] - 1002:9, 1003:1, 1005:14, 1008:23, 1012:7

**zornow** [1] - 1081:1

**Zornow** [4] - 1013:2, 1013:3, 1013:6, 1081:16

**ZUCKERMAN** [2] - 954:22, 955:2

**Zwaan** [28] - 965:18, 965:21, 966:1, 967:10, 977:22, 978:5, 978:18, 979:6, 979:11, 979:15, 983:18, 986:2, 997:23, 997:25, 998:2, 998:4, 1000:14, 1002:12, 1003:5, 1005:1, 1005:4, 1049:17, 1050:16, 1064:21, 1066:3, 1067:9

**Zwaan's** [4] - 966:9, 978:2, 978:3, 998:25