1118

1      UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF COLUMBIA
2

3  UNITED STATES OF AMERICA,        )
                                    )
4         v.                        )   Criminal Action No. 19-CR-125
                                    )
5  GREGORY B. CRAIG,                )   JURY TRIAL - DAY 6
                                    )   Afternoon Session
6             Defendant.            )
   _____  )   Washington, D.C.
7                                       August 19, 2019

8

9       TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
            BEFORE THE HONORABLE AMY BERMAN JACKSON
10              UNITED STATES DISTRICT JUDGE

11
                APPEARANCES:
12

13     For the Government:    Fernando Campoamor-Sanchez, AUSA
                              Molly Gulland Gaston, AUSA
14                            U.S. ATTORNEY'S OFFICE FOR THE
                              DISTRICT OF COLUMBIA
15                            555 Fourth Street, NW
                              Washington, DC 20530
16                               -and-
                              Jason Bradley Adam McCullough
17                            U.S. DEPARTMENT OF JUSTICE
                              950 Pennsylvania Avenue, NW
18                            Washington, DC 20530

19     For the Defendant:     Adam B. Abelson, Esq.
                              William James Murphy, Esq.
20                            ZUCKERMAN SPAEDER, LLP
                              100 East Pratt Street
21                            Suite 2440
                              Baltimore, MD 21202
22                               -and-
                              William W. Taylor, III, Esq.
23                            Paula M. Junghans, Esq.
                              ZUCKERMAN SPAEDER, LLP
24                            1800 M Street, NW
                              Suite 1000
25                            Washington, DC 20036

1119

1

2

3   Court Reporter:            PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                               U.S. Courthouse, Room 4700A
4                              333 Constitution Avenue, NW
                               Washington, D.C.  20001
5                              (202) 354-3243

6        Proceedings reported by stenotype shorthand.
         Transcript produced by computer-aided transcription.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1120

1  
2                    E X A M I N A T I O N S

3  
4  WITNESS                   DIRECT    CROSS    REDIRECT    RECROSS

5  JONATHAN HAWKER            1122

6  
7  
8                      E X H I B I T S

9                  (No exhibits admitted)

10  
11  
12  
13  
14  
15  
16  
17  
18  
19  
20  
21  
22  
23  
24  
25

1121

P R O C E E D I N G S

(2:02 p.m.)

1  THE DEPUTY CLERK:  Good afternoon, Your Honor.

2  Re-calling Criminal Case Number 18-125, United States

3  of America versus Gregory B. Craig.

4  THE COURT:  All right.  Are you ready to call your

5  next witness?

6  MR. CAMPOAMOR-SANCHEZ:  We are, Your Honor.

7  THE COURT:  All right.  I understand that the defense

8  has something it wants to discuss.  Does it relate to this

9  witness?

10  MR. TAYLOR:  No.

11  THE COURT:  Can we take it up then at the end?

12  MR. TAYLOR:  Yes.

13  THE COURT:  All right.  Let's bring in the witness.

14  (Jury present)

15  THE COURT:  Members of the jury, thank you for

16  returning.

17  I take it that no one had any discussions about the

18  case in the interim.

19  As I told you on Friday, I have a matter at 4 p.m. on

20  my calendar that has absolutely nothing to do with this case

21  whatsoever.  So we are still going to break to do that at 4.

22  So I'm going to try valiantly to go through between now and

23  then without taking a break because we will be breaking at 4.

1    If someone needs one before then, as I told you the first day

2    of your service, you don't have to sit there and be

3    uncomfortable.  Give me a sign or something, and we will take

4    a break.  Otherwise, my intention would be to go until 4.

5            So you can call your next witness.

6            MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

7            The government calls Jonathan Hawker.

8                          JONATHAN HAWKER,

9            having been duly sworn, was examined and testified as

10   follows:

11                       DIRECT EXAMINATION

12           BY MR. CAMPOAMOR-SANCHEZ:

13   Q.      Good afternoon, Sir.

14   A.      Good afternoon.

15   Q.      Can you please tell us your name and spell it for the

16   record.

17   A.      My name is Jonathan Hawker.  J-O-N-A-T-H-A-N

18   H-A-W-K-E-R.

19   Q.      Mr. Hawker, where are you from?

20   A.      I'm from Wales.

21   Q.      Where do you live now, without telling us your exact

22   address?

23   A.      I live in England, near London.

24   Q.      Why do you find yourself in the United States right

25   now?

1123

1    A.       I worked in Ukraine with Paul Manafort and many

2    others.

3    Q.       I guess the purpose of my question is:  Are you here

4    specifically to testify in this trial?

5    A.       Oh, yes.  I suppose I am.  Yes.

6    Q.       And very briefly, can you give the ladies and

7    gentlemen of the jury an idea about your educational

8    background.

9    A.       Yes.  My undergraduate study was in languages, so I

10   studied French and German primarily.  And interpreting.  I

11   then did a postgraduate course in journalism, specializing in

12   broadcasting.

13   Q.       And can you tell us what do you do for a living now?

14   A.       Now I'm a PR consultant.  Before that, I was a

15   journalist.

16   Q.       So very briefly, can you walk us through your

17   professional experience then?  Very briefly.

18   A.       As a journalist?

19   Q.       After you graduated, how did you get started?  Let's

20   go there first.

21   A.       Okay.  After graduating with a postgraduate diploma

22   in journalism, I became a trainee journalist for the BBC,

23   which is the state broadcasting channel in the UK.  I was at

24   the time the youngest TV reporter in the UK.  But back home

25   in Wales.

1    I then got approached by the independent channel.  We

2   only had five -- four channels in those days.  So the main

3   independent channel is ITV.  And so I went to Brussels, the

4   headquarters of the European Union, where I worked as a

5   television journalist, before returning back to the UK and

6   being mainly a political journalist focusing on UK domestic

7   politics, but also some travel around mainly Europe because

8   of my languages, covering international politics and

9   diplomacy and some legal matters.

10   Q.    Now, how about in the PR world; what is your

11   professional experience in public relations?

12   A.    Professional -- you don't actually have to have

13   professional experience to be a PR consultant.  But I think

14   that my experience as a journalist was the foundation of it.

15   And so because of being a journalist, I was offered a role by

16   an American company's office in the UK to be head of

17   broadcast PR.  Very quickly, I realized there wasn't a great

18   deal of broadcast PR.  So I found a niche as a specialist

19   crisis and litigation PR consultant.

20   Q.    Let me stop you there.

21    What does that mean?  What is a litigation and PR

22   crisis consultant?

23   A.    There is a slight difference.  So a crisis -- you

24   know, for a client, a crisis could be something as they found

25   an inquiry from a journalist that was a bit difficult to, you

1125

 1    know, they are subject to a very complex industrial issue

 2    that they can't find their way through, or there is an

 3    environmental issue that they're struggling with.  And

 4    litigation PR is helping clients -- in England, it is mainly

 5    about civil litigation, when you have party A suing party B,

 6    and it is to help represent that position in the course of

 7    the litigation outside the courtroom, not inside the

 8    courtroom.

 9    Q.      Finally, what entities or companies have you worked

10    in doing PR work?

11    A.      You want to know my clients?

12    Q.      No.  What companies have you worked for?

13    A.      The firms I worked for, you mean?

14    Q.      Yes.

15    A.      Sorry.

16            The first company I worked for was called

17    FleishmanHillard.  I left FleishmanHillard and worked for a

18    British company which wasn't a PR agency, to launch

19    congestion charging in London, which was very controversial.

20    Then I started my own business, which is called Partner PR,

21    which was a small niche crisis and litigation business.  I

22    sold that to a company called Financial Dynamics, which then

23    also got sold to FTI Consulting, which is how I find myself

24    here today.

25    Q.      Right now, are you working for somebody else, or are

1126

1    you working for yourself?

2    A.      Well, I'm working for a company, but, you know, I am

3    the company.

4    Q.      It's your own company?

5    A.      It is my own company.

6    Q.      Would that be -- would you consider that to be

7    self-employment?

8    A.      For tax reasons, no.  No.  It is a limited company,

9    and it is quite normal in the UK, if you're a consultant that

10   you would operate in this way.

11   Q.      And for this company you do litigation and crisis PR?

12   A.      Yes, that's all I do.

13   Q.      Okay.  Let me direct your attention back to 2012.

14   Were you -- I think you mentioned it already -- but were you

15   involved in creating and/or implementing the media rollout

16   plan for what is known as the Skadden Report?

17   A.      Yes, I was.

18   Q.      Who were you working for at the time?

19   A.      The ultimate client was the government of Ukraine.

20   At the start, the client was the Office of the Prosecutor

21   General of Ukraine, so the prosecution.  And then later our

22   relationship was transferred to the Ministry of Justice.  But

23   all of the instructions came from the Davis Manafort company.

24   So I guess they were the client, also.

25   Q.      All right.  And what company were you working for at

1    the time?

2    A.       The company I was working for was FTI Consulting,

3    which is a very large organization that does far more than

4    PR.

5    Q.       Okay.  Can you tell the ladies and gentlemen of the

6    jury how did you first learn about potentially working on

7    this project?

8    A.       I had a telephone call from a really -- a lawyer I

9    have worked with before who I knew very well, a man called

10   Matthew Cowie, who worked at Skadden, Arps in London.  And

11   Matthew and I had worked together on some issues within FTI.

12   And he gave me a call and said, you know, "Would you be

13   interested in this opportunity abroad?"  And he gave me some

14   information about what he thought the opportunity for us to

15   do the work would be.

16   Q.       Initially, do you recall what you were told about

17   what this project might be?

18   A.       Well, I wrote an e-mail, as you have to do in a PR

19   agency, you have to put it into the system because of

20   conflict checks.  You can't take two clients in opposition to

21   each other.  So I put it into the system and wrote an e-mail.

22   And in that, I explained what I understood from the call,

23   which it was to act for the government of Ukraine.  It was

24   litigation PR, so right up my street.  And that slightly

25   oddly Ukraine was potentially going to be doing litigation in

1    the United States.

2    Q.       If we can take a look at Government's Exhibit 106

3    that is already in evidence.

4    A.       Yeah.

5    Q.       I have a book in front of you that should have the

6    exhibits, as well.

7    A.       Yes, that's the e-mail.

8    Q.       So let me ask you -- I think you just said it, but

9    just to be clear -- is Government's 106 the e-mail that you

10   sent after being called by Mr. Cowie?

11   A.       Yes, it is.  Yes.  I sent this e-mail to my immediate

12   boss, his boss, and his boss, and a colleague who was

13   responsible for FTI's activities in Eastern Europe.

14   Q.       Okay.  The e-mail reads, "Confidential; prospective

15   client."  Who are the people that are in the "to" line?  Mark

16   Malloch-Brown --

17   A.       Yes.  Sorry.  That is what I meant.

18           John Waples is my boss, so he is the head of PR, the

19   PR part of FTI in England.  Ed Reilly is his boss.  He is the

20   global head of PR within FTI.  Mark Malloch-Brown -- I'm not

21   sure if he was his boss -- but Mark Malloch-Brown was like

22   the main person in Europe for all of the different bits of

23   FTI, so litigation consulting, forensic accounting, PR, the

24   whole lot.  And then Jon Aarons is -- he was at the same

25   level as me within the business, and Jon is an expert on

1    Eastern Europe, which is why I copied him in.  Well, I didn't

2    copy him in; I sent it to him.

3    Q.      All right.  And in the first paragraph that I'm

4    marking here with yellow to the left, that's what you're

5    describing, taking a call from Matt Cowie --

6    A.      Yeah, that's right.  Yeah.

7    Q.      -- as you just told the ladies and gentlemen of the

8    jury.

9            And the date of this e-mail is April 26, 2012?

10   A.      Yes, it is.  Long time ago.

11   Q.      Okay.  And here it says that you thought -- and I'm

12   reading -- "He has asked whether we would be able to act for

13   the government of Ukraine in litigation in the U.S. related

14   to Yulia Tymoshenko."

15   A.      Yes.

16   Q.      You thought the litigation was initially supposed to

17   happen in the United States?

18   A.      Yes, I did, actually.  And so I must have been told

19   that.  I tried to take notes during the call and put them in

20   the e-mail.

21   Q.      Now, let me direct your attention to the last part of

22   the paragraph, where it says, "I'm wondering whether we would

23   be willing to take on this work and whether there is a risk

24   that we would fall foul of the Foreign Agents Registration

25   Act."

1    Why did you include that?

2    A.    Well, the first part of it is because Ukraine had

3    such a terrible reputation.  You know, you had the Orange

4    Revolution, and people in Western Europe didn't think much of

5    this president and this government.  And then the second

6    half, I had read an article about this foreign agents act --

7    registration act in a trade publication.  I think it's *PRWeek*

8    in the UK.  And it just stuck in my mind that -- something to

9    do with politics in the U.S., you need to register, etc.  So

10   that's why I put it in.

11   Q.    And why was it that you certainly asked, "Can you let

12   me know what you think?"

13   A.    Because it has to go through the system.  So I

14   can't -- you know, as a PR consultant, I can't just decide

15   I'm going to take this case on, particularly one which is

16   slightly unusual, because working for a government is a bit

17   odd.  It has to be -- you go through several stages of

18   approval before we're allowed to do that.

19   Q.    Okay.  I think you were alluding to this, but did

20   anybody at the firm raise concerns about potentially you

21   taking this assignment?

22   A.    Yeah.  Even before we took on the job, my colleagues

23   in the Brussels office basically said they didn't want

24   anything to do with it.

25   Q.    And what was the concern internally at FTI?

1    A.       It's kind of like the first start of that sentence at

2    the end -- sorry, the document has disappeared -- but the

3    sentence at the end wondering whether we would be willing to

4    take on the work.  You know, this isn't a client that many

5    people in the PR industry were jumping up and down to get

6    because of this Orange Revolution, the perception that they

7    were on the wrong side in the, you know, East-West divide,

8    you know, the conflict between the West and Russia.

9    Q.       Did you want to take the job?

10   A.       I did.

11   Q.       And why did you want to take the job despite all of

12   these things that you've been mentioning?

13   A.       Being completely blunt, I needed the work.  You know,

14   we were going through -- in England, anyway, we were going

15   through a bit of an economic downturn.  You get these phases

16   where there isn't a lot of work around.  I needed the work.

17   I wanted to protect my people.  So when it came to --

18   Q.       I'm sorry.  When you say "your people," who are you

19   talking about?

20   A.       My colleagues who worked for me.  I didn't want to

21   get into a situation where I might be losing colleagues.  I

22   wanted the work.

23   Q.       And it sounds like you needed the work.

24   A.       I did.  Because, you know, when the financial market

25   goes down, there's always a bit of a drop in litigation work.

1    And so in the past, you know, I've been very lucky because I

2    get a lot of work outside of England in Europe.  But there

3    wasn't much around.  So it was brilliant in that sense.

4    Q.     Well, let me ask you, so after this initial call, did

5    you ultimately travel to Ukraine to learn more about this

6    potential assignment?

7    A.     Yes.  I did travel to Ukraine, and I took quite a few

8    colleagues with me because we weren't entirely clear what the

9    need was.

10   Q.     Can you describe what was it that you did in order to

11   sort of learn what this assignment would actually entail?

12   A.     So we went to meet the client.  And at this stage,

13   the potential client I suppose was the Prosecutor General of

14   Ukraine, the Deputy Prosecutor General, and have a discussion

15   with them, which in PR it is called a credentials meeting,

16   where you set out your store, really, and basically say, this

17   is what we can offer.  You know, in addition to just being

18   general, you try and give them a little bit of insight into

19   your thinking.  So we went over and had a chat with them,

20   actually.  We didn't really use the credentials in the way

21   that we expected, which is quite common, but we had a chat

22   with the Prosecutor General and his Deputy about their needs,

23   their concerns, what they wanted, and if and how they wanted

24   to work with us.

25   Q.     And in addition to meeting with the Prosecutor

1    General and the Deputy, did you meet or talk with others to

2    also learn what the assignment would be?

3    A.       Yes.  I spoke to Alex van der Zwaan from Skadden,

4    Arps.

5    Q.       Anybody else?

6    A.       I spoke with Rick Gates -- I met -- well, I hadn't

7    met him before -- but I spoke to him on the phone at some

8    point.  And I must have spoken to Matthew Cowie as well, but

9    I don't recall it.

10   Q.       After you learned information about the project, what

11   did you do?

12   A.       After I learned about the project?

13   Q.       Right.  Did you inform your management, for example?

14   A.       Oh, I see.  Well, yes.  I had, obviously, already

15   informed them to get permission to go, and I reported back.

16   Q.       If we can look at Government's Exhibit 118, which is

17   already in evidence.  If we can focus on the top, the first

18   paragraph first.

19           And before we get started, you sent this e-mail on

20   May 11th; is that right?

21   A.       I did.

22   Q.       And you sent it to Ed Reilly.  Why did you send it to

23   Mr. Reilly?

24   A.       Because he is the head of PR, you know, globally.

25   Q.       Okay.  And it says, "Ed, as discussed, we've met with

1  the Prosecutor General of Ukraine and his Deputy in relation

2  to the prosecution of the oligarch and former prime minister

3  of the country for abuse of office and fraud.  The task is to

4  provide litigation support within Europe for this team around

5  the trial and in terms of getting the facts of the case

6  across to the country's diplomats."

7          Is that generally what you learned from the Deputy

8  General -- the Prosecutor General I should say?

9  A.      Yes.  Generally, yes.

10  Q.      Now, how about how FTI would be paid or be in a

11  contract; how would that work?

12  A.      It was a bit of a weird one.  So, normally, when you

13  go and see a client and the client wants to work with you,

14  you say, all right, we'll send over a contract, they sign it,

15  and you agree do the terms.  But in this one, they said,

16  yeah, they'd love to work with us, but we would have to

17  contract with another entity -- they didn't want us to be on

18  their system -- and that we would likely need to be paid

19  through a third party, which was a new one on me.

20  Q.      And is that what you reported on the second paragraph

21  of this e-mail?

22  A.      Second paragraph.

23  Q.      I'm sorry.  I couldn't hear your answer.

24  A.      Yes, it is.  Sorry.  I needed to read it.

25  Q.      Let me know when you're done.

1    A.      I'm done.

2    Q.      Okay.  Did you also have some discussions about, in

3    addition to this third-party payment, who would be sort of

4    organizing or in charge of the contractual arrangements?

5    A.      Well, I understood that that would be sorted out by

6    Davis Manafort.

7    Q.      And what was that based on?

8    A.      That was based on a discussion with Rick Gates.

9    Q.      Okay.  Is that what you're reporting on in the third

10   paragraph as to "the political consulting firm which is

11   coordinating our contractual arrangements"?

12   A.      Yes.

13   Q.      And why was it that for reasons of transparency the

14   contract was supposed to be with the Prosecutor General's

15   Office?

16   A.      I mean, that would be normal to have the contract

17   with the Prosecutor General's Office.  It would be a bit odd

18   and unusual for it not to be.  So, effectively, we had the

19   Prosecutor General's Office saying, you know, we would like

20   to work with you, but we're not sure that we can pay you and

21   contract with you.  And we've got Rick Gates saying that

22   don't worry, we'll sort out a contract with the office --

23   Q.      Okay.

24   A.      -- but you'll be paid by a third party.

25   Q.      And if we go down to the next line in the following

1136

1    two paragraphs, it reads, "Can you advise if you are

2    comfortable with us proceeding on this basis?"

3            I assume you're asking Mr. Reilly.  Is that right?

4    A.     That's right.

5    Q.     Okay.  And he said, "I'm cutting and pasting the

6    third-party clause from Skadden's contract."

7            And then you have this language that begins with "We

8    understand."

9            How did you get that language?

10   A.     I got that from Alex van der Zwaan.

11   Q.     And so what was your understanding at this point as

12   to Skadden's own arrangement regarding the Skadden Report?

13   A.     Just that they had a similar arrangement and that

14   they were happy with it.

15   Q.     Finally, if we can go to your last paragraph that

16   starts "separately."

17           What were you communicating here to Mr. Reilly?

18   A.     That Skadden had said that there was no need to -- or

19   no need for them to register under FARA because the role was

20   in Europe.  The U.S. thing, you know, must have been

21   incorrect.

22   Q.     Okay.

23   A.     And I recall being told that we needed to take our

24   own advice, which is what I'm doing.

25   Q.     And when you -- the last part where it says, "Can you

1137

1    advise whether Eric is comfortable with this also," who was

2    Eric?

3    A.      Eric was the FTI in-house general counsel at the

4    time.  So he is the main lawyer to put it up to, really.

5    Q.      You're putting the question through Mr. Reilly to the

6    top lawyer at the firm?

7    A.      Yeah.  He was American and here, so it was the right

8    place to go.

9    Q.      Okay.  And if I can get you to the top again of the

10   message.  The subject line reads, "Confidential:  Project

11   Veritas contract."

12           What does that relate to?

13   A.      "Confidential" is obvious.  "Project Veritas" was a

14   name that we gave to this job.

15   Q.      Who gave the name to the job?

16   A.      It came from my colleague Jon Aarons.

17   Q.      Why was it named Project Veritas, if you know?

18   A.      "Veritas" is Latin for "truth."  And we used to like

19   to have a little bit of fun, and it was sort of a

20   tongue-in-cheek thing.

21   Q.      Okay.  Now, let me ask you:  Did FTI ultimately

22   actually approve your participation in this project?

23   A.      Yes, they did.

24   Q.      If we can take a look at Government's Exhibit 119

25   already in evidence.  And if we can look at the very top

1    first.

2    A.        I'm sorry.  Which one?

3    Q.        119.

4           And you see there is an e-mail from Mr. Reilly to a

5    lot of people, including you --

6    A.        That's right.

7    Q.        -- and that's on May 12, 2012.  Is that right?

8    A.        That's right.

9    Q.        That's the day after your meeting with the Prosecutor

10   General?

11   A.        Yes.

12   Q.        Okay.  It reads, "This week we made the decision to

13   represent the Prosecutor General of Ukraine and his Deputy in

14   relation to the prosecution of the oligarch and former prime

15   minister of the country for abuse of office and fraud.  Mark

16   Malloch-Brown and I have discussed the assignment and the

17   need to carefully manage our engagement."

18          What does that relate to?  Why does this engagement

19   need to be carefully managed?

20          MR. MURPHY:  Objection.  Foundation.

21          THE COURT:  He didn't write this.

22          MR. CAMPOAMOR-SANCHEZ:  Right.  But he is discussing

23   this with his manager.

24          Obviously, if you know, Mr. Hawker.

25          THE COURT:  I think you have asked him essentially

1    what Reilly meant by "the need to carefully manage our

2    engagement."

3                MR. CAMPOAMOR-SANCHEZ:  Well, I understood he knew.

4           But I'm not trying to ask you what Mr. Reilly meant,

5    but if the Court thinks that I'm -- I'm happy to move on.

6           THE COURT:  Is this a direction to you to do

7    something?  Did you take that as a direction to you?

8           THE WITNESS:  I did not.

9           THE COURT:  All right.  Ask the next question.

10          MR. CAMPOAMOR-SANCHEZ:  Will do, Your Honor.

11          BY MR. CAMPOAMOR-SANCHEZ:

12   Q.     Now, does Mr. Craig's participation play any role in

13   this project being approved at FTI?

14   A.     Well, in my view, the project was approved for three

15   reasons, really.  And the first one is working for a

16   government on such an interesting and complex brief was such

17   a huge reputational challenge.  You know, that was

18   interesting, interesting work, that would take up a lot of

19   staff at a time when things were a bit slow work-wise.  That

20   was important.

21          The second thing was that it was litigation PR, which

22   is my kind of work.  And so that was attractive.  But against

23   that, there was this perception about the problems with

24   Ukraine.  And I think the key reassuring point was the fact

25   that Greg Craig was the leader of the legal part of this

1    process.  He was somebody who was well-known by Ed Reilly, my

2    boss.  And so we were enormously reassured because, you know,

3    if it was problematic, then, you know, he wouldn't be there

4    and we wouldn't be there.

5    Q.    Well, let me -- now that we're talking about

6    Mr. Craig, did you have the opportunity to meet Mr. Craig

7    when the project actually got started?

8    A.    Yes.

9    Q.    And when do you recall meeting him, approximately?

10   A.    Either in May or June of 2012.  I think in May.  He

11   came out to Ukraine.  The Skadden team at the time were

12   doing -- they were doing a lot of interviews, you know, in

13   preparation for their report.  And he came out with some

14   colleagues, and we had a really nice conversation and, you

15   know, heard about -- I have to be honest, I had never heard

16   of Greg Craig before -- but we heard about his background,

17   and it was interesting.

18   Q.    Now, did you yourself have a chance in the first time

19   that you met him to discuss with him how Skadden and FTI

20   would work together?

21   A.    Yes, we did.

22   Q.    What do you recall about your conversation with

23   Mr. Craig about this?

24   A.    Greg wanted this to be an independent report, and he

25   wanted to keep separation, you know, between the PR people

1    who are working for -- at the time, for the Office of the

2    Prosecution General, and his team that were going to go off

3    and do independent interviews and research to gain firsthand

4    testimony to form opinions.

5    Q.    So during the project, can you characterize for us

6    how often you actually communicated with Mr. Craig directly?

7    A.    How many times I -- sorry?  I didn't quite catch

8    that.

9    Q.    How often -- not a total -- just how often would you

10   communicate with him directly?

11   A.    You know, in the beginning, not a great deal at all.

12   In fact, I don't really recall having any conversations

13   particularly.  I had the odd call.  But then later there was

14   far more contact.

15   Q.    Okay.  And sir, do you see Mr. Craig in the courtroom

16   today?

17   A.    Yes, I do.

18   Q.    You mind telling us where he is and what he is

19   wearing?

20   A.    Greg is over there.

21        THE COURT:  All right.  The record will reflect that

22   he's pointed to the defendant, I believe.  There's a lot of

23   people over there.

24        THE WITNESS:  I do apologize, Your Honor.

25        Greg is sitting there wearing a white shirt and a

1142

1    dark blue tie and a grey suit, in the corner.

2            THE COURT:  Well, that will differentiate him from

3    everybody else.  But I think you have pointed him out at the

4    end of the row.

5            All right.  Thank you.

6            BY MR. CAMPOAMOR-SANCHEZ:

7    Q.      Now, Mr. Hawker, can you explain to us how it was

8    that you would get instructions as to what you would do

9    regarding this project?

10   A.      Yes.  So most of my instructions came from Rick Gates

11   at Davis Manafort on the phone telling me, do this, do that.

12   But in addition to that, in the early phases, we had some

13   instructions which were unrelated to the Skadden Report from

14   the Prosecutor General's Department where we were based.

15   Q.      You already talked about sort of your communications

16   with Mr. Craig.  But was there somebody at Skadden that you

17   would also communicate with from time to time?

18   A.      So we were staying in the same hotel as the Skadden

19   team, which was a very strange, almost empty hotel outside of

20   the main part of the town on the river.  And so we bumped

21   into the Skadden people who were in Ukraine almost every day.

22   And they were Alexander van der Zwaan and Matthew Cowie, who

23   were there pretty much the whole time at the beginning.

24   Q.      Now, before we move on to another area, did you

25   experience any problems in ultimately obtaining the contract

1143

1    for your work in Ukraine?

2    A.      Oh, yes.

3    Q.      Just briefly, what were the problems you encountered?

4    A.      We didn't get one.  We didn't get a contract.

5    Q.      Okay.

6    A.      So the client interaction or the client management

7    was through Rick Gates.  And Rick Gates initially said, you

8    know, you'll get the contract out of the Prosecutor General's

9    Department even though they said not.  Then, I remember him

10   saying, oh, we've sorted it out, you're going to get a

11   contract from Skadden, Arps.  Unfortunately, he hadn't

12   appeared to discuss that with Skadden, Arps, so we didn't get

13   that.  So it just went on and on and on.  We ended up with no

14   contract ever on the job.

15   Q.      Let me ask you, why did you continue working -- or

16   why did FTI, you and your colleagues, continue working on

17   this without a contract?

18   A.      Well, initially, we threatened to walk away.  In

19   fact, we downed tools and, you know, headed for the airport

20   and back to England on a couple of occasions, I think, and

21   were persuaded by Mr. Gates that money would be forthcoming.

22   And so we plodded back to the same hotel in Kyiv and kept on

23   working.

24           And then, you know, before you knew it, some time had

25   passed, and we had spent a lot of money going back and forth

1  to Ukraine.  And we had to do it.  We had to carry on.

2  Eventually the money came through for the fees.  So everybody

3  breathed a huge sigh of relief, and we carried on.  Then we

4  sort of forgot about the contract, really.

5  Q.      So was FTI paid?

6  A.      FTI received its fees with a slight problem with the

7  expenses, which I think were over two hundred -- well, I

8  suppose that is three hundred thousand dollars in those days,

9  not a penny of which was paid.

10  Q.      So you were paid the fees but not the expenses?

11  A.      Not a bean.

12  Q.      Okay.  Did that ultimately cause problems for you?

13  A.      Yeah, it did.  Because it was my responsibility, and

14  so, yeah, it caused me no end of grief.  And yeah, hugely

15  problematic.

16  Q.      So let's move on to another area.  Do you recall

17  having to work on an emergency press release on or about

18  May of 2012?

19  A.      I do.

20  Q.      Can you tell the ladies and gentlemen of the jury

21  what do you recall about that?

22  A.      So, as I said a moment ago, the Skadden lawyers were

23  traveling around the country -- well, actually, maybe not the

24  country -- but certainly traveling around the capital of

25  Ukraine, Kyiv, interviewing people involved in the case.  And

1   these were like prosecutors, the judge, witnesses, lawyers

2   for the other side.  When they got to the lawyers for the

3   other side -- I probably need to explain -- it is a man

4   called Vlasenko, who was the lawyer for Yulia Tymoshenko, who

5   was kind of the subject -- the thorn in all of the

6   relationship between Ukraine and European Union was Yulia

7   Tymoshenko, the heroine of the Orange Revolution.

8          And so they went to -- I think they approached

9   Vlasenko, Ms. Tymoshenko's lawyer, to do one of their

10  interviews because, obviously, it was an independent report

11  and they needed to hear that side.  And obviously, that

12  immediately caused Mr. Vlasenko to say:  Well, why is this

13  American law firm running around Ukraine doing interviews?

14  Who is paying them?  Etc., etc.  It was leaked to the media

15  in the country.

16  Q.     Did you actually communicate with Mr. Craig regarding

17  the emergency press release that you worked on?

18  A.     Well, I actually communicated with Alex

19  van der Zwaan, who said, you know:  This has happened.  What

20  should we do?

21         And I produced a communications package to try to

22  sort of stem the difficulties that this might cause, you

23  know, which was a bit of an emergency news release.  And the

24  plan was that the Ministry of Justice of Ukraine would

25  announce that they had appointed Skadden, Arps to conduct an

1146

 1     independent inquiry into the whole Yulia Tymoshenko situation

 2     in relation to her trial, with a response from Skadden and I

 3     think the Office of the Prosecutor General.  And I sent that

 4     to Greg and others for them to consider, and a few changes

 5     were made, etc.

 6     Q.      Let's look at Government's Exhibit 128, already

 7     admitted in evidence.  And if we could start on page 4 of

 8     this exhibit.

 9             We can look at the very bottom e-mail first.  That is

10     Mr. Van der Zwaan forwarding something to you.  Is that

11     correct?

12     A.      Yes, sir.  I don't know what that is, to be honest.

13     Q.      Right.  That --

14     A.      That was the start of it, yeah.

15     Q.      That is May 22nd?

16     A.      Yes, it is.

17     Q.      And you respond then -- if we can look at page 3,

18     starting at that e-mail -- you responded also on May 22nd.

19     A.      Yeah, it was an emergency.  Right, yeah.

20     Q.      And you said, "Alex, as discussed, this is something

21     that I thought would be inevitable.  All that's surprising is

22     that they have not bothered to Google Greg yet, but this will

23     happen tomorrow."

24             I think you just testified about that.

25             But you said here, "our strategy involves the

1    Ministry of Justice, the PG's Department, and Skadden all

2    being ready to make statements.  The most important thing is

3    that the issue is preempted with a statement from the

4    Ministry of Justice along the following lines."

5          And we'll cover it briefly.  But what did you include

6    in this package?  What were the things that you included

7    here?

8    A.    Yes.  It's actually -- it is not a statement.  It is

9    a news release.  The difference between a statement is

10   something that you give in response to media inquiries or you

11   give to a journalist who already has a story.  And a news

12   release is an attempt to create a story.

13         So I did a news release, a draft news release for the

14   Ministry of Justice.  And then reactive statements from two

15   other voices.  So that would be Skadden, Arps and also the

16   Office of the Prosecutor General.  So it is a way of getting

17   multiple quotes in support of your position into an article

18   that, you know, is potentially critical.  So you get more

19   than one quote, basically.

20   Q.    So we have expanded it on the screen.  Is this the

21   entirety of the news or press release that you drafted for

22   the Ministry of Justice?

23   A.    Yes, it is.  And I didn't even know the name of the

24   minister at this stage, so I left it blank.

25   Q.    Okay.  And then if we can get out of that.

1148

1    At the very bottom of that page, it just says --

2    after "ends," it says, "Skadden reactive statement."

3    And then if we can go again back to page 4.  If you

4    can -- and where it says, "like all law firms," that would be

5    Skadden's reactive statement?

6    A.    Well, it was a suggested one.  It is obviously for

7    Skadden to choose what they say themselves.  But, you know, I

8    was asked by Alex van der Zwaan to give my advice.  I gave my

9    advice.  And that was that, really.  So this is what I

10   suggested to them.

11   Q.    All I meant is because the heading was on the prior

12   page, that this is what --

13   A.    Oh, sorry.  Yes.  This is the Skadden bit, yes, at

14   the top.

15   Q.    The final one is the bit you wrote for the Prosecutor

16   General's Office?

17   A.    That's right.

18   Q.    Now, did Mr. Craig actually comment on your suggested

19   press release?

20   A.    Yeah, he did.

21   Q.    Can we go now to page 2.

22   Was that Mr. Craig's response, which included you?

23   A.    Yes, it was.

24   Q.    And what changes was Mr. Craig suggesting to the

25   draft that you had made?

1    A.       Well, he was actually making his suggestions to Alex

2    to pass on, I think, but ultimately they would come to me.

3    His first point -- actually, yes, it was a really good point

4    and very sensible, which was -- you know, I had said -- I'd

5    referred to misunderstandings by the international media of

6    the crime committed.  And Greg said delete that first slam at

7    the media, which, you know, yeah, he was absolutely right.

8    It was good advice.

9    Q.       And that suggested change by Mr. Craig, that was to

10   the Ministry of Justice press release?

11   A.       Yes, it was.  Yes.

12   Q.       How about item 2, 3, and 4?

13   A.       Yes, so the second point was to -- he wanted to make

14   reference to the team members from Skadden, you know, two

15   experienced prosecutors, one experienced defense counsel,

16   one -- Cliff Sloan, leading appellate lawyer with experience

17   in the Solicitor General's Office.  So to boost the reference

18   to the Skadden team in country.

19   Q.       Well, maybe I can short-circuit this.  But points 2,

20   3, and 4, were they all suggestions to the press release you

21   had originally drafted for the Ministry of Justice?

22   A.       Yes, they were.

23   Q.       And you were copied on this e-mail also from

24   May 22nd?

25   A.       No, it was to me and Alex.

1   Q.      What did you do in response to what Mr. Craig

2   suggested you do?

3   A.      Well, I made his changes.

4   Q.      If we can go to page 1, the bottom.  And was this

5   your response to Mr. Craig?

6   A.      Yeah, I mean, because I wanted to make sure he was

7   happy with it.  So I made the changes and said, like this,

8   meaning are you happy.

9   Q.      Did you incorporate the four changes that Mr. Craig

10  suggested you do?

11  A.      Yes.

12  Q.      Okay.  If we can go to the e-mail right above that.

13          And did Mr. Craig respond to you?

14  A.      Yes, he did.

15  Q.      And what did Mr. Craig say to you?

16  A.      He said it was much better, which is true.  But I

17  would touch base with Lauren Weiss in New York City before

18  going any further.  She has the baton for Skadden.  So she

19  was the press officer representing Skadden.

20  Q.      And did you, in fact, do that?

21  A.      I didn't get in touch with her because she was copied

22  in.  I basically sent an e-mail saying, no problem, I have

23  done my bit for now, so I'll await instructions.

24  Q.      And that is what we're looking at at the top of

25  Government's Exhibit 128?

1    A.      Yeah.

2    Q.      Were you, in fact, contacted by press folks from

3    Skadden about the press release?

4    A.      Yeah, two, actually.  I remember Lauren and a

5    Melissa, I think it was, came back with some additional

6    points.

7    Q.      If we can look at Government's Exhibit 130, also in

8    evidence.

9    A.      130?

10   Q.      Yes, 130.  I have expanded the bottom part of that

11   e-mail.  Lauren Weiss wrote to you and said, "Jonathan, below

12   please find our initial edits.  Please note that these edits

13   reflect our conversation we had with Greg, however this still

14   requires approval."  And then she makes some suggested

15   changes.  Do you see that?

16   A.      Yes, I do.

17   Q.      Did the changes include both the changes to the press

18   release and the reactive statement you had drafted?

19   A.      Yes.  Yes.  But they were both relating to Skadden.

20   So the press release said it was just changing the way they

21   positioned the firm.  And then the reactive press statement I

22   think is -- she is referring to the Skadden one, not the

23   Office of the Prosecutor General.

24   Q.      And did Ms. Porter also join in and make some other

25   minor suggestions?

1152

 1    A.      Yeah, she made some minor suggestions, yes.

 2    Q.      Okay.  And do you know if the defendant was

 3    ultimately informed of the fact that you had been working

 4    with Ms. Weiss and Ms. Porter about that press release?

 5    A.      I don't know.

 6    Q.      Okay.  Let me show you Government's Exhibit Number

 7    132.  Already in evidence.

 8            And let's start at the bottom.  It is an e-mail from

 9    Mr. Craig to you and Ms. Weiss, copying van der Swaan.  You

10    see that?

11    A.      Yes.

12    Q.      It says, "The critical recipient of the final press

13    statements for the Ministry is Alex van der Zwaan, who will

14    translate it into Russian and give it to the appropriate

15    people at the Ministry first thing tomorrow morning."

16            Let me ask you this:  Do you know why it was

17    Mr. Van der Zwaan instead of you who would be giving the

18    ultimate proposed press release for the Ministry to the

19    Ministry?

20    A.      Well, yes.  One, Alex is a Skadden -- sorry -- Alex

21    was a Skadden associate.  He speaks fluent Russian.  I think

22    he is half Russian.  And the Skadden client was the Ministry

23    of Justice, a different client to us.  We were the Office of

24    the Prosecutor General.  So that's why.

25    Q.      And then let me ask you this:  Did you have a

1153

1      contact, direct contact, with the Ministry of Justice?

2      A.      I did a lot later.  I think it was at the end of

3      July.

4      Q.      Not at this time?

5      A.      No.  And it wasn't a good contact.  I met them once.

6      Q.      The e-mail above is from Lauren Weiss responding to

7      Mr. Craig, right?

8      A.      Yes, that's right.

9      Q.      Still on May 22nd?

10     A.      Yes.

11     Q.      And she writes, "Will do.  Thanks, Greg.  We've sent

12     our statement edits to Jonathan and should have a final

13     version for the group's approval shortly."

14             And Mr. Craig ultimately responded?

15     A.      Yes, he did.

16     Q.      He thanked everyone involved?

17     A.      Yes, he did.

18     Q.      Let's move on now to another topic, and let me ask

19     you:  Were you tasked with developing a media strategy for

20     the Skadden Report?

21     A.      Yes, I was.

22     Q.      Who asked you to prepare that media strategy for the

23     Skadden Report?

24     A.      Rick Gates.

25     Q.      And please explain to the ladies and gentlemen of the

1   jury, from your understanding, what was the purpose of the

2   Skadden Report?

3   A.      I understood the Skadden Report was a PR strategy to

4   conduct an independent assessment of the prosecution of Yulia

5   Tymoshenko, and to produce a report which would be put into

6   the public domain by an American law firm in order to

7   hopefully provide an independent endorsement of the Ukrainian

8   government's position.  So it was basically collateral, or

9   seen as collateral, for helping Ukraine to address the

10  criticism that the government had faced in relation to the

11  prosecution of Yulia Tymoshenko, the main political rival of

12  the then-president.

13  Q.      And Mr. Hawker, do you recall approximately when you

14  prepared the first draft of a media plan for the Skadden

15  Report?

16  A.      It would have been the end of May or June in 2012, I

17  guess.

18  Q.      Let me show you Government's Exhibit 161.  It is

19  already in evidence.

20  A.      Okay.  A bit later.

21  Q.      If we can look at the top.

22          Now, this is an e-mail from Jon Aarons to you.  It

23  says, "Here is a draft doc.  I suggest you give Rick a chase

24  this evening, saying 'Where's the contract and when can we

25  expect our money?'  Then, we don't hand over this doc until

1    we see at least one of those delivered."

2              THE COURT:  I'm sorry.  Can you tell me what the

3    exhibit number is?

4              MR. CAMPOAMOR-SANCHEZ:  161.

5              BY MR. CAMPOAMOR-SANCHEZ:

6    Q.      And this is an attachment, which reads, "Media

7    strategy for Skadden Report."

8    A.      That's right.

9    Q.      If you can take a look at page 2 first.

10             Do you recall if this was the first draft of a media

11   plan for the Skadden Report?

12   A.      Yes, it was.  Actually, this is -- the first draft I

13   wrote, and then this is Jon Aarons just reformatting it and

14   making a few changes.  So, technically, it is the second

15   draft.

16   Q.      Okay.  It reads at the top, "Media strategy for

17   publication of the Skadden Report."

18             Can you read the first paragraph and tell the ladies

19   and gentlemen of the jury what that means.

20   A.      Read the paragraph?  Okay.  "The public release of

21   the report prepared by the law firm Skadden, Arps will

22   provide a major opportunity for the government of Ukraine to

23   re-set the agenda and demand a fresh appraisal of its

24   position regarding the conviction of Yulia Tymoshenko."

25   Q.      What does that mean?

1156

1   A.      What I said just now, really.  We were preparing a PR

2   plan to use the Skadden Report for the strategic objective,

3   which was to try to re-set or to make moves to help Ukraine

4   re-set its relationship with the European Union.  You know,

5   that is what we were told this was all about.

6   Q.      Now, the second paragraph says, "However, this moment

7   presents equally significant challenges in addressing the

8   report's likely criticism of some procedural missteps and

9   countering the onslaught of an extremely effective campaign

10  being waged by the government's opponents."

11          First of all, had you seen any report at this point?

12  A.      Had I what?  I'm sorry.

13  Q.      Had you seen any draft of the Skadden Report at this

14  point?

15  A.      No.

16  Q.      Okay.  So why were you expecting challenges,

17  significant challenges, in addressing the report's likely

18  criticisms?

19  A.      So this is dated the 15th of June.  We had been in

20  the Ukraine for a considerable time already, where we were

21  based in the basement of the Office of the Prosecutor

22  General's Department and had frequent, you know, interactions

23  and briefings with the Prosecution Department there, during

24  which they gave us information about, you know, the case

25  against Yulia Tymoshenko and many, many other cases they

1   wanted to bring against Yulia Tymoshenko, and some of the

2   criticisms, and obviously we were media people, so we had

3   seen media coverage.  You know, and Greg had said it was

4   going to be an independent report.  Well, frankly, you know,

5   it's obvious an independent report is going to have

6   criticisms given what had taken place.  But it is a

7   presumption.

8   Q.      That's what you were assuming would happen?

9   A.      Oh, yeah.

10  Q.      If we can look a little bit further down in the

11  bullet points.  It says, "Our recommended communications

12  strategy cannot be finalized and agreed until we have had an

13  opportunity to review the report.  However, we can presume

14  the following."

15          Why were you presuming that the report was

16  commissioned by the Ministry of Justice and not the

17  Prosecutor General's Department, and why is that important?

18  A.      Well, firstly, the Prosecutor General's Department

19  pursued the case against Yulia Tymoshenko.  The Ministry of

20  Justice oversaw the legal system.  But Skadden, we understood

21  from Alex van der Zwaan, were working to the Ministry of

22  Justice.

23  Q.      As opposed to the prosecutors --

24  A.      Yeah.  We all had different clients.  Same

25  government, different clients.

1158

1    Q.       Right.

2             And you wrote also, "The report will conclude that

3    the trial was valid and that the crime was committed."

4             What was that based on?

5    A.       Guess.  It is kind of what, you know, Ukraine wanted.

6    So, you know, in the discussions with the Office of the

7    Prosecutor General, it is kind of what they expected, really.

8    Q.       And we may have covered this with your answer

9    previously, but it says on the fourth bullet, "The report

10   will contain some criticism of the government, based on

11   procedure, etc.  And this criticism will be exploited by our

12   opponents."

13            What was that based on?

14   A.       Also, it is a presumption based on the interaction

15   with the Office of the Prosecutor General.

16   Q.       And finally, the last bullet point here says,

17   "Skadden will be unwilling to take the lead in

18   communications, given their desire to avoid FARA registration

19   and disclosure."

20            First of all, who gave you that information?

21   A.       Alex van der Zwaan.

22   Q.       And what had Mr. Van der Zwaan told you about FARA?

23   A.       Not a great deal, really.

24            MR. MURPHY:  Your Honor, out-of-court statement --

25            MR. CAMPOAMOR-SANCHEZ:  I'm just trying to explain

1   why he put this in the bullet.

2           THE COURT:  All right.  So this was your

3   understanding based on your communications with Alex

4   van der Zwaan --

5           THE WITNESS:  Exactly.

6           THE COURT:  All right.  Ask your next question.

7           MR. CAMPOAMOR-SANCHEZ:  I will move on.

8           BY MR. CAMPOAMOR-SANCHEZ:

9   Q.      If we can go to page 2.

10          Actually, sorry, one back.

11          So why was it important from your perspective to know

12  whether Skadden would or would not be able to take the lead

13  in communications?

14  A.      So, again, the understanding that we at FTI had was

15  that the Skadden Report was a PR tool to help Ukraine re-set

16  its relationship with the European Union.  And our role was

17  to promote it through the media and amongst the political

18  community in Europe because the target was the European

19  Union, and to help to try to permit Ukraine to obtain

20  associate member status of the European Union.  That's what

21  they really wanted.  Because it meant that they would get

22  financial aid.

23          And I can't remember your question already.  Sorry.

24  Q.      All right.  My question was:  Why would Skadden's

25  ability to take a lead in communications impact your work?

1    Ability or inability?

2    A.      Okay, so I remember where I was trying to go.

3            Promoting a report without an author, the author of

4    that report speaking about the report makes it a really hard

5    sell, to be perfectly honest.  So if, you know, Skadden

6    weren't prepared to stand behind their report, you know, it

7    would make life very, very difficult.  And we would have to

8    try to find a different means to explain the lack of

9    interaction with the media and politicians.  And it would

10   create hurdles, really.  And that's the problem.

11   Q.      Let's go to page 3 of this exhibit.  And let me focus

12   your attention first on point number 3.

13           It reads, "A small number of international

14   journalists should be briefed in advance of the publication

15   of the report, under strict embargo, formally contacted on

16   behalf of the MOJ," or Ministry of Justice.

17           What does that mean?

18   A.      Okay.  So this is a pretty standard PR strategy

19   where, you know, if you want to, on a controversial issue,

20   try to get ahead of the criticism, what you do is you use a

21   process which we in the West -- in the West -- we, in

22   England, Wales, call seeding.  And seeding is, you know, you

23   plant the seed of the story with one journalist, and you hope

24   that it grows to be the plant that you envisaged.  Obviously,

25   you're going to have a few branches that have deformed or go

1    in a different way from what you want.  And you never know

2    what the ultimate tree is going to look like.  But the start

3    is a good start.  The process of seeding -- sometimes it is

4    called leaking, but I don't really like that because I think

5    that is a different strategy, really -- the process of

6    seeding is choosing the right journalist who would have an

7    interest in the subject, who would take time to understand

8    your position, and who could be given information on a sort

9    of exclusive basis, just ahead of the broader PR

10   communication.  And then what you often find is that

11   because -- you know, and it is not a criticism of journalists

12   because it is a hard job being a journalist.  Believe me, I

13   know.  You don't have time.  So when somebody has written a

14   story and you're under pressure to turn it around, you take

15   the seeds.  You just follow what is already out there.  So

16   that is seeding.

17   Q.      All right.  So let me now ask you, until the release

18   of the report -- we're here in mid-June of 2012 until the

19   report was released in December.  Do you draft a number of

20   media plans?

21   A.      Yes, I did.  Far more than I really like, actually,

22   yes.  But they're all variations of the same theme based on

23   instructions from Rick Gates.

24   Q.      So throughout all those media plans that you prepared

25   until the end, did the strategy of seeding change?

1162

1    A.      The strategy didn't change.  The targeting did.  So,

2    no, no, we executed their strategy.

3    Q.      The seeding strategy?

4    A.      Yeah.

5    Q.      Did --

6            THE COURT:  You say the strategy didn't change but

7    targeting did.  What does the word "targeting" mean?

8            THE WITNESS:  I'm sorry, Your Honor.  What I mean is

9    that the journalists that you target with the story --

10           THE COURT:  To do the seeding.

11           THE WITNESS:  Yeah.

12           THE COURT:  All right.

13           BY MR. CAMPOAMOR-SANCHEZ:

14   Q.      Let me show you Exhibit 176, already admitted in

15   evidence.

16           If you can take a look at the top.  It is another

17   e-mail from Jon Aarons, but now it is July 14, 2012.  Is that

18   right?

19   A.      Yes.

20   Q.      And the attachment is a communications strategy, and

21   it has got a number attached to it.

22   A.      That's the date.

23   Q.      Oh, that's the date.

24   A.      Yeah.

25   Q.      Okay.

1    A.       We write it a different way than you.

2    Q.       So is that -- if I read the date, it would be 13th of

3    July 2012?

4    A.       That's correct.

5    Q.       Okay.  And this is being sent to Mr. Gates and

6    copying you?

7    A.       Yeah, that's right.  Yep.

8    Q.       So let's take a look at the actual attachment, which

9    starts here on page 2 of the exhibit.

10            First of all, who created this document?

11   A.       It's me because I'm a bit sort of pernickety about

12   how I like documents to look, and so it is obviously me.

13   Q.       You recognize even how this looks?

14   A.       Yeah.  Oh, yeah.  I wrote this.

15   Q.       If we can please take a look at the first part of the

16   document, the first half.

17            I'm going to have you explain this.  But the document

18   starts, "Communication Strategy.  This document will address

19   the three key events that provide an opportunity for Ukraine

20   to challenge the international (European/U.S.) perception

21   that it is mounting selective political prosecutions that do

22   not comply with international standards."  And you list three

23   items.

24            So how is item number 1 going to help with this

25   strategy?

1  A.      In the way that I have already described; that it

2  would -- we hoped because this is -- this is a hypothetical

3  strategy which I developed according to the instructions of

4  my client, Rick Gates, which were, if given a completely free

5  hand, what would you do?  So I laid out a strategy that I

6  thought would help, which was for discussion.  But the

7  function of the strategy was to ensure that the Skadden

8  Report would have the impact that Ukraine desired.

9  Q.      What is item number 2, this prosecution for tax

10  evasion or trial two?

11  A.      We were based in the Office of the Prosecutor

12  General, and the role was to try to professionalize the

13  communications in that department, which were, you

14  know -- they were very, very reactive.  So they literally sat

15  around and they waited for a journalist to call with

16  criticism.  And then they had a little panic.  And then they

17  produced a news release, which was very, very long and didn't

18  really say anything.  And they also did loads and loads of,

19  you know, big news conferences that just went on for hours

20  and hours and hours but said nothing, which is not the best

21  way to deal with journalists, to be perfectly honest.

22       My point here is that there was a second trial, and

23  it was an opportunity for the prosecutors, who I had

24  media-trained, to use the strategies that we had suggested

25  they might want to consider.

1   Q.      Who was being prosecuted in the future?

2   A.      Sorry.  Yulia Tymoshenko.  I can't remember how many

3   potential cases there were against her.  I mean, I lost

4   count.  But the tax one was the next one.  And there were

5   several others, including my absolute favorite where she

6   potentially was going to be prosecuted for buying the wrong

7   ambulances, and then there was a potential murder charge as

8   well that they really wanted to pursue.

9   Q.      But this point on 2, was that a trial that was

10  supposed to happen shortly?

11  A.      Yes.  It was originally supposed to be in Kyiv, and

12  then I think it moved to Kharkiv, which is now in sort of the

13  area that has had the problems.

14  Q.      Let's move now to page 6 of this exhibit, where it

15  say, "Strategy, Skadden Report."

16          What are you trying to communicate here about what

17  the strategy is at this point regarding the report?

18  A.      Well, what I'm basically saying is I can't write the

19  documents until I have seen the draft.  You know, we had a

20  bit of a joke, we said, we're good but we're not that good.

21  You can't just make it up.  You got to have something to work

22  with.  We didn't have anything to work with.  You can't work

23  with presumptions, can you?

24  Q.      So let me ask you:  At this point, so mid-July, had

25  you yet seen the document that Skadden worked on?

1    A.      No.  It was getting a bit stressful, to be perfectly

2    honest.  Because we had, like, Rick Gates calling up every

3    day saying, "Have you done it?"  "No, I haven't done it

4    because I haven't seen anything."  So, you know, it was

5    getting a bit tense.  The reason it was getting tense is that

6    the publication of this report was due imminently.  I can't

7    remember the exact date because it changed too many times.

8    We were expecting to have to turn this whole package around,

9    you know, within a really short period of time.  You know, it

10   was a big piece of work for Skadden.  You know, they were

11   interviewing -- we knew they were interviewing lots and lots

12   of people.  Again, a presumption, but I didn't think it was

13   going to be a 10-pager I was going to be dealing with.  So,

14   yeah, we were a bit stressed.

15   Q.      Did this report also address the same seeding

16   strategy that you had previously discussed?

17   A.      Sorry.  The report?

18   Q.      Did it also include the seeding strategy that you had

19   created --

20   A.      Yeah, all the way along.  All the way along.  I think

21   we did 18 media plans in all.  Every one of them.

22   Q.      Let's look at page 10.  On page 10 of the exhibit --

23   it says 9 on the bottom, but it is page 10 of the exhibit --

24   where it reads, "Friday before publication of report."

25   A.      Yeah.

1   Q.      Are you there?

2   A.      Yeah.

3   Q.      What are you noting here in this document?

4   A.      This is seeding, although I think at this stage, you

5   know, Rick Gates was getting a bit greedy in terms of the

6   number of potential seeds.  So we had a huge list of people

7   that were there as potential people to be considered but, you

8   know, nothing specific.

9   Q.      When it says "embargoed media outreach with selected

10  journalists," what does that entail?

11  A.      That's seeding.  That's seeding.

12  Q.      That's the seeding strategy you discussed?

13  A.      Yeah.

14  Q.      Okay.  The note says, "FIT engagement to be on behalf

15  of the MOJ, contracted to Skadden."

16          What does that mean?

17  A.      What it means is, you know, FTI -- okay, so just like

18  Skadden is an American law firm, FTI is an American PR and

19  consulting business.  So, you know, the first thing any good

20  journalist will say is:  Why are you, an American PR and

21  consulting business, contacting us on behalf of Ukraine?  Who

22  is your client?  And so we needed to be able to say it was

23  the Ministry of Justice.

24          And then the "contracted to Skadden" bit was

25  optimistic, particularly given the fact that it had been

1  rejected.  But, you know, we needed to explain who we were

2  being paid for and how we were -- how we had got through

3  procurement, which frankly, you know, is difficult given that

4  we hadn't got a contract with anybody, we hadn't gone through

5  any procurement process.  We weren't sure what we were

6  supposed to do.

7  Q.      You said you thought Rick Gates was getting greedy

8  because there's a long list of people here to contact?

9  A.      Yeah.

10  Q.      Let's look at page 10.

11  A.      Sorry.  10?

12  Q.      Yes.  The very next page.

13  A.      Yeah.

14  Q.      And there is an entry there for United States, and it

15  has foreign policy and *New York Times*.

16  A.      Yeah.

17  Q.      Who provided that information?

18  A.      I'm pretty sure it came from Rick Gates because most

19  of this material, other than Moscow and the UK and Ukraine

20  came from Rick Gates.

21  Q.      So do you know, or did you know at the time, Steven

22  Lee Myers?

23  A.      No.  I knew the *New York Times*, but I didn't know the

24  journalist.

25  Q.      Same thing with Susan Glasser or Christian Caryl?

1    A.      I don't even know the publication.

2    Q.      Now, point 2 under that says, "SKP to be ready to

3    respond to any media inquiries."

4            What does that mean?

5    A.      Skadden's press office needed to be ready to respond

6    because they would have some goals.

7    Q.      And then point 3 says, "SKC to refer any inquiries as

8    to Skadden P or FTI."

9            What does that mean?

10   A.      I think SKC is a reference to Greg.  And, obviously,

11   Greg as the named person beyond the report is -- maybe has

12   relationships with journalists.  He's bound to get some

13   calls, and he would refer them to the press office and FTI --

14   or FTI.

15   Q.      I should have asked you, for that second trial, FTI,

16   were you helping with that second trial, the coming trial of

17   Ms. Tymoshenko?

18   A.      We were told we wouldn't help in court, but we would

19   help the prosecutors prepare, and I certainly did help them

20   prep.

21   Q.      Before we had talked about FARA and what you had

22   talked to your lawyers or the client, Mr. Reilly.  Do you

23   have any FARA concerns at this point where the names of *New

24   York Times* journalists are coming up in the media plan?

25   A.      No.

1170

1    Q.      Why is that?

2    A.      Well, firstly, I thought FARA related to politicians,

3    not media.

4            Secondly, our brief was European only.  And although

5    I tried really hard to persuade Rick Gates to contract, if a

6    contract was possible, to engage my colleagues in the United

7    States, so to expand the brief, so that I could get the

8    people in the U.S. who know the U.S. publications to be

9    involved.  He wouldn't do it.  I just couldn't get him to do

10   it.  So I thought somebody else was going to do it, you know,

11   Gates had an existing relationship.

12   Q.      Let me ask you:  When you're talking about your

13   colleagues in the U.S., did FTI have an office in the U.S.?

14   A.      God, yeah.  They're probably a really good one in the

15   U.S., I'd say.

16   Q.      Is that who you're referring to when you say your

17   colleagues in the U.S.?

18   A.      Yeah.  I had loads of colleagues in the U.S.

19   Obviously, I had not met very many of them, but I had worked

20   with some good people on international things in Washington

21   and New York particularly.

22   Q.      Okay.  And let me ask you:  Was the perception of

23   Skadden's independence about the report, was it important to

24   your job doing PR?

25   A.      Yeah.

1    Q.      Why?

2    A.      What's the point of having a report that's bought and

3    paid for, you know, spouting whatever Ukraine wants.  No

4    point whatsoever.  It would be a disaster.

5    Q.      Could you succeed in sort of your PR plan if the

6    Skadden Report was seen as biased?

7    A.      If it was seen as biased by who?

8    Q.      By the media, I guess.

9    A.      No.  If the media thinks something is completely

10   biased, then they're going to kill you.

11   Q.      Let's look at government's Exhibit 207, already

12   admitted in evidence.

13           Do you recognize this e-mail from August 5th?

14   A.      Oh, yes.

15   Q.      This is an e-mail from you to Mr. Gates?

16   A.      Yes.

17   Q.      It says, "Veritas master control plan d1."  And let's

18   look at the first page of that document.

19           What are we looking at here?  What is a master

20   control grid?

21   A.      It is a project management plan for media relations

22   and political engagement.  That's what it is.  It is to try

23   and make sure that everybody knows what they're supposed to

24   be doing; where, when, how, and why in multiple

25   jurisdictions.

1172

1    Q.        Okay.  So if we look at line 3 at the bottom, what

2    does that relate to?

3    A.        "Leak strategy in place."  They didn't like the word

4    "seeding."  So that is seeding.

5    Q.        So when you say -- when we see -- take that back.

6    You wrote this?

7    A.        I did write it, yeah.

8    Q.        Okay.  So when you write "leak strategy," you're

9    referring to what?

10   A.        Seeding.

11   Q.        What were you --

12   A.        Seeding the media.  Briefing a small number of

13   journalists in advance of the main publication of the report

14   so that you can hit the ground running, hopefully with a

15   story that just has a bit more of an inclination to say

16   something positive about the client, about Ukraine.

17   Q.        Let's look at page 4 of this exhibit, line 30.

18   A.        Yes.

19   Q.        What is being referenced here in line 30 at 1700?

20   A.        It's basically saying that whenever this is, at 5:00,

21   that it would be a conference call between FTI -- Charlie is

22   the client -- I don't know why we had Charlie, but there it

23   is -- and GC is Greg Craig.

24   Q.        And what was that conference call supposed to be

25   about?

1173

1    A.      Well, it is in the context of the plan.  I don't

2    specifically remember what that one is about because if you

3    look throughout it there are many conference calls between

4    various parties.

5    Q.      So let's go to the next page, line 33 through 35, if

6    you could expand 33 to 35.

7            What are we looking at in line 33, where it says

8    "FTI, Kyiv SKA GC."

9    A.      The time is 8 p.m. FTI Kyiv is me and my colleagues

10   who are stuck in the Prosecutor General's Office in Ukraine.

11   SKA GC is Greg Craig.  And it is conducting media briefings

12   on embargo.  So this is engaging in media seeding.

13   Q.      That's the seeding we have been talking about?

14   A.      Yeah.

15   Q.      And that is before the report is published?

16   A.      This is -- the seeding process is always before

17   something is published, yes.

18   Q.      What are we seeing at line 35?

19   A.      35?  That the report is then published the morning

20   after, standard seeding approach.

21   Q.      Finally, if we can look at page 30 of this exhibit.

22   What are we looking at here?

23   A.      I can't remember why it was all broken down in this

24   way.  But on day eight of the plan, so I think that is the

25   eighth day after publication there would be some other

1174

1   embargo.  It can't be eighth date after -- whenever it was,

2   it was supposed to be the seeding briefing, and I'm not sure

3   why there was a separate document because it is exactly the

4   same as what is written elsewhere.

5   Q.      Mr. Hawker, to be clear, at this point, have you

6   discussed this with Mr. Craig?

7   A.      No, absolutely not.  This is nothing to do with Greg.

8   I was asked, produce a plan with -- if you had a completely

9   free hand.  You know, so I produced a plan.  Then I come

10  under pressure to sort of expand the plan and format it in

11  such a way that everybody knows just in case if we need to go

12  quickly.

13          But no, Greg hasn't seen any of this from me.  He may

14  have seen it from somebody else.  But I have not discussed

15  this with Greg, and Greg had no input into this, none.

16  Q.      So this is just a plan that you put together in the

17  hopes of what you would be able to deploy in terms of the

18  media rollout?

19  A.      It is a hypothetical aspirational plan, what would

20  you do.  You know, I'm basically just trying to keep Rick

21  Gates off my back and give him a plan that we could adapt and

22  execute if we needed to go quickly.

23  Q.      Now, why did the role in the plans that we have seen

24  up to now change?  Before you noted in the other plan that

25  because of FARA concerns, Skadden could not take the lead,

 1      but now you do have him involved and Mr. Craig

 2      specifically --

 3                 MR. MURPHY:  Objection.  Leading, Your Honor.

 4                 MR. CAMPOAMOR-SANCHEZ:  Well, no, I'm just trying to

 5      set up --

 6                 THE COURT:  Well, let's be a little crisper setting

 7      it up.

 8                 MR. CAMPOAMOR-SANCHEZ:  Yes.

 9                 BY MR. CAMPOAMOR-SANCHEZ:

10      Q.      Was there a change in how you were envisioning or

11      putting -- preparing the plan as to what you expected

12      Mr. Craig to do?

13      A.      Yes.

14      Q.      Why has it changed now?

15      A.      Gates said that, you know Skadden was going to play a

16      part.  With the media, I meant.

17      Q.      Okay.  So you're doing it based upon what you were

18      told?

19      A.      Yes.  Gates, he gave my instructions to me.

20      Q.      Okay.  Now, let me ask you:  Did you ultimately gain

21      access sometime in August to at least a draft version of the

22      report?

23      A.      I was shown it.

24      Q.      Okay.  And were you concerned about the contents of

25      the report?

1  A.      Yeah.  I was shown it very briefly.  And so I had to

2  go through -- I went through the executive summary or the

3  beginning of it, whatever it was at that stage.  I went

4  through it very quickly and made a few notes.  And yeah, I

5  was a bit worried.

6  Q.      Why were you worried when you saw the draft report?

7  A.      Because I thought that, you know, it might not meet

8  the objectives -- you now, allow the country to achieve its

9  strategic objectives of getting closer to Europe.

10  Q.      Why did you think that?

11  A.      You know, because if I read it as a journalist, I

12  would have written a nasty story about Ukraine, basically.

13  Q.      What did you do once you sort of read part of it and

14  had these concerns?

15  A.      The first thing I did was I called Gates and reported

16  back that, you know, I hadn't got a copy, but I had read

17  it -- I read some of it, anyway, and that I was worried.

18  Q.      And what, if anything, happened after that?

19  A.      I was instructed to meet KK -- that Konstantin

20  Kilimnik, who is the Davis Manafort person who was based in

21  Ukraine, a Russian.  So I met with him, and we had a

22  discussion about it.  I said, look, you know, we might need

23  to think about not using this.

24  Q.      Okay.

25  A.      And he said, look, you know, just put in writing what

1    your concerns are in relation to the media, what would the

2    media see in this.  And he also wanted me to write a memo

3    saying why I didn't feel it was working in terms of the

4    coordination of all of the departments of Ukraine.  So I

5    wrote a document.  And he also said, send it from your

6    personal e-mail address.

7    Q.    But did you ultimately write down the concerns that

8    you had about the report in time?

9    A.    Yeah.  I had made a few notes.  I didn't see it for

10   very long.  I made a few notes, and I put them in the e-mail.

11   There were some good bits, too.

12   Q.    Let's move a little bit forward.  Did you ultimately

13   have an opportunity to actually discuss in person the media

14   rollout plan with Mr. Craig?

15   A.    Later, yes.

16   Q.    All right.  Where did that happen?

17   A.    It happened in New York.

18   Q.    Okay.  You remember approximately when it happened?

19   A.    September the 23rd.  2012.  Sorry.

20   Q.    And where was the meeting?  Where did the meeting

21   take place?

22   A.    It was at the Harvard Club in New York.

23   Q.    Do you know why you were meeting there?

24   A.    Greg went to Harvard Law, and so he's a member of the

25   club, and it was a good place to meet.

1    Q.      What was the purpose of this meeting at the Harvard

2    Club?

3    A.      It was called like a coordination meeting, and so I

4    had to write the agenda.  So Paul -- I think it was Paul

5    Manafort told me to write an agenda.  And the plan was to

6    hear from Greg about where we were with the report.  And then

7    we were supposed to talk about the PR plan.  So I sent all

8    the PR plans to everybody just ahead of it.  I think I

9    finished them the night before.  And to talk specifically

10   about Greg's role.  And many other sort of coordination

11   issues, from what I remember.

12   Q.      So what documents did you prepare in anticipation of

13   this meeting at the Harvard Club?

14   A.      What didn't I prepare?

15           I mean, I had what's called a messaging document,

16   which is like the main points that, you know, you would want

17   the Ukrainian parties to convey about the report and

18   different statements, talking points, and Q and A's for all

19   sorts of different elements of the Ukrainian political

20   machinery, you now, even down to, you know, what to do with

21   the judge who was, you know, likely to be criticized.  What

22   the penitentiary service that was holding Tymoshenko should

23   be doing.  There was a lot of work.

24   Q.      I think you just told us you were asked to prepare an

25   agenda.

1179

1   A.      Yes.

2   Q.      Did you actually prepare an agenda?

3   A.      Yeah.  Oh, yeah.

4   Q.      And did you send that and those documents you're

5   describing to the defendant?

6   A.      Yes, I did.

7   Q.      Let's look at Government's Exhibit 254, which is

8   already in evidence.

9            First of all, the e-mail appears dated as

10  September 23, 2012, 4:11 a.m.  But do you know approximately

11  what time this was actually sent?

12  A.      I think it was actually the day before.  I got to New

13  York -- there was some problem.  I got there on the night

14  before the meeting quite late.  There was some delay.  I had

15  to send them when I arrived.  I don't know.  I don't know

16  what time it was.  But it wasn't 4 a.m.

17           MR. MURPHY:  Your Honor, I couldn't hear the last

18  answer at all.

19           THE WITNESS:  I apologize.

20           THE COURT:  If you could lean into the microphone.

21  Unfortunately, it doesn't go as far back as the chair does.

22           THE WITNESS:  I'm sorry, Your Honor.  I'm sorry.

23           I said I arrived late the night before, and I sent

24  them when I arrived, but I don't know the specific time.

25           BY MR. CAMPOAMOR-SANCHEZ:

1    Q.      But it wasn't at 4 a.m.?

2    A.      It definitely wasn't 4 a.m.  I'm in bed.

3    Q.      Can you read to the ladies and gentlemen of the jury

4    what you wrote to Mr. Craig and others.

5    A.      "Dear All, I've been asked to send you an agenda and

6    a draft communications pack for consideration at tomorrow's

7    meeting.  I look forward to discussing these with you then.

8    If I have omitted anything, please let me know, and I'll

9    recirculate a changed document.  I'm not sure if I will be in

10   a position to print anything securely, so I'd be grateful if

11   you could bring a laptop or hard copy.  Please bear in mind

12   that the MFA" -- that is the Foreign Ministry of Ukraine --

13   "OPG" -- that's the Prosecutor General Department -- "MOJ" --

14   that's the Ministry of Justice -- "briefing packs are covered

15   off by a review of Veritas message master and Veritas master

16   Q and A.  It's also worth a quick read of the media plan."

17   Q.      Does the attachments above list all the different

18   documents that you included?

19   A.      It looks like it, yeah.

20   Q.      Let's look, first of all, at the meeting agenda.  It

21   should be the very next page in your exhibit.

22           Point number 1 reads, "Report update."

23           What is that supposed to encapsulate?  What was that

24   discussion supposed to be about?

25   A.      So, we wanted to have an update from Greg about where

1    they were and whether the report had been delivered and

2    finalized.

3    Q.      And what is point number 2, "Message review or

4    message master document"?

5    A.      So this is my bit where, you know, I have done the PR

6    messaging document, and it is just to have a discussion about

7    that to make sure that I've got the right messages, that

8    there is nothing that people think, you know, I've missed or

9    I have done incorrectly.  It is to get the messages right.

10   Q.      And then point number 3 is "PR Plan" and then

11   "Overview Master Control Grid."  What does that mean?

12   A.      So that's coming back to the documents that you have

13   already asked me to comment upon, which were, you know, the

14   strategy, and then the project management plan, so that, you

15   know, everybody could chip in and say if they were happy with

16   their roles, you know, if they foresaw any logistical

17   problems.  You know, it is to make sure that everybody knew

18   what they were supposed to be doing and they were comfortable

19   with it.

20   Q.      What was point (b) supposed to cover?

21   A.      It was to make sure that we reflected Greg's role in

22   accordance with his wishes.

23   Q.      His role as part of what?

24   A.      As part of the PR plan.  This is a PR section, and we

25   needed to understand -- because obviously we had heard

1  everything from Rick.  We needed to hear from Greg if what

2  Rick had required us to put in the plan was realistic and

3  deliverable.

4  Q.      And under "Ukraine activity," section (g) says, "SKA

5  Role."  What was that about?

6  A.      So we weren't going to do media relations and

7  communications in Ukraine.  You know, we're not Russian

8  speakers.  We don't have the relationships in the country.

9  The departments of government were going to do it themselves.

10 And there was this -- this should really have had a question

11 mark.  You know, would Skadden play a part in the country?

12 Q.      If we could go now to the rest of the agenda.  Then

13 you have a section "Skadden, Arps Reaction."  What is that

14 supposed to include?  Or what is that about, I should say.

15 A.      It is picking up yet again on the role of Skadden in

16 this PR plan.  How would Skadden react.  And then I'm listing

17 a couple of issues that I foresaw.  And not just me, my

18 colleagues and me foresaw, I should say.  You know, the

19 question of independence, frankly.  No matter what Greg and

20 his team wrote, the independence would be called into

21 question by somebody.  The fees issue.  You know, obviously,

22 we knew from early on that their fees were being paid by

23 somebody else.  Didn't know who.  But, you know, that is

24 something that is very attractive for a journalist to fish

25 around in.  Misquoting/misrepresentation by the opposition.

1   We understood from the government of Ukraine via the

2   Prosecutor General's Department that this was a standard

3   tactic that the opposition -- the political party and the

4   lawyers representing Tymoshenko undertook; that they took

5   something out of context or, you know, misrepresented it, or

6   placed it in a way that caused difficulty.  And then media

7   handling is a bit repetitive, actually, to be honest.  I

8   could have tightened it.  But I did do it very late.  It is

9   pretty much the same as earlier.

10   Q.      Let's take a look first at the master control grid

11   that you attached, page 1, which is page 3 of the exhibit.

12   And if we could have lines 3 to 7.

13          First of all, what are you envisioning in line 3 at

14   1400 hours?

15   A.      Conference call between Skadden and the project team,

16   the project team being FTI and Davis Manafort.

17   Q.      What would be the purpose of that conference call at

18   that point?

19   A.      At that stage, it would be a finalization conference

20   call.

21   Q.      Let's look at line 7, please.  2000 hours.  It says,

22   "Project team, engagement with *Bloomberg*."

23          What does this mean?

24   A.      At this stage, you'll recall we're going to seed like

25   the entire world.  And now we have narrowed it down to one

1184

1  journalist.  And so the plan now at the Harvard Club meeting

2  is to seed one journalist from *Bloomberg*.  And the thinking

3  on this is that we will firstly -- I suggested *Bloomberg* in

4  London because *Bloomberg* is a wire service, and a wire

5  service issues stories that are picked up by other

6  publications.  So if you seed with a wire service, then your

7  story suddenly crops up everywhere.  That's why I chose

8  *Bloomberg*.

9         But Rick Gates said, you know, let's do it through

10 some bloke I know in I think it was the Washington office, or

11 the Washington Bureau Chief of *Bloomberg*.  So that is what's

12 in the plan at this stage.

13 Q.     We have been talking about seeding.  Is *Bloomberg*

14 supposed to be the journalist with whom the report will be

15 seeded?

16 A.     Yes.  It's a single seed.

17 Q.     This is item number 7; is that right?

18 A.     Yes it is.

19 Q.     Of the master control grid?

20 A.     Yes.

21 Q.     Let's look at the next page at the very top, and

22 let's make it through line 10, from the top to line 10.

23 A.     Yeah.

24 Q.     On the top of the first page, now it says, "GC/SKA."

25 And there is no number next to it.

1    What does that mean?

2    A.    So the idea -- again, this hadn't been discussed with

3    Greg and he hadn't agreed to this -- but the idea was that,

4    you know, somebody would seed a PR person, probably Gates,

5    his person in the U.S., or me would seed the *Bloomberg*

6    journalist, i.e., persuade them, you know, there is a

7    possible story, you can have it on an exclusive basis, and by

8    the way, I could put you in touch with the author of the

9    report, Greg Craig, and I'm sure he can give you a few

10   pointers.

11   That is seeding.

12   Q.    When we see the initials "GC/SKA" at the top with no

13   number, what does that mean?

14   A.    Greg Craig of Skadden.  But this is aspirational,

15   this is not agreed.

16   Q.    What is the aspiration here?

17   A.    Again, coming back to the earlier point that we

18   needed Skadden to speak to their report.  I'm hoping, because

19   this is a document for discussion about what Skadden will do,

20   I'm hoping that Greg will be happy to speak to a journalist.

21   THE COURT:  Is this a carryover from line 7 on the

22   page before --

23   THE WITNESS:  Yes, it is.

24   THE COURT:  -- with a new unnumbered entry?

25   THE WITNESS:  It is the same thing, it is just across

1186

1     the page, Your Honor.

2                 BY MR. CAMPOAMOR-SANCHEZ:

3     Q.         It is all one entry?

4     A.         It is one entry.  It is just unfortunate that my font

5     was too large.

6     Q.         And then in the very next line, line 8, would have

7     been -- if you can get it from 7 on down.

8                 Thank you.

9                 Then, line 8, that denotes when the report would be

10    published the next day, at 8 a.m.?

11    A.         Yeah.

12    Q.         Okay.  Now, I'm not going to get into it now, but

13    there are other items in the master control grid that are

14    also potential items for Mr. Craig to act on.

15    A.         Yeah.

16    Q.         To be clear, this is the document you sent to

17    Mr. Craig?

18    A.         It is, yeah.  This is one of many documents that I

19    sent on the eve of this meeting at the Harvard Club, which

20    formed the basis of the discussions.

21    Q.         For which you had sent the agenda, as well?

22    A.         Yeah.

23    Q.         Let's look at page 12, the "SA Report Media Plan

24    Overview."  Let's look at the first half of this.

25                 Are you there?

1    A.        Yes.

2    Q.        Okay.  So this is very similar language to the other

3    media plans that we had seen previously.  Is that fair?

4    A.        It is a bit of a cut-and-paste.

5              MR. MURPHY:  Objection, leading, Your Honor.

6              THE COURT:  All right.  We will just direct his

7    attention to this report.

8              Ask your next question.

9              MR. CAMPOAMOR-SANCHEZ:  Yes.

10             BY MR. CAMPOAMOR-SANCHEZ:

11   Q.        What do you provide at the top as to what the public

12   release of the Skadden Report will do?

13   A.        As -- this is a bit of a cut-and-paste.  Pretty much

14   the same as it was always going to be based on the many

15   earlier iterations.  It is exactly the same as the start,

16   really.  The objective is to obtain media coverage that

17   changes perceptions through this independent endorsement of

18   the government's position and messages.

19   Q.        It picks up, and it reads, "The independent

20   endorsement of the government message that the trial of Yulia

21   Tymoshenko was not politically motivated and that her

22   conviction was based on the evidence before the court."

23   A.        Yeah.

24   Q.        Did I read that correctly?

25   A.        You did.

1    Q.      Okay.  And then let's talk about -- what else do you

2    mention here in the middle of the page?  What are you talking

3    about here about what the release plan would anticipate?

4    A.      That the opposition team would fight back.  Nobody

5    just sits there and takes criticism in the media.  They're

6    obviously going to convey their perspective.

7    Q.      And you have to be ready for that?

8    A.      You have to be ready for that, yeah.  And the plan

9    did envisage that.

10   Q.      Let's go to the bottom of the page where it reads

11   "Release Plan."

12           Can you read that to the ladies and gentlemen of the

13   jury, please.

14   A.      "In order to ensure the government message that

15   Skadden, Arps has found no evidence of political motivation

16   is conveyed at the outset of release, we propose to leak the

17   report to the head of the *Bloomberg* Bureau in Washington

18   after the Ukrainian media has closed down on Monday night.

19   The process will be that the journalist will be engaged by

20   the designated party (MCW)."

21   Q.      Who is MCW?

22   A.      Mercury Communications Washington.

23   Q.      Who are they, if you know?

24   A.      They're a PR agency.  I don't know them.

25   Q.      Continue on, please.

1  A.      "For a prebriefing and given an off-the-record

2  briefing call with GC, Greg Craig.  The journalist will be

3  told that he has until 2000" -- I'm sorry, I have lost it

4  now --

5  Q.      You can go on to the next page.

6  A.      "The New York time on the day of the briefing, in

7  which to release his exclusive.  The intention is that this

8  will effectively set the agenda for subsequent coverage."

9  Q.      And this is essentially another definition of

10  seeding?

11  A.      This is seeding.  It has not changed.

12  Q.      Why was this set up as to MCW will do the prebriefing

13  and then there will be an off-the-record call with GC?

14  A.      Somebody needs to sell a story and somebody needs to

15  comment on the story.  Sort of two distinct roles.

16  Q.      And what was the role you envisioned for Mr. Craig?

17  A.      Mr. Craig's role is to provide a quote that adds

18  color and to make sure that the journalist gets the facts

19  right.

20  Q.      Did you also discuss in this document whether

21  Mr. Craig would brief politicians or not?

22  A.      I suggested it.

23  Q.      Can we look at the middle of page 13 of the exhibit.

24          What did you write there?

25  A.      "We would hope that Greg Craig would brief key

1  politicians, the Ukrainian Human Rights Commissioner, and

2  certain diplomats on Tuesday.  We need to verify that he is

3  able to be in Kyiv on Monday ahead of this activity.  He

4  would then travel to Brussels, Berlin, and Moscow for

5  briefings with leading journalists and some political

6  stakeholders, who are listed in the Skadden, Arps outreach

7  document.  On his return to Washington, GC would brief U.S.

8  stakeholders."

9  Q.     Why did you write "we would hope"?

10  A.     We needed him -- you know, we needed him to engage

11  with some stakeholders, and we hoped that he would do

12  something.

13  Q.     To be clear, at this point, had you either discussed

14  or had this agreed with Mr. Craig?

15  A.     Absolutely not, no.

16  Q.     Let's go to the actual meeting.  What happened at the

17  Harvard Club meeting?

18  A.     I don't really remember a great deal of detail

19  because I was running the meeting and trying to sort of make

20  notes on the agenda.  But Greg arrived, and he was in great

21  form.  You know, we had a really good chat before we went

22  into the meeting.  He told us a bit about the club and

23  Harvard.  It was really interesting.

24         Then we went into the meeting, and we tried to work

25  through the agenda.  You know, we had a bit of an update on

1    the report.  I'm afraid I can't remember what it was.  We had

2    some discussion on the PR.  There was some changes that I

3    needed to -- quite a few changes I needed to incorporate.

4    Also, we discussed his role.

5    Q.      Was public relations discussed at the Harvard Club

6    meeting with Mr. Craig?

7    A.      Very much so, yes.

8    Q.      And from your perspective, was the meeting

9    successful?

10   A.      I thought so, yeah.

11   Q.      Why was the meeting successful?

12   A.      Because, you know, I came out of it with a clear

13   understanding, not from Rick Gates, you know, of what was

14   possible.  And what was possible was that Greg would engage

15   with the media on a reactive basis.  So that means that, you

16   know, if a journalist were to call him, he would have a chat

17   with them, basically.

18           My recollection is that he wasn't prepared to do some

19   of the political stuff, which frankly I didn't really care

20   about, it wasn't my area, but that he might engage with the

21   Human Rights people.

22   Q.      Okay.  Focusing on the journalists, what, if

23   anything, did he agree to do with regards to the journalists?

24   A.      He agreed to speak to them on a reactive basis.

25   Q.      When you say he agreed to speak on a reactive basis,

1192

 1    what do you mean by that what?  Does that mean?

 2    A.      In the seed, you know, somebody else would sell the

 3    story, brief the journalist.  And then the journalist would

 4    speak to Greg and, you know, get a bit of guidance and

 5    possibly a quote.

 6    Q.      All right.  And who, if anybody, at the meeting made

 7    the distinction that it would happen this way -- it would

 8    happen this way where somebody would sell it and then

 9    Mr. Craig would answer questions?

10    A.      Well, Greg didn't say that, you know.  Greg basically

11    said that he was comfortable engaging with the media

12    reactively.  I think on background was mentioned.  But Greg

13    didn't say, you know, that -- you know, he didn't propose

14    that somebody else sold the story.  That wasn't anything to

15    do with Greg.  I said that.

16    Q.      Do you understand why there was a distinction between

17    reactive versus proactive from Mr. Craig's perspective?

18    A.      It is not uncommon, to be perfectly honest.  I didn't

19    really worry about it.  I was just glad to have somebody

20    speaking to a journalist.  At the end of the day, we are now

21    in September, we have been in Ukraine since early May, I just

22    wanted to get the report done and go.

23    Q.      Why would it be important from your perspective to

24    have Mr. Craig at least be willing to speak with journalists?

25    A.      Because of who he is.  You know, this is an important

1    lawyer, you know, who's gotten to the very top of the legal

2    profession.  He is a man who's known for the work that he has

3    done in the past in the human rights arena.  You know, if you

4    have an endorsement of the position of the government from

5    Greg Craig, it's great.

6    Q.      All right.  Let me ask you, after the Harvard Club

7    meeting, did you have any other meetings in New York with

8    regards to the Skadden folks?

9    A.      In Europe, yes.

10   Q.      No, no, not in Europe.  After the Harvard Club

11   meeting, did you have any other meetings in New York with

12   Skadden personnel?

13   A.      Sorry.  I did.  I met with the Skadden people with

14   Alex van der Zwaan.

15   Q.      What was the purpose of that meeting?

16   A.      I hadn't met them.  It was just so they knew the

17   plan.  So I explained the plan to them.  And we had a chat

18   about media handling, and the suggestion was that any media

19   inquiries would be passed over to me.

20   Q.      Okay.  Do you recall when this meeting took place?

21   A.      I don't recall, but I think it was probably the next

22   day.  I don't know for sure.

23   Q.      The next day after the Harvard Club meeting?

24   A.      Yeah.  That would be like the 24th of September.  It

25   may have been the 25th.  I don't know.

1194

```
 1    Q.      After you had this meeting with the Skadden PR folks,

 2    did the defendant reach out to you?

 3    A.      Yes, he did.

 4    Q.      All right.  Let's look at Government's Exhibit 262.

 5            And we see at the bottom of this e-mail is Mr. Craig

 6    e-mailing you with the subject "Question re release planning

 7    in Ukraine."

 8            What happened here?

 9    A.      In the discussion with the two PR people from

10    Skadden, you know, I made a joke about, you know, we're not

11    going -- I didn't make a joke.  I said, basically, we're not

12    going to be dealing with Ukrainian media.  And I made a few

13    jokes about it, saying that they're a bit frenzied and nuts.

14    You know, the way that the government seems to work is that,

15    you know, they basically pay journalists to write what they

16    want.

17    Q.      Did Mr. Craig send you an e-mail about that?

18    A.      Yeah.  I'm not surprised, really.  It was obviously

19    reported back to him that, you know, in a way that caused him

20    concern, and quite rightly, he raised it.

21    Q.      As we see here, you asked him for a number to call,

22    and you got a number.

23    A.      Yeah, I gave him a call.

24    Q.      Did you talk to him?

25    A.      Yeah.  I basically said, look, that's not the way we
```

1195

1    work.  I tried to explain the context.  As far as I am

2    concerned, that was that, really.

3    Q.      Were you planning on paying journalists?

4    A.      No.

5    Q.      After you explained that to Mr. Craig, was that issue

6    settled?

7    A.      I think so.  You never know.

8    Q.      So that same evening, you get another e-mail from

9    Mr. Craig?

10   A.      I did.

11   Q.      Let's go look at Government's Exhibit 261.

12   A.      261.

13   Q.      This is an e-mail on September 24th; is that right?

14   A.      Yes, it is.

15   Q.      And who is it to?

16   A.      It is to Paul Manafort and me.

17   Q.      And can you read out loud, please, what this e-mail

18   says to the ladies and gentlemen of the jury.

19   A.      Okay.  It says, "I am afraid we will have to reverse

20   direction on the issue of Skadden lawyers being used to

21   background journalists about the report.  There is,

22   apparently, an ironclad policy inside this institution that

23   all communications with the press are channeled through our

24   communications people."

25   Q.      Let me stop you there for a second.

1196

1    Had, in fact, Mr. Craig agreed to background

2    journalists at the Harvard Club meeting?

3    A.    That's what I said, yeah.

4    Q.    Please go on.

5    A.    "The reason for this, of course, is self-evident.

6    Our communications people will be working from talking points

7    that have been carefully checked and cleared, and the firm

8    does not have that kind of control when individual lawyers

9    get involved with briefing journalists even on background

10   about the content of our work.  Skadden does not want to be

11   drawn into a controversy over whether one of its lawyers was

12   or was not quoted accurately in a story.  Our objective here

13   is to remain true to the mission, which is to do a

14   professional job and to prepare an independent report that

15   has maximum integrity.  The law firm runs the risk of being

16   drawn into the public controversy if we are the ones actually

17   backgrounding journalists, and we really don't want to be

18   seen as taking sides.  I am afraid this applies to Alex" --

19   van der Zwaan -- "with the Russian journalists as much as it

20   does to me.  As you know, I was eager to help you out on this

21   aspect of the project, but I guess I can't."

22   Q.    Was the idea of having Mr. Van der Zwaan also

23   backgrounding journalists, was that discussed at the Harvard

24   Club meeting?

25   A.    Yes, it was.

1   Q.      What was your understanding as to what

2   Mr. Van der Zwaan could do regarding backgrounding

3   journalists?

4   A.      He is, obviously, a fluent Russian speaker, the

5   only -- I think he was the only Russian speaker from the

6   Skadden team.  And given that this is a report for the

7   government of Ukraine that would obviously have quite an

8   enormous impact within Ukraine as without Ukraine, you know,

9   the hope -- because, again, it hadn't been discussed with

10  Skadden or Greg -- was that Alex could assist by speaking to

11  a small number of Ukrainian journalists.

12  Q.      And when you said you hadn't spoken with Craig about

13  it, you hadn't spoken to him before the Harvard Club meeting?

14  A.      Yes, that's what I meant.

15  Q.      How did you react when you got this e-mail late at

16  night on the 24th?

17  A.      I called Paul.

18  Q.      Why did you call -- you say Paul.  Is that Paul

19  Manafort?

20  A.      Yeah.

21  Q.      Why did you call Mr. Manafort?

22  A.      Paul is the big boss -- or sorry -- was the big boss.

23  It was his show.  I basically went back to him and said,

24  look, you know, if we can't have Skadden speaking to the

25  report, we're going to really struggle.  You know, what are

1198

1     we going to do?

2     Q.      Okay.  And I'm going to get back to that.  But before

3     then, when you received this e-mail from Mr. Craig, were you

4     yourself working on something else?

5     A.      I was trying to update all of the documents.  You

6     know, it was a long meeting.  Sorry.  The Harvard meeting was

7     a really long meeting.  I had a lot of notes that I tried to

8     remember.  I had only written bits on the agenda.  I hadn't

9     got extensive notes.  I knew there was a lot of stuff I

10    needed to change.  So, you know, I tried to do my best to

11    reflect everything that had been said.

12    Q.      Okay.  And let me now show you Government's

13    Exhibit 267.  Let's start with the bottom e-mail on that

14    page.  What are we looking at at the bottom of Government's

15    267, already in evidence?

16    A.      This is me basically saying I've reached the end of

17    it, you know, in updating the documents and saying, look, you

18    know, let me have any comments, corrections, or amendments so

19    I can update them again tomorrow.  I sent that to Greg, Paul,

20    and Rick, three of the people who were at the Harvard Club,

21    the three most important ones.

22           THE COURT:  Before you ask your next question, can I

23    just have counsel just to have a brief scheduling conference.

24           (At the bench)

25           THE COURT:  Where are you at in the direct?

1       MR. CAMPOAMOR-SANCHEZ:  I was hoping to -- we can

2  either stop here, or I can spend about 5 to 10 minutes

3  covering his response to the complaint that comes out from

4  Mr. Craig.

5       THE COURT:  Is that the end?

6       MR. CAMPOAMOR-SANCHEZ:  Of my direct?  No.  I have

7  about half an hour left.

8       MR. MURPHY:  I would prefer to stop now, Your Honor,

9  because I need a comfort break.

10      THE COURT:  Well, if this is a logical breaking

11 point.  If you aren't going to finish anyway, we may as well

12 accommodate everybody, and that gives us a chance to clear

13 the courtroom before we have another matter.

14      MR. CAMPOAMOR-SANCHEZ:  That's fine.

15      (In open court)

16      THE COURT:  All right.  I was trying to ascertain

17 whether this was a logical breaking point or whether it was

18 possible that there are only one or two questions left.  And

19 since this witness's testimony will not be over in the next

20 five minutes, at least the direct, I'm going to break today

21 for the afternoon, and we'll continue to hear from Mr. Hawker

22 tomorrow morning.

23      I ask you to please leave your notebooks on the

24 chair.  I want to caution you, as I do every evening when you

25 depart, that this trial has not yet been submitted to you.

1    Please do not discuss it with anybody else.  Please don't do

2    any research about it.  Please don't post or blog or discuss

3    it electronically.  Basically, put it aside for the evening.

4    Please return, be in the jury room by 9:15 tomorrow morning.

5    I don't think we have a lot of preliminary matters.  So it

6    really will be my goal to start at 9:30 and keep going as

7    efficiently as we have been this afternoon.

8              So thank you very much and have a good evening.

9                (Jury not present)

10             THE COURT:  All right.  Mr. Hawker, you can step off

11   the witness stand.

12             Do we need to take up whatever it was that you wanted

13   to raise briefly, Mr. Taylor?

14             MR. TAYLOR:  If I could now.

15             THE COURT:  Yes.

16             MR. TAYLOR:  I need a little guidance from the Court.

17   You asked us to produce *Jencks* material relating to

18   Mr. Haskell.  We don't have any statements relating to

19   Mr. Haskell.  Mr. Haskell, on direct, or when he was

20   converted from cross-examination to direct, testified on

21   three very narrow subjects.  If I have to go through what we

22   have looking for those subjects and then try to figure out if

23   they're verbatim, that's an enormous burden.  So if that's

24   the Court's order, can I have until the weekend to do that?

25             THE COURT:  The weekend?

 1              MR. TAYLOR:  Yeah.

 2              THE COURT:  That's a little bit long.  How many pages

 3     of material are we talking about?

 4              MR. TAYLOR:  I don't know exactly, but most of what

 5     you would think we would have was not prepared in

 6     anticipation of his being called by us as a witness.  So we

 7     don't have the typical direct witness statements of

 8     Mr. Hawker.

 9              THE COURT:  You have notes.

10              MR. TAYLOR:  We have notes, that's right.  Rough

11     notes.  And I doubt that any of them are substantially

12     verbatim.  But if you're asking me to look, asking us to

13     look, then we're going to have to look.

14              THE COURT:  I anticipate that the government is still

15     going to be putting on witnesses for most of this week.  Can

16     you have it here by Friday?

17              MR. TAYLOR:  Yes.

18              THE COURT:  All right.  Do your best.

19              MR. TAYLOR:  I'm not promising that there is

20     anything.

21              THE COURT:  I know.  But you're going to undertake

22     the review, which we appreciate.

23              MR. TAYLOR:  Thank you, Your Honor.

24              THE COURT:  You all can be excused.

25              (Proceedings adjourned)

1202

1    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, Patricia A. Kaneshiro-Miller, certify that the

4    foregoing is a correct transcript from the record of

5    proceedings in the above-entitled matter.

6

7

8    /s/ Patricia A. Kaneshiro-Miller          August 19, 2019
     ------------------------------------      --------------------
9    PATRICIA A. KANESHIRO-MILLER                     DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## /

**/s** [1] - 1202:8

## 1

**1** [4] - 1150:4, 1163:24, 1180:22, 1183:11
**10** [8] - 1166:22, 1166:23, 1168:10, 1168:11, 1184:22, 1199:2
**10-pager** [1] - 1166:13
**100** [1] - 1118:20
**1000** [1] - 1118:24
**106** [2] - 1128:2, 1128:9
**1122** [1] - 1120:5
**118** [1] - 1133:16
**119** [2] - 1137:24, 1138:3
**11th** [1] - 1133:20
**12** [2] - 1138:7, 1186:23
**128** [2] - 1146:6, 1150:25
**13** [1] - 1189:23
**130** [3] - 1151:7, 1151:9, 1151:10
**132** [1] - 1152:7
**13th** [1] - 1163:2
**14** [1] - 1162:17
**1400** [1] - 1183:14
**15th** [1] - 1156:19
**161** [2] - 1154:18, 1155:4
**1700** [1] - 1172:19
**176** [1] - 1162:14
**18** [1] - 1166:21
**18-125** [1] - 1121:4
**1800** [1] - 1118:24
**19** [2] - 1118:7, 1202:8
**19-CR-125** [1] - 1118:4

## 2

**2** [10] - 1148:21, 1149:12, 1149:19, 1155:9, 1159:9, 1163:9, 1164:9, 1165:9, 1169:2, 1181:3
**2000** [2] - 1183:21, 1189:3
**20001** [1] - 1119:4
**20036** [1] - 1118:25
**2012** [11] - 1126:13, 1129:9, 1138:7, 1140:10, 1144:18, 1154:16, 1161:18, 1162:17, 1163:3, 1177:19, 1179:10
**2019** [2] - 1118:7, 1202:8
**202** [1] - 1119:5
**20530** [2] - 1118:15, 1118:17
**207** [1] - 1171:11
**21202** [1] - 1118:21
**22nd** [4] - 1146:15, 1146:18, 1149:24, 1153:9
**23** [1] - 1179:10
**23rd** [1] - 1177:19
**2440** [1] - 1118:21
**24th** [3] - 1193:24, 1195:13, 1197:16
**254** [1] - 1179:7

**25th** [1] - 1193:25
**26** [1] - 1129:9
**261** [2] - 1195:11, 1195:12
**262** [1] - 1194:4
**267** [2] - 1198:13, 1198:15
**2:02** [1] - 1121:2

## 3

**3** [11] - 1146:17, 1149:12, 1149:20, 1160:11, 1160:12, 1169:7, 1172:1, 1181:10, 1183:11, 1183:12, 1183:13
**30** [3] - 1172:17, 1172:19, 1173:21
**33** [3] - 1173:5, 1173:6, 1173:7
**333** [1] - 1119:4
**35** [4] - 1173:5, 1173:6, 1173:18, 1173:19
**354-3243** [1] - 1119:5

## 4

**4** [12] - 1121:21, 1121:23, 1121:25, 1122:4, 1146:7, 1148:3, 1149:12, 1149:20, 1172:17, 1179:16, 1180:1, 1180:2
**4700A** [1] - 1119:3
**4:11** [1] - 1179:10

## 5

**5** [1] - 1199:2
**555** [1] - 1118:14
**5:00** [1] - 1172:20
**5th** [1] - 1171:13

## 6

**6** [2] - 1118:5, 1165:14

## 7

**7** [5] - 1183:12, 1183:21, 1184:17, 1185:21, 1186:7

## 8

**8** [4] - 1173:9, 1186:6, 1186:9, 1186:10

## 9

**9** [1] - 1166:23
**950** [1] - 1118:17
**9:15** [1] - 1200:4
**9:30** [1] - 1200:6

## A

**A's** [1] - 1178:18
**a.m** [5] - 1179:10, 1179:16, 1180:1, 1180:2, 1186:10
**Aarons** [5] - 1128:24, 1137:16,

1154:22, 1155:13, 1162:17
**Abelson** [1] - 1118:19
**ability** [2] - 1159:25, 1160:1
**able** [5] - 1129:12, 1159:12, 1167:22, 1174:17, 1190:3
**above-entitled** [1] - 1202:5
**abroad** [1] - 1127:13
**absolute** [1] - 1165:5
**absolutely** [4] - 1121:22, 1149:7, 1174:7, 1190:15
**abuse** [2] - 1134:3, 1138:15
**access** [1] - 1175:21
**accommodate** [1] - 1199:12
**accordance** [1] - 1181:22
**according** [1] - 1164:3
**accounting** [1] - 1128:23
**accurately** [1] - 1196:12
**achieve** [1] - 1176:8
**Act** [1] - 1129:25
**act** [5] - 1127:23, 1129:12, 1130:6, 1130:7, 1186:14
**Action** [1] - 1118:4
**activities** [1] - 1128:13
**activity** [2] - 1182:4, 1190:3
**actual** [2] - 1163:8, 1190:16
**Adam** [2] - 1118:16, 1118:19
**adapt** [1] - 1174:21
**addition** [4] - 1132:17, 1132:25, 1135:3, 1142:12
**additional** [1] - 1151:5
**address** [5] - 1122:22, 1154:9, 1163:18, 1166:15, 1177:6
**addressing** [2] - 1156:7, 1156:17
**adds** [1] - 1189:17
**adjourned** [1] - 1201:25
**admitted** [4] - 1120:9, 1146:7, 1162:14, 1171:12
**advance** [2] - 1160:14, 1172:13
**advice** [4] - 1136:24, 1148:8, 1148:9, 1149:8
**advise** [2] - 1136:1, 1137:1
**afraid** [3] - 1191:1, 1195:19, 1196:18
**Afternoon** [1] - 1118:5
**afternoon** [5] - 1121:3, 1122:13, 1122:14, 1199:21, 1200:7
**AFTERNOON** [1] - 1118:9
**agency** [3] - 1125:18, 1127:19, 1188:24
**agenda** [13] - 1155:23, 1178:4, 1178:5, 1178:25, 1179:2, 1180:5, 1180:20, 1182:12, 1186:21, 1189:8, 1190:20, 1190:25, 1198:8
**Agents** [1] - 1129:24
**agents** [1] - 1130:6
**ago** [2] - 1129:10, 1144:22
**agree** [2] - 1134:15, 1191:23
**agreed** [7] - 1157:12, 1185:3, 1185:15, 1190:14, 1191:24, 1191:25, 1196:1
**ahead** [4] - 1160:20, 1161:9, 1178:8,

1190:3
**aid** [1] - 1159:22
**aided** [1] - 1119:6
**airport** [1] - 1143:19
**Alex** [16] - 1133:3, 1136:10, 1145:18, 1146:20, 1148:8, 1149:1, 1149:25, 1152:13, 1152:20, 1157:21, 1158:21, 1159:3, 1193:14, 1196:18, 1197:10
**Alexander** [1] - 1142:22
**allow** [1] - 1176:8
**allowed** [1] - 1130:18
**alluding** [1] - 1130:19
**almost** [2] - 1142:19, 1142:21
**ambulances** [1] - 1165:7
**amendments** [1] - 1198:18
**AMERICA** [1] - 1118:3
**America** [1] - 1121:5
**American** [7] - 1124:16, 1137:7, 1145:13, 1154:6, 1167:18, 1167:20
**AMY** [1] - 1118:9
**announce** [1] - 1145:25
**answer** [4] - 1134:23, 1158:8, 1179:18, 1192:9
**anticipate** [2] - 1188:3, 1201:14
**anticipation** [2] - 1178:12, 1201:6
**anyway** [3] - 1131:14, 1176:17, 1199:11
**apologize** [2] - 1141:24, 1179:19
**APPEARANCES** [1] - 1118:11
**appeared** [1] - 1143:12
**appellate** [1] - 1149:16
**applies** [1] - 1196:18
**appointed** [1] - 1145:25
**appraisal** [1] - 1155:23
**appreciate** [1] - 1201:22
**approach** [1] - 1173:20
**approached** [2] - 1124:1, 1145:8
**appropriate** [1] - 1152:14
**approval** [3] - 1130:18, 1151:14, 1153:13
**approve** [1] - 1137:22
**approved** [2] - 1139:13, 1139:14
**April** [1] - 1129:9
**area** [4] - 1142:24, 1144:16, 1165:13, 1191:20
**arena** [1] - 1193:3
**Arps** [10] - 1127:10, 1133:4, 1143:11, 1143:12, 1145:25, 1147:15, 1155:21, 1182:13, 1188:15, 1190:6
**arrangement** [2] - 1136:12, 1136:13
**arrangements** [2] - 1135:4, 1135:11
**arrived** [4] - 1179:15, 1179:23, 1179:24, 1190:20
**article** [2] - 1130:6, 1147:17
**ascertain** [1] - 1199:16
**aside** [1] - 1200:3
**aspect** [1] - 1196:21
**aspiration** [1] - 1185:16
**aspirational** [1] - 1174:19, 1185:14

**assessment** [1] - 1154:4
**assignment** [5] - 1130:21, 1132:6, 1132:11, 1133:2, 1138:16
**assist** [1] - 1197:10
**associate** [2] - 1152:21, 1159:20
**assume** [1] - 1136:3
**assuming** [1] - 1157:8
**attached** [2] - 1162:21, 1183:11
**attachment** [3] - 1155:6, 1162:20, 1163:8
**attachments** [1] - 1180:17
**attempt** [1] - 1147:12
**attention** [4] - 1126:13, 1129:21, 1160:12, 1187:7
**ATTORNEY'S** [1] - 1118:13
**attractive** [2] - 1139:22, 1182:24
**August** [4] - 1118:7, 1171:13, 1175:21, 1202:8
**AUSA** [2] - 1118:12, 1118:13
**author** [2] - 1160:3, 1185:8
**Avenue** [2] - 1118:17, 1119:4
**avoid** [1] - 1158:18
**await** [1] - 1150:23

# B

**background** [6] - 1123:8, 1140:16, 1192:12, 1195:21, 1196:1, 1196:9
**backgrounding** [3] - 1196:17, 1196:23, 1197:2
**Baltimore** [1] - 1118:21
**base** [1] - 1150:17
**based** [15] - 1135:7, 1135:8, 1142:14, 1156:21, 1158:4, 1158:10, 1158:13, 1158:14, 1159:3, 1161:22, 1164:11, 1175:17, 1176:20, 1187:14, 1187:22
**basement** [1] - 1156:21
**basis** [7] - 1136:2, 1161:9, 1185:7, 1186:20, 1191:15, 1191:24, 1191:25
**baton** [1] - 1150:18
**BBC** [1] - 1123:22
**bean** [1] - 1144:11
**bear** [1] - 1180:11
**became** [1] - 1123:22
**bed** [1] - 1180:2
**BEFORE** [1] - 1118:9
**beginning** [3] - 1141:11, 1142:23, 1176:3
**begins** [1] - 1136:7
**behalf** [3] - 1160:16, 1167:14, 1167:21
**behind** [1] - 1160:6
**below** [1] - 1151:11
**bench** [1] - 1198:24
**Berlin** [1] - 1190:4
**BERMAN** [1] - 1118:9
**best** [3] - 1164:20, 1198:10, 1201:18
**better** [1] - 1150:16
**between** [9] - 1121:24, 1131:8, 1140:25, 1145:6, 1147:9, 1172:21,

1173:3, 1183:15, 1192:16
**beyond** [1] - 1169:11
**biased** [3] - 1171:6, 1171:7, 1171:10
**big** [4] - 1164:19, 1166:10, 1197:22
**bit** [34] - 1124:25, 1130:16, 1131:15, 1131:25, 1132:18, 1134:12, 1135:17, 1137:19, 1139:19, 1145:23, 1148:13, 1148:15, 1150:23, 1154:20, 1157:10, 1163:11, 1165:20, 1166:1, 1166:5, 1166:14, 1167:5, 1167:24, 1172:15, 1176:5, 1177:12, 1181:5, 1183:7, 1187:4, 1187:13, 1190:22, 1190:25, 1192:4, 1194:13, 1201:2
**bits** [3] - 1128:22, 1177:11, 1198:8
**blank** [1] - 1147:24
**blog** [1] - 1200:2
**bloke** [1] - 1184:10
**Bloomberg** [9] - 1183:22, 1184:2, 1184:3, 1184:4, 1184:8, 1184:11, 1184:13, 1185:5, 1188:17
**blue** [1] - 1142:1
**blunt** [1] - 1131:13
**book** [1] - 1128:5
**boost** [1] - 1149:17
**boss** [9] - 1128:12, 1128:18, 1128:19, 1128:21, 1140:2, 1197:22
**bothered** [1] - 1146:22
**bottom** [11] - 1146:9, 1148:1, 1150:4, 1151:10, 1152:8, 1166:23, 1172:1, 1188:10, 1194:5, 1198:13, 1198:14
**bought** [1] - 1171:2
**bound** [1] - 1169:12
**Bradley** [1] - 1118:16
**branches** [1] - 1160:25
**break** [5] - 1121:23, 1121:25, 1122:4, 1199:9, 1199:20
**breaking** [3] - 1121:25, 1199:10, 1199:17
**breathed** [1] - 1144:3
**brief** [8] - 1139:16, 1170:4, 1170:7, 1189:21, 1189:25, 1190:7, 1192:3, 1198:23
**briefed** [1] - 1160:14
**briefing** [6] - 1172:12, 1174:2, 1180:14, 1189:2, 1189:6, 1196:9
**briefings** [3] - 1156:23, 1173:11, 1190:5
**briefly** [7] - 1123:6, 1123:16, 1123:17, 1143:3, 1147:5, 1176:1, 1200:13
**brilliant** [1] - 1132:3
**bring** [3] - 1121:15, 1157:1, 1180:11
**British** [1] - 1125:18
**broadcast** [2] - 1124:17, 1124:18
**broadcasting** [2] - 1123:12, 1123:23
**broader** [1] - 1161:9
**broken** [1] - 1173:23
**Brown** [4] - 1128:16, 1128:20, 1128:21, 1138:16
**Brussels** [3] - 1124:3, 1130:23, 1190:4
**bullet** [4] - 1157:11, 1158:9, 1158:16,

1159:1
**bumped** [1] - 1142:20
**burden** [1] - 1200:23
**Bureau** [2] - 1184:11, 1188:17
**business** [5] - 1125:20, 1125:21, 1128:25, 1167:19, 1167:21
**buying** [1] - 1165:6
**BY** [9] - 1122:12, 1139:11, 1142:6, 1155:5, 1159:8, 1162:13, 1175:9, 1179:25, 1186:2

## C

**calendar** [1] - 1121:22
**campaign** [1] - 1156:9
**Campoamor** [1] - 1118:12
**CAMPOAMOR** [24] - 1121:8, 1122:6, 1122:12, 1138:22, 1139:3, 1139:10, 1139:11, 1142:6, 1155:4, 1155:5, 1158:25, 1159:7, 1159:8, 1162:13, 1175:4, 1175:8, 1175:9, 1179:25, 1186:2, 1187:9, 1187:10, 1199:1, 1199:6, 1199:14
**Campoamor-Sanchez** [1] - 1118:12
**CAMPOAMOR-SANCHEZ** [24] - 1121:8, 1122:6, 1122:12, 1138:22, 1139:3, 1139:10, 1139:11, 1142:6, 1155:4, 1155:5, 1158:25, 1159:7, 1159:8, 1162:13, 1175:4, 1175:8, 1175:9, 1179:25, 1186:2, 1187:9, 1187:10, 1199:1, 1199:6, 1199:14
**cannot** [1] - 1157:12
**capital** [1] - 1144:24
**care** [1] - 1191:19
**carefully** [4] - 1138:17, 1138:19, 1139:1, 1196:7
**carried** [1] - 1144:3
**carry** [1] - 1144:1
**carryover** [1] - 1185:21
**Caryl** [1] - 1168:25
**Case** [1] - 1121:4
**case** [8] - 1121:20, 1121:22, 1130:15, 1134:5, 1144:25, 1156:24, 1157:19, 1174:11
**cases** [2] - 1156:25, 1165:3
**catch** [1] - 1141:7
**caused** [4] - 1144:14, 1145:12, 1183:6, 1194:19
**caution** [1] - 1199:24
**certain** [1] - 1190:2
**certainly** [3] - 1130:11, 1144:24, 1169:19
**CERTIFICATE** [1] - 1202:1
**certify** [1] - 1202:3
**chair** [2] - 1179:21, 1199:24
**challenge** [2] - 1139:17, 1163:20
**challenges** [3] - 1156:7, 1156:16, 1156:17
**chance** [2] - 1140:18, 1199:12
**change** [7] - 1149:9, 1161:25, 1162:1,

1162:6, 1174:24, 1175:10, 1198:10
**changed** [4] - 1166:7, 1175:14, 1180:9, 1189:11
**changes** [12] - 1146:4, 1148:24, 1150:3, 1150:7, 1150:9, 1151:15, 1151:17, 1155:14, 1187:17, 1191:2, 1191:3
**changing** [1] - 1151:20
**channel** [3] - 1123:23, 1124:1, 1124:3
**channeled** [1] - 1195:23
**channels** [1] - 1124:2
**characterize** [1] - 1141:5
**charge** [2] - 1135:4, 1165:7
**charging** [1] - 1125:19
**Charlie** [2] - 1172:21, 1172:22
**chase** [1] - 1154:23
**chat** [5] - 1132:19, 1132:21, 1190:21, 1191:16, 1193:17
**checked** [1] - 1196:7
**checks** [1] - 1127:20
**cheek** [1] - 1137:20
**Chief** [1] - 1184:11
**chip** [1] - 1181:15
**choose** [1] - 1148:7
**choosing** [1] - 1161:6
**chose** [1] - 1184:7
**Christian** [1] - 1168:25
**circuit** [1] - 1149:19
**City** [1] - 1150:17
**civil** [1] - 1125:5
**clause** [1] - 1125:5
**clear** [7] - 1128:9, 1132:8, 1174:5, 1186:16, 1190:13, 1191:12, 1199:12
**cleared** [1] - 1196:7
**CLERK** [1] - 1121:3
**client** [19] - 1124:24, 1126:19, 1126:20, 1126:24, 1128:15, 1131:4, 1132:12, 1132:13, 1134:13, 1143:6, 1152:22, 1152:23, 1164:4, 1167:22, 1169:22, 1172:16, 1172:22
**clients** [5] - 1125:4, 1125:11, 1127:20, 1157:24, 1157:25
**Cliff** [1] - 1149:16
**closed** [1] - 1188:18
**closer** [1] - 1176:9
**Club** [14] - 1177:22, 1178:2, 1178:13, 1184:1, 1186:19, 1190:17, 1191:5, 1193:6, 1193:10, 1193:23, 1196:2, 1196:24, 1197:13, 1198:20
**club** [2] - 1177:25, 1190:22
**collateral** [2] - 1154:8, 1154:9
**colleague** [2] - 1128:12, 1137:16
**colleagues** [12] - 1130:22, 1131:20, 1131:21, 1132:8, 1140:14, 1143:16, 1170:6, 1170:13, 1170:17, 1170:18, 1173:9, 1182:18
**color** [1] - 1189:18
**COLUMBIA** [2] - 1118:1, 1118:14
**comfort** [1] - 1199:9

**comfortable** [4] - 1136:2, 1137:1, 1181:18, 1192:11
**coming** [4] - 1169:16, 1169:24, 1181:12, 1185:17
**comment** [3] - 1148:18, 1181:13, 1189:15
**comments** [1] - 1198:18
**commissioned** [1] - 1157:16
**Commissioner** [1] - 1190:1
**committed** [2] - 1149:6, 1158:3
**common** [1] - 1132:21
**communicate** [4] - 1141:10, 1142:17, 1145:16, 1165:16
**communicated** [2] - 1141:6, 1145:18
**communicating** [1] - 1136:17
**communication** [1] - 1161:10
**Communication** [1] - 1163:18
**communications** [14] - 1142:15, 1145:21, 1157:11, 1158:18, 1159:3, 1159:13, 1159:25, 1162:20, 1164:13, 1180:6, 1182:7, 1195:23, 1195:24, 1196:6
**Communications** [1] - 1188:22
**community** [1] - 1159:18
**companies** [2] - 1125:9, 1125:12
**company** [2] - 1125:16, 1125:18, 1125:22, 1126:2, 1126:3, 1126:4, 1126:5, 1126:8, 1126:11, 1126:23, 1126:25, 1127:2
**company's** [1] - 1124:16
**complaint** [1] - 1199:3
**completely** [4] - 1131:13, 1164:4, 1171:9, 1174:8
**complex** [2] - 1125:1, 1139:16
**comply** [1] - 1163:22
**computer** [1] - 1119:6
**computer-aided** [1] - 1119:6
**concern** [2] - 1130:25, 1194:20
**concerned** [2] - 1175:24, 1195:2
**concerns** [7] - 1130:20, 1132:23, 1169:23, 1174:25, 1176:14, 1177:1, 1177:7
**conclude** [1] - 1158:2
**conduct** [2] - 1145:25, 1154:4
**conducting** [1] - 1173:11
**conference** [5] - 1177:21, 1172:24, 1173:3, 1183:15, 1183:17, 1183:19, 1198:23
**conferences** [1] - 1164:19
**confidential** [1] - 1137:13
**Confidential** [2] - 1128:14, 1137:10
**conflict** [2] - 1127:20, 1131:8
**congestion** [1] - 1125:19
**consider** [3] - 1126:6, 1146:4, 1164:25
**considerable** [1] - 1156:20
**consideration** [1] - 1180:6
**considered** [1] - 1167:7
**Constitution** [1] - 1119:4
**consultant** [6] - 1123:14, 1124:13,

1124:19, 1124:22, 1126:9, 1130:14
**consulting** [4] - 1128:23, 1135:10, 1167:19, 1167:21
**Consulting** [2] - 1125:23, 1127:2
**contact** [5] - 1141:14, 1153:1, 1153:5, 1168:8
**contacted** [2] - 1151:2, 1160:15
**contacting** [1] - 1167:21
**contain** [1] - 1158:10
**content** [1] - 1196:10
**contents** [1] - 1175:24
**context** [3] - 1173:1, 1183:5, 1195:1
**continue** [4] - 1143:15, 1143:16, 1188:25, 1199:21
**contract** [20] - 1134:11, 1134:14, 1134:17, 1135:14, 1135:16, 1135:21, 1135:22, 1136:6, 1137:11, 1142:25, 1143:4, 1143:8, 1143:11, 1143:14, 1143:17, 1144:4, 1154:24, 1168:4, 1170:5, 1170:6
**contracted** [2] - 1167:15, 1167:24
**contractual** [2] - 1135:4, 1135:11
**Control** [1] - 1181:11
**control** [6] - 1171:17, 1171:20, 1183:10, 1184:19, 1186:13, 1196:8
**controversial** [2] - 1125:19, 1160:19
**controversy** [2] - 1196:11, 1196:16
**conversation** [3] - 1140:14, 1140:22, 1151:13
**conversations** [1] - 1141:12
**converted** [1] - 1200:20
**convey** [2] - 1178:17, 1188:6
**conveyed** [1] - 1188:16
**conviction** [2] - 1155:24, 1187:22
**coordinating** [1] - 1135:11
**coordination** [3] - 1177:4, 1178:3, 1178:10
**copied** [3] - 1129:1, 1149:23, 1150:21
**copy** [3] - 1129:2, 1176:16, 1180:11
**copying** [2] - 1152:9, 1163:6
**corner** [1] - 1142:1
**correct** [3] - 1146:11, 1163:4, 1202:4
**corrections** [1] - 1198:18
**correctly** [1] - 1187:24
**counsel** [3] - 1137:3, 1149:15, 1198:23
**count** [1] - 1165:4
**countering** [1] - 1156:9
**country** [9] - 1134:3, 1138:15, 1144:23, 1144:24, 1145:15, 1149:18, 1176:8, 1182:8, 1182:11
**country's** [1] - 1134:6
**couple** [2] - 1143:20, 1182:17
**course** [3] - 1123:11, 1125:6, 1196:5
**COURT** [38] - 1118:1, 1121:6, 1121:9, 1121:13, 1121:15, 1121:17, 1138:21, 1138:25, 1139:6, 1139:9, 1141:21, 1142:2, 1155:2, 1159:2, 1159:6, 1162:6, 1162:10, 1162:12, 1175:6, 1179:20, 1185:21, 1185:24, 1187:6,

1198:22, 1198:25, 1199:5, 1199:10, 1199:16, 1200:10, 1200:15, 1200:25, 1201:2, 1201:9, 1201:14, 1201:18, 1201:21, 1201:24, 1202:1
**court** [4] - 1158:24, 1169:18, 1187:22, 1199:15
**Court** [3] - 1119:3, 1139:5, 1200:16
**Court's** [1] - 1200:24
**Courthouse** [1] - 1119:3
**courtroom** [4] - 1125:7, 1125:8, 1141:15, 1199:13
**cover** [2] - 1147:5, 1181:20
**coverage** [3] - 1157:3, 1187:16, 1189:8
**covered** [2] - 1158:8, 1180:14
**covering** [2] - 1124:8, 1199:3
**Cowie** [5] - 1127:10, 1128:10, 1129:5, 1133:8, 1142:22
**CRAIG** [1] - 1118:5
**Craig** [49] - 1121:5, 1139:25, 1140:6, 1140:16, 1140:23, 1141:6, 1141:15, 1142:16, 1145:16, 1148:18, 1148:24, 1149:9, 1150:1, 1150:5, 1150:9, 1150:13, 1150:15, 1152:9, 1153:7, 1153:14, 1172:23, 1173:11, 1174:6, 1175:1, 1175:12, 1177:14, 1180:4, 1185:9, 1185:14, 1186:14, 1186:17, 1189:2, 1189:16, 1189:21, 1189:25, 1190:14, 1191:6, 1192:9, 1192:24, 1193:5, 1194:5, 1194:17, 1195:5, 1195:9, 1196:1, 1197:12, 1198:3, 1199:4
**Craig's** [2] - 1139:12, 1148:22, 1189:17, 1192:17
**create** [2] - 1147:12, 1160:10
**created** [2] - 1163:10, 1166:19
**creating** [1] - 1126:15
**credentials** [2] - 1132:15, 1132:20
**crime** [2] - 1149:6, 1158:3
**Criminal** [2] - 1118:4, 1121:4
**crisis** [6] - 1124:19, 1124:22, 1124:23, 1124:24, 1125:21, 1126:11
**crisper** [1] - 1175:6
**critical** [2] - 1147:18, 1152:12
**criticism** [8] - 1154:10, 1156:8, 1158:10, 1158:11, 1160:20, 1161:11, 1164:16, 1188:5
**criticisms** [3] - 1156:18, 1157:2, 1157:6
**criticized** [1] - 1178:21
**crops** [1] - 1184:7
**CROSS** [1] - 1120:4
**cross** [1] - 1200:20
**cross-examination** [1] - 1200:20
**CRR** [1] - 1119:3
**cut** [2] - 1187:4, 1187:13
**cut-and-paste** [2] - 1187:4, 1187:13
**cutting** [1] - 1136:5

# D

**D.C** [2] - 1118:6, 1119:4
**d1** [1] - 1171:17
**dark** [1] - 1142:1
**date** [6] - 1129:9, 1162:22, 1162:23, 1163:2, 1166:7, 1174:1
**DATE** [1] - 1202:9
**dated** [2] - 1156:19, 1179:9
**Davis** [5] - 1126:23, 1135:6, 1142:11, 1176:20, 1183:16
**DAY** [1] - 1118:5
**days** [2] - 1124:2, 1144:8
**DC** [3] - 1118:15, 1118:17, 1118:25
**deal** [5] - 1124:18, 1141:11, 1158:23, 1164:21, 1190:18
**dealing** [2] - 1166:13, 1194:12
**dear** [1] - 1180:5
**December** [1] - 1161:19
**decide** [1] - 1130:14
**decision** [1] - 1138:12
**defendant** [4] - 1141:22, 1152:2, 1179:5, 1194:2
**Defendant** [2] - 1118:6, 1118:19
**defense** [2] - 1121:9, 1149:15
**definitely** [1] - 1180:2
**definition** [1] - 1189:9
**deformed** [1] - 1160:25
**delay** [1] - 1179:14
**delete** [1] - 1149:6
**deliverable** [1] - 1182:3
**delivered** [2] - 1155:1, 1181:1
**demand** [1] - 1155:23
**denotes** [1] - 1186:9
**depart** [1] - 1199:25
**DEPARTMENT** [1] - 1118:16
**department** [1] - 1164:13
**Department** [9] - 1142:14, 1143:9, 1147:1, 1156:22, 1156:23, 1157:17, 1157:18, 1180:13, 1183:2
**departments** [1] - 1177:4, 1182:9
**deploy** [1] - 1174:17
**DEPUTY** [1] - 1121:3
**Deputy** [6] - 1132:14, 1132:22, 1133:1, 1134:1, 1134:7, 1138:13
**der** [17] - 1133:3, 1136:10, 1142:22, 1145:19, 1146:10, 1148:8, 1152:9, 1152:13, 1152:17, 1157:21, 1158:21, 1158:22, 1159:4, 1193:14, 1196:19, 1196:22, 1197:2
**describe** [1] - 1132:10
**described** [1] - 1164:1
**describing** [2] - 1129:5, 1179:5
**designated** [1] - 1188:20
**desire** [1] - 1158:18
**desired** [1] - 1164:8
**despite** [1] - 1131:11
**detail** [1] - 1190:18
**developed** [1] - 1164:3

**developing** [1] - 1153:19
**difference** [2] - 1124:23, 1147:9
**different** [11] - 1128:22, 1152:23, 1157:24, 1157:25, 1160:8, 1161:1, 1161:5, 1163:1, 1178:18, 1178:19, 1180:17
**differentiate** [1] - 1142:2
**difficult** [3] - 1124:25, 1160:7, 1168:3
**difficulties** [1] - 1145:22
**difficulty** [1] - 1183:6
**diploma** [1] - 1123:21
**diplomacy** [1] - 1124:9
**diplomats** [2] - 1134:6, 1190:2
**direct** [10] - 1126:13, 1129:21, 1153:1, 1187:6, 1198:25, 1199:6, 1199:20, 1200:19, 1200:20, 1201:7
**DIRECT** [2] - 1120:4, 1122:11
**direction** [3] - 1139:6, 1139:7, 1195:20
**directly** [2] - 1141:6, 1141:10
**disappeared** [1] - 1131:2
**disaster** [1] - 1171:4
**disclosure** [1] - 1158:19
**discuss** [7] - 1121:10, 1140:19, 1143:12, 1177:13, 1189:20, 1200:1, 1200:2
**discussed** [13] - 1133:25, 1138:16, 1146:20, 1166:16, 1167:12, 1174:6, 1174:14, 1185:2, 1190:13, 1191:4, 1191:5, 1196:23, 1197:9
**discussing** [2] - 1138:22, 1180:7
**discussion** [9] - 1132:14, 1135:8, 1164:6, 1176:22, 1180:24, 1181:6, 1185:19, 1191:2, 1194:9
**discussions** [4] - 1121:19, 1135:2, 1158:6, 1186:20
**distinct** [1] - 1189:15
**distinction** [2] - 1192:7, 1192:16
**DISTRICT** [4] - 1118:1, 1118:1, 1118:10, 1118:14
**divide** [1] - 1131:7
**doc** [2] - 1154:23, 1154:25
**document** [18] - 1131:2, 1163:10, 1163:16, 1163:17, 1163:18, 1165:25, 1167:3, 1171:18, 1174:3, 1177:5, 1178:15, 1180:9, 1181:4, 1181:6, 1185:19, 1186:16, 1189:20, 1190:7
**documents** [9] - 1163:12, 1165:19, 1178:12, 1179:4, 1180:18, 1181:12, 1186:18, 1198:5, 1198:17
**dollars** [1] - 1144:8
**domain** [1] - 1154:6
**domestic** [1] - 1124:6
**done** [9] - 1134:25, 1135:1, 1150:23, 1166:3, 1181:5, 1181:9, 1192:22, 1193:3
**doubt** [1] - 1201:11
**down** [10] - 1131:5, 1131:25, 1135:25, 1157:10, 1173:23, 1177:7, 1178:20, 1183:25, 1186:7, 1188:18
**downed** [1] - 1143:19

**downturn** [1] - 1131:15
**draft** [13] - 1147:13, 1148:25, 1154:14, 1154:23, 1155:10, 1155:12, 1155:15, 1156:13, 1161:19, 1165:19, 1175:21, 1176:6, 1180:6
**drafted** [3] - 1147:21, 1149:21, 1151:18
**drawn** [2] - 1196:11, 1196:16
**drop** [1] - 1131:25
**due** [1] - 1166:6
**duly** [1] - 1122:9
**during** [3] - 1129:19, 1141:5, 1156:23
**Dynamics** [1] - 1125:22

# E

**e-mail** [34] - 1127:18, 1127:21, 1128:7, 1128:9, 1128:11, 1128:14, 1129:9, 1129:20, 1133:19, 1134:21, 1138:4, 1146:9, 1146:18, 1149:23, 1150:12, 1150:22, 1151:11, 1152:8, 1153:6, 1154:22, 1162:17, 1171:13, 1171:15, 1177:6, 1177:10, 1179:9, 1194:5, 1194:17, 1195:8, 1195:13, 1195:17, 1197:15, 1198:3, 1198:13
**e-mailing** [1] - 1194:6
**eager** [1] - 1196:20
**early** [3] - 1142:12, 1182:22, 1192:21
**East** [2] - 1118:20, 1131:7
**East-West** [1] - 1131:7
**Eastern** [2] - 1128:13, 1129:1
**economic** [1] - 1131:15
**Ed** [4] - 1128:19, 1133:22, 1133:25, 1140:1
**edits** [3] - 1151:12, 1153:12
**educational** [1] - 1123:7
**effective** [1] - 1156:9
**effectively** [2] - 1135:18, 1189:8
**efficiently** [1] - 1200:7
**eight** [1] - 1173:24
**eighth** [2] - 1173:25, 1174:1
**either** [3] - 1140:10, 1190:13, 1199:2
**electronically** [1] - 1200:3
**elements** [1] - 1178:19
**elsewhere** [1] - 1174:4
**embargo** [3] - 1160:15, 1173:12, 1174:1
**embargoed** [1] - 1167:9
**emergency** [4] - 1144:17, 1145:17, 1145:23, 1146:19
**employment** [1] - 1126:7
**empty** [1] - 1142:19
**encapsulate** [1] - 1180:23
**encountered** [1] - 1143:3
**end** [11] - 1121:13, 1131:2, 1131:3, 1142:4, 1144:14, 1153:2, 1154:16, 1161:25, 1192:20, 1198:16, 1199:5
**ended** [1] - 1143:13
**endorsement** [4] - 1154:7, 1187:17, 1187:20, 1193:4

**ends** [1] - 1148:2
**engage** [4] - 1170:6, 1190:10, 1191:14, 1191:20
**engaged** [1] - 1188:19
**engagement** [6] - 1138:17, 1138:18, 1139:2, 1167:14, 1171:22, 1183:22
**engaging** [2] - 1173:12, 1192:11
**England** [7] - 1122:23, 1125:4, 1128:19, 1131:14, 1132:2, 1143:20, 1160:22
**enormous** [2] - 1197:8, 1200:23
**enormously** [1] - 1140:2
**ensure** [2] - 1164:7, 1188:14
**entail** [2] - 1132:11, 1167:10
**entire** [1] - 1183:25
**entirely** [1] - 1132:8
**entirety** [1] - 1147:21
**entities** [1] - 1125:9
**entitled** [1] - 1202:5
**entity** [1] - 1134:17
**entry** [4] - 1168:14, 1185:24, 1186:3, 1186:4
**environmental** [1] - 1125:3
**envisage** [1] - 1188:9
**envisaged** [1] - 1160:24
**envisioned** [1] - 1189:16
**envisioning** [2] - 1175:10, 1183:13
**equally** [1] - 1156:7
**Eric** [3] - 1137:1, 1137:2, 1137:3
**Esq** [4] - 1118:19, 1118:19, 1118:22, 1118:23
**essentially** [2] - 1138:25, 1189:9
**etc** [5] - 1130:9, 1145:14, 1146:5, 1158:11
**Europe** [12] - 1124:7, 1128:13, 1128:22, 1129:1, 1130:4, 1132:2, 1134:4, 1136:20, 1159:18, 1176:9, 1193:9, 1193:10
**European** [7] - 1124:4, 1145:6, 1156:4, 1159:16, 1159:18, 1159:20, 1170:4
**European/U.S** [1] - 1163:20
**evasion** [1] - 1164:10
**eve** [1] - 1186:19
**evening** [5] - 1154:24, 1195:8, 1199:24, 1200:3, 1200:8
**events** [1] - 1163:19
**eventually** [1] - 1144:2
**everywhere** [1] - 1184:7
**evidence** [13] - 1128:3, 1133:17, 1137:25, 1146:7, 1151:8, 1152:7, 1154:19, 1162:15, 1171:12, 1179:8, 1187:22, 1188:15, 1198:15
**evident** [1] - 1196:5
**exact** [2] - 1122:21, 1166:7
**exactly** [4] - 1159:5, 1174:3, 1187:15, 1201:4
**examination** [1] - 1200:20
**EXAMINATION** [1] - 1122:11

examined [1] - 1122:9
example [1] - 1133:13
exclusive [3] - 1161:9, 1185:7, 1189:7
excused [1] - 1201:24
execute [1] - 1174:22
executed [1] - 1162:2
executive [1] - 1176:2
exhibit [12] - 1146:8, 1155:3, 1160:11, 1163:9, 1165:14, 1166:22, 1166:23, 1172:17, 1173:21, 1180:21, 1183:11, 1189:23
Exhibit [14] - 1128:2, 1133:16, 1137:24, 1146:6, 1150:25, 1151:7, 1152:6, 1154:18, 1162:14, 1171:11, 1179:7, 1194:4, 1195:11, 1198:13
exhibits [2] - 1120:9, 1128:6
existing [1] - 1170:11
expand [3] - 1170:7, 1173:6, 1174:10
expanded [2] - 1147:20, 1151:10
expect [1] - 1154:25
expected [3] - 1132:21, 1158:7, 1175:11
expecting [2] - 1156:16, 1166:8
expenses [1] - 1144:7, 1144:10
experience [6] - 1123:17, 1124:11, 1124:13, 1124:14, 1142:25, 1149:16
experienced [2] - 1149:15
expert [1] - 1128:25
explain [8] - 1142:7, 1145:3, 1153:25, 1158:25, 1160:8, 1163:17, 1168:1, 1195:1
explained [3] - 1127:22, 1193:17, 1195:5
exploited [1] - 1158:11
extensive [1] - 1198:9
extremely [1] - 1156:9

**F**

faced [1] - 1154:10
fact [8] - 1139:24, 1141:12, 1143:19, 1150:20, 1151:2, 1152:3, 1167:25, 1196:1
facts [2] - 1134:5, 1189:18
fair [1] - 1187:3
fall [1] - 1129:24
far [5] - 1127:3, 1141:14, 1161:21, 1179:21, 1195:1
FARA [7] - 1136:19, 1158:18, 1158:22, 1169:21, 1169:23, 1170:2, 1174:25
favorite [1] - 1165:5
fees [5] - 1144:2, 1144:6, 1144:10, 1182:21, 1182:22
Fernando [1] - 1118:12
few [10] - 1132:7, 1146:4, 1155:14, 1160:25, 1176:4, 1177:9, 1177:10, 1185:9, 1191:3, 1194:12
fight [1] - 1188:4
figure [1] - 1200:22
final [3] - 1148:15, 1152:12, 1153:12

finalization [1] - 1183:19
finalized [2] - 1157:12, 1181:2
finally [4] - 1125:9, 1136:15, 1158:16, 1173:21
financial [2] - 1131:24, 1159:22
Financial [1] - 1125:22
fine [1] - 1199:14
finish [1] - 1199:11
finished [1] - 1178:9
firm [10] - 1130:20, 1135:10, 1137:6, 1145:13, 1151:21, 1154:6, 1155:21, 1167:18, 1196:7, 1196:15
firms [2] - 1125:13, 1148:4
first [36] - 1122:1, 1123:20, 1125:16, 1127:6, 1129:3, 1130:2, 1131:1, 1133:17, 1133:18, 1138:1, 1139:15, 1140:18, 1146:9, 1149:3, 1149:6, 1152:15, 1154:14, 1155:9, 1155:10, 1155:12, 1155:18, 1156:11, 1158:20, 1160:12, 1163:10, 1163:15, 1163:16, 1167:19, 1171:18, 1176:15, 1179:9, 1180:20, 1183:10, 1183:13, 1184:24, 1186:24
firsthand [1] - 1141:3
firstly [3] - 1157:18, 1170:2, 1184:3
fish [1] - 1182:24
FIT [1] - 1167:14
five [2] - 1124:2, 1199:20
FleishmanHillard [2] - 1125:17
fluent [2] - 1152:21, 1197:4
focus [2] - 1133:17, 1160:11
focusing [2] - 1124:6, 1191:22
folks [3] - 1151:2, 1193:8, 1194:1
follow [1] - 1161:15
following [3] - 1135:25, 1147:4, 1157:14
follows [1] - 1122:10
font [1] - 1186:4
FOR [2] - 1118:1, 1118:13
foregoing [1] - 1202:4
Foreign [2] - 1129:24, 1180:12
foreign [2] - 1130:6, 1168:15
forensic [1] - 1128:23
foresaw [3] - 1181:16, 1182:17, 1182:18
forgot [1] - 1144:4
form [2] - 1141:4, 1190:21
formally [1] - 1160:15
format [1] - 1174:10
formed [1] - 1186:20
former [2] - 1134:2, 1138:14
forth [1] - 1143:25
forthcoming [1] - 1143:21
forward [2] - 1177:12, 1180:7
forwarding [1] - 1146:10
foul [1] - 1129:24
foundation [2] - 1124:14, 1138:20
four [2] - 1124:2, 1150:9
Fourth [1] - 1118:14

fourth [1] - 1158:9
frankly [4] - 1157:4, 1168:3, 1182:19, 1191:19
fraud [2] - 1134:3, 1138:15
free [2] - 1164:4, 1174:9
French [1] - 1123:10
frenzied [1] - 1194:13
frequent [1] - 1156:22
fresh [1] - 1155:23
Friday [3] - 1121:21, 1166:24, 1201:16
front [1] - 1128:5
FTI [27] - 1125:23, 1127:2, 1127:11, 1128:19, 1128:20, 1128:23, 1130:25, 1134:10, 1137:3, 1137:21, 1139:13, 1140:19, 1143:16, 1144:5, 1144:6, 1159:14, 1167:17, 1167:18, 1169:8, 1169:13, 1169:14, 1169:15, 1170:13, 1172:21, 1173:8, 1173:9, 1183:16
FTI's [1] - 1128:13
fun [1] - 1137:19
function [1] - 1164:7
future [1] - 1165:1

**G**

gain [2] - 1141:3, 1175:20
Gaston [1] - 1118:13
gates [5] - 1143:21, 1163:5, 1171:15, 1175:15, 1175:19
Gates [21] - 1133:6, 1135:8, 1135:21, 1142:10, 1143:7, 1153:24, 1161:23, 1164:4, 1166:2, 1167:5, 1168:7, 1168:18, 1168:20, 1170:5, 1170:11, 1174:21, 1176:15, 1184:9, 1185:4, 1191:13
GC [6] - 1172:23, 1173:8, 1173:11, 1189:2, 1189:13, 1190:7
GC/SKA [2] - 1184:24, 1185:12
general [2] - 1132:18, 1137:3
General [19] - 1126:21, 1132:13, 1132:14, 1132:22, 1133:1, 1134:1, 1134:8, 1138:10, 1138:13, 1141:2, 1146:3, 1147:16, 1151:23, 1152:24, 1158:7, 1158:15, 1164:12, 1180:13
General's [12] - 1135:14, 1135:17, 1135:19, 1142:14, 1143:8, 1148:16, 1149:17, 1156:22, 1157:17, 1157:18, 1173:10, 1183:2
generally [2] - 1134:7, 1134:9
gentlemen [9] - 1123:7, 1127:5, 1129:7, 1144:20, 1153:25, 1155:19, 1180:3, 1188:12, 1195:18
German [1] - 1123:10
given [8] - 1157:6, 1158:18, 1161:8, 1164:4, 1167:25, 1168:3, 1189:1, 1197:6
glad [1] - 1192:19
Glasser [1] - 1168:25
global [1] - 1128:20
globally [1] - 1133:24

**goal** [1] - 1200:6
**goals** [1] - 1169:6
**god** [1] - 1170:14
**Google** [1] - 1146:22
**Government** [1] - 1118:12
**government** [19] - 1122:7, 1126:19, 1127:23, 1129:13, 1130:5, 1130:16, 1139:16, 1154:10, 1155:22, 1157:25, 1158:10, 1182:9, 1183:1, 1187:20, 1188:14, 1193:4, 1194:14, 1197:7, 1201:14
**government's** [4] - 1154:8, 1156:10, 1171:11, 1187:18
**Government's** [14] - 1128:2, 1128:9, 1133:16, 1137:24, 1146:6, 1150:25, 1151:7, 1152:6, 1154:18, 1179:7, 1194:4, 1195:11, 1198:12, 1198:14
**graduated** [1] - 1123:19
**graduating** [1] - 1123:21
**grateful** [1] - 1180:10
**great** [6] - 1124:17, 1141:11, 1158:23, 1190:18, 1190:20, 1193:5
**greedy** [2] - 1167:5, 1168:7
**Greg** [40] - 1139:25, 1140:16, 1140:24, 1141:20, 1141:25, 1146:4, 1146:22, 1149:6, 1151:13, 1153:11, 1157:3, 1169:10, 1169:11, 1172:23, 1173:11, 1174:7, 1174:13, 1174:15, 1177:24, 1178:6, 1180:25, 1182:1, 1182:19, 1185:3, 1185:9, 1185:14, 1185:20, 1189:2, 1189:25, 1190:20, 1191:14, 1192:4, 1192:10, 1192:12, 1192:15, 1193:5, 1197:10, 1198:19
**Greg's** [2] - 1178:10, 1181:21
**Gregory** [1] - 1121:5
**GREGORY** [1] - 1118:5
**grey** [1] - 1142:1
**grid** [4] - 1171:20, 1183:10, 1184:19, 1186:13
**Grid** [1] - 1181:11
**grief** [1] - 1144:14
**ground** [1] - 1172:14
**group's** [1] - 1153:13
**grows** [1] - 1160:24
**guess** [6] - 1123:3, 1126:24, 1154:17, 1158:5, 1171:8, 1196:21
**guidance** [2] - 1192:4, 1200:16
**Gulland** [1] - 1118:13

## H

**H-A-W-K-E-R** [1] - 1122:18
**half** [5] - 1130:6, 1152:22, 1163:16, 1186:24, 1199:7
**hand** [3] - 1154:25, 1164:5, 1174:9
**handling** [2] - 1183:7, 1193:18
**happy** [6] - 1136:14, 1139:5, 1150:7, 1150:8, 1181:15, 1185:20
**hard** [4] - 1160:4, 1161:12, 1170:5, 1180:11

**Harvard** [17] - 1177:22, 1177:24, 1178:1, 1178:13, 1184:1, 1186:19, 1190:17, 1190:23, 1191:5, 1193:6, 1193:10, 1193:23, 1196:2, 1196:23, 1197:13, 1198:6, 1198:20
**Haskell** [3] - 1200:18, 1200:19
**HAWKER** [2] - 1120:5, 1122:8
**Hawker** [10] - 1122:7, 1122:17, 1122:19, 1138:24, 1142:7, 1154:13, 1174:5, 1199:21, 1200:10, 1201:8
**head** [5] - 1124:16, 1128:18, 1128:20, 1133:24, 1188:17
**headed** [1] - 1143:19
**heading** [1] - 1148:11
**headquarters** [1] - 1124:4
**hear** [6] - 1134:23, 1145:11, 1178:6, 1179:17, 1182:1, 1199:21
**heard** [4] - 1140:15, 1140:16, 1181:25
**help** [10] - 1125:6, 1156:3, 1159:15, 1159:19, 1163:24, 1164:6, 1169:18, 1169:19, 1196:20
**helping** [3] - 1125:4, 1154:9, 1169:16
**heroine** [1] - 1145:7
**hit** [1] - 1172:14
**holding** [1] - 1178:22
**home** [1] - 1123:24
**honest** [7] - 1140:15, 1146:12, 1160:5, 1164:21, 1166:2, 1183:7, 1192:18
**Honor** [14] - 1121:3, 1121:8, 1122:6, 1139:10, 1141:24, 1158:24, 1162:8, 1175:3, 1179:17, 1179:22, 1186:1, 1187:5, 1199:8, 1201:23
**HONORABLE** [1] - 1118:9
**hope** [4] - 1160:23, 1189:25, 1190:9, 1197:9
**hoped** [2] - 1164:2, 1190:11
**hopefully** [2] - 1154:7, 1172:14
**hopes** [1] - 1174:17
**hoping** [3] - 1185:18, 1185:20, 1199:1
**hotel** [3] - 1142:18, 1142:19, 1143:22
**hour** [1] - 1199:7
**hours** [5] - 1164:19, 1164:20, 1183:14, 1183:21
**house** [1] - 1137:3
**huge** [3] - 1139:17, 1144:3, 1167:6
**hugely** [1] - 1144:14
**Human** [2] - 1190:1, 1191:21
**human** [1] - 1193:3
**hundred** [2] - 1144:7, 1144:8
**hurdles** [1] - 1160:10
**hypothetical** [2] - 1164:2, 1174:19

## I

**i.e** [1] - 1185:6
**idea** [4] - 1123:7, 1185:2, 1185:3, 1196:22
**III** [1] - 1118:22
**immediate** [1] - 1128:11
**immediately** [1] - 1145:12

**imminently** [1] - 1166:6
**impact** [3] - 1159:25, 1164:8, 1197:8
**implementing** [1] - 1126:15
**important** [8] - 1139:20, 1147:2, 1157:17, 1159:11, 1170:23, 1192:23, 1192:25, 1198:21
**in-house** [1] - 1137:3
**inability** [1] - 1160:1
**inclination** [1] - 1172:15
**include** [5] - 1130:1, 1147:5, 1151:17, 1166:18, 1182:14
**included** [3] - 1147:6, 1148:22, 1180:18
**including** [2] - 1138:5, 1165:5
**incorporate** [2] - 1150:9, 1191:3
**incorrect** [1] - 1136:21
**incorrectly** [1] - 1181:9
**independence** [3] - 1170:23, 1182:19, 1182:20
**independent** [13] - 1124:1, 1124:3, 1140:24, 1141:3, 1145:10, 1146:1, 1154:4, 1154:7, 1157:4, 1157:5, 1187:17, 1187:19, 1196:14
**individual** [1] - 1196:8
**industrial** [1] - 1125:1
**industry** [1] - 1131:5
**inevitable** [1] - 1146:21
**inform** [1] - 1133:13
**information** [6] - 1127:14, 1133:10, 1156:24, 1158:20, 1161:8, 1168:17
**informed** [2] - 1133:15, 1152:3
**initial** [2] - 1132:4, 1151:12
**initials** [1] - 1185:12
**input** [1] - 1174:15
**inquiries** [3] - 1147:10, 1169:3, 1169:7, 1193:19
**inquiry** [3] - 1124:25, 1146:1
**inside** [2] - 1125:7, 1195:22
**insight** [1] - 1132:18
**instead** [1] - 1152:17
**institution** [1] - 1195:22
**instructed** [1] - 1176:19
**instructions** [8] - 1126:23, 1142:8, 1142:10, 1142:13, 1150:23, 1161:23, 1164:3, 1175:19
**integrity** [1] - 1196:15
**intention** [2] - 1122:4, 1189:7
**interaction** [3] - 1143:6, 1158:14, 1160:9
**interactions** [1] - 1156:22
**interest** [1] - 1161:7
**interested** [1] - 1127:13
**interesting** [5] - 1139:16, 1139:18, 1140:17, 1190:23
**interim** [1] - 1121:20
**internally** [1] - 1130:25
**international** [6] - 1124:8, 1149:5, 1160:13, 1163:20, 1163:22, 1170:20
**interpreting** [1] - 1123:10

**interviewing** [3] - 1144:25, 1166:11
**interviews** [4] - 1140:12, 1141:3, 1145:10, 1145:13
**involved** [6] - 1126:15, 1144:25, 1153:16, 1170:9, 1175:1, 1196:9
**involves** [1] - 1146:25
**ironclad** [1] - 1195:22
**issue** [7] - 1125:1, 1125:3, 1147:3, 1160:19, 1182:21, 1195:5, 1195:20
**issues** [4] - 1127:11, 1178:11, 1182:17, 1184:5
**item** [4] - 1149:12, 1163:24, 1164:9, 1184:17
**items** [3] - 1163:23, 1186:13, 1186:14
**iterations** [1] - 1187:15
**ITV** [1] - 1124:3

## J

**JACKSON** [1] - 1118:9
**James** [1] - 1118:19
**Jason** [1] - 1118:16
**Jencks** [1] - 1200:17
**job** [9] - 1130:22, 1131:9, 1131:11, 1137:14, 1137:15, 1143:14, 1161:12, 1170:24, 1196:14
**John** [1] - 1128:18
**join** [1] - 1151:24
**joke** [3] - 1165:20, 1194:10, 1194:11
**jokes** [1] - 1194:13
**Jon** [6] - 1128:24, 1128:25, 1137:16, 1154:22, 1155:13, 1162:17
**JONATHAN** [3] - 1120:5, 1122:8, 1122:17
**Jonathan** [4] - 1122:7, 1122:17, 1151:11, 1153:12
**journalism** [2] - 1123:11, 1123:22
**journalist** [29] - 1123:15, 1123:18, 1123:22, 1124:5, 1124:6, 1124:14, 1124:15, 1124:25, 1147:11, 1160:23, 1161:6, 1161:12, 1164:15, 1167:20, 1168:24, 1176:11, 1182:24, 1184:1, 1184:2, 1184:14, 1185:6, 1185:20, 1188:19, 1189:2, 1189:18, 1191:16, 1192:3, 1192:20
**journalists** [22] - 1160:14, 1161:11, 1162:9, 1164:21, 1167:10, 1169:12, 1169:24, 1172:13, 1190:5, 1191:22, 1191:23, 1192:24, 1194:15, 1195:3, 1195:21, 1196:2, 1196:9, 1196:17, 1196:19, 1196:23, 1197:3, 1197:11
**judge** [2] - 1145:1, 1178:21
**JUDGE** [1] - 1118:10
**July** [4] - 1153:3, 1162:17, 1163:3, 1165:24
**jumping** [1] - 1131:5
**June** [4] - 1140:10, 1154:16, 1156:19, 1161:18
**Junghans** [1] - 1118:23
**jurisdictions** [1] - 1171:25

**Jury** [2] - 1121:16, 1200:9
**JURY** [2] - 1118:5, 1118:9
**jury** [11] - 1121:17, 1123:7, 1127:6, 1129:8, 1144:20, 1154:1, 1155:19, 1180:3, 1188:13, 1195:18, 1200:4
**Justice** [6] - 1126:22, 1145:24, 1147:1, 1147:4, 1147:14, 1147:22, 1149:10, 1149:21, 1152:23, 1153:1, 1157:16, 1157:20, 1157:22, 1160:16, 1167:23, 1180:14
**JUSTICE** [1] - 1118:16

## K

**Kaneshiro** [2] - 1202:3, 1202:8
**KANESHIRO** [2] - 1119:3, 1202:9
**Kaneshiro-Miller** [2] - 1202:3, 1202:8
**KANESHIRO-MILLER** [2] - 1119:3, 1202:9
**keep** [3] - 1140:25, 1174:20, 1200:6
**kept** [1] - 1143:22
**key** [3] - 1139:24, 1163:19, 1189:25
**Kharkiv** [1] - 1165:12
**Kilimnik** [1] - 1176:20
**kill** [1] - 1171:10
**kind** [6] - 1131:1, 1139:22, 1145:5, 1158:5, 1158:7, 1196:8
**KK** [1] - 1176:19
**known** [3] - 1126:16, 1140:1, 1193:2
**knows** [2] - 1171:23, 1174:11
**Konstantin** [1] - 1176:19
**Kyiv** [6] - 1143:22, 1144:25, 1165:11, 1173:8, 1173:9, 1190:3

## L

**lack** [1] - 1160:8
**ladies** [9] - 1123:6, 1127:5, 1129:7, 1144:20, 1153:25, 1155:18, 1180:3, 1188:12, 1195:18
**laid** [1] - 1164:5
**language** [3] - 1136:7, 1136:9, 1187:2
**languages** [2] - 1123:9, 1124:8
**laptop** [1] - 1180:11
**large** [2] - 1127:3, 1186:5
**last** [5] - 1129:21, 1136:15, 1136:25, 1158:16, 1179:17
**late** [4] - 1179:14, 1179:23, 1183:8, 1197:15
**Latin** [1] - 1137:18
**launch** [1] - 1125:18
**Lauren** [1] - 1150:17, 1151:4, 1151:11, 1153:6
**law** [6] - 1145:13, 1148:4, 1154:6, 1155:21, 1167:18, 1196:15
**Law** [1] - 1177:24
**lawyer** [7] - 1127:8, 1137:4, 1137:6, 1145:4, 1145:9, 1149:16, 1193:1
**lawyers** [8] - 1144:22, 1145:1, 1145:2, 1169:22, 1183:4, 1195:20, 1196:8,

1196:11
**lead** [4] - 1158:17, 1159:12, 1159:25, 1174:25
**leader** [1] - 1139:25
**leading** [4] - 1149:16, 1175:3, 1187:5, 1190:5
**leak** [3] - 1172:3, 1172:8, 1188:16
**leaked** [1] - 1145:14
**leaking** [1] - 1161:4
**lean** [1] - 1179:20
**learn** [4] - 1127:6, 1132:5, 1132:11, 1133:2
**learned** [3] - 1133:10, 1133:12, 1134:7
**least** [4] - 1155:1, 1175:21, 1192:24, 1199:20
**leave** [1] - 1199:23
**Lee** [1] - 1168:22
**left** [5] - 1125:17, 1129:4, 1147:24, 1199:7, 1199:18
**legal** [4] - 1124:9, 1139:25, 1157:20, 1193:1
**level** [1] - 1128:25
**life** [1] - 1160:7
**likely** [4] - 1134:18, 1156:8, 1156:17, 1178:21
**limited** [1] - 1126:8
**line** [17] - 1128:15, 1135:25, 1137:10, 1172:1, 1172:17, 1172:19, 1173:5, 1173:7, 1173:18, 1183:13, 1183:21, 1184:22, 1185:21, 1186:6, 1186:9
**lines** [2] - 1147:4, 1183:12
**list** [4] - 1163:22, 1167:6, 1168:8, 1180:17
**listed** [1] - 1190:6
**listing** [1] - 1182:16
**literally** [1] - 1164:14
**litigation** [15] - 1124:19, 1124:21, 1125:4, 1125:5, 1125:7, 1125:21, 1126:11, 1127:24, 1127:25, 1128:23, 1129:13, 1129:16, 1131:25, 1134:4, 1139:21
**live** [2] - 1122:21, 1122:23
**living** [1] - 1123:13
**LLP** [2] - 1118:20, 1118:23
**loads** [3] - 1164:18, 1170:18
**logical** [2] - 1199:10, 1199:17
**logistical** [1] - 1181:16
**London** [2] - 1122:23, 1125:19, 1127:10, 1184:4
**look** [43] - 1128:2, 1133:16, 1137:24, 1137:25, 1146:6, 1146:9, 1146:17, 1151:7, 1154:21, 1155:9, 1157:10, 1161:2, 1162:16, 1163:8, 1163:12, 1163:15, 1166:22, 1168:10, 1171:11, 1171:18, 1172:1, 1172:17, 1173:3, 1173:21, 1176:22, 1176:25, 1179:7, 1180:7, 1180:20, 1183:10, 1183:21, 1184:21, 1186:23, 1186:24, 1189:23, 1194:4, 1194:25, 1195:11, 1197:24, 1198:17, 1201:12, 1201:13

**looking** [6] - 1150:24, 1171:19, 1173:7, 1173:22, 1198:14, 1200:22
**looks** [2] - 1163:13, 1180:19
**losing** [1] - 1131:21
**lost** [2] - 1165:3, 1189:3
**loud** [1] - 1195:17
**love** [1] - 1134:16
**lucky** [1] - 1132:1

# M

**machinery** [1] - 1178:20
**mail** [34] - 1127:18, 1127:21, 1128:7, 1128:9, 1128:11, 1128:14, 1129:9, 1129:20, 1133:19, 1134:21, 1138:4, 1146:9, 1146:18, 1149:23, 1150:12, 1150:22, 1151:11, 1152:8, 1153:6, 1154:22, 1162:17, 1171:13, 1171:15, 1177:6, 1177:10, 1179:9, 1194:5, 1194:17, 1195:8, 1195:13, 1195:17, 1197:15, 1198:3, 1198:13
**mailing** [1] - 1194:6
**main** [7] - 1124:2, 1128:22, 1137:4, 1142:20, 1154:11, 1172:13, 1178:16
**major** [1] - 1155:22
**Malloch** [4] - 1128:16, 1128:20, 1128:21, 1138:16
**Malloch-Brown** [4] - 1128:16, 1128:20, 1128:21, 1138:16
**man** [3] - 1127:9, 1145:3, 1193:2
**Manafort** [10] - 1124:1, 1126:23, 1135:6, 1142:11, 1176:20, 1178:5, 1183:16, 1195:16, 1197:19, 1197:21
**manage** [2] - 1138:17, 1139:1
**managed** [1] - 1138:19
**management** [4] - 1133:13, 1143:6, 1171:21, 1181:14
**manager** [1] - 1138:23
**Mark** [4] - 1128:15, 1128:20, 1128:21, 1138:15
**mark** [1] - 1182:11
**market** [1] - 1131:24
**marking** [1] - 1129:4
**master** [8] - 1171:17, 1171:19, 1180:15, 1181:4, 1183:10, 1184:19, 1186:13
**Master** [1] - 1181:11
**material** [3] - 1168:19, 1200:17, 1201:3
**Matt** [1] - 1129:5
**matter** [4] - 1121:21, 1182:19, 1199:13, 1202:5
**matters** [2] - 1124:9, 1200:5
**Matthew** [4] - 1127:10, 1127:11, 1133:8, 1142:22
**maximum** [1] - 1196:15
**McCullough** [1] - 1118:16
**MCW** [2] - 1188:21, 1189:12
**MCW)** [1] - 1188:20
**MD** [1] - 1118:21

**mean** [19] - 1124:21, 1125:13, 1135:16, 1150:6, 1155:25, 1160:17, 1162:7, 1162:8, 1165:3, 1167:16, 1169:4, 1169:9, 1178:15, 1181:11, 1183:23, 1185:1, 1185:13, 1192:1
**meaning** [1] - 1150:8
**means** [4] - 1155:19, 1160:8, 1167:17, 1191:15
**meant** [7] - 1128:17, 1139:1, 1139:4, 1148:11, 1159:21, 1175:16, 1197:14
**media** [44] - 1126:15, 1145:14, 1147:10, 1149:5, 1149:7, 1153:19, 1153:22, 1154:14, 1155:10, 1157:2, 1157:3, 1159:17, 1160:9, 1161:20, 1161:24, 1164:24, 1166:21, 1167:9, 1169:3, 1169:24, 1170:3, 1171:8, 1171:9, 1171:21, 1172:12, 1173:11, 1173:12, 1174:18, 1175:16, 1177:1, 1177:2, 1177:13, 1180:16, 1182:6, 1183:6, 1187:3, 1187:16, 1188:5, 1188:18, 1191:15, 1192:11, 1193:18, 1194:12
**Media** [3] - 1155:6, 1155:16, 1186:23
**media-trained** [1] - 1164:24
**meet** [6] - 1132:12, 1133:1, 1140:6, 1176:7, 1176:19, 1177:25
**meeting** [36] - 1132:15, 1132:25, 1138:9, 1140:9, 1177:20, 1177:23, 1178:1, 1178:3, 1178:13, 1179:14, 1180:7, 1180:20, 1184:1, 1186:19, 1190:16, 1190:17, 1190:19, 1190:22, 1190:24, 1191:6, 1191:8, 1191:11, 1192:6, 1193:7, 1193:11, 1193:15, 1193:20, 1193:23, 1194:1, 1196:2, 1196:24, 1197:13, 1198:6, 1198:7
**meetings** [2] - 1193:7, 1193:11
**Melissa** [1] - 1151:5
**member** [2] - 1159:20, 1177:24
**members** [2] - 1121:17, 1149:14
**memo** [1] - 1177:2
**mention** [1] - 1188:2
**mentioned** [2] - 1126:14, 1192:12
**mentioning** [1] - 1131:12
**Mercury** [1] - 1188:22
**Message** [1] - 1181:3
**message** [5] - 1137:10, 1180:15, 1181:4, 1187:20, 1188:14
**messages** [3] - 1181:7, 1181:9, 1187:18
**messaging** [2] - 1178:15, 1181:6
**met** [9] - 1133:6, 1133:7, 1133:25, 1140:19, 1153:5, 1170:19, 1176:21, 1193:13, 1193:16
**MFA** [1] - 1180:12
**microphone** [1] - 1179:20
**mid** [2] - 1161:18, 1165:24
**mid-July** [1] - 1165:24
**mid-June** [1] - 1161:18
**middle** [2] - 1188:2, 1189:23
**might** [7] - 1127:17, 1131:21, 1145:22,

1164:25, 1176:7, 1176:22, 1191:20
**MILLER** [2] - 1119:3, 1202:9
**Miller** [2] - 1202:3, 1202:8
**mind** [3] - 1130:8, 1141:18, 1180:11
**minister** [3] - 1134:2, 1138:15, 1147:24
**Ministry** [21] - 1126:22, 1145:24, 1147:1, 1147:4, 1147:14, 1147:22, 1149:10, 1149:21, 1152:13, 1152:15, 1152:18, 1152:19, 1152:22, 1153:1, 1157:16, 1157:19, 1157:21, 1160:16, 1167:23, 1180:12, 1180:14
**minor** [2] - 1151:25, 1152:1
**minutes** [2] - 1199:2, 1199:20
**misquoting/misrepresentation** [1] - 1182:25
**misrepresented** [1] - 1183:5
**missed** [1] - 1181:8
**mission** [1] - 1196:13
**missteps** [1] - 1156:8
**misunderstandings** [1] - 1149:5
**MOJ** [3] - 1160:16, 1167:15, 1180:13
**Molly** [1] - 1118:13
**moment** [2] - 1144:22, 1156:6
**Monday** [2] - 1188:18, 1190:3
**money** [4] - 1143:21, 1143:25, 1144:2, 1154:25
**morning** [3] - 1152:15, 1173:19, 1199:22, 1200:4
**Moscow** [2] - 1168:19, 1190:4
**most** [6] - 1142:10, 1147:2, 1168:18, 1198:21, 1201:4, 1201:15
**motivated** [1] - 1187:21
**motivation** [1] - 1188:15
**mounting** [1] - 1163:21
**move** [7] - 1139:5, 1142:24, 1144:16, 1153:18, 1159:7, 1165:14, 1177:12
**moved** [1] - 1165:12
**moves** [1] - 1156:3
**MR** [40] - 1121:8, 1121:12, 1121:14, 1122:6, 1122:12, 1138:20, 1138:22, 1139:3, 1139:10, 1139:11, 1142:6, 1155:4, 1155:5, 1158:24, 1158:25, 1159:7, 1159:8, 1162:13, 1175:3, 1175:4, 1175:8, 1175:9, 1179:17, 1179:25, 1186:2, 1187:5, 1187:9, 1187:10, 1199:1, 1199:6, 1199:8, 1199:14, 1200:14, 1200:16, 1201:1, 1201:4, 1201:10, 1201:17, 1201:19, 1201:23
**multiple** [2] - 1147:17, 1171:24
**murder** [1] - 1165:7
**Murphy** [1] - 1118:19
**MURPHY** [6] - 1138:20, 1158:24, 1175:3, 1179:17, 1187:5, 1199:8
**must** [3] - 1129:18, 1133:8, 1136:20
**Myers** [1] - 1168:22

# N

**name** [5] - 1122:15, 1122:17, 1137:14, 1137:15, 1147:23
**named** [2] - 1137:17, 1169:11
**names** [1] - 1169:23
**narrow** [1] - 1200:21
**narrowed** [1] - 1183:25
**nasty** [1] - 1176:12
**near** [1] - 1122:23
**need** [15] - 1130:9, 1132:9, 1134:18, 1136:18, 1136:19, 1138:17, 1138:19, 1139:1, 1145:3, 1174:11, 1176:22, 1190:2, 1199:9, 1200:12, 1200:16
**needed** [18] - 1131:13, 1131:16, 1131:23, 1134:24, 1136:23, 1145:11, 1167:22, 1168:1, 1169:5, 1174:22, 1181:25, 1182:1, 1185:18, 1190:10, 1191:3, 1198:10
**needs** [4] - 1122:1, 1132:22, 1189:14
**never** [3] - 1140:15, 1161:1, 1195:7
**New** [11] - 1150:17, 1168:15, 1168:23, 1169:23, 1170:21, 1177:17, 1177:22, 1179:12, 1189:6, 1193:7, 1193:11
**new** [2] - 1134:19, 1185:24
**news** [8] - 1145:23, 1147:9, 1147:11, 1147:13, 1147:21, 1164:17, 1164:19
**next** [19] - 1121:7, 1122:5, 1135:25, 1139:9, 1159:6, 1165:4, 1168:12, 1173:5, 1180:21, 1184:21, 1184:25, 1186:6, 1186:10, 1187:8, 1189:5, 1193:21, 1193:23, 1198:22, 1199:19
**nice** [1] - 1140:14
**niche** [2] - 1124:18, 1125:21
**night** [5] - 1178:9, 1179:13, 1179:23, 1188:18, 1197:16
**nobody** [1] - 1188:4
**none** [1] - 1174:15
**normal** [2] - 1126:9, 1135:16
**normally** [1] - 1134:12
**note** [2] - 1151:12, 1167:14
**notebooks** [1] - 1199:23
**noted** [1] - 1174:24
**notes** [10] - 1129:19, 1176:4, 1177:9, 1177:10, 1190:20, 1198:7, 1198:9, 1201:9, 1201:10, 1201:11
**nothing** [5] - 1121:22, 1164:20, 1167:8, 1174:7, 1181:8
**noting** [1] - 1167:3
**number** [18] - 1155:3, 1160:12, 1160:13, 1161:19, 1162:21, 1163:24, 1164:9, 1167:6, 1172:12, 1180:22, 1181:3, 1181:10, 1184:17, 1184:25, 1185:13, 1194:21, 1194:22, 1197:11
**Number** [2] - 1121:4, 1152:6
**nuts** [1] - 1194:13
**NW** [4] - 1118:14, 1118:17, 1118:24, 1119:4

# O

**objection** [3] - 1138:20, 1175:3, 1187:5
**objective** [3] - 1156:2, 1187:16, 1196:12
**objectives** [2] - 1176:8, 1176:9
**obtain** [2] - 1159:19, 1187:16
**obtaining** [1] - 1142:25
**obvious** [2] - 1137:13, 1157:5
**obviously** [5] - 1133:14, 1138:24, 1145:10, 1145:11, 1148:6, 1157:2, 1160:24, 1163:12, 1169:10, 1181:25, 1182:21, 1188:6, 1194:18, 1197:4, 1197:7
**Obviously** [1] - 1170:19
**occasions** [1] - 1143:20
**odd** [3] - 1130:17, 1135:17, 1141:13
**oddly** [1] - 1127:25
**OF** [6] - 1118:1, 1118:3, 1118:9, 1118:14, 1118:16, 1202:1
**off-the-record** [2] - 1189:1, 1189:13
**offer** [1] - 1132:17
**offered** [1] - 1124:15
**OFFICE** [1] - 1118:13
**Office** [16] - 1126:20, 1135:15, 1135:17, 1135:19, 1141:1, 1146:3, 1147:16, 1148:16, 1149:17, 1151:23, 1152:23, 1156:21, 1158:6, 1158:15, 1164:11, 1173:10
**office** [9] - 1124:16, 1130:23, 1134:3, 1135:22, 1138:15, 1169:5, 1169:13, 1170:13, 1184:10
**officer** [1] - 1150:19
**OFFICIAL** [1] - 1202:1
**often** [4] - 1141:6, 1141:9, 1161:10
**oligarch** [2] - 1134:2, 1138:14
**omitted** [1] - 1180:8
**once** [2] - 1153:5, 1176:13
**one** [32] - 1121:19, 1122:1, 1130:15, 1134:12, 1134:15, 1134:19, 1138:2, 1139:15, 1143:4, 1145:9, 1147:19, 1148:6, 1148:15, 1149:15, 1149:16, 1151:22, 1152:20, 1155:1, 1159:10, 1160:23, 1165:4, 1166:21, 1170:14, 1173:2, 1183:25, 1184:2, 1186:3, 1186:4, 1186:18, 1196:11, 1199:18
**ones** [2] - 1196:16, 1198:21
**onslaught** [1] - 1156:9
**open** [1] - 1199:15
**operate** [1] - 1126:10
**OPG** [1] - 1180:13
**opinions** [1] - 1141:4
**opponents** [2] - 1156:10, 1158:12
**opportunity** [8] - 1127:13, 1127:14, 1140:6, 1155:22, 1157:13, 1163:19, 1164:23, 1177:13
**opposed** [1] - 1157:23
**opposition** [4] - 1127:20, 1182:25, 1183:3, 1188:4

**optimistic** [1] - 1167:25
**Orange** [3] - 1130:3, 1131:6, 1145:7
**order** [4] - 1132:10, 1154:6, 1188:14, 1200:24
**organization** [1] - 1127:3
**organizing** [1] - 1135:4
**originally** [2] - 1149:21, 1165:11
**otherwise** [1] - 1122:4
**out-of-court** [1] - 1158:24
**outreach** [2] - 1167:9, 1190:6
**outset** [1] - 1188:16
**outside** [3] - 1125:7, 1132:2, 1142:19
**oversaw** [1] - 1157:20
**Overview** [2] - 1181:11, 1186:24
**own** [5] - 1125:20, 1126:4, 1126:5, 1136:12, 1136:24

# P

**p.m** [3] - 1121:2, 1121:21, 1173:9
**pack** [1] - 1180:6
**package** [3] - 1145:21, 1147:6, 1166:8
**packs** [1] - 1180:14
**page** [34] - 1146:7, 1146:17, 1148:1, 1148:3, 1148:12, 1148:21, 1150:4, 1155:9, 1159:9, 1160:11, 1163:9, 1165:14, 1166:22, 1166:23, 1168:10, 1168:12, 1171:18, 1172:17, 1173:5, 1173:21, 1180:21, 1183:11, 1184:21, 1184:24, 1185:22, 1186:1, 1186:23, 1188:2, 1188:10, 1189:5, 1189:23, 1198:14
**pages** [1] - 1201:2
**paid** [9] - 1134:10, 1134:18, 1135:24, 1144:5, 1144:9, 1144:10, 1168:2, 1171:3, 1182:22
**panic** [1] - 1164:16
**paragraph** [9] - 1129:3, 1129:22, 1133:18, 1134:20, 1134:22, 1135:10, 1136:15, 1155:18, 1155:20, 1156:6
**paragraphs** [1] - 1136:1
**part** [13] - 1128:19, 1129:21, 1130:2, 1136:25, 1139:25, 1142:20, 1151:10, 1163:15, 1175:16, 1176:13, 1181:23, 1181:24, 1182:11
**participation** [2] - 1137:22, 1139:12
**particularly** [4] - 1130:15, 1141:13, 1167:25, 1170:21
**parties** [2] - 1173:4, 1178:17
**Partner** [1] - 1125:20
**party** [8] - 1125:5, 1134:19, 1135:3, 1135:24, 1136:6, 1183:3, 1188:20
**pass** [1] - 1149:2
**passed** [2] - 1143:25, 1193:19
**past** [2] - 1132:1, 1193:3
**paste** [2] - 1187:4, 1187:13
**pasting** [1] - 1136:5
**Patricia** [2] - 1202:3, 1202:8
**PATRICIA** [2] - 1119:3, 1202:9
**Paul** [9] - 1123:1, 1178:4, 1195:16,

1197:17, 1197:18, 1197:22, 1198:19
**Paula** [1] - 1118:23
**pay** [2] - 1135:20, 1194:15
**paying** [2] - 1145:14, 1195:3
**payment** [1] - 1135:3
**penitentiary** [1] - 1178:22
**Pennsylvania** [1] - 1118:17
**penny** [1] - 1144:9
**people** [25] - 1128:15, 1130:4, 1131:5, 1131:17, 1131:18, 1138:5, 1140:25, 1141:23, 1142:21, 1144:25, 1152:15, 1157:2, 1166:12, 1167:6, 1167:7, 1168:8, 1170:8, 1170:20, 1181:8, 1191:21, 1193:13, 1194:9, 1195:24, 1196:6, 1198:20
**perception** [4] - 1131:6, 1139:23, 1163:20, 1170:22
**perceptions** [1] - 1187:17
**perfectly** [4] - 1160:5, 1164:21, 1166:1, 1192:18
**period** [1] - 1166:9
**permission** [1] - 1133:15
**permit** [1] - 1159:19
**pernickety** [1] - 1163:11
**person** [6] - 1128:22, 1169:11, 1176:20, 1177:13, 1185:4, 1185:5
**personal** [1] - 1177:6
**personnel** [1] - 1193:12
**perspective** [5] - 1159:11, 1188:6, 1191:8, 1192:17, 1192:23
**persuade** [2] - 1170:5, 1185:6
**persuaded** [1] - 1143:21
**PG's** [1] - 1147:1
**phases** [2] - 1131:15, 1142:12
**phone** [2] - 1133:7, 1142:11
**picked** [1] - 1184:5
**picking** [1] - 1182:15
**picks** [1] - 1187:19
**piece** [1] - 1166:10
**place** [6] - 1137:8, 1157:6, 1172:3, 1177:21, 1177:25, 1193:20
**placed** [1] - 1183:6
**plan** [33] - 1126:16, 1145:24, 1154:14, 1155:11, 1156:2, 1169:24, 1171:5, 1171:17, 1171:21, 1173:1, 1173:24, 1174:8, 1174:9, 1174:10, 1174:16, 1174:19, 1174:21, 1174:24, 1175:11, 1177:14, 1178:5, 1178:7, 1180:16, 1181:14, 1181:24, 1182:2, 1182:16, 1184:1, 1184:12, 1188:3, 1188:8, 1193:17
**Plan** [1] - 1181:10, 1186:23, 1188:11
**planning** [2] - 1194:6, 1195:3
**plans** [6] - 1161:20, 1161:24, 1166:21, 1174:23, 1178:8, 1187:3
**plant** [2] - 1160:23, 1160:24
**play** [3] - 1139:12, 1175:15, 1182:11
**plodded** [1] - 1143:22
**point** [29] - 1133:8, 1136:11, 1139:24, 1149:3, 1149:13, 1156:11, 1156:14,

1158:16, 1160:12, 1164:22, 1165:9, 1165:17, 1165:24, 1169:2, 1169:7, 1169:23, 1171:2, 1171:4, 1174:5, 1180:22, 1181:3, 1181:10, 1181:20, 1183:18, 1185:17, 1190:13, 1199:11, 1199:17
**pointed** [2] - 1141:22, 1142:3
**pointers** [1] - 1185:10
**points** [6] - 1149:19, 1151:6, 1157:11, 1178:16, 1178:18, 1196:6
**policy** [2] - 1168:15, 1195:22
**political** [11] - 1124:6, 1135:10, 1154:11, 1159:17, 1163:21, 1171:22, 1178:19, 1183:3, 1188:15, 1190:5, 1191:19
**politically** [1] - 1187:21
**politicians** [4] - 1160:9, 1170:2, 1189:21, 1190:1
**politics** [3] - 1124:7, 1124:8, 1130:9
**porter** [2] - 1151:24, 1152:4
**position** [8] - 1125:6, 1147:17, 1154:8, 1155:24, 1161:8, 1180:10, 1187:18, 1193:4
**positioned** [1] - 1151:21
**positive** [1] - 1172:16
**possible** [5] - 1170:6, 1185:7, 1191:14, 1199:18
**possibly** [1] - 1192:5
**post** [1] - 1200:2
**postgraduate** [2] - 1123:11, 1123:21
**potential** [7] - 1132:6, 1132:13, 1165:3, 1165:7, 1167:6, 1167:7, 1186:14
**potentially** [5] - 1127:6, 1127:25, 1130:20, 1147:18, 1165:6
**PR** [46] - 1123:14, 1124:10, 1124:13, 1124:17, 1124:18, 1124:19, 1124:21, 1125:4, 1125:10, 1125:18, 1125:20, 1126:11, 1127:4, 1127:18, 1127:24, 1128:18, 1128:19, 1128:20, 1128:23, 1130:14, 1131:5, 1132:15, 1133:24, 1139:21, 1140:25, 1154:3, 1156:1, 1159:15, 1160:18, 1161:9, 1167:18, 1167:20, 1170:24, 1171:5, 1178:7, 1178:8, 1181:5, 1181:10, 1181:24, 1182:16, 1185:4, 1188:24, 1191:2, 1194:1, 1194:9
**Pratt** [1] - 1118:20
**prebriefing** [2] - 1189:1, 1189:12
**preempted** [1] - 1147:3
**prefer** [1] - 1199:8
**preliminary** [1] - 1200:5
**prep** [1] - 1169:20
**preparation** [1] - 1140:13
**prepare** [7] - 1153:22, 1169:19, 1178:12, 1178:14, 1178:24, 1179:2, 1196:14
**prepared** [6] - 1154:14, 1155:21, 1160:6, 1161:24, 1191:18, 1201:5
**preparing** [2] - 1156:1, 1175:11

**present** [2] - 1121:16, 1200:9
**presents** [1] - 1156:7
**president** [2] - 1130:5, 1154:12
**press** [18] - 1144:17, 1145:17, 1147:21, 1148:19, 1149:10, 1149:20, 1150:19, 1151:2, 1151:3, 1151:17, 1151:20, 1151:21, 1152:4, 1152:12, 1152:18, 1169:5, 1169:13, 1195:23
**pressure** [2] - 1161:14, 1174:10
**presume** [1] - 1157:13
**presuming** [1] - 1157:15
**presumption** [3] - 1157:7, 1158:14, 1166:12
**presumptions** [1] - 1165:23
**pretty** [5] - 1142:23, 1160:18, 1168:18, 1183:9, 1187:13
**previously** [3] - 1158:9, 1166:16, 1187:3
**primarily** [1] - 1123:10
**prime** [2] - 1134:2, 1138:14
**print** [1] - 1180:10
**proactive** [1] - 1192:17
**problem** [4] - 1144:6, 1150:22, 1160:10, 1179:13
**problematic** [2] - 1140:3, 1144:15
**problems** [6] - 1139:23, 1142:25, 1143:3, 1144:12, 1165:13, 1181:17
**procedural** [1] - 1156:8
**procedure** [1] - 1158:11
**proceeding** [1] - 1136:2
**proceedings** [1] - 1202:5
**Proceedings** [1] - 1119:6, 1201:25
**process** [7] - 1140:1, 1160:21, 1161:3, 1161:5, 1168:5, 1173:16, 1188:19
**procurement** [1] - 1168:3, 1168:5
**produce** [3] - 1154:5, 1174:8, 1200:17
**produced** [4] - 1119:6, 1145:21, 1164:17, 1174:9
**profession** [1] - 1193:2
**professional** [5] - 1123:17, 1124:11, 1124:12, 1124:13, 1196:14
**professionalize** [1] - 1164:12
**Project** [2] - 1137:17, 1183:22
**project** [17] - 1127:7, 1127:17, 1133:10, 1133:12, 1137:10, 1137:13, 1137:22, 1139:13, 1139:14, 1140:7, 1141:5, 1142:9, 1171:21, 1181:14, 1183:15, 1183:16, 1196:21
**promising** [1] - 1201:19
**promote** [1] - 1159:17
**promoting** [1] - 1160:3
**propose** [2] - 1188:16, 1192:13
**proposed** [1] - 1152:18
**prosecuted** [2] - 1165:1, 1165:6
**prosecution** [6] - 1126:21, 1134:2, 1138:14, 1154:4, 1154:11, 1164:9
**Prosecution** [2] - 1141:2, 1156:23
**prosecutions** [1] - 1163:21
**Prosecutor** [28] - 1126:20, 1132:13,

1132:14, 1132:22, 1132:25, 1134:1,
1134:8, 1135:14, 1135:17, 1135:19,
1138:9, 1138:13, 1142:14, 1143:8,
1146:3, 1147:16, 1148:15, 1151:23,
1152:24, 1156:21, 1157:17, 1157:18,
1158:7, 1158:15, 1164:11, 1173:10,
1180:13, 1183:2

**prosecutors** [5] - 1145:1, 1149:15,
1157:23, 1164:23, 1169:19

**prospective** [1] - 1128:14

**protect** [1] - 1131:17

**provide** [6] - 1134:4, 1154:7, 1155:22,
1163:19, 1187:11, 1189:17

**provided** [1] - 1168:17

**PRWeek** [1] - 1130:7

**public** [6] - 1124:11, 1154:6, 1155:20,
1187:11, 1191:5, 1196:16

**publication** [8] - 1130:7, 1155:17,
1160:14, 1166:6, 1166:24, 1169:1,
1172:13, 1173:25

**publications** [2] - 1170:8, 1184:6

**published** [4] - 1173:15, 1173:17,
1173:19, 1186:10

**purpose** [5] - 1123:3, 1154:1, 1178:1,
1183:17, 1193:15

**pursue** [1] - 1165:8

**pursued** [1] - 1157:19

**put** [13] - 1127:19, 1127:21, 1129:19,
1130:10, 1137:4, 1154:5, 1159:1,
1174:16, 1176:25, 1177:10, 1182:2,
1185:8, 1200:3

**putting** [3] - 1137:5, 1175:11, 1201:15

## Q

**questions** [2] - 1192:9, 1199:18

**quick** [1] - 1180:16

**quickly** [4] - 1124:17, 1174:12,
1174:22, 1176:4

**quite** [8] - 1126:9, 1132:7, 1132:21,
1141:7, 1179:14, 1191:3, 1194:20,
1197:7

**quote** [3] - 1147:19, 1189:17, 1192:5

**quoted** [1] - 1196:12

**quotes** [1] - 1147:17

## R

**raise** [2] - 1130:20, 1200:13

**raised** [1] - 1194:20

**re** [6] - 1121:4, 1155:23, 1156:3,
1156:4, 1159:15, 1194:6

**re-calling** [1] - 1121:4

**re-set** [4] - 1155:23, 1156:3, 1156:4,
1159:15

**reach** [1] - 1194:2

**reached** [1] - 1198:16

**react** [2] - 1182:16, 1197:15

**Reaction** [1] - 1182:13

**reactive** [10] - 1147:14, 1148:2,
1148:5, 1151:18, 1151:21, 1164:14,
1191:15, 1191:24, 1191:25, 1192:17

**reactively** [1] - 1192:12

**read** [14] - 1130:6, 1134:24, 1155:18,
1155:20, 1163:2, 1176:11, 1176:13,
1176:16, 1176:17, 1180:3, 1180:16,
1187:24, 1188:12, 1195:17

**reading** [1] - 1129:12

**reads** [11] - 1128:14, 1136:1, 1137:10,
1138:12, 1155:6, 1155:16, 1160:13,
1166:24, 1180:22, 1187:19, 1188:10

**ready** [6] - 1121:6, 1147:2, 1169:2,
1169:5, 1188:7, 1188:8

**realistic** [1] - 1182:2

**realized** [1] - 1124:17

**really** [37] - 1127:8, 1132:16, 1132:20,
1137:4, 1139:15, 1140:14, 1141:12,
1144:4, 1148:9, 1149:3, 1156:1,
1158:7, 1158:23, 1159:21, 1160:4,
1160:10, 1161:4, 1161:5, 1161:21,
1164:18, 1165:8, 1166:9, 1170:5,
1170:14, 1182:10, 1187:16, 1190:18,
1190:21, 1190:23, 1191:19, 1192:19,
1194:18, 1195:2, 1196:17, 1197:25,
1198:7, 1200:6

**reason** [2] - 1166:5, 1196:5

**reasons** [3] - 1126:8, 1135:13,
1139:15

**reassured** [1] - 1140:2

**reassuring** [1] - 1139:24

**received** [2] - 1144:6, 1198:3

**recipient** [1] - 1152:12

**recirculate** [1] - 1180:9

**recognize** [2] - 1163:13, 1171:13

**recollection** [1] - 1191:18

**recommended** [1] - 1157:11

**record** [5] - 1122:16, 1141:21, 1189:1,
1189:13, 1202:4

**RECROSS** [1] - 1120:4

**REDIRECT** [1] - 1120:4

**refer** [2] - 1169:7, 1169:13

**reference** [3] - 1149:14, 1149:17,
1169:10

**referenced** [1] - 1172:19

**referred** [1] - 1149:5

**referring** [3] - 1151:22, 1170:16,
1172:9

**reflect** [3] - 1141:21, 1151:13, 1198:11

**reflected** [1] - 1181:21

**reformatting** [1] - 1155:13

**regarding** [6] - 1136:12, 1142:9,
1145:16, 1155:24, 1165:17, 1197:2

**regards** [2] - 1191:23, 1193:8

**register** [2] - 1130:9, 1136:19

**Registration** [1] - 1129:24

**registration** [2] - 1130:7, 1158:18

**Reilly** [11] - 1128:19, 1133:22,
1133:23, 1136:3, 1136:17, 1137:5,
1138:4, 1139:1, 1139:4, 1140:1,
1169:22

**rejected** [1] - 1168:1

**relate** [4] - 1121:10, 1137:12, 1138:18,
1172:2

**related** [2] - 1129:13, 1170:2

**relating** [3] - 1151:19, 1200:17,
1200:18

**relation** [5] - 1134:1, 1138:14, 1146:2,
1154:10, 1177:1

**relations** [4] - 1124:11, 1171:21,
1182:6, 1191:5

**relationship** [5] - 1126:22, 1145:6,
1156:4, 1159:16, 1170:11

**relationships** [2] - 1169:12, 1182:8

**Release** [1] - 1188:11

**release** [24] - 1144:17, 1145:17,
1145:23, 1147:9, 1147:12, 1147:13,
1147:21, 1148:19, 1149:10, 1149:20,
1151:3, 1151:18, 1151:20, 1152:4,
1152:18, 1155:20, 1161:17, 1164:17,
1187:12, 1188:3, 1188:16, 1189:7,
1194:6

**released** [1] - 1161:19

**relief** [1] - 1144:3

**remain** [1] - 1196:13

**remember** [13] - 1143:9, 1151:4,
1159:23, 1160:2, 1165:2, 1166:7,
1173:2, 1173:23, 1177:18, 1178:11,
1190:18, 1191:1, 1198:8

**repetitive** [1] - 1183:7

**report** [49] - 1140:13, 1140:24,
1145:10, 1154:5, 1155:21, 1156:11,
1157:4, 1157:5, 1157:13, 1157:15,
1158:2, 1158:9, 1160:3, 1160:4,
1160:6, 1160:15, 1161:18, 1161:19,
1165:17, 1166:6, 1166:15, 1166:17,
1166:24, 1169:11, 1170:23, 1171:2,
1172:13, 1173:15, 1173:19, 1175:22,
1175:25, 1176:6, 1177:8, 1178:6,
1178:17, 1181:1, 1184:14, 1185:9,
1185:18, 1186:9, 1187:7, 1188:17,
1191:1, 1192:22, 1195:21, 1196:14,
1197:6, 1197:25

**Report** [20] - 1126:16, 1136:12,
1142:13, 1153:20, 1153:23, 1154:2,
1154:3, 1154:15, 1155:7, 1155:11,
1155:17, 1156:2, 1156:13, 1159:15,
1164:8, 1165:15, 1171:6, 1180:22,
1186:23, 1187:12

**report's** [1] - 1156:8, 1156:17

**reported** [5] - 1119:6, 1133:15,
1134:20, 1176:15, 1194:19

**reporter** [1] - 1123:24

**Reporter** [1] - 1119:3

**REPORTER** [1] - 1202:1

**reporting** [1] - 1135:9

**represent** [2] - 1125:6, 1138:13

**representing** [2] - 1150:19, 1183:4

**reputation** [1] - 1130:3

**reputational** [1] - 1139:17

**required** [1] - 1182:2

**requires** [1] - 1151:14
**research** [2] - 1141:3, 1200:2
**respond** [4] - 1146:17, 1150:13, 1169:3, 1169:5
**responded** [2] - 1146:18, 1153:14
**responding** [1] - 1153:6
**response** [6] - 1146:2, 1147:10, 1148:22, 1150:1, 1150:5, 1199:3
**responsibility** [1] - 1144:13
**responsible** [1] - 1128:13
**rest** [1] - 1182:12
**return** [2] - 1190:7, 1200:4
**returning** [2] - 1121:18, 1124:5
**reverse** [1] - 1195:19
**review** [4] - 1157:13, 1180:15, 1181:3, 1201:22
**Revolution** [3] - 1130:4, 1131:6, 1145:7
**Rick** [22] - 1133:6, 1135:8, 1135:21, 1142:10, 1143:7, 1153:24, 1154:23, 1161:23, 1164:4, 1166:2, 1167:5, 1168:7, 1168:18, 1168:20, 1170:5, 1174:20, 1182:1, 1182:2, 1184:9, 1191:13, 1198:20
**rightly** [1] - 1194:20
**Rights** [2] - 1190:1, 1191:21
**rights** [1] - 1193:3
**risk** [2] - 1129:23, 1196:15
**rival** [1] - 1154:11
**river** [1] - 1142:20
**RMR** [1] - 1119:3
**role** [13] - 1124:15, 1136:19, 1139:12, 1159:16, 1164:12, 1174:23, 1178:10, 1181:21, 1181:23, 1182:15, 1189:16, 1189:17, 1191:4
**Role** [1] - 1182:5
**roles** [2] - 1181:16, 1189:15
**rollout** [3] - 1126:15, 1174:18, 1177:14
**Room** [1] - 1119:3
**room** [1] - 1200:4
**rough** [1] - 1201:10
**row** [1] - 1142:4
**running** [3] - 1145:13, 1172:14, 1190:19
**runs** [1] - 1196:15
**Russia** [1] - 1131:8
**Russian** [8] - 1152:14, 1152:21, 1152:22, 1176:21, 1182:7, 1196:19, 1197:4, 1197:5

# S

**SA** [1] - 1186:23
**SANCHEZ** [24] - 1121:8, 1122:6, 1122:12, 1138:22, 1139:3, 1139:10, 1139:11, 1142:6, 1155:4, 1155:5, 1158:25, 1159:7, 1159:8, 1162:13, 1175:4, 1175:8, 1175:9, 1179:25, 1186:2, 1187:9, 1187:10, 1199:1, 1199:6, 1199:14

**Sanchez** [1] - 1118:12
**sat** [1] - 1164:14
**saw** [1] - 1176:6
**scheduling** [1] - 1198:23
**screen** [1] - 1147:20
**second** [11] - 1130:5, 1134:20, 1134:22, 1139:21, 1149:13, 1155:14, 1156:6, 1164:22, 1169:15, 1169:16, 1195:25
**secondly** [1] - 1170:4
**section** [3] - 1181:24, 1182:4, 1182:13
**securely** [1] - 1180:10
**see** [13] - 1133:14, 1134:13, 1138:4, 1141:15, 1151:15, 1152:10, 1155:1, 1172:5, 1177:2, 1177:9, 1185:12, 1194:5, 1194:21
**seed** [8] - 1160:23, 1183:24, 1184:2, 1184:6, 1184:16, 1185:4, 1185:5, 1192:2
**seeded** [1] - 1184:15
**seeding** [27] - 1160:22, 1161:3, 1161:6, 1161:16, 1161:25, 1162:3, 1162:10, 1166:15, 1166:18, 1167:4, 1167:11, 1167:12, 1172:4, 1172:10, 1172:12, 1173:12, 1173:13, 1173:16, 1173:20, 1174:2, 1184:13, 1185:11, 1189:10, 1189:11
**seeds** [2] - 1161:15, 1167:6
**seeing** [1] - 1173:18
**selected** [1] - 1167:9
**selective** [1] - 1163:21
**self** [2] - 1126:7, 1196:5
**self-employment** [1] - 1126:7
**self-evident** [1] - 1196:5
**sell** [4] - 1160:5, 1189:14, 1192:2, 1192:8
**send** [7] - 1133:22, 1134:14, 1177:5, 1179:4, 1179:15, 1180:5, 1194:17
**sense** [1] - 1132:3
**sensible** [1] - 1149:4
**sent** [16] - 1128:10, 1128:11, 1129:2, 1133:19, 1133:22, 1146:3, 1150:22, 1153:11, 1163:5, 1178:7, 1179:11, 1179:23, 1186:16, 1186:19, 1186:21, 1198:19
**sentence** [2] - 1131:1, 1131:3
**separate** [1] - 1174:3
**separately** [1] - 1136:16
**separation** [1] - 1140:25
**September** [5] - 1177:19, 1179:10, 1192:21, 1193:24, 1195:13
**service** [5] - 1122:2, 1178:22, 1184:4, 1184:5, 1184:6
**Session** [1] - 1118:5
**SESSION** [1] - 1118:9
**set** [8] - 1132:16, 1155:23, 1156:3, 1156:4, 1159:15, 1175:5, 1189:8, 1189:12
**setting** [1] - 1175:6
**settled** [1] - 1195:6

**several** [2] - 1130:17, 1165:5
**shirt** [1] - 1141:25
**short** [2] - 1149:19, 1166:9
**short-circuit** [1] - 1149:19
**shorthand** [1] - 1119:6
**shortly** [2] - 1153:13, 1165:10
**show** [5] - 1152:6, 1154:18, 1162:14, 1197:23, 1198:12
**shown** [2] - 1175:23, 1176:1
**side** [4] - 1131:7, 1145:2, 1145:3, 1145:11
**sides** [1] - 1196:18
**sigh** [1] - 1144:3
**sign** [2] - 1122:3, 1134:14
**significant** [2] - 1156:7, 1156:17
**similar** [2] - 1136:13, 1187:2
**single** [1] - 1184:16
**sit** [1] - 1122:2
**sits** [1] - 1188:5
**sitting** [1] - 1141:25
**situation** [2] - 1131:21, 1146:1
**SKA** [3] - 1173:8, 1173:11, 1182:4
**Skadden** [79] - 1126:16, 1127:10, 1133:3, 1136:12, 1136:18, 1140:11, 1140:19, 1142:13, 1142:16, 1142:18, 1142:21, 1143:11, 1143:12, 1144:22, 1145:25, 1146:2, 1147:1, 1147:15, 1148:2, 1148:7, 1148:13, 1149:14, 1149:18, 1150:18, 1150:19, 1151:3, 1151:19, 1151:22, 1152:20, 1152:21, 1152:22, 1153:20, 1153:23, 1154:2, 1154:3, 1154:14, 1155:7, 1155:11, 1155:17, 1155:21, 1156:2, 1156:13, 1157:20, 1158:17, 1159:12, 1159:15, 1160:5, 1164:7, 1165:15, 1165:25, 1166:10, 1167:15, 1167:18, 1167:24, 1169:8, 1171:6, 1174:25, 1175:15, 1182:11, 1182:13, 1182:15, 1182:16, 1183:15, 1185:14, 1185:18, 1185:19, 1187:12, 1188:15, 1190:6, 1193:8, 1193:12, 1193:13, 1194:1, 1194:10, 1195:20, 1196:10, 1197:6, 1197:10, 1197:24
**Skadden's** [6] - 1136:6, 1136:12, 1148:5, 1159:24, 1169:5, 1170:23
**SKC** [2] - 1169:7, 1169:10
**SKP** [1] - 1169:2
**slam** [1] - 1149:6
**slight** [2] - 1124:23, 1144:6
**slightly** [2] - 1127:24, 1130:16
**Sloan** [1] - 1149:16
**slow** [1] - 1139:19
**small** [4] - 1125:21, 1160:13, 1172:12, 1197:11
**sold** [3] - 1125:22, 1125:23, 1192:14
**Solicitor** [1] - 1149:17
**someone** [1] - 1122:1
**sometime** [1] - 1175:21
**sometimes** [1] - 1161:3
**sorry** [25] - 1125:15, 1128:17, 1131:2,

1131:18, 1134:23, 1134:24, 1138:2, 1141:7, 1148:13, 1152:20, 1155:2, 1156:12, 1159:10, 1159:23, 1162:8, 1165:2, 1166:17, 1168:11, 1177:19, 1179:22, 1189:3, 1193:13, 1197:22, 1198:6

**sort** [16] - 1132:11, 1135:3, 1135:22, 1137:19, 1142:15, 1144:4, 1145:22, 1161:8, 1163:11, 1165:12, 1171:5, 1174:10, 1176:13, 1178:10, 1189:15, 1190:19
**sorted** [2] - 1135:5, 1143:10
**sorts** [1] - 1178:19
**sounds** [1] - 1131:23
**SPAEDER** [2] - 1118:20, 1118:23
**speaker** [2] - 1197:4, 1197:5
**speakers** [1] - 1182:8
**speaking** [4] - 1160:4, 1192:20, 1197:10, 1197:24
**speaks** [1] - 1152:21
**specialist** [1] - 1124:18
**specializing** [1] - 1123:11
**specific** [2] - 1167:8, 1179:24
**specifically** [4] - 1123:4, 1173:2, 1175:2, 1178:9
**spell** [1] - 1122:15
**spend** [1] - 1199:2
**spent** [1] - 1143:25
**spoken** [3] - 1133:8, 1197:12, 1197:13
**spouting** [1] - 1171:3
**staff** [1] - 1139:19
**stage** [7] - 1132:12, 1147:24, 1167:4, 1176:3, 1183:19, 1183:24, 1184:12
**stages** [1] - 1130:17
**stakeholders** [3] - 1190:6, 1190:8, 1190:11
**stand** [2] - 1160:6, 1200:11
**standard** [3] - 1160:18, 1173:20, 1183:2
**standards** [1] - 1163:22
**start** [10] - 1126:20, 1131:1, 1146:7, 1146:14, 1152:8, 1161:2, 1161:3, 1187:15, 1198:13, 1200:6
**started** [4] - 1123:19, 1125:20, 1133:19, 1140:7
**starting** [1] - 1146:18
**starts** [3] - 1136:16, 1163:9, 1163:18
**state** [1] - 1123:23
**statement** [9] - 1147:3, 1147:8, 1147:9, 1148:2, 1148:5, 1151:18, 1151:21, 1153:12, 1158:24
**statements** [6] - 1147:2, 1147:14, 1152:13, 1178:18, 1200:18, 1201:7
**STATES** [3] - 1118:1, 1118:3, 1118:10
**States** [6] - 1121:4, 1122:24, 1128:1, 1129:17, 1168:14, 1170:7
**status** [1] - 1159:20
**staying** [1] - 1142:18
**stem** [1] - 1145:22
**stenotype** [1] - 1119:6

**step** [1] - 1200:10
**Steven** [1] - 1168:21
**still** [4] - 1121:23, 1151:13, 1153:9, 1201:14
**stop** [4] - 1124:20, 1195:25, 1199:2, 1199:8
**store** [1] - 1132:16
**stories** [1] - 1184:5
**story** [14] - 1147:11, 1147:12, 1160:23, 1161:14, 1162:9, 1172:15, 1176:12, 1184:7, 1185:7, 1189:14, 1189:15, 1192:3, 1192:14, 1196:12
**strange** [1] - 1142:19
**strategic** [2] - 1156:2, 1176:9
**strategies** [1] - 1164:24
**Strategy** [2] - 1163:18, 1165:15
**strategy** [26] - 1146:25, 1153:19, 1153:22, 1154:3, 1155:7, 1155:16, 1157:12, 1160:18, 1161:5, 1161:25, 1162:1, 1162:2, 1162:3, 1162:6, 1162:20, 1163:25, 1164:3, 1164:5, 1164:7, 1165:17, 1166:16, 1166:18, 1167:12, 1172:3, 1172:8, 1181:14
**street** [1] - 1127:24
**Street** [3] - 1118:14, 1118:20, 1118:24
**stressed** [1] - 1166:14
**stressful** [1] - 1166:1
**strict** [1] - 1160:15
**struggle** [1] - 1197:25
**struggling** [1] - 1125:3
**stuck** [2] - 1130:8, 1173:10
**studied** [1] - 1123:10
**study** [1] - 1123:9
**stuff** [2] - 1191:19, 1198:9
**subject** [5] - 1125:1, 1137:10, 1145:5, 1161:7, 1194:6
**subjects** [2] - 1200:21, 1200:22
**submitted** [1] - 1199:25
**subsequent** [1] - 1189:8
**substantially** [1] - 1201:11
**succeed** [1] - 1171:5
**successful** [2] - 1191:9, 1191:11
**suddenly** [1] - 1184:7
**suggest** [1] - 1154:23
**suggested** [10] - 1148:6, 1148:10, 1148:18, 1149:9, 1150:2, 1150:10, 1151:14, 1164:24, 1184:3, 1189:22
**suggesting** [1] - 1148:24
**suggestion** [1] - 1193:18
**suggestions** [4] - 1149:1, 1149:20, 1151:25, 1152:1
**suing** [1] - 1125:5
**suit** [1] - 1142:1
**Suite** [2] - 1118:21, 1118:24
**summary** [1] - 1176:2
**support** [2] - 1144:3, 1147:17
**suppose** [3] - 1123:5, 1132:13, 1144:8
**supposed** [15] - 1129:16, 1135:14, 1165:10, 1165:11, 1168:6, 1171:23,

1172:24, 1174:2, 1178:7, 1180:23, 1180:24, 1181:18, 1181:20, 1182:14, 1184:14
**surprised** [1] - 1194:18
**surprising** [1] - 1146:21
**Susan** [1] - 1168:25
**Swaan** [1] - 1152:9
**sworn** [1] - 1122:9
**system** [5] - 1127:19, 1127:21, 1130:13, 1134:18, 1157:20

# T

**tactic** [1] - 1183:3
**target** [2] - 1159:18, 1162:9
**targeting** [3] - 1162:1, 1162:7
**task** [1] - 1134:3
**tasked** [1] - 1153:19
**tax** [3] - 1126:8, 1164:9, 1165:4
**Taylor** [2] - 1118:22, 1200:13
**TAYLOR** [10] - 1121:12, 1121:14, 1200:14, 1200:16, 1201:1, 1201:4, 1201:10, 1201:17, 1201:19, 1201:23
**team** [12] - 1134:4, 1140:11, 1141:2, 1142:19, 1149:14, 1149:18, 1182:20, 1183:15, 1183:16, 1183:22, 1188:4, 1197:6
**technically** [1] - 1155:14
**telephone** [1] - 1127:8
**television** [1] - 1124:5
**tense** [2] - 1166:5
**terms** [5] - 1134:5, 1134:15, 1167:5, 1174:17, 1177:3
**terrible** [1] - 1130:3
**testified** [3] - 1122:9, 1146:24, 1200:20
**testify** [1] - 1123:4
**testimony** [2] - 1141:4, 1199:19
**thanked** [1] - 1153:16
**THE** [49] - 1118:1, 1118:9, 1118:13, 1121:3, 1121:6, 1121:9, 1121:13, 1121:15, 1121:17, 1138:21, 1138:25, 1139:6, 1139:8, 1139:9, 1141:21, 1141:24, 1142:2, 1155:2, 1159:2, 1159:5, 1159:6, 1162:6, 1162:8, 1162:10, 1162:11, 1162:12, 1175:6, 1179:19, 1179:20, 1179:22, 1185:21, 1185:23, 1185:24, 1185:25, 1187:6, 1198:22, 1198:25, 1199:5, 1199:10, 1199:16, 1200:10, 1200:15, 1200:25, 1201:2, 1201:9, 1201:14, 1201:18, 1201:21, 1201:24
**theme** [1] - 1161:22
**themselves** [2] - 1148:7, 1182:9
**then-president** [1] - 1154:12
**thinking** [2] - 1132:19, 1184:2
**thinks** [2] - 1139:5, 1171:9
**third** [5] - 1134:19, 1135:3, 1135:9, 1135:24, 1136:6
**third-party** [2] - 1135:3, 1136:6

**thorn** [1] - 1145:5
**thousand** [1] - 1144:8
**threatened** [1] - 1143:18
**three** [7] - 1139:14, 1144:8, 1163:19, 1163:22, 1198:20, 1198:21, 1200:21
**throughout** [2] - 1161:24, 1173:3
**tie** [1] - 1142:1
**tightened** [1] - 1183:8
**today** [3] - 1125:24, 1141:16, 1199:20
**together** [3] - 1127:11, 1140:20, 1174:16
**tomorrow** [5] - 1146:23, 1152:15, 1198:19, 1199:22, 1200:4
**tomorrow's** [1] - 1180:6
**tongue** [1] - 1137:20
**tongue-in-cheek** [1] - 1137:20
**took** [4] - 1130:22, 1132:7, 1183:4, 1193:20
**tool** [1] - 1159:15
**tools** [1] - 1143:19
**top** [15] - 1133:17, 1137:6, 1137:9, 1137:25, 1148:14, 1150:24, 1154:21, 1155:16, 1162:16, 1184:21, 1184:22, 1184:24, 1185:12, 1187:11, 1193:1
**topic** [1] - 1153:18
**total** [1] - 1141:9
**touch** [3] - 1150:17, 1150:21, 1185:8
**town** [1] - 1142:20
**trade** [1] - 1130:7
**trained** [1] - 1164:24
**trainee** [1] - 1123:22
**TRANSCRIPT** [1] - 1118:9
**Transcript** [1] - 1119:6
**transcript** [1] - 1202:4
**transcription** [1] - 1119:6
**transferred** [1] - 1126:22
**translate** [1] - 1152:14
**transparency** [1] - 1135:13
**travel** [4] - 1124:7, 1132:5, 1132:7, 1190:4
**traveling** [2] - 1144:23, 1144:24
**tree** [1] - 1161:2
**trial** [12] - 1123:4, 1134:5, 1146:2, 1158:3, 1164:10, 1164:22, 1165:9, 1169:15, 1169:16, 1187:20, 1199:25
**TRIAL** [2] - 1118:5, 1118:9
**tried** [6] - 1129:19, 1170:5, 1190:24, 1195:1, 1198:7, 1198:10
**true** [2] - 1150:16, 1196:13
**truth** [1] - 1137:18
**try** [10] - 1121:24, 1132:18, 1145:21, 1156:3, 1159:19, 1160:8, 1160:20, 1164:12, 1171:22, 1200:22
**trying** [9] - 1139:4, 1158:25, 1160:2, 1165:16, 1174:20, 1175:4, 1190:19, 1198:5, 1199:16
**Tuesday** [1] - 1190:2
**turn** [2] - 1161:14, 1166:8
**TV** [1] - 1123:24

**two** [10] - 1127:20, 1136:1, 1144:7, 1147:14, 1149:14, 1151:4, 1164:10, 1189:15, 1194:9, 1199:18
**Tymoshenko** [15] - 1129:14, 1145:4, 1145:7, 1146:1, 1154:5, 1154:11, 1155:24, 1156:25, 1157:1, 1157:19, 1165:2, 1169:17, 1178:22, 1183:4, 1187:21
**Tymoshenko's** [1] - 1145:9
**typical** [1] - 1201:7

## U

**U.S** [15] - 1118:13, 1118:16, 1119:3, 1129:13, 1130:9, 1136:20, 1170:8, 1170:13, 1170:15, 1170:17, 1170:18, 1185:5, 1190:7
**UK** [8] - 1123:23, 1123:24, 1124:5, 1124:6, 1124:16, 1126:9, 1130:8, 1168:19
**Ukraine** [47] - 1123:1, 1126:19, 1126:21, 1127:23, 1127:25, 1129:13, 1130:2, 1132:5, 1132:7, 1132:14, 1134:1, 1138:13, 1139:24, 1140:11, 1142:21, 1143:1, 1144:1, 1144:25, 1145:6, 1145:13, 1145:24, 1154:9, 1155:22, 1156:3, 1156:20, 1158:5, 1159:15, 1159:19, 1163:19, 1164:8, 1167:21, 1168:19, 1171:3, 1172:16, 1173:10, 1176:12, 1176:21, 1177:4, 1180:12, 1182:4, 1182:7, 1183:1, 1192:21, 1194:7, 1197:7, 1197:8
**Ukrainian** [7] - 1154:7, 1178:17, 1178:19, 1188:18, 1190:1, 1194:12, 1197:11
**ultimate** [3] - 1126:19, 1152:18, 1161:2
**ultimately** [10] - 1132:5, 1137:21, 1142:25, 1144:12, 1149:2, 1152:3, 1153:14, 1175:20, 1177:7, 1177:12
**uncomfortable** [1] - 1122:3
**uncommon** [1] - 1192:18
**under** [6] - 1136:19, 1160:15, 1161:14, 1169:2, 1174:10, 1182:4
**undergraduate** [1] - 1123:9
**understood** [6] - 1127:22, 1135:5, 1139:3, 1154:3, 1157:20, 1183:1
**undertake** [1] - 1201:21
**undertook** [1] - 1183:4
**unfortunate** [1] - 1186:4
**unfortunately** [2] - 1143:11, 1179:21
**Union** [6] - 1124:4, 1145:6, 1156:4, 1159:16, 1159:19, 1159:20
**United** [6] - 1121:4, 1122:24, 1128:1, 1129:17, 1168:14, 1170:6
**UNITED** [3] - 1118:1, 1118:3, 1118:10
**unnumbered** [1] - 1185:24
**unrelated** [1] - 1142:13
**unusual** [2] - 1130:16, 1135:18
**unwilling** [1] - 1158:17

**up** [18] - 1121:13, 1127:24, 1131:5, 1137:4, 1139:18, 1143:13, 1165:21, 1166:2, 1169:24, 1174:24, 1175:5, 1175:7, 1182:15, 1184:5, 1184:7, 1187:19, 1189:12, 1200:12
**update** [5] - 1180:22, 1180:25, 1190:25, 1198:5, 1198:19
**updating** [1] - 1198:17

## V

**valiantly** [1] - 1121:24
**valid** [1] - 1158:3
**van** [17] - 1133:3, 1136:10, 1142:22, 1145:19, 1146:10, 1148:8, 1152:9, 1152:13, 1152:17, 1157:21, 1158:21, 1158:22, 1159:4, 1193:14, 1196:19, 1196:22, 1197:2
**variations** [1] - 1161:22
**various** [1] - 1173:4
**verbatim** [2] - 1200:23, 1201:12
**verify** [1] - 1190:2
**Veritas** [7] - 1137:11, 1137:13, 1137:17, 1137:18, 1171:17, 1180:15
**version** [2] - 1153:13, 1175:21
**versus** [2] - 1121:5, 1192:17
**via** [1] - 1183:1
**view** [1] - 1139:14
**Vlasenko** [3] - 1145:4, 1145:9, 1145:12
**voices** [1] - 1147:15

## W

**waged** [1] - 1156:10
**waited** [1] - 1164:15
**Wales** [3] - 1122:20, 1123:25, 1160:22
**walk** [2] - 1123:16, 1143:18
**wants** [3] - 1121:10, 1134:13, 1171:3
**Waples** [1] - 1128:18
**Washington** [11] - 1118:6, 1118:15, 1118:17, 1118:25, 1119:4, 1170:20, 1184:10, 1184:11, 1188:17, 1188:22, 1190:7
**wearing** [2] - 1141:19, 1141:25
**week** [2] - 1138:12, 1201:15
**weekend** [2] - 1200:24, 1200:25
**weird** [1] - 1134:12
**Weiss** [5] - 1150:17, 1151:11, 1152:4, 1152:9, 1153:6
**well-known** [1] - 1140:1
**West** [4] - 1131:7, 1131:8, 1160:21
**Western** [1] - 1130:4
**whatsoever** [2] - 1121:23, 1171:4
**white** [1] - 1141:25
**whole** [4] - 1128:24, 1142:23, 1146:1, 1166:8
**William** [2] - 1118:19, 1118:22
**willing** [3] - 1129:23, 1131:3, 1192:24
**wire** [3] - 1184:4, 1184:6

**wise** [1] - 1139:19
**wishes** [1] - 1181:22
**WITNESS** [10] - 1120:4, 1139:8, 1141:24, 1159:5, 1162:8, 1162:11, 1179:19, 1179:22, 1185:23, 1185:25
**witness** [7] - 1121:7, 1121:11, 1121:15, 1122:5, 1200:11, 1201:6, 1201:7
**witness's** [1] - 1199:19
**witnesses** [2] - 1145:1, 1201:15
**wondering** [2] - 1129:22, 1131:3
**word** [2] - 1162:7, 1172:3
**work-wise** [1] - 1139:19
**world** [2] - 1124:10, 1183:25
**worried** [3] - 1176:5, 1176:6, 1176:17
**worry** [2] - 1135:22, 1192:19
**worth** [1] - 1180:16
**write** [12] - 1138:21, 1163:1, 1165:18, 1172:7, 1172:8, 1177:2, 1177:7, 1178:4, 1178:5, 1189:24, 1190:9, 1194:15
**writes** [1] - 1153:11
**writing** [1] - 1176:25
**written** [4] - 1161:13, 1174:4, 1176:12, 1198:8
**wrote** [11] - 1127:18, 1127:21, 1148:15, 1151:11, 1155:13, 1158:2, 1163:14, 1172:6, 1177:5, 1180:4, 1182:20

## Y

**yellow** [1] - 1129:4
**York** [11] - 1150:17, 1168:15, 1168:23, 1169:24, 1170:21, 1177:17, 1177:22, 1179:13, 1189:6, 1193:7, 1193:11
**youngest** [1] - 1123:24
**yourself** [4] - 1122:24, 1126:1, 1140:18, 1198:4
**Yulia** [12] - 1129:14, 1145:4, 1145:6, 1146:1, 1154:4, 1154:11, 1155:24, 1156:25, 1157:1, 1157:19, 1165:2, 1187:20

## Z

**ZUCKERMAN** [2] - 1118:20, 1118:23
**Zwaan** [16] - 1133:3, 1136:10, 1142:22, 1145:19, 1146:10, 1148:8, 1152:13, 1152:17, 1157:21, 1158:21, 1158:22, 1159:4, 1193:14, 1196:19, 1196:22, 1197:2