```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
        United States of America,      ) Criminal Action
 3                                      ) No. 19-CR-125
                            Plaintiff,  )
 4                                      ) JURY TRIAL
        vs.                             ) Day 7 - Morning
 5                                      )
        Gregory B. Craig,               ) Washington, DC
 6                                      ) August 20, 2019
                            Defendant.  ) Time:  9:30 a.m.
 7      _____

 8                     TRANSCRIPT OF JURY TRIAL
                      DAY 7 - MORNING SESSION
 9                         HELD BEFORE
            THE HONORABLE JUDGE AMY BERMAN JACKSON
10                UNITED STATES DISTRICT JUDGE
        _____
11
                      A P P E A R A N C E S
12
        For Plaintiff:    Fernando Campoamor-Sanchez
13                        Molly Gulland Gaston
                          U.S. Attorney's Office FOR THE
14                          DISTRICT OF COLUMBIA
                          555 Fourth Street, NW
15                        Washington, DC 20530
                          (202) 252-7698
16                        Email: Fernando.campoamor-sanchez@usdoj.gov
                          Email: Molly.gaston@usdoj.gov
17                        Jason Bradley Adam McCullough
                          U.S. Department of Justice
18                        950 Pennsylvania Avenue, NW
                          Washington, DC 20530
19                        (202) 233-0986
                          Email: Jason.mccullough@usdoj.gov
20
        For Defendant:    William James Murphy
21                        William W. Taylor, III
                          Adam B. Abelson
22                        ZUCKERMAN SPEADER, LLP
                          100 East Pratt Street
23                        Suite 2440
                          Baltimore, MD 21202
24                        (410) 949-1146
                          Email: Wmurphy@zuckerman.com
25                        Email: Wtaylor@zuckerman.com
                          Email: Aabelson@zuckerman.com
```

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

_____

Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                       Official Court Reporter
                       United States Courthouse, Room 6523
                       333 Constitution Avenue, NW
                       Washington, DC  20001
                       202-354-3267

INDEX

Jonathan Hawker

  Direct Examination (Cont.) By Mr. Campoamor-Sanchez...1208

  Cross-Examination By Mr. Murphy......................1274

EXHIBIT

Defense Exhibit 500 Offered/Received...............1329/1330

*   *   *

 1          THE COURTROOM DEPUTY:  Good morning, Your Honor.

 2          This morning we have Criminal Case Number 19-125, the

 3     United States of America v. Gregory B. Craig.  Mr. Craig is

 4     present and in the courtroom, Your Honor.

 5          Will counsel please approach the lectern, identify

 6     yourself and your colleagues for the record.

 7          MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.

 8          Molly Gaston, Jason McCullough, and

 9     Fernando Campoamor for the United States.  And also with us is

10     our legal specialist, Amanda Rohde.

11          THE COURT:  All right.  And are you ready to proceed

12     when -- as soon as I ask you to bring your witness in?

13          MR. CAMPOAMOR-SANCHEZ:  Yes.

14          THE COURT:  All right.

15          MR. MURPHY:  Good morning, Your Honor.

16          William Murphy for Mr. Craig, along with

17     Mr. William Taylor, Adam Abelson, Paula Junghans, and

18     Ezra Marcus.

19          THE COURT:  Good morning.

20          MR. MURPHY:  Your Honor, I do have one brief matter

21     to address the Court.

22          THE COURT:  All right.

23          MR. MURPHY:  I feel like I owe you an apology and an

24     explanation.  We had a discussion at the bench about my

25     questions of Mr. Kedem, and particularly about a gift that he

1   had received at a banquet.  I wanted to establish, if I could,

2   that he had received a particular clock.  And when we talked

3   about it at the bench, I said to you, "All I want to know is

4   whether he got the gift."

5        And your answer was, "I know what you want.  Go

6   ahead."

7        And then Ms. Gaston interrupted.  And then you said

8   that you were going to ask one more question and that's it.

9   Then, when he took the bench -- the Court did ask Mr. Kedem two

10  questions about the banquet, and then you said, "Ask your next

11  question."

12       And I thought, incorrectly, that you meant I could

13  ask the one question about whether he received a gift of the

14  clock.  I did not intend to violate an order or a directive

15  that the Court had given me.  It's not my practice, it's not

16  the way I practice law.  But, it's obvious to me that you -- I

17  misunderstood your directive.  And I just wanted you to know --

18       THE COURT:  Well, I think when you said you wanted to

19  ask the question about the clock, there was a paragraph before

20  that where you specified your concern was the date of the

21  dinner.

22       MR. MURPHY:  Yes.  Right.

23       THE COURT:  And whether that was the only dinner, or

24  whether there had been some other dinner with gifts and vodka.

25  And that was the point, was establishing the date of the

1    celebratory dinner.  And so that was why I asked the question,

2    to -- over Ms. Gaston's objection, to let that much come in --

3              MR. MURPHY:  Right.

4              THE COURT:  -- and then move on.  So, clearly --

5              MR. MURPHY:  I understand it now, Your Honor.

6              THE COURT:  -- if you misunderstood my ruling --

7              MR. MURPHY:  I did, Your Honor.

8              THE COURT:  -- and --

9              MR. MURPHY:  And, to me, the key point about it is,

10   everybody who was at the dinner from the outside received gifts

11   of these kind of clocks and orbs, and they were all sort of

12   designed a particular way.  And I don't know if Mr. Hawker is

13   going to testify about it or not, but he has given interviews

14   in which he describes the one that he received, the one that

15   Mr. Craig received, and, in fact, we've learned that Mr. Kedem

16   also received one.  That was the point.

17              So -- but I do apologize, Your Honor.

18              THE COURT:  All right.  Well, I appreciate your

19   apology.  I think that everyone in this courtroom is zealously

20   representing their clients and doing the best they can in the

21   heat of battle.  So, I appreciate it.

22              MR. MURPHY:  Thank you.

23              THE COURT:  All right.  Let's call the next

24   witness -- call your witness.

25              THE COURTROOM DEPUTY:  Jurors first.

1        THE COURT:  Oh, yeah, let's bring the jurors in.

2        MR. CAMPOAMOR-SANCHEZ:  Would you like the witness to

3   resume the stand?

4        THE COURT:  Yes, please.

5        (Jury enters courtroom.)

6        THE COURT:  All right.  And you can be seated.

7        Appreciate the fact that all the jurors have

8   returned, and I know you were all here on time this morning.

9   Once again, I just want to confirm that everyone has managed to

10  resist researching or communicating about this case over the

11  evening break.  And everyone is nodding at me, so I will take

12  that as a yes.  And we're going to resume with the testimony of

13  the witness who was on the stand yesterday afternoon.

14        Mr. Hawker, I want to advise you that you're still

15  under oath.

16        And you may proceed.

17                    JONATHAN HAWKER,

18              Continued Direct Examination

19  was recalled as a witness and, having been duly sworn, was

20  examined and testified as follows:

21        MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

22                  DIRECT EXAMINATION

23  MR. CAMPOAMOR-SANCHEZ:

24  Q.  Good morning, sir.

25  A.  Good morning.

1    Q.  If we can have -- I think at the break yesterday, we were

2    looking -- starting to look at Government's Exhibit 267, which

3    is in evidence.

4          And if we can focus first -- I'll let you have some

5    time to get there.

6          Are you there?

7    A.  I am.

8    Q.  Okay.  So, can you explain, just to remind us, with this

9    email down here, first of all, who were you emailing and what

10   were you doing?

11   A.  Okay.  So, just as a reminder, I arrived on the Saturday.

12   On the Sunday, we all met at the Harvard Club for our

13   discussion about the PR plans and to get an update from

14   Mr. Craig about the report.  And there was a lot of work to be

15   done updating everything on the back of that meeting.

16          And, so, this is the day after Harvard, when, you

17   know, I'm sending my -- my updates of, you know, everything I

18   could remember from the meeting to Mr. Craig, to Paul Manafort,

19   and Rick Gates.

20   Q.  And -- and I'm sorry.  Did you say Mr. Craig, too?

21   A.  I did.

22   Q.  Okay.

23   A.  He was the first person.

24   Q.  Right.  And can you just -- why did you say, "Please let me

25   have any comments, corrections, or amendments so that I can

1    incorporate them into the revisions of the Ministry packs

2    tomorrow"?

3    A.   So, at this point, I think I had been working a bit like a

4    dog.   So, I was bound to have, you know, mistakes and things in

5    the documents.   And, you know, I -- it's normal for a PR person

6    to put the documents to, you know, the client in order to make

7    sure they're right.

8    Q.   Okay.   And did you send that draft message document to the

9    people that were here?

10   A.   Yes.   I can't see the attachments.   But I definitely sent

11   the messaging document, yeah.

12   Q.   And we'll look at the next email of the chain.

13        And that's from Mr. Craig to you, but copying the

14   same other people and adding Mr. Sloan?

15   A.   Yes, that's right.

16   Q.   All right.   What did Mr. Craig express to you in this

17   email?

18   A.   Well, the key thing that sticks in the mind is that he said

19   my messaging was a total whitewash, and that some of it was

20   flatly wrong.   And if I think the report says that, we have

21   real problems.

22   Q.   Okay.   And were you trying, sir, to whitewash the report?

23   A.   No.   I was just trying to do my job, you know, as a PR

24   consultant to Ukraine.

25   Q.   And did you respond to Mr. Craig?

1    A.  I did respond.

2    Q.  Can we please take a look at the top email.

3         And what did you tell Mr. Craig in response to his

4    comments to you?

5    A.  Well, you know, I said, That's fine.  You know, let's speak

6    later.

7         And, you know, I said that, obviously, I don't want

8    to give a false impression of their work, but that, you know, I

9    don't think anyone would see the report as a whitewash.  And I

10   also pointed out that this is a messaging document, and a

11   messaging document isn't something that you share, you know, as

12   a document with third parties; it's to inform discussion, you

13   know.  But, if there's anything wrong, then I would have sorted

14   it out.

15   Q.  And did you ask Mr. Craig something?

16   A.  I asked him to help me and -- well, just as I'd asked, you

17   know, in the first email, "Can I have your comments,

18   corrections, and amendments?"  I said, "Look, it would be

19   really helpful if a member of your team could outline what's

20   wrong so that I can sort them out."

21   Q.  Did you also address the specific example he gave you in

22   his comment below?

23   A.  It looks like it, yes.

24   Q.  What did you tell him?

25   A.  Well, I have to read it.  But, "On the specific point you

1   raise, I intend to state that the record shows she produced no

2   evidence to support her allegations of political persecution."

3          Point 4 in the top line messaging.  "I'll review the

4   document again to see where I said that she offered no evidence

5   in support of her defense.  That is, obviously, an error."

6          It clearly is.  It's a fairly big one, actually.

7   Q.  Okay.  And did Mr. Craig actually take you up on your offer

8   to provide comments and corrections to your draft messaging?

9   A.  Yeah, he did.  He came back with an email with, you know, a

10  lot of corrections.

11  Q.  Okay.  And we'll look at Government's Exhibit 268.

12          THE COURTROOM DEPUTY:  Already in evidence?

13          MR. CAMPOAMOR-SANCHEZ:  Sorry.  Already in evidence.

14  MR. CAMPOAMOR-SANCHEZ:

15  Q.  And, sir, what are we looking at, at the bottom of 268?

16  A.  This is an email sent by Catherine Whitney, but on behalf

17  of Greg.  And he adds lines, you know, 13 points of correction.

18  Q.  And these 13 points of correction -- well, what do you say

19  in response, once you got the comments?

20  A.  I said, "That's helpful.  Many thanks."

21          And that was the full content of the email.

22  Q.  Can we look at the response?

23          And what did you do with the comments that you

24  received from Mr. Craig?

25  A.  I actioned most of the them.  And then I had a couple of

1    questions, so I tried to speak to Greg.

2         MR. CAMPOAMOR-SANCHEZ:  Let's look at Government's

3    Exhibit 269, already in evidence.

4    MR. CAMPOAMOR-SANCHEZ:

5    Q.  What are we looking at in 269?

6    A.  Because I think -- I don't know where Greg was.  But, I

7    responded by email, basically saying, "This is what I've done."

8         You know, I've taken all of these points and I

9    numbered them.  I've deleted the sentence he wanted deleted.

10        Point 5, I wanted to have a chat with Greg.

11        Point 9, I needed to speak to Paul Manafort.

12        And Point 11, I said, "I was unaware of this, and I'm

13   just thinking about what I'm going to do."

14   Q.  And did you actually ultimately -- and, so, let me ask you,

15   this email is to Ms. Catherine Whitney, the person that

16   forwarded the comments to you initially?

17   A.  Yes, it is.

18   Q.  And did you ultimate actually get to speak with Mr. Craig

19   about the few of the questions you had?

20   A.  I don't remember if I did or not.

21   Q.  Okay.

22        MR. CAMPOAMOR-SANCHEZ:  Let's look at Government's

23   Exhibit 272.  That is also in evidence.  And let's look at the

24   very bottom of page 2, going on to the top of page 3.  No.  The

25   bottom of page 2, going on to page 3.

1    MR. CAMPOAMOR-SANCHEZ:

2    Q.  And do you see that e-mail from you to Mr. Craig?

3    A.  The one at the bottom, yes.

4    Q.  Okay.  And what were you -- can you explain to the ladies

5    and gentlemen of the jury, what were you addressing to

6    Mr. Craig in the email?

7    A.  This was the reference to Point 5 that I needed to speak

8    with him about.  Or wanted to, you know, engage with him about.

9    Q.  What were you -- what were you asking him here?

10   A.  Just asking for, you know, how he wanted me to sort out,

11   you know, the problem.  Really, what he wanted me to say.

12   Q.  And did Mr. Craig respond to your question as to how to

13   handle this issue, Point 5?

14   A.  Yeah, he did.  He just -- he changed the words.  So, it

15   went from, you know, "The record is clear," full stop.

16   Statement.  To, "In the record of the trial" --

17   Q.  Is that -- I'm sorry.

18   A.  -- comma.

19   Q.  I'm sorry.  I didn't mean to --

20   A.  Comma.

21   Q.  Okay.  And is that what we see above the email from

22   Mr. Craig in response?  "In the record of the trial, Tymoshenko

23   failed to substantiate her claim of selective prosecution"?

24   A.  Yes.  Sorry.  So, I missed out, you know, the other bit.  I

25   wrote, "Tymoshenko has failed to produce any evidence to

1    support her allegations of political persecution."

2           Which was, you know, the language that the Ministry

3    was keen on.  And Mr. Craig said to change it to -- well, he

4    didn't say that, but, he had changed it to, "Tymoshenko failed

5    to substantiate her claim of selective prosecution."

6           So "political persecution" here, to "selective

7    prosecution," you know, from the report.

8    Q.  Okay.  And in this, sir, did you ask another question of

9    Mr. Craig?

10          You can move now to the next top two emails.  Let's

11   look first as your email that says here, September 25th, 2012,

12   at 6:11 p.m., Point 5.

13          What are you asking Mr. Craig at this point?

14   A.  I'm still trying to nail it down.  So, I'm saying, "Sir,

15   would you be comfortable with that being used by the MOJ" --

16   that's the Ministry of Justice of Ukraine -- "in a statement

17   attributed to them?  So, their PR communication?"

18          And then I haven't put it in quotes, but the sentence

19   below is giving him options on the verbs.  You know, "The

20   report states/shows/demonstrates, one of those, that in the

21   record of the trial, Tymoshenko failed to substantiate her

22   claim of selective prosecution," which are the words that he

23   wanted.

24   Q.  And did Mr. Craig respond to that?

25   A.  "Any of those verbs would be okay."

1    Q.  And when you say, "Would you be comfortable with that being

2    used by the MOJ in a statement attributed to them," what does

3    that mean?

4    A.  Well, you know, obviously, this messaging is messaging on

5    behalf of the Ministry of Justice of Ukraine, who, you may

6    recall, was the commissioner of the Report.  The Report was on

7    their behalf.  And, you know, they would need to communicate

8    about it because, obviously, you know, they are the point for

9    the government of Ukraine.

10   Q.  So when you're saying the statement here, is that part of

11   the Ministry of Justice PR?

12   A.  Yeah.  It -- you know, statement is, you know, it's a form

13   of words that you use with, usually, the media, sometimes, you

14   know, other stakeholders.  And, you know, it can be used in a

15   news release or it can be used in response to media inquiries.

16   Q.  And do you further respond to Mr. Craig above, once he told

17   you "Any of the verbs would be okay"?

18   A.  Yes, I did.  Yep.

19   Q.  Okay.  And can you tell the ladies and gentlemen of the

20   jury, what were you trying to do now here, with this email?

21   A.  I was still trying to see if there's something more

22   fundamental that I've got wrong, because, you know, you don't

23   hear "whitewash" word very often.  And so if I'd made, you

24   know, a major error, I needed to know.  So, I said, "Other than

25   your 13 points" -- which I'd gone through -- "what do you think

1  makes the messaging look like a whitewash," so that I could

2  deal with it.

3  Q.  And, again, was it your intention to make the Report look

4  like a whitewash?

5  A.  Absolutely not.  Because, you know, if I'd made the Report

6  look like a whitewash, then, you know, I wouldn't achieve the

7  objective of Ukraine because, you know, it would be exposed

8  pretty quickly.

9  Q.  And can we look at the response -- well, let me ask, did

10  Mr. Craig respond to the email you sent?

11  A.  He did.

12  Q.  And what did he say?

13  A.  Thank you.

14        He was still going back on the language.  He said,

15  "What do we say in the Report, may or should?"

16        But he didn't come back on my whitewash point.

17  Q.  So he did not answer your question?

18  A.  No.  He picked up on, you know, the verb change because

19  that was referred to in the email that was on the screen a

20  moment ago.

21  Q.  Okay.

22        MR. CAMPOAMOR-SANCHEZ:  And, finally, if we could

23  look at the last two emails, at the top.

24  MR. CAMPOAMOR-SANCHEZ:

25  Q.  And can you explain what is going on here now?

1    A.  So, Point 5, the one that I needed to have a chat with him

2    about, was -- it was basically an important point to get the

3    verb right.  And I think I'd written "would."  He wanted it to

4    be "may."

5              I went back to the Report and said, "Well, actually,

6    the Report said 'would likely.'"

7              And that's all that is, to be perfectly honest.

8              And then I put it into the sentence.  This time, I

9    went so far as putting in inverted commas, so that you can see

10   that it is a quote, and I said that I would make the change.

11   Q.  And what you say, in quotes, is that you changed executive

12   summary to read, "Tymoshenko's courtroom behavior would likely

13   have merited a summary contempt finding under western

14   standards"?

15   A.  That's right.

16   Q.  And did Mr. -- was Mr. Craig in agreement with your

17   suggested change?

18   A.  He said, "Good.  That should work just as well for you."

19              And, you know, of course it should, really, because

20   it's his language, or the language of the Report.

21   Q.  Okay.  All right.  Let me -- before we leave New York, do

22   you have any other meetings in New York before you left?

23   A.  Yes, I did.

24   Q.  So tell us about what was the other meeting you had in New

25   York?

```
1    A.  I had a meeting -- I had a meeting with the Skadden PR
2    people.
3    Q.  I believe we covered that yesterday.
4            Do you have any other --
5    A.  I had a second meeting with Paul Manafort and -- at Trump
6    Tower.
7    Q.  Okay.  And what was the purpose of the meeting that you had
8    with Mr. Manafort at Trump Tower?
9    A.  Okay.  So, you may remember that the original plan was that
10   we would seed a journalist, and then we hoped that Mr. Craig
11   with speak to a journalist.  The Harvard Club meeting outcome
12   was that, you know, he would do it reactively, not proactively.
13           Then we received an email from Mr. Craig saying that
14   the firm's policy was that -- you know, meant that they
15   couldn't do that.  And, so, the meeting with Paul Manafort was
16   to address this, you know, fairly major change to, you know,
17   the hopeful plan, and work out what to do.
18   Q.  Was anybody else in the meeting in addition to
19   Mr. Manafort?
20   A.  Rick Gates was there.
21   Q.  Anybody else that you recall?
22   A.  I can't remember.  It was a long time ago.
23   Q.  All right.  And I don't -- I don't want you to tell us what
24   was discussed at the meeting.  Okay?  But, I want to ask you
25   just a couple questions.
```

```
1              Did anybody have kind of an action item, something to
2     do after you guys met?
3     A.  Yes.
4     Q.  And who was that and what were they supposed to do?
5     A.  That was Paul Manafort.
6     Q.  And what was Mr. Manafort supposed to be doing?
7     A.  Speak to Greg.
8     Q.  And he was supposed to speak to Mr. Craig about what?
9     A.  About the reversal, you know, to the reversal in relation
10    to media relations.
11    Q.  And in terms of the instructions that you had at that
12    meeting, were you supposed to keep planning -- including
13    Mr. Craig in the plan or take him out of the plan?
14              MR. MURPHY:  Objection.  Leading, Your Honor.
15              THE COURT:  What was the state of the plan before you
16    went into this meeting?
17              THE WITNESS:  I -- the plan had been updated after
18    the Harvard meeting.  And I'm pretty sure that we still were
19    planning to do what we always planned to do, which was seeding.
20              THE COURT:  So --
21              THE WITNESS:  We hadn't taken him out, is what I'm
22    saying.
23              THE COURT:  -- after the meeting with Mr. Manafort
24    and Mr. Gates, did you do anything with respect to the plan,
25    that aspect of it?
```

1  A.  I probably did, but I didn't take Greg out of the plan.

2  BY MR. CAMPOAMOR-SANCHEZ:

3  Q.  Was that based upon the discussions you had with

4  Mr. Manafort?

5  A.  Yes.

6  Q.  All right.

7          MR. CAMPOAMOR-SANCHEZ:  Let's look now at

8  Government's Exhibit 276.

9          And if we can zoom in on both emails.

10  MR. CAMPOAMOR-SANCHEZ:

11  Q.  Starting at the bottom, you're getting an email from

12  Mr. Gates on September 30th; is that right?

13  A.  Yep.

14  Q.  And what was he sending you and asking you to do?

15  A.  So, at this point, Rick decided that he could do a master

16  control grid.  And he did his own version, which was a little

17  confusing, because, I think, it was based on the incorrect,

18  latest draft.

19  Q.  And why was he sending that to you?

20  A.  "Can you please send me an updated master grid document, as

21  well, to review?"

22          So, he wanted me to review his change and update it.

23  Q.  And did you do that at the top email, sending him these two

24  documents?

25  A.  I -- I basically pushed back a bit because, you know, we'd

1   put so much effort into what we'd had.  And, you know, I didn't

2   want to make work for no reason.  So, I suggested that, you

3   know, we stuck with the original formatting.

4   Q.  Okay.  Let's take a look at the attachments you sent.

5   First of all, at page 3 of Exhibit 276.

6              MR. CAMPOAMOR-SANCHEZ:  And if we can start where it

7   says, "Friday through A Day," and include that.  We can zoom in

8   on that.

9   MR. CAMPOAMOR-SANCHEZ:

10  Q.  All right.  So when we're looking at Monday, 1100, you

11  have, "FTI London."  It says, "Engagement with media targets."

12             What does that mean?

13  A.  Okay.  So, in the meeting with Paul, the plan -- well, the

14  original plan was to deal with just one journalist, Bloomberg,

15  and then the view was that we needed to engage with more

16  journalists in Europe.  And so this is the seeding.  So, the

17  bit at 11:00 a.m., "FTI London," is me, really.

18             "Engagement with media targets," you know, do the

19  seeding.  That's what it means.

20  Q.  And then at 1200 to 1900, it says, "FTI London briefing of

21  media targets."

22             What is that?

23  A.  If they're interested.  Just remember, you know,

24  journalists don't have to take a story.  They might think it's

25  rubbish.  So, if they're interested, then, you know, we would

1    go back and have a chat with them.

2    Q.  Was that, again, happening before the release of the

3    Report?

4    A.  Yes.  "A day" means announcement day.  That is the day that

5    the Report is out.

6    Q.  So if we look at A day, 1000 hours, that's MOJ publication

7    report?

8    A.  Yes.  Yeah.

9    Q.  Let's look at the second document you forwarded, which

10   begins on page 5 of this exhibit.

11            MR. CAMPOAMOR-SANCHEZ:  And if we can enlarge from

12   "Skadden Report" until the end of that page.

13   MR. CAMPOAMOR-SANCHEZ:

14   Q.  And what is this document, by the way, first of all?

15   A.  This is the thing that Rick was wanting, which was, you

16   know, a different format of, you know, pretty much the same

17   thing.

18   Q.  Okay.  So can you read the first paragraph?

19   A.  This is language you've probably heard already.  But, "The

20   Skadden Report is a vital tool in addressing international

21   ignorance of the facts relating to the Tymoshenko case.  Its

22   key finding that the Court's decision was based on the facts of

23   the case and not on political influence, and its clear

24   narrative outlining how the crime was committed will greatly

25   assist diplomatic and political audiences to understand why

1   they have misunderstood this matter.

2          "The Report is truly independent.  It blends these

3   findings with a number of critics of the prosecution process,

4   which, it argues, falls foul of normal western standards.  In

5   this area -- it is this area that will be seized upon by the

6   Ukraine media, depending on the political line each

7   organization holds, and it is likely, without proactive

8   communication, that this is the angle that international wire

9   services based in Kyiv, *AP, AFP, Reuters,* and *DPA*, will take

10  and send around the world."

11  Q.  And when you wrote "And it is likely, without proactive

12  communication, that this will happen," what does that mean?

13  A.  That if we didn't try to own the story and engage in, you

14  know, proactive seeding, that, you know, they'll just wander

15  through the Report and find the negatives very quickly, like I

16  predicted a lot earlier.

17  Q.  Right.  And is that what you address in the second

18  paragraph, that begins, "To avoid"?

19          And you can read that, too, please.

20  A.  Oh, sorry.

21          "To avoid negatively framing this report, we propose

22  briefing a small number of highly influential journalists we

23  know in targeted jurisdictions in advance of its publication,

24  so that their reporting will set the agenda for the reporting

25  that follows, and which will ensure our mitigation balance will

1    be, inevitably, wild allegations from the Tymoshenko camp."

2           So the thing I said just now was, obviously,

3    incorrect.

4    Q.  What do you mean?

5    A.  I -- you know, I got my versions of the document mixed up.

6    I, clearly, had taken Greg out of a plan and, you know,

7    forgotten about it.

8    Q.  Well, let's look at the next line.

9           Can you read that?

10   A.  Oh, okay.  Maybe I didn't, then.

11          "The background briefings will be done by FTI and

12   Skadden Arps and will include the following journalists.

13   Q.  So, had you taken him out or was he still in?

14   A.  In light of the document we looked at just now --

15   Q.  Right, the master control grid.

16   A.  Yeah.  But, he's back in this one.  So, I'm, obviously, a

17   bit confused at this point on the back of the -- you know, the

18   whole Harvard interaction and the reversal to the reversal on

19   media relations.

20   Q.  All right.  But, taking what we've been reading now in this

21   document, you were talking about one journalist to multiple

22   journalists.  Are you now envisioning using more than one

23   journalist?

24   A.  Yeah.  There was pressure from Ukraine to expand the

25   seeding program.  Frankly, they would have liked us to seed the

1    world.

2    Q.  Okay.  And in the United States, as of this date, who was

3    the person or journalist that was supposed to be seeded?

4    A.  It was an Al Hunt at Bloomberg, in Washington.

5    Q.  And then did the -- does this document go on to describe

6    other locations?  If we can look at page 2.

7    A.  Yeah, it did.

8         Sorry.  These are my contacts.  So, British

9    journalists, which is a far more comfortable environment for

10   me; the *Press Association* editor.  You know, he's not there

11   anymore.  But, it's the main domestic wire service, which is

12   the main court reporting -- or, sorry -- legal process

13   reporting vehicle in the UK.  So, that was an obvious choice.

14        And then Richard Fletcher, he wasn't the editor of a

15   newspaper, but he was the city editor, which is English for

16   business editor, of the *Daily Telegraph*, which is a broadsheets

17   newspaper, I suppose bit like *Wall Street Journal*, a bit, I

18   suppose.  Yeah.

19   Q.  So the plan had expanded to, now, multiple --

20   A.  Yeah.  They wanted more.

21   Q.  Now, let me ask you, to be clear, had you, at this point,

22   spoken to Mr. Craig about talking to Bloomberg after the

23   reversal, after the Harvard Club meeting?

24   A.  No.

25   Q.  And why had you not spoken to Mr. Craig directly?

1    A.  Because Paul would do it, you know, because they're at the

2    same level.

3    Q.  When you say they're at the same level, what does that

4    mean?

5    A.  You know, they're both people who, you know, have advised

6    presidents, and I'm -- you know, I'm a PR consultant.

7    Q.  Okay.

8              MR. CAMPOAMOR-SANCHEZ:  Let's look at 280, also in

9    evidence.  And we're now to October 2nd.  And let's take you to

10   the end of this email, on page 5.

11             If I can have the very bottom of page 4, into page 5.

12   MR. CAMPOAMOR-SANCHEZ:

13   Q.  What is going on here?

14   A.  Well, we call this, in Wales, a bit of a kicking, really.

15   So, Paul is getting impatient that I haven't progressed.

16   Q.  So he's asking you to do what?

17   A.  Get my finger out.

18   Q.  I'm sorry?

19   A.  Get my finger out and get on with it.  You know, progress

20   the plan.  But, you know, had -- he just hadn't understood it,

21   I think.

22   Q.  Okay.  And when he said "The grid is not more advanced than

23   the document I saw a month ago," when he says "The grid,"

24   what's he talking about?

25   A.  He's talking about the wonderful master control grid, you

1    know, that's supposed to be the project management plan.

2    Q.  Let's go, now, to the beginning of the document, 280.

3            And do we see, at the very top, your response to

4    Mr. Manafort?

5    A.  Yeah.

6    Q.  And you don't have to read it.  But, generally, what are

7    you telling him?

8    A.  I'm -- I think I'm the master of diplomacy in pushing back,

9    and basically saying, Look, you know, this is where I am.  You

10   know, I can -- you know, I've done most of this, but some of it

11   I can't do.

12   Q.  And did you --

13   A.  And other information.

14   Q.  I'm sorry.

15   A.  Sorry.

16   Q.  You then go item by item, addressing some of the questions

17   he had?

18   A.  Yes, I do.

19   Q.  All right.  Let's look at --

20   A.  I'm pulling them out of the master control grid.

21   Q.  Right.  So, let's look at the second page, at very top.

22           And, first of all, when you say you're pulling it out

23   of the master control grid, what are you talking about?  What

24   were you doing?

25   A.  You can see the format is a bit weird for an email.  This

1    is an email.  I just cut it out of the master control grid to

2    make my point.  I've already addressed everything that -- well,

3    not everything, but most of the stuff that he was worried

4    about.

5    Q.  So in the box itself of the master control grid, it says,

6    "Briefings of Fule, Cox" -- I'm afraid I'm not going to

7    pronounce it right -- "Kwasniewski, and Lutkovska.  Update to

8    FTI with any issues.  Who is setting up?  Who has numbers?  Has

9    GC provided time block?  Where are his briefing points?  Has CG

10   agreed to them?"

11        Where are those questions coming from?

12   A.  They come in from polls.  So he's done the same thing, of

13   pulling them out of the grid.

14   Q.  So, those are Mr. Manafort's questions to you?

15   A.  Yeah.  They are, yeah.

16   Q.  Okay.  And can you please read, now, your response to

17   Mr. Manafort's questions.

18   A.  Well, to that one or --

19   Q.  Yeah, to the -- just underneath.

20   A.  "Greg Craig is currently in Egypt.  In his last call with

21   me, he said he would do meetings with political stakeholders.

22   I don't have any agreed time with him yet, as the release date

23   has been changing.  Again, once agreement on the release was

24   confirmed at the meeting, I expected to speak to Greg and fix

25   up times when he would be available, and them" -- typo -- "then

1    then report back to the MOJ and MFA people charged with

2    contacting the stakeholders.  On talking points, Greg was clear

3    that he would speak to the Report."

4    Q.  Okay.  What does -- and let's start at the bottom.

5              When he says "On talking points, Greg was clear he

6    would speak to the Report," what does that mean?

7    A.  That he didn't need any messaging from me.  He knew the

8    Report and -- well, he knew it better than anyone, frankly.

9    So, he didn't need to use the same material that was being

10   prepared for PR purposes for the Ukrainian parties.

11   Q.  And then, if you can go to the top, where it says, "GC is

12   currently in Egypt.  In his last call with me," are you talking

13   to Mr. Craig on the phone?

14   A.  I must have, but, you know, I don't recall the discussion.

15   Q.  But this is after the Harvard Club meeting, right?

16              MR. MURPHY:  Objection, Your Honor.

17              THE COURT:  Well, I think it's dated.

18              Do you know what you're talking about when you look

19   at this right now?  Do you have any recollection of, when you

20   wrote this, whether you were referring to a phone call or

21   whether you were referring to the Harvard Club meeting?

22              THE WITNESS:  This is, obviously, a phone call after

23   the Harvard Club meeting, because otherwise I'd have said, you

24   know, at the Harvard Club meeting he said.

25              THE COURT:  Do you have any present recollection

1    beyond what you wrote on the paper?

2         THE WITNESS:  I'm sorry.  I don't.

3         THE COURT:  All right.  Ask your next question.

4    BY MR. CAMPOAMOR-SANCHEZ:

5    Q.  Do you know how he -- how he happened to be in Egypt or why

6    he was in Egypt?

7    A.  Well, that's why I must have known, you know, from a phone

8    call, yeah.

9    Q.  But you just don't recall specifically?

10   A.  I really don't recall, and I don't want to be wrong.

11   Q.  But, as you're reporting here now, Mr. Craig is willing to

12   talk to at least some of these folks, but without talking

13   points?

14   A.  Yeah.  Although, I have to say, I don't remember which

15   political stakeholders, you know.  Because remember, in my

16   original, you know, plan, I was planning for him to talk to the

17   world, which he never agreed to.

18   Q.  All right.  Let's go to Exhibit 305.

19         And what are we looking at in 305?

20   A.  Yet another update of our wonderful master control grid.

21   Q.  Okay.

22         MR. CAMPOAMOR-SANCHEZ:  I should say, 305 is also in

23   evidence, Mr. Haley.

24   MR. CAMPOAMOR-SANCHEZ:

25   Q.  And this is an email dated October 3rd?

```
1    A.  Yes, it is.

2    Q.  Is that a day after the email we were just looking at, with

3    your conversation with Mr. Manafort?

4    A.  I didn't make note of that.

5    Q.  Okay.  Let's go back to --

6    A.  Hang on.  Yes, it's correct.  Yeah.

7    Q.  So just the day after?

8    A.  It's the day after, yep.

9    Q.  So you -- what are you doing in the top email?  You're

10   forwarding to yourself the master control grid?

11   A.  Yeah.  So, I must have been traveling or something.  So, I

12   passed it from my home email address -- it's the same thing,

13   even though the end is different.  It's the name of my old

14   business, which is why it's a bit weird -- to my work one so

15   that I could work on it on a proper work computer.

16   Q.  So let's look at page 3 of this exhibit.

17            MR. CAMPOAMOR-SANCHEZ:  And if we can zoom in

18   starting on (indicating).

19   MR. CAMPOAMOR-SANCHEZ:

20   Q.  Are you there?

21   A.  Yes, I am.

22   Q.  Okay.  So, for Sunday, 1200 FTI, it says, "Provide SA

23   report to key journalist in U.S. for leak story"?

24            What does that mean?

25   A.  Well, I had to use the word "leak," you know, because it's
```

1    Gates.  But, it's seeding.

2    Q.  Okay.  So, is that the plan as to when you're going to

3    contact the journalist?

4    A.  Absolutely.  Yes.

5    Q.  All right.  And under it, it 1600 hours.  It says "SKA."

6    And it says, "GC to provide background briefings at the request

7    of U.S. journalists."

8    A.  Yes.

9    Q.  Why do you write that in there?

10   A.  Because I was told that that's what he had now agreed to.

11   So, there had been a reversal.

12   Q.  And, finally, if you look at A Day, which you told us means

13   what?

14   A.  Announcement day is when the Report becomes a live, public

15   document.

16   Q.  So at 1000 hours, "MOJ publication report and statement on

17   website."

18   A.  Yeah.  That's the Ministry of Justice website.

19   Q.  So, again, background briefings before publication?

20   A.  Yes.  It's the same plan all the way along, yeah.

21   Q.  And do you know why it was "GC to provide background

22   briefings at the request of U.S. journalists"?

23   A.  Well, there were --

24              MR. MURPHY:  Objection.  Leading.

25              THE COURT:  Do you know why it says that?

```
1                    THE WITNESS:  Yes.

2                    THE COURT:  That's not a leading question.

3                    Ask your next question.

4     BY MR. CAMPOAMOR-SANCHEZ:

5     Q.  How do you know?

6     A.  I know because that was -- you know, we've already spoken

7     about it from the Harvard Club meeting, that the intention was

8     that it would be a reactive engagement with the media, rather

9     than a proactive one.  That's why it's in this way.  It was

10    never the plan for Mr. Craig to be proactive in engaging with

11    the journalists.

12    Q.  Now, this document we're looking at --

13                    MR. CAMPOAMOR-SANCHEZ:  And you can take it down now.

14    MR. CAMPOAMOR-SANCHEZ:

15    Q.  -- that was in, as we saw, October 3rd?

16    A.  October the -- sorry.  This is October the 30th -- the 3rd,

17    did you say?

18    Q.  No.  3rd.

19    A.  October the 3rd.  Okay.  Yes, it is.  Yeah.

20    Q.  And can you explain to us why all these media plans?

21    What's happening to the Report or the publication of the Report

22    throughout?

23    A.  Oh, well, you know, this was a report that was supposed to

24    have been put into the public domain months earlier.  I think

25    the first publication date was, you know, June.  You know, and
```

1   it just -- we kept on being told, you know, it's going to be

2   next week, and there were delays.  So, I presume that there was

3   a publication date -- you know, another publication date around

4   this date.

5   Q.  In other words, that's the reason for updating the plan?

6   A.  Yeah.  Yeah.  Yeah.

7   Q.  All right.  Let's move now to December of 2012.  Okay?

8   A.  Yes.

9           MR. CAMPOAMOR-SANCHEZ:  Let's look at Government's

10  Exhibit 316, also in evidence.

11  MR. CAMPOAMOR-SANCHEZ:

12  Q.  And this is an email dated December 6, 2012?

13  A.  Yes, it is.

14  Q.  And it's an email from Mr. Gates to you and others?

15  A.  That's right.

16  Q.  Do you know who the others are, that being the AGF?

17  A.  Yes, I do.

18  Q.  And who's that?

19  A.  He's a man called Alan Friedman, and he is an -- well, he

20  was American.  I don't know if he is now a Swiss national --

21  who was -- we didn't realize there were other consultants

22  working for Manafort in Ukraine in different departments.  And

23  Alan and his colleague from Germany were based at the Ministry

24  of Foreign Affairs.  So, like at your State Department, I think

25  it is.

1    Q.  And Mr. Gates writes to you, "Gents, we have a green light

2    to release the Veritas report next week."

3                What does that mean?

4    A.  Well, it means that the Ministry would put the -- he never

5    really got the irony -- but, to put the Veritas report into the

6    public domain.  And, so, finally, we would execute the plan,

7    and the Skadden Report -- not the Veritas report -- would go

8    into the public domain.

9                MR. CAMPOAMOR-SANCHEZ:  Can we look at Government's

10   Exhibit 318?

11               Just zoom in on the top, please.

12   BY MS. GASTON:

13   Q.  And that's an e-mail from you --

14               MR. CAMPOAMOR-SANCHEZ:  Also in evidence, Mr. Haley.

15   A.  That is.

16   Q.  -- to Mr. Gates?

17   A.  That's correct.

18   Q.  And what is the subject line?

19   A.  "Docs."

20   Q.  Okay.  Do you know what that means?

21   A.  Yeah.  It's a reference to all of these, you know,

22   wonderful documents that I've been talking about:  You know,

23   the messaging document, the master control grid, you know,

24   talking points, you know, possibly the strat -- you know, all

25   of the PR package of stuff.

1   Q.  When you say "Everything has gone to Alex's Gmail," what

2   does that mean?

3   A.  Rick -- you know, Rick didn't like communicating through

4   normal, you know, corporate email systems and, you know, normal

5   phone calls.  He always wanted to use, you know, private emails

6   and, you know, encrypted phone systems.  And, so, he wanted it

7   to go to Alex's Gmail.

8   Q.  Then you say, "Can't get ahold of Greg yet."

9   A.  Needed to speak to Greg in order to make sure that he knew

10  it was, you know, happening, because it was the Ministry's

11  decision, not the Skadden decision.  And to make sure that, you

12  know, he hadn't changed his mind.

13  Q.  So you were trying to reach Mr. Craig how?  By email?

14  Phone?

15  A.  I can't remember.  Probably both.  But, I just don't know.

16  Q.  All right.  And do you recall, as you sit here today,

17  whether you actually reached him or not?

18  A.  Not without looking at a document, I can't remember.

19  Q.  Let's look at Government's Exhibit 322.

20          Now, this is an email from you to Mr. Gates?

21  A.  Yes, it is.  Yes.

22  Q.  Which date?

23  A.  That's the 6th of December.

24  Q.  Still the same day?

25  A.  Yes, it is.

1    Q.  In other words, the same day as the prior two emails we

2    just looked at?

3    A.  That's right, yeah.

4    Q.  You have as an attachment, "18 Veritas Phase One Media."

5    A.  Yeah.

6    Q.  And let's look at that.

7         What is this document that you sent to Mr. Gates?

8    A.  So, he now wanted yet another document.  So, you know, he

9    wanted a simple document that said, you know, which agency or

10   person is going to contact each of the target seeds.  And, as

11   you can see -- target seed -- the target journalists.  Sorry.

12   And, as you can see, it's now quite a lengthy list.

13   Q.  And what do the three columns mean?

14   A.  The column on the left is the publication, so, the

15   newspaper; the column in the middle is the name of the

16   journalist that we wanted to approach; and the column on the

17   right refers to who is going to do that initial engagement.

18   Q.  And, obviously, when we see FTI and your last name, what

19   does that mean?

20   A.  I ended up with, like, half the world to myself, yeah.

21   Q.  And, specifically, were you responsible -- what were you

22   responsible for in the UK?

23   A.  Well, obviously, the UK is where I'm from.  And, so, you

24   know, it's absolutely logical that I did the UK.  And that was

25   the *Daily Mail*.  Actually, the journalist wasn't interested.

1    The *Daily Telegraph*, which is the one we mentioned a moment

2    ago.  And the journalist referred it to the chap below,

3    Tom Parfitt, who was the Moscow correspondent.  And then the

4    one below is -- I've already spoken about the *Press*

5    *Association.*  "PA" means *Press Association*.

6    Q.  Were you also responsible for the USA?

7    A.  Yes, I was.  So, the target has now changed, and I was

8    supposed to make the initial approach.

9    Q.  Now, Mr. Craig's name is nowhere in this document.

10   A.  No.  It wouldn't be, you know, because, like I said, he

11   wasn't going to be proactive; he was going to be reactive.  So

12   the plan was never for Greg to contact the journalist.  You

13   know, I and all of the others were supposed to contact the

14   journalists.  And then, if the journalist was interested, then,

15   you know, we would get them in touch with Greg.

16   Q.  Now, when we see FH Berlin or FH Paris, and others, what is

17   that relating to?

18   A.  So, the Manafort people had other agencies everywhere

19   working for Ukraine and taking instructions from them in the

20   way that we were.  And FH stands for FleishmanHillard, which is

21   actually the company I worked for at the start of my PR career.

22   Which is coincidental, but, it is what it is.  And FH Paris is

23   also FleishmanHillard.

24   Q.  And, now, let's focus on the United States here for a

25   second.

1    Previously, we had seen in the plans that Al Hunt of

2    Bloomberg was listed for seeding in the US.

3    A.  That's right.

4    Q.  How did it come to be that now Mr. Sanger of *The New York*

5    *Times* is now listed in this plan?

6    A.  It came out of the discussion between Greg and

7    Paul Manafort.

8    Q.  Well --

9            MR. MURPHY:  Objection, Your Honor.  Move to strike.

10           THE COURT:  Who told you that -- that answer will be

11   stricken.

12           Who told you what name to put there?

13           THE WITNESS:  Rick Gates.

14           THE COURT:  Go on to the next question.

15           MR. CAMPOAMOR-SANCHEZ:  Yes.

16   BY MR. CAMPOAMOR-SANCHEZ:

17   Q.  So, it was because Mr. Gates told you that, that you put

18   the Sanger name on it?

19   A.  Yes, it was.

20   Q.  All right.  Let's take a look at 327.  And we start at the

21   bottom email.

22           And what are we looking at here?

23   A.  Yet another version of the master control grid.

24   Q.  Sent by whom?

25   A.  This is from Gates, again.

1    Q.  Okay.  And -- All right.  Same people that we were talking

2    about before, that had received the emails from Gates about the

3    green light?

4    A.  That's right.

5    Q.  And what --

6    A.  Oh, there's one extra.  Sorry.  That's Eckart, who worked

7    with Alan.  The German guy who worked with Alan.

8    Q.  The first name that we see, Eckart Sager?

9    A.  Yes.

10   Q.  So, that's an addition now?

11   A.  Yes.

12   Q.  And who was -- who was he?

13   A.  He was the partner of Alan Friedman, the American who

14   now -- who I mentioned was working for the Manafort operation

15   at the Ministry of Foreign Affairs in Ukraine.

16   Q.  All right.  Let's look, then, at the actual document, first

17   page.

18           And, first of all, did you yourself create this

19   master control grid?

20   A.  No.

21   Q.  Who created this master control grid?

22   A.  Rick Gates, I presume.

23   Q.  Okay.

24           MR. CAMPOAMOR-SANCHEZ:  And can we zoom in, first, on

25   the top right-hand corner?

1    MR. CAMPOAMOR-SANCHEZ:

2    Q.   What is that?

3    A.   It's a -- you know, he's called it a legend, and it just

4    explains the -- you know, the acronyms of, you know, who's --

5    who the parties are in each of the elements of the plan.

6    Q.   And is Mr. Craig specifically listed in this master control

7    grid?

8    A.   Yeah, by his initials, GC.

9    Q.   And how about you?  Are you listed here?

10   A.   No.  Not important enough.

11   Q.   Well, but --

12   A.   Oh, FTI Consulting is.  But, I mean, you know, I'm not.

13   Q.   So if we see FTI, is that something that you were supposed

14   to do or is that somebody else?

15   A.   It depends on the geography, but, usually, me.

16   Q.   So now let's take a look at the -- (indicating.)

17            All right.  Let me direct your attention first to the

18   1300 hours.

19            Do you see that?

20   A.   Yes.

21   Q.   And what does it say to the right of that?

22   A.   So, it's the assigned roles:  FTI, me, and Greg Craig --

23   GC.

24   Q.   Can you read what it says for what the action or the plan

25   was supposed to be?

1    A.  "The Report will be given to David Sanger of *The New York*

2    *Times*, who will have an exclusive on the material for 24

3    hours."

4    Q.  What is it -- at 1900 hours, what does it say?

5    A.  It says that "Greg Craig will give an on-recorder interview

6    with *The New York Times*."

7             Which, I'm presuming, is a typo from Gates.

8    Q.  What do you understand "on-recorder" to mean?

9    A.  I think it's on the record -- on-the-record interview.

10   Q.  And do you know why, now, the interview was supposed to be

11   on the record?

12   A.  No, I don't.  I mean, there isn't a huge difference between

13   being on background and being on the record.  The only

14   difference is that, you know, you may end up with an

15   on-the-record interview with a quote that has your name against

16   it.  So, it's a bit more overt, really.

17   Q.  What does it say on the line "GC will give an on-recorder

18   interview with *The New York Times*?

19   A.  There's a line that says, "Sanger will write an article to

20   be placed in *The New York Times* that will be released Thursday

21   morning, midnight."

22             And then...

23   Q.  And then what happens after that?

24   A.  At 0700, the, you know, *New York Times* article released.

25   Q.  And then we have this green dot that says -- or, this green

1   bar that says, "A Day, Thursday, December 13th."

2   A.  Yes.

3   Q.  What does that mean?

4   A.  This is the -- this is, actually, what was the final

5   release date for the Report.  So, you know, we finally got

6   there on December the 13th.

7   Q.  So when the ladies and gentlemen see in the documents "A

8   Day," what does that stand for?

9   A.  It's short for announcement day.  But, really, it means the

10  day when the Report becomes public.

11  Q.  Okay.  And if we can go to page 2 of this document.

12          MR. CAMPOAMOR-SANCHEZ:  And if we can zoom in on

13  (indicating).

14  MR. CAMPOAMOR-SANCHEZ:

15  Q.  And what do we see with regards to the United States?

16  A.  It says, "GC, FTI," rather than "FTI, GC."

17          So it's slightly changed.

18  Q.  And what does "GC" stand for?

19  A.  It means Greg Craig.  And FTI means me, in this context.

20  Q.  All right.  Now, let me ask you, sir -- and this applies to

21  anything that you heard from Mr. Craig directly, if you did --

22  did Mr. Craig ever indicate to you whether he knew Mr. Sanger?

23  A.  He did subsequently, yes.

24  Q.  "Subsequently," meaning what?

25  A.  After engaging with Sanger.

1    Q.  So, we'll get to that.

2         Before that, had you heard that from the defendant,

3    that you can recall?

4    A.  No, I definitely didn't.  No.  I heard it from Rick Gates.

5    Sorry.

6    Q.  Okay.  All right.  Let's -- let's go, then, to Government

7    Exhibit 328.

8         THE COURTROOM DEPUTY:  In evidence?

9         MR. CAMPOAMOR-SANCHEZ:  In evidence.

10        THE COURTROOM DEPUTY:  Thank you.

11   BY MR. CAMPOAMOR-SANCHEZ:

12   Q.  And we can focus on the bottom email first, please.

13   A.  Yep.

14   Q.  It's an email from you to Ms. Grace Reynolds.

15        Who's Ms. Reynolds?

16   A.  She's a colleague who is a member of my team who, you know,

17   came to Ukraine, you know, for much of the time in 2012.

18   Q.  Why were you asking her for numbers for David Sanger of *The*

19   *New York Times*?

20   A.  Because I had no idea how to contact him without getting a

21   number.

22   Q.  Do you have any relationship with that man?

23   A.  No, never.  I didn't even know of him.  Obviously, I knew

24   of *The New York Times*, but, you know, I didn't know this

25   journalist.

1   Q.  Okay.  And did she provide you that information, the email

2   above?

3   A.  Yeah.  So, PR agencies have, like, a database.  You just

4   put in the names, spits it out.

5   Q.  And I should have pointed out, this is happening, also, on

6   December 10th?

7   A.  Yes, it is.

8   Q.  Now, let's look at Government's Exhibit 332.

9           MR. CAMPOAMOR-SANCHEZ:  And let's start at the bottom

10  of page 1.  But, if we can also show -- (indicating).

11  MR. CAMPOAMOR-SANCHEZ:

12  Q.  Okay.  Do you recognize what we're looking at here?

13          MR. CAMPOAMOR-SANCHEZ:  And this is also in evidence,

14  Mr. Haley, Government's 322.

15  A.  Yes, I do.

16  MR. CAMPOAMOR-SANCHEZ:

17  Q.  And what is that first email that we're focused on?

18  A.  Because he was in America and I was in Ukraine, I decided

19  to do the approach by email, and this is what I sent him.

20  Q.  And did you send that to him on December the 10th?

21  A.  Yes, I did.

22  Q.  Okay.  And let's -- can you read to the ladies and

23  gentlemen of the jury what you wrote to Mr. Sanger on the 10th?

24  A.  "I'm working with Greg Craig of Skadden Arps, who I

25  understand you know well, and his client, the Ukrainian

1    Ministry of Justice, on a report Greg has written on the

2    Tymoshenko prosecution.  We were wondering whether you would be

3    interested in receiving the Report and a briefing with Greg on

4    an exclusive basis in the States."

5    Q.  Can you stop for a second?

6             What does that mean?  When you're writing "We're

7    wondering whether you're interested in receiving the Report and

8    a briefing with Greg on an exclusive basis in the States," what

9    does that mean?

10            MR. MURPHY:  Objection, Your Honor.  I don't

11   understand what the question is.

12            THE COURT:  You're asking what he meant by "receiving

13   the Report and a briefing on an exclusive basis"?

14            MR. CAMPOAMOR-SANCHEZ:  Right.

15            THE COURT:  What you meant by that.

16            THE WITNESS:  "Exclusive" means that, you know, he

17   would get it ahead of everybody else so that he would have, you

18   know, the first chance to write the story.  And then I'm

19   limiting the geography to the United States because we're doing

20   the same thing in other jurisdictions.

21   BY MR. CAMPOAMOR-SANCHEZ:

22   Q.  So you were not promising him exclusivity outside of the

23   U.S.?

24   A.  No.  I'm limiting it to the U.S.

25   Q.  Please, go on.  "If so"...

1    A.  "If so, I could email you the Report ahead of tomorrow

2    morning, your time, and arrange for a call with Greg towards

3    the end of the day, if that works for you.  We're hoping that

4    this makes an interesting story for Thursday, ahead of the

5    broader publication of the Report by the ministry, following

6    the start of the first section of the Rada."  That's like the

7    Ukrainian Parliament.

8         "The Report reviews the prosecution of Tymoshenko and

9    considers some of the international concerns about that

10   prosecution:  Whether it complied with international standards,

11   and whether the prosecution was politically motivated.  Could

12   you let me know if this is of interest to you?"

13   Q.  Now, Mr. Hawker, let me ask you, when you wrote "and

14   arrange for a call with Greg towards the end of the day,"

15   did -- before, you said -- well, let me -- let me just step

16   back.

17         Was it your understanding that Mr. Craig knew about

18   the reach-out?

19   A.  Yes, he did.

20   Q.  And was that because you talked to him or because somebody

21   else told you?

22   A.  I don't recall talking to him.  But, I certainly did speak

23   to my client.

24   Q.  And, sir, would you promise a call with somebody like

25   Greg Craig unless you believed that to have been arranged?

```
 1                  MR. MURPHY:  Objection, Your Honor.  Leading.

 2                  THE COURT:  Overruled.

 3                  You can answer --

 4                  THE WITNESS:  I'm so sorry.

 5                  THE COURT:  You can answer the question.

 6                  THE WITNESS:  I'm just trying to grab the water

 7      quickly.

 8                  THE COURT:  Go right ahead.

 9                  THE WITNESS:  Well, I'm really sorry.

10                  THE COURT:  That's All right.

11                  THE WITNESS:  I lost track of the question now.

12                  What was the question?  Sorry.

13      BY MR. CAMPOAMOR-SANCHEZ:

14      Q.  Yes.  So the question was, would you set up or promise a

15      journalist a call with Greg Craig unless you believed that that

16      would actually happen?

17      A.  There's no way in the world I would do that, because --

18      Q.  Why?

19      A.  -- I don't -- I don't want to look like an idiot.  You

20      know, if you promise something to a journalist and you don't

21      deliver, your name is mud.  You know, I'm a PR consultant.  You

22      know, I -- you know, I need to have good relationships with

23      journalists.  And, so, you know, I'm only going to promise

24      something if I can fulfill that promise.

25      Q.  Now, did Mr. Sanger respond to you?
```

1    MR. CAMPOAMOR-SANCHEZ:  And if we can go up to the

2    next exchange.

3    A.  Yes, he did.  Sorry.  Yes.

4    MR. CAMPOAMOR-SANCHEZ:

5    Q.  Okay.  We can look at that response.

6         And what did Mr. Sanger tell you in response to your

7    email?

8    A.  Well, he already knew about the Report because he'd had a

9    discussion a month earlier, which I hadn't realized.  And he

10   said it was -- the Report was supposed to arrive then and

11   everyone went silent, which I was a bit taken aback by.

12   Q.  All right.  So, let's be clear about this:  Did you have --

13   at this point, do you have any knowledge at all that Mr. Sanger

14   had been promised anything prior to your reach-out to him?

15   A.  I didn't.

16   Q.  And, so, when you received this email, what was your

17   reaction?

18   A.  Well, once I peeled myself off the roof, I tried to contact

19   Greg to discuss what to do next, because, you know, I didn't

20   really know where we were.

21   Q.  All right.  I'm going to get into that.

22        But, did you also respond to Mr. Sanger?

23   A.  I did respond to Mr. Sanger.  And I wrote an email which

24   basically said, "Hi, David, I hadn't realized that you had that

25   discussion so long ago and apologize for the confusion.  I

1  suspect that the parliamentary election must have got in the

2  way" --

3              There was an election in Ukraine.  That was one of

4  the -- I think, one of the reasons for an earlier delay.

5              -- "and I'm sorry that you weren't told about the

6  delay, and that I wasn't.  And would you have time to speak to

7  me when you're in the office?  I'm in Ukraine and Greg is in

8  Washington.  I would like to send you the Report, if you're

9  interested.  The timetable for release has been set by a

10  development here that I'd rather tell you about, if possible."

11  Q.  And did you have a conversation with Mr. Craig about, sort

12  of, Mr. Sanger's response to your email?

13  A.  Yeah.  So, then, you know, when I was, you know, on a level

14  footing, I gave Greg a call.

15  Q.  So tell us about the call.

16  A.  Well, you know, so, I explained what had happened, and he

17  said, Look, you know, don't worry.  I'll sort -- this is my

18  words, not his -- but, I'll sort it out.

19              You know, and that was that, really.

20  Q.  But what does that mean, that he'll sort it out?

21  A.  That he would speak to Mr. Sanger and just deal with it.

22  Q.  How about the delivery of the Report that you had promised

23  to Mr. Sanger earlier?

24  A.  He said that he would sort that out, too.  That he would

25  deliver the Report or he would have somebody deliver the

1    Report.

2    Q.  And did you forward your prior communications to Mr. Craig?

3    A.  Yes, I did.  Yeah.  So, after the call, I forwarded it on,

4    you know, and I tried to sort of not sound like I was a

5    crosspatch.  And that is that.

6    Q.  And can you read your email to Mr. Craig?

7    A.  "Here's the exchange.  The reaction seems logical, as I'd

8    erroneously presumed he knew it was coming."

9              I think there's a typo.

10             "But, then, why would he, as we all thought it was

11   coming since July?  Many thanks for your efforts."

12   Q.  When you say "We all thought it was coming since July,"

13   what do you mean?

14   A.  I think the second publication was supposed to be in

15   July -- the second planned publication date was July.  But, I

16   mean, I have to say, this is a weird email and I don't really

17   get it.

18   Q.  And when you say "Many thanks for your efforts," why do you

19   write that?

20   A.  I'm saying, Thank you for taking this off my plate.

21   Q.  Let's look at Government's Exhibit 351.

22             So what are we looking at in 351?

23   A.  Greg forwarded me the -- so he did it by email, too.  He

24   engaged with Mr. Sanger by email, too.  And he forwarded it on

25   to me, you know, what he'd sent David Sanger.

1    Q.  Right.  So if we look at the bottom email first, that's an

2    email from Mr. Craig to Mr. Sanger with the subject "Ukraine."

3    A.  That's right.

4    Q.  All right.  And it reads, "David, I just learned that the

5    Ukrainians intend to release our report about the Tymoshenko

6    case on Thursday.  Finally.  And the Ukrainians have determined

7    that you should be given first look at it.  Is this something

8    that you're truly interested in and have the time for?  I've

9    always assumed that these days your time would be taken up

10   selecting our new secretary of state.  But, if you're

11   interested, I would be happy to get you a copy, all 168 pages

12   of it" --

13   A.  186, actually.

14   Q.  -- "and even happier to talk to it about it.  Greg."

15   A.  You got the number wrong.

16   Q.  Oh, I'm sorry.

17            186; is that right?

18   A.  That's correct.

19   Q.  Okay.

20   A.  Yeah.

21   Q.  When Mr. Craig wrote to Mr. Sanger, "Intend to release a

22   report about the Tymoshenko case on Thursday.  Finally."  Was

23   Thursday the date that was included in the master control grid?

24   A.  Tuesday is the 11th.  So, yes, it is.  It's Thursday, the

25   13th of December.

1    Q.  Right.  So the date is right?

2    A.  The date is right, yeah.

3    Q.  Okay.  And he forwards that to you on December 11th?

4    A.  That's right.

5    Q.  Let's look now at 353.

6         MR. CAMPOAMOR-SANCHEZ:  Also in evidence.

7    MR. CAMPOAMOR-SANCHEZ:

8    Q.  Do you respond to Mr. Craig when he forwarded to you his

9    conversation with Mr. Sanger?  His conversation by email, I

10   should say.

11   A.  Yes.

12   Q.  And how do you respond to Mr. Craig?

13   A.  "Thank you very much for this.  If you don't hear back from

14   him by 1500, it might be best to speak to your *Post* contact, as

15   time is short.  Is that okay with you?"

16   Q.  First of all, when you say, "It might be best to speak to

17   your *Post* contact, as time is short," what does that mean?

18   A.  So he had said that if Sanger wasn't interested, he had a

19   backup plan of somebody else he had a relationship with.  And I

20   can't remember the name.

21   Q.  And is that *The Washington Post*?

22   A.  I guess so, yes.

23   Q.  You don't recall now, as you sit here today?

24   A.  I don't know any other Post in the U.S.  Must be *The

25   Washington Post*.

1    Q.  Did you have any contacts at the *Post*?

2    A.  No.

3    Q.  Whose idea was it to use the *Post* as a backup to

4    Mr. Sanger, if he was not ready?

5    A.  This is Greg's contact and idea.

6    Q.  And did he respond to you when you told him about that?

7    A.  Yes.  He said, "We are on it."

8    Q.  And we're still on December the 11th?

9    A.  We are still on December the 11th.

10   Q.  Let's look at Government's Exhibit 354.

11              MR. CAMPOAMOR-SANCHEZ:  Also in evidence.

12   MR. CAMPOAMOR-SANCHEZ:

13   Q.  Did you then respond to Mr. Craig's telling you, "We are on

14   it"?

15   A.  Yeah, I did.

16   Q.  What did you say?

17   A.  I said, "Thank you.  They are pressing me for reassurance

18   here, so any update would be very welcome.  I hope the chat

19   goes well."

20   Q.  When you say "They are pressing me for reassurances here,"

21   what do you mean?

22   A.  You know, the -- getting close to the Report date, the

23   Manafort people were just getting very flappy.

24   Q.  What does that mean?

25   A.  They are having -- they were having a flap.  You know, they

1    were getting panicky, and they were obviously under a lot of

2    pressure, and, you know, getting questions from the government.

3    And, you know, just constantly pressing for updates and

4    reassurance.

5    Q.   From the government of Ukraine?

6    A.   Yeah.

7    Q.   All right.  And why are they under pressure on December

8    11th?

9    A.   Because the -- you know, we -- you know, we're underway

10   with our very, very long-produced plan.  And we're only two

11   days to the day that this report finally reaches the public

12   domain and, you know, they're having a bit of a last minute

13   flap, or panic.

14   Q.   Okay.  And did Mr. Craig sort of respond and give you an

15   update?

16   A.   Yes, he did.

17   Q.   Let's look at Government's Exhibit 357.

18             MR. CAMPOAMOR-SANCHEZ:  In evidence.

19   MR. CAMPOAMOR-SANCHEZ:

20   Q.   And is this an email to you?

21   A.   Yes, it is.

22   Q.   From Mr. Craig?

23   A.   Yes.

24   Q.   Still on the 11th?

25   A.   Yes.

1   Q.  And what does Mr. Craig tell you?

2   A.  "David Sanger has received the Report by email.  I am

3   hand-delivering a hardcopy to his home this evening, on my way

4   home.  He will tell us tomorrow if he wants to use it.  He will

5   check with his deputy foreign editor."

6   Q.  And do you have an understanding, when he wrote to you, "He

7   will tell us tomorrow if he wants to use it," what he means?

8   A.  Yes.  So, you know, like with the *Daily Mail*, which, you

9   know, I spoke to and wasn't interested, he's going to come back

10  and say whether he was interested in this, you know, offer of

11  an exclusive about this report in the United States.  That's

12  what I understood.

13  Q.  And do you then respond to Mr. Craig's update about, you

14  know, the timing?  Sort of, like, they will let us know

15  tomorrow?

16  A.  Yeah, I did.

17  Q.  Let's look at Government's Exhibit 360.

18          MR. CAMPOAMOR-SANCHEZ:  Also in evidence.

19          THE COURTROOM DEPUTY:  360?

20          MR. CAMPOAMOR-SANCHEZ:  360.

21  BY MR. CAMPOAMOR-SANCHEZ:

22  Q.  And what did you say to Mr. Craig in response to his update

23  about delivering an email to Sanger and the hand delivery to

24  the home?

25  A.  I said, "Thanks, Greg.  That's great.  And I've shared with

```
 1    Rick.  We are both" --
 2    Q.  Let me -- let me stop you there.
 3              Who's Rick?
 4    A.  Rick Gates.
 5    Q.  Is Mr. Gates actually copied on this email?
 6    A.  Yes, he is.
 7    Q.  All right.  Go on.
 8    A.  "We are both keeping our fingers crossed for David, and
 9    thank you for your efforts here, especially hand-delivering the
10    Report.  Although we understand that he needs to run it by the
11    deputy foreign editor, Rick has pointed out that if the meeting
12    in which this is discussed is at 11 a.m., it would leave us
13    little time to take the Report to your contact at the Post, or
14    to Al Hunt, the Bloomberg person, if the Times decided not to
15    go with this.
16    Q.  Let me stop you there for a second.
17              So, Mr. Hunt, which you had seen in the -- in the
18    previous master control grids, what was his potential role now?
19    A.  He's like a backup plan.
20    Q.  Okay.  Go on.
21    A.  "Did you get a view on how keen David was to run this and
22    his confidence in getting to print, based on your conversation?
23    Rick is wondering whether we should wait until David reports
24    back before engaging with the Post, etcetera.  What are your
25    thoughts?"
```

1    Q.  And, again, when you're making reference to the *Post* twice

2    here in your communication, what are you referring to -- making

3    reference to?

4    A.  This is, you know, your contact at *The Washington Post*

5    above.

6    Q.  And did Mr. Craig respond above to your questions and

7    stated concerns?

8    A.  Yes, he did.

9    Q.  What did he say?

10   A.  He said, "We told Sanger that it was his, if he wanted to

11   use it.  He agreed to get back to us with an answer tomorrow.

12   Tomorrow is not too late for Al Hunt or *The Washington Post*.

13   Greg."

14   Q.  And, again, this is still on December 11th?

15   A.  Yeah.

16   Q.  Let's look at Government's Exhibit 364.

17              MR. CAMPOAMOR-SANCHEZ:  Also in evidence.

18   MR. CAMPOAMOR-SANCHEZ:

19   Q.  This is an email from you?

20   A.  It is.

21   Q.  To whom?

22   A.  Tom Parfitt is the -- he was the Moscow correspondent at

23   the *Daily Telegraph* who I was referred to by my contact at the

24   *Daily Telegraph* in London.

25   Q.  But who is your email to?

```
 1    A.  Oh, I'm terribly sorry.  It's to Greg -- it's to

 2    Greg Craig.

 3    Q.  Is the email about Mr. Parfitt?

 4    A.  Yes, it is.  Yeah.

 5    Q.  All right.  So, can you read the email to the ladies and

 6    gentlemen of the jury, please.

 7    A.  "Tom Parfitt at the Daily Telegraph will call very shortly.

 8    He's a very nice bloke.  He will certainly ask you about the

 9    difference between selective and political prosecution, by the

10    way."

11    Q.  So, why had you contacted Mr. Parfitt?

12    A.  Seeding.

13    Q.  Okay.  And why are you emailing Mr. Craig about a call he's

14    about to receive from Mr. Parfitt?

15    A.  Because he was going to reactively speak to Tom Parfitt

16    and, you know, have a discussion with him.

17    Q.  And had you had a discussion with Mr. Craig about the fact

18    that that might happen?

19    A.  Yes.

20    Q.  Let's look at Government's Exhibit 375.

21              MR. CAMPOAMOR-SANCHEZ:  Also in evidence.

22    MR. CAMPOAMOR-SANCHEZ:

23    Q.  And is this an email you sent?

24    A.  Yes, it is.  Yep.

25    Q.  To whom?
```

1   A.  To Greg.

2   Q.  Which date?

3   A.  This is the next day, the 12th of December; day before the

4   release of the Report.

5   Q.  Can you read to the ladies and gentlemen what you wrote to

6   Mr. Craig?

7   A.  "Hi, Greg, Apologies for interrupting you.  Rick's asked me

8   to get in touch to see if you've heard anything from the *Times*

9   on when the story will appear.  He is anxious that they know

10  that the story will become public in Ukraine at 3 a.m. Eastern

11  tomorrow, when the MOJ puts out its statement.  If you hear

12  anything, could you please email us both so that he stops

13  fretting?"

14  Q.  Why were you emailing Craig about this?

15  A.  I was instructed to email Greg by Rick Gates, who is now on

16  the ceiling himself.

17  Q.  Why is that?

18  A.  He was panicking.

19  Q.  But, why?

20  A.  Because he's under so much pressure to deliver *The New York*

21  *Times* story.

22  Q.  And when is the --

23              MR. MURPHY:  Objection, Your Honor.

24              THE COURT:  Sustained.

25              MR. CAMPOAMOR-SANCHEZ:  Sorry.

1    THE COURT:  All right.  We can ask Mr. Gates.  Ask

2  your next question.

3    MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.  Will

4  do.

5  MR. CAMPOAMOR-SANCHEZ:

6  Q.  All right.  Do you recall if Mr. Craig responded to you or

7  you talked to him about it?  If you recall.

8  A.  Yeah, I'm pretty sure he emailed back, you know.  Yes.

9  Q.  Well, did you talk to him, by the way, about Mr. Parfitt?

10  Or do you know if Mr. Parfitt ever reached Mr. Craig?

11  A.  Yeah, they spoke.

12  Q.  Let's look at Government's Exhibit 384.

13    MR. CAMPOAMOR-SANCHEZ:  Also in evidence.

14  MR. CAMPOAMOR-SANCHEZ:

15  Q.  Let's first look at the second email.

16    So, who is -- do you have it?

17  A.  Yep.

18  Q.  And what is this email about?

19  A.  "Report coverage" is the subject, and it's an email from

20  Rick Gates to Paul with loads of people copied in.

21  Q.  So who are the other people that are copied in this email?

22  A.  So Konstantin Kilimnik, who's the Manafort person who's

23  responsible in Ukraine for dealing with the ministries; so, the

24  direct contact.  Eckart Sager, who is the German guy who was --

25  along with Alan Friedman, worked at the Ministry of Foreign

1    Affairs, who's responsible for political engagement.  And me,

2    media.

3    Q.  All right.  And Mr. Gates writes, "P, here is an update as

4    of 8 a.m. Ukraine time.  Below are two articles thus far that

5    have been published from *The New York Times* and *The Telegraph*.

6    Overall, the strategy of targeting is -- a few select

7    journalists was absolutely the right one."

8              And let me ask you, first, is that accurate?  Was the

9    strategy of targeting a few select journalists part of the

10   media rollout plan for the Skadden report?

11   A.  Yeah, we were on track.

12   Q.  He continues.  "There are good quotes on selective

13   prosecution in the articles.  My only disappointment is one of

14   GC's quotes in *The New York Times* article about -- in *The New*

15   *York Times* article, but that was part of the strategy in using

16   him via *The New York Times*."

17             What was the strategy, if you know, of using

18   Mr. Craig via *The New York Times*?

19   A.  What was the strategy?

20   Q.  Yes.

21   A.  The strategy was that he would respond to -- he would be

22   the person who would engage with the journalist on the back of

23   the seed.  So, he would speak to the journalist at *The New York*

24   *Times* to answer any questions, you know, about the Report, and

25   to ensure that the journalist was fully informed on the story.

1    Q.  And he says -- he finishes, "He's much more direct and

2    positive on the same matter in *The Telegraph* article.  We are

3    getting ready to release the MOJ statement and the Report.

4    More coverage coming."

5              So, first of all, as of the time you got this email,

6    had the Ministry of Justice published the Skadden Report yet?

7    A.  I think the publication of the Report was due to be at

8    8 o'clock.

9    Q.  And do you respond to Mr. Gates' email?

10   A.  Yeah, I did, I'm afraid.

11             THE COURT:  Before we talk about that, can you all

12   just approach briefly?  I just --

13             MR. CAMPOAMOR-SANCHEZ:  Yes.

14             THE COURT:  -- want to talk about scheduling issues.

15             (Bench discussion:)

16             THE COURT:  Two things.  First of all, I don't want

17   to break of your flow, but I would like to give them a break at

18   some point.

19             MR. CAMPOAMOR-SANCHEZ:  Five minutes.

20             THE COURT:  Five minutes is all you have?

21             MR. CAMPOAMOR-SANCHEZ:  Yes.

22             THE COURT:  Okay.  There is a motion to reconsider my

23   ruling on the Manafort "well done" email, which I haven't

24   announced my intentions.  Were you planning to use that as part

25   of your conclusion with this gentlemen?

1    MR. CAMPOAMOR-SANCHEZ:  No.

2         THE COURT:  Okay.  That's what I wanted to talk

3    about.

4         MR. CAMPOAMOR-SANCHEZ:  Thank you, your Honor.

5         (Open court:)

6    MR. CAMPOAMOR-SANCHEZ:

7    Q.  Can we -- let me go to the top of 384, please.

8         We were talking about whether you email Mr. Gates in

9    response to the email we were just read at.

10   A.  Yes, I did.

11   Q.  Can you read to the ladies and gentlemen of the jury what

12   you wrote to Mr. Gates?

13   A.  "Rick, His quotes to *The Telegraph* were also massively

14   helpful, but I changed them.  He might be pissed about that, if

15   he finds out."

16        THE COURT:  Okay.  All right.  Well, I think you

17   missed a word.

18        THE WITNESS:  Oh, did I?  So sorry.

19        THE COURT:  Okay.  Try again.

20        THE WITNESS:  "His quotes to *The Telegraph* were also

21   not massively helpful, but I changed them.  He might be pissed

22   about that, if he finds out."

23   BY MR. CAMPOAMOR-SANCHEZ:

24   Q.  I think we did not hear the "not."

25   A.  Oh, I'm sorry.

1    Q.  But, there's a "not massively."  There's "not" in front of

2    the "massively."

3    A.  Definitely "not massively helpful," yep.

4    Q.  Okay.

5           So, did you change Mr. Craig's quotes to *The*

6    *Telegraph*?

7    A.  Yeah.  I tightened a bit of -- he had many quotes, but I

8    tightened a bit of one of them to ensure that several points

9    were within it.

10   Q.  And why did you do that, sir?

11   A.  Needed to ensure that everything was in the story.

12   Q.  Did you ever tell them that you had done that?

13   A.  No.

14   Q.  All right.  Did he ever complain about it to you?

15   A.  No, he didn't.  He didn't notice it, I don't think.

16   Q.  Okay.  Can we look at -- do you have the article there in

17   front of you?

18   A.  Yeah, I do.

19   Q.  Okay.  Can you tell us which part of the article you were

20   referring to when you said that you changed the quotes, and

21   tell us the page?

22   A.  So the article -- I think the article has got three chunks

23   of quote.

24   Q.  Uh-huh.

25   A.  The first quote is a negative --

```
 1    Q.  Wait.
 2              MR. CAMPOAMOR-SANCHEZ:  Can I -- can I approach, Your
 3    Honor?  I just want to look where he's pointing --
 4              THE WITNESS:  Oh, sorry.
 5              MR. CAMPOAMOR-SANCHEZ:  -- so I can identify --
 6              THE WITNESS:  I'm on 4.
 7              MR. CAMPOAMOR-SANCHEZ:  You're on 4 of 384.  Okay.
 8              Can we go to page 4 of 384, the bottom part?
 9    A.  So, this is the full article, without the headline.  And,
10    you know, the headline is, Trial of Ukraine's Tymoshenko
11    Flawed, Says Government-Commissioned Report.
12              And then there's an introduction, couple of
13    introductory paragraphs.  And then there's a paragraph with the
14    first quote from Greg, which I didn't touch.
15    BY MR. CAMPOAMOR-SANCHEZ:
16    Q.  Okay.  So are you at the bottom?
17    A.  No.  I'm third paragraph down.
18    Q.  Oh, I'm sorry.
19    A.  Do you want me to read it?  Would that --
20    Q.  Sure.  Go ahead.
21    A.  So his first quote was, "We concluded there are ways in
22    which Tymoshenko was not given a fair trial:  She was not
23    allowed to present all of the witnesses that we concluded were
24    relevant and material, and prosecutorial evidence was presented
25    during proceedings in court, when she was not represented by
```

1   counsel."

2   Q.  Did you change that?

3   A.  No.  It was a negative quote.  So, you know, I knew that

4   was important, so I didn't touch it.

5   Q.  All right.  Can we go down below, then?

6   A.  Then there's the bit in the middle, where the -- so, it was

7   a long, long interview.  And, so, all I asked is that the

8   journalist included several points.  That was the bits in

9   quotes:  Warranted sanctions in Western courts, including

10  charges of contempt, selective prosecution, had not been

11  established.  And said, We do not believe that Ms. Tymoshenko

12  has provided specific evidence of political motivation that

13  would be sufficient to overturn a conviction under American

14  standards.

15  Q.  I'm sorry.  Were you reading at the bottom of this page?

16  A.  I'm just, like, a little -- a paragraph up from the bottom,

17  after the three little bullety bits.  This is the bit I

18  condensed.

19  Q.  Okay.  Did you change its meaning?

20  A.  No, I didn't.  No.  I just compacted it, you know, which is

21  quite a normal thing if you're trying to get a lot in, you

22  know.  But, you know, I didn't tell Mr. Craig.  And, you know,

23  in all honesty, I should have, yeah.

24  Q.  All right.  So when you went to the -- when you told

25  Mr. Gates "I changed them," you didn't say, "I just modified

1    them slightly"?

2    A.  No.  I suppose I didn't, really, no.

3    Q.  So why do you tell Mr. Gates --

4    A.  Showing off, probably.

5    Q.  Huh?

6    A.  I think I was probably showing off.

7    Q.  Okay.

8             Now --

9             THE COURT:  I'm sorry.  Are these excerpts in the

10   article that you suggested changes to?

11            THE WITNESS:  No.  I suggested including them all.

12            THE COURT:  That you proposed to the reporter they be

13   included?

14            THE WITNESS:  Yeah.

15            THE COURT:  Are these -- the words that are in

16   quotes, do these purport to be quotes from an interview from

17   Craig or quotes from the Report?

18            THE WITNESS:  They're kind of both, because, you

19   know, he was using words from the Report in his discussion.  He

20   was speaking to the Report in the way that he said he was going

21   to.

22            MR. MURPHY:  Objection, Your Honor.  Hearsay.

23            THE COURT:  I'm just trying to figure out what -- I'm

24   just seeing this one paragraph pulled out, and I'm trying to

25   figure out what you -- well --

```
 1                    THE WITNESS:  I didn't write it.  What I did is, I

 2       suggested that these were the bits that would -- were

 3       important.

 4                    THE COURT:  All right.

 5                    MR. CAMPOAMOR-SANCHEZ:  Would the Court like me to

 6       just zoom in on the entire second half, instead of that

 7       paragraph?

 8                    THE COURT:  I think that might be helpful.

 9       BY MR. CAMPOAMOR-SANCHEZ:

10       Q.  So can you just -- you can even point with your finger.

11       Like, where were the points you said you changed?

12       A.  (Indicating.)

13       Q.  So it was the paragraph we had zoomed in?

14       A.  Yeah.  And then there's another quote at the end.

15       Q.  Did you change that, too?

16       A.  No.

17       Q.  Okay.  But there's another quote from Mr. Craig, you mean?

18       A.  Yes, there is.  Yeah.

19       Q.  Is that on page 3?

20       A.  It's at the end.  So he has a top, a middle, and a bottom.

21       Q.  And what are you talking about here?

22       A.  Um -- should I circle it?

23       Q.  Yeah, you can.  Sure.

24                    And did you change that quote?

25       A.  No, I didn't.
```

1  Q.  So, let's step back and go back to the email, 384.

2  A.  384?

3  Q.  Yeah.  It's the first page.

4  A.  All right.

5  Q.  So, Mr. Hawker, was the strategy successful?

6  A.  We got the articles we planned to get, you know.  And, you

7  know, it started the reporting of the story in the way that

8  we'd hoped.

9  Q.  And if we can take a look at the front page of 384.  Let's

10  look at the heading.

11       The heading said, "Failings Found in Trial of Ukraine

12  Ex-Premier."

13       That is a -- is that a good or bad heading?

14  A.  It's not the heading we wanted, but, you know, you can't

15  write the story.

16  Q.  Okay.  And if you look at the next page.

17  A.  Of *The New York Times*?

18  Q.  Yes.

19       MR. CAMPOAMOR-SANCHEZ:  Zoom in on the first two

20  paragraphs, where it says, "But overall, the lawyers from the

21  firm of Skadden, Arps, Slate, Meagher & Flom seem to side

22  heavily with the government of President Viktor Yanukovych,

23  which commissioned the Report."

24  MR. CAMPOAMOR-SANCHEZ:

25  Q.  Was that helpful?

1    A.   That's helpful.

2    Q.   And what about the next paragraph?  "The trial court based

3    its findings of Tymoshenko's guilt on factual determinations

4    that had evidentiary support in the trial record, the lawyers

5    wrote."

6              Was that helpful?

7    A.   Yes.

8    Q.   "Based on my review of the record," they added, "We do not

9    believe that Tymoshenko has provided specific evidence of

10   political motivation that would be sufficient to overturn her

11   conviction under American standards."

12             And was that also helpful?

13   A.   Yes.

14   Q.   Almost done, Mr. Hawker.

15             MR. CAMPOAMOR-SANCHEZ:  We can take that down.

16   MR. CAMPOAMOR-SANCHEZ:

17   Q.   In the conversations that you had with Mr. Craig in

18   December with the communications to Mr. Sanger, did he express

19   any hesitation about talking to Mr. Sanger?

20   A.   No.

21   Q.   Did he express any reservations to you about participating

22   in the media rollout plan?

23   A.   No.  Not in December, no.

24   Q.   Did he express any reservations about talking to

25   Mr. Parfitt?

```
 1    A.  No.

 2    Q.  And throughout, did he keep you updated about the progress

 3    of his efforts?

 4    A.  Yes.

 5    Q.  And during 2013, did Mr. Craig ever reach out to you to

 6    discuss an inquiry about the Department of Justice?

 7    A.  No.

 8    Q.  And, finally, sir -- I forgot to ask you yesterday -- how

 9    was FTI paid?

10    A.  Through a strange bank account in Cypress.

11    Q.  Do you remember the name?

12    A.  Black Sea something or other.

13    Q.  Okay.  And do you know who controlled that?

14    A.  No idea whatsoever.

15              MR. CAMPOAMOR-SANCHEZ:  No further questions, Your

16    Honor.

17              THE COURT:  All right.  Before the defense has an

18    opportunity to cross-examine this witness, all of us, I

19    believe, are due our midmorning break, and so we're going to

20    take it now.

21              Please remember that this case has not been submitted

22    to you, and it's not to be discussed or researched further

23    while you're on your break.  We'll resume in approximately ten

24    minutes.  So, please be back in the jury room by that time.

25              (Whereupon the jury exit the courtroom.)
```

```
 1                THE COURT:  All right.  Everyone else is excused as
 2      well.
 3                Thank you.
 4                THE WITNESS:  Thank you, Your Honor.
 5                (Recess.)
 6                THE COURTROOM DEPUTY:  Your Honor, recalling Case
 7      Number 19-125, the United States of America v. Gregory B Craig.
 8                THE COURT:  All right.  Can we bring the jury back?
 9                (Whereupon the jury enters the courtroom.)
10                THE COURT:  All right.  We've got all the jurors
11      back.  Defense can cross-examine the witness.
12                MR. MURPHY:  Thank you, Your Honor.
13                           CROSS-EXAMINATION
14      BY MR. MURPHY:
15      Q.  Good morning, Mr. Hawker.
16      A.  Good morning.
17      Q.  My name is Bill Murphy.  I represent Greg Craig.
18                We've never met before, have we?
19      A.  We have not.
20      Q.  Did you know that I asked to meet with you?
21      A.  Yes.
22      Q.  And you declined?
23      A.  Yes.
24      Q.  Now, you have been interviewed, however, by government
25      agents about these matters on several occasions, is that true?
```

1    A.  Yes, it is.

2    Q.  You were interviewed the first time, I think, on January

3    the 9th, 2018?

4    A.  I don't recall the dates, but I certainly have been

5    interviewed.

6    Q.  That was in Washington.  Do you remember the first

7    occasion?

8    A.  Yes.

9    Q.  That was the better part of a full day?

10   A.  Yes, it was.  Yes.

11   Q.  And then you were interviewed for a second time in July of

12   2018?

13   A.  Yes, I was.

14   Q.  And that was in New York City?

15   A.  Yes, it was.

16   Q.  And among the people that were present at that interview

17   were Mr. McCullough, who's seated at the counsel table today?

18   A.  Yes.

19   Q.  And Agent Kegl, the FBI agent?

20   A.  Yes.

21   Q.  Mr. Kegl is seated in the first row?

22   A.  I didn't know his name.  Yes.

23   Q.  You didn't know his name?

24   A.  No.

25   Q.  And then you were interviewed a third day, and I think that

1   was a two-day interview, here in Washington, January the 23rd,

2   and 24th of this year.  Do you recall that?

3   A.  I recall being interviewed.  I don't remember it being two

4   days, but it may very well have been.

5   Q.  Agent Kegl was there.  Do you recall him?

6   A.  Yes, he was.

7   Q.  And Mr. Campoamor-Sanchez was there?

8   A.  I presume so.  I don't remember.

9   Q.  You don't remember him being there?

10  A.  I remember being there, I just don't remember who was

11  there.

12  Q.  Mr. McCullough was there, right?

13  A.  Possibly, yeah.  I just don't remember.

14  Q.  All right.  And you got into town a few days ago, is that

15  right, here in Washington?

16  A.  I've been here forever.  Since -- a week last Sunday.

17  Q.  So you've been here since last Sunday?

18  A.  Yep.

19  Q.  So that's nine days ago?

20  A.  Feels like a longer one.  But, yeah.

21  Q.  Were you interviewed by any of the agents of the government

22  during that period, between last Sunday and yesterday, when you

23  took the witness stand?

24  A.  Yes, I've met them.

25  Q.  How many times?

1    A.  I think it's three.  But --

2    Q.  And were they long sessions?

3    A.  No, they weren't particularly long.  No.  They weren't,

4    like, the whole day ones, you know, from before.

5    Q.  Okay.  So, by my count, that sounds like six separate

6    interviews that you had with the government agents?

7    A.  Yeah, must be.  Must be.

8    Q.  Okay.  Were there occasions when you were interviewed when

9    you told the government agents that things that you had told

10   them before you had misremembered, and you corrected them?

11   A.  Yes, definitely.

12   Q.  And a lot of the events that we're talking about -- in

13   fact, all the events we're talking about took place in 2012,

14   right?

15   A.  Long time ago.

16   Q.  Long time ago.  And it was hard for you to remember exactly

17   what happened?

18   A.  Very much so, yep.

19   Q.  And so there were a couple of corrections that you needed

20   to make because you had told the agents of the government one

21   version of the facts, and later discovered that you were wrong

22   about your recollection, right?

23   A.  Yeah.  You know, documents spark, you know, fresh memories

24   and -- yeah.  You know, but you want to get it right.

25   Q.  Okay.  One of the things, for example, that you talked

1    about in your second interview, but that you corrected in your

2    third interview, was whether there was a pre-meeting before the

3    Harvard Club meeting at which you gathered with Mr. Manafort

4    and Mr. Gates in the morning in order to try to strategize

5    about ways to convince Mr. Craig to be more cooperative and

6    more engaged with the media plan, right?

7    A.  Yes, that's correct.  I got the sequence the wrong way

8    around.  Yeah.

9    Q.  And so, that meeting that you described in some detail on

10   that date, to the agents, actually had not occurred before the

11   Harvard Club meeting, had it?

12   A.  You're correct.

13   Q.  And what you then remembered was, well, we had a meeting in

14   Kyiv the week before at Mr. Manafort's suite, at Mr. Manafort's

15   hotel in Kyiv, right?

16   A.  We did.

17   Q.  Some of the same people gathered at that meeting?

18   A.  Yeah.  There's been a lot of meetings, so I just mixed them

19   up.

20   Q.  So Manafort was there, it was his suite, right?

21   A.  Which one are you talking about?

22   Q.  The one in Kyiv, on or about September the 18th, 2012.

23   A.  I don't remember the dates.

24   Q.  We'll look at the documents.

25   A.  I certainly attended a meeting at Mr. Manafort's hotel room

1    with others, yeah.

2    Q.  Was Mr. van der Zwaan there?

3    A.  I can't remember.

4    Q.  Was Mr. Kilimnik there?

5    A.  Yes.

6    Q.  Was Mr. Gates there?

7    A.  I don't remember.  I don't remember.  It's a long time ago.

8    Q.  Was the purpose of the meeting on or about September the

9    18th at Mr. Manafort's hotel suite in Kyiv, was part of the

10   purpose, at least, to strategize about how to get Mr. Craig to

11   become more cooperative with the media plan that you had been

12   designing for many months?

13   A.  I don't remember.

14   Q.  Do you remember that there was such a meeting, a strategy

15   meeting at which Mr. Greg Craig was not present?

16   A.  He wasn't present at most of our meetings.

17   Q.  Okay.  And then after the Harvard Club meeting, on or about

18   September 25th or 26th, you met with Mr. Manafort to talk about

19   what Mr. Craig had said at the Harvard Club meeting, right?

20   A.  To talk about the email that Mr. Craig had sent, which

21   said, you know, I wanted to help but now I can't because of

22   firm policy.

23   Q.  That was another strategy meeting to see whether you could

24   convince, or someone could convince Mr. Craig to become more

25   cooperative with the plan, right?

1    A.  Yeah.  It was a meeting to discuss what we were going to do

2    about the plan, now that we were likely not going to be able to

3    have Greg, you know, participate.  And the meeting in which

4    Paul, you know --

5    Q.  What you remember, essentially, is that Mr. Manafort said

6    something along the lines of he would take care of it, right?

7    A.  Yeah, exactly.  Yeah.

8    Q.  When you first met with Mr. Craig in the Ukraine, one of

9    the very first times you saw him, you had some discussion about

10   how he viewed FTI's role and Skadden's role in connection with

11   the Tymoshenko Report, right?

12   A.  Yes, we did.  Yeah.

13   Q.  And he made it quite clear to you that he thought those

14   roles were separate?

15   A.  Yes, he did.

16   Q.  And he made it clear that he did not want FTI and its

17   personnel, including yourself, to be involved in any way in

18   putting a public relations spin or message into the conclusions

19   of the Report that Skadden was working on and preparing, isn't

20   that right?

21   A.  Greg never asked FTI to participate in the writing of the

22   Report.

23   Q.  In fact, he made it clear to you that he did not want the

24   public relations aspect to influence the outcome of the Report,

25   isn't that right?

1    A.  I don't recall him ever saying that.

2    Q.  Do you remember saying, from your perspective, it seemed

3    like Mr. Craig had an academic interest in the issues

4    surrounding the Tymoshenko trial, he wanted to complete his

5    report and he didn't want to have anything to do with FTI until

6    the Report was done?

7    A.  Yeah, I think that's a fair assessment.  Yeah.

8    Q.  And you found Mr. Craig, on occasions, to be sort of

9    prickly with you, is that fair?

10   A.  I think I probably did upset him.

11   Q.  In fact, you described the fact that your view during the

12   time that you were in the Ukraine, you thought that Mr. Craig

13   viewed you as -- I think what you called a pain in the behind,

14   isn't that right?

15   A.  I -- you know, I think probably fairly, because I'm acting

16   for my client, the government of Ukraine, and I have a

17   different, you know, role.

18   Q.  So you understood that your role, acting for the government

19   of Ukraine, was to put out a message the best you could that

20   would be acceptable to the government of Ukraine, right?

21   A.  Yeah, my job was to use the PR materials that were

22   developed, you know, as part of all of these plans you've

23   already heard about, to help the government of Ukraine to

24   achieve its strategic objective, which was to try to influence

25   people, particularly in the European Union, because of

1    membership -- associate membership status.

2    Q.  Did you understand that the lawyers at Skadden had a

3    different goal?  And their goal was to write an independent

4    report on the Tymoshenko trial and whether her rights had been

5    violated in accordance with standards of western due process?

6    A.  Absolutely.  In fact, Mr. Craig was very clear from the

7    start, this would be an independent report, they would write

8    it.  And, you know, that's normal, you don't want a PR company

9    trying to do a legal analysis of anything.

10   Q.  All right.  Now, I want to take you back to the beginning

11   of the engagement.

12           Can we look at Government's Exhibit 116, please?

13   A.  Is that in Volume 1?

14   Q.  It is.  And you can follow along on the screen.  There are

15   some binders there.  There are some defense exhibits and some

16   government exhibits, and I'm not sure --

17   A.  Did you say 161?

18   Q.  116.  And it's Government's Exhibit 116.

19   A.  Sorry.  I have no idea what I'm looking at.

20           THE COURT:  It may be on your screen, if that helps.

21   But it's really small.

22           MR. MURPHY:  There's a lot of documents.

23           THE WITNESS:  Thank you, sorry about that.

24           THE COURTROOM DEPUTY:  Mr. Murphy, is this already in

25   evidence?

1      MR. MURPHY:  I think it's been admitted.

2      THE COURTROOM DEPUTY:  Thank you.

3  BY MR. MURPHY:

4  Q.  There is an email exchange between you and a Mr. Bhavnani?

5  A.  That's right.

6  Q.  He was an FTI person?

7  A.  Yes, he is.  He might still be, actually.  He definitely

8  was at the time.

9  Q.  And you were discussing with him whether or not this was an

10  assignment that FTI would be willing to take on, right?

11  A.  Yeah.  Raoul was in charge of, like, a research function

12  and we were, obviously, with the PR agency.  You try and bring

13  in other parts of the business to try and increase the scope of

14  the work.  So I was having a discussion with Raoul about that.

15  Q.  If we just highlight the top email.  On May the 10th you

16  told Mr. Bhavnani, when he said we should be able to make this

17  work, your response was, "Hope so.  I need the work,"

18  exclamation point, right?

19  A.  Yeah.  I said yesterday that we were going through a bit of

20  an economic, you know, downturn in the UK and, you know, I was

21  worried about getting enough litigation work to keep my staff.

22  Q.  Now, if we look at Government Exhibit 118 -- and you looked

23  at it yesterday?

24  A.  Yes.

25  Q.  This was an email that you wrote to Mr. Reilly and you

1    copied Mr. Aarons, it's May the 11th of 2012?

2    A.  Yes, it is.

3    Q.  And this is the first time I think we saw that phrase,

4    Project Veritas contract?

5    A.  Yeah.

6    Q.  And you described that name as sort of being tongue in

7    cheek?

8    A.  Yeah.  It was something that, you know, could be used

9    positively, you know.  But, yeah, it was a bit of a joke, yeah.

10   Q.  A bit of a joke?

11   A.  A bit of a joke.

12   Q.  You mentioned in your email, in the third paragraphs, that

13   the consulting firm for the Ukrainian presidency -- which was

14   Manafort -- was coordinating your contractual arrangements,

15   right?

16   A.  Well, we hoped.

17   Q.  You hoped.  Okay.  And you became familiar with Manafort

18   Davis, the firm, right?

19   A.  I think -- isn't it Davis Manafort?

20   Q.  Maybe.  Davis Manafort.  You're probably right.

21   A.  We sometimes refer to it as DMP in the documents.

22   Q.  David Manafort Partners?

23   A.  Must be.  Must be.

24   Q.  That's who Mr. Gates worked for, right?

25   A.  Yes.  And Konstantin Kilimnik.

1   Q.  And you viewed Mr. Manafort, I think you've said in some of

2   the documents, as kind of the big boss, in terms of your

3   relationship?

4   A.  You know, it's slightly odd.  You know, our client was

5   Ukraine, the government of Ukraine, but all of our instructions

6   were from the Manafort people, so they're the client, too.

7   Q.  And on a day-to-day basis, for many months, the person that

8   you took your directions from was Rick Gates, right?

9   A.  Absolutely, yes.

10  Q.  You didn't even actually meet Mr. Manafort until much

11  later, isn't that right?

12  A.  I didn't meet him until a lot later, yeah.

13  Q.  Maybe August or September?

14  A.  I can't remember when, but I didn't meet him at the start.

15  Q.  You didn't meet Mr. Kilimnik at the start?

16  A.  No.  I didn't even know him at the start.

17  Q.  And he was a Russian, right?

18  A.  I think he still is.

19  Q.  Was and is a Russian?

20  A.  Definitely a Russian.

21  Q.  But he was sort of Mr. Manafort's person who did a lot of

22  the dealing with the Ukrainian ministers and government

23  bureaucrats?

24  A.  Yeah.  He started off as, like, an interpreter, because

25  Paul doesn't speak Russian, and then the role took on a life of

1    its own, as all of it did, really.

2    Q.  Let's look at the last paragraph of this email separately.

3         You wrote, separately, "Skadden is of the view that

4    the fact that our role is exclusive to Europe means that FTI

5    would not be needed to register under FARA," right?

6    A.  That's right.

7    Q.  "They've taken that view themselves.  Can you advise

8    whether Eric is comfortable with this also?"

9    A.  Yes.

10   Q.  And you testified that Eric was a reference to Eric Miller,

11   who was the general counsel of FTI?

12   A.  Yes.

13   Q.  Did you ever hear back from Mr. Miller that there was a

14   problem?

15   A.  I don't think so, no.  I heard back from within the system

16   that they were comfortable.  I think it was Ed Reilly that sent

17   an email that basically said, Based on what we know, it's all

18   fine.

19   Q.  When you said, Skadden is of the view, as of May the 11th,

20   you had not met with Mr. Craig yet, had you?

21   A.  I don't believe so.  I said yesterday that this is

22   referring to a discussion with Alex van der Zwaan.

23   Q.  Alex van der Zwaan.  Now, let me ask you a little bit about

24   Mr. van der Zwaan.  He was an associate in the London office of

25   Skadden, right?

```
 1    A.  Yes, he was.  Yep.

 2    Q.  And he spoke Russian, right?

 3    A.  I thought he was half Russian, actually.  But, he was

 4    fluent in Russian.

 5    Q.  Did you come to learn that Mr. Manafort had made a job

 6    offer to Mr. van der Zwaan to lure him away from Skadden and to

 7    have him work for Mr. Manafort?

 8    A.  I'm learning it now, but I'm really unsurprised.

 9              THE COURT:  All right.  Well --

10              THE WITNESS:  Sorry.

11              THE COURT:  You don't know.

12              THE WITNESS:  I don't know.  Sorry.  I do apologize.

13    BY MR. MURPHY:

14    Q.  All right.  That's fine.  You say you're not surprised?

15    A.  I'm not surprised.

16              THE COURT:  Well, there's no evidence in the record

17    that it happened.  It was a question; he doesn't know.  Ask

18    your next question.

19    BY MR. MURPHY:

20    Q.  Did it appear to you, during the period of time that you

21    were working in the Ukraine, that Mr. van der Zwaan was very

22    close to Mr. Gates and Mr. Manafort?

23    A.  Yes.  Particularly Mr. Gates.

24    Q.  And were there times when Mr. van der Zwaan did some things

25    that you thought Mr. Craig didn't know about?
```

```
1            MR. CAMPOAMOR-SANCHEZ:  Objection.

2            THE COURT:  Can you approach the Bench?  Can we

3    approach the bench?

4            (Bench discussion:)

5            THE COURT:  All right.  So you want to bring in the

6    fact about that he had a copy of the Report.

7            MR. MURPHY:  Yeah.

8            THE COURT:  Now, he's testified at several points

9    that he saw bits and pieces of the Report.  So why can't he ask

10   that question?

11           MR. CAMPOAMOR-SANCHEZ:  It was really, then, to the

12   point -- I don't have any objection to him asking when he saw

13   the Report and how he saw the Report.  What I do have a problem

14   with is the way he phrased the question.

15           THE COURT:  I think you can go through when did you

16   get the Report?  Who gave you the Report?  Do you know whether

17   Mr. -- do you know who -- through your own personal knowledge,

18   whether Mr. Craig knew about it or permitted it?

19           MR. CAMPOAMOR-SANCHEZ:  Can we add to that, if the

20   Court allows, that he specify at the time?  Because he

21   certainly knows now.  But I just want to make sure that he asks

22   him at the time.

23           MR. MURPHY:  I'll ask him.  But --

24           THE COURT:  Well, I mean, I think --

25           MR. CAMPOAMOR-SANCHEZ:  Just like to start with the
```

1    answer.  Sorry.  So...

2            THE COURT:  Your question that bought us up here was

3    whether Mr. van der Zwaan did things that Mr. Craig didn't know

4    about.  And if he's learned, through the course of his

5    investigation -- so that's -- so the questions have to be at

6    that time did you know whether he had Mr. Craig's permission?

7            MR. CAMPOAMOR-SANCHEZ:  No objection to that.

8            MR. MURPHY:  Okay.  That's fine.

9            THE COURT:  All right.

10           MR. MURPHY:  Thank you.

11           (Open court:)

12   BY MR. MURPHY:

13   Q.  Mr. Hawker, you testified, either yesterday or this

14   morning, that there were times in the summer when you were very

15   anxious to see either a draft of the Report or the final

16   report, isn't that right?

17   A.  Yes.

18   Q.  And you testified that at some point you got a look at a

19   draft of the Report?

20   A.  That's right.

21   Q.  Right?

22   A.  Yes.

23   Q.  And you were able to review it?

24   A.  Yes.

25   Q.  But you didn't get a copy?

1    A.   No.   No, it was a bit weird.

2    Q.   It was a bit weird.   And you had asked -- isn't it true you

3    asked Mr. Gates to see -- let me -- strike that.   Start over.

4         You had asked Mr. Craig directly if you could get a

5    copy of the Report, didn't you?

6    A.   I tried to get a copy of the Report from Mr. Craig and he

7    said it wasn't ready.   We were coming up to one of these

8    publication dates and so we were under a lot of pressure and I

9    kind of needed the draft to make a start.   And so what happened

10   is I reported back to Mr. Gates that I couldn't get it and then

11   he arranged for me to see a copy through Alex van der Zwaan.

12   Q.   When you say he arranged for you to see a copy through

13   Alex van der Zwaan, what happened is you called Mr. Gates and

14   you said, Mr. Craig has said I'm not going to get a copy yet,

15   and then Mr. Gates told you to go to Mr. van der Zwaan's room

16   in the hotel in Kyiv, isn't that right?

17   A.   It's not quite right, but almost.

18   Q.   When you got to the room, Mr. van der Zwaan had left a copy

19   for you to read?

20   A.   No, he was in the room.

21   Q.   He was in the room?

22   A.   Yeah.   And he said to me, There's a copy of the Report on

23   my desk.   I'm going to go out now for a period of time -- I'm

24   pretty sure it was, like, half an hour -- do what you like and

25   I'll see you later.   And I took that as, okay, he wants me to

1    read the Report.  And I made a few notes in the half an hour I

2    was allowed to see it, and that was that.

3    Q.  And based on that experience, did you conclude that

4    Mr. van der Zwaan was doing some things that Mr. Craig didn't

5    know about?

6              MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

7    question.

8              THE COURT:  The question is:  Did you know at that

9    time whether Mr. van der Zwaan had Mr. Craig's authorization to

10   show you, or not?

11             THE WITNESS:  I thought it was extremely unlikely

12   that Mr. van der Zwaan would have an authorization from Greg,

13   who just earlier told me that I couldn't have the Report.

14             THE COURT:  Ask your next question.

15   BY MR. MURPHY:

16   Q.  You actually told the government about this little event

17   where you read the Report in Mr. van der Zwaan's room just

18   about a few days ago, on August the 18th, isn't that right?

19   A.  Sorry.  I thought you meant the Ukrainian government.  Yes,

20   I did.

21   Q.  The United States government.  I'm referring to these folks

22   here.

23   A.  Sorry.  When you say "government," I'm still stuck in

24   Ukraine.  Yes, I did tell it.  I remembered it subsequently,

25   yes.

1    Q.  So, this was probably your fourth or fifth interview with

2    government agents, and it's the first time that you remembered

3    that little event, isn't that right?

4    A.  It is, yeah.  It is.

5    Q.  Okay.  Now let's take a look at Exhibit 119.  And this is

6    an email.

7              If you blow up the top.  Thank you.

8              It's an email that Mr. Reilly sent to a whole group

9    of people at FTI, including yourself, announcing the decision

10   that had been taken to represent the prosecutor general of the

11   Ukraine and his deputy in relation to a prosecution of the

12   oligarch and former prime minister of the country for abuse of

13   office and fraud, right?

14   A.  Right.

15   Q.  And it says that he had Reilly -- who I think you described

16   as the head of strategic communications?

17   A.  Yeah, PR; it's the same thing.

18   Q.  PR equals strategic communications?

19   A.  It does.

20   Q.  He was the worldwide head for FTI?

21   A.  Yes, he was.

22   Q.  And he said that he had discussed it with Mark

23   Malloch-Brown and there was a need to carefully manage the

24   engagement?

25   A.  Yes.

1    Q.  And that Malloch-Brown, is he sometimes referred to as Lord

2    Malloch-Brown?

3    A.  He has a title.

4    Q.  Was he a member of English Parliament?

5    A.  There is no English Parliament.

6    Q.  I'm sorry.  United Kingdom?

7    A.  We do have one in the United Kingdom.  He was a member of

8    the House of Lords, which is one of the two Houses of

9    Parliament.

10   Q.  And was he a minister in one of the governments at the

11   time?

12   A.  Yeah, I think he might have been international development.

13   But I don't know, I don't know much about his career.

14   Q.  Did you come to find out that he and Mr. Reilly both were

15   acquainted with Mr. Craig from past events?

16   A.  Yeah, they have a political connection.

17   Q.  Okay.  And, in fact, if you go down to the third paragraph.

18          Mr. Reilly stated, "This assignment will be

19   controversial and will carry some risk in that we are working

20   alongside Skadden, with our long-time friend and colleague,

21   Skadden partner Greg Craig.  We have comfort that this matter

22   will be handled with the utmost degree of professionalism and

23   sensitivity."  That's what he wrote, right?

24   A.  It is.

25   Q.  Now, did you ever find out that Mr. Craig had complained to

1    Mr. Reilly and Lord Malloch-Brown about your lack of

2    professionalism?

3    A.  Not really, no.

4    Q.  Never heard that?

5    A.  No.

6    Q.  You left --

7    A.  He never complained to me.

8    Q.  You left FTI at some point, right?

9    A.  Yeah.  I left in -- I think it was March 2014.

10   Q.  And your belief is that the failure of FTI to receive

11   approximately $300,000 in out-of-pocket expenses that had been

12   incurred on the Ukraine assignment was one of the reasons that

13   you were sort of on the outs with management, right?

14   A.  Yes.

15   Q.  And I think you've explained this as you saw the

16   handwriting on the wall and it was time for you to go?

17   A.  That's not my words.

18   Q.  You didn't say "handwriting on the wall"?

19   A.  I don't believe so, no.

20   Q.  Is that a fair and accurate description of how you felt in

21   '14 when you left?

22   A.  I felt it was my responsibility and that, you know, not

23   receiving such a huge amount of income, you know, or money

24   within to the system, you know, fell on my shoulders and I

25   chose to resign --

1    Q.  Okay.

2    A.  -- sometime afterwards.

3    Q.  Okay.  All right.  Were there any other issues involving

4    your professionalism at the time?

5         Let me ask you about the Google matter.

6    A.  What's wrong with that?

7         MR. CAMPOAMOR-SANCHEZ:  Objection.  Can we approach?

8         THE COURT:  Can you approach?

9         MR. MURPHY:  Sure.

10         (Bench discussion:)

11         MR. CAMPOAMOR-SANCHEZ:  I believe what Mr. Murphy is

12    getting at is later, in mid-2013, he took on a client that put

13    in an ad against Google and FTI didn't like it, so they had a

14    conversation with him at the time.  This is well after the

15    events in the case.  This happened in mid-2013.

16         THE COURT:  Do you have evidence that he was fired

17    for or terminated for being unprofessional in any particular --

18         MR. MURPHY:  I think Mr. Reilly, who we have under

19    subpoena, will testify that one of the reasons why he was asked

20    to leave was this Google matter, which Mr. Hawker has not

21    testified about.

22         THE COURT:  I don't see the relevance.

23         MR. MURPHY:  Okay.

24         MR. CAMPOAMOR-SANCHEZ:  And I actually disagree with

25    what Mr. Reilly will say about it because I asked him a lot of

1     questions about it.  But be that as it may, I think it's

2     irrelevant.

3              THE COURT:  You asked him if he knew about complaints

4     about his unprofessionalism with respect to this, and he said

5     no.  And so that's all he can tell you about that.  And I don't

6     think this other matter is relevant.

7              MR. MURPHY:  But if he testifies in this Court, Your

8     Honor, that there was no other issue, and in fact there was

9     another issue, then his credibility is certainly at issue in

10    this case.  I think I should be entitled to ask him about this

11    matter that reflects on his credibility in this courtroom.

12             MR. CAMPOAMOR-SANCHEZ:  So I already asked -- I did

13    not object to him asking about the reasons for leaving.  So

14    that's his understanding.  If he wants to try to impeach on a

15    collateral issue later --

16             THE COURT:  If he says he was fired, he can say it

17    wasn't just the expense, we had been telling him for weeks we

18    were very upset with his professionalism.  But I don't think

19    you have anything more to ask him right now about this.  I

20    don't think that we're going to go down -- I don't think -- I

21    think you're trying to impeach his character with some specific

22    instance of his conduct that we don't even know had misconduct,

23    that's collateral to that case.

24             So you've asked him for his story, for why he's no

25    longer there, and if he he's lying about that, then you put on

1    evidence about that; you put on evidence about that.

2           MR. MURPHY:  Okay.  But he has testified in this

3    court and I think I should be entitled to ask whether his

4    testimony wasn't a little bit misleading.

5           THE COURT:  What testimony?

6           MR. MURPHY:  About the reason why he left.

7           MR. CAMPOAMOR-SANCHEZ:  So he already told you why he

8    thought he left.  He wasn't misleading.  That was his

9    understanding.

10          THE COURT:  You believe it's misleading --

11          MR. MURPHY:  That's all right, Your Honor.

12          THE COURT:  I've think we're done.  I don't want to

13   go further on that matter.

14          MR. MURPHY:  That's fine.

15          (Open court:)

16   BY MR. MURPHY:

17   Q.  Can we look next at Defendant's Exhibit 37?  And you might

18   have to switch books, Mr. Hawker, if you're trying to --

19   A.  Number two?  Two?

20   Q.  Wherever the defendant's exhibits are up there.

21          THE COURTROOM DEPUTY:  It's admitted.

22          MR. MURPHY:  It's been admitted.

23   BY MR. MURPHY:

24   Q.  Can I help you?

25   A.  I'm just trying to find the one you're referring to.

```
 1    Sorry.
 2                 THE COURT:  All right.  Does he have a binder for
 3    defense exhibits?
 4                 MR. MURPHY:  Yes, he does.
 5                 THE WITNESS:  Is it this one?
 6                 THE COURT:  All right.
 7                 THE WITNESS:  Volume 1.
 8    BY MR. MURPHY:
 9    Q.  Defendant's 37?
10    A.  I'm sorry, which one did you want?
11    Q.  37.
12    A.  37.  Yep.
13                 THE COURT:  That's why we have screens for you, so
14    you don't need 27 binders.
15    BY MR. MURPHY:
16    Q.  This was an email that Mr. Aarons sent to Rick Gates and
17    copied you about your letter of engagement, and it's dated May
18    13, 2012, right --
19    A.  Yes.
20    Q.  -- at the beginning?
21                 And Mr. Aarons was your colleague with this
22    assignment?
23    A.  Yes.
24    Q.  There were some periods of time when you were both in the
25    Ukraine and some times he was there and some times you were
```

1   there, depending on schedules and other business engagements?

2   A.   That's right.

3   Q.   Mr. Aarons didn't get along very well with Mr. Gates, did

4   he?

5   A.   I don't think anyone would have.

6   Q.   Okay.  Anyway, Mr. Aarons sent to Mr. Gates a draft letter

7   of engagement and standard terms of business for the project,

8   right?

9   A.   That's right.

10   Q.   And attached to this document is a draft of a form of a

11   consulting agreement for FTI and someone, right?

12   A.   That's right.

13        MR. MURPHY:  If we go to the second page.  If you

14   blow up the top part.  I'm sorry.

15        You are right, John, I was wrong.

16        Blow up the top part.

17        I'm sorry.  That one, so the jury can see.

18   BY MR. MURPHY:

19   Q.   So this was dated May the 14th of 2012 and it says, "Dear,

20   add name.  Strategic communications services project."  So at

21   the time you didn't really know who your client was likely to

22   be, or who it was?

23   A.   We didn't know who was going to be the contracting party,

24   but the client was going to be the prosecutor general.

25   Q.   Okay.  If you look at Government Exhibit 121.  And

1   unfortunately I'm going in sort of chronological order, which

2   requires you to switch back and forth.

3   A.  I'll do my best.

4          THE COURTROOM DEPUTY:  Is this already in?

5          MR. MURPHY:  Yes.

6   BY MR. MURPHY:

7   Q.  I think you were asked about this document yesterday.  Now,

8   this is the email from Matthew Cowie to you on May the 15th of

9   2012 and it says, "Jonathan, I'm available for a call when you

10  are free from your meeting.  We resume at 2.  Greg has some

11  firm views about how we work together, which he is happy to

12  discuss in the lounge over some food at 6," right?

13  A.  Yes.

14  Q.  And that's the meeting when Mr. Craig described the

15  separateness between FTI's role and Skadden's role?

16  A.  Yeah, his firm views.

17  Q.  Now, let's look at Exhibit 128, Government Exhibit 128.

18  Should be in the same book?

19  A.  Are they all mixed up together.

20          THE COURT:  One book has government exhibits in

21  chronological order, and then if he said defense exhibit,

22  that's in a different binder.

23  BY MR. MURPHY:

24  Q.  You should be in the same book you were just in.

25  A.  No, I'm not.

1          THE COURT:  If they put them on the screen and

2     they're directing your attention to any part in particular,

3     they're going to call it out and it gets bigger.

4          THE WITNESS:  I'm sorry.  I'm struggling to see the

5     screen.

6          THE COURT:  I have the same problem, but then they

7     cut it out and it's easier to see.

8          MR. MURPHY:  Let's blow up the very top email here.

9     BY MR. MURPHY:

10    Q.  Mr. Hawker, this was the email exchange that you were asked

11    about yesterday where you were involved in preparing some press

12    statements for the Ukraine Ministry of Justice about the fact

13    that they had hired Skadden, right?

14    A.  Yes.

15    Q.  Do you remember, sir, that after you did your work on that,

16    the Ukraine Ministry of Justice put out a press release?

17    A.  I don't remember.

18    Q.  You don't remember them doing kind of a poor job in terms

19    of explaining the project?

20    A.  Not at the moment.  Unless there's a document that

21    refreshes my memory, I don't remember it.

22    Q.  That's All right.

23          Let's look next at Defendant's Exhibit 48.  And I can

24    blow up the document for you, if you prefer.

25          And we start with the last page, page 4 of this

1    exhibit.  And this begins, this email exchange begins with an

2    emailed from Mr. Aarons to Mr. Gates, dated May the 23rd, 2012.

3    And the subject line was:  Still no cash or contract, right?

4    A.  Yeah.

5    Q.  And he copied you?  Mr. Aarons copied you, right?

6    A.  That's absolutely right, he did.

7    Q.  And in it Mr. Aarons says that there are a lot of things

8    that FTI would like to be doing and working on, but you're

9    going to want to wait until you have a contract and get paid,

10   right?

11   A.  Absolutely.

12   Q.  Among the things that he mentions is there should be a

13   dedicated media portal to serve the international media

14   embedded within the prosecutor's office website, and this would

15   be in English language, microsite, controlled directly by us

16   and populated with content, a range of back-grounders,

17   frequently asked questions, photo and video materials, key

18   events calendar and links to supportive online pieces, right?

19   A.  Yes.

20   Q.  Was that all in connection with the contemplated trial of

21   Ms. Tymoshenko that was expected to happen, the second trial?

22   A.  Sorry.  Sorry to interrupt.  It was broader than that.  It

23   was to professionalize the communications of them generally.

24   But, obviously, we were coming up to the second trial and it

25   would have played a part in it.

1   Q.  As far as you know, the second trial never occurred, did

2   it?

3   A.  It was delayed, from what I remember, and it didn't

4   proceed.

5   Q.  So for a period of time it was delayed, and then nothing

6   happened?

7   A.  Very Ukrainian, yeah.

8   Q.  Among the other things that Mr. Aarons discussed with

9   Mr. Gates was having a research and sentiment tracking among

10  policymakers and opinion leaders across Europe.  And says you

11  or Burson-Marsteller -- I think that's BM?

12  A.  Yeah.  It was one of the other operations that the Manafort

13  operation had working for them, you know, across Europe:

14  Q.  "You or Burson-Marsteller may already have this underway.

15  If so, we'd welcome access to it to help inform our messaging

16  tactics"?

17  A.  That's right.

18  Q.  And Item 3 was a digital social media strategy, beginning

19  with detailed content analysis, followed by proactive content

20  generation and search engine optimization.  Right?  These were

21  all things that were part of a very broad and general upgrading

22  of the public relations apparatus that the Ministry of Justice

23  and prosecutor's office would have, right?

24  A.  Yeah.  They had bits of it, but it was all in Ukrainian and

25  Russian and it was a bit of a mess.  And so we were just trying

```
1    to make it more accessible internationally.
2    Q.  Now, if you turn to the second page of the exhibit,
3    Mr. Aarons sends an email to you Mr. Hawker and the subject
4    line is (P) Rick, right?
5    A.  Yeah.
6    Q.  So the reference there is prick, right?
7    A.  That was what we called him.
8    Q.  That's what you called Mr. Gates, right?
9    A.  Yes.
10   Q.  Okay.  And Mr. Aarons told him, "We've left a voice mail
11   saying that we've taken a decision to pull out our team" -- I'm
12   sorry -- "pull our team out tomorrow, if we again see no sign
13   of a transfer in our bank account," right?
14   A.  Yes.
15   Q.  And further down, in the next paragraph, at the end, it
16   says, "They are still pushing for Pshonka to sign our contract.
17   But another option is for us to be a subcontractor of Skadden,"
18   right?  You later learned that Mr. Gates had not checked with
19   Skadden about that?
20   A.  It was a bit of an omission.
21   Q.  Pardon?
22   A.  It was a bit of omission.
23   Q.  On the part of Mr. Gates?
24   A.  Yeah, he definitely hadn't discussed it with Skadden.
25   Q.  And then if you look at the last paragraph of this email,
```

1   the last big paragraph, he thought it was okay.  So, what

2   Mr. Aarons is saying is he thought it was okay that Skadden's

3   name will now get out.  And he said that the president already

4   had leaked it a week ago, when the Council of Europe people

5   visited.  Rick feels a lot of their critics should welcome a

6   Skadden review, it was only Skadden that wanted to keep it

7   quiet, right?

8   A.  Quite rightly.

9   Q.  So, was it your understanding, too, that Skadden really

10  wanted to stay kind of under the radar and do their

11  investigation and do their report, and some folks in the

12  Ukraine government thought that they wanted to announce that

13  Skadden had been retained?

14  A.  I don't -- you know, I can't speculate on whether they did

15  or not, but the feeling I had is they hired Skadden for a

16  reason, and so they wanted it out.

17  Q.  Okay.

18  A.  I have no evidence.

19  Q.  Okay.  Now, if you look at the next email up, this is your

20  response to Mr. Aarons, on May the 24th.  And you said, "So he

21  effectively admitted lying to us about the bank transfer.  He

22  said that had been arranged for last Friday," right?

23  A.  Yes.

24  Q.  So Mr. Gates had told you that there was a wire transfer

25  coming, or some funds were coming, and they didn't come, right?

1    A.  Yeah.  You know, we -- we felt that, you know, trying to

2    get, you know, the money delivered by Mr. Gates, that he had

3    promised, was a bit like trying to grab eels with your hands;

4    you think you've got it, you look down and there's nothing

5    there.

6    Q.  If we go to the first page of this email exchange on May

7    the 24th.  Just the top email should be fine.

8            You and Mr. Aarons were talking about the fact that

9    one thing you ought to consider doing is packing your bags and

10   heading back to the United Kingdom because you hadn't been

11   paid, right?

12   A.  Yeah.  I wish we had.  Yeah.

13   Q.  And on this occasion, did you stay or did you go?

14   A.  We definitely left on one occasion.  But, you know, this

15   happened a few times, so I don't know.

16   Q.  All right.  Now, let's look at Defendant's Exhibit 49.  It

17   should be the next document in the same book.

18   A.  Yeah, got it.  Sorry.  Can I move this one now, then?

19   Q.  And let's start on the second page of this document.

20   There's a long email from Mr. Aarons?

21           MR. CAMPOAMOR-SANCHEZ:  Can we approach?

22           MR. MURPHY:  I'm sorry?

23           THE COURT:  Mr. Campoamor-Sanchez has asked to

24   approach the bench.  So you should come, too.

25           MR. MURPHY:  I'm sorry.

1          MR. CAMPOAMOR-SANCHEZ:  So it's another email with

2     the complaints with Mr. Gates.  I don't -- I would like this

3     witness to be finished today.  This has already been covered.

4     He has expressed his feelings to Mr. Gates.  This seems

5     cumulative to me.  I would like to see if we can cut this down

6     so we can get to the rest of your cross.

7          MR. MURPHY:  Fine.

8          THE COURT:  He gets to do what he wants to do.  If

9     he's belaboring a point or beating a dead horse, that's his

10    risk, I guess.  There's some number of times that we don't need

11    to do the same thing.  But if you're moving on, I'm going to

12    lets him ask him his questions.  I think we've brought out

13    already on direct and cross that there was tremendous

14    frustration with Rick Gates and money.  But I don't think that

15    asking another question about it is objectionable.

16          I will say that some of your questions have many

17    component parts and that makes it difficult for the witness to

18    answer.  So, if you could try -- there's just been some, you

19    know, really compound questions that haven't been objected to,

20    that it's hard to know what the parties are agreeing with and

21    objecting to.

22          Thank you.

23          (Open court:)

24          THE COURT:  Is there something else?  No?

25          (Bench discussion:)

 1              MR. MURPHY:  I do want to ask just about this one

 2      reference right here (indicating.)

 3              THE COURT:  I don't know, is there a conversation

 4      with me?  Or are you having a conversation with each other?

 5      Where is it?

 6              MR. MURPHY:  (Indicating.)

 7              MR. CAMPOAMOR-SANCHEZ:  If that's what he wants to

 8      do, that's fine.

 9              MR. MURPHY:  Okay.  Thanks.

10              (Open court:)

11      BY MR. MURPHY:

12      Q.  Looking at Defendant's Exhibit 49, Mr. Hawker.

13              This has to do with, among other things, the fact

14      that you hadn't yet been paid on May the 24th?

15      A.  Yes.

16      Q.  Gates is saying you're going to be a subcontractor to

17      Skadden?

18      A.  Yeah.

19      Q.  And you responded at one point to Mr. Aarons, "Presumably,

20      the A-hole didn't call us," right?

21      A.  You know, we Brits have a sort of funny sense of humor and

22      we're always joking and, you know, we're just having a bit of a

23      giggle about a difficult situation.

24      Q.  Okay.  Well, we have a sense of humor over on this side of

25      the Pond, too.

1   A.  Yeah, you have, you got a sense of humor over here.  But, I

2   think ours is a bit odd to many Americans.  So...

3   Q.  All right.

4          Let's look at Government's Exhibit 151.

5          And if we start --

6   A.  Sorry.

7   Q.  If we start at the second page, at the bottom.

8   A.  Did you say 151?

9   Q.  I did.  Government Exhibit 151.

10  A.  Oh.  Sorry.  Yes.  Sorry about that.

11  Q.  Okay.  Now, this was Mr. Aarons wrote a long email to

12  Mr. Craig, copying Mr. Riley and you and Matthew Cowie of

13  Skadden about the Ukraine engagement.  That begins at the

14  bottom of the second page of the exhibit.

15         Do you see that?

16  A.  I see it, yep.

17  Q.  And Mr. Aarons said, "We've now been informed by Rick Gates

18  at Davis Manafort that the decision has been taken for us to

19  contract with your firm, rather than with any Ukrainian

20  government entity," right?

21  A.  Yeah.

22  Q.  And then, if we go to the bottom of the first page, there

23  is an email from Mr. Craig to Mr. Reilly, which you eventually

24  got a copy of.

25         And Mr. Craig said, on May the 29 th, "I don't know

1    where the Skadden subcontract idea came from.  I have been

2    clear that we cannot run close to the FARA line, and if we were

3    seen as hiring and directing FTI, we would be doing much more

4    than just lawyering.  I think Manafort has to sort this out,"

5    right?

6    A.  Absolutely right.

7    Q.  Okay.  And then Mr. Riley responded to Mr. Craig in saying,

8    "As an FYI, as it relates to FARA, we" -- that would be FTI --

9    "are taking a position at this time that our work in Europe and

10   Brussels, in particular, does not require us to file under FARA

11   at this time," right?

12   A.  Yes.

13   Q.  Okay.  And then Mr. Aarons comments that -- at the top.

14            "Thanks.  It's a mess, but it's good to have his

15   support."

16            And that was a reference to Mr. Craig, right?

17   A.  Yes, it was.

18   Q.  Okay.  Let's look at Government Exhibit 161.  You were

19   shown this yesterday.

20            This is the June 15th email from Mr. Aarons to you,

21   copied to Mr. Ross Hall?

22   A.  Yeah.  He was one of our colleagues.

23   Q.  He was one of your colleagues.

24            It's called -- the subject line is, "Strategy

25   Document for Prick Gates," right?

1    A.  I'm afraid it was a routine name for the man.

2    Q.  You and Mr. Aarons had worked out a preliminary strategy

3    plan for the publication of the Skadden Report, right?

4    A.  I had worked out the plan and I'd sent it to Aarons to sort

5    out my typos, which I'm famous for, and to add a bit to it.

6    Q.  Okay.  And if we look at the second page, top half.

7            You had written in the third paragraph, "On the

8    current timeline, as we understand it, both the trial in the

9    tax fraud case" -- that's Tymoshenko 2 -- "and the appeal in

10   the gas case are scheduled to be heard in the last week of

11   June, as the European 2012 soccer tournament was reaching its

12   climax," right?

13   A.  Yeah.

14   Q.  "These events will proceed by only a few days the delivery

15   of the final report by Greg Craig and his team to the minister,

16   which will then be available for release to the media,

17   stakeholders, and the Ukrainian people," right?

18   A.  That's right.

19   Q.  So, that shows you're thinking that, at the time, the

20   Report might come out as early as late June or early July?

21   A.  That's absolutely right.

22   Q.  Okay.  The bullet points that are listed by you below --

23   A.  Yeah.

24   Q.  -- these are part of the communication strategy that you

25   believed was consistent with what the Ukraine wanted; isn't

1    that right?

2    A.  Yes, definitely.

3    Q.  So the Ukraine wanted to say that the Report will conclude

4    that the trial was valid and that the crime was committed?

5    A.  This is only coming from Ukraine.

6    Q.  Only.  And you heard that from the people in the

7    prosecutor's office?

8    A.  And from the Davis Manafort people.

9    Q.  Okay.

10   A.  Which, in this stage, it's only Gates.

11   Q.  All right.

12   A.  I'll leave out the first name.

13   Q.  So Mr. Gates and the folks that you're dealing with in the

14   prosecutor's office are telling you, "This report will conclude

15   that the trial was valid and the crime was committed," right?

16   A.  Yeah.  I'm probably being a bit more emphatic, but this is

17   what they expected and hoped.

18   Q.  You also wrote down that "Skadden will be unwilling" -- the

19   last bullet point -- "Skadden will be unwilling to take the

20   lead in communications, given their desire to avoid FARA

21   registration and disclosure," right?

22   A.  That's referring to what I had heard from Mr. Craig.

23   Q.  Well, you heard it because Mr. Craig said it to Mr. Riley,

24   right?

25   A.  No.  He said it -- yes.  Yes, you're absolutely right, it

1    was in an email exchange with Mr. Riley.

2    Q.  Right.  The May 29th email Mr. Craig sent --

3    A.  I'm sorry, I don't remember the specific --

4              THE COURT:  Okay.  You're talking over each other.

5              MR. MURPHY:  All right.

6              THE COURT:  So, Mr. Murphy, if you ask him a

7    question, you need to wait for him to answer.

8    BY MR. MURPHY:

9    Q.  You said on direct that the Skadden Report was a public

10   relations tool, and that your role at FTI was to promote it in

11   Europe as part of an effort for the Ukraine to become more

12   aligned with the European Union, right?

13   A.  Yeah.  You know, so -- the situation was that, you know, we

14   had a president who needed a lot of money, who had run out of

15   money.  There were two potential sources of money:  One was the

16   European Union through associate member status; the other one

17   was Russia.  The idea was to try to pull the Ukraine government

18   towards the European Union so they would get funds.

19   Q.  Do you know whether Mr. Craig and Mr. Sloan and Mr. Kedem

20   and the others working on the Report viewed it as a public

21   relations tool, or not?

22   A.  I've absolutely no idea what they thought.  I can't speak

23   for them, I'm afraid.  And I haven't heard one of the names

24   before.

25   Q.  Let's take a look at Defense Exhibit 77.

```
 1    A.  Yes.  Sorry.

 2    Q.  All right.

 3              MR. MURPHY:  If we look at the page -- second page.

 4    And kind of just blow up the top part of that email.

 5    BY MR. MURPHY:

 6    Q.  Mr. Aarons was sending an email to Mr. Gates.  This is now

 7    the 6th of July in 2012.

 8              MR. CAMPOAMOR-SANCHEZ:  9.

 9              MR. MURPHY:  Sorry.

10              THE COURT:  The email you were looking at originally

11    was the 9th, but, now, there's one from the 6th.

12              Which one are you talking about?

13              MR. MURPHY:  On page 2, the email from Mr. Aarons

14    dated the 6th of July.

15              THE COURT:  Okay.

16    A.  I'm with you.

17    BY MR. MURPHY:

18    Q.  And the subject matter is, "Asset Tracing."

19    A.  Yes.

20    Q.  Was that another project that FTI was interested in if --

21    in the event that the Ukraine was seeking to try to collect

22    damages from Ms. Tymoshenko, that you would assist in finding

23    those assets and helping to trace them?

24    A.  Yes.  So, the Ukrainian position was that Ms. Tymoshenko

25    had stolen money that was the property of the people of
```

1   Ukraine, and that they wanted to bring proceedings in other

2   jurisdictions in order to try to recover those funds for the

3   people of Ukraine.

4   Q.  One of the questions Mr. Aarons asked in the second line

5   was, "Any update on the Skadden Report," right?

6   A.  Yes, I can see that.

7   Q.  And then on the first page of the email string, at the

8   bottom, from Aarons to Gates, with a copy to you, Mr. Hawker,

9   he said, "We just ran into Matt Cowie of Skadden, who is in

10  Kyiv on another job.  He says that Greg Craig will be out here

11  next week.  Can you say when we will get to see a draft copy of

12  the Report and update us generally, as we have not heard from

13  you since last Tuesday," right?

14  A.  Yes.

15  Q.  So that's Mr. Aarons trying to get some information about

16  when you might see the Report?

17  A.  Yeah.  We were itching to get going.  Because, remember,

18  the publication date has been pushed back, and we're kind of

19  expecting it imminently.

20  Q.  We look at, next, Defendant's Exit 78, which is the next --

21  should be the next document.

22          At the bottom, you, on July the 12th, said that "The

23  Skadden Report is going to come out on Monday, July the 23rd."

24          So, this is now a second release date, right?

25  A.  Yep.  Ever the optimist.

1    Q.  And Mr. Aarons said to you, on July the 12th, "Jeez, let's

2    hope we get to see a draft soon," right?

3    A.  Yeah.  You have to read it with a Rick Gates' voice, and

4    you'll get it, yeah.

5    Q.  So, you still hadn't seen it?

6    A.  We hadn't seen it, I don't think, at this stage.  I saw it,

7    I think, at the end of July.

8    Q.  Now, let's take a look at Government's Exhibit 189.  It

9    should be in the same book that you were just looking at, I

10   think.

11   A.  No.  I got it, though.  I'm with you.

12   Q.  All right.  Government Exhibit 189.

13           MR. MURPHY:  It's been admitted.

14   BY MR. MURPHY:

15   Q.  This is an email from Mr. Gates to Mr. Aarons and you and

16   Mr. van der Zwaan, dated July 28th of 2012, right?

17   A.  Yes.

18   Q.  And he says, "Guys, Here is the revised media plan.  Please

19   review and provide comments.  But let's schedule a call to

20   discuss.  No discussions via emails."

21           And you'd told us earlier that Mr. Gates had this

22   tendency to want everything to be done in secret, sort of

23   clandestine communication, right?

24   A.  Yes.  He's --

25           MR. CAMPOAMOR-SANCHEZ:  Objection.

```
 1              THE COURT:  Overruled.
 2   BY MR. MURPHY:
 3   Q.  Mr. Gates attached a memorandum from SL to PJM.
 4   A.  No.  It's the other way around.  Sorry.  It's to SL from
 5   Manafort.
 6   Q.  From PJM.  PJM is Paul Manafort, right?
 7   A.  Yes.
 8   Q.  And "SL" is Serhiy Lyovochkin, right?
 9   A.  Yes.
10   Q.  Serhiy Lyovochkin was the chief of staff for
11   President Yanukovych?
12   A.  Yeah, their client.
13   Q.  Pardon?
14   A.  The Manafort client.
15   Q.  Right.
16   A.  So, you know, like I had to work with Gates, SL was their
17   conduit to the government.
18   Q.  Right.
19              Now, Mr. Gates had sort of taken it upon himself to
20   make some revisions in the format to the plan that you guys had
21   drafted up, right?
22   A.  Yes.
23   Q.  And then Mr. Manafort communicates that to the chief of
24   staff of the President.  And if you look at the third page of
25   the exhibit, the bullet points on the media strategy on the
```

1    plan.

2              It says, "The Report will conclude that the trial was

3    valid and that the crimes were committed by Yulia Tymoshenko,

4    but that some irregularities existed, not in line with Western

5    juris prudence."

6    A.  Yes.

7    Q.  It also said, in the last point, Skadden -- "SA" -- Skadden

8    Arps -- "cannot proactively lead in communications, giving

9    their restrictions by FARA registration and disclosure," right?

10   A.  Yes.

11   Q.  Same bullet point as appeared before?

12   A.  It's absolutely in the same bullet point, yes.

13   Q.  And then in Item 6 of the Report release discussion, at the

14   bottom of the same page, it says, "A small number of

15   international journalists shall be briefed in advance of the

16   publication of the Report, under strict embargo, and formally

17   contacted by the MOJ press team, with support from the AC team

18   on behalf of the MOJ."

19             Now, the MOJ is the Ministry of Justice, right?

20   A.  Yes, it is.

21   Q.  And the AC team, was that the anti-crisis team that

22   Mr. Manafort and Gates refer to?

23   A.  It may be.  I don't remember the term.

24   Q.  One of the things that this says is that "Note, need to

25   discuss with PJM.  One possibility is to have the FTI AC team

1  do the outreach on behalf of Skadden," right?

2  A.  Yes.

3  Q.  And that's because of the concern up above, that Skadden

4  was not going to be able to lead in communications, right?

5  A.  That's absolutely right.

6  Q.  Now, under the next page, there's a section called Post

7  Report Release, Item 8.

8  A.  Yes.

9  Q.  There's a reference to Greg Craig.

10        "Greg Craig will need to do briefings and interviews,

11  groups, and one-on-ones with key stakeholders in the

12  attachment, as specified below.  Greg Craig will not initiate

13  these briefings, but it will be done through FTI and the AC

14  team in key targeted cities," right?

15  A.  Yes.

16  Q.  Now, the stakeholders that are referred to, that's the

17  politicians; is that right?

18  A.  Probably, yes.

19  Q.  The next item says, "A private briefing with Greg Craig

20  should be offered to Cox and Kwasniewski," right?

21  A.  Yes.

22  Q.  Cox was a UN official?

23  A.  I can't remember their specific titles.  But, they were

24  people who were, like, special rapporteurs or monitors for

25  human rights.

1   Q.  Right.  Kwasniewski was the former president of Poland?

2   A.  Yes, he was the president -- former president of Poland.

3   Q.  Mr. Craig didn't do, as it turned out, either of these

4   things, did he?

5   A.  He did not.

6   Q.  Item 10.  "A private briefing should be offered to the

7   Ukranian Commissioner for Human Rights, a fluent English and

8   German speaker."

9          Mr. Craig never did a briefing with that person, did

10   he?

11   A.  He didn't.  No.

12   Q.  Item 11 refers to "Special attention being given to the

13   German and Russian media, as well as journalists previously

14   briefed by the first deputy procurator general on his media

15   tours in major European cities.  Consideration should be given

16   to Greg Craig visiting Moscow for one roundtable briefing with

17   a group of leading correspondents covering Ukrainian matters

18   from there.

19          "Similarly, he should do a roundtable in Berlin for

20   interviews with selection of the most influential

21   commentators," right?

22          Mr. Craig never did any of those things, did he?

23   A.  No.  All terrific ideas, but he did not do any of this.

24   Q.  Because he wasn't willing to, was he?

25   A.  This was based on the -- you know, the hypothetical

1    strategy that was produced by me at the request of Rick Gates,

2    saying, "If you had a free hand."

3              So, no, he definitely did not do any of this.

4    Q.  And would you say that this was sort of a wish list?

5    A.  Definitely a wish list.

6    Q.  Now, let's look at Government Exhibit 207, quickly.  It's

7    an email from you to Mr. Gates, with a draft plan attaching

8    this master control plan, d1.

9              It's a fairly fat document, right?

10   A.  It's too long.

11   Q.  I think you said on direct yesterday that there were, like,

12   18 versions of this media plan?

13   A.  I think there were.  But, maybe, you know -- there was

14   certainly lots of versions, but 18 springs to mind.  But, that

15   may be the messaging.  But, whatever it is, there were a hell

16   of -- sorry -- there was a lot of them.

17   Q.  Isn't it true that the only one that was ever sent to

18   Mr. Craig was the one that you sent to him the night before the

19   meeting at the Harvard Club?

20             MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

21   question.

22             THE COURT:  The only one that you sent to Mr. Craig.

23   Do you know?

24             THE WITNESS:  I can't tell you how many I sent or

25   not.  But, I can tell you that he did not receive anything

1    until just before the Harvard Club.

2    BY MR. MURPHY:

3    Q.  All right.  So up until the Harvard Club meeting, and just

4    before it, he had not received any of the versions of the media

5    plan?

6    A.  No, he hadn't received.

7              MR. CAMPOAMOR-SANCHEZ:  Objection to the form.

8              THE COURT:  He said he didn't send any.

9    BY MR. MURPHY:

10   Q.  You didn't send him any?

11   A.  I didn't send him any.

12             Sorry.  Let me rephrase that.

13             I did not send Mr. Craig any copies of this until

14   just before the Harvard Club.

15   Q.  And you had not discussed the elements of this media plan

16   with Mr. Craig before the Harvard Club meeting, had you?

17   A.  I had had no discussions -- sorry.

18             I had no discussions with Mr. Craig about any of this

19   until just before Harvard and/or at Harvard.

20   Q.  You were the person at FTI that was principally involved in

21   preparing these plans, right?

22   A.  I certainly was.

23   Q.  And you did not receive input from Mr. Craig about what the

24   plans should or should not say or include, did you?

25   A.  No.

1    Q.   Now, if we look at the third page of the exhibit.

2             And this is part of this master control grid you

3    referred to, right?

4    A.   Great title.

5    Q.   A great title.

6             Was it your title or Mr. Gates' title?

7    A.   No, I think it was my title, in all honesty.  But, you

8    know, again, you got to regard it with a bit of tongue in

9    cheek.

10   Q.   Okay.

11            Top of page 3, first couple lines of this plan say,

12   "Share the drafts with Charlie."

13            Now, who is Charlie?

14   A.   Charlie is the client.

15   Q.   So does that mean the Ukraine or does that mean

16   Mr. Manafort?

17   A.   No, it means Manafort's people.

18   Q.   So Mr. Manafort was code named Charlie for this project?

19   A.   Yeah.  It was more of a Gates thing.  You know, he liked

20   that sort of stuff.

21   Q.   Okay.  Now, I'm going to take a look at Exhibit 208.

22            MR. MURPHY:  Which is in evidence.

23            THE COURTROOM DEPUTY:  Government or defense?

24            MR. MURPHY:  I'm sorry?

25            THE COURTROOM DEPUTY:  Government or defense?

1            MR. MURPHY:  Oh, I'm sorry.  Government Exhibit 208.

2    BY MR. MURPHY:

3    Q.  I just want you to read that to yourself, Mr. Hawker.  And

4    I just want to ask you about the conversation that

5    Mr. van der Zwaan recounts having had with you on or about

6    August the 7th of 2012, which is paragraph --

7            MR. CAMPOAMOR-SANCHEZ:  I'm sorry, Your Honor.  He's

8    not copied on this email, as far as I know.

9            THE COURT:  All right.  So you're asking him to look

10   at an email, just to read an email?

11           MR. MURPHY:  Just to read contact with FTI, Item 1.

12           THE COURT:  All right.

13           So there's a portion of the email that recounts a

14   conversation with --

15           MR. MURPHY:  With Mr. Hawker.

16           THE COURT:  -- Mr. Hawker.  All right.  You can ask

17   him about it.

18   BY MR. MURPHY:

19   Q.  Do you remember having a conversation with

20   Mr. van der Zwaan on or about August the 7th, in which he --

21   you expressed to Mr. van der Zwaan that you would like to speak

22   to Mr. Craig about the media plan for the release of the

23   Report, and would -- he would be appreciative if you, Greg,

24   could reach out to Jonathan, the sooner the better.  And he

25   will want to cover, among other issues, when he will have sight

 1    of the Report.

 2    A.  I've no recollection of the discussion.  But, I spoke to

 3    him the whole time.  He was in the same hotel.

 4    Q.  So as of August the 7th, do you remember that you still

 5    hadn't seen the Report.

 6    A.  Yeah.

 7              MR. CAMPOAMOR-SANCHEZ:  Objection.

 8              THE COURT:  Well, do you have any recollection of

 9    when you saw the Report?

10              THE WITNESS:  I don't recall the date.  But, I recall

11    that I was shown the Report, briefly, by Alex van der Zwaan.

12              THE COURT:  Between that point and when you were

13    doing the media plans that you took to the Harvard Club, by the

14    time you were doing that, the Harvard Club versions of the

15    media plan, had you seen a draft report?

16              THE WITNESS:  Yes.  I had been officially given a

17    report, but it came from Alex van der Zwaan.

18              THE COURT:  But separate from the time that you

19    peeked at it in his --

20              THE WITNESS:  Yes, exactly.

21              THE COURT:  All right.  Do you know when, between

22    your first look and the Harvard Club, you actually got it?

23              THE WITNESS:  It's in an email.  But, I don't

24    remember the date of the email.

25              MR. MURPHY:  Your Honor, I'm going to get there.

```
1                    THE COURT:  All right.

2                    MR. MURPHY:  But I'm proceeding chronologically.

3                    THE COURT:  Okay.  But if you want to use a document

4      to refresh his recollection, that's fine.  But you can't just

5      put a document on the screen and say, "Now, you remember."

6                    MR. MURPHY:  I understand.

7                    THE COURT:  All right.

8      BY MR. MURPHY:

9      Q.  Can we look at Government Exhibit 222, please.

10                   And go to the second page of the exhibit.

11     A.  I don't have a second page.

12                   MR. MURPHY:  Let me check to see --

13                   (Pause.)

14                   MR. MURPHY:  Looks like I misnumbered my exhibit.

15     BY MR. MURPHY:

16     Q.  I want to show you the next Defendant's Exhibit, 500.

17     A.  Defendant's?

18                   MR. MURPHY:  And I think that's one --

19                   (Off-the-record discussion between counsel.)

20                   THE COURT:  Just show it, briefly, to counsel.

21     BY MR. MURPHY:

22     Q.  It's not in the book.  I'm sorry.

23     A.  Thank you.

24     Q.  Do you recognize Defendant's Exhibit 500 as an email you

25     wrote to Konstantin Kilimnik on Thursday, August the 30th?
```

```
 1    A.  Yes, I do.

 2    Q.  That's 2012?

 3    A.  Yes.

 4    Q.  Now, was this email written shortly after you got a look at

 5    the Report, in draft form, when you visited

 6    Mr. van der Zwaan's room?

 7              MR. CAMPOAMOR-SANCHEZ:  Your Honor --

 8              THE COURT:  I'm sorry?  All right.

 9              MR. MURPHY:  Oh, I'm sorry.

10              THE COURT:  I know.  But, I want to know, do you

11    object to its admission?

12              MR. CAMPOAMOR-SANCHEZ:  It's part of 107.

13              THE COURT:  All right.  Fine.

14              Yes, please put it on the screen.

15              MR. MURPHY:  Okay.

16              Thank you.  Sorry.

17              THE COURTROOM DEPUTY:  Put it on the ELMO.  You don't

18    have it electronically?  You do?  Do it.

19              THE COURT:  All right.

20              MR. MURPHY:  Okay.

21              THE COURT:  You can see it?

22              THE JURORS:  (Nod heads.)

23              THE COURT:  Yes.  All right.

24              Thank you.

25              MR. MURPHY:  Okay.
```

1    BY MR. MURPHY:

2    Q.  Defendant's Exhibit 500 is this email.  It looks like the

3    language of the email is either Russian or Ukrainian, at least

4    the To and the From and the Date, right?

5    A.  That looks like Russian to me, yep.

6    Q.  But, anyway, you wrote the email?

7    A.  I did.

8    Q.  Okay.  And it was addressed to Mr. Kilimnik?

9    A.  Yes, it is.

10   Q.  And it's about -- and it's captioned Confidential Report

11   and the Media, right?

12   A.  Yes.

13   Q.  And you begin by saying, "You asked that we do two things:

14   One, summarize the key points that the media will get excited

15   about in the Report, which I'll do below.  And, two, address

16   some areas which would help us perform better, which Jon is

17   working on and I'll get to you tomorrow."

18           That reference to Jon, I assume, is Jon Aarons?

19   A.  Yeah.

20   Q.  And then you wrote, "In terms of the media, if they read

21   the lawyer's report in the form in which I reviewed it, albeit

22   briefly and in the draft, the likely lines that they will get

23   excited about are as follows."

24           And then you have, "Supporting her position," and you

25   have six different items there, right?

1    A.  Yes.

2    Q.  And then you have, "Supporting the prosecution's position,"

3    and there's two items, right?

4    A.  Yes.

5    Q.  So you had reviewed the Report in draft form in

6    Mr. van der Zwaan's room, where he gave you access to it.  You

7    jotted down some notes.

8           And you were quite alarmed that the Report, if issued

9    in that form, would not be consistent with the Ukraine's public

10   relations goals; is that right?

11   A.  That's absolutely right.

12   Q.  Okay.  And what you said at the bottom --

13          THE COURT:  Is this description -- I think that was

14   your first question before we put the exhibit up.

15          This is based on your early review and not your

16   official receipt of the working version at that point?

17          THE WITNESS:  Yes, Your Honor.  This is based on the

18   half an hour or so that Alex van der Zwaan left it on his desk

19   in his bedroom and told me to have a quick read and make some

20   notes, you know, before he returned.

21          THE COURT:  All right.  All right.

22          MR. MURPHY:  Your Honor, if I haven't moved Exhibit

23   500 into evidence, I so move.

24          THE COURT:  All right.  Any objection?

25          MR. CAMPOAMOR-SANCHEZ:  No objection.

```
1              THE COURT:  Okay.  It will be in evidence.

2   BY MR. MURPHY:

3   Q.  And in the last paragraph of your message to Mr. Kilimnik

4   you said, "In my view, it is likely that the media and many in

5   the political communities will accelerate their call for a

6   retrial, based on the Report's findings, and will present the

7   points above as support from that perspective.  We must not

8   forget that this is the position many in the media will want to

9   convey, as it suits their agenda as conveyed in previous

10  stories.  The prosecution points will not mitigate their story,

11  and even the strong point about summary contempt will likely

12  not feature at all."

13             That was your conclusion, right?

14  A.  Yes.

15  Q.  Now, did Mr. Kilimnik tell you that he was aware of your

16  concerns about the Report because someone had overheard your

17  telephone conversations?

18             MR. CAMPOAMOR-SANCHEZ:  Objection as to what

19  Mr. Kilimnik said.

20             THE COURT:  I'm sorry?

21             MR. CAMPOAMOR-SANCHEZ:  To what Mr. Kilimnik said.

22             THE COURT:  All right.  Approach the bench.

23             You're objecting on hearsay grounds?

24             MR. MURPHY:  Let me try to rephrase it.

25  BY MR. MURPHY:
```

1    Q.  Did you learn, Mr. Hawker, that someone had been listening

2    in on your telephone conversations?

3              THE COURT:  That's kind of the same question.  Let's

4    approach.  Just want to make sure I understand the objection.

5              (Bench discussion:)

6              MR. CAMPOAMOR-SANCHEZ:  It's hearsay and I don't

7    understand the relevance, the relevance with respect to what he

8    understood.

9              THE COURT:  You're asking what Mr. Kilimnik told him;

10   you objected.  You asked him, did you learn it?  Presumably he

11   learned it through Mr. Kilimnik.

12             MR. MURPHY:  Or Mr. Gates.

13             THE COURT:  Well, if Mr. Gates has personal knowledge

14   about it, you can ask Mr. Gates.  I don't understand -- what

15   are you trying -- where are we trying to go here?

16             MR. MURPHY:  Just to establish that while he's

17   working in the Ukraine, working in the Ukraine, there's a

18   concern that the Ukranians are listening to all of his

19   conversations.

20             THE COURT:  You're sort of suggesting -- you said,

21   Did you learn that they were.  And do we have evidence of that

22   one way or the other?

23             MR. MURPHY:  He talks about it in several of his

24   302s.  He, Mr. Hawker.

25             THE COURT:  What does that have to do with anything?

1          MR. MURPHY:  Well --

2          THE COURT:  If you can't even articulate the

3   relevance, then let's just go on to something else.

4          MR. MURPHY:  Your Honor, it has --

5          THE COURT:  I wasn't being facetious.

6          MR. MURPHY:  It really has to do with the whole tenor

7   of the project over there and that the Ukrainians are very,

8   very upset and concerned about what's in the Report, to the

9   extent that they're listening in on his phone conversations.

10         THE COURT:  They could be listening in on everybody's

11  phone conversations.

12         MR. MURPHY:  Then Kilimnik approaches him to say

13  we're very upset to hear you're very upset.  Tell us what it's

14  all about.

15         THE COURT:  I don't think that that element adds

16  anything to anything.  You've certainly gone through every

17  single document; what one report would say, what they hoped it

18  would say.  That's the point.  So let's just leave it there.

19         MR. MURPHY:  All right.  Thank you.

20         (Open court:)

21  BY MR. MURPHY:

22  Q.  I just want to show you, Mr. Hawker, Defendant's Exhibit

23  514, which is another one I'll have to show you in hardcopy

24  form.

25         THE COURT:  Just for timing purposes, Mr. Murphy,

1   where do you think you are in terms of time in your

2   cross-examination?

3           MR. MURPHY:  Oh, I have a couple hours, at least,

4   left, Your Honor.

5           THE COURT:  All righty.  Let's try to go for about

6   ten more minutes, then we'll break for lunch.  And maybe over

7   lunch you can think about having it not be how many more hours

8   after lunch.

9           MR. MURPHY:  We'll pass it for now.

10          THE COURT:  All right.  Would this be an opportune

11  time to break for lunch, or would you rather go for ten more

12  minutes?

13          MR. MURPHY:  I would rather go for just -- well, no.

14  Let's take a lunch break.  That's fine.

15          THE COURT:  All right.  That's what we're going to do

16  then.  I'm sure no one will be disappointed.

17          So I ask you please leave your notebooks on the

18  table.

19          This case is nowhere close to being submitted to you

20  for decision, so you should not discuss it while you're having

21  lunch.  You should just enjoy your lunch.  So we'll -- it's

22  about 12:35, we'll resume at 1:45.  So please be back in the

23  jury room about five minutes before that.  And please don't

24  discuss the case among yourselves or with anybody else during

25  that period of time.

1    You're excused and enjoy your lunch.

2         (Whereupon the jurors leave the courtroom.)

3         THE COURT:  All right.  Everyone else is excused and

4    we'll be back at 1:45.

5         MR. MURPHY:  Thank you.

6                        *   *   *

1

2                        CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5              I, JANICE DICKMAN, do hereby certify that the above

6       and foregoing constitutes a true and accurate transcript of my

7       stenograph notes and is a full, true and complete transcript of

8       the proceedings to the best of my ability.

9                              Dated this 20th day of August, 2019.

10

11

12                              /s/_____

13                              Janice E. Dickman, CRR, RMR, CRC
                                Official Court Reporter
14                              Room 6523
                                333 Constitution Avenue NW
15                              Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25

**$**

**$300,000** [1] - 1294:11

**'**

**'14** [1] - 1294:21
**'would** [1] - 1218:6

**/**

**/s** [1] - 1335:12

**0**

**0700** [1] - 1243:24

**1**

**1** [4] - 1246:10, 1282:13, 1298:7, 1324:11
**10** [1] - 1320:6
**100** [1] - 1203:22
**1000** [3] - 1204:3, 1223:6, 1233:16
**107** [1] - 1327:12
**10th** [4] - 1246:6, 1246:20, 1246:23, 1283:15
**11** [3] - 1213:12, 1258:12, 1320:12
**1100** [1] - 1222:10
**116** [3] - 1282:12, 1282:18
**118** [1] - 1283:22
**119** [1] - 1292:5
**11:00** [1] - 1222:17
**11th** [9] - 1253:24, 1254:3, 1255:8, 1255:9, 1256:8, 1256:24, 1259:14, 1284:1, 1286:19
**1200** [2] - 1222:20, 1232:22
**121** [1] - 1299:25
**128** [2] - 1300:17
**12:35** [1] - 1333:22
**12th** [3] - 1261:3, 1315:22, 1316:1
**13** [4] - 1212:17, 1212:18, 1216:25, 1298:18
**1300** [1] - 1242:18
**13th** [3] - 1244:1, 1244:6, 1253:25
**14th** [1] - 1299:19
**1500** [1] - 1254:14
**151** [3] - 1309:4, 1309:8, 1309:9
**15th** [2] - 1300:8, 1310:20
**1600** [1] - 1233:5
**161** [2] - 1282:17, 1310:18
**168** [1] - 1253:11
**18** [3] - 1238:4, 1321:12, 1321:14
**1800** [1] - 1204:2

**186** [2] - 1253:13, 1253:17
**189** [2] - 1316:8, 1316:12
**18th** [3] - 1278:22, 1279:9, 1291:18
**19-125** [2] - 1205:2, 1274:7
**19-CR-125** [1] - 1203:3
**1900** [2] - 1222:20, 1243:4
**1:45** [1] - 1333:22, 1334:4

**2**

**2** [7] - 1213:24, 1213:25, 1226:6, 1244:11, 1300:10, 1311:9, 1314:13
**20** [1] - 1203:6
**20001** [2] - 1204:9, 1335:15
**20036** [1] - 1204:3
**2012** [16] - 1215:11, 1235:7, 1235:12, 1245:17, 1277:13, 1278:22, 1284:1, 1298:18, 1299:19, 1300:9, 1302:2, 1311:11, 1314:7, 1316:16, 1324:6, 1327:2
**2013** [1] - 1273:5
**2014** [1] - 1294:9
**2018** [2] - 1275:3, 1275:12
**2019** [2] - 1203:6, 1335:9
**202** [3] - 1203:15, 1203:19, 1204:4
**202-354-3267** [1] - 1204:9
**20530** [2] - 1203:15, 1203:18
**207** [1] - 1321:6
**208** [2] - 1323:21, 1324:1
**20th** [1] - 1335:9
**21202** [1] - 1203:23
**222** [1] - 1326:9
**233-0986** [1] - 1203:19
**23rd** [1] - 1276:1, 1302:2, 1315:23
**24** [1] - 1243:2
**2440** [1] - 1203:23
**24th** [4] - 1276:2, 1305:20, 1306:7, 1308:14
**252-7698** [1] - 1203:15
**25th** [2] - 1215:11, 1279:18
**267** [1] - 1209:2
**268** [2] - 1212:11, 1212:15
**269** [2] - 1213:3, 1213:5
**26th** [1] - 1279:18
**27** [1] - 1298:14
**272** [1] - 1213:23
**276** [2] - 1221:8, 1222:5
**280** [2] - 1227:8, 1228:2
**28th** [1] - 1316:16
**29** [1] - 1309:25
**29th** [1] - 1313:2
**2nd** [1] - 1227:9

**3**

**3** [8] - 1213:24, 1213:25, 1222:5, 1232:16, 1261:10, 1270:19, 1303:18, 1323:11
**302s** [1] - 1331:24
**305** [3] - 1231:18, 1231:19, 1231:22
**30th** [3] - 1221:12, 1234:16, 1326:25
**316** [1] - 1235:10
**318** [1] - 1236:10
**322** [1] - 1237:19, 1246:14
**327** [1] - 1240:20
**328** [1] - 1245:7
**332** [1] - 1246:8
**333** [2] - 1204:8, 1335:14
**351** [2] - 1252:21, 1252:22
**353** [1] - 1254:5
**354** [1] - 1255:10
**357** [1] - 1256:17
**360** [3] - 1257:17, 1257:19, 1257:20
**364** [1] - 1259:16
**37** [4] - 1297:17, 1298:9, 1298:11, 1298:12
**375** [1] - 1260:20
**384** [7] - 1262:12, 1265:7, 1267:7, 1267:8, 1271:1, 1271:2, 1271:9
**3rd** [5] - 1231:25, 1234:15, 1234:16, 1234:18, 1234:19

**4**

**4** [6] - 1212:3, 1227:11, 1267:6, 1267:7, 1267:8, 1301:25
**410** [1] - 1203:24
**48** [1] - 1301:23
**49** [2] - 1306:16, 1308:12

**5**

**5** [8] - 1213:10, 1214:7, 1214:13, 1215:12, 1218:1, 1223:10, 1227:10, 1227:11
**500** [4] - 1326:16, 1326:24, 1328:2, 1329:23
**514** [1] - 1332:23
**555** [1] - 1203:14

**6**

**6** [3] - 1235:12, 1300:12, 1318:13
**6523** [2] - 1204:8, 1335:14
**6:11** [1] - 1215:12
**6th** [4] - 1237:23, 1314:7, 1314:11, 1314:14

## 7

**7** [2] - 1203:4, 1203:8
**77** [1] - 1313:25
**778-1814** [1] - 1204:4
**78** [1] - 1315:20
**7th** [3] - 1324:6, 1324:20, 1325:4

## 8

**8** [3] - 1263:4, 1264:8, 1319:7

## 9

**9** [2] - 1213:11, 1314:8
**949-1146** [1] - 1203:24
**950** [1] - 1203:18
**9:30** [1] - 1203:6
**9th** [2] - 1275:3, 1314:11

## A

**A-hole** [1] - 1308:20
**a.m** [5] - 1203:6, 1222:17, 1258:12, 1261:10, 1263:4
**Aabelson@zuckerman.com** [1] - 1203:25
**Aarons** [26] - 1284:1, 1298:16, 1298:21, 1299:3, 1299:6, 1302:2, 1302:5, 1302:7, 1303:8, 1304:3, 1304:10, 1305:2, 1305:20, 1306:8, 1306:20, 1308:19, 1310:13, 1310:20, 1311:4, 1314:6, 1314:13, 1315:8, 1315:15, 1316:1, 1316:15, 1328:18
**aarons** [4] - 1309:11, 1309:17, 1311:2, 1315:4
**aback** [1] - 1250:11
**Abelson** [2] - 1203:21, 1205:17
**ability** [1] - 1335:8
**able** [4] - 1280:2, 1283:16, 1289:23, 1319:4
**absolutely** [15] - 1217:5, 1233:4, 1238:24, 1263:7, 1282:6, 1285:9, 1302:6, 1302:11, 1310:6, 1311:21, 1312:25, 1313:22, 1318:12, 1319:5, 1329:11
**abuse** [1] - 1292:12
**AC** [4] - 1318:17, 1318:21, 1318:25, 1319:13
**academic** [1] - 1281:3
**accelerate** [1] - 1330:5
**acceptable** [1] - 1281:20
**access** [2] - 1303:15, 1329:6
**accessible** [1] - 1304:1
**accordance** [1] - 1282:5
**account** [2] - 1273:10, 1304:13

**accurate** [3] - 1263:8, 1294:20, 1335:6
**achieve** [2] - 1217:6, 1281:24
**acquainted** [1] - 1293:15
**acronyms** [1] - 1242:4
**acting** [2] - 1281:15, 1281:18
**Action** [1] - 1203:2
**action** [2] - 1220:1, 1242:24
**actioned** [1] - 1212:25
**actual** [1] - 1241:16
**ad** [1] - 1295:13
**Adam** [3] - 1203:17, 1203:21, 1205:17
**add** [3] - 1288:19, 1299:20, 1311:5
**added** [2] - 1272:8
**adding** [1] - 1210:14
**addition** [2] - 1219:18, 1241:10
**address** [6] - 1205:21, 1211:21, 1219:16, 1224:17, 1232:12, 1328:15
**addressed** [2] - 1229:2, 1328:8
**addressing** [3] - 1214:5, 1223:20, 1228:16
**adds** [2] - 1212:17, 1332:15
**admission** [1] - 1327:11
**admitted** [5] - 1283:1, 1297:21, 1297:22, 1305:21, 1316:13
**advance** [2] - 1224:23, 1318:15
**advanced** [1] - 1227:22
**advise** [2] - 1208:14, 1286:7
**advised** [1] - 1227:5
**Affairs** [3] - 1235:24, 1241:15, 1263:1
**AFP** [1] - 1224:9
**afraid** [4] - 1229:6, 1264:10, 1311:1, 1313:23
**afternoon** [1] - 1208:13
**afterwards** [1] - 1295:2
**agencies** [2] - 1239:18, 1246:3
**agency** [2] - 1238:9, 1283:12
**agenda** [2] - 1224:24, 1330:9
**Agent** [1] - 1275:19
**agent** [2] - 1275:19, 1276:5
**agents** [7] - 1274:25, 1276:21, 1277:6, 1277:9, 1277:20, 1278:10, 1292:2
**AGF** [1] - 1235:16
**ago** [12] - 1217:20, 1219:22, 1227:23, 1239:2, 1250:25, 1276:14, 1276:19, 1277:15, 1277:16, 1279:7, 1291:18, 1305:4
**agreed** [5] - 1229:10, 1229:22, 1231:17, 1233:10, 1259:11
**agreeing** [1] - 1307:20
**agreement** [3] - 1218:16, 1229:23, 1299:11
**ahead** [6] - 1206:6, 1247:17,

1248:1, 1248:4, 1249:8, 1267:20
**ahold** [1] - 1237:8
**AI** [4] - 1226:4, 1240:1, 1258:14, 1259:12
**Alan** [6] - 1235:19, 1235:23, 1241:7, 1241:13, 1262:25
**alarmed** [1] - 1329:8
**albeit** [1] - 1328:21
**Alex** [7] - 1286:22, 1286:23, 1290:11, 1290:13, 1325:11, 1325:17, 1329:18
**Alex's** [2] - 1237:1, 1237:7
**aligned** [1] - 1313:12
**allegations** [3] - 1212:2, 1215:1, 1225:1
**allowed** [2] - 1267:23, 1291:2
**allows** [1] - 1288:20
**almost** [3] - 1272:14, 1290:17
**alongside** [1] - 1293:20
**Amanda** [1] - 1205:10
**amendments** [2] - 1209:25, 1211:18
**America** [4] - 1203:2, 1205:3, 1246:18, 1274:7
**American** [4] - 1235:20, 1241:13, 1268:13, 1272:11
**Americans** [1] - 1309:2
**amount** [1] - 1294:23
**AMY** [1] - 1203:9
**analysis** [2] - 1282:9, 1303:19
**angle** [1] - 1224:8
**announce** [1] - 1305:12
**announced** [1] - 1264:24
**announcement** [3] - 1223:4, 1233:14, 1244:9
**announcing** [1] - 1292:9
**answer** [10] - 1206:5, 1217:17, 1240:10, 1249:3, 1249:5, 1259:11, 1263:24, 1289:1, 1307:18, 1313:7
**anti** [1] - 1318:21
**anti-crisis** [1] - 1318:21
**anxious** [2] - 1261:9, 1289:15
**anyway** [2] - 1299:6, 1328:6
**AP** [1] - 1224:9
**Apologies** [1] - 1261:7
**apologize** [3] - 1207:17, 1250:25, 1287:12
**apology** [2] - 1205:23, 1207:19
**apparatus** [1] - 1303:22
**appeal** [1] - 1311:9
**appear** [2] - 1261:9, 1287:20
**appeared** [1] - 1318:11
**applies** [1] - 1244:20
**appreciate** [3] - 1207:18, 1207:21, 1208:7
**appreciative** [1] - 1324:23
**approach** [14] - 1205:5, 1238:16, 1239:8, 1246:19,

1264:12, 1267:2, 1288:2,
1288:3, 1295:7, 1295:8,
1306:21, 1306:24, 1330:22,
1331:4

**approaches** [1] - 1332:12
**area** [2] - 1224:5
**areas** [1] - 1328:16
**argues** [1] - 1224:4
**Arps** [4] - 1225:12, 1246:24,
1271:21, 1318:8
**arrange** [2] - 1248:2, 1248:14
**arranged** [4] - 1248:25,
1290:11, 1290:12, 1305:22
**arrangements** [1] - 1284:14
**arrive** [1] - 1250:10
**arrived** [1] - 1209:11
**article** [11] - 1243:19, 1243:24,
1263:14, 1263:15, 1264:2,
1266:16, 1266:19, 1266:22,
1267:9, 1269:10
**articles** [3] - 1263:4, 1263:13,
1271:6
**articulate** [1] - 1332:2
**aspect** [2] - 1220:25, 1280:24
**assessment** [1] - 1281:7
**Asset** [1] - 1314:18
**assets** [1] - 1314:23
**assigned** [1] - 1242:22
**assignment** [4] - 1283:10,
1293:18, 1294:12, 1298:22
**assist** [2] - 1223:25, 1314:22
**associate** [3] - 1282:1, 1286:24,
1313:16
**Association** [3] - 1226:10,
1239:5
**assume** [1] - 1328:18
**assumed** [1] - 1253:9
**attached** [2] - 1299:10, 1317:3
**attaching** [1] - 1321:7
**attachment** [2] - 1238:4,
1319:12
**attachments** [2] - 1210:10,
1222:4
**attended** [1] - 1278:25
**attention** [3] - 1242:17, 1301:2,
1320:12
**Attorney's** [1] - 1203:13
**attributed** [2] - 1215:17, 1216:2
**audiences** [1] - 1223:25
**August** [8] - 1203:6, 1285:13,
1291:18, 1324:6, 1324:20,
1325:4, 1326:25, 1335:9
**authorization** [2] - 1291:9,
1291:12
**available** [3] - 1229:25, 1300:9,
1311:16
**Avenue** [3] - 1203:18, 1204:8,
1335:14
**avoid** [3] - 1224:18, 1224:21,
1312:20

**aware** [1] - 1330:15

## B

**back-grounders** [1] - 1302:16
**background** [5] - 1225:11,
1233:6, 1233:19, 1233:21,
1243:13
**backup** [3] - 1254:19, 1255:3,
1258:19
**bad** [1] - 1271:13
**bags** [1] - 1306:9
**balance** [1] - 1224:25
**Baltimore** [1] - 1203:23
**bank** [3] - 1273:10, 1304:13,
1305:21
**banquet** [2] - 1206:1, 1206:10
**bar** [1] - 1244:1
**based** [13] - 1221:3, 1221:17,
1223:22, 1224:9, 1235:23,
1258:22, 1272:2, 1272:8,
1291:3, 1320:25, 1329:15,
1329:17, 1330:6
**Based** [1] - 1286:17
**basis** [4] - 1247:4, 1247:8,
1247:13, 1285:7
**battle** [1] - 1207:21
**beating** [1] - 1307:9
**became** [1] - 1284:17
**become** [4] - 1261:10, 1279:11,
1279:24, 1313:11
**becomes** [2] - 1233:14, 1244:10
**bedroom** [1] - 1329:19
**BEFORE** [1] - 1203:9
**begin** [1] - 1328:13
**beginning** [4] - 1228:2,
1282:10, 1298:20, 1303:18
**begins** [5] - 1223:10, 1224:18,
1302:1, 1309:13
**behalf** [5] - 1212:16, 1216:5,
1216:7, 1318:18, 1319:1
**behavior** [1] - 1218:12
**behind** [1] - 1281:13
**belaboring** [1] - 1307:9
**belief** [1] - 1294:10
**below** [9] - 1211:22, 1215:19,
1239:2, 1239:4, 1263:4, 1268:5,
1311:22, 1319:12, 1328:15
**Bench** [1] - 1288:2
**bench** [11] - 1205:24, 1206:3,
1206:9, 1264:15, 1288:3,
1288:4, 1295:10, 1306:24,
1307:25, 1330:22, 1331:5
**Berlin** [2] - 1239:16, 1320:19
**BERMAN** [1] - 1203:9
**best** [6] - 1207:20, 1254:14,
1254:16, 1281:19, 1300:3,
1335:8
**better** [4] - 1230:8, 1275:9,
1324:24, 1328:16

**between** [9] - 1240:6, 1243:12,
1260:9, 1276:22, 1283:4,
1300:15, 1325:12, 1325:21,
1326:19
**beyond** [1] - 1231:1
**Bhavnani** [2] - 1283:4, 1283:16
**big** [3] - 1212:6, 1285:2, 1305:1
**bigger** [1] - 1301:3
**Bill** [1] - 1274:17
**binder** [2] - 1298:2, 1300:22
**binders** [2] - 1282:15, 1298:14
**bit** [34] - 1210:3, 1214:24,
1221:25, 1222:17, 1225:17,
1226:17, 1227:14, 1228:25,
1232:14, 1243:16, 1250:11,
1256:12, 1266:7, 1266:8,
1268:6, 1268:17, 1283:19,
1284:9, 1284:10, 1284:11,
1286:23, 1290:1, 1290:2,
1297:4, 1303:25, 1304:20,
1304:22, 1306:3, 1308:22,
1309:2, 1311:5, 1312:16, 1323:8
**bits** [5] - 1268:8, 1268:17,
1270:2, 1288:9, 1303:24
**black** [1] - 1273:12
**blends** [1] - 1224:2
**block** [1] - 1229:9
**bloke** [1] - 1260:8
**Bloomberg** [5] - 1222:14,
1226:4, 1226:22, 1240:2,
1258:14
**blow** [6] - 1292:7, 1299:14,
1299:16, 1301:8, 1301:24,
1314:4
**BM** [1] - 1303:11
**book** [6] - 1300:18, 1300:20,
1300:24, 1306:17, 1316:9,
1326:22
**books** [1] - 1297:18
**boss** [1] - 1285:2
**bottom** [23] - 1212:15, 1213:24,
1213:25, 1214:3, 1221:11,
1227:11, 1230:4, 1240:21,
1245:12, 1246:9, 1253:1,
1267:8, 1267:16, 1268:15,
1268:16, 1270:20, 1309:7,
1309:14, 1309:22, 1315:8,
1315:22, 1318:14, 1329:12
**bought** [1] - 1289:2
**bound** [1] - 1210:4
**box** [1] - 1229:5
**Bradley** [1] - 1203:17
**break** [9] - 1208:11, 1209:1,
1264:17, 1273:19, 1273:23,
1333:6, 1333:11, 1333:14
**brief** [1] - 1205:20
**briefed** [2] - 1318:15, 1320:14
**briefing** [10] - 1222:20,
1224:22, 1229:9, 1247:3,
1247:8, 1247:13, 1319:19,

1320:6, 1320:9, 1320:16
**Briefings** [1] - 1229:6
**briefings** [6] - 1225:11, 1233:6, 1233:19, 1233:22, 1319:10, 1319:13
**briefly** [4] - 1264:12, 1325:11, 1326:20, 1328:22
**bring** [6] - 1205:12, 1208:1, 1274:8, 1283:12, 1288:5, 1315:1
**British** [1] - 1226:8
**Brits** [1] - 1308:21
**broad** [1] - 1303:21
**broader** [2] - 1248:5, 1302:22
**broadsheets** [1] - 1226:16
**brought** [1] - 1307:12
**Brown** [4] - 1292:23, 1293:1, 1293:2, 1294:1
**Brussels** [1] - 1310:10
**bullet** [5] - 1311:22, 1312:19, 1317:25, 1318:11, 1318:12
**bullety** [1] - 1268:17
**bureaucrats** [1] - 1285:23
**Burson** [2] - 1303:11, 1303:14
**Burson-Marsteller** [2] - 1303:11, 1303:14
**business** [5] - 1226:16, 1232:14, 1283:13, 1299:1, 1299:7
**BY** [43] - 1221:2, 1231:4, 1234:4, 1236:12, 1240:16, 1245:11, 1247:21, 1249:13, 1257:21, 1265:23, 1267:15, 1270:9, 1274:14, 1283:3, 1287:13, 1287:19, 1289:12, 1291:15, 1297:16, 1297:23, 1298:8, 1298:15, 1299:18, 1300:6, 1300:23, 1301:9, 1308:11, 1313:8, 1314:5, 1314:17, 1316:14, 1317:2, 1322:2, 1322:9, 1324:2, 1324:18, 1326:8, 1326:15, 1326:21, 1328:1, 1330:2, 1330:25, 1332:21

## C

**calendar** [1] - 1302:18
**camp** [1] - 1225:1
**Campoamor** [4] - 1203:12, 1205:9, 1276:7, 1306:23
**CAMPOAMOR** [113] - 1205:7, 1205:13, 1208:2, 1208:21, 1208:23, 1212:13, 1212:14, 1213:2, 1213:4, 1213:22, 1214:1, 1217:22, 1217:24, 1221:2, 1221:7, 1221:10, 1222:6, 1222:9, 1223:11, 1223:13, 1227:8, 1227:12, 1231:4, 1231:22, 1231:24, 1232:17, 1232:19, 1234:4,

1234:13, 1234:14, 1235:9, 1235:11, 1236:9, 1236:14, 1240:15, 1240:16, 1241:24, 1242:1, 1244:12, 1244:14, 1245:9, 1245:11, 1246:9, 1246:11, 1246:13, 1246:16, 1247:14, 1247:21, 1249:13, 1250:1, 1250:4, 1254:6, 1254:7, 1255:11, 1255:12, 1256:18, 1256:19, 1257:18, 1257:20, 1257:21, 1259:17, 1259:18, 1260:21, 1260:22, 1261:25, 1262:3, 1262:5, 1262:13, 1262:14, 1264:13, 1264:19, 1264:21, 1265:1, 1265:4, 1265:6, 1265:23, 1267:2, 1267:5, 1267:7, 1267:15, 1270:5, 1270:9, 1271:19, 1271:24, 1272:15, 1272:16, 1273:15, 1288:1, 1288:11, 1288:19, 1288:25, 1289:7, 1291:6, 1295:7, 1295:11, 1295:24, 1296:12, 1297:7, 1306:21, 1307:1, 1308:7, 1308:7, 1314:8, 1316:25, 1321:20, 1322:7, 1324:7, 1325:7, 1327:7, 1327:12, 1329:25, 1330:18, 1330:21, 1331:6
**Campoamor-Sanchez** [3] - 1203:12, 1276:7, 1306:23
**CAMPOAMOR-SANCHEZ** [113] - 1205:7, 1205:13, 1208:2, 1208:21, 1208:23, 1212:13, 1212:14, 1213:2, 1213:4, 1213:22, 1214:1, 1217:22, 1217:24, 1221:2, 1221:7, 1221:10, 1222:6, 1222:9, 1223:11, 1223:13, 1227:8, 1227:12, 1231:4, 1231:22, 1231:24, 1232:17, 1232:19, 1234:4, 1234:13, 1234:14, 1235:9, 1235:11, 1236:9, 1236:14, 1240:16, 1241:24, 1242:1, 1244:12, 1244:14, 1245:9, 1245:11, 1246:9, 1246:11, 1246:13, 1246:16, 1247:14, 1247:21, 1249:13, 1250:1, 1250:4, 1254:6, 1254:7, 1255:11, 1255:12, 1256:18, 1256:19, 1257:18, 1257:20, 1257:21, 1259:17, 1259:18, 1260:21, 1260:22, 1261:25, 1262:3, 1262:5, 1262:13, 1262:14, 1264:13, 1264:19, 1264:21, 1265:1, 1265:4, 1265:6, 1265:23, 1267:2, 1267:5, 1267:7, 1267:15, 1270:5, 1270:9, 1271:19, 1271:24, 1272:15, 1272:16, 1273:15, 1288:1, 1288:11, 1288:19,

1288:25, 1289:7, 1291:6, 1295:7, 1295:11, 1295:24, 1296:12, 1297:7, 1306:21, 1307:1, 1308:7, 1314:8, 1316:25, 1321:20, 1322:7, 1324:7, 1325:7, 1327:7, 1327:12, 1329:25, 1330:18, 1330:21, 1331:6
**cannot** [2] - 1310:2, 1318:8
**captioned** [1] - 1328:10
**care** [1] - 1280:6
**career** [2] - 1239:21, 1293:13
**carefully** [1] - 1292:23
**carry** [1] - 1293:19
**Case** [2] - 1205:2, 1274:6
**case** [13] - 1208:10, 1223:21, 1223:23, 1253:6, 1253:22, 1273:21, 1295:15, 1296:10, 1296:23, 1311:9, 1311:10, 1333:19, 1333:24
**cash** [1] - 1302:3
**Catherine** [2] - 1212:16, 1213:15
**ceiling** [1] - 1261:16
**celebratory** [1] - 1207:1
**certainly** [9] - 1248:22, 1260:8, 1275:4, 1278:25, 1288:21, 1296:9, 1321:14, 1322:22, 1332:16
**CERTIFICATE** [1] - 1335:2
**certify** [1] - 1335:5
**CG** [1] - 1229:9
**chain** [1] - 1210:12
**chance** [1] - 1247:18
**change** [11] - 1215:3, 1217:18, 1218:10, 1218:17, 1219:16, 1221:22, 1266:5, 1268:2, 1268:19, 1270:15, 1270:24
**changed** [11] - 1214:14, 1215:4, 1218:11, 1237:12, 1239:7, 1244:17, 1265:14, 1265:21, 1266:20, 1268:25, 1270:11
**changes** [1] - 1269:10
**changing** [1] - 1229:23
**chap** [1] - 1239:2
**character** [1] - 1296:21
**charge** [1] - 1283:11
**charged** [1] - 1230:1
**charges** [1] - 1268:10
**Charlie** [4] - 1323:12, 1323:13, 1323:14, 1323:18
**chat** [4] - 1213:10, 1218:1, 1223:1, 1255:18
**check** [2] - 1257:5, 1326:12
**checked** [1] - 1304:18
**cheek** [2] - 1284:7, 1323:9
**chief** [2] - 1317:10, 1317:23
**choice** [1] - 1226:13
**chose** [1] - 1294:25
**chronological** [2] - 1300:1,

1300:21
**chronologically** [1] - 1326:2
**chunks** [1] - 1266:22
**circle** [1] - 1270:22
**cities** [2] - 1319:14, 1320:15
**City** [1] - 1275:14
**city** [1] - 1226:15
**claim** [3] - 1214:23, 1215:5, 1215:22
**clandestine** [1] - 1316:23
**clear** [11] - 1214:15, 1223:23, 1226:21, 1230:2, 1230:5, 1250:12, 1280:13, 1280:16, 1280:23, 1282:6, 1310:2
**clearly** [3] - 1207:4, 1212:6, 1225:6
**client** [12] - 1210:6, 1246:25, 1248:23, 1281:16, 1285:4, 1285:6, 1295:12, 1299:21, 1299:24, 1317:12, 1317:14, 1323:14
**clients** [1] - 1207:20
**climax** [1] - 1311:12
**clock** [3] - 1206:2, 1206:14, 1206:19
**clocks** [1] - 1207:11
**close** [4] - 1255:22, 1287:22, 1310:2, 1333:19
**Club** [20] - 1209:12, 1219:11, 1226:23, 1230:15, 1230:21, 1230:23, 1230:24, 1234:7, 1278:3, 1278:11, 1279:17, 1279:19, 1321:19, 1322:1, 1322:3, 1322:14, 1322:16, 1325:13, 1325:14, 1325:22
**code** [1] - 1323:18
**coincidental** [1] - 1239:22
**collateral** [2] - 1296:15, 1296:23
**colleague** [4] - 1235:23, 1245:16, 1293:20, 1298:21
**colleagues** [3] - 1205:6, 1310:22, 1310:23
**collect** [1] - 1314:21
**COLUMBIA** [2] - 1203:1, 1203:14
**column** [3] - 1238:14, 1238:15, 1238:16
**columns** [1] - 1238:13
**comfort** [1] - 1293:21
**comfortable** [5] - 1215:15, 1216:1, 1226:9, 1286:8, 1286:16
**coming** [10] - 1229:11, 1252:8, 1252:11, 1252:12, 1264:4, 1290:7, 1302:24, 1305:25, 1312:5
**comma** [2] - 1214:18, 1214:20
**commas** [1] - 1218:9
**comment** [1] - 1211:22
**commentators** [1] - 1320:21

**comments** [9] - 1209:25, 1211:4, 1211:17, 1212:8, 1212:19, 1212:23, 1213:16, 1310:13, 1316:19
**Commissioned** [1] - 1267:11
**commissioned** [1] - 1271:23
**commissioner** [1] - 1216:6
**Commissioner** [1] - 1320:7
**committed** [4] - 1223:24, 1312:4, 1312:15, 1318:3
**communicate** [1] - 1216:7
**communicates** [1] - 1317:23
**communicating** [2] - 1208:10, 1237:3
**communication** [6] - 1215:17, 1224:8, 1224:12, 1259:2, 1311:24, 1316:23
**communications** [9] - 1252:2, 1272:18, 1292:16, 1292:18, 1299:20, 1302:23, 1312:20, 1318:8, 1319:4
**communities** [1] - 1330:5
**compacted** [1] - 1268:20
**company** [2] - 1239:21, 1282:8
**complain** [1] - 1266:14
**complained** [2] - 1293:25, 1294:7
**complaints** [2] - 1296:3, 1307:2
**complete** [2] - 1281:4, 1335:7
**complied** [1] - 1248:10
**component** [1] - 1307:17
**compound** [1] - 1307:19
**computer** [1] - 1232:15
**concern** [3] - 1206:20, 1319:3, 1331:18
**concerned** [1] - 1332:8
**concerns** [3] - 1248:9, 1259:7, 1330:16
**conclude** [4] - 1291:3, 1312:3, 1312:14, 1318:2
**concluded** [2] - 1267:21, 1267:23
**conclusion** [2] - 1264:25, 1330:13
**conclusions** [1] - 1280:18
**condensed** [1] - 1268:18
**conduct** [1] - 1296:22
**conduit** [1] - 1317:17
**confidence** [1] - 1258:22
**Confidential** [1] - 1328:10
**confirm** [1] - 1208:9
**confirmed** [1] - 1229:24
**confused** [1] - 1225:17
**confusing** [1] - 1221:17
**confusion** [1] - 1250:25
**connection** [3] - 1280:10, 1293:16, 1302:20
**consider** [1] - 1306:9
**consideration** [1] - 1320:15

**considers** [1] - 1248:9
**consistent** [2] - 1311:25, 1329:9
**constantly** [1] - 1256:3
**constitutes** [1] - 1335:6
**Constitution** [2] - 1204:8, 1335:14
**consultant** [3] - 1210:24, 1227:6, 1249:21
**consultants** [1] - 1235:21
**Consulting** [1] - 1242:12
**consulting** [2] - 1284:13, 1299:11
**contact** [14] - 1233:3, 1238:10, 1239:12, 1239:13, 1245:20, 1250:18, 1254:14, 1254:17, 1255:5, 1258:13, 1259:4, 1259:23, 1262:24, 1324:11
**contacted** [2] - 1260:11, 1318:17
**contacting** [1] - 1230:2
**contacts** [2] - 1226:8, 1255:1
**contemplated** [1] - 1302:20
**contempt** [3] - 1218:13, 1268:10, 1330:11
**content** [4] - 1212:21, 1302:16, 1303:19
**context** [1] - 1244:19
**Continued** [1] - 1208:18
**continues** [1] - 1263:12
**contract** [5] - 1284:4, 1302:3, 1302:9, 1304:16, 1309:19
**contracting** [1] - 1299:23
**contractual** [1] - 1284:14
**control** [18] - 1221:16, 1225:15, 1227:25, 1228:20, 1228:23, 1229:1, 1229:5, 1231:20, 1232:10, 1236:23, 1240:23, 1241:19, 1241:21, 1242:6, 1253:23, 1258:18, 1321:8, 1323:2
**controlled** [2] - 1273:13, 1302:15
**controversial** [1] - 1293:19
**conversation** [11] - 1232:3, 1251:11, 1254:9, 1258:22, 1295:14, 1308:3, 1308:4, 1324:4, 1324:14, 1324:19
**conversations** [6] - 1272:17, 1330:17, 1331:2, 1331:19, 1332:9, 1332:11
**convey** [1] - 1330:9
**conveyed** [1] - 1330:9
**conviction** [2] - 1268:13, 1272:11
**convince** [3] - 1278:5, 1279:24
**cooperative** [3] - 1278:5, 1279:11, 1279:25
**coordinating** [1] - 1284:14
**copied** [9] - 1258:5, 1262:20,

1262:21, 1284:1, 1298:17,
1302:5, 1310:21, 1324:8
 **copies** [1] - 1322:13
 **copy** [13] - 1253:11, 1288:6,
1289:25, 1290:5, 1290:6,
1290:11, 1290:12, 1290:14,
1290:18, 1290:22, 1309:24,
1315:8, 1315:11
 **copying** [2] - 1210:13, 1309:12
 **corner** [1] - 1241:25
 **corporate** [1] - 1237:4
 **correct** [5] - 1232:6, 1236:17,
1253:18, 1278:7, 1278:12
 **corrected** [2] - 1277:10, 1278:1
 **correction** [2] - 1212:17,
1212:18
 **corrections** [5] - 1209:25,
1211:18, 1212:8, 1212:10,
1277:19
 **correspondent** [2] - 1239:3,
1259:22
 **correspondents** [1] - 1320:17
 **Council** [1] - 1305:4
 **counsel** [6] - 1205:5, 1268:1,
1275:17, 1286:11, 1326:19,
1326:20
 **count** [1] - 1277:5
 **country** [1] - 1292:12
 **couple** [6] - 1212:25, 1219:25,
1267:12, 1277:19, 1323:11,
1333:3
 **course** [2] - 1218:19, 1289:4
 **court** [10] - 1226:12, 1265:5,
1267:25, 1272:2, 1289:11,
1297:3, 1297:15, 1307:23,
1308:10, 1332:20
 **Court** [9] - 1204:7, 1204:7,
1205:21, 1206:9, 1206:15,
1270:5, 1288:20, 1296:7,
1335:13
 **COURT** [127] - 1203:1, 1205:11,
1205:14, 1205:19, 1205:22,
1206:18, 1206:23, 1207:4,
1207:6, 1207:8, 1207:18,
1207:23, 1208:1, 1208:4,
1208:6, 1220:15, 1220:20,
1220:23, 1230:17, 1230:25,
1231:3, 1233:25, 1234:2,
1240:10, 1240:14, 1247:12,
1247:15, 1249:2, 1249:5,
1249:8, 1249:10, 1261:24,
1262:1, 1264:11, 1264:14,
1264:16, 1264:20, 1264:22,
1265:2, 1265:16, 1265:19,
1269:9, 1269:12, 1269:15,
1269:23, 1270:4, 1270:8,
1273:17, 1274:1, 1274:8,
1274:10, 1282:20, 1287:9,
1287:11, 1287:16, 1288:2,
1288:5, 1288:8, 1288:15,

1288:24, 1289:2, 1289:9,
1291:8, 1291:14, 1295:8,
1295:16, 1295:22, 1296:3,
1296:16, 1297:5, 1297:10,
1297:12, 1298:2, 1298:6,
1298:13, 1300:20, 1301:1,
1301:6, 1306:23, 1307:8,
1307:24, 1308:3, 1313:4,
1313:6, 1314:10, 1314:15,
1317:1, 1321:22, 1322:8,
1324:9, 1324:12, 1324:16,
1325:8, 1325:12, 1325:18,
1325:21, 1326:1, 1326:3,
1326:7, 1326:20, 1327:8,
1327:10, 1327:13, 1327:19,
1327:21, 1327:23, 1329:13,
1329:21, 1329:24, 1330:1,
1330:20, 1330:22, 1331:3,
1331:9, 1331:13, 1331:20,
1331:25, 1332:2, 1332:5,
1332:10, 1332:15, 1332:25,
1333:5, 1333:10, 1333:15,
1334:3, 1335:2
 **Court's** [1] - 1223:22
 **Courthouse** [1] - 1204:8
 **courtroom** [8] - 1205:4,
1207:19, 1208:5, 1218:12,
1273:25, 1274:9, 1296:11,
1334:2
 **COURTROOM** [14] - 1205:1,
1207:25, 1212:12, 1245:8,
1245:10, 1257:19, 1274:6,
1282:24, 1283:2, 1297:21,
1300:4, 1323:23, 1323:25,
1327:17
 **courts** [1] - 1268:9
 **cover** [1] - 1324:25
 **coverage** [2] - 1262:19, 1264:4
 **covered** [2] - 1219:3, 1307:3
 **covering** [1] - 1320:17
 **Cowie** [3] - 1300:8, 1309:12,
1315:9
 **Cox** [3] - 1229:6, 1319:20,
1319:22
 **Craig** [122] - 1203:5, 1205:3,
1205:16, 1207:15, 1209:14,
1209:18, 1209:20, 1210:13,
1210:16, 1210:25, 1211:3,
1211:15, 1212:7, 1212:24,
1213:18, 1214:2, 1214:6,
1214:12, 1214:22, 1215:3,
1215:9, 1215:13, 1215:24,
1216:16, 1217:10, 1218:16,
1219:10, 1219:13, 1220:8,
1220:13, 1226:22, 1226:25,
1229:20, 1230:13, 1231:11,
1234:10, 1237:13, 1242:6,
1242:22, 1243:5, 1244:19,
1244:21, 1244:22, 1246:24,
1248:17, 1248:25, 1249:15,

1251:11, 1252:2, 1252:6,
1253:2, 1253:21, 1254:8,
1254:12, 1256:14, 1256:22,
1257:1, 1257:22, 1259:6,
1260:2, 1260:13, 1260:17,
1261:6, 1261:14, 1262:10,
1263:18, 1268:22, 1269:17,
1270:17, 1272:17, 1273:5,
1274:7, 1274:17, 1278:5,
1279:10, 1279:15, 1279:19,
1279:20, 1279:24, 1280:8,
1281:3, 1281:8, 1281:12,
1282:6, 1286:20, 1287:25,
1288:18, 1289:3, 1290:4,
1290:6, 1290:14, 1291:4,
1293:15, 1293:21, 1293:25,
1300:14, 1309:12, 1309:23,
1309:25, 1310:7, 1310:16,
1311:15, 1312:22, 1312:23,
1313:19, 1315:10, 1319:9,
1319:10, 1319:12, 1319:19,
1320:3, 1320:9, 1320:16,
1320:22, 1321:18, 1321:22,
1322:13, 1322:16, 1322:18,
1322:23, 1324:22
 **craig** [2] - 1262:6, 1313:2
 **Craig's** [6] - 1239:9, 1255:13,
1257:13, 1266:5, 1269:6, 1291:9
 **CRC** [2] - 1204:7, 1335:13
 **create** [1] - 1241:18
 **created** [1] - 1241:21
 **credibility** [2] - 1296:9, 1296:11
 **crime** [2] - 1223:24, 1312:4,
1312:15
 **crimes** [1] - 1318:3
 **Criminal** [2] - 1203:2, 1205:2
 **crisis** [1] - 1318:21
 **critics** [2] - 1224:3, 1305:5
 **cross** [5] - 1273:18, 1274:11,
1307:6, 1307:13, 1333:2
 **CROSS** [1] - 1274:13
 **cross-examination** [1] - 1333:2
 **CROSS-EXAMINATION** [1] -
1274:13
 **cross-examine** [2] - 1273:18,
1274:11
 **crossed** [1] - 1258:8
 **crosspatch** [1] - 1252:5
 **CRR** [2] - 1204:7, 1335:13
 **cumulative** [1] - 1307:5
 **current** [1] - 1311:8
 **cut** [3] - 1229:1, 1301:7, 1307:5
 **Cypress** [1] - 1273:10

## D

 **D.C** [1] - 1335:15
 **d1** [1] - 1321:8
 **Daily** [7] - 1226:16, 1238:25,
1239:1, 1257:8, 1259:23,

1259:24, 1260:7
**damages** [1] - 1314:22
**database** [1] - 1246:3
**date** [21] - 1206:20, 1206:25,
1226:2, 1229:22, 1234:25,
1235:3, 1235:4, 1237:22,
1244:5, 1252:15, 1253:23,
1254:1, 1254:2, 1255:22,
1261:2, 1278:10, 1315:18,
1315:24, 1325:10, 1325:24
**Date** [1] - 1328:4
**dated** [8] - 1230:17, 1231:25,
1235:12, 1298:17, 1299:19,
1302:2, 1314:14, 1316:16
**Dated** [1] - 1335:9
**dates** [3] - 1275:4, 1278:23,
1290:8
**David** [10] - 1243:1, 1245:18,
1250:24, 1252:25, 1253:4,
1257:2, 1258:8, 1258:21,
1258:23, 1284:22
**Davis** [5] - 1284:18, 1284:19,
1284:20, 1309:18, 1312:8
**DAY** [1] - 1203:8
**day-to-day** [1] - 1285:7
**days** [7] - 1253:9, 1256:11,
1276:4, 1276:14, 1276:19,
1291:18, 1311:14
**DC** [5] - 1203:5, 1203:15,
1203:18, 1204:3, 1204:9
**dead** [1] - 1307:9
**deal** [3] - 1217:2, 1222:14,
1251:21
**dealing** [3] - 1262:23, 1285:22,
1312:13
**Dear** [1] - 1299:19
**December** [16] - 1235:7,
1235:12, 1237:23, 1244:1,
1244:6, 1246:6, 1246:20,
1253:25, 1254:3, 1255:8,
1255:9, 1256:7, 1259:14,
1261:3, 1272:18, 1272:23
**decided** [3] - 1221:15, 1246:18,
1258:14
**decision** [7] - 1223:22, 1237:11,
1292:9, 1304:11, 1309:18,
1333:20
**declined** [1] - 1274:22
**dedicated** [1] - 1302:13
**defendant** [1] - 1245:2
**Defendant** [2] - 1203:6, 1203:20
**Defendant's** [9] - 1297:17,
1301:23, 1306:16, 1308:12,
1315:20, 1326:16, 1326:24,
1328:2, 1332:22
**defendant's** [3] - 1297:20,
1298:9, 1326:17
**defense** [8] - 1212:5, 1273:17,
1274:11, 1282:15, 1298:3,
1300:21, 1323:23, 1323:25

**Defense** [1] - 1313:25
**definitely** [11] - 1210:10,
1245:4, 1266:3, 1277:11,
1283:7, 1285:20, 1304:24,
1306:14, 1312:2, 1321:3, 1321:5
**degree** [1] - 1293:22
**delay** [2] - 1251:4, 1251:6
**delayed** [2] - 1303:3, 1303:5
**delays** [1] - 1235:2
**deleted** [2] - 1213:9
**deliver** [4] - 1249:21, 1251:25,
1261:20
**delivered** [1] - 1306:2
**delivering** [3] - 1257:3,
1257:23, 1258:9
**delivery** [3] - 1251:22, 1257:23,
1311:14
**Department** [3] - 1203:17,
1235:24, 1273:6
**departments** [1] - 1235:22
**deputy** [4] - 1257:5, 1258:11,
1292:11, 1320:14
**DEPUTY** [14] - 1205:1, 1207:25,
1212:12, 1245:8, 1245:10,
1257:19, 1274:6, 1282:24,
1283:2, 1297:21, 1300:4,
1323:23, 1323:25, 1327:17
**der** [25] - 1279:2, 1286:22,
1286:23, 1286:24, 1287:6,
1287:21, 1287:24, 1289:3,
1290:11, 1290:13, 1290:15,
1290:18, 1291:4, 1291:9,
1291:12, 1291:17, 1316:16,
1324:5, 1324:20, 1324:21,
1325:11, 1325:17, 1327:6,
1329:6, 1329:18
**describe** [1] - 1226:5
**described** [5] - 1278:9,
1281:11, 1284:6, 1292:15,
1300:14
**describes** [1] - 1207:14
**description** [2] - 1294:20,
1329:13
**designed** [1] - 1207:12
**designing** [1] - 1279:12
**desire** [1] - 1312:20
**desk** [2] - 1290:23, 1329:18
**detail** [1] - 1278:9
**detailed** [1] - 1303:19
**determinations** [1] - 1272:3
**determined** [1] - 1253:6
**developed** [1] - 1281:22
**development** [2] - 1251:10,
1293:12
**Dickman** [2] - 1204:7, 1335:13
**DICKMAN** [1] - 1335:5
**difference** [3] - 1243:12,
1243:14, 1260:9
**different** [7] - 1223:16, 1232:13,
1235:22, 1281:17, 1282:3,

1300:22, 1328:25
**difficult** [2] - 1307:17, 1308:23
**digital** [1] - 1303:18
**dinner** [5] - 1206:21, 1206:23,
1206:24, 1207:1, 1207:10
**diplomacy** [1] - 1228:8
**diplomatic** [1] - 1223:25
**Direct** [1] - 1208:18
**direct** [6] - 1242:17, 1262:24,
1264:1, 1307:13, 1313:9,
1321:11
**DIRECT** [1] - 1208:22
**directing** [2] - 1301:2, 1310:3
**directions** [1] - 1285:8
**directive** [2] - 1206:14, 1206:17
**directly** [4] - 1226:25, 1244:21,
1290:4, 1302:15
**disagree** [1] - 1295:24
**disappointed** [1] - 1333:16
**disappointment** [1] - 1263:13
**disclosure** [2] - 1312:21,
1318:9
**discovered** [1] - 1277:21
**discuss** [8] - 1250:19, 1273:6,
1280:1, 1300:12, 1316:20,
1318:25, 1333:20, 1333:24
**discussed** [7] - 1219:24,
1258:12, 1273:22, 1292:22,
1303:8, 1304:24, 1322:15
**discussing** [1] - 1283:9
**discussion** [21] - 1205:24,
1209:13, 1211:12, 1230:14,
1240:6, 1250:9, 1250:25,
1260:16, 1260:17, 1264:15,
1269:19, 1280:9, 1283:14,
1286:22, 1288:4, 1295:10,
1307:25, 1318:13, 1325:2,
1326:19, 1331:5
**discussions** [4] - 1221:3,
1316:20, 1322:17, 1322:18
**DISTRICT** [4] - 1203:1, 1203:1,
1203:10, 1203:14
**DMP** [1] - 1284:21
**Docs** [1] - 1236:19
**Document** [1] - 1310:25
**document** [36] - 1210:8,
1210:11, 1211:10, 1211:11,
1211:12, 1212:4, 1221:20,
1223:9, 1223:14, 1225:5,
1225:14, 1225:21, 1226:5,
1227:23, 1228:2, 1233:15,
1234:12, 1236:23, 1237:18,
1238:7, 1238:8, 1238:9, 1239:9,
1241:16, 1244:11, 1299:10,
1300:7, 1301:20, 1301:24,
1306:17, 1306:19, 1315:21,
1321:9, 1326:3, 1326:5, 1332:17
**documents** [10] - 1210:5,
1210:6, 1221:24, 1236:22,
1244:7, 1277:23, 1278:24,

1282:22, 1284:21, 1285:2
**dog** [1] - 1210:4
**domain** [4] - 1234:24, 1236:6, 1236:8, 1256:12
**domestic** [1] - 1226:11
**done** [12] - 1209:15, 1213:7, 1225:11, 1228:10, 1229:12, 1264:23, 1266:12, 1272:14, 1281:6, 1297:12, 1316:22, 1319:13
**dot** [1] - 1243:25
**down** [13] - 1209:9, 1215:14, 1234:13, 1267:17, 1268:5, 1272:15, 1293:17, 1296:20, 1304:15, 1306:4, 1307:5, 1312:18, 1329:7
**downturn** [1] - 1283:20
**DPA** [1] - 1224:9
**draft** [15] - 1210:8, 1212:8, 1221:18, 1289:15, 1289:19, 1290:9, 1299:6, 1299:10, 1315:11, 1316:2, 1321:7, 1325:15, 1327:5, 1328:22, 1329:5
**drafted** [1] - 1317:21
**drafts** [1] - 1323:12
**due** [3] - 1264:7, 1273:19, 1282:5
**duly** [1] - 1208:19
**during** [6] - 1267:25, 1273:5, 1276:22, 1281:11, 1287:20, 1333:24

## E

**e-mail** [2] - 1214:2, 1236:13
**early** [3] - 1311:20, 1329:15
**easier** [1] - 1301:7
**East** [1] - 1203:22
**Eastern** [1] - 1261:10
**Eckart** [3] - 1241:6, 1241:8, 1262:24
**economic** [1] - 1283:20
**Ed** [1] - 1286:16
**editor** [6] - 1226:10, 1226:14, 1226:15, 1226:16, 1257:5, 1258:11
**eels** [1] - 1306:3
**effectively** [1] - 1305:21
**effort** [2] - 1222:1, 1313:11
**efforts** [4] - 1252:11, 1252:18, 1258:9, 1273:3
**Egypt** [4] - 1229:20, 1230:12, 1231:5, 1231:6
**either** [4] - 1289:13, 1289:15, 1320:3, 1328:3
**election** [2] - 1251:1, 1251:3
**electronically** [1] - 1327:18
**element** [1] - 1332:15
**elements** [2] - 1242:5, 1322:15

**ELMO** [1] - 1327:17
**Email** [8] - 1203:16, 1203:16, 1203:19, 1203:24, 1203:25, 1203:25, 1204:4, 1204:5
**email** [114] - 1209:9, 1210:12, 1210:17, 1211:2, 1211:17, 1212:9, 1212:16, 1212:21, 1213:7, 1213:15, 1214:6, 1214:21, 1215:11, 1216:20, 1217:10, 1217:19, 1219:13, 1221:11, 1221:23, 1227:10, 1228:25, 1229:1, 1231:25, 1232:2, 1232:9, 1232:12, 1235:12, 1235:14, 1237:4, 1237:13, 1237:20, 1240:21, 1245:12, 1245:14, 1246:1, 1246:17, 1246:19, 1248:1, 1250:7, 1250:16, 1250:23, 1251:12, 1252:6, 1252:16, 1252:23, 1252:24, 1253:1, 1253:2, 1254:9, 1256:20, 1257:2, 1257:23, 1258:5, 1259:19, 1259:25, 1260:3, 1260:5, 1260:23, 1261:12, 1261:15, 1262:15, 1262:18, 1262:19, 1262:21, 1264:5, 1264:9, 1264:23, 1265:8, 1265:9, 1271:1, 1279:20, 1283:4, 1283:15, 1283:25, 1284:12, 1286:2, 1286:17, 1292:6, 1292:8, 1298:16, 1300:8, 1301:8, 1301:10, 1302:1, 1304:3, 1304:25, 1305:19, 1306:6, 1306:7, 1306:20, 1307:1, 1309:11, 1309:23, 1310:20, 1313:1, 1313:2, 1314:4, 1314:6, 1314:10, 1314:13, 1315:7, 1316:15, 1321:7, 1324:8, 1324:10, 1324:13, 1325:23, 1325:24, 1326:24, 1327:4, 1328:2, 1328:3, 1328:6
**emailed** [2] - 1262:8, 1302:2
**emailing** [3] - 1209:9, 1260:13, 1261:14
**emails** [7] - 1215:10, 1217:23, 1221:9, 1237:5, 1238:1, 1241:2, 1316:20
**emarcus@zuckerman.com** [1] - 1204:5
**embargo** [1] - 1318:16
**embedded** [1] - 1302:14
**emphatic** [1] - 1312:16
**encrypted** [1] - 1237:6
**end** [10] - 1223:12, 1227:10, 1232:13, 1243:14, 1248:3, 1248:14, 1270:14, 1270:20, 1304:15, 1316:7
**ended** [1] - 1238:20
**engage** [4] - 1214:8, 1222:15,

1224:13, 1263:22
**engaged** [2] - 1252:24, 1278:6
**Engagement** [1] - 1222:11
**engagement** [9] - 1222:18, 1234:8, 1238:17, 1263:1, 1282:11, 1292:24, 1298:17, 1299:7, 1309:13
**engagements** [1] - 1299:1
**engaging** [3] - 1234:10, 1244:25, 1258:24
**engine** [1] - 1303:20
**English** [5] - 1226:15, 1293:4, 1293:5, 1302:15, 1320:7
**enjoy** [2] - 1333:21, 1334:1
**enlarge** [1] - 1223:11
**ensure** [4] - 1224:25, 1263:25, 1266:8, 1266:11
**enters** [2] - 1208:5, 1274:9
**entire** [1] - 1270:6
**entitled** [2] - 1296:10, 1297:3
**entity** [1] - 1309:20
**environment** [1] - 1226:9
**envisioning** [1] - 1225:22
**equals** [1] - 1292:18
**Eric** [3] - 1286:8, 1286:10
**erroneously** [1] - 1252:8
**error** [2] - 1212:5, 1216:24
**especially** [1] - 1258:9
**essentially** [1] - 1280:5
**establish** [2] - 1206:1, 1331:16
**established** [1] - 1268:11
**establishing** [1] - 1206:25
**etcetera** [1] - 1258:24
**Europe** [7] - 1222:16, 1286:4, 1303:10, 1303:13, 1305:4, 1310:9, 1313:11
**European** [6] - 1281:25, 1311:11, 1313:12, 1313:16, 1313:18, 1320:15
**evening** [2] - 1208:11, 1257:3
**event** [3] - 1291:16, 1292:3, 1314:21
**events** [6] - 1277:12, 1277:13, 1293:15, 1295:15, 1302:18, 1311:14
**eventually** [1] - 1309:23
**everywhere** [1] - 1239:18
**evidence** [35] - 1209:3, 1212:2, 1212:4, 1212:12, 1212:13, 1213:3, 1213:23, 1214:25, 1227:9, 1231:23, 1235:10, 1236:14, 1245:8, 1245:9, 1246:13, 1254:6, 1255:11, 1256:18, 1257:18, 1259:17, 1260:21, 1262:13, 1267:24, 1268:12, 1272:9, 1282:25, 1287:16, 1295:16, 1297:1, 1305:18, 1323:22, 1329:23, 1330:1, 1331:21
**evidentiary** [1] - 1272:4

**Ex** [1] - 1271:12
**Ex-Premier** [1] - 1271:12
**exactly** [3] - 1277:16, 1280:7, 1325:20
**examination** [1] - 1333:2
**Examination** [1] - 1208:18
**EXAMINATION** [2] - 1208:22, 1274:13
**examine** [2] - 1273:18, 1274:11
**examined** [1] - 1208:20
**example** [2] - 1211:21, 1277:25
**excerpts** [1] - 1269:9
**exchange** [7] - 1250:2, 1252:7, 1283:4, 1301:10, 1302:1, 1306:6, 1313:1
**excited** [2] - 1328:14, 1328:23
**exclamation** [1] - 1283:18
**exclusive** [7] - 1243:2, 1247:4, 1247:8, 1247:13, 1247:16, 1257:11, 1286:4
**exclusivity** [1] - 1247:22
**excused** [3] - 1274:1, 1334:1, 1334:3
**execute** [1] - 1236:6
**executive** [1] - 1218:11
**exhibit** [11] - 1223:10, 1232:16, 1300:21, 1302:1, 1304:2, 1309:14, 1317:25, 1323:1, 1326:10, 1326:14, 1329:14
**Exhibit** [45] - 1209:2, 1212:11, 1213:3, 1213:23, 1221:8, 1222:5, 1231:18, 1235:10, 1236:10, 1237:19, 1245:7, 1246:8, 1252:21, 1255:10, 1256:17, 1257:17, 1259:16, 1260:20, 1262:12, 1282:12, 1282:18, 1283:22, 1292:5, 1297:17, 1299:25, 1300:17, 1301:23, 1306:16, 1308:12, 1309:4, 1309:9, 1310:18, 1313:25, 1316:8, 1316:12, 1321:6, 1323:21, 1324:1, 1326:9, 1326:16, 1326:24, 1328:2, 1329:22, 1332:22
**exhibits** [5] - 1282:15, 1282:16, 1297:20, 1298:3, 1300:20
**existed** [1] - 1318:4
**exit** [1] - 1273:25
**Exit** [1] - 1315:20
**expand** [1] - 1225:24
**expanded** [1] - 1226:19
**expected** [3] - 1229:24, 1302:21, 1312:17
**expecting** [1] - 1315:19
**expense** [1] - 1296:17
**expenses** [1] - 1294:11
**experience** [1] - 1291:3
**explain** [4] - 1209:8, 1214:4, 1217:25, 1234:20
**explained** [2] - 1251:16,

1294:15
**explaining** [1] - 1301:19
**explains** [1] - 1242:4
**explanation** [1] - 1205:24
**exposed** [1] - 1217:7
**express** [4] - 1210:16, 1272:18, 1272:21, 1272:24
**expressed** [2] - 1307:4, 1324:21
**extent** [1] - 1332:9
**extra** [1] - 1241:6
**extremely** [1] - 1291:11
**Ezra** [2] - 1204:1, 1205:18

# F

**facetious** [1] - 1332:5
**fact** [15] - 1207:15, 1208:7, 1260:17, 1277:13, 1280:23, 1281:11, 1282:6, 1286:4, 1288:6, 1293:17, 1296:8, 1301:12, 1306:8, 1308:13
**facts** [3] - 1223:21, 1223:22, 1277:21
**factual** [1] - 1272:3
**failed** [4] - 1214:23, 1214:25, 1215:4, 1215:21
**Failings** [1] - 1271:11
**failure** [1] - 1294:10
**fair** [4] - 1267:22, 1281:7, 1281:9, 1294:20
**fairly** [4] - 1212:6, 1219:16, 1281:15, 1321:9
**falls** [1] - 1224:4
**false** [1] - 1211:8
**familiar** [1] - 1284:17
**famous** [1] - 1311:5
**far** [5] - 1218:9, 1226:9, 1263:4, 1303:1, 1324:8
**FARA** [6] - 1286:5, 1310:2, 1310:8, 1310:10, 1312:20, 1318:9
**fat** [1] - 1321:9
**FBI** [1] - 1275:19
**feature** [1] - 1330:12
**feelings** [1] - 1307:4
**fell** [1] - 1294:24
**felt** [3] - 1294:20, 1294:22, 1306:1
**Fernando** [2] - 1203:12, 1205:9
**fernando.campoamor** [1] - 1203:16
**fernando.campoamor-sanchez@usdoj.gov** [1] - 1203:16
**few** [8] - 1213:19, 1263:6, 1263:9, 1276:14, 1291:1, 1291:18, 1306:15, 1311:14
**FH** [4] - 1239:16, 1239:20, 1239:22

**fifth** [1] - 1292:1
**figure** [2] - 1269:23, 1269:25
**file** [1] - 1310:10
**final** [3] - 1244:4, 1289:15, 1311:15
**finally** [8] - 1217:22, 1233:12, 1236:6, 1244:5, 1253:6, 1253:22, 1256:11, 1273:8
**findings** [3] - 1224:3, 1272:3, 1330:6
**fine** [11] - 1211:5, 1286:18, 1287:14, 1289:8, 1297:14, 1306:7, 1307:7, 1308:8, 1326:4, 1327:13, 1333:14
**finger** [3] - 1227:17, 1227:19, 1270:10
**fingers** [1] - 1258:8
**finished** [1] - 1307:3
**finishes** [1] - 1264:1
**fired** [2] - 1295:16, 1296:16
**firm** [7] - 1271:21, 1279:22, 1284:13, 1284:18, 1300:11, 1300:16, 1309:19
**firm's** [1] - 1219:14
**first** [47] - 1207:25, 1209:4, 1209:9, 1209:23, 1211:17, 1215:11, 1222:5, 1223:14, 1223:18, 1228:22, 1234:25, 1241:8, 1241:16, 1241:18, 1241:24, 1242:17, 1245:12, 1246:17, 1247:18, 1248:6, 1253:1, 1253:7, 1254:16, 1262:15, 1263:8, 1264:5, 1264:16, 1266:25, 1267:14, 1267:21, 1271:3, 1271:19, 1275:2, 1275:6, 1275:21, 1280:8, 1280:9, 1284:3, 1292:2, 1306:6, 1309:22, 1312:12, 1315:7, 1320:14, 1323:11, 1325:22, 1329:14
**five** [3] - 1264:19, 1264:20, 1333:23
**fix** [1] - 1229:24
**flap** [2] - 1255:25, 1256:13
**flappy** [1] - 1255:23
**flatly** [1] - 1210:20
**Flawed** [1] - 1267:11
**FleishmanHillard** [2] - 1239:20, 1239:23
**Fletcher** [1] - 1226:14
**Flom** [1] - 1271:21
**flow** [1] - 1264:17
**fluent** [2] - 1287:4, 1320:7
**focus** [3] - 1209:4, 1239:24, 1245:12
**focused** [1] - 1246:17
**folks** [4] - 1231:12, 1291:21, 1305:11, 1312:13
**follow** [1] - 1282:14
**followed** [1] - 1303:19

**following** [2] - 1225:12, 1248:5
**follows** [3] - 1208:20, 1224:25, 1328:23
**food** [1] - 1300:12
**footing** [1] - 1251:14
**FOR** [2] - 1203:1, 1203:13
**foregoing** [1] - 1335:6
**Foreign** [3] - 1235:24, 1241:15, 1262:25
**foreign** [2] - 1257:5, 1258:11
**forever** [1] - 1276:16
**forget** [1] - 1330:8
**forgot** [1] - 1273:8
**forgotten** [1] - 1225:7
**form** [10] - 1216:12, 1291:6, 1299:10, 1321:20, 1322:7, 1327:5, 1328:21, 1329:5, 1329:9, 1332:24
**formally** [1] - 1318:16
**format** [3] - 1223:16, 1228:25, 1317:20
**formatting** [1] - 1222:3
**former** [3] - 1292:12, 1320:1, 1320:2
**forth** [1] - 1300:2
**forward** [1] - 1252:2
**forwarded** [6] - 1213:16, 1223:9, 1252:3, 1252:23, 1252:24, 1254:8
**forwarding** [1] - 1232:10
**forwards** [1] - 1254:3
**foul** [1] - 1224:4
**Fourth** [1] - 1203:14
**fourth** [1] - 1292:1
**framing** [1] - 1224:21
**frankly** [2] - 1225:25, 1230:8
**fraud** [2] - 1292:13, 1311:9
**free** [2] - 1300:10, 1321:2
**frequently** [1] - 1302:17
**fresh** [1] - 1277:23
**fretting** [1] - 1261:13
**Friday** [2] - 1222:7, 1305:22
**Friedman** [3] - 1235:19, 1241:13, 1262:25
**friend** [1] - 1293:20
**front** [3] - 1266:1, 1266:17, 1271:9
**frustration** [1] - 1307:14
**FTI** [36] - 1222:11, 1222:17, 1222:20, 1225:11, 1229:8, 1232:22, 1238:18, 1242:12, 1242:13, 1242:22, 1244:16, 1244:19, 1273:9, 1280:16, 1280:21, 1281:5, 1283:6, 1283:10, 1286:4, 1286:11, 1292:9, 1292:20, 1294:8, 1294:10, 1295:13, 1299:11, 1302:8, 1310:3, 1310:8, 1313:10, 1314:20, 1318:25, 1319:13, 1322:20, 1324:11

**FTI's** [2] - 1280:10, 1300:15
**Fule** [1] - 1229:6
**fulfill** [1] - 1249:24
**full** [5] - 1212:21, 1214:15, 1267:9, 1275:9, 1335:7
**fully** [1] - 1263:25
**function** [1] - 1283:11
**fundamental** [1] - 1216:22
**funds** [3] - 1305:25, 1313:18, 1315:2
**funny** [1] - 1308:21
**FYI** [1] - 1310:8

## G

**gas** [1] - 1311:10
**GASTON** [1] - 1236:12
**Gaston** [3] - 1203:13, 1205:8, 1206:7
**Gaston's** [1] - 1207:2
**Gates** [69] - 1209:19, 1219:20, 1220:24, 1221:12, 1233:1, 1235:14, 1236:1, 1236:16, 1237:20, 1238:7, 1240:13, 1240:17, 1240:25, 1241:2, 1241:22, 1243:7, 1245:4, 1258:4, 1258:5, 1261:15, 1262:1, 1262:20, 1263:3, 1265:8, 1265:12, 1268:25, 1269:3, 1278:4, 1279:6, 1284:24, 1285:8, 1287:22, 1287:23, 1290:3, 1290:10, 1290:13, 1290:15, 1298:16, 1299:3, 1299:6, 1302:2, 1303:9, 1304:8, 1304:18, 1304:23, 1305:24, 1306:2, 1307:2, 1307:4, 1307:14, 1308:16, 1309:17, 1310:25, 1312:10, 1312:13, 1314:6, 1315:8, 1316:15, 1316:21, 1317:3, 1317:16, 1317:19, 1318:22, 1321:1, 1321:7, 1323:19, 1331:12, 1331:13, 1331:14
**Gates'** [3] - 1264:9, 1316:3, 1323:6
**gathered** [2] - 1278:3, 1278:17
**GC** [10] - 1229:9, 1230:11, 1233:6, 1233:21, 1242:8, 1242:23, 1243:17, 1244:16, 1244:18
**GC's** [1] - 1263:14
**general** [5] - 1286:11, 1292:10, 1299:24, 1303:21, 1320:14
**generally** [3] - 1228:6, 1302:23, 1315:12
**generation** [1] - 1303:20
**gentlemen** [8] - 1214:5, 1216:19, 1244:7, 1246:23, 1260:6, 1261:5, 1264:25, 1265:11

**Gents** [1] - 1236:1
**geography** [2] - 1242:15, 1247:19
**German** [4] - 1241:7, 1262:24, 1320:8, 1320:13
**Germany** [1] - 1235:23
**gift** [3] - 1205:25, 1206:4, 1206:13
**gifts** [2] - 1206:24, 1207:10
**giggle** [1] - 1308:23
**given** [9] - 1206:15, 1207:13, 1243:1, 1253:7, 1267:22, 1312:20, 1320:12, 1320:15, 1325:16
**Gmail** [2] - 1237:1, 1237:7
**goal** [2] - 1282:3
**goals** [1] - 1329:10
**Google** [3] - 1295:5, 1295:13, 1295:20
**Government** [11] - 1245:6, 1267:11, 1283:22, 1299:25, 1300:17, 1309:9, 1310:18, 1316:12, 1321:6, 1324:1, 1326:9
**government** [28] - 1216:9, 1256:2, 1256:5, 1271:22, 1274:24, 1276:21, 1277:6, 1277:9, 1277:20, 1281:16, 1281:18, 1281:20, 1281:23, 1282:16, 1285:5, 1285:22, 1291:16, 1291:19, 1291:21, 1291:23, 1292:2, 1300:20, 1305:12, 1309:20, 1313:17, 1317:17, 1323:23, 1323:25
**Government's** [21] - 1209:2, 1212:11, 1213:2, 1213:22, 1221:8, 1235:9, 1236:9, 1237:19, 1246:8, 1246:14, 1252:21, 1255:10, 1256:17, 1257:17, 1259:16, 1260:20, 1262:12, 1282:12, 1282:18, 1309:4, 1316:8
**Government-Commissioned** [1] - 1267:11
**governments** [1] - 1293:10
**grab** [2] - 1249:6, 1306:3
**Grace** [1] - 1245:14
**great** [3] - 1257:25, 1323:4, 1323:5
**greatly** [1] - 1223:24
**green** [4] - 1236:1, 1241:3, 1243:25
**Greg** [55] - 1212:17, 1213:1, 1213:6, 1213:10, 1220:7, 1221:1, 1225:6, 1229:20, 1229:24, 1230:2, 1230:5, 1237:8, 1237:9, 1239:12, 1239:15, 1240:6, 1242:22, 1243:5, 1244:19, 1246:24, 1247:1, 1247:3, 1247:8, 1248:2, 1248:14, 1248:25, 1249:15,

1250:19, 1251:7, 1251:14,
1252:23, 1253:14, 1257:25,
1259:13, 1260:1, 1260:2,
1261:1, 1261:7, 1261:15,
1267:14, 1274:17, 1279:15,
1280:3, 1280:21, 1291:12,
1293:21, 1300:10, 1311:15,
1315:10, 1319:9, 1319:10,
1319:12, 1319:19, 1320:16,
1324:23
   **Greg's** [1] - 1255:5
   **Gregory** [3] - 1203:5, 1205:3,
1274:7
   **grid** [20] - 1221:16, 1221:20,
1225:15, 1227:22, 1227:23,
1227:25, 1228:20, 1228:23,
1229:1, 1229:5, 1229:13,
1231:20, 1232:10, 1236:23,
1240:23, 1241:19, 1241:21,
1242:7, 1253:23, 1323:2
   **grids** [1] - 1258:18
   **grounders** [1] - 1302:16
   **grounds** [1] - 1330:23
   **group** [2] - 1292:8, 1320:17
   **groups** [1] - 1319:11
   **guess** [2] - 1254:22, 1307:10
   **guilt** [1] - 1272:3
   **Gulland** [1] - 1203:13
   **guy** [2] - 1241:7, 1262:24
   **Guys** [1] - 1316:18
   **guys** [2] - 1220:2, 1317:20

## H

   **Haley** [3] - 1231:23, 1236:14,
1246:14
   **half** [7] - 1238:20, 1270:6,
1287:3, 1290:24, 1291:1,
1311:6, 1329:18
   **Hall** [1] - 1310:21
   **hand** [5] - 1241:25, 1257:3,
1257:23, 1258:9, 1321:2
   **hand-delivering** [2] - 1257:3,
1258:9
   **handle** [1] - 1214:13
   **handled** [1] - 1293:22
   **hands** [1] - 1306:3
   **handwriting** [2] - 1294:16,
1294:18
   **hang** [1] - 1232:6
   **happier** [1] - 1253:14
   **happy** [2] - 1253:11, 1300:11
   **hard** [2] - 1277:16, 1307:20
   **hardcopy** [2] - 1257:3, 1332:23
   **Harvard** [25] - 1209:12,
1209:16, 1219:11, 1220:18,
1225:18, 1226:23, 1230:15,
1230:21, 1230:23, 1230:24,
1234:7, 1278:3, 1278:11,
1279:17, 1279:19, 1321:19,

1322:1, 1322:3, 1322:14,
1322:16, 1322:19, 1325:13,
1325:14, 1325:22
   **hawker** [2] - 1207:12, 1324:16
   **Hawker** [17] - 1208:14, 1248:13,
1271:5, 1272:14, 1274:15,
1289:13, 1295:20, 1297:18,
1301:10, 1304:3, 1308:12,
1315:8, 1324:3, 1324:15,
1331:1, 1331:24, 1332:22
   **HAWKER** [1] - 1208:17
   **head** [2] - 1292:16, 1292:20
   **heading** [5] - 1271:10, 1271:11,
1271:13, 1271:14, 1306:10
   **headline** [2] - 1267:9, 1267:10
   **heads** [1] - 1327:22
   **hear** [6] - 1216:23, 1254:13,
1261:11, 1265:24, 1286:13,
1332:13
   **heard** [14] - 1223:19, 1244:21,
1245:2, 1245:4, 1261:8,
1281:23, 1286:15, 1294:4,
1311:10, 1312:6, 1312:22,
1312:23, 1313:23, 1315:12
   **hearsay** [3] - 1269:22, 1330:23,
1331:6
   **heat** [1] - 1207:21
   **heavily** [1] - 1271:22
   **HELD** [1] - 1203:9
   **hell** [1] - 1321:15
   **help** [6] - 1211:16, 1279:21,
1281:23, 1297:24, 1303:15,
1328:16
   **helpful** [10] - 1211:19, 1212:20,
1265:14, 1265:21, 1266:3,
1270:8, 1271:25, 1272:1,
1272:6, 1272:12
   **helping** [1] - 1314:23
   **helps** [1] - 1282:20
   **hereby** [1] - 1335:5
   **hesitation** [1] - 1272:19
   **Hi** [1] - 1250:24
   **hi** [1] - 1261:7
   **highlight** [1] - 1283:15
   **highly** [1] - 1224:22
   **himself** [2] - 1261:16, 1317:19
   **hired** [2] - 1301:13, 1305:15
   **hiring** [1] - 1310:3
   **holds** [1] - 1224:7
   **hole** [1] - 1308:20
   **home** [4] - 1232:12, 1257:3,
1257:4, 1257:24
   **honest** [1] - 1218:7
   **honesty** [2] - 1268:23, 1323:7
   **Honor** [32] - 1205:1, 1205:4,
1205:7, 1205:15, 1205:20,
1207:5, 1207:7, 1207:17,
1208:21, 1220:14, 1230:16,
1240:9, 1247:10, 1249:1,
1261:23, 1262:3, 1265:4,

1267:3, 1269:22, 1273:16,
1274:4, 1274:6, 1274:12,
1296:8, 1297:11, 1324:7,
1325:25, 1327:7, 1329:17,
1329:22, 1332:4, 1333:4
   **HONORABLE** [1] - 1203:9
   **Hope** [1] - 1283:17
   **hope** [2] - 1255:18, 1316:2
   **hoped** [6] - 1219:10, 1271:8,
1284:16, 1284:17, 1312:17,
1332:17
   **hopeful** [1] - 1219:17
   **hoping** [1] - 1248:3
   **horse** [1] - 1307:9
   **hotel** [5] - 1278:15, 1278:25,
1279:9, 1290:16, 1325:3
   **hour** [3] - 1290:24, 1291:1,
1329:18
   **hours** [8] - 1223:6, 1233:5,
1233:16, 1242:18, 1243:3,
1243:4, 1333:3, 1333:7
   **House** [1] - 1293:8
   **Houses** [1] - 1293:8
   **huge** [2] - 1243:12, 1294:23
   **human** [1] - 1319:25
   **Human** [1] - 1320:7
   **humor** [3] - 1308:21, 1308:24,
1309:1
   **Hunt** [5] - 1226:4, 1240:1,
1258:14, 1258:17, 1259:12
   **hypothetical** [1] - 1320:25

## I

   **idea** [8] - 1245:20, 1255:3,
1255:5, 1273:14, 1282:19,
1310:1, 1313:17, 1313:22
   **ideas** [1] - 1320:23
   **identify** [2] - 1205:5, 1267:5
   **idiot** [1] - 1249:19
   **ignorance** [1] - 1223:21
   **III** [1] - 1203:21
   **imminently** [1] - 1315:19
   **impatient** [1] - 1227:15
   **impeach** [2] - 1296:14, 1296:21
   **important** [4] - 1218:2, 1242:10,
1268:4, 1270:3
   **impression** [1] - 1211:8
   **IN** [1] - 1203:1
   **include** [3] - 1222:7, 1225:12,
1322:24
   **included** [3] - 1253:23, 1268:8,
1269:13
   **including** [5] - 1220:12, 1268:9,
1269:11, 1280:17, 1292:9
   **income** [1] - 1294:23
   **incorporate** [1] - 1210:1
   **incorrect** [2] - 1221:17, 1225:3
   **incorrectly** [1] - 1206:12
   **increase** [1] - 1283:13

**incurred** [1] - 1294:12
**independent** [3] - 1224:2, 1282:3, 1282:7
**indicate** [1] - 1244:22
**indicating** [4] - 1242:16, 1270:12, 1308:2, 1308:6
**indicating)** [3] - 1232:18, 1244:13, 1246:10
**inevitably** [1] - 1225:1
**influence** [3] - 1223:23, 1280:24, 1281:24
**influential** [2] - 1224:22, 1320:20
**inform** [2] - 1211:12, 1303:15
**information** [3] - 1228:13, 1246:1, 1315:15
**informed** [2] - 1263:25, 1309:17
**initial** [2] - 1238:17, 1239:8
**initials** [1] - 1242:8
**initiate** [1] - 1319:12
**input** [1] - 1322:23
**inquiries** [1] - 1216:15
**inquiry** [1] - 1273:6
**instance** [1] - 1296:22
**instead** [1] - 1270:6
**instructed** [1] - 1261:15
**instructions** [3] - 1220:11, 1239:19, 1285:5
**Intend** [1] - 1253:21
**intend** [3] - 1206:14, 1212:1, 1253:5
**intention** [2] - 1217:3, 1234:7
**intentions** [1] - 1264:24
**interaction** [1] - 1225:18
**interest** [2] - 1248:12, 1281:3
**interested** [13] - 1222:23, 1222:25, 1238:25, 1239:14, 1247:3, 1247:7, 1251:9, 1253:8, 1253:11, 1254:18, 1257:9, 1257:10, 1314:20
**interesting** [1] - 1248:4
**international** [7] - 1223:20, 1224:8, 1248:9, 1248:10, 1293:12, 1302:13, 1318:15
**internationally** [1] - 1304:1
**interpreter** [1] - 1285:24
**interrupt** [1] - 1302:22
**interrupted** [1] - 1206:7
**interrupting** [1] - 1261:7
**interview** [12] - 1243:5, 1243:9, 1243:10, 1243:15, 1243:18, 1268:7, 1269:16, 1275:16, 1276:1, 1278:1, 1278:2, 1292:1
**interviewed** [8] - 1274:24, 1275:2, 1275:5, 1275:11, 1275:25, 1276:3, 1276:21, 1277:8
**interviews** [4] - 1207:13, 1277:6, 1319:10, 1320:20
**introduction** [1] - 1267:12

**introductory** [1] - 1267:13
**inverted** [1] - 1218:9
**investigation** [2] - 1289:5, 1305:11
**involved** [3] - 1280:17, 1301:11, 1322:20
**involving** [1] - 1295:3
**irony** [1] - 1236:5
**irregularities** [1] - 1318:4
**irrelevant** [1] - 1296:2
**issue** [4] - 1214:13, 1296:8, 1296:9, 1296:15
**issued** [1] - 1329:8
**issues** [5] - 1229:8, 1264:14, 1281:3, 1295:3, 1324:25
**itching** [1] - 1315:17
**item** [6] - 1220:1, 1228:16, 1319:19, 1320:6, 1320:12
**Item** [4] - 1303:18, 1318:13, 1319:7, 1324:11
**items** [2] - 1328:25, 1329:3
**itself** [1] - 1229:5

## J

**JACKSON** [1] - 1203:9
**James** [1] - 1203:20
**JANICE** [1] - 1335:5
**Janice** [2] - 1204:7, 1335:13
**January** [2] - 1275:2, 1276:1
**Jason** [2] - 1203:17, 1205:8
**jason.mccullough@usdoj.gov** [1] - 1203:19
**Jeez** [1] - 1316:1
**job** [5] - 1210:23, 1281:21, 1287:5, 1301:18, 1315:10
**John** [1] - 1299:15
**joke** [3] - 1284:9, 1284:10, 1284:11
**joking** [1] - 1308:22
**Jon** [3] - 1328:16, 1328:18
**JONATHAN** [1] - 1208:17
**Jonathan** [2] - 1300:9, 1324:24
**jotted** [1] - 1329:7
**Journal** [1] - 1226:17
**journalist** [20] - 1219:10, 1219:11, 1222:14, 1225:21, 1225:23, 1226:3, 1232:23, 1233:3, 1238:16, 1238:25, 1239:2, 1239:12, 1239:14, 1245:25, 1249:15, 1249:20, 1263:22, 1263:23, 1263:25, 1268:8
**journalists** [16] - 1222:16, 1222:24, 1224:22, 1225:12, 1225:22, 1226:9, 1233:7, 1233:22, 1234:11, 1238:11, 1239:14, 1249:23, 1263:7, 1263:9, 1318:15, 1320:13
**JUDGE** [2] - 1203:9, 1203:10

**July** [13] - 1252:11, 1252:12, 1252:15, 1275:11, 1311:20, 1314:7, 1314:14, 1315:22, 1315:23, 1316:1, 1316:7, 1316:16
**June** [4] - 1234:25, 1310:20, 1311:11, 1311:20
**Junghans** [2] - 1204:1, 1205:17
**juris** [1] - 1318:5
**jurisdictions** [3] - 1224:23, 1247:20, 1315:2
**JURORS** [1] - 1327:22
**jurors** [5] - 1207:25, 1208:1, 1208:7, 1274:10, 1334:2
**JURY** [2] - 1203:4, 1203:8
**jury** [12] - 1208:5, 1214:5, 1216:20, 1246:23, 1260:6, 1265:11, 1273:24, 1273:25, 1274:8, 1274:9, 1299:17, 1333:23
**Justice** [12] - 1203:17, 1215:16, 1216:5, 1216:11, 1233:18, 1247:1, 1264:6, 1273:6, 1301:12, 1301:16, 1303:22, 1318:19

## K

**Kedem** [4] - 1205:25, 1206:9, 1207:15, 1313:19
**keen** [2] - 1215:3, 1258:21
**keep** [4] - 1220:12, 1273:2, 1283:21, 1305:6
**keeping** [1] - 1258:8
**Kegl** [3] - 1275:19, 1275:21, 1276:5
**kept** [1] - 1235:1
**key** [8] - 1207:9, 1210:18, 1223:22, 1232:23, 1302:17, 1319:11, 1319:14, 1328:14
**kicking** [1] - 1227:14
**Kilimnik** [13] - 1262:22, 1279:4, 1284:25, 1285:15, 1326:25, 1328:8, 1330:3, 1330:15, 1330:19, 1330:21, 1331:9, 1331:11, 1332:12
**kind** [10] - 1207:11, 1220:1, 1269:18, 1285:2, 1290:9, 1301:18, 1305:10, 1314:4, 1315:18, 1331:3
**Kingdom** [3] - 1293:6, 1293:7, 1306:10
**knowledge** [3] - 1250:13, 1288:17, 1331:13
**known** [1] - 1231:7
**knows** [1] - 1288:21
**Konstantin** [3] - 1262:22, 1284:25, 1326:25
**Kwasniewski** [3] - 1229:7, 1319:20, 1320:1

**Kyiv** [7] - 1224:9, 1278:14, 1278:15, 1278:22, 1279:9, 1290:16, 1315:10

## L

**lack** [1] - 1294:1
**ladies** [7] - 1214:4, 1216:19, 1244:7, 1246:22, 1260:5, 1261:5, 1265:11
**language** [7] - 1215:2, 1217:14, 1218:20, 1223:19, 1302:15, 1328:3
**last** [18] - 1217:23, 1229:20, 1230:12, 1238:18, 1256:12, 1276:16, 1276:17, 1276:22, 1286:2, 1301:25, 1304:25, 1305:1, 1305:22, 1311:10, 1312:19, 1315:13, 1318:7, 1330:3
**late** [2] - 1259:12, 1311:20
**latest** [1] - 1221:18
**law** [1] - 1206:16
**lawyer's** [1] - 1328:21
**lawyering** [1] - 1310:4
**lawyers** [3] - 1271:20, 1272:4, 1282:2
**lead** [3] - 1312:20, 1318:8, 1319:4
**leaders** [1] - 1303:10
**leading** [5] - 1220:14, 1233:24, 1234:2, 1249:1, 1320:17
**leak** [2] - 1232:23, 1232:25
**leaked** [1] - 1305:4
**learn** [4] - 1287:5, 1331:1, 1331:10, 1331:21
**learned** [5] - 1207:15, 1253:4, 1289:4, 1304:18, 1331:11
**learning** [1] - 1287:8
**least** [4] - 1231:12, 1279:10, 1328:3, 1333:3
**leave** [7] - 1218:21, 1258:12, 1295:20, 1312:12, 1332:18, 1333:17, 1334:2
**leaving** [1] - 1296:13
**lectern** [1] - 1205:5
**left** [13] - 1218:22, 1238:14, 1290:18, 1294:6, 1294:8, 1294:9, 1294:21, 1297:6, 1297:8, 1304:10, 1306:14, 1329:18, 1333:4
**legal** [3] - 1205:10, 1226:12, 1282:9
**legend** [1] - 1242:3
**lengthy** [1] - 1238:12
**letter** [2] - 1298:17, 1299:6
**level** [3] - 1227:2, 1227:3, 1251:13
**life** [1] - 1285:25
**light** [3] - 1225:14, 1236:1,

1241:3
**likely** [9] - 1218:6, 1218:12, 1224:7, 1224:11, 1280:2, 1299:21, 1328:22, 1330:4, 1330:11
**limiting** [2] - 1247:19, 1247:24
**line** [12] - 1212:3, 1224:6, 1225:8, 1236:18, 1243:17, 1243:19, 1302:3, 1304:4, 1310:2, 1310:24, 1315:4, 1318:4
**lines** [4] - 1212:17, 1280:6, 1323:11, 1328:22
**links** [1] - 1302:18
**list** [3] - 1238:12, 1321:4, 1321:5
**listed** [5] - 1240:2, 1240:5, 1242:6, 1242:9, 1311:22
**listening** [4] - 1331:1, 1331:18, 1332:9, 1332:10
**litigation** [1] - 1283:21
**live** [1] - 1233:14
**LLP** [2] - 1203:22, 1204:2
**loads** [1] - 1262:20
**locations** [1] - 1226:6
**logical** [2] - 1238:24, 1252:7
**London** [5] - 1222:11, 1222:17, 1222:20, 1259:24, 1286:24
**long-produced** [1] - 1256:10
**long-time** [1] - 1293:20
**look** [81] - 1209:2, 1210:12, 1211:2, 1212:11, 1212:22, 1213:2, 1213:22, 1213:23, 1215:11, 1217:1, 1217:3, 1217:6, 1217:9, 1217:23, 1221:7, 1222:4, 1223:6, 1223:9, 1225:8, 1226:6, 1227:8, 1228:19, 1228:21, 1230:18, 1232:16, 1233:12, 1235:9, 1236:9, 1237:19, 1238:6, 1240:20, 1241:16, 1242:16, 1246:8, 1249:19, 1250:5, 1252:21, 1253:1, 1253:7, 1254:5, 1255:10, 1256:17, 1257:17, 1259:16, 1260:20, 1262:12, 1262:15, 1266:16, 1267:3, 1271:9, 1271:10, 1271:16, 1278:24, 1282:12, 1283:22, 1286:2, 1289:18, 1292:5, 1297:17, 1299:25, 1300:17, 1301:23, 1304:25, 1305:19, 1306:4, 1306:16, 1309:4, 1310:18, 1311:6, 1313:25, 1314:3, 1315:20, 1316:8, 1317:24, 1321:6, 1323:1, 1323:21, 1324:9, 1325:22, 1326:9, 1327:4
**Look** [3] - 1211:18, 1228:9, 1251:17
**looked** [3] - 1225:14, 1238:2, 1283:22

**looking** [15] - 1209:2, 1212:15, 1213:5, 1222:10, 1231:19, 1232:2, 1234:12, 1237:18, 1240:22, 1246:12, 1252:22, 1282:19, 1308:12, 1314:10, 1316:9
**looks** [4] - 1211:23, 1326:14, 1328:2, 1328:5
**Lord** [2] - 1293:1, 1294:1
**Lords** [1] - 1293:8
**lost** [1] - 1249:11
**lounge** [1] - 1300:12
**lunch** [8] - 1333:6, 1333:7, 1333:8, 1333:11, 1333:14, 1333:21, 1334:1
**lure** [1] - 1287:6
**Lutkovska** [1] - 1229:7
**lying** [2] - 1296:25, 1305:21
**Lyovochkin** [2] - 1317:8, 1317:10

## M

**Mail** [2] - 1238:25, 1257:8
**mail** [3] - 1214:2, 1236:13, 1304:10
**main** [2] - 1226:11, 1226:12
**major** [3] - 1216:24, 1219:16, 1320:15
**Malloch** [4] - 1292:23, 1293:1, 1293:2, 1294:1
**Malloch-Brown** [4] - 1292:23, 1293:1, 1293:2, 1294:1
**man** [3] - 1235:19, 1245:22, 1311:1
**Manafort** [45] - 1209:18, 1213:11, 1219:5, 1219:8, 1219:15, 1219:19, 1220:5, 1220:6, 1220:23, 1221:4, 1228:4, 1232:3, 1235:22, 1239:18, 1240:7, 1241:14, 1255:23, 1262:22, 1264:23, 1278:3, 1278:20, 1279:18, 1280:5, 1284:14, 1284:17, 1284:19, 1284:20, 1284:22, 1285:1, 1285:6, 1285:10, 1287:5, 1287:7, 1287:22, 1303:12, 1309:18, 1310:4, 1312:8, 1317:5, 1317:6, 1317:14, 1317:23, 1318:22, 1323:16, 1323:18
**Manafort's** [8] - 1229:14, 1229:17, 1278:14, 1278:25, 1279:9, 1285:21, 1323:17
**manage** [1] - 1292:23
**managed** [1] - 1208:9
**management** [2] - 1228:1, 1294:13
**March** [1] - 1294:9
**Marcus** [2] - 1204:1, 1205:18

**Mark** [1] - 1292:22
**Marsteller** [2] - 1303:11, 1303:14
**massively** [5] - 1265:13, 1265:21, 1266:1, 1266:2, 1266:3
**master** [20] - 1221:15, 1221:20, 1225:15, 1227:25, 1228:8, 1228:20, 1228:23, 1229:1, 1229:5, 1231:20, 1232:10, 1236:23, 1240:23, 1241:19, 1241:21, 1242:6, 1253:23, 1258:18, 1321:8, 1323:2
**material** [3] - 1230:9, 1243:2, 1267:24
**materials** [2] - 1281:21, 1302:17
**Matt** [1] - 1315:9
**matter** [10] - 1205:20, 1224:1, 1264:2, 1293:21, 1295:5, 1295:20, 1296:6, 1296:11, 1297:13, 1314:18
**matters** [2] - 1274:25, 1320:17
**Matthew** [2] - 1300:8, 1309:12
**McCullough** [4] - 1203:17, 1205:8, 1275:17, 1276:12
**MD** [1] - 1203:23
**Meagher** [1] - 1271:21
**mean** [28] - 1214:19, 1216:3, 1222:12, 1224:12, 1225:4, 1227:4, 1230:6, 1232:24, 1236:3, 1237:2, 1238:13, 1238:19, 1242:12, 1243:8, 1243:12, 1244:3, 1247:6, 1247:9, 1251:20, 1252:13, 1252:16, 1254:17, 1255:21, 1255:24, 1270:17, 1288:24, 1323:15
**meaning** [2] - 1244:24, 1268:19
**means** [13] - 1222:19, 1223:4, 1233:12, 1236:4, 1236:20, 1239:5, 1244:9, 1244:19, 1247:16, 1257:7, 1286:4, 1323:17
**meant** [5] - 1206:12, 1219:14, 1247:12, 1247:15, 1291:19
**media** [33] - 1216:13, 1216:15, 1220:10, 1222:11, 1222:18, 1222:21, 1224:6, 1225:19, 1234:8, 1234:20, 1263:2, 1263:10, 1272:22, 1278:6, 1279:11, 1302:13, 1303:18, 1311:16, 1316:18, 1317:25, 1320:13, 1320:14, 1321:12, 1322:4, 1322:15, 1324:22, 1325:13, 1325:15, 1328:14, 1328:20, 1330:4, 1330:8
**Media** [2] - 1238:4, 1328:11
**meet** [5] - 1274:20, 1285:10, 1285:12, 1285:14, 1285:15
**meeting** [44] - 1209:15,

1209:18, 1218:24, 1219:1, 1219:5, 1219:7, 1219:11, 1219:15, 1219:18, 1219:24, 1220:12, 1220:16, 1220:18, 1220:23, 1222:13, 1226:23, 1229:24, 1230:15, 1230:21, 1230:23, 1230:24, 1234:7, 1258:11, 1278:2, 1278:3, 1278:9, 1278:11, 1278:13, 1278:17, 1278:25, 1279:8, 1279:14, 1279:15, 1279:17, 1279:19, 1279:23, 1280:1, 1280:3, 1300:10, 1300:14, 1321:19, 1322:3, 1322:16
**meetings** [4] - 1218:22, 1229:21, 1278:18, 1279:16
**member** [5] - 1211:19, 1245:16, 1293:4, 1293:7, 1313:16
**membership** [2] - 1282:1
**memorandum** [1] - 1317:3
**memories** [1] - 1277:23
**memory** [1] - 1301:21
**mentioned** [3] - 1239:1, 1241:14, 1284:12
**mentions** [1] - 1302:12
**merited** [1] - 1218:13
**mess** [2] - 1303:25, 1310:14
**message** [4] - 1210:8, 1280:18, 1281:19, 1330:3
**messaging** [13] - 1210:11, 1210:19, 1211:10, 1211:11, 1212:3, 1212:8, 1216:4, 1217:1, 1230:7, 1236:23, 1303:15, 1321:15
**met** [7] - 1209:12, 1220:2, 1274:18, 1276:24, 1279:18, 1280:8, 1286:20
**MFA** [1] - 1230:1
**microsite** [1] - 1302:15
**mid-2013** [2] - 1295:12, 1295:15
**middle** [3] - 1238:15, 1268:6, 1270:20
**midmorning** [1] - 1273:19
**midnight** [1] - 1243:21
**might** [12] - 1222:24, 1254:14, 1254:16, 1260:18, 1265:14, 1265:21, 1270:8, 1283:7, 1293:12, 1297:17, 1311:20, 1315:16
**Miller** [2] - 1286:10, 1286:13
**mind** [3] - 1210:18, 1237:12, 1321:14
**minister** [3] - 1292:12, 1293:10, 1311:15
**ministers** [1] - 1285:22
**ministries** [1] - 1262:23
**ministry** [1] - 1248:5
**Ministry** [16] - 1210:1, 1215:2, 1215:16, 1216:5, 1216:11, 1233:18, 1235:23, 1236:4,

1241:15, 1247:1, 1262:25, 1264:6, 1301:12, 1301:16, 1303:22, 1318:19
**Ministry's** [1] - 1237:10
**minute** [1] - 1256:12
**minutes** [6] - 1264:19, 1264:20, 1273:24, 1333:6, 1333:12, 1333:23
**misconduct** [1] - 1296:22
**misleading** [3] - 1297:4, 1297:8, 1297:10
**misnumbered** [1] - 1326:14
**misremembered** [1] - 1277:10
**missed** [2] - 1214:24, 1265:17
**mistakes** [1] - 1210:4
**misunderstood** [3] - 1206:17, 1207:6, 1224:1
**mitigate** [1] - 1330:10
**mitigation** [1] - 1224:25
**mixed** [3] - 1225:5, 1278:18, 1300:19
**modified** [1] - 1268:25
**MOJ** [10] - 1215:15, 1216:2, 1223:6, 1230:1, 1233:16, 1261:11, 1264:3, 1318:17, 1318:18, 1318:19
**Molly** [2] - 1203:13, 1205:8
**molly.gaston@usdoj.gov** [1] - 1203:16
**moment** [3] - 1217:20, 1239:1, 1301:20
**Monday** [2] - 1222:10, 1315:23
**money** [7] - 1294:23, 1306:2, 1307:14, 1313:14, 1313:15, 1314:25
**monitors** [1] - 1319:24
**month** [2] - 1227:23, 1250:9
**months** [3] - 1234:24, 1279:12, 1285:7
**morning** [14] - 1205:1, 1205:2, 1205:7, 1205:15, 1205:19, 1208:8, 1208:24, 1208:25, 1243:21, 1248:2, 1274:15, 1274:16, 1278:4, 1289:14
**Morning** [1] - 1203:4
**MORNING** [1] - 1203:8
**Moscow** [3] - 1239:3, 1259:22, 1320:16
**most** [5] - 1212:25, 1228:10, 1229:3, 1279:16, 1320:20
**motion** [1] - 1264:22
**motivated** [1] - 1248:11
**motivation** [1] - 1268:12, 1272:10
**move** [6] - 1207:4, 1215:10, 1235:7, 1240:9, 1306:18, 1329:23
**moved** [1] - 1329:22
**moving** [1] - 1307:11
**MR** [221] - 1205:7, 1205:13,

1205:15, 1205:20, 1205:23, 1206:22, 1207:3, 1207:5, 1207:7, 1207:9, 1207:22, 1208:2, 1208:21, 1208:23, 1212:13, 1212:14, 1213:2, 1213:4, 1213:22, 1214:1, 1217:22, 1217:24, 1220:14, 1221:2, 1221:7, 1221:10, 1222:6, 1222:9, 1223:11, 1223:13, 1227:8, 1227:12, 1230:16, 1231:4, 1231:22, 1231:24, 1232:17, 1232:19, 1233:24, 1234:4, 1234:13, 1234:14, 1235:9, 1235:11, 1236:9, 1236:14, 1240:9, 1240:15, 1240:16, 1241:24, 1242:1, 1244:12, 1244:14, 1245:9, 1245:11, 1246:9, 1246:11, 1246:13, 1246:16, 1247:10, 1247:14, 1247:21, 1249:1, 1249:13, 1250:1, 1250:4, 1254:6, 1254:7, 1255:11, 1255:12, 1256:18, 1256:19, 1257:18, 1257:20, 1257:21, 1259:17, 1259:18, 1260:21, 1260:22, 1261:23, 1261:25, 1262:3, 1262:5, 1262:13, 1262:14, 1264:13, 1264:19, 1264:21, 1265:1, 1265:4, 1265:6, 1265:23, 1267:2, 1267:5, 1267:7, 1267:15, 1269:22, 1270:5, 1270:9, 1271:19, 1271:24, 1272:15, 1272:16, 1273:15, 1274:12, 1274:14, 1282:22, 1283:1, 1283:3, 1287:13, 1287:19, 1288:1, 1288:7, 1288:11, 1288:19, 1288:23, 1288:25, 1289:7, 1289:8, 1289:10, 1289:12, 1291:6, 1291:15, 1295:7, 1295:9, 1295:11, 1295:18, 1295:23, 1295:24, 1296:7, 1296:12, 1297:2, 1297:6, 1297:7, 1297:11, 1297:14, 1297:16, 1297:22, 1297:23, 1298:4, 1298:8, 1298:15, 1299:13, 1299:18, 1300:5, 1300:6, 1300:23, 1301:8, 1301:9, 1306:22, 1306:25, 1307:1, 1307:7, 1308:1, 1308:6, 1308:7, 1308:9, 1308:11, 1313:5, 1313:8, 1314:3, 1314:5, 1314:8, 1314:9, 1314:13, 1314:17, 1316:13, 1316:14, 1316:25, 1317:2, 1321:20, 1322:2, 1322:7, 1322:9, 1323:22, 1323:24, 1324:1, 1324:2, 1324:7, 1324:11, 1324:15, 1324:18, 1325:7, 1325:25, 1326:2, 1326:6,

1326:8, 1326:12, 1326:14, 1326:15, 1326:18, 1326:21, 1327:7, 1327:9, 1327:12, 1327:15, 1327:20, 1327:25, 1328:1, 1329:22, 1329:25, 1330:2, 1330:18, 1330:21, 1330:24, 1330:25, 1331:6, 1331:12, 1331:16, 1331:23, 1332:1, 1332:4, 1332:6, 1332:12, 1332:19, 1332:21, 1333:3, 1333:9, 1333:13, 1334:5
**MS** [1] - 1236:12
**mud** [1] - 1249:21
**multiple** [2] - 1225:21, 1226:19
**MURPHY** [108] - 1205:15, 1205:20, 1205:23, 1206:22, 1207:3, 1207:5, 1207:7, 1207:9, 1207:22, 1220:14, 1230:16, 1233:24, 1240:9, 1247:10, 1249:1, 1261:23, 1269:22, 1274:12, 1274:14, 1282:22, 1283:1, 1283:3, 1287:13, 1287:19, 1288:7, 1288:23, 1289:8, 1289:10, 1289:12, 1291:15, 1295:9, 1295:18, 1295:23, 1296:7, 1297:2, 1297:6, 1297:11, 1297:14, 1297:16, 1297:22, 1297:23, 1298:4, 1298:8, 1298:15, 1299:13, 1299:18, 1300:5, 1300:6, 1300:23, 1301:8, 1301:9, 1306:22, 1306:25, 1307:7, 1308:1, 1308:6, 1308:9, 1308:11, 1313:5, 1313:8, 1314:3, 1314:5, 1314:13, 1314:17, 1316:13, 1316:14, 1317:2, 1322:2, 1322:9, 1323:22, 1323:24, 1324:1, 1324:2, 1324:11, 1324:15, 1324:18, 1325:25, 1326:2, 1326:8, 1326:12, 1326:14, 1326:14, 1326:18, 1326:21, 1327:9, 1327:15, 1327:20, 1327:25, 1328:1, 1329:22, 1330:2, 1330:24, 1330:25, 1331:12, 1331:16, 1331:23, 1332:1, 1332:4, 1332:6, 1332:12, 1332:19, 1332:21, 1333:3, 1333:9, 1333:13, 1334:5
**Murphy** [7] - 1203:20, 1205:16, 1274:17, 1282:24, 1295:11, 1313:6, 1332:25
**Must** [1] - 1254:24
**must** [9] - 1230:14, 1231:7, 1232:11, 1251:1, 1277:7, 1284:23, 1330:7

## N

**nail** [1] - 1215:14

**name** [19] - 1232:13, 1238:15, 1238:18, 1239:9, 1240:12, 1240:18, 1241:8, 1243:15, 1249:21, 1254:20, 1273:11, 1274:17, 1275:22, 1275:23, 1284:6, 1299:20, 1305:3, 1311:1, 1312:12
**named** [1] - 1323:18
**names** [2] - 1246:4, 1313:23
**narrative** [1] - 1223:24
**national** [1] - 1235:20
**need** [11] - 1216:7, 1230:7, 1230:9, 1249:22, 1283:17, 1292:23, 1298:14, 1307:10, 1313:7, 1318:24, 1319:10
**needed** [11] - 1213:11, 1214:7, 1216:24, 1218:1, 1222:15, 1237:9, 1266:11, 1277:19, 1286:5, 1290:9, 1313:14
**needs** [1] - 1258:10
**negative** [2] - 1266:25, 1268:3
**negatively** [1] - 1224:21
**negatives** [1] - 1224:15
**Never** [1] - 1294:4
**never** [11] - 1231:17, 1234:10, 1236:4, 1239:12, 1245:23, 1274:18, 1280:21, 1294:7, 1303:1, 1320:9, 1320:22
**New** [20] - 1218:21, 1218:22, 1218:24, 1240:4, 1243:1, 1243:6, 1243:18, 1243:20, 1243:24, 1245:19, 1245:24, 1261:20, 1263:5, 1263:14, 1263:16, 1263:18, 1263:23, 1271:17, 1275:14
**new** [1] - 1253:10
**news** [1] - 1216:15
**newspaper** [3] - 1226:15, 1226:17, 1238:15
**next** [30] - 1206:10, 1207:23, 1210:12, 1215:10, 1225:8, 1231:3, 1234:3, 1235:2, 1236:2, 1240:14, 1250:2, 1250:19, 1261:3, 1262:2, 1271:16, 1272:2, 1287:18, 1291:14, 1297:17, 1301:23, 1304:15, 1305:19, 1306:17, 1315:11, 1315:20, 1315:21, 1319:6, 1319:19, 1326:16
**nice** [1] - 1260:8
**night** [1] - 1321:18
**nine** [1] - 1276:19
**normal** [6] - 1210:5, 1224:4, 1237:4, 1268:21, 1282:8
**Note** [1] - 1318:24
**note** [1] - 1232:4
**notebooks** [1] - 1333:17
**notes** [4] - 1291:1, 1329:7, 1329:20, 1335:7
**nothing** [2] - 1303:5, 1306:4

**notice** [1] - 1266:15
**nowhere** [2] - 1239:9, 1333:19
**number** [7] - 1224:3, 1224:22, 1245:21, 1253:15, 1297:19, 1307:10, 1318:14
**Number** [2] - 1205:2, 1274:7
**numbered** [1] - 1213:9
**numbers** [2] - 1229:8, 1245:18
**NW** [5] - 1203:14, 1203:18, 1204:2, 1204:8, 1335:14

## O

**o'clock** [1] - 1264:8
**oath** [1] - 1208:15
**object** [2] - 1296:13, 1327:11
**objected** [2] - 1307:19, 1331:10
**objecting** [2] - 1307:21, 1330:23
**objection** [22] - 1207:2, 1220:14, 1230:16, 1233:24, 1240:9, 1247:10, 1249:1, 1261:23, 1269:22, 1288:1, 1288:12, 1289:7, 1291:6, 1295:7, 1316:25, 1321:20, 1322:7, 1325:7, 1329:24, 1329:25, 1330:18, 1331:4
**objectionable** [1] - 1307:15
**objective** [2] - 1217:7, 1281:24
**obvious** [2] - 1206:16, 1226:13
**obviously** [13] - 1211:7, 1212:5, 1216:4, 1216:8, 1225:2, 1225:16, 1230:22, 1238:18, 1238:23, 1245:23, 1256:1, 1283:12, 1302:24
**occasion** [3] - 1275:7, 1306:13, 1306:14
**occasions** [3] - 1274:25, 1277:8, 1281:8
**occurred** [2] - 1278:10, 1303:1
**October** [6] - 1227:9, 1231:25, 1234:15, 1234:16, 1234:19
**odd** [2] - 1285:4, 1309:2
**OF** [4] - 1203:1, 1203:8, 1203:14, 1335:2
**off-the-record** [1] - 1326:19
**offer** [3] - 1212:7, 1257:10, 1287:6
**offered** [3] - 1212:4, 1319:20, 1320:6
**Office** [1] - 1203:13
**office** [7] - 1251:7, 1286:24, 1292:13, 1302:14, 1303:23, 1312:7, 1312:14
**official** [2] - 1319:22, 1329:16
**OFFICIAL** [1] - 1335:2
**Official** [2] - 1204:7, 1335:13
**officially** [1] - 1325:16
**often** [1] - 1216:23
**old** [1] - 1232:13

**oligarch** [1] - 1292:12
**omission** [2] - 1304:20, 1304:22
**on-recorder** [3] - 1243:5, 1243:8, 1243:17
**on-the-record** [2] - 1243:9, 1243:15
**once** [5] - 1208:9, 1212:19, 1216:16, 1229:23, 1250:18
**One** [1] - 1238:4
**one** [70] - 1205:20, 1206:8, 1206:13, 1207:14, 1207:16, 1212:6, 1214:3, 1215:20, 1218:1, 1222:14, 1225:16, 1225:21, 1225:22, 1229:18, 1232:14, 1234:9, 1239:1, 1239:4, 1241:6, 1251:3, 1251:4, 1263:7, 1263:13, 1266:8, 1269:24, 1276:20, 1277:20, 1277:25, 1278:21, 1278:22, 1280:8, 1290:7, 1293:7, 1293:8, 1293:10, 1294:12, 1295:19, 1297:25, 1298:5, 1298:12, 1299:17, 1300:20, 1303:12, 1306:9, 1306:14, 1306:18, 1308:1, 1308:19, 1310:22, 1310:23, 1313:15, 1313:16, 1313:23, 1314:11, 1314:12, 1315:4, 1318:24, 1318:25, 1319:11, 1320:16, 1321:17, 1321:18, 1321:22, 1326:18, 1328:14, 1331:22, 1332:17, 1332:23, 1333:16
**one-on-ones** [1] - 1319:11
**ones** [2] - 1277:4, 1319:11
**online** [1] - 1302:18
**open** [6] - 1265:5, 1289:11, 1297:15, 1307:23, 1308:10, 1332:20
**operation** [2] - 1241:14, 1303:13
**operations** [1] - 1303:12
**opinion** [1] - 1303:10
**opportune** [1] - 1333:10
**opportunity** [1] - 1273:18
**optimist** [1] - 1315:25
**optimization** [1] - 1303:20
**option** [1] - 1304:17
**options** [1] - 1215:19
**orbs** [1] - 1207:11
**order** [7] - 1206:14, 1210:6, 1237:9, 1278:4, 1300:1, 1300:21, 1315:2
**organization** [1] - 1224:7
**original** [4] - 1219:9, 1222:3, 1222:14, 1231:16
**originally** [1] - 1314:10
**otherwise** [1] - 1230:23
**ought** [1] - 1306:9
**out-of-pocket** [1] - 1294:11

**outcome** [2] - 1219:11, 1280:24
**outline** [1] - 1211:19
**outlining** [1] - 1223:24
**outreach** [1] - 1319:1
**outs** [1] - 1294:13
**outside** [2] - 1207:10, 1247:22
**overall** [2] - 1263:6, 1271:20
**overheard** [1] - 1330:16
**overruled** [2] - 1249:2, 1317:1
**overt** [1] - 1243:16
**overturn** [2] - 1268:13, 1272:10
**owe** [1] - 1205:23
**own** [4] - 1221:16, 1224:13, 1286:1, 1288:17

## P

**p.m** [1] - 1215:12
**PA** [1] - 1239:5
**package** [1] - 1236:25
**packing** [1] - 1306:9
**packs** [1] - 1210:1
**page** [44] - 1213:24, 1213:25, 1222:5, 1223:10, 1223:12, 1226:6, 1227:10, 1227:11, 1228:21, 1232:16, 1241:17, 1244:11, 1246:10, 1266:21, 1267:8, 1268:15, 1270:19, 1271:3, 1271:9, 1271:16, 1299:13, 1301:25, 1304:2, 1306:6, 1306:19, 1309:7, 1309:14, 1309:22, 1311:6, 1314:3, 1314:13, 1315:7, 1317:24, 1318:14, 1319:6, 1323:1, 1323:11, 1326:10, 1326:11
**pages** [1] - 1253:11
**paid** [4] - 1273:9, 1302:9, 1306:11, 1308:14
**pain** [1] - 1281:13
**panic** [1] - 1256:13
**panicking** [1] - 1261:18
**panicky** [1] - 1261:18
**paper** [1] - 1231:1
**paragraph** [18] - 1206:19, 1223:18, 1224:18, 1267:13, 1267:17, 1268:16, 1269:24, 1270:7, 1270:13, 1272:2, 1286:2, 1293:17, 1304:15, 1304:25, 1305:1, 1311:7, 1324:6, 1330:3
**paragraphs** [1] - 1267:13, 1271:20, 1284:12
**pardon** [2] - 1304:21, 1317:13
**parfitt** [1] - 1260:14
**Parfitt** [9] - 1239:3, 1259:22, 1260:3, 1260:7, 1260:11, 1260:15, 1262:9, 1262:10, 1272:25
**Paris** [2] - 1239:16, 1239:22

**Parliament** [4] - 1248:7, 1293:4, 1293:5, 1293:9
**parliamentary** [1] - 1251:1
**part** [20] - 1216:10, 1263:9, 1263:15, 1264:24, 1266:19, 1267:8, 1275:9, 1279:9, 1281:22, 1299:14, 1299:16, 1301:2, 1302:25, 1303:21, 1304:23, 1311:24, 1313:11, 1314:4, 1323:2, 1327:12
**participate** [2] - 1280:3, 1280:21
**participating** [1] - 1272:21
**particular** [5] - 1206:2, 1207:12, 1295:17, 1301:2, 1310:10
**particularly** [4] - 1205:25, 1277:3, 1281:25, 1287:23
**parties** [4] - 1211:12, 1230:10, 1242:5, 1307:20
**partner** [2] - 1241:13, 1293:21
**Partners** [1] - 1284:22
**parts** [2] - 1283:13, 1307:17
**party** [1] - 1299:23
**pass** [1] - 1333:9
**passed** [1] - 1232:12
**past** [1] - 1293:15
**Paul** [13] - 1209:18, 1213:11, 1219:5, 1219:15, 1220:5, 1222:13, 1227:1, 1227:15, 1240:7, 1262:20, 1280:4, 1285:25, 1317:6
**Paula** [2] - 1204:1, 1205:17
**pause** [1] - 1326:13
**peeked** [1] - 1325:19
**peeled** [1] - 1250:18
**Pennsylvania** [1] - 1203:18
**people** [23] - 1210:9, 1210:14, 1219:2, 1227:5, 1230:1, 1239:18, 1241:1, 1255:23, 1262:20, 1262:21, 1275:16, 1278:17, 1281:25, 1285:6, 1292:9, 1305:4, 1311:17, 1312:6, 1312:8, 1314:25, 1315:3, 1319:24, 1323:17
**perfectly** [1] - 1218:7
**perform** [1] - 1328:16
**period** [5] - 1276:22, 1287:20, 1290:23, 1303:5, 1333:25
**periods** [1] - 1298:24
**permission** [1] - 1289:6
**permitted** [1] - 1288:18
**persecution** [3] - 1212:2, 1215:1, 1215:6
**person** [13] - 1209:23, 1210:5, 1213:15, 1226:3, 1238:10, 1258:14, 1262:22, 1263:22, 1283:6, 1285:7, 1285:21, 1320:9, 1322:20
**personal** [2] - 1288:17, 1331:13
**personnel** [1] - 1280:17

**perspective** [2] - 1281:2, 1330:7
**Phase** [1] - 1238:4
**phone** [9] - 1230:13, 1230:20, 1230:22, 1231:7, 1237:5, 1237:6, 1237:14, 1332:9, 1332:11
**photo** [1] - 1302:17
**phrase** [1] - 1284:3
**phrased** [1] - 1288:14
**picked** [1] - 1217:18
**pieces** [2] - 1288:9, 1302:18
**pissed** [2] - 1265:14, 1265:21
**PJM** [4] - 1317:3, 1317:6, 1318:25
**pjunghans@zuckerman.com** [1] - 1204:4
**place** [1] - 1277:13
**placed** [1] - 1243:20
**Plaintiff** [2] - 1203:3, 1203:12
**plan** [46] - 1219:9, 1219:17, 1220:13, 1220:15, 1220:17, 1220:24, 1221:1, 1222:13, 1222:14, 1225:6, 1226:19, 1227:20, 1228:1, 1231:16, 1233:2, 1233:20, 1234:10, 1235:5, 1236:6, 1239:12, 1240:5, 1242:5, 1242:24, 1254:19, 1256:10, 1258:19, 1263:10, 1272:22, 1278:6, 1279:11, 1279:25, 1280:2, 1311:3, 1311:4, 1316:18, 1317:20, 1318:1, 1321:7, 1321:8, 1321:12, 1322:5, 1322:15, 1323:11, 1324:22, 1325:15
**planned** [3] - 1220:19, 1252:15, 1271:6
**planning** [4] - 1220:12, 1220:19, 1231:16, 1264:24
**plans** [7] - 1209:13, 1234:20, 1240:1, 1281:22, 1322:21, 1322:24, 1325:13
**plate** [1] - 1252:20
**played** [1] - 1302:25
**pocket** [1] - 1294:11
**Point** [6] - 1213:10, 1213:12, 1214:7, 1214:13, 1215:12, 1218:1
**point** [32] - 1206:25, 1207:9, 1207:16, 1210:3, 1211:25, 1212:3, 1213:11, 1215:13, 1216:8, 1217:16, 1218:2, 1221:15, 1225:17, 1226:21, 1229:2, 1250:13, 1264:18, 1270:10, 1283:18, 1288:12, 1289:18, 1294:8, 1307:9, 1308:19, 1312:19, 1318:7, 1318:11, 1318:12, 1325:12, 1329:16, 1330:11, 1332:18

**pointed** [3] - 1211:10, 1246:5, 1258:11
**pointing** [1] - 1267:3
**points** [18] - 1212:17, 1212:18, 1213:8, 1216:25, 1229:9, 1230:2, 1230:5, 1231:13, 1236:24, 1266:8, 1268:8, 1270:11, 1288:8, 1311:22, 1317:25, 1328:14, 1330:7, 1330:10
**Poland** [2] - 1320:1, 1320:2
**policy** [2] - 1219:14, 1279:22
**policymakers** [1] - 1303:10
**political** [14] - 1212:2, 1215:1, 1215:6, 1223:23, 1223:25, 1224:6, 1229:21, 1231:15, 1260:9, 1263:1, 1268:12, 1272:10, 1293:16, 1330:5
**politically** [1] - 1248:11
**politicians** [1] - 1319:17
**polls** [1] - 1229:12
**Pond** [1] - 1308:25
**poor** [1] - 1301:18
**populated** [1] - 1302:16
**portal** [1] - 1302:13
**portion** [1] - 1324:13
**position** [5] - 1310:9, 1314:24, 1328:24, 1329:2, 1330:8
**positive** [1] - 1264:2
**positively** [1] - 1284:9
**possibility** [1] - 1318:25
**possible** [1] - 1251:10
**possibly** [2] - 1236:24, 1276:13
**Post** [13] - 1254:14, 1254:17, 1254:21, 1254:24, 1254:25, 1255:1, 1255:3, 1258:13, 1258:24, 1259:1, 1259:4, 1259:12, 1319:6
**potential** [2] - 1258:18, 1313:15
**PR** [17] - 1209:13, 1210:5, 1210:23, 1215:17, 1216:11, 1219:1, 1227:6, 1230:10, 1236:25, 1239:21, 1246:3, 1249:21, 1281:21, 1282:8, 1283:12, 1292:17, 1292:18
**practice** [2] - 1206:15, 1206:16
**Pratt** [1] - 1203:22
**pre** [1] - 1278:2
**pre-meeting** [1] - 1278:2
**predicted** [1] - 1224:16
**prefer** [1] - 1301:24
**preliminary** [1] - 1311:2
**Premier** [1] - 1271:12
**prepared** [1] - 1230:10
**preparing** [3] - 1280:19, 1301:11, 1322:21
**present** [7] - 1205:4, 1230:25, 1267:23, 1275:16, 1279:15, 1279:16, 1330:6
**presented** [1] - 1267:24

**presidency** [1] - 1284:13
**president** [5] - 1305:3, 1313:14, 1320:1, 1320:2
**President** [3] - 1271:22, 1317:11, 1317:24
**presidents** [1] - 1227:6
**press** [3] - 1301:11, 1301:16, 1318:17
**Press** [3] - 1226:10, 1239:4, 1239:5
**pressing** [3] - 1255:17, 1255:20, 1256:3
**pressure** [5] - 1225:24, 1256:2, 1256:7, 1261:20, 1290:8
**presumably** [1] - 1331:10
**Presumably** [1] - 1308:19
**presume** [3] - 1235:2, 1241:22, 1276:8
**presumed** [1] - 1252:8
**presuming** [1] - 1243:7
**pretty** [5] - 1217:8, 1220:18, 1223:16, 1262:8, 1290:24
**previous** [2] - 1258:18, 1330:9
**previously** [2] - 1240:1, 1320:13
**prick** [1] - 1304:6
**Prick** [1] - 1310:25
**prickly** [1] - 1281:9
**prime** [1] - 1292:12
**principally** [1] - 1322:20
**print** [1] - 1258:22
**private** [3] - 1237:5, 1319:19, 1320:6
**proactive** [7] - 1224:7, 1224:11, 1224:14, 1234:9, 1234:10, 1239:11, 1303:19
**proactively** [2] - 1219:12, 1318:8
**problem** [4] - 1214:11, 1286:14, 1288:13, 1301:6
**problems** [1] - 1210:21
**proceed** [4] - 1205:11, 1208:16, 1303:4, 1311:14
**proceeding** [1] - 1326:2
**proceedings** [3] - 1267:25, 1315:1, 1335:8
**process** [3] - 1224:3, 1226:12, 1282:5
**procurator** [1] - 1320:14
**produce** [1] - 1214:25
**produced** [3] - 1212:1, 1256:10, 1321:1
**professionalism** [4] - 1293:22, 1294:2, 1295:4, 1296:18
**professionalize** [1] - 1302:23
**program** [1] - 1225:25
**progress** [2] - 1227:19, 1273:2
**progressed** [1] - 1227:15
**Project** [1] - 1284:4

**project** [7] - 1228:1, 1299:7, 1299:20, 1301:19, 1314:20, 1323:18, 1332:7
**promise** [5] - 1248:24, 1249:14, 1249:20, 1249:23, 1249:24
**promised** [3] - 1250:14, 1251:22, 1306:3
**promising** [1] - 1247:22
**promote** [1] - 1313:10
**pronounce** [1] - 1229:7
**proper** [1] - 1232:15
**property** [1] - 1314:25
**propose** [1] - 1224:21
**proposed** [1] - 1269:12
**prosecution** [14] - 1214:23, 1215:5, 1215:7, 1215:22, 1224:3, 1247:2, 1248:8, 1248:10, 1248:11, 1260:9, 1263:13, 1268:10, 1292:11, 1330:10
**prosecution's** [1] - 1329:2
**prosecutor** [2] - 1292:10, 1299:24
**prosecutor's** [4] - 1302:14, 1303:23, 1312:7, 1312:14
**prosecutorial** [1] - 1267:24
**Provide** [1] - 1232:22
**provide** [5] - 1212:8, 1233:6, 1233:21, 1246:1, 1316:19
**provided** [3] - 1229:9, 1268:12, 1272:9
**prudence** [1] - 1318:5
**Pshonka** [1] - 1304:16
**public** [13] - 1233:14, 1234:24, 1236:6, 1236:8, 1244:10, 1256:11, 1261:10, 1280:18, 1280:24, 1303:22, 1313:9, 1313:20, 1329:9
**publication** [17] - 1223:6, 1224:23, 1233:16, 1233:19, 1234:21, 1234:25, 1235:3, 1238:14, 1248:5, 1252:14, 1252:15, 1264:7, 1290:8, 1311:3, 1315:18, 1318:16
**published** [2] - 1263:5, 1264:6
**pull** [3] - 1304:11, 1304:12, 1313:17
**pulled** [1] - 1269:24
**pulling** [3] - 1228:20, 1228:22, 1229:13
**purport** [1] - 1269:16
**purpose** [3] - 1219:7, 1279:8, 1279:10
**purposes** [2] - 1230:10, 1332:25
**pushed** [2] - 1221:25, 1315:18
**pushing** [2] - 1228:8, 1304:16
**put** [20] - 1210:6, 1215:18, 1218:8, 1222:1, 1234:24, 1236:4, 1236:5, 1240:12,

1240:17, 1246:4, 1281:19, 1295:12, 1296:25, 1297:1, 1301:1, 1301:16, 1326:5, 1327:14, 1327:17, 1329:14
**puts** [1] - 1261:11
**putting** [2] - 1218:9, 1280:18

**Q**

**questions** [20] - 1205:25, 1206:10, 1213:1, 1213:19, 1219:25, 1228:16, 1229:11, 1229:14, 1229:17, 1256:2, 1259:6, 1263:24, 1273:15, 1289:5, 1296:1, 1302:17, 1307:12, 1307:16, 1307:19, 1315:4
**quick** [1] - 1329:19
**quickly** [4] - 1217:8, 1224:15, 1249:7, 1321:6
**quiet** [1] - 1305:7
**quite** [6] - 1238:12, 1268:21, 1280:13, 1290:17, 1305:8, 1329:8
**quote** [10] - 1218:10, 1243:15, 1266:23, 1266:25, 1267:14, 1267:21, 1268:3, 1270:14, 1270:17, 1270:24
**quotes** [13] - 1215:18, 1218:11, 1263:12, 1263:14, 1265:13, 1265:20, 1266:5, 1266:7, 1266:20, 1268:9, 1269:16, 1269:17

**R**

**Rada** [1] - 1248:6
**radar** [1] - 1305:10
**raise** [1] - 1212:1
**ran** [1] - 1315:9
**range** [1] - 1302:16
**Raoul** [2] - 1283:11, 1283:14
**rapporteurs** [1] - 1319:24
**rather** [6] - 1234:8, 1244:16, 1251:10, 1309:19, 1333:11, 1333:13
**reach** [5] - 1237:13, 1248:18, 1250:14, 1273:5, 1324:24
**reach-out** [2] - 1248:18, 1250:14
**reached** [2] - 1237:17, 1262:10
**reaches** [1] - 1256:11
**reaching** [1] - 1311:11
**reaction** [2] - 1250:17, 1252:7
**reactive** [2] - 1234:8, 1239:11
**reactively** [2] - 1219:12, 1260:15
**read** [24] - 1211:25, 1218:12, 1223:18, 1224:19, 1225:9, 1228:6, 1229:16, 1242:24,

1246:22, 1252:6, 1260:5,
1261:5, 1265:9, 1265:11,
1267:19, 1290:19, 1291:1,
1291:17, 1316:3, 1324:3,
1324:10, 1324:11, 1328:20,
1329:19
 **reading** [2] - 1225:20, 1268:15
 **reads** [1] - 1253:4
 **ready** [4] - 1205:11, 1255:4,
1264:3, 1290:7
 **real** [1] - 1210:21
 **realize** [1] - 1235:21
 **realized** [2] - 1250:9, 1250:24
 **really** [23] - 1211:19, 1214:11,
1218:19, 1222:17, 1227:14,
1231:10, 1236:5, 1243:16,
1244:9, 1249:9, 1250:20,
1251:19, 1252:16, 1269:2,
1282:21, 1286:1, 1287:8,
1288:11, 1294:3, 1299:21,
1305:9, 1307:19, 1332:6
 **reason** [4] - 1222:2, 1235:5,
1297:6, 1305:16
 **reasons** [4] - 1251:4, 1294:12,
1295:19, 1296:13
 **reassurance** [2] - 1255:17,
1256:4
 **reassurances** [1] - 1255:20
 **recalled** [1] - 1208:19
 **recalling** [1] - 1274:6
 **receipt** [1] - 1329:16
 **receive** [4] - 1260:14, 1294:10,
1321:25, 1322:23
 **received** [14] - 1206:1, 1206:2,
1206:13, 1207:10, 1207:14,
1207:15, 1207:16, 1212:24,
1219:13, 1241:2, 1250:16,
1257:2, 1322:4, 1322:6
 **receiving** [4] - 1247:3, 1247:7,
1247:12, 1294:23
 **recess** [1] - 1274:5
 **recognize** [2] - 1246:12,
1326:24
 **recollection** [6] - 1230:19,
1230:25, 1277:22, 1325:2,
1325:8, 1326:4
 **reconsider** [1] - 1264:22
 **record** [15] - 1205:6, 1212:1,
1214:15, 1214:16, 1214:22,
1215:21, 1243:9, 1243:11,
1243:13, 1243:15, 1272:4,
1272:8, 1287:16, 1326:19
 **recorder** [3] - 1243:5, 1243:8,
1243:17
 **recounts** [2] - 1324:5, 1324:13
 **recover** [1] - 1315:2
 **refer** [2] - 1284:21, 1318:22
 **reference** [10] - 1214:7,
1236:21, 1259:1, 1259:3,
1286:10, 1304:6, 1308:2,

1310:16, 1319:9, 1328:18
 **referred** [6] - 1217:19, 1239:2,
1259:23, 1293:1, 1319:16,
1323:3
 **referring** [8] - 1230:20,
1230:21, 1259:2, 1266:20,
1286:22, 1291:21, 1297:25,
1312:22
 **refers** [2] - 1238:17, 1320:12
 **reflects** [1] - 1296:11
 **refresh** [1] - 1326:4
 **refreshes** [1] - 1301:21
 **regard** [1] - 1323:8
 **regards** [1] - 1244:15
 **register** [1] - 1286:5
 **registration** [2] - 1312:22,
1318:9
 **Reilly** [10] - 1283:25, 1286:16,
1292:8, 1292:15, 1293:14,
1293:18, 1294:1, 1295:18,
1295:25, 1309:23
 **relates** [1] - 1310:8
 **relating** [2] - 1223:21, 1239:17
 **relation** [2] - 1220:9, 1292:11
 **relations** [8] - 1220:10,
1225:19, 1280:18, 1280:24,
1303:22, 1313:10, 1313:21,
1329:10
 **relationship** [3] - 1245:22,
1254:19, 1285:3
 **relationships** [1] - 1249:22
 **release** [16] - 1216:15, 1223:2,
1229:22, 1229:23, 1236:2,
1244:5, 1251:9, 1253:5,
1253:21, 1261:4, 1264:3,
1301:16, 1311:16, 1315:24,
1318:13, 1324:22
 **Release** [1] - 1319:7
 **released** [2] - 1243:20, 1243:24
 **relevance** [4] - 1295:22, 1331:7,
1332:3
 **relevant** [2] - 1267:24, 1296:6
 **remember** [42] - 1209:18,
1213:20, 1219:9, 1219:22,
1222:23, 1231:14, 1231:15,
1237:15, 1237:18, 1254:20,
1273:11, 1273:21, 1275:6,
1276:3, 1276:8, 1276:9,
1276:10, 1276:13, 1277:16,
1278:23, 1279:3, 1279:7,
1279:13, 1279:14, 1280:5,
1281:2, 1285:14, 1301:15,
1301:17, 1301:18, 1301:21,
1303:3, 1313:3, 1315:17,
1318:23, 1319:23, 1324:19,
1325:4, 1325:24, 1326:5
 **remembered** [3] - 1278:13,
1291:24, 1292:2
 **remind** [1] - 1209:8
 **reminder** [1] - 1209:11

 **rephrase** [2] - 1322:12, 1330:24
 **Report** [94] - 1216:6, 1217:3,
1217:5, 1217:15, 1218:5,
1218:6, 1218:20, 1223:3,
1223:5, 1223:12, 1223:20,
1224:2, 1224:15, 1230:3,
1230:6, 1230:8, 1233:14,
1234:21, 1236:7, 1243:1,
1244:5, 1244:10, 1247:3,
1247:7, 1247:13, 1248:1,
1248:5, 1248:8, 1250:8,
1250:10, 1251:8, 1251:22,
1251:25, 1252:1, 1255:22,
1257:2, 1258:10, 1258:13,
1261:4, 1263:24, 1264:3,
1264:6, 1264:7, 1267:11,
1269:17, 1269:19, 1269:20,
1271:23, 1280:11, 1280:19,
1280:22, 1280:24, 1281:6,
1288:6, 1288:9, 1288:13,
1288:16, 1289:15, 1289:19,
1290:5, 1290:6, 1290:22,
1291:1, 1291:13, 1291:17,
1311:3, 1311:20, 1312:3,
1313:9, 1313:20, 1315:5,
1315:12, 1315:16, 1315:23,
1318:2, 1318:13, 1318:16,
1319:7, 1324:23, 1325:1,
1325:5, 1325:9, 1325:11,
1327:5, 1328:10, 1328:15,
1329:5, 1329:8, 1330:16, 1332:8
 **report** [33] - 1209:14, 1210:20,
1210:22, 1211:9, 1215:7,
1215:20, 1223:7, 1224:21,
1230:1, 1232:23, 1233:16,
1234:23, 1236:2, 1236:5,
1236:7, 1247:1, 1253:5,
1253:22, 1256:11, 1257:11,
1262:19, 1263:10, 1281:5,
1282:4, 1282:7, 1289:16,
1305:11, 1311:15, 1312:14,
1325:15, 1325:17, 1328:21,
1332:17
 **Report's** [1] - 1330:6
 **reported** [1] - 1290:10
 **reporter** [1] - 1269:12
 **Reporter** [3] - 1204:7, 1204:7,
1335:13
 **REPORTER** [1] - 1335:2
 **reporting** [6] - 1224:24,
1226:12, 1226:13, 1231:11,
1271:7
 **reports** [1] - 1258:23
 **represent** [2] - 1274:17,
1292:10
 **represented** [1] - 1267:25
 **representing** [1] - 1207:20
 **request** [2] - 1233:6, 1233:22,
1321:1
 **require** [1] - 1310:10

**requires** [1] - 1300:2
**research** [2] - 1283:11, 1303:9
**researched** [1] - 1273:22
**researching** [1] - 1208:10
**reservations** [2] - 1272:21, 1272:24
**resign** [1] - 1294:25
**resist** [1] - 1208:10
**respect** [3] - 1220:24, 1296:4, 1331:7
**respond** [18] - 1210:25, 1211:1, 1214:12, 1215:24, 1216:16, 1217:10, 1249:25, 1250:22, 1250:23, 1254:8, 1254:12, 1255:6, 1255:13, 1256:14, 1257:13, 1259:6, 1263:21, 1264:9
**responded** [4] - 1213:7, 1262:6, 1308:19, 1310:7
**response** [15] - 1211:3, 1212:19, 1212:22, 1214:22, 1216:15, 1217:9, 1228:3, 1229:16, 1250:5, 1250:6, 1251:12, 1257:22, 1265:9, 1283:17, 1305:20
**responsibility** [1] - 1294:22
**responsible** [5] - 1238:21, 1238:22, 1239:6, 1262:23, 1263:1
**rest** [1] - 1307:6
**restrictions** [1] - 1318:9
**resume** [5] - 1208:3, 1208:12, 1273:23, 1300:10, 1333:22
**retained** [1] - 1305:13
**retrial** [1] - 1330:6
**returned** [2] - 1208:8, 1329:20
**Reuters** [1] - 1224:9
**reversal** [6] - 1220:9, 1225:18, 1226:23, 1233:11
**review** [8] - 1212:3, 1221:21, 1221:22, 1272:8, 1289:23, 1305:6, 1316:19, 1329:15
**reviewed** [2] - 1328:21, 1329:5
**reviews** [1] - 1248:8
**revised** [1] - 1316:18
**revisions** [2] - 1210:1, 1317:20
**Reynolds** [2] - 1245:14, 1245:15
**Richard** [1] - 1226:14
**Rick** [25] - 1209:19, 1219:20, 1221:15, 1223:15, 1237:3, 1240:13, 1241:22, 1245:4, 1258:1, 1258:3, 1258:4, 1258:11, 1258:23, 1261:15, 1262:20, 1265:13, 1285:8, 1298:16, 1304:4, 1305:5, 1307:14, 1309:17, 1316:3, 1321:1
**rick's** [1] - 1261:7
**right-hand** [1] - 1241:25

**rightly** [1] - 1305:8
**rights** [2] - 1282:4, 1319:25
**Rights** [1] - 1320:7
**righty** [1] - 1333:5
**Riley** [4] - 1309:12, 1310:7, 1312:23, 1313:1
**risk** [2] - 1293:19, 1307:10
**RMR** [2] - 1204:7, 1335:13
**Rohde** [1] - 1205:10
**role** [10] - 1258:18, 1280:10, 1281:17, 1281:18, 1285:25, 1286:4, 1300:15, 1313:10
**roles** [2] - 1242:22, 1280:14
**rollout** [2] - 1263:10, 1272:22
**roof** [1] - 1250:18
**room** [10] - 1273:24, 1278:25, 1290:15, 1290:18, 1290:20, 1290:21, 1291:17, 1327:6, 1329:6, 1333:23
**Room** [2] - 1204:8, 1335:14
**Ross** [1] - 1310:21
**roundtable** [2] - 1320:16, 1320:19
**routine** [1] - 1311:1
**row** [1] - 1275:21
**rubbish** [1] - 1222:25
**ruling** [2] - 1207:6, 1264:23
**run** [4] - 1258:10, 1258:21, 1310:2, 1313:14
**Russia** [1] - 1313:17
**Russian** [11] - 1285:17, 1285:19, 1285:20, 1285:25, 1287:2, 1287:3, 1287:4, 1303:25, 1320:13, 1328:3, 1328:5

## S

**SA** [2] - 1232:22, 1318:7
**Sager** [2] - 1241:8, 1262:24
**Sanchez** [3] - 1203:12, 1276:7, 1306:23
**SANCHEZ** [113] - 1205:7, 1205:13, 1208:2, 1208:21, 1208:23, 1212:13, 1212:14, 1213:2, 1213:4, 1213:22, 1214:1, 1217:22, 1217:24, 1221:2, 1221:7, 1221:10, 1222:6, 1222:9, 1223:11, 1223:13, 1227:8, 1227:12, 1231:4, 1231:22, 1231:24, 1232:17, 1232:19, 1234:4, 1234:13, 1234:14, 1235:9, 1235:11, 1236:9, 1236:14, 1240:15, 1240:16, 1241:24, 1242:1, 1244:12, 1244:14, 1245:9, 1245:11, 1246:9, 1246:11, 1246:13, 1246:16, 1247:14, 1247:21, 1249:13, 1250:1, 1250:4, 1254:6, 1254:7,

1255:11, 1255:12, 1256:18, 1256:19, 1257:18, 1257:20, 1257:21, 1259:17, 1259:18, 1260:21, 1260:22, 1261:25, 1262:3, 1262:5, 1262:13, 1262:14, 1264:13, 1264:19, 1264:21, 1265:1, 1265:4, 1265:6, 1265:23, 1267:2, 1267:5, 1267:7, 1267:15, 1270:5, 1270:9, 1271:19, 1271:24, 1272:15, 1272:16, 1273:15, 1288:1, 1288:11, 1288:19, 1288:25, 1289:7, 1291:6, 1295:7, 1295:11, 1295:24, 1296:12, 1297:7, 1306:21, 1307:1, 1308:7, 1314:8, 1316:25, 1321:20, 1322:7, 1324:7, 1325:7, 1327:7, 1327:12, 1329:25, 1330:18, 1330:21, 1331:6
**sanchez@usdoj.gov** [1] - 1203:16
**sanctions** [1] - 1268:9
**sanger** [1] - 1250:23
**Sanger** [26] - 1240:4, 1240:18, 1243:1, 1243:19, 1244:22, 1244:25, 1245:18, 1246:23, 1249:25, 1250:6, 1250:13, 1250:22, 1251:21, 1251:23, 1252:24, 1252:25, 1253:2, 1253:21, 1254:9, 1254:18, 1255:4, 1257:2, 1257:23, 1259:10, 1272:18, 1272:19
**Sanger's** [1] - 1251:12
**Saturday** [1] - 1209:11
**saw** [10] - 1227:23, 1234:15, 1280:9, 1284:3, 1288:9, 1288:12, 1288:13, 1294:15, 1316:6, 1325:9
**schedule** [1] - 1316:19
**scheduled** [1] - 1311:10
**schedules** [1] - 1299:1
**scheduling** [1] - 1264:14
**scope** [1] - 1283:13
**screen** [7] - 1217:19, 1282:14, 1282:20, 1301:1, 1301:5, 1326:5, 1327:14
**screens** [1] - 1298:13
**Sea** [1] - 1273:12
**search** [1] - 1303:20
**seated** [3] - 1208:6, 1275:17, 1275:21
**second** [27] - 1219:5, 1223:9, 1224:17, 1228:21, 1239:25, 1247:5, 1252:14, 1252:15, 1258:16, 1262:15, 1270:6, 1275:11, 1278:1, 1299:13, 1302:21, 1302:24, 1303:1, 1304:2, 1306:19, 1309:7, 1309:14, 1311:6, 1314:3,

1315:4, 1315:24, 1326:10, 1326:11

**secret** [1] - 1316:22
**secretary** [1] - 1253:10
**section** [2] - 1248:6, 1319:6
**see** [40] - 1210:10, 1211:9, 1212:4, 1214:2, 1214:21, 1216:21, 1218:9, 1228:3, 1228:25, 1238:11, 1238:12, 1238:18, 1239:16, 1241:8, 1242:13, 1242:19, 1244:7, 1244:15, 1261:8, 1279:23, 1289:15, 1290:3, 1290:11, 1290:12, 1290:25, 1291:2, 1295:22, 1299:17, 1301:4, 1301:7, 1304:12, 1307:5, 1309:15, 1309:16, 1315:6, 1315:11, 1315:16, 1316:2, 1326:12, 1327:21
**seed** [4] - 1219:10, 1225:25, 1238:11, 1263:23
**seeded** [1] - 1226:3
**seeding** [8] - 1220:19, 1222:16, 1222:19, 1224:14, 1225:25, 1233:1, 1240:2, 1260:12
**seeds** [1] - 1238:10
**seeing** [1] - 1269:24
**seeking** [1] - 1314:21
**seem** [1] - 1271:21
**seized** [1] - 1224:5
**select** [2] - 1263:6, 1263:9
**selecting** [1] - 1253:10
**selection** [1] - 1320:20
**selective** [7] - 1214:23, 1215:5, 1215:6, 1215:22, 1260:9, 1263:12, 1268:10
**send** [9] - 1210:8, 1221:20, 1224:10, 1246:20, 1251:8, 1322:8, 1322:10, 1322:11, 1322:13
**sending** [5] - 1209:17, 1221:14, 1221:19, 1221:23, 1314:6
**sends** [1] - 1304:3
**sense** [3] - 1308:21, 1308:24, 1309:1
**sensitivity** [1] - 1293:23
**sent** [20] - 1210:10, 1212:16, 1217:10, 1222:4, 1238:7, 1240:24, 1246:19, 1252:25, 1260:23, 1279:20, 1286:16, 1292:8, 1298:16, 1299:6, 1311:4, 1313:2, 1321:17, 1321:18, 1321:22, 1321:24
**sentence** [3] - 1213:9, 1215:18, 1218:8
**sentiment** [1] - 1303:9
**separate** [3] - 1277:5, 1280:14, 1325:18
**separately** [2] - 1286:2, 1286:3
**separateness** [1] - 1300:15

**September** [6] - 1215:11, 1221:12, 1278:22, 1279:8, 1279:18, 1285:13
**sequence** [1] - 1278:7
**Serhiy** [2] - 1317:8, 1317:10
**serve** [1] - 1302:13
**service** [1] - 1226:11
**services** [2] - 1224:9, 1299:20
**SESSION** [1] - 1203:8
**sessions** [1] - 1277:2
**set** [3] - 1224:24, 1249:14, 1251:9
**setting** [1] - 1229:8
**several** [5] - 1266:8, 1268:8, 1274:25, 1288:8, 1331:23
**shall** [1] - 1318:15
**Share** [1] - 1323:12
**share** [1] - 1211:11
**shared** [1] - 1257:25
**short** [3] - 1244:9, 1254:15, 1254:17
**shortly** [2] - 1260:7, 1327:4
**shoulders** [1] - 1294:24
**show** [6] - 1246:10, 1291:10, 1326:16, 1326:20, 1332:22, 1332:23
**showing** [2] - 1269:4, 1269:6
**shown** [2] - 1310:19, 1325:11
**shows** [2] - 1212:1, 1311:19
**side** [2] - 1271:21, 1308:24
**sight** [1] - 1324:25
**sign** [2] - 1304:12, 1304:16
**silent** [1] - 1250:11
**similarly** [1] - 1320:19
**simple** [1] - 1238:9
**single** [1] - 1332:17
**sit** [2] - 1237:16, 1254:23
**situation** [2] - 1308:23, 1313:13
**six** [2] - 1277:5, 1328:25
**SKA** [1] - 1233:5
**Skadden** [41] - 1219:1, 1223:12, 1223:20, 1225:12, 1236:7, 1237:11, 1246:24, 1263:10, 1264:6, 1271:21, 1280:19, 1282:2, 1286:3, 1286:19, 1286:25, 1287:6, 1293:20, 1293:21, 1301:13, 1304:17, 1304:19, 1304:24, 1305:6, 1305:9, 1305:13, 1305:15, 1308:17, 1309:13, 1310:1, 1311:3, 1312:18, 1312:19, 1313:9, 1315:5, 1315:9, 1315:23, 1318:7, 1319:1, 1319:3
**Skadden's** [3] - 1280:10, 1300:15, 1305:2
**SL** [4] - 1317:3, 1317:4, 1317:8, 1317:16
**Slate** [1] - 1271:21
**slightly** [3] - 1244:17, 1269:1, 1285:4

**Sloan** [2] - 1210:14, 1313:19
**small** [3] - 1224:22, 1282:21, 1318:14
**so"..** [1] - 1247:25
**so..** [2] - 1289:1, 1309:2
**soccer** [1] - 1311:11
**social** [1] - 1303:18
**someone** [4] - 1279:24, 1299:11, 1330:16, 1331:1
**sometime** [1] - 1295:2
**sometimes** [3] - 1216:13, 1284:21, 1293:1
**soon** [2] - 1205:12, 1316:2
**sooner** [1] - 1324:24
**sorry** [67] - 1209:20, 1212:13, 1214:17, 1214:19, 1214:24, 1224:20, 1226:8, 1226:12, 1227:18, 1228:14, 1228:15, 1231:2, 1234:16, 1238:11, 1241:6, 1245:5, 1249:4, 1249:9, 1249:12, 1250:3, 1251:5, 1253:16, 1260:1, 1261:25, 1265:18, 1265:25, 1267:4, 1267:18, 1268:15, 1269:9, 1282:19, 1282:23, 1287:10, 1287:12, 1289:1, 1291:9, 1291:23, 1293:6, 1298:1, 1298:10, 1299:14, 1299:17, 1301:4, 1302:22, 1304:12, 1306:18, 1306:22, 1306:25, 1309:6, 1309:10, 1313:3, 1314:1, 1314:9, 1317:4, 1321:16, 1322:12, 1322:17, 1323:24, 1324:1, 1324:7, 1326:22, 1327:8, 1327:9, 1327:16, 1330:20
**sort** [24] - 1207:11, 1211:20, 1214:10, 1251:11, 1251:17, 1251:18, 1251:20, 1251:24, 1252:4, 1256:14, 1257:14, 1281:8, 1284:6, 1285:21, 1294:13, 1300:1, 1308:21, 1310:4, 1311:4, 1316:22, 1317:19, 1321:4, 1323:20, 1331:20
**sorted** [1] - 1211:13
**sound** [1] - 1252:4
**sounds** [1] - 1277:5
**sources** [1] - 1313:15
**SPAEDER** [2] - 1203:22, 1204:2
**spark** [1] - 1277:23
**speaker** [1] - 1320:8
**speaking** [1] - 1269:20
**special** [1] - 1319:24
**Special** [1] - 1320:12
**specialist** [1] - 1205:10
**specific** [7] - 1211:21, 1211:25, 1268:12, 1272:9, 1296:21, 1313:3, 1319:23
**specifically** [3] - 1231:9,

1238:21, 1242:6
**specified** [2] - 1206:20, 1319:12
**specify** [1] - 1288:20
**speculate** [1] - 1305:14
**spin** [1] - 1280:18
**spits** [1] - 1246:4
**spoken** [4] - 1226:22, 1226:25, 1234:6, 1239:4
**springs** [1] - 1321:14
**staff** [3] - 1283:21, 1317:10, 1317:24
**stage** [2] - 1312:10, 1316:6
**stakeholders** [7] - 1216:14, 1229:21, 1230:2, 1231:15, 1311:17, 1319:11, 1319:16
**stand** [5] - 1208:3, 1208:13, 1244:8, 1244:18, 1276:23
**standard** [1] - 1299:7
**standards** [6] - 1218:14, 1224:4, 1248:10, 1268:14, 1272:11, 1282:5
**stands** [1] - 1239:20
**start** [17] - 1222:6, 1230:4, 1239:21, 1240:20, 1246:9, 1248:6, 1282:7, 1285:14, 1285:15, 1285:16, 1288:25, 1290:3, 1290:9, 1301:25, 1306:19, 1309:5, 1309:7
**started** [2] - 1271:7, 1285:24
**starting** [3] - 1209:2, 1221:11, 1232:18
**state** [3] - 1212:1, 1220:15, 1253:10
**State** [1] - 1235:24
**statement** [8] - 1214:16, 1215:16, 1216:2, 1216:10, 1216:12, 1233:16, 1261:11, 1264:3
**statements** [1] - 1301:12
**STATES** [2] - 1203:1, 1203:10
**States** [13] - 1203:2, 1204:8, 1205:3, 1205:9, 1226:2, 1239:24, 1244:15, 1247:4, 1247:8, 1247:19, 1257:11, 1274:7, 1291:21
**states/shows/demonstrates** [1] - 1215:20
**status** [2] - 1282:1, 1313:16
**stay** [2] - 1305:10, 1306:13
**stenograph** [1] - 1335:7
**step** [2] - 1248:15, 1271:1
**sticks** [1] - 1210:18
**still** [18] - 1208:14, 1215:14, 1216:21, 1217:14, 1220:18, 1225:13, 1237:24, 1255:8, 1255:9, 1256:24, 1259:14, 1283:7, 1285:18, 1291:23, 1302:3, 1304:16, 1316:5, 1325:4
**stolen** [1] - 1314:25
**stop** [4] - 1214:15, 1247:5,

1258:2, 1258:16
**stops** [1] - 1261:12
**stories** [1] - 1330:10
**story** [14] - 1222:24, 1224:13, 1232:23, 1247:18, 1248:4, 1261:9, 1261:10, 1261:21, 1263:25, 1266:11, 1271:7, 1271:15, 1296:24, 1330:10
**strange** [1] - 1273:10
**strat** [1] - 1236:24
**strategic** [4] - 1281:24, 1292:16, 1292:18, 1299:20
**strategize** [2] - 1278:4, 1279:10
**Strategy** [1] - 1310:24
**strategy** [14] - 1263:6, 1263:9, 1263:15, 1263:17, 1263:19, 1263:21, 1271:5, 1279:14, 1279:23, 1303:18, 1311:2, 1311:24, 1317:25, 1321:1
**Street** [4] - 1203:14, 1203:22, 1204:2, 1226:17
**stricken** [1] - 1240:11
**strict** [1] - 1318:16
**strike** [2] - 1240:9, 1290:3
**string** [1] - 1315:7
**strong** [1] - 1330:11
**struggling** [1] - 1301:4
**stuck** [2] - 1222:3, 1291:23
**stuff** [3] - 1229:3, 1236:25, 1323:20
**subcontract** [1] - 1310:1
**subcontractor** [2] - 1304:17, 1308:16
**subject** [7] - 1236:18, 1253:2, 1262:19, 1302:3, 1304:3, 1310:24, 1314:18
**submitted** [2] - 1273:21, 1333:19
**subpoena** [1] - 1295:19
**subsequently** [3] - 1244:23, 1244:24, 1291:24
**substantiate** [3] - 1214:23, 1215:5, 1215:21
**successful** [1] - 1271:5
**sufficient** [2] - 1268:13, 1272:10
**suggested** [5] - 1218:17, 1222:2, 1269:10, 1269:11, 1270:2
**suggesting** [1] - 1331:20
**Suite** [2] - 1203:23, 1204:3
**suite** [3] - 1278:14, 1278:20, 1279:9
**suits** [1] - 1330:9
**summarize** [1] - 1328:14
**summary** [3] - 1218:12, 1218:13, 1330:11
**summer** [1] - 1289:14
**Sunday** [5] - 1209:12, 1232:22, 1276:16, 1276:17, 1276:22

**support** [7] - 1212:2, 1212:5, 1215:1, 1272:4, 1310:15, 1318:17, 1330:7
**Supporting** [1] - 1328:24, 1329:2
**supportive** [1] - 1302:18
**suppose** [3] - 1226:17, 1226:18, 1269:2
**supposed** [14] - 1220:4, 1220:6, 1220:8, 1220:12, 1226:3, 1228:1, 1234:23, 1239:8, 1239:13, 1242:13, 1242:25, 1243:10, 1250:10, 1252:14
**surprised** [2] - 1287:14, 1287:15
**surrounding** [1] - 1281:4
**suspect** [1] - 1251:1
**sustained** [1] - 1261:24
**Swiss** [1] - 1235:20
**switch** [2] - 1297:18, 1300:2
**sworn** [1] - 1208:19
**system** [2] - 1286:15, 1294:24
**systems** [2] - 1237:4, 1237:6

## T

**table** [2] - 1275:17, 1333:18
**tactics** [1] - 1303:16
**talks** [1] - 1331:23
**target** [4] - 1238:10, 1238:11, 1239:7
**targeted** [2] - 1224:23, 1319:14
**targeting** [2] - 1263:6, 1263:9
**targets** [3] - 1222:11, 1222:18, 1222:21
**tax** [1] - 1311:9
**Taylor** [2] - 1203:21, 1205:17
**team** [11] - 1211:19, 1245:16, 1304:11, 1304:12, 1311:15, 1318:17, 1318:21, 1318:25, 1319:14
**Telegraph** [10] - 1226:16, 1239:1, 1259:23, 1259:24, 1260:7, 1263:5, 1264:2, 1265:13, 1265:20, 1266:6
**telephone** [2] - 1330:17, 1331:2
**ten** [3] - 1273:23, 1333:6, 1333:11
**tendency** [1] - 1316:22
**tenor** [1] - 1332:6
**term** [1] - 1318:23
**terminated** [1] - 1295:17
**terms** [6] - 1220:11, 1285:2, 1299:7, 1301:18, 1328:20, 1333:1
**terribly** [1] - 1260:1
**terrific** [1] - 1320:23
**testified** [7] - 1208:20, 1286:10, 1288:8, 1289:13, 1289:18, 1295:21, 1297:2

**testifies** [1] - 1296:7
**testify** [2] - 1207:13, 1295:19
**testimony** [3] - 1208:12, 1297:4, 1297:5
**th** [1] - 1309:25
**THE** [177] - 1203:1, 1203:1, 1203:9, 1203:13, 1205:1, 1205:11, 1205:14, 1205:19, 1205:22, 1206:18, 1206:23, 1207:4, 1207:6, 1207:8, 1207:18, 1207:23, 1207:25, 1208:1, 1208:4, 1208:6, 1212:12, 1220:15, 1220:17, 1220:20, 1220:21, 1220:23, 1230:17, 1230:22, 1230:25, 1231:2, 1231:3, 1233:25, 1234:1, 1234:2, 1240:10, 1240:13, 1240:14, 1245:8, 1245:10, 1247:12, 1247:15, 1247:16, 1249:2, 1249:4, 1249:5, 1249:6, 1249:8, 1249:9, 1249:10, 1249:11, 1257:19, 1261:24, 1262:1, 1264:11, 1264:14, 1264:16, 1264:20, 1264:22, 1265:2, 1265:16, 1265:18, 1265:19, 1265:20, 1267:4, 1267:6, 1269:9, 1269:11, 1269:12, 1269:14, 1269:15, 1269:18, 1269:23, 1270:1, 1270:4, 1270:8, 1273:17, 1274:1, 1274:4, 1274:6, 1274:8, 1274:10, 1282:20, 1282:23, 1282:24, 1283:2, 1287:9, 1287:10, 1287:11, 1287:12, 1287:16, 1288:2, 1288:5, 1288:8, 1288:15, 1288:24, 1289:2, 1289:9, 1291:8, 1291:11, 1291:14, 1295:8, 1295:16, 1295:22, 1296:3, 1296:16, 1297:5, 1297:10, 1297:12, 1297:21, 1298:2, 1298:5, 1298:6, 1298:7, 1298:13, 1300:4, 1300:20, 1301:1, 1301:4, 1301:6, 1306:23, 1307:8, 1307:24, 1308:3, 1313:4, 1313:6, 1314:10, 1314:15, 1317:1, 1321:22, 1321:24, 1322:8, 1323:23, 1323:25, 1324:9, 1324:12, 1324:16, 1325:8, 1325:10, 1325:12, 1325:16, 1325:18, 1325:20, 1325:21, 1325:23, 1326:1, 1326:3, 1326:7, 1326:20, 1327:8, 1327:10, 1327:13, 1327:17, 1327:19, 1327:21, 1327:22, 1327:23, 1329:13, 1329:17, 1329:21, 1329:24, 1330:1, 1330:20, 1330:22, 1331:3, 1331:9,

1331:13, 1331:20, 1331:25, 1332:2, 1332:5, 1332:10, 1332:15, 1332:25, 1333:5, 1333:10, 1333:15, 1334:3
**themselves** [1] - 1286:7
**then..** [1] - 1243:22
**they've** [1] - 1286:7
**thinking** [2] - 1213:13, 1311:19
**third** [9] - 1211:12, 1267:17, 1275:25, 1278:2, 1284:12, 1293:17, 1311:7, 1317:24, 1323:1
**thoughts** [1] - 1258:25
**three** [4] - 1238:13, 1266:22, 1268:17, 1277:1
**throughout** [2] - 1234:22, 1273:2
**Thursday** [8] - 1243:20, 1244:1, 1248:4, 1253:6, 1253:22, 1253:23, 1253:24, 1326:25
**tightened** [2] - 1266:7, 1266:8
**timeline** [1] - 1311:8
**timetable** [1] - 1251:9
**timing** [2] - 1257:14, 1332:25
**title** [6] - 1293:3, 1323:4, 1323:5, 1323:6, 1323:7
**titles** [1] - 1319:23
**today** [4] - 1237:16, 1254:23, 1275:17, 1307:3
**together** [2] - 1300:11, 1300:19
**Tom** [4] - 1239:3, 1259:22, 1260:7, 1260:15
**tomorrow** [10] - 1210:2, 1248:1, 1257:4, 1257:7, 1257:15, 1259:11, 1259:12, 1261:11, 1304:12, 1328:17
**tongue** [2] - 1284:6, 1323:8
**took** [8] - 1206:9, 1276:23, 1277:13, 1285:8, 1285:25, 1290:25, 1295:12, 1325:13
**tool** [3] - 1223:20, 1313:10, 1313:21
**top** [24] - 1211:2, 1212:3, 1213:24, 1215:10, 1217:23, 1221:23, 1228:3, 1228:21, 1230:11, 1232:9, 1236:11, 1241:25, 1265:7, 1270:20, 1283:15, 1292:7, 1299:14, 1299:16, 1301:8, 1306:7, 1310:13, 1311:6, 1314:4, 1323:11
**total** [1] - 1210:19
**touch** [4] - 1239:15, 1261:8, 1267:14, 1268:4
**tournament** [1] - 1311:11
**tours** [1] - 1320:15
**towards** [3] - 1248:2, 1248:14, 1313:18
**Tower** [2] - 1219:6, 1219:8
**town** [1] - 1276:14

**trace** [1] - 1314:23
**Tracing** [1] - 1314:18
**track** [2] - 1249:11, 1263:11
**tracking** [1] - 1303:9
**transcript** [2] - 1335:6, 1335:7
**TRANSCRIPT** [1] - 1203:8
**transfer** [3] - 1304:13, 1305:21, 1305:24
**traveling** [1] - 1232:11
**tremendous** [1] - 1307:13
**Trial** [2] - 1267:10, 1271:11
**TRIAL** [2] - 1203:4, 1203:8
**trial** [16] - 1214:16, 1214:22, 1215:21, 1267:22, 1272:2, 1272:4, 1281:4, 1282:4, 1302:20, 1302:21, 1302:24, 1303:1, 1311:8, 1312:4, 1312:15, 1318:2
**tried** [4] - 1213:1, 1250:18, 1252:4, 1290:6
**true** [5] - 1274:25, 1290:2, 1321:17, 1335:6, 1335:7
**truly** [2] - 1224:2, 1253:8
**Trump** [2] - 1219:5, 1219:8
**try** [13] - 1224:13, 1265:19, 1278:4, 1281:24, 1283:12, 1283:13, 1296:14, 1307:18, 1313:17, 1314:21, 1315:2, 1330:24, 1333:5
**trying** [20] - 1210:22, 1210:23, 1215:14, 1216:20, 1216:21, 1237:13, 1249:6, 1268:21, 1269:23, 1269:24, 1282:9, 1296:21, 1297:18, 1297:25, 1303:25, 1306:1, 1306:3, 1315:15, 1331:15
**Tuesday** [2] - 1253:24, 1315:13
**turn** [1] - 1304:2
**turned** [1] - 1320:3
**twice** [1] - 1259:1
**two** [18] - 1206:9, 1215:10, 1217:23, 1221:23, 1238:1, 1256:10, 1263:4, 1264:16, 1271:19, 1276:1, 1276:3, 1293:8, 1297:19, 1313:15, 1328:13, 1328:15, 1329:3
**two-day** [1] - 1276:1
**Tymoshenko** [22] - 1214:22, 1214:25, 1215:4, 1215:21, 1223:21, 1225:1, 1247:2, 1248:8, 1253:5, 1253:22, 1267:10, 1267:22, 1268:11, 1272:9, 1280:11, 1281:4, 1282:4, 1302:21, 1311:9, 1314:22, 1314:24, 1318:3
**Tymoshenko's** [2] - 1218:12, 1272:3
**typo** [3] - 1229:25, 1243:7, 1252:9
**typos** [1] - 1311:5

1359

## U

**U.S** [8] - 1203:13, 1203:17, 1232:23, 1233:7, 1233:22, 1247:23, 1247:24, 1254:24
**UK** [5] - 1226:13, 1238:22, 1238:23, 1238:24, 1283:20
**Ukraine** [48] - 1210:24, 1215:16, 1216:5, 1216:9, 1217:7, 1224:6, 1225:24, 1235:22, 1239:19, 1241:15, 1245:17, 1246:18, 1251:3, 1251:7, 1253:2, 1256:5, 1261:10, 1262:23, 1263:4, 1271:11, 1280:8, 1281:12, 1281:16, 1281:19, 1281:20, 1281:23, 1285:5, 1287:21, 1291:24, 1292:11, 1294:12, 1298:25, 1301:12, 1301:16, 1305:12, 1309:13, 1311:25, 1312:3, 1312:5, 1313:11, 1313:17, 1314:21, 1315:1, 1315:3, 1323:15, 1331:17
**Ukraine's** [2] - 1267:10, 1329:9
**Ukrainian** [13] - 1230:10, 1246:25, 1248:7, 1284:13, 1285:22, 1291:19, 1303:7, 1303:24, 1309:19, 1311:17, 1314:24, 1320:17, 1328:3
**Ukrainians** [3] - 1253:5, 1253:6, 1332:7
**Ukranian** [1] - 1320:7
**Ukranians** [1] - 1331:18
**ultimate** [1] - 1213:18
**ultimately** [1] - 1213:14
**UN** [1] - 1319:22
**unaware** [1] - 1213:12
**under** [15] - 1208:15, 1218:13, 1233:5, 1256:1, 1256:7, 1261:20, 1268:13, 1272:11, 1286:5, 1290:8, 1295:18, 1305:10, 1310:10, 1318:16, 1319:6
**underneath** [1] - 1229:19
**understood** [4] - 1227:20, 1257:12, 1281:18, 1331:8
**underway** [2] - 1256:9, 1303:14
**unfortunately** [1] - 1300:1
**Union** [4] - 1281:25, 1313:12, 1313:16, 1313:18
**UNITED** [2] - 1203:1, 1203:10
**United** [14] - 1203:2, 1204:8, 1205:3, 1205:9, 1226:2, 1239:24, 1244:15, 1247:19, 1257:11, 1274:7, 1291:21, 1293:6, 1293:7, 1306:10
**unless** [3] - 1248:25, 1249:15, 1301:20
**unlikely** [1] - 1291:11
**unprofessional** [1] - 1295:17
**unprofessionalism** [1] - 1296:4

**unsurprised** [1] - 1287:8
**unwilling** [2] - 1312:18, 1312:19
**up** [28] - 1212:7, 1217:18, 1225:5, 1229:8, 1229:25, 1238:20, 1243:14, 1249:14, 1250:1, 1253:9, 1268:16, 1278:19, 1289:2, 1290:7, 1292:7, 1297:20, 1299:14, 1299:16, 1300:19, 1301:8, 1301:24, 1302:24, 1305:19, 1314:4, 1317:21, 1319:3, 1322:3, 1329:14
**update** [11] - 1209:13, 1221:22, 1229:7, 1231:20, 1255:18, 1256:15, 1257:13, 1257:22, 1263:3, 1315:5, 1315:12
**updated** [3] - 1220:17, 1221:20, 1273:2
**updates** [2] - 1209:17, 1256:3
**updating** [2] - 1209:15, 1235:5
**upgrading** [1] - 1303:21
**upset** [5] - 1281:10, 1296:18, 1332:8, 1332:13
**US** [1] - 1240:2
**USA** [1] - 1239:6
**utmost** [1] - 1293:22

## V

**valid** [3] - 1312:4, 1312:15, 1318:3
**van** [25] - 1279:2, 1286:22, 1286:23, 1286:24, 1287:6, 1287:21, 1287:24, 1289:3, 1290:11, 1290:13, 1290:15, 1290:18, 1291:4, 1291:9, 1291:12, 1291:17, 1316:16, 1324:5, 1324:20, 1324:21, 1325:11, 1325:17, 1327:6, 1329:6, 1329:18
**vehicle** [1] - 1226:13
**verb** [2] - 1217:18, 1218:3
**verbs** [3] - 1215:19, 1215:25, 1216:17
**Veritas** [5] - 1236:2, 1236:5, 1236:7, 1238:4, 1284:4
**version** [4] - 1221:16, 1240:23, 1277:21, 1329:16
**versions** [5] - 1225:5, 1321:12, 1321:14, 1322:4, 1325:14
**via** [3] - 1263:16, 1263:18, 1316:20
**video** [1] - 1302:17
**view** [7] - 1222:15, 1258:21, 1281:11, 1286:3, 1286:7, 1286:19, 1330:4
**viewed** [4] - 1280:10, 1281:13, 1285:1, 1313:20
**views** [2] - 1300:11, 1300:16

**Viktor** [1] - 1271:22
**violate** [1] - 1206:14
**violated** [1] - 1282:5
**visited** [2] - 1305:2, 1327:5
**visiting** [1] - 1320:16
**vital** [1] - 1223:20
**vodka** [1] - 1206:24
**voice** [2] - 1304:10, 1316:3
**Volume** [1] - 1282:13
**volume** [1] - 1298:7
**vs** [1] - 1203:4

## W

**wait** [4] - 1258:23, 1267:1, 1302:9, 1313:7
**Wales** [1] - 1227:14
**wall** [2] - 1294:16, 1294:18
**Wall** [1] - 1226:17
**wander** [1] - 1224:14
**wants** [6] - 1257:4, 1257:7, 1290:25, 1296:14, 1307:8, 1308:7
**warranted** [1] - 1268:9
**Washington** [15] - 1203:5, 1203:15, 1203:18, 1204:3, 1204:9, 1226:4, 1251:8, 1254:21, 1254:25, 1259:4, 1259:12, 1275:6, 1276:1, 1276:15, 1335:15
**water** [1] - 1249:6
**ways** [2] - 1267:21, 1278:5
**website** [3] - 1233:17, 1233:18, 1302:14
**week** [7] - 1235:2, 1236:2, 1276:16, 1278:14, 1305:4, 1311:10, 1315:11
**weeks** [1] - 1296:17
**weird** [5] - 1228:25, 1232:14, 1252:16, 1290:1, 1290:2
**welcome** [3] - 1255:18, 1303:15, 1305:5
**Western** [2] - 1268:9, 1318:4
**western** [3] - 1218:13, 1224:4, 1282:5
**whatsoever** [1] - 1273:14
**whitewash** [8] - 1210:19, 1210:22, 1211:9, 1216:23, 1217:1, 1217:4, 1217:6, 1217:16
**Whitney** [2] - 1212:16, 1213:15
**whole** [5] - 1225:18, 1277:4, 1292:8, 1325:3, 1332:6
**wild** [1] - 1225:1
**William** [4] - 1203:20, 1203:21, 1205:16, 1205:17
**willing** [3] - 1231:11, 1283:10, 1320:24
**wire** [3] - 1224:8, 1226:11, 1305:24
**wish** [3] - 1306:12, 1321:4,

1321:5
  **witness** [11] - 1205:12,
1207:24, 1208:2, 1208:13,
1208:19, 1273:18, 1274:11,
1276:23, 1307:3, 1307:17
  **WITNESS** [33] - 1220:17,
1220:21, 1230:22, 1231:2,
1234:1, 1240:13, 1247:16,
1249:4, 1249:6, 1249:9,
1249:11, 1265:18, 1265:20,
1267:4, 1267:6, 1269:11,
1269:14, 1269:18, 1270:1,
1274:4, 1282:23, 1287:10,
1287:12, 1291:11, 1298:5,
1298:7, 1301:4, 1321:24,
1325:10, 1325:16, 1325:20,
1325:23, 1329:17
  **witnesses** [1] - 1267:23
  **wmurphy@zuckerman.com** [1]
- 1203:24
  **wonderful** [3] - 1227:25,
1231:20, 1236:22
  **wondering** [3] - 1247:2, 1247:7,
1258:23
  **word** [3] - 1216:23, 1232:25,
1265:17
  **words** [9] - 1214:14, 1215:22,
1216:13, 1235:5, 1238:1,
1251:18, 1269:15, 1269:19,
1294:17
  **works** [1] - 1248:3
  **world** [5] - 1224:10, 1226:1,
1231:17, 1238:20, 1249:17
  **worldwide** [1] - 1292:20
  **worried** [2] - 1229:3, 1283:21
  **worry** [1] - 1251:17
  **write** [8] - 1233:9, 1243:19,
1247:18, 1252:19, 1270:1,
1271:15, 1282:3, 1282:7
  **writes** [2] - 1236:1, 1263:3
  **writing** [2] - 1247:6, 1280:21
  **written** [4] - 1218:3, 1247:1,
1311:7, 1327:4
  **wrote** [20] - 1214:25, 1224:11,
1230:20, 1231:1, 1246:23,
1248:13, 1250:23, 1253:21,
1257:6, 1261:5, 1265:12,
1272:5, 1283:25, 1286:3,
1293:23, 1309:11, 1312:18,
1326:25, 1328:6, 1328:20
  **wtaylor@zuckerman.com** [1] -
1203:25

## Y

  **Yanukovych** [2] - 1271:22,
1317:11
  **year** [1] - 1276:2
  **yesterday** [13] - 1208:13,
1209:1, 1219:3, 1273:8,

1276:22, 1283:19, 1283:23,
1286:21, 1289:13, 1300:7,
1301:11, 1310:19, 1321:11
  **York** [20] - 1218:21, 1218:22,
1218:25, 1240:4, 1243:1,
1243:6, 1243:18, 1243:20,
1243:24, 1245:19, 1245:24,
1261:20, 1263:5, 1263:14,
1263:15, 1263:16, 1263:18,
1263:23, 1271:17, 1275:14
  **yourself** [6] - 1205:6, 1232:10,
1241:18, 1280:17, 1292:9,
1324:3
  **yourselves** [1] - 1333:24
  **Yulia** [1] - 1318:3

## Z

  **zealously** [1] - 1207:19
  **zoom** [8] - 1221:9, 1222:7,
1232:17, 1236:11, 1241:24,
1244:12, 1270:6, 1271:19
  **zoomed** [1] - 1270:13
  **ZUCKERMAN** [2] - 1203:22,
1204:2
  **Zwaan** [21] - 1279:2, 1286:22,
1286:23, 1286:24, 1287:6,
1287:21, 1287:24, 1289:3,
1290:11, 1290:13, 1290:18,
1291:4, 1291:9, 1291:12,
1316:16, 1324:5, 1324:20,
1324:21, 1325:11, 1325:17,
1329:18
  **Zwaan's** [4] - 1290:15, 1291:17,
1327:6, 1329:6