1361

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,      )
                               )
     v.                        )   Criminal Action No. 19-CR-125
                               )
GREGORY B. CRAIG,              )   JURY TRIAL - DAY 7
                               )   Afternoon Session
          Defendant.           )
_____  )   Washington, D.C.
                                   August 20, 2019


          TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
            BEFORE THE HONORABLE AMY BERMAN JACKSON
                 UNITED STATES DISTRICT JUDGE


          APPEARANCES:

     For the Government:     Fernando Campoamor-Sanchez, AUSA
                             Molly Gulland Gaston, AUSA
                             U.S. ATTORNEY'S OFFICE FOR THE
                             DISTRICT OF COLUMBIA
                             555 Fourth Street, NW
                             Washington, DC 20530
                                -and-
                             Jason Bradley Adam McCullough
                             U.S. DEPARTMENT OF JUSTICE
                             950 Pennsylvania Avenue, NW
                             Washington, DC 20530


     For the Defendant:     Adam B. Abelson, Esq.
                             William James Murphy, Esq.
                             ZUCKERMAN SPAEDER, LLP
                             100 East Pratt Street
                             Suite 2440
                             Baltimore, MD 21202
                                -and-
                             William W. Taylor, III, Esq.
                             Paula M. Junghans, Esq.
                             ZUCKERMAN SPAEDER, LLP
                             1800 M Street, NW
                             Suite 1000
                             Washington, DC 20036

1362

1

2

3  Court Reporter:          PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                            U.S. Courthouse, Room 4700A
4                           333 Constitution Avenue, NW
                            Washington, D.C.  20001
5                           (202) 354-3243

6       Proceedings reported by stenotype shorthand.
        Transcript produced by computer-aided transcription.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1363

E X A M I N A T I O N S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JONATHAN HAWKER | | 1366 | 1491 | 1507 |
| | | | 1509 | |

E X H I B I T S

| DEFENDANT EXHIBIT | PAGE |
|---|---|
| 501 | 1367 |
| 503 | 1414 |
| 504 | 1467 |

AFTERNOON SESSION

(1:50 P.M.)

1    THE DEPUTY CLERK:  Your Honor, re-calling Criminal

2    Case Number 19-125, United States of America versus

3    Gregory B. Craig.

4    THE COURT:  I understand that the Government wants to

5    talk about something before we bring the jury back.

6    MR. CAMPOAMOR-SANCHEZ:  Very quickly, Your Honor.  I

7    just want to alert the Court -- I alerted the defense of this

8    last night -- Mr. Hawker has a business appointment tomorrow,

9    and we are very hopeful that both sides will work together to

10   try to get him finished today, I would ask if that even meant

11   staying another 10 or 15 minutes afterwards.  I'm not trying

12   to curtail their cross-examination.

13   THE COURT:  All right.  We don't have an official

14   ending time, so I think we should try to do that for many

15   reasons.

16   MR. CAMPOAMOR-SANCHEZ:  Then, secondly, I just want

17   to alert that our next witness, I have just been informed,

18   has jury duty tomorrow.  I think they are trying to get it

19   changed.  If not, I was wondering if there is something that

20   Mr. Haley or the Court could do to help us notify whatever

21   local court it is the requirement for her to be here.

22   THE COURT:  It's Superior Court?

23   MR. CAMPOAMOR-SANCHEZ:  No.  I believe it's in a

AFTERNOON SESSION

(1:50 P.M.)

1    THE DEPUTY CLERK:  Your Honor, re-calling Criminal

2    Case Number 19-125, United States of America versus

3    Gregory B. Craig.

4    THE COURT:  I understand that the Government wants to

5    talk about something before we bring the jury back.

6    MR. CAMPOAMOR-SANCHEZ:  Very quickly, Your Honor.  I

7    just want to alert the Court -- I alerted the defense of this

8    last night -- Mr. Hawker has a business appointment tomorrow,

9    and we are very hopeful that both sides will work together to

10   try to get him finished today, I would ask if that even meant

11   staying another 10 or 15 minutes afterwards.  I'm not trying

12   to curtail their cross-examination.

13   THE COURT:  All right.  We don't have an official

14   ending time, so I think we should try to do that for many

15   reasons.

16   MR. CAMPOAMOR-SANCHEZ:  Then, secondly, I just want

17   to alert that our next witness, I have just been informed,

18   has jury duty tomorrow.  I think they are trying to get it

19   changed.  If not, I was wondering if there is something that

20   Mr. Haley or the Court could do to help us notify whatever

21   local court it is the requirement for her to be here.

22   THE COURT:  It's Superior Court?

23   MR. CAMPOAMOR-SANCHEZ:  No.  I believe it's in a

1    neighboring jurisdiction, in Maryland or Virginia.

2              THE COURT:  Well, we're happy to confirm that the

3    person is here.  I have no idea what their procedures are.

4    So if there is any call that needs to be made, you can give

5    Mr. Haley the witness's name, and they can confirm it.  I

6    don't know what else we can do.  Maybe our jury office or

7    their jury office -- I don't know --

8              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

9    That's it.

10             THE COURT:  All right.  So I saw people nodding on

11   the defense side of the courtroom when the prosecutor was

12   talking about the witness's schedule.  So do you believe we

13   can finish up this afternoon, and if we need to push through,

14   we will?

15             MR. MURPHY:  I think so, Your Honor.

16             THE COURT:  All right.  Let's bring the jury in.

17             (Jury present)

18             THE COURT:  All right.  I remind the witness, you're

19   still under oath.

20                        JONATHAN HAWKER,

21   having been previously duly sworn, was examined and testified

22   further as follows:

23             THE COURT:  Mr. Murphy, you can continue.

24             MR. MURPHY:  Thank you, Your Honor.

25

1    CROSS-EXAMINATION

2         BY MR. MURPHY:

3    Q.   Mr. Hawker, I would like to look next at Defendant's

4    Exhibit 113.

5         THE DEPUTY CLERK:  In evidence?

6         MR. MURPHY:  It's in evidence.

7         BY MR. MURPHY:

8    Q.   If we could blow that up, please.

9         This is an e-mail from you to Mr. Aarons and your

10   other colleagues on September the 7th.

11        It says that "It still looks unclear whether next

12   week is the announcement week or not."  It says "I'm not this

13   morning."  I think that must be a typo.

14   A.   One of my many.

15   Q.   In any event, Mr. Kilimnik had indicated that Skadden

16   will not allow the report to be released until they've met

17   again with Yulia Tymoshenko.  And that was planned for

18   Wednesday.  You feared that this would put us either towards

19   the end of the week or early the week after.

20        "Greg Craig was unavailable last night, so you did

21   not get an update on his plans."  Right?

22   A.   Yes.

23   Q.   I want to look at Defendant's Exhibit 501.  And this is a

24   document that we'll have to show you.

25   A.   Thank you.

1    Q.   It appears to be an e-mail that you sent to your

2    colleague Mr. Aarons on September 11, 2012.  And the caption,

3    it says, "Subject, Journalism."  And the attachment is

4    "Worst-Case Scenario."  Right?

5    A.   Yes.

6    Q.   It appears to me that this is a draft of an

7    article -- oh, I'm sorry.  I have to move it into evidence so

8    the jury can see it.

9            I move Exhibit 501.

10           THE COURT:  Any objection?

11           MR. CAMPOAMOR-SANCHEZ:  No objection as long as it is

12   his document --

13           MR. MURPHY:  Is it your document, Mr. Hawker?

14           THE WITNESS:  Yes, it is.

15           THE COURT:  Both the e-mail and the attachment?

16           THE WITNESS:  Yes, it is.

17           MR. CAMPOAMOR-SANCHEZ:  No objection.

18           THE COURT:  All right.  It will be admitted.

19       (Defendant 501 admitted in evidence)

20           BY MR. MURPHY:

21   Q.   Now, I think earlier this morning, at one point on

22   direct, you said that you thought from a public relations

23   perspective the report that Skadden prepared was rubbish.

24           Do you remember saying that?

25   A.   I don't remember saying "rubbish," but maybe I did.

1   Q.   Okay.   This is a draft of an article that you wrote to

2   your colleague indicating what you thought the press would

3   say about the Skadden Report when it was released; isn't that

4   right?

5   A.   Yes.

6   Q.   What you wrote as a headline -- if we could put the

7   headline up -- was "Ukraine Violated Former Prime Minister's

8   Rights, According to Ukraine's Own Lawyer."

9        Right?

10  A.   Yes.

11  Q.   The first paragraph says, "The top U.S. lawyer hired by

12  the government of Ukraine has concluded that it violated the

13  rights of Prime Minister Yulia Tymoshenko during its

14  prosecution of her for abuse of power."

15       Right?

16  A.   Yes.

17  Q.   And you further wrote in the third paragraph, "Following

18  international concern, and the boycott of the Euro-2012

19  Football Championship by European leaders, including David

20  Cameron and Angela Merkel, Ukraine hired Bill Clinton's and

21  Barack Obama's former White House counsel, Greg Craig to

22  review the case."

23       Right?  You wrote that?

24  A.   I did.

25  Q.   And there had been a boycott by some European leaders of

1    that football -- or soccer tournament; right?

2    A.   I don't remember.

3    Q.   Okay.  You wrote in the next paragraph, "Craig concludes

4    that whilst the judge based his decision on the evidence

5    before it, the Court's decision not to call certain defense

6    witnesses compromised Tymoshenko's ability to present a

7    defense."

8              Right?

9    A.   I wrote that, yes.

10   Q.   And that was a direct quote from the report as it then

11   existed and as it finally was issued; isn't it?

12   A.   I don't recall whether it was.  It's an inverted comma,

13   so it suggests it was.

14   Q.   You further wrote, "He agrees" -- referring to

15   Mr. Craig -- "He agrees with the former Prime Minister's

16   claim that the trial should have not proceeded without her

17   having a lawyer in court to represent her.  The Court's

18   decisions not to permit the defendant to call certain

19   witnesses and to allow critical witnesses to testify while

20   Tymoshenko was unrepresented by counsel would constitute

21   violations of due process in western courts."

22             Those are also words that appeared in the draft

23   report that you saw and in the final report; aren't they?

24   A.   I don't remember the words of the report, but highly

25   likely, yes.

1    Q.   The last sentence of that paragraph, "Tymoshenko's

2    indefinite detention during trial and after trial prior to

3    her sentencing -- without sufficient review and

4    reconsideration -- was improper and would likely be

5    criticized by western courts."

6         You wrote that, too; right?

7    A.   Yeah, and I remember that from a draft of the report or

8    the report.

9    Q.   It appears in both the draft and in the final; doesn't

10   it?

11   A.   There we are.  There we are.

12   Q.   And then you wrote in the last paragraph, "The lawyer

13   ducked the question of whether Mrs. Tymoshenko is guilty of

14   the crime for which she was convicted.  This issue of

15   Ukrainian law -- the legal requirements necessary to satisfy

16   the elements of the statutory offense -- is beyond the scope

17   of our assignment and beyond our expertise," he wrote, and

18   adding, "We do not opine about whether the prosecution was

19   politically motivated or driven by an improper political

20   objective."

21        And those were also quotes from the draft that you

22   saw; right?

23   A.   Probably, yes.

24   Q.   And on the next page, in the middle paragraph, you

25   anticipated what Mrs. Tymoshenko's lawyer might have to say

1    about this report; right?

2    A.   Yes.

3    Q.   And you wrote to Tymoshenko's lawyer, Serhiy Vlasenko,

4    denied misconduct and called for Tymoshenko's immediate

5    release.  "Everyone knows this was a political prosecution.

6    The government's own hired gun has now concluded this was an

7    unfair trial in which Yulia's rights were violated.  So the

8    only reason that President Yanukovych is keeping her in jail

9    is politics, politics, politics.  A fair man would accept his

10   own lawyer's conclusions and free this political prisoner."

11         Right?

12   A.   Yeah.

13   Q.   And you were anticipating that that's the kind of thing

14   that Serhiy Vlasenko would say to the media when the report

15   was released; right?

16   A.   Yeah.  Obviously, you know, I'm just making it up, but

17   yeah, it is the sort of thing he had been saying.

18   Q.   That's the sort of thing he had been saying and continued

19   to say; right?

20   A.   Oh, he's been -- he was very vocal, yes.

21   Q.   Now, this is a draft of an article that you sent to your

22   colleague basically saying, if this report comes out in this

23   form, this is going to be really an uphill battle for us to

24   promote what the Ukrainian Ministry of Justice wanted to say

25   about the Skadden Report; right?

1    MR. CAMPOAMOR-SANCHEZ:  Objection.

2    THE COURT:  Sustained.

3    BY MR. MURPHY:

4  Q.  Well, you called it the worst-case scenario right?

5  A.  I do.  That's the title on the e-mail, "Worst-Case

6  Scenario."

7  Q.  And from your perspective, as the public relations guys,

8  knowing what the report would likely say, you thought it was

9  a public relations potential disaster; didn't you?

10  A.  I thought there was a risk, and this is a risk management

11  document.  You produce a worst-case scenario, and, you know,

12  then people can make informed decisions.

13  Q.  Now, after that -- first of all, were you aware that the

14  Ukraine Ministry of Justice had attempted to get the Skadden

15  folks to change some of the conclusions that you quoted in

16  this document?

17  A.  I was aware that they had tried to exercise influence at

18  some stage, but I don't know what on.

19  Q.  Okay.  Do you know that their efforts to exercise

20  influence over Skadden's report were unsuccessful?

21  A.  Yes.

22    MR. CAMPOAMOR-SANCHEZ:  Objection.  Lack of

23  foundation.

24    THE COURT:  You said you knew there were some

25  efforts.

1    THE WITNESS:  Oh, absolutely.

2    THE COURT:  Okay.  So do you know if any changes were

3    accepted, or were they all rejected, or what?

4    THE WITNESS:  I don't know whether some factual

5    corrections, you know, dates, things were changed, but

6    nothing substantive changed in this report.  It's an

7    independent report.

8    THE COURT:  All right.

9    MR. MURPHY:  Thank you, Mr. Hawker.

10   BY MR. MURPHY:

11   Q.  Then, around the same time that you got a copy of the

12   draft report, you had your e-mail communication with

13   Mr. Kilimnik, and then you wrote this worst-case scenario,

14   you made a recommendation to Mr. Kilimnik that the Ukrainian

15   government should seriously consider not releasing the

16   Skadden Report; didn't you?

17   A.  Yes, I did.

18   Q.  For all these reasons; right?

19   A.  Yeah.  You know, I think I have said already, really, I

20   was a bit worried about it because, you know, the government

21   of Ukraine was not a popular government, and it needed

22   something pretty radical, really, to overcome that.

23   Q.  Now, in the days after September of 2012, did you receive

24   requests from Mr. Manafort to alter your talking points and

25   your media documents in ways that might suggest that, in

1   fact, Skadden had found no evidence to support Tymoshenko's

2   claim that there was a political motivation behind her

3   prosecution?

4   A.   I definitely received, you know, directions from Paul

5   Manafort, but I don't remember what they were.

6   Q.   Well, don't you remember that one of the key issues from

7   the Ukrainian perspective was they wanted to be able to say

8   that the Skadden Report concluded that this was not a

9   politically motivated prosecution?

10  A.   Yes.

11  Q.   And you knew that the Skadden Report was not going to

12  make that conclusion; didn't you?

13  A.   Well, I don't remember what I knew at the time, to be

14  honest.  It's a 186-page document.  I don't remember.

15  Q.   Well, don't you remember that that was one of the key

16  aspects that were in the executive summary, that Skadden was

17  not in a position to make a judgment about whether this was a

18  politically motivated prosecution?  All that the report was

19  going to be able to say was what evidence did she present

20  during the trial.

21  A.   I just don't remember.

22  Q.   Okay.

23  A.   I don't remember.

24  Q.   You don't remember, sir, that there was a flak with

25  Mr. Craig when he saw your talking points, your media

1  summary, in late September, where you said in your document

2  that there's no evidence of political prosecution, and he had

3  a reaction to that?

4         MR. CAMPOAMOR-SANCHEZ:  Objection to the form.

5         MR. MURPHY:  Let me try to rephrase it.

6         THE COURT:  Okay.

7         BY MR. MURPHY:

8  Q.  Do you remember having discussions with Mr. Craig about

9  the difference between a finding that there was not a basis

10  for a selective prosecution claim to be successful and that

11  that was different from saying there's no evidence to support

12  her claims of political motivation?

13  A.  No, I don't remember that.

14  Q.  You don't remember that?

15  A.  No.  I'm sorry.

16  Q.  All right.  Let me show you next Exhibit 232, Government

17  Exhibit 232.

18         This is an e-mail that Mr. Gates sent to you,

19  Mr. Hawker, on September 12th, which I think is the day

20  after -- maybe the same day -- that you drafted your

21  worst-case scenario; right?

22  A.  Is it?  Okay.

23  Q.  And in it Mr. Gates tells you that "We're getting close

24  to the release of the report."  And he has a series of things

25  that he wants to talk to you about and have you work on,

1    right, the updates?

2    A.   Yes.

3    Q.   The proposed lead headline on the report, sample press

4    release on the report, key talking points on the report, who

5    are we engaging in the first 3 days, what media are we

6    privately leaking to.  And he said, "Remember, I want to use

7    Bloomberg in the United States."

8            Right?

9    A.   Yes.

10   Q.   So that was Mr. Gates' preference?

11   A.   It was his plan, his suggestion, all along.

12   Q.   Let's take a look at Defendant's Exhibit 126.

13           This is a document that you sent to Mr. Gates on the

14   same day, September the 12th, 2012.

15   A.   Sorry.  Where is this?

16   Q.   It is Defendant's 126.

17   A.   Sorry.  I'm with you.

18   Q.   Okay.  Can we have it blown up here.

19           You wrote to Mr. Gates, "Two things for you to

20   consider.  The messaging and draft statements from the

21   Ministry and the Office of the Procurator General are in the

22   Project Veritas document.  The other document is a Q and A

23   addressing thorny issues."

24           You say, "We've provided answers even where we do not

25   know the facts."

1           Right?

2    A.   Yes.

3    Q.   You were just sort of preparing a Q and A and making up

4    what you thought an answer might be?

5    A.   That is how it is done until you get the facts and change

6    it, yes.

7    Q.   Okay.  And you didn't have some of the facts; right?

8    A.   No, I didn't.  No.  I didn't have all of the answers, and

9    that is quite normal in the drafting of the

10   question-and-answer process that you engage with your clients

11   and others to make sure that you sort it out.

12   Q.   All right.  Let's look at the Q and A that you did.  And

13   on page 3 of this attached document -- I'm sorry -- page 3 of

14   this exhibit.

15           Now, these are questions and answers that you were

16   drawing up for the Ministry of Justice or the Office of the

17   Prosecutor General, things that they would say in response to

18   questions that they got about the Skadden Report.

19           Right?

20   A.   Yeah.

21   Q.   One question was:  "When did you first receive the

22   report?"

23           Your proposed answer was:  "We received it last

24   night."

25           Right?

1378

1    A.   Yes.

2    Q.   That wouldn't have been true; would it?

3    A.   I have no idea, actually.  Probably not.

4    Q.   You knew that the Office of the Procurator General and

5    the Ministry of Justice had received draft reports; didn't

6    you?

7    A.   Yes, I did.  Yes.  But this is presuming that this is a Q

8    and A for when the final report is published.  It's a draft.

9    So --

10   Q.   Well, isn't this, in fact, a draft of the Q and A for

11   when the report was going to be released?

12   A.   Yes, it is.

13   Q.   And the question you thought they might get was:  When

14   did you first receive the report?

15   A.   Yes.

16   Q.   The answer you proposed giving was:  We received it late

17   last night.  Right?

18   A.   Yeah.  That's fair enough.

19   Q.   That would not have been a true statement; would it?

20        THE COURT:  Now you're arguing with the witness.  He

21   said he knew when he got the draft.  He didn't know when he

22   got the final.

23        BY MR. MURPHY:

24   Q.   There was a proposed question:  "What opportunity did you

25   have to edit this report?"

1    And the answer was:  "We have not edited the report,

2    it is clearly independent."

3         Right?

4    A.   Yes.

5    Q.   You knew that there had been efforts by the Office of

6    Procurator General and --

7    A.   Yes.  I also knew they hadn't edited it because Mr. Craig

8    was absolutely adamant that it would be an independent

9    report, and he was a man of his word.  It was an independent

10   report.

11   Q.   Right.  Mr. Craig was a man of his word, and this was an

12   independent report?

13   A.   It was an independent report.  I've said that so many

14   times.

15   Q.   Okay.

16   A.   It was an independent report.

17   Q.   Next question:  "You say you have only just received this

18   report and are just reading it.  Isn't it odd that you paid

19   for it but you were not provided with a draft."

20        And your answer was:  "We wanted an independent

21   report.  It would not have been an independent report if we

22   had requested a draft."

23        Now, you knew that the Ministry had requested a

24   draft; didn't you?

25   A.   Yeah.  Oh, totally.

1    Q.   There is a question at the bottom of this page.  "The

2    report is inconclusive on political motivation.  Surely, this

3    was the key point that you wanted to address.  Are you

4    disappointed?"

5         And your draft answer was:  "On the contrary, the

6    report clearly states that there is no evidence of political

7    motivation.  This is now beyond doubt."

8         That's what you wrote; isn't it?

9    A.   It is, indeed, yes.

10   Q.   And you knew that that was a false characterization of

11   what the report was going to conclude; didn't you?

12   A.   It was an accurate characterization of the Ministry of

13   Justice's interpretation of the report.  It is not a

14   restatement of the report.  It is a statement of the view of

15   the Ministry of Justice.

16   Q.   And didn't you go about, sir, trying to help the Ministry

17   of Justice misstate that fundamental conclusion in the

18   report?

19   A.   I went about my job as a PR consultant to give the

20   Ministry of Justice the advice that they needed to

21   communicate about this report.

22   Q.   On the next page, at the top where it says, "Skadden

23   states that Tymoshenko."

24   A.   Sorry.  I can't hear you.

25   Q.   On the next page, the third paragraph, there is another

1    question.  "Skadden states that Tymoshenko would have been

2    given more time to prepare her defense if she had been

3    prosecuted in America.  Do you accept that she had

4    insufficient time, as she claims?"

5         Your proposed answer for the Ministry was:

6    "Ukrainian law was correctly applied.  She had sufficient

7    time to prepare a defense."  Right?

8    A.   Yes.

9    Q.   That's what you think the Ukraine Ministry would want to

10   say?

11   A.   That is what they did want to say.

12   Q.   Right.  Top of the next page.  The question:  "What do

13   you make of the judge's decision to remove Tymoshenko from

14   the court and to continue to accept evidence?  Skadden is

15   troubled by this."

16        Your proposed answer was:  "Skadden accepts that she

17   did not suffer any prejudice and raised no objection at the

18   time."

19        Now, that was a clear misstatement of the conclusions

20   of the report; wasn't it?

21   A.   I'm not sitting here with the conclusions of the report

22   in front of me.  And I'm sure I've written it for a reason.

23   Q.   And that reason would be to make a statement that the

24   Ministry might want to make; right?

25        MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

1382

1    question.

2        THE WITNESS:  I'm a PR consultant, and my job is to

3    try and convey things in the best way possible in the

4    interests of the client, and that's what I'm doing.

5        BY MR. MURPHY:

6    Q.   There was a question further down on the same page:  "Why

7    was Tymoshenko denied counsel?"

8        Your proposed answer:  "Her counsel disappeared at

9    one point, and she kept changing her mind about who would

10   represent her, whilst some of her counsel behaved

11   inappropriately.  In our view, she was the architect of this

12   denial."

13       That was something that the Ministry wanted to say;

14   isn't it?

15   A.   Yes.

16   Q.   But it is not something that is in the conclusions of the

17   report; is it?

18   A.   I think I have already said I'm not sitting here with it

19   in front of me, so I have no idea.

20   Q.   If we look at page 8 of this document, this is your

21   revised messaging statement.

22   A.   Yes.

23   Q.   And this was also sent by you to Mr. Gates on September

24   the 12th.  Right?

25       And you have a summary there of the findings of the

1     report.  And finding number 3, you wrote, "There is no

2     evidence to support Tymoshenko's claim that the prosecution

3     was politically motivated."

4          Right?

5     A.   Yes.

6     Q.   And that was a misstatement of the conclusions in the

7     Skadden Report; wasn't it?

8     A.   That's a statement which is an expression of the position

9     of the Ministry of Justice in relation to the Skadden Report,

10    not a statement about the content of the report.

11    Q.   So you distinguish between what the report actually said

12    and what it was going to say from what the Ukraine Ministry

13    of Justice would have liked it to have said.  Is that fair?

14    A.   No, that isn't what I said at all.  What I said is that

15    the report is a document which makes a number of findings.

16    This document is a comment upon that document.  It is an

17    expression of the view of the client about the document.

18    It's not a repetition.  You don't take the findings of the

19    report and just repeat them.  You know, you add value to a

20    story, a news story, by making a comment upon it.  And so

21    what I'm trying to do is to reflect the position of the

22    Ministry of Justice of Ukraine and the other Ukrainian

23    parties in relation to the report.

24          And all of these documents are draft documents that

25    were sent to Mr. Craig for consideration, amendment, and to

1    address factual errors ahead of the Harvard Club meeting.

2              THE COURT:  Well, this one you sent to Mr. Gates.

3              THE WITNESS:  Right.

4              THE COURT:  Do you know if you sent it --

5              THE WITNESS:  I sent versions of the same thing, Your

6    Honor.  I don't know which versions exactly, but the content

7    didn't particularly change.  Until Harvard.  I apologize.

8              BY MR. MURPHY:

9    Q.  You say that this is a statement about the report, but

10   actually it is captioned, you know, "Findings."  The report

11   concluded these things; right?

12   A.  Yes, that's a good observation.

13   Q.  Would you say that this was an effort to spin the report?

14   A.  No.  I'd say it's an effort to condense the report.

15   Q.  On page --

16   A.  My job was to spin, if you wish to use that word.

17   Q.  I'm sorry?

18   A.  My job as a PR consultant was to spin if you wish to use

19   that word.

20   Q.  Okay.  Over here -- I don't know how you refer to it over

21   in England -- but sometimes they refer to folks over here as

22   spin doctors.

23   A.  That's terrible, isn't it?  Terrible phrase.  I prefer to

24   use the word communications consultant.

25   Q.  But you were trying to spin this report; weren't you?

1      A.   I was trying to communicate about the report, but you can

2      say spin.  I'm not going to disagree with that.

3      Q.   You would not quarrel with the characterization that you

4      were spinning the report?

5      A.   I would never quarrel with you, Mr. Murphy.  I was trying

6      to convey this report in the way that my clients wished it to

7      be conveyed to achieve the strategic purpose that --

8      Q.   Thank you.

9      A.   -- was set out at the very start of the whole event.

10     Q.   On the next page, page 9 of the exhibit, you have a draft

11     of a Ministry of Justice statement, which you've captioned

12     "Proactive."

13          Right?

14     A.   Yeah.

15     Q.   The headline there is "Independent Report Concludes

16     Tymoshenko Trial was not Politically Motivated."

17          Right?

18     A.   Yes.  It's a draft news release.  That's why I have

19     written proactive.  But you're correct.

20     Q.   And you actually were the draftsman of the Ukraine

21     Ministry of Justice news release that went out

22     on December 13, 2012; aren't you?

23     A.   Which is unsurprising given my role as a communications

24     consultant or spin doctor.

25     Q.   This is an early draft of what became the Ukraine

1  Ministry of Justice press release; isn't it?

2  A.   I think this is my first stab at it in this pack that

3  went to the attendees at the Harvard Club for review.  I

4  think there were several other drafts.  But it came from me,

5  I confess.

6  Q.   The third paragraph of this draft statement says, "The

7  ministry welcomes the findings of the report that there is no

8  evidence that the prosecution was politically motivated, the

9  judge was anything but independent, and that Tymoshenko's

10  conduct in court would have been unacceptable in other

11  countries."

12       That's what you drafted?

13  A.   It is what I drafted, yes, I'd said that.

14  Q.   And in the final concluding section of this draft press

15  release, on page 10 -- actually, this is a draft of a written

16  statement by the Prosecutor General; right?  For reactive

17  use.

18  A.   Yes.

19  Q.   And you have the Prosecutor General saying in the second

20  paragraph, "Like everyone else, we are still reading this

21  long and detailed report.  Our initial reaction is that

22  Skadden, Arps has correctly noted that the case was not

23  politically motivated and that her conduct in court was

24  entirely inappropriate and unacceptable."

25       Right?

1387

1    A.    Yes.

2    Q.    Now, let's look at Defendant's Exhibit 125.

3          And this is another document that you sent to

4    Mr. Gates on September the 12th, the same date.

5    A.    Sorry?  Is this a government exhibit --

6    Q.    Defendant 125.

7    A.    Sorry.  I got the wrong one.

8    Q.    This is something called the "FTI cutdown media plan";

9    right?

10   A.    Yes, it is.

11   Q.    Was this prepared by Mr. Manafort and Mr. Gates and sent

12   back to you as a revision of what you had sent to them?

13   A.    Something was.  I don't know if it was this one, but I

14   certainly had a version of the plan which came from the

15   Manafort people.

16   Q.    And when Mr. Manafort and Mr. Gates sent you revisions to

17   what you had put together, you basically accepted what they

18   said because they were, in your view, the client

19   representatives; right?

20   A.    Yeah.  And they were my conduit to the position of the

21   Ukrainian government, yes.

22   Q.    Now, in this cutdown media plan, in the beginning first

23   paragraph, there's another reference to this not having been

24   a politically motivated prosecution.  Right?

25   A.    Yes.

1   Q.  And her conviction was based on the evidence before the

2   Court, it says that.

3   A.  Yes.

4   Q.  Further down in the fourth paragraph -- fifth

5   paragraph -- it says, "Greg Craig will brief key politicians,

6   the UKR" -- I assume that is Ukraine Human Rights

7   Commissioner -- "and some diplomats on Tuesday."  And then it

8   has got this travel arrangement for him.  He will be in Kyiv,

9   will travel to Brussels, Berlin, and Moscow.  He will come

10  back to Washington and brief U.S. stakeholders, as required.

11          These are all things that you know never happened;

12  right?

13  A.  I have already said that several times in this testimony,

14  yeah.

15  Q.  Defendant's Exhibit 130.

16          This is another e-mail that you sent to Mr. Gates on

17  September the 13th, and you suggested a Skadden, Arps press

18  release or response in connection with the release of the

19  report.  Right?

20  A.  I wouldn't have been doing my job if I hadn't, yes.

21  Q.  And in the second paragraph of this document, you

22  said -- proposed to say, I guess per Skadden, "It is our

23  view, based on our examination of this matter, that there is

24  no evidence that this was anything other than a criminal

25  prosecution, albeit of a crime apparently conducted by a

1    former senior politician whilst holding political office.

2    Simply because the crime was of this nature does not make

3    this a political prosecution.  We have seen no evidence of

4    political interference whatsoever beyond the claims of

5    Mrs. Tymoshenko and her colleagues."

6         Right?

7    A.   Yes.

8    Q.   Now, did you ever discuss this draft press release with

9    Mr. Craig?

10   A.   I don't know.  I can't remember if it was the subject of

11   discussion at Harvard.  But I know it was never used.

12   Q.   You know that Skadden, in fact, never issued any press

13   release; right?

14   A.   No, Skadden definitely didn't issue a press release or

15   any press statement whatsoever.

16   Q.   All right.  Let's look next to Government's Exhibit 234.

17   A.   234?

18   Q.   234, Government.

19        Now, the copy you have, does it actually attach the

20   whole draft report?

21   A.   Oh, it does, yeah.  Yeah.

22   Q.   186-page document?

23   A.   And the rest.

24   Q.   Okay.  And you --

25        THE COURT:  What exhibit is this?

1    MR. MURPHY:  234.  Government Exhibit 234.

2    BY MR. MURPHY:

3  Q.  You received this from Mr. Gates on September the 12th;

4  right?

5  A.  Yes.  I thought I had received it from Alex, but it would

6  appear so.

7  Q.  And you then forwarded it a few days later to Mr. Aarons

8  and your other colleagues; right?

9  A.  Yes, to help me with the work.

10  Q.  And you referred to it as "the infamous report."

11  A.  Yeah.

12  Q.  And you called it "the infamous report" because you were

13  kind of annoyed that it took so long to get it in an official

14  form; right?

15  A.  No.  I'm referring to it in that sort of British way of

16  just saying, you know, this is the report you all have been

17  waiting for.

18  Q.  In one of your interviews with these government agents

19  earlier, didn't you say that you were mad, sick of the job,

20  and hated Gates?

21    THE COURT:  What does that have to do with the use of

22  the word "infamous"?

23    BY MR. MURPHY:

24  Q.  That's how you explained your use of the term "the

25  infamous report"; right?

1391

1    A.   Well, I don't think that the two are contradictory.

2    Q.   You don't remember saying it?

3    A.   I honestly don't, no.  I said quite a lot in those

4    things.  I don't remember every word, I'm afraid.

5    Q.   Defendant's Exhibit 132.

6    A.   Defendant's exhibit.

7    Q.   Exhibit 132, Mr. Hawker, is an e-mail chain.  Let's start

8    with the one on the bottom.  Mr. Manafort sent an e-mail to

9    you -- I'm sorry -- to Gates and Kilimnik on Friday,

10   September 14th; right?

11   A.   He did.

12   Q.   He stays, "I have revised the submission.  I don't know

13   who has a copy of this document, but the revision should be

14   forwarded to them and to FTI."

15        Right?

16   A.   Yes.

17   Q.   And then Rick Gates sent to you, on September the 16th,

18   "Comments from Paul on the first part of your package."

19        Right?

20   A.   Yes.

21   Q.   And then you wrote to Aarons and your other colleagues,

22   "For discussion on the plane."

23        Right?

24   A.   Yes.

25   Q.   And you were on your way to Kyiv; weren't you?

1    A.   Oh, gosh, yes.

2    Q.   Okay.  So you were going to have a meeting with

3    Mr. Manafort and Mr. Gates in Kyiv, and this was the meeting,

4    among other things, where you discussed how to get Mr. Craig

5    more willing to take part in the release of the report?

6              MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

7    question.

8              THE COURT:  I think you have asked him several times

9    about that meeting, whether that was one of the topics.

10             Was that one of the topics at the meeting?

11             THE WITNESS:  No, it was not, Your Honor.

12             THE COURT:  All right.

13             BY MR. MURPHY:

14   Q.   When did you have the meeting without Mr. Gates present

15   at which you strategized about ways to get him more

16   cooperative?

17             MR. CAMPOAMOR-SANCHEZ:  Objection.

18             THE COURT:  Was there ever a meeting where you met

19   with Mr. Gates and Mr. Manafort where you were talking about

20   how to get Mr. Craig more involved, a meeting at which

21   Mr. Craig was not in attendance?

22             THE WITNESS:  The post Harvard Meeting at Trump Tower

23   is the only time that I recall that being discussed.  And it

24   was discussed in the way that Paul was going to speak to him.

25   That was the full extent of it, really.

1    BY MR. MURPHY:

2    Q.   You don't think you discussed that before the Harvard

3    meeting?

4    A.   No, not really.  No.  I think the plan at the Harvard

5    meeting was to review the documents and see what he wanted to

6    do.

7    Q.   So attached to this exhibit, 132, on page 2, is a little

8    outline called "Status Report 9-13-12."  Right?

9    A.   Yes.

10   Q.   And one of the items there was "Statement by Skadden

11   Arps.  This is not discussed with them, so it's just our

12   thoughts."

13        Right?

14   A.   Yes, exactly what I said earlier.

15   Q.   And then attached at page 4 is a messaging document.  And

16   if you would look at item number 5 concerning the report, it

17   says, "The report is being published without amendment or any

18   attempt to influence its contents."

19        Right?

20   A.   Yes.

21   Q.   So did Mr. Manafort make that revision to say, not only

22   was it not amended, but there was no attempt to amend it?

23   A.   No.  I think I wrote that originally, and it hasn't

24   changed.

25   Q.   Okay.

1    A.   I think I wrote it pretty much from the beginning.

2    Q.   Even though it wasn't true?

3    A.   I haven't updated it, I think.

4         Yeah, it isn't true.  I can tell you that.

5    Q.   But you continued to include it in your draft documents

6    even though you knew it wasn't true?

7    A.   Well, I was still working on these things.  And I was

8    working on it virtually until the eve of the Harvard meeting.

9    So it is what it is.

10   Q.   Now, after you got back from Kyiv, you made preparations

11   to go to New York for the Harvard Club meeting; right?

12   A.   Well, I must have.  I'm sure I packed my bag.

13   Q.   All right.  So the meeting was on the 23rd, which was a

14   Sunday?

15   A.   Yes, it was.  It was definitely the 23rd.

16   Q.   And you arrived late Saturday night?

17   A.   Yeah.  There was a problem.  I can't remember what.

18   Q.   Okay.  And your understanding from Mr. Manafort -- let me

19   rephrase that.

20        You prepared an agenda for the meeting?

21   A.   Yeah.  I was instructed to by Mr. Manafort.

22   Q.   Okay.  And Mr. Manafort had instructed that you should

23   lead the discussion during the meeting; right?

24   A.   Yeah.  Nice one.

25   Q.   It didn't turn out that way; did it?

1    A.   I seem to remember that it did.  You know, but it was a

2    chat.  So, I mean, I don't have a wonderful recollection of

3    that.

4    Q.   All right.  A couple of times you have indicated that you

5    took some notes during the meeting.

6    A.   I had a page of the agenda form.

7    Q.   Yeah.

8    A.   And I scribbled alongside it.

9    Q.   What happened to the notes?

10   A.   Once I made the corrections, I got rid of it.

11   Q.   You threw them away?

12   A.   Yeah, I didn't need them.  I had incorporated them in the

13   documents.

14   Q.   Okay.  Did Mr. Manafort, when he talked to you about the

15   meeting, suggest that you should be the leader of the

16   meeting?

17   A.   Yeah, I think he did.

18   Q.   But in fact wasn't Mr. Manafort and Mr. Gates -- I'm

19   sorry -- Mr. Manafort and Mr. Craig were the primary leaders

20   during the meeting?

21   A.   They were certainly the most important people in the

22   room, and so I'm sure they took control of the meeting.

23   Q.   And do you remember that Mr. Craig spent most of his time

24   at the meeting discussing what the report's conclusions were

25   and what they were not?

1   A.   I know that we started the meeting with Mr. Craig

2   explaining the findings of the report.  I don't really

3   remember much more than that.

4   Q.   Okay.  Now, let's take a look at defendant's Exhibit 142.

5        If you would blow up the top portion.

6        This is an e-mail that Mr. van der Zwaan wrote on the

7   21st, confirming that there will be a meeting and attaching a

8   copy of the report, which we have produced.

9   A.   Yes, this is the one that I had remembered, yeah.

10  Q.   You remembered getting it from van der Zwaan --

11  A.   Exactly.

12  Q.   -- but you had already gotten it from Gates a few days

13  before?

14  A.   That's what I had forgotten.  But yeah, I remembered

15  getting it from Alex.

16  Q.   And then if we look at Government Exhibit 254.

17  A.   I don't have it.

18  Q.   It is the Government Exhibit 254.

19  A.   It goes up to 234.

20  Q.   There is probably another book.

21  A.   I will look at it here.

22  Q.   You were shown this document by Mr. Campoamor.  It is the

23  e-mail that you sent.  It says Sunday, September 23, 2012, at

24  4:11 a.m.

25  A.   Oh, yes, yes.

1397

1    Q.   We have an understanding, at least a stipulation, that

2    most of the time documents that were produced either by

3    Skadden or FTI were on London time, UTC Greenwich time --

4    A.   I don't know.

5    Q.   -- so usually there's a five-hour difference.

6         Does it seem right to you that you sent these

7    documents out at around 11:00 at night on Saturday rather

8    than 4 a.m. on Sunday?

9    A.   Yeah.

10   Q.   Okay.  And you attached a large pack of documents, what

11   you referred to as the agenda and the draft communications

12   pack for consideration at the meeting.  Right?

13   A.   I certainly did.

14   Q.   And Exhibit 254 seems to include that large pack of

15   documents.

16   A.   It looks like it, yes.

17   Q.   The meeting was a luncheon meeting?

18   A.   Yes, it was.  It was a lunch meeting.

19   Q.   It started at about 12:30 at the Harvard Club?

20   A.   Don't know the time.  But, you know, I got there early

21   with Alex, and we met Greg and had a chat before it all

22   started.

23   Q.   You had lunch?

24   A.   We did.

25   Q.   And then how long after the lunch was over did the

1   meeting continue?

2   A.   I don't remember.

3   Q.   All right.

4   A.   But it wasn't a short meeting.

5   Q.   Was it a long meeting?  You didn't go through dinner, for

6   example?

7   A.   No, I don't think so.

8   Q.   Okay.  So two hours, maybe?

9   A.   I don't know.  I don't have any memory of its duration.

10  Q.   Okay.  You have really no clear memory of the meeting at

11  all; do you?

12  A.   Just that it was a positive meeting.

13  Q.   You thought that -- first of all, you had kind of, as we

14  talked about, a prickly relationship with Mr. Craig in your

15  prior discussions with him; right?

16  A.   Well, sort of an arm's length -- you know, I didn't

17  really have much of a relationship because I didn't see him

18  very often.  He was independent.

19  Q.   You described him as fiercely independent; right?

20  A.   There's nothing wrong with that.  It's not a criticism,

21  is it?  If you're going to set about doing an independent

22  report, you should be fiercely independent.

23  Q.   Okay.  So you were a little bit surprised that he was as

24  friendly as he was at the Harvard Club meeting?

25  A.   I was.  I thought it was great.

1    Q.  He described the club to you and his experiences at

2    Harvard.  He didn't go to Harvard Law School, by the way.

3    A.  I'm really sorry.

4    Q.  He is a Yale Law School, Harvard --

5    A.  I apologize.

6    Q.  If we look at master control grid -- that's the pages 3

7    through 5 of this exhibit -- did you go over each of the

8    items on this grid during this meeting?

9    A.  No, I don't think we did.  I'm pretty sure we just talked

10   around the general ideas.

11   Q.  Okay.

12   A.  And I don't have the exhibits.

13   Q.  If you would look at pages 2 and 3 of the grid, starting

14   at the bottom of 2, there's a reference . . .

15        Let's see.  I'm on page 4 of the exhibit, John, at

16   the bottom.  Blow up the bottom.  There's a couple of squares

17   there.

18        You have a briefing of a Ukrainian Commissioner for

19   Human Rights to be done by Skadden and Gregory Craig; right?

20   A.  Yeah, we referred to this previously.

21   Q.  And on the next page -- if you blow up the whole page --

22   you've got Mr. Craig's whirlwind tour of European capitals;

23   right?

24   A.  Yeah.

25   Q.  That was not discussed at the meeting; was it?

1    A.   Not in specifics because he made very clear what he was

2    happy to do and not do.

3    Q.   And he wasn't happy and he wasn't going to do any of

4    those things; was he?

5    A.   No.  But it was a hypothetical aspirational plan.  You

6    know, if we were given a free hand, and despite all of the

7    iterations of the same thing, it still was that.  So this

8    is -- as far as I'm aware, this is the first time that Greg

9    ever received this information.

10   Q.   Okay.  When he received it, he told you I'm not going to

11   be part of it?

12   A.   I don't recall him using those words, but it was clear

13   this was not for him.

14   Q.   Now, Exhibit 258, Government Exhibit 258.  Do you have

15   it?

16   A.   Yeah.

17   Q.   So it appears from this document, it's an e-mail that

18   Mr. Gates sent to you in response to a request that you made

19   to him.  He had notes from the meeting; didn't he?

20   A.   Yeah.  Because I was worried that because I had been, you

21   know, trying to, you know, write things down and keep the

22   thing going that I had missed things.

23   Q.   So Mr. Gates sent you his notes; right?

24   A.   Yes.  Yeah.  He had been typing.

25   Q.   And if you look at the second page of the exhibit, at the

1  top, there's a caption "Tymoshenko report media strategy."

2       Right?

3  A.   Yes.

4  Q.   And it says, "The single biggest issue for us is the fact

5  that Yulia Tymoshenko was not in court, with no defense

6  attorneys present, and other witnesses were called to testify

7  while she was absent."

8       Right?

9  A.   Yes.

10 Q.   And the other issue is the witnesses issue.  Right?

11 A.   Yes.

12 Q.   And that was the fact that the Skadden Report concluded

13 that she had witnesses that she wanted to call but the judge

14 wouldn't let them testify.  Right?

15 A.   Absolutely.

16 Q.   Okay.  Those were the two big issues that were problems

17 for the Ukraine in terms of a media release about this

18 report; weren't they?

19 A.   Yeah.  There were others, though.

20 Q.   But those were the two biggies, right?

21 A.   I don't remember whether there were others that were more

22 important, but they were certainly problematic.

23 Q.   Now, if you turn to the next page, Mr. Gates had written

24 down what he had considered to be the PR, public relations

25 items.  Right?

1    A.   Yes.

2    Q.   And the ones that he listed were these:  "Hawker, Gates,

3    van der Zwaan to link up with Skadden's PR person."

4         Right?

5    A.   Yes.

6    Q.   And you went over the next day and met with the people

7    from Skadden's communications department?

8    A.   Yeah.  I don't think Rick Gates came, but Alex and I did.

9    Q.   Then, it says, "Report to go on to the Skadden website."

10   Right?

11   A.   It didn't.

12   Q.   Well, the notes say that it was to go on the website of

13   Skadden; right?

14   A.   Yes.  Maybe that was the intention at the time.

15   Q.   But the answer was Skadden wouldn't do it; right?

16   A.   It didn't happen.

17   Q.   It didn't happen.

18   A.   No.

19   Q.   Then, it says, September the 27th Greg Craig will be in

20   Cairo for the week; right?

21   A.   Yes.  He was traveling with his work quite a lot.

22   Q.   Do you remember that he was traveling -- do you remember

23   that he was traveling for The Washington Institute For Near

24   East Policy?

25   A.   I don't think I ever knew that.

1    Q.   At the time of this Harvard Club meeting, it was

2    anticipated that the report was going to be released later

3    that week; wasn't it?

4    A.   Possibly.  You know, there were so many dates.  I just

5    don't know.  But probably.

6    Q.   Let me see if I can refresh your recollection a little

7    bit.

8    A.   Please.

9    Q.   The United Nations General Assembly was about to convene

10   in New York City, and the Ukrainians were coming, including

11   some of their ministers.  Right?

12            THE COURT:  Are you asking him if --

13            MR. MURPHY:  I'm asking if he remembers that.

14            THE WITNESS:  I have absolutely no idea about that at

15   all.

16            MR. MURPHY:

17   Q.   Do you not remember that the plan --

18            THE COURT:  Okay.  Can you approach the bench?

19        (At the bench)

20            THE COURT:  You are telling him facts in questions.

21   And if he doesn't know and he says, I don't know, then you

22   can't follow up as if that fact has just been (inaudible).  A

23   subsequent question in many cases now assumes that that is

24   part of (inaudible), including sometimes you start with "Let

25   me refresh your recollection."  So I think you have to be

1    careful if you don't want me to instruct the jury --

2              MR. MURPHY:  I'm just trying to refresh his

3    recollection, Your Honor.

4              THE COURT:  How do you refresh his recollection by

5    announcing a fact?

6              MR. CAMPOAMOR-SANCHEZ:  And he already said he did

7    not remember.

8              THE COURT:  Right.  In order to refresh his

9    recollection, maybe you can show him a document.  You have

10   been showing him plenty of documents.  The fact that you're

11   pulling from the air and putting it to him if he says he

12   doesn't remember it, you're basically testifying for him, and

13   you have been doing that a lot during this cross.

14             MR. MURPHY:  It's cross examination, Your Honor.

15             THE COURT:  Yeah.

16             MR. MURPHY:  And he is generally remembering when I

17   ask him things.

18             THE COURT:  Now, I think he is taking your word for

19   it.  Because sometimes he will say, no, that doesn't refresh

20   my recollection, and you'll repeat it in the next question.

21   I am just suggesting that you should not do that anymore.

22             MR. MURPHY:  Okay.

23        (In open court)

24             BY MR. MURPHY:

25   Q.  Going down the list of items that Mr. Gates listed as

1    being discussed at the meeting, it says, "KK" -- that's a

2    reference to Mr. Kilimnik; right?

3    A.   Yes.  It is.

4    Q.   "Is to get you information on the financing of the

5    Skadden Report by the Ministry."  Right?

6    A.   Yes.

7    Q.   And then, "The Helsinki Commission document, we need to

8    discredit this report."

9    A.   Yeah.

10   Q.   That was another document that had been issued by some

11   organization about Tymoshenko's prosecution?

12   A.   I have no recollection of this document.

13   Q.   Okay.  And then, "Greg Craig possibly meet with Fule in

14   transit to Europe."  Right?

15   A.   Yeah, possibly.

16   Q.   Is that Stefan Fule?

17   A.   Yeah.

18   Q.   And he was part of the EU Commission?

19   A.   I don't know what his role was.  But he was -- yeah, I

20   think he was like one of these UN or EU human rights

21   monitors, but I don't know what his title was.

22   Q.   There is nothing in Mr. Gates' list of PR items about

23   seeding the report or having Mr. Craig take part in

24   backgrounding journalists; is there?

25   A.   There's nothing there, but, you know, the plan wasn't

1       changed, and that was the plan that was executed.

2       Q.   The plan wasn't changed with respect to Mr. Craig taking

3       a worldwide -- not worldwide, but a European trip --

4       A.   With respect, your question was about seeding, and that's

5       what I was answering.  I wasn't saying anything about a

6       worldwide tour, which never happened.  It was purely

7       hypothetical.  And I don't want anyone to think that

8       Mr. Craig ever entertained that as an idea.

9       Q.   But it stayed in the plan even though he never

10      entertained it as an idea; isn't it true?

11      A.   I think it came out of the plan, but I think Rick Gates

12      put it back in erroneously, but it certainly did not happen.

13      Q.   Now, let's take a look at Government Exhibit 262.

14             You talked about this in your direct testimony.  This

15      is the e-mail exchange concerning what Mr. Craig heard about

16      a possibility that Ukrainian journalists were going to be

17      paid.

18      A.   Oh, yes, yes.

19      Q.   You recall that?

20      A.   I remember that now.

21      Q.   And you think perhaps that there was some joking

22      reference to paying Ukrainian journalists while you and

23      Mr. van der Zwaan were over at Skadden's communications

24      department?

25      A.   I know there was a joking reference that that was the way

1    the government of Ukraine operated.

2    Q.   Okay.  And you were there in your role as the public

3    relations consultant for the government of Ukraine; right?

4    A.   Yes, I was, but, you know, I really don't think, you

5    know, having a bit of fun with people is particularly

6    problematic, you know, which is why I was surprised that they

7    took it at face value.

8    Q.   Okay.  But apparently somebody took it at face value, and

9    Mr. Craig then reached out to you; right?

10   A.   As I would expect him to do because that is the right

11   thing to do.

12   Q.   One of the things that he said, if we look at Mr. Craig's

13   e-mail communication to you on September the 24th, he

14   said --

15   A.   Where is this?

16   Q.   -- "The report I got included a concern about the way the

17   release of the report and the backgrounding for the report

18   will be handled for journalists in Ukraine.  This is entirely

19   your department, and, as you know, our role has simply been

20   to advise FTI about the content of the report and what can be

21   fairly said about it.  We leave the logistics and the

22   strategy entirely up to you.  I understand, however, that

23   there may be some consideration that, as part of the plan to

24   release the report in Ukraine, some remuneration may be

25   provided to the journalists there.  If that is not the case,

1    please disregard this e-mail entirely.  If it is the case,

2    you should know that we would strenuously object to engaging

3    in that kind of conduct.  It is something that is totally

4    inconsistent with our practices and our principles.  If you

5    would like to talk about this, I am of course available."

6         Right?

7    A.   Yes.

8    Q.   And then you reached out to him and asked for his phone

9    number, and he gave you a number, and you spoke about it;

10   right?

11   A.   Yes, I did.  Because there is a fundamental

12   misunderstanding in this e-mail, which is that Mr. Craig says

13   that the briefing of journalists in Ukraine is our

14   responsibility, when it's specifically excluded from our

15   role.  The briefing of journalists in Ukraine was the

16   responsibility of the personnel of the government of Ukraine,

17   not us.  And my jokey comment, you know, was merely a jokey

18   comment because it is so extraordinary that, you know, in the

19   modern world that people think that it's the way to do media

20   relations, you know, to effectively give journalists extra

21   cash, and that is not something that we have ever done, and

22   that's what I explained to Mr. Craig.

23   Q.   And what he said about the role of FTI and Skadden in

24   this e-mail sort of reiterates what he told you from the

25   start, though, doesn't it?  Because he said, we leave the

1    logistics and the strategy for the rollout of the report

2    entirely up to you.  Right?

3            THE COURT:  Well, read what it says.

4            MR. MURPHY:  Okay.  Let's look at Exhibit 261.

5            MR. CAMPOAMOR-SANCHEZ:  Is he going to read it --

6            THE COURT:  He read it earlier, so if you're going to

7    paraphrase that, you have to paraphrase it accurately.  But

8    we can go on to the next --

9            MR. MURPHY:  We're going to move on to the next

10   document.

11           THE COURT:  All right.

12           THE WITNESS:  He didn't actually leave the logistics

13   and strategy entirely up to us, though, because --

14           THE COURT:  Well, there is no question pending, so

15   you have to wait --

16           THE WITNESS:  I apologize.

17           THE COURT:  All right.  Thank you.

18 Go ahead.

19           BY MR. MURPHY:

20   Q.   Mr. Hawker, I want to look next at Government

21   Exhibit 261.

22   A.   Yeah, I'm on it.

23   Q.   Okay.  So this e-mail from Mr. Craig, which you talked

24   about earlier today, is the one where he says, "I am afraid

25   we are going to have to reverse direction on the issue of

1    Skadden lawyers being used to background journalists about

2    the report."

3         Right?

4    A.   Yes.

5    Q.   And this e-mail was sent to you, it appears, at the same

6    time -- maybe a few minutes -- after he sent the e-mail about

7    the concern about paying journalists.  Isn't that right?

8    A.   It was certainly sent on the same day.  I don't have the

9    other one in front of me.  If you say it is, I'm sure it is.

10        Thank you.

11   Q.   And then the next thing that happened is the next

12   day -- actually, later the same day -- if we look at Exhibit

13   267 -- on that same day, you sent Mr. Craig an e-mail copying

14   Mr. Manafort and Mr. Gates, going through the report again

15   and attaching a messaging document for them to review.

16   Right?

17   A.   That's correct.

18   Q.   And you had taken what you had learned about the report

19   at the Harvard Club meeting and made an effort to revise some

20   of your documents to be more consistent with what the report

21   was going to say; right?

22   A.   Yes.

23   Q.   And Mr. Craig responded to you on the next day, the 25th,

24   and he said, "There is a lot of stuff in here that is just

25   wrong."  Right?

                                                          -1411-

1    A.   Yes.

2    Q.   And we talked about this before.  But he thought that

3    anybody reading what you had written would conclude that the

4    report was indeed a total whitewash; right?

5    A.   That's what he wrote, yes.

6    Q.   And he said, "I understand your desire to spin this

7    report in a way that supports Ukraine's view of this trial,

8    but much of what you say is not accurate."

9         Right?

10   A.   Yes.

11   Q.   So we had those three e-mails from Mr. Craig, all shortly

12   after the Harvard Club meeting.  One, the concern about

13   paying journalists --

14        MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

15   question.

16        THE COURT:  I think we're about to ask a compound

17   question.  You have asked him about each one individually.

18        MR. MURPHY:  That's right.

19        THE COURT:  All right.

20        BY MR. MURPHY:

21   Q.   The three exhibits I just asked you about all came from

22   e-mails right around the same time, September 24th, 25th;

23   right?

24   A.   Yes, they did.  You have already pointed out the dates.

25   Q.   I want you to look at Defendant's Exhibit 149.

1    This exhibit is a copy of the e-mail that you

2    actually sent to Mr. Craig on September the 25th and attaches

3    the revised messaging document; right?

4    A.   Yes.

5    Q.   Okay.  And if you turn to page 4 of this exhibit, there

6    is a section called "Ukraine's top-line messaging."  Right?

7    A.   Yes.

8    Q.   Top-line meaning these are the key highlights?

9    A.   You know, this is the bird's-eye view of what they wanted

10   to reflect.

11   Q.   And item number 4 -- if we could blow that up -- said,

12   "The record is clear.  Tymoshenko failed to produce any

13   evidence to support her allegations."

14       Right?

15   A.   Yes.

16   Q.   And that's the message in your messaging document that

17   Mr. Craig specifically objected to, right, and referred to?

18   A.   I don't remember.

19   Q.   Okay.  Now, let's take a look at Defendant's Exhibit 150.

20           MR. CAMPOAMOR-SANCHEZ:  Objection.  This is not --

21           THE COURT:  Can you approach?

22           MR. CAMPOAMOR-SANCHEZ:  It is a document between --

23           MR. MURPHY:  I don't think there is an objection to

24   the document, Your Honor.  That was identified at pretrial.

25           THE COURT:  That's not the question.

1              MR. CAMPOAMOR-SANCHEZ:  It --

2         THE COURT:  Please don't argue in the well of the

3    court.  It would help me if you just come here.  As annoying

4    it is for everybody to listen to the husher, I think it is

5    better than having everyone listen to your argument.

6         (At the bench)

7         THE COURT:  Okay.  The question of whether a document

8    is admissible is a different question than whether it is

9    appropriately shown to this witness.  So can someone show me

10   the document.  And then you can tell me what your objection

11   is.

12        All right.  So he's already testified about the

13   e-mail to him from Mr. Craig.  And I think before lunch you

14   went through more specifics.  I think that is where you

15   started.  Anyway, he has talked about that.  So now you are

16   showing him a list of dates.  So how can you say whether

17   Mr. Gates sent it or not or what he meant by it?

18        MR. MURPHY:  I just want to ask him whether this

19   message was a topic of a meeting that occurred the next day

20   in Mr. Manafort's apartment in New York.

21        THE COURT:  I think you can ask him, after Mr. Craig

22   sent these comments (inaudible).  I don't think you have any

23   basis, plus I don't even know what that means, to tell you

24   the truth.  It is not obvious what Mr. Gates is thinking.

25        (In open court)

1    BY MR. MURPHY:

2    Q.   Mr. Hawker, I want to show you next Defendant's

3    Exhibit 503, which is one that I will hand to you.

4         Mr. Abelson will hand it to you.

5    A.   Thank you.

6    Q.   Do you recognize this, sir, as an e-mail that you sent to

7    Jon Aarons, your colleague, on September the 26th?

8    A.   It is an e-mail I sent, yes.

9    Q.   And does it include your updated documents, the various

10   messaging documents that you had prepared --

11   A.   It looks like it, yes.

12        MR. MURPHY:  Your Honor, I move Defendant's 503.

13        THE COURT:  Any objection?

14        MR. CAMPOAMOR-SANCHEZ:  No objection.

15        THE COURT:  All right.

16   (Defendant 503 admitted in evidence)

17        BY MR. MURPHY:

18   Q.   So, Mr. Hawker, you were informing Mr. Aarons that you

19   were having a meeting with Paul at 8:00 U.S. time tomorrow

20   and need to give these all to him.  Right?

21   A.   Yeah.  I'm under pressure.

22   Q.   And you say to Mr. Aarons that "Mr. Manafort is getting

23   extremely concerned about the media situation as the

24   President is on his case big time."

25        Right?

1    A.   Oh, yes.  He was flapping a bit, too.

2    Q.   He was "flapping a bit," meaning Mr. Manafort was

3    flapping --

4    A.   Yeah.

5    Q.   And the President is a reference to President Yanukovych;

6    right?

7    A.   Yes, it is.

8             THE COURT:  I want to make clear, because we have

9    used this word a couple of times in different contexts.  A

10   "flap" is kind of a dust-up or an argument or a discussion.

11   But when someone is flapping, you're talking about they're

12   panicking, kind of floundering around.

13            THE WITNESS:  Yeah.  And I'm sorry.

14            THE COURT:  That's fine.

15            THE WITNESS:  It is an English expression.  It is so

16   normal.

17            THE COURT:  I just want to make sure we all have the

18   same understanding.

19            THE WITNESS:  Panicking, I suppose.

20            THE COURT:  Okay.

21            THE WITNESS:  Getting all excited, tense, irritable

22   and panicky.

23            THE COURT:  All right.

24            MR. MURPHY:  Two countries separated by a common

25   language.

1    THE WITNESS:  Yes.

2    BY MR. MURPHY:

3  Q.   Okay.  Do you remember that after the meeting with

4  Mr. Manafort at his apartment in New York that he sent you

5  some revisions and directed that his outline should become

6  the basis for the documents that would go forward?

7  A.   I do remember that.

8  Q.   Thank you.

9    Let me show you Exhibit 275.  Let me take that back.

10  Let me show you Government Exhibit 274.  274.

11    There is an e-mail from you -- I'm sorry -- from

12  Mr. Manafort to you with an outline of findings.  Right?

13  A.   Yes.

14  Q.   Is that on the screen?  I'm sorry.

15    And this is where he told you that he created an

16  outline that should become the basis of all of the documents

17  and talking points regarding the Skadden Report?

18  A.   That's right.

19  Q.   And he makes a reference to the top two findings; right?

20  A.   Yes.

21  Q.   And those top two findings exonerate the President of any

22  improper activity; right?

23  A.   Yes.  That was the key thing he cared about.

24  Q.   Right.  And if you look at the next page, this is his

25  outline of key findings of the Skadden Report, Mr. Manafort's

1    outline.  Right?

2    A.   Yes.

3    Q.   And he says in the paragraph that is numbered 3, "The two

4    major findings of the Skadden Report discredit the Tymoshenko

5    accusation that the case was politically motivated and that

6    the judge made his decision based on orders from the

7    political system, not on the record presented in court;

8    (a) Skadden found that the decision of the Court was based on

9    facts presented on the record and that Tymo did not present

10   any evidence of selective prosecution; and (b) these two

11   findings establish the fact that there is no basis to claim

12   that President Yanukovych influenced the Court to find

13   Tymoshenko guilty."

14         Right?

15   A.   Yes.

16   Q.   And that is essentially what Mr. Manafort directed you to

17   include as the top two findings of all of your media

18   messaging documents; right?

19   A.   Yes.

20   Q.   And you did, didn't you?

21   A.   I can't remember whether I did or not.

22   Q.   Okay.  Let's look next at Exhibit 275.

23         Are you with me, Mr. Hawker?

24   A.   I'm almost with you, yeah.

25   Q.   Exhibit 275 is an e-mail exchange between you and

1418

```
 1      Mr. Manafort; right?
 2      A.   Yes.
 3      Q.   And the subject line is "Re Greg."  Right?
 4      A.   Yes.
 5      Q.   And Greg is a reference to Greg Craig; isn't it?
 6      A.   There's only one.
 7      Q.   There is only one Greg involved in this case that you're
 8      aware of?
 9      A.   Absolutely.
10      Q.   And what you said to Mr. Manafort was:  "Paul, did you
11      get anywhere with Greg on the question of whether he has any
12      legal contacts who might be persuaded to speak in support of
13      the report?  Thanks, J."
14           Right?
15      A.   Yes.
16      Q.   And Mr. Manafort responded back to you the same day --
17      A.   "No."
18      Q.   One-word answer "No."  Right?
19           Now --
20           THE COURT:  For the court reporter, did you say the
21      word "no"?
22           THE WITNESS:  I was just reading the word "no."
23      Sorry.
24           THE COURT:  The answer from Mr. Manafort was "no."
25      Okay.
```

1    BY MR. MURPHY:

2    Q.  Now this subject came up because Mr. Craig was not

3    willing to speak in support of the report, and you had a

4    sense that someone was going to ask him whether he knew other

5    lawyers who might be enlisted to speak in support of the

6    report if he were not willing; isn't that right?

7         MR. CAMPOAMOR-SANCHEZ:  Objection to the form of

8    question.

9         THE COURT:  If you know, how did the issue come up

10   about whether he had somebody else who might be persuaded to

11   speak in support of the report?

12        THE WITNESS:  Is that a question to me?

13        MR. MURPHY:  Did you understand --

14        THE COURT:  Yes.

15        Did you get anywhere with Greg on the question of

16   whether he has any legal contacts?

17        THE WITNESS:  We were looking for another lawyer, an

18   expert on this sort of area to speak in support of, you know,

19   the report.

20        BY MR. MURPHY:

21   Q.  Was that because Mr. Craig had expressed unwillingness to

22   speak in support of the report?

23   A.  I don't remember whether it was or not.  It is, possibly,

24   because we had -- we had had the reversal e-mail, hadn't we,

25   at this stage?

1420

1    Q.   Yes, you had.

2    A.   I'm losing my timeline here.  I have no idea.

3    Q.   Well, the reversal e-mail was --

4    A.   We certainly did consider the use of other lawyers to

5    speak in support of the report.

6    Q.   All right.  Let's take a look at Defendant's Exhibit 167.

7         This is an e-mail to you, Mr. Hawker, from Mr. Gates

8    on September the 29th.  It just says, "Here you go."

9         Right?

10   A.   Yes.

11   Q.   And he is attaching a new Veritas timeline?

12   A.   Yes.

13   Q.   And if we look at page 4 of this exhibit, this is a list

14   of key contacts dated September 26, 2012; correct?

15   A.   Yes, it is.

16   Q.   And this is part of the expanded desire on the part of

17   Mr. Gates to reach out to more journalists than just a

18   couple?

19   A.   Yes, I guess it must be.

20   Q.   And he also has, in addition to the journalists, he's got

21   political contacts; right?

22   A.   Yes, he has.

23   Q.   He has listed Mr. Fule, under Brussels, as the

24   Commissioner for EU enlargement."  Right?

25   A.   That's correct.

1    Q.   That was his role?

2    A.   Yeah.

3    Q.   If the Ukraine desired to become part of the European

4    Union, Mr. Fule would be a person involved in assessing that?

5    A.   He is the key stakeholder in that regard.

6    Q.   And it indicates that Mr. Skadden and Mr. Craig will talk

7    to Mr. Fule; right?

8    A.   I didn't understand your question.

9    Q.   That the grid that Mr. Gates sent you indicates that

10   Mr. Craig will talk to Mr. Fule?

11   A.   Yeah, it certainly looks like that.

12   Q.   It also, on the next page, page 5, indicates that in the

13   United States the media outlet to be reached out to is Al

14   Hunt at *Bloomberg*; right?

15   A.   Yes.

16   Q.   And it says, FTI/MCW; right?

17   A.   Yes.

18   Q.   Now, I think earlier you identified MCW, but it is

19   Mercury, Clark & Weinstock; right?

20   A.   Oh, then I misunderstood.  I thought they were called

21   Mercury Communications.

22   Q.   Did you know what role Mercury, Clark & Weinstock was to

23   play in the release of the report in the U.S.?

24   A.   I presume that they were the agency that had been

25   appointed by Davis Manafort at some point to do the U.S.

-1422-

1    work.

2    Q.   All right.  Notwithstanding that, below this portion of

3    the grid, under political, there's an identification of Tony

4    Blinken, who was at the National Security Council, Philip

5    Gordon at the Department of State, and John Boehner, who was

6    then the speaker of the House of Representatives, I believe.

7    And it indicates that Mr. Craig was going to talk to them?

8    A.   That's what it writes, yeah.

9    Q.   None of that ever happened; did it?

10   A.   None of it ever happened at all.

11   Q.   Do you have any idea where Mr. Gates came up with these

12   ideas?

13        MR. CAMPOAMOR-SANCHEZ:  Objection.

14        THE COURT:  Sustained.

15        BY MR. MURPHY:

16   Q.   We looked earlier -- during your direct, you looked at

17   Government Exhibit 276.  This includes Mr. Gates' e-mail

18   message to you on September the 30th, sending you a rewrite

19   and asking you to look closely at the timeline and actions.

20   A.   Yes.

21   Q.   Okay.  On page 3 of Exhibit 276, at the bottom, below A

22   Day, there is a reference to, at noon, I guess, at 1200

23   hours, the MOJ/and the MFA -- the MFA is the Ministry of

24   Foreign Affairs in the Ukraine; is that right?

25   A.   Yes, it is.

                                                              —1423—

1   Q.  They were to set up meetings between Greg Craig, Cox,

2   Kwasniewski, Valeriya Lutkovska, and Stefan Fule; right?

3   A.  Lutkovska.

4   Q.  Again, this is after the Harvard Club meeting, but

5   Mr. Craig never indicated that he would do any of these

6   things, you never heard him say he would; right?

7          MR. CAMPOAMOR-SANCHEZ:  Object to the form of the

8   question.

9          THE COURT:  Yes, let's break that up.

10         BY MR. MURPHY:

11  Q.  Mr. Craig never indicated that he would do any of these

12  things to you; did he?

13  A.  I don't remember him ever agreeing to this, but I do

14  remember that in Rick Gates' notes from the Harvard Club

15  meeting he specifically said that Mr. Craig had agreed to

16  this, but I have absolutely no recollection of Mr. Craig ever

17  saying that.

18  Q.  Let's take a look at Government Exhibit 280.

19         This is an e-mail from you to Mr. Manafort, with a

20  copy to Mr. Gates and Mr. Kilimnik.  It is dated October the

21  2nd, 2012.  And it's -- I guess in one of the e-mail

22  exchanges sort of compressed, Mr. Manafort had some comments

23  about aspects of your plans, and you were responding to him

24  in the same document; right?

25  A.  Yeah.

1    Q.   And I think we talked about this -- you talked about it

2    earlier in your direct testimony -- you said that

3    Mr. Manafort was really sort of kicking at you?

4    A.   I think he was giving me a bit of a rocket.

5    Q.   A rocket?

6    A.   Yeah.

7    Q.   Meaning sort of firing you up?

8    A.   The Welsh expression is a kick-up the backside, with a

9    slightly different word.

10   Q.   Okay.  You make reference -- I think it is you -- but on

11   page 2 of Exhibit 280 -- at the top -- that area.  So this

12   has that reference to Mr. Craig giving briefings to these

13   various European politicians or stakeholders, and

14   Mr. Manafort had a lot of questions.  Who has the numbers?

15   Has Greg Craig provided time block?  Where are his briefing

16   points?  Has he agreed to this?

17          Right?

18          The answer, I guess, from your perspective is you

19   didn't know; did you?

20   A.   Well, what I wrote is, "Greg Craig is currently in Egypt.

21   In his last call with me, he said that he would do meetings

22   with political stakeholders.  I don't have any agreed time

23   with him yet, as the release date has been changing.  Again,

24   once agreement on the release date was confirmed at the

25   meeting, I expected to speak to Greg and fix up times when he

1    would be available."

2    Q.   And you never did have that kind of a conversation with

3    Mr. Craig where you fixed up times to make sure or to find

4    out whether he was available to have these various meetings?

5    A.   No, I did not have a conversation with Mr. Craig to fix

6    up times for an event that didn't take place.

7    Q.   And do you recall, when you were interviewed by the

8    government investigators back in January of 2018, when you

9    looked at this same document, you said you weren't sure that

10   it was accurate that you even had a call with Mr. Craig?

11   A.   I don't recall the conversation.  But you know what, you

12   try remembering a call seven years ago.  I couldn't remember

13   at the time.  Reviewing the documents is helpful.  But, I

14   mean, I don't have a memory of the detail of the call.

15   Q.   Let's look at Government Exhibit 281.  It is an e-mail

16   from Mr. Gates to you.  The subject is "Matrix - Actions."

17   A.   Yeah.

18   Q.   Okay.  And he says it is a document that he had discussed

19   with you on a call.

20        The next page has sort of a PowerPoint-type

21   presentation.

22   A.   I think we're having a battle in formats.

23   Q.   Okay.

24   A.   I won.

25   Q.   That's good.

1    A.   It is because you can't actually understand anything from

2    this.

3    Q.   But what Mr. Gates said, under Skadden Report action item

4    at the top, was "Finalize report release strategy for the

5    U.S.   Identify a key reporter and outlet that can leak the

6    story.   Possibly Bloomberg, but this needs to be vetted and

7    ensure that we get a balanced piece.   If Bloomberg is not

8    selected, we need to know the new entity ASAP.   Develop

9    messaging points for U.S. stakeholders."

10           Right?

11   A.   Yes.   This is a document from whichever agency he was

12   using in Washington, D.C.

13   Q.   So you think that this is something that one of the other

14   public relations firms in the United States prepared?

15   A.   It is, yeah.   It is not our format.   Maybe Gates did.

16   But it is not our document.

17   Q.   And all of these documents that are going back and forth

18   following the Harvard Club meeting about revisions to the

19   plan, none of them were copied to Mr. Craig; were they?

20   A.   I don't believe so, no.

21   Q.   Let's look at Defendant's Exhibit 175.

22   A.   Defendant?

23   Q.   Defendant's.   Sorry.

24           This is an e-mail exchange that you had with

25   Mr. Gates on October the 3rd of 2012.   He sent you something

                                                                    1427

1       called "List," and then it looks like you forwarded it to

2       yourself.  Right?

3       A.   Hang on.  I'm not quite with you.

4       Q.   Defendant 175.

5       A.   Yeah, that's right.  Yeah.  I think I was traveling, and

6       I put it onto my FD and FTI -- the same companies, the same

7       e-mail -- we were in the transition from the name Financial

8       Dynamics to FTI Consulting.  So I'm putting it on my system

9       so I can work on it.

10      Q.   Attached to it is a proposed outreach list for the

11      Skadden legal report.  Right?

12      A.   Yes.

13      Q.   And it is a 6-page, single-spaced list?

14      A.   I told you he was a bit overexcited.

15      Q.   And on page 5, under "U.S. Outreach" --

16      A.   Yes.

17      Q.   -- Mr. Gates has identified it looks like five people

18      from the State Department or the Justice Department or the

19      NSC, the National Security Council; right?

20      A.   Sorry.  I lost you there.

21      Q.   "U.S. Outreach," page 5.

22      A.   Right.

23      Q.   There are five people from the administration listed

24      there.

25      A.   Right.

1428

1    Q.   And then if you look at the next two pages, there are 25

2    people from the House of Representatives, 25 congressmen

3    maybe listed there.

4    A.   Right.

5    Q.   And then several senators, as well.

6    A.   I guess so.

7    Q.   And there's -- if you look at the top of page 7 -- seven

8    United States Senators are listed.

9    A.   Yes.

10   Q.   Then a whole list of third-party contacts.

11   A.   Yes.

12   Q.   And then two media people; right?

13   A.   Yes.

14   Q.   On this page.  And then if you turn to the next page,

15   nine more media people.

16   A.   Right.

17   Q.   None of those media people was David Sanger?

18   A.   No, none of them were David Sanger.  There is a reference

19   to the *New York Times*, but it says the Moscow Bureau.

20   Q.   And do you know where this list came from?

21   A.   It must have come from Rick Gates.  I have no idea.  It's

22   not my document.

23   Q.   Was he sending it to you in the hopes that you would

24   expand your media plan?

25   A.   No doubt he was.

1   Q.   But you didn't do it?

2   A.   Maybe I did, maybe I didn't.  Or maybe I just thought

3   retyping all of this and sticking all of this in the master

4   control grid was probably a little bit flaky, and I would

5   lose the will to live doing it.

6   Q.   Okay.  Do you remember that later in the fall you

7   believed --

8   A.   In the autumn.

9   Q.   In the autumn.  Later in autumn, you had a meeting in

10  Kyiv with Mr. Manafort and Mr. Kilimnik, at which time

11  Mr. Kilimnik seemed to be in a meltdown over this whole

12  project?

13          MR. CAMPOAMOR-SANCHEZ:  Objection --

14          THE COURT:  Let's start with:  Did you have a meeting

15  later in the autumn with Manafort and Kilimnik?

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  And what was Mr. Kilimnik's emotional

18  state at the time?

19          THE WITNESS:  His emotional state was always the

20  same.  He was in a complete panic.  A flap, as we say.

21          THE COURT:  All right.  Ask your next question.

22          BY MR. MURPHY:

23  Q.   And was he in a flap specifically because he thought that

24  when the Skadden Report would be released the Tymoshenko camp

25  would be prepared and would do a total kill?

1    MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

2    question.

3    THE COURT:  Well, was that what he was upset about,

4    the likely reaction?

5    THE WITNESS:  I don't recall specifically, but he was

6    generally in a total flap about how the Tymoshenko people

7    were going to, you know, damage the reputation of the

8    government, you know.  He was a flapper, full stop.

9    BY MR. MURPHY:

10   Q.   Okay.  And his concern was that the release of the report

11   would give a lot of additional ammunition to the Tymoshenko

12   side of the dispute?

13   MR. CAMPOAMOR-SANCHEZ:  Object to the form of the

14   question.

15   BY MR. MURPHY:

16   Q.   Is that right?

17   THE COURT:  Did he express that, that that was his

18   concern?

19   THE WITNESS:  To be honest, Your Honor, I just don't

20   remember the detail of that meeting.  But I would be

21   surprised if he didn't.

22   BY MR. MURPHY:

23   Q.   Let's look next at Defendant's Exhibit 194.

24   Do you have it?  Defendant's 194.

25   A.   Oh, sorry.  Yes.

1    Q.   This was an e-mail that Mr. Manafort send to

2    Mr. Kilimnik, to you, to Mr. Gates.  He copied Mr. Eckart

3    Sager, and he copied Alan Katzman.

4             That name is not familiar to you; is it?

5    A.   No idea.  Maybe it is a pseudonym.

6    Q.   Do you remember there was an Alan Friedman?

7    A.   That's what I wondered.

8    Q.   This is now November the 30th, 2012.  So about seven

9    weeks have passed since the last series of e-mails?

10            THE COURT:  Can I see people very, very briefly at

11   the bench.

12        (At the bench)

13            THE COURT:  I thought we all agreed that the Alan

14   that was listed was just a mistake when you get, like, the

15   first name and the wrong name pops it.  You suggested it was

16   some kind of a pseudonym --

17            MR. CAMPOAMOR-SANCHEZ:  The word pseudonym was used.

18   He was --

19            MR. MURPHY:  Mr. Hawker used the word.

20            MR. CAMPOAMOR-SANCHEZ:  He said maybe it was a

21   pseudonym.

22            THE COURT:  Can I just say that the parties have

23   agreed that is just an error --

24            MR. MURPHY:  We know who it is.  It was supposed to

25   be Friedman.

1          THE COURT:  I know that.  But we don't need to

2     explain who it is, but it's been left like there was

3     something fishy about it.  I would just like to say, that by

4     agreement of the parties, and we all know --

5          MR. CAMPOAMOR-SANCHEZ:  Yes.

6          MR. MURPHY:  Yes.

7          THE COURT:  All right.

8        (In open court)

9          THE COURT:  Members of the jury, I just want to tell

10    you that the parties are agreed that the inclusion of that

11    name that was unfamiliar to Mr. Hawker was actually just an

12    error by Mr. Manafort.

13          I'm sure we've all had that experience where you type

14    a name and the first name populates your e-mail with the full

15    name of not exactly the person you meant to send it to.

16    That's all this is.  And so that name is irrelevant.

17          BY MR. MURPHY:

18    Q.   Okay.  Getting back to Exhibit 194, this was November the

19    30th of 2012; right?

20    A.   Yes, it was.

21    Q.   And Mr. Manafort says that he has edited the OPG package,

22    and "those that I made changes in are attached.  Those not

23    attached must be in compliance with the changes I have made.

24    Jonathan Hawker and Rick Gates are responsible for this to

25    occur."

1    Right?

2    A.   Yes.

3    Q.   And then he makes mention further down to briefings.  You

4    see that?

5    A.   Yes.

6    Q.   And he says, "Once these actions are made, the documents

7    can be translated into Russian and Ukrainian.  Then, meetings

8    between the Veritas team and the relevant offices need to

9    occur to get the perspectives from the Ministry of Justice,

10   the Ministry of Foreign Affairs, and the Office of the

11   Procurator General to the documents, and to make any changes

12   required before going to print for distribution."

13   Right?

14   A.   Yes.

15   Q.   And then he identifies the people that he viewed to be

16   -- or he identifies people on the Veritas team; right?

17   A.   Yes, he does.

18   Q.   And those people are Konstantin Kilimnik, Jonathan

19   Hawker, Rick Gates, Alex van der Zwaan, and Alan Friedman.

20   Right?

21   A.   Yes.

22   Q.   And that team or group of people assembled in Kyiv about

23   10 days later for the distribution of the report; isn't that

24   right?

25   A.   Yes, I remember that now.  Yes.

1    Q.   And on the next page of this exhibit, under "Media," it

2    says, "Jonathan Hawker will be responsible for the initial

3    wave of stories.  It is very important that we have a major

4    U.S. and major European story on this report prepared to

5    publish prior to the official announcement by MOJ."

6         Right?

7    A.   Yes.

8    Q.   He doesn't identify who it is; does he?

9    A.   Not in this, no.

10   Q.   Let me show you next Defendant's Exhibit 196.

11        This is an e-mail, Mr. Hawker, that Mr. Manafort sent

12   to Mr. Kilimnik, with copies to you and Rick Gates.  Right?

13   A.   Yes.

14   Q.   And he is attaching a memo that he tells Mr. Kilimnik,

15   "You should get to Serhiy Lyovochkin this weekend."  Right?

16   A.   Yes.

17   Q.   He says, "missing from it is the name of an outside

18   counsel that Alex is recommending."

19        Right?

20   A.   Yes.

21   Q.   He says, "In addition, also run it by Jonathan Hawker for

22   his input."

23        Right?

24   A.   Yes.

25   Q.   And "I've attached a memo that I sent earlier today,

1  which is the Jonathan Hawker memo to me, on his plan for

2  implementation.  This memo should accompany my memo to Serhiy

3  Lyovochkin so that he has both of them at the same time."

4       Right?

5  A.   Yes.

6  Q.   And Lyovochkin was the Chief of Staff for the President,

7  Yanukovich.

8  A.   Yeah, Manafort's client.

9  Q.   Right.  And attached on page 2 of this exhibit is the

10  memo that Mr. Manafort directed to Mr. Lyovochkin; right?

11  A.   Yes.

12  Q.   On page 3, at the top, he identifies the Veritas briefing

13  team as follows.  Right?

14  A.   Yes.

15  Q.   He says, "1, Jonathan Hawker is the manager of the

16  communications program.  He is the PR consultant who is

17  overseeing the implementation of the communications plan."

18       Right?

19  A.   Yes.  He didn't say spin doctor.

20  Q.   No, he didn't.

21       Item 2, "Konstantin Kilimnik is managing the internal

22  Ukraine coordination."  Right?

23  A.   Yes.  He was in charge of all liaison with all government

24  departments.

25  Q.   Item 3, "Rick Gates is managing the external

1   consultants."

2          Right?

3   A.   Allegedly.

4   Q.   Pardon?

5   A.   Allegedly.

6   Q.   You didn't think he was going to do that?

7   A.   I gave him the nickname for a reason.

8          THE COURT:  All right.  We're being cheeky again.

9          THE WITNESS:  Sorry.  I do apologize.

10          THE COURT:  Let's just try to get through the

11   questions and answers.

12          BY MR. MURPHY:

13   Q.   And item 4, "Alan Friedman is managing the Ministry of

14   Foreign Affairs."  Right?

15   A.   Yes.  He was like embedded to them.

16   Q.   Now, further down, Mr. Manafort lays out the meetings

17   that should happen in order of priority; correct?

18   A.   Yes.

19   Q.   And if you go to item 2, he says that "The MFA" -- that

20   is the Ministry of Foreign Affairs -- "should be briefed and

21   a plan developed for how they will instruct the Ukrainian

22   embassies abroad, brief the foreign embassies in Kyiv brief

23   Barosso, Ashton, Fule, Shultz, Kwasniewski, and Cox and other

24   relevant officials."  And then he says, "I will be handling

25   the USG."

-1437-

1    Do you see that?

2    A.   Yes, I do.

3    Q.   So Mr. Manafort is indicating that he is going to handle

4    contacts with the United States government; right?

5    A.   Yes.

6    Q.   Now, if you turn to page 5 of this memo -- I'm sorry --

7    page 5 of the exhibit -- there's a second memo.  This is the

8    memo that he referred to as a memo to him from you dated

9    November the 30th of 2012; right?

10   A.   Yes.

11   Q.   And in the second paragraph, you say, "The public release

12   of the report prepared by the Skadden Arps law firm will

13   provide an opportunity for the independent endorsement of the

14   government's message that the trial of Yulia Tymoshenko was

15   not politically motivated and that her conviction was based

16   on the evidence before the Court."         Right?

17   A.   Yes.

18   Q.   And that is what you thought the Ukrainian Ministry

19   wanted you to say?

20   A.   Yes.

21   Q.   In your memo to Mr. Manafort, you make reference to the

22   release of the Report by the Skadden firm.  Do you say

23   anything in it about Mr. Craig and his role?

24   A.   I doubt it.

25   Q.   I didn't see it there.  And I was just wondering if you

1    saw something there.

2    A.   I can read the document, but I don't think it is there if

3    you have not seen it.

4    Q.   All right.   Let's take a look at Government Exhibit 317.

5         Are you with me?

6    A.   I am.

7    Q.   Thank you.

8         Exhibit 317 is the e-mail that Mr. Gates sent to

9    Konstantin Kilimnik on December the 5th, with copies to

10   Mr. Manafort and Mr. Hawker, that's you.

11        And Mr. Gates says, "KK, attached is the complete set

12   of documents for the Skadden Report release that includes

13   Paul's edits from last week.  The only new document is the

14   file entitled "Master Control Grid SA Report, which

15   consolidates material and is a cleaner and clearer version of

16   the action items list.  Let me know if you have any

17   questions."

18        Right?

19   A.   Yes.

20   Q.   And then you forwarded this document -- it is the

21   package, right, that was attached --

22   A.   Yes.

23   Q.   -- the whole package.  You forwarded it to      Mr. van

24   der Zwaan; didn't you?

25   A.   Yes, I did.

1    Q.   And you did that on December the 6th, 2012?

2    A.   Yes.

3    Q.   And you sent it to his private e-mail address, not his

4    Skadden e-mail address?

5    A.   That's right.  Rick wanted it to go to -- he wanted

6    pretty much everything to go to private e-mail addresses.

7    Q.   So did Rick Gates tell you to send it to van der Zwaan at

8    his private email address?

9    A.   I'm pretty sure he did.

10   Q.   He didn't tell you to send it to Mr. Craig; did he?

11   A.   No, he didn't.

12   Q.   To the best of your knowledge, Mr. Craig never got this

13   document, did he, to the extent that you have knowledge of

14   that fact?

15   A.   I don't know whether he did or not.

16   Q.   You didn't send it to him?

17   A.   I sent it to who I was told to send it to, and Alex was

18   Skadden.

19   Q.   Alex was the person, though, that you knew from prior

20   experience had done some things that you knew Mr. Craig

21   wasn't aware of?

22              MR. CAMPOAMOR-SANCHEZ:  Objection.

23              THE COURT:  A thing --

24              MR. MURPHY:  Pardon?

25              THE COURT:  A thing that he surmised Mr. Craig wasn't

1    aware of.

2         MR. MURPHY:  Right.

3         THE COURT:  Well, the point is he didn't send it to

4    Mr. Craig, he sent it to Alex van der Zwaan.

5         MR. MURPHY:  Right.

6         THE COURT:  Now you're arguing with him.  Why don't

7    you ask your next question.

8         BY MR. MURPHY:

9    Q.  Mr. Gates told you to send it to Mr. Van der Zwaan, he

10   didn't tell you to send it to Mr. Craig?

11   A.  That's correct.

12   Q.  Now, this document that the government showed you this

13   morning, if we turn to the back of the document, at pages 94

14   and 95 --

15   A.  Yes.

16   Q.  -- the last two pages of the document, this is the

17   revised master control grid.  Right?

18   A.  Yes.

19   Q.  And I think Mr. Campoamor had you look at the legend and

20   saw that Mr. Craig's initials are up there.  Right?

21   A.  Yes.  This is the one produced by Rick, yes.

22   Q.  And if we look at December the 12th, Wednesday -- can you

23   make that a little bigger?

24        Here we go.

25        So the schedule that Mr. Gates put forward in this

1    master control grid said that "On Wednesday, at noon,

2    courtesy calls will be initiated by LT."  That's the local

3    team.  You know who that is?

4    A.   I presume that's me and KK and his people and probably

5    Alan at the Foreign Ministry.  But I'm not entirely sure if

6    there is anyone else.

7    Q.   "The local team, Greg Craig, and the Ministry of Foreign

8    Affairs will announce that the report will be released to

9    selected stakeholders."

10            Right?

11   A.   Yes, that's what it says.

12   Q.   And "The list will include the following individuals:

13   Barosso, Fule, Shultz, Obama, Boehner, and Reid.

14            Do you see that?

15   A.   I do.

16   Q.   Now, that is a reference to President Barack Obama;

17   right?

18   A.   Yeah, I guess it must be.

19   Q.   And John Boehner, who was then the Speaker of the House;

20   right?

21   A.   I have no idea.  I have never heard of him.

22   Q.   Never heard of Mr. Boehner?

23   A.   No.

24   Q.   There's a Harry Reid, who was the, I think, the Majority

25   Leader in the Senate at that time.

1   A.   I have not heard of him, either.

2   Q.   Okay.

3   A.   I know Barosso and Shultz.

4   Q.   You knew the Europeans?

5   A.   I know the Europeans, and I obviously know Obama.

6   Q.   In this same box, Mr. Gates has "the report being given

7   to David Sanger of the *Times,* who will have an exclusive on

8   the material for 24 hours.  Greg Craig will give an" --

9   on-recorder -- probably misspelled -- "interview with the *New*

10  *York Times*.  Sanger will write the article to be placed in

11  the *Times*, and that will be released Thursday morning at

12  midnight."

13           Right?

14  A.   Yes.

15  Q.   Mr. Gates is making a lot of assumptions in that little

16  box; isn't he?

17           MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

18  question, what somebody else is assuming.

19           THE COURT:  Mr. Gates wrote this, you didn't write

20  this?

21           THE WITNESS:  Mr. Gates wrote this, Your Honor.

22           THE COURT:  All right.  What's your question?

23           BY MR. MURPHY:

24  Q.   And he is assuming that Mr. Sanger will take something

25  and turn around and write an article and deliver the article

1443

1     or release the article by Thursday morning, midnight; right?

2          MR. CAMPOAMOR-SANCHEZ:  Objection.

3          THE COURT:  Well, we have been looking at these

4     plans.  I think he has said what these plans are.  So what

5     does this mean?

6          THE WITNESS:  This is definitely an assumption and a

7     hope, Your Honor.

8          BY MR. MURPHY:

9     Q.   If you look further down on A Day, the next day -- what

10    did A Day stand for, by the way?

11    A.   It was short for announcement.  There is nothing rude

12    about it.

13    Q.   Okay.  It is not D Day either; right?

14    A.   No.  No.  I think that was . . .

15    Q.   At 11:00, Mr. Gates' plan says, "There will be phone

16    calls, meetings between Greg Craig and the agreed phase one

17    stakeholders in the EU and the U.S., as outlined in the key

18    stakeholders list."

19         And the main EU targets are those European

20    politicians, and the main U.S. contacts are including

21    President Obama, Speaker Boehner, and Majority Leader Reid.

22    Right?

23    A.   Yes.

24    Q.   Aspirational?

25    A.   Oh, totally.

1444

```
 1    Q.   Let's take a look at 318.
 2              This is an e-mail that you sent to Mr. Gates on
 3    December the 6th, in which you say, "Everything's gone to
 4    Alex's e-mail.  Can't get hold of Greg yet."
 5              Right?
 6    A.   It's gone to his gmail.
 7    Q.   gmail, I'm sorry.  His private account?
 8    A.   Exactly.
 9    Q.   You're letting Mr. Gates know you sent it to Alex van der
10    Zwaan's private account?
11    A.   At instructed.
12    Q.   As instructed.
13              And you say, "I can't get hold of Greg yet."  Right?
14    A.   Yes.
15    Q.   Let me show you the next exhibit, 319.
16              Now, this document is a message to Mr. Craig from --
17              MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.
18    Mr. Hawker is not in this e-mail.  We don't object to the
19    exhibit.
20              THE COURT:  He can't testify about it.  He doesn't
21    know anything about this.  I think you showed him documents
22    where he was told when it was going to be released.
23              BY MR. MURPHY:
24    Q.   Let me ask you:  Do you remember that you called for
25    Mr. Craig on December the 6th?
```

1    A.   Yes, sir.  I tried to get hold of Mr. Craig.

2    Q.   And do you recall that he wasn't in when you called?

3    A.   I do.

4    Q.   Do you recall that he didn't get back to you that day?

5    A.   I don't.

6    Q.   Did you leave a message for a secretary that the report

7    release will be definitely next week?

8    A.   I think I did.

9    Q.   Let's take a look at Government Exhibit 322.

10        THE COURT:  Mr. Murphy, how much more time do you

11   have?  I think it might be time for a break unless you're

12   close to the end.

13        MR. MURPHY:  I think about an hour, maybe less.

14        THE COURT:  All right.  I think it is a good time for

15   a break.

16        Members of the jury, we are going to take the

17   promised mid-afternoon break.  I ask you to please not

18   discuss the case with each other or with anyone else.  And we

19   will resume in approximately 10 minutes.

20        Thank you.

21     (Jury not present)

22        THE COURT:  All right.  All of you, including the

23   witness, are excused for an approximately 10-minute break.

24        Perhaps some of that time could be spent thinking

25   about whether an hour is necessary.  I think --

1    MR. MURPHY:  I think it is less, Your Honor.

2    THE COURT:  There has been a fair amount of

3    repetition.

4    MR. MURPHY:  I think it's less.

5    THE COURT:  So that would be great.  Okay.  Thank

6    you.

7    (Jury not present)

8    THE DEPUTY CLERK:  Your Honor, re-calling criminal

9    Case Number 19-125, United States of America versus

10   Gregory B. Craig.

11   THE COURT:  You can continue.  Let's bring the jury

12   in.

13   (Jury present)

14   THE COURT:  Mr. Murphy, you may proceed.

15   MR. MURPHY:  Thank you, Your Honor.

16   BY MR. MURPHY:

17   Q.   Mr. Hawker, I would like you to look next at Government's

18   Exhibit 323.

19   Do you have it?

20   This is an e-mail chain that begins on the bottom

21   with Mr. Gates' e-mail to Mr. Kilimnik, Mr. Manafort,

22   Mr. Hawker that we have just looked at, attaching the

23   complete set of documents for the release, and then you

24   forwarding it to Mr. van der Zwaan.  Mr. van der Zwaan

25   says -- you asked him, "I gather we'll be seeing you next

1   week."

2   A.   Yes.

3   Q.   Do you see that?

4        You expected that Mr. van der Zwaan may be coming to

5   Kyiv?

6   A.   Yes.

7   Q.   And he responded back to you on the 6th, "Thanks

8   Jonathan.  You will if Rick clears it with Greg.  Hope all is

9   well in the rundown to the big day."

10       Right?

11   A.   Yes.

12   Q.   Then, let's look at Exhibit 328.

13       Now, this is December the 10th of 2012; right?

14   A.   Yes.

15   Q.   You are in Kyiv.

16   A.   I am in Kyiv.

17   Q.   You have an understanding that you're going to be

18   reaching out to Mr. Sanger; right?

19   A.   Yes, I do.

20   Q.   Had you had a conversation with Mr. Craig about that or

21   not?

22   A.   I don't recall.

23   Q.   You don't know whether you talked to him or not?

24   A.   I honestly don't.

25   Q.   Okay.  And when you needed to get the phone number and

1    e-mail address for Mr. Sanger, you didn't call Mr. Craig; did

2    you?

3    A.   No, I called my colleague.

4    Q.   You called one of your colleagues in New York City?

5    A.   I didn't call, actually.  I e-mailed.

6    Q.   You e-mailed Grace Reynolds in New York, and you said,

7    "Could you get me some numbers for David Sanger, the

8    Washington Bureau Chief of *The New York Times*, please."

9         Right?

10   A.   Yes.  That's her job.

11   Q.   You could have called Mr. Craig.

12   A.   I'm sure that would have gone down well.  You know, Greg

13   is too important to ask him for a telephone number.

14   Q.   He is too important and too busy to talk to you about the

15   outreach to Mr. Sanger?

16   A.   Well, I just needed a telephone number.  My colleague has

17   a database.  It takes two minutes.

18   Q.   You needed a telephone number because you didn't have one

19   for Mr. Craig; did you?

20   A.   I'm sorry?

21   Q.   You didn't have Mr. Sanger's number from a conversation

22   that you had with Mr. Craig?

23   A.   Oh, I did not.  I definitely did not have it from

24   Mr. Craig.

25   Q.   All right.  Then, if we look at Exhibit 332, this was the

1   e-mail at the bottom of this exhibit, carrying over to the

2   next page, that you sent to Mr. Sanger on December the 10th

3   of 2012.  Right?

4   A.  Yes, it is.

5   Q.  Shortly after you got the e-mail address from your

6   colleague in New York, you e-mailed Mr. Sanger?

7   A.  Yes.

8   Q.  And at the end of your e-mail message to Mr. Sanger, you

9   said, "The report reviews the prosecution of Tymoshenko and

10  considers some of the international concerns about that

11  prosecution:  whether it complied with international

12  standards and whether the prosecution was politically

13  motivated."

14          That's what you said; right?

15  A.  Yes.

16  Q.  Did you have it in your mind at the time, sir, that the

17  Skadden Report says that they did not analyze whether or not

18  the prosecution was politically motivated?

19  A.  Sorry.  Can you repeat that question?

20  Q.  Did you have it in your mind when you wrote this e-mail

21  that the Skadden Report expressly did not opine on whether

22  the prosecution was politically motivated?

23  A.  I wrote what I understood to be right.

24  Q.  All through this period of time, did it not dawn on you,

25  sir, that the one thing that the Skadden folks kept saying

1    was that we are not reaching an opinion, in fact we are not

2    looking at the question of political motivation?

3              MR. CAMPOAMOR-SANCHEZ:  Objection to the form.

4              THE COURT:  Okay.  This simply says, "The report

5    considers whether."  It doesn't say whether it reached an

6    answer.  And you can ask him if he knows if it said anything

7    one way or the other about it, but you keep characterizing

8    the report and asking him if his characterization agrees with

9    your characterization, and I think you need to ask him what

10   he knows or ask him facts.

11             BY MR. MURPHY:

12   Q.   Mr. Hawker, when you reached out to Mr. Sanger, did you

13   have a copy of the report in front of you?

14   A.   I didn't, I don't think.

15   Q.   Were you aware when you wrote to him what the executive

16   summary of the report said?

17   A.   I would have read it, you know.  But this is just

18   reaching out to a journalist to say, this is the area that

19   this report goes into.  You interested?  This is not a "this

20   is what the report is about."  It is "this is the area."  And

21   so, he was going to speak to Greg, and Greg was going to talk

22   to the report.  And frankly, he can do it far better than I

23   can.  And if anyone knows whether it is about political

24   motivation, Greg will sort it out.

25   Q.   Would it be fair to say that what the Report exactly said

1    about that subject was not top of mind when you were writing

2    Mr. Sanger?

3    A.   I didn't include the report in the e-mail.  186 pages is

4    a lot of stuff.

5    Q.   Okay.  You mentioned that you were -- well, Mr. Sanger

6    says he was confused, and then you were confused about the

7    fact that someone had reached out to Mr. Sanger several weeks

8    or a month before; right?

9    A.   I think we were both very confused.

10   Q.   You don't know who reached out to Mr. Sanger; do you?

11   A.   I have no idea.

12   Q.   And you were pleased when you sent this e-mail string on

13   to Mr. Craig that Mr. Craig took it off your plate?

14   A.   I was delighted.  You know, he knew him, you know.

15   They're from the same country, you know.  It is just easier,

16   isn't it?  They're talking the same language for a start.

17   Q.   Let's look at Exhibit 351.

18              THE DEPUTY CLERK:  Government or defense?

19              MR. MURPHY:  Government Exhibit 351.

20              BY MR. MURPHY:

21   Q.   This is Mr. Craig's e-mail to Mr. Sanger saying, "David,

22   I just learned that the Ukrainians intend to release our

23   report about the Tymoshenko case on

24   Thursday -- finally -- and that the Ukrainians have

25   determined that you should be given first look at it.  Is

1    this something that you are truly interested in and have the

2    time for?"

3         Right?

4    A.   Yes.

5    Q.   And Mr. Craig said, "I have always assumed that

6    these days your time would be taken up selecting our new

7    Secretary of State."

8         Did you know at that time?

9         THE COURT:  Did you know what that meant?

10        THE WITNESS:  I knew that a Secretary of State was

11   like our foreign secretary, but I didn't know about the

12   process.

13        BY MR. MURPHY:

14   Q.   Did you know that Mrs. Clinton was stepping down and

15   somebody else was going to replace her?

16   A.   No.  I might have known at the time.

17   Q.   And Mr. Craig said, "But if you are interested, I would

18   be happy to get you a copy (all 186 pages of it) and even

19   happier to talk to you about it."

20        Right?

21   A.   Yeah.

22   Q.   And this was not consistent with what you thought was

23   going to happen as part of the plan; isn't that right?

24   A.   No.  Because the plan was that I would engage in the way

25   that I did and, hopefully, he would come back and say, yes,

1    I'm really interested, it sounds fascinating, I'd love to

2    talk to Greg.  And I'll say, well, you know, let me put you

3    two together, and you can have a discussion.  And I would

4    send the report to the journalist.

5    Q.  And you also thought you would be sending your talking

6    points to the journalists; right?

7    A.  No.  You don't send talking points to journalists.

8    Talking points are for use by interviewees.  But Mr. Craig

9    didn't need the talking points because he had always said he

10   would talk to the report.  You know, he didn't need any help

11   from me, did he?

12   Q.  He didn't ask for any help from you?

13   A.  I don't recall him ever asking for help.

14   Q.  And you didn't offer him any help?

15   A.  Don't offer what they don't need.

16   Q.  He didn't tell you what he was going to say to

17   Mr. Sanger?

18   A.  No.  Didn't ask.

19   Q.  Same thing with Mr. Parfitt; when he spoke to Mr. Parfitt

20   from *The Daily Telegraph*, he didn't tell you what he was

21   going to say to Mr. Parfitt?

22   A.  No.  And I deliberately left it to him.  Normally, in PR

23   you would sit on the call to monitor the call between the

24   journalist and the interviewee to seek to control it, and I

25   didn't.  I just left him to it.

1    Q.   So you didn't control Mr. Craig in any way?

2    A.   Well, obviously, we have already had my evidence about

3    tweaking one of his quotes.  And yes, of course, that does

4    control.

5    Q.   He didn't know you were going to tweak one of his quotes;

6    did he?

7    A.   No.

8    Q.   In fact, you thought, in your words, if he finds out, he

9    might be pissed?

10   A.   Well, as you said yourself, not so long ago the

11   relationship was a bit prickly.  This is a man who corrected

12   my use of the word "all" in a sentence in one of his

13   corrections.  He was picking up on quite a lot of errors,

14   which is fair enough, but it didn't feel like an easy

15   relationship.

16   Q.   Okay.  So even on December 10th and 11th, you didn't

17   think you had an easy relationship with Mr. Craig; did you?

18   A.   I thought it was improving, actually.

19   Q.   The next day, if we look at Exhibit 353, Mr. Craig had

20   forwarded his message to Mr. Sanger to you.  You thanked him.

21   You asked whether -- if he didn't get back by 1500 hours -- I

22   assume that is 3:00 in the afternoon -- it might be best to

23   speak to your *Post* contact.  Right?

24   A.   That's right.

25   Q.   You don't know who the *Post* contact is; do you?

1    A.   I have no idea.

2    Q.   Did Mr. Gates tell you that Mr. Craig had a *Post* contact?

3    A.   Yes, he did.

4    Q.   And Mr. Craig's response to you when you asked that

5    question was, "We are on it."  Right?

6    A.   Yes.

7    Q.   Basically, he is saying, Jonathan, don't worry, I'm

8    handling it.  Right?

9    A.   That's what I understand "We are on it" to mean.

10   Q.   And then let's look at Exhibit 354.

11        This is further communications about the same

12   exchange.  You wrote to Mr. Craig again on December the 11th.

13   And you said, "Thank you.  They are pressing me for

14   reassurance here, so any update would be very welcome.  I

15   hope the chat goes well."

16        And you're referring to a chat I guess between

17   Mr. Craig and Mr. Sanger.

18   A.   That's right.

19   Q.   The people that were pressing you for reassurance, was

20   that Kyiv-based team, right, that was assembled in Kyiv?

21   A.   This would have been Rick Gates and Konstantin Kilimnik,

22   who were both very excited.

23   Q.   They were both with you in Kyiv?

24   A.   I don't remember.  I don't remember.

25   Q.   Were Alan Friedman and Eckart Sager involved in

1456

1     monitoring what was going on with *The New York Times*?

2     A.   Not that I'm aware of.

3     Q.   But as you described it, the Manafort people were getting

4     a little flappy?

5     A.   Oh, yeah.

6     Q.   And you were surprised to find out that Mr. Craig was

7     actually taking charge of getting a copy of the report to

8     Mr. Sanger and delivering it?

9     A.   I was really surprised.

10    Q.   Let's look at Exhibit 360, government Exhibit 360.

11         Mr. Gates apparently was again asking you to reach

12    out to Mr. Craig and find out where things stood with *The New*

13    *York Times*.

14         Right?

15    A.   Yes.

16    Q.   And Mr. Craig responds to you and he says, "We told

17    Sanger that it was his if he wanted to use it.  He agreed to

18    get back to us with an answer tomorrow.  Tomorrow is not too

19    late for Al Hunt or the *Post*.

20         Right?

21    A.   That's what he says.

22    Q.   He's basically saying --

23    A.   Chill out.

24    Q.   Chill out, keep your shirt on.  Right?

25         Do you agree with that?

1    A.    Yes.  That is what I was saying, too, to Mr. Gates.

2    Q.    Okay.  Now, there's been some testimony about Mr. Craig

3    talking to Mr. Parfitt at *The Daily Telegraph*.

4    A.    Yes.

5    Q.    Let's take a look at Defendant's Exhibit 212.

6    A.    Yes.

7    Q.    You with me?

8          On December the 11th, you wrote to Mr. Fletcher at

9    *The Daily Telegraph* --

10   A.    That's right.

11   Q.    -- who is someone that you knew; correct?

12   A.    Very well, yes.

13   Q.    And you said, "Hope all's well.  I'm after a favor.

14   Could you introduce me to Tom Parfitt so that I'm not

15   starting from scratch with him.  I want to offer him an

16   exclusive on the Tymoshenko case.  Need to speak to him today

17   so I can send him a report if he is interested."

18          That's what you said; right?

19   A.    It is.

20   Q.    You didn't know Mr. Parfitt; did you?

21   A.    I didn't, actually.  He was -- no, I think he had just

22   moved to Moscow.  But I knew Mr. Fletcher.

23   Q.    Now, let's look at Government's Exhibit 364.

24          On December 12th, you sent an e-mail to Mr. Craig

25   saying, "Tom Parfitt of *The Daily Telegraph* will call very

1    shortly.  He's a very nice bloke.  He will certainly ask you

2    about the difference between selective and political

3    prosecution, by the way."

4          Right?

5          Now, you referred to Mr. Parfitt as "a very nice

6    bloke," but you didn't know him?

7    A.   No.  I had a chat with him.  That's the seeding.

8    Q.   You had a preliminary chat with him?

9    A.   Yes.

10   Q.   And from that, you're telling Mr. Craig he's "a very nice

11   bloke."

12   A.   Yes.

13   Q.   Let's look at Defendant's Exhibit 226.

14         This is an e-mail exchange between you and Rick Gates

15   on December the 12th; right?

16   A.   Yes, it is.

17   Q.   And the subject matter is "Answers to *The Daily*

18   *Telegraph*."  Right?

19   A.   Yes.

20   Q.   Mr. Parfitt had sent you or given you in some form a

21   series of questions about the Skadden Report.  Right?

22   A.   Yes.

23   Q.   And the first question was:  "What would you like to

24   highlight in the report?"

25   A.   Yes.

1  Q.  And your answer was:  "The Skadden Report's findings

2  discredit Tymoshenko's accusation that the case was

3  politically motivated and that the Judge made his decision

4  based on orders from the political system, not on the record

5  presented in the court.  Skadden found that the decision of

6  the Court was based on facts presented on the record and that

7  Tymoshenko did not present any evidence of 'selective

8  prosecution.'  These two findings establish the fact that

9  there is no basis to claim that President Yanukovych

10  influenced the Court to find Tymoshenko guilty."

11       That's what you wrote; right?

12  A.  Yes, it is.

13  Q.  And that is the Paul Manafort spin on how to best present

14  the Skadden conclusions; isn't it?

15       MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

16  question.

17       THE COURT:  I think we saw something like that in a

18  document earlier from Mr. Manafort.

19       You can answer the question if you can.

20       THE WITNESS:  I can't say if it is, but I suspect

21  that it probably is.

22       BY MR. MURPHY:

23  Q.  And you sent this set of answers to *The Daily Telegraph*

24  to Mr. Gates for him to look at it before you talked to

25  Mr. Parfitt; right?

—1460—

1 A. Yeah. I wanted it to be considered by the client, to

2 make sure that they were happy, before I issued it to *The*

3 *Daily Telegraph* on behalf of the Minister of Justice.

4 Q. There was a question number 4 on page 3 of this document.

5 The question was: "Do you believe that Tymoshenko was fairly

6 tried?"

7    The answer that you proposed was: "Absolutely. The

8 report clearly states that the Judge based his decision on

9 the evidence before the court."

10    Right? That's what you said?

11 A. Yes.

12 Q. You didn't make any mention of the procedural due process

13 findings that Skadden had articulated in the Report; did you?

14 A. I reflected the position of my client --

15 Q. Okay.

16 A. -- as is my role.

17 Q. Now, let's look at Defendant's 227.

18    This is your e-mail to Mr. Parfitt that same day

19 about an hour and 15 minutes later, after your e-mail to

20 Mr. Gates. Right?

21    Is that a yes?

22 A. You know, I presume so. I didn't see the times.

23 Q. Well, the e-mail to Mr. Gates was at 3:06, whatever time

24 zone we're in, and the e-mail to Mr. Parfitt is at 4:23.

25 A. That's fine.

1461

1    Q.   Okay.  Now, what you said is "Tom, Oleksandr Lavrynovych,

2    Minister of Justice, has approved the following answers to

3    your questions.  Let me know if you're happy with these."

4         Right?

5    A.   Yes.

6    Q.   Had you spoken to Mr. Lavrynovych?

7    A.   No, I wouldn't.  He didn't speak English.  I reported to

8    Gates, and then that took place.

9    Q.   To your knowledge, did Mr. Gates talk to Minister

10   Lavrynovych?

11   A.   No.  The person who would speak would be Konstantin

12   Kilimnik usually.

13   Q.   So Mr. Kilimnik, was he the person who approved these

14   statements, or was it Mr. Gates?

15   A.   I have no idea.

16   Q.   You don't know, but you told Mr. Parfitt that the

17   statements have been approved by the Minister, Alexander

18   Lavrynovych; right?

19   A.   I was told the statements were approved.  And on that

20   basis, you go with them.

21   Q.   Now, let's look at Exhibit 228.

22        This is also dated December the 12th, 2012.  It is an

23   e-mail to Mr. Gates, and it is a draft of the news release.

24   Right?

25   A.   Yes.

1462

1    Q.   Okay.  And you said to Mr. Gates, "As per your

2    instructions, here's the release with tracked changes, and

3    the answers attributed to Lavrynovych have gone to the

4    *Telegraph*."

5           Right?

6    A.   Yes.

7    Q.   And the draft press release is one that you prepared;

8    isn't it?

9    A.   It is.

10   Q.   And it says in the fourth paragraph, "This report

11   published today on the Ministry's website without amendment

12   concludes as groundless that Yulia Tymoshenko's claims that

13   her prosecution was politically motivated and states that she

14   has provided no factual evidence that would be sufficient to

15   overturn her conviction under European or American

16   standards."

17          Right?

18   A.   Yes.

19   Q.   That's not a fair summary of the Skadden Report

20   conclusions; is it?

21          MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

22   question.

23          THE COURT:  First of all, I don't know what the first

24   box is up at the top.  You were reading this one.  So what is

25   that that just appeared at the top of our screen?

1    MR. MURPHY:  It's Ukrainian.

2    THE COURT:  There's two boxes.  One says, "This

3    report, published today, was the paragraph that you called

4    out" --

5    MR. MURPHY:  Yes.

6    THE COURT:  What is the other box?  Why are we being

7    shown it at this moment?  You just didn't read it.  Is it

8    also from the press release?

9    MR. MURPHY:  Sure.

10    THE COURT:  What are you asking him about?

11    MR. MURPHY:  I'm asking you whether the statement

12    that you drafted for this press release was consistent with

13    the conclusions of the Skadden Report.

14    THE COURT:  Can we break this up?  We now have two

15    statements, which have multiple clauses in them.  So you can

16    ask him if, in his view, they were consistent with the

17    report.

18    MR. MURPHY:  Mr. Hawker --

19    THE COURT:  Or he understood them to be, or whatever

20    you want to ask him.  But you can't ask him 10 statements and

21    ask him were they consistent.  There is one up there that you

22    didn't read him.  I don't know why that one is up there.

23    MR. MURPHY:  I don't know why the tech person put

24    that one up there.

25    THE COURT:  All right.  Can we take it off.  It's

1    confusing.

2            MR. MURPHY:  I didn't know what you meant, Your

3    Honor.  I'm sorry.  I'm looking at the document rather than

4    the screen.

5            THE COURT:  I understand.

6            All right.  Now we're all talking about the same

7    sentence, and the sentence has multiple clauses.  You can ask

8    him a question about that sentence.

9            BY MR. MURPHY:

10   Q.  When you wrote that "This report concludes as groundless

11   Yulia Tymoshenko's claims that her prosecution was

12   politically motivated," you knew that that was not consistent

13   with the Skadden Report; didn't you?

14   A.  I understood that this was the position of the Ukrainian

15   parties, the government parties, and their view of the

16   conclusions of the report, which is why it is as it is.

17   Q.  That really wasn't the question I asked you, though, Mr.

18   Hawker.

19           MR. CAMPOAMOR-SANCHEZ:  Objection.  He answered the

20   question.

21           THE COURT:  All right.  Let's just not quibble about

22   it.  If you want to rephrase your question, that's fine.

23           BY MR. MURPHY:

24   Q.  You knew that the Skadden Report did not make any such

25   conclusion that her claims of political motivation were

1    groundless; didn't you?

2    A.    Is it the word "groundless" you're objecting to?

3    Q.    Groundless, prosecution politically motivated.  Those are

4    the words.

5    A.    This is a restatement of the Ukrainian position using

6    slightly different language to the language of the report.

7    But this is a statement of the position of the Ukrainian

8    government within a draft news release for the Ministry of

9    Justice of Ukraine.

10   Q.    Okay.  The next paragraph says, among other things, "The

11   Skadden, Arps Report shows how Yulia Tymoshenko overstepped

12   her authority and committed this crime."

13          You knew, didn't you, that the report did not make a

14   conclusion about whether or not she was guilty of the crime?

15   A.    All of these points came from the talking points, the

16   messaging documents that had been in review and subject to

17   scrutiny and discussion.  And the way this document came

18   together is that those points were put in and just run

19   together.  So all of this is taken from materials that have

20   been very heavily circulated.

21   Q.    They were heavily circulated to Mr. Gates and

22   Mr. Manafort; right?

23   A.    Yes.

24   Q.    They weren't circulated to Mr. Craig; were they?

25   A.    Some documents were, but I don't know which ones were and

-1466-

1    weren't at this point.

2    Q.   Are you aware of any document that was circulated to him

3    after September 23rd, 2012?

4    A.   The ones that he responded to and corrected, yes.

5    Q.   And that was on September the 25th; right?

6    A.   Yes, I think it was.

7    Q.   After that, you didn't circulate anything to Mr. Craig;

8    did you?

9    A.   Well, he didn't need them.  He didn't need me.  He was

10   going to talk to the report.  He didn't need me to tell him

11   what to say.  Frankly, he wouldn't have accepted that anyway,

12   quite rightly.  And these documents were documents for the

13   Ukrainian parties, not for Mr. Craig.

14   Q.   Okay.  Now, let's take a look at Defense Exhibit 504,

15   which I will have to give you a handwritten copy of.  I'm

16   sorry.  Physical copy.  Hard copy.

17   A.   Thank you.

18   Q.   Thank you, Mr. Abelson.

19            Exhibit 504 for identification, Mr. Hawker, is that

20   an e-mail that you received from Rick Gates on December the

21   12th, 2012?

22   A.   It's an e-mail to Alan that I am copied in on.

23            MR. MURPHY:  Okay.  I move the admission of Exhibit

24   504.

25            MR. CAMPOAMOR-SANCHEZ:  No objection.

1    THE COURT:  All right.  It will be admitted.

2    (Defendant 504 admitted in evidence)

3    BY MR. MURPHY:

4    Q.  So this is an e-mail chain, if we get it up on the

5    screen -- and the jurors have it -- e-mail exchange between

6    you and some other people who were part of the team in Kyiv

7    on December the 12th.

8    A.  It's not an exchange from me.  It's me being copied in on

9    an e-mail exchange between others.

10   Q.  Okay.  So a person named Oleg Voloshyn was identifying

11   for Mr. Gates the name of a reporter in Poland.  Right?

12       At the bottom.  From Oleg Voloshyn to Rick Gates.

13   A.  Right.  Okay.

14   Q.  You see that?

15   A.  Yes.

16   Q.  And Mr. Friedman asked the question -- and you were

17   copied on this e-mail -- "So will Alex be able to brief the

18   reporter?"

19       Do you see that?

20   A.  I don't.  Where is it?  I'm sorry.  I got it.  I have

21   seen it, yes.

22   Q.  This is again one of these e-mail tos and froms that are

23   written in Ukrainian, it appears.

24   A.  Yes.

25   Q.  But it looks like it is Alan Friedman, Rick Gates, with

1    copies to Sager, Konstantin Kilimnik, and yourself; right?

2    A.   Yes.

3    Q.   So the question asks, "So will Alex be able to brief the

4    reporter?"

5            Right?

6    A.   Yes.

7    Q.   And Konstantin Kilimnik writes, "Is there any reason why

8    not?"

9            Right?

10   A.   Yes.

11   Q.   And then Mr. Friedman said, "I'm not sure he got

12   permission."

13           Right?

14   A.   Right.

15   Q.   Mr. Gates responds, "He got a no from Greg on media."

16           Now, that is a reference to Mr. Craig; right?

17   A.   It is, yes.

18   Q.   And Gates said, "I will write to Greg now and see if we

19   can get an exception based on proximity, etc."

20           Do you see that?

21   A.   Yes.

22   Q.   Do you know whether Mr. Gates ever wrote to Mr. Craig to

23   ask about that question?

24   A.   I have no idea.

25   Q.   Do you know whether or not Mr. van der Zwaan gave

1    briefings to any reporters in Poland?

2    A.   I don't think he did.

3    Q.   Now, let's look at Exhibit 384, Government Exhibit 384.

4         This is Mr. Gates' e-mail in the middle of the

5    page --

6    A.   Yes.

7    Q.   -- on the 13th of December, which is I guess just prior

8    to the release of the report.  Right?

9    A.   It is hard to know whether those are the right timings,

10   but it's in the manner.

11   Q.   It is on or about the time when the report is about to be

12   released or maybe it had just been released; correct?

13   A.   Yes.  It could have been just after.  I just don't know.

14   Q.   And the people that Mr. Gates copies on this are

15   Manafort, Kilimnik, Sager, Friedman, and yourself.

16   A.   That's correct.

17   Q.   You're all part of this Kyiv team; right?

18   A.   Well, we're all responsible for the bits that you spoke

19   about earlier.

20   Q.   And he says, "Here is an update as of 8 a.m. Ukraine

21   time.  Below are two articles thus far that have been

22   published in *The New York Times* and *The Telegraph*.  Overall,

23   the strategy of targeting a few select journalists was

24   absolutely the right one."

25        That's what he said; right?

1    A.   Yes.

2    Q.   "There are good quotes on selective prosecution in the

3    articles," he said.

4    A.   Yes.

5    Q.   "My only disappointment is one of Greg Craig's quotes in

6    *The New York Times* article, but that was part of the strategy

7    in using him via *The New York Times*.  He is much more direct

8    and positive on the same matter in *The Telegraph* article."

9         That's what he says; right?

10   A.   That's what he says.

11   Q.   "And we are getting ready to release the statement and

12   the report.  More coverage coming."

13        Right?

14   A.   Yes.

15   Q.   The headline in *The New York Times*, "Failings Found in

16   Trial of Ukrainian Ex-Premier," is not exactly the message

17   that the Ukraine Ministry of Justice wanted to go out; is it?

18   A.   No, it isn't.

19   Q.   And I think you said in your e-mail to Mr. Gates, "These

20   quotes in *The Telegraph* also were not massively helpful, but

21   I changed them."

22        Right?

23   A.   Yes.

24   Q.   Was "not massively helpful" a bit of an understatement?

25   A.   In what sense?

1    Q.   Well, weren't they really, the quotes by Mr. Craig in *The*

2    *Telegraph*, also kind of the opposite of what the Ukraine

3    wanted to say about the report?

4    A.   Not entirely, no.  I thought that he gave a very

5    even-handed, you know, position, which is, you know, talking

6    to this independent report.  And so there was a bit of both.

7    Q.   Let's look at the headline of *The Telegraph*.

8    A.   Headline of *The Telegraph*?

9    Q.   Which is on the --

10   A.   Yeah.

11   Q.   You're there.  I don't know which page it is.

12   A.   Yeah.  Yeah.

13   Q.   Okay.  Can we bring that up, John?  It should be the

14   third page.

15   A.   It is on the same exhibit further down.

16   Q.   Exhibit 384, page 3.

17        Can we blow up the headline beneath *The Telegraph*.

18        It reads, "Trial of Ukraine's Tymoshenko Flawed Says

19   Government-Commissioned Report."

20        Right?

21   A.   Yes.

22   Q.   Somewhat akin to the headline that you had concocted when

23   you did your worst-case scenario; wasn't it?

24   A.   It wasn't me.

25   Q.   Pardon?

1    A.   It wasn't me.

2    Q.   What wasn't you?

3    A.   That put that headline in.

4    Q.   You didn't get to write the headline for *The Daily

5    Telegraph*; did you?

6    A.   No.

7    Q.   After Mr. Parfitt spoke to Mr. Craig and wrote an

8    article, that's the headline; isn't it?

9    A.   Yes.  And it does take you a little bit back to my

10   worst-case scenario, but Ukraine was happy despite the

11   headlines because there were some positive elements within

12   the story, both stories, and there was more balance they felt

13   than they ever experienced.  And that's why Rick Gates was

14   very pleased.

15   Q.   The first line of *The Telegraph* article reads, "The

16   trial" -- although it says here "trail" -- "The trial of

17   Ukraine's firebrand former prime minister, Yulia Tymoshenko,

18   was flawed and would not have passed muster in a western

19   court, according to an independent report on her trial seen

20   by" the Ukraine government's -- I'm sorry.  There must be

21   something missing.

22   A.   Yes, "seen by *The Daily Telegraph*."

23   Q.   Okay.  And it says, "Ukraine's government commissioned a

24   dossier from a team of U.S. lawyers in April in preparation

25   for its defense in the European Court of Human Rights, where

1    Ms. Tymoshenko was appealing her controversial jailing for

2    seven years for abuse of office.  Analysts say the government

3    hoped to justify the conviction, but ministers in Kyiv will

4    be forced to fight off fresh calls for Ms. Tymoshenko's

5    release today, after the report leaked to *The Daily Telegraph*

6    ahead of its publication this morning that *found that she was*

7    in parts tried unfairly."

8          Right?

9    A.  Yes.

10    Q.  And then it quotes Mr. Craig, identifies him as former

11    White House counsel, lead author of the report, and the quote

12    is, "We concluded that there were ways in which Tymoshenko

13    was not given a fair trial.  She was not allowed to present

14    all the witnesses that we concluded were relevant and

15    material.  And prosecutorial evidence was presented during

16    proceedings in court when she was not represented by

17    counsel."

18          Right?

19    A.  Yes.

20    Q.  And those are the two principal findings of due process

21    violations that the Skadden Report found concerning her

22    trial; correct?

23    A.  Yes.  So they certainly weren't misled.

24    Q.  And I'm a little confused about your reference to having

25    changed some of the quotes in the *Telegraph* story.  How did

1    you go about doing that?

2    A.   I spoke to the journalist.

3    Q.   So you asked Mr. Parfitt to change some of Mr. Craig's

4    quotes?

5    A.   I asked him to include a couple of positive elements in

6    the story.

7    Q.   When you say "positive elements," you mean more positive

8    pro Ukraine Ministry of Justice elements?

9    A.   Balancing elements.

10   Q.   So you thought that the way that Mr. Parfitt wrote the

11   report, the article, after he spoke to Mr. Craig was leaning

12   too far towards the Tymoshenko point of view, and you wanted

13   some more information from the report that might support the

14   government's position?

15   A.   Just as, you know, when I said to KK that, you know,

16   there were dangers for the media, this is the reality, and so

17   I needed to ensure that there was something there that

18   Ukraine, the client, could seize onto.

19   Q.   And you never told Mr. Craig that you had changed some of

20   the emphasis of the statements that he had made to *The Daily*

21   *Telegraph*; did you?

22   A.   I didn't speak to Mr. Craig about it.  But as you can see

23   from the quotes that you have just cited, which is not

24   helpful to the Ukrainian position, I didn't interfere with

25   what he wanted to say.

1   Q.   Okay.  You certainly did not direct him to say what he

2   said; did you?

3   A.   No.  No, I didn't.  Definitely not.

4   Q.   And you didn't give him any talking points to give him an

5   outline of what he should talk about with Mr. Parfitt?

6   A.   No.  As I have said several times, he said he would talk

7   to the report.  This is talking to the report.

8   Q.   When you say "talking to the report," you are saying that

9   Mr. Craig was going to speak to the conclusions that were in

10  the report?

11  A.   Well, they were Mr. Craig's words, not mine.  So, you

12  know, he can explain that.

13  Q.   Okay.  Did others share the view of Mr. Gates that this

14  was sort of an absolutely good decision and that there were

15  good quotes here and maybe it wasn't exactly what we wanted?

16  Did others share that view, or were others kind of upset?

17  A.   I'm not sure where you're going with that.  I don't

18  remember.

19  Q.   Do you remember whether Mr. Sager or Mr. Friedman or

20  Mr. Kilimnik expressed views about the articles that had

21  appeared in *The New York Times* and *The Daily Telegraph* and

22  whether they were consistent with what the Ukraine wanted?

23  A.   I don't remember.

24  Q.   Do you remember that there was some other seeding that

25  went on with respect to the European press?

-1476-

1    A.   Yes.

2    Q.   And that that seeding was much more successful in terms

3    of getting out the message that the Ukraine wanted to get

4    out?

5              MR. CAMPOAMOR-SANCHEZ:  Objection.  Beyond the scope.

6              THE COURT:  Do you recall -- you said there was other

7    seeding.

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  Was that seeding deemed to be successful?

10             THE WITNESS:  I don't remember.

11             BY MR. MURPHY:

12   Q.   Do you remember whether Mr. Craig was involved in any

13   other seeding?

14   A.   I don't remember.

15   Q.   Do you remember dealing with *The National Law Journal*?

16   A.   Yes, I do.

17   Q.   Okay.  Let's take a look at Defendant's Exhibit 259.

18   259.

19        Are you with me?

20   A.   I will try and follow you.

21   Q.   Okay.  This is an e-mail that you sent to Mr. Huisman of

22   *The National Law Journal* on December the 13th of 2012.

23        Do you see that?

24   A.   Yes, I do.

25   Q.   You said, "Hi, Matt.  Yes, they've put out a statement

1    earlier, which I'll give you a link to."

2         Right?

3    A.   Yes.

4    Q.   And "Mr. Huisman had written to you saying that he was

5    working on a story about the Tymoshenko report done by

6    Skadden attorneys, and I wanted to see if the Ministry of

7    Justice had a comment or a statement for the media."

8         Right?

9    A.   Yes.  He wrote to the Skadden press office, and they

10   passed him on to me.

11   Q.   And you sent him the Ministry of Justice press release

12   that you had composed; didn't you?

13   A.   I sent him a link to it, yes.

14   Q.   Are you aware of the fact one way or the other that *The*

15   *National Law Journal* later did a correction of its article?

16        MR. CAMPOAMOR-SANCHEZ:  Objection.

17        THE COURT:  Are you aware of whether they did an

18   article, whether they corrected it?

19        THE WITNESS:  No, I'm not aware of that.

20        BY MR. MURPHY:

21   Q.   Did you have any conversations at all with Mr. Craig

22   about your outreach to *The National Law Journal*?

23   A.   Well, it's not outreach --

24        MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

25   question.  It assumes facts not in evidence.

-1478-

1           MR. MURPHY:  Let me rephrase it.

2           THE COURT:  Can you just approach the bench quickly.

3           MR. MURPHY:  Sure.

4       (At the bench)

5           THE COURT:  The question before, are you aware of the

6   fact that -- the same thing we discussed earlier.

7   (Inaudible) You asked him if he is aware, and then he says he

8   is not aware, but it just hangs out there that you said it

9   was a fact.  I don't think you get to say it was a fact.

10          MR. MURPHY:  Your Honor, there has been testimony in

11  this trial that *The National Law Journal* issued a correction.

12  We had a lot of testimony --

13          THE COURT:  I know that.  By witnesses, and that's

14  fine.

15          MR. MURPHY:  It's not disputed.

16          THE COURT:  I'm using it as an example of you

17  positing facts in your questions.  The question was asked and

18  answered.  I think that is a problematic phraseology.

19          Now, what is the current question?  You were going to

20  rephrase your question.

21          MR. MURPHY:  I just want to ask him if Mr. Craig had

22  any discussions with him about *The National Law Journal*

23  article.

24          THE COURT:  Okay.

25          MR. CAMPOAMOR-SANCHEZ:  I guess I won't object to

1     that, but this is beyond the scope.  It is already 20 to 5.

2              THE COURT:  I know.

3              MR. CAMPOAMOR-SANCHEZ:  I don't understand the need

4     for these questions.

5              THE COURT:  All right.  He's going to ask if he

6     talked to Greg before he sent his communication with the

7     *National Law Journal*.  That's the end of that because he will

8     probably say no.

9              In terms of your redirect, you will be given the

10    opportunity to do it.  I think that, just as I have

11    encouraged defense to be crisp, you certainly should not be

12    under the impression that the length of the cross should

13    control the length of the redirect.

14             MR. CAMPOAMOR-SANCHEZ:  Absolutely not.  I'm trying

15    to get this man out of here today.

16             THE COURT:  You went through every document in great

17    detail on direct.

18             MR. CAMPOAMOR-SANCHEZ:  Correct.

19             THE COURT:  Mostly, the same documents have been gone

20    over in great detail in cross.  And he doesn't need to say

21    things again that he already said, so I hope you will be

22    focused.

23             MR. CAMPOAMOR-SANCHEZ:  That is my hope.

24             THE COURT:  You will get the opportunity.

25             MR. MURPHY:  I'm almost finished, Your Honor.

1       THE COURT:  Okay.  All right.

2          (In open court)

3          THE COURT:  Members of the jury, I just want to let

4    you know that our goal is to not only not use up too much of

5    your time, but this particular witness really needs to get

6    back tomorrow, and so we're trying to finish with him today,

7    which means this may not be a day where we finish at 4:30.

8    Obviously, it isn't.  It may not be a day where we finish on

9    the dot of 5.  I'm not going to hold you at some ridiculous

10   late night setting, but we're talking about how to get this

11   done all in one day, and that's primarily for the witness's

12   convenience.

13          You can continue.

14          MR. MURPHY:  Thank you, Your Honor.

15          BY MR. MURPHY:

16   Q.   Did you have any conversations with Mr. Craig about your

17   communication with Mr. Huisman of *The National Law Journal*?

18   A.   No.  I was informed about it by the Skadden PR people,

19   and I sent them out a statement.  I'm pretty sure that was

20   the full extent of the interaction.

21   Q.   Did you have any interaction with the *L.A. Times,* and

22   Emily Alpert?

23   A.   I don't remember.

24   Q.   Do you remember having any discussions with Mr. Craig or

25   anybody else at Skadden about an article that she was

1    writing?

2    A.   No, I don't remember.

3    Q.   Let me show you what has been marked as Defendant's

4    Exhibit 256.

5         This is an e-mail exchange you had with a Richard

6    Solash of Radio Free Europe.

7    A.   That's right.

8    Q.   That was on December 13, 2012?

9    A.   Yes.  The date of the release of the report.

10   Q.   If we go down to your e-mail to him on December the 13th,

11   in the first full paragraph, you were responding to some

12   questions that he sent you; right?

13   A.   Yes, and I misled him.

14   Q.   You told him, "We don't represent the Ministry.  We're

15   hoping the Skadden team in this report."  And then you

16   provided a lot of information for him about what the Ministry

17   might be saying about the report; right?

18   A.   Yes.

19   Q.   And you actually told him that you weren't representing

20   the Ministry?

21   A.   Yes.  It was a very bad decision.

22   Q.   Now, do you remember asking -- directing Mr. Hall of your

23   staff to compile a large number of articles about the release

24   of the Skadden Report that appeared in the press?

25   A.   I remember that he was responsible for that role.

1    Q.   I want to show you Defendant's Exhibit 251.

2    A.   251?

3    Q.   251.

4         This is an e-mail from Mr. Hall to Mr. Gates,

5    Mr. Kilimnik, yourself, and your colleague Ms. Reynolds;

6    right?

7    A.   Yes, it is.

8    Q.   It is dated December 13th; right?

9    A.   The release date of the report.

10   Q.   And it says, "Hi, Rick.  Please find attached a summary

11   of all the main headlines and the links to the articles from

12   today, as discussed."

13        Right?

14   A.   Yes.

15   Q.   And he says, in the second paragraph, "The majority of

16   the links in this document are from carriers of the Ministry

17   of Justice's statement that was distributed as part of the PR

18   Newswire strategy."

19        Right?

20   A.   Yes.

21   Q.   And your office, FTI, was responsible for putting that

22   Ministry of Justice press release on the PR Newswire; right?

23   A.   Yes, we were.

24   Q.   And the PR Newswire is a news service that goes out to

25   thousands of journalists and media outlets throughout the

1    world; right?

2    A.   It is a news release distribution system where you pay to

3    send news releases to news rooms in various geographies.

4    Q.   Now, the articles that were attached do not include *The*

5    *New York Times* or *The Daily Telegraph*; do they?

6    A.   I would have to read the e-mail, but if you say they

7    don't, I'm sure that they're not there.

8    Q.   If we look at just a couple of them on page 2 --

9            MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.

10   Relevance.  Beyond the scope.

11           MR. MURPHY:  I'm almost finished, Your Honor.  I

12   think it is relevant as to what the media team did.

13           MR. CAMPOAMOR-SANCHEZ:  He said that they did it.

14           THE COURT:  All right.  They put the news wire out.

15   What is your next question going to be?

16           MR. MURPHY:  I want to just go over a couple of the

17   headlines with him.

18           THE COURT:  These are European headlines that

19   received the Newswire?

20           MR. MURPHY:  Some of them were actually in the United

21   States.

22           THE COURT:  Go ahead.

23           BY MR. MURPHY:

24   Q.   Let me just ask one question, Your Honor, and then I'll

25   pass on this.

1     Are there about 60 headlines attached?

2   A.   I don't know.

3   Q.   Okay.

4   A.   I haven't counted them, but there were a few.

5   Q.   14 single-spaced pages of headlines from articles in

6   media outlets throughout; right?

7   A.   I guess so.

8   Q.   Okay.  Let me show you Exhibit 254.

9        This is an e-mail from Mr. Gates to Mr. Manafort

10  dated December the 13th.  He copied Mr. Kilimnik, Mr. Sager,

11  George Fenton.  Do you know who he is?

12  A.   Absolutely no idea.

13  Q.   Okay.  And you.

14       And he said, "The MOJ press release is getting very

15  good coverage globally.  Reuters, in particular, picked up

16  the release verbatim."

17       Right?

18  A.   Yes, that's what he wrote.

19  Q.   And he lists there seven links to various articles.

20  A.   Yes, he does.

21  Q.   Now, I just want to ask you something about the -- you

22  mentioned the Ukraine Ministry of Justice was pleased with

23  the media rollout.

24  A.   I was told they were, yes.

25  Q.   Did you attend a banquet at some point in the Ukraine?

1      MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.

2   Beyond the scope.  Can we approach?

3      THE COURT:  Okay.

4   (At the bench)

5      MR. CAMPOAMOR-SANCHEZ:  So I did not ask about this

6   on direct.  At one point, Mr. Hawker mentioned that he

7   thought he had attended a party after the event and that he

8   had gotten presents.

9      We checked, and we did not find Mr. Craig traveling

10  to Ukraine in December or January.  We told the defense about

11  that.

12     He's mistaken about when this party took place.

13  They're trying to set this up to impeach him and to again ask

14  him about it.  And it has absolutely no relevance.

15     MR. MURPHY:  The relevance, Your Honor, is this was a

16  very significant statement that he made to the investigators

17  about the fact that there was a celebratory dinner at which

18  the Ukrainian folks in the Prosecutor General's Office were

19  toasting him and Greg Craig for having done a successful

20  media rollout.  And he says that this occurred after the

21  report was released --

22     THE COURT:  He didn't say it in court.  There is no

23  evidence of that.  So you want to bring out the fact that he

24  said it once before and that it was wrong.  Under what theory

25  can you bring out the fact that he said something --

1    MR. MURPHY:  Because --

2    THE COURT:  -- that they're not introducing that's

3    incorrect.

4    MR. MURPHY:  It goes to whether or not he has a good

5    memory of these events, because when investigated by the FBI

6    and these folks, he described this event in great detail, and

7    then it turns out that he is completely wrong about the

8    dates.  It goes to his credibility.  Also, the substantive

9    that was discussed, there was no discussion of the media plan

10   at this banquet because the report hadn't been written yet.

11   THE COURT:  My question is:  Under what theory can

12   you --

13   MR. MURPHY:  Credibility --

14   THE COURT:  -- an out-of-court statement and then

15   attack it when it isn't in the record just for the purpose of

16   showing on some other occasion he got something wrong.

17   MR. CAMPOAMOR-SANCHEZ:  And --

18   THE COURT:  I just want you to walk me through how

19   this comes into evidence.  I understand --

20   MR. MURPHY:  It goes to his credibility, it goes to

21   the credibility of his testimony about things that he is

22   testifying about that occurred many years ago.  It goes to

23   the fact that he was providing this information, which turned

24   out to be incorrect.  I think we're entitled to show that he

25   doesn't have a good memory, at best, or that he was

1   fabricating, at worst, when he spoke to the FBI and the

2   Department of Justice lawyers in this matter.  This is a

3   statement that he made.  That is actually the third proffer.

4   At the tail end of that third proffer, he comes up with this

5   story, which frankly is shocking to us and a whopper.

6           MR. CAMPOAMOR-SANCHEZ:  Can I get something in?

7           THE COURT:  Sure.

8           MR. CAMPOAMOR-SANCHEZ:  First of all, all he

9   remembers was that there was a celebratory dinner, and he

10   assumed that this celebratory dinner happened to be

11   afterwards.  We now believe he is incorrect about that.  But

12   it did happen.  He did get a present.  Apparently, others got

13   it.  Mr. Kedem got it.  So we haven't asked him about it.

14           He has certainly said here that it happened a long

15   time ago and that his memory is not perfect about it.  He's

16   admitted all of those things.  I did not ask him about that.

17   I have not suggested that Mr. Craig was lauded or anything

18   else of the sort.  They're doing this just to impeach him

19   with something that is not important.

20           MR. TAYLOR:  Your Honor.  I know I haven't said a

21   word today.

22           THE COURT:  What do you want to say?

23           MR. TAYLOR:  This is an act of dishonesty by a

24   witness, and it is admissible.  Acts of dishonesty are

25   admissible to impeach the witness's credibility.

1    MR. CAMPOAMOR-SANCHEZ:  This is not an act of

2    dishonesty.  This is an act of somebody having a recollection

3    that happens to be incorrect.  The celebratory thing did

4    happen.  It is just when it happened that is wrong.  There

5    was no media plan discussed at the celebratory dinner.  It

6    was just a celebration.

7    THE COURT:  I'm looking at specific instances of

8    conduct --

9    MR. TAYLOR:  Yes.

10   THE COURT:  -- talking about whether extrinsic

11   evidence is admissible to prove a specific intent of a

12   witness's conduct in order to attack his character or

13   truthfulness.

14   MR. TAYLOR:  That's the extrinsic evidence prong,

15   it's whether you --

16   THE COURT:  It is not quite as definitive as you

17   suggest it.  It must be probative of his truthfulness or

18   untruthfulness.

19   I think this is largely collateral.  I will let you

20   do an extremely brief and focused cross-examination that will

21   essentially be:  You met with the government.  You told them

22   there was a celebratory dinner.  You said it came afterwards.

23   That was where the vodka and the gifts were.  That's it.

24   We're not going to go into all this.

25   What you told the government was incorrect, and then

1    you can get up and say it was a failure of recollection, and

2    that's it.  I'm talking like four questions.

3           MR. CAMPOAMOR-SANCHEZ:  Your Honor, they should call

4    him to do that.  We did not elicit that --

5           THE COURT:  I know that.  When some narrow thread

6    goes to his credibility, he said something wrong to the

7    government, they are saying that he's lying, you're saying it

8    is a mistake.  You're going to establish that he said

9    something to them that was inaccurate, and that's the end of

10   it.  I'm telling you, if you start going into the details of

11   the gifts and the details of this and that, and you said it

12   was a big deal --

13          MR. MURPHY:  I'm not going to do that.

14          THE COURT:  Let's go.

15          MR. MURPHY:  And this is my last area.

16      (In open court)

17          BY MR. MURPHY:

18   Q.  Mr. Hawker, earlier in the day -- it seems like a long

19   time ago, I'm sure -- I asked you about the numbers of times

20   that you had met with various agents and prosecutors of the

21   United States government to talk about the matters in this

22   case.  Right?

23   A.  Yes.

24   Q.  On January the 24th of 2019, this year, in the second day

25   of that two -day meeting --

1    MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

2    question.  Why are you editorializing?  Just ask the

3    question.

4    THE COURT:  Let's try not to make speeches in our

5    objections, but let's just be focused.

6    MR. MURPHY:  Did you --

7    THE COURT:  On that date --

8    BY MR. MURPHY:

9    Q.  Did you attend what you described as a celebration

10   dinner, which you compared to a feast, honoring you,

11   Mr. Craig, and Mr. van der Zwaan and thanking you for your

12   services to the Ukraine in connection with the successful

13   rollout of the report?

14   A.  Yeah, it was a "thank you" for our work.

15   Q.  And did you indicate that this party was given for you to

16   celebrate a unified effort to promote the Ukraine's view of

17   the Tymoshenko case?

18   A.  I don't know if they were my words.  But, you know,

19   probably.

20   Q.  Did you tell the investigators and prosecutors that you

21   were meeting with that this occurred after the rollout of the

22   report?

23   A.  Yeah.  My memory was that it happened after the rollout

24   of the report.

25   Q.  And that was not correct; was it, sir?

1    A.   It may or may not be.  I have no idea.  I don't know the

2    date.  But what I do know is that there was very much a

3    celebration, like a "thank you" really for our work and that

4    we were all there and it was a very strange event.

5    Q.   One last question:  Were you present in Kyiv on or about

6    July the 19th of 2012?

7    A.   No idea.

8    Q.   Okay.

9    A.   Probably.

10             MR. MURPHY:  That's all I have.  Thanks very much.

11             THE COURT:  All right.  Redirect.

12             We last had a break at 3:30.  If somebody needs

13   one -- I'm hoping this is going to be brief -- but if you

14   need a break, somebody should let me know.  Otherwise, my

15   goal is to try to get through this and then we can have a

16   long break.  All right.

17                     REDIRECT EXAMINATION

18             BY MR. CAMPOAMOR-SANCHEZ:

19   Q.   I will try to be very brief.  We all want to get out of

20   here.

21             Okay.  You were asked a lot of questions by

22   Mr. Murphy about messaging documents.  Do you recall those

23   questions?

24   A.   Not specifically, but there were a lot of them.

25   Q.   You recall lots of questions about all these messaging

1492

1    documents that you prepared before the Harvard Club meeting?

2    Do you recall generally those questions?

3    A.   Yes.

4    Q.   All right.  First of all, did you send the messaging

5    document to Mr. Craig before the Harvard Club meeting?

6    A.   Yes, I did.

7    Q.   And at the Harvard Club meeting did you discuss the

8    messaging with Mr. Craig?

9    A.   Yes.

10   Q.   And I think we covered it briefly, but after the Harvard

11   Club meeting did you send yet another version of the

12   messaging document to Mr. Craig?

13   A.   Yes.

14   Q.   We covered this very briefly before, but he ultimately

15   objected to some of the messages in that.  Is that right?

16   A.   Yes.

17   Q.   In fact, let's look very briefly at 267.

18           MR. MURPHY:  Government?

19           MR. CAMPOAMOR-SANCHEZ:  Government Exhibit 267, yes.

20   It's going to be on your screen.

21           Let me take that.  Here are just the government

22   exhibits you need.

23           Can we put it up on the screens for the jurors?

24           THE COURT:  Do you all have it?

25           THE JURY:  No.

1    (Pause)

2    THE JURY:  Yes.

3    BY MR. CAMPOAMOR-SANCHEZ:

4    Q.  If we can focus in on the bottom one.  That's where you

5    sent it again to Mr. Craig and others that we discussed

6    previously.

7    A.  Yes.

8    Q.  And then did Mr. Craig actually give you comments to

9    correct what was incorrect about that statement?

10   A.  Yes, he did.

11   Q.  Let's look at 268.  One moment.

12        And if we could zero in on -- let's go to the second

13   page.  Let me take just as an example the very top.  Let's

14   zoom in on the top.

15        Tell me if I read this correctly.  Point 6, you had

16   originally written, "Any country has the right to prosecute

17   those who break the law.  Politicians have been prosecuted in

18   many countries, not just here.  The report makes it clear

19   this was not a political prosecution but a prosecution of a

20   crime by a politician."

21        And what was the change that came from Mr. Craig to

22   you to make to that part of the messaging document?

23   A.  If you look below his changes are, "Delete 'the report

24   makes clear,'" and the second sentence would simply read,

25   "This was not a political prosecution but the prosecution of

1    a crime by a politician.  It would thus be a statement, but

2    not a statement that would be attributed to the report."

3    Q.   Did Mr. Craig know that in fact the messaging from

4    Ukraine would say that this is not a political prosecution?

5    A.   It is there in black and white.

6    Q.   The rest of the changes, were they minor changes?

7            MR. MURPHY:  Objection.  Leading.

8            MR. CAMPOAMOR-SANCHEZ:  It is.  I'm trying to be

9    quick.

10           BY MR. CAMPOAMOR-SANCHEZ:

11   Q.   How would you characterize the rest of the changes that

12   were suggested to you by Mr. Craig to the report?

13   A.   You know, quite a mixed bag.  Some were correcting my

14   typos, you know.  I did it in a rush.  There was the changing

15   of the tense that we referred to earlier, and then there were

16   a couple of elements that had been changed due to recent

17   events that I had been unaware of.

18   Q.   For example, look at point 8 that is highlighted.  It was

19   a change from "likely" to "unlikely," and "revere" to

20   "reverse."

21   A.   Yes.  My mistake.

22   Q.   And the next one is change "would" to "may."

23   A.   We had a lot of discussion on this in another e-mail.

24   But the report said -- it came from "would," it wasn't "may."

25   Q.   And did you ultimately have a specific discussion by

1  e-mail with Mr. Craig about the top-line messaging as to

2  whether what you could say about whether this was a political

3  prosecution or not?

4  A.   There was some interaction by e-mail.

5  Q.   Can we look at 272, please.  At page 2 of the report.

6  And the bottom half, if we could expand it.  The bottom half

7  starting with, "Yes, any verbs would be okay."

8       Is that, at the bottom, Mr. Craig telling you what

9  you could say, and then you responding, and then him

10  responding back to you?

11  A.   Yes, it is.

12  Q.   So you had an interaction with Mr. Craig about the

13  messaging document, and he gave you comments about it?

14  A.   Yes, he did.

15  Q.   All right.  Now, you were shown by the defense

16  Government's Exhibit 189.

17       Can we have 189, please.  Can we go to page 2.  Let's

18  go to actually -- one second.

19       Let's go to page 4, at the top, post report release.

20  If we can zoom in.  It was just the very top, but that's

21  fine.

22       Okay.  You were asked some questions about private

23  briefings, point 9.  Do you recall those questions from

24  Mr. Murphy?

25  A.   Not specifically.

1    Q.   Okay.  Well, let me ask you -- again, how do you

2    pronounce the name that starts with a "K"?

3    A.   Kwasniewski.

4    Q.   Did you know if after the release of the report somebody

5    from Skadden spoke to Kwasniewski?

6    A.   Yes.

7    Q.   Who spoke to Kwasniewski?

8    A.   Alex van der Zwaan.

9    Q.   So there was a briefing with Mr. Kwasniewski after the

10   report was released?

11   A.   Yes.

12   Q.   You were also asked some questions about whether you sent

13   plans or media rollout plans to Mr. Craig after the Harvard

14   Club meeting.  Do you recall those questions from Mr. Murphy?

15   A.   No.  It is all blending into one.

16   Q.   All right.  Fair enough.

17        So let me ask you, sir, after the Harvard Club

18   meeting, did you send to Mr. Craig any more of the media

19   rollout plans?

20   A.   Any more plans?

21   Q.   Yes.  After the Harvard Club meeting.

22   A.   Probably.  I just don't remember.

23   Q.   Well, let me ask you:  Are you aware of what

24   conversations Mr. Craig had with Mr. Manafort potentially

25   about the media rollout plan?

1    A.   No.

2    Q.   Or what conversations he could have had with anybody else

3    about the media rollout plan?

4    A.   I have no idea who Greg spoke to about it.

5    Q.   And in fact, was it your role to speak directly to

6    Mr. Craig as part of this engagement?

7    A.   No, actually.  You know, obviously, I had some contact,

8    but it wasn't my role.  My role was to work for the

9    government of Ukraine.

10   Q.   And who, if you know, had the primary contact with

11   Mr. Craig?

12   A.   Paul Manafort because they're the same level.  You know,

13   very senior people with a lot of worldly experience.

14   Q.   And who did Mr. Gates work for?

15   A.   He worked for Manafort.

16   Q.   And who do you receive your instructions from?

17   A.   Gates.

18   Q.   So let me briefly take you to Government Exhibit 305.

19           If we could look at the date.  You recall this e-mail

20   of October 3rd?

21   A.   Yeah, the one I sent to my work computer to work on.

22   Q.   Correct.

23           And if we can look now at page 3, zoom in where it

24   says "From Sunday through A Day."

25   A.   Yes.

1    Q.   Are you there?

2    A.   Yes.

3    Q.   And here is where it says, "FTI to provide SA Report to

4    key journalists in the U.S. for leak story."

5         Then, it says, "GC to provide background briefing at

6    the request of the U.S. journalists."

7         From October 3rd on through the release of the

8    report, did Mr. Craig remain in the media rollout plans as

9    providing background briefings at the requests of U.S.

10   journalists?

11        MR. MURPHY:  Objection, Your Honor.

12        THE COURT:  Overruled.

13        BY MR. CAMPOAMOR-SANCHEZ:

14   Q.   You can answer.

15   A.   Yes.

16   Q.   No change to that; right?

17   A.   Not that I'm aware of.

18   Q.   Okay.  Now, let's move now to December.  You were asked a

19   number of questions about the plans in December.  And you

20   recall the questions about -- Mr. Murphy asked you about the

21   plan included talking to Obama and John Boehner and some

22   others?  Do you recall those questions?

23   A.   I remember Obama mentioned.

24   Q.   I think you mentioned that you believed that to be

25   aspirational?

1    A.   Oh, yes, totally.  Fantasy.

2    Q.   Those people are not media people, they're not

3    journalists; right?

4    A.   I presume they're all politicians.

5    Q.   And what was your area of responsibility?

6    A.   I'm a journalist/media man.

7    Q.   Okay.  And did you have any responsibilities for reaching

8    out to politicians as part of this project?

9    A.   No.  They had a whole plethora of people and agencies who

10   were that specialists in that.

11   Q.   Now, putting that aside, was the plan as it related to

12   the seeding of a journalist, was that aspirational?

13         MR. MURPHY:  Objection.  Leading.

14         THE COURT:  Overruled.

15   Q.   You can answer.

16   A.   No, that was the plan that was executed.

17   Q.   But in your mind, even before it was executed, was it

18   ever aspirational?

19   A.   I think the expansion to the world in terms of media

20   contacts was very aspirational.  But as a strategy, it was a

21   simple strategy that we suggested from pretty much the start

22   that we delivered through execution.

23   Q.   Let me show you what defense introduced as Defense

24   Exhibit 504.  If I could ask John's help to get that because

25   I don't have an electronic version of that.  And if we can

1500

```
1    zoom in on the very top.
2            Do you remember Mr. Murphy reading you this e-mail
3    from Mr. Gates in which you were copied?
4    A.   Yes, I remember this one.
5    Q.   Right.  And that was the one about van der Zwaan not
6    being allowed to talk to the media.  Right?
7    A.   Yes.
8    Q.   So, sir, from your knowledge, were Gates and others in
9    contact with Mr. Craig during the media rollout plan for the
10   report?
11           MR. MURPHY:  Objection.  Foundation.
12           MR. CAMPOAMOR-SANCHEZ:  I'm asking from his
13   knowledge.
14           THE COURT:  Without saying what they said, was it
15   ever reported to you that --
16           MR. MURPHY:  Objection.  Hearsay.
17           THE COURT:  Can I finish the question?
18           MR. CAMPOAMOR-SANCHEZ:  Your Honor, this was --
19           THE COURT:  All right.  I think he asked him on cross
20   if he knows if they followed up to ask if they could get an
21   exception.  That was the question he asked on cross.
22           MR. CAMPOAMOR-SANCHEZ:  Right.
23           THE COURT:  So do you know if Mr. Craig or
24   Mr. Manafort were in communication with Mr. Craig about that
25   or anything else?
```

1501

1     MR. CAMPOAMOR-SANCHEZ:  Your Honor, I'm sorry.  I

2  thought you meant to say Mr. Gates or Mr. Manafort.

3     THE COURT:  Mr. Gates or Mr. Manafort.

4     Do you know whether they were in communication with

5  Mr. Craig?  Did they give you instructions?

6     THE WITNESS:  Yes.

7     BY MR. CAMPOAMOR-SANCHEZ:

8  Q.   Yes, they were?

9  A.   I know that Manafort was in communication with Greg.

10  Q.   Okay.

11  A.   I doubt Rick Gates was.

12  Q.   All right.  Let's look now at 332.  I'm sorry.  This is

13  Government's Exhibit 332.  So we need to switch back to us.

14     Let's zoom in on the top part, please.

15     You were asked some questions by Mr. Murphy as to

16  whether you recall sort of discussions with Mr. Craig or not

17  about the media plan in December.  Do you recall those

18  questions?

19  A.   Not specifically.  Sorry.

20  Q.   Okay.  Let me try to help you.

21     Putting those questions aside, did you at least have

22  a conversation with Mr. Craig about the contact with

23  Mr. Sanger and what would happen?

24  A.   Yeah.  I picked up the phone when I received the e-mail,

25  and I spoke to Greg.

1    Q.   And when you were doing that, were you doing that in your

2    role as the media consultant plan for Ukraine?

3    A.   Yeah, in terms of trying to work out -- well, what I

4    didn't want was an unhappy journalist who, you know -- for

5    the seeding to backfire, and Greg knew this bloke, and, you

6    know, the logical thing to do would be to ask Greg what his

7    guidance was.

8    Q.   All right.  You were also asked some questions from

9    Mr. Murphy about whether you gave talking points to

10   Mr. Craig.  Do you recall those?

11   A.   Well, vaguely, but I didn't give talking points to

12   Mr. Craig because he was going to talk to the report.

13   Q.   And I think you also, in answer to Mr. Murphy, you were

14   talking about that he knew the report better.

15        Well, let me just ask you:  Why was it important to

16   have Mr. Craig talk to the media even if you did not have the

17   control of giving him talking points about it?

18   A.   Authenticity.  You know, he is the author of the report.

19   You know, it is his report.  It means that there can be a

20   transparent interaction with a journalist where they don't

21   get what Mr. Murphy called spin, they get the facts from the

22   horse's mouth.  Any question they want, he can answer.

23   Q.   Okay.  So you wanted him to speak to Sanger?

24   A.   Oh, very much.  It would be a far better outcome if

25   Mr. Craig spoke to a journalist that I never met than me

1    talking to somebody about, you know, a very complicated

2    report.

3    Q.   Okay.  Can we have Defendant's Exhibit 228, which I

4    believe we do have.  If we can go to the -- no, to the next

5    page.  Can we zoom in on the heading.

6         Do you see that, sir?

7    A.   Yes.

8    Q.   Do you remember the questions you were asked about your

9    draft of the press release for Ukraine?

10   A.   Do I remember the questions?  No, not particularly.

11   Q.   Well, do you remember the phantom box that appeared when

12   Mr. Murphy was asking questions?

13   A.   Yeah, I remember that.  That was a good bit, yes.

14   Q.   Okay.  So let's talk about that box.  Did you write this

15   heading?

16   A.   This is a headline, Your Honor.  This is the mystery

17   thing that popped up.  And it is the headline that I wrote.

18   Q.   That's the one you wrote?

19   A.   I'm pretty sure I wrote it, yeah.

20   Q.   It says, "Tymoshenko failed to provide 'clear and

21   specific evidence of political motivation . . . sufficient to

22   overturn her conviction under American (international)

23   standards,' according to international report."

24        Were you quoting the report?

25   A.   I think I was.

-1504-

1    Q.   And finally, sir, did Mr. Craig help you to seed with *The*

2    *New York Times* and Mr. Sanger in this public relations media

3    rollout for the report?

4    A.   Ultimately, yes.

5              MR. CAMPOAMOR-SANCHEZ:  No further questions.

6              THE COURT:  All right.

7              MR. MURPHY:  One question.

8              THE COURT:  One question, all right.  One question.

9              MR. CAMPOAMOR-SANCHEZ:  Can we have a proffer of what

10   this question is?

11             MR. MURPHY:  I want to show him --

12             THE COURT:  If you proffer it out there, then you

13   have asked the question.  Do we really need a proffer from

14   him to ask one question?

15             MR. CAMPOAMOR-SANCHEZ:  Okay.

16             THE COURT:  Come to the bench.  I want to make this

17   shorter, not longer.  So let's just do this.

18             (At the bench)

19             THE COURT:  What's your one question?

20             MR. MURPHY:  I want to show him the actual press

21   release, not the draft, the one that actually went out, it

22   had a different headline, and he changed the headline.

23             MR. CAMPOAMOR-SANCHEZ:  No, that is actually

24   incorrect.  Mr. Gates changed the headline.

25             This was covered in cross.  He had the chance to do

1    it.  He did not do it.  This is not part of my redirect.  He

2    is trying to reopen it.

3              THE COURT:  All right, wait.  The one we just looked

4    at is the one that he transmitted that he wrote, it wasn't

5    the one that they put on their website?

6              MR. MURPHY:  Apparently not.

7              MR. CAMPOAMOR-SANCHEZ:  Mr. Murphy, be fair.  The one

8    he showed him, 228, is not the final one, but it is the one

9    that he showed him during cross.  I want to use that one

10   because that's the one he drafted.  It is correct that the

11   ultimate press release, which is in evidence, has a different

12   headline, but that was Mr. Gates that changed it.  So if he

13   gets to ask that, I'm going to have to establish how that was

14   changed.

15             THE COURT:  You had the chance to do that on

16   cross --

17             MR. MURPHY:  This is new -- this reference to the

18   headline is new.

19             THE COURT:  It goes to the redirect.  You can say,

20   ultimately, was that the headline, the one that was posted,

21   but then you have to ask him if he wrote that, or he gets to

22   stand up --

23             MR. MURPHY:  I understand.

24             THE COURT:  But the point was, of the cross, was that

25   he knew that he was mischaracterizing the report --

1          MR. CAMPOAMOR-SANCHEZ:  Right.

2          MR. MURPHY:  There are aspects of it --

3          THE COURT:  No, no, no, we're not going through that

4     again.

5          MR. MURPHY:  I'm not going through it again.  I just

6     want to ask him about the headline.

7          MR. CAMPOAMOR-SANCHEZ:  If you do this, you're

8     allowing recross on something that I didn't open.  I

9     addressed just directly the document he addressed, I was

10    addressing the points that, even though Mr. Murphy was

11    suggesting that what was in that document was incorrect, he

12    did not focus on the headline which was, indeed, correct.

13    They can argue this from the press release later.  It is in

14    evidence.  It is definitely a different headline.  But he

15    didn't write it.  It was Mr. Gates.

16         MR. MURPHY:  It's the headline that he sent to *The*

17    *National Law Journal* -- it was the headline that he put on

18    the wire that was distributed throughout the word.

19         MR. CAMPOAMOR-SANCHEZ:  It was the headline that the

20    Ministry of Ukraine put on and that he forwarded to *The*

21    *National Law Journal,* which you asked him about.  And the

22    headline in there --

23         THE COURT:  You can get up and say is this it, but

24    you can't say does this mischaracterize the report.  We're

25    not going through 20 minutes of that.

1        MR. MURPHY:  I'm not doing that.  I'm just asking him

2     how it changed if he knows.

3        THE COURT:  No, no, no, no.

4        MR. MURPHY:  No?

5        Did you write it?

6        THE COURT:  Did you write it.

7        MR. MURPHY:  How about did you issue it?

8        MR. CAMPOAMOR-SANCHEZ:  No.  That was not the purpose

9     of the cross.

10        MR. MURPHY:  That was the purpose.  The purpose of

11     the redirect was to suggest that the headline of this article

12     was a fair summary of the report.

13        THE COURT:  His headline was a fair summary after you

14     suggested that he didn't summarize it fairly.  That was the

15     whole focus --

16        MR. MURPHY:  I want to ask him --

17        THE COURT:  He can say that it got changed.  You can

18     ask him, did you change it.  He can say no.  And that's it.

19        MR. MURPHY:  Thank you, Your Honor.

20       (In open court)

21                         RECROSS EXAMINATION

22        BY MR. MURPHY:

23     Q.  I'm going to ask you to look at one more exhibit,

24     Defendant's Exhibit 241.

25        You have it?  241.

1           Let's go to the attachment to this document, which is

2     the press release that the Ministry issued.

3     A.   Okay.

4     Q.   Could you just highlight the headline, please.

5           That headline reads, "Leading international law firm

6     Skadden Arps, Slate, Meagher & Flom, LLP, did not find

7     evidence of political motivation in the judgment of

8     Tymoshenko."

9     A.   Yes.

10    Q.   The headline is different than the one that Mr. Campoamor

11    just showed you; isn't it?

12          MR. CAMPOAMOR-SANCHEZ:  Objection.  That is what you

13    showed him.

14          THE COURT:  All right.  Let's not try to make it

15    sound as if the prosecution did something untoward.

16          There was a press release, a direct press release

17    that you discussed during your cross-examination that

18    Mr. Murphy pulled out pieces for you to look at.  And on

19    redirect, Mr. Campoamor-Sanchez pulled out the headline of

20    the same draft and asked you to look at it.  This is another

21    document.

22          Now, you can ask the question about it.

23          BY MR. MURPHY:

24    Q.   Is this the version that was released?

25    A.   Could I see the page before to look at the date, or maybe

1    the page after?

2    Q.   The page before is an e-mail from Mr. Jackson to

3    Mr. Craig, forwarding a press release.

4    A.   Can I see the second page of the news release?

5    Q.   Sure.

6         THE COURT:  The second page --

7         THE WITNESS:  Sorry.  The news release.

8         It's got the date on it.  It's got all the details on

9    it.  It's got the link on it.  So that looks like the release

10   that was distributed.

11        MR. MURPHY:  Thank you, sir.

12        I have no further questions.

13                   REDIRECT EXAMINATION

14        BY MR. CAMPOAMOR-SANCHEZ:

15   Q.   For the final press release, do you know who wrote the

16   headline?

17   A.   I don't.

18   Q.   You don't recall?

19   A.   I just don't remember.

20   Q.   Okay.

21        THE COURT:  Did you write it?

22        THE WITNESS:  Possibly.  I doubt it, though.  I think

23   I wrote the earlier one.  I don't know if I wrote the new

24   one.

25        BY MR. CAMPOAMOR-SANCHEZ:

1    Q.   All right.  Here we go.  I'm going to show you

2    Government's Exhibit 704.

3              This is for the Court.

4              I'm handing you, sir, a document that I marked for

5    identification purposes as Government's Exhibit 704.  I ask

6    you to read the bottom e-mail, the date, what it says.  And

7    let us know if that refreshes your recollection about who

8    wrote the headline that ultimately made it out?

9              THE COURT:  Just read it to yourself.  If it

10   refreshes your recollection, let us know whether it did or it

11   didn't.

12             THE WITNESS:  Okay.

13             BY MR. CAMPOAMOR-SANCHEZ:

14   Q.   Does that refresh your recollection as to who actually

15   wrote the headline or who was responsible for the headline

16   that finally went out?

17   A.   The Manafort people.

18   Q.   Do you know whether Manafort did it?

19   A.   It's usually -- well, I don't know.

20   Q.   You don't know.

21             Thank you.  No further questions.

22             THE COURT:  Thank you, Mr. Hawker.  You can step

23   down.  You're excused as a witness.

24             THE COURT:  Yes, sir.

25             JUROR:  Your Honor, could we have the number of the

1    exhibit that was just read by the witness?

2         THE COURT:  It was given to him to refresh his

3    recollection.  It has not been moved in evidence.  So you can

4    show someone something, and if it refreshes their

5    recollection, their testimony is the evidence, but the

6    document has not been moved in evidence, and that's why it is

7    not on your screen.

8         JUROR:  Perfect.  Thank you.

9         THE COURT:  All right.  Mr. Hawker, you can step

10   down.

11        (Witness excused)

12        THE COURT:  Members of the jury, we are going to

13   break for the evening.  I appreciate your patience.  It has

14   been a long day.

15        We will resume tomorrow morning again at 9:30.  I ask

16   you to be, as you have been, in the jury room by 9:15.

17        Once again, I caution you that you may not discuss

18   this case with anyone.  You may not read anything about it.

19   You may not communicate about it, do any research about it.

20   You have probably spent enough hours of the day thinking

21   about it.  And you are now free and instructed to spend the

22   rest of the day thinking about something else.  So have a

23   good evening.

24        Thank you.

25        (Jury not present)

1           THE COURT:  All right.  I note that there have been

2    exhibits used in cross-examination and even moved in evidence

3    that weren't necessarily in the original set of exhibits.  So

4    I just want to make sure that anything you're moving around

5    and showing, and particularly anything that gets moved in,

6    has been provided to Mr. Haley in the thumb drive format that

7    is necessary to make sure that the jury gets it at the end of

8    the day.  Are we doing that on a regular basis?

9           THE DEPUTY CLERK:  Not yet.

10           THE COURT:  I just want to make sure that you know

11    that just handing him it with a sticker was good in the

12    old days, but it is not good enough anymore.

13           MR. CAMPOAMOR-SANCHEZ:  Your Honor, I just have one

14    brief matter before we go.

15           THE COURT:  All right.

16           MR. CAMPOAMOR-SANCHEZ:  I just want for the record to

17    be clear that Mr. Hawker is now excused --

18           THE COURT:  Mr. Hawker is excused.

19           MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

20           MR. MURPHY:  Absolutely.

21           THE COURT:  We will start again tomorrow morning.

22    Have a good evening, everybody.

23           (Proceedings adjourned at 5:27 p.m.)

24

25

—1513—

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3         I, Patricia A. Kaneshiro-Miller, certify that the foregoing

4    is a correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8    /s/ Patricia A. Kaneshiro-Miller            August 21, 2019
     -----------------------------------      ---------------------
9    PATRICIA A. KANESHIRO-MILLER                    DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### '

**'clear** [1] - 1503:20
**'selective** [1] - 1459:7
**'the** [1] - 1493:23

### /

**/s** [1] - 1513:8

### 1

**1** [1] - 1435:15
**10** [5] - 1364:13, 1386:15, 1433:23, 1445:19, 1463:20
**10-minute** [1] - 1445:23
**100** [1] - 1361:20
**1000** [1] - 1361:24
**10th** [1] - 1447:13, 1449:2, 1454:16
**11** [1] - 1367:2
**113** [1] - 1366:4
**11:00** [2] - 1397:7, 1443:15
**11th** [3] - 1454:16, 1455:12, 1457:8
**1200** [1] - 1422:22
**125** [2] - 1387:2, 1387:6
**126** [2] - 1376:12, 1376:16
**12:30** [1] - 1397:19
**12th** [11] - 1375:19, 1376:14, 1382:24, 1387:4, 1390:3, 1440:22, 1457:24, 1458:15, 1461:22, 1466:21, 1467:7
**13** [2] - 1385:22, 1481:8
**130** [1] - 1388:15
**132** [3] - 1391:5, 1391:7, 1393:7
**1366** [1] - 1363:5
**1367** [1] - 1363:13
**13th** [6] - 1388:17, 1469:7, 1476:22, 1481:10, 1482:8, 1484:10
**14** [1] - 1484:5
**1414** [1] - 1363:14
**142** [1] - 1396:4
**1467** [1] - 1363:15
**149** [1] - 1411:25
**1491** [1] - 1363:5
**14th** [1] - 1391:10
**15** [2] - 1364:13, 1460:19
**150** [1] - 1412:19
**1500** [1] - 1454:21
**1507** [1] - 1363:5
**1509** [1] - 1363:6
**167** [1] - 1420:6
**16th** [1] - 1391:17
**175** [2] - 1426:21, 1427:4
**1800** [1] - 1361:24
**186** [2] - 1451:3, 1452:18
**186-page** [2] - 1374:14, 1389:22
**189** [2] - 1495:16, 1495:17
**19-125** [2] - 1364:4, 1446:9
**19-CR-125** [1] - 1361:4
**194** [3] - 1430:23, 1430:24, 1432:18

**196** [1] - 1434:10
**19th** [1] - 1491:6
**1:50** [1] - 1364:2

### 2

**2** [10] - 1393:7, 1399:13, 1399:14, 1424:11, 1435:9, 1435:21, 1436:19, 1483:8, 1495:5, 1495:17
**20** [3] - 1361:7, 1479:1, 1506:25
**20001** [1] - 1362:4
**20036** [1] - 1361:25
**2012** [20] - 1367:2, 1373:23, 1376:14, 1385:22, 1396:23, 1420:14, 1423:21, 1426:25, 1431:8, 1432:19, 1437:9, 1439:1, 1447:13, 1449:3, 1461:22, 1466:3, 1466:21, 1476:22, 1481:8, 1491:6
**2018** [1] - 1425:8
**2019** [3] - 1361:7, 1489:24, 1513:8
**202** [1] - 1362:5
**20530** [2] - 1361:15, 1361:17
**21** [1] - 1513:8
**212** [1] - 1457:5
**21202** [1] - 1361:21
**21st** [1] - 1396:7
**226** [1] - 1458:13
**227** [1] - 1460:17
**228** [3] - 1461:21, 1503:3, 1505:8
**23** [1] - 1396:23
**232** [2] - 1375:16, 1375:17
**234** [6] - 1389:16, 1389:17, 1389:18, 1390:1, 1396:19
**23rd** [3] - 1394:13, 1394:15, 1466:3
**24** [1] - 1442:8
**241** [2] - 1507:24, 1507:25
**2440** [1] - 1361:21
**24th** [3] - 1407:13, 1411:22, 1489:24
**25** [2] - 1428:1, 1428:2
**251** [3] - 1482:1, 1482:2, 1482:3
**254** [4] - 1396:16, 1396:18, 1397:14, 1484:8
**256** [1] - 1481:4
**258** [2] - 1400:14
**259** [2] - 1476:17, 1476:18
**25th** [4] - 1410:23, 1411:22, 1412:2, 1466:5
**26** [1] - 1420:14
**261** [2] - 1409:4, 1409:21
**262** [1] - 1406:13
**267** [3] - 1410:13, 1492:17, 1492:19
**268** [1] - 1493:11
**26th** [1] - 1414:7
**272** [1] - 1495:5
**274** [2] - 1416:10
**275** [3] - 1416:9, 1417:22, 1417:25
**276** [2] - 1422:17, 1422:21
**27th** [1] - 1402:19
**280** [2] - 1423:18, 1424:11

**281** [1] - 1425:15
**29th** [1] - 1420:8
**2nd** [1] - 1423:21

### 3

**3** [13] - 1376:5, 1377:13, 1383:1, 1399:6, 1399:13, 1417:3, 1422:21, 1435:12, 1435:25, 1460:4, 1471:16, 1497:23
**305** [1] - 1497:18
**30th** [4] - 1422:18, 1431:8, 1432:19, 1437:9
**317** [2] - 1438:4, 1438:8
**318** [1] - 1444:1
**319** [1] - 1444:15
**322** [1] - 1445:9
**323** [1] - 1446:18
**328** [1] - 1447:12
**332** [3] - 1448:25, 1501:12, 1501:13
**333** [1] - 1362:4
**351** [2] - 1451:17, 1451:19
**353** [1] - 1454:19
**354** [1] - 1455:10
**354-3243** [1] - 1362:5
**360** [2] - 1456:10
**364** [1] - 1457:23
**384** [3] - 1469:3, 1471:16
**3:00** [1] - 1454:22
**3:06** [1] - 1460:23
**3:30** [1] - 1491:12
**3rd** [3] - 1426:25, 1497:20, 1498:7

### 4

**4** [9] - 1393:15, 1397:8, 1399:15, 1412:5, 1412:11, 1420:13, 1436:13, 1460:4, 1495:19
**4700A** [1] - 1362:3
**4:11** [1] - 1396:24
**4:23** [1] - 1460:24
**4:30** [1] - 1480:7

### 5

**5** [9] - 1393:16, 1399:7, 1421:12, 1427:15, 1427:21, 1437:6, 1437:7, 1479:1, 1480:9
**501** [4] - 1363:13, 1366:23, 1367:9, 1367:19
**503** [4] - 1363:14, 1414:3, 1414:12, 1414:16
**504** [6] - 1363:15, 1466:14, 1466:19, 1466:24, 1467:2, 1499:24
**555** [1] - 1361:14
**5:27** [1] - 1512:23
**5th** [1] - 1438:9

## 6

**6** [1] - 1493:15
**6-page** [1] - 1427:13
**60** [1] - 1484:1
**6th** [4] - 1439:1, 1444:3, 1444:25, 1447:7

## 7

**7** [2] - 1361:5, 1428:7
**704** [2] - 1510:2, 1510:5
**7th** [1] - 1366:10

## 8

**8** [3] - 1382:20, 1469:20, 1494:18
**8:00** [1] - 1414:19

## 9

**9** [2] - 1385:10, 1495:23
**9-13-12** [1] - 1393:8
**94** [1] - 1440:13
**95** [1] - 1440:14
**950** [1] - 1361:17
**9:15** [1] - 1511:16
**9:30** [1] - 1511:15

## A

**a.m** [3] - 1396:24, 1397:8, 1469:20
**Aarons** [7] - 1366:9, 1367:2, 1390:7, 1391:21, 1414:7, 1414:18, 1414:22
**Abelson** [3] - 1361:19, 1414:4, 1466:18
**ability** [1] - 1369:6
**able** [4] - 1374:7, 1374:19, 1467:17, 1468:3
**above-entitled** [1] - 1513:5
**abroad** [1] - 1436:22
**absent** [1] - 1401:7
**absolutely** [13] - 1373:1, 1379:8, 1401:15, 1403:14, 1418:9, 1423:16, 1460:7, 1469:24, 1475:14, 1479:14, 1484:12, 1485:14, 1512:20
**abuse** [2] - 1368:14, 1473:2
**accept** [3] - 1371:9, 1381:3, 1381:14
**accepted** [3] - 1373:3, 1387:17, 1466:11
**accepts** [1] - 1381:16
**accompany** [1] - 1435:2
**According** [1] - 1368:8
**according** [2] - 1472:19, 1503:23
**account** [2] - 1444:7, 1444:10
**accurate** [3] - 1380:12, 1411:8, 1425:10
**accurately** [1] - 1409:7
**accusation** [2] - 1417:5, 1459:2
**achieve** [1] - 1385:7

**act** [3] - 1487:23, 1488:1, 1488:2
**Action** [1] - 1361:4
**action** [2] - 1426:3, 1438:16
**actions** [2] - 1422:19, 1433:6
**Actions** [1] - 1425:16
**activity** [1] - 1416:22
**acts** [1] - 1487:24
**actual** [1] - 1504:20
**Adam** [2] - 1361:16, 1361:19
**adamant** [1] - 1379:8
**add** [1] - 1383:19
**adding** [1] - 1370:18
**addition** [2] - 1420:20, 1434:21
**additional** [1] - 1430:11
**address** [7] - 1380:3, 1384:1, 1439:3, 1439:4, 1439:8, 1448:1, 1449:5
**addressed** [2] - 1506:9
**addresses** [1] - 1439:6
**addressing** [2] - 1376:23, 1506:10
**adjourned** [1] - 1512:23
**administration** [1] - 1427:23
**admissible** [4] - 1413:8, 1487:24, 1487:25, 1488:11
**admission** [1] - 1466:23
**admitted** [6] - 1367:18, 1367:19, 1414:16, 1467:1, 1467:2, 1487:16
**advice** [1] - 1380:20
**advise** [1] - 1407:20
**Affairs** [5] - 1422:24, 1433:10, 1436:14, 1436:20, 1441:8
**afraid** [2] - 1391:4, 1409:24
**afternoon** [3] - 1365:13, 1445:17, 1454:22
**Afternoon** [1] - 1361:5
**AFTERNOON** [2] - 1361:9, 1364:1
**afterwards** [3] - 1364:13, 1487:11, 1488:22
**agencies** [1] - 1499:9
**agency** [2] - 1421:24, 1426:11
**agenda** [3] - 1394:20, 1395:6, 1397:11
**agents** [2] - 1390:18, 1489:20
**ago** [5] - 1425:12, 1454:10, 1486:22, 1487:15, 1489:19
**agree** [1] - 1456:25
**agreed** [8] - 1423:15, 1424:16, 1424:22, 1431:13, 1431:23, 1432:10, 1443:16, 1456:17
**agreeing** [1] - 1423:13
**agreement** [2] - 1424:24, 1432:4
**agrees** [3] - 1369:14, 1369:15, 1450:8
**ahead** [4] - 1384:1, 1409:18, 1473:6, 1483:22
**aided** [1] - 1362:6
**air** [1] - 1404:11
**akin** [1] - 1471:22
**Al** [2] - 1421:13, 1456:19
**Alan** [9] - 1431:3, 1431:6, 1431:13, 1433:19, 1436:13, 1441:5, 1455:25, 1466:22, 1467:25

**albeit** [1] - 1388:25
**alert** [2] - 1364:9, 1364:19
**alerted** [1] - 1364:9
**Alex** [13] - 1390:5, 1396:15, 1397:21, 1402:8, 1433:19, 1434:18, 1439:17, 1439:19, 1440:4, 1444:9, 1467:17, 1468:3, 1496:8
**Alex's** [1] - 1444:4
**Alexander** [1] - 1461:17
**all's** [1] - 1457:13
**allegations** [1] - 1412:13
**allegedly** [2] - 1436:3, 1436:5
**allow** [2] - 1366:16, 1369:19
**allowed** [2] - 1473:13, 1500:6
**allowing** [1] - 1506:8
**almost** [3] - 1417:24, 1479:25, 1483:11
**alongside** [1] - 1395:8
**Alpert** [1] - 1480:22
**alter** [1] - 1373:24
**amend** [1] - 1393:22
**amended** [1] - 1393:22
**amendment** [3] - 1383:25, 1393:17, 1462:11
**America** [3] - 1364:4, 1381:3, 1446:9
**AMERICA** [1] - 1361:3
**American** [2] - 1462:15, 1503:22
**ammunition** [1] - 1430:11
**amount** [1] - 1446:2
**AMY** [1] - 1361:9
**analysts** [1] - 1473:2
**analyze** [1] - 1449:17
**Angela** [1] - 1368:20
**announce** [1] - 1441:8
**announcement** [3] - 1366:12, 1434:5, 1443:11
**announcing** [1] - 1404:5
**annoyed** [1] - 1390:13
**annoying** [1] - 1413:3
**answer** [23] - 1377:4, 1377:10, 1377:23, 1378:16, 1379:1, 1379:20, 1380:5, 1381:5, 1381:16, 1382:8, 1402:15, 1418:18, 1418:24, 1424:18, 1450:6, 1456:16, 1459:1, 1459:19, 1460:7, 1498:14, 1499:15, 1502:13, 1502:22
**answered** [2] - 1464:19, 1478:18
**answering** [1] - 1406:5
**Answers** [1] - 1458:17
**answers** [7] - 1376:24, 1377:8, 1377:15, 1436:11, 1459:23, 1461:2, 1462:3
**anticipated** [2] - 1370:25, 1403:2
**anticipating** [1] - 1371:13
**anyway** [2] - 1413:15, 1466:11
**apartment** [2] - 1413:20, 1416:4
**apologize** [4] - 1384:7, 1399:5, 1409:16, 1436:9
**appealing** [1] - 1473:1

**appear** [1] - 1390:6
**APPEARANCES** [1] - 1361:11
**appeared** [5] - 1369:22, 1462:25, 1475:21, 1481:24, 1503:11
**applied** [1] - 1381:6
**appointed** [1] - 1421:25
**appointment** [1] - 1364:10
**appreciate** [1] - 1511:13
**approach** [4] - 1403:18, 1412:21, 1478:2, 1485:2
**appropriately** [1] - 1413:9
**approved** [4] - 1461:2, 1461:13, 1461:17, 1461:19
**April** [1] - 1472:24
**architect** [1] - 1382:11
**area** [6] - 1419:18, 1424:11, 1450:18, 1450:20, 1489:15, 1499:5
**argue** [2] - 1413:2, 1506:13
**arguing** [2] - 1378:20, 1440:6
**argument** [2] - 1413:5, 1415:10
**arm's** [1] - 1498:10
**Arps** [6] - 1386:22, 1388:17, 1393:11, 1437:12, 1465:11, 1508:6
**arrangement** [1] - 1388:8
**arrived** [1] - 1394:16
**article** [17] - 1367:7, 1368:1, 1371:21, 1442:10, 1442:25, 1443:1, 1470:6, 1470:8, 1472:8, 1472:15, 1474:11, 1477:15, 1477:18, 1478:23, 1480:25, 1507:11
**articles** [8] - 1469:21, 1470:3, 1475:20, 1481:23, 1482:11, 1483:4, 1484:5, 1484:19
**articulated** [1] - 1460:13
**ASAP** [1] - 1426:8
**Ashton** [1] - 1436:23
**aside** [2] - 1499:11, 1501:21
**aspects** [3] - 1374:16, 1423:23, 1506:2
**aspirational** [6] - 1400:5, 1443:24, 1498:25, 1499:12, 1499:18, 1499:20
**assembled** [2] - 1433:22, 1455:20
**Assembly** [1] - 1403:9
**assessing** [1] - 1421:4
**assignment** [1] - 1370:17
**assume** [2] - 1388:6, 1454:22
**assumed** [2] - 1452:5, 1487:10
**assumes** [2] - 1403:23, 1477:25
**assuming** [2] - 1442:18, 1442:24
**assumption** [1] - 1443:6
**assumptions** [1] - 1442:15
**attach** [1] - 1389:19
**attached** [14] - 1377:13, 1393:7, 1393:15, 1397:10, 1427:10, 1432:22, 1432:23, 1434:25, 1435:9, 1438:11, 1438:21, 1482:10, 1483:4, 1484:1
**attaches** [1] - 1412:2
**attaching** [5] - 1396:7, 1410:15, 1420:11, 1434:14, 1446:22
**attachment** [3] - 1367:3, 1367:15,

1508:1
**attack** [2] - 1486:15, 1488:12
**attempt** [2] - 1393:18, 1393:22
**attempted** [1] - 1372:14
**attend** [2] - 1484:25, 1490:9
**attendance** [1] - 1392:21
**attended** [1] - 1485:7
**attendees** [1] - 1386:3
**ATTORNEY'S** [1] - 1361:13
**attorneys** [2] - 1401:6, 1477:6
**attributed** [2] - 1462:3, 1494:2
**August** [2] - 1361:7, 1513:8
**AUSA** [2] - 1361:12, 1361:13
**authenticity** [1] - 1502:18
**author** [2] - 1473:11, 1502:18
**authority** [1] - 1465:12
**autumn** [4] - 1429:8, 1429:9, 1429:15
**available** [3] - 1408:5, 1425:1, 1425:4
**Avenue** [2] - 1361:17, 1362:4
**aware** [17] - 1372:13, 1372:17, 1400:8, 1418:8, 1439:21, 1440:1, 1450:15, 1456:2, 1466:2, 1477:14, 1477:17, 1477:19, 1478:5, 1478:7, 1478:8, 1496:23, 1498:17

## B

**backfire** [1] - 1502:5
**background** [3] - 1410:1, 1498:5, 1498:9
**backgrounding** [2] - 1405:24, 1407:17
**backside** [1] - 1424:8
**bad** [1] - 1481:21
**bag** [2] - 1394:12, 1494:13
**balance** [1] - 1472:12
**balanced** [1] - 1426:7
**balancing** [1] - 1474:9
**Baltimore** [1] - 1361:21
**banquet** [2] - 1484:25, 1486:10
**Barack** [2] - 1368:21, 1441:16
**Barosso** [3] - 1436:23, 1441:13, 1442:3
**based** [11] - 1369:4, 1388:1, 1388:23, 1417:6, 1417:8, 1437:15, 1455:20, 1459:4, 1459:6, 1460:8, 1468:19
**basis** [8] - 1375:9, 1413:23, 1416:6, 1416:16, 1417:11, 1459:9, 1461:20, 1512:8
**battle** [2] - 1371:23, 1425:22
**became** [1] - 1385:25
**become** [3] - 1416:5, 1416:16, 1421:3
**BEFORE** [1] - 1361:9
**beginning** [2] - 1387:22, 1394:1
**begins** [1] - 1446:20
**behalf** [1] - 1460:3
**behaved** [1] - 1382:10
**behind** [1] - 1374:2
**below** [4] - 1422:2, 1422:21, 1469:21, 1493:23

**bench** [10] - 1403:18, 1403:19, 1413:6, 1431:11, 1431:12, 1478:2, 1478:4, 1485:4, 1504:16, 1504:18
**beneath** [1] - 1471:17
**Berlin** [1] - 1388:9
**BERMAN** [1] - 1361:9
**best** [5] - 1382:3, 1439:12, 1454:22, 1459:13, 1486:25
**better** [4] - 1413:5, 1450:22, 1502:14, 1502:24
**between** [11] - 1375:9, 1383:11, 1412:22, 1417:25, 1423:1, 1433:8, 1443:16, 1453:23, 1455:16, 1458:2, 1458:14, 1467:5, 1467:9
**beyond** [8] - 1370:16, 1370:17, 1380:7, 1389:4, 1476:5, 1479:1, 1483:10, 1485:2
**big** [4] - 1401:16, 1414:24, 1447:9, 1489:12
**bigger** [1] - 1440:23
**biggest** [1] - 1401:4
**biggies** [1] - 1401:20
**Bill** [1] - 1368:20
**bird's** [1] - 1412:9
**bird's-eye** [1] - 1412:9
**bit** [7] - 1373:20, 1398:23, 1403:7, 1407:5, 1415:1, 1415:2, 1424:4, 1427:14, 1429:4, 1454:11, 1470:24, 1471:6, 1472:9, 1503:13
**bits** [1] - 1469:18
**black** [1] - 1494:5
**blending** [1] - 1496:15
**Blinken** [1] - 1422:4
**block** [1] - 1424:15
**bloke** [4] - 1458:1, 1458:6, 1458:11, 1502:5
**Bloomberg** [4] - 1376:7, 1421:14, 1426:6, 1426:7
**blow** [6] - 1366:8, 1396:5, 1399:16, 1399:21, 1412:11, 1471:17
**blown** [1] - 1376:18
**Boehner** [1] - 1422:5, 1441:13, 1441:19, 1441:22, 1443:21, 1498:21
**book** [1] - 1396:20
**bottom** [14] - 1380:1, 1391:8, 1399:14, 1399:16, 1422:21, 1446:20, 1449:1, 1467:12, 1493:4, 1495:6, 1495:8, 1510:6
**box** [6] - 1442:6, 1442:16, 1462:24, 1463:6, 1503:11, 1503:14
**boxes** [1] - 1463:2
**boycott** [2] - 1368:18, 1368:25
**Bradley** [1] - 1361:16
**break** [11] - 1423:9, 1445:11, 1445:15, 1445:17, 1445:23, 1463:14, 1491:12, 1491:14, 1491:16, 1491:17, 1511:13
**brief** [10] - 1388:5, 1388:10, 1436:22, 1467:17, 1468:3, 1488:20, 1491:13, 1491:19, 1512:14
**briefed** [1] - 1436:20

**briefing** [7] - 1399:18, 1408:13, 1408:15, 1424:15, 1435:12, 1496:9, 1498:5
**briefings** [5] - 1424:12, 1433:3, 1469:1, 1495:23, 1498:9
**briefly** [5] - 1431:10, 1492:10, 1492:14, 1492:17, 1497:18
**bring** [6] - 1364:7, 1365:16, 1446:11, 1471:13, 1485:23, 1485:25
**British** [1] - 1390:15
**Brussels** [2] - 1388:9, 1420:23
**Bureau** [2] - 1428:19, 1448:8
**business** [1] - 1364:10
**busy** [1] - 1448:14
**BY** [57] - 1366:2, 1366:7, 1367:20, 1372:3, 1373:10, 1375:7, 1378:23, 1382:5, 1384:8, 1390:2, 1390:23, 1392:13, 1393:1, 1404:24, 1409:19, 1411:20, 1414:1, 1414:17, 1416:2, 1419:1, 1419:20, 1422:15, 1423:10, 1429:22, 1430:9, 1430:15, 1430:22, 1432:17, 1436:12, 1440:8, 1442:23, 1443:8, 1444:23, 1446:16, 1450:11, 1451:20, 1452:13, 1459:22, 1464:9, 1464:23, 1467:3, 1476:11, 1477:20, 1480:15, 1483:23, 1489:17, 1490:8, 1491:18, 1493:3, 1494:10, 1498:13, 1501:7, 1507:22, 1508:23, 1509:14, 1509:25, 1510:13

**C**

**Cairo** [1] - 1402:20
**Cameron** [1] - 1368:20
**camp** [1] - 1429:24
**CAMPOAMOR** [82] - 1364:8, 1364:18, 1364:25, 1365:8, 1367:11, 1367:17, 1372:1, 1372:22, 1375:4, 1381:25, 1392:6, 1392:17, 1404:6, 1409:5, 1411:14, 1412:20, 1412:22, 1413:1, 1414:14, 1419:7, 1422:13, 1423:7, 1429:13, 1430:1, 1430:13, 1431:17, 1431:20, 1432:5, 1439:22, 1442:17, 1443:2, 1444:17, 1450:3, 1459:15, 1462:21, 1464:19, 1466:25, 1476:5, 1477:16, 1477:24, 1478:25, 1479:3, 1479:14, 1479:18, 1479:23, 1483:9, 1483:13, 1485:1, 1485:5, 1486:17, 1487:6, 1487:8, 1488:1, 1489:3, 1490:1, 1491:18, 1492:19, 1493:3, 1494:8, 1494:10, 1498:13, 1500:12, 1500:18, 1500:22, 1501:7, 1501:7, 1504:5, 1504:9, 1505:7, 1506:1, 1506:7, 1506:19, 1507:8, 1508:12, 1509:14, 1509:25, 1510:13, 1512:13, 1512:16, 1512:19
**Campoamor** [5] - 1361:12, 1396:22, 1440:19, 1508:10, 1508:19
**CAMPOAMOR-SANCHEZ** [82] - 1364:8, 1364:18, 1364:25, 1365:8,

1367:11, 1367:17, 1372:1, 1372:22, 1375:4, 1381:25, 1392:6, 1392:17, 1404:6, 1409:5, 1411:14, 1412:20, 1412:22, 1413:1, 1414:14, 1419:7, 1422:13, 1423:7, 1429:13, 1430:1, 1430:13, 1430:1, 1431:17, 1431:20, 1432:5, 1439:22, 1442:17, 1443:2, 1444:17, 1450:3, 1459:15, 1462:21, 1464:19, 1466:25, 1476:5, 1477:16, 1477:24, 1478:25, 1479:3, 1479:14, 1479:18, 1479:23, 1483:9, 1483:13, 1485:1, 1485:5, 1486:17, 1487:6, 1487:8, 1488:1, 1489:3, 1490:1, 1491:18, 1492:19, 1493:3, 1494:8, 1494:10, 1498:13, 1500:12, 1500:18, 1500:22, 1501:1, 1501:7, 1504:5, 1504:9, 1504:15, 1504:23, 1505:7, 1506:1, 1506:7, 1506:19, 1507:8, 1508:12, 1509:14, 1509:25, 1510:13, 1512:13, 1512:16, 1512:19
**Campoamor-Sanchez** [2] - 1361:12, 1508:19
**capitals** [1] - 1399:22
**caption** [2] - 1367:2, 1401:1
**captioned** [2] - 1384:10, 1385:11
**cared** [1] - 1416:23
**careful** [1] - 1404:1
**carriers** [1] - 1482:16
**carrying** [1] - 1449:1
**case** [20] - 1368:22, 1372:4, 1372:11, 1373:13, 1375:21, 1386:22, 1407:25, 1408:1, 1414:24, 1417:5, 1418:7, 1445:18, 1451:23, 1457:16, 1459:2, 1471:23, 1472:10, 1489:22, 1490:17, 1511:18
**Case** [4] - 1364:4, 1367:4, 1372:5, 1446:9
**cases** [1] - 1403:23
**cash** [1] - 1408:21
**caution** [1] - 1511:17
**celebrate** [1] - 1490:16
**celebration** [3] - 1488:6, 1490:9, 1491:3
**celebratory** [6] - 1485:17, 1487:9, 1487:10, 1488:3, 1488:5, 1488:22
**certain** [2] - 1369:5, 1369:18
**certainly** [13] - 1387:14, 1395:21, 1397:13, 1401:22, 1406:12, 1410:8, 1420:4, 1421:11, 1458:1, 1473:23, 1475:1, 1479:11, 1487:14
**CERTIFICATE** [1] - 1513:1
**certify** [1] - 1513:3
**chain** [3] - 1391:7, 1446:20, 1467:4
**Championship** [1] - 1368:19
**chance** [2] - 1504:25, 1505:15
**change** [9] - 1372:15, 1377:5, 1384:7, 1474:3, 1493:21, 1494:19, 1494:22, 1498:16, 1507:18
**changed** [16] - 1364:21, 1373:5, 1373:6, 1393:24, 1406:1, 1406:2,

1470:21, 1473:25, 1474:19, 1494:16, 1504:22, 1504:24, 1505:12, 1505:14, 1507:2, 1507:17
**changes** [9] - 1373:2, 1432:22, 1432:23, 1433:11, 1462:2, 1493:23, 1494:6, 1494:11
**changing** [3] - 1382:9, 1424:23, 1494:14
**character** [1] - 1488:12
**characterization** [5] - 1380:10, 1380:12, 1385:3, 1450:8, 1450:9
**characterize** [1] - 1494:11
**characterizing** [1] - 1450:7
**charge** [2] - 1435:23, 1456:7
**chat** [6] - 1395:2, 1397:21, 1455:15, 1455:16, 1458:7, 1458:8
**checked** [1] - 1485:9
**cheeky** [1] - 1436:8
**Chief** [1] - 1435:6, 1448:8
**chill** [2] - 1456:23, 1456:24
**circulate** [1] - 1466:7
**circulated** [4] - 1465:20, 1465:21, 1465:24, 1466:2
**cited** [1] - 1474:23
**City** [2] - 1403:10, 1448:4
**claim** [6] - 1369:16, 1374:2, 1375:10, 1383:2, 1417:11, 1459:9
**claims** [6] - 1375:12, 1381:4, 1389:4, 1462:12, 1464:11, 1464:25
**Clark** [2] - 1421:19, 1421:22
**clauses** [2] - 1463:15, 1464:7
**cleaner** [1] - 1438:15
**clear** [9] - 1381:19, 1398:10, 1400:1, 1400:12, 1412:12, 1415:8, 1493:18, 1493:24, 1512:17
**clearer** [1] - 1438:15
**clearly** [3] - 1379:2, 1380:6, 1460:8
**clears** [1] - 1447:8
**CLERK** [5] - 1364:3, 1366:5, 1446:8, 1451:18, 1512:9
**client** [7] - 1382:4, 1383:17, 1387:18, 1435:8, 1460:1, 1460:14, 1474:18
**clients** [2] - 1377:10, 1385:6
**Clinton** [1] - 1452:14
**Clinton's** [1] - 1368:20
**close** [2] - 1375:23, 1445:12
**closely** [1] - 1422:19
**club** [1] - 1399:1
**Club** [18] - 1384:1, 1386:3, 1394:11, 1397:19, 1398:24, 1403:1, 1410:19, 1411:12, 1423:4, 1423:14, 1426:18, 1492:1, 1492:5, 1492:7, 1492:11, 1496:14, 1496:17, 1496:21
**collateral** [1] - 1488:19
**colleague** [8] - 1367:2, 1368:2, 1371:22, 1414:7, 1448:3, 1448:16, 1449:6, 1482:5
**colleagues** [5] - 1366:10, 1389:5, 1390:8, 1391:21, 1448:4
**COLUMBIA** [2] - 1361:1, 1361:14

**coming** [3] - 1403:10, 1447:4, 1470:12

**comma** [1] - 1369:12

**comment** [5] - 1383:16, 1383:20, 1408:17, 1408:18, 1477:7

**comments** [4] - 1413:22, 1423:22, 1493:8, 1495:13

**Comments** [1] - 1391:18

**Commission** [2] - 1405:7, 1405:18

**Commissioned** [1] - 1471:19

**commissioned** [1] - 1472:23

**Commissioner** [3] - 1388:7, 1399:18, 1420:24

**committed** [1] - 1465:12

**common** [1] - 1415:24

**communicate** [3] - 1380:21, 1385:1, 1511:19

**communication** [7] - 1373:12, 1407:13, 1479:6, 1480:17, 1500:24, 1501:4, 1501:9

**communications** [8] - 1384:24, 1385:23, 1397:11, 1402:7, 1406:23, 1435:16, 1435:17, 1455:11

**Communications** [1] - 1421:21

**companies** [1] - 1427:6

**compared** [1] - 1490:10

**compile** [1] - 1481:23

**complete** [3] - 1429:20, 1438:11, 1446:23

**completely** [1] - 1486:7

**compliance** [1] - 1432:23

**complicated** [1] - 1503:1

**complied** [1] - 1449:11

**composed** [1] - 1477:12

**compound** [1] - 1411:16

**compressed** [1] - 1423:22

**compromised** [1] - 1369:6

**computer** [2] - 1362:6, 1497:21

**computer-aided** [1] - 1362:6

**concern** [6] - 1368:18, 1407:16, 1410:7, 1411:12, 1430:10, 1430:18

**concerned** [1] - 1414:23

**concerning** [3] - 1393:16, 1406:15, 1473:21

**concerns** [1] - 1449:10

**conclude** [2] - 1380:11, 1411:3

**concluded** [7] - 1368:12, 1371:6, 1374:8, 1384:11, 1401:12, 1473:12, 1473:14

**Concludes** [1] - 1385:15

**concludes** [3] - 1369:3, 1462:12, 1464:10

**concluding** [1] - 1386:14

**conclusion** [4] - 1374:12, 1380:17, 1464:25, 1465:14

**conclusions** [12] - 1371:10, 1372:15, 1381:19, 1381:21, 1382:16, 1383:6, 1395:24, 1459:14, 1462:20, 1463:13, 1464:16, 1475:9

**concocted** [1] - 1471:22

**condense** [1] - 1384:14

**conduct** [5] - 1386:10, 1386:23, 1408:3, 1488:8, 1488:12

**conducted** [1] - 1388:25

**conduit** [1] - 1387:20

**confess** [1] - 1386:5

**confirm** [2] - 1365:2, 1365:5

**confirmed** [1] - 1424:24

**confirming** [1] - 1396:7

**confused** [4] - 1451:6, 1451:9, 1473:24

**confusing** [1] - 1464:1

**congressmen** [1] - 1428:2

**connection** [2] - 1388:18, 1490:12

**consider** [3] - 1373:15, 1376:20, 1420:4

**consideration** [3] - 1383:25, 1397:12, 1407:23

**considered** [2] - 1401:24, 1460:1

**considers** [2] - 1449:10, 1450:5

**consistent** [7] - 1410:20, 1452:22, 1463:12, 1463:16, 1463:21, 1464:12, 1475:22

**consolidates** [1] - 1438:15

**constitute** [1] - 1369:20

**Constitution** [1] - 1362:4

**consultant** [8] - 1380:19, 1382:2, 1384:18, 1384:24, 1385:24, 1407:3, 1435:16, 1502:2

**consultants** [1] - 1436:1

**Consulting** [1] - 1427:8

**contact** [7] - 1454:23, 1454:25, 1455:2, 1497:7, 1497:10, 1500:9, 1501:22

**contacts** [8] - 1418:12, 1419:16, 1420:14, 1420:21, 1428:10, 1437:4, 1443:20, 1499:20

**content** [3] - 1383:10, 1384:6, 1407:20

**contents** [1] - 1393:18

**contexts** [1] - 1415:9

**continue** [5] - 1365:23, 1381:14, 1398:1, 1446:11, 1480:13

**continued** [2] - 1371:18, 1394:5

**contradictory** [1] - 1391:1

**contrary** [1] - 1380:5

**Control** [1] - 1438:14

**control** [10] - 1395:22, 1399:6, 1429:4, 1440:17, 1441:1, 1453:24, 1454:1, 1454:4, 1479:13, 1502:17

**controversial** [1] - 1473:1

**convene** [1] - 1403:9

**convenience** [1] - 1480:12

**conversation** [6] - 1425:2, 1425:5, 1425:11, 1447:20, 1448:21, 1501:22

**conversations** [4] - 1477:21, 1480:16, 1496:24, 1497:2

**convey** [2] - 1382:3, 1385:6

**conveyed** [1] - 1385:7

**convicted** [1] - 1370:14

**conviction** [5] - 1388:1, 1437:15, 1462:15, 1473:3, 1503:22

**cooperative** [1] - 1392:16

**coordination** [1] - 1435:22

**copied** [8] - 1426:19, 1431:2, 1431:3, 1466:22, 1467:8, 1467:17, 1484:10, 1500:3

**copies** [4] - 1434:12, 1438:9, 1468:1, 1469:14

**copy** [12] - 1373:11, 1389:19, 1391:13, 1396:8, 1412:1, 1423:20, 1450:13, 1452:18, 1456:7, 1466:15, 1466:16

**copying** [1] - 1410:13

**correct** [17] - 1385:19, 1410:17, 1420:14, 1420:25, 1436:17, 1440:11, 1457:11, 1469:12, 1469:16, 1473:22, 1479:18, 1490:25, 1493:9, 1497:22, 1505:10, 1506:12, 1513:4

**corrected** [3] - 1454:11, 1466:4, 1477:18

**correcting** [1] - 1494:13

**correction** [2] - 1477:15, 1478:11

**corrections** [3] - 1373:5, 1395:10, 1454:13

**correctly** [3] - 1381:6, 1386:22, 1493:15

**Council** [1] - 1422:4, 1427:19

**counsel** [8] - 1368:21, 1369:20, 1382:7, 1382:8, 1382:10, 1434:18, 1473:11, 1473:17

**counted** [1] - 1484:4

**countries** [3] - 1386:11, 1415:24, 1493:18

**country** [2] - 1451:15, 1493:16

**couple** [8] - 1395:4, 1399:16, 1415:9, 1420:18, 1474:5, 1483:8, 1483:16, 1494:16

**course** [2] - 1408:5, 1454:3

**COURT** [170] - 1361:1, 1364:6, 1364:15, 1364:24, 1365:2, 1365:10, 1365:16, 1365:18, 1365:23, 1367:10, 1367:15, 1367:18, 1372:2, 1372:24, 1373:2, 1373:8, 1375:6, 1378:20, 1384:2, 1384:4, 1389:25, 1390:21, 1392:8, 1392:12, 1392:18, 1403:12, 1403:18, 1403:20, 1404:4, 1404:8, 1404:15, 1404:18, 1409:3, 1409:6, 1409:11, 1409:14, 1409:17, 1411:16, 1411:19, 1412:21, 1412:25, 1413:2, 1413:7, 1413:21, 1414:13, 1414:15, 1415:8, 1415:14, 1415:17, 1415:20, 1415:23, 1418:20, 1418:24, 1419:9, 1419:14, 1422:14, 1423:9, 1429:14, 1429:17, 1429:21, 1430:3, 1430:17, 1431:10, 1431:13, 1431:22, 1432:1, 1432:7, 1432:9, 1436:8, 1436:10, 1439:23, 1439:25, 1440:3, 1440:6, 1442:19, 1442:22, 1443:3, 1444:20, 1445:10, 1445:14, 1445:22, 1446:2, 1446:5, 1446:11, 1446:14, 1450:4,

1452:9, 1459:17, 1462:23, 1463:2,
1463:6, 1463:10, 1463:14, 1463:19,
1463:25, 1464:5, 1464:21, 1467:1,
1476:6, 1476:9, 1477:17, 1478:2,
1478:5, 1478:13, 1478:16, 1478:24,
1479:2, 1479:5, 1479:16, 1479:19,
1479:24, 1480:1, 1480:3, 1483:14,
1483:18, 1483:22, 1485:3, 1485:22,
1486:2, 1486:11, 1486:14, 1486:18,
1487:7, 1487:22, 1488:7, 1488:10,
1488:16, 1489:5, 1489:14, 1490:4,
1490:7, 1491:11, 1492:24, 1498:12,
1499:14, 1500:14, 1500:17, 1500:19,
1500:23, 1501:3, 1504:6, 1504:8,
1504:12, 1504:16, 1504:19, 1505:3,
1505:15, 1505:19, 1505:24, 1506:3,
1506:23, 1507:3, 1507:6, 1507:13,
1507:17, 1508:14, 1509:6, 1509:21,
1510:9, 1510:22, 1510:24, 1511:2,
1511:9, 1511:12, 1512:1, 1512:10,
1512:15, 1512:18, 1512:21, 1513:1
 **court** [21] - 1364:23, 1369:17, 1381:14,
1386:10, 1386:23, 1401:5, 1404:23,
1413:3, 1413:25, 1417:7, 1418:20,
1432:8, 1459:5, 1460:9, 1472:19,
1473:16, 1480:2, 1485:22, 1486:14,
1489:16, 1507:20
 **Court** [12] - 1362:3, 1364:9, 1364:22,
1364:24, 1388:2, 1417:8, 1417:12,
1437:16, 1459:6, 1459:10, 1472:25,
1510:3
 **Court's** [2] - 1369:5, 1369:17
 **courtesy** [1] - 1441:2
 **Courthouse** [1] - 1362:3
 **courtroom** [1] - 1365:11
 **courts** [2] - 1369:21, 1370:5
 **coverage** [2] - 1470:12, 1484:15
 **covered** [3] - 1492:10, 1492:14,
1504:25
 **Cox** [1] - 1423:1, 1436:23
 **Craig** [142] - 1364:5, 1366:20, 1368:21,
1369:3, 1369:15, 1374:25, 1375:8,
1379:7, 1379:11, 1383:25, 1388:5,
1389:9, 1392:4, 1392:20, 1392:21,
1395:19, 1395:23, 1396:1, 1398:14,
1399:19, 1402:19, 1405:13, 1405:23,
1406:2, 1406:8, 1406:15, 1407:9,
1408:12, 1408:22, 1409:23, 1410:13,
1410:23, 1411:11, 1412:2, 1412:17,
1413:13, 1413:21, 1418:5, 1419:2,
1419:21, 1421:6, 1421:10, 1422:7,
1423:1, 1423:5, 1423:11, 1423:15,
1423:16, 1424:12, 1424:15, 1424:20,
1425:3, 1425:5, 1425:10, 1426:19,
1437:23, 1439:10, 1439:12, 1439:20,
1439:25, 1440:4, 1440:10, 1441:7,
1442:8, 1443:16, 1444:16, 1444:25,
1445:1, 1446:10, 1447:20, 1448:1,
1448:11, 1448:19, 1448:22, 1448:24,
1451:13, 1452:5, 1452:17, 1453:8,

1454:1, 1454:17, 1454:19, 1455:2,
1455:12, 1455:17, 1456:6, 1456:12,
1456:16, 1457:2, 1457:24, 1458:10,
1465:24, 1466:7, 1466:13, 1468:16,
1468:22, 1471:1, 1472:7, 1473:10,
1474:11, 1474:19, 1474:22, 1475:9,
1476:12, 1477:21, 1478:21, 1480:16,
1480:24, 1485:9, 1485:19, 1487:17,
1490:11, 1492:5, 1492:8, 1492:12,
1493:5, 1493:8, 1493:21, 1494:3,
1494:12, 1495:1, 1495:8, 1495:12,
1496:13, 1496:18, 1496:24, 1497:6,
1497:11, 1498:8, 1500:9, 1500:23,
1500:24, 1501:5, 1501:16, 1501:22,
1502:10, 1502:12, 1502:16, 1502:25,
1504:1, 1509:3
 **CRAIG** [1] - 1361:5
 **Craig's** [8] - 1399:22, 1407:12,
1440:20, 1451:21, 1455:4, 1470:5,
1474:3, 1475:11
 **created** [1] - 1416:15
 **credibility** [6] - 1486:8, 1486:13,
1486:20, 1486:21, 1487:25, 1489:6
 **crime** [7] - 1370:14, 1388:25, 1389:2,
1465:12, 1465:14, 1493:20, 1494:1
 **criminal** [2] - 1388:24, 1446:8
 **Criminal** [2] - 1361:4, 1364:3
 **crisp** [1] - 1479:11
 **critical** [1] - 1369:19
 **criticism** [1] - 1398:20
 **criticized** [1] - 1370:5
 **cross** [15] - 1364:14, 1404:13,
1404:14, 1479:12, 1479:20, 1488:20,
1500:19, 1500:21, 1504:25, 1505:9,
1505:16, 1505:24, 1507:9, 1508:17,
1512:2
 **CROSS** [2] - 1363:4, 1366:1
 **CROSS-EXAMINATION** [1] - 1366:1
 **cross-examination** [4] - 1364:14,
1488:20, 1508:17, 1512:2
 **CRR** [1] - 1362:3
 **current** [1] - 1478:19
 **curtail** [1] - 1364:14
 **cutdown** [1] - 1387:8, 1387:22

## D

 **D.C** [3] - 1361:6, 1362:4, 1426:12
 **Daily** [13] - 1453:20, 1457:3, 1457:9,
1457:25, 1458:17, 1459:23, 1460:3,
1472:4, 1472:22, 1473:5, 1474:20,
1475:21, 1483:5
 **damage** [1] - 1430:7
 **dangers** [1] - 1474:16
 **database** [1] - 1448:17
 **DATE** [1] - 1513:9
 **date** [11] - 1387:4, 1424:23, 1424:24,
1481:9, 1482:9, 1490:7, 1491:2,
1497:19, 1508:25, 1509:8, 1510:6
 **dated** [6] - 1420:14, 1423:20, 1437:8,

1461:22, 1482:8, 1484:10
 **dates** [5] - 1373:5, 1403:4, 1411:24,
1413:16, 1486:8
 **David** [6] - 1368:19, 1428:17, 1428:18,
1442:7, 1448:7, 1451:21
 **Davis** [1] - 1421:25
 **dawn** [1] - 1449:24
 **DAY** [1] - 1361:5
 **days** [7] - 1373:23, 1376:5, 1390:7,
1396:12, 1433:23, 1452:6, 1512:12
 **DC** [3] - 1361:15, 1361:17, 1361:25
 **deal** [1] - 1489:12
 **dealing** [1] - 1476:15
 **December** [26] - 1385:22, 1438:9,
1439:1, 1440:22, 1444:3, 1444:25,
1447:13, 1449:2, 1454:16, 1455:12,
1457:8, 1457:24, 1458:15, 1461:22,
1466:20, 1467:7, 1469:7, 1476:22,
1481:8, 1481:10, 1482:8, 1484:10,
1485:10, 1498:18, 1498:19, 1501:17
 **decision** [10] - 1369:4, 1369:5,
1381:13, 1417:6, 1417:8, 1459:3,
1459:5, 1460:8, 1475:14, 1481:21
 **decisions** [2] - 1369:18, 1372:12
 **deemed** [1] - 1476:9
 **DEFENDANT** [1] - 1363:12
 **Defendant** [5] - 1361:6, 1361:19,
1367:19, 1414:16, 1467:2
 **defendant** [4] - 1369:18, 1387:6,
1426:22, 1427:4
 **defendant's** [6] - 1388:15, 1391:5,
1391:6, 1396:4, 1426:23, 1430:24
 **Defendant's** [21] - 1366:3, 1366:23,
1376:12, 1376:16, 1387:2, 1411:25,
1412:19, 1414:2, 1414:12, 1420:6,
1426:21, 1430:23, 1434:10, 1457:5,
1458:13, 1460:17, 1476:17, 1481:3,
1482:1, 1503:3, 1507:24
 **Defense** [2] - 1466:14, 1499:23
 **defense** [13] - 1364:9, 1365:11,
1369:5, 1369:7, 1381:2, 1381:7,
1401:5, 1451:18, 1472:25, 1479:11,
1485:10, 1495:15, 1499:23
 **definitely** [8] - 1374:4, 1389:14,
1394:15, 1443:6, 1445:7, 1448:23,
1475:3, 1506:14
 **definitive** [1] - 1488:16
 **Delete** [1] - 1493:23
 **deliberately** [1] - 1453:22
 **delighted** [1] - 1451:14
 **deliver** [1] - 1442:25
 **delivered** [1] - 1499:22
 **delivering** [1] - 1456:8
 **denial** [1] - 1382:12
 **denied** [2] - 1371:4, 1382:7
 **department** [3] - 1402:7, 1406:24,
1407:19
 **Department** [4] - 1422:5, 1427:18,
1487:2
 **DEPARTMENT** [1] - 1361:16

**departments** [1] - 1435:24
**DEPUTY** [5] - 1364:3, 1366:5, 1446:8, 1451:18, 1506:10, 1512:9
**der** [17] - 1396:6, 1396:10, 1402:3, 1406:23, 1433:19, 1438:24, 1439:7, 1440:4, 1440:9, 1444:9, 1446:24, 1447:4, 1468:25, 1490:11, 1496:8, 1500:5
**described** [3] - 1398:19, 1399:1, 1456:3, 1486:6, 1490:9
**desire** [2] - 1411:6, 1420:16
**desired** [1] - 1421:3
**despite** [2] - 1400:6, 1472:10
**detail** [5] - 1425:14, 1430:20, 1479:17, 1479:20, 1486:6
**detailed** [1] - 1386:21
**details** [3] - 1489:10, 1489:11, 1509:8
**detention** [1] - 1370:2
**determined** [1] - 1451:25
**develop** [1] - 1426:8
**developed** [1] - 1436:21
**difference** [3] - 1375:9, 1397:5, 1458:2
**different** [9] - 1375:11, 1413:8, 1415:9, 1424:9, 1465:6, 1504:22, 1505:11, 1506:14, 1508:10
**dinner** [7] - 1398:5, 1485:17, 1487:9, 1487:10, 1488:5, 1488:22, 1490:10
**diplomats** [1] - 1388:7
**direct** [10] - 1367:22, 1369:10, 1406:14, 1422:16, 1424:2, 1470:7, 1475:1, 1479:17, 1485:6, 1508:16
**DIRECT** [1] - 1363:4
**directed** [3] - 1416:5, 1417:16, 1435:10
**directing** [1] - 1481:22
**direction** [1] - 1409:25
**directions** [1] - 1374:4
**directly** [2] - 1497:5, 1506:9
**disagree** [1] - 1385:2
**disappeared** [1] - 1382:8
**disappointed** [1] - 1380:4
**disappointment** [1] - 1470:5
**disaster** [1] - 1372:9
**discredit** [3] - 1405:8, 1417:4, 1459:2
**discuss** [4] - 1389:8, 1445:18, 1492:7, 1511:17
**discussed** [14] - 1392:4, 1392:23, 1392:24, 1393:2, 1393:11, 1399:25, 1405:1, 1425:18, 1478:6, 1482:12, 1486:9, 1488:5, 1493:5, 1508:17
**discussing** [1] - 1395:24
**discussion** [9] - 1389:11, 1391:22, 1394:23, 1415:10, 1453:3, 1465:17, 1486:9, 1494:23, 1494:25
**discussions** [5] - 1375:8, 1398:15, 1478:22, 1480:24, 1501:16
**dishonesty** [3] - 1487:23, 1487:24, 1488:2
**dispute** [1] - 1430:12
**disputed** [1] - 1478:15

**disregard** [1] - 1408:1
**distinguish** [1] - 1383:11
**distributed** [3] - 1482:17, 1506:18, 1509:10
**distribution** [3] - 1433:12, 1433:23, 1483:2
**DISTRICT** [4] - 1361:1, 1361:1, 1361:10, 1361:14
**doctor** [2] - 1385:24, 1435:19
**doctors** [1] - 1384:22
**document** [66] - 1366:24, 1367:12, 1367:13, 1372:11, 1372:16, 1374:14, 1375:1, 1376:13, 1376:22, 1377:13, 1382:20, 1383:15, 1383:16, 1383:17, 1387:3, 1388:21, 1389:22, 1391:13, 1393:15, 1396:22, 1400:17, 1404:9, 1405:7, 1405:10, 1405:12, 1409:10, 1410:15, 1412:3, 1412:16, 1412:22, 1412:24, 1413:7, 1413:10, 1423:24, 1425:9, 1425:18, 1426:11, 1426:16, 1428:22, 1438:2, 1438:13, 1438:20, 1439:13, 1440:12, 1440:13, 1440:16, 1444:16, 1459:18, 1460:4, 1464:3, 1465:17, 1466:2, 1479:16, 1482:16, 1492:5, 1492:12, 1493:22, 1495:13, 1506:9, 1506:11, 1508:1, 1508:21, 1510:4, 1511:6
**documents** [31] - 1373:25, 1383:24, 1393:5, 1394:5, 1395:13, 1397:2, 1397:7, 1397:10, 1397:15, 1404:10, 1410:20, 1414:9, 1414:10, 1416:6, 1416:16, 1417:18, 1425:13, 1426:17, 1433:6, 1433:11, 1438:12, 1444:21, 1446:23, 1465:16, 1465:25, 1466:12, 1479:19, 1491:22, 1492:1
**done** [7] - 1377:5, 1399:19, 1408:21, 1439:20, 1477:5, 1480:11, 1485:19
**dossier** [1] - 1472:24
**dot** [1] - 1480:9
**doubt** [5] - 1380:7, 1428:25, 1437:24, 1501:11, 1509:22
**down** [14] - 1382:6, 1388:4, 1400:21, 1401:24, 1404:25, 1433:3, 1436:16, 1443:9, 1448:12, 1452:14, 1471:15, 1481:10, 1510:23, 1511:10
**draft** [34] - 1367:6, 1368:1, 1369:22, 1370:7, 1370:9, 1370:21, 1371:21, 1373:12, 1376:20, 1378:5, 1378:8, 1378:10, 1378:21, 1379:19, 1379:22, 1379:24, 1380:5, 1383:24, 1385:10, 1385:18, 1385:25, 1386:6, 1386:14, 1386:15, 1389:8, 1389:20, 1394:5, 1397:11, 1461:23, 1462:7, 1465:8, 1503:9, 1504:21, 1508:20
**drafted** [5] - 1375:20, 1386:12, 1386:13, 1463:12, 1505:10
**drafting** [1] - 1377:9
**drafts** [1] - 1386:4
**draftsman** [1] - 1385:20
**drawing** [1] - 1377:16

**drive** [1] - 1512:6
**driven** [1] - 1370:19
**ducked** [1] - 1370:13
**due** [4] - 1369:21, 1460:12, 1473:20, 1494:16
**duly** [1] - 1365:21
**duration** [1] - 1398:9
**during** [13] - 1368:13, 1370:2, 1374:20, 1394:23, 1395:5, 1395:20, 1399:8, 1404:13, 1422:16, 1473:15, 1500:9, 1505:9, 1508:17
**dust** [1] - 1415:10
**dust-up** [1] - 1415:10
**duty** [1] - 1364:20
**Dynamics** [1] - 1427:8

## E

**e-mail** [86] - 1366:9, 1367:1, 1367:15, 1372:5, 1373:12, 1375:18, 1388:16, 1391:7, 1391:8, 1396:6, 1396:23, 1400:17, 1406:15, 1407:13, 1408:1, 1408:12, 1408:24, 1409:23, 1410:5, 1410:6, 1410:13, 1412:1, 1413:13, 1414:6, 1414:8, 1416:11, 1417:25, 1419:24, 1420:3, 1420:7, 1422:17, 1423:19, 1423:21, 1425:15, 1426:24, 1427:7, 1431:1, 1432:14, 1434:11, 1438:8, 1439:3, 1439:4, 1439:6, 1444:2, 1444:4, 1444:18, 1446:20, 1446:21, 1448:1, 1449:1, 1449:5, 1449:8, 1449:20, 1451:3, 1451:12, 1451:21, 1457:24, 1458:14, 1460:18, 1460:19, 1460:23, 1460:24, 1461:23, 1466:20, 1466:22, 1467:4, 1467:5, 1467:9, 1467:17, 1467:22, 1469:4, 1470:19, 1476:21, 1481:5, 1481:10, 1482:4, 1483:6, 1484:9, 1494:23, 1495:1, 1495:4, 1497:19, 1500:2, 1501:24, 1509:2, 1510:6
**e-mailed** [3] - 1448:5, 1448:6, 1449:6
**e-mails** [3] - 1411:11, 1411:22, 1431:9
**early** [3] - 1366:19, 1385:25, 1397:20
**easier** [1] - 1451:15
**East** [2] - 1361:20, 1402:24
**easy** [2] - 1454:14, 1454:17
**Eckart** [2] - 1431:2, 1455:25
**edit** [1] - 1378:25
**edited** [3] - 1379:1, 1379:7, 1432:21
**editorializing** [1] - 1490:2
**edits** [1] - 1438:13
**effectively** [1] - 1408:20
**effort** [4] - 1384:13, 1384:14, 1410:19, 1490:16
**efforts** [3] - 1372:19, 1372:25, 1379:5
**Egypt** [1] - 1424:20
**either** [4] - 1366:18, 1397:2, 1442:1, 1443:13
**electronic** [1] - 1499:25
**elements** [7] - 1370:16, 1472:11,

1474:5, 1474:7, 1474:8, 1474:9, 1494:16
**elicit** [1] - 1489:4
**email** [1] - 1439:8
**embassies** [2] - 1436:22
**embedded** [1] - 1436:15
**Emily** [1] - 1480:22
**emotional** [2] - 1429:17, 1429:19
**emphasis** [1] - 1474:20
**encouraged** [1] - 1479:11
**end** [7] - 1366:19, 1445:12, 1449:8, 1479:7, 1487:4, 1489:9, 1512:7
**ending** [1] - 1364:16
**endorsement** [1] - 1437:13
**engage** [2] - 1377:10, 1452:24
**engagement** [1] - 1497:6
**engaging** [2] - 1376:5, 1408:2
**England** [1] - 1384:21
**English** [2] - 1415:15, 1461:7
**enlargement** [1] - 1420:24
**enlisted** [1] - 1419:5
**ensure** [2] - 1426:7, 1474:17
**entertained** [2] - 1406:8, 1406:10
**entirely** [8] - 1386:24, 1407:18, 1407:22, 1408:1, 1409:2, 1409:13, 1441:5, 1471:4
**entitled** [3] - 1438:14, 1486:24, 1513:5
**entity** [1] - 1426:8
**erroneously** [1] - 1406:12
**error** [2] - 1431:23, 1432:12
**errors** [2] - 1384:1, 1454:13
**Esq** [4] - 1361:19, 1361:19, 1361:22, 1361:23
**essentially** [2] - 1417:16, 1488:21
**establish** [4] - 1417:11, 1459:8, 1489:8, 1505:13
**etc** [1] - 1468:19
**EU** [5] - 1405:18, 1405:20, 1420:24, 1443:17, 1443:19
**Euro-2012** [1] - 1368:18
**Europe** [2] - 1405:14, 1481:6
**European** [12] - 1368:19, 1368:25, 1399:22, 1406:3, 1421:3, 1424:13, 1434:4, 1443:19, 1462:15, 1472:25, 1475:25, 1483:18
**Europeans** [2] - 1442:4, 1442:5
**eve** [1] - 1394:8
**even-handed** [1] - 1471:5
**evening** [3] - 1511:13, 1511:23, 1512:22
**event** [6] - 1366:15, 1385:9, 1425:6, 1485:7, 1486:6, 1491:4
**events** [2] - 1486:5, 1494:17
**evidence** [39] - 1366:5, 1366:6, 1367:7, 1367:19, 1369:4, 1374:1, 1374:19, 1375:2, 1375:11, 1380:6, 1381:14, 1383:2, 1386:8, 1388:1, 1388:24, 1389:3, 1412:13, 1414:16, 1417:10, 1437:16, 1454:2, 1459:7,

1460:9, 1462:14, 1467:2, 1473:15, 1477:25, 1485:23, 1486:19, 1488:11, 1488:14, 1503:21, 1505:11, 1506:14, 1508:7, 1511:3, 1511:5, 1511:6, 1512:2
**Ex** [1] - 1470:16
**Ex-Premier** [1] - 1470:16
**exactly** [8] - 1384:6, 1393:14, 1396:11, 1432:15, 1444:8, 1450:25, 1470:16, 1475:15
**EXAMINATION** [4] - 1366:1, 1491:17, 1507:21, 1509:13
**examination** [6] - 1364:14, 1388:23, 1404:14, 1488:20, 1508:17, 1512:2
**examined** [1] - 1365:21
**example** [4] - 1398:6, 1478:16, 1493:13, 1494:18
**exception** [2] - 1468:19, 1500:21
**exchange** [9] - 1406:15, 1417:25, 1426:24, 1455:12, 1458:14, 1467:5, 1467:8, 1467:9, 1481:5
**exchanges** [1] - 1423:22
**excited** [2] - 1415:21, 1455:22
**excluded** [1] - 1408:14
**exclusive** [1] - 1442:7, 1457:16
**excused** [5] - 1445:23, 1510:23, 1511:1, 1512:17, 1512:18
**executed** [2] - 1406:1, 1499:16, 1499:17
**execution** [1] - 1499:22
**executive** [2] - 1374:16, 1450:15
**exercise** [2] - 1372:17, 1372:19
**Exhibit** [73] - 1366:4, 1366:23, 1367:9, 1375:16, 1375:17, 1376:12, 1387:2, 1388:15, 1389:16, 1390:1, 1391:5, 1396:4, 1396:16, 1396:18, 1397:14, 1400:14, 1406:13, 1409:4, 1409:21, 1410:12, 1411:25, 1412:19, 1414:3, 1416:9, 1416:10, 1417:22, 1417:25, 1420:6, 1422:17, 1422:21, 1423:18, 1432:18, 1434:10, 1438:4, 1438:8, 1445:9, 1446:18, 1447:12, 1448:25, 1451:17, 1451:19, 1454:19, 1455:10, 1456:10, 1457:5, 1457:23, 1458:13, 1461:21, 1466:14, 1466:19, 1466:23, 1469:3, 1471:16, 1476:17, 1481:4, 1482:1, 1484:8, 1492:19, 1495:16, 1497:18, 1499:24, 1501:13, 1503:3, 1507:24, 1510:2, 1510:5
**exhibit** [22] - 1377:14, 1385:10, 1387:5, 1389:25, 1391:6, 1391:7, 1393:7, 1399:7, 1399:15, 1400:25, 1412:1, 1412:5, 1420:13, 1434:1, 1435:9, 1437:7, 1444:15, 1444:19, 1449:1, 1471:15, 1507:23, 1511:1
**EXHIBIT** [1] - 1363:12
**exhibits** [5] - 1399:12, 1411:21, 1492:22, 1512:2, 1512:3
**existed** [1] - 1369:11
**exonerate** [1] - 1416:21

**expand** [2] - 1428:24, 1495:6
**expanded** [1] - 1420:16
**expansion** [1] - 1499:19
**expect** [1] - 1407:10
**expected** [2] - 1424:25, 1447:4
**experience** [3] - 1432:13, 1439:20, 1497:13
**experienced** [1] - 1472:13
**experiences** [1] - 1399:1
**expert** [1] - 1419:18
**expertise** [1] - 1370:17
**explain** [2] - 1432:2, 1475:12
**explained** [1] - 1390:24, 1408:22
**explaining** [1] - 1396:2
**express** [1] - 1430:17
**expressed** [2] - 1419:21, 1475:20
**expression** [4] - 1383:8, 1383:17, 1415:15, 1424:8
**expressly** [1] - 1449:21
**extent** [3] - 1392:25, 1439:13, 1480:20
**external** [1] - 1435:25
**extra** [1] - 1408:20
**extraordinary** [1] - 1408:18
**extremely** [2] - 1414:23, 1488:20
**extrinsic** [2] - 1488:10, 1488:14
**eye** [1] - 1412:9

**F**

**fabricating** [1] - 1487:1
**face** [2] - 1407:7, 1407:8
**fact** [26] - 1374:1, 1378:10, 1389:12, 1395:18, 1401:4, 1401:12, 1403:22, 1404:5, 1404:10, 1417:11, 1439:14, 1450:1, 1451:7, 1454:8, 1459:8, 1477:14, 1478:6, 1478:9, 1485:17, 1485:23, 1485:25, 1486:23, 1492:17, 1494:3, 1497:5
**facts** [10] - 1376:25, 1377:5, 1377:7, 1403:20, 1417:9, 1450:10, 1459:6, 1477:25, 1478:17, 1502:21
**factual** [3] - 1373:4, 1384:1, 1462:14
**failed** [2] - 1412:12, 1503:20
**Failings** [1] - 1470:15
**failure** [1] - 1489:1
**fair** [12] - 1371:9, 1378:18, 1383:13, 1446:2, 1450:25, 1454:14, 1462:19, 1473:13, 1496:16, 1505:7, 1507:12, 1507:13
**fairly** [3] - 1407:21, 1460:5, 1507:14
**fall** [1] - 1429:6
**false** [1] - 1380:10
**familiar** [1] - 1431:4
**fantasy** [1] - 1499:1
**far** [5] - 1400:8, 1450:22, 1469:21, 1474:12, 1502:24
**fascinating** [1] - 1453:1
**favor** [1] - 1457:13
**FBI** [2] - 1486:5, 1487:1
**FD** [1] - 1427:6

feared [1] - 1366:18
feast [1] - 1490:10
felt [1] - 1472:12
Fenton [1] - 1484:11
Fernando [1] - 1361:12
few [5] - 1390:7, 1396:12, 1410:6, 1469:23, 1484:4
fiercely [2] - 1398:19, 1398:22
fifth [1] - 1388:4
fight [1] - 1473:4
file [1] - 1438:14
final [7] - 1369:23, 1370:9, 1378:8, 1378:22, 1386:14, 1505:8, 1509:15
Finalize [1] - 1426:4
finally [4] - 1369:11, 1451:24, 1504:1, 1510:16
Financial [1] - 1427:7
financing [1] - 1405:4
Findings [1] - 1384:10
findings [16] - 1382:25, 1383:15, 1383:18, 1386:7, 1396:2, 1416:12, 1416:19, 1416:21, 1416:25, 1417:4, 1417:11, 1417:17, 1459:1, 1459:8, 1460:13, 1473:20
fine [5] - 1415:14, 1460:25, 1464:22, 1478:14, 1495:21
finish [5] - 1365:13, 1480:6, 1480:7, 1480:8, 1500:17
finished [3] - 1364:12, 1479:25, 1483:11
firebrand [1] - 1472:17
firing [1] - 1424:7
firm [3] - 1437:12, 1437:22, 1508:5
firms [1] - 1426:14
first [20] - 1368:11, 1372:13, 1376:5, 1377:21, 1378:14, 1386:2, 1387:22, 1391:18, 1398:13, 1400:8, 1431:15, 1432:14, 1451:25, 1458:23, 1462:23, 1472:15, 1481:11, 1487:8, 1492:4
fishy [1] - 1432:3
five [3] - 1397:5, 1427:17, 1427:23
five-hour [1] - 1397:5
fix [2] - 1424:25, 1425:5
fixed [1] - 1425:3
flak [1] - 1374:24
flaky [1] - 1429:4
flap [4] - 1415:10, 1429:20, 1429:23, 1430:6
flapper [1] - 1430:8
flapping [4] - 1415:1, 1415:2, 1415:3, 1415:11
flappy [1] - 1456:4
Flawed [1] - 1471:18
flawed [1] - 1472:18
Fletcher [2] - 1457:8, 1457:22
Flom [1] - 1508:6
floundering [1] - 1415:12
focus [3] - 1493:4, 1506:12, 1507:15
focused [3] - 1479:22, 1488:20,

1490:5
folks [5] - 1372:15, 1384:21, 1449:25, 1485:18, 1486:6
follow [2] - 1403:22, 1476:20
followed [1] - 1500:20
following [3] - 1426:18, 1441:12, 1461:2
Following [1] - 1368:17
follows [2] - 1365:22, 1435:13
Football [1] - 1368:19
football [1] - 1369:1
FOR [2] - 1361:1, 1361:13
forced [1] - 1473:4
foregoing [1] - 1513:3
Foreign [6] - 1422:24, 1433:10, 1436:14, 1436:20, 1441:5, 1441:7
foreign [2] - 1436:22, 1452:11
forgotten [1] - 1396:14
form [18] - 1371:23, 1375:4, 1381:25, 1390:14, 1392:6, 1395:6, 1411:14, 1419:7, 1423:7, 1430:1, 1430:13, 1442:17, 1450:3, 1458:20, 1459:15, 1462:21, 1477:24, 1490:1
format [2] - 1426:15, 1512:6
formats [1] - 1425:22
Former [1] - 1368:7
former [5] - 1368:21, 1369:15, 1389:1, 1472:17, 1473:10
forth [1] - 1426:17
forward [2] - 1416:6, 1440:25
forwarded [7] - 1390:7, 1391:14, 1427:1, 1438:20, 1438:23, 1454:20, 1506:20
forwarding [2] - 1446:24, 1509:3
foundation [2] - 1372:23, 1500:11
four [1] - 1489:2
fourth [2] - 1388:4, 1462:10
Fourth [1] - 1361:14
frankly [3] - 1450:22, 1466:11, 1487:5
free [3] - 1371:10, 1400:6, 1511:21
Free [1] - 1481:6
fresh [1] - 1473:4
Friday [1] - 1391:9
Friedman [10] - 1431:6, 1431:25, 1433:19, 1436:13, 1455:25, 1467:16, 1467:25, 1468:11, 1469:15, 1475:19
friendly [1] - 1398:24
froms [1] - 1467:22
front [4] - 1381:22, 1382:19, 1410:9, 1450:13
FTI [9] - 1387:8, 1391:14, 1397:3, 1407:20, 1408:23, 1427:6, 1427:8, 1482:21, 1498:3
FTI/MCW [1] - 1421:16
Fule [2] - 1405:13, 1405:16, 1420:23, 1421:4, 1421:7, 1421:10, 1423:2, 1436:23, 1441:13
full [5] - 1392:25, 1430:8, 1432:14, 1480:20, 1481:11

fun [1] - 1407:5
fundamental [2] - 1380:17, 1408:11

**G**

Gaston [1] - 1361:13
gates [61] - 1375:18, 1375:23, 1376:13, 1376:19, 1382:23, 1384:2, 1387:4, 1387:11, 1387:16, 1388:16, 1390:3, 1392:14, 1392:19, 1404:25, 1413:17, 1413:24, 1420:17, 1421:9, 1422:11, 1423:20, 1425:16, 1426:3, 1426:25, 1427:17, 1431:2, 1438:8, 1438:11, 1440:9, 1440:25, 1442:6, 1442:15, 1442:19, 1442:21, 1444:2, 1455:2, 1456:11, 1457:1, 1459:24, 1460:20, 1460:23, 1461:9, 1461:14, 1461:23, 1462:1, 1465:21, 1467:11, 1468:15, 1468:22, 1469:14, 1470:19, 1475:13, 1482:4, 1484:9, 1497:14, 1497:17, 1500:3, 1501:2, 1501:3, 1504:24, 1505:12, 1506:15
Gates [32] - 1390:20, 1391:9, 1391:17, 1392:3, 1395:18, 1396:12, 1400:18, 1400:23, 1401:23, 1402:2, 1402:8, 1406:11, 1410:14, 1420:7, 1426:15, 1428:21, 1432:24, 1433:19, 1434:12, 1435:25, 1439:7, 1444:9, 1455:21, 1458:14, 1461:8, 1466:20, 1467:12, 1467:25, 1468:18, 1472:13, 1500:8, 1501:11
Gates' [7] - 1376:10, 1405:22, 1422:17, 1423:14, 1443:15, 1446:21, 1469:4
gather [1] - 1446:25
GC [1] - 1498:5
general [1] - 1399:10
General [8] - 1376:21, 1377:17, 1378:4, 1379:6, 1386:16, 1386:19, 1403:9, 1433:11
General's [1] - 1485:18
generally [3] - 1404:16, 1430:6, 1492:2
geographies [1] - 1483:3
George [1] - 1484:11
gifts [2] - 1488:23, 1489:11
given [10] - 1381:2, 1385:23, 1400:6, 1442:6, 1451:25, 1458:20, 1473:13, 1479:9, 1490:15, 1511:2
globally [1] - 1484:15
gmail [2] - 1444:6, 1444:7
goal [2] - 1480:4, 1491:15
Gordon [1] - 1422:5
gosh [1] - 1392:1
Government [20] - 1361:12, 1364:6, 1375:16, 1389:18, 1390:1, 1396:16, 1396:18, 1400:14, 1406:13, 1409:20, 1416:10, 1422:17, 1423:18, 1425:15, 1438:4, 1445:9, 1451:19, 1469:3, 1471:19, 1497:18

**government** [29] - 1368:12, 1373:15, 1373:20, 1373:21, 1387:5, 1387:21, 1390:18, 1407:1, 1407:3, 1408:16, 1425:8, 1430:8, 1435:23, 1437:4, 1440:12, 1451:18, 1456:10, 1464:15, 1465:8, 1472:23, 1473:2, 1488:21, 1488:25, 1489:7, 1489:21, 1492:18, 1492:19, 1492:21, 1497:9
**government's** [4] - 1371:6, 1437:14, 1472:20, 1474:14
**Government's** [7] - 1389:16, 1446:17, 1457:23, 1495:16, 1501:13, 1510:2, 1510:5
**Government-Commissioned** [1] - 1471:19
**Grace** [1] - 1448:6
**great** [5] - 1398:25, 1446:5, 1479:16, 1479:20, 1486:6
**Greenwich** [1] - 1397:3
**Greg** [38] - 1366:20, 1368:21, 1388:5, 1397:21, 1400:8, 1402:19, 1405:13, 1418:3, 1418:5, 1418:7, 1418:11, 1419:15, 1423:1, 1424:15, 1424:20, 1424:25, 1441:7, 1442:8, 1443:16, 1444:4, 1444:13, 1447:8, 1448:12, 1450:21, 1450:24, 1453:2, 1468:15, 1468:18, 1470:5, 1479:6, 1485:19, 1497:4, 1501:9, 1501:25, 1502:5, 1502:6
**Gregory** [3] - 1364:5, 1399:19, 1446:10
**GREGORY** [1] - 1361:5
**Grid** [1] - 1438:14
**grid** [8] - 1399:6, 1399:8, 1399:13, 1421:9, 1422:3, 1429:4, 1440:17, 1441:1
**groundless** [5] - 1462:12, 1464:10, 1465:1, 1465:2, 1465:3
**group** [1] - 1433:22
**guess** [11] - 1388:22, 1420:19, 1422:22, 1423:21, 1424:18, 1428:6, 1441:18, 1455:16, 1469:7, 1478:25, 1484:7
**guidance** [1] - 1502:7
**guilty** [4] - 1370:13, 1417:13, 1459:10, 1465:14
**Gulland** [1] - 1361:13
**gun** [1] - 1371:6
**guys** [1] - 1372:7

**H**

**Haley** [3] - 1364:22, 1365:5, 1512:6
**half** [2] - 1495:6
**Hall** [2] - 1481:22, 1482:4
**hand** [3] - 1400:6, 1414:3, 1414:4
**handed** [1] - 1471:5
**handing** [2] - 1510:4, 1512:11
**handle** [1] - 1437:3
**handled** [1] - 1407:18

**handling** [2] - 1436:24, 1455:8
**handwritten** [1] - 1466:15
**hang** [1] - 1427:3
**hangs** [1] - 1478:8
**happier** [1] - 1452:19
**happy** [7] - 1365:2, 1400:2, 1400:3, 1452:18, 1460:2, 1461:3, 1472:10
**hard** [2] - 1466:16, 1469:9
**Harry** [1] - 1441:24
**Harvard** [27] - 1384:1, 1384:7, 1386:3, 1389:11, 1392:22, 1393:2, 1393:4, 1394:8, 1394:11, 1397:19, 1398:24, 1399:2, 1399:4, 1403:1, 1410:19, 1411:12, 1423:4, 1423:14, 1426:18, 1492:1, 1492:5, 1492:7, 1492:10, 1496:13, 1496:17, 1496:21
**hated** [1] - 1390:20
**HAWKER** [2] - 1363:5, 1365:20
**Hawker** [35] - 1364:10, 1366:3, 1367:13, 1373:9, 1375:19, 1391:7, 1402:2, 1409:20, 1414:2, 1414:18, 1417:23, 1420:7, 1431:19, 1432:11, 1432:24, 1433:19, 1434:2, 1434:11, 1434:21, 1435:1, 1435:15, 1438:10, 1444:18, 1446:17, 1446:22, 1450:12, 1463:18, 1464:18, 1466:19, 1485:6, 1489:18, 1510:22, 1511:9, 1512:17, 1512:18
**heading** [2] - 1503:5, 1503:15
**headline** [37] - 1368:6, 1368:7, 1376:3, 1385:15, 1470:15, 1471:7, 1471:8, 1471:17, 1471:22, 1472:3, 1472:4, 1472:8, 1503:16, 1503:17, 1504:22, 1504:24, 1505:12, 1505:18, 1505:20, 1506:6, 1506:12, 1506:14, 1506:16, 1506:17, 1506:19, 1506:22, 1507:11, 1507:13, 1508:4, 1508:5, 1508:10, 1508:19, 1509:16, 1510:8, 1510:15
**headlines** [6] - 1472:11, 1482:11, 1483:17, 1483:18, 1484:1, 1484:5
**hear** [1] - 1380:24
**heard** [5] - 1466:15, 1423:6, 1441:21, 1441:22, 1442:1
**hearsay** [1] - 1500:16
**heavily** [2] - 1465:20, 1465:21
**help** [11] - 1364:22, 1380:16, 1390:9, 1413:3, 1453:10, 1453:12, 1453:13, 1453:14, 1499:24, 1501:20, 1504:1
**helpful** [4] - 1425:13, 1470:20, 1470:24, 1474:24
**Helsinki** [1] - 1405:7
**Hi** [2] - 1476:25, 1482:10
**highlight** [2] - 1458:24, 1508:4
**highlighted** [1] - 1494:18
**highlights** [1] - 1412:8
**highly** [1] - 1369:24
**hired** [3] - 1368:11, 1368:20, 1371:6
**hold** [4] - 1444:4, 1444:13, 1445:1, 1480:9
**holding** [1] - 1389:1

**honest** [2] - 1374:14, 1430:19
**honestly** [2] - 1391:3, 1447:24
**Honor** [39] - 1364:3, 1364:8, 1365:8, 1365:15, 1365:24, 1384:6, 1392:11, 1404:3, 1404:14, 1412:24, 1414:12, 1429:16, 1430:19, 1442:21, 1443:7, 1444:17, 1446:1, 1446:8, 1446:15, 1464:3, 1476:8, 1478:10, 1479:25, 1480:14, 1483:9, 1483:11, 1483:24, 1485:1, 1485:15, 1487:20, 1489:3, 1498:11, 1500:18, 1501:1, 1503:16, 1507:19, 1510:25, 1512:13, 1512:19
**HONORABLE** [1] - 1361:9
**honoring** [1] - 1490:10
**hope** [5] - 1443:7, 1447:8, 1455:15, 1479:21, 1479:23
**Hope** [1] - 1457:13
**hoped** [1] - 1473:3
**hopeful** [1] - 1364:11
**hopefully** [1] - 1452:25
**hopes** [1] - 1428:23
**hoping** [2] - 1481:15, 1491:13
**horse's** [1] - 1502:22
**hour** [4] - 1397:5, 1445:13, 1445:25, 1460:19
**hours** [5] - 1398:8, 1422:23, 1442:8, 1454:21, 1511:20
**House** [5] - 1368:21, 1422:6, 1428:2, 1441:19, 1473:11
**Huisman** [3] - 1476:21, 1477:4, 1480:17
**human** [1] - 1405:20
**Human** [3] - 1388:6, 1399:19, 1472:25
**Hunt** [2] - 1421:14, 1456:19
**husher** [1] - 1413:4
**hypothetical** [2] - 1400:5, 1406:7

**I**

**idea** [19] - 1365:3, 1378:3, 1382:19, 1403:14, 1406:8, 1406:10, 1420:2, 1422:11, 1428:21, 1431:5, 1441:21, 1451:11, 1455:1, 1461:15, 1468:24, 1484:12, 1491:1, 1491:7, 1497:4
**ideas** [2] - 1399:10, 1422:12
**identification** [3] - 1422:3, 1466:19, 1510:5
**identified** [3] - 1412:24, 1421:18, 1427:17
**identifies** [4] - 1433:15, 1433:16, 1435:12, 1473:10
**Identify** [1] - 1426:5
**identify** [1] - 1434:8
**identifying** [1] - 1467:10
**Ill** [1] - 1361:22
**immediate** [1] - 1371:4
**impeach** [3] - 1485:13, 1487:18, 1487:25
**implementation** [2] - 1435:2, 1435:17
**important** [7] - 1395:21, 1401:22,

1434:3, 1448:13, 1448:14, 1487:19, 1502:15

**impression** [1] - 1479:12

**improper** [3] - 1370:4, 1370:19, 1416:22

**improving** [1] - 1454:18

**inaccurate** [1] - 1489:9

**inappropriate** [1] - 1386:24

**inappropriately** [1] - 1382:11

**inaudible** [1] - 1403:24

**Inaudible** [1] - 1478:7

**inaudible** [2] - 1403:22, 1413:22

**include** [8] - 1394:5, 1397:14, 1414:9, 1417:17, 1441:12, 1451:3, 1474:5, 1483:4

**included** [2] - 1407:16, 1498:21

**includes** [2] - 1422:17, 1438:12

**including** [5] - 1368:19, 1403:10, 1403:24, 1443:20, 1445:22

**inclusion** [1] - 1432:10

**inconclusive** [1] - 1380:2

**inconsistent** [1] - 1408:4

**incorporated** [1] - 1395:12

**incorrect** [8] - 1486:3, 1486:24, 1487:11, 1488:3, 1488:25, 1493:9, 1504:24, 1506:11

**indeed** [3] - 1380:9, 1411:4, 1506:12

**indefinite** [1] - 1370:2

**Independent** [1] - 1385:15

**independent** [17] - 1373:7, 1379:2, 1379:8, 1379:9, 1379:12, 1379:13, 1379:16, 1379:20, 1379:21, 1386:9, 1398:18, 1398:19, 1398:21, 1398:22, 1437:13, 1471:6, 1472:19

**indicate** [1] - 1490:15

**indicated** [4] - 1386:15, 1395:4, 1423:5, 1423:11

**indicates** [1] - 1421:6, 1421:9, 1421:12, 1422:7

**indicating** [2] - 1368:2, 1437:3

**individually** [1] - 1411:17

**individuals** [1] - 1441:12

**infamous** [4] - 1390:10, 1390:12, 1390:22, 1390:25

**influence** [3] - 1372:17, 1372:20, 1393:18

**influenced** [2] - 1417:12, 1459:10

**information** [5] - 1400:9, 1405:4, 1474:13, 1481:16, 1486:23

**informed** [3] - 1364:19, 1372:12, 1480:18

**informing** [1] - 1414:18

**initial** [2] - 1386:21, 1434:2

**initials** [1] - 1440:20

**initiated** [1] - 1441:2

**input** [1] - 1434:22

**instances** [1] - 1488:7

**Institute** [1] - 1402:23

**instruct** [2] - 1404:1, 1436:21

**instructed** [5] - 1394:21, 1394:22, 1444:11, 1444:12, 1511:21

**instructions** [3] - 1462:2, 1497:16, 1501:5

**insufficient** [1] - 1381:4

**intend** [1] - 1451:22

**intent** [1] - 1488:11

**intention** [1] - 1402:14

**interaction** [5] - 1480:20, 1480:21, 1495:4, 1495:12, 1502:20

**interested** [5] - 1450:19, 1452:1, 1452:17, 1453:1, 1457:17

**interests** [1] - 1382:4

**interfere** [1] - 1474:24

**interference** [1] - 1389:4

**internal** [1] - 1435:21

**international** [6] - 1368:18, 1449:10, 1449:11, 1503:22, 1503:23, 1508:5

**interpretation** [1] - 1380:13

**interview** [1] - 1442:9

**interviewed** [1] - 1425:7

**interviewee** [1] - 1453:24

**interviewees** [1] - 1453:8

**interviews** [1] - 1390:18

**introduce** [1] - 1457:14

**introduced** [1] - 1499:23

**introducing** [1] - 1486:2

**inverted** [1] - 1369:12

**investigated** [1] - 1486:5

**investigators** [3] - 1425:8, 1485:16, 1490:20

**involved** [5] - 1392:20, 1418:7, 1421:4, 1455:25, 1476:12

**irrelevant** [1] - 1432:16

**irritable** [1] - 1415:21

**issue** [8] - 1370:14, 1389:14, 1401:4, 1401:10, 1409:25, 1419:9, 1507:7

**issued** [6] - 1369:11, 1389:12, 1405:10, 1460:2, 1478:11, 1508:2

**issues** [3] - 1374:6, 1376:23, 1401:16

**item** [7] - 1393:16, 1412:11, 1426:3, 1435:21, 1435:25, 1436:13, 1436:19

**items** [6] - 1393:10, 1399:8, 1401:25, 1404:25, 1405:22, 1438:16

**iterations** [1] - 1400:7

---

# J

**JACKSON** [1] - 1361:9

**Jackson** [1] - 1509:2

**jail** [1] - 1371:8

**jailing** [1] - 1473:1

**James** [1] - 1361:19

**January** [3] - 1425:8, 1485:10, 1489:24

**Jason** [1] - 1361:16

**job** [7] - 1380:19, 1382:2, 1384:16, 1384:18, 1388:20, 1390:19, 1448:10

**John** [5] - 1399:15, 1422:5, 1441:19, 1471:13, 1498:21

**John's** [1] - 1499:24

**jokey** [2] - 1408:17

**joking** [2] - 1406:21, 1406:25

**Jon** [1] - 1414:7

**JONATHAN** [2] - 1363:5, 1365:20

**Jonathan** [8] - 1432:24, 1433:18, 1434:2, 1434:21, 1435:1, 1435:15, 1447:8, 1455:7

**Journal** [10] - 1476:15, 1476:22, 1477:15, 1477:22, 1478:11, 1478:22, 1479:7, 1480:17, 1506:17, 1506:21

**Journalism** [1] - 1367:3

**journalist** [8] - 1450:18, 1453:4, 1453:24, 1474:2, 1499:12, 1502:4, 1502:20, 1502:25

**journalist/media** [1] - 1499:6

**journalists** [21] - 1405:24, 1406:16, 1406:22, 1407:18, 1407:25, 1408:13, 1408:15, 1408:20, 1410:1, 1410:7, 1411:13, 1420:17, 1420:20, 1453:6, 1453:7, 1469:23, 1482:25, 1498:4, 1498:6, 1498:10, 1499:3

**Judge** [2] - 1459:3, 1460:8

**JUDGE** [1] - 1361:10

**judge** [4] - 1369:4, 1386:9, 1401:13, 1417:6

**judge's** [1] - 1381:13

**judgment** [2] - 1374:17, 1508:7

**July** [1] - 1491:6

**Junghans** [1] - 1361:23

**jurisdiction** [1] - 1365:1

**JUROR** [2] - 1510:25, 1511:8

**jurors** [2] - 1467:5, 1492:23

**jury** [14] - 1364:7, 1364:20, 1365:6, 1365:7, 1365:16, 1367:8, 1404:1, 1432:9, 1445:16, 1446:11, 1480:3, 1511:12, 1511:16, 1512:7

**JURY** [4] - 1361:5, 1361:9, 1492:25, 1493:2

**Jury** [5] - 1365:17, 1445:21, 1446:7, 1446:13, 1511:25

**Justice** [25] - 1371:24, 1372:14, 1377:16, 1378:5, 1380:15, 1380:17, 1380:20, 1383:9, 1383:13, 1383:22, 1385:11, 1385:21, 1386:1, 1427:18, 1433:9, 1460:3, 1461:2, 1465:9, 1470:17, 1474:8, 1477:7, 1477:11, 1482:22, 1484:22, 1487:2

**JUSTICE** [1] - 1361:16

**Justice's** [2] - 1380:13, 1482:17

**justify** [1] - 1473:3

---

# K

**KANESHIRO** [2] - 1362:3, 1513:9

**Kaneshiro** [2] - 1513:3, 1513:8

**KANESHIRO-MILLER** [2] - 1362:3, 1513:9

**Kaneshiro-Miller** [2] - 1513:3, 1513:8

**Katzman** [1] - 1431:3

**Kedem** [1] - 1487:13
**keep** [3] - 1400:21, 1450:7, 1456:24
**keeping** [1] - 1371:8
**kept** [2] - 1382:9, 1449:25
**key** [13] - 1374:6, 1374:15, 1376:4, 1380:3, 1388:5, 1412:8, 1416:23, 1416:25, 1420:14, 1421:5, 1426:5, 1443:17, 1498:4
**kick** [1] - 1424:8
**kick-up** [1] - 1424:8
**kicking** [1] - 1424:3
**Kilimnik** [25] - 1366:15, 1373:13, 1373:14, 1391:9, 1405:2, 1423:20, 1429:10, 1429:11, 1429:15, 1431:2, 1433:18, 1434:12, 1434:14, 1435:21, 1438:9, 1446:21, 1455:21, 1461:12, 1461:13, 1468:1, 1468:7, 1469:15, 1475:20, 1482:5, 1484:10
**Kilimnik's** [1] - 1429:17
**kill** [1] - 1429:25
**kind** [10] - 1371:13, 1390:13, 1398:13, 1408:3, 1415:10, 1415:12, 1425:2, 1431:16, 1471:2, 1475:16
**KK** [4] - 1405:1, 1438:11, 1441:4, 1474:15
**knowing** [1] - 1372:8
**knowledge** [5] - 1439:12, 1439:13, 1461:9, 1500:8, 1500:13
**known** [1] - 1452:16
**knows** [6] - 1371:5, 1450:6, 1450:10, 1450:23, 1500:20, 1507:2
**Konstantin** [7] - 1433:18, 1435:21, 1438:9, 1455:21, 1461:11, 1468:1, 1468:7
**Kwasniewski** [6] - 1423:2, 1436:23, 1496:3, 1496:5, 1496:7, 1496:9
**Kyiv** [17] - 1388:8, 1391:25, 1392:3, 1394:10, 1429:10, 1433:22, 1436:22, 1447:5, 1447:15, 1447:16, 1455:20, 1455:23, 1467:6, 1469:17, 1473:3, 1491:5
**Kyiv-based** [1] - 1455:20

**L**

**L.A** [1] - 1480:21
**lack** [1] - 1372:22
**language** [4] - 1415:25, 1451:16, 1465:6
**large** [3] - 1397:10, 1397:14, 1481:23
**largely** [1] - 1488:19
**last** [13] - 1364:10, 1366:20, 1370:1, 1370:12, 1377:23, 1378:17, 1424:21, 1431:9, 1438:13, 1440:16, 1489:15, 1491:5, 1491:12
**late** [5] - 1375:1, 1378:16, 1394:16, 1456:19, 1480:10
**lauded** [1] - 1487:17
**Lavrynovych** [5] - 1461:1, 1461:6, 1461:10, 1461:18, 1462:3

**Law** [12] - 1399:2, 1399:4, 1476:15, 1476:22, 1477:15, 1477:22, 1478:11, 1478:22, 1479:7, 1480:17, 1506:17, 1506:21
**law** [5] - 1370:15, 1381:6, 1437:12, 1493:17, 1508:5
**Lawyer** [1] - 1368:8
**lawyer** [6] - 1368:11, 1369:17, 1370:12, 1370:25, 1371:3, 1419:17
**lawyer's** [1] - 1371:10
**lawyers** [5] - 1410:1, 1419:5, 1420:4, 1472:24, 1487:2
**lays** [1] - 1436:16
**lead** [3] - 1376:3, 1394:23, 1473:11
**leader** [1] - 1395:15
**Leader** [2] - 1441:25, 1443:21
**leaders** [3] - 1368:19, 1368:25, 1395:19
**Leading** [1] - 1508:5
**leading** [2] - 1494:7, 1499:13
**leak** [2] - 1426:5, 1498:4
**leaked** [1] - 1473:5
**leaking** [1] - 1376:6
**leaning** [1] - 1474:11
**learned** [2] - 1410:18, 1451:22
**least** [2] - 1397:1, 1501:21
**leave** [4] - 1407:21, 1408:25, 1409:12, 1445:6
**left** [3] - 1432:2, 1453:22, 1453:25
**legal** [4] - 1370:15, 1418:12, 1419:16, 1427:11
**legend** [1] - 1440:19
**length** [3] - 1398:16, 1479:12, 1479:13
**less** [3] - 1445:13, 1446:1, 1446:4
**letting** [1] - 1444:9
**level** [1] - 1497:12
**liaison** [1] - 1435:23
**likely** [5] - 1369:25, 1370:4, 1372:8, 1430:4, 1494:19
**line** [5] - 1412:6, 1412:8, 1418:3, 1472:15, 1495:1
**link** [4] - 1402:3, 1477:1, 1477:13, 1509:9
**links** [3] - 1482:11, 1482:16, 1484:19
**List** [1] - 1427:1
**list** [11] - 1404:25, 1405:22, 1413:16, 1420:13, 1427:10, 1427:13, 1428:10, 1428:20, 1438:16, 1441:12, 1443:18
**listed** [7] - 1402:2, 1404:25, 1420:23, 1427:23, 1428:3, 1428:8, 1431:14
**listen** [2] - 1413:4, 1413:5
**lists** [1] - 1484:19
**live** [1] - 1429:5
**LLP** [3] - 1361:20, 1361:23, 1508:6
**local** [3] - 1364:23, 1441:2, 1441:7
**logical** [1] - 1502:6
**logistics** [3] - 1407:21, 1409:1, 1409:12
**London** [1] - 1397:3

**look** [69] - 1366:3, 1366:23, 1376:12, 1377:12, 1382:20, 1387:2, 1389:16, 1393:16, 1396:4, 1396:16, 1396:21, 1399:6, 1399:13, 1400:25, 1406:13, 1407:12, 1409:4, 1409:20, 1410:12, 1411:25, 1412:19, 1416:24, 1417:22, 1420:6, 1420:13, 1422:19, 1423:18, 1425:15, 1426:21, 1428:1, 1428:7, 1430:23, 1438:4, 1440:19, 1440:22, 1443:9, 1444:1, 1445:9, 1446:17, 1447:12, 1448:25, 1451:17, 1451:25, 1454:19, 1455:10, 1456:10, 1457:5, 1457:23, 1458:13, 1459:24, 1460:17, 1461:21, 1466:14, 1469:3, 1471:7, 1476:17, 1483:8, 1492:17, 1493:11, 1493:23, 1494:18, 1495:5, 1497:19, 1497:23, 1501:12, 1507:23, 1508:18, 1508:20, 1508:25
**looked** [5] - 1422:16, 1425:9, 1446:22, 1505:3
**looking** [5] - 1419:17, 1443:3, 1450:2, 1464:3, 1488:7
**looks** [8] - 1366:11, 1397:16, 1414:11, 1421:11, 1427:1, 1427:17, 1467:25, 1509:9
**lose** [1] - 1429:5
**losing** [1] - 1420:2
**lost** [1] - 1427:20
**love** [1] - 1453:1
**LT** [1] - 1441:2
**lunch** [4] - 1397:18, 1397:23, 1397:25, 1413:13
**luncheon** [1] - 1397:17
**Lutkovska** [2] - 1423:2, 1423:3
**lying** [1] - 1489:7
**Lyovochkin** [4] - 1434:15, 1435:3, 1435:6, 1435:10

**M**

**mad** [1] - 1390:19
**mail** [86] - 1366:9, 1367:1, 1367:15, 1372:5, 1373:12, 1375:18, 1388:16, 1391:7, 1391:8, 1396:6, 1396:23, 1400:17, 1406:15, 1407:13, 1408:1, 1408:12, 1408:24, 1409:23, 1410:5, 1410:6, 1410:13, 1412:1, 1413:13, 1414:6, 1414:8, 1416:11, 1417:25, 1419:24, 1420:3, 1420:7, 1422:17, 1423:19, 1423:21, 1425:15, 1426:24, 1427:7, 1431:1, 1432:14, 1434:11, 1438:8, 1439:3, 1439:4, 1439:6, 1442:2, 1444:4, 1444:18, 1446:20, 1446:21, 1448:1, 1449:1, 1449:5, 1449:8, 1449:20, 1451:3, 1451:12, 1451:21, 1457:24, 1458:14, 1460:18, 1460:19, 1460:23, 1460:24, 1461:23, 1466:20, 1466:22, 1467:4, 1467:5, 1467:9, 1467:17, 1467:22, 1469:4, 1470:19, 1476:21, 1481:5, 1481:10,

1482:4, 1483:6, 1484:9, 1494:23,
1495:1, 1495:4, 1497:19, 1500:2,
1501:24, 1509:2, 1510:6
  **mailed** [3] - 1448:5, 1448:6, 1449:6
  **mails** [3] - 1411:11, 1411:22, 1431:9
  **main** [3] - 1443:19, 1443:20, 1482:11
  **major** [3] - 1417:4, 1434:3, 1434:4
  **majority** [1] - 1482:15
  **Majority** [2] - 1441:24, 1443:21
  **man** [6] - 1371:9, 1379:9, 1379:11,
1454:11, 1479:15, 1499:6
  **Manafort** [57] - 1373:24, 1374:5,
1387:11, 1387:15, 1387:16, 1391:8,
1392:3, 1392:19, 1393:21, 1394:18,
1394:21, 1394:22, 1395:14, 1395:18,
1395:19, 1410:14, 1414:22, 1415:2,
1416:4, 1416:12, 1417:16, 1418:1,
1418:10, 1418:16, 1418:24, 1421:25,
1423:19, 1423:22, 1424:3, 1424:14,
1429:10, 1429:15, 1431:1, 1432:12,
1432:21, 1434:11, 1435:10, 1436:16,
1437:3, 1437:21, 1438:10, 1446:21,
1456:3, 1459:13, 1459:18, 1465:22,
1469:15, 1484:9, 1496:24, 1497:12,
1497:15, 1500:24, 1501:2, 1501:3,
1501:9, 1510:17, 1510:18
  **Manafort's** [3] - 1413:20, 1416:25,
1435:8
  **management** [1] - 1372:10
  **manager** [1] - 1435:15
  **managing** [3] - 1435:21, 1435:25,
1436:13
  **manner** [1] - 1469:10
  **marked** [2] - 1481:3, 1510:4
  **Maryland** [1] - 1365:1
  **massively** [2] - 1470:20, 1470:24
  **Master** [1] - 1438:14
  **master** [4] - 1399:6, 1429:3, 1440:17,
1441:1
  **material** [3] - 1438:15, 1442:8,
1473:15
  **materials** [1] - 1465:19
  **Matrix** [1] - 1425:16
  **Matt** [1] - 1476:25
  **matter** [6] - 1388:23, 1458:17, 1470:8,
1487:2, 1512:14, 1513:5
  **matters** [1] - 1489:21
  **McCullough** [1] - 1361:16
  **MCW** [1] - 1421:18
  **MD** [1] - 1361:21
  **Meagher** [1] - 1508:6
  **mean** [5] - 1395:2, 1425:14, 1443:5,
1455:9, 1474:7
  **meaning** [3] - 1412:8, 1415:2, 1424:7
  **means** [3] - 1413:23, 1480:7, 1502:19
  **meant** [6] - 1364:12, 1413:17,
1432:15, 1452:9, 1464:2, 1501:2
  **Media** [1] - 1434:1
  **media** [39] - 1371:14, 1373:25,
1374:25, 1376:5, 1387:8, 1387:22,

1401:1, 1401:17, 1408:19, 1414:23,
1417:17, 1421:13, 1428:12, 1428:15,
1428:17, 1428:24, 1468:15, 1474:16,
1477:7, 1482:25, 1483:12, 1484:6,
1484:23, 1485:20, 1486:9, 1488:5,
1496:13, 1496:18, 1496:25, 1497:3,
1498:8, 1499:2, 1499:19, 1500:6,
1500:9, 1501:17, 1502:2, 1502:16,
1504:2
  **meet** [1] - 1405:13
  **Meeting** [1] - 1392:22
  **meeting** [59] - 1384:1, 1392:2, 1392:3,
1392:9, 1392:10, 1392:14, 1392:18,
1392:20, 1393:3, 1393:5, 1394:8,
1394:11, 1394:13, 1394:20, 1394:23,
1395:5, 1395:15, 1395:16, 1395:20,
1395:22, 1395:24, 1396:1, 1396:7,
1397:12, 1397:17, 1397:18, 1398:1,
1398:4, 1398:5, 1398:10, 1398:12,
1398:24, 1399:8, 1399:25, 1400:19,
1403:1, 1405:1, 1410:19, 1411:12,
1413:19, 1414:19, 1416:3, 1423:4,
1423:15, 1424:25, 1426:18, 1429:9,
1429:14, 1430:20, 1489:25, 1490:21,
1492:1, 1492:5, 1492:7, 1492:11,
1496:14, 1496:18, 1496:21
  **meetings** [6] - 1423:1, 1424:21,
1425:4, 1433:7, 1436:16, 1443:16
  **meltdown** [1] - 1429:11
  **members** [4] - 1432:9, 1445:16,
1480:3, 1511:12
  **memo** [11] - 1434:14, 1434:25, 1435:1,
1435:2, 1435:10, 1437:6, 1437:7,
1437:8, 1437:21
  **memory** [7] - 1398:9, 1398:10,
1425:14, 1486:5, 1486:25, 1487:15,
1490:23
  **mention** [2] - 1433:3, 1460:12
  **mentioned** [5] - 1451:5, 1484:22,
1485:6, 1498:23, 1498:24
  **Mercury** [3] - 1421:19, 1421:21,
1421:22
  **merely** [1] - 1408:17
  **Merkel** [1] - 1368:20
  **message** [10] - 1412:16, 1413:19,
1422:18, 1437:14, 1444:16, 1445:6,
1449:8, 1454:20, 1470:16, 1476:3
  **messages** [1] - 1492:15
  **messaging** [20] - 1376:20, 1382:21,
1393:15, 1410:15, 1412:3, 1412:6,
1412:16, 1414:10, 1417:18, 1426:9,
1465:16, 1491:22, 1491:25, 1492:4,
1492:8, 1492:12, 1493:22, 1494:3,
1495:1, 1495:13
  **met** [7] - 1366:16, 1392:18, 1397:21,
1402:6, 1488:21, 1489:20, 1502:25
  **MFA** [3] - 1422:23, 1436:19
  **mid** [1] - 1445:17
  **mid-afternoon** [1] - 1445:17
  **middle** [2] - 1370:24, 1469:4

  **midnight** [2] - 1442:12, 1443:1
  **might** [14] - 1370:25, 1373:25, 1377:4,
1378:13, 1381:24, 1418:12, 1419:5,
1419:10, 1445:11, 1452:16, 1454:9,
1454:22, 1474:13, 1481:17
  **MILLER** [2] - 1362:3, 1513:9
  **Miller** [2] - 1513:3, 1513:8
  **mind** [5] - 1382:9, 1449:16, 1449:20,
1451:1, 1499:17
  **mine** [1] - 1475:11
  **Minister** [5] - 1368:13, 1460:3, 1461:2,
1461:9, 1461:17
  **minister** [1] - 1472:17
  **Minister's** [2] - 1368:7, 1369:15
  **ministers** [2] - 1403:11, 1473:3
  **Ministry** [42] - 1371:24, 1372:14,
1376:21, 1377:16, 1378:5, 1379:23,
1380:12, 1380:15, 1380:16, 1380:20,
1381:5, 1381:9, 1381:24, 1382:13,
1383:9, 1383:12, 1383:22, 1385:11,
1385:21, 1386:1, 1405:5, 1422:23,
1433:9, 1433:10, 1436:13, 1436:20,
1437:18, 1441:5, 1441:7, 1465:8,
1470:17, 1474:8, 1477:6, 1477:11,
1481:14, 1481:16, 1481:20, 1482:16,
1482:22, 1484:22, 1506:20, 1508:2
  **ministry** [1] - 1386:7
  **Ministry's** [1] - 1462:11
  **minor** [1] - 1494:6
  **minutes** [6] - 1364:13, 1410:6,
1445:19, 1448:17, 1460:19, 1506:25
  **mischaracterize** [1] - 1506:24
  **mischaracterizing** [1] - 1505:25
  **misconduct** [1] - 1371:4
  **misled** [2] - 1473:23, 1481:13
  **missed** [1] - 1400:22
  **missing** [2] - 1434:17, 1472:21
  **misspelled** [1] - 1442:9
  **misstate** [1] - 1380:17
  **misstatement** [2] - 1381:19, 1383:6
  **mistake** [3] - 1431:14, 1489:8, 1494:21
  **mistaken** [1] - 1485:12
  **misunderstanding** [1] - 1408:12
  **misunderstood** [1] - 1421:20
  **mixed** [1] - 1494:13
  **modern** [1] - 1408:19
  **MOJ** [2] - 1434:5, 1484:14
  **MOJ/and** [1] - 1422:23
  **Molly** [1] - 1361:13
  **moment** [2] - 1463:7, 1493:11
  **monitor** [1] - 1453:23
  **monitoring** [1] - 1456:1
  **monitors** [1] - 1405:21
  **month** [1] - 1451:8
  **morning** [8] - 1366:13, 1367:21,
1440:13, 1442:11, 1443:1, 1473:6,
1511:15, 1512:21
  **Moscow** [3] - 1388:9, 1428:19,
1457:22

**most** [3] - 1395:21, 1395:23, 1397:2
**mostly** [1] - 1479:19
**motivated** [16] - 1370:19, 1374:9, 1374:18, 1383:3, 1386:8, 1386:23, 1387:24, 1417:5, 1437:15, 1449:13, 1449:18, 1449:22, 1459:3, 1462:13, 1464:12, 1465:3
**Motivated** [1] - 1385:16
**motivation** [9] - 1374:2, 1375:12, 1380:2, 1380:7, 1450:2, 1450:24, 1464:25, 1503:21, 1508:7
**mouth** [1] - 1502:22
**move** [6] - 1367:7, 1367:9, 1409:9, 1414:12, 1466:23, 1498:18
**moved** [5] - 1457:22, 1511:3, 1511:6, 1512:2, 1512:5
**moving** [1] - 1512:4
**MR** [217] - 1364:8, 1364:18, 1364:25, 1365:8, 1365:15, 1365:24, 1366:2, 1366:6, 1366:7, 1367:11, 1367:13, 1367:17, 1367:20, 1372:1, 1372:3, 1372:22, 1373:9, 1373:10, 1375:4, 1375:5, 1375:7, 1378:23, 1381:25, 1382:5, 1384:8, 1390:1, 1390:2, 1390:23, 1392:6, 1392:13, 1392:17, 1393:1, 1403:13, 1403:16, 1404:2, 1404:6, 1404:14, 1404:16, 1404:22, 1404:24, 1409:4, 1409:5, 1409:9, 1409:19, 1411:14, 1411:18, 1411:20, 1412:20, 1412:22, 1412:23, 1413:1, 1413:18, 1414:1, 1414:12, 1414:14, 1414:17, 1415:24, 1416:2, 1419:1, 1419:7, 1419:13, 1419:20, 1422:13, 1422:15, 1423:7, 1423:10, 1429:13, 1429:22, 1430:1, 1430:9, 1430:13, 1430:15, 1430:22, 1431:17, 1431:19, 1431:20, 1431:24, 1432:5, 1432:6, 1432:17, 1436:12, 1439:24, 1440:2, 1440:5, 1440:8, 1442:17, 1442:23, 1443:2, 1443:8, 1444:17, 1444:23, 1445:13, 1446:1, 1446:4, 1446:15, 1446:16, 1450:3, 1450:11, 1451:19, 1451:20, 1452:13, 1459:15, 1459:22, 1462:21, 1463:1, 1463:5, 1463:9, 1463:11, 1463:18, 1463:23, 1464:2, 1464:9, 1464:2, 1464:9, 1464:19, 1464:23, 1466:23, 1466:25, 1467:3, 1476:5, 1476:11, 1477:16, 1477:20, 1477:24, 1478:1, 1478:3, 1478:10, 1478:15, 1478:21, 1478:25, 1479:3, 1479:14, 1479:18, 1479:23, 1479:25, 1480:14, 1480:15, 1483:9, 1483:11, 1483:13, 1483:16, 1483:20, 1483:23, 1485:1, 1485:5, 1485:15, 1486:1, 1486:4, 1486:13, 1486:17, 1486:20, 1487:6, 1487:8, 1487:20, 1487:23, 1488:1, 1488:9, 1488:14, 1489:13, 1489:15, 1489:17, 1490:1, 1490:6, 1490:8, 1491:10, 1491:18, 1492:18, 1492:19, 1493:3, 1494:7, 1494:8,

1494:10, 1498:11, 1498:13, 1499:13, 1500:11, 1500:12, 1500:16, 1500:18, 1500:22, 1501:1, 1501:7, 1504:5, 1504:7, 1504:9, 1504:11, 1504:15, 1504:20, 1504:23, 1505:6, 1505:7, 1505:17, 1505:23, 1506:1, 1506:2, 1506:5, 1506:7, 1506:16, 1506:19, 1507:1, 1507:4, 1507:7, 1507:8, 1507:10, 1507:16, 1507:19, 1507:22, 1508:12, 1508:23, 1509:11, 1509:14, 1509:25, 1510:13, 1512:13, 1512:16, 1512:19, 1512:20
**multiple** [2] - 1463:15, 1464:7
**MURPHY** [131] - 1365:15, 1365:24, 1366:2, 1366:6, 1366:7, 1367:13, 1367:20, 1372:3, 1373:9, 1373:10, 1375:5, 1375:7, 1378:23, 1382:5, 1384:8, 1390:1, 1390:2, 1390:23, 1392:13, 1393:1, 1403:13, 1403:16, 1404:2, 1404:14, 1404:16, 1404:22, 1404:24, 1409:4, 1409:9, 1409:19, 1411:18, 1411:20, 1412:23, 1413:18, 1414:1, 1414:12, 1414:17, 1415:24, 1416:2, 1419:1, 1419:13, 1419:20, 1422:15, 1423:10, 1429:22, 1430:9, 1430:15, 1430:22, 1431:19, 1431:24, 1432:6, 1432:17, 1436:12, 1439:24, 1440:2, 1440:5, 1440:8, 1442:23, 1443:8, 1444:23, 1445:13, 1446:1, 1446:4, 1446:15, 1446:16, 1450:11, 1451:19, 1451:20, 1452:13, 1459:22, 1463:1, 1463:5, 1463:9, 1463:11, 1463:18, 1463:23, 1466:23, 1467:3, 1476:11, 1477:20, 1478:1, 1478:3, 1478:10, 1478:15, 1478:21, 1479:25, 1480:14, 1480:15, 1483:11, 1483:16, 1483:20, 1483:23, 1485:15, 1486:1, 1486:4, 1486:13, 1486:20, 1489:13, 1489:15, 1489:17, 1490:1, 1490:6, 1490:8, 1491:10, 1492:18, 1494:7, 1498:11, 1499:13, 1500:11, 1500:16, 1504:7, 1504:11, 1504:20, 1505:6, 1505:17, 1505:23, 1506:2, 1506:5, 1506:16, 1507:1, 1507:4, 1507:7, 1507:10, 1507:16, 1507:19, 1507:22, 1508:23, 1509:11, 1512:20
**Murphy** [18] - 1361:19, 1365:23, 1385:5, 1445:10, 1446:14, 1491:22, 1495:24, 1496:14, 1498:20, 1500:2, 1501:15, 1502:9, 1502:13, 1502:21, 1503:12, 1505:7, 1506:10, 1508:18
**must** [8] - 1366:13, 1394:12, 1420:19, 1428:21, 1432:23, 1441:18, 1472:20, 1488:17
**muster** [1] - 1472:18
**mystery** [1] - 1503:16

**N**

**name** [13] - 1365:5, 1427:7, 1431:4,

1431:15, 1432:11, 1432:14, 1432:15, 1432:16, 1434:17, 1467:11, 1496:2
**named** [1] - 1467:10
**narrow** [1] - 1489:5
**National** [12] - 1422:4, 1427:19, 1476:15, 1476:22, 1477:15, 1477:22, 1478:11, 1478:22, 1479:7, 1480:17, 1506:17, 1506:21
**Nations** [1] - 1403:9
**nature** [1] - 1389:2
**Near** [1] - 1402:23
**necessarily** [1] - 1512:3
**necessary** [3] - 1370:15, 1445:25, 1512:7
**need** [21] - 1365:13, 1395:12, 1405:7, 1414:20, 1426:8, 1432:1, 1433:8, 1450:9, 1453:9, 1453:10, 1453:15, 1457:16, 1466:9, 1466:10, 1479:3, 1479:20, 1491:14, 1492:22, 1501:13, 1504:13
**needed** [6] - 1373:21, 1380:20, 1447:25, 1448:16, 1448:18, 1474:17
**needs** [4] - 1365:4, 1426:6, 1480:5, 1491:12
**neighboring** [1] - 1365:1
**never** [15] - 1385:5, 1388:11, 1389:11, 1389:12, 1406:6, 1406:9, 1423:5, 1423:6, 1423:11, 1425:2, 1439:12, 1441:21, 1441:22, 1474:19, 1502:25
**new** [7] - 1420:11, 1426:8, 1438:13, 1452:6, 1505:17, 1505:18, 1509:23
**New** [19] - 1394:11, 1403:10, 1413:20, 1416:4, 1428:19, 1442:9, 1448:4, 1448:6, 1448:8, 1449:6, 1456:1, 1456:12, 1469:22, 1470:6, 1470:7, 1470:15, 1475:21, 1483:5, 1504:2
**news** [12] - 1383:20, 1385:18, 1385:21, 1461:23, 1465:8, 1482:24, 1483:2, 1483:3, 1483:14, 1509:4, 1509:7
**Newswire** [4] - 1482:18, 1482:22, 1482:24, 1483:19
**next** [46] - 1364:19, 1366:3, 1366:11, 1369:3, 1370:24, 1375:16, 1379:17, 1380:22, 1380:25, 1381:12, 1385:10, 1389:16, 1399:21, 1401:23, 1402:6, 1404:20, 1409:8, 1409:9, 1409:20, 1410:11, 1410:23, 1413:19, 1414:2, 1416:24, 1417:22, 1421:12, 1425:20, 1428:1, 1428:14, 1429:21, 1430:23, 1434:1, 1434:10, 1440:7, 1443:9, 1444:15, 1445:7, 1446:17, 1446:25, 1449:2, 1454:19, 1465:10, 1483:15, 1494:22, 1503:4
**nice** [4] - 1394:24, 1458:1, 1458:5, 1458:10
**nickname** [1] - 1436:7
**night** [7] - 1364:10, 1366:20, 1377:24, 1378:17, 1394:16, 1397:7, 1480:10
**nine** [1] - 1428:15
**none** [5] - 1422:9, 1422:10, 1426:19,

1428:17, 1428:18
**noon** [2] - 1422:22, 1441:1
**normal** [2] - 1377:9, 1415:16
**normally** [1] - 1453:22
**note** [1] - 1512:1
**noted** [1] - 1386:22
**notes** [6] - 1395:5, 1395:9, 1400:19, 1400:23, 1402:12, 1423:14
**nothing** [5] - 1373:6, 1398:20, 1405:22, 1405:25, 1443:11
**notify** [1] - 1364:22
**notwithstanding** [1] - 1422:2
**November** [3] - 1431:8, 1432:18, 1437:9
**NSC** [1] - 1427:19
**number** [15] - 1383:1, 1383:15, 1393:16, 1408:9, 1412:11, 1447:25, 1448:13, 1448:16, 1448:18, 1448:21, 1460:4, 1481:23, 1498:19, 1510:25
**Number** [2] - 1364:4, 1446:9
**numbered** [1] - 1417:3
**numbers** [3] - 1424:14, 1448:7, 1489:19
**NW** [4] - 1361:14, 1361:17, 1361:24, 1362:4

## O

**oath** [1] - 1365:19
**Obama** [6] - 1441:13, 1441:16, 1442:5, 1443:21, 1498:21, 1498:23
**Obama's** [1] - 1368:21
**object** [5] - 1408:2, 1423:7, 1430:13, 1444:18, 1478:25
**objected** [2] - 1412:17, 1492:15
**objecting** [1] - 1465:2
**objection** [41] - 1367:10, 1367:11, 1367:17, 1372:1, 1372:22, 1375:4, 1381:17, 1381:25, 1392:6, 1392:17, 1411:14, 1412:20, 1412:23, 1413:10, 1414:13, 1414:14, 1419:7, 1422:13, 1429:13, 1430:1, 1439:22, 1442:17, 1443:2, 1444:17, 1450:3, 1459:15, 1462:21, 1464:19, 1466:25, 1476:5, 1477:16, 1477:24, 1483:9, 1485:1, 1490:1, 1494:7, 1498:11, 1499:13, 1500:11, 1500:16, 1508:12
**objections** [1] - 1490:5
**objective** [1] - 1370:20
**observation** [1] - 1384:12
**obvious** [1] - 1413:24
**obviously** [5] - 1371:16, 1442:5, 1454:2, 1480:8, 1497:7
**occasion** [1] - 1486:16
**occur** [2] - 1432:25, 1433:9
**occurred** [4] - 1413:19, 1485:20, 1486:22, 1490:21
**October** [4] - 1423:20, 1426:25, 1497:20, 1498:7
**odd** [1] - 1379:18

**OF** [6] - 1361:1, 1361:3, 1361:9, 1361:14, 1361:16, 1513:1
**offense** [1] - 1370:16
**offer** [3] - 1453:14, 1453:15, 1457:15
**office** [6] - 1365:6, 1365:7, 1389:1, 1473:2, 1477:9, 1482:21
**Office** [6] - 1376:21, 1377:16, 1378:4, 1379:5, 1433:10, 1485:18
**OFFICE** [1] - 1361:13
**offices** [1] - 1433:8
**OFFICIAL** [1] - 1513:1
**official** [3] - 1364:15, 1390:13, 1434:5
**officials** [1] - 1436:24
**often** [1] - 1398:18
**old** [1] - 1512:12
**Oleg** [2] - 1467:10, 1467:12
**Oleksandr** [1] - 1461:1
**on-recorder** [1] - 1442:9
**Once** [1] - 1433:6
**once** [4] - 1395:10, 1424:24, 1485:24, 1511:17
**one** [81] - 1366:14, 1367:21, 1374:6, 1374:15, 1377:21, 1382:9, 1384:2, 1387:7, 1387:13, 1390:18, 1391:8, 1392:9, 1392:10, 1393:10, 1394:24, 1396:9, 1405:20, 1407:12, 1409:24, 1410:9, 1411:12, 1411:17, 1414:3, 1418:6, 1418:7, 1418:18, 1423:21, 1426:13, 1440:21, 1443:16, 1448:4, 1448:18, 1449:25, 1450:7, 1454:3, 1454:5, 1454:12, 1462:7, 1462:24, 1463:2, 1463:21, 1463:22, 1463:24, 1467:22, 1469:24, 1470:5, 1477:14, 1480:11, 1483:24, 1485:6, 1491:5, 1491:13, 1493:4, 1493:11, 1494:22, 1495:18, 1496:15, 1497:21, 1500:4, 1500:5, 1503:18, 1504:7, 1504:8, 1504:14, 1504:19, 1504:21, 1505:3, 1505:4, 1505:5, 1505:7, 1505:8, 1505:9, 1505:10, 1505:20, 1507:23, 1508:10, 1509:23, 1509:24, 1512:13
**one-word** [1] - 1418:18
**ones** [3] - 1402:2, 1465:25, 1466:4
**open** [7] - 1404:23, 1413:25, 1432:8, 1480:2, 1489:16, 1506:8, 1507:20
**operated** [1] - 1407:1
**OPG** [1] - 1432:21
**opine** [3] - 1370:18, 1449:21
**opinion** [1] - 1450:1
**opportunity** [4] - 1378:24, 1437:13, 1479:10, 1479:24
**opposite** [1] - 1471:2
**order** [3] - 1404:8, 1436:17, 1488:12
**orders** [2] - 1417:6, 1459:4
**organization** [1] - 1405:11
**original** [1] - 1512:3
**originally** [2] - 1393:23, 1493:16
**otherwise** [1] - 1491:14
**out-of-court** [1] - 1486:14
**outcome** [1] - 1502:24

**outlet** [2] - 1421:13, 1426:5
**outlets** [1] - 1482:25, 1484:6
**outline** [7] - 1393:8, 1416:5, 1416:12, 1416:16, 1416:25, 1417:1, 1475:5
**outlined** [1] - 1443:17
**outreach** [4] - 1427:10, 1448:15, 1477:22, 1477:23
**Outreach** [2] - 1427:15, 1427:21
**outside** [1] - 1434:17
**overall** [1] - 1469:22
**overcome** [1] - 1373:22
**overexcited** [1] - 1427:14
**overruled** [2] - 1498:12, 1499:14
**overseeing** [1] - 1435:17
**overstepped** [1] - 1465:11
**overturn** [2] - 1462:15, 1503:22
**own** [2] - 1371:6, 1371:10
**Own** [1] - 1368:8

## P

**p.m** [1] - 1512:23
**P.M** [1] - 1364:2
**pack** [4] - 1386:2, 1397:10, 1397:12, 1397:14
**package** [4] - 1391:18, 1432:21, 1438:21, 1438:23
**packed** [1] - 1394:12
**page** [57] - 1370:24, 1377:13, 1380:1, 1380:22, 1380:25, 1381:12, 1382:6, 1382:20, 1384:15, 1385:10, 1386:15, 1393:7, 1393:15, 1395:6, 1399:15, 1399:21, 1400:25, 1401:23, 1412:5, 1416:24, 1420:13, 1421:12, 1422:21, 1424:11, 1425:20, 1427:15, 1427:21, 1428:7, 1428:14, 1434:1, 1435:9, 1435:12, 1437:6, 1437:7, 1449:2, 1460:4, 1469:5, 1471:11, 1471:14, 1471:16, 1483:8, 1493:13, 1495:5, 1495:17, 1495:19, 1497:23, 1503:5, 1508:25, 1509:1, 1509:2, 1509:4, 1509:6
**PAGE** [1] - 1363:12
**pages** [8] - 1399:6, 1399:13, 1428:1, 1440:13, 1440:16, 1451:3, 1452:18, 1484:5
**paid** [2] - 1379:18, 1406:17
**panic** [1] - 1429:20
**panicking** [2] - 1415:12, 1415:19
**panicky** [1] - 1415:22
**paragraph** [20] - 1368:11, 1368:17, 1369:3, 1370:1, 1370:12, 1370:24, 1380:25, 1386:6, 1386:20, 1387:23, 1388:4, 1388:5, 1388:21, 1417:3, 1437:11, 1462:10, 1463:3, 1465:10, 1481:11, 1482:15
**paraphrase** [2] - 1409:7
**Pardon** [1] - 1439:24
**pardon** [2] - 1436:4, 1471:25
**Parfitt** [17] - 1453:19, 1453:21, 1457:3,

1457:14, 1457:20, 1457:25, 1458:5, 1458:20, 1459:25, 1460:18, 1460:24, 1461:16, 1472:7, 1474:3, 1474:10, 1475:5

**part** [20] - 1391:18, 1392:5, 1400:11, 1403:24, 1405:18, 1405:23, 1407:23, 1420:16, 1421:3, 1452:23, 1467:6, 1469:17, 1470:6, 1482:17, 1493:22, 1497:6, 1499:8, 1501:14, 1505:1

**particular** [2] - 1480:5, 1484:15

**particularly** [4] - 1384:7, 1407:5, 1503:10, 1512:5

**parties** [7] - 1383:23, 1431:22, 1432:4, 1432:10, 1464:15, 1466:13

**parts** [1] - 1473:7

**party** [4] - 1428:10, 1485:7, 1485:12, 1490:15

**pass** [1] - 1483:25

**passed** [3] - 1431:9, 1472:18, 1477:10

**patience** [1] - 1511:13

**PATRICIA** [1] - 1362:3, 1513:9

**Patricia** [2] - 1513:3, 1513:8

**Paul** [7] - 1374:4, 1391:18, 1392:24, 1414:19, 1418:10, 1459:13, 1497:12

**Paul's** [1] - 1438:13

**Paula** [1] - 1361:23

**Pause** [1] - 1493:1

**pay** [1] - 1483:2

**paying** [3] - 1406:22, 1410:7, 1411:13

**pending** [1] - 1409:14

**Pennsylvania** [1] - 1361:17

**people** [30] - 1365:10, 1372:12, 1387:15, 1395:21, 1402:6, 1407:5, 1408:19, 1427:17, 1427:23, 1428:2, 1428:12, 1428:15, 1428:17, 1430:6, 1431:10, 1433:15, 1433:16, 1433:18, 1433:22, 1441:4, 1455:19, 1456:3, 1467:6, 1469:14, 1480:18, 1497:13, 1499:2, 1499:9, 1510:17

**per** [2] - 1388:22, 1462:1

**perfect** [2] - 1487:15, 1511:8

**perhaps** [2] - 1406:21, 1445:24

**period** [1] - 1449:24

**permission** [1] - 1468:12

**permit** [1] - 1369:18

**person** [9] - 1365:3, 1402:3, 1421:4, 1432:15, 1439:19, 1461:11, 1461:13, 1463:23, 1467:10

**personnel** [1] - 1408:16

**perspective** [4] - 1367:23, 1372:7, 1374:7, 1424:18

**perspectives** [1] - 1433:9

**persuaded** [2] - 1418:12, 1419:10

**phantom** [1] - 1503:11

**phase** [1] - 1443:16

**Philip** [1] - 1422:4

**phone** [4] - 1408:8, 1443:15, 1447:25, 1501:24

**phrase** [1] - 1384:23

**phraseology** [1] - 1478:18

**physical** [1] - 1466:16

**picked** [2] - 1484:15, 1501:24

**picking** [1] - 1454:13

**piece** [1] - 1426:7

**pieces** [1] - 1508:18

**pissed** [1] - 1454:9

**place** [3] - 1425:6, 1461:8, 1485:12

**placed** [1] - 1442:10

**plan** [31] - 1376:11, 1387:8, 1387:14, 1387:22, 1393:4, 1400:5, 1403:17, 1405:25, 1406:1, 1406:2, 1406:9, 1406:11, 1407:23, 1426:19, 1428:24, 1435:1, 1435:17, 1436:21, 1443:15, 1452:23, 1452:24, 1486:9, 1488:5, 1496:25, 1497:3, 1498:21, 1499:11, 1499:16, 1500:9, 1501:17, 1502:2

**plane** [1] - 1391:22

**planned** [1] - 1366:17

**plans** [10] - 1366:21, 1423:23, 1443:4, 1496:13, 1496:19, 1496:20, 1498:8, 1498:19

**plate** [1] - 1451:13

**play** [1] - 1421:23

**pleased** [3] - 1451:12, 1472:14, 1484:22

**plenty** [1] - 1404:10

**plethora** [1] - 1499:9

**plus** [1] - 1413:23

**point** [13] - 1367:21, 1380:3, 1382:9, 1421:25, 1440:3, 1466:1, 1474:12, 1484:25, 1485:6, 1493:15, 1494:18, 1495:23, 1505:24

**pointed** [1] - 1411:24

**points** [18] - 1373:24, 1374:25, 1376:4, 1416:17, 1424:16, 1426:9, 1453:6, 1453:7, 1453:8, 1453:9, 1465:15, 1465:18, 1475:4, 1502:9, 1502:11, 1502:17, 1506:10

**Poland** [2] - 1467:11, 1469:1

**Policy** [1] - 1402:24

**political** [26] - 1370:19, 1371:5, 1371:10, 1374:2, 1375:2, 1375:12, 1380:2, 1380:6, 1389:1, 1389:3, 1389:4, 1417:7, 1420:21, 1422:3, 1424:22, 1450:2, 1450:23, 1458:2, 1459:4, 1464:25, 1493:19, 1493:25, 1494:4, 1495:2, 1503:21, 1508:7

**Politically** [1] - 1385:16

**politically** [16] - 1370:19, 1374:9, 1374:18, 1383:3, 1386:8, 1386:23, 1387:24, 1417:5, 1437:15, 1449:12, 1449:18, 1449:22, 1459:3, 1462:13, 1464:12, 1465:3

**politician** [3] - 1389:1, 1493:20, 1494:1

**politicians** [6] - 1388:5, 1424:13, 1443:20, 1493:17, 1499:4, 1499:8

**politics** [3] - 1371:9

**popped** [1] - 1503:17

**pops** [1] - 1431:15

**popular** [1] - 1373:21

**populates** [1] - 1432:14

**portion** [2] - 1396:5, 1422:2

**positing** [1] - 1478:17

**position** [11] - 1374:17, 1383:8, 1383:21, 1387:20, 1460:14, 1464:14, 1465:5, 1465:7, 1471:5, 1474:14, 1474:24

**positive** [6] - 1398:12, 1470:8, 1472:11, 1474:5, 1474:7

**possibility** [1] - 1406:16

**possible** [1] - 1382:3

**possibly** [6] - 1403:4, 1405:13, 1405:15, 1419:23, 1426:6, 1509:22

**Post** [4] - 1454:23, 1454:25, 1455:2, 1456:19

**post** [2] - 1392:22, 1495:19

**posted** [1] - 1505:20

**potential** [1] - 1372:9

**potentially** [1] - 1496:24

**power** [1] - 1368:14

**PowerPoint** [1] - 1425:20

**PowerPoint-type** [1] - 1425:20

**PR** [12] - 1380:19, 1382:2, 1384:18, 1401:24, 1402:3, 1405:22, 1435:16, 1453:22, 1480:18, 1482:17, 1482:22, 1482:24

**practices** [1] - 1408:4

**Pratt** [1] - 1361:20

**prefer** [1] - 1384:23

**preference** [1] - 1376:10

**prejudice** [1] - 1381:17

**preliminary** [1] - 1458:8

**Premier** [1] - 1470:16

**preparation** [1] - 1472:24

**preparations** [1] - 1394:10

**prepare** [2] - 1381:2, 1381:7

**prepared** [10] - 1367:23, 1387:11, 1394:20, 1414:10, 1426:14, 1429:25, 1434:4, 1437:12, 1462:7, 1492:1

**preparing** [1] - 1377:3

**present** [15] - 1365:17, 1369:6, 1374:19, 1392:14, 1401:6, 1417:9, 1445:21, 1446:7, 1446:13, 1459:7, 1459:13, 1473:13, 1487:12, 1491:5, 1511:25

**presentation** [1] - 1425:21

**presented** [5] - 1417:7, 1417:9, 1459:5, 1459:6, 1473:15

**presents** [1] - 1485:8

**President** [10] - 1371:8, 1414:24, 1415:5, 1416:21, 1417:12, 1435:6, 1441:16, 1443:21, 1459:9

**press** [27] - 1368:2, 1376:3, 1386:1, 1386:14, 1388:17, 1389:8, 1389:12, 1389:14, 1389:15, 1462:7, 1463:8, 1463:12, 1475:25, 1477:9, 1477:11, 1481:24, 1482:22, 1484:14, 1503:9, 1504:20, 1505:11, 1506:13, 1508:2, 1508:16, 1509:3, 1509:15

**pressing** [2] - 1455:13, 1455:19
**pressure** [1] - 1414:21
**presume** [4] - 1421:24, 1441:4, 1460:22, 1499:4
**presuming** [1] - 1378:7
**pretrial** [1] - 1412:24
**pretty** [8] - 1373:22, 1394:1, 1399:9, 1439:6, 1439:9, 1480:19, 1499:21, 1503:19
**previously** [3] - 1365:21, 1399:20, 1493:6
**prickly** [2] - 1398:14, 1454:11
**primarily** [1] - 1480:17
**primary** [2] - 1395:19, 1497:10
**prime** [1] - 1472:17
**Prime** [3] - 1368:7, 1368:13, 1369:15
**principal** [1] - 1473:20
**principles** [1] - 1408:4
**print** [1] - 1433:12
**priority** [1] - 1436:17
**prisoner** [1] - 1371:10
**private** [6] - 1439:3, 1439:6, 1439:8, 1444:7, 1444:10, 1495:22
**privately** [1] - 1376:6
**pro** [1] - 1474:8
**Proactive** [1] - 1385:12
**proactive** [1] - 1385:19
**probative** [1] - 1488:17
**problem** [1] - 1394:17
**problematic** [3] - 1401:22, 1407:6, 1478:18
**problems** [1] - 1401:16
**procedural** [1] - 1460:12
**procedures** [1] - 1365:3
**proceed** [1] - 1446:14
**proceeded** [1] - 1369:16
**Proceedings** [2] - 1362:6, 1512:23
**proceedings** [2] - 1473:16, 1513:4
**process** [5] - 1369:21, 1377:10, 1452:12, 1460:12, 1473:20
**Procurator** [4] - 1376:21, 1378:4, 1379:6, 1433:11
**produce** [2] - 1372:11, 1412:12
**produced** [4] - 1362:6, 1396:8, 1397:2, 1440:21
**proffer** [5] - 1487:3, 1487:4, 1504:9, 1504:12, 1504:13
**program** [1] - 1435:16
**project** [2] - 1429:12, 1499:8
**Project** [1] - 1376:22
**promised** [1] - 1445:17
**promote** [2] - 1371:24, 1490:16
**prong** [1] - 1488:14
**pronounce** [1] - 1496:2
**proposed** [10] - 1376:3, 1377:23, 1378:16, 1378:24, 1381:5, 1381:16, 1382:8, 1388:22, 1427:10, 1460:7
**prosecute** [1] - 1493:16
**prosecuted** [2] - 1381:3, 1493:17

**prosecution** [33] - 1368:14, 1370:18, 1371:5, 1374:3, 1374:9, 1374:18, 1375:2, 1375:10, 1383:2, 1386:8, 1387:24, 1388:25, 1389:3, 1405:11, 1417:10, 1449:9, 1449:11, 1449:12, 1449:18, 1449:22, 1458:3, 1459:8, 1462:13, 1464:11, 1465:3, 1470:2, 1493:19, 1493:25, 1494:4, 1495:3, 1508:15
**Prosecutor** [4] - 1377:17, 1386:16, 1386:19, 1485:18
**prosecutor** [1] - 1365:11
**prosecutorial** [1] - 1473:15
**prosecutors** [2] - 1489:20, 1490:20
**prove** [1] - 1488:11
**provide** [4] - 1437:13, 1498:3, 1498:5, 1503:20
**provided** [7] - 1376:24, 1379:19, 1407:25, 1424:15, 1462:14, 1481:16, 1512:6
**providing** [2] - 1486:23, 1498:9
**proximity** [1] - 1468:19
**pseudonym** [4] - 1431:5, 1431:16, 1431:17, 1431:21
**public** [8] - 1367:22, 1372:7, 1372:9, 1401:24, 1407:2, 1426:14, 1437:11, 1504:2
**publication** [1] - 1473:6
**publish** [1] - 1434:5
**published** [5] - 1378:8, 1393:17, 1462:11, 1463:3, 1469:22
**pulled** [2] - 1508:18, 1508:19
**pulling** [1] - 1404:11
**purely** [1] - 1406:6
**purpose** [5] - 1385:7, 1486:15, 1507:8, 1507:10
**purposes** [1] - 1510:5
**push** [1] - 1365:13
**put** [16] - 1366:18, 1368:6, 1387:17, 1406:12, 1427:6, 1440:25, 1453:2, 1463:23, 1465:18, 1472:3, 1476:25, 1483:14, 1492:23, 1505:5, 1506:17, 1506:20
**putting** [5] - 1404:11, 1427:8, 1482:21, 1499:11, 1501:21

## Q

**quarrel** [2] - 1385:3, 1385:5
**question-and-answer** [1] - 1377:10
**questions** [33] - 1377:15, 1377:18, 1403:20, 1424:14, 1436:11, 1438:17, 1458:21, 1461:3, 1478:17, 1479:4, 1481:12, 1489:2, 1491:21, 1491:23, 1491:25, 1492:2, 1495:22, 1495:23, 1496:12, 1496:14, 1498:19, 1498:20, 1498:22, 1501:15, 1501:18, 1501:21, 1502:8, 1503:8, 1503:10, 1503:12, 1504:5, 1509:12, 1510:21
**quibble** [1] - 1464:21

**quick** [1] - 1494:9
**quickly** [2] - 1364:8, 1478:2
**quite** [8] - 1377:9, 1391:3, 1402:21, 1427:3, 1454:13, 1466:12, 1488:16, 1494:13
**quote** [2] - 1369:10, 1473:11
**quoted** [1] - 1372:15
**quotes** [12] - 1370:21, 1454:3, 1454:5, 1470:2, 1470:5, 1470:20, 1471:1, 1473:10, 1473:25, 1474:4, 1474:23, 1475:15
**quoting** [1] - 1503:24

## R

**radical** [1] - 1373:22
**Radio** [1] - 1481:6
**raised** [1] - 1381:17
**rather** [2] - 1397:7, 1464:3
**Re** [1] - 1418:3
**re** [2] - 1364:3, 1446:8
**re-calling** [2] - 1364:3, 1446:8
**reach** [2] - 1420:17, 1456:11
**reached** [7] - 1407:9, 1408:8, 1421:13, 1450:5, 1450:12, 1451:7, 1451:10
**reaching** [4] - 1447:18, 1450:1, 1450:18, 1499:7
**reaction** [3] - 1375:3, 1386:21, 1430:4
**reactive** [1] - 1386:16
**read** [14] - 1409:3, 1409:5, 1409:6, 1438:2, 1450:17, 1463:7, 1463:22, 1483:6, 1493:15, 1493:24, 1510:6, 1510:9, 1511:1, 1511:18
**reading** [6] - 1379:18, 1386:20, 1411:3, 1418:22, 1462:24, 1500:2
**reads** [3] - 1471:18, 1472:15, 1508:5
**ready** [1] - 1470:11
**reality** [1] - 1474:16
**really** [18] - 1371:23, 1373:19, 1373:22, 1392:25, 1393:4, 1396:2, 1398:10, 1398:17, 1399:3, 1407:4, 1424:3, 1453:1, 1456:9, 1464:17, 1471:1, 1480:5, 1491:3, 1504:13
**reason** [5] - 1371:8, 1381:22, 1381:23, 1436:7, 1468:7
**reasons** [2] - 1364:17, 1373:18
**reassurance** [2] - 1455:14, 1455:19
**receive** [4] - 1373:23, 1377:21, 1378:14, 1497:16
**received** [12] - 1374:4, 1377:23, 1378:5, 1378:16, 1379:17, 1390:3, 1390:5, 1400:9, 1400:10, 1466:20, 1483:19, 1501:24
**recent** [1] - 1494:16
**recognize** [1] - 1414:6
**recollection** [16] - 1395:2, 1403:6, 1403:25, 1404:3, 1404:4, 1404:9, 1404:20, 1405:12, 1423:16, 1488:2, 1489:1, 1510:7, 1510:10, 1510:14, 1511:3, 1511:5

**recommendation** [1] - 1373:14
**recommending** [1] - 1434:18
**reconsideration** [1] - 1370:4
**record** [8] - 1412:12, 1417:7, 1417:9, 1459:4, 1459:6, 1486:15, 1512:16, 1513:4
**recorder** [1] - 1442:9
**recross** [1] - 1506:8
**RECROSS** [2] - 1363:4, 1507:21
**redirect** [7] - 1479:9, 1479:13, 1491:11, 1505:1, 1505:19, 1507:11, 1508:19
**REDIRECT** [3] - 1363:4, 1491:17, 1509:13
**refer** [2] - 1384:20, 1384:21
**reference** [17] - 1387:23, 1399:14, 1405:2, 1406:22, 1406:25, 1415:5, 1416:19, 1418:5, 1422:22, 1424:10, 1424:12, 1428:18, 1437:21, 1441:16, 1468:16, 1473:24, 1505:17
**referred** [7] - 1390:10, 1397:11, 1399:20, 1412:17, 1437:8, 1458:5, 1494:15
**referring** [3] - 1369:14, 1390:15, 1455:16
**reflect** [2] - 1383:21, 1412:10
**reflected** [1] - 1460:14
**refresh** [8] - 1403:6, 1403:25, 1404:2, 1404:4, 1404:8, 1404:19, 1510:14, 1511:2
**refreshes** [3] - 1510:7, 1510:10, 1511:4
**regard** [1] - 1421:5
**regarding** [1] - 1416:17
**regular** [1] - 1512:8
**Reid** [3] - 1441:13, 1441:24, 1443:21
**reiterates** [1] - 1408:24
**rejected** [1] - 1373:3
**related** [1] - 1499:11
**relation** [2] - 1383:9, 1383:23
**relations** [8] - 1367:22, 1372:7, 1372:9, 1401:24, 1407:3, 1408:20, 1426:14, 1504:2
**relationship** [5] - 1398:14, 1398:17, 1454:11, 1454:15, 1454:17
**release** [60] - 1371:5, 1375:24, 1376:4, 1385:18, 1385:21, 1386:1, 1386:15, 1388:18, 1389:8, 1389:13, 1389:14, 1392:5, 1401:17, 1407:17, 1407:24, 1421:23, 1424:23, 1424:24, 1426:4, 1430:10, 1437:11, 1437:22, 1438:12, 1443:1, 1445:7, 1446:23, 1451:22, 1461:23, 1462:2, 1462:7, 1463:8, 1463:12, 1465:8, 1469:8, 1470:11, 1473:5, 1477:11, 1481:9, 1481:23, 1482:9, 1482:22, 1483:2, 1484:14, 1484:16, 1495:19, 1496:4, 1498:7, 1503:9, 1504:21, 1505:11, 1506:13, 1508:2, 1508:16, 1509:3, 1509:4, 1509:7, 1509:9, 1509:15

**released** [14] - 1366:16, 1368:3, 1371:15, 1378:11, 1403:2, 1429:24, 1441:8, 1442:11, 1444:22, 1469:12, 1485:21, 1496:10, 1508:24
**releases** [1] - 1483:3
**releasing** [1] - 1373:15
**relevance** [3] - 1483:10, 1485:14, 1485:15
**relevant** [4] - 1433:8, 1436:24, 1473:14, 1483:12
**remain** [1] - 1498:8
**remember** [68] - 1367:24, 1367:25, 1369:2, 1369:24, 1370:7, 1374:5, 1374:6, 1374:13, 1374:14, 1374:15, 1374:21, 1374:23, 1374:24, 1375:8, 1375:13, 1375:14, 1389:10, 1391:2, 1391:4, 1394:17, 1395:1, 1395:23, 1396:3, 1398:2, 1401:21, 1402:22, 1403:17, 1404:7, 1404:12, 1406:20, 1412:18, 1416:3, 1416:7, 1417:21, 1419:23, 1423:13, 1423:14, 1425:12, 1429:6, 1430:20, 1431:6, 1433:25, 1444:24, 1455:24, 1475:18, 1475:19, 1475:23, 1475:24, 1476:10, 1476:12, 1476:14, 1476:15, 1480:23, 1480:24, 1481:2, 1481:22, 1481:25, 1496:22, 1498:23, 1500:2, 1500:4, 1503:8, 1503:10, 1503:11, 1503:13, 1509:19
**Remember** [1] - 1376:6
**remembered** [3] - 1396:9, 1396:10, 1396:14
**remembering** [2] - 1404:16, 1425:12
**remembers** [2] - 1403:13, 1487:9
**remind** [1] - 1365:18
**remove** [1] - 1381:13
**remuneration** [1] - 1407:24
**reopen** [1] - 1505:2
**repeat** [2] - 1383:19, 1404:20, 1449:19
**repetition** [2] - 1383:18, 1446:3
**rephrase** [5] - 1375:5, 1394:19, 1464:22, 1478:1, 1478:20
**replace** [1] - 1452:15
**report** [177] - 1366:16, 1367:23, 1369:10, 1369:23, 1369:24, 1370:7, 1370:8, 1371:1, 1371:14, 1371:22, 1372:8, 1372:20, 1373:6, 1373:7, 1373:12, 1374:18, 1375:24, 1376:3, 1376:4, 1377:22, 1378:8, 1378:11, 1378:14, 1378:25, 1379:1, 1379:9, 1379:10, 1379:12, 1379:13, 1379:16, 1379:18, 1379:21, 1380:2, 1380:6, 1380:11, 1380:13, 1380:14, 1380:18, 1380:21, 1381:20, 1381:21, 1382:17, 1383:1, 1383:10, 1383:11, 1383:15, 1383:19, 1383:23, 1384:9, 1384:10, 1384:13, 1384:14, 1384:25, 1385:1, 1385:4, 1385:6, 1386:7, 1386:21, 1388:19, 1389:20, 1390:10, 1390:12, 1390:16, 1390:25, 1392:5, 1393:16, 1393:17, 1396:2, 1396:8, 1398:22,

1401:1, 1401:18, 1403:2, 1405:8, 1405:23, 1407:16, 1407:17, 1407:20, 1407:24, 1409:1, 1410:2, 1410:14, 1410:18, 1410:20, 1411:4, 1411:7, 1418:13, 1419:3, 1419:6, 1419:11, 1419:19, 1419:22, 1420:5, 1421:23, 1426:4, 1427:11, 1430:10, 1433:23, 1434:4, 1437:12, 1441:8, 1442:6, 1445:6, 1449:9, 1450:4, 1450:8, 1450:13, 1450:16, 1450:19, 1450:20, 1450:22, 1451:3, 1451:23, 1453:4, 1453:10, 1456:7, 1457:17, 1458:24, 1460:8, 1462:10, 1463:3, 1463:17, 1464:10, 1464:16, 1465:6, 1465:13, 1466:10, 1469:8, 1469:11, 1470:12, 1471:3, 1471:6, 1472:19, 1473:5, 1473:11, 1474:11, 1474:13, 1475:7, 1475:8, 1475:10, 1477:5, 1481:9, 1481:15, 1481:17, 1482:9, 1485:21, 1486:10, 1490:13, 1490:22, 1490:24, 1493:18, 1493:23, 1494:2, 1494:12, 1494:24, 1495:5, 1495:19, 1496:4, 1496:10, 1498:8, 1500:10, 1502:12, 1502:14, 1502:18, 1502:19, 1503:2, 1503:23, 1503:24, 1504:3, 1505:25, 1506:24, 1507:12
**Report** [35] - 1368:3, 1371:25, 1373:16, 1374:8, 1374:11, 1377:18, 1383:7, 1383:9, 1385:15, 1393:8, 1401:12, 1402:9, 1405:5, 1416:17, 1416:25, 1417:4, 1426:3, 1429:24, 1437:22, 1438:12, 1438:14, 1449:17, 1449:21, 1450:25, 1458:21, 1460:13, 1462:19, 1463:13, 1464:13, 1464:24, 1465:11, 1471:19, 1473:21, 1481:24, 1498:3
**report's** [1] - 1395:24
**Report's** [1] - 1459:1
**reported** [3] - 1362:6, 1461:7, 1500:15
**reporter** [5] - 1418:20, 1426:5, 1467:11, 1467:18, 1468:4
**REPORTER** [1] - 1513:1
**Reporter** [1] - 1362:3
**reporters** [1] - 1469:1
**reports** [1] - 1378:5
**represent** [3] - 1369:17, 1382:10, 1481:14
**representatives** [1] - 1387:19
**Representatives** [2] - 1422:6, 1428:2
**represented** [1] - 1473:16
**representing** [1] - 1481:19
**reputation** [1] - 1430:7
**request** [2] - 1400:18, 1498:6
**requested** [2] - 1379:22, 1379:23
**requests** [2] - 1373:24, 1498:9
**required** [2] - 1388:10, 1433:12
**requirement** [1] - 1364:23
**requirements** [1] - 1370:15
**research** [1] - 1511:19
**respect** [3] - 1406:2, 1406:4, 1475:25

**responded** [4] - 1410:23, 1418:16, 1447:7, 1466:4
**responding** [4] - 1423:23, 1481:11, 1495:9, 1495:10
**responds** [2] - 1456:16, 1468:15
**response** [4] - 1377:17, 1388:18, 1400:18, 1455:4
**responsibilities** [1] - 1499:7
**responsibility** [3] - 1408:14, 1408:16, 1499:5
**responsible** [6] - 1432:24, 1434:2, 1469:18, 1481:25, 1482:21, 1510:15
**rest** [4] - 1389:23, 1494:6, 1494:11, 1511:22
**restatement** [2] - 1380:14, 1465:5
**resume** [2] - 1445:19, 1511:15
**retyping** [1] - 1429:3
**Reuters** [1] - 1484:15
**revere** [1] - 1494:19
**reversal** [2] - 1419:24, 1420:3
**reverse** [2] - 1409:25, 1494:20
**review** [6] - 1368:22, 1370:3, 1386:3, 1393:5, 1410:15, 1465:16
**reviewing** [1] - 1425:13
**reviews** [1] - 1449:9
**revise** [1] - 1410:19
**revised** [4] - 1382:21, 1391:12, 1412:3, 1440:17
**revision** [3] - 1387:12, 1391:13, 1393:21
**revisions** [3] - 1387:16, 1416:5, 1426:18
**rewrite** [1] - 1422:18
**Reynolds** [2] - 1448:6, 1482:5
**Richard** [1] - 1481:5
**Rick** [21] - 1391:17, 1402:8, 1406:11, 1423:14, 1428:21, 1432:24, 1433:19, 1434:12, 1435:25, 1439:5, 1439:7, 1440:21, 1447:8, 1455:21, 1458:14, 1466:20, 1467:12, 1467:25, 1472:13, 1482:10, 1501:11
**rid** [1] - 1395:10
**ridiculous** [1] - 1480:9
**rightly** [1] - 1466:12
**Rights** [4] - 1368:8, 1388:6, 1399:19, 1472:25
**rights** [3] - 1368:13, 1371:7, 1405:20
**risk** [2] - 1372:10
**RMR** [1] - 1362:3
**rocket** [2] - 1424:4, 1424:5
**role** [15] - 1385:23, 1405:19, 1407:2, 1407:19, 1408:15, 1408:23, 1421:1, 1421:22, 1437:23, 1460:16, 1481:25, 1497:5, 1497:8, 1502:2
**rollout** [13] - 1409:1, 1484:23, 1485:20, 1490:13, 1490:21, 1490:23, 1496:13, 1496:19, 1496:25, 1497:3, 1498:8, 1500:9, 1504:3
**Room** [1] - 1362:3
**room** [2] - 1395:22, 1511:16

**rooms** [1] - 1483:3
**rubbish** [2] - 1367:23, 1367:25
**rude** [1] - 1443:11
**run** [2] - 1434:21, 1465:18
**rundown** [1] - 1447:9
**rush** [1] - 1494:14
**Russian** [1] - 1433:7

## S

**SA** [2] - 1438:14, 1498:3
**Sager** [6] - 1431:3, 1455:25, 1468:1, 1469:15, 1475:19, 1484:10
**sample** [1] - 1376:3
**Sanchez** [2] - 1361:12, 1508:19
**SANCHEZ** [82] - 1364:8, 1364:18, 1364:25, 1365:8, 1367:11, 1367:17, 1372:1, 1372:22, 1375:4, 1381:25, 1392:6, 1392:17, 1404:6, 1409:5, 1411:14, 1412:20, 1412:22, 1413:1, 1414:14, 1419:7, 1422:13, 1423:7, 1429:13, 1430:1, 1430:13, 1431:17, 1431:20, 1432:5, 1439:22, 1442:17, 1443:2, 1444:17, 1450:3, 1459:15, 1462:21, 1464:19, 1466:25, 1476:5, 1477:16, 1477:24, 1478:25, 1479:3, 1479:14, 1479:18, 1479:23, 1483:9, 1483:13, 1485:1, 1485:5, 1486:17, 1487:6, 1487:8, 1488:1, 1489:3, 1490:1, 1491:18, 1492:19, 1493:3, 1494:8, 1494:10, 1498:13, 1500:12, 1500:18, 1500:22, 1501:1, 1501:7, 1504:5, 1504:9, 1504:15, 1504:23, 1505:7, 1506:1, 1506:7, 1506:19, 1507:8, 1508:12, 1509:14, 1509:25, 1510:13, 1512:13, 1512:16, 1512:19
**Sanger** [6] - 1428:17, 1428:18, 1442:7, 1448:7, 1456:17, 1502:23
**sanger** [20] - 1442:10, 1442:24, 1447:18, 1448:1, 1448:15, 1449:2, 1449:6, 1449:8, 1450:12, 1451:2, 1451:5, 1451:7, 1451:10, 1451:21, 1453:17, 1454:20, 1455:17, 1456:8, 1501:23, 1504:2
**Sanger's** [1] - 1448:21
**satisfy** [1] - 1370:15
**Saturday** [2] - 1394:16, 1397:7
**saw** [7] - 1365:10, 1369:23, 1370:22, 1374:25, 1438:1, 1440:20, 1459:17
**Scenario** [2] - 1367:4, 1372:6
**scenario** [6] - 1372:4, 1372:11, 1373:13, 1375:21, 1471:23, 1472:10
**schedule** [2] - 1365:12, 1440:25
**School** [2] - 1399:2, 1399:4
**scope** [5] - 1370:16, 1476:5, 1479:1, 1483:10, 1485:2
**scratch** [1] - 1457:15
**screen** [8] - 1416:14, 1462:25, 1464:4, 1467:5, 1492:20, 1511:7
**screens** [1] - 1492:23

**scribbled** [1] - 1395:8
**scrutiny** [1] - 1465:17
**second** [12] - 1386:19, 1388:21, 1400:25, 1437:7, 1437:11, 1482:15, 1489:24, 1493:12, 1493:24, 1495:18, 1509:4, 1509:6
**secondly** [1] - 1364:18
**secretary** [2] - 1445:6, 1452:11
**Secretary** [2] - 1452:7, 1452:10
**section** [2] - 1386:14, 1412:6
**Security** [2] - 1422:4, 1427:19
**see** [22] - 1367:8, 1393:5, 1398:17, 1399:15, 1403:6, 1431:10, 1433:4, 1437:1, 1437:25, 1441:14, 1447:3, 1460:22, 1467:14, 1467:19, 1468:18, 1468:20, 1474:22, 1476:23, 1477:6, 1503:6, 1508:25, 1509:4
**seed** [1] - 1504:1
**seeding** [10] - 1405:23, 1406:4, 1458:7, 1475:24, 1476:2, 1476:7, 1476:9, 1476:13, 1499:12, 1502:5
**seeing** [1] - 1446:25
**seek** [1] - 1453:24
**seem** [2] - 1395:1, 1397:6
**seize** [1] - 1474:18
**select** [1] - 1469:23
**selected** [2] - 1426:8, 1441:9
**selecting** [1] - 1452:6
**selective** [4] - 1375:10, 1417:10, 1458:2, 1470:2
**Senate** [1] - 1441:25
**senators** [1] - 1428:5
**Senators** [1] - 1428:8
**send** [16] - 1431:1, 1432:15, 1439:7, 1439:10, 1439:16, 1439:17, 1440:3, 1440:9, 1440:10, 1453:4, 1453:7, 1457:17, 1483:3, 1492:4, 1492:11, 1496:18
**sending** [3] - 1422:18, 1428:23, 1453:5
**senior** [2] - 1389:1, 1497:13
**sense** [2] - 1419:4, 1470:25
**sent** [55] - 1367:1, 1371:21, 1375:18, 1376:13, 1382:23, 1383:25, 1384:2, 1384:4, 1384:5, 1387:3, 1387:11, 1387:12, 1387:16, 1388:16, 1391:8, 1391:17, 1396:23, 1397:6, 1400:18, 1400:23, 1410:5, 1410:6, 1410:8, 1410:13, 1412:2, 1413:17, 1413:22, 1414:6, 1414:8, 1416:4, 1421:9, 1426:25, 1434:11, 1434:25, 1438:8, 1439:3, 1439:17, 1440:4, 1444:2, 1444:9, 1449:2, 1451:12, 1457:24, 1458:20, 1459:23, 1476:21, 1477:11, 1477:13, 1479:6, 1480:19, 1481:12, 1493:5, 1496:12, 1497:21, 1506:16
**sentence** [6] - 1370:1, 1454:12, 1464:7, 1464:8, 1493:24
**sentencing** [1] - 1370:3
**separated** [1] - 1415:24

**September** [23] - 1366:10, 1367:2, 1373:23, 1375:1, 1375:19, 1376:14, 1382:23, 1387:4, 1388:17, 1390:3, 1391:10, 1391:17, 1396:23, 1402:19, 1407:13, 1411:22, 1412:2, 1414:7, 1420:8, 1420:14, 1422:18, 1466:3, 1466:5

**Serhiy** [4] - 1371:3, 1371:14, 1434:15, 1435:2

**series** [3] - 1375:24, 1431:9, 1458:21

**seriously** [1] - 1373:15

**service** [1] - 1482:24

**services** [1] - 1490:12

**Session** [1] - 1361:5

**SESSION** [2] - 1361:9, 1364:1

**set** [8] - 1385:9, 1398:21, 1423:1, 1438:11, 1446:23, 1459:23, 1485:13, 1512:3

**setting** [1] - 1480:10

**seven** [5] - 1425:12, 1428:7, 1431:8, 1473:2, 1484:19

**several** [6] - 1386:4, 1388:13, 1392:8, 1428:5, 1451:7, 1475:6

**share** [2] - 1475:13, 1475:16

**shirt** [1] - 1456:24

**shocking** [1] - 1487:5

**short** [2] - 1398:4, 1443:11

**shorter** [1] - 1504:17

**shorthand** [1] - 1362:6

**shortly** [3] - 1411:11, 1449:5, 1458:1

**show** [18] - 1366:24, 1375:16, 1404:9, 1413:9, 1414:2, 1416:9, 1416:10, 1434:10, 1444:15, 1481:3, 1482:1, 1484:8, 1486:24, 1499:23, 1504:11, 1504:20, 1510:1, 1511:4

**showed** [6] - 1440:12, 1444:21, 1505:8, 1505:9, 1508:11, 1508:13

**showing** [4] - 1404:10, 1413:16, 1486:16, 1512:5

**shown** [4] - 1396:22, 1413:9, 1463:7, 1495:15

**shows** [1] - 1465:11

**Shultz** [3] - 1436:23, 1441:13, 1442:3

**sick** [1] - 1390:19

**side** [2] - 1365:11, 1430:12

**sides** [1] - 1364:11

**significant** [1] - 1485:16

**simple** [1] - 1499:21

**simply** [4] - 1389:2, 1407:19, 1450:4, 1493:24

**single** [3] - 1401:4, 1427:13, 1484:5

**single-spaced** [2] - 1427:13, 1484:5

**sit** [1] - 1453:23

**sitting** [2] - 1381:21, 1382:18

**situation** [1] - 1414:23

**Skadden** [67] - 1366:15, 1367:23, 1368:3, 1371:25, 1372:14, 1373:16, 1374:1, 1374:8, 1374:11, 1374:16, 1377:18, 1380:22, 1381:1, 1381:14, 1381:16, 1383:7, 1383:9, 1386:22,

1388:17, 1388:22, 1389:12, 1389:14, 1393:10, 1397:3, 1399:19, 1401:12, 1402:9, 1402:13, 1402:15, 1405:5, 1408:23, 1410:1, 1416:17, 1416:25, 1417:4, 1417:8, 1421:6, 1426:3, 1427:11, 1429:24, 1437:12, 1437:22, 1438:12, 1439:4, 1439:18, 1449:17, 1449:21, 1449:25, 1458:21, 1459:1, 1459:5, 1459:14, 1460:13, 1462:19, 1463:13, 1464:13, 1464:24, 1465:11, 1473:21, 1477:6, 1477:9, 1480:18, 1480:25, 1481:15, 1481:24, 1496:5, 1508:6

**Skadden's** [4] - 1372:20, 1402:3, 1402:7, 1406:23

**Slate** [1] - 1508:6

**slightly** [2] - 1424:9, 1465:6

**soccer** [1] - 1369:1

**Solash** [1] - 1481:6

**someone** [6] - 1413:9, 1415:11, 1419:4, 1451:7, 1457:11, 1511:4

**sometimes** [3] - 1384:21, 1403:24, 1404:19

**somewhat** [1] - 1471:22

**sorry** [32] - 1367:7, 1375:15, 1376:15, 1376:17, 1377:13, 1380:24, 1384:17, 1387:5, 1387:7, 1391:9, 1395:19, 1399:3, 1415:13, 1416:11, 1416:14, 1418:23, 1426:23, 1427:20, 1430:25, 1436:9, 1437:6, 1444:7, 1448:20, 1449:19, 1464:3, 1466:16, 1467:20, 1472:20, 1501:1, 1501:12, 1501:19, 1509:7

**sort** [16] - 1371:17, 1371:18, 1377:3, 1377:11, 1390:15, 1398:16, 1408:24, 1419:18, 1423:22, 1424:3, 1424:7, 1425:20, 1450:24, 1475:14, 1487:18, 1501:16

**sound** [1] - 1508:15

**sounds** [1] - 1453:1

**spaced** [2] - 1427:13, 1484:5

**SPAEDER** [2] - 1361:20, 1361:23

**speaker** [1] - 1422:6

**Speaker** [2] - 1441:19, 1443:21

**specialists** [1] - 1499:10

**specific** [4] - 1488:7, 1488:11, 1494:25, 1503:21

**specifically** [8] - 1408:14, 1412:17, 1423:15, 1429:23, 1430:5, 1491:24, 1495:25, 1501:19

**specifics** [2] - 1400:1, 1413:14

**speeches** [1] - 1490:4

**spend** [1] - 1511:21

**spent** [3] - 1395:23, 1445:24, 1511:20

**spin** [11] - 1384:13, 1384:16, 1384:18, 1384:22, 1384:25, 1385:2, 1385:24, 1411:6, 1435:19, 1459:13, 1502:21

**spinning** [1] - 1385:4

**spoken** [1] - 1461:6

**squares** [1] - 1399:16

**stab** [1] - 1386:2

**Staff** [1] - 1435:6

**staff** [1] - 1481:23

**stage** [2] - 1372:18, 1419:25

**stakeholder** [1] - 1421:5

**stakeholders** [7] - 1388:10, 1424:13, 1424:22, 1426:9, 1441:9, 1443:17, 1443:18

**stand** [2] - 1443:10, 1505:22

**standards** [3] - 1449:12, 1462:16, 1503:23

**start** [9] - 1385:9, 1391:7, 1403:24, 1408:25, 1429:14, 1451:16, 1489:10, 1499:21, 1512:21

**started** [4] - 1396:1, 1397:19, 1397:22, 1413:15

**starting** [3] - 1399:13, 1457:15, 1495:7

**starts** [1] - 1496:2

**state** [2] - 1429:18, 1429:19

**State** [4] - 1422:5, 1427:18, 1452:7, 1452:10

**statement** [24] - 1378:19, 1380:14, 1381:23, 1382:21, 1383:8, 1383:10, 1384:9, 1385:11, 1386:6, 1386:16, 1389:15, 1463:11, 1465:7, 1470:11, 1476:25, 1477:7, 1480:19, 1482:17, 1485:16, 1486:14, 1487:3, 1493:9, 1494:1, 1494:2

**Statement** [1] - 1393:10

**statements** [7] - 1376:20, 1461:14, 1461:17, 1461:19, 1463:15, 1463:20, 1474:20

**STATES** [3] - 1361:1, 1361:3, 1361:10

**states** [5] - 1380:6, 1380:23, 1381:1, 1460:8, 1462:13

**States** [9] - 1364:4, 1376:7, 1421:13, 1426:14, 1428:8, 1437:4, 1446:9, 1483:21, 1489:21

**Status** [1] - 1393:8

**statutory** [1] - 1370:16

**stayed** [1] - 1406:9

**staying** [1] - 1364:13

**stays** [1] - 1391:12

**Stefan** [2] - 1405:16, 1423:2

**stenotype** [1] - 1362:6

**step** [2] - 1510:22, 1511:9

**stepping** [1] - 1452:14

**sticker** [1] - 1512:11

**sticking** [1] - 1429:3

**still** [5] - 1365:19, 1366:11, 1386:20, 1394:7, 1400:7

**stipulation** [1] - 1397:1

**stood** [1] - 1456:12

**stop** [1] - 1430:8

**stories** [2] - 1434:3, 1472:12

**story** [10] - 1383:20, 1426:6, 1434:4, 1472:12, 1473:25, 1474:6, 1477:5, 1487:5, 1498:4

**strange** [1] - 1385:4

**strategic** [1] - 1385:7

**strategized** [1] - 1392:15
**strategy** [10] - 1401:1, 1407:22, 1409:1, 1409:13, 1426:4, 1469:23, 1470:6, 1482:18, 1499:20, 1499:21
**Street** [3] - 1361:14, 1361:20, 1361:24
**strenuously** [1] - 1408:2
**string** [1] - 1451:12
**stuff** [2] - 1410:24, 1451:4
**Subject** [1] - 1367:3
**subject** [7] - 1389:10, 1418:3, 1419:2, 1425:16, 1451:1, 1458:17, 1465:16
**submission** [1] - 1391:12
**subsequent** [1] - 1403:23
**substantive** [2] - 1373:6, 1486:8
**successful** [5] - 1375:10, 1476:2, 1476:9, 1485:19, 1490:12
**suffer** [1] - 1381:17
**sufficient** [4] - 1370:3, 1381:6, 1462:14, 1503:21
**suggest** [4] - 1373:25, 1395:15, 1488:17, 1507:11
**suggested** [6] - 1388:17, 1431:15, 1487:17, 1494:12, 1499:21, 1507:14
**suggesting** [2] - 1404:21, 1506:11
**suggestion** [1] - 1376:11
**suggests** [1] - 1369:13
**Suite** [2] - 1361:21, 1361:24
**summarize** [1] - 1507:14
**summary** [8] - 1374:16, 1375:1, 1382:25, 1450:16, 1462:19, 1482:10, 1507:12, 1507:13
**Sunday** [4] - 1394:14, 1396:23, 1397:8, 1497:24
**Superior** [1] - 1364:24
**support** [12] - 1374:1, 1375:11, 1383:2, 1412:13, 1418:12, 1419:3, 1419:5, 1419:11, 1419:18, 1419:22, 1420:5, 1474:13
**supports** [1] - 1411:7
**suppose** [1] - 1415:19
**supposed** [1] - 1431:24
**surely** [1] - 1380:2
**surmised** [1] - 1439:25
**surprised** [5] - 1398:23, 1407:6, 1430:21, 1456:6, 1456:9
**suspect** [1] - 1459:20
**sustained** [2] - 1372:2, 1422:14
**switch** [1] - 1501:13
**sworn** [1] - 1365:21
**system** [4] - 1417:7, 1427:8, 1459:4, 1483:2

## T

**tail** [1] - 1487:4
**targeting** [1] - 1469:23
**targets** [1] - 1443:19
**Taylor** [1] - 1361:22
**TAYLOR** [4] - 1487:20, 1487:23, 1488:9, 1488:14

**team** [12] - 1433:8, 1433:16, 1433:22, 1435:13, 1441:3, 1441:7, 1455:20, 1467:6, 1469:17, 1472:24, 1481:15, 1483:12
**tech** [1] - 1463:23
**Telegraph** [23] - 1453:20, 1457:3, 1457:9, 1457:25, 1458:18, 1459:23, 1460:3, 1462:4, 1469:22, 1470:8, 1470:20, 1471:2, 1471:7, 1471:8, 1471:17, 1472:5, 1472:15, 1472:22, 1473:5, 1473:25, 1474:21, 1475:21, 1483:5
**telephone** [3] - 1448:13, 1448:16, 1448:18
**tense** [2] - 1415:21, 1494:15
**term** [1] - 1390:24
**terms** [5] - 1401:17, 1476:2, 1479:9, 1499:19, 1502:3
**terrible** [1] - 1384:23
**testified** [2] - 1365:21, 1413:12
**testify** [4] - 1369:19, 1401:6, 1401:14, 1444:20
**testifying** [1] - 1404:12, 1486:22
**testimony** [8] - 1388:13, 1406:14, 1424:2, 1457:2, 1478:10, 1478:12, 1486:21, 1511:5
**thanked** [1] - 1454:20
**thanking** [1] - 1490:11
**THE** [214] - 1361:1, 1361:9, 1361:13, 1364:3, 1364:6, 1364:15, 1364:24, 1365:2, 1365:10, 1365:16, 1365:18, 1365:23, 1366:5, 1367:10, 1367:14, 1367:15, 1367:16, 1367:18, 1372:2, 1372:24, 1373:1, 1373:2, 1373:4, 1373:8, 1375:6, 1378:20, 1382:2, 1384:2, 1384:3, 1384:4, 1384:5, 1389:25, 1390:21, 1392:8, 1392:11, 1392:12, 1392:18, 1392:22, 1403:12, 1403:14, 1403:18, 1403:20, 1404:4, 1404:8, 1404:15, 1404:18, 1409:3, 1409:6, 1409:11, 1409:12, 1409:14, 1409:16, 1409:17, 1411:16, 1411:19, 1412:21, 1412:25, 1413:2, 1413:7, 1413:21, 1414:13, 1414:15, 1415:8, 1415:13, 1415:14, 1415:15, 1415:17, 1415:19, 1415:20, 1415:21, 1415:23, 1416:1, 1418:20, 1418:22, 1418:24, 1419:9, 1419:12, 1419:14, 1419:17, 1422:14, 1423:9, 1429:14, 1429:16, 1429:17, 1429:19, 1429:21, 1430:3, 1430:5, 1430:17, 1430:19, 1431:10, 1431:13, 1431:22, 1432:1, 1432:7, 1432:9, 1436:8, 1436:9, 1436:10, 1439:23, 1439:25, 1440:3, 1440:6, 1442:19, 1442:21, 1442:22, 1443:3, 1443:6, 1444:20, 1445:10, 1445:14, 1445:22, 1446:2, 1446:5, 1446:8, 1446:11, 1446:14, 1450:4, 1451:18, 1452:9, 1452:10, 1459:17, 1459:20, 1462:23, 1463:2, 1463:6, 1463:10,

1463:14, 1463:19, 1463:25, 1464:5, 1464:21, 1467:1, 1476:6, 1476:8, 1476:9, 1476:10, 1477:17, 1477:19, 1478:2, 1478:5, 1478:13, 1478:16, 1478:24, 1479:2, 1479:5, 1479:16, 1479:19, 1479:24, 1480:1, 1480:3, 1483:14, 1483:18, 1483:22, 1485:3, 1485:22, 1486:2, 1486:11, 1486:14, 1486:18, 1487:7, 1487:22, 1488:7, 1488:10, 1488:16, 1489:5, 1489:14, 1490:4, 1490:7, 1491:11, 1492:24, 1492:25, 1493:2, 1498:12, 1499:14, 1500:14, 1500:17, 1500:19, 1500:23, 1501:3, 1501:6, 1504:6, 1504:8, 1504:12, 1504:16, 1504:19, 1505:3, 1505:15, 1505:19, 1505:24, 1506:3, 1506:23, 1507:3, 1507:6, 1507:13, 1507:17, 1508:14, 1509:6, 1509:7, 1509:21, 1509:22, 1510:9, 1510:12, 1510:22, 1510:24, 1511:2, 1511:9, 1511:12, 1512:1, 1512:9, 1512:10, 1512:15, 1512:18, 1512:21
**theory** [2] - 1485:24, 1486:11
**they've** [2] - 1366:16, 1476:25
**thinking** [4] - 1413:24, 1445:24, 1511:20, 1511:22
**third** [7] - 1368:17, 1380:25, 1386:6, 1428:10, 1471:14, 1487:3, 1487:4
**third-party** [1] - 1428:10
**thorny** [1] - 1376:23
**thoughts** [1] - 1393:12
**thousands** [1] - 1482:25
**thread** [1] - 1489:5
**three** [2] - 1411:11, 1411:21
**threw** [1] - 1395:11
**throughout** [3] - 1482:25, 1484:6, 1506:18
**thumb** [1] - 1512:6
**Thursday** [3] - 1442:11, 1443:1, 1451:24
**timeline** [3] - 1420:2, 1420:11, 1422:19
**timings** [1] - 1469:9
**title** [2] - 1372:5, 1405:21
**toasting** [1] - 1485:19
**today** [11] - 1364:12, 1409:24, 1434:25, 1457:16, 1462:11, 1463:3, 1473:5, 1479:15, 1480:6, 1482:12, 1487:21
**together** [5] - 1364:11, 1387:17, 1453:3, 1465:18, 1465:19
**Tom** [3] - 1457:14, 1457:25, 1461:1
**tomorrow** [8] - 1364:10, 1364:20, 1414:19, 1456:18, 1480:6, 1511:15, 1512:21
**Tony** [1] - 1422:3
**took** [8] - 1390:13, 1395:5, 1395:22, 1407:7, 1407:8, 1451:13, 1461:8, 1485:12
**top** [24] - 1368:11, 1380:22, 1381:12,

1396:5, 1401:1, 1412:6, 1412:8, 1416:19, 1416:21, 1417:17, 1424:11, 1426:4, 1428:7, 1435:12, 1451:1, 1462:24, 1462:25, 1493:13, 1493:14, 1495:1, 1495:19, 1495:20, 1500:1, 1501:14

**top-line** [3] - 1412:6, 1412:8, 1495:1
**topic** [1] - 1413:19
**topics** [2] - 1392:9, 1392:10
**tos** [1] - 1467:22
**total** [3] - 1411:4, 1429:25, 1430:6
**totally** [4] - 1379:25, 1408:3, 1443:25, 1499:1
**tour** [2] - 1399:22, 1406:6
**tournament** [1] - 1369:1
**towards** [2] - 1386:18, 1474:12
**Tower** [1] - 1392:22
**tracked** [1] - 1462:2
**trail** [1] - 1472:16
**TRANSCRIPT** [1] - 1361:9
**transcript** [1] - 1513:4
**Transcript** [1] - 1362:6
**transcription** [1] - 1362:6
**transit** [1] - 1405:14
**transition** [1] - 1427:7
**translated** [1] - 1433:7
**transmitted** [1] - 1505:4
**transparent** [1] - 1502:20
**travel** [2] - 1388:8, 1388:9
**traveling** [5] - 1402:21, 1402:22, 1402:23, 1427:5, 1485:9
**trial** [13] - 1369:16, 1370:2, 1371:7, 1374:20, 1411:7, 1437:14, 1472:16, 1472:19, 1473:13, 1473:22, 1478:11
**Trial** [3] - 1385:16, 1470:16, 1471:18
**TRIAL** [2] - 1361:5, 1361:9
**tried** [4] - 1372:17, 1445:1, 1460:6, 1473:7
**trip** [1] - 1406:3
**troubled** [1] - 1381:15
**true** [6] - 1378:2, 1378:19, 1394:2, 1394:4, 1394:6, 1406:10
**truly** [1] - 1452:1
**Trump** [1] - 1392:22
**truth** [1] - 1413:24
**truthfulness** [2] - 1488:13, 1488:17
**try** [12] - 1364:12, 1364:16, 1375:5, 1382:3, 1425:12, 1436:10, 1476:20, 1490:4, 1491:15, 1491:19, 1501:20, 1508:14
**trying** [15] - 1364:13, 1364:20, 1380:16, 1383:21, 1384:25, 1385:1, 1385:5, 1400:21, 1404:2, 1479:14, 1480:6, 1485:13, 1494:8, 1502:3, 1505:2
**Tuesday** [1] - 1388:7
**turn** [7] - 1394:25, 1401:23, 1412:5, 1428:14, 1437:6, 1440:13, 1442:25
**turned** [1] - 1486:23
**turns** [1] - 1486:7

**tweak** [1] - 1454:5
**tweaking** [1] - 1454:3
**two** [21] - 1391:1, 1398:8, 1401:16, 1401:20, 1415:24, 1416:19, 1416:21, 1417:3, 1417:10, 1417:17, 1428:1, 1428:12, 1440:16, 1448:17, 1453:3, 1459:8, 1463:2, 1463:14, 1469:21, 1473:20, 1489:25
**Two** [1] - 1376:19
**Tymo** [1] - 1417:9
**Tymoshenko** [35] - 1366:17, 1368:13, 1369:20, 1370:13, 1380:23, 1381:1, 1381:13, 1382:7, 1385:16, 1389:5, 1401:1, 1401:5, 1412:12, 1417:4, 1417:13, 1429:24, 1430:6, 1430:11, 1437:14, 1449:9, 1451:23, 1457:16, 1459:7, 1459:10, 1460:5, 1465:11, 1471:18, 1472:17, 1473:1, 1473:12, 1474:12, 1477:5, 1490:17, 1503:20, 1508:8
**Tymoshenko's** [13] - 1369:6, 1370:1, 1370:25, 1371:3, 1371:4, 1374:1, 1383:2, 1386:9, 1405:11, 1459:2, 1462:12, 1464:11, 1473:4
**type** [2] - 1425:20, 1432:13
**typing** [1] - 1400:24
**typo** [1] - 1366:13
**typos** [1] - 1494:14

## U

**U.S** [19] - 1361:13, 1361:16, 1362:3, 1368:11, 1388:10, 1414:19, 1421:23, 1421:25, 1426:5, 1426:9, 1427:15, 1427:21, 1434:4, 1443:17, 1443:20, 1472:24, 1498:4, 1498:6, 1498:9
**UKR** [1] - 1388:6
**Ukraine** [41] - 1368:7, 1368:12, 1368:20, 1372:14, 1373:21, 1381:9, 1383:12, 1383:22, 1385:20, 1385:25, 1388:6, 1401:17, 1407:1, 1407:3, 1407:18, 1407:24, 1408:13, 1408:15, 1408:16, 1421:3, 1422:24, 1435:22, 1465:9, 1469:20, 1470:17, 1471:2, 1472:10, 1472:20, 1474:8, 1474:18, 1475:22, 1476:3, 1484:22, 1484:25, 1485:10, 1490:12, 1494:4, 1497:9, 1502:2, 1503:9, 1506:20
**Ukraine's** [7] - 1368:8, 1411:7, 1412:6, 1471:18, 1472:17, 1472:23, 1490:16
**Ukrainian** [22] - 1370:15, 1371:24, 1373:14, 1374:7, 1381:6, 1383:22, 1387:21, 1399:18, 1406:16, 1406:22, 1433:7, 1436:21, 1437:18, 1463:1, 1464:14, 1465:5, 1465:7, 1466:13, 1467:23, 1470:16, 1474:24, 1485:18
**Ukrainians** [3] - 1403:10, 1451:22, 1451:24
**ultimate** [1] - 1505:11
**ultimately** [5] - 1492:14, 1494:25,

1504:4, 1505:20, 1510:8
**UN** [1] - 1405:20
**unacceptable** [2] - 1386:10, 1386:24
**unavailable** [1] - 1366:20
**unaware** [1] - 1494:17
**unclear** [1] - 1366:11
**under** [12] - 1365:19, 1414:21, 1420:23, 1422:3, 1426:3, 1427:15, 1434:1, 1462:15, 1479:12, 1485:24, 1486:11, 1503:22
**understatement** [1] - 1470:24
**understood** [3] - 1449:23, 1463:19, 1464:14
**unfair** [1] - 1371:7
**unfairly** [1] - 1473:7
**unfamiliar** [1] - 1432:11
**unhappy** [1] - 1502:4
**unified** [1] - 1490:16
**Union** [1] - 1421:4
**United** [10] - 1364:4, 1376:7, 1403:9, 1421:13, 1426:14, 1428:8, 1437:4, 1446:9, 1483:20, 1489:21
**UNITED** [3] - 1361:1, 1361:3, 1361:10
**unless** [1] - 1445:11
**unlikely** [1] - 1494:19
**unrepresented** [1] - 1369:20
**unsuccessful** [1] - 1372:20
**unsurprising** [1] - 1385:23
**untoward** [1] - 1508:15
**untruthfulness** [1] - 1488:18
**unwillingness** [1] - 1419:21
**up** [50] - 1365:13, 1366:8, 1368:7, 1371:16, 1376:18, 1377:3, 1377:16, 1396:5, 1396:19, 1399:16, 1399:21, 1402:3, 1403:22, 1407:22, 1409:2, 1409:13, 1412:11, 1415:10, 1419:2, 1419:9, 1422:11, 1423:1, 1423:9, 1424:7, 1424:8, 1424:25, 1425:3, 1425:6, 1440:20, 1452:6, 1454:13, 1462:24, 1463:14, 1463:21, 1463:22, 1463:24, 1467:4, 1471:13, 1471:17, 1480:4, 1484:15, 1485:13, 1487:4, 1489:1, 1492:23, 1500:20, 1501:24, 1503:17, 1505:22, 1506:23
**update** [3] - 1366:21, 1455:14, 1469:20
**updated** [2] - 1394:3, 1414:9
**updates** [1] - 1376:1
**uphill** [1] - 1371:23
**upset** [2] - 1430:3, 1475:16
**USG** [1] - 1436:25
**UTC** [1] - 1397:3

## V

**vaguely** [1] - 1502:11
**Valeriya** [1] - 1423:2
**value** [2] - 1383:19, 1407:7, 1407:8
**van** [17] - 1396:6, 1396:10, 1402:3, 1406:23, 1433:19, 1438:23, 1439:7,

1440:4, 1440:9, 1444:9, 1446:24, 1447:4, 1468:25, 1490:11, 1496:8, 1500:5

**various** [6] - 1414:9, 1424:13, 1425:4, 1483:3, 1484:19, 1489:20

**verbatim** [1] - 1484:16

**verbs** [1] - 1495:7

**Veritas** [5] - 1376:22, 1420:11, 1433:8, 1433:16, 1435:12

**version** [5] - 1387:14, 1438:15, 1492:11, 1499:25, 1508:24

**versions** [2] - 1384:5, 1384:6

**versus** [2] - 1364:4, 1446:9

**vetted** [1] - 1426:6

**via** [1] - 1470:7

**view** [13] - 1380:14, 1382:11, 1383:17, 1387:18, 1388:23, 1411:7, 1412:9, 1463:16, 1464:15, 1474:12, 1475:13, 1475:16, 1490:16

**viewed** [1] - 1433:15

**views** [1] - 1475:20

**violated** [2] - 1368:12, 1371:7

**Violated** [1] - 1368:7

**violations** [2] - 1369:21, 1473:21

**Virginia** [1] - 1365:1

**virtually** [1] - 1394:8

**Vlasenko** [2] - 1371:3, 1371:14

**vocal** [1] - 1371:20

**vodka** [1] - 1488:23

**Voloshyn** [2] - 1467:10, 1467:12

---

## W

**wait** [2] - 1409:15, 1505:3

**waiting** [1] - 1390:17

**walk** [1] - 1486:18

**wants** [2] - 1364:6, 1375:25

**Washington** [9] - 1361:6, 1361:15, 1361:17, 1361:25, 1362:4, 1388:10, 1402:23, 1426:12, 1448:8

**wave** [1] - 1434:3

**ways** [3] - 1373:25, 1392:15, 1473:12

**website** [4] - 1402:9, 1402:12, 1462:11, 1505:5

**Wednesday** [3] - 1366:18, 1440:22, 1441:1

**week** [9] - 1366:12, 1366:19, 1402:20, 1403:3, 1438:13, 1445:7, 1447:1

**weekend** [1] - 1434:15

**weeks** [2] - 1431:9, 1451:7

**Weinstock** [2] - 1421:19, 1421:22

**welcome** [1] - 1455:14

**welcomes** [1] - 1386:7

**Welsh** [1] - 1424:8

**western** [3] - 1369:21, 1370:5, 1472:18

**whatsoever** [2] - 1389:4, 1389:15

**whichever** [1] - 1426:11

**whilst** [3] - 1369:4, 1382:10, 1389:1

**whirlwind** [1] - 1399:22

**White** [2] - 1368:21, 1473:11

**white** [1] - 1494:5

**whitewash** [1] - 1411:4

**whole** [8] - 1385:9, 1389:20, 1399:21, 1428:10, 1429:11, 1438:23, 1499:9, 1507:15

**whopper** [1] - 1487:5

**William** [2] - 1361:19, 1361:22

**willing** [3] - 1392:5, 1419:3, 1419:6

**wire** [2] - 1483:14, 1506:18

**wish** [2] - 1384:16, 1384:18

**wished** [1] - 1385:6

**witness** [9] - 1364:19, 1365:18, 1378:20, 1413:9, 1445:23, 1480:5, 1487:24, 1510:23, 1511:1

**WITNESS** [37] - 1363:4, 1367:14, 1367:16, 1373:1, 1373:4, 1382:2, 1384:3, 1384:5, 1392:11, 1392:22, 1403:14, 1409:12, 1409:16, 1415:13, 1415:15, 1415:19, 1415:21, 1416:1, 1418:22, 1419:12, 1419:17, 1429:16, 1429:19, 1430:5, 1430:19, 1436:9, 1442:21, 1443:6, 1452:10, 1459:20, 1476:8, 1476:10, 1477:19, 1501:6, 1509:7, 1509:22, 1510:12

**Witness** [1] - 1511:11

**witness's** [5] - 1365:5, 1365:12, 1480:11, 1487:25, 1488:12

**witnesses** [2] - 1369:6, 1369:19, 1401:6, 1401:10, 1401:13, 1473:14, 1478:13

**won** [1] - 1425:24

**wondered** [1] - 1431:7

**wonderful** [1] - 1395:2

**wondering** [2] - 1364:21, 1437:25

**word** [19] - 1379:9, 1379:11, 1384:16, 1384:19, 1384:24, 1390:22, 1391:4, 1404:18, 1415:9, 1418:18, 1418:21, 1418:22, 1424:9, 1431:17, 1431:19, 1454:12, 1465:2, 1487:21, 1506:18

**words** [7] - 1369:22, 1369:24, 1400:12, 1454:8, 1465:4, 1475:11, 1490:18

**world** [3] - 1408:19, 1483:1, 1499:19

**worldly** [1] - 1497:13

**worldwide** [3] - 1406:3, 1406:6

**worried** [2] - 1373:20, 1400:20

**worry** [1] - 1455:7

**worst** [7] - 1372:4, 1372:11, 1373:13, 1375:21, 1471:23, 1472:10, 1487:1

**Worst** [2] - 1367:4, 1372:5

**worst-case** [6] - 1372:4, 1372:11, 1373:13, 1375:21, 1471:23, 1472:10

**Worst-Case** [2] - 1367:4, 1372:5

**write** [11] - 1400:21, 1442:10, 1442:19, 1442:25, 1468:18, 1472:4, 1503:14, 1506:15, 1507:5, 1507:6, 1509:21

**writes** [2] - 1422:8, 1468:7

**writing** [2] - 1451:1, 1481:1

**written** [9] - 1381:22, 1385:19,

1386:15, 1401:23, 1411:3, 1467:23, 1477:4, 1486:10, 1493:16

**wrote** [45] - 1368:1, 1368:6, 1368:17, 1368:23, 1369:3, 1369:9, 1369:14, 1370:6, 1370:12, 1370:17, 1371:3, 1373:13, 1376:19, 1380:8, 1383:1, 1391:21, 1393:23, 1394:1, 1396:6, 1411:5, 1424:20, 1442:19, 1442:21, 1449:20, 1449:23, 1450:15, 1455:12, 1457:8, 1459:11, 1464:10, 1468:22, 1472:7, 1474:10, 1477:9, 1484:18, 1503:17, 1503:18, 1503:19, 1505:4, 1505:21, 1509:15, 1509:23, 1510:8, 1510:15

---

## Y

**Yale** [1] - 1399:4

**Yanukovich** [1] - 1435:7

**Yanukovych** [4] - 1371:8, 1415:5, 1417:12, 1459:9

**year** [1] - 1489:24

**years** [3] - 1425:12, 1473:2, 1486:22

**York** [19] - 1394:11, 1403:10, 1413:20, 1416:4, 1428:19, 1442:10, 1448:4, 1448:6, 1448:8, 1449:6, 1456:1, 1456:13, 1469:22, 1470:6, 1470:7, 1470:15, 1475:21, 1483:5, 1504:2

**yourself** [6] - 1427:2, 1454:10, 1468:1, 1469:15, 1482:5, 1510:9

**Yulia** [8] - 1366:17, 1368:13, 1401:5, 1437:14, 1462:12, 1464:11, 1465:11, 1472:17

**Yulia's** [1] - 1371:7

---

## Z

**zero** [1] - 1493:12

**zone** [1] - 1460:24

**zoom** [6] - 1493:14, 1495:20, 1497:23, 1500:1, 1501:14, 1503:5

**ZUCKERMAN** [2] - 1361:20, 1361:23

**Zwaan** [16] - 1396:6, 1396:10, 1402:3, 1406:23, 1433:19, 1438:24, 1439:7, 1440:4, 1440:9, 1446:24, 1447:4, 1468:25, 1490:11, 1496:8, 1500:5

**Zwaan's** [1] - 1444:10