```
 1                 IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2

 3    United States of America,      ) Criminal Action
                                     ) No. 19-CR-125
 4                   Plaintiff,      )
                                     ) JURY TRIAL
 5    vs.                            ) DAY 8 - MORNING
                                     )
 6    Gregory B. Craig,              ) Washington, DC
                                     ) August 21, 2019
 7                   Defendant.      ) Time:  9:30 a.m.
      _____
 8
                 TRANSCRIPT OF JURY TRIAL - DAY 8 - MORNING
 9                          HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                  UNITED STATES DISTRICT JUDGE
      _____
11
                        A P P E A R A N C E S
12
      For Plaintiff:      Fernando Campoamor-Sanchez
13                        Molly Gulland Gaston
                          U.S. Attorney's Office FOR THE
14                          DISTRICT OF COLUMBIA
                          555 Fourth Street, NW
15                        Washington, DC 20530
                          (202) 252-7698
16                        Email: Fernando.campoamor-sanchez@usdoj.gov
                          Email: Molly.gaston@usdoj.gov
17                        Jason Bradley Adam McCullough
                          U.S. Department of Justice
18                        950 Pennsylvania Avenue, NW
                          Washington, DC 20530
19                        (202) 233-0986
                          Email: Jason.mccullough@usdoj.gov
20
      For Defendant:      William James Murphy
21                        William W. Taylor, III
                          Adam B. Abelson
22                        ZUCKERMAN SPAEDER, LLP
                          100 East Pratt Street
23                        Suite 2440
                          Baltimore, MD 21202
24                        (410) 949-1146
                          Email: Wmurphy@zuckerman.com
25                        Email: Wtaylor@zuckerman.com
                          Email: Aabelson@zuckerman.com
```

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

_____

Court Reporter:     Janice E. Dickman, RMR, CRR, CRC
                    Official Court Reporter
                    United States Courthouse, Room 6523
                    333 Constitution Avenue, NW
                    Washington, DC  20001
                    202-354-3267

INDEX

Witnesses:

Lauren Malet

   Direct Examination By Ms. Gaston..................... 1513


Peter Lesser

   Direct Examination By Ms. Gaston..................... 1549

   Cross-Examination By Mr. Abelson..................... 1639

EXHIBITS

Exhibits 9, 10, 452, 453, 454, 455, 456, and 457......... 1631

*   *   *

 1                    THE COURTROOM DEPUTY:  Your Honor, good morning.

 2               We have Criminal Case Number 19-125, the United

 3     States of America v. Gregory B. Craig.  Mr. Craig is present

 4     and in the courtroom.

 5               Will counsel please approach the lectern, identify

 6     yourself and your colleagues for the record.

 7                    MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.

 8               Jason McCullough, Molly Gaston, and

 9     Fernando Campoamor for the United States.  And we're joined by

10     paralegal specialist Amanda Rohde.

11                    THE COURT:  Good morning.

12                    MR. ABELSON:  Good morning, Your Honor.

13               Adam Abelson, William Taylor, William Murphy,

14     Paula Junghans.

15                    THE COURT:  All right.  Good morning.

16               In case I forget at the end of the trial, I just want

17     to state for the record that everybody really appreciates the

18     work being done by the paralegal specialists, who are being

19     called upon at a moment's notice to call up documents, under

20     great pressure, knowing that if they make a mistake, someone is

21     going to be very frustrated with them.

22               And I know it's a hard and stressful job.  And I

23     think kudos go to all of you for doing that so smoothly at the

24     request of opposite sides, as well.  Everybody has been very

25     civil and cooperative about that.  And I know the lawyers

```
 1          appreciate it.
 2                   But, in case I haven't mentioned it, I thought I
 3          would let you know that the Court appreciates it.
 4                   All right.  Are you ready to call your next witness?
 5                   MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.
 6                   THE COURT:  Let's bring the jury.
 7                   (Whereupon the jury enters the courtroom.)
 8                   THE COURT:  All right.  Good morning.  I note that
 9          all the jurors are present and that you were on time, again.  I
10          realize that sometimes forces conspire to make that difficult,
11          either at home or on the Metro.  And, so, we appreciate your
12          efforts to get here, and the fact that you're all here.
13                   I take it everyone has managed to avoid discussing
14          the case and has not done any research about the case
15          overnight.
16                   Great.  Everyone is nodding.
17                   So, the government can call its next witness.
18                   MS. GASTON:  Thank you, Your Honor.
19                   The government calls Lauren Malet.
20                             LAUREN MALET,
21          was called as a witness and, having been first duly sworn, was
22          examined and testified as follows:
23                             DIRECT EXAMINATION
24          BY MS. GASTON:
25          Q.  Good morning, Ms. Malet.
```

1    A.   Good morning.

2    Q.   Could you please state your name and introduce yourself to

3    the jury, and then spell it for the record?

4    A.   Sure.   Lauren Malet, L-A-U-R-E-N, M-A-L-E-T.

5    Q.   Ms. Malet, where do you work?

6    A.   I work at Skadden Arps.

7    Q.   What do you do there?

8    A.   I work in Skadden's D.C. office, in our marketing and

9    communications group.

10   Q.   And what do you do as part of the marketing and

11   communications group?

12   A.   My role is to help support our practices and attorneys in

13   the D.C. office; working with them on, you know, inquiries that

14   come in for new business opportunities or client seminars,

15   general marketing activities, dealing with our website and

16   bios.

17   Q.   When did you first join Skadden?

18   A.   I first joined Skadden in 2007, but in a different

19   capacity.

20   Q.   And what capacity was that?

21   A.   When I first joined the firm I was in our New York office,

22   and I worked as part of the attorney recruiting team,

23   recruiting for summer associate positions.

24   Q.   How long did you do that?

25   A.   I served in that position for about two years.

1   Q.  And did you then leave Skadden for a time?

2   A.  Yes.

3   Q.  Okay.  And when you returned from that other engagement,

4   approximately when did you return to Skadden?

5   A.  I rejoined the firm in January of 2010.

6   Q.  Okay.  And what role did you take when you rejoined in

7   2010?

8   A.  So, when I rejoined, I joined in the marketing and

9   communications group, which I am now in, but in a different

10  role.  I joined our public relations team.

11  Q.  And what office were you in?

12  A.  I was in the New York office.

13  Q.  What did that role entail?

14  A.  Sure.  So as part of the PR team, I would, again, work with

15  our practices and partners on, you know, their external

16  efforts, as it related to media.  So working with press

17  contacts to help, you know, share litigation wins or new deals

18  that were announced, and worked with reporters to help share

19  information, you know, as appropriate about the firm.

20  Q.  How would you get involved in a particular matter in that

21  role?

22  A.  It depends.  I mean, at some point either a partner would

23  make us aware of an engagement that was going to generate some

24  news or was going to become public, or was already public,

25  oftentimes.  And we would, you know, work with those partners

1    to determine what appropriate press outreach there may or may

2    not be.

3    Q.  And directing your attention to the 2012 time period.  Did

4    you become involved in some press activity related to Skadden's

5    Tymoshenko Report?

6    A.  Yes.

7    Q.  And in the intervening seven years, have you had some life

8    changes?

9    A.  I've had a few.

10   Q.  Did that include getting married?

11   A.  Yes.

12   Q.  So if we look at emails from that time period, what would

13   your name appear as?

14   A.  I am Lauren Weiss.

15   Q.  All right.  So, I want to direct your attention to late

16   September of 2012.

17          Do you remember any particular media activity or

18   preparing for media activity in that time period?

19   A.  In late September, I believe there was a point where the

20   Report was maybe coming out or we got some information that

21   the -- it was potentially -- the Report was potentially

22   becoming public at some time around then.

23   Q.  And I'm going to direct your attention to Government's

24   Exhibit 221 -- or, nope.  Sorry.  One moment.  250 -- no, 256,

25   which should be in the binder in front of you, but it will also

1    appear on the screen.  And it's been previously admitted.

2              So focusing first on the top of this email.

3              Who is this email from?

4    A.  The email is from Alex van der Zwaan.

5    Q.  And who is or was Alex van der Zwaan?

6    A.  Alex was an associate in our London office.

7    Q.  Okay.  And this email is on September 23rd, 2012?

8    A.  Correct.

9    Q.  And it's to you and to a Melissa Porter.

10             Who is Melissa Porter?

11   A.  Melissa, at the time, was my manager on the PR team.

12   Q.  And who's copied on this email?

13   A.  Copied here is Greg Craig, Saira Zaki, and Jonathan Hawker.

14   Q.  Just taking a moment apart from this email, who were the

15   Skadden attorneys who you understood to be involved in the

16   Tymoshenko Report?

17   A.  I understood the lead attorney to be Greg Craig.  And at

18   various points there were other attorneys that, you know, were

19   involved.

20   Q.  And did you understand Alex van der Zwaan to be involved?

21   A.  Yes.

22   Q.  And who is Ms. Zaki?

23   A.  Saira, at the time, was one of our counterparts in London,

24   in the marketing group.

25   Q.  And then Jonathan Hawker, who is that?

1   A.   Jonathan Hawker was our contact at FTI Consulting.

2   Q.   What is FTI Consulting?

3   A.   FTI is a -- it's a consulting firm.  They handle a variety

4   of, you know, matters for different clients.  In this capacity,

5   we had been working with them on PR-related activities.

6   Q.   And was Mr. Hawker the FTI employee who you understood to

7   be working primarily on this matter?

8   A.   Yes.

9   Q.   Can you please read what Mr. van der Zwaan wrote?

10   A.   "Dear Lauren and Melissa, I am in New York with

11   Jonathan Hawker of FTI, who is helping manage the PR on the

12   Tymoshenko Report.  We have been discussing certain PR aspects

13   and strategy today, and we thought it would be useful to meet

14   with you and Jonathan tomorrow morning at our offices in order

15   for him to discuss his plans.

16        "I have copied him on this email so that he might

17   send you his documents this evening, so that you can have an

18   opportunity to review them prior to our meeting.

19        "I will also bring another colleague, Rick Gates.

20        "Please let us know what time works.  10 or 11 a.m.

21   would be perfect.  Best, Alex."

22   Q.   Were you aware of whatever discussions that

23   Mr. van der Zwaan references in this email occurring on

24   September 23rd, 2012?

25   A.   The discussions he references with Mr. Hawker?

1    Q.  Right.  When he says, "We have been discussing certain PR

2    aspects and strategy today."

3    A.  No.

4    Q.  Okay.  And was there a meeting or a discussion, as

5    Mr. van der Zwaan proposed in this email?

6    A.  Yes.

7    Q.  And did that occur the following day?

8    A.  I believe that timing lines up.

9    Q.  Okay.  And directing your attention to Government's Exhibit

10   259, which has been previously admitted.

11        MS. GASTON:  If you could zoom in on the text.

12   BY MS. GASTON:

13   Q.  And who is this email from?

14   A.  This email is from Melissa Porter.

15   Q.  What's the date of this email?

16   A.  Monday, September 24th.

17   Q.  And who did Ms. Porter send the email to?

18   A.  To Saira Zaki, and copies myself and Alex van der Zwaan.

19   Q.  And Ms. Porter writes, "We just met to discuss the

20   Tymoshenko Report and wanted to circle back"; is that correct?

21   A.  Yes.

22   Q.  Okay.  Did you participate in that meeting or that

23   discussion?

24   A.  Yes.

25   Q.  And what do you remember about it?

1  A.  Well, what I remember is that I was not there in person; I

2  was in our D.C. office at the time, and this group was in New

3  York.

4  Q.  So did you call in to the meeting?

5  A.  Yes.

6  Q.  Are you able to remember who was on the other end of the

7  line?

8  A.  I know that Alex van der Zwaan and Melissa Porter were in

9  the room.  I believe there were others, but I don't remember

10  who was there and how many people were there.

11  Q.  Okay.  Do you remember whether Jonathan Hawker

12  participated?

13  A.  I don't remember.

14  Q.  And Ms. Porter first has a bullet point, an enumerated item

15  titled Press Inquiries.

16          Can you please read what she wrote?

17  A.  Sure.

18          "1.  Press inquiries:  We will not be commenting in

19  any fashion, on or off the record, on the Report or on our

20  role.  We will send you more specific 'no comment language'

21  tomorrow.  But, in the meantime, that is the basic position.

22  Any press inquiries should be sent to Jonathan Hawker" -- gives

23  his email -- "with a CC to Greg, Alex, and me.

24          "We expect most questions will center on our fees,

25  our perceived independence, how we were retained, or

1    clarifications on the Report itself, none of which we should

2    address."

3    Q.  And was that your understanding after the meeting, that FTI

4    would be handling press inquiries related to the Report?

5    A.  Yes.

6    Q.  And then Ms. Porter goes on to say that as of this date,

7    Monday, September 24th, that the Report will be released that

8    Friday?

9    A.  Yes.

10   Q.  Okay.  And then there's one more item that she lists, which

11   is Number 3.  Could you read that, please?

12   A.  "Background interviews in Ukraine:  Greg has asked Alex,

13   CCed, to handle background interviews that need to be done in

14   Russian with the Ukrainian press only.  While ground rules will

15   be established, we are obviously sensitive to the fact that

16   they may mention Alex or quote him, despite the ground rules we

17   have set -- we set.

18          "As such, we will be conducting a brief media

19   training session tomorrow with Alex to give him some basic

20   direction on handling combative press inquiries.  Would you

21   mind letting Bruce and Chris know that Greg has approved for

22   Alex to serve that role, and that we are preparing him

23   accordingly.

24          "As we understand it, the PR firm will also be

25   training him on messages that are more specific in the issues

1    in the Report and that align with their priorities."

2    Q.  And do you remember having a reaction to this particular

3    point of the meeting?

4                MR. ABELSON:  Objection.

5                THE COURT:  What basis?

6                MR. ABELSON:  Relevance.

7                THE COURT:  Can you come do the bench briefly?

8                (Bench discussion:)

9                THE COURT:  What are you seeking to elicit here?

10               MS. GASTON:  So, she then leaves the meeting with

11   some concerns about what she hears at the meeting.  I can move

12   on to the next question.

13               THE COURT:  Okay.

14               MR. ABELSON:  But, I think it's broader than that.  I

15   mean, these are the interviews in the Ukraine, with the

16   Ukrainian press.  This has nothing to do with the issues in

17   this case, U.S. media.

18               THE COURT:  Oh, well, come on, there's been dozens of

19   questions propounded by the defense to witnesses about the

20   press in Ukraine and meetings in Ukraine and who was there and

21   whether Greg was there and whether Alex was there, whether Alex

22   had Greg's permission to do it.

23               That ship has sailed, so, she can ask about it.

24               MR. ABELSON:  Okay.

25               THE COURT:  All right.

```
 1                    (Open court:)
 2    BY MS. GASTON:
 3    Q.  What was your reaction to the meeting?
 4    A.  My reaction to the meeting was, I remember having a couple
 5    concerns coming out of the meeting.  That was my reaction.
 6    Q.  Do you remember, in detail, what those concerns were,
 7    today?
 8    A.  I remember one of the concerns.
 9    Q.  And what was that?
10    A.  That concern related to something about journalists and
11    something about payments.  I know there were other concerns,
12    but I don't remember what they were specifically.
13    Q.  Okay.
14    A.  Or I don't remember them.
15    Q.  Okay.  Now, directing your attention to Government's
16    Exhibit 266, which has previously been admitted.
17             This is an email chain that begins with an email from
18    Mr. Craig to Mr. Sloan that's then forwarded to you; is that
19    correct?
20    A.  Yes.
21    Q.  Let's start with the bottom email.
22             So, this is an email from Mr. Craig to Mr. Sloan on
23    September 24th?
24    A.  Yes.
25    Q.  And what is the subject line of Mr. Craig's email?
```

1    A.  The subject reads, "Two problems."

2    Q.  And what does Mr. Craig write?

3    A.  The email reads, "Fixed.  One, Hawker said it wasn't true.

4    They have no intention of paying journalists and would not do

5    so.  Professionally, very dangerous for them ever to do that,

6    and inconsistent with their code of conduct.  They were

7    speculating about the relationship between the Ukrainian

8    government and Ukraine's favorite journalist.  He was truly

9    upset that we thought they would even consider doing that.

10            "Two, I have talked to Alex van der Zwaan, and he has

11   been instructed not to background journalists.  I sent the

12   email to Manafort and Hawker, and they are okay with it."

13   Q.  And then Mr. Sloan forwards that email to you; is that

14   right?

15   A.  Yes.  Yes.

16   Q.  And he writes, "FYI, see below.  Both issues taken care of.

17   Thanks very much."

18   A.  Yes.

19   Q.  And does seeing that refresh your recollection about what

20   the other -- what any of the other concerns that you may have

21   had were?

22   A.  I mean, I see that that's what the concern was, but I

23   didn't -- I didn't remember that second one.

24   Q.  Okay.  And then what do you respond to Mr. Sloan?

25   A.  I wrote, "Glad to hear it.  And apologies if I stirred the

1    pot.  Just wanted to make you aware."

2    Q.  And what was Mr. Sloan's response?

3    A.  He writes, "Always better to be careful than have a major

4    mistake.  Thanks for flagging, and please keep doing so."

5    Q.  Do you remember going to Mr. Sloan with concerns after the

6    meeting over the phone?

7    A.  I remember going to him with concerns; I don't remember how

8    I relayed them.

9    Q.  But, you do remember that you took concerns to Mr. Sloan,

10   and that this email is sort of an outcome of that?

11   A.  Yes.

12              MR. ABELSON:  Objection.  Form.

13              THE COURT:  Sustained.  It was leading.

14              But, at any rate, go on to your next question.

15              MS. GASTON:  Okay.

16   BY MS. GASTON:

17   Q.  All right.  Do you recall whether the Report did come out

18   that Friday, as had been suggested in Ms. Porter's email?

19   A.  It didn't come out at that time.

20   Q.  So the release was delayed for some time?

21   A.  Yes.

22   Q.  Do you remember when the Report did ultimately come out?

23   A.  Yes.

24   Q.  When?

25   A.  Sometime mid-December of that -- of 2012.

1    Q.  How did you find out that the Report was going to come out?

2    A.  I didn't -- I became aware of it somehow.  I don't remember

3    how --

4    Q.  Okay.

5    A.  -- if it was someone that told me or otherwise.

6    Q.  Okay.  Directing your attention to Government's

7    Exhibit 381, which has been previously admitted.

8            So, starting with the bottom email here, is this an

9    email to you from Mr. Sloan?

10   A.  Yes.

11   Q.  And what is the subject line?

12   A.  "Heads-up on Ukraine."

13   Q.  And what did Mr. Sloan tell you?

14   A.  "Hi, Lauren, You may already know this, but I think there

15   will be press on the Ukraine report tonight or -- tomorrow or

16   tonight, *New York Times* and other places."

17   Q.  What did you reply?

18   A.  I replied, "We hadn't heard that yet, no.  Any indication

19   if we're putting out a statement of some sort, or if there's a

20   contact at the PR firm we can direct inquiries to?"

21   Q.  So, Ms. Malet, at this point, on December 12th, at 7:25

22   p.m., were you aware that the Report was going to be released?

23   A.  Based on this email, I believe I was, but not otherwise.

24   Q.  And when Mr. Sloan said "*New York Times* and other places,"

25   had you had any media contacts related to the Report?

1    A.  At this time, no.

2    Q.  What was Mr. Sloan's response when you asked about whether

3    Skadden was putting out a statement?

4    A.  He responded, "I would direct that question to Greg, about

5    a contact.  No statement, that I'm aware of."

6    Q.  And how do you respond to him?

7    A.  I responded, "Thanks.  We'll send him a note.  Appreciate

8    the heads-up."

9    Q.  Directing your attention to Government's Exhibit 382, which

10   has been previously admitted.

11        And at the bottom, is this you sending Mr. Craig the

12   note that you indicated in the previous email?

13   A.  Yes.

14   Q.  And what did you ask Mr. Craig?

15   A.  I write, "Greg, Cliff mentioned there would be news coming

16   out tonight or tomorrow regarding the MOJ report.  Is there a

17   contact at the PR firm we can direct inquiries to, should calls

18   come in?  Thanks."

19   Q.  What did Mr. Craig reply?

20   A.  "Yes.  His name is Jonathan Hawker, at FTI in London.  I

21   will send contact info first thing tomorrow morning."

22   Q.  What did you reply to Mr. Craig?

23   A.  I write, "Got it.  Found it in an old email.  Will pass all

24   inquiries on to Jonathan unless I hear otherwise from you."

25   Q.  And at this point, was this consistent with what you

1    understood in September about how press inquiries should be

2    handled?

3    A.  Yes.

4    Q.  And directing your attention to Government's Exhibit 385.

5    If you look at the second page of this exhibit, the very first

6    email in it.

7            Is this that same email that you had sent to

8    Mr. Craig, and that you had copied Mr. van der Zwaan,

9    Ms. Porter, Ms. Whitney, and Mr. Sloan on?

10   A.  Yes.

11   Q.  And in this thread, Mr. van der Zwaan responds to you; is

12   that correct?

13   A.  Yes.

14   Q.  When does Mr. van der Zwaan respond to you?

15   A.  It's time stamped Thursday, December 13th, at 4:37 a.m.

16   Q.  And Mr. van der Zwaan also answers your question about

17   handling media inquiries; is that right?

18   A.  Yes.

19   Q.  What does Mr. van der Zwaan say?

20   A.  "Jonathan Hawker, from FTI Consulting, who you met in New

21   York this September, is the person to direct press inquiries

22   to, stressing that they are not retained by Skadden.  He

23   understands that we are not going to comment in any way on the

24   Report or the client."

25            And it shares his details.

1    Q.  And if you look at the second page, at the top, which

2    should still be on your screen.

3              Under Mr. van der Zwaan's name, Alex -- well, above

4    his name, does he say, "Some news articles I picked up this

5    morning are below"?

6    A.  Yes.

7    Q.  And then does he paste two links?

8    A.  Yes.

9    Q.  Is one URL starting www.telegraph.co.uk?

10   A.  Yes.

11   Q.  And the other is a nytimes.com URL?

12   A.  Yes.

13   Q.  So, then, if you look back at the first page, do you

14   respond to Mr. van der Zwaan that you will refer things to

15   Mr. Hawker?

16   A.  Yes.

17   Q.  And then what does Mr. Craig "reply all" to the thread

18   about?

19   A.  He writes, "Alex, I am somewhat irritated that *The*

20   *Telegraph* did not use the lead quote that I gave them.  We

21   insisted on absolute" -- quote -- 'We insisted on absolute

22   independence and total access, and we got both.'

23              "How did Warsaw go?  Call me when you have a

24   minute.'"

25   Q.  So, at this point, when Mr. Craig sends this email on

1    December 13th, 2012, at 2:10 p.m., have you done any media

2    contacts related to the Report?

3    A.  At this time, no.

4    Q.  And were you aware of any media contacts leading to those

5    two URLs that Mr. van der Zwaan had pasted?

6    A.  No.

7    Q.  And then Mr. van der Zwaan responds to Mr. Craig and says

8    what?

9    A.  "Greg, I have not been touching PR at all, apart from

10   emphasizing to everyone here the precise nature of our

11   assignment and findings, which has been a trying experience.

12          "Warsaw went very well.  Kwasnewski was very

13   impressed.  I am on the way to the hotel from the airport now.

14   I will call you when I get in."

15   Q.  And do you -- do you know what they're discussing when

16   they're mentioning Warsaw and Kwasnewski?  Which, I think, you

17   pronounce better than I can.

18   A.  No.

19   Q.  Okay.  Now, after this, did you get inquiries about the

20   Report from the media?

21   A.  Yes.

22   Q.  And do you remember who from the media inquired about the

23   Report?

24   A.  There were a couple inquiries that came in.  I only

25   remember working with one reporter directly.

1    Q.  What reporter was that?

2    A.  His name is Matt -- or Matthew Huisman, and was, at the

3    time, maybe still is, with *The National Law Journal*.

4    Q.  I'm directing your attention to Government's Exhibit 387,

5    which has previously been admitted.

6              MS. GASTON:  First, zooming on the bottom portion of

7    the email.

8    BY MS. GASTON:

9    Q.  Is this an email from Mr. Huisman on December 13th, 2012,

10   at a little after 10 a.m., to a Bryonie Byers?

11   A.  Yes.

12   Q.  Who is Ms. Byers?

13   A.  She was, at the time, in the position I currently am in, as

14   a manager in the marketing communications group in Skadden's

15   D.C. office.

16   Q.  And does Mr. Huisman say he's writing an article, and he

17   asks for a copy of the Report?

18   A.  Yes.

19   Q.  And then, if we look at the top of this email, is this you

20   providing him with a copy of the Report?

21   A.  Yes.

22   Q.  And the incoming email was to Ms. Byers, but you respond.

23              How does that work?

24   A.  When there's something -- when there's a PR activity that

25   involves multiple offices, or, you know, other jurisdictions

1    that Skadden has a marketing contact in, the PR team will

2    usually flag for the other managers around the firm, you know,

3    "You may get an inquiry."

4          Because, you know, *The Legal Times* and *The National*

5    *Law Journal* is based here in D.C., and they may not -- you

6    know, Ms. Byers may have been their direct contact.  So, in

7    this instance, I believe Bryonie was sending it to me because

8    we had previously asked them to help coordinate through the PR

9    team in New York.

10   Q.  And when you provided this copy of the Report to

11   Mr. Huisman, was the Report public?

12   A.  Yes.

13   Q.  And how do you know that?

14   A.  Well, we wouldn't have -- prior to sending a report like

15   this, we would only send it if it was public.  In an effort to

16   help journalists, you know, kind of find something maybe they

17   could on their own, we tried to just kind of point them in the

18   right direction of, Here's the link or information that you're

19   looking for.

20   Q.  But you wouldn't have sent it otherwise?

21   A.  We wouldn't have sent it otherwise.  And we also would have

22   gotten partner approval prior.  Even if something was public,

23   part of my team's process was to get clearance from a partner

24   to make sure we could send it, even if it was publicly

25   available.

1   Q.  So to get clearance from a partner involved in the project?

2   A.  Yes.

3   Q.  All right.  Did you -- and directing your attention to

4   Government's Exhibit 392.

5          MS. GASTON:  First, starting with the second page of

6   this -- which is previously admitted -- or, is admitted.

7   Looking at the second page of this exhibit, and sort of zooming

8   on the "From" down to the bottom of the -- there we go.

9   Perfect.

10          Thank you, Ms. Rohde.

11  BY MS. GASTON:

12  Q.  So, is this an -- a request about the Report that was

13  routed to you from Skadden's London office?

14  A.  Yes.

15  Q.  What did you do with that request after the London office

16  directed it to you?

17  A.  I forwarded it on to Jonathan Hawker.

18  Q.  Was that consistent with your understanding of how media

19  inquiries should be handled?

20  A.  Yes.

21  Q.  What did you write to Mr. Hawker?

22  A.  "Hi, Jonathan, We are not responding to the below, but

23  passing this on in case you want to engage with this reporter."

24  Q.  And what did Mr. Hawker write back to you?  Looking at the

25  bottom of the first page and top of the second page.

1    A.  He writes, "We won't bother going back on this.  Let the

2    Ministry deal with it.  The fee issue is very exciting for the

3    local media and for AP, it seems.  But, we are only dealing

4    with the content of the Report, not with the contractual

5    situation."

6    Q.  And then above that, on the first page, did you also inform

7    Mr. Hawker about the inquiry from Matthew Huisman of *The*

8    *National Law Journal*?

9    A.  Yes.

10   Q.  And if you look at the two -- the top half of this page,

11   and then we can work up.

12              And what was Mr. Hawker's response about *The National*

13   *Law Journal*?

14   A.  "He came through and asked for the MOJ statement, which was

15   fine.  Nothing about Skadden."

16   Q.  And what was your response to Mr. Hawker?

17   A.  "Great.  Thanks much.  To confirm, there is no statement I

18   should be providing on behalf of Greg to press, correct?  I'm

19   directing all calls to you, as Greg suggested, but just want to

20   be sure he didn't leave something out here.  Thanks."

21   Q.  And did Mr. Hawker confirm that the MOJ had a statement,

22   but there was -- but that the Report speaks for itself?

23   A.  Yes.

24   Q.  Okay.  And you responded, "Thought so.  I just wanted to

25   confirm"?

 1    A.  Yes.

 2    Q.  And this was consistent with what you had understood from

 3    Mr. Craig's email; is that correct?

 4    A.  Yes.  And what our role was -- what Skadden PR's role was

 5    in working with them on the -- with FTI on this matter.

 6    Q.  And was there a point at which Mr. Huisman published an

 7    article about the Skadden Report?

 8    A.  Yes.

 9    Q.  And when that initial article came out, was there a

10    reaction at Skadden about what it said?

11    A.  Yes.

12    Q.  What do you remember about that?

13    A.  I remember, at some point, there being a -- I don't

14    remember exactly what the concerns were.  I remember that --

15    and I don't remember if it was Greg or Cliff or somebody

16    else -- had shared that there was something incorrect in the

17    article.  And, you know, it was something that maybe we could

18    work to fix.  But, I don't remember what exactly the issue was.

19    Q.  Okay.  And if you look at Government's Exhibit 400, which

20    has previously been admitted.

21              THE COURTROOM DEPUTY:  400?

22              MS. GASTON:  Yes, sir.

23              You can just zoom in on the whole thing.

24    BY MS. GASTON:

25    Q.  And the first email at the bottom of the chain on

1   December 14th, at 10:30 a.m., are you informing Mr. Craig and

2   Mr. Sloan that Mr. Huisman would be calling them?

3   A.   Yes.

4   Q.   And then, if you look at the top email from Mr. Sloan.

5          Does he indicate to you, "We talked to him" --

6   meaning Mr. Huisman -- "and he will make changes"?

7   A.   Yes.

8   Q.   And is it your understanding that *The National Law Journal*

9   issued a correction -- a corrected version of its article about

10  the Report?

11  A.   Yes.

12  Q.   And this was as a result of conversations on

13  December 14th, 2012?

14  A.   Yes.

15  Q.   And that was after the Report was public?

16  A.   Yes.

17  Q.   And now, fast forwarding to the 2013 time period.

18          Do you remember learning that there was an inquiry by

19  the Department of Justice and/or FARA Unit of the Department of

20  Justice into Skadden's work for Ukraine?

21  A.   Yes.

22  Q.   Do you remember how you learned about that?

23  A.   At around this time, Greg -- I think Greg or Cliff had

24  emailed me asking for some articles and news that had come out

25  related to the Report.

1  Q.  And did you know anything about the Foreign Agents

2  Registration Act at this time?

3  A.  No.

4  Q.  And pointing you to Government's Exhibit 426, which has

5  previously been admitted.

6        This is a many-page exhibit, and we're going to start

7  on the back page, which is page 6.

8        And this is Monday April 22nd, 2013; is that right?

9  A.  Yes.

10  Q.  And Mr. Craig emails you with a subject line "News articles

11  about Ukraine report," and says, "Did you save any of those?

12  In particular, do you have the *LA Times* report?"

13  A.  Yes.

14  Q.  And is this the email that you just indicated you

15  remembered Mr. Craig writing to you?

16  A.  Yes.

17  Q.  Now, flipping to the fifth page of this exhibit, or the

18  previous page in your binder.

19        And you provided Mr. Craig with the *LA Times* article,

20  as he requested; is that right?

21  A.  Yes.

22  Q.  And said, "Below is the *LA Times* article.  I don't have

23  them saved, but I'm happy to pull top-tier publication coverage

24  around this time period, if helpful."

25  A.  Yes.

1    Q.  What did Mr. Craig respond?

2    A.  "Lauren, thanks for this.  We have been asked by DOJ, the

3    FARA office, if we gave any statements to the *LA Times*.  Did

4    they call us?  Did we say anything to them?  What about other

5    news outlets?"

6    Q.  And what did Mr. Sloan contribute in the above email?

7    A.  "Note the reference in the article to a Skadden

8    representative saying Skadden is not answering questions."

9    Q.  Then, if you go to page 3 of this exhibit.  So, two pages

10   prior to what we just looked at.

11          In this email, do you send Mr. Sloan and Mr. Craig a

12   copy of *The National Law Journal* article?

13   A.  Yes.

14   Q.  And what do you tell them about how you located that

15   article?

16   A.  How I located it?

17   Q.  What did you tell -- what did you write about the article

18   before you pasted it in?

19   A.  I wrote that -- this last sentence reads, "The only

20   interview our team handled was with *The National Law Journal*,

21   and the story is posted below."

22   Q.  And what did you say before that?

23   A.  Oh, sorry.

24          "I received a voicemail from the *LA Times* reporter

25   and returned the call, left a voicemail.  But we never

1    connected before she published her story."

2    Q.  And then?

3    A.  And then I write, "The only team -- the only interview our

4    team handled was with *The National Law Journal*, and that story

5    is below."

6    Q.  When you say "our team," what do you mean?

7    A.  That refers to the Skadden PR team, myself and

8    Melissa Porter.

9    Q.  And then if you look at the headline, which, it looks like,

10   is misspelled, and then the paragraph below the date line.  So,

11   from "former Urkanian" [sic] to "correction."

12              And we were talking before about how *The National Law*

13   *Journal* issued a corrected article.  Is what you pasted in the

14   corrected version of that article?

15   A.  Yes.

16   Q.  And then, if you look at page 2, Mr. Craig responds to your

17   email; is that right?

18   A.  Yes.

19   Q.  What did he say?

20   A.  "I remember this now.  We issued the statement in response

21   to what we thought was a totally erroneous report.

22              "Do you recall this event, Cliff?

23              "Thanks, Lauren.  Do you have *The New York Times*

24   article about the Report?"

25   Q.  And then, if we look at the first page of the exhibit.

```
 1              And Mr. Craig writes -- you provide The New York
 2     Times article; is that correct?
 3     A.  Yes.
 4     Q.  And what does Mr. Craig say?
 5     A.  "It looks like I also gave The New York Times a
 6     one-sentence statement.
 7              "Cliff, do you remember that?"
 8     Q.  How does Mr. Sloan respond?
 9     A.  "No, that one I don't remember."
10     Q.  And what did you write back to Mr. Craig?
11     A.  "Might you have worked with Jonathan Hawker and the FTI --
12     and FTI on that item?  I know he was involved in this project
13     generally, but that our team at Skadden did not handle."
14     Q.  And do you recall whether Mr. Craig wrote back to you?
15     A.  No.
16              MS. GASTON:  Okay.  Nothing further, Your Honor.
17              THE COURT:  All right.  Any cross-examination?
18              MR. ABELSON:  No questions, Your Honor.
19              THE COURT:  All righty.  This witness can be excused.
20              Thanks very much.
21              You can call your next witness.
22              MR. CAMPOAMOR-SANCHEZ:  We might need a couple
23     minutes.  We're trying to locate him now.
24              THE COURT:  All right.
25              MS. GASTON:  Apologies.
```

1           THE COURT:  That's all right.  It seems a little

2    early to take our break.  But, how long is this witness likely

3    to be?

4           MS. GASTON:  Approximately 90 minutes.

5           THE COURT:  Okay.  Well, then maybe it isn't.  Why

6    don't we take a break now, while we're finding the witness, and

7    then we'll be ready to sit through the witness's testimony.

8           So, the jury can leave their notebooks.  Please don't

9    discuss the case.  And we'll see you back in ten minutes.

10          Thank you.

11          (Whereupon the jury leaves the courtroom.)

12          THE COURT:  All right.  The lawyers can be similarly

13    excused, and the crowd, as well.

14          (Recess.)

15          THE COURTROOM DEPUTY:  Your Honor, recalling Case

16    Number 19-125, the United States v. Gregory Craig.

17          THE COURT:  All right.  I understand someone wants to

18    say something about the next witness.

19          MR. TAYLOR:  That would be I, Your Honor.

20          THE COURT:  All right.

21          MR. TAYLOR:  We understand that the next witness is

22    Mr. Lesser, who is the head of IT at Skadden, and that the

23    government proposes to introduce, through him, a number of

24    documents of which he has no knowledge, no involvement, and his

25    only role is as the custodian.  And that they intend to have

1    him read from the documents, read the emails into the record.

2          Now, we discussed early on about impropriety of

3    having someone who is simply -- has no connection to the case

4    being put in the position of reading or attempting to put into

5    the record, orally, testimony, basically --

6          THE COURT:  I think what we discussed was your

7    concern that once I ruled them in evidence, that then the

8    lawyers would be talking about the content.  And I said that

9    couldn't happen.  The documents actually have to be introduced

10   in the courtroom, although they didn't have to lay the

11   foundation and all that.  That part had been ruled on.  So we

12   didn't actually discuss this issue before.

13         So what's your objection?

14         MR. TAYLOR:  My objection is that while he may be --

15   it may be appropriate to have him identify the exhibits, it's

16   not appropriate to have him sit here and read them, as if he's

17   a summary witness.  He has -- there's no evidentiary basis for

18   having him read them, any more than there is for having the

19   government read them, since he doesn't have any information

20   about their contents, no connection to the case, and no way of

21   establishing any connection between the -- I don't know exactly

22   which emails they are.

23         But, if this is all coming in in an effort to put in

24   a story through emails that they don't have any witnesses to

25   testify to, by simply having this gentleman get on the stand

1    and say, "Yes, this is a document I got from the Skadden

2    system."

3              "Would you please read its contents"?

4              And so he then reads the contents.  It's -- I think

5    it's objectionable.  There may be a discretionary aspect of the

6    Court's ruling on it.  But, you know, in fairness, to put this

7    witness on the stand as if he is really a summary witness who's

8    going to tell the story of the case through a series of emails

9    that he has no firsthand knowledge about and no way that he

10   would know anything about it, seems to me to be improper.  And

11   the Court should restrict the presentation to the -- having him

12   testify, if they want -- although I think you've already

13   admitted the exhibits -- having him testify, "Yeah, these came

14   out of the Skadden files."

15             That's our objection.

16             THE COURT:  All right.  Well, but given the fact that

17   you objected to the idea that if I move them in, as I already

18   have, that the government shouldn't be able to talk about them

19   in their closing if no witness ever described them or read them

20   to a jury, how would one resolve this conundrum?

21             Let's assume that the first document that this

22   witness is going to introduce is an email written by Mr. Craig,

23   which we all agree is admissible against the party by the

24   opposing party.  And, so -- and this person can authenticate

25   it, and you're not disputing the authentication; you're

1    disputing the timing and the methodology of the publication.

2              So what would you say is the appropriate way to do

3    it?

4              MR. TAYLOR:  To have witnesses testify to the

5    relevance and meaning of these exhibits in the evidentiary

6    phase of this case.

7              In other words, to have someone connect the email.

8    We've seen a lot of emails come in through various witnesses

9    which contain statements by Mr. Craig, and then those witnesses

10   are knowledgeable about them.  But, to have a witness who's not

11   knowledgeable at all about the context in which these

12   communications occur, seems to me to violate the requirement

13   that there be an evidentiary connection between the witness's

14   testimony and the exhibit.

15             THE COURT:  Do you have a case that you would like me

16   to look at for that principle?

17             MR. TAYLOR:  I don't have a case in my hand.  I think

18   it relates to the Court's discretion to control the flow of

19   evidence.

20             I do think that having a witness testify -- having a

21   witness, who has no connection to the case, get on the stand

22   and simply read through a series of chronological emails, as if

23   he's telling a story, puts us in the realm of a summary

24   witness.  And that's -- you know, we've made our objections to

25   that, and would make it again.

 1          You can't put on a witness who has no participation

 2     in the facts and events of the case and say:  And, oh, yeah,

 3     I've seen these emails and, you know, here's what they are.

 4     And now let me read them to you.

 5          There has to be a connection made, Your Honor,

 6     between the issues in the case and the testimony of the

 7     witness.  And since this witness doesn't have any connection to

 8     the case, seems to me that if there were a question about their

 9     authenticity or where they came from, that's a legitimate

10     purpose to put him on the stand.

11          But, then to have him, without any connection or any

12     context to the issues in the case, as these other witnesses

13     have -- have had, simply sit there and read the story,

14     that's --

15          THE COURT:  Well, we may or may not have the other

16     witness on the chain who can or cannot be here, or testify, I

17     don't know.  But -- and I think if there were relevance

18     objections to these exhibits, we've already considered them.

19          I don't know that there's a legal requirement that a

20     custodian cannot be the tool through which an exhibit is

21     published to a jury.  I don't believe the government intends

22     to, but, certainly, the government can't connect them up with

23     questions the way it's been with other witnesses:  Did you go

24     to a meeting?  Do you remember what happened at the meeting?

25     No, but here's Document X, and they -- they put it in context.

 1            This witness, as you correctly noted, cannot.  But, I

 2    don't see why they can't go up on the screen as:  This -- this

 3    is a document that comes from Skadden's files.  It was sent by

 4    Mr. Craig on this date.  It says X.

 5            MR. TAYLOR:  It seems to me that they're obliged to

 6    make some connecting-up with the issues, the facts, and

 7    circumstances.

 8            THE COURT:  I don't believe every witness -- the

 9    witness through whom the exhibit comes in has to be the source

10    of the relevance.

11            MR. TAYLOR:  I'm not saying -- I beg your pardon.  I

12    interrupted you.  I didn't mean to.

13            THE COURT:  That's my point.  I think we certainly

14    had other witnesses being asked about other exhibits which they

15    either received or were on their desk or they were copied on or

16    they weren't copied on the bottom of the chain, but they got

17    them up above, testifying about, This email says X and it says

18    Y.

19            And that has not been objectionable, because the

20    email -- and whether you did it or the government did it -- the

21    email was deemed to be in evidence, has already determined by

22    me to be relevant.  And the relevance may be established by a

23    future person.  It may be the content of the statement itself,

24    and the fact that the defendant made it, that makes it

25    relevant, in and of itself.

1          So, I note your objection.  I think this is not an

2     inappropriate way to solve a practical problem.  I agree with

3     you, that it's better to put in the evidence through a witness

4     with knowledge; but, a lot of emails have come in through

5     witnesses who profess to have zero recollection whatsoever, but

6     they were still permitted to say, I got this.  I sent this.

7          And what he is saying is, this came in on the firm's

8     server; this went on the firm's server.  And if he's asked any

9     questions about the meaning or the content or the purpose of

10    the email, the objection would be sustained.

11         MR. TAYLOR:  I understand.

12         I think the difference between the testimony of the

13    previous witnesses about communications which they might or

14    might not remember, is that they have testimony that's relevant

15    to the issues in this case.  And these communications either

16    illustrate, corroborate, or advance some principle that tends

17    to go to the proof of the issues in this case.

18         He doesn't.  He's simply a narrator.  And I don't

19    think -- I'm not sure there's any rule in the Federal Rules of

20    Evidence that addresses this, one way or the other, except the

21    summary witness rule.  And this looks, to me, like a summary --

22    a 602 summary witness that -- maybe that will be the wrong

23    rule.  But --

24         THE COURT:  I mean, he's not even summarizing.  He's

25    literally presenting them verbatim, which avoids a lot of the

1   problems with the summary, because a summary witness does have

2   to be shown to be accurately summarizing the content of

3   anything.

4           And we're not going to ask him:  Here's a stack of

5   ten emails.  Can you tell us, generally, what they were about?

6   He can't do that.

7           And, so, I hear you.  Your point is well taken.  I

8   appreciate the fact that you say it's within my discretion.

9   But, I don't believe you've persuaded me that I have to

10  prohibit this.

11          MR. TAYLOR:  I haven't persuaded you that you need to

12  exercise your discretion in my favor.

13          THE COURT:  And you've done a good job of trying to

14  do that, but I don't believe you have successfully done that.

15          So, your objection is on the record, and let's

16  proceed.

17          MR. TAYLOR:  Thank you, Your Honor.

18          THE COURT:  All right.

19          THE COURTROOM DEPUTY:  Jurors?

20          THE COURT:  Yes.

21          (Whereupon the jury enters the courtroom.)

22          THE COURT:  All right.  I notice all our jurors are

23  back.  Appreciate that.  I assume no one has been discussing

24  the matter.

25          And you can call your next witness.

```
 1              MS. GASTON:  Thank you, Your Honor.
 2              The government calls Peter Lesser.
 3                         PETER LESSER,
 4    was called as a witness and, having been first duly sworn, was
 5    examined and testified as follows:
 6                    DIRECT EXAMINATION
 7    BY MS. GASTON:
 8    Q.  Good morning, Mr. Lesser.
 9    A.  Good morning.
10    Q.  Can you please introduce yourself to the jury and spell
11    your name for the record?
12    A.  My name is Peter Lesser.  I am the director of global
13    technology at Skadden Arps.  My last name is spelled
14    L-E-S-S-E-R.
15    Q.  And can you please describe what you do as the director of
16    global technology at Skadden Arps?
17    A.  I am responsible for a team of people who oversee the
18    technology elements at Skadden on computer systems, phone
19    systems, copiers, and so on.
20    Q.  Does that include email systems?
21    A.  Yes, it does.
22    Q.  Does it include a document management system?
23    A.  Yes, it does.
24    Q.  What is a document management system?  As short as you can
25    keep it.
```

1    A.  A document management system is a piece of software to

2    organize and provide access to documents, such as Word, Excel

3    and PowerPoint, across a large organization.

4    Q.  And can you describe your work history in terms of the

5    technology that you oversee?

6    A.  I began with a degree in computer science from Brown

7    University.  I worked for IBM for a short period of time.  I

8    then cofounded a consulting company, which I was at for about

9    18 years.  And I've spent the last 13 years at Skadden Arps.

10   Q.  And when you cofounded your business, was it doing the same

11   sort of thing that you do at Skadden Arps?

12   A.  Yes.  It was a consulting firm that provided technology

13   services only to law firms.

14           THE COURT:  All right.  Ms. Gaston, just for the

15   benefit of the people in the courtroom, you're kind of speaking

16   a little softly or kind of swallowing your words a little bit.

17   So, if you could either speak more directly into the microphone

18   or speak up, that would be helpful.

19           MS. GASTON:  I will speak up.

20           Thank you.

21           THE COURT:  All right.

22   BY MS. GASTON:

23   Q.  And, Mr. Lesser, in preparation for today, did you review

24   certain of the government's exhibits that came from Skadden's

25   email system?

1   A.  Yes, I did.

2   Q.  And did you also review some materials from Skadden's

3   document management system?

4   A.  Yes, I did.

5   Q.  And did you also review certain of the government's

6   exhibits that came from the hardcopy files kept from Mr. Craig?

7   A.  Yes, I did.

8   Q.  Okay.  We're going to go over some of those exhibits now.

9          MS. GASTON:  Starting with Government's Exhibit 59,

10  which was previously admitted.

11  BY MS. GASTON:

12  Q.  After the government asked you to determine whether

13  Exhibit 59 was on Skadden's email systems, did you do so?

14  A.  I did review a large number of documents.  I can't be

15  positive that this is one of them at this time.

16  Q.  Do you -- is there anything that would refresh your

17  recollection?

18  A.  Yes.

19         MR. ABELSON:  Objection, Your Honor.  Just for the

20  record, for the reasons stated by Mr. Taylor as to all the

21  documents that they're putting in through Mr. Lesser.

22         THE COURT:  All right.  Your objection is already on

23  the record.

24         Thank you.

25         MR. ABELSON:  Thank you.

 1              MS. GASTON:  Can we approach, very quickly?

 2              THE COURT:  Yes.

 3              (Bench discussion:)

 4              MS. GASTON:  So, this is where I do speak up.

 5              So we provided him with a list of the specific

 6     exhibits.  He very dutifully went and checked the specific ones

 7     that we provided him on the list.  I have the list.  I can

 8     refresh him with it.  It might take a long time, if I need to

 9     refresh him each time.  I expect him just to say, Yes.  But,

10     if you all want me to refresh him each time, I'm happy to do

11     that.

12              THE COURT:  Well, right now, he said he can't recall.

13              MS. GASTON:  Yes.

14              THE COURT:  And, so, you asked him if there's

15     anything that would refresh his recollection.  And if he says,

16     The list, then you can give him the list, and then he can keep

17     the list with him as we keep going.  If we have to do it each

18     time, that's fine.

19              MS. GASTON:  Excellent.

20              THE COURT:  All right.  Thank you.

21              (Open court:)

22     BY MS. GASTON:

23     Q.  Mr. Lesser, is there anything that would refresh your

24     recollection about whether this exhibit is one that you

25     checked?

1    A.  Yes.  There was a list of documents that I was given to

2    review that I did review.

3    Q.  Okay.

4            MS. GASTON:  May I approach, Your Honor?

5            THE COURT:  Yes.

6            And you don't have to ask me to approach the witness.

7    BY MS. GASTON:

8    Q.  Mr. Lesser, is that the list?

9    A.  Yes, it is.

10   Q.  Does that refresh your recollection about whether you

11   checked whether Government's Exhibit 59 is an email from the

12   Skadden system?

13   A.  Yes.  This is one of the documents I reviewed.

14           MS. GASTON:  And if we could zoom on the top half of

15   this email.

16           Sorry.  The top half of the page.

17   BY MS. GASTON:

18   Q.  Does Mr. Craig write an email to Paul Manafort,

19   pmanafort@dmpint on April 12th, 2012?

20   A.  Yes.

21   Q.  What does Mr. Craig write?

22   A.  This is from Paul Manafort to Greg Craig.

23   Q.  I'm sorry.  I'm referring to the bottom email, between

24   these two emails.

25   A.  "Paul, I just met Viktor, who has been told by COS to

1    transfer $1.5 million.  This is not right, and it is a serious

2    problem for me.  It was all clear between us.  I understood it

3    would be 2 at the end of the week, and another 2 by the end of

4    the month."

5            Should I continue?

6    Q.  Yes, please.

7    A.  "I told NYC that was the deal.  We have five lawyers in

8    Kyiv meeting with DPG and their trial team in half an hour.  I

9    really don't want to deal with this other kind of bullshit.  I

10   will be very clear:  We are gone unless your side lives up to

11   its commitments.

12           "If it is not 2, we will leave tomorrow, go home, and

13   say that we are lucky to be out of it.  I look forward to

14   hearing from you."

15   Q.  And does Manafort -- does Mr. Manafort respond?

16   A.  He does.

17   Q.  What does Mr. Manafort respond?

18   A.  "Greg, you will have 2.  Some is coming a different way.  I

19   am tracking hourly.  P."

20   Q.  And then directing your attention to Government's Exhibit

21   60, which is already in evidence.

22           Is Government's Exhibit 60 an exhibit that you

23   determined was from Skadden's system?

24   A.  Yes, I did.

25   Q.  And is this on the same day as Government's Exhibit 59,

1   April 12th, 2012?

2   A.  Yes.

3   Q.  And what is the subject line of the bottom email from

4   Mr. Manafort to Mr. Craig?

5   A.  The subject is "Confirmation."

6   Q.  And what does Mr. Manafort write?

7   A.  "Their wire was sent today.  It was for 2.  I will have the

8   reference number later today and will send it to you.  VP

9   picture was not full picture; it was only his picture.  I have

10  confirmed everything.  You can assure your people that the

11  promised package is en route, and the -- they will have the

12  tracking number later today.  P."

13  Q.  And did Mr. Craig respond?

14  A.  Yes.

15  Q.  What did Mr. Craig respond?

16  A.  "You rock."

17  Q.  And then directing your attention to Government's Exhibit

18  156, which is previously admitted.

19       Is Government's Exhibit 156 one of the exhibits that

20  you determined was on Skadden's email system?

21  A.  Yes.

22  Q.  And starting at the very bottom of the first page.

23       Is this an email from Mr. Craig to Mr. Manafort on

24  June 6th, 2012?

25  A.  Yes, it is.

1  Q.  And, in part, on the -- in the second paragraph, does

2  Mr. Craig indicate that he had two important meetings with

3  counsel for the other side?

4  A.  Yes.

5  Q.  And at this point in June, does Mr. Craig indicate that

6  Serhiy Vlasenko "Says he will cooperate with us"?

7  A.  Yes.

8  Q.  And on the following page, does he say, "We have yet to see

9  anything concrete"?

10  A.  Yes.

11  Q.  Okay.  If we go back to the first page.

12        Does Mr. Manafort respond?

13  A.  Yes, he does.

14  Q.  And what is the first line that Mr. Manafort writes?

15  A.  "Okay.  First, the good news:  You have the third package

16  in your account.  So, all is current."

17  Q.  And then, if we go up to Mr. Craig's response above that.

18        Can you read what he says, starting with "For my

19  clarification"?

20  A.  "For my clarification, when you refer to the third package,

21  are you talking about the last package or the next-to-last

22  package."

23  Q.  And does Mr. Manafort respond?

24  A.  Yes, he does.

25  Q.  What does he say?

1    A.   "The next-to-last package.  You now have three of the four.

2    The last is due at the end of this month."

3    Q.   Okay.  Okay.

4         Moving on to Government's Exhibit 111, which was

5    previously admitted.

6         Is Government's Exhibit 111 an email that you

7    determined was on Skadden's email system?

8    A.   Yes.

9    Q.   And is this an email from Mr. Craig to Mr. Manafort on

10   May 3rd, 2012?

11   A.   Yes, it is.

12   Q.   What is the subject of this email?

13   A.   The subject is, "Resolving letter agreement issue."

14   Q.   What does Mr. Craig write in this email?

15   A.   "Paul, Unless you think that this is a nonstarter, we will

16   be asking the Ministry of Justice to accept this attachment,

17   and to incorporate it by reference into the letter agreement

18   that we will sign with the Ministry, the terms of which we have

19   already negotiated and are agreeable to us.

20        "The main difference is that in the Ministry's

21   agreement, they cap the fees that they agree to pay.  In our

22   agreement, which will be incorporated by reference, we simply

23   report that, in addition, we are also billing our time and

24   expenses against a retainer that has been paid in advance.  We

25   make no reference to a third-party payer.

1        "If this makes sense to you, we will send it to the

2    ministry for its approval, and hope for the best."

3    Q.  And is there an attachment to this email?

4    A.  Yes, there is.

5    Q.  Okay.  And if you look at the second page of the document,

6    which is the first page of a letter.

7        What is the date on this?

8    A.  The date is April 10th, 2012.

9    Q.  And looking back at the email.

10       What is the date of the email?

11   A.  The date of the email is May 3rd, 2012.

12   Q.  Turning back to the document.  Looking at the paragraph

13   under Scope of Engagement.

14       Can you read the last sentence in that paragraph?

15   A.  "It is understood that the firm is not being retained to

16   engage in any political activities, and will not engage in any

17   such activities as defined in the Foreign Agent Registration

18   Act, FARA."

19       MR. ABELSON:  Your Honor, may we approach?

20       THE COURT:  Yes.

21       (Bench discussion:)

22       MR. TAYLOR:  We object to the selective quoting from

23   these emails.  She said they were going to have him read them.

24   She's really, very effectively and astutely, making the

25   argument about the case by taking pieces from one email and

1    another.  That's improper.

2         If the witness is going to say this came from the

3    system, and they want him to read it out loud, that's fine.

4    But, to change that from reading the email to taking one piece

5    of this one, another piece of that one, that turns this into --

6         THE COURT:  I understand.

7         MR. TAYLOR:  Okay.

8         THE COURT:  What's your response?

9         MS. GASTON:  My response is that the documents are

10   evidence.  We're allowed to emphasize the pieces of the

11   documents that we think are important.  And on cross, if they

12   want to highlight another piece of the document that they think

13   we've left out, they can.

14        THE COURT:  I don't have as much of a problem with

15   this, but the one before, that was an email, you were basically

16   calling out chunks, and then asking -- and then calling out

17   more chunks in response.  And it was more than just a pure,

18   Okay, we're publishing through this witness, and a little bit

19   more using the witness to tell the story.  And I think that

20   that's a little problematic, for some of the reasons that the

21   defense pointed out earlier.

22        I am -- I do note that if she gets someone else from

23   the firm who was involved in some of these discussions -- if

24   there was anybody else involved in the discussions instead of

25   Mr. Craig -- to testify about what was going on here, then the

1    defense would have objected that Mr. Craig wrote it and that

2    person didn't write it and that person can't be the sponsor.

3         So I can see that these can't necessarily be

4    sponsored through a human being with knowledge.  So, I'm going

5    to permit you to continue doing what you're doing.  But, I

6    think -- I mean, I think with respect to the engagement letter,

7    you know, something that's multiple pages long, for her to say:

8    Directing your attention to the last paragraph.  What does it

9    say?

10        But, I think, you know, with an email saying, well,

11   what is -- your reading this sentence and then that sentence, I

12   think that then does start to use him to convey meaning in a

13   way that's different from just this is on our system.  So I

14   would ask you to keep that in mind as you move forward.

15        MS. GASTON:  Okay.  I was not -- with the previous

16   email, I want to make clear, I wasn't trying -- I was trying to

17   focus on the parts that were not scheduling things.

18        THE COURT:  I understand you're not trying to waste

19   people's times.

20        MS. GASTON:  Yes.

21        THE COURT:  But, I think the better way to do it, if

22   there's a whole paragraph that's irrelevant and you want to

23   say, you know, Direct your attention to the second paragraph.

24   What does it say?

25        But, I think, you know, it's a little problematic

1    when you say:  Okay.  He says this about this, and then he

2    responded that about that, and it starts to be a little bit

3    like he's telling the story.

4              MS. GASTON:  Okay.  I was not trying to do

5    anything --

6              MR. TAYLOR:  Paraphrasing is different from having

7    him read it.

8              THE COURT:  Right.  Well, I think there was a little

9    paraphrasing in the questions, and so we won't do that anymore.

10             MS. GASTON:  All right.

11             MR. TAYLOR:  Thank you.

12             (Open court:)

13   BY MS. GASTON:

14   Q.  And, Mr. Lesser, directing your attention to Government's

15   Exhibit 149, which has been admitted into evidence.

16             Is this a document that you determined was on

17   Skadden's system?

18   A.  Yes.

19   Q.  And what is this email?  Who sent this email and to what

20   email address?

21   A.  It was sent by Alex van der Zwaan, and it was sent to two

22   email address, and it was CCed to two additional addresses.  It

23   was sent to kulchytskyy@minjust.gov.au, and

24   nazar.kulchytskyy@gmail.com.  It was CCed to Greg Craig and to

25   Kilimnik.

1   Q.  And what did Mr. van der Zwaan write?

2   A.  "Dear Nazar, Please final the Ministry of Justice

3   engagement letter countersigned by Skadden Arps attached.

4   Please note that we do not have a seal, and a signature of a

5   partner of the firm, such as Mr. Craig, is enough to bind the

6   firm in this regard.

7           "Mr. Craig has asked me to pass along to you that we

8   have signed your letter in anticipation of and in the

9   expectation that the Ukraine Ministry of Justice will also sign

10  our letter agreement, as attached for reference.  Please

11  confirm receipt.  With kind regards, Alex."

12  Q.  And looking -- is there an attachment to this email?

13  A.  There are multiple attachments to this email.

14  Q.  Okay.  And what is the date of this email from

15  Mr. van der Zwaan?

16  A.  May 24th, 2012.

17  Q.  And looking at the attachment after this email.

18          Is this -- what is the attachment to this email?

19  A.  This is an attachment with the subject "Retainer

20  memorandum."

21  Q.  And what is the date of this document?

22  A.  The date is April 10th, 2012.

23  Q.  And looking at the sixth page of this exhibit.

24          Is this letter signed?

25  A.  Yes, this is signed.

1    Q.  By whom?

2    A.  It appears to be signed by Greg Craig.

3    Q.  And then is there another line for another signature?

4    A.  No, there is not.

5    Q.  If you look below Mr. Craig's signature, is there a -- what

6    appears below and to the left?

7    A.  Oh, there is a blank for it to be countersigned by another

8    party.

9    Q.  Thank you.

10            Directing your attention to Government's Exhibit 150.

11            Is Government's Exhibit 150 one that you determined

12   was on Skadden's system?

13   A.  Yes.

14   Q.  Beginning with the email from Mr. van der Zwaan to

15   Mr. Craig on May 24th, 2012, at 11:55 a.m., what is the subject

16   of this email?

17   A.  The subject is, "Letter agreement."

18   Q.  And what does Mr. van der Zwaan write to Mr. Craig?

19   A.  "I have just had Nazar on the phone.  He had told me that

20   the minister is refusing to sign our letter agreement.  He says

21   that he never agreed to sign it.  Apparently, we need to speak

22   to Manafort about this to sort it out.  Nazar just passes on

23   the message.  When asked why, his answer is that he doesn't

24   know.  Sorry I can't provide you with more.  Let me know what

25   you want to do.  Alex."

1    Q.  And then above that is there an email from Mr. Craig?

2    A.  Yes, there is.

3    Q.  Are you able to tell to whom Mr. Craig sends that email?

4    A.  I cannot.

5    Q.  Okay.  What does Mr. Craig write?

6    A.  "I hate to bother you with these issues, but there are two

7    that I want to tell you about.  One, I have signed their

8    contract; they are still unwilling to sign mine.  See below.

9    Should I be concerned?

10        "Two, FTI is about to withdraw from participation in

11   this effort because they have no assurance of being paid.  If

12   Viktor is unwilling, are there others like him that might sign

13   on to this project?  Next week may have a lot of action on the

14   PR front, and it would be good to have FTI in the foxhole with

15   us.  They will not go back to Kyiv without their issue being

16   resolved."

17   Q.  And above that, is there an email from Mr. Manafort?

18   A.  Yes.

19   Q.  And what does Mr. Manafort write?

20   A.  "Nothing to worry about.  When is a good time to call?"

21   Q.  Now, directing your attention to Government's Exhibit 571,

22   which has been previously admitted.

23        Is 571 a document that you have determined came from

24   Skadden's system?

25   A.  Yes.

1   Q.  And can you please read the bottom email in this chain, and

2   indicate who it is from and to?

3   A.  This is an email from Greg Craig to Paul Manafort, with a

4   CC to Doug Schoen.

5            It -- subject is, "Heads-Up."  And it reads, "Various

6   Ukrainian government officials have been talking publicly about

7   this project, as you know.  No one believes that Skadden is

8   doing this job for only HRV 100,000.  Perhaps we should think

9   about a way to deal openly with the way it is being financed."

10  Q.  And does Mr. Manafort respond?

11  A.  Yes, he does.

12  Q.  What does he respond?

13  A.  He responds, "I do have some ideas on this.  We can discuss

14  at your convenience."

15  Q.  And what does Mr. Craig write?

16  A.  He responds, "Perhaps you can give me a number where I can

17  call you."

18  Q.  And moving, next, to Government's Exhibit 570, which has

19  previously been admitted.

20           Is this an email that you determined was on Skadden's

21  system?

22  A.  Yes.

23  Q.  And just looking at the bottom email in this chain.

24           Who is it from?

25  A.  It is from Lauren Weiss.

1   Q.  And who is it to?

2   A.  It's sent to a distribution list called Project Kyiv, but I

3   can't tell you who the recipients are within the Project Kyiv

4   distribution list.

5         It is also carbon copied to Melissa Porter,

6   Taylor Massa, and Saira Zaki.

7   Q.  What is the subject line of Ms. Weiss's email?

8   A.  The subject is, "Rapsi.com, U.S. attorneys in ECHR under

9   Tymoshenko case to cost Ukraine $12,500."

10  Q.  And then looking above that.

11        Does Mr. Craig forward that email?

12  A.  Yes.

13  Q.  And what is the date that he does that, and to whom?

14  A.  On June 22nd, 2012, he forwards it to Paul Manafort.

15  Q.  And just looking quickly back at 150.

16        Is that the same day as the previous email that we

17  looked at?

18        Oop, sorry.  I look at the wrong thing.  Never mind.

19  Don't do that.

20        Looking at Government Exhibit 165.

21        Is this a document that you determined was on

22  Skadden's system?

23  A.  Yes.

24  Q.  Okay.  And looking at the bottom email.

25        What is the date of this email?

```
 1    A.   June 22nd, 2012.

 2    Q.   And what is the email address that this is from?

 3    A.   This is from Serhiy.  The address is

 4    vlasenko.serhiy@gmail.com.

 5    Q.   And who is it to?

 6    A.   It is to Alex Haskell, with a CC to Greg Craig.

 7    Q.   I don't expect you to be able to read that subject line,

 8    but could you read the message below it?

 9    A.   Yes.

10              "Alex, GRAG" exclamation, "It is true, as the

11    Ministry of Justice said in their letter, that your contract

12    price for your job couldn't be more than 95,000 hryvnias, what

13    is less than 12,000 -- $20,000 U.S.  The answer is very

14    important for further cooperation.  Serhiy."

15    Q.   What does Mr. Craig do with that email?

16    A.   He replies, "Can you give me a call about this?"

17              MR. ABELSON:  Objection.

18              THE COURT:  Do you know if it's a reply or if he's

19    asking?  Do you know -- he ends an email.  Can you say who it

20    was to?

21              THE WITNESS:  I cannot say who it was to.

22              THE COURT:  Okay.

23    BY MS. GASTON:

24    Q.   Okay.  So he sends an email.

25              And what happens above Mr. Craig's email?
```

1    A.   Paul Manafort replies and says, "Are you free now?"

2    Q.   Okay.  Directing your attention to Government's Exhibit

3    184, which is previously admitted, and just focusing on the

4    top.

5               What is the date -- oh, sorry.

6               Is this an email that you determined was on Skadden's

7    system?

8    A.   Yes.

9    Q.   What is the date of his email?

10   A.   July 22nd, 2012.

11   Q.   I'm sorry.  What is the date?

12   A.   July 27th -- excuse me -- 2012.

13   Q.   And who is it from and to?

14   A.   It's from Greg Craig to Paul Manafort.

15   Q.   And what is the subject line?

16   A.   "Draft report."

17   Q.   What does Mr. Craig write?

18   A.   "Paul, Here is the draft report.  You are the only person

19   to whom I am sending this electronically.  We are still cite

20   checking and fact checking, but it is mostly done.  The draft

21   will be finalized before the end of today.  Alex van der Zwaan

22   took the executive summary to Pshonka, in both Russian and

23   English versions, and walked him through it yesterday.  Greg."

24   Q.   Now, directing your attention to Government's Exhibit --

25               MS. GASTON:  Actually, can we approach, briefly,

```
 1      before I --
 2                  THE COURT:  Yes.
 3                  (Bench discussion:)
 4                  MS. GASTON:  So, Government's Exhibit 200 was
 5      previously here, below.  Defense objected on completeness
 6      grounds.  So, this now includes the part of the chain that
 7      satisfies their objection.
 8                  MR. ABELSON:  Okay.  So what's the question?
 9                  MS. GASTON:  So, I just wanted to make sure that you
10      understood that it now was complete.
11                  MR. ABELSON:  Okay.
12                  MS. GASTON:  Okay.
13                  THE COURT:  All right.
14                  MR. ABELSON:  Bill.  Bill.
15                  MS. GASTON:  Shortly, we're going to get to a couple
16      exhibits that in your order, you said, should have a -- an
17      instruction before I call them up.
18                  Should I indicate that you would like to give an
19      instruction related to the email?
20                  THE COURT:  I think -- do you have a point of view
21      about whether I should do the limiting instruction before he
22      reads it or after he reads it?
23                  MR. TAYLOR:  Both.
24                  THE COURT:  We'll, I'm only going to do it once.
25                  MR. TAYLOR:  Before.  Before.
```

```
 1              THE COURT:  Okay.

 2              MS. GASTON:  All right.  I will let you know when

 3     we're about to get to it.

 4              THE COURT:  Okay.

 5              MS. GASTON:  Okay.

 6              THE COURT:  And we're talking about the hearsay.

 7     This is just for the fact it was said and not the --

 8              MS. GASTON:  Yes.  Yes.

 9              THE COURT:  I just want to make sure we're clear on

10     the instruction I'm giving.

11              MS. GASTON:  Yes.

12              THE COURT:  Thank you.

13              MR. TAYLOR:  They're not considered for the truth.

14              THE COURT:  I think that even saying, "Is this email

15     the same day as the one before," is probably a little bit of

16     asking him to summarize the content.  That we can just let the

17     exhibits speak for themselves.

18              MS. GASTON:  Okay.

19              THE COURT:  Thank you.

20              MS. GASTON:  Mr. Taylor.

21              MR. ABELSON:  Bill.

22              MR. TAYLOR:  Sorry.

23              MS. GASTON:  I'm sorry.  One last thing.

24              We're also going to get to hardcopy documents with

25     some handwriting.  Would it be permissible for me to read the
```

```
1    handwriting stipulation before we get to them?
2               THE COURT:  Yes.
3               MR. ABELSON:  Is he going to be reading the
4    handwriting.
5               MS. GASTON:  No.
6               THE COURT:  Okay.
7               MR. TAYLOR:  Are we done?
8               MS. GASTON:  Yes.
9               THE COURT:  All right.
10              (Open court:)
11   BY MS. GASTON:
12   Q.  All right.  Referring you to Government's Exhibit 200,
13   which has been previously admitted.
14              Is this a document that you determined was on
15   Skadden's email system?
16   A.  Yes.
17   Q.  And directing you to the bottom email in the chain.
18              Can you tell us who that is from and to?
19   A.  It is from Paul Manafort to Greg Craig.
20   Q.  And what is the date?
21   A.  The date is July 30th, 2012.
22   Q.  And what does Mr. Manafort write?
23   A.  Subject:  "Forward language issues."  Greg, I have been in
24   communication with Kyiv.  They really need a Russian and
25   Ukrainian version delivered to the GP and VY, and, ultimately,
```

1    to MOJ.  They understand the English version will be the only

2    official version.  But, they want you to transmit the Russian

3    version with the English, and are willing to wait until next

4    week for it.  Then any changes that are made would be made in

5    the official version -- English one -- and then the Russian and

6    Ukrainian ones.

7          "I know you are using Leonov.  This is -- the is able

8    to do perfect Russian and Ukrainian translations.  As long as

9    the English version is the official one, I think the best

10   course would be to have Leonov immediately begin the

11   translating of the Russian and Ukrainian versions, then the

12   draft can be submitted next week of the English and Russian.

13   This protects you and keeps the client happy.

14         "If it is only a matter of money, I can get the

15   additional amount needed.  This is my recommendation.  Let me

16   know what you want me to convey to Kyiv.  P."

17   Q.  What does Mr. Craig respond?

18   A.  "Okay.  We have pulled back delivery of the English

19   language version for tomorrow, and I am explaining that we do

20   not want to release English until we also have Russian.  I will

21   tell Pshonka that we have it ready to go -- which, we do -- and

22   we have a person ready to deliver it by hand to Pshonka's

23   agent -- which, we do -- but, we aren't doing it.

24         "Let me just say that I share your concern about the

25   risk of a leak.  That leak is still there, even though they

1    don't have the Report.  The worst thing that could happen to

2    the project, to this law firm, to your guy and to me, would be

3    to have someone on your side falsely leak a story that Skadden

4    finds Tymoshenko guilty.  Skadden Report exonerates Ukraine.

5    That kind of a story would be a disaster.  We have to join arms

6    to get something just a little more nuanced.  Yes?"

7    Q.  Does Mr. Manafort respond?

8    A.  Yes.

9    Q.  What does he respond?

10   A.  "I am on top of the leak situation.  This is why I want you

11   to do the translation and then submit both the

12   Russian/Ukrainian and the English versions at the same time.

13   This will dramatically reduce the chance of a leak.  Plus,

14   hand-delivering the doc is the best way to do it.  Let me know

15   the timetable to do it this way, and I will convey Kyiv, Paul."

16   Q.  Could you read the last four words again?

17   A.  Oh, "and I will cover Kyiv.  Paul."

18           Excuse me.

19   Q.  Thank you.

20           Showing you what's been marked as Government's

21   Exhibit 214.

22           Is this a document that you determined is on

23   Skadden's system?

24   A.  Yes.

25   Q.  Okay.  Starting with the bottom email in the chain.

1    Who is it from and to, and what is the date?

2    A.  It is from Paul Manafort to Greg Craig on August 14th,

3    2012.

4    Q.  What is the subject line?

5    A.  "VP or MOJ."

6    Q.  What does Mr. Manafort write?

7    A.  "Did you reach Schoen?  Kyiv wants to move ASAP and is

8    pressing me for an answer.  Please advise.  Paul."

9    Q.  All right.  And above that, does Mr. Craig write something,

10   also on August 14th?

11   A.  Yes.

12   Q.  What does Mr. Craig write?

13   A.  "I am still working the Schoen avenue.  No one promised

14   Pinchuk anonymity, did they?"

15   Q.  And what does Mr. Manafort write about that?

16   A.  "I don't know.  But, I do know that it is what he is saying

17   he wants now."

18   Q.  Then directing your attention to Government's Exhibit 582,

19   which is in evidence.

20            Is this an email that you determined is on Skadden's

21   systems?

22   A.  Yes.

23   Q.  And does -- what does -- what is this email?

24   A.  This is an email with the subject "Procedure for

25   supplemental payments."

1    Q.  And who is it from?

2    A.  It is from Paul Manafort to Greg Craig.

3    Q.  And what's the date of it?

4    A.  The date is August 15th, 2012.

5    Q.  And what does Mr. Manafort write at the top?

6    A.  "Per our conversation, this is the procedure and

7    justification of the process.  It was sent to me by MOJ.

8    Paul."

9    Q.  Okay.  Then directing your attention to Government's

10   Exhibit 583.

11              MR. ABELSON:  Objection, Your Honor.

12              THE COURT:  Okay.

13              MS. GASTON:  Do you want to --

14   BY MS. GASTON:

15   Q.  Could we go back to 582?

16              And can you please read the text below the line?

17   A.  "The Ministry of Justice has started a procedure of

18   purchasing services in terms of providing legal expert opinion.

19   This procedure is conducted in accordance with the law of

20   Ukraine on state purchases, which requires that all services

21   with budget over 100,000 UAH are purchased through tender

22   procedure.

23              "However, in Skadden's case, there was already an

24   agreement for an amount of 95,000 UAH, which was conducted

25   outside the tender procedure due to the low amount.  MOJ have

1     exchanged letters in which Skadden, A, explains that the

2     services to be provided under the original contract require

3     involvement of experts of the higher level and pay grade; and,

4     B, explains that the amount of materials to be researched is

5     much higher than expected, therefore, requires more labor and

6     expenditures.

7              "In addition, Skadden has to make certain" -- excuse

8     me.

9              "In addition, Skadden has to make certain number of

10    trips to Ukraine, reimbursement of expenses for which was not

11    initially budgeted in the contract.

12             "In this situation, MOJ is entitled to implement a

13    procedure of purchases of services from one supplier.

14    Purchases of services from one supplier is a procedure,

15    according to which the client concludes a contract on

16    purchasing services after conducting negotiations, provided

17    that the qualifications of the supplier of services correspond

18    to the qualification requirements, Article 8 of the law on

19    state purchases of Ukraine.

20             "Upon receipt of all necessary documents from

21    Skadden, as specified in the letter signed by Deputy Minster of

22    Justice Sedov, MOJ will write a justification memorandum saying

23    that based on conducted negotiations and continuity of the

24    previously concluded contract, only Skadden can provide these

25    particular legal services and take the decision, publishing the

1    results of the decision on the state web portal.  Then MOJ will

2    deal with the Cabinet of Ministers to get the funding in the

3    amount of XYZ UAH from the budget of Ukraine to pay Skadden to

4    finish the Report.

5              "This procedure has been implemented extensively

6    during Euro-2012, and neither comes as a surprise in Ukraine or

7    constitutes a violation of procedures.

8              "In other words, the mechanism to be applied is in

9    full compliance with the Ukrainian law.  The issue is

10   determining the amount which will considered to be sufficient

11   to cover travel and lodging of Skadden, as noted by Vlasenko

12   and other opposition people with whom Skadden met, and some

13   minimal legal fee.  Hope this answers your question.  K."

14   Q.  Directing your attention to Exhibit 583.

15             Is this an email -- which is previously admitted.

16             Is this an email that you determined was on Skadden's

17   system?

18   A.  Yes.

19   Q.  Starting with the second page of this exhibit.

20             Is it -- what is the first email in this thread?

21   A.  It is an email with the subject "Updates."

22   Q.  And who is it from?

23   A.  It is from Paul Manafort to Greg Craig.

24   Q.  What is the date?

25   A.  The date is August 15th, 2012.

1    Q.  What does Mr. Manafort write?

2    A.  He writes, "Greg, Any news from Schoen?  I need to get back

3    to SL if we are pursuing this approach.  Is the draft Russian

4    translation ready?  Getting pressure on this, too.  Please

5    advise, Paul."

6    Q.  What does Mr. Craig write above that?

7    A.  "Hold on a few more hours."

8    Q.  And then, if we look at the bottom of the first page and

9    the top of the second page.

10              What does Mr. Manafort write back?

11   A.  "I am by my fingernails....."

12   Q.  Then if we go to the first page.

13              At the very bottom, above that, does Mr. Craig write

14   to Mr. Manafort?

15   A.  Yes.

16   Q.  What does he write?

17   A.  "The answer from Schoen/Pinchuk is a firm and unqualified

18   no.  Can you put into a sentence how Ukraine wants to handle

19   this so I can clear it with the team?  Thanks."

20   Q.  And what does Mr. Manafort write back?

21   A.  "That is what I thought.  Given this response, I would like

22   to discuss with you, again, what SL proposes before putting

23   anything in writing.  P."

24   Q.  Does Mr. Craig write back to that?

25   A.  Yes.

1    Q.  What does he write?

2    A.  Oh, excuse me.

3             "Call me at" -- a redacted number.  "I am in the

4    office."

5             Or a redacted something.

6    Q.  And then does Mr. Manafort write on August 16th?

7    A.  Yes.

8    Q.  And what does Mr. Manafort write?

9    A.  "Greg, Any news on the delivery of the Russian, in current

10   state or on the payment mechanism?"

11   Q.  And does Mr. Craig write back to that?

12   A.  Yes.

13   Q.  What does he write?

14   A.  He writes, "Hopefully, by the end of today.  Working on

15   it."

16   Q.  And what does Mr. Manafort write above that?

17   A.  "Thanks.  Is the number 1.3 million good for official

18   submission?"

19   Q.  And what is Mr. Craig's response?

20   A.  "My thought is, 250,000 per month, which is either 1.25

21   million or 1.5 million."

22   Q.  And what does Mr. Manafort reply?

23   A.  "Okay.  I will tell them 1.250."

24   Q.  Directing your attention to Government's Exhibit 585, which

25   is previously admitted.

1     Is this an exhibit you checked to determine whether

2     it was on Skadden's system?

3     A.  Yes.

4     Q.  And was it?

5     A.  Yes.

6     Q.  Looking at the bottom email in the thread, what is the date

7     of this email?

8     A.  August 20th, 2012.

9     Q.  And what does Mr. -- who is it from and to?

10    A.  It is from Paul Manafort to Greg Craig.

11    Q.  And what does Mr. Manafort write?

12    A.  "Subject:  Letter to MOJ.

13          "Could you resend the same letter you sent, re,

14    submitting future bill, and date it July 18, 2012?  If you

15    could email a copy of it and the invoice for $1.25 million for

16    services rendered.  Ideally, I would get both tomorrow.  Paul."

17    Q.  Does Mr. Craig respond?

18    A.  Yes, he does.

19    Q.  What does he respond?

20    A.  "Not tomorrow, $.  Maybe Wednesday."

21    Q.  And at the top of the thread, what does Mr. Manafort write?

22    A.  "Okay.  That works.  I arrive in Kyiv on Weds."

23    Q.  Directing your attention to Government's Exhibit 216, which

24    is previously admitted.

25          Is Exhibit 216 one that you determined is on

1    Skadden's system?

2    A.  Yes.

3    Q.  What does -- what is this email?

4    A.  The original email is from Greg Craig, to Greg Craig, CCing

5    Greg Craig, with the subject "Scanned documents."

6    Q.  And then what is above that?

7    A.  An email from Greg Craig to Paul Manafort, with the subject

8    "Here is the letter, re:  Fees," with an attachment called

9    Scanned PDF.

10   Q.  And what is the date of this email?

11   A.  August 22nd, 2012.

12   Q.  Okay.  Does Mr. Craig write anything in the message of this

13   email?

14   A.  He writes, "We may be able to end (sic) you the -- end you

15   the entirety of the draft report in both English and Russian

16   versions tonight for your use tomorrow.  The Ukrainian version

17   will take a day or two longer."

18   Q.  Thank you.

19          In looking at the attachment for this document, what

20   is the attachment?

21   A.  It is a letter with the re line "Outstanding balance due."

22   Q.  And who is it addressed to?

23   A.  It is addressed to the Honorable -- and if someone could

24   zoom in?

25   Q.  Sorry.

1          MS. GASTON:  Could you?

2          THE WITNESS:  The Honorable Oleksandr Lavrynovych,

3    the Ministry of Justice of Ukraine.

4    BY MS. GASTON:

5    Q.  Okay.  And what is the date of this letter?

6    A.  The date is August 22nd, 2012.

7          MS. GASTON:  And could we please zoom on the body of

8    the letter?

9    BY MS. GASTON:

10   Q.  Could you read this, please?

11   A.  "You have asked me to provide you with an invoice setting

12   forth the outstanding payments due from the government of

13   Ukraine for the services rendered in connection with Skadden's

14   assignment to serve as a rule of law consultant to the Ministry

15   of Justice.  As you know, we are in the process of preparing

16   and finalizing an independent report based on an inquiry of the

17   facts and circumstances surrounding the trial, conviction, and

18   sentencing of Mrs. Yulia Tymoshenko.

19          "For services rendered during the months of April,

20   May, June, July, and August, there is an outstanding balance

21   due of $250,000 per month, for a total of $1.25 million.  I am

22   attaching wire instructions for purposes of making payment into

23   the appropriate account.

24          "We have enjoyed working with the Ministry, and we

25   are deeply grateful for the cooperation that you have

1    provided."

2              MS. GASTON:  And we don't need to go to it on the

3    screen.

4    BY MS. GASTON:

5    Q.  But, is the following page wiring information?

6    A.  I --

7    Q.  Oh, sorry.

8    A.  Yes, it is.

9    Q.  Okay.  Then we can go to the following page.

10   A.  Yes, the following page is wiring information.

11   Q.  Okay.  Thank you.

12              Directing your attention to Government's Exhibit 217.

13              Is this a document that you determined is on

14   Skadden's system?

15   A.  Yes.

16   Q.  And if you look at the bottom thread on this email, is the

17   bottom thread one that you just -- is that the email that we

18   just looked at?

19   A.  Yes.

20   Q.  And does this include Mr. Manafort responding to that

21   email?

22   A.  Yes.

23   Q.  And what is the date of that response?

24   A.  August 22nd, 2012.

25   Q.  And what is the subject?

1    A.  Subject is, "SK letter to MOJ." -- oh, excuse me.

2            The subject is, "Re:  Here is the letter, re fees."

3    Q.  And is there an attachment?

4    A.  There is.  "SK letter to moj.pdf."

5    Q.  What does Mr. Manafort write?

6    A.  "Greg, Thanks.  I also need you to date the attached letter

7    that you sent to MOJ in July.  You will note that it is

8    undated.  If you could put the date of July 18, 2012, on it and

9    email back to me, that would finish what I need for

10   administrative purposes.  Thanks, P."

11   Q.  And if you look at the attachment to this document.

12           Could you read the attachment, please?

13   A.  If you could zoom in, like --

14   Q.  Oh, a lot.  Okay.

15   A.  Yeah.

16           "On 10 April 2012, our company, Skadden, Arps, Slate,

17   Meagher & Flom LLP and Affiliates, and Ministry of Justice of

18   Ukraine entered into a contract on preparing expert examination

19   as to compliance with the principle of the rule of law.

20   According to Article 3, the price of the contract shall

21   constitute UAH 95,000.

22           "Besides, according to" --

23           Oh, that's "section," not "article."  Sorry.

24           "According to Section 5.2, the employer shall submit

25   to the executor copies of materials relating to the case, which

1    is to be the subject of examination, and which is currently

2    under consideration before the European Court of Human Rights,

3    as well as the list of questions which are to be examined.

4           "Materials relating to the case of Tymoshenko versus

5    Ukraine, which is currently considered by the European Court of

6    Human Rights, as well as questions which are to be considered

7    in the course of the hearing in the above case, which have been

8    transferred with the purpose of conducting expert examination

9    as to the compliance with the rule of law and the European

10   Court of Human Rights case law in the above case.

11          "Due to the complexity of the aforementioned case,

12   conducting" -- um --

13          Oh, if you could zoom in on that one word, the word

14   after "case."

15          THE COURT:  I think we're on the next paragraph.

16          THE WITNESS:  Next paragraph, excuse me.  And it's --

17   yeah, right at the top.  Yeah.

18          THE COURT:  It may be a typo.

19          THE WITNESS:  Yeah, there.

20   BY MS. GASTON:

21   Q.  If you're not able to read it, we can just move on from it.

22   Don't --

23   A.  Yeah.  I think it says, "Conduering [sic] of an examination

24   which would comply with Section 2 of the contract will require

25   involving a specialists of higher class than it was planned

1     when the contract was concluded, besides a huge amount of

2     materials, which are to be inspected, will require more working

3     hours than it is laid down in the contract.

4           "Execution of the above task requires also carrying

5     out of a certain amount of business travel to Ukraine, while

6     the contract does not provide for reimbursement of expenses

7     incurred by the executor.

8           "Bearing in mind all of the aforementioned, the

9     executor is not able to perform the above task upon the terms

10    set in the contract of 12 April 2012.  Hence, with the purpose

11    of execution of the task, an additional contract setting the

12    aforementioned issues should be concluded."

13    Q.  And at the bottom?

14    A.  "Yours faithfully, Gregory B. Craig."

15    Q.  Directing your attention to Government's Exhibit 218.

16          Is this a document that you determined is on the

17    Skadden system?

18    A.  Yes.

19    Q.  And looking at the middle email in this thread on

20    August 22nd, 2012, from Mr. Manafort to Mr. Craig.

21          Is that the email that we just looked at?

22    A.  Yes.

23    Q.  So is the top email in this thread Mr. Craig's response?

24    A.  Yes.

25    Q.  What does Mr. Craig respond:

 1   A.  "I don't ever recall having seen this letter before.  I

 2   will look at it now."

 3   Q.  Now, directing your attention to Government's Exhibit 587.

 4        Is Government's Exhibit 587 one that you determined

 5   is on Skadden's email system?

 6   A.  Yes.

 7   Q.  What is the date of this document?

 8   A.  August 23rd, 2012.

 9   Q.  Who is it from?

10   A.  It is from Paul Manafort to Greg Craig.

11   Q.  What is the subject?

12   A.  "Subject:  Letter to MOJ."

13   Q.  And what is the attachment?

14   A.  The attachment is, "SK letter to moj.pdf."

15   Q.  What does Mr. Manafort write to Mr. Craig?

16   A.  "Greg, I did some research today regarding the genesis of

17   letter you have.  I was mistaken as to the author.  The letter

18   that you have was drafted by MOJ, and sets up MOJ undertaking

19   the procedure outlined below.  Assuming the letter is

20   acceptable to you, I need it dated July 28, 2012, which works

21   the timetable the MOJ wants to use for the procedure below."

22   Q.  Can I stop you?

23        Could you read from "I need it dated" again, please?

24   A.  "I need it dated July 18, 2012, which works the timetable

25   the MOJ wants to use for the procedure below.  With this letter

1    dated July 18, and your August 22 letter, the MOJ has

2    everything it needs.  Please let me know if you can forward the

3    letter to me.  I have attached it again to this email.  Paul."

4    Q.  Can you --

5                THE COURT:  All right.  Can you all approach the

6    bench?

7                (Bench discussion:)

8                THE COURT:  When we had our conversation a little bit

9    ago about whether she could excerpt pieces of email and try to

10   convey meaning thereby, I agreed with you.  But, I don't

11   believe that I specified that she has to read aloud every

12   single word of every single email.

13               And, so, there was one earlier where there was kind

14   of a conversation at the defense table.  And in response to

15   accommodate what she believed was an objection, she read

16   everything on the piece of paper -- or, had the witness read

17   everything on the piece of paper.

18               I don't believe that is necessary.  If there is a --

19   pages of attachments or an explanation that you think is

20   relevant to have the witness read on cross, you can do that.

21   But, while I didn't want her, you know, cutting and pasting to

22   tell a story, essentially, by paraphrasing or shortening up an

23   email, I think it's another matter entirely when a whole long

24   thing is attached to a document, whether she chooses to have

25   him read it or not.

```
1              Do you disagree with that?
2              MR. ABELSON:  I agree in that one instance.  For
3    completeness purposes, I just think it was important to read
4    that one email.  I do not intend to object and have her read
5    every word of every one.
6              THE COURT:  Okay.  All right.
7              Thank you.
8              MS. GASTON:  Thank you.
9              (Open court:)
10   BY MS. GASTON:
11   Q.  All right.  And can you please look at the attachment to
12   this document.
13             And is that the document that you just read?
14   A.  Yes, it is.
15             MS. GASTON:  Now, I am going to switch, briefly, to a
16   hardcopy document.  Before I do that, I would like to read a
17   stipulation regarding handwriting.
18             THE COURT:  All right.
19             MS. GASTON:  And this is Exhibit 681.
20             Could we zoom on the text, please?
21             THE COURTROOM DEPUTY:  Is this in evidence?
22             MS. GASTON:  This is entering it into evidence now.
23             THE COURT:  The stipulation is Government Exhibit
24   what number?
25             MS. GASTON:  681.
```

1       THE COURT:  Okay.

2       MS. GASTON:  "The parties stipulate that the

3   handwriting on the following documents is the handwriting of

4   Mr. Craig:  GX500, GX503.  There's highlighting on that

5   document that may or may not be Mr. Craig's.  GX521, -525,

6   -526, -530, -531, -532, and -549.

7       And then, "The parties further stipulate that the

8   following specifically identified writing is the handwriting of

9   Mr. Craig; any other handwriting on the documents is not

10  Mr. Craig's:  GX535, Ukraine, in the upper right-hand corner,

11  and 'FARA language on Post-it' are Mr. Craig's handwriting.

12      "GX548, the handwriting on pages 4, 5, and 6 is

13  Mr. Craig's.  And GX550, in which the handwriting on pages 1

14  and 7 is Mr. Craig's."

15      THE COURT:  All right.  Members of the jury, the

16  government and the defendant may stipulate -- which is just a

17  long word for agree -- to certain facts, and you should

18  consider any stipulation of fact to be undisputed evidence.

19      You can proceed.

20      MS. GASTON:  Thank you.

21  BY MS. GASTON:

22  Q.  Now, looking at Government's 548, which is previously

23  admitted.

24      Mr. Lesser, is this a hardcopy document that you

25  determined were in Mr. Craig's files kept at Skadden?

1   A.  I was given a number of exhibits to review, as well as

2   boxes of files from Greg's office -- or that I believed are

3   from Greg's office.

4        Some of the documents -- some of the exhibits I

5   matched to actual documents in the box.  In some cases,

6   exhibits I were given I matched to a slip sheet that was put in

7   the place where the original document was taken from.  But, I

8   did not see the original document, only the slip sheet that was

9   put in its place.

10       This is one of the documents which I saw the exhibit

11  and I saw the corresponding slip sheet, but not the actual

12  document from the box.

13  Q.  And directing your -- so, 548 is one that you determined

14  that there was a slip sheet in Mr. Craig's file?

15  A.  Correct.

16       THE COURT:  Can you just say what a slip sheet is?

17       THE WITNESS:  A slip sheet is a blank, colored piece

18  of paper with numbers on it that match numbers on the document.

19       In this case, in the lower right-hand corner, is a

20  Bates stamp that is SAU237143.  That number uniquely identifies

21  this one document.  In the box, there was a colored slip sheet

22  with the corresponding Bates stamp, so that I could match the

23  Bates stamp from the exhibit to the Bates stamp number on the

24  colored slip sheet in the box.

25       MR. ABELSON:  Your Honor, may we approach?

1    THE COURT:  Sure.

2    (Bench discussion:)

3    MR. ABELSON:  We're following this, but it seems like

4    he doesn't actually know where this came from.  And I don't

5    know what the slip sheet is, and it doesn't sound like he put

6    any slip sheets in with numbers on them.

7    MS. GASTON:  So, what he means, the original was

8    given to the government.  So he has the placeholder for the

9    original that was scanned and produced to the government.

10   MR. ABELSON:  He doesn't have any personal knowledge,

11   then, that this was in the file.

12   MS. GASTON:  I can ask him if he knows what the slip

13   sheet indicated.

14   THE COURT:  I don't think he was the one who did the

15   production to the government and put the slip sheets in.  All

16   he can say is this corresponded to a slip sheet in the box.

17   I guess it's news to me that there are disputes at

18   this point about the authenticity of this document.

19   MR. ABELSON:  It's not authenticity.  But, what I'm a

20   little concerned about is that it's making it sound like, for

21   example, Mr. Craig took documents out of his files.

22   MS. GASTON:  Oh, no.

23   THE COURT:  That's true.

24   MR. ABELSON:  Okay.  But, I mean, if there's somebody

25   who has personal knowledge that this document was what was

 1    produced.  We don't dispute authenticity; this was in his file.

 2              THE COURT:  Well --

 3              MR. ABELSON:  But this whole business about slip

 4    sheets --

 5              THE COURT:  Do you just want to have me tell the jury

 6    that slip sheets were placed in the box at the time the

 7    documents were produced to the government, but it's not a

 8    suggestion that anyone removed a document from the file

 9    improperly?

10              MR. ABELSON:  I don't -- why do we need this whole

11    thing about slip sheets, anyway?

12              THE COURT:  Okay.  Well, I think he was explaining

13    where it came from.  So, if you don't want to cure it, or

14    anything more about it, we don't need to.  But...

15              MR. ABELSON:  I think --

16              MS. GASTON:  If you think that there's any chance

17    they think that, we should say there's no --

18              THE COURT:  Yeah, we don't want the wrong impression.

19    It's up to you.  You can think about it later.  We can add it

20    later, if you all think it's important.

21              MR. ABELSON:  That's right.

22              THE COURT:  Okay.  You can be seated.

23              (Open court:)

24    BY MS. GASTON:

25    Q.  All right.  Mr. Lesser, looking at this document -- and,

1    first, turning to page 2 of the document.

2              Is this a document that we saw in some of those

3    emails that you read?

4    A.  Yes, it is.

5    Q.  And turning to the -- to the sixth page of this exhibit.

6              Is this that document with handwriting on it?

7    A.  Yes, it is.

8    Q.  And turning to the previous page of the exhibit.

9              Is that a note with handwriting on it?

10   A.  Yes, it is.

11   Q.  Okay.  And then the previous page of the exhibit.

12             Is that a Word document with editing on it -- or,

13   handwriting on it?

14   A.  It's a letter with handwriting on it.

15   Q.  And then can we just look at the first page of the

16   document, again.

17             And what is the first page of the document?

18   A.  It is a letter to the Ministry of Justice of Ukraine from

19   Greg Craig.

20   Q.  And what is the date of it?

21   A.  It is dated July 16th, 2012.

22   Q.  Okay.  Thank you.

23             Now, Mr. Lesser, directing your attention to

24   Government's Exhibit 230, previously admitted.

25             Is this an email that you determined was on Skadden's

1   email system?

2   A.  Yes.

3   Q.  And starting at the bottom, is there an email from

4   Mr. Craig to Mr. Manafort on September 10th, 2012?

5   A.  Yes, there is.

6   Q.  And what does Mr. Craig write?

7   A.  "This is the final draft, in English, of the Report, with

8   two qualifications:  One, we have not yet gotten the document

9   from Konstantin proving regularity in the appointment of the

10  judge.  And when we get that, it will cause us to change

11  language.

12         "2, We may make some modifications or additions if we

13  have our telephone conversation with Tymoshenko on Wednesday,

14  but significant changes are unlikely.  We are still trying to

15  make that phone call happen.

16         "Can we talk about delivering hardcopy to OPG after

17  we get the Russian/Ukrainian language versions completed?"

18  Q.  Does Manafort respond above that?

19  A.  Yes.

20  Q.  And what does he respond?

21  A.  "Greg, I understand and will communicate this to Kyiv.

22  Let's talk tomorrow morning about transmission.  What is a good

23  time for us to talk?  I am flexible.  Paul."

24  Q.  Are the -- what are the next two messages?

25  A.  There is a response, 10 a.m.  "Call me at" -- redaction.

1      Then the next in the string is, "Talk then.  Let's

2   plan a night to have dinner, drinks, and decompress."

3   Q.  And above that, does Mr. Craig respond?

4   A.  He does.

5   Q.  What does he write?

6   A.  "Sounds good to me.  I would like to find our [sic] what

7   the communication strategy is.  No rush."

8   Q.  And what does Mr. Manafort write back to that?

9   A.  "FTI has done a build-out that we will not finalize.

10  Hawker will need to meet with you to develop the talking

11  points, statements, etcetera.  P."

12  Q.  Directing your attention to Government's Exhibit 250.

13      Is Exhibit 250 an email that you determined was on

14  the Skadden system?

15  A.  Yes.

16  Q.  And is this an email from Mr. Manafort to Mr. Craig on

17  September 13th, 2012?

18  A.  Yes.

19  Q.  What is the subject?

20  A.  The subject is, "FTI plan for release."

21  Q.  And what is the attachment named?

22  A.  The attachment is, "FTI memo on report release DR2.docx."

23  Q.  What does Mr. Manafort write?

24  A.  "Greg, I have attached FTI's proposed plan for release next

25  week.  It envisions a leaking of the document on Monday.  This

1    is not yet approved by the government.  I want to get this

2    document to you to bring your thinking into the process.

3    Paul."

4    Q.  And going to the first page of the attachment.

5              What does the -- what is the header at the top of the

6    page?

7    A.  "SA report media plan."

8    Q.  And what is the first paragraph of this document?

9    A.  "The public release of the Report prepared by the Skadden

10   Arps, SA, law firm will provide an opportunity for the

11   independent endorsement of the government message that the

12   trial of Yulia Tymoshenko, YT, was not politically motivated,

13   and that her conviction was based on the evidence before the

14   Court."

15   Q.  If you -- could you please then read the second paragraph?

16   A.  "The Report does provide ample justification, based on the

17   record, of the legitimacy of the process and conviction.  These

18   findings will be the foundation for our strategy.  It is

19   important that all parties on the government side to be linked

20   and coordinated.  The handling of the initial release is

21   critical to our ability to define the Report and its findings."

22   Q.  And then could we please look at the paragraph under the

23   header "release plan"?

24   A.  "In order to ensure the government message that SA has

25   found no evidence of political motivation is conveyed at the

1    outset of release, we propose to leak the Report to the head of

2    the Bloomberg Bureau in Washington after the Ukrainian media

3    has closed down on Monday night.

4           "The process will be that the journalist will be

5    engaged by the designated party, MCW, for a pre-briefing, and

6    given an off-the-record briefing call with GC.  The journalist

7    will be told that he has until 2000 New York time, Monday, to

8    release his exclusive.  This will effectively set the agenda

9    for subsequent coverage."

10   Q.  Thank you.

11          Now, we're going to move on to Government's Exhibit

12   263 -- oh, hold on.  Stop.  Wait one second.

13          Okay.  We're going to look at Government's Exhibit

14   263.

15          Is Exhibit 263 one that you determined is on

16   Skadden's email system?

17   A.  Yes.

18   Q.  Okay.  So, first, let's look at the bottom email in this

19   thread.

20          And what is the date of this email?

21   A.  September 24th, 2012.

22   Q.  And who is it from?

23   A.  From Greg Craig.

24   Q.  And who is it to?

25   A.  To Paul Manafort, Jonathan Hawker.  That's it.

1   Q.   And what is the subject line?

2   A.   "Backgrounding journalists."

3   Q.   What does Mr. Craig write?

4   A.   "I am afraid we will have to reverse direction on the issue

5   of Skadden lawyers being used to background journalists about

6   the Report.  There is, apparently, an ironclad policy inside

7   this institution that all communications with the press are

8   channeled through our communications people.

9        "The reason for this, of course, is self-evident.

10  Our communications people will be working from talking points

11  that have been carefully checked and cleared, and the firm does

12  not have that kind of control when individual lawyers get

13  involved with briefing journalists, even on background about

14  the contract of our work.

15       "Skadden does not want to be drawn into a controversy

16  over whether one its lawyers was or was not quoted accurately

17  in a story.  Our objective here is to remain true to the

18  mission, which is to do a professional job and to prepare an

19  independent report that has maximum integrity.

20       "The law firm runs the risk of being drawn into the

21  public controversy if we are the ones actually backgrounding

22  the journalists, and we really don't want to be seen as taking

23  sides.  I'm afraid this applies to Alex, with the Russian

24  journalists, as much as it does to me.

25       "As you know, I was eager to help you out on this

1    aspect of the project, but, I guess, I can't."

2    Q.  And then does Mr. Manafort respond?

3    A.  He did.

4    Q.  What does he respond?

5    A.  "The rule does not preclude you from briefing people like

6    Fule or Durbin, if they request the briefing, right?

7             "As for journalists, if we direct them to your

8    communications division, the questions will be referred to you

9    to answer back to them, right?"

10   Q.  And does Mr. Craig respond?

11   A.  Yes.

12   Q.  What does he write?

13   A.  "It does not.  No problem with me talking to the policy

14   people and political leadership."

15   Q.  Now, showing you what's been marked as Government's Exhibit

16   264.

17             Is 264 one that you determined is on Skadden's email

18   system?

19   A.  Yes.

20   Q.  And are the first two emails in the thread the same base of

21   the email that we just looked at?

22   A.  I -- this --

23   Q.  Okay.

24             MS. GASTON:  Could we zoom on the bottom?

25             THE WITNESS:  Bottom two.

```
1              Yes, these are the same.
2    BY MS. GASTON:
3    Q.  Okay.  And then, if we could look at the top email.
4              And what does Mr. Craig respond in this email thread?
5    A.  "On your second question, you are right.  We will answer
6    questions that are run through communications."
7    Q.  Now I'm about to show you another exhibit, but I believe
8    that Judge Jackson is going to give an instruction before we go
9    to 264A.
10             THE COURT:  All right.  There's certain exhibits that
11   are going to be admitted in evidence that are essentially --
12   and we've been looking at some statements or emails made by
13   someone that weren't made right here in the courtroom.
14             With respect to this exhibit that you're about to
15   see, you're instructed that the exhibit is being admitted in
16   evidence solely for the fact that the speaker or the writer
17   made the statement, and not for the truth of something the
18   writer or speaker said in the statement.
19             If they assert some fact, this exhibit cannot be
20   considered by you as to whether that fact is true; it's just
21   the fact that the person wrote that in an email.
22             And you may get similar instructions with respect to
23   other exhibits.  I believe that's already happened once in this
24   case before.
25             All right.  You can proceed.
```

```
1            MS. GASTON:  Thank you.

2    BY MS. GASTON:

3    Q.  Showing you what's been admitted as Government's Exhibit

4    264A.  And, again, looking at the two bottom emails in the

5    thread.

6            Are those the base that we've already seen?

7    A.  Yes.

8    Q.  And then if we look at the top two emails in the thread.

9            Is the email from Mr. Craig on September 24th one

10   that we've already seen?

11   A.  Yes.

12   Q.  And then does Mr. Manafort respond to that?

13   A.  Yes.

14   Q.  And what does Mr. Manafort respond?

15   A.  "Okay.  We can make this work."

16   Q.  Thank you.  All right.

17           All right.  Directing your attention to Government's

18   Exhibit 303.

19           Is Government's Exhibit 303 a document that you

20   determined is on Skadden's email system?

21   A.  Yes.

22   Q.  Looking at the bottom email in the thread.

23           Does Mr. Craig write something on October 2nd, at

24   12:34 p.m.?

25   A.  Yes.
```

1    Q.  And what does he write?

2    A.  "Would you take a call from Former Congressman Vin Weber

3    about a report that we -- Skadden, that is -- wrote about the

4    Tymoshenko case?"

5    Q.  And is there a response to that email above it?

6    A.  Yes.

7    Q.  And who responds?

8    A.  David Sanger.

9    Q.  And is the beginning of his email address -- what is the

10   beginning of his email address, before the suffix?

11   A.  It's --

12   Q.  Before the @ sign?

13   A.  Yeah.  Sangernyt.

14   Q.  Thank you.

15           And what is the date of this email?

16   A.  October 2nd of 2012.

17   Q.  What is the subject line?

18   A.  "Re Ukraine."

19   Q.  And what does Mr. Sanger write?

20   A.  "Sure.  Vin knows me, and cell is" -- redacted -- "in

21   Cambridge, but reachable tomorrow after 3, or Thursday a.m. in

22   DC.  David."

23   Q.  Okay.  And what does Mr. Craig do at the top of this email

24   thread?

25   A.  He sends an email back to sangernyt@gmail.com, and adds a

1    carbon copy to vin@cwdc.com.

2    Q.  And what does he put in the body of the email?

3    A.  The email address, vin@cwdc.com.

4    Q.  And then directing your attention to Government's Exhibit

5    304.

6            And is this an e-mail that you determined is on

7    Skadden's system?

8    A.  Yes.

9    Q.  Now, the -- are the bottom two emails emails that we have

10   just looked at?

11   A.  Yes.

12   Q.  And then what is the top email?

13   A.  It's a top email, with the text "This is Sanger contact

14   info."

15   Q.  And who is it from?

16   A.  It is from Greg Craig to vin@cwdc.com.

17   Q.  And what's the date?

18   A.  The date is October 3rd, 2012.

19   Q.  All right.  Showing you what has been admitted as

20   Government's Exhibit 311.

21           Is 311 an exhibit that you determined is on Skadden's

22   email system?

23   A.  Yes.

24   Q.  What's the date of this email?

25   A.  November 20th, 2012.

1   Q.  And who is it from?

2   A.  It's from Greg Craig.

3   Q.  Who is it to?

4   A.  Paul Manafort.

5   Q.  What is the subject line of the email?

6   A.  "Timing of delivery."

7   Q.  What does Mr. Craig write?

8   A.  "Paul, two things:  One, as described in my email to you of

9   yesterday, we have responded to the reactions from the Ministry

10  of Justice.  The tweaks have been made, and the final report is

11  ready for delivery.  I have asked Alex van der Zwaan to

12  communicate with the Ministry of Justice to identify a time and

13  date for delivery of the final report.  We will let you know

14  when that is.

15          "Two, we have more than exhausted the retainer.  We

16  are owed another $75,000 in time and expenses.  I will arrange

17  for an invoice, if you want one.  Can we expect or hope for

18  payment from MOJ at some point?  Greg."

19  Q.  Okay.  Showing you what's been marked as Government's

20  Exhibit 319, and admitted.

21          Is 319 an email that you determined is on the Skadden

22  system?

23  A.  Yes.

24  Q.  And who is this from and to?

25  A.  It's from Marsha Lantz to Greg Craig.

1    Q.  And what's the date of this email?

2    A.  December 6th, 2012.

3    Q.  What is the subject of the email?

4    A.  "Jonathan Hawker-011, redacted."

5    Q.  And what is the message in this email?

6    A.  "Report release is definitely next week.  Please call."

7    Q.  Now, I'm showing you what's been marked as Government

8    Exhibit 325 and admitted.

9         Is Government's Exhibit 325 one that you have

10   determined is on Skadden's system?

11   A.  Yes.

12   Q.  All right.  Starting at the bottom of this email.

13        It starts with an email from someone named

14   MargaretAnn Corbett; is that right?

15   A.  Yes.

16   Q.  What is the date of it?

17   A.  The date is December 7, 2012.

18   Q.  And who is it to?

19   A.  It is to Greg Craig.

20   Q.  Who is copied?

21   A.  Catherine Whitney and MargaretAnn Corbett.

22   Q.  What is the subject?

23   A.  "Do you have time to talk to Vin Weber today?"

24   Q.  What does Ms. Corbett write?

25   A.  "Vin would like to try to schedule a call with you today,

```
 1    12/7.  Would you have time this morning or early afternoon?
 2    Please let me know, and I will be happy to work with Catie to
 3    find a time.  Many thanks, MargaretAnn."
 4              MS. GASTON:  You can back out of that.
 5              And can we zoom in on the next two emails above it.
 6    BY MS. GASTON:
 7    Q.  So, does Mr. Craig respond to Ms. Corbett's e-mail at the
 8    bottom there?
 9    A.  He does.
10    Q.  What does he say?
11    A.  "I am in NYC.  Flying back on 2 p.m. shuttle.  He could
12    call me on my cell at" -- redacted -- "or I could call him."
13    Q.  And then does Ms. Corbett respond?
14    A.  Yes.
15    Q.  What does she say?
16    A.  "Greg, Vin asked me to email and let you know he left a
17    voicemail on your cell.  He has a doctor's appointment at 10:15
18    until about 11:30, but at anytime after that he could be
19    reached on his cell.  And if you don't reach him on his cell,
20    our office number is 202" -- redacted -- "and I can connect.
21    He said it would be a very short conversation, but a rather
22    timely one.  Let me know if there is anything I can do to
23    facilitate the call.  Many thanks, MargaretAnn."
24    Q.  At then, at the top of the page, does Mr. Weber respond?
25    A.  Yes.
```

1    Q.  And what does he say?

2    A.  "We talked."

3    Q.  All right.  I am directing your attention to Government's

4    Exhibit 350.

5            Is 350 an exhibit that you determined is on Skadden's

6    email system?

7    A.  Yes.

8            MS. GASTON:  Okay.  Let's zoom in.

9    BY MS. GASTON:

10   Q.  And who is this email from?

11   A.  Greg Craig.

12   Q.  And who is it to?

13   A.  Dasang@nytimes.com.

14   Q.  What is the subject of this email?

15   A.  Subject is, "Ukraine."

16   Q.  What does Mr. Craig write?

17   A.  "David, I just learned that the Ukrainians intend to

18   release our report about the Tymoshenko case on Thursday,

19   finally, and that the Ukrainians have determined that you

20   should be given first look at it.  Is this something that you

21   are truly interested in and have time for?

22           "I have always assumed that these days your time

23   would be taken up selecting our new secretary of state.  But,

24   if you are interested, I would be happy to get you a copy, all

25   186 pages of it, and even happier to talk to you about it.

1    Greg."

2    Q.   Now, directing your attention to Government's Exhibit 352.

3           And, Mr. Lesser, if you want a glass of water,

4    there's a pitcher right there.  I know you're reading a lot.

5    A.   Thanks very much.

6    Q.   Okay.

7           All right.  So, if you look at the base of this

8    email, is that the email that you just read?

9    A.   Yes, it is.

10   Q.   Okay.  So, looking at the top of the email, did Mr. Sanger

11   respond?

12   A.   Yes, he did.

13   Q.   Okay.  And this is on December 11th, 2012?

14   A.   Correct.

15   Q.   And what did Mr. Sanger respond?

16   A.   "Greg, Thanks much for the note.  Let's talk today.  Office

17   is 202-862-0322.  Cell is 202" -- redacted.  "It was a bit hard

18   for me to discuss with our foreign desk editors until I have a

19   sense of what the Report says.  And when your associates called

20   last month, or maybe earlier, they were promising to bring a

21   copy over within a day or two.  When they disappeared, I didn't

22   know what to make of it.

23           "Anyway, will be good to catch up.  And, yes, I am

24   doing a bit on the next secstate.  So, we can talk about that,

25   too.  And, the most important, a field report from Colorado

1   College.  Best, David."

2   Q.  Thank you.

3         Directing your attention to Government's Exhibit 355,

4   which was previously admitted.

5         Did you determine that 355 is on Skadden's email

6   system?

7   A.  Yes.

8   Q.  And is this an email from Mr. Craig to Mr. Sanger on

9   December 11th, 2012?

10  A.  Yes.

11  Q.  And what is the subject line of the Report?

12  A.  "Report on the Tymoshenko case."

13  Q.  And what does Mr. Craig write?

14  A.  "On my way back to Craig's home" -- redacted.  "I will

15  hand-deliver a hardcopy of this report to your home tonight."

16  Q.  And then is there an attachment to this document?

17  A.  There is.

18  Q.  And if we look at the second page of this document.

19         Do you recognize what that is?

20  A.  Yes, I do.

21  Q.  What does that signify?

22  A.  This is a link to a document contained in the firm's

23  document management system.

24  Q.  And would this link be accessible to somebody outside of

25  the firm?

1    A.   No.

2    Q.   Okay.  Then if we look at Government's Exhibit 362.

3         Is 362 an email that you determined was on Skadden's

4    system?

5    A.   Yes.

6    Q.   So, if you look at the base, is that email the one that we

7    just looked at?

8    A.   Yes, it is.

9    Q.   Okay.  And then above that, does Mr. Sanger respond, also

10   on December 11th, 2012?

11   A.   Yes.

12   Q.   And what does he say?

13   A.   "Just talked to foreign desk, and they are reaching out to

14   our Moscow bureau, which means, Ellen Barry and

15   David Herszenhorn.  David just back from Ukraine.  Likely we

16   can team up if I can cut the time."

17   Q.   Ask did Mr. Craig respond?

18   A.   He did.

19   Q.   What did he respond?

20   A.   "Did you get the email copy?  I am dropping off hardcopy at

21   Sanger's home in five minutes."

22   Q.   Okay.

23        MS. GASTON:  And on this, and all of the Skadden

24   emails, could I just remind the jury of the stipulation

25   regarding the timing of emails, Your Honor?

 1                    THE COURT:  Yes.

 2                    MS. GASTON:  Okay.

 3                    If we could bring up Government's Exhibit 680.

 4                    THE COURTROOM DEPUTY:  What number?

 5                    MS. GASTON:  680.  Sorry.  And entered into evidence.

 6             This is the one that Mr. Campoamor read on, I

 7   believe, the first day.  But, it is fairly complicated, so we

 8   can read it again.

 9             Many exhibits presented at this trial are emails.

10   Due to the manner in which the emails were processed, in emails

11   bearing a SAU document number at the bottom right-hand corner,

12   the email that appears at the top of the first page of an email

13   chain, i.e., the top of a first page of a email exhibit, will

14   include a timestamp that, unless specifically marked EST or

15   EDT, is five hours later than the actual time in Washington,

16   D.C., except for the following periods, when the timestamp will

17   be four hours later than the actual time in Washington, D.C."

18             And there are some of these small time periods.  But,

19   suffice it to say that the difference is either four or five

20   hours.

21                    THE COURT:  All right.  Once again, something that

22   the parties have stipulated to is something that you can accept

23   as undisputed evidence.

24   BY MS. GASTON:

25   Q.  All right.  Directing your attention, Mr. Lesser, to

1    Government's Exhibit 373.

2             Is this an email that you determined is on Skadden's

3    system?

4    A.  Yes.

5    Q.  Okay.  And starting with the bottom of the thread.

6             Is that a December 11th email that we have already

7    looked at?

8    A.  Yes.

9    Q.  Above that, does Mr. Craig also write something?

10   A.  "Is there no attachment to this?"

11   Q.  And then could we look at Mr. Sanger's email above that on

12   the morning of December 12th.

13            So, first, starting with, who is this email from and

14   to?

15   A.  It's from David Sanger to Greg Craig.

16   Q.  And what is the date of this?

17   A.  December 12th, 2012.  And there's also a CC to a third

18   person, dahers@nytimes.com.

19   Q.  And what does Mr. Sanger write?

20   A.  "Greg, No one seems able to open the thing which cons

21   [sic] in a strange doc.drf form.  Can you send in PDF or

22   regular doc to both addresses above?  Time of essence, given

23   time difference with Russia."

24   Q.  And is the doc.drf form that internal link that you

25   mentioned?

1    A.  Yes.

2    Q.  Looking above it, does Mr. Craig respond?

3    A.  He does.  "Working on it."

4           MS. GASTON:  Can we back out of that, please,

5    Ms. Rohde, and go to the top two emails.

6    BY MS. GASTON:

7    Q.  And after Mr. Craig says "Working on it," does Mr. Sanger

8    respond?

9    A.  Yes, he does.

10   Q.  And what does he write?

11   A.  "Greg, We have already" -- "Greg, We've read it and are

12   ready to talk.  Herszenhorn taking lead, since I've gotten

13   pulled in to North Korea.  One issue David has flagged, there's

14   rumor/dispute in Ukraine about how and how much Skadden got

15   paid.  Government" -- or, GOVT -- "at one point apparently

16   suggested it was pro bono, then a few substantive questions.

17   Best, David."

18   Q.  Now, directing your attention to Government's Exhibit 374.

19           Is this a document you determined is on Skadden's

20   email system?

21   A.  Yes.

22   Q.  Starting on the second page of this email.  If we could

23   focus on the -- from "original message" down.

24           Who is this email from and to?

25   A.  This email is from tomparfitt@telegraph.co.uk to

1    Greg Craig.

2    Q.  What is the date of it?

3    A.  December 12th, 2012.

4    Q.  What is the subject line?

5    A.  Subject is, "*Daily Telegraph* - 'approval.'  Please confirm

6    receipt."

7    Q.  What does Mr. Parfitt write?

8    A.  "Dear Mr. Craig, Thank you very much for speaking to me

9    earlier.  Firstly, as regards on-the-record quotes, would you

10   be happy with me using these quotes:

11         "Mr. Craig said the Report found Mrs. Tymoshenko's

12   lawyers had not proved in court that she was selectively

13   prosecuted.  But he clarified that he and his colleagues had

14   not addressed whether there had been political pressure outside

15   the Court to initiate the prosecution.

16         "We didn't evaluate the political motives of decision

17   makers in Ukraine on the basis of political history or

18   newspaper reports or personal loyalties, he said.  We looked at

19   what's in the Court record.

20         "Mr. Craig said, The only reason we were willing to

21   take on this assignment was because we insisted on total access

22   and independence and got both.  We spoke to the defendant,

23   prosecutors, judge, and many, many witnesses.

24         "Mr. Craig said, We concluded that there were ways in

25   which Tymoshenko was not given a fair trial.  She was not

1    allowed to present all the witnesses that we concluded were

2    relevant and material, and prosecutorial evidence was presented

3    during proceedings in court when she was not represented by

4    counsel.

5            "Anonymous source quotes.  Here's the one we already

6    agreed:  A source close to the Report said that a failure to

7    allow Ms. Tymoshenko to call important witnesses, and other

8    procedural violations which will be described later in the

9    article, would have probably led to a mistrial in the U.S.  A

10   Western appellate court reviewing this record would likely

11   reverse the conviction and call for a new trial, the source

12   said.

13           "Thank you very much, and in anticipation of your

14   prompt response.  Yours, Tom Parfitt, Moscow Correspondent, the

15   *Daily Telegraph*.'"

16   Q.  At the very top of the page, does Mr. Craig respond?

17   A.  Yeah.  Yes.

18   Q.  And what does he write?

19   A.  "Everything is fine as to the attributions.

20           "As to the anonymous quote from a source" -- or, "'a

21   source close to the case,' I would like it to appear on

22   background, rather than as an anonymous quote.  Can you do it

23   this way?

24           "For example, Western experts are in agreement that

25   comparable findings by an American court would result in a new

1 trial for Ms. Tymoshenko."

2 Q. And then going to the first page of the exhibit, and

3 focusing on the bottom thread.

4    Does Mr. Parfitt respond to that?

5 A. Yes, he does.

6 Q. What does he write?

7 A. "Thank you very much for getting back so quickly.  Would

8 you be happy for me to say this:

9    "A legal expert consulted by the *Daily Telegraph* said

10 that the procedural violations would have 'probably led to a

11 mistrial' in the west.  Best wishes, Tom.'"

12 Q. And what did Mr. Craig respond to that?

13 A. (No response.)

14 Q. What does he respond?

15 A. "Perfectly okay with me."

16 Q. And then does Mr. Parfitt say, "Thanks again for all of

17 your help"?

18 A. Yes, he does.

19 Q. And what does Mr. Craig respond?

20 A. "Happy to help out.  Give a call whenever you get to

21 D.C." -- "Give me a call whenever you get to D.C."

22 Q. Okay.  And directing your attention to Exhibit 376.

23    Is 376 a document that you determined is on Skadden's

24 system?

25 A. An email on our system, yes.

1    Q.  Yes.  Yes.

2            And who is this email from?

3    A.  This is from David Herszenhorn to Greg Craig.

4    Q.  And does Mr. Herszenhorn have a nytimes.com email address?

5    A.  Yes.

6    Q.  What is the subject line of this email?

7    A.  "Hello, and questions from NYT Moscow."

8    Q.  What is the date of this email?

9    A.  December 12th, 2012.

10   Q.  What does Mr. Herszenhorn write to Mr. Craig?

11   A.  "Hi, I am David Sanger's colleague in *The Times* Moscow

12   bureau.  Thanks much for the Report, which has been eagerly

13   anticipated by folks in Ukraine for many months.  Sanger

14   suggested that I reach out directly and, perhaps, we arrange a

15   conference call, if possible.  I am reachable on a tie line

16   at" -- redacted -- "and he's at" -- redacted.

17           "Since everyone is quite busy, and it's after

18   midnight here, here are some of the main questions.  Please let

19   me know if a conference call is possible within the next couple

20   of hours.  If not, David said he would be available to talk to

21   you later on in the day."

22   Q.  Okay.  And then could we look at the first couple of

23   questions?  And we'll go through them.

24   A.  "A, Did Skadden charge the Ukrainian Justice Ministry its

25   normal fees, or was there some pro bono work or other discount

1    involved?  Supporters of Tymoshenko for months have asserted

2    that there was something untoward about the arrangement and

3    that the Yanukovych government has insisted that the contract

4    for legal services was for less than $12,000 U.S. in order to

5    avoid a tender process required under Ukrainian law.  What was

6    the total sum paid by the Ukrainian government for legal

7    services and expenses?  Did any person or entity other than the

8    government pay for Skadden's work?

9              "B, can you just expand a bit on how much latitude

10   your team had in reviewing the trial records and investigating

11   the case?  The Report makes clear that 'independence' was

12   assured.  Did your team encounter any difficulties?  Was there

13   free and fair access to all relevant people and documentation?

14   Did you have any concerns, complaints?  Was any member of your

15   team an expert in Ukrainian law?  Did you enlist any such

16   expertise from local counsel?"

17   Q.  And then looking at C and D.

18   A.  "C, The report's narrow finding on 'selective prosecution'

19   seems to contradict the conclusion reached by the State

20   Department, Secretary Clinton, the European Union, and

21   Catherine Ashton, et al., that Mrs. Tymoshenko's prosecution

22   and conviction was politically motivated in an attempt to

23   sideline her and cripple her party.

24             "The Report states 'We do not opine about whether the

25   prosecution was politically motived or driven by an improper

 1    political objective - i.e., to remove her from political life

 2    in Ukraine in the future.'  Why not?  If Skadden's goal was to

 3    produce an independent report, why not provide the scrutiny

 4    that you say is merited by the prosecution of a former head of

 5    state?

 6         "D, The Report is dated September of 2012.  Why the

 7    delay in making it public?  Will there be a press conference to

 8    release it?  If so, in Washington or Kyiv?"

 9    Q.  And then E and F.

10    A.  "E, What is your understanding of the Justice Ministry's

11    overall goal in commissioning this analysis?  Are they trying

12    to prepare for the proceedings at the European Court of Human

13    Rights?  Will Skadden have any role in those proceedings?

14         "F, Given the criticism of the Yanukovych government

15    by the U.S. State Department, did Skadden have any reservations

16    about talking -- about taking on this assignment?"

17    Q.  And then after that, is it a signature block?

18    A.  "Thanks and best regards, David Herszenhorn."

19    Q.  Now, directing your attention to Exhibit 377, which is in

20    evidence.  Look at the top.

21         Did you determine that 377 is in Skadden's email

22    system?

23    A.  Yes.

24    Q.  Okay.  And is -- what is this email?

25    A.  It's an email from Greg Craig to davidsanger@gmail.com,

1    with the subject "Ukraine."

2    Q.  And is this on December 12th, 2012?

3    A.  Yes.

4    Q.  And is Mr. Craig emailing something in quotation marks to

5    Mr. Sanger?

6    A.  Yes.

7    Q.  What is it?

8    A.  In quotes:  We leave to others the question whether this

9    prosecution was politically motivated.  We say nothing about

10   that.  Our assignment was to look at the evidence in the record

11   and determine whether the trial was fair, end quote.

12   Q.  And directing your attention to Government's Exhibit 379,

13   which has been admitted.

14             And is 379 an email that you determined is on

15   Skadden's system?

16   A.  Yes.

17   Q.  Is this another email from Mr. Craig to Mr. Sanger on

18   December 12th, 2012?

19   A.  Yes.

20   Q.  And what is the subject line?

21   A.  The subject line is, "Re Political motivation."

22   Q.  What does Mr. Craig write?

23   A.  "Here is a shorter version.  'Our assignment was to look at

24   the evidence in the record and to evaluate the fairness of the

25   trial.'"

1    Q.  Now, directing your attention to Government's Exhibit 380.

2              Is 380 an email you that determined is on Skadden's

3    system?

4    A.  Yes.

5    Q.  Who is this email from and to?

6    A.  This email is from Greg Craig to davidsanger@gmail.com on

7    December 12th, 2012.

8    Q.  What's the subject?

9    A.  "Release time."

10   Q.  What does Mr. Craig write?

11   A.  "The Report will become public at 3 a.m. our time tomorrow

12   morning.  It will be released in Ukraine."

13             MS. GASTON:  Your Honor, we're about to reach

14   Exhibit 396, which I believe you have an instruction regarding.

15             THE COURT:  All right.  I'm going to tell you that

16   with respect to the exhibit you're about to see, the same rule

17   that I told you before applies.  The exhibit is admitted, and

18   you can consider the fact that the statement was made.  But, if

19   in the statement there is an assertion of some fact that

20   happened, it's not being admitted to prove that fact; it's only

21   being admitted for the limited purpose to prove the fact that

22   the person said it.

23             MS. GASTON:  Thank you.

24   BY MS. GASTON:

25   Q.  Mr. Lesser, is Exhibit 396 an email that you determined is

1    on Skadden's email system?

2    A.  Yes.

3    Q.  Starting with the bottom thread, who is this email from?

4    A.  It's from Paul Manafort to Greg Craig.

5    Q.  And what's the date?

6    A.  December 13th, 2012.

7    Q.  And what is the subject?

8    A.  "Well done."

9    Q.  And what does Mr. Manafort write?

10   A.  "Greg, The pro has emerged again.  The initial rollout has

11   been very effective, and your backgrounding has been key to it

12   all.  At least today, everyone in Kyiv is quite happy.  They

13   liked the Report, and are especially happy with the way the

14   media is playing it.  In my conversations with the Europeans,

15   and Bruce's, too, the reaction has been very positive.

16            "Alex did a great job in his briefings in Warsaw.  I

17   have asked Rick to send you a compendium of clips each day for

18   the next several days.  Let me know if you're going to be

19   around.  It is time for the celebratory dinner, my treat.

20   Best, Paul."

21   Q.  Does Mr. Craig respond?

22   A.  Yes, he does.

23   Q.  And what does he write?

24   A.  "I thought the piece in the *Kyiv Post* was terrific.  I am

25   glad it went so well.  Mr. Vlasenko is a very stupid man and

1    does daily damage to his client's case.  I need to talk to you

2    about Dumchuk.  He asked me whether I would, if invited, be

3    willing to meet with President Yanukovych.  I said, As a

4    general matter, whenever a head of state wants to talk to me, I

5    am willing to talk to the head of state.

6             "He then said he would arrange it, and asked for

7    dates in January when I could return to Kyiv.  He also invited

8    Greg Vistica, a strategic consultant in D.C., who is a really

9    good guy and a friend of mine, and who has asked me the

10   following question:  What is going on here?"

11   Q.  Okay.  Directing your attention to Exhibit 591.

12            Is 591 a document that -- an email that you

13   determined is on Skadden's email system?

14   A.  Yes.

15   Q.  And focusing on the top.

16            Who is this -- who writes this email and to whom?

17   A.  It's an email from Paul Manafort to Greg Craig on

18   December 26, 2012.

19   Q.  And what is the date of this email?

20   A.  December 26, 2012.

21   Q.  And what does Mr. Manafort -- what's the subject line?

22   A.  "Catch up."

23   Q.  And what does Mr. Manafort write?

24   A.  "Greg, Hope all is well on the slopes.  I am attaching

25   three documents:  One, Skadden letter to MOJ, 8-22-12; two,

1   Skadden" -- I'm sorry -- "MOJ letter to Skadden, 8-28-12;

2   three, MOJ letter to Skadden requesting information, 12-20-12.

3   All relate to the MOJ-Skadden contract.  Once you have read

4   them, I will review with you on the phone.

5          "The December 20 letter requires some basic

6   information from Skadden for the official record.  I am in the

7   U.S. for the next two weeks.  Unlike you, however, I am looking

8   for sun, not snow, so I will be in Florida.  Enjoy the

9   holidays.  Best, Paul."

10  Q.  And if --

11         THE COURT:  Ms. Gaston, before we go on to the next

12  exhibit, can you estimate time-wise?  My original thought was,

13  we would do them and then we would have lunch.  But I don't

14  know if that's still a good idea.

15         MS. GASTON:  Yes.  I think we can finish by one, but

16  we could also break now and stop after that.

17         THE COURT:  Do we have a sense of the group?

18         THE JURORS:  (Gesturing.)

19         THE COURT:  People are saying -- okay.  All right.

20  Let's keep going.

21         MS. GASTON:  We'll keep going.  All right.

22  BY MS. GASTON:

23  Q.  Without reading all the attachments, can we just look,

24  briefly, at what the attachments are.

25         MS. GASTON:  591.

1   BY MS. GASTON:

2   Q.  So, is -- it's a very bad copy.

3           Is this the August 22nd, 2012 letter that we

4   previously looked at?

5           MR. ABELSON:  Objection.

6           THE COURT:  All right.  What is it?

7   BY MS. GASTON:

8   Q.  Are you able to make out what this letter is?

9   A.  Oh --

10          THE COURT:  Can you just describe the letter without

11  answering the question, whether that is the same letter that we

12  saw before?  That will be either apparent or it won't.

13          But, can you just say what it is?

14          THE WITNESS:  Yes.  It is a letter on Skadden

15  letterhead dated August 22nd, 2012, titled -- or, with the

16  subject line "Outstanding balance due."

17  BY MS. GASTON:

18  Q.  And then, if we page a couple of pages in, is there a

19  document that I do not expect you to be able to read, because

20  it appears to be in a foreign language?

21  A.  Yes.

22          MR. TAYLOR:  I didn't hear the question.  I'm sorry.

23  BY MS. GASTON:

24  Q.  Is there a document in the foreign language?

25  A.  Yes, there is a document in what appears to be Cyrillic.

1 Q.  If you go to the next page in the document, there's a

2 document titled Unofficial Translation.

3    Are you able to read this document?

4 A.  I'll try.

5    "Mr. Craig, Ministry of Justice of Ukraine has

6 considered your letter of 22 August 2012 concerning increase of

7 the volume of work relating to the expert examinations as to

8 compliance with the principle of the rule of law in the case

9 *Tymoshenko v. Ukraine* and respective increase of the contract

10 price.

11    "Hereby inform that according to Article 18 of the

12 Budget Code of Ukraine, budget owners take budgetary

13 obligations and perform payments only within budget allocations

14 established by the estimates of costs.  Estimate of costs for

15 the year 2012 established the price of" -- can't really see,

16 but -- "95,000 indicated in the contract."

17    Something "in 2012 Ministry of Justice cannot allow

18 your request concerning payment for the sum exceeding one

19 indicated in the above contract.  Due to the aforementioned,

20 Ministry of Justice approves the increase of the contract price

21 for performed work, and suggests to enter into agreement which

22 would see all the aforementioned issues in the year 2013" --

23 sorry -- "which would set all the."

24    Sorry about that.

25 Q.  Okay.

1   A.  And it's signed, "Very sincerely, Deputy Minister, Head of

2   Personnel, A.Y. Sedov."

3   Q.  Is that "Yours sincerely"?

4   A.  Sorry.  "Yours sincerely."

5   Q.  All right.  Directing your attention to Government's

6   Exhibit 612, which has been admitted.

7           Is 612 a document you determined is within Skadden's

8   system?

9   A.  Yes.

10  Q.  Okay.  All right.

11          MS. GASTON:  Starting with the second page of this

12  document.  Can you zoom on that email, please?

13  BY MS. GASTON:

14  Q.  Is this an email from somebody -- well, can you say what

15  the email address of the person sending the document is?

16  A.  It is from gurtenko@minjust.gov.au to Alex van der Zwaan.

17  Q.  Is that UA?

18  A.  UA.

19  Q.  And is there a signature block on the email?

20  A.  Yes, there is.

21  Q.  And who is that person?

22  A.  Vladyslav Gurtenko, Assistant to the Minister, Ministry of

23  Justice of Ukraine.

24  Q.  What does Mr. Gurtenko write?

25  A.  "Dear Alex, In addition to the documents we are finalizing,

1   please provide us with the invoice for 8595523.65UAH.  It would

2   be nice if you could send the invoice together with the stamped

3   Ukrainian translation of it.  I would like, still, to speak

4   with you on the Doc 3.  Please call me back when you are free.

5   Thanks."

6   Q.  And does Mr. van der Zwaan respond at the bottom of the

7   first page and the top of the second?

8   A.  Yes.

9   Q.  And he indicates --

10  A.  He --

11  Q.  -- that he -- he will call him?

12  A.  Excuse me?

13  Q.  What does he say?

14  A.  "Dear Vladyslav, I am in meetings this morning, but will

15  call you in about an hour, if that suits.  Best, Alex."

16  Q.  What does Mr. Gurtenko respond?

17  A.  "Dear Alex, Have you managed to make proposed corrections

18  to the Document 3?  If yes, could you send it to me for final

19  approval?  We really hope to receive all documents, signed and

20  stamped, by the end of next week, as the latest."

21  Q.  And what does Mr. van der Zwaan write back?

22  A.  "Hi, Vladyslav, I have tried calling you.  Please call me

23  back on" -- redacted.  "We, too, would very much like to get

24  this wrapped up.  Thank you, Alex."

25  Q.  And then does Mr. Gurtenko write back and attach a

1  document?

2  A.  "Dear Alex, Please find attached document."

3  Q.  And if you look at the attachment, what is the attachment

4  to this document?

5  A.  It's a letter on Skadden letterhead dated August

6  22nd, 2012, to the Honorable Oleksandr Lavrynovych, Ministry of

7  Justice of Ukraine, Government of Ukraine, with the re line

8  "Outstanding balance due."

9  Q.  Who signed that letter?

10  A.  It appears to be signed by Greg Craig.

11  Q.  And directing your attention to Government's Exhibit 432,

12  which has previously been admitted.

13        Was 432 an email that you determined was on Skadden's

14  system?

15  A.  Yes.

16  Q.  Okay.  And what is the bottom email in this chain?

17  A.  It's an email from Greg Craig to Paul Manafort with the

18  subject, "Can we talk?"

19  Q.  And what's the date?

20  A.  The date is May 16th, 2013.

21  Q.  What does Mr. Manafort respond?

22  A.  He responds, "Greg, What is a good time on Friday?  I am in

23  Kyiv all day."

24  Q.  And then does Mr. Craig write back?

25  A.  He does.

1    Q.  What does he write back?

2    A.  "For me, any time after 11 a.m. my time.  I need advice

3    about getting business from Ukraine."

4    Q.  All right.  Now, I think you mentioned at the outset of

5    your testimony that you had reviewed some materials related to

6    Skadden's document management system; is that correct?

7    A.  Yes.

8    Q.  So, first, I would like to show you Government's Exhibit

9    10, which has previously been admitted.

10             MS. GASTON:  And can we zoom on the top part of the

11   email -- or, not the email.  Just zoom on the text.  Yeah.

12   BY MS. GASTON:

13   Q.  And what is this document?

14   A.  This is a history report from our document management

15   system.

16   Q.  Okay.  And the parties have entered into a stipulation

17   regarding this and other of these document history reports that

18   we will deal with later.

19             But, did you determine that Exhibits 9, 10, 452, 453,

20   454, 455, 456, and 457 are document history reports from

21   Skadden's document management system?

22   A.  Yes.

23             MS. GASTON:  Okay.  Your Honor, could I enter those

24   into evidence, please?

25             THE COURT:  Any objection?

```
 1              MR. ABELSON:  No objection.

 2              THE COURT:  All right.  They'll be admitted.

 3              MS. GASTON:  Okay.

 4              THE COURTROOM DEPUTY:  The numbers again?

 5              MS. GASTON:  Oh, sorry.

 6              10, 9, and 452, 453, 454, 455, 456, and 457.

 7    BY MS. GASTON:

 8    Q.  And then, Mr. Lesser, directing your attention to

 9    Government's Exhibit 8, which has previously been admitted.

10              And is Government's Exhibit 8 a Word document from

11    the document management system at Skadden?

12    A.  It's a printed copy of a document that is in our document

13    management system.

14    Q.  Okay.  And did you determine by looking at Exhibit 8 and

15    Exhibit 10, that this version of this document was edited on

16    September 24th of 2013?

17    A.  I would have to go back to the previous exhibit.

18    Q.  Oh, sorry.

19              I'll just hand you the document history report.

20    A.  Okay.  Perfect.

21              MR. ABELSON:  Your Honor, may we approach?

22              THE COURT:  Yes.

23              (Bench discussion:)

24              MR. ABELSON:  There's a stipulation.  I don't know

25    that we're going to be selectively having him testify.
```

1    MS. GASTON:  So, it's not in the stipulation that

2    this specific document is the one that was edited.

3    This is all we're going to do.  We're not going to do

4    more on this.

5    THE COURT:  Okay.  All right.

6    MR. ABELSON:  Thank you.

7    (Open court:)

8    BY MS. GASTON:

9    Q.  Were you able to determine that Document 8 is the document

10   edited on September 24th, 2013?

11   A.  Yes.  Yes, it was.

12   Q.  Okay.  All right.

13   Mr. Lesser, we are in the homestretch, I promise.

14   So, then, I just wanted to determine that certain

15   materials were hardcopy documents from Mr. Craig's files.  And

16   I think that you stated earlier that you had gone and checked

17   some exhibits that are on the exhibit list in front of you that

18   you had checked.

19   And could we just go quickly through those?

20   A.  Okay.

21   Q.  Okay.  So, first, directing your attention to Government's

22   Exhibit 517, which has been admitted.

23   Is this a document with handwriting on it?

24   A.  Yes, it is.

25   Q.  Okay.  And that's from Mr. Craig's hardcopy files?

1   A.   This is one of the documents that I saw the exhibit and

2   there was a slip sheet in its place.

3   Q.   Okay.  And then directing your attention to Government's

4   Exhibit 521.

5            And this is a hardcopy document -- a scan of a

6   hardcopy document with handwriting on it; is that correct?

7   A.   Correct.

8   Q.   And this, too, is from Mr. Craig's hardcopy files?

9   A.   And similarly, I saw this and the slip sheet in its place.

10  Q.   Okay.  And then directing your attention to government's

11  Exhibits 522 and 523 -- well, actually, let's start with 522.

12           So, looking at the top of this document, is this a

13  hardcopy document from Mr. Craig's files?

14  A.   Similarly, I saw this and the corresponding slip sheet.

15  Q.   Yes.

16           MS. GASTON:  And could we zoom on the top half of the

17  page?

18  BY MS. GASTON:

19  Q.   And does this appear to be information from a Department of

20  Justice website?

21  A.   Yes, it does.

22  Q.   And then, if we look at the bottom half of the document, is

23  there highlighting of one item on that list?

24  A.   Yes, there is.

25  Q.   And what does that say?

1   A.  "Political activities."

2   Q.  And then, if we look at the bottom of the page, is there a

3   date in the bottom right-hand corner?

4   A.  There is.

5   Q.  And what is that date?

6   A.  10/8/2013.

7   Q.  Okay.  And then could we please turn to page 3 of this

8   exhibit.

9           MS. GASTON:  And could you zoom in, Ms. Rohde,

10  please, on the highlighted text?

11  BY MS. GASTON:

12  Q.  And could you read G and H, please?

13  A.  "G, The term Public Relations Counsel includes any person

14  who engages directly or indirectly in informing, advertising,

15  or in any way representing a principal in any public relations

16  matter pertaining to political or public interests, policies,

17  or relations of such principal."

18  Q.  And I think before it said, "informing, advising, or in any

19  way"?

20  A.  Yes.  Sorry.  "Information, advising, or in any way

21  representing."

22  Q.  Okay.  And then H, please.

23  A.  "H, The term Publicity Agent includes any person who

24  engages directly or indirectly in the publication or

25  dissemination of oral, visual, graphic, written, or pictorial

1   information or matter of any kind, including publication by

2   means of advertising, books, periodicals, newspapers, lectures,

3   broadcasts, motion pictures, or otherwise."

4   Q.  And then turning to the next page of the document.

5           MS. GASTON:  And could we also zoom in on what's

6   highlighted there?

7   BY MS. GASTON:

8   Q.  Could you please read that?

9   A.  "O, The term Political Activities means any activity that

10  the person engaging in believes will, or that the person

11  intends to, in any way, influence any agency or official of the

12  government of the United States, or any section of the public

13  within the United States with reference to formulating,

14  adopting, or changing the domestic or foreign policies of the

15  United States, or with reference to the political or public

16  interests, policies, or relations of a government of a foreign

17  country or a foreign political party."

18  Q.  And then directing your attention to Government's Exhibit

19  525, Mr. Lesser.

20          Is this a hardcopy document from Mr. Craig's files?

21  A.  Yes.

22  Q.  Okay.  And looking at the top.

23          Is this the -- what is this document?

24  A.  This is a Skadden Arps new business or business unit

25  memorandum -- a new client or business unit memorandum.

```
1    Q.  And directing your attention to the second page of the

2    document.

3              MS. GASTON:  And could we zoom on project -- or, Part

4    4?

5    BY MS. GASTON:

6    Q.  And what is in the text here?

7    A.  This is the origination history and additional engagement

8    information.

9    Q.  And what is written in this section?

10   A.  "State how new client" -- do you want the order --

11   Q.  Not the --

12   A.  Not the boilerplate?

13   Q.  Yes.

14   A.  Okay.

15            "Paul Manafort, advisor to the president of Ukraine,

16   approached Greg Craig.  Doug Schoen, advisor to Viktor Pinchuk,

17   called Greg Craig in support of assignment."

18   Q.  Okay.  Thank you.

19            All right.  Directing your attention to Government's

20   Exhibit 528.

21            MS. GASTON:  Your Honor, I think I have five more

22   minutes.  Should we push forward?

23            THE COURT:  Go ahead.

24   BY MS. GASTON:

25   Q.  Directing your attention to 528.
```

 1              Is this a hardcopy document from Mr. Craig's files?

 2    A.  Yes.

 3    Q.  Okay.  Directing your attention to Government's Exhibit

 4    550.

 5              Is this a hardcopy document from Mr. Craig's files?

 6    A.  This is one in which I sought the exhibit and the slip

 7    sheet.

 8    Q.  And what does this say?

 9    A.  It's a pad from the Hyatt Regency, Kyiv.

10              "1:  Witness to interview -- witnesses to interview;

11              "2:  PR recommendations;

12              "3:  Procedural notes;

13              "4:  Opening statement themes.  Matt.

14              "Framing the second" --

15              I'm not sure I can read the word.

16    Q.  If you can't read it, you can't read it.

17    A.  Yeah.  Something "critical journalist."

18              And then, "John testify" -- can't really read it.

19    Q.  Okay.

20              MS. GASTON:  One second.

21              Nothing further, Your Honor.

22              THE COURT:  All right.  Without actually beginning

23    it, will you let me know if there is going to be

24    cross-examination of this witness?

25              MR. ABELSON:  Five questions.

```
 1              THE COURT:  All right.  Why don't we do them, and
 2     then the witness can be excused and we can start with a fresh
 3     witness after lunch.
 4                         CROSS-EXAMINATION
 5     BY MR. ABELSON:
 6     Q.  Mr. Lesser, you have no personal knowledge of any of the
 7     communications set forth in the emails that you read today,
 8     right?
 9     A.  None whatsoever.
10     Q.  So if there was a discussion that happened before or after
11     an email, you didn't -- you have no personal knowledge of those
12     either, right?
13     A.  I do not.
14     Q.  And just because somebody sends something in an email, you
15     don't know whether that happened or whether there were further
16     discussions about what was set forth in the email?
17     A.  I do not.
18              MR. ABELSON:  No further questions.
19              THE COURT:  All right.  I take it there's no
20     redirect?
21              MS. GASTON:  No.  No.
22              THE COURT:  All right.  Sir -- I'm sorry?
23              MR. ABELSON:  May we approach for one moment?
24              THE COURT:  Yes.  Can I let the jury go and then have
25     this conversation?  Are we planning to do anything further with
```

```
1    this witness?

2              MR. ABELSON:  It's about the slip sheet.

3              THE COURT:  All right.

4              Come back.

5              (Bench discussion:)

6              THE COURT:  I think we need to say something.

7              MS. GASTON:  Yes.

8              THE COURT:  Okay.  So what I would like to say,

9    because I think right now it leans on the inferences going both

10   ways, that the parties are agreeing the slip sheets were placed

11   in place of actual documents when Skadden produced actual

12   documents to the government.  And there's nothing untoward with

13   respect to a slip sheet.

14             MS. GASTON:  Perfect.

15             THE COURT:  All right.

16             MR. ABELSON:  Yes.  Thank you.

17             (Open court:)

18             THE COURT:  All right.  I just want to clarify one

19   thing, and then I promise we're going to have lunch.

20             And I'm informing you of another stipulation.  And

21   that is that the parties are agreed that the slip sheets were

22   placed into the boxes of documents obtained from Mr. Craig's

23   office during the process of producing the original pieces of

24   paper from Skadden to the government.

25             So there's nothing untoward or no inferences should
```

1    be drawn on either side about the fact that there's a slip

2    sheet in the box and the original document isn't in the box

3    anymore.

4            So that is now a fact that you can also assume to be

5    undisputed.

6            Does that suit everybody's purposes?

7            Okay.  Everyone is nodding.

8            So, that means it's time for lunch.  I ask you to

9    just leave your notebooks.  We will break, and we will resume

10   at -- well, it's a little bit after 1.  So, let's say we'll

11   resume at 2:15.  It's been a long morning.

12           Please do not discuss the case with each other or

13   anyone else.  Don't do any research.

14           And we'll be back after lunch.  Be in the jury room a

15   little bit before 2:15 so we can start right up at that time.

16           Thank you.

17           (Whereupon the jury leaves the courtroom.)

18           THE COURT:  Mr. Lesser, you are excused, as you seem

19   to have figured out.

20           THE WITNESS:  Sorry.  Thank you.

21           THE COURT:  All right.  And everyone else is excused

22   as well, and I'll see you at 2:15.

23           Thank you.

24                            *   *   *

25

## $

**$1.25** [2] - 1580:15, 1582:21
**$12,000** [1] - 1619:4
**$12,500** [1] - 1566:9
**$20,000** [1] - 1567:13
**$250,000** [1] - 1582:21
**$75,000** [1] - 1605:16

## '

**'a** [1] - 1616:20
**'approval** [1] - 1615:5
**'FARA** [1] - 1590:11
**'independence'** [1] - 1619:11
**'no** [1] - 1520:20
**'our** [1] - 1621:23
**'probably** [1] - 1617:10
**'selective** [1] - 1619:18
**'We** [2] - 1529:21, 1619:24

## 1

**1** [4] - 1520:18, 1590:13, 1638:10, 1641:10
**1.25** [1] - 1579:20
**1.250** [1] - 1579:23
**1.3** [1] - 1579:17
**1.5** [2] - 1554:1, 1579:21
**10** [9] - 1511:22, 1518:20, 1531:10, 1584:16, 1595:25, 1631:9, 1631:19, 1632:6, 1632:15
**10/8/2013** [1] - 1635:6
**100** [1] - 1510:22
**100,000** [2] - 1565:8, 1575:21
**1000** [1] - 1511:3
**10:15** [1] - 1607:17
**10:30** [1] - 1536:1
**10th** [3] - 1558:8, 1562:22, 1595:4
**11** [2] - 1518:20, 1631:2
**111** [2] - 1557:4, 1557:6
**11:30** [1] - 1607:18
**11:55** [1] - 1563:15
**11th** [4] - 1609:13, 1610:9, 1611:10, 1613:6
**12** [1] - 1586:10
**12,000** [1] - 1567:13
**12-20-12** [1] - 1625:2
**12/7** [1] - 1607:1
**12:34** [1] - 1602:24
**12th** [10] - 1526:21, 1553:19, 1555:1, 1613:12, 1613:17, 1615:3, 1618:9, 1621:2, 1621:18, 1622:7
**13** [1] - 1550:9
**13th** [5] - 1528:15, 1530:1, 1531:9, 1596:17, 1623:6
**149** [1] - 1561:15

**14th** [4] - 1536:1, 1536:13, 1574:2, 1574:10
**150** [3] - 1563:10, 1563:11, 1566:15
**1513** [1] - 1511:15
**1549** [1] - 1511:18
**156** [1] - 1555:18, 1555:19
**15th** [2] - 1575:4, 1577:25
**1631** [1] - 1511:22
**1639** [1] - 1511:19
**165** [1] - 1566:20
**16th** [3] - 1579:6, 1594:21, 1630:20
**18** [6] - 1550:9, 1580:14, 1584:8, 1587:24, 1588:1, 1627:11
**1800** [1] - 1511:2
**184** [1] - 1568:3
**186** [1] - 1608:25
**19-125** [2] - 1512:2, 1541:16
**19-CR-125** [1] - 1510:3

## 2

**2** [11] - 1539:16, 1554:3, 1554:12, 1554:18, 1555:7, 1585:24, 1594:1, 1595:12, 1607:11, 1638:11
**20** [1] - 1625:5
**200** [2] - 1569:4, 1571:12
**2000** [1] - 1598:7
**20001** [1] - 1511:9
**20036** [1] - 1511:3
**2007** [1] - 1514:18
**2010** [2] - 1515:5, 1515:7
**2012** [65] - 1516:3, 1516:16, 1517:7, 1518:24, 1525:25, 1530:1, 1531:9, 1536:13, 1553:19, 1555:1, 1555:24, 1557:10, 1558:8, 1558:11, 1562:16, 1562:22, 1563:15, 1566:14, 1567:1, 1568:10, 1568:12, 1571:21, 1574:3, 1575:4, 1577:25, 1580:8, 1580:14, 1581:11, 1582:6, 1583:24, 1584:8, 1584:16, 1586:10, 1586:20, 1587:8, 1587:20, 1587:24, 1594:21, 1595:4, 1596:17, 1598:21, 1603:16, 1604:18, 1604:25, 1606:2, 1606:17, 1609:13, 1610:9, 1611:10, 1613:17, 1615:3, 1618:9, 1620:6, 1621:2, 1621:18, 1622:7, 1623:6, 1624:18, 1624:20, 1626:3, 1626:15, 1627:6, 1627:15, 1627:17, 1630:6
**2013** [6] - 1536:17, 1537:8, 1627:22, 1630:20, 1632:16, 1633:10

**2019** [1] - 1510:6
**202** [5] - 1510:15, 1510:19, 1511:4, 1607:20, 1609:17
**202-354-3267** [1] - 1511:9
**202-862-0322** [1] - 1609:17
**20530** [2] - 1510:15, 1510:18
**20th** [2] - 1580:8, 1604:25
**21** [1] - 1510:6
**21202** [1] - 1510:23
**214** [1] - 1573:21
**216** [2] - 1580:23, 1580:25
**217** [1] - 1583:12
**218** [1] - 1586:15
**22** [2] - 1588:1, 1627:6
**221** [1] - 1516:24
**22nd** [11] - 1537:8, 1566:14, 1567:1, 1568:10, 1581:11, 1582:6, 1583:24, 1586:20, 1626:3, 1626:15, 1630:6
**230** [1] - 1594:24
**233-0986** [1] - 1510:19
**23rd** [3] - 1517:7, 1518:24, 1587:8
**2440** [1] - 1510:23
**24th** [9] - 1519:16, 1521:7, 1523:23, 1562:16, 1563:15, 1598:21, 1602:9, 1632:16, 1633:10
**250** [3] - 1516:24, 1596:12, 1596:13
**250,000** [1] - 1579:20
**252-7698** [1] - 1510:15
**256** [1] - 1516:24
**259** [1] - 1519:10
**26** [2] - 1624:18, 1624:20
**263** [3] - 1598:12, 1598:14, 1598:15
**264** [2] - 1600:16, 1600:17
**264A** [2] - 1601:9, 1602:4
**266** [1] - 1523:16
**27th** [1] - 1568:12
**28** [1] - 1587:20
**2:10** [1] - 1530:1
**2:15** [3] - 1641:11, 1641:15, 1641:22
**2nd** [2] - 1602:23, 1603:16

## 3

**3** [9] - 1521:11, 1538:9, 1584:20, 1603:21, 1622:11, 1629:4, 1629:18, 1635:7, 1638:12
**303** [2] - 1602:18, 1602:19
**304** [1] - 1604:5
**30th** [1] - 1571:21
**311** [2] - 1604:20, 1604:21
**319** [2] - 1605:20, 1605:21
**325** [2] - 1606:8, 1606:9
**333** [1] - 1511:8

**350** [2] - 1608:4, 1608:5
**352** [1] - 1609:2
**355** [2] - 1610:3, 1610:5
**362** [2] - 1611:2, 1611:3
**373** [1] - 1613:1
**374** [1] - 1614:18
**376** [2] - 1617:22, 1617:23
**377** [2] - 1620:19, 1620:21
**379** [2] - 1621:12, 1621:14
**380** [2] - 1622:1, 1622:2
**381** [1] - 1526:7
**382** [1] - 1527:9
**385** [1] - 1528:4
**387** [1] - 1531:4
**392** [1] - 1533:4
**396** [2] - 1622:14, 1622:25
**3rd** [1] - 1557:10, 1558:11, 1604:18

## 4

**4** [3] - 1590:12, 1637:4, 1638:13
**400** [2] - 1535:19, 1535:21
**410** [1] - 1510:24
**426** [1] - 1537:4
**432** [2] - 1630:11, 1630:13
**452** [3] - 1511:22, 1631:19, 1632:6
**453** [3] - 1511:22, 1631:19, 1632:6
**454** [2] - 1511:22, 1631:20, 1632:6
**455** [3] - 1511:22, 1631:20, 1632:6
**456** [3] - 1511:22, 1631:20, 1632:6
**457** [2] - 1631:20, 1632:6
**457........** [1] - 1511:22
**4:37** [1] - 1528:15

## 5

**5** [1] - 1590:12
**5.2** [1] - 1584:24
**517** [1] - 1633:22
**521** [1] - 1634:4
**522** [2] - 1634:11
**523** [1] - 1634:11
**525** [2] - 1590:5, 1636:19
**526** [1] - 1590:6
**528** [2] - 1637:20, 1637:25
**530** [1] - 1590:6
**531** [1] - 1590:6
**532** [1] - 1590:6
**548** [2] - 1590:22, 1591:13
**549** [1] - 1590:6
**550** [1] - 1638:4
**555** [1] - 1510:14
**570** [1] - 1565:18

**571** [2] - 1564:21, 1564:23
**582** [2] - 1574:18, 1575:15
**583** [1] - 1575:10, 1577:14
**585** [1] - 1579:24
**587** [2] - 1587:3, 1587:4
**59** [4] - 1551:9, 1551:13, 1553:11, 1554:25
**591** [3] - 1624:11, 1624:12, 1625:25

## 6

**6** [2] - 1537:7, 1590:12
**60** [2] - 1554:21, 1554:22
**602** [1] - 1547:22
**612** [2] - 1628:6, 1628:7
**6523** [1] - 1511:8
**680** [2] - 1612:3, 1612:5
**681** [1] - 1589:19, 1589:25
**6th** [2] - 1555:24, 1606:2

## 7

**7** [2] - 1590:14, 1606:17
**778-1814** [1] - 1511:4
**7:25** [1] - 1526:21

## 8

**8** [7] - 1510:5, 1510:8, 1576:18, 1632:9, 1632:10, 1632:14, 1633:9
**8-22-12** [1] - 1624:25
**8-28-12** [1] - 1625:1
**8595523.65UAH** [1] - 1629:1

## 9

**9** [3] - 1511:22, 1631:19, 1632:6
**90** [1] - 1541:4
**949-1146** [1] - 1510:24
**95,000** [4] - 1567:12, 1575:24, 1584:21, 1627:16
**950** [1] - 1510:18
**9:30** [1] - 1510:7

## A

**a.m** [10] - 1510:7, 1518:20, 1528:15, 1531:10, 1536:1, 1563:15, 1595:25, 1603:21, 1622:11, 1631:2
**A.Y** [1] - 1628:2
**Aabelson@zuckerman.com** [1] - 1510:25
**ABELSON** [38] - 1512:12, 1522:4, 1522:6, 1522:14, 1522:24, 1525:12, 1540:18, 1551:19, 1551:25, 1558:19, 1567:17, 1569:8, 1569:11,

1569:14, 1570:21, 1571:3, 1575:11, 1589:2, 1591:25, 1592:3, 1592:10, 1592:19, 1592:24, 1593:3, 1593:10, 1593:15, 1593:21, 1626:5, 1632:1, 1632:21, 1632:24, 1633:6, 1638:25, 1639:5, 1639:18, 1639:23, 1640:2, 1640:16
**Abelson** [2] - 1510:21, 1512:13
**Abelson...................** [1] - 1511:19
**ability** [1] - 1597:21
**able** [13] - 1520:6, 1543:18, 1564:3, 1567:7, 1572:7, 1581:14, 1585:21, 1586:9, 1613:20, 1626:8, 1626:19, 1627:3, 1633:9
**absolute** [2] - 1529:21
**accept** [2] - 1557:16, 1612:22
**acceptable** [1] - 1587:20
**access** [4] - 1529:22, 1550:2, 1615:21, 1619:13
**accessible** [1] - 1610:24
**accommodate** [1] - 1588:15
**accordance** [1] - 1575:19
**according** [5] - 1576:15, 1584:20, 1584:22, 1584:24, 1627:11
**accordingly** [1] - 1521:23
**account** [2] - 1556:16, 1582:23
**accurately** [2] - 1548:2, 1599:16
**Act** [2] - 1537:2, 1558:18
**action** [1] - 1564:13
**Action** [1] - 1510:3
**activities** [5] - 1514:15, 1518:5, 1558:16, 1558:17, 1635:1
**Activities** [1] - 1636:9
**activity** [5] - 1516:4, 1516:17, 1516:18, 1531:24, 1636:9
**actual** [6] - 1591:5, 1591:11, 1612:15, 1612:17, 1640:11
**Adam** [2] - 1510:17, 1510:21
**adam** [1] - 1512:13
**add** [1] - 1593:19
**addition** [4] - 1557:23, 1576:7, 1576:9, 1628:25
**additional** [4] - 1561:22, 1572:15, 1586:11, 1637:7
**additions** [1] - 1595:12
**address** [10] - 1521:2, 1561:20, 1561:22, 1567:2, 1567:3, 1603:9, 1603:10, 1604:3, 1618:4, 1628:15
**addressed** [3] - 1581:22, 1581:23, 1615:14
**addresses** [3] - 1547:20, 1561:22, 1613:22
**adds** [1] - 1603:25
**administrative** [1] - 1584:10

**admissible** [1] - 1543:23
**admitted** [41] - 1517:1, 1519:10, 1523:16, 1526:7, 1527:10, 1531:5, 1533:6, 1535:20, 1537:5, 1543:13, 1551:10, 1555:18, 1557:5, 1561:15, 1564:22, 1565:19, 1568:3, 1571:13, 1577:15, 1579:25, 1580:24, 1590:23, 1594:24, 1601:11, 1601:15, 1602:3, 1604:19, 1605:20, 1606:8, 1610:4, 1621:13, 1622:17, 1622:20, 1622:21, 1628:6, 1630:12, 1631:9, 1632:2, 1632:9, 1633:22
**adopting** [1] - 1636:14
**advance** [2] - 1547:16, 1557:24
**advertising** [2] - 1635:14, 1636:2
**advice** [1] - 1631:2
**advise** [2] - 1574:8, 1578:5
**advising** [2] - 1635:18, 1635:20
**advisor** [2] - 1637:15, 1637:16
**Affiliates** [1] - 1584:17
**aforementioned** [5] - 1585:11, 1586:8, 1586:12, 1627:19, 1627:22
**afraid** [2] - 1599:4, 1599:23
**afternoon** [1] - 1607:1
**agency** [1] - 1636:11
**agenda** [1] - 1598:8
**agent** [1] - 1572:23
**Agent** [2] - 1558:17, 1635:23
**Agents** [1] - 1537:1
**ago** [1] - 1588:9
**agree** [5] - 1543:23, 1547:2, 1557:21, 1589:2, 1590:17
**agreeable** [1] - 1557:19
**agreed** [4] - 1563:21, 1588:10, 1616:6, 1640:21
**agreeing** [1] - 1640:10
**agreement** [10] - 1557:13, 1557:17, 1557:21, 1557:22, 1562:10, 1563:17, 1563:20, 1575:24, 1616:24, 1627:21
**ahead** [1] - 1637:23
**airport** [1] - 1530:13
**al** [1] - 1619:21
**Alex** [32] - 1517:4, 1517:5, 1517:6, 1517:20, 1518:21, 1519:18, 1520:8, 1520:23, 1521:12, 1521:16, 1521:19, 1521:22, 1522:21, 1524:10, 1529:3, 1529:19, 1561:21, 1562:11, 1563:25, 1567:6, 1567:10, 1568:21, 1599:23, 1605:11, 1623:16, 1628:16, 1628:25, 1629:15, 1629:17, 1629:24, 1630:2
**align** [1] - 1522:1

**allocations** [1] - 1627:13
**allow** [2] - 1616:7, 1627:17
**allowed** [2] - 1559:10, 1616:1
**aloud** [1] - 1588:11
**Amanda** [1] - 1512:10
**America** [2] - 1510:3, 1512:3
**American** [1] - 1616:25
**amount** [8] - 1572:15, 1575:24, 1575:25, 1576:4, 1577:3, 1577:10, 1586:1, 1586:5
**ample** [1] - 1597:16
**AMY** [1] - 1510:9
**analysis** [1] - 1620:11
**announced** [1] - 1515:18
**anonymity** [1] - 1574:14
**anonymous** [3] - 1616:5, 1616:20, 1616:22
**answer** [6] - 1563:23, 1567:13, 1574:8, 1578:17, 1600:9, 1601:5
**answering** [2] - 1538:8, 1626:11
**answers** [2] - 1528:16, 1577:13
**anticipated** [1] - 1618:13
**anticipation** [2] - 1562:8, 1616:13
**anytime** [1] - 1607:18
**anyway** [2] - 1593:11, 1609:23
**AP** [1] - 1534:3
**apart** [2] - 1517:14, 1530:9
**apologies** [2] - 1524:25, 1540:25
**apparent** [1] - 1626:12
**appear** [4] - 1516:13, 1517:1, 1616:21, 1634:19
**appellate** [1] - 1616:10
**applied** [1] - 1577:8
**applies** [2] - 1599:23, 1622:17
**appointment** [2] - 1595:9, 1607:17
**appreciate** [5] - 1513:1, 1513:11, 1527:7, 1548:8, 1548:23
**appreciates** [2] - 1512:17, 1513:3
**approach** [11] - 1512:5, 1552:1, 1553:4, 1553:6, 1558:19, 1568:25, 1578:3, 1588:5, 1591:25, 1632:21, 1639:23
**approached** [1] - 1637:16
**appropriate** [6] - 1515:19, 1516:1, 1542:15, 1542:16, 1544:2, 1582:23
**approval** [3] - 1532:22, 1558:2, 1629:19
**approved** [2] - 1521:21, 1597:1
**approves** [1] - 1627:20
**April** [8] - 1537:8, 1553:19, 1555:1, 1558:8, 1562:22, 1582:19, 1584:16, 1586:10
**argument** [1] - 1558:25

**arms** [1] - 1573:5
**Arps** [9] - 1514:6, 1549:13, 1549:16, 1550:9, 1550:11, 1562:3, 1584:16, 1597:10, 1636:24
**arrange** [3] - 1605:16, 1618:14, 1624:6
**arrangement** [1] - 1619:2
**arrive** [1] - 1580:22
**article** [17] - 1531:16, 1535:7, 1535:9, 1535:17, 1536:9, 1537:19, 1537:22, 1538:7, 1538:12, 1538:15, 1538:17, 1539:13, 1539:14, 1539:24, 1540:2, 1584:23, 1616:9
**Article** [3] - 1576:18, 1584:20, 1627:11
**articles** [3] - 1529:4, 1536:24, 1537:10
**ASAP** [1] - 1574:7
**Ashton** [1] - 1619:21
**aspect** [2] - 1543:5, 1600:1
**aspects** [2] - 1518:12, 1519:2
**assert** [1] - 1601:19
**asserted** [1] - 1619:1
**assertion** [1] - 1622:19
**assignment** [7] - 1530:11, 1582:14, 1615:21, 1620:16, 1621:10, 1621:23, 1637:17
**Assistant** [1] - 1628:22
**associate** [2] - 1514:23, 1517:6
**associates** [1] - 1609:19
**assume** [3] - 1543:21, 1548:23, 1641:4
**assumed** [1] - 1608:22
**assuming** [1] - 1587:19
**assurance** [1] - 1564:11
**assure** [1] - 1555:10
**assured** [1] - 1619:12
**astutely** [1] - 1558:24
**attach** [1] - 1629:25
**attached** [7] - 1562:3, 1562:10, 1584:6, 1588:3, 1588:24, 1596:24, 1630:2
**attaching** [2] - 1582:22, 1624:24
**attachment** [22] - 1557:16, 1558:3, 1562:12, 1562:17, 1562:18, 1562:19, 1581:8, 1581:19, 1581:20, 1584:3, 1584:11, 1584:12, 1587:13, 1587:14, 1589:11, 1596:21, 1596:22, 1597:4, 1610:16, 1613:10, 1630:3
**attachments** [4] - 1562:13, 1588:19, 1625:23, 1625:24
**attempt** [1] - 1619:22
**attempting** [1] - 1542:4
**attention** [52] - 1516:3, 1516:15, 1516:23, 1519:9,

1523:15, 1526:6, 1527:9, 1528:4, 1531:4, 1533:3, 1554:20, 1555:17, 1560:8, 1560:23, 1561:14, 1563:10, 1564:21, 1568:2, 1568:24, 1574:18, 1575:9, 1577:14, 1579:24, 1580:23, 1583:12, 1586:15, 1587:3, 1594:23, 1596:12, 1602:17, 1604:4, 1608:3, 1609:2, 1610:3, 1612:25, 1614:18, 1617:22, 1620:19, 1621:12, 1622:1, 1624:11, 1628:5, 1630:11, 1632:8, 1633:21, 1634:3, 1634:10, 1636:18, 1637:1, 1637:19, 1637:25, 1638:3

**attorney** [2] - 1514:22, 1517:17
**Attorney's** [1] - 1510:13
**attorneys** [4] - 1514:12, 1517:15, 1517:18, 1566:8
**attributions** [1] - 1616:19
**August** [18] - 1510:6, 1574:2, 1574:10, 1575:4, 1577:25, 1579:6, 1580:8, 1581:11, 1582:6, 1582:20, 1583:24, 1586:20, 1587:8, 1588:1, 1626:3, 1626:15, 1627:6, 1630:5
**authenticate** [1] - 1543:24
**authentication** [1] - 1543:25
**authenticity** [4] - 1545:9, 1592:18, 1592:19, 1593:1
**author** [1] - 1587:17
**available** [2] - 1532:25, 1618:20
**Avenue** [2] - 1510:18, 1511:8
**avenue** [1] - 1574:13
**avoid** [2] - 1513:13, 1619:5
**avoids** [1] - 1547:25
**aware** [5] - 1515:23, 1518:22, 1525:1, 1526:2, 1526:22, 1527:5, 1530:4

**B**

**background** [6] - 1521:12, 1521:13, 1524:11, 1599:5, 1599:13, 1616:22
**backgrounding** [3] - 1599:2, 1599:21, 1623:11
**bad** [1] - 1626:2
**balance** [4] - 1581:21, 1582:20, 1626:16, 1630:8
**Baltimore** [1] - 1510:23
**Barry** [1] - 1611:14
**base** [4] - 1600:20, 1602:6, 1609:7, 1611:6
**based** [6] - 1526:23, 1532:5, 1576:23, 1582:16, 1597:13, 1597:16
**basic** [3] - 1520:21, 1521:19, 1625:5

**basis** [3] - 1522:5, 1542:17, 1615:17
**Bates** [4] - 1591:20, 1591:22, 1591:23
**bearing** [2] - 1586:8, 1612:11
**became** [1] - 1526:2
**become** [3] - 1515:24, 1516:4, 1622:11
**becoming** [1] - 1516:22
**BEFORE** [1] - 1510:9
**beg** [1] - 1546:11
**began** [1] - 1550:6
**begin** [1] - 1572:10
**beginning** [4] - 1563:14, 1603:9, 1603:10, 1638:22
**begins** [1] - 1523:17
**behalf** [1] - 1534:18
**believes** [2] - 1565:7, 1636:10
**Below** [1] - 1537:22
**below** [15] - 1524:16, 1529:5, 1533:22, 1538:21, 1539:5, 1539:10, 1563:5, 1563:6, 1564:8, 1567:8, 1569:5, 1575:16, 1587:19, 1587:21, 1587:25
**bench** [10] - 1522:7, 1522:8, 1552:3, 1558:21, 1569:3, 1588:6, 1588:7, 1592:2, 1632:23, 1640:5
**benefit** [1] - 1550:15
**BERMAN** [1] - 1510:9
**best** [11] - 1518:21, 1558:2, 1572:9, 1573:14, 1610:1, 1614:17, 1617:11, 1620:18, 1623:20, 1625:9, 1629:15
**better** [4] - 1525:3, 1530:17, 1547:3, 1560:21
**between** [7] - 1524:7, 1542:21, 1544:13, 1545:6, 1547:12, 1553:23, 1554:2
**bill** [3] - 1569:14, 1570:21, 1580:14
**Bill** [1] - 1569:14
**billing** [1] - 1557:23
**bind** [1] - 1562:5
**binder** [2] - 1516:25, 1537:18
**bios** [1] - 1514:16
**bit** [10] - 1550:16, 1559:18, 1561:2, 1570:15, 1588:8, 1609:17, 1609:24, 1619:9, 1641:10, 1641:15
**blank** [2] - 1563:7, 1591:17
**block** [2] - 1620:17, 1628:19
**Bloomberg** [1] - 1598:2
**body** [2] - 1582:7, 1604:2
**boilerplate** [1] - 1637:12
**bono** [2] - 1614:16, 1618:25
**books** [1] - 1636:2
**bother** [2] - 1534:1, 1564:6
**bottom** [40] - 1523:21, 1526:8,

1527:11, 1531:6, 1533:8, 1533:25, 1535:25, 1546:16, 1553:23, 1555:3, 1555:22, 1565:1, 1565:23, 1566:24, 1571:17, 1573:25, 1578:8, 1578:13, 1580:6, 1583:16, 1583:17, 1586:13, 1595:3, 1598:18, 1600:24, 1600:25, 1602:4, 1602:22, 1604:9, 1606:12, 1607:8, 1612:11, 1613:5, 1617:3, 1623:3, 1629:6, 1630:16, 1634:22, 1635:2, 1635:3
**box** [8] - 1591:5, 1591:12, 1591:21, 1591:24, 1592:16, 1593:6, 1641:2
**boxes** [2] - 1591:2, 1640:22
**Bradley** [1] - 1510:17
**break** [4] - 1541:2, 1541:6, 1625:16, 1641:9
**brief** [1] - 1521:18
**briefing** [5] - 1598:5, 1598:6, 1599:13, 1600:5, 1600:6
**briefings** [1] - 1623:16
**briefly** [4] - 1522:7, 1568:25, 1589:15, 1625:24
**bring** [5] - 1513:6, 1518:19, 1597:2, 1609:20, 1612:3
**broadcasts** [1] - 1636:3
**broader** [1] - 1522:14
**Brown** [1] - 1550:6
**Bruce** [1] - 1521:21
**Bruce's** [1] - 1623:15
**Bryonie** [2] - 1531:10, 1532:7
**budget** [4] - 1575:21, 1577:3, 1627:12, 1627:13
**Budget** [1] - 1627:12
**budgetary** [1] - 1627:12
**budgeted** [1] - 1576:11
**build** [1] - 1596:9
**build-out** [1] - 1596:9
**bullet** [1] - 1520:14
**bullshit** [1] - 1554:9
**bureau** [2] - 1611:14, 1618:12
**Bureau** [1] - 1598:2
**business** [8] - 1514:14, 1550:10, 1586:5, 1593:3, 1631:3, 1636:24, 1636:25
**busy** [1] - 1618:17
**but..** [1] - 1593:14
**BY** [46] - 1513:24, 1519:12, 1523:2, 1525:16, 1531:8, 1533:11, 1535:24, 1549:7, 1550:22, 1551:11, 1552:22, 1553:7, 1553:17, 1561:13, 1567:23, 1571:11, 1575:14, 1582:4, 1582:9, 1583:4, 1585:20, 1589:10, 1590:21, 1593:24, 1601:2, 1602:2, 1607:6, 1608:9, 1612:24,

1614:6, 1622:24, 1625:22,
1626:1, 1626:7, 1626:17,
1626:23, 1628:13, 1631:12,
1632:7, 1633:8, 1634:18,
1635:11, 1636:7, 1637:5,
1637:24, 1639:5
**Byers** [2] - 1531:10, 1531:12
**byers** [2] - 1531:22, 1532:6

## C

**Cabinet** [1] - 1577:2
**Cambridge** [1] - 1603:21
**Campoamor** [3] - 1510:12,
1512:9, 1612:6
**CAMPOAMOR** [3] - 1512:7,
1513:5, 1540:22
**Campoamor-Sanchez** [1] -
1510:12
**CAMPOAMOR-SANCHEZ** [3] -
1512:7, 1513:5, 1540:22
**cannot** [7] - 1545:16, 1545:20,
1546:1, 1564:4, 1567:21,
1601:19, 1627:17
**cap** [1] - 1557:21
**capacity** [3] - 1514:19, 1514:20,
1518:4
**carbon** [2] - 1566:5, 1604:1
**care** [1] - 1524:16
**careful** [1] - 1525:3
**carefully** [1] - 1599:11
**carrying** [1] - 1586:4
**Case** [2] - 1512:2, 1541:15
**case** [40] - 1512:16, 1513:2,
1513:14, 1522:17, 1533:23,
1541:9, 1542:3, 1542:20,
1543:8, 1544:6, 1544:15,
1544:17, 1544:21, 1545:2,
1545:6, 1545:8, 1545:12,
1547:15, 1547:17, 1558:25,
1566:9, 1575:23, 1584:25,
1585:4, 1585:7, 1585:10,
1585:11, 1585:14, 1591:19,
1601:24, 1603:4, 1608:18,
1610:12, 1616:21, 1619:11,
1624:1, 1627:8, 1641:12
**cases** [1] - 1591:5
**catch** [2] - 1609:23, 1624:22
**Catherine** [2] - 1606:21,
1619:21
**Catie** [1] - 1607:2
**CC** [4] - 1520:23, 1565:4,
1567:6, 1613:17
**CCed** [3] - 1521:13, 1561:22,
1561:24
**CCing** [1] - 1581:4
**celebratory** [1] - 1623:19
**cell** [6] - 1603:20, 1607:12,
1607:17, 1607:19, 1609:17
**center** [1] - 1520:24

**certain** [10] - 1518:12, 1519:1,
1550:24, 1551:5, 1576:7,
1576:9, 1586:5, 1590:17,
1601:10, 1633:14
**certainly** [2] - 1545:22, 1546:13
**chain** [11] - 1523:17, 1535:25,
1545:16, 1546:16, 1565:1,
1565:23, 1569:6, 1571:17,
1573:25, 1612:13, 1630:16
**chance** [2] - 1573:13, 1593:16
**change** [2] - 1559:4, 1595:10
**changes** [4] - 1516:8, 1536:6,
1572:4, 1595:14
**changing** [1] - 1636:14
**channeled** [1] - 1599:8
**charge** [1] - 1618:24
**checked** [7] - 1552:6, 1552:25,
1553:11, 1580:1, 1599:11,
1633:16, 1633:18
**checking** [2] - 1568:20
**chooses** [1] - 1588:24
**Chris** [1] - 1521:21
**chronological** [1] - 1544:22
**chunks** [2] - 1559:16, 1559:17
**circle** [1] - 1519:20
**circumstances** [2] - 1546:7,
1582:17
**cite** [1] - 1568:19
**civil** [1] - 1512:25
**clarification** [2] - 1556:19,
1556:20
**clarifications** [1] - 1521:1
**clarified** [1] - 1615:13
**clarify** [1] - 1640:18
**class** [1] - 1585:25
**clear** [6] - 1554:2, 1554:10,
1560:16, 1570:9, 1578:19,
1619:11
**clearance** [2] - 1532:23, 1533:1
**cleared** [1] - 1599:11
**client** [6] - 1514:14, 1528:24,
1572:13, 1576:15, 1636:25,
1637:10
**client's** [1] - 1624:1
**clients** [1] - 1518:4
**Cliff** [5] - 1527:15, 1535:15,
1536:23, 1539:22, 1540:7
**Clinton** [1] - 1619:20
**clips** [1] - 1623:17
**close** [2] - 1616:6, 1616:21
**closed** [1] - 1598:3
**closing** [1] - 1543:19
**code** [1] - 1524:6
**Code** [1] - 1627:12
**cofounded** [2] - 1550:8,
1550:10
**colleague** [2] - 1518:19,
1618:11
**colleagues** [2] - 1512:6,

1615:13
**College** [1] - 1610:1
**Colorado** [1] - 1609:25
**colored** [3] - 1591:17, 1591:21,
1591:24
**COLUMBIA** [2] - 1510:1,
1510:14
**combative** [1] - 1521:20
**coming** [5] - 1516:20, 1523:5,
1527:15, 1542:23, 1554:18
**comment** [2] - 1520:20,
1528:23
**commenting** [1] - 1520:18
**commissioning** [1] - 1620:11
**commitments** [1] - 1554:11
**communicate** [1] - 1595:21,
1605:12
**communication** [1] - 1571:24,
1596:7
**communications** [13] - 1514:9,
1514:11, 1515:9, 1531:14,
1544:12, 1547:13, 1547:15,
1599:7, 1599:8, 1599:10,
1600:8, 1601:6, 1639:7
**company** [2] - 1550:8, 1584:16
**comparable** [1] - 1616:25
**compendium** [1] - 1623:17
**complaints** [1] - 1619:14
**complete** [1] - 1569:10
**completed** [1] - 1595:17
**completeness** [2] - 1569:5,
1589:3
**complexity** [1] - 1585:11
**compliance** [4] - 1577:9,
1584:19, 1585:9, 1627:8
**complicated** [1] - 1612:7
**comply** [1] - 1585:24
**computer** [2] - 1549:18, 1550:6
**concern** [4] - 1523:10, 1524:22,
1542:7, 1572:24
**concerned** [2] - 1564:9,
1592:20
**concerning** [2] - 1627:6,
1627:18
**concerns** [11] - 1522:11,
1523:5, 1523:6, 1523:8,
1523:11, 1524:20, 1525:5,
1525:7, 1525:9, 1535:14,
1619:14
**concluded** [5] - 1576:24,
1586:1, 1586:12, 1615:24,
1616:1
**concludes** [1] - 1576:15
**conclusion** [1] - 1619:19
**concrete** [1] - 1556:9
**conduct** [1] - 1524:6
**conducted** [3] - 1575:19,
1575:24, 1576:23
**conducting** [4] - 1521:18,
1576:16, 1585:8, 1585:12

**Conduering** [1] - 1585:23
**conference** [3] - 1618:15, 1618:19, 1620:7
**confirm** [5] - 1534:17, 1534:21, 1534:25, 1562:11, 1615:5
**Confirmation** [1] - 1555:5
**confirmed** [1] - 1555:10
**Congressman** [1] - 1603:2
**connect** [3] - 1544:7, 1545:22, 1607:20
**connected** [1] - 1539:1
**connecting** [1] - 1546:6
**connecting-up** [1] - 1546:6
**connection** [9] - 1542:3, 1542:20, 1542:21, 1544:13, 1544:21, 1545:5, 1545:7, 1545:11, 1582:13
**cons** [1] - 1613:20
**consider** [3] - 1524:9, 1590:18, 1622:18
**consideration** [1] - 1585:2
**considered** [7] - 1545:18, 1570:13, 1577:10, 1585:5, 1585:6, 1601:20, 1627:6
**consistent** [3] - 1527:25, 1533:18, 1535:2
**conspire** [1] - 1513:10
**constitute** [1] - 1584:21
**constitutes** [1] - 1577:7
**Constitution** [1] - 1511:8
**consultant** [2] - 1582:14, 1624:8
**consulted** [1] - 1617:9
**Consulting** [3] - 1518:1, 1518:2, 1528:20
**consulting** [3] - 1518:3, 1550:8, 1550:12
**contact** [8] - 1518:1, 1526:20, 1527:5, 1527:17, 1527:21, 1532:1, 1532:6, 1604:13
**contacts** [4] - 1515:17, 1526:25, 1530:2, 1530:4
**contain** [1] - 1544:9
**contained** [1] - 1610:22
**content** [6] - 1534:4, 1542:8, 1546:23, 1547:9, 1548:2, 1570:16
**contents** [3] - 1542:20, 1543:3, 1543:4
**context** [3] - 1544:11, 1545:12, 1545:25
**continue** [2] - 1554:5, 1560:5
**continuity** [1] - 1576:23
**contract** [21] - 1564:8, 1567:11, 1576:2, 1576:11, 1576:15, 1576:24, 1584:18, 1584:20, 1585:24, 1586:1, 1586:3, 1586:6, 1586:10, 1586:11, 1599:14, 1619:3, 1625:3, 1627:9, 1627:16, 1627:19,

1627:20
**contractual** [1] - 1534:4
**contradict** [1] - 1619:19
**contribute** [1] - 1538:6
**control** [2] - 1544:18, 1599:12
**controversy** [2] - 1599:15, 1599:21
**conundrum** [1] - 1543:20
**convenience** [1] - 1565:14
**conversation** [6] - 1575:6, 1588:8, 1588:14, 1595:13, 1607:21, 1639:25
**conversations** [2] - 1536:12, 1623:14
**convey** [4] - 1560:12, 1572:16, 1573:15, 1588:10
**conveyed** [1] - 1597:25
**conviction** [7] - 1582:17, 1597:13, 1597:17, 1616:11, 1619:22
**cooperate** [1] - 1556:6
**cooperation** [2] - 1567:14, 1582:25
**cooperative** [1] - 1512:25
**coordinate** [1] - 1532:8
**coordinated** [1] - 1597:20
**copied** [8] - 1517:12, 1517:13, 1518:16, 1528:8, 1546:15, 1546:16, 1566:5, 1606:20
**copiers** [1] - 1549:19
**copies** [2] - 1519:18, 1584:25
**copy** [11] - 1531:17, 1531:20, 1532:10, 1538:12, 1580:15, 1604:1, 1608:24, 1609:21, 1611:20, 1626:2, 1632:12
**Corbett** [3] - 1606:14, 1606:21, 1606:24
**corbett** [1] - 1607:13
**corbett's** [1] - 1607:7
**corner** [4] - 1590:10, 1591:19, 1612:11, 1635:3
**correct** [12] - 1517:8, 1519:20, 1523:19, 1528:12, 1534:18, 1535:3, 1540:2, 1591:15, 1609:14, 1631:6, 1634:6, 1634:7
**corrected** [3] - 1536:9, 1539:13, 1539:14
**correction** [2] - 1536:9, 1539:11
**corrections** [1] - 1629:17
**correctly** [1] - 1546:1
**correspond** [1] - 1576:17
**corresponded** [1] - 1592:16
**Correspondent** [1] - 1616:14
**corresponding** [3] - 1591:11, 1591:22, 1634:14
**corroborate** [1] - 1547:16
**COS** [1] - 1553:25
**cost** [1] - 1566:9
**costs** [2] - 1627:14
**counsel** [4] - 1512:5, 1556:3,

1616:4, 1619:16
**Counsel** [1] - 1635:13
**counterparts** [1] - 1517:23
**countersigned** [2] - 1562:3, 1563:7
**country** [1] - 1636:17
**couple** [7] - 1523:4, 1530:24, 1540:22, 1569:15, 1618:19, 1618:22, 1626:18
**course** [3] - 1572:10, 1585:7, 1599:9
**COURT** [107] - 1510:1, 1512:11, 1512:15, 1513:6, 1513:8, 1522:5, 1522:7, 1522:9, 1522:13, 1522:18, 1522:25, 1525:13, 1540:17, 1540:19, 1540:24, 1541:1, 1541:5, 1541:12, 1541:17, 1541:20, 1542:6, 1543:16, 1544:15, 1545:15, 1546:8, 1546:13, 1547:24, 1548:13, 1548:18, 1548:20, 1548:22, 1550:14, 1550:21, 1551:22, 1552:2, 1552:12, 1552:14, 1552:20, 1553:5, 1558:20, 1559:6, 1559:8, 1559:14, 1560:18, 1560:21, 1561:8, 1567:18, 1567:22, 1569:2, 1569:13, 1569:20, 1569:24, 1570:1, 1570:4, 1570:6, 1570:9, 1570:12, 1570:14, 1570:19, 1571:2, 1571:6, 1571:9, 1575:12, 1585:15, 1585:18, 1588:5, 1588:8, 1589:6, 1589:18, 1589:23, 1590:1, 1590:15, 1591:16, 1592:1, 1592:14, 1592:23, 1593:2, 1593:5, 1593:12, 1593:18, 1593:22, 1601:10, 1612:1, 1612:21, 1622:15, 1625:11, 1625:17, 1625:19, 1626:6, 1626:10, 1631:25, 1632:2, 1632:22, 1633:5, 1637:23, 1638:22, 1639:1, 1639:19, 1639:22, 1639:24, 1640:3, 1640:6, 1640:8, 1640:15, 1640:18, 1641:18, 1641:21
**Court** [11] - 1511:7, 1511:7, 1513:3, 1543:11, 1585:2, 1585:5, 1585:10, 1597:14, 1615:15, 1615:19, 1620:12
**court** [12] - 1523:1, 1552:21, 1561:12, 1571:10, 1589:9, 1593:23, 1615:12, 1616:3, 1616:10, 1616:25, 1633:7, 1640:17
**Court's** [2] - 1543:6, 1544:18
**Courthouse** [1] - 1511:8
**COURTROOM** [7] - 1512:1, 1535:21, 1541:15, 1548:19,

1589:21, 1612:4, 1632:4
**courtroom** [8] - 1512:4, 1513:7, 1541:11, 1542:10, 1548:21, 1550:15, 1601:13, 1641:17
**cover** [2] - 1573:17, 1577:11
**coverage** [2] - 1537:23, 1598:9
**craig** [6] - 1523:18, 1523:22, 1553:21, 1574:12, 1578:13, 1590:4
**Craig** [133] - 1510:6, 1512:3, 1517:13, 1517:17, 1524:2, 2527:11, 1527:14, 1527:19, 1527:22, 1528:8, 1529:17, 1529:25, 1530:7, 1536:1, 1537:10, 1537:15, 1537:19, 1538:1, 1538:11, 1539:16, 1540:1, 1540:4, 1540:10, 1540:14, 1541:16, 1543:22, 1544:9, 1546:4, 1551:6, 1553:18, 1553:22, 1555:4, 1555:13, 1555:15, 1555:23, 1556:2, 1556:5, 1557:9, 1557:14, 1559:25, 1560:1, 1561:24, 1562:5, 1562:7, 1563:2, 1563:15, 1563:18, 1564:1, 1564:3, 1564:5, 1565:3, 1565:15, 1566:11, 1567:6, 1567:15, 1568:14, 1568:17, 1571:19, 1572:17, 1574:2, 1574:9, 1575:2, 1577:23, 1578:6, 1578:24, 1579:11, 1580:10, 1580:17, 1581:4, 1581:5, 1581:7, 1581:12, 1586:14, 1586:20, 1586:25, 1587:10, 1587:15, 1590:9, 1592:21, 1594:19, 1595:4, 1595:6, 1596:3, 1596:16, 1598:23, 1599:3, 1600:10, 1601:4, 1602:9, 1602:23, 1603:23, 1604:16, 1605:2, 1605:7, 1605:25, 1606:19, 1607:7, 1608:11, 1608:16, 1610:8, 1610:13, 1611:17, 1613:9, 1613:15, 1614:2, 1614:7, 1615:1, 1615:8, 1615:11, 1615:20, 1615:24, 1616:16, 1617:12, 1617:19, 1618:3, 1618:10, 1620:25, 1621:4, 1621:17, 1621:22, 1622:6, 1622:10, 1623:4, 1623:21, 1624:17, 1627:5, 1630:10, 1630:17, 1630:24, 1637:16, 1637:17
**Craig's** [23] - 1523:25, 1535:3, 1556:17, 1563:5, 1567:25, 1579:19, 1586:23, 1590:5, 1590:10, 1590:11, 1590:13, 1590:14, 1590:25, 1591:14, 1610:14, 1633:15, 1633:25, 1634:8, 1634:13, 1636:20,

1638:1, 1638:5, 1640:22
**CRC** [1] - 1511:7
**Criminal** [2] - 1510:3, 1512:2
**cripple** [1] - 1619:23
**critical** [2] - 1597:21, 1638:17
**criticism** [1] - 1620:14
**CROSS** [1] - 1639:4
**cross** [4] - 1540:17, 1559:11, 1588:20, 1638:24
**Cross** [1] - 1511:19
**CROSS-EXAMINATION** [1] - 1639:4
**Cross-Examination** [1] - 1511:19
**cross-examination** [2] - 1540:17, 1638:24
**crowd** [1] - 1541:13
**CRR** [1] - 1511:7
**cure** [1] - 1593:13
**current** [2] - 1556:16, 1579:9
**custodian** [2] - 1541:25, 1545:20
**cut** [1] - 1611:16
**cutting** [1] - 1588:21
**Cyrillic** [1] - 1626:25

## D

**D.C** [10] - 1514:8, 1514:13, 1520:2, 1531:15, 1532:5, 1612:16, 1612:17, 1617:21, 1624:8
**dahers@nytimes.com** [1] - 1613:18
**daily** [1] - 1624:1
**Daily** [3] - 1615:5, 1616:15, 1617:9
**damage** [1] - 1624:1
**dangerous** [1] - 1524:5
**dasang@nytimes.com** [1] - 1608:13
**date** [51] - 1519:15, 1521:6, 1539:10, 1546:4, 1558:7, 1558:8, 1558:10, 1558:11, 1562:14, 1562:21, 1562:22, 1566:13, 1566:25, 1568:5, 1568:9, 1568:11, 1571:20, 1571:21, 1574:1, 1575:3, 1575:4, 1577:24, 1577:25, 1580:6, 1580:14, 1581:10, 1582:5, 1582:6, 1583:23, 1584:6, 1584:8, 1587:7, 1594:20, 1598:20, 1603:15, 1604:17, 1604:18, 1604:24, 1605:13, 1606:1, 1606:16, 1606:17, 1613:16, 1615:2, 1618:8, 1623:5, 1624:19, 1630:19, 1630:20, 1635:3, 1635:5
**dated** [8] - 1587:20, 1587:23,

1587:24, 1588:1, 1594:21, 1620:6, 1626:15, 1630:5
**dates** [1] - 1624:7
**David** [13] - 1603:8, 1603:22, 1608:17, 1610:1, 1611:15, 1613:15, 1614:13, 1614:17, 1618:3, 1618:11, 1618:20, 1620:18
**davidsanger@gmail.com** [1] - 1620:25, 1622:6
**DAY** [1] - 1510:8
**days** [2] - 1608:22, 1623:18
**DC** [6] - 1510:6, 1510:15, 1510:18, 1511:3, 1511:9, 1603:22
**deal** [6] - 1534:2, 1554:7, 1554:9, 1565:9, 1577:2, 1631:18
**dealing** [2] - 1514:15, 1534:3
**deals** [1] - 1515:17
**dear** [7] - 1518:10, 1562:2, 1615:8, 1628:25, 1629:14, 1629:17, 1630:2
**December** [24] - 1525:25, 1526:21, 1528:15, 1530:1, 1531:9, 1536:1, 1536:13, 1606:2, 1606:17, 1609:13, 1610:9, 1611:10, 1613:6, 1613:12, 1613:17, 1615:3, 1618:9, 1621:2, 1621:18, 1622:7, 1623:6, 1624:18, 1624:20, 1625:5
**decision** [3] - 1576:25, 1577:1, 1615:16
**decompress** [1] - 1596:2
**deemed** [1] - 1546:21
**deeply** [1] - 1582:25
**Defendant** [2] - 1510:7, 1510:20
**defendant** [3] - 1546:24, 1590:16, 1615:22
**defense** [5] - 1522:19, 1559:21, 1560:1, 1569:5, 1588:14
**define** [1] - 1597:21
**defined** [1] - 1558:17
**definitely** [1] - 1606:6
**degree** [1] - 1550:6
**delay** [1] - 1620:7
**delayed** [1] - 1525:20
**deliver** [2] - 1572:22, 1610:15
**delivered** [1] - 1571:25
**delivering** [2] - 1573:14, 1595:16
**delivery** [5] - 1572:18, 1579:9, 1605:6, 1605:11, 1605:13
**Department** [6] - 1510:17, 1536:19, 1619:20, 1620:15, 1634:19
**Deputy** [2] - 1576:21, 1628:1
**DEPUTY** [7] - 1512:1, 1535:21, 1541:15, 1548:19, 1589:21, 1612:4, 1632:4

**der** [28] - 1517:4, 1517:5,
1517:20, 1518:9, 1518:23,
1519:5, 1519:18, 1520:8,
1524:10, 1528:8, 1528:11,
1528:14, 1528:16, 1528:19,
1529:3, 1529:14, 1530:5,
1530:7, 1561:21, 1562:1,
1562:15, 1563:14, 1563:18,
1568:21, 1605:11, 1628:16,
1629:6, 1629:21
  **describe** [3] - 1549:15, 1550:4,
1626:10
  **described** [3] - 1543:19,
1605:8, 1616:8
  **designated** [1] - 1598:5
  **desk** [3] - 1546:15, 1609:18,
1611:13
  **despite** [1] - 1521:16
  **detail** [1] - 1523:6
  **details** [1] - 1528:25
  **determine** [10] - 1516:1,
1551:12, 1580:1, 1610:5,
1620:21, 1621:11, 1631:19,
1632:14, 1633:9, 1633:14
  **determined** [41] - 1546:21,
1554:23, 1555:20, 1557:7,
1561:16, 1563:11, 1564:23,
1565:20, 1566:21, 1568:6,
1571:14, 1573:22, 1574:20,
1577:16, 1580:25, 1583:13,
1586:16, 1587:4, 1590:25,
1591:13, 1594:25, 1596:13,
1598:15, 1600:17, 1602:20,
1604:6, 1604:21, 1605:21,
1606:10, 1608:5, 1608:19,
1611:3, 1613:2, 1614:19,
1617:23, 1621:14, 1622:2,
1622:25, 1624:13, 1628:7,
1630:13
  **determining** [1] - 1577:10
  **develop** [1] - 1596:10
  **Dickman** [1] - 1511:7
  **difference** [4] - 1547:12,
1557:20, 1612:19, 1613:23
  **different** [6] - 1514:18, 1515:9,
1518:4, 1554:18, 1560:13,
1561:6
  **difficult** [1] - 1513:10
  **difficulties** [1] - 1619:12
  **dinner** [2] - 1596:2, 1623:19
  **DIRECT** [2] - 1513:23, 1549:6
  **direct** [9] - 1511:18, 1516:15,
1516:23, 1526:20, 1527:4,
1527:17, 1528:21, 1532:6,
1600:7
  **Direct** [2] - 1511:15, 1560:23
  **directed** [1] - 1533:16
  **directing** [51] - 1516:3, 1519:9,
1523:15, 1526:6, 1527:9,
1528:4, 1531:4, 1533:3,

1534:19, 1554:20, 1555:17,
1561:14, 1563:10, 1564:21,
1568:2, 1568:24, 1571:17,
1574:18, 1575:9, 1577:14,
1579:24, 1580:23, 1583:12,
1586:15, 1587:3, 1591:13,
1594:23, 1596:12, 1602:17,
1604:4, 1608:3, 1609:2, 1610:3,
1612:25, 1614:18, 1617:22,
1620:19, 1621:12, 1622:1,
1624:11, 1628:5, 1630:11,
1632:8, 1633:21, 1634:3,
1634:10, 1636:18, 1637:1,
1637:19, 1637:25, 1638:3
  **Directing** [1] - 1560:8
  **direction** [3] - 1521:20,
1532:18, 1599:4
  **directly** [5] - 1530:25, 1550:17,
1618:14, 1635:14, 1635:24
  **director** [2] - 1549:12, 1549:15
  **disagree** [1] - 1589:1
  **disappeared** [1] - 1609:21
  **disaster** [1] - 1573:5
  **discount** [1] - 1618:25
  **discretion** [3] - 1544:18,
1548:8, 1548:12
  **discretionary** [1] - 1543:5
  **discuss** [8] - 1518:15, 1519:19,
1541:9, 1542:12, 1565:13,
1578:22, 1609:18, 1641:12
  **discussed** [2] - 1542:2, 1542:6
  **discussing** [5] - 1513:13,
1518:12, 1519:1, 1530:15,
1548:23
  **discussion** [11] - 1519:4,
1519:23, 1522:8, 1552:3,
1558:21, 1569:3, 1588:7,
1592:2, 1632:23, 1639:10,
1640:5
  **discussions** [5] - 1518:22,
1518:25, 1559:23, 1559:24,
1639:16
  **dispute** [1] - 1593:1
  **disputes** [1] - 1592:17
  **disputing** [2] - 1543:25, 1544:1
  **dissemination** [1] - 1635:25
  **distribution** [2] - 1566:2,
1566:4
  **DISTRICT** [4] - 1510:1, 1510:1,
1510:10, 1510:14
  **division** [1] - 1600:8
  **Doc** [1] - 1629:4
  **doc** [2] - 1573:14, 1613:22
  **doc.drf** [2] - 1613:21, 1613:24
  **doctor's** [1] - 1607:17
  **Document** [3] - 1545:25,
1629:18, 1633:9
  **document** [94] - 1543:1,
1543:21, 1546:3, 1549:22,
1549:24, 1550:1, 1551:3,

1558:5, 1558:12, 1559:12,
1561:16, 1562:21, 1564:23,
1566:21, 1571:14, 1573:22,
1581:19, 1583:13, 1584:11,
1586:16, 1587:7, 1588:24,
1589:12, 1589:13, 1589:16,
1590:5, 1590:24, 1591:7,
1591:8, 1591:12, 1591:18,
1591:21, 1592:18, 1592:25,
1593:8, 1593:25, 1594:1,
1594:2, 1594:6, 1594:12,
1594:16, 1594:17, 1595:8,
1596:25, 1597:2, 1597:8,
1602:19, 1610:16, 1610:18,
1610:22, 1610:23, 1612:11,
1614:19, 1617:23, 1624:12,
1626:19, 1626:24, 1626:25,
1627:1, 1627:2, 1627:3, 1628:7,
1628:12, 1628:15, 1630:1,
1630:2, 1630:4, 1631:6,
1631:13, 1631:14, 1631:17,
1631:20, 1631:21, 1632:10,
1632:11, 1632:12, 1632:15,
1632:19, 1633:2, 1633:9,
1633:23, 1634:5, 1634:6,
1634:12, 1634:13, 1634:22,
1636:4, 1636:20, 1636:23,
1637:2, 1638:1, 1638:5, 1641:2
  **documentation** [1] - 1619:13
  **documents** [30] - 1512:19,
1518:17, 1541:24, 1542:1,
1542:9, 1550:2, 1551:14,
1551:21, 1553:1, 1553:13,
1559:9, 1559:11, 1570:24,
1576:20, 1581:5, 1590:3,
1590:9, 1591:4, 1591:5,
1591:10, 1592:21, 1593:7,
1624:25, 1628:25, 1629:19,
1633:15, 1634:1, 1640:11,
1640:12, 1640:22
  **DOJ** [1] - 1538:2
  **domestic** [1] - 1636:14
  **done** [10] - 1512:18, 1513:14,
1521:13, 1530:1, 1548:13,
1548:14, 1568:20, 1571:7,
1596:9, 1623:8
  **Doug** [2] - 1565:4, 1637:16
  **down** [4] - 1533:8, 1586:3,
1598:3, 1614:23
  **dozens** [1] - 1522:18
  **DPG** [1] - 1554:8
  **DR2.docx** [1] - 1596:22
  **draft** [7] - 1568:16, 1568:18,
1568:20, 1572:12, 1578:3,
1581:15, 1595:7
  **drafted** [1] - 1587:18
  **dramatically** [1] - 1573:13
  **drawn** [3] - 1599:15, 1599:20,
1641:1
  **drinks** [1] - 1596:2

**driven** [1] - 1619:25
**dropping** [1] - 1611:20
**due** [10] - 1557:2, 1575:25, 1581:21, 1582:12, 1582:21, 1585:11, 1612:10, 1626:16, 1627:19, 1630:8
**duly** [2] - 1513:21, 1549:4
**Dumchuk** [1] - 1624:2
**Durbin** [1] - 1600:6
**during** [4] - 1577:6, 1582:19, 1616:3, 1640:23
**dutifully** [1] - 1552:6

## E

**e-mail** [2] - 1604:6, 1607:7
**eager** [1] - 1599:25
**eagerly** [1] - 1618:12
**early** [3] - 1541:2, 1542:2, 1607:1
**East** [1] - 1510:22
**ECHR** [1] - 1566:8
**edited** [3] - 1632:15, 1633:2, 1633:10
**editing** [1] - 1594:12
**editors** [1] - 1609:18
**EDT** [1] - 1612:15
**effective** [1] - 1623:11
**effectively** [2] - 1558:24, 1598:8
**effort** [3] - 1532:15, 1542:23, 1564:11
**efforts** [2] - 1513:12, 1515:16
**either** [10] - 1513:11, 1515:22, 1546:15, 1547:15, 1550:17, 1579:20, 1612:19, 1626:12, 1639:12, 1641:1
**electronically** [1] - 1568:19
**elements** [1] - 1549:18
**elicit** [1] - 1522:9
**Ellen** [1] - 1611:14
**Email** [8] - 1510:16, 1510:16, 1510:19, 1510:24, 1510:25, 1510:25, 1511:4, 1511:5
**email** [228] - 1517:2, 1517:3, 1517:4, 1517:7, 1517:12, 1517:14, 1518:16, 1518:23, 1519:5, 1519:13, 1519:14, 1519:15, 1519:17, 1520:23, 1523:17, 1523:21, 1523:22, 1523:25, 1524:3, 1524:12, 1524:13, 1525:10, 1525:18, 1526:8, 1526:9, 1526:23, 1527:12, 1527:23, 1528:6, 1528:7, 1529:25, 1531:7, 1531:9, 1531:19, 1531:22, 1535:3, 1535:25, 1536:4, 1537:14, 1538:6, 1538:11, 1539:17, 1543:22, 1544:7, 1546:17, 1546:20, 1546:21, 1547:10, 1549:20, 1550:25,

1551:13, 1553:11, 1553:15, 1553:18, 1553:23, 1555:3, 1555:20, 1555:23, 1557:6, 1557:7, 1557:9, 1557:12, 1557:14, 1558:3, 1558:9, 1558:10, 1558:11, 1558:25, 1559:4, 1559:15, 1560:10, 1560:16, 1561:19, 1561:20, 1561:22, 1562:12, 1562:13, 1562:14, 1562:17, 1562:18, 1563:14, 1563:16, 1564:1, 1564:3, 1564:17, 1565:1, 1565:3, 1565:20, 1565:23, 1566:7, 1566:11, 1566:16, 1566:24, 1566:25, 1567:2, 1567:15, 1567:19, 1567:24, 1567:25, 1568:6, 1568:9, 1569:19, 1570:14, 1571:15, 1571:17, 1573:25, 1574:20, 1574:23, 1574:24, 1577:15, 1577:16, 1577:20, 1577:21, 1580:6, 1580:7, 1580:15, 1581:3, 1581:4, 1581:7, 1581:10, 1581:13, 1583:16, 1583:17, 1583:21, 1584:9, 1586:19, 1586:21, 1586:23, 1587:5, 1588:3, 1588:9, 1588:12, 1588:23, 1589:4, 1594:25, 1595:1, 1595:3, 1596:13, 1596:16, 1598:16, 1598:18, 1598:20, 1600:17, 1600:21, 1601:3, 1601:4, 1601:21, 1602:9, 1602:20, 1602:22, 1603:5, 1603:9, 1603:10, 1603:15, 1603:23, 1603:25, 1604:2, 1604:3, 1604:12, 1604:13, 1604:22, 1604:24, 1605:5, 1605:8, 1605:21, 1606:1, 1606:3, 1606:5, 1606:12, 1606:13, 1607:16, 1608:6, 1608:10, 1608:14, 1609:8, 1609:10, 1610:5, 1610:8, 1611:3, 1611:6, 1611:20, 1612:12, 1612:13, 1613:2, 1613:6, 1613:11, 1613:13, 1614:20, 1614:22, 1614:24, 1614:25, 1617:25, 1618:2, 1618:4, 1618:6, 1618:8, 1620:21, 1620:24, 1620:25, 1621:14, 1621:17, 1622:2, 1622:5, 1622:6, 1622:25, 1623:1, 1623:3, 1624:12, 1624:13, 1624:16, 1624:17, 1624:19, 1628:12, 1628:14, 1628:15, 1628:19, 1630:13, 1630:16, 1630:17, 1631:11, 1639:11, 1639:14, 1639:16
**emailed** [1] - 1536:24
**emailing** [1] - 1621:4
**emails** [28] - 1516:12, 1537:10, 1542:1, 1542:22, 1542:24,

1543:8, 1544:8, 1544:22, 1545:3, 1547:4, 1548:5, 1553:24, 1558:23, 1594:3, 1600:20, 1601:12, 1602:4, 1602:8, 1604:9, 1607:5, 1611:24, 1611:25, 1612:9, 1612:10, 1614:5, 1639:7
**emarcus@zuckerman.com** [1] - 1511:5
**emerged** [1] - 1623:10
**emphasize** [1] - 1559:10
**emphasizing** [1] - 1530:10
**employee** [1] - 1518:6
**employer** [1] - 1584:24
**en** [1] - 1555:11
**encounter** [1] - 1619:12
**end** [11] - 1512:16, 1520:6, 1554:3, 1557:2, 1568:21, 1579:14, 1581:14, 1621:11, 1629:20
**endorsement** [1] - 1597:11
**ends** [1] - 1567:19
**engage** [3] - 1533:23, 1558:16
**engaged** [1] - 1598:5
**engagement** [5] - 1515:3, 1515:23, 1560:6, 1562:3, 1637:7
**Engagement** [1] - 1558:13
**engages** [2] - 1635:14, 1635:24
**engaging** [1] - 1636:10
**English** [11] - 1568:23, 1572:1, 1572:3, 1572:5, 1572:9, 1572:12, 1572:18, 1572:20, 1573:12, 1581:15, 1595:7
**enjoy** [1] - 1625:8
**enjoyed** [1] - 1582:24
**enlist** [1] - 1619:15
**ensure** [1] - 1597:24
**entail** [1] - 1515:13
**enter** [2] - 1627:21, 1631:23
**entered** [3] - 1584:18, 1612:5, 1631:16
**entering** [1] - 1589:22
**enters** [2] - 1513:7, 1548:21
**entirely** [1] - 1588:23
**entirety** [1] - 1581:15
**entitled** [1] - 1576:12
**entity** [1] - 1619:7
**enumerated** [1] - 1520:14
**envisions** [1] - 1596:25
**erroneous** [1] - 1539:21
**especially** [1] - 1623:13
**essence** [1] - 1613:22
**essentially** [2] - 1588:22, 1601:11
**EST** [1] - 1612:14
**established** [4] - 1521:15, 1546:22, 1627:14, 1627:15
**establishing** [1] - 1542:21
**estimate** [2] - 1625:12, 1627:14

**estimates** [1] - 1627:14
**et** [1] - 1619:21
**etcetera** [1] - 1596:11
**Euro-2012** [1] - 1577:6
**European** [5] - 1585:2, 1585:5, 1585:9, 1619:20, 1620:12
**Europeans** [1] - 1623:14
**evaluate** [2] - 1615:16, 1621:24
**evening** [1] - 1518:17
**event** [1] - 1539:22
**events** [1] - 1545:2
**Evidence** [1] - 1547:20
**evidence** [22] - 1542:7, 1544:19, 1546:21, 1547:3, 1554:21, 1559:10, 1561:15, 1574:19, 1589:21, 1589:22, 1590:18, 1597:13, 1597:25, 1601:11, 1601:16, 1612:5, 1612:23, 1616:2, 1620:20, 1621:10, 1621:24, 1631:24
**evident** [1] - 1599:9
**evidentiary** [3] - 1542:17, 1544:5, 1544:13
**exactly** [3] - 1535:14, 1535:18, 1542:21
**EXAMINATION** [3] - 1513:23, 1549:6, 1639:4
**Examination** [3] - 1511:15, 1511:18, 1511:19
**examination** [6] - 1540:17, 1584:18, 1585:1, 1585:8, 1585:23, 1638:24
**examinations** [1] - 1627:7
**examined** [3] - 1513:22, 1549:5, 1585:3
**example** [2] - 1592:21, 1616:24
**exceeding** [1] - 1627:18
**Excel** [1] - 1550:2
**excellent** [1] - 1552:19
**except** [2] - 1547:20, 1612:16
**excerpt** [1] - 1588:9
**exchanged** [1] - 1576:1
**exciting** [1] - 1534:2
**exclamation** [1] - 1567:10
**exclusive** [1] - 1598:8
**excuse** [7] - 1568:12, 1573:18, 1576:7, 1579:2, 1584:1, 1585:16, 1629:12
**excused** [5] - 1540:19, 1541:13, 1639:2, 1641:18, 1641:21
**execution** [2] - 1586:4, 1586:11
**executive** [1] - 1568:22
**executor** [3] - 1584:25, 1586:7, 1586:9
**exercise** [1] - 1548:12
**exhausted** [1] - 1605:15
**exhibit** [35] - 1528:5, 1533:7, 1537:6, 1537:17, 1538:9, 1539:25, 1544:14, 1545:20, 1546:9, 1552:24, 1554:22,

1562:23, 1577:19, 1580:1, 1591:10, 1591:23, 1594:5, 1594:8, 1594:11, 1601:7, 1601:14, 1601:15, 1601:19, 1604:21, 1608:5, 1612:13, 1617:2, 1622:16, 1622:17, 1625:12, 1632:17, 1633:17, 1634:1, 1635:8, 1638:6
**Exhibit** [84] - 1516:24, 1519:9, 1523:16, 1526:7, 1527:9, 1528:4, 1531:4, 1533:4, 1535:19, 1537:4, 1551:9, 1551:13, 1553:11, 1554:20, 1554:22, 1554:25, 1555:17, 1555:19, 1557:4, 1557:6, 1561:15, 1563:10, 1563:11, 1564:21, 1565:18, 1566:20, 1568:2, 1568:24, 1569:4, 1571:12, 1573:21, 1574:18, 1575:10, 1577:14, 1579:24, 1580:23, 1580:25, 1583:12, 1586:15, 1587:3, 1587:4, 1589:19, 1589:23, 1594:24, 1596:12, 1596:13, 1598:11, 1598:13, 1598:15, 1600:15, 1602:3, 1602:18, 1602:19, 1604:4, 1604:20, 1605:20, 1606:8, 1606:9, 1608:4, 1609:2, 1610:3, 1611:2, 1612:3, 1613:1, 1614:18, 1617:22, 1620:19, 1621:12, 1622:1, 1622:14, 1622:25, 1624:11, 1628:6, 1630:11, 1631:8, 1632:9, 1632:10, 1632:14, 1632:15, 1633:22, 1634:4, 1636:18, 1637:20, 1638:3
**EXHIBITS** [1] - 1511:21
**exhibits** [19] - 1542:15, 1543:13, 1544:5, 1545:18, 1546:14, 1550:24, 1551:6, 1551:8, 1552:6, 1555:19, 1569:16, 1570:17, 1591:1, 1591:4, 1591:6, 1601:10, 1601:23, 1612:9, 1633:17
**Exhibits** [3] - 1511:22, 1631:19, 1634:11
**exonerates** [1] - 1573:4
**expand** [1] - 1619:9
**expect** [5] - 1520:24, 1552:9, 1567:7, 1605:17, 1626:19
**expectation** [1] - 1562:9
**expected** [1] - 1576:5
**expenditures** [1] - 1576:6
**expenses** [5] - 1557:24, 1576:10, 1586:6, 1605:16, 1619:7
**experience** [1] - 1530:11
**expert** [6] - 1575:18, 1584:18, 1585:8, 1617:9, 1619:15, 1627:7
**expertise** [1] - 1619:16

**experts** [2] - 1576:3, 1616:24
**explaining** [2] - 1572:19, 1593:12
**explains** [2] - 1576:1, 1576:4
**explanation** [1] - 1588:19
**extensively** [1] - 1577:5
**external** [1] - 1515:15
**Ezra** [1] - 1511:1

# F

**facilitate** [1] - 1607:23
**fact** [18] - 1513:12, 1521:15, 1543:16, 1546:24, 1548:8, 1568:20, 1570:7, 1590:18, 1601:16, 1601:19, 1601:20, 1601:21, 1622:18, 1622:19, 1622:20, 1622:21, 1641:1, 1641:4
**facts** [4] - 1545:2, 1546:6, 1582:17, 1590:17
**failure** [1] - 1616:6
**fair** [3] - 1615:25, 1619:13, 1621:11
**fairly** [1] - 1612:7
**fairness** [2] - 1543:6, 1621:24
**faithfully** [1] - 1586:14
**falsely** [1] - 1573:3
**FARA** [3] - 1536:19, 1538:3, 1558:18
**fashion** [1] - 1520:19
**fast** [1] - 1536:17
**favor** [1] - 1548:12
**favorite** [1] - 1524:8
**Federal** [1] - 1547:19
**fee** [2] - 1534:2, 1577:13
**fees** [5] - 1520:24, 1557:21, 1581:8, 1584:2, 1618:25
**Fernando** [2] - 1510:12, 1512:9
**fernando.campoamor** [1] - 1510:16
**fernando.campoamor-sanchez@usdoj.gov** [1] - 1510:16
**few** [3] - 1516:9, 1578:7, 1614:16
**field** [1] - 1609:25
**fifth** [1] - 1537:17
**figured** [1] - 1641:19
**file** [4] - 1591:14, 1592:11, 1593:1, 1593:8
**files** [13] - 1543:14, 1546:3, 1551:6, 1590:25, 1591:2, 1592:21, 1633:15, 1633:25, 1634:8, 1634:13, 1636:20, 1638:1, 1638:5
**final** [5] - 1562:2, 1595:7, 1605:10, 1605:13, 1629:18
**finalize** [1] - 1596:9
**finalized** [1] - 1568:21

**finalizing** [2] - 1582:16, 1628:25
**finally** [1] - 1608:19
**financed** [1] - 1565:9
**findings** [4] - 1530:11, 1597:18, 1597:21, 1616:25
**fine** [4] - 1534:15, 1552:18, 1559:3, 1616:19
**fingernails....** [1] - 1578:11
**finish** [3] - 1577:4, 1584:9, 1625:15
**firm** [1] - 1514:21, 1515:5, 1515:19, 1518:3, 1521:24, 1526:20, 1527:17, 1532:2, 1550:12, 1558:15, 1559:23, 1562:5, 1562:6, 1573:2, 1578:17, 1597:10, 1599:11, 1599:20, 1610:25
**firm's** [3] - 1547:7, 1547:8, 1610:22
**firms** [1] - 1550:13
**first** [42] - 1513:21, 1514:17, 1514:18, 1514:21, 1517:2, 1520:14, 1527:21, 1528:5, 1529:13, 1531:6, 1533:5, 1533:25, 1534:6, 1535:25, 1539:25, 1543:21, 1549:4, 1555:22, 1556:11, 1556:14, 1556:15, 1558:6, 1577:20, 1578:8, 1578:12, 1594:1, 1594:15, 1594:17, 1597:4, 1597:8, 1598:18, 1600:20, 1608:20, 1612:7, 1612:12, 1612:13, 1613:13, 1617:2, 1618:22, 1629:7, 1631:8, 1633:21
**firsthand** [1] - 1543:9
**firstly** [1] - 1615:9
**five** [6] - 1554:7, 1611:21, 1612:15, 1612:19, 1637:21, 1638:25
**fix** [1] - 1535:18
**Fixed** [1] - 1524:3
**flag** [1] - 1532:2
**flagged** [1] - 1614:13
**flagging** [1] - 1525:4
**flexible** [1] - 1595:23
**flipping** [1] - 1537:17
**Flom** [1] - 1584:17
**Florida** [1] - 1625:8
**flow** [1] - 1544:18
**flying** [1] - 1607:11
**focus** [2] - 1560:17, 1614:23
**focusing** [4] - 1517:2, 1568:3, 1617:3, 1624:15
**folks** [1] - 1618:13
**following** [10] - 1519:7, 1556:8, 1583:5, 1583:9, 1583:10, 1590:3, 1590:8, 1592:3, 1612:16, 1624:10
**follows** [2] - 1513:22, 1549:5

**FOR** [2] - 1510:1, 1510:13
**forces** [1] - 1513:10
**Foreign** [2] - 1537:1, 1558:17
**foreign** [7] - 1609:18, 1611:13, 1626:20, 1626:24, 1636:14, 1636:16, 1636:17
**forget** [1] - 1512:16
**form** [3] - 1525:12, 1613:21, 1613:24
**Former** [1] - 1603:2
**former** [2] - 1539:11, 1620:4
**formulating** [1] - 1636:13
**forth** [3] - 1582:12, 1639:7, 1639:16
**forward** [6] - 1554:13, 1560:14, 1566:11, 1571:23, 1588:2, 1637:22
**forwarded** [2] - 1523:18, 1533:17
**forwarding** [1] - 1536:17
**forwards** [2] - 1524:13, 1566:14
**foundation** [2] - 1542:11, 1597:18
**four** [4] - 1557:1, 1573:16, 1612:17, 1612:19
**Fourth** [1] - 1510:14
**foxhole** [1] - 1564:14
**framing** [1] - 1638:14
**free** [3] - 1568:1, 1619:13, 1629:4
**fresh** [1] - 1639:2
**Friday** [3] - 1521:8, 1525:18, 1630:22
**friend** [1] - 1624:9
**front** [3] - 1516:25, 1564:14, 1633:17
**frustrated** [1] - 1512:21
**FTI** [16] - 1518:1, 1518:2, 1518:3, 1518:6, 1518:11, 1521:3, 1527:20, 1528:20, 1535:5, 1540:11, 1540:12, 1564:10, 1564:14, 1596:9, 1596:20, 1596:22
**FTI's** [1] - 1596:24
**Fule** [1] - 1600:6
**full** [2] - 1555:9, 1577:9
**funding** [1] - 1577:2
**future** [3] - 1546:23, 1580:14, 1620:2
**FYI** [1] - 1524:16

# G

**Gaston** [4] - 1510:13, 1512:8, 1550:14, 1625:11
**GASTON** [126] - 1513:18, 1513:24, 1519:11, 1519:12, 1522:10, 1523:2, 1525:15, 1525:16, 1531:6, 1531:8, 1533:5, 1533:11, 1535:22,

1535:24, 1540:16, 1540:25, 1541:4, 1549:1, 1549:7, 1550:19, 1550:22, 1551:9, 1551:11, 1552:1, 1552:4, 1552:13, 1552:19, 1552:22, 1553:4, 1553:7, 1553:14, 1553:17, 1559:9, 1560:15, 1560:20, 1561:4, 1561:10, 1561:13, 1567:23, 1568:25, 1569:4, 1569:9, 1569:12, 1569:15, 1570:2, 1570:5, 1570:8, 1570:11, 1570:18, 1570:20, 1570:23, 1571:5, 1571:8, 1571:11, 1575:13, 1575:14, 1582:1, 1582:4, 1582:7, 1582:9, 1583:2, 1583:4, 1585:20, 1589:8, 1589:10, 1589:15, 1589:19, 1589:22, 1589:25, 1590:2, 1590:20, 1590:21, 1592:7, 1592:12, 1592:22, 1593:16, 1593:24, 1600:24, 1601:2, 1602:1, 1602:2, 1607:4, 1607:6, 1608:8, 1608:9, 1611:23, 1612:2, 1612:5, 1612:24, 1614:4, 1614:6, 1622:13, 1622:23, 1622:24, 1625:15, 1625:21, 1625:22, 1625:25, 1626:1, 1626:7, 1626:17, 1626:23, 1628:11, 1628:13, 1631:10, 1631:12, 1631:23, 1632:3, 1632:5, 1632:7, 1633:1, 1633:8, 1634:16, 1634:18, 1635:9, 1635:11, 1636:5, 1636:7, 1637:3, 1637:5, 1637:21, 1637:24, 1638:20, 1639:21, 1640:7, 1640:14
**Gaston...................** [2] - 1511:15, 1511:18
**Gates** [1] - 1518:19
**GC** [1] - 1598:6
**general** [2] - 1514:15, 1624:4
**generally** [2] - 1540:13, 1548:5
**generate** [1] - 1515:23
**genesis** [1] - 1587:16
**gentleman** [1] - 1542:25
**gesturing** [1] - 1625:18
**Given** [1] - 1620:14
**given** [10] - 1543:16, 1553:1, 1578:21, 1591:1, 1591:6, 1592:8, 1598:6, 1608:20, 1613:22, 1615:25
**Glad** [1] - 1524:25
**glad** [1] - 1623:25
**glass** [1] - 1609:3
**global** [2] - 1549:12, 1549:16
**goal** [2] - 1620:2, 1620:11
**government** [31] - 1513:17, 1513:19, 1524:8, 1541:23, 1542:19, 1543:18, 1545:21,

1545:22, 1546:20, 1549:2,
1551:12, 1565:6, 1582:12,
1590:16, 1592:8, 1592:9,
1592:15, 1593:7, 1597:1,
1597:11, 1597:19, 1597:24,
1614:15, 1619:3, 1619:6,
1619:8, 1620:14, 1636:12,
1636:16, 1640:12, 1640:24
**Government** [4] - 1566:20,
1589:23, 1606:7, 1630:7
**government's** [3] - 1550:24,
1551:5, 1634:10
**Government's** [69] - 1516:23,
1519:9, 1523:15, 1526:6,
1527:9, 1528:4, 1531:4, 1533:4,
1535:19, 1537:4, 1551:9,
1553:11, 1554:20, 1554:22,
1554:25, 1555:17, 1555:19,
1557:4, 1557:6, 1561:14,
1563:10, 1563:11, 1564:21,
1565:18, 1568:2, 1568:24,
1569:4, 1571:12, 1573:20,
1574:18, 1575:9, 1579:24,
1580:23, 1583:12, 1586:15,
1587:3, 1587:4, 1590:22,
1594:24, 1596:12, 1598:11,
1598:13, 1600:15, 1602:3,
1602:17, 1602:19, 1604:4,
1604:20, 1605:19, 1606:9,
1608:3, 1609:2, 1610:3, 1611:2,
1612:3, 1613:1, 1614:18,
1621:12, 1622:1, 1628:5,
1630:11, 1631:8, 1632:9,
1632:10, 1633:21, 1634:3,
1636:18, 1637:19, 1638:3
**GOVT** [1] - 1614:15
**GP** [1] - 1571:25
**grade** [1] - 1576:3
**GRAG** [1] - 1567:10
**graphic** [1] - 1635:25
**grateful** [1] - 1582:25
**great** [4] - 1512:20, 1513:16,
1534:17, 1623:16
**Greg** [67] - 1517:13, 1517:17,
1520:23, 1521:12, 1521:21,
1522:21, 1527:4, 1527:15,
1530:9, 1534:18, 1534:19,
1535:15, 1536:23, 1553:22,
1554:18, 1561:24, 1563:2,
1565:3, 1567:6, 1568:14,
1568:23, 1571:19, 1571:23,
1574:2, 1575:2, 1577:23,
1578:2, 1579:9, 1580:10,
1581:4, 1581:5, 1581:7, 1584:6,
1587:10, 1594:19, 1595:21,
1596:24, 1598:23, 1604:16,
1605:2, 1605:18, 1605:25,
1606:19, 1607:16, 1608:11,
1609:1, 1609:16, 1613:15,
1613:20, 1614:11, 1615:1,

1618:3, 1620:25, 1622:6,
1623:4, 1623:10, 1624:8,
1624:17, 1624:24, 1630:10,
1630:17, 1630:22, 1637:16,
1637:17
**greg** [1] - 1587:16
**Greg's** [3] - 1522:22, 1591:2,
1591:3
**Gregory** [4] - 1510:6, 1512:3,
1541:16, 1586:14
**ground** [2] - 1521:14, 1521:16
**grounds** [1] - 1569:6
**group** [7] - 1514:9, 1514:11,
1515:9, 1517:24, 1520:2,
1531:14, 1625:17
**guess** [2] - 1592:17, 1600:1
**guilty** [1] - 1573:4
**Gulland** [1] - 1510:13
**Gurtenko** [4] - 1628:22,
1628:24, 1629:16, 1629:25
**gurtenko@minjust.gov.au** [1] -
1628:16
**guy** [2] - 1573:2, 1624:9
**GX500** [1] - 1590:4
**GX503** [1] - 1590:4
**GX521** [1] - 1590:5
**GX535** [1] - 1590:10
**GX548** [1] - 1590:12
**GX550** [1] - 1590:13

## H

**half** [6] - 1534:10, 1553:14,
1553:16, 1554:8, 1634:16,
1634:22
**hand** [9] - 1544:17, 1572:22,
1573:14, 1590:10, 1591:19,
1610:15, 1612:11, 1632:19,
1635:3
**hand-deliver** [1] - 1610:15
**hand-delivering** [1] - 1573:14
**handle** [4] - 1518:3, 1521:13,
1540:13, 1578:18
**handled** [4] - 1528:2, 1533:19,
1538:20, 1539:4
**handling** [4] - 1521:4, 1521:20,
1528:17, 1597:20
**handwriting** [17] - 1570:25,
1571:1, 1571:4, 1589:17,
1590:3, 1590:8, 1590:9,
1590:11, 1590:12, 1590:13,
1594:6, 1594:9, 1594:13,
1594:14, 1633:23, 1634:6
**happier** [1] - 1608:25
**happy** [10] - 1537:23, 1552:10,
1572:13, 1607:2, 1608:24,
1615:10, 1617:8, 1617:20,
1623:12, 1623:13
**hard** [2] - 1512:22, 1609:17
**hardcopy** [16] - 1551:6,

1570:24, 1589:16, 1590:24,
1595:16, 1610:15, 1611:20,
1633:15, 1633:25, 1634:5,
1634:6, 1634:8, 1634:13,
1636:20, 1638:1, 1638:5
**Haskell** [1] - 1567:6
**hate** [1] - 1564:6
**Hawker** [22] - 1517:13, 1517:25,
1518:1, 1518:6, 1518:11,
1518:25, 1520:11, 1520:22,
1524:3, 1524:12, 1527:20,
1528:20, 1529:15, 1533:17,
1533:21, 1533:24, 1534:7,
1534:16, 1534:21, 1540:11,
1596:10, 1598:25
**Hawker's** [1] - 1534:12
**Hawker-011** [1] - 1606:4
**Head** [1] - 1628:1
**head** [5] - 1541:22, 1598:1,
1620:4, 1624:4, 1624:5
**header** [2] - 1597:5, 1597:23
**headline** [1] - 1539:9
**heads** [2] - 1526:12, 1527:8
**Heads** [1] - 1565:5
**heads-up** [2] - 1526:12, 1527:8
**Heads-Up** [1] - 1565:5
**hear** [4] - 1524:25, 1527:24,
1548:7, 1626:22
**heard** [1] - 1526:18
**hearing** [2] - 1554:14, 1585:7
**hears** [1] - 1522:11
**hearsay** [1] - 1570:6
**HELD** [1] - 1510:9
**hello** [1] - 1618:7
**help** [8] - 1514:12, 1515:17,
1515:18, 1532:8, 1532:16,
1599:25, 1617:17, 1617:20
**helpful** [2] - 1537:24, 1550:18
**helping** [1] - 1518:11
**hence** [1] - 1586:10
**hereby** [1] - 1627:11
**Herszenhorn** [6] - 1611:15,
1614:12, 1618:3, 1618:4,
1618:10, 1620:18
**hi** [4] - 1526:14, 1533:22,
1618:11, 1629:22
**higher** [3] - 1576:3, 1576:5,
1585:25
**highlight** [1] - 1559:12
**highlighted** [2] - 1635:10,
1636:6
**highlighting** [2] - 1590:4,
1634:23
**history** [7] - 1550:4, 1615:17,
1631:14, 1631:17, 1631:20,
1632:19, 1637:7
**hold** [2] - 1578:7, 1598:12
**holidays** [1] - 1625:9
**home** [5] - 1513:11, 1554:12,
1610:14, 1610:15, 1611:21

homestretch [1] - 1633:13
Honor [23] - 1512:1, 1512:7, 1512:12, 1513:5, 1513:18, 1540:16, 1540:18, 1541:15, 1541:19, 1545:5, 1548:17, 1549:1, 1551:19, 1553:4, 1558:19, 1575:11, 1591:25, 1611:25, 1622:13, 1631:23, 1632:21, 1637:21, 1638:21
HONORABLE [1] - 1510:9
Honorable [3] - 1581:23, 1582:2, 1630:6
hope [4] - 1558:2, 1577:13, 1605:17, 1629:19
Hope [1] - 1624:24
Hopefully [1] - 1579:14
hotel [1] - 1530:13
hour [2] - 1554:8, 1629:15
hourly [1] - 1554:19
hours [6] - 1578:7, 1586:3, 1612:15, 1612:17, 1612:20, 1618:20
HRV [1] - 1565:8
hryvnias [1] - 1567:12
huge [1] - 1586:1
Huisman [8] - 1531:2, 1531:9, 1531:16, 1532:11, 1534:7, 1535:6, 1536:2, 1536:6
Human [4] - 1585:2, 1585:6, 1585:10, 1620:12
human [1] - 1560:4
Hyatt [1] - 1638:9

**I**

i.e [2] - 1612:13, 1620:1
IBM [1] - 1550:7
idea [2] - 1543:17, 1625:14
ideally [1] - 1580:16
ideas [1] - 1565:13
identified [1] - 1590:8
identifies [1] - 1591:20
identify [3] - 1512:5, 1542:15, 1605:12
Ill [1] - 1510:21
illustrate [1] - 1547:16
immediately [1] - 1572:10
implement [1] - 1576:12
implemented [1] - 1577:5
important [8] - 1556:2, 1559:11, 1567:14, 1589:3, 1593:20, 1597:19, 1609:25, 1616:7
impressed [1] - 1530:13
impression [1] - 1593:18
improper [3] - 1543:10, 1559:1, 1619:25
improperly [1] - 1593:9
impropriety [1] - 1542:2
IN [1] - 1510:1
inappropriate [1] - 1547:2

include [5] - 1516:10, 1549:20, 1549:22, 1583:20, 1612:14
includes [3] - 1569:6, 1635:13, 1635:23
including [1] - 1636:1
incoming [1] - 1531:22
inconsistent [1] - 1524:6
incorporate [1] - 1557:17
incorporated [1] - 1557:22
incorrect [1] - 1535:16
increase [3] - 1627:6, 1627:9, 1627:20
incurred [1] - 1586:7
independence [3] - 1520:25, 1529:22, 1615:22
independent [4] - 1582:16, 1597:11, 1599:19, 1620:3
INDEX [1] - 1511:12
indicate [5] - 1536:5, 1556:2, 1556:5, 1565:2, 1569:18
indicated [5] - 1527:12, 1537:14, 1592:13, 1627:16, 1627:19
indicates [1] - 1629:9
indication [1] - 1526:18
indirectly [2] - 1635:14, 1635:24
individual [1] - 1599:12
inferences [2] - 1640:9, 1640:25
influence [1] - 1636:11
info [2] - 1527:21, 1604:14
inform [2] - 1534:6, 1627:11
information [12] - 1515:19, 1516:20, 1532:18, 1542:19, 1583:5, 1583:10, 1625:2, 1625:6, 1634:19, 1635:20, 1636:1, 1637:8
informing [4] - 1536:1, 1635:14, 1635:18, 1640:20
initial [3] - 1535:9, 1597:20, 1623:10
initiate [1] - 1615:15
inquired [1] - 1530:22
inquiries [14] - 1514:13, 1520:18, 1520:22, 1521:4, 1521:20, 1526:20, 1527:17, 1527:24, 1528:1, 1528:17, 1528:21, 1530:19, 1530:24, 1533:19
Inquiries [1] - 1520:15
inquiry [4] - 1532:3, 1534:7, 1536:18, 1582:16
inside [1] - 1599:6
insisted [4] - 1529:21, 1615:21, 1619:3
inspected [1] - 1586:2
instance [2] - 1532:7, 1589:2
instead [1] - 1559:24
institution [1] - 1599:7

instructed [2] - 1524:11, 1601:15
instruction [6] - 1569:17, 1569:19, 1569:21, 1570:10, 1601:8, 1622:14
instructions [2] - 1582:22, 1601:22
integrity [1] - 1599:19
intend [3] - 1541:25, 1589:4, 1608:17
intends [2] - 1545:21, 1636:11
intention [1] - 1524:4
interested [2] - 1608:21, 1608:24
interests [2] - 1635:16, 1636:16
internal [1] - 1613:24
interrupted [1] - 1546:12
intervening [1] - 1516:7
interview [4] - 1538:20, 1539:3, 1638:10
interviews [3] - 1521:12, 1521:13, 1522:15
introduce [4] - 1514:2, 1541:23, 1543:22, 1549:10
introduced [1] - 1542:9
investigating [1] - 1619:10
invited [2] - 1624:2, 1624:7
invoice [5] - 1580:15, 1582:11, 1605:17, 1629:1, 1629:2
involved [11] - 1515:20, 1516:4, 1517:15, 1517:19, 1517:20, 1533:1, 1540:12, 1559:23, 1559:24, 1599:13, 1619:1
involvement [2] - 1541:24, 1576:3
involves [1] - 1531:25
involving [1] - 1585:25
ironclad [1] - 1599:6
irrelevant [1] - 1560:22
irritated [1] - 1529:19
issue [8] - 1534:2, 1535:18, 1542:12, 1557:13, 1564:15, 1577:9, 1599:4, 1614:13
issued [3] - 1536:9, 1539:13, 1539:20
issues [12] - 1521:25, 1522:16, 1524:16, 1545:6, 1545:12, 1546:6, 1547:15, 1547:17, 1564:6, 1571:23, 1586:12, 1627:22
IT [1] - 1541:22
it' [1] - 1590:11
item [4] - 1520:14, 1521:10, 1540:12, 1634:23
itself [4] - 1521:1, 1534:22, 1546:23, 1546:25

**J**

JACKSON [1] - 1510:9

**Jackson** [1] - 1601:8
**James** [1] - 1510:20
**Janice** [1] - 1511:7
**January** [2] - 1515:5, 1624:7
**Jason** [2] - 1510:17, 1512:8
**jason.mccullough@usdoj.**
**gov** [1] - 1510:19
**job** [6] - 1512:22, 1548:13,
1565:8, 1567:12, 1599:18,
1623:16
**John** [1] - 1638:18
**join** [2] - 1514:17, 1573:5
**joined** [5] - 1512:9, 1514:18,
1514:21, 1515:8, 1515:10
**Jonathan** [15] - 1517:13,
1517:25, 1518:1, 1518:11,
1518:14, 1520:11, 1520:22,
1527:20, 1527:24, 1528:20,
1533:17, 1533:22, 1540:11,
1598:25, 1606:4
**Journal** [9] - 1531:3, 1532:5,
1534:8, 1534:13, 1536:8,
1538:12, 1538:20, 1539:4,
1539:13
**journalist** [4] - 1524:8, 1598:4,
1598:6, 1638:17
**journalists** [10] - 1523:10,
1524:4, 1524:11, 1532:16,
1599:2, 1599:5, 1599:13,
1599:22, 1599:24, 1600:7
**JUDGE** [2] - 1510:9, 1510:10
**judge** [2] - 1595:10, 1615:23
**Judge** [1] - 1601:8
**July** [11] - 1568:10, 1568:12,
1571:21, 1580:14, 1582:20,
1584:7, 1584:8, 1587:20,
1587:24, 1588:1, 1594:21
**June** [5] - 1555:24, 1556:5,
1566:14, 1567:1, 1582:20
**Junghans** [2] - 1511:1, 1512:14
**jurisdictions** [1] - 1531:25
**jurors** [3] - 1513:9, 1548:19,
1548:22
**JURORS** [1] - 1625:18
**JURY** [2] - 1510:4, 1510:8
**jury** [15] - 1513:6, 1513:7,
1514:3, 1541:8, 1541:11,
1543:20, 1545:21, 1548:21,
1549:10, 1590:15, 1593:5,
1611:24, 1639:24, 1641:14,
1641:17
**Justice** [23] - 1510:17, 1536:19,
1536:20, 1557:16, 1562:2,
1562:9, 1567:11, 1575:17,
1576:22, 1582:3, 1582:15,
1584:17, 1594:18, 1605:10,
1605:12, 1618:24, 1620:10,
1627:5, 1627:17, 1627:20,
1628:23, 1630:7, 1634:20
**justification** [3] - 1575:7,

1576:22, 1597:16

## K

**keep** [7] - 1525:4, 1549:25,
1552:16, 1552:17, 1560:14,
1625:20, 1625:21
**keeps** [1] - 1572:13
**kept** [2] - 1551:6, 1590:25
**key** [1] - 1623:11
**Kilimnik** [1] - 1561:25
**kind** [10] - 1532:16, 1532:17,
1550:15, 1550:16, 1554:9,
1562:11, 1573:5, 1588:13,
1599:12, 1636:1
**knowing** [1] - 1512:20
**knowledge** [8] - 1541:24,
1543:9, 1547:4, 1560:4,
1592:10, 1592:25, 1639:6,
1639:11
**knowledgeable** [2] - 1544:10,
1544:11
**knows** [2] - 1592:12, 1603:20
**Konstantin** [1] - 1595:9
**Korea** [1] - 1614:13
**kudos** [1] - 1512:23
**kulchytskyy@minjust.gov.au**
[1] - 1561:23
**Kwasnewski** [2] - 1530:12,
1530:16
**Kyiv** [17] - 1554:8, 1564:15,
1566:2, 1566:3, 1571:24,
1572:16, 1573:15, 1573:17,
1574:7, 1580:22, 1595:21,
1620:8, 1623:12, 1623:24,
1624:7, 1630:23, 1638:9

## L

**L-E-S-S-E-R** [1] - 1549:14
**LA** [5] - 1537:12, 1537:19,
1537:22, 1538:3, 1538:24
**labor** [1] - 1576:5
**laid** [1] - 1586:3
**language** [7] - 1571:23,
1572:19, 1590:11, 1595:11,
1595:17, 1626:20, 1626:24
**language'** [1] - 1520:20
**Lantz** [1] - 1605:25
**large** [2] - 1550:3, 1551:14
**last** [12] - 1538:19, 1549:13,
1550:9, 1556:21, 1557:1,
1557:2, 1558:14, 1560:8,
1570:23, 1573:16, 1609:20
**late** [2] - 1516:15, 1516:19
**latest** [1] - 1629:20
**latitude** [1] - 1619:9
**LAUREN** [1] - 1513:20, 1514:4
**Lauren** [9] - 1511:14, 1513:19,
1514:4, 1516:14, 1518:10,

1526:14, 1538:2, 1539:23,
1565:25
**Lavrynovych** [2] - 1582:2,
1630:6
**Law** [9] - 1531:3, 1532:5,
1534:8, 1534:13, 1536:8,
1538:12, 1538:20, 1539:4,
1539:12
**law** [14] - 1550:13, 1573:2,
1575:19, 1576:18, 1577:9,
1582:14, 1584:19, 1585:9,
1585:10, 1597:10, 1599:20,
1619:5, 1619:15, 1627:8
**lawyers** [8] - 1512:25, 1541:12,
1542:8, 1554:7, 1599:5,
1599:12, 1599:16, 1615:12
**lay** [1] - 1542:10
**lead** [3] - 1517:17, 1529:20,
1614:12
**leadership** [1] - 1600:14
**leading** [2] - 1525:13, 1530:4
**leak** [6] - 1572:25, 1573:3,
1573:10, 1573:13, 1598:1
**leaking** [1] - 1596:25
**leans** [1] - 1640:9
**learned** [2] - 1536:22, 1608:17
**learning** [1] - 1536:18
**least** [1] - 1623:12
**leave** [6] - 1515:1, 1534:20,
1541:8, 1554:12, 1621:8, 1641:9
**leaves** [3] - 1522:10, 1541:11,
1641:17
**lectern** [1] - 1512:5
**lectures** [1] - 1636:2
**led** [2] - 1616:9, 1617:10
**left** [4] - 1538:25, 1559:13,
1563:6, 1607:16
**Legal** [1] - 1532:4
**legal** [7] - 1545:19, 1575:18,
1576:25, 1577:13, 1617:9,
1619:4, 1619:6
**legitimacy** [1] - 1597:17
**legitimate** [1] - 1545:9
**Leonov** [2] - 1572:7, 1572:10
**less** [2] - 1567:13, 1619:4
**LESSER** [1] - 1549:3
**Lesser** [21] - 1511:17, 1541:22,
1549:2, 1549:8, 1549:12,
1550:23, 1551:21, 1552:23,
1553:8, 1561:14, 1590:24,
1593:25, 1594:23, 1609:3,
1612:25, 1622:25, 1632:8,
1633:13, 1636:19, 1639:6,
1641:18
**letter** [43] - 1557:13, 1557:17,
1558:6, 1560:6, 1562:3, 1562:8,
1562:10, 1562:24, 1563:20,
1567:11, 1576:21, 1580:12,
1580:13, 1581:8, 1581:21,
1582:5, 1582:8, 1584:1, 1584:2,

1584:4, 1584:6, 1587:1,
1587:14, 1587:17, 1587:19,
1587:25, 1588:1, 1588:3,
1594:14, 1594:18, 1624:25,
1625:1, 1625:2, 1625:5, 1626:3,
1626:8, 1626:10, 1626:11,
1626:14, 1627:6, 1630:5, 1630:9
**Letter** [2] - 1563:17, 1587:12
**letterhead** [2] - 1626:15, 1630:5
**letters** [1] - 1576:1
**letting** [1] - 1521:21
**level** [1] - 1576:3
**life** [1] - 1516:7, 1620:1
**likely** [3] - 1541:2, 1611:15,
1616:10
**limited** [1] - 1622:21
**limiting** [1] - 1569:21
**line** [26] - 1520:7, 1523:25,
1526:11, 1537:10, 1539:10,
1555:3, 1556:14, 1563:3,
1566:7, 1567:7, 1568:15,
1574:4, 1575:16, 1581:21,
1599:1, 1603:17, 1605:5,
1610:11, 1615:4, 1618:6,
1618:15, 1621:20, 1621:21,
1624:21, 1626:16, 1630:7
**lines** [1] - 1519:8
**link** [4] - 1532:18, 1610:22,
1610:24, 1613:24
**linked** [1] - 1597:19
**links** [1] - 1529:7
**list** [13] - 1552:5, 1552:7,
1552:16, 1552:17, 1553:1,
1553:8, 1566:2, 1566:4, 1585:3,
1633:17, 1634:23
**lists** [1] - 1521:10
**literally** [1] - 1547:25
**litigation** [1] - 1515:17
**lives** [1] - 1554:10
**LLP** [3] - 1510:22, 1511:2,
1584:17
**local** [2] - 1534:3, 1619:16
**locate** [1] - 1540:23
**located** [2] - 1538:14, 1538:16
**lodging** [1] - 1577:11
**London** [5] - 1517:6, 1517:23,
1527:20, 1533:13, 1533:15
**look** [41] - 1516:12, 1528:5,
1529:1, 1529:13, 1531:19,
1534:10, 1535:19, 1536:4,
1539:9, 1539:16, 1539:25,
1544:16, 1554:13, 1558:5,
1563:5, 1566:18, 1578:8,
1583:16, 1584:11, 1587:2,
1589:11, 1594:15, 1597:22,
1598:13, 1598:18, 1601:3,
1602:8, 1608:20, 1609:7,
1610:18, 1611:2, 1611:6,
1613:11, 1618:22, 1620:20,
1621:10, 1621:23, 1625:23,

1630:3, 1634:22, 1635:2
**looked** [10] - 1538:10, 1566:17,
1583:18, 1586:21, 1600:21,
1604:10, 1611:7, 1613:7,
1615:18, 1626:4
**looking** [28] - 1532:19, 1533:7,
1533:24, 1558:9, 1558:12,
1562:12, 1562:17, 1562:23,
1565:23, 1566:10, 1566:15,
1566:20, 1566:24, 1580:6,
1581:19, 1586:19, 1590:22,
1593:25, 1601:12, 1602:4,
1602:22, 1609:10, 1612:4,
1619:17, 1625:7, 1632:14,
1634:12, 1636:22
**looks** [3] - 1539:9, 1540:5,
1547:21
**loud** [1] - 1559:3
**low** [1] - 1575:25
**lower** [1] - 1591:19
**loyalties** [1] - 1615:18
**lucky** [1] - 1554:13
**lunch** [5] - 1625:13, 1639:3,
1640:19, 1641:8, 1641:14

# M

**M-A-L-E-T** [1] - 1514:4
**mail** [2] - 1604:6, 1607:7
**main** [2] - 1557:20, 1618:18
**major** [1] - 1525:3
**makers** [1] - 1615:17
**MALET** [1] - 1513:20
**Malet** [5] - 1511:14, 1513:19,
1514:4, 1514:5, 1526:21
**malet** [1] - 1513:25
**man** [1] - 1623:25
**manafort** [2] - 1555:4, 1596:23
**Manafort** [63] - 1524:12,
1553:18, 1553:22, 1554:15,
1554:17, 1555:6, 1555:23,
1556:12, 1556:14, 1556:23,
1557:9, 1563:22, 1564:17,
1564:19, 1565:3, 1565:10,
1566:14, 1568:1, 1568:14,
1571:19, 1571:22, 1573:7,
1574:2, 1574:6, 1574:15,
1575:2, 1575:5, 1577:23,
1578:1, 1578:10, 1578:14,
1578:20, 1579:6, 1579:8,
1579:16, 1579:22, 1580:10,
1580:11, 1580:21, 1581:7,
1583:20, 1584:5, 1586:20,
1587:10, 1587:15, 1595:4,
1595:18, 1596:8, 1596:16,
1598:25, 1600:2, 1602:12,
1602:14, 1605:4, 1623:4,
1623:9, 1624:17, 1624:21,
1624:23, 1630:17, 1630:21,
1637:15

**manage** [1] - 1518:11
**managed** [2] - 1513:13,
1629:17
**management** [10] - 1549:22,
1549:24, 1550:1, 1551:3,
1610:23, 1631:6, 1631:14,
1631:21, 1632:11, 1632:13
**manager** [2] - 1517:11, 1531:14
**managers** [1] - 1532:2
**manner** [1] - 1612:10
**many-page** [1] - 1537:6
**Marcus** [1] - 1511:1
**MargaretAnn** [4] - 1606:14,
1606:21, 1607:3, 1607:23
**marked** [5] - 1573:20, 1600:15,
1605:19, 1606:7, 1612:14
**marketing** [7] - 1514:8,
1514:10, 1514:15, 1515:8,
1517:24, 1531:14, 1532:1
**marks** [1] - 1621:4
**married** [1] - 1516:10
**Marsha** [1] - 1605:25
**Massa** [1] - 1566:6
**match** [2] - 1591:18, 1591:22
**matched** [2] - 1591:5, 1591:6
**material** [1] - 1616:2
**materials** [7] - 1551:2, 1576:4,
1584:25, 1585:4, 1586:2,
1631:5, 1633:15
**Matt** [2] - 1531:2, 1638:13
**matter** [9] - 1515:20, 1518:7,
1535:5, 1548:24, 1572:14,
1588:23, 1624:4, 1635:16,
1636:1
**matters** [1] - 1518:4
**Matthew** [2] - 1531:2, 1534:7
**maximum** [1] - 1599:19
**McCullough** [2] - 1510:17,
1512:8
**MCW** [1] - 1598:5
**MD** [1] - 1510:23
**Meagher** [1] - 1584:17
**mean** [8] - 1515:22, 1522:15,
1524:22, 1539:6, 1546:12,
1547:24, 1560:6, 1592:24
**meaning** [5] - 1536:6, 1544:5,
1547:9, 1560:12, 1588:10
**means** [5] - 1592:7, 1611:14,
1636:2, 1636:9, 1641:8
**meantime** [1] - 1520:21
**mechanism** [2] - 1577:8,
1579:10
**media** [16] - 1515:16, 1516:17,
1516:18, 1521:18, 1522:17,
1526:25, 1528:17, 1530:1,
1530:4, 1530:20, 1530:22,
1533:18, 1534:3, 1597:7,
1598:2, 1623:14
**meet** [3] - 1518:13, 1596:10,
1624:3

**meeting** [15] - 1518:18, 1519:4, 1519:22, 1520:4, 1521:3, 1522:3, 1522:10, 1522:11, 1523:3, 1523:4, 1523:5, 1525:6, 1545:24, 1554:8
**meetings** [3] - 1522:20, 1556:2, 1629:14
**Melissa** [8] - 1517:9, 1517:10, 1517:11, 1518:10, 1519:14, 1520:8, 1539:8, 1566:5
**member** [1] - 1619:14
**members** [1] - 1590:15
**memo** [1] - 1596:22
**memorandum** [4] - 1562:20, 1576:22, 1636:25
**mention** [1] - 1521:16
**mentioned** [4] - 1513:2, 1527:15, 1613:25, 1631:4
**mentioning** [1] - 1530:16
**merited** [1] - 1620:4
**message** [7] - 1563:23, 1567:8, 1581:12, 1597:11, 1597:24, 1606:5, 1614:23
**messages** [2] - 1521:25, 1595:24
**met** [4] - 1519:19, 1528:20, 1553:25, 1577:12
**methodology** [1] - 1544:1
**Metro** [1] - 1513:11
**microphone** [1] - 1550:17
**mid** [1] - 1525:25
**mid-December** [1] - 1525:25
**middle** [1] - 1586:19
**midnight** [1] - 1618:18
**might** [7] - 1518:16, 1540:11, 1540:22, 1547:13, 1547:14, 1552:8, 1564:12
**million** [6] - 1554:1, 1579:17, 1579:21, 1580:15, 1582:21
**mind** [4] - 1521:21, 1560:14, 1566:18, 1586:8
**mine** [2] - 1564:8, 1624:9
**minimal** [1] - 1577:13
**Minister** [2] - 1628:1, 1628:22
**minister** [1] - 1563:20
**Ministers** [1] - 1577:2
**Ministry** [20] - 1534:2, 1557:16, 1557:18, 1562:2, 1562:9, 1567:11, 1575:17, 1582:3, 1582:14, 1582:24, 1584:17, 1594:18, 1605:9, 1605:12, 1618:24, 1627:5, 1627:17, 1627:20, 1628:22, 1630:6
**ministry** [1] - 1558:2
**Ministry's** [2] - 1557:20, 1620:10
**Minster** [1] - 1576:21
**minute** [1] - 1529:24
**minutes** [5] - 1540:23, 1541:4, 1541:9, 1611:21, 1637:22

**mission** [1] - 1599:18
**misspelled** [1] - 1539:10
**mistake** [2] - 1512:20, 1525:4
**mistaken** [1] - 1587:17
**mistrial** [1] - 1616:9
**mistrial'** [1] - 1617:11
**modifications** [1] - 1595:12
**MOJ** [24] - 1527:16, 1534:14, 1534:21, 1572:1, 1574:5, 1575:7, 1575:25, 1576:12, 1576:22, 1577:1, 1580:12, 1584:1, 1584:7, 1587:12, 1587:18, 1587:21, 1587:25, 1588:1, 1605:18, 1624:25, 1625:1, 1625:2, 1625:3
**MOJ-Skadden** [1] - 1625:3
**moj.pdf** [2] - 1584:4, 1587:14
**Molly** [2] - 1510:13, 1512:8
**molly.gaston@usdoj.gov** [1] - 1510:16
**moment** [3] - 1516:24, 1517:14, 1639:23
**moment's** [1] - 1512:19
**Monday** [6] - 1519:16, 1521:7, 1537:8, 1596:25, 1598:3, 1598:7
**money** [1] - 1572:14
**month** [5] - 1554:4, 1557:2, 1579:20, 1582:21, 1609:20
**months** [3] - 1582:19, 1618:13, 1619:1
**MORNING** [2] - 1510:5, 1510:8
**morning** [19] - 1512:1, 1512:7, 1512:11, 1512:12, 1512:15, 1513:8, 1513:25, 1514:1, 1518:14, 1527:21, 1529:5, 1549:8, 1549:9, 1595:22, 1607:1, 1613:12, 1622:12, 1629:14, 1641:11
**Moscow** [4] - 1611:14, 1616:14, 1618:7, 1618:11
**most** [2] - 1520:24, 1609:25
**mostly** [1] - 1568:20
**motion** [1] - 1636:3
**motivated** [3] - 1597:12, 1619:22, 1621:9
**motivation** [2] - 1597:25, 1621:21
**motived** [1] - 1619:25
**motives** [1] - 1615:16
**move** [6] - 1522:11, 1543:17, 1560:14, 1574:7, 1585:21, 1598:11
**moving** [2] - 1557:4, 1565:18
**MR** [61] - 1512:7, 1512:12, 1513:5, 1522:4, 1522:6, 1522:14, 1522:24, 1525:12, 1540:18, 1540:22, 1541:19, 1541:21, 1542:14, 1544:4, 1544:17, 1546:5, 1546:11, 1547:11, 1548:11, 1548:17,

1551:19, 1551:25, 1558:19, 1558:22, 1559:7, 1561:6, 1561:11, 1567:17, 1569:8, 1569:11, 1569:14, 1569:23, 1569:25, 1570:13, 1570:21, 1570:22, 1571:3, 1571:7, 1575:11, 1589:2, 1591:25, 1592:3, 1592:10, 1592:19, 1592:24, 1593:3, 1593:10, 1593:15, 1593:21, 1626:5, 1626:22, 1632:1, 1632:21, 1632:24, 1633:6, 1638:25, 1639:5, 1639:18, 1639:23, 1640:2, 1640:16
**MS** [126] - 1513:18, 1513:24, 1519:11, 1519:12, 1522:10, 1523:2, 1525:15, 1525:16, 1531:6, 1531:8, 1533:5, 1533:11, 1535:22, 1535:24, 1540:16, 1540:25, 1541:4, 1549:1, 1549:7, 1550:19, 1550:22, 1551:9, 1551:11, 1552:1, 1552:4, 1552:13, 1552:19, 1552:22, 1553:4, 1553:7, 1553:14, 1553:17, 1559:9, 1560:15, 1560:20, 1561:4, 1561:10, 1561:13, 1567:23, 1568:25, 1569:4, 1569:9, 1569:12, 1569:15, 1570:2, 1570:5, 1570:8, 1570:11, 1570:18, 1570:20, 1570:23, 1571:5, 1571:8, 1571:11, 1575:13, 1575:14, 1582:1, 1582:4, 1582:7, 1582:9, 1583:2, 1583:4, 1585:20, 1589:8, 1589:10, 1589:15, 1589:19, 1589:22, 1589:25, 1590:2, 1590:20, 1590:21, 1592:7, 1592:12, 1592:22, 1593:16, 1593:24, 1600:24, 1601:2, 1602:1, 1602:2, 1607:4, 1607:6, 1608:8, 1608:9, 1611:23, 1612:2, 1612:5, 1612:24, 1614:4, 1614:6, 1622:13, 1622:23, 1622:24, 1625:15, 1625:21, 1625:22, 1625:25, 1626:1, 1626:7, 1626:17, 1626:23, 1628:11, 1628:13, 1631:10, 1631:12, 1631:23, 1632:3, 1632:5, 1632:7, 1633:1, 1633:8, 1634:16, 1634:18, 1635:9, 1635:11, 1636:5, 1636:7, 1637:3, 1637:5, 1637:21, 1637:24, 1638:20, 1639:21, 1640:7, 1640:14
**multiple** [3] - 1531:25, 1560:7, 1562:13
**Murphy** [2] - 1510:20, 1512:13

## N

**name** [9] - 1514:2, 1516:13, 1527:20, 1529:3, 1529:4, 1531:2, 1549:11, 1549:12, 1549:13
**named** [2] - 1596:21, 1606:13
**narrator** [1] - 1547:18
**narrow** [1] - 1619:18
**National** [9] - 1531:3, 1532:4, 1534:8, 1534:12, 1536:8, 1538:12, 1538:20, 1539:4, 1539:12
**nature** [1] - 1530:10
**Nazar** [3] - 1562:2, 1563:19, 1563:22
**nazar.kulchytskyy@gmail. com** [1] - 1561:24
**necessarily** [1] - 1560:3
**necessary** [2] - 1576:20, 1588:18
**need** [19] - 1521:13, 1540:22, 1548:11, 1552:8, 1563:21, 1571:24, 1578:2, 1583:2, 1584:6, 1584:9, 1587:20, 1587:23, 1587:24, 1593:10, 1593:14, 1596:10, 1624:1, 1631:2, 1640:6
**needed** [1] - 1572:15
**needs** [1] - 1588:2
**negotiated** [1] - 1557:19
**negotiations** [2] - 1576:16, 1576:23
**never** [3] - 1538:25, 1563:21, 1566:18
**new** [8] - 1514:14, 1515:17, 1608:23, 1616:11, 1616:25, 1636:24, 1636:25, 1637:10
**New** [12] - 1514:21, 1515:12, 1518:10, 1520:2, 1526:16, 1526:24, 1528:20, 1532:9, 1539:23, 1540:1, 1540:5, 1598:7
**News** [1] - 1537:10
**news** [9] - 1515:24, 1527:15, 1529:4, 1536:24, 1538:5, 1556:15, 1578:2, 1579:9, 1592:17
**newspaper** [1] - 1615:18
**newspapers** [1] - 1636:2
**next** [29] - 1513:4, 1513:17, 1522:12, 1525:14, 1540:21, 1541:18, 1541:21, 1548:25, 1556:21, 1557:1, 1564:13, 1565:18, 1572:3, 1572:12, 1585:15, 1585:16, 1595:24, 1596:1, 1596:24, 1606:6, 1607:5, 1609:24, 1618:19, 1623:18, 1625:7, 1625:11, 1627:1, 1629:20, 1636:4
**next-to-last** [2] - 1556:21,

1557:1
**nice** [1] - 1629:2
**night** [2] - 1596:2, 1598:3
**none** [2] - 1521:1, 1639:9
**nonstarter** [1] - 1557:15
**normal** [1] - 1618:25
**North** [1] - 1614:13
**note** [10] - 1513:8, 1527:7, 1527:12, 1538:7, 1547:1, 1559:22, 1562:4, 1584:7, 1594:9, 1609:16
**notebooks** [2] - 1541:8, 1641:9
**noted** [2] - 1546:1, 1577:11
**notes** [1] - 1638:12
**nothing** [8] - 1522:16, 1534:15, 1540:16, 1564:20, 1621:9, 1638:21, 1640:12, 1640:25
**notice** [2] - 1512:19, 1548:22
**November** [1] - 1604:25
**nuanced** [1] - 1573:6
**number** [15] - 1541:23, 1551:14, 1555:8, 1555:12, 1565:16, 1576:9, 1579:3, 1579:17, 1589:24, 1591:1, 1591:20, 1591:23, 1607:20, 1612:4, 1612:11
**Number** [3] - 1512:2, 1521:11, 1541:16
**numbers** [4] - 1591:18, 1592:6, 1632:4
**NW** [4] - 1510:14, 1510:18, 1511:2, 1511:8
**NYC** [2] - 1554:7, 1607:11
**NYT** [1] - 1618:7
**nytimes.com** [2] - 1529:11, 1618:4

## O

**object** [2] - 1558:22, 1589:4
**objected** [3] - 1543:17, 1560:1, 1569:5
**objection** [17] - 1522:4, 1525:12, 1542:13, 1542:14, 1543:15, 1547:1, 1547:10, 1548:15, 1551:19, 1551:22, 1567:17, 1569:7, 1575:11, 1588:15, 1626:5, 1631:25, 1632:1
**objectionable** [2] - 1543:5, 1546:19
**objections** [2] - 1544:24, 1545:18
**objective** [2] - 1599:17, 1620:1
**obligations** [1] - 1627:13
**obliged** [1] - 1546:5
**obtained** [1] - 1640:22
**obviously** [1] - 1521:15
**occur** [2] - 1519:7, 1544:12
**occurring** [1] - 1518:23

**October** [3] - 1602:23, 1603:16, 1604:18
**OF** [3] - 1510:1, 1510:8, 1510:14
**off-the-record** [1] - 1598:6
**Office** [1] - 1510:13
**office** [17] - 1514:8, 1514:13, 1514:21, 1515:11, 1515:12, 1517:6, 1520:2, 1531:15, 1533:13, 1533:15, 1538:3, 1579:4, 1591:2, 1591:3, 1607:20, 1609:16, 1640:23
**offices** [2] - 1518:14, 1531:25
**official** [6] - 1572:2, 1572:5, 1572:9, 1579:17, 1625:6, 1636:11
**Official** [1] - 1511:7
**officials** [1] - 1565:6
**oftentimes** [1] - 1515:25
**old** [1] - 1527:23
**Oleksandr** [2] - 1582:2, 1630:6
**on-the-record** [1] - 1615:9
**once** [5] - 1542:7, 1569:24, 1601:23, 1612:21, 1625:3
**one** [70] - 1516:24, 1517:23, 1521:10, 1523:8, 1524:3, 1524:23, 1529:9, 1530:25, 1540:6, 1540:9, 1543:20, 1547:20, 1548:23, 1551:15, 1552:24, 1553:13, 1555:19, 1558:25, 1559:4, 1559:5, 1559:15, 1563:11, 1564:7, 1565:7, 1570:15, 1570:23, 1572:5, 1572:9, 1574:13, 1576:13, 1576:14, 1580:25, 1583:17, 1585:13, 1587:4, 1588:13, 1589:2, 1589:4, 1589:5, 1591:10, 1591:13, 1591:21, 1592:14, 1595:8, 1598:12, 1598:15, 1599:16, 1600:17, 1602:9, 1605:8, 1605:17, 1606:9, 1607:22, 1611:6, 1612:6, 1613:20, 1614:13, 1614:15, 1616:5, 1624:25, 1625:15, 1627:18, 1633:2, 1634:1, 1634:23, 1638:6, 1638:20, 1639:23, 1640:18
**one-sentence** [1] - 1540:6
**ones** [3] - 1552:6, 1572:6, 1599:21
**oop** [1] - 1566:18
**open** [9] - 1523:1, 1552:21, 1561:12, 1571:10, 1589:9, 1593:23, 1613:20, 1633:7, 1640:17
**opening** [1] - 1638:13
**openly** [1] - 1565:9
**OPG** [1] - 1595:16
**opine** [1] - 1619:24

**opinion** [1] - 1575:18
**opportunities** [1] - 1514:14
**opportunity** [2] - 1518:18, 1597:10
**opposing** [1] - 1543:24
**opposite** [1] - 1512:24
**opposition** [1] - 1577:12
**oral** [1] - 1635:25
**orally** [1] - 1542:5
**order** [5] - 1518:14, 1569:16, 1597:24, 1619:4, 1637:10
**organization** [1] - 1550:3
**organize** [1] - 1550:2
**original** [10] - 1576:2, 1581:4, 1591:7, 1591:8, 1592:7, 1592:9, 1614:23, 1625:12, 1640:23, 1641:2
**origination** [1] - 1637:7
**otherwise** [6] - 1526:5, 1526:23, 1527:24, 1532:20, 1532:21, 1636:3
**outcome** [1] - 1525:10
**outlets** [1] - 1538:5
**outlined** [1] - 1587:19
**outreach** [1] - 1516:1
**outset** [2] - 1598:1, 1631:4
**outside** [3] - 1575:25, 1610:24, 1615:14
**Outstanding** [3] - 1581:21, 1626:16, 1630:8
**outstanding** [2] - 1582:12, 1582:20
**overall** [1] - 1620:11
**overnight** [1] - 1513:15
**oversee** [2] - 1549:17, 1550:5
**owed** [1] - 1605:16
**own** [1] - 1532:17
**owners** [1] - 1627:12

**P**

**p.m** [4] - 1526:22, 1530:1, 1602:24, 1607:11
**package** [6] - 1555:11, 1556:15, 1556:20, 1556:21, 1556:22, 1557:1
**pad** [1] - 1638:9
**page** [55] - 1528:5, 1529:1, 1529:13, 1533:5, 1533:7, 1533:25, 1534:6, 1534:10, 1537:6, 1537:7, 1537:17, 1537:18, 1538:9, 1539:16, 1539:25, 1553:16, 1555:22, 1556:8, 1556:11, 1558:5, 1558:6, 1562:23, 1577:19, 1578:8, 1578:9, 1578:12, 1583:5, 1583:9, 1583:10, 1594:1, 1594:5, 1594:8, 1594:11, 1594:15, 1594:17, 1597:4, 1597:6, 1607:24,

1610:18, 1612:12, 1612:13, 1614:22, 1616:16, 1617:2, 1626:18, 1627:1, 1628:11, 1629:7, 1634:17, 1635:2, 1635:7, 1636:4, 1637:1
**pages** [7] - 1538:9, 1560:7, 1588:19, 1590:12, 1590:13, 1608:25, 1626:18
**paid** [4] - 1557:24, 1564:11, 1614:15, 1619:6
**paper** [4] - 1588:16, 1588:17, 1591:18, 1640:24
**paragraph** [12] - 1539:10, 1556:1, 1558:12, 1558:14, 1560:8, 1560:22, 1560:23, 1585:15, 1585:16, 1597:8, 1597:15, 1597:22
**paralegal** [2] - 1512:10, 1512:18
**paraphrasing** [3] - 1561:6, 1561:9, 1588:22
**pardon** [1] - 1546:11
**parfitt** [1] - 1615:7
**Parfitt** [3] - 1616:14, 1617:4, 1617:16
**Part** [1] - 1637:3
**part** [8] - 1514:10, 1514:22, 1515:14, 1532:23, 1542:11, 1556:1, 1569:6, 1631:10
**participate** [1] - 1519:22
**participated** [1] - 1520:12
**participation** [2] - 1545:1, 1564:10
**particular** [5] - 1515:20, 1516:17, 1522:2, 1537:12, 1576:25
**parties** [7] - 1590:2, 1590:7, 1597:19, 1612:22, 1631:16, 1640:10, 1640:21
**partner** [5] - 1515:22, 1532:22, 1532:23, 1533:1, 1562:5
**partners** [2] - 1515:15, 1515:25
**parts** [1] - 1560:17
**party** [7] - 1543:23, 1543:24, 1557:25, 1563:8, 1598:5, 1619:23, 1636:17
**pass** [2] - 1527:23, 1562:7
**passes** [1] - 1563:22
**passing** [1] - 1533:23
**paste** [1] - 1529:7
**pasted** [3] - 1530:5, 1538:18, 1539:13
**pasting** [1] - 1588:21
**Paul** [34] - 1553:18, 1553:22, 1553:25, 1557:15, 1565:3, 1566:14, 1568:1, 1568:14, 1568:18, 1571:19, 1573:15, 1573:17, 1574:2, 1574:8, 1575:2, 1575:8, 1577:23, 1578:5, 1580:10, 1580:16,

1581:7, 1587:10, 1588:3, 1595:23, 1597:3, 1598:25, 1605:4, 1605:8, 1623:4, 1623:20, 1624:17, 1625:9, 1630:17, 1637:15
**Paula** [2] - 1511:1, 1512:14
**pay** [4] - 1557:21, 1576:3, 1577:3, 1619:8
**payer** [1] - 1557:25
**paying** [1] - 1524:4
**payment** [4] - 1579:10, 1582:22, 1605:18, 1627:18
**payments** [4] - 1523:11, 1574:25, 1582:12, 1627:13
**PDF** [2] - 1581:9, 1613:21
**Pennsylvania** [1] - 1510:18
**people** [11] - 1520:10, 1549:17, 1550:15, 1555:10, 1577:12, 1599:8, 1599:10, 1600:5, 1600:14, 1619:13, 1625:19
**people's** [1] - 1560:19
**per** [3] - 1575:6, 1579:20, 1582:21
**perceived** [1] - 1520:25
**perfect** [5] - 1518:21, 1533:9, 1572:8, 1632:20, 1640:14
**perfectly** [1] - 1617:15
**perform** [2] - 1586:9, 1627:13
**performed** [1] - 1627:21
**perhaps** [2] - 1565:8, 1618:14
**Perhaps** [1] - 1565:16
**period** [6] - 1516:3, 1516:12, 1516:18, 1536:17, 1537:24, 1550:7
**periodicals** [1] - 1636:2
**periods** [2] - 1612:16, 1612:18
**permissible** [1] - 1570:25
**permission** [1] - 1522:22
**permit** [1] - 1560:5
**permitted** [1] - 1547:6
**person** [18] - 1520:1, 1528:21, 1543:24, 1546:23, 1560:2, 1568:18, 1572:22, 1601:21, 1613:18, 1619:7, 1622:22, 1628:15, 1628:21, 1635:13, 1635:23, 1636:10
**personal** [5] - 1592:10, 1592:25, 1615:18, 1639:6, 1639:11
**Personnel** [1] - 1628:2
**persuaded** [2] - 1548:9, 1548:11
**pertaining** [1] - 1635:16
**Peter** [3] - 1511:17, 1549:2, 1549:12
**PETER** [1] - 1549:3
**phase** [1] - 1544:6
**phone** [5] - 1525:6, 1549:18, 1563:19, 1595:15, 1625:4
**picked** [1] - 1529:4

**pictorial** [1] - 1635:25
**picture** [3] - 1555:9
**pictures** [1] - 1636:3
**piece** [8] - 1550:1, 1559:4, 1559:5, 1559:12, 1588:16, 1588:17, 1591:17, 1623:24
**pieces** [4] - 1558:25, 1559:10, 1588:9, 1640:23
**Pinchuk** [2] - 1574:14, 1637:16
**pitcher** [1] - 1609:4
**pjunghans@zuckerman.com** [1] - 1511:4
**place** [5] - 1591:7, 1591:9, 1634:2, 1634:9, 1640:11
**placed** [3] - 1593:6, 1640:10, 1640:22
**placeholder** [1] - 1592:8
**places** [2] - 1526:16, 1526:24
**Plaintiff** [2] - 1510:4, 1510:12
**plan** [5] - 1596:2, 1596:20, 1596:24, 1597:7, 1597:23
**planned** [1] - 1585:25
**planning** [1] - 1639:25
**plans** [1] - 1518:15
**playing** [1] - 1623:14
**plus** [1] - 1573:13
**pmanafort@dmpint** [1] - 1553:19
**point** [17] - 1515:22, 1516:19, 1520:14, 1522:3, 1526:21, 1527:25, 1529:25, 1532:17, 1535:6, 1535:13, 1546:13, 1548:7, 1556:5, 1569:20, 1592:18, 1605:18, 1614:15
**pointed** [1] - 1559:21
**pointing** [1] - 1537:4
**points** [3] - 1517:18, 1596:11, 1599:10
**policies** [3] - 1635:16, 1636:14, 1636:16
**policy** [2] - 1599:6, 1600:13
**political** [12] - 1558:16, 1597:25, 1600:14, 1615:14, 1615:16, 1615:17, 1620:1, 1635:1, 1635:16, 1636:15, 1636:17
**Political** [2] - 1621:21, 1636:9
**politically** [4] - 1597:12, 1619:22, 1619:25, 1621:9
**portal** [1] - 1577:1
**porter** [3] - 1519:17, 1519:19, 1520:14
**Porter** [8] - 1517:9, 1517:10, 1519:14, 1520:8, 1521:6, 1528:9, 1539:8, 1566:5
**Porter's** [1] - 1525:18
**portion** [1] - 1531:6
**position** [4] - 1514:25, 1520:21, 1531:13, 1542:4
**positions** [1] - 1514:23

**positive** [2] - 1551:15, 1623:15
**possible** [2] - 1618:15, 1618:19
**Post** [2] - 1590:11, 1623:24
**Post-it'** [1] - 1590:11
**posted** [1] - 1538:21
**pot** [1] - 1525:1
**potentially** [2] - 1516:21
**PowerPoint** [1] - 1550:3
**PR** [16] - 1515:14, 1517:11, 1518:5, 1518:11, 1518:12, 1519:1, 1521:24, 1526:20, 1527:17, 1530:9, 1531:24, 1532:1, 1532:8, 1539:7, 1564:14, 1638:11
**PR's** [1] - 1535:4
**PR-related** [1] - 1518:5
**practical** [1] - 1547:2
**practices** [2] - 1514:12, 1515:15
**Pratt** [1] - 1510:22
**pre** [1] - 1598:5
**pre-briefing** [1] - 1598:5
**precise** [1] - 1530:10
**preclude** [1] - 1600:5
**preparation** [1] - 1550:23
**prepare** [2] - 1599:18, 1620:12
**prepared** [1] - 1597:9
**preparing** [4] - 1516:18, 1521:22, 1582:15, 1584:18
**present** [3] - 1512:3, 1513:9, 1616:1
**presentation** [1] - 1543:11
**presented** [2] - 1612:9, 1616:2
**presenting** [1] - 1547:25
**president** [1] - 1637:15
**President** [1] - 1624:3
**press** [16] - 1515:16, 1516:1, 1516:4, 1520:18, 1520:22, 1521:4, 1521:14, 1521:20, 1522:16, 1522:20, 1526:15, 1528:1, 1528:21, 1534:18, 1599:7, 1620:7
**Press** [1] - 1520:15
**pressing** [1] - 1574:8
**pressure** [3] - 1512:20, 1578:4, 1615:14
**previous** [8] - 1527:12, 1537:18, 1547:13, 1560:15, 1566:16, 1594:8, 1594:11, 1632:17
**previously** [29] - 1517:1, 1519:10, 1523:16, 1526:7, 1527:10, 1531:5, 1532:8, 1533:6, 1535:20, 1537:5, 1551:10, 1555:18, 1557:5, 1564:22, 1565:19, 1568:3, 1569:5, 1571:13, 1576:24, 1577:15, 1579:25, 1580:24, 1590:22, 1594:24, 1610:4, 1626:4, 1630:12, 1631:9, 1632:9

**price** [5] - 1567:12, 1584:20, 1627:10, 1627:15, 1627:20
**primarily** [1] - 1518:7
**principal** [2] - 1635:15, 1635:17
**principle** [4] - 1544:16, 1547:16, 1584:19, 1627:8
**printed** [1] - 1632:12
**priorities** [1] - 1522:1
**pro** [3] - 1614:16, 1618:25, 1623:10
**problem** [4] - 1547:2, 1554:2, 1559:14, 1600:13
**problematic** [2] - 1559:20, 1560:25
**problems** [2] - 1524:1, 1548:1
**procedural** [2] - 1616:8, 1617:10, 1638:12
**Procedure** [1] - 1574:24
**procedure** [1] - 1575:6, 1575:17, 1575:19, 1575:22, 1575:25, 1576:13, 1576:14, 1577:5, 1587:19, 1587:21, 1587:25
**procedures** [1] - 1577:7
**proceed** [3] - 1548:16, 1590:19, 1601:25
**proceedings** [3] - 1616:3, 1620:12, 1620:13
**process** [8] - 1532:23, 1575:7, 1582:15, 1597:2, 1597:17, 1598:4, 1619:5, 1640:23
**processed** [1] - 1612:10
**produce** [1] - 1620:3
**produced** [4] - 1592:9, 1593:1, 1593:7, 1640:11
**producing** [1] - 1640:23
**production** [1] - 1592:15
**profess** [1] - 1547:5
**professional** [1] - 1599:18
**professionally** [1] - 1524:5
**prohibit** [1] - 1548:10
**project** [7] - 1533:1, 1540:12, 1564:13, 1565:7, 1573:2, 1600:1, 1637:3
**Project** [2] - 1566:2, 1566:3
**promise** [2] - 1633:13, 1640:19
**promised** [2] - 1555:11, 1574:13
**promising** [1] - 1609:20
**prompt** [1] - 1616:14
**pronounce** [1] - 1530:17
**proof** [1] - 1547:17
**propose** [1] - 1598:1
**proposed** [3] - 1519:5, 1596:24, 1629:17
**proposes** [2] - 1541:23, 1578:22
**propounded** [1] - 1522:19
**prosecuted** [1] - 1615:13
**prosecution** [5] - 1615:15,

1619:21, 1619:25, 1620:4,
1621:9
  **prosecution'** [1] - 1619:18
  **prosecutorial** [1] - 1616:2
  **prosecutors** [1] - 1615:23
  **protects** [1] - 1572:13
  **prove** [2] - 1622:20, 1622:21
  **proved** [1] - 1615:12
  **provide** [10] - 1540:1, 1550:2,
1563:24, 1576:24, 1582:11,
1586:6, 1597:10, 1597:16,
1620:3, 1629:1
  **provided** [8] - 1532:10,
1537:19, 1550:12, 1552:5,
1552:7, 1576:2, 1576:16, 1583:1
  **providing** [3] - 1531:20,
1534:18, 1575:18
  **proving** [1] - 1595:9
  **Pshonka** [2] - 1568:22, 1572:21
  **Pshonka's** [1] - 1572:22
  **Public** [1] - 1635:13
  **public** [16] - 1515:10, 1515:24,
1516:22, 1532:11, 1532:15,
1532:22, 1536:15, 1597:9,
1599:21, 1620:7, 1622:11,
1635:15, 1635:16, 1636:12,
1636:15
  **publication** [4] - 1537:23,
1544:1, 1635:24, 1636:1
  **Publicity** [1] - 1635:23
  **publicly** [2] - 1532:24, 1565:6
  **published** [3] - 1535:6, 1539:1,
1545:21
  **publishing** [2] - 1559:18,
1576:25
  **pull** [1] - 1537:23
  **pulled** [2] - 1572:18, 1614:13
  **purchased** [1] - 1575:21
  **purchases** [4] - 1575:20,
1576:13, 1576:14, 1576:19
  **purchasing** [2] - 1575:18,
1576:16
  **pure** [1] - 1559:17
  **purpose** [5] - 1545:10, 1547:9,
1585:8, 1586:10, 1622:21
  **purposes** [4] - 1582:22,
1584:10, 1589:3, 1641:6
  **pursuing** [1] - 1578:3
  **push** [1] - 1637:22
  **put** [15] - 1542:4, 1542:23,
1543:6, 1545:1, 1545:10,
1545:25, 1547:3, 1578:18,
1584:8, 1591:6, 1591:9, 1592:5,
1592:15, 1604:2
  **puts** [1] - 1544:23
  **putting** [4] - 1526:19, 1527:3,
1551:21, 1578:22

## Q

  **qualification** [1] - 1576:18
  **qualifications** [2] - 1576:17,
1595:8
  **questions** [17] - 1520:24,
1522:19, 1538:8, 1540:18,
1545:23, 1547:9, 1561:9,
1585:3, 1585:6, 1600:8, 1601:6,
1614:16, 1618:7, 1618:18,
1618:23, 1638:25, 1639:18
  **quickly** [4] - 1552:1, 1566:15,
1617:7, 1633:19
  **quite** [2] - 1618:17, 1623:12
  **quotation** [1] - 1621:4
  **quote** [6] - 1521:16, 1529:20,
1529:21, 1616:20, 1616:22,
1621:11
  **quoted** [1] - 1599:16
  **quotes** [4] - 1615:9, 1615:10,
1616:5, 1621:8
  **quoting** [1] - 1558:22

## R

  **Rapsi.com** [1] - 1566:8
  **rate** [1] - 1525:14
  **rather** [2] - 1607:21, 1616:22
  **Re** [3] - 1584:2, 1603:18,
1621:21
  **re** [5] - 1580:13, 1581:8,
1581:21, 1584:2, 1630:7
  **reach** [4] - 1574:7, 1607:19,
1618:14, 1622:13
  **reachable** [2] - 1603:21,
1618:15
  **reached** [2] - 1607:19, 1619:19
  **reaching** [1] - 1611:13
  **reaction** [6] - 1522:2, 1523:3,
1523:4, 1523:5, 1535:10,
1623:15
  **reactions** [1] - 1605:9
  **read** [53] - 1518:9, 1520:16,
1521:11, 1542:1, 1542:16,
1542:18, 1542:19, 1543:3,
1543:19, 1544:22, 1545:4,
1545:13, 1556:18, 1558:14,
1558:23, 1559:3, 1561:7,
1565:1, 1567:7, 1567:8,
1570:25, 1573:16, 1575:16,
1582:10, 1584:12, 1585:21,
1587:23, 1588:11, 1588:15,
1588:16, 1588:20, 1588:25,
1589:3, 1589:4, 1589:13,
1589:16, 1594:3, 1597:15,
1609:8, 1612:6, 1612:8,
1614:11, 1625:3, 1626:19,
1627:3, 1635:12, 1636:8,
1638:15, 1638:16, 1638:18,
1639:7

  **reading** [6] - 1542:4, 1559:4,
1560:11, 1571:3, 1609:4,
1625:23
  **reads** [7] - 1524:1, 1524:3,
1538:19, 1543:4, 1565:5,
1569:22
  **ready** [7] - 1513:4, 1541:7,
1572:21, 1572:22, 1578:4,
1605:11, 1614:12
  **realize** [1] - 1513:10
  **really** [10] - 1512:17, 1543:7,
1554:9, 1558:24, 1571:24,
1599:22, 1624:8, 1627:15,
1629:19, 1638:18
  **realm** [1] - 1544:23
  **reason** [2] - 1599:9, 1615:20
  **reasons** [2] - 1551:20, 1559:20
  **recalling** [1] - 1541:15
  **receipt** [3] - 1562:11, 1576:20,
1615:6
  **receive** [1] - 1629:19
  **received** [2] - 1538:24, 1546:15
  **recess** [1] - 1541:14
  **recipients** [1] - 1566:3
  **recognize** [1] - 1610:19
  **recollection** [6] - 1524:19,
1547:5, 1551:17, 1552:15,
1552:24, 1553:10
  **recommendation** [1] - 1572:15
  **recommendations** [1] -
1638:11
  **record** [18] - 1512:6, 1512:17,
1514:3, 1520:19, 1542:1,
1542:5, 1548:15, 1549:11,
1551:20, 1551:23, 1597:17,
1598:6, 1615:9, 1615:19,
1616:10, 1621:10, 1621:24,
1625:6
  **records** [1] - 1619:10
  **recruiting** [2] - 1514:22,
1514:23
  **redacted** [11] - 1579:3, 1579:5,
1603:20, 1606:4, 1607:12,
1607:20, 1609:17, 1610:14,
1618:16, 1629:23
  **redaction** [1] - 1595:25
  **redirect** [1] - 1639:20
  **reduce** [1] - 1573:13
  **refer** [2] - 1529:14, 1556:20
  **reference** [8] - 1538:7, 1555:8,
1557:17, 1557:22, 1557:25,
1562:10, 1636:13, 1636:15
  **references** [2] - 1518:23,
1518:25
  **referred** [1] - 1600:8
  **referring** [2] - 1553:23, 1571:12
  **refers** [1] - 1539:7
  **refresh** [8] - 1524:19, 1551:16,
1552:8, 1552:9, 1552:10,
1552:15, 1552:23, 1553:10

**refusing** [1] - 1563:20
**regard** [1] - 1562:6
**regarding** [6] - 1527:16, 1587:16, 1589:17, 1611:25, 1622:14, 1631:17
**regards** [3] - 1562:11, 1615:9, 1620:18
**Regency** [1] - 1638:9
**Registration** [2] - 1537:2, 1558:17
**regular** [1] - 1613:22
**regularity** [1] - 1595:9
**reimbursement** [2] - 1576:10, 1586:6
**rejoined** [3] - 1515:5, 1515:6, 1515:8
**relate** [1] - 1625:3
**related** [10] - 1515:16, 1516:4, 1518:5, 1521:4, 1523:10, 1526:25, 1530:2, 1536:25, 1569:19, 1631:5
**relates** [1] - 1544:18
**relating** [3] - 1584:25, 1585:4, 1627:7
**Relations** [1] - 1635:13
**relations** [4] - 1515:10, 1635:15, 1635:17, 1636:16
**relationship** [1] - 1524:7
**relayed** [1] - 1525:8
**release** [14] - 1525:20, 1572:20, 1596:20, 1596:22, 1596:24, 1597:9, 1597:20, 1597:23, 1598:1, 1598:8, 1606:6, 1608:18, 1620:8, 1622:9
**released** [3] - 1521:7, 1526:22, 2622:12
**relevance** [5] - 1522:6, 1544:5, 1545:17, 1546:10, 1546:22
**relevant** [6] - 1546:22, 1546:25, 1547:14, 1588:20, 1616:2, 1619:13
**remain** [1] - 1599:17
**remember** [35] - 1516:17, 1519:25, 1520:1, 1520:6, 1520:9, 1520:11, 1520:13, 1522:2, 1523:4, 1523:6, 1523:8, 1523:12, 1523:14, 1524:23, 1525:5, 1525:7, 1525:9, 1525:22, 1526:2, 1530:22, 1530:25, 1535:12, 1535:13, 1535:14, 1535:15, 1535:18, 1536:18, 1536:22, 1539:20, 1540:7, 1540:9, 1545:24, 1547:14
**remembered** [1] - 1537:15
**remind** [1] - 1611:24
**remove** [1] - 1620:1
**removed** [1] - 1593:8
**rendered** [3] - 1580:16, 1582:13, 1582:19

**replied** [1] - 1526:18
**replies** [2] - 1567:16, 1568:1
**reply** [6] - 1526:17, 1527:19, 1527:22, 1529:17, 1567:18, 1579:22
**report** [25] - 1526:15, 1527:16, 1532:14, 1537:11, 1537:12, 1539:21, 1557:23, 1568:16, 1568:18, 1581:15, 1582:16, 1596:22, 1597:7, 1599:19, 1603:3, 1605:10, 1605:13, 1606:6, 1608:18, 1609:25, 1610:12, 1610:15, 1620:3, 1631:14, 1632:19
**Report** [51] - 1516:5, 1516:20, 1516:21, 1517:16, 1518:12, 1519:20, 1520:19, 1521:1, 1521:4, 1521:7, 1522:1, 1525:17, 1525:22, 1526:1, 1526:22, 1526:25, 1528:24, 1530:2, 1530:20, 1530:23, 1531:17, 1531:20, 1532:10, 1532:11, 1533:12, 1534:4, 1534:22, 1535:7, 1536:10, 1536:15, 1536:25, 1539:24, 1573:1, 1573:4, 1577:4, 1595:7, 1597:9, 1597:16, 1597:21, 1598:1, 1599:6, 1609:19, 1610:11, 1615:11, 1616:6, 1618:12, 1619:11, 1619:24, 1620:6, 1622:11, 1623:13
**report's** [1] - 1619:18
**Reporter** [2] - 1511:7, 1511:7
**reporter** [4] - 1530:25, 1531:1, 1533:23, 1538:24
**reporters** [1] - 1515:18
**reports** [3] - 1615:18, 1631:17, 1631:20
**representative** [1] - 1538:8
**represented** [1] - 1616:3
**representing** [2] - 1635:15, 1635:21
**request** [5] - 1512:24, 1533:12, 1533:15, 1600:6, 1627:18
**requested** [1] - 1537:20
**requesting** [1] - 1625:2
**require** [3] - 1576:2, 1585:24, 1586:2
**required** [1] - 1619:5
**requirement** [2] - 1544:12, 1545:19
**requirements** [1] - 1576:18
**requires** [4] - 1575:20, 1576:5, 1586:4, 1625:5
**research** [3] - 1513:14, 1587:16, 1641:13
**researched** [1] - 1576:4
**resend** [1] - 1580:13
**reservations** [1] - 1620:15
**resolve** [1] - 1543:20

**resolved** [1] - 1564:16
**Resolving** [1] - 1557:13
**respect** [5] - 1560:6, 1601:14, 1601:22, 1622:16, 1640:13
**respective** [1] - 1627:9
**respond** [49] - 1524:24, 1527:6, 1528:14, 1529:14, 1531:22, 1538:1, 1540:8, 1554:15, 1554:17, 1555:13, 1555:15, 1556:12, 1556:23, 1565:10, 1565:12, 1572:17, 1573:7, 1573:9, 1580:17, 1580:19, 1586:25, 1595:18, 1595:20, 1596:3, 1600:2, 1600:4, 1600:10, 1601:4, 1602:12, 1602:14, 1607:7, 1607:13, 1607:24, 1609:11, 1609:15, 1611:9, 1611:17, 1611:19, 1614:2, 1614:8, 1616:16, 1617:4, 1617:12, 1617:14, 1617:19, 1623:21, 1629:6, 1629:16, 1630:21
**responded** [5] - 1527:4, 1527:7, 1534:24, 1561:2, 1605:9
**responding** [2] - 1533:22, 1583:20
**responds** [7] - 1528:11, 1530:7, 1539:16, 1565:13, 1565:16, 1603:7, 1630:22
**response** [18] - 1525:2, 1527:2, 1534:12, 1534:16, 1539:20, 1556:17, 1559:8, 1559:9, 1559:17, 1578:21, 1579:19, 1583:23, 1586:23, 1588:14, 1595:25, 1603:5, 1616:14, 1617:13
**responsible** [1] - 1549:17
**restrict** [1] - 1543:11
**result** [2] - 1536:12, 1616:25
**results** [1] - 1577:1
**resume** [2] - 1641:9, 1641:11
**retained** [3] - 1520:25, 1528:22, 1558:15
**Retainer** [1] - 1562:19
**retainer** [2] - 1557:24, 1605:15
**return** [2] - 1515:4, 1624:7
**returned** [2] - 1515:3, 1538:25
**reverse** [2] - 1599:4, 1616:11
**review** [9] - 1518:18, 1550:23, 1551:2, 1551:5, 1551:14, 1553:2, 1591:1, 1625:4
**reviewed** [2] - 1553:13, 1631:5
**reviewing** [2] - 1616:10, 1619:10
**Rick** [2] - 1518:19, 1623:17
**right-hand** [4] - 1590:10, 1591:19, 1612:11, 1635:3
**Rights** [4] - 1585:2, 1585:6, 1585:10, 1620:13
**righty** [1] - 1540:19

**risk** [2] - 1572:25, 1599:20
**RMR** [1] - 1511:7
**rock** [1] - 1555:16
**Rohde** [3] - 1512:10, 1614:5, 1635:9
**rohde** [1] - 1533:10
**role** [11] - 1514:12, 1515:6, 1515:10, 1515:13, 1515:21, 1520:20, 1521:22, 1535:4, 1541:25, 1620:13
**rollout** [1] - 1623:10
**room** [2] - 1520:9, 1641:14
**Room** [1] - 1511:8
**route** [1] - 1555:11
**routed** [1] - 1533:13
**rule** [9] - 1547:19, 1547:21, 1547:23, 1582:14, 1584:19, 1585:9, 1600:5, 1622:16, 1627:8
**ruled** [2] - 1542:7, 1542:11
**Rules** [1] - 1547:19
**rules** [2] - 1521:14, 1521:16
**ruling** [1] - 1543:6
**rumor/dispute** [1] - 1614:14
**run** [1] - 1601:6
**runs** [1] - 1599:20
**rush** [1] - 1596:7
**Russia** [1] - 1613:23
**Russian** [13] - 1521:14, 1568:22, 1571:24, 1572:2, 1572:5, 1572:8, 1572:11, 1572:12, 1572:20, 1578:3, 1579:9, 1581:15, 1599:23
**Russian/Ukrainian** [2] - 1573:12, 1595:17

# S

**SA** [3] - 1597:7, 1597:10, 1597:24
**sailed** [1] - 1522:23
**Saira** [4] - 1517:13, 1517:23, 1519:18, 1566:6
**Sanchez** [1] - 1510:12
**SANCHEZ** [3] - 1512:7, 1513:5, 1540:22
**sanchez@usdoj.gov** [1] - 1510:16
**Sanger** [10] - 1603:8, 1604:13, 1609:15, 1610:8, 1611:9, 1613:15, 1613:19, 1614:7, 1621:5, 1621:17
**sanger** [3] - 1603:19, 1609:10, 1618:13
**Sanger's** [3] - 1611:21, 1613:11, 1618:11
**Sangernyt** [1] - 1603:13
**sangernyt@gmail.com** [1] - 1603:25
**satisfies** [1] - 1569:7
**SAU** [1] - 1612:11

**SAU237143** [1] - 1591:20
**save** [1] - 1537:11
**saved** [1] - 1537:23
**saw** [7] - 1591:10, 1591:11, 1594:2, 1626:12, 1634:1, 1634:9, 1634:14
**scan** [1] - 1634:5
**Scanned** [2] - 1581:5, 1581:9
**scanned** [1] - 1592:9
**schedule** [1] - 1606:25
**scheduling** [1] - 1560:17
**Schoen** [5] - 1565:4, 1574:7, 1574:13, 1578:2, 1637:16
**Schoen/Pinchuk** [1] - 1578:17
**science** [1] - 1550:6
**Scope** [1] - 1558:13
**screen** [4] - 1517:1, 1529:2, 1546:2, 1583:3
**scrutiny** [1] - 1620:3
**seal** [1] - 1562:4
**seated** [1] - 1593:22
**second** [21] - 1524:23, 1528:5, 1529:1, 1533:5, 1533:7, 1533:25, 1556:1, 1558:5, 1560:23, 1577:19, 1578:9, 1597:15, 1598:12, 1601:5, 1610:18, 1614:22, 1628:11, 1629:7, 1637:1, 1638:14, 1638:20
**Secretary** [1] - 1619:20
**secretary** [1] - 1608:23
**secstate** [1] - 1609:24
**section** [3] - 1584:23, 1636:12, 1637:9
**Section** [2] - 1584:24, 1585:24
**Sedov** [2] - 1576:22, 1628:2
**see** [13] - 1524:16, 1524:22, 1541:9, 1546:2, 1556:8, 1560:3, 1564:8, 1591:8, 1601:15, 1622:16, 1627:15, 1627:22, 1641:22
**seeing** [1] - 1524:19
**seeking** [1] - 1522:9
**seem** [1] - 1641:18
**selecting** [1] - 1608:23
**selective** [1] - 1558:22
**selectively** [2] - 1615:12, 1632:25
**self** [1] - 1599:9
**self-evident** [1] - 1599:9
**seminars** [1] - 1514:14
**send** [14] - 1518:17, 1519:17, 1520:20, 1527:7, 1527:21, 1532:15, 1532:24, 1538:11, 1555:8, 1558:1, 1613:21, 1623:17, 1629:2, 1629:18
**sending** [5] - 1527:11, 1532:7, 1532:14, 1568:19, 1628:15
**sends** [5] - 1529:25, 1564:3, 1567:24, 1603:25, 1639:14

**sense** [3] - 1558:1, 1609:19, 1625:17
**sensitive** [1] - 1521:15
**sent** [16] - 1520:22, 1524:11, 1528:7, 1532:20, 1532:21, 1546:3, 1547:6, 1555:7, 1561:19, 1561:21, 1561:23, 1566:2, 1575:7, 1580:13, 1584:7
**sentence** [6] - 1538:19, 1540:6, 1558:14, 1560:11, 1578:18
**sentencing** [1] - 1582:18
**September** [16] - 1516:16, 1516:19, 1517:7, 1518:24, 1519:16, 1521:7, 1523:23, 1528:1, 1528:21, 1595:4, 1596:17, 1598:21, 1602:9, 1620:6, 1632:16, 1633:10
**Serhiy** [3] - 1556:6, 1567:3, 1567:14
**series** [2] - 1543:8, 1544:22
**serious** [1] - 1554:1
**serve** [2] - 1521:22, 1582:14
**served** [1] - 1514:25
**server** [2] - 1547:8
**services** [14] - 1550:13, 1575:18, 1575:20, 1576:2, 1576:13, 1576:14, 1576:16, 1576:17, 1576:25, 1580:16, 1582:13, 1582:19, 1619:4, 1619:7
**session** [1] - 1521:19
**set** [7] - 1521:17, 1586:10, 1598:8, 1627:23, 1639:7, 1639:16
**sets** [1] - 1587:18
**setting** [2] - 1582:11, 1586:11
**seven** [1] - 1516:7
**several** [1] - 1623:18
**shall** [2] - 1584:20, 1584:24
**share** [3] - 1515:17, 1515:18, 1572:24
**shared** [1] - 1535:16
**shares** [1] - 1528:25
**sheet** [18] - 1591:6, 1591:8, 1591:11, 1591:14, 1591:16, 1591:17, 1591:21, 1591:24, 1592:5, 1592:13, 1592:16, 1634:2, 1634:9, 1634:14, 1638:7, 1640:2, 1640:13, 1641:2
**sheets** [7] - 1592:6, 1592:15, 1593:4, 1593:6, 1593:11, 1640:10, 1640:21
**ship** [1] - 1522:23
**short** [3] - 1549:24, 1550:7, 1607:21
**shortening** [1] - 1588:22
**shorter** [1] - 1621:23
**shortly** [1] - 1569:15
**show** [2] - 1601:7, 1631:8
**showing** [6] - 1573:20,

1600:15, 1602:3, 1604:19, 1605:19, 1606:7

**shown** [1] - 1548:2

**shuttle** [1] - 1607:11

**sic** [5] - 1539:11, 1581:14, 1585:23, 1596:6, 1613:21

**side** [5] - 1554:10, 1556:3, 1573:3, 1597:19, 1641:1

**sideline** [1] - 1619:23

**sides** [2] - 1512:24, 1599:23

**sign** [7] - 1557:18, 1562:9, 1563:20, 1563:21, 1564:8, 1564:12, 1603:12

**signature** [5] - 1562:4, 1563:3, 1563:5, 1620:17, 1628:19

**signed** [10] - 1562:8, 1562:24, 1562:25, 1563:2, 1564:7, 1576:21, 1628:1, 1629:19, 1630:9, 1630:10

**significant** [1] - 1595:14

**signify** [1] - 1610:21

**similar** [1] - 1601:22

**similarly** [3] - 1541:12, 1634:9, 1634:14

**simply** [6] - 1542:3, 1542:25, 1544:22, 1545:13, 1547:18, 1557:22

**sincerely** [3] - 1628:1, 1628:3, 1628:4

**single** [2] - 1588:12

**sit** [3] - 1541:7, 1542:16, 1545:13

**situation** [3] - 1534:5, 1573:10, 1576:12

**sixth** [2] - 1562:23, 1594:5

**SK** [3] - 1584:1, 1584:4, 1587:14

**Skadden** [64] - 1514:6, 1514:17, 1514:18, 1515:1, 1515:4, 1517:15, 1527:3, 1528:22, 1532:1, 1534:15, 1535:4, 1535:7, 1535:10, 1538:7, 1538:8, 1539:7, 1540:13, 1541:22, 1543:1, 1543:14, 1549:13, 1549:16, 1549:18, 1550:9, 1550:11, 1553:12, 1562:3, 1565:7, 1573:3, 1573:4, 1576:1, 1576:7, 1576:9, 1576:21, 1576:24, 1577:3, 1577:11, 1577:12, 1584:16, 1586:17, 1590:25, 1596:14, 1597:9, 1599:5, 1599:15, 1603:3, 1605:21, 1611:23, 1614:14, 1618:24, 1620:13, 1620:15, 1624:25, 1625:1, 1625:2, 1625:3, 1625:6, 1626:14, 1630:5, 1632:11, 1636:24, 1640:11, 1640:24

**Skadden's** [52] - 1514:8, 1516:4, 1531:14, 1533:13,

1536:20, 1546:3, 1550:24, 1551:2, 1551:13, 1554:23, 1555:20, 1557:7, 1561:17, 1563:12, 1564:24, 1565:20, 1566:22, 1568:6, 1571:15, 1573:23, 1574:20, 1575:23, 1577:16, 1580:2, 1581:1, 1582:13, 1583:14, 1587:5, 1594:25, 1598:16, 1600:17, 1602:20, 1604:7, 1604:21, 1606:10, 1608:5, 1610:5, 1611:3, 1613:2, 1614:19, 1617:23, 1619:8, 1620:2, 1620:21, 1621:15, 1622:2, 1623:1, 1624:13, 1628:7, 1630:13, 1631:6, 1631:21

**SL** [2] - 1578:3, 1578:22

**Slate** [1] - 1584:16

**slip** [25] - 1591:6, 1591:8, 1591:11, 1591:14, 1591:16, 1591:17, 1591:21, 1591:24, 1592:5, 1592:6, 1592:12, 1592:15, 1592:16, 1593:3, 1593:6, 1593:11, 1634:2, 1634:9, 1634:14, 1638:6, 1640:2, 1640:10, 1640:13, 1640:21, 1641:1

**Sloan** [15] - 1523:18, 1523:22, 1524:13, 1524:24, 1525:5, 1525:9, 1526:9, 1526:13, 1526:24, 1528:9, 1536:2, 1536:4, 1538:6, 1538:11, 1540:8

**Sloan's** [2] - 1525:2, 1527:2

**slopes** [1] - 1624:24

**small** [1] - 1612:18

**smoothly** [1] - 1512:23

**snow** [1] - 1625:8

**softly** [1] - 1550:16

**software** [1] - 1550:1

**solely** [1] - 1601:16

**solve** [1] - 1547:2

**someone** [10] - 1512:20, 1526:5, 1541:17, 1542:3, 1544:7, 1559:22, 1573:3, 1581:23, 1601:13, 1606:13

**sometime** [1] - 1525:25

**sometimes** [1] - 1513:10

**somewhat** [1] - 1529:19

**sorry** [24] - 1516:24, 1538:23, 1553:16, 1553:23, 1563:24, 1566:18, 1568:5, 1568:11, 1570:22, 1570:23, 1581:25, 1583:7, 1584:23, 1612:5, 1625:1, 1626:22, 1627:23, 1627:24, 1628:4, 1632:5, 1632:18, 1635:20, 1639:22, 1641:20

**sort** [5] - 1525:10, 1526:19, 1533:7, 1550:11, 1563:22

**sought** [1] - 1638:6

**sound** [2] - 1592:5, 1592:20

**sounds** [1] - 1596:6

**source** [6] - 1546:9, 1616:5, 1616:6, 1616:11, 1616:20, 1616:21

**SPAEDER** [2] - 1510:22, 1511:2

**speaker** [2] - 1601:16, 1601:18

**speaking** [2] - 1550:15, 1615:8

**speaks** [1] - 1534:22

**specialist** [1] - 1512:10

**specialists** [2] - 1512:18, 1585:25

**specific** [5] - 1520:20, 1521:25, 1552:5, 1552:6, 1633:2

**specifically** [3] - 1523:12, 1590:8, 1612:14

**specified** [2] - 1576:21, 1588:11

**speculating** [1] - 1524:7

**spell** [2] - 1514:3, 1549:10

**spelled** [1] - 1549:13

**spent** [1] - 1550:9

**sponsor** [1] - 1560:2

**sponsored** [1] - 1560:4

**stack** [1] - 1548:4

**stamp** [4] - 1591:20, 1591:22, 1591:23

**stamped** [3] - 1528:15, 1629:2, 1629:20

**stand** [4] - 1542:25, 1543:7, 1544:21, 1545:10

**start** [6] - 1523:21, 1537:6, 1560:12, 1634:11, 1639:2, 1641:15

**started** [1] - 1575:17

**starting** [15] - 1526:8, 1529:9, 1533:5, 1551:9, 1555:22, 1556:18, 1573:25, 1577:19, 1595:3, 1606:12, 1613:5, 1613:13, 1614:22, 1623:3, 1628:11

**starts** [2] - 1561:2, 1606:13

**state** [11] - 1512:17, 1514:2, 1575:20, 1576:19, 1577:1, 1579:10, 1608:23, 1620:5, 1624:4, 1624:5, 1637:10

**State** [2] - 1619:19, 1620:15

**statement** [14] - 1526:19, 1527:3, 1527:5, 1534:14, 1534:17, 1534:21, 1539:20, 1540:6, 1546:23, 1601:17, 1601:18, 1622:18, 1622:19, 1638:13

**statements** [4] - 1538:3, 1544:9, 1596:11, 1601:12

**STATES** [2] - 1510:1, 1510:10

**states** [1] - 1619:24

**States** [8] - 1510:3, 1511:8, 1512:3, 1512:9, 1541:16, 1636:12, 1636:13, 1636:15

**still** [10] - 1529:2, 1531:3,

1547:6, 1564:8, 1568:19,
1572:25, 1574:13, 1595:14,
1625:14, 1629:3
  **stipulate** [3] - 1590:2, 1590:7,
1590:16
  **stipulated** [1] - 1612:22
  **stipulation** [9] - 1571:1,
1589:17, 1589:23, 1590:18,
1611:24, 1631:16, 1632:24,
1633:1, 1640:20
  **stirred** [1] - 1524:25
  **stop** [3] - 1587:22, 1598:12,
1625:16
  **story** [13] - 1538:21, 1539:1,
1539:4, 1542:24, 1543:8,
1544:23, 1545:13, 1559:19,
1561:3, 1573:3, 1573:5,
1588:22, 1599:17
  **strange** [1] - 1613:21
  **strategic** [1] - 1624:8
  **strategy** [4] - 1518:13, 1519:2,
1596:7, 1597:18
  **Street** [3] - 1510:14, 1510:22,
1511:2
  **stressful** [1] - 1512:22
  **stressing** [1] - 1528:22
  **string** [1] - 1596:1
  **stupid** [1] - 1623:25
  **subject** [50] - 1523:25, 1524:1,
1526:11, 1537:10, 1555:3,
1555:5, 1557:12, 1557:13,
1562:19, 1563:15, 1563:17,
1565:5, 1566:7, 1566:8, 1567:7,
1568:15, 1571:23, 1574:4,
1574:24, 1577:21, 1580:12,
1581:5, 1581:7, 1583:25,
1584:1, 1584:2, 1585:1,
1587:11, 1587:12, 1596:19,
1596:20, 1599:1, 1603:17,
1605:5, 1606:3, 1606:22,
1608:14, 1608:15, 1610:11,
1615:4, 1615:5, 1618:6, 1621:1,
1621:20, 1621:21, 1622:8,
1623:7, 1624:21, 1626:16,
1630:18
  **submission** [1] - 1579:18
  **submit** [2] - 1573:11, 1584:24
  **submitted** [1] - 1572:12
  **submitting** [1] - 1580:14
  **subsequent** [1] - 1598:9
  **substantive** [1] - 1614:16
  **successfully** [1] - 1548:14
  **suffice** [1] - 1612:19
  **sufficient** [1] - 1577:10
  **suffix** [1] - 1603:10
  **suggested** [4] - 1525:18,
1534:19, 1614:16, 1618:14
  **suggestion** [1] - 1593:8
  **suggests** [1] - 1627:21
  **suit** [1] - 1641:6

  **Suite** [2] - 1510:23, 1511:3
  **suits** [1] - 1629:15
  **sum** [2] - 1619:6, 1627:18
  **summarize** [1] - 1570:16
  **summarizing** [2] - 1547:24,
1548:2
  **summary** [9] - 1542:17, 1543:7,
1544:23, 1547:21, 1547:22,
1548:1, 1568:22
  **summer** [1] - 1514:23
  **sun** [1] - 1625:8
  **supplemental** [1] - 1574:25
  **supplier** [3] - 1576:13, 1576:14,
1576:17
  **support** [2] - 1514:12, 1637:17
  **supporters** [1] - 1519:1
  **surprise** [1] - 1577:6
  **surrounding** [1] - 1582:17
  **sustained** [2] - 1525:13,
1547:10
  **swallowing** [1] - 1550:16
  **switch** [1] - 1589:15
  **sworn** [2] - 1513:21, 1549:4
  **system** [55] - 1543:2, 1549:22,
1549:24, 1550:1, 1550:25,
1551:3, 1553:12, 1554:23,
1555:20, 1557:7, 1559:3,
1560:13, 1561:17, 1563:12,
1564:24, 1565:21, 1566:22,
1568:7, 1571:15, 1573:23,
1577:17, 1580:2, 1581:1,
1583:14, 1586:17, 1587:5,
1595:1, 1596:14, 1600:18,
1600:18, 1602:20, 1604:7,
1604:22, 1605:22, 1606:10,
1608:6, 1610:6, 1610:23,
1611:4, 1613:3, 1614:20,
1617:24, 1617:25, 1620:22,
1621:15, 1622:3, 1623:1,
1624:13, 1628:8, 1630:14,
1631:6, 1631:15, 1631:21,
1632:11, 1632:13
  **systems** [5] - 1549:18, 1549:19,
1549:20, 1551:13, 1574:21

### T

  **table** [1] - 1588:14
  **task** [3] - 1586:4, 1586:9,
1586:11
  **Taylor** [5] - 1510:21, 1512:13,
1551:20, 1566:6, 1570:20
  **TAYLOR** [20] - 1541:19,
1541:21, 1542:14, 1544:4,
1544:17, 1546:5, 1546:11,
1547:11, 1548:11, 1548:17,
1558:22, 1559:7, 1561:6,
1561:11, 1569:23, 1569:25,
1570:13, 1570:22, 1571:7,
1626:22

  **team** [19] - 1514:22, 1515:10,
1515:14, 1517:11, 1532:1,
1532:9, 1538:20, 1539:3,
1539:4, 1539:6, 1539:7,
1540:13, 1549:17, 1554:8,
1578:19, 1611:16, 1619:10,
1619:12, 1619:15
  **team's** [1] - 1532:23
  **technology** [5] - 1549:13,
1549:16, 1549:18, 1550:5,
1550:12
  **Telegraph** [4] - 1529:20,
1615:5, 1616:15, 1617:9
  **telephone** [1] - 1595:13
  **ten** [2] - 1541:9, 1548:5
  **tender** [3] - 1575:21, 1575:25,
1619:5
  **tends** [1] - 1547:16
  **term** [3] - 1635:13, 1635:23,
1636:9
  **terms** [4] - 1550:4, 1557:18,
1575:18, 1586:9
  **terrific** [1] - 1623:24
  **testified** [2] - 1513:22, 1549:5
  **testify** [9] - 1542:25, 1543:12,
1543:13, 1544:4, 1544:20,
1545:16, 1559:25, 1632:25,
1638:18
  **testifying** [1] - 1546:17
  **testimony** [7] - 1541:7, 1542:5,
1544:14, 1545:6, 1547:12,
1547:14, 1631:5
  **text** [7] - 1519:11, 1575:16,
1589:20, 1604:13, 1631:11,
1635:10, 1637:6
  **THE** [126] - 1510:1, 1510:1,
1510:9, 1510:13, 1512:1,
1512:11, 1512:15, 1513:4,
1513:8, 1522:5, 1522:7, 1522:9,
1522:13, 1522:18, 1522:25,
1525:13, 1535:21, 1540:17,
1540:19, 1540:24, 1541:1,
1541:5, 1541:12, 1541:15,
1541:17, 1541:20, 1542:6,
1543:16, 1544:15, 1545:15,
1546:8, 1546:13, 1547:24,
1548:13, 1548:18, 1548:19,
1548:20, 1548:22, 1550:14,
1550:21, 1551:22, 1552:2,
1552:12, 1552:14, 1552:20,
1553:5, 1558:20, 1559:6,
1559:8, 1559:14, 1560:18,
1560:21, 1561:8, 1567:18,
1567:21, 1567:22, 1569:2,
1569:13, 1569:20, 1569:24,
1570:1, 1570:4, 1570:6, 1570:9,
1570:12, 1570:14, 1570:19,
1571:2, 1571:6, 1571:9,
1575:12, 1582:2, 1585:15,
1585:16, 1585:18, 1585:19,

1588:5, 1588:8, 1589:6, 1589:18, 1589:21, 1589:23, 1590:1, 1590:15, 1591:16, 1591:17, 1592:1, 1592:14, 1592:23, 1593:2, 1593:5, 1593:12, 1593:18, 1593:22, 1600:25, 1601:10, 1612:1, 1612:4, 1612:21, 1622:15, 1625:11, 1625:17, 1625:18, 1625:19, 1626:6, 1626:10, 1626:14, 1631:25, 1632:2, 1632:4, 1632:22, 1633:5, 1637:23, 1638:22, 1639:1, 1639:19, 1639:22, 1639:24, 1640:3, 1640:6, 1640:8, 1640:15, 1640:18, 1641:18, 1641:20, 1641:21

**themes** [1] - 1638:13

**themselves** [1] - 1570:17

**thereby** [1] - 1588:10

**therefore** [1] - 1576:5

**thinking** [1] - 1597:2

**third** [4] - 1556:15, 1556:20, 1557:25, 1613:17

**third-party** [1] - 1557:25

**thread** [19] - 1528:11, 1529:17, 1577:20, 1580:6, 1580:21, 1583:16, 1583:17, 1586:19, 1586:23, 1598:19, 1600:20, 1601:4, 1602:5, 1602:8, 1602:22, 1603:24, 1613:5, 1617:3, 1623:3

**three** [3] - 1557:1, 1624:25, 1625:2

**Thursday** [3] - 1528:15, 1603:21, 1608:18

**tie** [1] - 1618:15

**tier** [1] - 1537:23

**time-wise** [1] - 1625:12

**timely** [1] - 1607:22

**timestamp** [2] - 1612:14, 1612:16

**timetable** [3] - 1573:15, 1587:21, 1587:24

**timing** [4] - 1519:8, 1544:1, 1605:6, 1611:25

**titled** [3] - 1520:15, 1626:15, 1627:2

**today** [15] - 1518:13, 1519:2, 1523:7, 1550:23, 1555:7, 1555:8, 1555:12, 1568:21, 1579:14, 1587:16, 1606:23, 1606:25, 1609:16, 1623:12, 1639:7

**together** [1] - 1629:2

**Tom** [2] - 1616:14, 1617:11

**tomorrow** [14] - 1518:14, 1520:21, 1521:19, 1526:15, 1527:16, 1527:21, 1554:12, 1572:19, 1580:16, 1580:20,

1581:16, 1595:22, 1603:21, 1622:11

**tomparfitt@telegraph.co.uk** [1] - 1614:25

**tonight** [5] - 1526:15, 1526:16, 1527:16, 1581:16, 1610:15

**took** [3] - 1525:9, 1568:22, 1592:21

**tool** [1] - 1545:20

**top** [35] - 1517:2, 1529:1, 1531:19, 1533:25, 1534:10, 1536:4, 1537:23, 1553:14, 1553:16, 1568:4, 1573:10, 1575:5, 1578:9, 1580:21, 1585:17, 1586:23, 1597:5, 1601:3, 1602:8, 1603:23, 1604:12, 1604:13, 1607:24, 1609:10, 1612:12, 1612:13, 1614:5, 1616:16, 1620:20, 1624:15, 1629:7, 1631:10, 1634:12, 1634:16, 1636:22

**top-tier** [1] - 1537:23

**total** [4] - 1529:22, 1582:21, 1615:21, 1619:6

**totally** [1] - 1539:21

**touching** [1] - 1530:9

**tracking** [2] - 1554:19, 1555:12

**training** [2] - 1521:19, 1521:25

**TRANSCRIPT** [1] - 1510:8

**transfer** [1] - 1554:1

**transferred** [1] - 1585:8

**translating** [1] - 1572:11

**Translation** [1] - 1627:2

**translation** [3] - 1573:11, 1578:4, 1629:3

**translations** [1] - 1572:8

**transmission** [1] - 1595:22

**transmit** [1] - 1572:2

**travel** [2] - 1577:11, 1586:5

**treat** [1] - 1623:19

**TRIAL** [2] - 1510:4, 1510:8

**trial** [11] - 1512:16, 1554:8, 1582:17, 1597:12, 1612:9, 1615:25, 1616:11, 1617:1, 1619:10, 1621:11, 1621:25

**tried** [2] - 1532:17, 1629:22

**trips** [1] - 1576:10

**true** [5] - 1524:3, 1567:10, 1592:23, 1599:17, 1601:20

**truly** [2] - 1524:8, 1608:21

**truth** [2] - 1570:13, 1601:17

**try** [3] - 1588:9, 1606:25, 1627:4

**trying** [9] - 1530:11, 1540:23, 1548:13, 1560:16, 1560:18, 1561:4, 1595:14, 1620:11

**turn** [1] - 1635:7

**turning** [5] - 1558:12, 1594:1, 1594:5, 1594:8, 1636:4

**turns** [1] - 1559:5

**tweaks** [1] - 1605:10

**Two** [1] - 1524:1

**two** [27] - 1514:25, 1524:10, 1529:7, 1530:5, 1534:10, 1538:9, 1553:24, 1556:2, 1561:21, 1561:22, 1564:6, 1564:10, 1581:17, 1595:8, 1595:24, 1600:20, 1600:25, 1602:4, 1602:8, 1604:9, 1605:8, 1605:15, 1607:5, 1609:21, 1614:5, 1624:25, 1625:7

**Tymoshenko** [18] - 1516:5, 1517:16, 1518:12, 1519:20, 1566:9, 1573:4, 1582:18, 1585:4, 1595:13, 1597:12, 1603:4, 1608:18, 1610:12, 1615:25, 1616:7, 1617:1, 1619:1, 1627:9

**Tymoshenko's** [2] - 1615:11, 1619:21

**typo** [1] - 1585:18

## U

**U.S** [9] - 1510:13, 1510:17, 1522:17, 1566:8, 1567:13, 1616:9, 1619:4, 1620:15, 1625:7

**UA** [2] - 1628:17, 1628:18

**UAH** [4] - 1575:21, 1575:24, 1577:3, 1584:21

**Ukraine** [41] - 1521:12, 1522:15, 1522:20, 1526:12, 1526:15, 1536:20, 1537:11, 1562:9, 1566:9, 1573:4, 1575:20, 1576:10, 1576:19, 1577:3, 1577:6, 1578:18, 1582:3, 1582:13, 1584:18, 1585:5, 1586:5, 1590:10, 1594:18, 1603:18, 1608:15, 1611:15, 1614:14, 1615:17, 1618:13, 1620:2, 1621:1, 1622:12, 1627:5, 1627:9, 1627:12, 1628:23, 1630:7, 1631:3, 1637:15

**Ukraine's** [1] - 1524:8

**Ukrainian** [16] - 1521:14, 1522:16, 1524:7, 1565:6, 1571:25, 1572:6, 1572:8, 1572:11, 1577:9, 1581:16, 1598:2, 1618:24, 1619:5, 1619:6, 1619:15, 1629:3

**Ukrainians** [2] - 1608:17, 1608:19

**ultimately** [2] - 1525:22, 1571:25

**undated** [1] - 1584:8

**under** [8] - 1512:19, 1529:3, 1558:13, 1566:8, 1576:2, 1585:2, 1597:22, 1619:5

**understood** [8] - 1517:15, 1517:17, 1518:6, 1528:1,

1535:2, 1554:2, 1558:15, 1569:10
  **undertaking** [1] - 1587:18
  **undisputed** [3] - 1590:18, 1612:23, 1641:5
  **Union** [1] - 1619:20
  **uniquely** [1] - 1591:20
  **unit** [2] - 1636:24, 1636:25
  **Unit** [1] - 1536:19
  **UNITED** [2] - 1510:1, 1510:10
  **United** [8] - 1510:3, 1511:8, 1512:2, 1512:9, 1541:16, 1636:12, 1636:13, 1636:15
  **University** [1] - 1550:7
  **Unless** [1] - 1557:15
  **unless** [3] - 1527:24, 1554:10, 1612:14
  **unlike** [1] - 1625:7
  **unlikely** [1] - 1595:14
  **Unofficial** [1] - 1627:2
  **unqualified** [1] - 1578:17
  **untoward** [3] - 1619:2, 1640:12, 1640:25
  **unwilling** [2] - 1564:8, 1564:12
  **up** [26] - 1512:19, 1519:8, 1526:12, 1527:8, 1529:4, 1534:11, 1545:22, 1546:2, 1546:6, 1546:17, 1550:18, 1550:19, 1552:4, 1554:10, 1556:17, 1569:17, 1587:18, 1588:22, 1593:19, 1608:23, 1609:23, 1611:16, 1612:3, 1624:22, 1629:24, 1641:15
  **Up** [1] - 1565:5
  **Updates** [1] - 1577:21
  **upper** [1] - 1590:10
  **upset** [1] - 1524:9
  **Urkanian** [1] - 1539:11
  **URL** [2] - 1529:9, 1529:11
  **URLs** [1] - 1530:5
  **useful** [1] - 1518:13

## V

  **van** [28] - 1517:4, 1517:5, 1517:20, 1518:9, 1518:23, 1519:5, 1519:18, 1520:8, 1524:10, 1528:8, 1528:11, 1528:14, 1528:16, 1528:19, 1529:3, 1529:14, 1530:5, 1530:7, 1561:21, 1562:1, 1562:15, 1563:14, 1563:18, 1568:21, 1605:11, 1628:16, 1629:6, 1629:21
  **variety** [1] - 1518:3
  **Various** [1] - 1565:5
  **various** [2] - 1517:18, 1544:8
  **verbatim** [1] - 1547:25
  **version** [12] - 1536:9, 1539:14, 1571:25, 1572:1, 1572:2,

1572:3, 1572:5, 1572:9, 1572:19, 1581:16, 1621:23, 1632:15
  **versions** [5] - 1568:23, 1572:11, 1573:12, 1581:16, 1595:17
  **versus** [1] - 1585:4
  **view** [1] - 1569:20
  **Viktor** [3] - 1553:25, 1564:12, 1637:16
  **Vin** [5] - 1603:2, 1603:20, 1606:23, 1606:25, 1607:16
  **vin@cwdc.com** [2] - 1604:1, 1604:3, 1604:16
  **violate** [1] - 1544:12
  **violation** [1] - 1577:7
  **violations** [2] - 1616:8, 1617:10
  **Vistica** [1] - 1624:8
  **visual** [1] - 1635:25
  **Vladyslav** [3] - 1628:22, 1629:14, 1629:22
  **Vlasenko** [3] - 1556:6, 1577:11, 1623:25
  **vlasenko.serhiy@gmail.com** [1] - 1567:4
  **voicemail** [3] - 1538:24, 1538:25, 1607:17
  **volume** [1] - 1627:7
  **VP** [2] - 1555:8, 1574:5
  **vs** [1] - 1510:5
  **VY** [1] - 1571:25

## W

  **wait** [2] - 1572:3, 1598:12
  **walked** [1] - 1568:23
  **wants** [7] - 1541:17, 1574:7, 1574:17, 1578:18, 1587:21, 1587:25, 1624:4
  **Warsaw** [4] - 1529:23, 1530:12, 1530:16, 1623:16
  **Washington** [9] - 1510:6, 1510:15, 1510:18, 1511:3, 1511:9, 1598:2, 1612:15, 1612:17, 1620:8
  **waste** [1] - 1560:18
  **water** [1] - 1609:3
  **ways** [2] - 1615:24, 1640:10
  **web** [1] - 1577:1
  **Weber** [3] - 1603:2, 1606:23, 1607:24
  **website** [2] - 1514:15, 1634:20
  **Wednesday** [2] - 1580:20, 1595:13
  **Weds** [1] - 1580:22
  **week** [7] - 1554:3, 1564:13, 1572:4, 1572:12, 1596:25, 1606:6, 1629:20
  **weeks** [1] - 1625:7
  **Weiss** [2] - 1516:14, 1565:25

  **Weiss's** [1] - 1566:7
  **west** [1] - 1617:11
  **Western** [2] - 1616:10, 1616:24
  **whatsoever** [2] - 1547:5, 1639:9
  **Whitney** [2] - 1528:9, 1606:21
  **whole** [5] - 1535:23, 1560:22, 1588:23, 1593:3, 1593:10
  **William** [4] - 1510:20, 1510:21, 1512:13
  **willing** [4] - 1572:3, 1615:20, 1624:3, 1624:5
  **wins** [1] - 1515:17
  **wire** [2] - 1555:7, 1582:22
  **wiring** [2] - 1583:5, 1583:10
  **wise** [1] - 1625:12
  **wishes** [1] - 1617:11
  **withdraw** [1] - 1564:10
  **WITNESS** [8] - 1567:21, 1582:2, 1585:16, 1585:19, 1591:17, 1600:25, 1626:14, 1641:20
  **witness** [42] - 1513:4, 1513:17, 1513:21, 1540:19, 1540:21, 1541:2, 1541:6, 1541:18, 1541:21, 1542:17, 1543:7, 1543:19, 1543:22, 1544:10, 1544:20, 1544:21, 1544:24, 1545:1, 1545:7, 1545:16, 1546:1, 1546:8, 1546:9, 1547:3, 1547:21, 1547:22, 1548:1, 1548:25, 1549:4, 1553:6, 1559:2, 1559:18, 1559:19, 1588:16, 1588:20, 1638:10, 1638:24, 1639:2, 1639:3, 1640:1
  **witness's** [2] - 1541:7, 1544:13
  **witnesses** [15] - 1511:13, 1522:19, 1542:24, 1544:4, 1544:8, 1544:9, 1545:12, 1545:23, 1546:14, 1547:5, 1547:13, 1615:23, 1616:1, 1616:7, 1638:10
  **wmurphy@zuckerman.com** [1] - 1510:24
  **word** [6] - 1585:13, 1588:12, 1589:5, 1590:17, 1638:15
  **Word** [3] - 1550:2, 1594:12, 1632:10
  **words** [4] - 1544:7, 1550:16, 1573:16, 1577:8
  **works** [4] - 1518:20, 1580:22, 1587:20, 1587:24
  **worry** [1] - 1564:20
  **worst** [1] - 1573:1
  **wrapped** [1] - 1629:24
  **write** [74] - 1524:2, 1527:15, 1527:23, 1533:21, 1533:24, 1538:17, 1539:3, 1540:10, 1553:18, 1553:21, 1555:6, 1557:14, 1560:2, 1562:1, 1563:18, 1564:5, 1564:19,

1565:15, 1568:17, 1571:22, 1574:6, 1574:9, 1574:12, 1574:15, 1575:5, 1576:22, 1578:1, 1578:6, 1578:10, 1578:13, 1578:16, 1578:20, 1578:24, 1579:1, 1579:6, 1579:8, 1579:11, 1579:13, 1579:16, 1580:11, 1580:21, 1581:12, 1584:5, 1587:15, 1595:6, 1596:5, 1596:8, 1596:23, 1599:3, 1600:12, 1602:23, 1603:1, 1603:19, 1605:7, 1606:24, 1608:16, 1610:13, 1613:9, 1613:19, 1614:10, 1615:7, 1616:18, 1617:6, 1618:10, 1621:22, 1622:10, 1623:9, 1623:23, 1624:23, 1628:24, 1629:21, 1629:25, 1630:24, 1631:1

**writer** [2] - 1601:16, 1601:18

**writes** [11] - 1519:19, 1524:16, 1525:3, 1529:19, 1534:1, 1540:1, 1556:14, 1578:2, 1579:14, 1581:14, 1624:16

**writing** [4] - 1531:16, 1537:15, 1578:23, 1590:8

**written** [3] - 1543:22, 1635:25, 1637:9

**wrote** [8] - 1518:9, 1520:16, 1524:25, 1538:19, 1540:14, 1560:1, 1601:21, 1603:3

**wtaylor@zuckerman.com** [1] - 1510:25

**www.telegraph.co.uk** [1] - 1529:9

## X

**XYZ** [1] - 1577:3

## Y

**Yanukovych** [3] - 1619:3, 1620:14, 1624:3

**year** [2] - 1627:15, 1627:22

**years** [4] - 1514:25, 1516:7, 1550:9

**yesterday** [2] - 1568:23, 1605:9

**York** [12] - 1514:21, 1515:12, 1518:10, 1520:3, 1526:16, 1526:24, 1528:21, 1532:9, 1539:23, 1540:1, 1540:5, 1598:7

**yourself** [3] - 1512:6, 1514:2, 1549:10

**YT** [1] - 1597:12

**Yulia** [2] - 1582:18, 1597:12

## Z

**Zaki** [4] - 1517:13, 1517:22,

1519:18, 1566:6

**zero** [1] - 1547:5

**zoom** [18] - 1519:11, 1535:23, 1553:14, 1581:24, 1582:7, 1584:13, 1585:13, 1589:20, 1600:24, 1607:5, 1608:8, 1628:12, 1631:10, 1631:11, 1634:16, 1635:9, 1636:5, 1637:3

**zooming** [2] - 1531:6, 1533:7

**ZUCKERMAN** [2] - 1510:22, 1511:2

**Zwaan** [27] - 1517:4, 1517:5, 1517:20, 1518:9, 1518:23, 1519:5, 1519:18, 1520:8, 1524:10, 1528:8, 1528:11, 1528:14, 1528:16, 1528:19, 1529:14, 1530:5, 1530:7, 1561:21, 1562:1, 1562:15, 1563:14, 1563:18, 1568:21, 1605:11, 1628:16, 1629:6, 1629:21

**Zwaan's** [1] - 1529:3