1669

1        UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA
2

3   UNITED STATES OF AMERICA,        )
                                     )
4        v.                          )   Criminal Action No. 19-CR-125
                                     )
5   GREGORY B. CRAIG,                )   JURY TRIAL - DAY 8
                                     )   Afternoon Session
6            Defendant.              )
    _____ )   Washington, D.C.
7                                        August 21, 2019

8

9        TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
           BEFORE THE HONORABLE AMY BERMAN JACKSON
10              UNITED STATES DISTRICT JUDGE

11

              APPEARANCES:
12

13      For the Government:     Fernando Campoamor-Sanchez, AUSA
                                Molly Gulland Gaston, AUSA
14                              U.S. ATTORNEY'S OFFICE FOR THE
                                DISTRICT OF COLUMBIA
                                555 Fourth Street, NW
15                              Washington, DC 20530
                                   -and-
16                              Jason Bradley Adam McCullough
                                U.S. DEPARTMENT OF JUSTICE
17                              950 Pennsylvania Avenue, NW
                                Washington, DC 20530

18

19      For the Defendant:     Adam B. Abelson, Esq.
                                William James Murphy, Esq.
20                              ZUCKERMAN SPAEDER, LLP
                                100 East Pratt Street
21                              Suite 2440
                                Baltimore, MD 21202
22                                 -and-
                                William W. Taylor, III, Esq.
23                              Paula M. Junghans, Esq.
                                ZUCKERMAN SPAEDER, LLP
24                              1800 M Street, NW
                                Suite 1000
25                              Washington, DC 20036

1670

Court Reporter:                PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                              U.S. Courthouse, Room 4700A
                              333 Constitution Avenue, NW
                              Washington, D.C.  20001
                              (202) 354-3243

    Proceedings reported by stenotype shorthand.
    Transcript produced by computer-aided transcription.

1671

E X A M I N A T I O N S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Catherine Whitney | 1672 | 1694 | | |
| Noah Puntus | 1699 | 1721 | 1739 | |
| Lucy Saunders | 1744 | 1762 | | |

E X H I B I T S

| GOVERNMENT EXHIBIT | PAGE |
|---|---|
| 326 | 1681 |

1672

1       P R O C E E D I N G S

2                       (2:19 p.m.)

3               THE DEPUTY CLERK:  Your Honor, re-calling Criminal

4       Case Number 19-125, United States of America v. Gregory B.

5       Craig.

6               THE COURT:  Do we have our next witness ready to go?

7               MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

8               THE COURT:  All right.  Can we bring the jury in.

9                   (Jury present)

10              THE COURT:  We have got all our jurors back.

11              And I assume that no one has had any further

12      communications or research about the case.

13              All right.  We're ready to call the next witness.

14              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

15              The government calls Catherine Whitney to the stand.

16              THE COURT:  All right.  Thank you.

17                          Catherine Whitney,

18              having been duly sworn, was examined and testified as

19      follows:

20              THE COURT:  You can proceed.

21              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

22                          DIRECT EXAMINATION

23              BY MR. CAMPOAMOR-SANCHEZ:

24      Q.      Good afternoon.

25      A.      Good afternoon.

1673

1    Q.      Can you please tell us your name and spell it for the

2    record.

3    A.      My name is Catherine Whitney.  You want the spelling

4    of the whole name?

5    Q.      Yes, please.

6    A.      C-A-T-H-E-R-I-N-E.  Last name is W-H-I-T-N-E-Y.

7    Q.      Without telling us your address, where do you live?

8    A.      I live in Maryland.

9    Q.      And where do you work?

10   A.      I currently work at Skadden, Arps.

11   Q.      And what do you do at Skadden?

12   A.      I'm an assistant.

13   Q.      When you say you're an assistant, what does that

14   mean?

15   A.      I'm technically now Partner/Counsel Secretary, is my

16   official title.

17   Q.      Okay.  How long have you been working at Skadden?

18   A.      Approximately eight years, I believe.

19   Q.      And have you been in the same position for those

20   eight years?

21   A.      I have.

22   Q.      And during that time, did you work for Mr. Gregory

23   Craig?

24   A.      I did, yes.

25   Q.      Do you know him well?

1     A.      I know him well.

2     Q.      Okay.  Do you see him in the courtroom here today?

3     A.      Yes, I do.

4     Q.      Tell us where he is seated and what he is wearing.

5     A.      He is sitting there, and he is wearing a suit with a

6     blue shirt and a blue tie.

7             THE COURT:  All right.  The record will reflect that

8     she has identified the defendant.

9             BY MR. CAMPOAMOR-SANCHEZ:

10    Q.      And were you Mr. Craig's secretary during that time?

11    A.      At Skadden, Arps, yes.

12    Q.      And what were the years that you worked for him at

13    Skadden, Arps?

14    A.      I believe that I started at Skadden in approximately

15    2011.

16    Q.      Okay.  Until he left the firm?

17    A.      Correct.

18    Q.      Now, Ms. Whitney, I'm going to direct your attention

19    to a number of e-mails, and I know this was a long time ago,

20    but I have to ask you first:  Do you have any memory of

21    e-mail exchanges with a man by the name of Jonathan Hawker in

22    the September 2012 time frame?

23    A.      The name is familiar.

24    Q.      But you don't remember specifically e-mailing him and

25    what about?

1675

1    A.        No, I do not.

2    Q.        Let me direct your attention to Government's Exhibit

3    268, which is already in evidence.  And if we can focus first

4    on the bottom e-mail, the first and second sentence.

5              Ms. Whitney, in the e-mail that we are seeing, it is

6    an e-mail from you to Mr. Hawker.  Do you see that?

7    A.        I do.

8    Q.        What were you doing with this e-mail?

9    A.        I'm sorry?

10   Q.        What was the purpose of this e-mail?

11   A.        I was e-mailing Mr. Hawker.

12   Q.        And what were you doing in that e-mail?

13   A.        Passing a message along from Mr. Craig.

14   Q.        I'm sorry.  My questions are a little bit stilted.

15   It reads, "Greg is currently traveling but asks that I send

16   this below e-mail to you right away.  Sincerely, Catie."

17   A.        Correct.

18   Q.        So you were forwarding that to Mr. Hawker at

19   Mr. Craig's request?

20   A.        That's what it looks like, yes.

21   Q.        Okay.  And did Mr. Hawker respond and acknowledge

22   receipt of your e-mail?

23             If you look to the middle e-mail.  Do you see that?

24   A.        Yes.

25   Q.        Did that happen?

1676

1    A.        That's what it looks like, yes.

2    Q.        Let me ask you generally:  If Mr. Craig has given you

3    some instructions that you're following up on, once they're

4    accomplished, do you usually let him know?

5    A.        Typically, yes.

6    Q.        Let's look at the top part of this e-mail.

7              Is that what you're doing here by forwarding

8    Mr. Hawker's response to Mr. Craig?

9    A.        In my general practice, yes.

10   Q.        And specifically in this case that's what you did?

11   A.        That's what it looks like, yes.

12   Q.        Okay.  I assume the response will be the same, but

13   let me take a quick look at 269, the middle e-mail.

14             And do you see that you received a response back from

15   Mr. Hawker?

16   A.        Yes.

17   Q.        To your prior e-mail from Mr. Greg Craig?

18   A.        Yes.

19   Q.        It reads at the very top, "Could you let Greg know

20   that I have changed the following," and he lists the things

21   that he has changed.

22             Do you see that?

23   A.        Yes.

24   Q.        And again, if we look at the top e-mail, that's an

25   e-mail from you to Mr. Craig?

1    A.      Yes.

2    Q.      Are you forwarding, essentially, Mr. Hawker's

3    response?

4    A.      Yes.

5    Q.      Now, let me change topics again.  Again, I just have

6    to ask you if you first have a recollection.  Do you recall

7    having any -- well, strike that.

8            Do you recall Mr. Craig asking you to contact David

9    Sanger of *The New York Times* in early October of 2012?

10   A.      I don't recall.

11   Q.      Let me direct you to Government's Exhibit 300,

12   already in evidence.

13           And that's an e-mail from you to Mr. Craig?

14   A.      It is.

15   Q.      And what is the date?

16   A.      October 2, 2012.

17   Q.      I'm going to read it.  Let me know if I read it

18   correctly.  It says, "Okay, I had to go through the main D.C.

19   number (automated machine) and got his voicemail and left him

20   a message to call me with a phone number where you could

21   reach him."  And then you provide his e-mail address.

22   A.      Correct.

23   Q.      Obviously, you don't recall that today?

24   A.      No, I do not.

25   Q.      Okay.  And do you have any recollection of, following

1678

1    this attempt at -- or you communicating this to Mr. Craig or

2    Mr. Craig asking you to deliver a copy of the report to

3    anyone?

4    A.      No, I do not.

5    Q.      Let's take a look at Government's Exhibit 307.  Let's

6    look at the middle e-mail first.

7            And again, is this an e-mail from Mr. Craig to you?

8    A.      Yes.

9    Q.      And he is providing you some directions, and it

10   reads, "Please have hard copy of Ukraine report

11   hand-delivered this afternoon to Vin Weber at his office."

12   And then he provides the address.

13           Do you see that?

14   A.      Yes.

15   Q.      And then at the top you responded with the word

16   "okay."

17           Do you see that?

18   A.      Yes.

19   Q.      Okay.  Did you, in fact, deliver the copy of the

20   report to Mr. Vin Weber's office, as Mr. Craig requested?

21   A.      I don't recall.

22   Q.      Would it have been your practice to actually follow

23   up on those requests and make sure that they were

24   accomplished?

25   A.      Typically, yes.

1679

1    Q.      All right.  Let me now move on to sort of December of

2    2012.  And again, I know it is a long time, but I just have

3    to ask you:  Do you have any memory of sort of Mr. Craig

4    telling you that the Skadden Report on the Tymoshenko matter

5    was about to be released?

6    A.      Of him telling me directly?

7    Q.      Yes.  And asking you to do something.

8    A.      I don't recall.

9    Q.      Let's look at Government's Exhibit 320 -- if we can

10   expand -- already in evidence.

11           Is that an e-mail from you to Mr. van der Zwaan,

12   Mr. Haskell, Mr. Kedem, and Mr. Sloan?

13   A.      Yes.

14   Q.      And what does the subject read?

15   A.      "Report release date."

16   Q.      And do you mind reading the body of the e-mail?

17   A.      "Greg is traveling but wanted me to let you know that

18   the report will be released next Wednesday, December 12."

19   Q.      Even after reading this, do you have a memory of

20   this?

21   A.      I do not.

22   Q.      Okay.  And I think we know the answer, but similarly,

23   just to be clear, do you have any recollection of around this

24   time Mr. Vin Weber attempting to reach Mr. Craig to discuss

25   something?

1680

1    A.        I do not.

2    Q.        If I can direct you to 325.  It is already in

3    evidence.  And the bottom e-mail first -- or the bottom two

4    e-mails first.

5              Do you see, at the bottom, there is an e-mail to

6    Mr. Craig, and you are being copied?

7              First of all, do you know who Ms. MargaretAnn Corbett

8    is?

9    A.        I do not.

10   Q.        The subject reads, "Do you have time to talk to Vin

11   Weber today," and it goes on with some proposals.  But the

12   person who is writing says, "Please let me know, and I will

13   be happy to work with Catie to find a time."

14             I assume that is you.  But you don't know who

15   Ms. Corbett is?

16   A.        Correct.

17   Q.        Okay.  And then Mr. Craig responds and says, "I am in

18   New York City, flying back on 2 p.m. shuttle.  He could call

19   me on my cell."  And there's a redaction.

20             If we can look at the next two top e-mails.  And

21   Ms. Corbett again sort of responds to that e-mail, provides

22   information about Mr. Weber's appointments and talks some

23   more.

24             Finally, there is a response from Mr. Weber that

25   says, "We talked."

1    Did I read that correctly?

2    A.    Yes.

3    Q.    No recollection of that, either; right?

4    A.    No.

5    Q.    Okay.  And let me ask you, do you recall a Mr. Rick

6    Gates also attempting to reach -- and we can take that

7    down -- also attempting to reach Mr. Craig at this time?

8    A.    I do not.

9         MR. CAMPOAMOR-SANCHEZ:  Your Honor, we would -- at

10   this point, it is not in evidence, it is Government's 326 --

11   we can show it for the court, not for the jurors just yet --

12   but it's an e-mail from Ms. Whitney to Mr. Craig.

13        THE COURT:  Was there any objection?

14        Are you moving its admission?

15        MR. CAMPOAMOR-SANCHEZ:  I am moving its admission.

16   I'm sorry.

17        THE COURT:  Any objection?

18        MR. MURPHY:  No objection.

19        THE COURT:  All right.  It will be in evidence.

20        (Government 326 admitted in evidence)

21        BY MR. CAMPOAMOR-SANCHEZ:

22   Q.    Looking at 326.  Is that an e-mail from you to

23   Mr. Craig?

24   A.    It is.

25   Q.    And the subject line reads, "Did Rick Gates reach

1682

1    you?"

2    A.      Correct.

3    Q.      And the date is December 7, 2012?

4    A.      Correct.

5    Q.      Again, I assume no memory of that, either?

6    A.      No.

7    Q.      Do you recall talking to Mr. Sanger in December of

8    2012 at all?

9    A.      I do not.

10   Q.      Let's look at 370, which is in evidence.  That's an

11   e-mail from you to Mr. Craig, copying Mr. Haskell.

12   A.      Correct.

13   Q.      It is dated December the 12th, 2012.  The subject

14   line reads, "Sanger received the pdf of the report."  And the

15   e-mail itself says, "I just spoke with him and verified he

16   received it with no problem.  Just wanted to let you know."

17           Does this refresh your recollection about why you

18   were calling him?

19   A.      No, it does not.

20   Q.      All right.  Thank you.  We can take that down.

21           I have a few other documents to show you, but let me

22   ask you first, based upon your experience working with

23   Mr. Craig, if he ever told you to put something in final form

24   for his signature --

25   A.      Uh-huh.

1    Q.      -- did that have a specific meaning for you?

2    A.      If he asked me to put something in final, it did not

3    necessarily mean that it was going out the door.  He would

4    often put it in final -- or on occasion put things in final

5    to visualize, see how it would look in final format.

6    Q.      So if you received an instruction to put something in

7    final, that does not necessarily mean that it would actually

8    go out the door?

9    A.      Correct.

10   Q.      Let's look at Government's Exhibit 437, which is in

11   evidence.

12           And this is an e-mail from you to Mr. Craig?

13   A.      It is.

14   Q.      And is it dated May 1, 2013?

15   A.      It is.

16   Q.      And the subject says, "Please put in final form for

17   my signature."

18   A.      Correct.

19   Q.      And it does include an attachment to it?

20   A.      Yes.

21   Q.      All right.  Let's take a look at page number 2 under

22   number 1.

23           Number 1 reads, "To whom, if anyone, did your firm

24   release or distribute the report and when?"

25           The first line reads, "In addition to giving the

1684

1    report to representatives of the government of Ukraine, the

2    law firm on December 11-12, 2012 provided a copy of the

3    report to," and then it lists a number of people.

4           Did I read that correctly?

5    A.     Yes.

6    Q.     Okay.  Let's take a look now at 442, which is already

7    in evidence.  Now we're on -- I'm sorry.  This is an e-mail

8    from you?

9    A.     Yes.

10   Q.     Now, this is May 28, 2013.

11   A.     Yes.

12   Q.     And what are you sending here -- what are you sending

13   to Mr. Sloan?

14   A.     According to this e-mail, a document.

15   Q.     Okay.  And it reads, "Cliff - One last look-see at

16   this FARA response.  Greg asked that I send it to you.  If

17   you can quickly look it over and make sure it's okay, I will

18   send it out now.  Thanks.  I have the two attachments that go

19   with it."

20          As you read that, what does that mean?  What should

21   we understand from your message to Mr. Sloan?

22   A.     As I'm looking at this document now?

23   Q.     Yes.

24   A.     That I was sending him a document on Greg's request

25   for Mr. Sloan to review.

1685

1    Q.      Okay.  Was there an intention to send this soon?

2    A.      I don't recall, but looking at this, I would say yes,

3    per the e-mail.

4    Q.      Okay.  Let me just ask you about page number 3 of the

5    exhibit.  And that's part of the attachment.  Is that right?

6    A.      Yes.

7    Q.      And if we look again at paragraph number 1 --

8    A.      Well, that is not part of the attachment.  That is

9    part of the letter.  Is that what you said?  Part of the

10   attachment?

11   Q.      I'm sorry.  Was the letter not attached to the

12   e-mail?

13   A.      No, it is.  So we're looking at paragraph 1.  Okay.

14   Q.      To be clear, you attached the letter and the

15   attachments or just the letter?

16   A.      No, I thought you were talking about attachments,

17   like it's referenced in that.  So we're just talking about

18   the letter?  I'm just confirming we're talking about this

19   letter?

20   Q.      Yes.

21   A.      Correct.

22   Q.      And that was the letter that was attached to the

23   e-mail that you sent to Mr. Sloan?

24   A.      Correct.

25   Q.      If we can look at point 1.  Again, it is the same

1686

1    question that we saw in the prior Government's Exhibit 430,

2    right?  To whom?

3    A.        Correct.

4    Q.        Is that the same heading?

5    A.        Yes.

6    Q.        I will read the first line again, it says, "In

7    addition to giving the report to representatives of the

8    government of Ukraine, the law firm on December 12-13, 2012

9    provided a copy of the report," and then it gives a list of

10   the persons who they were provided to.  Is that right?

11   A.        Correct.

12   Q.        Let's go look at Government's Exhibit 444.  There's a

13   number of e-mails here.  Let's start with the very one at the

14   bottom.

15           So the very one at the bottom says it is from you;

16   right?

17   A.        Yes.

18   Q.        And then it says it is to you and copying you.  What

19   does that mean if we see documents like that?

20   A.        The very bottom where it is from me to me?

21   Q.        Where the subject is "Scanned documents."

22   A.        That's when we scan documents in our system, it

23   automatically comes into your inbox, which is where it shows

24   up as it is from me to me.

25   Q.        So when we see those, that means that you, or whoever

1687

1    the person is that has that, has scanned something and now it

2    has come back in the e-mail?

3    A.      Yes.  That's the firm's standard for how that shows

4    up, yes.

5    Q.      Okay.  If we can look at the e-mail right above that,

6    that is from you to Mr. Sloan again?

7    A.      Correct.

8    Q.      Is that on May 28, 2012?

9    A.      2013, yes.

10   Q.      Thank you.

11   A.      You're welcome.

12   Q.      So 2013.  I'm glad you're keeping me honest in the

13   reading.  So 2013.

14   A.      Correct.

15   Q.      And does it read, "Cliff - One last" -- well,

16   actually, is this -- are we seeing the same e-mail that we

17   just saw before?

18   A.      That's what it looks like, yes.

19   Q.      So let's look at Mr. Sloan's response just above

20   that.

21           And Mr. Sloan responds to both you and Mr. Craig.

22   A.      Yes.

23   Q.      All right.  And it reads, "Catie and Greg, looks

24   good.  A few comments.  Number 1, in question 1, I think

25   there is a "to" missing in number 4.  2, I assume you're sure

1688

1    about the dates that we provide.  3, I think you should send

2    it to Larry Spiegel before sending (and tell him that you

3    want to get it out right away)."

4           And did you respond to Mr. Sloan's e-mail above?

5    A.    Yes.

6    Q.    But you sent it to Mr. Craig specifically?

7    A.    Yes.

8    Q.    And it says, "Greg, I'll add the word "to" where

9    suggested.  2, I'll leave this one up to you."

10          What does that mean, "leave this up to you"?

11   A.    That means, as far as I was concerned, Mr. Craig

12   would have to respond to Mr. Sloan directly because I didn't

13   know what -- I mean I don't recall this, but that was for

14   Mr. Craig to respond to Mr. Sloan.

15   Q.    And was the question number 2, "I assume you're sure

16   about the dates that we provide"?

17   A.    In the e-mail from Mr. Sloan, yes.  Looking at this

18   e-mail, yes.

19   Q.    And let's look at 450 now, and this is in evidence.

20   If we can start in the bottom e-mail.

21          And that's an e-mail from Mr. Craig now to you,

22   copying Mr. Sloan; is that right?

23   A.    Yes.

24   Q.    Now, May 31, 2013.

25   A.    Correct.

1689

1    Q.      Okay.  And the subject line reads what?

2    A.      "FARA response."

3    Q.      It says, "David Sarnow and Larry Spiegel called and

4    asked me to make minor changes in our response and to run

5    this letter by Ukraine before sending it in.  Can you provide

6    me with a final draft" -- I assume that is draft -- "so that

7    I can make the necessary changes."

8            And do you respond to Mr. Craig's request?

9    A.      Yes.

10   Q.      Provided him with a draft?

11   A.      That's what it looks like, yes.

12   Q.      And then did Mr. Craig respond back to you and give

13   you some instructions?

14   A.      Yes.

15   Q.      And it said, "Can you run this off on our letterhead

16   so that I can send it to the Ministry of Justice?  Change the

17   date to May 31st."  It says 2012, but we are actually, as of

18   this e-mail, May 31, 2013.

19   A.      Correct.

20   Q.      Okay.  And then, finally, 451.

21           And that's an e-mail from Mr. Craig to you?

22   A.      It is.

23   Q.      What date?

24   A.      June 3, 2013.

25   Q.      And what is the subject line?

1690

1   A.        "Put in final form."

2   Q.        Okay.  And it has an attachment.  Is that right?  Can

3   we see that from the headings?

4   A.        It does, yes.

5   Q.        Okay.  And looking at the attachment itself, the

6   letter, if we go to page 3 of the exhibit, again paragraph 1,

7   does it maintain that date of December 12-13 that we saw in

8   the last draft?

9   A.        It does, yes.

10  Q.        Okay.  Now, let's move to another topic, and this is

11  Government's Exhibit 548.  It is a multipage exhibit, but I

12  want to start you at the end, so actually at page 5 of this

13  exhibit.  Let's start there first.

14            Let me know when you're there.

15  A.        Okay.

16  Q.        Do you recognize what this is?

17  A.        What this is?

18  Q.        Yes.

19  A.        Yes, it is just a note from Mr. Craig.

20  Q.        That's a poor question.  Do you recognize this

21  handwriting?

22  A.        I do.

23  Q.        What does it say?

24  A.        "Please put on letterhead for my signature."

25  Q.        And on the "to"?

1691

1    A.      "Min of Justice, from Gregory B. Craig, Skadden,

2    Arps."

3    Q.      Then, can we look at page 6, which follows the note

4    that you just read.

5            Do you recognize the handwriting on this document?

6    A.      I do.

7    Q.      Okay.  What date is written under "Ministry of

8    Justice" at the top?

9    A.      July 16, 2012.

10   Q.      Okay.  And now can we go to page 4.

11           And do you recognize what this is as related to

12   page 6 of this same exhibit?

13   A.      This just looks like a retyped version of this

14   document.

15   Q.      With the changes that had been previously indicated

16   on page 6?

17   A.      Yes.

18   Q.      Now we see the date of July 16, 2012 above, for

19   example.

20   A.      Yes.

21   Q.      But there's additional changes on it?

22   A.      Yes.

23   Q.      And again, do you recognize the handwriting on this?

24   A.      I do.

25   Q.      Whose handwriting is it?

1692

1    A.      Greg's.

2    Q.      Now, let's go to the very first page of this

3    document.

4            And this is an actual version of that letter that is

5    now signed?

6    A.      It is.

7    Q.      Can we zero in on the signature, please.

8            Now, do you recognize that signature?

9    A.      I do.

10   Q.      Whose signature is it?

11   A.      It is Mr. Craig's but not in his writing.

12   Q.      Okay.  Why don't you tell us what it is, then.

13   A.      That's my handwriting.

14   Q.      Okay.  So you're writing Mr. Craig's signature?

15   A.      Yes.

16   Q.      All right.  Do you recall the circumstances under

17   which you signed this letter with his name?

18   A.      This letter in particular, no.

19   Q.      Okay.  Would you sign a letter with Mr. Craig's name

20   absent his direction to you to sign that letter?

21   A.      No.

22   Q.      You can take that down.

23           At the very top, does it have the date that we were

24   talking about before, July 16, 2012?

25   A.      It does.

1693

```
 1    Q.       I think I just have one more question.

 2    A.       Uh-huh.

 3             MR. CAMPOAMOR-SANCHEZ:  The Court's indulgence.

 4             THE COURT:  Yes.

 5                  (Pause)

 6             BY MR. CAMPOAMOR-SANCHEZ:

 7    Q.       I have just one more question for you if I can show

 8    you what has already been admitted into evidence as

 9    Government's Exhibit 530.

10             Can we expand that.

11             Do you recognize this handwriting?

12    A.       I do.

13    Q.       Can you help us read -- can you read it throughout?

14    Start with point 1.  What does it say?

15    A.       "Witnesses to interview."

16    Q.       How about point 2?

17    A.       "PR recommendations."

18    Q.       Point 3.

19    A.       "Procedural" -- I'm unsure of the second word.

20    Q.       Point 4?

21    A.       "Opening statement themes (Matt)."

22    Q.       What's under the first line?

23    A.       It looks like "Framing the second" -- I'm not sure of

24    the last word.

25             And then under that --
```

1694

1     Q.      How about under that?

2     A.      "Backgrounding critical journalists."

3             MR. CAMPOAMOR-SANCHEZ:  Thank you, Ms. Whitney.  No

4     further questions.

5             THE COURT:  All right.  Any cross-examination?

6             MR. MURPHY:  Yes, Your Honor.

7                       CROSS-EXAMINATION

8             BY MR. MURPHY:

9     Q.      Good afternoon, Ms. Whitney.

10    A.      Good afternoon.

11    Q.      I wanted to ask you a couple of questions about

12    working for Mr. Craig.

13    A.      Uh-huh.

14    Q.      At one point you responded that sometimes Mr. Craig

15    would ask you to put a letter into final form, or another

16    document into final form so that he could look at it; right?

17    A.      Correct.

18    Q.      Did Mr. Craig, in the years that you worked for him,

19    did he have the capability, in your experience, to convert a

20    Word document that he had drafted as a letter into a form

21    that would fit on to the Skadden, Arps letterhead?

22    A.      No.

23    Q.      Is that something that he would typically ask you to

24    do, to put it on letterhead paper so it was on the letter

25    form that it would go out in?

1695

```
 1    A.      Yes.

 2    Q.      You've indicated that you know Mr. Craig well; right?

 3    A.      Yes.

 4    Q.      How long did you work as a secretary for Mr. Craig?

 5    A.      Altogether over the years.

 6    Q.      Altogether.

 7    A.      Approximately 20 years.

 8    Q.      Did you start as his secretary first when he was at

 9    Williams & Connolly?

10    A.      Yes.

11    Q.      And there came a time when he became President

12    Obama's White House Counsel; is that right?

13    A.      Yes.

14    Q.      Did you go to the White House Counsel's Office with

15    him as his secretary?

16    A.      Yes.

17    Q.      Did you work in the West Wing of the White House for

18    that period?

19    A.      Yes.

20    Q.      And then there came a time when Mr. Craig left the

21    position with President Obama and joined the Skadden, Arps

22    firm; right?

23    A.      Yes.

24    Q.      Did you stay at the White House Counsel's Office for

25    a period of time after Mr. Craig left?
```

1696

1   A.      I did.

2   Q.      Who did you work for after Mr. Craig left?

3   A.      Bob Bauer.

4   Q.      Was he the next White House Counsel for President

5   Obama?

6   A.      He was.

7   Q.      And then there came a time when you rejoined

8   Mr. Craig at Skadden; right?

9   A.      Yes.

10   Q.      And when you joined Skadden in 2011, did you do that

11   with the understanding that you would be working again for

12   Mr. Craig?

13   A.      I did.

14   Q.      You mentioned a gentleman by the name of Vin Weber.

15   Was Mr. Weber's name familiar to you?

16   A.      It was.

17   Q.      Did you know him to be a former Republican

18   congressman?

19   A.      I did not.

20   Q.      How did you know him, and did you know what his

21   relationships were with Mr. Craig?

22          MR. CAMPOAMOR-SANCHEZ:  Objection.  Beyond the scope.

23          THE COURT:  Let's just start:  Did you know what his

24   relationship was with Mr. Craig?

25          THE WITNESS:  He was an acquaintance of Mr. Craig's.

1697

1    THE COURT:  That's all you know?

2    THE WITNESS:  Yes.

3    THE COURT:  All right.  Ask your next question.

4    BY MR. MURPHY:

5    Q.    Are you familiar with Mr. Craig's role with the

6    Washington Institute For Near East Policy --

7    THE COURT:  No, no, no, no.  She doesn't know, so

8    we're --

9    MR. MURPHY:  Your Honor, I haven't asked her a

10   question yet.

11   THE COURT:  She doesn't know how they know each

12   other.

13   MR. MURPHY:  I'm asking her whether she is familiar

14   with --

15   THE COURT:  That's irrelevant.

16   MR. MURPHY:  -- The Washington Institute for Near

17   East Policy.

18   THE COURT:  All right.  Next question.

19   BY MR. MURPHY:

20   Q.    Were you aware that Mr. Craig and Mr. Weber took a

21   trip together to the Middle East in October of 2012?

22   A.    Yes.

23   Q.    Do you know what the trip was involved with, why they

24   were there?

25   MR. COMPOAMOR-SANCHEZ:  Objection.  Beyond the scope

1698

1    and relevance.

2            THE COURT:  Sustained.  I don't see the relevance.

3            BY MR. MURPHY:

4    Q.      When Mr. Craig sent you some e-mails, which you were

5    shown today, dated in early October of 2012, Exhibit 307, for

6    example -- if we could bring that back up, Government Exhibit

7    307.

8            Do you know whether this was during the period when

9    Mr. Craig and Mr. Weber were together in the Middle East?

10   A.      I don't recall.

11   Q.      Do you recall whether Mr. Craig and Mr. Weber put

12   together a position paper on Middle Eastern policy involving

13   Egypt?

14           MR. CAMPOAMOR-SANCHEZ:  Objection to relevance and

15   scope.

16           THE COURT:  Sustained.

17           BY MR. MURPHY:

18   Q.      Do you remember Mr. Craig having various discussions

19   and meetings with Mr. Weber in the fall of 2012?

20   A.      I'm not certain of the timing.

21   Q.      Okay.  Was Mr. Craig a good boss to work for?

22   A.      He was.

23           MR. MURPHY:  I have no further questions.

24           THE COURT:  All right.  Any redirect?

25           MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

1699

1        THE COURT:  Thank you very much.

2        This witness can be excused.

3        (Witness excused)

4        THE COURT:  You can call your next witness.

5        MR. McCULLOUGH:  Your Honor, the government calls

6   Mr. Noah Puntus.

7                        Noah Puntus,

8        having been duly sworn, was examined and testified as

9   follows:

10                     DIRECT EXAMINATION

11        BY MR. McCULLOUGH:

12   Q.    Good afternoon, Mr. Puntus.

13   A.    Good afternoon.

14   Q.    Can you please introduce yourself to the jurors by

15   telling them your name and spelling your last name for the

16   record.

17   A.    Hi.  My name is Noah Puntus.  My list name,

18   P-U-N-T-U-S.

19   Q.    And without stating your specific address, can you

20   tell us where you live?

21   A.    I live in New Jersey.

22   Q.    I understand that you have some previous connection

23   to the D.C. area.  Did you go to college here?

24   A.    I did.  I spent my undergraduate years at Georgetown

25   University here in D.C.

1700

1    Q.      And did you attend any other school after Georgetown?

2    A.      I got my Master's in Business Administration, my MBA,

3    from Columbia University in New York.

4    Q.      What year was that?

5    A.      I graduated in '98.

6    Q.      And just turning to your career, how many different

7    places have you worked over the course of your career?

8    A.      Two jobs post-college.

9    Q.      Tell us about your first job, if you would.

10   A.      I started out of college at Pricewaterhouse, which is

11   now PricewaterhouseCoopers, as an accountant, auditor.  I was

12   there until I made partner.  And I left there, and I went to

13   Skadden in probably around the date 2002, October 2002, went

14   to Skadden, and I have been at Skadden since then.

15   Q.      Okay.  Just focussing briefly at your time at

16   Pricewaterhouse, you mentioned auditing.  Can you describe

17   generally what are you talking about when you refer to

18   auditing?

19   A.      Auditing is going into a company and reviewing their

20   books and records, understanding the cash coming in and out,

21   really to present the financials of a company so that a

22   reader or investor can understand what a company is.  It is

23   making sure the numbers are good.

24   Q.      And then you said you joined Skadden in approximately

25   2002; is that right?

1701

1    A.       That's correct.

2    Q.       Did you continue working with finances and numbers at

3    that time?

4    A.       Yes.  I started at Skadden as the Senior Controller,

5    so responsible for the general accounting functions, whether

6    it was the general ledger, financial reporting, expense

7    management, and the like.

8    Q.       And what was your initial title when you joined

9    Skadden in 2002?

10   A.       I was the Senior Controller.

11   Q.       And did there come a time when you were promoted?

12   A.       Yes.  In 2011, early 2011, my official title was

13   changed to Executive Director/CFO.

14   Q.       And can you describe briefly kind of what are your

15   functional responsibilities as CFO?

16   A.       Sure.  Well, I continued on kind of being responsible

17   for all the general accounting that I had previously done as

18   a Senior Controller, and then took on the responsibility of

19   our client accounting department, our real estate department,

20   our benefits department, our treasury department, our partner

21   accounting and tax department.  I think I got them all.

22   Q.       And so you're responsible for overseeing multiple

23   functions related to the --

24   A.       Predominantly, the financial functions where there's

25   big financial ramifications at the firm, yes.

1  Q.      And you mentioned client accounting.  Can you tell us

2  what client accounting is?

3  A.      Client accounting is the accounting group that I'm

4  responsible for that does all the billing and collection side

5  of our business.

6  Q.      Okay.  Can you -- just turning specifically now to

7  how Skadden runs the business --

8  A.      Sure.

9  Q.      -- how does Skadden charge for its services, as a

10  general matter?

11  A.      As a general matter, the standard practice is what we

12  call the billable hour.  Our attorneys work on engagements,

13  they charge hours.  We accumulate those hours based upon

14  various rate structures, based upon their level of seniority

15  on to bills.  We mail those bills out to the client, and

16  hopefully they pay them in full.

17  Q.      And how does Skadden track its time and expenses?

18  A.      Our accounting system, our attorneys are responsible

19  for putting in their time daily.  It's tracked and

20  accumulated in the system under specific clients and/or

21  matters for specific engagements.

22  Q.      What function is it that is responsible for

23  generating a bill for a client?

24  A.      The client accounting group is responsible for doing

25  that.

1703

1    Q.      And so when it comes time to generate a bill for a

2    client, how does that process work, in general terms?

3    A.      The client accounting group will pull together what

4    we call a prebill, which will accumulate all of the time

5    charges or any other charges that are on the record for that

6    client and matter.  They will present or send that prebill to

7    a partner responsible for the engagement.  They'll talk about

8    the prebill and agree whether it is right, wrong, or if

9    adjustments need to be made, and ultimately issue a final

10   bill, which will be given to the partner to be sent off to

11   the client.

12   Q.      Understood.  And so if I understood that, the client

13   accounting function interacts with the partner that is

14   responsible for the matter?  Is that what you said?

15   A.      That is correct.

16   Q.      Does the partner that is responsible for the matter

17   have another name within the function --

18   A.      The engagement partner.

19   Q.      And is the billing partner part of the finance

20   function?

21   A.      No.  The client accounting group is separate and

22   distinct from a control perspective.

23   Q.      And so when the -- strike that.

24           So turning to how clients pay, you said you will

25   issue an invoice, and then you said hopefully the client

1704

1    would then pay that in full.  It's a sensible response.  I

2    understand that correctly?

3    A.      You did.

4    Q.      Are there circumstances where a client would pay in

5    advance?

6    A.      Yeah.  We have on -- clients will open a retainer

7    or -- look for a retainer amount in order to have money on

8    hand before we perform professional services, to make sure

9    that we get paid potentially, or for any other reason we will

10   take money up front.

11   Q.      What does that mean when you take money in advance?

12   Is there a term for that?

13   A.      A retainer.

14   Q.      Okay.  And when you receive a retainer, where does

15   that money get placed?

16   A.      We put that money in a separate bank account, an

17   escrow account, in order to track it separately for just that

18   client and matter, to make sure it is segregated from the

19   firm because it is money that belongs to our client.

20   Q.      And when a client pays an advance, do you still go

21   through the trouble of creating a bill for the client?

22   A.      We do.

23   Q.      Can you tell us why that is?

24   A.      Well, we prepare the bill to kind of detail out the

25   professional service, the time charges, as well as any

1   disbursements, to make sure the client is aware of what is on

2   the bill and to inform them of kind of the charges with the

3   idea that then they could approve it and then we charge it

4   against the retainer.

5   Q.      So in those situations where a retainer has been paid

6   in advance, when does Skadden actually withdraw money from

7   the escrow account?

8   A.      Well, our standard policy is that my client

9   accounting group will deliver the bill to the partner.  The

10  partner will deliver the bill to the client, and the partner

11  will confirm to my client accounting group that the client

12  has been spoken to ultimately.  And then at that point, we do

13  kind of the transfer out from the retainer account.

14  Q.      So if I understand --

15  A.      Or the escrow account.  Sorry.

16  Q.      -- it is after the billing partner has confirmed that

17  it is acceptable to withdraw money from the account that you

18  would withdraw --

19  A.      That is our standard policy, yeah.

20  Q.      I want to turn your attention to the time period

21  2012.  Did you have overall responsibility for client

22  accounting and other finance functions in 2012?

23  A.      I did.

24  Q.      And would that have included overall responsibility

25  for client accounting associated with a matter that Skadden

1706

1    worked on for the government of Ukraine?

2    A.      It would.

3    Q.      Have you had an opportunity to review the client

4    accounting records for that engagement?

5    A.      I have reviewed the documents that have been provided

6    to me, yes.

7    Q.      And who was the billing partner for that matter?

8    A.      Greg Craig.

9    Q.      And so pursuant to the firm's policies in 2012, who

10   would have been responsible for approving the final bills on

11   the matter?

12   A.      Greg Craig.

13   Q.      Was there an escrow account established for that --

14   A.      There was an escrow account established for the

15   engagement.

16   Q.      Okay.  Showing you what has been marked as Government

17   Exhibit 618, previously admitted.

18           This is a multipage document; is that right?

19   A.      It is.

20   Q.      Can you describe generally what this is?

21   A.      It is a bank statement for our master escrow account,

22   or specific pages that have been pulled from our bank

23   statements.

24   Q.      And what escrow account does this relate to?  What

25   matter does this relate to?

1707

```
 1    A.      The items shown here relate to the Ministry of

 2    Justice, the government of Ukraine, the matter we're

 3    discussing.

 4    Q.      Okay.  And what is shown on this first page here?

 5    And if we can --

 6    A.      The first page shows a deposit of $150,000 going into

 7    the escrow account.

 8    Q.      And that was on what date?

 9    A.      That was on 3/30.

10    Q.      Okay.

11    A.      2012.

12    Q.      Great.

13            Your Honor, I would like to read the stipulation

14    regarding payments to Skadden if I could.

15            THE COURT:  Okay.  Can it also be shown while you

16    read it?

17            MR. McCULLOUGH:  I think it can, yes.

18            THE COURT:  All right.

19            MR. McCULLOUGH:  This is Government Exhibit 682.

20            The parties stipulate to the following facts:

21            "Ukrainian businessman Victor Pinchuk paid $4,150,000

22    to Skadden in connection with its services to Ukraine.

23    Skadden received these payments through the following means:

24            "On or about March 20, 2012, Skadden received a check

25    in the amount of $150,000 from Douglas E. Schoen, NYC, LLC.
```

1708

1    The funds were deposited into Skadden's client escrow account

2    on March 30, 2012.  (SAU0001000)

3         "Skadden received four additional payments by wire

4    transfer from an entity called Black Sea View, Limited, with

5    an account at the Bank of Cyprus in the Republic of Cyprus.

6    The amounts and dates of the wire transfers were:

7         "(i) $2 million on April 20, 2012 (SAU282872).

8         "(ii) $1 million on June 7, 2012 (SAU282870).

9         "(iii) $1 million on July 16, 2012 (SAU282869).

10        "In addition, on or about June 6, 2013, Skadden

11   received a payment by wire transfer from the government of

12   Ukraine in the amount of $1,075,381.41.

13        "On or about June 14, 2017, Skadden returned

14   $567,812.50 to the government of Ukraine.

15        "All of the payments described in items 1 and 2 were

16   deposited into Skadden's Client Escrow Account Number

17   15662391 at Citi Private Bank.  The client name associated

18   with the escrow account was Douglas E. Schoen, NYC, LLC."

19        THE COURT:  All right.  As I have told you before,

20   you may consider stipulated facts to be agreed to by the

21   parties and undisputed evidence in the case.

22        BY MR. McCULLOUGH:

23   Q.   So Mr. Puntus, as of July 16, 2012, had over

24   $4 million been received into the client escrow account for

25   the Ministry of Justice matter?

1709

1    A.        Just double-checking the dates, but yes, the two

2    $1 million payments, the $2 million payment, and the original

3    $150,000 were there -- were in the escrow account or received

4    into the escrow account by the end of July, yes.

5    Q.        And you testified earlier that you have overall

6    responsibility for the client accounting function associated

7    with the government of Ukraine?

8    A.        I do.

9    Q.        And would that have included billing and invoices to

10   the Ministry of Justice?

11   A.        Oversight of that group, yes.

12   Q.        And were invoices issued to the government of

13   Ukraine?

14   A.        There were bills issued on this engagement, yes.

15   Q.        And were those bills paid through the escrow account?

16   A.        Those bills were all paid through the escrow account,

17   yes.

18   Q.        And which function within Skadden generated those

19   bills?  Generated those invoices or bills?

20   A.        The invoices are, as standard, generated through our

21   client accounting group.

22   Q.        I want to focus your attention on Government

23   Exhibit 586, which is Tab 18 in your binder.

24             THE DEPUTY CLERK:  It is already in?

25             MR. McCULLOUGH:  This was previously admitted, yes.

1710

```
1              BY MR. McCULLOUGH:

2    Q.      This appears to be a two-page document, a one-page

3    letter with an attachment; is that correct?

4    A.      It does.

5    Q.      The date of this letter is August 22, 2012?

6    A.      It is.

7    Q.      Who is this addressed to?

8    A.      The letter is addressed to the Honorable Oleksandr

9    Lavrynovych, the Minister of Justice of Ukraine.

10   Q.      And who signed this letter?

11   A.      It is signed by Greg Craig.

12   Q.      And what is the subject line?

13   A.      "Outstanding balance due."

14   Q.      I would like you to read the first paragraph, if you

15   could, please.

16   A.      "You have asked me to provide you with an invoice

17   setting forth the outstanding payments due from the

18   government of Ukraine for the services rendered in connection

19   with Skadden's assignment to serve as a rule-of-law

20   consultant to the Ministry of Justice.  As you know, we are

21   in the process of preparing -- and finalizing -- an

22   independent report based on an inquiry of the facts and

23   circumstances surrounding the trial, conviction, and

24   sentencing of Ms. Yulia Tymoshenko."

25   Q.      And this refers to providing the Ministry of Justice
```

1    with an invoice; is that right?

2    A.      Based upon my read, it is saying we're going to

3    provide you an invoice, yes.

4    Q.      Was this letter invoice prepared by the client

5    accounting function at Skadden?

6            MR. MURPHY:  Objection.  Leading, Your Honor.

7            THE COURT:  He can answer the question.

8            Was it?

9            THE WITNESS:  I am not aware that it was prepared by

10   my client accounting group.

11           BY MR. McCULLOUGH:

12   Q.      Are there any records of an invoice to the Ministry

13   of Justice dated August 22, 2012, in Skadden's accounting

14   system?

15   A.      In our accounting system, based upon my review of the

16   invoices on this engagement in this matter, there was no bill

17   for the amount of 1.25 million.

18   Q.      And turning to the second paragraph of the letter, if

19   you can read that first sentence, please.

20   A.      "For services rendered during the months of April,

21   May, June, July, and August, there is an outstanding balance

22   due of $250,000 per month for a total of $1.25 million."

23   Q.      It refers to an outstanding balance due of 250,000

24   per month.  Was there an outstanding balance due as of

25   August 22, 2012?

1712

1    A.      I would have to go look at all the balances on the

2    bills, but I don't believe there was at that point in time.

3    Q.      Just focus on the terms that are stated here.  So was

4    there -- were these the billing terms of the engagement,

5    $250,000 per month?

6            MR. MURPHY:  Objection to form, Your Honor.

7            THE COURT:  Do you know what the billing terms of the

8    engagement were?

9            THE WITNESS:  I am not aware of the billing terms of

10   the engagement, but we had a retainer on the account.

11           BY MR. McCULLOUGH:

12   Q.      Okay.  So turning your attention to Government

13   Exhibit 562, which is at Tab 6 in your binder --

14   A.      I'm sorry.  What tab is that?

15   Q.      Tab 6 in your binder.

16           THE COURT:  Were you diminishing the retainer by a

17   flat fee of $250,000 a month, or were you drawing from the

18   retainer based on the hours rendered according to the

19   procedure you discussed earlier?

20           THE WITNESS:  We were drawing based upon our actual

21   bill, so time and disbursements and the actual amounts.  No

22   fixed amount.

23           BY MR. McCULLOUGH:

24   Q.      So focusing your attention on Government Exhibit 562,

25   turning to the second page, is this an invoice that was

1    prepared by the client accounting function at Skadden?

2    A.    This is an invoice that was prepared by my client

3    accounting group, yes.

4    Q.    Does this relate to services rendered through

5    March 31, 2012?

6    A.    This relates to all the time -- any time or

7    disbursements we had on the books through March 30, 2012,

8    yes.

9    Q.    And was this paid out of the client escrow account?

10   A.    This was paid out of the client escrow account.

11   Q.    Turning your attention to Government Exhibit 563.

12         Is this an invoice that was prepared by the client

13   accounting function?

14   A.    Yes, it is.

15   Q.    Is the invoice date May 18, 2012?

16   A.    Yes.  The invoice date is May 18, 2012.

17   Q.    And did this -- did this cover services rendered

18   through April 30, 2012, with respect to the government of

19   Ukraine matter?

20   A.    It was for professional services, again, that were

21   recorded on our books and records through that period of time

22   when the bill went out, but yes.

23   Q.    Is there an indication on this as to whether this was

24   paid out of the client escrow account?

25   A.    There is an indication on the bill, there was a

1714

1    credit applied coming out of our escrow account, yes.

2    Q.      So this was fully satisfied --

3    A.      This was fully satisfied from our escrow account,

4    yes.

5    Q.      Government Exhibit 573, previously admitted.

6            This is an invoice dated June 26, 2012.  Was this

7    prepared by --

8    A.      It was.

9    Q.      -- Skadden's client accounting function?

10   A.      Yes, it was.

11   Q.      Does this cover services and expenses rendered

12   through May 31, 2012?

13   A.      For everything on our books and records through

14   May 31st, yes, it does.

15   Q.      Was this satisfied by funds in the client escrow

16   account?

17   A.      Yes, it was.

18   Q.      Is that indication also on this bill?

19   A.      That indication is on the bill, yes, on the bottom.

20   Q.      Is that the balance due line at the bottom here that

21   we're seeing?

22   A.      Showing the balance due of zero is showing that it

23   was paid through the retainer account, yes.

24   Q.      Government Exhibit 575, invoice July 24, 2012.  Was

25   this prepared by Skadden's client accounting function?

1715

```
1    A.       It was.

2    Q.       Does this represent services and expenses through

3    June 30, 2012?

4    A.       For everything on our books and records at that point

5    in time, yes, it does.

6    Q.       Was this invoice satisfied by funds in the client

7    escrow account?

8    A.       Yes, it was satisfied by funds in our escrow account.

9    Q.       Turning to Exhibit 584.  This is slightly different

10   than the first pages that we have been looking at.  What is

11   this?  Is this --

12   A.       It's -- I'm sorry.

13   Q.       What is the first page here that we're looking at?

14   A.       The first page is a cover letter for distribution of

15   the e-mail to the client.

16   Q.       What is the date of this letter?

17   A.       August 20, 2012.

18   Q.       And if you'll read the first -- who is this to?

19   A.       It is to the Ministry of Justice of the Ukraine care

20   of Douglas Schoen.

21   Q.       Who signed this letter?

22   A.       Signed by Greg Craig.

23   Q.       If you will read the first line.

24   A.       "Enclosed please find our invoices for professional

25   services rendered through July 31, 2012 with respect to the
```

1716

1      Tymoshenko matter."

2      Q.      Attached to this letter, or behind this letter, is

3      there the same invoice that we have been looking at, an

4      invoice similar to those that we have been looking at?

5      A.      They're similar invoices for services rendered

6      through July 31, 2012, yes.

7      Q.      Was this invoice satisfied by funds in the client

8      escrow account?

9      A.      This invoice was satisfied by funds in the escrow

10     account.

11     Q.      And then turning you to Government Exhibit 588, this

12     is an invoice dated November 2, 2012 --

13     A.      Yes, it is.

14     Q.      -- is that correct?

15     A.      Yes, it is.

16     Q.      Was this prepared by Skadden's client accounting

17     function?

18     A.      Yes, it was.

19     Q.      This is services rendered through August 31, 2012; is

20     that right?

21     A.      For everything on our books and records at that time,

22     yes.

23     Q.      And was this satisfied by the client escrow account?

24     A.      This was satisfied by the escrow account.

25     Q.      Turning back to Government Exhibit 586 and focusing

1717

1    on the second paragraph, where it says, "For services

2    rendered during the months of April, May, June, July, and

3    August, there is an outstanding balance due of 250,000 per

4    month for a total of $1.25 million."

5            Let's just start with the total.  Was $1.25 million

6    outstanding?

7    A.    At that point in time, based upon what was on our

8    books and records, $1.25 million was not outstanding.

9    Q.    And in fact, was the -- for services rendered during

10   the month of April, were those satisfied by funds from the

11   client escrow account?

12   A.    For what was recorded on our books and records, yes.

13   Q.    With respect to services and expenses rendered in

14   May, was there an outstanding balance?

15   A.    For what was recorded on our books and records at

16   that time, no, there was not an outstanding balance.

17   Q.    And for June, was there an outstanding balance for

18   June?

19   A.    There was not.

20   Q.    That was satisfied by funds in the --

21   A.    There was not an outstanding balance.

22   Q.    And as to July, was there an outstanding balance?

23   A.    There was not an outstanding balance as of July.

24   Q.    And as to August, was there an outstanding balance?

25   A.    There may have been for August based upon the timing

1718

1      of the bill because the bill -- the billing tab 11, as I'm

2      looking at it, it is a November 2nd bill for the services of

3      August.  So that bill, based upon the date of this letter,

4      August 22nd, hadn't been satisfied yet.  So there was

5      certainly time outstanding.

6      Q.      So looking at that bill, Government Exhibit 588, that

7      bill was for a total of $315,321.30; is that right?

8      A.      That is correct.

9      Q.      And that is based on time and expenses that are

10     recorded in the system at Skadden; is that right?

11     A.      That's correct.

12     Q.      Was that fully satisfied by funds in the client

13     escrow account?

14     A.      It was ultimately fully satisfied by the time this

15     invoice, or subsequent to November 2nd, from the escrow

16     account, yes.

17     Q.      And between the issuance -- between the issuance of

18     the letter that we were looking at dated August 22nd and

19     November 2nd, were any additional funds received into the

20     client escrow account?

21     A.      I would have to look at the account again just to

22     make sure.  I know there was an additional amount received at

23     one point, but I don't believe it was during that time frame.

24     I'm not sure.

25     Q.      Was there a time that additional --

1719

1    A.       There was additional funds received into the account,

2    yes.

3    Q.       And was that additional payment received in June of

4    2013?

5    A.       I would have to look at the bank statement just to

6    confirm the date.

7    Q.       Let's go to 618.  Showing you Government Exhibit 618,

8    page 20 --

9    A.       Yeah.

10   Q.       -- showing an additional payment of $1,075,381.41?

11   A.       Yes, there was an additional payment received on

12   June 6 of 2013, yes.

13   Q.       Had Skadden billed an additional $1 million in

14   services and expenses as of June 6, 2013?

15   A.       There is no bill in our account -- general ledger and

16   accounting system for that amount.  So based upon my review

17   of the bills that are in our system, there was no bill for

18   that amount, no.

19   Q.       So that was not an outstanding balance owed to

20   Skadden at that point; is that right?

21   A.       Based upon what was on the books and records at the

22   time when the money came in in June, not that I'm aware of

23   that there was a balance of that much outstanding.

24   Q.       And turning back to Government Exhibit 586, Tab 18.

25            Under Skadden's policies and procedures as they

1720

```
 1    existed in 2012, was Mr. Craig, as billing partner,

 2    authorized to issue an invoice such as this?

 3    A.      Our standard policy is my client accounting prepares

 4    a bill with a detailed list of the hours and the like,

 5    provides it to the partner to distribute to the client.  So

 6    this is not our standard practice.

 7    Q.      Invoices are prepared by client accounting?

 8    A.      Invoices are prepared by client accounting.

 9          MR. McCULLOUGH:  No further questions, Your Honor.

10          THE COURT:  All right.  Any cross-examination?

11          MR. MURPHY:  Yes, Your Honor.

12          JUROR:  Your Honor, I'm sorry.  I have to go to the

13    restroom.

14          THE COURT:  We will take a mid-afternoon break so

15    everyone can do that.  Let's try to be back in 10 minutes,

16    and we will resume.  That's fine, I told you you could do

17    that, so I appreciate it.

18               (Jury not present)

19          THE COURT:  All right.  Witnesses, counsel, everybody

20    can return in 10 minutes.

21          Thank you.

22          (Recess)

23          THE COURT:  All right.  Let's bring the jury back.

24          (Jury present)

25          THE COURT:  All right.  All of our jurors have
```

1    returned.

2         You can begin your cross-examination.

3         I remind you that you're still under oath.

4         MR. MURPHY:   Thank you, Your Honor.

5                          CROSS-EXAMINATION

6         BY MR. MURPHY:

7    Q.    Good afternoon, Mr. Puntus.

8    A.    Good afternoon.

9    Q.    We have not met before.  I'm Bill Murphy.  I

10   represent Mr. Craig.

11        In this matter, Mr. Craig required an initial

12   retainer to be paid to the law firm.  Is that your

13   understanding?

14   A.    That is my understanding.

15   Q.    And as the chief financial officer of Skadden,

16   sometimes would you agree that it is important for the law

17   firm to have an advance payment or a retainer against future

18   billings?

19   A.    As a law firm, we do receive retainers on various

20   clients for various reasons, yes.

21   Q.    Okay.  One of the reasons might be that the client is

22   a foreign entity, it might be difficult to collect if the

23   client chooses not to pay?  Is that a reason?

24   A.    Certainly, one of the possible reasons.

25   Q.    Okay.  In this instance, the retainer funds were

1722

1    placed in an escrow account; right?

2    A.      That is correct.

3    Q.      And there are basically a couple of different kinds

4    of escrow accounts that law firms maintain.  Some are called

5    IOLTA or IOLA accounts; right?

6    A.      That is correct.

7    Q.      And those are accounts where the law firm is holding

8    money for a client, but the interest on the account does not

9    go to the client but actually goes to a fund for charitable

10   purposes; right?

11   A.      That is my understanding of an IOLTA account, yes.

12   Q.      And then there are other escrow accounts where the

13   interest that is earned on the account is held for the

14   benefit of the client; correct?

15   A.      That is correct.

16   Q.      And this particular escrow account into which these

17   funds were deposited was the type of escrow account where the

18   interest that was earned was accrued for the benefit of the

19   client?

20   A.      This was an insured money market account, escrow

21   account.  And in the state of D.C., it is required to be for

22   the benefit of the client.

23   Q.      I'm sorry.  I could not really hear your answer.

24   A.      It was an IMMA account, an insured money market

25   account, that has an interest rate, and the interest does go

1    to the benefit of the client, the one we set up, yes.

2    Q.      Now, at the end of the day, at the end of the

3    account -- and I think you had an exhibit that has the

4    account history -- Exhibit 618 -- if you go to the back of

5    the exhibit, the last page, page 33 --

6    A.      Uh-huh.

7    Q.      -- does that show that the account was liquidated and

8    the funds were returned to the client?

9    A.      That shows the amounts all being liquidated and going

10   back to the client, yes.

11   Q.      And that would include the interest that had been

12   earned on the account during the period that there was a

13   positive balance; right?

14   A.      My understanding is it would.  What it is showing

15   here is the escrow account was going to zero.  So whatever

16   was in the escrow account had been utilized.

17   Q.      So is it your understanding that, at the end of the

18   day, Skadden returned $567,812.50 to the client?

19   A.      My understanding is that the $567,812.50 went back to

20   the government of Ukraine, yes.

21   Q.      Now, is it your understanding, based on your review,

22   that all of the payments that were made from the escrow

23   account to the law firm, to Skadden, that went into its

24   operating account, all of those payments were based on time

25   that had been served or services that had been provided and

1724

1    expenses that had been incurred on behalf of the Ukraine?

2    A.      All of the bills that we prepared that had time and

3    disbursements on it for this engagement were billed and

4    collected against the retainer accounts.

5    Q.      There were no funds that were taken out of the escrow

6    account for any reason other than the fact that there was a

7    bill for the services and the expenses incurred; right?

8    A.      Not that I'm aware of, no.

9    Q.      Okay.  So all of the money was accounted for and the

10   balance that was left over at the end of the day was returned

11   to the Ukraine; isn't that right?

12   A.      That is my understanding from the documents I have

13   reviewed here, that have been presented to me.

14   Q.      Now, you didn't actually directly supervise this

15   function of the billing and collections for the Ukraine

16   Ministry of Justice in your role as the chief financial

17   officer; did you?

18   A.      I have a very large group that does this.  I oversee

19   it, but certainly not on a day-to-day basis.

20   Q.      Okay.  I want to ask you about some of the invoices.

21   The first invoice that was issued, Exhibit 562 -- do you have

22   562?

23   A.      I do.

24   Q.      Was there a cover letter with that?

25   A.      There was a cover letter with that.

1725

1    Q.       Was it addressed to the Ministry of Justice of the

2    Ukraine, care of Douglas Schoen, at an address in New York?

3    A.       It was.

4    Q.       And the date of the invoice was May 2, 2012?

5    A.       It was.

6    Q.       The invoice that was attached also has Ministry of

7    Justice, care of Douglas Schoen, as the addressee of the

8    invoice; correct?

9    A.       It does.

10   Q.       And the amount was fairly modest, $13,760 for

11   professional services rendered through March the 31st; right?

12   A.       That's correct.

13   Q.       Let's look at the next invoice, which was dated

14   May the 18th.  That is Exhibit 563.

15            Was that invoice also addressed to the Ministry of

16   Justice, care of Douglas Schoen?

17   A.       It was.

18   Q.       It is a much more substantial invoice, would you

19   agree?

20   A.       The dollar value is much larger than the first, yes.

21   Q.       So this is for professional services rendered in the

22   month of April, and the professional services totaled

23   $635,000; right?

24   A.       It is for professional services rendered through the

25   month of April that were recorded on our books and ledger at

1726

1     the time of the bill, yes.

2     Q.        And if you page through the invoice, you can see that

3     there were a number of partners and associates who had done

4     work on this matter and recorded their time, and that time

5     became part of this bill; right?

6     A.        It did.

7     Q.        That's the way it's supposed to work at a law firm;

8     right?

9     A.        Yes, it is.

10    Q.        And in addition to the $635,000 in legal fees, there

11    was also a $103,000, approximately, in out-of-pocket

12    expenses; right?

13    A.        In charges and disbursements, yes.

14    Q.        Okay.  I always call those out-of-pocket expenses.

15              Most of it was for travel and meals; correct?

16    A.        The predominant portion was travel and meals, yes.

17    Q.        Did you have an understanding that the people from

18    the Skadden office were traveling over to Ukraine and

19    spending much of their time there?

20    A.        Not being involved in the engagement, I'm not a

21    hundred percent sure why it was, but I could imagine, given

22    the case, it makes sense, yes.

23    Q.        Let's look at the next invoice, which is Exhibit 573.

24              Now, that invoice is dated June 26, 2012; is that

25    right?

1727

1    A.    It is.

2    Q.    And it's addressed to the Ministry of Justice, care

3    of Mr. Schoen; right?

4    A.    It is.

5    Q.    And this one is for professional services rendered on

6    the Yulia Tymoshenko matter through May 31, 2012; right?

7    A.    Again, per what was on our books and records at the

8    time, yes.

9    Q.    Okay.  So that is for the month of May the services

10   that were rendered.  And those services in May totaled

11   $830,000 in professional fees; right?

12   A.    They did.

13   Q.    And there was an additional $97,000 in out-of-pocket

14   expenses or what is referred to on the invoice as charges and

15   disbursements?

16   A.    There was.

17   Q.    So the grand total of that bill was $928,000 for the

18   month; right?

19   A.    For the expenses and time that was recorded through

20   May 31st on this bill, yes, that was it.

21   Q.    And this bill, like the others, has the detailed time

22   entries for all of the attorneys who are working on the

23   matter during that month of May 2012; correct?

24   A.    It does.

25   Q.    Now, let's look next at Exhibit 575, which is the

1728

1     invoice dated July 24, 2012.

2              Do you see that?

3     A.      I do.

4     Q.      And that one is also addressed to the Ministry of

5     Justice, care of Douglas Schoen in New York; right?

6     A.      Yes, it is.

7     Q.      And for that month, the month of June, right, the

8     professional services rendered totaled $921,000; right?

9     A.      Again, for everything recorded on our books and

10    records through June 30th is what is on this invoice for

11    $921,000, yes.

12    Q.      And the charges and disbursements for travel and

13    meals and other expenses totaled $107,000; right?

14    A.      That were recorded on our books and records through

15    June 30, yes, on this bill, yes.

16    Q.      The grand total of that bill for the month was

17    $1,028,000; correct?

18    A.      That is correct.

19    Q.      Now, let's take a look at Exhibit 584.  And on this

20    particular exhibit, there is a cover letter for the invoice;

21    right?

22    A.      There is.

23    Q.      It is again addressed to the Ministry of Justice,

24    care of Mr. Schoen?

25    A.      It is.

1729

1   Q.      And attached to the letter is an invoice?

2   A.      Yes, there is.

3   Q.      And that invoice is for professional services that

4   had been rendered through July 31st; right?

5   A.      That had been recorded on our books through

6   July 31st, yes.

7   Q.      And the total of that -- for the professional

8   services rendered that month was approximately $850,000;

9   right?

10  A.      Approximately 850,000, yes.

11  Q.      And there are some charges and disbursements totaling

12  $43,000; is that right?

13  A.      That is correct.

14  Q.      So the grand total of the bill was $893,000?

15  A.      That is correct.

16  Q.      Now, as of the date that that bill was sent out, my

17  quick math shows me that about $3.6 million had been charged

18  to the client effective with that August 20th bill.

19          Do you want to --

20  A.      I mean I would have to add it up if you're asking me

21  to confirm up the numbers.  I know the individual invoices

22  certainly, and I know the dollars of each one, but I would

23  have to add it up.

24  Q.      Okay.  But if there were $3.6 million that had been

25  billed as of August the 20th --

1730

1    A.       Uh-huh.

2    Q.       -- if you accept my premise for a moment.

3    A.       Sure.

4    Q.       -- that would mean that there would be about $550,000

5    left in the escrow account if you take into account all of

6    those bills through the one that is dated August 20th; isn't

7    that right?

8    A.       The $4.15 million that was already in the escrow

9    account before the additional 1.075 came into the escrow

10   account, less, if I take your preposition, that is 3.6 would

11   be added up, that would be a ballpark number, yes.

12   Q.       So approximately $550,000 would have been left as of

13   August the 20th; right?

14   A.       Yeah, assuming the 3.6, yes.

15   Q.       And the bills had been running, as we just saw, that

16   $800,000, $900.000, a million a month for the prior months;

17   right?

18   A.       The three prior months' bills were of that magnitude,

19   yes.

20   Q.       Okay.  All right.  Now, let's look at the next bill

21   that was sent, the next invoice.  I think it is Exhibit 588.

22            Are you with me?

23   A.       I am.

24   Q.       Okay.  That bill is dated November the 2nd, 2012;

25   isn't it?

1    A.       It is.

2    Q.       And that is a little bit kind of late because it is

3    billings for services that were rendered through August the

4    31st; right?

5    A.       Uh-huh.

6    Q.       All of the other invoices that we have just been

7    looking at -- and this is sort of typical -- the bill would

8    go out in May for April time, the bill would go out in

9    June for May time, that's usually how it works; right?

10   A.       The standard practice on litigation work is to try to

11   get our invoices out monthly, yes.

12   Q.       Do you know why this bill didn't go out until

13   November 2, 2012?

14   A.       I do not know why.

15   Q.       Let me show you Exhibit 589, Government Exhibit 589,

16   which someone will have to show you on the screen.  I don't

17   think you have it up there.

18            If you can just blow that up.

19            MR. McCULLOUGH:  Objection, Your Honor.

20            THE COURT:  On what basis?

21            MR. McCULLOUGH:  There is no foundation for this

22   e-mail.  He is not on this e-mail.

23            THE COURT:  You can ask the question, if he knows

24   anything about it.

25            BY MR. MURPHY:

1    Q.      Do you know anything about, Mr. Puntus, the fact

2    reflected in this e-mail that Mr. Craig had asked his folks

3    to stop working on the project?

4    A.      I do not.

5    Q.      You don't know why Mr. Craig would have asked the

6    lawyers who were part of the team to stop working; do you?

7            MR. McCULLOUGH:  Objection, Your Honor.

8            THE COURT:  Asked and answered.  Ask your next

9    question.

10           BY MR. MURPHY:

11   Q.      Okay.  Now, when the bill went out on August 2, 2012,

12   the bill was in the amount of $315,000; right?

13   A.      That is correct.

14   Q.      Do you know whether there was a large portion of the

15   outstanding bills that Skadden had received from interpreters

16   and translators that had not yet been paid?

17   A.      I know that there were disbursements that hadn't been

18   reimbursed yet.  I don't know the exact magnitude of them.

19   Q.      Okay.  But with respect to this bill for the month of

20   August, the time value of the professional services provided

21   by the Skadden lawyers was $281,000; right?

22   A.      For the hours that were recorded through the time of

23   this bill, yes, it was 281,000.

24   Q.      And the charges and disbursements, the expenses that

25   month were 34,000; right?

1    A.        That were recorded on the bill that went out on

2    August 31st, they were $34,000.

3    Q.        So the grand total of that bill was $315,000; right?

4    A.        The grand total is 315,000, yes.

5    Q.        And there was still some money left in the escrow

6    account.  If it was approximately five fifty, there would

7    have been about $235,000 left?

8    A.        Well, the balance due, based upon the application of

9    the retainer, is zero.  So it was fully recouped.  And I

10   believe there was a subsequent bill that did take money out

11   of the retainer, so I don't know the exact number off the top

12   of my head, but, yes, I believe that number sounds in the

13   ballpark.  I think one of the other bills has the number.

14   Q.        Let's look next at Exhibit 601.

15            And this is an invoice dated February 20, 2013;

16   right?

17   A.        That is correct.

18   Q.        And this bill is for a total amount for professional

19   services of $387,000; right?

20   A.        Yes, for all the time that was recorded through then

21   on our books and records, yes.

22   Q.        Okay.  And the time, though, that is reflected on

23   this February 20th invoice is for services rendered between

24   September the 1st and December the 31st of 2012; right?

25   A.        That is correct, what was on our books and records

1734

1    for that period of time.

2    Q.      Okay.  So that would be the months of September,

3    October, November, and December.  That is four months

4    accumulated; right?

5    A.      Four months out of time on our records, yes.

6    Q.      Okay.  And as we said, the total was $387,000?

7    A.      Yes, it was.

8    Q.      And then the charges and disbursements were $42,000;

9    correct?

10   A.      That had been recorded on the books through that

11   period of time, yes.

12   Q.      For a grand total of $430,000; right?

13   A.      Yes.

14   Q.      What this invoice reflects is that the unapplied cash

15   was $233,900; right?

16   A.      The remaining amount in the escrow account of the

17   retainers that we received that we could apply to this bill

18   was $233,900, yes.

19   Q.      So after you subtracted out what was left in the

20   escrow account, which was approximately $234,000, there was a

21   shortfall of approximately $200,000; right?

22   A.      A balance due of approximately, yes, $200,000.

23   Q.      So at this point the retainer that had been deposited

24   had been completely consumed; correct?

25   A.      That is correct.

1735

1    Q.      And the Ministry of Justice of the Ukraine owed

2    Skadden approximately $200,000 for the time and the services

3    that had been rendered through December 31, 2012?

4    A.      That had been rendered and recorded on our books and

5    records at that point in time, yes.

6    Q.      And then let me look at -- let us look at the next

7    exhibit, which is 614, the next invoice.  And that invoice is

8    dated June 24, 2013.  Correct?

9    A.      It is.

10   Q.      And it's for services rendered through June 24, 2013,

11   totaling about $63,000; right?

12   A.      Again, the time that's been recorded on the books and

13   records through that period of time, yes.

14   Q.      And that would be for the months of January through

15   the date June 24, 2013; right?

16   A.      It would have been whatever was recorded on our books

17   and ledgers subsequent to the prior bill that hadn't been

18   billed yet.

19   Q.      Okay.  So the prior bill ended on December 31st;

20   right?

21   A.      Uh-huh.

22   Q.      As a year-end bill; right?

23   A.      Sure.

24   Q.      And then this next bill picks up everything from

25   January the 1st through June the 24th; right?

1736

1    A.      Yeah.  I mean you could look at the detailed time,

2    and it certainly has time charges that are showing in

3    January and February, and so yes, certainly.

4    Q.      If you look, there's cash -- I'm sorry -- charges and

5    disbursements that month which were applied of $201,000;

6    right?

7    A.      There were.

8    Q.      Of that total, $194,000 was for professional fees;

9    right?

10   A.      They were.

11   Q.      Do you know whether those were for the cost of

12   interpreters and translators who had worked on the Tymoshenko

13   project?

14   A.      My understanding is there are translation fees and

15   services in that number, yes.

16   Q.      And do you know that those bills received by Skadden

17   from the interpreters and translators weren't paid until

18   Skadden received the additional $1,075,000 that came into the

19   escrow account on about June 24, 2013?

20   A.      I know that this bill was paid out of the escrow

21   account with the additional funds, the 1.075 million that did

22   come in.

23          THE COURT:  What else are professional fees?  We had

24   them in a lot of the other invoices.  They weren't this big.

25   They got paid.  So what does professional fees cover?

1737

1       THE WITNESS:  Professional fees are when we hire

2   other professionals to do work on the engagement.  It could

3   be a translator.  It could be an accounting firm.  It could

4   be consultants.  It could be another lawyer.  Those are fees

5   that we pay as a firm to those professionals and ultimately

6   get reimbursed from the client in order to pay those

7   professional fees.

8       BY MR. MURPHY:

9   Q.      Other than translators and interpreters, are you

10  aware of any professionals that Skadden had hired in

11  connection with the Tymoshenko project?

12  A.      I do not know.  No, I'm not aware.  Again, I wasn't

13  involved, so I don't know.

14  Q.      Okay.  What this bill reflects then is that on

15  June the 24th, 2013, there was a total on the bill of

16  264,000, and that was applied from the new funds that had

17  come in, approximately $1,075,000; right?

18  A.      It had been taken out of the escrow account that had

19  additional funds put into it, yes.

20  Q.      Okay.  And looking at Exhibit 618 again, do you know

21  the date when the 1,075,000 came in?

22      Referring to page 21.

23  A.      Page 21 of Exhibit 1?

24      The date on the escrow account has the money coming

25  in June 3rd on what I'm looking on the screen.  Yeah.  Again,

1   the funds into the master escrow account on June 3rd into the

2   sub account on June 6th.

3   Q.      The money came in, went into the general account for

4   escrow, and then transferred to the sub account for the

5   interest-bearing account that the Ukraine had for its

6   benefit.  That was on June the 6th; right?

7   A.      That is correct.

8   Q.      The bill went out on June 24th?

9   A.      The bill was dated June 24th, yeah.

10  Q.      It looks like an application on June the 24th on your

11  escrow account record of $196,000; right?

12  A.      There was an application of $196,000 on June 24th,

13  yes.

14  Q.      Okay.  And that picked up the amount that was still

15  due and owing from Exhibit 601, the February 20th bill;

16  right?

17  A.      That was the remaining balance that hadn't been paid

18  on the February 20, 2013 bill, yes.

19  Q.      And then did Skadden transfer into its operating

20  account the moneys that are due and owing based on Exhibit

21  614, the June 24th invoice?

22  A.      The invoice shows it was applied to the retainer

23  account as zero balance, so yes.

24  Q.      And it looks like that was done on July the 8th, if

25  you look at page 22 of Exhibit 618.

1739

1    A.      It does show July 8th that $264,088.65 was taken out

2    of the escrow account.

3    Q.      Okay.  And then do you know why the funds that were

4    held in the escrow account after the application of the bills

5    that eventually was returned to the Ukraine, do you know why

6    that wasn't done until sometime in 2017?

7    A.      I do not.

8    Q.      Okay.  Exhibit 586, which you were asked a number of

9    questions about, Mr. Craig's August 22nd letter to the

10   Minister Lavrynovych, that's not an invoice; is it?

11   A.      It's not our standard form of a bill or an invoice.

12   Q.      It doesn't look like an invoice; does it?

13   A.      It does not look like our standard bills or invoices,

14   no.

15           MR. MURPHY:  That's all I have.  Thank you.

16           THE COURT:  All right.  Any redirect?

17                       REDIRECT EXAMINATION

18           BY MR. McCULLOUGH:

19   Q.      Going right back to Exhibit 586, if we could.

20           And the subject line of this is "Outstanding balance

21   due"; correct?

22   A.      It is.

23   Q.      Just turning your attention to the second page, what

24   are these?

25   A.      These are wire instructions.

1740

1    Q.      And wire instructions for payment to who?

2    A.      To Skadden, to our firm.

3    Q.      So this would have given the Ministry of Justice the

4    information it needed to wire over a million dollars to

5    Skadden?

6            MR. MURPHY:  Objection.  Leading.

7            THE COURT:  Well, he said they're wire instructions

8    for payment to the firm, so ask your next question.

9            BY MR. McCULLOUGH:

10   Q.      Was this enough information for the Ministry of

11   Justice to wire payment to Skadden?

12           MR. MURPHY:  Objection.  Leading.

13           THE COURT:  I think he answered that question.  So

14   let's just ask your next question.

15           BY MR. McCULLOUGH:

16   Q.      These wire instructions were included with the letter

17   that was sent?

18   A.      Based upon what I have been shown, the second page of

19   this document, it was included with the letter, yes.

20   Q.      And I want to turn to Exhibit 601.

21   A.      What tab is that?

22   Q.      This is Tab 13.

23   A.      Okay.

24   Q.      Total amount outstanding here is $196,000?

25   A.      It is.

1741

1    Q.       And turning to Tab 14, Exhibit 614, the total amount

2    outstanding here is 264,000?

3    A.       Total amount of the bill was $264,000.  The total

4    amount due was zero.  So there was no outstanding on this

5    bill.

6    Q.       Between those two last invoices, did Skadden need an

7    additional $1 million to satisfy itself for amounts owed?

8    A.       The $196,000 bill and the $264,000 bill were

9    certainly lower than the $1,075,000 that came in.

10   Q.       Skadden was never owed an additional $1 million of

11   outstanding balance over the life of this project?

12   A.       Based upon the time and disbursements that were

13   recorded on our books at this time, the time of this invoice,

14   we weren't owed that amount.

15   Q.       And in fact, over 500,000 was returned to the

16   government of Ukraine in June of 2017; is that right?

17   A.       There was $567,000 returned in June of '17, yes.

18   Q.       So do you know why Mr. Craig asked for over a million

19   dollars in August of 2012 for outstanding balance due?

20   A.       I do not.

21            MR. McCULLOUGH:  Thank you.  No further questions.

22            THE COURT:  All right.  This witness can be excused.

23   Thank you.

24            THE WITNESS:  Thank you.

25                (Witness excused)

1    THE COURT:  Do we have a shortish witness?

2    MR. McCULLOUGH:  Can we approach?

3    THE COURT:  Absolutely.

4    (At the bench)

5    MR. McCULLOUGH:  Your Honor, we have Lucy-Claire

6    Saunders available here.  I don't think she would take

7    particularly long.

8    I wanted to highlight for the Court that in our

9    pretrial sessions, originally the Court had suggested that we

10   handle Mr. Gates first and then call Lucy-Claire Saunders.

11   Frankly, we're going to ask for permission to call her first

12   because we anticipate Mr. Gates to be a much longer witness.

13   The issue is that Ms. Saunders is going to testify about a

14   document she created on or about October 3, 2012.  She

15   created it under the direction of Mr. Weber.  She also

16   participated in a telephone call with Mr. Gates and others

17   just a few days before.  And it is in that document where she

18   forwards both Mr. Sanger as well as Mr. Al Hunt from

19   *Bloomberg* together.

20   The Court had suggested in our pretrial that we

21   should have Mr. Gates talk about the fact that he had given

22   that information to Mr. Weber at some point, and therefore,

23   that maybe we should call Mr. Gates first.  We would like to

24   call her ahead.

25   THE COURT:  All right.  She is going to testify that

1743

1     she wrote it there because Mr. Gates gave her the name?

2             MR. McCULLOUGH:  No.  All that she recalls right now

3     is that she got the instructions either from Mr. Weber or her

4     direct supervisor.

5             THE COURT:  Okay.

6             MR. McCULLOUGH:  But she was in a conference call to

7     discuss the Ukraine matter with Mr. Gates some days before.

8     She does recall that, and we have a document to that effect.

9             THE COURT:  Okay.  She is going to testify as to why

10    she believes she wrote it --

11            MR. McCULLOUGH:  Correct.

12            THE COURT: -- she wrote it at someone's direction, as

13    she understood it.

14            MR. McCULLOUGH:  Correct.

15            THE COURT:  And then you are going to close the loop

16    later when Mr. Gates testifies.

17            MR. McCULLOUGH:  Correct.

18            THE COURT:  I don't see why we have to hold her until

19    after Mr. Gates testifies.  Even if she says Mr. Gates told

20    me something, he will be here to be cross-examined about

21    whether he told her that or not soon enough.

22            MR. McCULLOUGH:  Correct.

23            THE COURT:  All right.  Let's proceed.

24            Thank you.

25            (In open court)

1   MR. McCULLOUGH:  Your Honor, the government calls

2   Lucy-Claire Saunders to the stand.

3   THE COURT:  All right.  This will be our last witness

4   for the day.

5                    Lucy Saunders,

6   having been duly sworn, was examined and testified as

7   follows:

8                    DIRECT EXAMINATION

9   BY MR. McCULLOUGH:

10  Q.    Good afternoon, Ms. Saunders.

11  A.    Hello.

12  Q.    Can you please introduce yourself to the jury by

13  stating your name and spelling your last name for us, please.

14  A.    My name is Lucy Saunders, S-A-U-N-D-E-R-S.

15  Q.    And without providing us your specific address, can

16  you tell us generally where you live?

17  A.    Oakland, California.

18  Q.    And what is it that you do for a living?

19  A.    I'm a communications director for WildAid.

20  Q.    What is --

21  THE COURT:  I'm sorry?

22  THE WITNESS:  WildAid.  It is a global nonprofit.  We

23  reduce demand for endangered wildlife products like rhino

24  horns, elephant ivory, shark fins.

25  BY MR. McCULLOUGH:

1745

1    Q.      What does that mean to be a communications director?

2    What function does that serve?

3    A.      I oversee internal and external communications.  So

4    that is reporter relationships for earned media, donor

5    communications, contents of the website.

6    Q.      How long have you been at WildAid?

7    A.      A little over a year.

8    Q.      Does one go to school to become a communications

9    director?  How does one get started in that?

10   A.      Experience helps.  I did get my master's in

11   journalism from the University of British Columbia.

12   Q.      When was that?

13   A.      That was in 2007.

14   Q.      After getting your master's in journalism, what did

15   you do?

16   A.      I was a reporter for a local newspapers in Vancouver.

17   I was a general assignment reporter.

18   Q.      And how long did you do that?

19   A.      I did that for a few years before I moved to New

20   York, where I was -- became Xinhua's United Nations wire

21   correspondent.

22   Q.      What is Xinhua?

23   A.      Xinhua is a Chinese wire service.

24   Q.      You mentioned the UN.  What were you doing for

25   Xinhua?

1746

1    A.      So I covered the Security Council but mostly climate

2    change.

3    Q.      And how long did you perform that role for Xinhua?

4    A.      About a year.

5    Q.      And what did you take on after that?

6    A.      At that point I was hired by Mercury.

7    Q.      Approximately what year was that?

8    A.      2010.

9    Q.      And what is Mercury?

10   A.      Mercury is a public affairs agency.

11   Q.      And so please describe briefly what business Mercury

12   is in.

13   A.      Mercury oversees media relations, government

14   relations, advertising, social media, etc., to help

15   businesses achieve their objectives.

16   Q.      And what kinds of clients does Mercury work with?

17   A.      All sorts.  Predominantly coalitions, associations,

18   for-profits, nonprofit, and foreign governments.

19   Q.      And what does Mercury attempt to do for those

20   clients?

21   A.      To create a positive or hospitable public environment

22   for -- to help their clients achieve their objectives;

23   positive public discourse, positive advertising, third-party

24   surrogacies, that kind of thing.

25   Q.      And what was your role at Mercury?

1747

```
 1    A.       I started as a director.  That's about two levels
 2    higher than associate but several levels below managing
 3    partner.  And I oversaw earned media relations.
 4    Q.       You oversaw media relations for Mercury?
 5    A.       Right.
 6    Q.       And you joined Mercury in about 2010 as a director?
 7    A.       Uh-huh.
 8    Q.       How long did you work at Mercury?
 9    A.       I worked there for about five years.
10    Q.       Did your title ever change?
11    A.       Yes.  I left there as a VP, a vice president.
12    Q.       Where does VP fall in the hierarchy?
13    A.       It's a step up.  It's still a few levels down below
14    management, but it is a step up.
15    Q.       Moving in the right direction?
16    A.       Yes, it was moving in the right direction.
17    Q.       So you worked for a lot of different clients.  How
18    many clients did you work with at Mercury?
19    A.       More than 15.
20    Q.       I want to focus on one particular client at Mercury,
21    if we could.  During the course of your work at Mercury, did
22    you work with a client called The European Center for a
23    Modern Ukraine?
24    A.       Yes.
25    Q.       Was that also known as the ECFMU?
```

1748

1    A.      Yes.

2    Q.      What was the -- broadly, what was the stated mission

3    of ECFMU?

4    A.      To foster European Union integration and closer

5    relationships with the U.S.

6    Q.      And --

7            THE COURT:  To foster European Union integration and

8    closer relations with the U.S. for whom?

9            THE WITNESS:  For Ukraine.

10           BY MR. McCULLOUGH:

11   Q.      So it is The European Center for a Modern Ukraine?

12   A.      Right.

13   Q.      Who were Mercury's primary points of contact at the

14   ECFMU?

15   A.      We worked with Andy Engel, Ina Kirsch, and Rick

16   Gates.

17   Q.      Had you worked with Ina Kirsch, Andy Engel, or Rick

18   Gates previously?

19   A.      No.

20   Q.      And when approximately did that work begin?

21   A.      That work began in 2012.

22   Q.      Did Mercury's work for The European Center for a

23   Modern Ukraine, did that continue through 2012?

24   A.      Yes.

25   Q.      And it may be very similar to what you were doing for

1    other clients, but what were you doing for that client?

2    A.        Yes.  Overseeing their earned media.  Working with

3    reporters to help place stories.

4             THE COURT:  What is the word you used before "media"?

5             THE WITNESS:  "Earned."

6             THE COURT:  What does that mean?

7             THE WITNESS:  Earned as opposed to paid media.  Paid

8    is advertising; earned is organic.

9             BY MR. McCULLOUGH:

10   Q.        Aside from yourself, who else at Mercury was working

11   for this client?

12   A.        Andrew Wright, John Lonergan, Vin Weber, Ed Kutler.

13   Q.        You mentioned Vin Weber.  What role did Vin Weber

14   have at Mercury?

15   A.        He oversaw the government relations program.

16   Q.        And he worked on this client matter for ECFMU?

17   A.        Yes.

18   Q.        That was a client matter for work where one of the

19   client contacts was Rick Gates?

20   A.        Yes.

21   Q.        Was Vin Weber more or less senior than you?

22   A.        Very much more senior.

23   Q.        Okay.  And did you work in the same office as

24   Mr. Weber?

25   A.        No.  I worked in New York.  He worked in D.C.

1  Q.      During the course of your work at Mercury for the

2  ECFMU, did you come to know of a report called the Tymoshenko

3  report that had been produced by Skadden?

4  A.      Yes.

5  Q.      How did you learn about that?

6  A.      We were introduced to this as a report that was going

7  to help explain the current situation with Tymoshenko.

8  Q.      And as a communications professional, what was the

9  issue with Ms. Tymoshenko?

10  A.      Tymoshenko was a political opposition prisoner.  She

11  was currently in prison at the time by Yanukovych, who was

12  the president of Ukraine.  We, as a communications

13  professional -- it's important for us to be able to talk

14  about Tymoshenko's current status in prison and the concerns

15  about human rights that America and the West, particularly

16  the EU, were bringing up as they were considering Ukraine

17  coming into the fold.

18  Q.      Was the Tymoshenko matter an issue for your work in

19  trying to foster a closer relationship for Ukraine with the

20  EU?

21  A.      Yes.

22  Q.      And was the Tymoshenko matter relevant to people in

23  the United States?

24  A.      Yes.  Yes.  Very much so.

25  Q.      What was your experience?

1751

1    A.       Yes.  This was a question that would consistently

2    come up from reporters when we wanted to talk about positive

3    changes that the government of Ukraine was making in terms of

4    their parliamentary changes or election law changes.  So this

5    was a big point.  Lots of questions about her current -- why

6    she was in prison and whether the trial was seen as fair and

7    credible.

8    Q.       And did you know -- did you come to know any of the

9    names of attorneys that were working on the Tymoshenko report

10   that had been produced by Skadden?

11   A.       I came to know of Greg Craig.

12   Q.       Did you know Greg Craig?

13   A.       No.

14   Q.       Did you ever -- in the course of the engagement, did

15   you ever meet Greg Craig?

16   A.       No.

17   Q.       Do you recall ever speaking to him on the phone?

18   A.       No.

19   Q.       So what work did you do for ECFMU in connection with

20   the Skadden Report?

21   A.       I was responsible for helping to author the Skadden

22   media rollout, media and government relations rollout plan.

23   Q.       And that is media and government relations rollout

24   for the report itself?

25   A.       The report itself.

1    Q.      Do you recall approximately when that began?

2    A.      In the fall of 2012.

3    Q.      And do you recall how you first learned of that work?

4    A.      There was a -- we had a phone call, and it came from

5    the client that we were going to be helping to roll this

6    report out.

7    Q.      So I direct your attention to Government Exhibit 278.

8            Just focusing your attention at the top of the page

9    here, you mentioned a phone call.  Does this event have any

10   relationship to the phone call you mentioned?

11   A.      Yes.

12   Q.      What is this?

13   A.      This is dial-in instructions and time for us to

14   discuss the D.C. consultants' plan.

15   Q.      And what is the date of this call?

16   A.      October 1st, 2012.

17   Q.      And I notice this e-mail comes from -- or the

18   invitation comes from someone named Andrew Wright.  That is

19   someone you mentioned as being part of this team for Mercury;

20   is that right?

21   A.      Yes.

22   Q.      This came to an address called Centre,

23   Centre@MercuryLLC.com.  What does that mean?

24   A.      Yeah, that is the ECFMU.  But that's the -- the

25   people who were working on the clients.  Server list.

1753

1    Q.       Would that have included you?

2    A.       Yes.

3    Q.       Let me ask you about the rest of the individuals that

4    received this.  I notice the name Vin Weber.  The next name,

5    Tony Podesta, what does that mean to you?

6    A.       Podesta was a firm that we worked with.  They were

7    responsible for press relations, as well, but also government

8    relations on the Democratic side, whereas Mercury was

9    responsible for the Republican side.

10   Q.       Generally, Mercury was focusing on the Republican

11   side, while Podesta was working on the democratic side?

12   A.       Yes.

13   Q.       And you mentioned -- I think there is an attachment

14   to this.  It refers to D.C. consultants' plan.  What is your

15   understanding of what D.C. consultants are?

16   A.       D.C. consultants are most of the people on that list,

17   but it is the government relations team for both Podesta and

18   Mercury.

19   Q.       So the Podesta and Mercury teams that were working

20   for ECFMU?

21   A.       Correct.

22   Q.       And then the bottom of this, it says, "to discuss the

23   matrix attached (sent by Rick on Friday)."

24           Who is Rick?

25   A.       That refers to Rick Gates.

1754

1    Q.       Turning to the attachment.  So this refers to Engage

2    Ukraine - Project Map.

3             What was Engage Ukraine, if you remember?

4    A.       I don't remember specifically what that was referring

5    to.

6    Q.       So the top section here refers to the Skadden Report.

7    Is that the same Skadden Report that relates to the

8    Tymoshenko matter?

9    A.       Yes.

10   Q.       And under the column "Action Item," the first item is

11   "Finalize report, release strategy for the U.S."

12            What is going on here?

13   A.       That refers to how we were going to release the

14   Skadden Report to media and people on the Hill.

15   Q.       And the second line, second and third lines, can you

16   read the second and third lines for us?

17   A.       "Identify key reporter and outlet that can 'leak'

18   story.  Possibly *Bloomberg*.  But this needs to be vetted and

19   ensure we get a balanced piece."

20   Q.       Focusing on the first sentence, what does it mean to

21   "identify key reporter and outlet that can 'leak' story"?

22   A.       This would be referring to coming to an agreement on

23   which reporter and which outlet would be chosen to receive an

24   embargoed or an exclusive story -- to receive the report

25   ahead of time before a wider release, so they would have

1755

1    enough time to read the report and do their due diligence.

2    Q.        And why, if you know, was this part of the strategy?

3    A.        Generally, with the complex reports, you want to give

4    it to a reporter ahead of time so that they can do their due

5    diligence, so they can be thorough, they won't cut corners.

6    Also, it is good for relationship building, so they can,

7    quote/unquote, scoop their competitors.  And in some cases,

8    you can help manage the narrative that will come, and then

9    the following stories will kind of follow that initial story

10   in tone and substance.

11   Q.        And in the third line, it refers to "needing to be

12   vetted to ensure that we get a balanced piece."  What does it

13   mean to get a "balanced piece"?

14   A.        To make sure that your client's perspectives, the

15   messaging points that are deemed worthy and are necessary to

16   help them achieve their business objectives are included in

17   that story.

18   Q.        And this refers to *Bloomberg*.  Do you have an

19   understanding as to why *Bloomberg* was included in this?

20   A.        I did.  Al Hunt was a friend of Vin Weber's.

21   Q.        Who is Al Hunt?

22   A.        He was the editor, the primary editor --

23   Q.        Primary editor at *Bloomberg*?

24   A.        At Bloomberg, yes.

25   Q.        And so do you recall participating in this -- was

1756

```
1    there a conference call related to this?

2    A.      There was a conference call where different

3    reporters, outlets were floated.  It was a loose

4    conversation.

5    Q.      And after the conference call, do you remember taking

6    any actions related to the Skadden rollout plan?

7    A.      I took notes and started drafting an initial rollout

8    plan.

9    Q.      And were you among the people responsible for

10   drafting a rollout plan?

11   A.      Yes.

12   Q.      I'm going to turn your attention to Government

13   Exhibit 306.

14           Is this a rollout plan document?

15   A.      Yes.

16   Q.      And did you participate in the development of this

17   document?

18   A.      Yes.

19   Q.      I want to turn your attention to the last page of

20   this document.  Does this indicate your participation in the

21   creation of the document?

22           MS. JUNGHANS:  Objection.  Leading.

23           THE COURT:  She testified that she participated in

24   the development of the document.

25           BY MR. McCULLOUGH:
```

1757

1    Q.      Does this give you any indication as to when the

2    document was created?

3            MS. JUNGHANS:  Objection --

4            THE COURT:  Do you know from your own personal

5    recollection when the document was created?

6            THE WITNESS:  It was in early October.

7            THE COURT:  Do you know when it was created in

8    relationship to the phone call?

9            THE WITNESS:  I created it afterwards.

10           BY MR. McCULLOUGH:

11   Q.      How long after the call was it created?  Within --

12   A.      Like a week.

13           MS. JUNGHANS:  I can't hear.

14           THE WITNESS:  Within a week.  Sorry.

15           BY MR. McCULLOUGH:

16   Q.      So Ms. Saunders, I think that we are both not doing a

17   great job of speaking up.  So I will elevate, as well.

18   A.      Okay.

19   Q.      Probably more me than you.

20           Let's turn back to the first page.  I want to focus

21   on the top section of this document.

22           The first line says, "Arrange exclusive interviews

23   with David Sanger of *The New York Times* and Al Hunt of

24   *Bloomberg*."

25           Do you recall why these two names appear in this

1758

1      document?

2      A.      These were names that had been floated.

3      Q.      And when you say "floated" --

4      A.      Possible positive relationships.

5      Q.      And were these names that had been discussed on the

6      conference call?

7              MS. JUNGHANS:  Objection.  Leading.

8              THE COURT:  When had the names been floated to your

9      knowledge?  What made you write them on the piece of paper?

10             THE WITNESS:  Either in the phone call or later

11     through instructions given to me by management.

12             BY MR. McCULLOUGH:

13     Q.      When you say "management," who would that have been?

14     A.      It would have come from John Lonergan to Andrew

15     Wright.

16             MS. JUNGHANS:  Your Honor, I'm going to object and

17     move to strike.  I think she just repeated what somebody said

18     somebody else said.

19             THE COURT:  I think we have talked about this before

20     she testified, and she can say that.

21             BY MR. McCULLOUGH:

22     Q.      Now, focusing on the first open bullet, it says,

23     "Reach out to both publications this week and lock down an

24     exclusivity deal, including timing of when they will receive

25     the report, the interviews with Greg Craig, and embargo

1759

1    expiration."

2         When it mentions the name Greg Craig, do you recall

3    how that name came to appear in this document?

4    A.    At some point -- I don't remember exactly

5    when -- Greg Craig came up as affiliated with the Skadden

6    Report, and he was going to serve as a spokesperson.

7    Q.    And this refers to exclusivity terms.  The next open

8    bullet, it says, "*Bloomberg* and *New York Times* will have

9    access to the report on Monday, at 11 a.m., and an

10   opportunity to interview Greg Craig provided they agree to a

11   Tuesday, 2 a.m., online embargo."

12        What does that mean?  What is the process?

13   A.    The process is to make sure that *Bloomberg* and *The*

14   *New York Times*, they both have interviewed Greg Craig and

15   they have had access to the report on Monday, at 11, so that

16   when the embargo is listed and the wider public has access to

17   the report and the other reporters have access to the report,

18   they have already written their stories.  So they will have

19   gotten a jump on the story.

20   Q.    And so based on the plan that had been created, would

21   Mr. Craig have spoken to the media prior to the release of

22   the work?

23   A.    Yes.

24        MS. JUNGHANS:  Objection.

25        THE COURT:  All right.  Can you approach the bench.

1760

1        (At the bench)

2        THE COURT:  You have got to learn how to ask

3    non-leading questions, and you have to not repeat her answer

4    verbatim afterwards.  It is only evidence if she says it.  It

5    doesn't matter if you say it.  I know there is a tendency for

6    trial lawyers to hear the words coming out of their mouths,

7    but you need to ask an open-ended question.  If she says it,

8    you don't get to say it again.

9        The question you asked earlier, which was can you

10   explain what the exclusivity terms mean, that was an

11   independent question.  Then she answered.  And then you said,

12   so does that mean that Greg Craig -- that's a leading

13   question.  So I think you need to try to resist the

14   temptation.

15       MR. McCULLOUGH:  Yes, Your Honor.  Understood.

16       (In open court)

17       BY MR. McCULLOUGH:

18   Q.    When would the interview with Greg Craig take place,

19   according to the plan?

20   A.    They would have access to interviews Greg Craig

21   before Tuesday at 2 a.m.

22   Q.    And what was to happen on Tuesday at 2 a.m.?

23   A.    There would be a release of the news story to more

24   reporters.

25   Q.    And focusing on the third bullet, can you read that.

1761

1   A.        "Reasoning:  If the MOJ releases the report at

2   10 a.m. UKR, that is 3 a.m. Eastern on Tuesday, we need to

3   give *The Times* sufficient time to get its story in the

4   Tuesday paper, and both publications time to get their

5   stories online before the MOJ."

6   Q.        So what does that mean?

7   A.        The Ministry of Justice in Ukraine would release the

8   report at 10 a.m. their time, 3 a.m. Eastern.  So you need to

9   give *The New York Times* sufficient time to interview Greg

10  Craig and for both publications, meaning also *Bloomberg*, to

11  get their stories online beforehand.

12  Q.        The reference to Monday and Tuesday, is there

13  anything in this document that assists you in identifying

14  what the date of Monday and Tuesday were?

15  A.        Well, this is the week of October 1st.  So it would

16  be that week or the following week.

17  Q.        Turning your attention to the second page of the

18  document.

19  A.        Right.

20  Q.        Focusing on the top line, what, if anything, was the

21  plan calling for?

22  A.        For the release the following week.

23  Q.        And what day was that?

24  A.        That was Tuesday, October 9th.

25  Q.        Did you ever send this document to Mr. Craig?

1762

```
 1    A.      No.

 2    Q.      Do you know whether anyone ever sent this document to

 3    Mr. Craig?

 4    A.      No.

 5    Q.      Did the -- was the report released on or about

 6    October 9th?

 7    A.      I don't know.

 8    Q.      Do you know whether the report was ever released?

 9    A.      Eventually, it was.

10    Q.      And when -- did you ever read the report yourself?

11    A.      No.

12    Q.      And did you ever form an opinion as to the report

13    itself?

14    A.      No.

15            MR. McCULLOUGH:  Thank you.  No further questions.

16            THE COURT:  All right.  Any cross examination?

17                         CROSS-EXAMINATION

18            BY MS. JUNGHANS:

19    Q.      Good afternoon, Ms. Saunders.

20    A.      Good afternoon.

21    Q.      My name is Paula Junghans, and I'm one of Mr. Craig's

22    lawyers.  I have a few questions for you.

23            Now, I think you said that at Mercury your client was

24    this entity called the ECFMU, European Center for the Modern

25    Ukraine; right?
```

1763

1    A.      Yes.

2    Q.      That was allegedly or supposedly a nongovernmental

3    organization; right?

4            MR. McCULLOUGH:  Objection, Your Honor.

5            THE COURT:  Well, what did you understand it to be?

6            THE WITNESS:  It was a nonprofit.

7            BY MS. JUNGHANS:

8    Q.      Okay.  A nonprofit organization.

9            And it was supposed to be impartial; right?

10   A.      Yes.

11   Q.      Because nonprofit organizations are not supposed to

12   be advocating for the interests of any other party,

13   particularly a government; right?

14   A.      Yes.

15   Q.      And yet, what you said in your description of your

16   services was to advocate for Ukraine to get into the European

17   Union and to be viewed better in the West; right?

18   A.      Correct.

19   Q.      In fact, ECFMU was not an impartial organization, it

20   was an advocate for the Ukraine?

21   A.      Well, at some point, we started to realize that it

22   was not as what it seemed.

23   Q.      Right.  In fact, you came to understand that the

24   representations that had been made to you by Mr. Gates in

25   particular about what ECFMU was were wrong; right?

1     MR. McCULLOUGH:  Objection.

2     THE COURT:  I think you can answer.  What were you

3  told initially that it was?

4     THE WITNESS:  We were told it was a nonprofit or

5  nongovernmental organization.

6     THE COURT:  And then what did you come to understand

7  it to be?

8     THE WITNESS:  Later we came to believe that

9  potentially there were -- it was funded by businessmen in

10  Ukraine with close relationships to the government.

11     THE COURT:  And do you know who told you initially

12  that it was the impartial nongovernment?

13     THE WITNESS:  Rick Gates.

14     THE COURT:  Ask your next question.

15     BY MS. JUNGHANS:

16  Q.     And everything that you did, all the work that you

17  did, was for the purpose of taking the side of Ukraine in

18  whatever issue Ukraine wanted you to pursue; right?

19  A.     It's beyond my purview what Ukraine wanted.

20  Q.     No, I was just asking about the work that you did.

21  A.     Yeah.

22  Q.     It was to advocate for the point of view of Ukraine

23  as expressed to you by Mr. Gates?

24     MR. McCULLOUGH:  Objection, Your Honor.  Asked and

25  answered.  She does not know.

1765

 1          THE COURT:  Can you answer that question?

 2          THE WITNESS:  No.  I don't know at the time what the

 3     ECFMU wanted.  I didn't know if they were completely aligned

 4     with the Ukrainian government at all times.

 5          BY MS. JUNGHANS:

 6     Q.     But you didn't do any work that was against the

 7     interests of the Ukraine; did you?

 8          MR. McCULLOUGH:  Objection, Your Honor.

 9          THE COURT:  You can ask her where she got her

10     instructions.  She is saying she doesn't know what Ukraine

11     had in mind.

12          BY MS. JUNGHANS:

13     Q.     Well, let's move on.

14          You said that with respect to the Skadden Report that

15     you understood that the goal was to have it portrayed that

16     the trial of Yulia Tymoshenko had been fair and credible;

17     correct?

18     A.     That's what I said.

19     Q.     And so just focusing on that part of your job

20     vis-a-vis the ECFMU --

21     A.     Yes.

22     Q.     -- that was the goal?

23     A.     Yes.

24     Q.     Did you know personally whether the Skadden Report

25     criticized the trial of Yulia Tymoshenko in any way?

1    MR. McCULLOUGH:  Objection.

2    THE COURT:  I know she said she hasn't read it, but

3  she can repeat that answer.

4    THE WITNESS:  Yes, I didn't read the report.

5    BY MS. JUNGHANS:

6  Q.    You didn't read the report at all?

7  A.    No.

8  Q.    But you participated in the media plan to roll out

9  the report, but you didn't know anything about the substance

10  of the report?

11  A.    Yes.

12  Q.    Now, you said that --

13    THE COURT:  This is in October; correct?

14    THE WITNESS:  Correct.

15    MS. JUNGHANS:  I'm sorry, Your Honor.  I didn't hear

16  you.

17    THE COURT:  I said it was in October --

18    MS. JUNGHANS:  Right.  Right.

19    THE COURT:  -- is when she was participating.

20    BY MS. JUNGHANS:

21  Q.    Before we get to the conference call that you

22  referenced, were you told at the time you were doing this

23  work by Mr. Gates or anybody else that there was another firm

24  called FTI that was also working to prepare for a rollout of

25  the Skadden Report?

1767

```
1    A.       I remember the name FTI.  I don't remember in what
2    context.
3    Q.       You didn't communicate with FTI about the rollout;
4    did you?
5    A.       I don't think I did.
6    Q.       You don't know the name Jonathan Hawker?
7    A.       No.
8    Q.       And it wouldn't be normal to have firms doing a
9    rollout of the same report at the same time without talking
10   to each other; would it?
11   A.       It doesn't seem normal.
12   Q.       Pardon?
13   A.       It does not seem normal.
14   Q.       In fact, you were talking with people from the
15   Podesta Group that Mr. Gates had advised you about, but you
16   weren't working with FTI?
17   A.       Correct.
18   Q.       Okay.  Now, you said that you had this conference
19   call to float names for somebody who might talk to a
20   journalist; right?
21           MR. McCULLOUGH:  Objection, Your Honor.
22           THE COURT:  I think there was a conference call.
23           BY MS. JUNGHANS:
24   Q.       You said there was a conference call; right?
25   A.       Yes, there was a conference call.
```

1   Q.      You said during the conference call various names

2   were floated; correct?

3   A.      Reporters.

4   Q.      Right.  Okay.  And there were reporters from

5   *Bloomberg*?

6   A.      Al Hunt.

7   Q.      And was there the name of a reporter from *The New*

8   *York Times* that was floated?

9   A.      Al Sanger -- David Sanger.

10  Q.      David Sanger.  Okay.

11          And that name came from whom?

12  A.      I don't remember.  It was a lot of people on the

13  call.

14  Q.      Right.  And it was a long time ago.

15  A.      It was.

16  Q.      And you said that the goal of leaking the report to a

17  reporter was to get a balanced piece; correct?

18  A.      Correct.

19  Q.      Okay.  And then I think you said that balanced meant

20  that your client's point of view would be included.

21  A.      Yes.

22  Q.      And the point of view that you were being asked to

23  promote was that the trial of Yulia Tymoshenko had been fair

24  and credible?

25  A.      Yes.  That she was handled correctly, the trial was

1769

1    handled correctly.

2    Q.      But you don't know whether that was what the report

3    actually said?

4    A.      No.

5    Q.      And when you did the document which Mr. McCullough

6    showed you as Exhibit 301 -- can we have that for a moment,

7    please.

8            No, not that one.  301.  Excuse me.  I apologize.

9    306.

10           You don't know whether anybody at -- anybody at

11   all -- anybody was on the phone call, anybody in the world

12   had asked Mr. Craig whether he was going to do this?

13   A.      No.

14   Q.      Okay.  And you certainly didn't?

15   A.      Did not.

16   Q.      And when the report was actually released in -- let

17   me represent to you it was released in December of

18   2012 -- you were still at Mercury but you weren't working on

19   this anymore?

20   A.      Correct.

21   Q.      Okay.  But you do recall that at the time of the work

22   that you were doing on the report, you mentioned that other

23   people who had worked on it like Mr. Lonergan and Mr. Wright?

24   A.      Yes.

25   Q.      There was discussion in the firm that the report

1    wasn't in fact very good for Ukraine; wasn't there?

2            MR. McCULLOUGH:  Objection, Your Honor.  Can we

3    approach?

4            THE COURT:  Yes.

5            (At the bench)

6            THE COURT:  What is your objection?

7            MR. McCULLOUGH:  The question would solicit hearsay

8    as to others' opinion on the report.  It is, one, hearsay;

9    and two, to the extent that it is somebody else's opinion as

10   to the value of the report, the credibility of the report, it

11   is not relevant.

12           We addressed this through multiple documents at the

13   pretrial conference.

14           MS. JUNGHANS:  Well, I think there are two points to

15   this.  It is not whether the other people's opinions were

16   true or false, whether the report was good or bad.

17           THE COURT:  That is what you want in --

18           MS. JUNGHANS:  No, it is a question of opinion, and

19   that they were involved in advocating for something that they

20   didn't believe.

21           THE COURT:  Okay, first of all, you're trying to get

22   in the fact that this was her actual opinion based on their

23   actual review of the report, but you don't even know if they

24   had seen it yet --

25           MS. JUNGHANS:  It could not have been her opinion.

1    She didn't read the report.

2           THE COURT:  Right.

3           MS. JUNGHANS:  But as a PR firm, all they're trying

4    to do is to sell an opinion, sell a point of view that

5    somebody is handing to them, that they're not even educated

6    about themselves.

7           THE COURT:  We don't know under what context -- we

8    know what she did, which was very, very limited.  We don't

9    even know where the report -- who the report is even being

10   given to at that point.  Now you're trying to get from her

11   what was in other people's heads, what they were saying, what

12   they were doing, and whether that was right or wrong.  And I

13   think -- I don't see how she can say what other people were

14   saying to her based on their reading of the report if they

15   even read the report.  I don't even know if they read the

16   report.

17          MS. JUNGHANS:  All right, Your Honor.

18          (In open court)

19          MS. JUNGHANS:  Thank you, Ms. Saunders.  That is all

20   I have.

21          THE COURT:  Any redirect?

22          MR. McCULLOUGH:  Nothing further, Your Honor.

23          THE COURT:  All right.  Thank you.  You can be

24   excused.

25          (Witness excused)

1          THE COURT:  It is an excellent time to break for the

2     evening for the jurors.

3          I want to caution to you again that your evening is

4     to be spent talking and thinking and e-mailing and blogging

5     and reading about anything other than the trial.  Please

6     don't do any further research.  Please don't discuss it.

7     Please don't communicate with anybody else about it until the

8     case has been submitted to you, which has not happened yet.

9          I will excuse you right now.  Have a pleasant

10     evening.  We are going to start at the same time tomorrow.

11     So please be gathered by approximately 9:15, and we will try

12     to start right up at 9:30.

13          Thank you.

14               (Jury not present)

15          THE COURT:  All right.  You all can be seated.

16          Before we break for the evening, I have a question

17     that is really meant as a question and not as a direction to

18     either side.

19          There have been -- and this just came up a few

20     minutes ago, but it isn't the first time it has come

21     up -- there have been questions and testimony about whether a

22     statement in a press release or a draft press release or what

23     someone was trying to say or do or what someone said in a

24     newspaper or somewhere else is an "accurate

25     characterization" -- I'm putting that in quotes -- of the

1    report.  I think those words were used in questions and

2    answers this week.

3         And the point the jurors are being asked to consider

4    is whether the speaker or the author, who could be at that

5    moment advancing either the point of view of the Ukrainian

6    Ministry or the point of view of the Tymoshenko defense team,

7    is accurately describing the report or is being either

8    deliberately or inadvertently untruthful or disingenuous

9    about it.

10        Putting aside what Ms. Junghans has just told me,

11   which is one's view of the report is something of an opinion

12   and that when we talk about accuracy we don't mean arithmetic

13   accuracy, it is a judgment call that could be in the eye of

14   the beholder, what struck me yesterday -- and what I

15   continued mulling over -- is the fact that the jury is being

16   called upon to assess, at the very least, the credibility of

17   the witness's answers, as well as any inferences one side or

18   the other is going to ask the jury to draw based on the

19   accuracy or inaccuracy of the characterization of the report

20   without the benefit of the language in the report that is

21   being discussed.

22        The witnesses aren't being presented with the

23   language of the report when these questions are being posed,

24   and sometimes their answers are being challenged.

25        And sitting here and listening along with the jurors,

1    it made the question-and-answer process confusing and

2    difficult to follow and assess.  And it is not my job to tell

3    either side how to try its case as a matter of strategy, but

4    clarity does fall in my bailiwick.

5         So in terms of what the report says or doesn't say,

6    anything I know is based on the fact that it is an attachment

7    to an exhibit that has been moved in evidence.  And one

8    problem I see is that the questions that are being asked are

9    being asked as if the report is a unified whole with a single

10   overarching conclusion or bottom line.  When there were

11   multiple conclusions -- and the question of whether a

12   characterization is accurate or inaccurate could turn largely

13   on what aspect of the report it purports to summarize.

14        The executive summary listed, without numbering or

15   noting that any had priority over others, about 10 or 11

16   bullet points.  At least one, as I recall, could be

17   characterized as neutral.  We didn't undertake to review

18   issue A.  There were two or three, as has been noted by many

19   witnesses and counsel, which identified ways in which the

20   trial fell short of western standards of due process,

21   including violations of Ms. Tymoshenko's right to counsel.

22   And there are approximately six or seven other issues or

23   objections that are listed that had been raised by

24   Tymoshenko, and the bullet points dispose of them for one

25   reason or another.  This issue was not a violation of

1    Ukrainian practice even if it was unusual in the United

2    States.  That issue would not likely warrant a reversal of

3    the conviction in the United States, or she presented no

4    evidence to support another issue.

5           So whether someone is fairly summarizing the report

6    as a vindication in any way for Ms. Tymoshenko or a

7    vindication in any way for the Ministry could depend on which

8    conclusion the speaker or writer had selected to summarize.

9           Now, as I said before, the defendant has moved the

10   entire report in evidence.  And as I understand it, it is a

11   long document.  And I don't believe that any party has any

12   intention to get into the substance of it, the nitty-gritty.

13          But what I'm wondering is, the executive summary is

14   exactly five and a half pages long, about two and a half of

15   which aren't the conclusions at all, they are the process.

16   We got access to this many people, we did this much work,

17   this is how we did it.  It describes what went into the

18   report.  And then there is about a page and a half, two and a

19   half pages of the bulleted conclusions.

20          So I want to know if at some point anyone is

21   contemplating in these proceedings putting those in front of

22   the jury.

23          MR. TAYLOR:  May I?

24          THE COURT:  Yes.

25          MR. TAYLOR:  The answer is yes.

1          THE COURT:  All right.  How does that happen?  I

2     understand if Mr. Craig testified, it could come in that way.

3     If he doesn't, how does that happen?

4          MR. TAYLOR:  Mrs. Hunt said that she read the report.

5          THE COURT:  Okay.

6          MR. TAYLOR:  Your Honor, as I said in the opening,

7     the point is that the report drew conclusions, and the

8     conclusions in the report which Mr. Hawker was spinning and

9     which -- that is what motivated Mr. Craig to speak to the

10    reporters.  So it is not the reason why the content of the

11    report is relevant, as Mr. Murphy demonstrated yesterday, is

12    that Mr. Hawker readily admitted that he was determined to

13    spin it to get people to believe it said something that it

14    didn't.

15         THE COURT:  See, that's the part I'm having a problem

16    with.  That's what Mr. Murphy said, and that's what the

17    questions implied.

18         MR. TAYLOR:  Mr. Hawker.

19         THE COURT:  And the witness said at least three

20    times, I don't have it in front of me.

21         And you are absolutely going to be able to argue in

22    your closing, as you did in your opening, what you think the

23    evidence shows.  But if the jurors are supposed to determine

24    whether Mr. Hawker was being fair when he wrote A, B, C in a

25    press release, I don't see how they can make that assessment

1    without knowing what --

2             MR. TAYLOR:  We agree.

3             THE COURT:  -- what they did have in front of them

4    when they wrote the press release.  And there is a difference

5    between selecting only the good parts and burying the bad

6    parts and lying about, or being disingenuous or untruthful

7    about what's in there.

8             The government disagrees about whether any of that is

9    relevant.  I think their point is he talked to the press, but

10   he didn't tell Ms. Hunt he talked to the press when he talked

11   to the press.  Your point is it goes to his willfulness of

12   why he thought he was talking to the press.  Everybody has

13   their theory of the case.  I'm not talking about that.  I'm

14   not rejecting one theory or the other.

15            I'm just saying that the arguments that were being

16   advanced through the questions to the witness are impossible

17   for the jury to absorb and assess without, at the very least,

18   all of the bullet points in the executive summary at some

19   point being brought to their attention.

20            So that was my observation.

21            MR. TAYLOR:  If that is the Court's specific concern,

22   we do intend to make those conclusions very clear to the jury

23   in the form in which they appear in the report.

24            THE COURT:  All right.

25            MR. TAYLOR:  But I do want to take some -- take this

1    opportunity to say I don't think the question is whether

2    Mr. Hawker in fact got it right or wrong but whether

3    Mr. Craig distrusted Mr. Hawker for the reasons Mr. Hawker

4    said in fact that he was saying what the Ministry wanted him

5    to say and knowing, knowing, as he said, that that was not

6    what the report said.  So that's --

7         THE COURT:  I'm not quite sure that is a fair

8    characterization of his testimony.  He is saying that is what

9    they wanted him to say, and there were several exhibits that

10   came up that said based on this conclusion and this

11   conclusion they're going to say based on that finding that X

12   is their position.  Those exhibits were shown to him.

13        The jury's recollection of what Mr. Hawker said is

14   going to control.  My point is that the cross-examination of

15   whether it was fair or wasn't fair or whether it was accurate

16   or wasn't accurate came in in a vacuum that made it difficult

17   to be meaningful and difficult to process.

18        MR. TAYLOR:  That's a very important observation, and

19   we will make sure that that does not continue.  We want the

20   jury to be clear.  But the key question is why did Mr. Craig

21   not trust Mr. Hawker.

22        THE COURT:  Well, whether that is a key question or

23   not is debated.

24        MR. TAYLOR:  I don't appreciate --

25        THE COURT:  He doesn't need to snicker, but there has

1779

1    been snickering on your side of the courtroom, too.  I think

2    everybody is tired, and the jury is not here to see it.

3            But I do believe there is a serious difference of

4    opinion about whether that bears on the question that the

5    jury actually has to decide.  And I know you have reasons why

6    you think it does and they have reasons why they think it

7    doesn't, and I haven't said you can't explore all that and

8    make your argument.

9            If you're going to make that argument, then what it

10   said matters.  It doesn't matter to them, but it does seem to

11   matter to this argument.

12           MR. TAYLOR:  We agree.

13           THE COURT:  All right.

14           MS. JUNGHANS:  If I might just supplement my partner

15   here.  Mr. Gates is going to testify tomorrow.  I'm going to

16   cross-examine him.  I fully expect that the conclusions of

17   the report will be in front of him, and the spin on those

18   conclusions will be in front of him, and the contrast will be

19   obvious.

20           THE COURT:  Fine.  I'm just saying that if you start

21   with the spin without the conclusions, it is problematic or

22   it is hard to figure out what you're talking about.  And it

23   will be up to the government on its redirect, if it feels

24   that you left any out to bring them out or not if it thinks

25   it's important.

1780

1          MS. JUNGHANS:  I don't know whether the government is

2    going to offer the report or not.

3          THE COURT:  Well, it is already in evidence.  You

4    have moved evidence in during the trial.

5          MS. JUNGHANS:  But not through a witness so far.

6          THE COURT:  You moved the e-mail transmitting the

7    Tymoshenko report in its entirety in evidence.  So they don't

8    need to move the report in evidence.

9          MS. JUNGHANS:  No, no, they don't.  But I'm just

10   saying that it is sort of surprising that as part of telling

11   the story, the government hasn't done that.  They can try

12   their case, we will try our case, and I expect that what

13   you're referring to is going to come out tomorrow.

14         THE COURT:  All right.  I will see everybody

15   tomorrow.

16              (Proceedings adjourned at 5:02 p.m.)

17

18

19

20

21

22

23

24

25

1781

```
 1               CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3          I, Patricia A. Kaneshiro-Miller, certify that the

 4     foregoing is a correct transcript from the record of

 5     proceedings in the above-entitled matter.

 6

 7

 8     /s/ Patricia A. Kaneshiro-Miller        August 21, 2019
       ------------------------------------    --------------------
 9     PATRICIA A. KANESHIRO-MILLER                    DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# $

**$1,028,000** [1] - 1728:17
**$1,075,000** [3] - 1736:18, 1737:17, 1741:9
**$1,075,381.41** [2] - 1708:12, 1719:10
**$1.25** [4] - 1711:22, 1717:4, 1717:5, 1717:8
**$103,000** [1] - 1726:11
**$107,000** [1] - 1728:13
**$13,760** [1] - 1725:10
**$150,000** [3] - 1707:6, 1707:25, 1709:3
**$194,000** [1] - 1736:8
**$196,000** [4] - 1738:11, 1738:12, 1740:24, 1741:8
**$200,000** [3] - 1734:21, 1734:22, 1735:2
**$201,000** [1] - 1736:5
**$233,900** [2] - 1734:15, 1734:18
**$234,000** [1] - 1734:20
**$235,000** [1] - 1733:7
**$250,000** [3] - 1711:22, 1712:5, 1712:17
**$264,000** [2] - 1741:3, 1741:8
**$264,088.65** [1] - 1739:1
**$281,000** [1] - 1732:21
**$315,000** [2] - 1732:12, 1733:3
**$315,321.30** [1] - 1718:7
**$34,000** [1] - 1733:2
**$387,000** [2] - 1733:19, 1734:6
**$4,150,000** [1] - 1707:21
**$4.15** [1] - 1730:8
**$42,000** [1] - 1734:8
**$43,000** [1] - 1729:12
**$430,000** [1] - 1734:12
**$550,000** [2] - 1730:4, 1730:12
**$567,000** [1] - 1741:17
**$567,812.50** [3] - 1708:14, 1723:18, 1723:19
**$63,000** [1] - 1735:11
**$635,000** [2] - 1725:23, 1726:10
**$800,000** [1] - 1730:16
**$830,000** [1] - 1727:11
**$850,000** [1] - 1729:8
**$893,000** [1] - 1729:14
**$900,000** [1] - 1730:16
**$921,000** [2] - 1728:8, 1728:11
**$928,000** [1] - 1727:17
**$97,000** [1] - 1727:13

# '

**'17** [1] - 1741:17
**'98** [1] - 1700:5
**'leak'** [2] - 1754:17, 1754:21

# /

**/s** [1] - 1781:8

# 1

**1** [18] - 1683:14, 1683:22, 1683:23, 1685:7, 1685:13, 1685:25, 1687:24, 1690:6, 1693:14, 1708:8, 1708:9, 1708:15, 1709:2, 1719:13, 1737:23, 1741:7, 1741:10
**1,075,000** [1] - 1737:21
**1.075** [2] - 1730:9, 1736:21
**1.25** [1] - 1711:17
**10** [5] - 1720:15, 1720:20, 1761:2, 1761:8, 1774:15
**100** [1] - 1669:20
**1000** [1] - 1669:24
**11** [4] - 1718:1, 1759:9, 1759:15, 1774:15
**11-12** [1] - 1684:2
**12** [1] - 1679:18
**12-13** [2] - 1686:8, 1690:7
**12th** [1] - 1682:13
**13** [1] - 1740:22
**14** [2] - 1708:13, 1741:1
**15** [1] - 1747:19
**15662391** [1] - 1708:17
**16** [5] - 1691:9, 1691:18, 1692:24, 1708:9, 1708:23
**1672** [1] - 1671:5
**1681** [1] - 1671:13
**1694** [1] - 1671:5
**1699** [1] - 1671:6
**1721** [1] - 1671:6
**1739** [1] - 1671:6
**1744** [1] - 1671:7
**1762** [1] - 1671:7
**18** [4] - 1709:23, 1713:15, 1713:16, 1719:24
**1800** [1] - 1669:24
**18th** [1] - 1725:14
**19-125** [1] - 1672:4
**19-CR-125** [1] - 1669:4
**1st** [4] - 1733:24, 1735:25, 1752:16, 1761:15

# 2

**2** [17] - 1677:16, 1680:18, 1683:21, 1687:25, 1688:9, 1688:15, 1693:16, 1708:7, 1708:15, 1709:2, 1716:12, 1725:4, 1731:13, 1732:11, 1759:11, 1760:21, 1760:22
**20** [7] - 1695:7, 1707:24, 1708:7, 1715:17, 1719:8, 1733:15, 1738:18
**20001** [1] - 1670:4
**2002** [4] - 1700:13, 1700:25, 1701:9
**20036** [1] - 1669:25
**2007** [1] - 1745:13
**2010** [2] - 1746:8, 1747:6
**2011** [4] - 1674:15, 1696:10, 1701:12
**2012** [62] - 1674:22, 1677:9, 1677:16, 1679:2, 1682:3, 1682:8, 1682:13,

1684:2, 1686:8, 1687:8, 1689:17, 1691:9, 1691:18, 1692:24, 1697:21, 1698:5, 1698:19, 1705:21, 1705:22, 1706:9, 1707:11, 1707:24, 1708:2, 1708:7, 1708:8, 1708:9, 1708:23, 1710:5, 1711:13, 1711:25, 1713:5, 1713:7, 1713:15, 1713:16, 1713:18, 1714:6, 1714:12, 1714:24, 1715:3, 1715:17, 1715:25, 1716:6, 1716:12, 1716:19, 1720:1, 1725:4, 1726:24, 1727:6, 1727:23, 1728:1, 1730:24, 1731:13, 1732:11, 1733:24, 1735:3, 1741:19, 1742:14, 1748:21, 1748:23, 1752:2, 1752:16, 1769:18
**2013** [19] - 1683:14, 1684:10, 1687:9, 1687:12, 1687:13, 1688:24, 1689:18, 1689:24, 1708:10, 1719:4, 1719:12, 1719:14, 1733:15, 1735:8, 1735:10, 1735:15, 1736:19, 1737:15, 1738:18
**2017** [3] - 1708:13, 1739:6, 1741:16
**2019** [2] - 1669:7, 1781:8
**202** [1] - 1670:5
**20530** [2] - 1669:15, 1669:17
**20th** [6] - 1729:18, 1729:25, 1730:6, 1730:13, 1733:23, 1738:15
**21** [4] - 1669:7, 1737:22, 1737:23, 1781:8
**21202** [1] - 1669:21
**22** [4] - 1710:5, 1711:13, 1711:25, 1738:25
**22nd** [2] - 1718:4, 1718:18, 1739:9
**24** [6] - 1714:24, 1728:1, 1735:8, 1735:10, 1735:15, 1736:19
**2440** [1] - 1669:21
**24th** [7] - 1735:25, 1737:15, 1738:8, 1738:9, 1738:10, 1738:12, 1738:21
**250,000** [2] - 1711:23, 1717:3
**26** [2] - 1714:6, 1726:24
**264,000** [2] - 1737:16, 1741:2
**268** [1] - 1675:3
**269** [1] - 1676:13
**278** [1] - 1752:7
**28** [2] - 1684:10, 1687:8
**281,000** [1] - 1732:23
**2:19** [1] - 1672:2
**2nd** [4] - 1718:2, 1718:15, 1718:19, 1730:24

# 3

**3** [8] - 1685:4, 1688:1, 1689:24, 1690:6, 1693:18, 1742:14, 1761:2, 1761:8
**3.6** [4] - 1729:17, 1729:24, 1730:10, 1730:14
**3/30** [1] - 1707:9
**30** [5] - 1708:2, 1713:7, 1713:18, 1715:3, 1728:15
**300** [1] - 1677:11
**301** [2] - 1769:6, 1769:8

1783

**306** [2] - 1756:13, 1769:9
**307** [3] - 1678:5, 1698:5, 1698:7
**30th** [1] - 1728:10
**31** [9] - 1688:24, 1689:18, 1713:5, 1714:12, 1715:25, 1716:6, 1716:19, 1727:6, 1735:3
**315,000** [1] - 1733:4
**31st** [10] - 1689:17, 1714:14, 1725:11, 1727:20, 1729:4, 1729:6, 1731:4, 1733:2, 1733:24, 1735:19
**320** [1] - 1679:9
**325** [1] - 1680:2
**326** [4] - 1671:13, 1681:10, 1681:20, 1681:22
**33** [1] - 1723:5
**333** [1] - 1670:4
**34,000** [1] - 1732:25
**354-3243** [1] - 1670:5
**370** [1] - 1682:10
**3rd** [2] - 1737:25, 1738:1

## 4

**4** [4] - 1687:25, 1691:10, 1693:20, 1708:24
**430** [1] - 1686:1
**437** [1] - 1683:10
**442** [1] - 1684:6
**444** [1] - 1686:12
**450** [1] - 1688:19
**451** [1] - 1689:20
**4700A** [1] - 1670:3

## 5

**5** [1] - 1690:12
**500,000** [1] - 1741:15
**530** [1] - 1693:9
**548** [1] - 1690:11
**555** [1] - 1669:14
**562** [4] - 1712:13, 1712:24, 1724:21, 1724:22
**563** [2] - 1713:11, 1725:14
**573** [2] - 1714:5, 1726:23
**575** [2] - 1714:24, 1727:25
**584** [2] - 1715:9, 1728:19
**586** [5] - 1709:23, 1716:25, 1719:24, 1739:8, 1739:19
**588** [3] - 1716:11, 1718:6, 1730:21
**589** [2] - 1731:15
**5:02** [1] - 1780:16

## 6

**6** [8] - 1691:3, 1691:12, 1691:16, 1708:10, 1712:13, 1712:15, 1719:12, 1719:14
**601** [3] - 1733:14, 1738:15, 1740:20
**614** [3] - 1735:7, 1738:21, 1741:1
**618** [6] - 1706:17, 1719:7, 1723:4,

1737:20, 1738:25
**682** [1] - 1707:19
**6th** [2] - 1738:2, 1738:6

## 7

**7** [2] - 1682:3, 1708:8

## 8

**8** [1] - 1669:5
**850,000** [1] - 1729:10
**8th** [2] - 1738:24, 1739:1

## 9

**950** [1] - 1669:17
**9:15** [1] - 1772:11
**9:30** [1] - 1772:12
**9th** [2] - 1761:24, 1762:6

## A

**a.m** [8] - 1759:9, 1759:11, 1760:1, 1760:22, 1761:2, 1761:8
**Abelson** [1] - 1669:19
**able** [2] - 1750:13, 1776:21
**above-entitled** [1] - 1781:5
**absent** [1] - 1692:20
**absolutely** [2] - 1742:3, 1776:21
**absorb** [1] - 1777:17
**accept** [1] - 1730:2
**acceptable** [1] - 1705:17
**access** [6] - 1759:9, 1759:15, 1759:16, 1759:17, 1760:20, 1775:16
**accomplished** [2] - 1676:4, 1678:24
**according** [3] - 1684:14, 1712:18, 1760:19
**Account** [1] - 1708:16
**account** [80] - 1704:16, 1704:17, 1705:7, 1705:13, 1705:15, 1705:17, 1706:13, 1706:14, 1706:21, 1706:24, 1707:7, 1708:1, 1708:5, 1708:18, 1708:24, 1709:3, 1709:4, 1709:15, 1709:16, 1712:10, 1713:9, 1713:10, 1713:24, 1714:1, 1714:3, 1714:16, 1714:23, 1715:7, 1715:8, 1716:8, 1716:10, 1716:23, 1716:24, 1717:11, 1718:13, 1718:16, 1718:20, 1718:21, 1719:1, 1719:15, 1722:1, 1722:8, 1722:11, 1722:13, 1722:16, 1722:17, 1722:20, 1722:21, 1722:24, 1722:25, 1723:3, 1723:4, 1723:7, 1723:12, 1723:15, 1723:16, 1723:23, 1723:24, 1724:6, 1730:5, 1730:9, 1730:10, 1733:6, 1734:16, 1734:20, 1736:19, 1736:21, 1737:18, 1737:24, 1738:1, 1738:2, 1738:3, 1738:4, 1738:5, 1738:11, 1738:20, 1738:23, 1739:2, 1739:4

**accountant** [1] - 1700:11
**accounted** [1] - 1724:9
**accounting** [35] - 1701:5, 1701:17, 1701:19, 1701:21, 1702:1, 1702:2, 1702:3, 1702:18, 1702:24, 1703:3, 1703:13, 1703:21, 1705:9, 1705:11, 1705:22, 1705:25, 1706:4, 1709:6, 1709:21, 1711:5, 1711:10, 1711:13, 1711:15, 1713:1, 1713:3, 1713:13, 1714:9, 1714:25, 1716:16, 1719:16, 1720:3, 1720:7, 1720:8, 1737:3
**accounts** [5] - 1722:4, 1722:5, 1722:7, 1722:12, 1724:4
**accrued** [1] - 1722:18
**accumulate** [2] - 1702:13, 1703:4
**accumulated** [2] - 1702:20, 1734:4
**accuracy** [3] - 1773:12, 1773:13, 1773:19
**accurate** [4] - 1772:24, 1774:12, 1778:15, 1778:16
**accurately** [1] - 1773:7
**achieve** [3] - 1746:15, 1746:22, 1755:16
**acknowledge** [1] - 1675:21
**acquaintance** [1] - 1696:25
**Action** [2] - 1669:4, 1754:10
**actions** [1] - 1756:6
**actual** [4] - 1692:4, 1712:20, 1712:21, 1770:22, 1770:23
**Adam** [2] - 1669:16, 1669:19
**add** [3] - 1688:8, 1729:20, 1729:23
**added** [1] - 1730:11
**addition** [4] - 1683:25, 1686:7, 1708:10, 1726:10
**additional** [17] - 1691:21, 1708:3, 1718:19, 1718:22, 1718:25, 1719:1, 1719:3, 1719:10, 1719:11, 1719:13, 1727:13, 1730:9, 1736:18, 1736:21, 1737:19, 1741:7, 1741:10
**address** [7] - 1673:7, 1677:21, 1678:12, 1699:19, 1725:2, 1744:15, 1752:22
**addressed** [8] - 1710:7, 1710:8, 1725:1, 1725:15, 1727:2, 1728:4, 1728:23, 1770:12
**addressee** [1] - 1725:7
**adjourned** [1] - 1780:16
**adjustments** [1] - 1703:9
**Administration** [1] - 1700:2
**admission** [2] - 1681:14, 1681:15
**admitted** [4] - 1681:20, 1693:8, 1706:17, 1709:25, 1714:5, 1776:12
**advance** [5] - 1704:5, 1704:11, 1704:20, 1705:6, 1721:17
**advanced** [1] - 1777:16
**advancing** [1] - 1773:5
**advertising** [3] - 1746:14, 1746:23, 1749:8
**advised** [1] - 1767:15
**advocate** [3] - 1763:16, 1763:20,

1764:22
**advocating** [2] - 1763:12, 1770:19
**affairs** [1] - 1746:10
**affiliated** [1] - 1759:5
**Afternoon** [1] - 1669:5
**afternoon** [13] - 1672:24, 1672:25, 1678:11, 1694:9, 1694:10, 1699:12, 1699:13, 1720:14, 1721:7, 1721:8, 1744:10, 1762:19, 1762:20
**AFTERNOON** [1] - 1669:9
**afterwards** [2] - 1757:9, 1760:4
**agency** [1] - 1746:10
**ago** [3] - 1674:19, 1768:14, 1772:20
**agree** [6] - 1703:8, 1721:16, 1725:19, 1759:10, 1777:2, 1779:12
**agreed** [1] - 1708:20
**agreement** [1] - 1754:22
**ahead** [3] - 1742:24, 1754:25, 1755:4
**aided** [1] - 1670:6
**AI** [6] - 1742:18, 1755:20, 1755:21, 1757:23, 1768:6, 1768:9
**aligned** [1] - 1765:3
**allegedly** [1] - 1763:2
**altogether** [2] - 1695:5, 1695:6
**AMERICA** [1] - 1669:3
**America** [2] - 1672:4, 1750:15
**amount** [18] - 1704:7, 1707:25, 1708:12, 1711:17, 1712:22, 1718:22, 1719:16, 1719:18, 1725:10, 1732:12, 1733:18, 1734:16, 1738:14, 1740:24, 1741:1, 1741:3, 1741:4, 1741:14
**amounts** [4] - 1708:6, 1712:21, 1723:9, 1741:7
**AMY** [1] - 1669:9
**Andrew** [3] - 1749:12, 1752:18, 1758:14
**Andy** [2] - 1748:15, 1748:17
**answer** [9] - 1679:22, 1711:7, 1722:23, 1760:3, 1764:2, 1765:1, 1766:3, 1774:1, 1775:25
**answered** [4] - 1732:8, 1740:13, 1760:11, 1764:25
**answers** [3] - 1773:2, 1773:17, 1773:24
**anticipate** [1] - 1742:12
**apologize** [1] - 1769:8
**appear** [3] - 1757:25, 1759:3, 1777:23
**APPEARANCES** [1] - 1669:11
**application** [4] - 1733:8, 1738:10, 1738:12, 1739:4
**applied** [4] - 1714:1, 1736:5, 1737:16, 1738:22
**apply** [1] - 1734:17
**appointments** [1] - 1680:22
**appreciate** [2] - 1720:17, 1778:24
**approach** [3] - 1742:2, 1759:25, 1770:3
**approve** [1] - 1705:3
**approving** [1] - 1706:10

**April** [8] - 1708:7, 1711:20, 1713:18, 1717:2, 1717:10, 1725:22, 1725:25, 1731:8
**area** [1] - 1699:23
**argue** [1] - 1776:21
**argument** [3] - 1779:8, 1779:9, 1779:11
**arguments** [1] - 1777:15
**arithmetic** [1] - 1773:12
**Arps** [6] - 1673:10, 1674:11, 1674:13, 1691:2, 1694:21, 1695:21
**Arrange** [1] - 1757:22
**aside** [2] - 1749:10, 1773:10
**aspect** [1] - 1774:13
**assess** [3] - 1773:16, 1774:2, 1777:17
**assessment** [1] - 1776:25
**assignment** [2] - 1710:19, 1745:17
**assistant** [2] - 1673:12, 1673:13
**assists** [1] - 1761:13
**associate** [1] - 1747:2
**associated** [3] - 1705:25, 1708:17, 1709:6
**associates** [1] - 1726:3
**associations** [1] - 1746:17
**assume** [7] - 1672:11, 1676:12, 1680:14, 1682:5, 1687:25, 1688:15, 1689:6
**assuming** [1] - 1730:14
**attached** [7] - 1685:11, 1685:14, 1685:22, 1716:2, 1725:6, 1729:1, 1753:23
**attachment** [10] - 1683:19, 1685:5, 1685:8, 1685:10, 1690:2, 1690:5, 1710:3, 1753:13, 1754:1, 1774:6
**attachments** [3] - 1684:18, 1685:15, 1685:16
**attempt** [2] - 1678:1, 1746:19
**attempting** [3] - 1679:24, 1681:6, 1681:7
**attend** [1] - 1700:1
**attention** [14] - 1674:18, 1675:2, 1705:20, 1709:22, 1712:12, 1712:24, 1713:11, 1739:23, 1752:7, 1752:8, 1756:12, 1756:19, 1761:17, 1777:19
**ATTORNEY'S** [1] - 1669:13
**attorneys** [3] - 1702:12, 1702:18, 1727:22, 1751:9
**auditing** [3] - 1700:16, 1700:18, 1700:19
**auditor** [1] - 1700:11
**August** [24] - 1669:12, 1669:13, 1711:21, 1711:25, 1715:17, 1716:19, 1717:3, 1717:24, 1717:25, 1718:3, 1718:4, 1718:18, 1729:18, 1729:25, 1730:6, 1730:13, 1731:3, 1732:11, 1732:20, 1733:2, 1739:9, 1741:19, 1781:8
**AUSA** [2] - 1669:12, 1669:13
**author** [2] - 1751:21, 1773:4
**authorized** [1] - 1720:2

**automated** [1] - 1677:19
**automatically** [1] - 1686:23
**available** [1] - 1742:6
**Avenue** [2] - 1669:17, 1670:4
**aware** [8] - 1697:20, 1705:1, 1711:9, 1712:9, 1719:22, 1724:8, 1737:10, 1737:12
**away** [1] - 1688:3

# B

**backgrounding** [1] - 1694:2
**bad** [2] - 1770:16, 1777:5
**bailiwick** [1] - 1774:4
**balance** [25] - 1710:13, 1711:21, 1711:23, 1711:24, 1714:20, 1714:22, 1717:3, 1717:14, 1717:16, 1717:17, 1717:21, 1717:22, 1717:23, 1717:24, 1719:19, 1719:23, 1723:13, 1724:10, 1733:8, 1734:22, 1738:17, 1738:23, 1739:20, 1741:11, 1741:19
**balanced** [5] - 1754:19, 1755:12, 1755:13, 1768:17, 1768:19
**balances** [1] - 1712:1
**ballpark** [2] - 1730:11, 1733:13
**Baltimore** [1] - 1669:21
**bank** [4] - 1704:16, 1706:21, 1706:22, 1719:5
**Bank** [2] - 1708:5, 1708:17
**based** [27] - 1682:22, 1702:13, 1702:14, 1710:22, 1711:2, 1711:15, 1712:18, 1712:20, 1717:7, 1717:25, 1718:3, 1718:9, 1719:16, 1719:21, 1723:21, 1723:24, 1733:8, 1738:20, 1740:18, 1741:12, 1759:20, 1770:22, 1771:14, 1773:18, 1774:6, 1778:10, 1778:11
**basis** [2] - 1724:19, 1731:20
**Bauer** [1] - 1696:3
**bearing** [1] - 1738:5
**bears** [1] - 1779:4
**became** [3] - 1695:11, 1726:5, 1745:20
**become** [1] - 1745:8
**BEFORE** [1] - 1669:9
**beforehand** [1] - 1761:11
**began** [2] - 1748:21, 1752:1
**begin** [2] - 1721:2, 1748:20
**behalf** [1] - 1724:1
**behind** [1] - 1716:2
**beholder** [1] - 1773:14
**believes** [1] - 1743:10
**belongs** [1] - 1704:19
**below** [3] - 1675:16, 1747:2, 1747:13
**bench** [4] - 1742:4, 1759:25, 1760:1, 1770:5
**benefit** [6] - 1722:14, 1722:18, 1722:22, 1723:1, 1738:6, 1773:20
**benefits** [1] - 1701:20
**BERMAN** [1] - 1669:9
**better** [1] - 1763:17

1785

**between** [5] - 1718:17, 1733:23, 1741:6, 1777:5
**beyond** [3] - 1696:22, 1697:25, 1764:19
**big** [3] - 1701:25, 1736:24, 1751:5
**Bill** [1] - 1721:9
**bill** [64] - 1702:23, 1703:1, 1703:10, 1704:21, 1704:24, 1705:2, 1705:9, 1705:10, 1711:16, 1712:21, 1713:22, 1713:25, 1714:18, 1714:19, 1718:1, 1718:2, 1718:3, 1718:6, 1718:7, 1719:15, 1719:17, 1720:4, 1724:7, 1726:1, 1726:5, 1727:17, 1727:20, 1727:21, 1728:15, 1728:16, 1729:14, 1729:16, 1729:18, 1730:20, 1730:24, 1731:7, 1731:8, 1731:12, 1732:11, 1732:12, 1732:19, 1732:23, 1733:1, 1733:3, 1733:10, 1733:18, 1734:17, 1735:17, 1735:19, 1735:22, 1735:24, 1736:20, 1737:14, 1737:15, 1738:8, 1738:9, 1738:15, 1738:18, 1739:11, 1741:3, 1741:5, 1741:8
**billable** [1] - 1702:12
**billed** [4] - 1719:13, 1724:3, 1729:25, 1735:18
**billing** [11] - 1702:4, 1703:19, 1705:16, 1706:7, 1709:9, 1712:4, 1712:7, 1712:9, 1718:1, 1720:1, 1724:5
**billings** [2] - 1721:18, 1731:3
**bills** [19] - 1702:15, 1706:10, 1709:14, 1709:15, 1709:16, 1709:19, 1712:2, 1719:17, 1724:2, 1730:6, 1730:15, 1730:18, 1732:15, 1733:13, 1736:16, 1739:4, 1739:13
**binder** [3] - 1709:23, 1712:13, 1712:15
**bit** [2] - 1675:14, 1731:2
**Black** [1] - 1708:4
**blogging** [1] - 1772:4
**Bloomberg** [11] - 1742:19, 1754:18, 1755:18, 1755:19, 1755:23, 1755:24, 1757:24, 1759:8, 1759:13, 1761:10, 1768:5
**blow** [1] - 1731:18
**blue** [2] - 1674:6
**Bob** [1] - 1696:3
**body** [1] - 1679:16
**books** [22] - 1700:20, 1713:7, 1713:21, 1714:13, 1715:4, 1716:21, 1717:8, 1717:12, 1717:15, 1719:21, 1725:25, 1727:7, 1728:9, 1728:14, 1729:5, 1733:21, 1733:25, 1734:10, 1735:4, 1735:12, 1735:16, 1741:13
**boss** [1] - 1698:21
**bottom** [12] - 1675:4, 1680:3, 1680:5, 1686:14, 1686:15, 1686:20, 1688:20, 1714:19, 1714:20, 1753:22, 1774:10
**Bradley** [1] - 1669:16
**break** [3] - 1720:14, 1772:1, 1772:16
**briefly** [3] - 1700:15, 1701:14, 1746:11
**bring** [4] - 1672:8, 1698:6, 1720:23,

1779:24
**bringing** [1] - 1750:16
**British** [1] - 1745:11
**broadly** [1] - 1748:2
**brought** [1] - 1777:19
**building** [1] - 1755:6
**bullet** [6] - 1758:22, 1759:8, 1760:25, 1774:16, 1774:24, 1777:18
**bulleted** [1] - 1775:19
**burying** [1] - 1777:5
**business** [4] - 1702:5, 1702:7, 1746:11, 1755:16
**Business** [1] - 1700:2
**businesses** [1] - 1746:15
**businessman** [1] - 1707:21
**businessmen** [1] - 1764:9
**BY** [39] - 1672:23, 1674:9, 1681:21, 1693:6, 1694:8, 1697:4, 1697:19, 1698:3, 1698:17, 1699:11, 1708:22, 1710:1, 1711:11, 1712:11, 1712:23, 1731:25, 1732:10, 1737:8, 1739:18, 1740:9, 1740:15, 1744:9, 1744:25, 1748:10, 1749:9, 1756:25, 1757:10, 1757:15, 1758:12, 1758:21, 1760:17, 1762:18, 1763:7, 1764:15, 1765:5, 1765:12, 1766:5, 1766:20, 1767:23

## C

**C-A-T-H-E-R-I-N-E** [1] - 1673:6
**California** [1] - 1744:17
**Campoamor** [1] - 1669:12
**CAMPOAMOR** [14] - 1672:7, 1672:14, 1672:21, 1672:23, 1674:9, 1681:9, 1681:15, 1681:21, 1693:3, 1693:6, 1694:3, 1696:22, 1698:14, 1698:25
**Campoamor-Sanchez** [1] - 1669:12
**CAMPOAMOR-SANCHEZ** [14] - 1672:7, 1672:14, 1672:21, 1672:23, 1674:9, 1681:9, 1681:15, 1681:21, 1693:3, 1693:6, 1694:3, 1696:22, 1698:14, 1698:25
**capability** [1] - 1694:19
**care** [7] - 1715:19, 1725:2, 1725:7, 1725:16, 1727:2, 1728:5, 1728:24
**career** [2] - 1700:6, 1700:7
**Case** [1] - 1672:4
**case** [9] - 1672:12, 1676:10, 1708:21, 1726:22, 1772:8, 1774:3, 1777:13, 1780:12
**cases** [1] - 1755:7
**cash** [3] - 1700:20, 1734:14, 1736:4
**Catherine** [4] - 1671:5, 1672:15, 1672:17, 1673:3
**Catie** [3] - 1675:16, 1680:13, 1687:23
**caution** [1] - 1772:3
**cell** [1] - 1680:19
**Center** [2] - 1747:22, 1748:11, 1748:22, 1762:24
**Centre** [1] - 1752:22

**Centre@MercuryLLC.com** [1] - 1752:23
**certain** [1] - 1698:20
**certainly** [8] - 1718:5, 1721:24, 1724:19, 1729:22, 1736:2, 1736:3, 1741:9, 1769:14
**CERTIFICATE** [1] - 1781:1
**certify** [1] - 1781:3
**CFO** [1] - 1701:15
**challenged** [1] - 1773:24
**change** [4] - 1677:5, 1689:16, 1746:2, 1747:10
**changed** [3] - 1676:20, 1676:21, 1701:13
**changes** [7] - 1689:4, 1689:7, 1691:15, 1691:21, 1751:3, 1751:4
**characterization** [4] - 1772:25, 1773:19, 1774:12, 1778:8
**characterized** [1] - 1774:17
**charge** [3] - 1702:9, 1702:13, 1705:3
**charged** [1] - 1729:17
**charges** [12] - 1703:5, 1704:25, 1705:2, 1726:13, 1727:14, 1728:12, 1729:11, 1732:24, 1734:8, 1736:2, 1736:4
**charitable** [1] - 1722:9
**check** [1] - 1707:24
**checking** [1] - 1709:1
**chief** [2] - 1721:15, 1724:16
**Chinese** [1] - 1745:23
**chooses** [1] - 1721:23
**chosen** [1] - 1754:23
**circumstances** [3] - 1692:16, 1704:4, 1710:23
**Citi** [1] - 1708:17
**City** [1] - 1680:18
**Claire** [3] - 1742:5, 1742:10, 1744:2
**clarity** [1] - 1774:4
**clear** [4] - 1679:23, 1685:14, 1777:22, 1778:20
**CLERK** [2] - 1672:3, 1709:24
**client** [77] - 1701:19, 1702:1, 1702:2, 1702:3, 1702:15, 1702:23, 1702:24, 1703:2, 1703:3, 1703:6, 1703:11, 1703:12, 1703:21, 1703:25, 1704:4, 1704:18, 1704:19, 1704:20, 1704:21, 1705:1, 1705:8, 1705:10, 1705:11, 1705:21, 1705:25, 1706:3, 1708:1, 1708:17, 1708:24, 1709:6, 1709:21, 1711:4, 1711:10, 1713:1, 1713:2, 1713:9, 1713:10, 1713:12, 1713:24, 1714:9, 1714:15, 1714:25, 1715:6, 1715:15, 1716:7, 1716:16, 1716:23, 1717:11, 1718:12, 1718:20, 1720:3, 1720:5, 1720:7, 1720:8, 1721:21, 1721:23, 1722:8, 1722:9, 1722:14, 1722:19, 1722:22, 1723:1, 1723:8, 1723:10, 1723:18, 1729:18, 1737:6, 1747:20, 1747:22, 1749:1, 1749:11, 1749:16, 1749:18, 1749:19, 1752:5,

1762:23
  **Client** [1] - 1708:16
  **client's** [2] - 1755:14, 1768:20
  **clients** [11] - 1702:20, 1703:24,
1704:6, 1721:20, 1746:16, 1746:20,
1746:22, 1747:17, 1747:18, 1749:1,
1752:25
  **Cliff** [2] - 1684:15, 1687:15
  **climate** [1] - 1746:1
  **close** [2] - 1743:15, 1764:10
  **closer** [3] - 1748:4, 1748:8, 1750:19
  **closing** [1] - 1776:22
  **coalitions** [1] - 1746:17
  **collect** [1] - 1721:22
  **collected** [1] - 1724:4
  **collection** [1] - 1702:4
  **collections** [1] - 1724:15
  **college** [3] - 1699:23, 1700:8, 1700:10
  **COLUMBIA** [2] - 1669:1, 1669:14
  **Columbia** [2] - 1700:3, 1745:11
  **column** [1] - 1754:10
  **coming** [6] - 1700:20, 1714:1,
1737:24, 1750:17, 1754:22, 1760:6
  **comments** [1] - 1687:24
  **communicate** [2] - 1767:3, 1772:7
  **communicating** [1] - 1678:1
  **communications** [8] - 1672:12,
1744:19, 1745:1, 1745:3, 1745:5,
1745:8, 1750:8, 1750:12
  **company** [3] - 1700:19, 1700:21,
1700:22
  **competitors** [1] - 1755:7
  **completely** [2] - 1734:24, 1765:3
  **complex** [1] - 1755:3
  **COMPOAMOR** [1] - 1697:25
  **COMPOAMOR-SANCHEZ** [1] -
1697:25
  **computer** [1] - 1670:6
  **computer-aided** [1] - 1670:6
  **concern** [1] - 1777:21
  **concerned** [1] - 1688:11
  **concerns** [1] - 1750:14
  **conclusion** [4] - 1774:10, 1775:8,
1778:10, 1778:11
  **conclusions** [9] - 1774:11, 1775:15,
1775:19, 1776:7, 1776:8, 1777:22,
1779:16, 1779:18, 1779:21
  **conference** [12] - 1743:6, 1756:1,
1756:2, 1756:5, 1758:6, 1766:21,
1767:18, 1767:22, 1767:24, 1767:25,
1768:1, 1770:13
  **confirm** [3] - 1705:11, 1719:6, 1729:21
  **confirmed** [1] - 1705:16
  **confirming** [1] - 1685:18
  **confusing** [1] - 1774:1
  **congressman** [1] - 1696:18
  **connection** [5] - 1699:22, 1707:22,
1710:18, 1737:11, 1751:19
  **Connolly** [1] - 1695:9

  **consider** [2] - 1708:20, 1773:3
  **considering** [1] - 1750:16
  **consistently** [1] - 1751:1
  **Constitution** [1] - 1670:4
  **consultant** [1] - 1710:20
  **consultants** [3] - 1737:4, 1753:15,
1753:16
  **consultants'** [2] - 1752:14, 1753:14
  **consumed** [1] - 1734:24
  **contact** [2] - 1677:8, 1748:13
  **contacts** [1] - 1749:19
  **contemplating** [1] - 1775:21
  **content** [1] - 1776:10
  **contents** [1] - 1745:5
  **context** [2] - 1767:2, 1771:7
  **continue** [3] - 1701:2, 1748:23,
1778:19
  **continued** [2] - 1701:16, 1773:15
  **contrast** [1] - 1779:18
  **control** [2] - 1703:22, 1778:14
  **Controller** [3] - 1701:4, 1701:10,
1701:18
  **conversation** [1] - 1756:4
  **convert** [1] - 1694:19
  **conviction** [2] - 1710:23, 1775:3
  **copied** [1] - 1680:6
  **copy** [5] - 1678:2, 1678:10, 1678:19,
1684:2, 1686:9
  **copying** [3] - 1682:11, 1686:18,
1688:22
  **Corbett** [3] - 1680:7, 1680:15, 1680:21
  **corners** [1] - 1755:5
  **correct** [60] - 1674:17, 1675:17,
1677:22, 1680:16, 1682:2, 1682:4,
1682:12, 1683:9, 1683:18, 1685:21,
1685:24, 1686:3, 1686:11, 1687:7,
1687:14, 1688:25, 1689:19, 1694:17,
1701:1, 1703:15, 1710:3, 1716:14,
1718:8, 1718:11, 1722:2, 1722:6,
1722:14, 1722:15, 1725:8, 1725:12,
1726:15, 1727:23, 1728:17, 1728:18,
1729:13, 1729:15, 1732:13, 1733:17,
1733:25, 1734:9, 1734:24, 1734:25,
1735:8, 1738:7, 1739:21, 1743:11,
1743:14, 1743:17, 1743:22, 1753:21,
1763:18, 1765:17, 1766:13, 1766:14,
1767:17, 1768:2, 1768:17, 1768:18,
1769:20, 1781:4
  **correctly** [4] - 1677:18, 1681:1,
1684:4, 1704:2, 1768:25, 1769:1
  **correspondent** [1] - 1745:21
  **cost** [1] - 1736:11
  **Council** [1] - 1746:1
  **Counsel** [2] - 1695:12, 1696:4
  **counsel** [3] - 1720:19, 1774:19,
1774:21
  **Counsel's** [2] - 1695:14, 1695:24
  **couple** [2] - 1694:11, 1722:3
  **course** [4] - 1700:7, 1747:21, 1750:1,
1751:14

  **Court** [4] - 1670:3, 1742:8, 1742:9,
1742:20
  **COURT** [103] - 1669:1, 1672:6, 1672:8,
1672:10, 1672:16, 1672:20, 1674:7,
1681:13, 1681:17, 1681:19, 1693:4,
1694:5, 1696:23, 1697:1, 1697:3,
1697:7, 1697:11, 1697:15, 1697:18,
1698:2, 1698:16, 1698:24, 1699:1,
1699:4, 1707:15, 1707:18, 1708:19,
1711:7, 1712:7, 1712:16, 1720:10,
1720:14, 1720:19, 1720:23, 1720:25,
1731:20, 1731:23, 1732:8, 1736:23,
1739:16, 1740:7, 1740:13, 1741:22,
1742:1, 1742:3, 1742:25, 1743:5,
1743:9, 1743:12, 1743:15, 1743:18,
1743:23, 1744:3, 1744:21, 1748:7,
1749:4, 1749:6, 1756:23, 1757:4,
1757:7, 1758:8, 1758:19, 1759:25,
1760:2, 1762:16, 1763:5, 1764:2,
1764:6, 1764:11, 1764:14, 1765:1,
1765:9, 1766:2, 1766:13, 1766:17,
1766:19, 1767:22, 1770:4, 1770:6,
1770:17, 1770:21, 1771:2, 1771:7,
1771:21, 1771:23, 1772:1, 1772:15,
1775:24, 1776:1, 1776:5, 1776:15,
1776:19, 1777:3, 1777:24, 1778:7,
1778:22, 1778:25, 1779:13, 1779:20,
1780:3, 1780:6, 1780:14, 1781:1
  **court** [4] - 1681:11, 1743:25, 1760:16,
1771:18
  **Court's** [2] - 1693:3, 1777:21
  **Courthouse** [1] - 1670:3
  **courtroom** [2] - 1674:2, 1779:1
  **cover** [7] - 1713:17, 1714:11, 1715:14,
1724:24, 1724:25, 1728:20, 1736:25
  **covered** [1] - 1746:1
  **Craig** [80] - 1672:5, 1673:23, 1675:13,
1676:2, 1676:8, 1676:17, 1676:25,
1677:8, 1677:13, 1678:1, 1678:2,
1678:7, 1678:20, 1679:3, 1679:24,
1680:6, 1680:17, 1681:7, 1681:12,
1681:23, 1682:11, 1682:23, 1683:12,
1687:21, 1688:6, 1688:11, 1688:14,
1688:21, 1689:12, 1689:21, 1690:19,
1691:1, 1694:12, 1694:14, 1694:18,
1695:2, 1695:4, 1695:20, 1695:25,
1696:2, 1696:8, 1696:12, 1696:21,
1696:24, 1697:20, 1698:4, 1698:9,
1698:11, 1698:18, 1698:21, 1706:8,
1706:12, 1710:11, 1715:22, 1720:1,
1721:10, 1721:11, 1732:2, 1732:5,
1741:18, 1751:11, 1751:12, 1751:15,
1758:25, 1759:2, 1759:5, 1759:10,
1759:14, 1759:21, 1760:12, 1760:18,
1760:20, 1761:10, 1761:25, 1762:3,
1769:12, 1776:2, 1776:9, 1778:3,
1778:20
  **CRAIG** [1] - 1669:5
  **Craig's** [10] - 1674:10, 1675:19,
1689:8, 1692:11, 1692:14, 1692:19,

1696:25, 1697:5, 1739:9, 1762:21
**create** [1] - 1746:21
**created** [8] - 1742:14, 1742:15, 1757:2, 1757:5, 1757:7, 1757:9, 1757:11, 1759:20
**creating** [1] - 1704:21
**creation** [1] - 1756:21
**credibility** [2] - 1770:10, 1773:16
**credible** [3] - 1751:7, 1765:16, 1768:24
**credit** [1] - 1714:1
**Criminal** [2] - 1669:4, 1672:3
**critical** [1] - 1694:2
**criticized** [1] - 1765:25
**CROSS** [4] - 1671:4, 1694:7, 1721:5, 1762:17
**cross** [7] - 1694:5, 1720:10, 1721:2, 1743:20, 1762:16, 1778:14, 1779:16
**cross-examination** [4] - 1694:5, 1720:10, 1721:2, 1778:14
**CROSS-EXAMINATION** [3] - 1694:7, 1721:5, 1762:17
**cross-examine** [1] - 1779:16
**cross-examined** [1] - 1743:20
**CRR** [1] - 1670:3
**current** [3] - 1750:7, 1750:14, 1751:5
**cut** [1] - 1755:5
**Cyprus** [2] - 1708:5

## D

**D.C** [11] - 1669:6, 1670:4, 1677:18, 1699:23, 1699:25, 1722:21, 1749:25, 1752:14, 1753:14, 1753:15, 1753:16
**daily** [1] - 1702:19
**date** [24] - 1677:15, 1679:15, 1682:3, 1689:17, 1689:23, 1690:7, 1691:7, 1691:18, 1692:23, 1700:13, 1707:8, 1710:5, 1713:15, 1713:16, 1715:16, 1718:3, 1719:6, 1725:4, 1729:16, 1735:15, 1737:21, 1737:24, 1752:15, 1761:14
**DATE** [1] - 1781:9
**dated** [15] - 1682:13, 1683:14, 1698:5, 1711:13, 1714:6, 1716:12, 1718:18, 1725:13, 1726:24, 1728:1, 1730:6, 1730:24, 1733:15, 1735:8, 1738:9
**dates** [4] - 1688:1, 1688:16, 1708:6, 1709:1
**David** [5] - 1677:8, 1689:3, 1757:23, 1768:9, 1768:10
**DAY** [1] - 1669:5
**day-to-day** [1] - 1724:19
**days** [2] - 1742:17, 1743:7
**DC** [3] - 1669:15, 1669:17, 1669:25
**deal** [1] - 1758:24
**debated** [1] - 1778:23
**December** [13] - 1679:1, 1679:18, 1682:3, 1682:7, 1682:13, 1684:2, 1686:8, 1690:7, 1733:24, 1734:3,

1735:3, 1735:19, 1769:17
**decide** [1] - 1779:5
**deemed** [1] - 1755:15
**defendant** [2] - 1674:8, 1775:9
**Defendant** [2] - 1669:6, 1669:19
**defense** [1] - 1773:6
**deliberately** [1] - 1773:8
**deliver** [4] - 1678:2, 1678:19, 1705:9, 1705:10
**delivered** [1] - 1678:11
**demand** [1] - 1744:23
**Democratic** [1] - 1753:8
**democratic** [1] - 1753:11
**demonstrated** [1] - 1776:11
**department** [5] - 1701:19, 1701:20, 1701:21
**DEPARTMENT** [1] - 1669:16
**deposit** [1] - 1707:6
**deposited** [4] - 1708:1, 1708:16, 1722:17, 1734:23
**DEPUTY** [2] - 1672:3, 1709:24
**der** [1] - 1679:11
**describe** [4] - 1700:16, 1701:14, 1706:20, 1746:11
**described** [1] - 1708:15
**describes** [1] - 1775:17
**describing** [1] - 1773:7
**description** [1] - 1763:15
**detail** [1] - 1704:24
**detailed** [3] - 1720:4, 1727:21, 1736:1
**determine** [1] - 1776:23
**determined** [1] - 1776:12
**development** [2] - 1756:16, 1756:24
**dial** [1] - 1752:13
**dial-in** [1] - 1752:13
**difference** [2] - 1777:4, 1779:3
**different** [5] - 1700:6, 1715:9, 1722:3, 1747:17, 1756:2
**difficult** [4] - 1721:22, 1774:2, 1778:16, 1778:17
**diligence** [2] - 1755:1, 1755:5
**diminishing** [1] - 1712:16
**DIRECT** [4] - 1671:4, 1672:22, 1699:10, 1744:8
**direct** [6] - 1674:18, 1675:2, 1677:11, 1680:2, 1743:4, 1752:7
**direction** [6] - 1692:20, 1742:15, 1743:12, 1747:15, 1747:16, 1772:17
**directions** [1] - 1678:9
**directly** [3] - 1679:6, 1688:12, 1724:14
**director** [5] - 1744:19, 1745:1, 1745:9, 1747:1, 1747:6
**Director/CFO** [1] - 1701:13
**disagrees** [1] - 1777:8
**disbursements** [13] - 1705:1, 1712:21, 1713:7, 1724:3, 1726:13, 1727:15, 1728:12, 1729:11, 1732:17, 1732:24, 1734:8, 1736:5, 1741:12
**discourse** [1] - 1746:23

**discuss** [5] - 1679:24, 1743:7, 1752:14, 1753:22, 1772:6
**discussed** [3] - 1712:19, 1758:5, 1773:21
**discussing** [1] - 1707:3
**discussion** [1] - 1769:25
**discussions** [1] - 1698:18
**disingenuous** [2] - 1773:8, 1777:6
**dispose** [1] - 1774:24
**distinct** [1] - 1703:22
**distribute** [2] - 1683:24, 1720:5
**distribution** [1] - 1715:14
**DISTRICT** [4] - 1669:1, 1669:1, 1669:10, 1669:14
**distrusted** [1] - 1778:3
**document** [30] - 1684:14, 1684:22, 1684:24, 1691:5, 1691:14, 1692:3, 1694:16, 1694:20, 1706:18, 1710:2, 1740:19, 1742:14, 1742:17, 1743:8, 1756:14, 1756:17, 1756:20, 1756:21, 1756:24, 1757:2, 1757:5, 1757:21, 1758:1, 1759:3, 1761:13, 1761:18, 1761:25, 1762:2, 1769:5, 1775:11
**documents** [7] - 1682:21, 1686:19, 1686:21, 1686:22, 1706:5, 1724:12, 1770:12
**dollar** [1] - 1725:20
**dollars** [3] - 1729:22, 1740:4, 1741:19
**done** [5] - 1701:17, 1726:3, 1738:24, 1739:6, 1780:11
**donor** [1] - 1745:4
**door** [2] - 1683:3, 1683:8
**double** [1] - 1709:1
**double-checking** [1] - 1709:1
**Douglas** [7] - 1707:25, 1708:18, 1715:20, 1725:2, 1725:7, 1725:16, 1728:5
**down** [5] - 1681:7, 1682:20, 1692:22, 1747:13, 1758:23
**draft** [5] - 1689:6, 1689:10, 1690:8, 1772:22
**drafted** [1] - 1694:20
**drafting** [2] - 1756:7, 1756:10
**draw** [1] - 1773:18
**drawing** [2] - 1712:17, 1712:20
**drew** [1] - 1776:7
**due** [18] - 1710:13, 1710:17, 1711:22, 1711:23, 1711:24, 1714:20, 1714:22, 1717:3, 1733:8, 1734:22, 1738:15, 1738:20, 1739:21, 1741:4, 1741:19, 1755:1, 1755:4, 1774:20
**duly** [3] - 1672:18, 1699:8, 1744:6
**during** [13] - 1673:22, 1674:10, 1698:8, 1711:20, 1717:2, 1717:9, 1718:23, 1723:12, 1727:23, 1747:21, 1750:1, 1768:1, 1780:4

## E

**e-mail** [50] - 1674:21, 1675:4, 1675:5,

1675:6, 1675:8, 1675:10, 1675:12, 1675:16, 1675:22, 1675:23, 1676:6, 1676:13, 1676:17, 1676:24, 1676:25, 1677:13, 1677:21, 1678:6, 1678:7, 1679:11, 1679:16, 1680:3, 1680:5, 1680:21, 1681:12, 1681:22, 1682:11, 1682:15, 1683:12, 1684:7, 1684:14, 1685:3, 1685:12, 1685:23, 1687:2, 1687:5, 1687:16, 1688:4, 1688:17, 1688:18, 1688:20, 1688:21, 1689:18, 1689:21, 1715:15, 1731:22, 1732:2, 1752:17, 1780:6

**e-mailing** [3] - 1674:24, 1675:11, 1772:4

**e-mails** [5] - 1674:19, 1680:4, 1680:20, 1686:13, 1698:4

**early** [4] - 1677:9, 1698:5, 1701:12, 1757:6

**earned** [9] - 1722:13, 1722:18, 1723:12, 1745:4, 1747:3, 1749:2, 1749:5, 1749:7, 1749:8

**East** [5] - 1669:20, 1697:6, 1697:17, 1697:21, 1698:9

**Eastern** [3] - 1698:12, 1761:2, 1761:8

**ECFMU** [13] - 1747:25, 1748:3, 1748:14, 1749:16, 1750:2, 1751:19, 1752:24, 1753:20, 1762:24, 1763:19, 1763:25, 1765:3, 1765:20

**Ed** [1] - 1749:12

**editor** [3] - 1755:22, 1755:23

**educated** [1] - 1771:5

**effect** [1] - 1743:8

**effective** [1] - 1729:18

**Egypt** [1] - 1698:13

**eight** [2] - 1673:18, 1673:20

**either** [8] - 1681:3, 1682:5, 1743:3, 1758:10, 1772:18, 1773:5, 1773:7, 1774:3

**election** [1] - 1751:4

**elephant** [1] - 1744:24

**elevate** [1] - 1757:17

**embargo** [3] - 1758:25, 1759:11, 1759:16

**embargoed** [1] - 1754:24

**enclosed** [1] - 1715:24

**end** [7] - 1690:12, 1709:4, 1723:2, 1723:17, 1724:10, 1735:22

**endangered** [1] - 1744:23

**ended** [2] - 1735:19, 1760:7

**Engage** [2] - 1754:1, 1754:3

**engagement** [13] - 1703:7, 1703:18, 1706:4, 1706:15, 1709:14, 1711:16, 1712:4, 1712:8, 1712:10, 1724:3, 1726:20, 1737:2, 1751:14

**engagements** [2] - 1702:12, 1702:21

**Engel** [2] - 1748:15, 1748:17

**ensure** [2] - 1754:19, 1755:12

**entire** [1] - 1775:10

**entirety** [1] - 1780:7

**entitled** [1] - 1781:5

**entity** [3] - 1708:4, 1721:22, 1762:24

**entries** [1] - 1727:22

**environment** [1] - 1746:21

**escrow** [56] - 1704:17, 1705:7, 1705:15, 1706:13, 1706:14, 1706:21, 1706:24, 1707:7, 1708:1, 1708:18, 1708:24, 1709:3, 1709:4, 1709:15, 1709:16, 1713:9, 1713:10, 1713:24, 1714:1, 1714:3, 1714:15, 1715:7, 1715:8, 1716:8, 1716:9, 1716:23, 1716:24, 1717:11, 1718:13, 1718:15, 1718:20, 1722:1, 1722:4, 1722:12, 1722:16, 1722:17, 1722:20, 1723:15, 1723:16, 1723:22, 1724:5, 1730:5, 1730:8, 1730:9, 1733:5, 1734:16, 1734:20, 1736:19, 1736:20, 1737:18, 1737:24, 1738:1, 1738:4, 1738:11, 1739:2, 1739:4

**Escrow** [1] - 1708:16

**Esq** [4] - 1669:19, 1669:19, 1669:22, 1669:23

**essentially** [1] - 1677:2

**established** [2] - 1706:13, 1706:14

**estate** [1] - 1701:19

**etc** [1] - 1746:14

**EU** [2] - 1750:16, 1750:20

**European** [7] - 1747:22, 1748:4, 1748:7, 1748:11, 1748:22, 1762:24, 1763:16

**evening** [4] - 1772:2, 1772:3, 1772:10, 1772:16

**event** [1] - 1752:9

**eventually** [2] - 1739:5, 1762:9

**evidence** [22] - 1675:3, 1677:12, 1679:10, 1680:3, 1681:10, 1681:19, 1681:20, 1682:10, 1683:11, 1684:7, 1688:19, 1693:8, 1708:21, 1760:4, 1774:7, 1775:4, 1775:10, 1776:23, 1780:3, 1780:4, 1780:7, 1780:8

**exact** [2] - 1732:18, 1733:11

**exactly** [2] - 1759:4, 1775:14

**EXAMINATION** [7] - 1672:22, 1694:7, 1699:10, 1721:5, 1739:17, 1744:8, 1762:17

**examination** [5] - 1694:5, 1720:10, 1721:2, 1762:16, 1778:14

**examine** [1] - 1779:16

**examined** [4] - 1672:18, 1699:8, 1743:20, 1744:6

**example** [2] - 1691:19, 1698:6

**excellent** [1] - 1772:1

**exchanges** [1] - 1674:21

**exclusive** [2] - 1754:24, 1757:22

**exclusivity** [3] - 1758:24, 1759:7, 1760:10

**excuse** [2] - 1769:8, 1772:9

**excused** [6] - 1699:2, 1699:3, 1741:22, 1741:25, 1771:24, 1771:25

**executive** [3] - 1774:14, 1775:13, 1777:18

**Executive** [1] - 1701:13

**Exhibit** [47] - 1675:2, 1677:11, 1678:5, 1679:9, 1683:10, 1686:1, 1686:12, 1690:11, 1693:9, 1698:5, 1698:6, 1706:17, 1707:19, 1709:23, 1712:13, 1712:24, 1713:11, 1714:5, 1714:24, 1715:9, 1716:11, 1716:25, 1718:6, 1719:7, 1719:24, 1723:4, 1724:21, 1725:14, 1726:23, 1727:25, 1728:19, 1730:21, 1731:15, 1733:14, 1737:20, 1737:23, 1738:15, 1738:20, 1738:25, 1739:8, 1739:19, 1740:20, 1741:1, 1752:7, 1756:13, 1769:6

**EXHIBIT** [1] - 1671:12

**exhibit** [10] - 1685:5, 1690:6, 1690:11, 1690:13, 1691:12, 1723:3, 1723:5, 1728:20, 1735:7, 1774:7

**exhibits** [2] - 1778:9, 1778:12

**existed** [1] - 1720:1

**expand** [2] - 1679:10, 1693:10

**expect** [2] - 1779:16, 1780:12

**expense** [1] - 1701:6

**expenses** [14] - 1702:17, 1714:11, 1715:2, 1717:13, 1718:9, 1719:14, 1724:1, 1724:7, 1726:12, 1726:14, 1727:14, 1727:19, 1728:13, 1732:24

**experience** [4] - 1682:22, 1694:19, 1745:10, 1750:25

**expiration** [1] - 1759:1

**explain** [2] - 1750:7, 1760:10

**explore** [1] - 1779:7

**expressed** [1] - 1764:23

**extent** [1] - 1770:9

**external** [1] - 1745:3

**eye** [1] - 1773:13

## F

**fact** [15] - 1678:19, 1717:9, 1724:6, 1732:1, 1741:15, 1742:21, 1763:19, 1763:23, 1767:14, 1770:1, 1770:22, 1773:15, 1774:6, 1778:2, 1778:4

**facts** [3] - 1707:20, 1708:20, 1710:22

**fair** [7] - 1751:6, 1765:16, 1768:23, 1776:24, 1778:7, 1778:15

**fairly** [2] - 1725:10, 1775:5

**fall** [4] - 1698:19, 1747:12, 1752:2, 1774:4

**false** [1] - 1770:16

**familiar** [4] - 1674:23, 1696:15, 1697:5, 1697:13

**far** [2] - 1688:11, 1780:5

**FARA** [2] - 1684:16, 1689:2

**February** [5] - 1733:15, 1733:23, 1736:3, 1738:15, 1738:18

**fee** [1] - 1712:17

**fees** [9] - 1726:10, 1727:11, 1736:8, 1736:14, 1736:23, 1736:25, 1737:1, 1737:4, 1737:7

**fell** [1] - 1774:20

**Fernando** [1] - 1669:12
**few** [7] - 1682:21, 1687:24, 1742:17, 1745:19, 1747:13, 1762:22, 1772:19
**fifty** [1] - 1733:6
**figure** [1] - 1779:22
**final** [13] - 1682:23, 1683:2, 1683:4, 1683:5, 1683:7, 1683:16, 1689:6, 1690:1, 1694:15, 1694:16, 1703:9, 1706:10
**Finalize** [1] - 1754:11
**finalizing** [1] - 1710:21
**finally** [2] - 1680:24, 1689:20
**finance** [2] - 1703:19, 1705:22
**finances** [1] - 1701:2
**financial** [5] - 1701:6, 1701:24, 1701:25, 1721:15, 1724:16
**financials** [1] - 1700:21
**fine** [2] - 1720:16, 1779:20
**fins** [1] - 1744:24
**firm** [21] - 1674:16, 1683:23, 1684:2, 1686:8, 1695:22, 1701:25, 1704:19, 1721:12, 1721:17, 1721:19, 1722:7, 1723:23, 1726:7, 1737:3, 1737:5, 1740:2, 1740:8, 1753:6, 1766:23, 1769:25, 1771:3
**firm's** [2] - 1687:3, 1706:9
**firms** [2] - 1722:4, 1767:8
**first** [38] - 1674:20, 1675:3, 1675:4, 1677:6, 1678:6, 1680:3, 1680:4, 1680:7, 1682:22, 1683:25, 1686:6, 1690:13, 1692:2, 1693:22, 1695:8, 1700:9, 1707:4, 1707:6, 1710:14, 1711:19, 1715:10, 1715:13, 1715:14, 1715:18, 1715:23, 1724:21, 1725:20, 1742:10, 1742:11, 1742:23, 1752:3, 1754:10, 1754:20, 1757:20, 1757:22, 1758:22, 1770:21, 1772:20
**fit** [1] - 1694:21
**five** [3] - 1733:6, 1747:9, 1775:14
**fixed** [1] - 1712:22
**flat** [1] - 1712:17
**float** [1] - 1767:19
**floated** [6] - 1756:3, 1758:2, 1758:3, 1758:8, 1768:2, 1768:8
**flying** [1] - 1680:18
**focus** [5] - 1675:3, 1709:22, 1712:3, 1747:20, 1757:20
**focusing** [9] - 1712:24, 1716:25, 1752:8, 1753:10, 1754:20, 1758:22, 1760:25, 1761:20, 1765:19
**focussing** [1] - 1700:15
**fold** [1] - 1750:17
**folks** [1] - 1732:2
**follow** [3] - 1678:22, 1755:9, 1774:2
**following** [8] - 1676:3, 1676:20, 1677:25, 1707:20, 1707:23, 1755:9, 1761:16, 1761:22
**follows** [4] - 1672:19, 1691:3, 1699:9, 1744:7
**FOR** [2] - 1669:1, 1669:13

**for-profits** [1] - 1746:18
**foregoing** [1] - 1781:4
**foreign** [2] - 1721:22, 1746:18
**form** [11] - 1682:23, 1683:16, 1690:1, 1694:15, 1694:16, 1694:20, 1694:25, 1712:6, 1739:11, 1762:12, 1777:23
**format** [1] - 1683:5
**former** [1] - 1696:17
**forth** [1] - 1710:17
**forwarding** [3] - 1675:18, 1676:7, 1677:2
**forwards** [1] - 1742:18
**foster** [3] - 1748:4, 1748:7, 1750:19
**foundation** [1] - 1731:21
**four** [3] - 1708:3, 1734:3, 1734:5
**Fourth** [1] - 1669:14
**frame** [2] - 1674:22, 1718:23
**Framing** [1] - 1693:23
**frankly** [1] - 1742:11
**Friday** [1] - 1753:23
**friend** [1] - 1755:20
**front** [6] - 1704:10, 1775:21, 1776:20, 1777:3, 1779:17, 1779:18
**FTI** [4] - 1766:24, 1767:1, 1767:3, 1767:16
**full** [2] - 1702:16, 1704:1
**fully** [6] - 1714:2, 1714:3, 1718:12, 1718:14, 1733:9, 1779:16
**function** [14] - 1702:22, 1703:13, 1703:17, 1703:20, 1709:6, 1709:18, 1711:5, 1713:1, 1713:13, 1714:9, 1714:25, 1716:17, 1724:15, 1745:2
**functional** [1] - 1701:15
**functions** [4] - 1701:5, 1701:23, 1701:24, 1705:22
**fund** [1] - 1722:9
**funded** [1] - 1764:9
**funds** [20] - 1708:1, 1714:15, 1715:6, 1715:8, 1716:7, 1716:9, 1717:10, 1717:20, 1718:12, 1718:19, 1719:1, 1721:25, 1722:17, 1723:8, 1724:5, 1736:21, 1737:16, 1737:19, 1738:1, 1739:3
**future** [1] - 1721:17

**G**

**Gaston** [1] - 1669:13
**Gates** [10] - 1681:6, 1681:25, 1742:23, 1743:1, 1743:7, 1748:16, 1748:18, 1749:19, 1753:25, 1764:13
**gates** [12] - 1742:10, 1742:12, 1742:16, 1742:21, 1743:16, 1743:19, 1763:24, 1764:23, 1766:23, 1767:15, 1779:15
**gathered** [1] - 1772:11
**general** [10] - 1676:9, 1701:5, 1701:6, 1701:17, 1702:10, 1702:11, 1703:2, 1719:15, 1738:3, 1745:17
**generally** [6] - 1676:2, 1700:17,

1706:20, 1744:16, 1753:10, 1755:3
**generate** [1] - 1703:1
**generated** [3] - 1709:18, 1709:19, 1709:20
**generating** [1] - 1702:23
**gentleman** [1] - 1696:14
**Georgetown** [2] - 1699:24, 1700:1
**given** [7] - 1676:2, 1703:10, 1726:21, 1740:3, 1742:21, 1758:11, 1771:10
**glad** [1] - 1687:12
**global** [1] - 1744:22
**goal** [3] - 1765:15, 1765:22, 1768:16
**Government** [18] - 1669:12, 1681:20, 1698:6, 1706:16, 1707:19, 1709:22, 1712:12, 1712:24, 1713:11, 1714:24, 1716:11, 1716:25, 1718:6, 1719:7, 1719:24, 1731:15, 1752:7, 1756:12
**GOVERNMENT** [1] - 1671:12
**government** [30] - 1672:15, 1684:1, 1686:8, 1699:5, 1706:1, 1707:2, 1708:11, 1708:14, 1709:7, 1709:12, 1710:18, 1713:18, 1714:5, 1723:20, 1741:16, 1744:1, 1746:13, 1749:15, 1751:3, 1751:22, 1751:23, 1753:7, 1753:17, 1763:13, 1764:10, 1765:4, 1777:8, 1779:23, 1780:1, 1780:11
**Government's** [10] - 1675:2, 1677:11, 1678:5, 1679:9, 1681:10, 1683:10, 1686:1, 1686:12, 1690:11, 1693:9
**governments** [1] - 1746:18
**graduated** [1] - 1700:5
**grand** [6] - 1727:17, 1728:16, 1729:14, 1733:3, 1733:4, 1734:12
**great** [2] - 1707:12, 1757:17
**Greg** [23] - 1675:15, 1676:17, 1676:19, 1679:17, 1684:16, 1687:23, 1688:8, 1706:8, 1706:12, 1710:11, 1715:22, 1751:11, 1751:12, 1751:15, 1758:25, 1759:2, 1759:5, 1759:10, 1759:14, 1760:12, 1760:18, 1760:20, 1761:9
**Greg's** [2] - 1684:24, 1692:1
**Gregory** [3] - 1672:4, 1673:22, 1691:1
**GREGORY** [1] - 1669:5
**gritty** [1] - 1775:12
**Group** [1] - 1767:15
**group** [11] - 1702:3, 1702:24, 1703:3, 1703:21, 1705:9, 1705:11, 1709:11, 1709:21, 1711:10, 1713:3, 1724:18
**Gulland** [1] - 1669:13

**H**

**half** [4] - 1775:14, 1775:18, 1775:19
**hand** [2] - 1678:11, 1704:8
**hand-delivered** [1] - 1678:11
**handing** [1] - 1771:5
**handle** [1] - 1742:10
**handled** [2] - 1768:25, 1769:1
**handwriting** [6] - 1690:21, 1691:5, 1691:23, 1691:25, 1692:13, 1693:11

**happy** [1] - 1680:13
**hard** [2] - 1678:10, 1779:22
**Haskell** [2] - 1679:12, 1682:11
**Hawker** [16] - 1674:21, 1675:6, 1675:11, 1675:18, 1675:21, 1676:15, 1767:6, 1776:8, 1776:12, 1776:18, 1776:24, 1778:2, 1778:3, 1778:13, 1778:21
**Hawker's** [2] - 1676:8, 1677:2
**head** [1] - 1733:12
**heading** [1] - 1686:4
**headings** [1] - 1690:3
**heads** [1] - 1771:11
**hear** [4] - 1722:23, 1757:13, 1760:6, 1766:15
**hearsay** [2] - 1770:7, 1770:8
**held** [2] - 1722:13, 1739:4
**hello** [1] - 1744:11
**help** [7] - 1693:13, 1746:14, 1746:22, 1749:3, 1750:7, 1755:8, 1755:16
**helping** [1] - 1751:21, 1752:5
**helps** [1] - 1745:10
**hi** [1] - 1699:17
**hierarchy** [1] - 1747:12
**higher** [1] - 1747:2
**highlight** [1] - 1742:8
**Hill** [1] - 1754:14
**hire** [1] - 1737:1
**hired** [2] - 1737:10, 1746:6
**history** [1] - 1723:4
**hold** [1] - 1743:18
**holding** [1] - 1722:7
**honest** [1] - 1687:12
**Honor** [31] - 1672:3, 1672:7, 1672:14, 1672:21, 1681:9, 1694:6, 1697:9, 1698:25, 1699:5, 1707:13, 1711:6, 1712:6, 1720:9, 1720:11, 1720:12, 1721:4, 1731:19, 1732:7, 1742:5, 1744:1, 1758:16, 1760:15, 1763:4, 1764:24, 1765:8, 1766:15, 1767:21, 1770:2, 1771:17, 1771:22, 1776:6
**HONORABLE** [1] - 1669:9
**Honorable** [1] - 1710:8
**hopefully** [2] - 1702:16, 1703:25
**horns** [1] - 1744:24
**hospitable** [1] - 1746:21
**hour** [1] - 1702:12
**hours** [5] - 1702:13, 1712:18, 1720:4, 1732:22
**House** [5] - 1695:12, 1695:14, 1695:17, 1695:24, 1696:4
**human** [1] - 1750:15
**hundred** [1] - 1726:21
**Hunt** [5] - 1742:18, 1755:20, 1755:21, 1757:23, 1768:6
**hunt** [2] - 1776:4, 1777:10

---

**I**

**idea** [1] - 1705:3

---

**identified** [2] - 1674:8, 1774:19
**identify** [2] - 1754:17, 1754:21
**identifying** [1] - 1761:13
**ii** [1] - 1708:8
**III** [1] - 1669:22
**iii** [1] - 1708:9
**imagine** [1] - 1726:21
**IMMA** [1] - 1722:24
**impartial** [3] - 1763:9, 1763:19, 1764:12
**implied** [1] - 1776:17
**important** [4] - 1721:16, 1750:13, 1778:18, 1779:25
**impossible** [1] - 1777:16
**Ina** [2] - 1748:15, 1748:17
**inaccuracy** [1] - 1773:19
**inaccurate** [1] - 1774:12
**inadvertently** [1] - 1773:8
**inbox** [1] - 1686:23
**include** [2] - 1683:19, 1723:11
**included** [8] - 1705:24, 1709:9, 1740:16, 1740:19, 1753:1, 1755:16, 1755:19, 1768:20
**including** [2] - 1758:24, 1774:21
**incurred** [2] - 1724:1, 1724:7
**independent** [2] - 1710:22, 1760:11
**indicate** [1] - 1756:20
**indicated** [2] - 1691:15, 1695:2
**indication** [5] - 1713:23, 1713:25, 1714:18, 1714:19, 1757:1
**individual** [1] - 1729:21
**individuals** [1] - 1753:3
**indulgence** [1] - 1693:3
**inferences** [1] - 1773:17
**inform** [1] - 1705:2
**information** [4] - 1680:22, 1740:4, 1740:10, 1742:22
**initial** [4] - 1701:8, 1721:11, 1755:9, 1756:7
**inquiry** [1] - 1710:22
**instance** [1] - 1721:25
**Institute** [2] - 1697:6, 1697:16
**instruction** [1] - 1683:6
**instructions** [10] - 1676:3, 1689:13, 1739:25, 1740:1, 1740:7, 1740:16, 1743:3, 1752:13, 1758:11, 1765:10
**insured** [2] - 1722:20, 1722:24
**integration** [2] - 1748:4, 1748:7
**intend** [1] - 1777:22
**intention** [2] - 1685:1, 1775:12
**interacts** [1] - 1703:13
**interest** [7] - 1722:8, 1722:13, 1722:18, 1722:25, 1723:11, 1738:5
**interest-bearing** [1] - 1738:5
**interests** [2] - 1763:12, 1765:7
**internal** [1] - 1745:3
**interpreters** [4] - 1732:15, 1736:12, 1736:17, 1737:9
**interview** [4] - 1693:15, 1759:10,

---

1760:18, 1761:9
**interviewed** [1] - 1759:14
**interviews** [3] - 1757:22, 1758:25, 1760:20
**introduce** [2] - 1699:14, 1744:12
**introduced** [1] - 1750:6
**investor** [1] - 1700:22
**invitation** [1] - 1752:18
**invoice** [49] - 1703:25, 1710:16, 1711:1, 1711:3, 1711:4, 1711:12, 1712:25, 1713:2, 1713:12, 1713:15, 1713:16, 1714:6, 1714:24, 1715:6, 1716:3, 1716:4, 1716:7, 1716:9, 1716:12, 1718:15, 1720:2, 1724:21, 1725:4, 1725:6, 1725:8, 1725:13, 1725:15, 1725:18, 1726:2, 1726:23, 1726:24, 1727:14, 1728:1, 1728:10, 1728:20, 1729:1, 1729:3, 1730:21, 1733:15, 1733:23, 1734:14, 1735:7, 1738:21, 1738:22, 1739:10, 1739:11, 1739:12, 1741:13
**invoices** [16] - 1709:9, 1709:12, 1709:19, 1709:20, 1711:16, 1715:24, 1716:5, 1720:7, 1720:8, 1724:20, 1729:21, 1731:6, 1731:11, 1736:24, 1739:13, 1741:6
**involved** [4] - 1697:23, 1726:20, 1737:13, 1770:19
**involving** [1] - 1698:12
**IOLA** [1] - 1722:5
**IOLTA** [2] - 1722:5, 1722:11
**irrelevant** [1] - 1697:15
**issuance** [2] - 1718:17
**issue** [11] - 1703:9, 1703:25, 1720:2, 1742:13, 1750:9, 1750:18, 1764:18, 1774:18, 1774:25, 1775:2, 1775:4
**issued** [3] - 1709:12, 1709:14, 1724:21
**issues** [1] - 1774:22
**Item** [1] - 1754:10
**item** [1] - 1754:10
**items** [2] - 1707:1, 1708:15
**itself** [6] - 1682:15, 1690:5, 1741:7, 1751:24, 1751:25, 1762:13
**ivory** [1] - 1744:24

---

**J**

**JACKSON** [1] - 1669:9
**James** [1] - 1669:19
**January** [3] - 1735:14, 1735:25, 1736:3
**Jason** [1] - 1669:16
**Jersey** [1] - 1699:21
**job** [4] - 1700:9, 1757:17, 1765:19, 1774:2
**jobs** [1] - 1700:8
**John** [2] - 1749:12, 1758:14
**joined** [5] - 1695:21, 1696:10, 1700:24, 1701:8, 1747:6
**Jonathan** [2] - 1674:21, 1767:6

1791

**journalism** [2] - 1745:11, 1745:14
**journalist** [1] - 1767:20
**journalists** [1] - 1694:2
**JUDGE** [1] - 1669:10
**judgment** [1] - 1773:13
**July** [18] - 1691:9, 1691:18, 1692:24, 1708:9, 1708:23, 1709:4, 1711:21, 1714:24, 1715:25, 1716:6, 1717:2, 1717:22, 1717:23, 1728:1, 1729:4, 1729:6, 1738:24, 1739:1
**jump** [1] - 1759:19
**June** [36] - 1689:24, 1708:8, 1708:10, 1708:13, 1711:21, 1714:6, 1715:3, 1717:2, 1717:17, 1717:18, 1719:3, 1719:12, 1719:14, 1719:22, 1726:24, 1728:7, 1728:10, 1728:15, 1731:9, 1735:8, 1735:10, 1735:15, 1735:25, 1736:19, 1737:15, 1737:25, 1738:1, 1738:2, 1738:6, 1738:8, 1738:9, 1738:10, 1738:12, 1738:21, 1741:16, 1741:17
**JUNGHANS** [26] - 1756:22, 1757:3, 1757:13, 1758:7, 1758:16, 1759:24, 1762:18, 1763:7, 1764:15, 1765:5, 1765:12, 1766:5, 1766:15, 1766:18, 1766:20, 1767:23, 1770:14, 1770:18, 1770:25, 1771:3, 1771:17, 1771:19, 1779:14, 1780:1, 1780:5, 1780:9
**Junghans** [3] - 1669:23, 1762:21, 1773:10
**JUROR** [1] - 1720:12
**jurors** [8] - 1672:10, 1681:11, 1699:14, 1720:25, 1772:2, 1773:3, 1773:25, 1776:23
**JURY** [2] - 1669:5, 1669:9
**jury** [11] - 1672:8, 1720:23, 1744:12, 1773:15, 1773:18, 1775:22, 1777:17, 1777:22, 1778:20, 1779:2, 1779:5
**Jury** [4] - 1672:9, 1720:18, 1720:24, 1772:14
**jury's** [1] - 1778:13
**Justice** [22] - 1689:16, 1691:1, 1691:8, 1707:2, 1708:25, 1709:10, 1710:9, 1710:20, 1710:25, 1711:13, 1715:19, 1724:16, 1725:1, 1725:7, 1725:16, 1727:2, 1728:5, 1728:23, 1735:1, 1740:3, 1740:11, 1761:7
**JUSTICE** [1] - 1669:16

## K

**Kaneshiro** [2] - 1781:3, 1781:8
**KANESHIRO** [2] - 1670:3, 1781:9
**Kaneshiro-Miller** [2] - 1781:3, 1781:8
**KANESHIRO-MILLER** [2] - 1670:3, 1781:9
**Kedem** [1] - 1679:12
**keeping** [1] - 1687:12
**key** [4] - 1754:17, 1754:21, 1778:20, 1778:22

**kind** [8] - 1701:14, 1701:16, 1704:24, 1705:2, 1705:13, 1731:2, 1746:24, 1755:9
**kinds** [2] - 1722:3, 1746:16
**Kirsch** [2] - 1748:15, 1748:17
**knowing** [1] - 1777:1, 1778:5
**knowledge** [1] - 1758:9
**known** [1] - 1747:25
**knows** [1] - 1731:23
**Kutler** [1] - 1749:12

## L

**language** [2] - 1773:20, 1773:23
**large** [2] - 1724:18, 1732:14
**largely** [1] - 1774:12
**larger** [1] - 1725:20
**Larry** [2] - 1688:2, 1689:3
**last** [11] - 1673:6, 1684:15, 1687:15, 1690:8, 1693:24, 1699:15, 1723:5, 1741:6, 1744:3, 1744:13, 1756:19
**late** [1] - 1731:2
**Lavrynovych** [2] - 1710:9, 1739:10
**law** [11] - 1684:2, 1686:8, 1710:19, 1721:12, 1721:16, 1721:19, 1722:4, 1722:7, 1723:23, 1726:7, 1751:4
**lawyer** [1] - 1737:4
**lawyers** [4] - 1732:6, 1732:21, 1760:6, 1762:22
**leading** [7] - 1711:6, 1740:6, 1740:12, 1756:22, 1758:7, 1760:3, 1760:12
**leaking** [1] - 1768:16
**learn** [2] - 1750:5, 1760:2
**learned** [1] - 1752:3
**least** [4] - 1773:16, 1774:16, 1776:19, 1777:17
**leave** [1] - 1688:9, 1688:10
**ledger** [3] - 1701:6, 1719:15, 1725:25
**ledgers** [1] - 1735:17
**left** [14] - 1674:16, 1677:19, 1695:20, 1695:25, 1696:2, 1700:12, 1724:10, 1730:5, 1730:12, 1733:5, 1733:7, 1734:19, 1747:11, 1779:24
**legal** [1] - 1726:10
**less** [2] - 1730:10, 1749:21
**letter** [37] - 1685:9, 1685:11, 1685:14, 1685:15, 1685:18, 1685:19, 1685:22, 1689:5, 1690:6, 1692:4, 1692:17, 1692:18, 1692:19, 1692:20, 1694:15, 1694:20, 1694:24, 1710:3, 1710:5, 1710:8, 1710:10, 1711:4, 1711:18, 1715:14, 1715:16, 1715:21, 1716:2, 1718:3, 1718:18, 1724:24, 1724:25, 1728:20, 1729:1, 1739:9, 1740:16, 1740:19
**letterhead** [4] - 1689:15, 1690:24, 1694:21, 1694:24
**level** [1] - 1702:14
**levels** [3] - 1747:1, 1747:2, 1747:13
**life** [1] - 1741:11

**likely** [1] - 1775:2
**Limited** [1] - 1708:4
**limited** [1] - 1771:8
**line** [16] - 1681:25, 1682:14, 1683:25, 1686:6, 1689:1, 1689:25, 1693:22, 1710:12, 1714:20, 1715:23, 1739:20, 1754:15, 1755:11, 1757:22, 1761:20, 1774:10
**lines** [2] - 1754:15, 1754:16
**liquidated** [2] - 1723:7, 1723:9
**list** [5] - 1686:9, 1699:17, 1720:4, 1752:25, 1753:16
**listed** [3] - 1759:16, 1774:14, 1774:23
**listening** [1] - 1773:25
**lists** [2] - 1676:20, 1684:3
**litigation** [1] - 1731:10
**live** [5] - 1673:7, 1673:8, 1699:20, 1699:21, 1744:16
**living** [1] - 1744:18
**LLC** [2] - 1707:25, 1708:18
**LLP** [2] - 1669:20, 1669:23
**local** [1] - 1745:16
**lock** [1] - 1758:23
**Lonergan** [3] - 1749:12, 1758:14, 1769:23
**look** [40] - 1675:23, 1676:6, 1676:13, 1676:24, 1678:5, 1678:6, 1679:9, 1680:20, 1682:10, 1683:5, 1683:10, 1683:21, 1684:6, 1684:15, 1684:17, 1685:7, 1685:25, 1686:12, 1687:5, 1687:19, 1688:19, 1691:3, 1694:16, 1704:7, 1712:1, 1718:21, 1719:5, 1725:13, 1726:23, 1727:25, 1728:19, 1730:20, 1733:14, 1735:6, 1736:1, 1736:4, 1738:25, 1739:12, 1739:13
**look-see** [1] - 1684:15
**looking** [16] - 1681:22, 1684:22, 1685:2, 1685:13, 1688:17, 1690:5, 1715:10, 1715:13, 1716:3, 1716:4, 1718:2, 1718:6, 1718:18, 1731:7, 1737:20, 1737:25
**looks** [10] - 1675:20, 1676:1, 1676:11, 1687:18, 1687:23, 1689:11, 1691:13, 1693:23, 1738:10, 1738:24
**loop** [1] - 1743:15
**loose** [1] - 1756:3
**lower** [1] - 1741:9
**Lucy** [6] - 1671:7, 1742:5, 1742:10, 1744:2, 1744:5, 1744:14
**Lucy-Claire** [3] - 1742:5, 1742:10, 1744:2
**lying** [1] - 1777:6

## M

**machine** [1] - 1677:19
**magnitude** [2] - 1730:18, 1732:18
**mail** [51] - 1674:21, 1675:4, 1675:5, 1675:6, 1675:8, 1675:10, 1675:12, 1675:16, 1675:22, 1675:23, 1676:6,

1676:13, 1676:17, 1676:24, 1676:25,
1677:13, 1677:21, 1678:6, 1678:7,
1679:11, 1679:16, 1680:3, 1680:5,
1680:21, 1681:12, 1681:22, 1682:11,
1682:15, 1683:12, 1684:7, 1684:14,
1685:3, 1685:12, 1685:23, 1687:2,
1687:5, 1687:16, 1688:4, 1688:17,
1688:18, 1688:20, 1688:21, 1689:18,
1689:21, 1702:15, 1715:15, 1731:22,
1732:2, 1752:17, 1780:6

**mailing** [3] - 1674:24, 1675:11, 1772:4
**mails** [5] - 1674:19, 1680:4, 1680:20,
1686:13, 1698:4
**main** [1] - 1677:18
**maintain** [2] - 1690:7, 1722:4
**man** [1] - 1674:21
**manage** [1] - 1755:8
**management** [4] - 1701:7, 1747:14,
1758:11, 1758:13
**managing** [1] - 1747:2
**Map** [1] - 1754:2
**March** [5] - 1707:24, 1708:2, 1713:5,
1713:7, 1725:11
**MargaretAnn** [1] - 1680:7
**marked** [1] - 1706:16
**market** [2] - 1722:20, 1722:24
**Maryland** [1] - 1673:8
**master** [2] - 1706:21, 1738:1
**Master's** [1] - 1700:2
**master's** [2] - 1745:10, 1745:14
**math** [1] - 1729:17
**matrix** [1] - 1753:23
**Matt)** [1] - 1693:21
**matter** [31] - 1679:4, 1702:10, 1702:11,
1703:6, 1703:14, 1703:16, 1704:18,
1705:25, 1706:7, 1706:11, 1706:25,
1707:2, 1708:25, 1711:16, 1713:19,
1716:1, 1721:11, 1726:4, 1727:6,
1727:23, 1743:7, 1749:16, 1749:18,
1750:18, 1750:22, 1754:8, 1760:5,
1774:3, 1779:10, 1779:11, 1781:5
**matters** [2] - 1702:21, 1779:10
**MBA** [1] - 1700:2
**McCullough** [50] - 1669:16, 1699:5,
1699:11, 1707:17, 1707:19, 1708:22,
1709:25, 1710:1, 1711:11, 1712:11,
1712:23, 1720:9, 1731:19, 1731:21,
1732:7, 1739:18, 1740:9, 1740:15,
1741:21, 1742:2, 1742:5, 1743:2,
1743:6, 1743:11, 1743:14, 1743:17,
1743:22, 1744:1, 1744:9, 1744:25,
1748:10, 1749:9, 1756:25, 1757:10,
1757:15, 1758:12, 1758:21, 1760:15,
1760:17, 1762:15, 1763:4, 1764:1,
1764:24, 1765:8, 1766:1, 1767:21,
1769:5, 1770:2, 1770:7, 1771:22
**MD** [1] - 1669:21
**meals** [3] - 1726:15, 1726:16, 1728:13
**mean** [22] - 1673:14, 1683:3, 1683:7,
1684:20, 1686:19, 1688:10, 1688:13,

1704:11, 1729:20, 1730:4, 1736:1,
1745:1, 1749:6, 1752:23, 1753:5,
1754:20, 1755:13, 1759:12, 1760:10,
1760:12, 1761:6, 1773:12
**meaning** [2] - 1683:1, 1761:10
**meaningful** [1] - 1778:17
**means** [3] - 1686:25, 1688:11, 1707:23
**meant** [2] - 1768:19, 1772:17
**media** [14] - 1745:4, 1746:13, 1746:14,
1747:3, 1747:4, 1749:2, 1749:4,
1749:7, 1751:22, 1751:23, 1754:14,
1759:21, 1766:8
**meet** [1] - 1751:15
**meetings** [1] - 1698:19
**memory** [4] - 1674:20, 1679:3,
1679:19, 1682:5
**mentioned** [10] - 1696:14, 1700:16,
1702:1, 1745:24, 1749:13, 1752:9,
1752:10, 1752:19, 1753:13, 1769:22
**mentions** [1] - 1759:2
**Mercury** [24] - 1746:6, 1746:9,
1746:10, 1746:11, 1746:13, 1746:16,
1746:19, 1746:25, 1747:4, 1747:6,
1747:8, 1747:18, 1747:20, 1747:21,
1749:10, 1749:14, 1750:1, 1752:19,
1753:8, 1753:10, 1753:18, 1753:19,
1762:23, 1769:18
**Mercury's** [2] - 1748:13, 1748:22
**message** [3] - 1675:13, 1677:20,
1684:21
**messaging** [1] - 1755:15
**met** [1] - 1721:9
**mid** [1] - 1720:14
**mid-afternoon** [1] - 1720:14
**Middle** [3] - 1697:21, 1698:9, 1698:12
**middle** [3] - 1675:23, 1676:13, 1678:6
**might** [4] - 1721:21, 1721:22, 1767:19,
1779:14
**MILLER** [2] - 1670:3, 1781:9
**Miller** [2] - 1781:3, 1781:8
**million** [21] - 1708:7, 1708:8, 1708:9,
1708:24, 1709:2, 1711:17, 1711:22,
1717:4, 1717:5, 1717:8, 1719:13,
1729:17, 1729:24, 1730:8, 1730:16,
1736:21, 1740:4, 1741:7, 1741:10,
1741:18
**Min** [1] - 1691:1
**mind** [2] - 1679:16, 1765:11
**Minister** [2] - 1710:9, 1739:10
**Ministry** [23] - 1689:16, 1691:7,
1707:1, 1708:25, 1709:10, 1710:20,
1710:25, 1711:12, 1715:19, 1724:16,
1725:1, 1725:6, 1725:15, 1727:2,
1728:4, 1728:23, 1735:1, 1740:3,
1740:10, 1761:7, 1773:6, 1775:7,
1778:4
**minor** [1] - 1689:4
**minutes** [3] - 1720:15, 1720:20,
1772:20
**missing** [1] - 1687:25

**mission** [1] - 1748:2
**Modern** [4] - 1747:23, 1748:11,
1748:23, 1762:24
**modest** [1] - 1725:10
**MOJ** [2] - 1761:1, 1761:5
**Molly** [1] - 1669:13
**moment** [3] - 1730:2, 1769:6, 1773:5
**Monday** [4] - 1759:9, 1759:15,
1761:12, 1761:14
**money** [17] - 1704:7, 1704:10,
1704:11, 1704:15, 1704:16, 1704:19,
1705:6, 1705:17, 1719:22, 1722:8,
1722:20, 1722:24, 1729:4, 1733:5,
1733:10, 1737:24, 1738:3
**moneys** [1] - 1738:20
**month** [19] - 1711:22, 1711:24, 1712:5,
1712:17, 1717:4, 1717:10, 1725:22,
1725:25, 1727:9, 1727:18, 1727:23,
1728:7, 1728:16, 1729:8, 1730:16,
1732:19, 1732:25, 1736:5
**monthly** [1] - 1731:11
**months** [7] - 1711:20, 1717:2,
1730:16, 1734:2, 1734:3, 1734:5,
1735:14
**months'** [1] - 1730:18
**most** [2] - 1726:15, 1753:16
**mostly** [1] - 1746:1
**motivated** [1] - 1776:9
**mouths** [1] - 1760:6
**move** [5] - 1679:1, 1690:10, 1758:17,
1765:13, 1780:8
**moved** [5] - 1745:19, 1774:7, 1775:9,
1780:4, 1780:6
**moving** [4] - 1681:14, 1681:15,
1747:15, 1747:16
**MR** [96] - 1672:7, 1672:14, 1672:21,
1672:23, 1674:9, 1681:9, 1681:15,
1681:18, 1681:21, 1693:3, 1693:6,
1694:3, 1694:6, 1694:8, 1696:22,
1697:4, 1697:9, 1697:13, 1697:16,
1697:19, 1697:25, 1698:3, 1698:14,
1698:17, 1698:23, 1698:25, 1699:5,
1699:11, 1707:17, 1707:19, 1708:22,
1709:25, 1710:1, 1711:6, 1711:11,
1712:6, 1712:11, 1712:23, 1720:9,
1720:11, 1721:4, 1721:6, 1731:19,
1731:21, 1731:25, 1732:7, 1732:10,
1737:8, 1739:15, 1739:18, 1740:6,
1740:9, 1740:12, 1740:15, 1741:21,
1742:2, 1742:5, 1743:2, 1743:6,
1743:11, 1743:14, 1743:17, 1743:22,
1744:1, 1744:9, 1744:25, 1748:10,
1749:9, 1756:25, 1757:10, 1757:15,
1758:12, 1758:21, 1760:15, 1760:17,
1762:15, 1763:4, 1764:1, 1764:24,
1765:8, 1766:1, 1767:21, 1770:2,
1770:7, 1771:22, 1775:23, 1775:25,
1776:4, 1776:6, 1776:18, 1777:2,
1777:21, 1777:25, 1778:18, 1778:24,
1779:12

1793

**MS** [26] - 1756:22, 1757:3, 1757:13, 1758:7, 1758:16, 1759:24, 1762:18, 1763:7, 1764:15, 1765:5, 1765:12, 1766:5, 1766:15, 1766:18, 1766:20, 1767:23, 1770:14, 1770:18, 1770:25, 1771:3, 1771:17, 1771:19, 1779:14, 1780:1, 1780:5, 1780:9
 **mulling** [1] - 1773:15
 **multipage** [2] - 1690:11, 1706:18
 **multiple** [3] - 1701:22, 1770:12, 1774:11
 **Murphy** [4] - 1669:19, 1721:9, 1776:11, 1776:16
 **MURPHY** [22] - 1681:18, 1694:6, 1694:8, 1697:4, 1697:9, 1697:13, 1697:16, 1697:19, 1698:3, 1698:17, 1698:23, 1711:6, 1712:6, 1720:11, 1721:4, 1721:6, 1731:25, 1732:10, 1737:8, 1739:15, 1740:6, 1740:12

## N

 **name** [29] - 1673:1, 1673:3, 1673:4, 1673:6, 1674:21, 1674:23, 1692:17, 1692:19, 1696:14, 1696:15, 1699:15, 1699:17, 1703:17, 1708:17, 1743:1, 1744:13, 1744:14, 1753:4, 1759:2, 1759:3, 1762:21, 1767:1, 1767:6, 1768:7, 1768:11
 **named** [1] - 1752:18
 **names** [7] - 1751:9, 1757:25, 1758:2, 1758:5, 1758:8, 1767:19, 1768:1
 **narrative** [1] - 1755:8
 **Nations** [1] - 1745:20
 **Near** [2] - 1697:6, 1697:16
 **necessarily** [2] - 1683:3, 1683:7
 **necessary** [2] - 1689:7, 1755:15
 **need** [8] - 1703:9, 1741:6, 1760:7, 1760:13, 1761:2, 1761:8, 1778:25, 1780:8
 **needed** [1] - 1740:4
 **needing** [1] - 1755:11
 **needs** [1] - 1754:18
 **neutral** [1] - 1774:17
 **never** [1] - 1741:10
 **New** [13] - 1677:9, 1680:18, 1699:21, 1700:3, 1725:2, 1728:5, 1745:19, 1749:25, 1757:23, 1759:8, 1759:14, 1761:9, 1768:7
 **new** [1] - 1737:16
 **news** [1] - 1760:23
 **newspaper** [1] - 1772:24
 **newspapers** [1] - 1745:16
 **next** [23] - 1672:6, 1672:13, 1679:18, 1680:20, 1696:4, 1697:3, 1697:18, 1699:4, 1725:13, 1726:23, 1727:25, 1730:20, 1730:21, 1732:8, 1733:14, 1735:6, 1735:7, 1735:24, 1740:8, 1740:14, 1753:4, 1759:7, 1764:14
 **nitty** [1] - 1775:12

 **nitty-gritty** [1] - 1775:12
 **Noah** [4] - 1671:6, 1699:6, 1699:7, 1699:17
 **non** [1] - 1760:3
 **non-leading** [1] - 1760:3
 **nongovernment** [1] - 1764:12
 **nongovernmental** [2] - 1763:2, 1764:5
 **nonprofit** [6] - 1744:22, 1746:18, 1763:6, 1763:8, 1763:11, 1764:4
 **normal** [3] - 1767:8, 1767:11, 1767:13
 **note** [2] - 1690:19, 1691:3
 **noted** [1] - 1774:18
 **notes** [1] - 1756:7
 **nothing** [1] - 1771:22
 **notice** [2] - 1752:17, 1753:4
 **noting** [1] - 1774:15
 **November** [7] - 1716:12, 1718:2, 1718:15, 1718:19, 1730:24, 1731:13, 1734:3
 **Number** [2] - 1672:4, 1708:16
 **number** [20] - 1674:19, 1677:19, 1677:20, 1683:21, 1683:22, 1683:23, 1684:3, 1685:4, 1685:7, 1686:13, 1687:24, 1687:25, 1688:15, 1726:3, 1730:11, 1733:11, 1733:12, 1733:13, 1736:15, 1739:8
 **numbering** [1] - 1774:14
 **numbers** [3] - 1700:23, 1701:2, 1729:21
 **NW** [4] - 1669:14, 1669:17, 1669:24, 1670:4
 **NYC** [2] - 1707:25, 1708:18

## O

 **Oakland** [1] - 1744:17
 **oath** [1] - 1721:3
 **Obama** [2] - 1695:21, 1696:5
 **Obama's** [1] - 1695:12
 **object** [1] - 1758:16
 **objection** [24] - 1681:13, 1681:17, 1681:18, 1696:22, 1697:25, 1698:14, 1711:6, 1712:6, 1731:19, 1732:7, 1740:6, 1740:12, 1756:22, 1757:3, 1758:7, 1759:24, 1763:4, 1764:1, 1764:24, 1765:8, 1766:1, 1767:21, 1770:2, 1770:6
 **objections** [1] - 1774:23
 **objectives** [3] - 1746:15, 1746:22, 1755:16
 **observation** [2] - 1777:20, 1778:18
 **obvious** [1] - 1779:19
 **obviously** [1] - 1677:23
 **occasion** [1] - 1683:4
 **October** [14] - 1677:9, 1677:16, 1697:21, 1698:5, 1700:13, 1734:3, 1742:14, 1752:16, 1757:6, 1761:15, 1761:24, 1762:6, 1766:13, 1766:17
 **OF** [6] - 1669:1, 1669:3, 1669:9, 1669:14, 1669:16, 1781:1

 **offer** [1] - 1780:2
 **office** [4] - 1678:11, 1678:20, 1726:18, 1749:23
 **Office** [2] - 1695:14, 1695:24
 **OFFICE** [1] - 1669:13
 **officer** [2] - 1721:15, 1724:17
 **official** [2] - 1673:16, 1701:12
 **OFFICIAL** [1] - 1781:1
 **often** [1] - 1683:4
 **Oleksandr** [1] - 1710:8
 **once** [1] - 1676:3
 **One** [2] - 1684:15, 1687:15
 **one** [29] - 1672:11, 1686:13, 1686:15, 1688:9, 1693:1, 1693:7, 1694:14, 1710:2, 1718:23, 1721:21, 1721:24, 1723:1, 1727:5, 1728:4, 1729:22, 1730:6, 1733:13, 1745:8, 1745:9, 1747:20, 1749:18, 1762:21, 1769:8, 1770:8, 1773:17, 1774:7, 1774:16, 1774:24, 1777:14
 **one's** [1] - 1773:11
 **one-page** [1] - 1710:2
 **online** [3] - 1759:11, 1761:5, 1761:11
 **open** [7] - 1704:6, 1743:25, 1758:22, 1759:7, 1760:7, 1760:16, 1771:18
 **open-ended** [1] - 1760:7
 **opening** [3] - 1693:21, 1776:6, 1776:22
 **operating** [2] - 1723:24, 1738:19
 **opinion** [9] - 1762:12, 1770:8, 1770:9, 1770:18, 1770:22, 1770:25, 1771:4, 1773:11, 1779:4
 **opinions** [1] - 1770:15
 **opportunity** [3] - 1706:3, 1759:10, 1778:1
 **opposed** [1] - 1749:7
 **opposition** [1] - 1750:10
 **order** [3] - 1704:7, 1704:17, 1737:6
 **organic** [1] - 1749:8
 **organization** [4] - 1763:3, 1763:8, 1763:19, 1764:5
 **organizations** [1] - 1763:11
 **original** [1] - 1709:2
 **originally** [1] - 1742:9
 **others'** [1] - 1770:8
 **out-of-pocket** [3] - 1726:11, 1726:14, 1727:13
 **outlet** [3] - 1754:17, 1754:21, 1754:23
 **outlets** [1] - 1756:3
 **outstanding** [24] - 1710:13, 1710:17, 1711:21, 1711:23, 1711:24, 1717:3, 1717:6, 1717:8, 1717:14, 1717:16, 1717:17, 1717:21, 1717:22, 1717:23, 1717:24, 1718:5, 1719:19, 1719:23, 1732:15, 1740:24, 1741:2, 1741:4, 1741:11, 1741:19
 **Outstanding** [1] - 1739:20
 **overall** [2] - 1705:21, 1705:24, 1709:5
 **overarching** [1] - 1774:10
 **oversaw** [3] - 1747:3, 1747:4, 1749:15

1794

oversee [2] - 1724:18, 1745:3
overseeing [2] - 1701:22, 1749:2
oversees [1] - 1746:13
oversight [1] - 1709:11
owed [5] - 1719:19, 1735:1, 1741:7, 1741:10, 1741:14
owing [2] - 1738:15, 1738:20
own [1] - 1757:4

## P

P-U-N-T-U-S [1] - 1699:18
p.m [3] - 1672:2, 1680:18, 1780:16
page [30] - 1683:21, 1685:4, 1690:6, 1690:12, 1691:3, 1691:10, 1691:12, 1691:16, 1692:2, 1707:4, 1707:6, 1710:2, 1712:25, 1715:13, 1715:14, 1719:8, 1723:5, 1726:2, 1737:22, 1737:23, 1738:25, 1739:23, 1740:18, 1752:8, 1756:19, 1757:20, 1761:17, 1775:18
PAGE [1] - 1671:12
pages [4] - 1706:22, 1715:10, 1775:14, 1775:19
paid [17] - 1704:9, 1705:5, 1707:21, 1709:15, 1709:16, 1713:9, 1713:10, 1713:24, 1714:23, 1721:12, 1732:16, 1736:17, 1736:20, 1736:25, 1738:17, 1749:7
paper [4] - 1694:24, 1698:12, 1758:9, 1761:4
paragraph [6] - 1685:7, 1685:13, 1690:6, 1710:14, 1711:18, 1717:1
pardon [1] - 1767:12
parliamentary [1] - 1751:4
part [13] - 1676:6, 1685:5, 1685:8, 1685:9, 1703:19, 1726:5, 1732:6, 1752:19, 1755:2, 1765:19, 1776:15, 1780:10
participate [1] - 1756:16
participated [3] - 1742:16, 1756:23, 1766:8
participating [2] - 1755:25, 1766:19
participation [1] - 1756:20
particular [5] - 1692:18, 1722:16, 1728:20, 1747:20, 1763:25
particularly [3] - 1742:7, 1750:15, 1763:13
parties [2] - 1707:20, 1708:21
partner [17] - 1700:12, 1701:20, 1703:7, 1703:10, 1703:13, 1703:16, 1703:18, 1703:19, 1705:9, 1705:10, 1705:16, 1706:7, 1720:1, 1720:5, 1747:3, 1779:14
Partner/Counsel [1] - 1673:15
partners [1] - 1726:3
parts [2] - 1777:5, 1777:6
party [3] - 1746:23, 1763:12, 1775:11
passing [1] - 1675:13
Patricia [2] - 1781:3, 1781:8

PATRICIA [2] - 1670:3, 1781:9
Paula [2] - 1669:23, 1762:21
Pause [1] - 1693:5
pay [7] - 1702:16, 1703:24, 1704:1, 1704:4, 1721:23, 1737:5, 1737:6
payment [9] - 1708:11, 1709:2, 1719:3, 1719:10, 1719:11, 1721:17, 1740:1, 1740:8, 1740:11
payments [8] - 1707:14, 1707:23, 1708:3, 1708:15, 1709:2, 1710:17, 1723:22, 1723:24
pays [1] - 1704:20
pdf [1] - 1682:14
Pennsylvania [1] - 1669:17
people [13] - 1684:3, 1726:17, 1750:22, 1752:25, 1753:16, 1754:14, 1756:9, 1767:14, 1768:12, 1769:23, 1771:13, 1775:16, 1776:13
people's [2] - 1770:15, 1771:11
per [6] - 1685:3, 1711:22, 1711:24, 1712:5, 1717:3, 1727:7
percent [1] - 1726:21
perform [2] - 1704:8, 1746:3
period [9] - 1695:18, 1695:25, 1698:8, 1705:20, 1713:21, 1723:12, 1734:1, 1734:11, 1735:13
permission [1] - 1742:11
person [2] - 1680:12, 1687:1
personal [1] - 1757:4
personally [1] - 1765:24
persons [1] - 1686:10
perspective [1] - 1703:22
perspectives [1] - 1755:14
phone [8] - 1677:20, 1751:17, 1752:4, 1752:9, 1752:10, 1757:8, 1758:10, 1769:11
picked [1] - 1738:14
picks [1] - 1735:24
piece [5] - 1754:19, 1755:12, 1755:13, 1758:9, 1768:17
Pinchuk [1] - 1707:21
place [2] - 1749:3, 1760:18
placed [2] - 1704:15, 1722:1
places [1] - 1700:7
plan [11] - 1751:22, 1752:14, 1753:14, 1756:6, 1756:8, 1756:10, 1756:14, 1759:20, 1760:19, 1761:21, 1766:8
pleasant [1] - 1772:9
pocket [3] - 1726:11, 1726:14, 1727:13
Podesta [6] - 1753:5, 1753:6, 1753:11, 1753:17, 1753:19, 1767:15
point [34] - 1681:10, 1685:25, 1693:14, 1693:16, 1693:18, 1693:20, 1694:14, 1705:12, 1712:2, 1715:4, 1717:7, 1718:23, 1719:20, 1734:23, 1735:5, 1742:22, 1746:6, 1751:5, 1759:4, 1763:21, 1764:22, 1768:20, 1768:22, 1771:4, 1771:10, 1773:3, 1773:5, 1773:6, 1775:20, 1776:7, 1777:9,

1777:11, 1777:19, 1778:14
points [6] - 1748:13, 1755:15, 1770:14, 1774:16, 1774:24, 1777:18
policies [2] - 1706:9, 1719:25
Policy [2] - 1697:6, 1697:17
policy [4] - 1698:12, 1705:8, 1705:19, 1720:3
political [1] - 1750:10
poor [1] - 1690:20
portion [2] - 1726:16, 1732:14
portrayed [1] - 1765:15
posed [1] - 1773:23
position [4] - 1673:19, 1695:21, 1698:12, 1778:12
positive [6] - 1723:13, 1746:21, 1746:23, 1751:2, 1758:4
possible [2] - 1721:24, 1758:4
possibly [1] - 1754:18
post [1] - 1700:8
post-college [1] - 1700:8
potentially [2] - 1704:9, 1764:9
PR [2] - 1693:17, 1771:3
practice [6] - 1676:9, 1678:22, 1702:11, 1720:6, 1731:10, 1775:1
Pratt [1] - 1669:20
prebill [3] - 1703:4, 1703:6, 1703:8
predominant [1] - 1726:16
predominantly [2] - 1701:24, 1746:17
premise [1] - 1730:2
prepare [2] - 1704:24, 1766:24
prepared [11] - 1711:4, 1711:9, 1713:1, 1713:2, 1713:12, 1714:7, 1714:25, 1716:16, 1720:7, 1720:8, 1724:2
prepares [1] - 1720:3
preparing [1] - 1710:21
preposition [1] - 1730:10
present [6] - 1672:9, 1700:21, 1703:6, 1720:18, 1720:24, 1772:14
presented [3] - 1724:13, 1773:22, 1775:3
president [2] - 1747:11, 1750:12
President [3] - 1695:11, 1695:21, 1696:4
press [9] - 1753:7, 1772:22, 1776:25, 1777:4, 1777:9, 1777:10, 1777:11, 1777:12
pretrial [3] - 1742:9, 1742:20, 1770:13
previous [1] - 1699:22
previously [6] - 1691:15, 1701:17, 1706:17, 1709:25, 1714:5, 1748:18
Pricewaterhouse [2] - 1700:10, 1700:16
PricewaterhouseCoopers [1] - 1700:11
primary [3] - 1748:13, 1755:22, 1755:23
priority [1] - 1774:15
prison [3] - 1750:11, 1750:14, 1751:6

**prisoner** [1] - 1750:10
**Private** [1] - 1708:17
**problem** [3] - 1682:16, 1774:8, 1776:15
**problematic** [1] - 1779:21
**procedural** [1] - 1693:19
**procedure** [1] - 1712:19
**procedures** [1] - 1719:25
**proceed** [2] - 1672:20, 1743:23
**proceedings** [2] - 1775:21, 1781:5
**Proceedings** [2] - 1670:6, 1780:16
**process** [8] - 1703:2, 1710:21, 1759:12, 1759:13, 1774:1, 1774:20, 1775:15, 1778:17
**produced** [3] - 1670:6, 1750:3, 1751:10
**products** [1] - 1744:23
**professional** [22] - 1704:8, 1704:25, 1713:20, 1715:24, 1725:11, 1725:21, 1725:22, 1725:24, 1727:5, 1727:11, 1728:8, 1729:3, 1729:7, 1732:20, 1733:18, 1736:8, 1736:23, 1736:25, 1737:1, 1737:7, 1750:8, 1750:13
**professionals** [2] - 1737:2, 1737:5, 1737:10
**profits** [1] - 1746:18
**program** [1] - 1749:15
**project** [4] - 1732:3, 1736:13, 1737:11, 1741:11
**Project** [1] - 1754:2
**promote** [1] - 1768:23
**promoted** [1] - 1701:11
**proposals** [1] - 1680:11
**provide** [6] - 1677:21, 1688:1, 1688:16, 1689:5, 1710:16, 1711:3
**provided** [8] - 1684:2, 1686:9, 1686:10, 1689:10, 1706:5, 1723:25, 1732:20, 1759:10
**provides** [3] - 1678:12, 1680:21, 1720:5
**providing** [3] - 1678:9, 1710:25, 1744:15
**public** [4] - 1746:10, 1746:21, 1746:23, 1759:16
**publications** [3] - 1758:23, 1761:4, 1761:10
**pull** [1] - 1703:3
**pulled** [1] - 1706:22
**Puntus** [8] - 1671:6, 1699:6, 1699:7, 1699:12, 1699:17, 1708:23, 1721:7, 1732:1
**purports** [1] - 1774:13
**purpose** [2] - 1675:10, 1764:17
**purposes** [1] - 1722:10
**pursuant** [1] - 1706:9
**pursue** [1] - 1764:18
**purview** [1] - 1764:19
**put** [13] - 1682:23, 1683:2, 1683:4, 1683:6, 1683:16, 1690:1, 1690:24, 1694:15, 1694:24, 1698:11, 1704:16,

1737:19
**putting** [4] - 1702:19, 1772:25, 1773:10, 1775:21

## Q

**question-and-answer** [1] - 1774:1
**questions** [17] - 1675:14, 1694:4, 1694:11, 1698:23, 1720:9, 1739:9, 1741:21, 1751:5, 1760:3, 1762:15, 1762:22, 1772:21, 1773:1, 1773:23, 1774:8, 1776:17, 1777:16
**quick** [2] - 1676:13, 1729:17
**quickly** [1] - 1684:17
**quite** [1] - 1778:7
**quote/unquote** [1] - 1755:7
**quotes** [1] - 1772:25

## R

**raised** [1] - 1774:23
**ramifications** [1] - 1701:25
**rate** [2] - 1702:14, 1722:25
**re** [1] - 1672:3
**re-calling** [1] - 1672:3
**reach** [5] - 1677:21, 1679:24, 1681:6, 1681:7, 1681:25
**Reach** [1] - 1758:23
**read** [29] - 1677:17, 1679:14, 1681:1, 1684:4, 1684:20, 1686:6, 1687:15, 1691:4, 1693:13, 1707:13, 1707:16, 1710:14, 1711:2, 1711:19, 1715:18, 1715:23, 1734:16, 1755:1, 1760:25, 1762:10, 1766:2, 1766:4, 1766:6, 1771:1, 1771:15, 1776:4
**reader** [1] - 1700:22
**readily** [1] - 1776:12
**reading** [5] - 1679:16, 1679:19, 1687:13, 1771:14, 1772:5
**reads** [11] - 1675:15, 1676:19, 1678:10, 1680:10, 1681:25, 1682:14, 1683:23, 1683:25, 1684:15, 1687:23, 1689:1
**ready** [2] - 1672:6, 1672:13
**real** [1] - 1701:19
**realize** [1] - 1763:21
**really** [3] - 1700:21, 1722:23, 1772:17
**reason** [5] - 1704:9, 1721:23, 1724:6, 1774:25, 1776:10
**reasoning** [1] - 1761:1
**reasons** [6] - 1721:20, 1721:21, 1721:24, 1778:3, 1779:5, 1779:6
**receipt** [1] - 1675:22
**receive** [5] - 1704:14, 1721:19, 1754:23, 1754:24, 1758:24
**received** [20] - 1676:14, 1682:14, 1682:16, 1683:6, 1707:23, 1707:24, 1708:3, 1708:11, 1708:24, 1709:3, 1718:19, 1718:22, 1719:1, 1719:3, 1719:11, 1732:15, 1734:17, 1736:16,

1736:18, 1753:4
**Recess** [1] - 1720:22
**recognize** [7] - 1690:16, 1690:20, 1691:5, 1691:11, 1691:23, 1692:8, 1693:11
**recollection** [7] - 1677:6, 1677:25, 1679:23, 1681:3, 1682:17, 1757:5, 1778:13
**recommendations** [1] - 1693:17
**record** [6] - 1673:2, 1674:7, 1699:16, 1703:5, 1738:11, 1781:4
**recorded** [18] - 1713:21, 1717:12, 1717:15, 1718:10, 1725:25, 1726:4, 1727:19, 1728:9, 1728:14, 1729:5, 1732:22, 1733:1, 1733:20, 1734:10, 1735:4, 1735:12, 1735:16, 1741:13
**records** [19] - 1700:20, 1706:4, 1711:12, 1713:21, 1714:13, 1715:4, 1716:21, 1717:8, 1717:12, 1717:15, 1719:21, 1727:7, 1728:10, 1728:14, 1733:21, 1733:25, 1734:5, 1735:5, 1735:13
**recouped** [1] - 1733:9
**RECROSS** [1] - 1671:4
**redaction** [1] - 1680:19
**REDIRECT** [2] - 1671:4, 1739:17
**redirect** [4] - 1698:24, 1739:16, 1771:21, 1779:23
**reduce** [1] - 1744:23
**refer** [1] - 1700:17
**reference** [1] - 1761:12
**referenced** [2] - 1685:17, 1766:22
**referred** [1] - 1727:14
**referring** [4] - 1737:22, 1754:4, 1754:22, 1780:13
**refers** [10] - 1710:25, 1711:23, 1753:14, 1753:25, 1754:1, 1754:6, 1754:13, 1755:11, 1755:18, 1759:7
**reflect** [1] - 1674:7
**reflected** [2] - 1732:2, 1733:22
**reflects** [2] - 1734:14, 1737:14
**refresh** [1] - 1682:17
**regarding** [1] - 1707:14
**reimbursed** [2] - 1732:18, 1737:6
**rejecting** [1] - 1777:14
**rejoined** [1] - 1696:7
**relate** [4] - 1706:24, 1706:25, 1707:1, 1713:4
**related** [4] - 1691:11, 1701:23, 1756:1, 1756:6
**relates** [2] - 1713:6, 1754:7
**relations** [11] - 1746:13, 1746:14, 1747:3, 1747:4, 1748:8, 1749:15, 1751:22, 1751:23, 1753:7, 1753:8, 1753:17
**relationship** [5] - 1696:24, 1750:19, 1752:10, 1755:6, 1757:8
**relationships** [4] - 1726:21, 1745:4, 1748:5, 1758:4, 1764:10
**release** [13] - 1679:15, 1683:24,

1754:11, 1754:13, 1754:25, 1759:21, 1760:23, 1761:7, 1761:22, 1772:22, 1776:25, 1777:4

**released** [6] - 1679:5, 1679:18, 1762:5, 1762:8, 1769:16, 1769:17

**releases** [1] - 1761:1

**relevance** [3] - 1698:1, 1698:2, 1698:14

**relevant** [4] - 1750:22, 1770:11, 1776:11, 1777:9

**remaining** [1] - 1734:16, 1738:17

**remember** [9] - 1674:24, 1698:18, 1754:3, 1754:4, 1756:5, 1759:4, 1767:1, 1768:12

**remind** [1] - 1721:3

**rendered** [25] - 1710:18, 1711:20, 1712:18, 1713:4, 1713:17, 1714:11, 1715:25, 1716:5, 1716:19, 1717:2, 1717:9, 1717:13, 1725:11, 1725:21, 1725:24, 1727:5, 1727:10, 1728:8, 1729:4, 1729:8, 1731:3, 1733:23, 1735:3, 1735:4, 1735:10

**repeat** [2] - 1760:3, 1766:3

**repeated** [1] - 1758:17

**report** [76] - 1678:2, 1678:10, 1678:20, 1679:15, 1679:18, 1682:14, 1683:24, 1684:1, 1684:3, 1686:7, 1686:9, 1710:22, 1750:2, 1750:3, 1750:6, 1751:9, 1751:24, 1751:25, 1752:6, 1754:11, 1754:24, 1755:1, 1758:25, 1759:9, 1759:15, 1759:17, 1761:1, 1761:8, 1762:5, 1762:8, 1762:10, 1762:12, 1766:4, 1766:6, 1766:9, 1766:10, 1767:9, 1768:16, 1769:2, 1769:16, 1769:22, 1769:25, 1770:8, 1770:10, 1770:16, 1770:23, 1771:1, 1771:9, 1771:14, 1771:15, 1771:16, 1773:1, 1773:7, 1773:11, 1773:19, 1773:20, 1773:23, 1774:5, 1774:9, 1774:13, 1775:5, 1775:10, 1775:18, 1776:4, 1776:7, 1776:8, 1776:11, 1777:23, 1778:6, 1779:17, 1780:2, 1780:7, 1780:8

**Report** [9] - 1679:4, 1751:20, 1754:6, 1754:7, 1754:14, 1759:6, 1765:14, 1765:24, 1766:25

**reported** [1] - 1670:6

**REPORTER** [1] - 1781:1

**reporter** [9] - 1745:4, 1745:16, 1745:17, 1754:17, 1754:21, 1754:23, 1755:4, 1768:7, 1768:17

**Reporter** [1] - 1670:3

**reporters** [8] - 1749:3, 1751:2, 1756:3, 1759:17, 1760:24, 1768:3, 1768:4, 1776:10

**reporting** [1] - 1701:6

**reports** [1] - 1755:3

**represent** [3] - 1715:2, 1721:10, 1769:17

**representations** [1] - 1763:24

**representatives** [2] - 1684:1, 1686:7

**Republic** [1] - 1708:5

**Republican** [3] - 1696:17, 1753:9, 1753:10

**request** [3] - 1675:19, 1684:24, 1689:8

**requested** [1] - 1678:20

**requests** [1] - 1678:23

**required** [2] - 1721:11, 1722:21

**research** [2] - 1672:12, 1772:6

**resist** [1] - 1760:13

**respect** [5] - 1713:18, 1715:25, 1717:13, 1732:19, 1765:14

**respond** [6] - 1675:21, 1688:4, 1688:12, 1688:14, 1689:8, 1689:12

**responded** [2] - 1678:15, 1694:14

**responds** [3] - 1680:17, 1680:21, 1687:21

**response** [10] - 1676:8, 1676:12, 1676:14, 1677:3, 1680:24, 1684:16, 1687:19, 1689:2, 1689:4, 1704:1

**responsibilities** [1] - 1701:15

**responsibility** [4] - 1701:18, 1705:21, 1705:24, 1709:6

**responsible** [15] - 1701:5, 1701:16, 1701:22, 1702:4, 1702:18, 1702:22, 1702:24, 1703:7, 1703:14, 1703:16, 1706:10, 1751:21, 1753:7, 1753:9, 1756:9

**rest** [1] - 1753:3

**restroom** [1] - 1720:13

**resume** [1] - 1720:16

**retainer** [19] - 1704:6, 1704:7, 1704:13, 1704:14, 1705:4, 1705:5, 1705:13, 1712:10, 1712:16, 1712:18, 1714:23, 1721:12, 1721:17, 1721:25, 1724:4, 1733:9, 1733:11, 1734:23, 1738:22

**retainers** [2] - 1721:19, 1734:17

**return** [1] - 1720:20

**returned** [8] - 1708:13, 1721:1, 1723:8, 1723:18, 1724:10, 1739:5, 1741:15, 1741:17

**retyped** [1] - 1691:13

**reversal** [1] - 1775:2

**review** [7] - 1684:25, 1706:3, 1711:15, 1719:16, 1723:21, 1770:23, 1774:17

**reviewed** [2] - 1706:5, 1724:13

**reviewing** [1] - 1700:19

**rhino** [1] - 1744:23

**Rick** [9] - 1681:5, 1681:25, 1748:15, 1748:17, 1749:19, 1753:23, 1753:24, 1753:25, 1764:13

**rights** [1] - 1750:15

**RMR** [1] - 1670:3

**role** [5] - 1697:5, 1724:16, 1746:3, 1746:25, 1749:13

**roll** [2] - 1752:5, 1766:8

**rollout** [10] - 1751:22, 1751:23, 1756:6, 1756:7, 1756:10, 1756:14, 1766:24, 1767:3, 1767:9

**Room** [1] - 1670:3

**rule** [1] - 1710:19

**rule-of-law** [1] - 1710:19

**run** [2] - 1689:4, 1689:15

**running** [1] - 1730:15

**runs** [1] - 1702:7

## S

**S-A-U-N-D-E-R-S** [1] - 1744:14

**Sanchez** [1] - 1669:12

**SANCHEZ** [15] - 1672:7, 1672:14, 1672:21, 1672:23, 1674:9, 1681:9, 1681:15, 1681:21, 1693:3, 1693:6, 1694:3, 1696:22, 1697:25, 1698:14, 1698:25

**Sanger** [6] - 1677:9, 1682:14, 1757:23, 1768:9, 1768:10

**sanger** [2] - 1682:7, 1742:18

**Sarnow** [1] - 1689:3

**satisfied** [14] - 1714:2, 1714:3, 1714:15, 1715:6, 1715:8, 1716:7, 1716:9, 1716:23, 1716:24, 1717:10, 1717:20, 1718:4, 1718:12, 1718:14

**satisfy** [1] - 1741:7

**SAU0001000** [1] - 1708:2

**SAU282869)** [1] - 1708:9

**SAU282870)** [1] - 1708:8

**SAU282872)** [1] - 1708:7

**Saunders** [11] - 1671:7, 1742:6, 1742:10, 1742:13, 1744:2, 1744:5, 1744:10, 1744:14, 1757:16, 1762:19, 1771:19

**saw** [4] - 1686:1, 1687:17, 1690:7, 1730:15

**scan** [1] - 1686:22

**Scanned** [1] - 1686:21

**scanned** [1] - 1687:1

**Schoen** [9] - 1707:25, 1708:18, 1715:20, 1725:2, 1725:7, 1725:16, 1727:3, 1728:5, 1728:24

**school** [2] - 1700:1, 1745:8

**scoop** [1] - 1755:7

**scope** [3] - 1696:22, 1697:25, 1698:15

**screen** [2] - 1731:16, 1737:25

**Sea** [1] - 1708:4

**seated** [2] - 1674:4, 1772:15

**second** [12] - 1675:4, 1693:19, 1693:23, 1711:18, 1712:25, 1717:1, 1739:23, 1740:18, 1754:15, 1754:16, 1761:17

**Secretary** [1] - 1673:15

**secretary** [4] - 1674:10, 1695:4, 1695:8, 1695:15

**section** [2] - 1754:6, 1757:21

**Security** [1] - 1746:1

**see** [24] - 1674:2, 1675:6, 1675:23, 1676:14, 1676:22, 1678:13, 1678:17, 1680:5, 1683:5, 1684:15, 1686:19, 1686:25, 1690:3, 1691:18, 1698:2,

1726:2, 1728:2, 1743:18, 1771:13,
1774:8, 1776:15, 1776:25, 1779:2,
1780:14
   **seeing** [3] - 1675:5, 1687:16, 1714:21
   **seem** [3] - 1767:11, 1767:13, 1779:10
   **segregated** [1] - 1704:18
   **selected** [1] - 1775:8
   **selecting** [1] - 1777:5
   **sell** [2] - 1771:4
   **send** [8] - 1675:15, 1684:16, 1684:18,
1685:1, 1688:1, 1689:16, 1703:6,
1761:25
   **sending** [5] - 1684:12, 1684:24,
1688:2, 1689:5
   **senior** [2] - 1749:21, 1749:22
   **Senior** [3] - 1701:4, 1701:10, 1701:18
   **seniority** [1] - 1702:14
   **sense** [1] - 1726:22
   **sensible** [1] - 1704:1
   **sent** [9] - 1685:23, 1688:6, 1698:4,
1703:10, 1729:16, 1730:21, 1740:17,
1753:23, 1762:2
   **sentence** [3] - 1675:4, 1711:19,
1754:20
   **sentencing** [1] - 1710:24
   **separate** [2] - 1703:21, 1704:16
   **separately** [1] - 1704:17
   **September** [3] - 1674:22, 1733:24,
1734:2
   **serious** [1] - 1779:3
   **serve** [3] - 1710:19, 1745:2, 1759:6
   **served** [1] - 1723:25
   **server** [1] - 1752:25
   **service** [2] - 1704:25, 1745:23
   **services** [38] - 1702:9, 1704:8,
1707:22, 1710:18, 1711:20, 1713:4,
1713:17, 1713:20, 1714:11, 1715:2,
1715:25, 1716:5, 1716:19, 1717:1,
1717:9, 1717:13, 1718:2, 1719:14,
1723:25, 1724:7, 1725:11, 1725:21,
1725:22, 1725:24, 1727:5, 1727:9,
1727:10, 1728:8, 1729:3, 1729:8,
1731:3, 1732:20, 1733:19, 1733:23,
1735:2, 1735:10, 1736:15, 1763:16
   **Session** [1] - 1669:5
   **SESSION** [1] - 1669:9
   **sessions** [1] - 1742:9
   **set** [1] - 1723:1
   **setting** [1] - 1710:17
   **seven** [1] - 1774:22
   **several** [2] - 1747:2, 1778:9
   **shark** [1] - 1744:24
   **shirt** [1] - 1674:6
   **short** [1] - 1774:20
   **shortfall** [1] - 1734:21
   **shorthand** [1] - 1670:6
   **shortish** [1] - 1742:1
   **show** [7] - 1681:11, 1682:21, 1693:7,
1723:7, 1731:15, 1731:16, 1739:1
   **showed** [1] - 1769:6

   **showing** [7] - 1706:16, 1714:22,
1719:7, 1719:10, 1723:14, 1736:2
   **shown** [6] - 1698:5, 1707:1, 1707:4,
1707:15, 1740:18, 1778:12
   **shows** [7] - 1686:23, 1687:3, 1707:6,
1723:9, 1729:17, 1738:22, 1776:23
   **shuttle** [1] - 1680:18
   **side** [10] - 1702:4, 1753:8, 1753:9,
1753:11, 1764:17, 1772:18, 1773:17,
1774:3, 1779:1
   **sign** [2] - 1692:19, 1692:20
   **signature** [7] - 1682:24, 1683:17,
1690:24, 1692:7, 1692:8, 1692:10,
1692:14
   **signed** [6] - 1692:5, 1692:17, 1710:10,
1710:11, 1715:21, 1715:22
   **similar** [3] - 1716:4, 1716:5, 1748:25
   **similarly** [1] - 1679:22
   **Sincerely** [1] - 1675:16
   **single** [1] - 1774:9
   **sitting** [2] - 1674:5, 1773:25
   **situation** [1] - 1750:7
   **situations** [1] - 1705:5
   **six** [1] - 1774:22
   **Skadden** [64] - 1673:10, 1673:11,
1673:17, 1674:11, 1674:13, 1674:14,
1679:4, 1691:1, 1694:21, 1695:21,
1696:8, 1696:10, 1700:13, 1700:14,
1700:24, 1701:4, 1701:9, 1702:7,
1702:9, 1702:17, 1705:6, 1705:25,
1707:14, 1707:22, 1707:23, 1707:24,
1708:3, 1708:10, 1708:13, 1709:18,
1711:5, 1713:1, 1718:10, 1719:13,
1719:20, 1721:15, 1723:18, 1723:23,
1726:18, 1732:15, 1732:21, 1735:2,
1736:16, 1736:18, 1737:10, 1738:19,
1740:2, 1740:5, 1740:11, 1741:6,
1741:10, 1750:3, 1751:10, 1751:20,
1751:21, 1754:6, 1754:7, 1754:14,
1756:6, 1759:5, 1765:14, 1765:24,
1766:25
   **Skadden's** [8] - 1708:1, 1708:16,
1710:19, 1711:13, 1714:9, 1714:25,
1716:16, 1719:25
   **slightly** [1] - 1715:9
   **Sloan** [1] - 1679:12, 1684:13,
1684:21, 1684:25, 1685:23, 1687:6,
1687:21, 1688:12, 1688:14, 1688:17,
1688:22
   **Sloan's** [2] - 1687:19, 1688:4
   **snicker** [1] - 1778:25
   **snickering** [1] - 1779:1
   **social** [1] - 1746:14
   **solicit** [1] - 1770:7
   **someone** [6] - 1731:16, 1752:18,
1752:19, 1772:23, 1775:5
   **sometime** [1] - 1739:6
   **sometimes** [3] - 1694:14, 1721:16,
1773:24
   **somewhere** [1] - 1772:24

   **soon** [2] - 1685:1, 1743:21
   **sorry** [14] - 1675:9, 1675:14, 1681:16,
1684:7, 1685:11, 1705:15, 1712:14,
1715:12, 1720:12, 1722:23, 1736:4,
1744:21, 1757:14, 1766:15
   **sort** [5] - 1679:1, 1679:3, 1680:21,
1731:7, 1780:10
   **sorts** [1] - 1746:17
   **sounds** [1] - 1733:12
   **SPAEDER** [2] - 1669:20, 1669:23
   **speaker** [2] - 1773:4, 1775:8
   **speaking** [2] - 1751:17, 1757:17
   **specific** [7] - 1683:1, 1699:19,
1702:20, 1702:21, 1706:22, 1744:15,
1777:21
   **specifically** [5] - 1674:24, 1676:10,
1688:6, 1702:6, 1754:4
   **spell** [1] - 1673:1
   **spelling** [3] - 1673:3, 1699:15,
1744:13
   **spending** [1] - 1726:19
   **spent** [2] - 1699:24, 1772:4
   **Spiegel** [2] - 1688:2, 1689:3
   **spin** [3] - 1776:13, 1779:17, 1779:21
   **spinning** [1] - 1776:8
   **spoken** [2] - 1705:12, 1759:21
   **spokesperson** [1] - 1759:6
   **stand** [2] - 1672:15, 1744:2
   **standard** [10] - 1687:3, 1702:11,
1705:8, 1705:19, 1709:20, 1720:3,
1720:6, 1731:10, 1739:11, 1739:13
   **standards** [1] - 1774:20
   **start** [11] - 1686:13, 1688:20, 1690:12,
1690:13, 1693:14, 1695:8, 1696:23,
1717:5, 1772:10, 1772:12, 1779:20
   **started** [7] - 1674:14, 1700:10, 1701:4,
1745:9, 1747:1, 1756:7, 1763:21
   **state** [1] - 1722:21
   **statement** [4] - 1693:21, 1706:21,
1719:5, 1772:22
   **statements** [1] - 1706:23
   **STATES** [3] - 1669:1, 1669:3, 1669:10
   **States** [4] - 1672:4, 1750:23, 1775:2,
1775:3
   **stating** [2] - 1699:19, 1744:13
   **status** [1] - 1750:14
   **stay** [1] - 1695:24
   **stenotype** [1] - 1670:6
   **step** [2] - 1747:13, 1747:14
   **still** [6] - 1704:20, 1721:3, 1733:5,
1738:14, 1747:13, 1769:18
   **stilted** [1] - 1675:14
   **stipulate** [1] - 1707:20
   **stipulated** [1] - 1708:20
   **stipulation** [1] - 1707:13
   **stop** [2] - 1732:3, 1732:6
   **stories** [5] - 1749:3, 1755:9, 1759:18,
1761:5, 1761:11
   **story** [9] - 1754:18, 1754:21, 1754:24,

1755:9, 1755:17, 1759:19, 1760:23,
1761:3, 1780:11
**strategy** [3] - 1754:11, 1755:2, 1774:3
**Street** [3] - 1669:14, 1669:20, 1669:24
**strike** [3] - 1677:7, 1703:23, 1758:17
**struck** [1] - 1773:14
**structures** [1] - 1702:14
**sub** [2] - 1738:2, 1738:4
**subject** [10] - 1679:14, 1680:10,
1681:25, 1682:13, 1683:16, 1686:21,
1689:1, 1689:25, 1710:12, 1739:20
**submitted** [1] - 1772:8
**subsequent** [3] - 1718:15, 1733:10,
1735:17
**substance** [3] - 1755:10, 1766:9,
1775:12
**substantial** [1] - 1725:18
**subtracted** [1] - 1734:19
**sufficient** [2] - 1761:3, 1761:9
**suggested** [3] - 1688:9, 1742:9,
1742:20
**suit** [1] - 1674:5
**Suite** [2] - 1669:21, 1669:24
**summarize** [2] - 1774:13, 1775:8
**summarizing** [1] - 1775:5
**summary** [3] - 1774:14, 1775:13,
1777:18
**supervise** [1] - 1724:14
**supervisor** [1] - 1743:4
**supplement** [1] - 1779:14
**support** [1] - 1775:4
**supposed** [4] - 1726:7, 1763:9,
1763:11, 1776:23
**supposedly** [1] - 1763:2
**surprising** [1] - 1780:10
**surrogacies** [1] - 1746:24
**surrounding** [1] - 1710:23
**sustained** [2] - 1698:2, 1698:16
**sworn** [3] - 1672:18, 1699:8, 1744:6
**system** [8] - 1686:22, 1702:18,
1702:20, 1711:14, 1711:15, 1718:10,
1719:16, 1719:17

# T

**Tab** [5] - 1709:23, 1712:13, 1719:24,
1740:22, 1741:1
**tab** [4] - 1712:14, 1712:15, 1718:1,
1740:21
**talks** [1] - 1680:22
**tax** [1] - 1701:21
**TAYLOR** [11] - 1775:23, 1775:25,
1776:4, 1776:6, 1776:18, 1777:2,
1777:21, 1777:25, 1778:18, 1778:24,
1779:12
**Taylor** [1] - 1669:22
**team** [4] - 1732:6, 1752:19, 1753:17,
1773:6
**teams** [1] - 1753:19
**technically** [1] - 1673:15

**telephone** [1] - 1742:16
**temptation** [1] - 1760:14
**tendency** [1] - 1760:5
**term** [1] - 1704:12
**terms** [9] - 1703:2, 1712:3, 1712:4,
1712:7, 1712:9, 1751:3, 1759:7,
1760:10, 1774:5
**testified** [7] - 1672:18, 1699:8, 1709:5,
1744:6, 1756:23, 1758:20, 1776:2
**testifies** [2] - 1743:16, 1743:19
**testify** [4] - 1742:13, 1742:25, 1743:9,
1779:15
**testimony** [1] - 1772:21, 1778:8
**THE** [128] - 1669:1, 1669:9, 1669:13,
1672:3, 1672:6, 1672:8, 1672:10,
1672:16, 1672:20, 1674:7, 1681:13,
1681:17, 1681:19, 1693:4, 1694:5,
1696:23, 1696:25, 1697:1, 1697:2,
1697:3, 1697:7, 1697:11, 1697:15,
1697:18, 1698:2, 1698:16, 1698:24,
1699:1, 1699:4, 1707:15, 1707:18,
1708:19, 1709:24, 1711:7, 1711:9,
1712:7, 1712:9, 1712:16, 1712:20,
1720:10, 1720:14, 1720:19, 1720:23,
1720:25, 1731:20, 1731:23, 1732:8,
1736:23, 1737:1, 1739:16, 1740:7,
1740:13, 1741:22, 1741:24, 1742:1,
1742:3, 1742:25, 1743:5, 1743:9,
1743:12, 1743:15, 1743:18, 1743:23,
1744:3, 1744:21, 1744:22, 1748:7,
1748:9, 1749:4, 1749:5, 1749:6,
1749:7, 1756:23, 1757:4, 1757:6,
1757:7, 1757:9, 1757:14, 1758:8,
1758:10, 1758:19, 1759:25, 1760:2,
1762:16, 1763:5, 1763:6, 1764:2,
1764:4, 1764:6, 1764:8, 1764:11,
1764:13, 1764:14, 1765:1, 1765:2,
1765:9, 1766:2, 1766:4, 1766:13,
1766:14, 1766:17, 1766:19, 1767:22,
1770:4, 1770:6, 1770:17, 1770:21,
1771:2, 1771:7, 1771:21, 1771:23,
1772:1, 1772:15, 1775:24, 1776:1,
1776:5, 1776:15, 1776:19, 1777:3,
1777:24, 1778:7, 1778:22, 1778:25,
1779:13, 1779:20, 1780:3, 1780:6,
1780:14
**themes** [1] - 1693:21
**themselves** [1] - 1771:6
**theory** [2] - 1777:13, 1777:14
**therefore** [1] - 1742:22
**thinking** [1] - 1772:4
**thinks** [1] - 1779:24
**third** [5] - 1746:23, 1754:15, 1754:16,
1755:11, 1760:25
**third-party** [1] - 1746:23
**thorough** [1] - 1755:5
**three** [3] - 1730:18, 1774:18, 1776:19
**throughout** [1] - 1693:13
**tie** [1] - 1674:6
**timing** [3] - 1698:20, 1717:25, 1758:24

**tired** [1] - 1779:2
**title** [4] - 1673:16, 1701:8, 1701:12,
1747:10
**today** [4] - 1674:2, 1677:23, 1680:11,
1698:5
**together** [5] - 1697:21, 1698:9,
1698:12, 1703:3, 1742:19
**tomorrow** [4] - 1772:10, 1779:15,
1780:13, 1780:15
**tone** [1] - 1755:10
**Tony** [1] - 1753:5
**took** [3] - 1697:20, 1701:18, 1756:7
**top** [7] - 1676:6, 1676:19, 1676:24,
1678:15, 1680:20, 1691:8, 1692:23,
1733:11, 1752:8, 1754:6, 1757:21,
1761:20
**topic** [1] - 1690:10
**topics** [1] - 1677:5
**total** [19] - 1711:22, 1717:4, 1717:5,
1718:7, 1727:17, 1728:16, 1729:7,
1729:14, 1733:3, 1733:4, 1733:18,
1734:6, 1734:12, 1736:8, 1737:15,
1740:24, 1741:1, 1741:3
**totaled** [4] - 1725:22, 1727:10, 1728:8,
1728:13
**totaling** [2] - 1729:11, 1735:11
**track** [2] - 1702:17, 1704:17
**tracked** [1] - 1702:19
**Transcript** [1] - 1670:6
**transcript** [1] - 1781:4
**TRANSCRIPT** [1] - 1669:9
**transcription** [1] - 1670:6
**transfer** [4] - 1705:13, 1708:4,
1708:11, 1738:19
**transferred** [1] - 1738:4
**transfers** [1] - 1708:6
**translation** [1] - 1736:14
**translator** [1] - 1737:3
**translators** [4] - 1732:16, 1736:12,
1736:17, 1737:9
**transmitting** [1] - 1780:6
**travel** [3] - 1726:15, 1726:16, 1728:12
**traveling** [3] - 1675:15, 1679:17,
1726:18
**treasury** [1] - 1701:20
**TRIAL** [2] - 1669:5, 1669:9
**trial** [10] - 1710:23, 1751:6, 1760:6,
1765:16, 1765:25, 1768:23, 1768:25,
1772:5, 1774:20, 1780:4
**trip** [2] - 1697:21, 1697:23
**trouble** [1] - 1704:21
**true** [1] - 1770:16
**trust** [1] - 1778:21
**try** [7] - 1720:15, 1731:10, 1760:13,
1772:11, 1774:3, 1780:11, 1780:12
**trying** [5] - 1750:19, 1770:21, 1771:3,
1771:10, 1772:23
**Tuesday** [8] - 1759:11, 1760:21,
1760:22, 1761:2, 1761:4, 1761:12,
1761:14, 1761:24

**turn** [6] - 1705:20, 1740:20, 1756:12, 1756:19, 1757:20, 1774:12
**turning** [15] - 1700:6, 1702:6, 1703:24, 1711:18, 1712:12, 1712:25, 1713:11, 1715:9, 1716:11, 1716:25, 1719:24, 1739:23, 1741:1, 1754:1, 1761:17
**two** [14] - 1680:3, 1680:20, 1684:18, 1700:8, 1709:1, 1710:2, 1741:6, 1747:1, 1757:25, 1770:9, 1770:14, 1774:18, 1775:14, 1775:18
**two-page** [1] - 1710:2
**Tymoshenko** [21] - 1679:4, 1710:24, 1716:1, 1727:6, 1736:12, 1737:11, 1750:2, 1750:7, 1750:9, 1750:10, 1750:18, 1750:22, 1751:9, 1754:8, 1765:16, 1765:25, 1768:23, 1773:6, 1774:24, 1775:6, 1780:7
**Tymoshenko's** [2] - 1750:14, 1774:21
**type** [1] - 1722:17
**typical** [1] - 1731:7
**typically** [3] - 1676:5, 1678:25, 1694:23

# U

**U.S** [6] - 1669:13, 1669:16, 1670:3, 1748:5, 1748:8, 1754:11
**UKR** [1] - 1761:2
**Ukraine** [48] - 1678:10, 1684:1, 1686:8, 1689:5, 1706:1, 1707:2, 1707:22, 1708:12, 1708:14, 1709:7, 1709:13, 1710:9, 1710:18, 1713:19, 1715:19, 1723:20, 1724:1, 1724:11, 1724:15, 1725:2, 1726:18, 1735:1, 1738:5, 1739:5, 1741:16, 1743:7, 1747:23, 1748:9, 1748:11, 1748:23, 1750:12, 1750:16, 1750:19, 1751:3, 1754:2, 1754:3, 1761:7, 1762:25, 1763:16, 1763:20, 1764:10, 1764:17, 1764:18, 1764:19, 1764:22, 1765:7, 1765:10, 1770:1
**Ukrainian** [4] - 1707:21, 1765:4, 1773:5, 1775:1
**ultimately** [4] - 1703:9, 1705:12, 1718:14, 1737:5
**UN** [1] - 1745:24
**unapplied** [1] - 1734:14
**under** [12] - 1683:21, 1691:7, 1692:16, 1693:22, 1693:25, 1694:1, 1702:20, 1719:25, 1721:3, 1742:15, 1754:10, 1771:7
**undergraduate** [1] - 1699:24
**understood** [5] - 1703:12, 1743:13, 1760:15, 1765:15
**undertake** [1] - 1774:17
**undisputed** [1] - 1708:21
**unified** [1] - 1774:9
**Union** [3] - 1748:4, 1748:7, 1763:17
**United** [5] - 1672:4, 1745:20, 1750:23, 1775:1, 1775:3

**UNITED** [3] - 1669:1, 1669:3, 1669:10
**University** [3] - 1699:25, 1700:3, 1745:11
**unsure** [1] - 1693:19
**untruthful** [2] - 1773:8, 1777:6
**unusual** [1] - 1775:1
**up** [28] - 1676:3, 1678:23, 1686:24, 1687:4, 1688:9, 1688:10, 1698:6, 1704:10, 1723:1, 1729:20, 1729:21, 1729:23, 1730:11, 1731:17, 1731:18, 1735:24, 1738:14, 1747:13, 1747:14, 1750:16, 1751:2, 1757:17, 1759:5, 1772:12, 1772:19, 1772:21, 1778:10, 1779:23
**utilized** [1] - 1723:16

# V

**vacuum** [1] - 1778:16
**value** [3] - 1725:20, 1732:20, 1770:10
**van** [1] - 1679:11
**Vancouver** [1] - 1745:16
**various** [5] - 1698:18, 1702:14, 1721:19, 1721:20, 1768:1
**verbatim** [1] - 1760:4
**verified** [1] - 1682:15
**version** [2] - 1691:13, 1692:4
**vetted** [2] - 1754:18, 1755:12
**vice** [1] - 1747:11
**Victor** [1] - 1707:21
**view** [7] - 1764:22, 1768:20, 1768:22, 1771:4, 1773:5, 1773:6, 1773:11
**View** [1] - 1708:4
**viewed** [1] - 1763:17
**Vin** [11] - 1678:11, 1678:20, 1679:24, 1680:10, 1696:14, 1749:12, 1749:13, 1749:21, 1753:4, 1755:20
**vindication** [2] - 1775:6, 1775:7
**violation** [1] - 1774:25
**violations** [1] - 1774:21
**vis** [2] - 1765:20
**vis-a-vis** [1] - 1765:20
**visualize** [1] - 1683:5
**voicemail** [1] - 1677:19
**VP** [2] - 1747:11, 1747:12

# W

**W-H-I-T-N-E-Y** [1] - 1673:6
**warrant** [1] - 1775:2
**Washington** [7] - 1669:6, 1669:15, 1669:17, 1669:25, 1670:4, 1697:6, 1697:16
**ways** [1] - 1774:19
**wearing** [2] - 1674:4, 1674:5
**Weber** [10] - 1678:11, 1679:24, 1680:11, 1696:14, 1743:3, 1749:12, 1749:13, 1749:21, 1753:4
**weber** [8] - 1680:24, 1697:20, 1698:9, 1698:11, 1698:19, 1742:15, 1742:22,

1749:24
**Weber's** [4] - 1678:20, 1680:22, 1696:15, 1755:20
**website** [1] - 1745:5
**Wednesday** [1] - 1679:18
**week** [8] - 1757:12, 1757:14, 1758:23, 1761:15, 1761:16, 1761:22, 1773:2
**welcome** [1] - 1687:11
**West** [3] - 1695:17, 1750:15, 1763:17
**western** [1] - 1774:20
**whereas** [1] - 1753:8
**White** [5] - 1695:12, 1695:14, 1695:17, 1695:24, 1696:4
**Whitney** [9] - 1671:5, 1672:15, 1672:17, 1673:1, 1674:18, 1675:5, 1681:12, 1694:3, 1694:9
**whole** [2] - 1673:4, 1774:9
**wider** [2] - 1754:25, 1759:16
**WildAid** [3] - 1744:19, 1744:22, 1745:6
**wildlife** [1] - 1744:23
**willfulness** [1] - 1777:11
**William** [2] - 1669:19, 1669:22
**Williams** [1] - 1695:9
**Wing** [1] - 1695:17
**wire** [11] - 1708:3, 1708:6, 1708:11, 1739:25, 1740:1, 1740:4, 1740:7, 1740:11, 1740:16, 1745:20, 1745:23
**withdraw** [3] - 1705:6, 1705:17, 1705:18
**Witness** [3] - 1699:3, 1741:25, 1771:25
**WITNESS** [23] - 1671:4, 1696:25, 1697:2, 1711:9, 1712:9, 1712:20, 1737:1, 1741:24, 1744:22, 1748:9, 1749:5, 1749:7, 1757:6, 1757:9, 1757:14, 1758:10, 1763:6, 1764:4, 1764:8, 1764:13, 1765:2, 1766:4, 1766:14
**witness** [11] - 1672:6, 1672:13, 1699:2, 1699:4, 1741:22, 1742:1, 1742:12, 1744:3, 1776:19, 1777:16, 1780:5
**witness's** [1] - 1773:17
**witnesses** [4] - 1693:15, 1720:19, 1773:22, 1774:19
**wondering** [1] - 1775:13
**word** [5] - 1678:15, 1688:8, 1693:19, 1693:24, 1749:4
**Word** [1] - 1694:20
**words** [2] - 1760:6, 1773:1
**works** [1] - 1731:9
**world** [1] - 1769:11
**worthy** [1] - 1755:15
**Wright** [4] - 1749:12, 1752:18, 1758:15, 1769:23
**write** [1] - 1758:9
**writer** [1] - 1775:8
**writing** [3] - 1680:12, 1692:11, 1692:14
**written** [2] - 1691:7, 1759:18

1800

**wrote** [5] - 1743:1, 1743:10, 1743:12, 1776:24, 1777:4

## X

**Xinhua** [4] - 1745:22, 1745:23, 1745:25, 1746:3
**Xinhua's** [1] - 1745:20

## Y

**Yanukovych** [1] - 1750:11
**year** [5] - 1700:4, 1735:22, 1745:7, 1746:4, 1746:7
**year-end** [1] - 1735:22
**years** [9] - 1673:18, 1673:20, 1674:12, 1694:18, 1695:5, 1695:7, 1699:24, 1745:19, 1747:9
**yesterday** [2] - 1773:14, 1776:11
**York** [12] - 1677:9, 1680:18, 1700:3, 1725:2, 1728:5, 1745:20, 1749:25, 1757:23, 1759:8, 1759:14, 1761:9, 1768:8
**yourself** [4] - 1699:14, 1744:12, 1749:10, 1762:10
**Yulia** [5] - 1710:24, 1727:6, 1765:16, 1765:25, 1768:23

## Z

**zero** [6] - 1692:7, 1714:22, 1723:15, 1733:9, 1738:23, 1741:4
**ZUCKERMAN** [2] - 1669:20, 1669:23
**Zwaan** [1] - 1679:11