1991

1           UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2

3  UNITED STATES OF AMERICA,        )
                                    )
4       v.                          )   Criminal Action No. 19-CR-125
                                    )
5  GREGORY B. CRAIG,                )   JURY TRIAL - DAY 9
                                    )   Afternoon Session
6           Defendant.              )
   _____  )   Washington, D.C.
7                                       August 22, 2019

8

9       TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
          BEFORE THE HONORABLE AMY BERMAN JACKSON
10             UNITED STATES DISTRICT JUDGE

11

                APPEARANCES:
12

13      For the Government:    Fernando Campoamor-Sanchez, AUSA
                               Molly Gulland Gaston, AUSA
14                             U.S. ATTORNEY'S OFFICE FOR THE
                               DISTRICT OF COLUMBIA
15                             555 Fourth Street, NW
                               Washington, DC 20530
16                                -and-
                               Jason Bradley Adam McCullough
17                             U.S. DEPARTMENT OF JUSTICE
                               950 Pennsylvania Avenue, NW
18                             Washington, DC 20530

19      For the Defendant:     Adam B. Abelson, Esq.
                               William James Murphy, Esq.
20                             ZUCKERMAN SPAEDER, LLP
                               100 East Pratt Street
21                             Suite 2440
                               Baltimore, MD 21202
22                                -and-
                               William W. Taylor, III, Esq.
23                             Paula M. Junghans, Esq.
                               ZUCKERMAN SPAEDER, LLP
24                             1800 M Street, NW
                               Suite 1000
25                             Washington, DC 20036

1992

1

2

3    Court Reporter:          PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                              U.S. Courthouse, Room 4700A
4                             333 Constitution Avenue, NW
                              Washington, D.C.  20001
5                             (202) 354-3243
              Proceedings reported by stenotype shorthand.
6            Transcript produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1993

1

2                        E X A M I N A T I O N S

3   WITNESS                   DIRECT     CROSS     REDIRECT     RECROSS
    RICHARD GATES                        1994        2042

4
                              E X H I B I T S
5
    DEFENDANT EXHIBIT                              PAGE
6   418                                           2016

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                     AFTERNOON SESSION

 2                        (2:03 P.M.)

 3           THE COURT:  All right.  Let's bring the jury in.

 4           (Jury present)

 5           THE COURT:  The jurors are all present.

 6           Mr. Gates, I want to remind you that you're still

 7      under oath.

 8                You can be seated.

 9           Ms. Junghans, you can resume.

10           MS. JUNGHANS:  Thank you, Your Honor.

11                          RICHARD GATES,

12      having been duly sworn, was examined and testified as follows:

13                        CROSS-EXAMINATION

14           BY MS. JUNGHANS:

15      Q.   Mr. Gates, before we broke, we were talking about Exhibit

16      126, which I just want to go back to for a moment.  And we

17      were looking at the portion where it discussed whether the

18      report stated there was no evidence of political motivation.

19                Now, if you look at the first page of the e-mail that

20      sent this to you, the first page of the document which was

21      the e-mail that sent this to you, you'll notice that

22      Mr. Hawker says to you, "We've provided answers even where we

23      do not know the facts."

24                Do you see that?

25      A.   Yes.
```

1    Q.   And is that because at that point, if this was all still

2    hypothetical, what the report was going to say?

3    A.   I believe at that time we still had not seen a copy of

4    the full report, so there were pieces of it that still had

5    not been filled in by Mr. Hawker because of that.

6    Q.   Okay.  But pretty much simultaneously with this, you did

7    get the report; didn't you?

8         Let's look at Exhibit 234, Government Exhibit 234.

9         This shows that on September the 12th, 2012, you were

10   forwarding the report to Mr. Hawker and he was, in turn,

11   forwarding it to Jon Aarons; correct?

12   A.   Correct.

13   Q.   Okay.  And you have the paper document in front of you;

14   correct?

15   A.   Yes.

16   Q.   This is the report --

17   A.   Yes.

18   Q.   -- right?

19        So I take it you read it when you got it?

20   A.   Not the entire report, no.

21   Q.   Have you ever read the entire report?

22   A.   Honestly, I have not read the entire report.

23   Q.   I see.  So in order to get the facts right, you would

24   have to read the report, wouldn't you, to know what the

25   report said?

1996

1    A.   Mr. Hawker was preparing the detailed items that were

2    related to the previous attachments, so he was the one that

3    went through the report in more detail.

4    Q.   Let's look at Exhibit 233.

5         THE DEPUTY CLERK:   Government 233?

6         MS. JUNGHANS:   I'm sorry.   Government 233.   Thank

7    you.

8         BY MS. JUNGHANS:

9    Q.   There is a lot of activity on September 12th, so this is

10   another e-mail from you to Mr. Hawker on September 12th, and

11   you appear to be forwarding comments from Mr. Manafort;

12   correct?

13   A.   Yes.

14   Q.   Okay.   And if we turn to the -- and sending yet another

15   messaging document.   If you look at the caption of the

16   e-mail, it says, "Project Veritas messaging and draft NR PJM

17   REV."

18        Does that mean Paul J. Manafort revisions?

19   A.   Revisions, yes.

20   Q.   Okay.   And the same thing for the other document that is

21   attached; right?

22   A.   Yes, the MOJ QNA.

23   Q.   Can you go to the next page, please, John.

24        So, again, what this is is the messaging document --

25   A.   Yes.

1    Q.   -- what we're going to say about this report.  Okay.  Is

2    that right?

3    A.   I believe so, yes.

4    Q.   Okay.  And it summarizes the findings.  Now, did you

5    check to see whether the findings actually said these things?

6    A.   I believe -- yeah, we read the executive summary, which

7    had a conclusion section in it, and we largely used that as

8    the basis for a lot of the messaging memos that we put out.

9    Q.   Okay.  And turn to the next page, please.

10           And then you put together statements that various

11   interested parties might make about the report; correct?

12   A.   Yes.

13           MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

14   question.

15           MS. JUNGHANS:  Pardon?

16           MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

17   question.

18           THE COURT:  All right.  Well, this is still -- when

19   you say "you," was that your objection?

20           MR. CAMPOAMOR-SANCHEZ:  Right.

21           THE COURT:  Okay.  So are you talking about the

22   group --

23           MS. JUNGHANS:  Yes, the group.

24           BY MS. JUNGHANS:

25   Q.   You were working on statements that interested parties

1998

1    might make after the report was released?

2    A.   I had the occasion to edit the statements.  Mr. Hawker

3    did the initial preparation of the statements.

4    Q.   Okay.  And Mr. Manafort had occasion to edit the

5    statements?

6    A.   Correct.

7    Q.   This was a group project?

8    A.   Yes.

9    Q.   Okay.  In this draft on this page, the proposed statement

10   for the Ministry of Justice was in the headline, "Independent

11   report concludes Tymoshenko trial was not politically

12   motivated."

13   A.   Yes.

14   Q.   You see that?

15   A.   I do.

16   Q.   Is that statement in the report?

17   A.   That specific statement, no.  That was a headline that

18   Jonathan created based off the information from the report.

19          MS. JUNGHANS:  Excuse me.  Can I just consult with

20   counsel for one second, please?

21          THE COURT:  Yes.

22       (Counsel confer)

23          BY MS. JUNGHANS:

24   Q.   Let's look at page -- it is pdf page 9, John, of Exhibit

25   234 that we were just looking at; 234, page 9.

1     MR. CAMPOAMOR-SANCHEZ:  I'm confused as to

2     whether --

3     MS. JUNGHANS:  I apologize.  There are so many

4     iterations of this report.

5     BY MS. JUNGHANS:

6     Q.  Exhibit 234, which is the one we just looked at that you

7     had on September 12th, okay, and if you look at page 9, it

8     deals with selective prosecution; right?

9     A.  Yes.

10    Q.  And what it says is --

11    THE COURT:  Wait.  What are we quoting from?  The

12    last document we were asking him about was the messaging

13    plan.  This doesn't seem to be the messaging plan.

14    MS. JUNGHANS:  No, Your Honor.  This is the actual

15    report.

16    THE COURT:  Okay.  Well, we first got the step of

17    directing his attention to the e-mail transmitting the report

18    and --

19    MS. JUNGHANS:  I thought I had just done that.

20    THE COURT:  No, you missed it.  Things got a little

21    off track.  So let's go back.

22    MS. JUNGHANS:  Thank you.

23    BY MS. JUNGHANS:

24    Q.  Mr. Gates, Exhibit 234, which you have in front of you in

25    paper form -- right?

2000

1    A.   Yes.

2         THE COURT:  Defendant's Exhibit 234; correct.

3         MS. JUNGHANS:  No, Government's Exhibit 234.

4         THE COURT:  Okay.

5         MS. JUNGHANS:

6    Q.   Shows that on December the 12th -- September the 12th,

7    2012 you had the full report, and you sent it to Mr. Hawker;

8    correct?

9    A.   Yes.

10   Q.   Okay.  And then he sent it to Mr. Aarons?

11   A.   Yes.

12   Q.   Okay.  And if we turn to page 5, which is pdf page 9 of

13   this report -- and maybe before we do that, we should just

14   see how the report is -- let's back up for a second so

15   everybody can see how the report is organized.

16        So it has a cover page; right?

17        And then go to the next page, please.  It has a table

18   of contents.

19        Go on to the next page, please.  And then it

20   identifies several appendices that are attached to it.

21   Right?

22   A.   Yes.

23   Q.   Then it starts on page 1, which is pdf page 5, with the

24   executive summary; correct?

25   A.   Yes.

1    Q.   And the first number of bullet points are under the

2    heading of "Factual Conclusions."  And it talks about various

3    facts related to Ukraine, etc.; right?

4    A.   Yes.

5    Q.   And then there is another page of factual conclusions;

6    correct?

7    A.   Yes.

8    Q.   And then if you go to -- at the bottom of what is page 2

9    of the report, it starts identifying the conclusions of the

10   report; correct?

11   A.   Correct.

12   Q.   Okay.  Why don't we just so everybody is -- why don't we

13   all just run through them.

14        The first conclusion is the Court's opinion, and it

15   says, "The Court --

16        MR. CAMPOAMOR-SANCHEZ:  Can we approach?

17        THE COURT:  Yes.

18        MR. CAMPOAMOR-SANCHEZ:  Sorry.

19   (At the bench)

20        MR. CAMPOAMOR-SANCHEZ:  The document was still a

21   draft, it is not the final report.  So I don't just want

22   there to be any confusion that the conclusions in the

23   executive, whatever we're reading, are not from the final

24   report, they're from a draft report.

25        MS. JUNGHANS:  We can make that clear, but they don't

2002

1    change.

2            MR. CAMPOAMOR-SANCHEZ:  Okay.  Well, maybe they

3    don't.  I just want to be --

4            THE COURT:  We are now reading to him from the draft

5    report that he had in hand as of the time of the plan --

6            MS. JUNGHANS:  Exactly.

7            THE COURT:  All right.

8        (In open court)

9            BY MS. JUNGHANS:

10   Q.   Just to be clear, Mr. Gates, this is the version that was

11   in existence as of September 12, 2012?

12   A.   Correct.

13   Q.   Okay.  And the version that you were messaging about?

14   A.   Correct.

15   Q.   Okay.  So the first conclusion is that the Court's

16   opinion -- I'm not going to read every word of this --

17   "Although many facts were in sharp dispute and conflicting

18   evidence was offered on many issues, the Court, as finder of

19   fact, based its findings on evidence before the Court and, in

20   some instances, on inferences that the Court drew from that

21   evidence."

22           Correct?

23   A.   Yes.

24   Q.   Okay.  Let's go down to the second conclusion.

25           "Legal adequacy of the charges under Ukrainian law."

1        And it says, "The parties vigorously disputed what was in

2        issue.  And then it goes on to say, "This issue of Ukrainian

3        law -- the legal requirements necessary to satisfy the

4        elements of the statutory offense -- is beyond the scope of

5        our assignment and beyond our expertise."

6              So you understood from that conclusion that Skadden

7        was not undertaking to render an opinion about whether

8        Ms. Tymoshenko was or was not guilty under Ukrainian law?

9        A.   That is correct.

10       Q.   Then, the third conclusion deals with the opportunity to

11       prepare a defense, and that was an issue Ms. Tymoshenko had

12       complained about; correct?

13       A.   Correct.

14       Q.   Okay.  And again, it says in the center of the paragraph,

15       "We believe that, looking at this case, most American trial

16       courts would have given the defendant more time to prepare

17       her defense.  It is unlikely, however, that based on this

18       record, an American appellate court would find a due process

19       violation and reverse the conviction."

20             Everybody can read it eventually.  But that was

21       conclusion two; right?

22             THE COURT:  Three.

23             MS. JUNGHANS:  Three.  Thank you.

24             BY MS. JUNGHANS:

25       Q.   Can you go to the next one, please, John.

1          And then the next issue dealt with the selection of

2     the judge and dealt with Ms. Tymoshenko's allegation, in

3     essence, that Mr. Yanukovych had hand-picked the judge;

4     right?

5     A.   Yes.

6     Q.   Okay.  And it said that "The report concluded she has not

7     established that the judge's experience, tenure, or selection

8     violated Western standards of fairness --

9     A.   Yes.

10    Q.   -- right?

11         Okay.  Let's go to the next one.

12         Jury request.  It goes on -- if I may summarize, even

13    though she would have liked to have had a jury, juries are

14    not customarily used in Ukraine, not a violation of due

15    process.  Correct?

16    A.   Yes.

17    Q.   Okay.  And let's go to the next one.

18         Her courtroom behavior.  And it describes that

19    Ms. Tymoshenko refused to acknowledge the Court's legitimacy

20    and engaged in conduct that was disrespectful.  And that the

21    tactics made management of the trial substantially more

22    difficult.  And then it points you to the pages where that is

23    discussed in more detail.  Right?

24    A.   Yes.

25    Q.   Then, can you go to the next one, please.

1          Removal from the courtroom.  This goes to her

2     complaint that she was put out of the room during certain

3     portions of the trial.  Right?

4     A.   Yes.

5     Q.   Then it says, "Neither she nor her counsel raised any

6     objection to the admission of the document, and it does not

7     appear that she suffered any prejudice."  All right.

8          THE COURT:  Well, wait.  That doesn't quite --

9          MS. JUNGHANS:  As a result of the absence.

10         And one can find more details on that at the pages

11    that are cited?  Correct?

12         THE COURT:  Well, you read the first sentence that

13    there were two removals.  And I think just to fairly

14    characterize what is sitting here, the conclusion is that the

15    July 6 removal doesn't raise fairness concerns, the 15th was

16    more troubling, but she didn't suffer any prejudice as a

17    result.

18         MS. JUNGHANS:  Yes, Your Honor.  Thank you, Your

19    Honor.

20         THE COURT:  Is that a fair summary?

21         All right.

22         BY MS. JUNGHANS:

23    Q.   Can you go to the next one, please.

24         That deals with her detention.  And this goes to the

25    fact that she was put in jail during her trial.  Correct?

1    A.   Yes.

2    Q.   Okay.  And the conclusion that is expressed here, under

3    Western standards, "We find the decision to detain Tymoshenko

4    for the entire balance of her trial and after the trial had

5    concluded -- until sentencing -- without adequate

6    justification or review raises concerns about whether she was

7    inappropriately deprived of her liberty prior to her

8    conviction."

9         Right?

10   A.   Yes.

11        MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.  The

12   conclusion or the summary is not entirely accurate.

13        THE COURT:  I'm sorry.  You want to read the whole

14   paragraph?

15        MR. CAMPOAMOR-SANCHEZ:  Yes, I think it would be

16   better to just have it read.

17        MS. JUNGHANS:  Your Honor, I'm certainly not adverse,

18   but I'm trying not to bore everybody by standing here and

19   reading the whole thing.  I'm just trying to present how the

20   report is organized.

21        THE COURT:  Well, you're now presenting the actual

22   content of the report so you can ask him if the summary of

23   the report was accurate, so --

24        MS. JUNGHANS:  Well, I'm trying to get to just the

25   last one.

1          THE COURT:  All right.  I know.  And we'll get to all

2     of them.  But I think it is fair that this one --

3          MS. JUNGHANS:  I'm happy to read it.

4          THE COURT:  You might was well just read it rather

5     than talking about it.

6          MS. JUNGHANS:  Sure.

7          THE COURT:  I would be faster.

8          BY MS. JUNGHANS:

9     Q.  So what this conclusion says, Mr. Gates, is, under the

10    subject of "detention," "Tymoshenko claims that the Court's

11    decision to incarcerate her in a detention

12    facility -- beginning on August 5 and continuing through her

13    sentencing -- was an open-ended detention unjustified by the

14    facts.  Tymoshenko's courtroom behavior would likely have

15    merited a summary contempt finding under Western standards.

16    The Court's separate suggestion that she presented a flight

17    risk is problematic, however, on the record of this case.

18    Taking steps to maintain order in the courtroom is

19    justifiable.  Using detention to achieve that objective, as

20    the Court did in this case, is an accepted but rarely used

21    practice in Western courts.  Under Western standards, we find

22    that the decision to detain Tymoshenko for the entire balance

23    of her trial and after the trial had concluded -- until

24    sentencing -- without adequate justification or review raises

25    concerns about whether she was inappropriately deprived of

1    her liberty prior to her conviction."

2    A.   Yes.

3    Q.   Okay.  And then last, the last conclusion deals with

4    -- well, actually not the last.  The next one deals with

5    representation by counsel.  And so we're not confused, I'll

6    read the whole thing.

7        "Tymoshenko argues that the Court violated her right

8    to adequate representation by examining witnesses in the

9    absence of defense counsel and by failing to adjourn the

10   proceedings to allow her to acquire new legal representation.

11   Ukrainian law, as well as European and Western legal

12   standards, requires that a defendant who wishes to be

13   represented by counsel during trial must be able to exercise

14   that right.  Under Western standards, the continued

15   examination of witnesses without representation by counsel

16   would almost certainly be viewed as a violation of the right

17   to assistance of counsel."

18        Correct?

19   A.   Yes.

20   Q.   And then the next one, presentation of defense.  "During

21   the investigation stage of the proceeding, Tymoshenko

22   identified a large number of witnesses that she asked to be

23   interviewed.  Her request was found to be untimely, and the

24   chief investigator denied her request.  During the trial, she

25   identified other witnesses and asked that they be permitted

1      to testify.  Judge Kireyev refused to permit all but two of

2      these witnesses to testify.  Tymoshenko argues that Judge

3      Kireyev's refusal undermined her ability to present her

4      defense.  Under Western standards of fairness, we believe

5      that the Court's decision not to call certain defense

6      witnesses compromised Tymoshenko's ability to present a

7      defense."

8      A.   Yes.

9      Q.   All right.  And then last, selective prosecution.

10          Before we read that, you've already told us that this

11     question of selective or political prosecution was the most

12     important issue to your client, the Ministry of Justice.

13     A.   That's correct.

14     Q.   Okay.  And what it says is, "Tymoshenko has alleged that

15     her prosecution was a politically motivated reprisal

16     undertaken in order to silence a political opponent of the

17     ruling regime.  The prosecution of a former head of

18     government, unsuccessful presidential candidate, and leader

19     of the opposition merits close scrutiny in all respects.  In

20     this report -- could you highlight this part please, John --

21     "In this report, we do not opine about whether the

22     prosecution was politically motivated or driven by an

23     improper political objective -- i.e., to remove her from

24     political life in Ukraine in the future.  Instead, based on

25     the record of the case and established precedent, we do

2010

1      address the narrow doctrine of selective prosecution.

2      Tymoshenko has not provided specific evidence of political

3      motivation that would be sufficient to overturn her

4      conviction under American standards."

5              Right?

6      A.   Yes.

7      Q.   Okay.  Now, having this report with this executive

8      summary in hand at September 12, 2012, the messaging document

9      that was being prepared -- John, can you go back to 233,

10     please, on page 3 -- says in the headline, "Independent

11     report concludes Tymoshenko trial was not politically

12     motivated."

13             Do you see that?

14     A.   I do.

15     Q.   That was not the conclusion of the Skadden Report; was

16     it?

17     A.   That was Mr. Hawker's interpretation of the conclusion

18     from the report.

19     Q.   Well, that wasn't my question, sir.

20             MR. CAMPOAMOR-SANCHEZ:  Objection.

21             THE COURT:  You're asking him about whether something

22     someone else said is, in his judgment, the characterization

23     of something as if it is a yes-or-no fact question.  So is

24     the question -- he didn't write it.  It's in the plan.  So

25     what's your question.

1          MS. JUNGHANS:  Actually, Your Honor, he forwarded

2     this as a revised version from -- let me clarify -- from

3     yourself and Mr. Manafort?

4          THE WITNESS:  If that's at the previous e-mail you

5     showed me --

6          MS. JUNGHANS:  If you look at the first page.  John,

7     you can put that up again, please.

8          BY MS. JUNGHANS:

9     Q.  So this is a document from you to Hawker, not from Hawker

10    to you.

11    A.  But this is based off of a document that Mr. Hawker

12    provided to us first because that would reflect why there are

13    edits and revisions.

14    Q.  Okay.  So do you think this is an accurate

15    characterization of the conclusion that we just read from the

16    report?

17    A.  Based on the information at the time, yes, I do.

18    Q.  You think saying the independent report concludes it was

19    not politically motivated is the same as what I just read

20    from the --

21          MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

22    question.  Asked and answered.

23          MS. JUNGHANS:  It would be nice if I could get my

24    question out.

25          MR. CAMPOAMOR-SANCHEZ:  Objection.

2012

1        THE COURT:  Well, we have all been doing that.  Let's

2   try not to snipe at each other.  I realize everybody is

3   working very hard here and tensions are high.  This is a

4   complicated matter.  And I'm trying to avoid having everybody

5   come to the bench, but if we're going to argue at each other,

6   we're going to have to do that, and I think that would

7   frustrate everybody in the courtroom.

8        So you asked him what he thought.  You can ask

9   another question, but you can't argue with him.

10       BY MS. JUNGHANS:

11  Q.   Well, my question was:  Do you think that is an accurate

12  characterization of what we just read from the conclusions of

13  the report?

14  A.   And yes, I commented yes, I do believe that.

15  Q.   Okay.  Now, let's turn to Defendant's Exhibit 123.

16       If you could blow up the top of it, please, John.

17  No, actually, scroll down to the lower part of the page,

18  please.

19       So this is an e-mail from Mr. Hawker to you, also

20  September 12, 2006, sending you a control grid --

21       MR. TAYLOR:  2012.

22       MS. JUNGHANS:  Yes, September 12, 2012.

23       BY MS. JUNGHANS:

24  Q.   Do you see that?

25  A.   Yes.

2013

1    Q.   And you were exchanging these documents back and forth a

2    lot during this period of time; were you not?

3    A.   Correct.

4    Q.   Okay.  And the control grid is the chart that sort of

5    sets out what everybody is going to do on launch date?

6    A.   Yes.

7    Q.   So if we turn to the first page of what is

8    attached -- first of all, you will note that it says in the

9    upper left-hand corner, "Draft document for consideration of

10   legal counsel."

11   A.   Yes.

12   Q.   Who did you understand that to be?

13   A.   I could guess, but I don't recall.

14   Q.   Okay.  Mr. Hawker did not send this to Mr. Craig here?

15   A.   Not in the e-mail you just showed me.  It was sent to me.

16   Q.   And generally speaking, at this time, you were not

17   providing these grids to Mr. Craig?

18   A.   I was not.  That was not one of my responsibilities.

19   Q.   Now, if you turn to what is identified as page DX 123-3,

20   which is again the list of who is going to do what, and you

21   look at the line that is line 14 --

22   A.   Yes.

23   Q.   -- it refers to the project team and then -- who's the

24   project team?

25   A.   The project team would have been Mr. Hawker's team on the

2014

1    ground.

2    Q.   GC, that is Mr. Craig?

3    A.   Yes.

4    Q.   SKA, that's Skadden; right?

5    A.   Correct.

6    Q.   And it says, "Engagement with *Bloomberg*."

7    A.   Yes.

8    Q.   No David Sanger?

9    A.   Correct.

10   Q.   Okay.  And then it goes on to the next page, and we have

11   more, Mr. Craig talking to various officials; right?

12   A.   Yes.

13   Q.   And the last page, it repeats the Greg Craig travel log;

14   right?

15   A.   Yes.

16   Q.   Okay.  You had not heard from Mr. Craig that he was going

17   to take any of these trips that are identified here?

18   A.   That is correct.

19   Q.   Now, at the same time -- same day -- I guess later in the

20   day -- can we have Defendant's Exhibit 125.

21        And this is yet another version from Mr. Hawker to

22   you.  Why were you asking him for so many versions?

23   A.   So we had different audiences that these documents were

24   going to.  In reference to the document you're just citing

25   now, it was a cut-down version because it was going to

1    different stakeholders who would not have paid attention to

2    the level of detail that we had in the master grid.

3    Q.   And when you refer to a stakeholder, who are you talking

4    about?

5    A.   It could have been somebody inside the government.  It

6    could have been somebody outside the government.  It all

7    depends on at the time who Mr. Manafort requested the

8    document go to.

9    Q.   Okay.  And do you have an idea for whom this one,

10    particular version would have been intended since it is the

11    cut-down version?

12    A.   I believe this one went to Mr. Lyovochkin, who I

13    referenced earlier was the chief of staff to the President.

14    Q.   Okay.  So the purpose of this was for your firm to tell

15    the client all the great stuff that it was doing?

16    A.   That was the general idea, yes.

17    Q.   And all the great stuff you were going to get Mr. Craig

18    to do?

19    A.   Yes.

20    Q.   But you had had no assurances from Mr. Craig that he was

21    going to do them?

22    A.   I had none, that's correct.

23    Q.   Now, let's turn to what has been marked as Defendant's

24    Exhibit 418.

25         Now, Mr. Gates this is a document dated September 12,

1    2012.  Do you recognize it?

2    A.   Yes.  I think it was a document forwarded to me by

3    Mr. Hawker, and I, in turn, sent it to Mr. van der Zwaan.

4         MS. JUNGHANS:  Your Honor, I move the admission of

5    Defendant's Exhibit 418.

6         MR. CAMPOAMOR-SANCHEZ:  No objection.

7         THE COURT:  All right.  It will be admitted.

8       (Defendant 418 admitted in evidence)

9         BY MS. JUNGHANS:

10   Q.   And what this is, Mr. Gates, is the lower portion of it

11   is something you cut and pasted from an e-mail from

12   Mr. Hawker; right?

13        Everything under "FYI"?

14   A.   Yes, I believe so.

15   Q.   Can you blow that up, please, John.

16        And what this is is a sort of form of an article

17   about the report that Mr. Hawker had written, expressing what

18   he called the worst-case scenario?

19        MR. CAMPOAMOR-SANCHEZ:  Object to the form of the

20   question.

21        THE COURT:  I think that is a fair question.

22        You can answer it if you recall.

23        THE WITNESS:  Give me one second.  Let me look at

24   this, please.

25        MS. JUNGHANS:  Well, let me rephrase it a little

2017

1     different --

2              THE WITNESS:  Yes, I was going to say, could you

3     repeat the question --

4              MS. JUNGHANS:  Let me phrase it a little differently.

5              BY MS. JUNGHANS:

6     Q.   Actually, if you look at the caption of the article -- or

7     the caption of the e-mail, it says, "How a journalist will

8     see the report" --

9     A.   Uh-huh.

10    Q.   -- right?

11    A.   Yes.

12    Q.   So this was Mr. Hawker's take --

13    A.   Exactly.

14    Q.   -- on how he thought a journalist would see the report?

15    A.   It was one iteration of an idea that Mr. Hawker thought a

16    reporter could react to the Skadden effort, that's correct.

17    Q.   And the headline he thought that a reporter might issue,

18    start off with, was "Ukraine violated former Prime Minister's

19    rights, according to Ukraine's own lawyer"?

20    A.   Yes.

21    Q.   That's not the headline you were looking for?

22    A.   No.  But this also never appeared as the headline.

23    Q.   Well, we will get to that.

24              Let's turn to Defendant's Exhibit 134.

25              Now, at this point, you thought that the release of

1    the report was imminent; right?

2    A.   As of September 18th, yes, we thought it was going to be

3    very soon.

4    Q.   Okay.  And you had a version of the report that was

5    pretty significantly finished; wasn't it?

6    A.   Yes.

7    Q.   Okay.  And in fact, you had been told by the Skadden

8    folks that as far as they were concerned it was finished;

9    right?

10   A.   I believe that was Mr. Craig's representation, yes.

11   Q.   Okay.  But nevertheless, there were efforts by the

12   Ministry of Justice to get it to be changed yet again;

13   correct?

14   A.   That is correct.

15   Q.   If we look at Defendant's Exhibit 134, that is exactly

16   what this is, isn't it?

17           John, could you enlarge the lower part.  Thank you.

18           So this is an e-mail from you to Mr. Craig saying,

19   "Call me with questions."  And then is it fair to say that

20   what you're doing here is sending comments that Mr. Manafort

21   wrote but for whatever reason he asked you to send?

22   A.   Yes.  It is an e-mail from Mr. Manafort to me, which, in

23   turn, he asked me to forward it to Mr. Craig.

24   Q.   Okay.  And Mr. Craig's response was -- if you go to the

25   top -- "I thought we had dealt with all of the concerns that

2019

1    had been raised."  Right?

2    A.   Correct.

3    Q.   And the concerns were those of BG; correct?

4    A.   Yes.

5    Q.   BG was?

6    A.   That referred to the President of Ukraine.

7    Q.   BG is short for Big Guy?

8    A.   Yes.

9    Q.   Nevertheless, did Mr. Craig consent to consider these

10   comments?

11   A.   Yes.

12   Q.   Okay.  And in fact, that was one of the purposes for

13   convening the meeting at the Harvard Club; wasn't it?

14   A.   It was.

15   Q.   Okay.  If we go to Government's Exhibit 254, you have

16   identified it, I think, as the agenda and a batch of other

17   documents circulated prior to the meeting at the Harvard

18   Club.

19   A.   Yes.

20   Q.   Okay.  And you have that in paper form in your binder?

21   A.   I do.  What is the exhibit number again?

22   Q.   It is Defendant's Exhibit 254.

23            THE DEPUTY CLERK:  Government's.

24            MS. JUNGHANS:  Government's exhibit.  I apologize.

25            THE WITNESS:  Okay.  I have it.

2020

1          BY MS. JUNGHANS:

2     Q.   It is actually about 75 pages' worth of stuff; isn't it?

3     A.   Yes.  It is a rather large document.

4     Q.   Pardon?

5     A.   It is a rather large document.

6     Q.   Yes.  And do you recall what time -- well, strike that.

7     Do you recall receiving it?

8     A.   I do.

9     Q.   Do you recall what time you got it?

10    A.   I do not.

11    Q.   Okay.  Well, it says 4:11 a.m.  You don't know whether it

12    was actually sent at 4:11 or not; do you?

13    A.   That is actually from Mr. Hawker to me, so based on his

14    computer being on UK time, I would gather that that was

15    4 a.m. UK time at the time he sent it.

16    Q.   So it is probably more like midnight or so?

17    A.   About, yes.

18    Q.   And so you didn't have a conversation with Mr. Craig

19    about whether he had the opportunity to read this thing prior

20    to the Harvard Club meeting?

21    A.   No, I did not.

22    Q.   Okay.  And the whole master control grid was not reviewed

23    as part of the meeting; was it?

24    A.   To my recollection, it was not.

25    Q.   It was not?

2021

1     A.   Correct.

2              THE COURT:  Wasn't there a stipulation about what

3     time it was actually sent?

4              MR. MURPHY:  11:11, Your Honor.

5              THE COURT:  11:11 --

6              MR. MURPHY:  p.m., Saturday night.

7              THE COURT:  U.S. time or Hawker's time?

8              MR. MURPHY:  11:11 Saturday night, New York time.

9              THE COURT:  Okay.  Thank you.

10             BY MS. JUNGHANS:

11    Q.   So the master control grid that is attached to this, if

12    you could, John, go over to the -- if you could go to page 3

13    of the document, which is page 5 of the pdf.

14             It repeats -- it repeats what we have seen before

15    about Mr. Craig's engagement with U.S. media.  Right?

16             And then it repeats what we have seen before about

17    him going all over Europe to talk to people.

18    A.   Yes.

19    Q.   Okay.  And he had not consented to do these things before

20    the meeting took place?

21    A.   That is correct.

22    Q.   Okay.  Now, you have told us about the meeting at the

23    Harvard Club, and you said that Mr. Craig again mentioned the

24    name of David Sanger --

25    A.   Correct.

1    Q.   -- as a reporter he knew?

2    A.   To my recollection, yes.

3    Q.   Okay.  And what else is it that you say he said about

4    David Sanger?

5    A.   At the meeting, it was not a lot of discussion on any

6    specific component of Sanger but that he was a reporter that

7    we could potentially use based on Greg's relationship to get

8    the story out, the seed story out.

9    Q.   So he didn't say, "Don't worry, I'll do it, I'll go get

10   Sanger, just tell me when to launch?  He didn't say anything

11   like that?

12   A.   He did not.

13   Q.   It was just this is a good guy?

14   A.   That he had a relationship with, yes.

15   Q.   So that was not part of the media plan at the end of the

16   Harvard Club meeting that Greg Craig had taken on this

17   assignment?

18   A.   It was -- without specifically going through each

19   component of it, it was more general; that Craig had reduced

20   the amount of effort that he was willing to put into it, but

21   that he was still willing to do something.  And a lot of that

22   was still dependent on what we came up with for the final

23   plan.

24   Q.   Okay.  But you didn't go out, then, and immediately

25   change the plan to say that Greg Craig will talk to David

2023

1    Sanger?

2    A.   That's correct.

3    Q.   And that's why, if you look at -- well, strike that.

4         If you look at Exhibit 258, which is your notes from

5    the meeting, under "PR Items" on page 2 --

6    A.   Yes.

7    Q.   -- and I think you told us earlier this was -- the next

8    page, please, John -- I think you told us earlier this was a

9    list of action items emanating from the Harvard Club meeting?

10   A.   Notes and action items, yes.

11   Q.   So there is no action item for Greg Craig?

12   A.   Correct.

13   Q.   Except possibly meeting this Mr. Fule?

14   A.   Correct.

15   Q.   To your knowledge, he never did that?

16   A.   He did not.

17   Q.   Now, do you know that the day after the Harvard Club

18   meeting Mr. Craig said that whatever discussion may have

19   occurred during that meeting about him backgrounding

20   journalists, he wouldn't be able to do it?

21   A.   I wasn't part of any discussion.  I don't recall if

22   Jonathan had mentioned it or not, but there was reluctance on

23   Mr. Craig's part to take on a number of the actions that we

24   had outlined in some of the models.

25   Q.   Well, I think you said earlier that you never heard that

2024

1    Greg Craig changed his mind.

2    A.   I personally did not, that's correct.

3    Q.   Well, did you hear about it, him changing his mind?

4    A.   Yes, at different points throughout the project, so not

5    just specifically at that time, but in other months as well.

6    Q.   Well, how about specifically at this time?

7    A.   At this time, I did not hear Mr. Craig change his mind

8    about that specific issue, no.

9    Q.   Well, wasn't his changing his mind the subject of such

10   concern that a meeting was convened at Mr. Manafort's

11   apartment at Trump Tower to talk about what was going to

12   happen in view of him changing his mind?

13        MR. CAMPOAMOR-SANCHEZ:   Objection to the form of the

14   question.

15        THE COURT:   Was there a meeting convened at the Trump

16   Tower shortly after the meeting at the Harvard Club?

17        THE WITNESS:   Yes.

18        THE COURT:   Do you know what the purpose of the

19   meeting was?

20        THE WITNESS:   The purpose of the meeting was to

21   review and go through the report's content, and then also to

22   look at some of the material that we had discussed at the

23   meeting.

24        BY MS. JUNGHANS:

25   Q.   So it had nothing to do with --

2025

1      THE COURT:  Did you call the meeting?

2      THE WITNESS:  No.

3      BY MS. JUNGHANS:

4   Q.  Well, actually, take a look at Government Exhibit 270, if

5   you would.

6      This is an e-mail from yourself to Mr. Hawker --

7   A.  Yes.

8   Q.  -- saying, "We are going to meet at 10 a.m. at Paul's

9   apartment."

10     Is it fair to say that if you didn't call it, you

11  organized it?

12  A.  Paul asked me to call for the meeting.

13  Q.  And who was there?

14  A.  Myself, Mr. Hawker, Mr. Manafort, and I believe, for part

15  of it, Mr. van der Zwaan.

16  Q.  Well, he is not on the e-mail.

17  A.  Correct.  So maybe I'm wrong about that.

18  Q.  Okay.  And you're saying that the issue of Mr. Craig

19  reversing course was not an issue that was brought up at this

20  meeting?

21  A.  It was not an issue brought up directly at the Harvard

22  Club meeting.  From my understanding from Mr. Hawker, it was

23  brought up previously to the Harvard Club meeting.

24  Q.  I'm sorry, Mr. Gates.  Maybe I'm tired, but I'm not

25  following you.  I thought you said that at the Harvard Club

1      meeting Mr. Craig said David Sanger is a good reporter?

2      A.   Correct.  In the general discussion that we had.

3      Q.   Right.  And he didn't say, I will accept the assignment

4      of briefing David Sanger?

5      A.   No, not at that meeting.

6      Q.   Okay.  But he might have talked about backgrounding the

7      journalist, in general?

8      A.   Yes.

9      Q.   Okay.  And then you heard that he changed his mind?

10     A.   Correct.  But this is not the first time he had changed

11     his mind.

12     Q.   Understood.  But I'm talking about this specific subject.

13     A.   Yes.

14     Q.   You learned that the next day?

15     A.   Yes.

16     Q.   And was that a subject of concern to the group?

17     A.   To Mr. Hawker, it was.  But Mr. Manafort indicated that

18     he would talk to Mr. Craig and take care of --

19     Q.   I didn't ask you what Mr. Manafort --

20              THE COURT:  Well, you asked if it was a subject of

21     concern to the group --

22              MS. JUNGHANS:  And that was a "yes" or "no" question.

23              THE COURT:  -- the group had different brains --

24              MS. JUNGHANS:  Right, I'm just asking --

25              THE COURT:  -- so he didn't have the same answer for

1      every person.  He's trying to answer your question.

2              MS. JUNGHANS:  Right.  Okay.

3              THE COURT:  So it was the subject -- it was -- was

4      Mr. Hawker concerned?

5              THE WITNESS:  He was.

6              THE COURT:  Was Mr. Manafort concerned?

7              THE WITNESS:  Not as concerned.

8              BY MS. JUNGHANS:

9      Q.   Okay.  So then you had this meeting at Trump Tower.

10     A.   Yes.

11     Q.   And then you continued to do media plans.

12     A.   Yes.

13     Q.   And let's look at September 26th, which is Defendant's

14     Exhibit 161.

15              Again, this is a document from you to Mr. Hawker, the

16     "SA outreach list."

17     A.   Yes.

18     Q.   Okay.  And are you the one who put this together in

19     addition to circulating it?

20     A.   No, this was actually put together by the -- primarily,

21     the two D.C. firms.  It's a template that we just updated,

22     but it had already been prepared by them.

23     Q.   Okay.  And did you have any input into it?

24     A.   I did.

25     Q.   Okay.  And particularly as to U.S. journalists who might

-2028-

1    be employed in this process?

2    A.   Well, to be clear, I didn't have input in terms of who

3    that might be.  I had input into I could make changes based

4    on what I was directed to do with the document.

5    Q.   Okay.  And what the document says, if you go to page 2,

6    which is page 3 of the pdf -- so after you review journalists

7    in Europe, then you get to the United States.  And the United

8    States person was Al Hunt at *Bloomberg*; correct?

9    A.   That is correct.

10   Q.   Okay.  And did you direct that that information be

11   included?

12   A.   I don't recall, but we -- either I or Mr. Hawker updated

13   it with that information.

14   Q.   Okay.  So at this point, you are not operating on the

15   presumption that Mr. Craig is going to reach out to David

16   Sanger?

17   A.   At this stage, that is correct.

18   Q.   And if you go to Defendant's Exhibit 167, a couple of

19   days later, another version.  Do you have any idea what

20   caused you to update this version since September 26th?

21   A.   Other than just more changes as we continued to change

22   the plan.  I don't even think this is the last document,

23   either.

24   Q.   Probably not.  Let's look at pdf 167-5.

25   A.   Yes.

1    Q.   And if you look at the lower portion of the page, it has

2    got a whole bunch of assignments for Mr. Craig.  But I notice

3    in this one, it says, "Al Hunt and *Bloomberg* will be

4    contacted by FTI and MCW."

5    A.   Yes.

6    Q.   What is that?

7    A.   MCW was Mercury.  That was based on the contact that I

8    alluded to earlier that Mr. Weber had with the reporter,

9    Mr. Hunt.

10   Q.   Okay.  So Mr. Craig isn't involved in that, according to

11   this plan?

12   A.   That is correct.

13   Q.   Okay.  But Mr. Craig supposedly is going to go talk to

14   Tony Blinken, Philip Gordon, and John Boehner?

15   A.   That's who we identified, yes.

16   Q.   Pardon me?

17   A.   Yes, that's who we identified putting into the matrix.

18   Q.   You're saying that Mr. Craig told you he would talk to

19   these three individuals?

20   A.   No, I'm saying we just put it in the matrix.  We did not

21   have -- I did not have a conversation with Mr. Craig.

22   Q.   Okay.  This is your continuing wish list about what

23   Mr. Craig is going to do?

24   A.   Yes.

25   Q.   Not shared with him by you or by anybody else, as far as

1    you know?

2    A.   Correct.  This was a briefing of top level officials both

3    at Congress and at the administration that we thought that

4    Mr. Craig would be willing to do.

5    Q.   Okay.  You thought he would be willing to do, but you

6    hadn't asked him if he was willing to do it?

7    A.   I personally did not, no.

8    Q.   Now, if you go to Defendant's Exhibit 168, which is

9    September 30th, a couple of days later, again from you to

10   Mr. Hawker, yet another version, and you ask him to look

11   closely at it.

12          Now, at this point, did you think that the

13   report -- this was like getting down to crunch time?  I mean

14   you're exchanging lots of documents.

15   A.   This happened a couple of times -- actually, a few

16   times -- throughout the months that we thought we were going

17   to release it.  So it was another fire drill exercise in

18   which we were attempting and believed that the report would

19   be released, that we would be given the green light from

20   Ukraine so that we could then put these into action.

21   Q.   Right.  So, at that moment, if you look at page 168-2,

22   we're still sticking with Al Hunt and *Bloomberg*.

23   A.   That is correct.

24   Q.   Without saying who's going to do it?

25   A.   Correct.

```
1              MR. CAMPOAMOR-SANCHEZ:  Objection.  Are we at Exhibit

2       168?

3              MS. JUNGHANS:  168, page 2.

4              MR. CAMPOAMOR-SANCHEZ:  Can you show the jurors a

5       little bit above the box --

6              MS. JUNGHANS:  Sure.  Happy to.

7              MR. CAMPOAMOR-SANCHEZ:  Okay.

8              THE COURT:  Well, I do think -- she can ask her

9       questions, and you can ask your questions but --

10             MR. CAMPOAMOR-SANCHEZ:  May we approach, Your Honor?

11             THE COURT:  Yes.

12           (At the bench)

13             THE COURT:  I think his point was it wasn't a fair

14      question to say, without saying who's going to do it, when

15      immediately above it says this will be done by FTI and SA.

16             Now, you can establish whether he knew that, whether

17      it was a wish list, blah, blah, blah.  But it says that.  And

18      you asked a question that was misleading.  I don't think it

19      was deliberately you who put the box up --

20             MS. JUNGHANS:  I'm happy to fix it.

21             THE COURT:  Okay.

22             MS. JUNGHANS:  I'm happy to have him read this whole

23      thing.

24             THE COURT:  That's not the point.  I think what he

25      meant, information that was invisible at the moment, and so
```

1    it was an unfair question because it was written there.

2            MS. JUNGHANS:  I am not --

3            THE COURT:  Nobody is suggesting that you did it

4    deliberately.  All right.

5            Now, I just want to say that we're all trying to

6    remain calm.  I think you can object and ask to approach.

7    You don't need to turn back and look at him.  Let's put it

8    through me.

9            I do want to say -- and this isn't directed to you

10   personally, this is directed to everyone -- that when the

11   jurors were making the gesture that indicated let's just keep

12   going that I think that conveyed that they wanted to just

13   finish whatever we were doing before the next break.  I'm

14   concerned that it also reflects the notion that this is

15   taking a long time.  And that doesn't lie at the feet of

16   either side.  But there is, by both sides, in both directs

17   and crosses, a fair amount of replowing of territory and

18   recapitulation of testimony, and so I just want everybody to

19   think about the fact that it may be wearing on your untended

20   audience.  And as I said, I'm not directing that to you

21   personally; I'm directing that to everyone.

22           MS. JUNGHANS:  Your Honor, I appreciate that.  There

23   is evidentiary value to the fact that these people generated

24   iteration after iteration after iteration of these documents

25   that don't mention Mr. Craig.  You know, if I don't put that

1    in, I can't make the point.

2            THE COURT:  Well, I think Mr. Hawker was

3    cross-examined for an entire day during which that was put

4    in, and I think that this gentleman is being cross-examined

5    to put that in, and I understand the point, and the relevance

6    of the point will be both sides' ability to argue when the

7    time comes.  I'm just suggesting that everyone risks annoying

8    the jury with too much repetition.  I'm not directing that

9    only to the defense.  I think there has been a lot of

10   repetition by everyone.  And I think the jury's indicated

11   that.  So that's for what it is worth.

12           MS. JUNGHANS:  I hear you, and I'm doing my best.

13           THE COURT:  All right.  Thank you.

14       (In open court)

15           BY MS. JUNGHANS:

16   Q.   Mr. Gates, Mr. Campoamor pointed out that I failed to

17   highlight this whole section, and I want to make sure that it

18   is complete.

19           So, John, could you go up to -- you can just do the

20   line above the box.

21           Okay.  "The background briefings will be done by FTI

22   and SA" -- which would be Skadden, right?

23   A.   Yes.

24   Q.   -- "and include the following journalist."

25   A.   Yes.

2034

1    Q.   And the journalist is *Bloomberg*?

2    A.   Yes.

3    Q.   Okay.  Let's look at Government Exhibit 280.  And this is

4    an e-mail from Mr. Hawker to Mr. Manafort and you.  Right?

5    A.   Yes.

6    Q.   And what he does here is to take segments out of the

7    master grid and comment on them.  Right?

8    A.   Let me read it real quick.

9         Okay.

10   Q.   Okay.  And if you go to the next page, he says that

11   "Mr. Craig is in Egypt.  In his last call, he said that he

12   would do meetings with political stakeholders."

13        You see that?

14   A.   I do.

15   Q.   Now, Mr. Craig never -- you never heard him say that to

16   you?

17   A.   No.

18   Q.   And you don't know of him ever doing that?

19   A.   Political stakeholders, I do not believe he did.

20   Q.   Okay.  And then if you go down lower on that page, he

21   talks about the part that says "the setup" -- at the

22   bottom -- "The set up and numbers is the responsibility of

23   the agencies."  Again, it says, "briefings again would be

24   done by GC" -- Greg Craig" -- slash "me."  "Me" is

25   Mr. Hawker; right?

1      A.   That's correct.

2      Q.   "Or someone appropriate from the Ukraine."  Correct?

3      A.   Yes.

4      Q.   Now, this is a few days after you have just heard that

5      Mr. Craig had --

6            THE COURT:  Wait.  Are the typed comments Hawker's

7      comments or Manafort's comments?

8            MS. JUNGHANS:  Hawker's.

9            THE WITNESS:  Mr. Hawker's.

10           BY MS. JUNGHANS:

11     Q.   Okay.  This is a few days after you had been told that

12     Mr. Craig had reversed course about whatever he indicated at

13     the Harvard Club he might be able to do?

14           MR. CAMPOAMOR-SANCHEZ:  Objection to the form.

15           THE COURT:  I'm sorry.  Can you repeat the question?

16           BY MS. JUNGHANS:

17     Q.   You said that the Harvard Club meeting was

18     September 23rd; right?

19     A.   Correct.

20     Q.   And within a day or two after that you heard that

21     Mr. Craig said that no, I can't do that?

22     A.   With respect to media, not political stakeholders.

23     Q.   Okay.  Well, right.  But then we're talking about here,

24     the line we just looked at, we're talking about briefings

25     with political stakeholders at that point.  Right?

1    A.   Yes.

2    Q.   Okay.  So you're saying you still thought he was going to

3    do that but you understood clearly he was not going to do

4    media?

5    A.   Based on -- yes, that's correct.

6    Q.   Okay.  And let's just try to go through these.

7    Government Exhibit 281.  This is from you to Mr. Hawker,

8    "Matrix," and it says, "D.C. consultants plan."

9         Right?

10   A.   Yes.

11   Q.   And this is the Podesta and Mercury people?

12   A.   It is a revised version, yes.

13   Q.   Turn to the next page, please, John.

14        And again, we're still talking about identifying a

15   key reporter, an outlet that can leak the story, possibly

16   *Bloomberg*.  Right?

17   A.   Yes.

18   Q.   Okay.  No David Sanger?

19   A.   Not in this document.

20   Q.   Turn to Defendant's Exhibit 175.  This is from yourself

21   to Mr. Hawker, October 3rd.

22        Do you see that?  With a list?

23   A.   Yes.

24   Q.   More of the same?

25        If you scroll to the next page, please, John.

2037

1          "Proposed outreach list."  And when you get to the

2     media on page 175-7, down at the bottom, and then go to the

3     next page, the person from *The New York Times* is Steven Lee

4     Myers.

5     A.   Yes.

6     Q.   And so was that put in by somebody from Mercury or

7     Podesta?

8     A.   No.  In fact, this was a compilation of documents from

9     Mercury and Podesta, along with the document that Mr. Hawker

10    had created, and then in a lot of these instances things had

11    not been updated accordingly.

12    Q.   I'm sorry.  I didn't hear the last part.

13    A.   Some things had not been updated accordingly.

14    Q.   Okay.  So you're saying Steven Lee Myers was just like a

15    leftover from some prior version, or was he in active

16    contemplation?

17    A.   No, that was actually from the original document that you

18    showed me earlier where Mr. Hawker had put in Mr. Myers' name

19    as a placeholder.

20    Q.   So he is still a placeholder?

21    A.   At this stage, yes.

22    Q.   So there is no plan at that point for Mr. Craig to reach

23    out to David Sanger?

24    A.   At that stage, to my knowledge, no specifics had been

25    talked about about Mr. Craig reaching out -- Mr. Craig

2038

1    actually reaching out to him, that's correct.

2    Q.   Or Mr. Craig reaching out to any other particularly

3    identified journalist?

4    A.   That's correct.  Mr. Craig had agreed to do background

5    briefings, but the plan in the context of when he would do

6    those, how many, to who, had not been decided at this stage.

7    Q.   And then he said he couldn't do that, you heard?

8    A.   Yes.

9              MS. JUNGHANS:  Your Honor, if we could take a few

10   minutes, I can maybe consolidate this.  Is it too early?

11             THE COURT:  I think consolidation would be a useful

12   exercise.  It's a little early.  But I think it may be a

13   better use of our time than not consolidating.  So if you

14   would like to take the afternoon break now for 10 minutes, we

15   will do that.

16             MS. JUNGHANS:  Thank you.

17             THE COURT:  All right.  Members of the jury, we will

18   take our afternoon break.  It doesn't mean that if you need

19   one later that you don't get one.  But we are going to break

20   now and we will resume in 10 minutes.  That would be 3:15.

21   And our witness would get a break, too.

22             (Jury not present)

23             THE COURT:  All right.  Everyone is excused, and we

24   will resume in 10 minutes.  Thank you.

25             (Recess)

2039

1          THE DEPUTY CLERK:  Your Honor, re-calling Case Number

2     19-125, United States of America v. Gregory B. Craig.

3          THE COURT:  All right.  Can we bring the jury back

4     in.

5          (Jury present)

6  BY MS. JUNGHANS:

7     Q.  Mr. Gates, as it happened, the report was not released in

8     September of 2012; right?

9     A.  That's correct.

10    Q.  Or October?

11    A.  Correct.

12    Q.  Or November?

13    A.  Correct.

14    Q.  And it wasn't released, actually, until mid-December of

15    2012?

16    A.  That is correct.

17    Q.  And you learned in early December of 2012 that it was

18    going to be released; correct?

19    A.  Yes.

20    Q.  So there were more iterations of the plan?

21    A.  Yes.

22    Q.  Okay.  Now, let's look at December 5th, 2012.

23    A.  I'm sorry.  What exhibit?

24    Q.  I'm sorry.  Exhibit 317, Government Exhibit 317.

25          And if you look at the lower portion of the document,

2040

1    it is an email from yourself to Mr. Kilimnik, Mr. Manafort,

2    and Mr. Hawker, saying that you are sending a complete set of

3    documents for the Skadden Report --

4    A.   Yes.

5    Q.   -- that includes edits from Paul, which is Mr. Manafort;

6    right?

7    A.   Correct.

8    Q.   And the only new one is the file entitled "Master control

9    grid, SA report."

10           You see that?

11   A.   Yes.

12   Q.   Okay.  And then Mr. Hawker, you understand, forwarded

13   that on to Mr. van der Zwaan; correct?

14   A.   Yes.

15   Q.   And the address to which it was sent,

16   AlexanderVanDerZwaan@gmail.com is Mr. van der Zwaan's private

17   e-mail address, not his Skadden e-mail address; correct?

18   A.   Correct.

19   Q.   And then Mr. Hawker -- and you did not send this to

20   Mr. Craig?

21   A.   I did not.

22   Q.   And we don't have any evidence that Mr. Hawker sent it to

23   Mr. Craig?

24   A.   I don't know.

25   Q.   Okay.  Can you look at Defendant's -- Government's

1    Exhibit 318.

2            And Mr. Hawker notified you pretty quickly there that

3    "Everything had gone to Alex's gmail.  Can't get hold of

4    Greg" --

5    A.   Yes.

6    Q.   -- you see that?

7            And if you go back to 317, that was -- the documents

8    that were forwarded -- that you sent to Mr. Hawker and

9    Mr. Hawker sent to Mr. van der Zwaan were a whole raft of

10   documents; correct?

11   A.   Yes.  It was the entirety of the packet that we had

12   prepared.

13   Q.   So if you look at Exhibit 317 in your paper form --

14   A.   Okay.

15   Q.   -- it is actually about 90-some pages of documents; is it

16   not?

17   A.   It looks pretty close.

18   Q.   Okay.  And John, if you would put up page 317-94.

19           So on the 94th page of this batch of documents is an

20   item that says, in the middle of the page -- if you can blow

21   that up -- that the report will be given -- the upper

22   portion -- the report will be given to David Sanger, etc.;

23   right?

24   A.   Yes.

25   Q.   And this is the only media plan you crafted that said

2042

1       that, and it was not provided by you to Mr. Craig?

2       A.   I didn't craft the report.  I received a copy of it.  But

3       I did not send it to Mr. Craig, that's correct.

4            MS. JUNGHANS:  All right.  Thank you very much.

5       Nothing further.

6            THE COURT:  When you say the 94th page, was this all

7       one document or multiple documents?

8            THE WITNESS:  Multiple documents.

9            MS. JUNGHANS:  Multiple documents that are printed

10      that came as one package.

11           THE COURT:  They came as separate pdfs attached to

12      the email, and they have now been print and put in an order

13      that makes this the 94th page.

14           MS. JUNGHANS:  Correct.  And the last one that is

15      listed on the header is the master control grid.

16           THE COURT:  All right.  Any redirect?

17           MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

18                       REDIRECT EXAMINATION

19      BY MR. CAMPOAMOR-SANCHEZ:

20      Q.   Let's start with the last few sets of questions.

21           You were asked whether the documents were sent to

22      Mr. van der Zwaan's gmail account --

23      A.   Yes.

24      Q.   -- as opposed to his Skadden account.

25      A.   Yes.

2043

1    Q.   Was there a reason for that?

2    A.   There was.  There was concern very early on from the

3    project that Mr. Manafort's e-mail had been hacked on a prior

4    occasion, and he wanted to ensure the integrity of the

5    information.  There were a number of instances where we were

6    receiving highly sensitive information from the Skadden law

7    firm, particularly about the involvement of former Prime

8    Minister Tymoshenko, so we did not want that information to

9    be hacked, basically.  So we all used personal e-mail

10   accounts for some of the documents.

11   Q.   Why would that be safer than using the Skadden account or

12   the business account?

13   A.   Well, because most people would know the Skadden account.

14   They wouldn't specifically know my gmail account because it

15   might not even have my name.  It might be personalized in

16   some other way that would not be a unique identifier to any

17   of us working on the project.

18   Q.   All right.  Let me take you back to this morning very

19   briefly.  You were asked some questions on cross-examination

20   as to who was Skadden's client in this matter.

21        Do you recall those?

22   A.   I do.

23   Q.   Now, who arranged for Skadden to become involved in this

24   project?

25   A.   To my knowledge, it was Mr. Pinchuk.

1    Q.   Okay.  But who paid or who was arranging for the payment

2    to be made to Skadden?

3    A.   Mr. Manafort.

4    Q.   And who was actually delivering the payment to Skadden?

5    A.   I was.

6    Q.   At Mr. Manafort's instructions?

7    A.   Correct.

8    Q.   And who was the person that would communicate Ukraine's

9    position on the Skadden Report to Mr. Craig?

10   A.   It was Mr. Manafort.

11   Q.   Not the Ministry of Justice?

12   A.   No.

13   Q.   You were also asked a number of questions about media

14   plans, a lot of questions about media plans today.  But I

15   will be short.

16        Did you yourself ever send a media plan to Mr. Craig?

17   A.   I did not.

18   Q.   Were you copied on the one that was sent prior to the

19   Harvard Club meeting?

20   A.   I was.

21   Q.   Now, sir, do you know whether Mr. Craig -- well, strike

22   that.

23        Do you know whether Mr. Manafort had sent Mr. Craig

24   earlier versions of the media plan and you were not copied on

25   it?

1    A.   I do not.

2    Q.   Do you know whether Mr. van der Zwaan had received prior

3    versions of the media rollout plan?

4    A.   I know he did receive them from Mr. Hawker, yes.

5    Q.   And do you know if Mr. van der Zwaan had provided those

6    copies to Mr. Craig?

7    A.   I do not.

8    Q.   Do you know whether Mr. van der Zwaan had shared with

9    other members of the team at Skadden?

10   A.   I do not.

11   Q.   And did those versions of the media plan make reference

12   to all these other PR firms that were also involved?

13   A.   At different times, yes.

14   Q.   Now, talking about those other firms, you were asked some

15   questions again this morning about Podesta and Mercury and

16   whether you had lied about the ECFMU.

17        Do you recall those questions?

18   A.   I do.

19   Q.   Let me ask you, first, who was the head of the Podesta

20   Group?

21   A.   Tony Podesta.

22   Q.   And who was the person in charge of the Mercury Group?

23   A.   Vin Weber.

24   Q.   Okay.  And --

25        THE COURT:  Just for the record, he said who was in

1   charge of The Podesta Group, and you said Podesta.  What was

2   his first name?

3                 THE WITNESS:  Sorry.  Tony Podesta.

4                 MR. CAMPOAMOR-SANCHEZ:

5   Q.  And for Mercury, it was Vin Weber?

6   A.  Vin Weber, correct.

7   Q.  All right.  So I want to make sure now that I'm asking

8   you in their personal capacities as opposed to the business,

9   okay?

10                Sir, did you lie to Mr. Podesta himself about whether

11  the ECFMU was independent from the government of Ukraine?

12  A.  I did not.

13  Q.  Did you lie to Mr. Weber himself about whether the ECFMU

14  was independent from the government of Ukraine?

15  A.  I did not.

16  Q.  Did you, in fact, tell Podesta -- Tony Podesta --

17  that they were -- well, strike that.

18                Did you tell them who the client actually was?

19  A.  Yes.

20  Q.  And who was the client?

21  A.  The government of Ukraine.

22  Q.  So following up on that, you were also asked a lot of

23  questions about either lies or other crimes that you

24  committed earlier this morning.

25                You recall those?

1   A.   I do.

2   Q.   And sir, you also had made a reference to approximately

3   how many interviews you have done with the government?

4   A.   In excess of 40.

5   Q.   Did you tell the investigators from the government and

6   the Special Prosecutor's Office about those lies and crimes?

7   A.   Yes.

8   Q.   And that's why that long list that you went on this

9   morning is known to us and to the defense?

10  A.   Yes.

11  Q.   And sir, did you have to come clean as part of this

12  process and talk and tell about all of the things you had

13  done?

14  A.   Yes.

15  Q.   And did you do that?

16  A.   I did.

17  Q.   Sir, as you sit here today, do you have any incentive to

18  lie or hide anything else from this Court or from the ladies

19  and gentlemen of the jury?

20  A.   I certainly do not.

21          MS. JUNGHANS:  Objection.  Argumentative.

22          THE COURT:  A little.  On to your next question.

23          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  I will move

24  on.

25          BY MR. CAMPOAMOR-SANCHEZ:

2048

1    Q.   All right.  Let's go talk about the Harvard Club meeting

2    very briefly.

3           You got a lot of questions about that, and I

4    think -- please correct me -- you said at some point -- well,

5    first of all, did you yourself remember or recall Mr. Craig

6    reversing his position about backgrounding journalists?

7    A.   No.

8    Q.   Okay.  But upon questions of cross-examination, you said

9    that you heard about a reversal.

10   A.   I did.

11   Q.   Can you explain what you mean by that?

12   A.   Yes.  The primary point of contact with Mr. Craig with

13   respect to media was Mr. Hawker.  So often Mr. Hawker would

14   communicate various updates and messages to me, and I would

15   relay them to Mr. Manafort.  In this case, Mr. Manafort and I

16   were both present for the meeting.  So Mr. Hawker

17   communicated those messages to us directly.

18   Q.   Okay.  And you, I think, also were asked about whether

19   Mr. Hawker was concerned about that.

20   A.   Yes.

21   Q.   And was he?

22   A.   He was.

23   Q.   Okay.  And whether Mr. Manafort was concerned about that?

24   A.   Mr. Manafort was not as concerned.

25   Q.   And why was Mr. Manafort not concerned?

1        MS. JUNGHANS:  Objection.

2        THE COURT:  What did he say that led you to believe

3    he was more or less concerned?

4        I think this is fair redirect after you asked him

5    what Mr. Manafort thought.

6        THE WITNESS:  Yes, Mr. Manafort indicated to me that

7    he would talk to Greg and take care of the situation.

8        BY MR. CAMPOAMOR-SANCHEZ:

9    Q.   Do you know -- without telling us what was said -- do you

10   know if Mr. Manafort did have, indeed, contact with

11   Mr. Craig?

12   A.   I do know he had contact, yes.

13   Q.   After this alleged reversal?

14   A.   Yes.

15   Q.   And in any event, was the idea of using Mr. Craig to

16   background journalists abandoned at any point?

17   A.   No.

18   Q.   Why not?

19   A.   Because we needed Skadden to represent the findings of

20   the report.  There was nobody that was more credible to do

21   it.  So if I did it or Mr. Hawker did it, it wouldn't be the

22   same.  So we had to continue down a path.  Even if Mr. Craig

23   had indicated, I'm only willing to talk to one person, we

24   would have taken it because we needed his expertise and

25   credibility to debrief people on the report.

2050

1    Q.   Now, let me ask you:  You were shown some documents -- I

2    think it was reflected both in the notes and Government

3    Exhibit 280 that you were just shown by the defense.  But did

4    you learn of Mr. Craig traveling to Egypt around either late

5    September or early October 2012?

6    A.   I did.

7    Q.   And in fact, was that discussed at the Harvard Club

8    meeting?

9    A.   Yes.

10   Q.   Do you know who, if anybody, from the other PR firms was

11   with Mr. Craig during that trip?

12   A.   Yes.  Mr. Weber happened to be with Mr. Craig because

13   they had a separate but shared client.

14   Q.   In Egypt?

15   A.   In Egypt, yes.

16   Q.   Okay.

17   A.   Or I believe it was the Middle East.  I don't know if it

18   was Egypt specifically they were flying into and out of.

19   Q.   Okay.  Somewhere in the Middle East and they were

20   together?

21   A.   Yes.

22   Q.   Now, as you sit here today, do you recall when it was

23   that the name of David Sanger first got put in any document

24   related to the media PR plans?

25   A.    Physical document, I believe it was the first document

1      that came from Mercury that we saw earlier today.

2      Q.   And is that where Mr. Weber worked?

3      A.   It is.

4      Q.   And if we can take a look at Government's Exhibit 306.

5      Can we zoom in on the top.

6             Is this a document you're referring to?

7      A.   Yes.

8      Q.   And does this, indeed, talk about Mr. Sanger as well as

9      Mr. Hunt being part of the seeding process?

10     A.   It does.

11     Q.   And you were shown all of these media -- well, let me do

12     one more thing.  Let's go to page 3 of this report.  Let's

13     zoom in on the bottom right.

14            In looking at the created date of October 3rd, 2012,

15     in the morning, does that help refresh your recollection

16     approximately about when the name of David Sanger at least

17     was being discussed among the PR firms?

18            MS. JUNGHANS:  Objection, Your Honor.  He didn't say

19     he didn't have a recollection --

20            THE COURT:  I think he said he didn't know.  You

21     asked him do you recall when his name first showed up in a

22     document.  He said it was this document.

23            MR. CAMPOAMOR-SANCHEZ:  Right.  And I'm just trying

24     to see if this helps --

25            THE COURT:  All right.  Well, I think if you're

1    refreshing somebody's recollection, you do it slightly

2    differently.

3              MR. CAMPOAMOR-SANCHEZ:  Okay.  Then if --

4              THE COURT:  Ask your next question.

5              MR. CAMPOAMOR-SANCHEZ:  I will ask my next question.

6              BY MR. CAMPOAMOR-SANCHEZ:

7    Q.  As you sit here today, you don't recall?

8    A.  When David Sanger's name was first mentioned --

9    Q.  Yes.

10   A.  -- or in a document?

11   Q.  No, in a document.

12   A.  In a document, this document by Ms. Saunders was the

13   first time I had seen it in a document.

14   Q.  Now, was there a debate in the team as to whether to use

15   Mr. Sanger or Mr. Hunt?

16   A.  There was.

17   Q.  What was that debate?

18   A.  The debate, again, was that Mr. Weber was concerned that

19   Mr. Sanger would not --

20             MS. JUNGHANS:  Objection.  Objection.  Hearsay.

21             THE COURT:  All right.  Approach the bench.

22        (At the bench)

23             THE COURT:  I don't think he was bringing in the

24   truth of the matter asserted.  He's saying that there was a

25   debate, and someone said X and someone said Y.  Now, if he

2053

1     wasn't present for the debate and the debate was reported to

2     him by somebody else, X said that Y said, he can't do that.

3     But if he heard the person say, I don't like Sanger for this

4     reason, and somebody else said, I like him for that reason,

5     that is not hearsay.  I don't know why he can't say that.

6               MR. TAYLOR:  May I?

7               THE COURT:  Okay.  I think she's doing great.

8               MR. TAYLOR:  She is.

9               THE COURT:  All right.

10              MR. TAYLOR:  We're going to make sure that the record

11    is clear that we object to the extensive use of hearsay,

12    which is --

13              THE COURT:  Mr. Taylor, you can't lay down a general

14    objection.  She objected every time she thought she heard

15    hearsay.

16              MR. TAYLOR:  I know that.

17              THE COURT:  And then she got up on cross-examination

18    and elicited hearsay.  So now we're on redirect.  And what is

19    your objection to my question?  And I agree that hearsay is

20    generally inadmissible.

21              He said, was there a debate within the team?  He said

22    yes.  He asked him to explain it.  And he is, I think, about

23    to testify to the fact that something was said.

24              And I don't understand where the hearsay comes in.

25    Where is the assertion of a matter for the truth of the

1     matter asserted?  That is hearsay.

2           MR. TAYLOR:  What I want to say, Your Honor, is

3     regardless of what has occurred, the testimony that Manafort

4     said he was going to do something with Craig is a violation

5     of our right in a criminal case to confront the witnesses

6     against us.  I want to be sure that -- it is not just hearsay

7     but the government's efforts to put into the case --

8           THE COURT:  Okay.  I'm going to tell you exactly why

9     I ruled the way that I ruled.

10          MR. TAYLOR:  I --

11          THE COURT:  I'm going to put it on the record.

12    Ms. Junghans asked this witness on cross-examination about

13    the meeting in Mr. Manafort's office after the e-mail had

14    been received that he wasn't going to do the backgrounding.

15    And she said, what did the group think about that?  What did

16    the group think, group including Mr. Manafort?  And he

17    started to say what each of their positions was, including a

18    statement of future intention by Mr. Manafort, which again

19    seems to me it isn't hearsay, it falls within the exception,

20    I'm going to do X.  But it was directly responsive --

21    directly responsive -- to something that had been asked on

22    cross.  And so he asked about it on redirect.  And I hear

23    you.  Your objection is on the record.  But I believe if you

24    ask a question about what did the people in the room think,

25    because people can't see inside of other people's heads,

1        they're going to tell you what they said.

2              So I think where we are right now is in the middle of

3        an answer about what the nature of the debate was within the

4        team.

5              So tell me your hearsay objection to that.

6              MS. JUNGHANS:  What I was saying there, the debate,

7        some people thought it was good and some people thought it

8        was bad.  I don't have a problem.  He was about to -- the

9        testimony that I think was about to be elicited was Mr. Weber

10       thought a specific thing, and I don't think we need to know

11       Mr. Weber's specific opinions.

12             THE COURT:  So you're saying it is irrelevant or it's

13       hearsay?

14             MS. JUNGHANS:  Both.

15             THE COURT:  All right.  Well, I think you asked him

16       why -- you asked him many times, well, why didn't it get

17       changed --

18             MS. JUNGHANS:  Now, I didn't actually --

19             THE COURT:  You kept saying, nonetheless, it's not

20       there.  So he's bringing out one of the reasons it might not

21       be there.

22             MS. JUNGHANS:  Look, I don't have a perfect

23       recollection of every word I have uttered today, I'm sure.

24       But I think I just said, it is not in this one, it is not in

25       this one, it is not in this one.  And I didn't ask a single

1    question about Vin Weber, not a single question.  So Vin

2    Weber's opinion about thus and so, I just don't think is

3    relevant.

4            THE COURT:  Nobody has addressed my question about

5    why the words that came out of Mr. Weber's mouth, if they

6    were said to Mr. Gates -- do we know if they were said to

7    Mr. Gates?

8            MR. CAMPOAMOR-SANCHEZ:  I believe there was a phone

9    call where that was said.  I can't recall if it was -- I

10   believe so, but I'm not a hundred percent sure.

11           THE COURT:  Why don't we short-circuit some of this

12   and just ask him targeted questions.  Did Mr. Weber favor the

13   use of Mr. Sanger?  No.  Who did Mr. Weber favor?

14           MR. CAMPOAMOR-SANCHEZ:  Right.

15           THE COURT:  And I think you're allowed to bring that

16   out because it is responsive to many issues that were raised.

17           MR. CAMPOAMOR-SANCHEZ:  I am trying to establish why

18   the name of Sanger was not in the document --

19           THE COURT:  I understand that.

20           Will that solve your problem?

21           MR. CAMPOAMOR-SANCHEZ:  Yes.

22           MR. TAYLOR:  If it can be done without inadmissible

23   hearsay, that's one thing.

24           THE COURT:  All right.  I just told him exactly how

25   to do it.  And so far no one has explained to me why, if he

—2057—

1    heard what Mr. Weber said, it would even constitute hearsay.

2    But we're trying to skip that by having him simply say -- and

3    then don't object that it is leading -- without telling me

4    why, did Mr. Weber favor Mr. Sanger?  No.  Did he favor

5    someone else?  Yes.  Who?

6            Okay.  That's what we're going to do.

7            MR. TAYLOR:  May I tell you why it is hearsay?

8            THE COURT:  Yes.

9            MR. TAYLOR:  I know I'm trying your patience.  I'm

10   sorry.

11           THE COURT:  No, no.  It's just that you're arguing

12   broader principles than what I'm asking.

13           MR. TAYLOR:  If Mr. Gates is permitted to say

14   Mr. Weber recommended this, that conveys a message, a

15   statement, just like a doctor's diagnosis conveys.  That's

16   hearsay.  And the fact that it explains or may be relevant to

17   Mr. Weber's state of mind doesn't make it admissible against

18   a defendant in a criminal case.

19           THE COURT:  An out-of-court statement -- every

20   out-of-court statement is not hearsay.  An out-of-court

21   statement being offered for the truth of a matter asserted in

22   that statement is hearsay.  You know that.  I know that.

23   None of us need to lecture each other about what hearsay was.

24           And so I was asking him a more nuanced question about

25   why the words coming out of Mr. Weber's mouth, I want to use

2058

1    X and not Y, is a fact, an assertion of a true fact.  So I'm

2    not sure it is, but we don't need to look it up because we're

3    going to go past that with a much more tailored redirect so

4    that we can finish this bench conference and the trial.

5            MR. TAYLOR:  We just can't cross-examine Mr. Weber

6    about what he said.

7            THE COURT:  I know that.  You can call him.

8        (In open court)

9            BY MR. CAMPOAMOR-SANCHEZ:

10   Q.   Let me ask you, to try to make this shorter:  Did

11   Mr. Weber favor having Mr. Sanger be the person to be

12   backgrounding journalists?

13   A.   No.

14   Q.   Which journalist did Mr. Weber favor?

15   A.   Mr. Al Hunt from *Bloomberg*.

16   Q.   So when you were shown all those media plans in

17   October that did not have Mr. Sanger's name, the other ones,

18   is there a reason for that?

19   A.   There is no specific reason other than that at the time

20   we looked at potentially using other reporters.  I had

21   communicated the information from Mr. Weber to Mr. Manafort.

22   And we had made a decision --

23           MS. JUNGHANS:  Objection.

24           THE COURT:  All right.  You were doing what you were

25   supposed to do at the time?

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  All right.  Go on to your next question.

3          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

4          BY MR. CAMPOAMOR-SANCHEZ:

5     Q.   Ultimately, who made the call to use Sanger?

6     A.   Mr. Manafort.

7     Q.   And that was after Mr. Craig had suggested --

8          MS. JUNGHANS:  Your Honor, objection.  That is

9     hearsay.

10         THE COURT:  All right.

11         MS. JUNGHANS:  And I move to strike.  And it is

12    beyond the scope of the cross-examination.

13         THE COURT:  No, that one it is not.

14         At the time someone reached out to Mr. Sanger on a

15    particular date.  Do you know at whose direction -- do you

16    know from your own personal knowledge at whose direction they

17    were acting?

18         THE WITNESS:  Mr. Manafort's.

19         THE COURT:  All right.  Approach the bench.

20         MS. JUNGHANS:  I renew our objection.

21         THE COURT:  I know.

22    (At the bench)

23         MR. CAMPOAMOR-SANCHEZ:  I'm a little confused now

24    myself.

25         THE COURT:  Well, I had asked for the first two

1          questions.  I didn't know where you were going after that.

2                  So he is saying -- we don't know how he knew --

3                  MR. CAMPOAMOR-SANCHEZ:  I can ask him that.

4                  THE COURT:  Well, it would be because Mr. Manafort

5          told him --

6                  MR. CAMPOAMOR-SANCHEZ:  So I think there were

7          meetings at which they participated in phone calls.  But I

8          can ask him if that's the case.

9                  MS. JUNGHANS:  Excuse me.  I'm sorry.

10                 THE COURT:  If he was in a meeting where direction

11         was given to Mr. Hawker, do X --

12                 MS. JUNGHANS:  But the "do X" -- Mr. Hawker never

13         talked to David Sanger.

14                 THE COURT:  He sent him an e-mail.

15                 MS. JUNGHANS:  No, he didn't.  I apologize.

16         Mr. Gates never communicated with Mr. Sanger.  So asking

17         Mr. Gates why Mr. Hawker did something, I don't understand

18         that at all.  He never communicated with --

19                 THE COURT:  I'm going to ask him, was he ever at a

20         meeting where someone was -- where Mr. Manafort specifically

21         directed someone in his presence to contact Mr. Sanger.  I

22         think he can testify to that.  That's not hearsay.  That's

23         direction, do X, do Y.  If he was there, then he can say he

24         heard Mr. Manafort say, do X, do Y.  If he wasn't there, then

25         we have to go on.

1          MR. CAMPOAMOR-SANCHEZ:  And my understanding, Your

2    Honor, is that Mr. Manafort told him personally and then he

3    relayed that to Mr. Hawker, who puts it in the plan.  That's

4    the chain of command.

5          MS. JUNGHANS:  Well, let's be clear because I don't

6    want to keep popping up.  You're saying he is going to say

7    Manafort said --

8          MR. CAMPOAMOR-SANCHEZ:  Manafort made the decision.

9          MS. JUNGHANS:  Can I just get my words out?

10         Manafort instructed Hawker to send an e-mail to

11   Sanger and made sure of that -- is that what you're saying --

12         THE COURT:  He is saying Manafort told him, Gates,

13   tell Hawker to do it, and he did.  Told Hawker to do it.

14         MS. JUNGHANS:  Is that what you're saying?

15         MR. CAMPOAMOR-SANCHEZ:  That's what I believe, yes.

16         MS. JUNGHANS:  Well, you'd think if that had

17   happened, we would have heard it on direct.

18         MR. CAMPOAMOR-SANCHEZ:  You objected --

19         THE COURT:  Let's assume that's the testimony.  Did

20   Mr. Manafort direct you to do anything with respect to

21   Mr. Hawker and Mr. Sanger?  Yes.  What did he do?  He told me

22   to tell him to contact him.  Did you communicate that to

23   anyone?  Yes.  Mr. Hawker.

24         Is that hearsay?

25         MS. JUNGHANS:  Well, it probably isn't in that

1    precise format.  What this is all trying to hint at, which is

2    totally objectionable, is Manafort and Craig got together and

3    Craig agreed to do that and then Manafort told Hawker to do

4    it.  We really have to keep away from that.  If it is simply

5    Manafort told Hawker to e-mail Sanger and Hawker did it, I

6    don't think that is hearsay.

7         THE COURT:  And so we're going to continue to lead

8    him extremely tightly.

9         Did you get a direction?  Without telling me what it

10   is, did you get a direction from Mr. Manafort to tell

11   Mr. Hawker to do something?  Yes or no?  And then yes.  Okay.

12   What was it?  He told me to have him call Sanger.  And did

13   you pass that on to Mr. Sanger -- pass that on to Mr. Hawker?

14   And if you want to lead him through all of this, and the

15   questions are just "yes" and "no", you can do that, too.  You

16   can say, Mr. Gates, did you get a direction from Mr. Manafort

17   to pass on to Mr. Hawker?  Yes.  Was it to have Mr. Hawker

18   contact Mr. Sanger?  Yes.  And did you pass that on to

19   Mr. Hawker?  Yes.  And stop.

20        MS. JUNGHANS:  I don't know what the witness is going

21   to say as much as he does.  I'm not even sure he is going to

22   say he got a direction from Manafort to tell Hawker.

23        THE COURT:  If he says, did you get a direction to

24   pass on to Mr. Hawker, and he says no, then --

25        MR. CAMPOAMOR-SANCHEZ:  Right.  I believe -- well, I

1      will ask the question.  But I believe the direction is who's

2      the journalist to be seeded.  That's the direction.

3              THE COURT:  Did you get a specific direction from

4      Mr. Manafort to pass on to Mr. Hawker as to who to contact as

5      the first journalist?  Yes or no.  He answers yes.  Who was

6      the journalist?  Did you pass that information on to

7      Mr. Hawker?  Three questions.

8              MR. TAYLOR:  This is so important to the core of this

9      case that I want to implore you that this is a way of getting

10     before the jury the impression that Mr. Manafort had a

11     conversation with Mr. Craig, and that's the purpose of this.

12     The non-hearsay purpose is to get in front of a jury that the

13     implication that Manafort said something to Craig, he can't

14     avoid that.  And to let him testify --

15             THE COURT:  Well, I think there is already an

16     implication that it could have been a ton of people.  And we

17     have -- I mean, think of the end of the day, their closing

18     argument is going to be the documents were Craig reaches out

19     to Sanger.  But there was indication where Hawker sent an

20     e-mail to Sanger.  He seems to think he was supposed to do

21     that.  He got that direction from somebody.  And apparently

22     he got that from Gates.  And Gates didn't do it on his own.

23     He got that direction from somebody else.

24             I think the thing about Manafort said he would speak

25     to Craig, that was September.  We're now talking about

2064

1    December, in a different time period.  We actually don't even

2    know when these conversations took place.

3         There have been at least 20 minutes of our being up

4    here in between these two things.  And he is not going to ask

5    any questions to link those two things.  I'm not even sure it

6    is fair argument.  There is no testimony in the record about

7    what transpired between the two of them.  They could have

8    talked about something else completely different.  We don't

9    know whether Mr. Craig said I will participate or I won't

10   participate, when they had that conversation.  So I don't

11   think there will be any argument in closing argument about

12   what happened in some secret side conversation between the

13   two of them.  I don't think the evidence supports it.

14        MR. TAYLOR:  His testimony was that Paul Manafort

15   gave the instruction to put Craig -- Craig and Sanger's name

16   and that that's hearsay.  And it goes --

17        THE COURT:  It is not --

18        MR. TAYLOR:  The subject was --

19        THE COURT:  He has been asked a thousand times by the

20   defense:  Is this in the report?  He told you to put it in

21   the report.  Did you run it by this person?  Did you run it

22   by that person?

23        You demanded that no conversation with Mr. Manafort

24   be introduced in direct, and the prosecution adhered to that.

25   And I sustained every objection along those lines.

1        And then, on cross-examination, you stood up and

2   said, what was Mr. Manafort thinking.  You asked, what did

3   Manafort -- how did he react.  And the witness answered.  It

4   was elicited by the defense.

5        MR. TAYLOR:  Your Honor, I don't believe that

6   anything we've done waived the right that I'm asserting, that

7   is, not to have to confront this kind of issue.  We have been

8   concerned about this from the beginning.  I note my

9   objection.  I do believe that at the most tender portion in

10   this case the government is being permitted to get the

11   implication before the jury that Manafort spoke to Craig -- I

12   think that is wrong.

13        THE COURT:  Well, as I said, I think there is a

14   separation between the two different things.  We have now Vin

15   Weber and Craig going to Egypt together and talking about who

16   knows what.  And thereafter is the first time David Sanger's

17   name appears on the document, which gave me the implication

18   that it was Weber who told his associate to write it on the

19   piece of paper, and there have been further communications.

20        We also know from evidence that this witness is not

21   going to be permitted to discuss that it is precisely during

22   that period of time that Mr. Craig reaches out to Mr. Sanger

23   and mentions Mr. Weber.  So I think at the end of the day the

24   inference that you're concerned about is not necessarily the

25   inference, I don't believe, and I think it would be

2066

1    inappropriate in closing argument to stand up and say you all

2    can assume that Craig told Manafort he was going to do it

3    because Manafort told -- I understand their objection on that

4    point.  So I don't think you're going to argue that in

5    closing argument.  But I think asking these couple of

6    questions just to get out of this conundrum and on to your

7    next issue would be appropriate.

8           MS. JUNGHANS:  Thank you, Your Honor.

9       (In open court)

10          BY MR. CAMPOAMOR-SANCHEZ:

11   Q.   Mr. Gates, did you get direction from Mr. Manafort to

12   tell Mr. Hawker which journalist to contact for the purposes

13   of the seeding?

14          THE COURT:  That is just a "yes" or "no" question.

15          THE WITNESS:  Yes.

16          BY MR. CAMPOAMOR-SANCHEZ:

17   Q.   And which journalist was it?

18   A.   Mr. David Sanger.

19   Q.   And did you, in fact, pass on that information to

20   Mr. Hawker?

21   A.   I did.

22          MR. CAMPOAMOR-SANCHEZ:  The Court's indulgence.

23          (Pause)

24          BY MR. CAMPOAMOR-SANCHEZ:

25   Q.   Did Mr. Craig contact Mr. Sanger?

-2067-

```
 1      A.   He did.

 2              MR. CAMPOAMOR-SANCHEZ:  No further questions, Your

 3      Honor.

 4              THE COURT:  All right.  This witness can be excused.

 5      Thank you.

 6          (Witness excused)

 7              THE COURT:  Do we have a short witness, or a tall

 8      witness who isn't going to testify for a long time?

 9              MS. GASTON:  We don't have a really short witness

10      here, Your Honor.

11              THE COURT:  All right.  Then everybody has lots of

12      things to do.  So I think what we'll do is break for the

13      evening unless anybody has any objection.

14              All right.  We're going to break for the evening.

15              You are all, once again, cautioned to please do not

16      pay attention to any news accounts of this matter.  Do not

17      look back to try to find prior news accounts about this

18      matter.  Don't discuss it with anyone.  Don't discuss it with

19      each other.  The case has not yet been submitted to you.

20              Tomorrow morning, in an abundance of caution, just

21      given some other matters on my calendar, I'm going to say

22      we're going to start proceedings at 10.  You'll still get

23      your breakfast.  You can aim to be in the jury room between

24      9:30 and quarter of 10.  And then, hopefully, we will be

25      knocking on the door and beginning at 10 a.m.
```

1          I urge you to have a pleasant evening, and don't

2     think about the trial.

3               (Jury not present)

4          THE COURT:  All right.  Have you refined your witness

5     list such that you know how many more are left?

6          I understand that there's at least one more major

7     witness, and that would be Ms. Hunt.  But what else have we

8     got going on?

9          MR. CAMPOAMOR-SANCHEZ:  I believe we have five

10    witnesses in the mix, but likely only four.  But we just have

11    five.  Would you like me to identify them?

12         THE COURT:  Yes.

13         MS. JUNGHANS:  We can't hear you.

14         MR. CAMPOAMOR-SANCHEZ:  I'm sorry.

15         I believe we have, at most, five witnesses left,

16    although it could be as short as four.  We do expect,

17    assuming crosses are not overly long, to be done by Monday.

18         THE COURT:  All right.  That is very hopeful.  If you

19    determine which witness you're not calling, that you're

20    definitely not calling, you can let the defense know if you

21    know you're definitely not going to call them.

22         MR. CAMPOAMOR-SANCHEZ:  We will.  And we will also

23    give them the expected order for tomorrow.

24         THE COURT:  Thank you.

25         MR. TAYLOR:  Can I address the Court on a less

1        controversial matter?

2               THE COURT:  Okay.

3               MR. TAYLOR:  We expect the government will rest

4        tomorrow or Monday, and we will be addressing the Court on

5        the sufficiency issues.

6               THE COURT:  All right.

7               MR. TAYLOR:  There has been a fair amount of briefing

8        on the question of how the Court will define the duty that is

9        at issue in this case.

10              For us to meaningfully address the Rule 29 issues, it

11       would be helpful to have some understanding of how the Court

12       intends to proceed.  Obviously, that is an instruction issue.

13       But if we're going to address the question of whether or not

14       the government has proved the elements, including duty, then

15       it would be helpful to know from the Court, before we do

16       that, how the Court views the duty, as we have said in our

17       pleadings.

18              THE COURT:  I will do the best I can.  And certainly,

19       I won't make you articulate the argument if you have not yet

20       heard where I'm headed on that point.

21              I would note that the army of superb scribes on both

22       sides that are submitting information are submitting it to a

23       funnel, which is me, and I have been, as you know, here.  So

24       I have not concluded my examination of those issues, but I

25       understand that they are of the utmost importance; and that,

2070

1      as in this case, the recurring theme, there is a deadline
2      looming and about to happen.
3              MR. TAYLOR:  I wouldn't impose on the Court for this
4      in the ordinary case, but because this is a legal issue and
5      it comes up in connection with instructions, but if we're to
6      have a meaningful discussion about sufficiency it would be
7      helpful to us.
8              THE COURT:  All right.  And I appreciate that.  And I
9      think to the extent there is any lack of clarity about which
10     way I'm headed, until I have heard the whole case, you can
11     certainly -- if you argue that they haven't even met their
12     own standard, then they clearly wouldn't have met your higher
13     standard, and you can address both.
14             MR. TAYLOR:  I'm eager to do that.
15             THE COURT:  All right.
16             MR. TAYLOR:  Thank you, Your Honor.
17             THE COURT:  I certainly want to underscore something
18     that I said at the bench, which is that I'm not chagrinned
19     with anyone in this courtroom.  I think these are very
20     difficult issues, and we're all doing our best at threading
21     the needle carefully and in accordance with the rules of
22     evidence and all the challenges that this case has posed for
23     both sides.
24             All right.  Thank you.
25             (Proceedings adjourned at 4:10 p.m.)

—2071—

1            CERTIFICATE OF OFFICIAL COURT REPORTER

2

3      I, Patricia A. Kaneshiro-Miller, certify that the foregoing

4  is a correct transcript from the record of proceedings in the

5  above-entitled matter.

6

7

8  /s/ Patricia A. Kaneshiro-Miller          August 22, 2019
   ------------------------------------    ---------------------
9  PATRICIA A. KANESHIRO-MILLER                  DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## 1

**1** [1] - 2000:23
**10** [7] - 2025:8, 2038:14, 2038:20, 2038:24, 2067:22, 2067:24, 2067:25
**100** [1] - 1991:20
**1000** [1] - 1991:24
**11:11** [3] - 2021:4, 2021:5, 2021:8
**12** [5] - 2002:11, 2010:8, 2012:20, 2012:22, 2015:25
**123** [1] - 2012:15
**123-3** [1] - 2013:19
**125** [1] - 2014:20
**126** [1] - 1994:16
**12th** [6] - 1995:9, 1996:9, 1996:10, 1999:7, 2000:6
**134** [2] - 2017:24, 2018:15
**14** [1] - 2013:21
**15th** [1] - 2005:15
**161** [1] - 2027:14
**167** [1] - 2028:18
**167-5** [1] - 2028:24
**168** [3] - 2030:8, 2031:2, 2031:3
**168-2** [1] - 2030:21
**175** [1] - 2036:20
**175-7** [1] - 2037:2
**1800** [1] - 1991:24
**18th** [1] - 2018:2
**19-125** [1] - 2039:2
**19-CR-125** [1] - 1991:4
**1994** [1] - 1993:3

## 2

**2** [4] - 2001:8, 2023:5, 2028:5, 2031:3
**20** [1] - 2064:3
**20001** [1] - 1992:4
**20036** [1] - 1991:25
**2006** [1] - 2012:20
**2012** [13] - 1995:9, 2000:7, 2002:11, 2010:8, 2012:21, 2012:22, 2016:1, 2039:8, 2039:15, 2039:17, 2039:22, 2050:5, 2051:14
**2016** [1] - 1993:6
**2019** [1] - 1991:7
**202** [1] - 1992:5
**2042** [1] - 1993:3
**20530** [2] - 1991:15, 1991:17
**21202** [1] - 1991:21
**22** [1] - 1991:7
**233** [4] - 1996:4, 1996:5, 1996:6, 2010:9
**234** [8] - 1995:8, 1998:25, 1999:6, 1999:24, 2000:2, 2000:3
**23rd** [1] - 2035:18
**2440** [1] - 1991:21
**254** [2] - 2019:15, 2019:22
**258** [1] - 2023:4
**26th** [2] - 2027:13, 2028:20

**270** [1] - 2025:4
**280** [2] - 2034:3, 2050:3
**281** [1] - 2036:7
**29** [1] - 2069:10
**2:03** [1] - 1994:2

## 3

**3** [4] - 2010:10, 2021:12, 2028:6, 2051:12
**306** [1] - 2051:4
**30th** [1] - 2030:9
**317** [4] - 2039:24, 2041:7, 2041:13
**317-94** [1] - 2041:18
**318** [1] - 2041:1
**333** [1] - 1992:4
**354-3243** [1] - 1992:5
**3:15** [1] - 2038:20
**3rd** [2] - 2036:21, 2051:14

## 4

**4** [1] - 2020:15
**40** [1] - 2047:4
**418** [4] - 1993:6, 2015:24, 2016:5, 2016:8
**4700A** [1] - 1992:3
**4:10** [1] - 2070:25
**4:11** [2] - 2020:11, 2020:12

## 5

**5** [4] - 2000:12, 2000:23, 2007:12, 2021:13
**555** [1] - 1991:14
**5th** [1] - 2039:22

## 6

**6** [1] - 2005:15

## 7

**75** [1] - 2020:2

## 9

**9** [5] - 1991:5, 1998:24, 1998:25, 1999:7, 2000:12
**90-some** [1] - 2041:15
**94th** [3] - 2041:19, 2042:6, 2042:13
**950** [1] - 1991:17
**9:30** [1] - 2067:24

## A

**a.m** [4] - 2020:11, 2020:15, 2025:8, 2067:25
**Aarons** [2] - 1995:11, 2000:10
**abandoned** [1] - 2049:16

**Abelson** [1] - 1991:19
**ability** [3] - 2009:3, 2009:6, 2033:6
**able** [3] - 2008:13, 2023:20, 2035:13
**absence** [2] - 2005:9, 2008:9
**abundance** [1] - 2067:20
**accept** [1] - 2026:3
**accepted** [1] - 2007:20
**accordance** [1] - 2070:21
**according** [2] - 2017:19, 2029:10
**accordingly** [2] - 2037:11, 2037:13
**account** [6] - 2042:22, 2042:24, 2043:11, 2043:12, 2043:13, 2043:14
**accounts** [3] - 2043:10, 2067:16, 2067:17
**accurate** [4] - 2006:12, 2006:23, 2011:14, 2012:11
**achieve** [1] - 2007:19
**acknowledge** [1] - 2004:19
**acquire** [1] - 2008:10
**acting** [1] - 2059:17
**Action** [1] - 1991:4
**action** [4] - 2023:9, 2023:10, 2023:11, 2030:20
**actions** [1] - 2023:23
**active** [1] - 2037:15
**activity** [1] - 1996:9
**actual** [2] - 1999:14, 2006:21
**Adam** [2] - 1991:16, 1991:19
**addition** [1] - 2027:19
**address** [8] - 2010:1, 2040:15, 2040:17, 2068:25, 2069:10, 2069:13, 2070:13
**addressed** [1] - 2056:4
**addressing** [1] - 2069:4
**adequacy** [1] - 2002:25
**adequate** [3] - 2006:5, 2007:24, 2008:8
**adhered** [1] - 2064:24
**adjourn** [1] - 2008:9
**adjourned** [1] - 2070:25
**administration** [1] - 2030:3
**admissible** [1] - 2057:17
**admission** [2] - 2005:6, 2016:4
**admitted** [2] - 2016:7, 2016:8
**adverse** [1] - 2006:17
**Afternoon** [1] - 1991:5
**afternoon** [2] - 2038:14, 2038:18
**AFTERNOON** [2] - 1991:9, 1994:1
**agencies** [1] - 2034:23
**agenda** [1] - 2019:16
**agree** [1] - 2053:19
**agreed** [2] - 2038:4, 2062:3
**aided** [1] - 1992:6
**aim** [1] - 2067:23
**AI** [4] - 2028:8, 2029:3, 2030:22, 2058:15
**Alex's** [1] - 2041:3
**AlexanderVanDerZwaan@gmail.com** [1] - 2040:16

**allegation** [1] - 2004:2
**alleged** [2] - 2009:14, 2049:13
**allow** [1] - 2008:10
**allowed** [1] - 2056:15
**alluded** [1] - 2029:8
**almost** [1] - 2008:16
**AMERICA** [1] - 1991:3
**America** [1] - 2039:2
**American** [3] - 2003:15, 2003:18, 2010:4
**amount** [3] - 2022:20, 2032:17, 2069:7
**AMY** [1] - 1991:9
**annoying** [1] - 2033:7
**answer** [4] - 2016:22, 2026:25, 2027:1, 2055:3
**answered** [1] - 2011:22, 2065:3
**answers** [2] - 1994:22, 2063:5
**apartment** [2] - 2024:11, 2025:9
**apologize** [3] - 1999:3, 2019:24, 2060:15
**appear** [2] - 1996:11, 2005:7
**APPEARANCES** [1] - 1991:11
**appeared** [1] - 2017:22
**appellate** [1] - 2003:18
**appendices** [1] - 2000:20
**appreciate** [2] - 2032:22, 2070:8
**approach** [5] - 2001:16, 2031:10, 2032:6, 2052:21, 2059:19
**appropriate** [2] - 2035:2, 2066:7
**argue** [5] - 2012:5, 2012:9, 2033:6, 2066:4, 2070:11
**argues** [2] - 2008:7, 2009:2
**arguing** [1] - 2057:11
**argument** [7] - 2063:18, 2064:6, 2064:11, 2066:1, 2066:5, 2069:19
**argumentative** [1] - 2047:21
**army** [1] - 2069:21
**arranged** [1] - 2043:23
**arranging** [1] - 2044:1
**article** [2] - 2016:16, 2017:6
**articulate** [1] - 2069:19
**asserted** [3] - 2052:24, 2054:1, 2057:21
**asserting** [1] - 2065:6
**assertion** [2] - 2053:25, 2058:1
**assignment** [3] - 2003:5, 2022:17, 2026:3
**assignments** [1] - 2029:2
**assistance** [1] - 2008:17
**associate** [1] - 2065:18
**assume** [2] - 2061:19, 2066:2
**assuming** [1] - 2068:17
**assurances** [1] - 2015:20
**attached** [5] - 1996:21, 2000:20, 2013:8, 2021:11, 2042:11
**attachments** [1] - 1996:2
**attempting** [1] - 2030:18
**attention** [3] - 1999:17, 2015:1, 2067:16

**ATTORNEY'S** [1] - 1991:13
**audience** [1] - 2032:20
**audiences** [1] - 2014:23
**August** [2] - 1991:7, 2007:12
**AUSA** [1] - 1991:12, 1991:13
**Avenue** [1] - 1991:17, 1992:4
**avoid** [2] - 2012:4, 2063:14

## B

**background** [3] - 2033:21, 2038:4, 2049:16
**backgrounding** [5] - 2023:19, 2026:6, 2048:6, 2054:14, 2058:12
**bad** [1] - 2055:8
**balance** [2] - 2006:4, 2007:22
**Baltimore** [1] - 1991:21
**based** [11] - 1998:18, 2002:19, 2003:17, 2009:24, 2011:11, 2011:17, 2020:13, 2022:7, 2028:3, 2029:7, 2036:5
**basis** [1] - 1997:8
**batch** [2] - 2019:16, 2041:19
**become** [1] - 2043:23
**BEFORE** [1] - 1991:9
**beginning** [3] - 2007:12, 2065:8, 2067:25
**behavior** [2] - 2004:18, 2007:14
**bench** [9] - 2001:19, 2012:5, 2031:12, 2052:21, 2052:22, 2058:4, 2059:19, 2059:22, 2070:18
**BERMAN** [1] - 1991:9
**best** [3] - 2033:12, 2069:18, 2070:20
**better** [2] - 2006:16, 2038:13
**between** [5] - 2064:4, 2064:7, 2064:12, 2065:14, 2067:23
**beyond** [3] - 2003:4, 2003:5, 2059:12
**BG** [3] - 2019:3, 2019:5, 2019:7
**Big** [1] - 2019:7
**binder** [1] - 2019:20
**bit** [1] - 2031:5
**blah** [3] - 2031:17
**Blinken** [1] - 2029:14
**Bloomberg** [7] - 2014:6, 2028:8, 2029:3, 2030:22, 2034:1, 2036:16, 2058:15
**blow** [3] - 2012:16, 2016:15, 2041:20
**Boehner** [1] - 2029:14
**bore** [1] - 2006:18
**bottom** [4] - 2001:8, 2034:22, 2037:2, 2051:13
**box** [3] - 2031:5, 2031:19, 2033:20
**Bradley** [1] - 1991:16
**brains** [1] - 2026:23
**break** [7] - 2032:13, 2038:14, 2038:18, 2038:19, 2038:21, 2067:12, 2067:14
**breakfast** [1] - 2067:23
**briefing** [3] - 2026:4, 2030:2, 2069:7
**briefings** [4] - 2033:21, 2034:23, 2035:24, 2038:5

**briefly** [2] - 2043:19, 2048:2
**bring** [3] - 1994:3, 2039:3, 2056:15
**bringing** [2] - 2052:23, 2055:20
**broader** [2] - 2057:12
**broke** [1] - 1994:15
**brought** [3] - 2025:19, 2025:21, 2025:23
**bullet** [1] - 2001:1
**bunch** [1] - 2029:2
**business** [2] - 2043:12, 2046:8
**BY** [32] - 1994:14, 1996:8, 1997:24, 1998:23, 1999:5, 1999:23, 2002:9, 2003:24, 2005:22, 2007:8, 2011:8, 2012:10, 2012:23, 2016:9, 2017:5, 2020:1, 2021:10, 2024:24, 2025:3, 2027:8, 2033:15, 2035:16, 2039:6, 2042:19, 2047:25, 2049:8, 2052:6, 2058:9, 2066:10, 2066:16, 2066:24

## C

**calendar** [1] - 2067:21
**calm** [1] - 2032:6
**CAMPOAMOR** [54] - 1997:13, 1997:16, 1997:20, 1999:1, 2001:16, 2001:20, 2002:2, 2006:11, 2006:15, 2010:20, 2011:21, 2011:25, 2016:6, 2016:19, 2024:13, 2031:1, 2031:4, 2031:7, 2031:10, 2035:14, 2042:17, 2042:19, 2046:4, 2047:23, 2047:25, 2049:8, 2051:23, 2052:3, 2052:5, 2052:6, 2056:8, 2056:14, 2056:17, 2056:21, 2058:9, 2059:3, 2059:4, 2059:23, 2060:3, 2060:6, 2061:1, 2061:8, 2061:15, 2061:18, 2062:25, 2066:10, 2066:16, 2066:22, 2066:24, 2067:2, 2068:9, 2068:14, 2068:22
**Campoamor** [2] - 1991:12, 2033:16
**CAMPOAMOR-SANCHEZ** [54] - 1997:13, 1997:16, 1997:20, 1999:1, 2001:16, 2001:18, 2001:20, 2002:2, 2006:11, 2006:15, 2010:20, 2011:21, 2011:25, 2016:6, 2016:19, 2024:13, 2031:1, 2031:4, 2031:7, 2031:10, 2035:14, 2042:17, 2042:19, 2046:4, 2047:23, 2047:25, 2049:8, 2051:23, 2052:3, 2052:5, 2052:6, 2056:8, 2056:14, 2056:17, 2056:21, 2058:9, 2059:3, 2059:4, 2059:23, 2060:3, 2060:6, 2061:1, 2061:8, 2061:15, 2061:18, 2062:25, 2066:10, 2066:16, 2066:22, 2066:24, 2067:2, 2068:9, 2068:14, 2068:22
**Campoamor-Sanchez** [1] - 1991:12
**candidate** [1] - 2009:18
**capacities** [1] - 2046:8
**caption** [3] - 1996:15, 2017:6, 2017:7
**care** [2] - 2026:18, 2049:7

**carefully** [1] - 2070:21
**case** [18] - 2003:15, 2007:17, 2007:20, 2009:25, 2016:18, 2048:15, 2054:5, 2054:7, 2057:18, 2060:8, 2063:9, 2065:10, 2067:19, 2069:9, 2070:1, 2070:4, 2070:10, 2070:22
**Case** [1] - 2039:1
**caused** [1] - 2028:20
**caution** [1] - 2067:20
**cautioned** [1] - 2067:15
**center** [1] - 2003:14
**certain** [2] - 2005:2, 2009:5
**certainly** [6] - 2006:17, 2008:16, 2047:20, 2069:18, 2070:11, 2070:17
**chagrinned** [1] - 2070:18
**chain** [1] - 2061:4
**challenges** [1] - 2070:22
**change** [4] - 2002:1, 2022:25, 2024:7, 2028:21
**changed** [5] - 2018:12, 2024:1, 2026:9, 2026:10, 2055:17
**changes** [2] - 2028:3, 2028:21
**changing** [3] - 2024:3, 2024:9, 2024:12
**characterization** [3] - 2010:22, 2011:15, 2012:12
**characterize** [1] - 2005:14
**charge** [2] - 2045:22, 2046:1
**charges** [1] - 2002:25
**chart** [1] - 2013:4
**check** [1] - 1997:5
**chief** [2] - 2008:24, 2015:13
**circuit** [1] - 2056:11
**circulated** [1] - 2019:17
**circulating** [1] - 2027:19
**cited** [1] - 2005:11
**citing** [1] - 2014:24
**claims** [1] - 2007:10
**clarify** [1] - 2011:2
**clarity** [1] - 2070:9
**clean** [1] - 2047:11
**clear** [5] - 2001:25, 2002:10, 2028:2, 2053:11, 2061:5
**clearly** [2] - 2036:3, 2070:12
**CLERK** [3] - 1996:5, 2019:23, 2039:1
**client** [6] - 2009:12, 2015:15, 2043:20, 2046:18, 2046:20, 2050:13
**close** [2] - 2009:19, 2041:17
**closely** [1] - 2030:11
**closing** [4] - 2063:17, 2064:11, 2066:1, 2066:5
**Club** [16] - 2019:13, 2019:18, 2020:20, 2021:23, 2022:16, 2023:9, 2023:17, 2024:16, 2025:22, 2025:23, 2025:25, 2035:13, 2035:17, 2044:19, 2048:1, 2050:7
**COLUMBIA** [2] - 1991:1, 1991:14
**coming** [1] - 2057:25
**command** [1] - 2061:4

**comment** [1] - 2034:7
**commented** [1] - 2012:14
**comments** [6] - 1996:11, 2018:20, 2019:10, 2035:6, 2035:7
**committed** [1] - 2046:24
**communicate** [3] - 2044:8, 2048:14, 2061:22
**communicated** [4] - 2048:17, 2058:21, 2060:16, 2060:18
**communications** [1] - 2065:19
**compilation** [1] - 2037:8
**complained** [1] - 2003:12
**complaint** [1] - 2005:2
**complete** [2] - 2033:18, 2040:2
**completely** [1] - 2064:8
**complicated** [1] - 2012:4
**component** [2] - 2022:6, 2022:19
**compromised** [1] - 2009:6
**computer** [2] - 1992:6, 2020:14
**computer-aided** [1] - 1992:6
**concern** [4] - 2024:10, 2026:16, 2026:21, 2043:2
**concerned** [13] - 2018:8, 2027:4, 2027:6, 2027:7, 2032:14, 2048:19, 2048:23, 2048:24, 2048:25, 2049:3, 2052:18, 2065:8, 2065:24
**concerns** [2] - 2005:15, 2006:6, 2007:25, 2018:25, 2019:3
**concluded** [4] - 2004:6, 2006:5, 2007:23, 2069:24
**concludes** [3] - 1998:11, 2010:11, 2011:18
**conclusion** [15] - 1997:7, 2001:14, 2002:15, 2002:24, 2003:6, 2003:10, 2003:21, 2005:14, 2006:2, 2006:12, 2007:9, 2008:3, 2010:15, 2010:17, 2011:15
**Conclusions** [1] - 2001:2
**conclusions** [4] - 2001:5, 2001:9, 2001:22, 2012:12
**conduct** [1] - 2004:20
**confer** [1] - 1998:22
**conference** [1] - 2058:4
**conflicting** [1] - 2002:17
**confront** [2] - 2054:5, 2065:7
**confused** [3] - 1999:1, 2008:5, 2059:23
**confusion** [1] - 2001:22
**Congress** [1] - 2030:3
**connection** [1] - 2070:5
**consent** [1] - 2019:9
**consented** [1] - 2021:19
**consider** [1] - 2019:9
**consideration** [1] - 2013:9
**consolidate** [1] - 2038:10
**consolidating** [1] - 2038:13
**consolidation** [1] - 2038:11
**constitute** [1] - 2057:1
**Constitution** [1] - 1992:4

**consult** [1] - 1998:19
**consultants** [1] - 2036:8
**contact** [10] - 2029:7, 2048:12, 2049:10, 2049:12, 2060:21, 2061:22, 2062:18, 2063:4, 2066:12, 2066:25
**contacted** [1] - 2029:4
**contemplation** [1] - 2037:16
**contempt** [1] - 2007:15
**content** [2] - 2006:22, 2024:21
**contents** [1] - 2000:18
**context** [1] - 2038:5
**continue** [2] - 2049:22, 2062:7
**continued** [3] - 2008:14, 2027:11, 2028:21
**continuing** [2] - 2007:12, 2029:22
**control** [6] - 2012:20, 2013:4, 2020:22, 2021:11, 2040:8, 2042:15
**controversial** [1] - 2069:1
**conundrum** [1] - 2066:6
**convened** [2] - 2024:10, 2024:15
**convening** [1] - 2019:13
**conversation** [6] - 2020:18, 2029:21, 2063:11, 2064:10, 2064:12, 2064:23
**conversations** [1] - 2064:2
**conveyed** [1] - 2032:12
**conveys** [2] - 2057:14, 2057:15
**conviction** [3] - 2003:19, 2006:8, 2008:1, 2010:4
**copied** [2] - 2044:18, 2044:24
**copies** [1] - 2045:6
**copy** [2] - 1995:3, 2042:2
**core** [1] - 2063:8
**corner** [1] - 2013:9
**correct** [71] - 1995:11, 1995:12, 1995:14, 1996:12, 1997:11, 1998:6, 2000:2, 2000:8, 2000:24, 2001:6, 2001:10, 2001:11, 2002:12, 2002:14, 2002:22, 2003:9, 2003:12, 2003:13, 2004:15, 2005:11, 2005:25, 2008:18, 2009:13, 2013:3, 2014:5, 2014:9, 2014:18, 2015:22, 2017:16, 2018:13, 2018:14, 2019:2, 2019:3, 2021:1, 2021:21, 2021:25, 2023:2, 2023:12, 2023:14, 2024:2, 2025:17, 2026:2, 2026:10, 2028:8, 2028:9, 2028:17, 2029:12, 2030:2, 2030:23, 2030:25, 2035:1, 2035:2, 2035:19, 2036:5, 2038:1, 2038:4, 2039:9, 2039:11, 2039:13, 2039:16, 2039:18, 2040:7, 2040:13, 2040:17, 2040:18, 2041:10, 2042:3, 2042:14, 2044:7, 2046:6, 2048:4
**counsel** [8] - 1998:20, 2005:5, 2008:5, 2008:9, 2008:13, 2008:15, 2008:17, 2013:10
**Counsel** [1] - 1998:22
**couple** [4] - 2028:18, 2030:9, 2030:15, 2066:5
**course** [2] - 2025:19, 2035:12
**COURT** [116] - 1991:1, 1994:3, 1994:5,

1997:18, 1997:21, 1998:21, 1999:11,
1999:16, 1999:20, 2000:2, 2000:4,
2001:17, 2002:4, 2002:7, 2003:22,
2005:8, 2005:12, 2005:20, 2006:13,
2006:21, 2007:1, 2007:4, 2007:7,
2010:21, 2012:1, 2016:7, 2016:21,
2021:2, 2021:5, 2021:7, 2021:9,
2024:15, 2024:18, 2025:1, 2026:20,
2026:23, 2026:25, 2027:3, 2027:6,
2031:8, 2031:11, 2031:13, 2031:21,
2031:24, 2032:3, 2033:2, 2033:13,
2035:6, 2035:15, 2038:11, 2038:17,
2038:23, 2039:3, 2042:6, 2042:11,
2042:16, 2045:25, 2047:22, 2049:2,
2051:20, 2051:25, 2052:4, 2052:21,
2052:23, 2053:7, 2053:9, 2053:13,
2053:17, 2054:8, 2054:11, 2055:12,
2055:15, 2055:19, 2056:4, 2056:11,
2056:15, 2056:19, 2056:24, 2057:8,
2057:11, 2057:19, 2058:7, 2058:24,
2059:2, 2059:10, 2059:13, 2059:19,
2059:21, 2059:25, 2060:4, 2060:10,
2060:14, 2060:19, 2061:12, 2061:19,
2062:7, 2062:23, 2063:3, 2063:15,
2064:17, 2064:19, 2065:13, 2066:14,
2067:4, 2067:7, 2067:11, 2068:4,
2068:12, 2068:18, 2068:24, 2069:2,
2069:6, 2069:18, 2070:8, 2070:15,
2070:17

**court** [8] - 2002:8, 2003:18, 2033:14,
2057:19, 2057:20, 2058:8, 2066:9

**Court** [15] - 1992:3, 2001:15, 2002:18,
2002:19, 2002:20, 2007:20, 2008:7,
2047:18, 2068:25, 2069:4, 2069:8,
2069:11, 2069:15, 2069:16, 2070:3

**Court's** [7] - 2001:14, 2002:15,
2004:19, 2007:10, 2007:16, 2009:5,
2066:22

**Courthouse** [1] - 1992:3

**courtroom** [6] - 2004:18, 2005:1,
2007:14, 2007:18, 2012:7, 2070:19

**courts** [2] - 2003:16, 2007:21

**cover** [1] - 2000:16

**craft** [1] - 2042:2

**crafted** [1] - 2041:25

**CRAIG** [1] - 1991:5

**Craig** [77] - 2013:14, 2013:17, 2014:2,
2014:11, 2014:13, 2014:16, 2015:17,
2015:20, 2018:18, 2018:23, 2019:9,
2020:18, 2021:23, 2022:16, 2022:19,
2022:25, 2023:11, 2023:18, 2024:1,
2024:7, 2025:18, 2026:1, 2026:18,
2028:15, 2029:2, 2029:10, 2029:13,
2029:18, 2029:21, 2029:23, 2030:4,
2032:25, 2034:11, 2034:15, 2034:24,
2035:5, 2035:12, 2035:21, 2037:22,
2037:25, 2038:2, 2038:4, 2039:2,
2040:20, 2040:23, 2042:1, 2042:3,
2044:9, 2044:16, 2044:21, 2044:23,
2045:6, 2048:5, 2048:12, 2049:11,

2049:15, 2049:22, 2050:4, 2050:11,
2050:12, 2054:4, 2059:7, 2062:2,
2062:3, 2063:11, 2063:13, 2063:18,
2063:25, 2064:9, 2064:15, 2065:11,
2065:15, 2065:22, 2066:2, 2066:25

**Craig's** [4] - 2018:10, 2018:24,
2021:15, 2023:23

**created** [3] - 1998:18, 2037:10,
2051:14

**credibility** [1] - 2049:25

**credible** [1] - 2049:2

**crimes** [2] - 2046:23, 2047:6

**Criminal** [1] - 1991:4

**criminal** [2] - 2054:5, 2057:18

**CROSS** [2] - 1993:2, 1994:13

**cross** [10] - 2033:7, 2033:9, 2043:19,
2048:8, 2053:17, 2054:12, 2054:22,
2058:5, 2059:12, 2065:1

**cross-examination** [6] - 2043:19,
2048:8, 2053:17, 2054:12, 2059:12,
2065:1

**CROSS-EXAMINATION** [1] - 1994:13

**cross-examine** [1] - 2058:5

**cross-examined** [2] - 2033:3, 2033:4

**crosses** [2] - 2032:17, 2068:17

**CRR** [1] - 1992:3

**crunch** [1] - 2030:13

**customarily** [1] - 2004:14

**cut** [3] - 2014:25, 2015:11, 2016:11

**cut-down** [2] - 2014:25, 2015:11

# D

**D.C** [4] - 1991:6, 1992:4, 2027:21,
2036:8

**date** [3] - 2013:5, 2051:14, 2059:15

**dated** [1] - 2015:25

**David** [16] - 2014:8, 2021:24, 2022:4,
2022:25, 2026:1, 2026:4, 2028:15,
2036:18, 2037:23, 2041:22, 2050:23,
2051:16, 2052:8, 2060:13, 2065:16,
2066:18

**DAY** [1] - 1991:5

**days** [4] - 2028:19, 2030:9, 2035:4,
2035:11

**DC** [3] - 1991:15, 1991:17, 1991:25

**deadline** [1] - 2070:1

**deals** [5] - 1999:8, 2003:10, 2005:24,
2008:3, 2008:4

**dealt** [3] - 2004:1, 2004:2, 2018:25

**debate** [9] - 2052:14, 2052:17,
2052:18, 2052:25, 2053:1, 2053:21,
2055:3, 2055:6

**debrief** [1] - 2049:25

**December** [5] - 2000:6, 2039:14,
2039:17, 2039:22, 2064:1

**decided** [1] - 2038:6

**decision** [6] - 2006:3, 2007:11,
2007:22, 2009:5, 2058:22, 2061:8

**defendant** [3] - 2003:16, 2008:12,

2057:18

**Defendant** [3] - 1991:6, 1991:19,
2016:8

**DEFENDANT** [1] - 1993:5

**Defendant's** [13] - 2000:2, 2012:15,
2014:20, 2015:23, 2016:5, 2017:24,
2018:15, 2019:22, 2027:13, 2028:18,
2030:8, 2036:20, 2040:25

**defense** [13] - 2003:11, 2003:17,
2008:9, 2008:20, 2009:4, 2009:5,
2009:7, 2033:9, 2047:9, 2050:3,
2064:20, 2065:4, 2068:20

**define** [1] - 2069:8

**definitely** [2] - 2068:20, 2068:21

**deliberately** [2] - 2031:19, 2032:4

**delivering** [1] - 2044:4

**demanded** [1] - 2064:23

**denied** [1] - 2008:24

**DEPARTMENT** [1] - 1991:16

**dependent** [1] - 2022:22

**deprived** [2] - 2006:7, 2007:25

**DEPUTY** [3] - 1996:5, 2019:23, 2039:1

**der** [9] - 2016:3, 2025:15, 2040:13,
2040:16, 2041:9, 2042:22, 2045:2,
2045:5, 2045:8

**describes** [1] - 2004:18

**detail** [3] - 1996:3, 2004:23, 2015:2

**detailed** [1] - 1996:1

**details** [1] - 2005:10

**detain** [2] - 2006:3, 2007:22

**detention** [5] - 2005:24, 2007:10,
2007:11, 2007:13, 2007:19

**determine** [1] - 2068:19

**diagnosis** [1] - 2057:15

**different** [9] - 2014:23, 2015:1, 2017:1,
2024:4, 2026:23, 2045:13, 2064:1,
2064:8, 2065:14

**differently** [2] - 2017:4, 2052:2

**difficult** [2] - 2004:22, 2070:20

**direct** [4] - 2028:10, 2061:17, 2061:20,
2064:24

**DIRECT** [1] - 1993:2

**directed** [4] - 2028:4, 2032:9, 2032:10,
2060:21

**directing** [4] - 1999:17, 2032:20,
2032:21, 2033:8

**direction** [15] - 2059:15, 2059:16,
2060:10, 2060:23, 2062:9, 2062:10,
2062:16, 2062:22, 2062:23, 2063:1,
2063:2, 2063:3, 2063:21, 2063:23,
2066:11

**directly** [4] - 2025:21, 2048:17,
2054:20, 2054:21

**directs** [1] - 2032:16

**discuss** [3] - 2065:21, 2067:18

**discussed** [5] - 1994:17, 2004:23,
2024:22, 2050:7, 2051:17

**discussion** [5] - 2022:5, 2023:18,
2023:21, 2026:2, 2070:6

**dispute** [1] - 2002:17

**disputed** [1] - 2003:1
**disrespectful** [1] - 2004:20
**DISTRICT** [4] - 1991:1, 1991:1, 1991:10, 1991:14
**doctor's** [1] - 2057:15
**doctrine** [1] - 2010:1
**document** [41] - 1994:20, 1995:13, 1996:15, 1996:20, 1996:24, 1999:12, 2001:20, 2005:6, 2010:8, 2011:9, 2011:11, 2013:9, 2014:24, 2015:8, 2015:25, 2016:2, 2020:3, 2020:5, 2021:13, 2027:15, 2028:4, 2028:5, 2028:22, 2036:19, 2037:9, 2037:17, 2039:25, 2042:7, 2050:23, 2050:25, 2051:6, 2051:22, 2052:10, 2052:11, 2052:12, 2052:13, 2056:18, 2065:17
**documents** [18] - 2013:1, 2014:23, 2019:17, 2030:14, 2032:24, 2037:8, 2040:3, 2041:7, 2041:10, 2041:15, 2041:19, 2042:7, 2042:8, 2042:9, 2042:21, 2043:10, 2050:1, 2063:18
**done** [9] - 1999:19, 2031:15, 2033:21, 2034:24, 2047:3, 2047:13, 2056:22, 2065:6, 2068:17
**door** [1] - 2067:25
**down** [9] - 2002:24, 2012:17, 2014:25, 2015:11, 2030:13, 2034:20, 2037:2, 2049:22, 2053:13
**draft** [5] - 1996:16, 1998:9, 2001:21, 2001:24, 2002:4
**Draft** [1] - 2013:9
**drew** [1] - 2002:20
**drill** [1] - 2030:17
**driven** [1] - 2009:22
**due** [2] - 2003:18, 2004:14
**duly** [1] - 1994:12
**during** [10] - 2005:2, 2005:25, 2008:13, 2008:20, 2008:24, 2013:2, 2023:19, 2033:3, 2050:11, 2065:21
**duty** [3] - 2069:8, 2069:14, 2069:16
**DX** [1] - 2013:19

## E

**e-mail** [24] - 1994:19, 1994:21, 1996:10, 1996:16, 1999:17, 2011:4, 2012:19, 2013:15, 2016:11, 2017:7, 2018:18, 2018:22, 2025:6, 2025:16, 2034:4, 2040:17, 2043:3, 2043:9, 2054:13, 2060:14, 2061:10, 2062:5, 2063:20
**eager** [1] - 2070:14
**early** [5] - 2038:10, 2038:12, 2039:17, 2043:2, 2050:5
**East** [3] - 1991:20, 2050:17, 2050:19
**ECFMU** [3] - 2045:16, 2046:11, 2046:13
**edit** [2] - 1998:2, 1998:4
**edits** [2] - 2011:13, 2040:5
**effort** [2] - 2017:16, 2022:20

**efforts** [2] - 2018:11, 2054:7
**Egypt** [6] - 2034:11, 2050:4, 2050:14, 2050:15, 2050:18, 2065:15
**either** [5] - 2028:12, 2028:23, 2032:16, 2046:23, 2050:4
**elements** [2] - 2003:4, 2069:14
**elicited** [3] - 2053:18, 2055:9, 2065:4
**email** [2] - 2040:1, 2042:12
**emanating** [1] - 2023:9
**employed** [1] - 2028:1
**end** [3] - 2022:15, 2063:17, 2065:23
**ended** [1] - 2007:13
**engaged** [1] - 2004:20
**Engagement** [1] - 2014:6
**engagement** [1] - 2021:15
**enlarge** [1] - 2018:17
**ensure** [1] - 2043:4
**entire** [6] - 1995:20, 1995:21, 1995:22, 2006:4, 2007:22, 2033:3
**entirely** [1] - 2006:12
**entirety** [1] - 2041:11
**entitled** [1] - 2040:8
**Esq** [4] - 1991:19, 1991:19, 1991:22, 1991:23
**essence** [1] - 2004:3
**establish** [2] - 2031:16, 2056:17
**established** [2] - 2004:7, 2009:25
**etc** [2] - 2001:3, 2041:22
**Europe** [2] - 2021:17, 2028:7
**European** [1] - 2008:11
**evening** [3] - 2067:13, 2067:14, 2068:1
**event** [1] - 2049:15
**eventually** [1] - 2003:20
**evidence** [10] - 1994:18, 2002:18, 2002:19, 2002:21, 2010:2, 2016:8, 2040:22, 2064:13, 2065:20, 2070:22
**evidentiary** [1] - 2032:23
**exactly** [5] - 2002:6, 2017:13, 2018:15, 2054:8, 2056:24
**examination** [8] - 2008:15, 2043:19, 2048:8, 2053:17, 2054:12, 2059:12, 2065:1, 2069:24
**EXAMINATION** [2] - 1994:13, 2042:18
**examine** [1] - 2058:5
**examined** [3] - 1994:12, 2033:3, 2033:4
**examining** [1] - 2008:8
**except** [1] - 2023:13
**exception** [1] - 2054:19
**excess** [1] - 2047:4
**exchanging** [2] - 2013:1, 2030:14
**excuse** [2] - 1998:19, 2060:9
**excused** [3] - 2038:23, 2067:4, 2067:6
**executive** [4] - 1997:6, 2000:24, 2001:23, 2010:7
**exercise** [3] - 2008:13, 2030:17, 2038:12
**EXHIBIT** [1] - 1993:5

**exhibit** [3] - 2019:21, 2019:24, 2039:23
**Exhibit** [32] - 1994:15, 1995:8, 1996:4, 1998:24, 1999:6, 1999:24, 2000:2, 2000:3, 2012:15, 2014:20, 2015:24, 2016:5, 2017:24, 2018:15, 2019:15, 2019:22, 2023:4, 2025:4, 2027:14, 2028:18, 2030:8, 2031:1, 2034:3, 2036:7, 2036:20, 2039:24, 2041:1, 2041:13, 2050:3, 2051:4
**existence** [1] - 2002:11
**expect** [2] - 2068:16, 2069:3
**expected** [1] - 2068:23
**experience** [1] - 2004:7
**expertise** [2] - 2003:5, 2049:24
**explain** [2] - 2048:11, 2053:22
**explained** [1] - 2056:25
**explains** [1] - 2057:16
**expressed** [1] - 2006:2
**expressing** [1] - 2016:17
**extensive** [1] - 2053:11
**extent** [1] - 2070:9
**extremely** [1] - 2062:8

## F

**facility** [1] - 2007:12
**fact** [15] - 2002:19, 2005:25, 2010:23, 2018:7, 2019:12, 2032:19, 2032:23, 2037:8, 2046:16, 2050:7, 2053:23, 2057:16, 2058:1, 2066:19
**facts** [5] - 1994:23, 1995:23, 2001:3, 2002:17, 2007:14
**Factual** [1] - 2001:2
**factual** [1] - 2001:5
**failed** [1] - 2033:16
**failing** [1] - 2008:9
**fair** [10] - 2005:20, 2007:2, 2016:21, 2018:19, 2025:10, 2031:13, 2032:17, 2049:4, 2064:6, 2069:7
**fairly** [1] - 2005:13
**fairness** [3] - 2004:8, 2005:15, 2009:4
**falls** [1] - 2054:19
**far** [3] - 2018:8, 2029:25, 2056:25
**faster** [1] - 2007:7
**favor** [6] - 2056:12, 2056:13, 2057:4, 2058:11, 2058:14
**feet** [1] - 2032:15
**Fernando** [1] - 1991:12
**few** [5] - 2030:15, 2035:4, 2035:11, 2038:9, 2042:20
**file** [1] - 2040:8
**filled** [1] - 1995:5
**final** [3] - 2001:21, 2001:23, 2022:22
**finder** [1] - 2002:18
**findings** [4] - 1997:4, 1997:5, 2002:19, 2049:19
**finish** [2] - 2032:13, 2058:4
**finished** [2] - 2018:5, 2018:8
**fire** [1] - 2030:17

**firm** [2] - 2015:14, 2043:7
**firms** [5] - 2027:21, 2045:12, 2045:14, 2050:10, 2051:17
**first** [23] - 1994:19, 1994:20, 1999:16, 2001:1, 2001:14, 2002:15, 2005:12, 2011:6, 2011:12, 2013:7, 2013:8, 2026:10, 2045:19, 2046:2, 2048:5, 2050:23, 2050:25, 2051:21, 2052:8, 2052:13, 2059:25, 2063:5, 2065:16
**five** [3] - 2068:9, 2068:11, 2068:15
**fix** [1] - 2031:20
**flight** [1] - 2007:16
**flying** [1] - 2050:18
**folks** [1] - 2018:8
**following** [3] - 2025:25, 2033:24, 2046:22
**follows** [1] - 1994:12
**FOR** [2] - 1991:1, 1991:13
**form** [10] - 1997:13, 1997:16, 1999:25, 2011:21, 2016:16, 2016:19, 2019:20, 2024:13, 2035:14, 2041:13
**format** [1] - 2062:1
**former** [3] - 2009:17, 2017:18, 2043:7
**forth** [1] - 2013:1
**forward** [1] - 2018:23
**forwarded** [4] - 2011:1, 2016:2, 2040:12, 2041:8
**forwarding** [3] - 1995:10, 1995:11, 1996:11
**four** [2] - 2068:10, 2068:16
**Fourth** [1] - 1991:14
**front** [3] - 1995:13, 1999:24, 2063:12
**frustrate** [1] - 2012:7
**FTI** [3] - 2029:4, 2031:15, 2033:21
**Fule** [1] - 2023:13
**full** [2] - 1995:4, 2000:7
**funnel** [1] - 2069:23
**future** [2] - 2009:24, 2054:18
**FYI** [1] - 2016:13

**G**

**GASTON** [1] - 2067:9
**Gaston** [1] - 1991:13
**gates** [13] - 1994:6, 1999:24, 2007:9, 2015:25, 2025:24, 2033:16, 2039:7, 2056:6, 2056:7, 2057:13, 2060:16, 2060:17, 2062:16
**GATES** [2] - 1993:3, 1994:11
**Gates** [7] - 1994:15, 2002:10, 2016:10, 2061:12, 2063:22, 2066:11
**gather** [1] - 2020:14
**GC** [2] - 2014:2, 2034:24
**general** [5] - 2015:16, 2022:19, 2026:2, 2026:7, 2053:13
**generally** [2] - 2013:16, 2053:20
**generated** [1] - 2032:23
**gentleman** [1] - 2033:4
**gentlemen** [1] - 2047:19
**gesture** [1] - 2032:11

**given** [6] - 2003:16, 2030:19, 2041:21, 2041:22, 2060:11, 2067:21
**gmail** [3] - 2041:3, 2042:22, 2043:14
**Gordon** [1] - 2029:14
**Government** [6] - 1991:12, 1995:8, 2025:4, 2034:3, 2039:24, 2050:2
**government** [14] - 1996:5, 1996:6, 2009:18, 2015:5, 2015:6, 2036:7, 2046:11, 2046:14, 2046:21, 2047:3, 2047:5, 2065:10, 2069:3, 2069:14
**government's** [3] - 2019:23, 2019:24, 2054:7
**Government's** [4] - 2000:3, 2019:15, 2040:25, 2051:4
**great** [3] - 2015:15, 2015:17, 2053:7
**green** [1] - 2030:19
**Greg** [8] - 2014:13, 2022:16, 2022:25, 2023:11, 2024:1, 2034:24, 2041:4, 2049:7
**Greg's** [1] - 2022:7
**Gregory** [1] - 2039:2
**GREGORY** [1] - 1991:5
**grid** [8] - 2012:20, 2013:4, 2015:2, 2020:22, 2021:11, 2034:7, 2040:9, 2042:15
**grids** [1] - 2013:17
**ground** [1] - 2014:1
**group** [9] - 1997:22, 1997:23, 1998:7, 2026:16, 2026:21, 2026:23, 2054:15, 2054:16
**Group** [3] - 2045:20, 2045:22, 2046:1
**guess** [2] - 2013:13, 2014:19
**guilty** [1] - 2003:8
**Gulland** [1] - 1991:13
**Guy** [1] - 2019:7
**guy** [1] - 2022:13

**H**

**hacked** [2] - 2043:3, 2043:9
**hand** [4] - 2002:5, 2004:3, 2010:8, 2013:9
**hand-picked** [1] - 2004:3
**happy** [4] - 2007:3, 2031:6, 2031:20, 2031:22
**hard** [1] - 2012:3
**Harvard** [16] - 2019:13, 2019:17, 2020:20, 2021:23, 2022:16, 2023:9, 2023:17, 2024:16, 2025:21, 2025:23, 2025:25, 2035:13, 2035:17, 2044:19, 2048:1, 2050:7
**Hawker** [70] - 1994:22, 1995:5, 1995:10, 1996:1, 1996:10, 1998:2, 2000:7, 2011:9, 2011:11, 2012:19, 2013:14, 2014:21, 2016:3, 2016:12, 2016:17, 2017:15, 2020:13, 2025:6, 2025:14, 2025:22, 2026:17, 2027:4, 2027:15, 2028:12, 2030:10, 2033:2, 2034:4, 2034:25, 2036:7, 2036:21, 2037:9, 2037:18, 2040:2, 2040:12,

2040:19, 2040:22, 2041:2, 2041:8, 2041:9, 2045:4, 2048:13, 2048:16, 2048:19, 2049:21, 2060:11, 2060:12, 2060:17, 2061:3, 2061:10, 2061:13, 2061:21, 2061:23, 2062:3, 2062:5, 2062:11, 2062:13, 2062:17, 2062:19, 2062:22, 2062:24, 2063:4, 2063:7, 2063:19, 2066:12, 2066:20
**Hawker's** [7] - 2010:17, 2013:25, 2017:12, 2021:7, 2035:6, 2035:8, 2035:9
**head** [2] - 2009:17, 2045:19
**headed** [2] - 2069:20, 2070:10
**header** [1] - 2042:15
**heading** [1] - 2001:2
**headline** [6] - 1998:10, 1998:17, 2010:10, 2017:17, 2017:21, 2017:22
**heads** [1] - 2045:25
**hear** [6] - 2024:3, 2024:7, 2033:12, 2037:12, 2054:22, 2068:13
**heard** [15] - 2014:16, 2023:25, 2026:9, 2034:15, 2035:4, 2035:20, 2038:7, 2048:9, 2053:3, 2053:14, 2057:1, 2060:24, 2061:17, 2069:20, 2070:10
**hearsay** [25] - 2052:20, 2053:5, 2053:11, 2053:15, 2053:18, 2053:19, 2053:24, 2054:1, 2054:6, 2054:19, 2055:5, 2055:13, 2056:23, 2057:1, 2057:7, 2057:16, 2057:20, 2057:22, 2057:23, 2059:9, 2060:22, 2061:24, 2062:6, 2063:12, 2064:16
**help** [1] - 2051:15
**helpful** [3] - 2069:11, 2069:15, 2070:7
**helps** [1] - 2051:24
**hide** [1] - 2047:18
**high** [1] - 2012:3
**higher** [1] - 2070:12
**highlight** [2] - 2009:20, 2033:17
**highly** [1] - 2043:6
**himself** [2] - 2046:10, 2046:13
**hint** [1] - 2062:1
**hold** [1] - 2041:3
**honestly** [1] - 1995:22
**Honor** [25] - 1994:10, 1999:14, 2005:18, 2005:19, 2006:11, 2006:17, 2011:1, 2016:4, 2021:4, 2031:10, 2032:22, 2038:9, 2039:1, 2042:17, 2047:23, 2051:18, 2054:2, 2059:3, 2059:8, 2061:2, 2065:5, 2066:8, 2067:3, 2067:10, 2070:16
**HONORABLE** [1] - 1991:9
**hopeful** [1] - 2068:18
**hopefully** [1] - 2067:24
**hundred** [1] - 2056:10
**Hunt** [4] - 2028:8, 2029:3, 2030:22, 2058:15
**hunt** [4] - 2029:9, 2051:9, 2052:15, 2068:7
**hypothetical** [1] - 1995:2

## I

**i.e** [1] - 2009:23
**idea** [5] - 2015:9, 2015:16, 2017:15, 2028:19, 2049:15
**identified** [8] - 2008:22, 2008:25, 2013:19, 2014:17, 2019:16, 2029:15, 2029:17, 2038:3
**identifier** [1] - 2043:16
**identifies** [1] - 2000:20
**identify** [1] - 2068:11
**identifying** [2] - 2001:9, 2036:14
**III** [1] - 1991:22
**immediately** [2] - 2022:24, 2031:15
**imminent** [1] - 2018:1
**implication** [4] - 2063:13, 2063:16, 2065:11, 2065:17
**implore** [1] - 2063:9
**importance** [1] - 2069:25
**important** [2] - 2009:12, 2063:8
**impose** [1] - 2070:3
**impression** [1] - 2063:10
**improper** [1] - 2009:23
**inadmissible** [2] - 2053:20, 2056:22
**inappropriate** [1] - 2066:1
**inappropriately** [2] - 2006:7, 2007:25
**incarcerate** [1] - 2007:11
**incentive** [1] - 2047:17
**include** [1] - 2033:24
**included** [1] - 2028:11
**includes** [1] - 2040:5
**including** [3] - 2054:16, 2054:17, 2069:14
**indeed** [2] - 2049:10, 2051:8
**Independent** [2] - 1998:10, 2010:10
**independent** [3] - 2011:18, 2046:11, 2046:14
**indicated** [6] - 2026:17, 2032:11, 2033:10, 2035:12, 2049:6, 2049:23
**indication** [1] - 2063:19
**individuals** [1] - 2029:19
**indulgence** [1] - 2066:22
**inference** [2] - 2065:24, 2065:25
**inferences** [1] - 2002:20
**information** [12] - 1998:18, 2011:17, 2028:10, 2028:13, 2031:25, 2043:5, 2043:6, 2043:8, 2058:21, 2063:6, 2066:19, 2069:22
**initial** [1] - 1998:3
**input** [3] - 2027:23, 2028:2, 2028:3
**inside** [2] - 2015:5, 2054:25
**instances** [3] - 2002:20, 2037:10, 2043:5
**instead** [1] - 2009:24
**instructed** [1] - 2061:10
**instruction** [2] - 2064:15, 2069:12
**instructions** [2] - 2044:6, 2070:5
**integrity** [1] - 2043:4
**intended** [1] - 2015:10

**intends** [1] - 2069:12
**intention** [1] - 2054:18
**interested** [2] - 1997:11, 1997:25
**interpretation** [1] - 2010:17
**interviewed** [1] - 2008:23
**interviews** [1] - 2047:3
**introduced** [1] - 2064:24
**investigation** [1] - 2008:21
**investigator** [1] - 2008:24
**investigators** [1] - 2047:5
**invisible** [1] - 2031:25
**involved** [3] - 2029:10, 2043:23, 2045:12
**involvement** [1] - 2043:7
**irrelevant** [1] - 2055:12
**issue** [15] - 2003:2, 2003:11, 2004:1, 2009:12, 2017:17, 2024:8, 2025:18, 2025:19, 2025:21, 2065:7, 2066:7, 2069:9, 2069:12, 2070:4
**issues** [6] - 2002:18, 2056:16, 2069:5, 2069:10, 2069:24, 2070:20
**item** [2] - 2023:11, 2041:20
**items** [3] - 1996:1, 2023:9, 2023:10
**Items** [1] - 2023:5
**iteration** [4] - 2017:15, 2032:24
**iterations** [2] - 1999:4, 2039:20

## J

**JACKSON** [1] - 1991:9
**jail** [1] - 2005:25
**James** [1] - 1991:19
**Jason** [1] - 1991:16
**John** [16] - 1996:23, 1998:24, 2003:25, 2009:20, 2010:9, 2011:6, 2012:16, 2016:15, 2018:17, 2021:12, 2023:8, 2029:14, 2033:19, 2036:13, 2036:25, 2041:18
**Jon** [1] - 1995:11
**Jonathan** [2] - 1998:18, 2023:22
**journalist** [12] - 2017:7, 2017:14, 2026:7, 2033:24, 2034:1, 2038:3, 2058:14, 2063:2, 2063:5, 2063:6, 2066:12, 2066:17
**journalists** [6] - 2023:20, 2027:25, 2028:6, 2048:6, 2049:16, 2058:12
**Judge** [2] - 2009:1, 2009:2
**JUDGE** [1] - 1991:10
**judge** [2] - 2004:2, 2004:3
**judge's** [1] - 2004:7
**judgment** [1] - 2010:22
**July** [1] - 2005:15
**JUNGHANS** [91] - 1994:10, 1994:14, 1996:6, 1996:8, 1997:15, 1997:23, 1997:24, 1998:19, 1998:23, 1999:3, 1999:5, 1999:14, 1999:19, 1999:22, 1999:23, 2000:3, 2000:5, 2001:25, 2002:6, 2002:9, 2003:23, 2003:24, 2005:9, 2005:18, 2005:22, 2006:17, 2006:24, 2007:3, 2007:6, 2007:8,

2011:1, 2011:6, 2011:8, 2011:23, 2012:10, 2012:22, 2012:23, 2016:4, 2016:9, 2016:25, 2017:4, 2017:5, 2019:24, 2020:1, 2021:10, 2024:24, 2025:3, 2026:22, 2026:24, 2027:2, 2027:8, 2031:3, 2031:6, 2031:20, 2031:22, 2032:2, 2032:22, 2033:12, 2033:15, 2035:8, 2035:10, 2035:16, 2038:9, 2038:16, 2039:6, 2042:4, 2042:9, 2042:14, 2047:21, 2049:1, 2051:18, 2052:20, 2055:6, 2055:14, 2055:18, 2055:22, 2058:23, 2059:8, 2059:11, 2059:20, 2060:9, 2060:12, 2060:15, 2061:5, 2061:9, 2061:14, 2061:16, 2061:25, 2062:20, 2066:8, 2068:13
   **Junghans** [3] - 1991:23, 1994:9, 2054:12
   **juries** [1] - 2004:13
   **jurors** [3] - 1994:5, 2031:4, 2032:11
   **JURY** [2] - 1991:5, 1991:9
   **jury** [11] - 1994:3, 2004:12, 2004:13, 2033:8, 2038:17, 2039:3, 2047:19, 2063:10, 2063:12, 2065:11, 2067:23
   **Jury** [4] - 1994:4, 2038:22, 2039:5, 2068:3
   **jury's** [1] - 2033:10
   **Justice** [4] - 1998:10, 2009:12, 2018:12, 2044:11
   **JUSTICE** [1] - 1991:16
   **justifiable** [1] - 2007:19
   **justification** [2] - 2006:6, 2007:24

## K

**KANESHIRO** [1] - 1992:3
**KANESHIRO-MILLER** [1] - 1992:3
**keep** [3] - 2032:11, 2061:6, 2062:4
**kept** [1] - 2055:19
**key** [1] - 2036:15
**Kilimnik** [1] - 2040:1
**kind** [1] - 2065:7
**Kireyev** [1] - 2009:1
**Kireyev's** [1] - 2009:3
**knocking** [1] - 2067:25
**knowledge** [4] - 2023:15, 2037:24, 2043:25, 2059:16
**known** [1] - 2047:9
**knows** [1] - 2065:16

## L

**lack** [1] - 2070:9
**ladies** [1] - 2047:18
**large** [3] - 2008:22, 2020:3, 2020:5
**largely** [1] - 1997:7
**last** [12] - 1999:12, 2006:25, 2008:3, 2008:4, 2009:9, 2014:13, 2028:22, 2034:11, 2037:12, 2042:14, 2042:20
**late** [1] - 2050:4

**launch** [2] - 2013:5, 2022:10
**law** [5] - 2002:25, 2003:3, 2003:8, 2008:11, 2043:6
**lawyer** [1] - 2017:19
**lay** [1] - 2053:13
**lead** [2] - 2062:7, 2062:14
**leader** [1] - 2009:18
**leading** [1] - 2057:3
**leak** [1] - 2036:15
**learn** [1] - 2050:4
**learned** [2] - 2026:14, 2039:17
**least** [3] - 2051:16, 2064:3, 2068:6
**lecture** [1] - 2057:23
**led** [1] - 2049:2
**Lee** [2] - 2037:3, 2037:14
**left** [3] - 2013:9, 2068:5, 2068:15
**left-hand** [1] - 2013:9
**leftover** [1] - 2037:15
**legal** [6] - 2002:25, 2003:3, 2008:10, 2008:11, 2013:10, 2070:4
**legitimacy** [1] - 2004:19
**less** [2] - 2049:3, 2068:25
**level** [2] - 2015:2, 2030:2
**liberty** [2] - 2006:7, 2008:1
**lie** [4] - 2032:15, 2046:10, 2046:13, 2047:18
**lied** [1] - 2045:16
**lies** [2] - 2046:23, 2047:6
**life** [1] - 2009:24
**light** [1] - 2030:19
**likely** [2] - 2007:14, 2068:10
**line** [4] - 2013:21, 2033:20, 2035:24
**lines** [1] - 2064:25
**link** [1] - 2064:5
**list** [9] - 2013:20, 2023:9, 2027:16, 2029:22, 2031:17, 2036:22, 2037:1, 2047:8, 2068:5
**listed** [1] - 2042:15
**LLP** [2] - 1991:20, 1991:23
**log** [1] - 2014:13
**look** [30] - 1994:19, 1995:8, 1996:4, 1996:15, 1998:24, 1999:7, 2011:6, 2013:21, 2016:23, 2017:6, 2018:15, 2023:3, 2023:4, 2024:22, 2025:4, 2027:13, 2028:24, 2029:1, 2030:10, 2030:21, 2032:7, 2034:3, 2039:22, 2039:25, 2040:25, 2041:13, 2051:4, 2055:22, 2058:2, 2067:17
**looked** [3] - 1999:6, 2035:24, 2058:20
**looking** [5] - 1994:17, 1998:25, 2003:15, 2017:21, 2051:14
**looks** [1] - 2041:17
**looming** [1] - 2070:2
**lower** [6] - 2012:17, 2016:10, 2018:17, 2029:1, 2034:20, 2039:25
**Lyovochkin** [1] - 2015:12

# M

**ma'am** [1] - 2059:1

**mail** [24] - 1994:19, 1994:21, 1996:10, 1996:16, 1999:17, 2011:4, 2012:19, 2013:15, 2016:11, 2017:7, 2018:18, 2018:22, 2025:6, 2025:16, 2034:4, 2040:17, 2043:3, 2043:9, 2054:13, 2060:14, 2061:10, 2062:5, 2063:20
**maintain** [1] - 2007:18
**major** [1] - 2068:6
**Manafort** [57] - 1996:11, 1996:18, 1998:4, 2011:3, 2015:7, 2018:20, 2018:22, 2025:14, 2026:17, 2026:19, 2027:6, 2034:4, 2040:1, 2040:5, 2044:3, 2044:10, 2044:23, 2048:15, 2048:23, 2048:24, 2048:25, 2049:5, 2049:6, 2049:10, 2054:3, 2054:16, 2054:18, 2058:21, 2059:6, 2060:4, 2060:20, 2060:24, 2061:2, 2061:7, 2061:8, 2061:10, 2061:12, 2061:20, 2062:2, 2062:3, 2062:5, 2062:10, 2062:16, 2062:22, 2063:4, 2063:10, 2063:13, 2063:24, 2064:14, 2064:23, 2065:2, 2065:3, 2065:11, 2066:2, 2066:3, 2066:11
**Manafort's** [6] - 2024:10, 2035:7, 2043:3, 2044:6, 2054:13, 2059:18
**management** [1] - 2004:21
**marked** [1] - 2015:23
**Master** [1] - 2040:8
**master** [5] - 2015:2, 2020:22, 2021:11, 2034:7, 2042:15
**material** [1] - 2024:22
**matrix** [2] - 2029:17, 2029:20
**Matrix** [1] - 2036:8
**matter** [9] - 2012:4, 2043:20, 2052:24, 2053:25, 2054:1, 2057:21, 2067:16, 2067:18, 2069:1
**matters** [1] - 2067:21
**McCullough** [1] - 1991:16
**MCW** [2] - 2029:4, 2029:7
**MD** [1] - 1991:21
**mean** [5] - 1996:18, 2030:13, 2038:18, 2048:11, 2063:17
**meaningful** [1] - 2070:6
**meaningfully** [1] - 2069:10
**meant** [1] - 2031:25
**media** [17] - 2021:15, 2022:15, 2027:11, 2035:22, 2036:4, 2037:2, 2041:25, 2044:13, 2044:14, 2044:16, 2044:24, 2045:3, 2045:11, 2048:13, 2050:24, 2051:11, 2058:16
**meet** [1] - 2025:8
**meeting** [35] - 2019:13, 2019:17, 2020:20, 2020:23, 2021:20, 2021:22, 2022:5, 2022:16, 2023:5, 2023:9, 2023:13, 2023:18, 2023:19, 2024:10, 2024:15, 2024:16, 2024:19, 2024:20, 2024:23, 2025:1, 2025:12, 2025:20, 2025:22, 2025:23, 2026:1, 2026:5, 2027:9, 2035:17, 2044:19, 2048:1, 2048:16, 2050:8, 2054:13, 2060:10, 2060:20
**meetings** [2] - 2034:12, 2060:7
**members** [2] - 2038:17, 2045:9
**memos** [1] - 1997:8
**mention** [1] - 2032:25
**mentioned** [3] - 2021:23, 2023:22, 2052:8
**mentions** [1] - 2065:23
**Mercury** [8] - 2029:7, 2036:11, 2037:6, 2037:9, 2045:15, 2045:22, 2046:5, 2051:1
**merited** [1] - 2007:15
**merits** [1] - 2009:19
**message** [1] - 2057:14
**messages** [2] - 2048:14, 2048:17
**messaging** [8] - 1996:15, 1996:16, 1996:24, 1997:8, 1999:12, 1999:13, 2002:13, 2010:8
**met** [2] - 2070:11, 2070:12
**mid** [1] - 2039:14
**mid-December** [1] - 2039:14
**Middle** [2] - 2050:17, 2050:19
**middle** [2] - 2041:20, 2055:2
**midnight** [1] - 2020:16
**might** [11] - 1997:11, 1998:1, 2007:4, 2017:17, 2026:6, 2027:25, 2028:3, 2035:13, 2043:15, 2043:15, 2055:20
**MILLER** [1] - 1992:3
**mind** [8] - 2024:1, 2024:3, 2024:7, 2024:9, 2024:12, 2026:9, 2026:11, 2057:17
**Minister** [1] - 2043:8
**Minister's** [1] - 2017:18
**Ministry** [4] - 1998:10, 2009:12, 2018:12, 2044:11
**minutes** [5] - 2038:10, 2038:14, 2038:20, 2038:24, 2064:3
**misleading** [1] - 2031:18
**missed** [1] - 1999:20
**mix** [1] - 2068:10
**models** [1] - 2023:24
**MOJ** [1] - 1996:22
**Molly** [1] - 1991:13
**moment** [3] - 1994:16, 2030:21, 2031:25
**Monday** [2] - 2068:17, 2069:4
**months** [2] - 2024:5, 2030:16
**morning** [6] - 2043:18, 2045:15, 2046:24, 2047:9, 2051:15, 2067:20
**most** [5] - 2003:15, 2009:11, 2043:13, 2065:9, 2068:15
**motivated** [5] - 1998:12, 2009:15, 2009:22, 2010:12, 2011:19
**motivation** [2] - 1994:18, 2010:3
**mouth** [2] - 2056:5, 2057:25
**move** [3] - 2016:4, 2047:23, 2059:11
**MR** [79] - 1997:13, 1997:16, 1997:20, 1999:1, 2001:16, 2001:18, 2001:20, 2002:2, 2006:11, 2006:15, 2010:20,

2011:21, 2011:25, 2012:21, 2016:6,
2016:19, 2021:4, 2021:6, 2021:8,
2024:13, 2031:1, 2031:4, 2031:7,
2031:10, 2035:14, 2042:17, 2042:19,
2046:4, 2047:23, 2047:25, 2049:8,
2051:23, 2052:3, 2052:5, 2052:6,
2053:6, 2053:8, 2053:10, 2053:16,
2054:2, 2054:10, 2056:8, 2056:14,
2056:17, 2056:21, 2056:22, 2057:7,
2057:9, 2057:13, 2058:5, 2058:9,
2059:3, 2059:4, 2059:23, 2060:3,
2060:6, 2061:1, 2061:8, 2061:15,
2061:18, 2062:25, 2063:8, 2064:14,
2064:18, 2065:5, 2066:10, 2066:16,
2066:22, 2066:24, 2067:2, 2068:9,
2068:14, 2068:22, 2068:25, 2069:3,
2069:7, 2070:3, 2070:14, 2070:16
   **MS** [92] - 1994:10, 1994:14, 1996:6,
1996:8, 1997:15, 1997:23, 1997:24,
1998:19, 1998:23, 1999:3, 1999:5,
1999:14, 1999:19, 1999:22, 1999:23,
2000:3, 2000:5, 2001:25, 2002:6,
2002:9, 2003:23, 2003:24, 2005:9,
2005:18, 2005:22, 2006:17, 2006:24,
2007:3, 2007:6, 2007:8, 2011:1,
2011:6, 2011:8, 2011:23, 2012:10,
2012:22, 2012:23, 2016:4, 2016:9,
2016:25, 2017:4, 2017:5, 2019:24,
2020:1, 2021:10, 2024:24, 2025:3,
2026:22, 2026:24, 2027:2, 2027:8,
2031:3, 2031:6, 2031:20, 2031:22,
2032:2, 2032:22, 2033:12, 2033:15,
2035:8, 2035:10, 2035:16, 2038:9,
2038:16, 2039:6, 2042:4, 2042:9,
2042:14, 2047:21, 2049:1, 2051:18,
2052:20, 2055:6, 2055:14, 2055:18,
2055:22, 2058:23, 2059:8, 2059:11,
2059:20, 2060:9, 2060:12, 2060:15,
2061:5, 2061:9, 2061:14, 2061:16,
2061:25, 2062:20, 2066:8, 2067:9,
2068:13
   **multiple** [3] - 2042:7, 2042:8, 2042:9
   **Murphy** [1] - 1991:19
   **MURPHY** [3] - 2021:4, 2021:6, 2021:8
   **must** [1] - 2008:13
   **Myers** [2] - 2037:4, 2037:14
   **Myers'** [1] - 2037:18

## N

   **name** [12] - 2021:24, 2037:18,
2043:15, 2046:2, 2050:23, 2051:16,
2051:21, 2052:8, 2056:18, 2058:17,
2064:15, 2065:17
   **narrow** [1] - 2010:1
   **nature** [1] - 2055:3
   **necessarily** [1] - 2065:24
   **necessary** [1] - 2003:3
   **need** [5] - 2032:7, 2038:18, 2055:10,
2057:23, 2058:2

   **needed** [2] - 2049:19, 2049:24
   **needle** [1] - 2070:21
   **never** [8] - 2017:22, 2023:15, 2023:25,
2034:15, 2060:12, 2060:16, 2060:18
   **nevertheless** [2] - 2018:11, 2019:9
   **new** [2] - 2040:10, 2040:8
   **New** [2] - 2021:8, 2037:3
   **news** [2] - 2067:16, 2067:17
   **next** [25] - 1996:23, 1997:9, 2000:17,
2000:19, 2003:25, 2004:1, 2004:11,
2004:17, 2004:20, 2004:25, 2004:25,
2008:20, 2014:10, 2023:7, 2026:14,
2032:13, 2034:10, 2036:13, 2036:25,
2037:3, 2047:22, 2052:4, 2052:5,
2059:2, 2066:7
   **nice** [1] - 2011:23
   **night** [2] - 2021:6, 2021:8
   **nobody** [3] - 2032:3, 2049:20, 2056:4
   **non** [1] - 2063:12
   **non-hearsay** [1] - 2063:12
   **none** [2] - 2015:22, 2057:23
   **nonetheless** [1] - 2055:19
   **note** [3] - 2013:8, 2065:8, 2069:21
   **notes** [3] - 2023:4, 2023:10, 2050:2
   **nothing** [2] - 2024:25, 2042:5
   **notice** [2] - 1994:21, 2029:2
   **notified** [1] - 2041:2
   **notion** [1] - 2032:14
   **November** [2] - 2039:12
   **NR** [1] - 1996:16
   **nuanced** [1] - 2057:24
   **number** [6] - 2001:1, 2008:22,
2019:21, 2023:23, 2043:5, 2044:13
   **Number** [1] - 2039:1
   **numbers** [1] - 2034:22
   **NW** [4] - 1991:14, 1991:17, 1991:24,
1992:4

## O

   **oath** [1] - 1994:7
   **object** [4] - 2016:19, 2032:6, 2053:11,
2057:3
   **objected** [2] - 2053:14, 2061:18
   **objection** [27] - 1997:13, 1997:19,
2005:6, 2006:11, 2010:20, 2011:21,
2011:25, 2016:6, 2024:13, 2031:1,
2035:14, 2047:21, 2049:1, 2051:18,
2052:20, 2053:14, 2053:19, 2054:23,
2055:5, 2058:23, 2059:8, 2059:20,
2064:25, 2065:9, 2066:3, 2067:13
   **Objection** [1] - 1997:16
   **objectionable** [1] - 2062:2
   **objective** [2] - 2007:19, 2009:23
   **obviously** [1] - 2069:12
   **occasion** [3] - 1998:2, 1998:4, 2043:4
   **occurred** [2] - 2023:19, 2054:3
   **October** [5] - 2036:21, 2039:10,
2050:5, 2051:14, 2058:17
   **OF** [5] - 1991:1, 1991:3, 1991:9,

1991:14, 1991:16
   **offense** [1] - 2003:4
   **offered** [2] - 2002:18, 2057:21
   **Office** [1] - 2047:6
   **office** [1] - 2054:13
   **OFFICE** [1] - 1991:13
   **officials** [2] - 2014:11, 2030:2
   **often** [1] - 2048:13
   **once** [1] - 2067:15
   **one** [38] - 1996:2, 1998:20, 1999:6,
2003:25, 2004:11, 2004:17, 2004:25,
2005:10, 2005:23, 2006:25, 2007:2,
2008:4, 2008:20, 2013:18, 2015:9,
2015:12, 2016:23, 2017:15, 2019:12,
2027:18, 2029:3, 2038:19, 2040:8,
2042:7, 2042:10, 2042:14, 2044:18,
2049:23, 2051:12, 2055:20, 2055:24,
2055:25, 2056:23, 2056:25, 2059:13,
2068:6
   **ones** [1] - 2058:17
   **open** [5] - 2002:8, 2007:13, 2033:14,
2058:8, 2066:9
   **open-ended** [1] - 2007:13
   **operating** [1] - 2028:14
   **opine** [1] - 2009:21
   **opinion** [4] - 2001:14, 2002:16,
2003:7, 2056:2
   **opinions** [1] - 2055:11
   **opponent** [1] - 2009:16
   **opportunity** [2] - 2003:10, 2020:19
   **opposed** [2] - 2042:24, 2046:8
   **opposition** [1] - 2009:19
   **order** [5] - 1995:23, 2007:18, 2009:16,
2042:12, 2068:23
   **ordinary** [1] - 2070:4
   **organized** [3] - 2000:15, 2006:20,
2025:11
   **original** [1] - 2037:17
   **out-of-court** [3] - 2057:19, 2057:20
   **outlet** [1] - 2036:15
   **outlined** [1] - 2023:24
   **outreach** [2] - 2027:16, 2037:1
   **outside** [1] - 2015:6
   **overly** [1] - 2068:17
   **overturn** [1] - 2010:3
   **own** [4] - 2017:19, 2059:16, 2063:22,
2070:12

## P

   **p.m** [2] - 2021:6, 2070:25
   **P.M** [1] - 1994:2
   **package** [1] - 2042:10
   **packet** [1] - 2041:11
   **PAGE** [1] - 1993:5
   **page** [46] - 1994:19, 1994:20, 1996:23,
1997:9, 1998:9, 1998:24, 1998:25,
1999:7, 2000:12, 2000:16, 2000:17,
2000:19, 2000:23, 2001:5, 2001:8,
2010:10, 2011:6, 2012:17, 2013:7,

2013:19, 2014:10, 2014:13, 2021:12,
2021:13, 2023:5, 2023:8, 2028:5,
2028:6, 2029:1, 2030:21, 2031:3,
2034:10, 2034:20, 2036:13, 2036:25,
2037:2, 2037:3, 2041:18, 2041:19,
2041:20, 2042:6, 2042:13, 2051:12
   **pages** [3] - 2004:22, 2005:10, 2041:15
   **pages'** [1] - 2020:2
   **paid** [2] - 2015:1, 2044:1
   **paper** [5] - 1995:13, 1999:25, 2019:20,
2041:13, 2065:19
   **paragraph** [2] - 2003:14, 2006:14
   **pardon** [3] - 1997:15, 2020:4, 2029:16
   **part** [12] - 2009:20, 2012:17, 2018:17,
2020:23, 2022:15, 2023:21, 2023:23,
2025:14, 2034:21, 2037:12, 2047:11,
2051:9
   **participate** [2] - 2064:9, 2064:10
   **participated** [1] - 2060:7
   **particular** [2] - 2015:10, 2059:15
   **particularly** [3] - 2027:25, 2038:2,
2043:7
   **parties** [3] - 1997:11, 1997:25, 2003:1
   **pass** [8] - 2062:13, 2062:17, 2062:18,
2062:24, 2063:4, 2063:6, 2066:19
   **past** [1] - 2058:3
   **pasted** [1] - 2016:11
   **path** [1] - 2049:22
   **patience** [1] - 2057:9
   **PATRICIA** [1] - 1992:3
   **Paul** [4] - 1996:18, 2025:12, 2040:5,
2064:14
   **Paul's** [1] - 2025:8
   **Paula** [1] - 1991:23
   **Pause** [1] - 2066:23
   **pay** [1] - 2067:16
   **payment** [2] - 2044:1, 2044:4
   **pdf** [6] - 1998:24, 2000:12, 2000:23,
2021:13, 2028:6, 2028:24
   **pdfs** [1] - 2042:11
   **Pennsylvania** [1] - 1991:17
   **people** [10] - 2021:17, 2032:23,
2036:11, 2043:13, 2049:25, 2054:24,
2054:25, 2055:7, 2063:16
   **people's** [1] - 2054:25
   **percent** [1] - 2056:10
   **perfect** [1] - 2055:22
   **period** [3] - 2013:2, 2064:1, 2065:22
   **permit** [1] - 2009:1
   **permitted** [4] - 2008:25, 2057:13,
2065:10, 2065:21
   **person** [10] - 2027:1, 2028:8, 2037:3,
2044:8, 2045:22, 2049:23, 2053:3,
2058:11, 2064:21, 2064:22
   **personal** [3] - 2043:9, 2046:8, 2059:16
   **personalized** [1] - 2043:15
   **personally** [5] - 2024:2, 2030:7,
2032:10, 2032:21, 2061:2
   **Philip** [1] - 2029:14
   **phone** [2] - 2056:8, 2060:7

   **phrase** [1] - 2017:4
   **physical** [1] - 2050:25
   **picked** [1] - 2004:3
   **piece** [1] - 2065:19
   **pieces** [1] - 1995:4
   **Pinchuk** [1] - 2043:25
   **PJM** [1] - 1996:16
   **place** [2] - 2021:20, 2064:2
   **placeholder** [2] - 2037:19, 2037:20
   **plan** [19] - 1999:13, 2002:5, 2010:24,
2022:15, 2022:23, 2022:25, 2028:22,
2029:11, 2036:8, 2037:22, 2038:5,
2039:20, 2041:25, 2044:16, 2044:24,
2045:3, 2045:11, 2061:3
   **plans** [5] - 2027:11, 2044:14, 2050:24,
2058:16
   **pleadings** [1] - 2069:17
   **pleasant** [1] - 2068:1
   **Podesta** [12] - 2036:11, 2037:7,
2037:9, 2045:15, 2045:19, 2045:21,
2046:1, 2046:3, 2046:10, 2046:16
   **point** [16] - 1995:1, 2017:25, 2028:14,
2030:12, 2031:13, 2031:24, 2033:1,
2033:5, 2033:6, 2035:25, 2037:22,
2048:4, 2048:12, 2049:16, 2066:4,
2069:20
   **pointed** [1] - 2033:16
   **points** [3] - 2001:1, 2004:22, 2024:4
   **political** [10] - 1994:18, 2009:11,
2009:16, 2009:23, 2009:24, 2010:2,
2034:12, 2034:19, 2035:22, 2035:25
   **politically** [5] - 1998:11, 2009:15,
2009:22, 2010:11, 2011:19
   **popping** [1] - 2061:6
   **portion** [6] - 1994:17, 2016:10, 2029:1,
2039:25, 2041:22, 2065:9
   **portions** [1] - 2005:3
   **posed** [1] - 2070:22
   **position** [2] - 2044:9, 2048:6
   **positions** [1] - 2054:17
   **possibly** [2] - 2023:13, 2036:15
   **potentially** [2] - 2022:7, 2058:20
   **PR** [5] - 2023:5, 2045:12, 2050:10,
2050:24, 2051:17
   **practice** [1] - 2007:21
   **Pratt** [1] - 1991:20
   **precedent** [1] - 2009:25
   **precise** [1] - 2062:1
   **precisely** [1] - 2065:21
   **prejudice** [2] - 2005:7, 2005:16
   **preparation** [1] - 1998:3
   **prepare** [2] - 2003:11, 2003:16
   **prepared** [3] - 2010:9, 2027:22,
2041:12
   **preparing** [1] - 1996:1
   **presence** [1] - 2060:21
   **present** [10] - 1994:4, 1994:5, 2006:19,
2009:3, 2009:6, 2038:22, 2039:5,
2048:16, 2053:1, 2068:3

   **presentation** [1] - 2008:20
   **presented** [1] - 2007:16
   **presenting** [1] - 2006:21
   **President** [2] - 2015:13, 2019:6
   **presidential** [1] - 2009:18
   **presumption** [1] - 2028:15
   **pretty** [4] - 1995:6, 2018:5, 2041:2,
2041:17
   **previous** [2] - 1996:2, 2011:4
   **previously** [1] - 2025:23
   **primarily** [1] - 2027:20
   **primary** [1] - 2048:12
   **Prime** [2] - 2017:18, 2043:7
   **principles** [1] - 2057:12
   **print** [1] - 2042:12
   **printed** [1] - 2042:9
   **private** [1] - 2040:16
   **problem** [2] - 2055:8, 2056:20
   **problematic** [1] - 2007:17
   **proceed** [1] - 2069:12
   **proceeding** [1] - 2008:21
   **Proceedings** [2] - 1992:5, 2070:25
   **proceedings** [2] - 2008:10, 2067:22
   **process** [5] - 2003:18, 2004:15,
2028:1, 2047:12, 2051:9
   **produced** [1] - 1992:6
   **project** [8] - 1998:7, 2013:23, 2013:24,
2013:25, 2024:4, 2043:3, 2043:17,
2043:24
   **Project** [1] - 1996:16
   **proposed** [2] - 1998:9, 2037:1
   **prosecution** [8] - 1999:8, 2009:9,
2009:11, 2009:15, 2009:17, 2009:22,
2010:1, 2064:24
   **Prosecutor's** [1] - 2047:6
   **proved** [1] - 2069:14
   **provided** [5] - 1994:22, 2010:2,
2011:12, 2042:1, 2045:5
   **providing** [1] - 2013:17
   **purpose** [5] - 2015:14, 2024:18,
2024:20, 2063:11, 2063:12
   **purposes** [2] - 2019:12, 2066:12
   **put** [24] - 1997:8, 1997:10, 2005:2,
2005:25, 2011:7, 2022:20, 2027:18,
2027:20, 2029:20, 2030:20, 2031:19,
2032:7, 2032:25, 2033:3, 2033:5,
2037:6, 2037:18, 2041:18, 2042:12,
2050:23, 2054:7, 2054:11, 2064:15,
2064:20
   **puts** [1] - 2061:3
   **putting** [1] - 2029:17

# Q

   **QNA** [1] - 1996:22
   **quarter** [1] - 2067:24
   **questions** [19] - 2018:19, 2031:9,
2042:20, 2043:19, 2044:13, 2044:14,
2045:15, 2045:17, 2046:23, 2048:3,
2048:8, 2056:12, 2060:1, 2062:15,

2063:7, 2064:5, 2066:6, 2067:2
**quick** [1] - 2034:8
**quickly** [1] - 2041:2
**quite** [1] - 2005:8
**quoting** [1] - 1999:11

## R

**raft** [1] - 2041:9
**raise** [1] - 2005:15
**raised** [3] - 2005:5, 2019:1, 2056:16
**raises** [2] - 2006:6, 2007:24
**rarely** [1] - 2007:20
**rather** [3] - 2007:4, 2020:3, 2020:5
**re** [1] - 2039:1
**re-calling** [1] - 2039:1
**reach** [2] - 2028:15, 2037:22
**reached** [1] - 2059:14
**reaches** [2] - 2063:18, 2065:22
**reaching** [3] - 2037:25, 2038:1, 2038:2
**react** [2] - 2017:16, 2065:3
**read** [20] - 1995:19, 1995:21, 1995:22, 1995:24, 1997:6, 2002:16, 2003:20, 2005:12, 2006:13, 2006:16, 2007:3, 2007:4, 2008:6, 2009:10, 2011:15, 2011:19, 2012:12, 2020:19, 2031:22, 2034:8
**reading** [3] - 2001:23, 2002:4, 2006:19
**real** [1] - 2034:8
**realize** [1] - 2012:2
**really** [2] - 2062:4, 2067:9
**reason** [6] - 2018:21, 2043:1, 2053:4, 2058:18, 2058:19
**reasons** [1] - 2055:20
**recapitulation** [1] - 2032:18
**receive** [1] - 2045:4
**received** [3] - 2042:2, 2045:2, 2054:14
**receiving** [2] - 2020:7, 2043:6
**Recess** [1] - 2038:25
**recognize** [1] - 2016:1
**recollection** [6] - 2020:24, 2022:2, 2051:15, 2051:19, 2052:1, 2055:23
**recommended** [1] - 2057:14
**record** [8] - 2003:18, 2007:17, 2009:25, 2045:25, 2053:10, 2054:11, 2054:23, 2064:6
**RECROSS** [1] - 1993:2
**recurring** [1] - 2070:1
**redirect** [5] - 2042:16, 2049:4, 2053:18, 2054:22, 2058:3
**REDIRECT** [2] - 1993:2, 2042:18
**reduced** [1] - 2022:19
**refer** [1] - 2015:3
**reference** [3] - 2014:24, 2045:11, 2047:2
**referenced** [1] - 2015:13
**referred** [1] - 2019:6
**referring** [1] - 2051:6
**refers** [1] - 2013:23

**refined** [1] - 2068:4
**reflect** [1] - 2011:12
**reflected** [1] - 2050:2
**reflects** [1] - 2032:14
**refresh** [1] - 2051:15
**refreshing** [1] - 2052:1
**refusal** [1] - 2009:3
**refused** [2] - 2004:19, 2009:1
**regardless** [1] - 2054:3
**regime** [1] - 2009:17
**related** [4] - 1996:2, 2001:3, 2050:24
**relationship** [2] - 2022:7, 2022:14
**relay** [1] - 2048:15
**relayed** [1] - 2061:3
**release** [2] - 2017:25, 2030:17
**released** [5] - 1998:1, 2030:19, 2039:7, 2039:14, 2039:18
**relevance** [1] - 2033:5
**relevant** [2] - 2056:3, 2057:16
**reluctance** [1] - 2023:22
**remain** [1] - 2032:6
**remember** [1] - 2048:5
**remind** [1] - 1994:6
**removal** [2] - 2005:1, 2005:15
**removals** [1] - 2005:13
**remove** [1] - 2009:23
**render** [1] - 2003:7
**renew** [1] - 2059:20
**repeat** [2] - 2017:3, 2035:15
**repeats** [4] - 2014:13, 2021:14, 2021:16
**repetition** [2] - 2033:8, 2033:10
**rephrase** [1] - 2016:25
**replowing** [1] - 2032:17
**report** [60] - 1994:18, 1995:2, 1995:4, 1995:7, 1995:10, 1995:16, 1995:20, 1995:21, 1995:22, 1995:24, 1995:25, 1996:3, 1997:1, 1997:11, 1998:1, 1998:11, 1998:16, 1998:18, 1999:4, 1999:15, 1999:17, 2000:7, 2000:13, 2000:14, 2000:15, 2001:9, 2001:10, 2001:21, 2001:24, 2002:5, 2004:6, 2006:20, 2006:22, 2006:23, 2009:20, 2009:21, 2010:7, 2010:11, 2010:18, 2011:16, 2011:18, 2012:13, 2016:17, 2017:8, 2017:14, 2018:1, 2018:4, 2030:13, 2030:18, 2039:7, 2040:9, 2041:21, 2041:22, 2042:2, 2049:20, 2049:25, 2051:12, 2064:20, 2064:21
**Report** [3] - 2010:15, 2040:3, 2044:9
**report's** [1] - 2024:21
**reported** [2] - 1992:5, 2053:1
**reporter** [7] - 2017:16, 2017:17, 2022:1, 2022:6, 2026:1, 2029:8, 2036:15
**Reporter** [1] - 1992:3
**reporters** [1] - 2058:20
**represent** [1] - 2049:19
**representation** [5] - 2008:5, 2008:8,

2008:10, 2008:15, 2018:10
**represented** [1] - 2008:13
**reprisal** [1] - 2009:15
**request** [3] - 2004:12, 2008:23, 2008:24
**requested** [1] - 2015:7
**requirements** [1] - 2003:3
**requires** [1] - 2008:12
**respect** [3] - 2035:22, 2048:13, 2061:20
**respects** [1] - 2009:19
**response** [1] - 2018:24
**responsibilities** [1] - 2013:18
**responsibility** [1] - 2034:22
**responsive** [3] - 2054:20, 2054:21, 2056:16
**rest** [1] - 2069:3
**result** [2] - 2005:9, 2005:17
**resume** [3] - 1994:9, 2038:20, 2038:24
**REV** [1] - 1996:17
**reversal** [2] - 2048:9, 2049:13
**reverse** [1] - 2003:19
**reversed** [1] - 2035:12
**reversing** [2] - 2025:19, 2048:6
**review** [4] - 2006:6, 2007:24, 2024:21, 2028:6
**reviewed** [1] - 2020:22
**revised** [2] - 2011:2, 2036:12
**revisions** [3] - 1996:18, 1996:19, 2011:13
**RICHARD** [2] - 1993:3, 1994:11
**rights** [1] - 2017:19
**risk** [1] - 2007:17
**risks** [1] - 2033:7
**RMR** [1] - 1992:3
**rollout** [1] - 2045:3
**room** [3] - 2005:2, 2054:24, 2067:23
**Room** [1] - 1992:3
**Rule** [1] - 2069:10
**ruled** [1] - 2054:9
**rules** [1] - 2070:21
**ruling** [1] - 2009:17
**run** [3] - 2001:13, 2064:21

## S

**SA** [4] - 2027:16, 2031:15, 2033:22, 2040:9
**safer** [1] - 2043:11
**SANCHEZ** [54] - 1997:13, 1997:16, 1997:20, 1999:1, 2001:16, 2001:18, 2001:20, 2002:2, 2006:11, 2006:15, 2010:20, 2011:21, 2011:25, 2016:6, 2016:19, 2024:13, 2031:1, 2031:4, 2031:7, 2031:10, 2035:14, 2042:17, 2042:19, 2046:4, 2047:23, 2047:25, 2049:8, 2051:23, 2052:3, 2052:5, 2052:6, 2056:8, 2056:14, 2056:17, 2056:21, 2058:9, 2059:3, 2059:4, 2059:23, 2060:3, 2060:6, 2061:1,

2061:8, 2061:15, 2061:18, 2062:25,
2066:10, 2066:16, 2066:22, 2066:24,
2067:2, 2068:9, 2068:14, 2068:22
**Sanchez** [1] - 1991:12
**Sanger** [26] - 2014:8, 2021:24, 2022:4,
2022:6, 2022:10, 2023:1, 2026:1,
2026:4, 2028:16, 2036:18, 2037:23,
2041:22, 2050:23, 2051:16, 2052:15,
2053:3, 2056:18, 2057:4, 2059:5,
2060:13, 2061:11, 2062:5, 2062:12,
2063:19, 2063:20, 2066:18
**sanger** [12] - 2051:8, 2052:19,
2056:13, 2058:11, 2059:14, 2060:16,
2060:21, 2061:21, 2062:13, 2062:18,
2065:22, 2066:25
**Sanger's** [4] - 2052:8, 2058:17,
2064:15, 2065:16
**satisfy** [1] - 2003:3
**Saturday** [2] - 2021:6, 2021:8
**Saunders** [1] - 2052:12
**saw** [1] - 2051:1
**scenario** [1] - 2016:18
**scope** [2] - 2003:4, 2059:12
**scribes** [1] - 2069:21
**scroll** [2] - 2012:17, 2036:25
**scrutiny** [1] - 2009:19
**seated** [1] - 1994:8
**second** [4] - 1998:20, 2000:14,
2002:24, 2016:23
**secret** [1] - 2064:12
**section** [2] - 1997:7, 2033:17
**see** [16] - 1994:24, 1995:23, 1997:5,
1998:14, 2000:14, 2000:15, 2010:13,
2012:24, 2017:8, 2017:14, 2034:13,
2036:22, 2040:10, 2041:6, 2051:24,
2054:25
**seed** [1] - 2022:8
**seeded** [1] - 2063:2
**seeding** [2] - 2051:9, 2066:13
**seem** [1] - 1999:13
**segments** [1] - 2034:6
**selection** [2] - 2004:1, 2004:7
**selective** [4] - 1999:8, 2009:9,
2009:11, 2010:1
**send** [6] - 2013:14, 2018:21, 2040:19,
2042:3, 2044:16, 2061:10
**sending** [4] - 1996:14, 2012:20,
2018:20, 2040:2
**sensitive** [1] - 2043:6
**sent** [18] - 1994:20, 1994:21, 2000:7,
2000:10, 2013:15, 2016:3, 2020:12,
2020:15, 2021:3, 2040:15, 2040:22,
2041:8, 2041:9, 2042:21, 2044:18,
2044:23, 2060:14, 2063:19
**sentence** [1] - 2005:12
**sentencing** [3] - 2006:5, 2007:13,
2007:24
**separate** [3] - 2007:16, 2042:11,
2050:13
**separation** [1] - 2065:14

**September** [18] - 1995:9, 1996:9,
1996:10, 1999:7, 2000:6, 2002:11,
2010:8, 2012:20, 2012:22, 2015:25,
2018:2, 2027:13, 2028:20, 2030:9,
2035:18, 2039:8, 2050:5, 2063:25
**Session** [1] - 1991:5
**SESSION** [2] - 1991:9, 1994:1
**set** [2] - 2034:22, 2040:2
**sets** [2] - 2013:5, 2042:20
**setup** [1] - 2034:21
**several** [1] - 2000:20
**shared** [3] - 2029:25, 2045:8, 2050:13
**sharp** [1] - 2002:17
**short** [6] - 2019:7, 2044:15, 2056:11,
2067:7, 2067:9, 2068:16
**short-circuit** [1] - 2056:11
**shorter** [1] - 2058:10
**shorthand** [1] - 1992:5
**shortly** [1] - 2024:16
**show** [1] - 2031:4
**showed** [4] - 2011:5, 2013:15,
2037:18, 2051:21
**shown** [4] - 2050:1, 2050:3, 2051:11,
2058:16
**shows** [2] - 1995:9, 2000:6
**side** [2] - 2032:16, 2064:12
**sides** [3] - 2032:16, 2069:22, 2070:23
**sides'** [1] - 2033:6
**significantly** [1] - 2018:5
**silence** [1] - 2009:16
**simply** [2] - 2057:2, 2062:4
**simultaneously** [1] - 1995:6
**single** [2] - 2055:25, 2056:1
**sit** [3] - 2047:17, 2050:22, 2052:7
**sitting** [1] - 2005:14
**situation** [1] - 2049:7
**SKA** [1] - 2014:4
**Skadden** [18] - 2003:6, 2010:15,
2014:4, 2017:16, 2018:7, 2033:22,
2040:3, 2040:17, 2042:24, 2043:6,
2043:11, 2043:13, 2043:23, 2044:2,
2044:4, 2044:9, 2045:9, 2049:19
**Skadden's** [1] - 2043:20
**skip** [1] - 2057:2
**slash** [1] - 2034:24
**slightly** [1] - 2052:1
**snipe** [1] - 2012:2
**solve** [1] - 2056:20
**someone** [8] - 2010:22, 2035:2,
2052:25, 2057:5, 2059:14, 2060:20,
2060:21
**somewhere** [1] - 2050:19
**soon** [1] - 2018:3
**sorry** [12] - 1996:6, 2001:18, 2006:13,
2025:24, 2035:15, 2037:12, 2039:23,
2039:24, 2046:3, 2057:10, 2060:9,
2068:14
**sort** [2] - 2013:4, 2016:16
**SPAEDER** [2] - 1991:20, 1991:23

**speaking** [1] - 2013:16
**Special** [1] - 2047:6
**specific** [9] - 1998:17, 2010:2, 2022:6,
2024:8, 2026:12, 2055:10, 2055:11,
2058:19, 2063:3
**specifically** [6] - 2022:18, 2024:5,
2024:6, 2043:14, 2050:18, 2060:20
**specifics** [1] - 2037:24
**staff** [1] - 2015:13
**stage** [5] - 2008:21, 2028:17, 2037:21,
2037:24, 2038:6
**stakeholder** [1] - 2015:3
**stakeholders** [5] - 2015:1, 2034:12,
2034:19, 2035:22, 2035:25
**stand** [1] - 2066:1
**standard** [2] - 2070:12, 2070:13
**standards** [8] - 2004:8, 2006:3,
2007:15, 2007:21, 2008:12, 2008:14,
2009:4, 2010:4
**standing** [1] - 2006:18
**start** [3] - 2017:18, 2042:20, 2067:22
**started** [1] - 2054:17
**starts** [2] - 2000:23, 2001:9
**state** [1] - 2057:17
**statement** [9] - 1998:9, 1998:16,
1998:17, 2054:18, 2057:15, 2057:19,
2057:20, 2057:21, 2057:22
**statements** [5] - 1997:10, 1997:25,
1998:2, 1998:3, 1998:5
**States** [3] - 2028:7, 2028:8, 2039:2
**STATES** [3] - 1991:1, 1991:3, 1991:10
**statutory** [1] - 2003:4
**stenotype** [1] - 1992:5
**step** [1] - 1999:16
**steps** [1] - 2007:18
**Steven** [2] - 2037:3, 2037:14
**sticking** [1] - 2030:22
**still** [13] - 1994:6, 1995:1, 1995:3,
1995:4, 1997:18, 2001:20, 2022:21,
2022:22, 2030:22, 2036:2, 2036:14,
2037:20, 2067:22
**stipulation** [1] - 2021:2
**stood** [1] - 2065:1
**stop** [1] - 2062:19
**story** [3] - 2022:8, 2036:15
**Street** [3] - 1991:14, 1991:20, 1991:24
**strike** [5] - 2020:6, 2023:3, 2044:21,
2046:17, 2059:11
**stuff** [3] - 2015:15, 2015:17, 2020:2
**subject** [7] - 2007:10, 2024:9,
2026:12, 2026:16, 2026:20, 2027:3,
2064:18
**submitted** [1] - 2067:19
**submitting** [1] - 2069:22
**substantially** [1] - 2004:21
**suffer** [1] - 2005:16
**suffered** [1] - 2005:7
**sufficiency** [2] - 2069:5, 2070:6
**sufficient** [1] - 2010:3

**suggested** [1] - 2059:7
**suggesting** [2] - 2032:3, 2033:7
**suggestion** [1] - 2007:16
**Suite** [2] - 1991:21, 1991:24
**summarize** [1] - 2004:12
**summarizes** [1] - 1997:4
**summary** [7] - 1997:6, 2000:24, 2005:20, 2006:12, 2006:22, 2007:15, 2010:8
**superb** [1] - 2069:21
**supports** [1] - 2064:13
**supposed** [2] - 2058:25, 2063:20
**supposedly** [1] - 2029:13
**sustained** [1] - 2064:25
**sworn** [1] - 1994:12

## T

**table** [1] - 2000:17
**tactics** [1] - 2004:21
**tailored** [1] - 2058:3
**talks** [2] - 2001:2, 2034:21
**tall** [1] - 2067:7
**targeted** [1] - 2056:12
**TAYLOR** [22] - 2012:21, 2053:6, 2053:8, 2053:10, 2053:16, 2054:2, 2054:10, 2056:22, 2057:7, 2057:9, 2057:13, 2058:5, 2063:8, 2064:14, 2064:18, 2065:5, 2068:25, 2069:3, 2069:7, 2070:3, 2070:14, 2070:16
**Taylor** [2] - 1991:22, 2053:13
**team** [8] - 2013:23, 2013:24, 2013:25, 2045:9, 2052:14, 2053:21, 2055:4
**template** [1] - 2027:21
**tender** [1] - 2065:9
**tensions** [1] - 2012:3
**tenure** [1] - 2004:7
**terms** [1] - 2028:2
**territory** [1] - 2032:17
**testified** [1] - 1994:12
**testify** [6] - 2009:1, 2009:2, 2053:23, 2060:22, 2063:14, 2067:8
**testimony** [6] - 2032:18, 2054:3, 2055:9, 2061:19, 2064:6, 2064:14
**THE** [137] - 1991:1, 1991:9, 1991:13, 1994:3, 1994:5, 1996:5, 1997:18, 1997:21, 1998:21, 1999:11, 1999:16, 1999:20, 2000:2, 2000:4, 2001:17, 2002:4, 2002:7, 2003:22, 2005:8, 2005:12, 2005:20, 2006:13, 2006:21, 2007:1, 2007:4, 2007:7, 2010:21, 2011:4, 2012:1, 2016:7, 2016:21, 2016:23, 2017:2, 2019:23, 2019:25, 2021:2, 2021:5, 2021:7, 2021:9, 2025:1, 2025:2, 2026:20, 2026:23, 2026:25, 2027:3, 2027:5, 2027:6, 2027:7, 2031:8, 2031:11, 2031:13, 2031:21, 2031:24, 2032:3, 2033:2, 2033:13, 2035:6, 2035:9, 2035:15,

2038:11, 2038:17, 2038:23, 2039:1, 2039:3, 2042:6, 2042:8, 2042:11, 2042:16, 2045:25, 2046:3, 2047:22, 2049:2, 2049:6, 2051:20, 2051:25, 2052:4, 2052:21, 2052:23, 2053:7, 2053:9, 2053:13, 2053:17, 2054:8, 2054:11, 2055:12, 2055:15, 2055:19, 2056:4, 2056:11, 2056:15, 2056:19, 2056:24, 2057:8, 2057:11, 2057:19, 2058:7, 2058:24, 2059:1, 2059:2, 2059:10, 2059:13, 2059:18, 2059:19, 2059:21, 2059:25, 2060:4, 2060:10, 2060:14, 2060:19, 2061:12, 2061:19, 2062:7, 2062:23, 2063:3, 2063:15, 2064:17, 2064:19, 2065:13, 2066:14, 2066:15, 2066:17, 2067:4, 2067:7, 2067:11, 2068:4, 2068:12, 2068:18, 2068:24, 2069:2, 2069:6, 2069:18, 2070:8, 2070:15, 2070:17
**theme** [1] - 2070:1
**thereafter** [1] - 2065:16
**thinking** [1] - 2065:2
**third** [1] - 2003:10
**thousand** [1] - 2064:19
**threading** [1] - 2070:20
**three** [4] - 2003:22, 2003:23, 2029:19, 2063:7
**throughout** [2] - 2024:4, 2030:16
**tightly** [1] - 2062:8
**tired** [1] - 2025:24
**today** [6] - 2044:14, 2047:17, 2050:22, 2051:1, 2052:7, 2055:23
**together** [5] - 1997:10, 2027:18, 2027:20, 2050:20, 2062:2, 2065:15
**tomorrow** [3] - 2067:20, 2068:23, 2069:4
**ton** [1] - 2063:16
**Tony** [5] - 2029:14, 2045:21, 2046:3, 2046:16
**took** [2] - 2021:20, 2064:2
**top** [4] - 2012:16, 2018:25, 2030:2, 2051:5
**totally** [1] - 2062:2
**Tower** [3] - 2024:11, 2024:16, 2027:9
**track** [1] - 1999:21
**Transcript** [1] - 1992:6
**TRANSCRIPT** [1] - 1991:9
**transcription** [1] - 1992:6
**transmitting** [1] - 1999:17
**transpired** [1] - 2064:7
**travel** [1] - 2014:13
**traveling** [1] - 2050:4
**trial** [14] - 1998:11, 2003:15, 2004:21, 2005:3, 2005:25, 2006:4, 2007:23, 2008:13, 2008:24, 2010:11, 2058:4, 2068:2
**TRIAL** [2] - 1991:5, 1991:9
**trip** [1] - 2050:11
**trips** [1] - 2014:17
**troubling** [1] - 2005:16

**true** [1] - 2058:1
**Trump** [3] - 2024:11, 2024:15, 2027:9
**truth** [3] - 2052:24, 2053:25, 2057:21
**try** [4] - 2012:2, 2036:6, 2058:10, 2067:17
**trying** [11] - 2006:18, 2006:19, 2006:24, 2012:4, 2027:1, 2032:5, 2051:23, 2056:17, 2057:2, 2057:9, 2062:1
**turn** [14] - 1995:10, 1996:14, 1997:9, 2000:12, 2012:15, 2013:7, 2013:19, 2015:23, 2016:3, 2017:24, 2018:23, 2032:7, 2036:13, 2036:20
**two** [11] - 2003:21, 2005:13, 2009:1, 2027:21, 2035:20, 2059:25, 2064:4, 2064:5, 2064:7, 2064:13, 2065:14
**Tymoshenko** [14] - 1998:11, 2003:8, 2003:11, 2004:19, 2006:3, 2007:10, 2007:22, 2008:7, 2008:21, 2009:2, 2009:14, 2010:2, 2010:11, 2043:8
**Tymoshenko's** [3] - 2004:2, 2007:14, 2009:6
**typed** [1] - 2035:6

## U

**U.S** [6] - 1991:13, 1991:16, 1992:3, 2021:7, 2021:15, 2027:25
**UK** [2] - 2020:14, 2020:15
**Ukraine** [10] - 2001:3, 2004:14, 2009:24, 2017:18, 2019:6, 2030:20, 2035:2, 2046:11, 2046:14, 2046:21
**Ukraine's** [2] - 2017:19, 2044:8
**Ukrainian** [4] - 2002:25, 2003:2, 2003:8, 2008:11
**ultimately** [1] - 2059:5
**under** [13] - 1994:7, 2001:1, 2002:25, 2003:8, 2006:2, 2007:9, 2007:15, 2007:21, 2008:14, 2009:4, 2010:4, 2016:13, 2023:5
**undermined** [1] - 2009:3
**underscore** [1] - 2070:17
**understood** [3] - 2003:6, 2026:12, 2036:3
**undertaken** [1] - 2009:16
**undertaking** [1] - 2003:7
**unfair** [1] - 2032:1
**unique** [1] - 2043:16
**UNITED** [3] - 1991:1, 1991:3, 1991:10
**United** [3] - 2028:7, 2039:2
**unjustified** [1] - 2007:13
**unless** [1] - 2067:13
**unlikely** [1] - 2003:17
**unsuccessful** [1] - 2009:18
**untended** [1] - 2032:19
**untimely** [1] - 2008:23
**up** [22] - 2000:14, 2011:7, 2012:16, 2016:15, 2022:22, 2025:19, 2025:21, 2025:23, 2031:19, 2033:19, 2034:22, 2041:18, 2041:21, 2046:22, 2051:21,

2053:17, 2058:2, 2061:6, 2064:3, 2065:1, 2066:1, 2070:5
**update** [1] - 2028:20
**updated** [4] - 2027:21, 2028:12, 2037:11, 2037:13
**updates** [1] - 2048:14
**upper** [2] - 2013:9, 2041:21
**urge** [1] - 2068:1
**useful** [1] - 2038:11
**utmost** [1] - 2069:25
**uttered** [1] - 2055:23

## V

**value** [1] - 2032:23
**van** [9] - 2016:3, 2025:15, 2040:13, 2040:16, 2041:9, 2042:22, 2045:2, 2045:5, 2045:8
**various** [4] - 1997:10, 2001:2, 2014:11, 2048:14
**Veritas** [1] - 1996:16
**version** [13] - 2002:10, 2002:13, 2011:2, 2014:21, 2014:25, 2015:10, 2015:11, 2018:4, 2028:19, 2028:20, 2030:10, 2036:12, 2037:15
**versions** [4] - 2014:22, 2044:24, 2045:3, 2045:11
**view** [1] - 2024:12
**viewed** [1] - 2008:16
**views** [1] - 2069:16
**vigorously** [1] - 2003:1
**Vin** [6] - 2045:23, 2046:5, 2046:6, 2056:1, 2065:14
**violated** [3] - 2004:8, 2008:7, 2017:18
**violation** [4] - 2003:19, 2004:14, 2008:16, 2054:4

## W

**wait** [3] - 1999:11, 2005:8, 2035:6
**waived** [1] - 2065:6
**Washington** [5] - 1991:6, 1991:15, 1991:17, 1991:25, 1992:4
**wearing** [1] - 2032:19
**weber** [15] - 2029:8, 2050:12, 2051:2, 2052:18, 2055:9, 2056:12, 2056:13, 2057:1, 2057:4, 2057:14, 2058:5, 2058:11, 2058:14, 2058:21, 2065:23
**Weber** [7] - 2045:23, 2046:5, 2046:6, 2046:13, 2056:1, 2065:15, 2065:18
**Weber's** [5] - 2055:11, 2056:2, 2056:5, 2057:17, 2057:25
**Western** [8] - 2004:8, 2006:3, 2007:15, 2007:21, 2008:11, 2008:14, 2009:4
**whole** [9] - 2006:13, 2006:19, 2008:6, 2020:22, 2029:2, 2031:22, 2033:17, 2041:9, 2070:10
**William** [2] - 1991:19, 1991:22
**willing** [6] - 2022:20, 2022:21, 2030:4, 2030:5, 2030:6, 2049:23

**wish** [2] - 2029:22, 2031:17
**wishes** [1] - 2008:12
**witness** [12] - 2038:21, 2054:12, 2062:20, 2065:3, 2065:20, 2067:4, 2067:7, 2067:8, 2067:9, 2068:4, 2068:7, 2068:19
**Witness** [1] - 2067:6
**WITNESS** [17] - 1993:2, 2011:4, 2016:23, 2017:2, 2019:25, 2024:17, 2024:20, 2025:2, 2027:5, 2027:7, 2035:9, 2042:8, 2046:3, 2049:6, 2059:1, 2059:18, 2066:15
**witnesses** [9] - 2008:8, 2008:15, 2008:22, 2008:25, 2009:2, 2009:6, 2054:5, 2068:10, 2068:15
**word** [2] - 2002:16, 2055:23
**words** [3] - 2056:5, 2057:25, 2061:9
**worry** [1] - 2022:9
**worst** [1] - 2016:18
**worst-case** [1] - 2016:18
**worth** [2] - 2020:2, 2033:11
**write** [2] - 2010:24, 2065:18
**written** [2] - 2016:17, 2032:1
**wrote** [1] - 2018:21

## Y

**Yanukovych** [1] - 2004:3
**yes-or-no** [1] - 2010:23
**York** [2] - 2021:8, 2037:3
**yourself** [6] - 2011:3, 2025:6, 2036:20, 2040:1, 2044:16, 2048:5

## Z

**zoom** [2] - 2051:5, 2051:13
**ZUCKERMAN** [2] - 1991:20, 1991:23
**Zwaan** [7] - 2016:3, 2025:15, 2040:13, 2041:9, 2045:2, 2045:5, 2045:8
**Zwaan's** [2] - 2040:16, 2042:22