<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3      United States of America,      ) Criminal Action
                                       ) No. 19-CR-125
 4                     Plaintiff,      )
                                       ) JURY TRIAL
 5      vs.                            ) Day 10 - Morning
                                       )
 6      Gregory B. Craig,              ) Washington, D.C.
                                       ) August 23, 2019
 7                     Defendant.      ) Time:  10:00 a.m.
        _____

 8
               TRANSCRIPT OF JURY TRIAL - DAY 10 - MORNING
 9                            HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                  UNITED STATES DISTRICT JUDGE
        _____

11
                      A P P E A R A N C E S
12
</pre>

<pre>
        For Plaintiff:     Fernando Campoamor-Sanchez
13                         Molly Gulland Gaston
                           U.S. Attorney's Office FOR THE
14                           DISTRICT OF COLUMBIA
                           555 Fourth Street, NW
15                         Washington, D.C. 20530
                           (202) 252-7698
16                         Email: Fernando.campoamor-sanchez@usdoj.gov
                           Email: Molly.gaston@usdoj.gov
17                         Jason Bradley Adam McCullough
                           U.S. Department of Justice
18                         950 Pennsylvania Avenue, NW
                           Washington, D.C. 20530
19                         (202) 233-0986
                           Email: Jason.mccullough@usdoj.gov
20
        For Defendant:     William James Murphy
21                         William W. Taylor, III
                           Adam B. Abelson
22                         ZUCKERMAN SPAEDER, LLP
                           100 East Pratt Street
23                         Suite 2440
                           Baltimore, MD 21202
24                         (410) 949-1146
                           Email: Wmurphy@zuckerman.com
25                         Email: Wtaylor@zuckerman.com
                           Email: Aabelson@zuckerman.com
</pre>

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, D.C. 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

---

Court Reporter:      Janice E. Dickman, RMR, CRR, CRC
                     Official Court Reporter
                     United States Courthouse, Room 6523
                     333 Constitution Avenue, NW
                     Washington, D.C.  20001
                     202-354-3267

INDEX

WITNESS:

  Cliff Sloan

    Direct Examination By Ms. Gaston...................2089

    Cross-Examination By Mr. Murphy...................2162

*   *   *

```
 1              THE COURTROOM DEPUTY:  Good morning Your Honor.
 2              We have Criminal Case Number 19-125, the United
 3    States v. Gregory B. Craig.  Mr. Craig is present and in the
 4    courtroom.
 5              Will counsel please approach the lectern, identify
 6    yourself and your colleagues for the record.
 7              MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.
 8              Molly Gaston, Jason McCullough, and Fernando
 9    Campoamor.  And also with us is paralegal specialist
10    Amanda Rohde.
11              THE COURT:  All right.  Good morning.
12              MR. MURPHY:  Good morning, Your Honor.
13              William Murphy for Mr. Craig.  Mr. Taylor,
14    Ms. Junghans, Mr. Abelson, and Mr. Marcus are here.  Mr. Craig
15    is present as well.
16              THE COURT:  All right.  Good morning, everybody.  And
17    thank you for your flexibility with the timing this morning.
18              Are we ready to bring the jury in?
19              MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.
20              THE COURT:  All right.  Let's do that.
21              (Whereupon the jury enters the courtroom.)
22              THE COURT:  All right.  I note that all of our jurors
23    are present and accounted for.  I trust that everyone was able
24    to resist researching or communicating about the case in any
25    way last night.  I appreciate that.  And I appreciate your
```

1   compliance with the schedule this morning I hope that the extra

2   half hour was a convenience and not an inconvenience for all of

3   you.

4          All right.  Are you prepared to call your next

5   witness?

6          MS. GASTON:  We are, Your Honor.

7          THE COURT:  Okay.  You can proceed.

8          MS. GASTON:  Government calls Cliff Sloan.

9                    CLIFF SLOAN.

10  was called as a witness and, having been first duly sworn, was

11  examined and testified as follows:

12                   DIRECT EXAMINATION

13  BY MS. GASTON:

14  Q.  Good morning, sir.

15  A.  Good morning.

16  Q.  Could you please introduce yourself to the jury and spell

17  your name for the record?

18  A.  Yes.  I'm Clifford Sloan, and my last name is S-L-O-A-N.

19  Q.  And, sir, what's your city and state of residence?

20  A.  Chevy Chase, Maryland.

21  Q.  What is your occupation?

22  A.  I am a retired partner of Skadden, and I am now at

23  Georgetown Law School, where I am currently a dean's visiting

24  scholar, and I'm writing a book about the Supreme Court during

25  World War II.

1    Q.  And when did you retire from Skadden?

2    A.  June 1st of this year.

3    Q.  How long had you been at Skadden before that?

4    A.  I came to Skadden in April of 2008, and I was there as a

5    partner until I retired, with the exception of a period in 2013

6    and 2014, when I left to go into the government.  I was the

7    Special Envoy for Guantanamo Closure at the State Department.

8    Q.  And were you at Skadden in 2012?

9    A.  Yes, I was.

10   Q.  Okay.  And did you have occasion to work on the Skadden

11   Tymoshenko report?

12   A.  Yes, I did.

13   Q.  How did you come to be involved in that project?

14   A.  Greg Craig reached out to me at a certain point in early

15   2012.

16   Q.  And what do you remember about your initial understanding

17   of the project?

18   A.  As it was described to me, we were going to do an

19   independent report and review of the prosecution and conviction

20   of the former prime minister, Yulia Tymoshenko, to see if it

21   complied with western standards of due process and fairness.

22   Q.  And what was your role going to be in the project?

23   A.  Well, in my -- my role, as it proceeded, was I -- I was

24   having major responsibility for the Report and overseeing the

25   writing of the Report and the review of her prosecution and

1    conviction and the comparison to the Western standards, as I

2    mentioned.

3    Q.  So, essentially, the drafting of the document?

4    A.  The drafting and preparation of the Report, yes.

5    Q.  And what did you understand Mr. Craig's role in the project

6    to be?

7    A.  Well, he was the lead overall person on the project,

8    including with respect to the Report.  But he was -- he was the

9    lead person on it.

10   Q.  And who did you understand the client to be for the

11   project?

12   A.  The client was the government of Ukraine.  And I don't

13   remember exactly whether it was the Ministry of Justice; it may

14   have been the Ministry of Justice.  But, broadly speaking, it

15   was the government of Ukraine.

16   Q.  Did you have contacts with representatives from the

17   government of Ukraine in the course of the Report?

18   A.  Limited contact.  But, on -- on a couple of occasions, I

19   did -- or, more than a couple.  But, as I say, on a limited

20   basis I did.

21   Q.  Who primarily communicated with the client?

22   A.  Well, Greg Craig certainly did, and there were other

23   people.  There was an associate in the London office,

24   Alex van der Zwaan, who also, I think, who was fluent in

25   Russian, and he had a lot of contact with them.  And there were

1   other lawyers from Skadden who were on the ground in Ukraine

2   who, I believe, had contact with the officials as well.

3   Q.  Were you aware at any time during the project of an

4   individual named Paul Manafort?

5   A.  Yes.

6   Q.  Who did you understand Mr. Manafort to be?

7   A.  I understood that he was representing the government of

8   Ukraine, and he was one of the people -- one of the lead people

9   in reaching out to us about the independent report, who we

10  talked to early on about it, and then in the course of the

11  Report, who was representing the government of Ukraine.

12  Q.  And do you know who from Skadden had contacts with

13  Mr. Manafort?

14  A.  Well, I think -- as I was mentioning, Greg was the, sort

15  of, principal contact in terms of kind of overseeing the

16  project.  Other lawyers may have.  I can think of a few

17  occasions, maybe, when I maybe walked into Greg's office and he

18  was on the phone with Mr. Manafort and he put him on speaker

19  and we said hello, that kind of thing.

20          So, in that limited way, I had contact with him as

21  well.

22  Q.  Do you remember any details of those phones calls that you

23  had?

24  A.  No, I do not.

25  Q.  Now, directing your attention to February of 2012.

1          Do you recall having a conversation with Mr. Craig

2     and an individual named Schoen about the project?

3     A.  Well, I remember Doug Schoen being involved.  I don't

4     remember a conversation.  And the initial outreach for the

5     project, as I understand it, was from Doug Schoen on behalf of

6     a very wealthy person in Ukraine who wanted to fund this

7     independent review.

8     Q.  Directing your attention to what's been admitted as

9     Government's Exhibit 30.  And it will be both on the screen and

10    in the binder.

11    A.  I'm sorry.  Did you say 30?

12    Q.  30.

13    A.  Yes.

14    Q.  It should be the first item in your binder.

15    A.  Yes.

16    Q.  Is this an email chain between you and Mr. Craig on

17    February 13th of 2012?

18    A.  Yes, it is.

19    Q.  Yes.  And if we turn back to the second page of this

20    document, and focus on how the chain starts.

21          How does it start?

22    A.  Greg is sending a letter to Bruce -- I'm sorry.  Excuse

23    me -- he's sending an email to Bruce Buck, who is a senior

24    partner in our London office, and copying me.  And it says,

25    "Subject:  Yulia Tymoshenko."

1    Q.  Is this on February 10th of 2012?

2    A.  Yes.

3    Q.  And in this, does Mr. Craig recount to Mr. Buck a

4    conversation that you and Mr. Craig had had with Doug Shoen?

5    A.  Yes.

6    Q.  And how does Mr. Craig describe that conversation?

7    A.  Well, he said that the nature of the assignment is to

8    provide an independent analysis from the perspective of someone

9    who has expertise and experience in the American criminal

10   justice system, and who can provide a respected opinion about

11   due process and procedural fairness according to Western

12   standards of criminal justice.

13   Q.  And what -- was that your understanding of the project at

14   the time?

15   A.  Yes.

16   Q.  What does Mr. Buck respond, just above that?

17   A.  He says, "Have you considered the implications of our

18   coming to the view that there was not a fair trial?"

19   Q.  And what did Mr. Craig respond?

20   A.  He said, "My guess is that the client would want enough

21   control over the project to have an understanding in advance,

22   that they would want to be able to decide whether or not to

23   make the results of our work public, i.e., whether to publicize

24   our view of the fairness or unfairness of the trial.  My guess

25   is that if we decide that it wasn't a fair trial, they would

1  probably want us to not talk about it."

2  Q.  Do you know why you're emailing with Mr. Buck about this?

3  Who is Mr. Buck?

4  A.  As I mentioned, he is a senior partner in our London

5  office.  And I'm not sure if he had this formal position, but

6  Skadden had a number of offices in Europe, and he was viewed as

7  somebody who had a major role in Skadden's practice throughout

8  Europe.

9  Q.  And what did Mr. Buck reply to Mr. Craig?

10  A.  He said -- would you like me to read the whole email?

11  Q.  Just the first paragraph.

12  A.  Okay.  "The general view seems to be that this is a no-win

13  situation.  If we come up that it was not fair, they will not

14  use our opinion, and we could very probably be persona non

15  grata for doing work there in the future.  If we come out that

16  it was fair, it will be viewed by Russia and others as a

17  politically influenced opinion."

18  Q.  But does Mr. Buck then say, "But there's not a conflict,

19  and you can go ahead with the project"?

20  A.  Yes.

21  Q.  And then did you ask Mr. Craig if there was anything you

22  could do to help move the project along?

23  A.  Yes.

24  Q.  And what did Mr. Craig respond to you at 7:13 a.m. on

25  February 13th?

```
 1    A.  He said, "I don't want to register as a foreign agent under

 2    FARA.  I think we don't have to with this assignment.  Yes?"

 3    Q.  What did you say?

 4    A.  I said, "I'll need to check the law."

 5    Q.  And do you recall whether you then did check the law?

 6    A.  Yes.

 7    Q.  And showing you what's been previously admitted as

 8    Government's Exhibit 32.

 9          MS. GASTON:  And just zooming in on the top.

10    BY MS. GASTON:

11    Q.  Is this an email to you and Mr. Craig on February 13th,

12    that same day, from Alex Haskell?

13    A.  Yes, it is.

14    Q.  And who was Alex Haskell?

15    A.  He was an associate in the Washington, D.C. office of

16    Skadden.

17    Q.  And had you asked Mr. Haskell to do some research on FARA?

18    A.  Yes.

19    Q.  Now, do you remember a --

20          MS. GASTON:  We can take that down, Ms. Rohde.

21          Thank you.

22    BY MS. GASTON:

23    Q.  Do you remember an initial trip to Ukraine in early April

24    of 2012?

25    A.  I remember that there was an initial trip to Ukraine.  I
```

1    couldn't give you the exact date, but I do remember there was

2    an initial trip to Ukraine.

3    Q.  And did you go on that trip?

4    A.  No, I did not.

5    Q.  Directing your attention to what's been marked as

6    Government's Exhibit 50, and previously admitted.

7            MS. GASTON:  If we could go to the second page of the

8    document, and zoom in on the first email.

9    A.  Okay.

10   BY MS. GASTON:

11   Q.  Is this an email from Mr. Craig to you on April 5th, 2012?

12   A.  Yes, it is.

13   Q.  Does he start the email "From Kyiv"?

14   A.  Yes.

15   Q.  Does that mean that he is in Ukraine as he writes the

16   email?

17   A.  I'm sorry.  Could you say that again?

18   Q.  Was he in Ukraine when he wrote this email?

19   A.  That's my understanding.

20   Q.  What does Mr. Craig say to you?

21   A.  He says, "From Kyiv.  In addition to the Report, they want

22   us to be consultants on her second trial, to help make it go

23   better and look better vis-à-vis the West.  What do you think?

24   This could be a huge project.  Will require us to open an

25   office in Kyiv for six months."

```
1    Q.  What did you say?
2    A.  I said, "I think it sounds good.  Will need to vet within
3    the firm.  I would cast it all as rule of law advisors."
4    Q.  Thank you.
5              And then looking at the first page.
6              It says -- at the bottom, the first full email on
7    that page, does he then update you on more of what is happening
8    in Ukraine?
9    A.  Yes.
10   Q.  What does he say?
11   A.  Well, first, he says, "I signed Scudder up for Project
12   Number Two.  Just left the Proc Gen.  This is a powerful man.
13   He seems to be enthusiastic about our projects."
14   Q.  Do you remember any further conversation at that time with
15   Mr. Craig about any of the projects that Skadden was
16   considering in Ukraine?
17   A.  Well, I don't remember a particular conversation.  I
18   remember what my understanding of this new project was going to
19   be, that's described in the first email.
20   Q.  And what was that?
21   A.  That was to advise the prosecutors on rule of law issues
22   going forward.  The first project we had been talking about,
23   the independent report, was advising them, doing a rule of law
24   analysis of the first prosecution.  This was giving them advice
25   on rule of law going forward.
```

1           And I remember thinking at the time, that it reminded

2     me of situations where a police department has had a problem

3     with excessive force or police brutality, and they sometimes

4     bring in an outside advisor or monitor to teach them best

5     practices, to try to improve their protection of rights, their

6     performance.

7           And that was my understanding of Project Two.

8     Q.  Okay.  Did -- you mentioned before that there was a wealthy

9     individual in Ukraine who was interested in funding the

10    independent report?

11    A.  Yes.

12    Q.  And if you look above those emails, at Mr. Craig's email at

13    12:29 p.m. on April 5th.

14          When he writes, "We need the paymaster tomorrow at

15    breakfast."  Do you understand that he is going to be meeting

16    with that individual?

17    A.  Well, I don't remember this email.

18    Q.  Okay.

19    A.  Reading -- I mean, if you're asking me my reaction as I'm

20    sitting here reading it, I would believe it's referring to him

21    or to a representative of his.

22    Q.  Okay.  And if you look at your response above.

23    A.  I say, "Now, that is an important meeting.  Don't be

24    bashful about asking for a lot."

25    Q.  Do you remember knowing whether Mr. Craig was going to

1    propose an amount for the project?

2    A.  I don't remember if I knew at that time.

3    Q.  Do you remember understanding whether Mr. Craig had met

4    with the wealthy individual in Ukraine on this trip?

5    A.  Yeah, I believe that I understood that he had.

6    Q.  Okay.

7                THE COURT:  Let me just interrupt for a second.

8                Members of the jury, you'll see on this document, and

9    maybe some others -- there haven't been many -- places where it

10   says "redacted."  And that just means that there's a portion of

11   the document that you're not seeing.  Please don't draw any

12   inference from that whatsoever that there's something under

13   there that somebody doesn't want you to see.

14               Often, as you all probably know, people email about

15   more than one thing in one email, or they use an old email to

16   start a new email, and there may be matters that are simply

17   excised here because they have nothing to do with the case, one

18   way or the other.

19               You can proceed.

20               MS. GASTON:  Thank you.

21   BY MS. GASTON:

22   Q.  Mr. Sloan, do you recall whether the issue of FARA arose,

23   again, in the context of the Report in April of 2012?

24   A.  Yes, I do recall that it did.

25   Q.  And directing your attention to Government's Exhibit 61,

1    which has been previously admitted.

2            I'm looking at the top of this thread.

3    A.   Okay.

4    Q.   On April 13th, 2012, what did Mr. Craig write to you?

5    A.   He wrote "Another good visit comes to an end.  Very

6    successful.  We really need advice very soon on FARA.

7    Specifically, they have asked for PR advice.  Can we designate

8    one person on the team to be the FARA register without

9    requiring all of us to register?  When are you able to come

10   here?  You don't want to miss this.  Loucks is coming next

11   week."

12   Q.   When he references Loucks, who is Mr. Loucks?

13   A.   Michael Loucks is a partner in our Boston office.

14   Q.   Do you know what his role in the project was?

15   A.   Well, I know he spent a fair amount of time in Ukraine.

16   And I'm a little unclear whether he was working, sort of, just

17   on Project Two, the project we talked about before, about

18   helping with rule of law issues going forward.

19            I think he also was working on fact gathering, in

20   terms of the review, with regard to the Report, but I'm a

21   little uncertain about that.

22   Q.   Okay.  And then the email we were just looking at is on

23   April 13th, 2012.  Directing your attention to Government's

24   Exhibit 64.

25            MS. GASTON:  And zooming in on the middle of that

1    email.

2    BY MS. GASTON:

3    Q.  Is this an e-mail from Mr. Craig to you on April 16th,

4    2012?

5    A.  Yes.

6    Q.  And what does Mr. Craig say?

7    A.  He says, "Do you think we can get an answer soon to the

8    FARA question?  Which is, if we give PR advice to Ukraine, can

9    a Skadden lawyer from the London office give the advice, thus

10   avoiding the obligation to register?"

11   Q.  And do you remember what the specific issue was with

12   respect to a lawyer from the London office at this time?

13   A.  No, I don't recall what it was.

14   Q.  Do you remember this email?

15   A.  I don't remember this email in particular.  I do remember

16   the issue coming up, but I don't remember this particular

17   email.

18   Q.  Okay.  And what did you respond to Mr. Craig?

19   A.  I said, "Do you want me to ask Ken Gross?  He was the guy

20   that was mentioned."

21   Q.  And who is Ken Gross?

22   A.  He is a partner in the Washington, D.C. office of Skadden.

23   He was the head of the political law practice.  And political

24   law includes things like lobbying, compliance with federal

25   election commission requirements.  And, so -- and, so, this,

1    logically, would have been something also within political law.

2    Q.  And when you wrote, "He was the guy that was mentioned," do

3    you remember who mentioned him to you?

4    A.  I don't.

5    Q.  And then looking above that, how does Mr. Craig respond to

6    you?

7    A.  He says, "I don't really care who you ask, but we need an

8    answer" -- excuse me -- "but we need an answer from someone who

9    we can rely on with a straight face.  Does FARA cover me?  Do I

10   have to register when I'm working with a Dutch citizen who

11   lives and works in London and is giving Ukrainians PR advice?"

12   Q.  And do you -- at the time, did you know what he was

13   referring to when he mentions a Dutch citizen?

14   A.  I'm not sure that I did.

15   Q.  Now, directing your attention to Government's Exhibit 71,

16   which has been previously admitted.

17        MS. GASTON:  And going to the second page of this

18   exhibit, first, and zooming in on the first email.

19        The witness:  Okay.

20   BY MS. GASTON:

21   Q.  And is this on that same day, April 16th, 2012?

22   A.  Yes.

23   Q.  Who sent this email?

24   A.  Alex van der Zwaan.

25   Q.  And who was Alex van der Zwaan?

1    A.  He was an associate in the London office of Skadden.

2    Q.  And he sent this to a Project Kyiv DL.

3            Do you know what that was?

4    A.  Yes.

5    Q.  What was that?

6    A.  It was a distribution list for people who were working on

7    the project.

8    Q.  And there's a copy, also, to Mr. Loucks, correct?

9    A.  Yes.

10   Q.  What's the subject of Mr. van der Zwaan's email?

11   A.  It's "FARA issues."

12   Q.  What does Mr. van der Zwaan write?

13   A.  He says, "Dear Greg, Dear Cliff, Have you been able to make

14   any headway in relation to the FARA analysis which we discussed

15   last week?  I'm mindful that the clients view one of the aims

16   of both Project One and Project Two is improved PR on the issue

17   of Ukraine's conduct in relation to Yulia Tymoshenko and her

18   trial.

19           "To the extent that is the case, and we are able to

20   help them with this from a FARA perspective, we ought to

21   consider getting appropriate PR advisors engaged in this

22   process as soon as possible in order to maximize the effects of

23   the suggestions we are making.

24           Matt and I have thought of some companies which we

25   could use, and could begin to reach out to these people,

1     subject to your views on the FARA issues, as well as any other

2     clearance which we may need from Manafort or otherwise."

3     Q.  Do you remember this email from Mr. van der Zwaan?

4     A.  I don't remember this particular email.

5     Q.  But, you remember the issue arising?

6     A.  Exactly.  I remember the issue coming up.

7     Q.  And then if you look at the top of that page and the bottom

8     of the first page.

9              Did you then forward that email to Allon Kedem?

10    A.  Yes, I did.

11    Q.  And who is Allon Kedem?

12    A.  He's an associate in the Washington, D.C. office of

13    Skadden.

14    Q.  Did you ask Mr. Kedem to talk to Ken Gross?

15    A.  Yes.

16    Q.  What, in particular, were you asking Mr. Kedem to find out

17    from Mr. Gross?

18    A.  Could you repeat the question?

19    Q.  What, in particular, were you asking Mr. Kedem to find out

20    from Mr. Gross?

21    A.  I was asking to get advice on the FARA issue.

22    Q.  What particular aspect of the FARA issue?

23    A.  Well, it was following up on these questions that had

24    been raised in the e-mail we discussed by Alex van der Zwaan,

25    and also the emails that we discussed that had been raised by

1    Greg.

2    Q.  So, the issue of how public relations might affect the FARA

3    analysis?

4    A.  Yes.

5    Q.  And then did Mr. Kedem report back on what Mr. Gross's

6    advice was?

7    A.  Yes.

8    Q.  And what did he write to you and to Mr. Craig?

9    A.  He said, "I spoke with Ken, who seems to have a lot of FARA

10   expertise.  In his view, our work writing a report evaluating

11   the Ukraine proceedings would not trigger FARA obligations.

12   However, if we were to perform public relations work aimed at

13   the U.S., if our London lawyers were to do so, or if we were to

14   subcontract with a PR firm to do so, then we would be obligated

15   to register under FARA.  If the Ukrainian government were to

16   hire the PR firm directly, then FARA would not come into play

17   for us."

18   Q.  And then did he also note that FARA registration requires

19   some disclosures?

20   A.  Yes.

21   Q.  Okay.  And what was your reaction to this advice?

22   A.  I said, "Thanks very much, Allon.

23            "Greg, I think our engagement should not include PR

24   advice.  Manafort or Schoen or somebody else can hire the PR

25   team and manage that.  I say this for two reasons:  First, it

1    will create a FARA problem; second, I actually think it's much

2    better for our representation to be rule of law advisors, not

3    rule of law and PR advisors.  Including a PR component as part

4    of our representation has the potential to undermine our work.

5    We're in this representation as lawyers, not spin doctors, and

6    I think it's important that we be able to say that.

7              "In any event, the FARA issue looks insurmountable.

8    And, of course, we can provide information and answer questions

9    for the PR firm at the client's direction."

10   Q.  And did Mr. Craig respond to your email?

11   A.  Yes, he did.

12   Q.  And what did he respond?

13   A.  He said, "Good advice."

14   Q.  Do you remember any further discussion with him at this

15   time about this?

16   A.  No, I don't.

17   Q.  Now, moving on into the summertime, were you familiar with

18   an individual named Vin Weber?

19   A.  I -- just generally, from news, I knew that Vin Weber was a

20   former congressman.

21   Q.  And directing your attention to Government's Exhibit 173,

22   which has been previously admitted.

23   A.  Yes.

24              MS. GASTON:  And zooming in.

25   BY MS. GASTON:

1    Q.  Is this an email from Paul Kerlin to Mr. Craig, you,

2    Margaret Krawiec, Mr. Kedem, Kara Roseen, and Alex Haskell?

3    A.  Yes.

4    Q.  This is July 12, 2012?

5    A.  Yes.

6    Q.  Do you remember receiving this email or reading the

7    attached item?

8    A.  No, I do not.

9    Q.  And do you remember knowing anything about Vin Weber at

10   this time, other than that he was a former congressman?

11   A.  No, I don't.

12            THE COURT:  What was the document number on that?

13            MS. GASTON:  173.

14            THE COURT:  Thank you.

15   BY MS. GASTON:

16   Q.  Now, Mr. Sloan, at some point, did an issue arise in the

17   press in Ukraine regarding payment by the government for the

18   Skadden Report?

19   A.  Yes.

20   Q.  Okay.  And do you remember approximately when that was?

21   A.  I think it was in June, perhaps early June, of 2012.

22   Q.  I'm going to direct your attention to Government's Exhibit

23   210, which has been previously admitted.  And if you look down

24   at the bottom of the first page.

25            Is this an August 9th email from Lauren Weiss?

1   A.  Yes.

2   Q.  Who is Lauren Weiss?

3   A.  She was a -- or, is a PR person at Skadden.

4   Q.  And what is the subject line of her email?

5   A.  The subject line is, "*Kyiv Post* editorial Skadden Stink."

6   Q.  And did this refresh your recollection about -- and perhaps

7   you were talking about other media reports?

8   A.  I was.  What I was referring to in June, was that an issue

9   had come up, and sort of a threat of publicity about it or a

10  suggestion of publicity about it.  But, I think this is -- this

11  may be the first time there actually was publicity.  But the

12  issue had come up in June.

13  Q.  Got it.

14          And who is Ms. Weiss sending this email to?

15  A.  Who she's sending it to?

16  Q.  Yes.

17  A.  To Greg Craig, to me, to Michael Loucks, to Matthew Cowie,

18  and to Alex van der Zwaan.  And then she also copies three

19  people.

20  Q.  Are the people she copies press people for Skadden?

21  A.  Yes.

22  Q.  And do you remember seeing this editorial?

23  A.  Yes.

24  Q.  Okay.  And the title is, "Skadden Stink"?

25  A.  That's correct.

1    Q.  Okay.  And if you look at the second page of it, if we

2    could.

3            Is it discussing how much Skadden was being paid by

4    the government of Ukraine for the Report?

5    A.  Yes.

6    Q.  Okay.  And if you could, could you please read -- there's a

7    paragraph starting "These facts."

8    A.  "These facts fuel speculation that Skadden is being paid by

9    someone on the side.  No one knows who is paying Skadden, and

10   it's a question the company is ignoring.  So the public may

11   never know of conflicts of interest or worse things that may

12   lurk behind this arrangement."

13   Q.  And then could you please read the next paragraph?

14   A.  "We hope that Skadden will address these serious concerns.

15   We hope that U.S. anticorruption bodies are also looking into

16   this issue, since there's little hope that the case will be

17   investigated in Ukraine.

18           "Another question is what kind of report Skadden will

19   produce and how it will be used."

20           MS. GASTON:  And then going back to the first page,

21   and zooming in on your email above Ms. Weiss's email.

22   BY MS. GASTON:

23   Q.  Was this editorial of concern to you?

24   A.  Was the editorial of concern to me?  Yes.

25   Q.  Yes.

1          And why was that?

2    A.  Because it was raising serious questions.  And I thought

3    they were unwarranted because I thought that it was very easily

4    explained that there was a third-party paying for it.  That's

5    not -- that's not an uncommon arrangement in a wide variety of

6    context in a legal services field, and I thought that the

7    misunderstanding could easily be dispelled.

8    Q.  And I'm looking at your email above that, and also

9    Mr. Craig's response to you.

10   A.  Okay.

11          MS. GASTON:  Could we do the top?

12   BY MS. GASTON:

13   Q.  So do you forward the editorial to Mr. Craig and say, "We

14   really need to get them to disclose the funding"?

15   A.  Yes.

16   Q.  And when you wrote "them," who is "them"?

17   A.  Well, I think that I was -- so I don't recall as I'm

18   sitting here.  As I sit here looking at it, I think I was

19   probably referring both to Mr. Pinchuk, as the person providing

20   funds, and our client, the government of Ukraine.

21   Q.  And what did Mr. Craig respond to you?

22   A.  He said, "I have already told Manafort he has got to get

23   Pinchuk out, whether voluntarily or non-voluntarily."

24   Q.  And did you respond to him?

25   A.  Yes.

1    Q.  And what did you respond?

2    A.  I said, "Does Manafort have the new *Kyiv Post* editorial;

3    Renewed and intensified urgency, the Skadden Stink?  The issue

4    is about to explode, including in the American press.  Far, far

5    better to get ahead of it now, while we still have a bit of a

6    chance."

7    Q.  And then if you look at Government's Exhibit 211, which has

8    been previously admitted.

9           And this is on August 10th, which is the next day?

10   A.  Yes.

11   Q.  Did you raise the issue again with Mr. Craig?

12   A.  Yes.

13   Q.  And you indicated that you know he agrees with you on this

14   issue?

15   A.  Yes.

16   Q.  Okay.  Now, in -- and did Mr. Pinchuk agree to have his

17   role in funding disclosed?

18   A.  My understanding was that he did not.

19   Q.  So did the Report disclose Mr. Pinchuk's role?

20   A.  No.

21   Q.  And, now, Mr. Sloan, directing your attention to

22   Government's Exhibit 221, which has been previously admitted.

23           MS. GASTON:  And if we could just zoom in on all

24   three emails, please.

25   BY MS. GASTON:

1   Q.  So this is on August 28th, 2012.

2           Do you remember receiving this email?

3   A.  No, I do not.

4   Q.  And if we look at the bottom email.  Who is it from and who

5   is it to?

6   A.  It's from Alex van der Zwaan and it's to Lauren Weiss.

7   Q.  What's the date on this document?

8   A.  Tuesday, August 28th, 2012.

9   Q.  What email address is Mr. van der Zwaan using?

10  A.  It's a Gmail address.

11  Q.  Do you remember noticing that at the time --

12  A.  No.

13  Q.  -- he was using a Gmail?

14  A.  No.

15  Q.  And Ms. Weiss forwarded the email to you?

16  A.  Yes.

17  Q.  And then you forwarded the email to Mr. Craig?

18  A.  Yes.

19  Q.  And were -- do you -- you don't remember this email or the

20  attachments?

21  A.  No.

22  Q.  We're not going to go over them in detail, but we're just

23  going to page through.  If we could look at page 2 of the PDF.

24          Is that a memorandum with the subject "SA

25  report-media plan"?

```
 1   A.  Yes.

 2   Q.  And then if we look at page 6 of the document.

 3           Is that an attachment titled Master Control Grid?

 4   A.  Yes.

 5   Q.  Okay.  And then if we look at page 11 of the PDF.

 6           Is that an attachment called List of Contacts,

 7   Skadden Report?

 8   A.  Yes.

 9   Q.  And then if we look at page 15 of this document.

10           Is that an earlier version, a July 27th version of

11   that memorandum with the subject line "SA report-media plan"?

12   A.  Well, it's -- the date on it is July 27th, 2012.

13   Q.  And then the first one we looked at, if you look at the

14   second page of the PDF, is August 1st, 2012.

15   A.  That's correct.

16   Q.  And you forwarded those materials to Mr. Craig on

17   August 28th, 2012?

18   A.  Yes.

19   Q.  And you wrote, "Let's discuss"?

20   A.  Yes.

21   Q.  Do you remember discussing them?

22   A.  No.

23   Q.  Do you remember looking at them or thinking anything about

24   them?

25   A.  No.
```

1    Q.   Okay.   Now, moving on to September of 2012.

2         Do you remember an occasion in which Ms. Weiss came

3    to you with some concerns about something public-relations

4    related to the Ukraine report?

5    A.   No.

6    Q.   I'm directing your attention to what's previously been

7    admitted, which is Government's Exhibit 266.

8         And, first, if we could start at the bottom of the

9    email.

10   A.   Yes.

11   Q.   And it starts with an e-mail from Mr. Craig to you?

12   A.   Yes.

13   Q.   And this is September 24th, 2012?

14   A.   Yes.

15   Q.   What's the subject of this?

16   A.   "Two problems."

17   Q.   Okay.   Do you remember discussing two problems with

18   Mr. Craig on September 24th, 2012?

19   A.   No, I do not.

20   Q.   Could you please read what he wrote to you?

21   A.   What he wrote to me, he said, "Fixed.   One, Hawker said it

22   wasn't true.   They have no intention of paying journalists and

23   would not do so.   Professionally very dangerous for them ever

24   to do that, and inconsistent with their code of conduct.   They

25   were speculating about the relationship between the Ukrainian

1   government and Ukraine's favorite journalists.  He was truly

2   upset that we thought they would even consider doing it.

3          "Two, I have talked to Alex van der Zwaan, and he has

4   been instructed not to background journalists.  I sent the

5   email to Manafort and Hawker, and they are okay with it."

6   Q.  Okay.  So, first of all, when he references Hawker, do you

7   know who that is?

8   A.  Yes.

9   Q.  Who is that?

10  A.  I believe it's Jonathan Hawker of FTI.

11  Q.  And do you remember this issue of a concern about

12  potentially paying journalists coming up?

13  A.  No, I do not.

14  Q.  And then this second point about Alex van der Zwaan

15  backgrounding journalists, do you remember that coming up?

16  A.  No, I do not.

17  Q.  Do you remember at this time any discussion with Mr. Craig

18  about backgrounding journalists?

19  A.  No, I do not.

20  Q.  And then you forward that email to Ms. Weiss?

21  A.  Yes.

22  Q.  And said, "Both issues taken care of.  Thanks very much."

23  A.  Yes.

24  Q.  Do you remember discussing either of those issues with

25  Ms. Weiss?

1    A.  I do not.

2    Q.  And then she says, "Glad to hear it.  Apologize if I

3    stirred the pot.  I just wanted to make you aware."

4         I take it you don't remember her making you aware?

5    A.  Correct.

6    Q.  And you thank her for being careful and flagging; is that

7    right?

8    A.  Yes.

9    Q.  Okay.

10        Do you remember when -- do you remember learning, in

11   December of 2012, that the Report was going to be released?

12   A.  Well, I remember the Report -- that the Report was released

13   in December.  And I'm sure that at some point I was aware, but

14   I don't remember the precise time.

15   Q.  Okay.

16   A.  But, I knew it was going to be released.

17   Q.  So you don't have a specific memory of learning the Report

18   was going to be released?

19   A.  That's right.

20   Q.  Directing your attention to Government's Exhibit 320, which

21   has previously been admitted, and zooming in at the top.

22   A.  Yes.

23   Q.  Do you remember receiving an email from Ms. Whitney on

24   December 6th, 2012, saying the Report would be released on

25   December 12th?

```
1    A.  I don't remember that.

2    Q.  Now, Mr. Sloan, do you remember when the Report was made

3    public by Ukraine?

4    A.  No.

5    Q.  Okay.

6              THE COURT:  You meant the date?

7              MS. GASTON:  Yes.

8              THE COURT:  Okay.

9    BY MS. GASTON:

10   Q.  Do you remember the date when the Report was made public?

11   A.  No.

12   Q.  In advance of the Report being made public by Ukraine, did

13   you have any media contacts regarding the Report?

14   A.  No.

15   Q.  And did you give the Report to any reporters in advance of

16   Ukraine making the Report public?

17   A.  No.

18   Q.  Now, directing your attention to Government's Exhibit 359,

19   and zooming in on the bottom email.  This has been previously

20   admitted.

21             On December 11th, 2012, did Mr. Craig write to

22   you, "He thinks it will be Susan, and that Dennis will be

23   deputy"?

24   A.  Yes.

25   Q.  And is the subject of that "Sanger conversation"?
```

1      A.   Yes.

2      Q.   Do you remember Mr. Craig writing you this email?

3      A.   No.

4      Q.   Did you know who Sanger was?

5      A.   Well, yes.  I knew that David Sanger was a reporter at *The*

6      *New York Times*.

7               MS. GASTON:  And if we include the email above that,

8      so that we can see both emails.  Okay.

9      BY MS. GASTON:

10     Q.   What did you respond to Mr. Craig?

11     A.   I said, "What did he think of the Tymoshenko report?"

12     Q.   Do you remember knowing anything about Mr. Sanger in

13     relation to the Tymoshenko report on December 11th, 2012?

14     A.   No.

15     Q.   Do you know why you asked Mr. Craig what Mr. Sanger thought

16     of the Report at that time?

17     A.   No, I don't recall.

18     Q.   Okay.  Do you remember knowing whether Mr. Sanger had a

19     copy of the Report?

20     A.   No.

21     Q.   Do you remember knowing anything about Mr. Craig's contacts

22     with Mr. Sanger on that date?

23     A.   No.

24               MS. GASTON:  If we zoom in on the top two emails.

25     BY MS. GASTON:

1    Q.   And Mr. Craig asks you, "Come down and see you?"

2    A.   Yes.

3    Q.   And you said, "Sure"?

4    A.   Yes.

5    Q.   Do you remember whether you did have a conversation with

6    Mr. Craig that day?

7    A.   No, I don't.

8    Q.   Now, moving on to Government's Exhibit 378, which has been

9    previously admitted.

10             MS. GASTON:   If you zoom on the bottom two emails,

11   Ms. Rohde.

12   BY MS. GASTON:

13   Q.   What is the bottom email in this thread?

14   A.   The bottom is an email from Greg to David Sanger.

15   Q.   And what's the subject line?

16   A.   "Ukraine."

17   Q.   And what's the date?

18   A.   Wednesday, December 12th, 2012.

19   Q.   And what is the quote that Mr. Craig sends?

20   A.   "We leave to others the question whether this prosecution

21   was politically motivated.  We say nothing about that.  Our

22   assignment was to look at the evidence in the record and

23   determine whether the trial was fair."

24   Q.   And did you know, at this time, whether the Report was

25   public?

1    A.  I don't know whether it was public at that time.

2    Q.  And then Mr. Craig forwarded his email to Mr. Sanger to

3    you; is that correct?

4    A.  Yes.

5    Q.  And what did he write?

6    A.  He wrote, "On the question of selective prosecution versus

7    politically motivated prosecution, Sanger wants a quote.  What

8    do you think?"

9    Q.  And what did you --

10              MS. GASTON:  And if we could zoom out, and zoom in on

11   the top two.

12   BY MS. GASTON:

13   Q.  What did you respond?

14   A.  I said, "I would stay away from that one.  It's in the

15   Report.  He can quote from there."

16   Q.  Why do you write "I would stay away from that one"?

17   A.  I don't remember the email.

18   Q.  Okay.  And what did Mr. Craig respond to you?

19   A.  He says, "He does quote from the Report.  He wants

20   something further."

21   Q.  And do you remember this email thread?

22   A.  No.

23   Q.  Do you remember talking to Mr. Craig on December 12th about

24   Mr. Sanger?

25   A.  No.

1    Q.  Do you remember knowing, outside of this email, anything

2    about Mr. Craig's -- outside of this email and the previous

3    email, anything about Mr. Craig's contacts with Mr. Sanger?

4    A.  I just -- I don't recall.

5    Q.  Directing your attention to Government's Exhibit 381, which

6    has previously been admitted, and looking at the bottom email

7    in the thread.

8    A.  Yes.

9    Q.  Is this also on December 12th, 2012?

10   A.  Yes.

11   Q.  And you're giving Ms. Weiss a heads-up on Ukraine?

12   A.  Yes.

13   Q.  And what do you write to her?

14   A.  I say, "Hi, Lauren, You may already know this, but I think

15   there will be press on the Ukraine report tomorrow or tonight,

16   *NYT* and other places."

17   Q.  Do you remember sending this email to Ms. Weiss?

18   A.  No, I don't.

19   Q.  Do you know if the Report was public at this point?

20   A.  I don't know.

21   Q.  Okay.  And you reference *NYT*.

22         Do you know how you knew to tell Ms. Weiss that there

23   might be press in the *NYT* on the Ukraine report?

24   A.  I don't recall.

25         THE COURT:  What exhibit number is this?

```
 1              MS. GASTON:  That was 381.
 2              THE COURT:  Thank you.
 3   BY MS. GASTON:
 4   Q.  Now, Mr. Sloan, at some point after the Report was made
 5   public by Ukraine, did you see an article in The National Law
 6   Journal?
 7   A.  Yes.
 8   Q.  And do you remember that at the time that you saw that
 9   article, the Report was public?
10   A.  Yes.
11   Q.  Okay.  And were there some inaccuracies in that article
12   that you wanted to correct?
13   A.  There was major fundamental inaccuracy in the article,
14   beginning with the headline.
15   Q.  And did you work with Ms. Weiss to contact the reporter and
16   correct that article?
17   A.  Yes.  Along with Mr. Craig and with Alex Haskell, yes.
18   Q.  Now, do you know whether anyone from Skadden sent The
19   National Law Journal a copy of the Report?
20   A.  I don't know.
21   Q.  Okay.  You didn't send anyone a copy of the Report?
22   A.  Correct.
23   Q.  Now, moving on to another subject.
24              About a week after the Report was made public, do you
25   recall an inquiry from the Department of Justice FARA Unit?
```

1    A.  I recall an inquiry.  I don't remember the exact date, but

2    I recall an inquiry, yes.

3    Q.  Directing your attention to Government's Exhibit 410, which

4    has previously been admitted.

5              MS. GASTON:  And zooming in on the email, please.

6    BY MS. GASTON:

7    Q.  Is this an email from Lawrence Spiegel on December 22nd,

8    2012?

9    A.  Yes.

10   Q.  Is it to you and Mr. Craig?

11   A.  Yes.

12   Q.  And is it copying Eric Friedman, David Zornow, Earle Yaffa,

13   and Barbara Krasa Kelly?

14   A.  Yes.

15   Q.  And who are those individuals who are copied?

16   A.  Eric Friedman was the executive partner of the -- of

17   Skadden, which is the top position; David Zornow was the global

18   head of litigation, so he was in charge of the litigation;

19   Earle Yaffa, I'm not sure what his title was, but he was sort

20   of a major administrative person at Skadden; Barbara Kelly was

21   a lawyer who worked with Lawrence Spiegel.  He was the general

22   counsel of Skadden, and she worked with him on legal matters

23   affecting the firm.

24   Q.  What's the subject of this email?

25   A.  Subject is, "Request from" -- excuse me.

1          "Request for information from DOJ, Re:  Tymoshenko

2     trial review."

3     Q.  And what does Mr. Spiegel write to you?

4     A.  He says, "Greg and Cliff; Earle attached" -- I'm sorry.

5          "Greg and Cliff; Earle received the attached letter

6     today from the National Security Division of DOJ.  I am not

7     familiar with the obligations under FARA, but available to

8     discuss and review your response, as appropriate.  I am copying

9     Barbara Kelly, who can assist to the extent that you require

10    details about the firm's structure to respond.  I am out of the

11    office next week, so best way to reach me is by email or cell.

12    Thanks, Larry."

13    Q.  To the best of your memory, is this how you found out about

14    the FARA Unit inquiry?

15    A.  Yes.

16    Q.  Okay.  And then looking at the attachment --

17          MS. GASTON:  And zooming in on the second -- well,

18    first, zooming in on the top, the date, and down to Mr. Yaffa.

19    BY MS. GASTON:

20    Q.  And what is the Re line of the letter?

21    A.  "Possible obligation to register pursuant to the Foreign

22    Agents Registration Act.

23          MS. GASTON:  And then zooming out, please, Ms. Rohde.

24    And zooming in on the second full paragraph.

25    BY MS. GASTON:

1    Q.  And does the letter state that "In order that we may

2    determine whether your organization is required to register

3    under FARA, please provide this office with" -- and then a list

4    of enumerated items?

5    A.  Yes.

6    Q.  And are the first two items questions about the firm's

7    structure and business?

8    A.  Yes.

9    Q.  And then are the second two questions about the Ukraine

10   project?

11   A.  Yes.

12   Q.  And, if you recall, did you and Mr. Craig work on the third

13   and fourth items of this letter while others in the firm worked

14   on the structural questions?

15   A.  Yes.

16   Q.  Showing you what's been marked as Government's Exhibit 420,

17   which is previously admitted, and looking at the top email in

18   the chain.

19            Is this you forwarding to Mr. Spiegel, on

20   February 7th, the response letter that the firm sent to the

21   FARA Unit?

22   A.  Um-hum...

23   Q.  And you can take time and look at the letter.

24   A.  Okay.

25            Yes, it is.

1    Q.   Okay.  And if we then turn and look at the letter.

2         And was that a letter sent on February 6, 2013?

3    A.   Yes.

4    Q.   And the first page contains those first two items, which

5    are structural questions?

6    A.   Yes.

7    Q.   And then if we go on to the second page.

8         Items 3 and 4 describe --

9    A.   Yes.

10   Q.   -- answer the third and fourth items?

11   A.   Yes.

12   Q.   And did -- to your recollection, did you and Mr. Craig work

13   on 3 and 4?  And were those responses your responses to the

14   FARA Unit's inquiry?

15   A.   Yes.

16   Q.   And then if we look at the third page.

17        MS. GASTON:  And zoom in on the text and the

18   signature.

19        Okay.

20   BY MS. GASTON:

21   Q.   And this is a continuation of the answer to the fourth

22   question; is that right?

23        You can look back at the previous --

24   A.   Yes, that's correct.

25   Q.   And then who signs the letter?

```
 1    A.  Greg.

 2    Q.  Do you remember why Mr. Craig signed the letter?

 3    A.  When he signed it?

 4    Q.  Why he signed it.

 5    A.  Oh, why he signed it.  I'm sorry.

 6            I'm aware that there's an e-mail where, I think,

 7    Mr. Zornow or Mr. Spiegel had suggested that it would be best

 8    coming from Greg, that it would look less -- I think defensive

 9    was the word that was used -- than if it came from the firm's

10    general counsel.  But, I just know that from looking at emails.

11    Q.  So you don't remember specifically?

12    A.  No, I don't.

13    Q.  This is on February 7th; is that right?

14    A.  I think it's -- well, wait a minute.

15    Q.  It's dated February 6th, and then the email --

16    A.  The email is February 7th, yes, that's correct.

17    Q.  Now, directing your attention to Government's Exhibit 422,

18    which has previously been admitted.

19            MS. GASTON:  And zooming in on the text.

20

21    A.  Yes.

22    BY MS. GASTON:

23    Q.  Is this an April 4th e-mail from Mr. Craig to you?

24    A.  Yes, it is.

25    Q.  And is this Mr. Craig emailing you about the possibility of
```

1    updating information to the FARA Unit?

2    A.  May I take --

3    Q.  Take your time, please.

4    A.  Let me take a look at it for a second.

5        Yes.

6    Q.  And is the matter that he is writing to you about, possibly

7    updating additional contracts, related to the 2012 work?

8    A.  Yes, that's how I read it.

9    Q.  Okay.  And could you please read the second paragraph?

10   A.  "Their inquiry focuses on 'existing or proposed' written

11   and oral agreements.  I don't see any request for them to be

12   informed of new or additional agreements."

13   Q.  And then what does he go on to say?

14   A.  "We did notify them of the fact that there is additional

15   stuff in the works.  We reported, 'In addition to these

16   agreements, there have been discussions with the government of

17   Ukraine about the possibility of Skadden receiving additional

18   compensation from the government for the firm's work.'  The

19   most recent correspondence on this subject is attached."

20   Q.  When he writes that, is he referencing what you had written

21   in the previous letter to the FARA Unit?

22   A.  That's my reading of the email.

23   Q.  Okay.  And then what does he say?

24   A.  He says, "If they wanted to inquire about the outcome of

25   those discussions, they could ask; they have not.  I think we

1    have given what they asked for.  I don't think we owe them

2    anything more.  Do you agree?  If not, we will go to

3    Larry Spiegel."

4    Q.  Do you remember discussing this issue with Mr. Craig?

5    A.  No, I do not.

6    Q.  And do you remember whether you both discussed it with

7    Larry Spiegel?

8    A.  No, I do not.

9    Q.  Then, in fact, later in April, just about ten days later,

10   was there a follow-up inquiry from the FARA Unit?

11   A.  Yes, I remember there was a follow-up inquiry.  I don't

12   remember the date.

13   Q.  Okay.  Directing your attention to Government's Exhibit

14   425, which has been previously admitted.

15              MS. GASTON:  And if we zoom in on the text of this

16   email, please.  The whole thing.

17              Thank you, Ms. Rohde.

18   BY MS. GASTON:

19   Q.  Does it start just with Mr. Craig emailing you "Are you

20   here?"

21   A.  Yes.

22   Q.  And were you there?

23   A.  I was not.

24   Q.  Where were you?

25   A.  I was in Las Vegas for my nephew's wedding.

1    Q.  And then did Mr. Craig inform you of something in the email

2    above that, just --

3    A.  Yes, he did.

4    Q.  And what did he inform you?

5    A.  He said, "We got another letter from FARA DOJ asking for

6    more info, including the name and amount from Ukrainian

7    citizen."

8    Q.  When he says "Including the name and amount from Ukrainian

9    citizen," what does that mean?

10   A.  Well, my reading of it is that it's referring to the

11   payment from Mr. Pinchuk.

12   Q.  You don't remember this email?

13   A.  I don't.

14   Q.  Now, directing your attention to Government's Exhibit 427.

15            Is this an email from Mr. Craig to you on

16   April 29th, 2013?

17   A.  Yes.

18   Q.  And what does he write?

19   A.  He says, "I will bring down a copy of the letter from DOJ.

20   This is a draft response."

21   Q.  And then does he attach a draft response?

22   A.  Yes.

23   Q.  Okay.  And looking at that document --

24            And we are -- we're going to try some technology here

25   and see how it goes.

1              I'm also going to direct your attention to the next

2      exhibit in your binder, which is Government's Exhibit 3, which

3      has previously been admitted.  And we're going to see if we can

4      bring that up next to it.

5              Nope.

6              Bear with us just one moment.

7              Could we take down 517?

8              There we go.  That one (indicating).

9              (Off-the-record discussion between Ms. Gaston and Ms.

10     Rohde.)

11     BY MS. GASTON:

12     Q.  First, on Exhibit 3, is the incoming letter from the FARA

13     Unit that he references; is that correct?

14     A.  Yes.

15     Q.  Okay.

16             MS. GASTON:  And then if we go to the second page of

17     Exhibit 3, please, Ms. Rohde.  And if we could zoom in on the

18     final paragraph of that document.

19     BY MS. GASTON:

20     Q.  So, in the FARA Unit's letter, did they ask a list of

21     enumerated questions again?

22     A.  Yes.

23     Q.  And if we look at the last, did they include two Number 4s?

24     A.  Yes, they did.

25     Q.  Okay.

1          MS. GASTON:  So if we could put that back, Ms. Rohde.

2          Well, if we could actually zoom back in on it, but

3     not cover the whole screen, if possible.

4          Are we able to make it smaller?

5          Okay.  Let's put it back.  Okay.

6     BY MS. GASTON:

7     Q.  And, so, if you are able to see from the screens, is the

8     first enumerated question "To whom, if anyone, did your firm

9     release or distribute the Report and when?"

10    A.  Yes.

11    Q.  And then does Mr. Craig's draft propose a response to that?

12    A.  Yes.

13    Q.  What is the proposed response?

14    A.  It says, "One, the law firm provided a copy of the Report

15    to Mr. Tymoshenko's [sic] legal team in Ukraine and a member of

16    her team in the United States, James Slattery; to

17    Mr. Doug Schoen; to David Sanger, of *The New York Times*; to

18    Emily Alpert, of the *Los Angeles Times*, and to Matthew Huisman,

19    of *The National Law Journal*."

20    Q.  And does this draft response indicate when those copies

21    were provided?

22    A.  No.

23    Q.  Okay.

24          MS. GASTON:  And then if we could put that back,

25    please, Ms. Rohde.  And then zoom in on Number 6.

1          Now, is the incoming from the FARA Unit, "Did you or

2    anyone in your firm have any media interviews or comments to

3    the media or public or government officials about the Report

4    and the findings of your firm?"

5    A.  Yes.

6    Q.  What is Mr. Craig's draft response?

7    A.  "6, The firm made no comments to the media, the public, or

8    government officials about the Report.  Gregory Craig gave

9    brief statements to David Sanger, of *The New York Times*; to

10   Emily Alpert, of the *Los Angeles Times*; and to Matthew Huisman,

11   of *The National Law Journal*.  The purpose of each of those

12   statements was to correct misinformation that the media had

13   received and was reporting from the Ministry of justice in

14   Ukraine, as well as from the Tymoshenko legal team."

15   Q.  Thank you.

16          MS. GASTON:  And then, Ms. Rohde, if we could take

17   down Exhibit 3.  But, then, put Government's Exhibit 517, which

18   is previously admitted, on the split screen with Number 427,

19   page 2.

20   BY MS. GASTON:

21   Q.  And, Mr. Sloan, do you recognize Exhibit 517?

22   A.  I recognize it from this process.

23   Q.  Okay.  And do you recognize it to be a document that has

24   your handwriting on it?

25   A.  Yes.

1    Q.  Okay.  And if we look at these two items next to each

2    other, does it appear to be your handwriting on a printout of

3    the draft that Mr. Craig had sent to you?

4    A.  Yes, most of it appears to be my handwriting.

5    Q.  Okay.

6              MS. GASTON:  And then let's take down the item on --

7              THE COURT:  Well, let me just ask, are you the red

8    and the black writing or --

9              THE WITNESS:  Yes.  But there's one phrase in the

10   black that I'm not sure if it is my handwriting.  But -- but

11   I --

12             THE COURT:  Can you tell us what that is?

13             THE WITNESS:  "At his request," on the right-hand

14   side, and near --

15             THE COURT:  Okay.

16             THE WITNESS:  Yeah.

17             MS. GASTON:  Okay.

18             Ms. Rohde, could we take down the left half, and then

19   zoom in on 517, the first half.  So, down to the top -- down to

20   about the 2.

21   BY MS. GASTON:

22   Q.  Now, I believe you just indicated, Mr. Sloan, that -- that

23   "At his request," you do not recognize that to be your

24   handwriting?

25   A.  I'm not sure.

1   Q.  Okay.

2   A.  That's the one that I'm not sure of.  The rest of it seems

3   to be my handwriting.  I can't rule out that it's my

4   handwriting, but I'm not sure about that one that we're talking

5   about on the --

6   Q.  Sure.

7   A.  Yes.  That one that you have circled there, yes.

8   Q.  So when you can't rule out that it is your handwriting,

9   you're referring to "At his request"?

10  A.  Yes.

11  Q.  The rest of it is your handwriting?

12  A.  That's my understanding.

13  Q.  Now, starting from the -- just looking at Item Number 1.

14  A.  Yes.

15  Q.  Did you add "Besides representatives of the Ukraine

16  government" comma?

17  A.  It looks like I did.  That's how I read it.

18  Q.  Do you remember doing that?

19  A.  No.

20  Q.  Do you remember why you did that?

21  A.  No.

22  Q.  And then you correct Mr. Tymoshenko to Miss Tymoshenko?

23  A.  Yes.

24  Q.  And then it looks like, after the law firm provided a copy

25  of the Report, you drew a line to the top and wrote, "After its

1    public release by the Ukraine government"?

2    A.  Yes.

3    Q.  And then you also wrote, in brackets, "True?" and drew an

4    arrow?

5    A.  Correct.

6    Q.  Do you remember doing that?

7    A.  No.

8    Q.  Do you remember why you did that?

9    A.  No.

10   Q.  Did you know whether that was true?

11   A.  No.

12   Q.  Then that is crossed out.

13          Do you know whether you crossed that out?

14   A.  I do not.

15   Q.  Okay.  Then there's a circle around Mr. Doug Shoen --

16   A.  Yes.

17   Q.  -- and a question mark "role."

18          You indicated that it says the -- I'm not sure what

19   that says.

20          Are you able to decipher that?

21   A.  It looks to me like it said, "The Rep of," and then it

22   looks like it may have been crossed -- I'm sorry, cut off.

23   Q.  Okay.

24   A.  And then it says, "In Ukraine."

25   Q.  And then it looks like you bracketed "and to

1    Matthew Weissman, of *The National Law Journal,*" and wrote, "Did

2    we?"

3    A.   Yes.

4    Q.   Do you remember doing that?

5    A.   No, I don't remember doing that.

6    Q.   Do you know why you wrote that?

7    A.   Well, as I sit here, I think I would have done that because

8    what I was aware of with *The National Law Journal*, as we

9    discussed, was that he had a serious error in the article,

10   where he said that we had concluded it was a fair trial, where

11   we had concluded the opposite and we had corrected that.

12          I didn't remember anything.  To this day, I don't

13   know about providing a copy to him.

14   Q.   Okay.

15          MS. GASTON:  And, Ms. Rohde, could we back out and

16   focus on the bottom half?

17   BY MS. GASTON:

18   Q.   And then if we look at 4 and 5.

19          Did you put brackets and write "sic" next to the

20   mistaken double 4 and 5?

21   A.   It looks like I did, yes.

22   Q.   What does that indicate in a document?

23   A.   It indicates that's the way it is in the original, even

24   though erroneous.

25   Q.   And then did you add something to the Number 5 sic?

1    A.   To the -- you mean, to that paragraph?

2    Q.   Right there, yes (indicating).

3    A.   Yes.

4    Q.   Did you write, "The law firm viewed the distribution of the

5    Report as a matter that would be decided by the Ukraine

6    government in its sole discretion"?

7    A.   Yes.

8    Q.   And then looking at Number 6, the name "David Sanger, of

9    *The New York Times*" is circled.

10        Do you know whether you circled that?

11   A.   No, I do not.

12   Q.   And there is a line and an arrow at the bottom of that

13   paragraph.

14        Do you know whether you drew that line and that

15   arrow?

16   A.   I don't know whether I did.

17   Q.   But those are in -- that's in a different color ink?

18   A.   A different color ink from the red, but --

19   Q.   Yes.

20   A.   Yes.  But, I -- there are also comments in black that are

21   mine.

22   Q.   Okay.

23        MS. GASTON:  And if we could back out from that,

24   please, Ms. Rohde.

25        And then if we could bring up next to it the

```
 1    Government's Exhibit 428.  The first page first.  This has been
 2    previously admitted.
 3              And zooming in on the top of that email.
 4    BY MS. GASTON:
 5    Q.  And on May 1st, did Mr. Craig write you an email that says
 6    May -- on May 1st -- I already said that -- on May 1st, 2013,
 7    did Mr. Craig email you a draft with the subject line, "Next
 8    draft with some embellishments"?
 9    A.  Yes.
10    Q.  And what's the body of that say?
11    A.  "Let me know what you think."
12              MS. GASTON:  And then can we go to the second page of
13    423, please, Ms. Rohde?
14              All right.  So, now, first zooming in on Number 1 of
15    this.
16    BY MS. GASTON:
17    Q.  Now, does the answer to Number 1 now include a date range,
18    Mr. Sloan?
19    A.  Yes.
20    Q.  And what is that date range?
21    A.  December 12 to 13, 2012.
22    Q.  And do you know whether that was accurate?
23    A.  No.
24    Q.  Okay.
25              MS. GASTON:  And then, if we could please go to the
```

 1   second page of this document, Ms. Rohde.  And could we zoom in

 2   on the answer to Number 6.

 3          Okay.

 4   BY MS. GASTON:

 5   Q.  And, Mr. Sloan, could you please read the last sentence of

 6   the answer to Number 6?

 7   A.  "One purpose of the statements was to correct

 8   misinformation that the media had received and was reporting

 9   from the Ministry of Justice and from the Tymoshenko legal team

10   in Ukraine."

11          MS. GASTON:  And could we, Ms. Rohde, back out of

12   that, and just look at the answer to Number 6 in the first

13   draft.

14   BY MS. GASTON:

15   Q.  And what is the last sentence of the first draft?

16   A.  It says, "The purpose of each of those statements was to

17   correct misinformation that the media had received and was

18   reporting from the Ministry of Justice in Ukraine, as well as

19   from the Tymoshenko legal team."

20   Q.  So, between these two drafts, it's changed from "The

21   purpose" to "One purpose"?

22   A.  Yes.

23   Q.  Okay.  Now, Mr. Sloan, over the course of the next month --

24          MS. GASTON:  And we can take them both down, please,

25   Ms. Rohde.

1    BY MS. GASTON:

2    Q.  -- did you and Mr. Craig exchange drafts of this letter?

3    A.  Well, I don't recall the process.

4             MS. GASTON:  Can we look, please, at Government's

5    Exhibit 429 and 431?

6             We can bring them both up.

7    BY MS. GASTON:

8    Q.  And they should both be in your binder.

9    A.  Yes.  Okay.  Yes.

10   Q.  And, so, if we look at 429.

11            MS. GASTON:  And zoom in on the top.

12   A.  Yes.

13   BY MS. GASTON:

14   Q.  Is that you sending Mr. Craig some tweaks?

15   A.  Yes.

16   Q.  And then if we look at the next exhibit, 431.  And this is

17   on May 15th, 2013.

18            And Mr. Craig tells you he's added stuff?

19   A.  Yes.

20            MS. GASTON:  And then if we look at Exhibits 433 and

21   434.  And if we zoom on the top of those.

22   BY MS. GASTON:

23   Q.  So, is 433 you sending Mr. Craig's email, attaching one of

24   the drafts, to someone named Lillian Singer on May 20th?

25   A.  Yes.

```
 1    Q.  Who is Ms. Singer?

 2    A.  She is a secretary at Skadden.

 3    Q.  And then if we look at 434.

 4            On the same day, are you doing the same thing with a

 5    different draft?

 6    A.  Yes.

 7    Q.  Okay.  And then if we look at 435 and 436.

 8    A.  Yes.

 9            MS. GASTON:  And if you zoom on the top of 435,

10    please, Ms. Rohde.

11    BY MS. GASTON:

12    Q.  Is Ms. Singer sending you back red lines of the things that

13    you had previously sent her?

14    A.  Yes.

15    Q.  Okay.  And then if we look at 436.

16            Are you forwarding her another draft?

17    A.  436, yes.

18    Q.  Okay.

19            MS. GASTON:  And then if we back out of that.

20    BY MS. GASTON:

21    Q.  Look at 437 and 438.  And look at the tops of both of

22    those.

23    A.  Yes.

24    Q.  On the same date, is Ms. Singer sending you more red lines?

25    A.  Yes.
```

```
 1    Q.  And then if we look at 439 and 440.

 2    A.  Yes.

 3    Q.  That's 439 and then 440.

 4            And those are all red lines as well?

 5    A.  Yes.

 6    Q.  Okay.

 7            MS. GASTON:  Your Honor, I would ask that those be

 8    admitted into evidence.

 9            THE COURT:  Any objection?

10            MR. MURPHY:  No objection.

11            THE COURT:  All right.  They'll be admitted.

12            MS. GASTON:  And there's a stipulation that we will

13    read later, Your Honor, about the various drafts --

14            THE COURT:  All right.

15            MS. GASTON:  -- so that we don't have to go through

16    them.

17            THE COURT:  All right.  Can one counsel from each

18    side just approach the bench, very quickly?

19            MS. GASTON:  Yes.

20            MR. MURPHY:  Sorry?

21            THE COURT:  Can I have you up here, just for a

22    minute?

23            (Bench discussion:)

24            MR. MURPHY:  I was lost in the red lines, Your Honor.

25            MS. GASTON:  I'm very glad we had the stipulation.
```

1              THE COURT:  I wanted to ask you, in the big show, ask

2     your client to stop clicking his pen on the table.  You know,

3     he's --

4              MR. MURPHY:  Oh, okay.

5              THE COURT:  -- clicking, and it's driving me crazy.

6              MR. MURPHY:  Okay.

7              THE COURT:  I keep looking to see what's going on,

8     and then I realize it's nothing.  But, it's just annoying to

9     me.  So, if you could just ask him to stop.

10             MR. MURPHY:  Okay.  Yes.

11             It occurred to me this morning, Your Honor, and then

12    I forgot.  I think it's a good time to remind the jurors that

13    we can't talk to them.  I saw a juror in the bathroom this

14    morning.  He sort of smiled at me.  And I just sort of --

15             THE COURT:  Okay.  When we break.

16             MR. MURPHY:  Yeah.

17             THE COURT:  Okay.

18             MR. MURPHY:  And I don't want to offend anyone --

19             THE COURT:  So it doesn't seem like you --

20             MS. GASTON:  That would be appreciated.  We've had

21    the same experiences.

22             THE COURT:  Where are we in time?

23             MS. GASTON:  I have maybe ten minutes.

24             THE COURT:  Do you want to finish before we do our

25    break and then we'll do the cross?

```
 1                    Let's do that.

 2                    MR. MURPHY:  That would be great.

 3                    THE COURT:  All right.  Thank you.

 4                    (Open court:)

 5                    THE COURT:  We're going to complete the direct before

 6       we take our break, since we started a little later this

 7       morning.  But, if someone needs one, just let me know.

 8                    All right.  Continue.

 9       BY MS. GASTON:

10       Q.  I think, Mr. Sloan, we are not going to go through all of

11       these red lines, thankfully.

12                    I do want to just direct your attention briefly to

13       Exhibit 439.

14       A.  439?

15       Q.  Yes.

16                    And this is one of the red lines; is that right?

17       A.  Yes.

18       Q.  Okay.  And if we look at page 3, and look at the answer to

19       Number 1.

20                    In one or more of these drafts, does it appear that

21       the date range of December 11th to 12th is proposed?

22       A.  Is what?  I'm sorry.

23       Q.  It is proposed.  Appears in one of --

24       A.  Yes.  Yes.

25       Q.  And, now, Mr. Sloan, directing your attention to
```

1    Government's Exhibit 440 -- nope.  Sorry.  442.

2              MS. GASTON:  Zooming at the top.

3    A.  Yes.

4    BY MS. GASTON:

5    Q.  Is this an email from Ms. Whitney to you on May 28th, 2013?

6    A.  Yes.

7    Q.  And what does she write to you?

8    A.  She says, "Cliff, One last look-see at this FARA response.

9    Greg asked that I send it to you.  If you can quickly look it

10   over and make sure it's okay, I will send it out now.  Thanks.

11   I have the two attachments that go with it."

12   Q.  And, Mr. Sloan, looking at the attachment to this document,

13   is this a response to the incoming FARA Unit letter?

14   A.  Yes.

15   Q.  Okay.  And then if we page through to the back -- sorry --

16   to the third page.  Is it signed by Mr. Craig?

17              It's a PDF.

18   A.  Yes.

19   Q.  And then if we look at the second page.

20              Is the proposed date range in Number 1, December 12th

21   to 13th, 2012?

22   A.  I'm sorry.  Are we looking at the first --

23   Q.  Sorry.  So look at the second page --

24   A.  The answer to Number 1?

25   Q.  Yes.

1   A.  Yes, it says December 12th to 13th, 2012.

2   Q.  And then for the answer to Number 2 it says the Ministry of

3   Justice released the Report on December 12th to 13th?

4   A.  Yes.

5   Q.  And then directing your attention to Government's Exhibit

6   443, which has previously been admitted.

7            MS. GASTON:  And zooming in on the top two emails.

8   A.  Yes.

9   BY MS. GASTON:

10  Q.  Is this your response to Ms. Whitney and copying Mr. Craig?

11  A.  Yes.

12  Q.  And what do you write to Ms. Whitney?

13  A.  I said, "Catie and Greg, Looks good.  A few comments.  One,

14  in Question 1, I think there's a 'to' missing in Number 4.

15            "Two, I assume you're sure about the dates that we

16  provide.

17            "Three, I think you should send it to Larry Spiegel

18  before sending, and tell him that you want to get it out right

19  away."

20  Q.  And in Number 2, when you reference, "I assume you're sure

21  about the dates that we provide," why did you write that?

22  A.  I don't recall this email.

23  Q.  Okay.  Did -- who was responsible for the factual basis of

24  this letter?

25  A.  Well --

1              MR. MURPHY:  Objection, Your Honor.

2              THE COURT:  All right.

3              Well, do you know what you meant by "I assume you are

4    sure about the dates"?

5              THE WITNESS:  No, I'm not sure what that refers to,

6    beyond what it says in the email.

7              THE COURT:  You've been looking through your own

8    records to ascertain the dates and put them into drafts?

9              THE WITNESS:  I don't recall.

10             THE COURT:  Ask your next question.

11   BY MS. GASTON:

12   Q.  Directing your attention to Exhibit 446.

13             In this email on May 29th, does Mr. Spiegel indicate

14   that he's received a copy of that draft response from

15   Ms. Whitney?

16   A.  I'm sorry.  Could you repeat the question?

17   Q.  Sure.  If we look at this, in the bottom email.

18   A.  Yes.

19   Q.  Did Ms. Whitney write to Mr. Spiegel and attach that draft?

20   A.  Yes.

21   Q.  And then does Mr. Spiegel forward that to you?

22   A.  Yes.

23   Q.  And indicate that he hasn't seen the incoming letter?

24   A.  Yes.

25   Q.  And you tell him that that is interesting, and you will

1   send it to him?

2   A.  Yes.

3   Q.  And then looking at Exhibit 447.

4       Is that the same thread, but you tell him you only

5   have a hardcopy of the incoming?

6   A.  Yes.

7   Q.  Okay.  And you tell him you'll get it to him the following

8   day?

9   A.  Correct.

10  Q.  Now, Mr. Sloan, do you recall, with specificity, the final

11  letter that went out in response to that -- the incoming FARA

12  Unit that we were just talking about?

13  A.  No.

14  Q.  And at some point soon thereafter, did you leave Skadden

15  for a time, as you described earlier?

16  A.  Yes.

17  Q.  And when did you leave Skadden?

18  A.  At the end of June.

19  Q.  And when did you come back to Skadden?

20  A.  In January of 2015.

21  Q.  Okay.  And were you aware that after this response to the

22  FARA Unit, there were further communications between Skadden

23  and the FARA Unit over the issue?

24  A.  I was aware that an additional letter or request for

25  information had come from DOJ.

1    Q.  Directing your attention to Government's Exhibit 472.

2    A.  Yes.

3    Q.  And looking at the top.

4    A.  Yes.

5    Q.  Is this an email from Mr. Craig to you, at the State

6    Department?

7    A.  I am copied on it, yes.

8    Q.  And who is it to?

9    A.  I believe the person's name is Alice Kottmyer, who is a

10   lawyer in the legal advisor's office at the State Department.

11   Q.  Does Mr. Craig write, "Alice, Here's the most recent letter

12   from the FARA folks"?

13   A.  Yes.

14   Q.  If you look at the attachment.

15            Is this a September 5th letter from the FARA Unit?

16   A.  Yes.

17   Q.  Do you remember receiving this?

18   A.  As I say, my recollection is that I was aware that there

19   had been a request for more information, or there was further

20   discussion.  I actually don't recall receiving the letter in

21   particular.  I don't dispute it here, obviously, but I don't

22   recall it.

23   Q.  Right.  Okay.

24            And if we look at the attachment that was sent to

25   you, and look at the last three lines on the first page.

1    A.   The last three lines on the first page.  Yes.

2    Q.   Do you remember learning, at this point, that the FARA Unit

3    had determined that Skadden should register under FARA?

4    A.   You know, what I recall is that there were going to be,

5    sort of, further discussions about it, that there were

6    additional questions about it, and there was going to be a

7    continuing dialogue.  That's how I remember it.

8    Q.   Okay.  And do you remember talking to Mr. Craig about it at

9    this time?

10   A.   No, I don't remember anything in particular about

11   conversations with him.

12   Q.   Okay.

13           THE COURT:  Do you remember if you had conversations

14   with him?

15           THE WITNESS:  Well, let me back up for a second and

16   just -- in terms of kind of how I became aware of this, I

17   remember that it was either a conversation with Larry Spiegel

18   or with Greg Craig, or with both, that they had flagged for me

19   that there was additional requests for information from the

20   Justice Department.  And I brought that to the attention of the

21   people at the State Department, because I was there then, and I

22   was referred to Alice Kottmyer in the Legal Advisor's Office.

23   And, so, I think had put Greg together with her.  I think I had

24   a general conversation.

25           I certainly was aware of it.  And, as I say, I'm sure

1    there had been some contact with Greg because there's the email

2    to Alice Kottmyer.

3    BY MS. GASTON:

4    Q.  Okay.  Thank you.

5              And do you remember having any concern about the

6    ongoing discussions between the FARA Unit and Skadden?

7    A.  No, I don't remember having a concern about it.  No.

8    Q.  Was it your understanding that Ms. Kottmyer would deal with

9    this issue?

10   A.  Yes.

11   Q.  Okay.

12             MS. GASTON:  Nothing further, Your Honor.

13             THE COURT:  All right.  We're going to take a break,

14   as we usually do in the middle of the morning.  So I ask you to

15   please not discuss this case among yourselves or with anyone

16   else.

17             I also do want to remind you that while it's a big

18   building, a lot of us are kind of occupying the same portions

19   of it right now.  And early on in this case, I told you there

20   may be occasions where you see, in the hallway or in public

21   spaces, people who are involved with the case, and they may not

22   follow the ordinary civilities of saying good morning because

23   they're erring on the side of being extremely cautious about

24   speaking to any of you.

25             So, if that transpires, please don't think less of

1    the person.  Please recall that they're just following my

2    instructions.

3              And so you're excused for ten minutes.  Do not speak

4    among yourselves or with anyone else.

5              Thank you.

6              (Whereupon the jury leaves the courtroom.)

7              THE COURT:  All right.  Is that okay with you,

8    Mr. Murphy, the instruction?

9              MR. MURPHY:  Thank you, Your Honor.

10             THE COURT:  All right.  We'll be back in ten minutes.

11             Thank you.

12             (Recess.)

13             THE COURTROOM DEPUTY:  Your Honor, recalling Case

14   Number 19-125, the United States of America v. Gregory B.

15   Craig.

16             THE COURT:  All right.  Let's bring the jury back in.

17             MR. MURPHY:  Oh, Your Honor, before we do --

18             THE COURT:  All right.  Let's not.

19             MR. MURPHY:  -- rather than deal with the husher, I

20   would be inclined to ask Mr. Sloan about the independence of

21   the Report.

22             THE COURT:  Can you be inclined to move closer to the

23   microphone?

24             Thank you.

25             MR. MURPHY:  I would be inclined to ask Mr. Sloan

1     about the independence of the Report, and particularly with

2     respect to efforts --

3                  THE COURT:  I'm sorry.  Okay.  Wait a second.

4                  MR. MURPHY:  Mr. Sloan is here.

5                  THE COURT:  Can we excuse him, and then you can tell

6     me what you want to tell me.

7                  MR. MURPHY:  Sure.

8                  THE COURT:  Sir, can you step back out, sir?

9                  (Whereupon the witness leaves the courtroom.)

10                 THE COURT:  Okay.

11                 MR. MURPHY:  About the independence of the Report,

12    which he testified about, what -- his understanding of what

13    that meant.  There are ten or so sets of repetitive requests

14    for corrections and clarifications and changes in the Report

15    that Skadden received from the Ministry of Justice from

16    Mr. Manafort, from Mr. Pshanka.  And that begins in August and

17    continues up until October.  Mr. Sloan was involved in

18    reviewing all of those requests for changes with Mr. Craig,

19    with Mr. Kedem, with Mr. Haskell.

20                 As Your Honor probably knows, virtually none of the

21    changes were made, other than correcting a word here and there

22    because of Russian translation issues, or adding a document or

23    a footnote.

24                 So I would like to ask -- I don't want to go through

25    the changes in the request that are very repetitive, and that

1   sometimes are 20 pages of translated requests, but I would like

2   to just ask him, Did you get this request?  Did you review it?

3   Did you make any substantive change?

4           And it's not within the scope of direct, perhaps,

5   although I think, given the fact that Mr. Sloan had an

6   understanding that this was to be an independent report, I

7   think he would probably say that the Ukrainians didn't seem to

8   understand that, and that it was his sense that they were very

9   unhappy about some of the conclusions in the Report, which has

10  to do with --

11          THE COURT:  Okay.  Well, that's very different than

12  Did they send you edits, and did you make them.

13          MR. MURPHY:  Yeah.

14          THE COURT:  Which I haven't heard yet what the

15  government's position is.  That's one thing.

16          But, then asking him what their state of mind was at

17  the end, I don't believe that's a fair question, unless --

18          MR. MURPHY:  I'm sorry.  Whose state of mind?

19          THE COURT:  You went through, I'm going to be able to

20  show, and I would like to be able to show on my cross-

21  examination that they submitted edits, they were considered,

22  but virtually none of them were adopted.

23          MR. MURPHY:  Yes.  Right.

24          THE COURT:  And then you said, And so he should be

25  able to testify that at the end of the process the Ukrainians

1    were very upset with the --

2              MR. MURPHY:  I understand.

3              THE COURT:  Okay.

4              MR. MURPHY:  I understand that.

5              THE COURT:  Okay.  So, I don't think you can ask him,

6    At the end of the process, how did the Ukrainians receive the

7    Report -- view the Report.

8              MR. MURPHY:  There was a long delay, as you know,

9    between the day that Skadden stopped working and the Report was

10   finally released.  I think I should be able to ask him if he

11   had any sense of why that was.

12             THE COURT:  All right.  Well, we have emails about

13   that between, I believe, Mr. Craig and Mr. Manafort, where

14   there were a lot of reasons cited that don't necessarily say

15   it's because they don't like the Report.

16             So, if you just want him to offer his conclusion

17   without laying a foundation for the conclusion and trying to

18   get him to just summarize what other people were thinking, who

19   he didn't even speak to directly, I don't understand how

20   that -- you get that in.

21             MR. MURPHY:  Well, the foundation -- I think the

22   foundation, Your Honor, is the fact that they kept asking for

23   the same changes, particularly with respect to the procedural

24   due process violations and the failure of the Report to say

25   either that it was a politically motivated prosecution or that

1    the crime had been committed.

2              And those were the fundamental things that the

3    Ukraine wanted the Report to say, and that, ultimately, it did

4    not say.  And the foundation for his sense of the reason for

5    the delay is that fact.

6              THE COURT:  His sense.

7              MR. MURPHY:  His sense.

8              THE COURT:  Okay.  You can't ask him what his sense

9    was of somebody else's reason for the delay.  That's what I'm

10   saying you can't do.  If you want to put in the facts --

11             MR. MURPHY:  Yes.

12             THE COURT:  -- that allow you to argue some

13   inference, go right ahead.  But you can't ask him to draw an

14   inference from the facts.

15             MR. MURPHY:  If I can put in the facts, I'll be very

16   pleased.

17             THE COURT:  All right.  Well, we haven't gotten there

18   yet.

19             Ms. Gaston has something to say.

20             MR. MURPHY:  I'm not surprised about that.

21             THE COURT:  All right.  Well, everyone is taking --

22   doing what they're supposed to do here.

23             Yes?

24             MS. GASTON:  Your Honor, Mr. Murphy is welcome to ask

25   this witness those questions, but those are outside of the

1    scope of the direction examination of Mr. Sloan.  And, so, they

2    need to call him in their case to make this point.

3              It's the government's position that the change

4    process is not relevant.  And I understand that it's the

5    defense's position that it is.  But, if that is the case, then

6    they need to put that on in their case, and not in our case.

7              THE COURT:  I don't see why that isn't correct.  I

8    believe that most of the wrangling in this case has gone on

9    where a witness is put on for X, and then they try to get

10   cross-examined for X and Y and Z.  And to the extent it goes to

11   bias, it's permissible.  Obviously, Mr. Gates was asked about a

12   lot of things on cross that he wasn't asked about on direct

13   because it went to his bias or his credibility, and no one

14   objected to that.

15             But, I think this -- she skipped that process.  It's

16   part of your defense.  He certainly is not a witness who's only

17   available to the government.  All these documents, I believe,

18   were defense documents that I was asked to rule on the

19   admissibility of, and I've ruled on the admissibility of them.

20   But, I don't see why they have to come in during the

21   government's case.

22             MR. MURPHY:  May I say one more thing about this?

23             THE COURT:  Yes.

24             MR. MURPHY:  The letter to the FARA Unit about which

25   there was testimony includes a statement that the folks at

1    Skadden did not know, one way or the other, what the Ukraine

2    would do with the Report, and that that would depend on what

3    the Report said, and that it was in the Ukraine's sole

4    discretion as to whether or not to release it.

5            That is one of the things that Mr. Craig is accused,

6    I think, of having misled the FARA Unit about.  But, it is

7    exactly what Mr. Craig and Mr. Sloan and Mr. Kedem and others

8    thought throughout this process.  They just didn't know what

9    the Ukraine would do because the Ukraine had expressed its

10   dissatisfaction with the Report on so many occasions.

11           And the letter has been introduced, but through

12   Mr. Sloan.

13           THE COURT:  Well, and he testified that it was his

14   understanding, based on what Mr. Craig told him, that at the

15   end of the day it was going to be the Ukrainian's decision to

16   publish the Report.

17           MR. MURPHY:  Well, he knew that as well, Your Honor.

18           THE COURT:  Okay.  I think the testimony came out,

19   and I have that note in front of me, that he learned that from

20   Mr. Craig.  But, whether he learned it in a meeting when he

21   went there -- he testified to that.

22           MR. MURPHY:  I haven't even been able to ask him a

23   question about it yet, so --

24           THE COURT:  Well, he's already said it, that that was

25   his understanding, on direct.  He did.  I heard it, that --

```
1           MR. MURPHY:  That the release decision would be the

2      decision of the Ukraine's?

3           THE COURT:  Ukranian, correct.

4           MR. MURPHY:  He heard that from Mr. -- in a letter

5      that Mr. -- I think, Mr. Schoen sent.  And --

6           THE COURT:  All right.  That's a different question

7      than, Here's this -- or, here are these comments, what happened

8      here?  These comments, what happened?

9           Let's talk about an entire period of time and an

10     entire set of transactions that you would like to put in

11     evidence that are outside the scope of the cross.  I think the

12     reason you stood up to bring this to my attention is because

13     you know it's outside the scope of the cross.

14          MR. MURPHY:  I asked Ms. Gaston, before we broke,

15     whether she would object if I asked these questions, and she

16     said she would.

17          THE COURT:  Okay.  All right.  Then I take that back.

18     You anticipated she might object.

19          MR. MURPHY:  Based on the experience with Mr. Kedem,

20     yeah.

21          THE COURT:  I think it's a sound objection.

22          MR. MURPHY:  Okay.

23          THE COURT:  And I -- it is an issue that we've talked

24     about before.  And, so, I appreciate the fact that we're

25     clearing it up -- clarifying it up front, and I believe it is
```

1    now clarified.

2              MR. MURPHY:  Okay.

3              THE COURT:  All right.

4              MR. MURPHY:  Note our objection, Your Honor.

5              THE COURT:  Fine.

6              Let's bring the witness in.  And the jury.  Let's

7    bring everybody in.

8              (Whereupon the jury and the witness enter courtroom.)

9              THE COURT:  All right.  Our witness is back and the

10   jury is back.

11             I remind you, you're still under oath.

12             Mr. Murphy, you may proceed.

13             MR. MURPHY:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15   BY MR. MURPHY:

16   Q.  Good morning, Mr. Sloan.

17   A.  Good morning.

18   Q.  I wanted to ask you a little bit about your background.

19             I take it you graduated from college and law school?

20   A.  Yes.

21   Q.  When did those events occur?

22   A.  I graduated from college in 1979, and from law school in

23   1984.

24   Q.  And which college and which law school?

25   A.  Harvard College and Harvard Law School.

1   Q.   Okay.  How long have you known Mr. Craig?

2   A.   For about 40 years.

3   Q.   So since you were in law school, or even before?

4   A.   No, it was even before.  It was right after I graduated

5   from college, is when I first recall meeting him.

6   Q.   After you graduated from law school, what did you do next?

7   A.   After I graduated from law school, I clerked for two years.

8   First, on the U.S. Court of Appeals, in this building, for the

9   District of Columbia Circuit, and then on the Supreme Court for

10   Justice John Paul Stevens.

11   Q.   And which judge did you clerk for on the Court of Appeals

12   here?

13   A.   Judge J. Skelly Wright.

14   Q.   I think you mentioned Justice Stevens, you were a law clerk

15   for Justice Stevens?

16   A.   That's correct.

17   Q.   After completing your clerkship with Justice Stevens, what

18   did you do next?

19   A.   Well, for a few months, I was at Harvard on a project on

20   presidential debates.  And then I joined the Independent

21   Counsel's Office, investigating the Iran-Contra.

22   Q.   That was an investigation by an independent counsel, had to

23   do with the Iran-Contra funding issues?

24   A.   Yes.

25   Q.   How long were you working on that investigation?

1    A.  About two years.

2    Q.  And then after completing your work with the Iran-Contra

3    Special Counsel, what did you do next?

4    A.  Well, then I briefly was at a law firm for several months,

5    and then I joined the Solicitor General's Office in the

6    Department of Justice.

7    Q.  And I think Mr. Kedem described that, but that's the Office

8    of the Department of Justice that, among other things, presents

9    the position of the United States government and its agencies

10   to the Supreme Court of the United States in cases that are

11   presented to the Court; is that right?

12   A.  That's correct.

13   Q.  How long were you an assistant to the Solicitor General?

14   A.  About two years.

15   Q.  After you completed your tenure with the Solicitor

16   General's Office, what did you do?

17   A.  I was with a law firm.

18   Q.  Which law firm?

19   A.  Mayer, Brown, and Platt.

20   Q.  And where?  In what office?

21   A.  In the Washington, D.C. office.

22   Q.  Is that a large, national firm with offices in a lot of

23   places?

24   A.  Yes.

25              I'm sorry.  I started to answer before you finished

```
1    the question.
2    Q.  Yeah.
3          Is that a large, national law firm with offices in
4    many locations?
5    A.  Yes.
6    Q.  Did you continue as a Supreme Court appellate practice
7    there?
8    A.  Yes.
9    Q.  How long were you with Mayer Brown?
10   A.  I was there about two years.
11   Q.  And then what did you do?
12   A.  Then I worked in the White House Counsel's Office in the
13   Clinton administration -- for the first few years of the
14   Clinton administration.
15   Q.  So was your position as an associate White House counsel --
16   A.  Yes.
17   Q.  -- under President Clinton?
18          How long -- two years there, as well?
19   A.  Yeah.  About, yeah.
20   Q.  Okay.  And then what did you do after leaving the White
21   House Counsel's Office?
22   A.  Then I went to a law firm.  I went to the firm of Wiley,
23   Rein & Fielding, as it was then known, in Washington, D.C.
24   Q.  How long were you with the Wiley Rein firm?
25   A.  I was there about five years.
```

1    Q.   After leaving Wiley Rein, what did you do?

2    A.   I went to The Washington Post Company.  I was there for

3    about eight years.  I was the general counsel of their online

4    subsidiary.  I also had a variety of business positions, as

5    well as my general counsel position, including as publisher of

6    *Slate* magazine for a few years after The Washington Post

7    Company acquired *Slate*.

8    Q.   So you had experience in the media business as in-house

9    counsel for *The Post*?

10   A.   For the online subsidiary of *The Post*, yes.

11   Q.   You had a role with *Slate*, an online publication?

12   A.   Yes.  And the online subsidiary was responsible for

13   washingtonpost.com, and The Washington Post Company owned

14   *Newsweek* at that time, for newsweek.com, and for other media

15   properties.

16   Q.   How long were you with *The Post* and *Slate* and its

17   subsidiaries?

18   A.   I was at *The Washington Post* Company for eight years.

19   Q.   What did you do after that?

20   A.   I went to Skadden.

21   Q.   Okay.  So that's when you went to Skadden?

22   A.   Yes.

23   Q.   Okay.  You joined Skadden in -- I think you said 2008?

24   A.   Yeah, April of 2008.

25   Q.   Mr. Craig joined Skadden when?

1    A.   January of 2010.

2    Q.   Did you have a role to play in advising -- well, asking

3    Mr. Craig to come to Skadden?

4    A.   Yes, I had a major role in recruiting Greg to come to

5    Skadden.

6    Q.   Okay.  And after he got there, did you and he work on

7    projects together, other than the Tymoshenko project?

8    A.   Yes.

9    Q.   Can you describe approximately how many?

10   A.   At least a dozen.

11   Q.   Let's take a look at some of the exhibits that you were

12   shown.  We can look at Government Exhibit 30.

13        This was the February 13th of 2012 email exchange

14   between Mr. Buck, Mr. Craig, and you about the prospect of

15   doing the Tymoshenko Report; is that right?

16   A.   Yes.

17   Q.   If you look at Mr. Craig's email, the first one in this

18   chain, to Mr. Buck, on February the 10th, it's copied to you.

19        Mr. Craig said, in describing the project, that "We

20   are not being asked to render an opinion on her guilt or

21   innocence," right?

22   A.   Yes.

23   Q.   And did that remain true throughout the course of the

24   project, from the -- this was even before the project began, in

25   February.  But, until the Report was released, was it always

1    the position that Skadden was not going to opine on

2    Ms. Tymoshenko's guilt or innocence?

3    A.   Yes.

4    Q.   He goes on to say, in the next line, "We will be asked to

5    render an opinion on whether she is the victim of an unfair

6    procedure."

7              Do you see that?

8    A.   Yes, I do.

9    Q.   Was that always a consistent portion or theme of the

10   Report, whether or not Ms. Tymoshenko had been the victim of

11   unfair procedures?

12   A.   Yes.

13   Q.   At the end of the day, did the Report conclude, one way or

14   the other, about that?

15   A.   Yes.

16   Q.   What was the conclusion?

17   A.   Well, the Report considered several issues -- I think eight

18   issues in total.  But, of crucial importance on two fundamental

19   issues of due process and fairness, the Report concluded that

20   her rights were violated.  And those two areas were, first,

21   that she was denied counsel at critical parts of the

22   proceeding; and, second, that she was denied the opportunity to

23   call important witnesses.  Both of them very important and

24   fundamental constitutional rights in the U.S., and recognized

25   as such, generally, under Western standards of criminal

1      justice.

2      Q.  Now, let's look at Government's Exhibit 32.

3              This exhibit includes an email from Mr. Haskell to

4      you, with a copy to Mr. Craig, on February the 13th of 2012,

5      right?

6      A.  Yes.

7      Q.  Before the project got underway?

8      A.  Yes.

9      Q.  And Mr. Haskell was asked by you to do some research on the

10     FARA statute; is that right?

11     A.  Yes.

12     Q.  And he gave you an email in which he stated, "In this

13     situation, I do not believe that Skadden or an individual

14     attorney would be deemed an agent of a foreign principal under

15     FARA," right?

16     A.  Yes.

17     Q.  And the situation he is describing there is representing

18     the Ukrainian government in connection with an internal

19     investigation within the Ukraine relating to matters occurring

20     outside of the United States, right?

21     A.  Yes.

22     Q.  And those matters were an analysis of whether

23     Ms. Tymoshenko had been given a fair trial?

24     A.  Yes.

25     Q.  With his brief email, he described and defined some of the

1    terms that are applicable under FARA, right?  In this first --

2    under General Applicability, there's a paragraph in which he

3    talks about what the definition of an agent of a foreign

4    principal is, right?

5    A.  Yes.

6    Q.  Did you ever have any occasion to disagree with Mr.

7    Haskell's conclusions?

8    A.  No.

9    Q.  And in addition to talking about the statute and its

10   definitions, did he attach the statute?

11   A.  Yes, I believe he did.  Yes.

12   Q.  And do you see that on -- beginning on page 32-3?

13   A.  Yes.

14   Q.  And did he also attach the applicable regulations?

15   A.  Yes.

16   Q.  Okay.  And they begin, I think -- I'm sorry.  This person

17   doesn't have them attached.

18           But, do you recall that he attached the regulations

19   as well?

20   A.  I don't have an independent recollection.

21   Q.  Okay.  A number of times today, on direct testimony, you

22   indicated that you don't have a recollection of certain things,

23   right?

24   A.  Yes.

25   Q.  These events that you were asked about all occurred

1    approximately seven years ago?

2    A.  That's correct.

3    Q.  Would it be fair to say that you don't remember a lot of

4    the emails that you received or wrote back in 2012 and 2013?

5    A.  Yes, it would.

6    Q.  Would you have had a better recollection of some of these

7    things in 2013 than you would have today?

8    A.  Sure.

9    Q.  Okay.  But, there are a few things that stand out, in your

10   mind, about this report; is that right?

11   A.  Yes.

12   Q.  And among them would be that -- the nature of the

13   assignment?

14   A.  Yes.

15   Q.  That you --

16          MS. GASTON:  Objection, Your Honor.  Asked and

17   answered.

18          THE COURT:  All right.  Well, he can -- I don't know

19   what this question is yet.

20          MR. MURPHY:  Okay.

21   BY MR. MURPHY:

22   Q.  That the Report was to be an independent report?

23   A.  Yes.

24   Q.  And that when the Report was finished, did you think that

25   you had achieved your objective of having produced an

1    independent report?

2    A.   Absolutely.

3    Q.   And was part of that just a view that to the extent that

4    the Ministry of Justice had a view --

5              MS. GASTON:  Objection.

6              MR. MURPHY:  It's just one question, Your Honor.

7              THE COURT:  All right.  Well, you can say what the

8    question is.

9              And before you answer it, I want to hear the whole

10   question.

11             Go ahead.

12   BY MR. MURPHY:

13   Q.   Part of independence was that the view that you shared with

14   others at Skadden, that you weren't there to do the Ukraine

15   Ministry of Justice's bidding?

16             THE COURT:  All right.  You can answer that question.

17   A.   That was definitely our view.  We were not there to do the

18   Ministry of Justice's bidding.

19   BY MR. MURPHY:

20   Q.   Did you come to learn this the Ukraine Ministry of Justice,

21   or its Prosecutor General's Office, had certain views?

22             MS. GASTON:  Objection.

23             THE COURT:  Sustained.  As we discussed.

24   BY MR. MURPHY:

25   Q.   I may ask you these things at another time.

1           Let's take a look at Defendant's Exhibit 24.

2    A.   24, yes.

3    Q.   All right.  This is in evidence and I just want to direct

4    your attention to an email that Mr. Craig sent to you and to

5    Mr. van der Zwaan on April the 11th, 2012.  Do you see that?

6    A.   Yes.

7    Q.   And he says, "Alex I'm in the process of getting final

8    clearance from the powers that be in New York City."  Was that

9    a reference to the senior management of the law firm?

10   A.   That's my understanding, yes.

11   Q.   They insist, and I agree, that we should include a

12   provision in the retainer agreement that, "The law firm is not

13   being retained to engage, and will not engage, in political

14   activities as defined by the Foreign Agents Registration Act."

15   Do you see that?

16   A.   Yes.

17   Q.   Do you recall that that was incorporated into an engagement

18   letter?

19   A.   Yes.

20   Q.   I think you were asked about this exhibit on direct,

21   Exhibit 61, Government Exhibit 61.  This is an email exchange

22   on April the 12th, 2012 between several people, including

23   yourself and Mr. Craig, right?

24   A.   Yes.

25   Q.   Okay.  There's a Mr. Zornow, I think you've described him

1    as the head of litigation for Skadden's entire firm?

2    A.  Yes.

3    Q.  There's also a Mr. Oosterhuis.  I might have pronounced

4    that wrong.

5    A.  Oosterhuis, I think, yes.

6    Q.  Oosterhuis.

7    A.  Yes.

8    Q.  Who was he?

9    A.  Well, he was a senior partner in the tax practice.  But

10   relevant for this purpose, I believe he had a position on the

11   client engagement committee, which reviewed and advised on

12   taking on new clients.

13   Q.  Okay.  So Mr. Oosterhuis reveals that he had spoken to Eric

14   and he is fine with proceeding as we discussed?

15   A.  Yes.

16   Q.  And Eric, is that Eric Friedman?

17   A.  That's my understanding.

18   Q.  And he's the executive partner of the firm?

19   A.  Yes.

20   Q.  Some firms call that the managing partner?

21   A.  Yes.

22   Q.  Sort of the top guy?

23   A.  Exactly.

24   Q.  Mr. Craig wrote to you, on April 13th, as part of this,

25   "Another good visit comes to an end.  Very successful.  We

1    really need advice very soon on FARA.  Specifically, they have

2    asked for PR advice.  Can we designate one person on the team?"

3              And you do remember that this issue came up around

4    that time?

5    A.  Yes.

6    Q.  And then if we look at Government's Exhibit 64, this is --

7    that was a Friday the 13th email, April -- on Exhibit 61.  Now,

8    Monday the 16th, Mr. Craig asks you, "Do you think we can get

9    an answer soon on the FARA question?  Which is, if we give PR

10   advice to the Ukraine, can a Skadden lawyer from the London

11   office give the advice, thus avoiding the obligation to

12   register."  Do you see that question?

13   A.  Yes.

14   Q.  Now, you didn't know exactly who Mr. Craig had in mind, but

15   did you later come to learn that it was Mr. van der Zwaan?

16   A.  Yes.

17   Q.  And you didn't know the answer to that question off the top

18   of your head, whether a London-based lawyer with your firm

19   could be involved in giving PR advice, and whether that would

20   not require the firm to register under FARA?

21   A.  Correct.

22   Q.  And so, you asked whether Mr. Craig wanted you to ask

23   Ken Gross, right?

24   A.  Yes.

25   Q.  And it was your understanding, based on some conversation

1   that you had with someone that you can't remember today, that

2   someone told you that Ken Gross probably has the FARA

3   expertise?

4   A.  That's correct.

5   Q.  And Mr. Craig said, "I don't really care who you ask, but

6   we need an answer from someone that we can rely on with a

7   straight face," and he then clarifies, he's talking about

8   whether a Dutch citizen who lives and works in London could

9   give the advice, right?

10  A.  Yes.

11  Q.  And you have come to learn later that Mr. van der Zwaan was

12  a Dutch citizen?

13  A.  Much later, yes.

14  Q.  Now, if we look at Exhibit 71.  And this is -- was shown to

15  you earlier today, Government Exhibit 71.  In the middle of the

16  page Mr. Kedem reports that -- in the email he sent to you and

17  to Greg Craig on April the 17th, that he had spoken with Ken,

18  who does seem to have a lot of FARA expertise, right?

19  A.  Yes.

20  Q.  And he describes what Mr. Gross told him?

21  A.  Correct.

22  Q.  And what he suggests, basically, is that not only can your

23  London lawyers not do PR, but it would also be unwise for your

24  firm to subcontract with a PR firm and direct that firm,

25  because if you did that, then your firm would have to register

2177

1   under FARA?

2   A.  He said that if we did that, we would be obligated to

3   register under FARA.

4   Q.  And do you remember that there came a time when there was a

5   question about whether FTI could subcontract with Skadden to do

6   the work that FTI was doing in the Ukraine?

7   A.  I don't recall that.

8   Q.  Okay.  But, you knew that that subcontracted type of

9   arrangement would not pass muster under FARA, right?

10  A.  Right.  Well, that's what the email from Allon says.

11  Q.  But Allon's email also says if the Ukrainian government

12  were to hire the PR firm directly, then FARA would not come

13  into play for Skadden, right?

14  A.  Yes.

15  Q.  Now, if we look at the next email in the chain, you sent a

16  follow up message to Mr. Kedem and to Mr. Craig, thanked

17  Mr. Kedem for his work, and then you said, "I don't think our

18  engagement should include PR advice," right?

19  A.  Yes.

20  Q.  But at the end of that you said that one of the reasons is

21  that we're not -- "we're in this representation as lawyers, not

22  as spin doctors," right?

23  A.  Yes.

24  Q.  And you thought that it would be important to the project

25  that the firm would always be able to say that, right?

1    A.  Yes.

2    Q.  You also said, in a parenthetical at the end, "Of course,

3    we can provide information and answer questions for the PR firm

4    at the client's direction," right?

5    A.  Yes.

6    Q.  So, if there's a public relations firm working with the

7    Ukraine Ministry of Justice, and they want to publicize the

8    Report, it made sense that they would be able to ask the

9    Skadden lawyers who wrote the Report, what were its

10   conclusions?  What did it say?  What did you do?  There would

11   be an exchange of information and communication between the PR

12   firm and the law firm, right?

13   A.  Yes.

14   Q.  And you didn't think that that violated FARA?

15   A.  No.

16   Q.  Or would require registration?

17   A.  No.

18   Q.  And have you ever come to think otherwise?

19   A.  No.

20   Q.  And that's what you told Mr. Craig, right, on April the

21   17th?

22   A.  Yes.

23   Q.  And he advised you back, "Good advice"?

24   A.  Yes.

25   Q.  Okay.  And to the best of your knowledge, did Skadden

1      follow that advice?

2              MS. GASTON:  Objection.

3              THE COURT:  Approach the bench.

4              (Bench discussion:)

5              THE COURT:  All right.  What's your objection?

6              MS. GASTON:  He's essentially asking him the ultimate

7      question.

8              MR. MURPHY:  What?

9              MS. GASTON:  An ultimate question.  He's asking

10     whether Skadden was obligated to register.

11             THE COURT:  All right.  Well, you recommended that

12     they do that, and then you say --

13             MR. MURPHY:  To the best of his knowledge, did they

14     follow that advice.

15             MS. GASTON:  What advice?

16             MR. MURPHY:  The advice to not engage the PR firm,

17     but to talk to the PR firm if they needed information.

18             THE COURT:  Well, what was wrong with that?  So is

19     this your only question:  To the best of your knowledge, did

20     they not hire a PR firm?  Your question was much, much broader

21     than that.  So if you want to ask that, you're welcome to do

22     that.

23             MR. MURPHY:  Okay.  Okay.  All right.  Thanks.

24             (Open court:)

25     BY MR. MURPHY:

```
 1   Q.  To the best of your knowledge, Mr. Sloan, Skadden did not
 2   engage FTI or any other public relations firm, did it?
 3   A.  No.
 4   Q.  To the best of your knowledge did Skadden, from time to
 5   time, have discussions with the PR firm FTI?
 6   A.  Yes.
 7   Q.  And did you think that that was consistent with what you
 8   and Mr. Craig had discussed back in April?
 9           MS. GASTON:  Objection.
10           THE COURT:  You can ask that question.
11   A.  Yes.
12   BY MR. MURPHY:
13   Q.  Now let's take a look at Exhibit 67, Government's 67.
14           THE COURT:  All right.  Just to clarify, you don't
15   know every single thing that every single person from Skadden
16   said to FTI?
17           THE WITNESS:  That's correct.
18           THE COURT:  But, you are saying that answering
19   questions from FTI about the content of the Report would have
20   been consistent with your advice.
21           THE WITNESS:  Yes.
22           THE COURT:  Ask your next question.
23   BY MR. MURPHY:
24   Q.  And providing information to FTI about the content of the
25   Report would be consistent with your advice, too, right?
```

1   A.  Yes.

2   Q.  Exhibit 67 is a copy of an email exchange that you had with

3   Mr. Kedem on April the 17th, 2012, right?

4   A.  Yes.

5   Q.  And in it you attached, for his benefit, the research that

6   Mr. Haskell had done back in February, right?

7   A.  Yes.

8   Q.  And on this version of it, I think the regulations issued

9   under FARA by the Department of Justice is attached.  If you

10  look at page 67-16.

11  A.  Yes.

12  Q.  Okay.  And that runs for about 10 or 11 pages?

13  A.  Okay.

14  Q.  Now, I'm going to show you Government's Exhibit 164 --

15  A.  Okay.

16  Q.  -- which is an email exchange between Mr. Kerlin and you,

17  copying Margaret Krawiec.  I'll get it right one of these

18  times.  How does she pronounce her name?

19  A.  I think it's Krawiec.

20  Q.  Government's Exhibit 164.

21  A.  Yeah.  I mean, I'll look at it on the screen.  Okay.

22  Q.  Do you remember that you requested Mr. Kerlin to do some

23  additional FARA research at some point?

24  A.  No, I don't recall that.

25  Q.  Seeing this document, does it appear that Mr. Kerlin is

1    providing you some additional research on FARA?

2    A.  Yes.

3    Q.  This was in June of 2012?

4    A.  Yes.

5    Q.  Okay.  And you don't have any recollection of what it was

6    that prompted you to ask for it?

7    A.  No, I do not.

8    Q.  Okay.  But he did look into FARA registration requirements

9    after a meeting that you and he and others apparently had

10   during the latter part of June?

11   A.  Correct.

12   Q.  And he gave you a summary of his updated -- of the updated

13   research?

14   A.  Yes.

15   Q.  And he attached, in addition to the regulations and the

16   statute itself, some legal decisions, right?  Some court

17   decisions?

18   A.  Yes.

19   Q.  If you look at pages 164028 to 164030, he attached an

20   opinion of a Federal Court of Appeals in New York in the Second

21   Circuit, right?

22   A.  Yeah, I don't think I have that exhibit in front of me.  I

23   can look at it on the screen, but --

24              MR. MURPHY:  John, can you just jump to page --

25              MR. INT-HOUT:  Government 164?

```
 1                 MR. MURPHY:  Government Exhibit 164, page 28.
 2                 MS. GASTON:  Your Honor, may we approach?
 3                 THE COURT:  It should be on your screen, because it's
 4       on our screen.
 5                 MS. GASTON:  May we approach?
 6                 THE COURT:  All right.
 7                 (Bench discussion:)
 8                 MS. GASTON:  Can I ask if we're going to go through
 9       the legal decision?
10                 MR. MURPHY:  We're not.  That's it.
11                 THE COURT:  All right.
12                 (Open court:)
13       BY MR. MURPHY:
14       Q.  Just looking at that page, Mr. Sloan, is that a decision of
15       the Federal Court of Appeals for the Second Circuit?
16       A.  Yes.
17       Q.  All right.  Let's look at Government Exhibit 173 next,
18       which you were shown this morning.
19                 This was the email that Mr. Kerlin, the same fellow
20       who had done the research, sent to Mr. Craig and you, Mr. --
21       Ms. Krawiec, Mr. Kedem, Kara Roseen and Alex Haskell?
22       A.  Yes.
23       Q.  All these people worked on the Tymoshenko Report?
24       A.  Yes.
25       Q.  Along with several other lawyers from Skadden, probably a
```

1    dozen or more, approximately?

2    A.  I'm not sure if it was a dozen, but certainly several,

3    several lawyers, and some in addition to these who worked on

4    it, I think.

5    Q.  In addition to these, Mr. Cowie, Mr. Loucks, and

6    Mr. van der Zwaan from London were involved, right?

7    A.  Yes, although I don't remember Mr. Loucks and Mr. Cowie

8    being involved in drafting the Report, as I mentioned earlier;

9    maybe factual, fact gathering.

10   Q.  Mr. Cowie and Mr. Loucks were more involved in the

11   so-called Project 2 involving the second trial, right?

12   A.  More involved than what?  More involved than --

13   Q.  They were more involved in the Project 2 second trial and

14   the rule of law advice that Skadden was giving in connection

15   with that future trial than they were in the Project 1, the

16   preparation and report?

17   A.  They were definitely very involved in Project 2, as I

18   mentioned in the direct.  I'm not sure of their allocation of

19   time and how much was fact finding on Project 1.

20   Q.  In addition to those folks, there were also a number of

21   paralegals and summer associates who were involved in the

22   project?

23   A.  Yes.

24   Q.  So it was a big research project?

25   A.  Yes.

1    Q.  This email from Mr. Kerlin to the group on July the 12th

2    attached an article about lobbying on behalf of the Ukraine,

3    right?

4    A.  Yes.

5    Q.  And it identifies -- actually, what was attached was an

6    article from *The Daily Beast*?

7    A.  Yes.

8    Q.  Do you know what that is?

9    A.  It's a -- it's an online publication.

10   Q.  Okay.  And *The Daily Beast* was reporting that Vin Weber,

11   who was then a top advisor to the presidential candidate Mitt

12   Romney was also registered as a lobbyist for the Ukraine,

13   right?  That's what the headline says.  Or, Ukraine Group?

14   A.  Yes, that's what it says.

15   Q.  You don't have much recollection of this?

16   A.  I don't have any recollection of this.

17   Q.  Okay.  Do you remember that there was a time when Mr. Weber

18   sort of stepped down from his role with the Romney campaign

19   because of this issue involving whether he was working for the

20   Ukraine?

21   A.  I don't recall that.

22   Q.  Okay.  The article does reflect, in the first paragraph

23   below the photo, that "Mr. Weber, a former Minnesota

24   congressman and special advisor to Romney, is a registered

25   lobbyist for a Brussels-based group known as the European

1    Centre for a Modern Ukraine," right?

2    A.  That's what it says.

3    Q.  I want to ask you some questions about the Skadden Stink

4    article that there was some reference to.

5            Let's look at Government's Exhibit 210.

6            And if you turn to the -- well, the bottom of the

7    page, is a copy of the editorial that was posted on the *Kyiv*

8    *Post* website.  Do you see that?

9    A.  Yes.

10   Q.  Do you remember references to the *Kyiv Post* as being an

11   English language paper in the Ukraine?

12   A.  I remember at some point becoming aware that that's what it

13   was, yeah.

14   Q.  And this editorial was forwarded to lots of folks on the

15   team that were working on the Report by Ms. Weiss, right?

16   A.  Yes.

17   Q.  Okay.  And she's in the communications group of Skadden?

18   A.  Yes.

19   Q.  And she asks the question, "Is there anything more that we

20   can or should be saying beyond our approved statement and

21   confirming involvement at this point," right?

22   A.  Yes.

23   Q.  And she says, "If there's something more we want to say,

24   let me know"?

25   A.  That's right.

1    Q.  Okay.  Now, the editorial says, among other things -- if

2    you turn to the paragraph that begins, "The group stayed"?

3    A.  Yes.

4    Q.  So, the group had stayed in the Ukraine and visited

5    Ms. Tymoshenko in Kharkiv during a trip in June, right?

6    A.  Yes.

7    Q.  In fact, you were on that trip, right?

8    A.  Yes.

9    Q.  And that trip alone would have cost many times more than

10   the ridiculous $12,000 that the government claims it is paying,

11   right?

12   A.  Yes.

13   Q.  Okay.  And you recognized and others at Skadden recognized

14   that you weren't doing this work for $12,000, right?

15   A.  Yes.

16   Q.  In fact, you had an understanding that Mr. Pinchuk was

17   funding the project to the tune of about $4 million?

18   A.  Yes.

19   Q.  You knew that from the early days of when Mr. Craig had

20   gone over and met with Mr. Pinchuk?

21   A.  Yes.

22   Q.  In fact, there was an email --

23   A.  Although I don't know if I knew the amount from the early

24   days.  But, yes, that that was going to be Mr. Pinchuk's rule.

25   Q.  You eventually knew that the amount of the retainer that

1    was paid was 4 million, or a little more?

2    A.  Yes.

3    Q.  And, in fact, the government showed you an email in which

4    you said, "Please, Greg, don't be shy.  Ask for a big number"?

5    A.  Yes, because there was going to be a lot of expenses, a lot

6    of travel.  It was a very extensive commitment, and it was,

7    sort of, making sure that the law firm was going to be

8    compensated for its services and expenses.

9    Q.  Okay.  Did you later become aware that the $4 million

10   retainer was not sufficient to complete the job?

11             MS. GASTON:  Objection.

12             THE COURT:  All right.  You can answer it.  Do you

13   have any personal knowledge of that?

14             THE WITNESS:  I have a recollection of a concern

15   about a shortfall, or possible shortfall in the funds.

16   BY MR. MURPHY:

17   Q.  Okay.  Let me show you Government Exhibit 186.

18             And this is an email exchange between you and

19   Mr. Craig on July the 27th, 2012, isn't it?

20   A.  Yes.

21             THE COURT:  All right.  I'm sorry.  Go ahead, ask

22   your question.

23             MS. GASTON:  Out of the scope, Your Honor.

24             THE COURT:  Why don't you approach the bench.

25             (Bench discussion:)

```
 1              THE COURT:  Okay.  This is another example where you
 2    asked one question on cross and I let you ask that.  It is part
 3    of your case that there was nothing nefarious about the
 4    invoices that Mr. Craig sent at a time when there was no
 5    outstanding balance because ultimately there was an outstanding
 6    balance.  Or, maybe your contention that even at that time
 7    there was an outstanding balance.  But, that's part of your
 8    case.  They did not put on any evidence about that.
 9              And this time when I say -- when I go in there, it's
10    beyond the scope of the direct, you're not going back to the
11    lectern and asking your next question.  Because that's what
12    happened last week and it was distressing to me.  It already
13    happened this morning, it's not going to happen again.
14              MR. MURPHY:  Your Honor, he did have personal
15    knowledge.
16              THE COURT:  Maybe he did have personal knowledge; he
17    wasn't asked about it.
18              MR. MURPHY:  Okay.
19              (Open court:)
20    BY MR. MURPHY:
21    Q.  Returning to the editorial in the *Kyiv Post*.
22              THE COURT:  Okay.
23              MR. MURPHY:  I'm sorry?
24              THE COURT:  It's okay.  What's your next exhibit?
25    That's fine.
```

1    BY MR. MURPHY:

2    Q.  Returning to the editorial, Skadden Stink, Exhibit 210.

3    A.  Yes.

4    Q.  And if we could pull up the next paragraph.  "These facts

5    fuel speculation"?

6    A.  Yes.

7    Q.  So, the editorial says that, "These facts fuel speculation

8    that Skadden is paid by someone on the side.  No one knows who

9    is paying Skadden and it's a question that the company is

10   ignoring.  So the public" -- and that's the Ukrainian public, I

11   take it -- "may never know of conflicts of interest or worse

12   things that may lurk behind this arrangement," right?

13   A.  Yes.

14   Q.  As you testified, you were concerned about that?

15   A.  Yes.

16   Q.  Because it called into question the validity, independence,

17   and credibility of your report?

18   A.  I was concerned generally about the issue and the question.

19   I don't remember the particulars of this editorial, but I was

20   certainly concerned about the questions being raised.

21   Q.  You knew that Mr. Pinchuk had provided the funding?

22   A.  Yes.

23   Q.  And your thought was why don't we -- if we can, just reveal

24   that Mr. Pinchuk, or a third-party, is providing funding,

25   right?

1   A.  Yes.

2   Q.  And you thought that that would dispel the criticism?

3   A.  Well, I thought --

4   Q.  It potentially would?

5   A.  I thought it would dispel the misunderstanding.  And I

6   thought, just get the facts out there, and it's perfectly -- in

7   my view, perfectly appropriate arrangement, and just get the

8   facts out there.

9   Q.  Would it be fair to say, though, that law firms generally

10  don't reveal the details of their financial arrangements with

11  clients unless the clients say it's okay?

12  A.  Yes.

13  Q.  So unless the Ministry of Justice approved it, you would

14  not be in a position to say, oh, we're getting the money from

15  Victor Pinchuk, a third-party who's an oligarch, or a

16  billionaire in the Ukraine, right?

17  A.  Ministry of Justice.  And also, it may have been a

18  condition of Mr. Pinchuk's funding.  So there may have had to

19  be approval or consent from Mr. Pinchuk, as well.

20  Q.  Okay.  Now, if we turn back to the first page of this email

21  exchange.

22          Mr. Greg -- Mr. Craig, I'm sorry, responded to you on

23  August the 9th and said, "I have already told Manafort that

24  he's got to get Pinchuk out, whether voluntarily or

25  non-voluntarily," right.

1    A.  Yes.

2    Q.  And did you understand that to mean, when he said, "Get

3    Pinchuk out," that Pinchuk's role should be disclosed, out in

4    the public?

5    A.  Yes.

6    Q.  And then let's take a look at Defendant's Exhibit 92.

7    Exhibit 92 reflects further conversations within Skadden about

8    the reaction to this editorial, right?

9    A.  Yes.

10   Q.  And, now, Miss Porter sent an e-mail to the team on

11   August the 9th, right.

12   A.  Yes.

13   Q.  And she copied, in addition to the lawyers, Saira Zaki and

14   Bryonie Byers?

15   A.  Yes.

16   Q.  And were they all people in the communications department

17   at Skadden?

18   A.  Yes.

19   Q.  And Miss Porter said, "I may not be privy to all the

20   pertinent details, but my initial reaction is that while

21   offering some clarification might initially seem like an

22   attractive option, it is likely to serve as a teaser to the

23   press and they would probably begin to relentlessly dig around

24   to find out who that third-party payor is.  And if that

25   information needs to remain truly confidential, I think we

1    should just stick to not commenting and let the media confusion

2    about our fee arrangement stand," right?  That was her view?

3    A.  Yes.

4    Q.  She also said, "Our fees in most of our client engagements

5    are not publicly available, so I see no reason to cave here,

6    just because of a little pressure from the press.  If the

7    client advises otherwise, that's another story.  Welcome

8    others' thoughts," right?

9    A.  Yes.

10   Q.  And then Mr. Craig responded to Miss Porter, and he said "I

11   agree with Melissa, if the government wants the third-party to

12   step forward, that would be up to the government to make it

13   happen," right?

14   A.  Yes.

15   Q.  And then Miss Porter, looks like, forwarded this message

16   to, I think, Ms. Zaki and others.  At the top, Saira Zaki

17   weighs in on the issue.  Was she in the London office of

18   Skadden?

19   A.  That's my understanding.

20   Q.  And she says, "I agree.  We do not offer this kind of

21   commentary up -- we do not offer this kind of commentary up in

22   usual circumstances, on or off the record, negative or

23   positive, even if we felt we had to declare a hand by way of

24   deep background; we certainly haven't reached that point yet,"

25   right?

1    A.  That's what it says.

2    Q.  So the public relations folks were sort of advising; let's

3    stick by our usual practice, which is to not reveal details of

4    our financial arrangements with clients, including third-party

5    arrangements, unless the client says its okay?

6    A.  That's how I read this.

7    Q.  Okay.  And that's kind of where it was left, isn't it, at

8    that time?

9    A.  Well, I'm not sure.  I think there may have been some later

10   communications about it.

11   Q.  Okay.  Do you remember that an effort was made to find out

12   whether Mr. Pinchuk would agree to the revelation of his name?

13   A.  Yes.

14   Q.  And what was the result of that?

15   A.  He refused to allow it.

16   Q.  And that was the end of that?

17   A.  That's my recollection.

18        MR. MURPHY:  Okay.  Your Honor, I have quite a bit

19   more, but I've reached a logical break point.  I don't know

20   what Your Honor's wishes are with respect to lunch?

21        THE COURT:  Well, maybe you could come up and tell me

22   what "quite a bit" means.

23        (Bench discussion:)

24        THE COURT:  Do you have an estimate?  I mean, if

25   we're talking half an hour, I would do it.

1            MR. MURPHY:  I would say half hour, 45 minutes, but,

2      you know, depends.

3            THE COURT:  I would rather just keep going for a

4      while and --

5            MR. MURPHY:  I'm happy.

6            THE COURT:  -- you know, and we can try to pick up

7      the pace a little bit.  Ask your questions, but there's a lot

8      of time between the questions.  So maybe we can try to move

9      through it and we can see what we can get.  If people start

10     rustling around in their seats, then we'll break.

11           MR. MURPHY:  All right.

12           THE COURT:  All right.  Thank you.

13           (Open court:)

14           THE COURT:  We're going to try to go a little bit

15     longer and see how it goes.

16     BY MR. MURPHY:

17     Q.  Mr. Sloan, with respect to the Skadden Stink editorial, the

18     public relations concern that you had was really about the

19     reputation of Skadden; isn't that right?

20     A.  Yes, it was about the reputation of Skadden and, also, I

21     thought we were doing an important project on this independent

22     analysis of the rule of law, and if it was going to be made

23     public and there was a misunderstanding about it, I wanted to

24     dispel the misunderstanding, because I thought it was important

25     for that purpose, as well.

1    Q.  I want to ask you a few questions about FTI.  You mentioned

2    Jonathan Hawker in your direct testimony.  Do you remember

3    whether you ever met Jonathan Hawker?

4    A.  Not that I recall.

5    Q.  Did you ever meet his colleague, Jon Aarons?

6    A.  Not that I recall.

7    Q.  Did you ever meet anybody from FTI that you recall?

8    A.  Not that I recall.

9    Q.  Did you have any direct dealings with them?

10            MS. GASTON:  Objection, Your Honor.  It's outside the

11   scope.

12            THE COURT:  You can answer the question.  Did you

13   have any direct dealings with the FTI people?

14            THE WITNESS:  Not that I recall.  I may have been

15   copied on an email between somebody at Skadden and somebody at

16   FTI, but I don't recall having any direct dealings with them.

17   BY MR. MURPHY:

18   Q.  Okay.  Now let's take a look at Exhibit 182, Government

19   Exhibit 182.

20            At the top, it's --

21            MS. GASTON:  Objection as to the scope.

22            THE COURT:  All right.  Approach.

23            (Bench discussion:)

24            THE COURT:  It's a fair question to ask him if he had

25   any direct dealings with him, and so I let you ask that

1   question.  So, are we going to start going through the

2   substance of the Project Veritas documents with him, since he

3   said he didn't have any direct dealings?

4          MR. MURPHY:  No, and certainly not with this one.

5   I'll withdraw and move on.  The government did introduce one

6   set of documents that he was asked about.

7          THE COURT:  I think she just asked, did he get them?

8   And did Mr. Craig get them from Alex van der Zwaan?  I think

9   she was trying to establish that Mr. van der Zwaan sent them to

10  Craig by showing this document, so -- but she didn't get into

11  the content of any of it, because I don't believe this witness

12  played any role in assessing the content of it, and he just

13  said he didn't.

14         MR. MURPHY:  Well, he wrote an email to Mr. Craig

15  saying, "Let's discuss it."

16         MS. GASTON:  Then he says he has no memory.

17         MR. MURPHY:  He doesn't really remember discussing

18  it, but I would like to show him some of what was on it; not a

19  lot, just some.

20         THE COURT:  So what?  If you would like to say, Do

21  you have any recollection of what you said to Mr. Craig?  And

22  if he says no, and you say is there anything that would refresh

23  your recollection? and he says yes, and you want to show it to

24  him and he reads it and it refreshes his recollection, then I

25  guess he can testify about it.  But it would be --

1          MR. MURPHY:  Your Honor, he received the document --

2     I just want to ask him a couple questions about what the

3     document says; just a couple.

4          THE COURT:  All right.  You brought out the fact that

5     he received them.  He said he doesn't remember anything about

6     them.  And so, are we going through whether these accurately

7     characterize or don't accurately characterize, or he agreed or

8     didn't agree?

9          MR. MURPHY:  I'm not going to --

10         THE COURT:  What are we going to do with them?

11         MR. MURPHY:  I just want to show him that by the time

12    they got them, the anticipated report release date, that these

13    documents contemplate it was August the 9th, and they didn't

14    get them until August the 28th.  That's what I want to

15    establish.

16         THE COURT:  Okay.  She brought out that they were

17    transmitted on August 28th.  So if you would like to bring out

18    the fact that it was after --

19         MR. MURPHY:  They were dated a month earlier, the

20    anticipated release.

21         THE COURT:  You can bring out the dates.

22         MR. MURPHY:  Thank you.

23         (Open court:)

24    BY MR. MURPHY:

25    Q.  Mr. Sloan, I would ask you to take a look at Government

1    Exhibit 221, which you were shown this morning.  This is an

2    email exchange Mr. van der Zwaan sent Lauren Weiss, the New

3    York communications person, a document -- actually, two

4    documents, two memoranda, she sent them to -- I'm sorry,

5    Mr. van der Zwaan sent them to her on August the 28th, right.

6    A.  Yes.

7    Q.  And then she forwarded them to you, right?

8    A.  Yes.

9    Q.  And you forwarded them to Mr. Craig, right?

10   A.  Yes.

11   Q.  And you said, "Let's discuss"?

12   A.  Yes.

13   Q.  And there's a reference to the attachments; a media plan, a

14   master control grid, and an outreach list, and another Skadden

15   media plan.

16         You don't have any recollection of discussing this

17   with Mr. Craig?

18   A.  That's correct.

19   Q.  Okay.  If we look at the attachments, the first page

20   memorandum, the memorandum is a memorandum to SL from PJM,

21   Subject:  Skadden Report, or SA report-media plan, dated

22   August the 1st, 2012.  Do you see that.

23   A.  Yes.

24   Q.  And the other document, if you turn to page 15 of the

25   exhibit --

```
1    A.  Yes.

2    Q.  -- is another version of a similar memorandum to SL from

3    PJM about the Skadden Report media plan, it's dated July the

4    27th, right?

5    A.  That's what it appears to be.

6    Q.  If you turn to page 3 of the exhibit, under Media Strategy

7    and Plan, the first sentence says, "Based on current

8    information, Skadden is expected to report" -- I'm sorry -- "is

9    expected to deliver its report the week of August 9th to the

10   Ministry of Justice."  Do you see that.

11   A.  Yes, I do.

12   Q.  And then it describes the communication strategy outlined

13   below.

14            By the time that Mr. van der Zwaan got this document

15   on August the 28th and forwarded it to Miss Weiss who forwarded

16   it to you and then to Mr. Craig, this document was already

17   describing a proposed release on August the 9th, and no one

18   from Skadden saw the document until three weeks later, right.

19            MS. GASTON:  Objection.

20            THE COURT:  Okay.  Well, let's break that up.  Was

21   August 28th the first time you saw the document referring to a

22   release that might have happened on August 9th?  That was

23   expected to happen.

24            THE WITNESS:  I don't have a recollection of this

25   document.
```

```
1                THE COURT:  Do you know if you got --

2                Can you take this off the screen for a second?

3                Do you know if you got a similar transmittal email

4     from Mr. van der Swaan, or anybody else, giving you plans

5     earlier than that one that you just saw?

6                THE WITNESS:  I don't recall.

7     BY MR. MURPHY:

8     Q.  You know that Skadden has produced all of its records to

9     the government in this case, don't you?

10               MS. GASTON:  Objection.

11               THE COURT:  All right.  He just said he doesn't

12    recall.

13               MR. MURPHY:  Well --

14               THE COURT:  I don't --

15    BY MR. MURPHY:

16    Q.  Let me ask you this, Mr. Sloan:  Has anyone ever shown you

17    a version of the media plan that's dated before this

18    transmission on August the 28th.

19               MS. GASTON:  Objection.

20               THE COURT:  Do you know?  Have you ever seen one

21    before this?  Do you have any reason to believe you got it

22    before this?

23               THE WITNESS:  No.

24               THE COURT:  All right.

25               MR. MURPHY:  Thank you.
```

1    BY MR. MURPHY:

2    Q.  Now, Mr. Sloan, do you recall receiving some version of a

3    media plan at the end of September of 2012?  A FTI media plan

4    or messaging document?

5    A.  I remember an issue generally coming up about FTI --

6                MS. GASTON:  Objection.

7                THE COURT:  All right.  Just, did you get another

8    media plan at the end of September?

9                THE WITNESS:  Well, yes, I remember an incident

10   involving, I guess you could call it a media plan, at the end

11   of September, yes.

12               THE COURT:  All right.

13   BY MR. MURPHY:

14   Q.  And I show you just -- Defendant's Exhibit 152.

15               THE COURT:  Before it goes up on the screen,

16   Ms. Gaston, do you object to that question?  To his asking

17   questions about --

18               MS. GASTON:  May we approach?

19               THE COURT:  Yes.

20               (Bench discussion:)

21               THE COURT:  Can I just see what the exhibit is?

22               MR. MURPHY:  Yes.

23               THE COURT:  Okay.  What's your objection.

24               MS. GASTON:  Can I see?  This is getting into the

25   whole issue of correcting FTI stuff that -- that is outside of

1     the scope of direct.

2              MR. MURPHY:  I just want to ask about his statement

3     at the time.  I don't want to go into the whole -- this was the

4     whole thing with the Hawker revised messaging document that

5     Mr. Craig erupted about.  I'll do that if we call Mr. Sloan.

6     But I just wanted to talk about what his advice was.

7              THE COURT:  Can't just dip into it and dip out of it,

8     if it is part of a larger topic that we're not going into

9     because it wasn't part of the direct.  And so, if you need him

10    to explain what he did, at some point, you'll do that.

11             MR. MURPHY:  You mean, if I call him in our case?

12             THE COURT:  If you decide to.

13             MR. MURPHY:  Okay.

14             THE COURT:  All right.

15             MR. MURPHY:  All right.  That's fine.

16             (Open court:)

17    BY MR. MURPHY:

18    Q.  Let's turn to Government Exhibit 320, which you were shown

19    this morning.

20    A.  I'm sorry.  Yes.

21    Q.  Okay.  Mr. Sloan, you were asked about this this morning.

22    It's an email from Catherine Whitney to Mr. van der Zwaan,

23    Mr. Haskell, Mr. Kedem, and yourself concerning the release of

24    the Report?

25    A.  Yes.

1    Q.  Ms. Whitney was Mr. Craig's secretary?

2    A.  That's correct.

3    Q.  And she says, "Greg is traveling, but wanted me to let you

4    know the Report will be released next Wednesday, December the

5    12th?"

6    A.  Yes.

7    Q.  At the time, did you think that that was the final release

8    date or --

9    A.  As I mentioned before, I don't recall getting this email.

10   Q.  Okay.  Had you heard -- in the months between September and

11   December, had you heard anything about what was happening with

12   your report?

13          MS. GASTON:  Objection.

14          THE COURT:  You can answer that question.

15          THE WITNESS:  I don't recall hearing anything about

16   it and --

17          THE COURT:  All right.  Next question.

18   BY MR. MURPHY:

19   Q.  Did you have any thoughts about what was going to occur

20   with respect to the Report?

21          MS. GASTON:  Objection.

22          THE COURT:  Sustained.

23   BY MR. MURPHY:

24   Q.  Let's look at Exhibit -- Government Exhibit 359, which you

25   were shown this morning.  This is an email exchange between you

1   and Mr. Craig on December the 11th, between, it looks like,

2   5:56 p.m. and 6:11 p.m.  There's a -- the top email is at

3   11:11, but there's a convention with respect to the production

4   of these documents, so that usually we subtract five hours

5   because the original email was produced under UTC, or Greenwich

6   time, right?  You understand what I'm saying?

7   A.  Yes, I do.

8   Q.  So between 5:56 and 6:11 p.m., you and Mr. Craig had a

9   brief exchange of emails, correct?

10  A.  Yes.

11  Q.  It appears that you were aware that Mr. Craig had had some

12  conversation with David Sanger, right?

13  A.  That's what it looks like from the emails.

14  Q.  And one of the things that you -- that Mr. Craig is telling

15  you, is that he -- I assume that's a reference to Sanger --

16  thinks that it will be Susan, and that Denis will be the

17  deputy, right?

18  A.  Yes.

19  Q.  Was that with respect to who the secretary of state might

20  be?

21  A.  As I mentioned, I don't recall the email, but that's how I

22  read it.

23  Q.  Susan was a reference to Susan Rice?

24  A.  Yes.

25  Q.  Who was Denis?

1    A.   Denis McDonough, I believe.

2    Q.   And so at that time was it anticipated that Mrs. Clinton

3    would no longer be the secretary of state?

4    A.   Yes.

5    Q.   So there was speculation about who the new secretary of

6    state would be?

7    A.   That's correct.

8    Q.   And then you asked Mr. Craig, what did he think of the

9    Tymoshenko Report, right?

10   A.   Yes.

11   Q.   So you must have some awareness that Mr. Craig was talking

12   to Mr. Sanger about the Tymoshenko Report.

13   A.   That's what it appears from the email.

14   Q.   Okay.  Let's look at Exhibit 371.

15              THE COURTROOM DEPUTY:  Government?

16              MR. MURPHY:  Yeah, Government Exhibit 371.

17              THE COURTROOM DEPUTY:  Okay.

18              MS. GASTON:  Objection.

19              THE COURT:  All right.  I'm sorry to keep doing this

20   to you, but it's easier for me to hear the reasons when they

21   come up here, than to have them display them out for everyone

22   to see.

23              So please approach the bench so I can understand what

24   this objection is.

25              (Bench discussion:)

```
 1              MS. GASTON:  This is about The Telegraph, which I did

 2    not ask about on direct.

 3              MR. MURPHY:  But it's about the conversations between

 4    Mr. Craig and Mr. Sloan on December the 11th, in which

 5    Mr. Craig is giving comments and quotes to the media.  And

 6    Mr. Sloan is reacting to them and saying what he thinks

 7    Mr. Craig should say about the quotes to the media.

 8              MS. GASTON:  Actually, Mr. Sloan doesn't react to

 9    this at all.

10              THE COURT:  Well, let --

11              MR. MURPHY:  He says, "What do you think?"

12              MS. GASTON:  Mr. Craig asks that and there's no

13    response.

14              THE COURT:  And you want to put this in evidence?

15              MR. MURPHY:  I'm just going to put it in, that he had

16    an awareness that Mr. Craig was also talking to Mr. Parfitt at

17    The Daily Telegraph.

18              THE COURT:  Well, it is beyond the scope.  But you

19    just want to ask him if Mr. Craig forwarded to him what he was

20    saying to Mr. Parfitt?  And do you know right now whether he's

21    going to say he remembers this or he doesn't remember it?

22              MR. MURPHY:  My guess is that Mr. Sloan doesn't

23    remember any email from 2012, but --

24              MS. GASTON:  He's going to say he doesn't remember.

25              MR. MURPHY:  But it happened.  He will say that it
```

1    happened.

2              THE COURT:  He will say that he got the email?

3              MR. MURPHY:  Yeah.

4              THE COURT:  So it's just one question?  It's not

5    going to be his opinions about --

6              MR. MURPHY:  No, no, no.

7              THE COURT:  All right.  I'm going to let him do it.

8              MR. MURPHY:  Thank you, Your Honor.

9              (Open court:)

10   BY MR. MURPHY:

11   Q.  Mr. Sloan, turning to Government Exhibit 371.  This is an

12   email exchange between, at the bottom, a gentleman named Tom

13   Parfitt, from *The Daily Telegraph*, and Mr. Craig.  Do you see

14   that?

15   A.  Yes.

16   Q.  And this is dated December the 12th, 2012?

17   A.  Yes.

18   Q.  And Mr. Parfitt has sent to Mr. Craig a series of

19   on-the-record quotes and an anonymous source quote.  Do you see

20   that?

21   A.  Yes.

22   Q.  And then Mr. Craig forwarded -- if we go to the top email,

23   he forwarded that email exchange to you, right?

24   A.  Yes.

25   Q.  And Mr. Craig has said to you, "What do you think about *The*

1    *Daily Telegraph* quotes," right?

2    A.  Yes.

3    Q.  Do you remember anything about the discussion that you had

4    with Mr. Craig about that?

5    A.  No.

6    Q.  And then if we look at Exhibit 378, which the government

7    showed you this morning, I think, this is Mr. Craig sending

8    Mr. Sanger, at the bottom, a quote about the Ukraine project,

9    also on December the 12th, right?

10   A.  Yes.

11   Q.  And he forwards, then, to you a question, "On the question

12   of selective prosecution versus politically motivated

13   prosecution, Sanger wants a quote.  What do you think," right?

14   A.  Yes.

15   Q.  And you said, "I would stay away from that one.  It's in

16   the Report, he can quote from there," right?

17   A.  Yes.

18   Q.  Do you remember anything about that conversation with

19   Mr. Craig?

20   A.  No, I do not.

21   Q.  You don't have any reason to doubt that those emails, you

22   received them and you sent them, right?

23   A.  No reason to doubt that at all.

24   Q.  Okay.  Then if we look at Exhibit 381.  After the email

25   exchange Mr. Craig sent you about his conversation with Parfitt

1    and about the request for a quote by Mr. Sanger, you forwarded

2    to Lauren Weiss, in New York, an email, at the bottom of that

3    page, saying, "Hi, Lauren, you may already know this, but I

4    think there will be press on the Ukraine report tomorrow or

5    tonight, *New The York Times* and other places," right?

6    A.  Yes.

7    Q.  And the reason that you thought that, is that you had been

8    having email exchanges with Mr. Craig about his comments and

9    quotations given to Mr. Sanger and given to Mr. Parfitt, isn't

10   that true?

11   A.  Well, I don't remember the communication, but those emails

12   that we've looked at are certainly in the background to this.

13   Q.  So it makes sense that that's why you might have alerted

14   Ms. Weiss to the fact that there could be press coverage?

15   A.  Yes.

16   Q.  Okay.  And then she asked you whether there was any

17   indication if we're going to put out a statement of some sort

18   from Skadden, right?

19   A.  Yes.

20   Q.  And you told her to check with Greg about a contact.  And

21   you said, "No statement that I'm aware of," right?

22   A.  Yes.

23   Q.  And then let's look at Exhibit -- Government Exhibit 398.

24   If we go to the second page, at the bottom.  If you could blow

25   that up.

1            On Friday, December the 14th, you wrote to Mr. Craig

2       and Mr. Haskell, the subject being a headline, "Former

3       Ukrainian Leader's Trial was Fair, but Flawed, Skadden says,"

4       right?

5       A.   Yes.

6       Q.   And was this a reference to *The National Law Journal*

7       article you were asked about on direct?

8       A.   That's my understanding, yes.

9       Q.   Okay.  And you wrote, "Beginning with the headline, this

10      article misunderstands our conclusions.  I wonder if we should

11      reach out to educate him," right?

12      A.   Yes.

13      Q.   Okay.  So you had read *The National Law Journal* article and

14      you were concerned about it, right?

15      A.   Yes.

16      Q.   And then Mr. Haskell weighed in in the next email, saying,

17      "I agree that the article misunderstands our conclusions.  This

18      line is particularly troubling, 'However, the trial was not

19      politically motivated and the problems weren't enough to

20      undermine her conviction, the team said,'" right?

21      A.   Yes.

22      Q.   And you knew that that is not what the Skadden Report and

23      the authors of that report had said about the Tymoshenko trial,

24      right?

25      A.   That's correct.

1    Q.  And then Mr. Craig responded to you on the 14th, and he

2    said, "We have to do something about this story.  Letter to the

3    editor?  A phone call to the publisher?"  Right?

4    A.  Yes.

5    Q.  And eventually you and Mr. Craig spoke to Mr. Huisman of

6    *The National Law Journal* and demanded a correction, didn't you?

7    A.  Well, we -- we -- let me back up for a second.  I'm not

8    sure if I was on the conversation with him.  I just don't

9    recall one way or another.  But, we -- but I do remember that

10   we, collectively, pointed out to him that the statements and

11   the conclusions in the article, including the headline, which

12   says that it was fair --

13            THE COURT:  Wait.  Were you on the phone call or you

14   weren't on the phone call?

15            THE WITNESS:  I don't recall if I was on the phone

16   call, but I do remember that there was an exchange between

17   Skadden and *The National Law Journal*, and I remember the

18   substance of that exchange.

19            THE COURT:  Okay.  I think to testify about the

20   substance of the exchange, you have to know the substance of

21   the exchange.  So ask your next -- I think other people have

22   testified about the substance of the exchange.

23   BY MR. MURPHY:

24   Q.  Did *The National Law Journal* correct the article?

25   A.  Yes.

1    Q.  Did they correct the headline?

2    A.  Yes.

3    Q.  Did they change the headline, "Was flawed, but fair" to

4    "Flawed"?

5    A.  Yes.  I think initially it was "Fair, but flawed" and they

6    changed it to it was "Flawed."

7    Q.  And if we look at Government Exhibit 401, at the bottom, is

8    that an email from Mr. Craig to Mr. Huisman?

9    A.  Yes.

10   Q.  And he --

11              MS. GASTON:  Can you take it down?  Take it down.

12              THE COURT:  Do you have an objection?

13              (Off-the-record discussion between counsel.)

14              MS. GASTON:  Can we just approach to explain?

15              THE COURT:  Well, if you've worked it out --

16              MS. GASTON:  Okay.  Okay.

17              THE COURT:  All right.

18              MS. GASTON:  She'll put it up for you.

19              MR. MURPHY:  There was a redacted name, Your Honor,

20   that --

21              THE COURT:  All right.  So, now we have the redacted

22   version on the screen.

23              All right.  Go ahead.

24   BY MR. MURPHY:

25   Q.  So, is this email at the bottom of Exhibit 401 Mr. Craig's

1   email to Mr. Huisman, giving him some quotes with respect to

2   the article?

3   A.  Yes.

4   Q.  And then Mr. Craig wrote to you later that day and said,

5   "Better write, but not perfect"?

6   A.  Yes.

7   Q.  And you responded, "I think it's fine.  Now it reads like

8   it's a very balanced report, which it is"?

9   A.  Yes.

10  Q.  Okay.  I want to ask you a little bit about the FARA

11  inquiry with respect to Skadden's work on the Tymoshenko

12  Report.  And if we look first at Defendant's Exhibit 285.

13  A.  Yes.

14  Q.  Defendant's 285 is an email message at the bottom from

15  Larry Spiegel --

16          THE COURT:  Mr. Murphy, I don't want to interrupt

17  you, but this seems like a new subject matter.

18          MR. MURPHY:  It is, Your Honor.

19          THE COURT:  If you want to go into it at some length,

20  it probably is a good time to take a lunch break now.  I

21  thought, at 12:30, we should keep going, but I think at this

22  point it's probably a good time to take a break.

23          MR. MURPHY:  I think it is.

24          THE COURT:  All right.  Let's do that.

25          We're going to take our lunch break and we're going

1          to try to resume at 2.

2                    Please don't discuss the case among yourselves or

3          with anyone else.  Please don't do any research about the

4          matter.  Please be back so we can begin at 2 p.m.

5                    Thank you.

6                    (Whereupon the jurors leave the courtroom.)

7                    THE COURT:  All right.  Everybody is excused and

8          we'll be back at 2.

9                    (Noon recess.)

10                                    *   *   *

1

2                   CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5           I, JANICE DICKMAN, do hereby certify that the above

6     and foregoing constitutes a true and accurate transcript of my

7     stenograph notes and is a full, true and complete transcript of

8     the proceedings to the best of my ability.

9                         Dated this 23rd day of August, 2019.

10

11

12                         /s/_____

13                         Janice E. Dickman, CRR, RMR, CRC
                           Official Court Reporter
14                         Room 6523
                           333 Constitution Avenue NW
15                         Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25

## $

**$12,000** [2] - 2187:10, 2187:14

---

## '

**'existing** [1] - 2129:10
**'However** [1] - 2211:18
**'In** [1] - 2129:15
**'to'** [1] - 2148:14

---

## /

**/s** [1] - 2216:12

---

## 1

**1** [9] - 2136:13, 2140:14, 2140:17, 2146:19, 2147:20, 2147:24, 2148:14, 2184:15, 2184:19
**10** [3] - 2086:5, 2086:8, 2181:12
**100** [1] - 2086:22
**1000** [1] - 2087:3
**10:00** [1] - 2086:7
**10th** [3] - 2094:1, 2112:9, 2167:18
**11** [2] - 2114:5, 2181:12
**11:11** [1] - 2205:3
**11th** [6] - 2118:21, 2119:13, 2146:21, 2173:5, 2205:1, 2207:4
**12** [2] - 2108:4, 2140:21
**12:29** [1] - 2099:13
**12:30** [1] - 2214:21
**12th** [12] - 2117:25, 2120:18, 2121:23, 2122:9, 2146:21, 2147:20, 2148:1, 2148:3, 2173:22, 2185:1, 2204:5, 2208:16, 2209:9
**13** [1] - 2140:21
**13th** [12] - 2093:17, 2095:25, 2096:11, 2101:4, 2101:23, 2147:21, 2148:1, 2148:3, 2167:13, 2169:4, 2174:24, 2175:7
**14th** [2] - 2211:1, 2212:1
**15** [2] - 2114:9, 2199:24
**152** [1] - 2202:14
**15th** [1] - 2142:17
**164** [4] - 2181:14, 2181:20, 2182:25, 2183:1
**164028** [1] - 2182:19
**164030** [1] - 2182:19
**16th** [3] - 2102:3, 2103:21, 2175:8
**173** [3] - 2107:21, 2108:13, 2183:17
**17th** [3] - 2176:17, 2178:21, 2181:3
**1800** [1] - 2087:2

**182** [2] - 2196:18, 2196:19
**186** [1] - 2188:17
**19-125** [2] - 2088:2, 2154:14
**19-CR-125** [1] - 2086:3
**1979** [1] - 2162:22
**1984** [1] - 2162:23
**1st** [6] - 2090:2, 2114:14, 2140:5, 2140:6, 2199:22

---

## 2

**2** [11] - 2113:23, 2134:19, 2135:20, 2148:2, 2148:20, 2184:11, 2184:13, 2184:17, 2215:1, 2215:4, 2215:8
**20** [1] - 2156:1
**20001** [2] - 2087:9, 2216:15
**20036** [1] - 2087:3
**2008** [3] - 2090:4, 2166:23, 2166:24
**2010** [1] - 2167:1
**2012** [45] - 2090:8, 2090:15, 2092:25, 2093:17, 2094:1, 2096:24, 2097:11, 2100:23, 2101:4, 2101:23, 2102:4, 2103:21, 2108:4, 2108:21, 2113:1, 2113:8, 2114:12, 2114:14, 2114:17, 2115:1, 2115:13, 2115:18, 2117:11, 2117:24, 2118:21, 2119:13, 2120:18, 2122:9, 2124:8, 2129:7, 2140:21, 2147:21, 2148:1, 2167:13, 2169:4, 2171:4, 2173:5, 2173:22, 2181:3, 2182:3, 2188:19, 2199:22, 2202:3, 2207:23, 2208:16
**2013** [3] - 2090:5, 2127:2, 2131:16, 2140:6, 2142:17, 2147:5, 2171:4, 2171:7
**2014** [1] - 2090:6
**2015** [1] - 2150:20
**2019** [2] - 2086:6, 2216:9
**202** [3] - 2086:15, 2086:19, 2087:4
**202-354-3267** [1] - 2087:9
**20530** [2] - 2086:15, 2086:18
**20th** [1] - 2142:24
**210** [2] - 2108:23, 2186:5, 2190:2
**211** [1] - 2112:7
**21202** [1] - 2086:23
**221** [2] - 2112:22, 2199:1
**22nd** [1] - 2124:7
**23** [1] - 2086:6
**233-0986** [1] - 2086:19
**23rd** [1] - 2216:9
**24** [2] - 2173:1, 2173:2
**2440** [1] - 2086:23
**24th** [2] - 2115:13, 2115:18

**252-7698** [1] - 2086:15
**266** [1] - 2115:7
**27th** [4] - 2114:10, 2114:12, 2188:19, 2200:4
**28** [1] - 2183:1
**285** [2] - 2214:12, 2214:14
**28th** [10] - 2113:1, 2113:8, 2114:17, 2147:5, 2198:14, 2198:17, 2199:5, 2200:15, 2200:21, 2201:18
**29th** [2] - 2131:16, 2149:13

---

## 3

**3** [8] - 2127:8, 2127:13, 2132:2, 2132:12, 2132:17, 2134:17, 2146:18, 2200:6
**30** [4] - 2093:9, 2093:11, 2093:12, 2167:12
**32** [2] - 2096:8, 2169:2
**32-3** [1] - 2170:12
**320** [2] - 2117:20, 2203:18
**333** [2] - 2087:8, 2216:14
**359** [2] - 2118:18, 2204:24
**371** [3] - 2206:14, 2206:16, 2208:11
**378** [2] - 2120:8, 2209:6
**381** [3] - 2122:5, 2123:1, 2209:24
**398** [1] - 2210:23

---

## 4

**4** [8] - 2127:8, 2127:13, 2138:18, 2138:20, 2148:14, 2187:17, 2188:1, 2188:9
**40** [1] - 2163:2
**401** [2] - 2213:7, 2213:25
**410** [2] - 2086:24, 2124:3
**420** [1] - 2126:16
**422** [1] - 2128:17
**423** [1] - 2140:13
**425** [1] - 2130:14
**427** [2] - 2131:14, 2134:18
**428** [1] - 2140:1
**429** [2] - 2142:5, 2142:10
**431** [2] - 2142:5, 2142:16
**433** [2] - 2142:20, 2142:23
**434** [2] - 2142:21, 2143:3
**435** [2] - 2143:7, 2143:9
**436** [3] - 2143:7, 2143:15, 2143:17
**437** [1] - 2143:21
**438** [1] - 2143:21
**439** [4] - 2144:1, 2144:3, 2146:13, 2146:14
**440** [3] - 2144:1, 2144:3, 2147:1
**442** [1] - 2147:1
**443** [1] - 2148:6
**446** [1] - 2149:12

**447** [1] - 2150:3
**45** [1] - 2195:1
**472** [1] - 2151:1
**4s** [1] - 2132:23
**4th** [1] - 2128:23

### 5

**5** [3] - 2138:18, 2138:20,
2138:25
**50** [1] - 2097:6
**517** [4] - 2132:7, 2134:17,
2134:21, 2135:19
**555** [1] - 2086:14
**5:56** [2] - 2205:2, 2205:8
**5th** [3] - 2097:11, 2099:13,
2151:15

### 6

**6** [8] - 2114:2, 2127:2, 2133:25,
2134:7, 2139:8, 2141:2, 2141:6,
2141:12
**61** [4] - 2100:25, 2173:21,
2175:7
**64** [2] - 2101:24, 2175:6
**6523** [2] - 2087:8, 2216:14
**67** [3] - 2180:13, 2181:2
**67-16** [1] - 2181:10
**6:11** [2] - 2205:2, 2205:8
**6th** [2] - 2117:24, 2128:15

### 7

**71** [3] - 2103:15, 2176:14,
2176:15
**778-1814** [1] - 2087:4
**7:13** [1] - 2095:24
**7th** [3] - 2126:20, 2128:13,
2128:16

### 9

**92** [2] - 2192:6, 2192:7
**949-1146** [1] - 2086:24
**950** [1] - 2086:18
**9th** [7] - 2108:25, 2191:23,
2192:11, 2198:13, 2200:9,
2200:17, 2200:22

### A

**a.m** [2] - 2086:7, 2095:24
**Aabelson@zuckerman.com** [1]
- 2086:25
**Aarons** [1] - 2196:5
**Abelson** [2] - 2086:21, 2088:14
**ability** [1] - 2216:8
**able** [16] - 2088:23, 2094:22,
2101:9, 2104:13, 2104:19,

2107:6, 2133:4, 2133:7,
2137:20, 2156:19, 2156:20,
2156:25, 2157:10, 2160:22,
2177:25, 2178:8
**absolutely** [1] - 2172:2
**according** [1] - 2094:11
**accounted** [1] - 2088:23
**accurate** [2] - 2140:22, 2216:6
**accurately** [2] - 2198:6, 2198:7
**accused** [1] - 2160:5
**achieved** [1] - 2171:25
**acquired** [1] - 2166:7
**Act** [2] - 2125:22, 2173:14
**Action** [1] - 2086:3
**activities** [1] - 2173:14
**Adam** [2] - 2086:17, 2086:21
**add** [2] - 2136:15, 2138:25
**added** [1] - 2142:18
**adding** [1] - 2155:22
**addition** [8] - 2097:21, 2129:15,
2170:9, 2182:15, 2184:3,
2184:5, 2184:20, 2192:13
**additional** [9] - 2129:7,
2129:12, 2129:14, 2129:17,
2150:24, 2152:6, 2152:19,
2181:23, 2182:1
**address** [3] - 2110:14, 2113:9,
2113:10
**administration** [2] - 2165:13,
2165:14
**administrative** [1] - 2124:20
**admissibility** [2] - 2159:19
**admitted** [24] - 2093:8, 2096:7,
2097:6, 2101:1, 2103:16,
2107:22, 2108:23, 2112:8,
2112:22, 2115:7, 2117:21,
2118:20, 2120:9, 2122:6,
2124:4, 2126:17, 2128:18,
2130:14, 2132:3, 2134:18,
2140:2, 2144:8, 2144:11, 2148:6
**adopted** [1] - 2156:22
**advance** [3] - 2094:21, 2118:12,
2118:15
**advice** [27] - 2098:24, 2101:6,
2101:7, 2102:8, 2102:9,
2103:11, 2105:21, 2106:6,
2106:21, 2106:24, 2107:13,
2175:1, 2175:2, 2175:10,
2175:11, 2175:19, 2176:9,
2177:18, 2178:23, 2179:1,
2179:14, 2179:15, 2179:16,
2180:20, 2180:25, 2184:14,
2203:6
**advise** [1] - 2098:21
**advised** [2] - 2174:11, 2178:23
**advises** [1] - 2193:7
**advising** [3] - 2098:23, 2167:2,
2194:2
**advisor** [3] - 2099:4, 2185:11,
2185:24

**advisor's** [1] - 2151:10
**Advisor's** [1] - 2152:22
**advisors** [4] - 2098:3, 2104:21,
2107:2, 2107:3
**affect** [1] - 2106:2
**affecting** [1] - 2124:23
**agencies** [1] - 2164:9
**agent** [3] - 2096:1, 2169:14,
2170:3
**Agents** [2] - 2125:22, 2173:14
**ago** [1] - 2171:1
**agree** [8] - 2112:16, 2130:2,
2173:11, 2193:11, 2193:20,
2194:12, 2198:8, 2211:17
**agreed** [1] - 2198:7
**agreement** [1] - 2173:12
**agreements** [2] - 2129:11,
2129:12, 2129:16
**agrees** [1] - 2112:13
**ahead** [6] - 2095:19, 2112:5,
2158:13, 2172:11, 2188:21,
2213:23
**aimed** [1] - 2106:12
**aims** [1] - 2104:15
**alerted** [1] - 2210:13
**Alex** [15] - 2091:24, 2096:12,
2096:14, 2103:24, 2103:25,
2105:24, 2108:2, 2109:18,
2113:6, 2116:3, 2116:14,
2123:17, 2173:7, 2183:21,
2197:8
**Alice** [4] - 2151:9, 2151:11,
2152:22, 2153:2
**allocation** [1] - 2184:18
**Allon** [4] - 2105:9, 2105:11,
2106:22, 2177:10
**Allon's** [1] - 2177:11
**allow** [2] - 2158:12, 2194:15
**alone** [1] - 2187:9
**Alpert** [2] - 2133:18, 2134:10
**Amanda** [1] - 2088:10
**America** [2] - 2086:3, 2154:14
**American** [2] - 2094:9, 2112:4
**amount** [6] - 2100:1, 2101:15,
2131:6, 2131:8, 2187:23,
2187:25
**AMY** [1] - 2086:9
**analysis** [6] - 2094:8, 2098:24,
2104:14, 2106:3, 2169:22,
2195:22
**Angeles** [2] - 2133:18, 2134:10
**annoying** [1] - 2145:8
**anonymous** [1] - 2208:19
**answer** [23] - 2102:7, 2103:8,
2107:8, 2127:10, 2127:21,
2140:17, 2141:2, 2141:6,
2141:12, 2146:18, 2147:24,
2148:2, 2164:25, 2172:9,
2172:16, 2175:9, 2175:17,
2176:6, 2178:3, 2188:12,

2196:12, 2204:14
**answered** [1] - 2171:17
**answering** [1] - 2180:18
**anticipated** [4] - 2161:18, 2198:12, 2198:20, 2206:2
**anticorruption** [1] - 2110:15
**apologize** [1] - 2117:2
**Appeals** [4] - 2163:8, 2163:11, 2182:20, 2183:15
**appear** [3] - 2135:2, 2146:20, 2181:25
**appellate** [1] - 2165:6
**Applicability** [1] - 2170:2
**applicable** [2] - 2170:1, 2170:14
**appreciate** [3] - 2088:25, 2161:24
**appreciated** [1] - 2145:20
**approach** [10] - 2088:5, 2144:18, 2179:3, 2183:2, 2183:5, 2188:24, 2196:22, 2202:18, 2206:23, 2213:14
**appropriate** [3] - 2104:21, 2125:8, 2191:7
**approval** [1] - 2191:19
**approved** [2] - 2186:20, 2191:13
**April** [21] - 2090:4, 2096:23, 2097:11, 2099:13, 2100:23, 2101:4, 2101:23, 2102:3, 2103:21, 2128:23, 2130:9, 2131:16, 2166:24, 2173:5, 2173:22, 2174:24, 2175:7, 2176:17, 2178:20, 2180:8, 2181:3
**areas** [1] - 2168:20
**argue** [1] - 2158:12
**arise** [1] - 2108:16
**arising** [1] - 2105:5
**arose** [1] - 2100:22
**arrangement** [6] - 2110:12, 2111:5, 2177:9, 2190:12, 2191:7, 2193:2
**arrangements** [3] - 2191:10, 2194:4, 2194:5
**arrow** [3] - 2137:4, 2139:12, 2139:15
**article** [17] - 2123:5, 2123:9, 2123:11, 2123:13, 2123:16, 2138:9, 2185:2, 2185:6, 2185:22, 2186:4, 2211:7, 2211:10, 2211:13, 2211:17, 2212:11, 2212:24, 2214:2
**ascertain** [1] - 2149:8
**aspect** [1] - 2105:22
**assessing** [1] - 2197:12
**assignment** [4] - 2094:7, 2096:2, 2120:22, 2171:13
**assist** [1] - 2125:9
**assistant** [1] - 2164:13
**associate** [5] - 2091:23,

2096:15, 2104:1, 2105:12, 2165:15
**associates** [1] - 2184:21
**assume** [4] - 2148:15, 2148:20, 2149:3, 2205:15
**attach** [4] - 2131:21, 2149:19, 2170:10, 2170:14
**attached** [12] - 2108:7, 2125:4, 2125:5, 2129:19, 2170:17, 2170:18, 2181:5, 2181:9, 2182:15, 2182:19, 2185:2, 2185:5
**attaching** [1] - 2142:23
**attachment** [6] - 2114:3, 2114:6, 2125:16, 2147:12, 2151:14, 2151:24
**attachments** [4] - 2113:20, 2147:11, 2199:13, 2199:19
**attention** [26] - 2092:25, 2093:8, 2097:5, 2100:25, 2101:23, 2103:15, 2107:21, 2108:22, 2112:21, 2115:6, 2117:20, 2118:18, 2122:5, 2124:3, 2128:17, 2130:13, 2131:14, 2132:1, 2146:12, 2146:25, 2148:5, 2149:12, 2151:1, 2152:20, 2161:12, 2173:4
**attorney** [1] - 2169:14
**Attorney's** [1] - 2086:13
**attractive** [1] - 2192:22
**August** [22] - 2086:6, 2108:25, 2112:9, 2113:1, 2113:8, 2114:14, 2114:17, 2155:16, 2191:23, 2192:11, 2198:13, 2198:14, 2198:17, 2199:5, 2199:22, 2200:9, 2200:15, 2200:17, 2200:21, 2200:22, 2201:18, 2216:9
**authors** [1] - 2211:23
**available** [3] - 2125:7, 2159:17, 2193:5
**Avenue** [3] - 2086:18, 2087:8, 2216:14
**avoiding** [2] - 2102:10, 2175:11
**aware** [15] - 2092:3, 2117:3, 2117:4, 2117:13, 2128:6, 2138:8, 2150:21, 2150:24, 2151:18, 2152:16, 2152:25, 2186:12, 2188:9, 2205:11, 2210:21
**awareness** [2] - 2206:11, 2207:16

## B

**background** [4] - 2116:4, 2162:18, 2193:24, 2210:12
**backgrounding** [2] - 2116:15, 2116:18

**balance** [3] - 2189:5, 2189:6, 2189:7
**balanced** [1] - 2214:8
**Baltimore** [1] - 2086:23
**Barbara** [3] - 2124:13, 2124:20, 2125:9
**based** [5] - 2160:14, 2161:19, 2175:18, 2175:25, 2185:25
**Based** [1] - 2200:7
**bashful** [1] - 2099:24
**basis** [2] - 2091:20, 2148:23
**bathroom** [1] - 2145:13
**bear** [1] - 2132:6
**Beast** [2] - 2185:6, 2185:10
**became** [1] - 2152:16
**become** [1] - 2188:9
**becoming** [1] - 2186:12
**BEFORE** [1] - 2086:9
**began** [1] - 2167:24
**begin** [4] - 2104:25, 2170:16, 2192:23, 2215:4
**beginning** [2] - 2123:14, 2170:12
**Beginning** [1] - 2211:9
**begins** [2] - 2155:16, 2187:2
**behalf** [2] - 2093:5, 2185:2
**behind** [2] - 2110:12, 2190:12
**below** [2] - 2185:23, 2200:13
**bench** [12] - 2144:18, 2144:23, 2179:3, 2179:4, 2183:7, 2188:24, 2188:25, 2194:23, 2196:23, 2202:20, 2206:23, 2206:25
**benefit** [1] - 2181:5
**BERMAN** [1] - 2086:9
**best** [10] - 2099:4, 2125:11, 2125:13, 2128:7, 2178:25, 2179:13, 2179:19, 2180:1, 2180:4, 2216:8
**better** [5] - 2097:23, 2107:2, 2112:5, 2171:6
**Better** [1] - 2214:5
**between** [23] - 2093:16, 2115:25, 2132:9, 2141:20, 2150:22, 2153:6, 2157:9, 2157:13, 2167:14, 2173:22, 2178:11, 2181:16, 2188:18, 2195:8, 2196:15, 2204:10, 2204:25, 2205:1, 2205:8, 2207:3, 2208:12, 2212:16, 2213:13
**beyond** [4] - 2149:6, 2186:20, 2189:10, 2207:18
**bias** [2] - 2159:11, 2159:13
**bidding** [2] - 2172:15, 2172:18
**big** [4] - 2145:1, 2153:17, 2184:24, 2188:4
**billionaire** [1] - 2191:16
**binder** [4] - 2093:10, 2093:14, 2132:2, 2142:8

**bit** [7] - 2112:5, 2162:18, 2194:18, 2194:22, 2195:7, 2195:14, 2214:10

**black** [3] - 2135:8, 2135:10, 2139:20

**blow** [1] - 2210:24

**bodies** [1] - 2110:15

**body** [1] - 2140:10

**book** [1] - 2089:24

**Boston** [1] - 2101:13

**bottom** [21] - 2098:6, 2105:7, 2108:24, 2113:4, 2115:8, 2118:19, 2120:10, 2120:13, 2120:14, 2122:6, 2138:16, 2139:12, 2149:17, 2186:6, 2208:12, 2209:8, 2210:2, 2210:24, 2213:7, 2213:25, 2214:14

**bracketed** [1] - 2137:25

**brackets** [2] - 2137:3, 2138:19

**Bradley** [1] - 2086:17

**break** [10] - 2145:15, 2145:25, 2146:6, 2153:13, 2194:19, 2195:10, 2200:20, 2214:20, 2214:22, 2214:25

**breakfast** [1] - 2099:15

**brief** [3] - 2134:9, 2169:25, 2205:9

**briefly** [2] - 2146:12, 2164:4

**bring** [12] - 2088:18, 2099:4, 2131:19, 2132:4, 2139:25, 2142:6, 2154:16, 2161:12, 2162:6, 2162:7, 2198:17, 2198:21

**broader** [1] - 2179:20

**broadly** [1] - 2091:14

**broke** [1] - 2161:14

**brought** [3] - 2152:20, 2198:4, 2198:16

**Brown** [2] - 2164:19, 2165:9

**Bruce** [2] - 2093:22, 2093:23

**Brussels** [1] - 2185:25

**Brussels-based** [1] - 2185:25

**brutality** [1] - 2099:3

**Bryonie** [1] - 2192:14

**Buck** [1] - 2093:23

**buck** [8] - 2094:3, 2094:16, 2095:2, 2095:3, 2095:9, 2095:18, 2167:14, 2167:18

**building** [2] - 2153:18, 2163:8

**business** [3] - 2126:7, 2166:4, 2166:8

**BY** [70] - 2089:13, 2096:10, 2096:22, 2097:10, 2100:21, 2102:2, 2103:20, 2107:25, 2108:15, 2110:22, 2111:12, 2112:25, 2118:9, 2119:9, 2119:25, 2120:12, 2121:12, 2123:3, 2124:6, 2125:19, 2125:25, 2127:20, 2128:22, 2130:18, 2132:11, 2132:19, 2133:6, 2134:20, 2135:21, 2138:17, 2140:4, 2140:16, 2141:4, 2141:14, 2142:1, 2142:7, 2142:13, 2142:22, 2143:11, 2143:20, 2146:9, 2147:4, 2148:9, 2149:11, 2153:3, 2162:15, 2171:21, 2172:12, 2172:19, 2172:24, 2179:25, 2180:12, 2180:23, 2183:13, 2188:16, 2189:20, 2190:1, 2195:16, 2196:17, 2198:24, 2201:7, 2201:15, 2202:1, 2202:13, 2203:17, 2204:18, 2204:23, 2208:10, 2212:23, 2213:24

**Byers** [1] - 2192:14

## C

**campaign** [1] - 2185:18

**CAMPOAMOR** [2] - 2088:7, 2088:19

**Campoamor** [2] - 2086:12, 2088:9

**CAMPOAMOR-SANCHEZ** [2] - 2088:7, 2088:19

**Campoamor-Sanchez** [1] - 2086:12

**candidate** [1] - 2185:11

**care** [3] - 2103:7, 2116:22, 2176:5

**careful** [1] - 2117:6

**Case** [2] - 2088:2, 2154:13

**case** [18] - 2088:24, 2100:17, 2104:19, 2110:16, 2153:15, 2153:19, 2153:21, 2159:2, 2159:5, 2159:6, 2159:8, 2159:21, 2189:3, 2189:8, 2201:9, 2203:11, 2215:2

**cases** [1] - 2164:10

**cast** [1] - 2098:3

**Catherine** [1] - 2203:22

**Catie** [1] - 2148:13

**cautious** [1] - 2153:23

**cave** [1] - 2193:5

**cell** [1] - 2125:11

**Centre** [1] - 2186:1

**certain** [3] - 2090:14, 2170:22, 2172:21

**certainly** [8] - 2091:22, 2152:25, 2159:16, 2184:2, 2190:20, 2193:24, 2197:4, 2210:12

**CERTIFICATE** [1] - 2216:2

**certify** [1] - 2216:5

**chain** [5] - 2093:16, 2093:20, 2126:18, 2167:18, 2177:15

**chance** [1] - 2112:6

**change** [3] - 2156:3, 2159:3, 2213:3

**changed** [2] - 2141:20, 2213:6

**changes** [5] - 2155:14, 2155:18, 2155:21, 2155:25, 2157:23

**characterize** [2] - 2198:7

**charge** [1] - 2124:18

**Chase** [1] - 2089:20

**check** [3] - 2096:4, 2096:5, 2210:20

**Chevy** [1] - 2089:20

**circle** [1] - 2137:15

**circled** [3] - 2136:7, 2139:9, 2139:10

**Circuit** [3] - 2163:9, 2182:21, 2183:15

**circumstances** [1] - 2193:22

**cited** [1] - 2157:14

**citizen** [6] - 2103:10, 2103:13, 2131:7, 2131:9, 2176:8, 2176:12

**city** [1] - 2089:19

**City** [1] - 2173:8

**civilities** [1] - 2153:22

**claims** [1] - 2187:10

**clarification** [1] - 2192:21

**clarifications** [1] - 2155:14

**clarified** [1] - 2162:1

**clarifies** [1] - 2176:7

**clarify** [1] - 2180:14

**clarifying** [1] - 2161:25

**clearance** [2] - 2105:2, 2173:8

**clearing** [1] - 2161:25

**clerk** [2] - 2163:11, 2163:14

**clerked** [1] - 2163:7

**clerkship** [1] - 2163:17

**clicking** [2] - 2145:2, 2145:5

**client** [10] - 2091:10, 2091:12, 2091:21, 2094:20, 2111:20, 2145:2, 2174:11, 2193:4, 2193:7, 2194:5

**client's** [2] - 2107:9, 2178:4

**clients** [5] - 2104:15, 2174:12, 2191:11, 2194:4

**Cliff** [5] - 2089:8, 2104:13, 2125:4, 2125:5, 2147:8

**cliff** [1] - 2087:14

**CLIFF** [1] - 2089:9

**Clifford** [1] - 2089:18

**Clinton** [4] - 2165:13, 2165:14, 2165:17, 2206:2

**closer** [1] - 2154:22

**Closure** [1] - 2090:7

**code** [1] - 2115:24

**colleague** [1] - 2196:5

**colleagues** [1] - 2088:6

**collectively** [1] - 2212:10

**college** [4] - 2162:19, 2162:22, 2162:24, 2163:5

**College** [1] - 2162:25

**color** [2] - 2139:17, 2139:18

**COLUMBIA** [2] - 2086:1, 2086:14
**Columbia** [1] - 2163:9
**coming** [8] - 2094:18, 2101:10, 2102:16, 2105:6, 2116:12, 2116:15, 2128:8, 2202:5
**comma** [1] - 2136:16
**commentary** [2] - 2193:21
**commenting** [1] - 2193:1
**comments** [8] - 2134:2, 2134:7, 2139:20, 2148:13, 2161:7, 2161:8, 2207:5, 2210:8
**commission** [1] - 2102:25
**commitment** [1] - 2188:6
**committed** [1] - 2158:1
**committee** [1] - 2174:11
**communicated** [1] - 2091:21
**communicating** [1] - 2088:24
**communication** [3] - 2178:11, 2200:12, 2210:11
**communications** [5] - 2150:22, 2186:17, 2192:16, 2194:10, 2199:3
**companies** [1] - 2104:24
**Company** [4] - 2166:2, 2166:7, 2166:13, 2166:18
**company** [2] - 2110:10, 2190:9
**comparison** [1] - 2091:1
**compensated** [1] - 2188:8
**compensation** [1] - 2129:18
**complete** [3] - 2146:5, 2188:10, 2216:7
**completed** [1] - 2164:15
**completing** [2] - 2163:17, 2164:2
**compliance** [2] - 2089:1, 2102:24
**complied** [1] - 2090:21
**component** [1] - 2107:3
**concern** [7] - 2110:23, 2110:24, 2116:11, 2153:5, 2153:7, 2188:14, 2195:18
**concerned** [4] - 2190:14, 2190:18, 2190:20, 2211:14
**concerning** [1] - 2203:23
**concerns** [2] - 2110:14, 2115:3
**conclude** [1] - 2168:13
**concluded** [3] - 2138:10, 2138:11, 2168:19
**conclusion** [3] - 2157:16, 2157:17, 2168:16
**conclusions** [6] - 2156:9, 2170:7, 2178:10, 2211:10, 2211:17, 2212:11
**condition** [1] - 2191:18
**conduct** [2] - 2104:17, 2115:24
**confidential** [1] - 2192:25
**confirming** [1] - 2186:21
**conflict** [1] - 2095:18

**conflicts** [2] - 2110:11, 2190:11
**confusion** [1] - 2193:1
**congressman** [3] - 2107:20, 2108:10, 2185:24
**connection** [2] - 2169:18, 2184:14
**consent** [1] - 2191:19
**consider** [2] - 2104:21, 2116:2
**considered** [3] - 2094:17, 2156:21, 2168:17
**considering** [1] - 2098:16
**consistent** [4] - 2168:9, 2180:7, 2180:20, 2180:25
**constitutes** [1] - 2216:6
**Constitution** [2] - 2087:8, 2216:14
**constitutional** [1] - 2168:24
**consultants** [1] - 2097:22
**contact** [8] - 2091:18, 2091:25, 2092:2, 2092:15, 2092:20, 2123:15, 2153:1, 2210:20
**Contacts** [1] - 2114:6
**contacts** [5] - 2091:16, 2092:12, 2118:13, 2119:21, 2122:3
**contains** [1] - 2127:4
**contemplate** [1] - 2198:13
**content** [4] - 2180:19, 2180:24, 2197:11, 2197:12
**contention** [1] - 2189:6
**context** [2] - 2100:23, 2111:6
**continuation** [1] - 2127:21
**continue** [2] - 2146:8, 2165:6
**continues** [1] - 2155:17
**continuing** [1] - 2152:7
**Contra** [3] - 2163:21, 2163:23, 2164:2
**contracts** [1] - 2129:7
**control** [2] - 2094:21, 2199:14
**Control** [1] - 2114:3
**convenience** [1] - 2089:2
**convention** [1] - 2205:3
**conversation** [15] - 2093:1, 2093:4, 2094:4, 2094:6, 2098:14, 2098:17, 2118:25, 2120:5, 2152:17, 2152:24, 2175:25, 2205:12, 2209:18, 2209:25, 2212:8
**conversations** [4] - 2152:11, 2152:13, 2192:7, 2207:3
**conviction** [3] - 2090:19, 2091:1, 2211:20
**copied** [5] - 2124:15, 2151:7, 2167:18, 2192:13, 2196:15
**copies** [3] - 2109:18, 2109:20, 2133:20
**copy** [12] - 2104:8, 2119:19, 2123:19, 2123:21, 2131:19, 2133:14, 2136:24, 2138:13, 2149:14, 2169:4, 2181:2, 2186:7

**copying** [5] - 2093:24, 2124:12, 2125:8, 2148:10, 2181:17
**correct** [34] - 2104:8, 2109:25, 2114:15, 2117:5, 2121:3, 2123:12, 2123:16, 2123:22, 2127:24, 2128:16, 2132:13, 2134:12, 2136:22, 2137:5, 2141:7, 2141:17, 2150:9, 2159:7, 2161:3, 2163:16, 2164:12, 2171:2, 2175:21, 2176:4, 2176:21, 2180:17, 2182:11, 2199:18, 2204:2, 2205:9, 2206:7, 2211:25, 2212:24, 2213:1
**corrected** [1] - 2138:11
**correcting** [2] - 2155:21, 2202:25
**correction** [1] - 2212:6
**corrections** [1] - 2155:14
**correspondence** [1] - 2129:19
**cost** [1] - 2187:9
**counsel** [11] - 2088:5, 2124:22, 2128:10, 2144:17, 2163:22, 2165:15, 2166:3, 2166:5, 2166:9, 2168:21, 2213:13
**Counsel** [1] - 2164:3
**Counsel's** [3] - 2163:21, 2165:12, 2165:21
**couple** [4] - 2091:18, 2091:19, 2198:2, 2198:3
**course** [6] - 2091:17, 2092:10, 2107:8, 2141:23, 2167:23, 2178:2
**Court** [12] - 2087:7, 2087:7, 2089:24, 2163:8, 2163:9, 2163:11, 2164:10, 2164:11, 2165:6, 2182:20, 2183:15, 2216:13
**COURT** [143] - 2086:1, 2088:11, 2088:16, 2088:20, 2088:22, 2089:7, 2100:7, 2108:12, 2108:14, 2118:6, 2118:8, 2122:25, 2123:2, 2135:7, 2135:12, 2135:15, 2144:9, 2144:11, 2144:14, 2144:17, 2144:21, 2145:1, 2145:5, 2145:7, 2145:15, 2145:17, 2145:19, 2145:22, 2145:24, 2146:3, 2146:5, 2149:2, 2149:7, 2149:10, 2152:13, 2153:13, 2154:7, 2154:10, 2154:16, 2154:18, 2154:22, 2155:3, 2155:5, 2155:8, 2155:10, 2156:11, 2156:14, 2156:19, 2156:24, 2157:3, 2157:5, 2157:12, 2158:6, 2158:8, 2158:12, 2158:17, 2158:21, 2159:7, 2159:23, 2160:13, 2160:18, 2160:24, 2161:3, 2161:6, 2161:17, 2161:21,

2161:23, 2162:3, 2162:5,
2162:9, 2171:18, 2172:7,
2172:16, 2172:23, 2179:3,
2179:5, 2179:11, 2179:18,
2180:10, 2180:14, 2180:18,
2180:22, 2183:3, 2183:6,
2183:11, 2188:12, 2188:21,
2188:24, 2189:1, 2189:16,
2189:22, 2189:24, 2194:21,
2194:24, 2195:3, 2195:6,
2195:12, 2195:14, 2196:12,
2196:22, 2196:24, 2197:7,
2197:20, 2198:4, 2198:10,
2198:16, 2198:21, 2200:20,
2201:1, 2201:11, 2201:14,
2201:20, 2201:24, 2202:7,
2202:12, 2202:15, 2202:19,
2202:21, 2202:23, 2203:7,
2203:12, 2203:14, 2204:14,
2204:17, 2204:22, 2206:19,
2207:10, 2207:14, 2207:18,
2208:2, 2208:4, 2208:7,
2212:13, 2212:19, 2213:12,
2213:15, 2213:17, 2213:21,
2214:16, 2214:19, 2214:24,
2215:7, 2216:2
 **court** [9] - 2146:4, 2179:24,
2182:16, 2183:12, 2189:19,
2195:13, 2198:23, 2203:16,
2208:9
 **Courthouse** [1] - 2087:8
 **COURTROOM** [4] - 2088:1,
2154:13, 2206:15, 2206:17
 **courtroom** [6] - 2088:4,
2088:21, 2154:6, 2155:9,
2162:8, 2215:6
 **cover** [2] - 2103:9, 2133:3
 **coverage** [1] - 2210:14
 **Cowie** [4] - 2109:17, 2184:5,
2184:7, 2184:10
 **Craig** [137] - 2086:6, 2088:3,
2088:13, 2088:14, 2090:14,
2091:22, 2093:1, 2093:16,
2094:3, 2094:4, 2094:6,
2094:19, 2095:9, 2095:21,
2095:24, 2096:11, 2097:11,
2097:20, 2098:15, 2099:25,
2100:3, 2101:4, 2102:3, 2102:6,
2102:18, 2103:5, 2106:8,
2107:10, 2108:1, 2109:17,
2111:13, 2111:21, 2112:11,
2113:17, 2114:16, 2115:11,
2115:18, 2116:17, 2118:21,
2119:2, 2119:10, 2119:15,
2120:1, 2120:6, 2120:19,
2121:2, 2121:18, 2121:23,
2123:17, 2124:10, 2126:12,
2127:12, 2128:2, 2128:23,
2128:25, 2130:4, 2130:19,
2131:1, 2131:15, 2134:8,

2135:3, 2140:5, 2140:7, 2142:2,
2142:14, 2142:18, 2147:16,
2148:10, 2151:5, 2151:11,
2152:8, 2152:18, 2154:15,
2155:18, 2157:13, 2160:5,
2160:7, 2160:14, 2160:20,
2163:1, 2166:25, 2167:3,
2167:14, 2167:19, 2169:4,
2173:4, 2173:23, 2174:24,
2175:8, 2175:14, 2175:22,
2176:5, 2176:17, 2177:16,
2178:20, 2180:8, 2183:20,
2187:19, 2188:19, 2189:4,
2191:22, 2193:10, 2197:8,
2197:10, 2197:14, 2197:21,
2199:9, 2199:17, 2200:16,
2203:5, 2205:1, 2205:8,
2205:11, 2205:14, 2206:8,
2206:11, 2207:4, 2207:5,
2207:7, 2207:12, 2207:16,
2207:19, 2208:13, 2208:18,
2208:22, 2208:25, 2209:4,
2209:7, 2209:19, 2209:25,
2210:8, 2211:1, 2212:1, 2212:5,
2213:8, 2214:4
 **Craig's** [12] - 2091:5, 2099:12,
2111:9, 2119:21, 2122:2,
2122:3, 2133:11, 2134:6,
2142:23, 2167:17, 2204:1,
2213:25
 **crazy** [1] - 2145:5
 **CRC** [2] - 2087:7, 2216:13
 **create** [1] - 2107:21
 **credibility** [2] - 2159:13,
2190:17
 **crime** [1] - 2158:1
 **Criminal** [2] - 2086:3, 2088:2
 **criminal** [3] - 2094:9, 2094:12,
2168:25
 **critical** [1] - 2168:21
 **criticism** [1] - 2191:2
 **CROSS** [1] - 2162:14
 **cross** [7] - 2145:25, 2156:20,
2159:10, 2159:12, 2161:11,
2161:13, 2189:2
 **CROSS-EXAMINATION** [1] -
2162:14
 **cross-examined** [1] - 2159:10
 **crossed** [3] - 2137:12, 2137:13,
2137:22
 **CRR** [2] - 2087:7, 2216:13
 **crucial** [1] - 2168:18
 **current** [1] - 2200:7
 **cut** [1] - 2137:22

---

# D

 **D.C** [11] - 2086:6, 2086:15,
2086:18, 2087:3, 2087:9,
2096:15, 2102:22, 2105:12,

2164:21, 2165:23, 2216:15
 **Daily** [5] - 2185:6, 2185:10,
2207:17, 2208:13, 2209:1
 **dangerous** [1] - 2115:23
 **date** [17] - 2097:1, 2113:7,
2114:12, 2118:6, 2118:10,
2119:22, 2120:17, 2124:1,
2125:18, 2130:12, 2140:17,
2140:20, 2143:24, 2146:21,
2147:20, 2198:12, 2204:8
 **dated** [6] - 2128:15, 2198:19,
2199:21, 2200:3, 2201:17,
2208:16
 **Dated** [1] - 2216:9
 **dates** [5] - 2148:15, 2148:21,
2149:4, 2149:8, 2198:21
 **David** [8] - 2119:5, 2120:14,
2124:12, 2124:17, 2133:17,
2134:9, 2139:8, 2205:12
 **DAY** [1] - 2086:8
 **days** [3] - 2130:9, 2187:19,
2187:24
 **deal** [2] - 2153:8, 2154:19
 **dealings** [5] - 2196:9, 2196:13,
2196:16, 2196:25, 2197:3
 **dean's** [1] - 2089:23
 **Dear** [2] - 2104:13
 **debates** [1] - 2163:20
 **December** [22] - 2117:11,
2117:13, 2117:24, 2117:25,
2118:21, 2119:13, 2120:18,
2121:23, 2122:9, 2124:7,
2140:21, 2146:21, 2147:20,
2148:1, 2148:3, 2204:4,
2204:11, 2205:1, 2207:4,
2208:16, 2209:9, 2211:1
 **decide** [3] - 2094:22, 2094:25,
2203:12
 **decided** [1] - 2139:5
 **decipher** [1] - 2137:20
 **decision** [5] - 2160:15, 2161:1,
2161:2, 2183:9, 2183:14
 **decisions** [2] - 2182:16,
2182:17
 **declare** [1] - 2193:23
 **deemed** [1] - 2169:14
 **deep** [1] - 2193:24
 **Defendant** [2] - 2086:7, 2086:20
 **Defendant's** [4] - 2173:1,
2192:6, 2202:14, 2214:12
 **defendant's** [1] - 2214:14
 **defense** [2] - 2159:16, 2159:18
 **defense's** [1] - 2159:5
 **defensive** [1] - 2128:8
 **defined** [2] - 2169:25, 2173:14
 **definitely** [2] - 2172:17,
2184:17
 **definition** [1] - 2170:3
 **definitions** [1] - 2170:10
 **delay** [3] - 2157:8, 2158:5,

2158:9
**deliver** [1] - 2200:9
**demanded** [1] - 2212:6
**denied** [2] - 2168:21, 2168:22
**Denis** [3] - 2205:16, 2205:25, 2206:1
**Dennis** [1] - 2118:22
**department** [2] - 2099:2, 2192:16
**Department** [10] - 2086:17, 2090:7, 2123:25, 2151:6, 2151:10, 2152:20, 2152:21, 2164:6, 2164:8, 2181:9
**DEPUTY** [4] - 2088:1, 2154:13, 2206:15, 2206:17
**deputy** [2] - 2118:23, 2205:17
**der** [23] - 2091:24, 2103:24, 2103:25, 2104:10, 2104:12, 2105:3, 2105:24, 2109:18, 2113:6, 2113:9, 2116:3, 2116:14, 2173:5, 2175:15, 2176:11, 2184:6, 2197:8, 2197:9, 2199:2, 2199:5, 2200:14, 2201:4, 2203:22
**describe** [3] - 2094:6, 2127:8, 2167:9
**described** [6] - 2090:18, 2098:19, 2150:15, 2164:7, 2169:25, 2173:25
**describes** [2] - 2176:20, 2200:12
**describing** [3] - 2167:19, 2169:17, 2200:17
**designate** [2] - 2101:7, 2175:2
**detail** [1] - 2113:22
**details** [5] - 2092:22, 2125:10, 2191:10, 2192:20, 2194:3
**determine** [2] - 2120:23, 2126:2
**determined** [1] - 2152:3
**dialogue** [1] - 2152:7
**DICKMAN** [1] - 2216:5
**Dickman** [2] - 2087:7, 2216:13
**different** [5] - 2139:17, 2139:18, 2143:5, 2156:11, 2161:6
**dig** [1] - 2192:23
**dip** [2] - 2203:7
**direct** [23] - 2108:22, 2132:1, 2146:5, 2146:12, 2156:4, 2159:12, 2160:25, 2170:21, 2173:3, 2173:20, 2176:24, 2184:18, 2189:10, 2196:2, 2196:9, 2196:13, 2196:16, 2196:25, 2197:3, 2203:1, 2203:9, 2207:2, 2211:7
**DIRECT** [1] - 2089:12
**Direct** [1] - 2087:15
**directing** [20] - 2092:25, 2093:8, 2097:5, 2100:25, 2101:23, 2103:15, 2107:21, 2112:21, 2115:6, 2117:20,

2118:18, 2122:5, 2124:3, 2128:17, 2130:13, 2131:14, 2146:25, 2148:5, 2149:12, 2151:1
**direction** [2] - 2107:9, 2159:1, 2178:4
**directly** [3] - 2106:16, 2157:19, 2177:12
**disagree** [1] - 2170:6
**disclose** [2] - 2111:14, 2112:19
**disclosed** [2] - 2112:17, 2192:3
**disclosures** [1] - 2106:19
**discretion** [2] - 2139:6, 2160:4
**discuss** [6] - 2114:19, 2125:8, 2153:15, 2197:15, 2199:11, 2215:2
**discussed** [8] - 2104:14, 2105:24, 2105:25, 2130:6, 2138:9, 2172:23, 2174:14, 2180:8
**discussing** [7] - 2110:3, 2114:21, 2115:17, 2116:24, 2130:4, 2197:17, 2199:16
**discussion** [14] - 2107:14, 2116:17, 2132:9, 2144:23, 2151:20, 2179:4, 2183:7, 2188:25, 2194:23, 2196:23, 2202:20, 2206:25, 2209:3, 2213:13
**discussions** [5] - 2129:16, 2129:25, 2152:5, 2153:6, 2180:5
**dispel** [3] - 2191:2, 2191:5, 2195:24
**dispelled** [1] - 2111:7
**display** [1] - 2206:21
**dispute** [1] - 2151:21
**dissatisfaction** [1] - 2160:10
**distressing** [1] - 2189:12
**distribute** [1] - 2133:9
**distribution** [2] - 2104:6, 2139:4
**DISTRICT** [4] - 2086:1, 2086:1, 2086:10, 2086:14
**District** [1] - 2163:9
**Division** [1] - 2125:6
**DL** [1] - 2104:2
**doctors** [2] - 2107:5, 2177:22
**document** [29] - 2091:3, 2093:20, 2097:8, 2100:8, 2100:11, 2108:12, 2113:7, 2114:2, 2114:9, 2131:23, 2132:18, 2134:23, 2138:22, 2141:1, 2147:12, 2155:22, 2181:25, 2197:10, 2198:1, 2198:3, 2199:3, 2199:24, 2200:14, 2200:16, 2200:18, 2200:21, 2200:25, 2202:4, 2203:4
**documents** [7] - 2159:17, 2159:18, 2197:2, 2197:6,

2198:13, 2199:4, 2205:4
**DOJ** [5] - 2125:1, 2125:6, 2131:5, 2131:19, 2150:25
**done** [3] - 2138:7, 2181:6, 2183:20
**double** [1] - 2138:20
**doubt** [2] - 2209:21, 2209:23
**Doug** [5] - 2093:3, 2093:5, 2094:4, 2133:17, 2137:15
**down** [15] - 2096:20, 2108:23, 2120:1, 2125:18, 2131:19, 2132:7, 2134:17, 2135:6, 2135:18, 2135:19, 2141:24, 2185:18, 2213:11
**dozen** [3] - 2167:10, 2184:1, 2184:2
**draft** [14] - 2131:20, 2131:21, 2133:11, 2133:20, 2134:6, 2135:3, 2140:7, 2140:8, 2141:13, 2141:15, 2143:5, 2143:16, 2149:14, 2149:19
**drafting** [3] - 2091:3, 2091:4, 2184:8
**drafts** [6] - 2141:20, 2142:2, 2142:24, 2144:13, 2146:20, 2149:8
**draw** [2] - 2100:11, 2158:13
**drew** [3] - 2136:25, 2137:3, 2139:14
**driving** [1] - 2145:5
**due** [4] - 2090:21, 2094:11, 2157:24, 2168:19
**duly** [1] - 2089:10
**during** [5] - 2089:24, 2092:3, 2159:20, 2182:10, 2187:5
**Dutch** [4] - 2103:10, 2103:13, 2176:8, 2176:12

# E

**e-mail** [6] - 2102:3, 2105:24, 2115:11, 2128:6, 2128:23, 2192:10
**Earle** [4] - 2124:12, 2124:19, 2125:4, 2125:5
**early** [7] - 2090:14, 2092:10, 2096:23, 2108:21, 2153:19, 2187:19, 2187:23
**easier** [1] - 2206:20
**easily** [2] - 2111:3, 2111:7
**East** [1] - 2086:22
**editor** [1] - 2212:3
**editorial** [15] - 2109:5, 2109:22, 2110:23, 2110:24, 2111:13, 2112:2, 2186:7, 2186:14, 2187:1, 2189:21, 2190:2, 2190:7, 2190:19, 2192:8, 2195:17
**edits** [2] - 2156:12, 2156:21
**educate** [1] - 2211:11

**effects** [1] - 2104:22
**effort** [1] - 2194:11
**efforts** [1] - 2155:2
**eight** [3] - 2166:3, 2166:18, 2168:17
**either** [3] - 2116:24, 2152:17, 2157:25
**election** [1] - 2102:25
**email** [127] - 2093:16, 2093:23, 2095:10, 2096:11, 2097:8, 2097:11, 2097:13, 2097:16, 2097:18, 2098:6, 2098:19, 2099:12, 2099:17, 2100:14, 2100:15, 2100:16, 2101:22, 2102:1, 2102:14, 2102:15, 2102:17, 2103:18, 2103:23, 2104:10, 2105:3, 2105:4, 2105:9, 2107:10, 2108:1, 2108:6, 2108:25, 2109:4, 2109:14, 2110:21, 2111:8, 2113:2, 2113:4, 2113:9, 2113:15, 2113:17, 2113:19, 2115:9, 2116:5, 2116:20, 2117:23, 2118:19, 2119:2, 2119:7, 2120:13, 2120:14, 2121:2, 2121:17, 2121:21, 2122:1, 2122:2, 2122:3, 2122:6, 2122:17, 2124:5, 2124:7, 2124:24, 2125:11, 2126:17, 2128:15, 2128:16, 2129:22, 2130:16, 2131:1, 2131:12, 2131:15, 2140:3, 2140:5, 2140:7, 2142:23, 2147:5, 2148:22, 2149:6, 2149:13, 2149:17, 2151:5, 2153:1, 2167:13, 2167:17, 2169:3, 2169:12, 2169:25, 2173:4, 2173:21, 2175:7, 2176:16, 2177:10, 2177:11, 2177:15, 2181:2, 2181:16, 2183:19, 2185:1, 2187:22, 2188:3, 2188:18, 2191:20, 2196:15, 2197:14, 2199:2, 2201:3, 2203:22, 2204:9, 2204:25, 2205:2, 2205:5, 2205:21, 2206:13, 2207:23, 2208:2, 2208:12, 2208:22, 2208:23, 2209:24, 2210:2, 2210:8, 2211:16, 2213:8, 2213:25, 2214:1, 2214:14
**Email** [8] - 2086:16, 2086:16, 2086:19, 2086:24, 2086:25, 2086:25, 2087:4, 2087:5
**emailing** [3] - 2095:2, 2128:25, 2130:19
**emails** [14] - 2099:12, 2105:25, 2112:24, 2119:8, 2119:24, 2120:10, 2128:10, 2148:7, 2157:12, 2171:4, 2205:9, 2205:13, 2209:21, 2210:11

emarcus@zuckerman.com [1] - 2087:5
**embellishments** [1] - 2140:8
**Emily** [2] - 2133:18, 2134:10
**end** [14] - 2101:5, 2150:18, 2156:17, 2156:25, 2157:6, 2160:15, 2168:13, 2174:25, 2177:20, 2178:2, 2194:16, 2202:3, 2202:8, 2202:10
**engage** [4] - 2173:13, 2179:16, 2180:2
**engaged** [1] - 2104:21
**engagement** [4] - 2106:23, 2173:17, 2174:11, 2177:18
**engagements** [1] - 2193:4
**English** [1] - 2186:11
**enter** [1] - 2162:8
**enters** [1] - 2088:21
**enthusiastic** [1] - 2098:13
**entire** [3] - 2161:9, 2161:10, 2174:1
**enumerated** [3] - 2126:4, 2132:21, 2133:8
**Envoy** [1] - 2090:7
**Eric** [5] - 2124:12, 2124:16, 2174:13, 2174:16
**erring** [1] - 2153:23
**erroneous** [1] - 2138:24
**error** [1] - 2138:9
**erupted** [1] - 2203:5
**essentially** [2] - 2091:3, 2179:6
**establish** [2] - 2197:9, 2198:15
**estimate** [1] - 2194:24
**Europe** [2] - 2095:6, 2095:8
**European** [1] - 2185:25
**evaluating** [1] - 2106:10
**event** [1] - 2107:7
**events** [2] - 2162:21, 2170:25
**eventually** [2] - 2187:25, 2212:5
**evidence** [6] - 2120:22, 2144:8, 2161:11, 2173:3, 2189:8, 2207:14
**exact** [2] - 2097:1, 2124:1
**Exactly** [1] - 2174:23
**exactly** [4] - 2091:13, 2105:6, 2160:7, 2175:14
**EXAMINATION** [2] - 2089:12, 2162:14
**examination** [2] - 2156:21, 2159:1
**Examination** [1] - 2087:15
**examined** [2] - 2089:11, 2159:10
**example** [1] - 2189:1
**exception** [1] - 2090:5
**excessive** [1] - 2099:3
**exchange** [19] - 2142:2, 2167:13, 2173:21, 2178:11, 2181:2, 2181:16, 2188:18,

2191:21, 2199:2, 2204:25, 2205:9, 2208:12, 2208:23, 2209:25, 2212:16, 2212:18, 2212:20, 2212:21, 2212:22
**exchanges** [1] - 2210:8
**excised** [1] - 2100:17
**excuse** [4] - 2093:22, 2103:8, 2124:25, 2155:5
**excused** [2] - 2154:3, 2215:7
**executive** [2] - 2124:16, 2174:18
**exhibit** [13] - 2103:18, 2122:25, 2132:2, 2142:16, 2169:3, 2173:20, 2181:2, 2182:22, 2189:24, 2192:7, 2199:25, 2200:6, 2202:21
**Exhibit** [69] - 2093:9, 2096:8, 2097:6, 2100:25, 2101:24, 2103:15, 2107:21, 2108:22, 2112:7, 2112:22, 2115:7, 2117:20, 2118:18, 2120:8, 2122:5, 2124:3, 2126:16, 2128:17, 2130:13, 2131:14, 2132:2, 2132:12, 2132:17, 2134:17, 2134:21, 2140:1, 2142:5, 2146:13, 2147:1, 2148:5, 2149:12, 2150:3, 2151:1, 2167:12, 2169:2, 2173:1, 2173:21, 2175:6, 2175:7, 2176:14, 2176:15, 2180:13, 2181:14, 2181:20, 2183:1, 2183:17, 2186:5, 2188:17, 2190:2, 2192:6, 2196:18, 2196:19, 2199:1, 2202:14, 2203:18, 2204:24, 2206:14, 2206:16, 2208:11, 2209:6, 2209:24, 2210:23, 2213:7, 2213:25, 2214:12
**exhibits** [1] - 2167:11
**Exhibits** [1] - 2142:20
**expected** [3] - 2200:8, 2200:9, 2200:23
**expenses** [2] - 2188:5, 2188:8
**experience** [3] - 2094:9, 2161:19, 2166:8
**experiences** [1] - 2145:21
**expertise** [4] - 2094:9, 2106:10, 2176:3, 2176:18
**explain** [2] - 2203:10, 2213:14
**explained** [1] - 2111:4
**explode** [1] - 2112:4
**expressed** [1] - 2160:9
**extensive** [1] - 2188:6
**extent** [4] - 2104:19, 2125:9, 2159:10, 2172:3
**extra** [1] - 2089:1
**extremely** [1] - 2153:23
**Ezra** [1] - 2087:1

# F

**face** [2] - 2103:9, 2176:7
**fact** [16] - 2101:19, 2129:14, 2130:9, 2156:5, 2157:22, 2158:5, 2161:24, 2184:9, 2184:19, 2187:7, 2187:16, 2187:22, 2188:3, 2198:4, 2198:18, 2210:14
**facts** [9] - 2110:7, 2110:8, 2158:10, 2158:14, 2158:15, 2190:4, 2190:7, 2191:6, 2191:8
**factual** [2] - 2148:23, 2184:9
**failure** [1] - 2157:24
**Fair** [2] - 2211:3, 2213:5
**fair** [14] - 2094:18, 2094:25, 2095:13, 2095:16, 2101:15, 2120:23, 2138:10, 2156:17, 2169:23, 2171:3, 2191:9, 2196:24, 2212:12, 2213:3
**fairness** [4] - 2090:21, 2094:11, 2094:24, 2168:19
**familiar** [2] - 2107:17, 2125:7
**far** [2] - 2112:4
**FARA** [64] - 2096:2, 2096:17, 2100:22, 2101:6, 2101:8, 2102:8, 2103:9, 2104:11, 2104:14, 2104:20, 2105:1, 2105:21, 2105:22, 2106:2, 2106:9, 2106:11, 2106:15, 2106:16, 2106:18, 2107:1, 2107:7, 2123:25, 2125:7, 2125:14, 2126:3, 2126:21, 2127:14, 2129:1, 2129:21, 2130:10, 2131:5, 2132:12, 2132:20, 2134:1, 2147:8, 2147:13, 2150:11, 2150:22, 2150:23, 2151:12, 2151:15, 2152:2, 2152:3, 2153:6, 2159:24, 2160:6, 2169:10, 2169:15, 2170:1, 2175:1, 2175:9, 2175:20, 2176:2, 2176:18, 2177:1, 2177:3, 2177:9, 2177:12, 2178:14, 2181:9, 2181:23, 2182:1, 2182:8, 2214:10
**favorite** [1] - 2116:1
**February** [15] - 2092:25, 2093:17, 2094:1, 2095:25, 2096:11, 2126:20, 2127:2, 2128:13, 2128:15, 2128:16, 2167:13, 2167:18, 2167:25, 2169:4, 2181:6
**Federal** [2] - 2182:20, 2183:15
**federal** [1] - 2102:24
**fee** [1] - 2193:2
**fees** [1] - 2193:4
**fellow** [1] - 2183:19
**felt** [1] - 2193:23
**Fernando** [2] - 2086:12, 2088:8

**fernando.campoamor** [1] - 2086:16
**fernando.campoamor-sanchez@usdoj.gov** [1] - 2086:16
**few** [7] - 2092:16, 2148:13, 2163:19, 2165:13, 2166:6, 2171:9, 2196:1
**field** [1] - 2111:6
**Fielding** [1] - 2165:23
**final** [4] - 2132:18, 2150:10, 2173:7, 2204:7
**finally** [1] - 2157:10
**financial** [2] - 2191:10, 2194:4
**findings** [1] - 2134:4
**fine** [5] - 2162:5, 2174:14, 2189:25, 2203:15, 2214:7
**finish** [1] - 2145:24
**finished** [2] - 2164:25, 2171:24
**firm** [44] - 2098:3, 2106:14, 2106:16, 2107:9, 2124:23, 2126:13, 2126:20, 2133:8, 2133:14, 2134:2, 2134:4, 2134:7, 2136:24, 2139:4, 2164:4, 2164:17, 2164:18, 2164:22, 2165:3, 2165:22, 2165:24, 2173:9, 2173:12, 2174:1, 2174:18, 2175:18, 2175:20, 2176:24, 2176:25, 2177:12, 2177:25, 2178:3, 2178:6, 2178:12, 2179:16, 2179:17, 2179:20, 2180:2, 2180:5, 2188:7
**firm's** [4] - 2125:10, 2126:6, 2128:9, 2129:18
**firms** [2] - 2174:20, 2191:9
**first** [47] - 2089:10, 2093:14, 2095:11, 2097:8, 2098:5, 2098:6, 2098:11, 2098:19, 2098:22, 2098:24, 2103:18, 2105:8, 2106:25, 2108:24, 2109:11, 2110:20, 2114:13, 2115:8, 2116:6, 2125:18, 2126:6, 2127:4, 2132:12, 2133:8, 2135:19, 2140:1, 2140:14, 2141:12, 2141:15, 2147:22, 2151:25, 2152:1, 2163:5, 2163:8, 2165:13, 2167:17, 2168:20, 2170:1, 2185:22, 2191:20, 2199:19, 2200:7, 2200:21, 2214:12
**five** [2] - 2165:25, 2205:4
**Fixed** [1] - 2115:21
**flagged** [1] - 2152:18
**flagging** [1] - 2117:6
**Flawed** [3] - 2211:3, 2213:4, 2213:6
**flawed** [2] - 2213:3, 2213:5
**flexibility** [1] - 2088:17
**fluent** [1] - 2091:24

**focus** [2] - 2093:20, 2138:16
**focuses** [1] - 2129:10
**folks** [5] - 2151:12, 2159:25, 2184:20, 2186:14, 2194:2
**follow** [6] - 2130:10, 2130:11, 2153:22, 2177:16, 2179:1, 2179:14
**follow-up** [2] - 2130:10, 2130:11
**following** [3] - 2105:23, 2150:7, 2154:1
**follows** [1] - 2089:11
**footnote** [1] - 2155:23
**FOR** [2] - 2086:1, 2086:13
**force** [1] - 2099:3
**foregoing** [1] - 2216:6
**foreign** [3] - 2096:1, 2169:14, 2170:3
**Foreign** [2] - 2125:21, 2173:14
**forgot** [1] - 2145:12
**formal** [1] - 2095:5
**former** [4] - 2090:20, 2107:20, 2108:10, 2185:23
**Former** [1] - 2211:2
**forward** [8] - 2098:22, 2098:25, 2101:18, 2105:9, 2111:13, 2116:20, 2149:21, 2193:12
**forwarded** [14] - 2113:15, 2113:17, 2114:16, 2121:2, 2186:14, 2193:15, 2199:7, 2199:9, 2200:15, 2207:19, 2208:22, 2208:23, 2210:1
**forwarding** [2] - 2126:19, 2143:16
**forwards** [1] - 2209:11
**foundation** [4] - 2157:17, 2157:21, 2157:22, 2158:4
**fourth** [2] - 2126:13, 2127:10, 2127:21
**Fourth** [1] - 2086:14
**Friday** [2] - 2175:7, 2211:1
**Friedman** [3] - 2124:12, 2124:16, 2174:16
**front** [3] - 2160:19, 2161:25, 2182:22
**FTI** [15] - 2116:10, 2177:5, 2177:6, 2180:2, 2180:5, 2180:16, 2180:19, 2180:24, 2196:1, 2196:7, 2196:13, 2196:16, 2202:3, 2202:5, 2202:25
**fuel** [3] - 2110:8, 2190:5, 2190:7
**full** [3] - 2098:6, 2125:24, 2216:7
**fund** [1] - 2093:6
**fundamental** [4] - 2123:13, 2158:2, 2168:18, 2168:24
**funding** [8] - 2099:9, 2111:14, 2112:17, 2163:23, 2187:17, 2190:21, 2190:24, 2191:18

**funds** [2] - 2111:20, 2188:15
**future** [2] - 2095:15, 2184:15

# G

**GASTON** [131] - 2089:6, 2089:8, 2089:13, 2096:9, 2096:10, 2096:20, 2096:22, 2097:7, 2097:10, 2100:20, 2100:21, 2101:25, 2102:2, 2103:17, 2103:20, 2107:24, 2107:25, 2108:13, 2108:15, 2110:20, 2110:22, 2111:11, 2111:12, 2112:23, 2112:25, 2118:7, 2118:9, 2119:7, 2119:9, 2119:24, 2119:25, 2120:10, 2120:12, 2121:10, 2121:12, 2123:1, 2123:3, 2124:5, 2124:6, 2125:17, 2125:19, 2125:23, 2125:25, 2127:17, 2127:20, 2128:19, 2128:22, 2130:15, 2130:18, 2132:11, 2132:16, 2132:19, 2133:1, 2133:6, 2133:24, 2134:16, 2134:20, 2135:6, 2135:17, 2135:21, 2138:15, 2138:17, 2139:23, 2140:4, 2140:12, 2140:16, 2140:25, 2141:4, 2141:11, 2141:14, 2141:24, 2142:1, 2142:4, 2142:7, 2142:11, 2142:13, 2142:20, 2142:22, 2143:9, 2143:11, 2143:19, 2143:20, 2144:7, 2144:12, 2144:15, 2144:19, 2144:25, 2145:20, 2145:23, 2146:9, 2147:2, 2147:4, 2148:7, 2148:9, 2149:11, 2153:3, 2153:12, 2158:24, 2171:16, 2172:5, 2172:22, 2179:2, 2179:6, 2179:9, 2179:15, 2180:9, 2183:2, 2183:5, 2183:8, 2188:11, 2188:23, 2196:10, 2196:21, 2197:16, 2200:19, 2201:10, 2201:19, 2202:6, 2202:18, 2202:24, 2204:13, 2204:21, 2206:18, 2207:1, 2207:8, 2207:12, 2207:24, 2213:11, 2213:14, 2213:16, 2213:18
**Gaston** [6] - 2086:13, 2088:8, 2132:9, 2158:19, 2161:14, 2202:16
**Gaston**................ [1] - 2087:15
**Gates** [1] - 2159:11
**gathering** [2] - 2101:19, 2184:9
**Gen** [1] - 2098:12
**General** [2] - 2164:13, 2170:2
**general** [6] - 2095:12, 2124:21, 2128:10, 2152:24, 2166:3, 2166:5

**General's** [3] - 2164:5, 2164:16, 2172:21
**generally** [5] - 2107:19, 2168:25, 2190:18, 2191:9, 2202:5
**gentleman** [1] - 2208:12
**Georgetown** [1] - 2089:23
**given** [3] - 2130:1, 2156:5, 2169:23, 2210:9
**glad** [1] - 2144:25
**Glad** [1] - 2117:2
**global** [1] - 2124:17
**Gmail** [2] - 2113:10, 2113:13
**Government** [14] - 2167:12, 2173:21, 2176:15, 2183:1, 2183:17, 2188:17, 2196:18, 2198:25, 2203:18, 2204:24, 2206:16, 2208:11, 2210:23, 2213:7
**government** [32] - 2089:8, 2090:6, 2091:12, 2091:15, 2091:17, 2092:7, 2092:11, 2106:15, 2108:17, 2110:4, 2111:20, 2116:1, 2129:16, 2129:18, 2134:3, 2134:8, 2136:16, 2137:1, 2139:6, 2159:17, 2164:9, 2169:18, 2177:11, 2182:25, 2187:10, 2188:3, 2193:11, 2193:12, 2197:5, 2201:9, 2206:15, 2209:6
**government's** [3] - 2156:15, 2159:3, 2159:21
**Government's** [33] - 2093:9, 2096:8, 2097:6, 2100:25, 2101:23, 2103:15, 2107:21, 2108:22, 2112:7, 2112:22, 2115:7, 2117:20, 2118:18, 2120:8, 2122:5, 2124:3, 2126:16, 2128:17, 2130:13, 2131:14, 2132:2, 2134:17, 2140:1, 2142:4, 2147:1, 2148:5, 2151:1, 2169:2, 2175:6, 2180:13, 2181:14, 2181:20, 2186:5
**graduated** [5] - 2162:19, 2162:22, 2163:4, 2163:6, 2163:7
**grata** [1] - 2095:15
**great** [1] - 2146:2
**Greenwich** [1] - 2205:5
**Greg** [24] - 2090:14, 2091:22, 2092:14, 2093:22, 2104:13, 2106:1, 2106:23, 2109:17, 2120:14, 2125:4, 2125:5, 2128:1, 2128:8, 2147:9, 2148:13, 2152:18, 2152:23, 2153:1, 2167:4, 2176:17, 2188:4, 2191:22, 2204:3, 2210:20
**Greg's** [1] - 2092:17
**Gregory** [4] - 2086:6, 2088:3,

2134:8, 2154:14
**Grid** [1] - 2114:3
**grid** [1] - 2199:14
**Gross** [5] - 2102:19, 2102:21, 2105:14, 2175:23, 2176:2
**gross** [3] - 2105:17, 2105:20, 2176:20
**gross's** [1] - 2106:5
**ground** [1] - 2092:1
**group** [5] - 2185:1, 2185:25, 2186:17, 2187:2, 2187:4
**Group** [1] - 2185:13
**Guantanamo** [1] - 2090:7
**guess** [5] - 2094:20, 2094:24, 2197:25, 2202:10, 2207:22
**guilt** [2] - 2167:20, 2168:2
**Gulland** [1] - 2086:13
**guy** [3] - 2102:19, 2103:2, 2174:22

# H

**half** [6] - 2089:2, 2135:18, 2135:19, 2138:16, 2194:25, 2195:1
**hallway** [1] - 2153:20
**hand** [2] - 2135:13, 2193:23
**handwriting** [9] - 2134:24, 2135:2, 2135:4, 2135:10, 2135:24, 2136:3, 2136:4, 2136:8, 2136:11
**happy** [1] - 2195:5
**hardcopy** [1] - 2150:5
**Harvard** [3] - 2162:25, 2163:19
**Haskell** [13] - 2096:12, 2096:14, 2096:17, 2108:2, 2123:17, 2155:19, 2169:3, 2169:9, 2181:6, 2183:21, 2203:23, 2211:2, 2211:16
**Haskell's** [1] - 2170:7
**Hawker** [7] - 2115:21, 2116:5, 2116:6, 2116:10, 2196:2, 2196:3, 2203:4
**head** [4] - 2102:23, 2124:18, 2174:1, 2175:18
**headline** [7] - 2123:14, 2185:13, 2211:2, 2211:9, 2212:11, 2213:1, 2213:3
**heads** [1] - 2122:11
**heads-up** [1] - 2122:11
**headway** [1] - 2104:14
**hear** [3] - 2117:2, 2172:9, 2206:20
**heard** [5] - 2156:14, 2160:25, 2161:4, 2204:10, 2204:11
**hearing** [1] - 2204:15
**HELD** [1] - 2086:9
**hello** [1] - 2092:19
**help** [3] - 2095:22, 2097:22, 2104:20

**helping** [1] - 2101:18
**hereby** [1] - 2216:5
**Hi** [2] - 2122:14, 2210:3
**hire** [4] - 2106:16, 2106:24, 2177:12, 2179:20
**Honor** [31] - 2088:1, 2088:7, 2088:12, 2088:19, 2089:6, 2144:7, 2144:13, 2144:24, 2145:11, 2149:1, 2153:12, 2154:9, 2154:13, 2154:17, 2155:20, 2157:22, 2158:24, 2160:17, 2162:4, 2162:13, 2171:16, 2172:6, 2183:2, 2188:23, 2189:14, 2194:18, 2196:10, 2198:1, 2208:8, 2213:19, 2214:18
**Honor's** [1] - 2194:20
**HONORABLE** [1] - 2086:9
**hope** [4] - 2089:1, 2110:14, 2110:15, 2110:16
**hour** [3] - 2089:2, 2194:25, 2195:1
**hours** [1] - 2205:4
**House** [3] - 2165:12, 2165:15, 2165:21
**house** [1] - 2166:8
**HOUT** [1] - 2182:25
**huge** [1] - 2097:24
**Huisman** [5] - 2133:18, 2134:10, 2212:5, 2213:8, 2214:1
**hum..** [1] - 2126:22
**husher** [1] - 2154:19

**I**

**i.e** [1] - 2094:23
**identifies** [1] - 2185:5
**identify** [1] - 2088:5
**ignoring** [2] - 2110:10, 2190:10
**II** [1] - 2089:25
**III** [1] - 2086:21
**implications** [1] - 2094:17
**importance** [1] - 2168:18
**important** [7] - 2099:23, 2107:6, 2168:23, 2177:24, 2195:21, 2195:24
**improve** [1] - 2099:5
**improved** [1] - 2104:16
**IN** [1] - 2086:1
**in-house** [1] - 2166:8
**inaccuracies** [1] - 2123:11
**inaccuracy** [1] - 2123:13
**incident** [1] - 2202:9
**inclined** [3] - 2154:20, 2154:22, 2154:25
**include** [6] - 2106:23, 2119:7, 2132:23, 2140:17, 2173:11, 2177:18
**includes** [3] - 2102:24, 2159:25, 2169:3

**including** [8] - 2091:8, 2107:3, 2112:4, 2131:6, 2166:5, 2173:22, 2194:4, 2212:11
**Including** [1] - 2131:8
**incoming** [6] - 2132:12, 2134:1, 2147:13, 2149:23, 2150:5, 2150:11
**inconsistent** [1] - 2115:24
**inconvenience** [1] - 2089:2
**incorporated** [1] - 2173:17
**independence** [5] - 2154:20, 2155:1, 2155:11, 2172:13, 2190:16
**Independent** [1] - 2163:20
**independent** [12] - 2090:19, 2092:9, 2093:7, 2094:8, 2098:23, 2099:10, 2156:6, 2163:22, 2170:20, 2171:22, 2172:1, 2195:21
**INDEX** [1] - 2087:12
**indicate** [4] - 2133:20, 2138:22, 2149:13, 2149:23
**indicated** [4] - 2112:13, 2135:22, 2137:18, 2170:22
**indicates** [1] - 2138:23
**indicating)** [2] - 2132:8, 2139:2
**indication** [1] - 2210:17
**individual** [7] - 2092:4, 2093:2, 2099:9, 2099:16, 2100:4, 2107:18, 2169:13
**individuals** [1] - 2124:15
**inference** [3] - 2100:12, 2158:13, 2158:14
**influenced** [1] - 2095:17
**info** [1] - 2131:6
**inform** [2] - 2131:1, 2131:4
**information** [12] - 2107:8, 2125:1, 2129:1, 2150:25, 2151:19, 2152:19, 2178:3, 2178:11, 2179:17, 2180:24, 2192:25, 2200:8
**informed** [1] - 2129:12
**initial** [6] - 2090:16, 2093:4, 2096:23, 2096:25, 2097:2, 2192:20
**ink** [2] - 2139:17, 2139:18
**innocence** [2] - 2167:21, 2168:2
**inquire** [1] - 2129:24
**inquiry** [9] - 2123:25, 2124:1, 2124:2, 2125:14, 2127:14, 2129:10, 2130:10, 2130:11, 2214:11
**insist** [1] - 2173:11
**instructed** [1] - 2116:4
**instruction** [1] - 2154:8
**instructions** [1] - 2154:2
**insurmountable** [1] - 2107:7
**INT** [1] - 2182:25
**INT-HOUT** [1] - 2182:25

**intensified** [1] - 2112:3
**intention** [1] - 2115:22
**interest** [2] - 2110:11, 2190:11
**interested** [1] - 2099:9
**interesting** [1] - 2149:25
**internal** [1] - 2169:18
**interrupt** [2] - 2100:7, 2214:16
**interviews** [1] - 2134:2
**introduce** [2] - 2089:16, 2197:5
**introduced** [1] - 2160:11
**investigated** [1] - 2110:17
**investigating** [1] - 2163:21
**investigation** [3] - 2163:22, 2163:25, 2169:19
**invoices** [1] - 2189:4
**involved** [13] - 2090:13, 2093:3, 2153:21, 2155:17, 2175:19, 2184:6, 2184:8, 2184:10, 2184:12, 2184:13, 2184:17, 2184:21
**involvement** [1] - 2186:21
**involving** [3] - 2184:11, 2185:19, 2202:10
**Iran** [3] - 2163:21, 2163:23, 2164:2
**Iran-Contra** [3] - 2163:21, 2163:23, 2164:2
**issue** [28] - 2100:22, 2102:11, 2102:16, 2104:16, 2105:5, 2105:6, 2105:21, 2105:22, 2106:2, 2107:7, 2108:16, 2109:8, 2109:12, 2110:16, 2112:3, 2112:11, 2112:14, 2116:11, 2130:4, 2150:23, 2153:9, 2161:23, 2175:3, 2185:19, 2190:18, 2193:17, 2202:5, 2202:25
**issued** [1] - 2181:8
**issues** [11] - 2098:21, 2101:18, 2104:11, 2105:1, 2116:22, 2116:24, 2155:22, 2163:23, 2168:17, 2168:18, 2168:19
**item** [3] - 2093:14, 2108:7, 2135:6
**Item** [1] - 2136:13
**items** [7] - 2126:4, 2126:6, 2126:13, 2127:4, 2127:8, 2127:10, 2135:1
**itself** [1] - 2182:16

**J**

**JACKSON** [1] - 2086:9
**James** [2] - 2086:20, 2133:16
**JANICE** [1] - 2216:5
**Janice** [2] - 2087:7, 2216:13
**January** [2] - 2150:20, 2167:1
**Jason** [2] - 2086:17, 2088:8
**jason.mccullough@usdoj.gov** [1] - 2086:19

**job** [1] - 2188:10
**John** [2] - 2163:10, 2182:24
**joined** [4] - 2163:20, 2164:5, 2166:23, 2166:25
**Jon** [1] - 2196:5
**Jonathan** [3] - 2116:10, 2196:2, 2196:3
**Journal** [11] - 2123:6, 2123:19, 2133:19, 2134:11, 2138:1, 2138:8, 2211:6, 2211:13, 2212:6, 2212:17, 2212:24
**journalists** [6] - 2115:22, 2116:1, 2116:4, 2116:12, 2116:15, 2116:18
**JUDGE** [2] - 2086:9, 2086:10
**judge** [1] - 2163:11
**Judge** [1] - 2163:13
**July** [6] - 2108:4, 2114:10, 2114:12, 2185:1, 2188:19, 2200:3
**jump** [1] - 2182:24
**June** [9] - 2090:2, 2108:21, 2109:8, 2109:12, 2150:18, 2182:3, 2182:10, 2187:5
**Junghans** [2] - 2087:1, 2088:14
**juror** [1] - 2145:13
**jurors** [3] - 2088:22, 2145:12, 2215:6
**JURY** [2] - 2086:4, 2086:8
**jury** [9] - 2088:18, 2088:21, 2089:16, 2100:8, 2154:6, 2154:16, 2162:6, 2162:8, 2162:10
**justice** [4] - 2094:10, 2094:12, 2134:13, 2169:1
**Justice** [22] - 2086:17, 2091:13, 2091:14, 2123:25, 2141:9, 2141:18, 2148:3, 2152:20, 2155:15, 2163:10, 2163:14, 2163:15, 2163:17, 2164:6, 2164:8, 2172:4, 2172:20, 2178:7, 2181:9, 2191:13, 2191:17, 2200:10
**Justice's** [2] - 2172:15, 2172:18

## K

**Kara** [2] - 2108:2, 2183:21
**Kedem** [17] - 2105:9, 2105:11, 2105:14, 2105:16, 2105:19, 2106:5, 2108:2, 2155:19, 2160:7, 2161:19, 2164:7, 2176:16, 2177:16, 2177:17, 2181:3, 2183:21, 2203:23
**keep** [4] - 2145:7, 2195:3, 2206:19, 2214:21
**Kelly** [3] - 2124:13, 2124:20, 2125:9
**Ken** [7] - 2102:19, 2102:21, 2105:14, 2106:9, 2175:23,

2176:2, 2176:17
**kept** [1] - 2157:22
**Kerlin** [6] - 2108:1, 2181:16, 2181:22, 2181:25, 2183:19, 2185:1
**Kharkiv** [1] - 2187:5
**kind** [8] - 2092:15, 2092:19, 2110:18, 2152:16, 2153:18, 2193:20, 2193:21, 2194:7
**knowing** [6] - 2099:25, 2108:9, 2119:12, 2119:18, 2119:21, 2122:1
**knowledge** [8] - 2178:25, 2179:13, 2179:19, 2180:1, 2180:4, 2188:13, 2189:15, 2189:16
**known** [3] - 2163:1, 2165:23, 2185:25
**knows** [3] - 2110:9, 2155:20, 2190:8
**Kottmyer** [4] - 2151:9, 2152:22, 2153:2, 2153:8
**Krasa** [1] - 2124:13
**Krawiec** [4] - 2108:2, 2181:17, 2181:19, 2183:21
**Kyiv** [5] - 2097:13, 2097:21, 2097:25, 2104:2, 2109:5, 2112:2, 2186:7, 2186:10, 2189:21

## L

**language** [1] - 2186:11
**large** [2] - 2164:22, 2165:3
**larger** [1] - 2203:8
**Larry** [6] - 2125:12, 2130:3, 2130:7, 2148:17, 2152:17, 2214:15
**Las** [1] - 2130:25
**last** [10] - 2088:25, 2089:18, 2104:15, 2132:23, 2141:5, 2141:15, 2147:8, 2151:25, 2152:1, 2189:12
**latter** [1] - 2182:10
**Lauren** [7] - 2108:25, 2109:2, 2113:6, 2122:14, 2199:2, 2210:2, 2210:3
**Law** [13] - 2089:23, 2123:5, 2123:19, 2133:19, 2134:11, 2138:1, 2138:8, 2162:25, 2211:6, 2211:13, 2212:6, 2212:17, 2212:24
**law** [34] - 2096:4, 2096:5, 2098:3, 2098:21, 2098:23, 2098:25, 2101:18, 2102:23, 2102:24, 2103:1, 2107:2, 2107:3, 2133:14, 2136:24, 2139:4, 2162:19, 2162:22, 2162:24, 2163:3, 2163:6, 2163:7, 2163:14, 2164:4,

2164:17, 2164:18, 2165:3, 2165:22, 2173:9, 2173:12, 2178:12, 2184:14, 2188:7, 2191:9, 2195:22
**Lawrence** [2] - 2124:7, 2124:21
**lawyer** [6] - 2102:9, 2102:12, 2124:21, 2151:10, 2175:10, 2175:18
**lawyers** [10] - 2092:1, 2092:16, 2106:13, 2107:5, 2176:23, 2177:21, 2178:9, 2183:25, 2184:3, 2192:13
**laying** [1] - 2157:17
**lead** [3] - 2091:7, 2091:9, 2092:8
**Leader's** [1] - 2211:3
**learn** [3] - 2172:20, 2175:15, 2176:11
**learned** [2] - 2160:19, 2160:20
**learning** [3] - 2117:10, 2117:17, 2152:2
**least** [1] - 2167:10
**leave** [4] - 2120:20, 2150:14, 2150:17, 2215:6
**leaves** [2] - 2154:6, 2155:9
**leaving** [2] - 2165:20, 2166:1
**lectern** [2] - 2088:5, 2189:11
**left** [4] - 2090:6, 2098:12, 2135:18, 2194:7
**legal** [9] - 2111:6, 2124:22, 2133:15, 2134:14, 2141:9, 2141:19, 2151:10, 2182:16, 2183:9
**Legal** [1] - 2152:22
**length** [1] - 2214:19
**less** [2] - 2128:8, 2153:25
**letter** [30] - 2093:22, 2125:5, 2125:20, 2126:1, 2126:13, 2126:20, 2126:23, 2127:1, 2127:2, 2127:25, 2128:2, 2129:21, 2131:5, 2131:19, 2132:12, 2132:20, 2142:2, 2147:13, 2148:24, 2149:23, 2150:11, 2150:24, 2151:11, 2151:15, 2151:20, 2159:24, 2160:11, 2161:4, 2173:18, 2212:2
**likely** [1] - 2192:22
**Lillian** [1] - 2142:24
**limited** [3] - 2091:18, 2091:19, 2092:20
**line** [11] - 2109:4, 2109:5, 2114:11, 2120:15, 2125:20, 2136:25, 2139:12, 2139:14, 2140:7, 2168:4, 2211:18
**lines** [8] - 2143:12, 2143:24, 2144:4, 2144:24, 2146:11, 2146:16, 2151:25, 2152:1
**list** [4] - 2104:6, 2126:3, 2132:20, 2199:14

**List** [1] - 2114:6
**litigation** [3] - 2124:18, 2174:1
**lives** [2] - 2103:11, 2176:8
**LLP** [2] - 2086:22, 2087:2
**lobbying** [2] - 2102:24, 2185:2
**lobbyist** [2] - 2185:12, 2185:25
**locations** [1] - 2165:4
**logical** [1] - 2194:19
**logically** [1] - 2103:1
**London** [14] - 2091:23,
2093:24, 2095:4, 2102:9,
2102:12, 2103:11, 2104:1,
2106:13, 2175:10, 2175:18,
2176:8, 2176:23, 2184:6,
2193:17
   **London-based** [1] - 2175:18
   **look** [71] - 2097:23, 2099:12,
2099:22, 2105:7, 2108:23,
2110:1, 2112:7, 2113:4,
2113:23, 2114:2, 2114:5,
2114:9, 2114:13, 2120:22,
2126:23, 2127:1, 2127:16,
2127:23, 2128:8, 2129:4,
2132:23, 2135:1, 2138:18,
2141:12, 2142:4, 2142:10,
2142:16, 2142:20, 2143:3,
2143:7, 2143:15, 2143:21,
2144:1, 2146:18, 2147:8,
2147:9, 2147:19, 2147:23,
2149:17, 2151:14, 2151:24,
2151:25, 2167:11, 2167:12,
2167:17, 2169:2, 2173:1,
2175:6, 2176:14, 2177:15,
2180:13, 2181:10, 2181:21,
2182:8, 2182:19, 2182:23,
2183:17, 2186:5, 2192:6,
2196:18, 2198:25, 2199:19,
2204:24, 2206:14, 2209:6,
2209:24, 2210:23, 2213:7,
2214:12
   **look-see** [1] - 2147:8
   **looked** [2] - 2114:13, 2210:12
   **looking** [22] - 2098:5, 2101:2,
2101:22, 2103:5, 2110:15,
2111:8, 2111:18, 2114:23,
2122:6, 2125:16, 2126:17,
2128:10, 2131:23, 2136:13,
2139:8, 2145:7, 2147:12,
2147:22, 2149:7, 2150:3,
2151:3, 2183:14
   **Looks** [1] - 2148:13
   **looks** [10] - 2107:7, 2136:17,
2136:24, 2137:21, 2137:22,
2137:25, 2138:21, 2193:15,
2205:1, 2205:13
   **Los** [2] - 2133:18, 2134:10
**lost** [1] - 2144:24
**Loucks** [9] - 2101:10, 2101:12,
2101:13, 2104:8, 2109:17,
2184:5, 2184:7, 2184:10

**lunch** [3] - 2194:20, 2214:20,
2214:25
   **lurk** [2] - 2110:12, 2190:12

# M

**magazine** [1] - 2166:6
**mail** [6] - 2102:3, 2105:24,
2115:11, 2128:6, 2128:23,
2192:10
   **major** [5] - 2090:24, 2095:7,
2123:13, 2124:20, 2167:4
   **man** [1] - 2098:12
   **Manafort** [12] - 2092:4, 2092:6,
2092:13, 2092:18, 2105:2,
2106:24, 2111:22, 2112:2,
2116:5, 2155:16, 2157:13,
2191:23
   **manage** [1] - 2106:25
   **management** [1] - 2173:9
   **managing** [1] - 2174:20
**Marcus** [2] - 2087:1, 2088:14
**Margaret** [2] - 2108:2, 2181:17
   **mark** [1] - 2137:17
   **marked** [2] - 2097:5, 2126:16
**Maryland** [1] - 2089:20
   **master** [1] - 2199:14
   **Master** [1] - 2114:3
   **materials** [1] - 2114:16
   **matt** [1] - 2104:24
   **matter** [4] - 2129:6, 2139:5,
2214:17, 2215:4
   **matters** [4] - 2100:16, 2124:22,
2169:19, 2169:22
   **Matthew** [4] - 2109:17, 2133:18,
2134:10, 2138:1
   **maximize** [1] - 2104:22
**Mayer** [2] - 2164:19, 2165:9
**McCullough** [2] - 2086:17,
2088:8
   **McDonough** [1] - 2206:1
**MD** [1] - 2086:23
   **mean** [8] - 2097:15, 2099:19,
2131:9, 2139:1, 2181:21,
2192:2, 2194:24, 2203:11
   **means** [2] - 2100:10, 2194:22
   **meant** [3] - 2118:6, 2149:3,
2155:13
   **media** [24] - 2109:7, 2113:25,
2114:11, 2118:13, 2134:2,
2134:3, 2134:7, 2134:12,
2141:8, 2141:17, 2166:8,
2166:14, 2193:1, 2199:13,
2199:15, 2199:21, 2200:3,
2201:17, 2202:3, 2202:8,
2202:10, 2207:5, 2207:7
   **Media** [1] - 2200:6
   **meet** [2] - 2196:5, 2196:7
   **meeting** [5] - 2099:15, 2099:23,
2160:20, 2163:5, 2182:9

**Melissa** [1] - 2193:11
**member** [1] - 2133:15
**members** [1] - 2100:8
**memoranda** [1] - 2199:4
**memorandum** [6] - 2113:24,
2114:11, 2199:20, 2200:2
   **memory** [3] - 2117:17, 2125:13,
2197:16
   **mentioned** [12] - 2091:2,
2095:4, 2099:8, 2102:20,
2103:2, 2103:3, 2163:14,
2184:8, 2184:18, 2196:1,
2204:9, 2205:21
   **mentioning** [1] - 2092:14
   **mentions** [1] - 2103:13
   **message** [3] - 2177:16,
2193:15, 2214:14
   **messaging** [2] - 2202:4, 2203:4
   **met** [3] - 2100:3, 2187:20,
2196:3
   **michael** [1] - 2101:13
   **Michael** [1] - 2109:17
   **microphone** [1] - 2154:23
   **middle** [3] - 2101:25, 2153:14,
2176:15
   **might** [8] - 2106:2, 2122:23,
2161:18, 2174:3, 2192:21,
2200:22, 2205:19, 2210:13
   **million** [3] - 2187:17, 2188:1,
2188:9
   **mind** [4] - 2156:16, 2156:18,
2171:10, 2175:14
   **mindful** [1] - 2104:15
   **mine** [1] - 2139:21
   **minister** [1] - 2090:20
   **Ministry** [15] - 2091:13,
2091:14, 2134:13, 2141:9,
2141:18, 2148:2, 2155:15,
2172:4, 2172:15, 2172:18,
2172:20, 2178:7, 2191:13,
2191:17, 2200:10
   **Minnesota** [1] - 2185:23
   **minute** [2] - 2128:14, 2144:22
   **minutes** [4] - 2145:23, 2154:3,
2154:10, 2195:1
   **misinformation** [3] - 2134:12,
2141:8, 2141:17
   **misled** [1] - 2160:6
   **miss** [1] - 2101:10
   **Miss** [6] - 2136:22, 2192:10,
2192:19, 2193:10, 2193:15,
2200:15
   **missing** [1] - 2148:14
   **mistaken** [1] - 2138:20
   **misunderstanding** [4] - 2111:7,
2191:5, 2195:23, 2195:24
   **misunderstands** [2] - 2211:10,
2211:17
   **Mitt** [1] - 2185:11
   **Modern** [1] - 2186:1

**Molly** [2] - 2086:13, 2088:8
**molly.gaston@usdoj.gov** [1] - 2086:16
**moment** [1] - 2132:6
**Monday** [1] - 2175:8
**money** [1] - 2191:14
**monitor** [1] - 2099:4
**month** [2] - 2141:23, 2198:19
**months** [4] - 2097:25, 2163:19, 2164:4, 2204:10
**Morning** [1] - 2086:5
**morning** [23] - 2088:1, 2088:7, 2088:11, 2088:12, 2088:16, 2088:17, 2089:1, 2089:14, 2089:15, 2145:11, 2145:14, 2146:7, 2153:14, 2153:22, 2162:16, 2162:17, 2183:18, 2189:13, 2199:1, 2203:19, 2203:21, 2204:25, 2209:7
**MORNING** [1] - 2086:8
**most** [5] - 2129:19, 2135:4, 2151:11, 2159:8, 2193:4
**motivated** [5] - 2120:21, 2121:7, 2157:25, 2209:12, 2211:19
**move** [4] - 2095:22, 2154:22, 2195:8, 2197:5
**moving** [4] - 2107:17, 2115:1, 2120:8, 2123:23
**MR** [112] - 2088:7, 2088:12, 2088:19, 2144:10, 2144:20, 2144:24, 2145:4, 2145:6, 2145:10, 2145:16, 2145:18, 2146:2, 2149:1, 2154:9, 2154:17, 2154:19, 2154:25, 2155:4, 2155:7, 2155:11, 2156:13, 2156:18, 2156:23, 2157:2, 2157:4, 2157:8, 2157:21, 2158:7, 2158:11, 2158:15, 2158:20, 2159:22, 2159:24, 2160:17, 2160:22, 2161:1, 2161:4, 2161:14, 2161:19, 2161:22, 2162:2, 2162:4, 2162:13, 2162:15, 2171:20, 2171:21, 2172:6, 2172:12, 2172:19, 2172:24, 2179:8, 2179:13, 2179:16, 2179:23, 2179:25, 2180:12, 2180:23, 2182:24, 2182:25, 2183:1, 2183:10, 2183:13, 2188:16, 2189:14, 2189:18, 2189:20, 2189:23, 2190:1, 2194:18, 2195:1, 2195:5, 2195:11, 2195:16, 2196:17, 2197:4, 2197:14, 2198:1, 2198:9, 2198:11, 2198:19, 2198:22, 2198:24, 2201:7, 2201:13, 2201:15, 2201:25, 2202:1, 2202:13, 2202:22, 2203:2, 2203:11,

2203:13, 2203:15, 2203:17, 2204:18, 2204:23, 2206:16, 2207:3, 2207:11, 2207:15, 2207:22, 2207:25, 2208:3, 2208:6, 2208:8, 2208:10, 2212:23, 2213:19, 2213:24, 2214:18, 2214:23
**MS** [131] - 2089:6, 2089:8, 2089:13, 2096:9, 2096:10, 2096:20, 2096:22, 2097:7, 2097:10, 2100:20, 2100:21, 2101:25, 2102:2, 2103:17, 2103:20, 2107:24, 2107:25, 2108:13, 2108:15, 2110:20, 2110:22, 2111:11, 2111:12, 2112:23, 2112:25, 2118:7, 2118:9, 2119:7, 2119:9, 2119:24, 2119:25, 2120:10, 2120:12, 2121:10, 2121:12, 2123:1, 2123:3, 2124:5, 2124:6, 2125:17, 2125:19, 2125:23, 2125:25, 2127:17, 2127:20, 2128:19, 2128:22, 2130:15, 2130:18, 2132:11, 2132:16, 2132:19, 2133:1, 2133:6, 2133:24, 2134:16, 2134:20, 2135:6, 2135:17, 2135:21, 2138:15, 2138:17, 2139:23, 2140:4, 2140:12, 2140:16, 2140:25, 2141:4, 2141:11, 2141:14, 2141:24, 2142:1, 2142:4, 2142:7, 2142:11, 2142:13, 2142:20, 2142:22, 2143:9, 2143:11, 2143:19, 2143:20, 2144:7, 2144:12, 2144:15, 2144:19, 2144:25, 2145:20, 2145:23, 2146:9, 2147:2, 2147:4, 2148:7, 2148:9, 2149:11, 2153:3, 2153:12, 2158:24, 2171:16, 2172:5, 2172:22, 2179:2, 2179:6, 2179:9, 2179:15, 2180:9, 2183:2, 2183:5, 2183:8, 2188:11, 2188:23, 2196:10, 2196:21, 2197:16, 2200:19, 2201:10, 2201:19, 2202:6, 2202:18, 2202:24, 2204:13, 2204:21, 2206:18, 2207:1, 2207:8, 2207:12, 2207:24, 2213:11, 2213:14, 2213:16, 2213:18
**Murphy** [6] - 2086:20, 2088:13, 2154:8, 2158:24, 2162:12, 2214:16
**MURPHY** [109] - 2088:12, 2144:10, 2144:20, 2144:24, 2145:4, 2145:6, 2145:10, 2145:16, 2145:18, 2146:2, 2149:1, 2154:9, 2154:17, 2154:19, 2154:25, 2155:4, 2155:7, 2155:11, 2156:13,

2156:18, 2156:23, 2157:2, 2157:4, 2157:8, 2157:21, 2158:7, 2158:11, 2158:15, 2158:20, 2159:22, 2159:24, 2160:17, 2160:22, 2161:1, 2161:4, 2161:14, 2161:19, 2161:22, 2162:2, 2162:4, 2162:13, 2162:15, 2171:20, 2171:21, 2172:6, 2172:12, 2172:19, 2172:24, 2179:8, 2179:13, 2179:16, 2179:23, 2179:25, 2180:12, 2180:23, 2182:24, 2183:1, 2183:10, 2183:13, 2188:16, 2189:14, 2189:18, 2189:20, 2189:23, 2190:1, 2194:18, 2195:1, 2195:5, 2195:11, 2195:16, 2196:17, 2197:4, 2197:14, 2198:1, 2198:9, 2198:11, 2198:22, 2201:7, 2201:15, 2201:25, 2202:1, 2202:13, 2202:22, 2203:11, 2203:13, 2203:15, 2203:17, 2204:18, 2204:23, 2206:16, 2207:3, 2207:11, 2207:15, 2207:22, 2207:25, 2208:3, 2208:6, 2208:8, 2208:10, 2212:23, 2213:19, 2213:24, 2214:18, 2214:23
**must** [1] - 2206:11
**muster** [1] - 2177:9

**N**

**name** [9] - 2089:17, 2089:18, 2131:6, 2131:8, 2139:8, 2151:9, 2181:18, 2194:12, 2213:19
**named** [5] - 2092:4, 2093:2, 2107:18, 2142:24, 2208:12
**national** [2] - 2164:22, 2165:3
**National** [12] - 2123:5, 2123:19, 2125:6, 2133:19, 2134:11, 2138:1, 2138:8, 2211:6, 2211:13, 2212:6, 2212:17, 2212:24
**nature** [2] - 2094:7, 2171:12
**near** [1] - 2135:14
**necessarily** [1] - 2157:14
**need** [13] - 2096:4, 2098:2, 2099:14, 2101:6, 2103:7, 2103:8, 2105:2, 2111:14, 2159:2, 2159:6, 2175:1, 2176:6, 2203:9
**needed** [1] - 2179:17
**needs** [2] - 2146:7, 2192:25
**nefarious** [1] - 2189:3
**negative** [1] - 2193:22
**nephew's** [1] - 2130:25
**never** [2] - 2110:11, 2190:11

**New** [9] - 2119:6, 2133:17, 2134:9, 2139:9, 2173:8, 2182:20, 2199:2, 2210:2, 2210:5
**new** [7] - 2098:18, 2100:16, 2112:2, 2129:12, 2174:12, 2206:5, 2214:17
**news** [1] - 2107:19
**Newsweek** [1] - 2166:14
**newsweek.com** [1] - 2166:14
**next** [27] - 2089:4, 2101:10, 2110:13, 2112:9, 2125:15, 2132:1, 2132:4, 2135:1, 2138:19, 2139:25, 2141:23, 2142:16, 2149:10, 2163:6, 2163:18, 2164:3, 2168:4, 2177:15, 2180:22, 2183:17, 2189:11, 2189:24, 2190:4, 2204:4, 2204:17, 2211:16, 2212:21
**Next** [1] - 2140:7
**night** [1] - 2088:25
**no-win** [1] - 2095:12
**non** [3] - 2095:14, 2111:23, 2191:25
**non-voluntarily** [2] - 2111:23, 2191:25
**none** [2] - 2155:20, 2156:22
**noon** [1] - 2215:9
**note** [4] - 2088:22, 2106:18, 2160:19, 2162:4
**notes** [1] - 2216:7
**nothing** [5] - 2100:17, 2120:21, 2145:8, 2153:12, 2189:3
**noticing** [1] - 2113:11
**notify** [1] - 2129:14
**Number** [20] - 2088:2, 2098:12, 2132:23, 2133:25, 2134:18, 2136:13, 2138:25, 2139:8, 2140:14, 2140:17, 2141:2, 2141:6, 2141:12, 2146:19, 2147:20, 2147:24, 2148:2, 2148:14, 2148:20, 2154:14
**number** [6] - 2095:6, 2108:12, 2122:25, 2170:21, 2184:20, 2188:4
**NW** [5] - 2086:14, 2086:18, 2087:2, 2087:8, 2216:14
**NYT** [3] - 2122:16, 2122:21, 2122:23

## O

**oath** [1] - 2162:11
**object** [3] - 2161:15, 2161:18, 2202:16
**objected** [1] - 2159:14
**objection** [24] - 2144:9, 2144:10, 2149:1, 2161:21, 2162:4, 2171:16, 2172:5, 2172:22, 2179:2, 2179:5,

2180:9, 2188:11, 2196:10, 2196:21, 2200:19, 2201:10, 2201:19, 2202:6, 2202:23, 2204:13, 2204:21, 2206:18, 2206:24, 2213:12
**objective** [1] - 2171:25
**obligated** [3] - 2106:14, 2177:2, 2179:10
**obligation** [3] - 2102:10, 2125:21, 2175:11
**obligations** [2] - 2106:11, 2125:7
**obviously** [2] - 2151:21, 2159:11
**occasion** [3] - 2090:10, 2115:2, 2170:6
**occasions** [4] - 2091:18, 2092:17, 2153:20, 2160:10
**occupation** [1] - 2089:21
**occupying** [1] - 2153:18
**occur** [2] - 2162:21, 2204:19
**occurred** [2] - 2145:11, 2170:25
**occurring** [1] - 2169:19
**October** [1] - 2155:17
**OF** [4] - 2086:1, 2086:8, 2086:14, 2216:2
**Off-the-record** [2] - 2132:9, 2213:13
**offend** [1] - 2145:18
**offer** [3] - 2157:16, 2193:20, 2193:21
**offering** [1] - 2192:21
**office** [9] - 2091:23, 2092:17, 2093:24, 2095:5, 2096:15, 2097:25, 2101:13, 2102:9, 2102:12, 2102:22, 2104:1, 2105:12, 2125:11, 2126:3, 2151:10, 2164:20, 2164:21, 2175:11, 2193:17
**Office** [9] - 2086:13, 2152:22, 2163:21, 2164:5, 2164:7, 2164:16, 2165:12, 2165:21, 2172:21
**offices** [3] - 2095:6, 2164:22, 2165:3
**Official** [2] - 2087:7, 2216:13
**OFFICIAL** [1] - 2216:2
**officials** [3] - 2092:2, 2134:3, 2134:8
**often** [1] - 2100:14
**old** [1] - 2100:15
**oligarch** [1] - 2191:15
**on-the-record** [1] - 2208:19
**one** [48] - 2092:8, 2100:15, 2100:17, 2101:8, 2104:15, 2110:9, 2114:13, 2115:21, 2121:14, 2121:16, 2132:6, 2132:8, 2135:9, 2136:2, 2136:4, 2136:7, 2141:7, 2142:23, 2144:17, 2146:7, 2146:16,

2146:20, 2146:23, 2148:13, 2156:15, 2159:13, 2159:22, 2160:1, 2160:5, 2167:17, 2168:13, 2172:6, 2175:2, 2177:20, 2181:17, 2189:2, 2190:8, 2197:4, 2197:5, 2200:17, 2201:5, 2201:20, 2205:14, 2208:4, 2209:15, 2212:9
**One** [4] - 2104:16, 2133:14, 2141:21, 2147:8
**ongoing** [1] - 2153:6
**online** [5] - 2166:3, 2166:10, 2166:11, 2166:12, 2185:9
**Oosterhuis** [4] - 2174:3, 2174:5, 2174:6, 2174:13
**open** [9] - 2097:24, 2146:4, 2179:24, 2183:12, 2189:19, 2195:13, 2198:23, 2203:16, 2208:9
**opine** [1] - 2168:1
**opinion** [6] - 2094:10, 2095:14, 2095:17, 2167:20, 2168:5, 2182:20
**opinions** [1] - 2208:5
**opportunity** [1] - 2168:22
**opposite** [1] - 2138:11
**option** [1] - 2192:22
**oral** [1] - 2129:11
**order** [2] - 2104:22, 2126:1
**ordinary** [1] - 2153:22
**organization** [1] - 2126:2
**original** [2] - 2138:23, 2205:5
**others'** [1] - 2193:8
**otherwise** [3] - 2105:2, 2178:18, 2193:7
**ought** [1] - 2104:20
**outcome** [1] - 2129:24
**outlined** [1] - 2200:12
**outreach** [2] - 2093:4, 2199:14
**outside** [9] - 2099:4, 2122:1, 2122:2, 2158:25, 2161:11, 2161:13, 2169:20, 2196:10, 2202:25
**outstanding** [3] - 2189:5, 2189:7
**overall** [1] - 2091:7
**overseeing** [2] - 2090:24, 2092:15
**owe** [1] - 2130:1
**own** [1] - 2149:7
**owned** [1] - 2166:13

## P

**p.m** [5] - 2099:13, 2205:2, 2205:8, 2215:4
**pace** [1] - 2195:7
**page** [44] - 2093:19, 2097:7, 2098:5, 2098:7, 2103:17,

2105:7, 2105:8, 2108:24,
2110:1, 2110:20, 2113:23,
2114:2, 2114:5, 2114:9,
2114:14, 2127:4, 2127:7,
2127:16, 2132:16, 2134:19,
2140:1, 2140:12, 2141:1,
2146:18, 2147:15, 2147:16,
2147:19, 2147:23, 2151:25,
2152:1, 2170:12, 2176:16,
2181:10, 2182:24, 2183:1,
2183:14, 2186:7, 2191:20,
2199:19, 2199:24, 2200:6,
2210:3, 2210:24
   **pages** [3] - 2156:1, 2181:12,
2182:19
   **paid** [4] - 2110:3, 2110:8,
2188:1, 2190:8
   **paper** [1] - 2186:11
   **paragraph** [12] - 2095:11,
2110:7, 2110:13, 2125:24,
2129:9, 2132:18, 2139:1,
2139:13, 2170:2, 2185:22,
2187:2, 2190:4
   **paralegal** [1] - 2088:9
   **paralegals** [1] - 2184:21
   **parenthetical** [1] - 2178:2
   **Parfitt** [6] - 2207:16, 2207:20,
2208:13, 2208:18, 2209:25,
2210:9
   **part** [10] - 2107:3, 2159:16,
2172:3, 2172:13, 2174:24,
2182:10, 2189:2, 2189:7,
2203:8, 2203:9
   **particular** [9] - 2098:17,
2102:15, 2102:16, 2105:4,
2105:16, 2105:19, 2105:22,
2151:21, 2152:10
   **particularly** [3] - 2155:1,
2157:23, 2211:18
   **particulars** [1] - 2190:19
   **partner** [10] - 2089:22, 2090:5,
2093:24, 2095:4, 2101:13,
2102:22, 2124:16, 2174:9,
2174:18, 2174:20
   **parts** [1] - 2168:21
   **party** [6] - 2111:4, 2190:24,
2191:15, 2192:24, 2193:11,
2194:4
   **pass** [1] - 2177:9
   **Paul** [3] - 2092:4, 2108:1,
2163:10
   **Paula** [1] - 2087:1
   **paying** [6] - 2110:9, 2111:4,
2115:22, 2116:12, 2187:10,
2190:9
   **paymaster** [1] - 2099:14
   **payment** [2] - 2108:17, 2131:11
   **payor** [1] - 2192:24
   **PDF** [4] - 2113:23, 2114:5,
2114:14, 2147:17

   **pen** [1] - 2145:2
   **Pennsylvania** [1] - 2086:18
   **people** [18] - 2091:23, 2092:8,
2100:14, 2104:6, 2104:25,
2109:19, 2109:20, 2152:21,
2153:21, 2157:18, 2173:22,
2183:23, 2192:16, 2195:9,
2196:13, 2212:21
   **perfect** [1] - 2214:5
   **perfectly** [2] - 2191:6, 2191:7
   **perform** [1] - 2106:12
   **performance** [1] - 2099:6
   **perhaps** [3] - 2108:21, 2109:6,
2156:4
   **period** [2] - 2090:5, 2161:9
   **permissible** [1] - 2159:11
   **person** [12] - 2091:7, 2091:9,
2093:6, 2101:8, 2109:3,
2111:19, 2124:20, 2154:1,
2170:16, 2175:2, 2180:15,
2199:3
   **person's** [1] - 2151:9
   **persona** [1] - 2095:14
   **personal** [3] - 2188:13,
2189:14, 2189:16
   **perspective** [2] - 2094:8,
2104:20
   **pertinent** [1] - 2192:20
   **phone** [5] - 2092:18, 2212:3,
2212:13, 2212:14, 2212:15
   **phones** [1] - 2092:22
   **photo** [1] - 2185:23
   **phrase** [1] - 2135:9
   **pick** [1] - 2195:6
   **Pinchuk** [13] - 2111:19,
2111:23, 2112:16, 2131:11,
2187:16, 2187:20, 2190:21,
2190:24, 2191:15, 2191:19,
2191:24, 2192:3, 2194:12
   **Pinchuk's** [4] - 2112:19,
2187:24, 2191:18, 2192:3
   **PJM** [2] - 2199:20, 2200:3
   **pjunghans@zuckerman.com**
[1] - 2087:4
   **places** [4] - 2100:9, 2122:16,
2164:23, 2210:5
   **Plaintiff** [2] - 2086:4, 2086:12
   **plan** [11] - 2113:25, 2114:11,
2199:13, 2199:15, 2199:21,
2200:3, 2201:17, 2202:3,
2202:8, 2202:10
   **Plan** [1] - 2200:7
   **plans** [1] - 2201:4
   **Platt** [1] - 2164:19
   **play** [3] - 2106:16, 2167:2,
2177:13
   **played** [1] - 2197:12
   **pleased** [1] - 2158:16
   **point** [16] - 2090:14, 2108:16,
2116:14, 2117:13, 2122:19,

2123:4, 2150:14, 2152:2,
2159:2, 2181:23, 2186:12,
2186:21, 2193:24, 2194:19,
2203:10, 2214:22
   **pointed** [1] - 2212:10
   **police** [2] - 2099:2, 2099:3
   **political** [4] - 2102:23, 2103:1,
2173:13
   **politically** [6] - 2095:17,
2120:21, 2121:7, 2157:25,
2209:12, 2211:19
   **Porter** [4] - 2192:10, 2192:19,
2193:10, 2193:15
   **portion** [2] - 2100:10, 2168:9
   **portions** [1] - 2153:18
   **position** [6] - 2095:5, 2124:17,
2156:15, 2159:3, 2159:5,
2164:9, 2165:15, 2166:5,
2168:1, 2174:10, 2191:14
   **positions** [1] - 2166:4
   **positive** [1] - 2193:23
   **possibility** [2] - 2128:25,
2129:17
   **possible** [4] - 2104:22, 2125:21,
2133:3, 2188:15
   **possibly** [1] - 2129:6
   **Post** [12] - 2109:5, 2112:2,
2166:2, 2166:6, 2166:9,
2166:10, 2166:13, 2166:16,
2166:18, 2186:8, 2186:10,
2189:21
   **posted** [1] - 2186:7
   **pot** [1] - 2117:3
   **potential** [1] - 2107:4
   **potentially** [2] - 2116:12,
2191:4
   **powerful** [1] - 2098:12
   **powers** [1] - 2173:8
   **PR** [26] - 2101:7, 2102:8,
2103:11, 2104:16, 2104:21,
2106:14, 2106:16, 2106:23,
2106:24, 2107:3, 2107:9,
2109:3, 2175:2, 2175:9,
2175:19, 2176:23, 2176:24,
2177:12, 2177:18, 2178:3,
2178:11, 2179:16, 2179:17,
2179:20, 2180:5
   **practice** [5] - 2095:7, 2102:23,
2165:6, 2174:9, 2194:3
   **practices** [1] - 2099:5
   **Pratt** [1] - 2086:22
   **precise** [1] - 2117:14
   **preparation** [2] - 2091:4,
2184:16
   **prepared** [1] - 2089:4
   **present** [3] - 2088:3, 2088:15,
2088:23
   **presented** [1] - 2164:11
   **presents** [1] - 2164:8
   **President** [1] - 2165:17

**presidential** [2] - 2163:20, 2185:11
**press** [9] - 2108:17, 2109:20, 2112:4, 2122:15, 2122:23, 2192:23, 2193:6, 2210:4, 2210:14
**pressure** [1] - 2193:6
**previous** [3] - 2122:2, 2127:23, 2129:21
**previously** [22] - 2096:7, 2097:6, 2101:1, 2103:16, 2107:22, 2108:23, 2112:8, 2112:22, 2115:6, 2117:21, 2118:19, 2120:9, 2122:6, 2124:4, 2126:17, 2128:18, 2130:14, 2132:3, 2134:18, 2140:2, 2143:13, 2148:6
**primarily** [1] - 2091:21
**prime** [1] - 2090:20
**principal** [3] - 2092:15, 2169:14, 2170:4
**printout** [1] - 2135:2
**privy** [1] - 2192:19
**problem** [2] - 2099:2, 2107:1
**problems** [3] - 2115:16, 2115:17, 2211:19
**Proc** [1] - 2098:12
**procedural** [2] - 2094:11, 2157:23
**procedure** [1] - 2168:6
**procedures** [1] - 2168:11
**proceed** [3] - 2089:7, 2100:19, 2162:12
**proceeded** [1] - 2090:23
**proceeding** [2] - 2168:22, 2174:14
**proceedings** [2] - 2106:11, 2216:8
**process** [13] - 2090:21, 2094:11, 2104:22, 2134:22, 2142:3, 2156:25, 2157:6, 2157:24, 2159:4, 2159:15, 2160:8, 2168:19, 2173:7
**produce** [1] - 2110:19
**produced** [3] - 2171:25, 2201:8, 2205:5
**production** [1] - 2205:3
**professionally** [1] - 2115:23
**project** [34] - 2090:13, 2090:17, 2090:22, 2091:5, 2091:7, 2091:11, 2092:3, 2092:16, 2093:2, 2093:5, 2094:13, 2094:21, 2095:19, 2095:22, 2097:24, 2098:18, 2098:22, 2100:1, 2101:14, 2101:17, 2104:7, 2126:10, 2163:19, 2167:7, 2167:19, 2167:24, 2169:7, 2177:24, 2184:22, 2184:24, 2187:17, 2195:21, 2209:8

**Project** [12] - 2098:11, 2099:7, 2101:17, 2104:2, 2104:16, 2184:11, 2184:13, 2184:15, 2184:17, 2184:19, 2197:2
**projects** [3] - 2098:13, 2098:15, 2167:7
**prompted** [1] - 2182:6
**pronounce** [1] - 2181:18
**pronounced** [1] - 2174:3
**properties** [1] - 2166:15
**propose** [2] - 2100:1, 2133:11
**proposed** [5] - 2133:13, 2146:21, 2146:23, 2147:20, 2200:17
**proposed'** [1] - 2129:10
**prosecution** [9] - 2090:19, 2090:25, 2098:24, 2120:20, 2121:6, 2121:7, 2157:25, 2209:12, 2209:13
**Prosecutor** [1] - 2172:21
**prosecutors** [1] - 2098:21
**prospect** [1] - 2167:14
**protection** [1] - 2099:5
**provide** [7] - 2094:8, 2094:10, 2107:8, 2126:3, 2148:16, 2148:21, 2178:3
**provided** [4] - 2133:14, 2133:21, 2136:24, 2190:21
**providing** [5] - 2111:19, 2138:13, 2180:24, 2182:1, 2190:24
**provision** [1] - 2173:12
**Pshanka** [2] - 2155:16
**public** [27] - 2094:23, 2106:2, 2106:12, 2110:10, 2115:3, 2118:3, 2118:10, 2118:12, 2118:16, 2120:25, 2121:1, 2122:19, 2123:5, 2123:9, 2123:24, 2134:3, 2134:7, 2137:1, 2153:20, 2178:6, 2180:2, 2190:10, 2192:4, 2194:2, 2195:18, 2195:23
**public-relations** [1] - 2115:3
**publication** [2] - 2166:11, 2185:9
**publicity** [3] - 2109:9, 2109:10, 2109:11
**publicize** [2] - 2094:23, 2178:7
**publicly** [1] - 2193:5
**publish** [1] - 2160:16
**publisher** [2] - 2166:5, 2212:3
**pull** [1] - 2190:4
**purpose** [7] - 2134:11, 2141:7, 2141:16, 2141:21, 2174:10, 2195:25
**pursuant** [1] - 2125:21
**put** [18] - 2092:18, 2133:1, 2133:5, 2133:24, 2134:17, 2138:19, 2149:8, 2152:23, 2158:10, 2158:15, 2159:6,

2159:9, 2161:10, 2189:8, 2207:14, 2207:15, 2210:17, 2213:18

## Q

**questions** [20] - 2105:23, 2107:8, 2111:2, 2126:6, 2126:9, 2126:14, 2127:5, 2132:21, 2152:6, 2158:25, 2161:15, 2178:3, 2180:19, 2186:3, 2190:20, 2195:7, 2195:8, 2196:1, 2198:2, 2202:17
**quickly** [2] - 2144:18, 2147:9
**quite** [2] - 2194:18, 2194:22
**quotations** [1] - 2210:9
**quote** [9] - 2120:19, 2121:7, 2121:15, 2121:19, 2208:19, 2209:8, 2209:13, 2209:16, 2210:1
**quotes** [5] - 2207:5, 2207:7, 2208:19, 2209:1, 2214:1

## R

**raise** [1] - 2112:11
**raised** [3] - 2105:24, 2105:25, 2190:20
**raising** [1] - 2111:2
**range** [4] - 2140:17, 2140:20, 2146:21, 2147:20
**rather** [2] - 2154:19, 2195:3
**Re** [2] - 2125:1, 2125:20
**reach** [3] - 2104:25, 2125:11, 2211:11
**reached** [3] - 2090:14, 2193:24, 2194:19
**reaching** [1] - 2092:9
**react** [1] - 2207:8
**reacting** [1] - 2207:6
**reaction** [4] - 2099:19, 2106:21, 2192:8, 2192:20
**read** [12] - 2095:10, 2110:6, 2110:13, 2115:20, 2129:8, 2129:9, 2136:17, 2141:5, 2144:13, 2194:6, 2205:22, 2211:13
**reading** [5] - 2099:19, 2099:20, 2108:6, 2129:22, 2131:10
**reads** [2] - 2197:24, 2214:7
**ready** [1] - 2088:18
**realize** [1] - 2145:8
**really** [7] - 2101:6, 2103:7, 2111:14, 2175:1, 2176:5, 2195:18, 2197:17
**reason** [8] - 2158:4, 2158:9, 2161:12, 2193:5, 2201:21, 2209:21, 2209:23, 2210:7
**reasons** [4] - 2106:25, 2157:14, 2177:20, 2206:20

**recalling** [1] - 2154:13
**receive** [1] - 2157:6
**received** [10] - 2125:5, 2134:13, 2141:8, 2141:17, 2149:14, 2155:15, 2171:4, 2198:1, 2198:5, 2209:22
**receiving** [7] - 2108:6, 2113:2, 2117:23, 2129:17, 2151:17, 2151:20, 2202:2
**recent** [2] - 2129:19, 2151:11
**recess** [2] - 2154:12, 2215:9
**recognize** [4] - 2134:21, 2134:22, 2134:23, 2135:23
**recognized** [3] - 2168:24, 2187:13
**recollection** [16] - 2109:6, 2127:12, 2151:18, 2170:20, 2170:22, 2171:6, 2182:5, 2185:15, 2185:16, 2188:14, 2194:17, 2197:21, 2197:23, 2197:24, 2199:16, 2200:24
**recommended** [1] - 2179:11
**record** [7] - 2088:6, 2089:17, 2120:22, 2132:9, 2193:22, 2208:19, 2213:13
**records** [2] - 2149:8, 2201:8
**recount** [1] - 2094:3
**recruiting** [1] - 2167:4
**red** [8] - 2135:7, 2139:18, 2143:12, 2143:24, 2144:4, 2144:24, 2146:11, 2146:16
**redacted** [3] - 2100:10, 2213:19, 2213:21
**reference** [8] - 2122:21, 2148:20, 2173:9, 2186:4, 2199:13, 2205:15, 2205:23, 2211:6
**references** [4] - 2101:12, 2116:6, 2132:13, 2186:10
**referencing** [1] - 2129:20
**referred** [1] - 2152:22
**referring** [7] - 2099:20, 2103:13, 2109:8, 2111:19, 2131:10, 2136:9, 2200:21
**refers** [1] - 2149:5
**reflect** [1] - 2185:22
**reflects** [1] - 2192:7
**refresh** [2] - 2109:6, 2197:22
**refreshes** [1] - 2197:24
**refused** [1] - 2194:15
**regard** [1] - 2101:20
**regarding** [2] - 2108:17, 2118:13
**register** [14] - 2096:1, 2101:8, 2101:9, 2102:10, 2103:10, 2106:15, 2125:21, 2126:2, 2152:3, 2175:12, 2175:20, 2176:25, 2177:3, 2179:10
**registered** [2] - 2185:12, 2185:24

**Registration** [2] - 2125:22, 2173:14
**registration** [3] - 2106:18, 2178:16, 2182:8
**regulations** [4] - 2170:14, 2170:18, 2181:8, 2182:15
**Rein** [3] - 2165:23, 2165:24, 2166:1
**related** [2] - 2115:4, 2129:7
**relating** [1] - 2169:19
**relation** [3] - 2104:14, 2104:17, 2119:13
**relations** [7] - 2106:2, 2106:12, 2115:3, 2178:6, 2180:2, 2194:2, 2195:18
**relationship** [1] - 2115:25
**release** [10] - 2133:9, 2137:1, 2160:4, 2161:1, 2198:12, 2198:20, 2200:17, 2200:22, 2203:23, 2204:7
**released** [9] - 2117:11, 2117:12, 2117:16, 2117:18, 2117:24, 2148:3, 2157:10, 2167:25, 2204:4
**relentlessly** [1] - 2192:23
**relevant** [2] - 2159:4, 2174:10
**rely** [2] - 2103:9, 2176:6
**remain** [2] - 2167:23, 2192:25
**remember** [112] - 2090:16, 2091:13, 2092:22, 2093:3, 2093:4, 2096:19, 2096:23, 2096:25, 2097:1, 2098:14, 2098:17, 2098:18, 2099:1, 2099:17, 2099:25, 2100:2, 2100:3, 2102:11, 2102:14, 2102:15, 2102:16, 2103:3, 2105:3, 2105:4, 2105:5, 2105:6, 2107:14, 2108:6, 2108:9, 2108:20, 2109:22, 2113:2, 2113:11, 2113:19, 2114:21, 2114:23, 2115:2, 2115:17, 2116:11, 2116:15, 2116:17, 2116:24, 2117:4, 2117:10, 2117:12, 2117:14, 2117:23, 2118:1, 2118:2, 2118:10, 2119:2, 2119:12, 2119:18, 2119:21, 2120:5, 2121:17, 2121:21, 2121:23, 2122:1, 2122:17, 2123:8, 2124:1, 2128:2, 2128:11, 2130:4, 2130:6, 2130:11, 2130:12, 2131:12, 2136:18, 2136:20, 2137:6, 2137:8, 2138:4, 2138:5, 2138:12, 2151:17, 2152:2, 2152:7, 2152:8, 2152:10, 2152:13, 2152:17, 2153:5, 2153:7, 2171:3, 2175:3, 2176:1, 2177:4, 2181:22, 2184:7, 2185:17, 2186:10, 2186:12, 2190:19, 2194:11, 2196:2,

2197:17, 2198:5, 2202:5, 2202:9, 2207:21, 2207:23, 2207:24, 2209:3, 2209:18, 2210:11, 2212:9, 2212:16, 2212:17
**remembers** [1] - 2207:21
**remind** [3] - 2145:12, 2153:17, 2162:11
**reminded** [1] - 2099:1
**render** [2] - 2167:20, 2168:5
**Renewed** [1] - 2112:3
**Rep** [1] - 2137:21
**repeat** [2] - 2105:18, 2149:16
**repetitive** [2] - 2155:13, 2155:25
**reply** [1] - 2095:9
**Report** [82] - 2090:24, 2090:25, 2091:4, 2091:8, 2091:17, 2092:11, 2097:21, 2100:23, 2101:20, 2108:18, 2110:4, 2112:19, 2114:7, 2117:11, 2117:12, 2117:17, 2117:24, 2118:2, 2118:10, 2118:12, 2118:13, 2118:15, 2118:16, 2119:16, 2119:19, 2120:24, 2121:15, 2121:19, 2122:19, 2123:4, 2123:9, 2123:19, 2123:21, 2123:24, 2133:9, 2133:14, 2134:3, 2134:8, 2136:25, 2139:5, 2148:3, 2154:21, 2155:1, 2155:11, 2155:14, 2156:9, 2157:7, 2157:9, 2157:15, 2157:24, 2158:3, 2160:2, 2160:3, 2160:10, 2160:16, 2167:15, 2167:25, 2168:10, 2168:13, 2168:17, 2168:19, 2171:22, 2171:24, 2178:8, 2178:9, 2180:19, 2180:25, 2183:23, 2184:8, 2186:15, 2199:21, 2200:3, 2203:24, 2204:4, 2204:20, 2206:9, 2206:12, 2209:16, 2211:22, 2214:12
**report** [29] - 2090:11, 2090:19, 2092:9, 2098:23, 2099:10, 2106:5, 2106:10, 2110:18, 2113:25, 2114:11, 2115:4, 2119:11, 2119:13, 2122:15, 2122:23, 2156:6, 2171:10, 2171:22, 2172:1, 2184:16, 2190:17, 2198:12, 2199:21, 2200:8, 2200:9, 2204:12, 2210:4, 2211:23, 2214:8
**report-media** [3] - 2113:25, 2114:11, 2199:21
**reported** [1] - 2129:15
**reporter** [2] - 2119:5, 2123:15
**Reporter** [3] - 2087:7, 2087:7, 2216:13
**REPORTER** [1] - 2216:2

reporters [1] - 2118:15
reporting [4] - 2134:13, 2141:8, 2141:18, 2185:10
reports [2] - 2109:7, 2176:16
representation [4] - 2107:2, 2107:4, 2107:5, 2177:21
representative [1] - 2099:21
representatives [2] - 2091:16, 2136:15
representing [3] - 2092:7, 2092:11, 2169:17
reputation [2] - 2195:19, 2195:20
request [9] - 2129:11, 2135:13, 2135:23, 2136:9, 2150:24, 2151:19, 2155:25, 2156:2, 2210:1
Request [2] - 2124:25, 2125:1
requested [1] - 2181:22
requests [4] - 2152:19, 2155:13, 2155:18, 2156:1
require [4] - 2097:24, 2125:9, 2175:20, 2178:16
required [1] - 2126:2
requirements [2] - 2102:25, 2182:8
requires [1] - 2106:18
requiring [1] - 2101:9
research [9] - 2096:17, 2169:9, 2181:5, 2181:23, 2182:1, 2182:13, 2183:20, 2184:24, 2215:3
researching [1] - 2088:24
residence [1] - 2089:19
resist [1] - 2088:24
respect [11] - 2091:8, 2102:12, 2155:2, 2157:23, 2194:20, 2195:17, 2204:20, 2205:3, 2205:19, 2214:1, 2214:11
respected [1] - 2094:10
respond [14] - 2094:16, 2094:19, 2095:24, 2102:18, 2103:5, 2107:10, 2107:12, 2111:21, 2111:24, 2112:1, 2119:10, 2121:13, 2121:18, 2125:10
responded [4] - 2191:22, 2193:10, 2212:1, 2214:7
response [17] - 2099:22, 2111:9, 2125:8, 2126:20, 2131:20, 2131:21, 2133:11, 2133:13, 2133:20, 2134:6, 2147:8, 2147:13, 2148:10, 2149:14, 2150:11, 2150:21, 2207:13
responses [2] - 2127:13
responsibility [1] - 2090:24
responsible [2] - 2148:23, 2166:12
rest [2] - 2136:2, 2136:11

result [1] - 2194:14
results [1] - 2094:23
resume [1] - 2215:1
retained [1] - 2173:13
retainer [3] - 2173:12, 2187:25, 2188:10
retire [1] - 2090:1
retired [2] - 2089:22, 2090:5
returning [2] - 2189:21, 2190:2
reveal [3] - 2190:23, 2191:10, 2194:3
reveals [1] - 2174:13
revelation [1] - 2194:12
review [7] - 2090:19, 2090:25, 2093:7, 2101:20, 2125:2, 2125:8, 2156:2
reviewed [1] - 2174:11
reviewing [1] - 2155:18
revised [1] - 2203:4
Rice [1] - 2205:23
ridiculous [1] - 2187:10
right-hand [1] - 2135:13
rights [3] - 2099:5, 2168:20, 2168:24
RMR [2] - 2087:7, 2216:13
Rohde [17] - 2088:10, 2096:20, 2120:11, 2125:23, 2130:17, 2132:10, 2132:17, 2133:1, 2134:16, 2135:18, 2138:15, 2139:24, 2140:13, 2141:1, 2141:11, 2141:25, 2143:10
rohde [1] - 2133:25
role [14] - 2090:22, 2090:23, 2091:5, 2095:7, 2101:14, 2112:17, 2112:19, 2137:17, 2166:11, 2167:2, 2167:4, 2185:18, 2192:3, 2197:12
Romney [3] - 2185:12, 2185:18, 2185:24
Room [2] - 2087:8, 2216:14
Roseen [2] - 2108:2, 2183:21
rule [13] - 2098:3, 2098:21, 2098:23, 2098:25, 2101:18, 2107:2, 2107:3, 2136:3, 2136:8, 2159:18, 2184:14, 2187:24, 2195:22
ruled [1] - 2159:19
runs [1] - 2181:12
Russia [1] - 2095:16
Russian [2] - 2091:25, 2155:22
rustling [1] - 2195:10

S

S-L-O-A-N [1] - 2089:18
SA [3] - 2113:24, 2114:11, 2199:21
Saira [2] - 2192:13, 2193:16
SANCHEZ [2] - 2088:7, 2088:19
Sanchez [1] - 2086:12

sanchez@usdoj.gov [1] - 2086:16
sanger [1] - 2210:9
Sanger [21] - 2118:25, 2119:4, 2119:5, 2119:12, 2119:15, 2119:18, 2119:22, 2120:14, 2121:2, 2121:7, 2121:24, 2122:3, 2133:17, 2134:9, 2139:8, 2205:12, 2205:15, 2206:12, 2209:8, 2209:13, 2210:1
saw [5] - 2123:8, 2145:13, 2200:18, 2200:21, 2201:5
schedule [1] - 2089:1
Schoen [6] - 2093:2, 2093:3, 2093:5, 2106:24, 2133:17, 2161:5
scholar [1] - 2089:24
school [6] - 2162:19, 2162:22, 2162:24, 2163:3, 2163:6, 2163:7
School [2] - 2089:23, 2162:25
scope [10] - 2156:4, 2159:1, 2161:11, 2161:13, 2188:23, 2189:10, 2196:11, 2196:21, 2203:1, 2207:18
screen [10] - 2093:9, 2133:3, 2134:18, 2181:21, 2182:23, 2183:3, 2183:4, 2201:2, 2202:15, 2213:22
screens [1] - 2133:7
Scudder [1] - 2098:11
seats [1] - 2195:10
Second [2] - 2182:20, 2183:15
second [28] - 2093:19, 2097:7, 2097:22, 2100:7, 2103:17, 2107:1, 2110:1, 2114:14, 2116:14, 2125:17, 2125:24, 2126:9, 2127:7, 2129:4, 2129:9, 2132:16, 2140:12, 2141:1, 2147:19, 2147:23, 2152:15, 2155:3, 2168:22, 2184:11, 2184:13, 2201:2, 2210:24, 2212:7
secretary [5] - 2143:2, 2204:1, 2205:19, 2206:3, 2206:5
Security [1] - 2125:6
see [31] - 2090:20, 2100:8, 2100:13, 2119:8, 2120:1, 2123:5, 2129:11, 2131:25, 2132:3, 2133:7, 2145:7, 2147:8, 2153:20, 2159:7, 2159:20, 2168:7, 2170:12, 2173:5, 2173:15, 2175:12, 2186:8, 2193:5, 2195:9, 2195:15, 2199:22, 2200:10, 2202:21, 2202:24, 2206:22, 2208:13, 2208:19
seeing [3] - 2100:11, 2109:22, 2181:25
seem [4] - 2145:19, 2156:7,

2176:18, 2192:21
**selective** [2] - 2121:6, 2209:12
**send** [6] - 2123:21, 2147:9, 2147:10, 2148:17, 2150:1, 2156:12
**sending** [11] - 2093:22, 2093:23, 2109:14, 2109:15, 2122:17, 2142:14, 2142:23, 2143:12, 2143:24, 2148:18, 2209:7
**sends** [1] - 2120:19
**senior** [4] - 2093:23, 2095:4, 2173:9, 2174:9
**sense** [8] - 2156:8, 2157:11, 2158:4, 2158:6, 2158:7, 2158:8, 2178:8, 2210:13
**sent** [23] - 2103:23, 2104:2, 2116:4, 2123:18, 2126:20, 2127:2, 2135:3, 2143:13, 2151:24, 2161:5, 2173:4, 2176:16, 2177:15, 2183:20, 2189:4, 2192:10, 2197:9, 2199:2, 2199:4, 2199:5, 2208:18, 2209:22, 2209:25
**sentence** [3] - 2141:5, 2141:15, 2200:7
**September** [8] - 2115:1, 2115:13, 2115:18, 2151:15, 2202:3, 2202:8, 2202:11, 2204:10
**series** [1] - 2208:18
**serious** [3] - 2110:14, 2111:2, 2138:9
**serve** [1] - 2192:22
**services** [2] - 2111:6, 2188:8
**set** [2] - 2161:10, 2197:6
**sets** [1] - 2155:13
**seven** [1] - 2171:1
**several** [6] - 2164:4, 2168:17, 2173:22, 2183:25, 2184:2, 2184:3
**shared** [1] - 2172:13
**Shoen** [2] - 2094:4, 2137:15
**shortfall** [2] - 2188:15
**show** [9] - 2145:1, 2156:20, 2181:14, 2188:17, 2197:18, 2197:23, 2198:11, 2202:14
**showed** [2] - 2188:3, 2209:7
**showing** [3] - 2096:7, 2126:16, 2197:10
**shown** [7] - 2167:12, 2176:14, 2183:18, 2199:1, 2201:16, 2203:18, 2204:25
**shy** [1] - 2188:4
**sic** [3] - 2133:15, 2138:19, 2138:25
**side** [5] - 2110:9, 2135:14, 2144:18, 2153:23, 2190:8
**signature** [1] - 2127:18
**signed** [6] - 2098:11, 2128:2,

2128:3, 2128:4, 2128:5, 2147:16
**signs** [1] - 2127:25
**similar** [2] - 2200:2, 2201:3
**simply** [1] - 2100:16
**Singer** [1] - 2142:24
**singer** [3] - 2143:1, 2143:12, 2143:24
**single** [2] - 2180:15
**sit** [2] - 2111:18, 2138:7
**sitting** [2] - 2099:20, 2111:18
**situation** [3] - 2095:13, 2169:13, 2169:17
**situations** [1] - 2099:2
**six** [1] - 2097:25
**Skadden** [85] - 2089:22, 2090:1, 2090:3, 2090:4, 2090:8, 2090:10, 2092:1, 2092:12, 2095:6, 2096:16, 2098:15, 2102:9, 2102:22, 2104:1, 2105:13, 2108:18, 2109:3, 2109:5, 2109:20, 2109:24, 2110:3, 2110:8, 2110:9, 2110:14, 2110:18, 2112:3, 2114:7, 2123:18, 2124:17, 2124:20, 2124:22, 2129:17, 2143:2, 2150:14, 2150:17, 2150:19, 2150:22, 2152:3, 2153:6, 2155:15, 2157:9, 2160:1, 2166:20, 2166:21, 2166:23, 2166:25, 2167:3, 2167:5, 2168:1, 2169:13, 2172:14, 2175:10, 2177:5, 2177:13, 2178:9, 2178:25, 2179:10, 2180:1, 2180:4, 2180:15, 2183:25, 2184:14, 2186:3, 2186:17, 2187:13, 2190:2, 2190:8, 2190:9, 2192:7, 2192:17, 2193:18, 2195:17, 2195:19, 2195:20, 2196:15, 2199:14, 2199:21, 2200:3, 2200:8, 2200:18, 2201:8, 2210:18, 2211:3, 2211:22, 2212:17
**Skadden's** [3] - 2095:7, 2174:1, 2214:11
**Skelly** [1] - 2163:13
**skipped** [1] - 2159:15
**SL** [2] - 2199:20, 2200:2
**Slate** [4] - 2166:6, 2166:7, 2166:11, 2166:16
**Slattery** [1] - 2133:16
**SLOAN** [1] - 2089:9
**Sloan** [39] - 2087:14, 2089:8, 2089:18, 2100:22, 2108:16, 2112:21, 2118:2, 2123:4, 2134:21, 2135:22, 2140:18, 2141:5, 2141:23, 2146:10, 2146:25, 2147:12, 2150:10, 2154:20, 2154:25, 2155:4, 2155:17, 2156:5, 2159:1,

2160:7, 2160:12, 2162:16, 2180:1, 2183:14, 2195:17, 2198:25, 2201:16, 2202:2, 2203:5, 2203:21, 2207:4, 2207:6, 2207:8, 2207:22, 2208:11
**smaller** [1] - 2133:4
**smiled** [1] - 2145:14
**so-called** [1] - 2184:11
**sole** [2] - 2139:6, 2160:3
**Solicitor** [3] - 2164:5, 2164:13, 2164:15
**someone** [9] - 2094:8, 2103:8, 2110:9, 2142:24, 2146:7, 2176:1, 2176:2, 2176:6, 2190:8
**sometimes** [2] - 2099:3, 2156:1
**soon** [6] - 2101:6, 2102:7, 2104:22, 2150:14, 2175:1, 2175:9
**sorry** [24] - 2093:11, 2093:22, 2097:17, 2125:4, 2128:5, 2137:22, 2144:20, 2146:22, 2147:1, 2147:15, 2147:22, 2147:23, 2149:16, 2155:3, 2156:18, 2164:25, 2170:16, 2188:21, 2189:23, 2191:22, 2199:4, 2200:8, 2203:20, 2206:19
**sort** [12] - 2092:14, 2101:16, 2109:9, 2124:19, 2145:14, 2152:5, 2174:22, 2185:18, 2188:7, 2194:2, 2210:17
**sound** [1] - 2161:21
**sounds** [1] - 2098:2
**source** [1] - 2208:19
**spaces** [1] - 2153:21
**SPAEDER** [2] - 2086:22, 2087:2
**speaker** [1] - 2092:18
**speaking** [2] - 2091:14, 2153:24
**Special** [2] - 2090:7, 2164:3
**special** [1] - 2185:24
**specialist** [1] - 2088:9
**specific** [2] - 2102:11, 2117:17
**specifically** [3] - 2101:7, 2128:11, 2175:1
**specificity** [1] - 2150:10
**speculating** [1] - 2115:25
**speculation** [2] - 2110:8, 2190:5, 2190:7, 2206:5
**spell** [1] - 2089:16
**spent** [1] - 2101:15
**Spiegel** [13] - 2124:7, 2124:21, 2125:3, 2126:19, 2128:7, 2130:3, 2130:7, 2148:17, 2149:13, 2149:19, 2149:21, 2152:17, 2214:15
**spin** [2] - 2107:5, 2177:22
**split** [1] - 2134:18
**spoken** [2] - 2174:13, 2176:17
**stand** [2] - 2171:9, 2193:2

**standards** [4] - 2090:21, 2091:1, 2094:12, 2168:25
**start** [7] - 2093:21, 2097:13, 2100:16, 2115:8, 2130:19, 2195:9, 2197:1
**started** [2] - 2146:6, 2164:25
**starting** [2] - 2110:7, 2136:13
**starts** [2] - 2093:20, 2115:11
**state** [7] - 2089:19, 2126:1, 2156:16, 2156:18, 2205:19, 2206:3, 2206:6
**State** [4] - 2090:7, 2151:5, 2151:10, 2152:21
**statement** [5] - 2159:25, 2186:20, 2203:2, 2210:17, 2210:21
**statements** [5] - 2134:9, 2134:12, 2141:7, 2141:16, 2212:10
**STATES** [2] - 2086:1, 2086:10
**States** [8] - 2086:3, 2087:8, 2088:3, 2133:16, 2154:14, 2164:9, 2164:10, 2169:20
**statute** [4] - 2169:10, 2170:9, 2170:10, 2182:16
**stay** [3] - 2121:14, 2121:16, 2209:15
**stayed** [2] - 2187:2, 2187:4
**stenograph** [1] - 2216:7
**step** [2] - 2155:8, 2193:12
**stepped** [1] - 2185:18
**Stevens** [4] - 2163:10, 2163:14, 2163:15, 2163:17
**stick** [2] - 2193:1, 2194:3
**still** [2] - 2112:5, 2162:11
**Stink** [6] - 2109:5, 2109:24, 2112:3, 2186:3, 2190:2, 2195:17
**stipulation** [2] - 2144:12, 2144:25
**stirred** [1] - 2117:3
**stood** [1] - 2161:12
**stop** [2] - 2145:2, 2145:9
**stopped** [1] - 2157:9
**story** [2] - 2193:7, 2212:2
**straight** [2] - 2103:9, 2176:7
**strategy** [1] - 2200:12
**Strategy** [1] - 2200:6
**Street** [3] - 2086:14, 2086:22, 2087:2
**structural** [2] - 2126:14, 2127:5
**structure** [2] - 2125:10, 2126:7
**stuff** [3] - 2129:15, 2142:18, 2202:25
**subcontract** [3] - 2106:14, 2176:24, 2177:5
**subcontracted** [1] - 2177:8
**Subject** [2] - 2093:25, 2199:21
**subject** [16] - 2104:10, 2105:1, 2109:4, 2109:5, 2113:24, 2114:11, 2115:15, 2118:25,

2120:15, 2123:23, 2124:24, 2124:25, 2129:19, 2140:7, 2211:2, 2214:17
**submitted** [1] - 2156:21
**subsidiaries** [1] - 2166:17
**subsidiary** [3] - 2166:4, 2166:10, 2166:12
**substance** [2] - 2197:2, 2212:18, 2212:20, 2212:22
**substantive** [1] - 2156:3
**subtract** [1] - 2205:4
**successful** [2] - 2101:6, 2174:25
**sufficient** [1] - 2188:10
**suggested** [1] - 2128:7
**suggestion** [1] - 2109:10
**suggestions** [1] - 2104:23
**suggests** [1] - 2176:22
**Suite** [2] - 2086:23, 2087:3
**summarize** [1] - 2157:18
**summary** [1] - 2182:12
**summer** [1] - 2184:21
**summertime** [1] - 2107:17
**supposed** [1] - 2158:22
**Supreme** [4] - 2089:24, 2163:9, 2164:10, 2165:6
**surprised** [1] - 2158:20
**Susan** [4] - 2118:22, 2205:16, 2205:23
**sustained** [2] - 2172:23, 2204:22
**Swaan** [1] - 2201:4
**sworn** [1] - 2089:10
**system** [1] - 2094:10

**T**

**table** [1] - 2145:2
**talks** [1] - 2170:3
**tax** [1] - 2174:9
**Taylor** [2] - 2086:21, 2088:13
**teach** [1] - 2099:4
**team** [11] - 2101:8, 2106:25, 2133:15, 2133:16, 2134:14, 2141:9, 2141:19, 2175:2, 2186:15, 2192:10, 2211:20
**teaser** [1] - 2192:22
**technology** [1] - 2131:24
**Telegraph** [4] - 2207:1, 2207:17, 2208:13, 2209:1
**ten** [5] - 2130:9, 2145:23, 2154:3, 2154:10, 2155:13
**tenure** [1] - 2164:15
**terms** [4] - 2092:15, 2101:20, 2152:16, 2170:1
**testified** [6] - 2089:11, 2155:12, 2160:13, 2160:21, 2190:14, 2212:22
**testify** [3] - 2156:25, 2197:25, 2212:19

**testimony** [4] - 2159:25, 2160:18, 2170:21, 2196:2
**text** [3] - 2127:17, 2128:19, 2130:15
**thanked** [1] - 2177:16
**thankfully** [1] - 2146:11
**THE** [165] - 2086:1, 2086:1, 2086:9, 2086:13, 2088:1, 2088:11, 2088:16, 2088:20, 2088:22, 2089:7, 2100:7, 2108:12, 2108:14, 2118:6, 2118:8, 2122:25, 2123:2, 2135:7, 2135:9, 2135:12, 2135:13, 2135:15, 2135:16, 2144:9, 2144:11, 2144:14, 2144:17, 2144:21, 2145:1, 2145:5, 2145:7, 2145:15, 2145:17, 2145:19, 2145:22, 2145:24, 2146:3, 2146:5, 2149:2, 2149:5, 2149:7, 2149:9, 2149:10, 2152:13, 2152:15, 2153:13, 2154:7, 2154:10, 2154:13, 2154:16, 2154:18, 2154:22, 2155:3, 2155:5, 2155:8, 2155:10, 2156:11, 2156:14, 2156:19, 2156:24, 2157:3, 2157:5, 2157:12, 2158:6, 2158:8, 2158:12, 2158:17, 2158:21, 2159:7, 2159:23, 2160:13, 2160:18, 2160:24, 2161:3, 2161:6, 2161:17, 2161:21, 2161:23, 2162:3, 2162:5, 2162:9, 2171:18, 2172:7, 2172:16, 2172:23, 2179:3, 2179:5, 2179:11, 2179:18, 2180:10, 2180:14, 2180:17, 2180:18, 2180:21, 2180:22, 2183:3, 2183:6, 2183:11, 2188:12, 2188:14, 2188:21, 2188:24, 2189:1, 2189:16, 2189:22, 2189:24, 2194:21, 2194:24, 2195:3, 2195:6, 2195:12, 2195:14, 2196:12, 2196:14, 2196:22, 2196:24, 2197:7, 2197:20, 2198:4, 2198:10, 2198:16, 2198:21, 2200:20, 2200:24, 2201:1, 2201:6, 2201:11, 2201:14, 2201:20, 2201:23, 2201:24, 2202:7, 2202:9, 2202:12, 2202:15, 2202:19, 2202:21, 2202:23, 2203:7, 2203:12, 2203:14, 2204:14, 2204:15, 2204:17, 2204:22, 2206:15, 2206:17, 2206:19, 2207:10, 2207:14, 2207:18, 2208:2, 2208:4, 2208:7, 2212:13, 2212:15, 2212:19, 2213:12, 2213:15, 2213:17, 2213:21, 2214:16,

2214:19, 2214:24, 2215:7
**theme** [1] - 2168:9
**thereafter** [1] - 2150:14
**thinking** [3] - 2099:1, 2114:23, 2157:18
**thinks** [3] - 2118:22, 2205:16, 2207:6
**third** [10] - 2111:4, 2126:12, 2127:10, 2127:16, 2147:16, 2190:24, 2191:15, 2192:24, 2193:11, 2194:4
**third-party** [6] - 2111:4, 2190:24, 2191:15, 2192:24, 2193:11, 2194:4
**thoughts** [2] - 2193:8, 2204:19
**thread** [5] - 2101:2, 2120:13, 2121:21, 2122:7, 2150:4
**threat** [1] - 2109:9
**three** [6] - 2109:18, 2112:24, 2148:17, 2151:25, 2152:1, 2200:18
**throughout** [3] - 2095:7, 2160:8, 2167:23
**timing** [1] - 2088:17
**title** [2] - 2109:24, 2124:19
**titled** [1] - 2114:3
**today** [5] - 2125:6, 2170:21, 2171:7, 2176:1, 2176:15
**together** [2] - 2152:23, 2167:7
**Tom** [1] - 2208:12
**tomorrow** [3] - 2099:14, 2122:15, 2210:4
**tonight** [2] - 2122:15, 2210:5
**top** [26] - 2096:9, 2101:2, 2105:7, 2111:11, 2117:21, 2119:24, 2121:11, 2124:17, 2125:18, 2126:17, 2135:19, 2136:25, 2140:3, 2142:11, 2142:21, 2143:9, 2147:2, 2148:7, 2151:3, 2174:22, 2175:17, 2185:11, 2193:16, 2196:20, 2205:2, 2208:22
**topic** [1] - 2203:8
**tops** [1] - 2143:21
**total** [1] - 2168:18
**transactions** [1] - 2161:10
**TRANSCRIPT** [1] - 2086:8
**transcript** [2] - 2216:6, 2216:7
**translated** [1] - 2156:1
**translation** [1] - 2155:22
**transmission** [1] - 2201:18
**transmittal** [1] - 2201:3
**transmitted** [1] - 2198:17
**transpires** [1] - 2153:25
**travel** [1] - 2188:6
**traveling** [1] - 2204:3
**trial** [14] - 2094:18, 2094:24, 2094:25, 2097:22, 2104:18, 2120:23, 2125:2, 2138:10, 2169:23, 2184:11, 2184:13,

2184:15, 2211:18, 2211:23
**Trial** [1] - 2211:3
**TRIAL** [2] - 2086:4, 2086:8
**trigger** [1] - 2106:11
**trip** [8] - 2096:23, 2096:25, 2097:2, 2097:3, 2100:4, 2187:5, 2187:7, 2187:9
**troubling** [1] - 2211:18
**true** [6] - 2115:22, 2137:10, 2167:23, 2210:10, 2216:6, 2216:7
**True** [1] - 2137:3
**truly** [2] - 2116:1, 2192:25
**trust** [1] - 2088:23
**try** [7] - 2099:5, 2131:24, 2159:9, 2195:6, 2195:8, 2195:14, 2215:1
**trying** [2] - 2157:17, 2197:9
**Tuesday** [1] - 2113:8
**tune** [1] - 2187:17
**turn** [8] - 2093:19, 2127:1, 2186:6, 2187:2, 2191:20, 2199:24, 2200:6, 2203:18
**turning** [1] - 2208:11
**tweaks** [1] - 2142:14
**two** [25] - 2106:25, 2115:16, 2115:17, 2116:3, 2119:24, 2120:10, 2121:11, 2126:6, 2126:9, 2127:4, 2132:23, 2135:1, 2141:20, 2147:11, 2148:7, 2148:15, 2163:7, 2164:1, 2164:14, 2165:10, 2165:18, 2168:18, 2168:20, 2199:3, 2199:4
**Two** [4] - 2098:12, 2099:7, 2101:17, 2104:16
**Tymoshenko** [22] - 2090:11, 2090:20, 2093:25, 2104:17, 2119:11, 2119:13, 2125:1, 2134:14, 2136:22, 2141:9, 2141:19, 2167:7, 2167:15, 2168:10, 2169:23, 2183:23, 2187:5, 2206:9, 2206:12, 2211:23, 2214:11
**Tymoshenko's** [2] - 2133:15, 2168:2
**type** [1] - 2177:8

# U

**U.S** [6] - 2086:13, 2086:17, 2106:13, 2110:15, 2163:8, 2168:24
**Ukraine** [62] - 2091:12, 2091:15, 2091:17, 2092:1, 2092:8, 2092:11, 2093:6, 2096:23, 2096:25, 2097:2, 2097:15, 2097:18, 2098:8, 2098:16, 2099:9, 2100:4, 2101:15, 2102:8, 2106:11, 2108:17,

2110:4, 2110:17, 2111:20, 2115:4, 2118:3, 2118:12, 2118:16, 2120:16, 2122:11, 2122:15, 2122:23, 2123:5, 2126:9, 2129:17, 2133:15, 2134:14, 2136:15, 2137:1, 2137:24, 2139:5, 2141:10, 2141:18, 2158:3, 2160:1, 2160:9, 2169:19, 2172:14, 2172:20, 2175:10, 2177:6, 2178:7, 2185:2, 2185:12, 2185:13, 2185:20, 2186:1, 2186:11, 2187:4, 2191:16, 2209:8, 2210:4
**Ukraine's** [4] - 2104:17, 2116:1, 2160:3, 2161:2
**Ukrainian** [8] - 2106:15, 2115:25, 2131:6, 2131:8, 2169:18, 2177:11, 2190:10, 2211:3
**Ukrainian's** [1] - 2160:15
**Ukrainians** [4] - 2103:11, 2156:7, 2156:25, 2157:6
**Ukranian** [1] - 2161:3
**ultimate** [2] - 2179:6, 2179:9
**ultimately** [2] - 2158:3, 2189:5
**Um-hum..** [1] - 2126:22
**uncertain** [1] - 2101:21
**unclear** [1] - 2101:16
**uncommon** [1] - 2111:5
**under** [19] - 2096:1, 2100:12, 2106:15, 2125:7, 2126:3, 2152:3, 2162:11, 2165:17, 2168:25, 2169:14, 2170:1, 2170:2, 2175:20, 2177:1, 2177:3, 2177:9, 2181:9, 2200:6, 2205:5
**undermine** [2] - 2107:4, 2211:20
**understood** [2] - 2092:7, 2100:5
**underway** [1] - 2169:7
**unfair** [2] - 2168:5, 2168:11
**unfairness** [1] - 2094:24
**unhappy** [1] - 2156:9
**Unit** [17] - 2123:25, 2125:14, 2126:21, 2129:1, 2129:21, 2130:10, 2132:13, 2134:1, 2147:13, 2150:12, 2150:22, 2150:23, 2151:15, 2152:2, 2153:6, 2159:24, 2160:6
**Unit's** [2] - 2127:14, 2132:20
**UNITED** [2] - 2086:1, 2086:10
**United** [8] - 2086:3, 2087:8, 2088:2, 2133:16, 2154:14, 2164:9, 2164:10, 2169:20
**unless** [4] - 2156:17, 2191:11, 2191:13, 2194:5
**unwarranted** [1] - 2111:3
**unwise** [1] - 2176:23

**up** [36] - 2095:13, 2098:11, 2102:16, 2105:6, 2105:23, 2109:9, 2109:12, 2116:12, 2116:15, 2122:11, 2130:10, 2130:11, 2132:4, 2139:25, 2142:6, 2144:21, 2152:15, 2155:17, 2161:12, 2161:25, 2175:3, 2177:16, 2190:4, 2193:12, 2193:21, 2194:21, 2195:6, 2200:20, 2202:5, 2202:15, 2206:21, 2210:25, 2212:7, 2213:18
**update** [1] - 2098:7
**updated** [2] - 2182:12
**updating** [2] - 2129:1, 2129:7
**upset** [2] - 2116:2, 2157:1
**urgency** [1] - 2112:3
**usual** [2] - 2193:22, 2194:3
**UTC** [1] - 2205:5

## V

**validity** [1] - 2190:16
**van** [23] - 2091:24, 2103:24, 2103:25, 2104:10, 2104:12, 2105:3, 2105:24, 2109:18, 2113:6, 2113:9, 2116:3, 2116:14, 2173:5, 2175:15, 2176:11, 2184:6, 2197:8, 2197:9, 2199:2, 2199:5, 2200:14, 2201:4, 2203:22
**variety** [2] - 2111:5, 2166:4
**various** [1] - 2144:13
**Vegas** [1] - 2130:25
**Veritas** [1] - 2197:2
**version** [7] - 2114:10, 2181:8, 2200:2, 2201:17, 2202:2, 2213:22
**versus** [2] - 2121:6, 2209:12
**vet** [1] - 2098:2
**victim** [2] - 2168:5, 2168:10
**Victor** [1] - 2191:15
**view** [12] - 2094:18, 2094:24, 2095:12, 2104:15, 2106:10, 2157:7, 2172:3, 2172:4, 2172:13, 2172:17, 2191:7, 2193:2
**viewed** [3] - 2095:6, 2095:16, 2139:4
**views** [2] - 2105:1, 2172:21
**Vin** [4] - 2107:18, 2107:19, 2108:9, 2185:10
**violated** [2] - 2168:20, 2178:14
**violations** [1] - 2157:24
**virtually** [2] - 2155:20, 2156:22
**vis-à-vis** [1] - 2097:23
**visit** [2] - 2101:5, 2174:25
**visited** [1] - 2187:4
**visiting** [1] - 2089:23
**voluntarily** [4] - 2111:23,

2191:24, 2191:25
**vs** [1] - 2086:5

## W

**wait** [3] - 2128:14, 2155:3, 2212:13
**walked** [1] - 2092:17
**wants** [4] - 2121:7, 2121:19, 2193:11, 2209:13
**War** [1] - 2089:25
**Washington** [15] - 2086:6, 2086:15, 2086:18, 2087:3, 2087:9, 2096:15, 2102:22, 2105:12, 2164:21, 2165:23, 2166:2, 2166:6, 2166:13, 2166:18, 2216:15
**washingtonpost.com** [1] - 2166:13
**wealthy** [3] - 2093:6, 2099:8, 2100:4
**Weber** [6] - 2107:18, 2107:19, 2108:9, 2185:10, 2185:17, 2185:23
**website** [1] - 2186:8
**wedding** [1] - 2130:25
**Wednesday** [2] - 2120:18, 2204:4
**week** [6] - 2101:11, 2104:15, 2123:24, 2125:11, 2189:12, 2200:9
**weeks** [1] - 2200:18
**weighed** [1] - 2211:16
**weighs** [1] - 2193:17
**Weiss** [17] - 2108:25, 2109:2, 2109:14, 2113:6, 2113:15, 2115:2, 2116:20, 2116:25, 2122:11, 2122:17, 2122:22, 2123:15, 2186:15, 2199:2, 2200:15, 2210:2, 2210:14
**Weiss's** [1] - 2110:21
**Weissman** [1] - 2138:1
**welcome** [3] - 2158:24, 2179:21, 2193:7
**West** [1] - 2097:23
**western** [1] - 2090:21
**Western** [3] - 2091:1, 2094:11, 2168:25
**whatsoever** [1] - 2100:12
**White** [3] - 2165:12, 2165:15, 2165:20
**Whitney** [8] - 2117:23, 2147:5, 2148:10, 2148:12, 2149:15, 2149:19, 2203:22, 2204:1
**whole** [7] - 2095:10, 2130:16, 2133:3, 2172:9, 2202:25, 2203:3, 2203:4
**wide** [1] - 2111:5
**Wiley** [3] - 2165:22, 2165:24, 2166:1

**William** [3] - 2086:20, 2086:21, 2088:13
**win** [1] - 2095:12
**wishes** [1] - 2194:20
**withdraw** [1] - 2197:5
**WITNESS** [17] - 2087:13, 2135:9, 2135:13, 2135:16, 2149:5, 2149:9, 2152:15, 2180:17, 2180:21, 2188:14, 2196:14, 2200:24, 2201:6, 2201:23, 2202:9, 2204:15, 2212:15
**witness** [11] - 2089:5, 2089:10, 2103:19, 2155:9, 2158:25, 2159:9, 2159:16, 2162:6, 2162:8, 2162:9, 2168:17
**witnesses** [1] - 2168:23
**wmurphy@zuckerman.com** [1] - 2086:24
**wonder** [1] - 2211:10
**word** [2] - 2128:9, 2155:21
**works** [3] - 2103:11, 2129:15, 2176:8
**World** [1] - 2089:25
**worse** [2] - 2110:11, 2190:11
**wrangling** [1] - 2159:8
**Wright** [1] - 2163:13
**write** [18] - 2101:4, 2104:12, 2106:8, 2118:21, 2121:5, 2121:16, 2122:13, 2125:3, 2131:18, 2138:19, 2139:4, 2140:5, 2147:7, 2148:12, 2148:21, 2149:19, 2151:11, 2214:5
**writes** [3] - 2097:15, 2099:14, 2129:20
**writing** [6] - 2089:24, 2090:25, 2106:10, 2119:2, 2129:6, 2135:8
**written** [2] - 2129:10, 2129:20
**wrote** [19] - 2097:18, 2101:5, 2103:2, 2111:16, 2114:19, 2115:20, 2115:21, 2121:6, 2136:25, 2137:3, 2138:1, 2138:6, 2171:4, 2174:24, 2178:9, 2197:14, 2211:1, 2211:9, 2214:4
**wtaylor@zuckerman.com** [1] - 2086:25

## Y

**Yaffa** [3] - 2124:12, 2124:19, 2125:18
**year** [1] - 2090:2
**years** [12] - 2163:2, 2163:7, 2164:1, 2164:14, 2165:10, 2165:13, 2165:18, 2165:25, 2166:3, 2166:6, 2166:18, 2171:1
**York** [9] - 2119:6, 2133:17, 2134:9, 2139:9, 2173:8,

2182:20, 2199:3, 2210:2, 2210:5
**yourself** [4] - 2088:6, 2089:16, 2173:23, 2203:23
**yourselves** [3] - 2153:15, 2154:4, 2215:2
**Yulia** [3] - 2090:20, 2093:25, 2104:17

## Z

**Zaki** [3] - 2192:13, 2193:16
**zoom** [16] - 2097:8, 2112:23, 2119:24, 2120:10, 2121:10, 2127:17, 2130:15, 2132:17, 2133:2, 2133:25, 2135:19, 2141:1, 2142:11, 2142:21, 2143:9
**zooming** [17] - 2096:9, 2101:25, 2103:18, 2107:24, 2110:21, 2117:21, 2118:19, 2124:5, 2125:17, 2125:18, 2125:23, 2125:24, 2128:19, 2140:3, 2140:14, 2147:2, 2148:7
**Zornow** [3] - 2124:12, 2124:17, 2173:25
**zornow** [1] - 2128:7
**ZUCKERMAN** [2] - 2086:22, 2087:2
**Zwaan** [21] - 2091:24, 2103:24, 2103:25, 2104:12, 2105:3, 2105:24, 2109:18, 2113:6, 2113:9, 2116:3, 2116:14, 2173:5, 2175:15, 2176:11, 2184:6, 2197:8, 2197:9, 2199:2, 2199:5, 2200:14, 2203:22
**Zwaan's** [1] - 2104:10