2241

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,       )
                                )
        v.                      )       Criminal Action No. 19-CR-125
                                )
GREGORY B. CRAIG,               )       JURY TRIAL - DAY 10
                                )       Afternoon Session
            Defendant.          )
_____ )       Washington, D.C.
                                        August 23, 2019

TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
BEFORE THE HONORABLE AMY BERMAN JACKSON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:     Fernando Campoamor-Sanchez, AUSA
                        Molly Gulland Gaston, AUSA
                        U.S. ATTORNEY'S OFFICE FOR THE
                        DISTRICT OF COLUMBIA
                        555 Fourth Street, NW
                        Washington, DC 20530
                            -and-
                        Jason Bradley Adam McCullough
                        U.S. DEPARTMENT OF JUSTICE
                        950 Pennsylvania Avenue, NW
                        Washington, DC 20530

For the Defendant:      Adam B. Abelson, Esq.
                        William James Murphy, Esq.
                        ZUCKERMAN SPAEDER, LLP
                        100 East Pratt Street
                        Suite 2440
                        Baltimore, MD 21202
                            -and-
                        William W. Taylor, III, Esq.
                        Paula M. Junghans, Esq.
                        ZUCKERMAN SPAEDER, LLP
                        1800 M Street, NW
                        Suite 1000
                        Washington, DC 20036

2242

Court Reporter:              PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                             U.S. Courthouse, Room 4700A
                             333 Constitution Avenue, NW
                             Washington, D.C.  20001
                             (202) 354-3243

          Proceedings reported by stenotype shorthand.
          Transcript produced by computer-aided transcription.

2243

1

2                    E X A M I N A T I O N S

3

4   WITNESS                 DIRECT    CROSS    REDIRECT    RECROSS

5   Clifford Sloan                    2244       2304        2326

6   Kenneth Gross            2329     2342                   2342

7

8

9                       E X H I B I T S

10

11                  (No exhibits admitted)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    AFTERNOON SESSION

2                     (2:10 P.M.)

3              THE DEPUTY CLERK:  Your Honor, re-calling

4    Criminal Case Number 19-125, United States of America v.

5    Gregory Craig.

6              THE COURT:  All right.  Let's bring the jury back in.

7              (Jury present)

8              THE COURT:  All right.  The jurors have returned.

9              Mr. Murphy, you can continue.

10             MR. MURPHY:  Thank you.

11             THE COURT:  You're still under oath, sir.

12                     Clifford Sloan,

13             having been duly sworn, was examined and testified as

14   follows:

15                    CROSS-EXAMINATION

16             BY MR. MURPHY:

17   Q.    Good afternoon, Mr. Sloan.

18   A.    Good afternoon.

19   Q.    I want to turn next to the FARA inquiry that Skadden

20   received about its work on the Tymoshenko project.

21             Can we look, first, at Government's Exhibit 410.

22             Exhibit 410 is an e-mail that you received from Larry

23   Spiegel on, it looks like, Saturday, December the 22nd, 2012.

24   A.    Yes.

25   Q.    Okay.  Do you recall whether you were away on holiday
```

2245

1      at that time?

2      A.        I don't.

3      Q.        Do you recall whether Mr. Craig was away on holiday

4      at that time?

5      A.        I don't.

6      Q.        In the letter, Mr. Spiegel says, "Earle received the

7      attached letter today from the National Security Division of

8      DOJ.  I am not familiar with the obligations under FARA, but

9      available to discuss and review your response, as

10     appropriate.  I am copying Barbara Kelly, who can assist to

11     the extent that you require details about the firm's

12     structure to respond.  I am out of the office next week, so

13     best way to reach me is by e-mail or cellphone.  Thanks,

14     Larry."

15               Right?

16     A.        Yes.

17     Q.        And Larry was the general counsel of the firm?

18     A.        Yes.

19     Q.        Okay.  If you look at Exhibit 410, there is an

20     attached letter; right?

21     A.        Yes.

22     Q.        The letter is the letter from Ms. Hunt, addressed to

23     Earle Yaffa, managing director of Skadden in New York; right?

24     A.        Yes.

25     Q.        And the letter refers to an *LA Times* article; doesn't

2246

1      it?

2      A.      Yes, a *Los Angeles Times* article, yes.

3      Q.      And it doesn't refer to any other articles?

4      A.      That's correct.

5      Q.      Okay.  And although Ms. Hunt's letter says that there

6      are enclosures to her letter, the letter that you received

7      from Mr. Spiegel, the e-mail you received from Mr. Spiegel,

8      did not include those attachments; did it?

9      A.      Well, it's not here.  I don't have a recollection of

10     it, but it is not part of this exhibit.

11     Q.      And when you look at the attachments on the e-mail,

12     it says, "document.pdf"; right?

13     A.      I'm sorry?

14     Q.      Looking at Exhibit 410, the e-mail from Mr. Spiegel

15     to you with copies to Mr. Craig and Mr. Friedman, Mr. Zornow,

16     Yaffa, and Ms. Kelly, there is a reference to attachments

17     that says, "document.pdf" right?

18     A.      Yes, I see that.

19     Q.      Okay.  It does not appear to include the other

20     enclosures that Ms. Hunt had included with her letter?

21     A.      I just know what's here, and it is not here.

22     Q.      Let's look at Exhibit Number 285.

23     A.      Government Exhibit --

24     Q.      I'm sorry.  Defendant's Exhibit 285.  I don't think

25     you were shown this earlier.

2247

1              You can look on the screen, I think.

2    A.        Okay.  I will just look on the screen.  Thank you.

3    Q.        This is -- at the bottom, it is the same interview

4    from Mr. Spiegel to you, Mr. Craig, and the others; right?

5    A.        Yes.

6    Q.        And then above that you respond to Mr. Spiegel

7    saying, "Thanks, Larry.  We're happy to provide the

8    information on the representation.  Also, Larry, Greg and I

9    will follow up with you and Barbara separately on the plan

10   for next steps on the response.  Happy Holidays and Happy New

11   Year to everybody."

12             Right?

13   A.        Yes.

14   Q.        And you sent that on December 27th, which was five

15   days later.

16   A.        Yes.

17   Q.        Two days after Christmas.

18   A.        Yes.

19   Q.        Then, if we look at Exhibit 411, Government's

20   Exhibit 411, this is an e-mail from Mr. Craig to you.

21   A.        Yes.

22   Q.        I'm not sure you were shown this this morning.

23   A.        Let me just look at it on the screen.

24   Q.        Okay.  Look at it on the screen.

25             It makes reference to draft answers to 3 and 4.

2248

1    Right?  That's the subject --

2    A.       The subject line, yes.

3    Q.       And Mr. Craig says to you, "Cliff, I think we cannot

4    read question 4 as being satisfied by only providing a

5    description of our written agreements.  It wants a copy of

6    those written agreements, and it wants a description of the

7    oral agreements.  See what you think of this."

8             Right?

9    A.       Yes.

10   Q.       And attached to it is a document that Mr. Craig

11   apparently prepared and sent to you; right?

12   A.       Yes.

13   Q.       And he has a description there of a response to

14   question number 3; right?

15   A.       Yes.

16   Q.       And question number 4?

17   A.       Yes.

18   Q.       And the question number 3 response, draft, reads, "In

19   April 2012, the Ministry of Justice for the government of

20   Ukraine asked Skadden, Arps to serve as a consultant on the

21   rule-of-law and, in that capacity, to advise the Ministry on

22   a variety of rule-of-law issues, including those that might

23   arise before the European Court for Human Rights.  In

24   addition -- and more specifically -- the firm was asked to

25   conduct an independent inquiry into the facts and

2249

 1    circumstances surrounding the prosecution, trial, conviction,

 2    and sentencing of former Prime Minister Yulia Tymoshenko and

 3    to write a report."

 4              Right?

 5    A.      Yes.

 6    Q.      And it says, "The firm insisted on complete

 7    independence and total access.  It completed its work in

 8    September 2012 and delivered the report to the Ministry in

 9    December 2012."

10              Right?

11    A.      Yes.

12    Q.      So Mr. Craig's draft response didn't just refer to

13    the Tymoshenko report; did it?

14    A.      No.

15    Q.      It referred to other rule-of-law issues?

16    A.      Yes.

17    Q.      And in item number 4, Mr. Craig said, "Attached you

18    will find (a) a written agreement in Ukrainian and English

19    dated April 10, 2012; and (b) a written agreement in English

20    dated April 10, 2012.  There was, in addition, an oral

21    agreement with a private citizen of the Ukraine in which the

22    private citizen agreed to assist in paying the firm for the

23    work described above."

24              Right?

25    A.      Yes.

1    Q.       And so that's the draft that you received from

2    Mr. Craig about how to handle the third-party payor situation

3    involving Mr. Pinchuk; right?

4    A.       That's how I understand this e-mail, yes.

5    Q.       Without naming Mr. Pinchuk?

6    A.       Yes, that's how I read it.

7    Q.       Okay.  Now, let's look at Defendant's Exhibit 290.

8    And I think these Defendant's exhibits will be in the front

9    of your binder there.

10   A.       Yes, I have it.

11   Q.       Okay.  Good.

12            This is an e-mail from Mr. Craig to Mr. Spiegel with

13   a copy to you on January 4, 2013; right?

14   A.       Yes.

15   Q.       And in it Mr. Craig says he is attaching draft

16   answers to FARA questions?

17   A.       Yes.

18   Q.       He says, "The first document contains draft answers

19   to questions 3 and 4 in the FARA letter.  The two scanned

20   documents are the attachments thereto.  We should arrange a

21   time next week to walk you through this.  I am sorry that you

22   are being bothered with this.  Greg."

23            Right?

24   A.       Yes.

25   Q.       And attached to it, on page 2 of Exhibit 290 is a

1    draft of answers to the questions 3 and 4; right?

2    A.      Yes.

3    Q.      And this draft includes as item number 4 a reference

4    to the oral agreement with a private citizen of Ukraine in

5    which the private citizen agreed to assist in paying the firm

6    for the work described above; right?

7    A.      Yes.

8    Q.      And it also, in item number 3, says that, "The

9    Ministry had asked Skadden to serve as a consultant on the

10   rule-of-law and, in that capacity, to advise the Ministry on

11   a variety of rule-of-law issues."

12           Right?

13   A.      Yes.

14   Q.      Now, let's look at Government Exhibit 413.

15           And Government Exhibit 413 is an e-mail exchange, if

16   you'll look at it, from January -- it starts, actually, in

17   December 27th of 2012, with some of the earlier e-mails we

18   looked at, but continues up until January the 5th of 2013.

19           Right?

20   A.      Yes.

21   Q.      And some of those e-mail exchanges are just between

22   you and Mr. Spiegel; right?

23   A.      Yes.

24   Q.      And it looks like a question that someone had raised

25   was whether, if you look at Mr. Spiegel's e-mail to you at

2252

1    the top of the second page, on December the 27th, Mr. Spiegel

2    says, "I'm not sure I understand fully the question that you

3    want me to ask as my recollection is that the letter

4    referenced our representation in the Tymoshenko matter and

5    the government of Ukraine.  Is it that you want to confirm

6    that 'any other foreign entity' is modified by the stated

7    engagement, as opposed to every circumstance where we

8    represented a foreign entity?"

9           Do you see that?

10   A.     Yes.

11   Q.     Do you have any recollection of this attempt by

12   Mr. Spiegel and you to figure out exactly what the FARA

13   letter referred to with respect to foreign entities?

14          MS. GASTON:  Objection to the form of the question.

15          THE COURT:  Overruled.

16          Do you remember what he is asking you about here?

17          THE WITNESS:  No.

18          BY MR. MURPHY:

19   Q.     Do you remember that Mr. Spiegel did reach out to the

20   FARA Unit at some time over the holidays to let the FARA Unit

21   know that the letter was coming but it would be delayed by

22   people's travel plans?

23   A.     I may have a vague recollection of that.

24   Q.     Okay.  And several top e-mails on the first page,

25   that's just a back-and-forth between you and Mr. Spiegel

2253

1        about this information; right?

2     A.        Yes.

3     Q.        And you tell Mr. Spiegel that you -- you and Greg

4     will get the information on 3 and 4 in the DOJ response on

5     Monday.  Your understanding was that New York would put

6     together the answers to questions 1 and 2.  Correct?

7     A.        Yes.

8     Q.        And then Mr. Spiegel says, well, I'm glad you

9     conveyed that, I didn't know that we were doing that, but I

10    farmed it out.

11              Right?

12    A.        Right.

13    Q.        Then, if you look at Defendant's Exhibit 295, this is

14    an e-mail that you wrote to Mr. Craig on February 5, 2013.

15    And you say, "Hi there.  Are you back?"

16              Do you remember if Mr. Craig had been away for a

17    while?

18    A.        I don't recall.

19    Q.        Okay.  You say, "Here's the current version of the

20    FARA response.  David Z" -- is that Mr. Zornow?

21    A.        Yes.

22    Q.        He "thinks it seems less defensive if it comes from

23    you rather than from Larry.  See the attached."

24              Right?

25    A.        Yes.

2254

1    Q.      Okay.  So do you recall that earlier in the drafting

2    process that it had been contemplated that Mr. Spiegel would

3    sign the letter?

4    A.      Yeah, I remember -- yes -- that there had been --

5    there had been a question that had come to Mr. Yaffa, who was

6    an administrative person at the firm.  So the question was

7    who should send the response.

8    Q.      Okay.  And Mr. Zornow suggested that perhaps you or

9    Mr. Craig should send the response?

10   A.      Yes, that's what the e-mail says.  Yes.

11   Q.      As it turns out, when you look at the draft that's

12   attached to this, on page 295-4, it is Mr. Craig's name that

13   has been plugged in there as the signatory.  Right?

14   A.      It is his name on the draft, yes.

15   Q.      Okay.  And if you'll notice the description in item 3

16   of the services or activities that the firm engaged in for

17   the Ministry is described in answer to number 3.  Right?

18   A.      Yes.

19   Q.      And that there's an indication that the services that

20   the firm was asked to provide on the rule-of-law was to serve

21   as a consultant on whether Ukraine's justice standards were

22   compatible with Western standards of rule-of-law, including

23   those that might arise before the European Court of Human

24   Rights.  A major focus of the assignment was to conduct an

25   independent inquiry into the facts and circumstances

1    surrounding the prosecution, trial, conviction, and

2    sentencing of Prime Minister Yulia Tymoshenko and to write a

3    report of the firm's findings in light of Western standards

4    on rule-of-law issues."

5           So do you see that some changes had been made in the

6    drafting process?

7    A.     It looks like it, yes.

8    Q.     But there is still an indication that the Tymoshenko

9    report was not the only thing that the firm had done; right?

10   A.     Correct.

11   Q.     Now, if you look at item number 4 in the draft, and

12   at the bottom, it says, "In addition to these agreements,

13   there have been" -- discussed -- I'm sorry -- "there have

14   been discussions with the government of the Ukraine about the

15   possibility of Skadden receiving additional compensation from

16   the government for the firm's work.  The most recent

17   correspondence on this subject is attached.  Lastly, there

18   was an oral agreement with a private citizen of the Ukraine

19   in which that individual agreed to contribute funds to help

20   pay for the work described above."

21          Right?

22   A.     Yes.

23   Q.     Okay.  And it adds on, "There was nothing in the oral

24   agreement with the private citizen that was inconsistent with

25   the terms of the other agreements.  To the contrary, the

2256

```
 1        private citizen clearly understood that the firm would

 2        conduct an independent inquiry and write a report, and that

 3        the firm would not engage in any political activities as

 4        defined in the Foreign Agent Registration Act."

 5                Right?

 6        A.      Yes.

 7        Q.      So that language has also been expanded from the

 8        earlier drafts that you saw?

 9        A.      It looks like it, yes.

10        Q.      But it still includes a reference to the private

11        payor, Mr. Pinchuk --

12        A.      Yes.

13        Q.      -- although not by name?

14        A.      Yes.

15        Q.      And it also includes a reference to the fact that the

16        firm was in negotiations with the Ukrainian government for an

17        additional contract calling for additional payments; right?

18        A.      Yes.

19                THE COURT:  Wait.  I think if you're going to

20        characterize it, maybe you should just read it.

21                MR. MURPHY:  Okay.

22                THE COURT:  It says, "The possibility of receiving

23        additional compensation for the firm's work."

24                MR. MURPHY:  Right.

25                THE COURT:  And you said a new contract --
```

2257

1      BY MR. MURPHY:

2      Q.      What it says -- and I will quote -- "In addition to

3      these agreements, there have been discussions with the

4      government of Ukraine about the possibility of Skadden

5      receiving additional compensation from the government for the

6      firm's work.  The most recent correspondence on this subject

7      is attached."

8              Do you see that?

9      A.      Yes, I see that.

10     Q.      Okay.  If we look at Exhibit 420, Government

11     Exhibit 420, do you see that attached to the -- well, let's

12     start with the e-mail itself.

13             There's a confirmation on the first page of

14     Exhibit 420, in which Ms. Whitney is receiving confirmation

15     from an Alex Mudd at the National Security Division that they

16     had received Skadden's response to the FARA Unit's initial

17     letter; correct?

18     A.      Yes.

19     Q.      Okay.  And this e-mail attaches a copy of Mr. Craig's

20     letter and the attachments that Catie had sent by pdf the

21     night before.  That's the second e-mail in the chain; right?

22     On February 7th.

23     A.      Yes.

24     Q.      Let's go back, John, and just highlight that.

25             That shows that a Ms. Weitz had sent you a copy of

2258

1    the final letter and the attachments?

2    A.      Yes.

3    Q.      Do you know who Jean Weitz is?

4    A.      She was my secretary.

5    Q.      Okay.  And then you forwarded it to Mr. Spiegel?

6    A.      Yes.

7    Q.      With attachments?

8    A.      Yes.  That's what it looks like, yes.

9    Q.      If you look at the attachment, the first page is the

10   February 6th letter?

11   A.      The attachment to the e-mail, yes.

12   Q.      If you turn to the second page of the letter, which

13   is the third page of the exhibit --

14   A.      Yes.

15   Q.      -- paragraph 3 that we have been looking at does

16   indicate that in April of 2012 the Ministry asked the firm to

17   serve as a consultant on rule-of-law issues and to provide

18   advice about the question of Ukraine's criminal justice

19   system as viewed through the prism of Western standards of

20   due process, and, in particular, to advise the Ministry about

21   rule-of-law issues that might arise before the European Court

22   for Human Rights.  A major focus of the assignment was to

23   conduct an independent investigation and review?  Right?

24   A.      Yes.

25   Q.      Okay.  And then in item number 4, there is a

1    modification of the description of the contractual

2    arrangements.  There is a description -- there is an

3    attachment of the written agreement in Ukrainian and

4    English -- that's item (a), right?

5    A.     Yes.

6    Q.     And a proposed written agreement in English dated

7    April 10, 2012 as item (b)?

8    A.     Yes.

9    Q.     And it says, "In the proposed English language

10    written agreement described in (b) the parties addressed the

11    issue of FARA activity directly."

12           Right?

13    A.     Yes.

14    Q.     And quotes from that.

15           It says, "Both Skadden and the client understood and

16    accepted this explicit limitation on the scope of the firm's

17    engagement.  The client declined to sign the proposed English

18    agreement because of concerns about the confidentiality

19    clause.  The fact that the firm's work for the client would

20    not include any activities within the scope of FARA remained

21    nonetheless an explicit condition of the firm's engagement."

22           Right?

23    A.     Yes.

24    Q.     And then on the next page, there is a reference, in

25    the first paragraph, to that "In addition to these

2260

1    agreements, there have been discussions with the government

2    of Ukraine about the possibility of Skadden receiving

3    additional compensation from the government for the firm's

4    work."

5            Right?

6    A.      Yes.

7    Q.      It says, "The most recent correspondence on this

8    subject is attached as C and D."

9            Right?

10   A.      Yes.

11   Q.      In the last paragraph, there is a description again

12   of Mr. Pinchuk's role -- without naming him -- as a private

13   citizen who had agreed to fund the firm's work; right?

14   A.      Yes.

15   Q.      And if you look at the attachments, there is an

16   attachment C and an attachment D, which -- let me see if I

17   can find the page.

18           Attachment C begins on Exhibit 420, page 20.

19   A.      Okay.

20   Q.      And that attached a letter from the Ministry of

21   Justice, a Mr. Sedov, on December 20, 2012; correct?

22   A.      Yes.

23   Q.      And that's included in both English and Ukrainian,

24   Cyrillic, some foreign language?

25   A.      Yes.

2261

1    Q.       And then attachment D is a reply from Skadden dated

2    February 4, 2013; right?

3    A.       Yes.

4    Q.       And that reply is a letter from Mr. Craig to

5    Mr. Sedov about the additional compensation; right?

6    A.       Yes.

7    Q.       Okay.  And so the Ministry -- I'm sorry --

8    Mr. Craig's letter to the Deputy Minister of the Ministry of

9    Justice was dated February 4, 2013, and it was attached to

10   the letter that was sent to the FARA Unit on February 6,

11   2013; right?

12   A.       Yes.

13   Q.       When you completed this letter to the FARA Unit on

14   February 6, 2013, were you confident that it included all the

15   information that was pertinent?

16   A.       Yes, as far as I knew, yes.

17   Q.       Okay.  Was there any effort that you were aware of by

18   anyone at Skadden to conceal any information about the work

19   that you had done on behalf of the ministry?

20   A.       No.

21   Q.       Now, let's look at Exhibit 422, which the government

22   showed you this morning.  This was an e-mail that Mr. Craig

23   sent to you on April the 4th, 2013.

24            Do you remember whether there was any discussion

25   between you and Mr. Craig about updating the FARA Unit when

2262

1    the contemplated additional agreement with the Ukraine was

2    completed about sending that on to the FARA Unit?

3    A.      I don't recall that.

4    Q.      But that, apparently, is what this is a discussion

5    about; right?

6    A.      Yes.  That's how the e-mail reads, yes.

7    Q.      Okay.  And Mr. Craig said he went back and read the

8    FARA letter asking for information from us about our

9    representation of the Ukraine, and he notes that in this new

10   letter, they have made four -- I'm sorry -- in the old letter

11   they had made four requests; right?

12   A.      Yes.

13   Q.      And the inquiry focused on existing or proposed

14   written and oral agreements.  And it says, "I don't see any

15   requests for them to be informed of new or additional

16   agreements."

17           Right?

18   A.      Yes.

19   Q.      And he says, "We did notify them of the fact that

20   there is additional stuff in the works."

21           Right?

22   A.      Yes.

23   Q.      And in fact, the additional stuff was the

24   correspondence that had been attached to the letter in

25   February; right?

2263

1    A.        I'm sorry.  Could you repeat the question?

2    Q.        The additional stuff that he is referring to is the

3    exchange of letters between Mr. Sedov and Mr. Craig that were

4    attached to the February 6th letter?

5    A.        Yes.

6    Q.        Okay.  And he says, "If they wanted to inquire about

7    the outcome of those discussions, they could ask.  They have

8    not.  I think we have given them what they had asked for.  I

9    don't think we owe them anything more.  Do you agree?  And if

10   not, we can go to Larry Spiegel."

11   A.        Yes.

12   Q.        Do you remember any discussion further about this?

13   A.        No.

14   Q.        Okay.  Now, do you remember that a few days later you

15   got an additional letter from the FARA Unit?

16   A.        I remember the second letter from the FARA Unit came

17   in.

18   Q.        Okay.  So if we look at Exhibit 3, Government

19   Exhibit 3 --

20   A.        I will look at it on the screen.

21   Q.        -- that's the second letter from the FARA Unit;

22   right?

23   A.        Yes.

24   Q.        And it is dated April 9, 2013?

25   A.        Yes.

2264

1    Q.      And that's the letter that Ms. Gaston walked you

2    through that has the seven specific questions, but number 4

3    is in there twice; right?

4    A.      Yes, that's correct.

5    Q.      Okay.  Now, in this letter of April the 9th, the FARA

6    Unit asked on the top of page 2, they say, "It is unclear to

7    us from the contract and supporting documentation how much

8    additional money your firm charged the Ukrainian government

9    to perform this work.  In addition to the contract for 95,000

10   Ukrainian hryvnias to be paid by the Ukrainian Ministry, your

11   firm signed a retainer memorandum with the government of

12   Ukraine's Ministry of Justice on the same date."

13          And that's a reference to the two documents that had

14   been attached to the earlier letter that you sent.  Right?

15   A.      I would have to look to confirm.  It sounds right.

16   Q.      The FARA Unit says, "No mention is made of how much

17   money the retainer amounted to and who paid it."

18          Now, that is a reference to the third-party payor;

19   correct?

20   A.      Well, I'm just looking at it in the context of the

21   letter, and I'm not -- I'm not sure that it is a reference to

22   the third-party payor.

23   Q.      Okay.  Let's go back and look at Exhibit 420 again.

24   A.      Okay.  Okay.

25   Q.      Let's go to page 420-13.  So 420-13 is the attached

2265

1    engagement agreement between the Ministry of Justice and

2    Mr. Craig, dated April 10, 2012.  Right?

3    A.      Yes.

4    Q.      And if you will turn to the second page of the

5    agreement, at the top, there is a passage called "Fees and

6    expenses."

7    A.      Yes.

8    Q.      And what it says is, "Our fees will be based on the

9    time that the firm's lawyers spend on the engagement along

10   with our out-of-pocket expenses.  In addition to the terms

11   for payment set forth in the agreement to which this

12   memorandum is attached, we have agreed to offset our fees for

13   time -- charged at our normal hourly rates -- and

14   reimbursement of our out-of-pocket expenses against a

15   retainer that has been paid in advance."

16           Do you see that?

17   A.      I do see that.

18   Q.      So whereas the Ukrainian contract made a reference to

19   the 95 thousand hryvnias, which I think is about $12,000 this

20   memorandum refers to the firm having a retainer and charging

21   against that retainer based on your standard hourly rates;

22   isn't that right?

23   A.      Yes.

24   Q.      And so that retainer is a reference to the money that

25   Mr. Pinchuk paid; isn't it?

2266

1    A.       Well, I'm just reading the letter, and I'm not -- I
2    can't say that with confidence.
3    Q.       Was there any other retainer that the firm
4    received --
5    A.       No, there was no other retainer that I was aware of.
6    Q.       Okay.  Were you aware that every month the firm was
7    applying against the retainer the amount of fees that had
8    been incurred and the expenses that have been outlaid for the
9    project?
10    A.       That was my understanding.
11    Q.       Okay.  Now, if we go back to Government
12    Exhibit 3 -- and I was asking you about this passage at the
13    top of page 2 of the letter -- where it says, "No mention is
14    made of how much money the retainer amounted to and who paid
15    it."
16            Do you see that?
17    A.       Yes.
18    Q.       And the letter continues, "Furthermore, with respect
19    to the financing of the study, please advise this office of
20    the amount of money paid by the private citizen to your firm
21    as mentioned in your letter of February 6, the name of the
22    individual, as well as the individual's connection to your
23    work for the Ukrainian Ministry of Justice."
24            Right?
25    A.       Yes.

2267

1    Q.      It says, "In addition, please list any other sources

2    of money for the work."

3    A.      Yes.

4    Q.      So among the questions the FARA Unit asked in this

5    letter in addition to the seven specific questions, there was

6    also a question about Mr. Pinchuk's money and the retainer

7    and how much it was?

8    A.      Yes.

9    Q.      Okay.  Now, this letter, Exhibit 3, also asks those

10   specific questions -- if we could focus on those -- "We would

11   appreciate."

12          And question number 1 is, "To whom, if anyone, did

13   your firm release or distribute the report and when?"

14          Right?

15   A.      Yes.

16   Q.      Question 2 was, "When was the report released to the

17   Ukrainian Ministry of Justice?"

18   A.      Yes.

19   Q.      Number 3 was, "Did your firm give the report to the

20   *Los Angeles Times*".

21          Right?

22   A.      Yes.

23   Q.      There is no reference in this letter to *The National*

24   *Law Journal* or *The New York Times*; is there?

25   A.      No.

1    Q.      And there is a question of some firm and somebody

2    named Dmitry Shpenov.  Do you have any knowledge today or

3    then of who those people were?

4    A.      No.

5    Q.      Then, there is a question 4 about "any safeguards

6    that the firm took with respect to the Ministry's use of the

7    report, limiting the use of the report in the United States."

8            Do you see the question?

9    A.      Yes.

10   Q.      And the next question was, "What was your firm's

11   understanding of what would happen to the report when it was

12   released to the Ukrainian Ministry?"

13           Right?

14   A.      Yes.

15   Q.      And then, "Did you or anyone in your firm have media

16   interviews or comments to the media, public, or government

17   officials about the report and the findings of your firm?"

18   A.      Yes.

19   Q.      Okay.  Now, do you remember in preparation for the

20   answers to this, one of the things that you and Mr. Craig did

21   was to try to figure out where the firm had been quoted or

22   where the firm's lawyers had been quoted in articles that

23   appeared around the time of the release?

24   A.      I actually don't have an independent recollection.

25   Q.      Let me show you Exhibit 426, Government Exhibit 426.

2269

1    A.      Okay.

2    Q.      And this is an e-mail exchange between you and

3    Ms. Weiss and Mr. Craig.  And it runs from April the 22nd to

4    -- no, they are all on April 22, 2013.  So it is a series of

5    e-mails.

6            If we go to the back, page 6, of the exhibit, the

7    very first e-mail is from Mr. Craig to Ms. Weiss saying,

8    "News articles about the Ukraine Report" -- that's the

9    subject; right?

10   A.      Yes.

11   Q.      "Did you save any of those?  In particular, do you

12   have the *L.A. Times* report?"

13           Do you see that?

14   A.      Yes, I do.

15   Q.      And then the next e-mail, on page 5, is from

16   Ms. Weiss to Mr. Craig.  And she says, on April 22nd, "Below

17   is the *L.A. Times* article.  I don't have them saved, but I'm

18   happy to pull top-tier publication coverage around this time

19   period if that's helpful."

20           Do you see that?

21   A.      Yes.

22   Q.      And attached is the *L.A. Times* article?

23   A.      Yes.

24   Q.      And the *L.A. Times* article is the one that the FARA

25   Unit had initially asked about; right?

1    A.    Yes.

2    Q.    Okay.  Same subject matter, news articles about the

3    Ukraine report.  He says, "Lauren, thanks for this.  We have

4    been asked by DOJ -- the FARA Office -- if we gave any

5    statements to the *L.A. Times*.  Did they call us?  Did we say

6    anything to them?  What about other news outlets?"

7          That was his question; right?

8    A.    Yes.

9    Q.    Okay.  And then you commented in the next e-mail, you

10   wrote back to Mr. Craig and Ms. Weiss, you say, "Note the

11   reference in the article to a Skadden representative saying

12   that Skadden is not answering questions."

13         Right?

14   A.    Yes.

15   Q.    You picked that out of the article itself?

16   A.    Yes.

17   Q.    Okay.  And then the next e-mail is from Lauren Weiss,

18   and it is on page 3 of the exhibit.  Lauren Weiss responds to

19   you and Mr. Craig and copies her colleague, Ms. Melissa

20   Porter; right?

21   A.    Yes.

22   Q.    She says "I received a voicemail from the *L.A. Times*

23   reporter and returned the call and left a voice message, but

24   we never connected before she published her story."

25         I assume the "she" is Emily Alpert, the *L.A. Times*

1          reporter.

2                  "The only interview our team handled was with *The*

3          *National Law Journal* story pasted below."

4                  Right?

5          A.      Yes.

6          Q.      And then there is a copy pasted of the Matthew

7          Huisman -- that's the corrected article; right?

8          A.      Yes.

9          Q.      Then, on the next page, page 2 of the exhibit, at the

10         bottom, Mr. Craig responds to Ms. Weiss with a copy to you.

11         "I remember this now.  We issued the statement in response to

12         what we thought was a totally erroneous report.  Do you

13         recall this event, Cliff?  Thanks, Lauren."

14                 "Do you have *The New York Times* article about the

15         report?"

16                 That was his question.

17         A.      Yes.

18         Q.      And did you remember, on April 13, about the

19         reach-out to Mr. Huisman of *The National Law Journal* to see

20         if you could get a correction?

21         A.      Yes, I remember *The National Law Journal* incident.

22         Q.      Okay.  Then let's look at the next e-mail, which is

23         on page 1.  Ms. Weiss writes to Mr. Craig, with a copy to

24         you, "Below is *The New York Times* article."

25                 Do you see that?

2272

1    A.    Yes.

2    Q.    And you then wrote -- if you go up above -- -- I'm

3    sorry, Mr. Craig wrote to you first.  Mr. Craig said to

4    Ms. Weiss and you, "It looks like I also gave *The New York*

5    *Times* a one-sentence statement.  Cliff, do you remember

6    that?"

7          That was his question; right?

8    A.    Yes.

9    Q.    And you responded a few minutes later, "No, that one

10   I don't remember."

11         Right?

12   A.    That's correct.

13   Q.    And you did not remember at that time that there had

14   been an interaction between Mr. Craig and *The New York Times*?

15   A.    That's what the e-mail reflects.

16   Q.    Okay.  And then Ms. Weiss -- just to follow it up,

17   Ms. Weiss suggests, well, maybe that was something that was

18   worked on with Jonathan Hawker and FTI.

19         She says, "I know he was involved in this project

20   generally, but that our team at Skadden did not handle."

21         Right?

22   A.    Yes.

23   Q.    Okay.  Now, the article itself that was attached by

24   Ms. Weiss in this e-mail, if you turn to page 2 of the

25   exhibit and the second full paragraph, the article reads, "In

2273

1   an interview on Wednesday, Mr. Craig, one of the most

2   connected lawyers in the Washington establishment, said that

3   his team was not able to judge the local politics that

4   brought Mrs. Tymoshenko to trial on charges of abusing her

5   authority in agreeing to a natural gas deal with Russia when

6   she was Prime Minister."

7          Right?

8   A.     Yes.

9   Q.     And then if you move down just two paragraphs

10  further, the article says, "The report is dated September

11  2012, but it was held back by the Ukrainian government."

12         Do you see that?

13  A.     Yes.

14  Q.     "It will be publicly released Thursday."

15         Right?

16  A.     Yes.

17  Q.     The article reflects that Mr. Craig was interviewed

18  on Wednesday; right?

19  A.     Yes.

20  Q.     And that the publication of the report will occur on

21  Thursday; right?

22  A.     That's what it says, yes.

23  Q.     And the article was dated December 12th, right?

24  A.     I would have to look again.

25  Q.     Well, look at the --

2274

1    A.      Can you --

2    Q.      If you look at the page --

3    A.      Is it possible to put it on the screen?

4    Q.      Isn't it on the screen?

5    A.      Well --

6            THE COURT:  Not anymore.

7            THE WITNESS:  First page.  Okay.

8            BY MR. MURPHY:

9    Q.      And there is a line there about -- about where the

10   article is coming from, I think.

11           Okay.  Do you see that that's -- no, it is in the

12   other exhibit.  Okay.  I have to show you another version of

13   it.

14           Did you know -- when you were working on this

15   response to the FARA Unit, did you know that the report was

16   issued on December the 13th?

17   A.      I don't recall at this point what I knew at the time.

18   Q.      Okay.  Do you recall whether you knew that Mr. Craig,

19   according to *The New York Times*, had spoken to the *Times* on

20   December 12th?

21   A.      I don't recall if I knew that.

22   Q.      Okay.

23   A.      But as you mentioned, there is the quote in the

24   article.

25   Q.      The article seems to indicate that Mr. Craig spoke to

2275

1      *The Times* before the report was released.

2      A.      Yes, it certainly seems to indicate that, absolutely.

3      Q.      Okay.  Let's return back to -- let's look at

4      Government Exhibit 427, which I think you were shown this

5      morning.

6              This is an e-mail from Mr. Craig to you on

7      April 29th, and he says, "I will bring down a copy of the

8      letter from DOJ.  This is a draft response."

9              Right?

10     A.      Yes.

11     Q.      And in the draft response that's attached, he has a

12     statement in the first paragraph.  He says, in the first

13     paragraph on page 2 of your letter, "You ask us to tell you

14     the amount of money paid by the private citizen to Skadden,

15     the name of the individual, as well as the individual's

16     connection to your work for the Ukrainian Ministry of

17     Justice."

18             Right?

19     A.      Yes.

20     Q.      And he says in this draft response, he says, "If you

21     conclude that our work for the Ministry of Justice requires

22     us to register under the Foreign Agent Registration Act, we

23     will be required to register, and you will be entitled to

24     know the name of the individual who contributed the funds and

25     the amount of the funds.  We don't believe that we engaged in

1    conduct requiring us to register under FARA, and we therefore

2    don't think you are entitled to such information.  Other than

3    providing financial assistance to help fund this project,

4    this individual had no connection to the project either

5    professionally or personally."

6            Right?

7    A.      Yes.

8    Q.      That's what he drafted?

9    A.      Yes.

10   Q.      And then if you go down a little further, you see, in

11   response to question number 1, Mr. Craig's draft says, "The

12   law firm provided a copy of the report to" -- it says "Mr.,"

13   but it should have been "Ms." -- "Tymoshenko's legal team in

14   the Ukraine and a member of her team in the United States,

15   James Slattery; to Mr. Doug Schoen; to David Sanger of *The*

16   *New York Times*; to Emily Alpert of the *Los Angeles Times*; and

17   to Matthew Huisman of *The National Law Journal*."

18           Right?

19   A.      Yes.

20   Q.      If you go down to item number 6, he says in his

21   draft, "The firm made no comments to the media, the public or

22   government officials about the report."

23           Now, is it correct, as you understood it, that

24   Skadden had not made any official comment from the law firm

25   about the report?

2277

1    A.      As far as I can recall, yes.

2    Q.      All right.  And then it says in the next sentence,

3    "Gregory Craig gave brief statements to David Sanger of *The*

4    *New York Times*, to Emily Alpert of the *L.A. Times* and to

5    Matthew Huisman of *The National Law Journal*."

6            Right?

7    A.      Yes.

8    Q.      And then he says, "The purpose of each of those

9    statements was to correct misinformation that the media had

10   received -- and was reporting -- from the Ministry of Justice

11   in Ukraine as well as from the Tymoshenko legal team."

12           Right?

13   A.      Yes.

14   Q.      That is a draft that Mr. Craig sent you on

15   April 29th.

16           Now, you have looked at some documents here with

17   Ms. Gaston.  This drafting and redrafting process continued

18   for about a full month; didn't it?

19   A.      That's my understanding from the documents, yes.

20   Q.      Do you have any recollection of why it took so long?

21   A.      No.

22   Q.      Okay.  Were you working on other things during that

23   month?

24   A.      Yes, I was.

25   Q.      And was Mr. Craig working on other things during that

2278

1 month, as well?

2 A.  I'm sure he was.

3 Q.  Okay.  One of the documents that Ms. Gaston showed

4 you was Exhibit 517, Government 517, and this is a draft that

5 has a lot of handwritten interlineations on it; right?

6 A.  Yes.

7 Q.  That's a fancy lawyer word for a lot of scribbling by

8 someone making some changes.

9 A.  Yes.

10 Q.  Most of the scribbling on this document is in your

11 handwriting; isn't it?

12 A.  Yes.

13 Q.  Some of it is in red ink; right?

14 A.  Yes.

15 Q.  And some of your handwriting is in black ink; right?

16 A.  Yes.

17 Q.  For example, on the right-hand side, it says

18 something like -- I don't know -- "The rep in Ukraine" -- I

19 can't really read your scribbling there.

20 A.  Also, as we discussed this morning, it may be that

21 that is cut off a little bit as well.

22 Q.  Okay.

23 A.  But yes, that looks like my handwriting.

24 Q.  What it looks like it ties into is a copy of the

25 report was given to the representative of Ms. Tymoshenko in

1     the Ukraine.  I think that is what you're trying to indicate

2     there.

3     A.      Well, that's possible.  It is also possible that

4     that's pointing to Mr. Doug Schoen.  So it would have been

5     the representative of the person who was funding it in

6     Ukraine.

7     Q.      Okay, that could be, too.

8             You add a circle around Mr. Schoen's name, and that

9     looks like "role," question mark.

10    A.      Yes.

11    Q.      You thought you should further describe who

12    Mr. Schoen was?

13    A.      Yes.  Yes.  That's how I read it.

14    Q.      Okay.  And there is a bracket there about "and to

15    Matthew Huisman of *The National Law Journal*" and a little

16    dash.  And does that say, "Did we"?

17    A.      That's how I read it.

18    Q.      So you weren't sure whether Mr. Huisman had received

19    a copy of the report from Skadden?

20    A.      That's right.

21    Q.      Did you know at the time whether Mr. Haskell had

22    actually sent a copy of the report?

23    A.      To?

24    Q.      I take that back.  That somebody at the firm had

25    taken the time to send a copy of the report to Huisman?

1          THE COURT:  I think he said he didn't know whether

2    anyone -- that's why he wrote it.

3          BY MR. MURPHY:

4    Q.     You weren't sure about that?

5    A.     That's correct.

6    Q.     Okay.

7    A.     Let me emphasize, this is how I'm reading the

8    document.

9    Q.     Right.

10   A.     And I know that I did not know whether somebody had

11   sent it to *The National Law Journal*.

12   Q.     Okay.  So you and Mr. Craig were in the process of

13   putting a draft together and trying to figure out what the

14   facts were?

15   A.     Yes.

16   Q.     Now, let's look at Exhibit 428.

17          The Court's indulgence.

18             (Pause)

19   Q.     If you look at Exhibit 428, Mr. Craig sent you a

20   revision, it looks like, on May 1, 2013?

21   A.     Yes.

22   Q.     And it says, "Next draft with some embellishments."

23          Right?

24   A.     Yes.

25   Q.     "Let me know what you think."

2281

1    A.      Yes.

2    Q.      There is a reference to an attachment there with a

3    number on it, WASSRO1A-1246982-v1; right?

4    A.      Yes.

5    Q.      Is that a reference to some document in your document

6    management system?

7    A.      Yes.  In the Skadden system, yes.

8    Q.      And v1 would be version 1 of the document?

9    A.      Yes.

10   Q.      And the other numbers are an identifier for how you

11   find that document?

12   A.      Yes.

13   Q.      Okay.  And then let's look at Exhibit 429, Government

14   Exhibit 429.

15           This is also -- this is from Cliff Sloan -- okay, so

16   it is from you -- back to Mr. Craig.

17           MS. GASTON:  Your Honor, may we approach?

18           THE COURT:  Sure.

19           (At the bench)

20           MS. GASTON:  So the previous document was actually

21   attached, and this is the link to the document management

22   system.  So this has an attachment.

23           MR. MURPHY:  Right.

24           MS. GASTON:  But that is not just what you just asked

25   him.

2282

1          MR. MURPHY:  I was looking at the wrong one.

2          MS. GASTON:  Okay.

3          MR. MURPHY:  No, I didn't ask him about the

4    attachment.  I just asked him whether that was a document

5    identifier.  That's what I asked him.

6          MS. GASTON:  Okay.

7          MR. MURPHY:  Okay.

8          (In open court)

9          BY MR. MURPHY:

10   Q.     Looking again at Exhibit 429, Mr. Sloan, you told

11   Mr. Craig on May 1st, "I have made some tweaks in the

12   attached.  See what you think."

13          Right?

14   A.     Yes.

15   Q.     And that document has a -- or that e-mail has a

16   reference to an attachment.

17   A.     Yes.

18   Q.     That is a different document identifier; isn't it?

19   A.     Yes.

20   Q.     So Mr. Craig sent you one version of a document, and

21   you sent him back -- or -- yeah, a different version of the

22   document.

23   A.     I sent him back --

24   Q.     A different document?

25   A.     I sent him back a different document, according to

2283

1    this, yes.

2    Q.    So there are two different documents, both basically

3    saying the same things, one of them has his embellishments

4    and one of them has your tweaks?

5          MS. GASTON:  Objection to the form of the question.

6          THE COURT:  He sent you one, and then you revised it

7    and sent your revised version back?

8          THE WITNESS:  Yes.

9          BY MR. MURPHY:

10   Q.    But you did it in the form of a different document?

11   A.    Yes.

12   Q.    Not a version 2 of the same document?

13   A.    That's how I understand this, yes.

14   Q.    Okay.  Then let's look at Exhibit 431, which is two

15   weeks later.  Mr. Craig is sending to you an updated response

16   to FARA; right?

17   A.    Yes.

18   Q.    And do you see -- and maybe you'll have to look at

19   Exhibit 428 to tell -- but the attached document appears to

20   be the same one -- same document by identifying number that

21   Mr. Craig had sent to you earlier.

22   A.    That's how I read it, yes.

23   Q.    Okay.  And he says, "I have added stuff and included

24   a reference at the end to the new agreements.  This is for

25   your information and your editing pleasure."

2284

1          Right?

2    A.      Yes.

3    Q.      Which I'm sure was not really a pleasure.

4            So if you look at what is attached to Exhibit 431, in

5    the third paragraph --

6    A.      Yes.

7    Q.      -- there's another version of an answer with respect

8    to Mr. Pinchuk, and now the letter in draft form says, "If

9    after taking everything into consideration, the Department

10   concludes that our work for the Ministry of Justice requires

11   us to register under the Foreign Agents Registration Act, we

12   will, of course, register.  If the Department makes such a

13   finding, the Department will be entitled -- at that

14   time -- to know the name of the individual who contributed

15   the funds and the amount of the funds.  To this day, however,

16   we do not believe that we engaged in conduct requiring us to

17   register under FARA, and we therefore don't think you are yet

18   entitled to such information."

19           Do you see that?

20   A.      Yes.

21   Q.      And is that essentially what was said when the letter

22   was finalized?  We will look at it.

23   A.      I would have to look at it to make sure.

24   Q.      Okay.  You don't really remember?

25   A.      I mean, it is best to look at the letter in its final

1    form.

2    Q.    Do you recall, though, that you and Mr. Craig

3    discussed the fact that with respect to the identity of

4    Mr. Pinchuk, if you were required to register, you will be

5    required to provide that information, but if you're not

6    required to register, general firm practice would be we don't

7    reveal information that's not been authorized by our clients

8    to reveal about payment arrangements?

9         MS. GASTON:  Objection to the form of the question.

10        THE COURT:  Sustained.

11        MR. MURPHY:  I'm sorry.  Let me try it again.

12        BY MR. MURPHY:

13   Q.    Did the firm have a general policy that we discussed

14   earlier about not revealing information about payment

15   arrangements made by clients or third-party payors?

16        MS. GASTON:  Objection to the form of the question.

17        THE COURT:  I think he can answer that.

18        Were you aware of a firm policy about revealing the

19   identity of third-party payors?

20        THE WITNESS:  Yes, that there was a --

21        THE COURT:  Or a practice --

22        THE WITNESS:  That it would require the permission or

23   authorization of the client or payor.

24        BY MR. MURPHY:

25   Q.    And are there disciplinary rules that govern lawyers

1     that also require client confidentiality?

2     A.     Yes.

3     Q.     Is that Rule 1.6?

4     A.     I don't know the rule --

5     Q.     You don't know the numbers?

6     THE COURT:  Can you approach the bench?

7     MR. MURPHY:  Sure.

8     (At the bench)

9     THE COURT:  Okay.  We didn't see any documents that

10    talk about this as a legal or ethical obligation, and he's a

11    third party, he's not a client.  So I don't know if they owed

12    him an ethical duty or not.  And you just threw that out in a

13    question, and I want to know what the basis for it is.

14    MR. MURPHY:  Well, Mr. Craig --

15    THE COURT:  Keep your voice down.  Speak in the

16    microphone.

17    MR. MURPHY:  Mr. Craig believed that there was such

18    an ethical restriction.

19    THE COURT:  Okay.

20    MR. MURPHY:  And I think that others in the firm

21    thought so, as well.

22    THE COURT:  Okay.

23    MR. MURPHY:  If they had to register under FARA, then

24    there is a governmental command that you reveal the

25    information.  If not, they're not required to register, you

2287

1      just can't -- it is part of the Ukraine's confidence --

2             THE COURT:  The letter to -- the outgoing letter

3      doesn't mention the ethical obligation --

4             MR. MURPHY:  It doesn't.

5             THE COURT:  The other document that you showed him

6      earlier about their internal communications was our general

7      firm policy is we don't do this.  And you just asserted a

8      principle of legal ethics that said can't, and I think you're

9      trying to get, you know, whether Mr. Craig said something

10     about it, which would be hearsay, and I'm not sure -- you

11     just made it sound like that's what the testimony has already

12     shown, and it's not in here.

13            MR. MURPHY:  I'm just asking the questions.  These

14     are lawyers of 40 years' experience, Your Honor.

15            THE COURT:  Okay.  Well, then, I think --

16            MR. MURPHY:  I will withdraw the question.

17            THE COURT:  I think you have to ask -- if you want to

18     know what was the reason why they didn't do it -- I'm just

19     saying -- I haven't seen any factual basis for asking him in

20     a leading question that that was, in fact, the reason.

21            MR. MURPHY:  It was among the considerations.

22            MS. GASTON:  That is not anywhere in the record.

23            THE COURT:  All right.  Well, all I'm saying is there

24     has to be some foundation before you can just plop that out

25     there in a question and make it sound like they didn't say

1    this because it would have been a violation of legal ethics

2    to say it.

3           I don't have any problem with your saying that they

4    did say, and you've already shown some earlier in terms of

5    discussion about it, but that didn't mention any of this.

6           MR. MURPHY:  Okay.  I will either withdraw the

7    question or I can ask him an open-ended question whether

8    there were any ethical considerations that impacted this

9    decision about whether or not to reveal Mr. Pinchuk's name

10   and the amount of money that he contributed to the client.

11          THE COURT:  All right.  I thought he pretty much

12   claimed lack of recollection about all of this.

13          MR. MURPHY:  He may --

14          MS. GASTON:  Right.

15          THE COURT:  Well, maybe that would be the first

16   question, to remember why it was listed as opposed to saying

17   what ethical considerations were considered.

18          All right.

19          (In open court)

20          BY MR. MURPHY:

21   Q.    Mr. Sloan, did you remember any of the reasons why

22   you and Mr. Craig were concerned about not revealing

23   information about Mr. Pinchuk's role --

24          THE COURT:  Not what Mr. Craig was concerned about.

25   If you recall --

1          MR. MURPHY:  What you were concerned about.

2          MS. GASTON:  Your Honor, this is beyond the scope.

3          THE COURT:  You can ask him, do you recall -- do you

4     recall the reasons that underlay putting this into the

5     letter, as you sit here right now?

6          THE WITNESS:  No.

7          THE COURT:  Ask your next question.

8          BY MR. MURPHY:

9     Q.        If we look at the fifth paragraph of the draft, "You

10    should know that."  In this draft, the language is, "You

11    should know that, throughout the period of our work for the

12    Ministry, we believed that we were providing legal services

13    to the Ministry -- in our capacity as experienced lawyers and

14    independent experts -- and that we were not serving in any

15    way as the Ministry's agent in the United States.  You should

16    also know that, throughout the period of our work for the

17    Ministry, we were in all respects transparent, i.e., we told

18    everyone involved in the project that we had been retained by

19    and were working for the Ministry of Justice of Ukraine.

20    There was certainly no mystery about that."

21          Now, those statements that were contained in this

22    draft that Mr. Craig sent you, did you understand those to be

23    correct?

24    A.        Yes.

25          MS. GASTON:  Objection, Your Honor.

2290

1          THE COURT:  As far as you knew, these were correct?

2          THE WITNESS:  Yes.

3          BY MR. MURPHY:

4   Q.     Then, if we look at the next paragraph, there is a

5   response to item number 1.  And this is the question about

6   "To whom, if anyone, did your firm release or distribute the

7   report and when."

8          The answer here is, "In addition to giving the report

9   to representatives of the government of Ukraine, the law firm

10  on December 12-13 provided a copy," and then to various

11  people.

12         Right?

13  A.     Yes.

14  Q.     At this point, it includes a member of her team in

15  the United States, James Slattery; right?  He was -- did you

16  know him as a Wiley Rein lawyer who was working for

17  Ms. Tymoshenko?

18  A.     Yes.

19  Q.     And a representative of the individual in the Ukraine

20  who helped to fund the project, that is Doug Schoen; right?

21  A.     Yes.

22  Q.     Again, it identifies Mr. Sanger and Ms. Alpert;

23  right?

24  A.     Yes.

25  Q.     At this point, Mr. Huisman's name has been removed;

1    right?

2    A.        It's not there.

3    Q.        Okay.  If you look at the response to question 6, at

4    this point, this draft response is a little longer than the

5    earlier one, and it says, "After identifying Mr. Sanger,

6    Ms. Alpert, and Mr. Huisman as people that Mr. Craig provided

7    clarifying statements to," it says, "One purpose of the

8    statements was to correct misinformation that the media had

9    received -- and was reporting -- from the Ministry of Justice

10   and from the Tymoshenko legal team.  Other than taking the

11   specific steps described above aimed and correcting and

12   clarifying news reports about the report, neither the law

13   firm nor its lawyers ever sought to influence American public

14   opinion or U.S. Government policy."

15             Do you see that?

16   A.        Yes, I do.

17   Q.        At the time, to the best of your knowledge, was that

18   correct?

19   A.        Yes.

20   Q.        Now, Ms. Gaston showed you a series of exhibits, all

21   dated May the 20th, 2013, Exhibits -- I have 433, 434, 438,

22   and 439.  The first two, 433 and 434, seem to be forwarding

23   to Ms. Singer both Mr. Craig's May 1st draft and his May 15th

24   revised draft; right?

25   A.        Yes.

2292

```
1    Q.      And who was Ms. Singer?

2    A.      She was a secretary.

3    Q.      Okay.  Was she your usual secretary?

4    A.      No.  She was sort of my backup secretary when my

5    usual secretary was not there.

6    Q.      Okay.  And why were you sending her multiple versions

7    of the draft?

8    A.      Well, my understanding from the documents is I was

9    asking her to put together a redline or redlines so that I

10   could see changes that had been made and understand the

11   changes.

12   Q.      So Exhibits 438 and 439, are they -- they each attach

13   a document.  Are they redlines that she prepared?

14   A.      Yes.

15   Q.      If we look at 439 and the attachment to it.  Looking

16   at this attachment, can you tell what it is that she has done

17   in terms of a redline version?

18   A.      Well, I mean she has compared one document to another

19   and is showing the changes from one document to another.

20   Offhand, I can't tell you which document is the original and

21   which one is the revised.  She is comparing two documents to

22   show the changes between the documents.

23   Q.      And some of the changes are in blue, and some of the

24   strike-outs are in red, and some of the questions are in

25   purple; right?
```

1    A.      Yes.  Well, it looks like the additions are in blue

2    and the strike-outs are in red.

3    Q.      So if we look at page 3 of Exhibit 439 --

4    A.      Yes.

5    Q.      -- I think that is one Ms. Gaston asked you about --

6    one of the changes that's indicated in blue is the date

7    December 11, when it used to say 11 -- I'm sorry -- it used

8    to say 12-13, now it says 11-12.

9    A.      Yes.

10   Q.      Do you know that 11-12 would not be correct because

11   some of the reports were delivered on the 13th?

12           MS. GASTON:  Objection to the form of the question.

13           BY MR. MURPHY:

14   Q.      Do you know?

15           THE COURT:  Do you know what days are correct and

16   what days aren't correct?

17           THE WITNESS:  No.

18           BY MR. MURPHY:

19   Q.      Okay.  And at the time, do you remember doing

20   anything in particular to figure out what the dates should

21   be?

22   A.      I don't recall.

23   Q.      Okay.  If we look at Exhibit 442, Ms. Whitney is now

24   sending you for one last look a copy of the FARA response

25   that is now on letterhead paper; right?

2294

1    A.      Yes.

2    Q.      And it's got Mr. Craig's signature on it.

3    A.      Yes.

4    Q.      But in spite of that, she is saying to you, "Greg

5    asked that I send it to you.  If you can quickly look it over

6    and make sure it's okay, I will send it out now.  Thanks.  I

7    have the two attachments that go with it."

8            Right?

9    A.      Yes.

10   Q.      Okay.  And then in Exhibit 443, you got back to her,

11   and you had a typo that you noted in one of the paragraphs.

12   And you said, "I assume you're sure about the dates that we

13   provide."

14           Right?

15   A.      Yes.

16   Q.      But do you remember any discussion with anybody about

17   the dates?

18   A.      No.  And I don't recall this e-mail.

19   Q.      Okay.  But you did suggest to Ms. Whitney and to Greg

20   Craig, who is also copied, that it ought to be sent to

21   Mr. Spiegel; right?

22   A.      Yes.

23   Q.      Okay.  And then Ms. Gaston showed you Exhibit 446.

24   And at the top, Mr. -- let's see.  The second -- middle

25   e-mail there, Mr. Spiegel says to you, "Have you seen and

2295

1    signed off on the attached?  Interestingly, I don't recall

2    having been sent the letter, to which he is responding."

3            Right?

4    A.      Yes.

5    Q.      And you responded to him, "Yes, I have."

6            Right?

7    A.      Yes.

8    Q.      So you had, at that point, seen and signed off on

9    Mr. Craig's letter?

10   A.      Yes.

11   Q.      And then you said, I will -- you said, it is

12   interesting that Mr. Spiegel didn't have the original letter

13   that the FARA Unit sent, and you sent it to him; didn't you?

14   A.      Yes.

15   Q.      And then if you look at --

16   A.      Either I sent it to him or I asked somebody to send

17   it to him, but I arranged to have it sent to him.

18   Q.      Okay.  In fact, if we look at Exhibit 447, at the

19   top, this is your response to Mr. Spiegel, you say, "Looks

20   like I don't have an electronic copy.  Greg sent me a hard

21   copy.  I'll get it to you tomorrow."

22   A.      Right.

23   Q.      Okay.  And then Exhibit 450, Government Exhibit 450,

24   there is an e-mail exchange between you and Ms. Whitney and

25   Mr. Craig.  And Mr. Craig says to you and Ms. Whitney, "David

2296

1    Zornow" -- this is at the bottom -- "and Larry Spiegel called

2    and asked me to make some minor changes in our response and

3    to run this letter by Ukraine before sending it in.  Can you

4    provide me with the final draft so that I can make the

5    necessary changes."

6         Right?

7    A.    Yes.

8    Q.    And then, finally, Exhibit Number 4 is the final

9    version of this letter, which looks like it didn't go out

10   until June 3, 2013; right?

11   A.    Yes.

12   Q.    So there is a period of five or six days when the

13   last draft was prepared before the final letter went out?

14   A.    Yes.

15   Q.    Now, if you look at the attachments to this letter,

16   which begin on Exhibit 4, page 4, there's a contract there;

17   right?

18   A.    Yes.

19   Q.    And this contract is dated in the European format of

20   having the day first and then the month and then the year;

21   right?

22   A.    Yes.

23   Q.    So it says 11-03-2013, which would be March 11, 2013;

24   right?

25   A.    That's my understanding.

2297

1      Q.      Okay.  And this is a contract that includes, on

2   page 5, the column "Price of the Contract" at the top, "The

3   price of the present contract shall be 10,200,000 Ukrainian

4   hryvnias, VAT excluded."

5           Right?

6      A.      Yes.

7      Q.      Okay.  I don't know if you know the conversion but --

8      A.      I do not.

9      Q.      Okay.  That is approximately $1 million.

10          MS. GASTON:  Objection, Your Honor.

11          BY MR. MURPHY:

12     Q.      Do you recall, Mr. Sloan, that --

13          MS. GASTON:  Objection.

14          THE COURT:  All right.  Is this stipulated anywhere?

15          MR. MURPHY:  Yes.  It was stipulated that that amount

16   of money went into Skadden's trust account.

17          THE COURT:  All right.  Let's go on to the next

18   question.

19          MR. MURPHY:  I'm sorry, Your Honor?

20          THE COURT:  Let's go on to the next question.

21          MR. MURPHY:  Okay.

22          BY MR. MURPHY:

23     Q.      So that contract was attached to the letter of

24   June 3, 2013; right?

25     A.      Yes, as it appears here, yes.

2298

1    Q.       And in addition, an engagement agreement between the

2    Ukraine and Skadden -- on Skadden letterhead -- was also

3    attached.

4    A.       Yes.

5             I'm sorry.  Which exhibit are we on?

6    Q.       We're still on Exhibit 4.

7    A.       Okay.  Well, I can follow on the screen.  I will

8    follow on the screen.

9    Q.       Okay.

10   A.       Okay.

11   Q.       So there is an attachment of an April 5, 2012

12   retainer memorandum between the Ministry of Justice and

13   Mr. Craig --

14   A.       Yes.

15   Q.       -- also attached.

16   A.       Yes.

17   Q.       Now, when this letter of June the 3rd, 2013 went out,

18   you had reviewed it; right?

19   A.       Yes.

20   Q.       Did you think that you had concealed from the FARA

21   Unit information that had been requested of the firm in the

22   FARA unit's April letter?

23   A.       No.

24   Q.       Do you remember ever engaging in discussions with

25   Mr. Craig or anyone else about making efforts to conceal

2299

1    things or hide things from the FARA Unit?

2    A.      No, absolutely not.

3    Q.      Now, Ms. Gaston asked you about Exhibit 472.  Before

4    we get there, you left Skadden at the end of June; right?

5    A.      Yes.

6    Q.      So the June 3rd letter went out, and about a month

7    later you departed to go to work for the State Department.

8    A.      That's correct.

9    Q.      I think you said you were the Envoy for Guantanamo.

10   A.      Closure, yes.

11   Q.      For the closure of Guantanamo --

12   A.      Yes.

13   Q.      -- which was a -- well, never mind.

14           You stayed in that job for about -- how long?  Year

15   and a half?

16   A.      Yes.

17   Q.      And while you were there in the State Department, you

18   learned that the Skadden firm had received another letter

19   from the Department of Justice FARA Unit?

20   A.      Yes.

21   Q.      You identified Ms. Kottmeyer?

22   A.      Yes.

23   Q.      And she was an attorney within the Office of the

24   Legal Adviser of the Department of State?

25   A.      That's my understanding.  That's what I recall.

1    Q.      Because of this issue about the Ukraine and Skadden's

2    role with the Ukraine, did that impose any kind of

3    restrictions on your work as the Envoy for Guantanamo

4    closure?

5            MS. GASTON:  Objection, Your Honor.

6            THE COURT:  What's the basis?  Just in one word.

7            MS. GASTON:  Outside the scope.

8            THE COURT:  You can answer "yes" or "no."

9            Did it impose any restrictions on your work for

10   Guantanamo?

11           THE WITNESS:  It raised issues.

12           BY MS. MURPHY:

13   Q.      Is that why Ms. Kottmeyer was involved?

14   A.      Well, there had been discussions with the Legal

15   Adviser's Office about those issues that had come up, yes.

16   Q.      Okay.  And did the issues concern whether and to what

17   extent you could do work relating to the government of

18   Ukraine --

19   A.      Yes.

20   Q.      -- in your role as a State Department Adviser or --

21   I'm sorry -- Envoy?

22   A.      Yes.

23   Q.      And let's take a quick look at Exhibit 480,

24   Government 480.

25           MS. GASTON:  Objection, Your Honor.  Outside the

1      scope.

2              THE COURT:  All right.

3              MR. MURPHY:  It's the last document I want to ask

4      about, Your Honor.

5              MS. GASTON:  Can we take it down, please?

6              THE COURT:  All right.  Take it down and come up,

7      please.

8              (At the bench)

9              THE COURT:  Okay.  What's the objection?

10             MS. GASTON:  It's Mr. Craig's hearsay statement.

11             THE COURT:  Have I deemed this exhibit to be

12     admissible ever?

13             MR. MURPHY:  I think so.  I think it's been admitted.

14             THE COURT:  Is this document admitted?  It's got a

15     government exhibit sticker on.

16             MS. GASTON:  Right.  But if he is offering it, then

17     it is hearsay.

18             THE COURT:  Why are you offering it?

19             MR. MURPHY:  Just to show that this closes the loop,

20     and that when the matter was done, Mr. Craig wrote to

21     Mr. Sloan saying not to worry about your status anymore, it's

22     been resolved.

23             THE COURT:  That's not what it says.  It also makes

24     assertions.

25             MR. MURPHY:  Well --

2302

1          THE COURT:  I'm going to sustain the objection.

2          (In open court)

3          BY MR. MURPHY:

4     Q.     Mr. Sloan, did you come to learn at some point that

5     the inquiry was resolved?

6     A.     Yes.

7     Q.     The inquiry from the FARA Unit into Skadden?

8     A.     Yes.

9     Q.     Okay.  And did you learn that the determination had

10    been made that Skadden was not required to register under

11    FARA?

12    A.     Yes.

13    Q.     At any time that you were involved in the project,

14    did you think that you were an agent of the Ukraine, required

15    to register under FARA?

16         MS. GASTON:  Objection.

17         THE COURT:  I don't understand the relevance.

18         MR. MURPHY:  He is the coauthor of the report, Your

19    Honor.

20         THE COURT:  Right.

21         Do you want to come back to the bench.  Let's come

22    back.

23         (At the bench)

24         THE COURT:  There has not been a shred of evidence in

25    this case or a single argument made by the government at any

2303

1   point in this case that the authoring the report triggered a

2   violation of FARA and a need to register, never.  And there's

3   never been any indication that this gentleman spoke to the

4   press or had any media contact.

5          So when you say you, I don't know who --

6          MR. MURPHY:  Let me say Skadden.

7          THE COURT:  And we also have the problem, if you're

8   going to keep pushing this, that nobody at Skadden just ever

9   thought that they ever had to register, there ever been

10  various evolutions about that.  So I think you've asked him

11  about each letter, did you think that letter was truthful at

12  the time based on what you knew at the time, and I don't

13  think she liked that, either, but I let you do that.  So

14  that's the point.

15         MR. MURPHY:  Can I ask him whether he thought that

16  the firm was required to register --

17         THE COURT:  I don't think --

18         MS. GASTON:  Unless you want to ask him --

19         THE COURT:  I don't think -- that could open the

20  door, in all fairness.

21         MR. MURPHY:  All right.  Thanks.

22         THE COURT:  All right.

23         (In open court)

24         MR. MURPHY:  Thank you, Mr. Sloan.  I have no further

25  questions.

2304

1              THE COURT:  All right.  Before the very brief

2      redirect, we will do our mid-afternoon break unless it is

3      going to be, like, a two-question redirect.

4              It's not.

5              MS. GASTON:  No.

6              THE COURT:  We're going to take a brief mid-afternoon

7      break, 10 minutes.  We will resume and complete the testimony

8      of this witness.

9              Please don't discuss the case with anyone during the

10     break.

11                 (Jury not present)

12             THE COURT:  Thank you.  Everybody, you can be excused

13     for 10 minutes; the witness can, as well.

14                 (Recess)

15             THE DEPUTY CLERK:  Your Honor, re-calling case

16     19-125, United States of America v. Gregory B. Craig.

17             THE COURT:  All right.  Let's bring the jury in.

18                 (Jury present)

19             THE COURT:  All right.  Let's proceed.

20             Ms. Gaston.

21                      REDIRECT EXAMINATION

22             BY MS. GASTON:

23     Q.      Good afternoon Mr. Sloan.

24     A.      Good afternoon.

25     Q.      Before the break, Mr. Murphy asked you lots of

```
1    questions about whether you knew that the responses to the

2    FARA Unit that you had contributed to were accurate and

3    complete, to your knowledge.

4            Do you remember that?

5    A.      Yes.

6    Q.      And at the time that you contributed to those

7    responses, did you know whether Mr. Craig had edited a

8    Ministry of Justice press release before it was released?

9            MR. MURPHY:  Objection.

10           THE WITNESS:  No.

11           THE COURT:  I'm sorry?

12           MR. MURPHY:  Objection, Your Honor.  Lacks

13   foundation.

14           THE COURT:  Overruled.

15           MR. MURPHY:  Your Honor, may we approach?

16           THE COURT:  Yes.

17           (At the bench)

18           THE COURT:  She didn't have a factual foundation for

19   the question or a factual foundation for asking whether he

20   knew?

21           MR. MURPHY:  For the question.

22           What press release are we talking about?  Are we

23   talking about a press release from May of 2012, when Skadden

24   was going to be the subject of a press release from the

25   Ministry of Justice saying they had been hired?  Because I
```

1        don't think that there is any contention that that press

2        release has anything to do with the Foreign Agents

3        Registration Act.  For the government to suggest that it does

4        is improper.

5                MS. GASTON:  I can move on to the next --

6                MR. MURPHY:  Your Honor, I would like the Court to

7        instruct the jury that that question should be disregarded --

8                THE COURT:  I'm going to instruct the jury later at

9        the end of the day they are going to have to disregard a lot

10       of questions.  I haven't done it after all of your questions.

11       I'm not going to do it immediately.  Did he answer the

12       question?

13               MR. MURPHY:  He did.

14               THE COURT:  Okay.  Then, I will say that they should

15       disregard the question and the answer.  But they're going to

16       have a broader instruction later.

17               I think everybody needs to be careful about inserting

18       facts in questions --

19               MR. MURPHY:  I just note our objection, Your Honor,

20       to the fact that the government has attempted to suggest that

21       Mr. Craig did a press release -- edited a press release that

22       was meaningful to this case --

23               THE COURT:  I will instruct the jury -- okay, I think

24       you can dial it down about three notches.

25               MR. MURPHY:  Okay.

1          THE COURT:  The government has been steering quite

2     clear -- quite carefully from things they're not supposed to

3     get into, including the gorilla in the room that you were

4     getting quite close to in your questions.  So I feel

5     like -- I don't believe there is anything untoward going on

6     here.  I will sustain the objection.  We will tell the jury

7     the question and the answer is stricken.  But I think the

8     suggestion that, you know, the prosecution is being

9     deliberately unfair is a bit of an overstatement at this

10    moment.

11         MR. CAMPOAMOR-SANCHEZ:  I missed Mr. Murphy's first

12    part, but I was not understanding what was the basis for the

13    objection.  We did introduce evidence that Mr. Craig edited a

14    press release from Ukraine.

15         THE COURT:  I think he is saying it wasn't a press

16    release about the report.  So does it matter?

17         MR. CAMPOAMOR-SANCHEZ:  Well, respectfully, I

18    disagree as to whether it matters or not.  And that's the

19    reason we previously introduced evidence because it shows

20    what he did not tell the FARA Unit about all the things he

21    did for Ukraine.  And even though it was not -- and I do take

22    issue with whether it was related to the report or not

23    because it arose out of their attempted interview of

24    Ms. Tymoshenko.  It certainly shows things that he did on

25    Ukraine's behalf that he did not disclose to the FARA Unit.

2308

1          MR. MURPHY:  There is no issue of disclosure with

2     respect to this press release announcing that Skadden had

3     been hired by the Ministry of Justice.  No one, I don't

4     think, in the National Security Division would suggest that

5     if he had done a press release at Skadden saying you've been

6     hired to do this work that that makes you an agent of a

7     foreign government.

8          MR. CAMPOAMOR-SANCHEZ:  The press release was not the

9     Skadden press release but the edits to the Ministry of

10    Justice's own press release about the hiring of Skadden.  He

11    is being a PR adviser to the Ministry of Ukraine when he

12    suggests what they should include in the press releases.

13    That's the point.

14         THE COURT:  Is that the only question you're going to

15    ask about that?

16         MS. GASTON:  About that press release, yes.

17         THE COURT:  All right.  I don't recall that that one

18    is a specific allegation in the case, that it was something

19    that he omitted in his conversations with the Unit or that's

20    alleged to have been omitted in the letters.

21         MR. CAMPOAMOR-SANCHEZ:  I do think that the Court is

22    right that I don't think it is specifically mentioned -- I

23    will double-check -- but I think the Court is right that it

24    is not specifically mentioned in the indictment, but I don't

25    think the indictment has to list every single instance in

1    which he did --

2          THE COURT:  Maybe the way to do this is to get back

3    to the point, which is, when he was checking the letters, he

4    was doing it based on what he knew about, and he doesn't know

5    everything that everybody in the team did that he wasn't

6    copied on or he didn't participate in.  I think that is the

7    larger point to make here.

8          MR. MURPHY:  My request that this question and answer

9    be stricken stands.

10         MR. CAMPOAMOR-SANCHEZ:  Respectfully, I don't think

11   that was an inappropriate question --

12         THE COURT:  I don't think it was inappropriate.  I

13   don't think it is quite clear that it is relevant.  I'm going

14   to strike it, but I'm not going to strike it on the notion

15   that they have suddenly crossed some line of impropriety

16   here.  I feel like that there has been a lot of

17   envelope-pushing in this courtroom, and I'm not sure that

18   that's what they have been doing.  All right.

19         (In open court)

20         THE COURT:  There have been questions to which I have

21   either sustained objections at the bench, so you never got an

22   answer, and so I didn't have to say disregard the answer.

23   This one I'm sustaining the objection as irrelevant, so you

24   should disregard both the question and the answer.

25         You can proceed.

1               BY MS. GASTON:

2        Q.       Mr. Sloan, when you said earlier that the letters to

3   the FARA Unit that you contributed to were true and accurate,

4   to your knowledge, did you know whether Mr. Craig had

5   e-mailed Paul Manafort and asked him what the communications

6   plan for the report was?

7        A.       No.

8        Q.       Did you know whether on September 23rd Mr. Craig had

9   agreed to background journalists in relation to the release

10  of the report?

11       A.       No.

12       Q.       Did you know that on October 2nd, Mr. Craig had

13  e-mailed David Sanger and asked if he would talk to Vin Weber

14  of Mercury about the report?

15       A.       No, not that I recall.

16       Q.       Did you know whether on October 3rd Mr. Craig had had

17  a copy of the draft report delivered to Mr. Weber's office in

18  Washington, D.C.?

19       A.       No.

20       Q.       And did you know whether on December 11th the

21  defendant wrote to David Sanger of *The New York Times* and

22  told him that Ukraine had determined that Mr. Sanger should

23  get first look at the report?

24       A.       Not that I recall.

25       Q.       And did you know that he had offered a copy of the

2311

1    report to David Sanger?

2    A.      Well, there was the e-mail exchange that we reviewed,

3    which I don't recall, where I was e-mailing with Mr. Craig

4    about a conversation with David Sanger, but I don't recall

5    that.

6    Q.      Were you aware that Mr. Craig had e-mailed David

7    Sanger and offered him a copy of the report on December 11th?

8    A.      Not that I recall.

9    Q.      And were you aware that in that e-mail in which he

10   said that Ukraine had chosen Mr. Sanger to have first look at

11   the report the defendant had agreed to talk to Sanger about

12   the report?

13   A.      Not that I recall.

14   Q.      Did you know that as he did this, he forwarded his

15   messages to Jonathan Hawker of FTI?

16   A.      Not that I recall.

17   Q.      And do you know that Mr. Hawker then communicated

18   with Mr. Craig about his activities with respect to David

19   Sanger?

20   A.      Not that I recall.

21   Q.      And did you know that Mr. Hawker actually looped in

22   Rick Gates of Davis Manafort into some of those

23   communications?

24   A.      To some of which communications?

25   Q.      The communications with Mr. Craig on December 11th of

2312

1      2012 in reference to Mr. Craig's communications with David

2      Sanger of *The New York Times*.

3      A.      Not that I recall.

4      Q.      Did you know that on December 11th of 2012, the

5      defendant had driven a report copy to David Sanger's house in

6      Washington, D.C.?

7      A.      Not that I recall.

8      Q.      Okay.  And do you know that after Jonathan Hawker of

9      FTI had written him and asked him to tell David Sanger that

10     the report would be published by Ukraine at 3 a.m., U.S.

11     time, on December 13th, the defendant did so?

12     A.      Not that I recall.

13     Q.      So you did not know any of that when you were looking

14     at these draft letters?

15     A.      Not that I recall.

16     Q.      Okay.  Mr. Murphy asked you some questions about

17     Defense Exhibit 24.  Can we please call that up.  Could we

18     look at the top e-mail in that chain.

19             And this is the e-mail from Mr. Van der Zwaan to

20     Mr. Craig about incorporating FARA language into the

21     engagement letter?

22     A.      Yes.

23     Q.      The date of this e-mail is on April 11th of 2012;

24     isn't it?

25     A.      Yes.

2313

1    Q.      If we look at Government's Exhibit 420.  And if we

2    look at page 13.

3            The date of that retainer memorandum here appears to

4    be April 10, 2012; is that correct?

5    A.      The date of the memo on page 13 of Exhibit 420 is

6    April 10th, yes.

7    Q.      So does it appear that that language was included in

8    a letter after April 10th even though the date on the letter

9    is April 10th?

10   A.      I'm sorry.  I'm not following the question.

11   Q.      Sure.  So we just saw a conversation on April 11,

12   2012, about incorporating FARA language into the retainer

13   memorandum; is that right?

14   A.      Yes.

15   Q.      And the date of the retainer memorandum is April 10,

16   2012?

17   A.      Of this retainer letter, yes, it is April 10th.

18   Q.      Can we zoom out, please, Ms. Rohde.  And can we look

19   at the paragraph, "Scope of engagement."

20           And this includes the language about it is understood

21   that the firm is not being retained to engage in any

22   political activities and will not engage in any such

23   activities as defined in the Foreign Agent Registration Act?

24   A.      Yes.

25   Q.      So that's the language that was being discussed on

2314

1        April 11, 2012; is that right?

2        A.        Apparently, from the e-mail.

3        Q.        Okay.  Now, Mr. Sloan, we also looked at DX 92.

4        Could we please look at that, Ms. Rohde.

5                  And this is the e-mail chain that includes the press

6        folks about the "Skadden Stink" editorial.

7                  I will give you a chance to get to it.

8        A.        Okay.  Thank you.  Okay.

9        Q.        Then, if we could please zoom, Ms. Rohde, on

10       Mr. Craig's response on August 9, 2012.

11                 And Mr. Craig here writes, "If the government wants

12       the third party to step forward that would be up to the

13       Government to make happen."  Is that right?

14       A.        Yes.

15       Q.        That's because in the circumstance the government of

16       Ukraine was the client; is that right?

17       A.        Yes.

18       Q.        Now, is it your understanding that the government of

19       Ukraine actually was okay with some disclosure about

20       Mr. Pinchuk's role?

21       A.        Well, in terms of my recollection -- and I'm a bit

22       unclear on that -- I have seen an e-mail to that effect in

23       reviewing this -- but my recollection ultimately is that we

24       could not get the necessary permissions.

25       Q.        Well, you couldn't get the necessary permissions from

Case 1:19-cr-00125-ABJ   Document 147   Filed 09/11/19   Page 75 of 127

```
 1        Mr. Pinchuk; right?

 2        A.        Yes.  But as I say, my recollection is a bit unclear

 3        on it with regard to the government.

 4        Q.        Okay.  Can you hold on one moment, please.

 5                  I'm going to refresh your recollection.

 6                  THE COURT:  Well, you're going to give him a

 7        document, and he can read it and see if it refreshes --

 8                  BY MS. GASTON:

 9        Q.        I'm going to give you a document and see if it

10        refreshes.  Would you, please, read that.

11        A.        Read it to myself?

12        Q.        Yes.

13        A.        Yes.

14        Q.        Does that refresh your recollection that it seemed

15        the government of Ukraine was okay with disclosing some of

16        Mr. Pinchuk's role?

17        A.        I see it in the e-mail.

18        Q.        Does it refresh your recollection?

19        A.        It doesn't really refresh my recollection on it.

20        Okay.

21        Q.        Does it refresh your recollection that Mr. Manafort

22        informed you and Mr. Craig that the government might be --

23                  MR. MURPHY:  Objection.  Hearsay.

24                  THE COURT:  I don't think he remembers.  I think

25        there may have been other testimony and evidence about this
```

PATRICIA A. KANESHIRO-MILLER, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
202-354-3243

2316

1    point.

2              MS. GASTON:  Okay.

3              BY MS. GASTON:

4    Q.      In looking at Government's Exhibit 398, which you

5    looked at with Mr. Murphy --

6    A.      398, yes.

7    Q.      Yes.

8    A.      Okay.

9    Q.      Let's start on the second page of this one, please.

10   And starting at the bottom, just zooming very quickly.  This

11   is the e-mail on December 14th in which you call attention to

12   the fact that in your view *The National Law Journal*'s

13   headline and article was inaccurate?

14   A.      Yes.

15   Q.      And this is after the publication of the report by

16   Ukraine?

17   A.      Yes.

18   Q.      And then if we could go to the first page of this

19   document.  And zoom in at the bottom.

20   A.      Yes.

21   Q.      And you proposed looping in Ms. Weiss and then

22   talking to the reporter.

23   A.      Yes.

24   Q.      Okay.  If we could zoom out.

25              So this is a circumstance in which, after the report

2317

1    was public, you noted inaccuracies and looped in the press

2    department of Skadden to correct the reports; right?

3              MR. MURPHY:  Objection.  Leading, Your Honor.

4              THE COURT:  It was.  But you can answer it.

5              THE WITNESS:  Yes, that's correct.

6              THE COURT:  When you get to a new topic, I think you

7    do have to try not to lead.  All right.

8              BY MS. GASTON:

9    Q.    I believe you said before that you don't recall

10   receiving a copy of the FTI media plan before August; is that

11   correct?

12   A.    Yes.

13   Q.    Do you know whether Mr. Craig had received copies

14   separately from you?

15   A.    I don't know.

16   Q.    Okay.  Could we please look at Exhibit 420,

17   Ms. Rohde.

18              This is the letter, first response to the FARA Unit,

19   that was sent on February 6th.  I will wait for you to get to

20   that, too.

21   A.    Okay.  420, I have it.

22   Q.    All right.  Now, Ms. Rohde, if we could please go to

23   page 3 of that.  And if we could zoom in on number 3.

24              Now, this describes that in April 2012, the Ministry

25   of Justice for the government of Ukraine asked the firm to

2318

1      "serve as consultant on rule-of-law issues and to provide

2      advice about the question of Ukraine's criminal justice

3      system as viewed through the prism of Western standards of

4      due process, and, in particular, to advise the ministry about

5      rule-of-law issues that might arise before the European Court

6      for Human Rights."

7              And then it goes on to mention -- to describe the

8      report.  Is that right?

9      A.      Yes.

10     Q.      Now, that first part that I just read, does that

11     describe Project 1?

12     A.      I'm sorry.  Say that again.

13     Q.      Does that describe Project 2?  So it mentions the

14     European Court of Human Rights, but that is different from

15     Project 2; right?

16              MR. MURPHY:  Objection to the form of the question.

17              THE COURT:  Does it describe Project 2?

18              THE WITNESS:  The reference to the European Court for

19     Human Rights does not.

20              BY MS. GASTON:

21     Q.      Okay.  Now, on page 4 of this document, sir, if we

22     could blow up the paragraph "lastly."

23              You went over this with Mr. Murphy, as well.  This

24     states that, "a private citizen of Ukraine in which" --

25     "There was an oral agreement with a private citizen of

1    Ukraine in which that individual agreed to contribute funds

2    to help pay for the work described above."

3              Now, to be clear, Mr. Pinchuk essentially provided

4    all of the funding for the report; is that right?

5    A.       That's my understanding.  Or a very substantial part

6    of it, yes.

7    Q.       He provided more than $4 million?

8    A.       Yes, that's correct.

9    Q.       Okay.

10   A.       I'm sorry.  You said more than $4 million.  It might

11   have been $4 million.

12   Q.       It might have been $4 million.  Okay.

13             Can we look at Government's Exhibit 426, which you

14   looked at with Mr. Murphy.  All right.  Let's go to the back

15   of it.  All right.  Could we go to the back page of it,

16   please, Ms. Rohde.

17   A.       Yes.

18   Q.       So does this start with, "Mr. Craig asking Ms. Weiss

19   for the *L.A. Times* report"?

20   A.       Yes.

21   Q.       All right.  Then could we go to the previous page,

22   Ms. Rohde.

23             And then she provides the *L.A. Times* article; is that

24   right?

25   A.       Yes.

2320

1    Q.      Okay.  Then could we -- and Mr. Craig asks her to

2    provide more, more news articles; is that right?

3    A.      Yes.

4    Q.      All right.  Let's go to the page before that.  And

5    the page before that.

6            All right.  Could we blow up Ms. Weiss's e-mail down

7    to the headline and down to the correction.

8            Now, this is where Ms. Weiss is providing *The*

9    *National Law Journal* article that we have talked about

10   multiple times today; is that right?

11   A.      Yes.

12   Q.      Okay.  And Ms. Weiss tells you and Mr. Craig, "The

13   only interview our team handled was with *The National Law*

14   *Journal*."

15           Right?

16   A.      Yes.

17   Q.      And this was the press contact that you were involved

18   in; right?

19   A.      Yes.

20   Q.      And this was the press contact that started because

21   you looped in Ms. Weiss; right?

22   A.      Yes.

23   Q.      And this is a press contact that occurred after the

24   publication of the report; is that right?

25   A.      Yes.

1    Q.      Okay.  And Ms. Weiss is saying, this is the only

2    interview our team handled; is that right?

3    A.      That's what the e-mail says.

4    Q.      Okay.  Then can we back out of that, please, and go

5    to the previous page.  Thanks.

6            Then let's look at what Mr. Craig e-mails at the

7    bottom of that page.

8            And then he asks about *The New York Times* article; is

9    that correct?

10   A.      Yes.

11   Q.      And to be clear, this is on April 22, 2013?

12   A.      Yes.

13   Q.      So this is approximately four months after

14   Mr. Craig's contact with David Sanger of *The New York Times*?

15   A.      Yes.

16   Q.      Okay.  Let's back out, please, Ms. Rohde.  And let's

17   go up.  And continue moving up.  And could we zoom,

18   Ms. Rohde, from the top down to, "It looks like I also gave."

19           And Mr. Craig writes to you and says, "It looks like

20   I also gave *The New York Times* a one-sentence statement.

21   Cliff, do you remember that?"

22           And you say, "No, that one I don't remember."

23           Was that your press contact, Mr. Sloan?  Did you

24   contact David Sanger?

25   A.      I did not contact David Sanger.

2322

1    Q.    Did you give David Sanger a comment for the
2    publication?
3    A.    No, I did not.
4    Q.    What was Ms. Weiss's response?
5    A.    She said, "Might you have worked with Jonathan
6    Hawker/FTI on that item?  I know he was involved in this
7    project generally but that our team at Skadden did not
8    handle."
9    Q.    Again, Mrs. Weiss is saying our team at Skadden did
10   not handle?
11   A.    That's correct.
12   Q.    Do you remember whether Mr. Craig responded to this
13   e-mail?
14   A.    I don't remember.
15   Q.    Okay.  Finally, Mr. Sloan, let's look at Government's
16   Exhibit 442.  And is this the draft FARA response that, if
17   you recall, you responded to and said check the dates?
18   A.    I remember the e-mails that we looked at earlier
19   today, yes.
20   Q.    And let's look at page 3 of this document, please.
21   And let's look at number 1.
22   A.    Yes.
23   Q.    Now, of the contacts listed here -- so, first let's
24   start "To whom, if anyone, did your firm release or
25   distribute the report and when?"

2323

1          Did you know whether Mr. Craig had provided a draft

2     of the Report to Vin Weber on October 3, 2012?

3     A.     Not that I recall.

4     Q.     Of these other contacts that are listed here, the

5     only contact you were involved with was Matthew Huisman of

6     *The National Law Journal*; is that accurate?

7     A.     Yes, and I was not involved -- and this question is

8     about the releasing or distributing the report, and I was not

9     involved in that with him, but yes, he is the only one that I

10    had any contact with.

11    Q.     Right.  So you had no firsthand knowledge of any of

12    these individuals receiving a report from Skadden; is that

13    right?

14    A.     Well, no firsthand knowledge in terms of contact with

15    them and nothing I recall.  I'm aware that there is that

16    e-mail exchange about David Sanger that I had with Mr. Craig

17    that we talked about.

18    Q.     You're aware that there is an e-mail exchange on

19    December 11th in which it appears that you know that

20    Mr. Craig has spoken to David Sanger; right?

21    A.     Yes.

22    Q.     Did you give the report to David Sanger?

23    A.     No.

24    Q.     Did you give the report to Ms. Tymoshenko's legal

25    team in Ukraine?

2324

1    A.        No.

2    Q.        Did you give the report to a representative of

3    Mr. Pinchuk?

4    A.        No.

5    Q.        Did you give the report to David Sanger of *The New*

6    *York Times*?

7    A.        No.

8    Q.        Did you give the report to Matthew Huisman of *The*

9    *National Law Journal*?

10   A.        No.

11   Q.        Did you give it to Emily Alpert of the *Los Angeles*

12   *Times*?

13   A.        No.

14   Q.        So who had the factual knowledge to answer this

15   question?

16            MR. MURPHY:  Objection.

17            THE COURT:  You can answer the question, if you know.

18            THE WITNESS:  I mean, I did not, and, you know, at

19   least as to some of these, Greg Craig was the person who was

20   in touch with them.  I don't know if that is true with all of

21   them that are listed.

22            BY MS. GASTON:

23   Q.        So when you said earlier that this was true and

24   accurate to the best of your knowledge, you didn't have the

25   knowledge to answer this question accurately; is that right?

2325

1        A.        Yes.

2        Q.        Okay.  And then let's look at number 6.  This also

3        talks about Mr. Craig providing "brief clarifying statements

4        about the report to David Sanger of *The New York Times*, to

5        Emily Alpert of the *Los Angeles Times*, and to Matthew Huisman

6        of *The National Law Journal*."

7               Did you provide statements to David Sanger of *The New

8        York Times* or Emily Alpert of the *Los Angeles Times*?

9        A.        No.

10       Q.        Were you participating in conversations with

11       Mr. Craig and either of those journalists?

12       A.        With regard to *The New York Times* and *Los Angeles

13       Times*, no.

14       Q.        Other than this contact with Matthew Huisman that we

15       talked about, did you have the factual basis to answer this

16       question accurately?

17       A.        No.

18               MS. GASTON:  Nothing further.

19               THE COURT:  Mr. Sloan, I believe you can be excused.

20       Thank you very much.

21               MR. MURPHY:  Your Honor, I have a question or two.

22               THE COURT:  All right.  I will let you think about

23       that for a second.

24               All right.  You're not excused yet.

25               BY MR. CAMPOAMOR-SANCHEZ:  Is it allowed?

2326

1           THE COURT:  Well, if he has recross within the scope

2     of the redirect, but then they may want to get up again.

3     They get the last go-around.

4                        RECROSS-EXAMINATION

5           BY MR. MURPHY:

6     Q.      Mr. Sloan, Mr. Craig shared with you some comments

7     and quotes that he had given to Mr. Sanger and asked you to

8     review them; didn't he?

9     A.      We saw e-mails earlier today that reflected that,

10    yes.

11          MR. MURPHY:  Thank you very much.

12                       REDIRECT EXAMINATION

13          BY MS. GASTON:

14    Q.      Did you send those quotes to those reporters,

15    Mr. Sloan?

16    A.      I'm sorry?  Did I what?

17    Q.      Did you send those quotations to those reporters that

18    Mr. Craig consulted with you on?

19    A.      No.

20    Q.      Did you participate in any other conversations with

21    those reporters?

22    A.      No.

23    Q.      Did you know the content of the communications

24    between Mr. Craig and those reporters?

25    A.      Not beyond the e-mails that we've looked at today, to

1    the best of my recollection.

2            MS. GASTON:  Thank you.

3            THE COURT:  All right.  You are excused.

4            (Witness excused)

5            THE COURT:  Thank you.

6            Now, I take it you don't have any witnesses for whom

7    you have perhaps five questions?

8            MR. CAMPOAMOR-SANCHEZ:  Not five questions, no.

9            THE COURT:  So why don't we come up and talk about

10    where we are in the scheduling, noting that it is 10 after 4.

11            (At the bench)

12            MR. CAMPOAMOR-SANCHEZ:  So we were hoping to get

13    today to Mr. Ken Gross and Larry Spiegel.  We did not expect

14    the cross to last two and a half hours.  They're here.

15    Mr. Gross, I would expect, would be a direct of 20 minutes.

16    So it is not lengthy, but it is not five questions.

17    Mr. Spiegel will be a little longer than that.

18            THE COURT:  It seems like Mr. Spiegel would not be a

19    good choice for this afternoon.

20            MR. CAMPOAMOR-SANCHEZ:  Correct.

21            THE COURT:  Are you anticipating a lot of

22    cross-examination for Mr. Gross?

23            MR. MURPHY:  No.  Five minutes.

24            THE COURT:  Okay.  Because he's just going to say

25    what he said, but we're not going to get into law, and I

1      don't think he talked to any of these people.  He was just

2      asked questions --

3                   MR. TAYLOR:  He is primarily being called because he

4      attended the meeting.

5                   MR. CAMPOAMOR-SANCHEZ:  He did attend the meeting on

6      October 9th.  I'm also going to ask him about the advice that

7      he gave that's been referenced --

8                   THE COURT:  Why don't we try to do it.  Let's try to

9      get one of them done today.  All right.

10                  (In open court)

11                  THE COURT:  All right.  Members of the jury, we are

12     going to test your patience and try to do one more witness

13     who I have been assured is brief, and I think it actually

14     will be.  But just so you don't think I'm a terrible-horrible

15     person, there are actually two witnesses out there, and I'm

16     not going to make you listen to both of them.

17                  So let's call your next witness.

18                  MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.  The

19     government calls Kenneth Gross.

20                                 Kenneth Gross,

21            having been duly sworn, was examined and testified as

22     follows:

23                  BY MR. CAMPOAMOR-SANCHEZ:  May I proceed?

24                  THE COURT:  You may proceed, sir.

25

2329

                            DIRECT EXAMINATION

1

2                  BY MR. CAMPOAMOR-SANCHEZ:

3       Q.        Good afternoon, sir.

4       A.        Good afternoon.

5       Q.        Can you please tell us your full name and spell it

6       for the record.

7       A.        Kenneth Andrew Gross.  K-E-N-N-E-T-H A-N-D-R-E-W

8       G-R-O-S-S.

9       Q.        Without telling us your address, where do you live?

10      A.        I live in Bethesda, Maryland.

11      Q.        Where are you employed, sir?

12      A.        I'm employed at the law firm of Skadden, Arps, Slate,

13      Meagher & Flom.

14      Q.        Are you an attorney?

15      A.        Yes, I am.

16      Q.        How long have you been employed at Skadden, Arps as

17      an attorney?

18      A.        Over 33 years.

19      Q.        What is your area of practice?

20      A.        What we call political law; the regulation of money

21      and politics, lobby, disclosure, gifts and gratuities,

22      conflicts of interest.

23      Q.        Would that also include a practice on the Foreign

24      Agents Registration Act?

25      A.        I'm sorry?

2330

1    Q.      Does your practice include advising clients on the

2    Foreign Agents Registration Act?

3    A.      Yes, it does.

4    Q.      Let me direct your attention to 2012.  Okay?

5    A.      Okay.

6    Q.      As you sit here today, do you recall being approached

7    by members of Skadden to get advice from you on a project

8    related to Ukraine?

9    A.      I do not.

10   Q.      And I should ask you, back in 2012, did you know

11   Mr. Cliff Sloan?

12   A.      I knew him back at that time, yes.

13   Q.      How about Mr. Allon Kedem?

14   A.      Yes, I knew him as well.

15   Q.      Let me see if I can just try to refresh your

16   recollection, and it may not.  Let me show you Government's

17   Exhibit 69.  And let's start with the e-mail in the middle.

18          And as you will quickly see, it is an e-mail from

19   Mr. Sloan to Mr. Kedem, saying, "Allon, Ken Gross may give

20   you a call."

21          Do you see that?

22   A.      Yes.

23   Q.      And if we go up, there is a response, or an e-mail

24   from Mr. Kedem to Mr. Sloan, copying Mr. Craig, saying, "I

25   spoke with Ken."

2331

1       Do you recall or having any memory of having a

2   conversation with Mr. Kedem in or about April of 2012?

3   A.      I do not.

4   Q.      Okay.

5   A.      I get calls from colleagues regularly on these types

6   of questions.

7   Q.      Right.  If someone has a political law-related

8   question, they might call you?

9   A.      Exactly.

10   Q.      All right.  We can -- well, let me ask you

11   this -- well, I will move on.  Let me now move you towards

12   2013, okay?

13   A.      2013?

14   Q.      Yes, 2013 now.

15       Do you recall being approached on or about

16   October 2013 about an issue having come up related to some

17   work that Skadden performed on Ukraine's behalf?

18   A.      Later in 2013, yes.

19   Q.      Okay.  What do you recall about being initially

20   approached about an issue related to a project in Ukraine?

21   A.      What I remember is getting a phone call from Larry

22   Spiegel, the firm's general counsel, a partner of mine.  We

23   discussed FARA.  He seemed to know that I had Foreign Agents

24   Registration Act expertise, and asked me about it briefly, or

25   confirming that I actually knew FARA.

2332

1    Q.      Uh-huh.

2    A.      And that's really what I remember from that call.

3    Q.      Do you have any recollection of him mentioning a

4    potential meeting with the FARA Unit?

5    A.      I don't recall that.

6    Q.      Do you recall attending a meeting with FARA Unit and

7    Mr. Spiegel?

8    A.      Yes, I do recall attending a meeting.

9    Q.      Before we get to the meeting itself, how do you

10   recall that coming up?

11   A.      I don't remember exactly how it came up.  At some

12   point, it obviously came up.  I didn't just walk into a

13   meeting without any knowledge of what it was about.  But I

14   don't remember a pre-discussion about the meeting.  So that's

15   all I can say about it.

16   Q.      Okay.  So who was supposed to go to this meeting from

17   Skadden?

18   A.      Well, I don't know who was supposed to go, but who

19   did go was --

20   Q.      Better question:  Who did go to this meeting?

21   A.      I attended.

22   Q.      Uh-huh.

23   A.      Larry Spiegel attended, and Greg Craig attended from

24   Skadden.

25   Q.      And do you have any understanding as to why

2333

1      Mr. Spiegel was attending that meeting?

2      A.      I understood that he was there because he was the

3      firm's general counsel.

4      Q.      How about Mr. Craig; do you have an understanding of

5      why he was at that meeting?

6      A.      Yes.  Greg was the lead counsel on the case that was

7      the subject of this discussion, and he was the one that had

8      the information and facts related to that matter.

9      Q.      I should ask you, at that point did you know

10     Mr. Craig?

11     A.      I do.

12     Q.      Back then, in 2013?

13     A.      Yes, I did.

14     Q.      Do you see him in the courtroom here today?

15     A.      Yes, I do.

16     Q.      Can you point him out to us and tell us what he is

17     wearing.

18     A.      He is sitting right there.

19             THE COURT:  All right.  Let the record reflect he has

20     identified the defendant.

21             BY MR. CAMPOAMOR-SANCHEZ:

22     Q.      And Mr. Gross, do you recall any preparations being

23     done before you attended the meeting?

24     A.      I don't have a recollection of preparations for the

25     meeting.

2334

1    Q.      Okay.  So you don't recall, for example, or have any

2    memory of there being a meeting before the meeting between

3    you and Mr. Craig or Mr. Spiegel?

4    A.      I don't.  I know there was a determination letter,

5    and it's more likely than not that I reviewed it, but I don't

6    remember doing it.

7    Q.      Okay.  When you use the term "determination letter,"

8    what does that mean?

9    A.      There was an initial letter that we received from the

10   FARA Unit regarding the firm registration in this Ukraine

11   matter, and they had made an initial determination that the

12   firm should register under FARA.

13   Q.      And so was that related to the purpose of the

14   meeting?

15   A.      Yes, that was the purpose -- the purpose of the

16   meeting was to make a case that we were not required to

17   register and give Greg, who had the facts regarding the case,

18   an opportunity to make that presentation.

19   Q.      Did you yourself have any knowledge of the facts

20   about Skadden's engagement on the Ukraine project?

21   A.      I did not.

22   Q.      Okay.  So what was your role in attending the

23   meeting?

24   A.      I was there because of my expertise in FARA in case

25   an issue came up regarding FARA.  And I also knew the people

2335

1    in the registration unit; Heather Hunt, for example.  So I

2    had some familiarity with them and had prior dealings with

3    them.

4    Q.     So that could be helpful in terms of the

5    conversation?

6    A.     I would think.

7    Q.     All right.  Do you have a recollection of who from

8    the Skadden side -- I should ask you:  Did the meeting take

9    place?

10   A.     It did.

11   Q.     Do you recall where it was?

12   A.     Yes, it was over at the FARA Unit offices.  I believe

13   they call it the Bicentennial Building.

14   Q.     Do you recall who from the FARA Unit was in

15   attendance?

16   A.     Heather Hunt, the head of the unit was there sitting

17   at the end of the table.  A man named Alex Mudd, who I had

18   dealt with before was there.  There was another attorney that

19   I wasn't familiar with or didn't remember dealing with

20   sitting across the table.  And I believe yet a fourth person.

21   Q.     You don't recall who that was?

22   A.     I don't.

23   Q.     Okay.  And from Skadden, it was you, Mr. Spiegel, and

24   Mr. Craig?

25   A.     Correct.

2336

1      Q.      Okay.  And who from Skadden sort of led the meeting?

2      A.      Most of the presentation, if not all of it, was

3      handled by Craig.  He had the facts.  There may have been

4      some introductory statement or comment or, you know, "hello"

5      greeting type of thing.  But Craig handled the meeting.

6      Q.      Did you take any notes at the meeting?

7      A.      Not that I recall.

8      Q.      Do you remember anybody from Skadden's side taking

9      notes of the meeting?

10     A.      Not that I recall.

11     Q.      Do you know if Mr. Craig or anyone else from the

12     Skadden side had any materials or documents or a presentation

13     or anything along those lines?

14     A.      Not that I recall.

15     Q.      Well, so what, if anything, do you recall Mr. Craig

16     saying at that meeting?

17     A.      What I remember from this meeting back in 2013 is

18     that Greg was making the point that the contacts that he had

19     with certain press was to correct mischaracterizations that

20     were either printed or about to be printed or that he knew

21     was going to be printed and that the purpose was to say

22     that's not correct.  There were mischaracterizations, and

23     that's what I remember him saying at that meeting.

24     Q.      Okay.  And do you recall Mr. Craig mentioning any

25     specific publications that he had to correct

2337

1    mischaracterizations?

2    A.        Yes.  I remember *The New York Times* coming up, *The*

3    *National Journal,* and a third publication.

4    Q.        And you don't recall the name of that third

5    publication?

6    A.        I have learned it since, but I couldn't recall it.

7    Q.        Right.  Fair enough.  Anything else that you recall

8    from the meeting?

9    A.        That's really it right there.

10   Q.        That's really it.  Okay.

11             What was your perception about how the meeting went?

12   A.        I actually thought it went very well.  I do have a

13   memory of my impression of it as we walked out.  I thought

14   that Greg had made a very persuasive case to the FARA Unit.

15   I liked the responses and the types of -- and I don't

16   remember what was said -- my sense was that it was well

17   received by the FARA Unit and that we had a reasonable chance

18   that they might rule -- may make a determination in our

19   favor.

20   Q.        They might change their minds?

21   A.        Change their minds.

22   Q.        Right.  Let me show you -- well, let me ask you:  Was

23   there any sort of homework or assignment or thing to do after

24   the meeting?

25   A.        Not that I recall.  There may have been, but I don't

2338

1    recall it.

2    Q.      All right.  Let me show you Government's Exhibit 474,

3    which is in evidence.  And let's look at the bottom e-mail

4    first.

5            And this is an e-mail from Mr. Craig to you and

6    Mr. Spiegel, and the subject line reads, "One-Page FARA

7    letter."

8            First of all, do you recall getting this e-mail?

9    A.      I do not.

10   Q.      Okay.  But you do see the question from Mr. Craig

11   here, "Is this okay"?

12   A.      Correct.

13   Q.      Let's look at the second e-mail.  And that's a

14   response from you; is that correct?

15   A.      That is correct.

16   Q.      Okay.  And your response says, "This looks good.

17   What do you think about adding a sentence to the second

18   paragraph saying, "Otherwise, the firm provided no copies of

19   the report to any media."

20           Do you recall writing that?

21   A.      I do not.

22   Q.      Okay.  And I don't want you to give any legal

23   opinions because the judge is the only one that instructs on

24   the law here, but what was the reason that you were making

25   this suggestion as to the letter?

2339

1    A.       Just reading it now, not recalling doing it, but

2    reading it now, the point here is that if you are

3    disseminating materials on behalf of a foreign government,

4    you're potentially going to raise an issue

5    under -- registration issue under FARA.  And if, in fact, it

6    was correct and true that there were no other disseminations

7    other than those that we discussed, it would be helpful to

8    make that point.  And that's what I believe I was getting at

9    in this e-mail.

10   Q.       And you were suggesting adding to the second

11   paragraph.  If we can look at -- there's an attachment,

12   obviously, to this.  Let's take a quick look at it.

13        The second paragraph, as it appears now, reads, "With

14   respect to this law firm's decision to provide a copy of the

15   Tymoshenko Report (the Report) to U.S. media outlets, this

16   was done in response to requests from the media."

17        And to that paragraph, you were suggesting that

18   Mr. Craig add, "Otherwise the firm provided no copies of the

19   report to any media."

20        Is that how I should read it?

21   A.       I don't recall it and whether it related to a

22   specific paragraph.  It was the point that I was apparently

23   trying to make that somewhere in the letter you would make

24   that statement.

25   Q.       Okay.  Let's take a look at the first page again.

1    Obviously, if you don't remember, that's fine.

2    A.      Uh-huh.

3    Q.      But I just want to make sure.  You can take a look at

4    your statement.  As I'm reading it, it says, "What do you

5    think about adding a sentence to the second paragraph?"

6    A.      I see.  Uh-huh.  Okay.  You're right.

7    Q.      Understanding that you don't remember, but looking at

8    the actual draft, if we look at the second paragraph --

9    A.      Yeah.

10   Q.      -- it would be added after the draft reads, "With

11   respect to this law firm's decision to provide copies of the

12   report" --

13   A.      You are correct.  You are correct, yes.

14   Q.      And you already explained why you made that

15   suggestion.

16   A.      Yes.

17   Q.      Now, let's look at -- and let me ask you:  Do you

18   recall whether a letter was ultimately sent to the FARA Unit?

19   A.      I did not -- I don't recall seeing a letter going

20   out, so I can't say for sure that it did.  It apparently did

21   go, but I don't recall seeing it.

22   Q.      You don't recall seeing it.

23           All right.  Let's take a look at Government's

24   Exhibit 12.  If we can pull it together next to the prior

25   exhibit we were just looking at, but page 2.  So 12 and 474,

2341

1        second page.  And if we can first zoom in on the second

2        paragraph.  And then if we can move that to the top.  And

3        then let's look at the second paragraph of the actual letter,

4        Government's Exhibit 12.

5                And there's slight differences between both; right?

6        A.      Yes.

7        Q.      But it does add, as you suggested, "This was done in

8        response to requests from the media.  The firm did not

9        provide copies of the report to any other media outlets."

10       But then it says "In the United States."

11       A.      Correct.

12       Q.      I can go back, if you would like.  Your suggestion

13       just said, "any media," and now it says "any media in the

14       United States."

15       A.      Correct.

16       Q.      And do you know whether the FARA Unit ultimately

17       changed its mind as to its initial decision or determination

18       letter that Skadden should register?

19       A.      Yes, I recall learning that the FARA Unit ultimately

20       decided that the firm did not have to register.

21       Q.      And aside from attending the meeting, sir, did you

22       have any other involvement in this matter at that time?

23       A.      No, not that I recall.

24               MR. CAMPOAMOR-SANCHEZ:  No further questions.

25               THE COURT:  All right.  Cross-examination.

2342

1                        CROSS-EXAMINATION

2              BY MR. TAYLOR:

3     Q.      Mr. Gross, Mr. Craig said at the meeting that he was

4     correcting mischaracterizations that had occurred or which he

5     believed were going to occur; right?

6     A.      That's what I remember.  I remember something about

7     the timing, that either it had been printed or was going to

8     be printed, something along those lines.

9              THE COURT:  What do you mean "printed or going to be

10    printed"?

11             THE WITNESS:  That it was in a newspaper story; that

12    it was either correcting something that had already been

13    published or was about to be published.  I seem to have a

14    recollection about that.  I don't know how accurate that is,

15    but that was my recollection.

16             MR. TAYLOR:  Thank you, Mr. Gross.

17                       REDIRECT EXAMINATION

18             BY MR. CAMPOAMOR-SANCHEZ:

19    Q.      Obviously, you're doing your best job in terms of

20    memory --

21             THE COURT:  I'm sorry.  You have no further

22    questions?

23             MR. TAYLOR:  No.

24             THE COURT:  And you're back on redirect.  I'm sorry.

25    I missed that.

2343

1          The redirect has to be very short because he only

2     asked one question.

3          MR. TAYLOR:  Your Honor, I don't want to raise a

4     scope objection here, but the cross was very narrow.

5          THE COURT:  It certainly was.

6          MR. CAMPOAMOR-SANCHEZ:  For once I agree with

7     Mr. Taylor, but I'm going straight to what he asked.

8          THE COURT:  All right.  Why don't we just approach

9     the bench for a second.

10          (At the bench)

11          MR. CAMPOAMOR-SANCHEZ:  I'm not sure what the scope

12     objection is.

13          THE COURT:  I want to know what you're asking in case

14     there is one.  I'd rather discuss it first.

15          MR. CAMPOAMOR-SANCHEZ:  Okay.

16          THE COURT:  What do you want to ask him?

17          MR. CAMPOAMOR-SANCHEZ:  I wanted to go back.  He made

18     a statement along the lines of, you know, I'm not sure if

19     it's correct, but that's kind of my recollection, that it

20     either had been printed or could potentially be printed.

21          THE COURT:  He clarified that he was talking about he

22     was correcting newspaper articles that were either out or on

23     their way out, newspaper articles, is what he clarified just

24     now.

25          So what are you going to ask him?

2344

1          MR. CAMPOAMOR-SANCHEZ:  So I was going to ask him to

2     further explain what that means, whether it was one way or

3     the other or he --

4          THE COURT:  I don't think he's sure.

5          MR. CAMPOAMOR-SANCHEZ:  That's my point.

6          THE COURT:  Well, but I also think --

7          MR. CAMPOAMOR-SANCHEZ:  Okay.  If you would like me

8     to sit down, I can sit down.

9          THE COURT:  You can try your case, but I think it

10    doesn't make sense to keep delving into something that he is

11    not sure about, that he is now pretty much clarified what he

12    meant.

13         MR. CAMPOAMOR-SANCHEZ:  Okay.  I just did not hear

14    maybe as clearly as the Court did.  I thought there was some

15    wiggle room in there, and I was going to get him to explain

16    what he meant.  That is all I intended to do.  I was

17    definitely not trying to get beyond the scope.

18         THE COURT:  I think he was clear.  It may have

19    something to do with the fact that Mr. Taylor sat down.

20         I mean, I just think probing somebody's recollection

21    that is flawed is probably not the best thing to do since he

22    has already said he is giving you his best shot on what he

23    remembers.  So I think you can't ask 20 more questions based

24    on one very short question.

25         MR. CAMPOAMOR-SANCHEZ:  I wasn't going to ask 20 more

2345

1    questions.  I'm happy if the Court thinks it is clear, I will

2    sit down.  The Court probably knows best.

3              THE COURT:  I'm not trying to --

4              MR. CAMPOAMOR-SANCHEZ:  No, no, no.

5              THE COURT:  -- tell you what to do as a matter of

6    strategy.  I'm just trying to figure out if there is anything

7    to do here.  I'm not sure there is, just from a matter of

8    scope perspective.

9              MR. CAMPOAMOR-SANCHEZ:  Right.

10              THE COURT:  And you can go confer with your

11    colleagues, if you want to.  Is that what you were about to

12    ask to do or no?  What were you going to ask?

13              MR. CAMPOAMOR-SANCHEZ:  I was going to say, has he

14    given us his best recollection, and sit down.  Has he given

15    his best recollection?

16              THE COURT:  If you want to ask him that, you can ask

17    him that.

18              MR. CAMPOAMOR-SANCHEZ:  Are you okay with that?

19              MR. TAYLOR:  I object.

20              THE COURT:  Go ahead.

21              (In open court)

22              BY MR. CAMPOAMOR-SANCHEZ:

23    Q.    Mr. Gross, have you given us your best recollection

24    about what you believe happened -- what you recall happening

25    -- Mr. Craig saying at the meeting?

2346

1      A.      What was the last thing you said?

2      Q.      Have you given us your best recollection as to what

3      you believe Mr. Craig said at that meeting?

4      A.      I have given you my best recollection as to what

5      Mr. Craig said at the meeting, yes.

6              MR. CAMPOAMOR-SANCHEZ:  Thank you.  No further

7      questions.

8              THE COURT:  All right.  This gentleman is also

9      excused.

10             Thank you very much --

11             THE WITNESS:  Thank you.

12             (Witness excused)

13             THE COURT:  I don't believe we're going to call any

14     more witnesses this afternoon.

15             I'm going to be excusing you for the weekend.

16             And I do want to reiterate one more time rules that I

17     know you can probably recite along with me.  But the weekend,

18     it's supposed to be nice this time, so you might actually get

19     outside, unlike last weekend.  But please don't use this time

20     to try to figure out, well, I just want to nail down that one

21     thing about who was in charge of Ukraine or who this guy was

22     or who that guy was or anything.  You're not going to do any

23     research about anything that even remotely touches on this

24     case.  You're not going to talk about it, blog about it,

25     e-mail about it.  You're going to spend your weekend enjoying

2347

1        your weekend.  So I want you to do that.

2            I also want to reiterate something I said in my

3    initial instructions quite some time ago that I think bears

4    repeating now.  One of the things I told you is the words

5    that come out of the lawyers' mouths, whether it is opening,

6    whether it is closing or whether it is a question, either

7    lawyer, either side, is not evidence.  It doesn't matter who

8    is asking the question.  It doesn't matter the form of the

9    question.  If the question has a fact -- isn't it true

10   that -- it is still not evidence.  It is only evidence if the

11   witness answered it.

12            So there's some questions where there never was an

13   answer.  The question hung out there.  We had some

14   discussion.  And life went on.  You may not speculate about

15   what the answer was, and you may not assume that what was

16   said in the question is evidence in the case because it is

17   not.  So you can't consider anything any lawyer said as

18   evidence.  You can only consider the answer to the questions

19   as evidence.

20            With that, I'm going to release you for the weekend.

21   Have a wonderful weekend.  We will see you Monday morning at

22   the 9:10, 9:15 time frame so that we can knock on the door

23   and get started at 9:30.

24            Thank you very much.

25                (Jury not present)

2348

1          THE COURT:  All right.  While I was feeling a little

2    panicky on Monday and Tuesday, I feel like we have actually

3    accomplished quite a bit this week.

4          If my math is correct, there's three government

5    witnesses left.  That might or might not finish up on Monday.

6    We can all hope.

7          MR. CAMPOAMOR-SANCHEZ:  We hope.

8          THE COURT:  At any rate, it seems like the

9    government's case will conclude at the latest on Tuesday, if

10   it hasn't concluded on Monday.  Then there will be time to

11   have legal arguments before the defense needs to let us know

12   if it's planning to put on a case.

13         I do think that Monday, when we finish -- or when we

14   finish -- will be an appropriate time to take up the issue we

15   have shelved, which is the number of character witnesses and

16   whether there would be any restriction on that.  There is a

17   motion in limine that has yet to be ruled on.  So I think by

18   Monday morning you should inform the government how many

19   you're planning to call and who they are.

20         All right.  I say this with great trepidation:  Is

21   there anything else we need to discuss?

22         Yes.

23         MR. MURPHY:  Your Honor, we talked about scheduling a

24   long time ago.  You had told us that the Labor Day

25   weekend -- I'm not sure we're going to get to the Labor Day

2349

1    weekend -- but if we do, we're not going to sit on Thursday

2    and Friday of that week.  The transcript of that says we're

3    also not going to sit on the following Monday if we get that

4    far.  Is that correct, or you don't know about that?

5              THE COURT:  There is some flexibility about that.  I

6    think I will make that decision on Wednesday.  It was

7    certainly part of my intention, but if the jury is out, then

8    I think we would come back and let them deliberate, but it is

9    still a possibility.

10             MR. MURPHY:  Okay.  I think, with all hope, we won't

11   need to cross that bridge.

12             THE COURT:  That would be great.  So we will see what

13   happens.

14             MR. MURPHY:  Thank you.

15             THE COURT:  All right.  Thank you.

16                  (Proceedings adjourned at 4:41 p.m.)

17

18

19

20

21

22

23

24

25

2350

```
 1                  CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3             I, Patricia A. Kaneshiro-Miller, certify that the

 4      foregoing is a correct transcript from the record of

 5      proceedings in the above-entitled matter.

 6

 7

 8      /s/ Patricia A. Kaneshiro-Miller          August 23, 2019
        ------------------------------------      ---------------------
 9      PATRICIA A. KANESHIRO-MILLER                     DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2351

## $

**$12,000** [1] - 2265:19

## '

**'any** [1] - 2252:6

## /

**/s** [1] - 2350:8

## 1

**1** [10] - 2253:6, 2267:12, 2271:23, 2276:11, 2280:20, 2281:8, 2290:5, 2297:9, 2318:11, 2322:21
**1.6** [1] - 2286:3
**10** [10] - 2241:6, 2249:19, 2249:20, 2259:7, 2265:2, 2304:7, 2304:13, 2313:4, 2313:15, 2327:10
**10,200,000** [1] - 2297:3
**100** [1] - 2241:21
**1000** [1] - 2241:25
**10th** [4] - 2313:6, 2313:8, 2313:9, 2313:17
**11** [5] - 2293:7, 2296:23, 2313:11, 2314:1
**11-03-2013** [1] - 2296:23
**11-12** [2] - 2293:8, 2293:10
**11th** [6] - 2310:20, 2311:7, 2311:25, 2312:4, 2312:23, 2323:19
**12** [3] - 2340:24, 2340:25, 2341:4
**12-13** [2] - 2290:10, 2293:8
**12th** [2] - 2273:23, 2274:20
**13** [3] - 2271:18, 2313:2, 2313:5
**13th** [3] - 2274:16, 2293:11, 2312:11
**14th** [1] - 2316:11
**15th** [1] - 2291:23
**1800** [1] - 2241:24
**19-125** [2] - 2244:4, 2304:16
**19-CR-125** [1] - 2241:5
**1st** [2] - 2282:11, 2291:23

## 2

**2** [13] - 2250:25, 2253:6, 2264:6, 2266:13, 2267:16, 2271:9, 2272:24, 2275:13, 2283:12, 2318:13, 2318:15, 2318:17, 2340:25
**20** [5] - 2260:18, 2260:21, 2327:15, 2344:23, 2344:25
**20001** [1] - 2242:3
**20036** [1] - 2241:25
**2012** [27] - 2244:23, 2248:19, 2249:8, 2249:9, 2249:19, 2249:20, 2251:17, 2258:16, 2259:7, 2260:21, 2265:2, 2273:11, 2298:11, 2305:23, 2312:1, 2312:4, 2312:23, 2313:4, 2313:12, 2313:16, 2314:1, 2314:10, 2317:24,

2323:2, 2330:4, 2330:10, 2331:2
**2013** [24] - 2250:13, 2251:18, 2253:14, 2261:2, 2261:9, 2261:11, 2261:14, 2261:23, 2263:24, 2269:4, 2280:20, 2291:21, 2296:10, 2296:23, 2297:24, 2298:17, 2321:11, 2331:12, 2331:13, 2331:14, 2331:16, 2331:18, 2333:12, 2336:17
**2019** [2] - 2241:8, 2350:8
**202** [1] - 2242:4
**20530** [2] - 2241:16, 2241:18
**20th** [1] - 2291:21
**21202** [1] - 2241:22
**22** [2] - 2269:4, 2321:11
**2244** [1] - 2243:5
**22nd** [3] - 2244:23, 2269:3, 2269:16
**23** [2] - 2241:8, 2350:8
**2304** [1] - 2243:5
**2326** [1] - 2243:5
**2329** [1] - 2243:6
**2342** [2] - 2243:6
**23rd** [1] - 2310:8
**24** [1] - 2312:17
**2440** [1] - 2241:21
**27th** [3] - 2247:14, 2251:17, 2252:1
**285** [2] - 2246:22, 2246:24
**290** [2] - 2250:7, 2250:25
**295** [1] - 2253:13
**295-4** [1] - 2254:12
**29th** [2] - 2275:7, 2277:15
**2:10** [1] - 2244:2
**2nd** [1] - 2310:12

## 3

**3** [24] - 2247:25, 2248:14, 2248:18, 2250:19, 2251:1, 2251:8, 2253:4, 2254:15, 2254:17, 2258:15, 2263:18, 2263:19, 2266:12, 2267:9, 2267:19, 2270:18, 2293:3, 2296:10, 2297:24, 2312:10, 2317:23, 2322:20, 2323:2
**33** [1] - 2329:18
**333** [1] - 2242:3
**354-3243** [1] - 2242:4
**398** [2] - 2316:4, 2316:6
**3rd** [3] - 2298:17, 2299:6, 2310:16

## 4

**4** [25] - 2247:25, 2248:4, 2248:16, 2249:17, 2250:13, 2250:19, 2251:1, 2251:3, 2253:4, 2255:11, 2258:25, 2261:2, 2261:9, 2264:2, 2268:5, 2296:8, 2296:16, 2298:6, 2318:21, 2319:7, 2319:10, 2319:11, 2319:12, 2327:10
**40** [1] - 2287:14
**410** [4] - 2244:21, 2244:22, 2245:19, 2246:14
**411** [2] - 2247:19, 2247:20

**413** [2] - 2251:14, 2251:15
**420** [9] - 2257:10, 2257:11, 2257:14, 2260:18, 2264:23, 2313:1, 2313:5, 2317:16, 2317:21
**420-13** [1] - 2264:25
**422** [1] - 2261:21
**426** [3] - 2268:25, 2319:13
**427** [1] - 2275:4
**428** [3] - 2280:16, 2280:19, 2283:19
**429** [3] - 2281:13, 2281:14, 2282:10
**431** [2] - 2283:14, 2284:4
**433** [2] - 2291:21, 2291:22
**434** [2] - 2291:21, 2291:22
**438** [2] - 2291:21, 2292:12
**439** [4] - 2291:22, 2292:12, 2292:15, 2293:3
**442** [2] - 2293:23, 2322:16
**443** [1] - 2294:10
**446** [1] - 2294:23
**447** [1] - 2295:18
**450** [2] - 2295:23
**4700A** [1] - 2242:2
**472** [1] - 2299:3
**474** [2] - 2338:2, 2340:25
**480** [2] - 2300:23, 2300:24
**4:41** [1] - 2349:16
**4th** [1] - 2261:23

## 5

**5** [4] - 2253:14, 2269:15, 2297:2, 2298:11
**517** [2] - 2278:4
**555** [1] - 2241:15
**5th** [2] - 2251:18

## 6

**6** [7] - 2261:10, 2261:14, 2266:21, 2269:6, 2276:20, 2291:3, 2325:2
**69** [1] - 2330:17
**6th** [3] - 2258:10, 2263:4, 2317:19

## 7

**7th** [1] - 2257:22

## 9

**9** [2] - 2263:24, 2314:10
**92** [1] - 2314:3
**95** [1] - 2265:19
**95,000** [1] - 2264:9
**950** [1] - 2241:18
**9:10** [1] - 2347:22
**9:15** [1] - 2347:22
**9:30** [1] - 2347:23
**9th** [2] - 2264:5, 2328:6

2352

# A

**a.m** [1] - 2312:10
**Abelson** [1] - 2241:19
**able** [1] - 2273:3
**above-entitled** [1] - 2350:5
**absolutely** [2] - 2275:2, 2299:2
**abusing** [1] - 2273:4
**accepted** [1] - 2259:16
**access** [1] - 2249:7
**accomplished** [1] - 2348:3
**according** [2] - 2274:19, 2282:25
**account** [1] - 2297:16
**accurate** [5] - 2305:2, 2310:3, 2323:6, 2324:24, 2342:14
**accurately** [2] - 2324:25, 2325:16
**Act** [8] - 2256:4, 2275:22, 2284:11, 2306:3, 2313:23, 2329:24, 2330:2, 2331:24
**Action** [1] - 2241:5
**activities** [6] - 2254:16, 2256:3, 2259:20, 2311:18, 2313:22, 2313:23
**activity** [1] - 2259:11
**actual** [2] - 2340:8, 2341:3
**Adam** [2] - 2241:17, 2241:19
**add** [3] - 2279:8, 2339:18, 2341:7
**added** [2] - 2283:23, 2340:10
**adding** [3] - 2338:17, 2339:10, 2340:5
**addition** [11] - 2248:24, 2249:20, 2255:12, 2257:2, 2259:25, 2264:9, 2265:10, 2267:1, 2267:5, 2290:8, 2298:1
**additional** [14] - 2255:15, 2256:17, 2256:23, 2257:5, 2260:3, 2261:5, 2262:1, 2262:15, 2262:20, 2262:23, 2263:2, 2263:15, 2264:8
**additions** [1] - 2293:1
**address** [1] - 2329:9
**addressed** [2] - 2245:22, 2259:10
**adds** [1] - 2255:23
**adjourned** [1] - 2349:16
**administrative** [1] - 2254:6
**admissible** [1] - 2301:12
**admitted** [3] - 2243:11, 2301:13, 2301:14
**advance** [1] - 2265:15
**advice** [4] - 2258:18, 2318:2, 2328:6, 2330:7
**advise** [5] - 2248:21, 2251:10, 2258:20, 2266:19, 2318:4
**adviser** [1] - 2308:11
**Adviser** [2] - 2299:24, 2300:20
**Adviser's** [1] - 2300:15
**advising** [1] - 2330:1
**afternoon** [10] - 2244:17, 2244:18, 2304:2, 2304:6, 2304:23, 2304:24, 2327:19, 2329:3, 2329:4, 2346:14
**Afternoon** [1] - 2241:6
**AFTERNOON** [2] - 2241:10, 2244:1

**agent** [3] - 2289:15, 2302:14, 2308:6
**Agent** [3] - 2256:4, 2275:22, 2313:23
**Agents** [5] - 2284:11, 2306:2, 2329:24, 2330:2, 2331:23
**ago** [2] - 2347:3, 2348:24
**agree** [2] - 2263:9, 2343:6
**agreed** [8] - 2249:22, 2251:5, 2255:19, 2260:13, 2265:12, 2310:9, 2311:11, 2319:1
**agreeing** [1] - 2273:5
**agreement** [16] - 2249:18, 2249:19, 2249:21, 2251:4, 2255:18, 2255:24, 2259:3, 2259:6, 2259:10, 2259:18, 2262:1, 2265:1, 2265:5, 2265:11, 2298:1, 2318:25
**agreements** [10] - 2248:5, 2248:6, 2248:7, 2255:12, 2255:25, 2257:3, 2260:1, 2262:14, 2262:16, 2283:24
**ahead** [1] - 2345:20
**aided** [1] - 2242:5
**aimed** [1] - 2291:11
**Alex** [2] - 2257:15, 2335:17
**allegation** [1] - 2308:18
**alleged** [1] - 2308:20
**Allon** [2] - 2330:13, 2330:19
**allowed** [1] - 2325:25
**Alpert** [8] - 2270:25, 2276:16, 2277:4, 2290:22, 2291:6, 2324:11, 2325:5, 2325:8
**AMERICA** [1] - 2241:4
**America** [2] - 2244:4, 2304:16
**American** [1] - 2291:13
**amount** [7] - 2266:7, 2266:20, 2275:14, 2275:25, 2284:15, 2288:10, 2297:15
**amounted** [2] - 2264:17, 2266:14
**AMY** [1] - 2241:10
**Andrew** [1] - 2329:7
**ANDREW** [1] - 2329:7
**Angeles** [7] - 2246:2, 2267:20, 2276:16, 2324:11, 2325:5, 2325:8, 2325:12
**announcing** [1] - 2308:2
**answer** [20] - 2254:17, 2284:7, 2285:17, 2290:8, 2300:8, 2306:11, 2306:15, 2307:7, 2309:8, 2309:22, 2309:24, 2317:4, 2324:14, 2324:17, 2324:25, 2325:15, 2347:13, 2347:15, 2347:18
**answered** [1] - 2347:11
**answering** [1] - 2270:12
**answers** [6] - 2247:25, 2250:16, 2250:18, 2251:1, 2253:6, 2268:20
**anticipating** [1] - 2327:21
**appear** [2] - 2246:19, 2313:7
**APPEARANCES** [1] - 2241:12
**appeared** [1] - 2268:23
**applying** [1] - 2266:7
**appreciate** [1] - 2267:11
**approach** [4] - 2281:17, 2286:6,

2305:15, 2343:8
**approached** [3] - 2330:6, 2331:15, 2331:20
**appropriate** [2] - 2245:10, 2348:14
**April** [29] - 2248:19, 2249:19, 2249:20, 2258:16, 2259:7, 2261:23, 2263:24, 2264:5, 2265:2, 2269:3, 2269:4, 2269:16, 2271:18, 2275:7, 2277:15, 2298:11, 2298:22, 2312:23, 2313:4, 2313:6, 2313:8, 2313:9, 2313:11, 2313:15, 2313:17, 2314:1, 2317:24, 2321:11, 2331:2
**area** [1] - 2329:19
**argument** [1] - 2302:25
**arguments** [1] - 2348:11
**arise** [4] - 2248:23, 2254:23, 2258:21, 2318:5
**arose** [1] - 2307:23
**Arps** [3] - 2248:20, 2329:12, 2329:16
**arrange** [1] - 2250:20
**arranged** [1] - 2295:17
**arrangements** [3] - 2259:2, 2285:8, 2285:15
**article** [22] - 2245:25, 2246:2, 2269:17, 2269:22, 2269:24, 2270:11, 2270:15, 2271:7, 2271:14, 2271:24, 2272:23, 2272:25, 2273:10, 2273:17, 2273:23, 2274:10, 2274:24, 2274:25, 2316:13, 2319:23, 2320:9, 2321:8
**articles** [7] - 2246:3, 2268:22, 2269:8, 2270:2, 2320:2, 2343:22, 2343:23
**aside** [1] - 2341:21
**asserted** [1] - 2287:7
**assertions** [1] - 2301:24
**assignment** [3] - 2254:24, 2258:22, 2337:23
**assist** [3] - 2245:10, 2249:22, 2251:5
**assistance** [1] - 2276:3
**assume** [3] - 2270:25, 2294:12, 2347:15
**assured** [1] - 2328:13
**attach** [1] - 2292:12
**Attached** [1] - 2249:17
**attached** [28] - 2245:7, 2245:20, 2248:10, 2250:25, 2253:23, 2254:12, 2255:17, 2257:7, 2257:11, 2260:8, 2260:20, 2261:9, 2262:24, 2263:4, 2264:14, 2264:25, 2265:12, 2269:22, 2272:23, 2275:11, 2281:21, 2282:12, 2283:19, 2284:4, 2295:1, 2297:23, 2298:3, 2298:15
**attaches** [1] - 2257:19
**attaching** [1] - 2250:15
**attachment** [15] - 2258:9, 2258:11, 2259:3, 2260:16, 2260:18, 2261:1, 2281:2, 2281:22, 2282:4, 2282:16, 2292:15, 2292:16, 2298:11, 2339:11
**attachments** [10] - 2246:8, 2246:11, 2246:16, 2250:20, 2257:20, 2258:1, 2258:7, 2260:15, 2294:7, 2296:15

**attempt** [1] - 2252:11
**attempted** [2] - 2306:20, 2307:23
**attend** [1] - 2328:5
**attendance** [1] - 2335:15
**attended** [5] - 2328:4, 2332:21, 2332:23, 2333:23
**attending** [5] - 2332:6, 2332:8, 2333:1, 2334:22, 2341:21
**attention** [2] - 2316:11, 2330:4
**attorney** [4] - 2299:23, 2329:14, 2329:17, 2335:18
**ATTORNEYS** [1] - 2241:14
**August** [4] - 2241:8, 2314:10, 2317:10, 2350:8
**AUSA** [2] - 2241:13, 2241:14
**authoring** [1] - 2303:1
**authority** [1] - 2273:5
**authorization** [1] - 2285:23
**authorized** [1] - 2285:7
**available** [1] - 2245:9
**Avenue** [2] - 2241:18, 2242:3
**aware** [8] - 2261:17, 2266:5, 2266:6, 2285:18, 2311:6, 2311:9, 2323:15, 2323:18

**B**

**back-and-forth** [1] - 2252:25
**background** [1] - 2310:9
**backup** [1] - 2292:4
**Baltimore** [1] - 2241:22
**Barbara** [2] - 2245:10, 2247:9
**based** [5] - 2265:8, 2265:21, 2303:12, 2309:4, 2344:23
**basis** [5] - 2286:13, 2287:19, 2300:6, 2307:12, 2325:15
**bears** [1] - 2347:3
**BEFORE** [1] - 2241:10
**begin** [1] - 2296:16
**begins** [1] - 2260:18
**behalf** [4] - 2261:19, 2307:25, 2331:17, 2339:3
**Below** [2] - 2269:16, 2271:24
**below** [1] - 2271:3
**bench** [11] - 2281:19, 2286:6, 2286:8, 2301:8, 2302:21, 2302:23, 2305:17, 2309:21, 2327:11, 2343:9, 2343:10
**BERMAN** [1] - 2241:10
**best** [14] - 2245:13, 2284:25, 2291:17, 2324:24, 2327:1, 2342:19, 2344:21, 2344:22, 2345:2, 2345:14, 2345:15, 2345:23, 2346:2, 2346:4
**Bethesda** [1] - 2329:10
**better** [1] - 2332:20
**between** [14] - 2251:21, 2252:25, 2261:25, 2263:3, 2265:1, 2269:2, 2272:14, 2292:22, 2295:24, 2298:1, 2298:12, 2326:24, 2334:2, 2341:5
**beyond** [3] - 2289:2, 2326:25, 2344:17
**Bicentennial** [1] - 2335:13

**binder** [1] - 2250:9
**bit** [5] - 2278:21, 2307:9, 2314:21, 2315:2, 2348:3
**black** [1] - 2278:15
**blog** [1] - 2346:24
**blow** [2] - 2318:22, 2320:6
**blue** [3] - 2292:23, 2293:1, 2293:6
**bothered** [1] - 2250:22
**bottom** [8] - 2247:3, 2255:12, 2271:10, 2296:1, 2316:10, 2316:19, 2321:7, 2338:3
**bracket** [1] - 2279:14
**Bradley** [1] - 2241:17
**break** [4] - 2304:2, 2304:7, 2304:10, 2304:25
**bridge** [1] - 2349:11
**brief** [5] - 2277:3, 2304:1, 2304:6, 2325:3, 2328:13
**briefly** [1] - 2331:24
**bring** [3] - 2244:6, 2275:7, 2304:17
**broader** [1] - 2306:16
**brought** [1] - 2273:4
**Building** [1] - 2335:13
**BY** [34] - 2244:16, 2252:18, 2257:1, 2274:8, 2280:3, 2282:9, 2283:9, 2285:12, 2285:24, 2288:20, 2289:8, 2290:3, 2293:13, 2293:18, 2297:11, 2297:22, 2300:12, 2302:3, 2304:22, 2310:1, 2315:8, 2316:3, 2317:8, 2318:20, 2324:22, 2325:25, 2326:5, 2326:13, 2328:23, 2329:2, 2333:21, 2342:2, 2342:18, 2345:22

**C**

**Campoamor** [1] - 2241:13
**CAMPOAMOR** [32] - 2307:11, 2307:17, 2308:8, 2308:21, 2309:10, 2325:25, 2327:8, 2327:12, 2327:20, 2328:5, 2328:18, 2328:23, 2329:2, 2333:21, 2341:24, 2342:18, 2343:6, 2343:11, 2343:15, 2343:17, 2344:1, 2344:5, 2344:7, 2344:13, 2344:25, 2345:4, 2345:9, 2345:13, 2345:18, 2345:22, 2346:6, 2348:7
**Campoamor-Sanchez** [1] - 2241:13
**CAMPOAMOR-SANCHEZ** [32] - 2307:11, 2307:17, 2308:8, 2308:21, 2309:10, 2325:25, 2327:8, 2327:12, 2327:20, 2328:5, 2328:18, 2328:23, 2329:2, 2333:21, 2341:24, 2342:18, 2343:6, 2343:11, 2343:15, 2343:17, 2344:1, 2344:5, 2344:7, 2344:13, 2344:25, 2345:4, 2345:9, 2345:13, 2345:18, 2345:22, 2346:6, 2348:7
**cannot** [1] - 2248:3
**capacity** [3] - 2248:21, 2251:10, 2289:13
**careful** [1] - 2306:17
**carefully** [1] - 2307:2

**Case** [1] - 2244:4
**case** [17] - 2302:25, 2303:1, 2304:9, 2304:15, 2306:22, 2308:18, 2333:6, 2334:16, 2334:17, 2334:24, 2337:14, 2343:13, 2344:9, 2346:24, 2347:16, 2348:9, 2348:12
**Catie** [1] - 2257:20
**cellphone** [1] - 2245:13
**certain** [1] - 2336:19
**certainly** [5] - 2275:2, 2289:20, 2307:24, 2343:5, 2349:7
**CERTIFICATE** [1] - 2350:1
**certify** [1] - 2350:3
**chain** [3] - 2257:21, 2312:18, 2314:5
**chance** [2] - 2314:7, 2337:17
**change** [2] - 2337:20, 2337:21
**changed** [1] - 2341:17
**changes** [10] - 2255:5, 2278:8, 2292:10, 2292:11, 2292:19, 2292:22, 2292:23, 2293:6, 2296:2, 2296:5
**character** [1] - 2348:15
**characterize** [1] - 2256:20
**charge** [1] - 2346:21
**charged** [2] - 2264:8, 2265:13
**charges** [1] - 2273:4
**charging** [1] - 2265:20
**check** [2] - 2308:23, 2322:17
**checking** [1] - 2309:3
**choice** [1] - 2327:19
**chosen** [1] - 2311:10
**Christmas** [1] - 2247:17
**circle** [1] - 2279:8
**circumstance** [3] - 2252:7, 2314:15, 2316:25
**circumstances** [2] - 2249:1, 2254:25
**citizen** [12] - 2249:21, 2249:22, 2251:4, 2251:5, 2255:18, 2255:24, 2256:1, 2260:13, 2266:20, 2275:14, 2318:24, 2318:25
**claimed** [1] - 2288:12
**clarified** [3] - 2343:21, 2343:23, 2344:11
**clarifying** [3] - 2291:7, 2291:12, 2314:16
**clause** [1] - 2259:19
**clear** [6] - 2307:2, 2309:13, 2319:3, 2321:11, 2344:18, 2345:1
**clearly** [2] - 2256:1, 2344:14
**CLERK** [2] - 2244:3, 2304:15
**client** [8] - 2259:15, 2259:17, 2259:19, 2285:23, 2286:1, 2286:11, 2288:10, 2314:16
**clients** [3] - 2285:7, 2285:15, 2330:1
**cliff** [2] - 2272:5, 2321:21
**Cliff** [4] - 2248:3, 2271:13, 2281:15, 2330:11
**Clifford** [2] - 2243:5, 2244:12
**close** [1] - 2307:4
**closes** [1] - 2301:19

**closing** [1] - 2347:6
**closure** [3] - 2299:10, 2299:11, 2300:4
**coauthor** [1] - 2302:18
**colleague** [1] - 2270:19
**colleagues** [2] - 2331:5, 2345:11
**COLUMBIA** [2] - 2241:2, 2241:15
**column** [1] - 2297:2
**coming** [4] - 2252:21, 2274:10, 2332:10, 2337:2
**command** [1] - 2286:24
**comment** [3] - 2276:24, 2322:1, 2336:4
**commented** [1] - 2270:9
**comments** [3] - 2268:16, 2276:21, 2326:6
**communicated** [1] - 2311:17
**communications** [7] - 2287:6, 2310:5, 2311:23, 2311:24, 2311:25, 2312:1, 2326:23
**compared** [1] - 2292:18
**comparing** [1] - 2292:21
**compatible** [1] - 2254:22
**compensation** [5] - 2255:15, 2256:23, 2257:5, 2260:3, 2261:5
**complete** [3] - 2249:6, 2304:7, 2305:3
**completed** [3] - 2249:7, 2261:13, 2262:2
**computer** [1] - 2242:5
**computer-aided** [1] - 2242:5
**conceal** [2] - 2261:18, 2298:25
**concealed** [1] - 2298:20
**concern** [1] - 2300:16
**concerned** [3] - 2288:22, 2288:24, 2289:1
**concerns** [1] - 2259:18
**conclude** [2] - 2275:21, 2348:9
**concluded** [1] - 2348:10
**concludes** [1] - 2284:10
**condition** [1] - 2259:21
**conduct** [6] - 2248:25, 2254:24, 2256:2, 2258:23, 2276:1, 2284:16
**confer** [1] - 2345:10
**confidence** [2] - 2266:2, 2287:1
**confident** [1] - 2261:14
**confidentiality** [2] - 2259:18, 2286:1
**confirm** [2] - 2252:5, 2264:15
**confirmation** [2] - 2257:13, 2257:14
**confirming** [1] - 2331:25
**conflicts** [1] - 2329:22
**connected** [2] - 2270:24, 2273:2
**connection** [3] - 2266:22, 2275:16, 2276:4
**consider** [2] - 2347:17, 2347:18
**consideration** [1] - 2348:9
**considerations** [3] - 2287:21, 2288:8, 2288:17
**considered** [1] - 2288:17
**Constitution** [1] - 2242:3
**consultant** [5] - 2248:20, 2251:9,

**consulted** [1] - 2326:18
**contact** [12] - 2303:4, 2320:17, 2320:20, 2320:23, 2321:14, 2321:23, 2321:24, 2321:25, 2323:5, 2323:10, 2323:14, 2325:14
**contacts** [2] - 2322:23, 2323:4, 2336:18
**contained** [1] - 2289:21
**contains** [1] - 2250:18
**contemplated** [2] - 2254:2, 2262:1
**content** [1] - 2326:23
**contention** [1] - 2306:1
**context** [1] - 2264:20
**continue** [2] - 2244:9, 2321:17
**continued** [1] - 2277:17
**continues** [2] - 2251:18, 2266:18
**contract** [10] - 2256:17, 2256:25, 2264:7, 2264:9, 2265:18, 2296:16, 2296:19, 2297:1, 2297:3, 2297:23
**Contract** [1] - 2297:2
**contractual** [1] - 2259:1
**contrary** [1] - 2255:25
**contribute** [2] - 2255:19, 2319:1
**contributed** [6] - 2275:24, 2284:14, 2288:10, 2305:2, 2305:6, 2310:3
**conversation** [4] - 2311:4, 2313:11, 2331:2, 2335:5
**conversations** [2] - 2308:19, 2325:10, 2326:20
**conversion** [1] - 2297:7
**conveyed** [1] - 2253:9
**conviction** [2] - 2249:1, 2255:1
**copied** [2] - 2294:20, 2309:6
**copies** [7] - 2246:15, 2270:19, 2317:13, 2338:18, 2339:18, 2340:11, 2341:9
**copy** [23] - 2248:5, 2250:13, 2257:19, 2257:25, 2271:6, 2271:10, 2271:23, 2275:7, 2276:12, 2278:24, 2279:19, 2279:22, 2279:25, 2290:10, 2293:24, 2295:20, 2295:21, 2310:17, 2310:25, 2311:7, 2312:5, 2317:10, 2339:14
**copying** [2] - 2245:10, 2330:24
**correct** [43] - 2246:4, 2253:6, 2255:10, 2257:17, 2260:21, 2264:4, 2264:19, 2272:12, 2276:23, 2277:9, 2280:5, 2289:23, 2290:1, 2291:8, 2291:18, 2293:10, 2293:15, 2293:16, 2299:8, 2313:4, 2317:2, 2317:5, 2317:11, 2319:8, 2321:9, 2322:11, 2327:20, 2335:25, 2336:19, 2336:22, 2336:25, 2338:12, 2338:14, 2338:15, 2339:6, 2340:13, 2341:11, 2341:15, 2343:19, 2348:4, 2349:4, 2350:4
**corrected** [1] - 2271:7
**correcting** [4] - 2291:11, 2342:4, 2342:12, 2343:22
**correction** [2] - 2271:20, 2320:7
**correspondence** [4] - 2255:17,

2257:6, 2260:7, 2262:24
**counsel** [4] - 2245:17, 2331:22, 2333:3, 2333:6
**course** [1] - 2284:12
**Court** [13] - 2242:2, 2248:23, 2254:23, 2258:21, 2306:6, 2308:21, 2308:23, 2318:5, 2318:14, 2318:18, 2344:14, 2345:1, 2345:2
**COURT** [116] - 2241:2, 2244:6, 2244:8, 2244:11, 2252:15, 2256:19, 2256:22, 2256:25, 2274:6, 2280:1, 2281:18, 2283:6, 2285:10, 2285:17, 2285:21, 2286:6, 2286:9, 2286:15, 2286:19, 2286:22, 2287:2, 2287:5, 2287:15, 2287:17, 2287:23, 2288:11, 2288:15, 2288:24, 2289:3, 2289:7, 2290:1, 2293:15, 2297:14, 2297:17, 2297:20, 2300:6, 2300:8, 2301:2, 2301:6, 2301:9, 2301:11, 2301:14, 2301:18, 2301:23, 2302:1, 2302:17, 2302:20, 2302:24, 2303:7, 2303:17, 2303:19, 2303:22, 2304:1, 2304:6, 2304:12, 2304:17, 2304:19, 2305:11, 2305:14, 2305:16, 2305:18, 2306:8, 2306:14, 2306:23, 2307:1, 2307:15, 2308:14, 2308:17, 2309:2, 2309:12, 2309:20, 2315:6, 2315:24, 2317:4, 2317:6, 2318:17, 2324:17, 2325:19, 2325:22, 2326:1, 2327:3, 2327:5, 2327:9, 2327:18, 2327:21, 2327:24, 2328:8, 2328:11, 2328:24, 2333:19, 2341:25, 2342:9, 2342:21, 2342:24, 2343:5, 2343:8, 2343:13, 2343:16, 2343:21, 2344:4, 2344:6, 2344:9, 2344:18, 2345:3, 2345:5, 2345:10, 2345:16, 2345:20, 2346:8, 2346:13, 2348:1, 2348:8, 2349:5, 2349:12, 2349:15, 2350:1
**court** [7] - 2282:8, 2288:19, 2302:2, 2303:23, 2309:19, 2328:10, 2345:21
**Court's** [1] - 2280:17
**Courthouse** [1] - 2242:2
**courtroom** [2] - 2309:17, 2333:14
**coverage** [1] - 2269:18
**Craig** [109] - 2244:5, 2245:3, 2246:15, 2247:4, 2247:20, 2248:3, 2248:10, 2249:17, 2250:2, 2250:12, 2250:15, 2253:14, 2253:16, 2254:9, 2261:4, 2261:22, 2261:25, 2262:7, 2263:3, 2265:2, 2268:20, 2269:3, 2269:7, 2269:16, 2270:10, 2270:19, 2271:10, 2271:23, 2272:3, 2272:14, 2273:1, 2273:17, 2274:18, 2274:25, 2275:6, 2277:3, 2277:14, 2277:25, 2280:12, 2280:19, 2281:16, 2282:11, 2282:20, 2283:15, 2283:21, 2285:2, 2286:14, 2286:17, 2287:9, 2288:22, 2288:24, 2289:22, 2291:6, 2294:20, 2295:25, 2298:13, 2298:25, 2301:20, 2304:16, 2305:7, 2306:21, 2307:13, 2310:4,

2310:8, 2310:12, 2310:16, 2311:3,
2311:6, 2311:18, 2311:25, 2312:20,
2314:11, 2315:22, 2317:13, 2319:18,
2320:1, 2320:12, 2321:6, 2321:19,
2322:12, 2323:1, 2323:16, 2323:20,
2324:19, 2325:3, 2325:11, 2326:6,
2326:18, 2326:24, 2330:24, 2332:23,
2333:4, 2333:10, 2334:3, 2335:24,
2336:3, 2336:5, 2336:11, 2336:15,
2336:24, 2338:5, 2338:10, 2339:18,
2342:3, 2345:25, 2346:3, 2346:5
   **CRAIG** [1] - 2241:6
   **Craig's** [12] - 2249:12, 2254:12,
2257:19, 2261:8, 2276:11, 2291:23,
2294:2, 2295:9, 2301:10, 2312:1,
2314:10, 2321:14
   **criminal** [2] - 2258:18, 2318:2
   **Criminal** [2] - 2241:5, 2244:4
   **cross** [5] - 2327:14, 2327:22, 2341:25,
2343:4, 2349:11
   **CROSS** [3] - 2243:4, 2244:15, 2342:1
   **CROSS-EXAMINATION** [2] - 2244:15,
2342:1
   **cross-examination** [2] - 2327:22,
2341:25
   **crossed** [1] - 2309:15
   **CRR** [1] - 2242:2
   **current** [1] - 2253:19
   **cut** [1] - 2278:21
   **Cyrillic** [1] - 2260:24

# D

   **D.C** [4] - 2241:7, 2242:3, 2310:18,
2312:6
   **dash** [1] - 2279:16
   **date** [7] - 2264:12, 2293:6, 2312:23,
2313:3, 2313:5, 2313:8, 2313:15
   **DATE** [1] - 2350:9
   **dated** [11] - 2249:19, 2249:20, 2259:6,
2261:1, 2261:9, 2263:24, 2265:2,
2273:10, 2273:23, 2291:21, 2296:19
   **dates** [4] - 2293:20, 2294:12, 2294:17,
2322:17
   **David** [23] - 2253:20, 2276:15, 2277:3,
2295:25, 2310:13, 2310:21, 2311:1,
2311:4, 2311:6, 2311:18, 2312:1,
2312:5, 2312:9, 2321:14, 2321:24,
2321:25, 2322:1, 2323:16, 2323:20,
2323:22, 2324:5, 2325:4, 2325:7
   **Davis** [1] - 2311:22
   **DAY** [1] - 2241:6
   **days** [6] - 2247:15, 2247:17, 2263:14,
2293:15, 2293:16, 2296:12
   **DC** [3] - 2241:16, 2241:18, 2241:25
   **deal** [1] - 2273:5
   **dealing** [1] - 2335:19
   **dealings** [1] - 2335:2
   **dealt** [1] - 2335:18
   **December** [18] - 2244:23, 2247:14,

2249:9, 2251:17, 2252:1, 2260:21,
2273:23, 2274:16, 2274:20, 2290:10,
2293:7, 2310:20, 2311:7, 2311:25,
2312:4, 2312:11, 2316:11, 2323:19
   **decided** [1] - 2341:20
   **decision** [5] - 2288:9, 2339:14,
2340:11, 2341:17, 2349:6
   **declined** [1] - 2259:17
   **deemed** [1] - 2301:11
   **defendant** [5] - 2310:21, 2311:11,
2312:5, 2312:11, 2333:20
   **Defendant** [2] - 2241:7, 2241:19
   **defendant's** [1] - 2246:24
   **Defendant's** [3] - 2250:7, 2250:8,
2253:13
   **defense** [1] - 2348:11
   **Defense** [1] - 2312:17
   **defensive** [1] - 2253:22
   **defined** [1] - 2256:4, 2313:23
   **definitely** [1] - 2344:17
   **delayed** [1] - 2252:21
   **deliberate** [1] - 2349:8
   **deliberately** [1] - 2307:9
   **delivered** [3] - 2249:8, 2293:11,
2310:17
   **delving** [1] - 2344:10
   **departed** [1] - 2299:7
   **DEPARTMENT** [1] - 2241:17
   **department** [1] - 2317:2
   **Department** [8] - 2284:9, 2284:12,
2284:13, 2299:7, 2299:17, 2299:19,
2299:24, 2300:20
   **Deputy** [1] - 2261:8
   **DEPUTY** [2] - 2244:3, 2304:15
   **der** [1] - 2312:19
   **describe** [5] - 2299:11, 2318:7,
2318:11, 2318:13, 2318:17
   **described** [7] - 2249:23, 2251:6,
2254:17, 2255:20, 2259:10, 2291:11,
2319:2
   **describes** [1] - 2317:24
   **description** [7] - 2248:5, 2248:6,
2248:13, 2254:15, 2259:1, 2259:2,
2260:11
   **details** [1] - 2245:11
   **determination** [6] - 2302:9, 2334:4,
2334:7, 2334:11, 2337:18, 2341:17
   **determined** [1] - 2310:22
   **dial** [1] - 2306:24
   **differences** [1] - 2341:5
   **different** [7] - 2282:18, 2282:21,
2282:24, 2282:25, 2283:2, 2283:10,
2318:14
   **DIRECT** [2] - 2243:4, 2329:1
   **direct** [2] - 2327:15, 2330:4
   **directly** [1] - 2259:11
   **director** [1] - 2245:23
   **disagree** [1] - 2307:18
   **disciplinary** [1] - 2285:25

   **disclose** [1] - 2307:25
   **disclosing** [1] - 2315:15
   **disclosure** [3] - 2308:1, 2314:19,
2329:21
   **discuss** [4] - 2245:9, 2304:9, 2343:14,
2348:21
   **discussed** [7] - 2255:13, 2278:20,
2285:3, 2285:13, 2313:25, 2331:23,
2339:7
   **discussion** [8] - 2261:24, 2262:4,
2263:12, 2288:5, 2294:16, 2332:14,
2333:7, 2347:14
   **discussions** [6] - 2255:14, 2257:3,
2260:1, 2263:7, 2298:24, 2300:14
   **disregard** [4] - 2306:9, 2306:15,
2309:22, 2309:24
   **disregarded** [1] - 2306:7
   **disseminating** [1] - 2339:3
   **disseminations** [1] - 2339:6
   **distribute** [3] - 2267:13, 2290:6,
2322:25
   **distributing** [1] - 2323:8
   **DISTRICT** [4] - 2241:2, 2241:2,
2241:11, 2241:15
   **Division** [3] - 2245:7, 2257:15, 2308:4
   **Dmitry** [1] - 2268:2
   **document** [33] - 2248:10, 2250:18,
2278:10, 2280:8, 2281:5, 2281:8,
2281:11, 2281:20, 2281:21, 2282:4,
2282:15, 2282:18, 2282:20, 2282:22,
2282:24, 2282:25, 2283:10, 2283:12,
2283:19, 2283:20, 2287:5, 2292:13,
2292:18, 2292:19, 2292:20, 2301:3,
2301:14, 2315:7, 2315:9, 2316:19,
2318:21, 2322:20
   **document.pdf** [2] - 2246:12, 2246:17
   **documentation** [1] - 2264:7
   **documents** [11] - 2250:20, 2264:13,
2277:16, 2277:19, 2278:3, 2283:2,
2286:9, 2292:8, 2292:21, 2292:22,
2336:12
   **DOJ** [4] - 2245:8, 2253:4, 2270:4,
2275:8
   **done** [10] - 2255:9, 2261:19, 2292:16,
2301:20, 2306:10, 2308:5, 2328:9,
2333:23, 2339:16, 2341:7
   **door** [2] - 2303:20, 2347:22
   **double** [1] - 2308:23
   **double-check** [1] - 2308:23
   **Doug** [3] - 2276:15, 2279:4, 2290:20
   **down** [17] - 2273:9, 2275:7, 2276:10,
2276:20, 2286:15, 2301:5, 2301:6,
2306:24, 2320:6, 2320:7, 2321:18,
2344:8, 2344:19, 2345:2, 2345:14,
2346:20
   **draft** [36] - 2247:25, 2248:18, 2249:12,
2250:1, 2250:15, 2250:18, 2251:1,
2251:3, 2254:11, 2254:14, 2255:11,
2275:8, 2275:11, 2275:20, 2276:11,
2276:21, 2277:14, 2278:4, 2280:13,

2356

2280:22, 2284:8, 2289:9, 2289:10,
2289:22, 2291:4, 2291:23, 2291:24,
2292:7, 2296:4, 2296:13, 2310:17,
2312:14, 2322:16, 2323:1, 2340:8,
2340:10
**drafted** [1] - 2276:8
**drafting** [3] - 2254:1, 2255:6, 2277:17
**drafts** [1] - 2256:8
**driven** [1] - 2312:5
**due** [2] - 2258:20, 2318:4
**duly** [2] - 2244:13, 2328:21
**during** [3] - 2277:22, 2277:25, 2304:9
**duty** [1] - 2286:12
**DX** [1] - 2314:3

# E

**e-mail** [56] - 2244:22, 2245:13, 2246:9,
2246:11, 2246:14, 2247:20, 2250:4,
2250:12, 2251:15, 2251:21, 2251:25,
2253:14, 2254:10, 2257:12, 2257:19,
2257:21, 2258:11, 2261:22, 2262:6,
2269:2, 2269:7, 2269:15, 2270:9,
2270:17, 2271:22, 2272:15, 2272:24,
2275:6, 2282:15, 2294:18, 2294:25,
2295:24, 2311:2, 2311:9, 2312:18,
2312:19, 2312:23, 2314:2, 2314:5,
2314:22, 2315:17, 2316:11, 2320:6,
2321:3, 2322:13, 2323:16, 2323:18,
2330:17, 2330:18, 2330:23, 2338:3,
2338:5, 2338:8, 2338:13, 2339:9,
2346:25
**e-mailed** [3] - 2310:5, 2310:13, 2311:6
**e-mailing** [1] - 2311:3
**e-mails** [7] - 2251:17, 2252:24, 2269:5,
2321:6, 2322:18, 2326:9, 2326:25
**Earle** [2] - 2245:6, 2245:23
**East** [1] - 2241:21
**edited** [3] - 2305:7, 2306:21, 2307:13
**editing** [1] - 2283:25
**editorial** [1] - 2314:6
**edits** [1] - 2308:9
**effect** [1] - 2314:22
**effort** [1] - 2261:17
**efforts** [1] - 2298:25
**either** [13] - 2276:4, 2288:6, 2295:16,
2303:13, 2309:21, 2325:11, 2336:20,
2342:7, 2342:12, 2343:20, 2343:22,
2347:6, 2347:7
**electronic** [1] - 2295:20
**embellishments** [2] - 2280:22, 2283:3
**Emily** [6] - 2270:25, 2276:16, 2277:4,
2324:11, 2325:5, 2325:8
**emphasize** [1] - 2280:7
**employed** [3] - 2329:11, 2329:12,
2329:16
**enclosures** [2] - 2246:6, 2246:20
**end** [4] - 2283:24, 2299:4, 2306:9,
2335:17
**ended** [1] - 2288:7

**engage** [3] - 2256:3, 2313:21, 2313:22
**engaged** [3] - 2254:16, 2275:25,
2284:16
**engagement** [9] - 2252:7, 2259:17,
2259:21, 2265:1, 2265:9, 2298:1,
2312:21, 2313:19, 2334:20
**engaging** [1] - 2298:24
**English** [7] - 2249:18, 2249:19,
2259:4, 2259:6, 2259:9, 2259:17,
2260:23
**enjoying** [1] - 2346:25
**entities** [1] - 2252:13
**entitled** [5] - 2275:23, 2276:2,
2284:13, 2284:18, 2350:5
**entity** [1] - 2252:8
**entity'** [1] - 2252:6
**envelope** [1] - 2309:17
**envelope-pushing** [1] - 2309:17
**Envoy** [3] - 2299:9, 2300:3, 2300:21
**erroneous** [1] - 2271:12
**Esq** [4] - 2241:19, 2241:20, 2241:23,
2241:23
**essentially** [2] - 2284:21, 2319:3
**establishment** [1] - 2273:2
**ethical** [6] - 2286:10, 2286:12,
2286:18, 2287:3, 2288:8, 2288:17
**ethics** [2] - 2287:8, 2288:1
**European** [7] - 2248:23, 2254:23,
2258:21, 2296:19, 2318:5, 2318:14,
2318:18
**event** [1] - 2271:13
**evidence** [11] - 2302:24, 2307:13,
2307:19, 2315:25, 2338:3, 2347:7,
2347:10, 2347:16, 2347:18, 2347:19
**evolutions** [1] - 2303:10
**exactly** [3] - 2252:12, 2333:19, 2332:11
**examination** [2] - 2327:22, 2341:25
**EXAMINATION** [7] - 2244:15, 2304:21,
2326:4, 2326:12, 2329:1, 2342:1,
2342:17
**examined** [2] - 2244:13, 2328:21
**example** [3] - 2278:17, 2334:1, 2335:1
**exchange** [7] - 2251:15, 2263:3,
2269:2, 2295:24, 2311:2, 2323:16,
2323:18
**exchanges** [1] - 2251:21
**excluded** [1] - 2297:4
**excused** [7] - 2304:12, 2325:19,
2325:24, 2327:3, 2327:4, 2346:9,
2346:12
**excusing** [1] - 2346:15
**Exhibit** [59] - 2244:21, 2244:22,
2245:19, 2246:14, 2246:22, 2246:23,
2246:24, 2247:19, 2247:20, 2250:7,
2250:25, 2251:14, 2251:15, 2253:13,
2257:10, 2257:11, 2257:14, 2260:18,
2261:21, 2263:18, 2263:19, 2264:23,
2266:12, 2267:9, 2268:25, 2275:4,
2278:4, 2280:16, 2280:19, 2281:13,
2281:14, 2282:10, 2283:14, 2283:19,

2284:4, 2293:3, 2293:23, 2294:10,
2294:23, 2295:18, 2295:23, 2296:8,
2296:16, 2298:6, 2299:3, 2300:23,
2312:17, 2313:1, 2313:5, 2316:4,
2317:16, 2319:13, 2322:16, 2330:17,
2338:2, 2340:24, 2341:4
**exhibit** [11] - 2246:10, 2258:13,
2269:6, 2270:18, 2271:9, 2272:25,
2274:12, 2298:5, 2301:11, 2301:15,
2340:25
**exhibits** [3] - 2243:11, 2250:8,
2291:20
**Exhibits** [2] - 2291:21, 2292:12
**existing** [1] - 2262:13
**expanded** [1] - 2256:7
**expect** [2] - 2327:13, 2327:15
**expenses** [4] - 2265:6, 2265:10,
2265:14, 2266:8
**experience** [1] - 2287:14
**experienced** [1] - 2289:13
**expertise** [2] - 2331:24, 2334:24
**experts** [1] - 2289:14
**explain** [2] - 2344:2, 2344:15
**explained** [1] - 2340:14
**explicit** [2] - 2259:16, 2259:21
**extent** [2] - 2245:11, 2300:17

# F

**fact** [12] - 2256:15, 2259:19, 2262:19,
2262:23, 2285:3, 2287:20, 2295:18,
2306:20, 2316:12, 2339:5, 2344:19,
2347:9
**facts** [8] - 2248:25, 2254:25, 2280:14,
2306:18, 2333:8, 2334:17, 2334:19,
2336:3
**factual** [5] - 2287:19, 2305:18,
2305:19, 2324:14, 2325:15
**fair** [1] - 2337:7
**fairness** [1] - 2303:20
**familiar** [2] - 2245:8, 2335:19
**familiarity** [1] - 2335:2
**fancy** [1] - 2278:7
**far** [4] - 2261:16, 2277:1, 2290:1,
2349:4
**FARA** [64] - 2244:19, 2245:8, 2250:16,
2250:19, 2252:12, 2252:20, 2253:20,
2257:16, 2259:11, 2259:20, 2261:10,
2261:13, 2261:25, 2262:2, 2262:8,
2263:15, 2263:16, 2263:21, 2264:5,
2264:16, 2267:4, 2269:24, 2270:4,
2274:15, 2276:1, 2283:16, 2284:17,
2286:23, 2293:24, 2295:13, 2298:20,
2298:22, 2299:1, 2299:19, 2302:7,
2302:11, 2302:15, 2303:2, 2305:2,
2307:20, 2307:25, 2310:3, 2312:20,
2313:12, 2317:18, 2322:16, 2331:23,
2331:25, 2332:4, 2332:6, 2334:10,
2334:12, 2334:24, 2334:25, 2335:12,
2335:14, 2337:14, 2337:17, 2338:6,

2339:5, 2340:18, 2341:16, 2341:19
**farmed** [1] - 2253:10
**favor** [1] - 2337:19
**February** [11] - 2253:14, 2257:22, 2258:10, 2261:2, 2261:9, 2261:10, 2261:14, 2262:25, 2263:4, 2266:21, 2317:19
**Fees** [1] - 2265:5
**fees** [3] - 2265:8, 2265:12, 2266:7
**Fernando** [1] - 2241:13
**few** [2] - 2263:14, 2272:9
**fifth** [1] - 2289:9
**figure** [6] - 2252:12, 2268:21, 2280:13, 2293:20, 2345:6, 2346:20
**final** [5] - 2258:1, 2284:25, 2296:4, 2296:8, 2296:13
**finalized** [1] - 2284:22
**finally** [2] - 2296:8, 2322:15
**financial** [1] - 2276:3
**financing** [1] - 2266:19
**findings** [2] - 2255:3, 2268:17
**fine** [1] - 2340:1
**finish** [3] - 2348:5, 2348:13, 2348:14
**firm** [51] - 2245:17, 2248:24, 2249:6, 2249:22, 2251:5, 2254:6, 2254:16, 2254:20, 2255:9, 2256:1, 2256:3, 2256:16, 2258:16, 2264:8, 2264:11, 2265:20, 2266:3, 2266:6, 2266:20, 2267:13, 2267:19, 2268:1, 2268:6, 2268:15, 2268:17, 2268:21, 2276:12, 2276:21, 2276:24, 2279:24, 2285:6, 2285:13, 2285:18, 2286:20, 2287:7, 2290:6, 2290:9, 2291:13, 2298:21, 2299:18, 2303:16, 2313:21, 2317:25, 2322:24, 2329:12, 2334:10, 2334:12, 2338:18, 2339:18, 2341:8, 2341:20
**firm's** [17] - 2245:11, 2255:3, 2255:16, 2256:23, 2257:6, 2259:16, 2259:19, 2259:21, 2260:3, 2260:13, 2265:9, 2268:10, 2268:22, 2331:22, 2333:3, 2339:14, 2340:11
**first** [26] - 2244:21, 2250:18, 2252:24, 2257:13, 2258:9, 2259:25, 2269:7, 2272:3, 2274:7, 2275:12, 2288:15, 2291:22, 2296:20, 2307:11, 2310:23, 2311:10, 2316:18, 2317:18, 2318:10, 2322:23, 2338:4, 2338:8, 2339:25, 2341:1, 2343:14
**firsthand** [2] - 2323:11, 2323:14
**five** [6] - 2247:14, 2296:12, 2327:7, 2327:8, 2327:16, 2327:23
**flawed** [1] - 2344:21
**flexibility** [1] - 2349:5
**Flom** [1] - 2329:13
**focus** [3] - 2254:24, 2258:22, 2267:10
**focused** [1] - 2262:13
**folks** [1] - 2314:6
**follow** [4] - 2247:9, 2272:16, 2298:7, 2298:8
**following** [2] - 2313:10, 2349:3

**follows** [2] - 2244:14, 2328:22
**FOR** [2] - 2241:2, 2241:14
**foregoing** [1] - 2350:4
**foreign** [6] - 2252:6, 2252:8, 2252:13, 2260:24, 2308:7, 2339:3
**Foreign** [8] - 2256:4, 2275:22, 2284:11, 2306:2, 2313:23, 2329:23, 2330:2, 2331:23
**form** [10] - 2252:14, 2283:5, 2283:10, 2284:8, 2285:1, 2285:9, 2285:16, 2293:12, 2318:16, 2347:8
**format** [1] - 2296:19
**former** [1] - 2249:2
**forth** [2] - 2252:25, 2265:11
**forward** [1] - 2314:12
**forwarded** [2] - 2258:5, 2311:14
**forwarding** [1] - 2291:22
**foundation** [4] - 2287:24, 2305:13, 2305:18, 2305:19
**four** [3] - 2262:10, 2262:11, 2321:13
**Fourth** [1] - 2241:15
**fourth** [1] - 2335:20
**frame** [1] - 2347:22
**Friday** [1] - 2349:2
**Friedman** [1] - 2246:15
**front** [1] - 2250:8
**FTI** [4] - 2272:18, 2311:15, 2312:9, 2317:10
**full** [3] - 2272:25, 2277:18, 2329:5
**fully** [1] - 2252:2
**fund** [3] - 2260:13, 2276:3, 2290:20
**funding** [2] - 2279:5, 2319:4
**funds** [6] - 2255:19, 2275:24, 2275:25, 2284:15, 2319:1
**Furthermore** [1] - 2266:18

# G

**G-R-O-S-S** [1] - 2329:8
**gas** [1] - 2273:5
**GASTON** [38] - 2252:14, 2281:17, 2281:20, 2281:24, 2282:2, 2282:6, 2283:5, 2285:9, 2285:16, 2287:22, 2288:14, 2289:2, 2289:25, 2293:12, 2297:10, 2297:13, 2300:5, 2300:7, 2300:25, 2301:5, 2301:10, 2301:16, 2302:16, 2303:18, 2304:5, 2304:22, 2306:5, 2308:16, 2310:1, 2315:8, 2316:2, 2316:3, 2317:8, 2318:20, 2324:22, 2325:18, 2326:13, 2327:2
**Gaston** [9] - 2241:14, 2264:1, 2277:17, 2278:3, 2291:20, 2293:5, 2294:23, 2299:3, 2304:20
**Gates** [1] - 2311:22
**general** [6] - 2245:17, 2285:6, 2285:13, 2287:6, 2331:22, 2333:3
**generally** [2] - 2272:20, 2322:7
**gentleman** [2] - 2303:3, 2346:8
**gifts** [1] - 2329:21
**given** [8] - 2263:8, 2278:25, 2326:7,

2345:14, 2345:23, 2346:2, 2346:4
**glad** [1] - 2253:8
**go-around** [2] - 2326:3
**gorilla** [1] - 2307:3
**govern** [1] - 2285:25
**Government** [14] - 2241:13, 2251:14, 2251:15, 2257:10, 2263:18, 2266:11, 2268:25, 2275:4, 2278:4, 2281:13, 2291:14, 2295:23, 2300:24, 2314:13
**government** [35] - 2246:23, 2248:19, 2252:5, 2255:14, 2255:16, 2256:16, 2257:4, 2257:5, 2260:1, 2260:3, 2261:21, 2264:8, 2264:11, 2268:16, 2273:11, 2276:22, 2290:9, 2300:17, 2301:15, 2302:25, 2306:3, 2306:20, 2307:1, 2308:7, 2314:11, 2314:15, 2314:18, 2315:3, 2315:15, 2315:22, 2317:25, 2328:19, 2339:3, 2348:4, 2348:18
**Government's** [10] - 2244:21, 2247:19, 2313:1, 2316:4, 2319:13, 2322:15, 2330:16, 2338:2, 2340:23, 2341:4
**government's** [1] - 2348:9
**governmental** [1] - 2286:24
**gratuities** [1] - 2329:21
**great** [2] - 2348:20, 2349:12
**greeting** [1] - 2336:5
**Greg** [12] - 2247:8, 2250:22, 2253:3, 2294:4, 2294:19, 2295:20, 2324:19, 2332:23, 2333:6, 2334:17, 2336:18, 2337:14
**GREGORY** [1] - 2241:6
**Gregory** [3] - 2244:5, 2277:3, 2304:16
**Gross** [6] - 2243:6, 2327:13, 2328:19, 2328:20, 2329:7, 2330:19
**gross** [6] - 2327:15, 2327:22, 2333:22, 2342:3, 2342:16, 2345:23
**Guantanamo** [4] - 2299:9, 2299:11, 2300:3, 2300:10
**Gulland** [1] - 2241:14
**guy** [2] - 2346:21, 2346:22

# H

**half** [2] - 2299:15, 2327:14
**hand** [1] - 2278:17
**handle** [4] - 2250:2, 2272:20, 2322:8, 2322:10
**handled** [5] - 2271:2, 2320:13, 2321:2, 2336:3, 2336:5
**handwriting** [3] - 2278:11, 2278:15, 2278:23
**handwritten** [1] - 2278:5
**happy** [4] - 2247:7, 2247:10, 2269:18, 2345:1
**Happy** [1] - 2247:10
**hard** [1] - 2295:20
**Haskell** [1] - 2279:21
**Hawker** [5] - 2272:18, 2311:15, 2311:17, 2311:21, 2312:8

2358

**Hawker/FTI** [1] - 2322:6
**head** [1] - 2335:16
**headline** [2] - 2316:13, 2320:7
**hear** [1] - 2344:13
**hearsay** [4] - 2287:10, 2301:10, 2301:17, 2315:23
**Heather** [2] - 2335:1, 2335:16
**held** [1] - 2273:11
**hello** [1] - 2336:4
**help** [3] - 2255:19, 2276:3, 2319:2
**helped** [1] - 2290:20
**helpful** [3] - 2269:19, 2335:4, 2339:7
**Hi** [1] - 2253:15
**hide** [1] - 2299:1
**highlight** [1] - 2257:24
**hired** [3] - 2305:25, 2308:3, 2308:6
**hiring** [1] - 2308:10
**hold** [1] - 2315:4
**holiday** [2] - 2244:25, 2245:3
**holidays** [1] - 2252:20
**Holidays** [1] - 2247:10
**homework** [1] - 2337:23
**Honor** [21] - 2244:3, 2281:17, 2287:14, 2289:2, 2289:25, 2297:10, 2297:19, 2300:5, 2300:25, 2301:4, 2302:19, 2304:15, 2305:12, 2305:15, 2306:6, 2306:19, 2317:3, 2325:21, 2328:18, 2343:3, 2348:23
**HONORABLE** [1] - 2241:10
**hope** [3] - 2348:6, 2348:7, 2349:10
**hoping** [1] - 2327:12
**horrible** [1] - 2328:14
**hourly** [2] - 2265:13, 2265:21
**hours** [1] - 2327:14
**house** [1] - 2312:5
**hryvnias** [3] - 2264:10, 2265:19, 2297:4
**Huisman** [12] - 2271:7, 2271:19, 2276:17, 2277:5, 2279:15, 2279:18, 2279:25, 2291:6, 2323:5, 2324:8, 2325:5, 2325:14
**Huisman's** [1] - 2290:25
**Human** [6] - 2248:23, 2254:23, 2258:22, 2318:6, 2318:14, 2318:19
**hung** [1] - 2347:13
**Hunt** [3] - 2245:22, 2335:1, 2335:16
**hunt** [1] - 2246:20
**Hunt's** [1] - 2246:5

---

**I**

**i.e** [1] - 2289:17
**identified** [2] - 2299:21, 2333:20
**identifier** [3] - 2281:10, 2282:5, 2282:18
**identifies** [1] - 2290:22
**identifying** [2] - 2283:20, 2291:5
**identity** [2] - 2285:3, 2285:19
**III** [1] - 2241:23

**immediately** [1] - 2306:11
**impacted** [1] - 2288:8
**impose** [2] - 2300:2, 2300:9
**impression** [1] - 2337:13
**improper** [1] - 2306:4
**impropriety** [1] - 2309:15
**inaccuracies** [1] - 2317:1
**inaccurate** [1] - 2316:13
**inappropriate** [2] - 2309:11, 2309:12
**incident** [1] - 2271:21
**include** [6] - 2246:8, 2246:19, 2259:20, 2308:12, 2329:23, 2330:1
**included** [5] - 2246:20, 2260:23, 2261:14, 2283:23, 2313:7
**includes** [7] - 2251:3, 2256:10, 2256:15, 2290:14, 2297:1, 2313:20, 2314:5
**including** [3] - 2248:22, 2254:22, 2307:3
**inconsistent** [1] - 2255:24
**incorporating** [2] - 2312:20, 2313:12
**incurred** [1] - 2266:8
**independence** [1] - 2249:7
**independent** [6] - 2248:25, 2254:25, 2256:2, 2258:23, 2268:24, 2289:14
**indicate** [4] - 2258:16, 2274:25, 2275:2, 2279:1
**indicated** [1] - 2293:6
**indication** [3] - 2254:19, 2255:8, 2303:3
**indictment** [2] - 2308:24, 2308:25
**individual** [8] - 2255:19, 2266:22, 2275:15, 2275:24, 2276:4, 2284:14, 2290:19, 2319:1
**individual's** [2] - 2266:22, 2275:15
**individuals** [1] - 2323:12
**indulgence** [1] - 2280:17
**influence** [1] - 2291:13
**inform** [1] - 2348:18
**information** [16] - 2247:8, 2253:1, 2253:4, 2261:15, 2261:18, 2262:8, 2276:2, 2283:25, 2284:18, 2285:5, 2285:7, 2285:14, 2286:25, 2288:23, 2298:21, 2333:8
**informed** [2] - 2262:15, 2315:22
**initial** [5] - 2257:16, 2334:9, 2334:11, 2341:17, 2347:3
**ink** [2] - 2278:13, 2278:15
**inquire** [1] - 2263:6
**inquiry** [7] - 2244:19, 2248:25, 2254:25, 2256:2, 2262:13, 2302:5, 2302:7
**inserting** [1] - 2306:17
**insisted** [1] - 2249:6
**instance** [1] - 2308:25
**instruct** [3] - 2306:7, 2306:8, 2306:23
**instruction** [1] - 2306:16
**instructions** [1] - 2347:3
**instructs** [1] - 2338:23

**intended** [1] - 2344:16
**intention** [1] - 2349:7
**interaction** [1] - 2272:14
**interest** [1] - 2329:22
**interesting** [1] - 2295:12
**interestingly** [1] - 2295:1
**interlineations** [1] - 2278:5
**internal** [1] - 2287:6
**interview** [6] - 2247:3, 2271:2, 2273:1, 2307:23, 2320:13, 2321:2
**interviewed** [1] - 2273:17
**interviews** [1] - 2268:16
**introduce** [1] - 2307:13
**introduced** [1] - 2307:19
**introductory** [1] - 2336:4
**investigation** [1] - 2258:23
**involved** [9] - 2272:19, 2289:18, 2300:13, 2302:13, 2320:17, 2322:6, 2323:5, 2323:7, 2323:9
**involvement** [1] - 2341:22
**involving** [1] - 2250:3
**irrelevant** [1] - 2309:23
**issue** [10] - 2259:11, 2300:1, 2307:22, 2308:1, 2331:16, 2331:20, 2334:25, 2339:4, 2339:5, 2348:14
**issued** [2] - 2271:11, 2274:16
**issues** [11] - 2248:22, 2249:15, 2251:11, 2255:4, 2258:17, 2258:21, 2300:11, 2300:15, 2300:16, 2318:1, 2318:5
**item** [11] - 2249:17, 2251:3, 2251:8, 2254:15, 2255:11, 2258:25, 2259:4, 2259:7, 2276:20, 2290:5, 2322:6
**itself** [4] - 2257:12, 2270:15, 2272:23, 2332:9

---

**J**

**JACKSON** [1] - 2241:10
**James** [3] - 2241:20, 2276:15, 2290:15
**January** [3] - 2250:13, 2251:16, 2251:18
**Jason** [1] - 2241:17
**Jean** [1] - 2258:3
**job** [2] - 2299:14, 2342:19
**John** [1] - 2257:24
**Jonathan** [4] - 2272:18, 2311:15, 2312:8, 2322:5
**Journal** [14] - 2267:24, 2271:3, 2271:19, 2271:21, 2276:17, 2277:5, 2279:15, 2280:11, 2320:9, 2320:14, 2323:6, 2324:9, 2325:6, 2337:3
**Journal's** [1] - 2316:12
**journalists** [2] - 2310:9, 2325:11
**judge** [2] - 2273:3, 2338:23
**JUDGE** [1] - 2241:11
**June** [5] - 2296:10, 2297:24, 2298:17, 2299:4, 2299:6
**Junghans** [1] - 2241:23
**jurors** [1] - 2244:8

2359

**JURY** [2] - 2241:6, 2241:10
**jury** [8] - 2244:6, 2304:17, 2306:7, 2306:8, 2306:23, 2307:6, 2328:11, 2349:7
**Jury** [4] - 2244:7, 2304:11, 2304:18, 2347:25
**justice** [3] - 2254:21, 2258:18, 2318:2
**JUSTICE** [1] - 2241:17
**Justice** [19] - 2248:19, 2260:21, 2261:9, 2264:12, 2265:1, 2266:23, 2267:17, 2275:17, 2275:21, 2277:10, 2284:10, 2289:19, 2291:9, 2298:12, 2299:19, 2305:8, 2305:25, 2308:3, 2317:25
**Justice's** [1] - 2308:10

## K

**Kaneshiro** [2] - 2350:3, 2350:8
**KANESHIRO** [2] - 2242:2, 2350:9
**Kaneshiro-Miller** [2] - 2350:3, 2350:8
**KANESHIRO-MILLER** [2] - 2242:2, 2350:9
**Kedem** [4] - 2330:13, 2330:19, 2330:24, 2331:2
**keep** [3] - 2286:15, 2303:8, 2344:10
**Kelly** [2] - 2245:10, 2246:16
**Ken** [3] - 2327:13, 2330:19, 2330:25
**Kenneth** [4] - 2243:6, 2328:19, 2328:20, 2329:7
**KENNETH** [1] - 2329:7
**kind** [2] - 2300:2, 2343:19
**knock** [1] - 2347:22
**knowledge** [11] - 2268:2, 2291:17, 2305:3, 2310:4, 2323:11, 2323:14, 2324:14, 2324:24, 2324:25, 2332:13, 2334:19
**knows** [1] - 2345:2
**Kottmeyer** [2] - 2299:21, 2300:13

## L

**L.A** [10] - 2269:12, 2269:17, 2269:22, 2269:24, 2270:5, 2270:22, 2270:25, 2277:4, 2319:19, 2319:23
**LA** [1] - 2245:25
**Labor** [2] - 2348:24, 2348:25
**lack** [1] - 2288:12
**lacks** [1] - 2305:12
**language** [9] - 2256:7, 2259:9, 2260:24, 2289:10, 2312:20, 2313:7, 2313:12, 2313:20, 2313:25
**larger** [1] - 2309:7
**Larry** [11] - 2244:22, 2245:14, 2245:17, 2247:7, 2247:8, 2253:23, 2263:10, 2296:1, 2327:13, 2331:21, 2332:23
**last** [8] - 2260:11, 2293:24, 2296:13, 2301:3, 2326:3, 2327:14, 2346:1, 2346:19
**lastly** [2] - 2255:17, 2318:22

**latest** [1] - 2348:9
**Lauren** [4] - 2270:3, 2270:17, 2270:18, 2271:13
**law** [23] - 2248:21, 2248:22, 2249:15, 2251:10, 2251:11, 2254:20, 2254:22, 2255:4, 2258:17, 2258:21, 2276:12, 2276:24, 2290:9, 2291:12, 2318:1, 2318:5, 2327:25, 2329:12, 2329:20, 2331:7, 2338:24, 2339:14, 2340:11
**Law** [14] - 2267:24, 2271:3, 2271:19, 2271:21, 2276:17, 2277:5, 2279:15, 2280:11, 2316:12, 2320:9, 2320:13, 2323:6, 2324:9, 2325:6
**law-related** [1] - 2331:7
**lawyer** [4] - 2278:7, 2290:16, 2347:7, 2347:17
**lawyers** [7] - 2265:9, 2268:22, 2273:2, 2285:25, 2287:14, 2289:13, 2291:13
**lawyers'** [1] - 2347:5
**lead** [2] - 2317:7, 2333:6
**leading** [2] - 2287:20, 2317:3
**learn** [2] - 2302:4, 2302:9
**learned** [2] - 2299:18, 2337:6
**learning** [1] - 2341:19
**least** [1] - 2324:19
**led** [1] - 2336:1
**left** [3] - 2270:23, 2299:4, 2348:5
**legal** [10] - 2276:13, 2277:11, 2286:10, 2287:8, 2288:1, 2289:12, 2291:10, 2323:24, 2338:22, 2348:11
**Legal** [2] - 2299:24, 2300:14
**lengthy** [1] - 2327:16
**less** [1] - 2253:22
**letter** [81] - 2245:6, 2245:7, 2245:20, 2245:22, 2245:25, 2246:5, 2246:6, 2246:20, 2250:19, 2252:3, 2252:13, 2252:21, 2254:3, 2257:17, 2257:20, 2258:1, 2258:10, 2258:12, 2260:20, 2261:4, 2261:8, 2261:10, 2261:13, 2262:8, 2262:10, 2262:24, 2263:4, 2263:15, 2263:16, 2263:21, 2264:1, 2264:5, 2264:14, 2264:21, 2266:1, 2266:13, 2266:18, 2266:21, 2267:5, 2267:9, 2267:23, 2275:8, 2275:13, 2284:8, 2284:21, 2284:25, 2287:2, 2289:5, 2295:2, 2295:9, 2295:12, 2296:3, 2296:9, 2296:13, 2296:15, 2297:23, 2298:17, 2298:22, 2299:6, 2299:18, 2303:11, 2312:21, 2313:8, 2313:17, 2317:18, 2334:4, 2334:7, 2334:9, 2338:7, 2338:25, 2339:23, 2340:18, 2340:19, 2341:3, 2341:18
**letterhead** [2] - 2293:25, 2298:2
**letters** [5] - 2263:3, 2308:20, 2309:3, 2310:2, 2312:14
**life** [1] - 2347:14
**light** [1] - 2255:3
**likely** [1] - 2334:5
**limine** [1] - 2348:17
**limitation** [1] - 2259:16

**limiting** [1] - 2268:7
**line** [4] - 2248:2, 2274:9, 2309:15, 2338:6
**lines** [3] - 2336:13, 2342:8, 2343:18
**link** [1] - 2281:21
**list** [2] - 2267:1, 2308:25
**listed** [4] - 2288:16, 2322:23, 2323:4, 2324:21
**listen** [1] - 2328:16
**live** [2] - 2329:9, 2329:10
**LLP** [2] - 2241:20, 2241:24
**lobby** [1] - 2329:21
**local** [1] - 2273:3
**look** [74] - 2244:21, 2245:19, 2246:11, 2246:22, 2247:1, 2247:2, 2247:19, 2247:23, 2247:24, 2250:7, 2251:14, 2251:16, 2251:25, 2253:13, 2254:11, 2255:11, 2257:10, 2258:9, 2260:15, 2261:21, 2263:18, 2263:20, 2264:15, 2264:23, 2271:22, 2273:24, 2273:25, 2274:2, 2275:3, 2280:16, 2280:19, 2281:13, 2283:14, 2283:18, 2284:4, 2284:22, 2284:23, 2284:25, 2289:9, 2290:4, 2291:3, 2292:15, 2293:3, 2293:23, 2293:24, 2294:5, 2295:15, 2295:18, 2296:15, 2300:23, 2310:23, 2311:10, 2312:18, 2313:1, 2313:2, 2313:18, 2314:4, 2317:19, 2319:13, 2321:6, 2322:15, 2322:20, 2322:21, 2325:2, 2338:3, 2338:13, 2339:11, 2339:12, 2339:25, 2340:8, 2340:17, 2340:23, 2341:3
**looked** [5] - 2251:18, 2277:16, 2314:3, 2316:5, 2319:14, 2322:18, 2326:25
**looking** [10] - 2246:14, 2258:15, 2264:20, 2282:1, 2282:10, 2292:15, 2312:13, 2316:4, 2340:7, 2340:25
**Looks** [1] - 2295:19
**looks** [15] - 2244:23, 2251:24, 2255:7, 2256:9, 2258:8, 2272:4, 2278:23, 2278:24, 2279:9, 2280:20, 2293:1, 2296:9, 2321:18, 2321:19, 2338:16
**loop** [1] - 2301:19
**looped** [3] - 2311:21, 2317:1, 2320:21
**looping** [1] - 2316:21
**Los** [7] - 2246:2, 2267:20, 2276:16, 2324:11, 2325:5, 2325:8, 2325:12

## M

**mail** [56] - 2244:22, 2245:13, 2246:7, 2246:11, 2246:14, 2247:20, 2250:4, 2250:12, 2251:15, 2251:21, 2251:25, 2253:14, 2254:10, 2257:12, 2257:19, 2257:21, 2258:11, 2261:22, 2262:6, 2269:2, 2269:7, 2269:15, 2270:9, 2270:17, 2271:22, 2272:15, 2272:24, 2275:6, 2282:15, 2294:18, 2294:25, 2295:24, 2311:2, 2311:9, 2312:18, 2312:19, 2312:23, 2314:2, 2314:5,

2314:22, 2315:17, 2316:11, 2320:6,
2321:3, 2322:13, 2323:16, 2323:18,
2330:17, 2330:18, 2330:23, 2338:3,
2338:5, 2338:8, 2338:13, 2339:9,
2346:25
  **mailed** [3] - 2310:5, 2310:13, 2311:6
  **mailing** [1] - 2311:3
  **mails** [7] - 2251:17, 2252:24, 2269:5,
2321:6, 2322:18, 2326:9, 2326:25
  **major** [2] - 2254:24, 2258:22
  **man** [1] - 2335:17
  **Manafort** [3] - 2310:5, 2311:22,
2315:21
  **management** [2] - 2281:6, 2281:21
  **managing** [1] - 2245:23
  **March** [1] - 2296:23
  **mark** [1] - 2279:9
  **Maryland** [1] - 2329:10
  **materials** [2] - 2336:12, 2339:3
  **math** [1] - 2348:4
  **matter** [12] - 2252:4, 2270:2, 2301:20,
2307:16, 2333:8, 2334:11, 2341:22,
2345:5, 2345:7, 2347:7, 2347:8, 2350:5
  **matters** [1] - 2307:18
  **Matthew** [8] - 2271:6, 2276:17, 2277:5,
2279:15, 2323:5, 2324:8, 2325:5,
2325:14
  **McCullough** [1] - 2241:17
  **MD** [1] - 2241:22
  **Meagher** [1] - 2329:13
  **mean** [6] - 2284:25, 2292:18, 2324:18,
2334:8, 2342:9, 2344:20
  **meaningful** [1] - 2306:22
  **means** [1] - 2344:2
  **meant** [2] - 2344:12, 2344:16
  **media** [15] - 2268:15, 2268:16,
2276:21, 2277:9, 2291:8, 2303:4,
2317:10, 2338:19, 2339:15, 2339:16,
2339:19, 2341:8, 2341:9, 2341:13
  **meeting** [35] - 2328:4, 2328:5, 2332:4,
2332:6, 2332:8, 2332:9, 2332:13,
2332:14, 2332:16, 2332:20, 2333:1,
2333:5, 2333:23, 2333:25, 2334:2,
2334:14, 2334:16, 2334:23, 2335:8,
2336:1, 2336:5, 2336:6, 2336:9,
2336:16, 2336:17, 2336:23, 2337:8,
2337:11, 2337:24, 2341:21, 2342:3,
2345:25, 2346:3, 2346:5
  **Melissa** [1] - 2270:19
  **member** [2] - 2276:14, 2290:14
  **members** [2] - 2328:11, 2330:7
  **memo** [1] - 2313:5
  **memorandum** [7] - 2264:11, 2265:12,
2265:20, 2298:12, 2313:3, 2313:13,
2313:15
  **memory** [4] - 2331:1, 2334:2, 2337:13,
2342:20
  **mention** [5] - 2264:16, 2266:13,
2287:3, 2288:5, 2318:7
  **mentioned** [4] - 2266:21, 2274:23,

2308:22, 2308:24
  **mentioning** [2] - 2332:3, 2336:24
  **mentions** [1] - 2318:13
  **Mercury** [1] - 2310:14
  **message** [1] - 2270:23
  **messages** [1] - 2311:15
  **microphone** [1] - 2286:16
  **mid** [2] - 2304:2, 2304:6
  **mid-afternoon** [2] - 2304:2, 2304:6
  **middle** [2] - 2294:24, 2330:17
  **Might** [1] - 2322:5
  **might** [13] - 2248:22, 2254:23,
2258:21, 2315:22, 2318:5, 2319:10,
2319:12, 2331:8, 2337:18, 2337:20,
2346:18, 2348:5
  **MILLER** [2] - 2242:2, 2350:9
  **Miller** [2] - 2350:3, 2350:8
  **million** [5] - 2297:9, 2319:7, 2319:10,
2319:11, 2319:12
  **mind** [2] - 2299:13, 2341:17
  **minds** [2] - 2337:20, 2337:21
  **mine** [1] - 2331:22
  **Minister** [4] - 2249:2, 2255:2, 2261:8,
2273:6
  **Ministry** [33] - 2248:19, 2248:21,
2249:8, 2251:9, 2251:10, 2254:17,
2258:16, 2258:20, 2260:20, 2261:7,
2261:8, 2264:10, 2264:12, 2265:1,
2266:23, 2267:17, 2268:12, 2275:16,
2275:21, 2277:10, 2284:10, 2289:12,
2289:13, 2289:17, 2289:19, 2291:9,
2298:12, 2305:8, 2305:25, 2308:3,
2308:9, 2308:11, 2317:24
  **ministry** [2] - 2261:19, 2318:4
  **Ministry's** [2] - 2268:6, 2289:15
  **minor** [1] - 2296:2
  **minutes** [5] - 2272:9, 2304:7, 2304:13,
2327:15, 2327:23
  **mischaracterizations** [4] - 2336:19,
2336:22, 2337:1, 2342:4
  **misinformation** [2] - 2277:9, 2291:8
  **missed** [2] - 2307:11, 2342:25
  **modification** [1] - 2259:1
  **modified** [1] - 2252:6
  **Molly** [1] - 2241:14
  **moment** [2] - 2307:10, 2315:4
  **Monday** [8] - 2253:5, 2347:21, 2348:2,
2348:5, 2348:10, 2348:13, 2348:18,
2349:3
  **money** [11] - 2264:8, 2264:17,
2265:24, 2266:14, 2266:20, 2267:2,
2267:6, 2275:14, 2288:10, 2297:16,
2329:20
  **month** [6] - 2266:6, 2277:18, 2277:23,
2278:1, 2296:20, 2299:6
  **months** [1] - 2321:13
  **morning** [6] - 2247:22, 2261:22,
2275:5, 2278:20, 2347:21, 2348:18
  **most** [6] - 2255:16, 2257:6, 2260:7,
2273:1, 2278:10, 2336:2

  **motion** [1] - 2348:17
  **mouths** [1] - 2347:5
  **move** [5] - 2273:9, 2306:5, 2331:11,
2341:2
  **moving** [1] - 2321:17
  **MR** [108] - 2244:10, 2244:16, 2252:18,
2256:21, 2256:24, 2257:1, 2274:8,
2280:3, 2281:23, 2282:1, 2282:3,
2282:7, 2282:9, 2283:9, 2285:11,
2285:12, 2285:24, 2286:7, 2286:14,
2286:17, 2286:20, 2286:23, 2287:4,
2287:13, 2287:16, 2287:21, 2288:6,
2288:13, 2288:20, 2289:1, 2289:8,
2290:3, 2293:13, 2293:18, 2297:11,
2297:15, 2297:19, 2297:21, 2297:22,
2301:3, 2301:13, 2301:19, 2301:25,
2302:3, 2302:18, 2303:6, 2303:15,
2303:21, 2303:24, 2305:9, 2305:12,
2305:15, 2305:21, 2306:6, 2306:13,
2306:19, 2306:25, 2307:11, 2307:17,
2308:1, 2308:8, 2308:21, 2309:8,
2309:10, 2315:23, 2317:3, 2318:16,
2324:16, 2325:21, 2325:25, 2326:5,
2326:11, 2327:8, 2327:12, 2327:20,
2327:23, 2328:3, 2328:5, 2328:18,
2328:23, 2329:2, 2333:21, 2341:24,
2342:2, 2342:16, 2342:18, 2342:23,
2343:3, 2343:6, 2343:11, 2343:15,
2343:17, 2344:1, 2344:5, 2344:7,
2344:13, 2344:25, 2345:4, 2345:9,
2345:13, 2345:18, 2345:19, 2345:22,
2346:6, 2348:7, 2348:23, 2349:10,
2349:14
  **MS** [39] - 2252:14, 2281:17, 2281:20,
2281:24, 2282:2, 2282:6, 2283:5,
2285:9, 2285:16, 2287:22, 2288:14,
2289:2, 2289:25, 2293:12, 2297:10,
2297:13, 2300:5, 2300:7, 2300:12,
2300:25, 2301:5, 2301:10, 2301:16,
2302:16, 2303:18, 2304:5, 2304:22,
2306:5, 2308:16, 2310:1, 2315:8,
2316:2, 2316:3, 2317:8, 2318:20,
2324:22, 2325:18, 2326:13, 2327:2
  **Mudd** [2] - 2257:15, 2335:17
  **multiple** [2] - 2292:6, 2320:10
  **Murphy** [7] - 2241:20, 2244:9,
2304:25, 2312:16, 2316:5, 2318:23,
2349:14
  **MURPHY** [71] - 2244:10, 2244:16,
2252:18, 2256:21, 2256:24, 2257:1,
2274:8, 2280:3, 2281:23, 2282:1,
2282:3, 2282:7, 2282:9, 2283:9,
2285:11, 2285:12, 2285:24, 2286:7,
2286:14, 2286:17, 2286:20, 2286:23,
2287:4, 2287:13, 2287:16, 2287:21,
2288:6, 2288:13, 2288:20, 2289:1,
2289:8, 2290:3, 2293:13, 2293:18,
2297:11, 2297:15, 2297:19, 2297:21,
2297:22, 2300:12, 2301:3, 2301:13,
2301:19, 2301:25, 2302:3, 2302:18,

2303:6, 2303:15, 2303:21, 2303:24,
2305:9, 2305:12, 2305:15, 2305:21,
2306:6, 2306:13, 2306:19, 2306:25,
2308:1, 2309:8, 2315:23, 2317:3,
2318:16, 2324:16, 2325:21, 2326:5,
2326:11, 2327:23, 2348:23, 2349:10,
2349:14
  **Murphy's** [1] - 2307:11
  **mystery** [1] - 2289:20

# N

  **nail** [1] - 2346:20
  **name** [12] - 2254:12, 2254:14,
2256:13, 2266:21, 2275:15, 2275:24,
2279:8, 2284:14, 2288:9, 2290:25,
2329:5, 2337:4
  **named** [2] - 2268:2, 2335:17
  **naming** [2] - 2250:5, 2260:12
  **narrow** [1] - 2343:4
  **National** [18] - 2245:7, 2257:15,
2267:23, 2271:3, 2271:19, 2271:21,
2276:17, 2277:5, 2279:15, 2280:11,
2308:4, 2316:12, 2320:9, 2320:13,
2323:6, 2324:9, 2325:6, 2337:3
  **natural** [1] - 2273:5
  **necessary** [3] - 2296:5, 2314:24,
2314:25
  **need** [3] - 2303:2, 2348:21, 2349:11
  **needs** [2] - 2306:17, 2348:11
  **negotiations** [1] - 2256:16
  **never** [6] - 2270:24, 2299:13, 2303:2,
2303:3, 2309:21, 2347:12
  **new** [5] - 2256:25, 2262:9, 2262:15,
2283:24, 2317:6
  **New** [18] - 2245:23, 2247:10, 2253:5,
2267:24, 2271:14, 2271:24, 2272:4,
2272:14, 2274:19, 2276:16, 2277:4,
2310:21, 2312:2, 2321:8, 2321:14,
2321:20, 2324:5, 2325:4, 2325:7,
2325:12, 2337:2
  **News** [1] - 2269:8
  **news** [4] - 2270:2, 2270:6, 2291:12,
2320:2
  **newspaper** [3] - 2342:11, 2343:22,
2343:23
  **next** [19] - 2244:19, 2245:12, 2247:10,
2250:21, 2259:24, 2268:10, 2269:15,
2270:9, 2270:17, 2271:9, 2271:22,
2277:2, 2289:7, 2290:4, 2297:17,
2297:20, 2306:5, 2328:17, 2340:24
  **Next** [1] - 2280:22
  **nice** [1] - 2346:18
  **night** [1] - 2257:21
  **nobody** [1] - 2303:8
  **nonetheless** [1] - 2259:21
  **normal** [1] - 2265:13
  **notches** [1] - 2306:24
  **Note** [1] - 2270:10
  **note** [1] - 2306:19

  **noted** [2] - 2294:11, 2317:1
  **notes** [3] - 2262:9, 2336:6, 2336:9
  **nothing** [3] - 2255:23, 2323:15,
2325:18
  **notice** [1] - 2254:15
  **notify** [1] - 2262:19
  **noting** [1] - 2327:10
  **notion** [1] - 2309:14
  **number** [21] - 2248:14, 2248:16,
2248:18, 2249:17, 2251:3, 2251:8,
2254:17, 2255:11, 2258:25, 2264:2,
2267:12, 2267:19, 2276:11, 2276:20,
2281:3, 2283:20, 2290:5, 2317:23,
2322:21, 2325:2, 2348:15
  **Number** [3] - 2244:4, 2246:22, 2296:8
  **numbers** [2] - 2256:11, 2286:5
  **NW** [4] - 2241:15, 2241:18, 2241:24,
2242:3

# O

  **oath** [1] - 2244:11
  **object** [1] - 2345:19
  **objection** [25] - 2252:14, 2283:5,
2285:9, 2285:16, 2289:25, 2293:12,
2297:10, 2297:13, 2300:5, 2300:25,
2301:9, 2302:1, 2302:16, 2305:9,
2305:12, 2306:19, 2307:6, 2307:13,
2309:23, 2315:23, 2317:3, 2318:16,
2324:16, 2343:4, 2343:12
  **objections** [1] - 2309:21
  **obligation** [2] - 2286:10, 2287:3
  **obligations** [1] - 2245:8
  **obviously** [4] - 2332:12, 2339:12,
2340:1, 2342:19
  **occur** [2] - 2273:20, 2342:5
  **occurred** [2] - 2320:23, 2342:4
  **October** [5] - 2310:12, 2310:16,
2323:2, 2328:6, 2331:16
  **OF** [6] - 2241:2, 2241:4, 2241:10,
2241:15, 2241:17, 2350:1
  **offered** [2] - 2310:25, 2311:7
  **offering** [2] - 2301:16, 2301:18
  **offhand** [1] - 2292:20
  **OFFICE** [1] - 2241:14
  **Office** [3] - 2270:4, 2299:23, 2300:15
  **office** [3] - 2245:12, 2266:19, 2310:17
  **offices** [1] - 2335:12
  **OFFICIAL** [1] - 2350:1
  **official** [1] - 2276:24
  **officials** [2] - 2268:17, 2276:22
  **offset** [1] - 2265:12
  **old** [1] - 2262:10
  **omitted** [2] - 2308:19, 2308:20
  **once** [1] - 2343:6
  **One** [2] - 2291:7, 2338:6
  **one** [40] - 2268:20, 2269:24, 2272:5,
2272:9, 2273:1, 2278:3, 2282:1,
2282:20, 2283:3, 2283:4, 2283:6,
2283:20, 2291:5, 2292:18, 2292:19,

2292:21, 2293:5, 2293:6, 2293:24,
2294:11, 2300:6, 2308:3, 2308:17,
2309:23, 2315:4, 2316:9, 2321:20,
2321:22, 2323:9, 2328:9, 2328:12,
2333:7, 2338:23, 2343:2, 2343:14,
2344:2, 2344:24, 2346:16, 2346:20,
2347:4
  **One-Page** [1] - 2338:6
  **one-sentence** [2] - 2272:5, 2321:20
  **open** [9] - 2282:8, 2288:7, 2288:19,
2302:2, 2303:19, 2303:23, 2309:19,
2328:10, 2345:21
  **open-ended** [1] - 2288:7
  **opening** [1] - 2347:5
  **opinion** [1] - 2291:14
  **opinions** [1] - 2338:23
  **opportunity** [1] - 2334:18
  **opposed** [2] - 2252:7, 2288:16
  **oral** [7] - 2248:7, 2249:20, 2251:4,
2255:18, 2255:23, 2262:14, 2318:25
  **original** [2] - 2292:20, 2295:12
  **Otherwise** [2] - 2338:18, 2339:18
  **ought** [1] - 2294:20
  **out-of-pocket** [2] - 2265:10, 2265:14
  **outcome** [1] - 2263:7
  **outgoing** [1] - 2287:2
  **outlaid** [1] - 2266:8
  **outlets** [3] - 2270:6, 2339:15, 2341:9
  **outs** [2] - 2292:24, 2293:2
  **outside** [3] - 2300:7, 2300:25, 2346:19
  **overruled** [2] - 2252:15, 2305:14
  **overstatement** [1] - 2307:9
  **owe** [1] - 2263:9
  **owed** [1] - 2286:11
  **own** [1] - 2308:10

# P

  **P.M** [1] - 2244:2
  **p.m** [1] - 2349:16
  **page** [44] - 2250:25, 2252:1, 2252:24,
2254:12, 2257:13, 2258:9, 2258:12,
2258:13, 2259:24, 2260:17, 2260:18,
2264:6, 2264:25, 2265:4, 2266:13,
2269:6, 2269:15, 2270:18, 2271:9,
2271:23, 2272:24, 2274:2, 2274:7,
2275:13, 2293:3, 2296:16, 2297:2,
2313:2, 2313:5, 2316:9, 2316:18,
2317:23, 2318:21, 2319:15, 2319:21,
2320:4, 2320:5, 2321:5, 2321:7,
2322:20, 2339:25, 2340:25, 2341:1
  **Page** [1] - 2338:6
  **paid** [7] - 2264:10, 2264:17, 2265:15,
2265:25, 2266:14, 2266:20, 2275:14
  **panicky** [1] - 2348:2
  **paper** [1] - 2293:25
  **paragraph** [20] - 2258:15, 2259:25,
2260:11, 2272:25, 2275:12, 2275:13,
2284:5, 2289:9, 2290:4, 2313:19,
2318:22, 2338:18, 2339:11, 2339:13,

2362

2339:17, 2339:22, 2340:5, 2340:8,
2341:2, 2341:3
**paragraphs** [2] - 2273:9, 2294:11
**part** [6] - 2246:10, 2287:1, 2307:12,
2318:10, 2319:5, 2349:7
**participate** [2] - 2309:6, 2326:20
**participating** [1] - 2325:10
**particular** [4] - 2258:20, 2269:11,
2293:20, 2318:4
**parties** [1] - 2259:10
**partner** [1] - 2331:22
**party** [7] - 2250:2, 2264:18, 2264:22,
2285:15, 2285:19, 2286:11, 2314:12
**passage** [2] - 2265:5, 2266:12
**pasted** [2] - 2271:3, 2271:6
**patience** [1] - 2328:12
**Patricia** [2] - 2350:3, 2350:8
**PATRICIA** [2] - 2242:2, 2350:9
**Paul** [1] - 2310:5
**Paula** [1] - 2241:23
**Pause** [1] - 2280:18
**pay** [2] - 2255:20, 2319:2
**paying** [2] - 2249:22, 2251:5
**payment** [3] - 2265:11, 2285:8,
2285:14
**payments** [1] - 2256:17
**payor** [5] - 2250:2, 2256:11, 2264:18,
2264:22, 2285:23
**payors** [2] - 2285:15, 2285:19
**pdf** [1] - 2257:20
**Pennsylvania** [1] - 2241:18
**people** [5] - 2268:3, 2290:11, 2291:6,
2328:1, 2334:25
**people's** [1] - 2252:22
**perception** [1] - 2337:11
**perform** [1] - 2264:9
**performed** [1] - 2331:17
**perhaps** [2] - 2254:8, 2327:7
**period** [4] - 2269:19, 2289:11,
2289:16, 2296:12
**permission** [1] - 2285:22
**permissions** [2] - 2314:24, 2314:25
**person** [5] - 2254:6, 2279:5, 2324:19,
2328:15, 2335:20
**personally** [1] - 2276:5
**perspective** [1] - 2345:8
**persuasive** [1] - 2337:14
**pertinent** [1] - 2261:15
**phone** [1] - 2331:21
**picked** [1] - 2270:15
**Pinchuk** [9] - 2250:3, 2250:5, 2256:11,
2265:25, 2284:8, 2285:4, 2315:1,
2319:3, 2324:3
**Pinchuk's** [6] - 2260:12, 2267:6,
2288:9, 2288:23, 2314:20, 2315:16
**place** [1] - 2335:9
**plan** [3] - 2247:9, 2310:6, 2317:10
**planning** [2] - 2348:12, 2348:19
**plans** [1] - 2252:22

**pleasure** [2] - 2283:25, 2284:3
**plop** [1] - 2287:24
**plugged** [1] - 2254:13
**pocket** [2] - 2265:10, 2265:14
**point** [20] - 2274:17, 2290:14, 2290:25,
2291:4, 2295:8, 2302:4, 2303:1,
2303:14, 2308:13, 2309:3, 2309:7,
2316:1, 2332:12, 2333:9, 2333:16,
2336:18, 2339:2, 2339:8, 2339:22,
2344:5
**pointing** [1] - 2279:4
**policy** [4] - 2285:13, 2285:18, 2287:7,
2291:14
**political** [4] - 2256:3, 2313:22,
2329:20, 2331:7
**politics** [2] - 2273:3, 2329:21
**Porter** [1] - 2270:20
**possibility** [5] - 2255:15, 2256:22,
2257:4, 2260:2, 2349:9
**possible** [3] - 2274:3, 2279:3
**potential** [1] - 2332:4
**potentially** [2] - 2339:4, 2343:20
**PR** [1] - 2308:11
**practice** [5] - 2285:6, 2285:21,
2329:19, 2329:23, 2330:1
**Pratt** [1] - 2241:21
**pre** [1] - 2332:14
**pre-discussion** [1] - 2332:14
**preparation** [1] - 2268:19
**preparations** [2] - 2333:22, 2333:24
**prepared** [3] - 2248:11, 2292:13,
2296:13
**present** [5] - 2244:7, 2297:3, 2304:11,
2304:18, 2347:25
**presentation** [3] - 2334:18, 2336:2,
2336:12
**press** [24] - 2303:4, 2305:8, 2305:22,
2305:23, 2305:24, 2306:1, 2306:21,
2307:14, 2307:15, 2308:2, 2308:5,
2308:8, 2308:9, 2308:10, 2308:12,
2308:16, 2314:5, 2317:1, 2320:17,
2320:20, 2320:23, 2321:23, 2336:19
**pretty** [2] - 2288:11, 2344:11
**previous** [3] - 2281:20, 2319:21,
2321:5
**previously** [1] - 2307:19
**Price** [1] - 2297:2
**price** [1] - 2297:3
**primarily** [1] - 2328:3
**Prime** [3] - 2249:2, 2255:2, 2273:6
**principle** [1] - 2287:8
**printed** [9] - 2336:20, 2336:21, 2342:7,
2342:8, 2342:9, 2342:10, 2343:20
**prism** [2] - 2258:19, 2318:3
**private** [13] - 2249:21, 2249:22,
2251:4, 2251:5, 2255:18, 2255:24,
2256:1, 2256:10, 2260:12, 2266:20,
2275:14, 2318:24, 2318:25
**probing** [1] - 2344:20
**problem** [2] - 2288:3, 2303:7

**proceed** [4] - 2304:19, 2309:25,
2328:23, 2328:24
**proceedings** [1] - 2350:5
**Proceedings** [2] - 2242:5, 2349:16
**process** [6] - 2254:2, 2255:6, 2258:20,
2277:17, 2280:12, 2318:4
**produced** [1] - 2242:5
**professionally** [1] - 2276:5
**Project** [2] - 2318:11, 2318:13,
2318:15, 2318:17
**project** [12] - 2244:20, 2266:9,
2272:19, 2276:3, 2276:4, 2289:18,
2290:20, 2302:13, 2322:7, 2330:7,
2331:20, 2334:20
**proposed** [5] - 2259:6, 2259:9,
2259:17, 2262:13, 2316:21
**prosecution** [3] - 2249:1, 2255:1,
2307:8
**provide** [12] - 2247:7, 2254:20,
2258:17, 2285:5, 2294:13, 2296:4,
2318:1, 2320:2, 2325:7, 2339:14,
2340:11, 2341:9
**provided** [8] - 2276:12, 2290:10,
2291:6, 2319:3, 2319:7, 2323:1,
2338:18, 2339:18
**provides** [1] - 2319:23
**providing** [5] - 2248:4, 2276:3,
2289:12, 2320:8, 2325:3
**public** [4] - 2268:16, 2276:21,
2291:13, 2317:1
**publication** [7] - 2269:18, 2273:20,
2316:15, 2320:24, 2322:2, 2337:3,
2337:5
**publications** [1] - 2336:25
**publicly** [1] - 2273:14
**published** [4] - 2270:24, 2312:10,
2342:13
**pull** [2] - 2269:18, 2340:24
**purple** [1] - 2292:25
**purpose** [6] - 2277:8, 2291:7, 2334:13,
2334:15, 2336:21
**pushing** [2] - 2303:8, 2309:17
**put** [4] - 2253:5, 2274:3, 2292:9,
2348:12
**putting** [2] - 2280:13, 2289:4

## Q

**questions** [31] - 2250:16, 2250:19,
2251:1, 2253:6, 2264:2, 2267:4,
2267:5, 2267:10, 2270:12, 2287:13,
2292:24, 2303:25, 2305:1, 2306:10,
2306:18, 2307:4, 2309:20, 2312:16,
2327:7, 2327:8, 2327:16, 2328:2,
2331:6, 2341:24, 2342:22, 2344:23,
2345:1, 2346:7, 2347:12, 2347:18
**quick** [2] - 2300:23, 2339:12
**quickly** [2] - 2294:5, 2316:10, 2330:18
**quite** [6] - 2307:1, 2307:2, 2307:4,
2309:13, 2347:3, 2348:3

2363

**quotations** [1] - 2326:17
**quote** [2] - 2257:2, 2274:23
**quoted** [2] - 2268:21, 2268:22
**quotes** [3] - 2259:14, 2326:7, 2326:14

## R

**raise** [2] - 2339:4, 2343:3
**raised** [2] - 2251:24, 2300:11
**rate** [1] - 2348:8
**rates** [2] - 2265:13, 2265:21
**rather** [2] - 2253:23, 2343:14
**re** [2] - 2244:3, 2304:15
**re-calling** [2] - 2244:3, 2304:15
**reach** [3] - 2245:13, 2252:19, 2271:19
**reach-out** [1] - 2271:19
**read** [13] - 2248:4, 2250:6, 2256:20, 2262:7, 2278:19, 2279:13, 2279:17, 2283:22, 2315:7, 2315:10, 2315:11, 2318:10, 2339:20
**reading** [5] - 2266:1, 2280:7, 2339:1, 2339:2, 2340:4
**reads** [6] - 2248:18, 2262:6, 2272:25, 2338:6, 2339:13, 2340:10
**really** [7] - 2278:19, 2284:3, 2284:24, 2315:19, 2332:2, 2337:9, 2337:10
**reason** [4] - 2287:18, 2287:20, 2307:19, 2338:24
**reasonable** [1] - 2337:17
**reasons** [2] - 2288:21, 2289:4
**recalling** [1] - 2339:1
**received** [16] - 2244:20, 2244:22, 2245:6, 2246:6, 2246:7, 2250:1, 2257:16, 2266:4, 2270:22, 2277:10, 2279:18, 2291:9, 2299:18, 2317:13, 2334:9, 2337:17
**receiving** [7] - 2255:15, 2256:22, 2257:5, 2257:14, 2260:2, 2317:10, 2323:12
**recent** [3] - 2255:16, 2257:6, 2260:7
**Recess** [1] - 2304:14
**recite** [1] - 2346:17
**recollection** [29] - 2246:9, 2252:3, 2252:11, 2252:23, 2268:24, 2277:20, 2288:12, 2314:21, 2314:23, 2315:2, 2315:5, 2315:14, 2315:18, 2315:19, 2315:21, 2327:1, 2330:16, 2332:3, 2333:24, 2335:7, 2342:14, 2342:15, 2343:19, 2344:20, 2345:14, 2345:15, 2345:23, 2346:2, 2346:4
**record** [4] - 2287:22, 2329:6, 2333:19, 2350:4
**recross** [1] - 2326:1
**RECROSS** [2] - 2243:4, 2326:4
**RECROSS-EXAMINATION** [1] - 2326:4
**red** [3] - 2278:13, 2292:24, 2293:2
**redirect** [5] - 2304:2, 2304:3, 2326:2, 2342:24, 2343:1
**REDIRECT** [4] - 2243:4, 2304:21,

2326:12, 2342:17
**redline** [2] - 2292:9, 2292:17
**redlines** [2] - 2292:9, 2292:13
**redrafting** [1] - 2277:17
**refer** [2] - 2246:3, 2249:12
**reference** [19] - 2246:16, 2247:25, 2251:3, 2256:10, 2256:15, 2259:24, 2264:13, 2264:18, 2264:21, 2265:18, 2265:24, 2267:23, 2270:11, 2281:2, 2281:5, 2282:16, 2283:24, 2312:1, 2318:18
**referenced** [2] - 2252:4, 2328:7
**referred** [2] - 2249:15, 2252:13
**referring** [1] - 2263:2
**refers** [2] - 2245:25, 2265:20
**reflect** [1] - 2333:19
**reflected** [1] - 2326:9
**reflects** [2] - 2272:15, 2273:17
**refresh** [6] - 2315:5, 2315:14, 2315:18, 2315:19, 2315:21, 2330:15
**refreshes** [2] - 2315:7, 2315:10
**regard** [2] - 2315:3, 2325:12
**regarding** [3] - 2334:10, 2334:17, 2334:25
**register** [19] - 2275:22, 2275:23, 2276:1, 2284:11, 2284:12, 2284:17, 2285:4, 2285:6, 2286:23, 2286:25, 2302:10, 2302:15, 2303:2, 2303:9, 2303:16, 2334:12, 2334:17, 2341:18, 2341:20
**registration** [3] - 2334:10, 2335:1, 2339:5
**Registration** [8] - 2256:4, 2275:22, 2284:11, 2306:3, 2313:23, 2329:24, 2330:2, 2331:24
**regularly** [1] - 2331:18
**regulation** [1] - 2329:20
**reimbursement** [1] - 2265:14
**Rein** [1] - 2290:16
**reiterate** [2] - 2346:16, 2347:2
**related** [8] - 2307:22, 2330:8, 2331:7, 2331:16, 2331:20, 2333:8, 2334:13, 2339:21
**relating** [1] - 2300:17
**relation** [1] - 2310:9
**release** [21] - 2267:13, 2268:23, 2290:6, 2305:8, 2305:22, 2305:23, 2305:24, 2306:2, 2306:21, 2307:14, 2307:16, 2308:2, 2308:5, 2308:8, 2308:9, 2308:10, 2308:16, 2310:9, 2322:24, 2347:20
**released** [5] - 2267:16, 2268:12, 2273:14, 2275:1, 2305:8
**releases** [1] - 2308:12
**releasing** [1] - 2323:8
**relevance** [1] - 2302:17
**relevant** [1] - 2309:13
**remained** [1] - 2259:20
**remember** [42] - 2252:16, 2252:19, 2253:16, 2254:4, 2261:24, 2263:12,

2263:14, 2263:16, 2268:19, 2271:11, 2271:18, 2271:21, 2272:5, 2272:10, 2272:13, 2284:24, 2288:16, 2288:21, 2293:19, 2294:16, 2298:24, 2305:4, 2321:21, 2321:22, 2322:12, 2322:14, 2322:18, 2331:21, 2332:2, 2332:11, 2332:14, 2334:6, 2335:19, 2336:8, 2336:17, 2336:23, 2337:2, 2337:16, 2340:1, 2340:7, 2342:6
**remembers** [2] - 2315:24, 2344:23
**remotely** [1] - 2346:23
**removed** [1] - 2290:25
**rep** [1] - 2278:18
**repeat** [1] - 2263:1
**repeating** [1] - 2347:4
**reply** [2] - 2261:1, 2261:4
**report** [65] - 2249:3, 2249:8, 2249:13, 2255:3, 2255:9, 2256:2, 2267:13, 2267:16, 2267:19, 2268:7, 2268:11, 2268:17, 2269:12, 2270:3, 2271:12, 2271:15, 2273:20, 2274:15, 2275:1, 2276:12, 2276:22, 2276:25, 2278:25, 2279:19, 2279:22, 2279:25, 2290:7, 2290:8, 2291:12, 2302:18, 2303:1, 2307:16, 2307:22, 2310:6, 2310:10, 2310:14, 2310:17, 2310:23, 2311:1, 2311:7, 2311:11, 2311:12, 2312:5, 2312:10, 2316:14, 2316:25, 2318:8, 2319:4, 2319:19, 2320:24, 2322:25, 2323:8, 2323:12, 2323:22, 2323:24, 2324:2, 2324:5, 2324:8, 2325:4, 2338:19, 2339:19, 2340:12, 2341:9
**Report** [4] - 2269:8, 2323:2, 2339:15
**reported** [1] - 2242:5
**REPORTER** [1] - 2350:1
**reporter** [3] - 2270:23, 2271:1, 2316:22
**Reporter** [1] - 2242:2
**reporters** [4] - 2326:14, 2326:17, 2326:21, 2326:24
**reporting** [2] - 2277:10, 2291:9
**reports** [3] - 2291:12, 2293:11, 2317:2
**representation** [3] - 2247:8, 2252:4, 2262:9
**representative** [5] - 2270:11, 2278:25, 2279:5, 2290:19, 2324:2
**representatives** [1] - 2290:9
**represented** [1] - 2252:8
**request** [1] - 2309:8
**requested** [1] - 2298:21
**requests** [4] - 2262:11, 2262:15, 2339:16, 2341:8
**require** [3] - 2245:11, 2285:22, 2286:1
**required** [9] - 2275:23, 2285:4, 2285:5, 2285:6, 2286:25, 2302:10, 2302:14, 2303:16, 2334:16
**requires** [2] - 2275:21, 2284:10
**requiring** [2] - 2276:1, 2284:16
**research** [1] - 2346:23

2364

resolved [2] - 2301:22, 2302:5
respect [9] - 2252:13, 2266:18, 2268:6, 2284:7, 2285:3, 2308:2, 2311:18, 2339:14, 2340:11
respectfully [2] - 2307:17, 2309:10
respects [1] - 2289:17
respond [2] - 2245:12, 2247:6
responded [4] - 2272:9, 2295:5, 2322:12, 2322:17
responding [1] - 2295:2
responds [2] - 2270:18, 2271:10
response [32] - 2245:9, 2247:10, 2248:13, 2248:18, 2249:12, 2253:4, 2253:20, 2254:7, 2254:9, 2257:16, 2271:11, 2274:15, 2275:8, 2275:11, 2275:20, 2276:11, 2283:15, 2290:5, 2291:3, 2291:4, 2293:24, 2295:19, 2296:2, 2314:10, 2317:18, 2322:4, 2322:16, 2330:23, 2338:14, 2338:16, 2339:16, 2341:8
responses [3] - 2305:1, 2305:7, 2337:15
restriction [2] - 2286:18, 2348:16
restrictions [2] - 2300:3, 2300:9
resume [1] - 2304:7
retained [2] - 2289:18, 2313:21
retainer [16] - 2264:11, 2264:17, 2265:15, 2265:20, 2265:21, 2265:24, 2266:3, 2266:5, 2266:7, 2266:14, 2267:6, 2298:12, 2313:3, 2313:12, 2313:15, 2313:17
return [1] - 2275:3
returned [2] - 2244:8, 2270:23
reveal [4] - 2285:7, 2285:8, 2286:24, 2288:9
revealing [3] - 2285:14, 2285:18, 2288:22
review [3] - 2245:9, 2258:23, 2326:8
reviewed [3] - 2298:18, 2311:2, 2334:5
reviewing [1] - 2314:23
revised [4] - 2283:6, 2283:7, 2291:24, 2292:21
revision [1] - 2280:20
Rick [1] - 2311:22
right-hand [1] - 2278:17
Rights [6] - 2248:23, 2254:24, 2258:22, 2318:6, 2318:14, 2318:19
RMR [1] - 2242:2
Rohde [9] - 2313:18, 2314:4, 2314:9, 2317:17, 2317:22, 2319:16, 2319:22, 2321:16, 2321:18
role [8] - 2260:12, 2279:9, 2288:23, 2300:2, 2300:20, 2314:20, 2315:16, 2334:22
room [2] - 2307:3, 2344:15
Room [1] - 2242:2
rule [14] - 2248:21, 2248:22, 2249:15, 2251:10, 2251:11, 2254:20, 2254:22, 2255:4, 2258:17, 2258:21, 2286:4, 2318:1, 2318:5, 2337:18

Rule [1] - 2286:3
rule-of-law [12] - 2248:21, 2248:22, 2249:15, 2251:10, 2251:11, 2254:20, 2254:22, 2255:4, 2258:17, 2258:21, 2318:1, 2318:5
ruled [1] - 2348:17
rules [2] - 2285:25, 2346:16
run [1] - 2296:3
runs [1] - 2269:3
Russia [1] - 2273:5

## S

safeguards [1] - 2268:5
SANCHEZ [32] - 2307:11, 2307:17, 2308:8, 2308:21, 2309:10, 2325:25, 2327:8, 2327:12, 2327:20, 2328:5, 2328:18, 2328:23, 2329:2, 2333:21, 2341:24, 2342:18, 2343:6, 2343:11, 2343:15, 2343:17, 2344:1, 2344:5, 2344:7, 2344:13, 2344:25, 2345:4, 2345:9, 2345:13, 2345:18, 2345:22, 2346:6, 2348:7
Sanchez [1] - 2241:13
sanger [5] - 2290:22, 2291:5, 2310:22, 2311:10, 2326:7
Sanger [21] - 2276:15, 2277:3, 2310:13, 2310:21, 2311:1, 2311:4, 2311:7, 2311:11, 2311:19, 2312:2, 2312:9, 2321:14, 2321:24, 2321:25, 2322:1, 2323:16, 2323:20, 2323:22, 2324:5, 2325:4, 2325:7
Sanger's [1] - 2312:5
sat [1] - 2344:19
satisfied [1] - 2248:4
Saturday [1] - 2244:23
save [1] - 2269:11
saved [1] - 2269:17
saw [3] - 2256:8, 2313:11, 2326:9
scanned [1] - 2250:19
scheduling [2] - 2327:10, 2348:23
Schoen [4] - 2276:15, 2279:4, 2279:12, 2290:20
Schoen's [1] - 2279:8
scope [10] - 2259:16, 2259:20, 2289:2, 2300:7, 2301:1, 2326:1, 2343:4, 2343:11, 2344:17, 2345:8
Scope [1] - 2313:19
screen [9] - 2247:1, 2247:2, 2247:23, 2247:24, 2263:20, 2274:3, 2274:4, 2298:7, 2298:8
scribbling [3] - 2278:7, 2278:10, 2278:19
second [20] - 2252:1, 2257:21, 2258:12, 2263:16, 2263:21, 2265:4, 2272:25, 2294:24, 2316:9, 2325:23, 2338:13, 2338:17, 2339:10, 2339:13, 2340:5, 2340:8, 2341:1, 2341:3, 2343:9
secretary [5] - 2258:4, 2292:2, 2292:3, 2292:4, 2292:5

Security [3] - 2245:7, 2257:15, 2308:4
Sedov [3] - 2260:21, 2261:5, 2263:3
see [39] - 2246:18, 2248:7, 2252:9, 2253:23, 2255:5, 2257:8, 2257:9, 2257:11, 2260:16, 2262:14, 2265:16, 2265:17, 2266:16, 2268:8, 2269:13, 2269:20, 2271:19, 2271:25, 2273:12, 2274:11, 2276:10, 2282:12, 2283:18, 2284:19, 2286:9, 2291:15, 2292:10, 2294:24, 2315:7, 2315:9, 2315:17, 2330:15, 2330:18, 2330:21, 2333:14, 2338:10, 2340:6, 2347:21, 2349:12
seeing [3] - 2340:19, 2340:21, 2340:22
seem [2] - 2291:22, 2342:13
send [8] - 2254:7, 2254:9, 2279:25, 2294:5, 2294:6, 2295:16, 2326:14, 2326:17
sending [5] - 2262:2, 2283:15, 2292:6, 2293:24, 2296:3
sense [2] - 2337:16, 2344:10
sent [28] - 2247:14, 2248:11, 2257:20, 2257:25, 2261:10, 2261:23, 2264:14, 2277:14, 2279:22, 2280:11, 2280:19, 2282:20, 2282:21, 2282:23, 2282:25, 2283:6, 2283:7, 2283:21, 2289:22, 2294:20, 2295:2, 2295:13, 2295:16, 2295:17, 2295:20, 2317:19, 2340:18
sentence [5] - 2272:5, 2277:2, 2321:20, 2338:17, 2340:5
sentencing [2] - 2249:2, 2255:2
separately [2] - 2247:9, 2317:14
September [3] - 2249:8, 2273:10, 2310:8
series [2] - 2269:4, 2291:20
serve [5] - 2248:20, 2251:9, 2254:20, 2258:17, 2318:1
services [3] - 2254:16, 2254:19, 2289:12
serving [1] - 2289:14
Session [1] - 2241:6
SESSION [2] - 2241:10, 2244:1
set [1] - 2265:11
seven [2] - 2264:2, 2267:5
several [1] - 2252:24
shall [1] - 2297:3
shared [1] - 2326:6
shelved [1] - 2348:15
short [2] - 2343:1, 2344:24
shorthand [1] - 2242:5
shot [1] - 2344:22
show [7] - 2268:25, 2274:12, 2292:22, 2301:19, 2330:16, 2337:22, 2338:2
showed [5] - 2261:22, 2278:3, 2287:5, 2291:20, 2294:23
showing [1] - 2292:19
shown [5] - 2246:25, 2247:22, 2275:4, 2287:12, 2288:4
shows [3] - 2257:25, 2307:19, 2307:24
Shpenov [1] - 2268:2
shred [1] - 2302:24

2365

side [5] - 2278:17, 2335:8, 2336:8, 2336:12, 2347:7
sign [2] - 2254:3, 2259:17
signatory [1] - 2254:13
signature [1] - 2294:2
signed [3] - 2264:11, 2295:1, 2295:8
Singer [2] - 2291:23, 2292:1
single [2] - 2302:25, 2308:25
sit [8] - 2289:5, 2330:6, 2344:8, 2345:2, 2345:14, 2349:1, 2349:3
sitting [3] - 2333:18, 2335:16, 2335:20
situation [1] - 2250:2
six [1] - 2296:12
Skadden [46] - 2244:19, 2245:23, 2248:20, 2251:9, 2255:15, 2257:4, 2259:15, 2260:2, 2261:1, 2261:18, 2270:11, 2270:12, 2272:20, 2275:14, 2276:24, 2279:19, 2281:7, 2298:2, 2299:4, 2299:18, 2302:7, 2302:10, 2303:6, 2303:8, 2305:23, 2308:2, 2308:5, 2308:9, 2308:10, 2314:6, 2317:2, 2322:7, 2322:9, 2323:12, 2329:12, 2329:16, 2330:7, 2331:17, 2332:17, 2332:24, 2335:8, 2335:23, 2336:1, 2336:12, 2341:18
Skadden's [5] - 2257:16, 2297:16, 2300:1, 2334:20, 2336:8
Slate [1] - 2329:12
Slattery [2] - 2276:15, 2290:15
slight [1] - 2341:5
Sloan [21] - 2243:5, 2244:12, 2244:17, 2281:15, 2282:10, 2288:21, 2297:12, 2301:21, 2302:4, 2303:24, 2304:23, 2310:2, 2314:3, 2321:23, 2322:15, 2325:19, 2326:6, 2326:15, 2330:11, 2330:19, 2330:24
someone [3] - 2251:24, 2278:8, 2331:7
somewhere [1] - 2339:23
sorry [21] - 2246:13, 2246:24, 2250:21, 2255:13, 2261:7, 2262:10, 2263:1, 2272:3, 2285:11, 2293:7, 2297:19, 2298:5, 2300:21, 2305:11, 2313:10, 2318:12, 2319:10, 2326:16, 2329:25, 2342:21, 2342:24
sort [3] - 2292:4, 2336:1, 2337:23
sought [1] - 2291:13
sound [2] - 2287:11, 2287:25
sounds [1] - 2264:15
sources [1] - 2267:1
SPAEDER [2] - 2241:20, 2241:24
specific [7] - 2264:2, 2267:5, 2267:10, 2291:11, 2308:18, 2336:25, 2339:22
specifically [3] - 2248:24, 2308:22, 2308:24
speculate [1] - 2347:14
spell [1] - 2329:5
spend [2] - 2265:9, 2346:25
Spiegel [33] - 2244:23, 2245:6, 2246:7, 2246:14, 2247:4, 2247:6, 2250:12,

2251:22, 2252:1, 2252:12, 2252:19, 2252:25, 2253:3, 2253:8, 2254:2, 2258:5, 2263:10, 2294:21, 2294:25, 2295:12, 2295:19, 2296:1, 2327:13, 2327:17, 2327:18, 2331:22, 2332:7, 2332:23, 2333:1, 2334:3, 2335:23, 2338:6
Spiegel's [2] - 2251:25
spite [1] - 2294:4
spoken [2] - 2274:19, 2323:20
standard [1] - 2265:21
standards [5] - 2254:21, 2254:22, 2255:3, 2258:19, 2318:3
stands [1] - 2309:9
start [5] - 2257:12, 2316:9, 2319:18, 2322:24, 2330:17
started [2] - 2320:20, 2347:23
starting [1] - 2316:10
starts [1] - 2251:16
State [4] - 2299:7, 2299:17, 2299:24, 2300:20
statement [9] - 2271:11, 2272:5, 2275:12, 2301:10, 2321:20, 2336:4, 2339:24, 2340:4, 2343:18
statements [8] - 2270:5, 2277:3, 2277:9, 2289:21, 2291:7, 2291:8, 2325:3, 2325:7
states [1] - 2318:24
STATES [3] - 2241:2, 2241:4, 2241:11
States [8] - 2244:4, 2268:7, 2276:14, 2289:15, 2290:15, 2304:16, 2341:10, 2341:14
status [1] - 2301:21
stayed [1] - 2299:14
steering [1] - 2307:1
stenotype [1] - 2242:5
step [1] - 2314:12
steps [2] - 2247:10, 2291:11
sticker [1] - 2301:15
still [6] - 2244:11, 2255:8, 2256:10, 2298:6, 2347:10, 2349:9
Stink [1] - 2314:6
stipulated [2] - 2297:14, 2297:15
story [3] - 2270:24, 2271:3, 2342:11
straight [1] - 2343:7
strategy [1] - 2345:6
Street [3] - 2241:15, 2241:21, 2241:24
stricken [2] - 2307:7, 2309:9
strike [4] - 2292:24, 2293:2, 2309:14
strike-outs [2] - 2292:24, 2293:2
structure [1] - 2245:12
study [1] - 2266:19
stuff [4] - 2262:20, 2262:23, 2263:2, 2283:23
subject [10] - 2248:1, 2248:2, 2255:17, 2257:6, 2260:8, 2269:9, 2270:2, 2305:24, 2333:7, 2338:6
substantial [1] - 2319:5
suddenly [1] - 2309:15
suggest [4] - 2294:19, 2306:3,

2306:20, 2308:4
suggested [2] - 2254:8, 2341:7
suggesting [2] - 2339:10, 2339:17
suggestion [4] - 2307:8, 2338:25, 2340:15, 2341:12
suggests [2] - 2272:17, 2308:12
Suite [2] - 2241:21, 2241:25
supporting [1] - 2264:7
supposed [4] - 2307:2, 2332:16, 2332:18, 2346:18
surrounding [2] - 2249:1, 2255:1
sustain [2] - 2302:1, 2307:6
sustained [2] - 2285:10, 2309:21
sustaining [1] - 2309:23
sworn [2] - 2244:13, 2328:21
system [5] - 2258:19, 2281:6, 2281:7, 2281:22, 2318:3

## T

table [2] - 2335:17, 2335:20
talks [1] - 2325:3
Taylor [3] - 2341:23, 2343:7, 2344:19
TAYLOR [6] - 2328:3, 2342:2, 2342:16, 2342:23, 2343:3, 2345:19
team [14] - 2271:2, 2272:20, 2273:3, 2276:13, 2276:14, 2277:11, 2290:14, 2291:10, 2309:5, 2320:13, 2321:2, 2322:7, 2322:9, 2323:25
term [1] - 2334:7
terms [6] - 2255:25, 2265:10, 2288:4, 2292:17, 2314:21, 2323:14, 2335:4, 2342:19
terrible [1] - 2328:14
terrible-horrible [1] - 2328:14
test [1] - 2328:12
testified [2] - 2244:13, 2328:21
testimony [3] - 2287:11, 2304:7, 2315:25
THE [134] - 2241:2, 2241:10, 2241:14, 2244:3, 2244:6, 2244:8, 2244:11, 2252:15, 2252:17, 2256:19, 2256:22, 2256:25, 2274:6, 2274:7, 2280:1, 2281:18, 2283:6, 2283:8, 2285:10, 2285:17, 2285:20, 2285:21, 2285:22, 2286:6, 2286:9, 2286:15, 2286:19, 2286:22, 2287:2, 2287:5, 2287:15, 2287:17, 2287:23, 2288:11, 2288:15, 2288:24, 2289:3, 2289:6, 2289:7, 2290:1, 2290:2, 2293:15, 2293:17, 2297:14, 2297:17, 2297:20, 2300:6, 2300:8, 2300:11, 2301:2, 2301:6, 2301:9, 2301:11, 2301:14, 2301:18, 2301:23, 2302:1, 2302:17, 2302:20, 2302:24, 2303:7, 2303:17, 2303:19, 2303:22, 2304:1, 2304:6, 2304:12, 2304:15, 2304:17, 2304:19, 2305:10, 2305:11, 2305:14, 2305:16, 2305:18, 2306:8, 2306:14, 2306:23, 2307:1, 2307:15, 2308:14, 2308:17, 2309:2,

2366

2309:12, 2309:20, 2315:6, 2315:24,
2317:4, 2317:5, 2317:6, 2318:17,
2318:18, 2324:17, 2324:18, 2325:19,
2325:22, 2326:1, 2327:3, 2327:5,
2327:9, 2327:18, 2327:21, 2327:24,
2328:8, 2328:11, 2328:24, 2333:19,
2341:25, 2342:9, 2342:11, 2342:21,
2342:24, 2343:5, 2343:8, 2343:13,
2343:16, 2343:21, 2344:4, 2344:6,
2344:9, 2344:18, 2345:3, 2345:5,
2345:10, 2345:16, 2345:20, 2346:8,
2346:11, 2346:13, 2348:1, 2348:8,
2349:5, 2349:12, 2349:15

**therefore** [2] - 2276:1, 2284:17
**thereto** [1] - 2250:20
**thinks** [2] - 2253:22, 2345:1
**third** [11] - 2250:2, 2258:13, 2264:18,
2264:22, 2284:5, 2285:15, 2285:19,
2286:11, 2314:12, 2337:3, 2337:4
**third-party** [5] - 2250:2, 2264:18,
2264:22, 2285:15, 2285:19
**thousand** [1] - 2265:19
**three** [2] - 2306:24, 2348:4
**threw** [1] - 2286:12
**throughout** [2] - 2289:11, 2289:16
**Thursday** [3] - 2273:14, 2273:21,
2349:1
**tier** [1] - 2269:18
**ties** [1] - 2278:24
**Times"** [1] - 2267:20
**timing** [1] - 2342:7
**today** [10] - 2245:7, 2268:2, 2320:10,
2322:19, 2326:9, 2326:25, 2327:13,
2328:9, 2330:6, 2333:14
**together** [4] - 2253:6, 2280:13, 2292:9,
2340:24
**tomorrow** [1] - 2295:21
**took** [2] - 2268:6, 2277:20
**top** [12] - 2252:1, 2252:24, 2264:6,
2265:5, 2266:13, 2269:18, 2294:24,
2295:19, 2297:2, 2312:18, 2321:18,
2341:2
**top-tier** [1] - 2269:18
**topic** [1] - 2317:6
**total** [1] - 2249:7
**totally** [1] - 2271:12
**touch** [1] - 2324:20
**touches** [1] - 2346:23
**towards** [1] - 2331:11
**TRANSCRIPT** [1] - 2241:10
**transcript** [2] - 2349:2, 2350:4
**Transcript** [1] - 2242:5
**transcription** [1] - 2348:20
**transparent** [1] - 2289:17
**travel** [1] - 2252:22
**trepidation** [1] - 2348:20
**TRIAL** [2] - 2241:6, 2241:10
**trial** [3] - 2249:1, 2255:1, 2273:4
**triggered** [1] - 2303:1
**true** [5] - 2310:3, 2324:20, 2324:23,

2339:6, 2347:9
**trust** [1] - 2297:16
**truthful** [1] - 2303:11
**try** [9] - 2268:21, 2285:11, 2317:7,
2328:8, 2328:12, 2330:15, 2344:9,
2346:20
**trying** [7] - 2279:1, 2280:13, 2287:9,
2339:23, 2344:17, 2345:3, 2345:6
**Tuesday** [2] - 2348:2, 2348:9
**turn** [4] - 2244:19, 2258:12, 2265:4,
2272:24
**turns** [1] - 2254:11
**tweaks** [2] - 2282:11, 2283:4
**twice** [1] - 2264:3
**two** [13] - 2247:17, 2250:19, 2264:13,
2273:9, 2283:2, 2283:14, 2291:22,
2292:21, 2294:7, 2304:3, 2325:21,
2327:14, 2328:15
**two-question** [1] - 2304:3
**Tymoshenko** [13] - 2244:20, 2249:2,
2249:13, 2252:4, 2255:2, 2255:8,
2273:4, 2277:11, 2278:25, 2290:17,
2291:10, 2307:24, 2339:15
**Tymoshenko's** [2] - 2276:13, 2323:24
**type** [1] - 2336:5
**types** [2] - 2331:5, 2337:15
**typo** [1] - 2294:11

## U

**U.S** [6] - 2241:14, 2241:17, 2242:2,
2291:14, 2312:10, 2339:15
**Ukraine** [45] - 2248:20, 2249:21,
2251:4, 2252:5, 2255:14, 2255:18,
2257:4, 2260:2, 2262:1, 2262:9,
2269:8, 2270:3, 2276:14, 2277:11,
2278:18, 2279:1, 2279:6, 2289:19,
2290:9, 2290:19, 2296:3, 2298:2,
2300:1, 2300:2, 2300:18, 2302:14,
2307:14, 2307:21, 2308:11, 2310:22,
2311:10, 2312:10, 2314:16, 2314:19,
2315:15, 2316:16, 2317:25, 2318:24,
2319:1, 2323:25, 2330:8, 2331:20,
2334:10, 2334:20, 2346:21
**Ukraine's** [7] - 2254:21, 2258:18,
2264:12, 2287:1, 2307:25, 2318:2,
2331:17
**Ukrainian** [14] - 2249:18, 2256:16,
2259:3, 2260:23, 2264:8, 2264:10,
2265:18, 2266:23, 2267:17, 2268:12,
2273:11, 2275:16, 2297:3
**ultimately** [4] - 2314:23, 2340:18,
2341:16, 2341:19
**unclear** [3] - 2264:6, 2314:22, 2315:2
**under** [12] - 2244:11, 2245:8, 2275:22,
2276:1, 2284:11, 2284:17, 2286:23,
2302:10, 2302:15, 2334:12, 2339:5
**underlay** [1] - 2289:4
**understood** [5] - 2256:1, 2259:15,
2276:23, 2313:20, 2333:2

**unfair** [1] - 2307:9
**unit** [2] - 2335:1, 2335:16
**Unit** [35] - 2252:20, 2261:10, 2261:13,
2261:25, 2262:2, 2263:15, 2263:16,
2263:21, 2264:6, 2264:16, 2267:4,
2269:25, 2274:15, 2295:13, 2298:21,
2299:1, 2299:19, 2302:7, 2305:2,
2307:20, 2307:25, 2308:19, 2310:3,
2317:18, 2332:4, 2332:6, 2334:10,
2335:12, 2335:14, 2337:14, 2337:17,
2340:18, 2341:16, 2341:19
**Unit's** [1] - 2257:16
**unit's** [1] - 2298:22
**UNITED** [3] - 2241:2, 2241:4, 2241:11
**United** [8] - 2244:4, 2268:7, 2276:14,
2289:15, 2290:15, 2304:16, 2341:10,
2341:14
**unless** [2] - 2303:18, 2304:2
**unlike** [1] - 2346:19
**untoward** [1] - 2307:5
**up** [23] - 2247:9, 2251:18, 2272:2,
2272:16, 2300:15, 2301:6, 2312:17,
2314:12, 2318:22, 2320:6, 2321:17,
2326:2, 2327:9, 2330:23, 2331:16,
2332:10, 2332:11, 2332:12, 2334:25,
2337:2, 2348:5, 2348:14
**updated** [1] - 2283:15
**updating** [1] - 2261:25
**usual** [2] - 2292:3, 2292:5

## V

**v1** [1] - 2281:8
**vague** [1] - 2252:23
**van** [1] - 2312:19
**variety** [2] - 2248:22, 2251:11
**various** [2] - 2290:10, 2303:10
**VAT** [1] - 2297:4
**version** [10] - 2253:19, 2274:12,
2281:8, 2282:20, 2282:21, 2283:7,
2283:12, 2284:7, 2292:17, 2296:9
**versions** [1] - 2292:6
**view** [1] - 2316:12
**viewed** [2] - 2258:19, 2318:3
**Vin** [2] - 2310:13, 2323:2
**violation** [2] - 2288:1, 2303:2
**voice** [2] - 2270:23, 2286:15
**voicemail** [1] - 2270:22

## W

**wait** [2] - 2256:19, 2317:19
**walk** [2] - 2250:21, 2332:12
**walked** [2] - 2264:1, 2337:13
**wants** [3] - 2248:5, 2248:6, 2314:11
**Washington** [8] - 2241:7, 2241:16,
2241:18, 2241:25, 2242:3, 2273:2,
2310:18, 2312:6
**WASSRO1A-1246982-v1** [1] - 2281:3
**wearing** [1] - 2333:17

**Weber** [2] - 2310:13, 2323:2
**Weber's** [1] - 2310:17
**Wednesday** [3] - 2273:1, 2273:18, 2349:6
**week** [4] - 2245:12, 2250:21, 2348:3, 2349:2
**weekend** [9] - 2346:15, 2346:17, 2346:19, 2346:25, 2347:1, 2347:20, 2347:21, 2348:25, 2349:1
**weeks** [1] - 2283:15
**Weiss** [19] - 2269:3, 2269:7, 2269:16, 2270:10, 2270:17, 2270:18, 2271:10, 2271:23, 2272:4, 2272:16, 2272:17, 2272:24, 2316:21, 2319:18, 2320:8, 2320:12, 2320:21, 2321:1, 2322:9
**Weiss's** [2] - 2320:6, 2322:4
**Weitz** [2] - 2257:25, 2258:3
**Western** [4] - 2254:22, 2255:3, 2258:19, 2318:3
**whereas** [1] - 2265:18
**Whitney** [5] - 2257:14, 2293:23, 2294:19, 2295:24, 2295:25
**wiggle** [1] - 2344:15
**Wiley** [1] - 2290:16
**William** [2] - 2241:20, 2241:23
**withdraw** [2] - 2287:16, 2288:6
**witness** [5] - 2304:8, 2304:13, 2328:12, 2328:17, 2347:11
**WITNESS** [16] - 2243:4, 2252:17, 2274:7, 2283:8, 2285:20, 2285:22, 2289:6, 2290:2, 2293:17, 2300:11, 2305:10, 2317:5, 2318:18, 2324:18, 2342:11, 2346:11
**Witness** [2] - 2327:4, 2346:12
**witnesses** [5] - 2327:6, 2328:15, 2346:14, 2348:5, 2348:15
**wonderful** [1] - 2347:21
**word** [2] - 2278:7, 2300:6
**words** [1] - 2347:4
**works** [1] - 2262:20
**worry** [1] - 2301:21
**write** [3] - 2249:3, 2255:2, 2256:2
**writes** [3] - 2271:23, 2314:11, 2321:19
**writing** [1] - 2338:20
**written** [9] - 2248:5, 2248:6, 2249:18, 2249:19, 2259:3, 2259:6, 2259:10, 2262:14, 2312:9
**wrote** [7] - 2253:14, 2270:10, 2272:2, 2272:3, 2280:2, 2301:20, 2310:21

## Y

**Yaffa** [3] - 2245:23, 2246:16, 2254:5
**Year** [1] - 2247:11
**year** [2] - 2296:20, 2299:14
**years** [1] - 2329:18
**years'** [1] - 2287:14
**York** [20] - 2245:23, 2253:5, 2267:24, 2271:14, 2271:24, 2272:4, 2272:14, 2274:19, 2276:16, 2277:4, 2310:21,

2312:2, 2321:8, 2321:14, 2321:20, 2324:6, 2325:4, 2325:8, 2325:12, 2337:2
**yourself** [1] - 2334:19
**Yulia** [2] - 2249:2, 2255:2

## Z

**zoom** [7] - 2313:18, 2314:9, 2316:19, 2316:24, 2317:23, 2321:17, 2341:1
**zooming** [1] - 2316:10
**Zornow** [4] - 2246:15, 2253:20, 2254:8, 2296:1
**ZUCKERMAN** [2] - 2241:20, 2241:24
**Zwaan** [1] - 2312:19