```
1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,        )  Criminal Action
                                        )  No. 19-CR-125
4                          Plaintiff,   )
                                        )  JURY TRIAL
5      vs.                              )  DAY 11 - MORNING
                                        )
6      Gregory B. Craig,                )  Washington, D.C.
                                        )  August 26, 2019
7                          Defendant.   )  Time:  9:45 a.m.
       _____
8
               TRANSCRIPT OF JURY TRIAL - DAY 11 - MORNING
9                           HELD BEFORE
             THE HONORABLE JUDGE AMY BERMAN JACKSON
10                  UNITED STATES DISTRICT JUDGE
       _____
11
                       A P P E A R A N C E S
12
       For Plaintiff:     Fernando Campoamor-Sanchez
13                        Molly Gulland Gaston
                          U.S. Attorney's Office FOR THE
14                          DISTRICT OF COLUMBIA
                          555 Fourth Street, NW
15                        Washington, D.C. 20530
                          (202) 252-7698
16                        Email: Fernando.campoamor-sanchez@usdoj.gov
                          Email: Molly.gaston@usdoj.gov
17                        Jason Bradley Adam McCullough
                          U.S. Department of Justice
18                        950 Pennsylvania Avenue, NW
                          Washington, D.C. 20530
19                        (202) 233-0986
                          Email: Jason.mccullough@usdoj.gov
20
       For Defendant:     William James Murphy
21                        William W. Taylor, III
                          Adam B. Abelson
22                        ZUCKERMAN SPAEDER, LLP
                          100 East Pratt Street
23                        Suite 2440
                          Baltimore, MD 21202
24                        (410) 949-1146
                          Email: Wmurphy@zuckerman.com
25                        Email: Wtaylor@zuckerman.com
                          Email: Aabelson@zuckerman.com
```

1                         **Paula M. Junghans**
                          **Ezra B. Marcus**
2                         ZUCKERMAN SPAEDER, LLP
                          1800 M Street, NW
3                         Suite 1000
                          Washington, D.C. 20036
4                         (202) 778-1814
                          Email: Pjunghans@zuckerman.com
5                         Email: Emarcus@zuckerman.com

6       _____

7    Court Reporter:      Janice E. Dickman, RMR, CRR, CRC
                          Official Court Reporter
8                         United States Courthouse, Room 6523
                          333 Constitution Avenue, NW
9                         Washington, D.C.  20001
                          202-354-3267

10

11

12                              INDEX

13   Witnesses:

14     **Lawrence Spiegel**

15       Direct Examination By Ms. Gaston....................2372

16       Cross-Examination By Mr. Taylor....................2413

17       Redirect Examination By Ms. Gaston.................2415

18     **Helen Hunt**

19       Direct Examination By Mr. McCullough...............2431

20                         *   *   *

21

22

23

24

25

1          THE COURTROOM DEPUTY:  Counsel here for the Craig

2     matter, please approach the well of the Court.

3          Your Honor, this is Criminal Case Number 19-125,

4     United States of America versus Gregory B. Craig.

5          Will counsel please approach the lectern, introduce

6     yourselves for the record.

7          MR. CAMPOAMOR-SANCHEZ:  Good morning, Your Honor.

8          Molly Gaston, Jason McCullough, and

9     Fernando Campoamor for the United States.  And also with us,

10    Amanda Rohde, our paralegal specialist.

11         THE COURT:  All right.  Good morning.

12         MR. TAYLOR:  William Taylor, William Murphy, Paula

13    Junghans, Adam Abelson, and Ezra Marcus for Mr. Craig.

14         THE COURT:  All right.  Good morning, everybody.

15         Do we have any preliminary matters we need to take up

16    before we bring in the jury?

17         MR. CAMPOAMOR-SANCHEZ:  Not for the government.

18         THE COURT:  All right.  I just have one sort of

19    good-news-bad-news situation.  The bad news is that I've

20    developed some sort of horrific sore throat; the good news is,

21    I don't really want to talk very much.  So that could work to

22    everyone's benefit.

23         But that means, I need to ask the prosecution to try

24    extra hard to not ask leading questions and not repeat the

25    witnesses answers after they give them, and the defense to do

1    its best to not ask compound questions and argumentative

2    questions and go outside the scope, so that we can have fewer

3    bench conferences and we can all survive the morning.

4          All right.  Let's bring the jury in, and then you can

5    call your next witness.

6          (Whereupon the jury enters the courtroom.)

7          THE COURT:  All right.  Good morning.  I see that all

8    the jurors are present.  I hope everyone had a good weekend --

9    it was actually nice out this weekend -- and that everyone

10   avoided talking about the case, reading about the case,

11   thinking about the case, possibly.

12         All right.  The government can call its next witness.

13         MS. GASTON:  Thank you, Your Honor.

14         The government calls Lawrence Spiegel.

15                     LAWRENCE SPIEGEL,

16   was called as a witness and, having been first duly sworn, was

17   examined and testified as follows:

18         MR. TAYLOR:  Pardon me.  May I get my hearing device,

19   please?

20         THE COURT:  Yes.

21         Do you have one, in case there are bench conferences,

22   for Mr. Craig?

23         MR. McCULLOUGH:  Thank you.

24         THE COURT:  You should have water.

25         THE WITNESS:  Just a little bit.

```
 1                    THE COURT:  Let's try this one.  Everything just

 2         falls apart when Mr. Haley is not here.

 3                    All right.  You can proceed.

 4                    MS. GASTON:  I'm sorry.  Was the witness sworn?

 5                    THE COURT:  Yes.

 6                    MS. GASTON:  I'm sorry.  I missed it.

 7                              DIRECT EXAMINATION

 8         BY MS. GASTON:

 9         Q.  Sir, could you please introduce yourself for the jury and

10         spell your name for the record?

11         A.  Sure.  Lawrence Spiegel, S-P-I-E-G-E-L.

12         Q.  And, Mr. Spiegel, what's your occupation?

13         A.  I'm an attorney.

14         Q.  And where do you work?

15         A.  I work at the law firm of Skadden, Arps, Slate, Meagher &

16         Flom.

17         Q.  What's your role at Skadden Arps?

18         A.  Since -- well, for the last, almost, ten years, I've been

19         the general counsel for the firm, and I'm also a partner in the

20         white color criminal defense group in New York.

21         Q.  And how long have you been with Skadden Arps?

22         A.  I've been with Skadden since 2004.

23         Q.  Which office do you -- are you in at Skadden?

24         A.  I'm in the New York office -- I'm sorry.  I misspoke.

25         1994.
```

1   Q.  And you mentioned that you're a partner as well as the

2   general counsel.  Can you describe those two different roles?

3   A.  Sure.  So as a partner in the white color criminal defense

4   group, I take on client work, private clients who retain the

5   firm.  And then as the firm general counsel, I provide legal

6   advice to the firm throughout all of our offices.  We're a firm

7   with approximately 4500 people, and at the time of what we're

8   talking about, I believe 22 offices around the world.

9   Q.  How would you estimate that you divide your time between

10  those roles?

11  A.  It would depend on the day and what's happening.  But, I

12  would say, at least at this point in time, 30 to 40 percent of

13  my time on any given day was spent on firm matters and the

14  remainder was spent on client matters.

15  Q.  And you've been referencing the time period that we're

16  going to talk about.  When you say that, do you mean 2012 to

17  2013?

18  A.  Correct.

19  Q.  And how many people were working in the general counsel's

20  office at the time?

21  A.  At that time, in addition to me, there were approximately

22  four to five full-time associates.

23  Q.  Now, sir, at some point in 2012 to 2013, did you learn that

24  Skadden had been engaged by the government of Ukraine?

25  A.  I did.

1    Q.  And what, generally, was your understanding of that

2    engagement?

3    A.  The first recollection I have of that engagement was in

4    connection with the outreach by the FARA Unit of the Department

5    of Justice, raising questions about the engagement.  That's the

6    first time I recall it coming up.

7    Q.  And who did you understand -- or, did you work on the

8    Ukraine engagement?

9    A.  I did not.

10   Q.  Who did you understand to be the lead partners on that

11   engagement?

12   A.  I understood the lead partners to be Mr. Craig, Greg Craig,

13   and Clifford Sloan.

14   Q.  At that point, did you know Mr. Sloan?

15   A.  I did.

16   Q.  How did you know Mr. Sloan?

17   A.  At that point, I had known Mr. Sloan for probably in excess

18   of 20 years.  One of the first cases I did when I was at

19   Skadden -- this is before I became the general counsel -- was a

20   trial that we did where Mr. Sloan was at another law firm, and

21   we had brought him in -- he had a prior relationship with one

22   of my colleagues -- had brought him in to do some of the brief

23   writing for that matter.  And he's someone that I stayed in

24   touch with throughout that point.

25            And then he came to Skadden, and we, obviously,

1   became -- interacted more frequently.

2   Q.  And do you know Mr. Craig?

3   A.  I knew Mr. Craig from his time at the firm.

4   Q.  And do you remember approximately when he came to Skadden?

5   A.  I would -- I would think it would probably be a couple to

6   several years prior to the Ukraine matter.

7   Q.  Now, directing your attention to December of 2012.

8           I think you mentioned before that you recalled that

9   there was an inquiry from the FARA Unit around that time?

10  A.  Yes.

11  Q.  And what do you remember about first learning about that

12  inquiry?

13  A.  I recall receiving in interoffice mail, a document, which

14  was the inquiry from the FARA Unit, with a Post-it from the

15  person who it was addressed to, in substance, saying, Handle

16  this.

17  Q.  Do you remember who the person who the letter was addressed

18  to was?

19  A.  Yes.  It was addressed to Earle Yaffa, who is a managing

20  director at the firm.

21  Q.  So, somehow, he routed this to you?

22  A.  Yes.

23  Q.  And as a result of that sticky note, what did you then do?

24  A.  What I next recall is I sent it to a number of people for a

25  combination of asking them to prepare a response, assist in

1    preparing the response.  And just certain of those people were

2    knowledgeable about the request and that we were handling it.

3    Q.  Now, directing your attention to Government's Exhibit 410,

4    which has previously been admitted, and which should be the

5    first tab in your binder.

6              We'll just wait for a moment.

7              MS. GASTON:  The fault is on our end.  Sorry.

8              There we go.

9    BY MS. GASTON:

10   Q.  And is this the email that you just mentioned sending?

11   A.  It is.

12   Q.  What's the date on this email?

13   A.  The email is dated Saturday, December 22nd, 2012.

14   Q.  And it's to Mr. Sloan and Mr. Craig?

15   A.  Correct.

16   Q.  And who are the folks on the CC line?

17   A.  Sure.  Eric Friedman is the managing partner of the Skadden

18   law firm.  David Zornow is the global head of litigation.

19   Earle Yaffa is our managing director.  He was the recipient of

20   the FARA inquiry.  Barbara Kelly is someone who works with me

21   in the general counsel's office.

22   Q.  What did you say in your email?

23   A.  Do you want me to read it?

24   Q.  Yes, please.

25   A.  "Greg and Cliff, Earle received the attached letter today

1    from the National Security Division of DOJ.  I am not familiar

2    with the obligations under FARA, but available to discuss and

3    review your response, as appropriate.  I am copying

4    Barbara Kelly, who can assist to the extent that you require

5    details about the firm's structure to respond.  I am out of the

6    office next week, so best way to reach me is by email or cell.

7    Thank, Larry."

8    Q.  And then if we look at the attachment.

9          Is this the document that came to you in interoffice

10   mail?

11   A.  It is.

12   Q.  And then if we look at the second full paragraph.

13          And, first of all, is this a letter from the National

14   Security Division of the Department of Justice?

15   A.  It is.

16   Q.  And what is the Re line of the letter?

17   A.  Re:  "Possible obligation to register pursuant to the

18   Foreign Agents Registration Act."

19   Q.  And the date of the letter?

20   A.  The letter is dated December 18, 2012.

21   Q.  And then if we could look at the first full paragraph --

22   the second full paragraph.

23          And then is there a list of enumerated requests that

24   the letter says it would like answers to "In order that we may

25   determine whether your organization is required to register

1    under FARA"?

2    A.   Yes.   The letter set out, I guess, four categories of

3    information they were looking for in our response.

4    Q.   And what's the general nature of the first two requests?

5    A.   The first two requests we're looking at, at least as I

6    understood it, about the firm's structure, how we were set up

7    and organized.

8    Q.   And is that why, in your cover email, you copied in

9    Ms. Kelly?

10   A.   She was someone who would be able to assist in getting that

11   information to respond to the first two requests.

12   Q.   Okay.   And then what is the nature of the second two

13   requests in the letter?

14   A.   It's going to the underlying engagement, sort of what we

15   did and sort of, I guess, how it was structured in terms of the

16   agreements.

17   Q.   And who did you expect to prepare responses to that?

18   A.   I guess my recollection is, I expected a response from the

19   firm to be prepared by Mr. Sloan and Mr. Craig.

20   Q.   Okay.

21   A.   Or at least the draft of it, in the first instance.

22   Q.   And now, directing your attention to Government's Exhibit

23   413, which is already in evidence.   And if we start on the very

24   back page of this exhibit.   I'm zooming in on that first email.

25             Is this that email that we just looked at that you

1    had sent to that group?

2    A.   That is.

3    Q.   And then if we look at the next page.

4         And is this page generally some emails between you

5    and Mr. Sloan about how to respond to the letter?

6    A.   The emails on the second page are between me and Mr. Sloan,

7    with a copy to Mr. Craig, at the bottom.  And then it breaks

8    off, and then it's just me to Mr. Sloan.

9    Q.   And then if we look at the first page of this.  And look at

10   your email on January 4th, 2013.

11        And, sir, do you indicate that you had left a

12   voicemail for a staffer at the FARA Unit, and said that you

13   plan to respond the following week?

14   A.   I don't recall doing that, but I see that's what the email

15   reflects.

16   Q.   All right.  And then in the top two emails, do you and

17   Mr. Sloan discuss who will be drafting the responses to

18   Questions 1 and 2 versus 3 and 4?

19   A.   Yes.

20   Q.   Now, sir, directing your attention to Government's Exhibit

21   420, which has been previously admitted.  And, first, zooming

22   in on the bottom half.

23        Is this an email from someone at the FARA Unit

24   confirming receipt of a letter --

25   A.   Yes.

1    Q.  -- on February 7th, 2013?

2    A.  Correct.

3    Q.  And then if we look at the top two emails.

4           Is this Mr. Sloan forwarding to you the response that

5    was sent to the FARA Unit?

6    A.  It is.

7    Q.  And then if we look at the attachment.

8           Is this letter dated February 6th, 2013?

9    A.  It is.

10   Q.  And if we look at the last page of this document.

11          Who signed this letter?

12   A.  It was signed by Mr. Craig.

13   Q.  And do you remember why Mr. Craig signed the letter?

14   A.  I recalled that he signed it as the senior member of the

15   team who had worked on the matter.

16   Q.  Okay.  And then if we look at the previous pages, and look

17   at the responses to 3 and 4.

18          Do you recall whether you made any substantive

19   changes to these responses before the letter was sent?

20   A.  I recall having some substantive discussions.  I don't know

21   in terms of the change.  I think it varies, depending on which

22   it was.  But, I had raised some substantive issues.

23   Q.  Did you have a factual basis to provide answers to these

24   two questions?

25   A.  I did not.

1    Q.  Now, did you learn, at some point, that there was a

2    follow-up request from the FARA Unit?

3    A.  I did.

4    Q.  Do you remember approximately when that was?

5    A.  I learned that the very end of May of 2013.

6    Q.  Do you remember how you learned?

7    A.  I learned it when I received a draft response that had

8    already been signed by Mr. Craig, that was responding to a

9    prior inquiry or request.  That's how I learned of it.

10   Q.  Go it.

11              And when you received that draft response, had you

12   seen the incoming letter from the FARA Unit to which it

13   responded?

14   A.  I don't believe I did.

15   Q.  Okay.  Directing your attention, first, to Government's

16   Exhibit 445.  And looking at the bottom email in this chain.

17              Is this an email from Mr. Catherine Whitney on

18   May 28th, 2013 June?

19              MS. GASTON:  I'm sorry?

20              THE JURORS:  We don't have it up on our screens.

21              THE COURTROOM DEPUTY:  It hasn't been admitted yet,

22   445.

23              MS. GASTON:  Yes, it has been previously admitted.

24              THE COURTROOM DEPUTY:  I don't have it in.

25              MS. GASTON:  Oh, it's been admitted, yes, 445.

```
 1              THE COURT:  It's been admitted earlier in a pretrial

 2    conference, so you can put it up on the screen.

 3              Thank you for being careful.

 4    BY MS. GASTON:

 5    Q.  Is this an email from Ms. Catherine Whitney to you?

 6    A.  It is.

 7    Q.  And is this how you remember learning about the fact that

 8    there had been a follow-up letter from the FARA Unit?

 9    A.  That's correct.

10    Q.  And who was Ms. Whitney?

11    A.  Ms. Whitney was Mr. Craig's assistant.

12    Q.  And what did she write to you?

13    A.  She said, "Larry, Greg asked that I send you a copy of the

14    attached document.  We were hoping to get this out this

15    afternoon.  If you have any questions, Greg can be reached in

16    his office.  Sincerely, Catie."

17    Q.  If we look at the attachment.

18              What is this attachment?

19    A.  The attachment is what Ms. Whitney forwarded to me,

20    asking -- or, saying that she hoped to get out that afternoon.

21    Q.  Is it dated May 28th, 2013?

22    A.  It is.

23    Q.  And is it signed by Mr. Craig?

24    A.  Yes.

25    Q.  And it's a PDF on letterhead?
```

1    A.  I'm sorry?

2    Q.  And is it a PDF on letterhead?

3    A.  I don't know how I would tell that from this.  But it's --

4    it looks like it's the attachment to the email she sent me.

5    Q.  If you look at the cover email.

6            Is the attachment a PDF?

7    A.  It says, "Scanned PDF," yes.

8    Q.  Yeah.  And then what did you do with what Ms. Whitney had

9    sent you?

10   A.  I, at that point -- I guess a sent a number of emails to

11   try to understand better what was happening.

12   Q.  Okay.  What was your action -- your reaction to receiving

13   this document in this way?

14   A.  I recall being annoyed.

15   Q.  Why?

16   A.  I was -- I guess a few reasons.  I was learning about it at

17   the end of the day, I think it's 4:30, and the -- sort of the

18   direction was that they wanted it to go out that day.  It was

19   being sent to me already and in signed form, and it references

20   a reply to a letter of April 9, which I had never seen before.

21           So, those were the different reasons.

22   Q.  And you forwarded it to Mr. Zornow?

23   A.  I did.

24   Q.  Why did you do that?

25   A.  I forwarded it to him, really, going back to the first

1    inquiry from the FARA Unit.  As the global head of litigation,

2    I thought he should be aware of the developments in the case

3    and the matter.  And, so, this was another development that I

4    wanted him to be aware of.

5    Q.  And, now, directing your attention to Government's Exhibit

6    446.

7         What else did you do with the email that Ms. Whitney

8    had forwarded to you?

9    A.  I reached out to Mr. Sloan.

10   Q.  Why did you reach out to Mr. Sloan?

11   A.  From the beginning, when we had the first inquiry from the

12   FARA Unit, I had envisioned that the two senior partners on the

13   matter would be preparing the firm's responses.  I thought that

14   was a useful way to get it done, to make sure, from a quality

15   perspective, there were two people who would each have input.

16        And, so, when I received this from Ms. Whitney, it

17   wasn't clear to me what process, if any, had happened.  And I

18   was reaching out to Mr. Sloan to try to understand sort of what

19   was his involvement.  Had I received something that he had

20   signed off on that went through a whole process, or was this

21   something he was learning about now, for the first time, from

22   me?

23   Q.  Then directing your attention to Government's Exhibit 447.

24        Is this another response from Mr. Sloan, in which he

25   indicates that -- what does Mr. Sloan indicate in this response

1    to you?

2    A.  I guess on -- on this one, I was asking him, also, for a

3    copy of the -- or, I guess, implicitly asking him for a copy of

4    the underlying letter from the FARA Unit that this was a

5    response to because I still hadn't seen it.  He said he didn't

6    have an electronic copy, that Greg had given him a hardcopy,

7    and that he was going to send it to me tomorrow.

8    Q.  And then directing you to Government's Exhibit 448.  And

9    starting with the bottom two emails in this chain, which has

10   been previously admitted.

11          And does this indicate that you had responded to

12   Ms. Whitney's email to you with the draft letter?

13   A.  I did respond.

14   Q.  And what did you ask her for?

15   A.  I asked her for the underlying April 9 letter that he is

16   responding to.  I told her that I didn't believe that I ever

17   received a copy.  And I asked her the question of whether Cliff

18   had reviewed and signed off on the proposed response.

19   Q.  And then if you look at Ms. Whitney's -- the top two emails

20   in this chain.

21   A.  Yes.

22   Q.  Does Ms. Whitney provide you with the incoming letter from

23   DOJ?

24   A.  She does.

25   Q.  And what does she indicate about the copy that she's

1    providing you?

2    A.  She says, "The highlighting on the document is from Greg,

3    so you could ignore it."

4    Q.  And does she tell you something about Mr. Sloan?

5    A.  She does.  She says, "Cliff has reviewed the proposed

6    response and has signed off.  Greg is in the office today, in

7    and out of meetings.  So, if you need to talk to him, just let

8    me know, and I'll make sure he reaches you."

9    Q.  And you forwarded that to Mr. Zornow?

10   A.  I did.

11   Q.  And looking at the attachment, and just looking at the

12   header information.

13           What's the date of the incoming letter?

14   A.  It is April 9, 2013.

15   Q.  What is the Re line of this letter?

16   A.  Re:  "Possible obligation to register pursuant to the

17   Foreign Agents Registration Act."

18   Q.  And if we look at the first paragraph.

19           What does the last sentence in that first paragraph

20   say?

21   A.  "We have reviewed the materials and need additional

22   information to determine whether your firm is obligated to

23   register under the Act."

24   Q.  And then if we look at the second page of this document.

25           MS. GASTON:  Can we hold on one moment, please.

```
1                    (Pause.)

2             MS. GASTON:  How troublesome is it to switch to the

3     ELMO, very briefly?

4             THE COURTROOM DEPUTY:  Okay.

5     BY MS. GASTON:

6     Q.  So, Mr. Spiegel, starting with the first highlighted

7     portion in this attachment.

8             What is the first highlighted request from the FARA

9     Unit?

10    A.  Do you want me to read it?

11    Q.  Yes, please.

12    A.  It says, "Advise this office of the amount of money paid by

13    the private citizen to your firm, as mentioned in your letter

14    of February 6, 2012, the name of the individual, as well as the

15    individual's connection to your work for the Ukrainian Ministry

16    of Justice.  In addition, please list any other sources of

17    money for the Tymoshenko work."

18    Q.  And then looking at the last full paragraph on this page.

19            What are the four enumerated requests in this

20    paragraph?

21    A.  I think there are six.

22    Q.  You're right, there are six.

23            Thank you.

24            THE COURT:  Actually, seven, because there's two 4s,

25    right?
```

```
 1                 MS. GASTON:  Yes.

 2                 THE COURT:  Is that the one?

 3                 MS. GASTON:  Yes.  I'm just perpetuating the problem.

 4       A.  Do you want me to read all seven?

 5       BY MS. GASTON:

 6       Q.  Yes, please.

 7       A.  Okay.

 8                 First, "To whom, if anyone, did your firm release or

 9       distribute the Report and when;

10                 "2:  When was the Report released to the Ukrainian

11       Ministry of Justice;

12                 "3:  Did your firm give the Report to the Los Angeles

13       Times;

14                 "4:  Did your firm know that Arnall Golden Gregory or

15       Tauzin Consultants would be agents of Dmitry Shpenov in

16       advocating in the United States for Ukraine."

17                 Again, Number 4:  "Because your firm was aware of the

18       requirement of FARA, and mentioned that it would not engage in

19       any political activity in connection with the Tymoshenko case,

20       what safeguards or agreements, if any, did your firm have with

21       the Ukrainian Ministry of Justices about limiting the use of

22       this report in the United States;

23                 "5:  What was your firm's understanding of what would

24       happen to the Report when it was released to the Ukrainian

25       Ministry of Justice;
```

1              "6:  Did you or anyone in your firm have any media

2       interviews or comments to the media, public, or government

3       officials about the Report and the findings of your firm?"

4       Q.  And just to refer you back to Ms. Whitney's cover email.

5              Who's highlighting did she indicate this was?

6       A.  She indicated the highlighting was Mr. Craig's.

7       Q.  Now, do you recall whether you asked that anything be done

8       to this letter before it be sent?

9       A.  I recall --

10             MR. TAYLOR:  Objection.  Which letter, before we --

11             MS. GASTON:  Sure.  The --

12             MR. TAYLOR:  Are you talking about the government

13      letter?

14             MS. GASTON:  Sorry.  Thank you.

15      BY MS. GASTON:

16      Q.  The draft response that you had received, also on May 28th.

17      A.  I don't recall that I made any substantive comments.  But,

18      I do recall suggesting or directing that the response be

19      reviewed with the client to make sure they were comfortable

20      with it.

21      Q.  And who was the client, to your knowledge?

22      A.  As I understood it, it was the government of Ukraine.

23      Q.  Now, directing your attention to Government's Exhibit 4.

24      And zooming in on the top.

25             Is this the final letter that was sent to the FARA

1    Unit?

2    A.  It is.

3    Q.  And what was the date of that?

4    A.  The final letter was dated June 3rd, 2013.

5            MS. GASTON:  And if we could look at page 3 of that

6    letter, please, Ms. Rohde.

7    BY MS. GASTON:

8    Q.  And who signed that letter?

9    A.  It was signed by Mr. Craig.

10   Q.  Now, Mr. Spiegel, do you know whether the FARA Unit

11   responded to that letter?

12   A.  I do.

13   Q.  And do you remember how you learned about that?

14   A.  At some point after this letter, it was several months

15   after, I was informed by Mr. Craig, I believe in an email, that

16   the FARA Unit had determined that we, the firm, had to register

17   under the FARA statute.

18   Q.  Showing you what's been admitted as Government's Exhibit

19   460.  And zooming in at the top.

20           Is this the email that you just referenced?

21   A.  It is.

22   Q.  What was the date of that?

23   A.  That is dated September 9, 2013.

24   Q.  And what did Mr. Craig write to you?

25   A.  He wrote that "DOJ has concluded that we should register

1   under FARA.  I am looking at what options are available, if

2   any."

3              MS. GASTON:  If we could look at the attachment,

4   please.

5   BY MS. GASTON:

6   Q.  What's the date of this letter?

7   A.  That is dated September 5, 2013.

8              MS. GASTON:  And if we could zoom in on the bottom

9   paragraph of the page, please.

10  BY MS. GASTON:

11  Q.  And could you please read the last two sentences of this

12  paragraph?

13  A.  "We have determined that your actions in contacting the

14  media were activities meant to influence the U.S. public with

15  reference to the political or public interests, policies, or

16  relations of Ukraine.  Accordingly, Skadden must register under

17  FARA as an agent of the Ministry."

18  Q.  And what did you do after you received this email from

19  Mr. Craig?

20  A.  I recall, generally, having a discussion or discussions

21  with Mr. Zornow and Mr. Friedman, and then ultimately with

22  Mr. Craig.

23  Q.  So, first, if we look at Government's Exhibit 462.  And

24  just zoom in on all of the text.

25              What does this email show that you did?

1    A.   This was me informing Mr. Zornow of the latest development,

2    and that it's something that we should talk about, I guess,

3    next week or whenever we next overlapped.

4    Q.   And then if we would look at Government's Exhibit 463,

5    which has been admitted.

6         What does this email chain show on September 12th,

7    2013?

8    A.   Basically, the same point, with Mr. Friedman saying that we

9    should put it on our list to -- of items to talk about the next

10   time we speak, which, it looks like, would be next week.

11   Q.   And when you use the term "agenda" -- or, "list," what does

12   that mean to you?

13   A.   It sort of goes back to being the general counsel of a

14   large institution, which is that there are, you know, a number

15   of items or issues that could come up any given week.  And, so,

16   you know, it leads to someone like me being a list maker.  And,

17   so, you know, you sort of keep a list of the people who, you

18   know, essentially are your clients so that they're aware of

19   developments or how you're handling things, or things of that

20   sort.

21        So, that's what I mean by the "list."  It would be

22   among things that I thought were useful or appropriate to bring

23   to their attention.

24   Q.   And when you -- did you have discussions with Mr. Friedman

25   and Mr. Zornow?

1     A.  I did.

2     Q.  Can you describe, generally, what the firm leadership's

3     reaction to this was?

4              MR. TAYLOR:  Objection.  Hearsay.

5              THE COURT:  Can you approach?

6              (Bench discussion:)

7              THE COURT:  All right.  We've kind of tried to go

8     around statements by people who aren't here.

9              MS. GASTON:  Yes.  So, he has sort of a decision

10    point that he then communicates.  I'm trying not to get into

11    privileged discussions.

12             THE COURT:  Okay.  So, why can't you say, Did you

13    speak to firm leadership?  And, as a result of that, what did

14    you do?

15             MS. GASTON:  Yes.

16             MR. TAYLOR:  That's different from, What was their

17    reaction?

18             THE COURT:  I understand.

19             MR. TAYLOR:  Thank you, your Honor.

20             (Open court:)

21    BY MS. GASTON:

22    Q.  Mr. Spiegel, after you spoke with firm leadership, what did

23    you do?

24    A.  The next thing I recall is a discussion with Mr. Craig.

25    Q.  Okay.  And directing your attention to Government's

1    Exhibit 464.

2         Is -- does this email -- the middle email, on

3    September 18th, 2013, you -- what are you asking Mr. Craig?

4    A.  I'm asking -- or, trying to figure out when would be a good

5    time for him and me to follow up on the determination by the

6    FARA Unit, and his sort of -- I guess what we had understood,

7    he was looking into options.  So, I wanted to follow up on

8    that, sort of, thought.

9    Q.  And do you recall having any conversation or conversations

10   with Mr. Craig on or around September 19th?

11   A.  I do.

12   Q.  Now, first, going into that conversation with Mr. Craig,

13   what was your position regarding FARA registration?

14   A.  I guess my position reflected the firm's position at that

15   point, which is that we were leaving open the possibility of

16   registering.  I think we didn't really know what we were going

17   to do, and we were looking for the input from Mr. Craig about

18   what our options are, just to understand it better.  I guess we

19   were sort of trying to figure out how we would balance this and

20   what we would do next.

21   Q.  Okay.  And what do you remember about the conversation with

22   Mr. Craig?

23   A.  I recall that Mr. Craig set out for me why he thought that

24   the FARA Unit was wrong in its determination, and why, as a

25   result, we should not register -- we, the firm, should not

1    register under the FARA statute.

2    Q.  What did you tell him about the firm's position?

3    A.  I don't recall specific words I used.  But, in essence, I

4    told him what I just described, which is that the firm was

5    figuring out what to do, and that we were -- among our options

6    were the possibility of our registering and just doing what the

7    FARA Unit had said.

8    Q.  Okay.  And what was Mr. Craig's response to that stated

9    position?

10   A.  Mr. Craig, as I said, thought that the FARA Unit was wrong,

11   totally wrong, and then proceeded to explain why he thought

12   they were wrong.

13   Q.  And did he talk about potential consequences of

14   registering?

15   A.  The bulk -- yes, after -- I mean, what I recall is, the

16   bulk of the conversation was about why they were wrong, and

17   describing that and setting it out.  And as a general matter,

18   at some point towards the middle or end of it, I recall saying

19   something to the effect of, Why does it matter if we filed?  In

20   other words, even if they're right, or even if they're wrong,

21   sort of, what's the difference?  If they take this view, it's

22   just a registration.

23        And he said that it could have consequences for him

24   and potentially others on the team, if the firm registered as a

25   foreign agent.

 1   Q.  And what were those consequences, as he articulated them?

 2   A.  I recall that he said something about a -- I don't know if

 3   it was an Obama pledge or a conflict policy, but that if we

 4   registered, that it would bar him and potentially others on the

 5   team from going into the government for -- I think he said two

 6   years.

 7   Q.  And what was Mr. Craig's tone in this conversation, if you

 8   recall?

 9   A.  The tone about -- I don't -- well, the tone about the why

10   they were wrong, which is, you know, they just did the wrong

11   analysis, they didn't understand.  He was very strongly

12   advocating that we were right and they got it wrong.

13          That's what I remember.

14   Q.  Okay.  And after that conversation, did Mr. Craig follow up

15   with you?

16   A.  He did.

17   Q.  And how did he follow up with you?

18   A.  I received an email from Mr. Craig, you know, sometime -- I

19   think somewhat shortly after our call.

20   Q.  And directing you, what's been admitted as Government's

21   Exhibit 6.  And zooming in on this.

22          Is this the email that Mr. Craig sent you after the

23   phone conversation?

24   A.  It is.

25   Q.  Can you please read it?

1    A.  It says, "Just for the record, 1, Skadden did not

2    'disseminate the Report to news media.'  Three media outlets

3    who were not able to obtain a copy of the Report from the

4    Ministry in Kyiv contacted us and asked us to provide them with

5    a copy.  The Report was a public document.

6            "2, at no time did Skadden 'contact the media.'

7    Quite to the contrary.  We were approached by the media, asked

8    for interviews, asked for background commentary, etcetera, and

9    we did not respond.  The only time we responded was to correct

10   misinformation.

11           "3, to the best of my recollection, our statements to

12   the press were not about Ukraine.  They were to correct

13   misinformation.  The statements were about our report and about

14   us."

15   Q.  Were these points that Mr. Craig made to you consistent

16   with what he articulated on the phone call?

17   A.  Yes.  My understanding is, these were the, sort of, main

18   points that were made on the call.

19   Q.  And with respect to the contention in Number 1, that

20   Skadden did not disseminate the Report, and that "Three media

21   outlets who were not able to obtain a copy of the Report from

22   the Ministry in Kyiv contacted us and asked us to provide them

23   with a copy.  The Report was a public document," did you have a

24   factual basis to know whether that was accurate?

25   A.  No.  I mean, my factual basis was what I was told.

1    Q.  And similarly, with respect to Number 2, the contention

2    that "At no time did Skadden contact the media.  Quite to the

3    contrary.  We were approached by the media, asked for

4    interviews, asked for background commentary, etcetera, and we

5    did not respond.  The only time we responded was to correct

6    misinformation," did you have a factual basis so know whether

7    that was accurate?

8    A.  I did not have a factual basis beyond what I was being told

9    here.

10   Q.  Now, directing your attention to Government's 468.  Which,

11   if we could zoom in, begins with an email from Mr. Craig to you

12   the following day.

13         What did -- what did Mr. Craig do in this email?

14   A.  What it looks like is, he prepared a draft of a response to

15   the FARA Unit, a response to their determination that the firm

16   had to register.

17   Q.  And you had forward that to Mr. Zornow?

18   A.  I did.

19   Q.  And if we could look at the attachment.

20         So, if we could look at the first -- the header.

21         Does this indicate, as you just said, that it's a

22   draft response?

23   A.  It is.

24   Q.  And then in the first paragraph, it's a draft response to

25   the September 5th, 2013 letter that the FARA Unit had sent?

```
 1    A.  Correct.

 2    Q.  And now, if we could please focus on the fourth paragraph

 3    on this first page.

 4         And what is the -- what does Mr. Craig write in the

 5    first sentence?

 6    A.  He writes, "It seems to us, reading your letter of

 7    September 5, 2013, that the critical issue for the department

 8    is the firm's conduct relating to the release of the Report."

 9    Q.  Okay.  And then if we could look at the first -- or, the

10    last paragraph on this page.

11         And could you please read, beginning with, "In our

12    answer"?

13    A.  "In our answer, we told you that the firm provided a copy

14    of the Report to a reporter from The New The York Times, The

15    National Law Journal and the Los Angeles Times."

16         Keep going?

17    Q.  Yes, please.

18    A.  "Ukraine authorities had released the report to the general

19    public much earlier in that day, but these three outlets, for

20    some reason, had not been able to obtain copies of the Report.

21    They approached the firm, asked us if we could provide them

22    with a copy, and we did so."

23    Q.  And just to compare this paragraph to the exhibit in 006.

24         MS. GASTON:  And maybe, Ms. Rohde, we can try to do a

25    split screen.
```

```
 1                    So, if we could zoom on Number 1 in Exhibit 6, and
 2          the last paragraph of Exhibit 468.
 3          BY MS. GASTON:
 4          Q.  So, Mr. Spiegel, did these seem to be making the same
 5          points about three media outlets?
 6                    MR. TAYLOR:  Objection.  Leading.
 7                    THE COURT:  All right.  I think it is a leading
 8          question.  I think he can --
 9                    MS. GASTON:  Yes.
10                    THE COURT:  People can read the documents for
11          themselves.
12                    Why don't you ask the next question?
13                    MS. GASTON:  Okay.
14          BY MS. GASTON:
15          Q.  What are the three media outlets described in Exhibit 468?
16          A.  The three media outlets are *The New The York Times*, *The*
17          *National Law Journal*, and the *Los Angeles Times*.
18          Q.  And what does Mr. Craig write about the circumstances of
19          them trying to get the Report?
20          A.  He writes -- in the draft letter, right, as opposed to
21          the --
22          Q.  Yes.  Yes.
23          A.  He writes that the Report had been released earlier in the
24          day, but that those three news outlets for, you know, for some
25          reason couldn't get the Report, I guess, from the public
```

1    source.  And, so, they went to the firm and said could we give

2    them a copy, and we did.

3    Q.  And, again, did you have a factual basis to know whether

4    that was accurate?

5    A.  Only what was represented in the materials, these two

6    documents provided to me.

7    Q.  And then looking at the second page of the draft letter.

8            MS. GASTON:  And we can take down Number 6, please,

9    Ms. Rohde.

10   A.  Well, I guess, the two documents provided to me and the

11   discussion I had had with Mr. Craig.  In terms of a factual

12   basis at that point, I had talked to him, and I had these two

13   documents.

14   BY MS. GASTON:

15   Q.  So, these two documents and the discussion with Mr. Craig

16   were the factual basis that you had to --

17   A.  Correct.

18   Q.  Okay.

19           MS. GASTON:  And if we could zoom on the paragraph

20   starting, "To my knowledge" and the following paragraph,

21   please.

22   BY MS. GASTON:

23   Q.  And could you read these, please, Mr. Spiegel?

24   A.  Sure.  "To my knowledge, no one in this law firm initiated

25   any contacts with the media.  It is simply wrong to say that

1    Skadden took 'actions to contact the media.'  The law firm did

2    not accept invitations from the media to appear or to be

3    interviewed.  The law firm declined the opportunity to

4    communicate with the journalists on background.  The law firm

5    declined to discuss the Report with government officials, from

6    either the legislative or the executive branch, or with experts

7    from think tanks.

8            "As I told you in my letter of June 3, 2013, I did

9    communicate briefly with two print media journalists.  Even

10   with them, I took no action to contact them.  They initiated

11   the contact."

12   Q.  And, again, with respect to these representations, what was

13   your factual basis for this?

14   A.  My factual basis were the interactions in the writings we

15   talked about and my communication with Mr. Craig.

16   Q.  So who was providing you with this information?

17   A.  This is being provided to me by Mr. Craig.

18   Q.  Was this letter sent to the FARA Unit?

19   A.  It was not.

20   Q.  And can you tell us about the firm's decision not to send

21   this letter?

22   A.  We had decided that the tone of the letter was not the type

23   of way that we, as an institution, would want to express

24   ourselves in dealing with the Department of Justice.

25   Q.  And, so, what did the firm decide to do instead?

1    A.  We -- I don't remember the exact timing, but we -- we

2    thought that a meeting would make more sense, as opposed to

3    sending a letter.

4    Q.  And then did you talk to others within the firm about the

5    potential for a meeting?

6    A.  Yes, I did.

7    Q.  For instance, who did you speak with?

8    A.  I spoke with Mr. Zornow, and I also, at some point, started

9    having discussions with Mr. Gross.

10   Q.  And who is Mr. Gross?

11   A.  Mr. Gross is a partner in our Washington, D.C. office who,

12   I came to understand, is our person with FARA expertise.

13   Q.  Why did you involve Mr. Gross?

14   A.  At this point it had -- sort of, our interactions with the

15   FARA Unit had advanced beyond simply providing information, and

16   there was a decision.  We were going to go to a meeting, a type

17   of meeting I had never been to before.  And, as I said in my

18   initial email, FARA is not something I had experience with.

19   And so I thought it would be useful to include in the

20   discussions and to have -- ideally, have present at the meeting

21   someone who was experienced, you know, in connection with FARA

22   and these types of meetings and these issues.

23   Q.  And directing your attention to Government's Exhibit 471.

24   And zooming in on the middle email in this thread.

25              Is this an email from Mr. Craig to you on

1    September 24th, 2013?

2    A.  It is.

3    Q.  And what is Mr. Craig communicating to you?

4    A.  What he's trying to -- well, I guess what he's

5    communicating to me is that he is trying to avoid the FARA Unit

6    doing something before we have an opportunity to make our

7    points to them.

8    Q.  Okay.  And do you remember when the meeting was -- did the

9    meeting that you were mentioning happen?

10   A.  It did.

11   Q.  Do you remember what day it happened?

12   A.  I do.  I remember the day because it was my birthday, which

13   was October 9th.

14   Q.  And where was the meeting scheduled to take place?

15   A.  It was scheduled to take place, and took place, in

16   Washington.

17   Q.  Do you remember what time of day it took place?

18   A.  It was around, like, normal lunchtime.  So, I would say,

19   11:30 to 12-ish.  Like, around that middle day.

20   Q.  Who was going to go to this meeting from Skadden?

21   A.  The attendees that went were me, Mr. Gross, and Mr. Craig.

22   Q.  How did you prepare for this meeting?

23   A.  How I prepared was -- I guess is what I can talk about --

24   which is that I flew to Washington that morning.  I recall that

25   it was one of those days where I was sort of trying to keep up

```
1    with things that were going on, unrelated things.  And I recall
2    sort of an outreach from -- I don't know if it was Mr. Craig's
3    assistant or someone -- saying, in substance, like, you know,
4    Are you going to come up here to talk about what's going on?
5              And then I went to either Mr. Craig or Mr. Gross's
6    office -- again I don't know which one -- and there was already
7    a discussion in progress, which I then joined, about the
8    meeting with the FARA Unit and what we were going to do.
9    Q.  What were you going to do?
10   A.  The -- what I recall is, there was a -- at least for what I
11   was present for, there was a part where Mr. Gross explained
12   sort of what to expect at this meeting and who the participants
13   were.  And I could tell you what I remember about that.
14             He said that this was the type of meeting where the
15   government and we would share information, that it was an
16   opportunity for us to sort of lay out the facts and the like.
17   And that this was a process that was -- I remember -- I don't
18   know that he used the word unique, but was used by the FARA
19   Unit, so that there can be a -- sort of an appropriate outcome
20   that everyone got a chance to share their views.
21             He said that the person that we were meeting with,
22   Ms. Hunt, who had shared the letters -- or, sent the letters,
23   is someone that he had worked with before, held in high regard,
24   and said she was someone who was reasonable, that we could have
25   a conversation with.  And, so, it, you know, was described in a
```

1    way consistent with what our -- at least my expectations or

2    hopes would be, in moving from a letter to a meeting.

3    Q.  Did you prepare any written materials for this meeting?

4    A.  I don't recall preparing any written materials.

5    Q.  Did you and Mr. Gross and Mr. Craig plan who would say what

6    at the meeting, if you recall?

7    A.  I don't recall a who-would-say-what type of discussion.  I

8    do remember, again, very generally, that there was -- there was

9    some discussion about our basic themes, which were the themes

10   that we saw in the email that was sent to me, the draft letter,

11   that was sent to me, the notion that -- you know, that at

12   heart, we weren't an agent of the Ukrainians.  And that was

13   indicated by -- even though we had limited press contact, that

14   we were reacting to outreach to us, not trying to reach to the

15   press, and correcting misstatements for the firm's own purpose,

16   to make sure that the independent report was appropriately

17   portrayed in the press.

18           And not in those words, but at heart, those were the

19   themes that, at least, you know, we were going to -- at least

20   my understanding is, were going to communicate with them.

21   Q.  These were things consistent, as you said, with the facts

22   that had been provided to you?

23   A.  Yes.

24           MR. TAYLOR:  Objection.  Leading.

25           THE COURT:  Overruled.

1   BY MS. GASTON:

2   Q.  How did you get to the meeting, if you recall?

3   A.  I don't recall.

4   Q.  What do you remember about where the meeting was?

5   A.  I remember it was, you know, in a government building.  I

6   remember that it was at the time of a government shutdown, and

7   so there was sort of a lot of logistics about, you know, the

8   lights were turned out and how do we get past security and

9   security wasn't there.  I remember all that sort of, How do we

10  get in?

11        But, I remember it was what appeared to be sort of a

12  secured location.  It sort of had this feel like we were almost

13  entering a bank vault, in terms of where we were.

14  Q.  Who from the FARA Unit was at the meeting?

15  A.  I remember Ms. Hunt was there.  And I remember that there

16  were, you know, a couple, or maybe three gentlemen who were

17  there with her.  I don't remember their names.

18  Q.  Do you remember how the meeting started?

19  A.  Only that there were pleasantries and introductions.

20  Q.  Who from Skadden did the talking, if you recall?

21  A.  Most of the talking was done by Mr. Craig.  And by "most,"

22  I would say, 95-plus percent of the meeting.

23  Q.  What do you remember about the communications back and

24  forth between Mr. Craig and the FARA Unit?

25  A.  I recall that the meeting sort of began with themes, but

1    very quickly -- and this is the 95 percent -- moved to the FARA

2    Unit asking a large number of what seemed, to me, to be

3    detailed questions to try to poke at and probe whether what we

4    were saying in terms of not being an agent and reactive and

5    corrective, whether that was consistent with the facts.

6            And, so, the questions were at a level of factual

7    detail intended to -- at least my -- my -- the way I perceived

8    it, was that they were intended to try to flush that out,

9    whether there were exceptions or whether it could be looked at

10   in different ways, and do these principles really stand up to a

11   bright light being put on all the facts.

12   Q.  Okay.  And who answered those questions from Skadden?

13   A.  Mr. Craig.

14   Q.  Okay.  Do you remember there being anything in that

15   interaction that was inconsistent with what you knew from the

16   email or the letter, the conversation with Mr. Craig?

17   A.  No, I don't remember anything being said that was

18   inconsistent with our understanding going in.  Which is that,

19   you know, we weren't an agent, we were reacting to outreach to

20   us, and that we were making corrections.  Those principles, I

21   understood -- you know, to the extent I understood the facts.

22   And, you know, a lot of the detail was new to me because I

23   was -- I didn't know it and I was hearing it for the first

24   time.

25           But in the -- you know, the base point, I didn't

1    perceive inconsistency between what was being said and our base

2    position.

3    Q.  At the meeting's conclusion, was there going to be some

4    additional communication, if you recall?

5    A.  There was an understanding that we were going to provide a

6    writing of some sort.

7    Q.  Do you remember who asked for that or who offered it or how

8    that came about?

9    A.  I don't remember who asked for it.  But, in essence, what I

10   recall is, we were going to put in a writing that made our

11   points.  It was another opportunity for us to sort of say why

12   we thought we were right.

13   Q.  Okay.  Now, directing your attention to Government's

14   Exhibit 474, and zooming in on the top.  Looking first at the

15   bottom email from Mr. Craig.

16             What's the date of this?

17   A.  This is dated October 10, 2013.

18   Q.  So, where does this fall in relation to the meeting?

19   A.  So this was the day following the meeting.

20   Q.  What's the subject of this?

21   A.  Subject is.  "One-page FARA letter."

22   Q.  And what does Mr. Craig write?

23   A.  "Is this okay?"

24   Q.  And if we look at the attachment to this, and zoom in on

25   the header and the first paragraph.

```
 1              Is this a -- is this the first draft response to --
 2      or, is this the first draft writing that you just mentioned?
 3      A.  It's a draft.  I'm assuming it's the first draft.
 4      Q.  Okay.
 5              MS. GASTON:  And if we could look, Ms. Rohde, at the
 6      second paragraph.
 7      BY MS. GASTON:
 8      Q.  And what does Mr. Craig write?
 9      A.  He writes, "With respect to this law firm's decision to
10      provide a copy of the Tymoshenko Report, defined as the Report,
11      to U.S. media outlets, this was done in response to requests
12      from the media."
13      Q.  And was this consistent with your understanding at the
14      meeting?
15      A.  Yes.  This was the, sort of, reactive theme that we did it
16      in response to requests.
17      Q.  And then if we look at the last paragraph.
18              Could you please read the last paragraph?
19      A.  "In responding to inaccuracies in U.S. news reports, some
20      of which were directly attributable to Ukraine, the law firm
21      did not consult with Ukraine, did not inform Ukraine, did not
22      act under instruction from Ukraine, and was in no way serving
23      as an agent for Ukraine."
24      Q.  Thank you.
25              And was that also consistent with your understanding
```

1    at the meeting?

2    A.  Yes, that was our broad theme, that we weren't their agent.

3    Q.  And that the law firm did not consult with Ukraine and did

4    not inform them?

5    A.  Correct.

6    Q.  Okay.  And then looking back at the cover email.

7            Did Mr. Gross weigh in on the draft?

8    A.  He provided a suggestion.

9    Q.  What did he suggest?

10   A.  He said, "This looks good.  What do you think about adding

11   a sentence to the second paragraph saying, 'Otherwise, the firm

12   provided no copies of the Report to any media.'"

13   Q.  Do you remember weighing in on the draft?

14   A.  I do.

15   Q.  How did you weigh in?

16   A.  I weighed in describing, generally, by saying that I was

17   okay with it.  But, I said that I was only okay with

18   Mr. Gross's comment if we were certain it was accurate.

19   Q.  And why did you weigh in in that way?

20   A.  Because Mr. Gross was there without factual knowledge.  He

21   was there as a FARA law person.  And I didn't want his comment

22   to be misinterpreted or misconstrued.  I viewed his comment as

23   a fact comment, and I didn't want it simply cut and pasted into

24   the letter because our FARA guy gave a comment.  I wanted to

25   make sure that, you know, Mr. Craig, who knew the facts, would

1    basically only put it in if he decided that it was factually

2    accurate.  Otherwise, it shouldn't have been in.

3    Q.  And then directing your attention to Government's

4    Exhibit 12, which is previously admitted.

5         Is this the final letter that went out?

6    A.  It is.

7    Q.  Okay.  And, again, looking at the second paragraph of this.

8         Does this resemble the draft that we just looked at?

9    A.  It does resemble the draft.

10   Q.  And then does it also include Mr. Gross's -- a variation of

11   Mr. Gross's suggestion?

12   A.  It includes a variation of his suggestion.

13   Q.  And then looking at the last paragraph of this.

14        MS. GASTON:  Could we zoom in on the last paragraph?

15   BY MS. GASTON:

16   Q.  How does this compare with the last paragraph of the draft?

17   A.  They're the same.

18   Q.  Okay.  Did you learn, at some point, that the FARA Unit

19   responded to this letter?

20   A.  I did.

21   Q.  Do you remember approximately when that was?

22   A.  It was sometime thereafter.  So, if this was October, it

23   was probably January-ish of the next year.

24   Q.  Okay.  And what was the response by the FARA Unit?

25   A.  As I recall it generally, they accepted our arguments and

1    they changed their decision and said that we weren't an agent

2    of Ukraine, or they accepted that, and that the firm did not

3    have to register under the FARA statute.

4    Q.   Thank you.

5              MS. GASTON:   Nothing further.

6              THE COURT:   All right.   Before we proceed with

7    cross-examination, why don't we take a short break.

8              So, we're going to take our midmorning break now, for

9    ten minutes.   We'll be back.   We'll resume at five after.

10   Please leave your notebooks here.   Don't discuss the case with

11   anyone during the break.

12             Okay.   The jury can be excused.

13             (Whereupon the jury exits the courtroom.)

14             THE COURT:   All right.   The witness and everyone else

15   can be excused, also, for ten minutes.

16             (Recess.)

17             THE COURT:   All right.   Let's bring the jury back in.

18             (Whereupon the jury enters the courtroom.)

19             THE COURT:   Our jurors have all returned.

20             Mr. Spiegel, you can be seated.   You're still under

21   oath.

22             Cross-examination.

23                           CROSS-EXAMINATION

24   BY MR. TAYLOR:

25   Q.   Mr.  Spiegel.

1    A.  Good morning.

2    Q.  Government's Exhibit 6 and 7, the email and the draft

3    letter that you testified about.

4         Do you recall those documents?

5    A.  I don't recall them by number.  I mean --

6    Q.  Well, you don't need to look at them because I'm not going

7    to ask you -- I'm going to ask you only whether they were ever

8    sent to the FARA Unit.

9    A.  Can I just make sure I'm answering about what you're asking

10   me about?

11   Q.  Of course.  Of course.

12        Government's Exhibit 6 and 7.

13   A.  Correct, neither of those were ever sent to the FARA Unit.

14   Q.  When you talked to Mr. Craig about the FARA Unit's

15   position, it's fair to say that he was very passionate, isn't

16   it?

17   A.  I would say, he was very passionate.

18   Q.  In fact, he wanted to demand that the attorney general

19   review the matter?

20        Do you remember that reference in his draft letter?

21   A.  I see it in the draft letter.  I don't recall that

22   specifically, but I do see that it is there.

23   Q.  Now, at the meeting, did you take any notes?

24   A.  I don't recall taking notes.

25   Q.  Do you know if Mr. Gross took any notes?

1    A.  I don't know.  I don't believe so.

2    Q.  Did you see any of the members of the FARA team taking any

3    notes?

4    A.  I don't recall.

5    Q.  And it's true, isn't it, Mr. Spiegel, that you just don't

6    recall anything specific that was said, other than the themes?

7    A.  I don't recall any specific words from the meeting,

8    correct.

9    Q.  And you don't recall any of the questions that he was asked

10   or any of the answers that he gave, do you?

11   A.  I don't recall the specific words and questions or answers.

12          MR. TAYLOR:  I don't have any further questions, Your

13   Honor.

14          THE COURT:  All right.

15          Is there any redirect?

16          MS. GASTON:  Very brief.

17                      REDIRECT EXAMINATION

18   BY MS. GASTON:

19   Q.  Mr. Taylor asked you about Exhibits 6 and 7, which -- and I

20   can grab the binder -- but, you're familiar.  It's the email

21   from Mr. Craig to you and then the draft letter.

22   A.  Right.

23   Q.  Was there anything that was said at the FARA Unit meeting

24   that was inconsistent with those representations to you?

25          MR. TAYLOR:  Asked and answered, Your Honor.

1          THE COURT:  Well, she can ask it.

2          THE WITNESS:  I don't recall having a reaction that

3     anything that was said at the FARA meeting was inconsistent

4     with my understandings going into that meeting.

5     BY MS. GASTON:

6     Q.  And then Mr. Taylor asked you about whether there were any

7     notes from the meeting.

8          But, I believe we looked at Government's Exhibit 12,

9     which is the letter following up on the meeting?

10    A.  Correct.

11    Q.  Okay.  And that letter puts into writing the pertinent

12    points that Mr. Craig expressed?

13         MR. TAYLOR:  Objection.  Leading.

14         THE COURT:  All right.  Overruled.

15    A.  The letter makes the reactive, corrective points.  You

16    know, the meeting was an hour-ish long, and I -- and the

17    letter, which is a page, wasn't intended to be a transcript of

18    what happened; it was our -- at least as I understood it, our

19    opportunity to make our arguments, sort of, again, in another

20    form.

21    Q.  Thank you.

22         MS. GASTON:  Nothing further.

23         THE COURT:  All right.  This witness -- you can be

24    excused.

25         Thank you.

```
 1                THE WITNESS:  Thank you.

 2                THE COURT:  All right.  Call your next witness.

 3                MR. McCULLOUGH:  Your Honor, the government calls

 4      Ms. Heather Hunt.

 5                THE COURT:  All right.

 6                MR. McCULLOUGH:  Your Honor, I think before the

 7      witness arrives, we would like to read one stipulation into the

 8      record.

 9                MR. TAYLOR:  I would like to address the Court as

10      well.

11                THE COURT:  Do we need to have your conversation at

12      the bench?

13                MR. TAYLOR:  Not as long as the witness isn't

14      present.

15                THE COURT:  Well, she's on her way in.  So, why don't

16      you come up to the bench just in case she walks in and you

17      don't see her and I do.

18                MR. TAYLOR:  I apologize for interrupting.

19                THE COURT:  That's fine.

20                (Bench discussion:)

21                MR. TAYLOR:  Your Honor, Ms. Hunt, I expect, will be

22      asked, first of all, about omissions, about what she wasn't

23      told and difference it would make.  And I think she may be

24      asked questions about duty, and questions which go to legal

25      conclusions.  I don't want to have to get up and down.  We've
```

 1     made our objections to these.

 2            But, I am requesting that the Court give us some

 3     understanding of whether the duty that we are dealing with here

 4     is one that comes from 618 registration statute or from

 5     something else.  Because, I mean, it's kind of an exaggeration

 6     to say that her testimony is pivotal in the case.

 7            THE COURT:  All right.  I don't think she can be

 8     asked about what he had a duty to disclose.  She can be asked

 9     questions that relate to the materiality of facts that she

10     either did or did not hear.  So, you can ask those questions.

11     That's what we talked about in the pretrial conference, and

12     that's what I'm going to permit.

13            I don't think you can ask her, Did he have a legal

14     duty to tell you X, Y, and Z?  That would be a legal

15     conclusion, so that's not going to happen.  And if it does

16     happen, you can object and I will sustain it.

17            And we're not going to ask her, What does FARA

18     require?  All the letters indicate that the purpose of the

19     discussion was Re possible obligation to -- the first set of

20     letters, Re possible obligation to register.  Then there was a

21     decision, you should register.  Then there was a meeting

22     called, by Mr. Craig and Skadden, to reverse the decision, and

23     then a follow-up letter summarizing that, and then a new

24     decision.

25            So, she can certainly testify about whether this fact

1    or that fact she would have wanted to know in making those

2    decisions, that would have been important to her in making

3    those decisions.  That goes to materiality, and I think that's

4    appropriate.

5          MR. TAYLOR:  As you know, we've taken the position

6    that there is no such duty to volunteer any of that

7    information.  So, technically, I would have to object to every

8    time they ask a did-you-know-and-would-it-have-mattered

9    question.  And I don't -- I don't want to -- I don't want to

10   have to do that.  But, I don't -- I want to be clear that we

11   are objecting to any questions --

12         THE COURT:  Well, a lot of these did-you-knows are

13   the flip side of what they were told.  He goes into the

14   meeting, and he says -- or, he says, in writing, exactly what

15   he said in the letter:  I didn't give the Report to anyone.  I

16   only gave it to them in response to a request.

17         I think it's entirely fair to ask if it would have

18   affected her decision, if she knew that he voluntarily dropped

19   it off at the house, not in response to a request.  I mean, I

20   think they are just the flip side of the alleged falsehoods.

21   They're allowed to ask those.

22         I have already ruled that if you voluntarily

23   undertake to go sit down with a government official and detail

24   the facts, that you have an obligation to be truthful and not

25   mislead by omission.  And you all quibbled with me in a recent

1    pleading about whether you agreed with that proposition, but I

2    certainly recall people agreeing with that proposition, even on

3    the defense side, at the motions hearing.  But, whether you

4    agree with it or not, I have found that to be the case.

5              I understand that you believe that that's

6    inconsistent with *Safavian*.  I think *Safavian* was limited to a

7    very narrow circumstance where a person wouldn't even know what

8    was relevant or what needs to be said or not be said because

9    the ethical guidelines were so vague.  And that is how the

10   statutory underpinnings of FARA come into the materiality to

11   the question.

12             But, she can ask -- materiality is a question of part

13   fact, part law that the jury has to determine.  And I think

14   there was a motion in limine about this.  But, we certainly

15   talked about it at the pretrial conference.  And, so, I think

16   it is appropriate for them to be able to ask about facts and

17   whether it would have been important to her in making her

18   decision.

19             MR. TAYLOR:  I understand that.  That's not quite why

20   I'm here.

21             They're going to ask, Did he tell you or did you know

22   X?  And she's going to say, No.

23             Our position has been and continues to be that he had

24   no duty whatsoever to volunteer any of that information.  So I

25   have no object to the question as it's asked.  And that's why

1    I'm -- you know, getting a continuing objection to the line of

2    questions is one way to handle this.  I don't want to have

3    to -- but, I don't think there's any secret that we object to

4    any inquiry into what he did not say.

5              THE COURT:  I understand that.  I think it's fully on

6    the record from before, and now, it's fully on the record now.

7    And we can handle this in one of two ways.  We can note right

8    now, for the record, that you object to every question about

9    omitted fact.

10             Or if you want to object to the first one, and I'll

11   say, Overruled for the reasons discussed at the bench, and your

12   continuing objection is noted for the record.  I'm happy to do

13   it that way, so that it's really clear that you did it at the

14   time you needed to do it.  There's no question that you're not

15   waiving this.

16             But, I -- as long as the questions are not framed,

17   And did he have a duty to tell you X, Y, and Z?  But they're

18   framed in, Did he tell you X, Y, and Z?  And, clearly, there

19   has to be an appropriate factual basis for the question.  And I

20   don't think she can even say that would have been the one, the

21   straw that broke the camel's back, that would have pushed her

22   one way or the other.

23             But, she can say whether it would have been important

24   to her decision-making process or influential in her

25   decision-making process, which is what the materiality

1   definition is.

2           MR. TAYLOR:  We've noted our objections --

3           THE COURT:  All right.

4           MR. TAYLOR:  -- to both the questions and to her

5   subjective -- her testimony as a subjective matter.  Those

6   objections we continue to press.  Continue to be clear that we

7   object both to the questions, Did you know, Would it have

8   mattered?  And her answer, which is, It would have mattered to

9   me.  Because that's subjective and doesn't meet the objective

10  test for materiality.

11          THE COURT:  Well, she -- the organization works

12  through its people.  She's the one who ultimately announced the

13  decision.  Materiality relates to whether something could have

14  objectively affected a decision-maker.  And I believe at the

15  pretrial conference we had case law in front of us that said

16  that these questions are permissible at this stage.

17          MR. TAYLOR:  We did.

18          THE COURT:  All right.  And also, just to be clear,

19  as I see -- I haven't heard every question yet about what might

20  be an omitted fact, but the ones that come to mind at this

21  point, seem to me, to be almost 100 percent of the flip side of

22  a statement that was made, as opposed to some fact that never

23  got raised at all; the difference between, I gave it out after

24  it had been public and they couldn't get it any other way, and

25  he asking -- asking, Were you told that it was given out before

```
 1      it was public?
 2              Yes, that's an omission.  But, it's -- it's part and
 3      parcel of the falsehood as well.
 4              MR. TAYLOR:  Well, you know, we've made a distinction
 5      between false statements and omissions.
 6              THE COURT:  I know.  But, not every omission can only
 7      be characterized as an omission.  Some of them are the fact
 8      that rendered the statement allegedly false.
 9              MR. TAYLOR:  This case depends, in our view, on a
10      legal -- on a legal view that it is a crime to omit the
11      material that he omitted because he had a duty.
12              THE COURT:  It turns on both.  I mean, the entire
13      charge has been whether it seemed to falsify, presume or cover
14      up.  The affirmative actions in furtherance of that scheme can
15      be false statements or omissions.  A fact, such as a report was
16      given before the Report was public, is a fact that goes to
17      both -- allegedly, it's an omitted fact.  But, it also goes to
18      whether a stated fact, an affirmative statement, was true or
19      false.  It does.
20              MR. TAYLOR:  That may very well be true.  But, if
21      there is no duty to say those things which were concealed, then
22      the legal theory supports which that portion of the indictment
23      is defective, and it affects the whole indictment.
24              THE COURT:  It doesn't.  Because there's a legal duty
25      not to falsify, conceal, or cover up by saying things that
```

1    aren't true.  So, if you say, I did something on Tuesday, and

2    you actually did it on Monday, and that matters; did you do it

3    on Tuesday, as opposed to did he tell you he did it on Monday,

4    are two sides of the same coin.

5                MR. TAYLOR:  That's a false statement.

6                THE COURT:  That's part of this case, too.

7                MR. TAYLOR:  I agree.

8                THE COURT:  They're allowed to prove it.

9                MR. TAYLOR:  I agree.  I'm talking about the

10   concealment stuff.  I'm talking about the allegation in the

11   indictment that he had a duty not to conceal, and that the

12   things he had a duty not to conceal are contained in

13   paragraph 63.  They are essential and fundamental to the

14   sufficiency of this indictment, and that's why I'm objecting to

15   questions that go to omission.

16               THE COURT:  But when I ruled that the indictment

17   survived, one of the grounds for it was that those are the

18   facts that allegedly put the lie to a ripe status.

19               MR. TAYLOR:  We'll respectfully disagree with Your

20   Honor's view.

21               THE COURT:  I know.

22               MR. TAYLOR:  And I just want to make sure that when

23   this witness testifies, our legal position as to each and every

24   one of these questions is preserved.

25               THE COURT:  All right.  So, as far as I understand

1    your continuing objection, they can ask about anything he did

2    say.  But, if they flip it and say, Would it have been

3    important to the agency's decision to know X, you object.

4            MR. TAYLOR:  I do.

5            THE COURT:  All right.  And you'll stand up and

6    you'll object the first time.  And let's just do it.  And then

7    I'll overrule it for the reasons stated at the bench, and that

8    you have a continuing objection to those kinds of questions.

9            All righty.  Thank you.

10           MR. TAYLOR:  Thank you, Your Honor.

11           (Open court:)

12           THE COURT:  All right.  Let's bring in the witness.

13           MR. McCULLOUGH:  Your Honor, if we could -- prior to

14   the witness, we could read one stipulation.

15           THE COURT:  Yes.

16           MR. McCULLOUGH:  We'll keep the witness out.

17           THE COURT:  You can read it whenever you want.  If

18   it's as clear as the last couple of submissions, you should

19   probably put it on the screen.

20           MS. GASTON:  So, this one is rather long.  It

21   references multiple exhibits.  We can just read it.  Another

22   way we thought of doing it is, we have copies that we could

23   hand out and then take back, and show the exhibits as they're

24   discussed in the stipulation.

25           But, whatever the Court prefers.

1          THE COURT:  Well, the stipulation is evidence, and it

2      will be available to the jurors when the exhibits are also

3      available.  So, I think that you can just read it and be done

4      with it.

5          MS. GASTON:  Very well.  Thank you.

6          THE COURT:  All right.

7          MS. GASTON:  Stipulation regarding Skadden document

8      management system, document history reports, and drafts.

9          The parties stipulate to the following facts:

10         At all times relevant to this case, the law firm

11     Skadden, Arps, *Slate*, Meagher & Flom, LLP, "Skadden,"

12     maintained an electronic document management system, "system."

13         This system kept electronic records of the dates and

14     times when Skadden employees created, accessed, edited, and

15     emailed documents, including documents created in the program

16     Microsoft Word.  This system enabled Skadden employees to

17     access, open, and edit a document created by other Skadden

18     employees, as long as another Skadden employee did not have the

19     document open at the same time, or the document did not have

20     security restrictions blocking access to some or all other

21     Skadden employees.  If a document was already open, others

22     could view the document or create a copy of the document to

23     work on.

24         When the document management system reflects a

25     document being "checked out," that could mean the user has

1    opened the document in editable form on the document management

2    system.

3          In contrast, when the document management system

4    reflects a specific document having been "accessed" by a user

5    without another corresponding entry at approximately the same

6    time, that means the user did not open the specific document in

7    editable form, did not save edits to the specific document, and

8    did not email the specific document.  In addition, an access

9    entry does not necessarily mean that the user read or even

10   looked at the document.

11         Document history reports reflect the following

12   information about drafts of the letter that Mr. Craig

13   ultimately sent to the FARA Unit on or about June 3rd, 2013.

14         On April 29th, 2013, as reflected in the document

15   history report in GX456, Mr. Craig created a first draft of

16   this response, Document Number 1246982, Version 1 in the

17   system, and emailed it, all around 6 p.m., Eastern Daylight

18   Time.  The email and attachment in GX427 reflect that the draft

19   response, bearing the same document and version numbers, was

20   sent to Mr. Sloan.

21         On May 1st, 2013, Mr. Craig accessed and edited the

22   same document, Number 1246982, Version 1, from approximately

23   1:10 to 1:50 p.m., EDT, as reflected in GX456.  Mr. Craig

24   emailed this draft response, bearing the same document and

25   version numbers, to Mr. Sloan, as reflected in GX428.

1          Shortly thereafter, also on May 1st, 2013, the

2     document history report in GX455 reflects that Mr. Sloan

3     created a new document, Number 1082842, Version 1, titled FARA

4     Responses, G. Craig Draft, at around 2:19, EDT, and sent

5     Mr. Craig a link to the new document at around 2:41 p.m., EDT,

6     as reflected in GX429.  Mr. Craig then edited and emailed

7     Document Number 1082842 to Ms. Catherine Whitney, Mr. Craig's

8     administrative assistant, as reflected in GX430.

9          On May 15th, 2013, as reflected in the document

10    history report in GX456, Mr. Craig accessed, edited, and

11    emailed Document Number 1246982, Version 1, the separate,

12    earlier draft of the response letter that he had first created

13    on April 29, 2013, between approximately 12:55 to 1:18 p.m.,

14    EST.  As reflected in GX431, Mr. Craig emailed this draft

15    response to Mr. Sloan, again using the filed bearing the same

16    document and version numbers he had originally created on April

17    29th and sent to Mr. Sloan on May 1, 2013.

18          On May 20th, 2013, Mr. Sloan forwarded to

19    Lillian Singer, an administrative assistant at Skadden, three

20    different drafts of this letter.

21          These documents included the drafts that Mr. Craig

22    had emailed Mr. Sloan on May 1st, 2013 and May 15th, 2013, as

23    reflected in GX433 and GX434, and the document that Mr. Sloan

24    had created, and which Mr. Craig edited, on May 1st, 2013, as

25    reflected in GX436 and GX455.

1          Ms. Singer proceeded to create several documents from

2     those that Mr. Sloan sent to her, and then she created multiple

3     documents that reflected the various changes among these

4     documents, as reflected by the emails at GX435, -437, -438,

5     -439, and -440, as well as their attachments.

6          As reflected in the document history report in GX452

7     and the email in GX451, the document that was ultimately

8     finalized and sent to the FARA Unit was Document Number

9     1249835, Version 1 in the system.  This was created by

10    Ms. Singer on May 20th, 2013, and then accessed and edited by

11    Ms. Whitney, Mr. Craig's administrative assistant, on May 21st

12    and May 28th, accessed by Ms. Whitney on May 31st, accessed and

13    edited by Mr. Craig on May 31, 2013, and accessed by Mr. Craig

14    on June 3rd, 2013.

15         The document history reports in GX9 and GX10 provide

16    information about the documents named GBC First Draft to FARA

17    Response, Document Number 1265000, Version 1, and GBC 2 Draft

18    FARA Letter, Document Number 1265005, Version 1, respectively,

19    both of which Mr. Craig created on or about September 20th,

20    2013.  These document history reports reflect that:

21         On September 20th, 2013, Mr. Craig created GBC

22    first draft of FARA Response, Document Number 1265000, Version

23    1, at 1:06 p.m., EDT, and immediately checked the document back

24    into the document management system.

25         Mr. Craig created GBC 2 Draft FARA Letter, Document

1    Number 1265005, Version 1, a few minutes later, at 1:11 p.m.,

2    EDT, and he also edited the document on that date.  Mr. Craig

3    emailed this document, bearing the same document and version

4    numbers, as reflected in GX7 to Lawrence Spiegel and

5    Allon Kedem.

6              On September 24th, 2013, Mr. Craig accessed and

7    edited the document, bearing the same document and version

8    numbers, between 9:30 a.m. and 9:59 a.m., EDT, and again

9    between 10:32 and 10:38 a.m., EDT.

10             On September 26, 2013, Mr. Craig accessed the

11   document, bearing the same document and version numbers, at

12   approximately 2:19, EDT.  He did not edit the document or email

13   it.

14             On October 4th, 2013, Mr. Craig accessed the document

15   at approximately 4:48 p.m., EDT.  He did not edit the document

16   or email it.

17             On October 9th, 2013, Mr. Craig accessed the document

18   at approximately 10:36 a.m., EDT.  He did not edit the document

19   or email it.

20             THE COURT:  All right.  Thank you.

21             As I told you earlier, the word "stipulation" is

22   simply a fancy word for agreement.  The parties have agreed

23   that these facts are undisputed, and you may consider them as

24   undisputed evidence in the case.

25             Now you can call your next witness.

1          MR. McCULLOUGH:  Your Honor, the government calls

2     Heather Hunt.

3          THE COURT:  All right.

4                    HEATHER HUNG,

5     was called as a witness and, having been first duly sworn, was

6     examined and testified as follows:

7                    DIRECT EXAMINATION

8     BY MR. McCULLOUGH:

9     Q.  Good morning, Ms. Hunt.

10    A.  Good morning.

11    Q.  Would you please introduce yourself to the jury by stating

12    your name and spelling your name for the record?

13    A.  My name is Heather Hunt -- Heather Hilliard Hunt.  It's

14    H-E-A-T-H-E-R, H-I-L-L-I-A-R-D, Hunt, H-U-N-T.

15    Q.  And, Ms. Hunt, where do you work?

16    A.  I work at the Department of Justice.

17          THE COURT:  All right.  Ms. Hunt, we have a lot of

18    people that are straining, actually, to hear you.  So, if you

19    could -- the chair will not move.  The microphone will get a

20    little closer to you.  But, if you could speak into the

21    microphone and maybe speak a little bit louder, that would be

22    appreciated.

23          THE WITNESS:  Yes.

24          THE COURT:  All right.  Go ahead.

25    BY MR. McCULLOUGH:

1   Q.  Did you work at any particular section of the Department of

2   Justice?

3   A.  I work in the Counterintelligence and Export Control

4   Section, and specifically in the Foreign Agents Registration

5   Unit.

6   Q.  And how long have you worked in the Foreign Agent

7   Registration Unit?

8   A.  I'm going on -- I'm in my 36th year with the department.

9   Q.  Ms. Hunt, how did you get your start in the Foreign Agent

10  Registration Unit?

11  A.  I started right out of college.  I was hired as a

12  clerk/typist in the FARA Unit.

13  Q.  So how long did you work as a clerk/typist in the FARA

14  Unit?

15  A.  About five months, and then I was --

16  Q.  Did you move on to another role?

17  A.  Yes.  I became a paralegal specialist.

18  Q.  And how long were you a paralegal specialist with the

19  Foreign Agent Registration Unit?

20  A.  I was a paralegal specialist until I graduated from law

21  school -- about a year after I graduated from law school, and

22  that was about --

23  Q.  When did you go to law school?

24  A.  Graduated from law school in '89.  So, I was a paralegal

25  specialist from 1984 to 1989 -- or, '90.

1    Q.   Were you working at the FARA Unit during law school?

2    A.   Yes.  I went to law school at night.

3    Q.   Did you change roles in the FARA Unit after graduating from

4    law school?

5    A.   Yes.

6    Q.   What was your new role?

7    A.   About a year after I graduated from law school, I became a

8    line attorney in the FARA Unit.

9    Q.   And what did you -- what were your roles and

10   responsibilities -- how long were you a line attorney in the

11   FARA Unit?

12   A.   From about 1990 until about 2002.

13   Q.   What were your roles while you were a line attorney at the

14   FARA Unit?

15   A.   I --

16   Q.   Roles and responsibilities.

17   A.   My roles and responsibilities as a line attorney were to

18   review what we call Rule 2 advisory opinions.  I would provide

19   advisory opinions as to whether or not people have an

20   obligation to register under FARA.

21        I would be an advisor to the other analysts and the

22   paralegals who review FARA filings and help them with all of

23   that.

24        Also, would review possible obligations to register

25   under FARA.  So, I would review articles, public source

1    documents, you know, or any other information in whatever

2    manner came to our attention to determine whether or not

3    there's a registration under FARA.

4    Q.  And you said that you were a line attorney until 2002.

5            What happened in 2002?

6    A.  In 2002, the chief of the FARA Unit retired and I became

7    the acting chief of the Foreign Agents Registration Unit.

8    Q.  And how long were you the acting chief?

9    A.  A couple -- a year, maybe, and then I -- maybe not even --

10   and then I became chief of the unit.

11   Q.  So, how long did you serve as chief of the FARA Unit?

12   A.  Basically, from 2002 until about March of 2019.

13   Q.  And what's happened since March of 2019?

14   A.  Since then, there's -- a new position was created in our --

15   in NSD, National Security Division, that would oversee all of

16   foreign influence for the National Security Division, and under

17   that came the Foreign Agents Registration Unit.  And, so, I

18   made a transition to another role at -- in the unit.  I'm now

19   the senior counsel for FARA administration.

20   Q.  Do you like your new role?

21   A.  I do, very much.

22   Q.  So let's turn to the Foreign Agent Registration Act.

23            Is that also known as FARA?

24   A.  Yes.

25   Q.  Are you familiar with FARA?

1   A.  Very familiar with FARA.

2   Q.  In general terms, can you explain how the FARA Unit

3   enforces the FARA statute?  What does the FARA Unit do?

4   A.  The FARA Unit does a lot.  We process -- not only we

5   process all of the FARA registrations that are made under the

6   statute and we review them all, we look at them all to

7   determine whether or not there's adequate compliance,

8   disclosure, and reporting under the statute.

9        We go on inspections to -- you know, for those who

10   are registered under the statute, whether or not -- and we look

11   at their books and records to determine with what they reported

12   to us and what is in their books and records is -- you know,

13   matches up.

14        We make determinations as to whether or not people

15   have an obligation to register.  We send out what we call

16   letters of inquiry, where we -- we may have seen something from

17   whatever source that may trigger a question in our minds as to

18   whether or not somebody has an obligation to register.  So, we

19   write a letter to them and say, We think you may have an

20   obligation.  We don't know.  So, let's talk.

21        So we do that.  And then we take a look at all of

22   what they provide to us and make a determination.

23        We also -- that would be us reaching out to potential

24   registrants.

25        And then the flip side of that is, potential

1    registrants reach out to us.  And we call those Rule 2 advisory

2    opinions, where we provide an advisory opinion.  They give us a

3    certain, you know, set of circumstances and facts, not a

4    hypothetical situation, and say, Hey, based on these, do we

5    have an obligation to register, or not?

6          And then we would review that and go back and forth

7    with them, if necessary, and determine if they have an

8    obligation to register.

9          So, that's basically it.

10   Q.  And so if someone has a -- if a potential registrant has an

11   obligation to register, what is then required of them?

12   A.  If they have an obligation to register, they are required

13   to disclose their relationship with the foreign principal.  And

14   they do that on a number of forms that they file with the FARA

15   Unit.

16   Q.  And what kinds of information are disclosed on those forms?

17   A.  It's a pretty in-depth amount of information that they have

18   to disclose to us.  They disclose on an initial registration

19   statement who they are and, basically, the makeup of their

20   organization; or if they're an individual, what they're all

21   about.

22          And then they file an Exhibit A.  An Exhibit A is who

23   is the foreign principal?  Who's your client?  Are they a

24   foreign government?  A foreign political party?  Are they a

25   foreign person?  Who are they?  Tell me about them.

1          And there's just several questions on that form about

2     that.

3          Then there's an Exhibit B, we call it, and that's the

4     contract.  The agreement that you have with the Foreign

5     principal, is it an oral agreement?  Is it a written agreement?

6     Is it a letter?  What are the terms of the agreement?

7          And they disclose that.  And if it's an actual

8     written agreement or a letter of agreement, they attach it to

9     that Exhibit B.

10          And then there's short-form registration statements

11     and the actual individual.  So that the firm that's

12     registering, then the individuals within the firm file what we

13     call short-form registration statement, where they disclose who

14     they are and what they're doing for that particular foreign

15     principal.

16          And there's also, if you disseminate information --

17     we call it informational materials -- on behalf of the foreign

18     principal, then you have to send that into our office as well.

19     And all of that is made public on our website.

20     Q.  As part of all of the filings that are made that you just

21     described, does the foreign agent describe their activities on

22     behalf of the foreign agent?

23     A.  Oh, yes.  In each one of those -- each one of those forms,

24     they describe their activities and the terms of their

25     agreement.  And then every six months -- I didn't say, every

1      six months there's a supplemental statement that they file

2      where they disclose in full detail their activities, their

3      political activities and their receipts, monies that they

4      received and monies that they disbursed.  And then they list

5      all of their informational materials that they disseminated.

6      Q.  And what is your understanding of the purpose of all this

7      filing?

8      A.  The purpose is to let the American people know who's

9      representing foreign interests in the United States, and to let

10     our lawmakers know who's representing foreign interests.

11     Q.  And approximately how many registrants are currently on

12     file under the FARA Unit?

13     A.  Probably about, you know, a little over 400, 450, something

14     like that.

15     Q.  And what kinds of people or entities register under FARA?

16     A.  Of those 450, there are a lot of U.S. law firms, U.S.

17     public relations firms, government relations firms, some

18     tourist offices.

19     Q.  Ms. Hunt, do you know whether Mr. Craig has ever filed a --

20     any registration statement under FARA?

21     A.  Yes.

22     Q.  What can you tell us about that?

23     A.  I know he filed a short-form registration statement years

24     ago, probably in the late '80s, early '90s.

25     Q.  And do you know whether Mr. Craig filed more than one

1   statement to the FARA Unit?

2   A.  I know that he filed a short-form registration on his own,

3   and I know that he has signed registration statements on behalf

4   of a firm.

5   Q.  Okay.  I want to focus your attention to the time period in

6   2012, 2013.

7            And what was your -- just to -- what was your role at

8   that time, in 2012, 2013, in the FARA Unit?

9   A.  I was the chief of the FARA Unit.

10  Q.  And, so, were you involved in an inquiry by the FARA Unit

11  into work that had been performed by Skadden -- the law firm

12  Skadden on behalf of the government of Ukraine?

13  A.  Yes.

14  Q.  And who was responsible for that inquiry for the FARA Unit?

15  A.  I was.

16  Q.  In the course of that inquiry, did the FARA Unit make a

17  determination as to whether Skadden had to register under FARA?

18  A.  Yes, we did.

19  Q.  And did the FARA Unit change that determination?

20  A.  Yes.

21  Q.  Without discussing the legal analysis, what events caused

22  the change in that determination?

23  A.  We had -- we had a meeting.  It was requested by the -- by

24  Skadden -- actually, by Skadden's general counsel, to have a

25  meeting with us to talk about our conclusions that we made in

1    our determination letter.

2    Q.  Okay.  And then after that meeting, the determination was

3    changed?

4    A.  Yes.  After the -- we had a meeting, and then there was a

5    letter of -- confirming what was discussed in the meeting.  And

6    after we received that letter and took it under advisement,

7    both the meeting and the letter, we changed our decision.

8    Q.  And what was the ultimate decision that had been

9    communicated in 2013 or 2014 to Skadden?

10   A.  We told them that based on the information that we received

11   in the meeting, and based on the information in the letter,

12   that we see no registration obligation.

13   Q.  I would like to walk through those events, if you can help

14   us do that.

15   A.  Um-hum.

16   Q.  Do you recall how you first learned that Skadden was

17   performing work for the government of Ukraine?

18   A.  Like most of the things that come to my attention, I have

19   several people on my staff that review public source documents.

20   And in this case, Alex, in my office --

21   Q.  Who is Alex?

22   A.  Alex is a program specialist, and he reviews public source

23   documents on a daily basis.  It's a very routine thing for him

24   to do.  And he brought an article to my attention.  Said, Hey,

25   this may require a registration obligation.  Will you take a

1   look at it?

2           So, that's how it came to my attention.

3   Q.  And you mentioned an article.

4           Can you just -- without describing the details, just,

5   can you describe what, generally, that article was about?

6   A.  Article was about the law firm of Skadden.  That they had a

7   client, it was the government of Ukraine, and they wrote a

8   report for them.  And based on that article, felt there was

9   enough there to send a letter of inquiry because of what

10  FARA -- a basis for FARA registration is, if somebody is

11  representing a foreign government in the United States, there

12  may be a registration obligation.

13          So, based on that, I sent a letter.

14  Q.  And, so, you said you did send a letter?

15  A.  Yes.

16  Q.  Turning to Government Exhibit 1, previously admitted.  It's

17  on the screen.  It's also in your binder.  Whichever you are

18  more comfortable with.  I think we can blow things up on the

19  screen.

20  A.  Okay.

21  Q.  So, whatever you like.

22  A.  So, Number 1?

23  Q.  Let's just begin with, is this the letter of inquiry that

24  was sent?

25  A.  Yes.

1    Q.  And what is the date of this letter?

2    A.  December 18th, 2012.

3    Q.  And approximately how long after seeing the article was

4    this letter sent?

5    A.  About five days.

6    Q.  And who did you send the letter to?

7    A.  I sent the letter to Earle Yaffa, the managing director of

8    Skadden Arps.

9    Q.  What is the subject line of this?

10   A.  "Possible obligation to register pursuant to the Foreign

11   Agents Registration Act."

12   Q.  What does it mean -- what does "possible obligation" mean?

13   A.  At this point, we don't know in our office.  And we don't

14   know if there's a registration obligation or not.  So, this is

15   a letter of inquiry, where we're asking questions as to

16   whether -- so we can determine whether or not there is an

17   obligation.

18   Q.  Okay.  Focusing you on the first paragraph of the letter.

19          Did you reference the article in the letter?

20   A.  Yes.

21   Q.  And if you can read the title of the article, please.

22   A.  "Ukraine lawmakers brawl; report finds Tymoshenko trial

23   flawed."

24   Q.  Now, how did the content of that headline impact your

25   analysis?

1    A.  It didn't impact my analysis.

2    Q.  Why not?

3    A.  We -- the content of the article raised the question to me

4    as to whether or not there would be a registration obligation,

5    and that's what triggered my letter of inquiry.  I don't --

6    whatever the Report finds there, whatever -- like, "Ukraine

7    lawmakers brawl; report finds Tymoshenko trial flawed," we

8    don't look at the content of whatever that report is there.

9    FARA is very content neutral.

10   Q.  Without describing the legal requirements of FARA, what do

11   you look at?

12   A.  When I look at -- when I look at determining whether or not

13   somebody has an obligation to register, I am going to look at,

14   did they enter into an agreement with a foreign principal?  In

15   this case, did they enter into an agreement with a foreign

16   government?  And did they engage in certain activities at the

17   order, request, direction, or control of the foreign government

18   in the specified activities in FARA, and whether or not there's

19   an exemption.  So I look at that.

20           I don't look at, you know, what their -- what exactly

21   their message would be, or what the content of, for instance,

22   in this report would be.  I'm just looking to know whether or

23   not they're acting in any of those activities at the order,

24   request, direction, or control of a foreign principal.

25   Q.  Focusing you on the second paragraph of the letter.

1           Were you communicating why you were sending this

2     letter?

3     A.  Yes.  We're sending it so we can determine whether or not

4     there's a requirement to register.  And, so, yes.

5     Q.  And focusing you on the last paragraph of the letter,

6     briefly.

7           Did you enclose any additional information about

8     FARA?

9     A.  Yes.  Just as we typically do, we put a copy of the statute

10    in there, and then the rules and the regulations under the

11    statute.

12           MR. McCULLOUGH:  And, Ms. Rohde, if we can look at

13    the second page, briefly.

14    BY MR. McCULLOUGH:

15    Q.  Is this the first page of the FARA statute as it existed in

16    2012?

17    A.  Yes.

18           MR. McCULLOUGH:  So, if you take us back to the first

19    page.  Let's focus on the second paragraph.

20    BY MR. McCULLOUGH:

21    Q.  So, this appears to list four questions.

22    A.  Yes.

23    Q.  Those questions were being asked of Skadden; is that right?

24    A.  Yes.

25    Q.  How do you come up with these four questions for the

1    initial letter?

2    A.  These four questions are in every letter of inquiry that we

3    send.  We tailor it to -- obviously it's not going to be

4    "Ministry of Justice of the government of Ukraine" in every

5    letter.  That's probably the only thing that we change in

6    there.  Everything else is in every letter we send.

7    Q.  Okay.

8             MR. McCULLOUGH:  And, Ms. Rohde, if we can put up

9    Government's Exhibit 1 on the left and Government Exhibit 14 on

10   the right.

11            And if we just take the top banner on the right-hand

12   side.

13   BY MR. McCULLOUGH:

14   Q.  I'm showing you what's been marked Government's Exhibit 14,

15   which is on the right, previously admitted.

16            Ms. Hunt, can you describe what this is that we're

17   looking at, Government Exhibit 14?

18   A.  This is the registration statement.  It's the initial

19   statement that registrants file when they first register with

20   the Justice Department.

21   Q.  And by looking at the header and the footer on this page,

22   can you tell when this form was in effect?

23   A.  Yes.  It was revised in March of 2011.  We have a

24   three-year -- three-year series, basically, before we have to

25   update the form.  So, this was -- yes, this was in effect.

1    Q.  Was this form in effect in 2012?

2    A.  Yes.

3    Q.  Focusing your attention on the third page of the

4    registration statement.

5            MR. McCULLOUGH:  And, Ms. Rohde, if we can blow up

6    questions 5.i. and 5.j.

7    BY MR. McCULLOUGH:

8    Q.  Can you read these two questions?

9    A.  5.i. says, "Describe the nature of the registrant's regular

10   business or activity."

11           And 5.j. says, "Give a complete statement of the

12   ownership and control of the registrant."

13   Q.  How do these questions compare to the questions that you

14   had asked in the letter?

15   A.  This asks for the same information as we ask in the letter.

16   It's Number 1 and Number 2.  Number 1 says, "A complete

17   statement."

18           And then we ask them to "Please provide this office

19   with a complete statement of the ownership and control of the

20   firm, and a description of the nature of the firm's regular

21   business and/or activity."

22           MR. McCULLOUGH:  Okay.  And, Ms. Rohde, if we can

23   keep Exhibit 1 on the left, and we'll put Government Exhibit 17

24   on the right.

25   BY MR. McCULLOUGH:

1    Q.  And just focusing on the top banner.

2            What are which looking at here?

3    A.  This is the Exhibit B to the registration statement.  This

4    is the one I spoke of earlier, that is the statement that

5    provides the terms of the agreement and the actual contract.

6    Q.  And by looking at this form, can you tell whether this form

7    was in effect in 2012?

8    A.  Yes.  This one expired -- it was revised in 2011 and

9    expired in 2014.

10   Q.  And if we -- focusing your attention on questions 4 through

11   6 on the first page.

12           How -- just generally, how do these questions compare

13   to any questions you were raising in the December 18th letter

14   to Skadden?

15   A.  Well, we want to -- we asked in the letter, you know -- you

16   know, Is there a formal agreement?  Then we would like to see

17   it.  We would like to know the terms of any oral agreement.

18           All these questions, 4, 5, and 6, all go to that.

19           Number 4 is the actual written agreement, Number 5 is

20   if it's a letter of agreement.  And then the sixth question

21   there is, you know, the terms of any oral agreement, if there's

22   no written agreement.

23           So those follow questions -- let's see.  They follow

24   questions number -- well, 3 and 4.  Description of the

25   activities they've engaged in or services rendered to the

1   Ministry of the government of Ukraine or any other foreign

2   entity, and a copy of any existing or proposed written

3   agreement, if any, or a full description of the terms and

4   conditions of each existing or proposed oral agreement, if any.

5            MR. McCULLOUGH:  Okay.  And, Ms. Rohde, if we can

6   look at the second page of Exhibit B, Question 8, briefly.

7   BY MR. McCULLOUGH:

8   Q.  Ms. Hunt, I think you were just describing this a moment

9   ago.

10            But, Question 8 of the Exhibit B to the registration

11   statement, what's that question?

12   A.  That's asking for the -- it describe -- asks for the

13   registrant to describe fully the activities the registrant

14   engages in or proposes to engage in on behalf of the foreign

15   principal.

16   Q.  And how does that compare to any of the questions that were

17   in your December 18th letter?

18   A.  That's Number 3, "A description of the activities the firm

19   has engaged in or the services it has rendered to the Ministry

20   of the government."

21   Q.  Why is that information important to the inquiry?

22   A.  That's pretty much the basis.  We use that information to

23   determine what they're going to do for them, so we can try to

24   determine if they have an obligation to register or not.

25   Q.  So, was this letter issued on or about December 18th, 2012?

1    A.  Yes.

2    Q.  And did the FARA Unit receive a response to the initial

3    letter of inquiry that was sent to Skadden?

4    A.  Yes.

5    Q.  Showing you what's been marked Government Exhibit 2,

6    previously admitted.

7         Is this the response?

8    A.  Yes.

9    Q.  What is the date of this letter?

10   A.  February the 6th, 2013.

11   Q.  And who signed the letter?

12   A.  Greg Craig.

13   Q.  Had you personally interacted with Greg Craig in relation

14   to this prior to receiving the letter?

15   A.  No.

16   Q.  Focusing your attention on Question 3.

17        MR. McCULLOUGH:  And you can blow that up, Ms. Rohde.

18   BY MR. McCULLOUGH:

19   Q.  It says, "A description of the activities the firm has

20   engaged in or the services it has rendered to the Ministry of

21   Justice of the government of Ukraine or any other foreign

22   entity relating to such services.

23        What information did you receive in response?

24   A.  To that question, we were told in that letter that they

25   were going to serve as a consultant on rule of law issues, and

1   to provide advice on Western standards of due process and

2   whether or not it -- the trial of Tymoshenko fell within, you

3   know, Western standards.

4   Q.  And what was your reaction to receiving this description of

5   the activities that Skadden said it was performing for Ukraine?

6   A.  What was my reaction?

7   Q.  What was your reaction?

8   A.  At this point, I was just -- I suppose I was just reading

9   through the letter.  I mean, they were -- at this point, it

10  was, they're going to do -- they're going to advise on the rule

11  of law and they're going to -- they're going to write -- on

12  this one, they're going to advise on the rule of law and

13  they're going to conduct a -- basically, an investigation as to

14  whether or not this trial that -- where Tymoshenko was

15  convicted, whether or not she was going -- whether that was in

16  Western standards or not.

17          And that was what they were going to do.

18  Q.  And did this provide you with enough information to make a

19  determination as to whether FARA would apply to Skadden?

20  A.  No, it did not.

21  Q.  I want to focus you on the bottom part of this paragraph.

22          The response says, "As an explicit component of our

23  assignment from the very beginning, Skadden's work was

24  conditioned on the understanding that the firm would not

25  provide any services that would be covered by the Foreign

1    Registration Act, or would require registration under FARA."

2         Do you see where it says that?

3    A.  Yes.

4    Q.  Why didn't that end the inquiry?

5    A.  Because this -- what is referenced in a contract like this,

6    to say that you're not going to do any FARA work, is not

7    necessarily relevant.  What's relevant is what actually

8    happened.  And in this case, we were looking not at prospective

9    activity.  Often we're looking at prospective activity.  But,

10   this one, we're looking at activity that actually happened.

11   So, this is past activity.

12        Planned activity sometimes doesn't always go as

13   planned.  So, you know, we were looking at -- back, what

14   actually did happen.  So, that would be not relevant.

15   Q.  Looking at Item Number 4.

16        You had requested information about agreements; is

17   that right?

18   A.  Yes.

19   Q.  And focusing on the first sentence there.

20        What was Skadden providing in response?

21   A.  The written agreement -- the written agreement with the

22   government of the Ukraine.

23   Q.  And did Skadden indicate that those were attached to the

24   letter?

25   A.  Yes.

1    Q.  And so, if we turn to page 5 of the exhibit, and focusing

2    your attention on the bottom of the page, right-hand side.

3              MR. McCULLOUGH:  And, Ms. Rohde, I don't know if you

4    can scroll it up.

5              Perfect.

6    BY MR. McCULLOUGH:

7    Q.  Did the attached contract provide information about the

8    amount that was being paid to Skadden?

9    A.  Yes.

10   Q.  And what did the contract say about the amount that was

11   being paid to Skadden?

12   A.  The price was going to be 100 in Ukrainian currency per one

13   hour of study, and they were going to do up to 950, not to

14   exceed 950 hours.

15   Q.  Focusing you on Item 3.1, where -- if you'll read that,

16   please.

17   A.  Um-hum.  It says that it was going to be 95,000 Ukrainian

18   currency.

19   Q.  Ukrainian local currency?

20   A.  Yeah.

21   Q.  I'll take it that's hryvnias.

22   A.  Yeah.  Thank you.

23   Q.  Who knows.

24              Why is the amount of money relevant -- the amount of

25   money that someone is being paid relevant to the inquiry?

1    A.  In my analysis of whether or not somebody has a

2    registration obligation, we take into account, you know,

3    what -- the funding of the project.  And in this case, it was

4    interesting, because in our research, we found that this amount

5    of money was about $12,000.  And it was, you know, quite a bit

6    of work involved for $12,000.  So, it was -- it was a factor we

7    were looking at.

8    Q.  Okay.  If we look back at the letter, to page 1 -- page 2,

9    rather.  Look at the last paragraph of the letter, on page 3.

10                  What is Mr. Craig describing here?

11   A.  This is about an oral agreement that -- with a private

12   citizen of Ukraine, which the individual was going to

13   contribute some amount of money for the -- to help with the

14   project.  And, so, yeah, a private citizen provided some money

15   for the project.

16   Q.  Did the February 6th response provide the name of that

17   individual or the amount of money that was being funded?

18   A.  No.

19   Q.  And did you want additional information about that?

20   A.  Yes.

21   Q.  And so after receiving the February 6th, 2013 letter, what

22   did the FARA Unit do?

23   A.  We sent another letter.

24   Q.  Okay.  Turning you to Government Exhibit 3, previously

25   admitted.

1          Is this the letter that was sent in response?

2    A.   Yes.

3    Q.   And I notice -- what is the date?

4    A.   April the 9th, 2013.

5    Q.   And the subject line of the letter?

6    A.   "Possible obligation to register pursuant to the Foreign

7    Agents Registration Act."

8    Q.   So, if we look at the first paragraph.  Focusing your

9    attention on the last sentence of the first paragraph.

10         Were you communicating why this letter was being

11   sent?

12   A.   Yes.  There wasn't enough information in the first letter

13   for us to make a determination.  And we're not going to make a

14   determination, one way or the other, without enough

15   information, and we're not going to have anybody register that

16   doesn't need to.  So, we needed to get additional information

17   so we could actually make a determination.

18   Q.   Okay.  And focusing your attention on the second paragraph

19   of this letter.  And reading from the middle of the paragraph

20   there.

21         It says -- it refers to Viktor Yanukovych.  And then

22   it says, "After he won the election, Ms. Tymoshenko was charged

23   criminally with exceeding her authority while negotiating a gas

24   deal with Russia.  The agreement at issue was reached with

25   Gazprom, owned by the Russian government, and also a client of

1   your firm."

2           "Your firm" there refers to Skadden; is that right?

3   A.  Yes.

4   Q.  "After her conviction, Tymoshenko was sent to prison for

5   seven years.  She is appealing her conviction to the European

6   Court of Human Rights.  She maintains, among other things, that

7   her prosecution was motivated by politics, to silence her as a

8   political opponent of the Yanukovych regime.  Recently, she was

9   changed with tax evasion and embezzlement, and has been named

10  as a suspect in a murder case.  She currently awaits further

11  court proceedings in the Ukraine."

12          Do you see that?

13  A.  Yes.

14  Q.  Where did the FARA Unit get that information?

15  A.  In our research of the issue, trying to come to a

16  determination.  So, in our research.

17  Q.  And was that information provided by Skadden or Mr. Craig

18  in response to your inquiry?

19  A.  Not that I recall, no.

20  Q.  And did Skadden -- focusing on the second-to-the-last

21  sentence.  "Recently, she was charged with tax evasion and

22  embezzlement, and she has been named as a suspect in a murder

23  case."

24          Did Skadden ever indicate whether it had any

25  involvement in any of those matters?

1    A.  No, not that I recall.

2    Q.  So, focusing on the third paragraph.

3           I think you referred previously to the price that --

4    the amount that Skadden was being paid.

5           What is this -- what is this relating to?

6    A.  This is relating to the contract.  It is saying what amount

7    that Skadden would be paid, which is just under 12,000 U.S.

8    dollars.

9    Q.  And if we can turn over to the next page.  Paragraph -- the

10   top paragraph.

11          And you write, the second half of that paragraph, "No

12   mention is made of how much money the retainer amounted to and

13   who paid it."

14          What were you referring to there?

15   A.  There was another agreement that was -- that was

16   incorporated into the original contract.  And there was some

17   retainer, we didn't know how much it was.  We don't know who

18   was paying the retainer.  And all of that was important into,

19   you know, trying to determine, you know, the different foreign

20   principals involved.  It was basically going to, you know, who

21   is behind this whole effort.

22   Q.  And did you ask any additional questions about the -- who

23   was paying Skadden or --

24   A.  Yes.  Yeah, we asked.  We wanted to know, you know, who is

25   the private citizen that was mentioned in the letter, in that

1    February letter.  And, you know, what was their connection to

2    Skadden's work for the Ukraine Ministry of Justice?  And we

3    wanted to know all the sources of funding so that we could see

4    the whole picture.

5    Q.  And, so, reading the last sentence of that paragraph, if

6    you'll read that for us.

7    A.  "In addition, please list any other sources of money for

8    the Tymoshenko work."

9    Q.  Was that information important to your inquiry?

10   A.  Yes.

11   Q.  Did this letter ask any additional questions, other than

12   questions about payment?

13   A.  Yes.

14   Q.  So, if we zoom out, we can look at the last paragraph of

15   this letter.

16          This lists seven questions that were being asked; is

17   that right?

18   A.  Yes.

19   Q.  And just generally, what subject matters were you covering

20   with these questions?

21   A.  These were trying to get at what -- you know, the

22   distribution of this report.  The Report was written.  It

23   was -- was it distributed?  Were there contacts with the media?

24          And, you know, we knew there were a couple of public

25   relations firms that had registered in something with

1    connection to Ukraine.  They had disseminated various -- they

2    had actually disseminated and filed with us the executive

3    summary of the Report.

4         So all of this, we were trying to determine whether

5    or not there was any registrable activity, whether there was a

6    dissemination of the Report, whether there was contact with the

7    media.  All of that, in my analysis, would be important in

8    determining whether there was a registration obligation.  So,

9    we were asking those questions.

10   Q.  And are those types of questions things that are identified

11   in the questions to a registration statement or Exhibit A or

12   Exhibit B?

13   A.  Yes.  Well, like the first one, yes, we would we want to

14   know.  If it was informational materials, that would be

15   disclosed on a supplemental statement and an initial

16   registration statement.

17   Q.  So, focusing you very briefly.

18        MR. McCULLOUGH:  Ms. Rohde, if we can do Exhibit 1 on

19   the left and Exhibit 14 on the right.

20        Sorry.  I said Exhibit 1.  I meant 3.

21   BY MR. McCULLOUGH:

22   Q.  So, if we can turn to 6, on the right-hand side,

23   Exhibit 14.

24        THE COURT:  Just for the record, you've now taken

25   Exhibit 1 down and substituted Exhibit 3?

1              MR. McCULLOUGH:  Correct.  Exhibit 3 is on the left

2       and Exhibit 14 is on the right.

3              Thank you, Your Honor.

4              MR. TAYLOR:  Objection.

5              Your Honor, may we approach?

6              THE COURT:  Yes.

7              (Bench discussion:)

8              MR. TAYLOR:  Objection, Your Honor.  Mr. Craig is not

9       accused of filing a false registration statement or failing to

10      provide any information in a registration statement under 6 --

11      618.  And I object to the line of inquiry that identifies the

12      registration statement information as information that they are

13      required to be disclosed in an effort to determine whether he

14      has to be registered.

15             THE COURT:  I don't think he's said anything about

16      him being required to do anything.  I think he's trying to

17      probe why she put the questions in, and why she was curious

18      about the answers to help her make her determination.  And the

19      fact that these are the acts that may change registration, a

20      registration obligation, I think she's entitled to say that.

21             You know, I take your point, that this is the form,

22      but I think she's saying her inquiry is informed by the form.

23      And I think he's doing that to keep her from quoting chapter

24      and verse from the statutes that are inquiries informed by.

25             What's your response?

1          MR. McCULLOUGH:  My response is, that is precisely

2     why I am asking the questions, is to elicit from Ms. Hunt why

3     she was posing the questions she was posing, and why that

4     information in response would be relevant to her inquiry.

5          THE COURT:  All right.  Well, why don't you ask those

6     questions.

7          MR. McCULLOUGH:  May I -- may I leave 14 on the --

8     Exhibit 14 on the right?

9          THE COURT:  Well, I think that's a different question

10    than those two questions.  So, why don't you ask those two

11    questions, and if she says, Those are factors that are

12    important to me in determining whether the statute applies, I

13    don't think that's a legal opinion, and she's allowed to stay

14    that.

15         MR. TAYLOR:  We still object to the use of the

16    registration --

17         THE COURT:  Well, I just asked him to do something

18    else.

19         MR. TAYLOR:  I don't know where he's going from here,

20    really.

21         THE COURT:  All right.

22         (Open court:)

23         MR. McCULLOUGH:  And if we can focus back on the

24    questions that were being asked.

25         So, the bottom paragraph Ms. Rohde.

1    BY MR. McCULLOUGH:

2    Q.  Ms. Hunt, why are you asking questions as to media

3    contacts?

4    A.  Because it's important to my analysis as to whether or not

5    these activities fall within political activities under the

6    statute.  And, so, we would -- contacting media is important in

7    the analysis, because if it's political activity, it's one of

8    the specified activities in the statute.

9            If you're trying to influence any section of the

10   public within the United States concerning the political or

11   public interests of a government of a foreign country, that is

12   one of the -- that's political activity under the statute.  And

13   if you're contacting media, then that -- that is the -- that is

14   a great way to get to influence the American public, through

15   the media.

16   Q.  And if one is required to register under FARA, is

17   information about the distribution of materials or contact with

18   media required to be disclosed as part of the FARA

19   registration?

20   A.  Yes.

21   Q.  And after sending this letter, did the FARA Unit receive a

22   response?

23   A.  Yes.

24   Q.  Directing you to Exhibit 4, previously admitted.

25           Is this the -- is this the response that you

1    received?

2    A.  Yes, it is.

3    Q.  And what is the date of the response?

4    A.  June the 3rd, 2013.

5    Q.  And who signed this?

6    A.  This was signed by Gregory Craig.

7             MR. McCULLOUGH:  And I want to look at the first

8    paragraph -- sorry -- the first page of the letter.  Focusing

9    on the third -- it's actually -- sorry.  It'll be, I believe,

10   the second paragraph.

11   BY MR. McCULLOUGH:

12   Q.  Mr. Craig writes, "You should know that throughout the

13   period of our work for the Ministry we were, in this respect,

14   completely transparent.  We told everyone who was involved in

15   the project that we had been retained by and were working for

16   the Ministry of Justice in conducting this independent

17   examination of the events that occurred in Ukraine.

18             "As you know from reading the Report, the Report is

19   sharply critical of many aspects of the prosecution, and

20   concludes that, on various grounds, Ms. Tymoshenko's conviction

21   likely would be reversed under Western legal standards."

22             Do you see where it says that?

23   A.  Yes.

24   Q.  Why didn't this information end the inquiry?  "The Report

25   was sharply critical," why didn't that information end the

1    inquiry?

2    A.   Because, like I said earlier, the content of the Report in

3    my analysis is not important.   FARA is -- it's content neutral.

4    It's not -- it's not what's in the Report that matters so much.

5    It's not that I don't care what's in the Report, it just -- it

6    doesn't matter so much with registration.

7            What matters is that there's some message, regardless

8    of what the message is, that if a foreign principal wants a

9    message out, and that message is -- you know, if contacts with

10   the media or whatnot are done at the order, request, or

11   direction, or control of the foreign government in this case,

12   then registration would be required.   It does not matter what

13   the content of the Report is.

14   Q.   Okay.   And focusing on the fourth -- the bottom paragraph

15   of the first page.

16           It says, "In the first paragraph on page 2 of the

17   letter you ask us to tell you the amount of money paid by the

18   private citizen to Skadden."

19           Did Mr. Craig provide information about how much or

20   who that private citizen was?

21   A.   No.

22   Q.   And did Mr. Craig indicate why he was not providing that

23   information?

24   A.   Yes.   He said that the Ministry of the government of

25   Ukraine, Ministry of Justice, asked that it not be provided to

1   us.

2   Q.  And was that relevant to you?  Was that relevant that he

3   was telling you that the Ministry of Justice asked them not to

4   disclose it?

5   A.  It was interesting, and we definitely took it into

6   consideration while we were determining whether or not there

7   was a registration obligation.  This would be information that,

8   if there's a requirement to register, we would have that

9   information disclosed after registration.  So, it would be one

10  thing that we would want to look at, but -- but, you know,

11  here, he didn't -- they didn't provide it.

12  Q.  Okay.  And you had outlined seven questions in your April

13  letter; is that right?

14  A.  Yes.

15  Q.  And did Mr. Craig provide responses to those seven

16  questions?

17  A.  He provided a response to the seven questions, yes.

18  Q.  And, so, if we could turn to page 2.

19          Looks like he is setting forth the question and then

20  the response; is that your understanding?

21  A.  Yes.

22          MR. McCULLOUGH:  If we focus, first, on page 3,

23  Number 6 -- sorry.  Rather, Number 5.  If we can highlight

24  that, please.

25  BY MR. McCULLOUGH:

1    Q.  You had asked, "What was your firm's understanding of what

2    would happen to the Report when it was released to the

3    Ukrainian Ministry of Justice?"

4         And Mr. Craig writes in response, "The law firm was

5    aware that the Ministry of Justice was considering various

6    ideas about what to do with the Report."

7         And then if you can read the last two sentences of

8    Mr. Craig's response.

9    A.  "The law firm viewed the distribution of the Report as a

10   matter that would be decided by the Ukraine government in its

11   sole discretion.  The law firm did not advise the Ministry on

12   that issue."

13   Q.  And what did that -- what did that mean to you?

14   A.  It meant that they were not involved at all in the

15   distribution of the Report.  It was going to be something that

16   was decided by the Ukrainian government.  And they knew that

17   they were going to do something with it, but they didn't know

18   exactly what.

19   Q.  And turning your attention to Question 6.

20        You were asking, "Did you or anyone in your firm have

21   any media interviews or comments to the media, public, or

22   government officials about the Report and the findings of your

23   firm?"

24        Why were you asking that question?

25   A.  This basically goes to the heart of the statute, really.

1    We wanted to see if there was media contacts.  If there were

2    media contacts made at the order, request, direction, or

3    control of the Ukrainian government, then we would require

4    registration.

5    Q.  And did Mr. Craig identify any media that had been

6    contacted?

7    A.  Yes.

8    Q.  What did Mr. Craig say?

9    A.  He contacted *The New York Times*, the *LA Times*, and *The*

10   *National Law Journal*.

11   Q.  And reading the third sentence there.

12           Did Mr. Craig describe why those contacts had taken

13   place?

14   A.  He said that one purpose of the statements was to correct

15   misinformation that the media had received and was reporting

16   from the Ministry of Justice and from the Tymoshenko legal team

17   in Ukraine.

18   Q.  How did you react to reading that?

19   A.  I reacted that one person -- one purpose was to correct

20   misinformation.  When if it was specifically said that "one

21   purpose was," there must have been some other purpose as well.

22   Q.  So what did you want to know?

23   A.  I wanted to know whether or not the other purpose was to

24   get a message out to the American people regarding -- you know,

25   at the request, order, direction, or control of the government

1    of Ukraine.

2    Q.  Okay.  If we can focus -- if we go back one page and focus

3    on questions 1 and 2.

4          You write in the first question, "To whom, if anyone,

5    did your firm release or distribute the Report and when?"

6          Why is that question relevant?

7    A.  We wanted to know who -- who they gave the Report to.  Was

8    it distributed within the United States and when, so we could

9    just see the basic timeline.  It basically would be to tell the

10   story, sort of, of the Report.  You know, when it was written,

11   when it was released, you know, who it was released to.

12   Q.  And did Mr. Craig indicate that the Report had been

13   released to any media, in response to Question 1?

14   A.  Yes.  He said that the Report was distributed to a

15   representative -- I'm sorry, to -- yeah, *The New York Times*,

16   *The National Law Journal*, and the *LA Times*.

17   Q.  And when did Mr. Craig indicate that that had happened?

18   A.  Around December 12th or 13th of 2012.

19   Q.  Does the letter set forth those dates?

20   A.  Yes.

21   Q.  And the response to Question 2, "When was the Report

22   released to the Ukrainian Ministry of Justice?"

23          The response to that includes the second sentence.

24   "The Ministry of Justice released the Report on December

25   12th-13th, 2012"?

1    A.   Yes.

2    Q.   What was your understanding of what had happened?

3    A.   My understanding was that the law firm wrote the Report --

4    did the investigation, wrote the Report, provided it to the

5    Ministry in September of 2012, and then the Ministry of Justice

6    released the Report around the 12th or 13th of December, at the

7    same time that Skadden released the Report to the press.

8    Q.   And after reading the response that Mr. -- the responses

9    that Mr. Craig had provided, did the FARA Unit make any

10   decisions?

11   A.   Yes.

12   Q.   What was the FARA Unit's decision?

13   A.   We decided that there was enough information there to

14   require registration.

15   Q.   Without stating the legal reasons, why did you make the

16   determination?

17   A.   I was looking at -- there were several things.  One, you

18   know, you had this contract with the government of Ukraine, you

19   had a distribution of this report, so that there was a

20   relationship with the Ukraine.  Then you had the distribution

21   of the Report to press.  And then you had some actual

22   communications with the press.

23           And then, you know, the Ministry was not wanting the

24   release of the name of the individual funding it, what that

25   individual really had to do with it, who it was, how much

1    money.  All these factors went into determining that there's

2    enough here.  You got to register.

3    Q.  And, again, without stating the legal basis, what were the

4    factors that were driving your decision as to why they needed

5    to register?

6    A.  It would be the -- the distribution of the Report and the

7    media contacts were what we would view as political activity,

8    and that is registrable activity.  And it would also fall

9    within two other areas of the statute as well.

10   Q.  And, so, did the FARA Unit advise Skadden and Mr. Craig of

11   this determination?

12   A.  Yes.

13   Q.  I'm showing you what's been previously admitted as

14   Government Exhibit 5.

15              What is this?

16   A.  This is our letter.  It's September 5th, 2013, my letter to

17   Mr. Craig.

18              MR. McCULLOUGH:  And focusing on the first -- the

19   second paragraph of the letter, Ms. Rohde.

20   BY MR. McCULLOUGH:

21   Q.  What are you doing here in this paragraph?

22   A.  We were -- I was saying back to them what they had told us.

23   Basically, that, you know, this is what your retainer agreement

24   says, and this is what you said that you were going to be doing

25   for them in the retainer agreement.

```
 1    Q.  And if you'll read, starting with, "According to your
 2    June 3rd, 2013, letter."
 3    A.  Yes.
 4              "According to your June 3rd, 2013 letter, in December
 5    2012 your firm disseminated a copy of the Report to
 6    representatives of *The New York Times*, *The National Law
 7    Journal*, and *Los Angeles Times*.  Following distribution" --
 8              Do you want me to read on?
 9    Q.  Please.
10    A.  "Following distribution, you spoke with these
11    representatives to correct misinformation that the media had
12    received and was reporting from the Ministry of Justice and
13    from the Tymoshenko legal team in Ukraine."
14    Q.  Focusing your attention on the last sentence of the
15    letter -- last two sentences.
16              If you could read those, please.
17    A.  "We have determined that your actions in contacting the
18    media were activities meant to influence the U.S. public with
19    reference to the political, public interest, policies, or
20    relations of Ukraine.  Accordingly, Skadden must register under
21    FARA as an agent to the Ministry."
22    Q.  At this point, when you had made the determination and
23    informed Skadden, what was your understanding of why Skadden
24    and Mr. Craig had been in touch with the media?
25    A.  To disseminate the Report and to correct misinformation --
```

1  provide, you know, corrections to misinformation.

2  Q.  And did you have an understanding as to who had been

3  directing them?

4  A.  We had determined that since they had a contract with the

5  government of the Ukraine, that we determined that they had to

6  register because they were acting at the request or under the

7  direction of the government of the Ukraine.

8  Q.  And, so, in informing Skadden that they must register under

9  FARA, what was the demand?  What did that mean?

10  A.  That they would have to register under FARA?  That means

11  they would file the forms that we looked at earlier, the

12  initial registration statement, the Exhibit A, the Exhibit B,

13  and any short-form registration statements that would -- of

14  individuals working on the contract.

15  Q.  And would there have been any penalties associated with the

16  filing?

17  A.  There are penalties for -- under FARA.

18  Q.  At the time, were you considering any penalties?

19  A.  We were seeking the registration at this time, um-hum.

20  Q.  And were you seeking anything other than the registration

21  at that time?

22  A.  No.

23  Q.  And, so, I think you've described this previously, but what

24  happened after you sent this letter?

25  A.  After I sent this letter, we received contact from Skadden

1    law firm that they wanted to meet with us to discuss our

2    conclusions in the letter.

3    Q.  And what did you think when you heard that they wanted a

4    meeting?

5              MR. TAYLOR:  Objection.  Relevance.

6              THE COURT:  Well, I think that's a little bit of a

7    mushy question.

8              Was that an unusual event, that people meet with you

9    to discuss your determination?

10             THE WITNESS:  No.  It's very -- it's routine that we

11   would meet with people to talk about our decisions.

12             THE COURT:  So what did you decide to do next?

13             THE WITNESS:  Decided that we would meet with them.

14             THE COURT:  Okay.

15             Ask your next question.

16   BY MR. McCULLOUGH:

17   Q.  And why did you agree to meet with Skadden?

18   A.  Because if they had additional information to provide us to

19   help us with the determination, if there was additional

20   information that would somehow change our minds about

21   registration obligation, we would want to hear that.  Because,

22   like I said before, we're not going to have anybody register

23   that doesn't need to register.  So, we would be open to hearing

24   whatever information -- additional information they would like

25   to provide.

1   Q.  And, so, did a meeting take place?

2   A.  Yes.

3   Q.  Where did it take place?

4   A.  In -- at our offices at the Department of Justice.

5   Q.  And where -- at the time, 2013, where were those offices?

6   A.  They were in the Bicentennial Building at 600 E Street --

7   is that when we were?  Yeah, 600 E Street.

8   Q.  600 E Street in Washington, D.C.; is that right?

9   A.  Yes, Northwest.

10  Q.  Who attended from FARA?

11  A.  I was there; Kevin Connolly, he was a trial attorney with

12  the FARA Unit at the time; and Alex and Tim.

13  Q.  And who are Alex and Tim?

14  A.  Alex I mentioned earlier, he's a program specialist.  And

15  Tim is a supervisory program manager in the FARA Unit.

16  Q.  So -- and why did you include those other three people in

17  this meeting?

18  A.  We're a relatively small office, and we do a lot as a team.

19  We hash things out together and we want to hear, you know,

20  everybody's input into our decision.  So it's often that we

21  would have other people at the meeting.

22  Q.  And had those three other people been involved in the

23  inquiry to this date?

24  A.  Yes.

25  Q.  And do you recall who attended from Skadden?

1    A.  Yes.

2    Q.  Who was that?

3    A.  Mr. Craig, Mr. Gross, and Mr. Spiegel.

4    Q.  And had you met Mr. Craig before?

5    A.  Not that I recall, no.

6    Q.  And how about Mr. Spiegel?  Had you ever met Mr. Spiegel

7    before?

8    A.  Not that I recall, no.

9    Q.  And with respect to Mr. Gross, had you ever met Mr. Gross

10   before?

11   A.  I have had communications with Mr. Gross before that time.

12   Q.  And why is that?

13   A.  He often has questions regarding FARA because he represents

14   various clients under FARA.  So he would reach out to us in

15   certain situations and ask us questions.

16   Q.  Okay.  And, so, I want to take you to the meeting itself.

17           What was the format of the meeting?

18   A.  They -- everybody came into the room, and we exchanged

19   pleasantries.  And since they requested the meeting, I said,

20   Okay.  You requested this meeting.

21           Basically, paraphrasing.

22           But, go ahead and let us know why you're here.  And

23   we're willing to listen to what you have to say.

24   Q.  And who was running the meeting on behalf of the FARA Unit?

25   A.  I was.

1    Q.  And did you take any notes at this meeting?

2    A.  Not that I recall.

3    Q.  Why?

4    A.  When I'm at meetings like this and I'm talking, I talk; I

5    don't write.  Otherwise, I would be looking down all the time,

6    and I wouldn't be able to carry on a conversation and honestly

7    listen to what they're saying.

8    Q.  And did you notice anyone else taking notes at the meeting?

9    A.  I don't recall if anybody else took any notes at the

10   meeting.

11   Q.  And have you looked for notes of the meeting?

12   A.  Yes.

13   Q.  Have you found any notes of the meeting?

14   A.  No.

15   Q.  So, after opening the meeting with Skadden, what happened?

16   A.  They -- they were discussing their relationship and their

17   agreement with the government of Ukraine and talked to us about

18   that.  They wanted to make clear to us that all the

19   communications that they had with the media were done

20   independently, on -- on his own, like -- and I would say

21   Mr. Craig did most of the talking.  And it was any contact that

22   he had with the government -- with the press, with *The New York*

23   *Times*, *LA Times*, or *The National Law Journal*, was done on his

24   own to correct mischaracterizations that were made -- that were

25   reported about his work product, this report on the Tymoshenko

1    case.

2    Q.  And what does that -- you say "on his own."

3            What does that mean?

4    A.  It meant -- it means, to me, that -- and did at the time,

5    that he had written this report.  He was the main person

6    writing this report.  It was his work product.  He didn't like

7    that there were mischaracterizations made about the Report

8    because he thought they were mischaracterizations, and he was

9    going to fix it.  He was going to try to go out and talk to

10   these press people and say, These were mischaracterizations and

11   we need to correct this, and I'm doing it on my own.

12           That was the -- that was the takeaway from the

13   meeting, he did it on his own, and not at the request or under

14   the direction or control of the government of Ukraine.

15   Q.  And did Mr. Craig indicate whether he was correcting

16   mischaracterizations that had already been published?

17   A.  Yes.

18   Q.  What was your understanding?

19   A.  My understanding was -- and it was from the meeting and

20   confirmed in the letter -- that he was correcting inaccuracies

21   that were reported.

22   Q.  And in describing the contacts with the media, did

23   Mr. Craig indicate whether he had been asked by Ukraine to

24   contact the media?

25   A.  No.

1   Q.  What was your understanding?

2   A.  My understanding that -- was that this was an effort on his

3   part, because he didn't like the way it was being characterized

4   in the press, and he needed to fix it.

5   Q.  And during the meeting, who was communicating those points

6   to you and others at the FARA Unit?

7   A.  Greg Craig.

8   Q.  So how did the meeting end?  Did you request anything?

9   A.  Yes.  I requested that based on what was said at the

10  meeting, if they could put it in writing, in a letter to the

11  FARA Unit, basically summarizing the meeting.  And then they

12  did.

13  Q.  And summarizing what from the meeting?

14  A.  That -- that this was not -- none of the media contacts

15  that were made were made at the request or under the direction

16  or control of the Ukraine government.  And that was the gist of

17  the meeting.  And I asked that it be confirmed in a letter to

18  us.

19  Q.  I'm showing you what's been marked as Government's

20  Exhibit 12, previously admitted.

21          Ms. Hunt, what is this?

22  A.  This is a letter of October 10th, 2013, that was -- that

23  was basically summarizing our meeting of October 9th.

24  Q.  Was this the letter that you had asked for at the end of

25  the meeting?

1    A.   Yes.

2    Q.   And who signed this letter?

3    A.   Gregory Craig.

4    Q.   And focusing your attention on the second paragraph of the

5    letter.

6              Can you read what it says there, please?

7    A.   "As reported in earlier correspondence, this law firm

8    provided a copy of the Tymoshenko Report, the Report, to

9    certain U.S. media outlets.  This was done in response to

10   requests from the media.  The firm did not provide copies of

11   the Report to any other media outlets in the United States."

12   Q.   Was this information consistent with the information that

13   you had received during the meeting?

14   A.   Yes.

15   Q.   Was this one of the points that you had asked to be

16   memorialized in the letter?

17   A.   Yes.  I asked for the gist of the meeting to be

18   memorialized in the letter, and this was it.

19   Q.   Focussing your attention to the last paragraph of this

20   letter.

21             It says, "In responding to inaccuracies in U.S. news

22   reports, some of which were directly attributable to Ukraine,

23   the law firm did not consult with Ukraine, did not inform

24   Ukraine, did not act under instruction from Ukraine, and was in

25   no way serving as an agent for Ukraine."

1          Is this information consistent with what was

2    communicated to you during the meeting?

3    A.   Yes.

4    Q.   Why was this information relevant?

5    A.   This goes to the heart of the whole matter.  If they're not

6    doing it at the order, request, direction, or control of the

7    government of Ukraine, then I'm not going to require a

8    registration.

9    Q.   And, so, what affect did the letter and meeting have on

10   your decision as to whether Skadden needed to register?

11   A.   We reversed our decision and said that they did not have an

12   obligation to register, based on their representations at the

13   meeting and confirmed in the letter.

14   Q.   And did you advise Mr. Craig of FARA's change in

15   determination?

16   A.   Yes.

17   Q.   Showing you what's been marked as Government's Exhibit 13.

18          Is this the -- is this a letter that you sent?

19   A.   Yes.

20   Q.   And were you communicating the change in determination?

21   A.   Yes.

22   Q.   What is the date of this letter?

23   A.   January the 16th, 2014.

24   Q.   And who signed this letter?

25   A.   I did.

1    Q.  And focusing your attention on the penultimate paragraph,

2    "You conclude."

3            You write, "You conclude that your firm, in response

4    to U.S. news inquiries, did not act as an agent of Ukraine.  We

5    agree and find, based on the information you brought to our

6    attention, that your firm has no present obligation to register

7    under FARA."

8            Does this --

9    A.  Yes.

10   Q.  Does this summarize the basis of why you reversed your

11   decision?

12   A.  Yes.

13   Q.  And what is that?

14   A.  That none of the communications with the U.S. news

15   organizations were on behalf of the government of Ukraine, and

16   so we reversed our decision.

17   Q.  At any time in communications or meetings with

18   Greg Craig -- communications with Greg Craig or during the

19   meeting with Greg Craig, did he indicate that he had

20   recommended a public relations firm to the government of

21   Ukraine?

22           MR. TAYLOR:  Objection, Your Honor.  The discussion

23   at the bench.

24           THE COURT:  All right.  Overruled, for the reasons I

25   set forth on the bench.  And your objection is noted, and your

1    continuing objection to these kinds of questions is noted.

2    A.  Could you repeat the question, please?

3    BY MR. McCULLOUGH:

4    Q.  Absolutely.

5            Ms. Hunt, at any time during the communications or

6    during the meeting with Greg Craig, did he indicate to you that

7    he had recommended the hiring of a public relations firm to his

8    client, the government of Ukraine?

9    A.  No.

10   Q.  Is that something that would have been relevant to your

11   analysis?

12   A.  It would have been relevant to my analysis, yes.

13   Q.  Is that something that you would have wanted to know?

14   A.  Yes.

15   Q.  At any time during the correspondence or at the meeting,

16   did he indicate that he had been aware of the public relations

17   media strategy for the rollout of his report?

18           MR. TAYLOR:  Objection.  Approach the bench, Your

19   Honor?

20           THE COURT:  All right.  Well, then maybe you should

21   approach.

22           (Bench discussion:)

23           MR. TAYLOR:  There is no testimony that Mr. Craig was

24   aware that the Ukraine intended to use this as a public

25   relations tool.  There was the testimony from Hawker and Gates

1     that that's what they --

2              THE COURT:  That wasn't the question.  The question

3     was:  Did he indicate he was aware of the media strategy for

4     the rollout of the Report?  And I think there's been a lot of

5     testimony about a lot of media plans that were not sent to him.

6     But, there was certainly testimony about a media plan that was

7     sent to him, and a meeting of September 24th that he attended

8     with that.

9              MR. TAYLOR:  I misheard the question, Your Honor.

10             THE COURT:  That's okay.

11             MR. TAYLOR:  I thought the question was, was he aware

12    that there was a plan to use the Report from the --

13             THE COURT:  No.  I think he said the media strategy

14    for the rollout of the Report.

15             MR. TAYLOR:  The rollout.  Yeah.

16             THE COURT:  Okay.  All right.

17             MR. TAYLOR:  Okay.

18             THE COURT:  Yes.

19             (Open court:)

20             THE COURT:  Do you recall the question?

21             THE WITNESS:  No, I don't.

22             THE COURT:  All right.

23             You can re-ask it.

24    BY MR. McCULLOUGH:

25    Q.  At any time during the correspondence or the meeting with

1    Mr. Craig, did Mr. Craig indicate to you that he was aware that

2    there was a public relations media rollout strategy in

3    connection with the Report?

4    A.  No.

5    Q.  At any time during the communications at the meeting with

6    Mr. Craig, did he indicate that he had commented on the public

7    relations strategy that had been prepared by Ukraine's public

8    relations firm?

9    A.  No.

10   Q.  At any time during the correspondence or the meeting with

11   Mr. Craig, did he indicate to you that he had met with the

12   public relations firm to discuss management of the release?

13   A.  No.

14   Q.  At any time during the correspondence with Mr. Craig or

15   during the meeting with Mr. Craig, did he indicate to you that

16   he had a relationship with one of the reporters that he had

17   identified in his letters?

18   A.  That he had a relationship with one?

19   Q.  (Nods head.)

20   A.  No.

21   Q.  At any time during the correspondence or the meetings with

22   Mr. Craig, did he indicate that he had connected a *New York*

23   *Times* journalist with a lobbyist for Ukraine --

24   A.  No.

25   Q.  -- about the Report itself?

1    A.  No.

2    Q.  At any time during the correspondence or the meeting with

3    Mr. Craig, did he indicate that he had connected that lobbyist

4    with the journalist at *The New York Times*, and provided a copy

5    of the Report to that lobbyist in advance of the public

6    release?

7    A.  No.

8    Q.  Any correspondence or during the meeting with Mr. Craig,

9    did he indicate that he had informed *The New York Times* of the

10   timing of the public release of the Report, so that *The New*

11   *York Times* could publish an exclusive prior to that public

12   release?

13          MR. TAYLOR:  Objection to the form of the question.

14          THE COURT:  I think that might need to be rephrased

15   slightly.

16          MR. McCULLOUGH:  Happy to rephrase.

17   BY MS. GASTON:

18   Q.  At any time during the correspondence or at the meeting

19   with Mr. Craig, did he indicate that he had, at the direction

20   of Ukraine, communicated the timing of the public release of

21   the Report, that he had communicated that to *The New York Times*

22   journalist?

23   A.  No.

24   Q.  At any time during the correspondence or during the meeting

25   with Mr. Craig, did he indicate to you that he was in contact

1    with Ukraine and its public relations firm about whether *The*

2    *New York Times* would publish an exclusive prior to the public

3    release of the Report?

4            MR. TAYLOR:  Objection, Your Honor.  Argumentative.

5            THE COURT:  That's fair.

6            But, you can still answer the question.

7    A.  No.

8    BY MR. McCULLOUGH:

9    Q.  Would that information have been relevant to your inquiry?

10   A.  It would have been very relevant to my inquiry, yes.

11   Q.  Why is that?

12   A.  Because an involvement -- in my analysis, an involvement

13   with a public relations firm and -- would go to the heart of

14   political activities, where you're trying to influence any

15   section of the public within the United States concerning the

16   political or public interests of a government of a foreign

17   country.

18           And if you're involved in providing -- in my

19   analysis, providing a strategy related to the dissemination of

20   what we would call informational materials into the -- to the

21   media, then that would be -- that would be registrable

22   activity.

23           MR. McCULLOUGH:  Point of privilege, Your Honor?

24           THE COURT:  All right.

25           (Pause.)

```
 1              MR. McCULLOUGH:  No further questions, Your Honor.
 2              THE COURT:  All right.  I think we ought to take a
 3    lunch break before we begin our cross-examination.  So we're
 4    going to do that.  We'll resume at 2 p.m.
 5              Members of the jury, please do not discuss the case
 6    among yourselves or with anyone else, and we'll pick up again
 7    at 2 with the cross-examination.
 8              Thank you.
 9              (Whereupon the Jury exits the courtroom.)
10              THE COURT:  All right.  The rest of you are excused
11    as well, and the witness is, too, and we'll resume at 2 p.m.
12              Thank you.
13              (Recess.)
14                              *   *   *
15
16
17
18
19
20
21
22
23
24
25
```

CERTIFICATE OF OFFICIAL COURT REPORTER

I, JANICE DICKMAN, do hereby certify that the above

and foregoing constitutes a true and accurate transcript of my

stenograph notes and is a full, true and complete transcript of

the proceedings to the best of my ability.

Dated this 26th day of August, 2019.

/s/_____

Janice E. Dickman, CRR, RMR, CRC
Official Court Reporter
Room 6523
333 Constitution Avenue NW
Washington, D.C. 20001

## $

**$12,000** [2] - 2453:5, 2453:6

## '

**'80s** [1] - 2438:24
**'89** [1] - 2432:24
**'90** [1] - 2432:25
**'90s** [1] - 2438:24
**'actions** [1] - 2402:1
**'contact** [1] - 2397:6
**'disseminate** [1] - 2397:2
**'Otherwise** [1] - 2411:11

## /

**/s** [1] - 2487:12

## 0

**006** [1] - 2399:23

## 1

**1** [26] - 2379:18, 2397:1, 2397:19, 2400:1, 2427:16, 2427:22, 2428:3, 2428:11, 2428:17, 2429:9, 2429:17, 2429:18, 2429:23, 2430:1, 2441:16, 2441:22, 2445:9, 2446:16, 2446:23, 2453:8, 2458:18, 2458:20, 2458:25, 2467:3, 2467:13
**10** [1] - 2409:17
**100** [3] - 2368:22, 2422:21, 2452:12
**1000** [1] - 2369:3
**1082842** [2] - 2428:3, 2428:7
**10:32** [1] - 2430:9
**10:36** [1] - 2430:18
**10:38** [1] - 2430:9
**10th** [1] - 2477:22
**11** [2] - 2368:5, 2368:8
**11:30** [1] - 2404:19
**12** [3] - 2412:4, 2416:8, 2477:20
**12,000** [1] - 2456:7
**12-ish** [1] - 2404:19
**1246982** [3] - 2427:16, 2427:22, 2428:11
**1249835** [1] - 2429:9
**1265000** [2] - 2429:17, 2429:22
**1265005** [2] - 2429:18, 2430:1
**12:55** [1] - 2428:13
**12th** [3] - 2392:6, 2467:18, 2468:6
**12th-13th** [1] - 2467:25
**13** [1] - 2479:17
**13th** [2] - 2467:18, 2468:6
**14** [8] - 2445:9, 2445:14,

2445:17, 2458:19, 2458:23, 2459:2, 2460:7, 2460:8
**15th** [2] - 2428:9, 2428:22
**16th** [1] - 2479:23
**17** [1] - 2446:23
**18** [1] - 2377:20
**1800** [1] - 2369:2
**18th** [5] - 2394:3, 2442:2, 2447:13, 2448:17, 2448:25
**19-125** [1] - 2370:3
**19-CR-125** [1] - 2368:3
**1984** [1] - 2432:25
**1989** [1] - 2432:25
**1990** [1] - 2433:12
**1994** [1] - 2372:25
**19th** [1] - 2394:10
**1:06** [1] - 2429:23
**1:10** [1] - 2427:23
**1:11** [1] - 2430:1
**1:18** [1] - 2428:13
**1:50** [1] - 2427:23
**1st** [4] - 2427:21, 2428:1, 2428:22, 2428:24

## 2

**2** [18] - 2379:18, 2388:10, 2397:6, 2398:1, 2429:17, 2429:25, 2433:18, 2436:1, 2446:16, 2449:5, 2453:8, 2463:16, 2464:18, 2467:3, 2467:21, 2486:4, 2486:7, 2486:11
**20** [1] - 2374:18
**20001** [2] - 2369:9, 2487:15
**2002** [5] - 2433:12, 2434:4, 2434:5, 2434:6, 2434:12
**20036** [1] - 2369:3
**2004** [1] - 2372:22
**2011** [2] - 2445:23, 2447:8
**2012** [17] - 2373:16, 2373:23, 2375:7, 2376:13, 2377:20, 2387:14, 2439:6, 2439:8, 2442:2, 2444:16, 2446:1, 2447:7, 2448:25, 2467:18, 2467:25, 2468:5, 2470:5
**2013** [51] - 2373:17, 2373:23, 2379:10, 2380:1, 2380:8, 2381:5, 2381:18, 2382:21, 2386:14, 2390:4, 2390:23, 2391:7, 2392:7, 2394:3, 2398:25, 2399:7, 2402:8, 2404:1, 2409:17, 2427:13, 2427:14, 2427:21, 2428:1, 2428:9, 2428:13, 2428:17, 2428:18, 2428:22, 2428:24, 2429:10, 2429:13, 2429:14, 2429:20, 2429:21, 2430:6, 2430:10, 2430:14, 2430:17, 2439:6, 2439:8, 2440:9,

2449:10, 2453:21, 2454:4, 2462:4, 2469:16, 2470:2, 2470:4, 2473:5, 2477:22
**2014** [3] - 2440:9, 2447:9, 2479:23
**2019** [4] - 2368:6, 2434:12, 2434:13, 2487:9
**202** [3] - 2368:15, 2368:19, 2369:4
**202-354-3267** [1] - 2369:9
**20530** [2] - 2368:15, 2368:18
**20th** [4] - 2428:18, 2429:10, 2429:19, 2429:21
**21202** [1] - 2368:23
**21st** [1] - 2429:11
**22** [1] - 2373:8
**22nd** [1] - 2376:13
**233-0986** [1] - 2368:19
**2440** [1] - 2368:23
**24th** [3] - 2404:1, 2430:6, 2482:7
**252-7698** [1] - 2368:15
**26** [2] - 2368:6, 2430:10
**26th** [1] - 2487:9
**28th** [4] - 2381:18, 2382:21, 2389:16, 2429:12
**29** [1] - 2428:13
**29th** [2] - 2427:14, 2428:17
**2:19** [2] - 2428:4, 2430:12
**2:41** [1] - 2428:5

## 3

**3** [15] - 2379:18, 2380:17, 2388:12, 2390:5, 2397:11, 2402:8, 2447:24, 2448:18, 2449:16, 2453:9, 2453:24, 2458:20, 2458:25, 2459:1, 2464:22
**3.1** [1] - 2452:15
**30** [1] - 2373:12
**31** [1] - 2429:13
**31st** [1] - 2429:12
**333** [2] - 2369:8, 2487:14
**36th** [1] - 2432:8
**3rd** [6] - 2390:4, 2427:13, 2429:14, 2462:4, 2470:2, 2470:4

## 4

**4** [11] - 2379:18, 2380:17, 2388:14, 2388:17, 2389:23, 2447:10, 2447:18, 2447:19, 2447:24, 2451:15, 2461:24
**40** [1] - 2373:12
**400** [1] - 2438:13
**410** [2] - 2368:24, 2376:3
**413** [1] - 2378:23
**420** [1] - 2379:21
**437** [1] - 2429:4

**438** [1] - 2429:4
**439** [1] - 2429:5
**440** [1] - 2429:5
**445** [3] - 2381:16, 2381:22, 2381:25
**446** [1] - 2384:6
**447** [1] - 2384:23
**448** [1] - 2385:8
**450** [2] - 2438:13, 2438:16
**4500** [1] - 2373:7
**460** [1] - 2390:19
**462** [1] - 2391:23
**463** [1] - 2392:4
**464** [1] - 2394:1
**468** [3] - 2398:10, 2400:2, 2400:15
**471** [1] - 2403:23
**474** [1] - 2409:14
**4:30** [1] - 2383:17
**4:48** [1] - 2430:15
**4s** [1] - 2387:24
**4th** [2] - 2379:10, 2430:14

## 5

**5** [8] - 2388:23, 2391:7, 2399:7, 2447:18, 2447:19, 2452:1, 2464:23, 2469:14
**5.i** [2] - 2446:6, 2446:9
**5.j** [2] - 2446:6, 2446:11
**555** [1] - 2368:14
**5th** [2] - 2398:25, 2469:16

## 6

**6** [15] - 2387:14, 2389:1, 2396:21, 2400:1, 2401:8, 2414:2, 2414:12, 2415:19, 2427:17, 2447:11, 2447:18, 2458:22, 2459:10, 2464:23, 2465:19
**600** [3] - 2473:6, 2473:7, 2473:8
**618** [2] - 2418:4, 2459:11
**63** [1] - 2424:13
**6523** [2] - 2369:8, 2487:14
**6th** [4] - 2380:8, 2449:10, 2453:16, 2453:21

## 7

**7** [3] - 2414:2, 2414:12, 2415:19
**778-1814** [1] - 2369:4
**7th** [1] - 2380:1

## 8

**8** [2] - 2448:6, 2448:10

## 9

**9** [4] - 2383:20, 2385:15, 2386:14, 2390:23
**949-1146** [1] - 2368:24
**95** [1] - 2408:1
**95,000** [1] - 2452:17
**95-plus** [2] - 2407:22
**950** [3] - 2368:18, 2452:13, 2452:14
**9:30** [1] - 2430:8
**9:45** [1] - 2368:7
**9:59** [1] - 2430:8
**9th** [4] - 2404:13, 2430:17, 2454:4, 2477:23

## A

**a.m** [5] - 2368:7, 2430:8, 2430:9, 2430:18
**Aabelson@zuckerman.com** [1] - 2368:25
**Abelson** [2] - 2368:21, 2370:13
**ability** [1] - 2487:8
**able** [6] - 2378:10, 2397:3, 2397:21, 2399:20, 2420:16, 2475:6
**absolutely** [1] - 2481:4
**accept** [1] - 2402:2
**accepted** [2] - 2412:25, 2413:2
**access** [3] - 2426:17, 2426:20, 2427:8
**accessed** [12] - 2426:14, 2427:4, 2427:21, 2428:10, 2429:10, 2429:12, 2429:13, 2430:6, 2430:10, 2430:14, 2430:17
**According** [1] - 2470:1
**according** [1] - 2470:4
**accordingly** [2] - 2391:16, 2470:20
**account** [1] - 2453:2
**accurate** [6] - 2397:24, 2398:7, 2401:4, 2411:18, 2412:2, 2487:6
**accused** [1] - 2459:9
**act** [3] - 2410:22, 2478:24, 2480:4
**Act** [7] - 2377:18, 2386:17, 2386:23, 2434:22, 2442:11, 2451:1, 2454:7
**acting** [4] - 2434:7, 2434:8, 2443:23, 2471:6
**action** [2] - 2383:12, 2402:10
**Action** [1] - 2368:3
**actions** [3] - 2391:13, 2423:14, 2470:17
**activities** [18] - 2391:14, 2437:21, 2437:24, 2438:2, 2438:3, 2443:16, 2443:18, 2443:23, 2447:25, 2448:13,

2448:18, 2449:19, 2450:5, 2461:5, 2461:8, 2470:18, 2485:14
**activity** [14] - 2388:19, 2446:10, 2446:21, 2451:9, 2451:10, 2451:11, 2451:12, 2458:5, 2461:7, 2461:12, 2469:7, 2469:8, 2485:22
**acts** [1] - 2459:19
**actual** [5] - 2437:7, 2437:11, 2447:5, 2447:19, 2468:21
**Adam** [3] - 2368:17, 2368:21, 2370:13
**adding** [1] - 2411:10
**addition** [4] - 2373:21, 2387:16, 2427:8, 2457:7
**additional** [10] - 2386:21, 2409:4, 2444:7, 2453:19, 2454:16, 2456:22, 2457:11, 2472:18, 2472:19, 2472:24
**address** [1] - 2417:9
**addressed** [3] - 2375:15, 2375:17, 2375:19
**adequate** [1] - 2435:7
**administration** [1] - 2434:19
**administrative** [3] - 2428:8, 2428:19, 2429:11
**admitted** [18] - 2376:4, 2379:21, 2381:21, 2381:23, 2381:25, 2382:1, 2385:10, 2390:18, 2392:5, 2396:20, 2412:4, 2441:16, 2445:15, 2449:6, 2453:25, 2461:24, 2469:13, 2477:20
**advance** [1] - 2484:5
**advanced** [1] - 2403:15
**advice** [2] - 2373:6, 2450:1
**Advise** [1] - 2387:12
**advise** [5] - 2450:10, 2450:12, 2465:11, 2469:10, 2479:14
**advisement** [1] - 2440:6
**advisor** [1] - 2433:21
**advisory** [4] - 2433:18, 2433:19, 2436:1, 2436:2
**advocating** [2] - 2388:16, 2396:12
**affect** [1] - 2479:9
**affected** [2] - 2419:18, 2422:14
**affects** [1] - 2423:23
**afternoon** [2] - 2382:15, 2382:20
**agency's** [1] - 2425:3
**agenda** [1] - 2392:11
**Agent** [4] - 2432:6, 2432:9, 2432:19, 2434:22
**agent** [13] - 2391:17, 2395:25, 2406:12, 2408:4, 2408:19, 2410:23, 2411:2, 2413:1, 2437:21, 2437:22, 2470:21, 2478:25, 2480:4

**Agents** [7] - 2377:18, 2386:17, 2432:4, 2434:7, 2434:17, 2442:11, 2454:7
**agents** [1] - 2388:15
**ago** [2] - 2438:24, 2448:9
**agree** [5] - 2420:4, 2424:7, 2424:9, 2472:17, 2480:5
**agreed** [2] - 2420:1, 2430:22
**agreeing** [1] - 2420:2
**agreement** [27] - 2430:22, 2437:4, 2437:5, 2437:6, 2437:8, 2437:25, 2443:14, 2443:15, 2447:5, 2447:16, 2447:17, 2447:19, 2447:20, 2447:21, 2447:22, 2448:3, 2448:4, 2451:21, 2453:11, 2454:24, 2456:15, 2469:23, 2469:25, 2475:17
**agreements** [3] - 2378:16, 2388:20, 2451:16
**ahead** [2] - 2431:24, 2474:22
**Alex** [6] - 2440:20, 2440:21, 2440:22, 2473:12, 2473:13, 2473:14
**allegation** [1] - 2424:10
**alleged** [1] - 2419:20
**allegedly** [3] - 2423:8, 2423:17, 2424:18
**Allon** [1] - 2430:5
**allowed** [3] - 2419:21, 2424:8, 2460:13
**almost** [3] - 2372:18, 2407:12, 2422:21
**Amanda** [1] - 2370:10
**America** [2] - 2368:3, 2370:4
**American** [3] - 2438:8, 2461:14, 2466:24
**amount** [12] - 2387:12, 2436:17, 2452:8, 2452:10, 2452:24, 2453:4, 2453:13, 2453:17, 2456:4, 2456:6, 2463:17
**amounted** [1] - 2456:12
**AMY** [1] - 2368:9
**analysis** [13] - 2396:11, 2439:21, 2442:25, 2443:1, 2453:1, 2458:7, 2461:4, 2461:7, 2463:3, 2481:11, 2481:12, 2485:12, 2485:19
**analysts** [1] - 2433:21
**Angeles** [4] - 2388:12, 2399:15, 2400:17, 2470:7
**announced** [1] - 2422:12
**annoyed** [1] - 2383:14
**answer** [4] - 2399:12, 2399:13, 2422:8, 2485:6
**answered** [2] - 2408:12, 2415:25
**answering** [1] - 2414:9
**answers** [6] - 2370:25, 2377:24, 2380:23, 2415:10, 2415:11,

2459:18
**apart** [1] - 2372:2
**apologize** [1] - 2417:18
**appealing** [1] - 2455:5
**appear** [1] - 2402:2
**appeared** [1] - 2407:11
**applies** [1] - 2460:12
**apply** [1] - 2450:19
**appreciated** [1] - 2431:22
**approach** [6] - 2370:2, 2370:5, 2393:5, 2459:5, 2481:18, 2481:21
**approached** [3] - 2397:7, 2398:3, 2399:21
**appropriate** [6] - 2377:3, 2392:22, 2405:19, 2419:4, 2420:16, 2421:19
**appropriately** [1] - 2406:16
**April** [8] - 2383:20, 2385:15, 2386:14, 2427:14, 2428:13, 2428:16, 2454:4, 2464:12
**areas** [1] - 2469:9
**argumentative** [2] - 2371:1, 2485:4
**arguments** [2] - 2412:25, 2416:19
**Arnall** [1] - 2388:14
**Arps** [5] - 2372:15, 2372:17, 2372:21, 2426:11, 2442:8
**arrives** [1] - 2417:7
**article** [9] - 2440:24, 2441:3, 2441:5, 2441:6, 2441:8, 2442:3, 2442:19, 2442:21, 2443:3
**articles** [1] - 2433:25
**articulated** [2] - 2396:1, 2397:16
**aspects** [1] - 2462:19
**assignment** [1] - 2450:23
**assist** [3] - 2375:25, 2377:4, 2378:10
**assistant** [5] - 2382:11, 2405:3, 2428:8, 2428:19, 2429:11
**associated** [1] - 2471:15
**associates** [1] - 2373:22
**assuming** [1] - 2410:3
**attach** [1] - 2437:8
**attached** [4] - 2376:25, 2382:14, 2451:23, 2452:7
**attachment** [13] - 2377:8, 2380:7, 2382:17, 2382:18, 2382:19, 2383:4, 2383:6, 2386:11, 2387:7, 2391:3, 2398:19, 2409:24, 2427:18
**attachments** [1] - 2429:5
**attended** [3] - 2473:10, 2473:25, 2482:7
**attendees** [1] - 2404:21
**attention** [31] - 2375:7, 2376:3, 2378:22, 2379:20, 2381:15, 2384:5, 2384:23, 2389:23,

2392:23, 2393:25, 2398:10, 2403:23, 2409:13, 2412:3, 2434:2, 2439:5, 2440:18, 2440:24, 2441:2, 2446:3, 2447:10, 2449:16, 2452:2, 2454:9, 2454:18, 2465:19, 2470:14, 2478:4, 2478:19, 2480:1, 2480:6
**attorney** [8] - 2372:13, 2414:18, 2433:8, 2433:10, 2433:13, 2433:17, 2434:4, 2473:11
**Attorney's** [1] - 2368:13
**attributable** [2] - 2410:20, 2478:22
**August** [2] - 2368:6, 2487:9
**authorities** [1] - 2399:18
**authority** [1] - 2454:23
**available** [4] - 2377:2, 2391:1, 2426:2, 2426:3
**Avenue** [3] - 2368:18, 2369:8, 2487:14
**avoid** [1] - 2404:5
**avoided** [1] - 2371:10
**awaits** [1] - 2455:10
**aware** [10] - 2384:2, 2384:4, 2388:17, 2392:18, 2465:5, 2481:16, 2481:24, 2482:3, 2482:11, 2483:1

## B

**background** [3] - 2397:8, 2398:4, 2402:4
**bad** [2] - 2370:19
**balance** [1] - 2394:19
**Baltimore** [1] - 2368:23
**bank** [1] - 2407:13
**banner** [2] - 2445:11, 2447:1
**bar** [1] - 2396:4
**Barbara** [2] - 2376:20, 2377:4
**base** [2] - 2408:25, 2409:1
**based** [8] - 2436:4, 2440:10, 2440:11, 2441:8, 2441:13, 2477:9, 2479:12, 2480:5
**basic** [2] - 2406:9, 2467:9
**basis** [16] - 2380:23, 2397:24, 2397:25, 2398:6, 2398:8, 2401:3, 2401:12, 2401:16, 2402:13, 2402:14, 2421:19, 2440:23, 2441:10, 2448:22, 2469:3, 2480:10
**bearing** [6] - 2427:19, 2427:24, 2428:15, 2430:3, 2430:7, 2430:11
**became** [6] - 2374:19, 2375:1, 2432:17, 2433:7, 2434:6, 2434:10
**BEFORE** [1] - 2368:9
**began** [1] - 2407:25
**begin** [2] - 2441:23, 2486:3

**beginning** [3] - 2384:11, 2399:11, 2450:23
**begins** [1] - 2398:11
**behalf** [7] - 2437:17, 2437:22, 2439:3, 2439:12, 2448:14, 2474:24, 2480:15
**behind** [1] - 2456:21
**bench** [13] - 2371:3, 2371:21, 2393:6, 2417:12, 2417:16, 2417:20, 2421:11, 2425:7, 2459:7, 2480:23, 2480:25, 2481:18, 2481:22
**benefit** [1] - 2370:22
**BERMAN** [1] - 2368:9
**best** [4] - 2371:1, 2377:6, 2397:11, 2487:8
**better** [2] - 2383:11, 2394:18
**between** [10] - 2373:9, 2379:4, 2379:6, 2407:24, 2409:1, 2422:23, 2423:5, 2428:13, 2430:8, 2430:9
**beyond** [2] - 2398:8, 2403:15
**Bicentennial** [1] - 2473:6
**binder** [3] - 2376:5, 2415:20, 2441:17
**birthday** [1] - 2404:12
**bit** [4] - 2371:25, 2431:21, 2453:5, 2472:6
**blocking** [1] - 2426:20
**blow** [3] - 2441:18, 2446:5, 2449:17
**books** [2] - 2435:11, 2435:12
**bottom** [10] - 2379:7, 2379:22, 2381:16, 2385:9, 2391:8, 2409:15, 2450:21, 2452:2, 2460:25, 2463:14
**Bradley** [1] - 2368:17
**branch** [1] - 2402:6
**brawl** [2] - 2442:22, 2443:7
**break** [4] - 2413:7, 2413:8, 2413:11, 2486:3
**breaks** [1] - 2379:7
**brief** [2] - 2374:22, 2415:16
**briefly** [6] - 2387:3, 2402:9, 2444:6, 2444:13, 2448:6, 2458:17
**bright** [1] - 2408:11
**bring** [5] - 2370:16, 2371:4, 2392:22, 2413:17, 2425:12
**broad** [1] - 2411:2
**broke** [1] - 2421:21
**brought** [4] - 2374:21, 2374:22, 2440:24, 2480:5
**building** [1] - 2407:5
**Building** [1] - 2473:6
**bulk** [2] - 2395:15, 2395:16
**business** [2] - 2446:10, 2446:21
**BY** [40] - 2372:8, 2376:9, 2382:4, 2387:5, 2388:5, 2389:15, 2390:7, 2391:5,

2391:10, 2393:21, 2400:3, 2400:14, 2401:14, 2401:22, 2407:1, 2410:7, 2412:15, 2413:24, 2415:18, 2416:5, 2431:8, 2431:25, 2444:14, 2444:20, 2445:13, 2446:7, 2446:25, 2448:7, 2449:18, 2452:6, 2458:21, 2461:1, 2462:11, 2464:25, 2469:20, 2472:16, 2481:3, 2482:24, 2484:17, 2485:8

## C

**camel's** [1] - 2421:21
**Campoamor** [2] - 2368:12, 2370:9
**CAMPOAMOR** [2] - 2370:7, 2370:17
**Campoamor-Sanchez** [1] - 2368:12
**CAMPOAMOR-SANCHEZ** [2] - 2370:7, 2370:17
**care** [1] - 2463:5
**careful** [1] - 2382:3
**carry** [1] - 2475:6
**Case** [1] - 2370:3
**case** [24] - 2371:10, 2371:11, 2371:21, 2384:2, 2388:19, 2413:10, 2417:16, 2418:6, 2420:4, 2422:15, 2423:9, 2424:6, 2426:10, 2430:24, 2440:20, 2443:15, 2451:8, 2453:3, 2455:10, 2455:23, 2463:11, 2476:1, 2486:5
**cases** [1] - 2374:18
**categories** [1] - 2378:2
**Catherine** [3] - 2381:17, 2382:5, 2428:7
**Catie** [1] - 2382:16
**caused** [1] - 2439:21
**CC** [1] - 2376:16
**cell** [1] - 2377:6
**certain** [6] - 2376:1, 2411:18, 2436:3, 2443:16, 2474:15, 2478:9
**certainly** [4] - 2418:25, 2420:2, 2420:14, 2482:6
**CERTIFICATE** [1] - 2487:2
**certify** [1] - 2487:5
**chain** [4] - 2381:16, 2385:9, 2385:20, 2392:6
**chair** [1] - 2431:19
**chance** [1] - 2405:20
**change** [9] - 2380:21, 2433:3, 2439:19, 2439:22, 2445:5, 2459:19, 2472:20, 2479:14, 2479:20
**changed** [4] - 2413:1, 2440:3, 2440:7, 2455:9

**changes** [2] - 2380:19, 2429:3
**chapter** [1] - 2459:23
**characterized** [2] - 2423:7, 2477:3
**charge** [1] - 2423:13
**charged** [2] - 2454:22, 2455:21
**checked** [2] - 2426:25, 2429:23
**chief** [6] - 2434:6, 2434:7, 2434:8, 2434:10, 2434:11, 2439:9
**circumstance** [1] - 2420:7
**circumstances** [2] - 2400:18, 2436:3
**citizen** [6] - 2387:13, 2453:12, 2453:14, 2456:25, 2463:18, 2463:20
**clear** [7] - 2384:17, 2419:10, 2421:13, 2422:6, 2422:18, 2425:18, 2475:18
**clearly** [1] - 2421:18
**clerk/typist** [2] - 2432:12, 2432:13
**client** [8] - 2373:4, 2373:14, 2389:19, 2389:21, 2436:23, 2441:7, 2454:25, 2481:8
**clients** [3] - 2373:4, 2392:18, 2474:14
**Cliff** [3] - 2376:25, 2385:17, 2386:5
**Clifford** [1] - 2374:13
**closer** [1] - 2431:20
**coin** [1] - 2424:4
**colleagues** [1] - 2374:22
**college** [1] - 2432:11
**color** [2] - 2372:20, 2373:3
**COLUMBIA** [2] - 2368:1, 2368:14
**combination** [1] - 2375:25
**comfortable** [2] - 2389:19, 2441:18
**coming** [1] - 2374:6
**comment** [5] - 2411:18, 2411:21, 2411:22, 2411:23, 2411:24
**commentary** [2] - 2397:8, 2398:4
**commented** [1] - 2483:6
**comments** [3] - 2389:2, 2389:17, 2465:21
**communicate** [3] - 2402:4, 2402:9, 2406:20
**communicated** [4] - 2440:9, 2479:2, 2484:20, 2484:21
**communicates** [1] - 2393:10
**communicating** [6] - 2404:3, 2404:5, 2444:1, 2454:10, 2477:5, 2479:20
**communication** [2] - 2402:15, 2409:4
**communications** [9] - 2407:23,

2468:22, 2474:11, 2475:19,
2480:14, 2480:17, 2480:18,
2481:5, 2483:5
  **compare** [5] - 2399:23,
2412:16, 2446:13, 2447:12,
2448:16
  **complete** [4] - 2446:11,
2446:16, 2446:19, 2487:7
  **completely** [1] - 2462:14
  **compliance** [1] - 2435:7
  **component** [1] - 2450:22
  **compound** [1] - 2371:1
  **conceal** [3] - 2423:25, 2424:11,
2424:12
  **concealed** [1] - 2423:21
  **concealment** [1] - 2424:10
  **concerning** [2] - 2461:10,
2485:15
  **conclude** [2] - 2480:2, 2480:3
  **concluded** [1] - 2390:25
  **concludes** [1] - 2462:20
  **conclusion** [2] - 2409:3,
2418:15
  **conclusions** [3] - 2417:25,
2439:25, 2472:2
  **conditioned** [1] - 2450:24
  **conditions** [1] - 2448:4
  **conduct** [2] - 2399:8, 2450:13
  **conducting** [1] - 2462:16
  **conference** [4] - 2382:2,
2418:11, 2420:15, 2422:15
  **conferences** [2] - 2371:3,
2371:21
  **confirmed** [3] - 2476:20,
2477:17, 2479:13
  **confirming** [2] - 2379:24,
2440:5
  **conflict** [1] - 2396:3
  **connected** [2] - 2483:22,
2484:3
  **connection** [7] - 2374:4,
2387:15, 2388:19, 2403:21,
2457:1, 2458:1, 2483:3
  **Connolly** [1] - 2473:11
  **consequences** [3] - 2395:13,
2395:23, 2396:1
  **consider** [1] - 2430:23
  **consideration** [1] - 2464:6
  **considering** [2] - 2465:5,
2471:18
  **consistent** [8] - 2397:15,
2406:1, 2406:21, 2408:5,
2410:13, 2410:25, 2478:12,
2479:1
  **constitutes** [1] - 2487:6
  **Constitution** [2] - 2369:8,
2487:14
  **consult** [3] - 2410:21, 2411:3,
2478:23
  **consultant** [1] - 2449:25

  **Consultants** [1] - 2388:15
  **contact** [11] - 2398:2, 2402:1,
2402:10, 2402:11, 2406:13,
2458:6, 2461:17, 2471:25,
2475:21, 2476:24, 2484:25
  **contacted** [4] - 2397:4,
2397:22, 2466:6, 2466:9
  **contacting** [4] - 2391:13,
2461:6, 2461:13, 2470:17
  **contacts** [10] - 2401:25,
2457:23, 2461:3, 2463:9,
2466:1, 2466:2, 2466:12,
2469:7, 2476:22, 2477:14
  **contained** [1] - 2424:12
  **content** [8] - 2442:24, 2443:3,
2443:8, 2443:9, 2443:21,
2463:2, 2463:3, 2463:13
  **contention** [2] - 2397:19,
2398:1
  **continue** [2] - 2422:6
  **continues** [1] - 2420:23
  **continuing** [5] - 2421:1,
2421:12, 2425:1, 2425:8, 2481:1
  **contract** [10] - 2437:4, 2447:5,
2451:5, 2452:7, 2452:10,
2456:6, 2456:16, 2468:18,
2471:4, 2471:14
  **contrary** [2] - 2397:7, 2398:3
  **contrast** [1] - 2427:3
  **contribute** [1] - 2453:13
  **Control** [1] - 2432:3
  **control** [10] - 2443:17, 2443:24,
2446:12, 2446:19, 2463:11,
2466:3, 2466:25, 2476:14,
2477:16, 2479:6
  **conversation** [11] - 2394:9,
2394:12, 2394:21, 2395:16,
2396:7, 2396:14, 2396:23,
2405:25, 2408:16, 2417:11,
2475:6
  **conversations** [1] - 2394:9
  **convicted** [1] - 2450:15
  **conviction** [3] - 2455:4, 2455:5,
2462:20
  **copied** [1] - 2378:8
  **copies** [4] - 2399:20, 2411:12,
2425:22, 2478:10
  **copy** [21] - 2379:7, 2382:13,
2385:3, 2385:6, 2385:17,
2385:25, 2397:3, 2397:5,
2397:21, 2397:23, 2399:13,
2399:22, 2401:2, 2410:10,
2426:22, 2444:9, 2448:2,
2470:5, 2478:8, 2484:4
  **copying** [1] - 2377:3
  **correct** [20] - 2373:18, 2376:15,
2380:2, 2382:9, 2397:9,
2397:12, 2398:5, 2399:1,
2401:17, 2411:5, 2414:13,
2415:8, 2416:10, 2459:1,

2466:14, 2466:19, 2470:11,
2470:25, 2475:24, 2476:11
  **correcting** [3] - 2406:15,
2476:15, 2476:20
  **corrections** [2] - 2408:20,
2471:1
  **corrective** [2] - 2408:5, 2416:15
  **correspondence** [9] - 2478:7,
2481:15, 2482:25, 2483:10,
2483:14, 2483:21, 2484:2,
2484:8, 2484:18, 2484:24
  **corresponding** [1] - 2427:5
  **counsel** [9] - 2370:1, 2370:5,
2372:19, 2373:2, 2373:5,
2374:19, 2392:13, 2434:19,
2439:24
  **counsel's** [2] - 2373:19,
2376:21
  **Counterintelligence** [1] -
2432:3
  **country** [2] - 2461:11, 2485:17
  **couple** [5] - 2375:5, 2407:16,
2425:18, 2434:9, 2457:24
  **course** [3] - 2414:11, 2439:16
  **COURT** [81] - 2368:1, 2370:11,
2370:14, 2370:18, 2371:7,
2371:20, 2371:24, 2372:1,
2372:5, 2382:1, 2387:24,
2388:2, 2393:5, 2393:7,
2393:12, 2393:18, 2400:7,
2400:10, 2406:25, 2413:6,
2413:14, 2413:17, 2413:19,
2415:14, 2416:1, 2416:14,
2416:23, 2417:2, 2417:5,
2417:11, 2417:15, 2417:19,
2418:7, 2419:12, 2421:5,
2422:3, 2422:11, 2422:18,
2423:6, 2423:12, 2423:24,
2424:6, 2424:8, 2424:16,
2424:21, 2424:25, 2425:5,
2425:12, 2425:15, 2425:17,
2426:1, 2426:6, 2430:20,
2431:3, 2431:17, 2431:24,
2458:24, 2459:6, 2459:15,
2460:5, 2460:9, 2460:17,
2460:21, 2472:6, 2472:12,
2472:14, 2480:24, 2481:20,
2482:2, 2482:10, 2482:13,
2482:16, 2482:18, 2482:20,
2482:22, 2484:14, 2485:5,
2485:24, 2486:2, 2486:10,
2487:2
  **court** [5] - 2393:20, 2425:11,
2455:11, 2460:22, 2482:19
  **Court** [8] - 2369:7, 2369:7,
2370:2, 2417:9, 2418:2,
2425:25, 2455:6, 2487:13
  **Courthouse** [1] - 2369:8
  **COURTROOM** [4] - 2370:1,
2381:21, 2381:24, 2387:4

**courtroom** [4] - 2371:6, 2413:13, 2413:18, 2486:9
**cover** [6] - 2378:8, 2383:5, 2389:4, 2411:6, 2423:13, 2423:25
**covered** [1] - 2450:25
**covering** [1] - 2457:19
**craig** [3] - 2371:22, 2428:24, 2430:6
**Craig** [122] - 2368:6, 2370:1, 2370:4, 2370:13, 2374:12, 2375:2, 2375:3, 2376:14, 2378:19, 2379:7, 2380:12, 2380:13, 2381:8, 2382:23, 2390:9, 2390:15, 2390:24, 2391:19, 2391:22, 2393:24, 2394:3, 2394:10, 2394:12, 2394:17, 2394:22, 2394:23, 2395:10, 2396:14, 2396:18, 2396:22, 2397:15, 2398:11, 2398:13, 2399:4, 2400:18, 2401:11, 2401:15, 2402:15, 2402:17, 2403:25, 2404:3, 2404:21, 2405:5, 2406:5, 2407:21, 2407:24, 2408:13, 2408:16, 2409:15, 2409:22, 2410:8, 2411:25, 2414:14, 2415:21, 2416:12, 2418:22, 2427:12, 2427:15, 2427:21, 2427:23, 2428:4, 2428:5, 2428:6, 2428:10, 2428:14, 2428:21, 2429:13, 2429:19, 2429:21, 2429:25, 2430:2, 2430:10, 2430:14, 2430:17, 2438:19, 2438:25, 2449:12, 2449:13, 2453:10, 2455:17, 2459:8, 2462:6, 2462:12, 2463:19, 2463:22, 2464:15, 2465:4, 2466:5, 2466:8, 2466:12, 2467:12, 2467:17, 2468:9, 2469:10, 2469:17, 2470:24, 2474:3, 2474:4, 2475:21, 2476:15, 2476:23, 2477:7, 2478:3, 2479:14, 2480:18, 2480:19, 2481:6, 2481:23, 2483:1, 2483:6, 2483:11, 2483:14, 2483:15, 2483:22, 2484:3, 2484:8, 2484:19, 2484:25
**Craig's** [8] - 2382:11, 2389:6, 2395:8, 2396:7, 2405:2, 2428:7, 2429:11, 2465:8
**CRC** [2] - 2369:7, 2487:13
**create** [2] - 2426:22, 2429:1
**created** [14] - 2426:14, 2426:15, 2426:17, 2427:15, 2428:3, 2428:12, 2428:16, 2428:24, 2429:2, 2429:9, 2429:19, 2429:21, 2429:25, 2434:14
**crime** [1] - 2423:10

**criminal** [2] - 2372:20, 2373:3
**Criminal** [2] - 2368:3, 2370:3
**criminally** [1] - 2454:23
**critical** [3] - 2399:7, 2462:19, 2462:25
**Cross** [1] - 2369:16
**cross** [4] - 2413:7, 2413:22, 2486:3, 2486:7
**CROSS** [1] - 2413:23
**Cross-Examination** [1] - 2369:16
**cross-examination** [4] - 2413:7, 2413:22, 2486:3, 2486:7
**CROSS-EXAMINATION** [1] - 2413:23
**CRR** [2] - 2369:7, 2487:13
**curious** [1] - 2459:17
**currency** [3] - 2452:12, 2452:18, 2452:19
**cut** [1] - 2411:23

# D

**D.C** [8] - 2368:6, 2368:15, 2368:18, 2369:3, 2369:9, 2403:11, 2473:8, 2487:15
**daily** [1] - 2440:23
**date** [14] - 2376:12, 2377:19, 2386:13, 2390:3, 2390:22, 2391:6, 2409:16, 2430:2, 2442:1, 2449:9, 2454:3, 2462:3, 2473:23, 2479:22
**Dated** [1] - 2487:9
**dated** [8] - 2376:13, 2377:20, 2380:8, 2382:21, 2390:4, 2390:23, 2391:7, 2409:17
**dates** [2] - 2426:13, 2467:19
**David** [1] - 2376:18
**DAY** [2] - 2368:5, 2368:8
**Daylight** [1] - 2427:17
**days** [2] - 2404:25, 2442:5
**deal** [1] - 2454:24
**dealing** [2] - 2402:24, 2418:3
**December** [11] - 2375:7, 2376:13, 2377:20, 2442:2, 2447:13, 2448:17, 2448:25, 2467:18, 2467:24, 2468:6, 2470:4
**decide** [2] - 2402:25, 2472:12
**decided** [6] - 2402:22, 2412:1, 2465:10, 2465:16, 2468:13, 2472:13
**decision** [24] - 2393:9, 2402:20, 2403:16, 2410:9, 2413:1, 2418:21, 2418:22, 2418:24, 2419:18, 2420:18, 2421:24, 2421:25, 2422:13, 2422:14, 2425:3, 2440:7, 2440:8, 2468:12, 2469:4, 2473:20, 2479:10, 2479:11, 2480:11,

2480:16
**decision-maker** [1] - 2422:14
**decision-making** [2] - 2421:24, 2421:25
**decisions** [4] - 2419:2, 2419:3, 2468:10, 2472:11
**declined** [2] - 2402:3, 2402:5
**defective** [1] - 2423:23
**Defendant** [2] - 2368:7, 2368:20
**defense** [4] - 2370:25, 2372:20, 2373:3, 2420:3
**defined** [1] - 2410:10
**definitely** [1] - 2464:5
**definition** [1] - 2422:1
**demand** [2] - 2414:18, 2471:9
**Department** [8] - 2368:17, 2374:4, 2377:14, 2402:24, 2431:16, 2432:1, 2445:20, 2473:4
**department** [2] - 2399:7, 2432:8
**depth** [1] - 2436:17
**DEPUTY** [4] - 2370:1, 2381:21, 2381:24, 2387:4
**Describe** [1] - 2446:9
**describe** [9] - 2373:2, 2393:2, 2437:21, 2437:24, 2441:5, 2445:16, 2448:12, 2448:13, 2466:12
**described** [5] - 2395:4, 2400:15, 2405:25, 2437:21, 2471:23
**describing** [7] - 2395:17, 2411:16, 2441:4, 2443:10, 2448:8, 2453:10, 2476:22
**description** [6] - 2446:20, 2447:24, 2448:3, 2448:18, 2449:19, 2450:4
**detail** [4] - 2408:7, 2408:22, 2419:23, 2438:2
**detailed** [1] - 2408:3
**details** [2] - 2377:5, 2441:4
**determination** [22] - 2394:5, 2394:24, 2398:15, 2435:22, 2439:17, 2439:19, 2439:22, 2440:1, 2440:2, 2450:19, 2454:13, 2454:14, 2454:17, 2455:16, 2459:18, 2468:16, 2469:11, 2470:22, 2472:9, 2472:19, 2479:15, 2479:20
**determinations** [1] - 2435:14
**determine** [14] - 2377:25, 2386:22, 2420:13, 2434:2, 2435:7, 2435:11, 2436:7, 2442:16, 2444:3, 2448:23, 2448:24, 2456:19, 2458:4, 2459:13
**determined** [5] - 2390:16, 2391:13, 2470:17, 2471:4, 2471:5
**determining** [5] - 2443:12,

2494

2458:8, 2460:12, 2464:6, 2469:1
**developed** [1] - 2370:20
**development** [2] - 2384:3, 2392:1
**developments** [2] - 2384:2, 2392:19
**device** [1] - 2371:18
**Dickman** [2] - 2369:7, 2487:13
**DICKMAN** [1] - 2487:5
**did-you-know-and-would-it-have-mattered** [1] - 2419:8
**did-you-knows** [1] - 2419:12
**difference** [3] - 2395:21, 2417:23, 2422:23
**different** [7] - 2373:2, 2383:21, 2393:16, 2408:10, 2428:20, 2456:19, 2460:9
**DIRECT** [2] - 2372:7, 2431:7
**Direct** [2] - 2369:15, 2369:19
**directing** [18] - 2375:7, 2376:3, 2378:22, 2379:20, 2381:15, 2384:5, 2384:23, 2385:8, 2389:18, 2389:23, 2393:25, 2396:20, 2398:10, 2403:23, 2409:13, 2412:3, 2461:24, 2471:3
**direction** [11] - 2383:18, 2443:17, 2443:24, 2463:11, 2466:2, 2466:25, 2471:7, 2476:14, 2477:15, 2479:6, 2484:19
**directly** [2] - 2410:20, 2478:22
**director** [3] - 2375:20, 2376:19, 2442:7
**disagree** [1] - 2424:19
**disbursed** [1] - 2438:4
**disclose** [8] - 2418:8, 2436:13, 2436:18, 2437:7, 2437:13, 2438:2, 2464:4
**disclosed** [5] - 2436:16, 2458:15, 2459:13, 2461:18, 2464:9
**disclosure** [1] - 2435:8
**discretion** [1] - 2465:11
**discuss** [8] - 2377:2, 2379:17, 2402:5, 2413:10, 2472:1, 2472:9, 2483:12, 2486:5
**discussed** [2] - 2421:11, 2425:24, 2440:5
**discussing** [2] - 2439:21, 2475:16
**discussion** [13] - 2391:20, 2393:6, 2393:24, 2401:11, 2401:15, 2405:7, 2406:7, 2406:9, 2417:20, 2418:19, 2459:7, 2480:22, 2481:22
**discussions** [6] - 2380:20, 2391:20, 2392:24, 2393:11, 2403:9, 2403:20
**disseminate** [3] - 2397:20,

2437:16, 2470:25
**disseminated** [4] - 2438:5, 2458:1, 2458:2, 2470:5
**dissemination** [2] - 2458:6, 2485:19
**distinction** [1] - 2423:4
**distribute** [2] - 2388:9, 2467:5
**distributed** [3] - 2457:23, 2467:8, 2467:14
**distribution** [9] - 2457:22, 2461:17, 2465:9, 2465:15, 2468:19, 2468:20, 2469:6, 2470:7, 2470:10
**DISTRICT** [4] - 2368:1, 2368:1, 2368:10, 2368:14
**divide** [1] - 2373:9
**Division** [4] - 2377:1, 2377:14, 2434:15, 2434:16
**Dmitry** [1] - 2388:15
**document** [57] - 2375:13, 2377:9, 2380:10, 2382:14, 2383:13, 2386:2, 2386:24, 2397:5, 2397:23, 2426:7, 2426:8, 2426:12, 2426:17, 2426:19, 2426:21, 2426:22, 2426:24, 2426:25, 2427:1, 2427:3, 2427:4, 2427:6, 2427:7, 2427:8, 2427:10, 2427:11, 2427:14, 2427:19, 2427:22, 2427:24, 2428:2, 2428:3, 2428:5, 2428:9, 2428:16, 2428:23, 2429:6, 2429:7, 2429:15, 2429:20, 2429:23, 2429:24, 2430:2, 2430:3, 2430:7, 2430:11, 2430:12, 2430:14, 2430:15, 2430:17, 2430:18
**Document** [8] - 2427:16, 2428:7, 2428:11, 2429:8, 2429:17, 2429:18, 2429:22, 2429:25
**documents** [16] - 2400:10, 2401:6, 2401:10, 2401:13, 2401:15, 2414:4, 2426:15, 2428:21, 2429:1, 2429:3, 2429:4, 2429:16, 2434:1, 2440:19, 2440:23
**DOJ** [3] - 2377:1, 2385:23, 2390:25
**dollars** [1] - 2456:8
**done** [9] - 2384:14, 2389:7, 2407:21, 2410:11, 2426:3, 2463:10, 2475:19, 2475:23, 2478:9
**down** [5] - 2401:8, 2417:25, 2419:23, 2458:25, 2475:5
**draft** [30] - 2378:21, 2381:7, 2381:11, 2385:12, 2389:16, 2398:14, 2398:22, 2398:24, 2400:20, 2401:7, 2406:10,

2410:1, 2410:2, 2410:3, 2411:7, 2411:13, 2412:8, 2412:9, 2412:16, 2414:2, 2414:20, 2414:21, 2415:21, 2427:15, 2427:18, 2427:24, 2428:12, 2428:14, 2429:22
**Draft** [4] - 2428:4, 2429:16, 2429:17, 2429:25
**drafting** [1] - 2379:17
**drafts** [4] - 2426:8, 2427:12, 2428:20, 2428:21
**driving** [1] - 2469:4
**dropped** [1] - 2419:18
**due** [1] - 2450:1
**duly** [2] - 2371:16, 2431:5
**during** [20] - 2413:11, 2433:1, 2477:5, 2478:13, 2479:2, 2480:18, 2481:5, 2481:6, 2481:15, 2482:25, 2483:5, 2483:10, 2483:14, 2483:15, 2483:21, 2484:2, 2484:8, 2484:18, 2484:24
**duty** [12] - 2417:24, 2418:3, 2418:8, 2418:14, 2419:6, 2420:24, 2421:17, 2423:11, 2423:21, 2423:24, 2424:11, 2424:12

## E

**Earle** [4] - 2375:19, 2376:19, 2376:25, 2442:7
**early** [1] - 2438:24
**East** [1] - 2368:22
**Eastern** [1] - 2427:17
**edit** [4] - 2426:17, 2430:12, 2430:15, 2430:18
**editable** [2] - 2427:1, 2427:7
**edited** [9] - 2426:14, 2427:21, 2428:6, 2428:10, 2428:24, 2429:10, 2429:13, 2430:2, 2430:7
**edits** [1] - 2427:7
**EDT** [10] - 2427:23, 2428:4, 2428:5, 2429:23, 2430:2, 2430:8, 2430:9, 2430:12, 2430:15, 2430:18
**effect** [5] - 2395:19, 2445:22, 2445:25, 2446:1, 2447:7
**effort** [3] - 2456:21, 2459:13, 2477:2
**either** [3] - 2402:6, 2405:5, 2418:10
**election** [1] - 2454:22
**electronic** [3] - 2385:6, 2426:12, 2426:13
**elicit** [1] - 2460:2
**ELMO** [1] - 2387:3
**email** [45] - 2376:10, 2376:12, 2376:13, 2376:22, 2377:6,

2378:8, 2378:24, 2378:25, 2379:10, 2379:14, 2379:23, 2381:16, 2381:17, 2382:5, 2383:4, 2383:5, 2384:7, 2385:12, 2389:4, 2390:15, 2390:20, 2391:18, 2391:25, 2392:6, 2394:2, 2396:18, 2396:22, 2398:11, 2398:13, 2403:18, 2403:24, 2403:25, 2406:10, 2408:16, 2409:15, 2411:6, 2414:2, 2415:20, 2427:8, 2427:18, 2429:7, 2430:12, 2430:16, 2430:19

**Email** [8] - 2368:16, 2368:16, 2368:19, 2368:24, 2368:25, 2368:25, 2369:4, 2369:5

**emailed** [8] - 2426:15, 2427:17, 2427:24, 2428:6, 2428:11, 2428:14, 2428:22, 2430:3

**emails** [8] - 2379:4, 2379:6, 2379:16, 2380:3, 2383:10, 2385:9, 2385:19, 2429:4

**emarcus@zuckerman.com** [1] - 2369:5

**embezzlement** [2] - 2455:9, 2455:22

**employee** [1] - 2426:18

**employees** [4] - 2426:14, 2426:16, 2426:18, 2426:21

**enabled** [1] - 2426:16

**enclose** [1] - 2444:7

**end** [9] - 2376:7, 2381:5, 2383:17, 2395:18, 2451:4, 2462:24, 2462:25, 2477:8, 2477:24

**enforces** [1] - 2435:3

**engage** [3] - 2388:18, 2443:16, 2448:14

**engaged** [4] - 2373:24, 2447:25, 2448:19, 2449:20

**engagement** [6] - 2374:2, 2374:3, 2374:5, 2374:8, 2374:11, 2378:14

**engages** [1] - 2448:14

**enter** [2] - 2443:14, 2443:15

**entering** [1] - 2407:13

**enters** [2] - 2371:6, 2413:18

**entire** [1] - 2423:12

**entirely** [1] - 2419:17

**entities** [1] - 2438:15

**entitled** [1] - 2459:20

**entity** [2] - 2448:2, 2449:22

**entry** [2] - 2427:5, 2427:9

**enumerated** [1] - 2377:23, 2387:19

**envisioned** [1] - 2384:12

**Eric** [1] - 2376:17

**essence** [2] - 2395:3, 2409:9

**essential** [1] - 2424:13

**essentially** [1] - 2392:18

**EST** [1] - 2428:14

**estimate** [1] - 2373:9

**etcetera** [2] - 2397:8, 2398:4

**ethical** [1] - 2420:9

**European** [1] - 2455:5

**evasion** [2] - 2455:9, 2455:21

**event** [1] - 2472:8

**events** [3] - 2439:21, 2440:13, 2462:17

**evidence** [3] - 2378:23, 2426:1, 2430:24

**exact** [1] - 2403:1

**exactly** [3] - 2419:14, 2443:20, 2465:18

**exaggeration** [1] - 2418:5

**examination** [5] - 2413:7, 2413:22, 2462:17, 2486:3, 2486:7

**EXAMINATION** [4] - 2372:7, 2413:23, 2415:17, 2431:7

**Examination** [4] - 2369:15, 2369:16, 2369:17, 2369:19

**examined** [2] - 2371:17, 2431:6

**exceed** [1] - 2452:14

**exceeding** [1] - 2454:23

**exceptions** [1] - 2408:9

**excess** [1] - 2374:17

**exchanged** [1] - 2474:18

**exclusive** [2] - 2484:11, 2485:2

**excused** [4] - 2413:12, 2413:15, 2416:24, 2486:10

**executive** [2] - 2402:6, 2458:2

**exemption** [1] - 2443:19

**Exhibit** [54] - 2376:3, 2378:22, 2379:20, 2381:16, 2384:5, 2384:23, 2385:8, 2389:23, 2390:18, 2391:23, 2392:4, 2394:1, 2396:21, 2400:1, 2400:2, 2400:15, 2403:23, 2409:14, 2412:4, 2414:2, 2414:12, 2416:8, 2436:22, 2437:3, 2437:9, 2441:16, 2445:9, 2445:14, 2445:17, 2446:23, 2447:3, 2448:6, 2448:10, 2449:5, 2453:24, 2458:11, 2458:12, 2458:18, 2458:19, 2458:20, 2458:23, 2458:25, 2459:2, 2460:8, 2461:24, 2469:14, 2471:12, 2477:20, 2479:17

**exhibit** [4] - 2378:24, 2399:23, 2452:1, 2459:1

**exhibits** [3] - 2425:21, 2425:23, 2426:2

**Exhibits** [1] - 2415:19

**existed** [1] - 2444:15

**existing** [2] - 2448:2, 2448:4

**exits** [2] - 2413:13, 2486:9

**expect** [3] - 2378:17, 2405:12, 2417:21

**expectations** [1] - 2406:1

**expected** [1] - 2378:18

**experience** [1] - 2403:18

**experienced** [1] - 2403:21

**expertise** [1] - 2403:12

**experts** [1] - 2402:6

**expired** [2] - 2447:8, 2447:9

**explain** [2] - 2395:11, 2435:2

**explained** [1] - 2405:11

**explicit** [1] - 2450:22

**Export** [1] - 2432:3

**express** [1] - 2402:23

**expressed** [1] - 2416:12

**extent** [2] - 2377:4, 2408:21

**extra** [1] - 2370:24

**Ezra** [2] - 2369:1, 2370:13

**F**

**fact** [15] - 2382:7, 2411:23, 2414:18, 2418:25, 2419:1, 2420:13, 2421:9, 2422:20, 2422:22, 2423:7, 2423:15, 2423:16, 2423:17, 2423:18, 2459:19

**factor** [1] - 2453:6

**factors** [3] - 2460:11, 2469:1, 2469:4

**facts** [13] - 2405:16, 2406:21, 2408:5, 2408:11, 2408:21, 2411:25, 2418:9, 2419:24, 2420:16, 2424:18, 2426:9, 2430:23, 2436:3

**factual** [13] - 2380:23, 2397:24, 2397:25, 2398:6, 2398:8, 2401:3, 2401:11, 2401:16, 2402:13, 2402:14, 2408:6, 2411:20, 2421:19

**factually** [1] - 2412:1

**failing** [1] - 2459:9

**fair** [3] - 2414:15, 2419:17, 2485:5

**fall** [3] - 2409:18, 2461:5, 2469:8

**falls** [1] - 2372:2

**false** [6] - 2423:5, 2423:8, 2423:15, 2423:19, 2424:5, 2459:9

**falsehood** [1] - 2423:3

**falsehoods** [1] - 2419:20

**falsify** [2] - 2423:13, 2423:25

**familiar** [4] - 2377:1, 2415:20, 2434:25, 2435:1

**fancy** [1] - 2430:22

**far** [1] - 2424:25

**FARA** [130] - 2374:4, 2375:9, 2375:14, 2376:20, 2377:2, 2378:1, 2379:12, 2379:23, 2380:5, 2381:2, 2381:12, 2382:8, 2384:1, 2384:12,

2385:4, 2387:8, 2388:18,
2389:25, 2390:10, 2390:16,
2390:17, 2391:1, 2391:17,
2394:6, 2394:13, 2394:24,
2395:1, 2395:7, 2395:10,
2398:15, 2398:25, 2402:18,
2403:12, 2403:15, 2403:18,
2403:21, 2404:5, 2405:8,
2405:18, 2407:14, 2407:24,
2408:1, 2409:21, 2411:21,
2411:24, 2412:18, 2412:24,
2413:3, 2414:8, 2414:13,
2414:14, 2415:2, 2415:23,
2416:3, 2418:17, 2420:10,
2427:13, 2428:3, 2429:8,
2429:16, 2429:18, 2429:22,
2429:25, 2432:12, 2432:13,
2433:1, 2433:3, 2433:8,
2433:11, 2433:14, 2433:20,
2433:22, 2433:25, 2434:3,
2434:6, 2434:11, 2434:19,
2434:23, 2434:25, 2435:1,
2435:2, 2435:3, 2435:4, 2435:5,
2436:14, 2438:12, 2438:15,
2438:20, 2439:1, 2439:8,
2439:9, 2439:10, 2439:14,
2439:16, 2439:17, 2439:19,
2441:10, 2443:9, 2443:10,
2443:18, 2444:8, 2444:15,
2449:2, 2450:19, 2451:1,
2451:6, 2453:22, 2455:14,
2461:16, 2461:18, 2461:21,
2463:3, 2468:9, 2468:12,
2469:10, 2470:21, 2471:9,
2471:10, 2471:17, 2473:10,
2473:12, 2473:15, 2474:13,
2474:14, 2474:24, 2477:6,
2477:11, 2480:7
  **FARA's** [1] - 2479:14
  **fault** [1] - 2376:7
  **February** [7] - 2380:1, 2380:8,
2387:14, 2449:10, 2453:16,
2453:21, 2457:1
  **fell** [1] - 2450:2
  **felt** [1] - 2441:8
  **Fernando** [2] - 2368:12, 2370:9
  **fernando.campoamor** [1] -
2368:16
  **fernando.campoamor-
sanchez@usdoj.gov** [1] -
2368:16
  **few** [2] - 2383:16, 2430:1
  **fewer** [1] - 2371:2
  **figure** [2] - 2394:4, 2394:19
  **figuring** [1] - 2395:5
  **file** [7] - 2436:14, 2436:22,
2437:12, 2438:1, 2438:12,
2445:19, 2471:11
  **filed** [7] - 2395:19, 2428:15,
2438:19, 2438:23, 2438:25,

2439:2, 2458:2
  **filing** [3] - 2438:7, 2459:9,
2471:16
  **filings** [2] - 2433:22, 2437:20
  **final** [3] - 2389:25, 2390:4,
2412:5
  **finalized** [1] - 2429:8
  **findings** [2] - 2389:3, 2465:22
  **fine** [1] - 2417:19
  **firm** [74] - 2372:15, 2372:19,
2373:5, 2373:6, 2373:13,
2374:20, 2375:3, 2375:20,
2376:18, 2378:19, 2386:22,
2387:13, 2388:8, 2388:12,
2388:14, 2388:17, 2388:20,
2389:1, 2389:3, 2390:16,
2393:2, 2393:13, 2393:22,
2394:25, 2395:4, 2395:24,
2398:15, 2399:13, 2399:21,
2401:1, 2401:24, 2402:1,
2402:3, 2402:4, 2402:25,
2403:4, 2410:20, 2411:3,
2411:11, 2413:2, 2426:10,
2437:11, 2437:12, 2439:4,
2439:11, 2441:6, 2446:20,
2448:18, 2449:19, 2450:24,
2455:1, 2455:2, 2465:4, 2465:9,
2465:11, 2465:20, 2465:23,
2467:5, 2468:3, 2470:5, 2472:1,
2478:7, 2478:10, 2478:23,
2480:3, 2480:6, 2480:20,
2481:7, 2483:8, 2483:12,
2485:1, 2485:13
  **firm's** [12] - 2377:5, 2378:6,
2384:13, 2388:23, 2394:14,
2395:2, 2399:8, 2402:20,
2406:15, 2410:9, 2446:20,
2465:1
  **firms** [4] - 2438:16, 2438:17,
2457:25
  **first** [63] - 2371:16, 2374:3,
2374:6, 2374:18, 2375:11,
2376:5, 2377:13, 2377:21,
2378:4, 2378:5, 2378:11,
2378:21, 2378:24, 2379:9,
2379:21, 2381:15, 2383:25,
2384:11, 2384:21, 2386:18,
2386:19, 2387:6, 2387:8,
2388:8, 2391:23, 2394:12,
2398:20, 2398:24, 2399:3,
2399:5, 2399:9, 2408:23,
2409:14, 2409:25, 2410:1,
2410:2, 2410:3, 2417:22,
2418:19, 2421:10, 2425:6,
2427:15, 2428:12, 2429:22,
2431:5, 2440:16, 2442:18,
2444:15, 2444:18, 2445:19,
2447:11, 2451:19, 2454:8,
2454:9, 2454:12, 2458:13,
2462:7, 2462:8, 2463:15,

2463:16, 2464:22, 2467:4,
2469:18
  **First** [1] - 2429:16
  **five** [4] - 2373:22, 2413:9,
2432:15, 2442:5
  **fix** [2] - 2476:9, 2477:4
  **flawed** [2] - 2442:23, 2443:7
  **flew** [1] - 2404:24
  **flip** [5] - 2419:13, 2419:20,
2422:21, 2425:2, 2435:25
  **Flom** [2] - 2372:16, 2426:11
  **flush** [1] - 2408:8
  **focus** [8] - 2399:2, 2439:5,
2444:19, 2450:21, 2460:23,
2464:22, 2467:2
  **focusing** [21] - 2442:18,
2443:25, 2444:5, 2446:3,
2447:1, 2447:10, 2449:16,
2451:19, 2452:1, 2452:15,
2454:8, 2454:18, 2455:20,
2456:2, 2458:17, 2462:8,
2463:14, 2469:18, 2470:14,
2478:4, 2480:1
  **focussing** [1] - 2478:19
  **folks** [1] - 2376:16
  **follow** [9] - 2381:2, 2382:8,
2394:5, 2394:7, 2396:14,
2396:17, 2418:23, 2447:23
  **follow-up** [3] - 2381:2, 2382:8,
2418:23
  **following** [9] - 2379:13,
2398:12, 2401:20, 2409:19,
2416:9, 2426:9, 2427:11,
2470:7, 2470:10
  **follows** [2] - 2371:17, 2431:6
  **footer** [1] - 2445:21
  **FOR** [2] - 2368:1, 2368:13
  **foregoing** [1] - 2487:6
  **Foreign** [13] - 2377:18,
2386:17, 2432:4, 2432:6,
2432:9, 2432:19, 2434:7,
2434:17, 2434:22, 2437:4,
2442:10, 2450:25, 2454:6
  **foreign** [26] - 2395:25, 2434:16,
2436:13, 2436:23, 2436:24,
2436:25, 2437:14, 2437:17,
2437:21, 2437:22, 2438:9,
2438:10, 2441:11, 2443:14,
2443:15, 2443:17, 2443:24,
2448:1, 2448:14, 2449:21,
2456:19, 2461:11, 2463:8,
2463:11, 2485:16
  **form** [18] - 2383:19, 2416:20,
2427:1, 2427:7, 2437:1,
2437:10, 2437:13, 2438:23,
2439:2, 2445:22, 2445:25,
2446:1, 2447:6, 2459:21,
2459:22, 2471:13, 2484:13
  **formal** [1] - 2447:16
  **format** [1] - 2474:17

**forms** [4] - 2436:14, 2436:16, 2437:23, 2471:11
**forth** [5] - 2407:24, 2436:6, 2464:19, 2467:19, 2480:25
**forward** [1] - 2398:17
**forwarded** [6] - 2382:19, 2383:22, 2383:25, 2384:8, 2386:9, 2428:18
**forwarding** [1] - 2380:4
**four** [6] - 2373:22, 2378:2, 2387:19, 2444:21, 2444:25, 2445:2
**Fourth** [1] - 2368:14
**fourth** [2] - 2399:2, 2463:14
**framed** [2] - 2421:16, 2421:18
**frequently** [1] - 2375:1
**Friedman** [4] - 2376:17, 2391:21, 2392:8, 2392:24
**front** [1] - 2422:15
**full** [8] - 2373:22, 2377:12, 2377:21, 2377:22, 2387:18, 2438:2, 2448:3, 2487:7
**full-time** [1] - 2373:22
**fully** [3] - 2421:5, 2421:6, 2448:13
**fundamental** [1] - 2424:13
**funded** [1] - 2453:17
**funding** [3] - 2453:3, 2457:3, 2468:24
**furtherance** [1] - 2423:14

# G

**gas** [1] - 2454:23
**Gaston** [2] - 2368:13, 2370:8
**GASTON** [51] - 2371:13, 2372:4, 2372:6, 2372:8, 2376:7, 2376:9, 2381:19, 2381:23, 2381:25, 2382:4, 2386:25, 2387:2, 2387:5, 2388:1, 2388:3, 2388:5, 2389:11, 2389:14, 2389:15, 2390:5, 2390:7, 2391:3, 2391:9, 2391:8, 2391:10, 2393:9, 2393:15, 2393:21, 2399:24, 2400:3, 2400:9, 2400:13, 2400:14, 2401:8, 2401:14, 2401:19, 2401:22, 2407:1, 2410:5, 2410:7, 2412:14, 2412:15, 2413:5, 2415:16, 2415:18, 2416:5, 2416:22, 2425:20, 2426:5, 2426:7, 2484:17
**Gaston....................2372** [1] - 2369:15
**Gaston.................2415** [1] - 2369:17
**Gates** [1] - 2481:25
**Gazprom** [1] - 2454:25
**GBC** [4] - 2429:16, 2429:17, 2429:21, 2429:25

**general** [13] - 2372:19, 2373:2, 2373:5, 2373:19, 2374:19, 2376:21, 2378:4, 2392:13, 2395:17, 2399:18, 2414:18, 2435:2, 2439:24
**generally** [10] - 2374:1, 2379:4, 2391:20, 2393:2, 2406:8, 2411:16, 2412:25, 2441:5, 2447:12, 2457:19
**gentlemen** [1] - 2407:16
**gist** [2] - 2477:16, 2478:17
**given** [5] - 2373:13, 2385:6, 2392:15, 2422:25, 2423:16
**global** [2] - 2376:18, 2384:1
**Golden** [1] - 2388:14
**good-news-bad-news** [1] - 2370:19
**Government** [7] - 2441:16, 2445:9, 2445:17, 2446:23, 2449:5, 2453:24, 2469:14
**government** [49] - 2370:17, 2371:12, 2371:14, 2373:24, 2389:2, 2389:12, 2389:22, 2396:5, 2402:5, 2405:15, 2407:5, 2407:6, 2417:3, 2419:23, 2431:1, 2436:24, 2438:17, 2439:12, 2440:17, 2441:7, 2441:11, 2443:16, 2443:17, 2445:4, 2448:1, 2448:20, 2449:21, 2451:22, 2454:25, 2461:11, 2463:11, 2463:24, 2465:10, 2465:16, 2465:22, 2466:3, 2466:25, 2468:18, 2471:5, 2471:7, 2475:17, 2475:22, 2476:14, 2477:16, 2479:7, 2480:15, 2480:20, 2481:8, 2485:16
**Government's** [24] - 2376:3, 2378:22, 2379:20, 2381:15, 2384:5, 2384:23, 2385:8, 2389:23, 2390:18, 2391:23, 2392:4, 2393:25, 2396:20, 2398:10, 2403:23, 2409:13, 2412:3, 2414:2, 2414:12, 2416:8, 2445:9, 2445:14, 2477:19, 2479:17
**grab** [1] - 2415:20
**graduated** [4] - 2432:20, 2432:21, 2432:24, 2433:7
**graduating** [1] - 2433:3
**great** [1] - 2461:14
**Greg** [14] - 2374:12, 2376:25, 2382:13, 2382:15, 2385:6, 2386:2, 2386:6, 2449:12, 2449:13, 2477:7, 2480:18, 2480:19, 2481:6
**Gregory** [5] - 2368:6, 2370:4, 2388:14, 2462:6, 2478:3
**gross** [14] - 2403:9, 2403:10, 2403:11, 2403:13, 2404:21,

2405:11, 2406:5, 2411:7, 2411:20, 2414:25, 2474:3, 2474:9, 2474:11
**gross's** [4] - 2405:5, 2411:18, 2412:10, 2412:11
**grounds** [2] - 2424:17, 2462:20
**group** [3] - 2372:20, 2373:4, 2379:1
**guess** [15] - 2378:2, 2378:15, 2378:18, 2383:10, 2383:16, 2385:2, 2385:3, 2392:2, 2394:6, 2394:14, 2394:18, 2400:25, 2401:10, 2404:4, 2404:23
**guidelines** [1] - 2420:9
**Gulland** [1] - 2368:13
**guy** [1] - 2411:24
**GX10** [1] - 2429:15
**GX427** [1] - 2427:18
**GX428** [1] - 2427:25
**GX429** [1] - 2428:6
**GX430** [1] - 2428:8
**GX431** [1] - 2428:14
**GX433** [1] - 2428:23
**GX434** [1] - 2428:23
**GX435** [1] - 2429:4
**GX436** [1] - 2428:25
**GX451** [1] - 2429:7
**GX452** [1] - 2429:6
**GX455** [2] - 2428:2, 2428:25
**GX456** [3] - 2427:15, 2427:23, 2428:10
**GX7** [1] - 2430:4
**GX9** [1] - 2429:15

# H

**H-U-N-T** [1] - 2431:14
**Haley** [1] - 2372:2
**half** [2] - 2379:22, 2456:11
**hand** [4] - 2425:23, 2445:11, 2452:2, 2458:22
**handle** [2] - 2421:2, 2421:7
**Handle** [1] - 2375:15
**handling** [2] - 2376:2, 2392:19
**happy** [2] - 2421:12, 2484:16
**hard** [1] - 2370:24
**hardcopy** [1] - 2385:6
**hash** [1] - 2473:19
**Hawker** [1] - 2481:25
**head** [3] - 2376:18, 2384:1, 2483:19
**header** [4] - 2386:12, 2398:20, 2409:25, 2445:21
**headline** [1] - 2442:24
**hear** [4] - 2418:10, 2431:18, 2472:21, 2473:19
**heard** [2] - 2422:19, 2472:3
**hearing** [4] - 2371:18, 2408:23, 2420:3, 2472:23
**hearsay** [1] - 2393:4

**heart** [5] - 2406:12, 2406:18, 2465:25, 2479:5, 2485:13
**HEATHER** [2] - 2431:4, 2431:14
**Heather** [4] - 2417:4, 2431:2, 2431:13
**HELD** [1] - 2368:9
**held** [1] - 2405:23
**Helen** [1] - 2369:18
**help** [5] - 2433:22, 2440:13, 2453:13, 2459:18, 2472:19
**hereby** [1] - 2487:5
**high** [1] - 2405:23
**highlight** [1] - 2464:23
**highlighted** [2] - 2387:6, 2387:8
**highlighting** [3] - 2386:2, 2389:5, 2389:6
**Hilliard** [1] - 2431:13
**HILLIARD** [1] - 2431:14
**hired** [1] - 2432:11
**hiring** [1] - 2481:7
**history** [8] - 2426:8, 2427:11, 2427:15, 2428:2, 2428:10, 2429:6, 2429:15, 2429:20
**hold** [1] - 2386:25
**honestly** [1] - 2475:6
**Honor** [21] - 2370:3, 2370:7, 2371:13, 2393:19, 2415:13, 2415:25, 2417:3, 2417:6, 2417:21, 2425:10, 2425:13, 2431:1, 2459:3, 2459:5, 2459:8, 2480:22, 2481:19, 2482:9, 2485:4, 2485:23, 2486:1
**Honor's** [1] - 2424:20
**HONORABLE** [1] - 2368:9
**hope** [1] - 2371:8
**hoped** [1] - 2382:20
**hopes** [1] - 2406:2
**hoping** [1] - 2382:14
**horrific** [1] - 2370:20
**hour** [2] - 2416:16, 2452:13
**hour-ish** [1] - 2416:16
**hours** [1] - 2452:14
**house** [1] - 2419:19
**hryvnias** [1] - 2452:21
**hum** [3] - 2440:15, 2452:17, 2471:19
**Human** [1] - 2455:6
**HUNG** [1] - 2431:4
**Hunt** [14] - 2369:18, 2407:15, 2417:4, 2417:21, 2431:2, 2431:9, 2431:13, 2431:14, 2431:15, 2431:17, 2432:9, 2438:19, 2445:16
**hunt** [6] - 2405:22, 2448:8, 2460:2, 2461:2, 2477:21, 2481:5
**hypothetical** [1] - 2436:4

## I

**ideally** [1] - 2403:20

**ideas** [1] - 2465:6
**identified** [2] - 2458:10, 2483:17
**identifies** [1] - 2459:11
**identify** [1] - 2466:5
**ignore** [1] - 2386:3
**III** [1] - 2368:21
**immediately** [1] - 2429:23
**impact** [2] - 2442:24, 2443:1
**implicitly** [1] - 2385:3
**important** [12] - 2419:2, 2420:17, 2421:23, 2425:3, 2448:21, 2456:18, 2457:9, 2458:7, 2460:12, 2461:4, 2461:6, 2463:3
**IN** [1] - 2368:1
**in-depth** [1] - 2436:17
**inaccuracies** [3] - 2410:19, 2476:20, 2478:21
**include** [3] - 2403:19, 2412:10, 2473:16
**included** [1] - 2428:21
**includes** [2] - 2412:12, 2467:23
**including** [1] - 2426:15
**incoming** [3] - 2381:12, 2385:22, 2386:13
**inconsistency** [1] - 2409:1
**inconsistent** [5] - 2408:15, 2408:18, 2415:24, 2416:3, 2420:6
**incorporated** [1] - 2456:16
**independent** [2] - 2406:16, 2462:16
**independently** [1] - 2475:20
**INDEX** [1] - 2369:12
**indicate** [27] - 2379:11, 2384:25, 2385:11, 2385:25, 2389:5, 2398:21, 2418:18, 2451:23, 2455:24, 2463:22, 2467:12, 2467:17, 2476:15, 2476:23, 2480:19, 2481:6, 2481:16, 2482:3, 2483:1, 2483:6, 2483:11, 2483:15, 2483:22, 2484:3, 2484:9, 2484:19, 2484:25
**indicated** [2] - 2389:6, 2406:13
**indicates** [1] - 2384:25
**indictment** [5] - 2423:22, 2423:23, 2424:11, 2424:14, 2424:16
**individual** [7] - 2387:14, 2436:20, 2437:11, 2453:12, 2453:17, 2468:24, 2468:25
**individual's** [1] - 2387:15
**individuals** [2] - 2437:12, 2471:14
**influence** [6] - 2391:14, 2434:16, 2461:9, 2461:14, 2470:18, 2485:14
**influential** [1] - 2421:24

**inform** [3] - 2410:21, 2411:4, 2478:23
**information** [54] - 2378:3, 2378:11, 2386:12, 2386:22, 2402:16, 2403:15, 2405:15, 2419:7, 2420:24, 2427:12, 2429:16, 2434:1, 2436:16, 2436:17, 2437:16, 2440:10, 2440:11, 2444:7, 2446:15, 2448:21, 2448:22, 2449:23, 2450:18, 2451:16, 2452:7, 2453:19, 2454:12, 2454:15, 2454:16, 2455:14, 2455:17, 2457:9, 2459:10, 2459:12, 2460:4, 2461:17, 2462:24, 2462:25, 2463:19, 2463:23, 2464:7, 2464:9, 2468:13, 2472:18, 2472:20, 2472:24, 2478:12, 2479:1, 2479:4, 2480:5, 2485:9
**informational** [4] - 2437:17, 2438:5, 2458:14, 2485:20
**informed** [5] - 2390:15, 2459:22, 2459:24, 2470:23, 2484:9
**informing** [2] - 2392:1, 2471:8
**initial** [7] - 2403:18, 2436:18, 2445:1, 2445:18, 2449:2, 2458:15, 2471:12
**initiated** [2] - 2401:24, 2402:10
**input** [3] - 2384:15, 2394:17, 2473:20
**inquiries** [2] - 2459:24, 2480:4
**inquiry** [31] - 2375:9, 2375:12, 2375:14, 2376:20, 2381:9, 2384:1, 2384:11, 2421:4, 2435:16, 2439:10, 2439:14, 2439:16, 2441:9, 2441:23, 2442:15, 2443:5, 2445:2, 2448:21, 2449:3, 2451:4, 2452:25, 2455:18, 2457:9, 2459:11, 2459:22, 2460:4, 2462:24, 2463:1, 2473:23, 2485:9, 2485:10
**inspections** [1] - 2435:9
**instance** [3] - 2378:21, 2403:7, 2443:21
**instead** [1] - 2402:25
**institution** [2] - 2392:14, 2402:23
**instruction** [2] - 2410:22, 2478:24
**intended** [4] - 2408:7, 2408:8, 2416:17, 2481:24
**interacted** [2] - 2375:1, 2449:13
**interaction** [1] - 2408:15
**interactions** [2] - 2402:14, 2403:14
**interest** [1] - 2470:19
**interesting** [2] - 2453:4, 2464:5

**interests** [5] - 2391:15, 2438:9, 2438:10, 2461:11, 2485:16
**interoffice** [2] - 2375:13, 2377:9
**interrupting** [1] - 2417:18
**interviewed** [1] - 2402:3
**interviews** [4] - 2389:2, 2397:8, 2398:4, 2465:21
**introduce** [3] - 2370:5, 2372:9, 2431:11
**introductions** [1] - 2407:19
**investigation** [2] - 2450:13, 2468:4
**invitations** [1] - 2402:2
**involve** [1] - 2403:13
**involved** [7] - 2439:10, 2453:6, 2456:20, 2462:14, 2465:14, 2473:22, 2485:18
**involvement** [2] - 2384:19, 2455:25, 2485:12
**ish** [2] - 2412:23, 2416:16
**issue** [4] - 2399:7, 2454:24, 2455:15, 2465:12
**issued** [1] - 2448:25
**issues** [4] - 2380:22, 2392:15, 2403:22, 2449:25
**It'll** [1] - 2462:9
**Item** [2] - 2451:15, 2452:15
**items** [2] - 2392:9, 2392:15
**itself** [2] - 2474:16, 2483:25

## J

**JACKSON** [1] - 2368:9
**James** [1] - 2368:20
**JANICE** [1] - 2487:5
**Janice** [2] - 2369:7, 2487:13
**January** [3] - 2379:10, 2412:23, 2479:23
**January-ish** [1] - 2412:23
**Jason** [2] - 2368:17, 2370:8
**jason.mccullough@usdoj. gov** [1] - 2368:19
**joined** [1] - 2405:7
**Journal** [6] - 2399:15, 2400:17, 2466:10, 2467:16, 2470:7, 2475:23
**journalist** [3] - 2483:23, 2484:4, 2484:22
**journalists** [2] - 2402:4, 2402:9
**JUDGE** [2] - 2368:9, 2368:10
**June** [8] - 2381:18, 2390:4, 2402:8, 2427:13, 2429:14, 2462:4, 2470:2, 2470:4
**Junghans** [2] - 2369:1, 2370:13
**JURORS** [1] - 2381:20
**jurors** [3] - 2371:8, 2413:19, 2426:2
**jury** [11] - 2370:16, 2371:4, 2371:6, 2372:9, 2413:12, 2413:13, 2413:17, 2413:18,

2420:13, 2431:11, 2486:5
**JURY** [2] - 2368:4, 2368:8
**Jury** [1] - 2486:9
**Justice** [24] - 2368:17, 2374:5, 2377:14, 2387:16, 2388:11, 2388:25, 2402:24, 2431:16, 2432:2, 2445:4, 2445:20, 2449:21, 2457:2, 2462:16, 2463:25, 2464:3, 2465:3, 2465:5, 2466:16, 2467:22, 2467:24, 2468:5, 2470:12, 2473:4
**Justices** [1] - 2388:21

## K

**Kedem** [1] - 2430:5
**keep** [6] - 2392:17, 2399:16, 2404:25, 2425:16, 2446:23, 2459:23
**Kelly** [3] - 2376:20, 2377:4, 2378:9
**kept** [1] - 2426:13
**Kevin** [1] - 2473:11
**kind** [2] - 2393:7, 2418:5
**kinds** [4] - 2425:8, 2436:16, 2438:15, 2481:1
**knowledge** [4] - 2389:21, 2401:20, 2401:24, 2411:20
**knowledgeable** [1] - 2376:2
**known** [2] - 2374:17, 2434:23
**knows** [2] - 2419:12, 2452:23
**Kyiv** [2] - 2397:4, 2397:22

## L

**LA** [3] - 2466:9, 2467:16, 2475:23
**large** [2] - 2392:14, 2408:2
**Larry** [2] - 2377:7, 2382:13
**last** [23] - 2372:18, 2380:10, 2386:19, 2387:18, 2391:11, 2399:10, 2400:2, 2410:17, 2410:18, 2412:13, 2412:14, 2412:16, 2425:18, 2444:5, 2453:9, 2454:9, 2455:20, 2457:5, 2457:14, 2465:7, 2470:14, 2470:15, 2478:19
**late** [1] - 2438:24
**latest** [1] - 2392:1
**Law** [6] - 2399:15, 2400:17, 2466:10, 2467:16, 2470:6, 2475:23
**law** [35] - 2372:15, 2374:20, 2376:18, 2401:24, 2402:1, 2402:3, 2402:4, 2410:9, 2410:20, 2411:3, 2411:21, 2420:13, 2422:15, 2426:10, 2432:20, 2432:21, 2432:23, 2432:24, 2433:1, 2433:2,

2433:4, 2433:7, 2438:16, 2439:11, 2441:6, 2449:25, 2450:11, 2450:12, 2465:4, 2465:9, 2465:11, 2468:3, 2472:1, 2478:7, 2478:23
**lawmakers** [3] - 2438:10, 2442:22, 2443:7
**LAWRENCE** [1] - 2371:15
**Lawrence** [4] - 2369:14, 2371:14, 2372:11, 2430:4
**lay** [1] - 2405:16
**lead** [2] - 2374:10, 2374:12
**leadership** [2] - 2393:13, 2393:22
**leadership's** [1] - 2393:2
**leading** [5] - 2370:24, 2400:6, 2400:7, 2406:24, 2416:13
**leads** [1] - 2392:16
**learn** [3] - 2373:23, 2381:1, 2412:18
**learned** [6] - 2381:5, 2381:6, 2381:7, 2381:9, 2390:13, 2440:16
**learning** [4] - 2375:11, 2382:7, 2383:16, 2384:21
**least** [9] - 2373:12, 2378:5, 2378:21, 2405:10, 2406:1, 2406:19, 2408:7, 2416:18
**leave** [2] - 2413:10, 2460:7
**leaving** [1] - 2394:15
**lectern** [1] - 2370:5
**left** [5] - 2379:11, 2445:9, 2446:23, 2458:19, 2459:1
**legal** [17] - 2373:5, 2417:24, 2418:13, 2418:14, 2423:10, 2423:22, 2423:24, 2424:23, 2439:21, 2443:10, 2460:13, 2462:21, 2466:16, 2468:15, 2469:3, 2470:13
**legislative** [1] - 2402:6
**Letter** [2] - 2429:18, 2429:25
**letter** [147] - 2375:17, 2376:25, 2377:13, 2377:16, 2377:19, 2377:20, 2377:24, 2378:2, 2378:13, 2379:5, 2379:24, 2380:8, 2380:11, 2380:13, 2380:19, 2381:12, 2382:8, 2383:20, 2385:4, 2385:12, 2385:15, 2385:22, 2386:13, 2386:15, 2387:13, 2389:8, 2389:10, 2389:13, 2389:25, 2390:4, 2390:6, 2390:8, 2390:11, 2390:14, 2391:6, 2398:25, 2399:6, 2400:20, 2401:7, 2402:8, 2402:18, 2402:21, 2402:22, 2403:3, 2406:2, 2406:10, 2408:16, 2409:21, 2411:24, 2412:19, 2414:3, 2414:20, 2414:21, 2415:21, 2416:9,

2416:11, 2416:15, 2416:17, 2418:23, 2419:15, 2427:12, 2428:12, 2428:20, 2435:19, 2437:6, 2437:8, 2440:1, 2440:5, 2440:6, 2440:7, 2440:11, 2441:9, 2441:13, 2441:14, 2441:23, 2442:1, 2442:4, 2442:6, 2442:7, 2442:15, 2442:18, 2442:19, 2443:5, 2443:25, 2444:2, 2444:5, 2445:1, 2445:2, 2445:5, 2445:6, 2446:14, 2446:15, 2447:13, 2447:15, 2447:20, 2448:17, 2448:25, 2449:3, 2449:9, 2449:11, 2449:14, 2449:24, 2450:9, 2451:24, 2453:8, 2453:9, 2453:21, 2453:23, 2454:1, 2454:5, 2454:10, 2454:12, 2454:19, 2456:25, 2457:1, 2457:11, 2457:15, 2461:21, 2462:8, 2463:17, 2464:13, 2467:19, 2469:16, 2469:19, 2470:2, 2470:4, 2470:15, 2471:24, 2471:25, 2472:2, 2476:20, 2477:10, 2477:17, 2477:22, 2477:24, 2478:2, 2478:5, 2478:16, 2478:18, 2478:20, 2479:9, 2479:13, 2479:18, 2479:22, 2479:24

**letterhead** [2] - 2382:25, 2383:2
**letters** [6] - 2405:22, 2418:18, 2418:20, 2435:16, 2483:17
**level** [1] - 2408:6
**lie** [1] - 2424:18
**light** [1] - 2408:11
**lights** [1] - 2407:8
**likely** [1] - 2462:21
**Lillian** [1] - 2428:19
**limine** [1] - 2420:14
**limited** [2] - 2406:13, 2420:6
**limiting** [1] - 2388:21
**line** [12] - 2376:16, 2377:16, 2386:15, 2421:1, 2433:8, 2433:10, 2433:13, 2433:17, 2434:4, 2442:9, 2454:5, 2459:11
**link** [1] - 2428:5
**list** [10] - 2377:23, 2387:16, 2392:9, 2392:11, 2392:16, 2392:17, 2392:21, 2438:4, 2444:21, 2457:7
**listen** [2] - 2474:23, 2475:7
**lists** [1] - 2457:16
**litigation** [2] - 2376:18, 2384:1
**LLP** [3] - 2368:22, 2369:2, 2426:11
**lobbyist** [3] - 2483:23, 2484:3, 2484:5
**local** [1] - 2452:19
**location** [1] - 2407:12

**logistics** [1] - 2407:7
**look** [46] - 2377:8, 2377:12, 2377:21, 2379:3, 2379:9, 2380:3, 2380:7, 2380:10, 2380:16, 2382:17, 2383:5, 2385:19, 2386:18, 2386:24, 2390:5, 2391:3, 2391:23, 2392:4, 2398:19, 2398:20, 2399:9, 2409:24, 2410:5, 2410:17, 2414:6, 2435:6, 2435:10, 2435:21, 2441:1, 2443:8, 2443:11, 2443:12, 2443:13, 2443:19, 2443:20, 2444:12, 2448:6, 2453:8, 2453:9, 2454:8, 2457:14, 2462:7, 2464:10
**looked** [7] - 2378:25, 2408:9, 2412:8, 2416:8, 2427:10, 2471:11, 2475:11
**looking** [27] - 2378:3, 2378:5, 2381:16, 2386:11, 2387:18, 2391:1, 2394:7, 2394:17, 2401:7, 2409:14, 2411:6, 2412:7, 2412:13, 2443:22, 2445:17, 2445:21, 2447:2, 2447:6, 2451:8, 2451:9, 2451:10, 2451:13, 2451:15, 2453:7, 2468:17, 2475:5
**looks** [5] - 2383:4, 2392:10, 2398:14, 2411:10, 2464:19
**Los** [4] - 2388:12, 2399:15, 2400:17, 2470:7
**louder** [1] - 2431:21
**lunch** [1] - 2486:3
**lunchtime** [1] - 2404:18

# M

**mail** [2] - 2375:13, 2377:10
**main** [2] - 2397:17, 2476:5
**maintained** [1] - 2426:12
**maintains** [1] - 2455:6
**maker** [2] - 2392:16, 2422:14
**makeup** [1] - 2436:19
**management** [7] - 2426:8, 2426:12, 2426:24, 2427:1, 2427:3, 2429:24, 2483:12
**manager** [1] - 2473:15
**managing** [4] - 2375:19, 2376:17, 2376:19, 2442:7
**manner** [1] - 2434:2
**March** [3] - 2434:12, 2434:13, 2445:23
**Marcus** [2] - 2369:1, 2370:13
**marked** [4] - 2445:14, 2449:5, 2477:19, 2479:17
**matches** [1] - 2435:13
**material** [1] - 2423:11
**materiality** [7] - 2418:9, 2419:3, 2420:10, 2420:12, 2421:25,

2422:10, 2422:13
**materials** [9] - 2386:21, 2401:5, 2406:3, 2406:4, 2437:17, 2438:5, 2458:14, 2461:17, 2485:20
**matter** [14] - 2370:2, 2374:23, 2375:6, 2380:15, 2384:3, 2384:13, 2395:17, 2395:19, 2414:19, 2422:5, 2463:6, 2463:12, 2465:10, 2479:5
**mattered** [3] - 2419:8, 2422:8
**matters** [8] - 2370:15, 2373:13, 2373:14, 2424:2, 2455:25, 2457:19, 2463:4, 2463:7
**McCullough** [46] - 2368:17, 2370:8, 2371:23, 2417:3, 2417:6, 2425:13, 2425:16, 2431:1, 2431:8, 2431:25, 2444:12, 2444:14, 2444:18, 2444:20, 2445:8, 2445:13, 2446:5, 2446:7, 2446:22, 2446:25, 2448:5, 2448:7, 2449:17, 2449:18, 2452:3, 2452:6, 2458:18, 2458:21, 2459:1, 2460:1, 2460:7, 2460:23, 2461:1, 2462:7, 2462:11, 2464:22, 2464:25, 2469:18, 2469:20, 2472:16, 2481:3, 2482:24, 2484:16, 2485:8, 2485:23, 2486:1
**McCullough.................2431** [1] - 2369:19
**MD** [1] - 2368:23
**Meagher** [2] - 2372:15, 2426:11
**mean** [17] - 2373:16, 2392:12, 2392:21, 2395:15, 2397:25, 2423:12, 2426:25, 2427:9, 2442:12, 2450:9, 2465:13, 2471:9, 2476:3
**means** [4] - 2370:23, 2427:6, 2471:10, 2476:4
**meant** [5] - 2391:14, 2458:20, 2465:14, 2470:18, 2476:4
**media** [53] - 2389:1, 2389:2, 2391:14, 2397:2, 2397:6, 2397:7, 2397:20, 2398:2, 2398:3, 2400:5, 2400:15, 2400:16, 2401:25, 2402:1, 2402:2, 2402:9, 2410:11, 2410:12, 2411:12, 2457:23, 2458:7, 2461:2, 2461:6, 2461:13, 2461:15, 2461:18, 2463:10, 2465:21, 2466:1, 2466:2, 2466:5, 2466:15, 2467:13, 2469:7, 2470:11, 2470:18, 2470:24, 2475:19, 2476:22, 2476:24, 2477:14, 2478:9, 2478:10, 2478:11, 2481:17, 2482:3, 2482:5,

2482:6, 2482:13, 2483:2, 2485:21
**meet** [6] - 2422:9, 2472:1, 2472:8, 2472:11, 2472:13, 2472:17
**meeting** [86] - 2403:2, 2403:5, 2403:16, 2403:17, 2403:20, 2404:8, 2404:9, 2404:14, 2404:20, 2404:22, 2405:8, 2405:12, 2405:14, 2405:21, 2406:2, 2406:3, 2406:6, 2407:2, 2407:4, 2407:14, 2407:18, 2407:22, 2407:25, 2409:18, 2409:19, 2410:14, 2411:1, 2414:23, 2415:7, 2415:23, 2416:3, 2416:4, 2416:7, 2416:9, 2416:16, 2418:21, 2419:14, 2439:23, 2439:25, 2440:2, 2440:4, 2440:5, 2440:7, 2440:11, 2472:4, 2473:1, 2473:17, 2473:21, 2474:16, 2474:17, 2474:19, 2474:20, 2474:24, 2475:1, 2475:8, 2475:10, 2475:11, 2475:13, 2475:15, 2476:13, 2476:19, 2477:5, 2477:8, 2477:10, 2477:11, 2477:13, 2477:17, 2477:23, 2477:25, 2478:13, 2478:17, 2479:2, 2479:9, 2479:13, 2480:19, 2481:6, 2481:15, 2482:7, 2482:25, 2483:5, 2483:10, 2483:15, 2484:2, 2484:8, 2484:18, 2484:24
**meeting's** [1] - 2409:3
**meetings** [5] - 2386:7, 2403:22, 2475:4, 2480:17, 2483:21
**member** [1] - 2380:14
**members** [2] - 2415:2, 2486:5
**memorialized** [2] - 2478:16, 2478:18
**mention** [1] - 2456:12
**mentioned** [9] - 2373:1, 2375:8, 2376:10, 2387:13, 2388:18, 2410:2, 2441:3, 2456:25, 2473:14
**mentioning** [1] - 2404:9
**message** [6] - 2443:21, 2463:7, 2463:8, 2463:9, 2466:24
**met** [4] - 2474:4, 2474:6, 2474:9, 2483:11
**microphone** [2] - 2431:19, 2431:21
**Microsoft** [1] - 2426:16
**middle** [5] - 2394:2, 2395:18, 2403:24, 2404:19, 2454:19
**midmorning** [1] - 2413:8
**might** [2] - 2422:19, 2484:14
**mind** [1] - 2422:20
**minds** [2] - 2435:17, 2472:20

**Ministry** [28] - 2387:15, 2388:11, 2388:21, 2388:25, 2391:17, 2397:4, 2397:22, 2445:4, 2448:1, 2448:19, 2449:20, 2457:2, 2462:13, 2462:16, 2463:24, 2463:25, 2464:3, 2465:3, 2465:5, 2465:11, 2466:16, 2467:22, 2467:24, 2468:5, 2468:23, 2470:12, 2470:21
**minutes** [3] - 2413:9, 2413:15, 2430:1
**mischaracterizations** [5] - 2475:24, 2476:7, 2476:8, 2476:10, 2476:16
**misconstrued** [1] - 2411:22
**misheard** [1] - 2482:9
**misinformation** [8] - 2397:10, 2397:13, 2398:6, 2466:15, 2466:20, 2470:11, 2470:25, 2471:1
**misinterpreted** [1] - 2411:22
**mislead** [1] - 2419:25
**missed** [1] - 2372:6
**misspoke** [1] - 2372:24
**misstatements** [1] - 2406:15
**Molly** [2] - 2368:13, 2370:8
**molly.gaston@usdoj.gov** [1] - 2368:16
**moment** [3] - 2376:6, 2386:25, 2448:8
**Monday** [2] - 2424:2, 2424:3
**money** [9] - 2387:12, 2387:17, 2452:24, 2452:25, 2453:5, 2453:13, 2453:14, 2453:17, 2456:12, 2457:7, 2463:17, 2469:1
**monies** [2] - 2438:3, 2438:4
**months** [4] - 2390:14, 2432:15, 2437:25, 2438:1
**MORNING** [2] - 2368:5, 2368:8
**morning** [9] - 2370:7, 2370:11, 2370:14, 2371:3, 2371:7, 2404:24, 2414:1, 2431:9, 2431:10
**most** [4] - 2407:21, 2440:18, 2475:21
**motion** [1] - 2420:14
**motions** [1] - 2420:3
**motivated** [1] - 2455:7
**move** [2] - 2431:19, 2432:16
**moved** [1] - 2408:1
**moving** [1] - 2406:2
**MR** [92] - 2370:7, 2370:12, 2370:17, 2371:18, 2371:23, 2389:10, 2389:12, 2393:4, 2393:16, 2393:19, 2400:6, 2406:24, 2413:24, 2415:12, 2415:25, 2416:13, 2417:3, 2417:6, 2417:9, 2417:13,

2417:18, 2417:21, 2419:5, 2420:19, 2422:2, 2422:4, 2422:17, 2423:4, 2423:9, 2423:20, 2424:5, 2424:7, 2424:9, 2424:19, 2424:22, 2425:4, 2425:10, 2425:13, 2425:16, 2431:1, 2431:8, 2431:25, 2444:12, 2444:14, 2444:18, 2444:20, 2445:8, 2445:13, 2446:5, 2446:7, 2446:22, 2446:25, 2448:5, 2448:7, 2449:17, 2449:18, 2452:3, 2452:6, 2458:18, 2458:21, 2459:1, 2459:4, 2459:8, 2460:1, 2460:7, 2460:15, 2460:19, 2460:23, 2461:1, 2462:7, 2462:11, 2464:22, 2464:25, 2469:18, 2469:20, 2472:5, 2472:16, 2480:22, 2481:3, 2481:18, 2481:23, 2482:9, 2482:11, 2482:15, 2482:17, 2482:24, 2484:13, 2484:16, 2485:4, 2485:8, 2485:23, 2486:1
**MS** [51] - 2371:13, 2372:4, 2372:6, 2372:8, 2376:7, 2376:9, 2381:19, 2381:23, 2381:25, 2382:4, 2386:25, 2387:2, 2387:5, 2388:1, 2388:3, 2388:5, 2389:11, 2389:14, 2389:15, 2390:5, 2390:7, 2391:3, 2391:5, 2391:8, 2391:10, 2393:9, 2393:15, 2393:21, 2399:24, 2400:3, 2400:9, 2400:13, 2400:14, 2401:8, 2401:14, 2401:19, 2401:22, 2407:1, 2410:5, 2410:7, 2412:14, 2412:15, 2413:5, 2415:16, 2415:18, 2416:5, 2416:22, 2425:20, 2426:5, 2426:7, 2484:17
**multiple** [2] - 2425:21, 2429:2
**murder** [2] - 2455:10, 2455:22
**Murphy** [2] - 2368:20, 2370:12
**mushy** [1] - 2472:7
**must** [4] - 2391:16, 2466:21, 2470:20, 2471:8

# N

**name** [7] - 2372:10, 2387:14, 2431:12, 2431:13, 2453:16, 2468:24
**named** [3] - 2429:16, 2455:9, 2455:22
**names** [1] - 2407:17
**narrow** [1] - 2420:7
**National** [10] - 2377:1, 2377:13, 2399:15, 2400:17, 2434:15, 2434:16, 2466:10, 2467:16,

2470:6, 2475:23
**nature** [4] - 2378:4, 2378:12, 2446:9, 2446:20
**necessarily** [2] - 2427:9, 2451:7
**necessary** [1] - 2436:7
**need** [10] - 2370:15, 2370:23, 2386:7, 2386:21, 2414:6, 2417:11, 2454:16, 2472:23, 2476:11, 2484:14
**needed** [5] - 2421:14, 2454:16, 2469:4, 2477:4, 2479:10
**needs** [1] - 2420:8
**negotiating** [1] - 2454:23
**neutral** [2] - 2443:9, 2463:3
**never** [3] - 2383:20, 2403:17, 2422:22
**New** [14] - 2372:20, 2372:24, 2399:14, 2400:16, 2466:9, 2467:15, 2470:6, 2475:22, 2483:22, 2484:4, 2484:9, 2484:10, 2484:21, 2485:2
**new** [7] - 2408:22, 2418:23, 2428:3, 2428:5, 2433:6, 2434:14, 2434:20
**news** [10] - 2370:19, 2370:20, 2397:2, 2400:24, 2410:19, 2478:21, 2480:4, 2480:14
**next** [18] - 2371:5, 2371:12, 2375:24, 2377:6, 2379:3, 2392:3, 2392:9, 2392:10, 2393:24, 2394:20, 2400:12, 2412:23, 2417:2, 2430:25, 2456:9, 2472:12, 2472:15
**nice** [1] - 2371:9
**night** [1] - 2433:2
**none** [2] - 2477:14, 2480:14
**normal** [1] - 2404:18
**Northwest** [1] - 2473:9
**note** [2] - 2375:23, 2421:7
**notebooks** [1] - 2413:10
**noted** [4] - 2421:12, 2422:2, 2480:25, 2481:1
**notes** [11] - 2414:23, 2414:24, 2414:25, 2415:3, 2416:7, 2475:1, 2475:8, 2475:9, 2475:11, 2475:13, 2487:7
**nothing** [2] - 2413:5, 2416:22
**notice** [2] - 2454:3, 2475:8
**notion** [1] - 2406:11
**NSD** [1] - 2434:15
**number** [7] - 2375:24, 2383:10, 2392:14, 2408:2, 2414:5, 2436:14, 2447:24
**Number** [26] - 2370:3, 2388:17, 2397:19, 2398:1, 2400:1, 2401:8, 2427:16, 2427:22, 2428:3, 2428:7, 2428:11, 2429:8, 2429:17, 2429:18, 2429:22, 2430:1, 2441:22, 2446:16, 2447:19, 2448:18,

2451:15, 2464:23
**numbers** [6] - 2427:19, 2427:25, 2428:16, 2430:4, 2430:8, 2430:11
**NW** [5] - 2368:14, 2368:18, 2369:2, 2369:8, 2487:14

## O

**oath** [1] - 2413:21
**Obama** [1] - 2396:3
**object** [11] - 2418:16, 2419:7, 2420:25, 2421:3, 2421:8, 2421:10, 2422:7, 2425:3, 2425:6, 2459:11, 2460:15
**objecting** [2] - 2419:11, 2424:14
**objection** [18] - 2389:10, 2393:4, 2400:6, 2406:24, 2416:13, 2421:1, 2421:12, 2425:1, 2425:8, 2459:4, 2459:8, 2472:5, 2480:22, 2480:25, 2481:1, 2481:18, 2484:13, 2485:4
**objections** [3] - 2418:1, 2422:2, 2422:6
**objective** [1] - 2422:9
**objectively** [1] - 2422:14
**obligated** [1] - 2386:22
**obligation** [31] - 2377:17, 2386:16, 2418:19, 2418:20, 2419:24, 2433:20, 2435:15, 2435:18, 2435:20, 2436:5, 2436:8, 2436:11, 2436:12, 2440:12, 2440:25, 2441:12, 2442:10, 2442:12, 2442:14, 2442:17, 2443:4, 2443:13, 2448:24, 2453:2, 2454:6, 2458:8, 2459:20, 2464:7, 2472:21, 2479:12, 2480:6
**obligations** [2] - 2377:2, 2433:24
**obtain** [3] - 2397:3, 2397:21, 2399:20
**obviously** [2] - 2374:25, 2445:3
**occupation** [1] - 2372:12
**occurred** [1] - 2462:17
**October** [7] - 2404:13, 2409:17, 2412:22, 2430:14, 2430:17, 2477:22, 2477:23
**OF** [4] - 2368:1, 2368:8, 2368:14, 2487:2
**offered** [1] - 2409:7
**Office** [1] - 2368:13
**office** [15] - 2372:23, 2372:24, 2373:20, 2376:21, 2377:6, 2382:16, 2386:6, 2387:12, 2403:11, 2405:6, 2437:18, 2440:20, 2442:13, 2446:18, 2473:18

**offices** [5] - 2373:6, 2373:8, 2438:18, 2473:4, 2473:5
**OFFICIAL** [1] - 2487:2
**Official** [2] - 2369:7, 2487:13
**official** [1] - 2419:23
**officials** [3] - 2389:3, 2402:5, 2465:22
**often** [3] - 2451:9, 2473:20, 2474:13
**omission** [5] - 2419:25, 2423:2, 2423:6, 2423:7, 2424:15
**omissions** [3] - 2417:22, 2423:5, 2423:15
**omit** [1] - 2423:10
**omitted** [4] - 2421:9, 2422:20, 2423:11, 2423:17
**One** [1] - 2409:21
**one** [46] - 2370:18, 2371:21, 2372:1, 2374:18, 2374:21, 2385:2, 2386:25, 2388:2, 2401:24, 2404:25, 2405:6, 2417:7, 2418:4, 2421:2, 2421:7, 2421:10, 2421:20, 2421:22, 2422:12, 2424:17, 2424:24, 2425:14, 2425:20, 2437:23, 2438:25, 2447:4, 2447:8, 2450:12, 2451:10, 2452:12, 2454:14, 2458:13, 2461:7, 2461:12, 2461:16, 2464:9, 2466:14, 2466:19, 2466:20, 2467:2, 2468:17, 2478:15, 2483:16, 2483:18
**One-page** [1] - 2409:21
**ones** [1] - 2422:20
**open** [10] - 2393:20, 2394:15, 2425:11, 2426:17, 2426:19, 2426:21, 2427:6, 2460:22, 2472:23, 2482:19
**opened** [1] - 2427:1
**opening** [1] - 2475:15
**opinion** [2] - 2436:2, 2460:13
**opinions** [3] - 2433:18, 2433:19, 2436:22
**opponent** [1] - 2455:8
**opportunity** [5] - 2402:3, 2404:6, 2405:16, 2409:11, 2416:19
**opposed** [4] - 2400:20, 2403:2, 2422:22, 2424:3
**options** [4] - 2391:1, 2394:7, 2394:18, 2395:5
**oral** [5] - 2437:5, 2447:17, 2447:21, 2448:4, 2453:11
**order** [7] - 2377:24, 2443:17, 2443:23, 2463:10, 2466:2, 2466:25, 2479:6
**organization** [3] - 2377:25, 2422:11, 2436:20
**organizations** [1] - 2480:15
**organized** [1] - 2378:7

**original** [1] - 2456:16
**originally** [1] - 2428:16
**otherwise** [2] - 2412:2, 2475:5
**ought** [1] - 2486:2
**ourselves** [1] - 2402:24
**outcome** [1] - 2405:19
**outlets** [10] - 2397:2, 2397:21, 2399:19, 2400:5, 2400:15, 2400:16, 2400:24, 2410:11, 2478:9, 2478:11
**outlined** [1] - 2464:12
**outreach** [4] - 2374:4, 2405:2, 2406:14, 2408:19
**outside** [1] - 2371:2
**overlapped** [1] - 2392:3
**overrule** [1] - 2425:7
**overruled** [3] - 2406:25, 2416:14, 2480:24
**Overruled** [1] - 2421:11
**oversee** [1] - 2434:15
**own** [7] - 2406:15, 2439:2, 2475:20, 2475:24, 2476:2, 2476:11, 2476:13
**owned** [1] - 2454:25
**ownership** [2] - 2446:12, 2446:19

## P

**p.m** [9] - 2427:17, 2427:23, 2428:5, 2428:13, 2429:23, 2430:1, 2430:15, 2486:4, 2486:11
**page** [34] - 2378:24, 2379:3, 2379:4, 2379:6, 2379:9, 2380:10, 2386:24, 2387:18, 2390:5, 2391:9, 2399:3, 2399:10, 2401:7, 2409:21, 2416:17, 2444:13, 2444:15, 2444:19, 2445:21, 2446:3, 2447:11, 2448:6, 2452:1, 2452:2, 2453:8, 2453:9, 2456:9, 2462:8, 2463:15, 2463:16, 2464:18, 2464:22, 2467:2
**pages** [1] - 2380:16
**paid** [8] - 2387:12, 2452:8, 2452:11, 2452:25, 2456:4, 2456:7, 2456:13, 2463:17
**paragraph** [52] - 2377:12, 2377:21, 2377:22, 2386:18, 2386:19, 2387:18, 2387:20, 2391:9, 2391:12, 2398:24, 2399:2, 2399:10, 2399:23, 2400:2, 2401:19, 2401:20, 2409:25, 2410:6, 2410:17, 2410:18, 2411:11, 2412:7, 2412:13, 2412:14, 2412:16, 2424:13, 2442:18, 2443:25, 2444:5, 2444:19, 2450:21, 2453:9, 2454:8, 2454:9,

2454:18, 2454:19, 2456:2, 2456:9, 2456:10, 2456:11, 2457:5, 2457:14, 2460:25, 2462:8, 2462:10, 2463:14, 2463:16, 2469:19, 2469:21, 2478:4, 2478:19, 2480:1
**paralegal** [5] - 2370:10, 2432:17, 2432:18, 2432:20, 2432:24
**paralegals** [1] - 2433:22
**paraphrasing** [1] - 2474:21
**parcel** [1] - 2423:3
**pardon** [1] - 2371:18
**part** [9] - 2405:11, 2420:12, 2420:13, 2423:2, 2424:6, 2437:20, 2450:21, 2461:18, 2477:3
**participants** [1] - 2405:12
**particular** [2] - 2432:1, 2437:14
**parties** [2] - 2426:9, 2430:22
**partner** [5] - 2372:19, 2373:1, 2373:3, 2376:17, 2403:11
**partners** [3] - 2374:10, 2374:12, 2384:12
**party** [1] - 2436:24
**passionate** [2] - 2414:15, 2414:17
**past** [2] - 2407:8, 2451:11
**pasted** [1] - 2411:23
**Paula** [2] - 2369:1, 2370:12
**pause** [2] - 2387:1, 2485:25
**paying** [2] - 2456:18, 2456:23
**payment** [1] - 2457:12
**PDF** [4] - 2382:25, 2383:2, 2383:6, 2383:7
**penalties** [3] - 2471:15, 2471:17, 2471:18
**Pennsylvania** [1] - 2368:18
**penultimate** [1] - 2480:1
**people** [23] - 2373:7, 2373:19, 2375:24, 2376:1, 2384:15, 2392:17, 2393:8, 2400:10, 2420:2, 2422:12, 2431:18, 2433:19, 2435:14, 2438:8, 2438:15, 2440:19, 2466:24, 2472:8, 2472:11, 2473:16, 2473:21, 2473:22, 2476:10
**per** [1] - 2452:12
**perceive** [1] - 2409:1
**perceived** [1] - 2408:7
**percent** [4] - 2373:12, 2407:22, 2408:1, 2422:21
**perfect** [1] - 2452:5
**performed** [1] - 2439:11
**performing** [2] - 2440:17, 2450:5
**period** [3] - 2373:15, 2439:5, 2462:13
**permissible** [1] - 2422:16
**permit** [1] - 2418:12

**perpetuating** [1] - 2388:3
**person** [9] - 2375:15, 2375:17, 2403:12, 2405:21, 2411:21, 2420:7, 2436:25, 2466:19, 2476:5
**personally** [1] - 2449:13
**perspective** [1] - 2384:15
**pertinent** [1] - 2416:11
**phone** [2] - 2396:23, 2397:16
**pick** [1] - 2486:6
**picture** [1] - 2457:4
**pivotal** [1] - 2418:6
**pjunghans@zuckerman.com** [1] - 2369:4
**place** [7] - 2404:14, 2404:15, 2404:17, 2466:13, 2473:1, 2473:3
**Plaintiff** [2] - 2368:4, 2368:12
**plan** [4] - 2379:13, 2406:5, 2482:6, 2482:12
**planned** [2] - 2451:12, 2451:13
**plans** [1] - 2482:5
**pleading** [1] - 2420:1
**pleasantries** [2] - 2407:19, 2474:19
**pledge** [1] - 2396:3
**point** [24] - 2373:12, 2373:23, 2374:14, 2374:17, 2374:24, 2381:1, 2383:10, 2390:14, 2392:8, 2393:10, 2394:15, 2395:18, 2401:12, 2403:8, 2403:14, 2408:25, 2412:18, 2422:21, 2442:13, 2450:8, 2450:9, 2459:21, 2470:22, 2485:23
**points** [9] - 2397:15, 2397:18, 2400:5, 2404:7, 2409:11, 2416:12, 2416:15, 2477:5, 2478:15
**poke** [1] - 2408:3
**policies** [2] - 2391:15, 2470:19
**policy** [1] - 2396:3
**political** [13] - 2388:19, 2391:15, 2436:24, 2438:3, 2455:8, 2461:5, 2461:7, 2461:10, 2461:12, 2469:7, 2470:19, 2485:14, 2485:16
**politics** [1] - 2455:7
**portion** [2] - 2387:7, 2423:22
**portrayed** [1] - 2406:17
**posing** [2] - 2460:3
**position** [11] - 2394:13, 2394:14, 2395:2, 2395:9, 2409:2, 2414:15, 2419:5, 2420:23, 2424:23, 2434:14
**possibility** [2] - 2394:15, 2395:6
**possible** [8] - 2377:17, 2386:16, 2418:19, 2418:20, 2433:24, 2442:10, 2442:12, 2454:6

**possibly** [1] - 2371:11
**Post** [1] - 2375:14
**Post-it** [1] - 2375:14
**potential** [5] - 2395:13, 2403:5, 2435:23, 2435:25, 2436:10
**potentially** [2] - 2395:24, 2396:4
**Pratt** [1] - 2368:22
**precisely** [1] - 2460:1
**prefers** [1] - 2425:25
**preliminary** [1] - 2370:15
**prepare** [4] - 2375:25, 2378:17, 2404:22, 2406:3
**prepared** [4] - 2378:19, 2398:14, 2404:23, 2483:7
**preparing** [3] - 2376:1, 2384:13, 2406:4
**present** [5] - 2371:8, 2403:20, 2405:11, 2417:14, 2480:6
**preserved** [1] - 2424:24
**press** [11] - 2397:12, 2406:13, 2406:15, 2406:17, 2422:6, 2468:7, 2468:21, 2468:22, 2475:22, 2476:10, 2477:4
**presume** [1] - 2423:13
**pretrial** [4] - 2382:1, 2418:11, 2420:15, 2422:15
**pretty** [2] - 2436:17, 2448:22
**previous** [1] - 2380:16
**previously** [14] - 2376:4, 2379:21, 2381:23, 2385:10, 2412:4, 2441:16, 2445:15, 2449:6, 2453:24, 2456:3, 2461:24, 2469:13, 2471:23, 2477:20
**price** [2] - 2452:12, 2456:3
**principal** [9] - 2436:13, 2436:23, 2437:5, 2437:15, 2437:18, 2443:14, 2443:24, 2448:15, 2463:8
**principals** [1] - 2456:20
**principles** [2] - 2408:10, 2408:20
**print** [1] - 2402:9
**prison** [1] - 2455:4
**private** [7] - 2373:4, 2387:13, 2453:11, 2453:14, 2456:25, 2463:18, 2463:20
**privilege** [1] - 2485:23
**privileged** [1] - 2393:11
**probe** [2] - 2408:3, 2459:17
**problem** [1] - 2388:3
**proceed** [2] - 2372:3, 2413:6
**proceeded** [2] - 2395:11, 2429:1
**proceedings** [2] - 2455:11, 2487:8
**process** [8] - 2384:17, 2384:20, 2405:17, 2421:24, 2421:25, 2435:4, 2435:5, 2450:1

**product** [2] - 2475:25, 2476:6
**program** [4] - 2426:15, 2440:22, 2473:14, 2473:15
**progress** [1] - 2405:7
**project** [4] - 2453:3, 2453:14, 2453:15, 2462:15
**proposed** [4] - 2385:18, 2386:5, 2448:2, 2448:4
**proposes** [1] - 2448:14
**proposition** [2] - 2420:1, 2420:2
**prosecution** [3] - 2370:23, 2455:7, 2462:19
**prospective** [2] - 2451:8, 2451:9
**prove** [1] - 2424:8
**provide** [26] - 2373:5, 2380:23, 2385:22, 2397:4, 2397:22, 2399:21, 2409:5, 2410:10, 2429:15, 2433:18, 2435:22, 2436:2, 2446:18, 2450:1, 2450:18, 2450:25, 2452:7, 2453:16, 2459:10, 2463:19, 2464:11, 2464:15, 2471:1, 2472:18, 2472:25, 2478:10
**provided** [15] - 2399:13, 2401:6, 2401:10, 2402:17, 2406:22, 2411:8, 2411:12, 2453:14, 2455:17, 2463:25, 2464:17, 2468:4, 2468:9, 2478:8, 2484:4
**provides** [1] - 2447:5
**providing** [7] - 2386:1, 2402:16, 2403:15, 2451:20, 2463:22, 2485:18, 2485:19
**public** [39] - 2389:2, 2391:14, 2391:15, 2397:5, 2397:23, 2399:19, 2400:25, 2422:24, 2423:1, 2423:16, 2433:25, 2437:19, 2438:17, 2440:19, 2440:22, 2457:24, 2461:10, 2461:11, 2461:14, 2465:21, 2470:18, 2470:19, 2480:20, 2481:7, 2481:16, 2481:24, 2483:2, 2483:6, 2483:7, 2483:12, 2484:5, 2484:10, 2484:11, 2484:20, 2485:1, 2485:2, 2485:13, 2485:15, 2485:16
**publish** [2] - 2484:11, 2485:2
**published** [1] - 2476:16
**purpose** [9] - 2406:15, 2418:18, 2438:6, 2438:8, 2466:14, 2466:19, 2466:21, 2466:23
**pursuant** [4] - 2377:17, 2386:16, 2442:10, 2454:6
**pushed** [1] - 2421:21
**put** [12] - 2382:2, 2392:9, 2408:11, 2409:10, 2412:1, 2424:18, 2425:19, 2444:9, 2445:8, 2446:23, 2459:17,

2477:10
**puts** [1] - 2416:11

## Q

**quality** [1] - 2384:14
**questions** [66] - 2370:24, 2371:1, 2371:2, 2374:5, 2380:24, 2382:15, 2408:3, 2408:6, 2408:12, 2415:9, 2415:11, 2415:12, 2417:24, 2418:9, 2418:10, 2419:11, 2421:2, 2421:16, 2422:4, 2422:7, 2422:16, 2424:15, 2424:24, 2425:8, 2437:1, 2442:15, 2444:21, 2444:23, 2444:25, 2445:2, 2446:6, 2446:8, 2446:13, 2447:10, 2447:12, 2447:13, 2447:18, 2447:23, 2447:24, 2448:16, 2456:22, 2457:11, 2457:12, 2457:16, 2457:20, 2458:9, 2458:10, 2458:11, 2459:17, 2460:2, 2460:3, 2460:6, 2460:10, 2460:11, 2460:24, 2461:2, 2464:12, 2464:16, 2464:17, 2467:3, 2474:13, 2474:15, 2481:1, 2486:1
**Questions** [1] - 2379:18
**quibbled** [1] - 2419:25
**quickly** [1] - 2408:1
**quite** [4] - 2397:7, 2398:2, 2420:19, 2453:5
**quoting** [1] - 2459:23

## R

**raised** [3] - 2380:22, 2422:23, 2443:3
**raising** [2] - 2374:5, 2447:13
**rather** [3] - 2425:20, 2453:9, 2464:23
**Re** [6] - 2377:16, 2377:17, 2386:15, 2386:16, 2418:19, 2418:20
**re** [1] - 2482:23
**re-ask** [5] - 2482:23
**reach** [5] - 2377:6, 2384:10, 2406:14, 2436:1, 2474:14
**reached** [3] - 2382:15, 2384:9, 2454:24
**reaches** [1] - 2386:8
**reaching** [2] - 2384:18, 2435:23
**react** [1] - 2466:18
**reacted** [1] - 2466:19
**reacting** [2] - 2406:14, 2408:19
**reaction** [7] - 2383:12, 2393:3, 2393:17, 2416:2, 2450:4, 2450:6, 2450:7
**reactive** [3] - 2408:4, 2410:15,

2416:15

**read** [24] - 2376:23, 2387:10, 2388:4, 2391:11, 2396:25, 2399:11, 2400:10, 2401:23, 2410:18, 2417:7, 2425:14, 2425:17, 2425:21, 2426:3, 2427:9, 2442:21, 2446:8, 2452:15, 2457:6, 2465:7, 2470:1, 2470:8, 2470:16, 2478:6

**reading** [9] - 2371:10, 2399:6, 2450:8, 2454:19, 2457:5, 2462:18, 2466:11, 2466:18, 2468:8

**really** [8] - 2370:21, 2383:25, 2394:16, 2408:10, 2421:13, 2460:20, 2465:25, 2468:25

**reason** [2] - 2399:20, 2400:25

**reasonable** [1] - 2405:24

**reasons** [6] - 2383:16, 2383:21, 2421:11, 2425:7, 2468:15, 2480:24

**recalled** [2] - 2375:8, 2380:14

**receipt** [1] - 2379:24

**receipts** [1] - 2438:3

**receive** [3] - 2449:2, 2449:23, 2461:21

**received** [17] - 2376:25, 2381:7, 2381:11, 2384:16, 2384:19, 2385:17, 2389:16, 2391:18, 2396:18, 2438:4, 2440:6, 2440:10, 2462:1, 2466:15, 2470:12, 2471:25, 2478:13

**receiving** [5] - 2375:13, 2383:12, 2449:14, 2450:4, 2453:21

**recent** [1] - 2419:25

**recently** [2] - 2455:8, 2455:21

**recess** [2] - 2413:16, 2486:13

**recipient** [1] - 2376:19

**recollection** [3] - 2374:3, 2378:18, 2397:11

**recommended** [2] - 2480:20, 2481:7

**record** [10] - 2370:6, 2372:10, 2397:1, 2417:8, 2421:6, 2421:8, 2421:12, 2431:12, 2458:24

**records** [3] - 2426:13, 2435:11, 2435:12

**Redirect** [1] - 2369:17

**redirect** [1] - 2415:15

**REDIRECT** [1] - 2415:17

**refer** [1] - 2389:4

**reference** [4] - 2391:15, 2414:20, 2442:19, 2470:19

**referenced** [2] - 2390:20, 2451:5

**references** [2] - 2383:19, 2425:21

**referencing** [1] - 2373:15

**referred** [1] - 2456:3

**referring** [1] - 2456:14

**refers** [2] - 2454:21, 2455:2

**reflect** [3] - 2427:11, 2427:18, 2429:20

**reflected** [14] - 2394:14, 2427:14, 2427:23, 2427:25, 2428:6, 2428:8, 2428:9, 2428:14, 2428:23, 2428:25, 2429:3, 2429:4, 2429:6, 2430:4

**reflects** [4] - 2379:15, 2426:24, 2427:4, 2428:2

**regard** [1] - 2405:23

**regarding** [4] - 2394:13, 2426:7, 2466:24, 2474:13

**regardless** [1] - 2463:7

**regime** [1] - 2455:8

**register** [43] - 2377:17, 2377:25, 2386:16, 2386:23, 2390:16, 2390:25, 2391:16, 2394:25, 2395:1, 2398:16, 2413:3, 2418:20, 2418:21, 2433:20, 2433:24, 2435:15, 2435:18, 2436:5, 2436:8, 2436:11, 2436:12, 2438:15, 2439:17, 2442:10, 2443:13, 2444:4, 2445:19, 2448:24, 2454:6, 2454:15, 2461:16, 2464:8, 2469:2, 2469:5, 2470:20, 2471:6, 2471:8, 2471:10, 2472:22, 2472:23, 2479:10, 2479:12, 2480:6

**registered** [5] - 2395:24, 2396:4, 2435:10, 2457:25, 2459:14

**registering** [4] - 2394:16, 2395:6, 2395:14, 2437:12

**registrable** [3] - 2458:5, 2469:8, 2485:21

**registrant** [4] - 2436:10, 2446:12, 2448:13

**registrant's** [1] - 2446:9

**registrants** [4] - 2435:24, 2436:1, 2438:11, 2445:19

**registration** [45] - 2394:13, 2395:22, 2418:4, 2434:3, 2436:18, 2437:10, 2437:13, 2438:20, 2438:23, 2439:2, 2439:3, 2440:12, 2440:25, 2441:10, 2441:12, 2442:14, 2443:4, 2445:18, 2446:4, 2447:3, 2448:10, 2451:1, 2453:2, 2458:8, 2458:11, 2458:16, 2459:9, 2459:10, 2459:12, 2459:19, 2459:20, 2460:16, 2461:19, 2463:6, 2463:12, 2464:7, 2464:9, 2466:4, 2468:14, 2471:12, 2471:13, 2471:19, 2471:20, 2472:21, 2479:8

**Registration** [12] - 2377:18,

2386:17, 2432:4, 2432:7, 2432:10, 2432:19, 2434:7, 2434:17, 2434:22, 2442:11, 2451:1, 2454:7

**registrations** [1] - 2435:5

**regular** [2] - 2446:9, 2446:20

**regulations** [1] - 2444:10

**relate** [1] - 2418:9

**related** [1] - 2485:19

**relates** [1] - 2422:13

**relating** [4] - 2399:8, 2449:22, 2456:5, 2456:6

**relation** [2] - 2409:18, 2449:13

**relations** [15] - 2391:16, 2438:17, 2457:25, 2470:20, 2480:20, 2481:7, 2481:16, 2481:25, 2483:2, 2483:7, 2483:8, 2483:12, 2485:1, 2485:13

**relationship** [6] - 2374:21, 2436:13, 2468:20, 2475:16, 2483:16, 2483:18

**relatively** [1] - 2473:18

**release** [10] - 2388:8, 2399:8, 2467:5, 2468:24, 2483:12, 2484:6, 2484:10, 2484:12, 2484:20, 2485:3

**released** [12] - 2388:10, 2388:24, 2399:18, 2400:23, 2465:2, 2467:11, 2467:13, 2467:22, 2467:24, 2468:6, 2468:7

**relevance** [1] - 2472:5

**relevant** [16] - 2420:8, 2426:10, 2451:7, 2451:14, 2452:24, 2452:25, 2460:4, 2464:2, 2467:6, 2479:4, 2481:10, 2481:12, 2485:9, 2485:10

**remainder** [1] - 2373:14

**remember** [35] - 2375:4, 2375:11, 2375:17, 2380:13, 2381:4, 2381:6, 2382:7, 2390:13, 2394:21, 2396:13, 2403:1, 2404:8, 2404:11, 2404:12, 2404:17, 2405:13, 2405:17, 2406:8, 2407:4, 2407:5, 2407:6, 2407:9, 2407:11, 2407:15, 2407:17, 2407:18, 2407:23, 2408:14, 2408:17, 2409:7, 2409:9, 2411:13, 2412:21, 2414:20

**rendered** [4] - 2423:8, 2447:25, 2448:19, 2449:20

**repeat** [2] - 2370:24, 2481:2

**rephrase** [1] - 2484:16

**rephrased** [1] - 2484:14

**reply** [1] - 2383:20

**Report** [67] - 2388:9, 2388:10, 2388:12, 2388:24, 2389:3, 2397:2, 2397:3, 2397:5,

2397:20, 2397:21, 2397:23, 2399:8, 2399:14, 2399:20, 2400:19, 2400:23, 2400:25, 2402:5, 2410:10, 2411:12, 2419:15, 2423:16, 2443:6, 2457:22, 2458:3, 2458:6, 2462:18, 2462:24, 2463:2, 2463:4, 2463:5, 2463:13, 2465:2, 2465:6, 2465:9, 2465:15, 2465:22, 2467:5, 2467:7, 2467:10, 2467:12, 2467:14, 2467:21, 2467:24, 2468:3, 2468:4, 2468:6, 2468:7, 2468:21, 2469:6, 2470:5, 2470:25, 2476:7, 2478:8, 2478:11, 2482:4, 2482:12, 2482:14, 2483:3, 2483:25, 2484:5, 2484:10, 2484:21, 2485:3

**report** [20] - 2388:22, 2397:13, 2399:18, 2406:16, 2423:15, 2427:15, 2428:2, 2428:10, 2429:6, 2441:8, 2442:22, 2443:7, 2443:8, 2443:22, 2457:22, 2468:19, 2475:25, 2476:5, 2476:6, 2481:17

**reported** [4] - 2435:11, 2475:25, 2476:21, 2478:7

**Reporter** [3] - 2369:7, 2369:7, 2487:13

**reporter** [1] - 2399:14

**REPORTER** [1] - 2487:2

**reporters** [2] - 2483:16

**reporting** [3] - 2435:8, 2466:15, 2470:12

**reports** [6] - 2410:19, 2426:8, 2427:11, 2429:15, 2429:20, 2478:22

**representations** [3] - 2402:12, 2415:24, 2479:12

**representative** [1] - 2467:15

**representatives** [2] - 2470:6, 2470:11

**represented** [1] - 2401:5

**representing** [3] - 2438:9, 2438:10, 2441:11

**represents** [1] - 2474:13

**request** [16] - 2376:2, 2381:2, 2381:9, 2387:8, 2419:16, 2419:19, 2443:17, 2443:24, 2463:10, 2466:2, 2466:25, 2471:6, 2476:13, 2477:8, 2477:15, 2479:6

**requested** [5] - 2439:23, 2451:16, 2474:19, 2474:20, 2477:9

**requesting** [1] - 2418:2

**requests** [9] - 2377:23, 2378:4, 2378:5, 2378:11, 2378:13, 2387:19, 2410:11, 2410:16,

2478:10

**require** [7] - 2377:4, 2418:18, 2440:25, 2451:1, 2466:3, 2468:14, 2479:7

**required** [8] - 2377:25, 2436:11, 2436:12, 2459:13, 2459:16, 2461:16, 2461:18, 2463:12

**requirement** [3] - 2388:18, 2444:4, 2464:8

**requirements** [1] - 2443:10

**research** [2] - 2453:4, 2455:15, 2455:16

**resemble** [2] - 2412:8, 2412:9

**respect** [6] - 2397:19, 2398:1, 2402:12, 2410:9, 2462:13, 2474:9

**respectfully** [1] - 2424:19

**respectively** [1] - 2429:18

**respond** [7] - 2377:5, 2378:11, 2379:5, 2379:13, 2385:13, 2397:9, 2398:5

**responded** [6] - 2381:13, 2385:11, 2390:11, 2397:9, 2398:5, 2412:19

**responding** [4] - 2381:8, 2385:16, 2410:19, 2478:21

**response** [55] - 2375:25, 2376:1, 2377:3, 2378:3, 2378:18, 2380:4, 2381:7, 2381:11, 2384:24, 2384:25, 2385:5, 2385:18, 2386:6, 2389:16, 2389:18, 2395:8, 2398:14, 2398:15, 2398:22, 2398:24, 2410:1, 2410:11, 2410:16, 2412:24, 2419:16, 2419:19, 2427:16, 2427:19, 2427:24, 2428:12, 2428:15, 2449:2, 2449:7, 2449:23, 2450:22, 2451:20, 2453:16, 2454:1, 2455:18, 2459:25, 2460:1, 2460:4, 2461:22, 2461:25, 2462:3, 2464:17, 2464:20, 2465:4, 2465:8, 2467:13, 2467:21, 2467:23, 2468:8, 2478:9, 2480:3

**Response** [2] - 2429:17, 2429:22

**Responses** [1] - 2428:4

**responses** [7] - 2378:17, 2379:17, 2380:17, 2380:19, 2384:13, 2464:15, 2468:8

**responsibilities** [3] - 2433:10, 2433:16, 2433:17

**responsible** [1] - 2439:14

**rest** [1] - 2486:10

**restrictions** [1] - 2426:20

**result** [3] - 2375:23, 2393:13, 2394:25

**resume** [3] - 2413:9, 2486:4, 2486:11

**retain** [1] - 2373:4

**retained** [1] - 2462:15

**retainer** [5] - 2456:12, 2456:17, 2456:18, 2469:23, 2469:25

**retired** [1] - 2434:6

**returned** [1] - 2413:19

**reverse** [1] - 2418:22

**reversed** [4] - 2462:21, 2479:11, 2480:10, 2480:16

**review** [9] - 2377:3, 2414:19, 2433:18, 2433:22, 2433:24, 2433:25, 2435:6, 2436:6, 2440:19

**reviewed** [4] - 2385:18, 2386:5, 2386:21, 2389:19

**reviews** [1] - 2440:22

**revised** [2] - 2445:23, 2447:8

**right-hand** [3] - 2445:11, 2452:2, 2458:22

**Rights** [1] - 2455:6

**righty** [1] - 2425:9

**ripe** [1] - 2424:18

**RMR** [2] - 2369:7, 2487:13

**rohde** [1] - 2458:18

**Rohde** [14] - 2370:10, 2390:6, 2399:24, 2401:9, 2410:5, 2444:12, 2445:8, 2446:5, 2446:22, 2448:5, 2449:17, 2452:3, 2460:25, 2469:19

**role** [6] - 2372:17, 2432:16, 2433:6, 2434:18, 2434:20, 2439:7

**roles** [7] - 2373:2, 2373:10, 2433:3, 2433:9, 2433:13, 2433:16, 2433:17

**rollout** [5] - 2481:17, 2482:4, 2482:14, 2482:15, 2483:2

**Room** [2] - 2369:8, 2487:14

**room** [1] - 2474:18

**routed** [1] - 2375:21

**routine** [2] - 2440:23, 2472:10

**rule** [3] - 2449:25, 2450:10, 2450:12

**Rule** [2] - 2433:18, 2436:1

**ruled** [2] - 2419:22, 2424:16

**rules** [1] - 2444:10

**running** [1] - 2474:24

**Russia** [1] - 2454:24

**Russian** [1] - 2454:25

**S**

**S-P-I-E-G-E-L** [1] - 2372:11

**Safavian** [1] - 2420:6

**safeguards** [1] - 2388:20

**Sanchez** [1] - 2368:12

**SANCHEZ** [2] - 2370:7, 2370:17

**sanchez@usdoj.gov** [1] - 2368:16

**Saturday** [1] - 2376:13

**save** [1] - 2427:7
**saw** [1] - 2406:10
**Scanned** [1] - 2383:7
**scheduled** [2] - 2404:14, 2404:15
**scheme** [1] - 2423:14
**school** [8] - 2432:21, 2432:23, 2432:24, 2433:1, 2433:2, 2433:4, 2433:7
**scope** [1] - 2371:2
**screen** [5] - 2382:2, 2399:25, 2425:19, 2441:17, 2441:19
**screens** [1] - 2381:20
**scroll** [1] - 2452:4
**seated** [1] - 2413:20
**second** [20] - 2377:12, 2377:22, 2378:12, 2379:6, 2386:24, 2401:7, 2410:6, 2411:11, 2412:7, 2443:25, 2444:13, 2444:19, 2448:6, 2454:18, 2455:20, 2456:11, 2462:10, 2467:23, 2469:19, 2478:4
**second-to-the-last** [1] - 2455:20
**secret** [1] - 2421:3
**section** [3] - 2432:1, 2461:9, 2485:15
**Section** [1] - 2432:4
**secured** [1] - 2407:12
**Security** [4] - 2377:1, 2377:14, 2434:15, 2434:16
**security** [3] - 2407:8, 2407:9, 2426:20
**see** [16] - 2371:7, 2379:14, 2414:21, 2414:22, 2415:2, 2417:17, 2422:19, 2440:12, 2447:16, 2447:23, 2451:2, 2455:12, 2457:3, 2462:22, 2466:1, 2467:9
**seeing** [1] - 2442:3
**seeking** [2] - 2471:19, 2471:20
**seem** [2] - 2400:4, 2422:21
**send** [10] - 2382:13, 2385:7, 2402:20, 2435:15, 2437:18, 2441:9, 2441:14, 2442:6, 2445:3, 2445:6
**sending** [5] - 2376:10, 2403:3, 2444:1, 2444:3, 2461:21
**senior** [3] - 2380:14, 2384:12, 2434:19
**sense** [1] - 2403:2
**sent** [38] - 2375:24, 2379:1, 2380:5, 2380:19, 2383:4, 2383:9, 2383:10, 2383:19, 2389:8, 2389:25, 2396:22, 2398:25, 2402:18, 2405:22, 2406:10, 2406:11, 2414:8, 2414:13, 2427:13, 2427:20, 2428:4, 2428:17, 2429:2, 2429:8, 2441:13, 2441:24,

2442:4, 2442:7, 2449:3, 2453:23, 2454:1, 2454:11, 2455:4, 2471:24, 2471:25, 2479:18, 2482:5, 2482:7
**sentence** [10] - 2386:19, 2399:5, 2411:11, 2451:19, 2454:9, 2455:21, 2457:5, 2466:11, 2467:23, 2470:14
**sentences** [3] - 2391:11, 2465:7, 2470:15
**separate** [1] - 2428:11
**September** [15] - 2390:23, 2391:7, 2392:6, 2394:3, 2394:10, 2398:25, 2399:7, 2404:1, 2429:19, 2429:21, 2430:6, 2430:10, 2468:5, 2469:16, 2482:7
**series** [1] - 2445:24
**serve** [2] - 2434:11, 2449:25
**services** [5] - 2447:25, 2448:19, 2449:20, 2449:22, 2450:25
**serving** [2] - 2410:22, 2478:25
**set** [7] - 2378:2, 2378:6, 2394:23, 2418:19, 2436:3, 2467:19, 2480:25
**setting** [2] - 2395:17, 2464:19
**seven** [7] - 2387:24, 2388:4, 2455:5, 2457:16, 2464:12, 2464:15, 2464:17
**several** [6] - 2375:6, 2390:14, 2429:1, 2437:1, 2440:19, 2468:17
**share** [2] - 2405:15, 2405:20
**shared** [1] - 2405:22
**sharply** [2] - 2462:19, 2462:25
**short** [6] - 2413:7, 2437:10, 2437:13, 2438:23, 2439:2, 2471:13
**short-form** [5] - 2437:10, 2437:13, 2438:23, 2439:2, 2471:13
**shortly** [2] - 2396:19, 2428:1
**show** [3] - 2391:25, 2392:6, 2425:23
**showing** [6] - 2390:18, 2445:14, 2449:5, 2469:13, 2477:19, 2479:17
**Shpenov** [1] - 2388:15
**shutdown** [1] - 2407:6
**side** [8] - 2419:13, 2419:20, 2420:3, 2422:21, 2435:25, 2445:12, 2452:2, 2458:22
**sides** [1] - 2424:4
**signed** [18] - 2380:11, 2380:12, 2380:13, 2380:14, 2381:8, 2382:23, 2383:19, 2384:20, 2385:18, 2386:6, 2390:8, 2390:9, 2439:3, 2449:11, 2462:5, 2462:6, 2478:2, 2479:24
**silence** [1] - 2455:7

**similarly** [1] - 2398:1
**simply** [4] - 2401:25, 2403:15, 2411:23, 2430:22
**sincerely** [1] - 2382:16
**Singer** [1] - 2428:19
**singer** [2] - 2429:1, 2429:10
**sit** [1] - 2419:23
**situation** [2] - 2370:19, 2436:4
**situations** [1] - 2474:15
**six** [4] - 2387:21, 2387:22, 2437:25, 2438:1
**sixth** [1] - 2447:20
**Skadden** [65] - 2372:15, 2372:17, 2372:21, 2372:22, 2372:23, 2373:24, 2374:19, 2374:25, 2375:4, 2376:17, 2391:16, 2397:1, 2397:6, 2397:20, 2398:2, 2402:1, 2404:20, 2407:20, 2408:12, 2418:22, 2426:7, 2426:11, 2426:14, 2426:16, 2426:17, 2426:18, 2426:21, 2428:19, 2439:11, 2439:12, 2439:17, 2439:24, 2440:9, 2440:16, 2441:6, 2442:8, 2444:23, 2447:14, 2449:3, 2450:5, 2450:19, 2451:20, 2451:23, 2452:8, 2452:11, 2455:2, 2455:17, 2455:20, 2455:24, 2456:4, 2456:7, 2456:23, 2463:18, 2468:7, 2469:10, 2470:20, 2470:23, 2471:8, 2471:25, 2472:17, 2473:25, 2475:15, 2479:10
**Skadden's** [3] - 2439:24, 2450:23, 2457:2
**Slate** [2] - 2372:15, 2426:11
**slightly** [1] - 2484:15
**Sloan** [27] - 2374:13, 2374:14, 2374:16, 2374:17, 2374:20, 2376:14, 2378:19, 2379:5, 2379:6, 2379:8, 2379:17, 2380:4, 2384:9, 2384:10, 2384:18, 2384:24, 2384:25, 2386:4, 2427:20, 2427:25, 2428:2, 2428:15, 2428:17, 2428:18, 2428:22, 2428:23, 2429:2
**small** [1] - 2473:18
**sole** [1] - 2465:11
**someone** [11] - 2374:23, 2376:20, 2378:10, 2379:23, 2392:16, 2403:21, 2405:3, 2405:23, 2405:24, 2436:10, 2452:25
**sometime** [2] - 2396:18, 2412:22
**sometimes** [1] - 2451:12
**somewhat** [1] - 2396:19
**sore** [1] - 2370:20

**sorry** [12] - 2372:4, 2372:6,
2372:24, 2376:7, 2381:19,
2383:1, 2389:14, 2458:20,
2462:8, 2462:9, 2464:23,
2467:15
**sort** [31] - 2370:18, 2370:20,
2378:14, 2378:15, 2383:17,
2384:18, 2392:13, 2392:17,
2392:20, 2393:9, 2394:6,
2394:8, 2394:19, 2395:21,
2397:17, 2403:14, 2404:25,
2405:2, 2405:12, 2405:16,
2405:19, 2407:7, 2407:9,
2407:11, 2407:12, 2407:25,
2409:6, 2409:11, 2410:15,
2416:19, 2467:10
**source** [5] - 2401:1, 2433:25,
2435:17, 2440:19, 2440:22
**sources** [3] - 2387:16, 2457:3,
2457:7
**SPAEDER** [2] - 2368:22, 2369:2
**specialist** [7] - 2370:10,
2432:17, 2432:18, 2432:20,
2432:25, 2440:22, 2473:14
**specific** [8] - 2395:3, 2415:6,
2415:7, 2415:11, 2427:4,
2427:6, 2427:7, 2427:8
**specifically** [3] - 2414:22,
2432:4, 2466:20
**specified** [2] - 2443:18, 2461:8
**spell** [1] - 2372:10
**spelling** [1] - 2431:12
**spent** [2] - 2373:13, 2373:14
**Spiegel** [16] - 2369:14, 2371:14,
2372:11, 2372:12, 2387:6,
2390:10, 2393:22, 2400:4,
2401:23, 2413:20, 2413:25,
2415:5, 2430:4, 2474:3, 2474:6
**SPIEGEL** [1] - 2371:15
**split** [1] - 2399:25
**staff** [1] - 2440:19
**staffer** [1] - 2379:12
**stage** [1] - 2422:16
**stand** [2] - 2408:10, 2425:5
**standards** [4] - 2450:1, 2450:3,
2450:16, 2462:21
**start** [2] - 2378:23, 2432:9
**started** [3] - 2403:8, 2407:18,
2432:11
**starting** [4] - 2385:9, 2387:6,
2401:20, 2470:1
**statement** [26] - 2422:22,
2423:8, 2423:18, 2424:5,
2436:19, 2437:13, 2438:1,
2438:20, 2438:23, 2439:1,
2445:18, 2445:19, 2446:4,
2446:11, 2446:17, 2446:19,
2447:3, 2447:4, 2448:11,
2458:11, 2458:15, 2458:16,
2459:9, 2459:10, 2459:12,

2471:12
**statements** [9] - 2393:8,
2397:11, 2397:13, 2423:5,
2423:15, 2437:10, 2439:3,
2466:14, 2471:13
**STATES** [2] - 2368:1, 2368:10
**States** [12] - 2368:3, 2369:8,
2370:4, 2370:9, 2388:16,
2388:22, 2438:9, 2441:11,
2461:10, 2467:8, 2478:11,
2485:15
**stating** [3] - 2431:11, 2468:15,
2469:3
**status** [1] - 2424:18
**statute** [17] - 2390:17, 2395:1,
2413:3, 2418:4, 2435:3, 2435:6,
2435:8, 2435:10, 2444:9,
2444:11, 2444:15, 2460:12,
2461:6, 2461:8, 2461:12,
2465:25, 2469:9
**statutes** [1] - 2459:24
**statutory** [1] - 2420:10
**stay** [1] - 2460:13
**stayed** [1] - 2374:23
**stenograph** [1] - 2487:7
**sticky** [1] - 2375:23
**still** [4] - 2385:5, 2413:20,
2460:15, 2485:6
**stipulate** [1] - 2426:9
**stipulation** [6] - 2417:7,
2425:14, 2425:24, 2426:1,
2426:7, 2430:21
**story** [1] - 2467:10
**straining** [1] - 2431:18
**strategy** [6] - 2481:17, 2482:3,
2482:13, 2483:2, 2483:7,
2485:19
**straw** [1] - 2421:21
**Street** [6] - 2368:14, 2368:22,
2369:2, 2473:6, 2473:7, 2473:8
**strongly** [1] - 2396:11
**structure** [2] - 2377:5, 2378:6
**structured** [1] - 2378:15
**study** [1] - 2452:13
**stuff** [1] - 2424:10
**subject** [5] - 2409:20, 2409:21,
2442:9, 2454:5, 2457:19
**subjective** [3] - 2422:5, 2422:9
**submissions** [1] - 2425:18
**substance** [2] - 2375:15,
2405:3
**substantive** [4] - 2380:18,
2380:20, 2380:22, 2389:17
**substituted** [1] - 2458:25
**sufficiency** [1] - 2424:14
**suggest** [1] - 2411:9
**suggesting** [1] - 2389:18
**suggestion** [3] - 2411:8,
2412:11, 2412:12
**Suite** [2] - 2368:23, 2369:3

**summarize** [1] - 2480:10
**summarizing** [4] - 2418:23,
2477:11, 2477:13, 2477:23
**summary** [1] - 2458:3
**supervisory** [1] - 2473:15
**supplemental** [2] - 2438:1,
2458:15
**supports** [1] - 2423:22
**suppose** [1] - 2450:8
**survive** [1] - 2371:3
**survived** [1] - 2424:17
**suspect** [2] - 2455:10, 2455:22
**sustain** [1] - 2418:16
**switch** [1] - 2387:2
**sworn** [3] - 2371:16, 2372:4,
2431:5
**system** [11] - 2426:8, 2426:12,
2426:13, 2426:16, 2426:24,
2427:2, 2427:3, 2427:17,
2429:9, 2429:24

## T

**tab** [1] - 2376:5
**tailor** [1] - 2445:3
**takeaway** [1] - 2476:12
**tanks** [1] - 2402:7
**Tauzin** [1] - 2388:15
**tax** [2] - 2455:9, 2455:21
**Taylor** [4] - 2368:21, 2370:12,
2415:19, 2416:6
**TAYLOR** [46] - 2370:12,
2371:18, 2389:10, 2393:2,
2393:4, 2393:16, 2393:19,
2400:6, 2406:24, 2413:24,
2415:12, 2415:25, 2416:13,
2417:9, 2417:13, 2417:18,
2417:21, 2419:5, 2420:19,
2422:2, 2422:4, 2422:17,
2423:4, 2423:9, 2423:20,
2424:5, 2424:7, 2424:9,
2424:19, 2424:22, 2425:4,
2425:10, 2459:4, 2459:8,
2460:15, 2460:19, 2472:5,
2480:22, 2481:18, 2481:23,
2482:9, 2482:11, 2482:15,
2482:17, 2484:13, 2485:4
**Taylor**....................**2413** [1] -
2369:16
**team** [7] - 2380:15, 2395:24,
2396:5, 2415:2, 2466:16,
2470:13, 2473:18
**technically** [1] - 2419:7
**ten** [3] - 2372:18, 2413:9,
2413:15
**term** [1] - 2392:11
**terms** [12] - 2378:15, 2380:21,
2401:11, 2407:13, 2408:4,
2435:2, 2437:6, 2437:24,
2447:5, 2447:17, 2447:21,

2448:3

**test** [1] - 2422:10
**testified** [3] - 2371:17, 2414:3, 2431:6
**testifies** [1] - 2424:23
**testify** [1] - 2418:25
**testimony** [6] - 2418:6, 2422:5, 2481:23, 2481:25, 2482:5, 2482:6
**text** [1] - 2391:24
**THE** [95] - 2368:1, 2368:1, 2368:9, 2368:13, 2370:1, 2370:11, 2370:14, 2370:18, 2371:7, 2371:20, 2371:24, 2371:25, 2372:1, 2372:5, 2381:20, 2381:21, 2381:24, 2382:1, 2387:4, 2387:24, 2388:2, 2393:5, 2393:7, 2393:12, 2393:18, 2400:7, 2400:10, 2406:25, 2413:6, 2413:14, 2413:17, 2413:19, 2415:14, 2416:1, 2416:2, 2416:14, 2416:23, 2417:1, 2417:2, 2417:5, 2417:11, 2417:15, 2417:19, 2418:7, 2419:12, 2421:5, 2422:3, 2422:11, 2422:18, 2423:6, 2423:12, 2423:24, 2424:6, 2424:8, 2424:16, 2424:21, 2424:25, 2425:5, 2425:12, 2425:15, 2425:17, 2426:1, 2426:6, 2430:20, 2431:3, 2431:17, 2431:23, 2431:24, 2458:24, 2459:6, 2459:15, 2460:5, 2460:9, 2460:17, 2460:21, 2472:6, 2472:10, 2472:12, 2472:13, 2472:14, 2480:24, 2481:20, 2482:2, 2482:10, 2482:13, 2482:16, 2482:18, 2482:20, 2482:21, 2482:22, 2484:14, 2485:5, 2485:24, 2486:2, 2486:10
**theme** [2] - 2410:15, 2411:2
**themes** [5] - 2406:9, 2406:19, 2407:25, 2415:6
**themselves** [1] - 2400:11
**theory** [1] - 2423:22
**thereafter** [2] - 2412:22, 2428:1
**they've** [1] - 2447:25
**thinking** [1] - 2371:11
**third** [4] - 2446:3, 2456:2, 2462:9, 2466:11
**thread** [1] - 2403:24
**three** [12] - 2397:2, 2399:19, 2400:5, 2400:15, 2400:16, 2400:24, 2407:16, 2428:19, 2445:24, 2473:16, 2473:22
**Three** [1] - 2397:20
**three-year** [2] - 2445:24
**throat** [1] - 2370:20

**throughout** [3] - 2373:6, 2374:24, 2462:12
**Tim** [3] - 2473:12, 2473:13, 2473:15
**timeline** [1] - 2467:9
**timing** [3] - 2403:1, 2484:10, 2484:20
**title** [1] - 2442:21
**titled** [1] - 2428:3
**today** [2] - 2376:25, 2386:6
**together** [1] - 2473:19
**tomorrow** [1] - 2385:7
**tone** [4] - 2396:7, 2396:9, 2402:22
**took** [8] - 2402:1, 2402:10, 2404:15, 2404:17, 2414:25, 2440:6, 2464:5, 2475:9
**tool** [1] - 2481:25
**top** [9] - 2379:16, 2380:3, 2385:19, 2389:24, 2390:19, 2409:14, 2445:11, 2447:1, 2456:10
**totally** [1] - 2395:11
**touch** [2] - 2374:24, 2470:24
**tourist** [1] - 2438:18
**towards** [1] - 2395:18
**TRANSCRIPT** [1] - 2368:8
**transcript** [3] - 2416:17, 2487:6, 2487:7
**transition** [1] - 2434:18
**transparent** [1] - 2462:14
**trial** [6] - 2374:20, 2442:22, 2443:7, 2450:2, 2450:14, 2473:11
**TRIAL** [2] - 2368:4, 2368:8
**tried** [1] - 2393:7
**trigger** [1] - 2435:17
**triggered** [1] - 2443:5
**troublesome** [1] - 2387:2
**true** [6] - 2415:5, 2423:18, 2423:20, 2424:1, 2487:6, 2487:7
**truthful** [1] - 2419:24
**try** [9] - 2370:23, 2372:1, 2383:11, 2384:18, 2399:24, 2408:3, 2408:8, 2448:23, 2476:9
**trying** [15] - 2393:10, 2394:4, 2394:19, 2400:19, 2404:4, 2404:5, 2404:25, 2406:14, 2455:15, 2456:19, 2457:21, 2458:4, 2459:16, 2461:9, 2485:14
**Tuesday** [2] - 2424:1, 2424:3
**turn** [5] - 2434:22, 2452:1, 2456:9, 2458:22, 2464:18
**turned** [1] - 2407:8
**turning** [3] - 2441:16, 2453:24, 2465:19
**turns** [1] - 2423:12
**two** [28] - 2373:2, 2378:4, 2378:5, 2378:11, 2378:12,

2379:16, 2380:3, 2380:24, 2384:12, 2384:15, 2385:9, 2385:19, 2387:24, 2391:11, 2396:5, 2401:5, 2401:10, 2401:12, 2401:15, 2402:9, 2421:7, 2424:4, 2446:8, 2460:10, 2465:7, 2469:9, 2470:15
**Tymoshenko** [14] - 2387:17, 2388:19, 2410:10, 2442:22, 2443:7, 2450:2, 2450:14, 2454:22, 2455:4, 2457:8, 2466:16, 2470:13, 2475:25, 2478:8
**Tymoshenko's** [1] - 2462:20
**type** [4] - 2402:22, 2403:16, 2405:14, 2406:7
**types** [2] - 2403:22, 2458:10
**typically** [1] - 2444:9

## U

**U.S** [13] - 2368:13, 2368:17, 2391:14, 2410:11, 2410:19, 2438:16, 2456:7, 2470:18, 2478:9, 2478:21, 2480:4, 2480:14
**Ukraine** [58] - 2373:24, 2374:8, 2375:6, 2388:16, 2389:22, 2391:16, 2397:12, 2399:18, 2410:20, 2410:21, 2410:22, 2410:23, 2411:3, 2413:2, 2439:12, 2440:17, 2441:7, 2442:22, 2443:6, 2445:4, 2448:1, 2449:21, 2450:5, 2451:22, 2453:12, 2455:11, 2457:2, 2458:1, 2462:17, 2463:25, 2465:10, 2466:17, 2467:1, 2468:18, 2468:20, 2470:13, 2470:20, 2471:5, 2471:7, 2475:17, 2476:14, 2476:23, 2477:16, 2478:22, 2478:23, 2478:24, 2478:25, 2479:7, 2480:4, 2480:15, 2480:21, 2481:8, 2481:24, 2483:23, 2484:20, 2485:1
**Ukraine's** [1] - 2483:7
**Ukrainian** [11] - 2387:15, 2388:10, 2388:21, 2388:24, 2452:12, 2452:17, 2452:19, 2465:3, 2465:16, 2466:3, 2467:22
**Ukrainians** [1] - 2406:12
**ultimate** [1] - 2440:8
**ultimately** [4] - 2391:21, 2422:12, 2427:13, 2429:7
**um-hum** [1] - 2471:19
**Um-hum** [2] - 2440:15, 2452:17
**under** [40] - 2377:2, 2378:1, 2386:23, 2390:17, 2391:1,

2391:16, 2395:1, 2410:22,
2413:3, 2413:20, 2433:20,
2433:25, 2434:3, 2434:16,
2435:5, 2435:8, 2435:10,
2438:12, 2438:15, 2438:20,
2439:17, 2440:6, 2444:10,
2451:1, 2456:7, 2459:10,
2461:5, 2461:12, 2461:16,
2462:21, 2470:20, 2471:6,
2471:8, 2471:10, 2471:17,
2474:14, 2476:13, 2477:15,
2478:24, 2480:7

**underlying** [3] - 2378:14,
2385:4, 2385:15

**underpinnings** [1] - 2420:10

**understandings** [1] - 2416:4

**understood** [7] - 2374:12,
2378:6, 2389:22, 2394:6,
2408:21, 2416:18

**undertake** [1] - 2419:23

**undisputed** [2] - 2430:23,
2430:24

**unique** [1] - 2405:18

**Unit** [75] - 2374:4, 2375:9,
2375:14, 2379:12, 2379:23,
2380:5, 2381:2, 2381:12,
2382:8, 2384:1, 2384:12,
2385:4, 2387:9, 2390:1,
2390:10, 2390:16, 2394:6,
2394:24, 2395:7, 2395:10,
2398:15, 2398:25, 2402:18,
2403:15, 2404:5, 2405:8,
2405:19, 2407:14, 2407:24,
2408:2, 2412:18, 2412:24,
2414:8, 2414:13, 2415:23,
2427:13, 2429:8, 2432:5,
2432:7, 2432:10, 2432:12,
2432:14, 2432:19, 2433:1,
2433:3, 2433:8, 2433:11,
2433:14, 2434:6, 2434:7,
2434:11, 2434:17, 2435:2,
2435:3, 2435:4, 2436:15,
2438:12, 2439:1, 2439:8,
2439:9, 2439:10, 2439:14,
2439:16, 2439:19, 2449:2,
2453:22, 2455:14, 2461:21,
2468:9, 2469:10, 2473:12,
2473:15, 2474:24, 2477:6,
2477:11

**unit** [2] - 2434:10, 2434:18

**Unit's** [2] - 2414:14, 2468:12

**UNITED** [2] - 2368:1, 2368:10

**United** [12] - 2368:3, 2369:8,
2370:4, 2370:9, 2388:16,
2388:22, 2438:9, 2441:11,
2461:10, 2467:8, 2478:11,
2485:15

**unrelated** [1] - 2405:1

**unusual** [1] - 2472:8

**up** [31] - 2370:15, 2374:6,

2378:6, 2381:2, 2381:20,
2382:2, 2382:8, 2392:15,
2394:5, 2394:7, 2396:14,
2396:17, 2404:25, 2405:4,
2408:10, 2416:9, 2417:16,
2417:25, 2418:23, 2423:14,
2423:25, 2425:5, 2435:13,
2441:18, 2444:25, 2445:8,
2446:5, 2449:17, 2452:4,
2452:13, 2486:6

**update** [1] - 2445:25

**useful** [3] - 2384:14, 2392:22,
2403:19

**user** [4] - 2426:25, 2427:4,
2427:6, 2427:9

## V

**vague** [1] - 2420:9

**variation** [2] - 2412:10, 2412:12

**varies** [1] - 2380:21

**various** [5] - 2429:3, 2458:1,
2462:20, 2465:5, 2474:14

**vault** [1] - 2407:13

**verse** [1] - 2459:24

**Version** [9] - 2427:16, 2427:22,
2428:3, 2428:11, 2429:9,
2429:17, 2429:18, 2429:22,
2430:1

**version** [6] - 2427:19, 2427:25,
2428:16, 2430:3, 2430:7,
2430:11

**versus** [2] - 2370:4, 2379:18

**view** [6] - 2395:21, 2423:9,
2423:10, 2424:20, 2426:22,
2469:7

**viewed** [2] - 2411:22, 2465:9

**views** [1] - 2405:20

**Viktor** [1] - 2454:21

**voicemail** [1] - 2379:12

**voluntarily** [2] - 2419:18,
2419:22

**volunteer** [2] - 2419:6, 2420:24

**vs** [1] - 2368:5

## W

**wait** [1] - 2376:6

**waiving** [1] - 2421:15

**walk** [1] - 2440:13

**walks** [1] - 2417:16

**wants** [1] - 2463:8

**Washington** [10] - 2368:6,
2368:15, 2368:18, 2369:3,
2369:9, 2403:11, 2404:16,
2404:24, 2473:8, 2487:15

**water** [1] - 2371:24

**ways** [2] - 2408:10, 2421:7

**website** [1] - 2437:19

**week** [5] - 2377:6, 2379:13,

2392:3, 2392:10, 2392:15

**weekend** [2] - 2371:8, 2371:9

**weigh** [3] - 2411:7, 2411:15,
2411:19

**weighed** [1] - 2411:16

**weighing** [1] - 2411:13

**Western** [4] - 2450:1, 2450:3,
2450:16, 2462:21

**whatnot** [1] - 2463:10

**whatsoever** [1] - 2420:24

**whichever** [1] - 2441:17

**white** [2] - 2372:20, 2373:3

**Whitney** [12] - 2381:17, 2382:5,
2382:10, 2382:11, 2382:19,
2383:8, 2384:7, 2384:16,
2385:22, 2428:7, 2429:11,
2429:12

**Whitney's** [3] - 2385:12,
2385:19, 2389:4

**who-would-say-what** [1] -
2406:7

**whole** [5] - 2384:20, 2423:23,
2456:21, 2457:4, 2479:5

**William** [4] - 2368:20, 2368:21,
2370:12

**willing** [1] - 2474:23

**witness** [16] - 2371:5, 2371:12,
2371:16, 2372:4, 2413:14,
2416:23, 2417:2, 2417:7,
2417:13, 2424:23, 2425:12,
2425:14, 2425:16, 2430:25,
2431:5, 2486:11

**WITNESS** [7] - 2371:25, 2416:2,
2417:1, 2431:23, 2472:10,
2472:13, 2482:21

**witnesses** [2] - 2369:13,
2370:25

**wmurphy@zuckerman.com** [1]
- 2368:24

**won** [1] - 2454:22

**Word** [1] - 2426:16

**word** [3] - 2405:18, 2430:21,
2430:22

**words** [5] - 2395:3, 2395:20,
2406:18, 2415:7, 2415:11

**works** [2] - 2376:20, 2422:11

**world** [1] - 2373:8

**write** [12] - 2382:12, 2390:24,
2399:4, 2400:18, 2409:22,
2410:8, 2435:19, 2450:11,
2456:11, 2467:4, 2475:5, 2480:3

**writes** [6] - 2399:6, 2400:20,
2400:23, 2410:9, 2462:12,
2465:4

**writing** [8] - 2374:23, 2409:6,
2409:10, 2410:2, 2416:11,
2419:14, 2476:6, 2477:10

**writings** [1] - 2402:14

**written** [12] - 2406:3, 2406:4,
2437:5, 2437:8, 2447:19,

2447:22, 2448:2, 2451:21,
2457:22, 2467:10, 2476:5
**wrote** [4] - 2390:25, 2441:7,
2468:3, 2468:4
**wtaylor@zuckerman.com** [1] -
2368:25

## Y

**Yaffa** [3] - 2375:19, 2376:19,
2442:7
**Yanukovych** [2] - 2454:21,
2455:8
**year** [7] - 2412:23, 2432:8,
2432:21, 2433:7, 2434:9,
2445:24
**years** [6] - 2372:18, 2374:18,
2375:6, 2396:6, 2438:23, 2455:5
**York** [14] - 2372:20, 2372:24,
2399:14, 2400:16, 2466:9,
2467:15, 2470:6, 2475:22,
2483:22, 2484:4, 2484:9,
2484:11, 2484:21, 2485:2
**yourself** [2] - 2372:9, 2431:11
**yourselves** [2] - 2370:6, 2486:6

## Z

**zoom** [8] - 2391:8, 2391:24,
2398:11, 2400:1, 2401:19,
2409:24, 2412:14, 2457:14
**zooming** [7] - 2378:24,
2379:21, 2389:24, 2390:19,
2396:21, 2403:24, 2409:14
**Zornow** [7] - 2376:18, 2386:9,
2391:21, 2392:1, 2392:25,
2398:17, 2403:8
**zornow** [1] - 2383:22
**ZUCKERMAN** [2] - 2368:22,
2369:2