2512

```
 1
 2                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 3
 4   UNITED STATES OF AMERICA,      )
                                    )
 5        v.                        )   Criminal Action No. 19-CR-125
                                    )
 6   GREGORY B. CRAIG,              )   JURY TRIAL - DAY 11
                                    )   Afternoon Session
 7             Defendant.           )
     _____        )   Washington, D.C.
 8                                      August 26, 2019
 9
10        TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
            BEFORE THE HONORABLE AMY BERMAN JACKSON
11             UNITED STATES DISTRICT JUDGE
12
                  APPEARANCES:
13
        For the Government:      Fernando Campoamor-Sanchez, AUSA
14                               Molly Gulland Gaston, AUSA
                                 U.S. ATTORNEY'S OFFICE FOR THE
15                               DISTRICT OF COLUMBIA
                                 555 Fourth Street, NW
16                               Washington, DC 20530
                                      -and-
17                               Jason Bradley Adam McCullough
                                 U.S. DEPARTMENT OF JUSTICE
18                               950 Pennsylvania Avenue, NW
                                 Washington, DC 20530
19
        For the Defendant:      Adam B. Abelson, Esq.
20                               William James Murphy, Esq.
                                 ZUCKERMAN SPAEDER, LLP
21                               100 East Pratt Street
                                 Suite 2440
22                               Baltimore, MD 21202
                                      -and-
23                               William W. Taylor, III, Esq.
                                 Paula M. Junghans, Esq.
24                               ZUCKERMAN SPAEDER, LLP
                                 1800 M Street, NW
25                               Suite 1000
                                 Washington, DC 20036
```

2513

1

2  Court Reporter:          PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                            U.S. Courthouse, Room 4700A
3                           333 Constitution Avenue, NW
                            Washington, D.C.  20001
4                           (202) 354-3243

5              Proceedings reported by stenotype shorthand.
               Transcript produced by computer-aided transcription.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2514

```
 1

 2                    E X A M I N A T I O N S

 3

 4    WITNESS                DIRECT     CROSS     REDIRECT     RECROSS

 5    HEATHER HUNT                      2517       2588        2595

 6                                                 2596

 7

 8

 9                       E X H I B I T S

10

11    DEFENDANT EXHIBIT                          PAGE

12    533                                        2556

13    539                                        2570

14

15

16

17

18

19

20

21

22

23

24

25
```

2515

                              AFTERNOON SESSION

1                                  (2:05 P.M.)

2          (Jury not present)

3          THE COURT:  Good afternoon.

4          I understand there's some preliminary matters before

5    we get to the cross.

6          MR. CAMPOAMOR-SANCHEZ:  Very quickly, Your Honor.

7          I just wanted the Court to know that we have a

8    potential last witness after Ms. Hunt, but he is currently in

9    the air.  So he won't arrive until 4.

10         Mr. Taylor has been so good about keeping his crosses

11   short, but we did not anticipate that.

12         THE COURT:  All right.

13         MR. CAMPOAMOR-SANCHEZ:  So he's not here.

14         But also before we make that determination, we might

15   need to bring up some issues and have the Court decide before

16   we decide to call him.  So that's an issue that we might want

17   to address after Ms. Hunt today.

18         THE COURT:  All right.

19         MR. CAMPOAMOR-SANCHEZ:  But other than that, we just

20   have to move in certain exhibits and one stipulation left to

21   read.  We can also accomplish that this afternoon.  But

22   before we rest, there are some other issues that we would

23   like to bring to the Court's attention.

24         THE COURT:  The witness in the air is your last

25

2516

1          witness?

2                    MR. CAMPOAMOR-SANCHEZ:  That would be our last

3          witness.

4                    THE COURT:  Okay.

5                    MR. CAMPOAMOR-SANCHEZ:  But we are still

6          considering -- to be candid, we may not ultimately call him,

7          but we are --

8                    THE COURT:  Okay.  I understand.  All right.

9          Is there anything we need to talk about before we do

10         the cross?

11                   MR. TAYLOR:  No, Your Honor.  But if you'll forgive

12         me, the witness is not the only thing about this case that is

13         in the air.

14                   THE COURT:  All right.  All right.  Let's go.

15                   (Jury present)

16                   THE COURT:  All right.  All our jurors are back.

17         I take it no one has tried to discuss the case with

18         you and you haven't tried to discuss it with anyone else.

19         All right.  Ms. Hunt can resume the stand.  I remind

20         you you are still under oath.

21                   Mr. Taylor, it is your witness.

22                              HEATHER HUNT,

23         having been duly sworn, was examined and testified as

24         follows:

25

1                        CROSS-EXAMINATION

2              BY MR. TAYLOR:

3    Q.       Ms. Hunt, My Name is Bill Taylor.  I'm going to ask

4    you a few questions on Mr. Craig's behalf.

5    A.       Okay.

6    Q.       You don't have any notes of what was said at the

7    meeting on October 9th; do you?

8    A.       No.

9    Q.       And that's because you didn't take any notes?

10   A.       I don't recall taking any notes.

11   Q.       And Mr. Pugh doesn't have any notes of the meeting;

12   does he?

13   A.       I don't recall that Mr. Pugh has any notes, no.

14   Q.       That's because he didn't take any notes at the

15   meeting?

16   A.       I don't recall if he took notes.

17   Q.       And Mr. Mudd, he doesn't have any notes?

18   A.       I don't recall if he took notes.  He doesn't have any

19   notes.

20   Q.       And there was another man at the meeting by the name

21   of Kevin Connolly; right?

22   A.       Yes.

23   Q.       And Mr. Connolly did take some notes; didn't he?

24   A.       I don't recall if Kevin -- Mr. Connolly took notes or

25   not.

2518

1      Q.      You don't know if he did or not.

2              But anyway, we don't have any notes from

3      Mr. Connolly?

4      A.      No, we do not.

5      Q.      And he is retired?

6      A.      Yes.

7      Q.      And there was no memorandum of this meeting that was

8      done by you or any other staff after the meeting was

9      concluded; was there?

10     A.      No.

11     Q.      And you didn't have any procedure for filing or

12     storing notes of a meeting like this at FARA; did you?

13     A.      Could you repeat your question, please?

14     Q.      You didn't have any procedure for filing or storing

15     notes of a meeting like this in your offices at FARA?

16     A.      We have a records system in our office.

17     Q.      Did you have such a records system for filing notes

18     of a meeting like this?

19     A.      Any -- any information related to a particular matter

20     is put together in what we call our 149DJ records system, and

21     we collect everything and put it in a file.

22     Q.      And you have looked in that file, I take it?

23     A.      Yes.

24     Q.      And you don't find any notes of this meeting in that

25     file?

1    A.      No.

2    Q.      And was the first time you realized there were no

3    notes of this meeting when investigators asked you for your

4    files in connection with this matter in October of 2017?

5    A.      I don't recall if that was the first time that I

6    didn't know there were notes.

7    Q.      When do you think you didn't know there were notes?

8    A.      I don't recall.

9            MR. McCULLOUGH:  Objection.

10           THE COURT:  I sustain the form of the question.  When

11   did a person first not know anything?  She's not sure anybody

12   took any notes.

13           MR. TAYLOR:  May I rephrase?

14           THE COURT:  Yes.

15           BY MR. TAYLOR:

16   Q.      When was the first time you looked for notes?

17   A.      When -- I don't recall the first time I looked for

18   notes.

19   Q.      Was it when the investigators asked you to produce

20   your files in connection with this matter in October of 2017?

21           MR. McCULLOUGH:  Objection, Your Honor.

22           THE COURT:  Basis?  One word?

23           MR. McCULLOUGH:  Form of the question.

24           THE COURT:  If you know.

25           THE WITNESS:  I don't recall when the first time I

2520

1      looked for notes.

2              BY MR. TAYLOR:

3      Q.      And on June the 12th of 2019, Mr. McCullough and

4      Agent Kegl came over to your office; right?

5      A.      Yes.

6      Q.      And they also looked for documents relating to this

7      case at that time?

8      A.      Yes.

9      Q.      Five and a half years later?

10     A.      They came on that date, yes.

11     Q.      They found some things, didn't they, Ms. Hunt?

12     A.      I don't recall if they found anything or not.

13     Q.      Didn't they show you some things which they located

14     in the FARA files as a result of their search?

15     A.      If you could show me what it is to which you're

16     referring.

17     Q.      May I show you Defense Exhibit 560 in your binder,

18     please.

19              It's been admitted.

20     A.      560?

21     Q.      560.

22              Apparently not admitted.

23              THE COURT:  So it shouldn't be in your binder then.

24     All right.

25              BY MR. TAYLOR:

2521

1    Q.      Do you see that?

2            THE COURT:  Wait.  Are you planning to admit it?

3            MR. TAYLOR:  I am.

4            THE COURT:  All right.  Let me see it.

5            Don't put it on the screen yet.

6            All right.  Approach the bench.

7            (At the bench)

8            THE COURT:  Okay.  What is it that you think these

9    are?

10           MR. TAYLOR:  I'm going to ask her.  I think they are

11   three business cards.

12           THE COURT:  Yes.  They were probably handed over at

13   the time of the meeting.

14           MR. TAYLOR:  Probably.  Not produced thereafter.

15           The rest of it, I don't intend to inquire in detail

16   about it.

17           THE COURT:  Well, the problem is with the rest of it,

18   some of it looks like it could be notes from your meeting,

19   names of people over there, but then you start getting

20   things -- who know what that is --

21           MR. TAYLOR:  I'm not seeking to admit this document.

22           THE COURT:  Well, they're all attached.  So if you

23   want to just hand him the first page.

24           MR. TAYLOR:  I would like to ask her to look at the

25   notes so she can tell us what they are.

2522

1          THE COURT:  Right.  But the problem with some of them

2    is they don't even -- there is nothing about them -- the one

3    that gets into other consultants, or these details on page 7,

4    page 8 -- by handing them to her in this method, they're

5    suggesting that they are notes from the meetings.  We don't

6    have any basis for that.

7          MR. TAYLOR:  They were produced to us by the

8    government.

9          THE COURT:  As pieces of paper in the file.

10          MR. TAYLOR:  And relevant, therefore, to this case.

11          I don't know what file they were in.  We have not

12    been able to interview her.

13          MR. McCULLOUGH:  If I may, Your Honor.

14          THE COURT:  Yes.

15          MR. McCULLOUGH:  In our production, we indicated what

16    these are.  And these are not Ms. Hunt's notes.  So had we

17    been given an opportunity to evaluate this exhibit in advance

18    of the trial, we would have explained that these are not

19    Ms. Hunt's notes and these are not produced from Ms. Hunt's

20    files.  Therefore, it means that these were not saved in a

21    common record.  These were the notes in a notebook that was

22    identified of Mr. Alex Mudd.  And so there is no basis to

23    show Ms. Hunt Mr. Mudd's notebook from 2012 and 2013.  There

24    is no basis, there is no relevance to Mr. Mudd's notebook.

25          THE COURT:  I don't understand why he is showing them

1    to her.

2              MR. TAYLOR:  Well, it goes to whether or not the

3    United States government has conducted its duty to search for

4    and produce notes and records relevant to this case.  And if

5    it wasn't until this past summer McCullough and Kegl went

6    over there and they found these things, that's relevant.

7              THE COURT:  This isn't a discovery dispute.  And I

8    don't understand -- you have asked her if they looked for

9    notes.  She said they looked for notes.  They didn't have any

10   in the file.  She doesn't know if anybody took any.

11             We don't know at this moment whether these were

12   contemporaneous notes.  Probably the first page given the

13   names of the people.  But the rest have all kinds of other

14   information that could just have been notes that this

15   gentleman took at another time.  So I don't understand --

16             MR. TAYLOR:  I would like to ask her --

17             THE COURT:  What is the relevant point you're trying

18   to make?

19             MR. TAYLOR:  I want to ask her if she has ever seen

20   them and if she knows what they are.

21             THE COURT:  Just ask an open-ended question, do you

22   have any reason to believe that they were ever shown to her

23   when you found them?

24             MR. TAYLOR:  No.

25             THE COURT:  Because you asked the question, did they

2524

1    come and look for documents, and did they find anything.  And

2    she says she doesn't recall.

3            So why don't you ask her:  Did they show you

4    anything?  And if she says no, then I think we're done with

5    this.

6            All right.

7            (In open court)

8            BY MR. TAYLOR:

9    Q.     When Mr. McCullough and Agent Kegl were in your

10   offices, did they show you anything they found?

11   A.     I don't recall.

12   Q.     Can you look at Defense Exhibit 560, page 1, just the

13   first page of it.

14           MR. McCULLOUGH:  Objection, Your Honor.

15           THE COURT:  Okay.  You can look at it.

16           Just looking at that page, does that refresh your

17   recollection of whether anybody showed you anything that they

18   may have found that day?

19           THE WITNESS:  Okay.  These --

20           THE COURT:  Does that refresh your recollection?

21   Answer that question.

22           THE WITNESS:  I think I do recall them showing me

23   those business cards.

24           BY MR. TAYLOR:

25   Q.     Those are three business cards; are they not?

2525

1    A.      I don't recall that they handed those to me or showed

2    them to me.

3    Q.      Okay.

4    A.      I just don't.

5    Q.      You don't know whether those -- that document, which

6    is page 1 of this exhibit, was something Mr. Mccullough and

7    Kegl found when they were at your office?

8    A.      I don't know if they did.

9    Q.      All right.  So were people in your office permitted

10   to keep records of their work and not put them in a central

11   file?

12   A.      Could you repeat your question, please?

13   Q.      Were people who worked in your office permitted to

14   keep notebooks and records and not store them in your central

15   file?

16   A.      People keep their -- people keep notebooks of

17   conversations, of telephone conversations and whatnot, and

18   keep them in their personal -- on their desks and don't put

19   them in the file.

20   Q.      And they're not required to store them in a central

21   file?

22   A.      No.  Not something like that.

23   Q.      Calling your attention to the meeting that you've

24   been -- that you testified about -- you estimated it lasted

25   somewhere around 45 minutes?

1    A.        Around that.  Maybe less.

2    Q.        And the subject matter of the meeting was the

3    question of Mr. Craig's contact with the media; was it not?

4    A.        Yes.

5    Q.        And your letter to him of September the

6    10th -- September the 5th -- had raised two issues, right?

7    One was the distribution of the report, and the other was his

8    conversations with journalists?

9    A.        Could you show me the letter to which you refer,

10   please.

11   Q.        Sure.  Can we put up the government's exhibit whose

12   number I don't have at my fingertips, but it is the letter of

13   September the 5th.

14   A.        Could you repeat your question, please?

15   Q.        Yes.  The subject of the meeting, the meeting on

16   October the 9th was your letter -- first of all, it was your

17   letter of September 5th; wasn't it?

18   A.        That was the subject.

19   Q.        That was the subject.

20             And your letter of September 5th had concluded there

21   were two reasons why you thought the firm should register;

22   right?

23   A.        Could you refer to that, exactly where you're

24   speaking about in the letter?

25   Q.        May I ask you:  Was one of the reasons that the firm

1    had disseminated the report?  If you look at the first

2    paragraph.

3              Second paragraph.

4    A.        There's no conclusions in that letter, but that

5    basically states -- that paragraph states back what happened.

6    Q.        Well, you used the word "disseminated" in that

7    paragraph; right?

8    A.        Yes.

9    Q.        Was that one of the reasons why you considered that

10   Skadden might have to register?

11   A.        That they distributed the report --

12   Q.        Yes.

13   A.        -- in the United States?

14             Yes.

15   Q.        And the other -- the second was that the contacts

16   with the journalists were political activities; right?

17   A.        Yes.

18   Q.        So it is true, though, isn't it, Mrs. Hunt, that you

19   can't tell us any words that anybody spoke in that meeting?

20   A.        I know the -- what the basis of the meeting was, and

21   I know the takeaway from the meeting that was confirmed in

22   the letter written the next day.

23   Q.        I understand that.  My question is:  Can you tell us

24   the words that anybody spoke at the meeting?

25   A.        You're asking if can I recite verbatim what was said

1    at a 30-minute meeting?  No.

2    Q.      You can't even tell us, Ms. Hunt, can you, who was

3    the main person doing the talking?

4    A.      I know that there were three people from Skadden at

5    the meeting.  They all spoke.  And Mr. Craig spoke the

6    majority of the time.

7    Q.      Ms. Hunt, were you present at a session of the grand

8    jury on March 21, 2019, in the District of Columbia?

9    A.      Do I recall the exact date?  I was at the grand jury,

10   yes.

11   Q.      You were at the grand jury; were you not?

12           And when you were there, you were asked some

13   questions by Mr. Campoamor?

14   A.      Yes.

15   Q.      And didn't Mr. Campoamor ask you who was the main

16   person talking during the meeting from the Skadden side?

17           If you want to look at Defense Exhibit 559, which is

18   the transcript.  And at page 40, line 22.

19           I will pass them around.

20           THE COURT:  Are you going to read her the question

21   and the answer?

22           MR. TAYLOR:  I am.

23           BY MR. TAYLOR:

24   Q.      You see, Ms. Hunt, line 22?

25   A.      Yes.

```
1     Q.      Mr. Campoamor asked you who was the main person
2     talking from the Skadden side.  You see that?
3     A.      Yes.
4     Q.      And you answered him, did you not, "I don't recall if
5     he was the main one talking or not."
6             Do you see that?
7     A.      Yes.
8     Q.      That was true --
9             MR. McCULLOUGH:  Objection, Your Honor.
10            THE COURT:  Are you going to finish the --
11            MR. TAYLOR:  I'm happy to finish it.
12            THE COURT:  I think you have to.
13            MR. TAYLOR:  Beg your pardon, Your Honor?
14            THE COURT:  Yes, I think you should do that.
15            BY MR. TAYLOR:
16    Q.      And you answered, "I don't recall if he was the main
17    one talking or not.  They probably all talked at the meeting,
18    but he definitely did talk at the meeting about his role with
19    the media contacts."
20    A.      Yes, Mr. Craig talked at the meeting on October 9th.
21    They all three spoke at the meeting on October 9th.
22    Q.      Okay.  And do you recall Mr. Craig saying in words or
23    substance that he contacted the media?
24    A.      Could you repeat your question, please?
25    Q.      Do you recall Mr. Craig saying in words or substance
```

2530

1          at that meeting that he made contacts --

2     A.          Yes.

3     Q.          -- with the media?

4     A.          Yes.

5     Q.          That he initiated contacts with the media?

6     A.          That he made contacts to correct mischaracterizations

7     that were reported.  That's what I recall of the meeting.

8     Q.          Okay.  And I think you referred -- when

9     Mr. McCullough was questioning you -- to the fact that he

10    said he did it independently?

11    A.          Yes.

12    Q.          That is, not at the instruction or direction of the

13    government of Ukraine?

14    A.          Yes.

15    Q.          But you have no doubt that he said he contacted some

16    reporters for that purpose?

17    A.          He contacted reporters for the purpose of correcting

18    mischaracterizations --

19    Q.          Yes, ma'am.

20    A.          -- that were reported in the press.

21    Q.          All right.  And you remember his describing being

22    proactive?

23    A.          Proactive in what sense?

24    Q.          Well, let me ask you, if you would look at the same

25    grand jury transcript at page 41.

2531

1          MR. McCULLOUGH:  Objection, Your Honor.

2          Can we approach?

3          THE COURT:  Yes.

4          (At the bench)

5          THE COURT:  What's your objection?

6          MR. McCULLOUGH:  He is attempting to impeach her on

7     something that she hasn't said.

8          THE COURT:  Right.  You have to get some inconsistent

9     testimony before you --

10         MR. TAYLOR:  I thought she said she didn't remember.

11    "I don't remember" is as good as a "no."

12         THE COURT:  "I don't remember right now" lets you

13    impeach her or --

14         MR. TAYLOR:  If I ask her, Didn't you say he was

15    proactive, and she says, I don't remember whether I said that

16    or not, then I'm entitled allowed to impeach her with the

17    statement at the prior time that she said the contrary.

18         MR. McCULLOUGH:  Your Honor, the section of the

19    transcript in the grand jury hearing, when she was asked if

20    it was proactive or reactive, in responding to those answers,

21    she ultimately clarified that she understood him to be

22    proactively reaching out in response to mischaracterizations,

23    so the record is very clear on that.

24         And I think if we are going to get into what she said

25    or what she didn't say, her testimony today is consistent on

2532

1        this point with the grand jury testimony as a whole.

2                MR. TAYLOR:  That's argumentative.

3                THE COURT:  What is the thing that you want to draw

4        her attention to right now?

5                MR. TAYLOR:  I gave the page reference.  Let me get

6        it.

7                (Pause)

8                MR. TAYLOR:  Page 41, lines 3 to 8.

9                THE COURT:  I'm sorry?

10               MR. TAYLOR:  Lines 3 to 8.

11               MR. McCULLOUGH:  Your Honor, that conversation

12       continues on to pages 42 and 43.

13               THE COURT:  All right.  Well, I guess my question is,

14       I think we have to figure out what the foundation is

15       for -- the question is:  Do you recall his saying proactive,

16       and this is -- she is saying her takeaway --

17               MR. TAYLOR:  I can ask her that question.

18               I'm being curtailed in my ability to cross-examine --

19               THE COURT:  He is allowed to object.  You haven't

20       been curtailed in anything.

21               Okay.  Now, there are rules about when you get to go

22       to a prior statement and rules when you aren't.  And I'm

23       trying to figure out what you do.

24               You asked the question:  Do you recall his saying it

25       was proactive?  I don't see anything here that would make

1    -- even if she said, "I don't recall," I don't see this as

2    being inconsistent with that because she was asked that.  She

3    was asked to characterize her understanding.  Did you have an

4    understanding whether in terms of the explanation, whether he

5    was being proactive?  He was being proactive.

6         You can certainly ask her:  It was your take that he

7    was being proactive, wasn't it?  If she says no, then you can

8    bring this out.  If there is something you think puts it in

9    more context, then you will bring that out.

10        MR. McCULLOUGH:  Understood, Your Honor.

11        And just to be clear, my colleagues actually pointed

12   out to me that she didn't say, "I don't remember that."  She

13   said, "Would you please be clear about what you mean by

14   proactive."

15        MR. TAYLOR:  I will rephrase it.

16        THE COURT:  All right.

17        (In open court)

18        BY MR. TAYLOR:

19   Q.    Excuse us, Ms. Hunt.

20        Ms. Hunt, your takeaway from the meeting was that

21   Mr. Craig was being proactive in contacting reporters; wasn't

22   he?

23   A.    My takeaway from the meeting was Mr. Craig --

24   Mr. Craig, on his own, contacted the media.  He did not do it

25   at the order, request, direction, or control of the

2534

1    government of Ukraine.  That was my takeaway from the

2    meeting.

3    Q.      Have you used the word "proactive" to describe your

4    takeaway of Mr. Craig's --

5    A.      Yes.  He proactively went out to try to fix the

6    mischaracterizations that were made, that were reported in

7    the press, and he did that on his own proactively in

8    order -- and not at the order, request, direction, or control

9    of the government of Ukraine.  So proactive in that sense.

10   Q.      Thank you.

11           And did you get the impression that he contacted some

12   media before the media had the report?

13   A.      I don't recall.

14   Q.      Would you look, please, at page 42, lines 5 to 13 of

15   the same exhibit.

16   A.      Excuse me.  What line?

17   Q.      Lines 5 to 13.

18           MR. McCULLOUGH:  Objection, Your Honor.

19           THE COURT:  What was the question you asked her?

20           Do you recall having the impression -- can you finish

21   the rest of your question?

22           BY MR. TAYLOR:

23   Q.      Did you get the impression that he contacted some

24   media before the media had the report?

25           MR. McCULLOUGH:  Objection, Your Honor.

2535

1          THE COURT:  All right.  And you're directing to that

2    page in the transcript?

3          MR. TAYLOR:  Page 42, lines 5 to 13.

4          THE COURT:  All right.  I'm not sure what this has to

5    do with that question, this particular excerpt has to do with

6    that question.

7          BY MR. TAYLOR:

8    Q.    Did you get the impression that he needed to

9    correct -- I'm sorry.

10         THE COURT:  The question was:  Did you get the

11   impression that he contacted the media before the media had

12   the report?  And I'm just not seeing that in that particular

13   excerpt one way or the other.

14         MR. TAYLOR:  If you look at lines 7 -- I'm sorry, I

15   have lost my place.

16         It is 42, 5 to 13.

17         THE COURT:  All right.  Well, you can come to the

18   bench, but I don't see any reference to the timing in

19   relationship to when the media had the report in this chunk

20   of testimony, so I don't know how it goes to what you just

21   asked.  It might go to some other question, but it doesn't go

22   to that one.

23         MR. TAYLOR:  Your Honor, I can come to the bench.

24         THE COURT:  Okay.

25         (At the bench)

2536

1          MR. TAYLOR:  Your Honor, she says, "My understanding

2    of what he said was he needed to correct

3    mischaracterizations," so that the proactive part was that.

4    And then provided a report.

5          So it is clear from this that he speaks to the media.

6    Does she remember his speaking to the media before they had

7    the report --

8          THE COURT:  Oh, no, no, no, no.  That he needed to

9    correct mischaracterizations.  So she's not talking about the

10   release of the Ukrainian report in this sentence.  It is not

11   at all clear that that's what that is about.

12         MR. TAYLOR:  Okay, and then he says -- and because

13   it's like, okay, those are mischaracterizations, can we have

14   a copy of the report --

15         THE COURT:  Okay.  After he spoke to them --

16         MR. TAYLOR:  Yes.

17         THE COURT:  -- about the mischaracterizations.

18         MR. TAYLOR:  Yes.

19         THE COURT:  Right.  But you said before the media had

20   the report, which is --

21         MR. TAYLOR:  That's exactly what I said, and that's

22   exactly what this says.

23         MR. McCULLOUGH:  It says nothing about whether the

24   media had this report.  She is describing this in general

25   terms.  She is not describing this --

2537

1              THE COURT:  He made it sound like the general media.

2     And she's talking about that after he talked to them, some of

3     those people said, can we have a copy --

4              MR. TAYLOR:  Your Honor --

5              THE COURT:  -- that's what he told her at the time.

6              MR. TAYLOR:  I know.

7              THE COURT:  Okay.

8              MR. TAYLOR:  The quote is --

9              THE COURT:  I understand what you're saying.  I think

10    it is slightly different than the question you asked.

11             I don't have any problem with your saying:  Did he

12    tell you -- or was your understanding, after he talked to

13    you, that after he corrected mischaracterizations, some of

14    the reporters asked for a copy of the report?

15             MR. CAMPOAMOR-SANCHEZ:  Can I add, Your Honor,

16    because I was the one that actually asked questions of

17    Ms. Hunt in the grand jury.  If the Court were to look at

18    page 43 --

19             MR. TAYLOR:  He'll get the right to impeach this

20    witness.

21             THE COURT:  We haven't got an inconsistent statement

22    yet.  We're just trying to figure out --

23             MR. CAMPOAMOR-SANCHEZ:  Right.

24             THE COURT:  -- and whether this is inconsistent with

25    it.

1          The way you phrased your question didn't quite make

2     the point that you're trying to make, and I think the

3     objection was well taken about whether this is inconsistent.

4     But I don't have any problem with your saying, wasn't it your

5     understanding that he talked to the reporters to correct, and

6     then they asked for a copy of the report.

7          MR. TAYLOR:  Some of it --

8          THE COURT:  The ones he was talking to.

9          MR. CAMPOAMOR-SANCHEZ:  Right.  And if the Court

10    reviews page 43, she clarifies the timing issue, which is the

11    question that he was trying to get at and suggesting that he

12    was going to impeach her with the fact that she had

13    previously said that he reached out before the report was

14    released.  And she clarifies on page 23, and the Court can

15    look at lines 11 through 22, where I cover that again with

16    her.  And it is made entirely clear that what she has been

17    talking about was that her understanding was that Mr. Craig

18    reached out to the media, but he reached out after the media

19    has reported something inaccurate that he wants to correct.

20    And she says, yes, yes, yes.

21          THE COURT:  Okay.

22          MR. TAYLOR:  He can bring that out --

23          MR. CAMPOAMOR-SANCHEZ:  You cannot -- we would have a

24    completeness objection if he tries to impeach suggesting

25    timing, which is clarified a couple of pages later.  He is

1    trying to select a slice, give it a different meaning from

2    what it actually says, and suggesting that's not accurate.

3              She is clear that there was no -- that she understood

4    that she found this context happened after there were

5    publications out there.

6              THE COURT:  There does seem to be a long

7    back-and-forth while he is trying to figure out what she

8    meant.

9              MR. CAMPOAMOR-SANCHEZ:  Right.

10             THE COURT:  And it goes on for a page.

11             Now, if you want to selectively pick out part of it

12   that doesn't tell the whole story, then I don't think right

13   now he has to read the whole thing, but you certainly can.

14             MR. CAMPOAMOR-SANCHEZ:  I think that it would be

15   inappropriate to suggest that she is being impeached as to

16   timing when she herself --

17             THE COURT:  He is not even impeaching her yet.

18             MR. CAMPOAMOR-SANCHEZ:  Right.

19             THE COURT:  All he asked her was:  Do you recall

20   having any impression that he contacted the media before the

21   media had the report?

22             And you objected that that was not what this was

23   about.

24             And now I understand the sequencing in the piece that

25   he is looking at.  And I thought maybe that needed to be

2540

1    rephrased.  But we still haven't gotten to whether she is

2    going to be impeached or not.  If she says something

3    inconsistent with what she said, he is allowed to bring that

4    out.  If she clarifies it on the next page, then you can

5    bring that out.

6              MR. TAYLOR:  I believe the record is that she says I

7    don't remember or I don't -- we can have the court reporter

8    read it back.

9              THE COURT:  Wait.  But the problem is the question

10   was a little different from what she said, which --

11             MR. CAMPOAMOR-SANCHEZ:  Right.

12             THE COURT:  -- was, like, going straight to that as

13   impeachment wasn't quite fair.  I'm trying to get the

14   predicate question to at least track what is in the

15   transcript so that there is a basis to bring it out as

16   opposed to asking her, do you recall this, and then --

17             MR. TAYLOR:  Your Honor, the whole question in this

18   case is whether in this meeting Mr. Craig made some false

19   statements.  The first question is what statements he made.

20   And so I'm asking her what statements he made, what she

21   remembers he said in this meeting.  And I have a written

22   record of what she remembers he said.

23             THE COURT:  That's fine.  You can ask what she

24   remembers he said.

25             I don't think that's the whole question in this case.

2541

1       I think they pretty much stake their case on his written

2       statements and not this because they put in very little

3       testimony about what happened during the meeting other than

4       the general takeaway.

5               But go ahead.

6               MR. McCULLOUGH:  Your Honor, we just want to be sure

7       that the predicate question actually matches what the

8       transcript says.

9               THE COURT:  I understand.  All right.

10              (In open court)

11              MR. TAYLOR:  Could I have the reporter read back that

12      question, Your Honor.

13              THE COURT:  I don't know.  Can you?

14              (The record was read as follows:)

15              "BY MR. TAYLOR:

16              "Question:  Did you get the impression that he needed

17      to correct -- I'm sorry.

18              "THE COURT:  The question was:  Did you get the

19      impression that he contacted the media before the media had

20      the report?"

21

22              THE COURT:  What was his question before I started

23      talking?

24              (The record was read as follows:)

25              "BY MR. TAYLOR:

2542

1           "Question:  Did you get the impression that he

2      contacted some media before the media had the report?"

3

4           MR. TAYLOR:  Yes.

5           THE COURT:  All right.  Can you answer that?

6           Is that still your question?

7           MR. TAYLOR:  Yes.

8           THE COURT:  Can you answer that question?

9           THE WITNESS:  My understanding from -- was that the

10     media contacts were made to correct mischaracterizations that

11     were reported in the press.  That was -- and that all media

12     contacts generally related to this were not conducted at the

13     request, order, direction, or control of the government of

14     Ukraine.  That was my understanding of the contacts with the

15     press.

16          MR. TAYLOR:  Thank you.

17          BY MR. TAYLOR:

18     Q.     I don't mean to be tedious.  But do you have an

19     impression about whether some of his contacts with the media

20     were followed by requests from the media for copies of the

21     report?

22     A.     All of this was -- all of the media contacts, it was

23     my impression, were conducted in that December 12, 13 time

24     frame, and it was a back-and-forth with correcting these

25     mischaracterizations, and that's what I recall.

2543

1    Q.       Thank you.

2             Now, you knew, didn't you, Ms. Hunt, that he had

3    provided copies of the report to three newspapers?

4    A.       Yes.

5    Q.       And did you ask him any questions in the meeting

6    about his conversations with any of the reporters?

7    A.       The meeting was about that.

8    Q.       And did you ask him what his conversation with the

9    *New York Times* reporter was?

10   A.       I don't recall my exact questions to him, but we

11   discussed at the meeting the communications that were made to

12   the media.  And the takeaway from the meeting, which was

13   confirmed in the letter, was that they were to correct

14   mischaracterizations that were reported and that they were

15   not at all made at the order, request, direction, or control

16   of the government of Ukraine.

17   Q.       Thank you, ma'am.

18            What I meant to ask you -- and let me be clear -- did

19   you discuss with him the content of what he said to the

20   reporters?

21   A.       We discussed -- we discussed that -- he also

22   confirmed what some of the content was, if that is what

23   you're referring to --

24   Q.       Yes.

25   A.       -- in his letter of October 10th.  Is that what

2544

1      you're asking?

2      Q.      Do you remember anything he said about the content of

3      his conversation with the *Los Angeles Times*, for example?

4      A.      He was correcting mischaracterizations.  They were

5      reporting one thing, and they weren't the same things as what

6      he felt his report said.

7      Q.      Can you be any more specific than that?

8      A.      Well, he referred to them in the October 10th letter.

9      Q.      Other than that?

10     A.      No, I don't recall.

11     Q.      Didn't he bring along one of the articles to show you

12     where he was quoting?

13     A.      I don't recall that he brought -- I don't recall.

14     Q.      You asked him to write a letter, I believe you

15     testified.

16     A.      Yes.

17     Q.      And that letter is Government Exhibit 12; right?

18             I will just show it to you, so we're all on the same

19     page.

20     A.      October 10th letter, yes.

21     Q.      Uh-huh.  And you wrote back on January the 16th;

22     right?

23     A.      Yes.

24     Q.      Your letter to him is Government Exhibit 13.  Let me

25     show that to you.

1           Calling your attention to the middle paragraph there,

2     do you see that, Ms. Hunt?

3     A.      Yes.

4     Q.      Did you write that?

5     A.      It was actually drafted by Kevin Connolly.

6     Q.      Okay.  But I take it you approved it when you signed

7     the letter?

8     A.      Yes.

9     Q.      Could you read it out loud to the ladies and

10    gentlemen of the jury.

11    A.      "You explained during the meeting" --

12    Q.      More slowly.

13    A.      "You explained during the meeting and in your recent

14    letter that your firm prepared the Tymoshenko report for the

15    Ukrainian" --

16           THE COURT:  I'm sorry.  You need to keep your voice

17    up a little bit.

18           THE WITNESS:  -- "for the Ukrainian Ministry of

19    Justice, and you indicated in your comments to *The National*

20    *Law Journal*, *Los Angeles Times*, and *The New York Times* were

21    not political activities, but were meant to correct

22    mischaracterizations of the report attributable to the

23    Ukrainian Ministry of Justice and Tymoshenko's Ukrainian

24    lawyers concerning whether the Tymoshenko prosecution was a

25    political prosecution.  You informed the media of the

2546

1    inaccuracy, indicating that the report did not decide this

2    issue."

3          BY MR. TAYLOR:

4    Q.     So one of the pieces of content that you were aware

5    of is that he was worried about the mischaracterization of

6    the report concerning whether the Tymoshenko prosecution was

7    a political prosecution?

8    A.     Yes, that's what it says there in the letter.

9    Q.     This is your writing back to him based upon what he

10   said in the meeting and what was in his letter; right?

11   A.     Yes.

12   Q.     And Mr. McCullough asked you some questions about

13   what Mr. Craig did not say.

14          Do you remember that?

15   A.     Yes.

16   Q.     And you testified, I believe, that his letter to you

17   of October 10 was at your request to summarize his position

18   on that meeting.  Right?

19   A.     Yes.

20   Q.     And Mr. Craig did not tell you then or ever, did he,

21   that he believed that Jonathan Hawker of FTI was a liar?

22          MR. McCULLOUGH:  Objection.  Form.

23          THE COURT:  You want to approach the bench.

24          (At the bench)

25          THE COURT:  What is the relevance of that question?

1          MR. TAYLOR:  The point is that all the things that

2     Mr. Craig didn't say, which were positive and indicate that

3     he is entirely innocent of this.  I can point out that he

4     didn't say them, either.

5          THE COURT:  Innocent of what?

6          MR. TAYLOR:  Innocent of lying to FARA, lying and

7     concealing from FARA.

8          THE COURT:  They asked about things that they allege

9     were material facts that he omitted.  So why in a

10    conversation with her would whether he -- either then or

11    now -- believes --

12         MR. TAYLOR:  Or ever.

13         THE COURT:  -- be a material fact with respect to

14    anything --

15         MR. TAYLOR:  I didn't say it was.  I'm saying it

16    is --

17         THE COURT:  He didn't say either --

18         MR. TAYLOR:  Your Honor --

19         THE COURT:  No.  Under what circumstances would he

20    have said that?  What does it matter that he didn't say it at

21    the meeting?  Why is that a relevant thing?

22         MR. TAYLOR:  It doesn't matter.  But the government's

23    position is that he had a duty to volunteer anything that was

24    relevant -- anything -- relevant and material to this

25    decision.  And I'm pointing out --

2548

1              THE COURT:  -- might or might not agree with that as

2      a statement of law, and I might not.  So I don't agree that

3      he had an obligation to volunteer anything.

4              But I think that question is just putting your theory

5      out there, and there is no reason why he would have said it

6      at the meeting, should have said it at the meeting.  He

7      didn't tell her then.  The fact that he didn't tell her then

8      the reasons why you believe now that he might or might not

9      have given the report to David Sanger doesn't -- he gave his

10     reason.  He told her his reason for why he gave it to David

11     Sanger.  And the question is --

12             MR. TAYLOR:  I don't think he did.

13             THE COURT:  Well, okay.  We can argue about that.

14             But I don't think that is a fair question.  I just

15     think it is irrelevant and argumentative.

16             MR. TAYLOR:  Your Honor, I'm cross-examining this

17     witness.  The government has taken the position that he had a

18     duty to say everything material -- everything material -- to

19     the registration decision and he failed to do that.

20             And I am pointing out that he didn't say a lot of

21     things because he didn't --

22             THE COURT:  Whether he believed Jonathan Hawker was a

23     liar or not doesn't have anything to do with the registration

24     decision.

25             I just think it was a gratuitous, argumentative

2549

1      question.

2           MR. MURPHY:  Your Honor, if I may -- and excuse me --

3      the letter she has testified that she requested was a summary

4      of what had been said at the meeting.

5           THE COURT:  Right.

6           MR. MURPHY:  So all of Mr. McCullough's questions

7      about things that were not said at the meeting in the letter

8      but they were not repeated -- well, they weren't discussed

9      during the meeting --

10          THE COURT:  He said were they at either.  I don't

11     think he questioned how come it was left out of the letter

12     after he said it at the meeting.  He said, did he say these

13     things at either place.  There may be some of those that I

14     think at the end of the day are actionable, and there may be

15     some of those at the end of the day that I don't.

16          But the only question is the relevance of

17     Mr. Taylor's pending question, which I'm going to sustain the

18     objection as being irrelevant, because no one has even told

19     me any relevance yet.  They're just telling me what's wrong

20     with what he did.  And I don't even see it being responsive

21     to what he did --

22          MR. MURPHY:  The focus of the meeting, and the focus

23     of the subsequent letter, was for Skadden to explain to the

24     FARA Unit, including Ms. Hunt, why her letter opinion on

25     September 6th was incorrect --

2550

1          THE COURT:  Right, that supposedly --

2          MR. MURPHY:  -- and --

3          THE COURT:  -- he hadn't had any conversations about

4    PR.  So why would he be in a meeting talking about thinking

5    that Jonathan Hawker is a liar?

6          Is it your contention that he did walk in there and

7    say that?

8          MR. TAYLOR:  No.

9          THE COURT:  All right.

10         MR. MURPHY:  Then, again, why were there all those

11   questions sustained as to the PR aspects of the report when

12   that was not in the September 5th letter and, therefore,

13   wasn't discussed at the October meeting and, therefore, is

14   not in the October 10th letter, either --

15         THE COURT:  They're taking the position -- they

16   weren't saying that they were left out of the letter

17   improperly because they were said at the meeting but he left

18   them out of the letter.  That was not the upshot of the

19   question.  The upshot of the question was that they were

20   omitted both times.  I believe that is a fair

21   characterization of the question because he lumped them

22   together.

23         Now, you have argued, and you are going to be arguing

24   at the close of the government's evidence -- which might

25   happen if the bench conference ever ends -- that those aren't

1      all appropriate bases for actionable omissions, and some may

2      be and some may not.  And if I agree with you with respect to

3      some of them, they may fall out of the case.  But he wasn't

4      asking about the letter to suggest that the letter hadn't

5      fully captured the meeting.  He was bringing out the fact

6      that those things weren't said in either place because it is

7      their position that those are material things that he should

8      have said in a conversation about what did you do with

9      respect to the dissemination of the report.  That's his

10     theory.  Everybody is going to get to argue to me whether

11     that's part of the case of not.  But that's a different

12     question.  And the only question we're talking about right

13     now, which is your question, to which the objection is

14     sustained.

15             MR. TAYLOR:  I have a series of questions.

16             THE COURT:  All right.  Tell me some of the other

17     ones.

18             MR. TAYLOR:  Did you know -- did he tell you that Tom

19     Parfitt told him that the Ministry of Justice of Ukraine was

20     lying to the press about what the report said?

21             Did he tell you that --

22             THE COURT:  So you're opening the door, then, for

23     them to bring out that before the report was ever public, he

24     was on the phone with Tom Parfitt, he was ending commentary

25     from Tom Parfitt --

2552

1          MR. TAYLOR:  He --

2          THE COURT:  -- but he didn't ask her about it.  So if

3     you want to ask her about Tom Parfitt, they get to ask all

4     about Tom Parfitt and whether she would have liked to know

5     whether Tom Parfitt was sending him quotes and whether he

6     believed he could use this one anonymous -- you can use this

7     one as background.  This one is exact.  And yes, it is the

8     UK, it is not the U.S., but it does tend to support their

9     argument that he was involved at the behest of the Ukraine in

10    massaging the media rollout.  So if you don't want them to

11    get into that, then don't get into it.  But if you get into

12    it, it they can redirect about it.  I don't know why they

13    couldn't.

14         MR. TAYLOR:  Well, I was also going to ask him:  Did

15    Mr. Craig tell you that the government of Ukraine tried to

16    get him to make changes in the report?  The government of

17    Ukraine refused -- did he tell you the government of Ukraine

18    refused -- this all goes to --

19         THE COURT:  I think that goes to the independence of

20    the report.  I think we have stressed many, many times in

21    this case that there is no allegation that it wasn't

22    independent.  The question is whether, when he spoke to the

23    press about it, he was on "Team Ukraine" or he was on "Team

24    Greg Craig."  And that's the case I think at this point.

25         MR. TAYLOR:  You know, I'm not withdrawing the

1    questions, but I understand --

2         THE COURT:  If you want to bring out in one, did he

3    tell you that -- but I haven't heard from any witness that he

4    discussed the independence of the report at the meeting.  So

5    I think you have to lay a predicate as to whether it was even

6    discussed before you can say, did he tell you they asked for

7    changes and they didn't make them --

8         MR. TAYLOR:  May I take just one second?

9         There are many things he didn't discuss, many things

10   in his letters to FARA, and he didn't discuss them because he

11   didn't believe that they were relevant, material, or he had

12   an obligation to.  And they, however, have been given the

13   opportunity to say, well, he didn't tell you A or B or C.

14        THE COURT:  Well, it is a pretty limited list of

15   things they have talked about, all of which relate only to PR

16   and Mr. Weber.  And they have even stayed away from things

17   Alex may have done in Europe, or the *The Daily Telegraph* they

18   haven't gone into with her.

19        If you want to ask -- because as the letters went

20   back and forth, the focus was more and more media, media,

21   media, media.  It wasn't --

22        MR. TAYLOR:  It was all media --

23        THE COURT:  -- a concern that you were working at

24   their behest when you drafted the report.  It doesn't suggest

25   that in the letter, that was part of her conclusion.  If it

2554

1  was, you would certainly -- if you think it was and that is

2  one of the things they went into the meeting to refute, we

3  haven't heard any testimony about that.  But if that was part

4  of it and you want to bring out that they defended the

5  independence of the report at the meeting, you can ask her

6  that.

7          MR. MURPHY:  Mr. Spiegel described it several times

8  as "the independent report."

9          MR. McCULLOUGH:  The questions --

10         THE COURT:  That has nothing to do with what I just

11 said.

12         MR. McCULLOUGH:  The questions that I was posing to

13 Ms. Hunt related to -- they were within the subject matters

14 that she was asking questions about, and that's why I was

15 addressing those with Ms. Hunt.

16         THE COURT:  If he has good faith reason to believe

17 that part of their defense in this meeting with the

18 non-registration obligation was to detail why it was

19 independent and that happened in the meeting, then you can

20 ask her about it, but you can't ask her about what didn't

21 happen at the meeting --

22         MR. TAYLOR:  That is clearly not our defense in this

23 case.  Our defense in this case is that the allegation of

24 concealment are insufficient -- he had no obligation, no

25 knowledge of a duty to disclose --

2555

```
 1              THE COURT:  All right.  We're going to talk about
 2      that.
 3              MR. TAYLOR:  All right.
 4              THE COURT:  All right.
 5              (In open court)
 6              THE COURT:  Members of the jury, I'm not liking this
 7      any more than you are.  It is taking a long time, and I
 8      apologize.  My throat hurts, and it is hard to talk, but
 9      sometimes there's a lot to discuss.
10              All right.
11              BY MR. TAYLOR:
12      Q.      Do you remember seeing an article in the L.A. Times,
13      which was the subject matter of your letter to Skadden?
14      A.      Yes.
15      Q.      Could you look at Defense Exhibit 533, please.
16      A.      533?
17      Q.      Right.
18              Have you had a chance to look at it?
19      A.      Okay.
20      Q.      Is this, in fact, the e-mail from Mr. Mudd to you
21      which brought to your attention the entire matter?
22      A.      Yes.
23      Q.      And it attaches the L.A. Times article?
24      A.      Yes.
25      Q.      And did the L.A. Times refer to a statement --
```

2556

```
 1            THE COURT:  Can you see it?

 2            JUROR:  No.

 3            THE COURT:  Are you moving it in evidence?

 4            MR. TAYLOR:  I am.

 5            THE COURT:  Any objection?

 6            MR. McCULLOUGH:  No, Your Honor.

 7            THE COURT:  You can put it on the screen.  Thank you.

 8            (Defendant 533 admitted in evidence)

 9            BY MR. TAYLOR:

10    Q.      Ms. Hunt, this article refers to a statement by the

11    Ukrainian Ministry of Justice; doesn't it?

12    A.      Can you show me the statement to which you refer,

13    please?

14    Q.      Yes.  Third paragraph from the bottom.  In the

15    article.  533-2.

16    A.      Do you want me to read it --

17    Q.      No.  I'm just asking you if you recall it referred to

18    a statement by the Ministry of Justice?

19    A.      Yes.

20    Q.      Did you get a copy of the statement by the Ministry

21    of Justice?

22    A.      Not that I recall.

23    Q.      So you never had a chance to compare the statement by

24    the Ministry of Justice to the article in the *L.A. Times*?

25    A.      This *L.A. Times* article is what raised the question
```

2557

1     in my mind as to whether or not a registration obligation was

2     required -- whether there was a registration obligation.  And

3     it raised the question, which is why I would then go out to

4     the actual person and hear from the person their take on it.

5     I wouldn't refer to anything else at that point.  It raised

6     the question, and I asked the question to the law firm.

7     Q.      Did you ever get a copy of the Ministry of Justice

8     press release?

9             MR. McCULLOUGH:  Objection.

10            THE COURT:  You can answer "yes" or "no," if you

11    know.

12            THE WITNESS:  I may have.

13            BY MR. TAYLOR:

14    Q.      You don't remember?

15    A.      I don't recall --

16    Q.      Do you see --

17    A.      -- if you would like to show me the document, I can

18    tell you --

19    Q.      I, unfortunately, have to ask you what you remember.

20    A.      Well, right here, right this moment, I don't

21    recall --

22    Q.      Do you see the reference --

23    A.      -- I saw a lot on the subject.

24    Q.      No doubt you have been asked a lot of questions about

25    this matter.

2558

1          Do you see where in the *L.A. Times* article the writer

2    says the Ministry of Justice, "underplayed the critical

3    findings"?

4    A.        I see where it says that, yes.

5    Q.        And did that tell you that the Ministry of Justice

6    was trying to underplay the critical findings of the report?

7    A.        It wasn't important to me.  What was important to me

8    was whether or not activity was conducted in the United

9    States by an agent of a foreign government, and that's what

10   was important to me.  What --

11   Q.        So --

12   A.        -- the content -- and I believe I said that

13   earlier -- the content of the report is not important in my

14   analysis.

15   Q.        The content of the news article --

16   A.        The content of the news articles -- I don't make

17   determinations of a registration obligation based on what I

18   read in the press.  It will raise questions, articles in the

19   press, but I never make a decision based on what is reported

20   in the press.

21   Q.        So if the *L.A. Times* reported that Greg Craig, author

22   of the Tymoshenko report, said that the government of the

23   Ukraine was trying to misrepresent his report, that wouldn't

24   be relevant?

25   A.        Could you repeat your question, please?

1   Q.      So if the newspapers said that Greg Craig, author of

2   the Tymoshenko report, paid for by the government of the

3   Ukraine, says the Ukraine is trying to mischaracterize his

4   report, that content in that article wouldn't be relevant to

5   whether Mr. Craig is acting as an agent of the Ukraine?

6   A.      Again, what is relevant is contacts with media and

7   dissemination of informational materials, and whether that,

8   regardless of what it says, is done at the order, request,

9   direction, or control of the government of Ukraine.  That's

10  what's important.  And the mischaracterizations in this sense

11  were important because that was what was the takeaway, for

12  instance, from the meeting, was that the contacts were to

13  correct mischaracterizations.

14  Q.      And the article makes clear, wouldn't you agree, that

15  the Skadden Report concluded that Ms. Tymoshenko did not get

16  a fair trial?

17  A.      I am going to ask you to repeat that question again.

18  Q.      The article makes clear that the report concluded

19  that Ms. Tymoshenko did not get a fair trial?

20  A.      I don't know that the article makes that clear.

21  Q.      Okay.  But nothing in the article suggested that

22  Mr. Craig was promoting the report on behalf of the Ukraine;

23  did it?

24  A.      The article raised the question in my mind that there

25  may be an obligation to register, and that's why we started

2560

1     the inquiry, so we could discuss one-on-one with Skadden and

2     any other representatives at Skadden that were involved in

3     it, to hear it basically right from them and not from what is

4     reported in the press.

5     Q.     So nothing in the article suggested or said that

6     Mr. Craig was helping the Ukraine promote the report; was

7     there?

8     A.     The article raised the question as to whether or not

9     there's a possible obligation to register under FARA.  We

10    wanted to know that -- we knew that there was a -- from the

11    article -- the article implied that there was a contract and

12    that Skadden had entered into a contract with a foreign

13    government and that that article raised questions as to

14    whether or not they were engaged in activity that would

15    require registration.  So we needed to ask, and we did.

16    Q.     You discussed these possible obligation letters in

17    response to Mr. McCullough's question --

18    A.     Yes.

19    Q.     -- right?

20          It is true, isn't it, that no one has a legal

21    obligation to respond to that possible obligation letter?

22    A.     At this particular letter of inquiry, we did receive

23    a response, and Mr. Craig chose to respond.

24    Q.     That's not my question, Ms. Hunt.

25          Nobody who receives such a letter had a legal

2561

1        obligation to respond --

2        A.        They don't have to respond.

3        Q.        Don't have to respond.

4                  So anybody who got one could just ignore it?

5        A.        People can ignore a letter from the Department of

6        Justice, yes, they can.

7        Q.        And you didn't have any legal authority to require

8        anybody to respond to that letter of possible obligation?

9        A.        My letter is a letter asking questions, and I can't

10       require them to respond.

11       Q.        Okay.  There is nothing in FARA that says what has to

12       go into your possible obligation letters; is there?

13                  MR. McCULLOUGH:  Objection.

14                  THE COURT:  Are you asking her a legal question?

15                  MR. TAYLOR:  No.  I'm asking is there any requirement

16       in FARA or the regulations as to the content of the possible

17       obligation letter.

18                  THE COURT:  Does the statute tell you what to write

19       in the letter?

20                  THE WITNESS:  No, not precisely what to write in the

21       letter, no.

22                  BY MR. TAYLOR:

23       Q.        Mr. Craig and Skadden did respond to your letter; did

24       they not?

25       A.        He did.

2562

1    Q.      Let's look at the letters that you sent and the

2    responses to those, please.  The first is Government

3    Exhibit 1.

4           Can you identify Government's Exhibit 1 as the letter

5    that you sent on December 18, 2012?

6    A.      Yes.

7    Q.      And you said you ask everybody the same four

8    questions?

9    A.      Yes, we do.

10   Q.      You just plug in the name of the country?

11   A.      Pretty much that's what we do.  We treat everybody

12   the same.

13   Q.      You don't tailor the questions in these first letters

14   to the reason why you come to ask somebody about it, in the

15   first place?

16   A.      We tailor them in the sense that we will refer to a

17   particular public source document usually, and we did here.

18   So it is not going to be the same public source document

19   every time, and it is not going to be the same possible

20   foreign principal all the time.

21   Q.      So you asked about Skadden's ownership and control?

22   A.      Yes.

23   Q.      And about its regular business or activity?

24   A.      Yes.

25   Q.      You knew what Skadden, Arps was at the time; didn't

2563

 1    you?

 2    A.      Of course, yes.  I have been --

 3    Q.      You thought about just picking up the phone and

 4    calling them and bringing this to their attention; didn't

 5    you?

 6    A.      Yes.

 7    Q.      Because you knew Mr. Gross?

 8    A.      Yes.

 9    Q.      But you would ask these same four questions in a

10    letter like this whether you knew a little or a lot --

11    A.      Yes.

12    Q.      -- about the people it was going to?

13            Okay.  And you could have asked, I suppose, any

14    questions you wanted about the report in this letter; could

15    you not have?

16    A.      I could have.

17    Q.      Or about who drafted the Ministry of Justice press

18    release?  You could have asked that question.

19    A.      You're talking about a press release -- I don't

20    recall the press release, so I --

21    Q.      The one I asked you about --

22    A.      Right.

23    Q.      -- the Ministry of Justice press release that was

24    referred to in the *L.A. Times* article.

25    A.      This letter -- we have -- it is almost a form letter

2564

1    that we send to everybody, is what it is.  I'm not going to

2    -- we didn't ask any other questions because this was our

3    letter of inquiry we send to anybody, no matter who they are,

4    and we send the exact same letter basically to everybody.

5    Q.      I understand.  So Skadden asked your questions about

6    ownership and control, you've testified.

7    A.      Yes.

8    Q.      Do you need to look at Skadden's --

9    A.      I recall the answer to that question.

10   Q.      You remember the answer to that question?

11   A.      Yes.

12   Q.      And they described their activities in paragraph 3 of

13   the letter to you?

14   A.      Well, I would like to have that letter up, please.

15   Q.      Let's put it in front of you.  It is Government's

16   Exhibit 2.

17           Could you bring up paragraph 3, please.

18           Now, do you remember that they described their

19   activities?

20   A.      Yes.

21   Q.      And this is the description they gave you; isn't it?

22   A.      It is the description they gave me.

23   Q.      In addition, in paragraph 4 of the letter, they

24   referred to a written agreement in Ukrainian and English and

25   a proposed written agreement in English.  You see that?

2565

```
 1        A.      Yes.

 2        Q.      And they attached those to this letter; right?

 3        A.      Yes.

 4        Q.      And that's in response to your request for a copy of

 5   the contracts or proposed contracts?

 6        A.      Yes.

 7        Q.      And they also told you that they were in discussions

 8   about additional payments from the government of Ukraine; did

 9   they not?

10        A.      Could you show me that, to what you reference, what

11   you're referring to there?

12        Q.      Yes.  Next page.

13        A.      Could you repeat your question, please?

14        Q.      They told you that they were in discussions with the

15   government of the Ukraine about additional payments?

16        A.      Yes.

17        Q.      They disclosed that to you?

18        A.      Yes.

19        Q.      And they attached correspondence between Mr. Craig

20   and an official of the government of Ukraine relating to this

21   proposal that was under discussion?

22        A.      Yes.

23        Q.      And they told you that there was a private citizen

24   who had basically paid for the report; right?

25        A.      They told me there was a private citizen, but they
```

2566

1    didn't tell me the name of the private citizen.

2    Q.      Right.  They told you what appears here in this

3    paragraph that has been called out, "There was an oral

4    agreement" -- beginning "There was an oral agreement."

5    A.      Yes.

6    Q.      That's what they told you?

7    A.      Yes.

8            THE COURT:  That he agreed to contribute funds to

9    help pay for the work?

10           MR. TAYLOR:  Beg your pardon?

11           THE WITNESS:  Yes, they told me that "there was an

12   oral agreement with a private citizen of Ukraine in which the

13   individual agreed to contribute funds to help pay for the

14   work described above."

15           BY MR. TAYLOR:

16   Q.      And you might as well just read the rest of it,

17   please.

18   A.      "There was nothing in the oral agreement with the

19   private citizen that was inconsistent with the terms of the

20   other agreements.  To the contrary, the private citizen

21   clearly understood that the firm would conduct an independent

22   inquiry and write a report, and the firm would not engage in

23   any political activities as defined in FARA," Foreign Agent

24   Registration Act.

25   Q.      Thank you.

2567

```
 1              You sent another letter a couple of months later on

 2     April 9th; right?

 3     A.      Yes.

 4     Q.      That's the seven questions letter?

 5     A.      Yes.

 6     Q.      The seven questions numbered six questions.

 7     A.      The seven questions.

 8     Q.      Right.  And on June 3, the firm answered that letter;

 9     am I correct?

10     A.      Yes.

11     Q.      And that's Government Exhibit 4.

12              You identify that as the firm's response to your

13     letter --

14     A.      Yes.

15     Q.      -- your April letter?

16     A.      Yes.

17     Q.      We call this the seven questions letter.

18     A.      Yes.

19     Q.      And your question -- let's just go to the response,

20     please.

21              Your question number 1, "To whom did your firm

22     release or distribute the report and when?"

23              That was the first question you asked; right?

24     A.      Yes.

25     Q.      And you knew that somebody had disseminated the
```

2568

1     report; right?

2     A.      Yes.

3     Q.      You knew it had been on the MOJ website by that time;

4     didn't you?

5     A.      No, I did not know that.

6     Q.      You didn't?

7     A.      Not necessarily.

8     Q.      Had you looked at the MOJ website, Ms. Hunt?

9     A.      I don't recall if I looked at the website.

10    Q.      Did you not know that hundreds of media outlets

11    around the world had reported on this report?

12    A.      I don't recall if I knew that.

13    Q.      The only U.S. media you had at this point in time was

14    the *Los Angeles Times*; wasn't it?

15    A.      I only need one article to raise the question, and

16    the *L.A. Times* article was sufficient for me so that then I

17    could open a true dialog with the actual person.

18    Q.      Is the answer to my question "yes" or "no"?

19            The only media you had at this time was the *Los

20    Angeles Times*; right?

21    A.      I don't recall if the media -- at what time?

22    Q.      At the time you wrote these seven questions.

23    A.      I don't recall.  I most likely read other articles

24    about it, but I don't recall.

25    Q.      Well, when you were drafting these questions, you

 1      discussed possible questions among your staff, you and your

 2      staff?

 3      A.      Yes.

 4      Q.      And there were no restrictions on questions that you

 5      could ask; were there?

 6      A.      No.

 7      Q.      Or no rules or regulations that required that the

 8      questions be done this way or that way?

 9      A.      No.

10      Q.      And you did some drafting yourself; didn't you,

11      Ms. Hunt?

12      A.      I did some editing.  I did some discussing.  I don't

13      know what you mean by "drafting myself."  To what are you

14      referring?

15      Q.      If you would kindly look at Defense Exhibit 539.

16              This is not admitted yet, Your Honor.

17              THE COURT:  All right.

18              BY MR. TAYLOR:

19      Q.      Do you see Exhibit 539?

20      A.      Yes.

21      Q.      Are these your handwritten notes?

22      A.      It is my notes.

23      Q.      This is your handwriting?

24      A.      Yes.

25      Q.      And these are drafts of questions potentially to be

2570

1      included in this letter; are they not?

2      A.      Yes.

3              MR. TAYLOR:  Move their admission, Your Honor.

4              THE COURT:  Any objection?

5              MR. McCULLOUGH:  No objection.

6              THE COURT:  All right.  They will be admitted.

7              (Defendant 539 admitted in evidence)

8              BY MR. TAYLOR:

9      Q.      On the second page in your handwritten draft, you

10     write -- I believe I get this right -- "What was Skadden's

11     understanding of what would happen with the report, and what

12     did Skadden do with the report following production?"

13             Did I read that right?

14     A.      Yes.

15     Q.      So you drafted two questions there:  One, what was

16     Skadden's understanding of what would happen to the report

17     after it was produced?  Right?

18     A.      Yes.

19     Q.      And the second:  What did Skadden do with the report

20     following production?  Second question in the same sentence.

21     A.      Right.

22     Q.      You never asked the second question, did you?

23     A.      In my follow-up letter to them?

24     Q.      Yes.

25     A.      I believe all the questions that I asked -- if we

2571

1    could go back to my letter that I actually sent -- I believe

2    it was broader and covered everything in those questions.

3              If you could bring it back up.

4    Q.     Do you want to look at your letter of April 9 and

5    tell me --

6    A.     Sure.

7    Q.     -- tell me where you asked the question "What did

8    Skadden do with the report following production?"

9    A.     I asked seven questions.  I asked, you know, to whom

10   did your firm release -- this would be -- I'm looking at

11   the --

12   Q.     I'm sorry, Ms. Hunt.

13             THE COURT:  She is trying to look at your letter.

14             MR. TAYLOR:  And I'm trying to hear her.

15             THE WITNESS:  I asked:  "To whom, if anyone, did your

16   firm release or distribute the report and when?"  That refers

17   to the dissemination.

18             I asked:  "When was the report released to the

19   Ukrainian Ministry of Justice?"

20             I asked:  "Did your firm give the report to the

21   L.A. Times?"

22             I asked questions about some PR firms that were

23   registered and if they knew anything about them.

24             I asked, you know, a question about what Skadden's

25   understanding -- whether -- because they were engaged, knew

2572

1    the requirements of FARA and whatnot, did they have any

2    understanding -- let me read that question.

3            "Because your firm was aware of the requirements of

4    FARA and mentioned that it would not engage in any political

5    activities in connection with the Tymoshenko case, what

6    safeguards or agreements, if any, did your firm have with the

7    Ukrainian Ministry of Justice about limiting the use of this

8    report in the United States?"

9            That covers it as well.  And then the next page -- so

10   that's four of the questions.  If I could go see the next

11   page of that letter.

12           MR. TAYLOR:  Certainly.

13           THE WITNESS:  I asked:  "What was your firm's

14   understanding about what happened to the report when it was

15   released to the Ukrainian Ministry of Justice?"

16           That is a very broad question about what the firm's

17   understanding was.

18           And "Did you or anyone in your firm have any media

19   interviews or comments to the media?"

20           So I believe all of those were pretty much covered.

21   These were notes.

22           BY MR. TAYLOR:

23   Q.      In your letter, you did not include the question:

24   "What did Skadden do with the report following production?"

25   Did you?

2573

1    A.        I asked if they disseminated it and when.

2    Q.        Ms. Hunt --

3    A.        I specifically asked that question.  I think it was

4    covered in all of the other questions.

5    Q.        Are you saying there is a question in these seven

6    questions about whether Skadden disseminated the report?

7    A.        If you could go back to the first page, please.

8    Q.        Uh-huh.  Please.

9    A.        "To whom, if anyone" -- I need to go -- I'm sorry.

10   The second page.

11   Q.        Yes.

12   A.        "To whom, if anyone, did your firm release or

13   distribute the report and when?"

14   Q.        All right.  That's the question you asked.

15   A.        I asked that question.

16   Q.        Let me call your attention to your handwritten notes

17   that we were just looking at.

18            Do you see the second question that you drafted

19   there?

20            Tell me if I read it correctly.  "Did Skadden

21   disseminate the report within the U.S., and if so, to whom;

22   if not, who did?"

23            THE COURT:  What's your question?

24            THE WITNESS:  Is there a question for me?

25            BY MR. TAYLOR:

2574

1    Q.      You never asked if Skadden didn't disseminate the

2    report, who did; did you?

3    A.      I was looking to see if Skadden disseminated the

4    report because that was the question before me.  The question

5    before me was:  Did Skadden disseminate the report in the

6    United States at the order, request, direction, or control of

7    the government of Ukraine, and that was the question that was

8    important.

9    Q.      No reason that you couldn't have asked the question:

10   If Skadden didn't disseminate it, who did?  Was there?

11           MR. McCULLOUGH:  Objection, Your Honor.

12           THE COURT:  I think that has been asked and answered

13   multiple times.

14           BY MR. TAYLOR:

15   Q.      Let me bring you back to question 4, please,

16   Mrs. Hunt.  This is a question about this firm, Arnall,

17   Golden, Gregory, & Tauzin Consultants.  Do you see that?

18   A.      Yes.

19   Q.      Those are people who popped up on your registration

20   list?

21   A.      Yes, they registered.

22   Q.      So you knew somebody had said they were working to

23   help Ukraine with its public relations in connection with the

24   Skadden Report; right?

25   A.      I knew that there were two agents who were agents of

2575

1    this Dmitry Shpenov that were advocating for the Ukraine.

2    And I knew that those firms filed informational materials,

3    which was the executive summary of the Skadden Report.

4    Q.      And Mr. Craig told you that Skadden didn't know

5    anything about these companies; right?

6    A.      Yes.

7    Q.      You didn't ask whether there were any other companies

8    who were promoting the Skadden Report; did you?

9    A.      I didn't need to ask that question.  The question

10   before me at this time with this particular individual was

11   whether he was engaged in activity requiring registration.

12   Q.      You were interested in only what Mr. Craig had done;

13   weren't you?

14   A.      I was interested in what -- if Skadden and Greg Craig

15   and anybody else in Skadden, if they were engaged in

16   activities which would require registration.  And that means

17   activities that they were doing at the order, request,

18   direction, or control of the government of Ukraine.

19   Q.      And you weren't interested in what anybody else

20   anywhere had done in connection with this report?

21           MR. McCULLOUGH:  Objection to the form.

22           THE COURT:  She can answer.

23           THE WITNESS:  I'm always interested in getting people

24   who need to register registered.  So if there are other

25   people out there, that's another letter on another day.

2576

1          BY MR. TAYLOR:

2     Q.       And in this June letter, Mr. Craig told you that

3     he -- he had told you there was a third-party payor, and you

4     asked him in your April letter to identify the person and say

5     how much money?

6     A.       Yes.

7     Q.       And he told you, respectfully, that we don't believe

8     you're entitled to such information?

9     A.       Yes.

10    Q.       Am I paraphrasing correctly?

11    A.       Yes, that's paraphrasing it correctly.

12    Q.       And basically, we don't think we have to answer that

13    question?

14    A.       Yes.

15    Q.       Is that paraphrasing correctly?

16    A.       Yes.

17    Q.       But he did invite you, didn't he, if you think this

18    is important, tell us why, and we will think about it?

19             Do you remember that language?

20    A.       Something to that effect he said, yes.

21    Q.       But you didn't ever follow up or respond to his

22    invitation to have any further discussion about the

23    third-party payor; did you?

24    A.       I didn't need to.  I didn't need to, because if there

25    is a registration obligation, that information would come out

1    in the registration.

2    Q.       I thought you said that in determining whether

3    someone should register, you were interested in who paid

4    them.

5    A.       Yes, because I'm interested in this case if there was

6    another foreign principal, perhaps.

7    Q.       So were you no longer interested in June in who paid

8    Skadden?

9    A.       Yes, I was very interested, but here there would have

10   been -- there was a registration obligation, is what we

11   determined from this letter.  We determined there is a

12   registration obligation on behalf of the government of

13   Ukraine.  Once we received that registration, then the

14   registrant would be required to report other moneys,

15   activities all related to it --

16   Q.       I see.

17   A.       -- and from that, our normal course would be to reach

18   out -- perhaps they would have to register for somebody else,

19   or perhaps somebody else would have to register from that

20   registration.  We would gain information.

21   Q.       You would agree with me that you didn't follow up on

22   Mr. Craig's invitation to tell him --

23   A.       I did not --

24   Q.       -- any more about --

25   A.       No --

2578

1    Q.      -- the third-party payor?

2    A.      -- no.

3    Q.      And in this June 6th letter, they attached the new

4    contract with the government of Ukraine.  You remember that?

5    A.      Yes.  Do you want me to -- could we pull that up?

6    Q.      No, I'm just happy if you can confirm it.

7    A.      They did, yes.

8    Q.      So when you wrote your questions, your seven

9    questions, the *Los Angeles Times* was the only article you

10   knew about then; wasn't it?

11           MR. McCULLOUGH:  Objection, Your Honor.  Asked and

12   answered.

13           THE COURT:  I think so.

14           BY MR. TAYLOR:

15   Q.      You only asked in question 3 about whether they gave

16   the report to the *Los Angeles Times*; am I right?

17   A.      Yes.  I asked them in number 1:  "To whom, if anyone,

18   did your firm release or distribute the report," which would

19   cover anything else.

20   Q.      But you didn't know anybody -- any media related to

21   this other than the *L.A. Times*; did you?

22           MR. McCULLOUGH:  Objection, Your Honor.  Asked and

23   answered.

24           THE COURT:  All right.  You can answer about that's

25   the only name you listed in 3 at that point.

1          THE WITNESS:  Yes, that was the only one I listed

2     there.

3          BY MR. TAYLOR:

4     Q.     So this letter to you of June 3rd was the first time

5     you heard about *The New York Times* and *The National Law*

6     *Journal*?

7     A.     I don't recall.  The *L.A. Times* article, like I said

8     before, was the article that I used to send the letter of

9     inquiry out.  I was on a fast track on it and used that

10    letter to then reach out directly to the individual firm to

11    hear from them what -- so that they could enter the dialogue.

12    Like I said before, I would hear it from them.  All the press

13    from that point I'm not really that interested in.  I want to

14    have the dialogue with the person so I can hear it from them

15    and we can determine whether or not there is a registration

16    obligation.

17    Q.     So when he referred you to conversations or

18    statements to *The National Law Journal* in his letter in

19    response to you of June 3rd, you didn't go look up the

20    article in *The National Law Journal*; did you?

21    A.     I don't recall.

22    Q.     And did you even know what his statements to *The*

23    *National Law Journal* were?

24          MR. McCULLOUGH:  Objection.

25          THE COURT:  She doesn't recall.  She went to look at

1     it.

2           Did you know from any other source what he had said

3     to *The National Law Journal*?

4           THE WITNESS:  I don't recall.  I mean, we got it from

5     him.  In the October 10th letter, there were some statements.

6           BY MR. TAYLOR:

7     Q.     I'm sorry.  I'm having a little trouble --

8     A.     The October 10th letter.

9     Q.     I'm asking you about the June 3rd letter.  He

10    disclosed to you in that letter, did he not, that he had made

11    statements to *The New York Times* and *The National Law*

12    *Journal*; right?

13    A.     Yes.

14    Q.     You didn't read either *The New York Times* or *National*

15    *Law Journal* articles?

16    A.     I don't recall if I did or did not.

17    Q.     All right.  And so you didn't know that *The National*

18    *Law Journal* had run an erroneous article about the report

19    before Mr. Craig and Mr. Sloan saw it; did you?

20          MR. McCULLOUGH:  Objection.  Asked and answered.

21          THE COURT:  Well, she doesn't know anything about it.

22          MR. TAYLOR:  That's right.  And I'm asking her

23    several other questions about what she didn't know.

24          THE COURT:  Go ahead.

25          BY MR. TAYLOR:

2581

1    Q.      You did not know that *The National Law Journal* had

2    run an article about the report which was erroneous and had

3    adopted the Ukrainian characterization; did you?

4    A.      I don't recall.

5    Q.      And did you know that Mr. Craig and Mr. Sloan had

6    called the reporter and told him that it was wrong and gotten

7    a correction?

8    A.      He had indicated that there were

9    mischaracterizations -- that he was contacting --

10          THE COURT:  He's telling you, at this time, when this

11   letter landed on your desk, did you know any of these things?

12          THE WITNESS:  Did I know he was contacting -- could

13   you repeat your question?

14          BY MR. TAYLOR:

15   Q.      Did you know at this time, on June 3rd or thereafter

16   when you got this, that *The National Law Journal* had run an

17   article that Mr. Craig had called them about and demanded a

18   correction?

19   A.      I don't recall.

20   Q.      You didn't know anything about the *National Law*

21   *Journal* article other than what he told you in his answer to

22   the first question?

23          MR. McCULLOUGH:  Objection, Your Honor, as to form,

24   asked and answered, and argumentative.

25          MR. TAYLOR:  It is none of those things.

2582

1          THE COURT:  Well, I think it might be a little bit of

2    all of those things.

3          The question is, for the last time at this point:

4    Before you got that, did you know anything else about the

5    nature, the substance, anything about the contacts with *The*

6    *National Law Journal* before he said this is someone -- this

7    is someone?

8          THE WITNESS:  I don't recall if I did.  My goal in

9    this is to have the dialogue with the person directly, and I

10   really -- I really don't want to make determinations based on

11   anything that's read in the press on that, and I would have

12   the conversation with the person.

13         BY MS. TAYLOR:

14   Q.    So Ms. Hunt, am I right, that without ever reading

15   *the National Law Journal* article, you decided his contact

16   with *The National Law Journal* was a political activity

17   requiring him to register?

18   A.    I decided based on what he had told me in his letters

19   that there was enough there to require registration.

20   Q.    Regardless of the content?

21   A.    Regardless of the content of what?

22   Q.    Of what appeared in *The National Law Journal*.

23   A.    I based my determination on what Mr. Craig told us.

24   Q.    Thank you.

25         Also, with regard to *The New York Times*, this was the

2583

1      first time you learned about *The New York Times* article?   I

2      think I have already asked you, and I apologize.   Is that

3      correct?   The first time you knew about *The New York Times*

4      article?

5      A.       I don't recall if it was the first time that I --

6      Q.       Did you read *The New York Times* article?

7      A.       At what point in time?

8      Q.       Then.

9      A.       Then, when?

10     Q.       Then, between June and September of 2012.

11     A.       I don't recall if I read it during that time.

12     Q.       And so you didn't see -- could we put up the *New York*

13     *Times* article, please.

14              Have you seen it since then?

15     A.       I'm familiar with this article.

16     Q.       And you can see from the article that he spoke to the

17     reporters the day before the report was released; can you

18     not?

19     A.       Could you show me where in the article you're

20     referring?

21     Q.       Do you see that?

22     A.       Okay.   Yes.   I see it.

23     Q.       *The New York Times* itself makes it clear that

24     Mr. Craig spoke to the reporters before the report was

25     released; does it not?

2584

1      A.      The article says that.  The article --

2      Q.      The article --

3      A.      -- says that.  The article says that.  But

4      that -- yes.

5      Q.      So let me just ask you this question -- if you would

6      call out the quote that's in the third paragraph from the

7      bottom, "We leave to others."

8              You see that, Ms. Hunt?

9      A.      Yes.

10     Q.      That represents the quote that Mr. Craig gave to *The*

11     *New York Times*.

12             Do you see that?

13     A.      Yes.

14     Q.      And he had told you in his letter of June 3rd that he

15     had given the quote to *The New York Times*; had he not?

16     A.      Repeat your question, please.

17     Q.      He told you in his letter of June the 3rd that he had

18     given a quote to *The New York Times*?

19     A.      Can you show me in the June 3rd letter exactly what

20     you're referring to.

21     Q.      Sure.  Get the questions back, please.  I think it's

22     question 5 or 6.

23             Yeah, 6, which is actually 7.

24             Do you see that?

25     A.      Yes.  "Greg Craig provided brief clarifying

1       statements about the report to David Sanger."

2       Q.      To David Sanger.

3       A.      Yes.

4       Q.      That's the quote where he says, "We leave to others

5       the question of whether this prosecution was politically

6       motivated."

7               Do you see that?

8       A.      I don't think --

9               THE COURT:  Can you approach the bench.

10              MR. TAYLOR:  I'm moving on, Your Honor.

11              (At the bench)

12              THE COURT:  There is a statement in the article, but

13      for you to point to that and then point to the thing in the

14      letter where it says clarifying, and that's it, isn't it,

15      suggests -- there was a statement in *The New York Times*

16      but -- and he told her that he gave a statement to *The Times.*

17              MR. TAYLOR:  And this is a statement in *The New York*

18      *Times.*

19              THE COURT:  Right.  But your phraseology was a little

20      different than that, suggesting that here's a statement in a

21      letter, so that must be --

22              MR. TAYLOR:  It's not so anything.  I'm pointing out

23      what she did and didn't do, and I'm about three questions

24      away from being finished.

25              THE COURT:  Well, I just think it is important to

2586

1    characterize it carefully, and I thought your last question,

2    when you said something like that's the clarifying statement,

3    that's "the" as opposed -- I believe you were characterizing

4    the evidence in a way that suggested more than what you had

5    in front of you.  I wasn't sure it was a fair question.

6         MR. TAYLOR:  I don't mean to ask unfair questions.

7    But I do want to cross-examine this witness --

8         THE COURT:  No one is stopping you from

9    cross-examining the witness.  We have been going for a while,

10   and nobody has told you you have to stop.

11        MR. TAYLOR:  But I'm about to stop.

12        THE COURT:  Well, good.

13        (In open court)

14        BY MR. TAYLOR:

15   Q.     Now, Ms. Hunt, I want to call your attention back to

16   your letter to Mr. Craig of January 16th, which is Government

17   Exhibit 13.  We have shown this to you before.

18   A.     Uh-huh.

19   Q.     One of the things Mr. Craig had said to you, either

20   in the meeting or in the letter, that the characterization

21   that he was upset about was that the Ministry of Justice said

22   the report drew conclusions about whether the prosecution was

23   politically motivated.  Right?

24        MR. McCULLOUGH:  Object to form, Your Honor.

25        THE COURT:  Is that consistent with your

2587

1        recollection?

2                THE WITNESS:  Yes.  Yes.  Yes.

3                MR. TAYLOR:  Thank you.

4                BY MR. TAYLOR:

5        Q.      And when you write back to him calling out this

6        paragraph -- just the center paragraph -- you referred to his

7        explaining to you during the meeting and in his letter that

8        his comments were not political activities but were meant to

9        correct mischaracterizations of the report attributable to

10       the Ukrainian Ministry of Justice and Tymoshenko's Ukrainian

11       lawyers concerning whether the Tymoshenko prosecution was a

12       political prosecution.

13               So you must have gotten that either from what he said

14       to you in the meeting or from his letter.  Is that fair?

15       A.      Yes.

16       Q.      And this quote that I just showed you from *The New*

17       *York Times*, isn't that exactly what he said was the reason

18       why he talked to *The New York Times*?

19               MR. McCULLOUGH:  Objection.

20               MR. TAYLOR:  Nothing further.

21               THE COURT:  Sustained.

22               All right.  I think this witness may be our last

23       witness for the afternoon, so do we want to take a break

24       before the very, very brief redirect; or do we want to have

25       the very, very brief redirect and possibly recess for the

2588

1      afternoon?

2          Okay.  I believe you have gotten your marching

3      orders.

4          Mr. McCullough.

5                    REDIRECT EXAMINATION

6          BY MR. McCULLOUGH:

7      Q.     Ms. Rohde, can we bring up Government Exhibit 5,

8      please.  If you'll highlight the second paragraph.

9          Ms. Hunt, Mr. Taylor just asked you a series of

10     questions about Mr. Craig's statements about correcting

11     mischaracterizations.

12     A.     Yes.  Okay.

13     Q.     I'm showing you the determination letter that you

14     sent on September 5th, 2013.  Did you have an understanding

15     that one of the reasons that Mr. Craig was reaching out was

16     to correct mischaracterizations at that time?

17     A.     Yes.

18     Q.     And is that stated in this letter?

19     A.     "You spoke with these representatives to correct

20     misinformation that the media had received and was reporting

21     from the Ministry of Justice and from the Tymoshenko legal

22     team in Ukraine," yes.

23     Q.     And with that information, did you make a

24     determination on September 5th as to whether Mr. Craig had to

25     register?

1    A.    Yes.

2    Q.    Why was that?

3    A.    Because we believed that the distribution of the

4    report and the media contacts that were made -- there were a

5    lot of things that went into the decision -- one, there was a

6    contract.  There was a dissemination of this report.  There

7    were media contacts that were made.  There was a direction by

8    the Ukrainian government that you're not going to tell who

9    paid for the report, it's a private citizen.  And all of this

10   information together, we determined that there was a

11   registration obligation.

12   Q.    And when you later made the decision to reverse that

13   determination, did that reversal turn on whether or not there

14   were mischaracterizations in the press?

15   A.    Yes.  It was all based on the fact that what was told

16   to us, and the representations at the meeting, and confirmed

17   in the letter, that the reason for the contacts with the

18   press were to correct mischaracterizations that were made and

19   reported.

20   Q.    And why was Mr. -- what was your understanding after

21   the meeting on October 9th as to why Mr. Craig was reaching

22   out to correct those mischaracterizations?

23   A.    This was his report, his work product, he had done

24   it, and people reporting incorrectly out there on it.  And

25   they were getting that information from somewhere.  And he

2590

1    wanted to correct that record.  So he reached out to correct

2    those mischaracterizations that were made out there in the

3    press.  And that he did not reach out to the press at the

4    order, request, direction, or control of the Ukrainian

5    government.  He did it on his own, because it was his work

6    product, and he wanted to set the record straight.

7    Q.      He had explained to you that he had not been asked to

8    contact the press; is that right?

9    A.      Excuse me.  Can you repeat the question?

10   Q.      He told you, communicated to you through the meeting

11   and the follow-up correspondence that he had not been asked

12   to contact the media?

13   A.      He was not asked by the Ukrainian government to do

14   that, right.

15   Q.      Showing you what has been marked as Government

16   Exhibit 12, going to the last paragraph of the letter.

17          Again, Mr. Taylor asked you a number of questions

18   about notes of the meeting or whether there was a memorandum

19   of the meeting.  Does this statement reflect what Mr. Craig

20   told you at the meeting as to whether he had been asked to

21   contact the media?

22   A.      This does, and this is why I asked for the letter so

23   that we would have it in our record.  And the last paragraph

24   says, "In responding to inaccuracies in the U.S. news

25   reports -- some of which were directly attributable to

2591

1    Ukraine -- the law firm did not consult with Ukraine, did not

2    inform Ukraine, did not act under instruction from Ukraine,

3    and was in no way serving as an agent for Ukraine."

4    Q.     And what was the relevance -- what was the importance

5    of this information to you in changing the determination?

6    A.     This goes to the heart of the statute again.  This is

7    the heart of it.  If you're not acting at the order, request,

8    direction, or control of a foreign government or foreign

9    principal, then you don't have a registration obligation.  So

10   this statement was critical.  It is why I changed my mind.

11   Q.     Ms. Rohde, if we can put up Government Exhibit 353.

12   I want to highlight the first e-mail, please.

13          MR. TAYLOR:  Objection.  Beyond the scope.

14          THE COURT:  You want to approach the bench?

15          (At the bench)

16          THE COURT:  All right.  What is your objection?

17          MR. TAYLOR:  Beyond the scope, and it is one of these

18   "Did you know" questions.  He wants to simply use the

19   redirect now, which I've had no opportunity to deal with, to

20   put in these various e-mails as if they prove something

21   nefarious.  It is primarily scope.

22          THE COURT:  Okay.  I mean, I think you asked many

23   questions about he only provided brief clarifying statements,

24   that's what he told you.  The one thing he said was he was

25   upset about this, and that article shows that he was upset

1    about that.

2              What is the question you want to ask?

3              I think showing her these e-mails that she has never

4    seen before takes it a little too far.

5              So what is the question you want to ask?

6              MR. McCULLOUGH:  Your Honor, there have been a number

7    of questions about her lack of memory of the meeting, lack of

8    notes at the meeting, and what she was told at the meeting.

9    And this e-mail indicates something that had she known, had

10   she been told at the meeting that this had happened, she

11   would have remembered it.  And I think it is a very important

12   point to make here because there has been a question raised

13   as to what she remembers.  And if anything had been mentioned

14   about the fact that he reached out to Mr. Sanger and offered

15   a copy of the report, notwithstanding the idea that he was

16   correcting mischaracterizations and all these other reasons,

17   if she had heard that at the meeting, it would have stuck in

18   her mind, and this is an opportunity to ask her the

19   question --

20             THE COURT:  -- I don't think she can say, if she

21   heard it, it would have stuck in her mind.  I think you can

22   certainly say --

23             MR. McCULLOUGH:  Did you say --

24             THE COURT:  -- would it have been important to you

25   whether he offered it as opposed -- I mean, I think you can

2593

1       ask the information.  I mean, I think she has pretty much

2       said it was critical to her determination that she understood

3       reactive, reactive, reactive.  Correcting

4       mischaracterizations that happened behind Tymoshenko and the

5       Ministry of Justice that were being reported, all of which

6       implies that he was talking to the press after all those

7       things happened.

8                   MR. TAYLOR:  She said it was all proactive.

9                   THE COURT:  You're using those terms differently.

10      The point is, I think -- I think you can ask whether it would

11      have mattered to her to know if he reached out to *The New*

12      *York Times* before the report had ever been made public and

13      was being publicly commented on.  I don't see why that's not

14      a fair question given where we've been.

15            I mean, but I don't think it is fair to show her

16      these e-mails and ask her to assess e-mails that she has

17      never seen before.  But I think you can ask her the

18      underlying fact as long as you characterize it accurately.

19                  MR. McCULLOUGH:  Yes, Your Honor.

20                  THE COURT:  All right.

21                  (In open court)

22                  BY MR. McCULLOUGH:

23      Q.      Ms. Hunt, at any time during the communications with

24      Mr. Craig or during the meeting with Mr. Craig, did he

25      indicate to you that he reached out to David Sanger on

2594

1    December 11th and offered to provide a copy of the report?

2    A.       No.

3    Q.       Is that something that would have been important to

4    your decision?

5    A.       Yes.

6    Q.       At any time during the communications or in the

7    meeting, did Mr. Craig indicate to you that on December 11th

8    he reached out to Mr. Sanger and offered to speak with him

9    about the report?

10   A.       No.

11   Q.       And is that something that would have been important

12   to your determination?

13   A.       Yes.

14   Q.       At any time during the communications or during the

15   meeting, did Mr. Craig indicate to you that he had said to

16   David Sanger that the Ukrainians had determined that

17   Mr. Sanger should get first look at the report?

18   A.       No.

19   Q.       Is that something that would have been relevant to

20   your inquiry?

21   A.       Yes, it would have.

22   Q.       Did Mr. Craig ever tell you in any of the

23   communications or in a meeting that he had had an interview

24   with a separate *New York Times* reporter named David

25   Herszenhorn on December 12th?

2595

1              MR. TAYLOR:  Objection, Your Honor -- I should have

2      objected to the last few questions -- for the same reasons

3      that I objected --

4              THE COURT:  All right.  You can answer the question.

5              THE WITNESS:  Could you repeat the question, please?

6              BY MR. McCULLOUGH:

7      Q.      Did Mr. Craig during any of his conversations or in

8      any of his meetings with you indicate that on December 12th

9      he had had an interview with, not David Sanger, but David

10     Herszenhorn of *The New York Times*?

11     A.      No.

12     Q.      Would that have been important to you?

13     A.      Yes.

14     Q.      And if any of those things had come up at the

15     meeting --

16             THE COURT:  Don't sum it up.

17             All right.  Do you have any further questions?

18             MR. McCULLOUGH:  No, Your Honor.  Thank you.

19             THE COURT:  All right.

20             MR. TAYLOR:  One question.

21             THE COURT:  All right.  One.

22                        RECROSS-EXAMINATION

23             BY MR. TAYLOR:

24     Q.      Wouldn't it matter to you, Ms. Hunt, why he spoke to

25     David Sanger and David Herszenhorn?

2596

1    A.      Yes.

2            MR. TAYLOR:  Thank you.

3            THE WITNESS:  I mean . . .

4                        REDIRECT EXAMINATION

5        BY MR. McCULLOUGH:

6    Q.      Your last answer as to why he spoke with David Sanger

7    and Mr. Herszenhorn, what is the "why" that would be

8    important to you?

9    A.      The "why" is if it was to correct

10   mischaracterizations, if it was done on his own, that's one

11   thing; if it is to contact them at the request, order

12   direction, or control of the Ukrainian government, then

13   that's another.  One would require registration and one would

14   not.

15   Q.      And which one requires registration?

16   A.      The one that requires registration, if you are

17   contacting the press at the order, request, direction, or

18   control of a foreign government, then you have a registration

19   obligation, and that was my analysis.

20           MR. McCULLOUGH:  No further questions.

21           THE COURT:  All right.  Thank you.

22           This witness can be excused.

23           I take it I can, before I excuse all of you, excuse

24   the juror for the day?  We're not going to put on another

25   witness at the moment?

1            MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

2            THE COURT:  All right.  You can step down.  Thank

3    you.

4            (Witness excused)

5            THE COURT:  Before I tell you what time you are going

6    to come back tomorrow, maybe I should get some idea from the

7    lawyers what's happening tomorrow.  So can you come to the

8    bench?

9            (At the bench)

10           THE COURT:  Are you calling the other witness at all?

11           MR. CAMPOAMOR-SANCHEZ:  I need some time to make that

12   decision.

13           THE COURT:  You haven't decided?

14           MR. CAMPOAMOR-SANCHEZ:  No.

15           THE COURT:  If you weren't, then I would have them

16   come in later because there's going to be a lot you want to

17   say in the morning.  We can still --

18           MR. CAMPOAMOR-SANCHEZ:  And that decision would be

19   after a conversation I would have with the Court outside the

20   presence of the jury, a decision whether I am going to call

21   him or not.

22           THE COURT:  Maybe I should have them wait in the jury

23   room and have that conversation?  Is that what we need to do?

24           Well, we're outside the presence of the jury.  Do you

25   want to tell me something?

2598

1          MR. CAMPOAMOR-SANCHEZ:  Yes.  So one of the big

2    issues is, if we call the agent, I would have him testify

3    about the interview of Mr. Craig in October of 2017.  There

4    is a second interview that takes place in March of 2018.  Our

5    questions would be limited to the interview that occurred

6    months earlier in March of 2017 -- sorry -- October 2017 --

7    but I asked if there would be an objection, because we put

8    him on for one date, that they would get to ask him questions

9    about the second interview.  And I wanted to raise that

10   before.  Because if the Court were to rule simply because

11   we're asking about the interview that happened in October,

12   that they could cross-examine him on what happened in March,

13   that that might impact our decision.

14          THE COURT:  All right.  It seems to me, if part of

15   your case is that he said X, Y, and Z when he was interviewed

16   by the Special Counsel's Office that bears on his state of

17   mind, knowingness, willfulness, all of the things you have

18   said, everything he said to them, I think that would be fair

19   cross-examination for them as part of what he said to them.

20          MR. CAMPOAMOR-SANCHEZ:  Even though it happened five

21   or six month later?

22          Because as the Court knows, there is a very different

23   factual scenario.  All the Skadden documents hadn't been

24   produced.  There are all sorts of reasons why we think that

25   happened, but he did make some different statements in March.

1          THE COURT:  Well, if you bring out the ones you bring

2     out and they bring out the ones they bring out, then you can

3     bring out on redirect materials had been produced in the

4     meantime.  But I don't see how, if it is relevant that he was

5     saying X, Y, and Z to them that they can't get into X, Y, Z,

6     and W that he was saying to them.  But if your point is, that

7     at that point, he was better prepared and knew how to thread

8     the needle or whatever, I don't think I can truncate their

9     cross on that.  That seems to unfair to me.

10          MR. CAMPOAMOR-SANCHEZ:  I think I would still want

11     some time to discuss it.  And it might be a short time.

12     Maybe I can have 10 or 15 minutes, and we can come back and

13     tell them whether we're going to rest or not.

14          THE COURT:  All right.  Why don't we just have the

15     jury cool their heels for a few minutes, and try to

16     ascertain, and then we can talk about what else we need to do

17     tomorrow, and then we'll either bring them back in and tell

18     them what time they're due, or have the courtroom deputy tell

19     them what time they're due.

20          MR. CAMPOAMOR-SANCHEZ:  All right.

21          (In open court)

22          THE COURT:  To eliminate your sitting there with

23     nothing to do and listening to the husher, the scheduling is

24     complicated, but I don't want to let you go and have you back

25     here at 9:15 or 9:30 if for some reason we're not going to

1    need you in the morning.  What I'm going to ask you to do, so

2    that you can get up and stretch your legs and use your phone

3    and all those good things, I'm going to excuse you just to go

4    to the jury room and to wait.  And then we'll either call you

5    in here or have the courtroom deputy come out and tell you

6    tomorrow you're due back at X time, and at that point you'll

7    be excused.

8         So while you're excused right now and this evening

9    once again -- it seems like we're getting close to the end --

10   but the case has not been submitted to you.  You may not

11   research it, you may not discuss it.  And you'll know shortly

12   what time we'll need you back tomorrow.

13        Thank you.

14        (Jury not present)

15        THE COURT:  In addition from hearing the witness or

16   not, I know you're going to need to complete your record by

17   moving exhibits in.

18        Is there any reason why, so that we could have the

19   arguments tomorrow morning, if you're not going to do that,

20   if you're not going to call the witness, that you could move

21   them in with me and then we can just tell the jury the next

22   time we saw them that the following exhibits have been moved

23   into evidence.  I mean, you have a stipulation you want to

24   read.

25        I think there is a way we could do this, that if

1    we're done with witnesses, we can still have them come in

2    later --

3             MR. CAMPOAMOR-SANCHEZ:  I agree, Your Honor.

4             THE COURT:  -- and create the appropriate record for

5    Rule 29 purposes.

6             Do you want to come back at 4:15 and talk about this

7    a little bit more?

8             MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

9             THE COURT:  If you need more time, let me know.  The

10   courtroom deputy will let me know when you're ready, and I

11   will come back.  Just remember that they are waiting for you,

12   too.

13            Okay.  Thank you.

14            (Recess taken)

15            (Jury not present)

16            THE COURT:  Do we expect there is going to be another

17   witness tomorrow?

18            MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

19            THE COURT:  All right.  So you're going to want to

20   read them the stipulation and tell them that there have been

21   other exhibits that have been moved in.

22            MR. CAMPOAMOR-SANCHEZ:  Correct.

23            THE COURT:  And we can do the exhibit part with me,

24   just so they know what exhibits are in evidence and are not

25   before they counter that evidence.

1          Now, then, we have to talk about your motion.  And if

2     I either reserve on your motion or deny your motion, have you

3     made a determination about how many character witnesses you

4     would intend to call?

5          MR. MURPHY:  We have listed a total of five, and I

6     think we will call four.

7          THE COURT:  You will call four out of five.

8          All right.  What's the government's position in terms

9     of that and your motion in limine?

10         MR. CAMPOAMOR-SANCHEZ:  Your Honor, I should allow

11    Ms. Gaston to handle that.  But we are going to oppose that.

12    We essentially thought any more than two would be cumulative.

13    And we also, I believe, have not really discussed -- for the

14    character witnesses the Court allows, what are the proper

15    questions they can ask.

16         THE COURT:  Can you say that again for the benefit of

17    the people that didn't hear it.

18         MR. CAMPOAMOR-SANCHEZ:  Oh, I'm sorry.  I was in

19    front of the mic.

20         What I said was I should let Ms. Gaston handle this.

21    But we do not believe that four witnesses are necessary for

22    purposes of character.  I think that is, frankly, way too

23    many.  It is going to be repetitive and cumulative.  We argue

24    that, frankly, two was enough for them to establish

25    Mr. Craig's character.  And in addition, I think the Court

1    has not yet ruled on what the proper questions should be that

2    would be allowed, as we submitted in our papers.

3             THE COURT:  Well, I think the questions are pretty

4    much established by the Federal Rules of Evidence, and I

5    don't have that aspect of the motion in limine in front of me

6    right now.

7             With respect to the number, I feel like they should

8    probably be entitled to make a judgment if they want more

9    than two, but I think five would have been too many, and I'm

10   wondering about four.  I think it does get to a point of

11   being cumulative and burdensome for the jury.  I think just

12   even from a strategic perspective, there is a point where you

13   risk wearing on the jury, particularly given the fact that

14   many of the government's witnesses were asked

15   about -- questions about Mr. Craig's past and integrity and

16   character.  So there has been some of that seeded in the

17   record already.

18            But I'm happy to have you address why you think four

19   is the right number and whether I should stay out of it.

20            MR. MURPHY:  Your Honor, Mr. Craig, is 74 years old.

21   He's been practicing law for close to 50 years.  He has had a

22   career in public life, in private practice, with NGOs that

23   are involved in human rights issues, in foreign policy

24   issues, including the expansion of NATO to include countries

25   potentially like the Ukraine.  He has been a human rights

1       advocate.  He has founded organizations dedicated to human

2       rights issues.  And we are calling four witnesses who have

3       known him -- all -- for a long time, but all in different

4       aspects of his life and his career.  And in general, they

5       have opinions about his honesty, his integrity, his

6       professionalism, and his qualities as a law-abiding citizen,

7       all of which are at issue in this case.  And certainly,

8       honesty and integrity is at issue in the charger under 1001.

9               THE COURT:  I'm fine with honesty and integrity.

10      Where does professionalism come into play?

11              MR. MURPHY:  Well, I think his professionalism has

12      been called into question by aspects of the government's

13      case.  There have been suggestions about backdated invoices

14      and things of that nature.  I think that people who have

15      practiced law with him should be able to testify about his

16      professionalism and his adherence to the code of conduct of

17      lawyers.  And some of the witnesses can testify about

18      multiple traits, and other witnesses will testify about one

19      or more of the traits.

20              I think it would be an abuse of discretion in this

21      case involving this defendant to restrict him to any less

22      than four character witnesses.

23              THE COURT:  I think the wider you open the character

24      traits that you're trying to put on, the more -- I mean, it

25      wouldn't really have occurred to me that they would be able

1      to cross-examine about the invoice or alleged false

2      statements within the law firm and things like that.  So if

3      you start talking about professionalism, are you saying that

4      they're not going to be able to cross-examine about things

5      like that?

6            MR. MURPHY:  Your Honor, there is case law from

7      probably four or five circuits that say that a question that

8      would say, for example, hypothetically, if you knew that

9      Mr. Craig had falsified an invoice, where that is an issue in

10     this case, where there is a different take on it from the

11     defense perspective, that's what some courts have referred to

12     as an improper prosecutorial question that calls into play

13     the presumption of innocence and that the prosecution should

14     not be able to ask a character witness that if you knew about

15     some of the facts at issue in this case, would that change

16     your opinion or would that affect your view about his

17     reputation.

18           So I think the case law is pretty strongly against

19     that kind of question, and should be.

20           THE COURT:  Right.  But I think if we're going to do

21     this in accordance with the rules, then I think we need to be

22     talking about his character for something that's an issue in

23     the case.  And his character for truthfulness and

24     untruthfulness is an issue in the case.  I'm not sure that

25     his thoroughness and his professionalism is.  And I realize

2606

1    that in explaining how the witnesses know him, you're going

2    to get into all his public-spiritedness and all that even

3    though that is not an issue in the case, and the fact that he

4    stands up for human rights, even though that is not an issue

5    in the case.  But I think when it gets down to, when you ask

6    the person, based on your knowledge of this person, do you

7    have an opinion as to X, I think we ought to stick with

8    truthfulness or untruthfulness.

9            MR. MURPHY:  Your Honor, in every criminal

10   case -- every criminal case -- whether or not honesty and

11   integrity is involved as an element of the offense and

12   whether the person, the defendant testifies, it is always

13   appropriate for a character witness to testify that, in my

14   opinion, this gentleman or this lady is a law-abiding citizen

15   of this country.

16           THE COURT:  That's fine, too.  Law abiding, truthful,

17   untruthful.  Getting into professionalism I think isn't, I

18   think, a character trait at issue in this case.

19           MR. MURPHY:  I expect we will not hear the government

20   in closing argument make any arguments that Mr. Craig took

21   some actions that were inappropriate as a lawyer.  Maybe

22   we'll not hear then about this so-called --

23           THE COURT:  You're going to hear about the letter,

24   they're not going to talk about --

25           MR. MURPHY:  I'm not talking about the letter --

1          THE COURT:  -- whether he violated an ethical rule.

2     Talking about the invoice he violated an ethical rule --

3          MR. MURPHY:  -- I'm talking about the invoice.

4          THE COURT:  Well, there is no reason why they can't

5     bring out the invoice, they're going to characterize it as in

6     violation of A, B, C ethical rule, which I don't believe they

7     have any intention of doing.  You will jump up.  And your

8     objection will be sustained.

9          MR. MURPHY:  I think that there is a trait, a trait

10    at issue here of adherence to professional norms and

11    professional standards.

12         THE COURT:  I think you're going to have plenty to do

13    with law-abiding and honesty.  I think, you know, through

14    every witness that you've already gone through already, all

15    the things he has done in his career, you're getting a pretty

16    wide berth about it.  I think at some point -- I will let you

17    call no more than four.  You want to call four?  You call

18    four.  I think you risk the jury wondering why they're

19    listening to this for the fourth time.

20         MR. MURPHY:  Your Honor, it typically takes, as you

21    know, probably 15 to 20 minutes to put a character witness

22    on.

23         THE COURT:  It took longer than that for you to

24    cross-examine the government witnesses about their character

25    and their background and their clerkships and all their

1    employment, so I'm sure it is going to be pretty in-depth.

2    And you're entitled to do it.  And I'm not going to require

3    it to be less than four, but I think it is going to get

4    cumulative, and you should be targeted about not asking them

5    all the same parts of his life --

6             MR. MURPHY:  We won't.  That's why we have four

7    separate witnesses.

8             THE COURT:  All right.

9             MR. MURPHY:  Thank you, Your Honor.

10            MS. GASTON:  Your Honor, may I be heard?

11            THE COURT:  Sure.  It is your motion, after all.

12            MS. GASTON:  Thank you.

13            So we agree that truthfulness is the character trait

14   at issue here, which is exactly why it is unnecessary to have

15   four character witnesses providing essentially the same

16   testimony because the proper scope of character evidence is

17   essentially a basic question about how the witness knows the

18   defendant and then if they know his reputation for

19   truthfulness in the community.  And having four different

20   people answer that same question is cumulative and doesn't

21   make sense.

22            The other thing that I would say is, in response to

23   what Mr. Murphy said, if the government has a good faith

24   basis to cross-examine the character witnesses, to probe

25   their actual knowledge of the defendant's reputation for

1    truthfulness in the community, we can certainly do that.  He

2    has mentioned case law, but I don't think he cited any in his

3    response to our motion.

4         So we certainly intend to cross-examine these

5    witnesses about whether they actually know about his

6    reputation for truthfulness.

7         THE COURT:  I guess his point was, are you going to

8    question them about specific issues of potential

9    untruthfulness?

10        MS. GASTON:  Yes, as is appropriate under the rules

11   and as the rules provide for us to do.

12        THE COURT:  If the defense thinks that is not

13   appropriate, certainly my understanding is that happens when

14   you put a character witness on.  And remember, we're asking

15   about whether the witness has a basis to know what the

16   reputation is, and the witness knows him within a certain

17   time period.  I think the reputation has to -- they have to

18   know the relevant time period reputation, not, you know, I

19   went to kindergarten with him, and in kindergarten he had a

20   great reputation for being truthful, and I haven't dealt with

21   him since.  I'm being facetious.  I'm pretty sure you're not

22   going to do that.  But I'm not going to truncate the

23   cross-examination if you haven't provided me with case law

24   that requires me to do so.

25        If you have something that tells me they can't ask

1    those questions, then you need to give it to me.

2            MR. MURPHY:  Sure, Your Honor.  I will give it to you

3    right now.

4            THE COURT:  You're just going to read it to me right

5    now?  All right.

6            MR. MURPHY:  We could send you a short memo.  But in

7    the D.C. Circuit case, I think the leading case is probably

8    *U.S. v. Lewis*, 482 F.2d 632.

9            THE COURT:  Okay.  That would be the circuit that I

10   would need to know.

11           MR. MURPHY:  Okay.  But I have cases from the Second,

12   Third, Fourth, Fifth, Eighth, Ninth, Eleventh Circuits that

13   have specifically to do with improper cross-examination and

14   the issue that I talked about.  Matters that are issues in

15   the trial of this case should not be inquired into by the

16   prosecution when they ask someone, if you knew this, would it

17   affect your opinion, or did you know that, and how does that

18   relate to your assessment of his reputation.

19           Your Honor, we're going to be dealing with both

20   reputation evidence, which is the kind of historic classic

21   form of character testimony, but also opinion testimony,

22   which since the federal rules were enacted is allowed as

23   well.  If the character witness knows the person well and has

24   dealt with him, he can testify about his dealings with him

25   and, based on those dealings, has he formed an opinion about

1    his honesty and integrity.  And he or she can testify about

2    that.

3           But again, these cases from these circuits say that a

4    guilt-assuming question is an improper question.

5           THE COURT:  Well, so you're saying they can't say, if

6    you knew the defendant lied to the FARA Unit in this letter

7    on such-and-such a day, would that change your opinion.

8           MR. MURPHY:  Right.

9           THE COURT:  I think that is a little different than

10   the example you gave before.

11          MR. MURPHY:  Well, I think if they're saying that

12   there was a false invoice or a backdated letter -- I mean,

13   these are all things that are in dispute.  The defense has

14   other explanations for those documents.  The prosecution

15   should not be able to suggest to the witness that this is an

16   established fact.  This is an issue that is in the trial of

17   this case.

18          It also --

19          THE COURT:  Well, the language you just quoted from

20   an opinion says something like it's the issue at trial.  And

21   so what you can do -- I will read the *Lewis* case, and someone

22   in your firm can file a notice with the cites and the page of

23   anything else you want me to look at.  I don't need you to

24   tell me what it says.  Just tell me what you want me to read.

25          MR. MURPHY:  Thank you, Your Honor.

2612

1          THE COURT:  That would be helpful.

2          MR. MURPHY:  Okay.

3          THE COURT:  All right.  We may have to take that on a

4    case-by-case basis going forward.  And obviously, any

5    questions they ask have to be factually based.

6          So after those four witnesses, if -- Ms. Gaston.

7          MS. GASTON:  I'm sorry to interrupt, Your Honor.

8          But this is why we filed a motion in limine at the

9    beginning of the trial.  And they did not provide this

10   authority in response to our motion in limine.  So it is a

11   little frustrating that now they are asserting these cases

12   that they didn't call to our attention before when presumably

13   tomorrow we're going to start the process of cross-examining

14   these witnesses.

15         THE COURT:  Well, maybe.  Obviously, I don't have the

16   motion in front of me.  I know it went to the number.  I know

17   it went to what they could do on direct.  I don't know if it

18   went to what you could do on cross.

19         Now, it seems to me, if you did want to limit their

20   cross, that is kind of what a motion in limine is about.  But

21   if they had never filed a motion in limine and they stand up

22   and say "objection," I would say on what basis, and if they

23   start citing these cases, I would have rather read them

24   before than after.

25         And I take your point.  But you now have as much time

1    as I do to read them.

2         MS. GASTON:  Certainly.  I would just note that in

3    our motion in limine, we told them that we planned to

4    cross-examine their witnesses along these lines.

5         THE COURT:  All right.  If you had something to say

6    in response to it, you should have said it.  But I'm not

7    going to say that it is too late to tell me about some law

8    that might apply to the cross-examination of a character

9    witness at this moment.

10        Now, have you made a determination at this point

11   about whether you are going to call the defendant?

12        MR. MURPHY:  Yes, Your Honor.

13        THE COURT:  Yes, you made a determination; or yes,

14   you're going to call him?

15        MR. MURPHY:  That's another question.

16        Yes, Your Honor, to both questions.

17        THE COURT:  All right.  So that affects how much time

18   we have left to go.

19        MR. MURPHY:  We will have one additional witness.  We

20   are going to re-call Mr. Sloan for very brief areas that

21   because of the scope of direct, I was not able to ask him

22   about on cross.  That should not take very long.

23        THE COURT:  All right.  Does it make sense to tell

24   the jury to come -- just anticipating -- knowing how long

25   every evidentiary discussion has been, I would think that the

1    Rule 29 argument may take some time.  So why don't we tell

2    them to come at 2 p.m.  Does that make sense?

3         All right.  Now, we will all resume at, let's say,

4    10 a.m. tomorrow, and we will hear your motion.  And why

5    don't -- before you move your exhibits in evidence, which she

6    is going to have to make a note of, I want to have the

7    courtroom deputy notify the jurors that they need to be here

8    at 2.  Let's let her do that, and then you can put your

9    exhibits in evidence.

10        Okay.  Thank you.

11        (Pause)

12        THE COURT:  So, now there are exhibits that you also

13   want to move in evidence.

14        MR. CAMPOAMOR-SANCHEZ:  Your Honor, I believe all

15   these are actually in evidence, but these are the originals

16   of those exhibits, and I can tender it to the Court, but

17   they're the actual handwritten for some of the exhibits.  I

18   can read into the record which exhibits they are.  We wanted

19   the jury to have the originals in the back.

20        THE COURT:  All right.

21        MR. CAMPOAMOR-SANCHEZ:  Those are Government

22   Exhibit 530 --

23        MR. MURPHY:  Would you mind, could I look over his

24   shoulder?

25        MR. CAMPOAMOR-SANCHEZ:  Yes.

2615

1          THE COURT:  When you say it, if you can say 530,

2     which is the original of -- do you know that?  Do you have

3     that information handy?

4          MR. MURPHY:  I will be able to recognize it as such.

5          THE COURT:  I know you know it is the original of

6     something, but will you know it is the original of --

7          MR. MURPHY:  It has a tag on it.

8          MR. CAMPOAMOR-SANCHEZ:  We tagged it with the same

9     number.

10          THE COURT:  Thank you.

11          MR. CAMPOAMOR-SANCHEZ:  So it is Government's

12     Exhibit 530, 517, 522, 503.

13          (Counsel confer)

14          THE COURT:  I believe the courtroom deputy has a list

15     of everything that's been used so far.

16          What is the number you're questioning about?

17          MS. GASTON:  530, 517, 522, 548.

18          (Counsel confer)

19          MR. CAMPOAMOR-SANCHEZ:  So we're moving the originals

20     as Ms. Gaston just read them.

21          And Your Honor, since the jury is not here, I just

22     want to make sure we will have the opportunity tonight to

23     review, make sure we're not missing anything.

24          THE COURT:  Sure.

25          MR. CAMPOAMOR-SANCHEZ:  The last thing I wanted to

2616

1      bring to the Court's attention, we have one stipulation to

2      read; but in addition to that, we still have the issue

3      outstanding of the instructions regarding the duty to

4      disclose.  And I know we're going to have a charge conference

5      later.  The unusual position that we're in is the Court asked

6      the parties to provide proposed instructions, but the defense

7      has refused to do so.  So what we're wondering and trying to

8      figure out, is do we need for Rule 29 purposes to move for

9      the Court to take judicial notice of the statute and whether

10     that is something that needs to be, therefore, in our case.

11     We certainly believe that the Court needs to instruct the

12     jury about it.  But we're trying to figure out, frankly,

13     whether we need to ask the Court to take judicial notice of

14     that for the purpose of Rule 29.

15          THE COURT:  I don't know that I have to take judicial

16     notice of the statute.  If you want to make sure that it is

17     in the record, you can go ahead and do that.  That doesn't

18     answer the question of what I am or not going to say about

19     the duty.  But the statute exists.  It 's been referenced in

20     this case many times.  And it says what it says.  And I'm

21     happy to take judicial notice of the fact that it says what

22     it says.

23          MR. CAMPOAMOR-SANCHEZ:  Okay.  For purposes of at

24     least a Rule 29 analysis, that should be enough.

25          THE COURT:  There is a little homework that I think

2617

1    would be helpful to me, and I think because we're at the

2    stage of looking at the government's side of the case,

3    unfortunately it falls to the government to do it.  And that

4    is to address a combination of some of the defendant's

5    arguments about willfulness, materiality, duty to disclose,

6    all of which are substantially blurred at various points, and

7    the sufficiency of the evidence on any of those points.

8         I want to ask the government to list for me in a

9    pleading, or a notice, each statement that has now been

10    introduced in evidence -- so I'm moving away from the

11    indictment now to your summary of your case.  If you had to

12    get up in front of the jury right now and say, the following

13    statements made by the defendant were false, I want you to

14    tell me exactly which ones they are.  And obviously, it would

15    be helpful to say, in Government's Exhibit 22, in this

16    letter, this statement, as opposed to just saying the

17    statement he made to the FARA Unit or to whoever.  I think

18    what we are talking about are the alleged false statements --

19    and then I'm going to get to the omissions -- that were

20    allegedly in furtherance of the alleged scheme.

21         So, first, I would like to know every statement that

22    you allege is false or that you allege that you have

23    established as false.  And then I would like to know exactly

24    which material facts you believe you have proved have been

25    omitted.  And then with respect to those facts, I want to

1    know, first of all, to which question asked by the FARA Unit,

2    if any, is it your position that those facts were responsive;

3    and/or which statement of the defendant was rendered false or

4    misleading in the absence of that material fact by the

5    omission of that allegedly material fact; and/or what is the

6    source of the defendant's duty to offer up that fact in the

7    preregistration response to inquiry context.  Just to give,

8    you know, an example that doesn't arise out of this case, if

9    there was a fact that he disseminated the report to his Aunt

10   Matilda on December 11th, that might have been responsive to,

11   to whom did you disseminate the report.  So that would be he

12   omitted the dissemination to Aunt Matilda, and it was

13   responsive to question 1 of the X, Y, Z letter from the

14   second letter with the seven of questions.  If the question

15   was, the light was green when I drove through the

16   intersection of Wisconsin and Western, then the question is,

17   what was it that obligated him to offer that in the context

18   of the responses to these inquiries or his post-decision

19   meeting or letter.

20        I think that will help me go through and figure out

21   whether these are legally actionable or not or whether the

22   evidence is sufficient, etc., because most of the briefing is

23   very broad, and I want to be specific.

24        And I can let the defense know -- though you may or

25   may not need to do this tomorrow -- that to the extent you

2619

1    have argued that the jury should be instructed or that I

2    should find that a statement is literally true and therefore

3    that is a defense, I would like to know exactly which

4    statements you believe factually support the giving of such

5    an instruction -- in other words, which statements could

6    someone read and possibly find to be false or misleading but

7    actually are literally true.

8         I'm having a little difficulty dancing on the head of

9    that pin.  I understand the legal concept, but I would like

10   to know -- I didn't think the examples in your pleadings of

11   what are literally true statements were that helpful since

12   they were not responsive to the questions that they were

13   purportedly being responded to.  And so I want to know

14   exactly which statements you believe are covered by the

15   literal truth defense.  And all that will help me make it

16   through the thicket tomorrow.

17        All right.  Is there anything else we need to talk

18   about tonight?

19        MR. CAMPOAMOR-SANCHEZ:  When does the Court expect

20   this to be --

21        THE COURT:  Well, assuming we're going to be on the

22   bench talking about this stuff at 10, if I could have it by

23   9, that would be very helpful.

24        All right.  Thank you, everybody.

25             (Proceedings adjourned)

2620

```
1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3              I, Patricia A. Kaneshiro-Miller, certify that the

4      foregoing is a correct transcript from the record of

5      proceedings in the above-entitled matter.

6

7

8      /s/ Patricia A. Kaneshiro-Miller          August 26, 2019
       ------------------------------------      --------------------
9      PATRICIA A. KANESHIRO-MILLER                       DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

2621

## /

**/s** [1] - 2620:8

## 1

**1** [7] - 2524:12, 2525:6, 2562:3, 2562:4, 2567:21, 2578:17, 2618:13
**10** [4] - 2546:17, 2599:12, 2614:4, 2619:22
**100** [1] - 2512:21
**1000** [1] - 2512:25
**1001** [1] - 2604:8
**10th** [7] - 2526:6, 2543:25, 2544:8, 2544:20, 2550:14, 2580:5, 2580:8
**11** [2] - 2512:6, 2538:15
**11th** [3] - 2594:1, 2594:7, 2618:10
**12** [3] - 2542:23, 2544:17, 2590:16
**12th** [3] - 2520:3, 2594:25, 2595:8
**13** [7] - 2534:14, 2534:17, 2535:3, 2535:16, 2542:23, 2544:24, 2586:17
**149DJ** [1] - 2518:20
**15** [2] - 2599:12, 2607:21
**16th** [2] - 2544:21, 2586:16
**18** [1] - 2562:5
**1800** [1] - 2512:24
**19-CR-125** [1] - 2512:5

## 2

**2** [3] - 2564:16, 2614:2, 2614:8
**20** [1] - 2607:21
**20001** [1] - 2513:3
**20036** [1] - 2512:25
**2012** [3] - 2522:23, 2562:5, 2583:10
**2013** [2] - 2522:23, 2588:14
**2017** [5] - 2519:4, 2519:20, 2598:3, 2598:6
**2018** [1] - 2598:4
**2019** [4] - 2512:8, 2520:3, 2528:8, 2620:8
**202** [1] - 2513:4
**20530** [2] - 2512:16, 2512:18
**21** [1] - 2528:8
**21202** [1] - 2512:22
**22** [4] - 2528:18, 2528:24, 2538:15, 2617:15
**23** [1] - 2538:14
**2440** [1] - 2512:21
**2517** [1] - 2514:5
**2556** [1] - 2514:12
**2570** [1] - 2514:13
**2588** [1] - 2514:5
**2595** [1] - 2514:5
**2596** [1] - 2514:6
**26** [2] - 2512:8, 2620:8
**29** [5] - 2601:5, 2614:1, 2616:8, 2616:14, 2616:24
**2:05** [1] - 2515:2

## 3

**3** [7] - 2532:8, 2532:10, 2564:12, 2564:17, 2567:8, 2578:15, 2578:25
**30-minute** [1] - 2528:1
**333** [1] - 2513:3
**353** [1] - 2591:11
**354-3243** [1] - 2513:4
**3rd** [7] - 2579:4, 2579:19, 2580:9, 2581:15, 2584:14, 2584:17, 2584:19

## 4

**4** [4] - 2515:10, 2564:23, 2567:11, 2574:15
**40** [1] - 2528:18
**41** [2] - 2530:25, 2532:8
**42** [4] - 2532:12, 2534:14, 2535:3, 2535:16
**43** [2] - 2532:12, 2537:18, 2538:10
**45** [1] - 2525:25
**4700A** [1] - 2513:2
**482** [1] - 2610:8
**4:15** [1] - 2601:6

## 5

**5** [6] - 2534:14, 2534:17, 2535:3, 2535:16, 2584:22, 2588:7
**50** [1] - 2603:21
**503** [1] - 2615:12
**517** [2] - 2615:12, 2615:17
**522** [2] - 2615:12, 2615:17
**530** [4] - 2614:22, 2615:1, 2615:12, 2615:17
**533** [4] - 2514:12, 2555:15, 2555:16, 2556:8
**533-2** [1] - 2556:15
**539** [4] - 2514:13, 2569:15, 2569:19, 2570:7
**548** [1] - 2615:17
**555** [1] - 2512:15
**559** [1] - 2528:17
**560** [4] - 2520:17, 2520:20, 2520:21, 2524:12
**5th** [7] - 2526:6, 2526:13, 2526:17, 2526:20, 2550:12, 2588:14, 2588:24

## 6

**6** [2] - 2584:22, 2584:23
**632** [1] - 2610:8
**6th** [2] - 2549:25, 2578:3

## 7

**7** [3] - 2522:3, 2535:14, 2584:23
**74** [1] - 2603:20

## 8

**8** [3] - 2522:4, 2532:8, 2532:10

## 9

**9** [2] - 2571:4, 2619:23
**950** [1] - 2512:18
**9:15** [1] - 2599:25
**9:30** [1] - 2599:25
**9th** [6] - 2517:7, 2526:16, 2529:20, 2529:21, 2567:2, 2589:21

## A

**a.m** [1] - 2614:4
**Abelson** [1] - 2512:19
**abiding** [4] - 2604:6, 2606:14, 2606:16, 2607:13
**ability** [1] - 2532:18
**able** [8] - 2522:12, 2604:15, 2604:25, 2605:4, 2605:14, 2611:15, 2613:21, 2615:4
**above-entitled** [1] - 2620:5
**absence** [1] - 2618:4
**abuse** [1] - 2604:20
**accomplish** [1] - 2515:22
**accordance** [1] - 2605:21
**accurate** [1] - 2539:2
**accurately** [1] - 2593:18
**Act** [1] - 2566:24
**act** [1] - 2591:2
**acting** [2] - 2559:5, 2591:7
**Action** [1] - 2512:5
**actionable** [3] - 2549:14, 2551:1, 2618:21
**actions** [1] - 2606:21
**activities** [10] - 2527:16, 2545:21, 2564:12, 2564:19, 2566:23, 2572:5, 2575:16, 2575:17, 2577:15, 2587:8
**activity** [5] - 2558:8, 2560:14, 2562:23, 2575:11, 2582:16
**actual** [5] - 2557:4, 2568:17, 2608:25, 2614:17
**Adam** [2] - 2512:17, 2512:19
**add** [1] - 2537:15
**addition** [4] - 2564:23, 2600:15, 2602:25, 2616:2
**additional** [3] - 2565:8, 2565:15, 2613:19
**address** [3] - 2515:18, 2603:18, 2617:4
**addressing** [1] - 2554:15
**adherence** [2] - 2604:16, 2607:10
**adjourned** [1] - 2619:25
**admission** [1] - 2570:3
**admit** [2] - 2521:2, 2521:21
**admitted** [6] - 2520:19, 2520:22, 2556:8, 2569:16, 2570:6, 2570:7
**adopted** [1] - 2581:3

2622

**advance** [1] - 2522:17
**advocate** [1] - 2604:1
**advocating** [1] - 2575:1
**affect** [2] - 2605:16, 2610:17
**affects** [1] - 2613:17
**Afternoon** [1] - 2512:6
**afternoon** [4] - 2515:4, 2515:22, 2587:23, 2588:1
**AFTERNOON** [2] - 2512:10, 2515:1
**agent** [4] - 2558:9, 2559:5, 2591:3, 2598:2
**Agent** [3] - 2520:4, 2524:9, 2566:23
**agents** [1] - 2574:25
**agree** [7] - 2548:1, 2548:2, 2551:2, 2559:14, 2577:21, 2601:3, 2608:13
**agreed** [2] - 2566:8, 2566:13
**agreement** [6] - 2564:24, 2564:25, 2566:4, 2566:12, 2566:18
**agreements** [2] - 2566:20, 2572:6
**ahead** [3] - 2541:5, 2580:24, 2616:17
**aided** [1] - 2513:5
**air** [3] - 2515:10, 2515:25, 2516:13
**Alex** [2] - 2522:22, 2553:17
**allegation** [2] - 2552:21, 2554:23
**allege** [3] - 2547:8, 2617:22
**alleged** [3] - 2605:1, 2617:18, 2617:20
**allegedly** [2] - 2617:20, 2618:5
**allow** [1] - 2602:10
**allowed** [5] - 2531:16, 2532:19, 2540:3, 2603:2, 2610:22
**allows** [1] - 2602:14
**almost** [1] - 2563:25
**AMERICA** [1] - 2512:4
**AMY** [1] - 2512:10
**analysis** [3] - 2558:14, 2596:19, 2616:24
**Angeles** [6] - 2544:3, 2545:20, 2568:14, 2568:20, 2578:9, 2578:16
**anonymous** [1] - 2552:6
**answer** [16] - 2524:21, 2528:21, 2542:5, 2542:8, 2557:10, 2564:9, 2564:10, 2568:18, 2575:22, 2576:12, 2578:24, 2581:21, 2595:4, 2596:6, 2608:20, 2616:18
**answered** [8] - 2529:4, 2529:16, 2567:8, 2574:12, 2578:12, 2578:23, 2580:20, 2581:24
**answers** [1] - 2531:20
**anticipate** [1] - 2515:12
**anticipating** [1] - 2613:24
**anyway** [1] - 2518:2
**apologize** [2] - 2555:8, 2583:2
**APPEARANCES** [1] - 2512:12
**appeared** [1] - 2582:22
**apply** [1] - 2613:8
**approach** [5] - 2521:6, 2531:2, 2546:23, 2585:9, 2591:14
**appropriate** [5] - 2551:1, 2601:4, 2606:13, 2609:10, 2609:13

**approved** [1] - 2545:6
**April** [4] - 2567:2, 2567:15, 2571:4, 2576:4
**areas** [1] - 2613:20
**argue** [3] - 2548:13, 2551:10, 2602:23
**argued** [2] - 2550:23, 2619:1
**arguing** [1] - 2550:23
**argument** [3] - 2552:9, 2606:20, 2614:1
**argumentative** [4] - 2532:2, 2548:15, 2548:25, 2581:24
**arguments** [3] - 2600:19, 2606:20, 2617:5
**arise** [1] - 2618:8
**Arnall** [1] - 2574:16
**Arps** [1] - 2562:25
**arrive** [1] - 2515:10
**article** [44] - 2555:12, 2555:23, 2556:10, 2556:15, 2556:24, 2556:25, 2558:1, 2558:15, 2559:4, 2559:14, 2559:18, 2559:20, 2559:21, 2559:24, 2560:5, 2560:8, 2560:11, 2560:13, 2563:24, 2568:15, 2568:16, 2578:9, 2579:7, 2579:8, 2579:20, 2580:18, 2581:2, 2581:17, 2581:21, 2582:15, 2583:1, 2583:4, 2583:6, 2583:13, 2583:15, 2583:16, 2583:19, 2584:1, 2584:2, 2584:3, 2585:12, 2591:25
**articles** [5] - 2544:11, 2558:16, 2558:18, 2568:23, 2580:15
**ascertain** [1] - 2599:16
**aspect** [1] - 2603:5
**aspects** [3] - 2550:11, 2604:4, 2604:12
**asserting** [1] - 2612:11
**assess** [1] - 2593:16
**assessment** [1] - 2610:18
**assuming** [2] - 2611:4, 2619:21
**attached** [4] - 2521:22, 2565:2, 2565:19, 2578:3
**attaches** [1] - 2555:23
**attempting** [1] - 2531:6
**attention** [10] - 2515:24, 2525:23, 2532:4, 2545:1, 2555:21, 2563:4, 2573:16, 2586:15, 2612:12, 2616:1
**ATTORNEY'S** [1] - 2512:14
**attributable** [3] - 2545:22, 2587:9, 2590:25
**August** [2] - 2512:8, 2620:8
**Aunt** [2] - 2618:9, 2618:12
**AUSA** [2] - 2512:13, 2512:14
**author** [2] - 2558:21, 2559:1
**authority** [2] - 2561:7, 2612:10
**Avenue** [2] - 2512:18, 2513:3
**aware** [2] - 2546:4, 2572:3

**B**

**back-and-forth** [2] - 2539:7, 2542:24
**backdated** [2] - 2604:13, 2611:12
**background** [2] - 2552:7, 2607:25

**Baltimore** [1] - 2512:22
**based** [10] - 2546:9, 2558:17, 2558:19, 2582:10, 2582:18, 2582:23, 2589:15, 2606:6, 2610:25, 2612:5
**bases** [1] - 2551:1
**basic** [1] - 2608:17
**basis** [10] - 2519:22, 2522:6, 2522:22, 2522:24, 2527:20, 2540:15, 2608:24, 2609:15, 2612:4, 2612:22
**bears** [1] - 2598:16
**BEFORE** [1] - 2512:10
**beg** [2] - 2529:13, 2566:10
**beginning** [2] - 2566:4, 2612:9
**behalf** [3] - 2517:4, 2559:22, 2577:12
**behest** [2] - 2552:9, 2553:24
**behind** [1] - 2593:4
**believes** [1] - 2547:11
**bench** [16] - 2521:6, 2521:7, 2531:4, 2535:18, 2535:23, 2535:25, 2546:23, 2546:24, 2550:25, 2585:9, 2585:11, 2591:14, 2591:15, 2597:8, 2597:9, 2619:22
**benefit** [1] - 2602:16
**BERMAN** [1] - 2512:10
**berth** [1] - 2607:16
**better** [1] - 2599:7
**between** [2] - 2565:19, 2583:10
**beyond** [2] - 2591:13, 2591:17
**big** [1] - 2598:1
**Bill** [1] - 2517:3
**binder** [2] - 2520:17, 2520:23
**bit** [3] - 2545:17, 2582:1, 2601:7
**blurred** [1] - 2617:6
**bottom** [2] - 2556:14, 2584:7
**Bradley** [1] - 2512:17
**break** [1] - 2587:23
**brief** [5] - 2584:25, 2587:24, 2587:25, 2591:23, 2613:20
**briefing** [1] - 2618:22
**bring** [24] - 2515:16, 2515:24, 2533:8, 2533:9, 2538:22, 2540:3, 2540:5, 2540:15, 2544:11, 2551:23, 2553:2, 2554:4, 2564:17, 2571:3, 2574:15, 2588:7, 2599:1, 2599:2, 2599:3, 2599:17, 2607:5, 2616:1
**bringing** [2] - 2551:5, 2563:4
**broad** [2] - 2572:16, 2618:23
**broader** [1] - 2571:2
**brought** [2] - 2544:13, 2555:21
**burdensome** [1] - 2603:11
**business** [4] - 2521:11, 2524:23, 2524:25, 2562:23
**BY** [39] - 2517:2, 2519:15, 2520:2, 2520:25, 2524:8, 2524:24, 2528:23, 2529:15, 2533:18, 2534:22, 2535:7, 2541:15, 2541:25, 2542:17, 2546:3, 2555:11, 2556:9, 2557:13, 2561:22, 2566:15, 2569:18, 2570:8, 2572:22, 2573:25, 2574:14, 2576:1, 2578:14, 2579:3, 2580:6, 2580:25, 2581:14,

2582:13, 2586:14, 2587:4, 2588:6, 2593:22, 2595:6, 2595:23, 2596:5

# C

**Campoamor** [4] - 2512:13, 2528:13, 2528:15, 2529:1
**CAMPOAMOR** [36] - 2515:7, 2515:14, 2515:20, 2516:2, 2516:5, 2537:15, 2537:23, 2538:9, 2538:23, 2539:9, 2539:14, 2539:18, 2540:11, 2597:1, 2597:11, 2597:14, 2597:18, 2598:1, 2598:20, 2599:10, 2599:20, 2601:3, 2601:8, 2601:18, 2601:22, 2602:10, 2602:18, 2614:14, 2614:21, 2614:25, 2615:8, 2615:11, 2615:19, 2615:25, 2616:23, 2619:19
**Campoamor-Sanchez** [1] - 2512:13
**CAMPOAMOR-SANCHEZ** [36] - 2515:7, 2515:14, 2515:20, 2516:2, 2516:5, 2537:15, 2537:23, 2538:9, 2538:23, 2539:9, 2539:14, 2539:18, 2540:11, 2597:1, 2597:11, 2597:14, 2597:18, 2598:1, 2598:20, 2599:10, 2599:20, 2601:3, 2601:8, 2601:18, 2601:22, 2602:10, 2602:18, 2614:14, 2614:21, 2614:25, 2615:8, 2615:11, 2615:19, 2615:25, 2616:23, 2619:19
**candid** [1] - 2516:6
**cannot** [1] - 2538:23
**captured** [1] - 2551:5
**cards** [3] - 2521:11, 2524:23, 2524:25
**career** [3] - 2603:22, 2604:4, 2607:15
**carefully** [1] - 2586:1
**case** [46] - 2516:12, 2516:17, 2520:7, 2522:10, 2523:4, 2540:18, 2540:25, 2541:1, 2551:3, 2551:11, 2552:21, 2552:24, 2554:23, 2572:5, 2577:5, 2598:15, 2600:10, 2604:7, 2604:13, 2604:21, 2605:6, 2605:10, 2605:15, 2605:18, 2605:23, 2605:24, 2606:3, 2606:5, 2606:10, 2606:18, 2609:2, 2609:23, 2610:7, 2610:15, 2611:17, 2611:21, 2612:4, 2616:10, 2616:20, 2617:2, 2617:11, 2618:8
**case-by-case** [1] - 2612:4
**cases** [4] - 2610:11, 2611:3, 2612:11, 2612:23
**center** [1] - 2587:6
**central** [3] - 2525:10, 2525:14, 2525:20
**certain** [2] - 2515:21, 2609:16
**certainly** [11] - 2533:6, 2539:13, 2554:1, 2572:12, 2592:22, 2604:7, 2609:1, 2609:4, 2609:13, 2613:2, 2616:11
**CERTIFICATE** [1] - 2620:1
**certify** [1] - 2620:3
**chance** [2] - 2555:18, 2556:23
**change** [2] - 2605:15, 2611:7

**changed** [1] - 2591:10
**changes** [2] - 2552:16, 2553:7
**changing** [1] - 2591:5
**character** [22] - 2602:3, 2602:14, 2602:22, 2602:25, 2603:16, 2604:22, 2604:23, 2605:14, 2605:22, 2605:23, 2606:13, 2606:18, 2607:21, 2607:24, 2608:13, 2608:15, 2608:16, 2608:24, 2609:14, 2610:21, 2610:23, 2613:8
**characterization** [3] - 2550:21, 2581:3, 2586:20
**characterize** [4] - 2533:3, 2586:1, 2593:18, 2607:5
**characterizing** [1] - 2586:3
**charge** [1] - 2616:4
**charger** [1] - 2604:8
**chose** [1] - 2560:23
**chunk** [1] - 2535:19
**Circuit** [1] - 2610:7
**circuit** [1] - 2610:9
**circuits** [2] - 2605:7, 2611:3
**Circuits** [1] - 2610:12
**circumstances** [1] - 2547:19
**cited** [1] - 2609:2
**cites** [1] - 2611:22
**citing** [1] - 2612:23
**citizen** [9] - 2565:23, 2565:25, 2566:1, 2566:12, 2566:19, 2566:20, 2589:9, 2604:6, 2606:14
**clarified** [2] - 2531:21, 2538:25
**clarifies** [3] - 2538:10, 2538:14, 2540:4
**clarifying** [4] - 2584:25, 2585:14, 2586:2, 2591:23
**classic** [1] - 2610:20
**clear** [12] - 2531:23, 2533:11, 2533:13, 2536:5, 2536:11, 2538:16, 2539:3, 2543:18, 2559:14, 2559:18, 2559:20, 2583:23
**clearly** [2] - 2554:22, 2566:21
**clerkships** [1] - 2607:25
**close** [3] - 2550:24, 2600:9, 2603:21
**closing** [1] - 2606:20
**code** [1] - 2604:16
**colleagues** [1] - 2533:11
**collect** [1] - 2518:21
**Columbia** [1] - 2528:8
**COLUMBIA** [2] - 2512:2, 2512:15
**combination** [1] - 2617:4
**commentary** [1] - 2551:24
**commented** [1] - 2593:13
**comments** [3] - 2545:19, 2572:19, 2587:8
**common** [1] - 2522:21
**communicated** [1] - 2590:10
**communications** [5] - 2543:11, 2593:23, 2594:6, 2594:14, 2594:23
**community** [2] - 2608:19, 2609:1
**companies** [2] - 2575:5, 2575:7

**compare** [1] - 2556:23
**complete** [1] - 2600:16
**completeness** [1] - 2538:24
**complicated** [1] - 2599:24
**computer** [1] - 2513:5
**computer-aided** [1] - 2513:5
**concealing** [1] - 2547:7
**concealment** [1] - 2554:24
**concept** [1] - 2619:9
**concern** [1] - 2553:23
**concerning** [3] - 2545:24, 2546:6, 2587:11
**concluded** [4] - 2518:9, 2526:20, 2559:15, 2559:18
**conclusion** [1] - 2553:25
**conclusions** [2] - 2527:4, 2586:22
**conduct** [2] - 2566:21, 2604:16
**conducted** [4] - 2523:3, 2542:12, 2542:23, 2558:8
**confer** [2] - 2615:13, 2615:18
**conference** [2] - 2550:25, 2616:4
**confirm** [1] - 2578:6
**confirmed** [4] - 2527:21, 2543:13, 2543:22, 2589:16
**connection** [5] - 2519:4, 2519:20, 2572:5, 2574:23, 2575:20
**Connolly** [5] - 2517:21, 2517:23, 2517:24, 2518:3, 2545:5
**considered** [1] - 2527:9
**considering** [1] - 2516:6
**consistent** [2] - 2531:25, 2586:25
**Constitution** [1] - 2513:3
**consult** [1] - 2591:1
**consultants** [1] - 2522:3
**Consultants** [1] - 2574:17
**contact** [6] - 2526:3, 2582:15, 2590:8, 2590:12, 2590:21, 2596:11
**contacted** [10] - 2529:23, 2530:15, 2530:17, 2533:24, 2534:11, 2534:23, 2535:11, 2539:20, 2541:19, 2542:2
**contacting** [4] - 2533:21, 2581:9, 2581:12, 2596:17
**contacts** [16] - 2527:15, 2529:19, 2530:1, 2530:5, 2530:6, 2542:10, 2542:12, 2542:14, 2542:19, 2542:22, 2559:6, 2559:12, 2582:5, 2589:4, 2589:7, 2589:17
**contemporaneous** [1] - 2523:12
**content** [12] - 2543:19, 2543:22, 2544:2, 2546:4, 2558:12, 2558:13, 2558:15, 2558:16, 2559:4, 2561:16, 2582:20, 2582:21
**contention** [1] - 2550:6
**context** [4] - 2533:9, 2539:4, 2618:7, 2618:17
**continues** [1] - 2532:12
**contract** [4] - 2560:11, 2560:12, 2578:4, 2589:6
**contracts** [1] - 2565:5

2624

contrary [2] - 2531:17, 2566:20
contribute [2] - 2566:8, 2566:13
control [13] - 2533:25, 2534:8, 2542:13, 2543:15, 2559:9, 2562:21, 2564:6, 2574:6, 2575:18, 2590:4, 2591:8, 2596:12, 2596:18
conversation [8] - 2532:11, 2543:8, 2544:3, 2547:10, 2551:8, 2582:12, 2597:19, 2597:23
conversations [7] - 2525:17, 2526:8, 2543:6, 2550:3, 2579:17, 2595:7
cool [1] - 2599:15
copies [2] - 2542:20, 2543:9
copy [9] - 2536:14, 2537:3, 2537:14, 2538:6, 2556:20, 2557:7, 2565:4, 2592:15, 2594:1
correct [23] - 2530:6, 2535:9, 2536:2, 2536:9, 2538:5, 2538:19, 2541:17, 2542:10, 2543:13, 2545:21, 2559:13, 2567:9, 2583:3, 2587:9, 2588:16, 2588:19, 2589:18, 2589:22, 2590:1, 2596:9, 2601:22, 2620:4
corrected [1] - 2537:13
correcting [6] - 2530:17, 2542:24, 2544:4, 2588:10, 2592:16, 2593:3
correction [2] - 2581:7, 2581:18
correctly [4] - 2573:20, 2576:10, 2576:11, 2576:15
correspondence [2] - 2565:19, 2590:11
Counsel [2] - 2615:13, 2615:18
Counsel's [1] - 2598:16
counter [1] - 2601:25
countries [1] - 2603:24
country [2] - 2562:10, 2606:15
couple [2] - 2538:25, 2567:1
course [2] - 2563:2, 2577:17
Court [17] - 2513:2, 2515:8, 2515:16, 2537:17, 2538:9, 2538:14, 2597:19, 2598:10, 2598:22, 2602:14, 2602:25, 2614:16, 2616:5, 2616:9, 2616:11, 2616:13, 2619:19
COURT [200] - 2512:2, 2515:4, 2515:13, 2515:19, 2515:25, 2516:4, 2516:8, 2516:14, 2516:16, 2519:10, 2519:14, 2519:22, 2519:24, 2520:23, 2521:2, 2521:4, 2521:8, 2521:12, 2521:17, 2521:22, 2522:1, 2522:9, 2522:14, 2522:25, 2523:7, 2523:17, 2523:21, 2523:25, 2524:15, 2524:20, 2528:20, 2529:10, 2529:12, 2529:14, 2531:3, 2531:5, 2531:8, 2531:12, 2532:3, 2532:9, 2532:13, 2532:19, 2533:16, 2534:19, 2535:1, 2535:4, 2535:10, 2535:17, 2535:24, 2536:8, 2536:15, 2536:17, 2536:19, 2537:1, 2537:5, 2537:7, 2537:9, 2537:21, 2537:24, 2538:8, 2538:21, 2539:6, 2539:10, 2539:17, 2539:19, 2540:9, 2540:12, 2540:23, 2541:9, 2541:13,

2541:18, 2541:22, 2542:5, 2542:8, 2545:16, 2546:23, 2546:25, 2547:5, 2547:8, 2547:13, 2547:17, 2547:19, 2548:1, 2548:13, 2548:22, 2549:5, 2549:10, 2550:1, 2550:3, 2550:9, 2550:15, 2551:16, 2551:22, 2552:2, 2552:19, 2553:2, 2553:14, 2553:23, 2554:10, 2554:16, 2555:1, 2555:4, 2555:6, 2556:1, 2556:3, 2556:5, 2556:7, 2557:10, 2561:14, 2561:18, 2566:8, 2569:17, 2570:4, 2570:6, 2571:13, 2573:23, 2574:12, 2575:22, 2578:13, 2578:24, 2579:25, 2580:21, 2580:24, 2581:10, 2582:1, 2585:9, 2585:12, 2585:19, 2585:25, 2586:8, 2586:12, 2586:25, 2587:21, 2591:14, 2591:16, 2591:22, 2592:20, 2592:24, 2593:9, 2593:20, 2595:4, 2595:16, 2595:19, 2595:21, 2596:21, 2597:2, 2597:5, 2597:10, 2597:13, 2597:15, 2597:22, 2598:14, 2599:1, 2599:14, 2599:22, 2600:15, 2601:4, 2601:9, 2601:16, 2601:19, 2601:23, 2602:7, 2602:16, 2603:3, 2604:9, 2604:23, 2605:20, 2606:16, 2606:23, 2607:1, 2607:4, 2607:12, 2607:23, 2608:8, 2608:11, 2609:7, 2609:12, 2610:4, 2610:9, 2611:5, 2611:9, 2611:19, 2612:1, 2612:3, 2612:15, 2613:5, 2613:13, 2613:17, 2613:23, 2614:12, 2614:20, 2615:1, 2615:5, 2615:10, 2615:14, 2615:24, 2616:15, 2616:25, 2619:21, 2620:1
court [8] - 2524:7, 2533:17, 2540:7, 2541:10, 2555:5, 2586:13, 2593:21, 2599:21
Court's [2] - 2515:24, 2616:1
Courthouse [1] - 2513:2
courtroom [5] - 2599:18, 2600:5, 2601:10, 2614:7, 2615:14
courts [1] - 2605:11
cover [2] - 2538:15, 2578:19
covered [4] - 2571:2, 2572:20, 2573:4, 2619:14
covers [1] - 2572:9
Craig [49] - 2528:5, 2529:20, 2529:22, 2529:25, 2533:21, 2533:23, 2533:24, 2538:17, 2540:18, 2546:13, 2546:20, 2547:2, 2552:15, 2552:24, 2558:21, 2559:1, 2559:5, 2559:22, 2560:6, 2560:23, 2561:23, 2565:19, 2575:4, 2575:12, 2575:14, 2576:2, 2580:19, 2581:5, 2581:17, 2582:23, 2583:24, 2584:10, 2584:25, 2586:16, 2586:19, 2588:15, 2588:24, 2589:21, 2590:19, 2593:24, 2594:7, 2594:15, 2594:22, 2595:7, 2598:3, 2603:20, 2605:9, 2606:20
CRAIG [1] - 2512:6
Craig's [7] - 2517:4, 2526:3, 2534:4,

2577:22, 2588:10, 2602:25, 2603:15
create [1] - 2601:4
criminal [2] - 2606:9, 2606:10
Criminal [1] - 2512:5
critical [4] - 2558:2, 2558:6, 2591:10, 2593:2
cross [22] - 2515:6, 2516:10, 2532:18, 2548:16, 2586:7, 2586:9, 2598:12, 2598:19, 2599:9, 2605:1, 2605:4, 2607:24, 2608:24, 2609:4, 2609:23, 2610:13, 2612:13, 2612:18, 2612:20, 2613:4, 2613:8, 2613:22
CROSS [2] - 2514:4, 2517:1
cross-examination [4] - 2598:19, 2609:23, 2610:13, 2613:8
CROSS-EXAMINATION [1] - 2517:1
cross-examine [9] - 2532:18, 2586:7, 2598:12, 2605:1, 2605:4, 2607:24, 2608:24, 2609:4, 2613:4
cross-examining [3] - 2548:16, 2586:9, 2612:13
crosses [1] - 2515:11
CRR [1] - 2513:2
cumulative [5] - 2602:12, 2602:23, 2603:11, 2608:4, 2608:20
curtailed [2] - 2532:18, 2532:20

## D

D.C [3] - 2512:7, 2513:3, 2610:7
Daily [1] - 2553:17
dancing [1] - 2619:8
date [2] - 2520:10, 2528:9, 2598:8
DATE [1] - 2620:9
David [12] - 2548:9, 2548:10, 2585:1, 2585:2, 2593:25, 2594:16, 2594:24, 2595:9, 2595:25, 2596:6
DAY [1] - 2512:6
DC [3] - 2512:16, 2512:18, 2512:25
deal [1] - 2591:19
dealing [1] - 2610:19
dealings [2] - 2610:24, 2610:25
dealt [2] - 2609:20, 2610:24
December [7] - 2542:23, 2562:5, 2594:1, 2594:7, 2594:25, 2595:8, 2618:10
decide [3] - 2515:16, 2515:17, 2546:1
decided [3] - 2582:15, 2582:18, 2597:13
decision [12] - 2547:25, 2548:19, 2548:24, 2558:19, 2589:5, 2589:12, 2594:4, 2597:12, 2597:18, 2597:20, 2598:13, 2618:18
dedicated [1] - 2604:1
Defendant [4] - 2512:7, 2512:19, 2556:8, 2570:7
DEFENDANT [1] - 2514:11
defendant [7] - 2604:21, 2606:12, 2608:18, 2611:6, 2613:11, 2617:13, 2618:3

**defendant's** [3] - 2608:25, 2617:4, 2618:6
**defended** [1] - 2554:4
**Defense** [5] - 2520:17, 2524:12, 2528:17, 2555:15, 2569:15
**defense** [10] - 2554:17, 2554:22, 2554:23, 2605:11, 2609:12, 2611:13, 2616:6, 2618:24, 2619:3, 2619:15
**defined** [1] - 2566:23
**definitely** [1] - 2529:18
**demanded** [1] - 2581:17
**deny** [1] - 2602:2
**Department** [1] - 2561:5
**DEPARTMENT** [1] - 2512:17
**depth** [1] - 2608:1
**deputy** [5] - 2599:18, 2600:5, 2601:10, 2614:7, 2615:14
**describe** [1] - 2534:3
**described** [4] - 2554:7, 2564:12, 2564:18, 2566:14
**describing** [3] - 2530:21, 2536:24, 2536:25
**description** [2] - 2564:21, 2564:22
**desk** [1] - 2581:11
**desks** [1] - 2525:18
**detail** [2] - 2521:15, 2554:18
**details** [1] - 2522:3
**determination** [11] - 2515:15, 2582:23, 2588:13, 2588:24, 2589:13, 2591:5, 2593:2, 2594:12, 2602:3, 2613:10, 2613:13
**determinations** [2] - 2558:17, 2582:10
**determine** [1] - 2579:15
**determined** [4] - 2577:11, 2589:10, 2594:16
**determining** [1] - 2577:2
**dialog** [1] - 2568:17
**dialogue** [3] - 2579:11, 2579:14, 2582:9
**different** [11] - 2537:10, 2539:1, 2540:10, 2551:11, 2585:20, 2598:22, 2598:25, 2604:3, 2605:10, 2608:19, 2611:9
**differently** [1] - 2593:9
**difficulty** [1] - 2619:8
**direct** [2] - 2612:17, 2613:21
**DIRECT** [1] - 2514:4
**directing** [1] - 2535:1
**direction** [13] - 2530:12, 2533:25, 2534:8, 2542:13, 2543:15, 2559:9, 2574:6, 2575:18, 2589:7, 2590:4, 2591:8, 2596:12, 2596:17
**directly** [3] - 2579:10, 2582:9, 2590:25
**disclose** [3] - 2554:25, 2616:4, 2617:5
**disclosed** [2] - 2565:17, 2580:10
**discovery** [1] - 2523:7
**discretion** [1] - 2604:20
**discuss** [9] - 2516:17, 2516:18, 2543:19, 2553:9, 2553:10, 2555:9, 2560:1, 2599:11, 2600:11

**discussed** [10] - 2543:11, 2543:21, 2549:8, 2550:13, 2553:4, 2553:6, 2560:16, 2569:1, 2602:13
**discussing** [1] - 2569:12
**discussion** [3] - 2565:21, 2576:22, 2613:25
**discussions** [2] - 2565:7, 2565:14
**dispute** [2] - 2523:7, 2611:13
**disseminate** [5] - 2573:21, 2574:1, 2574:5, 2574:10, 2618:11
**disseminated** [7] - 2527:1, 2527:6, 2567:25, 2573:1, 2573:6, 2574:3, 2618:9
**dissemination** [5] - 2551:9, 2559:7, 2571:17, 2589:6, 2618:12
**distribute** [3] - 2567:22, 2571:16, 2573:13, 2578:18
**distributed** [1] - 2527:11
**distribution** [2] - 2526:7, 2589:3
**DISTRICT** [4] - 2512:2, 2512:2, 2512:11, 2512:15
**District** [1] - 2528:8
**Dmitry** [1] - 2575:1
**document** [5] - 2521:21, 2525:5, 2557:17, 2562:17, 2562:18
**documents** [4] - 2520:6, 2524:1, 2598:23, 2611:14
**done** [11] - 2518:8, 2524:4, 2553:17, 2559:8, 2569:8, 2575:12, 2575:20, 2589:23, 2596:10, 2601:1, 2607:15
**door** [1] - 2551:22
**doubt** [2] - 2530:15, 2557:24
**down** [2] - 2597:2, 2606:5
**draft** [1] - 2570:9
**drafted** [5] - 2545:5, 2553:24, 2563:17, 2570:15, 2573:18
**drafting** [2] - 2568:25, 2569:10, 2569:13
**drafts** [1] - 2569:25
**draw** [1] - 2532:3
**drew** [1] - 2586:22
**drove** [1] - 2618:15
**due** [3] - 2599:18, 2599:19, 2600:6
**duly** [1] - 2516:23
**during** [13] - 2528:16, 2541:3, 2545:11, 2545:13, 2549:9, 2583:11, 2587:7, 2593:23, 2593:24, 2594:6, 2594:14, 2595:7
**duty** [8] - 2523:2, 2547:23, 2548:18, 2554:25, 2616:3, 2616:19, 2617:5, 2618:6

## E

**e-mail** [3] - 2555:20, 2591:12, 2592:9
**e-mails** [4] - 2591:20, 2592:3, 2593:16
**East** [1] - 2512:21
**editing** [1] - 2569:12
**effect** [1] - 2576:20
**Eighth** [1] - 2610:12

**either** [13] - 2547:4, 2547:10, 2547:17, 2549:10, 2549:13, 2550:14, 2551:6, 2580:14, 2586:19, 2587:13, 2599:17, 2600:4, 2602:2
**element** [1] - 2606:11
**Eleventh** [1] - 2610:12
**eliminate** [1] - 2599:22
**employment** [1] - 2608:1
**enacted** [1] - 2610:22
**end** [3] - 2549:14, 2549:15, 2600:9
**ended** [1] - 2523:21
**ending** [1] - 2551:24
**ends** [1] - 2550:25
**engage** [2] - 2566:22, 2572:4
**engaged** [4] - 2560:14, 2571:25, 2575:11, 2575:15
**English** [2] - 2564:24, 2564:25
**enter** [1] - 2579:11
**entered** [1] - 2560:12
**entire** [1] - 2555:21
**entirely** [2] - 2538:16, 2547:3
**entitled** [5] - 2531:16, 2576:8, 2603:8, 2608:2, 2620:5
**erroneous** [2] - 2580:18, 2581:2
**Esq** [4] - 2512:19, 2512:20, 2512:23, 2512:23
**essentially** [3] - 2602:12, 2608:15, 2608:17
**establish** [1] - 2602:24
**established** [3] - 2603:4, 2611:16, 2617:23
**estimated** [1] - 2525:24
**etc** [1] - 2618:22
**ethical** [3] - 2607:1, 2607:2, 2607:6
**Europe** [1] - 2553:17
**evaluate** [1] - 2522:17
**evening** [1] - 2600:8
**evidence** [17] - 2550:24, 2556:3, 2556:8, 2570:7, 2586:4, 2600:23, 2601:24, 2601:25, 2608:16, 2610:20, 2614:5, 2614:9, 2614:13, 2614:15, 2617:7, 2617:10, 2618:22
**Evidence** [1] - 2603:4
**evidentiary** [1] - 2613:25
**exact** [4] - 2528:9, 2543:10, 2552:7, 2564:4
**exactly** [10] - 2526:23, 2536:21, 2536:22, 2584:19, 2587:17, 2608:14, 2617:14, 2617:23, 2619:3, 2619:14
**examination** [4] - 2598:19, 2609:23, 2610:13, 2613:8
**EXAMINATION** [4] - 2517:1, 2588:5, 2595:22, 2596:4
**examine** [9] - 2532:18, 2586:7, 2598:12, 2605:1, 2605:4, 2607:24, 2608:24, 2609:4, 2613:4
**examined** [1] - 2516:23
**examining** [3] - 2548:16, 2586:9, 2612:13
**example** [4] - 2544:3, 2605:8, 2611:10,

2618:8
**examples** [1] - 2619:10
**excerpt** [2] - 2535:5, 2535:13
**Excuse** [1] - 2533:19
**excuse** [6] - 2534:16, 2549:2, 2590:9, 2596:23, 2600:3
**excused** [4] - 2596:22, 2597:4, 2600:7, 2600:8
**executive** [1] - 2575:3
**Exhibit** [19] - 2520:17, 2524:12, 2528:17, 2544:17, 2544:24, 2555:15, 2562:3, 2562:4, 2564:16, 2567:11, 2569:15, 2569:19, 2586:17, 2588:7, 2590:16, 2591:11, 2614:22, 2615:12, 2617:15
**EXHIBIT** [1] - 2514:11
**exhibit** [5] - 2522:17, 2525:6, 2526:11, 2534:15, 2601:23
**exhibits** [11] - 2515:21, 2600:17, 2600:22, 2601:21, 2601:24, 2614:5, 2614:9, 2614:12, 2614:16, 2614:17, 2614:18
**exists** [1] - 2616:19
**expansion** [1] - 2603:24
**expect** [3] - 2601:16, 2606:19, 2619:19
**explain** [1] - 2549:23
**explained** [4] - 2522:18, 2545:11, 2545:13, 2590:7
**explaining** [2] - 2587:7, 2606:1
**explanation** [1] - 2533:4
**explanations** [1] - 2611:14
**extent** [1] - 2618:25

## F

**F.2d** [1] - 2610:8
**facetious** [1] - 2609:21
**fact** [17] - 2530:9, 2538:12, 2547:13, 2548:7, 2551:5, 2555:20, 2589:15, 2592:14, 2593:18, 2603:13, 2606:3, 2611:16, 2616:21, 2618:4, 2618:5, 2618:6, 2618:9
**facts** [5] - 2547:9, 2605:15, 2617:24, 2617:25, 2618:2
**factual** [1] - 2598:23
**factually** [2] - 2612:5, 2619:4
**failed** [1] - 2548:19
**fair** [10] - 2540:13, 2548:14, 2550:20, 2559:16, 2559:19, 2586:5, 2587:14, 2593:14, 2593:15, 2598:18
**faith** [2] - 2554:16, 2608:23
**fall** [1] - 2551:3
**falls** [1] - 2617:3
**false** [9] - 2540:18, 2605:1, 2611:12, 2617:13, 2617:18, 2617:22, 2617:23, 2618:3, 2619:6
**falsified** [1] - 2605:9
**familiar** [1] - 2583:15
**far** [2] - 2592:4, 2615:15
**FARA** [16] - 2518:12, 2518:15,

2520:14, 2547:6, 2547:7, 2549:24, 2553:10, 2560:9, 2561:11, 2561:16, 2566:23, 2572:1, 2572:4, 2611:6, 2617:17, 2618:1
**fast** [1] - 2579:9
**federal** [1] - 2610:22
**Federal** [1] - 2603:4
**felt** [1] - 2544:6
**Fernando** [1] - 2512:13
**few** [3] - 2517:4, 2595:2, 2599:15
**Fifth** [1] - 2603:4
**figure** [7] - 2532:14, 2532:23, 2537:22, 2539:7, 2616:8, 2616:12, 2618:20
**file** [11] - 2518:21, 2518:22, 2518:25, 2522:9, 2522:11, 2523:10, 2525:11, 2525:15, 2525:19, 2525:21, 2611:22
**filed** [2] - 2575:2, 2612:8, 2612:21
**files** [4] - 2519:4, 2519:20, 2520:14, 2522:20
**filing** [3] - 2518:11, 2518:14, 2518:17
**findings** [2] - 2558:3, 2558:6
**fine** [3] - 2540:23, 2604:9, 2606:16
**fingertips** [1] - 2526:12
**finish** [3] - 2529:10, 2529:11, 2534:20
**finished** [1] - 2585:24
**firm** [21] - 2526:21, 2526:25, 2545:14, 2557:6, 2566:21, 2566:22, 2567:8, 2567:21, 2571:10, 2571:16, 2571:20, 2572:3, 2572:6, 2572:18, 2573:12, 2574:16, 2578:18, 2579:10, 2591:1, 2605:2, 2611:22
**firm's** [3] - 2567:12, 2572:13, 2572:16
**firms** [2] - 2571:22, 2575:2
**first** [26] - 2519:2, 2519:5, 2519:11, 2519:16, 2519:17, 2519:25, 2521:23, 2523:12, 2524:13, 2526:16, 2527:1, 2540:19, 2562:2, 2562:13, 2562:15, 2567:23, 2573:7, 2579:4, 2581:22, 2583:1, 2583:3, 2583:5, 2591:12, 2594:17, 2617:21, 2618:1
**five** [6] - 2520:9, 2598:20, 2602:5, 2602:7, 2603:9, 2605:7
**fix** [1] - 2534:5
**focus** [3] - 2549:22, 2553:20
**follow** [4] - 2570:23, 2576:21, 2577:21, 2590:11
**follow-up** [2] - 2570:23, 2590:11
**followed** [1] - 2542:20
**following** [6] - 2570:12, 2570:20, 2571:8, 2572:24, 2600:22, 2617:12
**follows** [3] - 2516:24, 2541:14, 2541:24
**FOR** [2] - 2512:2, 2512:14
**foregoing** [1] - 2620:4
**Foreign** [1] - 2566:23
**foreign** [3] - 2558:9, 2560:12, 2562:20, 2577:6, 2591:8, 2596:18, 2603:23
**forgive** [1] - 2516:11
**form** [8] - 2519:10, 2519:23, 2546:22, 2563:25, 2575:21, 2581:23, 2586:24,

2610:21
**formed** [1] - 2610:25
**forth** [3] - 2539:7, 2542:24, 2553:20
**forward** [1] - 2612:4
**foundation** [1] - 2532:14
**founded** [1] - 2604:1
**four** [19] - 2562:7, 2563:9, 2572:10, 2602:6, 2602:7, 2602:21, 2603:10, 2603:18, 2604:2, 2604:22, 2605:7, 2607:17, 2607:18, 2608:3, 2608:6, 2608:15, 2608:19, 2612:6
**Fourth** [2] - 2512:15, 2610:12
**fourth** [1] - 2607:19
**frame** [1] - 2542:24
**frankly** [3] - 2602:22, 2602:24, 2616:12
**front** [6] - 2564:15, 2586:5, 2602:19, 2603:5, 2612:16, 2617:12
**frustrating** [1] - 2612:11
**FTI** [1] - 2546:21
**fully** [1] - 2551:5
**funds** [2] - 2566:8, 2566:13
**furtherance** [1] - 2617:20

## G

**gain** [1] - 2577:20
**GASTON** [6] - 2608:10, 2608:12, 2609:10, 2612:7, 2613:2, 2615:17
**Gaston** [5] - 2512:14, 2602:11, 2602:20, 2612:6, 2615:20
**general** [4] - 2536:24, 2537:1, 2541:4, 2604:4
**generally** [1] - 2542:12
**gentleman** [2] - 2523:15, 2606:14
**gentlemen** [1] - 2545:10
**given** [8] - 2522:17, 2523:12, 2548:9, 2553:12, 2584:15, 2584:18, 2593:14, 2603:13
**goal** [1] - 2582:8
**Golden** [1] - 2574:17
**government** [34] - 2522:8, 2523:3, 2530:13, 2534:1, 2534:9, 2542:13, 2543:16, 2548:17, 2552:15, 2552:16, 2552:17, 2558:9, 2558:22, 2559:2, 2559:9, 2560:13, 2565:8, 2565:15, 2565:20, 2574:7, 2575:18, 2577:12, 2578:4, 2589:8, 2590:5, 2590:13, 2591:8, 2596:12, 2596:18, 2606:19, 2607:24, 2608:23, 2617:3, 2617:8
**Government** [10] - 2512:13, 2544:17, 2544:24, 2562:2, 2567:11, 2586:16, 2588:7, 2590:15, 2591:11, 2614:21
**Government's** [4] - 2562:4, 2564:15, 2615:11, 2617:15
**government's** [7] - 2526:11, 2547:22, 2550:24, 2602:8, 2603:14, 2604:12, 2617:2
**grand** [12] - 2528:7, 2528:9, 2528:11, 2530:25, 2531:19, 2532:1, 2537:17,

**gratuitous** [1] - 2548:25
**great** [1] - 2609:20
**green** [1] - 2618:15
**Greg** [5] - 2552:24, 2558:21, 2559:1, 2575:14, 2584:25
**Gregory** [1] - 2574:17
**GREGORY** [1] - 2512:6
**gross** [1] - 2563:7
**guess** [2] - 2532:13, 2609:7
**guilt** [1] - 2611:4
**guilt-assuming** [1] - 2611:4
**Gulland** [1] - 2512:14

## H

**half** [1] - 2520:9
**hand** [1] - 2521:23
**handed** [2] - 2521:12, 2525:1
**handing** [1] - 2522:4
**handle** [2] - 2602:11, 2602:20
**handwriting** [1] - 2569:23
**handwritten** [4] - 2569:21, 2570:9, 2573:16, 2614:17
**handy** [1] - 2615:3
**happy** [4] - 2529:11, 2578:6, 2603:18, 2616:21
**hard** [1] - 2555:8
**Hawker** [3] - 2546:21, 2548:22, 2550:5
**head** [1] - 2619:8
**hear** [11] - 2557:4, 2560:3, 2571:14, 2579:11, 2579:12, 2579:14, 2602:17, 2606:19, 2606:22, 2606:23, 2614:4
**heard** [6] - 2553:3, 2554:3, 2579:5, 2592:17, 2592:21, 2608:10
**hearing** [2] - 2531:19, 2600:15
**heart** [2] - 2591:6, 2591:7
**HEATHER** [2] - 2514:5, 2516:22
**heels** [1] - 2599:15
**help** [5] - 2566:9, 2566:13, 2574:23, 2618:20, 2619:15
**helpful** [5] - 2612:1, 2617:1, 2617:15, 2619:11, 2619:23
**helping** [1] - 2560:6
**herself** [1] - 2539:16
**Herszenhorn** [4] - 2594:25, 2595:10, 2595:25, 2596:7
**highlight** [2] - 2588:8, 2591:12
**historic** [1] - 2610:20
**homework** [1] - 2616:25
**honesty** [6] - 2604:5, 2604:8, 2604:9, 2606:10, 2607:13, 2611:1
**Honor** [55] - 2515:7, 2516:11, 2519:21, 2522:13, 2524:14, 2529:9, 2529:13, 2531:1, 2531:18, 2532:11, 2533:10, 2534:18, 2534:25, 2535:23, 2536:1, 2537:4, 2537:15, 2540:17, 2541:6, 2541:12, 2547:18, 2548:16, 2549:2, 2556:6, 2569:16, 2570:3, 2574:11, 2578:11, 2578:22, 2581:23, 2585:10, 2586:24, 2592:6, 2593:19, 2595:1,

2595:18, 2597:1, 2601:3, 2601:8, 2601:18, 2602:10, 2603:20, 2605:6, 2606:9, 2607:20, 2608:9, 2608:10, 2610:2, 2610:19, 2611:25, 2612:7, 2613:12, 2613:16, 2614:14, 2615:21
**HONORABLE** [1] - 2512:10
**human** [4] - 2603:23, 2603:25, 2604:1, 2606:4
**hundreds** [1] - 2568:10
**hunt** [25] - 2515:9, 2516:19, 2520:11, 2522:23, 2527:18, 2528:2, 2528:7, 2528:24, 2533:20, 2537:17, 2543:2, 2545:2, 2549:24, 2554:13, 2554:15, 2568:8, 2569:11, 2573:2, 2574:16, 2582:14, 2584:8, 2586:15, 2588:9, 2593:23, 2595:24
**HUNT** [2] - 2514:5, 2516:22
**Hunt** [6] - 2515:18, 2517:3, 2533:19, 2556:10, 2560:24, 2571:12
**Hunt's** [2] - 2522:16, 2522:19
**hunt's** [1] - 2522:19
**hurts** [1] - 2555:8
**husher** [1] - 2599:23
**hypothetically** [1] - 2605:8

## I

**idea** [2] - 2592:15, 2597:6
**identified** [1] - 2522:22
**identify** [3] - 2562:4, 2567:12, 2576:4
**ignore** [2] - 2561:4, 2561:5
**III** [1] - 2512:23
**impact** [1] - 2598:13
**impeach** [6] - 2531:6, 2531:13, 2531:16, 2537:19, 2538:12, 2538:24
**impeached** [2] - 2539:15, 2540:2
**impeaching** [1] - 2539:17
**impeachment** [1] - 2540:13
**implied** [1] - 2560:11
**implies** [1] - 2593:6
**importance** [1] - 2591:4
**important** [15] - 2558:7, 2558:10, 2558:13, 2559:10, 2559:11, 2574:8, 2576:18, 2585:25, 2592:11, 2592:24, 2594:3, 2594:11, 2595:12, 2596:8
**impression** [7] - 2534:11, 2534:20, 2534:23, 2535:8, 2535:11, 2539:20, 2541:16, 2541:19, 2542:1, 2542:19, 2542:23
**improper** [3] - 2605:12, 2610:13, 2611:4
**improperly** [1] - 2550:17
**in-depth** [1] - 2608:1
**inaccuracies** [1] - 2590:24
**inaccuracy** [1] - 2546:1
**inaccurate** [1] - 2538:19
**inappropriate** [2] - 2539:15, 2606:21
**include** [2] - 2572:23, 2603:24
**included** [1] - 2570:1
**including** [2] - 2549:24, 2603:24

**inconsistent** [7] - 2531:8, 2533:2, 2537:21, 2537:24, 2538:3, 2540:3, 2566:19
**incorrect** [1] - 2549:25
**incorrectly** [1] - 2589:24
**independence** [3] - 2552:19, 2553:4, 2554:5
**independent** [4] - 2552:22, 2554:8, 2554:19, 2566:21
**independently** [1] - 2530:10
**indicate** [5] - 2547:2, 2593:25, 2594:7, 2594:15, 2595:8
**indicated** [3] - 2522:15, 2545:19, 2581:8
**indicates** [1] - 2592:9
**indicating** [1] - 2546:1
**indictment** [1] - 2617:11
**individual** [3] - 2566:13, 2575:10, 2579:10
**inform** [1] - 2591:2
**information** [11] - 2518:19, 2523:14, 2576:8, 2576:25, 2577:20, 2588:23, 2589:10, 2589:25, 2591:5, 2593:1, 2615:3
**informational** [2] - 2559:7, 2575:2
**informed** [1] - 2545:25
**initiated** [1] - 2530:5
**innocence** [1] - 2605:13
**innocent** [3] - 2547:3, 2547:5, 2547:6
**inquire** [1] - 2521:15
**inquired** [1] - 2610:15
**inquiries** [1] - 2618:18
**inquiry** [7] - 2560:1, 2560:22, 2564:3, 2566:22, 2579:9, 2594:20, 2618:7
**instance** [1] - 2559:12
**instruct** [1] - 2616:11
**instructed** [1] - 2619:1
**instruction** [3] - 2530:12, 2591:2, 2619:5
**instructions** [2] - 2616:3, 2616:6
**insufficient** [1] - 2554:24
**integrity** [6] - 2603:15, 2604:5, 2604:8, 2604:9, 2606:11, 2611:1
**intend** [3] - 2521:15, 2602:4, 2609:4
**interested** [9] - 2575:12, 2575:14, 2575:19, 2575:23, 2577:3, 2577:5, 2577:7, 2577:9, 2579:13
**interrupt** [1] - 2612:7
**intersection** [1] - 2618:16
**interview** [8] - 2522:12, 2594:23, 2595:9, 2598:3, 2598:4, 2598:5, 2598:9, 2598:11
**interviewed** [1] - 2598:15
**interviews** [1] - 2572:19
**introduced** [1] - 2617:10
**investigators** [2] - 2519:3, 2519:19
**invitation** [2] - 2576:22, 2577:22
**invite** [1] - 2576:17

2628

invoice [6] - 2605:1, 2605:9, 2607:2, 2607:3, 2607:5, 2611:12
invoices [1] - 2604:13
involved [4] - 2552:9, 2560:2, 2603:23, 2606:11
involving [1] - 2604:21
irrelevant [2] - 2548:15, 2549:18
issue [18] - 2515:17, 2538:10, 2546:2, 2604:7, 2604:8, 2605:9, 2605:15, 2605:22, 2605:24, 2606:3, 2606:4, 2606:18, 2607:10, 2608:14, 2610:14, 2611:16, 2611:20, 2616:2
issues [9] - 2516:16, 2515:23, 2526:6, 2598:2, 2603:23, 2603:24, 2604:2, 2609:8, 2610:14
itself [1] - 2583:23

## J

JACKSON [1] - 2512:10
James [1] - 2512:20
January [2] - 2544:21, 2586:16
Jason [1] - 2512:17
Jonathan [3] - 2546:21, 2548:22, 2550:5
Journal [16] - 2545:20, 2579:6, 2579:18, 2579:20, 2579:23, 2580:3, 2580:12, 2580:15, 2580:18, 2581:1, 2581:16, 2581:21, 2582:6, 2582:15, 2582:16, 2582:22
journalists [2] - 2526:8, 2527:16
JUDGE [1] - 2512:11
judgment [1] - 2603:8
judicial [4] - 2616:9, 2616:13, 2616:15, 2616:21
jump [1] - 2607:7
June [13] - 2520:3, 2567:8, 2576:2, 2577:7, 2578:3, 2579:4, 2579:19, 2580:9, 2581:15, 2583:10, 2584:14, 2584:17, 2584:19
Junghans [1] - 2512:23
juror [1] - 2596:24
JUROR [1] - 2556:2
jurors [2] - 2516:16, 2614:7
JURY [2] - 2512:6, 2512:10
Jury [4] - 2515:3, 2516:15, 2600:14, 2601:15
jury [24] - 2528:8, 2528:9, 2528:11, 2530:25, 2531:19, 2532:1, 2537:17, 2545:10, 2555:6, 2597:20, 2597:22, 2597:24, 2599:15, 2600:4, 2600:21, 2603:11, 2603:13, 2607:18, 2613:24, 2614:19, 2615:21, 2616:12, 2617:12, 2619:1
Justice [20] - 2545:19, 2545:23, 2551:19, 2556:11, 2556:18, 2556:21, 2556:24, 2557:7, 2558:2, 2558:5, 2561:6, 2563:17, 2563:23, 2571:19, 2572:7, 2572:15, 2586:21, 2587:10, 2588:21, 2593:5

JUSTICE [1] - 2512:17

## K

KANESHIRO [2] - 2513:2, 2620:9
Kaneshiro [2] - 2620:3, 2620:8
KANESHIRO-MILLER [2] - 2513:2, 2620:9
Kaneshiro-Miller [2] - 2620:3, 2620:8
keep [6] - 2525:10, 2525:14, 2525:16, 2525:18, 2545:16
keeping [1] - 2515:11
Kegl [4] - 2520:4, 2523:5, 2524:9, 2525:7
Kevin [3] - 2517:21, 2517:24, 2545:5
kind [3] - 2605:19, 2610:20, 2612:20
kindergarten [2] - 2609:19
kindly [1] - 2569:15
kinds [3] - 2523:13
knowing [1] - 2613:24
knowingness [1] - 2598:17
knowledge [3] - 2554:25, 2606:6, 2608:25
known [3] - 2592:9, 2604:3
knows [5] - 2523:20, 2598:22, 2608:17, 2609:16, 2610:23

## L

L.A [12] - 2555:12, 2555:23, 2555:25, 2556:24, 2556:25, 2558:1, 2558:21, 2563:24, 2568:16, 2571:21, 2578:21, 2579:7
lack [2] - 2592:7
ladies [1] - 2545:9
lady [1] - 2606:14
landed [1] - 2581:11
language [2] - 2576:19, 2611:19
last [11] - 2515:9, 2515:25, 2516:2, 2582:3, 2586:1, 2587:22, 2590:16, 2590:23, 2595:2, 2596:6, 2615:25
lasted [1] - 2525:24
late [1] - 2553:6
Law [16] - 2545:20, 2579:5, 2579:18, 2579:20, 2579:23, 2580:3, 2580:11, 2580:15, 2580:18, 2581:1, 2581:16, 2581:20, 2582:6, 2582:15, 2582:16, 2582:22
law [15] - 2548:2, 2557:6, 2591:1, 2603:21, 2604:6, 2604:15, 2605:2, 2605:6, 2605:18, 2606:14, 2606:16, 2607:13, 2609:2, 2609:23, 2613:7
law-abiding [3] - 2604:6, 2606:14, 2607:13
lawyer [1] - 2606:21
lawyers [4] - 2545:24, 2587:11, 2597:7, 2604:17
lay [1] - 2553:5
leading [1] - 2610:7
learned [1] - 2583:1

least [2] - 2540:14, 2616:24
leave [2] - 2584:7, 2585:4
left [5] - 2515:21, 2549:11, 2550:16, 2550:17, 2613:18
legal [6] - 2560:20, 2560:25, 2561:7, 2561:14, 2588:21, 2619:9
legally [1] - 2618:21
legs [1] - 2600:2
less [3] - 2526:1, 2604:21, 2608:3
letter [105] - 2526:5, 2526:9, 2526:12, 2526:16, 2526:17, 2526:20, 2526:24, 2527:4, 2527:22, 2543:13, 2543:25, 2544:8, 2544:14, 2544:17, 2544:20, 2544:24, 2545:7, 2545:14, 2546:8, 2546:10, 2546:16, 2549:3, 2549:7, 2549:11, 2549:23, 2549:24, 2550:12, 2550:14, 2550:16, 2550:18, 2551:4, 2553:25, 2555:13, 2560:21, 2560:22, 2560:25, 2561:5, 2561:8, 2561:9, 2561:17, 2561:19, 2561:21, 2561:23, 2562:4, 2563:10, 2563:14, 2563:25, 2564:3, 2564:4, 2564:13, 2564:14, 2564:23, 2565:2, 2567:1, 2567:4, 2567:8, 2567:13, 2567:15, 2567:17, 2570:1, 2570:23, 2571:1, 2571:4, 2571:13, 2572:11, 2572:23, 2575:25, 2576:2, 2576:4, 2577:11, 2578:3, 2579:4, 2579:8, 2579:10, 2579:18, 2580:5, 2580:8, 2580:9, 2580:10, 2581:11, 2584:14, 2584:17, 2584:19, 2585:14, 2585:21, 2586:16, 2586:20, 2587:7, 2587:14, 2588:13, 2588:18, 2589:17, 2590:16, 2590:22, 2606:23, 2606:25, 2611:6, 2611:12, 2617:16, 2618:13, 2618:14, 2618:19
letters [7] - 2553:10, 2553:19, 2560:16, 2561:12, 2562:1, 2562:13, 2582:18
Lewis [2] - 2610:8, 2611:21
liar [2] - 2546:21, 2548:23, 2550:5
lied [1] - 2611:6
life [3] - 2603:22, 2604:4, 2608:5
light [1] - 2618:15
likely [1] - 2568:23
limine [7] - 2602:9, 2603:5, 2612:8, 2612:10, 2612:20, 2612:21, 2613:3
limit [1] - 2612:19
limited [2] - 2553:14, 2598:5
limiting [1] - 2572:7
line [3] - 2528:18, 2528:24, 2534:16
lines [2] - 2532:8, 2532:10, 2534:14, 2534:17, 2535:3, 2535:14, 2538:15, 2613:4
list [4] - 2553:14, 2574:20, 2615:14, 2617:8
listed [3] - 2578:25, 2579:1, 2602:5
listening [2] - 2599:23, 2607:19
literal [1] - 2619:15
literally [3] - 2619:2, 2619:7, 2619:11
LLP [2] - 2512:20, 2512:24

2629

**located** [1] - 2520:13
**look** [23] - 2521:24, 2524:1, 2524:12, 2524:15, 2527:1, 2528:17, 2530:24, 2534:14, 2535:14, 2537:17, 2538:15, 2555:15, 2555:18, 2562:1, 2564:8, 2569:15, 2571:4, 2571:13, 2579:19, 2579:25, 2594:17, 2611:23, 2614:23
**looked** [9] - 2518:22, 2519:16, 2519:17, 2520:1, 2520:6, 2523:8, 2523:9, 2568:8, 2568:9
**looking** [6] - 2524:16, 2539:25, 2571:10, 2573:17, 2574:3, 2617:2
**looks** [1] - 2521:18
**Los** [6] - 2544:3, 2545:20, 2568:14, 2568:19, 2578:9, 2578:16
**lost** [1] - 2535:15
**loud** [1] - 2545:9
**lumped** [1] - 2550:21
**lying** [3] - 2547:6, 2551:20

## M

**ma'am** [2] - 2530:19, 2543:17
**mail** [3] - 2555:20, 2591:12, 2592:9
**mails** [4] - 2591:20, 2592:3, 2593:16
**main** [5] - 2528:3, 2528:15, 2529:1, 2529:5, 2529:16
**majority** [1] - 2528:6
**man** [1] - 2517:20
**March** [5] - 2528:8, 2598:4, 2598:6, 2598:12, 2598:25
**marching** [1] - 2588:2
**marked** [1] - 2590:15
**massaging** [1] - 2552:10
**matches** [1] - 2541:7
**material** [10] - 2547:9, 2547:13, 2547:24, 2548:18, 2551:7, 2553:11, 2617:24, 2618:4, 2618:5
**materiality** [1] - 2617:5
**materials** [3] - 2559:7, 2575:2, 2599:3
**Matilda** [2] - 2618:10, 2618:12
**matter** [12] - 2518:19, 2519:4, 2519:20, 2526:2, 2547:20, 2547:22, 2555:13, 2555:21, 2557:25, 2564:3, 2595:24, 2620:5
**mattered** [1] - 2593:11
**matters** [3] - 2515:5, 2554:13, 2610:14
**mccullough** [1] - 2525:6
**McCullough** [48] - 2512:17, 2519:9, 2519:21, 2519:23, 2520:3, 2522:13, 2522:15, 2523:5, 2524:9, 2524:14, 2529:9, 2530:9, 2531:1, 2531:6, 2531:18, 2532:11, 2533:10, 2534:18, 2534:25, 2536:23, 2541:6, 2546:12, 2546:22, 2554:9, 2554:12, 2556:6, 2557:9, 2561:13, 2570:5, 2574:11, 2575:21, 2578:11, 2578:22, 2579:24, 2580:20, 2581:23, 2586:24, 2587:19, 2588:4, 2588:6, 2592:6, 2592:23, 2593:19, 2593:22, 2595:6, 2595:18,

2596:5, 2596:20
**McCullough's** [2] - 2549:6, 2560:17
**MD** [1] - 2512:22
**mean** [13] - 2533:13, 2542:18, 2569:13, 2580:4, 2586:6, 2591:22, 2592:25, 2593:1, 2593:15, 2596:3, 2600:23, 2604:24, 2611:12
**meaning** [1] - 2539:1
**means** [2] - 2522:20, 2575:16
**meant** [4] - 2539:8, 2543:18, 2545:21, 2587:8
**meantime** [1] - 2599:4
**media** [52] - 2526:3, 2529:19, 2529:23, 2530:3, 2530:5, 2533:24, 2534:12, 2534:24, 2535:11, 2535:19, 2536:5, 2536:6, 2536:19, 2536:24, 2537:1, 2538:18, 2539:20, 2539:21, 2541:19, 2542:2, 2542:10, 2542:11, 2542:19, 2542:20, 2542:22, 2543:12, 2545:25, 2552:10, 2553:20, 2553:21, 2553:22, 2559:6, 2568:10, 2568:13, 2568:19, 2568:21, 2572:18, 2572:19, 2578:20, 2588:20, 2589:4, 2589:7, 2590:12, 2590:21
**meeting** [83] - 2517:7, 2517:11, 2517:15, 2517:20, 2518:7, 2518:8, 2518:12, 2518:15, 2518:18, 2518:24, 2519:3, 2521:13, 2521:18, 2525:23, 2526:2, 2526:15, 2527:19, 2527:20, 2527:21, 2527:24, 2528:1, 2528:5, 2528:16, 2529:17, 2529:18, 2529:20, 2529:21, 2530:1, 2530:7, 2533:20, 2533:23, 2534:2, 2540:18, 2540:21, 2541:3, 2543:5, 2543:7, 2543:11, 2543:12, 2545:11, 2545:13, 2546:10, 2546:18, 2547:21, 2548:6, 2549:4, 2549:7, 2549:9, 2549:12, 2549:22, 2550:4, 2550:13, 2550:17, 2551:5, 2553:4, 2554:2, 2554:5, 2554:17, 2554:19, 2554:21, 2559:12, 2586:20, 2587:7, 2587:14, 2589:16, 2589:21, 2590:10, 2590:18, 2590:19, 2590:20, 2592:7, 2592:8, 2592:10, 2592:17, 2593:24, 2594:7, 2594:15, 2594:23, 2595:15, 2618:19
**meetings** [2] - 2522:5, 2595:8
**members** [1] - 2555:6
**memo** [1] - 2610:6
**memorandum** [2] - 2518:7, 2590:18
**memory** [1] - 2592:7
**mentioned** [3] - 2572:4, 2592:13, 2609:2
**method** [1] - 2522:4
**mic** [1] - 2602:19
**middle** [1] - 2545:1
**might** [16] - 2515:15, 2515:17, 2527:10, 2535:21, 2548:1, 2548:2, 2548:8, 2550:24, 2566:16, 2582:1, 2598:13, 2599:11, 2613:8, 2618:10
**Miller** [2] - 2620:3, 2620:8

**MILLER** [2] - 2513:2, 2620:9
**mind** [7] - 2557:1, 2559:24, 2591:10, 2592:18, 2592:21, 2598:17, 2614:23
**Ministry** [19] - 2545:18, 2545:23, 2551:19, 2556:11, 2556:18, 2556:20, 2556:24, 2557:7, 2558:2, 2558:5, 2563:17, 2563:23, 2571:19, 2572:7, 2572:15, 2586:21, 2587:10, 2588:21, 2593:5
**minutes** [4] - 2525:25, 2599:12, 2599:15, 2607:21
**mischaracterization** [1] - 2546:5
**mischaracterizations** [27] - 2530:6, 2530:18, 2531:22, 2534:6, 2536:3, 2536:9, 2536:13, 2536:17, 2537:13, 2542:10, 2542:25, 2543:14, 2544:4, 2545:22, 2559:10, 2559:13, 2581:9, 2587:9, 2588:11, 2588:16, 2589:14, 2589:18, 2589:22, 2590:2, 2592:16, 2593:4, 2596:10
**mischaracterize** [1] - 2559:3
**misinformation** [1] - 2588:20
**misleading** [2] - 2618:4, 2619:6
**misrepresent** [1] - 2558:23
**missing** [1] - 2615:23
**MOJ** [2] - 2568:3, 2568:8
**Molly** [1] - 2512:14
**moment** [2] - 2523:11, 2557:20, 2596:25, 2613:9
**money** [1] - 2576:5
**moneys** [1] - 2577:14
**month** [1] - 2598:21
**months** [2] - 2567:1, 2598:6
**morning** [2] - 2597:17, 2600:1, 2600:19
**most** [2] - 2568:23, 2618:22
**motion** [14] - 2602:1, 2602:2, 2602:9, 2603:5, 2608:11, 2609:3, 2612:8, 2612:10, 2612:16, 2612:20, 2612:21, 2613:3, 2614:4
**motivated** [2] - 2585:6, 2586:23
**move** [6] - 2515:21, 2570:3, 2600:20, 2614:5, 2614:13, 2616:8
**moved** [2] - 2600:22, 2601:21
**moving** [5] - 2556:3, 2585:10, 2600:17, 2615:19, 2617:10
**MR** [225] - 2515:7, 2515:14, 2515:20, 2516:2, 2516:5, 2516:11, 2517:2, 2519:9, 2519:13, 2519:15, 2519:21, 2519:23, 2520:2, 2520:25, 2521:3, 2521:10, 2521:14, 2521:21, 2521:24, 2522:7, 2522:10, 2522:13, 2522:15, 2523:2, 2523:16, 2523:19, 2523:24, 2524:8, 2524:14, 2524:24, 2528:22, 2528:23, 2529:9, 2529:11, 2529:13, 2529:15, 2531:1, 2531:6, 2531:10, 2531:14, 2531:18, 2532:2, 2532:5, 2532:8, 2532:10, 2532:11, 2532:17, 2533:10, 2533:15, 2533:18, 2534:18, 2534:22, 2534:25, 2535:3, 2535:7,

2535:14, 2535:23, 2536:1, 2536:12,
2536:16, 2536:18, 2536:21, 2536:23,
2537:4, 2537:6, 2537:8, 2537:15,
2537:19, 2537:23, 2538:7, 2538:9,
2538:22, 2538:23, 2539:9, 2539:14,
2539:18, 2540:6, 2540:11, 2540:17,
2541:6, 2541:11, 2541:15, 2541:25,
2542:4, 2542:7, 2542:16, 2542:17,
2546:3, 2546:22, 2547:1, 2547:6,
2547:12, 2547:15, 2547:18, 2547:22,
2548:12, 2548:16, 2549:2, 2549:6,
2549:22, 2550:2, 2550:8, 2550:10,
2551:15, 2551:18, 2552:1, 2552:14,
2552:25, 2553:8, 2553:22, 2554:7,
2554:9, 2554:12, 2554:22, 2555:3,
2555:11, 2556:4, 2556:6, 2556:9,
2557:9, 2557:13, 2561:13, 2561:15,
2561:22, 2566:10, 2566:15, 2569:18,
2570:3, 2570:5, 2570:8, 2571:14,
2572:12, 2572:22, 2573:25, 2574:11,
2574:14, 2575:21, 2576:1, 2578:11,
2578:14, 2578:22, 2579:3, 2579:24,
2580:6, 2580:20, 2580:22, 2580:25,
2581:14, 2581:23, 2581:25, 2585:10,
2585:17, 2585:22, 2586:6, 2586:11,
2586:14, 2586:24, 2587:3, 2587:4,
2587:19, 2587:20, 2588:6, 2591:13,
2591:17, 2592:6, 2592:23, 2593:8,
2593:19, 2593:22, 2595:1, 2595:6,
2595:18, 2595:20, 2595:23, 2596:2,
2596:5, 2596:20, 2597:1, 2597:11,
2597:14, 2597:18, 2598:1, 2598:20,
2599:10, 2599:20, 2601:3, 2601:8,
2601:18, 2601:22, 2602:5, 2602:10,
2602:18, 2603:20, 2604:11, 2605:6,
2606:9, 2606:19, 2606:25, 2607:3,
2607:9, 2607:20, 2608:6, 2608:9,
2610:2, 2610:6, 2610:11, 2611:8,
2611:11, 2611:25, 2612:2, 2613:12,
2613:15, 2613:19, 2614:14, 2614:21,
2614:23, 2614:25, 2615:4, 2615:7,
2615:8, 2615:11, 2615:19, 2615:25,
2616:23, 2619:19
**MS** [7] - 2582:13, 2608:10, 2608:12,
2609:10, 2612:7, 2613:2, 2615:17
**Mudd** [3] - 2517:17, 2522:22, 2555:20
**Mudd's** [2] - 2522:23, 2522:24
**multiple** [2] - 2574:13, 2604:18
**MURPHY** [31] - 2549:2, 2549:6,
2549:22, 2550:2, 2550:10, 2554:7,
2602:5, 2603:20, 2604:11, 2605:6,
2606:9, 2606:19, 2606:25, 2607:3,
2607:9, 2607:20, 2608:6, 2608:9,
2610:2, 2610:6, 2610:11, 2611:8,
2611:11, 2611:25, 2612:2, 2613:12,
2613:15, 2613:19, 2614:23, 2615:4,
2615:7
**Murphy** [2] - 2512:20, 2608:23
**must** [2] - 2585:21, 2587:13

# N

**Name** [1] - 2517:3
**name** [4] - 2517:20, 2562:10, 2566:1,
2578:25
**named** [1] - 2594:24
**names** [2] - 2521:19, 2523:13
**National** [16] - 2545:19, 2579:5,
2579:18, 2579:20, 2579:23, 2580:3,
2580:11, 2580:14, 2580:17, 2581:1,
2581:16, 2581:20, 2582:6, 2582:15,
2582:16, 2582:22
**NATO** [1] - 2603:24
**nature** [2] - 2582:5, 2604:14
**necessarily** [1] - 2568:7
**necessary** [1] - 2602:21
**need** [26] - 2515:16, 2516:9, 2545:16,
2564:8, 2568:15, 2573:9, 2575:9,
2575:24, 2576:24, 2597:11, 2597:23,
2599:16, 2600:1, 2600:12, 2600:16,
2601:9, 2605:21, 2610:1, 2610:10,
2611:23, 2614:7, 2616:8, 2616:13,
2618:25, 2619:17
**needed** [6] - 2535:8, 2536:2, 2536:8,
2539:25, 2541:16, 2560:15
**needle** [1] - 2599:8
**needs** [2] - 2616:10, 2616:11
**nefarious** [1] - 2591:21
**never** [7] - 2556:23, 2558:19, 2570:22,
2574:1, 2592:3, 2593:17, 2612:21
**new** [1] - 2578:3
**New** [21] - 2543:9, 2545:20, 2579:5,
2580:11, 2580:14, 2582:25, 2583:1,
2583:3, 2583:6, 2583:12, 2583:23,
2584:11, 2584:15, 2584:18, 2585:15,
2585:17, 2587:16, 2587:18, 2593:11,
2594:24, 2595:10
**news** [3] - 2558:15, 2558:16, 2590:24
**newspapers** [2] - 2543:3, 2559:1
**next** [6] - 2527:22, 2540:4, 2565:12,
2572:9, 2572:10, 2600:21
**NGOs** [1] - 2603:22
**Ninth** [1] - 2610:12
**nobody** [2] - 2560:25, 2586:10
**non** [1] - 2554:18
**non-registration** [1] - 2554:18
**none** [1] - 2581:25
**normal** [1] - 2577:17
**norms** [1] - 2607:10
**note** [2] - 2613:2, 2614:6
**notebook** [3] - 2522:21, 2522:23,
2522:24
**notebooks** [2] - 2525:14, 2525:16
**notes** [41] - 2517:6, 2517:9, 2517:10,
2517:11, 2517:13, 2517:14, 2517:16,
2517:17, 2517:18, 2517:19, 2517:23,
2517:24, 2518:2, 2518:12, 2518:15,
2518:17, 2518:24, 2519:3, 2519:6,
2519:7, 2519:12, 2519:16, 2519:18,
2520:1, 2521:18, 2521:25, 2522:5,

2522:16, 2522:19, 2522:21, 2523:4,
2523:9, 2523:12, 2523:14, 2569:21,
2569:22, 2572:21, 2573:16, 2590:18,
2592:8
**nothing** [9] - 2522:2, 2536:23,
2554:10, 2559:21, 2560:5, 2561:11,
2566:18, 2587:20, 2599:23
**notice** [6] - 2611:22, 2616:9, 2616:13,
2616:16, 2616:21, 2617:9
**notify** [1] - 2614:7
**notwithstanding** [1] - 2592:15
**number** [10] - 2526:12, 2567:21,
2578:17, 2590:17, 2592:6, 2603:7,
2603:19, 2612:16, 2615:9, 2615:16
**numbered** [1] - 2567:6
**NW** [4] - 2512:15, 2512:18, 2512:24,
2513:3

# O

**oath** [1] - 2516:20
**object** [2] - 2532:19, 2586:24
**objected** [3] - 2539:22, 2595:2, 2595:3
**objection** [32] - 2519:9, 2519:21,
2524:14, 2529:9, 2531:1, 2531:5,
2534:18, 2534:25, 2538:3, 2538:24,
2546:22, 2549:18, 2551:13, 2556:5,
2557:9, 2561:13, 2570:4, 2570:5,
2574:11, 2575:21, 2578:11, 2578:22,
2579:24, 2580:20, 2581:23, 2587:19,
2591:13, 2591:16, 2595:1, 2598:7,
2607:8, 2612:22
**obligated** [1] - 2618:17
**obligation** [23] - 2548:3, 2553:12,
2554:18, 2554:24, 2557:1, 2557:2,
2558:17, 2559:25, 2560:9, 2560:16,
2560:21, 2561:1, 2561:8, 2561:12,
2561:17, 2576:25, 2577:10, 2577:12,
2579:16, 2589:11, 2591:9, 2596:19
**obviously** [3] - 2612:4, 2612:15,
2617:14
**occurred** [2] - 2598:5, 2604:25
**October** [18] - 2517:7, 2519:4,
2519:20, 2526:16, 2529:20, 2529:21,
2543:25, 2544:8, 2544:20, 2546:17,
2550:13, 2550:14, 2580:5, 2580:8,
2589:21, 2598:3, 2598:6, 2598:11
**OF** [6] - 2512:2, 2512:4, 2512:10,
2512:15, 2512:17, 2620:1
**offense** [1] - 2606:11
**offer** [2] - 2618:6, 2618:17
**offered** [4] - 2592:14, 2592:25, 2594:1,
2594:8
**Office** [1] - 2598:16
**office** [5] - 2518:16, 2520:4, 2525:7,
2525:9, 2525:13
**OFFICE** [1] - 2512:14
**offices** [2] - 2518:15, 2524:10
**OFFICIAL** [1] - 2620:1
**official** [1] - 2565:20

old [1] - 2603:20
omission [1] - 2618:5
omissions [2] - 2551:1, 2617:19
omitted [4] - 2547:9, 2550:20, 2617:25, 2618:12
once [2] - 2577:13, 2600:9
one [48] - 2515:21, 2516:17, 2519:22, 2522:2, 2526:7, 2526:25, 2527:9, 2529:5, 2529:17, 2535:13, 2535:22, 2537:16, 2544:5, 2544:11, 2546:4, 2549:18, 2552:6, 2552:7, 2553:2, 2553:8, 2554:2, 2560:1, 2560:20, 2561:4, 2563:21, 2568:15, 2570:15, 2579:1, 2586:8, 2586:19, 2588:15, 2589:5, 2591:17, 2591:24, 2595:20, 2595:21, 2596:10, 2596:13, 2596:15, 2596:16, 2598:1, 2598:8, 2604:18, 2613:19, 2616:1
one-on-one [1] - 2560:1
ones [5] - 2538:8, 2551:17, 2599:1, 2599:2, 2617:14
open [10] - 2523:21, 2524:7, 2533:17, 2541:10, 2555:5, 2568:17, 2586:13, 2593:21, 2599:21, 2604:23
open-ended [1] - 2523:21
opening [1] - 2551:22
opinion [9] - 2549:24, 2605:16, 2606:7, 2606:14, 2610:17, 2610:21, 2610:25, 2611:7, 2611:20
opinions [1] - 2604:5
opportunity [5] - 2522:17, 2553:13, 2591:19, 2592:18, 2615:22
oppose [1] - 2602:11
opposed [4] - 2540:16, 2586:3, 2592:25, 2617:16
oral [4] - 2566:3, 2566:4, 2566:12, 2566:18
order [12] - 2533:25, 2534:8, 2542:13, 2543:15, 2559:8, 2574:6, 2575:17, 2590:4, 2591:7, 2596:11, 2596:17
orders [1] - 2588:3
organizations [1] - 2604:1
original [3] - 2615:2, 2615:5, 2615:6
originals [3] - 2614:15, 2614:19, 2615:19
ought [1] - 2606:7
outlets [1] - 2568:10
outside [2] - 2597:19, 2597:24
outstanding [1] - 2616:3
own [4] - 2533:24, 2534:7, 2590:5, 2596:10
ownership [2] - 2562:21, 2564:6

## P

P.M [1] - 2515:2
p.m [1] - 2614:2
page [28] - 2521:23, 2522:3, 2522:4, 2523:12, 2524:12, 2524:13, 2524:16, 2525:6, 2528:18, 2530:25, 2532:5,

2532:8, 2534:14, 2535:2, 2535:3, 2537:18, 2538:10, 2538:14, 2539:10, 2540:4, 2544:19, 2565:12, 2570:9, 2572:9, 2572:11, 2573:7, 2573:10, 2611:22
PAGE [1] - 2514:11
pages [2] - 2532:12, 2538:25
paid [5] - 2559:2, 2565:24, 2577:3, 2577:7, 2589:9
paper [1] - 2522:9
papers [1] - 2603:2
paragraph [16] - 2527:2, 2527:3, 2527:5, 2527:7, 2545:1, 2556:14, 2564:12, 2564:17, 2564:23, 2566:3, 2584:6, 2587:6, 2588:8, 2590:16, 2590:23
paraphrasing [3] - 2576:10, 2576:11, 2576:15
pardon [2] - 2529:13, 2566:10
Parfitt [6] - 2551:19, 2551:24, 2551:25, 2552:3, 2552:4, 2552:5
part [9] - 2536:3, 2539:11, 2551:11, 2553:25, 2554:3, 2554:17, 2598:14, 2598:19, 2601:23
particular [6] - 2518:19, 2535:5, 2535:12, 2560:22, 2562:17, 2575:10
particularly [1] - 2603:13
parties [1] - 2616:6
parts [1] - 2608:5
party [3] - 2576:3, 2576:23, 2578:1
pass [1] - 2558:19
past [2] - 2523:5, 2603:15
PATRICIA [2] - 2513:2, 2620:9
Patricia [2] - 2620:3, 2620:8
Paula [1] - 2512:23
Pause [2] - 2532:7, 2614:11
pay [2] - 2566:9, 2566:13
payments [2] - 2565:8, 2565:15
payor [3] - 2576:3, 2576:23, 2578:1
pending [1] - 2549:17
Pennsylvania [1] - 2512:18
people [17] - 2521:19, 2523:13, 2525:9, 2525:13, 2525:16, 2528:4, 2537:3, 2561:5, 2563:12, 2574:19, 2575:23, 2575:25, 2589:24, 2602:17, 2604:14, 2608:20
perhaps [3] - 2577:6, 2577:18, 2577:19
period [2] - 2609:17, 2609:18
permitted [2] - 2525:9, 2525:13
person [15] - 2519:11, 2528:3, 2528:16, 2529:1, 2557:4, 2568:17, 2576:4, 2579:14, 2582:9, 2582:12, 2606:6, 2606:12, 2610:23
personal [1] - 2525:18
perspective [2] - 2603:12, 2605:11
phone [3] - 2551:24, 2563:3, 2600:2
phrased [1] - 2538:1
phraseology [1] - 2585:19
pick [1] - 2539:11

picking [1] - 2563:3
piece [1] - 2539:24
pieces [2] - 2522:9, 2546:4
pin [1] - 2619:9
place [3] - 2535:15, 2549:13, 2551:6, 2562:15, 2598:4
planned [1] - 2613:3
planning [1] - 2521:2
play [2] - 2604:10, 2605:12
pleading [1] - 2617:9
pleadings [1] - 2619:10
plenty [1] - 2607:12
plug [1] - 2562:10
point [25] - 2523:17, 2532:1, 2538:2, 2547:1, 2547:3, 2552:24, 2557:5, 2568:13, 2578:25, 2579:13, 2582:3, 2583:7, 2585:13, 2592:12, 2593:10, 2599:6, 2599:7, 2600:6, 2603:10, 2603:12, 2607:16, 2609:7, 2612:25, 2613:10
pointed [1] - 2533:11
pointing [3] - 2547:25, 2548:20, 2585:22
points [2] - 2617:6, 2617:7
policy [1] - 2603:23
political [9] - 2527:16, 2545:21, 2545:25, 2546:7, 2566:23, 2572:4, 2582:16, 2587:8, 2587:12
politically [2] - 2585:5, 2586:23
popped [1] - 2574:19
posing [1] - 2554:12
position [8] - 2546:17, 2547:23, 2548:17, 2550:15, 2551:7, 2602:8, 2616:5, 2618:2
positive [1] - 2547:2
possible [5] - 2560:9, 2560:16, 2560:21, 2561:8, 2561:12, 2561:16, 2562:19, 2569:1
possibly [2] - 2587:25, 2619:6
post [1] - 2618:18
post-decision [1] - 2618:18
potential [2] - 2515:9, 2609:8
potentially [2] - 2569:25, 2603:25
PR [4] - 2550:4, 2550:11, 2553:15, 2571:22
practice [1] - 2603:22
practiced [1] - 2604:15
practicing [1] - 2603:21
Pratt [1] - 2512:21
precisely [1] - 2561:20
predicate [3] - 2540:14, 2541:7, 2553:5
preliminary [1] - 2515:5
prepared [2] - 2545:14, 2599:7
preregistration [1] - 2618:7
presence [2] - 2597:20, 2597:24
present [5] - 2515:3, 2516:15, 2528:7, 2600:14, 2601:15
press [24] - 2530:20, 2534:7, 2542:11,

2632

2542:15, 2551:20, 2552:23, 2557:8,
2558:18, 2558:19, 2558:20, 2560:4,
2563:17, 2563:19, 2563:20, 2563:23,
2579:12, 2582:11, 2589:14, 2589:18,
2590:3, 2590:8, 2593:6, 2596:17
  **presumably** [1] - 2612:12
  **presumption** [1] - 2605:13
  **pretty** [10] - 2541:1, 2553:14, 2562:11,
2572:20, 2593:1, 2603:3, 2605:18,
2607:15, 2608:1, 2609:21
  **previously** [1] - 2538:13
  **primarily** [1] - 2591:21
  **principal** [3] - 2562:20, 2577:6, 2591:9
  **private** [8] - 2565:23, 2565:25, 2566:1,
2566:12, 2566:19, 2566:20, 2589:9,
2603:22
  **proactive** [15] - 2530:22, 2530:23,
2531:15, 2531:20, 2532:15, 2532:25,
2533:5, 2533:7, 2533:14, 2533:21,
2534:3, 2534:9, 2536:3, 2593:8
  **proactively** [3] - 2531:22, 2534:5,
2534:7
  **probe** [1] - 2608:24
  **problem** [5] - 2521:17, 2522:1,
2537:11, 2538:4, 2540:9
  **procedure** [2] - 2518:11, 2518:14
  **proceedings** [1] - 2620:5
  **Proceedings** [2] - 2513:5, 2619:25
  **process** [1] - 2612:13
  **produce** [2] - 2519:19, 2523:4
  **produced** [7] - 2513:5, 2521:14,
2522:7, 2522:19, 2570:17, 2598:24,
2599:3
  **product** [2] - 2589:23, 2590:6
  **production** [5] - 2522:15, 2570:12,
2570:20, 2571:8, 2572:24
  **professional** [2] - 2607:10, 2607:11
  **professionalism** [7] - 2604:6,
2604:10, 2604:11, 2604:16, 2605:3,
2605:25, 2606:17
  **promote** [1] - 2560:6
  **promoting** [2] - 2559:22, 2575:8
  **proper** [3] - 2602:14, 2603:1, 2608:16
  **proposal** [1] - 2565:21
  **proposed** [3] - 2564:25, 2565:5,
2616:6
  **prosecution** [11] - 2545:24, 2545:25,
2546:6, 2546:7, 2585:5, 2586:22,
2587:11, 2587:12, 2605:13, 2610:16,
2611:14
  **prosecutorial** [1] - 2605:12
  **prove** [1] - 2591:20
  **proved** [1] - 2617:24
  **provide** [4] - 2594:1, 2609:11, 2612:9,
2616:6
  **provided** [5] - 2536:4, 2543:3,
2584:25, 2591:23, 2609:23
  **providing** [1] - 2608:15
  **public** [7] - 2551:23, 2562:17,
2562:18, 2574:23, 2593:12, 2603:22,

2606:2
  **public-spiritedness** [1] - 2606:2
  **publications** [1] - 2539:5
  **publicly** [1] - 2593:13
  **Pugh** [2] - 2517:11, 2517:13
  **pull** [1] - 2578:5
  **purportedly** [1] - 2619:13
  **purpose** [3] - 2530:16, 2530:17,
2616:14
  **purposes** [4] - 2601:5, 2602:22,
2616:8, 2616:23
  **put** [18] - 2518:20, 2518:21, 2521:5,
2525:10, 2525:18, 2526:11, 2541:2,
2556:7, 2564:15, 2583:12, 2591:11,
2591:20, 2596:24, 2598:7, 2604:24,
2607:21, 2609:14, 2614:8
  **puts** [1] - 2533:8
  **putting** [1] - 2548:4

## Q

  **qualities** [1] - 2604:6
  **questioned** [1] - 2549:11
  **questioning** [2] - 2530:9, 2615:16
  **questions** [67] - 2517:4, 2528:13,
2537:16, 2543:5, 2543:10, 2546:12,
2549:6, 2550:11, 2551:15, 2553:1,
2554:9, 2554:12, 2554:14, 2557:24,
2558:18, 2560:13, 2561:9, 2562:8,
2562:13, 2563:9, 2563:14, 2564:2,
2564:5, 2567:4, 2567:6, 2567:7,
2567:17, 2568:22, 2568:25, 2569:1,
2569:4, 2569:8, 2569:25, 2570:15,
2570:25, 2571:2, 2571:9, 2571:22,
2572:10, 2573:4, 2573:6, 2578:8,
2578:9, 2580:23, 2584:21, 2585:23,
2586:6, 2588:10, 2590:17, 2591:18,
2591:23, 2592:7, 2595:2, 2595:17,
2596:20, 2598:5, 2598:8, 2602:15,
2603:1, 2603:3, 2603:15, 2610:1,
2612:5, 2613:16, 2618:14, 2619:12
  **quickly** [1] - 2515:7
  **quite** [2] - 2538:1, 2540:13
  **quote** [7] - 2537:8, 2584:6, 2584:10,
2584:15, 2584:18, 2585:4, 2587:16
  **quoted** [1] - 2611:19
  **quotes** [1] - 2552:5
  **quoting** [1] - 2544:12

## R

  **raise** [3] - 2558:18, 2568:15, 2598:9
  **raised** [8] - 2526:6, 2556:25, 2557:3,
2557:5, 2559:24, 2560:8, 2560:13,
2592:12
  **rather** [1] - 2612:23
  **re** [1] - 2613:20
  **re-call** [1] - 2613:20
  **reach** [3] - 2577:17, 2579:10, 2590:3
  **reached** [8] - 2538:13, 2538:18,

2590:1, 2592:14, 2593:11, 2593:25,
2594:8
  **reaching** [3] - 2531:22, 2588:15,
2589:21
  **reactive** [4] - 2531:20, 2593:3
  **read** [30] - 2515:22, 2528:20, 2539:13,
2540:8, 2541:11, 2541:14, 2541:24,
2545:9, 2556:16, 2558:18, 2566:16,
2568:23, 2570:13, 2572:2, 2573:20,
2580:14, 2582:11, 2583:6, 2583:11,
2600:24, 2601:20, 2610:4, 2611:21,
2611:24, 2612:23, 2613:1, 2614:18,
2615:20, 2616:2, 2619:6
  **reading** [1] - 2582:14
  **ready** [1] - 2601:10
  **realize** [1] - 2605:25
  **realized** [1] - 2519:2
  **really** [6] - 2579:13, 2582:10, 2602:13,
2604:25
  **reason** [12] - 2523:22, 2548:5,
2548:10, 2554:16, 2562:14, 2574:9,
2587:17, 2589:17, 2599:25, 2600:18,
2607:4
  **reasons** [8] - 2526:21, 2526:25,
2527:9, 2548:8, 2588:15, 2592:16,
2595:2, 2598:24
  **receive** [1] - 2560:22
  **received** [2] - 2577:13, 2588:20
  **receives** [1] - 2560:25
  **recent** [1] - 2545:13
  **recess** [1] - 2587:25
  **Recess** [1] - 2601:14
  **recite** [1] - 2527:25
  **recognize** [1] - 2615:4
  **recollection** [3] - 2524:17, 2524:20,
2587:1
  **record** [15] - 2522:21, 2531:23,
2540:6, 2540:22, 2541:14, 2541:24,
2590:1, 2590:6, 2590:23, 2600:16,
2601:4, 2603:17, 2614:18, 2616:17,
2620:4
  **records** [6] - 2518:16, 2518:17,
2518:20, 2523:4, 2525:10, 2525:14
  **RECROSS** [2] - 2514:4, 2595:22
  **RECROSS-EXAMINATION** [1] -
2595:22
  **redirect** [5] - 2552:12, 2587:24,
2587:25, 2591:19, 2599:3
  **REDIRECT** [3] - 2514:4, 2588:5,
2596:4
  **refer** [6] - 2526:9, 2526:23, 2555:25,
2556:12, 2557:5, 2562:16
  **reference** [4] - 2532:5, 2535:18,
2557:22, 2565:10
  **referenced** [1] - 2616:19
  **referred** [8] - 2530:8, 2544:8, 2556:17,
2563:24, 2564:24, 2579:17, 2587:6,
2605:11
  **referring** [6] - 2520:16, 2543:23,
2565:11, 2569:14, 2583:20, 2584:20

2633

**refers** [2] - 2556:10, 2571:16
**reflect** [1] - 2590:19
**refresh** [2] - 2524:16, 2524:20
**refused** [3] - 2552:17, 2552:18, 2616:7
**refute** [1] - 2554:2
**regard** [1] - 2582:25
**regarding** [1] - 2616:3
**regardless** [3] - 2559:8, 2582:20, 2582:21
**register** [10] - 2526:21, 2527:10, 2559:25, 2560:9, 2575:24, 2577:3, 2577:18, 2577:19, 2582:17, 2588:25
**registered** [3] - 2571:23, 2574:21, 2575:24
**registrant** [1] - 2577:14
**Registration** [1] - 2566:24
**registration** [24] - 2548:19, 2548:23, 2554:18, 2557:1, 2557:2, 2558:17, 2560:15, 2574:19, 2575:11, 2575:16, 2576:25, 2577:1, 2577:10, 2577:12, 2577:13, 2577:20, 2579:15, 2582:19, 2589:11, 2591:9, 2596:13, 2596:15, 2596:16, 2596:18
**regular** [1] - 2562:23
**regulations** [2] - 2561:16, 2569:7
**relate** [2] - 2553:15, 2610:18
**related** [5] - 2518:19, 2542:12, 2554:13, 2577:15, 2578:20
**relating** [2] - 2520:6, 2565:20
**relations** [1] - 2574:23
**relationship** [1] - 2535:19
**release** [11] - 2536:10, 2557:8, 2563:18, 2563:19, 2563:20, 2563:23, 2567:22, 2571:10, 2571:16, 2573:12, 2578:18
**released** [5] - 2538:14, 2571:18, 2572:15, 2583:17, 2583:25
**relevance** [5] - 2522:24, 2546:25, 2549:16, 2549:19, 2591:4
**relevant** [14] - 2522:10, 2523:4, 2523:6, 2523:17, 2547:21, 2547:24, 2553:11, 2558:24, 2559:4, 2559:6, 2594:19, 2599:4, 2609:18
**remember** [19] - 2530:21, 2531:10, 2531:11, 2531:12, 2531:15, 2533:12, 2536:6, 2540:7, 2544:2, 2546:14, 2555:12, 2557:14, 2557:19, 2564:10, 2564:18, 2576:19, 2578:4, 2601:11, 2609:14
**remembered** [1] - 2592:11
**remembers** [4] - 2540:21, 2540:22, 2540:24, 2592:13
**remind** [1] - 2516:19
**rendered** [1] - 2618:3
**repeat** [11] - 2518:13, 2525:12, 2526:14, 2529:24, 2558:25, 2559:17, 2565:13, 2581:13, 2584:16, 2590:9, 2595:5
**repeated** [1] - 2549:8
**repetitive** [1] - 2602:23

**rephrase** [2] - 2519:13, 2533:15
**rephrased** [1] - 2540:1
**report** [91] - 2526:7, 2527:1, 2527:11, 2534:12, 2534:24, 2535:12, 2535:19, 2536:4, 2536:7, 2536:10, 2536:14, 2536:20, 2536:24, 2537:14, 2538:6, 2538:13, 2539:21, 2541:20, 2542:2, 2542:21, 2543:3, 2544:6, 2545:14, 2545:22, 2546:1, 2546:6, 2548:9, 2550:11, 2551:9, 2551:20, 2551:23, 2552:16, 2552:20, 2553:4, 2553:24, 2554:5, 2554:8, 2558:6, 2558:13, 2558:22, 2558:23, 2559:2, 2559:4, 2559:18, 2559:22, 2560:6, 2563:14, 2565:24, 2566:22, 2567:22, 2568:1, 2568:11, 2570:11, 2570:12, 2570:16, 2570:19, 2571:8, 2571:16, 2571:18, 2571:20, 2572:8, 2572:14, 2572:24, 2573:6, 2573:13, 2573:21, 2574:2, 2574:4, 2574:5, 2575:20, 2577:14, 2578:16, 2578:18, 2580:18, 2581:2, 2583:17, 2583:24, 2585:1, 2586:22, 2587:9, 2589:4, 2589:6, 2589:9, 2589:23, 2592:15, 2593:12, 2594:1, 2594:9, 2594:17, 2618:9, 2618:11
**Report** [4] - 2559:15, 2574:24, 2575:3, 2575:8
**reported** [13] - 2513:5, 2530:7, 2530:20, 2534:6, 2538:19, 2542:11, 2543:14, 2558:19, 2558:21, 2560:4, 2568:11, 2589:19, 2593:5
**REPORTER** [1] - 2620:1
**reporter** [5] - 2540:7, 2541:11, 2543:9, 2581:6, 2594:24
**Reporter** [1] - 2513:2
**reporters** [9] - 2530:16, 2530:17, 2533:21, 2537:14, 2538:5, 2543:6, 2543:20, 2583:17, 2583:24
**reporting** [2] - 2544:5, 2588:20, 2589:24
**reports** [1] - 2590:25
**representations** [1] - 2589:16
**representatives** [2] - 2560:2, 2588:19
**represents** [1] - 2584:10
**reputation** [10] - 2605:17, 2608:18, 2608:25, 2609:6, 2609:16, 2609:17, 2609:18, 2609:20, 2610:18, 2610:20
**request** [13] - 2533:25, 2534:8, 2542:13, 2543:15, 2546:17, 2559:8, 2565:4, 2574:6, 2575:17, 2590:4, 2591:7, 2596:11, 2596:17
**requested** [1] - 2549:3
**requests** [1] - 2542:20
**require** [7] - 2560:15, 2561:7, 2561:10, 2575:16, 2582:19, 2596:13, 2608:2
**required** [4] - 2525:20, 2557:2, 2569:7, 2577:14
**requirement** [1] - 2561:15
**requirements** [2] - 2572:1, 2572:3
**requires** [3] - 2596:15, 2596:16,

2609:24
**requiring** [2] - 2575:11, 2582:17
**research** [1] - 2600:11
**reserve** [1] - 2602:2
**respect** [5] - 2547:13, 2551:2, 2551:9, 2603:7, 2617:25
**respectfully** [1] - 2576:7
**respond** [9] - 2560:21, 2560:23, 2561:1, 2561:2, 2561:3, 2561:8, 2561:10, 2561:23, 2576:21
**responded** [1] - 2619:13
**responding** [2] - 2531:20, 2590:24
**response** [12] - 2531:22, 2560:17, 2560:23, 2565:4, 2567:12, 2567:19, 2579:19, 2608:22, 2609:3, 2612:10, 2613:6, 2618:7
**responses** [2] - 2562:2, 2618:18
**responsive** [5] - 2549:20, 2618:2, 2618:10, 2618:13, 2619:12
**rest** [7] - 2515:23, 2521:15, 2521:17, 2523:13, 2534:21, 2566:16, 2599:13
**restrict** [1] - 2604:21
**restrictions** [1] - 2569:4
**result** [1] - 2520:14
**resume** [2] - 2516:19, 2614:3
**retired** [1] - 2518:5
**reversal** [1] - 2589:13
**reverse** [1] - 2589:12
**review** [1] - 2615:23
**reviews** [1] - 2538:10
**rights** [4] - 2603:23, 2603:25, 2604:2, 2606:4
**risk** [2] - 2603:13, 2607:18
**RMR** [1] - 2513:2
**Rohde** [2] - 2588:7, 2591:11
**role** [1] - 2529:18
**rollout** [1] - 2552:10
**Room** [1] - 2513:2
**room** [2] - 2597:23, 2600:4
**Rule** [5] - 2601:5, 2614:1, 2616:8, 2616:14, 2616:24
**rule** [4] - 2598:10, 2607:1, 2607:2, 2607:6
**ruled** [1] - 2603:1
**rules** [7] - 2532:21, 2532:22, 2569:7, 2605:21, 2609:10, 2609:11, 2610:22
**Rules** [1] - 2603:4
**run** [3] - 2580:18, 2581:2, 2581:16

## S

**safeguards** [1] - 2572:6
**Sanchez** [1] - 2512:13
**SANCHEZ** [36] - 2515:7, 2515:14, 2515:20, 2516:2, 2516:5, 2537:15, 2537:23, 2538:8, 2538:23, 2539:9, 2539:14, 2539:18, 2540:11, 2597:1, 2597:11, 2597:14, 2597:18, 2598:1, 2598:20, 2599:10, 2599:20, 2601:3, 2601:8, 2601:18, 2601:22, 2602:10,

2634

2602:18, 2614:14, 2614:21, 2614:25, 2615:8, 2615:11, 2615:19, 2615:25, 2616:23, 2619:19

**Sanger** [11] - 2548:9, 2548:11, 2585:1, 2585:2, 2593:25, 2594:8, 2594:16, 2594:17, 2595:9, 2595:25, 2596:6

**sanger** [1] - 2592:14

**saved** [1] - 2522:20

**saw** [3] - 2557:23, 2580:19, 2600:22

**scenario** [1] - 2598:23

**scheduling** [1] - 2599:23

**scheme** [1] - 2617:20

**scope** [5] - 2591:13, 2591:17, 2591:21, 2608:16, 2613:21

**screen** [2] - 2521:5, 2556:7

**search** [2] - 2520:14, 2523:3

**Second** [1] - 2610:11

**second** [13] - 2527:3, 2527:15, 2553:8, 2570:9, 2570:19, 2570:20, 2570:22, 2573:10, 2573:18, 2588:8, 2598:4, 2598:9, 2618:14

**section** [1] - 2531:18

**see** [32] - 2521:1, 2521:4, 2528:24, 2529:2, 2529:6, 2532:25, 2533:1, 2535:18, 2545:2, 2549:20, 2556:1, 2557:16, 2557:22, 2558:1, 2558:4, 2564:25, 2569:19, 2572:10, 2573:18, 2574:3, 2574:17, 2577:16, 2583:12, 2583:16, 2583:21, 2583:22, 2584:8, 2584:12, 2584:24, 2585:7, 2593:13, 2599:4

**seeded** [1] - 2603:16

**seeing** [2] - 2535:12, 2555:12

**seeking** [1] - 2521:21

**seem** [1] - 2539:6

**select** [1] - 2539:1

**selectively** [1] - 2539:11

**send** [5] - 2564:1, 2564:3, 2564:4, 2579:8, 2610:6

**sending** [1] - 2552:5

**sense** [7] - 2530:23, 2534:9, 2559:10, 2562:16, 2608:21, 2613:23, 2614:2

**sent** [5] - 2562:1, 2562:5, 2567:1, 2571:1, 2588:14

**sentence** [2] - 2536:10, 2570:20

**separate** [2] - 2594:24, 2608:7

**September** [10] - 2526:5, 2526:6, 2526:13, 2526:17, 2526:20, 2549:25, 2550:12, 2583:10, 2588:14, 2588:24

**sequencing** [1] - 2539:24

**series** [2] - 2551:15, 2588:9

**serving** [1] - 2591:3

**Session** [1] - 2512:6

**session** [1] - 2528:7

**SESSION** [2] - 2512:10, 2515:1

**set** [1] - 2590:6

**seven** [9] - 2567:4, 2567:6, 2567:7, 2567:17, 2568:22, 2571:9, 2573:5, 2578:8, 2618:14

**several** [2] - 2554:7, 2580:23

**short** [3] - 2515:12, 2599:11, 2610:6

**shorthand** [1] - 2513:5

**shortly** [1] - 2600:11

**shoulder** [1] - 2614:24

**show** [16] - 2520:13, 2520:15, 2520:17, 2522:23, 2524:3, 2524:10, 2526:9, 2544:11, 2544:18, 2544:25, 2556:12, 2557:17, 2565:10, 2583:19, 2584:19, 2593:15

**showed** [3] - 2524:17, 2525:1, 2587:16

**showing** [5] - 2522:25, 2524:22, 2588:13, 2590:15, 2592:3

**shown** [2] - 2523:22, 2586:17

**shows** [1] - 2591:25

**Shpenov** [1] - 2575:1

**side** [3] - 2528:16, 2529:2, 2617:2

**signed** [1] - 2545:6

**simply** [2] - 2591:18, 2598:10

**sitting** [1] - 2599:22

**six** [2] - 2567:6, 2598:21

**Skadden** [31] - 2527:10, 2528:4, 2528:16, 2529:2, 2549:23, 2555:13, 2559:15, 2560:1, 2560:2, 2560:12, 2561:23, 2562:25, 2564:5, 2570:12, 2570:19, 2571:8, 2572:24, 2573:6, 2573:20, 2574:1, 2574:3, 2574:5, 2574:10, 2574:24, 2575:3, 2575:4, 2575:8, 2575:14, 2575:15, 2577:8, 2598:23

**Skadden's** [5] - 2562:21, 2564:8, 2570:10, 2570:16, 2571:24

**slice** [1] - 2539:1

**slightly** [1] - 2537:10

**Sloan** [3] - 2580:19, 2581:5, 2613:20

**slowly** [1] - 2545:12

**so-called** [1] - 2606:22

**someone** [6] - 2577:3, 2582:6, 2582:7, 2610:16, 2611:21, 2619:6

**sometimes** [1] - 2555:9

**somewhere** [2] - 2525:25, 2589:25

**sorry** [11] - 2532:9, 2535:9, 2535:14, 2541:17, 2545:16, 2571:12, 2573:9, 2580:7, 2598:6, 2602:18, 2612:7

**sorts** [1] - 2598:24

**sound** [1] - 2537:1

**source** [4] - 2562:17, 2562:18, 2580:2, 2618:6

**SPAEDER** [2] - 2512:20, 2512:24

**speaking** [2] - 2526:24, 2536:6

**speaks** [1] - 2536:5

**Special** [1] - 2598:16

**specific** [3] - 2544:7, 2609:8, 2618:23

**specifically** [2] - 2573:3, 2610:13

**Spiegel** [1] - 2554:7

**spiritedness** [1] - 2606:2

**staff** [3] - 2518:8, 2569:1, 2569:2

**stage** [1] - 2617:2

**stake** [1] - 2541:1

**stand** [2] - 2516:19, 2612:21

**standards** [1] - 2607:11

**stands** [1] - 2606:4

**start** [4] - 2521:19, 2605:3, 2612:13, 2612:23

**started** [2] - 2541:22, 2559:25

**state** [1] - 2598:16

**statement** [24] - 2531:17, 2532:22, 2537:21, 2548:2, 2555:25, 2556:10, 2556:12, 2556:18, 2556:20, 2556:23, 2585:12, 2585:15, 2585:16, 2585:17, 2585:20, 2586:2, 2590:19, 2591:10, 2617:9, 2617:16, 2617:17, 2617:21, 2618:3, 2619:2

**statements** [19] - 2540:19, 2540:20, 2541:2, 2579:18, 2579:22, 2580:5, 2580:11, 2585:1, 2588:10, 2591:23, 2598:25, 2605:2, 2617:13, 2617:18, 2619:4, 2619:5, 2619:11, 2619:14

**states** [2] - 2527:5

**STATES** [3] - 2512:2, 2512:4, 2512:11

**States** [5] - 2523:3, 2527:13, 2558:9, 2572:8, 2574:6

**statute** [5] - 2561:18, 2591:6, 2616:9, 2616:16, 2616:19

**stay** [1] - 2603:19

**stayed** [1] - 2553:16

**stenotype** [1] - 2513:5

**step** [1] - 2597:2

**stick** [1] - 2606:7

**still** [8] - 2516:5, 2516:20, 2540:1, 2542:6, 2597:17, 2599:10, 2601:1, 2616:2

**stipulation** [4] - 2515:21, 2600:23, 2601:20, 2616:1

**stop** [2] - 2586:10, 2586:11

**stopping** [1] - 2586:8

**store** [2] - 2525:14, 2525:20

**storing** [2] - 2518:12, 2518:14

**story** [1] - 2539:12

**straight** [2] - 2540:12, 2590:6

**strategic** [1] - 2603:12

**Street** [3] - 2512:15, 2512:21, 2512:24

**stressed** [1] - 2552:20

**stretch** [1] - 2600:2

**strongly** [1] - 2605:18

**stuck** [2] - 2592:17, 2592:21

**stuff** [1] - 2619:22

**subject** [7] - 2526:2, 2526:15, 2526:18, 2526:19, 2554:13, 2555:13, 2557:23

**submitted** [2] - 2600:10, 2603:2

**subsequent** [1] - 2549:23

**substance** [3] - 2529:23, 2529:25, 2582:5

**substantially** [1] - 2617:6

**such-and-such** [1] - 2611:7

**sufficiency** [1] - 2617:7

**sufficient** [2] - 2568:16, 2618:22

**suggest** [4] - 2539:15, 2551:4, 2553:24, 2611:15

2635

**suggested** [3] - 2559:21, 2560:5, 2586:4

**suggesting** [5] - 2522:5, 2538:11, 2538:24, 2539:2, 2585:20

**suggestions** [1] - 2604:13

**suggests** [1] - 2585:15

**Suite** [2] - 2512:21, 2512:25

**sum** [1] - 2595:16

**summarize** [1] - 2546:17

**summary** [3] - 2549:3, 2575:3, 2617:11

**summer** [1] - 2523:5

**support** [2] - 2552:8, 2619:4

**suppose** [1] - 2563:13

**supposedly** [1] - 2550:1

**sustain** [2] - 2519:10, 2549:17

**sustained** [4] - 2550:11, 2551:14, 2587:21, 2607:8

**sworn** [1] - 2516:23

**system** [3] - 2518:16, 2518:17, 2518:20

## T

**tag** [1] - 2615:7

**tagged** [1] - 2615:8

**tailor** [2] - 2562:13, 2562:16

**takeaway** [9] - 2527:21, 2532:16, 2533:20, 2533:23, 2534:1, 2534:4, 2541:4, 2543:12, 2559:11

**targeted** [1] - 2608:4

**Tauzin** [1] - 2574:17

**TAYLOR** [118] - 2516:11, 2517:2, 2519:13, 2519:15, 2520:2, 2520:25, 2521:3, 2521:10, 2521:14, 2521:21, 2521:24, 2522:7, 2522:10, 2523:2, 2523:16, 2523:19, 2523:24, 2524:8, 2524:24, 2528:22, 2528:23, 2529:11, 2529:13, 2529:15, 2531:10, 2531:14, 2532:2, 2532:5, 2532:8, 2532:10, 2532:17, 2533:15, 2533:18, 2534:22, 2535:3, 2535:7, 2535:14, 2535:23, 2536:1, 2536:12, 2536:16, 2536:18, 2536:21, 2537:4, 2537:6, 2537:8, 2537:19, 2538:7, 2538:22, 2540:6, 2540:17, 2541:11, 2541:15, 2541:25, 2542:4, 2542:7, 2542:16, 2542:17, 2546:3, 2547:1, 2547:6, 2547:12, 2547:15, 2547:18, 2547:22, 2548:12, 2548:16, 2550:8, 2551:15, 2551:18, 2552:1, 2552:14, 2552:25, 2553:8, 2553:22, 2554:22, 2555:3, 2555:11, 2556:4, 2556:9, 2557:13, 2561:15, 2561:22, 2566:10, 2566:15, 2569:18, 2570:3, 2570:8, 2571:14, 2572:12, 2572:22, 2573:25, 2574:14, 2576:1, 2578:14, 2579:3, 2580:6, 2580:22, 2580:25, 2581:14, 2581:25, 2582:13, 2585:10, 2585:17, 2585:22, 2586:6, 2586:11, 2586:14, 2587:3, 2587:4,

2587:20, 2591:13, 2591:17, 2593:8, 2595:1, 2595:20, 2595:23, 2596:2

**Taylor** [6] - 2512:23, 2515:11, 2516:21, 2517:3, 2588:9, 2590:17

**Taylor's** [1] - 2549:17

**Team** [2] - 2552:23

**team** [1] - 2588:22

**tedious** [1] - 2542:18

**Telegraph** [1] - 2553:17

**telephone** [1] - 2525:17

**tend** [1] - 2552:8

**tender** [1] - 2614:16

**terms** [5] - 2533:4, 2536:25, 2566:19, 2593:9, 2602:8

**testified** [6] - 2516:23, 2525:24, 2544:15, 2546:16, 2549:3, 2564:6

**testifies** [1] - 2606:12

**testify** [7] - 2598:2, 2604:15, 2604:17, 2604:18, 2606:13, 2610:24, 2611:1

**testimony** [9] - 2531:9, 2531:25, 2532:1, 2535:20, 2541:3, 2554:3, 2608:16, 2610:21

**THE** [219] - 2512:2, 2512:10, 2512:14, 2515:4, 2515:13, 2515:19, 2515:25, 2516:4, 2516:8, 2516:14, 2516:16, 2519:10, 2519:14, 2519:22, 2519:24, 2519:25, 2520:23, 2521:2, 2521:4, 2521:8, 2521:12, 2521:17, 2521:22, 2522:1, 2522:9, 2522:14, 2522:25, 2523:7, 2523:17, 2523:21, 2523:25, 2524:15, 2524:19, 2524:20, 2524:22, 2528:20, 2529:10, 2529:12, 2529:14, 2531:3, 2531:5, 2531:8, 2531:12, 2532:3, 2532:9, 2532:13, 2532:19, 2533:16, 2534:19, 2535:1, 2535:4, 2535:10, 2535:17, 2535:24, 2536:8, 2536:15, 2536:17, 2536:19, 2537:1, 2537:5, 2537:7, 2537:9, 2537:21, 2537:24, 2538:8, 2538:21, 2539:6, 2539:10, 2539:17, 2539:19, 2540:9, 2540:12, 2540:23, 2541:9, 2541:13, 2541:18, 2541:22, 2542:5, 2542:8, 2542:9, 2545:16, 2545:18, 2546:23, 2546:25, 2547:5, 2547:8, 2547:13, 2547:17, 2547:19, 2548:1, 2548:13, 2548:22, 2549:5, 2549:10, 2550:1, 2550:3, 2550:9, 2550:15, 2551:16, 2551:22, 2552:2, 2552:19, 2553:2, 2553:14, 2553:23, 2554:10, 2554:16, 2555:1, 2555:4, 2555:6, 2556:1, 2556:3, 2556:5, 2556:7, 2557:10, 2557:12, 2561:14, 2561:18, 2561:20, 2566:8, 2566:11, 2569:17, 2570:4, 2570:6, 2571:13, 2571:15, 2572:13, 2573:23, 2573:24, 2574:12, 2575:22, 2575:23, 2578:13, 2578:24, 2579:1, 2579:25, 2580:4, 2580:21, 2580:24, 2581:10, 2581:12, 2582:1, 2582:8, 2585:9, 2585:12, 2585:19, 2585:25, 2586:8, 2586:12, 2586:25, 2587:2,

2587:21, 2591:14, 2591:16, 2591:22, 2592:20, 2592:24, 2593:9, 2593:20, 2595:4, 2595:5, 2595:16, 2595:19, 2595:21, 2596:3, 2596:21, 2597:2, 2597:5, 2597:10, 2597:13, 2597:15, 2597:22, 2598:14, 2599:1, 2599:14, 2600:15, 2601:4, 2601:9, 2601:16, 2601:19, 2601:23, 2602:7, 2602:16, 2603:3, 2604:9, 2604:23, 2605:20, 2606:16, 2606:23, 2607:1, 2607:4, 2607:12, 2607:23, 2608:8, 2608:11, 2609:7, 2609:12, 2610:4, 2610:9, 2611:5, 2611:9, 2611:19, 2612:1, 2612:3, 2612:15, 2613:5, 2613:13, 2613:17, 2613:23, 2614:12, 2614:20, 2615:1, 2615:5, 2615:10, 2615:14, 2615:24, 2616:15, 2616:25, 2619:21

**theory** [2] - 2548:4, 2551:10

**thereafter** [2] - 2521:14, 2581:15

**therefore** [6] - 2522:10, 2522:20, 2550:12, 2550:13, 2616:10, 2619:2

**thicket** [1] - 2619:16

**thinking** [1] - 2550:4

**thinks** [1] - 2609:12

**third** [5] - 2556:14, 2576:3, 2576:23, 2578:1, 2584:6

**Third** [1] - 2610:12

**third-party** [3] - 2576:3, 2576:23, 2578:1

**thoroughness** [1] - 2605:25

**thread** [1] - 2599:7

**three** [6] - 2521:11, 2524:25, 2528:4, 2529:21, 2543:3, 2585:23

**throat** [1] - 2555:8

**timing** [4] - 2535:18, 2538:10, 2538:25, 2539:16

**today** [2] - 2515:18, 2531:25

**together** [3] - 2518:20, 2550:22, 2589:10

**Tom** [6] - 2551:18, 2551:24, 2551:25, 2552:3, 2552:4, 2552:5

**tomorrow** [11] - 2597:6, 2597:7, 2599:17, 2600:6, 2600:12, 2600:19, 2601:17, 2612:13, 2614:4, 2618:25, 2619:16

**tonight** [2] - 2615:22, 2619:18

**took** [8] - 2517:16, 2517:18, 2517:24, 2519:12, 2523:10, 2523:15, 2606:20, 2607:23

**total** [1] - 2602:5

**track** [2] - 2540:14, 2579:9

**trait** [4] - 2606:18, 2607:9, 2608:13

**traits** [3] - 2604:18, 2604:19, 2604:24

**transcript** [7] - 2528:18, 2530:25, 2531:19, 2535:2, 2540:15, 2541:8, 2620:4

**Transcript** [1] - 2513:5

**TRANSCRIPT** [1] - 2512:10

**transcription** [1] - 2513:5

**treat** [1] - 2562:11

**TRIAL** [2] - 2512:6, 2512:10
**trial** [7] - 2522:18, 2559:16, 2559:19, 2610:15, 2611:16, 2611:20, 2612:9
**tried** [3] - 2516:17, 2516:18, 2552:15
**tries** [1] - 2538:24
**trouble** [1] - 2580:7
**true** [7] - 2527:18, 2529:8, 2560:20, 2568:17, 2619:2, 2619:7, 2619:11
**truncate** [2] - 2599:8, 2609:22
**truth** [1] - 2619:15
**truthful** [2] - 2606:16, 2609:20
**truthfulness** [6] - 2605:23, 2606:8, 2608:13, 2608:19, 2609:1, 2609:6
**try** [2] - 2534:5, 2599:15
**trying** [16] - 2523:17, 2532:23, 2537:22, 2538:2, 2538:11, 2539:1, 2539:7, 2540:13, 2558:6, 2558:23, 2559:3, 2571:13, 2571:14, 2604:24, 2616:7, 2616:12
**turn** [1] - 2589:13
**two** [7] - 2526:6, 2526:21, 2570:15, 2574:25, 2602:12, 2602:24, 2603:9
**Tymoshenko** [11] - 2545:14, 2545:24, 2546:6, 2558:22, 2559:2, 2559:15, 2559:19, 2572:5, 2587:11, 2588:21, 2593:4
**Tymoshenko's** [2] - 2545:23, 2587:10
**typically** [1] - 2607:20

## U

**U.S** [8] - 2512:14, 2512:17, 2513:2, 2552:8, 2568:13, 2573:21, 2590:24, 2610:8
**UK** [1] - 2552:8
**Ukraine** [35] - 2530:13, 2534:1, 2534:9, 2542:14, 2543:16, 2551:19, 2552:9, 2552:15, 2552:17, 2552:23, 2558:23, 2559:3, 2559:5, 2559:9, 2559:22, 2560:6, 2565:8, 2565:15, 2565:20, 2566:12, 2574:7, 2574:23, 2575:1, 2575:18, 2577:13, 2578:4, 2588:22, 2591:1, 2591:2, 2591:3, 2603:25
**Ukrainian** [17] - 2536:10, 2545:15, 2545:18, 2545:23, 2556:11, 2564:24, 2571:19, 2572:7, 2572:15, 2581:3, 2587:10, 2589:8, 2590:4, 2590:13, 2596:12
**Ukrainians** [1] - 2594:16
**ultimately** [2] - 2516:6, 2531:21
**under** [7] - 2516:20, 2547:19, 2560:9, 2565:21, 2591:2, 2604:8, 2609:10
**underlying** [1] - 2593:18
**underplay** [1] - 2558:6
**underplayed** [1] - 2558:2
**understood** [5] - 2531:21, 2533:10, 2539:3, 2566:21, 2593:2
**unfair** [2] - 2586:6, 2599:9
**unfortunately** [2] - 2557:19, 2617:3

**Unit** [4] - 2549:24, 2611:6, 2617:17, 2618:1
**United** [6] - 2523:3, 2527:13, 2558:8, 2572:8, 2574:6
**UNITED** [3] - 2512:2, 2512:4, 2512:11
**unnecessary** [1] - 2608:14
**untruthful** [1] - 2606:17
**untruthfulness** [3] - 2605:24, 2606:8, 2609:9
**unusual** [1] - 2616:5
**up** [25] - 2515:16, 2526:11, 2545:17, 2563:3, 2564:14, 2564:17, 2570:23, 2571:3, 2574:19, 2576:21, 2577:21, 2578:5, 2579:19, 2583:12, 2588:7, 2590:11, 2591:11, 2595:14, 2595:16, 2600:2, 2606:4, 2607:7, 2612:21, 2617:12, 2618:6
**upset** [3] - 2586:21, 2591:25
**upshot** [2] - 2550:18, 2550:19

## V

**various** [2] - 2591:20, 2617:6
**verbatim** [1] - 2527:25
**view** [1] - 2605:16
**violated** [2] - 2607:1, 2607:2
**violation** [1] - 2607:6
**voice** [1] - 2545:16
**volunteer** [2] - 2547:23, 2548:3

## W

**wait** [4] - 2521:2, 2540:9, 2597:22, 2600:4
**waiting** [1] - 2601:11
**walk** [1] - 2550:6
**wants** [2] - 2538:19, 2591:18
**Washington** [5] - 2512:7, 2512:16, 2512:18, 2512:25, 2513:3
**wearing** [1] - 2603:13
**Weber** [1] - 2553:16
**website** [3] - 2568:3, 2568:8, 2568:9
**Western** [1] - 2618:16
**whatnot** [2] - 2525:17, 2572:1
**whole** [5] - 2532:1, 2539:12, 2539:13, 2540:17, 2540:25
**wide** [1] - 2607:16
**wider** [1] - 2604:23
**willfulness** [2] - 2598:17, 2617:5
**William** [2] - 2512:20, 2512:23
**Wisconsin** [1] - 2618:16
**withdrawing** [1] - 2552:25
**witness** [31] - 2515:9, 2515:25, 2516:1, 2516:3, 2516:12, 2516:21, 2537:20, 2548:17, 2553:3, 2586:7, 2586:9, 2587:22, 2587:23, 2596:22, 2596:25, 2597:10, 2600:15, 2600:20, 2601:17, 2605:14, 2606:13, 2607:14, 2607:21, 2608:17, 2609:14, 2609:15, 2609:16, 2610:23, 2611:15, 2613:9,

2613:19
**WITNESS** [20] - 2514:4, 2519:25, 2524:19, 2524:22, 2542:9, 2545:18, 2557:12, 2561:20, 2566:11, 2571:15, 2572:13, 2573:24, 2575:23, 2579:1, 2580:4, 2581:12, 2582:8, 2587:2, 2595:5, 2596:3
**Witness** [1] - 2597:4
**witnesses** [18] - 2601:1, 2602:3, 2602:14, 2602:21, 2603:14, 2604:2, 2604:17, 2604:18, 2604:22, 2606:1, 2607:24, 2608:7, 2608:15, 2608:24, 2609:5, 2612:6, 2612:14, 2613:4
**wondering** [3] - 2603:10, 2607:18, 2616:7
**word** [3] - 2519:22, 2527:6, 2534:3
**words** [5] - 2527:19, 2527:24, 2529:22, 2529:25, 2619:5
**world** [1] - 2568:11
**worried** [1] - 2546:5
**write** [7] - 2544:14, 2545:4, 2561:18, 2561:20, 2566:22, 2570:10, 2587:5
**writer** [1] - 2558:1
**writing** [1] - 2546:9
**written** [5] - 2527:22, 2540:21, 2541:1, 2564:24, 2564:25
**wrote** [3] - 2544:21, 2568:22, 2578:8

## Y

**years** [3] - 2520:9, 2603:20, 2603:21
**York** [21] - 2543:9, 2545:20, 2579:5, 2580:11, 2580:14, 2582:25, 2583:1, 2583:3, 2583:6, 2583:12, 2583:23, 2584:11, 2584:15, 2584:18, 2585:15, 2585:17, 2587:17, 2587:18, 2593:12, 2594:24, 2595:10
**yourself** [1] - 2569:10

## Z

**ZUCKERMAN** [2] - 2512:20, 2512:24