2728

                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      )
                               )
        v.                     )    Criminal Action No. 19-CR-125
                               )
GREGORY B. CRAIG,              )    JURY TRIAL - DAY 12
                               )    Afternoon Session
            Defendant.         )
_____)    Washington, D.C.
                                    August 27, 2019


            TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
              BEFORE THE HONORABLE AMY BERMAN JACKSON
                   UNITED STATES DISTRICT JUDGE


            APPEARANCES:

     For the Government:     Fernando Campoamor-Sanchez, AUSA
                             Molly Gulland Gaston, AUSA
                             U.S. ATTORNEY'S OFFICE FOR THE
                             DISTRICT OF COLUMBIA
                             555 Fourth Street, NW
                             Washington, DC 20530
                                  -and-
                             Jason Bradley Adam McCullough
                             U.S. DEPARTMENT OF JUSTICE
                             950 Pennsylvania Avenue, NW
                             Washington, DC 20530

     For the Defendant:      Adam B. Abelson, Esq.
                             William James Murphy, Esq.
                             ZUCKERMAN SPAEDER, LLP
                             100 East Pratt Street
                             Suite 2440
                             Baltimore, MD 21202
                                  -and-
                             William W. Taylor, III, Esq.
                             Paula M. Junghans, Esq.
                             ZUCKERMAN SPAEDER, LLP
                             1800 M Street, NW
                             Suite 1000
                             Washington, DC 20036

2729

1

2   Court Reporter:            PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                               U.S. Courthouse, Room 4700A
3                              333 Constitution Avenue, NW
                               Washington, D.C.  20001
4                              (202) 354-3243

5

6                 Proceedings reported by stenotype shorthand.
              Transcript produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2730

E X A M I N A T I O N S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Clifford Sloan | 2734 | 2760 | | |
| Brendan Sullivan | 2783 | 2794 | | |
| Gay Cioffi | 2803 | 2808 | | |
| Clinton Deveaux | 2809 | 2813 | | |
| Jessica Mathews | 2815 | 2819 | | |

E X H I B I T S

| GOVERNMENT EXHIBIT | PAGE |
|--------------------|------|
| 900 | 2780 |

2731

1                     AFTERNOON SESSION

2                        (2:08 p.m.)

3          THE COURT:  All right.  Are we ready to bring the

4     jury in?

5          MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

6          THE COURT:  All right.  Let's do that.

7          (Jury present)

8          THE COURT:  All right.  All of our jurors are here.

9          I appreciate the fact that you are all here on time.

10    I take it that no one has done any research or had any

11    conversations over the evening or this morning about the

12    case.  I believe the government has a few matters to bring to

13    your attention, and then we will proceed with any additional

14    witnesses.

15          Go ahead.

16          MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

17          At this point, the government would like to read an

18    additional stipulation that was reached between the

19    government and the defense regarding an e-mail, that is

20    Government's Exhibit 683.

21          THE COURT:  Government 683 can be on the screens.

22          Thank you, you can proceed.

23          MR. CAMPOAMOR-SANCHEZ:  If we can focus on the top

24    part.  This is a stipulation regarding e-mail.

25          "The parties stipulate to the following facts:

2732

1          "Defendant, Gregory B. Craig, was the person who was

2     the assigned subscriber of the e-mail account

3     Gregory.Craig@Skadden.com.

4          "The persons identified next to the e-mail accounts

5     listed below were the assigned subscribers of the specified

6     e-mail account."

7          Then, there's a lot of names that I will not read out

8     loud.  But if needed, jurors can consult Government's

9     Exhibit 683.

10         If we could go to the last part, third page, it

11    reads:

12         "With respect to all e-mails introduced at trial,

13    which had previously been produced by the United States to

14    the defense as part of the discovery process:

15         "A.  The e-mails are authentic, and no further

16    testimony is necessary to establish their authenticity.

17         "B.  The e-mails were authored and sent by the person

18    and e-mail account listed on the particular e-mails if such

19    account is identified in item 2 above.

20         "C.  The e-mails were received by the recipients and

21    e-mail accounts listed on the particular e-mails if such

22    account is identified in item 2 above."

23         That is Stipulation 683, Your Honor.

24         THE COURT:  All right.  And as I have told you

25    before, a stipulation is an agreement that these facts are

1    undisputed and may be considered to be undisputed evidence by

2    you in this case.

3         MR. CAMPOAMOR-SANCHEZ:  And if we could switch to the

4    Elmo, please.

5         Now, Your Honor, the government is -- we have

6    previously admitted these exhibits, but we have original

7    copies of them that we also would like to move in.  They bear

8    the same number.

9         The first one is Government's Exhibit 530, which we

10   have the original.

11        Then, Government Exhibit 517.

12        Government Exhibit 522.

13        And Government Exhibit 548, which consists of six

14   pages.

15        Your Honor, with that introduction, the government

16   rests.

17        THE COURT:  All right.  Can I have counsel briefly at

18   the bench.

19        MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

20        (At the bench)

21        THE COURT:  All right.  Just for purposes of the

22   record, I just want to state that the defense made a timely

23   Rule 29 motion, which was heard and argued earlier, but it

24   was made for purposes of the record at the close of the

25   government's case, and it's been ruled on.  I wanted to make

2734

1    sure that the record reflected that your motion was made at

2    the appropriate time, and I reserved it, I didn't rule on it.

3          MR. TAYLOR:  We understand.  The fact that the

4    government hadn't quite rested at the time we made the motion

5    was discussed at that time.  And for the purposes of the

6    record, we would renew the motion now at the close of the

7    government's case.

8          THE COURT:  For the same reasons, I will reserve, and

9    you can call your first witness.

10         (In open court)

11         THE COURT:  All right.  Does the defense intend to

12   call any witnesses?

13         MR. MURPHY:  Yes, Your Honor.

14         THE COURT:  All right.  You can call your first

15   witness.

16         MR. MURPHY:  Your Honor, the defense will call to the

17   witness stand Clifford Sloan.

18                         Clifford Sloan,

19   having been duly sworn, was examined and testified as follows:

20                       DIRECT EXAMINATION

21         BY MR. MURPHY:

22   Q.   Good Afternoon, Mr. Sloan.

23   A.   Good afternoon.

24   Q.   Welcome back.

25   A.   Thank you.

1    Q.   Could you just remind the jury quickly who you are in
2    terms of your occupation and your current profession.
3    A.   Yes.  I'm Clifford Sloan.  I'm a retired partner of
4    Skadden, and I'm now at Georgetown Law School.
5    Q.   All right.  Mr. Sloan, when we had met last week, I had
6    asked you a question about do you recall whether there was a
7    time when Mr. Craig talked with you about the level that
8    remained in the retainer?
9    A.   Yes.
10   Q.   I want to show you Government's Exhibit 186, which is in
11   evidence.
12        If you look at the bottom of this e-mail on the first
13   page --
14   A.   Yes.
15   Q.   -- is that an e-mail that you received -- I'm
16   sorry -- that Mr. Craig received, or his secretary received,
17   and that e-mail was forwarded on to you?
18   A.   Yes.
19   Q.   Can you describe what Mr. Craig said to you on Friday,
20   July 27th, in the e-mail that's at the top of the page,
21   towards the top of the page.
22   A.   He is advising me of the amount of money that remains in
23   the account, and he is conveying that there's a limited
24   amount of money that remains in the account.
25   Q.   Okay.  What was the date of the e-mail?

-2736-

1    A.   His e-mail to me was July 27, 2012.

2    Q.   And was that before the report was finalized?

3    A.   Yes.

4    Q.   And can you just read the third sentence -- the third

5    sentence through the end of the e-mail.  Just read it out

6    loud.

7    A.   Of Greg's e-mail to me?

8    Q.   Yes.

9    A.   Yes.  So, "As of June 30th, there was approximately"

10   1.7 --

11   Q.   1.47?

12   A.   I'm sorry.  Thank you.

13        "1.47 in the account yet to be used.  Time and

14   expenses for July will probably use $1 million of that,

15   leaving .47 million dollars in the account at the end of this

16   month.  Just a guess."

17   Q.   And .47 million, is that 470,000?

18   A.   Yes.

19   Q.   Okay.  Now, I wanted to ask you some questions concerning

20   an e-mail you received from Mr. Craig following the Harvard

21   Club meeting.  Do you remember that there was a meeting at

22   the Harvard Club?

23   A.   I don't recall that from the time period, no.

24   Q.   Okay.  You did not attend the meeting?

25   A.   Correct.

-2737-

1    Q.   Do you remember whether there was some action that you

2    took after the Harvard Club meeting?

3             THE COURT:  He doesn't know that there was a meeting.

4             BY MR. MURPHY:

5    Q.   Let me direct your attention to the late September 2012

6    period.

7             Do you remember taking any actions with respect to a

8    document prepared by Mr. Hawker?

9    A.   Yes.

10   Q.   What do you recall about that?

11   A.   Well, I remember generally that there was great concern

12   that there had been a document that was prepared that

13   mischaracterized the report in serious ways and that had been

14   sent to us and that had very, very -- as I said -- serious

15   mischaracterizations of the content of the report.

16   Q.   And what did you do as a result?

17   A.   Well, so I then, after receiving that from Mr. Craig,

18   worked with Alex Haskell on preparing corrections to their

19   descriptions of the document by FTI.  And the document by FTI

20   was also what they call sort of a messaging or strategy

21   document.  Within it it had statements about the report.  And

22   we were very careful in our response that we were limiting

23   ourselves to what it said about our report.  We were not

24   commenting on the messaging or the strategy.  But there were

25   some mischaracterizations of what the report said.  And so we

1    were working on a document to be forwarded to FTI that

2    corrected those mischaracterizations.

3    Q.   Let me ask you, when you say you were careful not to

4    comment on the strategy but only on references to the report,

5    why was that?

6    A.   Well, because our role was only in terms of commenting on

7    the report.  We spoke last week about the fact that, from the

8    beginning, we were not doing the PR, we were doing this

9    independent report.  But part of our understanding from the

10   beginning was that we could communicate with the government

11   and its representatives -- and FTI was one of its

12   representatives -- about the report, the facts in the report,

13   the statements in the report.  And so we were limiting

14   ourselves to that content in terms of accuracy about the

15   report.

16          But as to messaging or strategy or anything like

17   that, that was not in our bailiwick, and we were not

18   commenting on that.

19   Q.   I want to show you a couple of documents about this.  If

20   we can look at Defendant's Exhibit 492.

21   A.   Yes.

22   Q.   If you focus on the e-mail at the bottom of the page,

23   which was an e-mail from Mr. Hawker to Mr. Craig,

24   Mr. Manafort, and Mr. Gates --

25          JUROR:  We cannot see it.  Has this been admitted

-2739-

1    into evidence yet?

2              THE COURT:  Yes.  You are permitted to look at it.

3    So it is just a screen issue, not a permission issue.

4              Can you see it now?

5              MR. MURPHY:  It was on my screen.

6              BY MR. MURPHY:

7    Q.   So, the bottom e-mail, Mr. Sloan, is that an e-mail from

8    Mr. Hawker to Mr. Craig and others?

9    A.   Yes.

10   Q.   And then did he forward that to you --

11   A.   Yes.

12   Q.   -- in the next e-mail up?

13   A.   Yes.

14   Q.   What was the date of his e-mail to you?

15   A.   September 25, 2012.

16   Q.   What did Mr. Craig say in his e-mail, if you could just

17   read it.

18   A.   He says, "I need help here.  The PR guys are over the

19   top.  Can you weigh in while I am traveling?"

20   Q.   And then did you respond to Mr. Craig?

21   A.   Yes, I did.

22   Q.   And what did you say?

23   A.   Well, I would need to look --

24   Q.   It is the top e-mail.

25   A.   This is where I believe I'm forwarding it to Alex Haskell

1    in this e-mail chain.

2    Q.   Oh, I see.   Okay.   What did you say to Mr. Haskell?

3    A.   I said, "I'll call you in a while about this."

4    Q.   If we look at the second page of the document -- and it

5    is a called a "Project Veritas messaging document."   Correct?

6    A.   Yes.

7    Q.   And could you read aloud item number 4.

8    A.   Item number 4, "The defense's claims of political

9    prosecution have clouded examination of the case, its

10   evidence and the record."

11   Q.   And then could you read item 7.

12   A.   "The report is being published without amendment or any

13   attempt to influence its contents."

14   Q.   Did you have any concerns about that?

15   A.   Yes.   I know that in the email we expressed concern about

16   that statement, and I know, as I'm sitting here, that

17   statement was inaccurate.

18            THE COURT:   Which statement?

19            THE WITNESS:   In number 7, particularly the

20   statement, "Any attempt to influence its contents," because

21   by that point the government of Ukraine had made many

22   attempts to influence its contents.

23            BY MR. MURPHY:

24   Q.   All right.   And then if you turn to page 4 of the

25   exhibit, which I think is page 3 of the attachment, under

1    "Ukraine's top-line messaging," item 4, could you read that
2    aloud?
3    A.   You say item number 4?
4    Q.   Yes.
5    A.   "The record is clear.  Tymoshenko failed to produce any
6    evidence to support her allegations."
7    Q.   Did you have any concern about that statement?
8    A.   Yes.
9    Q.   Why?
10   A.   Because it was a mischaracterization.  It is not true
11   that she had failed to produce any evidence, and that was not
12   at all what the report said.  It was a mischaracterization of
13   the report.
14   Q.   And then if you would read aloud item 7 on the same page.
15   A.   "Any country has the right to prosecute those who break
16   the law.  Politicians have been prosecuted in many countries,
17   not just here.  The report makes clear this was not a
18   political prosecution but the prosecution of a crime by a
19   politician."
20   Q.   Did you have any concerns about that statement?
21   A.   Yes, I did.
22   Q.   Why?
23   A.   Because, in the second sentence, it says, "The report
24   makes clear," and continues, and that was not at all what the
25   report said.  The report said that she had failed to produce

-2742-

1    evidence under the legal doctrine of selective prosecution,

2    and it very explicitly said we were not opining about whether

3    there had been any political motivation.  So it was a serious

4    misrepresentation of the report.

5    Q.  If you would look on the next page of this same exhibit,

6    there is an item 14.

7         Could you read that aloud?

8    A.  Yes.  It says, "Even where the Skadden Report questions

9    certain decisions by the court, it concludes that such

10   decisions were based on actions by Tymoshenko that appear to

11   have been designed to disrupt the court's work."

12   Q.  Did you have any reaction to that --

13   A.  Yes.

14   Q.  -- when you read it?

15        What was your reaction?

16   A.  That was a mischaracterization of our conclusions and of

17   the report in very important respects because the report did

18   not say that all of the decisions that we questioned or said

19   violated Western standards were based on actions by

20   Tymoshenko that appeared to have been designed to disrupt the

21   court's work.  So it was a serious misrepresentation of what

22   the report said.

23   Q.  I would like to look next at Defendant's Exhibit 152,

24   which is in evidence.  Defendant's 152.

25        At the middle is a copy of Mr. Craig's initial e-mail

—2743—

1    to you saying he needed help?

2    A.   Yes.

3    Q.   Is this your response to him?

4    A.   Yes.

5    Q.   Can you read what your response was on September 25th.

6    A.   "Will jump on it and do what I can.  I think we don't

7    want to own their product, but I'm happy to give them any

8    comments."

9    Q.   What did you mean by that, not owning their product?

10   A.   That was my shorthand for what we discussed earlier; that

11   we weren't going to comment on the messaging or the strategy.

12   The only thing that we were going to comment on was what they

13   said about what the report said, which as we've gone through

14   had some very serious mischaracterizations.

15   Q.   Let's look next at Government's Exhibit 267, which is in

16   evidence.

17   A.   Yes.

18   Q.   This is a part of a similar e-mail chain but with

19   different communications.

20          If you look at the middle e-mail, it appears to be an

21   e-mail from Mr. Craig to Mr. Hawker, Mr. Manafort, Mr. Gates.

22   And he has copied you on that e-mail.  Is that right?

23   A.   Yes.

24   Q.   What is the date of this e-mail?

25   A.   September 25, 2012.

1    Q.   Can you just read aloud what Mr. Craig said to you,

2    Mr. Hawker, Mr. Manafort, and Mr. Gates?

3    A.   "There is a lot of stuff in here that is just wrong.  I

4    understand your desire to spin this report in a way that

5    supports Ukraine's view of this trial, but much of what you

6    say is not accurate.  Actually, if I read this or heard this,

7    I would think that Skadden had been bought and paid for, and

8    that this report was indeed a total whitewash.  As just one

9    example, it is not accurate to say that Tymoshenko produced

10   no evidence to support her defense.  That is flatly wrong.

11   And if you think this report says that, we have real

12   problems.  I am on a plane now and cannot talk.  I will call

13   you this afternoon.  Meanwhile, I am sending this to Cliff to

14   look at, as well."

15   Q.   Who did you work with in preparing comments about the

16   messaging document that Mr. Hawker had forwarded?

17   A.   Alex Haskell.

18   Q.   If we look next at Defendant's Exhibit 154.

19        Is this an e-mail that you sent to Mr. Craig?

20   A.   Yes.

21   Q.   Is the date still September 25, 2012?

22   A.   Yes.

23   Q.   Can you read aloud -- well, what is this -- what is this

24   e-mail?

25   A.   This is an e-mail that Alex Haskell and I prepared to go

2745

1    to FTI, enumerating the errors that we saw in the description

2    of what the report said.

3    Q.   Now, this is formulated as an e-mail from you to

4    Mr. Craig.  Why is that?

5    A.   I was sending it to Greg, and I know that I had suggested

6    to Greg that he be the one to send it to Mr. Hawker because I

7    had had no dealings with Mr. Hawker.

8    Q.   Okay.  And does this e-mail at the bottom reflect a

9    number of comments on the draft messaging document prepared

10   by FTI and Mr. Hawker?

11   A.   Yes.

12   Q.   How many comments are there?

13   A.   There's a total of 13.

14   Q.   And if we look at item number 2 --

15   A.   Yes.

16   Q.   -- is that one of the ones that you and I just discussed

17   a moment ago?

18   A.   Yes, it is.

19   Q.   If we look at item 5, is that one that you and I

20   discussed a moment ago?

21   A.   Yes, it is.

22   Q.   And if we look at item 6, is that another one that you

23   and I just discussed?

24   A.   Yes.

25   Q.   Item 7, is that --

-2746-

1    A.   Yes, it is.

2    Q.   And finally, item 11, is that one -- I'm not sure we

3    talked about that one.  Let me ask you to look at item 11 and

4    read aloud what the quote was and then what your comment was.

5    A.   The quote says -- so this is quoting from what the FTI

6    document said.  And the quote from the FTI document says,

7    "Her legal counsel could have lodged an appeal at any time

8    concerning her ongoing detention at the trial's conclusion

9    but did not do so."

10   Q.   And what does the response say?

11   A.   Our comment was, "This sentence does not appear to be

12   accurate and should be deleted.  Alex van der Zwaan spoke

13   with Mikitenko yesterday.  Mikitenko told Alex that it was

14   impossible legally to make such a motion after the end of the

15   trial given that once trial ends and the judge goes into his

16   deliberation period, neither party is allowed to have any

17   contact with the judge, including making any motions to the

18   judge."

19   Q.   Now, I want to direct your attention to a related but a

20   different topic.  I think you mentioned that there were a

21   number of occasions when the folks at Skadden, including

22   yourself, had received comments or requests for changes in

23   the report.

24   A.   Yes.

25   Q.   I want you to look first at Defendant's Exhibit 94.

-2747-

1    A.   Yes.

2    Q.   And this is in evidence.

3            Did you receive Defendant's 94?

4    A.   Yes.

5    Q.   What is it?

6    A.   This is an e-mail from Alex van der Zwaan, forwarding

7    comments from the government of Ukraine.

8    Q.   And he says, "Please find Mr. Pshonka's comments."  Who

9    is Mr. Pshonka?

10   A.   I believe that he was the Prosecutor General or within

11   the Prosecutor General's Office.

12   Q.   Were you among the people who received these comments

13   from Mr. Van der Zwaan?

14   A.   Yes.

15   Q.   All right.  And if you look at the attachment, which

16   begins on page 3 of the exhibit, if we just highlight the

17   top --

18   A.   Yes.

19   Q.   -- could you just read that paragraph.

20   A.   "In connection" -- well, it starts, "Further

21   clarifications.  In connection with the receipt of the

22   executive summary, we note our disagreement with the certain

23   conclusions regarding the evaluation of the actions of Y.

24   Tymoshenko, the former Prime Minister of Ukraine, and the

25   circumstances surrounding the conclusion of contracts as of

-2748-

1 19 January 2009 for the supply and transit of gas for the

2 period from 2009 to 2019."

3 Q. And looking at the document, does it contain a series of

4 requests for clarifications?

5 A. Yes.

6 Q. Eight pages in all?

7 A. Yes.

8    And my understanding is this is a translation of the

9 comments that had come in a different language, either

10 Russian or Ukrainian, but this is the translation of them.

11 Q. And these were received on August the 10th?  Received by

12 you on August the 10th, 2012?

13 A. Yes.  That's correct.  Yes.

14 Q. What was the practice with respect to Skadden's

15 activities when these comments came in?

16 A. Well, they would be considered by a group that would

17 include Greg, me, Allon Kedem, Alex Haskell.  Alex

18 van der Zwaan was having the interface with the client in

19 part because, as I mentioned, he spoke Russian.  And we would

20 consider them sometimes in meetings, sometimes in e-mails,

21 sometimes in calls.  But our guidelines were very clear on

22 the comments, is that we would consider them for accuracy,

23 for completeness, and for clarity.  But in terms of our

24 bottom-line fundamental conclusions, including that very

25 important fundamental rights of Ms. Tymoshenko were violated

-2749-

1   by the government of Ukraine, we were absolutely not changing

2   our conclusions, and despite repeated comments by the

3   government of Ukraine, asking us to change the conclusions

4   and calling on us to change the conclusions, we were not

5   doing that, and that was clear based on our guidelines.

6   Because we had reached our independent conclusion, reviewing

7   everything we could about the trial.  But as to accuracy,

8   completeness, or clarity, we would consider the comments

9   because we wanted the report to be as strong as possible.  So

10  if there were comments that went to accuracy or completeness

11  or clarity, in fairness, we wanted to consider them and take

12  them into account.

13  Q.   I want to quickly show you some of the additional

14  requests for clarifications.

15          Can we look next at Defendant's Exhibit 97.

16  A.   Yes.

17  Q.   Was this another e-mail from Mr. Van der Zwaan?

18  A.   Yes.

19  Q.   And were you among the recipients?

20  A.   Yes.

21  Q.   What is the date of this e-mail?

22  A.   August 24, 2012.

23  Q.   That is about two weeks after the first one?

24  A.   Yes.

25  Q.   And what does Mr. Van der Zwaan say?

2750

1    A.   He says --

2    Q.   Let's just look at the first line.

3    A.   He says, "All, I attach the latest round of comments

4    received for your review."

5    Q.   And attached on the next page, page 97-2, is that

6    captioned "Additional arguments"?

7    A.   Yes.

8    Q.   And are there about seven single-spaced pages of

9    additional requests for clarifications and changes?

10   A.   Yes.

11   Q.   All right.  I want to show you next Defendant's

12   Exhibit 105.  Is this an e-mail that you received from

13   Mr. van der Zwaan?

14   A.   Yes.

15   Q.   What is the date of this one?

16   A.   August 30, 2012.

17   Q.   So, again, about two weeks after the last one?

18   A.   Well, or a week or so.  Was it August 24th?

19   Q.   Just a week.

20   A.   Yes.

21   Q.   What does Mr. Van der Zwaan say in his e-mail to you?

22   A.   "All, I attach the further explanations received from

23   Oleg, translated into English."

24   Q.   Do you remember who Oleg was?

25   A.   I do not.

-2751-

1    Q.   Attached is there a document?

2    A.   Yes.

3    Q.   How is that captioned at the top?

4    A.   "Final additional arguments on the draft report."

5    Q.   And those so-called "Final additional arguments," do they

6    comprise eight pages of single-spaced comments?

7    A.   Let me just check one second.

8         Yes.

9    Q.   I want to show you next Defendant's Exhibit 109.  This

10   appears to be an e-mail exchange between Mr. Manafort and

11   Mr. Craig that Mr. Craig then forwarded a reply to

12   Mr. Manafort and copied you.

13        Do you see that?

14   A.   Yes.

15   Q.   If we look at the bottom e-mail first, was

16   Mr. Manafort -- well, what is the date of it?

17   A.   September 3, 2012.

18   Q.   So this is about four days after the last set of

19   comments?

20   A.   Yes.

21   Q.   If you could just read the paragraph that is numbered 1

22   and the first two sentences.

23   A.   "1. Their final comments" --

24        MS. GASTON:  Your Honor, may we approach?

25        THE COURT:  Yes.

1          (At the bench)

2                MS. GASTON:  Mr. Manafort is hearsay --

3                THE COURT:  I need to look at it.

4                Can we put it on my screen while we're talking about

5     it, or can someone hand me a copy?

6                MR. MURPHY:  I can get a copy.

7                THE COURT:  I just want to hear her objection before

8     I rule on it.

9                MR. MURPHY:  Sure.

10               THE COURT:  Go ahead.

11               MS. GASTON:  It is Mr. Manafort's hearsay and

12    Mr. Craig's hearsay.

13               THE COURT:  All right.  So how does he get to testify

14    about what Manafort told Craig and what Craig told him?

15               MR. MURPHY:  All I want to do is establish that there

16    were comments that came in from Mr. Manafort and then

17    Mr. Craig forwarded them to Mr. Sloan with a message.  What I

18    want to focus on is the message at the top.

19               MS. GASTON:  That's Mr. Craig's message, so it is

20    hearsay.

21               THE COURT:  Right.

22               MR. MURPHY:  I don't think an objection was raised to

23    this exhibit, Your Honor, prior to the trial.

24               THE COURT:  Well, I don't know off the top of my

25    head.

-2753-

1          MS. GASTON:  I don't know off the top of my head,

2     either.

3          MR. MURPHY:  I wrote it in.  That's my notation that

4     this was in.

5          THE COURT:  Has that been admitted?

6          MR. ABELSON:  It has been admitted.

7          MR. MURPHY:  Yes.

8          THE COURT:  All right.  It is admissible for the fact

9     that it was sent to Mr. Sloan.  A lot of it is self-serving

10    stuff, but if we have admitted it, then they're allowed to

11    show it to him and say that he got these comments.

12         I'm not sure that he can say anything about the

13    comments because they're not even attached, they

14    just say that --

15         MR. MURPHY:  I think these are the comments that he

16    is making, 1, 2, 3, 4.

17         THE COURT:  No, he says the comments are 20 pages

18    in Russian --

19         MR. MURPHY:  Oh, I do have those coming.  It will be

20    the next document, I think.

21         THE COURT:  All right.  Well, you can ask him if

22    Mr. Craig told him more comments were coming on September

23    3rd.

24         MR. MURPHY:  Thank you.

25         (In open court)

1    BY MR. MURPHY:

2    Q.   Mr. Sloan, in the e-mail, did Mr. Craig indicate that

3    there were additional comments coming from Mr. Manafort?

4    A.   That's my understanding, yes.

5    Q.   I would like to ask Mr. Sloan to just read in Mr. Craig's

6    e-mail to Mr. Manafort and Mr. Sloan, the sentence that

7    begins in the fifth line of Mr. Craig's e-mail at the top.

8    A.   In the fifth line?

9    Q.   Beginning, "I haven't seen."

10   A.   Okay.  "I haven't seen their comments, but if they are

11   comparable to the comments we have seen before, they will be

12   disappointed in our response."

13   Q.   Thank you.

14        Now, I want to show you next Defendant's Exhibit 112.

15   Is this an e-mail that you received from Mr. van der Zwaan?

16   A.   Yes.

17   Q.   And what was the date of the e-mail that        Mr. van

18   der Zwaan sent you?

19   A.   September 4, 2012.

20   Q.   And does this e-mail attach the comments that were

21   referred to in the prior document that have now been

22   translated?

23   A.   That's my understanding, yes.

24   Q.   And if you'll look at page 3 of this exhibit, how is that

25   captioned?

2755

1    A.   It says, "Suggestions to the complete draft report."

2    Q.   And does this then comprise about 20 pages of

3    single-spaced comments to the report?

4    A.   Yes.

5    Q.   I want to show you next Defendant's Exhibit 131.

6            Is this an e-mail that you received from

7    Mr. van der Zwaan?

8    A.   Yes.

9    Q.   What is the date of this e-mail?

10   A.   September 14, 2012.

11   Q.   That is about 10 days after the last e-mail with the 20

12   pages of comments?

13   A.   Yes.

14   Q.   What does Mr. van der Zwaan tell you on September 14,

15   2012?

16   A.   He says, "All, we received more comments from the OPG

17   this afternoon, attached now translated."

18   Q.   And -- I'm sorry.  Go ahead.

19   A.   "Please let me know if and when we would like to

20   discuss."

21   Q.   And attached to this exhibit, are there three pages of

22   single-spaced comments?

23   A.   Yes.

24   Q.   What is this captioned?

25   A.   "Proposals for the final project report."

-2756-

1    Q.   I want to show you next Government's Exhibit 252.

2    A.   Yes.

3    Q.   If you could just blow that e-mail up.

4         The top line, is it an e-mail from Mr. Van der Zwaan

5    to you and Mr. Craig and Mr. Haskell?

6    A.   Yes.

7    Q.   What is he attaching there?

8    A.   He says, "Here you go.  The doc you were waiting for."

9    It looks like it is forwarding an e-mail and a document that

10   Mr. Gates had sent to him.

11   Q.   Attached are there additional documents about the report?

12   A.   Yes.

13   Q.   Five pages?

14   A.   Yes.

15   Q.   And what's the date of the e-mail that you received from

16   Mr. Van der Zwaan?

17   A.   September 19, 2012.

18   Q.   So that is five days after the last set of comments you

19   received?

20   A.   Yes.

21   Q.   And I want to show you next Defendant's Exhibit 178.  I

22   will also show you --

23            MS. GASTON:  Objection, Your Honor.

24            THE COURT:  You can approach.

25            Or what basis?

-2757-

1          MS. GASTON:  Lack of foundation.  He is not on this

2     e-mail.

3          MR. MURPHY:  I want to show him also Defendant's

4     Exhibit 180, which goes with this.

5          MS. GASTON:  Your Honor, may we approach?

6          THE COURT:  All right.

7          (At the bench)

8          MS. GASTON:  178, which Mr. Murphy is trying to do

9     something with right now, only comes in with 177 if Mr. Craig

10    testifies.

11         MR. MURPHY:  It is the other way around, Your Honor.

12    But I'm not using 177.  178 and 180.

13         MS. GASTON:  177 and 178 come in together if

14    Mr. Craig testifies.

15         THE DEPUTY CLERK:  Excuse me, Judge.

16         The headphones aren't working.  The attorneys at the

17    table can't hear you.  It worked up until this minute.

18         THE COURT:  Well, we have two attorneys here.  That

19    ought to do it for purposes of the bench conference.

20         I am trying to find my final ruling on that.

21         MR. ABELSON:  It may have been on the first page of

22    that order.

23         THE COURT:  Out-of-court statements, okay.  I said,

24    Defense 177 may be admitted if 178 is also admitted for

25    completeness.

1              So what are we doing?

2              MR. MURPHY:  I am introducing Defendant's 180, Your

3      Honor, which is in.  There wasn't any objection to that.

4              THE COURT:  All right.

5              MR. MURPHY:  Just for context, 180, at the bottom, is

6      an e-mail from Manafort to Craig.  "I held off on sending

7      this until you returned."

8              MS. GASTON:  Which Mr. Sloan is not on.

9              MR. MURPHY:  No, but he is on the next e-mail,

10     Mr. Craig, and Mr. Sloan talking about those comments.

11             THE COURT:  All right.  So more comments get

12     transmitted?

13             MR. MURPHY:  Yes.  And then Mr. Craig said something

14     about them, which I want Mr. Sloan to read, and then I'm

15     done.

16             THE COURT:  We keep trying to move Mr. Craig's

17     statements in this way.  And I thought you said you're trying

18     to move in 180.

19             MR. MURPHY:  Yes.

20             THE COURT:  So move in 180.

21             MR. MURPHY:  Okay.  That's it.

22             THE COURT:  All right.  Do I rule on 180?

23             MS. GASTON:  The one I'm objecting to is 178, which

24     is the one that he was putting up on the screen.

25             MR. MURPHY:  I don't need it.

2759

1      THE COURT:  All right.  Okay.

2      MR. MURPHY:  We're going to talk about 180.

3      (In open court)

4      THE COURT:  You can proceed.

5      BY MR. MURPHY:

6  Q.   Mr. Sloan, can I ask you to look at Defendant's 180,

7  please.

8  A.   Yes.

9  Q.   There is a large -- well, larger e-mail towards the

10  bottom of the page.  Is that an e-mail from Mr. Craig to you,

11  Mr. Haskell, Mr. Kedem, and Mr. Van der Zwaan?

12  A.   Yes.

13  Q.   What is the date of it?

14  A.   October 8, 2012.

15  Q.   And in it, is Mr. Craig reacting to a note?

16  A.   Yes.

17  Q.   All right.  I want to ask you to just read his very last

18  paragraph of the e-mail to you.

19  A.   "Any other thoughts?  I am close to telling them to pound

20  sand.  And if they don't want to publish it, so be it.  If

21  they want to publish it and then criticize it, so be it."

22  Q.   As of October the 8th, did you have a sense -- did you

23  know whether the report would be released or not?

24  A.   No.  I thought there was a very real possibility that it

25  was not going to be released because it had severe criticism

-2760-

1    of the government of Ukraine for violating the rights of

2    Yulia Tymoshenko, and we had repeatedly been hearing from

3    them of their objection to that.  So I thought there was a

4    very real possibility that the report was never going to be

5    revealed.  Or publicized, released to the public is what I

6    meant to say.

7              MR. MURPHY:  Thank you very much, Mr. Sloan.  That's

8    all I have.

9              THE COURT:  All right.  Any cross-examination?

10             MS. GASTON:  Yes.

11                         CROSS-EXAMINATION

12             BY MS. GASTON:

13   Q.   Good afternoon, Mr. Sloan.  Nice to see you again.

14   A.   Good afternoon.

15   Q.   I think you began with Mr. Murphy with Government's

16   Exhibit 186.  So could we bring that up, please.

17             All right.  So could we zoom in on the top two -- is

18   it there now?

19             THE DEPUTY CLERK:  Who is showing it?  The defense or

20   the government?

21             MS. GASTON:  The government.

22             THE COURT:  Yes, no?

23             JUROR:  No.

24             MS. GASTON:  Is it on yours or no?

25             JUROR:  Now it is.

-2761-

1    BY MS. GASTON:

2 Q. Okay.  Excellent.  Can you zoom in on the top two

3 e-mails, please.  So, looking at Mr. Craig's e-mail to you on

4 July 27th --

5 A. Yes.

6 Q. -- when he writes, "Time and expenses for July will

7 probably use 1 million of that, leaving .47 million in the

8 account at the end of the month."

9 A. Yes.

10 Q. So this means that through the end of July the retainer

11 has fully covered all of the expenses of the report; is that

12 correct?

13 A. That's how I read it.

14 Q. Okay.  Well, let's zoom out and go to the bottom so that

15 we can make sure.

16 A. Okay.

17 Q. Let's look at Ms. Prender's e-mail --

18 A. Yes.

19 Q. -- to Ms. Whitney at the bottom.

20 A. Yes.

21 Q. It says, "We have received 4.150000."  That's $4,150,000

22 from the clients; right?

23 A. Yes.

24 Q. But, actually, you hadn't received it from the client,

25 you had received it from Victor Pinchuk; right?

-2762-

1    A.   My understanding is that the money was coming from Victor

2    Pinchuk, that's correct.

3    Q.   Right.  And so that was the retainer for the entire

4    project?

5    A.   Yes.  But I just wanted to clarify one point, because you

6    were drawing a distinction, if it was Victor Pinchuk, it

7    wasn't the client.  And I viewed them as interwoven.  As we

8    spoke about before, it was a third-party payor situation,

9    so --

10   Q.   Mr. Sloan, I asked a specific question.  Ms. Prender

11   writes, "We have received $4,150,000 from the client."

12        But the $4,150,000 came from Victor Pinchuk; right?

13   A.   Yes.

14   Q.   And the client was the government of Ukraine; right?

15   A.   Yes.  But I do have to say for clarity, as I sit here now

16   reading this, I believe I would have understood that as

17   referring to Mr. Pinchuk, not suggesting that, oh, it was

18   from the government of Ukraine rather than from Mr. Pinchuk.

19   So I do think that is important for clarity.

20   Q.   Right.  The important thing for clarity is that

21   Mr. Pinchuk provided $4,150,000 as a retainer for the

22   project; correct?

23   A.   Yes.

24   Q.   Okay.  Let's zoom out, and let's go to the top two

25   e-mails.

2763

1        And Craig forwards this to you as a status report for

2   the Ukraine account, right?

3   A.   Yes.

4   Q.   And he tells you that the June invoice is in excess of

5   $1 million?

6   A.   Yes.

7   Q.   So at the end of June, there will be $1.47 million in the

8   account.

9   A.   Yes.

10  Q.   And time and expenses for July will probably use

11  $1 million; right?

12  A.   Yes.

13  Q.   So that will leave .47 million dollars in the account at

14  the end of the month of July?

15  A.   Yes, that's what it says.

16  Q.   So the expenses and fees have been fully covered by

17  Mr. Pinchuk's retainer; correct?

18  A.   At that point, yes.

19  Q.   Yes.

20  A.   There was a considerable amount of work still to be done,

21  but yes.

22  Q.   Okay.  Well, actually, let's look at your response, then,

23  at the top of the page.

24  A.   Yes.

25  Q.   You say in that e-mail to Mr. Craig on July 27, "I'm

-2764-

1     giving the opus a final read now."

2              That's the draft report?

3     A.   Yes.

4     Q.   And then you say, "By the way, we need to figure out our

5     next projects to keep little Alex busy."

6              Is that Alex Haskell?

7     A.   Yes.

8     Q.   And so you are talking to Mr. Craig about what the next

9     project will be that Alex Haskell will work on; right?

10    A.   Yes.

11    Q.   Okay.  I'm also going to show you Government's

12    Exhibit 311.

13              No, no, not yet.

14              I'm going to show you 589.  This is a November e-mail

15    from Mr. Craig?

16    A.   Yes.

17    Q.   And he is telling you in November, that in November, the

18    retainer has been exhausted; correct?

19    A.   Yes.

20    Q.   Okay.  I think the next thing that Mr. Murphy showed you

21    was starting with DX 492.  All right.  So this was Mr. Craig

22    forwarding you a document from Jonathan Hawker?

23    A.   Yes.

24    Q.   Let's look at Mr. Hawker's e-mail at the bottom of that

25    chain.

-2765-

1    A.   Okay.

2    Q.   And Mr. Hawker sends this e-mail to a group of people,

3    including Mr. Craig.  And he says, "Please let me have any

4    comments, corrections, or amendments so that I can

5    incorporate them in the revisions of the Ministry packs

6    tomorrow."

7         Right?

8    A.   Yes.

9    Q.   So he is asking for the comments that you then helped

10   form; correct?

11   A.   He is asking for comments, yes.

12   Q.   And you remembered receiving this document today.  Can we

13   look at Government's Exhibit 221.

14        This is a media plan you had actually received

15   earlier from Alex van der Zwaan that we asked you about last

16   week, but you didn't remember that; did you?

17   A.   That's correct.

18   Q.   And you didn't remember discussing it with Mr. Craig?

19   A.   That's correct.

20   Q.   Okay.  So, then, let's look at Defense Exhibit 152.  And

21   let's look at your comment at the top.  This was where you

22   said that you don't think you want to own their project;

23   right?

24   A.   Yes.

25   Q.   And that's consistent with your advice to the FARA Unit

2766

1       back in April 2012 that you didn't want to get too involved

2       with public relations because it would violate FARA; correct?

3               MR. MURPHY:  Objection to the form of the question,

4       Your Honor.

5               THE COURT:  Yeah, I think she just misspoke.  You

6       said that was consistent with your advice to the FARA Unit.

7       You mean his advice to his partners.

8               MS. GASTON:  Sorry.

9               BY MS. GASTON:

10      Q.   Your advice that you responded to Mr. Craig and Mr. Kedem

11      with, in response to Ken Gross's advice; correct?

12      A.   Yes.

13      Q.   When you said that if you got involved in public

14      relations regarding the report, you'd be doing much more than

15      just lawyering; correct?

16      A.   Yes.

17      Q.   Okay.  Now let's look at Government's Exhibit 267.  I

18      think Mr. Murphy showed you Mr. Craig's response to this, but

19      he didn't focus on Mr. Hawker's response above that.  Let's

20      look at that.

21               Did Mr. Hawker respond to Mr. Craig's e-mail?

22      A.   Yes, he did.

23      Q.   And did he write, "That's fine, Greg.  Let's speak later.

24      Obviously, I don't want to give a false impression of your

25      work.  However, I simply can't agree that anyone would see

1       the report as a whitewash even if they had the opportunity to

2       read the document I have written, which in any event is not

3       its purpose.  It would be helpful if a member of your team

4       could outline the points that are incorrect so that I can

5       address them."

6               So Mr. Hawker responded and said, that's not my

7       intention, give me comments.  So, again, he is asking for the

8       comments you prepared; correct?

9               MR. MURPHY:  Objection to the form.

10              THE COURT:  Probably one question at a time would be

11      better.

12              BY MS. GASTON:

13      Q.   He's asking for the comments that you prepared; correct?

14      A.   He's asking for comments, yes.

15      Q.   Okay.  Let's look at DX 154.  And let's look at the top.

16              These are the proposed responses to Mr. Hawker that

17      you prepared for Mr. Craig to send to him?

18      A.   Yes.

19      Q.   Did you send them to Mr. Hawker?

20      A.   No.

21      Q.   Did you talk to Mr. Hawker about them?

22      A.   No.

23      Q.   Do you know whether Mr. Hawker made any of them?

24      A.   No.

25      Q.   Okay.

-2768-

1    A.   I should say --

2    Q.   In --

3    A.   I should say not that I recall.  I don't know if there

4    are e-mails that would reflect it, but not that I recall as

5    I'm sitting here today.

6    Q.   Okay.  Mr. Murphy showed you a lot of comments from

7    Ukraine over the course of September and August.

8    A.   Yes.

9    Q.   And you received comments from Ukraine because you had

10   provided Ukraine with a draft copy of the report?

11   A.   Yes.

12   Q.   You did not, however, share a copy of the report with

13   Ms. Tymoshenko or her attorneys; did you?

14   A.   No, but we talked to them about all of the issues and

15   asked for their comments on all the issues.  But that's

16   correct, we did not share a draft report with them.

17   Q.   Okay.  You mentioned before that there was a process,

18   Mr. Sloan, of taking in comments in the group and discussing

19   them.

20        Do you remember mentioning that?

21   A.   Yes.

22   Q.   All right.  Let's look, for instance, at Defendant's

23   Exhibit 119.  And let's go to the back of this exhibit and

24   start with Mr. Craig's e-mail on September 11, 2012.

25        Does Mr. Craig say that "Mr. Manafort called and was

1    very pleased that he had an all-but-final draft"?

2    A.   I'm trying to orient myself.  Where is this in the e-mail

3    trail?

4    Q.   Sure.  It's on the very start of the chain.

5    A.   At the bottom.  So at the bottom of the chain, yes, okay.

6         Yes, I see it.  Yes.

7    Q.   He says that "Manafort called and was very pleased that

8    he had an all-but-final"?

9    A.   Yes.

10   Q.   Okay.  And Mr. Craig says that -- Mr. Craig agreed to

11   consider two proposed changes after sharply editing them --

12   A.   Yes.

13   Q.   -- right?

14        And when he writes "after sharply editing them," you

15   take that to mean that Mr. Craig edited them before sharing

16   them with the group; correct?

17   A.   Yes.

18   Q.   All right.  And he writes, "2. In the executive summary

19   section with respect to the section on selective prosecution,

20   would we be willing to add the sentence, in red, just before

21   the final sense, based on our analysis of the record, we find

22   no basis to support a finding of selective prosecution.

23   Tymoshenko has not provided specific evidence of political

24   motivation that would be sufficient to overturn her

25   conviction under American standards."

2770

1          Any problem with these two but with including that

2     change?

3          Did he write that?

4          MR. MURPHY:  Did who write it?

5          BY MS. GASTON:

6     Q.   Did Mr. Craig write that?

7     A.   Yes.  The wording, I think, is a little different from

8     what you read in the last sentence.  But, yes, it says, any

9     problems with these two changes, let me know.

10    Q.   So Mr. Craig wrote number 2 in this e-mail?

11    A.   Yes.

12    Q.   This is something he is proposing after having received

13    comments from Mr. Manafort?

14    A.   Yes.

15    Q.   And Mr. Craig is proposing to the group that the report

16    state, "Based on our analysis of the record, we find no basis

17    to support a finding of selective prosecution."

18    A.   Yes.

19    Q.   Okay.  Now, the group considered that, if you page

20    through.  If you look at page 3, for instance, of this

21    exhibit, Mr. Kedem challenges number 2, and then

22    Mr. van der Zwaan chimes in.  And then if you look at

23    page 2 of the exhibit --

24          MR. MURPHY:  Objection.

25          THE COURT:  These are multipart questions.  So if you

-2771-

1    want to make them part of your question, you need to take

2    them one by one.

3           MS. GASTON:  All right.

4           BY MS. GASTON:

5    Q.   So if we look at page 3 of the exhibit, does Mr. Kedem

6    respond to Mr. Craig's comment on number 2?

7    A.   Yes.

8    Q.   Okay.  But he notes that Mr. Kedem thinks there was

9    circumstantial evidence supporting the claim?

10          MR. MURPHY:  Objection, Your Honor.  Mr. Kedem -- I'm

11   sorry -- Mr. Kedem said something, but I don't think it's

12   appropriate to paraphrase what he said.

13          BY MR. GASTON:

14   Q.   Mr. Kedem wrote, "I do think that there was

15   circumstantial evidence supporting her claim."

16          Correct?

17   A.   Yes, and then the sentence goes on to say, "although not,

18   as we say, sufficient specific evidence."  Yes.

19   Q.   Yes.  So, then, if you look at page 2 of the document, at

20   5:23 p.m., Mr. Craig responded, "Again, this is not asking

21   for a new or different conclusion.  I agree that saying no

22   basis would be wrong and overkill.  I also think -- and agree

23   with you -- that we should not be commenting on the

24   sufficiency of the evidence for the court's conclusions.  Can

25   we say something much weaker?  Based on our review of the

1    record, we do not believe there is sufficient evidence to

2    support a finding of selective prosecution."

3          Did Mr. Craig write that?

4    A.   That's what it says, yes.

5    Q.   And then at the bottom of the first page, Mr. Kedem asked

6    Mr. Craig a question about the proposal?

7    A.   Yes.

8    Q.   And then Mr. Craig responded, "I agree that would be

9    duplicative.  What about a melding?  Based on our review of

10    the record, we do not believe that Tymoshenko has provided

11    specific evidence of political motivation that would be

12    sufficient to overturn her conviction under American

13    standards."

14    A.   Yes.

15    Q.   "Is that okay with everyone?"

16    A.   Yes.  That's what it says.

17    Q.   So is this the process by which the group came to a

18    finding in the executive summary of the report?

19    A.   Can you repeat the question?

20    Q.   Is this the process that you described by which the group

21    came to a finding in the executive summary of the report?

22    A.   Well, I -- this reflects the process I was describing of

23    considering the comments, if that's the question, yes.

24    Q.   And it started on page 4 with Mr. Craig proposing a

25    sentence that said, "Based on our analysis of the record, we

2773

1    find no basis to support a finding of selective prosecution"?

2    A.   Yes.  And he was asking others for their response.  And

3    as I indicated, the guidelines I think were clear to

4    everybody in considering the comments.  But this was part of

5    an ongoing process where everybody was considering the

6    comments and evaluating them and part of a back-and-forth.

7    Q.   Okay.  I'm going to show you an exhibit that has not been

8    admitted.  Two of them, actually.

9              MR. MURPHY:  Your Honor, may we approach?

10             THE COURT:  Yes.  Bring them with you.

11             (At the bench)

12             THE COURT:  These have never been considered, not

13   just not used previously?

14             MS. GASTON:  Correct.

15             MR. MURPHY:  Okay.  So these are beyond the scope of

16   my --

17             THE COURT:  Wait.  Don't turn the husher off.

18             Thank you.

19             These are beyond the scope of my direct examination

20   of Mr. Sloan.  They are comments that were made before the

21   report was finalized and given to the Ukraine.  All of my

22   questions had to do with the comment period after they gave

23   Ukraine a copy of the report and Ukraine reacted.  This is

24   all beforehand.  I think it is well beyond the scope of what

25   I asked about.

1          THE COURT:  Okay.

2          MR. MURPHY:  If they wanted to ask Mr. Sloan these

3     questions, they could have --

4          THE COURT:  Let me just glance at them and then hear

5     what she is planning to do with them --

6          MR. MURPHY:  Okay.

7          THE COURT:  -- and then now I know what your

8     objection is to them.

9          MR. MURPHY:  Thank you.

10          (Pause)

11          THE COURT:  Okay.  And what is your purpose for

12     trying to introduce these?

13          MS. GASTON:  My purpose is that Mr. Murphy just spent

14     a great deal of time going over comments from Ukraine and how

15     none of them were accepted.  And this is showing that as

16     early as July, Mr. Craig was anticipating comments from

17     Ukraine and proposing language in the report that would make

18     Ukraine happier.

19          THE COURT:  What is this one?

20          MS. GASTON:  And this is a chain between Mr. Craig

21     and Mr. Sloan about the proposed change.

22          THE COURT:  All right.  I agree that the specific

23     wordsmithing of the executive summary that's attached, how

24     they went about drafting it, what they were thinking it might

25     say in July isn't relevant.  But I think that just this, the

1        fact that from the git-go they are anticipating comments, and

2        that I think there was a portrait painted on your direct of

3        this was just completely outside the contemplation of the

4        lawyers that it would get comments, and I think she is

5        allowed to show this email and say they thought they would be

6        coming and they tried to take them into consideration on the

7        front end.

8               So I think I'm going to permit her to use 900.  I

9        note your objection.  And 901 is just responses to it.

10              Do we need it?

11              MS. GASTON:  Well, it's --

12              THE COURT:  I mean, it is really kind of getting into

13       the weeds.

14              MS. GASTON:  We can use 900 by itself.  901 reflects

15       Mr. Sloan's statement that he thinks that the proposed

16       comments open him up to criticism, it doesn't look like it is

17       designed to appease the government.

18              THE COURT:  Well, I think, instead of moving it in,

19       why don't you show him this, and then say:  And did you all

20       discuss this, and was one of your concerns about whether it

21       would look like you were trying to appease the government?

22              I mean, he is trying to keep it independent, that's

23       what he is going to say.  So I don't think that's

24       inconsistent with his testimony.  Yes?

25              MR. MURPHY:  The comments were not accepted.  So

-2776-

1    where does this appear -- I mean, these changes --

2          THE COURT:  I don't think we're talking about

3    specific changes.  These aren't changes that were received

4    from the government at all.  This is just an e-mail, that I'm

5    sending you this document, because when you think about the

6    fact that they're going to have concerns, and I'm

7    anticipating them.  Then she can bring them in.  I don't

8    think the attachment is really relevant.  And I'm not sure

9    everything that they did in response to this is relevant.

10   But I think you can ask if Craig sent him drafts even before

11   they got comments, anticipating the comments would be coming

12   and figuring out how to interest them at the front end.

13         That's a fair question that I believe fits within the

14   cross.  You can ask that.

15         MR. MURPHY:  Your Honor, I object because I did not

16   suggest that they never expected comments.  What I was

17   suggesting is they didn't expect to get 10 sets of comments

18   and get them every four to eight days.  That's what was

19   unusual about the Ukraine's reaction.  And it goes to show

20   that at the end of the day the folks at Skadden didn't know

21   whether the report was going to be released or not because

22   they --

23         THE COURT:  That's all in evidence.

24         MR. MURPHY:  I don't know why this entitles the

25   government to show they're drafting the report.  They were

1    anticipating the --

2           THE COURT:  I think it is one fair question within

3    the scope of examination.  It doesn't take away or raise the

4    evidence that you put in.  It is just a question on

5    cross-examination that I'm going to permit.

6           MR. MURPHY:  All right.  Thank you, Your Honor.

7           MS. GASTON:  Just to make sure I do exactly what you

8    just said, does the e-mail cover of 900 come in?  Is it just

9    to refresh his recollection?

10           THE COURT:  No, I think you can put 900 on the --

11           MS. GASTON:  Okay.  Thank you.

12       (In open court)

13           BY MS. GASTON:

14    Q.  Ms. Rohde, could we bring 900, please.  Can we zoom in on

15    the top?

16           THE DEPUTY CLERK:  Is this in evidence?

17           MS. GASTON:  This is now being entered into evidence.

18           BY MS. GASTON:

19    Q.  Mr. Sloan, do you remember receiving this e-mail from

20    Mr. Craig in July of 2012?

21    A.  No, I don't.

22    Q.  Okay.  And did Mr. Craig write to you at that point in an

23    e-mail with the subject, "Two amendments to executive

24    summary"?

25    A.  Yes.

2778

1    Q.   And did he write, "I anticipate that Ukraine will push

2    back and look for something to be said that is more positive

3    about what they did and more explicit about her conduct on

4    January 19, 2009.  Does anyone have any objection to the

5    suggested amendments in blue on the attached executive

6    summary?"

7    A.   Yes.

8    Q.   Do you remember receiving that?

9    A.   No.

10   Q.   Okay.  Do you remember Mr. Craig anticipating Ukraine's

11   reaction to the report in this way?

12   A.   Well, I remember all of us anticipating reactions from

13   Ukraine and from Ms. Tymoshenko.  We knew we were writing a

14   report on a controversial subject that people had strong

15   feelings on on both sides, and we were conscious at all times

16   that there was likely to be reactions and criticisms from

17   both sides.  So, absolutely, it was part of it, as it did not

18   affect our evaluation of the issues, but we were always

19   conscious of it.  And again, we wanted to be taking into

20   account as much as we could the concerns from both sides

21   about fairness and wording and to sort of present it the best

22   way that we could in light of that.

23   Q.   Uh-huh.  And he attached an executive summary with

24   amendments because he wrote he anticipated -- quote, "I

25   anticipate that Ukraine will push back and look for something

1    to be said that is more positive."

2             Right?

3    A.  "About what they did and more explicit about her conduct

4    on January 19, 2009."

5             And the reason I complete the sentence is he is

6    talking about a particular issue.  He is adding a sentence or

7    two for consideration for the team that included Mr. Kedem

8    and Mr. Haskell.  And again, we were considering it.  As with

9    lots of changes, the process was considering them to see if

10   the report was as accurate and complete and clear as

11   possible.

12   Q.  Do you remember what your reaction to his proposed

13   changes here were?

14   A.  I don't remember this particular e-mail, no.  But there

15   were many, many e-mails, suggestions, drafting.  It's close

16   to a 200-page report, and during the course of drafting it,

17   there were many e-mails and conversations about many things

18   in the report.

19   Q.  Okay.  Do you recall, Mr. Sloan, that you responded to

20   one of his changes that, quote, "It unnecessarily opens us up

21   to criticism because it looks like it is designed to appease

22   the government"?

23   A.  I don't recall that, no.

24   Q.  Okay.

25             THE COURT REPORTER:  Judge, do I show Exhibit 900 as

1    admitted?

2              THE COURT:  Yes.  Exhibit 900 is admitted.  Thank

3    you.

4         (Government 900 admitted in evidence)

5              BY MS. GASTON:

6    Q.   Mr. Murphy showed you DX 180, which was October 8th.

7    Could we please bring that up, Ms. Rohde?

8              And Mr. Sloan, is that around the last time you

9    remember weighing in on comments regarding the report?

10   A.   Well, let's see, there's a couple of things with your

11   question.  "Weighing in," I'm not sure what you --

12   Q.   When is the last time that you remember there being

13   comments from Ukraine or editing to the report by Skadden?

14   A.   By my recollection, I would have said the end of

15   September, because what I recall is that the report was

16   basically done in September, and I was moving on and working

17   on other things.  I see from the e-mail that this e-mail is

18   from about a week after that.  But in terms of my

19   recollection, I don't remember it extending into October.

20   The report -- things were basically done at the end of

21   September is how I remember it.

22   Q.   And who from Ukraine or what representatives of Ukraine

23   were you communicating with?

24   A.   I wasn't communicating with anybody from Ukraine.

25   Q.   Okay.  Can we please bring up Government's Exhibit 311,

-2781-

1    Ms. Rohde.  And could we zoom in on that text.

2         So, Mr. Sloan, were you aware of this e-mail from

3    Mr. Craig to Paul Manafort on November 20th?

4    A.  Not that I recall.

5    Q.  And were you aware that as of November 20, 2012,

6    Mr. Craig was writing to Mr. Manafort and saying that tweaks

7    have been made and the final report is ready for delivery?

8    A.  Not that I recall.

9    Q.  And finally, Mr. Sloan, you're friends with Mr. Craig;

10    aren't you?

11    A.  Yes.

12    Q.  You're close friends with Mr. Craig?

13    A.  Yes.

14    Q.  I can't imagine that it would have been a pleasant

15    experience to testify last week or today.

16         MR. MURPHY:  Objection, Your Honor.

17         THE COURT:  Sustained.  I think the first two

18    questions are factual.

19         MS. GASTON:  Okay.

20         THE WITNESS:  But . . .

21         BY MS. GASTON:

22    Q.  And Mr. Sloan, after your testimony last week, you spoke

23    with the defendant; correct?

24    A.  With the defendant?  No.

25    Q.  Okay.  Did you leave the courthouse last week with

-2782-

1    Mr. Craig?

2    A.   No.

3    Q.   You didn't?

4    A.   No.

5           MR. MURPHY:  May we approach, Your Honor?

6           THE COURT:  Okay.

7           (At the bench)

8           MR. MURPHY:  I saw a photograph last week, this

9    photograph.  This is another client of Mr. Sloan and

10   Mr. Craig, and this photograph is from about three or four

11   years ago.

12          MS. GASTON:  Then, I just made a big mistake, and

13   however you want to fix it --

14          MR. MURPHY:  I believe that's General Cartwright and

15   Mr. Craig and Mr. Sloan --

16          MS. GASTON:  -- news article the other day, so I

17   thought it was after his testimony.

18          THE COURT:  Okay.  All right.  He answered no.

19          MS. GASTON:  Okay.

20          THE COURT:  So I can also say that you shouldn't draw

21   any inference from the questions since they were asked in

22   error or you can withdraw them if you'd like.

23          MS. GASTON:  Okay.  I would like to do that.

24          MR. MURPHY:  Thank you, Your Honor.

25        (In open court)

                                                               -2783-

1                 MS. GASTON:  I will withdraw that last question.

2           Thank you, Mr. Sloan.

3                 THE COURT:  All right.  Any redirect?

4                 MR. MURPHY:  No further questions of Mr. Sloan.

5                 THE COURT:  Okay.  Thank you, sir.  You can be

6     excused again.

7                 THE WITNESS:  Thank you.

8              (Witness excused)

9                 THE COURT:  All right.  Call your next witness.

10                MR. MURPHY:  Your Honor, the defense calls Brendan

11    Sullivan.

12                THE COURT:  All right.

13                          Brendan Sullivan,

14    having been duly sworn, was examined and testified as follows:

15                        DIRECT EXAMINATION

16          BY MR. MURPHY:

17    Q.  Mr. Sullivan, you can close that book.  It has nothing to

18    do with you.

19          Can you please tell the ladies and gentlemen of the

20    jury what your occupation is.

21    A.  I am an attorney-at-law.

22    Q.  And where do you reside, sir?

23    A.  I reside in Washington, D.C., and I practice in

24    Washington, D.C.

25    Q.  Where do you practice?

-2784-

1    A.   At the law firm of Williams & Connolly.

2    Q.   I want to ask you, sir, when did you -- where did you go

3    to college and law school and when did you graduate?

4    A.   I came -- I went to Georgetown College beginning in

5    September of 1960, graduated in 1964.  I went straight on to

6    law school from there at Georgetown, and graduated from the

7    law school in 1967.  And then I did two years in the Army as

8    an Army Captain.  And after that went to work at

9    Williams & Connolly on January 2, 1970.  This is my 50th year

10   at the law firm.

11   Q.   Are you still actively practicing at Williams & Connolly?

12   A.   Too actively.

13   Q.   Are you married, sir?

14   A.   Yes, sir.  I married a Washington native, Lila O'Brien

15   Sullivan, also a lawyer.  And we had three children, and

16   currently have eight grandchildren under the age of seven.

17   It's called bedlam.

18   Q.   Do you practice in any particular area of law?

19   A.   Yes, sir.  I am a trial lawyer, which means that I'm a

20   courtroom lawyer like those here in the courtroom, and I do a

21   mix of civil and criminal litigation.  Mostly in federal

22   courts throughout the country.  And sometimes in state

23   courts, as well.

24   Q.   Do you know the defendant, Gregory Craig?

25   A.   Yes, sir, I know him well.

-2785-

1    Q.   How long have you known Mr. Craig?

2    A.   I have known him for 47 years.

3    Q.   And how did you first come to know him?

4    A.   I began, as I said, at the law firm in January of 1970.

5    And Gregory came to the -- I was the 18th lawyer in the law

6    firm.  And Gregory came to the law firm just about three

7    years later, in November of 1972.  So we were both young

8    lawyers, learning how to be lawyers, at the Washington law

9    firm founded by the legendary Edward Bennett Williams.

10   Q.   Over the course of time, Mr. Sullivan, how often were you

11   and Mr. Craig actually practicing law together in the same

12   firm at the same time?

13   A.   Of the 47 years that I knew Gregory Craig, he was at the

14   law firm, by my calculation, for about 26 years.

15   Q.   Why is that?

16   A.   Because he --

17             MR. CAMPOAMOR-SANCHEZ:  Objection.  "Why?"

18             THE COURT:  I think I understand the question.

19   Overruled.

20             Where was he the other whatever the rest of the math

21   turns out to be, if you knew?

22             THE WITNESS:  Yes.  He went to government service

23   four or five times protracted periods of time.  So, at the

24   law firm, he was there basically for two years to begin, and

25   then he went to Public Defender's Office.  Then he came back,

1    and he was there for six years.  Then he went to work for

2    Senator Ted Kennedy after that.  And then after he was

3    finished working for the senator, he came back for two

4    periods of nine years each.  So that's my count of two, six,

5    nine, and nine.  That's how I know him, 26 years of working

6    with him closely at the law firm.  And then the other years

7    he was in government serving a long time in the Clinton

8    Administration --

9             THE COURT:  Well, let him ask you the next question.

10   How's that?

11            THE WITNESS:  Okay.

12            BY MR. MURPHY:

13   Q.  Mr. Sullivan, did you actually work on cases with

14   Mr. Craig?

15   A.  Yes, I did.

16   Q.  Over the course of time that you worked with Mr. Craig,

17   did you form any opinions about his honesty, integrity, his

18   truthfulness?

19   A.  Yes, I did.

20   Q.  What is your opinion, sir?

21   A.  My opinion is that his integrity is beyond reproach.

22            I worked with him in different ways over this period

23   of time.  I worked with him while he was running cases and I

24   was running other cases.  And I worked with him directly on

25   major cases, for example, out of town in New York for three

1    or four years straight.  And also, at the law firm, after 20

2    years or so, I had administrative responsibilities and served

3    on the executive committee.  In that capacity -- you don't

4    exactly have bosses in law firms, but you have executive

5    committee.  And in the context of my duties as a member of

6    the executive committee, five or six people in the law firm,

7    I would have frequent contact with Greg and understand what

8    he was doing in his practice and working with him both as a

9    partner and as a quasi-supervisor.

10   Q.   Did you ever have any reason to question his honesty in

11   any matter that came to your attention?

12   A.   Not once.  I not only worked with him on a day-to-day

13   basis on cases, sometimes all day long on cases, other times

14   he and I had an office about 60 feet apart in the building

15   that we're located in now, and I would see him -- literally,

16   over that period of 26 years, I had hundreds of encounters

17   with Greg Craig on business.  I wasn't a social friend in the

18   sense we didn't go out together, we didn't go to sporting

19   events or bars.  But all of it was professional and working

20   for our clients.

21   Q.   Do you have an opinion as to whether or not Mr. Craig is

22   a law-abiding citizen?

23   A.   Yes, I do.  I would trust him with the matters most

24   crucial to me or my family.  He is an extraordinary lawyer,

25   always puts his client first and understands his duty.

1          To me, Gregory, you know, when you talk about someone

2     who has character, to me, the foundation of character is

3     truthfulness.  And not once over those period of 26 years of

4     closely working with him and knowing him for 47 years have I

5     ever had any experience where he did not tell me the candid

6     truth about any matter.

7     Q.   Now, Mr. Sullivan, you are a practicing lawyer in the

8     Washington community.  Are you someone who knows other

9     lawyers in the Washington legal community?

10    A.   Yes, I do.

11          MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.  It is

12    beyond the scope of proper --

13          THE COURT:  Well, I think this is the predicate for

14    whether he knows what his reputation is.  So I think he can

15    ask the question.

16          MR. CAMPOAMOR-SANCHEZ:  He asked about his

17    reputation.

18          THE COURT:  He asked his opinion, and now he is

19    getting into the reputation.

20          You can ask your question.

21          BY MR. MURPHY:

22    Q.   Based on your familiarity with other lawyers practicing

23    in Washington, D.C., do you know whether Mr. Craig has a

24    reputation for honesty and integrity and truthfulness in that

25    Washington, D.C. legal community?

1    A.   Yes, I do.  First off, the community is made up of the

2    lawyers right within Williams & Connolly.  We have 340

3    lawyers today at Williams & Connolly.  In addition, we have

4    frequent contact with lawyers outside of the community.  In

5    many cases, we work with multiple law firms.  And so I

6    know -- and again, as I use the term lightly, light

7    supervision as a member of the executive committee, I know

8    what other lawyers say about Greg Craig.  In all of that

9    period of time, not once, ever, did anyone say anything

10   negative about Gregory's integrity or his truthfulness.

11   Q.   And so what is his reputation within the community?

12   A.   A man of extraordinary character and extraordinary

13   integrity.  What he says, you believe it.

14            MR. MURPHY:  I have no further questions for

15   Mr. Sullivan.

16            THE COURT:  All right.  Any cross-examination?

17            MR. CAMPOAMOR-SANCHEZ:  Can we approach, Your Honor.

18            THE COURT:  Yes.

19            (At the bench)

20            MR. CAMPOAMOR-SANCHEZ:  Your Honor, I think they have

21   opened the door for me asking this witness about the Skadden

22   settlement and what it says about Mr. Craig, and what is said

23   about Mr. Craig in the settlement, essentially lying to Larry

24   Spiegel and others at Skadden.

25            I mean, I just want to be clear before I ask the

-2790-

1    question.

2         MR. MURPHY:  I disagree, Your Honor.  And actually,

3    we have an agreement about the Skadden settlement; that it is

4    not to come into evidence in this case.

5         I do not believe that anything that Mr. Sullivan said

6    had anything to do with what is in the Skadden settlement.

7    Even the lawyers who represented Skadden have said in court

8    that they did not mean to impugn or suggest that Mr. Craig

9    ever lied.  They said that some of the things that he said

10   were inaccurate.  They made a big distinction about whether

11   or not he had made false statements as opposed to with an

12   intent, as opposed to just an inaccurate statement.

13        So I don't think this Skadden settlement comes in in

14   this fashion at all.

15        MR. CAMPOAMOR-SANCHEZ:  How can I even question his

16   statement about his reputation in the community if he's a

17   lawyer and has not heard of the Skadden settlement and what

18   that implies for his friend Greg Craig?  I can't challenge

19   it, then, if I can't ask him about it.

20        THE COURT:  When you said he has never once heard

21   anything negative about his integrity or truthfulness, I mean

22   he pretty much said, within the Williams & Connolly community

23   and in contact with other lawyers in cases.

24        I mean, I think you can certainly ask him because

25   there was evidence that he can't say anything about

1    statements he made within Skadden or statements he may have

2    made in this case, and he's not including that in his

3    opinion, but -- I mean, I do think, when you get beyond the

4    person's opinion and into his reputation in the community,

5    that he has never heard anything, you know, you're kind of

6    trying to have your cake and eat it too with the settlement.

7    And I think part of the way is the way the witness answered

8    the questions, but it is also part of the breadth of the

9    questions.  So, you know, I think it is a very close

10   question.

11              MR. TAYLOR:  May I?

12              THE COURT:  Yes.

13              MR. TAYLOR:  Those are guilt-assuming questions --

14              THE COURT:  No, no, he was talking about the fact

15   that there is a -- if you're aware of his reputation in the

16   community for honesty and integrity, are you aware of a

17   settlement in which the law firm told the government that he

18   had lied to the government?

19              MR. TAYLOR:  No, that's not what the law firm said.

20   But never --

21              MR. CAMPOAMOR-SANCHEZ:  I agree that the word "lied"

22   wasn't used.  But certainly, his statements to his partners

23   were not accurate, and that the very statements in this

24   case --

25              THE COURT:  I think the firm admitted that the

-2792-

1    statements made to the government were not accurate.  I

2    haven't looked at it lately, but it certainly is a thing, and

3    if one knew about it, it would bear on his reputation in the

4    community, if he knew about it.

5          The question is whether I want to bring in something

6    that is that prejudicial, I think we have tried that hard to

7    stay away from --

8          MR. CAMPOAMOR-SANCHEZ:  We have stayed away from it.

9          THE COURT:  Okay.  So I think that I'm not going to

10   permit it at this time, but I don't think you should ask

11   anyone else what his reputation in the community is.  Let's

12   stick to opinion.  Because it really is a little unfair

13   when -- I think there was a lot of discussion in the

14   community at the time about what it meant, and I don't think

15   you can dance so close to it and then not let them do it.

16         We didn't really talk about this before you started

17   or we could have ruled on it before and discussed it before,

18   and I probably would not have permitted this question in

19   light of it.  But given the fact that I don't think they were

20   on notice that I was going to consider this to be

21   door-opening.  I'm going to consider it in the future.  I may

22   even consider striking the testimony about the community as

23   opposed to his opinion.  I think it is very prejudicial, but

24   I also think there is a certain unfairness right now the way

25   this is left.

2793

1      MR. CAMPOAMOR-SANCHEZ:  Your Honor, I'm not trying to

2    introduce this, I really am not.  So I think our preference

3    would be the Court instruct the jury that his opinion about

4    the reputation in the community be stricken and not

5    considered, and then I don't have to ask any questions about

6    it.

7      MR. MURPHY:  We don't agree to that, Your Honor, but

8    we will abide by whatever your ruling is, obviously.

9      THE COURT:  All right.  Well, I think what I'm going

10   to say, and not suggest that anything improper occurred, that

11   I have ruled that his testimony concerning his opinion is

12   admissible but concerning his reputation is not, and so they

13   can't consider that, and that's all I'm going to say.

14      MR. MURPHY:  Okay.  Thank you.

15    (In open court)

16      THE COURT:  All right.  Members of the jury, we have

17   talked about situations that could arise after bench

18   conferences.

19      I am suggesting to you right now that the testimony

20   that you heard about Mr. Sullivan's opinion about Mr. Craig's

21   honesty and truthfulness and law-abidingness is evidence that

22   you can consider in the case.  But his testimony about his

23   reputation within the legal community is not going to be

24   admissible, so you can ignore that testimony as if it isn't

25   part of the record anymore.

-2794-

1      Do you have any questions?

2           MR. CAMPOAMOR-SANCHEZ:  Very briefly.

3           THE COURT:  All right.

4                          CROSS-EXAMINATION

5           BY MR. COMPOAMOR-SANCHEZ:

6    Q.  Good afternoon, sir.

7    A.  Good afternoon.

8    Q.  You and I have not had the pleasure of meeting before; is

9    that right?

10   A.  That's correct.

11   Q.  Sir, I hadn't seen you in the courtroom, but let me just

12   ask you:  You have not been sitting here and heard the

13   evidence in this case; correct?

14   A.  Correct.

15   Q.  And you have also not examined the documents that the

16   ladies and gentlemen of the jury have in this case?

17   A.  That is correct.  I'm a character witness.

18   Q.  So you know nothing about the facts about what Mr. Craig

19   did as it relates to this case?

20   A.  That, too, is correct.

21           MR. CAMPOAMOR-SANCHEZ:  No further questions.

22           THE COURT:  All right.  Any redirect?

23           MR. MURPHY:  No redirect.

24           THE COURT:  Okay.  Thank you very much, sir.

25           You're excused.

-2795-

1          THE WITNESS:  Thank you, Your Honor.

2          (Witness excused)

3          THE COURT:  Do you have another witness ready to

4     call?

5          MR. JUNGHANS:  We do, Your Honor.  But could we

6     approach a moment?

7          THE COURT:  Okay.

8          Wait, wait.  She asked to approach, so let's wait

9     before we put another witness on the stand.

10          Thank you.

11          (At the bench)

12          MS. JUNGHANS:  We do, Your Honor, but the witness has

13     been prepared to --

14          THE COURT:  Just so you know, I was going to call for

15     a break.  You will have an opportunity to let her know --

16          MS. JUNGHANS:  This person is not a lawyer.  I have

17     no reason to think she even knows about the Skadden

18     settlement.  But I'm not going to go there if the Court is

19     going to permit the question to be asked, which I understood

20     your ruling to be that even a witness who says she knows a

21     whole different community --

22          THE COURT:  What is the community she knows about?

23          MS. JUNGHANS:  She is an educational consultant who

24     has been on boards with Mr. Craig.  His children went to the

25     school of which she was a principal.  He has represented the

1   school.  Sometimes he referred parents to the school when

2   they talk about what they know about him.  But she is not a

3   lawyer.

4            THE COURT:  Is this a witness to whom you would be

5   proposing to question --

6            MS. GASTON:  About the Skadden settlement?  No.

7            THE COURT:  We will take a break anyway.  But I don't

8   think her testimony has the same problems as a member of the

9   legal community.

10            MS. JUNGHANS:  Right.  I don't think it does, either

11   but --

12            THE COURT:  I'm agreeing with you.

13            (In open court)

14            THE COURT:  We're just going to take a quick

15   mid-afternoon break.  No one seems to be objecting to that.

16   And we'll resume at approximately 10 of 4.

17            Please don't discuss the case with anyone or do any

18   research about it, either.

19            Thank you.

20            (Recess)

21         (Jury not present)

22            THE COURT:  All right.  I'm advised that there is

23   something we want to talk about before.

24            MR. TAYLOR:  Yes, Your Honor.

25            THE COURT:  All right.

1        MR. TAYLOR:  Before the bench conference, the last

2   one or the next-to-the-last one, Ms. Gaston had in her hand

3   the photograph, which the jury saw.  You couldn't tell what

4   was in it, but you could tell there was a photograph in her

5   hand.

6        I think, in fairness, the Court should instruct the

7   jury that that was not a photograph of Mr. Craig and

8   Mr. Sloan leaving the courthouse.  That's the first one.

9        THE COURT:  I don't know -- I didn't know she had a

10  photograph until she came all the way up here.

11       MR. TAYLOR:  I could see it -- I'm not describing

12  malice.  I'm just saying when she walked by the jury box, the

13  jury could see she had a photograph in her hand.

14       MR. CAMPOAMOR-SANCHEZ:  May I address this?

15       THE COURT:  Sure.

16       MR. CAMPOAMOR-SANCHEZ:  My distinct recollection is

17  Ms. Gaston had a piece of paper that was folded like this.

18  It was a photograph, but it was folded.  She approached the

19  bench with the folded thing and put it for the Court to see.

20  So there was a folded-up piece of paper that she

21  approached --

22       THE COURT:  I think --

23       MS. CAMPOAMOR-SANCHEZ:  -- but she ultimately

24  withdrew the question.

25       THE COURT:  She withdrew the question.  He answered

                                                                2798

1      the question "no."  And then she withdrew the question.  And

2      I'm happy to say that the question and answer, not part of

3      the record, there is no evidence in the record of this, but I

4      don't want to get into -- I don't want to raise the

5      suggestion of a photograph if there is no indication that

6      they saw it.

7              MR. TAYLOR:  In this case, where everyone agrees that

8      Mr. Sloan's answer to the question was true, that is, they

9      did not leave the courthouse together, and there is a risk of

10     impression that it was something you wouldn't let in that

11     related to that photograph, I do think there is a danger --

12             THE COURT:  Well, I --

13             MR. TAYLOR:  I do think there is a danger.

14             THE COURT:  Well, I offered to strike the question.

15     She withdrew the question.

16             I'm happy to say that not only was the question

17     withdrawn, but there is no evidence that they left the

18     courtroom together and they shouldn't draw any inference from

19     the question.

20             Do you have a problem with that?

21             MR. CAMPOAMOR-SANCHEZ:  If it had been done at the

22     time, I guess it would make more sense.  Now we seem to be

23     going back to it and highlighting for some unknown reason

24     that issue to the jury.

25             THE COURT:  Well, I can also say there is no

1    suggestion that the prosecution did anything improper.  It is

2    just I want to make sure everybody understands that there is

3    no evidence of that at this time.  All right?

4         MR. CAMPOAMOR-SANCHEZ:  The witness answered "no."

5         THE COURT:  I know.  But then she withdrew the

6    question.

7         I can't tell you from my own recollection whether she

8    had in a roll or she had it folded over.  I accept your

9    representation.  I don't believe there is any danger they saw

10   it.  I think it is clear that it is not part of the record.

11        I'm happy to say that, in case there is any confusion

12   on the record, there is no evidence that they walked out of

13   the court together or they spoke after his testimony.  But I

14   don't also want to leave some impression that they were

15   deliberately misled.  So I think I would just say that

16   there's no suggestion that anyone did anything improper here.

17        MR. TAYLOR:  The second issue I wanted to raise is

18   the Court's ruling on the scope of cross on character

19   witnesses.  And I wanted to call to the Court's attention the

20   caselaw which holds that cross-examination should be limited

21   to awareness of events which transpired before the time in

22   issue.  In other words, since the relevant time for the trait

23   is the time when he is alleged to have committed a crime,

24   then cross-examination as to events which occur after that

25   ought not to be permitted, particularly when they're

1    guilt-assuming questions.

2          So we would like to be able to ask our character

3    witnesses which remain questions concerning his reputation.

4          THE COURT:  Well, I think I have already told

5    Ms. Junghans that I don't have a problem with the

6    preschool-related witness being asked, and I don't think that

7    would open the door to the question.

8          I think part of the problem was that your evidence

9    isn't relevant unless it is temporally limited to a relevant

10   time period, as well.  And the question that was asked of

11   Mr. Sullivan was:  What is his reputation in the legal

12   community?  Not what was his reputation in 2012 and 2013.

13   What was his reputation when he worked at Williams &

14   Connolly?  But what is his reputation?  And with respect to

15   that I think they made a fair point about what they wanted to

16   do in an effort to --

17         MR. TAYLOR:  I'm not asking you to revisit that

18   ruling.

19         THE COURT:  I think it was to prevent very

20   prejudicial evidence from coming in that I made the decision

21   that I made.  But I think if you want to ensure that the

22   testimony wouldn't be within the scope of the direct, then

23   you need to make sure with your questions on direct that it

24   isn't within the scope of direct.

25         But are any of your other witnesses going to be asked

1    what his reputation is within the legal community?

2           MR. TAYLOR:  No.  I mean, the community for

3    Ms. Junghans' witness is mixed.

4           THE COURT:  I understand.  There are lawyers that

5    send their children to the school and da, da, da.

6           MS. JUNGHANS:  Exactly, but it wouldn't be lawyers as

7    lawyers.

8           THE COURT:  You're going to talk about the community,

9    i.e. --

10           MR. TAYLOR:  The community that he knows.

11           THE COURT:  -- the community that they work in or

12    live in.

13           I think I have said a couple of times that I don't

14    believe that would open the door.

15           Now, when did he work with this organization?

16           MS. JUNGHANS:  Since 1988.

17           THE COURT:  Is he still on the board?

18           MS. JUNGHANS:  No.

19           THE COURT:  When did he stop being on the board?

20           MS. JUNGHANS:  Your Honor, I don't remember exactly.

21           MR. TAYLOR:  She knew him through this period.

22           MS. JUNGHANS:  She still knows him today, but she

23    knew him through the period 2012, 2013.

24           THE COURT:  All right.  I'm not suggesting that it is

25    not relevant, but I'm saying you may want to cabin the

-2802-

1    question.  But I still said you can ask that witness the

2    question.  I don't know who your next one is, but if it's a

3    lawyer and you're going to ask for the reputation in the D.C.

4    legal community, then I think you're dancing close to the

5    problem.

6              MS. JUNGHANS:  I don't think that question would come

7    up with the next witness after Ms. Cioffi, either.

8              THE COURT:  All right.  Okay.  Then, let's bring the

9    jury in and call the next witness.

10             MR. TAYLOR:  May I be excused for 30 seconds?

11             THE COURT:  Yes.

12        (Jury present)

13             THE COURT:  All right.  Before the next witness comes

14   in, I just want to clarify something I said to you earlier at

15   the close of the testimony of Mr. Sloan.  And so I want to

16   instruct you that at this point, in case there is any

17   confusion about it, there is no evidence in the record that

18   Mr. Sloan and the defendant spoke or exited the courthouse

19   together after his testimony.  But there is also no

20   suggestion or inference that you should draw that anyone did

21   anything improper in asking or withdrawing the question.  The

22   question was asked.  It was answered "no."  And that's what

23   the evidence is.  All right.

24             MS. JUNGHANS:  The defense calls Gay Cioffi.

25             ///

1                          Gay Cioffi,

2    having been duly sworn, was examined and testified as follows:

3                        DIRECT EXAMINATION

4              BY MS. JUNGHANS:

5    Q.   Would you tell us your name and spell it, please.

6    A.   Yes.  My name is Gay, G-A-Y, Cioffi, C-I-O-F-F-I.

7    Q.   Where do you live?

8    A.   I live in Washington, D.C.

9    Q.   Okay.  Tell us what your education is, please.

10   A.   I have an undergraduate degree in education from Penn

11   State University, and a master's degree in education and the

12   arts from Tufts University.

13   Q.   And are you currently employed?

14   A.   I am.  I'm an educational consultant.  I left my job as

15   the director of the Little Folks School here in Washington in

16   August of 2017.

17   Q.   Okay.  And how long had you been employed with the Little

18   Folks School before you left in August of 2017?

19              THE COURT:  I'm sorry.  Little Folks.

20              THE WITNESS:  Little Folks School.

21              38 years.

22              BY MS. JUNGHANS:

23   Q.   What is that school?

24   A.   Little Folks is a small nursery school.  It is in the

25   Georgetown neighborhood of Washington.  It was founded in, I

1      think, 1976.  And it is an early childhood program for

2      children ages two and a half through five.

3      Q.   Okay.  And your position for the school was what?

4      A.   For 25 years I was a teaching director.  And then for the

5      last 13, I was just an administrator.  I was the director.

6      Q.   Okay.  And are you acquainted with Gregory Craig?

7      A.   Yes, I am.

8      Q.   How long have you known him?

9      A.   I first met Greg in 1988, when the oldest of his children

10     was enrolled at the Little Folks School.

11     Q.   Okay.  And other than having his child as a pupil in your

12     school, have you had any other dealings with him since 1988?

13     A.   I have.

14     Q.   And can you tell us what they are, please.

15     A.   Yes.  So his oldest son was enrolled in 1988.  And then

16     over the next 10 years, his other four children were enrolled

17     at the school.  And three of them, I was their teacher, as

18     well as the director of the school.  So I knew him in that

19     relationship as the head of the school and his son and

20     daughters' teacher.

21          And then he began to serve as a legal counsel for the

22     school, giving advice and helping with policy decisions and,

23     in some cases, writing correspondence in some matters, some

24     policy matters in the school with parents.  So I knew him

25     then, not just as a parent but somebody who was actually a

1    supportive -- a professional supporting the school legally.

2          Also, he served as a time on the board of another

3    school, the Beauvoir School, and many of our students went to

4    that school after Little Folks.  And so, you know, we were

5    sort of communicating as people involved in supporting

6    educational institutions.

7    Q.   Did you have -- in addition to these professional

8    relationships, did you have any personal relationship with

9    Mr. Craig?

10   A.   Well, I definitely did.  I think as an educator dealing

11   with young children, it's not unusual to develop a personal

12   relationship and a somewhat intimate relationship with the

13   parents.

14         In this case, because we were working, besides sort

15   of the parent-administrator relationship and the

16   parent-teacher relationship, he was also supporting the

17   school professionally with legal advice.  And he was someone

18   that I developed a friendship with and a relationship with

19   that I felt that I could go to him for advice.  I felt like

20   he understood, as someone involved in other educational

21   institutions, kind of the issues that would come up in terms

22   of school policy.  And in those interactions, I certainly

23   felt like I got to know him quite well as someone I could

24   trust and depend on to look out for sort of the mission of

25   the school and what would be best for the school.

1    Q.   And in the course of this association, did you form an

2    opinion as to his truthfulness and honesty?

3    A.   I did.

4    Q.   What is that opinion?

5    A.   My opinion is that he stood out as someone that was

6    truthful and honest, and I would say being someone in my

7    position in Washington, where I really could get to know a

8    lot of people, in this situation, he sort of stood out as

9    somebody who I depended on to be honest and trustworthy, and

10   that wasn't always the case.

11   Q.   During this time, did you know other people who knew him?

12   A.   I did.  I did.  Part of this is just Washington is a

13   small town and people -- there's lots of sort of crossing of

14   the paths with the schools and sports.

15          Also, I didn't mention this before, but our

16   children -- I have a son and daughter, and my children are

17   the same ages as his two older children.  And so they were on

18   sports teams or competed against each other at schools or on

19   sports teams.  So we had lots of opportunities to interact,

20   and our paths would cross in that way, as well.

21   Q.   All right.  Okay.  You anticipated my next question,

22   which is the community of people you know who knew what you

23   just told us; right?

24   A.   Right.  So there were many people at the school, whether

25   it was through the field of law or journalism or economics or

-2807-

1    the neighborhood or the State Department or old friends that

2    he had gone to college with that my paths crossed with

3    theirs, as well.  So we knew that we all knew each other and

4    that I was -- I knew Craig, etc.

5    Q.   So were you -- through these associations, were you

6    familiar with his reputation in the community you just

7    described --

8    A.   I --

9    Q.   -- let me just finish my question -- for truthfulness and

10   honesty up through the period of 2012, 2013?

11   A.   Yes.

12   Q.   What was that reputation as you knew it?

13   A.   Well, I think that, again, because I knew him, other

14   people knew that we knew each other.  When Greg was involved

15   in a case that was newsworthy, whether it was with the State

16   Department or whatever --

17             MR. McCULLOUGH:  Objection.

18             THE COURT:  I'm sorry?

19             MR. McCULLOUGH:  Objection.

20             THE COURT:  Yes, I think the question was what was

21   his reputation in the community for truthfulness and honesty.

22             THE WITNESS:  And the reputation is that he is a

23   person that you can depend on to tell the truth and be sort

24   of a straight shooter and honest.

25             MS. JUNGHANS:  Thank you.

-2808-

```
 1              No further questions.
 2              THE COURT:  All right.  Any cross-examination?
 3              MR. McCULLOUGH:  Very brief, Your Honor.
 4                        CROSS-EXAMINATION
 5              BY MR. McCULLOUGH:
 6    Q.  Hi, Ms. Cioffi.
 7    A.  Hello.
 8    Q.  Have you been in this courtroom for the past two weeks
 9    with us?
10    A.  No, I have not.
11    Q.  And have you heard any of the testimony of the witnesses?
12    A.  I have not.
13    Q.  And have you seen any of the documents that have been
14    admitted in this case?
15              MS. JUNGHANS:  I can't hear you, sir.
16              THE COURT:  Use the microphone.
17              BY MR. McCULLOUGH:
18    Q.  Have you seen any of the documents that have -- have you
19    read any of the documents that have been admitted in this
20    case?
21    A.  No.
22              MR. McCULLOUGH:  No further questions, Your Honor.
23              THE COURT:  All right.  Ms. Cioffi, you're excused.
24    Thank you very much.
25              THE WITNESS:  Thank you.
```

1          (Witness excused)

2          THE COURT:  Do you have another witness ready to go?

3          MR. ABELSON:  Yes, Your Honor.

4          THE COURT:  Why don't you call that witness.

5          MR. ABELSON:  Your Honor, the defense calls Judge

6     Clinton Deveaux.

7                         Clinton Deveaux,

8     having been duly sworn, was examined and testified as follows:

9                        DIRECT EXAMINATION

10         BY MR. ABELSON:

11    Q.  Good afternoon, Judge Deveaux.

12         Could you state your name for the jury and spell it

13    for the record, please.

14    A.  It's Clinton Deveaux, D-E-V-E-A-U-X.

15    Q.  What city do you live in?

16    A.  I live in Atlanta, Georgia.

17    Q.  What's your occupation?

18    A.  I retired from the Municipal Court of Atlanta in 2011.  I

19    served on that bench for 30 years, 4 months, and 3 weeks.

20         THE COURT:  But who is counting?

21         THE WITNESS:  But who is counting, yeah.  At 40

22    defendants a day, yes, who's counting.

23         BY MR. ABELSON:

24    Q.  I think this is clear, but when you say you served on the

25    bench, you were a judge on that court?

1    A.   Yes.

2    Q.   What's your educational background?

3    A.   I attended public schools in Nassau in The Bahamas, in

4    New York, and then college at the University of Buffalo, and

5    law school at Emory University just outside of Atlanta.

6    Q.   Do you know Gregory Craig?

7    A.   Yes, I do.

8    Q.   How long have you known him?

9    A.   Over fifty years.  We met between our junior and senior

10   years of undergraduate.

11   Q.   How did you meet?

12   A.   We met at The National Student Association at a meeting

13   in August of 1966.  And we're part of -- I was the student

14   body president at the University of Buffalo.  He was in an

15   equivalent position at Harvard.  And a number of us were

16   concerned about the Vietnam War and its efficacy, and felt it

17   ought to be publicly discussed, yet it was isolated to the

18   fringe of the American polity at that time.  It was not an

19   issue that was being discussed broadly.

20   Q.   What were your and Mr. Craig's role in that organization?

21   A.   Well, we were part of a steering committee that

22   eventually drafted a letter, with the help of a mentor of

23   ours named Allard Lowenstein to raise questions about the war

24   and its efficacy as a matter of American foreign policy.

25   When we published the letter, there were probably initially

1  50 student body presidents and student newspaper editors from

2  across the country, from colleges and universities across the

3  country. And eventually we were invited -- it was on the

4  front page of *The New York Times* on a Monday morning, which

5  meant that by afternoon it was in every other newspaper in

6  the country. And we were invited to a meeting in January of

7  the following year, 1967, with Dean Rusk, the then-Secretary

8  of State. And during that weekend, Greg invited me and

9  probably six or seven other student leaders to stay at his

10  home, his parents' home, and then began a relationship, not

11  just with Greg, but probably as much with his parents, who

12  were truly extraordinary and wonderful people. And Greg and

13  I have been good friends ever since.

14  Q.  So in the fifty or so years since you first met and

15  worked on that advocacy work, in what kind of circumstances

16  have you interacted with Mr. Craig?

17  A.  Well, on a personal level, we both adopted children. My

18  daughter was four years old when we came through Washington

19  on a drive up to New England from Atlanta and met his oldest

20  child, who was also adopted. And it was an opportunity

21  for -- it's special for an adopted child to see another

22  adopted child and see adoptive parents and to understand that

23  kind of relationship.

24        It's been deeply personal. It's also been political.

25  Because part of my activity in Atlanta was working on

1    campaigns and then making a decision about going to law

2    school, which happened for me five years after undergraduate

3    school, so there were these -- he helped me make a decision

4    that having the skills that law school can give you would be

5    a good thing for me.

6    Q.   Over the course of your friendship with Mr. Craig, did

7    you gain an opinion of his honesty, integrity, and

8    truthfulness?

9    A.   Yes.

10   Q.   What is that opinion?

11   A.   He may be the toughest, clearest thinker about issues of

12   ethics and honesty and forthrightness.

13         In times when, for example -- in the early days when

14   there were frustrated, angry young people of our generation

15   who were looking to do things that might have been unlawful

16   in protest against the war, we were advocating, sometimes to

17   the derision of people on the left, that everything we did

18   had to be consistent with the ends that we had in mind, and

19   that is peaceful, lawful protest.  It sort of, in many ways,

20   it was in the anti-war movement, it was like the civil rights

21   struggle, where Martin King talked consistently about

22   nonviolence and persistently about using the courts and the

23   law to win victories, to make a difference, and change the

24   country.  So it was -- it was not just honesty and integrity,

25   there was courage in the face of, you know, your peers, who

1       might be considered more radical or more in vogue.

2       Q.   Have you ever had any reason to question Mr. Craig's

3       honesty and integrity?

4       A.   No.

5       Q.   Over the course of your relationship with him, did you

6       gain an opinion of his character for being law-abiding?

7       A.   Yes.

8       Q.   What's the basis --

9       A.   That he -- part of it is, as a lawyer, he took on

10      difficult cases.  We would tease -- I would tease him

11      occasionally when he had a defendant who was accused of

12      difficult behaviors, but he was clear in his own mind

13      that -- and of course, it is what you learn as a

14      lawyer -- that everyone is entitled to a defense, everyone is

15      entitled to your best effort, and to representation with

16      zeal, but also that you never let anyone whom you represent

17      lie on the stand.

18             MR. ABELSON:  No further questions, Your Honor.

19             THE COURT:  All right.  Any cross?

20                         CROSS-EXAMINATION

21             BY MS. GASTON:

22      Q.   Good afternoon, sir.

23      A.   Hello.

24      Q.   Have you been in the courtroom over the past two weeks as

25      the trial has been going on?

-2814-

1    A.   No.

2    Q.   I'm sure that you've had enough of court for a while.

3    A.   No, no.  I was in Atlanta.  I arrived here this morning.

4    Q.   Have you seen any of the evidence in this case?

5    A.   I have not seen any of the evidence in the case.  I have

6    seen a few television reports.  I have avoided reading the

7    *New York Times* coverage of the case.

8    Q.   And --

9    A.   I'm told I should read it today --

10          MR. ABELSON:  Your Honor --

11          THE COURT:  Okay, make your questions very focused.

12          BY MS. GASTON:

13   Q.   Have you heard any of the testimony in this case?

14   A.   No.

15          MS. GASTON:  Nothing further.

16          THE COURT:  Thank you very much.  Judge Deveaux,

17   thanks for being here.  And you're excused.

18          THE WITNESS:  Thank you.

19        (Witness excused)

20          THE COURT:  All right.  Are you prepared with the

21   remaining character witnesses?

22          MR. TAYLOR:  We have one more witness.

23          THE COURT:  Okay.  Let's go.

24          MR. TAYLOR:  The defense calls Jessica Tuchan

25   Mathews.

                                                                    2815

1                      Jessica Tuchan Mathews,

2    having been duly sworn, was examined and testified as follows:

3                        DIRECT EXAMINATION

4              BY MR. TAYLOR:

5    Q.   Would you state your name, please.

6    A.   Jessica Tuchan Mathews.

7    Q.   And can you spell your last name, please?

8    A.   M-A-T-H-E-W-S.

9    Q.   Where do you live, Ms. Mathews?

10   A.   In Virginia.  In Marshall, Virginia.

11   Q.   And Ms. Mathews, what has been the nature of your

12   employment?

13   A.   Of my?

14   Q.   Employment.

15   A.   Employment.  In and out of government, but mostly in the

16   nonprofit sector, both working on foreign policy and on

17   environmental issues.

18   Q.   And most recently who was your employer?

19   A.   The Carnegie Endowment for International Peace.  I was

20   the president for 18 years.

21   Q.   And Ms. Mathews, I neglected to ask you, where did you go

22   to school?

23   A.   I went to Radcliffe College, which was the women's part

24   of Harvard and now deceased, now part of Harvard.  And Cal

25   Tech.  So I did a Ph.D. at Cal Tech.

-2816-

1    Q.   Tell the ladies and gentlemen of the jury, please, the

2    nature of the work of The Carnegie Institute.

3    A.   It is an international think tank, with offices in

4    Russia, China, the Middle East, Brussels in Europe, and New

5    Delhi.  But the headquarters is in Washington.  And it does

6    research and writing and publication and engagement with

7    policymakers on a whole range of issues from nuclear

8    proliferation to democracy promotion to bilateral

9    relationships between the U.S. and all those countries and

10   regions.  Economic issues, as well.  It's a 110-year-old

11   institution.

12   Q.   What was your position at The Endowment?

13   A.   So I became president in 1997, and I stepped down in

14   19- -- in 2015.

15   Q.   Did you have any role in the organization before 1997?

16   A.   I served on the board briefly before I was chosen as

17   president.

18   Q.   Ms. Mathews, do you know Gregory Craig?

19   A.   I do.

20   Q.   How long have you known Mr. Craig?

21   A.   Over fifty years.

22   Q.   And when did you meet Mr. Craig?

23   A.   We were undergraduates in the same class.  We -- I was a

24   science nerd, and he was the president of the student body,

25   but -- so we didn't have a lot to do with each other.  But we

-2817-

1    got to be -- we were friends.

2    Q.   What's been the nature of your relationship with him

3    since then?

4    A.   I would say the time that I -- I mean, I have known

5    him -- we've kind of worked in the same fields in Washington,

6    cared about some of the same issues.  But the part that I

7    have known him best was when I was president of Carnegie and

8    he was a member of the board of directors and vice chair of

9    the board for much of the period that I was president.

10   Q.   Do you remember when he became a member of the board of

11   directors?

12   A.   I looked it up last night.  He became a member in 1989.

13   Q.   And in his role as a member of the board of directors,

14   what sort of contact, what frequency of contact, if I may

15   ask, did you have with him?

16   A.   Well, it varies depending on what issues are most

17   prevalent at the time.  There are, of course, quarterly board

18   meetings.  And as vice chair, he had a leadership role on the

19   board.  But there were issues in particular, democracy

20   promotion issues in which Carnegie was very, very active

21   because we had a long history in working on these issues

22   abroad.  And there were times when -- for example, we had

23   opened an office in Moscow.  And in the period early on the

24   Russian government was accusing us of being American spies.

25   And Greg's advice -- Greg was one of the people I most turned

1    to for advice about how to handle situations like that.

2         So I would say it's hard to give you a specific kind

3    of number of hours, number of days.  But I would say more

4    than almost anybody else on the board, he combined government

5    experience with deep knowledge of some of the policy issues

6    that we were dealing with and terrific judgment.  So I turned

7    to him for advice.

8    Q.   Did you have any personal relationship with him or his

9    family?

10   A.   No, not really, except, you know, friendship.

11   Q.   And did you know him in the period December -- I mean

12   2010, 2011, 2012, 2013?

13   A.   Yes, because he was still serving on the board.  He

14   served through 2014.  I was still president.  So that period,

15   as well as all the rest of those years, I knew him well, yes.

16   Q.   Did you have a personal opinion of his integrity and

17   honesty --

18   A.   I did.

19   Q.   -- in that period?

20   A.   Back from college days, when he really kind of towered

21   over everybody else in the class in terms of kind of

22   political maturity at a time, you know, with Vietnam just

23   starting, the civil rights movement, he was somebody that

24   from then all through his years in the senate and the years

25   when he and I overlapped on a number of issues and then the

2819

1    years at Carnegie, I would say that there was almost nobody I

2    knew in Washington who I thought more highly of in terms of

3    his integrity.  "Integrity" is the right word.  He had deep

4    knowledge about the issues, and he had passion about those

5    issues, and he was willing to throw himself into -- I mean,

6    he was willing to make an effort and to care about those

7    things.  I think there are very few people in Washington that

8    I thought more highly of in terms of his commitment of things

9    he believes in.

10   Q.   Do you know of other people who knew Mr. Craig?

11   A.   Many.

12   Q.   Did you have an opinion as to what his reputation was

13   among those other people for honesty and integrity?

14   A.   I would say that he has a broad reputation in Washington

15   as somebody whose word was gold and whose judgment was solid

16   and whose commitment to values of honesty and integrity was

17   unimpeachable.

18           MR. TAYLOR:  Thank you, Ms. Mathews.

19           THE COURT:  All right.  Any questions?

20           MR. CAMPOAMOR-SANCHEZ:  Yes, Your Honor.

21           THE COURT:  Okay.

22                    CROSS-EXAMINATION

23           BY MR. CAMPOAMOR-SANCHEZ:

24   Q.   Good afternoon, Ms. Mathews.

25   A.   Good afternoon.

1    Q.   You and I have not had the pleasure of meeting before; is

2    that right?

3    A.   That's right.

4    Q.   I just have a few questions for you.

5    A.   Sure.

6    Q.   Did I understand correctly that at Carnegie during the

7    period 2012, 2013, one of the things your organization was

8    involved with was democracy promotion issues?

9    A.   Throughout all of 18 years, we worked on those issues,

10   yes.

11   Q.   But I wanted to focus on that time frame specifically.

12   A.   Yes.  Yeah.

13   Q.   All right.  And is it right that at the time one of the

14   things of concern was the fact that the President of Ukraine

15   had imprisoned his political rival, Ms. Tymoshenko, in

16   Ukraine?  Was that one of the issues that was being discussed

17   and of concern at the time?

18   A.   You mean by us or in general?

19   Q.   At Carnegie.

20   A.   We -- I don't know that we were engaged on that issue

21   specifically.  I mean, I would have to go back and look.  But

22   certainly in the Orange Revolution in Ukraine we had been

23   engaged.

24   Q.   And Ms. Tymoshenko was kind of the face of the Orange

25   Revolution?

1    A.   Not really, but she was involved early.

2    Q.   And then she was tried and imprisoned by her political

3    rival; right?

4    A.   Yes.

5    Q.   Okay.  And moving outside of Carnegie, you were aware,

6    were you not, that various human rights groups and

7    organizations were very critical of the Yanukovych government

8    for doing just that; right?

9    A.   I knew it was -- I knew that what was happening in

10   Ukraine was very controversial.  I can't say I followed the

11   ins and outs of -- there were, you know, not a lot of good

12   guys.

13   Q.   Not a lot of good guys in Ukraine; is that fair to say?

14   A.   Yes.

15   Q.   Okay.  And you were certainly aware that Mr. Craig was

16   involved in this project related to Ukraine back then; right?

17   A.   No.

18   Q.   You were not?

19   A.   No.

20   Q.   Okay.  Were you aware that when the report was published,

21   President Obama's Administration was very critical of

22   Mr. Craig and the report that he put out?

23   A.   No, I'm not aware of that.

24   Q.   You were not aware of that?

25   A.   No.

1    Q.  Were you aware specifically that the State Department

2    made statements about his report and the fact that if he was

3    not looking for political motivation he was not going to find

4    it?

5             MR. TAYLOR:  Objection.  Scope and relevance.

6             THE COURT:  Okay.  Can you approach the bench.

7             (At the bench)

8             MR. CAMPOAMOR-SANCHEZ:  Your Honor, I'm testing her

9    knowledge that she expressed --

10            THE COURT:  Well, I think you asked, were you aware

11   of the project.  No.  And then you said, were you aware of

12   Obama's reaction or the State Department's reaction.  And was

13   her answer "no"?

14            MR. TAYLOR:  That's when I objected.

15            MR. CAMPOAMOR-SANCHEZ:  I think that's when he

16   objected.

17            THE COURT:  All right.  I think if she isn't aware of

18   it, then you can't really ask her the substance of it.

19            MR. CAMPOAMOR-SANCHEZ:  Okay.  But can I get an

20   answer to whether she knew there was criticism of him in late

21   2012?

22            THE COURT:  What are the traits that they brought out

23   that you think that goes to?

24            MR. CAMPOAMOR-SANCHEZ:  So, his word is gold, his

25   judgment was solid, and he is the person with the highest

-2823-

1     honesty and integrity that she knows in Washington, D.C.

2               THE COURT:  All right.  So you want to ask if at that

3     time period when the report came out --

4               MR. CAMPOAMOR-SANCHEZ:  Right.

5               THE COURT:  -- was there criticism within the

6     community in Washington, D.C. related to his integrity and

7     judgment?

8               MR. CAMPOAMOR-SANCHEZ:  Yes.

9               THE COURT:  That's what you want to ask?

10              MR. CAMPOAMOR-SANCHEZ:  Yes.

11              MR. TAYLOR:  There is no remote connection between

12    criticism by the State Department of the substance of the

13    report and Mr. Craig's integrity.  The questions on

14    cross-examination have to go to --

15              THE COURT:  I think you should talk a little bit

16    softer because I'm concerned the jury can hear you.  Speak

17    into the microphone.

18              MR. TAYLOR:  Sorry.

19              There has to be a connection, a relevance, a

20    demonstrated relevance between the incident that he's asking

21    about and Mr. Craig's integrity.

22              As we all know, this report was a product of a lot of

23    different people.  And for what they want to do, have as an

24    inference that somehow the criticism of the report goes to

25    Mr. Craig's integrity, it really doesn't, Your Honor.  It

1    doesn't advance that question.

2            MR. CAMPOAMOR-SANCHEZ:  So there was --

3            THE COURT:  I --

4            MR. CAMPOAMOR-SANCHEZ:  Sorry.

5            THE COURT:  I feel like it has been very much a theme

6    of the case that the integrity of the report and the

7    integrity of Mr. Craig were linked because that's one of the

8    reasons, according to the defense, he leapt to its defense,

9    separate and apart from any representation of Ukraine, but

10   acted on his own behalf.  Right?

11           MR. TAYLOR:  I think you're maybe exaggerating the

12   defense's contention --

13           THE COURT:  Okay.

14           MR. TAYLOR:  -- in that regard.

15           But we certainly do contend that one of the reasons

16   he wanted to do it was because of his interest.

17           But the point, in connection with this, is in the

18   cross-examination of a character witness, can they ask about

19   something that in and of itself bears no relationship to his

20   integrity.

21           MR. CAMPOAMOR-SANCHEZ:  Well, it bears relation to

22   her opinion.

23           THE COURT:  I think it is fair to ask, were you aware

24   of criticism in this same community that she says she is very

25   much a part of, this foreign policy, political or human

1    rights community, of criticism in the time period that you

2    asked about, about the integrity of the report.  She can

3    either say yes or no.

4            MR. TAYLOR:  I'm sorry.  About the integrity of the

5    report?

6            THE COURT:  Integrity of the report.

7            MR. TAYLOR:  Yes, it has to be connected to

8    integrity.

9            THE COURT:  Okay.  I think he can say that, the

10   integrity of the report.  And she can say "yes" or "no."  And

11   if she says "yes," then she takes that into consideration in

12   terms of her overall opinion.  If she says "no," then it is

13   not something that we're taking into consideration in your

14   opinion.  But I think he can ask that.

15           MR. TAYLOR:  All right.

16           THE COURT:  Okay.

17        (In open court)

18           BY MR. CAMPOAMOR-SANCHEZ:

19   Q.  Ms. Mathews, let me try it a slightly different way.  In

20   the end of 2012 or the beginning of 2013, were you aware of

21   any criticisms in your general community about Mr. Craig and

22   his report, the integrity of that report?

23   A.  No.

24   Q.  And I think you mentioned that you thought that

25   Mr. Craig's word was gold.  Did I hear that correctly?

-2826-

1    A.   Yes.

2    Q.   And I take it that you think very highly of his

3    reputation?

4    A.   I do.

5    Q.   And that is a reputation that Mr. Craig has worked hard

6    to maintain; is that fair to say?

7    A.   His life has lived -- been lived that way.

8    Q.   And he would want to keep that be that way, right, that

9    reputation to be maintained; you would agree with me on that?

10   A.   Yes, if I understand you.  I'm not quite clear what

11   you're asking.  But, yeah, I mean, a reputation like that

12   comes out of the day-to-day living and work of somebody over

13   a lifetime.

14   Q.   And you would agree with me that something that

15   challenges that reputation, that is something you would want

16   to protect against; right?

17   A.   Well, sure, I mean nobody wants -- welcomes criticism of

18   any kind, but I would have said that Greg was sort of the

19   last person in this town to tarnish what he has believed in

20   for a lifetime.

21   Q.   He wouldn't risk his reputation?

22   A.   I think not.

23   Q.   Finally, Ms. Mathews, you're certainly -- if I understood

24   you correctly, you know nothing about this report; is that

25   fair?

-2827-

1    A.   That's true.

2    Q.   And similarly, you have obviously not been sitting here

3    for the last two weeks?

4    A.   That's true.  Yes.

5    Q.   And certainly you haven't seen all of the e-mail

6    communications and the documents back and forth between the

7    defendant and others; right?

8    A.   Yes, that's correct.

9         MR. CAMPOAMOR-SANCHEZ:  No further questions.

10        THE COURT:  All right.  Ms. Mathews, you can be

11   excused.

12        Thank you.

13      (Witness excused)

14        THE COURT:  All right.  If I am understanding

15   correctly, I believe the next witness, if there is going to

16   be one, would be a longer witness?

17        MR. TAYLOR:  Longer witness than these, Your Honor.

18        THE COURT:  All right.  So I think this is an

19   appropriate time to break for the evening.

20        I'm going to ask the jurors to please not discuss the

21   case among yourselves or with anyone else.  Please leave your

22   notebooks on your chair.  Please don't do any research about

23   the case or any aspect of the case, even new witnesses you

24   have heard about for the first time today.  What happens in

25   the courtroom is the evidence, and that's it.  And you can't

-2828-

1     talk about it until the case is submitted to you.

2               Please have a pleasant evening.

3               We will start the testimony again tomorrow morning at

4     9:30.  So please be back here at our ordinary 9:15-ish time,

5     at which point there should be food in the jury room, which

6     should also be unlocked when you get here.

7               Thank you and have a pleasant evening.

8               (Jury not present)

9               THE COURT:  Do we have any other matters we have to

10    take up before we adjourn for the afternoon?

11              All right.  I will see you tomorrow.  Thank you.

12              (Proceedings adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25

2829

1                 CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Patricia A. Kaneshiro-Miller, certify that the foregoing

4   is a correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8   /s/ Patricia A. Kaneshiro-Miller          August 27, 2019
    ----------------------------------      ---------------------
9   PATRICIA A. KANESHIRO-MILLER                  DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$1.47** [1] - 2763:7
**$4,150,000** [4] - 2761:21, 2762:11, 2762:12, 2762:21

## /

**/s** [1] - 2829:8

## 1

**1** [7] - 2736:14, 2751:21, 2751:23, 2753:16, 2761:7, 2763:5, 2763:11
**1.47** [2] - 2736:11, 2736:13
**1.7** [1] - 2736:10
**10** [4] - 2755:11, 2776:17, 2796:16, 2804:16
**100** [1] - 2728:21
**1000** [1] - 2728:25
**105** [1] - 2750:12
**109** [1] - 2751:9
**10th** [2] - 2748:11, 2748:12
**11** [3] - 2746:2, 2746:3, 2768:24
**110-year-old** [1] - 2816:10
**112** [1] - 2754:14
**119** [1] - 2768:23
**12** [1] - 2728:6
**13** [2] - 2745:13, 2804:5
**131** [1] - 2755:5
**14** [3] - 2742:6, 2755:10, 2755:14
**152** [3] - 2742:23, 2742:24, 2765:20
**154** [2] - 2744:18, 2767:15
**177** [4] - 2757:9, 2757:12, 2757:13, 2757:24
**178** [6] - 2756:21, 2757:8, 2757:12, 2757:13, 2757:24, 2758:23
**18** [2] - 2815:20, 2820:9
**180** [10] - 2757:4, 2757:12, 2758:2, 2758:5, 2758:18, 2758:20, 2758:22, 2759:2, 2759:6, 2780:6
**1800** [1] - 2728:24
**186** [2] - 2735:10, 2760:16
**18th** [1] - 2785:5
**19** [5] - 2748:1, 2756:17, 2778:4, 2779:4, 2816:14
**19-CR-125** [1] - 2728:5
**1960** [1] - 2784:5
**1964** [1] - 2784:5
**1966** [1] - 2810:13
**1967** [2] - 2784:7, 2811:7
**1970** [2] - 2784:9, 2785:4
**1972** [1] - 2785:7
**1976** [1] - 2804:1
**1988** [4] - 2801:16, 2804:9, 2804:12, 2804:15
**1989** [1] - 2817:12
**1997** [2] - 2816:13, 2816:15

## 2

**2** [11] - 2732:19, 2732:22, 2745:14, 2753:16, 2769:18, 2770:10, 2770:21, 2770:23, 2771:6, 2771:19, 2784:9
**20** [5] - 2753:17, 2755:2, 2755:11, 2781:5, 2787:1
**200-page** [1] - 2779:16
**20001** [1] - 2729:3
**20036** [1] - 2728:25
**2009** [4] - 2748:1, 2748:2, 2778:4, 2779:4
**2010** [1] - 2818:12
**2011** [2] - 2809:18, 2818:12
**2012** [25] - 2736:1, 2737:5, 2739:15, 2743:25, 2744:21, 2748:12, 2749:22, 2750:16, 2751:17, 2754:19, 2755:10, 2755:15, 2756:17, 2759:14, 2766:1, 2768:24, 2777:20, 2781:5, 2800:12, 2801:23, 2807:10, 2818:12, 2820:7, 2822:21, 2825:20
**2013** [6] - 2800:12, 2801:23, 2807:10, 2818:12, 2820:7, 2825:20
**2014** [1] - 2818:14
**2015** [1] - 2816:14
**2017** [2] - 2803:16, 2803:18
**2019** [3] - 2728:8, 2748:2, 2829:8
**202** [1] - 2729:4
**20530** [2] - 2728:16, 2728:18
**20th** [1] - 2781:3
**21202** [1] - 2728:22
**221** [1] - 2765:13
**24** [1] - 2749:22
**2440** [1] - 2728:21
**24th** [1] - 2750:18
**25** [4] - 2739:15, 2743:25, 2744:21, 2804:4
**252** [1] - 2756:1
**25th** [1] - 2743:5
**26** [4] - 2785:14, 2786:5, 2787:16, 2788:3
**267** [2] - 2743:15, 2766:17
**27** [4] - 2728:8, 2736:1, 2763:25, 2829:8
**2734** [1] - 2730:5
**2760** [1] - 2730:5
**2780** [1] - 2730:15
**2783** [1] - 2730:6
**2794** [1] - 2730:6
**27th** [2] - 2735:20, 2761:4
**2803** [1] - 2730:7
**2808** [1] - 2730:7
**2809** [1] - 2730:8
**2813** [1] - 2730:8
**2815** [1] - 2730:9
**2819** [1] - 2730:9
**29** [1] - 2733:23
**2:08** [1] - 2731:2

## 3

**3** [8] - 2740:25, 2747:16, 2751:17, 2753:16, 2754:24, 2770:20, 2771:5, 2809:19
**30** [3] - 2750:16, 2802:10, 2809:19
**30th** [1] - 2736:9
**311** [2] - 2764:12, 2780:25
**333** [1] - 2729:3
**340** [1] - 2789:2
**354-3243** [1] - 2729:4
**38** [1] - 2803:21
**3rd** [1] - 2753:23

## 4

**4** [10] - 2740:7, 2740:8, 2740:24, 2741:1, 2741:3, 2753:16, 2754:19, 2772:24, 2796:16, 2809:19
**4.150000** [1] - 2761:21
**40** [1] - 2809:21
**47** [7] - 2736:15, 2736:17, 2761:7, 2763:13, 2785:2, 2785:13, 2788:4
**470,000** [1] - 2736:17
**4700A** [1] - 2729:2
**492** [2] - 2738:20, 2764:21

## 5

**5** [1] - 2745:19
**50** [1] - 2811:1
**50th** [1] - 2784:9
**517** [1] - 2733:11
**522** [1] - 2733:12
**530** [1] - 2733:9
**548** [1] - 2733:13
**555** [1] - 2728:15
**589** [1] - 2764:14
**5:23** [1] - 2771:20

## 6

**6** [1] - 2745:22
**60** [1] - 2787:14
**683** [4] - 2731:20, 2731:21, 2732:9, 2732:23

## 7

**7** [4] - 2740:11, 2740:19, 2741:14, 2745:25

## 8

**8** [1] - 2759:14
**8th** [2] - 2759:22, 2780:6

## 9

**900** [9] - 2730:15, 2775:8, 2775:14,

2777:8, 2777:10, 2777:14, 2779:25, 2780:2, 2780:4
**901** [2] - 2775:9, 2775:14
**94** [2] - 2746:25, 2747:3
**950** [1] - 2728:18
**97** [1] - 2749:15
**97-2** [1] - 2750:5
**9:15-ish** [1] - 2828:4
**9:30** [1] - 2828:4

# A

**ABELSON** [8] - 2753:6, 2757:21, 2809:3, 2809:5, 2809:10, 2809:23, 2813:18, 2814:10
**Abelson** [1] - 2728:19
**abide** [1] - 2793:8
**abiding** [2] - 2787:22, 2813:6
**abidingness** [1] - 2793:21
**able** [1] - 2800:2
**above-entitled** [1] - 2829:5
**abroad** [1] - 2817:22
**absolutely** [2] - 2749:1, 2778:17
**accept** [1] - 2799:8
**accepted** [2] - 2774:15, 2775:25
**according** [1] - 2824:8
**account** [15] - 2732:2, 2732:6, 2732:18, 2732:19, 2732:22, 2735:23, 2735:24, 2736:13, 2736:15, 2749:12, 2761:8, 2763:2, 2763:8, 2763:13, 2778:20
**accounts** [2] - 2732:4, 2732:21
**accuracy** [4] - 2738:14, 2748:22, 2749:7, 2749:10
**accurate** [6] - 2744:6, 2744:9, 2746:12, 2779:10, 2791:23, 2792:1
**accused** [1] - 2813:11
**accusing** [1] - 2817:24
**acquainted** [1] - 2804:6
**acted** [1] - 2824:10
**Action** [1] - 2728:5
**action** [1] - 2737:1
**actions** [4] - 2737:7, 2742:10, 2742:19, 2747:23
**active** [1] - 2817:20
**actively** [2] - 2784:11, 2784:12
**activities** [1] - 2748:15
**activity** [1] - 2811:25
**Adam** [2] - 2728:17, 2728:19
**add** [1] - 2769:20
**adding** [1] - 2779:6
**addition** [2] - 2789:3, 2805:7
**Additional** [1] - 2750:6
**additional** [8] - 2731:13, 2731:18, 2749:13, 2750:9, 2751:4, 2751:5, 2754:3, 2756:11
**address** [2] - 2767:5, 2797:14
**adjourn** [1] - 2828:10
**adjourned** [1] - 2828:12

**Administration** [2] - 2786:8, 2821:21
**administrative** [1] - 2787:2
**administrator** [2] - 2804:5, 2805:15
**admissible** [3] - 2753:8, 2793:12, 2793:24
**admitted** [14] - 2733:6, 2738:25, 2753:5, 2753:6, 2753:10, 2757:24, 2773:8, 2780:1, 2780:2, 2780:4, 2791:25, 2808:14, 2808:19
**adopted** [4] - 2811:17, 2811:20, 2811:21, 2811:22
**adoptive** [1] - 2811:22
**advance** [1] - 2824:1
**advice** [11] - 2765:25, 2766:6, 2766:7, 2766:10, 2766:11, 2804:22, 2805:17, 2805:19, 2817:25, 2818:1, 2818:7
**advised** [1] - 2796:22
**advising** [1] - 2735:22
**advocacy** [1] - 2811:15
**advocating** [1] - 2812:16
**affect** [1] - 2778:18
**afternoon** [14] - 2734:23, 2744:13, 2755:17, 2760:13, 2760:14, 2794:6, 2794:7, 2796:15, 2809:11, 2811:5, 2813:22, 2819:24, 2819:25, 2828:10
**Afternoon** [2] - 2728:6, 2734:22
**AFTERNOON** [2] - 2728:10, 2731:1
**age** [1] - 2784:16
**ages** [2] - 2804:2, 2806:17
**ago** [3] - 2745:17, 2745:20, 2782:11
**agree** [9] - 2766:25, 2771:21, 2771:22, 2772:8, 2774:22, 2791:21, 2793:7, 2826:9, 2826:14
**agreed** [1] - 2769:10
**agreeing** [1] - 2796:12
**agreement** [2] - 2732:25, 2790:3
**agrees** [1] - 2798:7
**ahead** [3] - 2731:15, 2752:10, 2755:18
**aided** [1] - 2729:6
**Alex** [13] - 2737:18, 2739:25, 2744:17, 2744:25, 2746:12, 2746:13, 2747:6, 2748:17, 2764:5, 2764:6, 2764:9, 2765:15
**all-but-final** [2] - 2769:1, 2769:8
**Allard** [1] - 2810:23
**allegations** [1] - 2741:6
**alleged** [1] - 2799:23
**Allon** [1] - 2748:17
**allowed** [3] - 2746:16, 2753:10, 2775:5
**almost** [2] - 2818:4, 2819:1
**aloud** [7] - 2740:7, 2741:2, 2741:14, 2742:7, 2744:1, 2744:23, 2746:4
**amendment** [1] - 2740:12
**amendments** [4] - 2765:4, 2777:23, 2778:5, 2778:24
**AMERICA** [1] - 2728:4
**American** [5] - 2769:25, 2772:12, 2810:18, 2810:24, 2817:24
**amount** [3] - 2735:22, 2735:24,

2763:20
**AMY** [1] - 2728:10
**analysis** [3] - 2769:21, 2770:16, 2772:25
**angry** [1] - 2812:14
**answer** [4] - 2798:2, 2798:8, 2822:13, 2822:20
**answered** [5] - 2782:18, 2791:7, 2797:25, 2799:4, 2802:22
**anti** [1] - 2812:20
**anti-war** [1] - 2812:20
**anticipate** [2] - 2778:1, 2778:25
**anticipated** [2] - 2778:24, 2806:21
**anticipating** [7] - 2774:16, 2775:1, 2776:7, 2776:11, 2777:1, 2778:10, 2778:12
**anyway** [1] - 2796:7
**apart** [2] - 2787:14, 2824:9
**appeal** [1] - 2746:7
**appear** [3] - 2742:10, 2746:11, 2776:1
**APPEARANCES** [1] - 2728:12
**appeared** [1] - 2742:20
**appease** [3] - 2775:17, 2775:21, 2779:21
**appreciate** [1] - 2731:9
**approach** [9] - 2751:24, 2756:24, 2757:5, 2773:9, 2782:5, 2789:17, 2795:6, 2795:8, 2822:6
**approached** [2] - 2797:18, 2797:21
**appropriate** [3] - 2734:2, 2771:12, 2827:19
**April** [1] - 2766:1
**area** [1] - 2784:18
**argued** [1] - 2733:23
**arguments** [3] - 2750:6, 2751:4, 2751:5
**arise** [1] - 2793:17
**Army** [2] - 2784:7, 2784:8
**arrived** [1] - 2814:3
**article** [1] - 2782:16
**arts** [1] - 2803:12
**aspect** [1] - 2827:23
**assigned** [2] - 2732:2, 2732:5
**Association** [1] - 2810:12
**association** [1] - 2806:1
**associations** [1] - 2807:5
**assuming** [2] - 2791:13, 2800:1
**Atlanta** [6] - 2809:16, 2809:18, 2810:5, 2811:19, 2811:25, 2814:3
**attach** [3] - 2750:3, 2750:22, 2754:20
**attached** [7] - 2750:5, 2751:1, 2753:13, 2755:17, 2755:21, 2756:11, 2774:23, 2778:5, 2778:23
**attaching** [1] - 2756:7
**attachment** [3] - 2740:25, 2747:15, 2776:8
**attempt** [2] - 2740:13, 2740:20
**attempts** [1] - 2740:22
**attend** [1] - 2736:24

**attended** [1] - 2810:3
**attention** [5] - 2731:13, 2737:5, 2746:19, 2787:11, 2799:19
**attorney** [1] - 2783:21
**ATTORNEY'S** [1] - 2728:14
**attorney-at-law** [1] - 2783:21
**attorneys** [3] - 2757:16, 2757:18, 2768:13
**August** [11] - 2728:8, 2748:11, 2748:12, 2749:22, 2750:16, 2750:18, 2768:7, 2803:16, 2803:18, 2810:13, 2829:8
**AUSA** [2] - 2728:13, 2728:14
**authentic** [1] - 2732:15
**authenticity** [1] - 2732:16
**authored** [1] - 2732:17
**Avenue** [2] - 2728:18, 2729:3
**avoided** [1] - 2814:6
**aware** [15] - 2781:2, 2781:5, 2791:15, 2791:16, 2821:5, 2821:15, 2821:20, 2821:23, 2821:24, 2822:1, 2822:10, 2822:11, 2822:17, 2824:23, 2825:20
**awareness** [1] - 2799:21

# B

**back-and-forth** [1] - 2773:6
**background** [1] - 2810:2
**Bahamas** [1] - 2810:3
**bailiwick** [1] - 2738:17
**Baltimore** [1] - 2728:22
**bars** [1] - 2787:19
**based** [7] - 2742:10, 2742:19, 2749:5, 2769:21, 2771:25, 2772:9, 2788:22
**Based** [2] - 2770:16, 2772:25
**basis** [7] - 2756:25, 2769:22, 2770:16, 2771:22, 2773:1, 2787:13, 2813:8
**bear** [2] - 2737:3, 2792:3
**bears** [2] - 2824:19, 2824:21
**Beauvoir** [1] - 2805:3
**became** [3] - 2816:13, 2817:10, 2817:12
**bedlam** [1] - 2784:17
**BEFORE** [1] - 2728:10
**beforehand** [1] - 2773:24
**began** [4] - 2760:15, 2785:4, 2804:21, 2811:10
**begin** [1] - 2785:24
**beginning** [5] - 2738:8, 2738:10, 2754:9, 2784:4, 2825:20
**begins** [2] - 2747:16, 2754:7
**behalf** [1] - 2824:10
**behaviors** [1] - 2813:12
**believes** [1] - 2819:9
**below** [1] - 2732:5
**bench** [16] - 2733:18, 2733:20, 2752:1, 2757:7, 2757:19, 2773:11, 2782:7, 2789:19, 2793:17, 2795:11, 2797:1, 2797:19, 2809:19, 2809:25, 2822:6, 2822:7

**Bennett** [1] - 2785:9
**BERMAN** [1] - 2728:10
**best** [4] - 2778:21, 2805:25, 2813:15, 2817:7
**better** [1] - 2767:11
**between** [8] - 2731:18, 2751:10, 2774:20, 2810:9, 2816:9, 2823:11, 2823:20, 2827:6
**beyond** [6] - 2773:15, 2773:19, 2773:24, 2786:21, 2788:12, 2791:3
**big** [2] - 2782:12, 2790:10
**bilateral** [1] - 2816:8
**bit** [1] - 2823:15
**blow** [1] - 2756:3
**blue** [1] - 2778:5
**board** [12] - 2801:17, 2801:19, 2805:2, 2816:16, 2817:8, 2817:9, 2817:10, 2817:13, 2817:17, 2817:19, 2818:4, 2818:13
**boards** [1] - 2795:24
**body** [3] - 2810:14, 2811:1, 2816:24
**book** [1] - 2783:17
**bosses** [1] - 2787:4
**bottom** [14] - 2735:12, 2738:22, 2739:7, 2745:8, 2748:24, 2751:15, 2758:5, 2759:10, 2761:14, 2761:19, 2764:24, 2769:5, 2772:5
**bottom-line** [1] - 2748:24
**bought** [1] - 2744:7
**box** [1] - 2797:12
**Bradley** [1] - 2728:17
**breadth** [1] - 2791:8
**break** [5] - 2741:15, 2795:15, 2796:7, 2796:15, 2827:19
**Brendan** [3] - 2730:6, 2783:10, 2783:13
**brief** [1] - 2808:3
**briefly** [3] - 2733:17, 2794:2, 2816:16
**bring** [10] - 2731:3, 2731:12, 2760:16, 2773:10, 2776:7, 2777:14, 2780:7, 2780:25, 2792:5, 2802:8
**broad** [1] - 2819:14
**broadly** [1] - 2810:19
**brought** [1] - 2822:22
**Brussels** [1] - 2816:4
**Buffalo** [2] - 2810:4, 2810:14
**building** [1] - 2787:14
**business** [1] - 2787:17
**busy** [1] - 2764:5
**BY** [32] - 2734:21, 2737:4, 2739:6, 2740:23, 2754:1, 2759:5, 2760:12, 2761:1, 2766:9, 2767:12, 2770:5, 2771:4, 2771:13, 2777:13, 2777:18, 2780:5, 2781:21, 2783:16, 2786:12, 2788:21, 2794:5, 2803:4, 2803:22, 2808:5, 2808:17, 2809:10, 2809:23, 2813:21, 2814:12, 2815:4, 2819:23, 2825:18

# C

**C-I-O-F-F-I** [1] - 2803:6
**cabin** [1] - 2801:25
**cake** [1] - 2791:6
**Cal** [2] - 2815:24, 2815:25
**calculation** [1] - 2785:14
**campaigns** [1] - 2812:1
**CAMPOAMOR** [35] - 2731:5, 2731:16, 2731:23, 2733:3, 2733:19, 2785:17, 2788:11, 2788:16, 2789:17, 2789:20, 2790:15, 2791:21, 2792:8, 2793:1, 2794:2, 2794:21, 2797:14, 2797:16, 2797:23, 2798:21, 2799:4, 2819:20, 2819:23, 2822:8, 2822:15, 2822:19, 2822:24, 2823:4, 2823:8, 2823:10, 2824:2, 2824:4, 2824:21, 2825:18, 2827:9
**Campoamor** [1] - 2728:13
**CAMPOAMOR-SANCHEZ** [35] - 2731:5, 2731:16, 2731:23, 2733:3, 2733:19, 2785:17, 2788:11, 2788:16, 2789:17, 2789:20, 2790:15, 2791:21, 2792:8, 2793:1, 2794:2, 2794:21, 2797:14, 2797:16, 2797:23, 2798:21, 2799:4, 2819:20, 2819:23, 2822:8, 2822:15, 2822:19, 2822:24, 2823:4, 2823:8, 2823:10, 2824:2, 2824:4, 2824:21, 2825:18, 2827:9
**Campoamor-Sanchez** [1] - 2728:13
**candid** [1] - 2788:5
**cannot** [2] - 2738:25, 2744:12
**capacity** [1] - 2787:3
**Captain** [1] - 2784:8
**captioned** [4] - 2750:6, 2751:3, 2754:25, 2755:24
**care** [1] - 2819:6
**cared** [1] - 2817:6
**careful** [2] - 2737:22, 2738:3
**Carnegie** [8] - 2815:19, 2816:2, 2817:7, 2817:20, 2819:1, 2820:6, 2820:19, 2821:5
**Cartwright** [1] - 2782:14
**case** [30] - 2731:12, 2733:2, 2733:25, 2734:7, 2740:9, 2790:4, 2791:2, 2791:24, 2793:22, 2794:13, 2794:16, 2794:19, 2796:17, 2798:7, 2799:11, 2802:16, 2805:14, 2806:10, 2807:15, 2808:14, 2808:20, 2814:4, 2814:5, 2814:7, 2814:13, 2824:6, 2827:21, 2827:23, 2828:1
**caselaw** [1] - 2799:20
**cases** [10] - 2786:13, 2786:23, 2786:24, 2786:25, 2787:13, 2789:5, 2790:23, 2804:23, 2813:10
**certain** [3] - 2742:9, 2747:22, 2792:24
**certainly** [9] - 2790:24, 2791:22, 2792:2, 2805:22, 2820:22, 2821:15, 2824:15, 2826:23, 2827:5
**CERTIFICATE** [1] - 2829:1

**certify** [1] - 2829:3
**chain** [6] - 2740:1, 2743:18, 2764:25, 2769:4, 2769:5, 2774:20
**chair** [3] - 2817:8, 2817:18, 2827:22
**challenge** [1] - 2790:18
**challenges** [2] - 2770:21, 2826:15
**change** [5] - 2749:3, 2749:4, 2770:2, 2774:21, 2812:23
**changes** [10] - 2746:22, 2750:9, 2769:11, 2770:9, 2776:1, 2776:3, 2779:9, 2779:13, 2779:20
**changing** [1] - 2749:1
**character** [9] - 2788:2, 2789:12, 2794:17, 2799:18, 2800:2, 2813:6, 2814:21, 2824:18
**check** [1] - 2751:7
**child** [4] - 2804:11, 2811:20, 2811:21, 2811:22
**childhood** [1] - 2804:1
**children** [11] - 2784:15, 2795:24, 2801:5, 2804:2, 2804:9, 2804:16, 2805:11, 2806:16, 2806:17, 2811:17
**chimes** [1] - 2770:22
**China** [1] - 2816:4
**chosen** [1] - 2816:16
**Cioffi** [7] - 2730:7, 2802:7, 2802:24, 2803:1, 2803:6, 2808:6, 2808:23
**circumstances** [2] - 2747:25, 2811:15
**circumstantial** [2] - 2771:9, 2771:15
**citizen** [1] - 2787:22
**city** [1] - 2809:15
**civil** [3] - 2784:21, 2812:20, 2818:23
**claim** [2] - 2771:9, 2771:15
**claims** [1] - 2740:8
**clarifications** [4] - 2747:21, 2748:4, 2749:14, 2750:9
**clarify** [2] - 2762:5, 2802:14
**clarity** [6] - 2748:23, 2749:8, 2749:11, 2762:15, 2762:19, 2762:20
**class** [2] - 2816:23, 2818:21
**clear** [12] - 2741:5, 2741:17, 2741:24, 2748:21, 2749:5, 2773:3, 2779:10, 2789:25, 2799:10, 2809:24, 2813:12, 2826:10
**clearest** [1] - 2812:11
**CLERK** [3] - 2757:15, 2760:19, 2777:16
**client** [7] - 2748:18, 2761:24, 2762:7, 2762:11, 2762:14, 2782:9, 2787:25
**clients** [2] - 2761:22, 2787:20
**Cliff** [1] - 2744:13
**Clifford** [4] - 2730:5, 2734:17, 2734:18, 2735:3
**Clinton** [5] - 2730:8, 2786:7, 2809:6, 2809:7, 2809:14
**close** [10] - 2733:24, 2734:6, 2759:19, 2779:15, 2781:12, 2783:17, 2791:9, 2792:15, 2802:4, 2802:15
**closely** [2] - 2786:6, 2788:4
**clouded** [1] - 2740:9

**Club** [3] - 2736:21, 2736:22, 2737:2
**college** [4] - 2784:3, 2807:2, 2810:4, 2818:20
**College** [2] - 2784:4, 2815:23
**colleges** [1] - 2811:2
**COLUMBIA** [2] - 2728:2, 2728:15
**combined** [1] - 2818:4
**coming** [7] - 2753:19, 2753:22, 2754:3, 2762:1, 2775:6, 2776:11, 2800:20
**comment** [8] - 2738:4, 2743:11, 2743:12, 2746:4, 2746:11, 2765:21, 2771:6, 2773:22
**commenting** [4] - 2737:24, 2738:6, 2738:18, 2771:23
**comments** [63] - 2743:8, 2744:15, 2745:9, 2745:12, 2746:22, 2747:7, 2747:8, 2747:12, 2748:9, 2748:15, 2748:22, 2749:2, 2749:8, 2749:10, 2750:3, 2751:6, 2751:19, 2751:23, 2752:16, 2753:11, 2753:13, 2753:15, 2753:17, 2753:22, 2754:3, 2754:10, 2754:11, 2754:20, 2755:3, 2755:12, 2755:16, 2755:22, 2756:18, 2758:10, 2758:11, 2765:4, 2765:9, 2765:11, 2767:7, 2767:8, 2767:13, 2767:14, 2768:6, 2768:9, 2768:15, 2768:18, 2770:13, 2772:23, 2773:4, 2773:6, 2773:20, 2774:14, 2774:16, 2775:1, 2775:4, 2775:16, 2775:25, 2776:11, 2776:16, 2776:17, 2780:9, 2780:13
**commitment** [2] - 2819:8, 2819:16
**committed** [1] - 2799:23
**committee** [5] - 2787:3, 2787:5, 2787:6, 2789:7, 2810:21
**communicate** [1] - 2738:10
**communicating** [3] - 2780:23, 2780:24, 2805:5
**communications** [2] - 2743:19, 2827:6
**community** [33] - 2788:8, 2788:9, 2788:25, 2789:1, 2789:4, 2789:11, 2790:16, 2790:22, 2791:4, 2791:16, 2792:4, 2792:11, 2792:14, 2792:22, 2793:4, 2793:23, 2795:21, 2795:22, 2796:9, 2800:12, 2801:1, 2801:2, 2801:8, 2801:10, 2801:11, 2802:4, 2806:22, 2807:6, 2807:21, 2823:6, 2824:24, 2825:1, 2825:21
**comparable** [1] - 2754:11
**competed** [1] - 2806:18
**complete** [3] - 2755:1, 2779:5, 2779:10
**completely** [1] - 2775:3
**completeness** [4] - 2748:23, 2749:8, 2749:10, 2757:25
**COMPOAMOR** [1] - 2794:5
**COMPOAMOR-SANCHEZ** [1] - 2794:5
**comprise** [2] - 2751:6, 2755:2
**computer** [1] - 2729:6

**computer-aided** [1] - 2729:6
**concern** [5] - 2737:11, 2740:15, 2741:7, 2820:14, 2820:17
**concerned** [2] - 2810:16, 2823:16
**concerning** [5] - 2736:19, 2746:8, 2793:11, 2793:12, 2800:3
**concerns** [5] - 2740:14, 2741:20, 2775:20, 2776:6, 2778:20
**concludes** [1] - 2742:9
**conclusion** [4] - 2746:8, 2747:25, 2749:6, 2771:21
**conclusions** [7] - 2742:16, 2747:23, 2748:24, 2749:2, 2749:3, 2749:4, 2771:24
**conduct** [2] - 2778:3, 2779:3
**conference** [2] - 2757:19, 2797:1
**conferences** [1] - 2793:18
**confusion** [2] - 2799:11, 2802:17
**connected** [1] - 2825:7
**connection** [5] - 2747:20, 2747:21, 2823:11, 2823:19, 2824:17
**Connolly** [7] - 2784:1, 2784:9, 2784:11, 2789:2, 2789:3, 2790:22, 2800:14
**conscious** [2] - 2778:15, 2778:19
**consider** [10] - 2748:20, 2748:22, 2749:8, 2749:11, 2769:11, 2792:20, 2792:21, 2792:22, 2793:13, 2793:22
**considerable** [1] - 2763:20
**consideration** [4] - 2775:6, 2779:7, 2825:11, 2825:13
**considered** [6] - 2733:1, 2748:16, 2770:19, 2773:12, 2793:5, 2813:1
**considering** [5] - 2772:23, 2773:4, 2773:5, 2779:8, 2779:9
**consistent** [3] - 2765:25, 2766:6, 2812:18
**consistently** [1] - 2812:21
**consists** [1] - 2733:13
**Constitution** [1] - 2729:3
**consult** [1] - 2732:8
**consultant** [2] - 2795:23, 2803:14
**contact** [6] - 2746:17, 2787:7, 2789:4, 2790:23, 2817:14
**contain** [1] - 2748:3
**contemplation** [1] - 2775:3
**contend** [1] - 2824:15
**content** [2] - 2737:15, 2738:14
**contention** [1] - 2824:12
**contents** [3] - 2740:13, 2740:20, 2740:22
**context** [2] - 2758:5, 2787:5
**continues** [1] - 2741:24
**contracts** [1] - 2747:25
**controversial** [2] - 2778:14, 2821:10
**conversations** [2] - 2731:11, 2779:17
**conveying** [1] - 2735:23
**conviction** [2] - 2769:25, 2772:12
**copied** [2] - 2743:22, 2751:12

2834

**copies** [1] - 2733:7
**copy** [6] - 2742:25, 2752:5, 2752:6, 2768:10, 2768:12, 2773:23
**correct** [28] - 2736:25, 2740:5, 2748:13, 2761:12, 2762:2, 2762:22, 2763:17, 2764:18, 2765:10, 2765:17, 2765:19, 2766:2, 2766:11, 2766:15, 2767:8, 2767:13, 2768:16, 2769:16, 2771:16, 2773:14, 2781:23, 2794:10, 2794:13, 2794:14, 2794:17, 2794:20, 2827:8, 2829:4
**corrected** [1] - 2738:2
**corrections** [2] - 2737:18, 2765:4
**correctly** [4] - 2820:6, 2825:25, 2826:24, 2827:15
**correspondence** [1] - 2804:23
**counsel** [3] - 2733:17, 2746:7, 2804:21
**count** [1] - 2786:4
**counting** [3] - 2809:20, 2809:21, 2809:22
**countries** [2] - 2741:16, 2816:9
**country** [6] - 2741:15, 2784:22, 2811:2, 2811:3, 2811:6, 2812:24
**couple** [3] - 2738:19, 2780:10, 2801:13
**courage** [1] - 2812:25
**course** [9] - 2768:7, 2779:16, 2785:10, 2786:16, 2806:1, 2812:6, 2813:5, 2813:13, 2817:17
**court** [14] - 2734:10, 2742:9, 2753:25, 2757:23, 2759:3, 2777:12, 2782:25, 2790:7, 2793:15, 2796:13, 2799:13, 2809:25, 2814:2, 2825:17
**COURT** [147] - 2728:2, 2731:3, 2731:6, 2731:8, 2731:21, 2732:24, 2733:17, 2733:21, 2734:8, 2734:11, 2734:14, 2737:3, 2739:2, 2740:18, 2751:25, 2752:3, 2752:7, 2752:10, 2752:13, 2752:21, 2752:24, 2753:5, 2753:8, 2753:17, 2753:21, 2756:24, 2757:6, 2757:18, 2757:23, 2758:4, 2758:11, 2758:16, 2758:20, 2758:22, 2759:1, 2759:4, 2760:9, 2760:22, 2766:5, 2767:10, 2770:25, 2773:10, 2773:12, 2773:17, 2774:1, 2774:4, 2774:7, 2774:11, 2774:19, 2774:22, 2775:12, 2775:18, 2776:2, 2776:23, 2777:2, 2777:10, 2779:25, 2780:2, 2781:17, 2782:6, 2782:18, 2782:20, 2783:3, 2783:5, 2783:9, 2783:12, 2785:18, 2786:9, 2788:13, 2788:18, 2789:16, 2789:18, 2790:20, 2791:12, 2791:14, 2791:25, 2792:9, 2793:9, 2793:16, 2794:3, 2794:22, 2794:24, 2795:3, 2795:7, 2795:14, 2795:22, 2796:4, 2796:7, 2796:12, 2796:14, 2796:22, 2796:25, 2797:9, 2797:12, 2797:22, 2797:25, 2798:12, 2798:14, 2798:25, 2799:5, 2800:4, 2800:19, 2801:4,

2801:8, 2801:11, 2801:17, 2801:19, 2801:24, 2802:8, 2802:11, 2802:13, 2803:19, 2807:18, 2807:20, 2808:2, 2808:16, 2808:23, 2809:2, 2809:4, 2809:20, 2813:19, 2814:11, 2814:16, 2814:20, 2814:23, 2818:19, 2819:21, 2822:6, 2822:10, 2822:17, 2822:22, 2823:2, 2823:5, 2823:9, 2823:15, 2824:3, 2824:5, 2824:13, 2824:23, 2825:6, 2825:9, 2825:16, 2827:10, 2827:14, 2827:18, 2828:9, 2829:1
**Court** [6] - 2729:2, 2793:3, 2795:18, 2797:6, 2797:19, 2809:18
**Court's** [2] - 2799:18, 2799:19
**court's** [3] - 2742:11, 2742:21, 2771:24
**Courthouse** [1] - 2729:2
**courthouse** [4] - 2781:25, 2797:8, 2798:9, 2802:18
**courtroom** [7] - 2784:20, 2794:11, 2798:18, 2808:8, 2813:24, 2827:25
**courts** [3] - 2784:22, 2784:23, 2812:22
**cover** [1] - 2777:8
**coverage** [1] - 2814:7
**covered** [2] - 2761:11, 2763:16
**Craig** [95] - 2732:1, 2735:7, 2735:16, 2735:19, 2736:20, 2737:17, 2738:23, 2739:8, 2739:16, 2739:20, 2743:21, 2744:1, 2744:19, 2745:4, 2751:11, 2752:14, 2752:17, 2753:22, 2754:2, 2756:5, 2757:9, 2757:14, 2758:6, 2758:10, 2758:13, 2759:10, 2759:15, 2763:1, 2763:25, 2764:8, 2764:15, 2764:21, 2765:3, 2765:18, 2766:10, 2767:17, 2768:25, 2769:10, 2769:15, 2770:6, 2770:10, 2770:15, 2771:20, 2772:3, 2772:6, 2772:8, 2772:24, 2774:16, 2774:20, 2776:10, 2777:20, 2777:22, 2778:10, 2781:3, 2781:6, 2781:9, 2781:12, 2782:1, 2782:10, 2782:15, 2784:24, 2785:1, 2785:11, 2785:13, 2786:14, 2786:16, 2787:17, 2787:21, 2788:23, 2789:8, 2789:22, 2789:23, 2790:8, 2790:18, 2794:18, 2795:24, 2797:7, 2804:6, 2805:9, 2807:4, 2810:6, 2811:16, 2812:6, 2816:18, 2816:20, 2816:22, 2819:10, 2821:15, 2821:22, 2824:7, 2825:21, 2826:5
**CRAIG** [1] - 2728:6
**Craig's** [18] - 2742:25, 2752:12, 2752:19, 2754:5, 2754:7, 2758:16, 2761:3, 2766:18, 2766:21, 2768:24, 2771:6, 2793:20, 2810:20, 2813:2, 2823:13, 2823:21, 2823:25, 2825:25
**crime** [2] - 2741:18, 2799:23
**Criminal** [1] - 2728:5
**criminal** [5] - 2784:21
**critical** [2] - 2821:7, 2821:21
**criticism** [10] - 2759:25, 2775:16,

2779:21, 2822:20, 2823:5, 2823:12, 2823:24, 2824:24, 2825:1, 2826:17
**criticisms** [2] - 2778:16, 2825:21
**criticize** [1] - 2759:21
**CROSS** [6] - 2730:4, 2760:11, 2794:4, 2808:4, 2813:20, 2819:22
**cross** [12] - 2760:9, 2776:14, 2777:5, 2789:16, 2799:18, 2799:20, 2799:24, 2806:20, 2808:2, 2813:19, 2823:14, 2824:18
**cross-examination** [8] - 2760:9, 2777:5, 2789:16, 2799:20, 2799:24, 2808:2, 2823:14, 2824:18
**CROSS-EXAMINATION** [5] - 2760:11, 2794:4, 2808:4, 2813:20, 2819:22
**crossed** [1] - 2807:2
**crossing** [1] - 2806:13
**CRR** [1] - 2729:2
**crucial** [1] - 2787:24
**current** [1] - 2735:2

## D

**D-E-V-E-A-U-X** [1] - 2809:14
**D.C** [10] - 2728:7, 2729:3, 2783:23, 2783:24, 2788:23, 2788:25, 2802:3, 2803:8, 2823:1, 2823:6
**dance** [1] - 2792:15
**dancing** [1] - 2802:4
**danger** [3] - 2798:11, 2798:13, 2799:9
**date** [11] - 2735:25, 2739:14, 2743:24, 2744:21, 2749:21, 2750:15, 2751:16, 2754:17, 2755:9, 2756:15, 2759:13
**DATE** [1] - 2829:9
**daughter** [2] - 2806:16, 2811:18
**daughters'** [1] - 2804:20
**DAY** [1] - 2728:6
**day-to-day** [2] - 2787:12, 2826:12
**days** [7] - 2751:18, 2755:11, 2756:18, 2776:18, 2812:13, 2818:3, 2818:20
**DC** [3] - 2728:16, 2728:18, 2728:25
**deal** [1] - 2774:14
**dealing** [2] - 2805:10, 2818:6
**dealings** [2] - 2745:7, 2804:12
**Dean** [1] - 2811:7
**deceased** [1] - 2815:24
**December** [1] - 2818:11
**decision** [2] - 2800:20, 2812:1, 2812:3
**decisions** [4] - 2742:9, 2742:10, 2742:18, 2804:22
**deep** [2] - 2818:5, 2819:3
**deeply** [1] - 2811:24
**Defendant** [2] - 2728:7, 2728:19
**defendant** [7] - 2732:1, 2781:23, 2781:24, 2784:24, 2802:18, 2813:11, 2827:7
**Defendant's** [25] - 2738:20, 2742:23, 2744:18, 2746:25, 2747:3, 2749:15, 2750:11, 2751:9, 2754:14, 2755:5, 2756:21, 2757:3, 2758:2, 2759:6,

2768:22
 **defendant's** [1] - 2742:24
 **defendants** [1] - 2809:22
 **Defender's** [1] - 2785:25
 **defense** [14] - 2731:19, 2732:14,
2733:22, 2734:11, 2734:16, 2744:10,
2760:19, 2783:10, 2802:24, 2809:5,
2813:14, 2814:24, 2824:8
 **Defense** [2] - 2757:24, 2765:20
 **defense's** [1] - 2740:8, 2824:12
 **definitely** [1] - 2805:10
 **degree** [2] - 2803:10, 2803:11
 **deleted** [1] - 2746:12
 **Delhi** [1] - 2816:5
 **deliberately** [1] - 2799:15
 **deliberation** [1] - 2746:16
 **delivery** [1] - 2781:7
 **democracy** [3] - 2816:8, 2817:19,
2820:8
 **demonstrated** [1] - 2823:20
 **Department** [4] - 2807:1, 2807:16,
2822:1, 2823:12
 **DEPARTMENT** [1] - 2728:17
 **Department's** [1] - 2822:12
 **depended** [1] - 2806:9
 **DEPUTY** [3] - 2757:15, 2760:19,
2777:16
 **der** [17] - 2746:12, 2747:6, 2747:13,
2748:18, 2749:17, 2749:25, 2750:13,
2750:21, 2754:15, 2754:18, 2755:7,
2755:14, 2756:4, 2756:16, 2759:11,
2765:15, 2770:22
 **derision** [1] - 2812:17
 **describe** [1] - 2735:19
 **described** [2] - 2772:20, 2807:7
 **describing** [2] - 2772:22, 2797:11
 **description** [1] - 2745:1
 **descriptions** [1] - 2737:19
 **designed** [4] - 2742:11, 2742:20,
2775:17, 2779:21
 **desire** [1] - 2744:4
 **despite** [1] - 2749:2
 **detention** [1] - 2746:8
 **Deveaux** [6] - 2730:8, 2809:6, 2809:7,
2809:11, 2809:14, 2814:16
 **develop** [1] - 2805:11
 **developed** [1] - 2805:18
 **difference** [1] - 2812:23
 **different** [9] - 2743:19, 2746:20,
2748:9, 2770:7, 2771:21, 2786:22,
2795:21, 2823:23, 2825:19
 **difficult** [2] - 2813:10, 2813:12
 **DIRECT** [6] - 2730:4, 2734:20,
2783:15, 2803:3, 2809:9, 2815:3
 **direct** [7] - 2737:5, 2746:19, 2773:19,
2775:2, 2800:22, 2800:23, 2800:24
 **directly** [1] - 2786:24
 **director** [4] - 2803:15, 2804:4, 2804:5,
2804:18

 **directors** [3] - 2817:8, 2817:11,
2817:13
 **disagree** [1] - 2790:2
 **disagreement** [1] - 2747:22
 **disappointed** [1] - 2754:12
 **discovery** [1] - 2732:14
 **discuss** [4] - 2755:20, 2775:20,
2796:17, 2827:20
 **discussed** [9] - 2734:5, 2743:10,
2745:16, 2745:20, 2745:23, 2792:17,
2810:17, 2810:19, 2820:16
 **discussing** [2] - 2765:18, 2768:18
 **discussion** [1] - 2792:13
 **disrupt** [2] - 2742:11, 2742:20
 **distinct** [1] - 2797:16
 **distinction** [2] - 2762:6, 2790:10
 **DISTRICT** [4] - 2728:2, 2728:2,
2728:11, 2728:15
 **doc** [1] - 2756:8
 **doctrine** [1] - 2742:1
 **document** [22] - 2737:8, 2737:12,
2737:19, 2737:21, 2738:1, 2740:4,
2740:5, 2744:16, 2745:9, 2746:6,
2748:3, 2751:1, 2753:20, 2754:21,
2756:9, 2764:22, 2765:12, 2767:2,
2771:19, 2776:5
 **documents** [7] - 2738:19, 2756:11,
2794:15, 2808:13, 2808:18, 2808:19,
2827:6
 **dollars** [2] - 2736:15, 2763:13
 **done** [6] - 2731:10, 2758:15, 2763:20,
2780:16, 2780:20, 2798:21
 **door** [4] - 2789:21, 2792:21, 2800:7,
2801:14
 **door-opening** [1] - 2792:21
 **down** [1] - 2816:13
 **draft** [7] - 2745:9, 2751:4, 2755:1,
2764:2, 2768:10, 2768:16, 2769:1
 **drafted** [1] - 2810:22
 **drafting** [4] - 2774:24, 2776:25,
2779:15, 2779:16
 **drafts** [1] - 2776:10
 **draw** [3] - 2782:20, 2798:18, 2802:20
 **drawing** [1] - 2762:6
 **drive** [1] - 2811:19
 **duly** [5] - 2734:19, 2783:14, 2803:2,
2809:8, 2815:2
 **duplicative** [1] - 2772:9
 **during** [4] - 2779:16, 2806:11, 2811:8,
2820:6
 **duties** [1] - 2787:5
 **duty** [1] - 2787:25
 **DX** [3] - 2764:21, 2767:15, 2780:6

---

**E**

---

 **e-mail** [81] - 2731:19, 2731:24, 2732:2,
2732:4, 2732:6, 2732:18, 2732:21,
2735:12, 2735:15, 2735:17, 2735:20,
2735:25, 2736:1, 2736:5, 2736:7,

2736:20, 2738:22, 2738:23, 2739:7,
2739:12, 2739:14, 2739:16, 2739:24,
2740:1, 2742:25, 2743:18, 2743:20,
2743:21, 2743:22, 2743:24, 2744:19,
2744:24, 2744:25, 2745:3, 2745:8,
2747:6, 2749:17, 2749:21, 2750:12,
2750:21, 2751:10, 2751:15, 2754:2,
2754:6, 2754:7, 2754:15, 2754:17,
2754:20, 2755:6, 2755:9, 2755:11,
2756:3, 2756:4, 2756:9, 2756:15,
2757:2, 2758:6, 2758:9, 2759:9,
2759:10, 2759:18, 2761:3, 2761:17,
2763:25, 2764:14, 2764:24, 2765:2,
2766:21, 2768:24, 2769:2, 2770:10,
2776:4, 2777:8, 2777:19, 2777:23,
2779:14, 2780:17, 2781:2, 2827:5
 **e-mails** [12] - 2732:12, 2732:15,
2732:17, 2732:18, 2732:20, 2732:21,
2748:20, 2761:3, 2762:25, 2768:4,
2779:15, 2779:17
 **early** [5] - 2774:16, 2804:1, 2812:13,
2817:23, 2821:1
 **East** [2] - 2728:21, 2816:4
 **eat** [1] - 2791:6
 **economic** [1] - 2816:10
 **economics** [1] - 2806:25
 **edited** [1] - 2769:15
 **editing** [3] - 2769:11, 2769:14,
2780:13
 **editors** [1] - 2811:1
 **education** [3] - 2803:9, 2803:10,
2803:11
 **educational** [5] - 2795:23, 2803:14,
2805:6, 2805:20, 2810:2
 **educator** [1] - 2805:10
 **Edward** [1] - 2785:9
 **efficacy** [2] - 2810:16, 2810:24
 **effort** [6] - 2748:9, 2753:2, 2796:10,
2796:18, 2802:7, 2825:3
 **eight** [4] - 2748:6, 2751:6, 2776:18,
2784:16
 **either** [6] - 2748:9, 2753:2, 2796:10,
2796:18, 2802:7, 2825:3
 **Elmo** [1] - 2733:4
 **email** [2] - 2740:15, 2775:5
 **Emory** [1] - 2810:5
 **employed** [2] - 2803:13, 2803:17
 **employer** [1] - 2815:18
 **employment** [3] - 2815:12, 2815:14,
2815:15
 **encounters** [1] - 2787:16
 **end** [13] - 2736:5, 2736:15, 2746:14,
2761:8, 2761:10, 2763:7, 2763:14,
2775:7, 2776:12, 2776:20, 2780:14,
2780:20, 2825:20
 **Endowment** [2] - 2815:19, 2816:12
 **ends** [2] - 2746:15, 2812:18
 **engaged** [2] - 2820:20, 2820:23
 **engagement** [1] - 2816:6
 **England** [1] - 2811:19
 **English** [1] - 2750:23

**enrolled** [3] - 2804:10, 2804:15, 2804:16
**ensure** [1] - 2800:21
**entered** [1] - 2777:17
**entire** [1] - 2762:3
**entitled** [3] - 2813:14, 2813:15, 2829:5
**entitles** [1] - 2776:24
**enumerating** [1] - 2745:1
**environmental** [1] - 2815:17
**equivalent** [1] - 2810:15
**error** [1] - 2782:22
**errors** [1] - 2745:1
**Esq** [4] - 2728:19, 2728:20, 2728:23, 2728:23
**essentially** [1] - 2789:23
**establish** [2] - 2732:16, 2752:15
**etc** [1] - 2807:4
**ethics** [1] - 2812:12
**Europe** [1] - 2816:4
**evaluating** [1] - 2773:6
**evaluation** [2] - 2747:23, 2778:18
**evening** [4] - 2731:11, 2827:19, 2828:2, 2828:7
**event** [1] - 2767:2
**events** [3] - 2787:19, 2799:21, 2799:24
**eventually** [2] - 2810:22, 2811:3
**evidence** [38] - 2733:1, 2735:11, 2739:1, 2740:10, 2741:6, 2741:11, 2742:1, 2742:24, 2743:16, 2744:10, 2747:2, 2769:23, 2771:9, 2771:15, 2771:18, 2771:24, 2772:1, 2772:11, 2776:23, 2777:4, 2777:16, 2777:17, 2780:4, 2790:4, 2790:25, 2793:21, 2794:13, 2798:3, 2798:17, 2799:3, 2799:12, 2800:8, 2800:20, 2802:17, 2802:23, 2814:4, 2814:5, 2827:25
**exactly** [4] - 2777:7, 2787:4, 2801:6, 2801:20
**exaggerating** [1] - 2824:11
**EXAMINATION** [10] - 2734:20, 2760:11, 2783:15, 2794:4, 2803:3, 2808:4, 2809:9, 2813:20, 2815:3, 2819:22
**examination** [11] - 2740:9, 2760:9, 2773:19, 2777:3, 2777:5, 2789:16, 2799:20, 2799:24, 2808:2, 2823:14, 2824:18
**examined** [6] - 2734:19, 2783:14, 2794:15, 2803:2, 2809:8, 2815:2
**example** [4] - 2744:9, 2786:25, 2812:13, 2817:22
**excellent** [1] - 2761:2
**except** [1] - 2818:10
**excess** [1] - 2763:4
**exchange** [1] - 2751:10
**excuse** [1] - 2757:15
**excused** [11] - 2783:6, 2783:8, 2794:25, 2795:2, 2802:10, 2808:23, 2809:1, 2814:17, 2814:19, 2827:11, 2827:13

**executive** [12] - 2747:22, 2769:18, 2772:18, 2772:21, 2774:23, 2777:23, 2778:5, 2778:23, 2787:3, 2787:4, 2787:6, 2789:7
**exhausted** [1] - 2764:18
**EXHIBIT** [1] - 2730:14
**exhibit** [11] - 2740:25, 2742:5, 2747:16, 2752:23, 2754:24, 2755:21, 2768:23, 2770:21, 2770:23, 2771:5, 2773:7
**Exhibit** [29] - 2731:20, 2732:9, 2733:9, 2733:11, 2733:12, 2733:13, 2735:10, 2738:20, 2742:23, 2743:15, 2744:18, 2746:25, 2749:15, 2750:12, 2751:9, 2754:14, 2755:5, 2756:1, 2756:21, 2757:4, 2760:16, 2764:12, 2765:13, 2765:20, 2766:17, 2768:23, 2779:25, 2780:2, 2780:25
**exhibits** [1] - 2733:6
**exited** [1] - 2802:18
**expect** [1] - 2776:17
**expected** [1] - 2776:16
**expenses** [5] - 2736:14, 2761:6, 2761:11, 2763:10, 2763:16
**experience** [3] - 2781:15, 2788:5, 2818:5
**explanations** [1] - 2750:22
**explicit** [2] - 2778:3, 2779:3
**explicitly** [1] - 2742:2
**expressed** [2] - 2740:15, 2822:9
**extending** [1] - 2780:19
**extraordinary** [4] - 2787:24, 2789:12, 2811:12

## F

**face** [2] - 2812:25, 2820:24
**fact** [10] - 2731:9, 2734:3, 2738:7, 2753:8, 2775:1, 2776:6, 2791:14, 2792:19, 2820:14, 2822:2
**facts** [4] - 2731:25, 2732:25, 2738:12, 2794:18
**factual** [1] - 2781:18
**failed** [3] - 2741:5, 2741:11, 2741:25
**fair** [7] - 2776:13, 2777:2, 2800:15, 2821:13, 2824:23, 2826:6, 2826:25
**fairness** [3] - 2749:11, 2778:21, 2797:6
**false** [2] - 2766:24, 2790:11
**familiar** [1] - 2807:6
**familiarity** [1] - 2788:22
**family** [2] - 2787:24, 2818:9
**FARA** [3] - 2765:25, 2766:2, 2766:6
**fashion** [1] - 2790:14
**federal** [1] - 2784:21
**feelings** [1] - 2778:15
**fees** [1] - 2763:16
**feet** [1] - 2787:14
**felt** [4] - 2805:19, 2805:23, 2810:16
**Fernando** [1] - 2728:13

**few** [4] - 2731:12, 2814:6, 2819:7, 2820:4
**field** [1] - 2806:25
**fields** [1] - 2817:5
**fifth** [2] - 2754:7, 2754:8
**fifty** [3] - 2810:9, 2811:14, 2816:21
**figure** [1] - 2764:4
**figuring** [1] - 2776:12
**final** [9] - 2751:4, 2751:23, 2755:25, 2757:20, 2764:1, 2769:1, 2769:8, 2769:21, 2781:7
**Final** [1] - 2751:5
**finalized** [2] - 2736:2, 2773:21
**finally** [3] - 2746:2, 2781:9, 2826:23
**fine** [1] - 2766:23
**finish** [1] - 2807:9
**finished** [1] - 2786:3
**firm** [15] - 2784:1, 2784:10, 2785:4, 2785:6, 2785:9, 2785:12, 2785:14, 2785:24, 2786:6, 2787:1, 2787:6, 2791:17, 2791:19, 2791:25
**firms** [2] - 2787:4, 2789:5
**first** [19] - 2733:9, 2734:9, 2734:14, 2735:12, 2746:25, 2749:23, 2750:2, 2751:15, 2751:22, 2757:21, 2772:5, 2781:17, 2785:3, 2787:25, 2789:11, 2797:8, 2804:9, 2811:14, 2827:24
**fits** [1] - 2776:13
**five** [6] - 2756:13, 2756:18, 2785:23, 2787:6, 2804:2, 2812:2
**fix** [1] - 2782:13
**flatly** [1] - 2744:10
**focus** [5] - 2731:23, 2738:22, 2752:18, 2766:19, 2820:11
**focused** [1] - 2814:11
**folded** [5] - 2797:17, 2797:18, 2797:19, 2797:20, 2799:8
**folded-up** [1] - 2797:20
**folks** [2] - 2746:21, 2776:20
**Folks** [7] - 2803:15, 2803:18, 2803:19, 2803:20, 2803:24, 2804:10, 2805:4
**followed** [1] - 2821:10
**following** [3] - 2731:25, 2736:20, 2811:7
**follows** [5] - 2734:19, 2783:14, 2803:2, 2809:8, 2815:2
**food** [1] - 2828:5
**FOR** [2] - 2728:2, 2728:14
**foregoing** [1] - 2829:3
**foreign** [3] - 2810:24, 2815:16, 2824:25
**form** [5] - 2765:10, 2766:3, 2767:9, 2786:17, 2806:1
**former** [1] - 2747:24
**formulated** [1] - 2745:3
**forth** [2] - 2773:6, 2827:6
**forthrightness** [1] - 2812:12
**forward** [1] - 2739:10
**forwarded** [5] - 2735:17, 2738:1,

2744:16, 2751:11, 2752:17
**forwarding** [4] - 2739:25, 2747:6, 2756:9, 2764:22
**forwards** [1] - 2763:1
**foundation** [2] - 2757:1, 2788:2
**founded** [2] - 2785:9, 2803:25
**four** [7] - 2751:18, 2776:18, 2782:10, 2785:23, 2787:1, 2804:16, 2811:18
**Fourth** [1] - 2728:15
**frame** [1] - 2820:11
**frequency** [1] - 2817:14
**frequent** [2] - 2787:7, 2789:4
**Friday** [1] - 2735:19
**friend** [2] - 2787:17, 2790:18
**friends** [5] - 2781:9, 2781:12, 2807:1, 2811:13, 2817:1
**friendship** [3] - 2805:18, 2812:6, 2818:10
**fringe** [1] - 2810:18
**front** [3] - 2775:7, 2776:12, 2811:4
**frustrated** [1] - 2812:14
**FTI** [8] - 2737:19, 2738:1, 2738:11, 2745:1, 2745:10, 2746:5, 2746:6
**fully** [2] - 2761:11, 2763:16
**fundamental** [2] - 2748:24, 2748:25
**future** [1] - 2792:21

### G

**gain** [2] - 2812:7, 2813:6
**gas** [1] - 2748:1
**GASTON** [46] - 2751:24, 2752:2, 2752:11, 2752:19, 2753:1, 2756:23, 2757:1, 2757:5, 2757:8, 2757:13, 2758:8, 2758:23, 2760:10, 2760:12, 2760:21, 2760:24, 2761:1, 2766:8, 2766:9, 2767:12, 2770:5, 2771:3, 2771:4, 2771:13, 2773:14, 2774:3, 2774:20, 2775:11, 2775:14, 2777:7, 2777:11, 2777:13, 2777:17, 2777:18, 2780:5, 2781:19, 2781:21, 2782:12, 2782:16, 2782:19, 2782:23, 2783:1, 2796:6, 2813:21, 2814:12, 2814:15
**Gaston** [3] - 2728:14, 2797:2, 2797:17
**gates** [4] - 2738:24, 2743:21, 2744:2, 2756:10
**GAY** [1] - 2803:6
**Gay** [4] - 2730:7, 2802:24, 2803:1, 2803:6
**general** [2] - 2820:18, 2825:21
**General** [2] - 2747:10, 2782:14
**General's** [1] - 2747:11
**generally** [1] - 2737:11
**generation** [1] - 2812:14
**gentlemen** [3] - 2783:19, 2794:16, 2816:1
**Georgetown** [4] - 2735:4, 2784:4, 2784:6, 2803:25
**Georgia** [1] - 2809:16
**git** [1] - 2775:1

**git-go** [1] - 2775:1
**given** [3] - 2746:15, 2773:21, 2792:19
**glance** [1] - 2774:4
**gold** [3] - 2819:15, 2822:24, 2825:25
**GOVERNMENT** [1] - 2730:14
**Government** [5] - 2728:13, 2733:11, 2733:12, 2733:13, 2780:4
**government** [31] - 2731:12, 2731:17, 2731:19, 2731:21, 2733:5, 2733:15, 2734:4, 2738:10, 2740:21, 2747:7, 2749:1, 2749:3, 2760:1, 2760:20, 2760:21, 2762:14, 2762:18, 2775:17, 2775:21, 2776:4, 2776:25, 2779:22, 2785:22, 2786:7, 2791:17, 2791:20, 2792:1, 2815:15, 2817:24, 2818:4, 2821:7
**government's** [2] - 2733:25, 2734:7
**Government's** [11] - 2731:20, 2732:8, 2733:9, 2735:10, 2743:15, 2756:1, 2760:15, 2764:11, 2765:13, 2766:17, 2780:25
**graduate** [1] - 2784:3
**graduated** [2] - 2784:5, 2784:6
**grandchildren** [1] - 2784:16
**great** [2] - 2737:11, 2774:14
**Greg** [15] - 2745:5, 2745:6, 2748:17, 2766:23, 2787:7, 2787:17, 2789:8, 2790:18, 2804:9, 2807:14, 2811:8, 2811:11, 2811:12, 2817:25, 2826:18
**Greg's** [2] - 2736:7, 2817:25
**Gregory** [9] - 2732:1, 2784:24, 2785:5, 2785:6, 2785:13, 2788:1, 2804:6, 2810:6, 2816:18
**GREGORY** [1] - 2728:6
**Gregory's** [1] - 2789:10
**Gregory.Craig@Skadden.com** [1] - 2732:3
**Gross's** [1] - 2766:11
**group** [8] - 2748:16, 2765:2, 2768:18, 2769:16, 2770:15, 2770:19, 2772:17, 2772:20
**groups** [1] - 2821:6
**guess** [2] - 2736:16, 2798:22
**guidelines** [3] - 2748:21, 2749:5, 2773:3
**guilt** [2] - 2791:13, 2800:1
**guilt-assuming** [2] - 2791:13, 2800:1
**Gulland** [1] - 2728:14
**guys** [3] - 2739:18, 2821:12, 2821:13

### H

**half** [1] - 2804:2
**hand** [4] - 2752:5, 2797:2, 2797:5, 2797:13
**handle** [1] - 2818:1
**happier** [1] - 2774:18
**happy** [4] - 2743:7, 2798:2, 2798:16, 2799:11
**hard** [3] - 2792:6, 2818:2, 2826:5

**Harvard** [6] - 2736:20, 2736:22, 2737:2, 2810:15, 2815:24
**Haskell** [11] - 2737:18, 2739:25, 2740:2, 2744:17, 2744:25, 2748:17, 2756:5, 2759:11, 2764:6, 2764:9, 2779:8
**Hawker** [17] - 2737:8, 2738:23, 2739:8, 2743:21, 2744:2, 2744:16, 2745:6, 2745:7, 2745:10, 2764:22, 2765:2, 2766:21, 2767:6, 2767:16, 2767:19, 2767:21, 2767:23
**Hawker's** [2] - 2764:24, 2766:19
**head** [3] - 2752:25, 2753:1, 2804:19
**headphones** [1] - 2757:16
**headquarters** [1] - 2816:5
**hear** [6] - 2752:7, 2757:17, 2774:4, 2808:15, 2823:16, 2825:25
**heard** [10] - 2733:23, 2744:6, 2790:17, 2790:20, 2791:5, 2793:20, 2794:12, 2808:11, 2814:13, 2827:24
**hearing** [1] - 2760:2
**hearsay** [4] - 2752:2, 2752:11, 2752:12, 2752:20
**held** [1] - 2758:6
**hello** [2] - 2808:7, 2813:23
**help** [3] - 2739:18, 2743:1, 2810:22
**helped** [2] - 2765:9, 2812:3
**helpful** [1] - 2767:3
**helping** [1] - 2804:22
**hi** [1] - 2808:6
**highest** [1] - 2822:25
**highlight** [1] - 2747:16
**highlighting** [1] - 2798:23
**highly** [3] - 2819:2, 2819:8, 2826:2
**himself** [1] - 2819:5
**history** [1] - 2817:21
**holds** [1] - 2799:20
**home** [2] - 2811:10
**honest** [3] - 2806:6, 2806:9, 2807:24
**honesty** [16] - 2786:17, 2787:10, 2788:24, 2791:16, 2793:21, 2806:2, 2807:10, 2807:21, 2812:7, 2812:12, 2812:24, 2813:3, 2818:17, 2819:13, 2819:16, 2823:1
**Honor** [44] - 2731:5, 2731:16, 2732:23, 2733:5, 2733:15, 2733:19, 2734:13, 2734:16, 2751:24, 2752:23, 2756:23, 2757:5, 2757:11, 2758:3, 2766:4, 2771:10, 2773:9, 2776:15, 2777:6, 2781:16, 2782:5, 2782:24, 2783:10, 2788:11, 2789:17, 2789:20, 2790:2, 2793:1, 2793:7, 2795:1, 2795:5, 2795:12, 2796:24, 2801:20, 2808:3, 2808:22, 2809:3, 2809:5, 2813:18, 2814:10, 2819:20, 2822:8, 2823:25, 2827:17
**HONORABLE** [1] - 2728:10
**hours** [1] - 2818:3
**human** [2] - 2821:6, 2824:25
**hundreds** [1] - 2787:16

**husher** [1] - 2773:17

**I**

**i.e** [1] - 2801:9
**identified** [3] - 2732:4, 2732:19, 2732:22
**ignore** [1] - 2793:24
**Ill** [1] - 2728:23
**imagine** [1] - 2781:14
**implies** [1] - 2790:18
**important** [4] - 2742:17, 2748:25, 2762:19, 2762:20
**impossible** [1] - 2746:14
**impression** [3] - 2766:24, 2798:10, 2799:14
**imprisoned** [2] - 2820:15, 2821:2
**improper** [4] - 2793:10, 2799:1, 2799:16, 2802:21
**impugn** [1] - 2790:8
**inaccurate** [3] - 2740:17, 2790:10, 2790:12
**incident** [1] - 2823:20
**include** [1] - 2748:17
**included** [1] - 2779:7
**including** [6] - 2746:17, 2746:21, 2748:24, 2765:3, 2770:1, 2791:2
**inconsistent** [1] - 2775:24
**incorporate** [1] - 2765:5
**incorrect** [1] - 2767:4
**indeed** [1] - 2744:8
**independent** [3] - 2738:9, 2749:6, 2775:22
**indicate** [1] - 2754:2
**indicated** [1] - 2773:3
**indication** [1] - 2798:5
**inference** [4] - 2782:21, 2798:18, 2802:20, 2823:24
**influence** [3] - 2740:13, 2740:20, 2740:22
**initial** [1] - 2742:25
**instance** [2] - 2768:22, 2770:20
**instead** [1] - 2775:18
**Institute** [1] - 2816:2
**institution** [1] - 2816:11
**institutions** [2] - 2805:6, 2805:21
**instruct** [3] - 2793:3, 2797:6, 2802:16
**integrity** [29] - 2786:17, 2786:21, 2788:24, 2789:10, 2789:13, 2790:21, 2791:16, 2812:7, 2812:24, 2813:3, 2818:16, 2819:3, 2819:16, 2823:1, 2823:6, 2823:13, 2823:21, 2823:25, 2824:6, 2824:7, 2824:20, 2825:2, 2825:4, 2825:6, 2825:8, 2825:10, 2825:22
**intend** [1] - 2734:11
**intent** [1] - 2790:12
**intention** [1] - 2767:7
**interact** [1] - 2806:19
**interacted** [1] - 2811:16

**interactions** [1] - 2805:22
**interest** [2] - 2776:12, 2824:16
**interface** [1] - 2748:18
**International** [1] - 2815:19
**international** [1] - 2816:3
**interwoven** [1] - 2762:7
**intimate** [1] - 2805:12
**introduce** [2] - 2774:12, 2793:2
**introduced** [1] - 2732:12
**introducing** [1] - 2758:2
**introduction** [1] - 2733:15
**invited** [3] - 2811:3, 2811:6, 2811:8
**invoice** [1] - 2763:4
**involved** [8] - 2766:1, 2766:13, 2805:5, 2805:20, 2807:14, 2820:8, 2821:1, 2821:16
**isolated** [1] - 2810:17
**issue** [8] - 2739:3, 2779:6, 2798:24, 2799:17, 2799:22, 2810:19, 2820:20
**issues** [20] - 2768:14, 2768:15, 2778:18, 2805:21, 2812:11, 2815:17, 2816:7, 2816:10, 2817:6, 2817:16, 2817:19, 2817:20, 2817:21, 2818:5, 2818:25, 2819:4, 2819:5, 2820:8, 2820:9, 2820:16
**item** [15] - 2732:19, 2732:22, 2740:7, 2740:8, 2740:11, 2741:1, 2741:3, 2741:14, 2742:6, 2745:14, 2745:19, 2745:22, 2745:25, 2746:2, 2746:3
**itself** [2] - 2775:14, 2824:19

**J**

**JACKSON** [1] - 2728:10
**James** [1] - 2728:20
**January** [6] - 2748:1, 2778:4, 2779:4, 2784:9, 2785:4, 2811:6
**Jason** [1] - 2728:17
**Jessica** [4] - 2730:9, 2814:24, 2815:1, 2815:6
**job** [1] - 2803:14
**Jonathan** [1] - 2764:22
**journalism** [1] - 2806:25
**judge** [6] - 2746:15, 2746:17, 2746:18, 2779:25, 2809:25, 2814:16
**JUDGE** [1] - 2728:11
**Judge** [3] - 2757:15, 2809:5, 2809:11
**judgment** [4] - 2818:6, 2819:15, 2822:25, 2823:7
**July** [12] - 2735:20, 2736:1, 2736:14, 2761:4, 2761:6, 2761:10, 2763:10, 2763:14, 2763:25, 2774:16, 2774:25, 2777:20
**jump** [1] - 2743:6
**June** [3] - 2736:9, 2763:4, 2763:7
**JUNGHANS** [16] - 2795:5, 2795:12, 2795:16, 2795:23, 2796:10, 2801:6, 2801:16, 2801:18, 2801:20, 2801:22, 2802:6, 2802:24, 2803:4, 2803:22, 2807:25, 2808:15

**Junghans** [2] - 2728:23, 2800:5
**Junghans'** [1] - 2801:3
**junior** [1] - 2810:9
**JUROR** [3] - 2738:25, 2760:23, 2760:25
**jurors** [3] - 2731:8, 2732:8, 2827:20
**JURY** [2] - 2728:6, 2728:10
**jury** [16] - 2731:4, 2735:1, 2783:20, 2793:3, 2793:16, 2794:16, 2797:3, 2797:7, 2797:12, 2797:13, 2798:24, 2802:9, 2809:12, 2816:1, 2823:16, 2828:5
**Jury** [4] - 2731:7, 2796:21, 2802:12, 2828:8
**JUSTICE** [1] - 2728:17

**K**

**KANESHIRO** [2] - 2729:2, 2829:9
**Kaneshiro** [2] - 2829:3, 2829:8
**KANESHIRO-MILLER** [2] - 2729:2, 2829:9
**Kaneshiro-Miller** [2] - 2829:3, 2829:8
**Kedem** [11] - 2748:17, 2759:11, 2766:10, 2770:21, 2771:5, 2771:8, 2771:10, 2771:11, 2771:14, 2772:5, 2779:7
**keep** [4] - 2758:16, 2764:5, 2775:22, 2826:8
**Ken** [1] - 2766:11
**Kennedy** [1] - 2786:2
**kind** [11] - 2775:12, 2791:5, 2805:21, 2811:15, 2811:23, 2817:5, 2818:2, 2818:20, 2818:21, 2820:24, 2826:18
**King** [1] - 2812:21
**knowing** [1] - 2788:4
**knowledge** [2] - 2818:5, 2819:4, 2822:9
**known** [7] - 2785:1, 2785:2, 2804:8, 2810:8, 2816:20, 2817:4, 2817:7
**knows** [8] - 2788:8, 2788:14, 2795:17, 2795:20, 2795:22, 2801:10, 2801:22, 2823:1

**L**

**lack** [1] - 2757:1
**ladies** [3] - 2783:19, 2794:16, 2816:1
**language** [2] - 2748:9, 2774:17
**large** [1] - 2759:9
**larger** [1] - 2759:9
**Larry** [1] - 2789:23
**last** [24] - 2732:10, 2735:5, 2738:7, 2750:17, 2751:18, 2755:11, 2756:18, 2759:17, 2765:15, 2770:8, 2780:8, 2780:12, 2781:15, 2781:22, 2781:25, 2782:8, 2783:1, 2797:1, 2797:2, 2804:5, 2815:7, 2817:12, 2826:19, 2827:3
**late** [2] - 2737:5, 2822:20

**lately** [1] - 2792:2
**latest** [1] - 2750:3
**Law** [1] - 2735:4
**law** [30] - 2741:16, 2783:21, 2784:1, 2784:3, 2784:6, 2784:7, 2784:10, 2784:18, 2785:4, 2785:5, 2785:6, 2785:8, 2785:11, 2785:14, 2785:24, 2786:6, 2787:1, 2787:4, 2787:6, 2787:22, 2789:5, 2791:17, 2791:19, 2793:21, 2806:25, 2810:5, 2812:1, 2812:4, 2812:23, 2813:6
**law-abiding** [2] - 2787:22, 2813:6
**law-abidingness** [1] - 2793:21
**lawful** [1] - 2812:19
**lawyer** [12] - 2784:15, 2784:19, 2784:20, 2785:5, 2787:24, 2788:7, 2790:17, 2795:16, 2796:3, 2802:3, 2813:9, 2813:14
**lawyering** [1] - 2766:15
**lawyers** [14] - 2775:4, 2785:8, 2788:9, 2788:22, 2789:2, 2789:3, 2789:4, 2789:8, 2790:7, 2790:23, 2801:4, 2801:6, 2801:7
**leaders** [1] - 2811:9
**leadership** [1] - 2817:18
**leapt** [1] - 2824:8
**learn** [1] - 2813:13
**learning** [1] - 2785:8
**leave** [5] - 2763:13, 2781:25, 2798:9, 2799:14, 2827:21
**leaving** [3] - 2736:15, 2761:7, 2797:8
**left** [5] - 2792:25, 2798:17, 2803:14, 2803:18, 2812:17
**legal** [11] - 2742:1, 2746:7, 2788:9, 2788:25, 2793:23, 2796:9, 2800:11, 2801:1, 2802:4, 2804:21, 2805:17
**legally** [2] - 2746:14, 2805:1
**legendary** [1] - 2785:9
**letter** [2] - 2810:22, 2810:25
**level** [2] - 2735:7, 2811:17
**lie** [1] - 2813:17
**lied** [3] - 2790:9, 2791:18, 2791:21
**life** [1] - 2826:7
**lifetime** [2] - 2826:13, 2826:20
**light** [3] - 2778:22, 2789:6, 2792:19
**lightly** [1] - 2789:6
**likely** [1] - 2778:16
**Lila** [1] - 2784:14
**limited** [3] - 2735:23, 2799:20, 2800:9
**limiting** [2] - 2737:22, 2738:13
**line** [6] - 2741:1, 2748:24, 2750:2, 2754:7, 2754:8, 2756:4
**linked** [1] - 2824:7
**listed** [3] - 2732:5, 2732:18, 2732:21
**literally** [1] - 2787:15
**litigation** [1] - 2784:21
**live** [6] - 2801:12, 2803:7, 2803:8, 2809:15, 2809:16, 2815:9
**lived** [2] - 2826:7

**living** [1] - 2826:12
**LLP** [2] - 2728:20, 2728:24
**located** [1] - 2787:15
**lodged** [1] - 2746:7
**look** [44] - 2735:12, 2738:20, 2739:2, 2739:23, 2740:4, 2742:5, 2742:23, 2743:15, 2743:20, 2744:14, 2744:18, 2745:14, 2745:19, 2745:22, 2746:3, 2746:25, 2747:15, 2749:15, 2750:2, 2751:15, 2752:3, 2754:24, 2759:6, 2761:17, 2762:22, 2764:24, 2765:13, 2765:20, 2765:21, 2766:17, 2766:20, 2767:15, 2768:22, 2770:20, 2770:22, 2771:5, 2771:19, 2775:16, 2775:21, 2778:2, 2778:25, 2805:24, 2820:21
**looked** [2] - 2792:2, 2817:12
**looking** [4] - 2748:3, 2761:3, 2812:15, 2822:3
**looks** [2] - 2756:9, 2779:21
**loud** [2] - 2732:8, 2736:6
**Lowenstein** [1] - 2810:23
**lying** [1] - 2789:23

# M

**M-A-T-H-E-W-S** [1] - 2815:8
**mail** [81] - 2731:19, 2731:24, 2732:2, 2732:4, 2732:6, 2732:18, 2732:21, 2735:12, 2735:15, 2735:17, 2735:20, 2735:25, 2736:1, 2736:5, 2736:7, 2736:20, 2738:22, 2738:23, 2739:7, 2739:12, 2739:14, 2739:16, 2739:24, 2740:1, 2742:25, 2743:18, 2743:20, 2743:21, 2743:22, 2743:24, 2744:19, 2744:24, 2744:25, 2745:3, 2745:8, 2747:6, 2749:17, 2749:21, 2750:12, 2750:21, 2751:10, 2751:15, 2754:2, 2754:6, 2754:7, 2754:15, 2754:17, 2754:20, 2755:6, 2755:9, 2755:11, 2756:3, 2756:4, 2756:9, 2756:15, 2757:2, 2758:6, 2758:9, 2759:9, 2759:10, 2759:18, 2761:3, 2761:17, 2763:25, 2764:14, 2764:24, 2765:2, 2766:21, 2768:24, 2769:2, 2770:10, 2776:4, 2777:8, 2777:19, 2777:23, 2779:14, 2780:17, 2781:2, 2827:5
**mails** [12] - 2732:12, 2732:15, 2732:17, 2732:18, 2732:20, 2732:21, 2748:20, 2761:3, 2762:25, 2768:4, 2779:15, 2779:17
**maintain** [1] - 2826:6
**maintained** [1] - 2826:9
**major** [1] - 2786:25
**malice** [1] - 2797:12
**man** [1] - 2789:12
**Manafort** [17] - 2738:24, 2743:21, 2744:2, 2751:10, 2751:12, 2751:16, 2752:2, 2752:14, 2752:16, 2754:3, 2754:6, 2758:6, 2768:25, 2769:7, 2770:13, 2781:3, 2781:6

**Manafort's** [1] - 2752:11
**married** [2] - 2784:13, 2784:14
**Marshall** [1] - 2815:10
**Martin** [1] - 2812:21
**master's** [1] - 2803:11
**math** [1] - 2785:20
**Mathews** [13] - 2730:9, 2814:25, 2815:1, 2815:6, 2815:9, 2815:11, 2815:21, 2816:18, 2819:18, 2819:24, 2825:19, 2826:23, 2827:10
**matter** [4] - 2787:11, 2788:6, 2810:24, 2829:5
**matters** [5] - 2731:12, 2787:23, 2804:23, 2804:24, 2828:9
**maturity** [1] - 2818:22
**McCullough** [7] - 2728:17, 2807:17, 2807:19, 2808:3, 2808:5, 2808:17, 2808:22
**MD** [1] - 2728:22
**mean** [19] - 2743:9, 2766:7, 2769:15, 2775:12, 2775:22, 2776:1, 2789:25, 2790:8, 2790:21, 2790:24, 2791:3, 2801:2, 2817:4, 2818:11, 2819:5, 2820:18, 2820:21, 2826:11, 2826:17
**means** [2] - 2761:10, 2784:19
**meant** [3] - 2760:6, 2792:14, 2811:5
**meanwhile** [1] - 2744:13
**media** [1] - 2765:14
**meet** [2] - 2810:11, 2816:22
**meeting** [9] - 2736:21, 2736:24, 2737:2, 2737:3, 2794:8, 2810:12, 2811:6, 2820:1
**meetings** [2] - 2748:20, 2817:18
**melding** [1] - 2772:9
**member** [8] - 2767:3, 2787:5, 2789:7, 2796:8, 2817:8, 2817:10, 2817:12, 2817:13
**members** [1] - 2793:16
**mention** [1] - 2806:15
**mentioned** [4] - 2746:20, 2748:19, 2768:17, 2825:24
**mentioning** [1] - 2768:20
**mentor** [1] - 2810:22
**message** [3] - 2752:17, 2752:18, 2752:19
**messaging** [8] - 2737:20, 2737:24, 2738:16, 2740:5, 2741:1, 2743:11, 2744:16, 2745:9
**met** [6] - 2735:5, 2804:9, 2810:9, 2810:12, 2811:14, 2811:19
**microphone** [2] - 2808:16, 2823:17
**mid** [1] - 2796:15
**mid-afternoon** [1] - 2796:15
**Middle** [1] - 2816:4
**middle** [2] - 2742:25, 2743:20
**might** [3] - 2774:24, 2812:15, 2813:1
**Mikitenko** [1] - 2746:13
**Miller** [2] - 2829:3, 2829:8
**MILLER** [2] - 2729:2, 2829:9
**million** [9] - 2736:14, 2736:15,

2736:17, 2761:7, 2763:5, 2763:7, 2763:11, 2763:13

**mind** [2] - 2812:18, 2813:12
**Minister** [1] - 2747:24
**Ministry** [1] - 2765:5
**minute** [1] - 2757:17
**mischaracterization** [3] - 2741:10, 2741:12, 2742:16
**mischaracterizations** [4] - 2737:15, 2737:25, 2738:2, 2743:14
**mischaracterized** [1] - 2737:13
**misled** [1] - 2799:15
**misrepresentation** [2] - 2742:4, 2742:21
**mission** [1] - 2805:24
**misspoke** [1] - 2766:5
**mistake** [1] - 2782:12
**mix** [1] - 2784:21
**mixed** [1] - 2801:3
**Molly** [1] - 2728:14
**moment** [3] - 2745:17, 2745:20, 2795:6
**Monday** [1] - 2811:4
**money** [3] - 2735:22, 2735:24, 2762:1
**month** [3] - 2736:16, 2761:8, 2763:14
**months** [1] - 2809:19
**morning** [4] - 2731:11, 2811:4, 2814:3, 2828:3
**Moscow** [1] - 2817:23
**most** [4] - 2787:23, 2815:18, 2817:16, 2817:25
**mostly** [2] - 2784:21, 2815:15
**motion** [5] - 2733:23, 2734:1, 2734:4, 2734:6, 2746:14
**motions** [1] - 2746:17
**motivation** [4] - 2742:3, 2769:24, 2772:11, 2822:3
**move** [4] - 2733:7, 2758:16, 2758:18, 2758:20
**movement** [2] - 2812:20, 2818:23
**moving** [3] - 2775:18, 2780:16, 2821:5
**MR** [138] - 2731:5, 2731:16, 2731:23, 2733:3, 2733:19, 2734:3, 2734:13, 2734:16, 2734:21, 2737:4, 2739:5, 2739:6, 2740:23, 2752:6, 2752:9, 2752:15, 2752:22, 2753:3, 2753:7, 2753:7, 2753:15, 2753:19, 2753:24, 2754:1, 2757:3, 2757:11, 2757:21, 2758:2, 2758:5, 2758:9, 2758:13, 2758:19, 2758:21, 2758:25, 2759:2, 2759:5, 2760:7, 2766:3, 2767:9, 2770:4, 2770:24, 2771:10, 2771:13, 2773:9, 2773:15, 2774:2, 2774:6, 2774:9, 2775:25, 2776:15, 2776:24, 2777:6, 2781:16, 2782:5, 2782:8, 2782:14, 2782:24, 2783:4, 2783:10, 2783:16, 2785:17, 2786:12, 2788:11, 2788:16, 2788:21, 2789:14, 2789:17, 2789:20, 2790:2, 2790:15, 2791:11, 2791:13, 2791:19, 2791:21, 2792:8,

2793:1, 2793:7, 2793:14, 2794:2, 2794:5, 2794:21, 2794:23, 2795:5, 2796:24, 2797:1, 2797:11, 2797:14, 2797:16, 2798:7, 2798:13, 2798:21, 2799:4, 2799:17, 2800:17, 2801:2, 2801:10, 2801:21, 2802:10, 2807:17, 2807:19, 2808:3, 2808:5, 2808:17, 2808:22, 2809:3, 2809:5, 2809:10, 2809:23, 2813:18, 2814:10, 2814:22, 2814:24, 2815:4, 2819:18, 2819:20, 2819:23, 2822:5, 2822:8, 2822:14, 2822:15, 2822:19, 2822:24, 2823:4, 2823:8, 2823:10, 2823:11, 2823:18, 2824:2, 2824:4, 2824:11, 2824:14, 2824:21, 2825:4, 2825:7, 2825:15, 2825:18, 2827:9, 2827:17
**MS** [61] - 2751:24, 2752:2, 2752:11, 2752:19, 2753:1, 2756:23, 2757:1, 2757:5, 2757:8, 2757:13, 2758:8, 2758:23, 2760:10, 2760:12, 2760:21, 2760:24, 2761:1, 2766:8, 2766:9, 2767:12, 2770:5, 2771:3, 2771:4, 2773:14, 2774:13, 2774:20, 2775:11, 2775:14, 2777:7, 2777:11, 2777:13, 2777:17, 2777:18, 2780:5, 2781:19, 2781:21, 2782:12, 2782:16, 2782:19, 2782:23, 2783:1, 2795:12, 2795:16, 2795:23, 2796:6, 2796:10, 2797:23, 2801:6, 2801:16, 2801:18, 2801:20, 2801:22, 2802:6, 2802:24, 2803:4, 2803:22, 2807:25, 2808:15, 2813:21, 2814:12, 2814:15
**multipart** [1] - 2770:25
**multiple** [1] - 2789:5
**Municipal** [1] - 2809:18
**Murphy** [8] - 2728:20, 2757:8, 2760:15, 2764:20, 2766:18, 2768:6, 2774:13, 2780:6
**MURPHY** [58] - 2734:13, 2734:16, 2734:21, 2737:4, 2739:5, 2739:6, 2740:23, 2752:6, 2752:9, 2752:15, 2752:22, 2753:3, 2753:7, 2753:15, 2753:19, 2753:24, 2754:1, 2757:3, 2757:11, 2758:2, 2758:5, 2758:9, 2758:13, 2758:19, 2758:21, 2758:25, 2759:2, 2759:5, 2760:7, 2766:3, 2767:9, 2770:4, 2770:24, 2771:10, 2773:9, 2773:15, 2774:2, 2774:6, 2774:9, 2775:25, 2776:15, 2776:24, 2777:6, 2781:16, 2782:5, 2782:8, 2782:14, 2782:24, 2783:4, 2783:10, 2783:16, 2786:12, 2788:21, 2789:14, 2790:2, 2793:7, 2793:14, 2794:23

## N

**name** [5] - 2803:5, 2803:6, 2809:12, 2815:5, 2815:7
**named** [1] - 2810:23
**names** [1] - 2732:7

**Nassau** [1] - 2810:3
**National** [1] - 2810:12
**native** [1] - 2784:14
**nature** [3] - 2815:11, 2816:2, 2817:2
**necessary** [1] - 2732:16
**need** [8] - 2739:18, 2739:23, 2752:3, 2758:25, 2764:4, 2771:1, 2775:10, 2800:23
**needed** [2] - 2732:8, 2743:1
**negative** [2] - 2789:10, 2790:21
**neglected** [1] - 2815:21
**neighborhood** [2] - 2803:25, 2807:1
**nerd** [1] - 2816:24
**never** [7] - 2760:4, 2773:12, 2776:16, 2790:20, 2791:5, 2791:20, 2813:16
**New** [8] - 2786:25, 2810:4, 2811:4, 2811:19, 2814:7, 2816:4
**new** [2] - 2771:21, 2827:23
**news** [1] - 2782:16
**newspaper** [2] - 2811:1, 2811:5
**newsworthy** [1] - 2807:15
**next** [29] - 2732:4, 2739:12, 2742:5, 2742:23, 2743:15, 2744:18, 2749:15, 2750:5, 2750:11, 2751:9, 2753:20, 2754:14, 2755:5, 2756:1, 2756:21, 2758:9, 2764:5, 2764:8, 2764:20, 2783:9, 2786:9, 2797:2, 2802:2, 2802:7, 2802:9, 2802:13, 2804:16, 2806:21, 2827:15
**next-to-the-last** [1] - 2797:2
**nice** [1] - 2760:13
**night** [1] - 2817:12
**nine** [3] - 2786:4, 2786:5
**nobody** [2] - 2819:1, 2826:17
**none** [1] - 2774:15
**nonprofit** [1] - 2815:16
**nonviolence** [1] - 2812:22
**notation** [1] - 2753:3
**note** [3] - 2747:22, 2759:15, 2775:9
**notebooks** [1] - 2827:22
**notes** [1] - 2771:8
**nothing** [4] - 2783:17, 2794:18, 2814:15, 2826:24
**notice** [1] - 2792:20
**November** [2] - 2764:14, 2764:17, 2781:3, 2781:5, 2785:7
**nuclear** [1] - 2816:7
**number** [15] - 2733:8, 2740:7, 2740:8, 2740:19, 2741:3, 2745:9, 2745:14, 2746:21, 2770:10, 2770:21, 2771:6, 2810:15, 2818:3, 2818:25
**numbered** [1] - 2751:21
**nursery** [1] - 2803:24
**NW** [4] - 2728:15, 2728:18, 2728:24, 2729:3

## O

**O'Brien** [1] - 2784:14
**Obama's** [2] - 2821:21, 2822:12

**object** [1] - 2776:15
**objected** [2] - 2822:14, 2822:16
**objecting** [2] - 2758:23, 2796:15
**objection** [18] - 2752:7, 2752:22, 2756:23, 2758:3, 2760:3, 2766:3, 2767:9, 2770:24, 2771:10, 2774:8, 2775:9, 2778:4, 2781:16, 2785:17, 2788:11, 2807:17, 2807:19, 2822:5
**obviously** [3] - 2766:24, 2793:8, 2827:2
**occasionally** [1] - 2813:11
**occasions** [1] - 2746:21
**occupation** [3] - 2735:2, 2783:20, 2809:17
**occur** [1] - 2799:24
**occurred** [1] - 2793:10
**October** [4] - 2759:14, 2759:22, 2780:6, 2780:19
**OF** [6] - 2728:2, 2728:4, 2728:10, 2728:15, 2728:17, 2829:1
**offered** [1] - 2798:14
**OFFICE** [1] - 2728:14
**office** [2] - 2787:14, 2817:23
**Office** [2] - 2747:11, 2785:25
**offices** [1] - 2816:3
**OFFICIAL** [1] - 2829:1
**often** [1] - 2785:10
**old** [2] - 2807:1, 2811:18
**older** [1] - 2806:17
**oldest** [3] - 2804:9, 2804:15, 2811:19
**Oleg** [2] - 2750:23, 2750:24
**once** [5] - 2746:15, 2787:12, 2788:3, 2789:9, 2790:20
**one** [38] - 2731:10, 2733:9, 2738:11, 2744:8, 2745:6, 2745:16, 2745:19, 2745:22, 2746:2, 2746:3, 2749:23, 2750:15, 2750:17, 2751:7, 2758:23, 2758:24, 2762:5, 2767:10, 2771:2, 2774:19, 2775:20, 2777:2, 2779:20, 2792:3, 2796:15, 2797:2, 2797:8, 2802:2, 2814:22, 2817:25, 2820:7, 2820:13, 2820:16, 2824:7, 2824:15, 2827:16
**ones** [1] - 2745:16
**ongoing** [2] - 2746:8, 2773:5
**open** [11] - 2734:10, 2753:25, 2759:3, 2775:16, 2777:12, 2782:25, 2793:15, 2796:13, 2800:7, 2801:14, 2825:17
**opened** [2] - 2789:21, 2817:23
**opening** [1] - 2792:21
**opens** [1] - 2779:20
**OPG** [1] - 2755:16
**opining** [1] - 2742:2
**opinion** [22] - 2786:20, 2786:21, 2787:21, 2788:18, 2791:3, 2791:4, 2792:12, 2792:23, 2793:3, 2793:11, 2793:20, 2806:2, 2806:4, 2806:5, 2812:7, 2812:10, 2813:6, 2818:16, 2819:12, 2824:22, 2825:12, 2825:14
**opinions** [1] - 2786:17

**opportunities** [1] - 2806:19
**opportunity** [3] - 2767:1, 2795:15, 2811:20
**opposed** [3] - 2790:11, 2790:12, 2792:23
**opus** [1] - 2764:1
**Orange** [2] - 2820:22, 2820:24
**order** [1] - 2757:22
**ordinary** [1] - 2828:4
**organization** [4] - 2801:15, 2810:20, 2816:15, 2820:7
**organizations** [1] - 2821:7
**orient** [1] - 2769:2
**original** [2] - 2733:6, 2733:10
**ought** [3] - 2757:19, 2799:25, 2810:17
**ourselves** [2] - 2737:23, 2738:14
**out-of-court** [1] - 2757:23
**outline** [1] - 2767:4
**outs** [1] - 2821:11
**outside** [4] - 2775:3, 2789:4, 2810:5, 2821:5
**overall** [1] - 2825:12
**overkill** [1] - 2771:22
**overlapped** [1] - 2818:25
**overruled** [1] - 2785:19
**overturn** [2] - 2769:24, 2772:12
**own** [5] - 2743:7, 2765:22, 2799:7, 2813:12, 2824:10
**owning** [1] - 2743:9

## P

**p.m** [2] - 2731:2, 2771:20
**packs** [1] - 2765:5
**page** [25] - 2732:10, 2735:13, 2735:20, 2735:21, 2738:22, 2740:4, 2740:24, 2740:25, 2741:14, 2742:5, 2747:16, 2750:5, 2754:24, 2757:21, 2759:10, 2763:23, 2770:19, 2770:20, 2770:23, 2771:5, 2771:19, 2772:5, 2772:24, 2811:4
**PAGE** [1] - 2730:14
**pages** [9] - 2733:14, 2748:6, 2750:8, 2751:6, 2753:17, 2755:2, 2755:12, 2755:21, 2756:13
**paid** [1] - 2744:7
**painted** [1] - 2775:2
**paper** [2] - 2797:17, 2797:20
**paragraph** [3] - 2747:19, 2751:21, 2759:18
**paraphrase** [1] - 2771:12
**parent** [3] - 2804:25, 2805:15, 2805:16
**parent-administrator** [1] - 2805:15
**parent-teacher** [1] - 2805:16
**parents** [5] - 2796:1, 2804:24, 2805:13, 2811:11, 2811:22
**parents'** [1] - 2811:10
**part** [25] - 2731:24, 2732:10, 2732:14, 2738:9, 2743:18, 2748:19, 2771:1, 2773:4, 2773:6, 2778:17, 2791:7,

2791:8, 2793:25, 2798:2, 2799:10, 2800:8, 2806:12, 2810:13, 2810:21, 2811:25, 2813:9, 2815:23, 2815:24, 2817:6, 2824:25
**particular** [6] - 2732:18, 2732:21, 2779:6, 2779:14, 2784:18, 2817:19
**particularly** [2] - 2740:19, 2799:25
**parties** [1] - 2731:25
**partner** [2] - 2735:3, 2787:9
**partners** [2] - 2766:7, 2791:22
**party** [2] - 2746:16, 2762:8
**passion** [1] - 2819:4
**past** [2] - 2808:8, 2813:24
**paths** [3] - 2806:14, 2806:20, 2807:2
**PATRICIA** [2] - 2729:2, 2829:9
**Patricia** [2] - 2829:3, 2829:8
**Paul** [1] - 2781:3
**Paula** [1] - 2728:23
**pause** [1] - 2774:10
**payor** [1] - 2762:8
**Peace** [1] - 2815:19
**peaceful** [1] - 2812:19
**peers** [1] - 2812:25
**Penn** [1] - 2803:10
**Pennsylvania** [1] - 2728:18
**people** [19] - 2747:12, 2765:2, 2778:14, 2787:6, 2805:5, 2806:8, 2806:11, 2806:13, 2806:22, 2806:24, 2807:14, 2811:12, 2812:14, 2812:17, 2817:25, 2819:7, 2819:10, 2819:13, 2823:23
**period** [21] - 2736:23, 2737:6, 2746:16, 2748:2, 2773:22, 2786:22, 2787:16, 2788:3, 2789:9, 2800:10, 2801:21, 2801:23, 2807:10, 2817:9, 2817:23, 2818:11, 2818:14, 2818:19, 2820:7, 2823:3, 2825:1
**periods** [2] - 2785:23, 2786:4
**permission** [1] - 2739:3
**permit** [4] - 2775:8, 2777:5, 2792:10, 2795:19
**permitted** [3] - 2739:2, 2792:18, 2799:25
**persistently** [1] - 2812:22
**person** [6] - 2732:1, 2732:17, 2795:16, 2807:23, 2822:25, 2826:19
**person's** [1] - 2791:4
**personal** [6] - 2805:8, 2805:11, 2811:17, 2811:24, 2818:8, 2818:16
**persons** [1] - 2732:4
**Ph.D** [1] - 2815:25
**photograph** [11] - 2782:8, 2782:9, 2782:10, 2797:3, 2797:4, 2797:7, 2797:10, 2797:13, 2797:18, 2798:5, 2798:11
**piece** [2] - 2797:17, 2797:20
**Pinchuk** [7] - 2761:25, 2762:2, 2762:6, 2762:12, 2762:17, 2762:18, 2762:21
**Pinchuk's** [1] - 2763:17
**plan** [1] - 2765:14

**plane** [1] - 2744:12
**planning** [1] - 2774:5
**pleasant** [3] - 2781:14, 2828:2, 2828:7
**pleased** [2] - 2769:1, 2769:7
**pleasure** [2] - 2794:8, 2820:1
**point** [9] - 2731:17, 2740:21, 2762:5, 2763:18, 2777:22, 2800:15, 2802:16, 2824:17, 2828:5
**points** [1] - 2767:4
**policy** [7] - 2804:22, 2804:24, 2805:22, 2810:24, 2815:16, 2818:5, 2824:25
**policymakers** [1] - 2816:7
**political** [11] - 2740:8, 2741:18, 2742:3, 2769:23, 2772:11, 2811:24, 2818:22, 2820:15, 2821:2, 2822:3, 2824:25
**politician** [1] - 2741:19
**politicians** [1] - 2741:16
**polity** [1] - 2810:18
**portrait** [1] - 2775:2
**position** [4] - 2804:3, 2806:7, 2810:15, 2816:12
**positive** [2] - 2778:2, 2779:1
**possibility** [2] - 2759:24, 2760:4
**possible** [2] - 2749:9, 2779:11
**pound** [1] - 2759:19
**PR** [2] - 2738:8, 2739:18
**practice** [5] - 2748:14, 2783:23, 2783:25, 2784:18, 2787:8
**practicing** [4] - 2784:11, 2785:11, 2788:7, 2788:22
**Pratt** [1] - 2728:21
**predicate** [1] - 2788:13
**preference** [1] - 2793:2
**prejudicial** [3] - 2792:6, 2792:23, 2800:20
**Prender** [1] - 2762:10
**Prender's** [1] - 2761:17
**prepared** [9] - 2737:8, 2737:12, 2744:25, 2745:9, 2767:8, 2767:13, 2767:17, 2795:13, 2814:20
**preparing** [2] - 2737:18, 2744:15
**preschool** [1] - 2800:6
**preschool-related** [1] - 2800:6
**present** [5] - 2731:7, 2778:21, 2796:21, 2802:12, 2828:8
**President** [2] - 2820:14, 2821:21
**president** [8] - 2810:14, 2815:20, 2816:13, 2816:17, 2816:24, 2817:7, 2817:9, 2818:14
**presidents** [1] - 2811:1
**pretty** [1] - 2790:22
**prevalent** [1] - 2817:17
**prevent** [1] - 2800:19
**previously** [3] - 2732:13, 2733:6, 2773:13
**Prime** [1] - 2747:24
**principal** [1] - 2795:25
**problem** [5] - 2770:1, 2798:20, 2800:5,

2800:8, 2802:5
**problems** [3] - 2744:12, 2770:9, 2796:8
**proceed** [3] - 2731:13, 2731:22, 2759:4
**proceedings** [1] - 2829:4
**Proceedings** [2] - 2729:5, 2828:12
**process** [7] - 2732:14, 2768:17, 2772:17, 2772:20, 2772:22, 2773:5, 2779:9
**produce** [3] - 2741:5, 2741:11, 2741:25
**produced** [3] - 2729:6, 2732:13, 2744:9
**product** [3] - 2743:7, 2743:9, 2823:22
**profession** [1] - 2735:2
**professional** [3] - 2787:19, 2805:1, 2805:7
**professionally** [1] - 2805:17
**program** [1] - 2804:1
**Project** [1] - 2740:5
**project** [7] - 2755:25, 2762:4, 2762:22, 2764:9, 2765:22, 2821:16, 2822:11
**projects** [1] - 2764:5
**proliferation** [1] - 2816:8
**promotion** [3] - 2816:8, 2817:20, 2820:8
**proper** [1] - 2788:12
**proposal** [1] - 2772:6
**proposals** [1] - 2755:25
**proposed** [5] - 2767:16, 2769:11, 2774:21, 2775:15, 2779:12
**proposing** [2] - 2770:12, 2770:15, 2772:24, 2774:17, 2796:5
**prosecute** [1] - 2741:15
**prosecuted** [1] - 2741:16
**prosecution** [10] - 2740:9, 2741:18, 2742:1, 2769:19, 2769:22, 2770:17, 2772:2, 2773:1, 2799:1
**Prosecutor** [2] - 2747:10, 2747:11
**protect** [1] - 2826:16
**protest** [2] - 2812:16, 2812:19
**protracted** [1] - 2785:23
**provided** [4] - 2762:21, 2768:10, 2769:23, 2772:10
**Pshonka** [1] - 2747:9
**Pshonka's** [1] - 2747:8
**public** [4] - 2760:5, 2766:2, 2766:13, 2810:3
**Public** [1] - 2785:25
**publication** [1] - 2816:6
**publicized** [1] - 2760:5
**publicly** [1] - 2810:17
**publish** [2] - 2759:20, 2759:21
**published** [3] - 2740:12, 2810:25, 2821:20
**pupil** [1] - 2804:11
**purpose** [3] - 2767:3, 2774:11, 2774:13

**purposes** [4] - 2733:21, 2733:24, 2734:5, 2757:19
**push** [2] - 2778:1, 2778:25
**put** [6] - 2752:4, 2777:4, 2777:10, 2795:9, 2797:19, 2821:22
**puts** [1] - 2787:25
**putting** [1] - 2758:24

## Q

**quarterly** [1] - 2817:17
**quasi** [1] - 2787:9
**quasi-supervisor** [1] - 2787:9
**questioned** [1] - 2742:18
**questions** [27] - 2736:19, 2742:8, 2770:25, 2773:22, 2774:3, 2781:18, 2782:21, 2783:4, 2789:14, 2791:8, 2791:9, 2791:13, 2793:5, 2794:1, 2794:21, 2800:1, 2800:3, 2800:23, 2808:1, 2808:22, 2810:23, 2813:18, 2814:11, 2819:19, 2820:4, 2823:13, 2827:9
**quick** [1] - 2796:14
**quickly** [2] - 2735:1, 2749:13
**quite** [3] - 2734:4, 2805:23, 2826:10
**quote** [5] - 2746:4, 2746:5, 2746:6, 2778:24, 2779:20
**quoting** [1] - 2746:5

## R

**Radcliffe** [1] - 2815:23
**radical** [1] - 2813:1
**raise** [4] - 2777:3, 2798:4, 2799:17, 2810:23
**raised** [1] - 2752:22
**range** [1] - 2816:7
**rather** [1] - 2762:18
**reached** [2] - 2731:18, 2749:6
**reacted** [1] - 2773:23
**reacting** [1] - 2759:15
**reaction** [7] - 2742:12, 2742:15, 2776:19, 2778:11, 2779:12, 2822:12
**reactions** [2] - 2778:12, 2778:16
**read** [27] - 2731:17, 2732:7, 2736:4, 2736:5, 2739:17, 2740:7, 2740:11, 2741:1, 2741:14, 2742:7, 2742:14, 2743:5, 2744:1, 2744:6, 2744:23, 2746:4, 2747:19, 2751:21, 2754:5, 2758:14, 2759:17, 2761:13, 2764:1, 2767:2, 2770:8, 2808:19, 2814:9
**reading** [2] - 2762:16, 2814:6
**reads** [1] - 2732:11
**ready** [4] - 2731:3, 2781:7, 2795:3, 2809:2
**real** [3] - 2744:11, 2759:24, 2760:4
**really** [11] - 2775:12, 2776:8, 2792:12, 2792:16, 2793:2, 2806:7, 2818:10, 2818:20, 2821:1, 2822:18, 2823:25
**reason** [5] - 2779:5, 2787:10, 2795:17,

2798:23, 2813:2
**reasons** [3] - 2734:8, 2824:8, 2824:15
**receipt** [1] - 2747:21
**receive** [1] - 2747:3
**received** [25] - 2732:20, 2735:15, 2735:16, 2736:20, 2746:22, 2747:12, 2748:11, 2750:4, 2750:12, 2750:22, 2754:15, 2755:6, 2755:16, 2756:15, 2756:19, 2761:21, 2761:24, 2761:25, 2762:11, 2765:14, 2768:9, 2770:12, 2776:3
**receiving** [4] - 2737:17, 2765:12, 2777:19, 2778:8
**recently** [1] - 2815:18
**Recess** [1] - 2796:20
**recipients** [2] - 2732:20, 2749:19
**recollection** [5] - 2777:9, 2780:14, 2780:19, 2797:16, 2799:7
**record** [19] - 2733:22, 2733:24, 2734:1, 2734:6, 2740:10, 2741:5, 2769:21, 2770:16, 2772:1, 2772:10, 2772:25, 2793:25, 2798:3, 2799:10, 2799:12, 2802:17, 2809:13, 2829:4
**RECROSS** [1] - 2730:4
**red** [1] - 2769:20
**REDIRECT** [1] - 2730:4
**redirect** [3] - 2783:3, 2794:22, 2794:23
**references** [1] - 2738:4
**referred** [2] - 2754:21, 2796:1
**referring** [1] - 2762:17
**reflect** [2] - 2745:8, 2768:4
**reflected** [1] - 2734:1
**reflects** [2] - 2772:22, 2775:14
**refresh** [1] - 2777:9
**regard** [1] - 2824:14
**regarding** [5] - 2731:19, 2731:24, 2747:23, 2766:14, 2780:9
**regions** [1] - 2816:10
**related** [5] - 2746:19, 2798:11, 2800:6, 2821:16, 2823:6
**relates** [1] - 2794:19
**relation** [1] - 2824:21
**relations** [2] - 2766:2, 2766:14
**relationship** [13] - 2804:19, 2805:8, 2805:12, 2805:15, 2805:16, 2805:18, 2811:10, 2811:23, 2813:5, 2817:2, 2818:8, 2824:19
**relationships** [2] - 2805:8, 2816:9
**released** [4] - 2759:23, 2759:25, 2760:5, 2776:21
**relevance** [3] - 2822:5, 2823:19, 2823:20
**relevant** [7] - 2774:25, 2776:8, 2776:9, 2799:22, 2800:9, 2801:25
**remain** [1] - 2800:3
**remained** [1] - 2735:8
**remaining** [1] - 2814:21
**remains** [2] - 2735:22, 2735:24
**remember** [20] - 2736:21, 2737:1, 2737:7, 2737:11, 2750:24, 2765:16,

2765:18, 2768:20, 2777:19, 2778:8, 2778:10, 2778:12, 2779:12, 2779:14, 2780:9, 2780:12, 2780:19, 2780:21, 2801:20, 2817:10
**remembered** [1] - 2765:12
**remind** [1] - 2735:1
**remote** [1] - 2823:11
**renew** [1] - 2734:6
**repeat** [1] - 2772:19
**repeated** [1] - 2749:2
**repeatedly** [1] - 2760:2
**reply** [1] - 2751:11
**Report** [1] - 2742:8
**report** [79] - 2736:2, 2737:13, 2737:15, 2737:21, 2737:23, 2737:25, 2738:4, 2738:7, 2738:9, 2738:12, 2738:13, 2738:15, 2740:12, 2741:12, 2741:13, 2741:17, 2741:23, 2741:25, 2742:4, 2742:17, 2742:22, 2743:13, 2744:4, 2744:8, 2744:11, 2745:2, 2746:23, 2749:9, 2751:4, 2755:1, 2755:3, 2755:25, 2756:11, 2759:23, 2760:4, 2761:11, 2763:1, 2764:2, 2766:14, 2767:1, 2768:10, 2768:12, 2768:16, 2770:15, 2772:18, 2772:21, 2773:21, 2773:23, 2774:17, 2776:21, 2776:25, 2778:11, 2778:14, 2779:10, 2779:16, 2779:18, 2780:9, 2780:13, 2780:15, 2780:20, 2781:7, 2821:20, 2821:22, 2822:2, 2823:3, 2823:13, 2823:22, 2823:24, 2824:6, 2825:2, 2825:5, 2825:6, 2825:10, 2825:22, 2826:24
**reported** [1] - 2729:5
**REPORTER** [2] - 2779:25, 2829:1
**Reporter** [1] - 2729:2
**reports** [1] - 2814:6
**represent** [1] - 2813:16
**representation** [3] - 2799:9, 2813:15, 2824:9
**representatives** [3] - 2738:11, 2738:12, 2780:22
**represented** [2] - 2790:7, 2795:25
**reproach** [1] - 2786:21
**reputation** [32] - 2788:14, 2788:17, 2788:19, 2788:24, 2789:11, 2790:16, 2791:4, 2791:15, 2792:3, 2792:11, 2793:4, 2793:12, 2793:23, 2800:3, 2800:11, 2800:12, 2800:13, 2800:14, 2801:1, 2802:3, 2807:6, 2807:12, 2807:21, 2807:22, 2819:12, 2819:14, 2826:3, 2826:5, 2826:9, 2826:11, 2826:15, 2826:21
**requests** [4] - 2746:22, 2748:4, 2749:14, 2750:9
**research** [4] - 2731:10, 2796:18, 2816:6, 2827:22
**reserve** [1] - 2734:8
**reserved** [1] - 2734:2
**reside** [2] - 2783:22, 2783:23
**respect** [5] - 2732:12, 2737:7,

2748:14, 2769:19, 2800:14
**respects** [1] - 2742:17
**respond** [3] - 2739:20, 2766:21, 2771:6
**responded** [5] - 2766:10, 2767:6, 2771:20, 2772:8, 2779:19
**response** [11] - 2737:22, 2743:3, 2743:5, 2746:10, 2754:12, 2763:22, 2766:11, 2766:18, 2766:19, 2772:3, 2776:9
**responses** [2] - 2767:16, 2775:9
**responsibilities** [1] - 2787:2
**rest** [2] - 2785:20, 2818:15
**rested** [1] - 2734:4
**rests** [1] - 2733:16
**result** [1] - 2737:16
**resume** [1] - 2796:16
**retainer** [6] - 2735:8, 2761:10, 2762:3, 2762:21, 2763:17, 2764:18
**retired** [2] - 2735:3, 2809:18
**returned** [1] - 2758:7
**revealed** [1] - 2760:5
**review** [3] - 2750:4, 2771:25, 2772:9
**reviewing** [1] - 2749:6
**revisions** [1] - 2765:5
**revisit** [1] - 2800:17
**Revolution** [1] - 2820:22, 2820:25
**rights** [6] - 2748:25, 2760:1, 2812:20, 2818:23, 2821:6, 2825:1
**risk** [2] - 2798:9, 2826:21
**rival** [2] - 2820:15, 2821:3
**RMR** [1] - 2729:2
**Rohde** [3] - 2777:14, 2780:7, 2781:1
**role** [5] - 2738:6, 2810:20, 2816:15, 2817:13, 2817:18
**roll** [1] - 2799:8
**room** [1] - 2828:5
**Room** [1] - 2729:2
**round** [1] - 2750:3
**Rule** [1] - 2733:23
**rule** [3] - 2734:2, 2752:8, 2758:22
**ruled** [3] - 2733:25, 2792:17, 2793:11
**ruling** [5] - 2757:20, 2793:8, 2795:20, 2799:18, 2800:18
**running** [2] - 2786:23, 2786:24
**Rusk** [1] - 2811:7
**Russia** [1] - 2816:4
**Russian** [4] - 2748:10, 2748:19, 2753:18, 2817:24

**S**

**Sanchez** [1] - 2728:13
**SANCHEZ** [36] - 2731:5, 2731:16, 2731:23, 2733:3, 2733:19, 2785:17, 2788:11, 2788:16, 2789:17, 2789:20, 2790:15, 2791:21, 2792:8, 2793:1, 2794:2, 2794:5, 2794:21, 2797:14, 2797:16, 2797:23, 2798:21, 2799:4, 2819:20, 2819:23, 2822:8, 2822:15,

2822:19, 2822:24, 2823:4, 2823:8, 2823:10, 2824:2, 2824:4, 2824:21, 2825:18, 2827:9

**sand** [1] - 2759:20

**saw** [5] - 2745:1, 2782:8, 2797:3, 2798:6, 2799:9

**School** [6] - 2735:4, 2803:15, 2803:18, 2803:20, 2804:10, 2805:3

**school** [29] - 2784:3, 2784:6, 2784:7, 2795:25, 2796:1, 2801:5, 2803:23, 2803:24, 2804:3, 2804:12, 2804:17, 2804:18, 2804:19, 2804:22, 2804:24, 2805:1, 2805:3, 2805:4, 2805:17, 2805:22, 2805:25, 2806:24, 2810:5, 2812:2, 2812:3, 2812:4, 2815:22

**schools** [3] - 2806:14, 2806:18, 2810:3

**science** [1] - 2816:24

**scope** [9] - 2773:15, 2773:19, 2773:24, 2777:3, 2788:12, 2799:18, 2800:22, 2800:24, 2822:5

**screen** [4] - 2739:3, 2739:5, 2752:4, 2758:24

**screens** [1] - 2731:21

**second** [4] - 2740:4, 2741:23, 2751:7, 2799:17

**seconds** [1] - 2802:10

**Secretary** [1] - 2811:7

**secretary** [1] - 2735:16

**section** [2] - 2769:19

**sector** [1] - 2815:16

**see** [17] - 2738:25, 2739:4, 2740:2, 2751:13, 2760:13, 2766:25, 2769:6, 2779:9, 2780:10, 2780:17, 2787:15, 2797:11, 2797:13, 2797:19, 2811:21, 2811:22, 2828:11

**seem** [1] - 2798:22

**selective** [6] - 2742:1, 2769:19, 2769:22, 2770:17, 2772:2, 2773:1

**self** [1] - 2753:9

**self-serving** [1] - 2753:9

**senate** [1] - 2818:24

**Senator** [1] - 2786:2

**senator** [1] - 2786:3

**send** [4] - 2745:6, 2767:17, 2767:19, 2801:5

**sending** [4] - 2744:13, 2745:5, 2758:6, 2776:5

**sends** [1] - 2765:2

**senior** [1] - 2810:9

**sense** [4] - 2759:22, 2769:21, 2787:18, 2798:22

**sent** [7] - 2732:17, 2737:14, 2744:19, 2753:9, 2754:18, 2756:10, 2776:10

**sentence** [11] - 2736:4, 2736:5, 2741:23, 2746:11, 2754:6, 2769:20, 2770:8, 2771:17, 2772:25, 2779:5, 2779:6

**sentences** [1] - 2751:22

**separate** [1] - 2824:9

**September** [17] - 2737:5, 2739:15, 2743:5, 2743:25, 2744:21, 2751:17, 2753:22, 2754:19, 2755:10, 2755:14, 2756:17, 2768:7, 2768:24, 2780:15, 2780:16, 2780:21, 2784:5

**series** [1] - 2748:3

**serious** [5] - 2737:13, 2737:14, 2742:3, 2742:21, 2743:14

**serve** [1] - 2804:21

**served** [6] - 2787:2, 2805:2, 2809:19, 2809:24, 2816:16, 2818:14

**service** [1] - 2785:22

**serving** [3] - 2753:9, 2786:7, 2818:13

**Session** [1] - 2728:6

**SESSION** [2] - 2728:10, 2731:1

**set** [2] - 2751:18, 2756:18

**sets** [1] - 2776:17

**settlement** [10] - 2789:22, 2789:23, 2790:3, 2790:6, 2790:13, 2790:17, 2791:6, 2791:17, 2795:18, 2796:6

**seven** [3] - 2750:8, 2784:16, 2811:9

**severe** [1] - 2759:25

**share** [2] - 2768:12, 2768:16

**sharing** [1] - 2769:15

**sharply** [2] - 2769:11, 2769:14

**shooter** [1] - 2807:24

**shorthand** [2] - 2729:5, 2743:10

**show** [20] - 2735:10, 2738:19, 2749:13, 2750:11, 2751:9, 2753:11, 2754:14, 2755:5, 2756:1, 2756:21, 2756:22, 2757:3, 2764:11, 2764:14, 2773:7, 2775:5, 2775:19, 2776:19, 2776:25, 2779:25

**showed** [2] - 2764:20, 2766:18, 2768:6, 2780:6

**showing** [2] - 2760:19, 2774:15

**sides** [3] - 2778:15, 2778:17, 2778:20

**similar** [1] - 2743:18

**similarly** [1] - 2827:2

**simply** [1] - 2766:25

**single** [4] - 2750:8, 2751:6, 2755:3, 2755:22

**single-spaced** [4] - 2750:8, 2751:6, 2755:3, 2755:22

**sit** [1] - 2762:15

**sitting** [4] - 2740:16, 2768:5, 2794:12, 2827:2

**situation** [2] - 2762:8, 2806:8

**situations** [2] - 2793:17, 2818:1

**six** [5] - 2733:13, 2786:1, 2786:4, 2787:6, 2811:9

**Skadden** [16] - 2735:4, 2742:8, 2744:7, 2746:21, 2776:20, 2780:13, 2789:21, 2789:24, 2790:3, 2790:6, 2790:7, 2790:13, 2790:17, 2791:1, 2795:17, 2796:6

**Skadden's** [1] - 2748:14

**skills** [1] - 2812:4

**slightly** [1] - 2825:19

**Sloan** [36] - 2730:5, 2734:17, 2734:18,

2734:22, 2735:3, 2735:5, 2739:7, 2752:17, 2753:9, 2754:2, 2754:5, 2754:6, 2758:8, 2758:10, 2758:14, 2759:6, 2760:7, 2760:13, 2762:10, 2768:18, 2773:20, 2774:2, 2774:21, 2777:19, 2779:19, 2780:8, 2781:2, 2781:9, 2781:22, 2782:9, 2782:15, 2783:2, 2783:4, 2797:8, 2802:15, 2802:18

**Sloan's** [2] - 2775:15, 2798:8

**small** [2] - 2803:24, 2806:13

**so-called** [1] - 2751:5

**social** [1] - 2787:17

**softer** [1] - 2823:16

**solid** [2] - 2819:15, 2822:25

**someone** [8] - 2752:5, 2788:1, 2788:8, 2805:17, 2805:20, 2805:23, 2806:5, 2806:6

**sometimes** [7] - 2748:20, 2748:21, 2784:22, 2787:13, 2796:1, 2812:16

**somewhat** [1] - 2805:12

**son** [3] - 2804:15, 2804:19, 2806:16

**sorry** [7] - 2735:16, 2736:12, 2755:18, 2766:8, 2771:11, 2803:19, 2807:16, 2823:18, 2824:4, 2825:4

**sort** [11] - 2737:20, 2778:21, 2805:5, 2805:14, 2805:24, 2806:8, 2806:13, 2807:23, 2812:19, 2817:14, 2826:18

**spaced** [4] - 2750:8, 2751:6, 2755:3, 2755:22

**SPAEDER** [2] - 2728:20, 2728:24

**special** [1] - 2811:21

**specific** [7] - 2762:10, 2769:23, 2771:18, 2772:11, 2774:22, 2776:3, 2818:2

**specifically** [3] - 2820:11, 2820:21, 2822:1

**specified** [1] - 2732:5

**spell** [3] - 2803:5, 2809:12, 2815:7

**spent** [1] - 2774:13

**Spiegel** [1] - 2789:24

**spies** [1] - 2817:24

**spin** [1] - 2744:4

**sporting** [1] - 2787:18

**sports** [3] - 2806:14, 2806:18, 2806:19

**stand** [3] - 2734:17, 2795:9, 2813:17

**standards** [3] - 2742:19, 2769:25, 2772:13

**start** [3] - 2768:24, 2769:4, 2828:3

**started** [2] - 2772:24, 2792:16

**starting** [2] - 2764:21, 2818:23

**starts** [1] - 2747:20

**State** [7] - 2803:11, 2807:1, 2807:15, 2811:8, 2822:1, 2822:12, 2823:12

**state** [5] - 2733:22, 2770:16, 2784:22, 2809:12, 2815:5

**statement** [9] - 2740:16, 2740:17, 2740:18, 2740:20, 2741:7, 2741:20, 2775:15, 2790:12, 2790:16

**statements** [11] - 2737:21, 2738:13,

2757:23, 2758:17, 2790:11, 2791:1,
2791:22, 2791:23, 2792:1, 2822:2
  **STATES** [3] - 2728:2, 2728:4, 2728:11
  **States** [1] - 2732:13
  **status** [1] - 2763:1
  **stay** [2] - 2792:7, 2811:9
  **stayed** [1] - 2792:8
  **steering** [1] - 2810:21
  **stenotype** [1] - 2729:5
  **stepped** [1] - 2816:13
  **stick** [1] - 2792:12
  **still** [8] - 2744:21, 2763:20, 2784:11,
2801:17, 2801:22, 2802:1, 2818:13,
2818:14
  **stipulate** [1] - 2731:25
  **Stipulation** [1] - 2732:23
  **stipulation** [3] - 2731:18, 2731:24,
2732:25
  **stood** [2] - 2806:5, 2806:8
  **stop** [1] - 2801:19
  **straight** [3] - 2784:5, 2787:1, 2807:24
  **strategy** [5] - 2737:20, 2737:24,
2738:4, 2738:16, 2743:11
  **Street** [3] - 2728:15, 2728:21, 2728:24
  **stricken** [1] - 2793:4
  **strike** [1] - 2798:14
  **striking** [1] - 2792:22
  **strong** [2] - 2749:9, 2778:14
  **struggle** [1] - 2812:21
  **Student** [1] - 2810:12
  **student** [5] - 2810:13, 2811:1, 2811:9,
2816:24
  **students** [1] - 2805:3
  **stuff** [2] - 2744:3, 2753:10
  **subject** [2] - 2777:23, 2778:14
  **submitted** [1] - 2828:1
  **subscriber** [1] - 2732:2
  **subscribers** [1] - 2732:5
  **substance** [2] - 2822:18, 2823:12
  **sufficiency** [1] - 2771:24
  **sufficient** [4] - 2769:24, 2771:18,
2772:1, 2772:12
  **suggest** [3] - 2776:16, 2790:8,
2793:10
  **suggested** [2] - 2745:5, 2778:5
  **suggesting** [4] - 2762:17, 2776:17,
2793:19, 2801:24
  **suggestion** [4] - 2798:5, 2799:1,
2799:16, 2802:20
  **Suggestions** [1] - 2755:1
  **suggestions** [1] - 2719:15
  **Suite** [2] - 2728:21, 2728:25
  **Sullivan** [11] - 2730:6, 2783:11,
2783:13, 2783:17, 2784:15, 2785:10,
2786:13, 2788:7, 2789:15, 2790:5,
2800:11
  **Sullivan's** [1] - 2793:20
  **summary** [8] - 2747:22, 2769:18,
2772:18, 2772:21, 2774:23, 2777:24,

2778:6, 2778:23
  **supervision** [1] - 2789:7
  **supervisor** [1] - 2787:9
  **supply** [1] - 2748:1
  **support** [6] - 2741:6, 2744:10,
2769:22, 2770:17, 2772:2, 2773:1
  **supporting** [5] - 2771:9, 2771:15,
2805:1, 2805:5, 2805:16
  **supportive** [1] - 2805:1
  **supports** [1] - 2744:5
  **surrounding** [1] - 2747:25
  **sustained** [1] - 2781:17
  **switch** [1] - 2733:3
  **sworn** [5] - 2734:19, 2783:14, 2803:2,
2809:8, 2815:2

---

# T

  **table** [1] - 2757:17
  **tank** [1] - 2816:3
  **tarnish** [1] - 2826:19
  **Taylor** [1] - 2728:23
  **TAYLOR** [29] - 2734:3, 2791:11,
2791:13, 2791:19, 2796:24, 2797:1,
2797:11, 2798:7, 2798:13, 2799:17,
2800:17, 2801:2, 2801:10, 2801:21,
2802:10, 2814:22, 2814:24, 2815:4,
2819:18, 2822:5, 2822:14, 2823:11,
2823:18, 2824:11, 2824:14, 2825:4,
2825:7, 2825:15, 2827:17
  **teacher** [3] - 2804:17, 2804:20,
2805:16
  **teaching** [1] - 2804:4
  **team** [2] - 2767:3, 2779:7
  **teams** [2] - 2806:18, 2806:19
  **tease** [2] - 2813:10
  **Tech** [2] - 2815:25
  **Ted** [1] - 2786:2
  **television** [1] - 2814:6
  **temporally** [1] - 2800:9
  **term** [1] - 2789:6
  **terms** [10] - 2735:2, 2738:6, 2738:14,
2748:23, 2780:18, 2805:21, 2818:21,
2819:2, 2819:8, 2825:12
  **terrific** [1] - 2818:6
  **testified** [5] - 2734:19, 2783:14,
2803:2, 2809:8, 2815:2
  **testifies** [2] - 2757:10, 2757:14
  **testify** [2] - 2752:13, 2781:15
  **testimony** [17] - 2732:16, 2775:24,
2781:22, 2782:17, 2792:22, 2793:11,
2793:19, 2793:22, 2793:24, 2796:8,
2799:13, 2800:22, 2802:15, 2802:19,
2808:11, 2814:13, 2828:3
  **testing** [1] - 2822:8
  **text** [1] - 2781:1
  **THE** [162] - 2728:2, 2728:10, 2728:14,
2731:3, 2731:6, 2731:8, 2731:21,
2732:24, 2733:17, 2733:21, 2734:8,
2734:11, 2734:14, 2737:3, 2739:2,

2740:18, 2740:19, 2751:25, 2752:3,
2752:7, 2752:10, 2752:13, 2752:21,
2752:24, 2753:5, 2753:8, 2753:17,
2753:21, 2756:24, 2757:6, 2757:15,
2757:18, 2757:23, 2758:4, 2758:11,
2758:16, 2758:20, 2758:22, 2759:1,
2759:4, 2760:9, 2760:19, 2760:22,
2766:5, 2767:10, 2770:25, 2773:10,
2773:12, 2773:17, 2774:1, 2774:4,
2774:7, 2774:11, 2774:19, 2774:22,
2775:12, 2775:18, 2776:2, 2776:23,
2777:2, 2777:10, 2777:16, 2779:25,
2780:2, 2781:17, 2781:20, 2782:6,
2782:18, 2782:20, 2783:3, 2783:5,
2783:7, 2783:9, 2783:12, 2785:18,
2785:22, 2786:9, 2786:11, 2788:13,
2788:18, 2789:16, 2789:18, 2790:20,
2791:12, 2791:14, 2791:25, 2792:9,
2793:9, 2793:16, 2794:3, 2794:22,
2794:24, 2795:1, 2795:3, 2795:7,
2795:14, 2795:22, 2796:4, 2796:7,
2796:12, 2796:14, 2796:22, 2796:25,
2797:9, 2797:15, 2797:22, 2797:25,
2798:12, 2798:14, 2798:25, 2799:5,
2800:4, 2800:19, 2801:4, 2801:8,
2801:11, 2801:17, 2801:19, 2801:24,
2802:8, 2802:11, 2802:13, 2803:19,
2803:20, 2807:18, 2807:22, 2807:22,
2808:2, 2808:16, 2808:23, 2808:25,
2809:2, 2809:4, 2809:20, 2809:21,
2813:19, 2814:11, 2814:16, 2814:18,
2814:20, 2814:23, 2819:19, 2819:21,
2822:6, 2822:10, 2822:15, 2822:22,
2823:2, 2823:5, 2823:9, 2823:15,
2824:3, 2824:5, 2824:13, 2824:23,
2825:6, 2825:9, 2825:16, 2827:10,
2827:14, 2827:18, 2828:9
  **theirs** [1] - 2807:3
  **theme** [1] - 2824:5
  **then-Secretary** [1] - 2811:7
  **thinker** [1] - 2812:11
  **thinking** [1] - 2774:24
  **thinks** [2] - 2771:8, 2775:15
  **third** [4] - 2732:10, 2736:4, 2762:8
  **third-party** [1] - 2762:8
  **thoughts** [1] - 2759:19
  **three** [6] - 2755:21, 2782:10, 2784:15,
2785:6, 2786:25, 2804:17
  **throughout** [2] - 2784:22, 2820:9
  **throw** [1] - 2819:5
  **timely** [1] - 2733:22
  **today** [7] - 2765:12, 2768:5, 2781:15,
2789:3, 2801:22, 2814:9, 2827:24
  **together** [2] - 2757:13, 2785:11,
2787:18, 2798:9, 2798:18, 2799:13,
2802:19
  **tomorrow** [3] - 2765:6, 2828:3,
2828:11
  **took** [2] - 2737:2, 2813:9
  **top** [20] - 2731:23, 2735:20, 2735:21,

2739:19, 2739:24, 2741:1, 2747:17, 2751:3, 2752:18, 2752:24, 2753:1, 2754:7, 2756:4, 2760:17, 2761:2, 2762:24, 2763:23, 2765:21, 2767:15, 2777:15

**top-line** [1] - 2741:1
**topic** [1] - 2746:20
**total** [2] - 2744:8, 2745:13
**toughest** [1] - 2812:11
**towards** [2] - 2735:21, 2759:9
**towered** [1] - 2818:20
**town** [3] - 2786:25, 2806:13, 2826:19
**trail** [1] - 2769:3
**trait** [1] - 2799:22
**traits** [1] - 2822:22
**TRANSCRIPT** [1] - 2728:10
**Transcript** [1] - 2729:6
**transcript** [1] - 2829:4
**transcription** [1] - 2729:6
**transit** [1] - 2748:1
**translated** [3] - 2750:23, 2754:22, 2755:17
**translation** [2] - 2748:8, 2748:10
**transmitted** [1] - 2758:12
**transpired** [1] - 2799:21
**traveling** [1] - 2739:19
**trial** [8] - 2732:12, 2744:5, 2746:15, 2749:7, 2752:23, 2784:19, 2813:25
**TRIAL** [2] - 2728:6, 2728:10
**trial's** [1] - 2746:8
**tried** [3] - 2775:6, 2792:6, 2821:2
**true** [4] - 2741:10, 2798:8, 2827:1, 2827:4
**truly** [1] - 2811:12
**trust** [2] - 2787:23, 2805:24
**trustworthy** [1] - 2806:9
**truth** [2] - 2788:6, 2807:23
**truthful** [1] - 2806:6
**truthfulness** [10] - 2786:18, 2788:3, 2788:24, 2789:10, 2790:21, 2793:21, 2806:2, 2807:9, 2807:21, 2812:8
**try** [1] - 2825:19
**trying** [10] - 2757:8, 2757:20, 2758:16, 2758:17, 2769:2, 2774:12, 2775:21, 2775:22, 2791:6, 2793:1
**Tuchan** [3] - 2814:24, 2815:1, 2815:6
**Tufts** [1] - 2803:12
**turn** [2] - 2740:24, 2773:17
**turned** [2] - 2817:25, 2818:6
**turns** [1] - 2785:21
**tweaks** [1] - 2781:6
**two** [22] - 2749:23, 2750:17, 2751:22, 2757:18, 2760:17, 2761:2, 2762:24, 2769:11, 2770:1, 2770:9, 2773:8, 2779:7, 2781:17, 2784:7, 2785:24, 2786:3, 2786:4, 2802:4, 2806:17, 2808:8, 2813:24, 2827:3
**Two** [1] - 2777:23
**Tymoshenko** [13] - 2741:5, 2742:10,

---

2742:20, 2744:9, 2747:24, 2748:25, 2760:2, 2768:13, 2769:23, 2772:10, 2778:13, 2820:15, 2820:24

## U

**U.S** [4] - 2728:14, 2728:17, 2729:2, 2816:9
**Ukraine** [32] - 2740:21, 2747:7, 2747:24, 2749:1, 2749:3, 2760:1, 2762:14, 2762:18, 2763:2, 2768:7, 2768:9, 2768:10, 2773:21, 2773:23, 2774:14, 2774:17, 2774:18, 2778:1, 2778:13, 2778:25, 2780:13, 2780:22, 2780:24, 2820:14, 2820:16, 2820:22, 2821:10, 2821:13, 2821:16, 2824:9
**Ukraine's** [4] - 2741:1, 2744:5, 2776:19, 2778:10
**Ukrainian** [1] - 2748:10
**ultimately** [1] - 2797:23
**under** [5] - 2740:25, 2742:1, 2769:25, 2772:12, 2784:16
**undergraduate** [3] - 2803:10, 2810:10, 2812:2
**undergraduates** [1] - 2816:23
**understood** [4] - 2762:16, 2795:19, 2805:20, 2826:23
**undisputed** [2] - 2733:1
**unfair** [1] - 2792:12
**unfairness** [1] - 2792:24
**unimpeachable** [1] - 2819:17
**Unit** [2] - 2765:25, 2766:6
**UNITED** [3] - 2728:2, 2728:4, 2728:11
**United** [1] - 2732:13
**universities** [1] - 2811:2
**University** [5] - 2803:11, 2803:12, 2810:4, 2810:5, 2810:14
**unknown** [1] - 2798:23
**unlawful** [1] - 2812:15
**unless** [1] - 2800:9
**unlocked** [1] - 2828:6
**unnecessarily** [1] - 2779:20
**unusual** [2] - 2776:19, 2805:11
**up** [18] - 2739:12, 2756:3, 2757:17, 2758:24, 2760:16, 2775:16, 2779:20, 2780:7, 2780:25, 2789:1, 2797:10, 2797:20, 2802:7, 2805:21, 2807:10, 2811:19, 2817:12, 2828:10

## V

**values** [1] - 2819:16
**van** [17] - 2746:12, 2747:6, 2747:13, 2748:18, 2749:17, 2749:25, 2750:13, 2750:21, 2754:15, 2754:17, 2755:7, 2755:14, 2756:4, 2756:16, 2759:11, 2765:15, 2770:22
**varies** [1] - 2817:16
**various** [1] - 2821:6
**Veritas** [1] - 2740:5

---

**vice** [2] - 2817:8, 2817:18
**Victor** [4] - 2761:25, 2762:1, 2762:6, 2762:12
**victories** [1] - 2812:23
**Vietnam** [2] - 2810:16, 2818:22
**view** [1] - 2744:5
**viewed** [1] - 2762:7
**violate** [1] - 2766:2
**violated** [2] - 2742:19, 2748:25
**violating** [1] - 2760:1
**Virginia** [2] - 2815:10
**vogue** [1] - 2813:1

## W

**wait** [4] - 2773:17, 2795:8
**waiting** [1] - 2756:8
**walked** [2] - 2797:12, 2799:12
**wants** [1] - 2826:17
**war** [3] - 2810:23, 2812:16, 2812:20
**War** [1] - 2810:16
**Washington** [26] - 2728:7, 2728:16, 2728:18, 2728:25, 2729:3, 2783:23, 2783:24, 2784:14, 2785:8, 2788:8, 2788:9, 2788:23, 2788:25, 2803:8, 2803:15, 2803:25, 2806:7, 2806:12, 2811:18, 2816:5, 2817:5, 2819:2, 2819:7, 2819:14, 2823:1, 2823:6
**ways** [3] - 2737:13, 2786:22, 2812:19
**weaker** [1] - 2771:25
**weeds** [1] - 2775:13
**week** [10] - 2735:5, 2738:7, 2750:18, 2750:19, 2765:16, 2780:18, 2781:15, 2781:22, 2781:25, 2782:8
**weekend** [1] - 2811:8
**weeks** [6] - 2749:23, 2750:17, 2808:8, 2809:19, 2813:24, 2827:3
**weigh** [1] - 2739:19
**weighing** [2] - 2780:9, 2780:11
**welcome** [1] - 2734:24
**welcomes** [1] - 2826:17
**Western** [1] - 2742:19
**whitewash** [2] - 2744:8, 2767:1
**Whitney** [1] - 2761:19
**whole** [2] - 2795:21, 2816:7
**William** [2] - 2728:20, 2728:23
**Williams** [8] - 2784:1, 2784:9, 2784:11, 2785:9, 2789:2, 2789:3, 2790:22, 2800:13
**willing** [3] - 2769:20, 2819:5, 2819:6
**win** [1] - 2812:23
**withdraw** [2] - 2782:22, 2783:1
**withdrawing** [1] - 2802:21
**withdrawn** [1] - 2798:17
**withdrew** [5] - 2797:24, 2797:25, 2798:1, 2798:15, 2799:5
**witness** [27] - 2734:9, 2734:15, 2734:17, 2783:9, 2789:21, 2791:7, 2794:17, 2795:2, 2795:3, 2795:9, 2795:12, 2795:20, 2796:4, 2799:4,

2800:6, 2801:3, 2802:1, 2802:7, 2802:9, 2802:13, 2809:2, 2809:4, 2814:22, 2824:18, 2827:15, 2827:16, 2827:17
  **WITNESS** [12] - 2730:4, 2740:19, 2781:20, 2783:7, 2785:22, 2786:11, 2795:1, 2803:20, 2807:22, 2808:25, 2809:21, 2814:18
  **Witness** [4] - 2783:8, 2809:1, 2814:19, 2827:13
  **witnesses** [8] - 2731:14, 2734:12, 2799:19, 2800:3, 2800:25, 2808:11, 2814:21, 2827:23
  **women's** [1] - 2815:23
  **wonderful** [1] - 2811:12
  **word** [5] - 2791:21, 2819:3, 2819:15, 2822:24, 2825:25
  **wording** [2] - 2770:7, 2778:21
  **words** [1] - 2799:22
  **wordsmithing** [1] - 2774:23
  **write** [7] - 2766:23, 2770:3, 2770:4, 2770:6, 2772:3, 2777:22, 2778:1
  **writes** [4] - 2761:6, 2762:11, 2769:14, 2769:18
  **writing** [4] - 2778:13, 2781:8, 2804:23, 2816:6
  **written** [1] - 2767:2
  **wrote** [4] - 2753:3, 2770:10, 2771:14, 2778:24

### Y

  **Yanukovych** [1] - 2821:7
  **year** [2] - 2784:9, 2811:7
  **years** [32] - 2782:11, 2784:7, 2785:2, 2785:7, 2785:13, 2785:14, 2785:24, 2786:1, 2786:4, 2786:5, 2786:6, 2787:1, 2787:2, 2787:16, 2788:3, 2788:4, 2803:21, 2804:4, 2804:16, 2809:19, 2810:9, 2810:10, 2811:14, 2811:18, 2812:2, 2815:20, 2816:21, 2818:15, 2818:24, 2819:1, 2820:9
  **yesterday** [1] - 2746:13
  **York** [4] - 2786:25, 2810:4, 2811:4, 2814:7
  **young** [3] - 2785:7, 2805:11, 2812:14
  **yourself** [1] - 2746:22
  **yourselves** [1] - 2827:21
  **Yulia** [1] - 2760:2

### Z

  **zeal** [1] - 2813:16
  **zoom** [6] - 2760:17, 2761:2, 2761:14, 2762:24, 2777:14, 2781:1
  **ZUCKERMAN** [2] - 2728:20, 2728:24
  **Zwaan** [17] - 2746:12, 2747:6, 2747:13, 2748:18, 2749:17, 2749:25, 2750:13, 2750:21, 2754:15, 2754:18, 2755:7, 2755:14, 2756:4, 2756:16,

2759:11, 2765:15, 2770:22