```
1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
2

3        United States of America,        ) Criminal Action
                                          ) No. 19-CR-125
4                          Plaintiff,     )
                                          ) JURY TRIAL
5        vs.                              ) DAY 13 - Morning
                                          )
6        Gregory B. Craig,                ) Washington, D.C.
                                          ) August 28, 2019
7                          Defendant.     ) Time:  9:30 a.m.
         _____
8
                 TRANSCRIPT OF JURY TRIAL - DAY 13 - MORNING
9                            HELD BEFORE
              THE HONORABLE JUDGE AMY BERMAN JACKSON
10                    UNITED STATES DISTRICT JUDGE
         _____
11
                        A P P E A R A N C E S
12
        For Plaintiff:      Fernando Campoamor-Sanchez
13                          Molly Gulland Gaston
                            U.S. Attorney's Office FOR THE
14                              DISTRICT OF COLUMBIA
                            555 Fourth Street, NW
15                          Washington, D.C. 20530
                            (202) 252-7698
16                          Email: Fernando.campoamor-sanchez@usdoj.gov
                            Email: Molly.gaston@usdoj.gov
17                          Jason Bradley Adam McCullough
                            U.S. Department of Justice
18                          950 Pennsylvania Avenue, NW
                            Washington, D.C. 20530
19                          (202) 233-0986
                            Email: Jason.mccullough@usdoj.gov
20
        For Defendant:      William James Murphy
21                          William W. Taylor, III
                            Adam B. Abelson
22                          ZUCKERMAN SPAEDER, LLP
                            100 East Pratt Street
23                          Suite 2440
                            Baltimore, MD 21202
24                          (410) 949-1146
                            Email: Wmurphy@zuckerman.com
25                          Email: Wtaylor@zuckerman.com
                            Email: Aabelson@zuckerman.com
```

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, D.C. 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

_____

Court Reporter:      Janice E. Dickman, RMR, CRR, CRC
                     Official Court Reporter
                     United States Courthouse, Room 6523
                     333 Constitution Avenue, NW
                     Washington, D.C.  20001
                     202-354-3267

INDEX

Witness:

    Gregory Craig

        Direct Examination by Mr. Taylor.................2851

                        *   *   *

```
 1              THE COURTROOM DEPUTY:  Good morning, Your Honor.

 2              THE COURT:  Good morning.

 3              THE COURTROOM DEPUTY:  Your Honor, this is Criminal

 4    Case 19-125, United States of America versus Gregory B. Craig.

 5              I'm going to ask counsel, please approach the podium,

 6    state your appearance for the record, introduce the parties at

 7    your table.

 8              MR. CAMPOAMOR-SANCHEZ:  Good Morning, Your Honor.

 9              Molly Gaston, Jason McCullough, and

10    Fernando Campoamor for the United States.  And with us is

11    paralegal specialist Amanda Rohde.

12              THE COURT:  Good morning.

13              MR. TAYLOR:  Good morning, Your Honor.

14              Bill Taylor, Bill Murphy, Paula Junghans, Adam

15    Abelson, and Ezra Marcus for Mr. Craig.

16              THE COURT:  All right.  And I note that Mr. Craig is

17    present.

18              Are we ready to proceed?

19              MR. TAYLOR:  We are.

20              THE COURT:  All right.  Let's bring the jury in.

21              (Whereupon the jury enters the courtroom.)

22              THE COURT:  All right.  If your notebooks got

23    distributed incorrectly, you can trade them.

24              All right.  Does everybody have their own notebooks

25    and their own pens?  And we're good to go.  All right.
```

```
 1              And I appreciate the fact everyone was here, again,
 2      on time.  And you can confirm for me that no one has
 3      communicated with you about the case and you haven't
 4      communicated with anyone else?
 5              THE JURORS:  (Nod heads.)
 6              THE COURT:  All right.
 7              Mr. Taylor, you can proceed.
 8              MR. TAYLOR:  Thank you, Your Honor.
 9              The defense calls Gregory Craig to the stand.
10              THE COURT:  All right.
11                            GREGORY CRAIG,
12      was called as a witness and, having been first duly sworn, was
13      examined and testified as follows:
14                          DIRECT EXAMINATION
15      BY MR. TAYLOR:
16      Q.  Mr. Craig, would you state your full name for the jury and
17      spell the last name?
18      A.  Gregory B. Craig, C-R-A-I-G.
19      Q.  Where do you live, sir?
20      A.  I live in Washington, D.C.
21      Q.  Do you have a family?
22      A.  I do.  Large family.
23      Q.  What do you -- tell us about the size of your family.
24      A.  We have five children.
25      Q.  And are you still engaged in the practice of law,
```

1    Mr. Craig?

2    A.  No, I am retired; although, I am a member of the Bar of the

3    District of Columbia.

4    Q.  Mr. Craig, did you lie to Ms. Hunt and members of the FARA

5    Unit?

6    A.  I did not lie to Ms. Hunt or the members of the FARA Unit.

7    Q.  Did you withhold or conceal any information from the FARA

8    Unit?

9    A.  I did not withhold or conceal any information from the FARA

10   Unit.

11   Q.  Other than the identity of Mr. Pinchuk and the fees, did

12   you make any effort to keep any information from the FARA Unit?

13   A.  I did not.

14   Q.  Mr. Craig, did you have any conversations with reporters in

15   December of 2012?

16   A.  I did.

17   Q.  Did you have these conversations because you were playing a

18   part in a Ukraine PR campaign?

19   A.  No, I did not.

20             MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

21   question.

22             THE WITNESS:  No.

23             THE COURT:  It's getting close to leading, but I'll

24   allow it; I allowed yes or no questions before.

25             So you've answered the question, "No."

1    You can ask your next question.

2    BY MR. TAYLOR:

3    Q.  Did anybody ask you, on behalf of Ukraine, to have these

4    conversations?

5    A.  No.

6    Q.  Tell the ladies and gentlemen of the jury why you talked to

7    reporters at *The New York Times* in December 2012, and what you

8    said to them, please, sir.

9    A.  I did not trust Jonathan Hawker to give an accurate or

10   honest description of the Report that we had written about the

11   Tymoshenko trial to *The New York Times*.  We had written a

12   report that found serious flaws in that trial.  We had written

13   a report that found that her due process rights had been

14   violated.  This was bad news for Ukraine.

15        And given my limited contacts with Mr. Hawker, I had

16   no confidence that he would be accurate or honest in any

17   discussions with *The New York Times*.  In fact, I was more

18   concerned that he would care more about pleasing Mr. Gates and

19   Mr. Manafort than being faithful to the findings of our report.

20        And, so, Mr. Taylor, in my judgment, if anybody was

21   going to talk to *The New York Times*, it was going to be me.

22   Q.  Did you get any communications from Mr. Hawker concerning

23   conversations with *The New York Times*?

24   A.  He gave me a call and said that he'd been in touch with

25   Mr. Sanger and that he wanted to get some advice about talking

1    to Mr. Sanger.

2    Q.  And can you tell the jury what conversations you had with

3    reporters at *The New York Times* and why?

4    A.  I told Mr. Hawker that I'd handle this, but I wanted to

5    find out what the exchanges were that he'd had with the *Times*,

6    and he sent me the email that he had sent to Mr. Sanger.  I

7    wrote an email to Mr. Sanger, asking him some questions, and

8    then we had a conversation on the phone, Mr. Sanger and I,

9    later in the day.

10   Q.  What happened next?

11   A.  Well, I wrote Mr. Sanger, and I said, David, Ukraine has

12   decided that you would be a good person to get early access to

13   this report.  If you are truly interested and have the time, I

14   would be happy to help you out, and I would be happy to talk to

15   you about the Report.  I got an email back from him.  He sent

16   me his telephone number, and he said, Let's talk later in the

17   day.

18          So, that was when I had my first, you know,

19   voice-to-voice, man-to-man communication with David Sanger, was

20   that afternoon.

21          I said, David are you interested in this report?

22          He says, I can't tell you whether we are, whether the

23   deputy foreign editor who will make this decision is interested

24   in this report because we haven't read it, we haven't seen it

25   yet.  Can you get me a copy?

1              I said, Done.  That's easily done.

2              He gave me -- he asked me to send an electronic copy,

3     so that I could send him electronic copy and he could forward

4     it to *The New York Times* reporter in Moscow.  I said, Fine.

5              He said, Also, I would like to get a hardcopy as

6     well.

7              And I said, Where do you want me to send the

8     hardcopy?  The offices of *The New York Times* are over in

9     Farragut Square.  That's only three or four blocks away.  I can

10    do that.

11             And he said, No, I would like it delivered to my

12    house.

13             And he gave me the address.  I realized that his

14    house -- I think this was probably late in the afternoon that

15    we had this conversation -- his house was about a mile from my

16    house.

17             And I said, David, I'll just drop it off on the way

18    home.

19    Q.  What happened next?

20    A.  What happened next was, I think, I dropped -- I dropped the

21    hardcopy report off at David's -- oh, I reported back to -- I

22    think I reported back to Mr. Jonathan Hawker that I had been in

23    touch with Sanger, that I'd talked with him, that I was giving

24    him the Report.

25    Q.  Okay.

1    A.  And then that night, that evening, around 7:15, that's what

2    I remembered, I dropped that report off at Mr. Sanger's house

3    and went home.

4    Q.  Did you have any further conversations with Mr. Sanger?

5    A.  The next day.

6    Q.  Tell us about that conversation.

7    A.  Well, early in the morning, I think it was 7:15 or so,

8    David wrote me an email and said, I can't get access to the

9    electronic copy that you sent.

10             And I went right back to him and sent it back again.

11   And I said, It's an attachment, I think.

12             And then I went into the office.

13             Later in the day, we had more communications.

14   Q.  And tell us what further communications you had with

15   Mr. Sanger.

16   A.  He sent me an email.  He said -- well, first of all, I

17   arranged for a new electronic copy to be sent to him because

18   they couldn't get access to the one that I'd sent before, for

19   some reason.  So, I got Alex Haskell to fix the problem, and he

20   sent another electronic copy.

21             But, later in the day, David sent back a note saying,

22   We've had a chance to read it, David Herszenhorn in the Moscow

23   bureau will be sending some questions, and he'll want to talk

24   to you.

25   Q.  Did anything happen after that?

1    A.  I did get some questions from Mr. Herszenhorn -- I didn't

2    know Mr. Herszenhorn -- and I did have a conversation with

3    Herszenhorn later in the evening.  It was probably around

4    6 o'clock my time.

5    Q.  Did anything happen between the time you had your

6    conversation with Mr. Sanger and the time you had the

7    conversation with Mr. Herszenhorn?

8    A.  Shortly after I'd gotten to the office, a journalist from

9    the *Daily Telegraph* in London called in -- his name was

10   Tom Parfitt -- and wanted to talk about the Report.  I took the

11   call, and asked him what he thought of the Report.  Had he

12   gotten the Report?  Had he seen it?  What do you think of it?

13          And he said he hadn't seen the Report, but he'd

14   gotten a press statement from the Ministry of Justice and he'd

15   gotten a statement from the Ministry of Justice characterizing

16   the Report.  I asked him what was being said about the Report,

17   and he read, I think, excerpts from the press release, and he

18   also read one of the quotations from the Ministry of Justice.

19          I said, Mr. Parfitt, we don't know each other, but

20   let me tell you that I think the headline about this report is

21   that there were serious flaws in the trial, and what you've

22   heard from the Ministry of Justice and from the press release

23   is not accurate.  She was denied representation of counsel, she

24   was denied a right to put on her defense.

25          And that really is the significant thing, from a news

 1    point of view, that this report is about.

 2            She said -- he said, Can we have some quotation from

 3    you on the record?

 4            And I said, Fine.

 5            And I gave him some quotations to that effect, that

 6    the trial was flawed.  And I was responding also to one of the

 7    statements that had been quoted to me by Mr. Parfitt from the

 8    Ministry of Justice, saying that our report concluded that

 9    there was no political motivation in the prosecution of

10    Ms. Tymoshenko.

11            Well, that was not true.  We had not made any

12    conclusion about that.  We specifically and explicitly said, We

13    are not drawing any judgment or making any opinion as to

14    whether or not her prosecution was politically motivated.

15    We're talking only about whether she got a fair trial.

16    Q.  Did Mr. Parfitt send you an email containing those quotes?

17    A.  He did.

18    Q.  And after you had that discussion with Mr. Parfitt and

19    exchanged the emails, did you have a conversation with

20    Mr. Herszenhorn or Mr. Sanger?

21    A.  With Mr. Herszenhorn.  What happened with Mr. Herszenhorn

22    was that he had sent me an email with five or six questions

23    that he wanted to talk to me about, but I didn't want to talk

24    to him about those questions.  I wanted to present to him what

25    I thought was the important aspects of this report.  And the

1    most important aspect of this report was that it found that the

2    trial was flawed, that there was due process violations of

3    Ms. Tymoshenko's rights.

4            And, so, when David called -- David Herszenhorn

5    called, I said pretty much the same thing that I had said to

6    Parfitt.  I said, Listen, the headline in this report is that

7    she did not get a fair trial, and that should be your -- to me,

8    that's your lead.

9            And I said to him, People are saying that this was a

10   report that found there was no political motivation, and that's

11   not what we found at all.

12           So I had this very -- it was a -- my conversation

13   with Parfitt was 10 or 15 minutes.  My conversation with

14   Herszenhorn was very brief.  And I said, I'm prepared to go on

15   the record and be quoted to that effect.

16           And I think I agreed to send him a quote.

17           He said, Don't send me the quote.  I'm writing the

18   article.  It's almost midnight here.  I want to go home and go

19   to bed.  I'm going to write the article and send it to

20   David Sanger.  You send your quotes to Sanger.

21   Q.  Did you do that?

22   A.  I did.

23   Q.  Did your conversation with Mr. Parfitt have any impact on

24   your conversations with Mr. Herszenhorn?

25   A.  Absolutely.

1    Q.  In what way?

2    A.  Well, if you look at what I said to Mr. Herszenhorn, was

3    quoted in the *The New York Times*, I am actually directly

4    responding to what the Ministry was telling Mr. Parfitt in

5    the -- what Mr. Parfitt told me the Ministry was saying when

6    the Ministry said there was no political motivation -- Skadden

7    found no political motivation in the prosecution of

8    Ms. Tymoshenko.

9    Q.  Did you see the article that appeared in *The New York Times*

10   the next day?

11   A.  I did.

12   Q.  Did it contain any quotes?

13   A.  Yes, it did.

14   Q.  I'll show it to you in just a moment.

15   A.  I'm sorry.  I didn't hear you.

16   Q.  I said, I'm going to show it to you in just a moment.

17        Could I ask you to look, please, at Government

18   Exhibit 352.

19   A.  Government Exhibit 352.

20        MR. TAYLOR:  It's in evidence, Your Honor.

21        THE COURT:  Okay.

22   A.  Yes, I've got it.

23   BY MR. TAYLOR:

24   Q.  What is this email, Mr. Craig?

25   A.  This is the exchange between myself and David Sanger on

1    December 11th -- Tuesday, December 11th.

2    Q.  Can you summarize it?

3    A.  Well, the first email is from me to David.  And I can read

4    it or summarize.

5             Which do you want, Mr. Taylor?

6    Q.  Summarize it.

7    A.  Okay.

8             I told him that I'd just learned that the Ukrainians

9    had decided that he was going to get an early copy of it, of

10   the Report about the Tymoshenko case, and that determined that

11   he would have a first look at it.

12            And then I asked him, pointblank, Is this something

13   that you're interested in?

14            By the way, I made a point of saying that the

15   Ukrainians had made that determination.  That was the

16   Ukrainian's determination, not mine.  I did not want David to

17   think that I was the one that was asking him for a favor here.

18            And I said that, The Ukrainians have determined that

19   you had should be given a first look.  Do you have the time,

20   and are you truly interested in it?  And if you do, I would be

21   happy to provide you a copy and talk to you about it.

22   Q.  Mr. Craig, did you ask Mr. Sanger to write an article?

23   A.  I did not, no.

24   Q.  Why --

25   A.  I asked him if he was interested in it.

1   Q.  And what did he say about that?

2   A.  He returned the email a little later and said, Let's talk

3   today, and sent me his telephone number.  And said in the email

4   that it was hard for him to discuss with his editors until he

5   has a sense of what the Report says.  And he hadn't seen a copy

6   of the Report yet.

7            And, anyway, it will be good to catch up.  Yes, he is

8   writing on the new secretary of state, but we can talk about

9   that, too.

10           And then -- oh, he makes a mention here.  The most

11   important is a field report from Colorado College.  We had seen

12   each other in September because both of our boys were

13   registering as freshman at Colorado College.

14  Q.  Mr. Craig, why didn't you just send Mr. Sanger the Report

15  and then contact him?

16  A.  I didn't -- I didn't know whether he was interested in it.

17  I didn't know whether he was going to write a story about it.

18  I wanted to find out if he wanted to write a story about it

19  before I sent it to him.

20  Q.  What caused you to send him or deliver him the Report?

21  A.  He asked for it.  He said he couldn't make a determination

22  about whether they were going to write a report until he -- an

23  article about the Report until he'd seen it.  So, he asked me

24  to arrange for him to get one.

25  Q.  Let me show you, please, Government Exhibit 332, in

1    evidence.

2    A.  Got it.

3    Q.  What is this, Mr. Craig?

4    A.  These are emails between Jonathan Hawker and David Sanger

5    that Hawker sent to me after our telephone conversation.  If

6    you recall, I had had this telephone conversation with Hawker

7    where he told me he was trying to get in touch with Sanger.

8    And I said, I'll handle it.  Don't worry about it.

9            And then I asked him to send me whatever email

10   exchange he'd had, and he sent me the exchange.  And at the

11   top, he said, Here's the exchange.

12           And then I realized that I could see what Hawker had

13   said to David Sanger.

14   Q.  Let me ask you a couple of questions --

15   A.  Sure.

16   Q.  -- Mr. Craig.

17           Mr. Hawker says, I'm working with Greg Craig of

18   Skadden.

19           Were you working with Mr. Hawker?

20   A.  I was not.  He was not a member of my team, and I certainly

21   was not a member of his team, and I didn't feel as though I was

22   part of his project.  So, I thought that was inaccurate, when

23   he said, "I'm working with Greg Craig."

24   Q.  Calling to your attention the three lines at the top of the

25   second page of this email.

1              Do you see those?

2      A.  I do.

3      Q.  Were those part of the email that Mr. Hawker sent to

4      Mr. Sanger?

5      A.  Yes.  This was the -- I think the initial email that Hawker

6      sent to David Sanger in which he said he was working with Greg

7      Craig, which was not really correct.  And then he said at the

8      end -- he described the Report.  And right there he says

9      something that's inaccurate.

10     Q.  What is that?

11     A.  "The Report reviews the prosecution of Tymoshenko" --

12     that's correct -- "and considers some of the international

13     concerns about that prosecution" -- I suppose that's generally

14     correct -- "whether it complied with international

15     standards" -- well, we were talking about Western standards of

16     due process.  "International standards" was close enough --

17     "and whether the prosecution was politically motivated."  That

18     was not accurate.  We explicitly declined to discuss or to make

19     findings about whether the prosecution was politically

20     motivated.

21             And so that raised concerns that I described earlier,

22     Mr. Taylor, that Mr. Hawker was -- if he'd talked to

23     Mr. Sanger, was not going to be accurate or honest about what

24     the Report actually said.

25     Q.  Mr. Craig, you said that you didn't trust Mr. Hawker.

1    A.  I did say that.

2    Q.  Why didn't you trust Mr. Hawker?

3    A.  Well, I'd had previous experience with him.  I think the

4    most significant experience was the meeting that I'd had at the

5    Harvard Club, followed by his distribution to me of a document

6    that had messaging points about the Report that were just

7    wrong, flat wrong.  And that gave me great concern about his

8    integrity, about his honesty, and about his reliability.  I

9    didn't trust him.

10   Q.  Did you know that Mr. Hawker was trying to get *The New York*

11   *Times* to write an article before anybody else did?

12   A.  I did know that, yes.

13   Q.  Did you think that your contact with Mr. Sanger was part of

14   that strategy?

15   A.  It may have been.  It may have been.  But that was not why

16   I was contacting Mr. Sanger.

17   Q.  Did you believe that your contact with *The New York Times*

18   made you an agent of the Ukraine?

19   A.  I did not.

20           MR. CAMPOAMOR-SANCHEZ:  I object to the form of the

21   question.  I don't know what that means in this context.

22           THE COURT:  Sustained.

23           I think you -- are you asking about his legal

24   conclusion about --

25           MR. TAYLOR:  About whether he considered that this

1    contact made him a foreign agent of the government of Ukraine

2    for purposes of --

3              THE COURT:  All right.  Well, can we approach the

4    bench to hear the objection?

5              (Bench discussion:)

6              THE COURT:  Go ahead.

7              MR. CAMPOAMOR-SANCHEZ:  He's trying to get him to

8    enter a legal opinion that he's going to, hopefully, dovetail

9    with the instructions the Court is going to give.  I mean, I

10   think he can ask whether he thought he was acting at their

11   request or pursuant to their plan, but this agent, he's asking

12   him to, essentially, render an opinion.

13             THE COURT:  I think that falls -- I think we're very

14   careful not to ask anybody those questions throughout the case

15   because that's not the issue the jury has to decide.  He's not

16   charged with concealing the fact that he had to register from

17   the FARA Unit; he's charged with concealing facts material to

18   its inquiry about whether he had to register and whether he

19   told the truth about what he did or he didn't tell the truth

20   about what he did.

21             And, so, what is the -- why is this question

22   appropriate?

23             MR. TAYLOR:  His state of mind about whether he was

24   required to register is directly relevant to whether or not he

25   lied to FARA.  The indictment charges that he lied to FARA to

1    cover up the fact that he thought he had to register.  So his

2    knowledge --

3              THE COURT:  No.  No, it doesn't cover up the fact

4    that he thought he had to register.  It doesn't allege that at

5    all.

6              MR. TAYLOR:  With respect, Your Honor, the

7    indictment, in paragraph 42, alleges that he -- as a result of

8    these contacts, he was required to register as an agent of the

9    Ukraine.  And furthermore, that his purpose --

10             THE COURT:  But I have specifically said that that is

11   not coming in.

12             MR. TAYLOR:  I agree with that.

13             THE COURT:  And, so, whether he thought he was

14   required is a legal question; it's not a factual question.

15             MR. TAYLOR:  It is a factual question.

16             THE COURT:  Oh, no, it's not.

17             MR. TAYLOR:  It's a factual question as to what he

18   believed.  Whether he was right or not is a legal question, but

19   what he believed about whether or not any of these contacts put

20   him over the FARA line is directly relevant to the issue of his

21   guilt or innocence in this case, Your Honor.

22             THE COURT:  Well, I mean --

23             MR. CAMPOAMOR-SANCHEZ:  We disagree completely.

24             THE COURT:  -- what they're saying is, the allegation

25   is that he didn't describe the contacts at all or that he

1    didn't describe them accurately or he didn't describe the date

2    or the purpose of them accurately, not that he lied when he

3    said, I don't believe these contacts required me to register.

4    Because he didn't actually say that.

5         The allegation is that he didn't give them the facts

6    to let them determine whether they required him to register or

7    not.

8         So, I don't think you can keep going down this road

9    about what his legal conclusion was about whether he did this

10   or not.

11        MR. TAYLOR:  It's state of mind.  If he has an

12   innocent state of mind --

13        THE COURT:  Innocent state of mind about what?

14        MR. TAYLOR:  About whether or not when FARA asked him

15   questions, and when they said he was required to register, that

16   he disagreed with that.  I mean, I said earlier in this case,

17   that there's no question that his conclusion about whether he

18   had to register is directly relevant to his state of mind when

19   he spoke to FARA.  Because if he -- if he believed he had to

20   register and covered it up, that's -- that's the motive --

21   that's the motive the government --

22        THE COURT:  He -- the allegation is that he covered

23   it up so that they would change their minds.  And there's no

24   indication that he said to them what he just said, I gave a

25   copy of the Report on December 11.  I offered to speak with you

1    on December 11.  I sat down and talked to him and I talked to

2    Herszenhorn and I talked to the *Daily Telegraph* all before the

3    publication of the Report, but, Ms. Hunt, I respectfully submit

4    that none of those contacts, which I've now detailed the dates

5    and times accurately, did not prompt a duty to register.

6           Nobody is arguing that that's a false statement.

7    What they're saying is that the factual presentation, not the

8    legal presentation, was inaccurate, so --

9           MR. TAYLOR:  Your Honor --

10          MR. CAMPOAMOR-SANCHEZ:  I have no objection to asking

11    why he did things, like, Why did you contact them?  But to

12    actually then offer the opinion that I did nothing --

13          THE COURT:  Tying it to the FARA law, now we're

14    putting him on -- you know, I wouldn't let -- you know, we

15    wouldn't let Hunt say whether it was or was not.  She was just

16    allowed to say whether it was important to her.

17          MR. TAYLOR:  But, remember that the government

18    brought out that they had gotten FARA advice about public

19    relations.  The government made a big deal out of that.  And

20    then they said he disregarded the advice.  That's the

21    government's position, he got the advice and then he

22    disregarded it.

23          So whether he -- he thought he was crossing the line

24    and disregarding the FARA advice is directly relevant for his

25    mens rea in this case.

1          MR. CAMPOAMOR-SANCHEZ:  They can ask him, Do you

2     think you were disregarding the advice of Mr. Sloan when you

3     talked to him?

4          I don't have a problem with that question.

5          MR. TAYLOR:  I'm just handing you paragraph 49 of the

6     indictment.

7          THE COURT:  I know.  But, the indictment is not

8     evidence.  The indictment is not going to the jury.  The jury

9     is going to be instructed that the question of whether he's

10     legally required to register isn't the issue in this case.  If

11     you need me to say that, I'll say that to him, but, it's not.

12     They're going to be told what the issue is.

13          Now, you've asked him the one question:  Did you

14     think when you met with him that that required you to register

15     under FARA?

16          MR. TAYLOR:  Yes.

17          THE COURT:  And he's answered it.  And I don't think

18     you can ask him any more questions about his opinion.  It's an

19     opinion.  What he thinks -- he's a lawyer.  I mean, it comes so

20     close to asking him for his legal conclusion.

21          MR. TAYLOR:  I can't help that.  Mrs. Hunt said the

22     question at the heart of the statute is his purpose.  If he

23     can't say that --

24          THE COURT:  His purpose for the meeting.

25          MR. TAYLOR:  No.  No.  His purpose for the contacts

1    with the reporters.

2              THE COURT:  Yes.  And you asked about that.  No one

3    objected to a word of that.

4              MR. TAYLOR:  But that goes -- this is -- this goes to

5    whether this proves Mr. Craig's state of mind when he spoke to

6    FARA was entirely innocent.  That he had no reason, no reason

7    to conceal anything because he didn't believe he had done

8    anything that required him to register.

9              Your Honor, this is the fundamental of the defense:

10   That he didn't believe -- he did not believe that he had done

11   anything that required him to register.

12             THE COURT:  They're going to argue that that's

13   exactly why he didn't --

14             MR. TAYLOR:  They may argue that, but --

15             THE COURT:  -- tell them the truth.

16             MR. TAYLOR:  -- that's not the question.

17             THE COURT:  But, I don't think...

18             MR. CAMPOAMOR-SANCHEZ:  Again, if he wants to ask

19   him, When you talked to him, did you think you were

20   disregarding Mr. Sloan's advice?

21             No, I did not think I was disregarding Mr. Sloan's

22   advice, that's fine.

23             But to say that he did not think he was acting as a

24   foreign agent, that's the part that --

25             MR. TAYLOR:  Remember how important the issue of

1    willfulness?  We talked about this, his knowledge that he's

2    doing something illegal.  This his state of mind as to whether

3    he has crossed a line and been required to register goes

4    directly to what he believes.

5              MR. CAMPOAMOR-SANCHEZ:  He was not charged with

6    failing to register.  That's not a charge.  The charge is not

7    telling the truth about what his contacts were.  That's the

8    charge.

9              MR. TAYLOR:  Then you amended the indictment.

10             THE COURT:  No.  No.  No.  Let's not argue with each

11   other.  Everyone's making good faith legal arguments here, and

12   I don't want you sniping at each other up here.

13             I think he can answer the one question you just

14   asked:  Did you believe, when you spoke to David Sanger,

15   that -- and I don't think you can say that you had to register,

16   I think that you had to register as it had been -- as the rules

17   have been explained to you; you know, as you discussed within

18   your firm or Mr. Sloan's advice, or tie it to what's in the

19   record about advice.  But, then that's it.  You can't draw him

20   back to the FARA language because --

21             MR. TAYLOR:  I'm not going to.  I don't intend to.

22             THE COURT:  And we're not going to be introducing

23   legal opinions about this.

24             MR. TAYLOR:  I'm not going to.

25             THE COURT:  All right.  You can ask that one question

1   with that gloss on it.

2          MR. CAMPOAMOR-SANCHEZ:  So he's not going to use the

3   word "agent," I do not think.  Because he fed him that word,

4   "acting as a foreign agent."  That's the part that I --

5          MR. TAYLOR:  That's the part that requires him to

6   register.

7          MR. CAMPOAMOR-SANCHEZ:  Then it's really -- what

8   we're talking is a legal opinion.  Again, I have no problem

9   with the facts.  If he wants to say that he did not believe he

10  was violating the advice he received from Sloan or Gross, not a

11  problem.  You can even say, I was not doing this at the request

12  of Hawker or Manafort or Gates.

13         THE COURT:  He already did that.

14         MR. CAMPOAMOR-SANCHEZ:  Right, which he did.

15         THE COURT:  All right.  So, I think the point is to

16  not -- what exact question, do you want to go back and re-ask?

17  Tell me what you're going to ask him.

18         MR. TAYLOR:  Did you believe that your contact with

19  *The New York Times* reporters made you an agent of foreign -- a

20  foreign agent of the government of Ukraine, which required you

21  to register?

22         MR. CAMPOAMOR-SANCHEZ:  We object to that question.

23         THE COURT:  Okay.  I thought that we were going to

24  change it slightly, to say, Did you believe at that time that

25  you had crossed the line that you had established within your

```
1    firm about engaging in PR activities --

2              MR. TAYLOR:  I can ask that question.

3              THE COURT:  -- that put you in FARA.

4              Okay.  All right.

5              (Open court:)

6    BY MR. TAYLOR:

7    Q.  Mr. Craig, did you believe that your conversations with The

8    New York Times reporters crossed the line of the advice you had

9    been given previously about the limitations on public relations

10   activity in connection with FARA?

11   A.  No, I did not think it crossed the line.

12   Q.  Let me show you Exhibit 371 -- Government Exhibit 371.

13   A.  Yes.

14   Q.  What is this, Mr. Craig?

15             MR. TAYLOR:  It's in evidence, Your Honor.

16   A.  This is an email from Tom Parfitt.

17   BY MR. TAYLOR:

18   Q.  This is the email you referred to earlier?

19   A.  Yes, it is.  And he is running by me on-the-record quotes

20   that he would like to use in his article about the Report.

21   Q.  Can you explain the difference between on-the-record quotes

22   and anonymous source quotes?

23   A.  Well, "on the record" is a quote that is directly

24   attributable to you, the speaker, by name.  And, it appears --

25   the journalist is permitted to use your name and the quote in
```

1      the article.  And that means, on the record.

2              You have the backgrounding category of

3      communications, where the journalist is allowed to use

4      information from a source, but is not allowed to attribute that

5      information to the individual by name.  And that, I think, is

6      the same as an anonymous source is.

7              I said, Mr. Parfitt, you can use this quote from me,

8      but you would -- I would appreciate it if you don't attribute

9      it to me.  The other quotes, you can attribute to me.  But,

10     what I said here was, A Western appellate court reviewing this

11     record would likely reverse the conviction.

12             And he attributed that, with my acceptance and

13     consent, to an expert on criminal justice in the United States.

14     Q.  Mr. Craig, did you think that your contacts with

15     Mr. Parfitt crossed the line which had been explained to you

16     concerning public relations and FARA?

17     A.  I did not.

18     Q.  Can I show you Defense Exhibit 236, please.

19             What is this, Mr. Craig?

20     A.  This is the article that appeared in the *Daily Telegraph* on

21     December 13th.

22     Q.  Written by whom?

23     A.  It's written by Tom Parfitt.  This is the article that, I

24     think, quotes -- quotes me for attribution in the body of the

25     article.

1    Q.  You referred to some quotes that Mr. Parfitt --

2              THE JURORS:  Your Honor, are we supposed to see this?

3              THE COURTROOM DEPUTY:  Counsel, is this in evidence?

4              THE COURT:  Yes.

5              MR. TAYLOR:  Yes.  Sorry.  It is in evidence.

6              THE COURT:  Thanks for letting me know.

7    BY MR. TAYLOR:

8    Q.  You referred to Mr. Parfitt's just telling you something

9    about quotes from the Ministry of Justice?

10   A.  Yes, sir.

11   Q.  Do you see reference to those quotes in this article?

12   A.  I don't think it's up on the monitor.  You would have to --

13   why don't you send me to the newspaper article in the exhibit?

14           Oh, there it is.

15   Q.  Defense Exhibit 236.

16   A.  Oleksandr Lavrynovych, Ukraine's Ministry of Justice, told

17   the *Daily Telegraph*, "The Skadden report's findings discredit

18   Tymoshenko's accusation that the case was politically motivated

19   and that the judge made his decision based on orders from the

20   political system, not on the record presented in court."

21           He added -- and this is another quote from

22   Lavrynovych -- "Skadden found that the decision of the Court

23   was based on facts presented on the record, and that Tymoshenko

24   did not present any evidence of selective prosecution.  And he

25   concluded these two findings establish the fact there is no

1    basis to claim that President Yanukovych influenced the Court

2    to find Tymoshenko guilty."

3    Q.  Were Mr. Lavrynovych's quotes accurate?

4    A.  Absolutely not.  The very first sentence attributable to

5    Lavrynovych is wrong.

6    Q.  Can you point to this -- anyplace in this article where you

7    believe you had input?

8    A.  Well, if you begin with the headline, "Trial of Ukraine's

9    Tymoshenko flawed says government-commissioned report," that's

10   what I said to Tom Parfitt.  I said, The headline about this

11   report should be that we found that the trial was flawed.  You

12   know, I can't say for certain that that's attributable to me,

13   but that's what I said to Mr. Parfitt.

14   Q.  How about in the text of the article?

15   A.  If you go down to the third paragraph under Ms.

16   Tymoshenko's picture, there is a quote on the record, from me,

17   that says, "We concluded that there were ways in which

18   Tymoshenko was not given a fair trial.  She was not allowed to

19   present all the witnesses that we concluded were relevant and

20   material, and prosecutorial evidence was presented during

21   proceedings in court when she was not represented by counsel."

22           And then, "The legal expert consulted by the *Daily*

23   *Telegraph*" -- that would be me -- "said that the procedural

24   violations would have 'probably led to a cancellation of the

25   verdict in the West.'"

1  Q.  Mr. Craig, did you believe that anything that you had done

2  interacting with Mr. Parfitt violated the instructions or the

3  legal advice you'd been given about public relations and FARA?

4  A.  No, I did not.

5  Q.  I'm going to show you *The New York Times* article, Defense

6  Exhibit 235.

7          THE COURTROOM DEPUTY:  Is this in evidence, Counsel?

8          MR. TAYLOR:  Yes, it is.  Sorry.  If I don't say it,

9  it's --

10          THE COURTROOM DEPUTY:  Okay.  Thank you.

11          MR. TAYLOR:  I apologize.

12  A.  This is defendant's exhibit?

13  BY MR. TAYLOR:

14  Q.  Yes.

15  A.  I've got it.

16  Q.  Can you point out the places in that article where you had

17  input?

18  A.  Well, again, I think the headline.  I can't say that it's

19  directly attributable to me, Mr. Taylor, but when I had that

20  conversation with David Herszenhorn, I said, Mr. Herszenhorn,

21  I'm not here to answer all your questions.  I'm here to tell

22  you what I think is the most important thing about this report

23  so you can get an accurate view of what our findings were.  And

24  to me, the lead finding is that the trial wasn't fair; that

25  there was a flaw in the procedure in the trial.

1           And, so, I'll take credit for that headline,

2      "Failings found in trial of Ukraine ex-premier."

3           But, there is another location here where I'm quoted

4      to clarify the fact that we did not make findings as to whether

5      it was politically motivated.  I was concerned that the

6      Ministry of Justice was circulating the Report that the

7      Skadden -- Skadden Report concluded that the trial was not

8      politically motivated, and I wanted it clear as a bell that

9      this was not accurate.  And I think there's a quotation

10     attributable to me in this article to that effect.

11     Q.  Mr. Craig, does this article state when your interview was

12     given?

13     A.  It does, indeed.  First of all, there's a date there,

14     December 12th, which is the day before the formal release and

15     public release of the Report in Kyiv.  But, also, there's a

16     reference here, "In an interview on Wednesday," that would have

17     been the day before.  They quote me, and said that I talked to

18     them the day before the Report was released.

19          And, Mr. Taylor, if you go down to "We leave to

20     others the question" --

21     Q.  Yes, sir.

22     A.  -- that quotation, "We leave to others the question of

23     whether this prosecution was politically motivated, Craig said.

24     Our assignment was to look at the evidence in the record and

25     determine whether the trial was fair."

1              That was in response to what I had understood to be

2    what the Ministry was saying about the Report, which was that

3    we concluded there was no political motivation.  I didn't -- I

4    wanted to refute that.

5    Q.  Why was it important to get this message into the press?

6    A.  Well, it was important to me that the reports in the

7    newspapers, that the media accurately described the work that

8    we had done and the Report that we had written.  Otherwise, it

9    would appear as though we were just there writing whatever

10   Ukraine wanted us to write, and that wasn't true.  We were an

11   independent group of lawyers who had conducted this

12   investigation and evaluated the fairness of the trial.

13   Q.  What was your understanding, Mr. Craig, of what Mr. Hawker

14   and the Ministry of Justice wanted the media to write about the

15   Report?

16   A.  I think they wanted -- based on my --

17   Q.  I'm asking you what you thought at the time.

18   A.  At the time, I thought they wanted to portray the Report as

19   justifying their prosecution, and saying that it was not

20   politically motivated.  That was their intention.

21   Q.  Did you take any action to further that goal for the

22   Ministry of Justice and Mr. Hawker?

23   A.  I did not.  Quite to the contrary.  I was saying precisely

24   the opposite.  I was not acting in the interests of Ukraine.  I

25   was defending the integrity of the Report, and trying to make

1   sure that the articles in the news media were accurate about

2   our report.

3   Q.  Mr. Craig, tell the jury what contacts you had with the *Los*

4   *Angeles Times* during this period.

5   A.  My recollection is that on the 13th, which is the day that

6   the Report was issued in Kyiv, and, I think, it was put on the

7   website in the Ministry of Justice, we got a call from

8   Emily Alpert, who is a reporter for the *Los Angeles Times*,

9   asking us to send a report to her and asking for an interview.

10          I think the answer that she got -- and I'm not sure I

11  know exactly who answered her -- was, we declined the

12  interview, but we arranged for her to get a report.

13          I think in her -- I'm remembering this from memory,

14  Mr. Taylor:  She asked if we would resolve an issue for her

15  because there had been mixed reports as to whether or not we

16  had concluded Ms. Tymoshenko was guilty, or in -- did we opine

17  upon her guilt.  And, so, I asked Alex to tell her we had not

18  opined on that, and to make arrangements for her to get a copy

19  of the Report.

20  Q.  Did you believe that any communication or contact you had

21  concerning the *Los Angeles Times* crossed the line that you had

22  been given or that you knew about concerning public relations

23  and FARA?

24  A.  I did not.

25  Q.  Did you have a conversation with someone from *The National*

1    *Law Journal* during this time?

2    A.  We did.

3    Q.  Can you describe what happened with regard to *The National*

4    *Law Journal*?

5    A.  A reporter by the name of Matthew Huisman, spelled

6    H-U-I-S-M-A-N, had contacted our office in New York and asked

7    for a copy of the Report and wanted an interview -- I think

8    asked for an interview with me.  I believe that Lauren Weiss

9    sent a copy of the Report to Mr. Huisman and referred

10   Mr. Huisman to Jonathan Hawker.

11             Jonathan Hawker then sent a link to Mr. Huisman that

12   contained the Ministry of Justice press release, which had, in

13   my judgment, erroneous information about the Report.

14             Mr. Huisman wrote an article that appeared in *The*

15   *National Law Journal*.  Lauren Weiss sent the article to

16   Cliff Sloan.  The article was erroneous in fundamental ways.

17   Cliff sent it to me and said, We should do something about

18   this.

19             I agreed.  I suggested that we write a letter to the

20   editor or talk to the publisher.  And Cliff said, No, the

21   better thing to do is for us to talk directly to the reporter.

22             So, Cliff and I called up Matthew Huisman and

23   explained to him that his headline and his reporting were

24   inaccurate.  The headline said, "The trial" -- "Skadden finds

25   the trial fair but flawed."

 1          We did not find the trail was fair; we found that it

 2     was unfair and flawed.  And we told him he should change his

 3     headline because it was wrong.

 4          And then there was some other -- I think other

 5     additions.  I'm quoted, I believe, in *The National Law Journal*

 6     by name.

 7     Q.  Let me show you Defendant's Exhibit 266, which is in

 8     evidence.

 9     A.  Defendant's?

10          Yep.

11     Q.  Do you have it?

12     A.  Yes, I do.

13          MR. TAYLOR:  Jury has it?

14     BY MR. TAYLOR:

15     Q.  What is this, Mr. Craig?

16     A.  This is the corrected article written by Mr. Huisman, with

17     the corrected headline, "Former Ukrainian leader's trial was

18     flawed, Skadden says."

19          And if you look in the body of the article,

20     "Correction:  This article has been changed to clarify that

21     Skadden attorneys were unable to determine, given the evidence

22     they reviewed, that there were political motivations behind

23     Yulia Tymoshenko's claims of selective prosecution.  And

24     additionally, the article now contains comments by Skadden

25     attorney Gregory Craig."

1          So there, you can specifically see what we said to

2     the National -- to Matthew Huisman.  We said, We want you to

3     know that we did not find, one way or another, whether there

4     were political motivations behind her prosecution.

5     Q.  Did you believe that any communication you had with *The*

6     *National Law Journal* crossed the line that we've been

7     describing to make you --

8               MR. CAMPOAMOR-SANCHEZ:  Objection.

9               THE COURT:  Well, let him finish the question.

10    BY MR. TAYLOR:

11    Q.  -- crossed the line concerning the advice you'd been given

12    about public relations and FARA?

13              MR. CAMPOAMOR-SANCHEZ:  Objection on the relevance as

14    to his thoughts or state of mind with communications with *The*

15    *National Law Journal*.

16              THE COURT:  Well, he can answer that question.

17    A.  I did not think my communications with *The National Law*

18    *Journal*, correcting misinformation that had been given to them

19    by Ukraine, crossed any line or turned me into a press agent

20    for Ukraine.  I did not believe that.

21              MR. TAYLOR:  May we approach?

22              THE COURT:  Yes.

23              (Bench discussion:)

24              MR. TAYLOR:  I had forgotten that Ms. Hunt testified

25    that the critical question was whether he was doing something

1   at the request or direction of Ukraine.  And I want to ask him

2   whether he was doing any of this at the direction or request of

3   Ukraine.

4          MR. CAMPOAMOR-SANCHEZ:  I thought that had been asked

5   because he explained why he did it, but --

6          THE COURT:  You can ask that question.

7          MR. TAYLOR:  Okay.

8          MR. CAMPOAMOR-SANCHEZ:  And while we're up here, the

9   reason I objected previously, Your Honor, is, we're not

10  alleging that there's anything wrong with the context of *The*

11  *National Law Journal* and the *LA Times*.  And the way their

12  questions are phrased is suggesting that that is one of the

13  allegations we are making, which it's not.

14         THE COURT:  Well, I think you'll make that clear in

15  your argument.

16         MR. CAMPOAMOR-SANCHEZ:  We will.  I just -- that's

17  why.

18         THE COURT:  All right.

19         MR. TAYLOR:  Your Honor, the September 5 letter from

20  the FARA Unit does say that the contacts with *The National Law*

21  *Journal* crossed the line.

22         THE COURT:  That's what she said.

23         MR. TAYLOR:  Yes.

24         THE COURT:  That's not an issue.  And he's not --

25  they're not alleging that when he wrote her back and said, This

1      is what I did with *The National Law Journal*, that he was not

2      truthful.

3                 MR. TAYLOR:  Doesn't matter.

4                 THE COURT:  It matters.

5                 MR. TAYLOR:  If he's -- her letter, which is in

6      evidence, which the jury is going to read, says that "Your

7      contacts with *The National Law Journal* and the *LA Times*" --

8                 THE COURT:  He has every right to say, This is what I

9      did with the *LA Times*.  This is what I did with *The National

10     Law Journal*.  And the government has not alleged, at any point

11     in this trial, that anything he said about those two

12     publications was false.

13                Now, you've asked him if it was true; he said it was

14     true.  You've asked him if it had legal implications to him; he

15     said he didn't.  They can certainly tell the jury at the end of

16     the day, that's all fine, we're not saying he lied about that.

17                MR. TAYLOR:  I know.  But his view of whether his

18     conduct crossed the line depends upon whether he believed he

19     was acting as an agent for --

20                THE COURT:  No one objected to the question.  He's

21     just saying that --

22                MR. TAYLOR:  Okay.

23                THE COURT:  -- they're not relevant, and that the

24     charges -- and they aren't relevant to the charge, that they

25     are relevant to the entire conversation that he had.

 1              But, I'm sure the government will clarify exactly

 2      what it is that it thinks was false, and exactly what it is

 3      it's not alleging is false.

 4              All right.

 5              (Open court:)

 6      BY MR. TAYLOR:

 7      Q.  Mr. Craig in your communications with *The New York Times*,

 8      the *LA Times*, the *Daily Telegraph*, and *The National Law*

 9      *Journal*, were you acting at the direction or control of the

10      Ukraine?

11      A.  I was not.

12      Q.  And do you think that -- did you have a view as to whether

13      that fact affected whether or not you had to register?

14      A.  Absolutely.

15              MR. CAMPOAMOR-SANCHEZ:  Objection.

16              THE COURT:  We talked about this.

17              MR. TAYLOR:  The Court is sustaining the objection?

18              THE COURT:  Yes.

19      BY MR. TAYLOR:

20      Q.  Mr. Craig, why didn't you think your communications with

21      *The National Law Journal*, the *LA Times*, the *Daily Telegraph*,

22      and *The New York Times* constituted conduct that required

23      registration?

24              THE COURT:  All right.  Can we approach the bench?

25              (Bench discussion:)

1           THE COURT:  All right.  First of all, by lumping them

2    together you are suggesting that the government is lumping them

3    together.

4           And second of all, I thought we said that you can ask

5    him if his state of mind was, did those communications cross

6    the line, as he understood it to be through the advice from his

7    firm?  And you are able to ask all those questions.  But, the

8    ultimate conclusion -- legal conclusion about whether he was an

9    agent or he wasn't an agent, I thought you weren't going to ask

10   him.

11          MR. TAYLOR:  No.  I -- I'm sorry.  Did I interrupt?

12          THE COURT:  No.  You can talk now.

13          MR. TAYLOR:  I'm asking him whether the fact that he

14   was not acting at the direction or control of Ukraine entered

15   into his thinking about whether he was an agent who was

16   required to register.

17          THE COURT:  I think Mr. Murphy wants to say

18   something, too.

19          MR. MURPHY:  Just a suggestion --

20          MR. TAYLOR:  That it crossed the line.

21          THE COURT:  I think that's the problem.  I don't want

22   you framing it in terms of his statutory obligation.  I want

23   you to frame it in the way that we've gone all along.

24          But, there's also the compound nature of the question

25   and the form of the question.  You have asked him individually,

1   with each one, whether he thought it applied to him

2   individually, each one, he's given you his testimony, it's no.

3   And I think with each one you've asked him, Did you do that?

4   Did anybody tell you to do it?  And he's already said, no.

5        So, this kind of summary question, I think there's a

6   form-of-the-question problem to it, to put them all in one

7   question like that.

8        MR. TAYLOR:  So, Your Honor, just to be clear, he's

9   not testifying as to whether he was or was not an agent; he's

10   testifying as to whether he thought he was.

11        THE COURT:  I understand that.  But --

12        MR. TAYLOR:  Those are the questions I want -- that's

13   the line of questioning I want to pursue.

14        MR. CAMPOAMOR-SANCHEZ:  Well, I think he's pursued

15   the line of questioning, and I think I have not objected to him

16   just saying, I did not do it at the direction or control of

17   anybody.

18        It's just the legal conclusion that he's trying to

19   reach, and also the lumping in, as the Court is -- it's making

20   it seem like that's what we're alleging, when he's not charged

21   with that.  They want the defendant's case as if we charged him

22   with failure to register, and we didn't.

23        THE COURT:  And as if you've charged him with failing

24   to register because of the *LA Times* and *The National Law*

25   *Journal*, which isn't part of it either.

1          So, I think the point continues to be that you've

2     been asking -- that you've gone all the way through, one

3     question at a time, one fact at a time, as to whether -- I let

4     you ask if he thought that crossed the line, that he had in his

5     head that he'd been given advice that you can't do this, but

6     you can do that.  He's answered every one individually.

7          And you've asked him, I think, with respect to each

8     one, Why did you do it?  And the specific question about

9     whether you did it at the direction or under the control of the

10    Ukraine.  Individually, you've asked him.

11         So, now you've got a summary question where you're

12    asking, with all of those communications, which are different,

13    Did you, essentially, think you had a registration obligation?

14         MR. TAYLOR:  As to any of those.  As to any of them.

15    It's a fair question.

16         THE COURT:  I think -- well, that wasn't your

17    question.  You said --

18         MR. TAYLOR:  No, it wasn't.  But, I was interrupted.

19         THE COURT:  Okay.  So, that went your question.

20         So, you have a new question, now, you want to ask?

21    What's the new question you want to ask?

22         MR. TAYLOR:  Well, I can take him through each one

23    again.  I don't want to do that.

24         But, I do want to pursue a line that explains why, in

25    his mind, those contacts did not make him an agent of the

```
 1      Ukraine.  I want to be clear, that's the line of questioning I

 2      want to pursue.

 3              And I understand you have ruled that I can ask him

 4      whether he believed that any of those contacts crossed the line

 5      that he had been directed to.  But, I can't ask --

 6              THE COURT:  I think the question is not the ultimate

 7      legal conclusion.  The question is, Did you think during that

 8      contact you were -- and then you use the language that he used,

 9      you know, consulting, acting, or on behalf.

10              MR. TAYLOR:  Right.

11              THE COURT:  But, so, because the question is whether

12      he thought what he was writing on the paper was true.  That's a

13      different question from whether he thought the statute had been

14      triggered.

15              MR. TAYLOR:  Well, the --

16              THE COURT:  No one is saying that he didn't have a

17      right to go in and advocate about whether the statute had been

18      triggered or not, based on the facts.

19              MR. TAYLOR:  I know.

20              THE COURT:  The question is whether the facts were

21      accurately portrayed.

22              MR. TAYLOR:  The letter of September 5 clearly says

23      that his contacts with these three news organizations required

24      him to register.

25              THE COURT:  Okay.
```

```
1          MR. TAYLOR:  So his belief that that's not true is
2    directly --
3          THE COURT:  Then you can direct his attention to the
4    letter.  And you can say, When you got that letter, did you
5    agree with that conclusion?
6          No.
7          And then what did you do?
8          MR. TAYLOR:  But I've got to be able to ask him why
9    not.
10         MR. CAMPOAMOR-SANCHEZ:  Well, let's see, when we get
11   there, how he sets it up.  But, I mean, he can -- I think he
12   can explain why he disagreed.  But I -- I am very leery of him
13   trying to give legal opinions about what parts of the statute
14   mean or don't mean.  That is the concern.
15         THE COURT:  I mean, that's fine, that he got the
16   letter and the letter said X and he disputed that.
17         MR. TAYLOR:  And why.
18         THE COURT:  And why.
19         MR. TAYLOR:  Okay.
20         MR. CAMPOAMOR-SANCHEZ:  But, we're not there.  We're
21   still in December.
22         MR. TAYLOR:  Right.
23         THE COURT:  Okay.
24         (Open court:)
25   BY MR. TAYLOR:
```

1    Q.  At the risk of repeating a question I've already asked,

2    Mr. Craig, you've discussed contacts with four media

3    organizations, right?

4    A.  Yes.

5    Q.  And I'm going to ask you, again, did you believe that your

6    contacts with any one of them caused you to cross the line and

7    required you to register under FARA?

8    A.  I did not think any of those contacts made me a press agent

9    or an agent for Ukraine.

10   Q.  Can I show you Government Exhibit 396, please.

11               THE COURTROOM DEPUTY:  This is in evidence, Counsel?

12               MR. TAYLOR:  Yes.

13               THE COURTROOM DEPUTY:  Okay.  Thank you.

14               MR. TAYLOR:  Pretty sure --

15               THE COURTROOM DEPUTY:  Yes.

16   BY MR. TAYLOR:

17   Q.  There is a chain, an email from Mr. Manafort to you and

18   then a response from Mr. Manafort.

19               Do you see that?

20   A.  Yes.

21   Q.  Mr. Manafort refers to you as the "Pro," and "The initial

22   rollout has been very effective" and your backgrounding has

23   been "Key to it all."

24               Did you know what he was talking about?

25   A.  I really didn't.

1    Q.  Why?  Why do you say that?

2    A.  Because I thought the quotes that I had given to *The*

3    *Telegraph*, to The *Times*, and to *The National Law Journal* had

4    been very critical of Ukraine and inconsistent with what

5    Mr. Manafort wanted the public relations message to be.  That's

6    what I thought.

7    Q.  And he says your "Backgrounding has been key to it all."

8         Had you backgrounded anybody?

9    A.  No.  I was on the record.  I think I was on the record with

10   everybody, except that one quote from the *Daily Telegraph*,

11   where I said it would have been reversed under Western

12   standards.  Everything else was right on the record.  There was

13   no backgrounding.

14   Q.  And what's your response to Mr. Manafort?

15   A.  Well, I said, "I thought the piece in the *Kyiv Post* was

16   terrific."

17        And that needs a little bit of explanation.

18        The *Kyiv Post* is the English-language newspaper based

19   in Kyiv, Ukraine.  It was aligned with the opposition against

20   Yanukovych, it was associated with the forces that supported

21   Tymoshenko, and it was very critical of the Yanukovych

22   administration.

23        The *Kyiv Post*, in other words, was an adversary of

24   Manafort and Yanukovych, and the *Kyiv Post*, by far, wrote the

25   best article about our report.  It was lengthy, it was

1    thoughtful, it was detailed, and it was balanced.  And, so, by

2    telling him I thought the piece in the *Kyiv Post* was terrific,

3    I'm telling him, this is the honest report.  This was the

4    accurate report.

5    Q.  Let me show you Defense Exhibit 248.

6    A.  I got it.

7    Q.  Can you turn to the next -- second page?

8         Can you identify Defense Exhibit 248, at page 2?

9    A.  This is the article -- the English-language article that

10    appeared in the *Kyiv Post* that I was referring to in my email

11    to Mr. Manafort, telling him, This is what I thought was the

12    best report about our work.

13    Q.  So, when you referred Mr. Manafort to the *Kyiv Post*, were

14    you referring it to him as an example of the success of his

15    media strategy?

16    A.  No, quite to the contrary.

17         MR. CAMPOAMOR-SANCHEZ:  Object to the form of the

18    question.

19         THE COURT:  That's a little leading.

20         MR. TAYLOR:  Sorry.

21         THE COURT:  Well --

22    BY MR. TAYLOR:

23    Q.  What was your purpose in referring him to the *Kyiv Post*?

24    A.  I think I was telling him that I thought that the accurate

25    and balanced and thorough article that appeared in the *Kyiv*

1    *Post* was the terrific article, and that was the -- that was the

2    way this should have been handled.

3    Q.  Mr. Craig, did you have any information as to how media

4    around the world were describing the Report?

5              THE COURT:  At what time?

6              MR. TAYLOR:  At that time.

7              THE COURT:  At what time?

8              MR. TAYLOR:  12-13, December 12, 13, 14.

9              THE COURT:  Well, let's pick a time.  I think there's

10   a difference in those times.

11             MR. TAYLOR:  Yes.  But, I meant to include any time

12   December 12th, 13, 14, 15, in that period, did he obtain any

13   information during that period as to how media around the world

14   were describing the Report.

15             THE COURT:  Well, let's lay a foundation.

16             Were media around the world describing the Report on

17   December 12th?

18             MR. TAYLOR:  Your Honor, I asked him --

19             THE COURT:  Well, you lumped in two things that

20   aren't necessarily the same in your questions.  So, I think for

21   him to answer it fairly, it has to be a clear question.

22             So, the objection to the form is sustained.

23   BY MR. TAYLOR:

24   Q.  Did you have any information as to how media around the

25   world were portraying the Report --

1    A.  I did.

2    Q.  -- during this period?

3            MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the

4    question.

5            When?

6            MR. TAYLOR:  During this period.

7            THE COURT:  All right.  I think you have to define

8    "during this period."

9    BY MR. TAYLOR:

10   Q.  Well, December 12, 13, 14, 15 of 2012.

11   A.  I learned about coverage in other newspaper and media

12   outlets after the 13th, primarily -- it was the 13th, 14th,

13   15th, from newspaper headlines and articles that were sent to

14   me, I think by Mr. Gates at Mr. Manafort's request.  And I saw

15   all of those articles had headlines that were wrong.

16           That was my understanding of the way in which this

17   had been publicized to the rest of the world, was that they had

18   been told that Skadden had concluded that there was no

19   political motivation.  And overwhelmingly, that was where the

20   message was coming, from these media outlets all over Europe

21   and all over the world.

22   Q.  I want to direct your attention, Mr. Craig, to the meeting

23   which you attended with the FARA Unit on October 9, 2013.

24           What was the purpose of the meeting?

25   A.  In September, we had received a letter from FARA, telling

 1    us that on the basis of the responses that we had given FARA in

 2    previous communications, they had concluded that we had to

 3    register.  I thought that was a mistaken and erroneous

 4    conclusion, and I wanted to have an opportunity to explain to

 5    the FARA decision-makers or other people in the Justice

 6    Department why I thought this was a mistaken conclusion.

 7              So, in response to that letter, we had a meeting --

 8    set up a meeting with the FARA Unit on -- that occurred on

 9    October 9th.

10    Q.  Will you tell the jury, please, why you thought the

11    conclusion in the September 5 letter was wrong?

12    A.  The letter said that there were two reasons why they

13    concluded that we had engaged in political activities.  One was

14    that we had disseminated the Report.  And, two, that we had

15    communicated to media outlets in service to Ukraine, as agents

16    for Ukraine, and concluded that that was why we had to

17    register.

18              I thought the circulation of three reports -- not the

19    circulation, but our response, giving a report to *The National

20    Law Journal*, to the *Los Angeles Times*, and to *The New York

21    Times* was not a dissemination.  And I thought that my

22    communications with those newspapers to correct

23    mischaracterizations of our report was not acting as a press

24    agent in the service of Ukraine.

25              We wanted to have an opportunity to discuss that

1  issue with the FARA Unit, and that was the meeting on October

2  9th, for that purpose.

3  Q.  Do you remember whether you took any articles -- any news

4  articles with you to the meeting?  And let me -- can you answer

5  that question?

6  A.  Yes, I do.

7  Q.  Can I show you Government's Exhibit 506 and 510, please?

8  506 first.

9           What is 506, Mr. Craig?

10 A.  This is a copy of *The New York Times* article that appeared

11 in *The New York Times* December 12th, the day before the release

12 of the Report in Europe.

13 Q.  Do you remember whether it was you who put the highlighting

14 on this?

15 A.  I do.  I think I did this in my office.

16 Q.  And does the article show when you printed it out?

17 A.  October -- the lower right, I think.

18 Q.  Yes.

19 A.  There's a date that appears above the various numbers that

20 identify the document:  10-9-2013.

21 Q.  And --

22 A.  That was the date of the meeting that we had at FARA.

23 Q.  And the next exhibit, Government's Exhibit 510.

24           What is that?

25 A.  That is a copy of the *Los Angeles Times* report -- news

1    article reporting on the Report.

2    Q.   And does it show when you printed it out?

3    A.   Yes.  In the same location, Mr. Taylor, in the lower right:

4    October 9th, 2013.

5    Q.   Mr. Craig, do you remember why you printed these articles

6    out on October 9, 2013?

7    A.   Well, it was my belief that what FARA -- the FARA

8    decision-makers wanted to know was what we had done with the

9    media and why we had done it.  And I thought the most powerful

10   evidence of what we had done and why we had done it was what

11   appeared in the articles themselves.  Because I thought the

12   quotations, the attributions explained my motivation in talking

13   to these media outlets.

14   Q.   What did you say in the meeting?

15   A.   Well, my recollection of the meeting is that Larry opened

16   with some general comments, and then I made a presentation

17   explaining why I thought the decision that FARA had made in its

18   September letter about dissemination and about media contacts

19   was mistaken, and I hoped they would reconsider it.

20        And I think I quoted from these articles, and I made

21   the case that we were not acting as agents promulgating an ad

22   campaign or message for Ukraine; we were trying to correct

23   mistakes and errors that Ukraine itself was distributing to the

24   public.  So, if we are trying to correct what Ukraine is doing,

25   we're doing something contrary to the interests of our own

1   client, and how could you consider us to be agents of the

2   client?

3                And, so, that was, essentially, the presentation that

4   I made.  There were a few questions.  And it was a pretty quick

5   meeting.  I mean, I heard the testimony from Ms. Hunt, saying

6   it was half an hour, 45 minutes.  I agree with that.  It was

7   that quick.

8   Q.  And did you lie at that meeting?

9   A.  I did not.  I did not lie to the FARA Unit.

10  Q.  Did you withhold or conceal information about anything else

11  that had occurred in connection with this project in order to

12  fool the FARA Unit?

13  A.  I did not.

14  Q.  Did you write a letter to the FARA Unit?

15  A.  I did.

16  Q.  Why did you write a letter?

17  A.  At the end of the meeting, as we were leaving, Heather Hunt

18  said to me that she would be grateful if I would put what had

19  happened in the meeting on paper, summarize, essentially, what

20  the conversation had been, and present the gist of our

21  arguments.  She said she wanted to have a written record for

22  them to use as the basis for their reconsideration.  I said,

23  fine, I would do that.

24  Q.  Mr. Craig, you're accused of leaving out or concealing

25  certain facts in connection with your communications with FARA.

1        Do you understand that?

2   A.  I do.

3   Q.  Why didn't you mention FTI or Jonathan Hawker or Vin Weber

4   or Paul Manafort in the meeting or in the letter?

5   A.  Well, it was my understanding that what was going on in

6   that meeting was, A, in response to their conclusion that we

7   should register, to discuss what we had done, Skadden, the

8   team, what I had done, and why I had done it.  They were not

9   asking me questions about other folks or other companies or

10  other actors in the process, they were focused on Skadden.  The

11  issue was Skadden.

12        And that was our response, we were focused on

13  answering with that information.

14  Q.  Did you think by not mentioning FTI or Jonathan Hawker or

15  Vin Weber or Paul Manafort or Tom Parfitt you were concealing

16  information from the FARA Unit that it had asked you for?

17  A.  I did not think so.

18  Q.  Was the letter an accurate summary of what you had said at

19  the meeting?

20  A.  It my judgment, it was accurate.  It accurately reflected

21  the gist -- not verbatim, not word for word what I said, but

22  the gist of the arguments.  And I think it's significant that

23  in that letter, I cite quotations from the various articles to

24  support my position.

25  Q.  You're getting ahead of me, Mr. Craig.

```
 1    A.  Oh, I'm sorry.

 2    Q.  Let me show you Government's Exhibit 12.

 3    A.  Government?

 4    Q.  Exhibit 12.

 5    A.  Yes.

 6    Q.  Is this the letter that you wrote?

 7    A.  This is the letter I wrote.

 8    Q.  And is it truthful and accurate?

 9    A.  Yes.

10    Q.  And looking at the second paragraph.

11             Do you see that?

12    A.  Yes.

13    Q.  Was that truthful and accurate?

14    A.  It was.

15    Q.  And was your providing a copy of the Tymoshenko Report to

16    media outlets in response to requests from the media?

17    A.  Yes.

18    Q.  And in -- did you mean to include in that -- or, did you

19    include in that the request from Mr. Sanger?

20    A.  I did, indeed.

21    Q.  And what about the next paragraph?

22    A.  With respect to --

23    Q.  Is that true?

24    A.  Are you talking about *The National Law Journal* and *The New*

25    *York Times*?
```

1    Q.  Yes.  Yes.

2    A.  That's correct.

3    Q.  And how --

4    A.  The statements -- these are about my statements, Mr.

5    Taylor, that appeared in *The National Law Journal* and *The New*

6    *York Times*.  Those were quotations attributed to me, on the

7    record.  Nobody is trying to hide them or conceal them.  I am

8    talking to the media outlets and I am saying that -- that we

9    did not have any -- we gave no opinion as to whether or not

10   there was a political motivation, to correct the

11   mischaracterizations that were coming from the Ukraine.

12   Q.  And look at the bottom paragraph and the footnote there.

13          Why did you write that paragraph and include that

14   footnote?

15   A.  As I said, I thought the quotes that appeared in The New

16   York Times and the other newspapers were the best evidence of

17   my intent when I spoke to them.  And if you read that quote,

18   "Mr. Craig said his team was not able to judge the local

19   politics that brought Ms. Tymoshenko to trial on charges of

20   abusing her authority.  We leave to others the question of

21   whether this prosecution was politically motivated."

22          I wouldn't have said that unless I was responding to

23   what I thought were erroneous -- and they were erroneous and

24   wrong and false characterizations of our report.  That was the

25   purpose of including that statement for FARA.

 1          But, also, the December 12th date establishes that it

 2    actually happened the day before the Report was released.

 3    Q.  Well, Mr. Craig, your footnote is attached to a portion of

 4    the text.

 5          What is the relationship between the quote that you

 6    include in the footnote and what you say in the text there?

 7    A.  Well, they're directly related.

 8    Q.  In what way?

 9    A.  The statement in the text says, "The firm's response was

10    aimed at correcting this mischaracterization," which is

11    described a little earlier in that same paragraph.  And there

12    is the statement that I'm quoted, trying to correct that

13    mischaracterization.

14          And, Mr. Taylor, I think --

15          THE COURT:  Well, let him ask a question.

16          THE WITNESS:  Okay.

17    BY MR. TAYLOR:

18    Q.  Mr. Craig, what -- and let's look at the last paragraph,

19    please.

20    A.  Yes, sir.

21    Q.  Well, the paragraph before the last paragraph, about *The*

22    *National Law Journal.*

23          Was that correct?

24    A.  Yes.  There, I am describing for FARA what I had described

25    in the meeting with FARA, that *The National Law Journal*

1    originally just got it dead wrong.  We called them up,

2    corrected it, and the correction was this:  The trial was not

3    politically motivated.

4    Q.  What about the last paragraph?

5    A.  The last paragraph states something that I think was also

6    true.  When we communicated with *The National Law Journal*, with

7    *The New York Times*, and with the *Los Angeles Times*, and with

8    the *Daily Telegraph*, as well, we did not consult with Ukraine,

9    did not inform Ukraine, and did not act under instruction from

10   Ukraine, and were not serving as an agent for Ukraine; we were

11   responding to inaccuracies in U.S. news reports.

12        And the statements that I made and the quotations and

13   the conversations that we had with the reporters in those three

14   outlets -- four outlets, if you count *The Telegraph* -- we

15   didn't consult with Ukraine about those statements.  We did not

16   inform Ukraine about those statements.  We did not make those

17   statements under instruction from Ukraine.  We did this on our

18   own, independently from Ukraine.

19   Q.  Mr. Craig, taking you back to the 11th and 12th of December

20   of 2012.

21   A.  Yes.

22   Q.  Did you send a message --

23        MR. CAMPOAMOR-SANCHEZ:  Objection.

24        THE COURT:  I'm sorry?

25        MR. CAMPOAMOR-SANCHEZ:  Objection.  Can we specify

 1    the 11th or the 12th?

 2              THE COURT:  Well, let's hear the whole question and

 3    then find out if he needs to rephrase that question.

 4              What's your question?

 5    BY MR. TAYLOR:

 6    Q.  During the interaction with Mr. Sanger and *The New York*

 7    *Times* --

 8    A.  Yes.

 9    Q.  -- on the 11th and the 12th, did you inform Mr. Hawker that

10    you had spoken to Mr. Sanger?

11    A.  I did.  I told him that we were talking.

12    Q.  And did you tell him that, in response to one of his

13    questions, "I'm on it"?

14    A.  I did.

15    Q.  And did you tell him that you had had a conversation with

16    Mr. Sanger --

17    A.  I think I did.

18    Q.  -- after you'd had it?

19    A.  I did.

20    Q.  Now, were these contacts with Mr. Sanger inconsistent with

21    your statement that you did not inform Ukraine about your

22    contacts with the press?

23    A.  My statement is that I did not inform Ukraine about the

24    inaccurate -- my corrections to the inaccuracies.  I did not

25    run my statements by Mr. Hawker.  I told Mr. Hawker that we

1    were in touch with *The New York Times*, but I did not tell

2    Mr. Hawker what I was saying to *The New York Times*, did not run

3    the quotations by him, did not discuss with him what I was

4    saying to *The New York Times*.

5    Q.  Mr. Craig, why did you not want to register?

6    A.  The -- well, first of all, the project, I thought, could be

7    carried out without having to be a foreign agent.  I didn't

8    think we ever served as a foreign agent, and I thought we could

9    do the project without being a foreign agent.

10              MR. CAMPOAMOR-SANCHEZ:  Object to the

11   characterizations that are being made as legal conclusions.

12              THE COURT:  All right.  I think he asked why you

13   didn't want to register, and you can answer that question.  You

14   said you thought you could do it without registering.

15              THE WITNESS:  Correct.

16              THE COURT:  Writing the Report.

17              THE WITNESS:  Yes.

18              THE COURT:  Okay.  So were there any other reasons

19   why you didn't want to register?

20              THE WITNESS:  There were.

21              THE COURT:  All right.  You can continue to answer

22   the question.

23   BY MR. TAYLOR:

24   Q.  Would you answer the Judge's question?  Were there any

25   other reasons you didn't want to register?

1    A.  We were writing an independent report.  This project was

2    different from your traditional representation where lawyers

3    are representing a party or an advocate or an individual in a

4    litigation.  Our project was not representing Ukraine or

5    arguing for Ukraine in an administrative proceeding or in a

6    trial or in some kind of administrative activity.  We were --

7    the definition of our job was to conduct this investigation,

8    make a determination, and write a report.  That was the

9    definition of the project.

10          If we also registered as an agent for Ukraine at the

11   same time we were writing this report, that was saying we could

12   not do this independently.  It was saying we had -- it's a sort

13   of catch-22.  If you register, that means you are a foreign

14   agent under the direction and instruction of this foreign

15   sovereign.

16          MR. CAMPOAMOR-SANCHEZ:  Objection.  Legal opinion.

17          THE COURT:  All right.  I think he's saying that it

18   would suggest that it lacked the independence that --

19          THE WITNESS:  I'm saying it with too many words,

20   then, Your Honor.  I'm sorry.

21          THE COURT:  All right.

22   BY MR. TAYLOR:

23   Q.  Good ahead.

24   A.  There were other reasons.

25   Q.  Why didn't you think that doing the project required you to

 1    register?

 2            THE COURT:  Well, that's a different question.

 3    That's the legal question.  I think you asked him why he didn't

 4    want to register.

 5            And did you finish your answer?

 6            THE WITNESS:  No, I had some more to say.

 7            THE COURT:  Well, without talking about whether

 8    the -- you were correct about whether the law would have

 9    required or wouldn't have required you to register, you can

10    complete your answer about why you didn't want to register.

11            THE WITNESS:  There was another reason that had to do

12    with a government service.  I had been White House counsel and

13    vetting appointments.  And we had a policy in the Obama

14    administration that if people had served as foreign agents,

15    they had to wait two years before they could be considered for

16    appointments in the administration.  It was an attempt to

17    reduce the perception that people were going in and out of

18    government for their own benefit and their own profit.

19            And, so, there were -- there were people -- I'd had

20    high positions in government.  I was less concerned about

21    myself, although that policy would have affected me.  But,

22    there were other people on our team that would have been

23    adversely affected, had they had to register as a public -- as

24    a foreign agent.  So I was hopeful that we would be able to get

25    through this project without engaging in any activities that

1    would require us to register.

2           As you know, Mr. Sloan went into government,

3    Mr. Kedem went into government.  Had they had to have

4    registered as a foreign agent, that would have been a problem

5    for them.

6    BY MR. TAYLOR:

7    Q.  Were you afraid of being embarrassed by anything you would

8    have had to disclose on the foreign agents registration form?

9    A.  Not at all.

10           MR. TAYLOR:  May we approach?

11           THE COURT:  Yes.

12           (Bench discussion:)

13           MR. TAYLOR:  Just want to be clear.

14           The question that I want to ask him is, Why didn't

15   you think you had to register?

16           MR. CAMPOAMOR-SANCHEZ:  I thought he answered that.

17           THE COURT:  To write the Report or all in all?

18           MR. TAYLOR:  All in all.

19           THE COURT:  I think he's, really, answered.  You

20   asked him the question, When you sat down at the meeting and

21   you thought the conclusion was wrong, why did you think the

22   conclusion was wrong?  And he answered that.  And that's a

23   different question than, Did the law apply to you, which, I

24   think, is problematical.

25           Also -- is there anything you want to say right now?

1           MR. CAMPOAMOR-SANCHEZ:  No.  No.

2           THE COURT:  Okay.

3           I was also concerned that his testimony that, "And,

4    as you know, people from my firm went into the government,"

5    sort of suggesting that there had been some governmental stamp

6    of approval on the failure to register.  So --

7           MR. TAYLOR:  Your Honor --

8           THE COURT:  -- I think he said he was hopeful he

9    would get through -- he didn't think writing a report required

10   registering.  He hoped to get through it without engaging in

11   registrable activities.  That he believed that, in fact, is

12   already in the record, that he didn't.  And that's what he told

13   them at the meeting.

14          MR. TAYLOR:  Okay.

15          THE COURT:  And so that goes to everything that you

16   wanted to go to, which is his intent, that he didn't believe he

17   crossed the line, and he had that in his mind when he said what

18   he said.  But, that's different than this legal wrap-up

19   question that you want to ask.  So I think that question --

20          MR. TAYLOR:  Understand.

21          I maintain that his state of mind as to whether he

22   was required to register and why not ought to be a relevant and

23   admissible question.

24          THE COURT:  But, I believe we've gotten at that

25   exactly already, when you asked him -- you were permitted to

1   ask him, Did you think the DOJ got it wrong?

2              And he said, Yes.

3              And you said, Why?

4              And he answered.

5              All right.

6              (Open court:)

7   BY MR. TAYLOR:

8   Q.  Mr. Craig, did you hear Mr. Spiegel testify about an email

9   that you sent to him?

10  A.  I did.

11  Q.  Can you look at Government's Exhibit 6?

12  A.  Yep.

13  Q.  Were there any inaccuracies in that email, Mr. Craig?

14  A.  Yes, there were.

15  Q.  And what were they?

16  A.  The first sentence.  "Skadden did not disseminate the

17  Report to news media."

18              I think that was accurate.

19              "Three media outlets who were not able to obtain a

20  copy of the Report from the Ministry in Kyiv contacted us and

21  asked us to provide them with a copy."

22              I think that's accurate with respect to *The National

23  Law Journal* and the *Los Angeles Times*, but was not fully

24  accurate with respect to *The New York Times,* because we were

25  contacting them and asking them if they were interested.

1              "At no time did Skadden contact the media."

2              I think that is also not accurate with respect to *The*

3     *New York Times*.  I sent an email to David Sanger, and I asked

4     him, Are you interested in this report?  In which case, I would

5     say that that was contacting David Sanger.

6     Q.  And do you know why you got it wrong?

7     A.  Do I know what?

8     Q.  Do you know why you got it wrong?

9     A.  Why did I get it wrong?  I just muddled it up.  I had not

10    done a review of those emails, and I was -- what the -- the

11    purpose of this email was to tell Larry that I thought, very

12    strongly, that the -- that FARA had made a mistake, and I

13    wanted to make sure that Larry Spiegel understood where I was

14    on this.  I didn't think we had disseminated the Report when we

15    gave it to three news outlets.

16             And I think the last statement, by the way, is

17    accurate, Mr. Taylor.

18    Q.  Did you ever -- I'm sorry.

19             Did you ever discuss this email with Mr. Spiegel

20    after you wrote it?

21    A.  No.

22    Q.  And you were also shown Government's Exhibit 6 to Exhibit

23    7, a draft letter.

24    A.  Yep.

25             THE COURT:  Just for timing purposes, Mr. Taylor, you

 1    can take as much time as you want.  I wondered if you had a

 2    thought about how much more time you have?

 3                 MR. TAYLOR:  If I can get the response to this

 4    question, then it would be a good place to break.

 5                 THE COURT:  All right.

 6    A.  I'm sorry, Mr. Taylor.  Could you repeat the --

 7    BY MR. TAYLOR:

 8    Q.  I hadn't asked one yet.

 9    A.  Oh.

10    Q.  Do you see -- do you see your draft letter?

11    A.  I do, sir.

12    Q.  Were there some inaccuracies in the draft letter?

13    A.  Yes, there were.

14    Q.  And what inaccuracies, generally speaking, were in the

15    letter?

16    A.  I think they were the same kinds of inaccuracies that I had

17    in that email to Larry.

18    Q.  Did you ever discuss this draft letter with Mr. Spiegel?

19    A.  No, other than to hear from Mr. Spiegel that the -- we

20    weren't going to be sending a letter; we were going to be

21    having a meeting.

22    Q.  Okay.  Why did you write the draft?

23    A.  Well, for one thing, I wanted to sort of organize my

24    quotations, because I thought that the quotations were

25    significant, and this was one location for the quotations.  And

 1    we were, as I said, exploring options and writing a letter to

 2    the FARA division.  Taking issue with their finding was one way

 3    of which we might pursue the challenge.

 4    Q.  Is there any reference in that draft letter to the attorney

 5    general?  If you look at the letter.

 6    A.  Yes, there is, in the first paragraph.  I think that -- "We

 7    are writing to respond to your letter of September 5th."

 8             I think we were talking about that letter, which

 9    required us -- told us that we had to register.

10             "And with respect, we disagree with your decision,

11    and we would like an opportunity to review it with the attorney

12    general."

13    Q.  Do you remember whether you had any intention at that time

14    to seek review of the FARA decision, if it was unfavorable?

15    A.  Did I have any -- if I had written that, then I was

16    thinking, Yeah, we're going to go talk to the attorney general

17    about this.

18    Q.  All right.

19             MR. TAYLOR:  If Your Honor wants to take a morning

20    break, now is a good time.

21             THE COURT:  All right.  I think that's a good idea.

22             All right.  We're going to take a break.  Ask you to

23    leave your notebooks.  Don't discuss the case with anyone you

24    run into during the break, including each other, and we'll

25    resume at approximately 20 after 11.

```
 1              (Whereupon the jury exits the courtroom.)

 2              THE COURT:  All right.  Everyone, including the

 3      witness, is excused for ten minutes.

 4              Thank you.

 5              (Recess.)

 6              MR. TAYLOR:  Your Honor, can we approach, please?

 7              THE COURT:  Sure.

 8              (Bench discussion:)

 9              THE COURT:  One second.

10              Okay.

11              MR. TAYLOR:  Yeah.  I'm embarrassed to say, I haven't

12      looked at the local rule in a while.

13              Are we permitted to talk to Mr. Craig during his

14      direct examination, when we're on breaks?

15              THE COURT:  Do you have a position?

16              MR. CAMPOAMOR-SANCHEZ:  Generally, it would be no.

17      But, since it's their own client, I don't know how we can

18      object talking to their client.

19              MR. TAYLOR:  That's my understanding, but I didn't

20      know if the Court had a view.

21              THE COURT:  All right.  I think it's preferable if

22      you don't.

23              MR. TAYLOR:  Judge, you needn't worry.  There wasn't

24      a -- but, I don't want to run afoul of a prohibition.

25              THE COURT:  All right.
```

1      MR. CAMPOAMOR-SANCHEZ:  Obviously, I haven't read the

2  rule.  I don't know if there's anything else.

3      THE COURT:  And I haven't had the chance to look at

4  it either, since I didn't know this was coming.  I don't know

5  if there is a local rule on the subject or not, even off the

6  top of my head.

7      MR. TAYLOR:  Some courts have local rules.  But, you

8  know, courts like to say they're all the same, but they're not.

9      THE COURT:  I mean, it seems to me you've prepared

10  him in advance of his testimony, and that should probably do

11  it.

12      MR. TAYLOR:  Well, I might want to have lunch with

13  him.

14      MR. MURPHY:  Your Honor --

15      THE COURT:  Do you have a point of view?

16      MR. MURPHY:  I have a little bit of one.

17      The District of Maryland has an explicit local rule

18  that, basically says that you can talk to any witness while on

19  direct but not on cross, the exception being for a criminal

20  case in which the lawyers for the defendant are always allowed

21  to speak to the defendant because of the Sixth Amendment right

22  to counsel.  But, I don't know --

23      THE COURT:  Makes sense to me.

24      MR. CAMPOAMOR-SANCHEZ:  Right, that's -- makes sense

25  to me, too, but --

```
1              THE COURT:  All right.

2              MR. MURPHY:  I'm not sure.  We kind of took a quick

3     look in the local rules of this court.  I didn't see it.

4              THE COURT:  Let's do this:  How much more do you

5     have, direct?

6              MR. TAYLOR:  If you can stand it until 1 o'clock, I

7     think I can finish by 1 o'clock.

8              THE COURT:  Why don't we start the lunch break before

9     he starts his cross, and then we don't have an issue about

10    whether you were chitchatting with him during the cross.

11             MR. TAYLOR:  Oh, I would like them to start the cross

12    before the lunch break, Your Honor.

13             THE COURT:  Well, it may or may not.  It's

14    certainly --

15             MR. TAYLOR:  No, I understand.

16             THE COURT:  That also seems like an appropriate

17    breaking time for everybody.

18             MR. TAYLOR:  All right.

19             THE COURT:  All right.

20             (Open court:)

21             (Whereupon the jury enters the courtroom.)

22             THE COURT:  All right.  Mr. Taylor, you can continue.

23    BY MR. TAYLOR:

24    Q.  Mr. Craig, I'm going to ask you some questions about

25    yourself.
```

1          You've mentioned that you have a family and children,

2     and you live in the District of Columbia.

3     A.   Yes.

4     Q.   Where were you born?

5     A.   I was born in the Navy hospital in Norfolk, Virginia, 1945.

6     Q.   Where did you go to school, Mr. Craig?

7     A.   Well, during elementary and grammar school, I went to

8     public schools all over the country.  My father was an educator

9     and, so, I went to public school in Washington state, Kansas

10    state, Massachusetts, Palo Alto, California.

11    Q.   And where did you go to high school?

12    A.   I was lucky enough to get a scholarship to a boarding

13    school in New Hampshire called Phillips Exeter Academy.

14    Q.   And after Phillips Exeter, did you go to college?

15    A.   I went to Harvard.

16    Q.   And after Harvard, what did you do?

17    A.   I had a fellowship in Cambridge University, where I did

18    a -- sort of a masters, it was called Diploma in Historical

19    Studies.  And then I came back to the United States, and I

20    worked in Harlem, actually, for six months -- five or six

21    months.

22    Q.   And where did you go to law school?

23    A.   Went to Yale Law School.

24    Q.   We've had some descriptions of your career, but could you

25    give us a summary of your professional activities since law

1  school?

2  A.  When I left law school, I came to Washington, D.C., and

3  worked for the law firm Williams, Connolly & Califano.  But,

4  then I met my wife, and she was still a graduate student at

5  Yale.  So, I left the practice of law and went to New Haven,

6  Connecticut, again, where I was the federal public defender for

7  two years -- or, one of the federal defenders for two years in

8  the federal courts of Connecticut.

9       Thereafter, I returned to Washington, D.C., and came

10  back to Williams and Connolly & Califano, and practiced law

11  there until 1983, when I left to go work for Senator Kennedy.

12  I was his senior foreign policy advisor, national security guy

13  for Senator Kennedy for five years.

14       After that, I went back to Williams and Connolly,

15  practiced law until 1997, when I went to work for

16  Secretary Albright as the director of the policy planning staff

17  in the State Department.  That is an organization that serves

18  the secretary state, sort of as a think tank, where we're

19  supposed to avoid the trivia or the day-to-day activities of

20  the State Department and think big thoughts and long-term

21  trends, and advise her about how to get ahead of the curve.

22       After that, what happened was I -- my lawyering came

23  back, and the President asked me to come over and work in the

24  White House, to help with the defense of the impeachment.  And

25  I was one of the members of the impeachment trial team in the

1    Senate, but was also working in the White House, coordinating

2    the various components of the White House in defense of

3    President Clinton during the impeachment.

4           I returned to the law firm and practiced law, again,

5    until 2008, when I got involved in Senator Obama's campaign.

6    Was a foreign policy advisor to Senator Obama.  He was elected.

7    I left the law firm, was part of the transition, and became

8    White House counsel.

9           Then, when I left the White House in 2010, I joined

10   the law firm of Skadden Arps, which was a -- as you've heard, a

11   huge, international organization.

12   Q.  In your career, Mr. Craig, have you had any interest and

13   experience in rule of law issues?

14   A.  It's actually been a theme throughout my entire personal

15   and professional life, beginning exactly 56 years ago today,

16   August 28th, 1963, when I went to the March on Washington.

17   That was a life-changing experience.

18   Q.  And what about other experiences?

19   A.  Well, that got me involved in the Civil Rights Movement.  I

20   was in Mississippi, briefly, in '64, worked for the Mississippi

21   Freedom Democratic Party.  Went to Mississippi in '65,

22   registering -- trying to register voters in Mississippi.

23          And I guess the interest that I had was involved with

24   fairness and freedom, and trying to use the courts to protect

25   American citizens, or the citizens of any country that's trying

1    to develop a democracy, from the abuse of power by governments.

2    Q.  And do you -- did you belong to any organizations --

3    private organizations related to this interest of yours?

4    A.  Well, almost all of the organizations that I was involved

5    in had a rule of law component to it.  I was chairman of the

6    board of the International Human Rights Law Group -- which is

7    the D.C. legal community's human rights organization -- for

8    many years.

9         I was on the board of the Carnegie Endowment, which

10    had some very robust democracy programs.

11         I was on the board of the German Marshall Fund, which

12    was more focused on Europe and Eastern Europe, the Balkans, and

13    Lithuania, Estonia, and Latvia, and eastern countries.

14         I was on the board of the Truman National Security

15    Project, which was focused on young people in America getting

16    involved in national security issues and educating themselves

17    and becoming proficient and involved in developing progressive

18    attitudes towards national security issues.

19    Q.  So, Mr. Craig, why did you want to do this project for the

20    government of Ukraine?

21    A.  Well, there were many reasons.  I guess, when a piece of

22    business comes in to a lawyer working in a law firm, and it's

23    going to pay for some lawyers to do some work, that's a plus.

24    And so that, of course, was one reason why I was interested in

25    having this client -- not a client so much as this project that

 1     was going to be -- that we were going to do.

 2              Secondly, I was excited about the challenge of the

 3     job.  This was going to be a tough and demanding enterprise,

 4     trying to conduct this kind of investigation, interviewing

 5     groups of people that were pitted against each other

 6     politically, and trying to develop some kind of common

 7     understanding of what happened, and looking at it through the

 8     prism of the Western due process standards.

 9              And we had a great team.  I was very excited about

10     having this team.

11              A third reason was, learning curve.  It was just an

12     extraordinary learning curve for me and for the -- all the

13     people in our team to learn about a country that was going

14     through such an ordeal trying to improve its institutions,

15     confront corruption, deal with the past -- which had been such

16     a difficult past for them, living under the oppression of

17     Soviet communism -- and to develop some modern institutions

18     that would bring them closer to the European and Western values

19     and lifestyle that we all cherish.

20              And, so, that's the last reason.  The last reason

21     was, I thought we might be able to make a difference.

22              If working with lawyers in Ukraine, working with

23     lawyers on both sides, we could learn from each other, as well

24     as maybe improve the way in which they conducted their lives

25     and looked at their institutions, I thought the projects that

1    we were involved in in Ukraine could make a difference.

2    Q.  What was your understanding of the purpose of the project?

3    A.  Well, the definition of the project, I think, we've

4    discussed; we were conducting this investigation and writing a

5    report.  The purpose was originally laid out to me in my

6    meeting with Mr. Pinchuk, who was funding this.  And I asked

7    him what -- why was he doing this and what did he hope to

8    achieve by us writing this report.

9           And he said this trial and this chain of events --

10   the investigation, the prosecution, the trial, the conviction,

11   the sentencing to prison, the issues having to do with

12   Ms. Tymoshenko's conditions of incarceration, her health, had

13   been so polarizing in the country.

14          The country is polarized, in any event.  The Western

15   part of the country is much more oriented towards Europe; the

16   eastern part of the country is much more oriented towards

17   Russia.  So, it takes a lot of integration, even inside the

18   country, to bring the country together.

19          And so -- I lost my train there.

20          What was your question?

21   Q.  What was the purpose?

22   A.  The purpose.  The purpose.

23          He said -- Mr. Pinchuk said to me, We need a common

24   database as to what happened and what the evidence is.  A

25   common database that people who are going to be debating this

1    and discussing it and taking positions about it could not

2    ignore and had to deal with.  And he said, What's happening

3    now, of course, in this debate that's going on, is people are

4    making claims about the trial without any evidence to support

5    the claims, and it's just a storm of rhetoric and anger.

6         And he thought that by writing a report, we would

7    bring together, at least, a common understanding of what the

8    facts were associated with this trial.

9    Q.  What was the importance of your independence in this

10   engagement?

11   A.  Well, it was everything, I think.  We needed to be able to

12   make our own decisions about who we were going to talk to.

13        I don't think I've explained, but one of the

14   conditions of us taking this assignment was to get a guarantee

15   from the government of Ukraine that we would have access to

16   people that were relevant to our inquiry.  We would be able to

17   talk to prosecutors, investigators, government witnesses, the

18   judge.  We would be able to talk to the defendant.  She was in

19   a hospital prison.  And if the government wasn't going to let

20   us talk to her, that would make it impossible for us, I think,

21   to write a report.

22        So, we needed their cooperation.

23   Q.  And what about the independence of the conclusion?

24   A.  The independence of the conclusions was absolutely vital.

25   We had to be able to make our own judgment as to whether or

1    not, through the prism of the Western due process principles,

2    she had gotten a fair trial.  And we were zealous in our

3    defense of our independence when it came to those conclusions.

4    Q.  Mr. Craig, did you view the Report as part of a larger

5    public relations plan for Ukraine?

6    A.  No, I did not.

7    Q.  Did Mr. Manafort ever tell you that he viewed the Report as

8    part of a larger public relations plan for Ukraine?

9    A.  No.  No.

10    Q.  Mr. Craig, did you hear the testimony of Alex Haskell and

11    Allon Kedem about how the project was done?

12    A.  I did.

13    Q.  And was their testimony accurate?

14            MR. CAMPOAMOR-SANCHEZ:  Objection.

15            THE COURT:  Sustained.

16            I don't think one witness can comment on another

17    witness's --

18    BY MR. TAYLOR:

19    Q.  Well, to your recollection?

20            THE COURT:  Why don't you just ask him about how it

21    was conducted.

22            MR. TAYLOR:  I thought I would avoid having to do

23    that, since we already have a lot of testimony in the record

24    about it.

25            THE COURT:  Well, I think, technically, you can't ask

 1    one witness to endorse another.

 2            THE WITNESS:  I can do it briefly.

 3            THE COURT:  Ask the next question.

 4            THE WITNESS:  I can do it --

 5            THE COURT:  Wait.

 6            Let's have a question on the record before you answer

 7    it briefly.

 8    BY MR. TAYLOR:

 9    Q.  All right.  Mr. Craig, how was the project done?  Tell us

10    the steps that you went through.

11    A.  We identified the exhibits that we needed, the documents

12    that had been used at the trial, the documents that had been

13    created by the prosecution in the course of the investigation

14    and the trial.  And those were in categories.  Like, there were

15    pretrial interviews of the various witnesses, all in Russian,

16    that we had to get translated.  There were transcripts of the

17    trial that we had to get translated.  We also had the exhibits

18    themselves in the trial that were all in Russian or Ukrainian.

19            So that was the category of documentary evidence that

20    we needed to be able to consult.

21            We also needed to be able to talk to witnesses who

22    had testified and witnesses who had not testified.  There were

23    many witnesses that the defense wanted to call but were not

24    allowed to call to testify at the trial.  We wanted to find out

25    what they would say, had they been called to testify, and

1    whether that was a meaningful denial or was it a harmless

2    denial of rights to call your defendants -- or, your defense

3    case.

4            So, it was a series of interviews of investigators,

5    as well as other -- other individuals involved in the trial.

6    Let me give you an example.

7            The president that was responsible at the time

8    Ms. Tymoshenko was minister -- was prime minister was

9    President Yushchenko.  And Yushchenko was an ally of the prime

10   minister in the Orange Revolution.  We interviewed him two or

11   three times because he had relevant information to give to us

12   about what had happened when she went and negotiated this

13   agreement with Putin in Russia.

14           And he was the one who actually launched the first

15   investigation of Tymoshenko, as to whether or not she'd engaged

16   in these activities lawfully and whether the agreement was

17   lawful.  So we had to talk to him.

18           There was probably 25 or 30 witnesses, all of whom

19   had to have translators or interpreters.

20   Q.  What was Mr. Sloan's role?

21   A.  He was really -- he came over and helped us.  I mean, he

22   was there at the interview of Ms. Tymoshenko, when that was

23   conducted.  So he did have experience with the investigation.

24           But, his primary job was to organize the data and the

25   writing of the Report.  And so he had four or five lawyers at

1   the Skadden office in Washington, D.C., doing that because that

2   was the location of where we were writing the Report.

3   Q.  And what about yourself?  What role did you play?

4   A.  Well, I was -- I went to, by my count, between April and

5   July -- middle of July, I went back and forth to Ukraine eight

6   times.  And most of that period of time was spent on the

7   ground, interviewing people that were critical to our

8   understanding of the trial and the sentencing.  I think we

9   interviewed the judge that presided over the trial three times.

10  Q.  All right.  And did there come a time when a report was

11  written?

12  A.  I would say, in July, we were working on it.  I think Allon

13  was working on it end of June, early July.  I think the first

14  draft was competed around July 27th, 2012.

15  Q.  Would you look at Government's Exhibit 387, please?

16          It's in a separate binder, Mr. Craig.

17  A.  Oh, it's the Report.  This is the Report.  Okay.  Yeah.

18  Q.  What is Government's Exhibit 387?

19  A.  This is our Report.

20          MR. TAYLOR:  It's in evidence, Your Honor.

21          THE COURT:  All right.

22  BY MR. TAYLOR:

23  Q.  Could you explain to the jury how it's put together?

24  A.  Yeah.  It's fairly straightforward.  It's about 185 pages

25  of writing, and then there's another 120 pages of appendices.

1          But, it has an executive summary, four or five pages

2     long, that really tries to summarize the findings of the

3     Report, if you don't want to go through all 185 pages.

4          It has two, sort of, historical components to it.

5     One is a brief history of the Russia, Ukraine gas issue and

6     conflict, which has been going on for years and years.

7          And then the second chronological, sort of historical

8     narrative -- I'm in the table of contents here, yeah -- had to

9     do with the specifics of the 2008, 2009 gas dispute, which

10    resulted in the negotiations in December and January 2008, 2009

11    that was the subject matter of the prosecution of Ms.

12    Tymoshenko.

13         The allegation was that she had exceeded her

14    authority and abused her power and entered into an agreement

15    that she was not authorized to enter into.  That was the

16    dispute.

17         And, so, the third part is a definition of the

18    offense and a discussion of the judge's opinion.

19         The core of the -- the core of the Report, really, is

20    the 100 pages, from 82 to 185, which deals with the eight due

21    process claims that she made with respect to whether she got a

22    fair trial.  And, as you can see from the table of contents,

23    those eight due process issues are each addressed in separate

24    subsections of the Report.  And then the conclusion is only two

25    or three pages, at most, I think.

1          That's the way it was structured.

2    Q.  Does the executive summary contain a discussion of the

3    conclusions?

4    A.  It does, yes.

5    Q.  And what conclusions did you draw, if you remember, on her

6    claims of violations of due process?

7    A.  Well, there were three that, I think, were critical.  And I

8    would go to page 4 of the executive summary.

9    Q.  So we're now looking, Mr. Craig, at page 4 of the executive

10   summary?

11   A.  Right.

12   Q.  Which one of these paragraphs would you call to our

13   attention as reflecting a conclusion?

14   A.  I would -- there's a bullet point called "Detention."

15   Q.  Yes, sir.

16          THE COURT:  Are all the paragraphs different

17   conclusions?  Is that what the bullets are?

18          THE WITNESS:  Yes.

19          THE COURT:  This is the one that you're saying is one

20   of the three that were critical?

21          THE WITNESS:  Yes.

22          THE COURT:  Okay.

23          THE WITNESS:  I'm directing you to the three

24   conclusions that we made that resulted in our finding that she

25   did not get a fair trial.

1    BY MR. TAYLOR:

2    Q.  And what conclusion did you draw about her detention?

3    A.  We noted that sometimes it is justifiable to detain a

4    defendant, if the defendant is disrupting the Court in such a

5    fashion that you cannot conduct the proceedings.  But, we also

6    point --

7    Q.  Had Ms. Tymoshenko been disruptive?

8    A.  She had been, in our judgment, and we made that point.  And

9    we say, if you want to see it, "Using detention to achieve that

10   objective, as the Court did in this case, is an accepted but

11   rarely used practice in Western courts.  But, we find under

12   Western standards, that the decision to detain Tymoshenko for

13   the entire balance of her trial and after the trial had

14   concluded, before she had been found guilty, before she had

15   been sentenced, without adequate justification or review,

16   raises concerns about whether she was inappropriately deprived

17   of her liberty prior to her conviction."

18              Now, "inappropriately deprived of liberty" raises

19   questions of whether the presumption of innocence is being

20   respected, and that's a violation of due process.  The fact

21   that she was kept in jail, that she was -- the reasons for

22   keeping her in jail were not reviewed or not explained, we

23   found to be a troublesome violation of her due process rights.

24              The next one had to do with the representation by

25   counsel.

1          We looked --

2    Q.  This is -- for the record, you're looking at the same page,

3    subparagraph?

4    A.  Yeah, the next bullet point down.

5          We identify her argument that the Court violated her

6    right to adequate representation by examining witnesses in the

7    absence of defense counsel, and by failing to adjourn the

8    proceedings to allow her to acquire new legal representation.

9    We found that that happened.  We found that there were critical

10   prosecution witnesses that came in and testified against her

11   when she did not have counsel present to participate in a

12   cross-examination or presentation of her defense.

13         That is a core value of our system of justice in the

14   United States and in the West, and we found that to be a

15   violation of the right to assistance of counsel under Western

16   standards.

17         Now, let me just point to something here.  We discuss

18   it at greater length, as you can see, between pages 143 to -61

19   of the Report.  So, if you read that executive summary

20   reference in that bullet point, that will send you right to

21   pages 143 to -61 in the Report for a full discussion of the

22   facts in the case.

23         The third point, and the last point I would make,

24   Mr. Taylor, is the one having to do with the right to present a

25   defense, and that's the next bullet point down.

1          During the period of time that a crime is being

2     investigated in Ukraine, the defense has an opportunity to tell

3     the investigators, We want you to see and talk to these

4     witnesses.  And she did.  She identified a large number of

5     witnesses that she asked the investigators to talk to.  And

6     they concluded that she had not been timely in that request

7     and, so, they didn't do that, and her request was denied.

8          During the trial, she identified a number of

9     witnesses that she wanted to call in her defense -- in support

10    of her defense, and the judge refused to permit those witnesses

11    to testify, all but two.  She only had two witnesses that she

12    was allowed to call in her defense at the trial.

13         We found that to be a violation of her ability to

14    present a defense and wrote, "Under Western standards of

15    fairness, we believe that the Court's decision not to call

16    certain defense witnesses compromised Tymoshenko's ability to

17    present a defense."

18         And then you can see we refer you to a 14-page

19    segment.

20    Q.  Were there certain conclusions, Mr. Craig, that you wanted

21    the Report to make clear you did not draw?

22    A.  Yes.  For example -- I think we've talked about this

23    earlier today, Mr. Taylor -- we made it clear that we were not

24    going to opine, for a number of reasons, on whether she was

25    guilty or innocent of the charges that had been brought against

1    her under Ukraine law.  For one thing, we were not experts in

2    Ukraine law, and we really could not opine as to whether the

3    components or the various requirements of Ukraine law had been

4    met.

5            But, secondly, matters that are often tested in a

6    courtroom involve demeanor testimony and credibility judgments.

7    And since we couldn't have been there or talk about the

8    demeanor or the credibility of certain witnesses, we didn't

9    think it would be wise for us to opine about credibility.  And

10   that prevented us, I think, from opining about guilt or

11   innocence.

12           Now, we made that clear at the beginning, that we

13   were not going to be able to opine about guilt or innocence.

14   What we did, instead, was we laid out the evidence that the

15   government presented that they argued showed her guilt, and we

16   laid out the evidence that she presented that she argued showed

17   that she was innocent.  And people could make up their own

18   minds.

19   Q.  Was there anything else that you wanted to make clear in

20   the Report that you were not deciding?

21   A.  We were not opining, we were not giving an opinion, we were

22   not making a judgment as to whether or not the prosecution had

23   been politically motivated.  And let me explain, just briefly,

24   why we thought we had to do that.

25           We are being hired as experts on the rule of law and

1    understanding due process standards as it applies to the

2    criminal justice system in the west and applying those

3    standards and principles and values to this particular

4    proceeding.

5         We were not being hired as experts in Ukrainian

6    politics.  We had no ability to understand the various

7    alliances or alignments or personalities, financial issues that

8    might have motivated people to do X or Y.  So, we steered clear

9    of trying to -- and we did not -- and explicitly did not

10   express an opinion as to whether the prosecution had been

11   politically motivated.  And you'll see that, Mr. Taylor, on

12   page 5, the top bullet point.

13        "In this report, we do not opine about whether the

14   prosecution was politically motivated or driven by an improper

15   political objective, i.e., to remove her from political life."

16   Q.  Mr. Craig, is there anywhere else in the Report where you

17   summarize the conclusions?

18   A.  At the conclusion of the Report.  I'd say, page 183.

19   Q.  Could I turn your attention, please, to 183?

20   A.  That's 185, is where the conclusions are.

21        But, could I draw your attention to 183, where we say

22   it again?  "We have not been asked to opine and do not opine

23   about whether this prosecution was politically motivated or

24   driven by an improper political objective."

25        So, that statement appears not once, but twice in

1    this report.

2            The conclusions appear in the next page, at page 185

3    and 186.  And you can see that the third conclusion, "The

4    Court's decision not to permit the defendant to call certain

5    witnesses and to allow important witnesses to testify while

6    Tymoshenko was unrepresented by counsel would constitute

7    violations of due process in Western courts."

8    Q.  Mr. Craig, when was the Report finished?

9    A.  I think it was finished in September of 2012.

10   Q.  When did you deliver it in final form to the Ukraine?

11   A.  In final form, we tried to deliver it in September, but

12   were not successful.  I think it finally ended up in the hands

13   of the Ukraine government in November.

14   Q.  When did you give a draft of the Report to anyone from the

15   Ukraine?

16   A.  We provided a draft to Mr. Manafort on July 27th.  That was

17   the first draft of the Report.

18   Q.  Did you receive any messages or information from the

19   Ukraine about how it viewed the conclusions in the Report?

20   A.  Well, during the entire month of August and into September,

21   there were efforts to try to change those conclusions, to try

22   to change the Report in substantive ways.

23   Q.  May I show you Defense Exhibit 88, please?

24           THE COURTROOM DEPUTY:  Counsel, is this in evidence?

25           MR. TAYLOR:  Yes.

1           THE COURT:  Yes.

2   A.  Okay.  I've got it.

3   BY MR. TAYLOR:

4   Q.  You have it?

5   A.  Yep.

6   Q.  What is this, Mr. Craig?

7   A.  This is a series of emails between me and Paul Manafort.

8   Q.  What are you talking to him about?

9   A.  I think we're talking about how we're going to organize the

10  translations.  It was important that this report be translated

11  into Russian and Ukraine languages, as well as in English.  And

12  one of the things I did not want to have happen was for Ukraine

13  to have its own Russian translation of our report, and claim

14  that that Russian translation said X when our English

15  translation report said Y.

16          You did not want to have dueling reports out there.

17  So, I wanted to make sure that we had control over all of the

18  reports, Ukraine, Russian, and English.

19  Q.  And you reference the word "leak" in your email to

20  Mr. Manafort --

21  A.  Well, I --

22  Q.  -- do you remember -- do you remember what you were

23  concerned about?

24  A.  I was concerned that a draft of the Report might be leaked,

25  and --

1    Q.  To whom?

2    A.  -- that a false description of the Report would appear in

3    the public domain.  And that, I think, this email from me to

4    Paul Manafort on July 30th reflects that.

5    Q.  More specifically, Mr. Craig, you were afraid that the

6    Report would be leaked to whom?

7    A.  To -- to anybody that was not going to be true to the

8    Report.  I mean, it was -- I was concerned that it could be

9    leaked to the press.  It could be leaked to other people that

10    didn't have -- had no -- no respect for the -- what the Report

11    stood for.

12         And my nightmare, as I reflect here in this letter --

13    or, in this email to Manafort, is that I would wake up one

14    morning and see some headline in some newspaper based on a leak

15    that falsely described the findings of the Report, saying,

16    Skadden finds Tymoshenko guilty, or Skadden Report exonerates

17    Ukraine.  We would be forever climbing out of that hole, if

18    that happened.

19         So I was expressing my concern to Manafort, saying

20    that kind of a story would be a disaster.  We've got to work

21    together to make sure it doesn't happen, and there are no

22    leaks.

23    Q.  You used the word "nuanced."

24         What did you mean by that?

25    A.  Well, I think I was just understating my view that what we

1    wanted, really, was an honest report -- an honest analysis of

2    our report when it got out, rather than someone

3    mischaracterizing it.

4    Q.  Did Mr. Manafort respond?

5    A.  He tells me -- he reassures me.  He says, I'm on top of the

6    leak situation.

7              And he agreed that we should be doing the translation

8    and submitting both the Russian, Ukrainian, and the English

9    versions at the same time.  And he agreed that by doing it that

10   way, it would dramatically reduce the risk of a leak.

11   Q.  Mr. Craig, I'm not sure we understand what the context of

12   this is.  Could you -- can you enlighten us on what

13   Mr. Manafort is referring to as the "leak situation," and why

14   the issue of translation of the Report is relevant to the leak

15   situation?

16             MR. CAMPOAMOR-SANCHEZ:  Objection.  Asked and

17   answered.

18             THE COURT:  All right.  Sustain the objection.

19             I think he just explained it, and I don't -- he

20   explained what his concern was, and now you're asking him to

21   say what Manafort's concern was when Manafort was responding to

22   the email where he said what his concern was.

23             So, I'll sustain the objection.

24             MR. TAYLOR:  Well, Your Honor, can we approach?

25             THE COURT:  Yes.

1          (Bench discussion:)

2          THE COURT:  I mean, you asked multiple questions:

3   What did you mean about the translation?  What did you mean

4   about the leak?

5          And he said, "I was concerned that if we didn't do a

6   translation, Ukraine could translate it its own way and it

7   wouldn't be fair to the Report."

8          And then he said that he's talking about a leak.  "I

9   was concerned that it could be a direct leak with a false

10  description."

11         And you said, "Well, who were you concerned about it

12  being leaked to?"

13         And he said, "Anybody who wasn't going to be true to

14  the Report, respectful of the Report.  The press.  Anybody."

15         And, so, then Mr. Manafort says, I think -- you know,

16  agreed about the leak situation.  And now you're asking him,

17  What did Manafort mean by that?

18         MR. TAYLOR:  No.  No.

19         THE COURT:  And you started by saying, "I don't think

20  it's clear what we mean by a leak situation."

21         And maybe you were focused on what your next question

22  was, but -- and I think he said it in great detail.

23         MR. TAYLOR:  Well, what Manafort tells him his

24  concern is is relevant to Mr. Craig's state of mind.  But, I --

25         THE COURT:  What Manafort says is fine.  And you

1    already said, "What did Manafort say?"

2              And he said, "He agreed with me and said that we

3    should do the translation."

4              So, you can certainly ask him what Manafort said,

5    which I think he's already read to you.

6              MR. TAYLOR:  I agree.

7              THE COURT:  Okay.  All right.

8              MR. TAYLOR:  I think it's a little vague, just

9    reading the email.

10             MR. CAMPOAMOR-SANCHEZ:  Well, he explained it.

11             THE COURT:  He explained it.

12             MR. CAMPOAMOR-SANCHEZ:  I think the way I'm

13   perceiving it is, Mr. Taylor was not satisfied with the

14   explanation that the witness gave and is trying to give him

15   another chance in doing it.

16             THE COURT:  He has explained it.

17             MR. CAMPOAMOR-SANCHEZ:  Right.  So --

18             THE COURT:  So, ask your next question.

19             (Open court:)

20   BY MR. TAYLOR:

21   Q.  Let me show you Defense Exhibit 107, Mr. Craig.

22             What is this document?

23             MR. TAYLOR:  Also in evidence, Madam Clerk.

24             THE CLERK:  Thank you.

25             THE WITNESS:  This, as well, is an exchange of emails

1    between myself and Paul Manafort.

2    BY MR. TAYLOR:

3    Q.  And where does it start?

4    A.  It starts at the bottom, and it's dated Sunday, September

5    2nd, 6:30 a.m. in the morning.  And the subject line says,

6    "Concern."  And it reports that Mr. Manafort's assistant,

7    Konstantin Kilimnik, had met with Hawker to review Hawker's

8    opinion of the Report and how to sell it.

9            I'm quoting from the --

10   Q.  Now, again, slow down.

11   A.  Okay.

12   Q.  Who's Mr. Kilimnik?

13   A.  He's an assistant.  He works for -- I think he works for

14   Manafort.

15   Q.  All right.  And who has he met with?

16   A.  According to Mr. Manafort, he's telling me that Kilimnik

17   met with Hawker and wanted to review Hawker's opinion of the

18   Report and how to sell it.  And Manafort is saying, "I wanted

19   to understand how he" -- Hawker -- "perceived the media's

20   reaction to it."

21           And Manafort tells me that Hawker's reaction has

22   caused him alarm.  And it is Hawker's opinion that the media

23   will see this report as a vindication of Tymo's position --

24   that's Tymoshenko -- and that the international community will

25   come down hard on Ukraine.

1          And if you go to the last sentence of his email to

2    me, he says, "Given Hawker's opinion, I need your ideas on how

3    we deal with this potential catastrophe."

4    Q.  What did you understand the "potential catastrophe" to be?

5    A.  Well, I --

6          THE COURT:  Well, what it meant to you.  That's fine,

7    he can answer.

8          THE WITNESS:  Well, what it meant to me was that they

9    viewed the publication of our report, in its present state, as

10   a catastrophe for Ukraine.

11   BY MR. TAYLOR:

12   Q.  And what was your response?

13   A.  I said, "I can talk later today.  Should I call you?"

14         He then told me he was in Europe.  He said, "We can

15   speak about 6 p.m. New York time."

16         I then wrote back and said to him, "I didn't get

17   Hawker's comments.  He hasn't read it yet."

18         Now, attached to this email chain are Hawker's

19   comments.

20   Q.  Right.  Why did you say, "He hasn't read it yet"?

21   A.  Well, I didn't think that we had provided -- certainly I

22   didn't know we had provided a draft of the Report to

23   Mr. Hawker, as of that date.

24   Q.  Did you know that Mr. van der Zwaan had given Mr. Hawker a

25   look at the Report, contrary to your instruction?

1    A.  I did not.

2    Q.  Were there requests -- did you receive requests from the

3    government of Ukraine for changes to the Report?

4    A.  I had been already.  During the month of August, we had

5    gotten four or five specific requests to try to change this or

6    to try to change that.  It continued throughout September, I

7    think.

8    Q.  Mr. Craig, what was Mr. Manafort's role in this exchange of

9    communications between you and the government of the Ukraine?

10   A.  Prior to this August, September timeframe, Paul Manafort

11   really wasn't very much on the scene.  In fact, when we were

12   doing our investigation, we had very little or limited contact

13   with Manafort.  We were about the business of interviewing

14   people and gathering documents and translating and doing the

15   work of the investigation.

16        When we sent the draft on July 27th to Mr. Manafort,

17   he suddenly became a much more visible and active interlocutor

18   between the Skadden team and the government of Ukraine.  And

19   what he did, I think, during August and September, was to

20   preside over the effort to try to change the conclusions of the

21   Report.

22   Q.  Let me show you Defense Exhibit 109, please.

23   A.  Yeah.  This is -- do you have a question?

24   Q.  Yes.

25        I want to know, Mr. Craig, if this is an email chain

1    from Manafort to you and your response.

2    A.   It's a September 3rd email from Paul Manafort on wrapping

3    up.

4    Q.   "Wrapping up."

5             Where do you get that?

6    A.   The subject line says, "Urgent.  Actions this week,

7    wrapping up."

8    Q.   And what about the substance, or the content of the email

9    from him to you.  What's he telling you?

10   A.   He is urging me, I think, to view the final comments as a

11   specific request that the information be used to revise our

12   conclusions.

13   Q.   Referring you to paragraph -- numbered paragraph Number 1.

14   A.   He says there, "The submission today" -- which is their

15   final comments -- "is the definitive and final version."

16            And he says, "They" -- whoever had made these

17   proposals -- "say that our review should have no trouble -- no

18   problem incorporating most of their final comments, and to

19   revise several of our conclusions."

20   Q.   Mr. Craig, what did he say about whether these were the

21   last comments that he expected to give you?

22   A.   He said, "These are the final comments.  The submission

23   today is their definitive and final version."

24            And says that the -- that whoever he's speaking for

25   thinks that there are inaccuracies in our report, and we should

1    have changes.

2    Q.  Did it turn out that these were the Ukrainian's definitive

3    and final version of comments?

4    A.  No.  They kept making efforts to change our report.

5    Q.  All right.  Let's look at your response, please.

6              I want to call your attention to a paragraph of it.

7    A.  I think the best way of -- what's your question?

8    Q.  I want you to look at the fifth line down, the sentence, "I

9    haven't seen their comments."

10             Just read that from that line down to "factual

11   dispute."

12   A.  In this email, I am telling Mr. Manafort, with a copy to my

13   partner, Cliff Sloan, that "I haven't seen the comments you're

14   referring to.  But, if they are comparable to the comments we

15   have seen before, they" -- whoever is proposing these

16   comments -- "will be disappointed in our response.  I have

17   explained to you from the beginning that when it comes to

18   disputed evidence, we respectfully decline to sign up with one

19   side or the other.

20             "We will be comprehensive and detailed in laying out

21   the evidence, and we will demonstrate beyond any doubt that the

22   Court's verdict was based on evidence in the record, but we

23   won't take sides when there's a factual dispute."

24             I'm explaining that to him, yet one more time.

25   Q.  Okay.  Look at Defense Exhibit 178, please.

```
 1              THE COURTROOM DEPUTY:  Is this in evidence, Counsel?
 2              MR. TAYLOR:  Yes.
 3              THE COURTROOM DEPUTY:  Thank you.
 4    A.  Yes, sir.
 5    BY MR. TAYLOR:
 6    Q.  Can you identify this?
 7    A.  This is an email that I got from Paul Manafort on October
 8    8th.
 9    Q.  Does it have an attachment?
10    A.  It does.
11    Q.  What is it?
12    A.  It's a -- another -- the attachment is another email -- or,
13    it's a memo from Manafort to me --
14    Q.  About what?
15    A.  -- about the Report update.  And it's dated October 4th,
16    which is four days earlier.
17    Q.  What's the memo about?
18    A.  I think he's trying to make additional changes in the
19    Report.
20    Q.  And do you remember what your team did when it received
21    requests for changes in the Report?
22    A.  There was sort of a subgroup of us, four of us, I think,
23    that met on a regular basis in my office when comments came in.
24    And we had a pretty serious routine to deal with these comments
25    and to evaluate them and to see if there was, in fact, a need
```

1    for clarification -- a need for factual correction.  And the

2    members of the team were Cliff Sloan, myself, Allon Kedem, and

3    Alex Haskell.

4             And we must have met four or five times to consider

5    these various efforts to change the Report.  And we sometimes

6    recognized that there were clarifications that were warranted,

7    but, by and large, we made no substantive changes in the

8    conclusions of the Report.

9    Q.  Did you say anything to Mr. Manafort about your reaction to

10   the changes?

11   A.  Well, at one point I told him we were going to go -- he

12   should stop sending these in because it's a waste of our time,

13   something like that.

14   Q.  Look at Defense Exhibit 177.

15   A.  177?

16   Q.  Yes, sir.

17            THE COURTROOM DEPUTY:  This is in evidence?

18            MR. TAYLOR:   (Nods head.)

19   A.  Okay.

20   BY MR. TAYLOR:

21   Q.  What is this, sir?

22   A.  I'm responding to the email that we just discussed -- I

23   mean, actually, I'm responding to the memo that Manafort sent

24   to me on October 8th, with the attachment of the October 4th

25   memo.

1    Q.  Looking at the last paragraph in your email to Mr.

2    Manafort.

3            What do you tell him?

4    A.  Well, I'm saying to whoever he's speaking for -- it could

5    be the president, it could be the Ministry of Justice, it could

6    be the procurator general -- I'm saying, "If they want to take

7    the position that the Report is incomplete and factually

8    deficient, they are, of course, free to do so.  As far as we

9    are concerned, Ukraine has had plenty of time to comment, and

10   we have been more than accommodating in responding to those

11   comments."

12   Q.  And if you wouldn't mind, also, let's look at Defense

13   Exhibit 180.

14           Is this an email that you sent, Mr. Craig, on or

15   about October 8th?

16   A.  Are you talking the one on the --

17   Q.  Bottom.

18   A.  -- bottom of the email chain?

19           This is an email that I sent to Cliff and to -- this

20   is our team.  This is, really, our team, and I -- I am

21   complaining -- I'm giving them my reactions to the October 4th

22   note from Mr. Manafort.

23   Q.  What do you say at the bottom of that email, Mr. Craig?

24   A.  Well, I invite their thought or their input.  And I say, "I

25   am close to telling them to pound sand.  And if they don't want

1    to publish it, so be it.  If they want to publish it and then

2    criticize it, so be it."

3    Q.  What did you mean by that?

4    A.  I was getting impatient, very impatient, with their efforts

5    to try to change, amend, modify, whether it was factual

6    disputes, substantive conclusions, word choices, footnotes,

7    including documents.  I was getting impatient with this

8    process.  And I had told Manafort, in September, that it was

9    done, and I wanted to deliver it.

10   Q.  Did you ever get a message that people in Kyiv and the

11   president were insisting on changes being made before the

12   Report is delivered?

13            MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.

14            THE COURT:  All right.  Why don't we approach?

15            MR. TAYLOR:  I have an email I'm going to show him.

16            THE COURT:  Mr. Taylor --

17            MR. TAYLOR:  I'm sorry.

18            THE COURT:  -- that's the point of asking you to

19   approach.

20            (Bench discussion:)

21            MR. CAMPOAMOR-SANCHEZ:  Your Honor, I'm really trying

22   not to object, but I think this is all irrelevant.  The point

23   has been made that he -- changes that weren't going to be

24   changes.  But, now, he's wanting to try to get him to testify

25   and get hearsay about what other people thought are the reasons

1   why the Report was or wasn't being accepted.  It's totally

2   irrelevant.

3           THE COURT:  What is the email?  To him or from him?

4           MR. TAYLOR:  It is from Konstantin Kilimnik to

5   Alexander van der Zwaan.  It says, "Our friends in Kyiv and

6   client insist that these changes be made before the delivery of

7   the Report."

8           THE COURT:  Okay.  So, Kilimnik is saying that to

9   Alex van der Zwaan.  Kilimnik is not here to be cross-examined

10  about what he said.

11          MR. TAYLOR:  Van der Zwaan passes the email to Craig.

12          THE COURT:  He gets the email, which still contains

13  hearsay --

14          MR. TAYLOR:  Absolutely.

15          THE COURT:  -- about what the Ministry of Justice

16  said.  So you're putting it in for the truth --

17          MR. TAYLOR:  No.

18          THE COURT:  Well, the question you asked is, "Were

19  you told that Ukraine wanted changes before it published it?"

20          You're trying to establish that that's why it wasn't

21  published at that time, because they didn't change it.

22          MR. TAYLOR:  I'm not.  I'm trying to establish what

23  Mr. Craig knew about the government of the Ukraine's attitude

24  towards the Report.  It's classic state-of-mind evidence,

25  notwithstanding --

```
 1              THE COURT:  Why is his state of mind relevant?  I
 2    mean, we've drawn out the fact that he didn't care whether they
 3    published it or not, and that he was beginning to think they
 4    might not, or they might publish it and then say it was bad,
 5    and that was fine by him.  He brought that out.
 6              So, why is this relevant?
 7              MR. TAYLOR:  Two reasons:  One is, it demonstrated to
 8    Mr. Craig why they would want to lie about it.  And, two --
 9              THE COURT:  Well, then you are making --
10              MR. TAYLOR:  It's what Mr. Craig believes, Your
11    Honor.  This is all about what Mr. Craig believed.
12              But, secondly --
13              Mr. Campoamor?
14              MR. CAMPOAMOR-SANCHEZ:  I did not mean to interrupt
15    you.  Go ahead.
16              THE COURT:  And you probably shouldn't laugh, either.
17              MR. TAYLOR:  And the second is, he is accused of
18    omitting the fact or lying about the fact that he knew what
19    Ukraine was going to do with the Report at various points in
20    time.  It is a point of accusation that he lied about when he
21    said he didn't know what they were going to do.  And this is
22    proof of what he knew about -- or not, about what they were
23    going to do.  It proves directly that he was up in the air.
24              THE COURT:  They're saying they don't want it.  This
25    isn't about what they're going to do when they get it; this is
```

1    that they don't like it.  And I think we've been through a lot

2    of emails where he was personally asked to fix this or fix that

3    and his response to all of it.

4              I think what Kilimnik said to van der Zwaan about

5    what the administrator said to Kilimnik...

6              MR. TAYLOR:  Alex is --

7              THE COURT:  I mean, we did the -- we were very

8    careful.  You know, you have made a lot of objections about

9    what Manafort said to anybody throughout the government's case

10   because he's not here.  And I think you are trying to get into

11   what he understood the actual intentions were of the Ministry

12   of Justice.  You know, every time you say why it's important --

13             MR. TAYLOR:  That's a question in the case, what he

14   understood the intentions of the Ministry of Justice to be.

15   That is an allegation in the indictment --

16             THE COURT:  Upon receiving this report.

17             This email says what?

18             MR. TAYLOR:  It tells him they may not ever take it.

19             MR. CAMPOAMOR-SANCHEZ:  He has already testified that

20   he believed that Hawker, on behalf of the Ukraine, was trying

21   to make corrections to the Report.  And that was his belief

22   when he contacted Sanger and did all the things he did.  He --

23   you got that evidence in.  That's his belief; it's in.

24             Now, as to what the Ministry actually believed itself

25   or why it was doing these actions, I don't think that's

1    relevant.

2            MR. TAYLOR:  To repeat myself, it's not what the

3    Ministry believed; it's what Mr. Craig believed about the

4    Ministry's intention.

5            MR. CAMPOAMOR-SANCHEZ:  And he testified about it,

6    what he believed.

7            MR. TAYLOR:  Then the objection is, it's cumulative,

8    and that's all.

9            THE COURT:  Can I see the document?

10           MR. TAYLOR:  Yeah.  It's in evidence.

11           THE COURT:  I know.

12           MR. TAYLOR:  I'm sorry.

13           THE COURT:  I'm not saying it's not in evidence.  I

14   just wanted to see it.  It wasn't an accusation.  I just need

15   to look at it.

16           (Pause.)

17           THE COURT:  All right.  I think we've already seen

18   all of this.  So, you can ask him if Mr. van der Zwaan

19   forwarded him this email and what it said.

20           MR. TAYLOR:  That's all I want to do.

21           THE COURT:  If that was communicated to him.

22           (Open court:)

23   BY MR. TAYLOR:

24   Q.  Showing you Government's Exhibit 279, Mr. Craig.

25           What is this?

1    A.  This is an email that was sent to me by Alex van der Zwaan

2    that attaches an email from Mr. Kilimnik with additional

3    comments from the Ministry of Justice.

4    Q.  And what does Mr. Kilimnik say to Mr. van der Zwaan?

5    A.  He's sending the attached pages, and said, "I got this from

6    our friends at the Ministry of Justice today."

7            And I think he means in the morning.

8            "They, as well as our client" -- when he says "our

9    client," I think he's talking about Yanukovych -- "they" -- the

10   Ministry of Justice -- "as well as our client" -- the

11   president -- "insist that these comments are reviewed and taken

12   into account before the Report is delivered."

13   Q.  Thank you, sir.

14           Mr. Craig, did you draw any conclusions from the

15   continuing effort to get changes made as to what the government

16   of the Ukraine intended to do with the Report?

17   A.  I had no idea what they were going to do with the Report.

18   I drew one conclusion, was that they didn't like the

19   conclusions that we had made in the Report, and I didn't know

20   what they were going to do with the Report.  I thought it was

21   highly likely that they were just going to kill the Report.

22   Q.  When did you first try to deliver the Report?

23   A.  I think we tried to deliver it in New York the week of

24   September 23rd, when the United Nations General Assembly was

25   going on and a delegation of Ukrainian leaders were in the

1     city.  And I think that was the time that we first tried to

2     deliver the Report.

3     Q.  And what happened?

4     A.  They would not take it.  You know, it's my understanding

5     that Alex, who was given the three copies of the Report, went

6     and tried --

7               MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.

8               THE COURT:  Wait.

9               Without saying what somebody said to you, they tried

10    to deliver it, and was unsuccessful?

11              THE WITNESS:  That's correct.

12              THE COURT:  All right.

13              Ask your next question.

14    BY MR. TAYLOR:

15    Q.  Did you receive information as to how it was attempted to

16    be delivered?

17              MR. CAMPOAMOR-SANCHEZ:  Objection.

18              THE COURT:  By whom?  From whom?

19              THE WITNESS:  I can't hear you, Mr. Taylor.

20              I can hear you, Your Honor, but I can't hear --

21              THE COURT:  All right.

22    BY MR. TAYLOR:

23    Q.  Did you receive information from Mr. van der Zwaan as to

24    what efforts were made to deliver?

25              THE COURT:  Do you have an objection to that

1    question?

2          MR. CAMPOAMOR-SANCHEZ:  No.  If it's not the content,

3    no.

4          THE COURT:  All right.

5          So, he's asking the question:  Did you receive

6    information from Mr. van der Zwaan about how the attempts were

7    made?

8          THE WITNESS:  Yes, I did.

9          THE COURT:  All right.

10   BY MR. TAYLOR:

11   Q.  And what did you learn?

12   A.  I learned that he had --

13         THE COURT:  Well, are you objecting or not?  You

14   can't just make a face.

15         MR. CAMPOAMOR-SANCHEZ:  Yes.  Yes, I am objecting.

16         THE COURT:  All right.  Sustained.

17   BY MR. TAYLOR:

18   Q.  Let me show you Defense Exhibit 186, please.

19         THE COURTROOM DEPUTY:  Is it in evidence?

20         MR. TAYLOR:  Yes.

21         THE COURTROOM DEPUTY:  Thank you.

22   BY MR. TAYLOR:

23   Q.  What is 186, Mr. Craig?

24   A.  This is an email that I sent -- if you start at the second

25   page, Mr. Taylor, I sent to Mr. Manafort on October 16th.

1   Q.  And what do you say to Mr. Manafort?

2   A.  I told him that I'd just spoken with Alex -- and that would

3   be van der Zwaan -- "and he told me that you/Rick Gates have

4   instructed him not to deliver the final report to Kyiv."

5           This is in October.

6           "Paul, the Report has been done since September 17th.

7   As you know, we tried to deliver it to the chief of staff in

8   New York City, as well as to the Ministry of Justice during

9   UNGA."

10           "UNGA" is the United Nations General Assembly.

11           "They declined to accept it.  We have offered to have

12   it hand-delivered in hardcopy to the Ministry of Justice in

13   Kyiv, but, you/Rick have said not to do it.  What is the

14   problem here?"

15   Q.  Mr. Craig, what conclusions, if any, did you draw from the

16   government of the Ukraine's continued refusal to accept your

17   report?

18   A.  I thought they didn't like the Report, the conclusions that

19   we had drawn in the Report, and that they were, perhaps,

20   thinking of ways to kill it.

21   Q.  When you began the project, did you know what the Ministry

22   of Justice intended to do with your report?

23   A.  I did not.

24   Q.  And over time, did you get any more certainty about what

25   the government of the Ukraine intended to do with the Report

1    when it received it?

2    A.  I did not.

3    Q.  Mr. Craig, let's talk about FTI.

4         Why did you recommend that the Ministry of Justice

5    hire a PR firm?

6    A.  Well, I think the Ministry of Justice desperately needed

7    experienced, knowledgeable PR advice.

8    Q.  And why did you recommend they hire a PR firm to do it?

9    A.  Well, Skadden couldn't do it.  We had declined to

10   participate in advising the Ministry of Justice on

11   communications strategy or press affairs or PR matters.  If we

12   had done that, that would have been an activity that would have

13   required us to register.

14        So, we said to them from the beginning, We're not

15   going to be doing that.  But, you guys do need PR advice, and

16   we urge you to hire a firm.

17   Q.  Didn't you think that giving them advice to hire a firm was

18   giving them public relations advice?

19   A.  I did not.

20        MR. CAMPOAMOR-SANCHEZ:  Objection to the form.

21        THE COURT:  It was a leading question.

22        But, did you think that crossed the line that you had

23   laid down within your firm?

24        THE WITNESS:  I certainly did not, Your Honor.

25        THE COURT:  All right.

1    BY MR. TAYLOR:

2    Q.  Mr. Craig, did anyone tell you -- strike that.

3            Did you have a discussion with Mr. Hawker in May or

4    June in Kyiv?

5    A.  Yes, I did.

6    Q.  Tell the ladies and gentlemen of the jury what you recall

7    about that discussion.

8    A.  I think this may have been my first encounter with

9    Jonathan Hawker.  It was in the hotel, and I think I ran into

10   him in the lobby of the hotel.  And he had been trying to get

11   in touch with me, and, so, we sat and talked for a few minutes.

12           And I said to him, specifically, Jonathan, you are

13   going to be involved in the PR function, PR side of advice to

14   the Ministry.  We have our own project that doesn't intersect

15   with you until the very, very end of the project, when we have

16   completed our report.  So, I think our activity should be kept

17   separate.

18           And he understood that message and he agreed to do

19   that.

20   Q.  Did you know that Mr. Hawker and Mr. Gates were drafting a

21   plan for rolling out the Report in June, before it had even

22   been drafted?

23   A.  I did not.

24   Q.  Did there come a time when you began to believe that

25   Mr. Hawker intended to lie to the press about the report's

1    conclusions?

2    A.  Yes, I did.

3    Q.  When was that?

4    A.  It was September 24th, in connection with the messaging

5    document that he sent to me after our meeting at the Harvard

6    Club in New York.  At that point, I believed, thought very

7    seriously that he was going to lie about the Report as part of

8    the public relations advice he was giving.

9         And that's the moment.

10   Q.  Did you complain to anybody about it?

11   A.  Yes.  I think I called FTI.  I mean, I had some contacts in

12   FTI.  I knew Mark Malloch-Brown.  His kids had been at Little

13   Folks.  I called Mark, and I said, We're having trouble with

14   the FTI guy on this case.  He doesn't have a respect for what's

15   going on in the Report, and he seems to have just signed up to

16   be with the Ministry of Justice, whatever they want him to do.

17   Q.  There's been some testimony about a meeting at the Harvard

18   Club, Mr. Craig, on September 23rd, 2012.

19        Do you remember that meeting?

20   A.  I do.

21   Q.  Tell the ladies and gentlemen of the jury what you remember

22   about the meeting, starting with how it came to be in the first

23   place.

24   A.  I think the meeting took place as a result of conversations

25   I'd had with Paul Manafort about finalizing the Report and

1    getting it ready for delivery to Ukraine.  He was the one that

2    suggested that the delivery should happen in New York, when the

3    Ukrainians were there for the UN General Assembly, and that he

4    was going to be there, his boss was going to be there, the

5    chief of staff was going to be there, the Ministry officials,

6    head of the Ministry of Justice was going to be there.

7              And so he suggested that, perhaps, we meet the

8    weekend before and finalize all the comments, make any final

9    changes in the draft text of the Report, and then deliver it

10   during that week to the Ukrainians.

11             So, he also said, It's now time, it seems to me --

12   said Manafort -- for you to brief FTI on what the findings are

13   in the Report.

14             And I said, That's fine, I would be happy -- it's

15   important for them to understand exactly what the Report says

16   and what it does not say.

17             So, from my point of view, the meeting on the

18   weekend, I selected -- I suggested the Harvard Club, because

19   that's where I was going to be staying, as a good meeting

20   place.  I suggested we do it on Sunday, on the 23rd.  The

21   meeting occurred.

22   Q.  Did you meet with Mr. Manafort the night before?

23   A.  I did not.  I had dinner with Alex van der Zwaan.

24   Q.  And, so, what do you remember about the meeting?

25   A.  What I remember is, first of all, I was in good spirits

1    because I thought this was going to be the end of the project,

2    and we were going to succeed in finalizing and delivering the

3    Report.

4              And I remember the meeting breaking down into three

5    parts, really.  The first part was, basically, me and

6    Paul Manafort sitting down, and me receiving -- I think there

7    were three, maybe four comments -- final comments from the

8    crowd in Kyiv about the Report.  And I said, at the end of our

9    conversation, which must have been 20 minutes, half an hour, I

10   will take this back to our team, we'll review them and see

11   if -- see if there's any of these comments that we can include

12   in the Report.

13             We then had a brunch -- I think it was a brunch --

14   and, by the way, I don't think either Hawker, who was there; or

15   Gates, who was there; or van der Zwaan, who was there,

16   participated in that part of the meeting at all.  I don't think

17   anybody spoke, other than Paul and myself.

18             We had -- it was not business over lunch; it was,

19   rather, just a civil lunch, and then we returned to the meeting

20   room.  And that was the time that I -- I think I gave a little

21   presentation to Jonathan Hawker as to what our report said,

22   what the findings were, and he should understand what our

23   conclusions were and what we had done and what we had not said.

24   Q.  Mr. Craig, did you think that giving Mr. Hawker a briefing

25   on what the Report said or didn't say crossed the line about

1    public relations and concerning FARA that has been discussed

2    here?

3    A.  I did not.  In fact, I was quite confident that it didn't.

4    Q.  All right.  What happened then?

5    A.  There was conversation about one aspect of the release of

6    the plan that had to do with whether Skadden, me or any of the

7    lawyers associated with the project, would be willing to take

8    calls from the press who asked questions about the Report.  Did

9    you find this?  Did you find that?  What are the facts about

10   the Report?

11        And I said I thought that was a gray area in the FARA

12   statute, and that I thought that, probably, it would be

13   possible for us to respond to questions from the press that

14   were genuine, good-faith questions about the Report, to tell

15   them what the Report said and what it didn't say.  And I left

16   them with that.  I told them that I thought we could respond to

17   questions.

18   Q.  Had Mr. Hawker brought any materials to the meeting?

19   A.  Well, I think he brought a huge stack of documents, which

20   we did not go over and did not review.

21   Q.  And what about an agenda?  Did you go through his agenda or

22   any discussions at the meeting with him?

23   A.  We did not.

24   Q.  Did anyone ask you to contact David Sanger at that meeting?

25   A.  No, they did not.

1    Q.  Did you agree to contact David Sanger or any other reporter

2    at that meeting?

3    A.  I did not.

4    Q.  How did the meeting end?

5    A.  I was very pleased that I'd gotten the submission from

6    Mr. Manafort.  I thought the briefing with Mr. Hawker had gone

7    well.  I was a little concerned about my agreement to respond

8    to inquiries from the press.

9            But, that was the way it ended.  Those were the three

10   takeaways that I had.

11   Q.  And what happened on the 24th, the next day?

12   A.  The 24th, I think the first thing that happened that

13   morning was, I got news from the -- it may have been late in

14   the morning, I got news from Lauren Weiss that she had met with

15   Mr. Hawker and Mr. van der Zwaan.  And it was clear to her that

16   as part of the plan to release this report, they were going to

17   be paying journalists in Ukraine to write positive things about

18   the Report.

19   Q.  What else happened that day?

20   A.  Well, I wrote an email to Hawker saying, This is

21   unacceptable.  We won't have anything to do with it.  This is

22   your area of the world, but I -- you know, you just don't pay

23   journalists to write stuff.

24   Q.  If you're not involved in public relations, Mr. Craig, why

25   do you care whether they're paying journalists?

1   A.  It's a matter of, I think, ethics and principles.  And if I

2   know that something unethical or maybe even illegal is going

3   on, I think I should call that to the attention of the person

4   responsible for it.

5   Q.  Did you consider it giving public relations advice?

6   A.  I did not.

7   Q.  What happened -- what else happened on the 24th?

8   A.  After considering the matter further, I concluded that even

9   responding to questions from the press about the Report might

10  be closer to the line than I want to get on FARA issues.  So, I

11  wrote them an email saying, I'm not going to do that, the

12  Skadden lawyers are not going to do that.

13          And I took refuge in a policy that I attributed to

14  the law firm, which was that, on matters like this, inquiries

15  from the press should be channeled through the New York office

16  involved in communications.  And I said, We're not going to be

17  backgrounding journalist.

18          That was the second event of 24.

19          And there's a third event.

20  Q.  What's the third event?

21  A.  The third event is, I got that email and the attachment of

22  the messaging points from Mr. Hawker.  And I wrote an email

23  back to him, which has been the subject of testimony before,

24  which says, You are so wrong.  If anybody reads what you have

25  written here about the Report, they will think that it's a

1    whitewash.

2    Q.  Let me show you Defense Exhibit 149.

3              THE COURTROOM DEPUTY:  This is in evidence?

4              MR. TAYLOR:  In evidence.

5    BY MR. TAYLOR:

6    Q.  Is this an email that you got from Mr. Hawker on that

7    Tuesday?

8    A.  Yes.

9    Q.  And what does he say about whether he's looked through the

10   Report and reviewed the conclusions?

11   A.  Oh, this is Tuesday, rather than Monday.  I was wrong on

12   the date.

13   Q.  Okay.

14   A.  He writes, "Dear All" -- and it's directed to Manafort,

15   Gates, and Craig -- "I've gone through the Report, again, and I

16   attach a messaging document for you to review.  Please give me

17   your comments, corrections, amendments so I can incorporate

18   them in the revisions of the Ministry pack tomorrow."

19   Q.  Did you see the messaging document?

20   A.  I did.

21             MR. TAYLOR:  Your Honor, I believe that by

22   stipulation, the time which is indicated on this exhibit is

23   actually Monday, not Tuesday.

24             THE COURT:  Because it's supposed to be Monday night

25   at --

```
 1              MR. TAYLOR:  Right.

 2              THE COURT:  -- however many hours before --

 3              MR. TAYLOR:  Oh.

 4              THE COURT:  -- 5 a.m. it is.

 5              All right.  Fine.

 6              MR. CAMPOAMOR-SANCHEZ:  That's right.

 7              THE WITNESS:  So I was right, it was the 24th.

 8              MR. TAYLOR:  Thank you.

 9    BY MR. TAYLOR:

10    Q.  Now, let me show you the messaging document itself.

11              Is this the messaging document that you referred to?

12    A.  Yes.

13    Q.  What's wrong with it?

14    A.  There are many serious flaws in this document.  If you look

15    at the fourth page of the document, DX149-4, the second Number

16    2.

17              "The Skadden Report reflects a legal analysis that

18    answers the criticisms of those who have challenged the process

19    and conviction."

20              It's as if we were responding criticism by criticism

21    by criticism, and that's not what the Report did at all.  That

22    was an inaccurate description of the Report.

23              The third point is even more egregious.

24              "The Report documents how Tymoshenko committed her

25    crime, how she used every ruse possible to avoid answering the
```

1    charges against her, delaying and disrupting proceedings, even

2    harassing the judge and witnesses.  And those actions can only

3    reflect the weakness of her legal response."

4         That report does not document how Tymoshenko

5    committed her crime.  We don't even reach a judgment whether

6    she committed a crime or not.  We presented the evidence that

7    the prosecution submitted to Court, and we presented her

8    evidence.  We did not say she committed a crime.

9         Now, the fourth one is even more egregious.  I mean,

10   it does get worse and worse.

11        "The record is clear, Tymoshenko failed to produce

12   any evidence to support her allegations.

13        That's a flat-out lie about our report.  We never

14   said that.

15        Then there are others.

16        I'm not sure I went into detail, but I was very angry

17   that even after I had briefed him on Sunday about the Report

18   and the findings of the Report, after I had spent time

19   explaining to him what our findings were and what we were not

20   saying, he comes up with this.

21        So, if you ask me, Mr. Taylor, whether I suspected

22   Jonathan Hawker --

23        THE COURT:  Let him ask you the question.

24   A.  -- would lie about this report, I did.

25        MR. CAMPOAMOR-SANCHEZ:  Objection, Your Honor.

1              THE COURT:  Mr. Craig, you asked him a question, what

2        was wrong with the --

3              MR. TAYLOR:  Messaging document.

4              THE COURT:  -- the messaging document.  And just -- I

5        understand you have passionate feelings about all of this, but

6        so that we know what question you're answering, you have to

7        answer in the form of a response to the question he asked.

8              So, why don't you ask your next question.

9              THE WITNESS:  I'm sorry, Your Honor.

10       BY MR. TAYLOR:

11       Q.  Did you send him a response?

12       A.  I did.  It's the next exhibit, 150.

13       Q.  Would you please look at Defense Exhibit 150.

14             Is this your response?

15       A.  Yes.

16       Q.  Could you read aloud to the ladies and gentlemen of the

17       jury what you said to Mr. Hawker?

18       A.  "There is a lot of stuff in here that is just wrong.  I

19       understand your desire to spin this report in a way that

20       supports Ukraine's view of this trial, but much of what you say

21       is not accurate.  Actually, if I read this or heard this, I

22       would think that Skadden had been bought and paid for, and that

23       this report was, indeed, a total whitewash.

24             "As just one example, it is not accurate to say that

25       Tymoshenko produced no evidence to support her defense.  That

1    is flatly wrong.  And if you think this report says that, we

2    have real problems.

3            "I am on a plane now and cannot talk.  I will call

4    you this afternoon.  Meanwhile, I am sending this to Cliff to

5    look at as well."

6    Q.  Mr. Craig, did you personally have any role in dealing with

7    the errors in the messaging document?

8    A.  No, I didn't.

9    Q.  Who did?

10   A.  That was Cliff and Alex.

11   Q.  Mr. Craig, after this email from you to Mr. Hawker, did you

12   receive any more talking points from him?

13   A.  No.  That was the end.

14   Q.  Did you receive any so-called "media plans" from Mr. Hawker

15   or anybody else --

16   A.  I did not.

17   Q.  -- after you sent this email?

18   A.  No.

19   Q.  Mr. Craig, did you care what Ukraine's media strategy was?

20   A.  I did, yes.

21   Q.  Why?

22   A.  I did not want Ukraine to misrepresent or mischaracterize

23   what our report said.

24   Q.  You heard testimony that Mr. Gates and Hawker and others

25   were sending plans and assignments back and forth between

1    September and December.

2           You heard that testimony?

3    A.  I did.

4    Q.  Did you ever see any of them?

5    A.  Of the plans?

6    Q.  Yes.

7    A.  No.

8    Q.  Were you aware that the Podesta Group in Washington, D.C.

9    was working on something, what they called the rollout?

10   A.  I did not know that.

11   Q.  Were you aware that Mercury was working on something they

12   called the rollout?

13   A.  I did not know that.

14   Q.  Were you aware that a firm called Eckart Sager was working

15   on the rollout?

16   A.  I did not know that.

17   Q.  Or that a firm called FleishmanHillard was working on the

18   rollout?

19   A.  I did not know that either.

20   Q.  Or Burson-Marsteller?

21   A.  No.

22   Q.  Did you take a trip to Egypt, Mr. Craig, in the fall of

23   2012?

24   A.  At the end of September, after that -- it was after the

25   Harvard Club meeting.  I had a longstanding commitment to

1    travel to Egypt for the Washington Institute for Near East

2    Policy.

3    Q.  Tell us what the purpose of the trip was.

4    A.  The purpose of the trip was to interview Egyptian officials

5    in the military, in the intelligence community, in the

6    government, in civic groups, in chamber of commerce in Egypt,

7    to interview intelligence officials in Israel, and to make

8    recommendations to the government of the United States as to

9    what policy the United States government should pursue with

10   respect to the new Egyptian government, which had been elected.

11          It was -- the Muslim Brotherhood had been elected,

12   and President Morsi, who was an Islamic fundamentalist, was the

13   new president of Egypt.  And people were looking for advice and

14   reaction to how the United States should deal within this new

15   government.

16   Q.  Who was on the trip?

17   A.  Well, my partner on the trip, and sort of the cochairman of

18   the delegation, was Vin Weber.

19   Q.  Who is Vin Weber?

20   A.  Vin Weber is a former republican congressman from Minnesota

21   that I'd gotten to know over the years, purely socially, I

22   think, or working on democracy matters, because I think he'd

23   been chairman of the National Endowment for Democracy.

24   Q.  What was the content of the trip?  What were the activities

25   that you all went to?

1   A.   It was early morning to late night we had these interviews,

2   and talked to, as I say -- and American diplomats, as well.  We

3   talked to the ambassador and to other American officials that

4   had views about U.S. policy towards Egypt at that point.

5   Egypt, being a, really, very important country in the Middle

6   East, in many respects.

7            And, so, the days were long and full and completely

8   preoccupied with these issues, which were interesting.

9   Q.   Did the subject of Ukraine or your work for Ukraine come

10   up?

11   A.   Yeah.  One evening, Vin told me that he was working for

12   Ukraine.  And I said, you know, Do you know that we're doing

13   this report?

14            And he said, We've heard all about your report.

15            And then he asked, Do you know David Sanger?

16            And I said, I do know David Sanger.

17            And he said, Would you put me in touch with

18   David Sanger?

19            I said, Sure.

20   Q.   And did you do that?

21   A.   I did.  I believed Vin Weber when he told me that he was

22   working for Ukraine.  And, so, in that capacity, I arranged for

23   him to get a copy.  This was in October.  I thought the Report

24   was done.  Gave it to Vin Weber and gave him contact

25   information with Sanger and put them in touch with each other.

```
 1              MR. TAYLOR:  Your Honor, I've got another -- probably

 2     another half an hour.

 3              THE COURT:  All right.  I don't know if that's a

 4     unanimous -- the jurors, do you want to complete the direct

 5     before we break for lunch?  I think you're all entitled to

 6     lunch, and you've been here a long time.  But, do I have a

 7     sense of people would like to break now or would they like to

 8     finish?

 9              You don't care, one way or another.  All right.

10              Well, then, why don't we try to keep going.

11              I'm sorry.  Did somebody say, We need to eat?

12              THE JURORS:  Fin.

13              THE COURT:  Fin.  Okay.  We're going to finish the

14     direct.

15              MR. TAYLOR:  All right.

16              THE COURT:  Thank you for clarifying that.

17              I do know that the cafeteria closes at 2.  So, let's

18     stick to your less than half an hour.

19              MR. TAYLOR:  We'll be done before that.

20              THE COURT:  All right.

21     BY MR. TAYLOR:

22     Q.  Mr. Craig, did you receive a letter written from

23     Heather Hunt to Earle Yaffa at Skadden Arps in December of

24     2012?

25     A.  I received -- from the New York office, they sent me a copy
```

 1    of the letter that they had received from the FARA Unit, yes.

 2    Q.  And did you participate in preparing a response to it?

 3    A.  I did.

 4    Q.  Let me show you Government's Exhibit 2.

 5              What's this, Mr. Craig?

 6    A.  This is the response that we sent in reply to Ms. Hunt's

 7    original letter.

 8    Q.  And what part of it did you draft?

 9    A.  Cliff and I did the answers to 3 and 4.

10              MR. TAYLOR:  Could I have 3 and 4, please?

11    BY MR. TAYLOR:

12    Q.  Did you attach anything to this letter, Mr. Craig?

13    A.  Yes.  I think we attached -- my memory is that we attached

14    the Ukrainian English contract that had been signed, and we

15    attached the English Skadden contract, which I had signed and

16    Ukraine had not signed.  And I think we attached some

17    correspondence between me and Ukraine Ministry of Justice about

18    discussions about getting additional compensation from the

19    Ministry.

20    Q.  Why did you attach these things?

21    A.  I think they'd asked for written agreements in connection

22    with the work we had done for Ukraine.

23    Q.  Does your letter contain any reference to a third-party

24    payer?

25    A.  Yes.

1          Let me just say, to continue the answer, The fourth

2     request was "A copy of the existing or proposed written

3     agreement, if any, or a full description of the terms and

4     conditions of" --

5               THE COURT:  What are you reading from?

6               THE WITNESS:  I'm reading from -- I'm sorry, Your

7     Honor.  It's Government's Exhibit 1.

8               THE COURT:  Okay.

9               THE WITNESS:  And that was the original letter from

10    FARA that was asking us to perform these questions.

11              THE COURT:  All right.  In answering your questions,

12    though, I think it's important to answer your lawyer's

13    questions.  It's --

14              THE WITNESS:  Okay.

15              THE COURT:  So he's got you looking at Exhibit 2.

16              THE WITNESS:  Right.

17              THE COURT:  Are you --

18              THE WITNESS:  And I'm saying -- okay.

19              THE COURT:  You put what you put in response to 4

20    because it had been asked for in your letter; is that --

21              THE WITNESS:  Yes, that's correct.

22              THE COURT:  All right.

23              Ask your next question.

24              THE WITNESS:  That's correct.

25    BY MR. TAYLOR:

1    Q.  And does the letter contain any reference to payment by a

2    third-party?

3    A.  Yes, I think it does.

4    Q.  Why did you include that?

5    A.  It seemed to be called for by the inquiry that came from

6    FARA, asking us to provide information of oral agreements, as

7    well as written agreements.  And it seemed to me that our -- my

8    conversation and understanding with Mr. Pinchuk fell within

9    that request.

10   Q.  And did you then receive a letter from FARA dated April the

11   9th?

12           I'm not showing you an exhibit, Mr. Craig.  I'm just

13   asking you --

14   A.  Yes, we did.

15   Q.  -- if you got a letter from FARA dated April the 9th.

16   A.  Yes.

17   Q.  And did you respond to it?

18   A.  Yes, we did.

19   Q.  And is Government's Exhibit 4 your response to the April 9

20   letter from FARA?

21   A.  Yes, it is.

22   Q.  How did you go about putting together answers to the seven

23   questions?

24   A.  My recollection is that Cliff and I got together and

25   decided that I would take the first shot at drafting responses,

1    and that he would react and edit; add, modify.  So it was a

2    combination of Craig and Sloan coming up with draft responses

3    to the June 3rd -- I mean, to the April 9th letter.  We're in

4    2013.

5    Q.  Yes.  And would you go -- would you look at Government's

6    Exhibit 426, please?

7    A.  Government's Exhibit 426?

8    Q.  This seems to be an email chain, Mr. Craig.  And I'm going

9    to call your attention to the first email in the chain.

10           Do you recognize this?

11   A.  Yes.  Yes.

12   Q.  What is it?

13   A.  This is -- I think I asked Lauren Weiss to help us gather

14   all the articles relating to the Ukraine report, and this was

15   her response.

16   Q.  Now, go, please, to the first email at the back of the

17   chain, at the far end.

18   A.  Okay.

19   Q.  Do you see an email from you to Ms. Weiss?

20   A.  Yes.  And I'm saying -- the subject is, "News articles

21   about Ukraine report."

22           And I asked her, "Did you save any of those?  In

23   particular, do you have the *LA Times* report?"

24   Q.  Do you know why you asked her that question?

25   A.  About the *LA Times*, because that was the subject that

1  prompted FARA -- that was the Report -- the article that

2  prompted FARA to send us a letter.

3  Q.  Did she respond to you?

4  A.  Yes, she did.

5  Q.  What did she say?

6  A.  She sent me the *LA Times* article, pasted into her email.

7  She then said that she did not have news articles about Ukraine

8  saved, but she's happy to pull top-tier publication coverage

9  around this time period, if helpful.

10  Q.  Mr. Craig, why did you ask Ms. Weiss to do this task?

11  A.  Well, she's in the New York office and she is the person I

12  thought was monitoring the Ukraine project for Skadden in

13  New York.  And I thought one of the jobs that she did was to

14  keep track of publicity, commentary, public information

15  relating to Ukraine.  So, she seemed to be a natural person to

16  ask us -- to ask to help gather that information to respond to

17  FARA.

18  Q.  I know you've been on -- we've been at this for a long

19  time.

20        Was there a question from FARA about media in the

21  seven questions that you were asked?

22  A.  Yes.

23  Q.  Okay.

24  A.  They asked us about interviews and asked us about who we

25  had given the Report to.

1    Q.  And as a result of that, did you ask Ms. Weiss to do this

2    research?

3    A.  That's correct.

4    Q.  And the next email in this chain from you to her says what?

5    A.  I thanked her for the *Los Angeles Times* article written by

6    Emily Alpert, and told her that we'd been asked by the FARA

7    office and DOJ if we gave any statements to the *LA Times*.  And

8    I was trying to recreate what happened.

9         So, I had asked Lauren, "Did they call us?  Did we

10   say anything to them?  What about other news outlets?"

11   Q.  And did she respond to that?

12   A.  Yeah.  She noted the reference in the *LA Times* article to a

13   Skadden representative saying, "Skadden is not answering

14   questions."

15             MR. TAYLOR:  John, can you pull that up, please?

16             Next one up.

17             Sorry.  I think we're not quite on the same page.

18             Let's go up.  Go up a little bit.

19             Okay.  Here.

20   BY MR. TAYLOR:

21   Q.  This email from Mr. -- no, from Mr. Sloan to you.

22   A.  That's Cliff saying to me --

23   Q.  How did Mr. Sloan get in the mix?

24   A.  I think we were copying -- I sent a copy to him of my email

25   to Lauren, which had the *LA Times* article pasted into it.

1   Q.  Okay.  And what's the next email in the chain after the one

2   from Sloan to you?

3   A.  It's Cliff that says that the article is not answering

4   questions.

5          And the next one has to do with Lauren Weiss's

6   response to me about the *LA Times*.  She said she received a

7   voicemail from the *LA Times* reporter, returned the call, and

8   left a voicemail.  "But" -- says Lauren -- "we never connected

9   before she published her story."

10         And then she told me that the only interview her team

11  handled was with *The National Law Journal*, and she pasted in

12  the story from *The National Law Journal*, which you can see

13  there.  And that was the sorry written by Matthew Huisman.

14  Q.  Had she, in fact, handled an interview with *The National

15  Law Journal*?

16  A.  She had responded to *The National Law Journal's* inquiry,

17  but she had not handled the interview.  That was something that

18  Cliff and I did.  After the erroneous report had been

19  published, we called up Matt Huisman.  And it was Cliff and me.

20  I think maybe Lauren had been -- was on the call, but I think

21  we -- the two of us managed that interview with Huisman.

22  Q.  And what's the next exchange?  What's the next message?

23  A.  And then I write back, and I think I'm talking about *The*

24  *National Law Journal* here.  And I say, I remember this now.  We

25  issued the statement" -- which was my statement on the

1       record -- "in response to what we thought was a totally

2       erroneous report.  Do you recall this event, Cliff?

3               "Thanks, Lauren."

4               And then I ask Lauren, "Do you have *The New York*

5       *Times* article about the Report?"

6       Q.  Mr. Craig, did you remember *The National Law Journal* piece

7       before she referred you to it?

8       A.  *The National Law Journal* piece?

9               MR. CAMPOAMOR-SANCHEZ:  Objection to the question.

10              THE COURT:  Do you recall, right now, whether you

11      remembered, before she brought *The National Law Journal* to your

12      attention on April 22nd, whether you -- that refreshed your

13      recollection, or whether you remembered it before she reminded

14      you?

15              THE WITNESS:  I don't recall, one way or the other.

16              THE COURT:  All right.

17              THE WITNESS:  I'm sorry.

18              THE COURT:  Ask your next question.

19      BY MR. TAYLOR:

20      Q.  Next, what's the next message in the chain?

21      A.  I asked her about *The New York Times* article.  "Wasn't

22      there a *New The York Times* article about this?"

23              And she sent it to me, pasted it into her email, and

24      says, "Below is *The New York Times* article."

25              So, in this collection of emails are the three

1    articles at issue, in terms of the U.S. media outlets.

2    Q.  And did you respond --

3    A.  Yes.  I say --

4    Q.  -- to the email about *The New York Times*?

5    A.  To Lauren and to Cliff, I say, "It looks like I also gave

6    *The New York Times* a one-sentence statement."

7            The "also" meaning, I see that I gave *The National*

8    *Law Journal* a statement.  It looks like I also gave *The New*

9    *York Times* a one-sentence statement.  And I asked Cliff if he

10   remembered that.

11   Q.  Did he remember it?

12   A.  Nope.  He said that "I don't remember.  That one, I don't

13   remember."

14   Q.  And she writes an email at the top of the chain, where

15   "Might you have worked with Jonathan Hawker, FTI, on that item?

16   I know he was involved in this project, but that our team at

17   Skadden did not handle."

18           Had you, in fact, worked with Jonathan Hawker on the

19   interview at *The New York Times*?

20   A.  I hadn't worked with him.  But, I found out that

21   Jonathan Hawker was trying to connect with David Sanger.  And,

22   so, I intervened and said, Jonathan, I'll handle it.

23           Now, I don't regard that as working with

24   Jonathan Hawker, but Hawker was involved at the early stages of

25   my contact with *The New York Times*.

```
1    Q.  Mr. Craig, you drafted the response, which is Government
2    Exhibit 4.  And in the answers to Question 1 --
3              MR. TAYLOR:  Do we have Question 1?
4    BY MR. TAYLOR:
5    Q.  -- you used the date December 12 and 13.
6              Do you see that?
7    A.  Yes, I do.
8    Q.  Do you remember why you used those dates?
9    A.  I think I used those dates because they referred to the
10   dates of the articles.
11   Q.  Why didn't you use December the 11th?
12   A.  Well, I should have, because that was the day that I
13   hand-delivered a hardcopy to David Sanger.  But, I was focused
14   more on the dates that the articles appeared.  *The New York*
15   *Times* appeared the 12th.  The other two, *The National Law*
16   *Journal* and the *Los Angeles Times*, I think, appeared the 13th.
17   Q.  Did you --
18   A.  It should have included the 11th.
19   Q.  Did you see a suggested change in the editing process from
20   December 12, 13 to December the 11, 12?
21             MR. CAMPOAMOR-SANCHEZ:  Objection to the form of the
22   question.  Leading.
23             MR. TAYLOR:  It's not a leading question.
24             THE COURT:  Well, did you see an edited version that
25   had a December 11, instead?  Do you recall whether you did or
```

1    you didn't?

2            THE WITNESS:  I don't recall seeing a version that

3    had 11 in it.

4    BY MR. TAYLOR:

5    Q.  Mr. Craig, would it have been accurate to exclude

6    December 13th?

7    A.  It would have been inaccurate to exclude December 13.

8    Because on December 13th, we provided -- well, it was Lauren

9    provided a copy of the Report to *The National Law Journal*, and

10   Alex Haskell provided a copy of the Report to the *Los Angeles*

11   *Times*, on the 13th.

12   Q.  Now, Mr. Craig, in this response to the seven questions,

13   did you attach anything?

14   A.  Yes.  I think we attached the new contract that we had

15   entered into with the government -- with the Ministry of

16   Justice, the government of Ukraine, to provide additional

17   funding for our work.

18   Q.  And let me call to your attention pages 4 and 5 of this

19   exhibit.

20            MR. TAYLOR:  Let's go to the previous page, please.

21            Bless you.

22   BY MR. TAYLOR:

23   Q.  Do you see this document?

24   A.  I do.

25   Q.  Is this what was attached to the letter that you sent to

1    FARA on June the 5th?

2    A.  Yes, it was.

3    Q.  What is this?

4    A.  This is the additional agreement that was the subject of

5    the communications that we had with the Ministry of Justice,

6    which we had included in the previous response to FARA.  We

7    had, in fact, by that time, entered into on agreement for

8    additional funding from the government of Ukraine to help fund

9    the cost of the Report.

10   Q.  Who drafted this contract, Mr. Craig?

11   A.  I think the contract was drafted originally by the

12   Ukrainians, but I think there was some negotiation with

13   Alex van der Zwaan, who was on the scene.

14   Q.  Does the contract contain terms about the price of the

15   contract?

16            And calling to your attention --

17   A.  It does.

18   Q.  -- 405.

19            What does it say about the terms of the price of the

20   contract?

21   A.  It says, "The price of the contract shall be 10,200,000

22   Ukrainian hryvnias."

23   Q.  And what is Section 3.2 and 3.3?  How do they relate to the

24   price of the contract?

25   A.  "The final price of the services shall be determined in

1    accordance with the number of hours worked, and the hourly rate

2    calculated according to the basic rates of the executor."

3              I think the --

4    Q.  Who's the executor?

5    A.  I think that's Skadden.  We're the executor.

6              "The executor shall keep accounting of the hours

7    taken to carry out the study.  And based on those data, the

8    executor shall draw up the Report and submit it to the

9    employer."  The employer being the Ministry of Justice.

10             "The Report shall contain a detailed description of

11   the services time had been expended in."

12   Q.  Why did you provide this to FARA?

13   A.  Because it seemed to me that the very first request had

14   asked for any contracts or oral agreements, and we now had a

15   contract -- another contract with Ukraine to help us pay for

16   the costs overruns of the project.

17   Q.  And did you respond to their request that you identify the

18   third-party payer that paid for the project?

19   A.  No.  We said that we would, if we were required to

20   register.  But, we respectfully declined because both the

21   client and the third-party payer had requested confidentiality.

22   Q.  Let me show you the last page of Government's Exhibit 4.

23             No.  I'm sorry.

24             The last page of the letter.

25   A.  I don't know what exhibit you're in.

1    Q.   Government's Exhibit 4.

2              Previous page, please.  Previous page.

3              I just want to get to the language where you discuss

4    the third-party payer.  And it's --

5    A.   Oh, okay.

6    Q.   -- it's on page 1.

7    A.   Yes, it's at the bottom of page 1.

8    Q.   What about the language on page 2?

9    A.   At the top of page 2?

10   Q.   At the top of page 2.

11             What did you say?

12   A.   Well, let me just read the sentence, beginning at the

13   bottom of the previous page.

14             "If you conclude that we are required to register, or

15   if, for some reason, you believe that such information is

16   material to your inquiry, please let us know so that we may

17   consider and understand your request in the context of your

18   analysis of this issue."

19   Q.   Did anyone at FARA ever ask you any further questions about

20   the third-party payer --

21   A.   No.

22   Q.   -- or your refusal to provide that information?

23   A.   This was an invitation for them to ask further questions,

24   if they thought this information was material to their inquiry,

25   and they did not ask us any additional information.

1   Q.  Mr. Craig, were the answers that you provided to FARA in

2   this letter truthful?

3   A.  Yes.

4   Q.  Did you leave anything out of the letter that you thought

5   FARA was asking for?

6   A.  Well, going back and reviewing it, I wish we'd put

7   December 11th in there, rather than December 12th.

8   Q.  Did you leave anything out?

9   A.  No, I did not leave anything out.

10   Q.  And did you ever lie to FARA?

11   A.  I did not.

12   Q.  Did you ever intentionally leave something out of a letter

13   or a meeting that they had asked you to provide?

14   A.  No.

15   Q.  Let me show you Government's Exhibit 13, please.

16       Is this the letter you received from FARA dated

17   January 16, 2014?

18   A.  Yes, it is.

19   Q.  Could you read the middle paragraph of the letter aloud to

20   the jury, please?

21   A.  This is a letter from Ms. Hunt to me in January, 2014.

22       "You explained during the meeting and in your recent

23   letter that your firm prepared the Tymoshenko Report for the

24   Ukrainian Ministry of Justice.  And you indicated that your

25   comments to *The National Law Journal*, *Los Angeles Times*, and

1  *The New York Times* were not political activities, but were

2  meant to correct mischaracterizations of the Report

3  attributable to the Ukrainian Ministry of Justice and

4  Tymoshenko's Ukrainian lawyers concerning whether the

5  Tymoshenko prosecution was a political prosecution.  You

6  informed the media of the inaccuracy, indicating that the

7  Report did not decide this issue."

8  Q.  Is that a fair summary of what you told her in that

9  meeting?

10  A.  It is.

11  Q.  Was it true?

12  A.  It is true.

13          MR. TAYLOR:  No further questions.

14          THE COURT:  All right.  We're going to break now for

15  lunch, before cross-examination.  It's 20 after 1, so we will

16  resume at 2:30.

17          Please be back and be ready at that time.  Please do

18  not discuss the case with each other or anyone else you might

19  run into in the building between now and then.

20          (Whereupon the jury exits the courtroom.)

21          THE COURT:  All right.  We're adjourned and we'll

22  resume at 2:30.

23          (Recess.)

24                      *   *   *

25

1

2                    CERTIFICATE OF OFFICIAL COURT REPORTER

3

4

5           I, JANICE DICKMAN, do hereby certify that the above

6      and foregoing constitutes a true and accurate transcript of my

7      stenograph notes and is a full, true and complete transcript of

8      the proceedings to the best of my ability.

9                          Dated this 28th day of August, 2019.

10

11

12                          /s/_____

13                          Janice E. Dickman, CRR, RMR, CRC
                            Official Court Reporter
14                          Room 6523
                            333 Constitution Avenue NW
15                          Washington, D.C. 20001

16

17

18

19

20

21

22

23

24

25

## '

**'64** [1] - 2922:20
**'65** [1] - 2922:21
**'probably** [1] - 2877:24

## /

**/s** [1] - 2994:12

## 1

**1** [9] - 2919:6, 2919:7, 2947:13, 2979:7, 2987:2, 2987:3, 2991:6, 2991:7, 2993:15
**10** [1] - 2859:13
**10,200,000** [1] - 2989:21
**10-9-2013** [1] - 2899:20
**100** [2] - 2848:22, 2931:20
**1000** [1] - 2849:3
**107** [1] - 2943:21
**109** [1] - 2946:22
**11** [6] - 2868:25, 2869:1, 2916:25, 2987:20, 2987:25, 2988:3
**11th** [8] - 2861:1, 2906:19, 2907:1, 2907:9, 2987:11, 2987:18, 2992:7
**12** [7] - 2896:8, 2897:10, 2903:2, 2903:4, 2987:5, 2987:20
**12-13** [1] - 2896:8
**120** [1] - 2930:25
**12th** [10] - 2879:14, 2896:12, 2896:17, 2899:11, 2905:1, 2906:19, 2907:1, 2907:9, 2987:15, 2992:7
**13** [9] - 2848:5, 2848:8, 2896:8, 2896:12, 2897:10, 2987:5, 2987:20, 2988:7, 2992:15
**13th** [8] - 2875:21, 2881:5, 2897:12, 2987:16, 2988:6, 2988:8, 2988:11
**14** [3] - 2896:8, 2896:12, 2897:10
**14-page** [1] - 2935:18
**143** [2] - 2934:18, 2934:21
**149** [1] - 2969:2
**14th** [1] - 2897:12
**15** [3] - 2859:13, 2896:12, 2897:10
**150** [2] - 2972:12, 2972:13
**15th** [1] - 2897:13
**16** [1] - 2992:17
**16th** [1] - 2959:25
**177** [2] - 2950:14, 2950:15
**178** [1] - 2948:25
**17th** [1] - 2960:6
**180** [1] - 2951:13
**1800** [1] - 2849:2
**183** [3] - 2937:18, 2937:19,

2937:21
**185** [5] - 2930:24, 2931:3, 2931:20, 2937:20, 2938:2
**186** [3] - 2938:3, 2959:18, 2959:23
**19-125** [1] - 2850:4
**19-CR-125** [1] - 2848:3
**1945** [1] - 2920:5
**1963** [1] - 2922:16
**1983** [1] - 2921:11
**1997** [1] - 2921:15

## 2

**2** [8] - 2895:8, 2970:16, 2977:17, 2978:4, 2979:15, 2991:8, 2991:9, 2991:10
**20** [3] - 2916:25, 2965:9, 2993:15
**20001** [2] - 2849:9, 2994:15
**20036** [1] - 2849:3
**2008** [3] - 2922:5, 2931:9, 2931:10
**2009** [2] - 2931:9, 2931:10
**2010** [1] - 2922:9
**2012** [9] - 2852:15, 2853:7, 2897:10, 2906:20, 2930:14, 2938:9, 2963:18, 2974:23, 2977:24
**2013** [4] - 2897:23, 2900:4, 2900:6, 2981:4
**2014** [2] - 2992:17, 2992:21
**2019** [2] - 2848:6, 2994:9
**202** [3] - 2848:15, 2848:19, 2849:4
**202-354-3267** [1] - 2849:9
**20530** [2] - 2848:15, 2848:18
**21202** [1] - 2848:23
**22nd** [1] - 2985:12
**233-0986** [1] - 2848:19
**235** [1] - 2878:6
**236** [2] - 2875:18, 2876:15
**23rd** [3] - 2957:24, 2963:18, 2964:20
**24** [1] - 2968:18
**2440** [1] - 2848:23
**248** [2] - 2895:5, 2895:8
**24th** [5] - 2963:4, 2967:11, 2967:12, 2968:7, 2970:7
**25** [1] - 2929:18
**252-7698** [1] - 2848:15
**266** [1] - 2883:7
**279** [1] - 2956:24
**27th** [3] - 2930:14, 2938:16, 2946:16
**28** [1] - 2848:6
**28th** [2] - 2922:16, 2994:9
**2:30** [2] - 2993:16, 2993:22
**2nd** [1] - 2944:5

## 3

**3** [2] - 2978:9, 2978:10
**3.2** [1] - 2989:23
**3.3** [1] - 2989:23
**30** [1] - 2929:18
**30th** [1] - 2940:4
**332** [2] - 2862:25
**333** [2] - 2849:8, 2994:14
**352** [2] - 2860:18, 2860:19
**371** [2] - 2874:12
**387** [2] - 2930:15, 2930:18
**396** [1] - 2893:10
**3rd** [2] - 2947:2, 2981:3

## 4

**4** [10] - 2932:8, 2932:9, 2978:9, 2978:10, 2979:19, 2980:19, 2987:2, 2988:18, 2990:22, 2991:1
**405** [1] - 2989:18
**410** [1] - 2848:24
**42** [1] - 2867:7
**426** [2] - 2981:6, 2981:7
**45** [1] - 2901:6
**49** [1] - 2870:5
**4th** [3] - 2949:15, 2950:24, 2951:21

## 5

**5** [6] - 2885:19, 2891:22, 2898:11, 2937:12, 2970:4, 2988:18
**506** [3] - 2899:7, 2899:8, 2899:9
**510** [2] - 2899:7, 2899:23
**555** [1] - 2848:14
**56** [1] - 2922:15
**5th** [2] - 2916:7, 2989:1

## 6

**6** [4] - 2857:4, 2913:11, 2914:22, 2945:15
**61** [2] - 2934:18, 2934:21
**6523** [2] - 2849:8, 2994:14
**6:30** [1] - 2944:5

## 7

**7** [1] - 2914:23
**778-1814** [1] - 2849:4
**7:15** [2] - 2856:1, 2856:7

## 8

**82** [1] - 2931:20
**88** [1] - 2938:23
**8th** [3] - 2949:8, 2950:24,

2951:15

# 9

**9** [3] - 2897:23, 2900:6, 2980:19
**949-1146** [1] - 2848:24
**950** [1] - 2848:18
**9:30** [1] - 2848:7
**9th** [6] - 2898:9, 2899:2, 2900:4, 2980:11, 2980:15, 2981:3

# A

**a.m** [3] - 2848:7, 2944:5, 2970:4
**Aabelson@zuckerman.com** [1] - 2848:25
**Abelson** [2] - 2848:21, 2850:15
**ability** [4] - 2935:13, 2935:16, 2937:6, 2994:8
**able** [13] - 2888:7, 2892:8, 2904:18, 2910:24, 2913:19, 2924:21, 2926:11, 2926:16, 2926:18, 2926:25, 2928:20, 2928:21, 2936:13
**absence** [1] - 2934:7
**absolutely** [5] - 2859:25, 2877:4, 2887:14, 2926:24, 2953:14
**abuse** [1] - 2923:1
**abused** [1] - 2931:14
**abusing** [1] - 2904:20
**Academy** [1] - 2920:13
**accept** [2] - 2960:11, 2960:16
**acceptance** [1] - 2875:12
**accepted** [2] - 2933:10, 2953:1
**access** [4] - 2854:12, 2856:8, 2856:18, 2926:15
**accommodating** [1] - 2951:10
**accordance** [1] - 2990:1
**according** [2] - 2944:16, 2990:2
**account** [1] - 2957:12
**accounting** [1] - 2990:6
**accurate** [25] - 2853:9, 2853:16, 2857:23, 2864:18, 2864:23, 2877:3, 2878:23, 2879:9, 2881:1, 2895:4, 2895:24, 2902:18, 2902:20, 2903:8, 2903:13, 2913:18, 2913:22, 2913:24, 2914:2, 2914:17, 2927:13, 2972:21, 2972:24, 2988:5, 2994:6
**accurately** [6] - 2868:1, 2868:2, 2869:5, 2880:7, 2891:21, 2902:20
**accusation** [3] - 2876:18, 2954:20, 2956:14
**accused** [2] - 2901:24, 2954:17
**achieve** [2] - 2925:8, 2933:9
**acquire** [1] - 2934:8
**act** [1] - 2906:9

**acting** [10] - 2866:10, 2871:23, 2873:4, 2880:24, 2886:19, 2887:9, 2888:14, 2891:9, 2898:23, 2900:21
**Action** [1] - 2848:3
**action** [1] - 2880:21
**actions** [3] - 2947:6, 2955:25, 2971:2
**active** [1] - 2946:17
**activities** [9] - 2874:1, 2898:13, 2910:25, 2912:11, 2920:25, 2921:19, 2929:16, 2975:24, 2993:1
**activity** [4] - 2874:10, 2909:6, 2961:12, 2962:16
**actors** [1] - 2902:10
**actual** [1] - 2955:11
**ad** [1] - 2900:21
**Adam** [3] - 2848:17, 2848:21, 2850:14
**add** [1] - 2981:1
**added** [1] - 2876:21
**additional** [7] - 2949:18, 2957:2, 2978:18, 2988:16, 2989:4, 2989:8, 2991:25
**additionally** [1] - 2883:24
**additions** [1] - 2883:5
**address** [1] - 2855:13
**addressed** [1] - 2931:23
**adequate** [2] - 2933:15, 2934:6
**adjourn** [1] - 2934:7
**adjourned** [1] - 2993:21
**administration** [3] - 2894:22, 2910:14, 2910:16
**administrative** [2] - 2909:5, 2909:6
**administrator** [1] - 2955:5
**admissible** [1] - 2912:23
**advance** [1] - 2918:10
**adversary** [1] - 2894:23
**adversely** [1] - 2910:23
**advice** [24] - 2853:25, 2869:18, 2869:20, 2869:21, 2869:24, 2870:2, 2871:20, 2871:22, 2872:18, 2872:19, 2873:10, 2874:8, 2878:3, 2884:11, 2888:6, 2890:5, 2961:7, 2961:15, 2961:17, 2961:18, 2962:13, 2963:8, 2968:5, 2975:13
**advise** [1] - 2921:21
**advising** [1] - 2961:10
**advisor** [2] - 2921:12, 2922:6
**advocate** [2] - 2891:17, 2909:3
**affairs** [1] - 2961:11
**affected** [3] - 2887:13, 2910:21, 2910:23
**afoul** [1] - 2917:24
**afraid** [2] - 2911:7, 2940:5
**afternoon** [3] - 2854:20,

2855:14, 2973:4
**agenda** [2] - 2966:21
**agent** [27] - 2865:18, 2866:1, 2866:11, 2867:8, 2871:24, 2873:3, 2873:4, 2873:19, 2873:20, 2884:19, 2886:19, 2888:9, 2888:15, 2889:9, 2890:25, 2893:8, 2893:9, 2898:24, 2906:10, 2908:7, 2908:8, 2908:9, 2909:10, 2909:14, 2910:24, 2911:4
**agents** [5] - 2898:15, 2900:21, 2901:1, 2910:14, 2911:8
**ago** [1] - 2922:15
**agree** [5] - 2867:12, 2892:5, 2901:6, 2943:6, 2967:1
**agreed** [7] - 2859:16, 2882:19, 2941:7, 2941:9, 2942:16, 2943:2, 2962:18
**agreement** [7] - 2929:13, 2929:16, 2931:14, 2967:7, 2979:3, 2989:4, 2989:7
**agreements** [4] - 2978:21, 2980:6, 2980:7, 2990:14
**ahead** [5] - 2866:6, 2902:25, 2909:23, 2921:21, 2954:15
**aimed** [1] - 2905:10
**air** [1] - 2954:23
**alarm** [1] - 2944:22
**Albright** [1] - 2921:16
**Alex** [13] - 2856:19, 2881:17, 2927:10, 2950:3, 2953:9, 2955:6, 2957:1, 2958:5, 2960:2, 2964:23, 2973:10, 2988:10, 2989:13
**Alexander** [1] - 2953:5
**aligned** [1] - 2894:19
**alignments** [1] - 2937:7
**allegation** [5] - 2867:24, 2868:5, 2868:22, 2931:13, 2955:15
**allegations** [2] - 2885:13, 2971:12
**allege** [1] - 2867:4
**alleged** [1] - 2886:10
**alleges** [1] - 2867:7
**alleging** [4] - 2885:10, 2885:25, 2887:3, 2889:20
**alliances** [1] - 2937:7
**Allon** [3] - 2927:11, 2930:12, 2950:2
**allow** [3] - 2852:24, 2934:8, 2938:5
**allowed** [8] - 2852:24, 2869:16, 2875:3, 2875:4, 2877:18, 2918:20, 2928:24, 2935:12
**ally** [1] - 2929:9
**almost** [2] - 2859:18, 2923:4
**aloud** [2] - 2972:16, 2992:19
**Alpert** [2] - 2881:8, 2983:6

**Alto** [1] - 2920:10
**Amanda** [1] - 2850:11
**ambassador** [1] - 2976:3
**amend** [1] - 2952:5
**amended** [1] - 2872:9
**Amendment** [1] - 2918:21
**amendments** [1] - 2969:17
**America** [3] - 2848:3, 2850:4, 2923:15
**American** [3] - 2922:25, 2976:2, 2976:3
**AMY** [1] - 2848:9
**analysis** [3] - 2941:1, 2970:17, 2991:18
**Angeles** [11] - 2881:4, 2881:8, 2881:21, 2898:20, 2899:25, 2906:7, 2913:23, 2983:5, 2987:16, 2988:10, 2992:25
**anger** [1] - 2926:5
**angry** [1] - 2971:16
**anonymous** [2] - 2874:22, 2875:6
**answer** [16] - 2872:13, 2878:21, 2881:10, 2884:16, 2896:21, 2899:4, 2908:13, 2908:21, 2908:24, 2910:5, 2910:10, 2928:6, 2945:7, 2972:7, 2979:1, 2979:12
**answered** [9] - 2852:25, 2870:17, 2881:11, 2890:6, 2911:16, 2911:19, 2911:22, 2913:4, 2941:17
**answering** [6] - 2902:13, 2970:25, 2972:6, 2979:11, 2983:13, 2984:3
**answers** [5] - 2970:18, 2978:9, 2980:22, 2987:2, 2992:1
**anyplace** [1] - 2877:6
**anyway** [1] - 2862:7
**apologize** [1] - 2878:11
**appear** [3] - 2880:9, 2938:2, 2940:2
**appearance** [1] - 2850:6
**appeared** [12] - 2860:9, 2875:20, 2882:14, 2895:10, 2895:25, 2899:10, 2900:11, 2904:5, 2904:15, 2987:14, 2987:15, 2987:16
**appellate** [1] - 2875:10
**appendices** [1] - 2930:25
**applied** [1] - 2889:1
**applies** [1] - 2937:1
**apply** [1] - 2911:23
**applying** [1] - 2937:2
**appointments** [2] - 2910:13, 2910:16
**appreciate** [2] - 2851:1, 2875:8
**approach** [9] - 2850:5, 2866:3, 2884:21, 2887:24, 2911:10, 2917:6, 2941:24, 2952:14,

2952:19
**appropriate** [2] - 2866:22, 2919:16
**approval** [1] - 2912:6
**April** [6] - 2930:4, 2980:10, 2980:15, 2980:19, 2981:3, 2985:12
**area** [2] - 2966:11, 2967:22
**argue** [2] - 2871:12, 2871:14, 2872:10
**argued** [2] - 2936:15, 2936:16
**arguing** [2] - 2869:6, 2909:5
**argument** [2] - 2885:15, 2934:5
**arguments** [3] - 2872:11, 2901:21, 2902:22
**Arps** [2] - 2922:10, 2977:23
**arrange** [1] - 2862:24
**arranged** [3] - 2856:17, 2881:12, 2976:22
**arrangements** [1] - 2881:18
**article** [44] - 2859:18, 2859:19, 2860:9, 2861:22, 2862:23, 2865:11, 2874:20, 2875:1, 2875:20, 2875:23, 2875:25, 2876:11, 2876:13, 2877:6, 2877:14, 2878:5, 2878:16, 2879:10, 2879:11, 2882:14, 2882:15, 2882:16, 2883:16, 2883:19, 2883:20, 2883:24, 2894:25, 2895:9, 2895:25, 2896:1, 2899:10, 2899:16, 2900:1, 2982:1, 2982:6, 2983:5, 2983:12, 2983:25, 2984:3, 2985:5, 2985:21, 2985:22, 2985:24
**articles** [15] - 2881:1, 2897:13, 2897:15, 2899:3, 2899:4, 2900:5, 2900:11, 2900:20, 2902:23, 2981:14, 2981:20, 2982:7, 2986:1, 2987:10, 2987:14
**aspect** [2] - 2859:1, 2966:5
**aspects** [1] - 2858:25
**Assembly** [3] - 2957:24, 2960:10, 2964:3
**assignment** [2] - 2879:24, 2926:14
**assignments** [1] - 2973:25
**assistance** [1] - 2934:15
**assistant** [2] - 2944:6, 2944:13
**associated** [3] - 2894:20, 2926:8, 2966:7
**attach** [4] - 2969:16, 2978:12, 2978:20, 2988:13
**attached** [9] - 2905:3, 2945:18, 2957:5, 2978:13, 2978:15, 2978:16, 2988:14, 2988:25
**attaches** [1] - 2957:2
**attachment** [5] - 2856:11, 2949:9, 2949:12, 2950:24,

2968:21
**attempt** [1] - 2910:16
**attempted** [1] - 2958:15
**attempts** [1] - 2959:6
**attended** [1] - 2897:23
**attention** [12] - 2863:24, 2892:3, 2897:22, 2932:13, 2937:19, 2937:21, 2948:6, 2968:3, 2981:9, 2985:12, 2988:18, 2989:16
**attitude** [1] - 2953:23
**attitudes** [1] - 2923:18
**attorney** [4] - 2883:25, 2916:4, 2916:11, 2916:16
**Attorney's** [1] - 2848:13
**attorneys** [1] - 2883:21
**attributable** [6] - 2874:24, 2877:4, 2877:12, 2878:19, 2879:10, 2993:3
**attribute** [3] - 2875:4, 2875:8, 2875:9
**attributed** [3] - 2875:12, 2904:6, 2968:13
**attribution** [1] - 2875:24
**attributions** [1] - 2900:12
**August** [7] - 2848:6, 2922:16, 2938:20, 2946:4, 2946:10, 2946:19, 2994:9
**authority** [2] - 2904:20, 2931:14
**authorized** [1] - 2931:15
**Avenue** [3] - 2848:18, 2849:8, 2994:14
**avoid** [3] - 2921:19, 2927:22, 2970:25
**aware** [3] - 2974:8, 2974:11, 2974:14

## B

**backgrounded** [1] - 2894:8
**backgrounding** [4] - 2875:2, 2893:22, 2894:13, 2968:17
**Backgrounding** [1] - 2894:7
**bad** [2] - 2853:14, 2954:4
**balance** [1] - 2933:13
**balanced** [2] - 2895:1, 2895:25
**Balkans** [1] - 2923:12
**Baltimore** [1] - 2848:23
**Bar** [1] - 2852:2
**based** [8] - 2876:19, 2876:23, 2880:16, 2891:18, 2894:18, 2940:14, 2948:22, 2990:7
**basic** [1] - 2902:16
**basis** [4] - 2877:1, 2898:1, 2901:22, 2949:23
**became** [2] - 2922:7, 2946:17
**becoming** [1] - 2923:17
**bed** [1] - 2859:19
**BEFORE** [1] - 2848:9
**began** [2] - 2960:21, 2962:24

**begin** [1] - 2877:8
**beginning** [6] - 2922:15, 2936:12, 2948:17, 2954:3, 2961:14, 2991:12
**behalf** [3] - 2853:3, 2891:9, 2955:20
**behind** [2] - 2883:22, 2884:4
**belief** [4] - 2892:1, 2900:7, 2955:21, 2955:23
**believes** [2] - 2872:4, 2954:10
**bell** [1] - 2879:8
**belong** [1] - 2923:2
**Below** [1] - 2985:24
**bench** [9] - 2866:4, 2866:5, 2884:23, 2887:24, 2887:25, 2911:12, 2917:8, 2942:1, 2952:20
**benefit** [1] - 2910:18
**BERMAN** [1] - 2848:9
**best** [5] - 2894:25, 2895:12, 2904:16, 2948:7, 2994:8
**better** [1] - 2882:21
**between** [14] - 2857:5, 2860:25, 2863:4, 2874:21, 2905:5, 2930:4, 2934:18, 2939:7, 2944:1, 2946:9, 2946:18, 2973:25, 2978:17, 2993:19
**beyond** [1] - 2948:21
**big** [2] - 2869:19, 2921:20
**bill** [1] - 2850:14
**Bill** [1] - 2850:14
**binder** [1] - 2930:16
**bit** [3] - 2894:17, 2918:16, 2983:18
**bless** [1] - 2988:21
**blocks** [1] - 2855:9
**board** [4] - 2923:6, 2923:9, 2923:11, 2923:14
**boarding** [1] - 2920:12
**body** [2] - 2875:24, 2883:19
**born** [2] - 2920:4, 2920:5
**boss** [1] - 2964:4
**bottom** [7] - 2904:12, 2944:4, 2951:17, 2951:18, 2951:23, 2991:7, 2991:13
**bought** [1] - 2972:22
**boys** [1] - 2862:12
**Bradley** [1] - 2848:17
**break** [7] - 2915:4, 2916:20, 2916:22, 2916:24, 2919:8, 2919:12, 2977:5, 2977:7, 2993:14
**breaking** [2] - 2919:17, 2965:4
**breaks** [1] - 2917:14
**brief** [3] - 2859:14, 2931:5, 2964:12
**briefed** [1] - 2971:17
**briefing** [2] - 2965:24, 2967:6
**briefly** [4] - 2922:20, 2928:2, 2928:7, 2936:23

**bring** [4] - 2850:20, 2924:18, 2925:18, 2926:7
**Brotherhood** [1] - 2975:11
**brought** [7] - 2869:18, 2904:19, 2935:25, 2954:5, 2966:18, 2966:19, 2985:11
**Brown** [1] - 2963:12
**brunch** [1] - 2965:13
**building** [1] - 2993:19
**bullet** [5] - 2932:14, 2934:4, 2934:20, 2934:25, 2937:12
**bullets** [1] - 2932:17
**bureau** [1] - 2856:23
**Burson** [1] - 2974:20
**Burson-Marsteller** [1] - 2974:20
**business** [3] - 2923:22, 2946:13, 2965:18
**BY** [52] - 2851:15, 2853:2, 2860:23, 2874:6, 2874:17, 2876:7, 2878:13, 2883:14, 2884:10, 2887:6, 2887:19, 2892:25, 2893:16, 2895:22, 2896:23, 2897:9, 2905:17, 2907:5, 2908:23, 2909:22, 2911:6, 2913:7, 2915:7, 2919:23, 2927:18, 2928:8, 2930:22, 2933:1, 2939:3, 2943:20, 2944:2, 2945:11, 2949:5, 2950:20, 2956:23, 2958:14, 2958:22, 2959:10, 2959:17, 2959:22, 2962:1, 2969:5, 2970:9, 2972:10, 2977:21, 2978:11, 2979:25, 2983:20, 2985:19, 2987:4, 2988:4, 2988:22

# C

**C-R-A-I-G** [1] - 2851:18
**cafeteria** [1] - 2977:17
**calculated** [1] - 2990:2
**Califano** [2] - 2921:3, 2921:10
**California** [1] - 2920:10
**Cambridge** [1] - 2920:17
**campaign** [1] - 2852:18, 2900:22, 2922:5
**Campoamor** [3] - 2848:12, 2850:10, 2954:13
**CAMPOAMOR** [52] - 2850:8, 2852:20, 2865:20, 2866:7, 2867:23, 2869:10, 2870:1, 2871:18, 2872:5, 2873:2, 2873:7, 2873:14, 2873:22, 2884:8, 2884:13, 2885:4, 2885:8, 2885:16, 2887:15, 2889:14, 2892:10, 2892:20, 2895:17, 2897:3, 2906:23, 2906:25, 2908:10, 2909:16, 2911:16, 2912:1, 2917:16,

2918:1, 2918:24, 2927:14, 2941:16, 2943:10, 2943:12, 2943:17, 2952:13, 2952:21, 2954:14, 2955:19, 2956:5, 2958:7, 2958:17, 2959:2, 2959:15, 2961:20, 2970:6, 2971:25, 2985:9, 2987:21
**Campoamor-Sanchez** [1] - 2848:12
**CAMPOAMOR-SANCHEZ** [52] - 2850:8, 2852:20, 2865:20, 2866:7, 2867:23, 2869:10, 2870:1, 2871:18, 2872:5, 2873:2, 2873:7, 2873:14, 2873:22, 2884:8, 2884:13, 2885:4, 2885:8, 2885:16, 2887:15, 2889:14, 2892:10, 2892:20, 2895:17, 2897:3, 2906:23, 2906:25, 2908:10, 2909:16, 2911:16, 2912:1, 2917:16, 2918:1, 2918:24, 2927:14, 2941:16, 2943:10, 2943:12, 2943:17, 2952:13, 2952:21, 2954:14, 2955:19, 2956:5, 2958:7, 2958:17, 2959:2, 2959:15, 2961:20, 2970:6, 2971:25, 2985:9, 2987:21
**cancellation** [1] - 2877:24
**cannot** [2] - 2933:5, 2973:3
**capacity** [1] - 2976:22
**care** [5] - 2853:18, 2954:2, 2967:25, 2973:19, 2977:9
**career** [2] - 2920:24, 2922:12
**careful** [2] - 2866:14, 2955:8
**Carnegie** [1] - 2923:9
**carried** [1] - 2908:7
**carry** [1] - 2990:7
**Case** [1] - 2850:4
**case** [20] - 2851:3, 2861:10, 2866:14, 2867:21, 2868:16, 2869:25, 2870:10, 2876:18, 2889:21, 2900:21, 2914:4, 2916:23, 2918:20, 2929:3, 2933:10, 2934:22, 2955:9, 2955:13, 2963:14, 2993:18
**catastrophe** [3] - 2945:3, 2945:4, 2945:10
**catch** [1] - 2862:7
**catch-22** [1] - 2909:13
**categories** [1] - 2928:14
**category** [2] - 2875:2, 2928:19
**caused** [3] - 2862:20, 2893:6, 2944:22
**certain** [6] - 2877:12, 2901:25, 2935:16, 2935:20, 2936:8, 2938:4
**certainly** [6] - 2863:20, 2886:15, 2919:14, 2943:4, 2945:21, 2961:24

certainty [1] - 2960:24
CERTIFICATE [1] - 2994:2
certify [1] - 2994:5
chain [12] - 2893:17, 2925:9,
2945:18, 2946:25, 2951:18,
2981:8, 2981:9, 2981:17,
2983:4, 2984:1, 2985:20,
2986:14
chairman [2] - 2923:5, 2975:23
challenge [2] - 2916:3, 2924:2
challenged [1] - 2970:18
chamber [1] - 2975:6
chance [3] - 2856:22, 2918:3,
2943:15
change [13] - 2868:23, 2873:24,
2883:2, 2938:21, 2938:22,
2946:5, 2946:6, 2946:20,
2948:4, 2950:5, 2952:5,
2953:21, 2987:19
changed [1] - 2883:20
changes [13] - 2946:3, 2948:1,
2949:18, 2949:21, 2950:7,
2950:10, 2952:11, 2952:23,
2952:24, 2953:6, 2953:19,
2957:15, 2964:9
changing [1] - 2922:17
channeled [1] - 2968:15
characterizations [2] - 2904:24,
2908:11
characterizing [1] - 2857:15
charge [4] - 2872:6, 2872:8,
2886:24
charged [6] - 2866:16, 2866:17,
2872:5, 2889:20, 2889:21,
2889:23
charges [5] - 2866:25, 2886:24,
2904:19, 2935:25, 2971:1
cherish [1] - 2924:19
chief [2] - 2960:7, 2964:5
children [2] - 2851:24, 2920:1
chitchatting [1] - 2919:10
choices [1] - 2952:6
chronological [1] - 2931:7
circulating [1] - 2879:6
circulation [2] - 2898:18,
2898:19
cite [1] - 2902:23
citizens [2] - 2922:25
city [1] - 2958:1
City [1] - 2960:8
civic [1] - 2975:14
civil [1] - 2965:19
Civil [1] - 2922:19
claim [2] - 2877:1, 2939:13
claims [5] - 2883:23, 2926:4,
2926:5, 2931:21, 2932:6
clarification [1] - 2950:1
clarifications [1] - 2950:6
clarify [3] - 2879:4, 2883:20,
2887:1

clarifying [1] - 2977:16
classic [1] - 2953:24
clear [14] - 2879:8, 2885:14,
2889:8, 2891:1, 2896:21,
2911:13, 2935:21, 2935:23,
2936:12, 2936:19, 2937:8,
2942:20, 2967:15, 2971:11
clearly [1] - 2891:22
Clerk [1] - 2943:23
CLERK [1] - 2943:24
client [11] - 2901:1, 2901:2,
2917:17, 2917:18, 2923:25,
2953:6, 2957:8, 2957:9,
2957:10, 2990:21
Cliff [18] - 2882:16, 2882:17,
2882:20, 2882:22, 2948:13,
2950:2, 2951:19, 2973:4,
2973:10, 2978:9, 2980:24,
2983:22, 2984:3, 2984:18,
2984:19, 2985:2, 2986:5, 2986:9
climbing [1] - 2940:17
Clinton [1] - 2922:3
close [4] - 2852:23, 2864:16,
2870:20, 2951:25
closer [2] - 2924:18, 2968:10
closes [1] - 2977:17
Club [5] - 2865:5, 2963:6,
2963:18, 2964:18, 2974:25
cochairman [1] - 2975:17
collection [1] - 2985:25
college [1] - 2940:14
College [2] - 2862:11, 2862:13
Colorado [2] - 2862:11,
2862:13
COLUMBIA [2] - 2848:1,
2848:14
Columbia [1] - 2852:3, 2920:2
combination [1] - 2981:2
coming [5] - 2867:11, 2897:20,
2904:11, 2918:4, 2981:2
comment [2] - 2927:16, 2951:9
commentary [1] - 2982:14
comments [25] - 2883:24,
2900:16, 2945:17, 2945:19,
2947:10, 2947:15, 2947:18,
2947:21, 2947:22, 2948:3,
2948:9, 2948:13, 2948:14,
2948:16, 2949:23, 2949:24,
2951:11, 2957:3, 2957:11,
2964:8, 2965:7, 2965:11,
2969:17, 2992:25
commerce [1] - 2975:6
commissioned [1] - 2877:9
commitment [1] - 2974:25
committed [4] - 2970:24,
2971:5, 2971:6, 2971:8
common [4] - 2924:6, 2925:23,
2925:25, 2926:7
communicated [5] - 2851:3,
2851:4, 2898:15, 2906:6,

2956:21
communication [3] - 2854:19,
2881:20, 2884:5
communications [17] -
2853:22, 2856:13, 2856:14,
2875:3, 2884:14, 2884:17,
2887:7, 2887:20, 2888:5,
2890:12, 2898:2, 2898:22,
2901:25, 2946:9, 2961:11,
2968:16, 2989:5
communism [1] - 2924:17
community [2] - 2944:24,
2975:5
community's [1] - 2923:7
companies [1] - 2902:9
comparable [1] - 2948:14
compensation [1] - 2978:18
competed [1] - 2930:14
complain [1] - 2963:10
complaining [1] - 2951:21
complete [3] - 2910:10, 2977:4,
2994:7
completed [1] - 2962:16
completely [2] - 2867:23,
2976:7
complied [1] - 2864:14
component [1] - 2923:5
components [3] - 2922:2,
2931:4, 2936:3
compound [1] - 2888:24
comprehensive [1] - 2948:20
compromised [1] - 2935:16
conceal [5] - 2852:7, 2852:9,
2871:7, 2901:10, 2904:7
concealing [4] - 2866:16,
2866:17, 2901:24, 2902:15
Concern [1] - 2944:6
concern [7] - 2865:7, 2892:14,
2940:19, 2941:20, 2941:21,
2941:22, 2942:24
concerned [12] - 2853:18,
2879:5, 2910:20, 2912:3,
2939:23, 2939:24, 2940:8,
2942:5, 2942:9, 2942:11,
2951:9, 2967:7
concerning [7] - 2853:22,
2875:16, 2881:21, 2881:22,
2884:11, 2966:1, 2993:4
concerns [3] - 2864:13,
2864:21, 2933:16
conclude [1] - 2991:14
concluded [14] - 2858:8,
2876:25, 2877:17, 2877:19,
2879:7, 2880:3, 2881:16,
2897:18, 2898:2, 2898:13,
2898:16, 2933:14, 2935:6,
2968:8
conclusion [23] - 2858:12,
2865:24, 2868:9, 2868:17,
2870:20, 2888:8, 2889:18,

2891:7, 2892:5, 2898:4, 2898:6,
2898:11, 2902:6, 2911:21,
2911:22, 2926:23, 2931:24,
2932:13, 2933:2, 2937:18,
2938:3, 2957:18
  **conclusions** [25] - 2908:11,
2926:24, 2927:3, 2932:3,
2932:5, 2932:17, 2932:24,
2935:20, 2937:17, 2937:20,
2938:2, 2938:19, 2938:21,
2946:20, 2947:12, 2947:19,
2950:8, 2952:6, 2957:14,
2957:19, 2960:15, 2960:18,
2963:1, 2965:23, 2969:10
  **conditions** [3] - 2925:12,
2926:14, 2979:4
  **conduct** [5] - 2886:18, 2887:22,
2909:7, 2924:4, 2933:5
  **conducted** [4] - 2880:11,
2924:24, 2927:21, 2929:23
  **conducting** [1] - 2925:4
  **confidence** [1] - 2853:16
  **confident** [1] - 2966:3
  **confidentiality** [1] - 2990:21
  **confirm** [1] - 2851:2
  **conflict** [1] - 2931:6
  **confront** [1] - 2924:15
  **congressman** [1] - 2975:20
  **connect** [1] - 2986:21
  **connected** [1] - 2984:8
  **Connecticut** [2] - 2921:6,
2921:8
  **connection** [5] - 2874:10,
2901:11, 2901:25, 2963:4,
2978:21
  **Connolly** [3] - 2921:3, 2921:10,
2921:14
  **consent** [1] - 2875:13
  **consider** [4] - 2901:1, 2950:4,
2968:5, 2991:17
  **considered** [2] - 2865:25,
2910:15
  **considering** [1] - 2968:8
  **considers** [1] - 2864:12
  **constitute** [1] - 2938:6
  **constituted** [1] - 2887:22
  **constitutes** [1] - 2994:6
  **Constitution** [2] - 2849:8,
2994:14
  **consult** [3] - 2906:8, 2906:15,
2928:20
  **consulted** [1] - 2877:22
  **consulting** [1] - 2891:9
  **contact** [14] - 2862:15, 2865:13,
2865:17, 2866:1, 2869:11,
2873:18, 2881:20, 2891:8,
2914:1, 2946:12, 2966:24,
2967:1, 2976:24, 2986:25
  **contacted** [3] - 2882:6,
2913:20, 2955:22

  **contacting** [3] - 2865:16,
2913:25, 2914:5
  **contacts** [22] - 2853:15, 2867:8,
2867:19, 2867:25, 2868:3,
2869:4, 2870:25, 2872:7,
2875:14, 2881:3, 2885:20,
2886:7, 2890:25, 2891:4,
2891:23, 2893:2, 2893:6,
2893:8, 2900:18, 2907:20,
2907:22, 2963:11
  **contain** [6] - 2860:12, 2932:2,
2978:23, 2980:1, 2989:14,
2990:10
  **contained** [1] - 2882:12
  **containing** [1] - 2858:16
  **contains** [2] - 2883:24, 2953:12
  **content** [3] - 2947:8, 2959:2,
2975:24
  **contents** [2] - 2931:8, 2931:22
  **context** [4] - 2865:21, 2885:10,
2941:11, 2991:17
  **continue** [3] - 2908:21,
2919:22, 2979:1
  **continued** [2] - 2946:6, 2960:16
  **continues** [1] - 2890:1
  **continuing** [1] - 2957:15
  **contract** [12] - 2978:14,
2978:15, 2988:14, 2989:10,
2989:11, 2989:14, 2989:15,
2989:20, 2989:21, 2989:24,
2990:15
  **contracts** [1] - 2990:14
  **contrary** [4] - 2880:23, 2895:16,
2900:25, 2945:25
  **control** [5] - 2887:9, 2888:14,
2889:16, 2890:9, 2939:17
  **conversation** [20] - 2854:8,
2855:15, 2856:6, 2857:2,
2857:6, 2857:7, 2858:19,
2859:12, 2859:13, 2859:23,
2863:5, 2863:6, 2878:20,
2881:25, 2886:25, 2901:20,
2907:15, 2965:9, 2966:5, 2980:8
  **conversations** [10] - 2852:14,
2852:17, 2853:4, 2853:23,
2854:2, 2856:4, 2859:24,
2874:7, 2906:13, 2963:24
  **conviction** [4] - 2875:11,
2925:10, 2933:17, 2970:19
  **cooperation** [1] - 2926:22
  **coordinating** [1] - 2922:1
  **copies** [1] - 2958:5
  **copy** [25] - 2854:25, 2855:2,
2855:3, 2856:9, 2856:17,
2856:20, 2861:9, 2861:21,
2862:5, 2868:25, 2881:18,
2882:7, 2882:9, 2899:10,
2899:25, 2903:15, 2913:20,
2913:21, 2948:12, 2976:23,
2977:25, 2979:2, 2983:24,

2988:9, 2988:10
  **copying** [1] - 2983:24
  **core** [3] - 2931:19, 2934:13
  **correct** [17] - 2864:7, 2864:12,
2864:14, 2898:22, 2900:22,
2900:24, 2904:2, 2904:10,
2905:12, 2905:23, 2908:15,
2910:8, 2958:11, 2979:21,
2979:24, 2983:3, 2993:2
  **corrected** [3] - 2883:16,
2883:17, 2906:2
  **correcting** [2] - 2884:18,
2905:10
  **correction** [2] - 2906:2, 2950:1
  **Correction** [1] - 2883:20
  **corrections** [3] - 2907:24,
2955:21, 2969:17
  **correspondence** [1] - 2978:17
  **corruption** [1] - 2924:15
  **cost** [1] - 2989:9
  **costs** [1] - 2990:16
  **counsel** [13] - 2850:5, 2857:23,
2876:3, 2877:21, 2910:12,
2918:22, 2922:8, 2933:25,
2934:7, 2934:11, 2934:15,
2938:6, 2938:24
  **Counsel** [3] - 2878:7, 2893:11,
2949:1
  **count** [2] - 2906:14, 2930:4
  **countries** [1] - 2923:13
  **country** [10] - 2920:8, 2922:25,
2924:13, 2925:13, 2925:14,
2925:15, 2925:16, 2925:18,
2976:5
  **couple** [1] - 2863:14
  **course** [4] - 2923:24, 2926:3,
2928:13, 2951:8
  **court** [11] - 2874:5, 2875:10,
2876:20, 2877:21, 2887:5,
2892:24, 2913:6, 2919:3,
2919:20, 2943:19, 2956:22
  **COURT** [191] - 2848:1, 2850:2,
2850:12, 2850:16, 2850:20,
2850:22, 2851:6, 2851:10,
2852:23, 2860:21, 2865:22,
2866:3, 2866:6, 2866:13,
2867:3, 2867:10, 2867:13,
2867:16, 2867:22, 2867:24,
2868:13, 2868:22, 2869:13,
2870:7, 2870:17, 2870:24,
2871:2, 2871:12, 2871:15,
2871:17, 2872:10, 2872:22,
2872:25, 2873:13, 2873:15,
2873:23, 2874:3, 2876:4,
2876:6, 2884:9, 2884:16,
2884:22, 2885:6, 2885:14,
2885:18, 2885:22, 2885:24,
2886:4, 2886:8, 2886:20,
2886:23, 2887:16, 2887:18,
2887:24, 2888:1, 2888:12,

2888:17, 2888:21, 2889:11, 2889:23, 2890:16, 2890:19, 2891:6, 2891:11, 2891:16, 2891:20, 2891:25, 2892:3, 2892:15, 2892:18, 2892:23, 2895:19, 2895:21, 2896:5, 2896:7, 2896:9, 2896:15, 2896:19, 2897:7, 2905:15, 2906:24, 2907:2, 2908:12, 2908:16, 2908:18, 2908:21, 2909:17, 2909:21, 2910:2, 2910:7, 2911:11, 2911:17, 2911:19, 2912:2, 2912:8, 2912:15, 2912:24, 2914:25, 2915:5, 2916:21, 2917:2, 2917:7, 2917:9, 2917:15, 2917:21, 2917:25, 2918:3, 2918:9, 2918:15, 2918:23, 2919:1, 2919:4, 2919:8, 2919:13, 2919:16, 2919:19, 2919:22, 2927:15, 2927:20, 2927:25, 2928:3, 2928:5, 2930:21, 2932:16, 2932:19, 2932:22, 2939:1, 2941:18, 2941:25, 2942:2, 2942:19, 2942:25, 2943:7, 2943:11, 2943:16, 2943:18, 2945:6, 2952:14, 2952:16, 2952:18, 2953:3, 2953:8, 2953:12, 2953:15, 2953:18, 2954:1, 2954:9, 2954:16, 2954:24, 2955:7, 2955:16, 2956:9, 2956:11, 2956:13, 2956:17, 2956:21, 2958:8, 2958:12, 2958:18, 2958:21, 2958:25, 2959:4, 2959:9, 2959:13, 2959:16, 2961:21, 2961:25, 2969:24, 2970:2, 2970:4, 2971:23, 2972:1, 2972:4, 2977:3, 2977:13, 2977:16, 2977:20, 2979:5, 2979:8, 2979:11, 2979:15, 2979:17, 2979:19, 2979:22, 2985:10, 2985:16, 2985:18, 2987:24, 2993:14, 2993:21, 2994:2
  **Court** [13] - 2849:7, 2849:7, 2866:9, 2876:22, 2877:1, 2887:17, 2889:19, 2917:20, 2933:4, 2933:10, 2934:5, 2971:7, 2994:13
  **Court's** [3] - 2935:15, 2938:4, 2948:22
  **Courthouse** [1] - 2849:8
  **courtroom** [5] - 2850:21, 2917:1, 2919:21, 2936:6, 2993:20
  **COURTROOM** [15] - 2850:1, 2850:3, 2876:3, 2878:7, 2878:10, 2893:11, 2893:13, 2893:15, 2938:24, 2949:1,

2949:3, 2950:17, 2959:19, 2959:21, 2969:3
  **courts** [6] - 2918:7, 2918:8, 2921:8, 2922:24, 2933:11, 2938:7
  **cover** [2] - 2867:1, 2867:3
  **coverage** [2] - 2897:11, 2982:8
  **covered** [2] - 2868:20, 2868:22
  **Craig** [103] - 2848:6, 2849:14, 2850:4, 2850:15, 2850:16, 2851:9, 2851:16, 2851:18, 2852:1, 2852:4, 2852:14, 2860:24, 2861:22, 2862:14, 2863:3, 2863:16, 2863:17, 2863:23, 2864:7, 2864:25, 2874:7, 2874:14, 2875:14, 2875:19, 2878:1, 2879:11, 2879:23, 2880:13, 2881:3, 2883:15, 2883:25, 2887:7, 2887:20, 2893:2, 2896:3, 2897:22, 2899:9, 2900:5, 2901:24, 2902:25, 2904:18, 2905:3, 2905:18, 2906:19, 2908:5, 2913:8, 2913:13, 2917:13, 2919:24, 2920:6, 2922:12, 2923:19, 2927:4, 2927:10, 2928:9, 2930:16, 2932:9, 2935:20, 2937:16, 2938:8, 2939:6, 2940:5, 2941:11, 2943:21, 2946:8, 2946:25, 2947:20, 2951:14, 2951:23, 2953:11, 2953:23, 2954:8, 2954:10, 2954:11, 2956:3, 2956:24, 2957:14, 2959:23, 2960:15, 2961:3, 2962:2, 2963:18, 2965:24, 2967:24, 2969:15, 2972:1, 2973:6, 2973:11, 2973:19, 2974:22, 2977:22, 2978:5, 2978:12, 2980:12, 2981:2, 2981:8, 2982:10, 2985:6, 2987:1, 2988:5, 2988:12, 2989:10, 2992:1
  **CRAIG** [1] - 2851:11
  **Craig's** [2] - 2871:5, 2942:24
  **CRC** [2] - 2849:7, 2994:13
  **created** [1] - 2928:13
  **credibility** [3] - 2936:6, 2936:8, 2936:9
  **credit** [1] - 2879:1
  **crime** [5] - 2935:1, 2970:25, 2971:5, 2971:6, 2971:8
  **criminal** [3] - 2875:13, 2918:19, 2937:2
  **Criminal** [2] - 2848:3, 2850:3
  **critical** [7] - 2884:25, 2894:4, 2894:21, 2930:7, 2932:7, 2932:20, 2934:9
  **criticism** [3] - 2970:20, 2970:21
  **criticisms** [1] - 2970:18

  **criticize** [1] - 2952:2
  **cross** [9] - 2888:5, 2893:6, 2918:19, 2919:9, 2919:10, 2919:11, 2934:12, 2953:9, 2993:15
  **cross-examination** [2] - 2934:12, 2993:15
  **cross-examined** [1] - 2953:9
  **crossed** [17] - 2872:3, 2873:25, 2874:8, 2874:11, 2875:15, 2881:21, 2884:6, 2884:11, 2884:19, 2885:21, 2886:18, 2888:20, 2890:4, 2891:4, 2912:17, 2961:22, 2965:25
  **crossing** [1] - 2869:23
  **crowd** [1] - 2965:8
  **CRR** [2] - 2849:7, 2994:13
  **cumulative** [1] - 2956:7
  **curve** [3] - 2921:21, 2924:11, 2924:12

## D

  **D.C** [12] - 2848:6, 2848:15, 2848:18, 2849:3, 2849:9, 2851:20, 2921:2, 2921:9, 2923:7, 2930:1, 2974:8, 2994:15
  **Daily** [9] - 2857:9, 2869:2, 2875:24, 2876:17, 2877:22, 2887:8, 2887:21, 2894:10, 2906:8
  **data** [2] - 2929:24, 2990:7
  **database** [2] - 2925:24, 2925:25
  **date** [8] - 2868:1, 2879:13, 2899:19, 2899:22, 2905:1, 2945:23, 2969:12, 2987:5
  **Dated** [1] - 2994:9
  **dated** [5] - 2944:4, 2949:15, 2980:10, 2980:15, 2992:16
  **dates** [5] - 2869:4, 2987:8, 2987:9, 2987:10, 2987:14
  **David** [27] - 2854:11, 2854:19, 2854:21, 2855:17, 2856:8, 2856:21, 2856:22, 2859:4, 2859:20, 2860:25, 2861:3, 2861:16, 2863:4, 2863:13, 2864:6, 2872:14, 2878:20, 2914:3, 2914:5, 2966:24, 2967:1, 2976:15, 2976:16, 2976:18, 2986:21, 2987:13
  **David's** [1] - 2855:21
  **DAY** [2] - 2848:5, 2848:8
  **day-to-day** [1] - 2921:19
  **days** [2] - 2949:16, 2976:7
  **dead** [1] - 2906:1
  **deal** [6] - 2869:19, 2924:15, 2926:2, 2945:3, 2949:24, 2975:14
  **dealing** [1] - 2973:6
  **deals** [1] - 2931:20

**Dear** [1] - 2969:14
**debate** [1] - 2926:3
**debating** [1] - 2925:25
**December** [29] - 2852:15,
2853:7, 2861:1, 2868:25,
2869:1, 2875:21, 2879:14,
2892:21, 2896:8, 2896:12,
2896:17, 2897:10, 2899:11,
2905:1, 2906:19, 2931:10,
2974:1, 2977:23, 2987:5,
2987:11, 2987:20, 2987:25,
2988:6, 2988:7, 2988:8, 2992:7
**decide** [2] - 2866:15, 2993:7
**decided** [3] - 2854:12, 2861:9,
2980:25
**deciding** [1] - 2936:20
**decision** [11] - 2854:23,
2876:19, 2876:22, 2898:5,
2900:8, 2900:17, 2916:10,
2916:14, 2933:12, 2935:15,
2938:4
**decision-makers** [2] - 2898:5,
2900:8
**decisions** [1] - 2926:12
**decline** [1] - 2948:18
**declined** [5] - 2864:18, 2881:11,
2960:11, 2961:9, 2990:20
**Defendant** [2] - 2848:7, 2848:20
**defendant** [6] - 2918:20,
2918:21, 2926:18, 2933:4,
2938:4
**defendant's** [3] - 2878:12,
2883:9, 2889:21
**Defendant's** [1] - 2883:7
**defendants** [1] - 2929:2
**defender** [1] - 2921:6
**defenders** [1] - 2921:7
**defending** [1] - 2880:25
**defense** [19] - 2851:9, 2857:24,
2871:9, 2921:24, 2922:2,
2927:3, 2928:23, 2929:2,
2934:7, 2934:12, 2934:25,
2935:2, 2935:9, 2935:10,
2935:12, 2935:14, 2935:16,
2935:17, 2972:25
**Defense** [14] - 2875:18,
2876:15, 2878:5, 2895:5,
2895:8, 2938:23, 2943:21,
2946:22, 2948:25, 2950:14,
2951:12, 2959:18, 2969:2,
2972:13
**deficient** [1] - 2951:8
**define** [1] - 2897:7
**definition** [4] - 2909:7, 2909:9,
2925:3, 2931:17
**definitive** [3] - 2947:15,
2947:23, 2948:2
**delaying** [1] - 2971:1
**delegation** [2] - 2957:25,
2975:18

**deliver** [12] - 2862:20, 2938:10,
2938:11, 2952:9, 2957:22,
2957:23, 2958:2, 2958:10,
2958:24, 2960:4, 2960:7, 2964:9
**delivered** [6] - 2855:11,
2952:12, 2957:12, 2958:16,
2960:12, 2987:13
**delivering** [1] - 2965:2
**delivery** [3] - 2953:6, 2964:1,
2964:2
**demanding** [1] - 2924:3
**demeanor** [2] - 2936:6, 2936:8
**Democracy** [1] - 2975:23
**democracy** [3] - 2923:1,
2923:10, 2975:22
**Democratic** [1] - 2922:21
**demonstrate** [1] - 2948:21
**demonstrated** [1] - 2954:7
**denial** [2] - 2929:1, 2929:2
**denied** [3] - 2857:23, 2857:24,
2935:7
**Department** [4] - 2848:17,
2898:6, 2921:17, 2921:20
**deprived** [2] - 2933:16, 2933:18
**DEPUTY** [15] - 2850:1, 2850:3,
2876:3, 2878:7, 2878:10,
2893:11, 2893:13, 2893:15,
2938:24, 2949:1, 2949:3,
2950:17, 2959:19, 2959:21,
2969:3
**deputy** [1] - 2854:23
**der** [15] - 2945:24, 2953:5,
2953:9, 2953:11, 2955:4,
2956:18, 2957:1, 2957:4,
2958:23, 2959:6, 2960:3,
2964:23, 2965:15, 2967:15,
2989:13
**describe** [2] - 2867:25, 2868:1,
2882:3
**described** [6] - 2864:8,
2864:21, 2880:7, 2905:11,
2905:24, 2940:15
**describing** [5] - 2884:7, 2896:4,
2896:14, 2896:16, 2905:24
**description** [6] - 2853:10,
2940:2, 2942:10, 2970:22,
2979:3, 2990:10
**descriptions** [1] - 2920:24
**desire** [1] - 2972:19
**desperately** [1] - 2961:6
**detail** [2] - 2942:22, 2971:16
**detailed** [4] - 2869:4, 2895:1,
2948:20, 2990:10
**detain** [2] - 2933:3, 2933:12
**Detention** [1] - 2932:14
**detention** [2] - 2933:2, 2933:9
**determination** [4] - 2861:15,
2861:16, 2862:21, 2909:8
**determine** [3] - 2868:6,
2879:25, 2883:21

**determined** [3] - 2861:10,
2861:18, 2989:25
**develop** [3] - 2923:1, 2924:6,
2924:17
**developing** [1] - 2923:17
**DICKMAN** [1] - 2994:5
**Dickman** [2] - 2849:7, 2994:13
**difference** [4] - 2874:21,
2896:10, 2924:21, 2925:1
**different** [7] - 2890:12, 2891:13,
2909:2, 2910:2, 2911:23,
2912:18, 2932:16
**difficult** [1] - 2924:16
**dinner** [1] - 2964:23
**Diploma** [1] - 2920:18
**diplomats** [1] - 2976:2
**direct** [8] - 2892:3, 2897:22,
2917:14, 2918:19, 2919:5,
2942:9, 2977:4, 2977:14
**DIRECT** [1] - 2851:14
**Direct** [1] - 2849:15
**directed** [2] - 2891:5, 2969:14
**directing** [1] - 2932:23
**direction** [7] - 2885:1, 2885:2,
2887:9, 2888:14, 2889:16,
2890:9, 2909:14
**directly** [12] - 2860:3, 2866:24,
2867:20, 2868:18, 2869:24,
2872:4, 2874:23, 2878:19,
2882:21, 2892:2, 2905:7,
2954:23
**director** [1] - 2921:16
**disagree** [2] - 2867:23, 2916:10
**disagreed** [2] - 2868:16,
2892:12
**disappointed** [1] - 2948:16
**disaster** [1] - 2940:20
**disclose** [1] - 2911:8
**discredit** [1] - 2876:17
**discuss** [11] - 2862:4, 2864:18,
2898:25, 2902:7, 2908:3,
2914:19, 2915:18, 2916:23,
2934:17, 2991:3, 2993:18
**discussed** [5] - 2872:17,
2893:2, 2925:4, 2950:22, 2966:1
**discussing** [1] - 2926:1
**discussion** [13] - 2858:18,
2866:5, 2884:23, 2887:25,
2911:12, 2917:8, 2931:18,
2932:2, 2934:21, 2942:1,
2952:20, 2962:3, 2962:7
**discussions** [3] - 2853:17,
2966:22, 2978:18
**dispute** [4] - 2931:9, 2931:16,
2948:11, 2948:23
**disputed** [2] - 2892:16, 2948:18
**disputes** [1] - 2952:6
**disregarded** [2] - 2869:20,
2869:22
**disregarding** [4] - 2869:24,

2870:2, 2871:20, 2871:21
**disrupting** [2] - 2933:4, 2971:1
**disruptive** [1] - 2933:7
**disseminate** [1] - 2913:16
**disseminated** [2] - 2898:14, 2914:14
**dissemination** [2] - 2898:21, 2900:18
**distributed** [1] - 2850:23
**distributing** [1] - 2900:23
**distribution** [1] - 2865:5
**DISTRICT** [4] - 2848:1, 2848:1, 2848:10, 2848:14
**District** [3] - 2852:3, 2918:17, 2920:2
**division** [1] - 2916:2
**document** [16] - 2865:5, 2899:20, 2943:22, 2956:9, 2963:5, 2969:16, 2969:19, 2970:10, 2970:11, 2970:14, 2970:15, 2971:4, 2972:3, 2972:4, 2973:7, 2988:23
**documentary** [1] - 2928:19
**documents** [6] - 2928:11, 2928:12, 2946:14, 2952:7, 2966:19, 2970:24
**DOJ** [2] - 2913:1, 2983:7
**domain** [1] - 2940:3
**Done** [1] - 2855:1
**done** [22] - 2855:1, 2871:7, 2871:10, 2878:1, 2880:8, 2900:8, 2900:9, 2900:10, 2902:7, 2902:8, 2914:10, 2927:11, 2928:9, 2952:9, 2960:6, 2961:12, 2965:23, 2976:24, 2977:19, 2978:22
**doubt** [1] - 2948:21
**dovetail** [1] - 2866:8
**down** [14] - 2868:8, 2869:1, 2877:15, 2879:19, 2911:20, 2934:4, 2934:25, 2944:10, 2944:25, 2948:8, 2948:10, 2961:23, 2965:4, 2965:6
**draft** [16] - 2914:23, 2915:10, 2915:12, 2915:18, 2915:22, 2916:4, 2930:14, 2938:14, 2938:16, 2938:17, 2939:24, 2945:22, 2946:16, 2964:9, 2978:8, 2981:2
**drafted** [4] - 2962:22, 2987:1, 2989:10, 2989:11
**drafting** [2] - 2962:20, 2980:25
**dramatically** [1] - 2941:10
**draw** [8] - 2872:19, 2932:5, 2933:2, 2935:21, 2937:21, 2957:14, 2960:15, 2990:8
**drawing** [1] - 2858:13
**drawn** [2] - 2954:2, 2960:19
**drew** [1] - 2957:18
**driven** [2] - 2937:14, 2937:24

**drop** [1] - 2855:17
**dropped** [3] - 2855:20, 2856:2
**due** [12] - 2853:13, 2859:2, 2864:16, 2924:8, 2927:1, 2931:20, 2931:23, 2932:6, 2933:20, 2933:23, 2937:1, 2938:7
**dueling** [1] - 2939:16
**duly** [1] - 2851:12
**during** [22] - 2877:20, 2881:4, 2882:1, 2891:7, 2896:13, 2897:2, 2897:6, 2897:8, 2907:6, 2916:24, 2917:13, 2919:10, 2920:7, 2922:3, 2935:1, 2935:8, 2938:20, 2946:4, 2946:19, 2960:8, 2964:10, 2992:22
**duty** [1] - 2869:5
**DX149-4** [1] - 2970:15

## E

**Earle** [1] - 2977:23
**early** [6] - 2854:12, 2856:7, 2861:9, 2930:13, 2976:1, 2986:24
**easily** [1] - 2855:1
**East** [3] - 2848:22, 2975:1, 2976:6
**Eastern** [1] - 2923:12
**eastern** [2] - 2923:13, 2925:16
**eat** [1] - 2977:11
**Eckart** [1] - 2974:14
**edit** [1] - 2981:1
**edited** [1] - 2987:24
**editing** [1] - 2987:19
**editor** [2] - 2854:23, 2882:20
**editors** [1] - 2862:4
**educating** [1] - 2923:16
**educator** [1] - 2920:8
**effect** [3] - 2858:5, 2859:15, 2879:10
**effective** [1] - 2893:22
**effort** [3] - 2852:12, 2946:20, 2957:15
**efforts** [5] - 2938:21, 2948:4, 2950:5, 2952:4, 2958:24
**egregious** [2] - 2970:23, 2971:9
**Egypt** [3] - 2974:22, 2975:1, 2975:6, 2975:13, 2976:4, 2976:5
**Egyptian** [2] - 2975:4, 2975:10
**eight** [3] - 2930:5, 2931:20, 2931:23
**either** [5] - 2889:25, 2918:4, 2954:16, 2965:14, 2974:19
**elected** [3] - 2922:6, 2975:10, 2975:11
**electronic** [5] - 2855:2, 2855:3, 2856:9, 2856:17, 2856:20
**elementary** [1] - 2920:7
**Email** [8] - 2848:16, 2848:16,

2848:19, 2848:24, 2848:25, 2848:25, 2849:4, 2849:5
**email** [72] - 2854:6, 2854:7, 2854:15, 2856:8, 2856:16, 2858:16, 2858:22, 2860:24, 2861:3, 2862:2, 2862:3, 2863:9, 2863:25, 2864:3, 2864:5, 2874:16, 2874:18, 2893:17, 2895:10, 2913:8, 2913:13, 2914:3, 2914:11, 2914:19, 2915:17, 2939:19, 2940:3, 2940:13, 2941:22, 2943:9, 2945:1, 2945:18, 2946:25, 2947:2, 2947:8, 2948:12, 2949:7, 2949:12, 2950:22, 2951:1, 2951:14, 2951:18, 2951:19, 2951:23, 2952:15, 2953:3, 2953:11, 2953:12, 2955:17, 2956:19, 2957:1, 2957:2, 2959:24, 2967:20, 2968:11, 2968:21, 2968:22, 2969:6, 2973:11, 2973:17, 2981:8, 2981:9, 2981:16, 2981:19, 2982:6, 2983:4, 2983:21, 2983:24, 2984:1, 2985:23, 2986:4, 2986:14
**emails** [7] - 2858:19, 2863:4, 2914:10, 2939:7, 2943:25, 2955:2, 2985:25
**emarcus@zuckerman.com** [1] - 2849:5
**embarrassed** [2] - 2911:7, 2917:11
**Emily** [2] - 2881:8, 2983:6
**employer** [2] - 2990:9
**encounter** [1] - 2962:8
**end** [11] - 2864:8, 2886:15, 2901:17, 2930:13, 2962:15, 2965:1, 2965:8, 2967:4, 2973:13, 2974:24, 2981:17
**ended** [2] - 2938:12, 2967:9
**endorse** [1] - 2928:1
**Endowment** [2] - 2923:9, 2975:23
**engaged** [3] - 2851:25, 2898:13, 2929:15
**engagement** [1] - 2926:10
**engaging** [3] - 2874:1, 2910:25, 2912:10
**English** [8] - 2894:18, 2895:9, 2939:11, 2939:14, 2939:18, 2941:8, 2978:14, 2978:15
**English-language** [2] - 2894:18, 2895:9
**enlighten** [1] - 2941:12
**enter** [2] - 2866:8, 2931:15
**entered** [4] - 2888:14, 2931:14, 2988:15, 2989:7
**enterprise** [1] - 2924:3
**enters** [2] - 2850:21, 2919:21

**entire** [4] - 2886:25, 2922:14, 2933:13, 2938:20
**entirely** [1] - 2871:6
**entitled** [1] - 2977:5
**erroneous** [7] - 2882:13, 2882:16, 2898:3, 2904:23, 2984:18, 2985:2
**errors** [2] - 2900:23, 2973:7
**essentially** [4] - 2866:12, 2890:13, 2901:3, 2901:19
**establish** [3] - 2876:25, 2953:20, 2953:22
**established** [1] - 2873:25
**establishes** [1] - 2905:1
**Estonia** [1] - 2923:13
**ethics** [1] - 2968:1
**Europe** [6] - 2897:20, 2899:12, 2923:12, 2925:15, 2945:14
**European** [1] - 2924:18
**evaluate** [1] - 2949:25
**evaluated** [1] - 2880:12
**evening** [3] - 2856:1, 2857:3, 2976:11
**event** [6] - 2925:14, 2968:18, 2968:19, 2968:20, 2968:21, 2985:2
**events** [1] - 2925:9
**evidence** [40] - 2860:20, 2863:1, 2870:8, 2874:15, 2876:3, 2876:5, 2876:24, 2877:20, 2878:7, 2879:24, 2883:8, 2883:21, 2886:6, 2893:11, 2900:10, 2904:16, 2925:24, 2926:4, 2928:19, 2930:20, 2936:14, 2936:16, 2938:24, 2943:23, 2948:18, 2948:21, 2948:22, 2949:1, 2950:17, 2953:24, 2955:23, 2956:10, 2956:13, 2959:19, 2969:3, 2969:4, 2971:6, 2971:8, 2971:12, 2972:25
**ex** [1] - 2879:2
**ex-premier** [1] - 2879:2
**exact** [1] - 2873:16
**exactly** [7] - 2871:13, 2881:11, 2887:1, 2887:2, 2912:25, 2922:15, 2964:15
**EXAMINATION** [1] - 2851:14
**examination** [3] - 2917:14, 2934:12, 2993:15
**Examination** [1] - 2849:15
**examined** [2] - 2851:13, 2953:9
**examining** [1] - 2934:6
**example** [4] - 2895:14, 2929:6, 2935:22, 2972:24
**exceeded** [1] - 2931:13
**except** [1] - 2894:10
**exception** [1] - 2918:19
**excerpts** [1] - 2857:17
**exchange** [7] - 2860:25,

2863:10, 2863:11, 2943:25, 2946:8, 2984:22
**exchanged** [1] - 2858:19
**exchanges** [1] - 2854:5
**excited** [2] - 2924:2, 2924:9
**exclude** [2] - 2988:5, 2988:7
**excused** [1] - 2917:3
**executive** [5] - 2931:1, 2932:2, 2932:8, 2932:9, 2934:19
**executor** [5] - 2990:2, 2990:4, 2990:5, 2990:6, 2990:8
**Exeter** [2] - 2920:13, 2920:14
**exhibit** [9] - 2876:13, 2878:12, 2899:23, 2903:4, 2969:22, 2972:12, 2980:12, 2988:19, 2990:25
**Exhibit** [40] - 2860:18, 2860:19, 2862:25, 2874:12, 2875:18, 2876:15, 2878:6, 2883:7, 2893:10, 2895:5, 2895:8, 2899:7, 2899:23, 2903:2, 2913:11, 2914:22, 2930:15, 2930:18, 2938:23, 2943:21, 2946:22, 2948:25, 2950:14, 2951:13, 2956:24, 2959:18, 2969:2, 2972:13, 2978:4, 2979:7, 2979:15, 2980:19, 2981:6, 2981:7, 2987:2, 2990:22, 2991:1, 2992:15
**exhibits** [2] - 2928:11, 2928:17
**existing** [1] - 2979:2
**exits** [2] - 2917:1, 2993:20
**exonerates** [1] - 2940:16
**expected** [1] - 2947:21
**expended** [1] - 2990:11
**experience** [5] - 2865:3, 2865:4, 2922:13, 2922:17, 2929:23
**experienced** [1] - 2961:7
**experiences** [1] - 2922:18
**expert** [2] - 2875:13, 2877:22
**experts** [3] - 2936:1, 2936:25, 2937:5
**explain** [5] - 2874:21, 2892:12, 2898:4, 2930:23, 2936:23
**explained** [14] - 2872:17, 2875:15, 2882:23, 2885:5, 2900:12, 2926:13, 2933:22, 2941:19, 2941:20, 2943:10, 2943:11, 2943:16, 2948:17, 2992:22
**explaining** [3] - 2900:17, 2948:24, 2971:19
**explains** [1] - 2890:24
**explanation** [2] - 2894:17, 2943:14
**explicit** [1] - 2918:17
**explicitly** [3] - 2858:12, 2864:18, 2937:9
**exploring** [1] - 2916:1

**express** [1] - 2937:10
**expressing** [1] - 2940:19
**extraordinary** [1] - 2924:12
**Ezra** [2] - 2849:1, 2850:15

**F**

**face** [1] - 2959:14
**fact** [21] - 2851:1, 2853:17, 2866:16, 2867:1, 2867:3, 2876:25, 2879:4, 2887:13, 2888:13, 2890:3, 2912:11, 2933:20, 2946:11, 2949:23, 2954:2, 2954:18, 2966:3, 2984:14, 2986:18, 2989:7
**facts** [10] - 2866:17, 2868:5, 2873:9, 2876:23, 2891:18, 2891:20, 2901:25, 2926:8, 2934:22, 2966:9
**factual** [8] - 2867:14, 2867:15, 2867:17, 2869:7, 2948:10, 2948:23, 2950:1, 2952:5
**factually** [1] - 2951:7
**failed** [1] - 2971:11
**failing** [3] - 2872:6, 2889:23, 2934:7
**Failings** [1] - 2879:2
**failure** [2] - 2889:22, 2912:6
**fair** [13] - 2858:15, 2859:7, 2877:18, 2878:24, 2879:25, 2882:25, 2883:1, 2890:15, 2927:2, 2931:22, 2932:25, 2942:7, 2993:8
**fairly** [2] - 2896:21, 2930:24
**fairness** [3] - 2880:12, 2922:24, 2935:15
**faith** [2] - 2872:11, 2966:14
**faithful** [1] - 2853:19
**fall** [1] - 2974:22
**falls** [1] - 2866:13
**false** [7] - 2869:6, 2886:12, 2887:2, 2887:3, 2904:24, 2940:2, 2940:9
**falsely** [1] - 2940:15
**family** [4] - 2851:21, 2851:22, 2851:23, 2920:1
**far** [3] - 2894:24, 2951:8, 2981:17
**FARA** [68] - 2852:4, 2852:6, 2852:7, 2852:9, 2852:12, 2866:17, 2866:25, 2867:20, 2868:14, 2868:19, 2869:13, 2869:18, 2869:24, 2870:15, 2871:6, 2872:20, 2874:3, 2874:10, 2875:16, 2878:3, 2881:23, 2884:12, 2885:20, 2893:7, 2897:23, 2897:25, 2898:1, 2898:5, 2898:8, 2899:1, 2899:22, 2900:7, 2900:17, 2901:9, 2901:12, 2901:14,

2901:25, 2902:16, 2904:25,
2905:24, 2905:25, 2914:12,
2916:2, 2916:14, 2966:1,
2966:11, 2968:10, 2978:1,
2979:10, 2980:6, 2980:10,
2980:15, 2980:20, 2982:1,
2982:2, 2982:17, 2982:20,
2983:6, 2989:1, 2989:6,
2990:12, 2991:19, 2992:1,
2992:5, 2992:10, 2992:16
   **Farragut** [1] - 2855:9
   **fashion** [1] - 2933:5
   **father** [1] - 2920:8
   **favor** [1] - 2861:17
   **fed** [1] - 2873:3
   **federal** [3] - 2921:6, 2921:7,
2921:8
   **feelings** [1] - 2972:5
   **fees** [1] - 2852:11
   **fell** [1] - 2980:8
   **fellowship** [1] - 2920:17
   **Fernando** [2] - 2848:12,
2850:10
   **fernando.campoamor** [1] -
2848:16
   **fernando.campoamor-**
**sanchez@usdoj.gov** [1] -
2848:16
   **few** [2] - 2901:4, 2962:11
   **field** [1] - 2862:11
   **fifth** [1] - 2948:8
   **Fin** [2] - 2977:12, 2977:13
   **final** [13] - 2938:10, 2938:11,
2947:10, 2947:15, 2947:18,
2947:22, 2947:23, 2948:3,
2960:4, 2964:8, 2965:7, 2989:25
   **finalize** [1] - 2964:8
   **finalizing** [2] - 2963:25, 2965:2
   **finally** [1] - 2938:12
   **financial** [1] - 2937:7
   **findings** [12] - 2853:19,
2864:19, 2876:17, 2876:25,
2878:23, 2879:4, 2931:2,
2940:15, 2964:12, 2965:22,
2971:18, 2971:19
   **Fine** [2] - 2855:4, 2858:4
   **fine** [9] - 2871:22, 2886:16,
2892:15, 2901:23, 2942:25,
2945:6, 2954:5, 2964:14, 2970:5
   **finish** [5] - 2884:9, 2910:5,
2919:7, 2977:8, 2977:13
   **finished** [2] - 2938:8, 2938:9
   **firm** [18] - 2872:18, 2874:1,
2888:7, 2912:4, 2921:3, 2922:4,
2922:7, 2922:10, 2923:22,
2961:5, 2961:8, 2961:16,
2961:17, 2961:23, 2968:14,
2974:14, 2974:17, 2992:23
   **firm's** [1] - 2905:9
   **first** [27] - 2851:12, 2854:18,

2856:16, 2861:3, 2861:11,
2861:19, 2877:4, 2879:13,
2888:1, 2899:8, 2908:6,
2913:16, 2916:6, 2929:14,
2930:13, 2938:17, 2957:22,
2958:1, 2962:8, 2963:22,
2964:25, 2965:5, 2967:12,
2980:25, 2981:9, 2981:16,
2990:13
   **five** [8] - 2851:24, 2858:22,
2920:20, 2921:13, 2929:25,
2931:1, 2946:5, 2950:4
   **fix** [3] - 2856:19, 2955:2
   **flat** [2] - 2865:7, 2971:13
   **flat-out** [1] - 2971:13
   **flatly** [1] - 2973:1
   **flaw** [1] - 2878:25
   **flawed** [5] - 2858:6, 2859:2,
2877:9, 2877:11, 2882:25,
2883:2, 2883:18
   **flaws** [3] - 2853:12, 2857:21,
2970:14
   **FleishmanHillard** [1] - 2974:17
   **focused** [6] - 2902:10, 2902:12,
2923:12, 2923:15, 2942:21,
2987:13
   **Folks** [1] - 2963:13
   **folks** [1] - 2902:9
   **followed** [1] - 2865:5
   **follows** [1] - 2851:13
   **fool** [1] - 2901:12
   **footnote** [4] - 2904:12, 2904:14,
2905:3, 2905:6
   **footnotes** [1] - 2952:6
   **FOR** [2] - 2848:1, 2848:13
   **forces** [1] - 2894:20
   **foregoing** [1] - 2994:6
   **foreign** [17] - 2854:23, 2866:1,
2871:24, 2873:4, 2873:19,
2873:20, 2908:7, 2908:8,
2908:9, 2909:13, 2909:14,
2910:14, 2910:24, 2911:4,
2911:8, 2921:12, 2922:6
   **forever** [1] - 2940:17
   **forgotten** [1] - 2884:24
   **form** [13] - 2852:20, 2865:20,
2888:25, 2889:6, 2895:17,
2896:22, 2897:3, 2911:8,
2938:10, 2938:11, 2961:20,
2972:7, 2987:21
   **form-of-the-question** [1] -
2889:6
   **formal** [1] - 2879:14
   **former** [1] - 2975:20
   **Former** [1] - 2883:17
   **forth** [2] - 2930:5, 2973:25
   **forward** [1] - 2855:3
   **forwarded** [1] - 2956:19
   **foundation** [1] - 2896:15
   **four** [10] - 2855:9, 2893:2,

2906:14, 2929:25, 2931:1,
2946:5, 2949:16, 2949:22,
2950:4, 2965:7
   **fourth** [3] - 2970:15, 2971:9,
2979:1
   **Fourth** [1] - 2848:14
   **frame** [1] - 2888:23
   **framing** [1] - 2888:22
   **free** [1] - 2951:8
   **Freedom** [1] - 2922:21
   **freedom** [1] - 2922:24
   **freshman** [1] - 2862:13
   **friends** [2] - 2953:5, 2957:6
   **FTI** [8] - 2902:3, 2902:14,
2961:3, 2963:11, 2963:12,
2963:14, 2964:12, 2986:15
   **full** [5] - 2851:16, 2934:21,
2976:7, 2979:3, 2994:7
   **fully** [1] - 2913:23
   **function** [1] - 2962:13
   **fund** [1] - 2989:8
   **Fund** [1] - 2923:11
   **fundamental** [2] - 2871:9,
2882:16
   **fundamentalist** [1] - 2975:12
   **funding** [3] - 2925:6, 2988:17,
2989:8
   **furthermore** [1] - 2867:9

## G

   **gas** [2] - 2931:5, 2931:9
   **Gaston** [2] - 2848:13, 2850:9
   **Gates** [8] - 2853:18, 2873:12,
2897:14, 2960:3, 2962:20,
2965:15, 2969:15, 2973:24
   **gather** [2] - 2981:13, 2982:16
   **gathering** [1] - 2946:14
   **general** [5] - 2900:16, 2916:5,
2916:12, 2916:16, 2951:6
   **General** [3] - 2957:24, 2960:10,
2964:3
   **generally** [3] - 2864:13,
2915:14, 2917:16
   **gentlemen** [4] - 2853:6, 2962:6,
2963:21, 2972:16
   **genuine** [1] - 2966:14
   **German** [1] - 2923:11
   **gist** [3] - 2901:20, 2902:21,
2902:22
   **given** [17] - 2853:15, 2861:19,
2874:9, 2877:18, 2878:3,
2879:12, 2881:22, 2883:21,
2884:11, 2884:18, 2889:2,
2890:5, 2894:2, 2898:1,
2945:24, 2958:5, 2982:25
   **Given** [1] - 2945:2
   **gloss** [1] - 2873:1
   **goal** [1] - 2880:21
   **good-faith** [1] - 2966:14

**Government** [6] - 2860:17, 2860:19, 2862:25, 2874:12, 2893:10, 2987:1

**government** [37] - 2866:1, 2868:21, 2869:17, 2869:19, 2873:20, 2877:9, 2886:10, 2887:1, 2888:2, 2903:3, 2910:12, 2910:18, 2910:20, 2911:2, 2911:3, 2912:4, 2923:20, 2926:15, 2926:17, 2926:19, 2936:15, 2938:13, 2946:3, 2946:9, 2946:18, 2953:23, 2957:15, 2960:16, 2960:25, 2975:6, 2975:8, 2975:9, 2975:10, 2975:15, 2988:15, 2988:16, 2989:8

**Government's** [16] - 2899:7, 2899:23, 2903:2, 2913:11, 2914:22, 2930:15, 2930:18, 2956:24, 2978:4, 2979:7, 2980:19, 2981:5, 2981:7, 2990:22, 2991:1, 2992:15

**government's** [2] - 2869:21, 2955:9

**government-commissioned** [1] - 2877:9

**governmental** [1] - 2912:5

**governments** [1] - 2923:1

**graduate** [1] - 2921:4

**grammar** [1] - 2920:7

**grateful** [1] - 2901:18

**gray** [1] - 2966:11

**great** [3] - 2865:7, 2924:9, 2942:22

**greater** [1] - 2934:18

**Greg** [3] - 2863:17, 2863:23, 2864:6

**GREGORY** [1] - 2851:11

**Gregory** [6] - 2848:6, 2849:14, 2850:4, 2851:9, 2851:18, 2883:25

**Gross** [1] - 2873:10

**ground** [1] - 2930:7

**group** [1] - 2880:11

**Group** [2] - 2923:6, 2974:8

**groups** [2] - 2924:5, 2975:6

**guarantee** [1] - 2926:14

**guess** [2] - 2922:23, 2923:21

**guilt** [5] - 2867:21, 2881:17, 2936:10, 2936:13, 2936:15

**guilty** [5] - 2877:2, 2881:16, 2933:14, 2935:25, 2940:16

**Gulland** [1] - 2848:13

**guy** [2] - 2921:12, 2963:14

**guys** [1] - 2961:15

## H

**half** [4] - 2901:6, 2965:9, 2977:2, 2977:18

**Hampshire** [1] - 2920:13

**hand** [2] - 2960:12, 2987:13

**hand-delivered** [2] - 2960:12, 2987:13

**handing** [1] - 2870:5

**handle** [4] - 2854:4, 2863:8, 2986:17, 2986:22

**handled** [4] - 2896:2, 2984:11, 2984:14, 2984:17

**hands** [1] - 2938:12

**happy** [5] - 2854:14, 2861:21, 2964:14, 2982:8

**harassing** [1] - 2971:2

**hard** [2] - 2862:4, 2944:25

**hardcopy** [5] - 2855:5, 2855:8, 2855:21, 2960:12, 2987:13

**Harlem** [1] - 2920:20

**harmless** [1] - 2929:1

**Harvard** [7] - 2865:5, 2920:15, 2920:16, 2963:5, 2963:17, 2964:18, 2974:25

**Haskell** [4] - 2856:19, 2927:10, 2950:3, 2988:10

**Haven** [1] - 2921:5

**hawker** [1] - 2973:14

**Hawker** [56] - 2853:9, 2853:15, 2853:22, 2854:4, 2855:22, 2863:4, 2863:5, 2863:6, 2863:12, 2863:17, 2863:19, 2864:3, 2864:5, 2864:22, 2864:25, 2865:2, 2865:10, 2873:12, 2880:13, 2880:22, 2882:10, 2882:11, 2902:3, 2902:14, 2907:9, 2907:25, 2908:2, 2944:7, 2944:17, 2944:19, 2945:23, 2945:24, 2955:20, 2962:3, 2962:9, 2962:20, 2962:25, 2965:14, 2965:21, 2965:24, 2966:18, 2967:6, 2967:15, 2967:20, 2968:22, 2969:6, 2971:22, 2972:17, 2973:11, 2973:24, 2986:15, 2986:18, 2986:21, 2986:24

**Hawker's** [7] - 2944:7, 2944:17, 2944:21, 2944:22, 2945:2, 2945:17, 2945:18

**head** [4] - 2890:5, 2918:6, 2950:18, 2964:6

**headline** [11] - 2857:20, 2859:6, 2877:8, 2877:10, 2878:18, 2879:1, 2882:23, 2882:24, 2883:3, 2883:17, 2940:14

**headlines** [2] - 2897:13, 2897:15

**heads** [1] - 2851:5

**health** [1] - 2925:12

**hear** [9] - 2860:15, 2866:4, 2907:2, 2913:8, 2915:19, 2927:10, 2958:19, 2958:20

**heard** [7] - 2857:22, 2901:5, 2922:10, 2972:21, 2973:24, 2974:2, 2976:14

**hearsay** [2] - 2952:25, 2953:13

**heart** [1] - 2870:22

**Heather** [2] - 2901:17, 2977:23

**HELD** [1] - 2848:9

**help** [7] - 2854:14, 2870:21, 2921:24, 2981:13, 2982:16, 2989:8, 2990:15

**helped** [1] - 2929:21

**helpful** [1] - 2982:9

**hereby** [1] - 2994:5

**Herszenhorn** [15] - 2856:22, 2857:1, 2857:2, 2857:3, 2857:7, 2858:20, 2858:21, 2859:4, 2859:14, 2859:24, 2860:2, 2869:2, 2878:20

**hide** [1] - 2904:7

**high** [2] - 2910:20, 2920:11

**highlighting** [1] - 2899:13

**highly** [1] - 2957:21

**hire** [4] - 2961:5, 2961:8, 2961:16, 2961:17

**hired** [2] - 2936:25, 2937:5

**Historical** [1] - 2920:18

**historical** [2] - 2931:4, 2931:7

**history** [1] - 2931:5

**hole** [1] - 2940:17

**home** [3] - 2855:18, 2856:3, 2859:18

**honest** [6] - 2853:10, 2853:16, 2864:23, 2895:3, 2941:1

**honesty** [1] - 2865:8

**Honor** [35] - 2850:1, 2850:3, 2850:8, 2850:13, 2851:8, 2860:20, 2867:6, 2867:21, 2869:9, 2871:9, 2874:15, 2876:2, 2885:9, 2885:19, 2889:8, 2896:18, 2909:20, 2912:7, 2916:19, 2917:6, 2918:14, 2919:12, 2930:20, 2941:24, 2952:13, 2952:21, 2954:11, 2958:7, 2958:20, 2961:24, 2969:21, 2971:25, 2972:9, 2977:1, 2979:7

**HONORABLE** [1] - 2848:9

**hope** [1] - 2925:7

**hoped** [2] - 2900:19, 2912:10

**hopeful** [2] - 2910:24, 2912:8

**hopefully** [1] - 2866:8

**hospital** [2] - 2920:5, 2926:19

**hotel** [2] - 2962:9, 2962:10

**hour** [4] - 2901:6, 2965:9, 2977:2, 2977:18

**hourly** [1] - 2990:1

**hours** [3] - 2970:2, 2990:1, 2990:6

**House** [6] - 2910:12, 2921:24, 2922:1, 2922:2, 2922:8, 2922:9

**house** [5] - 2855:12, 2855:14, 2855:15, 2855:16, 2856:2
**hryvnias** [1] - 2989:22
**huge** [2] - 2922:11, 2966:19
**Huisman** [11] - 2882:5, 2882:9, 2882:10, 2882:11, 2882:14, 2882:22, 2883:16, 2884:2, 2984:13, 2984:19, 2984:21
**HUISMAN** [1] - 2882:6
**Human** [1] - 2923:6
**human** [1] - 2923:7
**Hunt** [9] - 2852:4, 2852:6, 2869:3, 2869:15, 2870:21, 2884:24, 2901:17, 2977:23, 2992:21
**hunt** [1] - 2901:5
**Hunt's** [1] - 2978:6

## I

**i.e** [1] - 2937:15
**idea** [2] - 2916:21, 2957:17
**ideas** [1] - 2945:2
**identified** [3] - 2928:11, 2935:4, 2935:8
**identify** [5] - 2895:8, 2899:20, 2934:5, 2949:6, 2990:17
**identity** [1] - 2852:11
**ignore** [1] - 2926:2
**Ill** [1] - 2848:21
**illegal** [2] - 2872:2, 2968:2
**impact** [1] - 2859:23
**impatient** [3] - 2952:4, 2952:7
**impeachment** [3] - 2921:24, 2921:25, 2922:3
**implications** [1] - 2886:14
**importance** [1] - 2926:9
**important** [14] - 2858:25, 2859:1, 2862:11, 2869:16, 2871:25, 2878:22, 2880:5, 2880:6, 2938:5, 2939:10, 2955:12, 2964:15, 2976:5, 2979:12
**impossible** [1] - 2926:20
**improper** [2] - 2937:14, 2937:24
**improve** [2] - 2924:14, 2924:24
**IN** [1] - 2848:1
**inaccuracies** [7] - 2906:11, 2907:24, 2913:13, 2915:12, 2915:14, 2915:16, 2947:25
**inaccuracy** [1] - 2993:6
**inaccurate** [7] - 2863:22, 2864:9, 2869:8, 2882:24, 2907:24, 2970:22, 2988:7
**inappropriately** [2] - 2933:16, 2933:18
**incarceration** [1] - 2925:12
**include** [7] - 2896:11, 2903:18, 2903:19, 2904:13, 2905:6, 2965:11, 2980:4

**included** [2] - 2987:18, 2989:6
**including** [4] - 2904:25, 2916:24, 2917:2, 2952:7
**incomplete** [1] - 2951:7
**inconsistent** [2] - 2894:4, 2907:20
**incorporate** [1] - 2969:17
**incorporating** [1] - 2947:18
**incorrectly** [1] - 2850:23
**indeed** [3] - 2879:13, 2903:20, 2972:23
**independence** [5] - 2909:18, 2926:9, 2926:23, 2926:24, 2927:3
**independent** [2] - 2880:11, 2909:1
**independently** [2] - 2906:18, 2909:12
**iNDEX** [1] - 2849:12
**indicated** [2] - 2969:22, 2992:24
**indicating** [1] - 2993:6
**indication** [1] - 2868:24
**indictment** [7] - 2866:25, 2867:7, 2870:6, 2870:7, 2870:8, 2872:9, 2955:15
**individual** [2] - 2875:5, 2909:3
**individually** [4] - 2888:25, 2889:2, 2890:6, 2890:10
**individuals** [1] - 2929:5
**influenced** [1] - 2877:1
**inform** [5] - 2906:9, 2906:16, 2907:9, 2907:21, 2907:23
**information** [26] - 2852:7, 2852:9, 2852:12, 2875:4, 2875:5, 2882:13, 2896:3, 2896:13, 2896:24, 2901:10, 2902:13, 2902:16, 2929:11, 2938:18, 2947:11, 2958:15, 2958:23, 2959:6, 2976:25, 2980:6, 2982:14, 2982:16, 2991:15, 2991:22, 2991:24, 2991:25
**informed** [1] - 2993:6
**initial** [2] - 2864:5, 2893:21
**innocence** [4] - 2867:21, 2933:19, 2936:11, 2936:13
**innocent** [5] - 2868:12, 2868:13, 2871:6, 2935:25, 2936:17
**input** [3] - 2877:7, 2878:17, 2951:24
**inquiries** [2] - 2967:8, 2968:14
**inquiry** [6] - 2866:18, 2926:16, 2980:5, 2984:16, 2991:16, 2991:24
**inside** [1] - 2925:17
**insist** [2] - 2953:6, 2957:11
**insisting** [1] - 2952:11
**instead** [2] - 2936:14, 2987:25

**Institute** [1] - 2975:1
**institutions** [3] - 2924:14, 2924:17, 2924:25
**instructed** [2] - 2870:9, 2960:4
**instruction** [4] - 2906:9, 2906:17, 2909:14, 2945:25
**instructions** [2] - 2866:9, 2878:2
**integration** [1] - 2925:17
**integrity** [2] - 2865:8, 2880:25
**intelligence** [2] - 2975:5, 2975:7
**intend** [1] - 2872:21
**intended** [4] - 2957:16, 2960:22, 2960:25, 2962:25
**intent** [2] - 2904:17, 2912:16
**intention** [2] - 2880:20, 2916:13, 2956:4
**intentionally** [1] - 2992:12
**intentions** [2] - 2955:11, 2955:14
**interacting** [1] - 2878:2
**interaction** [2] - 2907:6
**interest** [3] - 2922:12, 2922:23, 2923:3
**interested** [10] - 2854:13, 2854:21, 2854:23, 2861:13, 2861:20, 2861:25, 2862:16, 2913:25, 2914:4, 2923:24
**interesting** [2] - 2976:8
**interests** [2] - 2880:24, 2900:25
**interlocutor** [1] - 2946:17
**international** [5] - 2864:12, 2864:14, 2864:16, 2922:11, 2944:24
**International** [1] - 2923:6
**interpreters** [1] - 2929:19
**interrupt** [2] - 2888:11, 2954:14
**interrupted** [1] - 2890:18
**intersect** [1] - 2962:14
**intervened** [1] - 2986:22
**interview** [14] - 2879:11, 2879:16, 2881:9, 2881:12, 2882:7, 2882:8, 2929:22, 2975:4, 2975:7, 2984:10, 2984:14, 2984:17, 2984:21, 2986:19
**interviewed** [2] - 2929:10, 2930:9
**interviewing** [3] - 2924:4, 2930:7, 2946:13
**interviews** [4] - 2928:15, 2929:4, 2976:1, 2982:24
**introduce** [1] - 2850:6
**introducing** [1] - 2872:22
**investigated** [1] - 2935:2
**investigation** [10] - 2880:12, 2909:7, 2924:4, 2925:4, 2925:10, 2928:13, 2929:15, 2929:23, 2946:12, 2946:15

**investigators** [4] - 2926:17, 2929:4, 2935:3, 2935:5
**invitation** [1] - 2991:23
**invite** [1] - 2951:24
**involve** [1] - 2936:6
**involved** [13] - 2922:5, 2922:19, 2922:23, 2923:4, 2923:16, 2923:17, 2925:1, 2929:5, 2962:13, 2967:24, 2968:16, 2986:16, 2986:24
**irrelevant** [2] - 2952:22, 2953:2
**Islamic** [1] - 2975:12
**Israel** [1] - 2975:7
**issue** [16] - 2866:15, 2867:20, 2870:10, 2870:12, 2871:25, 2881:14, 2885:24, 2899:1, 2902:11, 2916:2, 2919:9, 2931:5, 2941:14, 2986:1, 2991:18, 2993:7
**issued** [2] - 2881:6, 2984:25
**issues** [8] - 2922:13, 2923:16, 2923:18, 2925:11, 2931:23, 2937:7, 2968:10, 2976:8
**item** [1] - 2986:15
**itself** [3] - 2900:23, 2955:24, 2970:10

**J**

**JACKSON** [1] - 2848:9
**jail** [2] - 2933:21, 2933:22
**James** [1] - 2848:20
**JANICE** [1] - 2994:5
**Janice** [2] - 2849:7, 2994:13
**January** [3] - 2931:10, 2992:17, 2992:21
**Jason** [2] - 2848:17, 2850:9
**jason.mccullough@usdoj. gov** [1] - 2848:19
**job** [3] - 2909:7, 2924:3, 2929:24
**jobs** [1] - 2982:13
**John** [1] - 2983:15
**joined** [1] - 2922:9
**Jonathan** [16] - 2853:9, 2855:22, 2863:4, 2882:10, 2882:11, 2902:3, 2902:14, 2962:9, 2962:12, 2965:21, 2971:22, 2986:15, 2986:18, 2986:21, 2986:22, 2986:24
**Journal** [34] - 2882:1, 2882:4, 2882:15, 2883:5, 2884:6, 2884:15, 2884:18, 2885:11, 2885:21, 2886:1, 2886:7, 2886:10, 2887:9, 2887:21, 2889:25, 2894:3, 2898:20, 2903:24, 2904:5, 2905:22, 2905:25, 2906:6, 2913:23, 2984:11, 2984:12, 2984:15, 2984:24, 2985:6, 2985:8,

2985:11, 2986:8, 2987:16, 2988:9, 2992:25
**Journal's** [1] - 2984:16
**journalist** [4] - 2857:8, 2874:25, 2875:3, 2968:17
**journalists** [3] - 2967:17, 2967:23, 2967:25
**JUDGE** [2] - 2848:9, 2848:10
**judge** [7] - 2876:19, 2904:18, 2917:23, 2926:18, 2930:9, 2935:10, 2971:2
**Judge's** [1] - 2908:24
**judge's** [1] - 2931:18
**judgment** [8] - 2853:20, 2858:13, 2882:13, 2902:20, 2926:25, 2933:8, 2936:22, 2971:5
**judgments** [1] - 2936:6
**July** [8] - 2930:5, 2930:12, 2930:13, 2930:14, 2938:16, 2940:4, 2946:16
**June** [5] - 2930:13, 2962:4, 2962:21, 2981:3, 2989:1
**Junghans** [2] - 2849:1, 2850:14
**JURORS** [3] - 2851:5, 2876:2, 2977:12
**jurors** [1] - 2977:4
**jury** [21] - 2850:20, 2850:21, 2851:16, 2853:6, 2854:2, 2866:15, 2870:8, 2881:3, 2883:13, 2886:6, 2886:15, 2898:10, 2917:1, 2919:21, 2930:23, 2962:6, 2963:21, 2972:17, 2992:20, 2993:20
**JURY** [2] - 2848:4, 2848:8
**Justice** [35] - 2848:17, 2857:14, 2857:15, 2857:18, 2857:22, 2858:8, 2876:9, 2876:16, 2879:6, 2880:14, 2880:22, 2881:7, 2882:12, 2898:5, 2951:5, 2953:15, 2955:12, 2955:14, 2957:3, 2957:6, 2957:10, 2960:8, 2960:12, 2960:22, 2961:4, 2961:6, 2961:10, 2963:16, 2964:6, 2978:17, 2988:16, 2989:5, 2990:9, 2992:24, 2993:3
**justice** [2] - 2875:13, 2934:13, 2937:2
**justifiable** [1] - 2933:3
**justification** [1] - 2933:15
**justifying** [1] - 2880:19

**K**

**Kansas** [1] - 2920:9
**Kedem** [3] - 2911:3, 2927:11, 2950:2
**keep** [5] - 2852:12, 2868:8, 2977:10, 2982:14, 2990:6

**keeping** [1] - 2933:22
**Kennedy** [2] - 2921:11, 2921:13
**kept** [3] - 2933:21, 2948:4, 2962:16
**Key** [1] - 2893:23
**key** [1] - 2894:7
**kids** [1] - 2963:12
**Kilimnik** [9] - 2944:7, 2944:12, 2944:16, 2953:4, 2953:8, 2953:9, 2955:4, 2957:2, 2957:4
**Kilimnik..** [1] - 2955:5
**kill** [2] - 2957:21, 2960:20
**kind** [6] - 2889:5, 2909:6, 2919:2, 2924:4, 2924:6, 2940:20
**kinds** [1] - 2915:16
**knowledge** [2] - 2867:2, 2872:1
**knowledgeable** [1] - 2961:7
**Konstantin** [2] - 2944:7, 2953:4
**Kyiv** [19] - 2879:15, 2881:6, 2894:15, 2894:18, 2894:19, 2894:23, 2894:24, 2895:2, 2895:10, 2895:13, 2895:23, 2895:25, 2913:20, 2952:10, 2953:5, 2960:4, 2960:13, 2962:4, 2965:8

**L**

**LA** [14] - 2885:11, 2886:7, 2886:9, 2887:8, 2887:21, 2889:24, 2981:23, 2981:25, 2982:6, 2983:7, 2983:12, 2983:25, 2984:6, 2984:7
**lacked** [1] - 2909:18
**ladies** [4] - 2853:6, 2962:6, 2963:21, 2972:16
**laid** [4] - 2925:5, 2936:14, 2936:16, 2961:23
**language** [6] - 2872:20, 2891:8, 2894:18, 2895:9, 2991:3, 2991:8
**languages** [1] - 2939:11
**large** [3] - 2851:22, 2935:4, 2950:7
**larger** [2] - 2927:4, 2927:8
**Larry** [4] - 2900:15, 2914:11, 2914:13, 2915:17
**last** [14] - 2851:17, 2905:18, 2905:21, 2906:4, 2906:5, 2914:16, 2924:20, 2934:23, 2945:1, 2947:21, 2951:1, 2990:22, 2990:24
**late** [3] - 2855:14, 2967:13, 2976:1
**Latvia** [1] - 2923:13
**laugh** [1] - 2954:16
**launched** [1] - 2929:14
**Lauren** [13] - 2882:8, 2882:15, 2967:14, 2981:13, 2983:9, 2983:25, 2984:5, 2984:8, 2984:20, 2985:3, 2985:4,

2986:5, 2988:8
**Lavrynovych** [3] - 2876:16, 2876:22, 2877:5
**Lavrynovych's** [1] - 2877:3
**law** [23] - 2851:25, 2869:13, 2910:8, 2911:23, 2920:22, 2920:25, 2921:2, 2921:3, 2921:5, 2921:10, 2921:15, 2922:4, 2922:7, 2922:10, 2922:13, 2923:5, 2923:22, 2936:1, 2936:2, 2936:3, 2936:25, 2968:14
**Law** [37] - 2882:1, 2882:4, 2882:15, 2883:5, 2884:6, 2884:15, 2884:17, 2885:11, 2885:20, 2886:1, 2886:7, 2886:10, 2887:8, 2887:21, 2889:24, 2894:3, 2898:20, 2903:24, 2904:5, 2905:22, 2905:25, 2906:6, 2913:23, 2920:23, 2923:6, 2984:11, 2984:12, 2984:15, 2984:16, 2984:24, 2985:6, 2985:8, 2985:11, 2986:8, 2987:15, 2988:9, 2992:25
**lawful** [1] - 2929:17
**lawfully** [1] - 2929:16
**lawyer** [2] - 2870:19, 2923:22
**lawyer's** [1] - 2979:12
**lawyering** [1] - 2921:22
**lawyers** [10] - 2880:11, 2909:2, 2918:20, 2923:23, 2924:22, 2924:23, 2929:25, 2966:7, 2968:12, 2993:4
**lay** [1] - 2896:15
**laying** [1] - 2948:20
**lead** [2] - 2859:8, 2878:24
**leader's** [1] - 2883:17
**leaders** [1] - 2957:25
**leading** [5] - 2852:23, 2895:19, 2961:21, 2987:22, 2987:23
**leak** [11] - 2939:19, 2940:14, 2941:6, 2941:10, 2941:13, 2941:14, 2942:4, 2942:8, 2942:9, 2942:16, 2942:20
**leaked** [5] - 2939:24, 2940:6, 2940:9, 2942:12
**leaks** [1] - 2940:22
**learn** [3] - 2924:13, 2924:23, 2959:11
**learned** [3] - 2861:8, 2897:11, 2959:12
**learning** [2] - 2924:11, 2924:12
**least** [1] - 2926:7
**leave** [8] - 2879:19, 2879:22, 2904:20, 2916:23, 2992:4, 2992:8, 2992:9, 2992:12
**leaving** [2] - 2901:17, 2901:24
**led** [1] - 2877:24
**leery** [1] - 2892:12

**left** [7] - 2921:2, 2921:5, 2921:11, 2922:7, 2922:9, 2966:15, 2984:8
**legal** [25] - 2865:23, 2866:8, 2867:14, 2867:18, 2868:9, 2869:8, 2870:20, 2872:11, 2872:23, 2873:8, 2877:22, 2878:3, 2886:14, 2888:8, 2889:18, 2891:7, 2892:13, 2908:11, 2909:16, 2910:3, 2912:18, 2923:7, 2934:8, 2970:17, 2971:3
**legally** [1] - 2870:10
**length** [1] - 2934:18
**lengthy** [1] - 2894:25
**less** [2] - 2910:20, 2977:18
**letter** [54] - 2882:19, 2885:19, 2886:5, 2891:22, 2892:4, 2892:16, 2897:25, 2898:7, 2898:11, 2898:12, 2900:18, 2901:14, 2901:16, 2902:4, 2902:18, 2902:23, 2903:6, 2903:7, 2914:23, 2915:10, 2915:12, 2915:15, 2915:18, 2915:20, 2916:1, 2916:4, 2916:5, 2916:7, 2916:8, 2940:12, 2977:22, 2978:1, 2978:7, 2978:12, 2978:23, 2979:9, 2979:20, 2980:1, 2980:10, 2980:15, 2980:20, 2981:3, 2982:2, 2988:25, 2990:24, 2992:2, 2992:4, 2992:12, 2992:16, 2992:19, 2992:21, 2992:23
**letting** [1] - 2876:6
**liberty** [2] - 2933:17, 2933:18
**lie** [10] - 2852:4, 2852:6, 2901:8, 2901:9, 2954:8, 2962:25, 2963:7, 2971:13, 2971:24, 2992:10
**lied** [5] - 2866:25, 2868:2, 2886:16, 2954:20
**life** [3] - 2922:15, 2922:17, 2937:15
**life-changing** [1] - 2922:17
**lifestyle** [1] - 2924:19
**likely** [2] - 2875:11, 2957:21
**limitations** [1] - 2874:9
**limited** [2] - 2853:15, 2946:12
**line** [30] - 2867:20, 2869:23, 2872:3, 2873:25, 2874:8, 2874:11, 2875:15, 2881:21, 2884:6, 2884:11, 2884:19, 2885:21, 2886:18, 2888:6, 2888:20, 2889:13, 2889:15, 2890:4, 2890:24, 2891:1, 2891:4, 2893:6, 2912:17, 2944:5, 2947:6, 2948:8, 2948:10, 2961:22, 2965:25, 2968:10

**lines** [1] - 2863:24
**link** [1] - 2882:11
**Listen** [1] - 2859:6
**Lithuania** [1] - 2923:13
**litigation** [1] - 2909:4
**live** [3] - 2851:19, 2851:20, 2920:2
**lives** [1] - 2924:24
**living** [1] - 2924:16
**LLP** [2] - 2848:22, 2849:2
**lobby** [1] - 2962:10
**local** [6] - 2904:18, 2917:12, 2918:5, 2918:7, 2918:17, 2919:3
**location** [4] - 2879:3, 2900:3, 2915:25, 2930:2
**London** [1] - 2857:9
**long-term** [1] - 2921:20
**longstanding** [1] - 2974:25
**look** [24] - 2860:2, 2860:17, 2861:11, 2861:19, 2879:24, 2883:19, 2904:12, 2905:18, 2913:11, 2916:5, 2918:3, 2919:3, 2930:15, 2945:25, 2948:5, 2948:8, 2948:25, 2950:14, 2951:12, 2956:15, 2970:14, 2972:13, 2973:5, 2981:5
**looked** [4] - 2917:12, 2924:25, 2934:1, 2969:9
**looking** [7] - 2903:10, 2924:7, 2932:9, 2934:2, 2951:1, 2975:13, 2979:15
**looks** [2] - 2986:5, 2986:8
**Los** [11] - 2881:3, 2881:8, 2881:21, 2898:20, 2899:25, 2906:7, 2913:23, 2983:5, 2987:16, 2988:10, 2992:25
**lost** [1] - 2925:19
**lower** [2] - 2899:17, 2900:3
**lucky** [1] - 2920:12
**lumped** [1] - 2896:19
**lumping** [3] - 2888:1, 2888:2, 2889:19
**lunch** [8] - 2918:12, 2919:8, 2919:12, 2965:18, 2965:19, 2977:5, 2977:6, 2993:15
**lying** [1] - 2954:18

# M

**Madam** [1] - 2943:23
**maintain** [1] - 2912:21
**makers** [2] - 2898:5, 2900:8
**Malloch** [1] - 2963:12
**Malloch-Brown** [1] - 2963:12
**man** [2] - 2854:19
**man-to-man** [1] - 2854:19
**Manafort** [55] - 2853:19, 2873:12, 2893:17, 2893:18, 2893:21, 2894:5, 2894:14,

2894:24, 2895:11, 2895:13,
2902:4, 2902:15, 2927:7,
2938:16, 2939:7, 2939:20,
2940:4, 2940:13, 2940:19,
2941:4, 2941:13, 2941:21,
2942:15, 2942:17, 2942:23,
2942:25, 2943:1, 2943:4,
2944:1, 2944:14, 2944:16,
2944:18, 2944:21, 2946:10,
2946:13, 2946:16, 2947:1,
2947:2, 2948:12, 2949:7,
2949:13, 2950:9, 2950:23,
2951:2, 2951:22, 2952:8,
2955:9, 2959:25, 2960:1,
2963:25, 2964:12, 2964:22,
2965:6, 2967:6, 2969:14

**Manafort's** [4] - 2897:14,
2941:21, 2944:6, 2946:8

**managed** [1] - 2984:21
**March** [1] - 2922:16
**Marcus** [2] - 2849:1, 2850:15
**Mark** [2] - 2963:12, 2963:13
**Marshall** [1] - 2923:11
**Marsteller** [1] - 2974:20
**Maryland** [1] - 2918:17
**Massachusetts** [1] - 2920:10
**masters** [1] - 2920:18
**material** [4] - 2866:17, 2877:20,
2991:16, 2991:24

**materials** [1] - 2966:18
**Matt** [1] - 2984:19
**matter** [4] - 2886:3, 2931:11,
2968:1, 2968:8

**matters** [5] - 2886:4, 2936:5,
2961:11, 2968:14, 2975:22

**Matthew** [4] - 2882:5, 2882:22,
2884:2, 2984:13

**McCullough** [2] - 2848:17,
2850:9

**MD** [1] - 2848:23
**mean** [27] - 2866:9, 2867:22,
2868:16, 2870:19, 2892:11,
2892:14, 2892:15, 2901:5,
2903:18, 2918:9, 2929:21,
2940:8, 2940:24, 2942:2,
2942:3, 2942:17, 2942:20,
2950:23, 2952:3, 2954:2,
2954:14, 2955:7, 2963:11,
2971:9, 2981:3

**meaning** [1] - 2986:7
**meaningful** [1] - 2929:1
**means** [4] - 2865:21, 2875:1,
2909:13, 2957:7

**meant** [4] - 2896:11, 2945:6,
2945:8, 2993:2

**meanwhile** [1] - 2973:4
**media** [27] - 2880:7, 2880:14,
2881:1, 2893:2, 2895:15,
2896:3, 2896:13, 2896:16,
2896:24, 2897:11, 2897:20,

2898:15, 2900:9, 2900:13,
2900:18, 2903:16, 2904:8,
2913:17, 2913:19, 2914:1,
2944:22, 2973:14, 2973:19,
2982:20, 2986:1, 2993:6

**media's** [1] - 2944:19
**meet** [2] - 2964:7, 2964:22
**meeting** [44] - 2865:4, 2870:24,
2897:22, 2897:24, 2898:7,
2898:8, 2899:1, 2899:4,
2899:22, 2900:14, 2900:15,
2901:5, 2901:8, 2901:17,
2901:19, 2902:4, 2902:6,
2902:19, 2905:25, 2911:20,
2912:13, 2915:21, 2925:6,
2963:5, 2963:17, 2963:19,
2963:22, 2963:24, 2964:17,
2964:19, 2964:21, 2964:24,
2965:4, 2965:16, 2965:19,
2966:18, 2966:22, 2966:24,
2967:2, 2967:4, 2974:25,
2992:13, 2992:22, 2993:9

**member** [3] - 2852:2, 2863:20,
2863:21

**members** [4] - 2852:4, 2852:6,
2921:25, 2950:2

**memo** [4] - 2949:13, 2949:17,
2950:23, 2950:25

**memory** [2] - 2881:13, 2878:13
**mens** [1] - 2869:25
**mention** [2] - 2862:10, 2902:3
**mentioned** [1] - 2920:1
**mentioning** [1] - 2902:14
**Mercury** [1] - 2974:11
**message** [9] - 2880:5, 2894:5,
2897:20, 2900:22, 2906:22,
2952:10, 2962:18, 2984:22,
2985:20

**messages** [1] - 2938:18
**messaging** [10] - 2865:6,
2963:4, 2968:22, 2969:16,
2969:19, 2970:10, 2970:11,
2972:3, 2972:4, 2973:7

**met** [9] - 2870:14, 2921:4,
2936:4, 2944:7, 2944:15,
2944:17, 2949:23, 2950:4,
2967:14

**middle** [2] - 2930:5, 2992:19
**Middle** [1] - 2976:5
**midnight** [1] - 2859:18
**might** [9] - 2916:3, 2918:12,
2924:21, 2937:8, 2939:24,
2954:4, 2968:9, 2993:18

**Might** [1] - 2986:15
**mile** [1] - 2855:15
**military** [1] - 2975:5
**mind** [16] - 2866:23, 2868:11,
2868:12, 2868:13, 2868:18,
2871:5, 2872:2, 2884:14,
2888:5, 2890:25, 2912:17,

2912:21, 2942:24, 2951:12,
2953:24, 2954:1

**minds** [2] - 2868:23, 2936:18
**mine** [1] - 2861:16
**minister** [3] - 2929:8, 2929:10
**Ministry** [44] - 2857:14,
2857:15, 2857:18, 2857:22,
2858:8, 2860:4, 2860:5, 2860:6,
2876:9, 2876:16, 2879:6,
2880:2, 2880:14, 2880:22,
2881:7, 2882:12, 2913:20,
2951:5, 2953:15, 2955:11,
2955:14, 2955:24, 2956:3,
2957:3, 2957:6, 2957:10,
2960:8, 2960:12, 2960:21,
2961:4, 2961:6, 2961:10,
2962:14, 2963:16, 2964:5,
2964:6, 2969:18, 2978:17,
2978:19, 2988:15, 2989:5,
2990:9, 2992:24, 2993:3

**Ministry's** [1] - 2956:4
**Minnesota** [1] - 2975:20
**minutes** [5] - 2859:13, 2901:6,
2917:3, 2962:11, 2965:9

**mischaracterization** [2] -
2905:10, 2905:13

**mischaracterizations** [3] -
2898:23, 2904:11, 2993:2

**mischaracterize** [1] - 2973:22
**mischaracterizing** [1] - 2941:3
**misinformation** [1] - 2884:18
**misrepresent** [1] - 2973:22
**Mississippi** [4] - 2922:20,
2922:21, 2922:22

**mistake** [1] - 2914:12
**mistaken** [3] - 2898:3, 2898:6,
2900:19

**mistakes** [1] - 2900:23
**mix** [1] - 2983:23
**mixed** [1] - 2881:15
**modern** [1] - 2924:17
**modify** [2] - 2952:5, 2981:1
**Molly** [2] - 2848:13, 2850:9
**molly.gaston@usdoj.gov** [1] -
2848:16

**moment** [3] - 2860:14, 2860:16,
2963:9

**Monday** [3] - 2969:11, 2969:23,
2969:24

**monitor** [1] - 2876:12
**monitoring** [1] - 2982:12
**month** [2] - 2938:20, 2946:4
**months** [2] - 2920:20, 2920:21
**Morning** [1] - 2848:5, 2850:8
**morning** [12] - 2850:1, 2850:2,
2850:12, 2850:13, 2856:7,
2916:19, 2940:14, 2944:5,
2957:7, 2967:13, 2967:14,
2976:1

**MORNING** [1] - 2848:8

**Morsi** [1] - 2975:12
**Moscow** [2] - 2855:4, 2856:22
**most** [8] - 2859:1, 2862:10, 2865:4, 2878:22, 2900:9, 2930:6, 2931:25, 2947:18
**motivated** [15] - 2858:14, 2864:17, 2864:20, 2876:18, 2879:5, 2879:8, 2879:23, 2880:20, 2904:21, 2906:3, 2936:23, 2937:8, 2937:11, 2937:14, 2937:23
**motivation** [8] - 2858:9, 2859:10, 2860:6, 2860:7, 2880:3, 2897:19, 2900:12, 2904:10
**motivations** [2] - 2883:22, 2884:4
**motive** [2] - 2868:20, 2868:21
**Movement** [1] - 2922:19
**MR** [239] - 2850:8, 2850:13, 2850:19, 2851:8, 2851:15, 2852:20, 2853:2, 2860:20, 2860:23, 2865:20, 2865:25, 2866:7, 2866:23, 2867:6, 2867:12, 2867:15, 2867:17, 2867:23, 2868:11, 2868:14, 2869:9, 2869:10, 2869:17, 2870:1, 2870:5, 2870:16, 2870:21, 2870:25, 2871:4, 2871:14, 2871:16, 2871:18, 2871:25, 2872:5, 2872:9, 2872:21, 2872:24, 2873:2, 2873:5, 2873:7, 2873:14, 2873:18, 2873:22, 2874:2, 2874:6, 2874:15, 2874:17, 2876:5, 2876:7, 2878:8, 2878:11, 2878:13, 2883:13, 2883:14, 2884:8, 2884:10, 2884:13, 2884:21, 2884:24, 2885:4, 2885:7, 2885:8, 2885:16, 2885:19, 2885:23, 2886:3, 2886:5, 2886:17, 2886:22, 2887:6, 2887:15, 2887:17, 2887:19, 2888:11, 2888:13, 2888:19, 2888:20, 2889:8, 2889:12, 2889:14, 2890:14, 2890:18, 2890:22, 2891:10, 2891:15, 2891:19, 2891:22, 2892:1, 2892:8, 2892:10, 2892:17, 2892:19, 2892:20, 2892:22, 2892:25, 2893:12, 2893:14, 2893:16, 2895:17, 2895:20, 2895:22, 2896:6, 2896:8, 2896:11, 2896:18, 2896:23, 2897:3, 2897:6, 2897:9, 2905:17, 2906:23, 2906:25, 2907:5, 2908:10, 2908:23, 2909:16, 2909:22, 2911:6, 2911:10, 2911:13, 2911:16, 2911:18,

2912:1, 2912:7, 2912:14, 2912:20, 2913:7, 2915:3, 2915:7, 2916:19, 2917:6, 2917:11, 2917:16, 2917:19, 2917:23, 2918:1, 2918:7, 2918:12, 2918:14, 2918:16, 2918:24, 2919:2, 2919:6, 2919:11, 2919:15, 2919:18, 2919:23, 2927:14, 2927:18, 2927:22, 2928:8, 2930:20, 2930:22, 2933:1, 2938:25, 2939:3, 2941:16, 2941:24, 2942:18, 2942:23, 2943:6, 2943:8, 2943:10, 2943:12, 2943:17, 2943:20, 2943:23, 2944:2, 2945:11, 2949:2, 2949:5, 2950:18, 2950:20, 2952:13, 2952:15, 2952:17, 2952:21, 2953:4, 2953:11, 2953:14, 2953:17, 2953:22, 2954:7, 2954:10, 2954:14, 2954:17, 2955:6, 2955:13, 2955:18, 2955:19, 2956:2, 2956:5, 2956:7, 2956:10, 2956:12, 2956:20, 2956:23, 2958:7, 2958:14, 2958:17, 2958:22, 2959:2, 2959:10, 2959:15, 2959:17, 2959:20, 2959:22, 2961:20, 2962:1, 2969:4, 2969:5, 2969:21, 2970:1, 2970:3, 2970:6, 2970:8, 2970:9, 2971:25, 2972:3, 2972:10, 2977:1, 2977:15, 2977:19, 2977:21, 2978:10, 2978:11, 2979:25, 2983:15, 2983:20, 2985:9, 2985:19, 2987:3, 2987:4, 2987:21, 2987:23, 2988:4, 2988:20, 2988:22, 2993:13
**muddled** [1] - 2914:9
**multiple** [1] - 2942:2
**Murphy** [3] - 2848:20, 2850:14, 2888:17
**MURPHY** [4] - 2888:19, 2918:14, 2918:16, 2919:2
**Muslim** [1] - 2975:11
**must** [2] - 2950:4, 2965:9

# N

**name** [8] - 2851:16, 2851:17, 2857:9, 2874:24, 2874:25, 2875:5, 2882:5, 2883:6
**narrative** [1] - 2931:8
**National** [38] - 2881:25, 2882:3, 2882:15, 2883:5, 2884:2, 2884:6, 2884:15, 2884:17, 2885:11, 2885:20, 2886:1, 2886:7, 2886:9, 2887:8, 2887:21, 2889:24, 2894:3,

2898:19, 2903:24, 2904:5, 2905:22, 2905:25, 2906:6, 2913:22, 2923:14, 2975:23, 2984:11, 2984:12, 2984:14, 2984:16, 2984:24, 2985:6, 2985:8, 2985:11, 2986:7, 2987:15, 2988:9, 2992:25
**national** [3] - 2921:12, 2923:16, 2923:18
**Nations** [2] - 2957:24, 2960:10
**natural** [1] - 2982:15
**nature** [1] - 2888:24
**Navy** [1] - 2920:5
**Near** [1] - 2975:1
**necessarily** [1] - 2896:20
**need** [8] - 2870:11, 2925:23, 2945:2, 2949:25, 2950:1, 2956:14, 2961:15, 2977:11
**needed** [6] - 2926:11, 2926:22, 2928:11, 2928:20, 2928:21, 2961:6
**needn't** [1] - 2917:23
**needs** [2] - 2894:17, 2907:3
**negotiated** [1] - 2929:12
**negotiation** [1] - 2989:12
**negotiations** [1] - 2931:10
**never** [2] - 2971:13, 2984:8
**new** [9] - 2856:17, 2862:8, 2890:20, 2890:21, 2934:8, 2975:10, 2975:13, 2975:14, 2988:14
**New** [53] - 2853:7, 2853:11, 2853:17, 2853:21, 2853:23, 2854:3, 2855:4, 2855:8, 2860:3, 2860:9, 2865:10, 2865:17, 2873:19, 2874:8, 2878:5, 2882:6, 2887:7, 2887:22, 2898:20, 2899:10, 2899:11, 2903:24, 2904:5, 2904:15, 2906:7, 2907:6, 2908:1, 2908:2, 2908:4, 2913:24, 2914:3, 2920:13, 2921:5, 2945:15, 2957:23, 2960:8, 2963:6, 2964:2, 2968:15, 2977:25, 2982:11, 2982:13, 2985:4, 2985:21, 2985:22, 2985:24, 2986:4, 2986:6, 2986:8, 2986:19, 2986:25, 2987:14, 2993:1
**News** [1] - 2981:20
**news** [13] - 2853:14, 2857:25, 2881:1, 2891:23, 2899:3, 2899:25, 2906:11, 2913:17, 2914:15, 2967:13, 2967:14, 2982:7, 2983:10
**newspaper** [5] - 2876:13, 2894:18, 2897:11, 2897:13, 2940:14
**newspapers** [3] - 2880:7, 2898:22, 2904:16

**next** [30] - 2853:1, 2854:10, 2855:19, 2855:20, 2856:5, 2860:10, 2895:7, 2899:23, 2903:21, 2928:3, 2933:24, 2934:4, 2934:25, 2938:2, 2942:21, 2943:18, 2958:13, 2967:11, 2972:8, 2972:12, 2979:23, 2983:4, 2983:16, 2984:1, 2984:5, 2984:22, 2985:18, 2985:20
**night** [2] - 2856:1, 2964:22, 2969:24, 2976:1
**nightmare** [1] - 2940:12
**nobody** [2] - 2869:6, 2904:7
**none** [1] - 2869:4
**Norfolk** [1] - 2920:5
**note** [3] - 2850:16, 2856:21, 2951:22
**notebooks** [3] - 2850:22, 2850:24, 2916:23
**noted** [2] - 2933:3, 2983:12
**notes** [1] - 2994:7
**nothing** [1] - 2869:12
**notwithstanding** [1] - 2953:25
**November** [1] - 2938:13
**nuanced** [1] - 2940:23
**number** [6] - 2854:16, 2862:3, 2935:4, 2935:8, 2935:24, 2990:1
**Number** [2] - 2947:13, 2970:15
**numbered** [1] - 2947:13
**numbers** [1] - 2899:19
**NW** [5] - 2848:14, 2848:18, 2849:2, 2849:8, 2994:14

## O

**o'clock** [3] - 2857:4, 2919:6, 2919:7
**Obama** [2] - 2910:13, 2922:6
**Obama's** [1] - 2922:5
**object** [6] - 2865:20, 2873:22, 2895:17, 2908:10, 2917:18, 2952:22
**objected** [4] - 2871:3, 2885:9, 2886:20, 2889:15
**objecting** [2] - 2959:13, 2959:15
**objection** [25] - 2852:20, 2866:4, 2869:10, 2884:8, 2884:13, 2887:15, 2887:17, 2896:22, 2897:3, 2906:23, 2906:25, 2909:16, 2927:14, 2941:16, 2941:18, 2941:23, 2952:13, 2956:7, 2958:7, 2958:17, 2958:25, 2961:20, 2971:25, 2985:9, 2987:21
**objections** [1] - 2955:8
**objective** [3] - 2933:10, 2937:15, 2937:24
**obligation** [2] - 2888:22,

2890:13
**obtain** [2] - 2896:12, 2913:19
**obviously** [1] - 2918:1
**occurred** [3] - 2898:8, 2901:11, 2964:21
**October** [15] - 2897:23, 2898:9, 2899:1, 2899:17, 2900:4, 2900:6, 2949:7, 2949:15, 2950:24, 2951:15, 2951:21, 2959:25, 2960:5, 2976:23
**OF** [4] - 2848:1, 2848:8, 2848:14, 2994:2
**offense** [1] - 2931:18
**offer** [1] - 2869:12
**offered** [2] - 2868:25, 2960:11
**office** [10] - 2856:12, 2857:8, 2882:6, 2899:15, 2930:1, 2949:23, 2968:15, 2977:25, 2982:11, 2983:7
**Office** [1] - 2848:13
**offices** [1] - 2855:8
**Official** [2] - 2849:7, 2994:13
**OFFICIAL** [1] - 2994:2
**officials** [4] - 2964:5, 2975:4, 2975:7, 2976:3
**often** [1] - 2936:5
**Oleksandr** [1] - 2876:16
**omitting** [1] - 2954:18
**on-the-record** [2] - 2874:19, 2874:21
**once** [1] - 2937:25
**one** [69] - 2851:2, 2856:18, 2857:18, 2858:6, 2861:17, 2862:24, 2870:13, 2871:2, 2872:13, 2872:25, 2884:3, 2885:12, 2886:20, 2889:1, 2889:2, 2889:3, 2889:6, 2890:2, 2890:3, 2890:6, 2890:8, 2890:22, 2891:16, 2893:6, 2894:10, 2898:13, 2907:12, 2915:8, 2915:23, 2915:25, 2916:2, 2917:9, 2918:16, 2921:7, 2921:25, 2923:24, 2926:13, 2927:16, 2928:1, 2929:14, 2931:5, 2932:12, 2932:19, 2933:24, 2934:24, 2936:1, 2939:12, 2940:13, 2948:18, 2948:24, 2950:11, 2951:16, 2954:7, 2957:18, 2964:1, 2966:5, 2971:9, 2972:24, 2976:11, 2977:9, 2982:13, 2983:16, 2984:1, 2984:5, 2985:15, 2986:6, 2986:9, 2986:12
**one-sentence** [2] - 2986:6, 2986:9
**open** [7] - 2874:5, 2887:5, 2892:24, 2916:3, 2919:20, 2943:19, 2956:22
**opened** [1] - 2900:15

**opine** [8] - 2881:16, 2935:24, 2936:2, 2936:9, 2936:13, 2937:13, 2937:22
**opined** [1] - 2881:18
**opining** [2] - 2936:10, 2936:21
**opinion** [16] - 2858:13, 2866:8, 2866:12, 2869:12, 2870:18, 2870:19, 2873:8, 2904:9, 2909:16, 2931:18, 2936:21, 2937:10, 2944:8, 2944:17, 2944:22, 2945:2
**opinions** [2] - 2872:23, 2892:13
**opportunity** [4] - 2898:4, 2898:25, 2916:11, 2935:2
**opposite** [1] - 2880:24
**opposition** [1] - 2894:19
**oppression** [1] - 2924:16
**options** [1] - 2916:1
**oral** [2] - 2980:6, 2990:14
**Orange** [1] - 2929:10
**ordeal** [1] - 2924:14
**order** [1] - 2901:11
**orders** [1] - 2876:19
**organization** [3] - 2921:17, 2922:11, 2923:7
**organizations** [3] - 2891:23, 2893:3, 2923:2, 2923:3, 2923:4
**organize** [2] - 2915:23, 2929:24, 2939:9
**oriented** [2] - 2925:15, 2925:16
**original** [2] - 2978:7, 2979:9
**originally** [3] - 2906:1, 2925:5, 2989:11
**otherwise** [1] - 2880:8
**ought** [1] - 2912:22
**outlets** [12] - 2897:12, 2897:20, 2898:15, 2900:13, 2903:16, 2904:8, 2906:14, 2913:19, 2914:15, 2983:10, 2986:1
**overruns** [1] - 2990:16
**overwhelmingly** [1] - 2897:19
**own** [13] - 2850:24, 2850:25, 2900:25, 2906:18, 2910:18, 2917:17, 2926:12, 2926:25, 2936:17, 2939:13, 2942:6, 2962:14

## P

**p.m** [1] - 2945:15
**pack** [1] - 2969:18
**page** [24] - 2863:25, 2895:7, 2895:8, 2932:8, 2932:9, 2934:2, 2937:12, 2937:18, 2938:2, 2959:25, 2970:15, 2983:17, 2988:20, 2990:22, 2990:24, 2991:2, 2991:6, 2991:7, 2991:8, 2991:9, 2991:10, 2991:13
**pages** [10] - 2930:24, 2930:25, 2931:1, 2931:3, 2931:20,

2931:25, 2934:18, 2934:21, 2957:5, 2988:18
**paid** [2] - 2972:22, 2990:18
**Palo** [1] - 2920:10
**paper** [2] - 2891:12, 2901:19
**paragraph** [19] - 2867:7, 2870:5, 2877:15, 2903:10, 2903:21, 2904:12, 2904:13, 2905:11, 2905:18, 2905:21, 2906:4, 2906:5, 2916:6, 2947:13, 2948:6, 2951:1, 2992:19
**paragraphs** [2] - 2932:12, 2932:16
**paralegal** [1] - 2850:11
**Parfitt** [19] - 2857:10, 2857:19, 2858:7, 2858:16, 2858:18, 2859:6, 2859:13, 2859:23, 2860:4, 2860:5, 2874:16, 2875:7, 2875:15, 2875:23, 2876:1, 2877:10, 2877:13, 2878:2, 2902:15
**Parfitt's** [1] - 2876:8
**part** [19] - 2852:18, 2863:22, 2864:3, 2865:13, 2871:24, 2873:4, 2873:5, 2889:25, 2922:7, 2925:15, 2925:16, 2927:4, 2927:8, 2931:17, 2963:7, 2965:5, 2965:16, 2967:16, 2978:8
**participate** [3] - 2934:11, 2961:10, 2978:2
**participated** [1] - 2965:16
**particular** [2] - 2937:3, 2981:23
**parties** [1] - 2850:6
**partner** [2] - 2948:13, 2975:17
**parts** [2] - 2892:13, 2965:5
**Party** [1] - 2922:21
**party** [7] - 2909:3, 2978:23, 2980:2, 2990:18, 2990:21, 2991:4, 2991:20
**passes** [1] - 2953:11
**passionate** [1] - 2972:5
**past** [2] - 2924:15, 2924:16
**pasted** [4] - 2982:6, 2983:25, 2984:11, 2985:23
**Paul** [12] - 2902:4, 2902:15, 2939:7, 2940:4, 2944:1, 2946:10, 2947:2, 2949:7, 2960:6, 2963:25, 2965:6, 2965:17
**Paula** [2] - 2849:1, 2850:14
**pause** [1] - 2956:16
**pay** [3] - 2923:23, 2967:22, 2990:15
**payer** [5] - 2978:24, 2990:18, 2990:21, 2991:4, 2991:20
**paying** [2] - 2967:17, 2967:25
**payment** [1] - 2980:1
**Pennsylvania** [1] - 2848:18

**pens** [1] - 2850:25
**people** [21] - 2898:5, 2910:14, 2910:17, 2910:19, 2910:22, 2912:4, 2923:15, 2924:5, 2924:13, 2925:25, 2926:3, 2926:16, 2930:7, 2936:17, 2937:8, 2940:9, 2946:14, 2952:10, 2952:25, 2975:13, 2977:7
**People** [1] - 2859:9
**perceived** [1] - 2944:19
**perceiving** [1] - 2943:13
**perception** [1] - 2910:17
**perform** [1] - 2979:10
**perhaps** [2] - 2960:19, 2964:7
**period** [9] - 2881:4, 2896:12, 2896:13, 2897:2, 2897:6, 2897:8, 2930:6, 2935:1, 2982:9
**permit** [2] - 2935:10, 2938:4
**permitted** [3] - 2874:25, 2912:25, 2917:13
**person** [4] - 2854:12, 2968:3, 2982:11, 2982:15
**personal** [1] - 2922:14
**personalities** [1] - 2937:7
**personally** [2] - 2955:2, 2973:6
**Phillips** [2] - 2920:13, 2920:14
**phone** [1] - 2854:8
**phrased** [1] - 2885:12
**pick** [1] - 2896:9
**picture** [1] - 2877:16
**piece** [5] - 2894:15, 2895:2, 2923:21, 2985:6, 2985:8
**Pinchuk** [4] - 2852:11, 2925:6, 2925:23, 2980:8
**pitted** [1] - 2924:5
**pjunghans@zuckerman.com** [1] - 2849:4
**place** [4] - 2915:4, 2963:23, 2963:24, 2964:20
**places** [1] - 2878:16
**Plaintiff** [2] - 2848:4, 2848:12
**plan** [6] - 2866:11, 2927:5, 2927:8, 2962:21, 2966:6, 2967:16
**plane** [1] - 2973:3
**planning** [1] - 2921:16
**plans** [3] - 2973:14, 2973:25, 2974:5
**play** [1] - 2930:3
**playing** [1] - 2852:17
**pleased** [1] - 2967:5
**pleasing** [1] - 2853:18
**plenty** [1] - 2951:9
**plus** [1] - 2923:23
**Podesta** [1] - 2974:8
**podium** [1] - 2850:5
**point** [26] - 2858:1, 2861:14, 2873:15, 2877:6, 2878:16, 2886:10, 2890:1, 2918:15,

2932:14, 2933:6, 2933:8, 2934:4, 2934:17, 2934:20, 2934:23, 2934:25, 2937:12, 2950:11, 2952:18, 2952:22, 2954:20, 2963:6, 2964:17, 2970:23, 2976:4
**pointblank** [1] - 2861:12
**points** [4] - 2865:6, 2954:19, 2968:22, 2973:12
**polarized** [1] - 2925:14
**polarizing** [1] - 2925:13
**policy** [8] - 2910:13, 2910:21, 2921:12, 2921:16, 2922:6, 2968:13, 2975:9, 2976:4
**Policy** [1] - 2975:2
**political** [16] - 2858:9, 2859:10, 2860:6, 2860:7, 2876:20, 2880:3, 2883:22, 2884:4, 2897:19, 2898:13, 2904:10, 2937:15, 2937:24, 2993:1, 2993:5
**politically** [15] - 2858:14, 2864:17, 2864:19, 2876:18, 2879:5, 2879:8, 2879:23, 2880:20, 2904:21, 2906:3, 2924:6, 2936:23, 2937:11, 2937:14, 2937:23
**politics** [2] - 2904:19, 2937:6
**portion** [1] - 2905:3
**portray** [1] - 2880:18
**portrayed** [1] - 2891:21
**portraying** [1] - 2896:25
**position** [5] - 2869:21, 2902:24, 2917:15, 2944:23, 2951:7
**positions** [2] - 2910:20, 2926:1
**positive** [1] - 2967:17
**possible** [2] - 2966:13, 2970:25
**Post** [9] - 2894:15, 2894:18, 2894:23, 2894:24, 2895:2, 2895:10, 2895:13, 2895:23, 2896:1
**potential** [2] - 2945:3, 2945:4
**pound** [1] - 2951:25
**power** [2] - 2923:1, 2931:14
**powerful** [1] - 2900:9
**PR** [9] - 2852:18, 2874:1, 2961:5, 2961:7, 2961:8, 2961:11, 2961:15, 2962:13
**practice** [3] - 2851:25, 2921:5, 2933:11
**practiced** [3] - 2921:10, 2921:15, 2922:4
**Pratt** [1] - 2848:22
**precisely** [1] - 2880:23
**preferable** [1] - 2917:21
**premier** [1] - 2879:2
**preoccupied** [1] - 2976:8
**prepared** [3] - 2859:14, 2918:9, 2992:23
**preparing** [1] - 2978:2

**present** [10] - 2850:17, 2858:24, 2876:24, 2877:19, 2901:20, 2934:11, 2934:24, 2935:14, 2935:17, 2945:9
**presentation** [6] - 2869:7, 2869:8, 2900:16, 2901:3, 2934:12, 2965:21
**presented** [7] - 2876:20, 2876:23, 2877:20, 2936:15, 2936:16, 2971:6, 2971:7
**preside** [1] - 2946:20
**presided** [1] - 2930:9
**President** [5] - 2877:1, 2921:23, 2922:3, 2929:9, 2975:12
**president** [5] - 2929:7, 2951:5, 2952:11, 2957:11, 2975:13
**press** [18] - 2857:14, 2857:17, 2857:22, 2880:5, 2882:12, 2884:19, 2893:8, 2898:23, 2907:22, 2940:9, 2942:14, 2961:11, 2962:25, 2966:8, 2966:13, 2967:8, 2968:9, 2968:15
**presumption** [1] - 2933:19
**pretrial** [1] - 2928:15
**pretty** [4] - 2859:5, 2893:14, 2901:4, 2949:24
**prevented** [1] - 2936:10
**previous** [7] - 2865:3, 2898:2, 2988:20, 2989:6, 2991:2, 2991:13
**previously** [2] - 2874:9, 2885:9
**price** [5] - 2989:14, 2989:19, 2989:21, 2989:24, 2989:25
**primarily** [1] - 2897:12
**primary** [1] - 2929:24
**prime** [1] - 2929:8, 2929:9
**principles** [3] - 2927:1, 2937:3, 2968:1
**printed** [3] - 2899:16, 2900:2, 2900:5
**prism** [2] - 2924:8, 2927:1
**prison** [2] - 2925:11, 2926:19
**private** [1] - 2923:3
**Pro** [1] - 2893:21
**problem** [9] - 2856:19, 2870:4, 2873:8, 2873:11, 2888:21, 2889:6, 2911:4, 2947:18, 2960:14
**problematical** [1] - 2911:24
**problems** [1] - 2973:2
**procedural** [1] - 2877:23
**procedure** [1] - 2878:25
**proceed** [2] - 2850:18, 2851:7
**proceeding** [2] - 2909:5, 2937:4
**proceedings** [5] - 2877:21, 2933:5, 2934:8, 2971:1, 2994:8
**process** [16] - 2853:13, 2859:2, 2864:16, 2902:10, 2924:8, 2927:1, 2931:21, 2931:23,

2932:6, 2933:20, 2933:23, 2937:1, 2938:7, 2952:8, 2970:18, 2987:19
**procurator** [1] - 2951:6
**produce** [1] - 2971:11
**produced** [1] - 2972:25
**professional** [2] - 2920:25, 2922:15
**proficient** [1] - 2923:17
**profit** [1] - 2910:18
**programs** [1] - 2923:10
**progressive** [1] - 2923:17
**prohibition** [1] - 2917:24
**project** [24] - 2863:22, 2901:11, 2908:6, 2908:9, 2909:1, 2909:4, 2909:9, 2909:25, 2910:25, 2923:19, 2923:25, 2925:2, 2925:3, 2927:11, 2928:9, 2960:21, 2962:14, 2962:15, 2965:1, 2966:7, 2982:12, 2986:16, 2990:16, 2990:18
**Project** [1] - 2923:15
**projects** [1] - 2924:25
**prompt** [1] - 2869:5
**prompted** [2] - 2982:1, 2982:2
**promulgating** [1] - 2900:21
**proof** [1] - 2954:22
**proposals** [1] - 2947:17
**proposed** [1] - 2979:2
**proposing** [1] - 2948:15
**prosecution** [24] - 2858:9, 2858:14, 2860:7, 2864:11, 2864:13, 2864:17, 2864:19, 2876:24, 2879:23, 2880:19, 2883:23, 2884:4, 2904:21, 2925:10, 2928:13, 2931:11, 2934:10, 2936:22, 2937:10, 2937:14, 2937:23, 2971:7, 2993:5
**prosecutorial** [1] - 2877:20
**prosecutors** [1] - 2926:17
**protect** [1] - 2922:24
**proves** [2] - 2871:5, 2954:23
**provide** [7] - 2861:21, 2913:21, 2980:6, 2988:16, 2990:12, 2991:22, 2992:13
**provided** [7] - 2938:16, 2945:21, 2945:22, 2988:8, 2988:9, 2988:10, 2992:1
**providing** [1] - 2903:15
**public** [5] - 2869:18, 2874:9, 2875:16, 2878:3, 2879:15, 2881:22, 2884:12, 2894:5, 2900:24, 2910:23, 2920:8, 2920:9, 2921:6, 2927:5, 2927:8, 2940:3, 2961:18, 2963:8, 2966:1, 2967:24, 2968:5, 2982:14
**publication** [3] - 2869:3, 2945:9, 2982:8

**publications** [1] - 2886:12
**publicity** [1] - 2982:14
**publicized** [1] - 2897:17
**publish** [3] - 2952:1, 2954:4
**published** [5] - 2953:19, 2953:21, 2954:3, 2984:9, 2984:19
**publisher** [1] - 2882:20
**pull** [2] - 2982:8, 2983:15
**purely** [1] - 2975:21
**purpose** [17] - 2867:9, 2868:2, 2870:22, 2870:24, 2870:25, 2895:23, 2897:24, 2899:2, 2904:25, 2914:11, 2925:2, 2925:5, 2925:21, 2925:22, 2975:3, 2975:4
**purposes** [2] - 2866:2, 2914:25
**pursuant** [1] - 2866:11
**pursue** [5] - 2889:13, 2890:24, 2891:2, 2916:3, 2975:9
**pursued** [1] - 2889:14
**put** [13] - 2857:24, 2867:19, 2874:3, 2881:6, 2889:6, 2899:13, 2901:18, 2930:23, 2976:17, 2976:25, 2979:19, 2992:6
**Putin** [1] - 2929:13
**putting** [3] - 2869:14, 2953:16, 2980:22

## Q

**questioning** [3] - 2889:13, 2889:15, 2891:1
**questions** [37] - 2852:24, 2854:7, 2856:23, 2857:1, 2858:22, 2858:24, 2863:14, 2866:14, 2868:15, 2870:18, 2878:21, 2885:12, 2888:7, 2889:12, 2896:20, 2901:4, 2902:9, 2907:13, 2919:24, 2933:19, 2942:2, 2966:8, 2966:13, 2966:14, 2966:17, 2968:9, 2979:10, 2979:11, 2979:13, 2980:23, 2982:21, 2983:14, 2984:4, 2988:12, 2991:19, 2991:23, 2993:13
**quick** [3] - 2901:4, 2901:7, 2919:2
**quite** [4] - 2880:23, 2895:16, 2966:3, 2983:17
**quotation** [3] - 2858:2, 2879:9, 2879:22
**quotations** [10] - 2857:18, 2858:5, 2900:12, 2902:23, 2904:6, 2906:12, 2908:3, 2915:24, 2915:25
**quote** [11] - 2859:16, 2859:17, 2874:23, 2874:25, 2875:7, 2876:21, 2877:16, 2879:17,

2894:10, 2904:17, 2905:5
**quoted** [7] - 2858:7, 2859:15, 2860:3, 2879:3, 2883:5, 2900:20, 2905:12
**quotes** [15] - 2858:16, 2859:20, 2860:12, 2874:19, 2874:21, 2874:22, 2875:9, 2875:24, 2876:1, 2876:9, 2876:11, 2877:3, 2894:2, 2904:15
**quoting** [1] - 2944:9

## R

**raised** [1] - 2864:21
**raises** [2] - 2933:16, 2933:18
**ran** [1] - 2962:9
**rarely** [1] - 2933:11
**rate** [1] - 2990:1
**rates** [1] - 2990:2
**rather** [4] - 2941:2, 2965:19, 2969:11, 2992:7
**re** [1] - 2873:16
**re-ask** [1] - 2873:16
**rea** [1] - 2869:25
**reach** [2] - 2889:19, 2971:5
**react** [1] - 2981:1
**reaction** [4] - 2944:20, 2944:21, 2950:9, 2975:14
**reactions** [1] - 2951:21
**read** [17] - 2854:24, 2856:22, 2857:17, 2857:18, 2861:3, 2886:6, 2904:17, 2918:1, 2934:19, 2943:5, 2945:17, 2945:20, 2948:10, 2972:16, 2972:21, 2991:12, 2992:19
**reading** [3] - 2943:9, 2979:5, 2979:6
**reads** [1] - 2968:24
**ready** [3] - 2850:18, 2964:1, 2993:17
**real** [1] - 2973:2
**realized** [2] - 2855:13, 2863:12
**really** [15] - 2857:25, 2864:7, 2873:7, 2893:25, 2911:19, 2929:21, 2931:2, 2931:19, 2936:2, 2941:1, 2946:11, 2951:20, 2952:21, 2965:5, 2976:5
**reason** [10] - 2856:19, 2871:6, 2885:9, 2910:11, 2923:24, 2924:11, 2924:20, 2991:15
**reasons** [9] - 2898:12, 2908:18, 2908:25, 2909:24, 2923:21, 2933:21, 2935:24, 2952:25, 2954:7
**reassures** [1] - 2941:5
**receive** [9] - 2938:18, 2946:2, 2958:15, 2958:23, 2959:5, 2973:12, 2973:14, 2977:22, 2980:10

**received** [8] - 2873:10, 2897:25, 2949:20, 2961:1, 2977:25, 2978:1, 2984:6, 2992:16
**receiving** [2] - 2955:16, 2965:6
**recent** [1] - 2992:22
**recess** [2] - 2917:5, 2993:23
**recognize** [1] - 2981:10
**recognized** [1] - 2950:6
**recollection** [5] - 2881:5, 2900:15, 2927:19, 2980:24, 2985:13
**recommend** [2] - 2961:4, 2961:8
**recommendations** [1] - 2975:8
**reconsider** [1] - 2900:19
**reconsideration** [1] - 2901:22
**record** [25] - 2850:6, 2858:3, 2859:15, 2872:19, 2874:19, 2874:21, 2874:23, 2875:1, 2875:11, 2876:20, 2876:23, 2877:16, 2879:24, 2894:9, 2894:12, 2901:21, 2904:7, 2912:12, 2927:23, 2928:6, 2934:2, 2948:22, 2971:11, 2985:1
**recreate** [1] - 2983:8
**reduce** [2] - 2910:17, 2941:10
**refer** [1] - 2935:18
**reference** [8] - 2876:11, 2879:16, 2916:4, 2934:20, 2939:19, 2978:23, 2980:1, 2983:12
**referred** [8] - 2874:18, 2876:1, 2876:8, 2882:9, 2895:13, 2970:11, 2985:7, 2987:9
**referring** [6] - 2895:10, 2895:14, 2895:23, 2941:13, 2947:13, 2948:14
**refers** [1] - 2893:21
**reflect** [2] - 2940:12, 2971:3
**reflected** [1] - 2902:20
**reflecting** [1] - 2932:13
**reflects** [2] - 2940:4, 2970:17
**refreshed** [1] - 2985:12
**refuge** [1] - 2968:13
**refusal** [2] - 2960:16, 2991:22
**refused** [1] - 2935:10
**refute** [1] - 2880:4
**regard** [2] - 2882:3, 2986:23
**register** [50] - 2866:16, 2866:18, 2866:24, 2867:1, 2867:4, 2867:8, 2868:3, 2868:6, 2868:15, 2868:18, 2868:20, 2869:5, 2870:10, 2870:14, 2871:8, 2871:11, 2872:3, 2872:6, 2872:15, 2872:16, 2873:6, 2873:21, 2887:13, 2888:16, 2889:22, 2889:24, 2891:24, 2893:7, 2898:3, 2898:17, 2902:7, 2908:5,

2908:13, 2908:19, 2908:25, 2909:13, 2910:1, 2910:4, 2910:9, 2910:10, 2910:23, 2911:1, 2911:15, 2912:6, 2912:22, 2916:9, 2922:22, 2961:13, 2990:20, 2991:14
**registered** [2] - 2909:10, 2911:4
**registering** [4] - 2862:13, 2908:14, 2912:10, 2922:22
**registrable** [1] - 2912:11
**registration** [3] - 2887:23, 2890:13, 2911:8
**regular** [1] - 2949:23
**relate** [1] - 2989:23
**related** [2] - 2905:7, 2923:3
**relating** [2] - 2981:14, 2982:15
**relations** [14] - 2869:19, 2874:9, 2875:16, 2878:3, 2881:22, 2884:12, 2894:5, 2927:5, 2927:8, 2961:18, 2963:8, 2966:1, 2967:24, 2968:5
**relationship** [1] - 2905:5
**release** [6] - 2857:17, 2857:22, 2879:14, 2879:15, 2882:12, 2899:11, 2966:5, 2967:16
**released** [2] - 2879:18, 2905:2
**relevance** [1] - 2884:13
**relevant** [16] - 2866:24, 2867:20, 2868:18, 2869:24, 2877:19, 2886:23, 2886:24, 2886:25, 2912:22, 2926:16, 2929:11, 2941:14, 2942:24, 2954:1, 2954:6, 2956:1
**reliability** [1] - 2865:8
**remember** [21] - 2869:17, 2871:25, 2899:3, 2899:13, 2900:5, 2916:13, 2932:5, 2939:22, 2949:20, 2963:19, 2963:21, 2964:24, 2964:25, 2965:4, 2984:24, 2985:6, 2986:11, 2986:12, 2986:13, 2987:8
**remembered** [4] - 2856:2, 2985:11, 2985:13, 2986:10
**remembering** [1] - 2881:13
**reminded** [1] - 2985:13
**remove** [1] - 2937:15
**render** [1] - 2866:12
**repeat** [2] - 2915:6, 2956:2
**repeating** [1] - 2893:1
**rephrase** [1] - 2907:3
**reply** [1] - 2978:6
**Report** [151] - 2853:10, 2854:15, 2855:24, 2857:10, 2857:11, 2857:12, 2857:13, 2857:16, 2861:10, 2862:5, 2862:6, 2862:14, 2862:20, 2862:23, 2864:8, 2864:11, 2864:24, 2865:6, 2868:25, 2869:3, 2874:20, 2879:6, 2879:7,

2879:15, 2879:18, 2880:2,
2880:8, 2880:15, 2880:18,
2880:25, 2881:6, 2881:19,
2882:7, 2882:9, 2882:13,
2896:4, 2896:14, 2896:16,
2896:25, 2898:14, 2899:12,
2900:1, 2903:15, 2905:2,
2908:16, 2911:17, 2913:17,
2913:20, 2914:14, 2927:4,
2927:7, 2929:25, 2930:2,
2930:17, 2930:19, 2931:3,
2931:19, 2931:24, 2934:19,
2934:21, 2935:21, 2936:20,
2937:16, 2937:18, 2938:8,
2938:14, 2938:17, 2938:19,
2938:22, 2939:24, 2940:2,
2940:6, 2940:8, 2940:10,
2940:15, 2940:16, 2941:14,
2942:7, 2942:14, 2944:8,
2944:18, 2945:22, 2945:25,
2946:3, 2946:21, 2949:15,
2949:19, 2949:21, 2950:5,
2950:8, 2951:7, 2952:12,
2953:1, 2953:7, 2953:24,
2954:19, 2955:21, 2957:12,
2957:16, 2957:17, 2957:19,
2957:20, 2957:21, 2957:22,
2958:2, 2958:5, 2960:6,
2960:18, 2960:19, 2960:25,
2962:21, 2963:7, 2963:15,
2963:25, 2964:9, 2964:13,
2964:15, 2965:3, 2965:8,
2965:12, 2965:25, 2966:8,
2966:10, 2966:14, 2966:15,
2967:18, 2968:9, 2968:25,
2969:10, 2969:15, 2970:17,
2970:21, 2970:22, 2970:24,
2971:17, 2971:18, 2976:23,
2982:1, 2982:25, 2985:5,
2988:9, 2988:10, 2989:9,
2990:8, 2990:10, 2992:23,
2993:2, 2993:7

  **report** [73] - 2853:12, 2853:13,
2853:19, 2854:13, 2854:21,
2854:24, 2855:21, 2856:2,
2857:20, 2858:1, 2858:8,
2858:25, 2859:1, 2859:6,
2859:10, 2862:11, 2862:22,
2877:9, 2877:11, 2878:22,
2881:2, 2881:9, 2881:12,
2894:25, 2895:3, 2895:4,
2895:12, 2898:19, 2898:23,
2899:25, 2904:24, 2909:1,
2909:8, 2909:11, 2912:9,
2914:4, 2925:5, 2925:8, 2926:6,
2926:21, 2930:10, 2937:13,
2938:1, 2939:10, 2939:13,
2939:15, 2941:1, 2941:2,
2944:23, 2945:9, 2947:25,
2948:4, 2955:16, 2960:4,
2960:17, 2960:22, 2962:16,

2965:21, 2967:16, 2971:4,
2971:13, 2971:24, 2972:19,
2972:23, 2973:1, 2973:23,
2976:13, 2976:14, 2981:14,
2981:21, 2981:23, 2984:18,
2985:2
  **report's** [2] - 2876:17, 2962:25
  **reported** [2] - 2855:21, 2855:22
  **REPORTER** [1] - 2994:2
  **reporter** [6] - 2855:4, 2881:8,
2882:5, 2882:21, 2967:1, 2984:7
  **Reporter** [3] - 2849:7, 2849:7,
2994:13
  **reporters** [7] - 2852:14, 2853:7,
2854:3, 2871:1, 2873:19,
2874:8, 2906:13
  **reporting** [2] - 2882:23, 2900:1
  **reports** [7] - 2880:6, 2881:15,
2898:18, 2906:11, 2939:16,
2939:18, 2944:6
  **representation** [5] - 2857:23,
2909:2, 2933:24, 2934:6, 2934:8
  **representative** [1] - 2983:13
  **represented** [1] - 2877:21
  **representing** [2] - 2909:3,
2909:4
  **republican** [1] - 2975:20
  **request** [14] - 2866:11, 2873:11,
2885:1, 2885:2, 2897:14,
2903:19, 2935:6, 2935:7,
2947:11, 2979:2, 2980:9,
2990:13, 2990:17, 2991:17
  **requested** [1] - 2990:21
  **requests** [5] - 2903:16, 2946:2,
2946:5, 2949:21
  **require** [1] - 2911:1
  **required** [25] - 2866:24, 2867:8,
2867:14, 2868:3, 2868:6,
2868:15, 2870:10, 2870:14,
2871:8, 2871:11, 2872:3,
2873:20, 2887:22, 2888:16,
2891:23, 2893:7, 2909:25,
2910:9, 2912:9, 2912:22,
2916:9, 2961:13, 2990:19,
2991:14
  **requirements** [1] - 2936:3
  **requires** [1] - 2873:5
  **research** [1] - 2983:2
  **resolve** [1] - 2881:14
  **respect** [11] - 2867:6, 2890:7,
2903:22, 2913:22, 2913:24,
2914:2, 2916:10, 2931:21,
2940:10, 2963:14, 2975:10
  **respected** [1] - 2933:20
  **respectful** [1] - 2942:14
  **respectfully** [3] - 2869:3,
2948:18, 2990:20
  **respects** [1] - 2976:6
  **respond** [11] - 2916:7, 2941:4,
2966:13, 2966:16, 2967:7,

2980:17, 2982:3, 2982:16,
2983:11, 2986:2, 2990:17
  **responded** [1] - 2984:16
  **responding** [10] - 2858:6,
2860:4, 2904:22, 2906:11,
2941:21, 2950:22, 2950:23,
2951:10, 2968:9, 2970:20
  **response** [30] - 2880:1,
2893:18, 2894:14, 2898:7,
2898:19, 2902:6, 2902:12,
2903:16, 2905:9, 2907:12,
2915:3, 2945:12, 2947:1,
2948:5, 2948:16, 2955:3,
2971:3, 2972:7, 2972:11,
2972:14, 2978:2, 2978:6,
2979:19, 2980:19, 2981:15,
2984:6, 2985:1, 2987:1,
2988:12, 2989:6
  **responses** [3] - 2898:1,
2980:25, 2981:2
  **responsible** [2] - 2929:7,
2968:4
  **rest** [1] - 2897:17
  **result** [3] - 2867:7, 2963:24,
2983:1
  **resulted** [2] - 2931:10, 2932:24
  **resume** [3] - 2916:25, 2993:16,
2993:22
  **retired** [1] - 2852:2
  **returned** [5] - 2862:2, 2921:9,
2922:4, 2965:19, 2984:7
  **reverse** [1] - 2875:11
  **reversed** [1] - 2894:11
  **review** [10] - 2914:10, 2916:11,
2916:14, 2933:15, 2944:7,
2944:17, 2947:17, 2965:10,
2966:20, 2969:16
  **reviewed** [4] - 2883:22,
2933:22, 2957:11, 2969:10
  **reviewing** [2] - 2875:10, 2992:6
  **reviews** [1] - 2864:11
  **revise** [2] - 2947:11, 2947:19
  **revisions** [1] - 2969:18
  **Revolution** [1] - 2929:10
  **rhetoric** [1] - 2926:5
  **Rights** [2] - 2922:19, 2923:6
  **rights** [5] - 2853:13, 2859:3,
2923:7, 2929:2, 2933:23
  **risk** [2] - 2893:1, 2941:10
  **RMR** [2] - 2849:7, 2994:13
  **road** [1] - 2868:8
  **robust** [1] - 2923:10
  **Rohde** [1] - 2850:11
  **role** [4] - 2929:20, 2930:3,
2946:8, 2973:6
  **rolling** [1] - 2962:21
  **rollout** [3] - 2893:22, 2974:9,
2974:12, 2974:15, 2974:18
  **room** [1] - 2965:20
  **Room** [2] - 2849:8, 2994:14

routine [1] - 2949:24
rule [7] - 2917:12, 2918:2, 2918:5, 2918:17, 2922:13, 2923:5, 2936:25
ruled [1] - 2891:3
rules [3] - 2872:16, 2918:7, 2919:3
run [5] - 2907:25, 2908:2, 2916:24, 2917:24, 2993:19
running [1] - 2874:19
ruse [1] - 2970:25
Russia [3] - 2925:17, 2929:13, 2931:5
Russian [7] - 2928:15, 2928:18, 2939:11, 2939:13, 2939:14, 2939:18, 2941:8

## S

Sager [1] - 2974:14
SANCHEZ [52] - 2850:8, 2852:20, 2865:20, 2866:7, 2867:23, 2869:10, 2870:1, 2871:18, 2872:5, 2873:2, 2873:7, 2873:14, 2873:22, 2884:8, 2884:13, 2885:4, 2885:8, 2885:16, 2887:15, 2889:14, 2892:10, 2892:20, 2895:17, 2897:3, 2906:23, 2906:25, 2908:10, 2909:16, 2911:16, 2912:1, 2917:16, 2918:1, 2918:24, 2927:14, 2941:16, 2943:10, 2943:12, 2943:17, 2952:13, 2952:21, 2954:14, 2955:19, 2956:5, 2958:7, 2958:17, 2959:2, 2959:15, 2961:20, 2970:6, 2971:25, 2985:9, 2987:21
Sanchez [1] - 2848:12
sanchez@usdoj.gov [1] - 2848:16
sand [1] - 2951:25
Sanger [42] - 2853:25, 2854:1, 2854:6, 2854:7, 2854:8, 2854:11, 2854:19, 2855:23, 2856:4, 2856:15, 2857:6, 2858:20, 2859:20, 2860:25, 2861:22, 2862:14, 2863:4, 2863:7, 2863:13, 2864:4, 2864:6, 2864:23, 2865:13, 2865:16, 2872:14, 2903:19, 2907:6, 2907:10, 2907:16, 2907:20, 2914:3, 2914:5, 2955:22, 2966:24, 2967:1, 2976:15, 2976:16, 2976:18, 2976:25, 2986:21, 2987:13
Sanger's [1] - 2856:2
sat [3] - 2869:1, 2911:20, 2962:11
satisfied [1] - 2943:13

save [1] - 2981:22
saved [1] - 2982:8
saw [1] - 2897:14
scene [2] - 2946:11, 2989:13
scholarship [1] - 2920:12
school [8] - 2920:6, 2920:7, 2920:9, 2920:11, 2920:13, 2920:22, 2921:1, 2921:2
School [1] - 2920:23
schools [1] - 2920:8
second [10] - 2863:25, 2888:4, 2895:7, 2903:10, 2917:9, 2931:7, 2954:17, 2959:24, 2968:18, 2970:15
secondly [3] - 2924:2, 2936:5, 2954:12
secretary [2] - 2862:8, 2921:18
Secretary [1] - 2921:16
Section [1] - 2989:23
Security [1] - 2923:14
security [3] - 2921:12, 2923:16, 2923:18
see [35] - 2860:9, 2863:12, 2864:1, 2876:2, 2876:11, 2884:1, 2892:10, 2893:19, 2903:11, 2915:10, 2919:3, 2931:22, 2933:9, 2934:18, 2935:3, 2935:18, 2937:11, 2938:3, 2940:14, 2944:23, 2949:25, 2956:9, 2956:14, 2965:10, 2965:11, 2969:19, 2974:4, 2981:19, 2984:12, 2986:7, 2987:6, 2987:19, 2987:24, 2988:23
seeing [1] - 2988:2
seek [1] - 2916:14
seem [1] - 2889:20
segment [1] - 2935:19
selected [1] - 2964:18
selective [2] - 2876:24, 2883:23
sell [2] - 2944:8, 2944:18
Senate [1] - 2922:1
Senator [4] - 2921:11, 2921:13, 2922:5, 2922:6
send [17] - 2855:2, 2855:3, 2855:7, 2858:16, 2859:16, 2859:17, 2859:19, 2859:20, 2862:14, 2862:20, 2863:9, 2876:13, 2881:9, 2906:22, 2934:20, 2972:11, 2982:2
sending [6] - 2856:23, 2915:20, 2950:12, 2957:5, 2973:4, 2973:25
senior [1] - 2921:12
sense [4] - 2862:5, 2918:23, 2918:24, 2977:7
sent [39] - 2854:6, 2854:15, 2856:9, 2856:10, 2856:16, 2856:17, 2856:18, 2856:20, 2856:21, 2858:22, 2862:3,

2862:19, 2863:5, 2863:10, 2864:3, 2864:6, 2882:9, 2882:11, 2882:15, 2882:17, 2897:13, 2913:9, 2914:3, 2946:16, 2950:23, 2951:14, 2951:19, 2957:1, 2959:24, 2959:25, 2963:5, 2973:17, 2977:25, 2978:6, 2982:6, 2983:24, 2985:23, 2988:25
sentence [7] - 2877:4, 2913:16, 2945:1, 2948:8, 2986:6, 2986:9, 2991:12
sentenced [1] - 2933:15
sentencing [2] - 2925:11, 2930:8
separate [3] - 2930:16, 2931:23, 2962:17
September [22] - 2862:12, 2885:19, 2891:22, 2897:25, 2898:11, 2900:18, 2916:7, 2938:9, 2938:11, 2938:20, 2944:4, 2946:6, 2946:10, 2946:19, 2947:2, 2952:8, 2957:24, 2960:6, 2963:4, 2963:18, 2974:1, 2974:24
series [2] - 2929:4, 2939:7
serious [4] - 2853:12, 2857:21, 2949:24, 2970:14
seriously [1] - 2963:7
served [2] - 2908:8, 2910:14
serves [1] - 2921:17
service [3] - 2898:15, 2898:24, 2910:12
services [2] - 2989:25, 2990:11
serving [1] - 2906:10
set [1] - 2898:8
sets [1] - 2892:11
seven [3] - 2980:22, 2982:21, 2988:12
several [1] - 2947:19
shall [5] - 2989:21, 2989:25, 2990:6, 2990:8, 2990:10
shortly [1] - 2857:8
shot [1] - 2980:25
show [23] - 2860:14, 2860:16, 2862:25, 2874:12, 2875:18, 2878:5, 2883:7, 2893:10, 2895:5, 2899:7, 2899:16, 2900:2, 2903:2, 2938:23, 2943:21, 2946:22, 2952:15, 2959:18, 2969:2, 2970:10, 2978:4, 2990:22, 2992:15
showed [2] - 2936:15, 2936:16
showing [2] - 2956:24, 2980:12
shown [1] - 2914:22
side [2] - 2948:19, 2962:13
sides [2] - 2924:23, 2948:23
sign [1] - 2948:18
signed [4] - 2963:15, 2978:14, 2978:15, 2978:16

**significant** [4] - 2857:25, 2865:4, 2902:22, 2915:25
**sitting** [1] - 2965:6
**situation** [5] - 2941:6, 2941:13, 2941:15, 2942:16, 2942:20
**six** [3] - 2858:22, 2920:20
**Sixth** [1] - 2918:21
**size** [1] - 2851:23
**Skadden** [33] - 2860:6, 2863:18, 2876:17, 2876:22, 2879:7, 2882:24, 2883:18, 2883:21, 2883:24, 2897:18, 2902:7, 2902:10, 2902:11, 2913:16, 2914:1, 2922:10, 2930:1, 2940:16, 2946:18, 2961:9, 2966:6, 2968:12, 2970:17, 2972:22, 2977:23, 2978:15, 2982:12, 2983:13, 2986:17, 2990:5
**slightly** [1] - 2873:24
**Sloan** [10] - 2870:2, 2873:10, 2882:16, 2911:2, 2948:13, 2950:2, 2981:2, 2983:21, 2983:23, 2984:2
**sloan's** [1] - 2871:20
**Sloan's** [3] - 2871:21, 2872:18, 2929:20
**slow** [1] - 2944:10
**sniping** [1] - 2872:12
**so-called** [1] - 2973:14
**socially** [1] - 2975:21
**someone** [2] - 2881:25, 2941:2
**sometimes** [2] - 2933:3, 2950:5
**sorry** [19] - 2860:15, 2876:5, 2878:8, 2888:11, 2895:20, 2903:1, 2906:24, 2909:20, 2914:18, 2915:6, 2952:17, 2956:12, 2972:9, 2977:11, 2979:6, 2983:17, 2984:13, 2985:17, 2990:23
**sort** [9] - 2909:12, 2912:5, 2915:23, 2920:18, 2921:18, 2931:4, 2931:7, 2949:22, 2975:17
**source** [3] - 2874:22, 2875:4, 2875:6
**sovereign** [1] - 2909:15
**Soviet** [1] - 2924:17
**SPAEDER** [2] - 2848:22, 2849:2
**speaker** [1] - 2874:24
**speaking** [3] - 2915:14, 2947:24, 2951:4
**specialist** [1] - 2850:11
**specific** [3] - 2890:8, 2946:5, 2947:11
**specifically** [5] - 2858:12, 2867:10, 2884:1, 2940:5, 2962:12
**specifics** [1] - 2931:9
**specify** [1] - 2906:25

**spell** [1] - 2851:17
**spelled** [1] - 2882:5
**spent** [2] - 2930:6, 2971:18
**Spiegel** [5] - 2913:8, 2914:13, 2914:19, 2915:18, 2915:19
**spin** [1] - 2972:19
**spirits** [1] - 2964:25
**spoken** [2] - 2907:10, 2960:2
**Square** [1] - 2855:9
**stack** [1] - 2966:19
**staff** [3] - 2921:16, 2960:7, 2964:5
**stages** [1] - 2986:24
**stamp** [1] - 2912:5
**stand** [2] - 2851:9, 2919:6
**standards** [10] - 2864:15, 2864:16, 2894:12, 2924:8, 2933:12, 2934:16, 2935:14, 2937:1, 2937:3
**start** [4] - 2919:8, 2919:11, 2944:3, 2959:24
**started** [1] - 2942:19
**starting** [1] - 2963:22
**starts** [2] - 2919:9, 2944:4
**State** [2] - 2921:17, 2921:20
**state** [21] - 2850:6, 2851:16, 2862:8, 2866:23, 2868:11, 2868:12, 2868:13, 2868:18, 2871:5, 2872:2, 2879:11, 2884:14, 2888:5, 2912:21, 2920:9, 2920:10, 2921:18, 2942:24, 2945:9, 2953:24, 2954:1
**state-of-mind** [1] - 2953:24
**statement** [15] - 2857:14, 2857:15, 2869:6, 2904:25, 2905:9, 2905:12, 2907:21, 2907:23, 2914:16, 2937:25, 2984:25, 2986:6, 2986:8, 2986:9
**statements** [9] - 2858:7, 2904:4, 2906:12, 2906:15, 2906:16, 2906:17, 2907:25, 2983:7
**states** [1] - 2906:5
**STATES** [2] - 2848:1, 2848:10
**States** [10] - 2848:3, 2849:8, 2850:4, 2850:10, 2875:13, 2920:19, 2934:14, 2975:8, 2975:9, 2975:14
**statute** [5] - 2870:22, 2891:13, 2891:17, 2892:13, 2966:12
**statutory** [1] - 2888:22
**staying** [1] - 2964:19
**steered** [1] - 2937:8
**stenograph** [1] - 2994:7
**steps** [1] - 2928:10
**stick** [1] - 2977:18
**still** [4] - 2851:25, 2892:21, 2921:4, 2953:12
**stipulation** [1] - 2969:22

**stood** [1] - 2940:11
**stop** [1] - 2950:12
**storm** [1] - 2926:5
**story** [5] - 2862:17, 2862:18, 2940:20, 2984:9, 2984:12
**straightforward** [1] - 2930:24
**strategy** [4] - 2865:14, 2895:15, 2961:11, 2973:19
**Street** [3] - 2848:14, 2848:22, 2849:2
**strike** [1] - 2962:2
**strongly** [1] - 2914:12
**structured** [1] - 2932:1
**student** [1] - 2921:4
**Studies** [1] - 2920:19
**study** [1] - 2990:7
**stuff** [2] - 2967:23, 2972:18
**subgroup** [1] - 2949:22
**subject** [9] - 2918:5, 2931:11, 2944:5, 2947:6, 2968:23, 2976:9, 2981:20, 2981:25, 2989:4
**submission** [3] - 2947:14, 2947:22, 2967:5
**submit** [2] - 2869:3, 2990:8
**submitted** [1] - 2971:7
**submitting** [1] - 2941:8
**subparagraph** [1] - 2934:3
**subsections** [1] - 2931:24
**substance** [1] - 2947:8
**substantive** [3] - 2938:22, 2950:7, 2952:6
**succeed** [1] - 2965:2
**success** [1] - 2895:14
**successful** [1] - 2938:12
**suddenly** [1] - 2946:17
**suggest** [1] - 2909:18
**suggested** [6] - 2882:19, 2964:2, 2964:7, 2964:18, 2964:20, 2987:19
**suggesting** [2] - 2885:12, 2888:2, 2912:5
**suggestion** [1] - 2888:19
**Suite** [2] - 2848:23, 2849:3
**summarize** [6] - 2861:2, 2861:4, 2861:6, 2901:19, 2931:2, 2937:17
**summary** [10] - 2889:5, 2890:11, 2902:18, 2920:25, 2931:1, 2932:2, 2932:8, 2932:10, 2934:19, 2993:8
**Sunday** [3] - 2944:4, 2964:20, 2971:17
**support** [5] - 2902:24, 2926:4, 2935:9, 2971:12, 2972:25
**supported** [1] - 2894:20
**supports** [1] - 2972:20
**suppose** [1] - 2864:13
**supposed** [3] - 2876:2,

2921:19, 2969:24
**suspected** [1] - 2971:21
**sustain** [2] - 2941:18, 2941:23
**sustained** [4] - 2865:22,
2896:22, 2927:15, 2959:16
**sustaining** [1] - 2887:17
**sworn** [1] - 2851:12
**system** [3] - 2876:20, 2934:13,
2937:2

# T

**table** [3] - 2850:7, 2931:8,
2931:22
**takeaways** [1] - 2967:10
**tank** [1] - 2921:18
**task** [1] - 2982:10
**Taylor** [24] - 2848:21, 2850:14,
2851:7, 2853:20, 2861:5,
2864:22, 2878:19, 2879:19,
2881:14, 2900:3, 2904:5,
2905:14, 2914:17, 2914:25,
2915:6, 2919:22, 2934:24,
2935:23, 2937:11, 2943:13,
2952:16, 2958:19, 2959:25,
2971:21
**TAYLOR** [183] - 2850:13,
2850:19, 2851:8, 2851:15,
2853:2, 2860:20, 2860:23,
2865:25, 2866:23, 2867:6,
2867:12, 2867:15, 2867:17,
2868:11, 2868:14, 2869:9,
2869:17, 2870:5, 2870:16,
2870:21, 2870:25, 2871:4,
2871:14, 2871:16, 2871:25,
2872:9, 2872:21, 2872:24,
2873:5, 2873:18, 2874:2,
2874:6, 2874:15, 2874:17,
2876:5, 2876:7, 2878:8,
2878:11, 2878:13, 2883:13,
2883:14, 2884:10, 2884:21,
2884:24, 2885:7, 2885:19,
2885:23, 2886:3, 2886:5,
2886:17, 2886:22, 2887:6,
2887:17, 2887:19, 2888:11,
2888:13, 2888:20, 2889:8,
2889:12, 2890:14, 2890:18,
2890:22, 2891:10, 2891:15,
2891:19, 2891:22, 2892:1,
2892:8, 2892:17, 2892:19,
2892:22, 2892:25, 2893:12,
2893:14, 2893:16, 2895:20,
2895:22, 2896:6, 2896:8,
2896:11, 2896:18, 2896:23,
2897:6, 2897:9, 2905:17,
2907:5, 2908:23, 2909:22,
2911:6, 2911:10, 2911:13,
2911:18, 2912:7, 2912:14,
2912:20, 2913:7, 2915:3,
2915:7, 2916:19, 2917:6,

2917:11, 2917:19, 2917:23,
2918:7, 2918:12, 2919:6,
2919:11, 2919:15, 2919:18,
2919:23, 2927:18, 2927:22,
2928:8, 2930:20, 2930:22,
2933:1, 2938:25, 2939:3,
2941:24, 2942:18, 2942:23,
2943:6, 2943:8, 2943:20,
2943:23, 2944:2, 2945:11,
2949:2, 2949:5, 2950:18,
2950:20, 2952:15, 2952:17,
2953:4, 2953:11, 2953:14,
2953:17, 2953:22, 2954:7,
2954:10, 2954:17, 2955:6,
2955:13, 2955:18, 2956:2,
2956:7, 2956:10, 2956:12,
2956:20, 2956:23, 2958:14,
2958:22, 2959:10, 2959:17,
2959:20, 2959:22, 2962:1,
2969:4, 2969:5, 2969:21,
2970:1, 2970:3, 2970:8, 2970:9,
2972:3, 2972:10, 2977:1,
2977:15, 2977:19, 2977:21,
2978:10, 2978:11, 2979:25,
2983:15, 2983:20, 2985:19,
2987:3, 2987:4, 2987:23,
2988:4, 2988:20, 2988:22,
2993:13
**taylor**.................**2851** [1] -
2849:15
**team** [17] - 2863:20, 2863:21,
2902:8, 2904:18, 2910:22,
2921:25, 2924:9, 2924:10,
2924:13, 2946:18, 2949:20,
2950:2, 2951:20, 2965:10,
2984:10, 2986:16
**technically** [1] - 2927:25
**Telegraph** [11] - 2857:9, 2869:2,
2875:20, 2876:17, 2877:23,
2887:8, 2887:21, 2894:3,
2894:10, 2906:8, 2906:14
**telephone** [4] - 2854:16,
2862:3, 2863:5, 2863:6
**ten** [1] - 2917:3
**term** [1] - 2921:20
**terms** [5] - 2888:22, 2979:3,
2986:1, 2989:14, 2989:19
**terrific** [3] - 2894:16, 2895:2,
2896:1
**tested** [1] - 2936:5
**testified** [7] - 2851:13, 2884:24,
2928:22, 2934:10, 2955:19,
2956:5
**testify** [6] - 2913:8, 2928:24,
2928:25, 2935:11, 2938:5,
2952:24
**testifying** [2] - 2889:9, 2889:10
**testimony** [12] - 2889:2, 2901:5,
2912:3, 2918:10, 2927:10,
2927:13, 2927:23, 2936:6,

2963:17, 2968:23, 2973:24,
2974:2
**text** [5] - 2877:14, 2905:4,
2905:6, 2905:9, 2964:9
**thanked** [1] - 2983:5
**THE** [243] - 2848:1, 2848:1,
2848:9, 2848:13, 2850:1,
2850:2, 2850:3, 2850:12,
2850:16, 2850:20, 2850:22,
2851:5, 2851:6, 2851:10,
2852:22, 2852:23, 2860:21,
2865:22, 2866:3, 2866:6,
2866:13, 2867:3, 2867:10,
2867:13, 2867:16, 2867:22,
2867:24, 2868:13, 2868:22,
2869:13, 2870:7, 2870:17,
2870:24, 2871:2, 2871:12,
2871:15, 2871:17, 2872:10,
2872:22, 2872:25, 2873:13,
2873:15, 2873:23, 2874:3,
2876:2, 2876:3, 2876:4, 2876:6,
2878:7, 2878:10, 2884:9,
2884:16, 2884:22, 2885:6,
2885:14, 2885:18, 2885:22,
2885:24, 2886:4, 2886:8,
2886:20, 2886:23, 2887:16,
2887:18, 2887:24, 2888:1,
2888:12, 2888:17, 2888:21,
2889:11, 2889:23, 2890:16,
2890:19, 2891:6, 2891:11,
2891:16, 2891:20, 2891:25,
2892:3, 2892:15, 2892:18,
2892:23, 2893:11, 2893:13,
2893:15, 2895:19, 2895:21,
2896:5, 2896:7, 2896:9,
2896:15, 2896:19, 2897:7,
2905:15, 2905:16, 2906:24,
2907:2, 2908:12, 2908:15,
2908:16, 2908:17, 2908:18,
2908:20, 2908:21, 2909:17,
2909:19, 2909:21, 2910:2,
2910:6, 2910:7, 2910:11,
2911:11, 2911:17, 2911:19,
2912:2, 2912:8, 2912:15,
2912:24, 2914:25, 2915:5,
2916:21, 2917:2, 2917:7,
2917:9, 2917:15, 2917:21,
2917:25, 2918:3, 2918:9,
2918:15, 2918:23, 2919:1,
2919:4, 2919:8, 2919:13,
2919:16, 2919:19, 2919:22,
2927:15, 2927:20, 2927:25,
2928:2, 2928:3, 2928:4, 2928:5,
2930:21, 2932:16, 2932:18,
2932:19, 2932:21, 2932:22,
2932:23, 2938:24, 2939:1,
2941:18, 2941:25, 2942:2,
2942:19, 2942:25, 2943:7,
2943:11, 2943:16, 2943:18,
2943:24, 2943:25, 2945:6,
2945:8, 2949:1, 2949:3,

2950:17, 2952:14, 2952:16,
2952:18, 2953:3, 2953:8,
2953:12, 2953:15, 2953:18,
2954:1, 2954:9, 2954:16,
2954:24, 2955:7, 2955:16,
2956:9, 2956:11, 2956:13,
2956:17, 2956:21, 2958:8,
2958:11, 2958:12, 2958:18,
2958:19, 2958:21, 2958:25,
2959:4, 2959:8, 2959:9,
2959:13, 2959:16, 2959:19,
2959:21, 2961:21, 2961:24,
2961:25, 2969:3, 2969:24,
2970:2, 2970:4, 2970:7,
2971:23, 2972:1, 2972:4,
2972:9, 2977:3, 2977:12,
2977:13, 2977:16, 2977:20,
2979:5, 2979:6, 2979:8, 2979:9,
2979:11, 2979:14, 2979:15,
2979:16, 2979:17, 2979:18,
2979:19, 2979:21, 2979:22,
2979:24, 2985:10, 2985:15,
2985:16, 2985:17, 2985:18,
2987:24, 2988:2, 2993:14,
2993:21
  **theme** [1] - 2922:14
  **themselves** [3] - 2900:11,
2923:16, 2928:18
  **thereafter** [1] - 2921:9
  **think..** [1] - 2871:17
  **thinking** [3] - 2888:15, 2916:16,
2960:20
  **thinks** [3] - 2870:19, 2887:2,
2947:25
  **third** [15] - 2877:15, 2924:11,
2931:17, 2934:23, 2938:3,
2968:19, 2968:20, 2968:21,
2970:23, 2978:23, 2980:2,
2990:18, 2990:21, 2991:4,
2991:20
  **third-party** [6] - 2978:23,
2980:2, 2990:18, 2990:21,
2991:4, 2991:20
  **thorough** [1] - 2895:25
  **thoughtful** [1] - 2895:1
  **thoughts** [2] - 2884:14, 2921:20
  **three** [18] - 2855:9, 2863:24,
2891:23, 2898:18, 2906:13,
2913:19, 2914:15, 2929:11,
2930:9, 2931:25, 2932:7,
2932:20, 2932:23, 2958:5,
2965:4, 2965:7, 2967:9, 2985:25
  **throughout** [4] - 2866:14,
2922:14, 2946:6, 2955:9
  **tie** [1] - 2872:18
  **tier** [1] - 2982:8
  **timeframe** [1] - 2946:10
  **timely** [1] - 2935:6
  **timing** [1] - 2914:25
  **today** [7] - 2862:3, 2922:15,

2935:23, 2945:13, 2947:14,
2947:23, 2957:6
  **together** [8] - 2888:2, 2888:3,
2925:18, 2926:7, 2930:23,
2940:21, 2980:22, 2980:24
  **Tom** [5] - 2857:10, 2874:16,
2875:23, 2877:10, 2902:15
  **tomorrow** [1] - 2969:18
  **took** [5] - 2857:10, 2899:3,
2919:2, 2963:24, 2968:13
  **top** [9] - 2863:11, 2863:24,
2918:6, 2937:12, 2941:5,
2982:8, 2986:14, 2991:9,
2991:10
  **top-tier** [1] - 2982:8
  **total** [1] - 2972:23
  **totally** [2] - 2953:1, 2985:1
  **touch** [7] - 2853:24, 2855:23,
2863:7, 2908:1, 2962:11,
2976:17, 2976:25
  **tough** [1] - 2924:3
  **towards** [5] - 2923:18, 2925:15,
2925:16, 2953:24, 2976:4
  **track** [1] - 2982:14
  **trade** [1] - 2850:23
  **traditional** [1] - 2909:2
  **trail** [1] - 2883:1
  **train** [1] - 2925:19
  **transcript** [2] - 2994:6, 2994:7
  **TRANSCRIPT** [1] - 2848:8
  **transcripts** [1] - 2928:16
  **transition** [1] - 2922:7
  **translate** [1] - 2942:6
  **translated** [3] - 2928:16,
2928:17, 2939:10
  **translating** [1] - 2946:14
  **translation** [8] - 2939:13,
2939:14, 2939:15, 2941:7,
2941:14, 2942:3, 2942:6, 2943:3
  **translations** [1] - 2939:10
  **translators** [1] - 2929:19
  **travel** [1] - 2975:1
  **trends** [1] - 2921:21
  **trial** [43] - 2853:11, 2853:12,
2857:21, 2858:6, 2858:15,
2859:2, 2859:7, 2877:11,
2877:18, 2878:24, 2878:25,
2879:2, 2879:7, 2879:25,
2880:12, 2882:24, 2882:25,
2883:17, 2886:11, 2904:19,
2906:2, 2909:6, 2921:25,
2925:9, 2925:10, 2926:4,
2926:8, 2927:2, 2928:12,
2928:14, 2928:17, 2928:18,
2928:24, 2929:5, 2930:8,
2930:9, 2931:22, 2932:25,
2933:13, 2935:8, 2935:12,
2972:20
  **TRIAL** [2] - 2848:4, 2848:8
  **Trial** [1] - 2877:8

  **tried** [6] - 2938:11, 2957:23,
2958:1, 2958:6, 2958:9, 2960:7
  **tries** [1] - 2931:2
  **triggered** [2] - 2891:14, 2891:18
  **trip** [6] - 2974:22, 2975:3,
2975:4, 2975:16, 2975:17,
2975:24
  **trivia** [1] - 2921:19
  **trouble** [2] - 2947:17, 2963:13
  **troublesome** [1] - 2933:23
  **true** [14] - 2858:11, 2880:10,
2886:13, 2886:14, 2891:12,
2892:1, 2903:23, 2906:6,
2940:7, 2942:13, 2993:11,
2993:12, 2994:6, 2994:7
  **truly** [2] - 2854:13, 2861:20
  **Truman** [1] - 2923:14
  **trust** [4] - 2873:9, 2864:25,
2865:2, 2865:9
  **truth** [5] - 2866:19, 2871:15,
2872:7, 2953:16
  **truthful** [4] - 2886:2, 2903:8,
2903:13, 2992:2
  **try** [9] - 2938:21, 2946:5,
2946:6, 2946:20, 2952:5,
2952:24, 2957:22, 2977:10
  **trying** [27] - 2863:7, 2865:10,
2866:7, 2880:25, 2889:18,
2892:13, 2900:22, 2900:24,
2904:7, 2905:12, 2922:22,
2922:24, 2922:25, 2924:4,
2924:6, 2924:14, 2937:9,
2943:14, 2949:18, 2952:21,
2953:20, 2953:22, 2955:10,
2955:20, 2962:10, 2983:8,
2986:21
  **Tuesday** [4] - 2861:1, 2969:7,
2969:11, 2969:23
  **turn** [3] - 2895:7, 2937:19,
2948:2
  **turned** [1] - 2884:19
  **twice** [1] - 2937:25
  **two** [17] - 2876:25, 2886:11,
2896:19, 2898:12, 2898:14,
2910:15, 2921:7, 2929:10,
2931:4, 2931:24, 2935:11,
2954:7, 2954:8, 2984:21,
2987:15
  **tying** [1] - 2869:13
  **Tymo's** [1] - 2944:23
  **Tymoshenko** [28] - 2853:11,
2858:10, 2860:8, 2861:10,
2864:11, 2876:23, 2877:2,
2877:9, 2877:18, 2881:16,
2894:21, 2903:15, 2904:19,
2929:8, 2929:15, 2929:22,
2931:12, 2933:7, 2933:12,
2938:6, 2940:16, 2944:24,
2970:24, 2971:4, 2971:11,
2972:25, 2992:23, 2993:5

**Tymoshenko's** [7] - 2859:3, 2876:18, 2877:16, 2883:23, 2925:12, 2935:16, 2993:4

## U

**U.S** [5] - 2848:13, 2848:17, 2906:11, 2976:4, 2986:1
**Ukraine** [92] - 2852:18, 2853:3, 2853:14, 2854:11, 2865:18, 2866:1, 2867:9, 2873:20, 2879:2, 2880:10, 2880:24, 2884:19, 2884:20, 2885:1, 2885:3, 2887:10, 2888:14, 2890:10, 2891:1, 2893:9, 2894:4, 2894:19, 2898:15, 2898:16, 2898:24, 2900:22, 2900:23, 2900:24, 2904:11, 2906:8, 2906:9, 2906:10, 2906:15, 2906:16, 2906:17, 2906:18, 2907:21, 2907:23, 2909:4, 2909:5, 2909:10, 2923:20, 2924:22, 2925:1, 2926:15, 2927:5, 2927:8, 2930:5, 2931:5, 2935:2, 2936:1, 2936:2, 2936:3, 2938:10, 2938:13, 2938:15, 2938:19, 2939:11, 2939:12, 2939:18, 2940:17, 2942:6, 2944:25, 2945:10, 2946:3, 2946:9, 2946:18, 2951:9, 2953:19, 2954:19, 2955:20, 2957:16, 2960:25, 2964:1, 2967:17, 2973:22, 2976:9, 2976:12, 2976:22, 2978:16, 2978:17, 2978:22, 2981:14, 2981:21, 2982:7, 2982:12, 2982:15, 2988:16, 2989:8, 2990:15
**Ukraine's** [6] - 2876:16, 2877:8, 2953:23, 2960:16, 2972:20, 2973:19
**Ukrainian** [10] - 2883:17, 2928:18, 2937:5, 2941:8, 2957:25, 2978:14, 2989:22, 2992:24, 2993:3, 2993:4
**Ukrainian's** [2] - 2861:16, 2948:2
**Ukrainians** [6] - 2861:8, 2861:15, 2861:18, 2964:3, 2964:10, 2989:12
**ultimate** [2] - 2888:8, 2891:6
**UN** [1] - 2964:3
**unable** [1] - 2883:21
**unacceptable** [1] - 2967:21
**unanimous** [1] - 2977:4
**under** [12] - 2870:15, 2877:15, 2890:9, 2893:7, 2894:11, 2906:9, 2906:17, 2909:14, 2924:16, 2933:11, 2934:15, 2936:1

**Under** [1] - 2935:14
**understating** [1] - 2940:25
**understood** [6] - 2880:1, 2888:6, 2914:13, 2955:11, 2955:14, 2962:18
**unethical** [1] - 2968:2
**unfair** [1] - 2883:2
**unfavorable** [1] - 2916:14
**UNGA** [2] - 2960:9, 2960:10
**Unit** [15] - 2852:5, 2852:6, 2852:8, 2852:10, 2852:12, 2866:17, 2885:20, 2897:23, 2898:8, 2899:1, 2901:9, 2901:12, 2901:14, 2902:16, 2978:1
**UNITED** [2] - 2848:1, 2848:10
**United** [12] - 2848:3, 2849:8, 2850:4, 2850:10, 2875:13, 2920:19, 2934:14, 2957:24, 2960:10, 2975:8, 2975:9, 2975:14
**University** [1] - 2920:17
**unless** [1] - 2904:22
**unrepresented** [1] - 2938:6
**unsuccessful** [1] - 2958:10
**up** [32] - 2862:7, 2867:1, 2867:3, 2868:20, 2868:23, 2872:12, 2876:12, 2882:22, 2885:8, 2892:11, 2898:8, 2906:1, 2912:18, 2914:9, 2936:17, 2938:12, 2940:13, 2947:3, 2947:4, 2947:7, 2948:18, 2954:23, 2963:15, 2971:20, 2976:10, 2981:2, 2983:15, 2983:16, 2983:18, 2984:19, 2990:8
**update** [1] - 2949:15
**urge** [1] - 2961:16
**Urgent** [1] - 2947:6
**urging** [1] - 2947:10

## V

**vague** [1] - 2943:8
**value** [1] - 2934:13
**values** [2] - 2924:18, 2937:3
**Van** [1] - 2953:11
**van** [14] - 2945:24, 2953:5, 2953:9, 2955:4, 2956:18, 2957:1, 2957:4, 2958:23, 2959:6, 2960:3, 2964:23, 2965:15, 2967:15, 2989:13
**various** [8] - 2899:19, 2902:23, 2922:2, 2928:15, 2936:3, 2937:6, 2950:5, 2954:19
**verbatim** [1] - 2902:21
**verdict** [2] - 2877:25, 2948:22
**version** [5] - 2947:15, 2947:23, 2948:3, 2987:24, 2988:2
**versions** [1] - 2941:9

**versus** [1] - 2850:4
**vetting** [1] - 2910:13
**view** [11] - 2858:1, 2878:23, 2886:17, 2887:12, 2917:20, 2918:15, 2927:4, 2940:25, 2947:10, 2964:17, 2972:20
**viewed** [3] - 2927:7, 2938:19, 2945:9
**views** [1] - 2976:4
**Vin** [8] - 2902:3, 2902:15, 2975:18, 2975:19, 2975:20, 2976:11, 2976:21, 2976:24
**vindication** [1] - 2944:23
**violated** [3] - 2853:14, 2878:2, 2934:5
**violating** [1] - 2873:10
**violation** [4] - 2933:20, 2933:23, 2934:15, 2935:13
**violations** [4] - 2859:2, 2877:24, 2932:6, 2938:7
**Virginia** [1] - 2920:5
**visible** [1] - 2946:17
**vital** [1] - 2926:24
**voice** [2] - 2854:19
**voice-to-voice** [1] - 2854:19
**voicemail** [2] - 2984:7, 2984:8
**voters** [1] - 2922:22
**vs** [1] - 2848:5

## W

**wait** [3] - 2910:15, 2928:5, 2958:8
**wake** [1] - 2940:13
**wants** [4] - 2871:18, 2873:9, 2888:17, 2916:19
**warranted** [1] - 2950:6
**Washington** [14] - 2848:6, 2848:15, 2848:18, 2849:3, 2849:9, 2851:20, 2920:9, 2921:2, 2921:9, 2922:16, 2930:1, 2974:8, 2975:1, 2994:15
**waste** [1] - 2950:12
**ways** [4] - 2877:17, 2882:16, 2938:22, 2960:20
**weakness** [1] - 2971:3
**Weber** [7] - 2902:3, 2902:15, 2975:18, 2975:19, 2975:20, 2976:21, 2976:24
**website** [1] - 2881:7
**Wednesday** [1] - 2879:16
**week** [3] - 2947:6, 2957:23, 2964:10
**weekend** [2] - 2964:8, 2964:18
**Weiss** [7] - 2882:8, 2882:15, 2967:14, 2981:13, 2981:19, 2982:10, 2983:1
**Weiss's** [1] - 2864:5
**West** [2] - 2877:25, 2934:14
**west** [1] - 2937:2

**Western** [12] - 2864:15, 2875:10, 2894:11, 2924:8, 2924:18, 2925:14, 2927:1, 2933:11, 2933:12, 2934:15, 2935:14, 2938:7

**White** [6] - 2910:12, 2921:24, 2922:1, 2922:2, 2922:8, 2922:9

**whitewash** [2] - 2969:1, 2972:23

**whole** [1] - 2907:2

**wife** [1] - 2921:4

**willfulness** [1] - 2872:1

**William** - 2848:20, 2848:21

**Williams** [3] - 2921:3, 2921:10, 2921:14

**willing** [1] - 2966:7

**wise** [1] - 2936:9

**wish** [1] - 2992:6

**withhold** [3] - 2852:7, 2852:9, 2901:10

**witness** [7] - 2849:13, 2851:12, 2917:3, 2918:18, 2927:16, 2928:1, 2943:14

**WITNESS** [31] - 2852:22, 2905:16, 2908:15, 2908:17, 2908:20, 2909:19, 2910:6, 2910:11, 2928:2, 2928:4, 2932:18, 2932:21, 2932:23, 2943:25, 2945:8, 2958:11, 2958:19, 2959:8, 2961:24, 2970:7, 2972:9, 2979:6, 2979:9, 2979:14, 2979:16, 2979:18, 2979:21, 2979:24, 2985:15, 2985:17, 2988:2

**witness's** [1] - 2927:17

**witnesses** [19] - 2877:19, 2926:17, 2928:15, 2928:21, 2928:22, 2928:23, 2929:18, 2934:6, 2934:10, 2935:4, 2935:5, 2935:9, 2935:10, 2935:11, 2935:16, 2936:8, 2938:5, 2971:2

**wmurphy@zuckerman.com** [1] - 2848:24

**wondered** [1] - 2915:1

**word** [8] - 2871:3, 2873:3, 2902:21, 2939:19, 2940:23, 2952:6

**words** [2] - 2894:23, 2909:19

**works** [2] - 2944:13

**world** [7] - 2896:4, 2896:13, 2896:16, 2896:25, 2897:17, 2897:21, 2967:22

**worry** [2] - 2863:8, 2917:23

**worse** [2] - 2971:10

**wrap** [1] - 2912:18

**wrap-up** [1] - 2912:18

**wrapping** [3] - 2947:2, 2947:4, 2947:7

**write** [19] - 2859:19, 2861:22, 2862:17, 2862:18, 2862:22, 2865:11, 2880:10, 2880:14, 2882:19, 2901:14, 2901:16, 2904:13, 2909:8, 2911:17, 2915:22, 2926:21, 2967:17, 2967:23, 2984:23

**writes** [2] - 2969:14, 2986:14

**writing** [16] - 2859:17, 2862:8, 2880:9, 2891:12, 2908:16, 2909:1, 2909:11, 2912:9, 2916:1, 2916:7, 2925:4, 2925:8, 2926:6, 2929:25, 2930:2, 2930:25

**written** [17] - 2853:10, 2853:11, 2853:12, 2875:22, 2875:23, 2880:8, 2883:16, 2901:21, 2916:15, 2930:11, 2968:25, 2977:22, 2978:21, 2979:2, 2980:7, 2983:5, 2984:13

**wrote** [14] - 2854:7, 2854:11, 2856:8, 2882:14, 2885:25, 2894:24, 2903:6, 2903:7, 2914:20, 2935:14, 2945:16, 2967:20, 2968:11, 2968:22

**wtaylor@zuckerman.com** [1] - 2848:25

# Y

**Yaffa** [1] - 2977:23

**Yale** [2] - 2920:23, 2921:5

**Yanukovych** [5] - 2877:1, 2894:20, 2894:21, 2894:24, 2957:9

**years** [9] - 2910:15, 2921:7, 2921:13, 2922:15, 2923:8, 2931:6, 2975:21

**York** [51] - 2853:7, 2853:11, 2853:17, 2853:21, 2853:23, 2854:3, 2855:4, 2855:8, 2860:3, 2860:9, 2865:10, 2865:17, 2873:19, 2874:8, 2878:5, 2882:6, 2887:7, 2887:22, 2898:20, 2899:10, 2899:11, 2903:25, 2904:6, 2904:16, 2906:7, 2907:6, 2908:1, 2908:2, 2908:4, 2913:24, 2914:3, 2945:15, 2957:23, 2960:8, 2963:6, 2964:2, 2968:15, 2977:25, 2982:11, 2982:13, 2985:4, 2985:21, 2985:22, 2985:24, 2986:4, 2986:6, 2986:9, 2986:19, 2986:25, 2987:14, 2993:1

**you/Rick** [2] - 2960:3, 2960:13

**young** [1] - 2923:15

**yourself** [2] - 2919:25, 2930:3

**Yulia** [1] - 2883:23

**Yushchenko** [2] - 2929:9

# Z

**zealous** [1] - 2927:2

**ZUCKERMAN** [2] - 2848:22, 2849:2

**Zwaan** [15] - 2945:24, 2953:5, 2953:9, 2953:11, 2955:4, 2956:18, 2957:1, 2957:4, 2958:23, 2959:6, 2960:3, 2964:23, 2965:15, 2967:15, 2989:13