3023

1

2                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
3

4    UNITED STATES OF AMERICA,      )
                                    )
5         v.                        )   Criminal Action No. 19-CR-125
                                    )
6    GREGORY B. CRAIG,              )   JURY TRIAL - DAY 13
                                    )   Afternoon Session
7              Defendant.           )
     _____        )   Washington, D.C.
8                                       August 28, 2019

9

10          TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
              BEFORE THE HONORABLE AMY BERMAN JACKSON
11                UNITED STATES DISTRICT JUDGE

12
                    APPEARANCES:
13
        For the Government:     Fernando Campoamor-Sanchez, AUSA
14                              Molly Gulland Gaston, AUSA
                                U.S. ATTORNEY'S OFFICE FOR THE
15                              DISTRICT OF COLUMBIA
                                555 Fourth Street, NW
16                              Washington, DC 20530
                                      -and-
17                              Jason Bradley Adam McCullough
                                U.S. DEPARTMENT OF JUSTICE
18                              950 Pennsylvania Avenue, NW
                                Washington, DC 20530
19
        For the Defendant:      Adam B. Abelson, Esq.
20                              William James Murphy, Esq.
                                ZUCKERMAN SPAEDER, LLP
21                              100 East Pratt Street
                                Suite 2440
22                              Baltimore, MD 21202
                                      -and-
23                              William W. Taylor, III, Esq.
                                Paula M. Junghans, Esq.
24                              ZUCKERMAN SPAEDER, LLP
                                1800 M Street, NW
25                              Suite 1000
                                Washington, DC 20036

3024

1

2    Court Reporter:          PATRICIA A. KANESHIRO-MILLER, RMR, CRR
                              U.S. Courthouse, Room 4700A
3                             333 Constitution Avenue, NW
                              Washington, D.C.  20001
4                             (202) 354-3243

5

6              Proceedings reported by stenotype shorthand.
           Transcript produced by computer-aided transcription.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E X A M I N A T I O N S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Gregory Craig | | 3026 | | |

E X H I B I T S

| GOVERNMENT EXHIBIT | PAGE |
|--------------------|------|
| 33 | 3040 |
| 802 | 3071 |

3026

```
 1                      AFTERNOON SESSION

 2                        (2:38 p.m.)

 3          THE COURT:  All right.  Are we ready to proceed?

 4          Mr. Craig, you can resume the stand.

 5          Can we take a break for one second before we bring

 6      the jury in.

 7          Can I speak to the Court Security Officer for a

 8      second.

 9          (Pause)

10          (Jury present)

11          THE COURT:  All right.  All my jurors are back.

12          I take it no one has spoken to you about this in the

13      past hour or so.

14          And you may proceed, Mr. Campoamor.

15          MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

16

17                      Gregory Craig,

18          having been duly sworn, was examined and testified as

19      follows:

20                    CROSS-EXAMINATION

21          BY MR. CAMPOAMOR-SANCHEZ:

22      Q.    Good afternoon, sir.

23      A.    Good afternoon.

24      Q.    Mr. Taylor asked you a lot of questions this morning

25      about your report and the contents, we well as changes.
```

3027

1        Do you recall those?

2    A.      Yes.

3    Q.      All right.  Now, to be clear, you understand, sir,

4    that, obviously, you're not on trial for the contents of your

5    report; right?

6    A.      That's true.

7    Q.      Or for whether it was independent or not

8    independent --

9    A.      That's true.

10   Q.      -- you agree with that?  Okay.

11   A.      Can you speak a little bit more into the microphone.

12   I'm having difficulty hearing you.  It may be my age.

13           JUROR:  Us, too.

14           MR. CAMPOAMOR-SANCHEZ:  Okay.  Then, I will speak

15   louder.

16           THE COURT:  Oh, that's much better.  Get a little

17   closer to the microphone.  Thank you.

18           MR. CAMPOAMOR-SANCHEZ:  I will do that.

19           BY MR. CAMPOAMOR-SANCHEZ:

20   Q.      I was saying that, similarly, you're not on trial

21   for, obviously, whether your report was independent or not

22   independent.  You know that?

23           MR. TAYLOR:  Objection, Your Honor.

24           THE COURT:  Well, I think he can ask him that

25   question.

1          THE WITNESS:  I'm not on trial for what?

2          BY MR. CAMPOAMOR-SANCHEZ:

3     Q.    For whether your report was independent or not, sir.

4     A.    That's true.

5     Q.    Okay.  So why you're actually on trial, your

6     understanding of that is for the statements or omissions that

7     you made to the FARA Unit in 2013; right?

8     A.    That's what I understand, yes.

9     Q.    Okay.  Let's talk about that.  So do you recall, sir,

10    being interviewed in October of 2017 about your work on the

11    Ukraine case?

12    A.    I do.

13    Q.    And that interview was conducted by FBI agents;

14    right?

15    A.    And lawyers.

16    Q.    And lawyers from the Special Counsel's Office?

17    A.    Yes.

18    Q.    And that interview took place in Washington, D.C.?

19    A.    It did.

20    Q.    And you were represented by lawyers, by counsel?

21    A.    I was.

22    Q.    And you had the opportunity to prepare before that

23    interview; right?

24    A.    I did.

25    Q.    And sir, during that interview that took place -- oh,

1    one more thing.  You were advised before that interview that

2    you had to be truthful in your answers --

3    A.      Of course.

4    Q.      -- right?

5            Now, sir, during that interview you said that

6    Mr. Hawker asked if you could help him out and deliver the

7    report to Mr. Sanger at *The New York Times*.  And you said

8    yes.

9    A.      I don't think that's exactly what the 302 says.

10   Q.      You don't think that's exactly what the 302 says?

11   A.      No.  Why don't you read the 302 exactly.

12           MR. CAMPOAMOR-SANCHEZ:  Your Honor, for

13   authentication purposes, I have marked 832.

14           THE COURT:  This is not being moved into evidence at

15   this point, so that's why it is not going to be on your

16   screen.

17           BY MR. CAMPOAMOR-SANCHEZ:

18   Q.      Sir, let me direct you to page 13.  Let me know when

19   you're there.

20   A.      Yes.

21   Q.      And, sir, did you not say that "Hawker asked if he

22   could help Craig get the report to David Sanger at *The New

23   York Times*, and Craig told him yes"?

24   A.      That's right.  That's correct.

25   Q.      Right.  You did say that to the Special Counsel's

3030

1    Office?

2    A.        I did say yes.

3    Q.        Okay.  And you also said to the Special Counsel's

4    Office that the only thing you did pursuant to the media plan

5    was deliver the report to Mr. Sanger?

6    A.        I told the Special Counsel that I delivered the

7    report to Mr. Sanger.

8    Q.        Right.  And if you look back at page 13, the

9    questions you were being asked about was about a media plan

10   that you were shown; right?

11   A.        Can you direct my attention to the page you're

12   talking about?

13   Q.        Yes, page 13.

14   A.        Yes.

15   Q.        The paragraph that starts -- the first full paragraph

16   that starts, "Craig was shown documents labeled."

17            MR. TAYLOR:  Objection to reading the 302.  If he is

18   going to impeach him, he needs to ask questions that --

19            THE COURT:  All right.  I think the point -- the

20   question was:  When they asked you if you delivered the

21   report at Mr. Hawker's request, that you were answering that

22   as something you did pursuant to the media plan?

23            THE WITNESS:  What I stated here -- let me just say

24   what this says -- is I stated that the only thing I did was

25   deliver the Skadden Report to Sanger and that all the other

3031

1    things the media plan states Craig would do were never done

2    by Craig.

3              All I stated here was that I delivered the plan -- I

4    delivered the report to Mr. Sanger.  That's all I said.

5              BY MR. CAMPOAMOR-SANCHEZ:

6    Q.     Sir, my question is:  You were being -- before you

7    gave that answer, you were being asked questions about a

8    media plan; correct?

9    A.     I was shown documents labeled "Media plan."

10   Q.     Right.  And you said that the only thing you did

11   pursuant to the media plan was deliver the Skadden Report and

12   that the other things in the media plan you did not do?

13   A.     I don't want to argue with you, Mr. Campoamor, but

14   that is not what the 302 says.  I did not say "pursuant to

15   the media plan."  What I said was I did deliver the Skadden

16   Report to Sanger.  I did do that.

17   Q.     Sir, does the 302 not read --

18             MR. TAYLOR:  Objection.

19             THE COURT:  Wait.

20             MR. TAYLOR:  He can't read the 302.

21             MR. CAMPOAMOR-SANCHEZ:  Well --

22             THE COURT:  He keeps saying -- he's the one who keeps

23   directing attention to the 302, but I think he just read the

24   sentence.  So I think at this point --

25             MR. CAMPOAMOR-SANCHEZ:  Actually, I don't

1    think -- I'm happy to read it so that everybody can see what

2    it says and he can --

3                 MR. TAYLOR:  Objection.

4                 Can we come to the bench?

5                 THE COURT:  Yes.

6                 (At the bench)

7                 THE COURT:  All right.  It does not say that Craig

8    stated that the only thing he did pursuant to the plan was

9    deliver the Skadden Report.

10               MR. CAMPOAMOR-SANCHEZ:  No, but it continues, "and

11   that all the other things the media plan states Craig would

12   not do were never done by Craig."  That is the full context

13   of it.

14               THE COURT:  He is saying it didn't say it.  You're

15   saying the sentence implies that.

16               MR. CAMPOAMOR-SANCHEZ:  Right.  And that's why I

17   asked if the questions preceded that -- the answers that

18   preceded that was after he was shown the media plan.

19               THE COURT:  I think that you're arguing with the

20   witness about whether that implication is in the sentence or

21   not.  And your objection is to his reading the entire

22   sentence now that the defendant has said twice that's not

23   what the 302 says --

24               MR. TAYLOR:  That's one objection.  The other is, if

25   you're going to ask the witness if he made a prior statement,

1   you have to ask the witness if he made a prior statement.

2   You can't show him somebody else's note and ask as if that

3   proves he made the prior statement.

4           THE COURT:  Well, he actually did just ask, did you

5   make the statement?  And then the defendant said --

6           MR. TAYLOR:  No.

7           THE COURT:  -- that -- no.  He said -- he did

8   say that -- he said the 302 didn't say that.

9           MR. TAYLOR:  That's what he said.

10          THE COURT:  He specifically asked to see the 302,

11  essentially brought in the 302.  And so he read it, and then

12  he confirmed that the 302 -- that he did say that to the

13  Office of Special Counsel.  Hawker asked him if he could

14  deliver it, and he said yes.

15          So the next question is, so that was -- you told him

16  that was the only thing he did pursuant to the plan.  And we

17  don't have a direct quote about that.  You're saying that's

18  the implications from what the 302 says.

19          MR. CAMPOAMOR-SANCHEZ:  Right.

20          THE COURT:  And so I think at this point we're

21  getting a little argumentative.

22          The point is he did agree that he did that.  And I

23  think you can say:  And that was something in the media plan,

24  wasn't it?  And if he says it wasn't, then you can show him

25  the media plan.

1          MR. CAMPOAMOR-SANCHEZ:  Okay.

2          THE COURT:  But I think we shouldn't continue to

3    quibble about -- I think it is a fair reading of this

4    statement but this statement is a paraphrase of his

5    statement.

6          MR. CAMPOAMOR-SANCHEZ:  Right, which is why I

7    prefaced my question that he was being asked questions about

8    the media plan.  And so I tried to do it in a way that I was

9    not --

10         THE COURT:  I understand that.  I think he's said

11   that.  And he keeps going to the 302, which makes it

12   challenging to not go to it.

13         MS. JUNGHANS:  The problem with the 302 is that the

14   questions aren't there.

15         THE COURT:  I understand that.  But the 302 keeps

16   being brought up by Mr. Craig.

17         MS. JUNGHANS:  Well, I know.  We should just tell

18   everybody to stop referring to the 302.

19         THE COURT:  Well, I'm not going to tell Mr. Craig not

20   to answer the questions the way you don't want him to answer

21   the questions --

22         MS. JUNGHANS:  Yeah, but it's obvious that

23   Mr. Campoamor-Sanchez was waving the 302 around.  I'm sure

24   that --

25         THE COURT:  He wasn't when he started.  He reached

1      for it after the defendant raised it --

2              MS. JUNGHANS:  It does not say "pursuant to" --

3              THE COURT:  That's correct --

4              MS. JUNGHANS:  -- so --

5              THE COURT:  -- that's why I don't think he can

6      continue to quibble with him about that.  I think we have

7      already established that they were talking about the media

8      plan.  And you can just ask him straight out:  And that was

9      something that was set up for you to do in the media plan,

10     wasn't it?  He can agree or disagree with that, and then you

11     can take on that.

12             MR. CAMPOAMOR-SANCHEZ:  Okay.

13             (In open court)

14             BY MR. CAMPOAMOR-SANCHEZ:

15     Q.      Mr. Craig, let me ask you, delivering the plan to

16     Mr. Sanger at *The New York Times* was one of the things that

17     was included in the media plan?

18     A.      Delivering the report.  I don't have that media plan

19     in front of me, but I think it was a part of a media plan.

20     Q.      All right.  You also said during that interview that

21     you did not have any knowledge or insight into how the

22     Skadden Report was rolled out by the Ukrainian government or

23     what FTI did with regard to the rollout.

24     A.      That's true.

25     Q.      You were also asked questions about the Harvard Club

3036

1    meeting.  Do you recall those?

2    A.        I remember I was asked questions about the Harvard

3    Club meeting.  I don't know which questions you're going to

4    ask me about.

5              THE COURT:  I hate to do this, but can we just come

6    back to the bench very briefly.

7              (At the bench)

8              THE COURT:  I think to say, you said X on a prior

9    occasion, first you have to establish what his current

10   testimony is, because you can only go to what he said on the

11   prior occasions -- I think you have to say:  You had no

12   knowledge as to how, da, da, da, isn't that correct?  If he

13   says no, then you say:  Didn't you tell the Office of Special

14   Counsel that . . .

15             Your questions are starting with, you told this to

16   the Office of Special Counsel, you told that.  At this point,

17   we don't have a predicate for that.

18             MR. CAMPOAMOR-SANCHEZ:  You're absolutely right.  I

19   will ask the underlying question, which is his testimony here

20   today.

21             THE COURT:  All right.

22             (In open court)

23             BY MR. CAMPOAMOR-SANCHEZ:

24   Q.        Let me be a little more clear.  You testified earlier

25   today about the Harvard Club meeting.  Do you recall that?

3037

1    A.       Yes.

2    Q.       And you told the ladies and gentlemen of the jury

3    what your recollections were about that meeting; correct?

4    A.       I did.

5    Q.       At your interview with the Special Counsel's Office,

6    however, you said that you remember that the meeting took

7    place but you did not remember the details of what was

8    discussed.

9    A.       That's probably true.

10   Q.       Okay.  And you were also asked some questions by

11   Mr. Taylor about your communications with Mr. Weber.  Do you

12   recall those earlier today?

13   A.       Yes.

14   Q.       And in your interview with the Special Counsel's

15   Office, you said that Vin Weber never asked you about the

16   report; isn't that right?

17   A.       I don't think that's correct.  What the 302 reports,

18   I don't think that is an accurate compilation of what I said

19   in that interview.

20   Q.       Okay.  So you do not deny that that is what appears

21   in the document which you've seen; you're just saying that's

22   not what you said to the FBI --

23   A.       Yes, I deny that I said that to the FBI.

24   Q.       Okay.  And sir, you were also asked a number of

25   questions about your belief about Ukraine's motives when they

1    were submitting comments to you during the process that you

2    previously discussed with Mr. Taylor.  Do you recall those?

3              MR. TAYLOR:  Objection.  Questions asked by me or by

4    the FBI?

5              THE COURT:  I think he is talking about direct this

6    morning.

7              MR. CAMPOAMOR-SANCHEZ:  Direct this morning.

8              BY MR. CAMPOAMOR-SANCHEZ:

9    Q.    Do you recall those questions Mr. Taylor asked you?

10   A.    I'm not sure I know exactly what questions you're

11   talking about.

12   Q.    Okay.  You were asked about your belief about why

13   Ukraine was making the comments or the suggested changes to

14   your report.

15            Do you remember those questions by Mr. Taylor?

16   A.    I do.

17   Q.    Sir, do you also remember that you told the Special

18   Counsel's Office that you could not discern any motives

19   behind the comments you were getting from Ukraine to your

20   report?

21   A.    I don't recall that at all.

22   Q.    Would you like to -- I can direct you, if you would

23   like, to page 7 of the 302.

24            Do you still have it there?

25            And you'll see a headline that says "Draft report."

1       If you can just read the first --

2               MR. TAYLOR:  Objection.

3               THE COURT:  Read it to yourself and see if that

4       refreshes your recollection about what you told the Office of

5       Special Counsel.

6               MR. CAMPOAMOR-SANCHEZ:  Right.  And I'm not intending

7       to read it, Your Honor.  I was just directing him to the

8       lines --

9               THE COURT:  All right.

10              MR. TAYLOR:  I thought he wanted him to read it out

11      loud.

12              THE COURT:  All right.

13              THE WITNESS:  I don't recall saying that.

14              BY MR. CAMPOAMOR-SANCHEZ:

15      Q.      You don't recall saying that?

16      A.      No.

17      Q.      Okay.  All right.  Let's move on.  You were also

18      asked some questions this morning about the reasons you

19      undertook this project --

20      A.      Yes.

21      Q.      -- right?

22              And sir, you would agree with me that the main reason

23      you undertook this project was the money that you were going

24      to generate for Skadden?

25      A.      That was one of the reasons.  I'm not sure that it

3040

1    was the main reason.

2    Q.      Wasn't it the primary reason?

3    A.      It was one of the reasons.

4    Q.      Okay.  Well, sir, when you were first approached, you

5    demanded $150,000 before you would travel to Ukraine;

6    correct?

7    A.      I said that we would not be able to make that trip

8    unless we had some adequate compensation for the time and the

9    expenses incurred, yes.

10   Q.      But you specifically said, I need $150,000 before I

11   would travel to Ukraine; right?

12   A.      I'm not sure I said it in those words.

13   Q.      Okay.  Would you like to -- let's look at

14   Government's Exhibit 33.  It should be in a binder that is in

15   front of you that starts with tab number 25.

16   A.      Yes.

17          MR. CAMPOAMOR-SANCHEZ:  Your Honor, I don't believe

18   33 has been admitted.  I move 33.

19          THE COURT:  Any objection?

20          MR. TAYLOR:  No objection.

21          THE COURT:  Did you say, "No objection"?

22          MR. TAYLOR:  No objection.

23          THE COURT:  All right.  It will be admitted.

24          (Government 33 admitted in evidence)

25          BY MR. CAMPOAMOR-SANCHEZ:

3041

1    Q.      And, sir, that is a draft retainer agreement that you

2    sent to Mr. Sloan for his review on February 20th; isn't that

3    right?

4    A.      That's correct.

5    Q.      And it was your intention to send it to Mr. Manafort

6    that afternoon with a copy to Doug Schoen?

7    A.      Yes.

8    Q.      And if you look at page 3 of the exhibit, the fees

9    and expenses, you set out the fees for the preliminary

10   engagement would be $150,000; correct?

11   A.      That's correct.

12   Q.      All right.  And in fact, when the $150,000 was not

13   delivered on time, you did not go on the trip; correct?

14   A.      That's correct.

15   Q.      You said, hey, if you're not going to pay me the

16   money, I'm not going to go?

17   A.      That's correct.

18   Q.      Right.  In fact, Mr. Manafort even offered to forward

19   or advance that sum to get you to go, and you said no.

20   Right?

21   A.      I don't recall that, but it's possible.

22   Q.      Okay.  Ultimately, you did receive the $150,000.

23   A.      Yes.

24   Q.      And you went on the trip to Ukraine; correct?

25   A.      Yes, we did.

3042

1      Q.      And once you got there, you had a meeting with

2    Mr. Pinchuk?

3      A.      That was one of the things we did there, yes.

4      Q.      And before you had traveled to Ukraine, you had a

5    conversation with Mr. Schoen?

6      A.      That's true.

7      Q.      About the project?

8      A.      That's correct.

9      Q.      And Mr. Schoen gave you a piece of advice.  Do you

10   recall that?

11     A.      I do.

12     Q.      And the piece of advice was that you should ask for

13   even more than you thought the project would cost so that you

14   did not have to go back to Ukraine and ask for more money?

15     A.      That's correct.  That was the piece of advice that he

16   gave to me.

17     Q.      And in fact -- you may have seen it yesterday or the

18   other day -- Mr. Schoen encouraged you, before you met with

19   Mr. Pinchuk, to ask for a lot of money; right?

20     A.      I remember -- yes, he did.

21     Q.      In fact, he told you, don't be bashful; right?

22     A.      That's my recollection.

23     Q.      Okay.  And you ultimately asked Mr. Pinchuk for

24   $4 million to conduct the project?

25     A.      I don't think the numbers were discussed in my

3043

1    meeting with Mr. Pinchuk.  At that meeting.

2    Q.     You don't think it was discussed at that meeting?

3    A.     Not at that meeting.

4    Q.     When do you believe it was discussed?

5    A.     I think it was discussed with Mr. Manafort and that

6    Mr. Manafort confirmed that it was acceptable.

7    Q.     Okay.  So Mr. Manafort really controlled -- he called

8    the shots; right?

9    A.     I don't -- he did not call the shots with our -- with

10   our team.

11   Q.     Well, he certainly called the shots with regards to

12   the client engagement part; right?

13   A.     Mr. Pinchuk was the person that I had directly

14   engaged in, that's the purpose, and he was the one that I

15   understood was funding it.

16   Q.     Right.  But the one that was actually controlling the

17   logistics, how it would happen, and in fact your money was

18   Mr.  Manafort?

19          MR. TAYLOR:  Objection.  Compound question.

20          MR. CAMPOAMOR-SANCHEZ:  I will break it down.

21          THE COURT:  All right.

22          BY MR. CAMPOAMOR-SANCHEZ:

23   Q.     So Mr. Manafort -- you sent a retainer agreement to

24   Mr. Manafort; correct?

25   A.     That's true.

3044

1   Q.      Mr. Manafort helped to arrange --

2   A.      We're talking about the preliminary agreement?

3   Q.      Yes, sir.

4   A.      Okay.  That was not the retainer agreement.  It was a

5   preliminary agreement, I think.

6   Q.      Correct.  Before you even went down to Ukraine;

7   right?

8   A.      Yes.

9   Q.      So you send --

10  A.      Scope of the preliminary engagement.

11  Q.      Let's call it "preliminary engagement agreement."

12          You sent that preliminary engagement agreement to

13  Mr. Manafort?

14  A.      I did send it to Mr. Manafort.

15  Q.      You arranged the logistics of traveling down to

16  Ukraine with Mr. Manafort?

17  A.      I arranged the dates.  I think we did the logistics

18  in terms of flights and hotels.

19  Q.      And once you got there, you were reporting to

20  Mr. Manafort on the report -- on the outcome of your

21  discussions; right?

22  A.      I told him what had happened, but this was after we

23  had had meetings with Mr. Pinchuk, with Mr. Pshonka, with

24  Lavrynovych.  We had our meetings with the Ukrainian

25  officials, who were going to be our client.  And I think at

1      some point I did report to Mr. Manafort what had happened.

2      Q.      Right.  In fact, it was Mr. Manafort who told you who

3      the client would be within the government of Ukraine?

4      A.      I think that was -- yes, I think that's right.  I

5      think it was a conversation I had with him confirming that it

6      was going to be the Ministry of Justice, yes.

7      Q.      But he suggested it to you; didn't he?  He suggested

8      that --

9      A.      I can't recall.

10     Q.      You cannot recall that as you sit here today.  Okay.

11     Let me see if I can help with that.

12             While I'm looking that up, you believe you did not

13     discuss the $4 million with Mr. Pinchuk?

14     A.      Not at that initial meeting.

15     Q.      Okay.

16     A.      There was a second meeting where we talked about the

17     funds that would be available for the project.

18     Q.      Well, you certainly -- well, let's look at

19     Government's Exhibit 51.  It's going to be on your screen,

20     also.

21             So April 5th is when you had your initial meetings in

22     Ukraine; correct?

23     A.      This -- I can't remember the precise date of the

24     meetings in Ukraine.  This is an e-mail that is dated

25     April 6th.

3046

1    Q.      Right.  And underneath, there is one from

2    Mr. Manafort that is dated April 5th; right?

3    A.      That's an e-mail from Manafort dated April 5th

4    saying, "I hear you had a good meeting."

5            JUROR:  Are we supposed to see this?

6            THE COURT:  Yes.  This is in evidence already?

7            MR. CAMPOAMOR-SANCHEZ:  I believe so.

8            THE COURT:  What I'm saying is that the deputy

9    courtroom clerk doesn't always know.  So if you say, then she

10   knows to turn on the jury screen.  She is waiting for a

11   signal.

12           Thank you.

13           MR. CAMPOAMOR-SANCHEZ:  My apologies.

14           BY MR. CAMPOAMOR-SANCHEZ:

15   Q.      So, sir, you see that, that he sent you an e-mail on

16   the 5th; right?

17   A.      Yes.  "I hear you had a good meeting so everything is

18   moving well."

19   Q.      Who is Konstantin, by the way?

20   A.      I think that is Mr. Manafort's assistant in Kyiv by

21   the name of Konstantin Kilimnik.

22   Q.      Okay.  I take it you never met him before you went

23   down to Kyiv?

24   A.      Oh, that's not so.  I think I met him a year or two

25   before.

1     Q.     You had met Mr. Kilimnik before?

2     A.     Yes.

3     Q.     Okay.  Another engagement, I assume?

4     A.     We were pursuing another engagement in Ukraine, and

5    Mr. Kilimnik was involved in trying to set up meetings for us

6    with some government officials.

7     Q.     Okay.  Now, you certainly reported back to the firm

8    also the fees that you had agreed for the project?

9     A.     I think I reported back to the firm what our

10    expectation was in terms of the fees for the project --

11     Q.     Right.

12     A.     -- that's correct.

13     Q.     And you reported that it was 4 million; right?

14     A.     I can't remember.  I would assume so since it was.

15     Q.     All right.  So let's look at Government's Exhibit 56.

16    It is in evidence.

17     You see the question at the bottom from Mr. Zornow to

18    you and Mr. Sloan?

19     A.     Yes.

20     Q.     Saying, "Is Viktor paying all of our fees?"  Right?

21     A.     That is from David Zornow to me and to Cliff Sloan.

22     Q.     Right.  And then you said that he was paying

23    4 million?

24     A.     Right.

25     Q.     And you, sir, did not expect the actual government of

1    Ukraine to pay anything other than a nominal amount, if

2    anything?

3    A.      At that time, I was expecting that $4 million to

4    cover our time and expenses for the entire project.

5    Q.      Right.  That's what you --

6    A.      At that time.

7    Q.      -- that's what you had in fact reported and discussed

8    with Mr. Schoen; right?

9    A.      We discussed -- I'm not sure we discussed the

10   $4 million with Mr. Schoen.  We might have, yes.

11   Q.      Okay.  And then the payment was supposed to happen,

12   $2 million ahead of time; right?

13   A.      The payment schedule was established, I think, by

14   Mr. Manafort.  He was going to tell us how the payments were

15   going to be made.

16   Q.      So, again, Mr. Manafort was controlling the purse

17   strings of Mr. Pinchuk's money; correct?

18   A.      I think that's right.

19   Q.      All right.  Let's look at Government's Exhibit 58.

20   Very top e-mail.

21           You said, "Paul, I just met with Viktor, who has been

22   told by the COS to transfer 1.5.  This is not right, and it

23   is a serious problem for me.  All was clear between us.  I

24   understood it would be 2 by the end of the week and another 2

25   by the end of the month."

3049

1        That's what you understood; right?

2    A.        That's what it says, yes.

3    Q.        Right.  And then --

4    A.        After I had had a conversation with Viktor Pinchuk, a

5    second meeting with Pinchuk.

6    Q.        Right.  But the payments were being made by

7    Mr. Manafort; right?

8    A.        The money was Pinchuk's money.  The transfer of funds

9    I think was managed by Mr. Manafort.  You're right.

10   Q.        Through the Black Sea View Limited Corporation;

11   correct?

12   A.        I came to learn that later.

13   Q.        Out of Cyprus?

14   A.        I came to learn that the Black Sea View Corporation

15   was in a bank in Cyprus.

16   Q.        Right.  And you said, "We have five lawyers in Kyiv

17   meeting with DPG and their trial team in half an hour.  I

18   really don't want to deal with this other kind of bullshit.

19   I will be very clear.  We are gone unless your side lives up

20   to its commitments.  If it is not 2, we will leave tomorrow,

21   go home, and say that we are lucky to be out of it."

22   A.        That's what that e-mail says.

23   Q.        And that's how you felt; right?

24   A.        I did.

25   Q.        So, in fact, if you were not going to get the amount

1    of money you were promised, you were going to leave?

2    A.      If we did not get the retainer that we had been

3    promised that we could bill against in terms of our time and

4    expenses, we were going to go.

5    Q.      Okay.

6    A.      Because we had agreed on a certain amount, and it

7    looked as though they were changing the amount on us.

8    Q.      Okay.  And Mr. Manafort responded and said, no, I

9    will take care of it?

10   A.      In words or substance, yes.

11   Q.      In fact, look at 59, if you'd like -- also in

12   evidence -- at the very top.  Responded right away and said,

13   "Greg, you will have 2.  Some is coming a different way."

14   Right?

15   A.      That's what it says.

16   Q.      And you stayed?

17           Is that right?  You stayed on the project?

18   A.      We did stay on the project, yes.

19   Q.      Right.

20   A.      We did the project.

21   Q.      Okay.

22   A.      And they made the payments.

23   Q.      They did.  But they were not made when they initially

24   said, right?  The next million dollars came in June; right?

25   A.      I can't recall --

1    Q.       Can't recall.

2    A.       -- the sequence of payments.  I was just concerned

3    that they were there, as understood and agreed to, and we

4    could bill our time and our expenses against those payments.

5    Q.       And I think you will agree with me, but to be clear,

6    even though Pinchuk is paying, Manafort is controlling how

7    the money is coming to you; right?

8    A.       That was, I guess, what I learned as it -- as it

9    occurred.

10   Q.       Okay.  All right.  So let's talk about the scope of

11   your project.  We can take that down.

12            When you first traveled to Ukraine, the first trip

13   you took when you met with the personnel at the Ministry of

14   Justice, you learned that, actually, Ukraine wanted you to do

15   more than just write the report on the Tymoshenko matter;

16   right?

17   A.       In my first meeting with the Procurator General, he

18   asked us if we would be interested and would we be willing to

19   get involved in a rule-of-law project, consulting with the

20   Office of the Procurator General about the second trial, yes.

21   Q.       Well, they did not actually call it a rule-of-law

22   project; did they?

23   A.       I don't know what they called it.  That's what we --

24   Q.       Okay.

25   A.       -- we took it as being.

3052

 1    Q.      Let's look at Government's Exhibit 50.  We can start

 2    at page 2, please.

 3    A.      At 50?

 4    Q.      Yes, Government's Exhibit 50, page 2, first e-mail.

 5    And that's an e-mail from you to Mr. Sloan; right?

 6    A.      The bottom e-mail is from me to Cliff dated

 7    April 5th --

 8    Q.      Right.

 9    A.      -- and I'm writing from Kyiv.

10    Q.      Right.  You said from Kyiv.

11            "In addition to the report, they want us to be

12    'consultants' on her second trial to help make it better and

13    look better vis-a-vis the West.  What do you think?  This

14    could be a huge project.  Will require us to open up an

15    office in Kyiv for six months."

16            You remember sending that?

17    A.      Yes.

18    Q.      Right.  In fact, what you understood Ukraine wanted

19    was, not only to make sure the process went better, but to

20    look better vis-a-vis the West; right?

21    A.      That's what that e-mail says.

22    Q.      And that could lead to Skadden actually opening at

23    least a temporary office for an extended period of time in

24    Kyiv; right?

25    A.      I thought it had the potential for us to be

1    rule-of-law consultants with some major projects inside the

2    Ministry, yes.

3    Q.      In fact, that was Mr. Sloan's term; right?  If we

4    look at the e-mail above it, it was Mr. Sloan who suggested

5    to you that we should now cast this project as rule-of-law

6    advisors; right?

7    A.      That's what it was.

8    Q.      Right.  But it was Mr. Sloan who suggested using that

9    term; right?

10   A.      This e-mail says, "I think it sounds good.  Will need

11   to vet within the firm.  I'd cast it all as rule-of-law

12   advisors."

13   Q.      Right.  That was his suggestion to you?

14   A.      That's his e-mail to me.

15   Q.      And his suggestion to you; right?

16   A.      It wasn't a suggestion.  He's telling me what he is

17   going to do.  No suggestion there.

18   Q.      Okay.  And you responded and said, if we look at the

19   e-mail above, "I signed up" -- it says "Skudder," but you

20   mean Skadden, I take it -- up for Project 2?

21   A.      Next page?

22   Q.      "I signed up" Skadden for Project 2.

23   A.      No, that is Michael Skudder.  Michael Skudder was a

24   partner in the Chicago office with extensive prosecutorial

25   experience.

1    Q.      Okay.  Except it did not end up being Mr. Skudder;

2    right?

3    A.      Well, I had talked to Michael Skudder about it.  That

4    reference is to Skudder, not Skadden.

5    Q.      Okay.  But my question, sir, was:  It did not end up

6    being Mr. Skudder who was involved with Project --

7    A.      No.  It was Michael Loucks --

8    Q.      It was Michael Loucks.

9    A.      -- who came in.

10   Q.      Right.  And you said, "Just left the Prosecutor

11   General.  He is a powerful man.  He seems to be

12   enthusiastic."

13           So, actually, you agreed that the scope of what you

14   were going to do had expanded to include this second project;

15   is that fair?

16   A.      It was going to be more than just conducting an

17   investigation and writing a report.  We were going

18   to -- Project 2.

19   Q.      Right.  You were also going to be involved in

20   Project 2; right?

21   A.      Yes.

22   Q.      Okay.  Now, sir, you understood from the beginning

23   that Ukraine and Manafort were interested in improving

24   Ukraine's PR image?  You knew that; right?

25   A.      I had no doubt of it.

1    Q.      Right.  In fact, this was an issue that was discussed

2    internally among the Skadden team; right?

3    A.      There were many issues that we talked about.  I

4    assume that this was probably one of them.  Are you talking

5    about something specific?

6    Q.      Happy to refer you to something specific.  Let's take

7    a look at Government's Exhibit 101, in evidence.

8            It is an e-mail from Mr. Haskell; right?

9    A.      Yes, it is.

10   Q.      It is dated April 23rd, and he includes an

11   attachment, and the subject line to the e-mail reads,

12   "Ukraine representation status report - 4/23/12."

13           Right?

14   A.      Yes.

15   Q.      All right.  Let's look at the actual attachment of

16   "Ukraine representation."  And let's look at the second page,

17   where it says "Project 2."

18   A.      Oh, okay.  The litigation consultation?

19   Q.      Right.  And one of the items that was discussed

20   amongst the team was providing the Prosecutor General's

21   Office with public relations advice; right?

22   A.      That's what it says right there.

23   Q.      Right.  And you recall that; right?  That was

24   something that was discussed within the team?

25   A.      I don't remember the discussion.  I assume that Alex

1       was reflecting a discussion with somebody.  Certainly, we

2       understood that the Prosecutor General wanted public

3       relations advice and had asked us if we could do it.

4       Q.      Right.  In fact, if you look at page 3, there is a

5       series of bullet points.  If we look at the bottom half --

6       you can pull them all -- the next-to-last bullet point says,

7       "Identify critical newspapers, periodicals, and journalists."

8               Did I read that correctly?

9       A.      You did.

10      Q.      And your initials are listed as one of the

11      individuals that's responsible for that at the time.  Right?

12      A.      That's right.

13      Q.      Now, in addition to that, Mr. Manafort himself would

14      come to you and try to get you to help him think through

15      about PR issues for Ukraine; right?

16      A.      He was writing me notes all the time telling me that

17      he wanted my views on PR issues and strategy.

18      Q.      Right.  So let's take a look at Government's Exhibit

19      109.  It's in evidence.  And we can look -- if you'd

20      like -- well, let me just ask you:  You are forwarding to the

21      team in this e-mail a memorandum that you had received from

22      Mr. Manafort; is that right?

23      A.      Give me a second here, please.

24      Q.      Sure.

25      A.      Yes.

3057

1      Q.      And you asked the team, "What steps might we

2    recommend to ensure that the findings will be viewed as

3    credible and authoritative."

4             Right?

5      A.      Where is that?  It sounds right, but I would like to

6    see it.

7      Q.      Sure.  It is at the bottom.

8      A.      At the bottom?

9      Q.      Yes.  At the bottom of that paragraph on the e-mail.

10            Here, I'm happy to point it out to you (indicating).

11            THE COURT:  They're also being called out on the

12   screen, if that is easier for you.

13            THE WITNESS:  Oh, thank you, yeah.

14            BY MR. CAMPOAMOR-SANCHEZ:

15     Q.      You see the-next-to-last sentence, "What steps"?

16     A.      Yeah.  Is there a better way for the authorities to

17   do it?  Meaning conduct the investigation that is being

18   discussed in the memorandum.

19     Q.      Right.  But one of the main goals of that was to make

20   sure that it would be viewed as credible; right?

21     A.      How would you make the investigation credible and

22   authoritative.

23     Q.      Right.  But viewed as credible?

24     A.      The way you make it viewed as credible and

25   authoritative is you make it credible and authoritative.

1    Q.      Okay.  You certainly wanted the team's help with

2    that?

3    A.      I'm sorry.

4    Q.      You certainly wanted the team's help with that, their

5    thoughts about it?

6    A.      Paul Manafort asked us for ways -- for any

7    observations we had about his proposal to conduct an internal

8    investigation of the way she had been treated and her

9    conditions in prison, to make sure that if we had some good

10   ideas about how that investigation could be improved we might

11   share them with him.

12   Q.      Would it be fair to say, sir, that in addition to the

13   Tymoshenko report and Project 2, you were consulted by

14   Mr. Manafort from time to time about things that you could

15   strategize with or help him with to help Ukraine?

16   A.      They were related to rule-of-law -- every now and

17   then he would ask us a question like this, and this one had

18   to do with Tymoshenko and the rule-of-law and issues like

19   that, particularly the Procurator General's Office.  And he

20   did ask us for advice about how to make the investigation

21   credible and authoritative.

22   Q.      Right.  And my point, sir, is, in addition to writing

23   the Tymoshenko report and working on Project 2, did you from

24   time to time also consult and provide assistance to

25   Mr. Manafort, and therefore Ukraine, about other issues they

1    were dealing with?

2    A.      There weren't other issues.  I think they were

3    related issues.

4    Q.      All right.  And you say they're related because you

5    call them all rule-of-law?  Is that why?

6    A.      No, they involved Tymoshenko.  They involved the

7    Office of the Procurator General and the criminal justice

8    system, and they call on our expertise and experience in

9    rule-of-law issues in the West.

10    Q.      Right, sir.  And you were also asked these questions

11    by Mr. Taylor.  You advocated for FTI to be hired; right?

12    A.      We went -- our lawyers went through a process

13    identifying three or four firms that were London-based -- I

14    didn't know them at all -- I knew FTI, but I don't know any

15    of the -- I don't think I knew any of the other firms.  And

16    at the end of the day I think Michael Cowie and Alex

17    van der Zwaan recommended FTI.  Then I went to bat for FTI

18    with the Procurator General's Office, yes.

19    Q.      Right.  In fact, you gave some talking points to

20    Mr. van der Zwaan to help him convince the Prosecutor

21    General's Office to hire FTI?

22    A.      I did.

23    Q.      Right.  And in those talking points that you gave to

24    Mr. van der Zwaan, you said, "We have concluded that FTI and

25    Jonathan Hawker are the best we can do, and we're willing to

```
1     stake the success of our common project on FTI's competence
2     and its diligence and its hard work."
3           Right?
4     A.    I recall those words, yes.
5     Q.    And you believed that at the time?
6     A.    I did.
7     Q.    All right, sir.  Oh, one last thing.  You were
8     preparing an independent report; right?
9     A.    We had started the process of conducting interviews
10    and gathering documents.  And yes, we were working on an
11    independent report.
12    Q.    And even from the beginning you understood the idea
13    that perhaps if your findings were not to Ukraine's liking
14    they had the choice to either publish the report or not
15    publish the report?
16    A.    That's correct.  We didn't know what Ukraine was
17    going to do with our report.  We certainly didn't know what
18    our report was going to say and certainly could not predict
19    what the Ukraine was going to do with it.
20    Q.    Right.  And Mr. Kedem asked you, sir --
21    A.    Kedem.
22    Q.    I'm sorry?
23    A.    Kedem, Allon Kedem.
24    Q.    I'm sorry, sir.  Kedem.
25          Mr. Kedem asked you, sir, "Why would they want an
```

3061

1       independent report?"

2               And you said to Mr. Kedem that anything would be

3       better than the PR situation and mess that we're in.  Isn't

4       that right?

5       A.      I think I said that, yes.

6       Q.      You understood how deep in the hole Ukraine was in

7       terms of its public image in the world; right?

8       A.      Just in the Tymoshenko matter, there were three or

9       four storms that were underway with respect to Ukraine.

10      Q.      Right.  And in fact, at this point, Ukraine is trying

11      to become part of the European Union; correct?

12      A.      I hope so.

13      Q.      That's what they were trying to do; right?

14      A.      Yes.

15      Q.      So solving their public relations nightmare could

16      help with that; right?

17      A.      It might.

18      Q.      Now, you alluded to this in some of your questions,

19      but the Ministry of Justice never signed your engagement

20      letter; right?

21      A.      That's not true.  I think they ultimately signed it.

22      Q.      Okay.  Are you saying that they signed it in 2013?

23      Is that what you're saying?

24      A.      I think that's when they finally signed the

25      engagement letter.

1   Q.      Right.  You were actually frustrated in May of 2012

2   because they would not sign your --

3   A.      That's correct.

4   Q.      -- letter agreement; right?

5   A.      Yes.  They objected to one provision that they said

6   they couldn't agree to.

7   Q.      So you kept trying to get them to sign your letter

8   and they would not?

9   A.      I was not successful in getting them to sign the

10  letter at the end of the day until 2013.

11  Q.      And in fact, they had, on the other hand, had sent

12  you a contract which you did sign?

13  A.      I did.

14  Q.      And actually, instead of signing it, you authorized

15  Mr. van der Zwaan to sign for you?

16  A.      I suppose you're right.  I can't remember exactly.

17  Q.      And that happened --

18  A.      I do know we signed that contract.

19  Q.      Right.  And that happened late May of 2012?

20  A.      It sounds right.

21  Q.      All right.  Okay.  We can take a quick look at it.

22  Let's look at Government's Exhibit 149.

23  A.      149?

24  Q.      Yes, sir.  And we will put it up on the screen for

25  you, as well.

3063

1           That's an e-mail of May 24th, right, from

2     Mr. van der Zwaan?

3     A.      Yes.

4     Q.      To some individuals in the Ministry of Justice?

5     A.      Yes.  This was the person I think that Alex was

6     working with --

7     Q.      And --

8     A.      -- on the contracts.

9     Q.      Right.  And Mr. van der Zwaan writes, "Please find

10    the Ministry of Justice engagement letter counter-signed by

11    Skadden, Arps attached.  Please note that we do not have a

12    seal, and a signature of a partner of the firm such as

13    Mr. Craig is enough to bind the firm in this regard.

14    Mr. Craig has asked me to pass along to you that we have

15    signed your letter in anticipation of and in the expectation

16    that the Ukraine Ministry of Justice will also sign our

17    letter agreement (as attached for reference)."

18           And if we look at the first page of this exhibit,

19    which is the top page of your engagement letter, your

20    engagement letter or your proposed engagement letter is still

21    dated April 10th; is that right?

22    A.      Yes.

23    Q.      And your engagement letter does not make any

24    reference to a third-party payor in this case; is that

25    correct?

1  A.      Unlike the preliminary engagement agreement, this one
2  does not.
3  Q.      So this one does not.
4          And then this exhibit also includes the agreement
5  that you signed for the Ukraine.
6          If you can, you can look at the last page.  That's
7  page 14.  And you'll --
8  A.      You want me to go to the last page?
9  Q.      Yes.  You see the signature at the bottom?
10 A.      Yes.
11 Q.      And that is not your actual signature?
12 A.      No.  I think Alex signed for me.
13 Q.      I think it says AVDZ at the bottom there; right?
14 A.      Yes.
15 Q.      But if we look at the actual agreement, this
16 agreement has a price and is limiting the amount to be paid
17 under this contract to 95,000 -- I won't even attempt to
18 pronounce it -- local currency in Ukraine?
19 A.      Hryvnias, yes.
20 Q.      Yes.  So when you signed this agreement, you
21 understood that the Ukrainian agreement was limited to the
22 local currency, the 95,000, which is approximately $12,000;
23 correct?
24 A.      That's right.
25 Q.      And you understood that that had something to do with

3065

1       the procurement process?

2       A.      That was what Alex explained to me.

3       Q.      Okay.  You can take that down.

4               And that became an issue as you were approaching and

5       attempting to call to Ms. Tymoshenko; right?

6       A.      What became an issue?

7       Q.      I will be more specific.  Ms. Tymoshenko's lawyer

8       raised an issue about who was paying Skadden; right?

9       A.      Yes, he did.

10      Q.      And he was also raising the issue that the Ministry

11      of Justice had been saying you had been hired for $12,000.

12      Do you recall that?

13      A.      I think he said that, yes.

14      Q.      And he was raising this as issues before you had the

15      opportunity to interview her?

16      A.      That's correct.

17      Q.      And he wanted answers to those questions before he

18      would allow you to interview her?

19      A.      He wanted to -- he wanted more information about the

20      system of funding and payment than we had provided up to that

21      time.  And threatened that he would not cooperate with us

22      unless they got that information.  That's true.

23      Q.      And as part of attempting to solve that problem, you

24      ultimately had a meeting with Ms. Tymoshenko's lawyer in

25      D.C., Mr. Slattery?

1    A.      That's correct.

2    Q.      And you had that meeting in order to try to pave the

3    way so that the interview could proceed; right?

4    A.      Yes.  Mr. Sloan and I met with Congressman Slattery,

5    former-Congressman Slattery.

6    Q.      Right.  Now, before we get to that, as you were

7    approaching the time to interview Ms. Tymoshenko, you

8    became concerned about Ms. Tymoshenko finding out that

9    Skadden was also working on a second prosecution against her;

10   right?

11   A.      That we were advising the Ministry of Justice in

12   connection with the outstanding second prosecution.  I was

13   concerned that there was a risk that she would not cooperate

14   with us in our project, conducting the investigation, if she

15   also was aware that we were engaged as a consultant with the

16   Ministry on the second trial.

17   Q.      It is for that reason that you asked Mr. Loucks and

18   Mr. Cowie not to attend the interview with Ms. Tymoshenko;

19   right?

20   A.      They were never going to attend.

21   Q.      Well, you asked them not to attend; right?

22   A.      Well, I arranged for them to attend.  They were not

23   going to attend.

24   Q.      Well, sir, you had a conversation with Mr. Loucks,

25   and Mr. Loucks agreed that he would not attend, that that

1    would be the best course of action; right?

2    A.      I explained to him why he was not going to be

3    attending, and he agreed that that was the best course of

4    action.

5    Q.      So you, as the leader of the team, were saying,

6    sorry, Michael, you're not attending?

7    A.      We went through the reasons.  I explained it to him.

8    We discussed it.  And he agreed that it was probably better

9    for him not to be there.

10   Q.      Right.  Because ultimately you were in charge of that

11   team?

12   A.      I was in charge of that team.

13   Q.      It was your decision as to who would go and what

14   would happen?

15   A.      It was.

16   Q.      And if we look at 162, you e-mailed Mr. Sloan at the

17   top, "Forward Project 2," and you write, "I had a talk with

18   Michael, and he agreed that he shouldn't attend the meeting

19   in Kharkiv."

20   A.      Right.

21   Q.      And Kharkiv, by the way, is the prison where

22   Ms. Tymoshenko was being held?

23   A.      It was a prison hospital where she was being held,

24   and that's where we had to go to conduct the interview.

25           THE COURT:  Yes, it is in evidence.

1          MR. CAMPOAMOR-SANCHEZ:  I'm sorry.  I keep

2     forgetting.

3          THE COURT:  You're welcome to just ask out loud on

4     the record.  Because when you come up to me, I'm not

5     listening anymore.  So feel free to just speak up if you have

6     a concern.

7          I appreciate your concern about doing this right.

8          MR. CAMPOAMOR-SANCHEZ:  Thank you.

9          BY MR. CAMPOAMOR-SANCHEZ:

10    Q.     And, sir, you were concerned that if Ms. Tymoshenko

11    found this out it could damage the reputation of Skadden and

12    its report; right?

13    A.     No, it was not quite that way.  I was concerned that

14    if Vlasenko and Tymoshenko found out that we were advising

15    the Ministry of Justice, even as rule-of-law consultants on

16    this second project, that they would not cooperate with us on

17    the central project that we were working on, which was the

18    investigation.  And we wanted very much to have their input

19    and their cooperation on that central project, which was

20    writing the report, conducting the investigation and writing

21    the report.

22    Q.     Sir, you were concerned that if that became publicly

23    known it would be used to discredit the Skadden Report?

24    A.     I wasn't so concerned about that.  I wanted -- what I

25    was worried about was Ms. Tymoshenko not cooperating with us

1     if she found out about that.  That is what I was concerned

2     about.  And that would have made it very difficult for us to

3     have the kind of comprehensive and independent report that I

4     thought would be the best for everyone.

5     Q.     All right.  So let's take a look at Government's

6     Exhibit 226 in evidence.

7            And that's an e-mail from you, on August 30th, to

8     Matt Cowie, Mr. van der Zwaan, a copy to Mr. Loucks, and

9     Mr. Sloan; right?

10           Is that right, sir?

11    A.     Which one are you looking at?

12    Q.     The one on your screen.

13    A.     There's a bunch of e-mails.

14    Q.     So it's the one on your screen, August 30th, at

15    10:04.

16    A.     Okay.

17    Q.     All right.  And this is an e-mail --

18    A.     Can I read it if you're going to ask me about it?

19    Q.     Sure.  Go ahead.

20           (Pause)

21           Let me ask you again, sir --

22    A.     Yes.

23    Q.     -- isn't it true that you were concerned that if this

24    information became public, it would be used to discredit the

25    report at some point?

3070

1    A.        I was concerned that if it came to the attention of

2    Tymoshenko's lawyer that he would use it to discredit the

3    report, yes.

4    Q.        Right.

5    A.        That's what that says.

6    Q.        And it can only come two ways:  Either you told him

7    or it became publicly known some other way; right?

8    A.        There may be a variety of different ways that he

9    might learn about it because we were conducting interviews

10   all over the city as well as elsewhere, and there were a

11   variety of ways he might have learned about it.  So I'm not

12   sure I could agree that there were only two ways that he

13   might have learned about it.

14   Q.        Okay.  But certainly, having that in the public

15   domain would allow Mr. Vlasenko to use that to discredit the

16   report; right?

17   A.        I was concerned --

18   Q.        Yeah --

19   A.        -- that he would not cooperate that --

20   Q.        -- well, at this point, you had already interviewed

21   her; right?  By August 30th --

22   A.        Yes, we had.  You're right.  You're right.  You're

23   quite right.

24   Q.        And in fact, the plug, if it was not already pulled,

25   got pulled after this?  There was no more work on Project 2

1    after August 30th?

2    A.      That's correct.  Yes.

3    Q.      All right.  So let's go back to that interview that

4    we were talking about.

5            In anticipation of that potential interview, you were

6    so concerned that you drafted a statement, a draft statement,

7    that could be used to combat Mr. Vlasenko's statement about

8    the issue of who is paying Skadden and how much; right?

9    A.      I don't recall.  You would have to show it to me.

10   Q.      Okay.  Let's look at Government's Exhibit 802.  It is

11   not in evidence.  You should have it in your binder, as well,

12   but if not, I will be glad to give you copies.  It might be

13   easier if I just hand you one.

14           First of all, sir, are these e-mails that you either

15   sent or received on or about June 22, 2012?

16   A.      There are four e-mails here.  They're all dated

17   June 22nd.

18           MR. CAMPOAMOR-SANCHEZ:  Okay.  Your Honor, we would

19   move the admission of Government's Exhibit 802.

20           THE COURT:  Any objection?

21           MR. TAYLOR:  No objection.

22           THE COURT:  All right.  It will be in evidence.  You

23   can put it on the screen.

24           (Government 802 admitted in evidence)

25           BY MR. CAMPOAMOR-SANCHEZ:

1   Q.      Let's start with the bottom e-mail.  That's an e-mail

2   that you sent to Mr. Manafort; right?

3   A.      That's correct.

4   Q.      Copy to Mr. Sloan?

5   A.      Yes.

6   Q.      And the subject line reads, "Here's a draft

7   statement.  I'm thinking it will be released only if

8   absolutely necessary."

9           Did I read that right?

10  A.      Yes, you read it correctly.

11  Q.      And then, it says, "An individual concerned about the

12  rule-of-law in Ukraine first approached Greg Craig with the

13  idea and resources for this project.  Greg insisted on full

14  independence but also required total access.  To achieve that

15  access, Skadden entered into an agreement with the Ministry

16  of Justice based on a guarantee of Skadden's complete

17  independence."

18          And then it goes on.  And then at the end, you ask,

19  "Can you get right back to me so we are prepared in the event

20  Slattery tracks us down or Vlasenko says he won't let us talk

21  to her without a response to his questions?  We aren't there

22  yet, but we should be prepared."

23          Did I read that right?

24  A.      You read it correctly.

25  Q.      And this is the issue we're talking about, right,

3073

1    Vlasenko might not allow you to meet with her unless those

2    questions are answered?

3    A.      I think that's correct.  That was the timing of this

4    e-mail.

5    Q.      Right.  And Mr. Manafort responded to you and said

6    that that was fine and that from the government's standpoint,

7    that would work; right?

8    A.      This statement that I drafted --

9    Q.      Right.

10   A.      -- was fine with the government of Ukraine.

11   Q.      Right.  And again, Mr. Manafort is speaking for the

12   government of Ukraine, telling you and giving you approval

13   that this is okay if that's what needs to happen; right?

14   A.      What he says is, this is fine, and points out that

15   they will demand the name -- and the time -- and at this time

16   Pinchuk has not agreed to his involvement being disclosed.

17   Q.      Right.

18   A.      And the statement does not disclose Pinchuk.

19   Q.      Right.  This was kind of your attempt at a middle

20   ground, right?  Just saying there might be someone else out

21   there but not saying who it is; right?

22   A.      I don't see anything in this statement that talks

23   about a third party.

24           Oh, yes, an individual concerned about the

25   rule-of-law, it does explain.  Yes.

1    Q.      Okay.

2    A.      We were disclosing that there was a third-party payor

3    when it said "an individual concerned about the rule-of-law

4    with the idea and resources for this project."

5    Q.      Ultimately, you didn't have to release the report

6    because you were able to talk to Mr. Slattery, and you were

7    able to interview Ms. Tymoshenko without answering those

8    questions; right?

9    A.      I think we told Mr. Slattery that there was a third

10   party involved in the funding, and he was satisfied with that

11   and urged Mr. Vlasenko to cooperate with us, and I think

12   that's how it got resolved.

13   Q.      Sir, isn't it right that you kept all that hidden

14   from Mr. Slattery, that you did not answer any of those

15   questions?

16   A.      I think we told him there was a third party that was

17   involved in it.

18   Q.      Okay.

19   A.      That's my recollection.

20   Q.      Okay.  Let's look at Government's Exhibit 167.  In

21   evidence.

22   A.      Which book?

23   Q.      Let me see if I can help you.

24           THE COURT:  Are the binders from you and the binders

25   from the defense different colors?

1          MR. CAMPOAMOR-SANCHEZ:  So they are both the

2     government's binders.

3          THE COURT:  It is just volume one and volume two in

4     numerical order?

5          MR. CAMPOAMOR-SANCHEZ:  Not quite.

6          THE COURT:  No.  Okay.  All right.  Ask your next

7     question.

8          BY MR. CAMPOAMOR-SANCHEZ:

9     Q.       Sir, directing your attention to the bottom e-mail

10    first, you got an e-mail from Mr. van der Zwaan trying to

11    communicate a concern Mr. Gates had, right, about what you

12    might say to Vlasenko and the payment by a private individual

13    specifically?

14    A.       Yes, if you read that e-mail from Alex, he is telling

15    me that Haskell is suggesting that we might tell Vlasenko

16    that the report is paid for by a private individual.

17    Q.       Right.

18    A.       And Gates is saying that that should be voided

19    altogether.

20    Q.       Right.  And then you responded, right?  You said,

21    "Alex, Cliff and I just had a meeting with Tymo's person in

22    D.C., former-Congressman Jim Slattery.  We got through the

23    meeting without disclosing whose idea it was, who asked us to

24    do it, or who is paying for it.  We shall continue that

25    policy."

3076

 1    A.      That's what it says.

 2    Q.      Right.

 3    A.      But we did tell him there was a third party that was

 4    involved in this.

 5    Q.      So were you lying to Mr. van der Zwaan when you said

 6    that you did not disclose that?

 7    A.      We got through the meeting without disclosing whose

 8    idea it was --

 9    Q.      Right.

10    A.      -- who asked us to do it --

11    Q.      Or who's paying for it?

12    A.      -- or who's paying for it.

13    Q.      And Mr. Pinchuk is paying for it?

14    A.      We didn't disclose the identity.  But I think we told

15    Mr. Slattery that there was a third-party payor that was

16    funding the costs and expenses of the report.

17    Q.      Would you agree with me that that is not what it says

18    here?

19    A.      I disagree with you.

20    Q.      Okay.  Well, sir, would you agree with me that if

21    Mr. Vlasenko had learned that, he would have made that an

22    issue publicly in Ukraine?

23    A.      That is pure speculation.  But Mr. Vlasenko almost

24    immediately went to the press about everything.  So it's a

25    good prediction that that is what he would have done.

1    Q.      Right.  So let's take a look at Government's Exhibit

2    209, then.

3            Do you recall -- in evidence --

4    A.      Yes.

5    Q.      Do you recall --

6    A.      I do.

7    Q.      Do you recall the article "Skadden Stink"?

8    A.      I do.

9    Q.      It is hard not to recall it with that headline.

10           All right.  Now, isn't it true, sir -- let's

11   look -- true, sir, that the article says, "The government

12   claims that Skadden, a top American firm with annual turnover

13   of 2.17 billion, works for a mere $12,000 for Ukraine's

14   government.  None of the company's expenses is paid,

15   including expensive flights and staying in Fairmont Hotel,

16   where prices start at 300 euros per night.

17           "Skadden representatives have visited Ukraine at

18   least three or four times.  In at least one of the cases the

19   team was made up of two partners from the Washington office

20   plus two associates.  One of the partners" -- and it quotes

21   your hourly rate -- and then it says, "The facts fuel

22   speculation that Skadden is being paid by someone on the

23   side.  No one knows who is paying Skadden, and it is a

24   question the company is ignoring, so the public may never

25   know of conflicts of interest or worse things that may lurk

1    behind this arrangement."

2            Did I read that right?

3    A.      You read it correctly, thank you.

4    Q.      Isn't it, therefore, true that in fact Mr. Vlasenko's

5    legal team did not know that there was a third-party payor or

6    who it was?

7    A.      I don't know what they knew or didn't know.  This is

8    an editorial from the *Kyiv Post*.

9    Q.      All right.  But you believe that you told

10   Mr. Slattery that there was a third-party payor?

11   A.      I believe so, yes.

12   Q.      Okay.  All right, sir, and in response to this

13   article, Mr. Sloan, in particular, became very concerned;

14   right?

15   A.      He was not alone.

16   Q.      All right.  And he wanted this to be disclosed;

17   right?

18   A.      He wanted to disclose either the fact of a

19   third-party payor or the identity of Mr. Pinchuk, yes.

20   Q.      He thought it was better to get ahead of it and

21   include that information publicly or at least as part of the

22   report; right?

23   A.      Absolutely.

24   Q.      Right.  And he wanted you to talk to Manafort about

25   that?

1      A.      I think that's right.

2      Q.      Right.  And you can look at Government's Exhibit 210,

3      the third e-mail from the top.  It should be on your screen.

4              And this is Mr. Sloan advocating that you really need

5      to disclose the funding; right?

6      A.      Yes.

7      Q.      And then he -- you respond, on August 9th, "I have

8      already told Manafort that he's got to get Pinchuk out

9      whether voluntarily or non-voluntarily."  Right?

10     A.      And when I say he has to get Pinchuk out, that means

11     his identity disclosed and his role disclosed, whether

12     voluntarily or involuntarily.

13     Q.      But you had not sent him an e-mail about that; right?

14     Are you saying that you had a phone conversation with him?

15     A.      I said to Cliff that I had told Manafort that he has

16     got to help us get Pinchuk out.

17     Q.      In fact, that relates back to the June e-mails that

18     we were looking at, right, when you were planning for the

19     Tymoshenko interview?

20     A.      I don't know what it relates back to.  I don't think

21     it relates back to anything.  I think it relates to the

22     "Skadden Stink" editorial and the communications that I am

23     having with Cliff about how we should go about resolving the

24     issue of getting Pinchuk's name out or getting a third-party

25     payor identity out into the press.

1    Q.     You certainly haven't seen an e-mail from you to

2    Manafort saying those things, right, here on August 9th or

3    August 10th?

4    A.     I don't recall how I communicated with him, whether

5    it was by e-mail or by phone.

6    Q.     Okay.  All right.

7    A.     But I am telling Cliff that I have told Manafort that

8    he has to help us get Pinchuk out.

9    Q.     Right, and that's my point.  Is there an e-mail to

10   that effect?

11   A.     I don't know.  I don't think so.

12   Q.     You don't think so.  Okay.

13          So that's on August 9th, right, the same day as the

14   editorial came out?

15   A.     Yes.

16   Q.     All right.  Mr. Sloan followed up with you the next

17   day; right?

18          Exhibit 211, in for the record.

19   A.     Okay.

20   Q.     Mr. Sloan follows up with you, right?

21          He's like, "Hi Greg, you were mentioning the Ukraine

22   payment situation last night and then our connection broke

23   up.  I really think we need to get it out there as soon as we

24   can.  I know you agree.  If we don't, it's self-defeating for

25   Pinchuk and the government.  Will put us in a very deep hole

1    in the Western press.  We still have a bit of a window now

2    and we should take it."

3            Right?

4    A.      Yes.

5    Q.      And again, he followed up with you on August 13th.

6    That's Government's Exhibit 212.

7            It is also admitted in evidence.

8            He says, "Here's a possibility to think about.  Maybe

9    we disclose the source of the funding in a matter of fact,

10   professional tone in a footnote in the report."

11           Right?

12   A.      Yes.

13   Q.      He really is following up with you to make sure

14   something happens about this; right?

15   A.      He is writing me yet another e-mail about how we

16   might resolve this problem.

17   Q.      Okay.

18   A.      I wanted to resolve it, as well.

19   Q.      All right.  But he certainly keeps reaching out to

20   you.  He seems very eager to do so.  Right?

21           MR. TAYLOR:  Objection to form.

22           THE COURT:  Sustained.

23           BY MR. CAMPOAMOR-SANCHEZ:

24   Q.      How many times had he reached out to you since the

25   article?

1    A.      Two or three times.

2    Q.      Okay.  So let's look at Government's Exhibit 214,

3    also in evidence.  And let's look at the bottom e-mail from

4    Mr. Manafort to you first.

5            And he is asking you here whether you had reached

6    Mr. Schoen; right?

7    A.      This is on another matter entirely.

8    Q.      You believe this is another matter?

9    A.      I do.

10   Q.      Well, Mr. Manafort is asking you whether you reached

11   Mr. Schoen; right?

12   A.      There is an e-mail from Manafort to me.

13   Q.      Right.

14   A.      And the subject is, "Viktor Pinchuk or Ministry of

15   Justice," MOJ.

16   Q.      Right.

17   A.      So there's two topics.

18           And the question from Manafort is, "Did you reach

19   Schoen?"

20   Q.      Uh-huh.

21   A.      And then "Kyiv wants to move as soon as possible and

22   is pressing me for an answer.  Please advise."

23   Q.      Right.  And you responded; right?

24   A.      Yes.

25   Q.      "I'm still working the Schoen avenue."

3083

```
1              Right?

2    A.        That's what it says.

3    Q.        "No one promised Pinchuk anonymity; did they?"

4    A.        That's what it says.

5    Q.        Right.  This relates specifically to the "Skadden

6    Stink" article; does it not?

7    A.        When I'm talking about the "Schoen avenue," that is

8    my effort to go back to Mr. Pinchuk and see if he might be

9    willing to contribute more funding because we were running

10   short on funding.

11   Q.        Sir, you don't say anything about funding here; do

12   you?

13   A.        "I'm still working the Schoen avenue."  That's what

14   the topic was.

15   Q.        My question, sir, was:  You mentioned nothing about

16   the funding in this e-mail; do you?

17   A.        I do not, yeah.

18   Q.        But you do mention the fact of Pinchuk's anonymity in

19   the e-mail; do you not?

20   A.        That was the second topic.

21   Q.        And Mr. Manafort did respond to you; right?

22   A.        I don't know.  You will have to show me the e-mail.

23   Q.        It's the top of this e-mail, sir.

24   A.        Oh, "I don't know, but I do know that is what he is

25   saying he wants now."  He responded to the anonymity issue,
```

3084

1      yes.

2      Q.      He is talking about the same issue of anonymity for

3      Pinchuk; right?

4      A.      No one promised Pinchuk anonymity; did they?

5              And he says, I don't know, but I do know that is what

6      he is saying he wants now."

7      Q.      Right.  In fact, it was the Pinchuk anonymity issue

8      that was being discussed with Mr. Sloan just the days before

9      about the "Skadden Stink"; right?

10     A.      With Mr. Sloan?

11     Q.      Yes.

12     A.      That's correct.

13     Q.      Okay.  And then, sir, let's move on to August 22nd.

14     That is Government's Exhibit 216.  In evidence.

15             And this, sir, is an e-mail from you to Mr. Manafort;

16     correct?

17     A.      That's right.

18     Q.      And he says, "Here is the letter about the fees."

19     A.      Yes.

20     Q.      One moment.  (Pause).

21             I'm sorry.  I jumped.  So let's go, instead, to

22     Government's Exhibit 581.  In evidence.  Let's start at the

23     bottom.

24             Now, this is -- I'm sorry.  It is on your screen,

25     too.

3085

1    A.      581?

2    Q.      Yes, sir.

3    A.      I don't have it in my book.  I would really like to

4    look at the document if I could.

5            Is it in the first book or the second book?

6    Q.      Let me see.

7            THE COURT:  While they're doing that, I just want to

8    let the jurors know that I'm going to just continue to keep

9    going since we got a late start after lunch.  Unless someone

10   signals they want a break, we're going to go for a while.

11           That's a "yes," not "I want a break."  Okay.

12           We have a whole series of sign language that we're

13   communicating with in this courtroom now.  All right.

14           THE WITNESS:  I see it here.

15           BY MR. CAMPOAMOR-SANCHEZ:

16   Q.      We'll start from the bottom to make sure we include

17   everything.  Okay?

18           So it is an e-mail from Mr. Manafort to you with

19   updates; right?

20           That's the subject line?

21   A.      The subject line is "Updates," yes.

22   Q.      And the last e-mail we had looked at was 214, and

23   that was the e-mail from August 14th.  So we're now at the

24   next day, August 15th.  Okay?

25   A.      Okay.  That's fine.

1      Q.      All right.  And it says, "Greg, any news from Schoen?

2      I need to get back to SL if we are pursuing his approach.  Is

3      the draft Russian translation ready?  Getting pressure on

4      this, too.  Please advise."

5              Let's look at the next e-mail, then.

6      A.      No, no, can I --

7              MR. TAYLOR:  Is there a question?

8              THE WITNESS:  Yeah --

9              THE COURT:  All right.  Let's wait for him to ask the

10     question, and then you'll answer it.

11             Do you have a question --

12             THE WITNESS:  I'm going to get --

13             THE COURT:  -- or are you asking if --

14             THE WITNESS:  Yeah --

15             MR. CAMPOAMOR-SANCHEZ:  Since he doesn't have it in

16     front of him, other than on the screen, I'm just letting him

17     know everything that is in it, but my question is going to be

18     towards the top.

19             MR. TAYLOR:  Couldn't hear you.

20             THE COURT:  Do you see this e-mail from August 15th

21     that is Government's Exhibit 581?

22             All right.  So did you receive that e-mail?

23             THE WITNESS:  I did receive that email.

24             THE COURT:  Ask your next question.

25             BY MR. CAMPOAMOR-SANCHEZ:

3087

1    Q.      And did you respond?

2    A.      I said, "Hold on a few more hours."

3    Q.      Okay.  And did Mr. Manafort respond to you?

4    A.      He said, "I am, by my fingernails."

5    Q.      And did you respond to that?

6            And here you write, "The answer from Schoen/Pinchuk

7    is a firm and unqualified no.  Can you put into a sentence

8    how Ukraine wants to handle this so I can clear it with the

9    team?  Thanks."

10           Did I read that right?

11   A.      You read it correctly.

12   Q.      Okay.  And let's look at what Mr. Manafort says at

13   the top.  What did he respond?

14   A.      You can read it again if you want.

15   Q.      Okay.  "This is what I thought.  Given this response,

16   I would like to discuss with you again what SL proposes

17   before putting anything in writing."

18   A.      And "SL" refers to the Chief of Staff of the

19   President, Serhiy Lyovochkin, who was working on a project

20   that would allow us to get additional compensation from the

21   government of Ukraine.  And that is the topic of the Serhiy

22   Lyovochkin proposal.

23   Q.      And sir, did you get some instructions from

24   Mr. Manafort after this e-mail related to this issue?

25   A.      I think I probably did, yes.

1    Q.      Okay.  Let's look at Government's Exhibit 582, in

2    evidence.  Let's look first at the top, at what Mr. Manafort

3    says.

4            And the subject line is, "Procedure for supplemental

5    payments."

6            And he writes, "Per our conversation, this is the

7    procedure and justification of the process.  It was sent to

8    me by MOJ."

9            Do you see that?

10   A.      And that was the procedure and justification for

11   supplemental payments.

12   Q.      That's what it says; right?

13   A.      That's what it is.

14   Q.      And it includes --

15   A.      And it was sent to him -- sent to him by Ministry of

16   Justice.

17   Q.      And then he includes some instructions below; right?

18           Where the Ministry of Justice has started a procedure

19   of purchasing services in terms of providing legal expert

20   opinions; right?

21   A.      This is, as I understand it, the procedure for

22   getting supplemental payments.

23   Q.      And that's what you claim is happening here?

24   A.      Yes.

25   Q.      Okay.  In fact, the next paragraph makes a reference

1    to the agreement with Skadden of 95,000 Ukrainian currency;

2    right?

3    A.      Yes.

4    Q.      All right.  Let's look at the bottom, the one that

5    says, "in other words."

6            "In other words, the mechanism to be applied is in

7    full compliance with the Ukrainian law.  The issue is

8    determining the amount which will be considered to be

9    sufficient to cover travel and lodging of Skadden, as noted

10   by Vlasenko and other opposition people with whom Skadden

11   met, and some minimal legal fee."

12           Did I read that right, sir?

13   A.      Yes, you did.

14   Q.      All right.  And sir, isn't it true this is Manafort

15   asking you for help so that the government of Ukraine has a

16   contractual basis to fight off the bad press they're getting

17   in Ukraine?

18   A.      This is Mr. Manafort explaining to me the procedure

19   that we will have to go through to get a supplemental

20   appropriation from the government of Ukraine to help us with

21   our cost overrun.

22   Q.      And yet, he is talking about Vlasenko's criticism and

23   the opposition's criticism about the Skadden fee issue;

24   right?

25           MR. TAYLOR:  Objection.  Argumentative.

1          THE COURT:  Overruled.

2          THE WITNESS:  You're referring to the last paragraph?

3          MR. CAMPOAMOR-SANCHEZ:  Yes, sir.

4          THE WITNESS:  What he says there is, "The issue is

5  determining the amount which will be considered sufficient to

6  cover travel and lodging of Skadden, as noted by Vlasenko."

7  That's where he references Vlasenko.

8          MR. CAMPOAMOR-SANCHEZ:  Right.

9          THE WITNESS:  But every other part of this e-mail has

10 to do with a procedure by which we, working with the Ministry

11 of Justice, are able to supplement the compensation.

12          BY MR. CAMPOAMOR-SANCHEZ:

13 Q.     So you're going to supplement the compensation with a

14 minimal legal fee?

15          That's how you're going to supplement the

16 compensation?

17 A.     No, I didn't -- I didn't focus on that.

18 Q.     Okay.  Then let's look at Government's Exhibit 583,

19 sir.

20          You recognize this e-mail?

21 A.     There's about three or four e-mails.

22 Q.     Okay.  Let's start at the bottom then, and let's

23 start scrolling up.

24          This is, at the bottom, to get you oriented -- we

25 looked at the e-mails, in terms of before, "The answer from

1    Schoen/Pinchuk is a firm and unqualified no."

2            Do you remember that, we looked at that e-mail --

3    A.      "The answer from Schoen/Pinchuk is a firm and

4    unqualified no" to the question of whether they would be

5    willing to supplement the payment to Skadden.

6    Q.      All right.

7    A.      Then I asked Mr. Manafort, "Can you tell me in a

8    sentence how Ukraine wants to handle this so I can clear it

9    with the team."

10   Q.      Right.  And my question, sir, was actually not that.

11   I was just --

12   A.      I was just reading the e-mail.

13   Q.      I understand you were reading it and explaining it,

14   but that was not my question.

15           My question is, I was just orienting you that we just

16   saw these e-mails before.  Right?  So I want to move up to

17   the responses.

18           You recognize that we just read this a minute ago?

19   A.      I don't but --

20   Q.      You don't?

21   A.      -- but maybe my mind is failing me at this --

22   Q.      All right.  Let's go up a little bit, please.  Let's

23   take it from the top to the middle of the page.

24           All right.  So, at the bottom, you write "Call me.  I

25   am in the office."

1              Right?  Do you recall talking to Mr. Manafort on

2      August 16th?

3      A.      I don't.

4      Q.      Okay.  Then he asks you about news of the delivery of

5      the Russian in current state or on the payment mechanism;

6      right?

7      A.      That's right.  The "payment mechanism" referring to

8      supplemental payment.

9      Q.      I know that's what you're explaining, and let's move

10     on.

11             Then he says -- or you say, "Hopeful by the end of

12     today.  Working on it."

13             Then, Mr. Manafort writes:  Thanks.  Is the amount

14     one million point three good for official submission?

15     A.      I see that.

16     Q.      And you write:  My thought is 250,000 per month,

17     which is either one and a quarter million or one and a half

18     million; right?

19             That's what you respond?

20     A.      That's what the e-mail says, yes.

21     Q.      And Mr. Manafort says:  Okay.  I will tell them a

22     million and a half.

23     A.      No, it's 1.25.

24     Q.      I'm sorry.  One million and a quarter.

25     A.      Yes.

1    Q.      And my question, sir, is:  This is about creating a

2    new contract that will help Ukraine in its public relations

3    nightmare, that is, to "Skadden Stink"?

4    A.      It is about a new contract that will help pay the

5    overrun that we have incurred in connection with outstanding

6    expenses and fees.

7    Q.      Okay.  So let's look at, then, Government's

8    Exhibit 585.

9            Mr. Manafort asks you something on August 20th;

10   right?

11   A.      Yes, he sends me an e-mail on August 20th.

12   Q.      And he says, "Could you resend the same letter you

13   sent re submitting future bill and date it July 18, 2012?"

14           Let me ask you first:  This is an e-mail that was

15   sent to you on August 20th; right?

16   A.      Right.

17   Q.      And then he says:  If you could e-mail a copy of it

18   and the invoice for a million and a quarter for services

19   rendered.  Ideally, I would get both tomorrow.

20           Right?

21   A.      Yes.

22   Q.      Right.  And he is asking you to send him a bill for

23   services rendered; right?

24   A.      Yes.

25   Q.      He is not asking you to send a bill for what you

3094

1    think you're going to need in the future; right?

2    A.    No, it is for services already rendered --

3    Q.    And then you say --

4    A.    -- and expenses incurred.

5    Q.    And then you say, "Not tomorrow.  Maybe Wednesday."

6          And then he responds, "Okay.  That works.  I'm in

7    Kyiv."

8          Did I read that right?

9    A.    You left out the dollar sign --

10   Q.    Okay.

11   A.    -- which was a typographical error.

12   Q.    Okay.  So did you do as Mr. Manafort asks and send

13   him the letter?

14   A.    Yes, I did.

15   Q.    All right.  Let's look at Government's Exhibit 216.

16   And, sir -- let's look at the e-mail.

17         And if we look at the bottom e-mail, you understand

18   that that means that you scanned a document and sent it to

19   yourself; right?

20   A.    I guess so, yes.

21   Q.    Right.

22   A.    I heard that explained earlier in the trial.

23   Q.    In other words, this was not Ms. Whitney or somebody

24   else actually scanning this for you, you did this yourself?

25   A.    I guess.  I don't remember doing this, but I guess

1        that's what that means.

2        Q.      And then you write to Mr. Manafort, "Subject:  Here

3        is the letter re fees."

4                And then you write, "We may be able to end" -- send

5        -- well, it says, "end you the entirety of the draft report

6        in both English and Russian versions tonight for your use

7        tomorrow.  The Ukrainian version will take a day or two

8        longer."

9                So let's look at the attachment, sir.  And that's a

10       letter dated August 22nd; right?

11       A.      Yes.

12       Q.      It is addressed to the Minister of Justice; right?

13       A.      Lavrynovych, yes.

14       Q.      Right?  And then it is actually signed by you at the

15       bottom; right?

16       A.      It is.

17       Q.      And that is, indeed, your signature?

18       A.      It is my signature.

19       Q.      So let's look at from the "re" line to the end of the

20       letter.

21               "Dear Mr. Minister," it says, "You have asked me to

22       provide you with an invoice setting forth the outstanding

23       payments due from the government of Ukraine for the services

24       rendered in connection with Skadden's assignment to serve as

25       a rule-of-law consultant to the Ministry of Justice."

1      Sir, there were no outstanding payments due as of the

2 date of the this letter; correct?

3 A.      We had not sent an invoice with outstanding -- with a

4 charge, no.

5 Q.      Not only that, you had a retainer of 4 million that

6 had covered your professional fees and expenses through this

7 time?

8 A.      That's correct.

9 Q.      You say, "As you know, we are in the process of

10 preparing -- and finalizing -- an independent report based on

11 an inquiry of the facts and circumstances surrounding the

12 trial, conviction and sentencing of Mrs. Yulia Tymoshenko."

13      Then, it says, "For services rendered during the

14 months of April, May, June, July and August, there is an

15 outstanding balance due of 250,000 per month for a total of"

16 a million and a quarter.

17      Is that right?

18 A.      That's correct.

19 Q.      Right.  Sir, there were no outstanding payments due

20 from the government of Ukraine for your work on the

21 Tymoshenko report; right?

22 A.      At that moment, there were not.

23 Q.      Right.  But yet, you are signing a letter on

24 Skadden's letterhead stating that they are?

25 A.      That's true.

3097

1    Q.      That's a lie?

2    A.      It wasn't accurate.  I was responding to instructions

3    from Mr. Manafort about how to satisfy, as an accommodation,

4    the government of Ukraine for the supplemental payments.

5    Q.      There is no mention of supplemental payments here; is

6    there, sir?

7    A.      You asked me what I was doing and why I was doing it.

8    Q.      No, actually, I don't think that is what I asked.

9    But my question now, sir, is:  You did not mention

10   supplemental payments here at all?

11   A.      That's correct.

12   Q.      And not only do you say that outstanding balance due

13   but you attached wire instructions for the purposes of making

14   payment into the appropriate account?

15   A.      That's correct.

16   Q.      And you did attach the wire instructions?

17   A.      I did.

18   Q.      And those were correct wire instructions?

19   A.      I think so.

20   Q.      Okay.  But, sir, you did not send this through the

21   Skadden system; right?

22   A.      No, I sent it directly to Ukraine.

23   Q.      Right.  This was not something you sent to billing

24   and they generated an invoice and then they sent out; right?

25   A.      No.

1    Q.      And nowhere in this letter does it say that this is

2    to cover future expenses or fees?

3    A.      No, I'm telling you that.  I'm telling you that that

4    is what it was for.

5            May I say also, the Ukraine knew that is what it was

6    for.

7    Q.      Well, sir, I think you may have said this, but you

8    did this as an accommodation to Ukraine because Mr. Manafort

9    asked you to; right?

10   A.      Well, Mr. Manafort was telling me what the Ministry

11   of Justice wanted us to do to accomplish a supplemental

12   payment.

13   Q.      Right.  So they wanted to accomplish something, and

14   you did it?

15   A.      We did it.

16   Q.      Now, that wasn't the end of this episode because

17   Mr. Manafort asked you for something else afterwards; right?

18   A.      You'll have to refresh my recollection.

19   Q.      Okay.  Let's look at Government's Exhibit 217.  And

20   if you look at the bottom first, that is the same e-mail that

21   we just saw with the attached letter, right, the one that you

22   had scanned and sent to yourself?

23   A.      You're referring to the "We may be able to end

24   you" -- send you?

25   Q.      The very bottom where it says, "Original message."

1    A.        Oh, I see that, yes.  Yes.  Correct.

2    Q.        I'm just tying it to the one we just saw.  All right.

3              And then you respond at the top, and then

4    Mr. Manafort asks you, in response to the letter that you

5    sent that we just looked at, he says, "Greg, thanks.  I also

6    need you to date the attached letter that you sent to MOJ in

7    July.  You will note that it is undated.  If you could put

8    the date of July 18, 2012 on it and e-mail it back to me,

9    that would finish what I need for administrative purposes."

10   A.        That's what it says.

11   Q.        And then if we can look, he attaches for you this

12   document that appears -- it says at the top, "Ministry of

13   Justice of Ukraine."

14             You see that?

15   A.        I do.

16   Q.        Right.  And then it talks about, at the bottom of

17   this first paragraph -- sorry -- it makes reference again to

18   the price of the contract shall constitute the 95,000

19   Ukrainian currency.  Right?

20   A.        That was the original contract with the Ministry.

21   Q.        Which we looked at earlier; right?

22             And then it has at the bottom, as if it was being

23   sent by you, it says, "Yours faithfully, Gregory B. Craig."

24   A.        That's what it says.

25   Q.        Right.  Actually, when he sent you that, you said, I

3100

1    have never seen this before.

2    A.      I think I said that in words or substance.

3    Q.      Right.  You hadn't seen that.  And then Mr. Manafort

4    responded to your "I haven't seen that," and let's look at

5    Government's Exhibit 219.

6            THE DEPUTY CLERK:  Is 219 in?

7            MR. CAMPOAMOR-SANCHEZ:  219 is also in evidence.

8    Thank you.

9            BY MR. CAMPOAMOR-SANCHEZ:

10   Q.      Now, we're at the next day, August 23rd, and

11   Mr. Manafort says, "Greg, I did some research today regarding

12   the genesis of the letter you have.  I was mistaken as to the

13   author.  The letter that you have was drafted by MOJ and sets

14   up MOJ undertaking the procedure outlined before.  Assuming

15   the letter is acceptable to you, I need it dated July 18,

16   2012, which works the timetable the MOJ wants to use for the

17   procedure below.  With this letter dated July 18, and your

18   August 22 letter, the MOJ has everything it needs."

19           Did I read that correctly?

20   A.      You read it correctly.

21   Q.      Okay.  And then he again sort of attaches that

22   procedure below; right?

23   A.      And the procedure below has to do with the way in

24   which we will get supplemental payments --

25   Q.      Okay.

1    A.       -- to account for the overrun.

2    Q.       Okay.  Now, you keep saying the overrun.  You are not

3    saying, are you, that you asked Mr. Schoen for money?

4    A.       I went back to Mr. Schoen and requested -- I asked

5    him if Mr. Pinchuk would be willing to increase his

6    contribution to satisfy the expenses and the time that we had

7    incurred over and above the $4 million that he had already

8    paid.

9    Q.       And, sir, isn't it true that actually the reason that

10   you called Mr. Schoen was to get Mr. Pinchuk to agree to get

11   his name out there publicly?

12   A.       That was another call.  I did, indeed, call

13   Mr. Schoen and ask him that question.  But I also asked him,

14   I think in a different call, whether Mr. Pinchuk would be

15   willing to help us out with the overrun.

16   Q.       So you had more than one call in the mid-August time

17   frame with Mr. Schoen; is that what you're saying?

18   A.       That's what I recall.

19   Q.       Okay.  All right.  You ultimately did what

20   Mr. Manafort asked you to do right?  You did sign another

21   letter?

22   A.       He was telling me what the Ministry of Justice

23   procedure was and what they needed in order to achieve that

24   supplemental payment, yes.

25   Q.       So let's look at Government's Exhibit 548, which is

1    also in evidence.  We can start at the back of this exhibit.

2    A.      Yeah.  I'm familiar with that.

3    Q.      I have it on the screen also for you, sir.

4    A.      It's all right.  I will do the screen.

5    Q.      Okay.  And you recognize this as your handwriting;

6    right?

7    A.      Yes, it is.

8    Q.      And this is the letter that you got, or the form

9    letter that you got from Mr. Manafort that we were looking

10   at?

11   A.      This is the letter that they asked us to send to the

12   Ministry of Justice.

13   Q.      This is the letter that Mr. Manafort sent you; right?

14   A.      Yes.

15   Q.      Right.  And then if we look at the next page from the

16   end, that's a note from you to Ms. Whitney?

17   A.      Catie.

18   Q.      I'm sorry.  I didn't hear.

19   A.      I think I asked Catie to put this letter on our

20   letterhead --

21   Q.      Right.

22   A.      -- to the Ministry of Justice in Ukraine.

23   Q.      And she did so.  And if we look at the next page.

24           She now has it in letter form, and you had additional

25   changes; is that correct?

3103

1    A.      That's correct.

2    Q.      And if we can go to the next page.  Another copy of

3    that.  Please keep going up.

4            Same copy of the same original letter.  And let's

5    look at the top.

6            Now, this is the letter that -- well, first of all,

7    there is a signature of Gregory B. Craig at the bottom, but

8    that is not your signature; right?

9    A.      No, I think Catie signed for me.

10   Q.      Again, she would not have signed it but for you

11   telling her to?

12   A.      No, she would not.

13   Q.      Okay.  So, let's look at this letter.  It reads, "on

14   April 10, 2012, Skadden, Arps entered into an agreement with

15   the Ministry of Justice."  And the agreed amount was the

16   95,000 hryvnias.  Right?

17   A.      You're reading it correctly.

18   Q.      And then it continues, "Materials relating to the

19   case of *Tymoshenko v. Ukraine* are currently being considered

20   by the European Court of Human Rights.  Skadden has now been

21   asked to consider the questions raised in that case."

22           Had your role expanded in the case as of August of

23   2012?

24   A.      No, we were always being -- always considering the

25   questions in the European Court of Human Rights issues.  They

1    were raised by Ms. Tymoshenko at the European Court of Human

2    Rights as well with us and in the court when she was tried in

3    the trial court.

4    Q.      Right.

5    A.      Those are the same issues.

6    Q.      Right.  But the letter says, "Skadden has now been

7    asked to consider the questions raised in that case."

8            That is not an accurate statement; right?

9    A.      I think it was part of the original agreement that we

10   negotiated at the very beginning of the arrangement with the

11   Ministry of Justice, if you look at the very first contract.

12   Q.      So you are advising on Tymoshenko, or the Tymoshenko

13   Report, Project 2, and also European Court of Human Rights?

14   A.      The question before the European Court of Human

15   Rights I think are the same questions and claims that

16   Ms. Tymoshenko made about the defects in her trial --

17   Q.      But my point, sir --

18   A.      -- so there is an overlap here.

19   Q.      Right.  But my question, sir, is not about whether

20   they're related or not.  But your statement, "has now been

21   asked to consider the questions raised in that case."

22           That's not accurate; is it?

23   A.      We had been asked to consider those questions earlier

24   on, yes.

25   Q.      Originally?

3105

1    A.      Yes.

2    Q.      And it says that "The ministry has given Skadden the

3    additional assignment of conducting an expert examination as

4    to Ukraine's compliance with the rule-of-law and the European

5    Court of Human Rights caselaw in the Tymoshenko case."

6            And again, that was not new, that had not happened in

7    August of 2012; right?

8    A.      I agree with you.

9    Q.      Okay.  And you claim, "Due to the complexity of the

10   case, conducting an examination that would comply with

11   Section 2 of the contract will require specialists of a

12   higher class and greater training than was originally planned

13   when the initial contract was concluded."

14           That is also not an accurate statement, is it, sir?

15   A.      I think -- well, we needed more experts in terms of

16   translation.  But it is not -- we were not getting new

17   lawyers or new experts.  It is not accurate in that regard.

18   Q.      You're not getting more Supreme Court clerks --

19   A.      No.

20   Q.      -- assigned to the case?

21   A.      No, it's the same crowd.

22   Q.      And certainly it was not necessary to get other

23   lawyers; right?

24   A.      I'm sorry?

25   Q.      It was not necessary to get any other lawyers

3106

1    involved at this point?

2    A.        No.  We had plenty.

3    Q.        Right.  Then, you said, "In addition, because of the

4    volume of materials that need to be inspected, carrying out

5    that assignment will require many more working hours than was

6    first contemplated in the contract."

7          That is also not accurate; right?

8    A.        I think that is generally true, that we were spending

9    much more time than we anticipated at the beginning of the

10   project.

11   Q.        Sir, by the end of August, you had already

12   interviewed everybody and reviewed all the exhibits related

13   to the work; there was no new exhibits that you were going to

14   review.  Right?

15   A.        I think that's right.

16   Q.        And certainly you were not planning to travel again

17   to Ukraine; correct?

18   A.        I think I had one more -- my last trip was on

19   July 19th.  There was the potential for one more trip for

20   another interview of Ms. Tymoshenko, which would have been

21   two or three lawyers going yet one more time.  So I think

22   that was outstanding as a possibility.

23   Q.        And sir, the last paragraph says, "Skadden

24   respectfully submits that it is not able to perform the above

25   task upon the terms set in the contract of April 10, and

3107

 1    recommends that an additional contract settling the

 2    aforementioned issues should be concluded."

 3              That is not accurate, is it, sir?

 4    A.        We asked for an additional contract for reimbursement

 5    of expenses, and additional time that was not compensated for

 6    in the original $4 million.

 7    Q.        Your task was done as of August of 2012; was it not?

 8    A.        We had given the first draft to Mr. Manafort in

 9    July 27th.  We were responding to their request for changes.

10    I don't think we considered the report finished until

11    September.

12    Q.        Right.  But you had pulled the plug on Project 2;

13    right?

14    A.        Yes.

15    Q.        You were not doing any new work on the European

16    Commission of Human Rights at that point; right?

17    A.        Not new work.

18    Q.        Right.  You were simply taking in the comments and

19    making modifications to the report you already made?

20    A.        That's correct.

21    Q.        Right.  And sir, this was not a letter that you just

22    sat down, typed it, and sent it off; right?

23    A.        This was actually done at the request and suggestion

24    of the Ministry of Justice --

25    Q.        Through Mr. Manafort?

3108

1    A.      -- as a way of getting supplemental payment to

2    Skadden.

3    Q.      Through Mr. Manafort?

4    A.      Through Mr. Manafort.

5    Q.      And you sat down and you --

6    A.      It wasn't just Mr. Manafort.  There were also

7    Ministry officials that Alex was working with on the ground

8    in Kyiv on this same project.

9    Q.      Okay.  And you sat down and you revised this letter

10   by hand; right?

11   A.      I did, yes.

12   Q.      And you gave it to your secretary?

13   A.      I did.

14   Q.      She put the changes.  And you made some more changes

15   to it again; right?

16   A.      Yes.

17   Q.      And then it was put in final form?

18   A.      That's correct.

19   Q.      So you had to think about doing all these things;

20   right?

21   A.      Yes.

22   Q.      You very carefully drafted this letter; right?

23   A.      Yes.

24   Q.      And you modified it as you thought appropriate?

25   A.      I did.

1    Q.      All right.  You can take that down.

2            Your Honor, would this be a good time to take a short

3    break?

4            THE COURT:  Yes, it would.  Let's take a short break.

5            Members of the jury, please enjoy the break and do

6    not discuss the case with anyone that you see in the hallway,

7    including each other.  Don't consult your phones or anything

8    else about the case.

9            We will bring you back in approximately 10 minutes.

10   And before the parties are excused, I would like to get some

11   scheduling information from you.

12           (Jury not present)

13           THE COURT:  All right.  Knowing how long it has taken

14   you to do that much, how much more do you think you have?

15           MR. CAMPOAMOR-SANCHEZ:  I have a number of topics

16   still left.

17           THE COURT:  I figured that.  I guess my question is:

18   It is not possible to finish it today in all likelihood?

19           THE WITNESS:  Probably not likely.  I'm doing my

20   best, but it is probably not likely.

21           THE COURT:  All right.  With the understanding that

22   it is going to get broken in chunks, why don't we go for

23   another 45 minutes --

24           MR. CAMPOAMOR-SANCHEZ:  Okay.

25           THE COURT:  -- and then break unless you come to a

1    logical between-topic breaking point between now and then.

2         MR. CAMPOAMOR-SANCHEZ:  Okay.

3         THE COURT:  All right.  And then if I can just see

4    counsel at the bench to talk about larger scheduling as a

5    result of that.

6         (At the bench)

7         THE COURT:  Assuming he is still testifying tomorrow,

8    are you planning to call any other witnesses?

9         MR. TAYLOR:  No.

10        THE COURT:  Are you planning to call any rebuttal

11   witnesses?

12        MR. CAMPOAMOR-SANCHEZ:  Yes, we have the agent here

13   ready to go.

14        THE COURT:  Okay.  With respect to what he said in

15   the 302?  You're not calling any other witnesses?

16        MR. CAMPOAMOR-SANCHEZ:  Correct, yeah.  No.

17        THE COURT:  All right.

18        MR. CAMPOAMOR-SANCHEZ:  Correct.

19        THE COURT:  You can think about whether that is

20   necessary in light of how he actually answered the questions.

21        MR. CAMPOAMOR-SANCHEZ:  Right.

22        THE COURT:  We have to discuss jury instructions.  So

23   I believe it is not only unlikely but largely impossible to

24   have a jury instruction conference, close, and instruct the

25   jury tomorrow, and I personally would like more time to think

1      about the jury instructions than that, in any event.

2             So what I believe we should do is complete the

3      testimony tomorrow morning, release the jury for Mr. Murphy's

4      four-day weekend -- it started with you, and we all got on

5      board.  So then we will have our four-day weekend.  It would

6      be my goal to send out draft jury instructions before I go

7      home on Thursday afternoon, but I cannot tell you that that

8      will be done or not.  But I will at least try to get them to

9      you before we reconvene the following Tuesday to have as

10     brief as possible a jury instruction conference because I

11     believe the argument with respect to what the law is has been

12     thoroughly vetted.  And I have read a lot and I have thought

13     a lot, and there may be tweaks here and there.  But I think I

14     really do know what everybody's position is on every issue,

15     and I agree with some of you on some of it and some of you on

16     others of it.  We will have something in front of us to

17     discuss.  And then it seems to me the jury would be summoned

18     for Tuesday afternoon, at which point I would love to say

19     that we will close and instruct the jury, but I don't

20     necessarily have confidence that we could have two closing

21     arguments and rebuttal and instruct the jury, which means, in

22     all likelihood, the jury is going to get instructed on

23     Wednesday morning.

24             And does that sound about what everybody is

25     anticipating?

3112

1          MR. CAMPOAMOR-SANCHEZ:  Yes.

2          MR. TAYLOR:  Judge, you're in charge of the trains

3     here, so whatever you say.  But I have got one -- I know Greg

4     Craig, he is tired.

5          THE COURT:  Okay.  Look, I think everybody is tired.

6     So if you all would like to just resume, since all we are

7     going to do is cross-examine him tomorrow, if you want to

8     stop now, we will stop now.

9          MR. TAYLOR:  I do.  I saw him --

10          THE COURT:  All right.  His direct was longer than I

11     anticipated.  So, you know, he's been here a long time.  I

12     don't have a problem with that.  We can do that.  That means

13     we're definitely not having a jury instruction conference on

14     Thursday --

15          MR. TAYLOR:  Tomorrow is Thursday.

16          THE COURT:  Tomorrow, Thursday.  And I'm going to

17     pray that there will actually be some time during that day

18     left to work on the jury instructions so that we're not all

19     doing it over the weekend.  So that would be my sincere hope.

20     We will then reconvene Tuesday morning for a jury instruction

21     conference.  We'll try to close on Tuesday afternoon.

22          Have you thought in your mind about how much time

23     you're going to be asking for to close?

24          MR. CAMPOAMOR-SANCHEZ:  I have not had a lot of free

25     time to think about it, but I would say an hour and a half.

1          THE COURT:  Combined, the two arguments?

2          MR. CAMPOAMOR-SANCHEZ:  Yeah.

3          THE COURT:  I think that really would be the most of

4     anybody could tolerate, an hour and half for each side, which

5     would be three hours.  We opened, I think, in an hour.  You

6     should be able to close in an hour and a half.  I'm not a

7     time clock person, but I think that is a useful guide.  And I

8     would like to do it because I don't think you want a

9     situation where we split the closing and the rebuttal, so we

10    don't want them rebutting at 6 p.m.  So we will try to finish

11    the trial on the Tuesday after Labor Day, bring them in

12    Wednesday after Labor Day, and I'll instruct them with as

13    much alacrity as I can muster, but I have to get through it.

14    I give them copies to read along so they'll have it.  And

15    then they'll begin their deliberations.  They will have

16    Wednesday to deliberate.  I will be here Thursday morning, so

17    they can deliberate Thursday morning until 12:30 p.m.

18          MR. CAMPOAMOR-SANCHEZ:  And that was a question --

19    not that I'm asking for it -- but you don't have other judges

20    baby-sit the juries --

21          THE COURT:  I have looked at the rules many times,

22    and you can all look at the rules.  But my understanding of

23    the rules is that I have to be either dead or disabled.

24          MR. TAYLOR:  You have to be what?

25          THE COURT:  Either dead or disabled.

3114

1          I recognize that judges do this --

2          MR. TAYLOR:  I'm sorry.

3          THE COURT:  I recognize that judges do this.

4          MR. MURPHY:  "Disability" is a relative term.

5          THE COURT:  I recognize this happens, but I don't

6    believe it is permissible.  I'm going to read the rule again.

7    But if it is a complicated question anyway, what difference

8    does it make?  The only thing they could possibly do is, "We

9    have reached a verdict," that I could trust another judge to

10   do, but even then there can be complications and motions.

11   And I regret to inform you that that is the way it is.

12          MR. CAMPOAMOR-SANCHEZ:  That's fine.

13          THE COURT:  But I will come in in the morning.  They

14   will be allowed to sit until 12:30, and then they will be

15   released.  I will come in on Monday for them to resume

16   deliberations if they have not --

17          MR. TAYLOR:  I thought you were going to be out.

18          THE COURT:  It was my goal.  But we if we have a jury

19   out, I can come back and sit here while they're still out.

20   It is bad enough having a day and a half and a weekend.  So I

21   can physically be here doing that much on Monday if I have

22   to.  I think there are so many documents it is hard to

23   anticipate they will have reached a verdict by then, but you

24   never know.  So we will play it by ear, but I'm not -- I

25   would not be inclined that just for my own personal

1     convenience -- I will insist on Thursday and Friday, but I am

2     not going to insist on Monday --

3             MR. TAYLOR:  Look --

4             THE COURT:  -- all completely unbelievable to me.

5             MR. TAYLOR: -- my only suggestion is we might be able

6     to move a little faster if you could do the charge conference

7     Tuesday morning.  And it is possible to close Tuesday

8     afternoon.

9             THE COURT:  That's the goal.  That's exactly what

10    we're doing.

11            MR. TAYLOR:  Is that what you said?

12            THE COURT:  We agree 100 percent.

13            All right.  So everybody is tired.  If we're going to

14    break, let's bring the jury back and tell them we're going to

15    break for the day.  And I think we know where we're headed,

16    and we don't have anything further to discuss about the

17    schedule.

18            Okay.  That's just the way it is.

19            (In open court)

20            (Jury present)

21            THE COURT:  Members of the jury, I have some news.  I

22    don't know whether it will be received as good news or bad

23    news, but it is news.  Everybody has determined that this is

24    a good time to break for the evening.  Many of the

25    participants have been in this courtroom, including you, and

3116

1    working hard since early this morning.  And so since it

2    doesn't appear that we would complete the cross-examination

3    this afternoon anyway, we're going to pick it up again

4    tomorrow morning when everyone has had the benefit of the

5    freshening of an evening's rest.

6         My usual instructions to you about what to do this

7    evening continue.  Do not discuss the case.  Do not research

8    the case.  Do not talk about it even with each other.

9         And we will see you tomorrow morning on our ordinary

10   schedule.  Please be ready at 9:15 so that we can knock on

11   the door at 9:30 and begin.

12         Thank you very much, and have a pleasant evening.

13              (Jury not present)

14         THE COURT:  All right.  Everyone, you're all excused

15   until tomorrow morning at the usual time and place.

16              (Proceedings adjourned)

17

18

19

20

21

22

23

24

25

3117

1                   CERTIFICATE OF OFFICIAL COURT REPORTER

2

3            I, Patricia A. Kaneshiro-Miller, certify that the

4       foregoing is a correct transcript from the record of

5       proceedings in the above-entitled matter.

6

7

8       /s/ Patricia A. Kaneshiro-Miller        August 28, 2019
        ------------------------------------    ---------------------
9       PATRICIA A. KANESHIRO-MILLER                      DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$12,000** [3] - 3064:22, 3065:11, 3077:13
**$150,000** [5] - 3040:5, 3040:10, 3041:10, 3041:12, 3041:22

## '

**'consultants'** [1] - 3052:12

## /

**/s** [1] - 3117:8

## 1

**1.25** [1] - 3092:23
**1.5** [1] - 3048:22
**10** [3] - 3103:14, 3106:25, 3109:9
**100** [2] - 3023:21, 3115:12
**1000** [1] - 3023:25
**101** [1] - 3055:7
**109** [1] - 3056:19
**10:04** [1] - 3069:15
**10th** [2] - 3063:21, 3080:3
**12:30** [2] - 3113:17, 3114:14
**13** [4] - 3023:6, 3029:18, 3030:8, 3030:13
**13th** [1] - 3081:5
**14** [1] - 3064:7
**149** [2] - 3062:22, 3062:23
**14th** [1] - 3085:23
**15th** [2] - 3085:24, 3086:20
**162** [1] - 3067:16
**167** [1] - 3074:20
**16th** [1] - 3092:2
**18** [4] - 3093:13, 3099:8, 3100:15, 3100:17
**1800** [1] - 3023:24
**19-CR-125** [1] - 3023:5
**19th** [1] - 3106:19

## 2

**2** [19] - 3048:12, 3048:24, 3049:20, 3050:13, 3052:2, 3052:4, 3053:20, 3053:22, 3054:18, 3054:20, 3055:17, 3058:13, 3058:23, 3067:17, 3070:25, 3104:13, 3105:11, 3107:12
**2.17** [1] - 3077:13
**20001** [1] - 3024:3
**20036** [1] - 3023:25
**2012** [10] - 3062:1, 3062:19, 3071:15, 3093:13, 3099:8, 3100:16, 3103:14, 3103:23, 3105:7, 3107:7
**2013** [3] - 3028:7, 3061:22, 3062:10
**2017** [1] - 3028:10
**2019** [2] - 3023:8, 3117:8
**202** [1] - 3024:4

**20530** [2] - 3023:16, 3023:18
**209** [1] - 3077:2
**20th** [4] - 3041:2, 3093:9, 3093:11, 3093:15
**210** [1] - 3079:2
**211** [1] - 3080:18
**212** [1] - 3081:6
**21202** [1] - 3023:22
**214** [2] - 3082:2, 3085:22
**216** [2] - 3084:14, 3094:15
**217** [1] - 3098:19
**219** [3] - 3100:5, 3100:6, 3100:7
**22** [1] - 3071:15, 3100:18
**226** [1] - 3069:6
**22nd** [1] - 3071:17, 3084:13, 3095:10
**23rd** [2] - 3055:10, 3100:10
**2440** [1] - 3023:21
**24th** [1] - 3063:1
**25** [1] - 3040:15
**250,000** [1] - 3092:16, 3096:15
**27th** [1] - 3107:9
**28** [2] - 3023:8, 3117:8
**2:38** [1] - 3026:2

## 3

**3** [2] - 3041:8, 3056:4
**300** [1] - 3077:16
**302** [22] - 3029:9, 3029:10, 3029:11, 3030:17, 3031:14, 3031:17, 3031:20, 3031:23, 3032:23, 3033:8, 3033:10, 3033:11, 3033:12, 3033:18, 3034:11, 3034:13, 3034:15, 3034:18, 3034:23, 3037:17, 3038:23, 3110:15
**3026** [1] - 3025:5
**3040** [1] - 3025:11
**3071** [1] - 3025:12
**30th** [4] - 3069:7, 3069:14, 3070:21, 3071:1
**33** [5] - 3025:11, 3040:14, 3040:18, 3040:24
**333** [1] - 3024:3
**354-3243** [1] - 3024:4

## 4

**4** [9] - 3042:24, 3045:13, 3047:13, 3047:23, 3048:3, 3048:10, 3096:5, 3101:7, 3107:6
**4/23/12** [1] - 3055:12
**45** [1] - 3109:23
**4700A** [1] - 3024:2

## 5

**50** [3] - 3052:1, 3052:3, 3052:4
**51** [1] - 3045:19
**548** [1] - 3101:25
**555** [1] - 3023:15
**56** [1] - 3047:15

**58** [1] - 3048:19
**581** [3] - 3084:22, 3085:1, 3086:21
**582** [1] - 3088:1
**583** [1] - 3090:18
**585** [1] - 3093:8
**59** [1] - 3050:11
**5th** [5] - 3045:21, 3046:2, 3046:3, 3046:16, 3052:7

## 6

**6** [1] - 3113:10
**6th** [1] - 3045:25

## 7

**7** [1] - 3038:23

## 8

**802** [4] - 3025:12, 3071:10, 3071:19, 3071:24
**832** [1] - 3029:13

## 9

**95,000** [5] - 3064:22, 3064:22, 3089:1, 3099:18, 3103:16
**950** [1] - 3023:18
**9:15** [1] - 3116:10
**9:30** [1] - 3116:11
**9th** [3] - 3079:7, 3080:2, 3080:13

## A

**Abelson** - 3023:19
**able** [9] - 3040:7, 3074:6, 3074:7, 3090:11, 3095:4, 3098:23, 3106:24, 3113:6, 3115:5
**above-entitled** [1] - 3117:5
**absolutely** [3] - 3036:18, 3072:8, 3078:23
**acceptable** [2] - 3043:6, 3100:15
**access** [2] - 3072:14, 3072:15
**accommodation** [2] - 3097:3, 3098:8
**accomplish** [2] - 3098:11, 3098:13
**account** [2] - 3097:14, 3101:1
**accurate** [8] - 3037:18, 3097:2, 3104:8, 3104:22, 3105:14, 3105:17, 3106:7, 3107:3
**achieve** [2] - 3072:14, 3101:23
**action** [2] - 3067:1, 3067:4
**Action** [1] - 3023:5
**actual** [4] - 3047:25, 3055:15, 3064:11, 3064:15
**Adam** [2] - 3023:17, 3023:19
**addition** [5] - 3052:11, 3056:13, 3058:12, 3058:22, 3106:3
**additional** [6] - 3087:20, 3102:24, 3105:3, 3107:1, 3107:4, 3107:5

3119

**addressed** [1] - 3095:12
**adequate** [1] - 3040:8
**adjourned** [1] - 3116:16
**administrative** [1] - 3099:9
**admission** [1] - 3071:19
**admitted** [5] - 3040:18, 3040:23, 3040:24, 3071:24, 3081:7
**advance** [1] - 3041:19
**advice** [6] - 3042:9, 3042:12, 3042:15, 3055:21, 3056:3, 3058:20
**advise** [2] - 3082:22, 3086:4
**advised** [1] - 3029:1
**advising** [3] - 3066:11, 3068:14, 3104:12
**advisors** [2] - 3053:6, 3053:12
**advocated** [1] - 3059:11
**advocating** [1] - 3079:4
**aforementioned** [1] - 3107:2
**afternoon** [8] - 3026:22, 3026:23, 3041:6, 3111:7, 3111:18, 3112:21, 3115:8, 3116:3
**Afternoon** [1] - 3023:6
**AFTERNOON** [2] - 3023:10, 3026:1
**afterwards** [1] - 3098:17
**age** [1] - 3027:12
**agent** [1] - 3110:12
**agents** [1] - 3028:13
**ago** [1] - 3091:18
**agree** [14] - 3027:10, 3033:22, 3035:10, 3039:22, 3051:5, 3062:6, 3070:12, 3076:17, 3076:20, 3080:24, 3101:10, 3105:8, 3111:15, 3115:12
**agreed** [10] - 3047:8, 3050:6, 3051:3, 3054:13, 3066:25, 3067:3, 3067:8, 3067:18, 3073:16, 3103:15
**agreement** [19] - 3041:1, 3043:23, 3044:2, 3044:4, 3044:5, 3044:11, 3044:12, 3062:4, 3063:17, 3064:1, 3064:4, 3064:15, 3064:16, 3064:20, 3064:21, 3072:15, 3089:1, 3103:14, 3104:9
**ahead** [3] - 3048:12, 3069:19, 3078:20
**aided** [1] - 3024:6
**alacrity** [1] - 3113:13
**Alex** [8] - 3055:25, 3059:16, 3063:5, 3064:12, 3065:2, 3075:14, 3075:21, 3108:7
**Allon** [1] - 3060:23
**allow** [4] - 3065:18, 3070:15, 3073:1, 3087:20
**allowed** [1] - 3114:14
**alluded** [1] - 3061:18
**almost** [1] - 3076:23
**alone** [1] - 3078:15
**altogether** [1] - 3075:19
**AMERICA** [1] - 3023:4
**American** [1] - 3077:12
**amount** [9] - 3048:1, 3049:25, 3050:6, 3050:7, 3064:16, 3089:8, 3090:5, 3092:13, 3103:15

**AMY** [1] - 3023:10
**annual** [1] - 3077:12
**anonymity** [6] - 3083:3, 3083:18, 3083:25, 3084:2, 3084:4, 3084:7
**answer** [9] - 3031:7, 3034:20, 3074:14, 3082:22, 3086:10, 3087:6, 3090:25, 3091:3
**answered** [2] - 3073:2, 3110:20
**answering** [2] - 3030:21, 3074:7
**answers** [3] - 3029:2, 3032:17, 3065:17
**anticipate** [1] - 3114:23
**anticipated** [2] - 3106:9, 3112:11
**anticipating** [1] - 3111:25
**anticipation** [2] - 3063:15, 3071:5
**anyway** [2] - 3114:7, 3116:3
**apologies** [1] - 3046:13
**appear** [1] - 3116:2
**APPEARANCES** [1] - 3023:12
**applied** [1] - 3089:6
**appreciate** [1] - 3068:7
**approach** [1] - 3086:2
**approached** [2] - 3040:4, 3072:12
**approaching** [2] - 3065:4, 3066:7
**appropriate** [2] - 3097:14, 3108:24
**appropriation** [1] - 3089:20
**approval** [1] - 3073:12
**April** [10] - 3045:21, 3045:25, 3046:2, 3046:3, 3052:7, 3055:10, 3063:21, 3096:14, 3103:14, 3106:25
**argue** [1] - 3031:13
**arguing** [1] - 3032:19
**argument** [1] - 3111:11
**argumentative** [2] - 3033:21, 3089:25
**arguments** [2] - 3111:21, 3113:1
**Arps** [2] - 3063:11, 3103:14
**arrange** [1] - 3044:1
**arranged** [3] - 3044:15, 3044:17, 3066:22
**arrangement** [2] - 3078:1, 3104:10
**article** [5] - 3077:7, 3077:11, 3078:13, 3081:25, 3083:6
**assigned** [1] - 3105:20
**assignment** [3] - 3095:24, 3105:3, 3106:5
**assistance** [1] - 3058:24
**assistant** [1] - 3046:20
**associates** [1] - 3077:20
**assume** [4] - 3047:3, 3047:14, 3055:4, 3055:25
**assuming** [2] - 3100:14, 3110:7
**attach** [1] - 3097:16
**attached** [5] - 3063:11, 3063:17, 3097:13, 3098:21, 3099:6
**attaches** [1] - 3099:11, 3100:21
**attachment** [3] - 3055:11, 3055:15, 3095:9
**attempt** [2] - 3064:17, 3073:19
**attempting** [2] - 3065:5, 3065:23

**attend** [7] - 3066:18, 3066:20, 3066:21, 3066:22, 3066:23, 3066:25, 3067:18
**attending** [2] - 3067:3, 3067:6
**attention** [4] - 3030:11, 3031:23, 3070:1, 3075:9
**ATTORNEY'S** [1] - 3023:14
**August** [28] - 3023:8, 3069:7, 3069:14, 3070:21, 3071:1, 3079:7, 3080:2, 3080:3, 3080:13, 3081:5, 3084:13, 3085:23, 3085:24, 3086:20, 3092:2, 3093:9, 3093:11, 3093:15, 3095:10, 3096:14, 3100:10, 3100:18, 3101:16, 3103:22, 3105:7, 3106:11, 3107:7, 3117:8
**AUSA** [2] - 3023:13, 3023:14
**authentication** [1] - 3029:13
**author** [1] - 3100:13
**authoritative** [5] - 3057:3, 3057:22, 3057:25, 3058:21
**authorities** [1] - 3057:16
**authorized** [1] - 3062:14
**available** [1] - 3045:17
**AVDZ** [1] - 3064:13
**avenue** [3] - 3082:25, 3083:7, 3083:13
**Avenue** [2] - 3023:18, 3024:3
**aware** [1] - 3066:15

## B

**baby** [1] - 3113:20
**baby-sit** [1] - 3113:20
**bad** [3] - 3089:16, 3114:20, 3115:22
**balance** [2] - 3096:15, 3097:12
**Baltimore** [1] - 3023:22
**bank** [1] - 3049:15
**based** [3] - 3059:13, 3072:16, 3096:10
**bashful** [1] - 3042:21
**basis** [1] - 3089:16
**bat** [1] - 3059:17
**became** [7] - 3065:4, 3065:6, 3066:8, 3068:22, 3069:24, 3070:7, 3078:13
**become** [1] - 3061:11
**BEFORE** [1] - 3023:10
**begin** [2] - 3113:15, 3116:11
**beginning** [4] - 3054:22, 3060:12, 3104:10, 3106:9
**behind** [2] - 3038:19, 3078:1
**belief** [2] - 3037:25, 3038:12
**below** [4] - 3088:17, 3100:17, 3100:22, 3100:23
**bench** [6] - 3032:4, 3032:6, 3036:6, 3036:7, 3110:4, 3110:6
**benefit** [1] - 3116:4
**BERMAN** [1] - 3023:10
**best** [5] - 3059:25, 3067:1, 3067:3, 3069:4, 3109:20
**better** [9] - 3027:16, 3052:12, 3052:13, 3052:19, 3052:20, 3057:16, 3061:3, 3067:8, 3078:20

**between** [3] - 3048:23, 3110:1
**between-topic** [1] - 3110:1
**bill** [5] - 3050:3, 3051:4, 3093:13, 3093:22, 3093:25
**billing** [1] - 3097:23
**billion** [1] - 3077:13
**bind** [1] - 3063:13
**binder** [2] - 3040:14, 3071:11
**binders** [3] - 3074:24, 3075:2
**bit** [3] - 3027:11, 3081:1, 3091:22
**Black** [2] - 3049:10, 3049:14
**board** [1] - 3111:5
**book** [4] - 3074:22, 3085:3, 3085:5
**bottom** [24] - 3047:17, 3052:6, 3056:5, 3057:7, 3057:8, 3057:9, 3064:9, 3064:13, 3072:1, 3075:9, 3082:3, 3084:23, 3085:16, 3089:4, 3090:22, 3090:24, 3091:24, 3094:17, 3095:15, 3098:20, 3098:25, 3099:16, 3099:22, 3103:7
**Bradley** [1] - 3023:17
**break** [11] - 3026:5, 3043:20, 3085:10, 3085:11, 3109:3, 3109:4, 3109:5, 3109:25, 3115:14, 3115:15, 3115:24
**breaking** [1] - 3110:1
**brief** [1] - 3111:10
**briefly** [1] - 3036:6
**bring** [4] - 3026:5, 3109:9, 3113:11, 3115:14
**broke** [1] - 3080:22
**broken** [1] - 3109:22
**brought** [2] - 3033:11, 3034:16
**bullet** [2] - 3056:5, 3056:6
**bullshit** [1] - 3049:18
**bunch** [1] - 3069:13
**BY** [21] - 3026:21, 3027:19, 3028:2, 3029:17, 3031:5, 3035:14, 3036:23, 3038:8, 3039:14, 3040:25, 3043:22, 3046:14, 3057:14, 3068:9, 3071:25, 3075:8, 3081:23, 3085:15, 3086:25, 3090:12, 3100:9

## C

**Campoamor** [4] - 3023:13, 3026:14, 3031:13, 3034:23
**CAMPOAMOR** [61] - 3026:15, 3026:21, 3027:14, 3027:18, 3027:19, 3028:2, 3029:12, 3029:17, 3031:5, 3031:21, 3031:25, 3032:10, 3032:16, 3033:19, 3034:1, 3034:6, 3035:12, 3035:14, 3036:18, 3036:23, 3038:7, 3038:8, 3039:6, 3039:14, 3040:17, 3040:25, 3043:20, 3043:22, 3046:7, 3046:13, 3046:14, 3057:14, 3068:1, 3068:8, 3068:9, 3071:18, 3071:25, 3075:1, 3075:5, 3075:8, 3081:23, 3085:15, 3086:25, 3090:3, 3090:8, 3090:12, 3100:7, 3100:9, 3109:15, 3109:24, 3110:2, 3110:12,
3110:16, 3110:18, 3110:21, 3112:1, 3112:24, 3113:2, 3113:18, 3114:12
**Campoamor-Sanchez** [2] - 3023:13, 3034:23
**CAMPOAMOR-SANCHEZ** [61] - 3026:15, 3026:21, 3027:14, 3027:18, 3027:19, 3028:2, 3029:12, 3029:17, 3031:5, 3031:21, 3031:25, 3032:10, 3032:16, 3033:19, 3034:1, 3034:6, 3035:12, 3035:14, 3036:18, 3036:23, 3038:7, 3038:8, 3039:6, 3039:14, 3040:17, 3040:25, 3043:20, 3043:22, 3046:7, 3046:13, 3046:14, 3057:14, 3068:1, 3068:8, 3068:9, 3071:18, 3071:25, 3075:1, 3075:5, 3075:8, 3081:23, 3085:15, 3086:25, 3090:3, 3090:8, 3090:12, 3100:7, 3100:9, 3109:15, 3109:24, 3110:2, 3110:12, 3110:16, 3110:18, 3110:21, 3112:1, 3112:24, 3113:2, 3113:18, 3114:12
**cannot** [2] - 3045:10, 3111:7
**care** [1] - 3050:9
**carefully** [1] - 3108:22
**carrying** [1] - 3106:4
**case** [14] - 3028:11, 3063:24, 3103:19, 3103:21, 3103:22, 3104:7, 3104:21, 3105:5, 3105:10, 3105:20, 3109:6, 3109:8, 3116:7, 3116:8
**caselaw** [1] - 3105:5
**cases** [1] - 3077:18
**cast** [2] - 3053:5, 3053:11
**Catie** [3] - 3102:17, 3102:19, 3103:9
**central** [2] - 3068:17, 3068:19
**certain** [1] - 3050:6
**certainly** [3] - 3043:11, 3045:18, 3047:7, 3056:1, 3058:1, 3058:4, 3060:17, 3060:18, 3070:14, 3080:1, 3081:19, 3105:22, 3106:16
**CERTIFICATE** [1] - 3117:1
**certify** [1] - 3117:3
**challenging** [1] - 3034:12
**changes** [6] - 3026:25, 3038:13, 3102:25, 3107:9, 3108:14
**changing** [1] - 3050:7
**charge** [3] - 3067:10, 3067:12, 3096:4, 3112:2, 3115:6
**Chicago** [1] - 3053:24
**Chief** [1] - 3087:18
**choice** [1] - 3060:14
**chunks** [1] - 3109:22
**circumstances** [1] - 3096:11
**city** [1] - 3070:10
**claim** [2] - 3088:23, 3105:9
**claims** [2] - 3077:12, 3104:15
**class** [1] - 3105:12
**clear** [7] - 3027:3, 3036:24, 3048:23, 3049:19, 3051:5, 3087:8, 3091:8
**CLERK** [1] - 3100:6
**clerk** [1] - 3046:9

**clerks** [1] - 3105:18
**client** [3] - 3043:12, 3044:25, 3045:3
**Cliff** [6] - 3047:21, 3052:6, 3075:21, 3079:15, 3079:23, 3080:7
**clock** [1] - 3113:7
**close** [6] - 3110:24, 3111:19, 3112:21, 3112:23, 3113:6, 3115:7
**closer** [1] - 3027:17
**closing** [2] - 3111:20, 3113:9
**Club** [3] - 3035:25, 3036:3, 3036:25
**colors** [1] - 3074:25
**COLUMBIA** [2] - 3023:2, 3023:15
**combat** [1] - 3071:7
**combined** [1] - 3113:1
**coming** [2] - 3050:13, 3051:7
**comments** [4] - 3038:1, 3038:13, 3038:19, 3107:18
**Commission** [1] - 3107:16
**commitments** [1] - 3049:20
**common** [1] - 3060:1
**communicate** [1] - 3075:11
**communicated** [1] - 3080:4
**communicating** [1] - 3085:13
**communications** [2] - 3037:11, 3079:22
**company** [1] - 3077:24
**company's** [1] - 3077:14
**compensated** [1] - 3107:5
**compensation** [5] - 3040:8, 3087:20, 3090:11, 3090:13, 3090:16
**competence** [1] - 3060:1
**compilation** [1] - 3037:18
**complete** [3] - 3072:16, 3111:2, 3116:2
**completely** [1] - 3115:4
**complexity** [1] - 3105:9
**compliance** [2] - 3089:7, 3105:4
**complicated** [1] - 3114:7
**complications** [1] - 3114:10
**comply** [1] - 3105:10
**compound** [1] - 3043:19
**comprehensive** [1] - 3069:3
**computer** [1] - 3024:6
**computer-aided** [1] - 3024:6
**concern** [3] - 3068:6, 3068:7, 3075:11
**concerned** [16] - 3051:2, 3066:8, 3066:13, 3068:10, 3068:13, 3068:22, 3068:24, 3069:1, 3069:23, 3070:1, 3070:17, 3071:6, 3072:11, 3073:24, 3074:3, 3078:13
**concluded** [3] - 3059:24, 3105:13, 3107:2
**conditions** [1] - 3058:9
**conduct** [4] - 3042:24, 3057:17, 3058:7, 3067:24
**conducted** [1] - 3028:13
**conducting** [7] - 3054:16, 3060:9, 3066:14, 3068:20, 3070:9, 3105:3, 3105:10

3121

**conference** [5] - 3110:24, 3111:10, 3112:13, 3112:21, 3115:6
**confidence** [1] - 3111:20
**confirmed** [2] - 3033:12, 3043:6
**confirming** [1] - 3045:5
**conflicts** [1] - 3077:25
**Congressman** [3] - 3066:4, 3066:5, 3075:22
**connection** [4] - 3066:12, 3080:22, 3093:5, 3095:24
**consider** [4] - 3103:21, 3104:7, 3104:21, 3104:23
**considered** [4] - 3089:8, 3090:5, 3103:19, 3107:10
**considering** [1] - 3103:24
**constitute** [1] - 3099:18
**Constitution** [1] - 3024:3
**consult** [2] - 3058:24, 3109:7
**consultant** [2] - 3066:15, 3095:25
**consultants** [2] - 3053:1, 3068:15
**consultation** [1] - 3055:18
**consulted** [1] - 3058:13
**consulting** [1] - 3051:19
**contemplated** [1] - 3106:6
**contents** [2] - 3026:25, 3027:4
**context** [1] - 3032:12
**continue** [5] - 3034:2, 3035:6, 3075:24, 3085:8, 3116:7
**continues** [2] - 3032:10, 3103:18
**contract** [14] - 3062:12, 3062:18, 3064:17, 3093:2, 3093:4, 3099:18, 3099:20, 3104:11, 3105:11, 3105:13, 3106:6, 3106:25, 3107:1, 3107:4
**contracts** [1] - 3063:8
**contractual** [1] - 3089:16
**contribute** [1] - 3083:9
**contribution** [1] - 3101:6
**controlled** [1] - 3043:7
**controlling** [3] - 3043:16, 3048:16, 3051:6
**convenience** [1] - 3115:1
**conversation** [6] - 3042:5, 3045:5, 3049:4, 3066:24, 3079:14, 3088:6
**conviction** [1] - 3096:12
**convince** [1] - 3059:20
**cooperate** [5] - 3065:21, 3066:13, 3068:16, 3070:19, 3074:11
**cooperating** [1] - 3068:25
**cooperation** [1] - 3068:19
**copies** [2] - 3071:12, 3113:14
**copy** [6] - 3041:6, 3069:8, 3072:4, 3093:17, 3103:2, 3103:4
**Corporation** [2] - 3049:10, 3049:14
**Correct** [1] - 3110:18
**correct** [48] - 3029:24, 3031:8, 3035:3, 3036:12, 3037:3, 3037:17, 3040:6, 3041:4, 3041:10, 3041:11, 3041:13, 3041:14, 3041:17, 3041:24, 3042:8, 3042:15, 3043:24, 3044:6, 3045:22,

3047:12, 3048:17, 3049:11, 3060:16, 3061:11, 3062:3, 3063:25, 3064:23, 3065:16, 3066:1, 3071:2, 3072:3, 3073:3, 3084:12, 3084:16, 3096:2, 3096:8, 3096:18, 3097:11, 3097:15, 3097:18, 3099:1, 3102:25, 3103:1, 3106:17, 3107:20, 3108:18, 3110:16, 3117:4
**correctly** [8] - 3056:8, 3072:10, 3072:24, 3078:3, 3087:11, 3100:19, 3100:20, 3103:17
**COS** [1] - 3048:22
**cost** [2] - 3042:13, 3089:21
**costs** [1] - 3076:16
**counsel** [2] - 3028:20, 3110:4
**Counsel** [5] - 3030:6, 3033:13, 3036:14, 3036:16, 3039:5
**Counsel's** [6] - 3028:16, 3029:25, 3030:3, 3037:5, 3037:14, 3038:18
**counter** [1] - 3063:10
**counter-signed** [1] - 3063:10
**course** [3] - 3029:3, 3067:1, 3067:3
**COURT** [81] - 3023:2, 3026:3, 3026:11, 3027:16, 3027:24, 3029:14, 3030:19, 3031:19, 3031:22, 3032:5, 3032:7, 3032:14, 3032:19, 3033:4, 3033:7, 3033:10, 3033:20, 3034:2, 3034:10, 3034:15, 3034:19, 3034:25, 3035:3, 3035:5, 3036:5, 3036:8, 3036:21, 3038:5, 3039:3, 3039:9, 3039:12, 3040:19, 3040:21, 3040:23, 3043:21, 3046:6, 3046:8, 3057:11, 3067:25, 3068:3, 3071:20, 3071:22, 3074:24, 3075:3, 3075:6, 3081:22, 3085:7, 3086:9, 3086:13, 3086:20, 3086:24, 3090:1, 3109:4, 3109:13, 3109:17, 3109:21, 3109:25, 3110:3, 3110:7, 3110:10, 3110:14, 3110:17, 3110:19, 3110:22, 3112:5, 3112:10, 3112:16, 3113:1, 3113:3, 3113:21, 3113:25, 3114:3, 3114:5, 3114:13, 3114:18, 3115:4, 3115:9, 3115:12, 3115:21, 3116:14, 3117:1
**Court** [9] - 3024:2, 3026:7, 3103:20, 3103:25, 3104:1, 3104:13, 3104:14, 3105:5, 3105:18
**court** [5] - 3035:13, 3036:22, 3104:2, 3104:3, 3115:19
**Courthouse** [1] - 3024:2
**courtroom** [3] - 3046:9, 3085:13, 3115:25
**cover** [4] - 3048:4, 3089:9, 3090:6, 3098:2
**covered** [1] - 3096:6
**Cowie** [1] - 3059:16, 3066:18, 3069:8
**CRAIG** [1] - 3023:6
**Craig** [20] - 3025:5, 3026:4, 3026:17, 3029:22, 3029:23, 3030:16, 3031:1, 3031:2, 3032:7, 3032:11, 3032:12, 3034:16, 3034:19, 3035:15, 3063:13,

3063:14, 3072:12, 3099:23, 3103:7, 3112:4
  **creating** [1] - 3093:1
  **credible** [7] - 3057:3, 3057:20, 3057:21, 3057:23, 3057:24, 3057:25, 3058:21
  **Criminal** [1] - 3023:5
  **criminal** [1] - 3059:7
  **critical** [1] - 3056:7
  **criticism** [2] - 3089:22, 3089:23
  **CROSS** [2] - 3025:4, 3026:20
  **cross** [2] - 3112:7, 3116:2
  **cross-examination** [1] - 3116:2
  **CROSS-EXAMINATION** [1] - 3026:20
  **cross-examine** [1] - 3112:7
  **crowd** [1] - 3015:21
  **CRR** [1] - 3024:2
  **currency** [4] - 3064:18, 3064:22, 3089:1, 3099:19
  **current** [2] - 3036:9, 3092:5
  **Cyprus** [2] - 3049:13, 3049:15

# D

  **D.C** [5] - 3023:7, 3024:3, 3028:18, 3065:25, 3075:22
  **damage** [1] - 3068:11
  **DATE** [1] - 3117:9
  **date** [5] - 3045:23, 3093:13, 3096:2, 3099:6, 3099:8
  **dated** [10] - 3045:24, 3046:2, 3046:3, 3052:6, 3055:10, 3063:21, 3071:16, 3095:10, 3100:15, 3100:17
  **dates** [1] - 3044:17
  **David** [2] - 3029:22, 3047:21
  **DAY** [1] - 3023:6
  **days** [1] - 3084:8
  **DC** [3] - 3023:16, 3023:18, 3023:25
  **dead** [2] - 3113:23, 3113:25
  **deal** [1] - 3049:18
  **dealing** [1] - 3059:1
  **dear** [1] - 3095:21
  **decision** [1] - 3067:13
  **deep** [2] - 3061:6, 3080:25
  **defeating** [1] - 3080:24
  **defects** [1] - 3104:16
  **defendant** [3] - 3032:22, 3033:5, 3035:1
  **Defendant** [2] - 3023:7, 3023:19
  **defense** [1] - 3074:25
  **definitely** [1] - 3112:13
  **deliberate** [2] - 3113:16, 3113:17
  **deliberations** [2] - 3113:15, 3114:16
  **deliver** [5] - 3029:6, 3030:5, 3030:25, 3031:11, 3031:15, 3032:9, 3033:14
  **delivered** [5] - 3030:6, 3030:20, 3030:3, 3031:4, 3041:13
  **delivering** [1] - 3035:15, 3035:18
  **delivery** [1] - 3092:4

3122

**demand** [1] - 3073:15
**demanded** [1] - 3040:5
**deny** [2] - 3037:20, 3037:23
**DEPARTMENT** [1] - 3023:17
**deputy** [1] - 3046:8
**DEPUTY** [1] - 3100:6
**der** [9] - 3059:17, 3059:20, 3059:24, 3062:15, 3063:2, 3063:9, 3069:8, 3075:10, 3076:5
**details** [1] - 3037:7
**determined** [1] - 3115:23
**determining** [2] - 3089:8, 3090:5
**difference** [1] - 3114:7
**different** [4] - 3050:13, 3070:8, 3074:25, 3101:14
**difficult** [1] - 3069:2
**difficulty** [1] - 3027:12
**diligence** [1] - 3060:2
**direct** [7] - 3029:18, 3030:11, 3033:17, 3038:5, 3038:7, 3038:22, 3112:10
**DIRECT** [1] - 3025:4
**directing** [3] - 3031:23, 3039:7, 3075:9
**directly** [2] - 3043:13, 3097:22
**disability** [1] - 3114:4
**disabled** [2] - 3113:23, 3113:25
**disagree** [2] - 3035:10, 3076:19
**discern** [1] - 3038:18
**disclose** [6] - 3073:18, 3076:6, 3076:14, 3078:18, 3079:5, 3081:9
**disclosed** [4] - 3073:16, 3078:16, 3079:11
**disclosing** [3] - 3074:2, 3075:23, 3076:7
**discredit** [4] - 3068:23, 3069:24, 3070:2, 3070:15
**discuss** [7] - 3045:13, 3087:16, 3109:6, 3110:22, 3111:17, 3115:16, 3116:7
**discussed** [15] - 3037:8, 3038:2, 3042:25, 3043:2, 3043:4, 3043:5, 3048:7, 3048:9, 3055:1, 3055:19, 3055:24, 3057:18, 3067:8, 3084:8
**discussion** [2] - 3055:25, 3056:1
**discussions** [1] - 3044:21
**DISTRICT** [4] - 3023:2, 3023:2, 3023:11, 3023:15
**document** [4] - 3037:21, 3085:4, 3094:18, 3099:12
**documents** [4] - 3030:16, 3031:9, 3060:10, 3114:22
**dollar** [1] - 3094:9
**dollars** [1] - 3050:24
**domain** [1] - 3070:15
**done** [6] - 3031:1, 3032:12, 3076:25, 3107:7, 3107:23, 3111:8
**door** [1] - 3116:11
**doubt** [1] - 3054:25
**Doug** [1] - 3041:6
**down** [11] - 3043:20, 3044:6, 3044:15,

3046:23, 3051:11, 3065:3, 3072:20, 3107:22, 3108:5, 3108:9, 3109:1
**DPG** [1] - 3049:17
**draft** [7] - 3041:1, 3071:6, 3072:6, 3086:3, 3095:5, 3107:8, 3111:6
**Draft** [1] - 3038:25
**drafted** [4] - 3071:6, 3073:8, 3100:13, 3108:22
**due** [5] - 3095:23, 3096:1, 3096:15, 3096:19, 3097:12
**Due** [1] - 3105:9
**duly** [1] - 3026:18
**during** [6] - 3028:25, 3029:5, 3035:20, 3038:1, 3096:13, 3112:17

## E

**e-mail** [58] - 3045:24, 3046:3, 3046:15, 3048:20, 3049:22, 3052:4, 3052:5, 3052:6, 3052:21, 3053:4, 3053:10, 3053:14, 3053:19, 3055:8, 3055:11, 3056:21, 3057:9, 3063:1, 3069:7, 3069:17, 3072:1, 3073:4, 3075:9, 3075:10, 3075:14, 3079:3, 3079:13, 3080:1, 3080:5, 3080:9, 3081:15, 3082:3, 3082:12, 3083:16, 3083:19, 3083:22, 3083:23, 3084:15, 3085:18, 3085:22, 3085:23, 3086:5, 3086:20, 3086:22, 3087:24, 3090:9, 3090:20, 3091:2, 3091:12, 3092:20, 3093:11, 3093:14, 3093:17, 3094:16, 3094:17, 3098:20, 3099:8
**e-mailed** [1] - 3067:16
**e-mails** [7] - 3069:13, 3071:14, 3071:16, 3079:17, 3090:21, 3090:25, 3091:16
**eager** [1] - 3081:20
**ear** [1] - 3114:24
**early** [1] - 3116:1
**easier** [2] - 3057:12, 3071:13
**East** [1] - 3023:21
**editorial** [3] - 3078:8, 3079:22, 3080:14
**effect** [1] - 3080:10
**effort** [1] - 3083:8
**either** [7] - 3060:14, 3070:6, 3071:14, 3078:18, 3092:17, 3113:23, 3113:25
**elsewhere** [1] - 3070:10
**email** [1] - 3086:23
**encouraged** [1] - 3042:18
**end** [15] - 3048:24, 3048:25, 3054:1, 3054:5, 3059:16, 3062:10, 3072:18, 3092:11, 3095:4, 3095:5, 3095:19, 3098:16, 3098:23, 3102:16, 3106:11
**engaged** [2] - 3043:14, 3066:15
**engagement** [15] - 3041:10, 3043:12, 3044:10, 3044:11, 3044:12, 3047:3, 3047:4, 3061:19, 3061:25, 3063:10, 3063:19, 3063:20, 3063:23, 3064:1
**English** [1] - 3095:6

**enjoy** [1] - 3109:5
**ensure** [1] - 3057:2
**entered** [2] - 3072:15, 3103:14
**enthusiastic** [1] - 3054:12
**entire** [2] - 3032:21, 3048:4
**entirely** [1] - 3082:7
**entirety** [1] - 3095:5
**entitled** [1] - 3117:5
**episode** [1] - 3098:16
**error** [1] - 3094:11
**Esq** [4] - 3023:19, 3023:20, 3023:23, 3023:23
**essentially** [1] - 3033:11
**establish** [1] - 3036:9
**established** [2] - 3035:7, 3048:13
**European** [2] - 3061:11, 3103:20, 3103:25, 3104:1, 3104:13, 3104:14, 3105:4, 3107:15
**euros** [1] - 3077:16
**evening** [3] - 3115:24, 3116:7, 3116:12
**evening's** [1] - 3116:5
**event** [2] - 3072:19, 3111:1
**evidence** [21] - 3029:14, 3040:24, 3046:6, 3047:16, 3050:12, 3055:7, 3056:19, 3067:25, 3069:6, 3071:11, 3071:22, 3071:24, 3074:21, 3077:3, 3081:7, 3082:3, 3084:14, 3084:22, 3088:2, 3100:7, 3102:1
**exactly** [6] - 3029:9, 3029:10, 3029:11, 3038:10, 3062:16, 3115:9
**examination** [3] - 3105:3, 3105:10, 3116:2
**EXAMINATION** [1] - 3026:20
**examine** [1] - 3112:7
**examined** [1] - 3026:18
**except** [1] - 3054:1
**excused** [2] - 3109:10, 3116:14
**Exhibit** [28] - 3040:14, 3045:19, 3047:15, 3048:19, 3052:1, 3052:4, 3055:7, 3056:18, 3062:22, 3069:6, 3071:10, 3071:19, 3074:20, 3077:1, 3079:2, 3080:18, 3081:6, 3082:2, 3084:14, 3084:22, 3086:21, 3088:1, 3090:18, 3093:8, 3094:15, 3098:19, 3100:5, 3101:25
**EXHIBIT** [1] - 3025:10
**exhibit** [4] - 3041:8, 3063:18, 3064:4, 3102:1
**exhibits** [2] - 3106:12, 3106:13
**expanded** [2] - 3054:14, 3103:22
**expect** [1] - 3047:25
**expectation** [2] - 3047:10, 3063:15
**expecting** [1] - 3048:3
**expenses** [13] - 3040:9, 3041:9, 3048:4, 3050:4, 3051:4, 3076:16, 3077:14, 3093:6, 3094:4, 3096:6, 3098:2, 3101:6, 3107:5
**expensive** [1] - 3077:15
**experience** [2] - 3053:25, 3059:8

**expert** [2] - 3088:19, 3105:3
**expertise** [1] - 3059:8
**experts** [2] - 3105:15, 3105:17
**explain** [1] - 3073:25
**explained** [4] - 3065:2, 3067:2, 3067:7, 3094:22
**explaining** [3] - 3089:18, 3091:13, 3092:9
**extended** [1] - 3052:23
**extensive** [1] - 3053:24

## F

**fact** [24] - 3041:12, 3041:18, 3042:17, 3042:21, 3043:17, 3045:2, 3048:7, 3049:25, 3050:11, 3052:18, 3053:3, 3055:1, 3056:4, 3059:19, 3061:10, 3062:11, 3070:24, 3078:4, 3078:18, 3079:17, 3081:9, 3083:18, 3084:7, 3088:25
**facts** [2] - 3077:21, 3096:11
**failing** [1] - 3091:21
**fair** [3] - 3034:3, 3054:15, 3058:12
**Fairmont** [1] - 3077:15
**faithfully** [1] - 3099:23
**familiar** [1] - 3102:2
**FARA** [1] - 3028:7
**faster** [1] - 3115:6
**FBI** [4] - 3028:13, 3037:22, 3037:23, 3038:4
**February** [1] - 3041:2
**fee** [3] - 3089:11, 3089:23, 3090:14
**fees** [10] - 3041:8, 3041:9, 3047:8, 3047:10, 3047:20, 3084:18, 3093:6, 3095:3, 3096:6, 3098:2
**felt** [1] - 3049:23
**Fernando** [1] - 3023:13
**few** [1] - 3087:2
**fight** [1] - 3089:16
**figured** [1] - 3109:17
**final** [1] - 3108:17
**finalizing** [1] - 3096:10
**finally** [1] - 3061:24
**findings** [2] - 3057:2, 3060:13
**fine** [5] - 3073:6, 3073:10, 3073:14, 3085:25, 3114:12
**fingernails** [1] - 3087:4
**finish** [3] - 3099:9, 3109:18, 3113:10
**finished** [1] - 3107:10
**firm** [9] - 3047:7, 3047:9, 3053:11, 3063:12, 3063:13, 3077:12, 3087:7, 3091:1, 3091:3
**firms** [2] - 3059:13, 3059:15
**first** [22] - 3030:15, 3036:9, 3039:1, 3040:4, 3051:12, 3051:17, 3052:4, 3063:18, 3071:14, 3072:12, 3075:10, 3082:4, 3085:5, 3088:2, 3093:14, 3098:20, 3099:17, 3103:6, 3104:11, 3106:6, 3107:8
**five** [1] - 3049:16

**flights** [2] - 3044:18, 3077:15
**focus** [1] - 3090:17
**followed** [1] - 3080:16, 3081:5
**following** [1] - 3081:13, 3111:9
**follows** [2] - 3026:19, 3080:20
**footnote** [1] - 3081:10
**FOR** [2] - 3023:2, 3023:14
**foregoing** [1] - 3117:4
**forgetting** [1] - 3068:2
**form** [4] - 3081:21, 3102:8, 3102:24, 3108:17
**former** [2] - 3066:5, 3075:22
**former-Congressman** [2] - 3066:5, 3075:22
**forth** [1] - 3095:22
**Forward** [1] - 3067:17
**forward** [1] - 3041:18
**forwarding** [1] - 3056:20
**four** [7] - 3059:13, 3061:9, 3071:16, 3077:18, 3090:21, 3111:4, 3111:5
**four-day** [2] - 3111:4, 3111:5
**Fourth** [1] - 3023:15
**frame** [1] - 3101:17
**free** [2] - 3068:5, 3112:24
**freshening** [1] - 3116:5
**Friday** [1] - 3115:1
**front** [4] - 3035:19, 3040:15, 3086:16, 3111:16
**frustrated** [1] - 3062:1
**FTI** [7] - 3035:23, 3059:11, 3059:14, 3059:17, 3059:21, 3059:24
**FTI's** [1] - 3060:1
**fuel** [1] - 3077:21
**full** [4] - 3030:15, 3032:12, 3072:13, 3089:7
**funding** [10] - 3043:15, 3065:20, 3074:10, 3076:16, 3079:5, 3081:9, 3083:9, 3083:10, 3083:11, 3083:16
**funds** [2] - 3045:17, 3049:8
**future** [3] - 3093:13, 3094:1, 3098:2

## G

**Gaston** [1] - 3023:14
**gates** [1] - 3075:11
**Gates** [1] - 3075:18
**gathering** [1] - 3060:10
**General** [5] - 3051:17, 3051:20, 3054:11, 3056:2, 3059:7
**General's** [4] - 3055:20, 3058:19, 3059:18, 3059:21
**generally** [1] - 3106:8
**generate** [1] - 3039:24
**generated** [1] - 3097:24
**genesis** [1] - 3100:12
**gentlemen** [1] - 3037:2
**given** [3] - 3087:15, 3105:2, 3107:8
**glad** [1] - 3071:12
**goal** [3] - 3111:6, 3114:18, 3115:9

**goals** [1] - 3057:19
**government** [15] - 3035:22, 3045:3, 3047:6, 3047:25, 3073:10, 3073:12, 3077:11, 3077:14, 3080:25, 3087:21, 3089:15, 3089:20, 3095:23, 3096:20, 3097:4
**Government** [3] - 3023:13, 3040:24, 3071:24
**GOVERNMENT** [1] - 3025:10
**Government's** [27] - 3040:14, 3045:19, 3047:15, 3048:19, 3052:1, 3052:4, 3055:7, 3056:18, 3062:22, 3069:5, 3071:10, 3071:19, 3074:20, 3077:1, 3079:2, 3081:6, 3082:2, 3084:14, 3084:22, 3086:21, 3088:1, 3090:18, 3093:7, 3094:15, 3098:19, 3100:5, 3101:25
**government's** [2] - 3073:6, 3075:2
**greater** [1] - 3105:12
**Greg** [8] - 3050:13, 3072:12, 3072:13, 3080:21, 3086:1, 3099:5, 3100:11, 3112:3
**GREGORY** [1] - 3023:6
**Gregory** [4] - 3025:5, 3026:17, 3099:23, 3103:7
**ground** [2] - 3073:20, 3108:7
**guarantee** [1] - 3072:16
**guess** [5] - 3051:8, 3094:20, 3094:25, 3109:17
**guide** [1] - 3113:7
**Gulland** [1] - 3023:14

## H

**half** [8] - 3049:17, 3056:5, 3092:17, 3092:22, 3112:25, 3113:4, 3113:6, 3114:20
**hallway** [1] - 3109:6
**hand** [3] - 3062:11, 3071:13, 3108:10
**handle** [2] - 3087:8, 3091:8
**handwriting** [1] - 3102:5
**happy** [3] - 3032:1, 3055:6, 3057:10
**hard** [4] - 3060:2, 3077:9, 3114:22, 3116:1
**Harvard** [3] - 3035:25, 3036:2, 3036:25
**Haskell** [2] - 3055:8, 3075:15
**hate** [1] - 3036:5
**Hawker** [2] - 3029:6, 3029:21, 3033:13, 3059:25
**Hawker's** [1] - 3030:21
**headed** [1] - 3115:15
**headline** [2] - 3038:25, 3077:9
**hear** [4] - 3046:4, 3046:17, 3086:19, 3102:18
**heard** [1] - 3094:22
**hearing** [1] - 3027:12
**held** [2] - 3067:22, 3067:23
**help** [19] - 3029:6, 3029:22, 3045:11, 3052:12, 3056:14, 3058:1, 3058:4, 3058:15, 3059:20, 3061:16, 3074:23,

3124

3079:16, 3080:8, 3089:15, 3089:20, 3093:2, 3093:4, 3101:15
**helped** [1] - 3044:1
**Hi** [1] - 3080:21
**hidden** [1] - 3074:13
**higher** [1] - 3105:12
**himself** [1] - 3056:13
**hire** [1] - 3059:21
**hired** [2] - 3059:11, 3065:11
**Hold** [1] - 3087:2
**hole** [2] - 3061:6, 3080:25
**home** [2] - 3049:21, 3111:7
**Honor** [7] - 3026:15, 3027:23, 3029:12, 3039:7, 3040:17, 3071:18, 3109:2
**HONORABLE** [1] - 3023:10
**hope** [1] - 3061:12, 3112:19
**Hopeful** [1] - 3092:11
**hospital** [1] - 3067:23
**Hotel** [1] - 3077:15
**hotels** [1] - 3044:18
**hour** [6] - 3026:13, 3049:17, 3112:25, 3113:4, 3113:5, 3113:6
**hourly** [1] - 3077:21
**hours** [3] - 3087:2, 3106:5, 3113:5
**hryvnias** [2] - 3064:19, 3103:16
**huge** [1] - 3052:14
**Human** [7] - 3103:20, 3103:25, 3104:1, 3104:13, 3104:14, 3105:5, 3107:16

## I

**idea** [5] - 3060:12, 3072:13, 3074:4, 3075:23, 3076:8
**ideally** [1] - 3093:19
**ideas** [1] - 3058:10
**Identify** [1] - 3056:7
**identifying** [1] - 3059:13
**identity** [4] - 3076:14, 3078:19, 3079:11, 3079:25
**ignoring** [1] - 3077:24
**III** [1] - 3023:23
**image** [2] - 3054:24, 3061:7
**immediately** [1] - 3076:24
**impeach** [1] - 3030:18
**implication** [1] - 3032:20
**implications** [1] - 3033:18
**implies** [1] - 3032:15
**impossible** [1] - 3110:23
**improved** [1] - 3058:10
**improving** [1] - 3054:23
**inclined** [1] - 3114:25
**include** [3] - 3054:14, 3078:21, 3085:16
**included** [1] - 3035:17
**includes** [4] - 3055:10, 3064:4, 3088:14, 3088:17
**including** [3] - 3077:15, 3109:7, 3115:25

**increase** [1] - 3101:5
**incurred** [4] - 3040:9, 3093:5, 3094:4, 3101:7
**indeed** [2] - 3095:17, 3101:12
**independence** [2] - 3072:14, 3072:17
**independent** [10] - 3027:7, 3027:8, 3027:21, 3027:22, 3028:3, 3060:8, 3060:11, 3061:1, 3069:3, 3096:10
**indicating** [1] - 3057:10
**individual** [5] - 3072:11, 3073:24, 3074:3, 3075:12, 3075:16
**individuals** [2] - 3056:11, 3063:4
**inform** [1] - 3114:11
**information** [5] - 3065:19, 3065:22, 3069:24, 3078:21, 3109:11
**initial** [3] - 3045:14, 3045:21, 3105:13
**initials** [1] - 3056:10
**input** [1] - 3068:18
**inquiry** [1] - 3096:11
**inside** [1] - 3053:1
**insight** [1] - 3035:21
**insist** [2] - 3115:1, 3115:2
**insisted** [1] - 3072:13
**inspected** [1] - 3106:4
**instead** [2] - 3062:14, 3084:21
**instruct** [4] - 3110:24, 3111:19, 3111:21, 3113:12
**instructed** [1] - 3111:22
**instruction** [4] - 3110:24, 3111:10, 3112:13, 3112:20
**instructions** [11] - 3087:23, 3088:17, 3097:2, 3097:13, 3097:16, 3097:18, 3110:22, 3111:1, 3111:6, 3112:18, 3116:6
**intending** [1] - 3039:6
**intention** [1] - 3041:5
**interest** [1] - 3077:25
**interested** [2] - 3051:18, 3054:23
**internal** [1] - 3058:7
**internally** [1] - 3055:2
**interview** [21] - 3028:13, 3028:18, 3028:23, 3028:25, 3029:1, 3029:5, 3035:20, 3037:5, 3037:14, 3037:19, 3065:15, 3065:18, 3066:3, 3066:7, 3066:18, 3067:24, 3071:3, 3071:5, 3074:7, 3079:19, 3106:20
**interviewed** [3] - 3028:10, 3070:20, 3106:12
**interviews** [2] - 3060:9, 3070:9
**investigation** [9] - 3054:17, 3057:17, 3057:21, 3058:8, 3058:10, 3058:20, 3066:14, 3068:18, 3068:20
**invoice** [4] - 3093:18, 3095:22, 3096:3, 3097:24
**involuntarily** [1] - 3079:12
**involved** [10] - 3047:5, 3051:19, 3054:6, 3054:19, 3059:6, 3074:10, 3074:17, 3076:4, 3106:1
**involvement** [1] - 3073:16
**issue** [17] - 3055:1, 3065:4, 3065:6,

3065:8, 3065:10, 3071:8, 3072:25, 3076:22, 3079:24, 3083:25, 3084:2, 3084:7, 3087:24, 3089:7, 3089:23, 3090:4, 3111:14
**issues** [12] - 3055:3, 3056:15, 3056:17, 3058:18, 3058:25, 3059:2, 3059:3, 3059:9, 3065:14, 3103:25, 3104:5, 3107:2
**items** [1] - 3055:19

## J

**JACKSON** [1] - 3023:10
**James** [1] - 3023:20
**Jason** [1] - 3023:17
**Jim** [1] - 3075:22
**Jonathan** [1] - 3059:25
**journalists** [1] - 3056:7
**JUDGE** [1] - 3023:11
**judge** [1] - 3114:9
**Judge** [1] - 3112:2
**judges** [3] - 3113:19, 3114:1, 3114:3
**July** [8] - 3093:13, 3096:14, 3099:7, 3099:8, 3100:15, 3100:17, 3106:19, 3107:9
**jumped** [1] - 3084:21
**June** [5] - 3050:24, 3071:15, 3071:17, 3079:17, 3096:14
**Junghans** [1] - 3023:23
**JUNGHANS** [5] - 3034:13, 3034:17, 3034:22, 3035:2, 3035:4
**juries** [1] - 3113:20
**JUROR** [2] - 3027:13, 3046:5
**jurors** [2] - 3026:11, 3085:8
**JURY** [2] - 3023:6, 3023:10
**jury** [21] - 3026:6, 3037:2, 3046:10, 3109:5, 3110:22, 3110:24, 3110:25, 3111:1, 3111:3, 3111:6, 3111:10, 3111:17, 3111:19, 3111:21, 3111:22, 3112:13, 3112:18, 3112:20, 3114:18, 3115:14, 3115:21
**Jury** [4] - 3026:10, 3109:12, 3115:20, 3116:13
**justice** [1] - 3059:7
**JUSTICE** [1] - 3023:17
**Justice** [24] - 3045:6, 3051:14, 3061:19, 3063:4, 3063:10, 3063:16, 3065:11, 3066:11, 3068:15, 3072:16, 3082:15, 3088:16, 3088:18, 3090:11, 3095:12, 3095:25, 3098:11, 3099:13, 3101:22, 3102:12, 3102:22, 3103:15, 3104:11, 3107:24
**justification** [2] - 3088:7, 3088:10

## K

**Kaneshiro** [2] - 3117:3, 3117:8
**KANESHIRO** [2] - 3024:2, 3117:9
**Kaneshiro-Miller** [2] - 3117:3, 3117:8
**KANESHIRO-MILLER** [2] - 3024:2,

3117:9
**Kedem** [7] - 3060:20, 3060:21, 3060:23, 3060:24, 3060:25, 3061:2
**keep** [4] - 3068:1, 3085:8, 3101:2, 3103:3
**keeps** [5] - 3031:22, 3034:11, 3034:15, 3081:19
**kept** [2] - 3062:7, 3074:13
**Kharkiv** [2] - 3067:19, 3067:21
**Kilimnik** [3] - 3046:21, 3047:1, 3047:5
**kind** [3] - 3049:18, 3069:3, 3073:19
**knock** [1] - 3116:10
**knowing** [1] - 3109:13
**knowledge** [2] - 3035:21, 3036:12
**known** [2] - 3068:23, 3070:7
**knows** [2] - 3046:10, 3077:23
**Konstantin** [2] - 3046:19, 3046:21
**Kyiv** [11] - 3046:20, 3046:23, 3049:16, 3052:9, 3052:10, 3052:15, 3052:24, 3078:8, 3082:21, 3094:7, 3108:8

# L

**labeled** [2] - 3030:16, 3031:9
**Labor** [2] - 3113:11, 3113:12
**ladies** [1] - 3037:2
**language** [1] - 3085:12
**largely** [1] - 3110:23
**larger** [1] - 3110:4
**last** [10] - 3056:6, 3057:15, 3060:7, 3064:6, 3064:8, 3080:22, 3085:22, 3090:2, 3106:18, 3106:23
**late** [2] - 3062:19, 3085:9
**Lavrynovych** [2] - 3044:24, 3095:13
**law** [17] - 3051:19, 3051:21, 3053:1, 3053:5, 3053:11, 3058:16, 3058:18, 3059:5, 3059:9, 3068:15, 3072:12, 3073:25, 3074:3, 3089:7, 3095:25, 3105:4, 3111:11
**lawyer** [3] - 3065:7, 3065:24, 3070:2
**lawyers** [9] - 3028:15, 3028:16, 3028:20, 3049:16, 3059:12, 3105:17, 3105:23, 3105:25, 3106:21
**lead** [1] - 3052:22
**leader** [1] - 3067:5
**learn** [3] - 3049:12, 3049:14, 3070:9
**learned** [5] - 3051:8, 3051:14, 3070:11, 3070:13, 3076:21
**least** [5] - 3052:23, 3077:18, 3078:21, 3111:8
**leave** [2] - 3049:20, 3050:1
**left** [4] - 3054:10, 3094:9, 3109:16, 3112:18
**legal** [4] - 3078:5, 3088:19, 3089:11, 3090:14
**letter** [43] - 3061:20, 3061:25, 3062:4, 3062:7, 3062:10, 3063:10, 3063:15, 3063:17, 3063:19, 3063:20, 3063:23, 3084:18, 3093:12, 3094:13, 3095:3, 3095:10, 3095:20, 3096:2, 3096:23,

3098:1, 3098:21, 3099:4, 3099:6, 3100:12, 3100:13, 3100:15, 3100:17, 3100:18, 3101:21, 3102:8, 3102:9, 3102:11, 3102:13, 3102:19, 3102:24, 3103:4, 3103:6, 3103:13, 3104:6, 3107:21, 3108:9, 3108:22
**letterhead** [2] - 3096:24, 3102:20
**letting** [1] - 3086:16
**lie** [1] - 3097:1
**light** [1] - 3110:20
**likelihood** [2] - 3109:18, 3111:22
**likely** [2] - 3109:19, 3109:20
**Limited** [1] - 3049:10
**limited** [1] - 3064:21
**limiting** [1] - 3064:16
**line** [6] - 3055:11, 3072:6, 3085:20, 3085:21, 3088:4, 3095:19
**lines** [1] - 3039:8
**listed** [1] - 3056:10
**listening** [1] - 3068:5
**litigation** [1] - 3055:18
**lives** [1] - 3049:19
**LLP** [2] - 3023:20, 3023:24
**local** [2] - 3064:18, 3064:22
**lodging** [2] - 3089:9, 3090:6
**logical** [1] - 3110:1
**logistics** [3] - 3043:17, 3044:15, 3044:17
**London** [1] - 3059:13
**London-based** [1] - 3059:13
**look** [59] - 3030:8, 3040:13, 3041:8, 3045:18, 3047:15, 3048:19, 3050:11, 3052:1, 3052:13, 3052:20, 3053:4, 3053:18, 3055:7, 3055:15, 3055:16, 3056:4, 3056:5, 3056:18, 3056:19, 3062:21, 3062:22, 3063:18, 3064:6, 3064:15, 3067:16, 3069:5, 3071:10, 3074:20, 3077:1, 3077:11, 3079:2, 3082:2, 3082:3, 3085:4, 3086:5, 3087:12, 3088:1, 3088:2, 3089:4, 3090:18, 3093:7, 3094:15, 3094:16, 3094:17, 3095:9, 3095:19, 3098:19, 3098:20, 3099:11, 3100:4, 3101:25, 3102:15, 3102:23, 3103:5, 3103:13, 3104:11, 3112:5, 3113:22, 3115:3
**looked** [7] - 3050:7, 3085:22, 3090:25, 3091:2, 3099:5, 3099:21, 3113:21
**looking** [4] - 3045:12, 3069:11, 3079:18, 3102:9
**Loucks** [6] - 3054:7, 3054:8, 3066:17, 3066:24, 3066:25, 3069:8
**loud** [2] - 3039:11, 3068:3
**louder** [1] - 3027:15
**love** [1] - 3111:18
**lucky** [1] - 3049:21
**lunch** [1] - 3085:9
**lurk** [1] - 3077:25
**lying** [1] - 3076:5
**Lyovochkin** [2] - 3087:19, 3087:22

# M

**mail** [58] - 3045:24, 3046:3, 3046:15, 3048:20, 3049:22, 3052:4, 3052:5, 3052:6, 3052:21, 3053:4, 3053:10, 3053:14, 3053:19, 3055:8, 3055:11, 3056:21, 3057:9, 3063:1, 3069:7, 3069:17, 3072:1, 3073:4, 3075:9, 3075:10, 3075:14, 3079:3, 3079:13, 3080:1, 3080:5, 3080:9, 3081:15, 3082:3, 3082:12, 3083:16, 3083:19, 3083:22, 3083:23, 3084:15, 3085:18, 3085:22, 3085:23, 3086:5, 3086:20, 3086:22, 3087:24, 3090:9, 3090:20, 3091:2, 3091:12, 3092:20, 3093:11, 3093:14, 3093:17, 3094:16, 3094:17, 3098:20, 3099:8
**mailed** [1] - 3067:16
**mails** [7] - 3069:13, 3071:14, 3071:16, 3079:17, 3090:21, 3090:25, 3091:16
**main** [3] - 3039:22, 3040:1, 3057:19
**major** [1] - 3053:1
**man** [1] - 3054:11
**manafort** [1] - 3095:2
**Manafort** [71] - 3041:5, 3041:18, 3043:5, 3043:6, 3043:7, 3043:18, 3043:23, 3043:24, 3044:1, 3044:13, 3044:14, 3044:16, 3044:20, 3045:1, 3045:2, 3046:2, 3046:3, 3048:14, 3048:16, 3049:7, 3049:9, 3050:8, 3051:6, 3054:23, 3056:13, 3056:22, 3058:6, 3058:14, 3058:25, 3072:2, 3073:5, 3073:11, 3078:24, 3079:8, 3079:15, 3080:2, 3080:7, 3082:4, 3082:10, 3082:12, 3082:18, 3083:21, 3084:15, 3085:18, 3087:3, 3087:12, 3087:24, 3088:2, 3089:14, 3089:18, 3091:7, 3092:1, 3092:13, 3092:21, 3093:9, 3094:12, 3097:3, 3098:8, 3098:10, 3098:17, 3099:4, 3100:3, 3100:11, 3101:20, 3102:9, 3102:13, 3107:8, 3107:25, 3108:3, 3108:4, 3108:6
**Manafort's** [1] - 3046:20
**managed** [1] - 3049:9
**marked** [1] - 3029:13
**materials** [1] - 3106:4
**Materials** [1] - 3103:18
**Matt** [1] - 3069:8
**matter** [6] - 3051:15, 3061:8, 3081:9, 3082:7, 3082:8, 3117:5
**McCullough** [1] - 3023:17
**MD** [1] - 3023:22
**mean** [1] - 3053:20
**meaning** [1] - 3057:17
**means** [5] - 3079:10, 3094:18, 3095:1, 3111:21, 3112:12
**mechanism** [3] - 3089:6, 3092:5, 3092:7
**media** [18] - 3030:4, 3030:9, 3030:22,

3126

3031:1, 3031:8, 3031:11, 3031:12, 3031:15, 3032:11, 3032:18, 3033:23, 3033:25, 3034:8, 3035:7, 3035:9, 3035:17, 3035:18, 3035:19
**Media** [1] - 3031:9
**meet** [1] - 3073:1
**meeting** [23] - 3036:1, 3036:3, 3036:25, 3037:3, 3037:6, 3042:1, 3043:1, 3043:2, 3043:3, 3045:14, 3045:16, 3046:4, 3046:17, 3049:5, 3049:17, 3051:17, 3065:24, 3066:2, 3067:18, 3075:21, 3075:23, 3076:7
**meetings** [5] - 3044:23, 3044:24, 3045:21, 3045:24, 3047:5
**members** [2] - 3109:5, 3115:21
**memorandum** [2] - 3056:21, 3057:18
**mention** [3] - 3083:18, 3097:5, 3097:9
**mentioned** [1] - 3083:15
**mentioning** [1] - 3080:21
**mere** [1] - 3077:13
**mess** [1] - 3061:3
**message** [1] - 3098:25
**met** [8] - 3042:18, 3046:22, 3046:24, 3047:1, 3048:21, 3051:13, 3066:4, 3089:11
**Michael** [8] - 3053:23, 3054:3, 3054:7, 3054:8, 3059:16, 3067:6, 3067:18
**microphone** [2] - 3027:11, 3027:17
**mid** [1] - 3101:16
**mid-August** [1] - 3101:16
**middle** [2] - 3073:19, 3091:23
**might** [15] - 3048:10, 3057:1, 3058:10, 3061:17, 3070:9, 3070:11, 3070:13, 3071:12, 3073:1, 3073:20, 3075:12, 3075:15, 3081:16, 3083:8, 3115:5
**mind** [2] - 3091:21, 3112:22
**minimal** [2] - 3089:11, 3090:14
**Minister** [1] - 3095:12
**minister** [1] - 3095:21
**ministry** [1] - 3105:2
**Ministry** [27] - 3045:6, 3051:13, 3053:2, 3061:19, 3063:4, 3063:10, 3063:16, 3065:10, 3066:11, 3066:16, 3068:15, 3072:15, 3082:14, 3088:15, 3088:18, 3090:10, 3095:25, 3098:10, 3099:12, 3099:20, 3102:12, 3102:12, 3102:22, 3103:15, 3104:11, 3107:24, 3108:7
**minute** [1] - 3091:18
**minutes** [2] - 3109:9, 3109:23
**mistaken** [1] - 3100:12
**modifications** [1] - 3107:19
**modified** [1] - 3108:24

**MOJ** [7] - 3082:15, 3088:8, 3099:6, 3100:13, 3100:14, 3100:16, 3100:18
**Molly** [1] - 3023:14
**moment** [2] - 3084:20, 3096:22
**Monday** [3] - 3114:15, 3114:21, 3115:2
**money** [11] - 3039:23, 3041:16, 3042:14, 3042:19, 3043:17, 3048:17, 3049:8, 3050:1, 3051:7, 3101:3
**month** [3] - 3048:25, 3092:16, 3096:15
**months** [2] - 3052:15, 3096:14
**morning** [5] - 3026:24, 3038:6, 3038:7, 3039:18, 3111:3, 3111:23, 3112:20, 3113:16, 3113:17, 3114:13, 3115:7, 3116:1, 3116:4, 3116:9, 3116:15
**most** [1] - 3113:3
**motions** [1] - 3114:10
**motives** [2] - 3037:25, 3038:18
**move** [8] - 3039:17, 3040:18, 3071:19, 3082:21, 3084:13, 3091:16, 3092:9, 3115:6
**moved** [1] - 3029:14
**moving** [1] - 3046:18
**MR** [91] - 3026:15, 3026:21, 3027:14, 3027:18, 3027:19, 3027:23, 3028:2, 3029:12, 3029:17, 3030:17, 3031:5, 3031:18, 3031:20, 3031:21, 3031:25, 3032:3, 3032:10, 3032:16, 3032:24, 3033:6, 3033:9, 3033:19, 3034:1, 3034:6, 3035:12, 3035:14, 3036:18, 3036:23, 3038:3, 3038:7, 3038:8, 3039:2, 3039:6, 3039:10, 3039:14, 3040:17, 3040:20, 3040:22, 3040:25, 3043:19, 3043:20, 3043:22, 3046:7, 3046:13, 3046:14, 3057:14, 3068:1, 3068:8, 3068:9, 3071:18, 3071:21, 3071:25, 3075:1, 3075:5, 3075:8, 3081:21, 3081:23, 3085:15, 3086:7, 3086:15, 3086:19, 3086:25, 3089:25, 3090:3, 3090:8, 3090:12, 3100:7, 3100:9, 3109:15, 3109:24, 3110:2, 3110:9, 3110:12, 3110:16, 3110:18, 3110:21, 3112:1, 3112:2, 3112:9, 3112:15, 3112:24, 3113:2, 3113:18, 3113:24, 3114:2, 3114:4, 3114:12, 3114:17, 3115:3, 3115:5, 3115:11
**MS** [5] - 3034:13, 3034:17, 3034:22, 3035:2, 3035:4
**MURPHY** [1] - 3114:4
**Murphy** [1] - 3023:20
**Murphy's** [1] - 3111:3
**muster** [1] - 3113:13

# N

**name** [4] - 3046:21, 3073:15, 3079:24, 3101:11
**necessarily** [1] - 3111:20
**necessary** [4] - 3072:8, 3105:22, 3105:25, 3110:20

**need** [10] - 3040:10, 3053:10, 3079:4, 3080:23, 3086:2, 3094:1, 3099:6, 3099:9, 3100:15, 3106:4
**needed** [2] - 3101:23, 3105:15
**needs** [3] - 3030:18, 3073:13, 3100:18
**negotiated** [1] - 3104:10
**never** [9] - 3031:1, 3032:12, 3037:15, 3046:22, 3061:19, 3066:20, 3077:24, 3100:1, 3114:24
**new** [8] - 3093:2, 3093:4, 3105:6, 3105:16, 3105:17, 3106:13, 3107:15, 3107:17
**New** [3] - 3029:7, 3029:22, 3035:16
**news** [5] - 3086:1, 3092:4, 3115:21, 3115:22, 3115:23
**newspapers** [1] - 3056:7
**next** [15] - 3033:15, 3050:24, 3053:21, 3056:6, 3057:15, 3076:5, 3080:16, 3085:24, 3086:5, 3086:24, 3088:25, 3100:10, 3102:15, 3102:23, 3103:2
**next-to-last** [1] - 3056:6
**night** [2] - 3077:16, 3080:22
**nightmare** [2] - 3061:15, 3093:3
**nominal** [2] - 3048:1
**non** [1] - 3079:9
**non-voluntarily** [1] - 3079:9
**none** [1] - 3077:14
**note** [4] - 3033:2, 3063:11, 3099:7, 3102:16
**noted** [2] - 3089:9, 3090:6
**notes** [1] - 3056:16
**nothing** [1] - 3083:15
**nowhere** [1] - 3098:1
**number** [3] - 3037:24, 3040:15, 3109:15
**numbers** [1] - 3042:25
**numerical** [1] - 3075:4
**NW** [4] - 3023:15, 3023:18, 3023:24, 3024:3

# O

**objected** [1] - 3062:5
**objection** [17] - 3027:23, 3030:17, 3031:18, 3032:3, 3032:21, 3032:24, 3038:3, 3039:2, 3040:19, 3040:20, 3040:21, 3040:22, 3043:19, 3071:20, 3071:21, 3081:21, 3089:25
**observations** [1] - 3058:7
**obvious** [1] - 3034:22
**obviously** [2] - 3027:4, 3027:21
**occasion** [1] - 3036:9
**occasions** [1] - 3036:11
**occurred** [1] - 3051:9
**October** [1] - 3028:10
**OF** [6] - 3023:2, 3023:4, 3023:10, 3023:15, 3023:17, 3117:1
**offered** [1] - 3041:18
**office** [5] - 3052:15, 3052:23, 3053:24, 3077:19, 3091:25

3127

**Office** [16] - 3028:16, 3030:1, 3030:4, 3033:13, 3036:13, 3036:16, 3037:5, 3037:15, 3038:18, 3039:4, 3051:20, 3055:21, 3058:19, 3059:7, 3059:18, 3059:21

**OFFICE** [1] - 3023:14
**Officer** [1] - 3026:7
**OFFICIAL** [1] - 3117:1
**official** [1] - 3092:14
**officials** [3] - 3044:25, 3047:6, 3108:7
**omissions** [1] - 3028:6
**once** [2] - 3042:1, 3044:19
**one** [44] - 3026:5, 3026:12, 3029:1, 3031:22, 3032:24, 3035:16, 3039:25, 3040:3, 3042:3, 3043:14, 3043:16, 3046:1, 3055:4, 3055:19, 3056:10, 3057:19, 3058:17, 3060:7, 3062:5, 3064:1, 3064:3, 3069:11, 3069:12, 3069:14, 3071:13, 3075:3, 3077:18, 3077:20, 3077:23, 3083:3, 3084:4, 3084:20, 3089:4, 3092:14, 3092:17, 3092:24, 3098:21, 3099:2, 3101:16, 3106:18, 3106:19, 3106:21, 3112:3
**open** [4] - 3035:13, 3036:22, 3052:14, 3115:19
**opened** [1] - 3113:5
**opening** [1] - 3052:22
**opinions** [1] - 3088:20
**opportunity** [2] - 3028:22, 3065:15
**opposition** [1] - 3089:10
**opposition's** [1] - 3089:23
**order** [3] - 3066:2, 3075:4, 3101:23
**ordinary** [1] - 3116:9
**oriented** [1] - 3090:24
**orienting** [1] - 3091:15
**Original** [1] - 3098:25
**original** [4] - 3099:20, 3103:4, 3104:9, 3107:6
**originally** [2] - 3104:25, 3105:12
**outcome** [1] - 3044:20
**outlined** [1] - 3100:14
**outstanding** [9] - 3066:12, 3093:5, 3095:22, 3096:1, 3096:3, 3096:15, 3096:19, 3097:12, 3106:22
**overlap** [1] - 3104:18
**overruled** [1] - 3090:1
**overrun** [5] - 3089:21, 3093:5, 3101:1, 3101:2, 3101:15
**own** [1] - 3114:25

## P

**p.m** [3] - 3026:2, 3113:10, 3113:17
**PAGE** [1] - 3025:10
**page** [20] - 3029:18, 3030:8, 3030:11, 3030:13, 3038:23, 3041:8, 3052:2, 3052:4, 3053:21, 3055:16, 3056:4, 3063:18, 3063:19, 3064:6, 3064:7, 3064:8, 3091:23, 3102:15, 3102:23, 3103:2

**paid** [5] - 3064:16, 3075:16, 3077:14, 3077:22, 3101:8
**paragraph** [7] - 3030:15, 3057:9, 3088:25, 3090:2, 3099:17, 3106:23
**paraphrase** [1] - 3034:4
**part** [7] - 3035:19, 3043:12, 3061:11, 3065:23, 3078:21, 3090:9, 3104:9
**participants** [1] - 3115:25
**particular** [1] - 3078:13
**particularly** [1] - 3058:19
**parties** [1] - 3109:10
**partner** [2] - 3053:24, 3063:12
**partners** [2] - 3077:19, 3077:20
**party** [11] - 3063:24, 3073:23, 3074:2, 3074:10, 3074:16, 3076:3, 3076:15, 3078:5, 3078:10, 3078:19, 3079:24
**pass** [1] - 3063:14
**past** [1] - 3026:13
**Patricia** [2] - 3117:3, 3117:8
**PATRICIA** [2] - 3024:2, 3117:9
**Paul** [2] - 3048:21, 3058:6
**Paula** [1] - 3023:23
**Pause** [2] - 3026:9, 3069:20
**Pause]** [1] - 3084:20
**pave** [1] - 3066:2
**pay** [3] - 3041:15, 3048:1, 3093:4
**paying** [10] - 3047:20, 3047:22, 3051:6, 3065:8, 3071:8, 3075:24, 3076:11, 3076:12, 3076:13, 3077:23
**payment** [13] - 3048:11, 3048:13, 3065:20, 3075:12, 3080:22, 3091:5, 3092:5, 3092:7, 3092:8, 3097:14, 3098:12, 3101:24, 3108:1
**payments** [15] - 3048:14, 3049:6, 3050:22, 3051:2, 3051:4, 3088:5, 3088:11, 3088:22, 3095:23, 3096:1, 3096:19, 3097:4, 3097:5, 3097:10, 3100:24
**payor** [7] - 3063:24, 3074:2, 3076:15, 3078:5, 3078:10, 3078:19, 3079:25
**Pennsylvania** [1] - 3023:18
**people** [1] - 3089:10
**per** [3] - 3077:16, 3092:16, 3096:15
**Per** [1] - 3088:6
**percent** [1] - 3115:12
**perform** [1] - 3106:24
**perhaps** [1] - 3060:13
**period** [1] - 3052:23
**periodicals** [1] - 3056:7
**permissible** [1] - 3114:6
**person** [4] - 3043:13, 3063:5, 3075:21, 3113:7
**personal** [1] - 3114:25
**personally** [1] - 3110:25
**personnel** [1] - 3051:13
**phone** [2] - 3079:14, 3080:5
**phones** [1] - 3109:7
**physically** [1] - 3114:21
**pick** [1] - 3116:3

**piece** [3] - 3042:9, 3042:12, 3042:15
**Pinchuk** [28] - 3042:2, 3042:19, 3042:23, 3043:1, 3043:13, 3044:23, 3045:13, 3049:4, 3049:5, 3051:6, 3073:16, 3073:18, 3076:13, 3078:19, 3079:8, 3079:10, 3079:19, 3080:8, 3080:25, 3082:14, 3083:3, 3083:8, 3084:3, 3084:4, 3084:7, 3101:5, 3101:10, 3101:14
**Pinchuk's** [4] - 3048:17, 3049:8, 3079:24, 3083:18
**place** [4] - 3028:18, 3028:25, 3037:7, 3116:15
**plan** [23] - 3030:4, 3030:9, 3030:22, 3031:1, 3031:3, 3031:8, 3031:9, 3031:11, 3031:12, 3031:15, 3032:8, 3032:11, 3032:18, 3033:16, 3033:23, 3033:25, 3034:8, 3035:8, 3035:9, 3035:15, 3035:17, 3035:18, 3035:19
**planned** [1] - 3105:12
**planning** [4] - 3079:18, 3106:16, 3110:8, 3110:10
**play** [1] - 3114:24
**pleasant** [1] - 3116:12
**plenty** [1] - 3106:2
**plug** [2] - 3070:24, 3107:12
**plus** [1] - 3077:20
**point** [20] - 3029:15, 3030:19, 3031:24, 3033:20, 3033:22, 3036:16, 3045:1, 3056:6, 3057:10, 3058:22, 3061:10, 3069:25, 3070:20, 3080:9, 3092:14, 3104:17, 3106:1, 3107:16, 3110:1, 3111:18
**points** [4] - 3056:5, 3059:19, 3059:23, 3073:14
**policy** [1] - 3075:25
**position** [1] - 3111:14
**possibility** [2] - 3081:8, 3106:22
**possible** [5] - 3041:21, 3082:21, 3109:18, 3111:10, 3115:7
**possibly** [1] - 3114:8
**Post** [1] - 3078:8
**potential** [3] - 3052:25, 3071:5, 3106:19
**powerful** [1] - 3054:11
**PR** [4] - 3054:24, 3056:15, 3056:17, 3061:3
**Pratt** [1] - 3023:21
**pray** [1] - 3112:17
**preceded** [2] - 3032:17, 3032:18
**precise** [1] - 3045:23
**predicate** [1] - 3036:17
**predict** [1] - 3060:18
**prediction** [1] - 3076:25
**prefaced** [1] - 3034:7
**preliminary** [7] - 3041:9, 3044:2, 3044:5, 3044:10, 3044:11, 3044:12, 3064:1
**prepare** [1] - 3028:22
**prepared** [2] - 3072:19, 3072:22

3128

**preparing** [2] - 3060:8, 3096:10
**present** [4] - 3026:10, 3109:12, 3115:20, 3116:13
**President** [1] - 3087:19
**press** [4] - 3076:24, 3079:25, 3081:1, 3089:16
**pressing** [1] - 3082:22
**pressure** [1] - 3086:3
**previously** [1] - 3038:2
**price** [2] - 3064:16, 3099:18
**prices** [1] - 3077:16
**primary** [1] - 3040:2
**prison** [3] - 3058:9, 3067:21, 3067:23
**private** [2] - 3075:12, 3075:16
**problem** [5] - 3034:13, 3048:23, 3065:23, 3081:16, 3112:12
**Procedure** [1] - 3088:4
**procedure** [11] - 3088:7, 3088:10, 3088:18, 3088:21, 3089:18, 3090:10, 3100:14, 3100:17, 3100:22, 3100:23, 3101:23
**proceed** [3] - 3026:3, 3026:14, 3066:3
**proceedings** [1] - 3117:5
**Proceedings** [2] - 3024:5, 3116:16
**process** [7] - 3038:1, 3052:19, 3059:12, 3060:9, 3065:1, 3088:7, 3096:9
**Procurator** [5] - 3051:17, 3051:20, 3058:19, 3059:7, 3059:18
**procurement** [1] - 3065:1
**produced** [1] - 3024:6
**professional** [2] - 3081:10, 3096:6
**Project** [12] - 3053:20, 3053:22, 3054:6, 3054:18, 3054:20, 3055:17, 3058:13, 3058:23, 3067:17, 3070:25, 3104:13, 3107:12
**project** [28] - 3039:19, 3039:23, 3042:7, 3042:13, 3042:24, 3045:17, 3047:8, 3047:10, 3048:4, 3050:17, 3050:18, 3050:20, 3051:11, 3051:19, 3051:22, 3052:14, 3053:5, 3054:14, 3060:1, 3066:14, 3068:16, 3068:17, 3068:19, 3072:13, 3074:4, 3087:19, 3106:10, 3108:8
**projects** [1] - 3053:1
**promised** [4] - 3050:1, 3050:3, 3083:3, 3084:4
**pronounce** [1] - 3064:18
**proposal** [2] - 3058:7, 3087:22
**proposed** [1] - 3063:20
**proposes** [1] - 3087:16
**prosecution** [2] - 3066:9, 3066:12
**Prosecutor** [4] - 3054:10, 3055:20, 3056:2, 3059:20
**prosecutorial** [1] - 3053:24
**proves** [1] - 3033:3
**provide** [2] - 3058:24, 3095:22
**provided** [1] - 3065:20
**providing** [2] - 3055:20, 3088:19
**provision** [1] - 3062:5

**Pshonka** [1] - 3044:23
**public** [8] - 3055:21, 3056:2, 3061:7, 3061:15, 3069:24, 3070:14, 3077:24, 3093:2
**publicly** [5] - 3068:22, 3070:7, 3076:22, 3078:21, 3101:11
**publish** [2] - 3060:14, 3060:15
**pull** [1] - 3056:6
**pulled** [3] - 3070:24, 3070:25, 3107:12
**purchasing** [1] - 3088:19
**pure** [1] - 3076:23
**purpose** [1] - 3043:14
**purposes** [3] - 3029:13, 3097:13, 3099:9
**purse** [1] - 3048:16
**pursuant** [7] - 3030:4, 3030:22, 3031:11, 3031:14, 3032:8, 3033:16, 3035:2
**pursuing** [2] - 3047:4, 3086:2
**put** [8] - 3062:24, 3071:23, 3080:25, 3087:7, 3099:7, 3102:19, 3108:14, 3108:17
**putting** [1] - 3087:17

## Q

**quarter** [4] - 3092:17, 3092:24, 3093:18, 3096:16
**questions** [34] - 3026:24, 3030:9, 3030:18, 3031:7, 3032:17, 3034:7, 3034:14, 3034:20, 3034:21, 3035:25, 3036:2, 3036:3, 3036:15, 3037:10, 3037:25, 3038:3, 3038:9, 3038:10, 3038:15, 3039:18, 3059:10, 3061:18, 3065:17, 3072:21, 3073:2, 3074:8, 3074:15, 3103:21, 3103:25, 3104:7, 3104:15, 3104:21, 3104:23, 3110:20
**quibble** [2] - 3034:3, 3035:6
**quick** [1] - 3062:21
**quite** [3] - 3068:13, 3070:23, 3075:5
**quote** [1] - 3033:17
**quotes** [1] - 3077:20

## R

**raised** [6] - 3035:1, 3065:8, 3103:21, 3104:1, 3104:7, 3104:21
**raising** [2] - 3065:10, 3065:14
**rate** [1] - 3077:21
**re** [3] - 3093:13, 3095:3, 3095:19
**reach** [1] - 3082:18
**reached** [6] - 3034:25, 3081:24, 3082:5, 3082:10, 3114:9, 3114:23
**reaching** [1] - 3081:19
**read** [30] - 3029:11, 3031:17, 3031:20, 3031:23, 3032:1, 3033:11, 3039:1, 3039:3, 3039:7, 3039:10, 3056:8, 3069:18, 3072:9, 3072:10, 3072:23, 3072:24, 3075:14, 3078:2, 3078:3, 3087:10, 3087:11, 3087:14, 3089:12,

3091:18, 3094:8, 3100:19, 3100:20, 3111:12, 3113:14, 3114:6
**reading** [6] - 3030:17, 3032:21, 3034:3, 3091:12, 3091:13, 3103:17
**reads** [3] - 3055:11, 3072:6, 3103:13
**ready** [4] - 3026:3, 3086:3, 3110:13, 3116:10
**really** [8] - 3043:7, 3049:18, 3079:4, 3080:23, 3081:13, 3085:3, 3111:14, 3113:3
**reason** [5] - 3039:22, 3040:1, 3040:2, 3066:17, 3101:9
**reasons** [4] - 3039:18, 3039:25, 3040:3, 3067:7
**rebuttal** [3] - 3110:10, 3111:21, 3113:9
**rebutting** [1] - 3113:10
**receive** [3] - 3041:22, 3086:22, 3086:23
**received** [3] - 3056:21, 3071:15, 3115:22
**recognize** [6] - 3090:20, 3091:18, 3102:5, 3114:1, 3114:3, 3114:5
**recollection** [4] - 3039:4, 3042:22, 3074:19, 3098:18
**recollections** [1] - 3037:3
**recommend** [1] - 3057:2
**recommended** [1] - 3059:17
**recommends** [1] - 3107:1
**reconvene** [2] - 3111:9, 3112:20
**record** [3] - 3068:4, 3080:18, 3117:4
**RECROSS** [1] - 3025:4
**REDIRECT** [1] - 3025:4
**refer** [1] - 3055:6
**reference** [3] - 3054:4, 3063:24, 3088:25, 3099:17
**reference)** [1] - 3063:17
**references** [1] - 3090:7
**referring** [4] - 3034:18, 3090:2, 3092:7, 3098:23
**refers** [1] - 3087:18
**reflecting** [1] - 3056:1
**refresh** [1] - 3098:18
**refreshes** [1] - 3039:4
**regard** [3] - 3035:23, 3063:13, 3105:17
**regarding** [1] - 3100:11
**regards** [1] - 3043:11
**regret** [1] - 3114:11
**reimbursement** [1] - 3107:4
**related** [6] - 3058:16, 3059:3, 3059:4, 3087:24, 3104:20, 3106:12
**relates** [5] - 3079:17, 3079:20, 3079:21, 3083:5
**relating** [1] - 3103:18
**relations** [4] - 3055:21, 3056:3, 3061:15, 3093:2
**relative** [1] - 3114:4
**release** [2] - 3074:5, 3111:3
**released** [2] - 3072:7, 3114:15
**remember** [13] - 3036:2, 3037:6,

3129

3037:7, 3038:15, 3038:17, 3042:20,
3045:23, 3047:14, 3052:16, 3055:25,
3062:16, 3091:2, 3094:25
   **rendered** [5] - 3093:19, 3093:23,
3094:2, 3095:24, 3096:13
   **report** [47] - 3026:25, 3027:5, 3027:21,
3028:3, 3029:7, 3029:22, 3030:5,
3030:7, 3030:21, 3031:4, 3035:18,
3037:16, 3038:14, 3038:20, 3038:25,
3044:20, 3045:1, 3051:15, 3052:11,
3054:17, 3055:12, 3058:13, 3058:23,
3060:8, 3060:11, 3060:14, 3060:15,
3060:17, 3060:18, 3061:1, 3068:12,
3068:20, 3068:21, 3069:3, 3069:25,
3070:3, 3070:16, 3074:5, 3075:16,
3076:16, 3078:22, 3081:10, 3095:5,
3096:10, 3096:21, 3107:10, 3107:19
   **Report** [7] - 3030:25, 3031:11,
3031:16, 3032:9, 3035:22, 3068:23,
3104:13
   **reported** [5] - 3024:5, 3047:7, 3047:9,
3047:13, 3048:7
   **REPORTER** [1] - 3117:1
   **Reporter** [1] - 3024:2
   **reporting** [1] - 3044:19
   **reports** [1] - 3037:17
   **representation** [2] - 3055:12, 3055:16
   **representatives** [1] - 3077:17
   **represented** [1] - 3028:20
   **reputation** [1] - 3068:11
   **request** [3] - 3030:21, 3107:9, 3107:23
   **requested** [1] - 3101:4
   **require** [3] - 3052:14, 3105:11, 3106:5
   **required** [1] - 3072:14
   **research** [2] - 3100:11, 3116:7
   **resend** [1] - 3093:12
   **resolve** [2] - 3081:16, 3081:18
   **resolved** [1] - 3074:12
   **resolving** [1] - 3079:23
   **resources** [2] - 3072:13, 3074:4
   **respect** [3] - 3061:9, 3110:14, 3111:11
   **respectfully** [1] - 3106:24
   **respond** [8] - 3079:7, 3083:21, 3087:1,
3087:3, 3087:5, 3087:13, 3092:19,
3099:3
   **responded** [8] - 3050:8, 3050:12,
3053:18, 3073:5, 3075:20, 3082:23,
3083:25, 3100:4
   **responding** [2] - 3097:2, 3107:9
   **responds** [1] - 3094:6
   **response** [4] - 3072:21, 3078:12,
3087:15, 3099:4
   **responses** [1] - 3091:17
   **responsible** [1] - 3056:11
   **rest** [1] - 3116:5
   **result** [1] - 3110:5
   **resume** [3] - 3026:4, 3112:6, 3114:15
   **retainer** [5] - 3041:1, 3043:23, 3044:4,
3050:2, 3096:5
   **review** [2] - 3041:2, 3106:14

   **reviewed** [1] - 3106:12
   **revised** [1] - 3108:9
   **Rights** [7] - 3103:20, 3103:25, 3104:2,
3104:13, 3104:15, 3105:5, 3107:16
   **risk** [1] - 3066:13
   **RMR** [1] - 3024:2
   **role** [2] - 3079:11, 3103:22
   **rolled** [1] - 3035:22
   **rollout** [1] - 3035:23
   **Room** [1] - 3024:2
   **rule** [16] - 3051:19, 3051:21, 3053:1,
3053:5, 3053:11, 3058:16, 3058:18,
3059:5, 3059:9, 3068:15, 3072:12,
3073:25, 3074:3, 3095:25, 3105:4,
3114:6
   **rule-of-law** [15] - 3051:19, 3051:21,
3053:1, 3053:5, 3053:11, 3058:16,
3058:18, 3059:5, 3059:9, 3068:15,
3072:12, 3073:25, 3074:3, 3095:25,
3105:4
   **rules** [3] - 3113:21, 3113:22, 3113:23
   **running** [1] - 3083:9
   **Russian** [3] - 3086:3, 3092:5, 3095:6

## S

   **Sanchez** [2] - 3023:13, 3034:23
   **SANCHEZ** [61] - 3026:15, 3026:21,
3027:14, 3027:18, 3027:19, 3028:2,
3029:12, 3029:17, 3031:5, 3031:21,
3031:25, 3032:10, 3032:16, 3033:19,
3034:1, 3034:6, 3035:12, 3035:14,
3036:18, 3036:23, 3038:7, 3038:8,
3039:6, 3039:14, 3040:17, 3040:25,
3043:20, 3043:22, 3046:7, 3046:13,
3046:14, 3057:14, 3068:1, 3068:8,
3068:9, 3071:18, 3071:25, 3075:1,
3075:5, 3075:8, 3081:23, 3085:15,
3086:15, 3086:25, 3090:3, 3090:8,
3090:12, 3100:7, 3100:9, 3109:15,
3109:24, 3110:2, 3110:12, 3110:16,
3110:18, 3110:21, 3112:1, 3112:24,
3113:2, 3113:18, 3114:12
   **sanger** [5] - 3029:7, 3030:5, 3030:7,
3031:4, 3035:16
   **Sanger** [3] - 3029:22, 3030:25,
3031:16
   **sat** [3] - 3107:22, 3108:5, 3108:9
   **satisfied** [1] - 3074:10
   **satisfy** [2] - 3097:3, 3101:6
   **saw** [4] - 3091:16, 3098:21, 3099:2,
3112:9
   **scanned** [2] - 3094:18, 3098:22
   **scanning** [1] - 3094:24
   **schedule** [3] - 3048:13, 3115:17,
3116:10
   **scheduling** [2] - 3109:11, 3110:4
   **Schoen** [18] - 3041:6, 3042:5, 3042:9,
3042:18, 3048:8, 3048:10, 3082:6,
3082:11, 3082:19, 3082:25, 3083:7,

3083:13, 3086:1, 3101:3, 3101:4,
3101:10, 3101:13, 3101:17
   **Schoen/Pinchuk** [3] - 3087:6, 3091:1,
3091:3
   **scope** [3] - 3044:10, 3051:10, 3054:13
   **screen** [13] - 3029:16, 3045:19,
3046:10, 3057:12, 3062:24, 3069:12,
3069:14, 3071:23, 3079:3, 3084:24,
3086:16, 3102:3, 3102:4
   **scrolling** [1] - 3090:23
   **Sea** [2] - 3049:10, 3049:14
   **seal** [1] - 3063:12
   **second** [15] - 3026:5, 3026:8, 3045:16,
3049:5, 3051:20, 3052:12, 3054:14,
3055:16, 3056:23, 3066:9, 3066:12,
3066:16, 3068:16, 3083:20, 3085:5
   **secretary** [1] - 3108:12
   **Section** [1] - 3105:11
   **Security** [1] - 3026:7
   **see** [24] - 3032:1, 3033:10, 3038:25,
3039:3, 3045:11, 3046:5, 3046:15,
3047:17, 3057:6, 3057:15, 3064:9,
3073:22, 3074:23, 3083:8, 3085:6,
3085:14, 3086:20, 3088:9, 3092:15,
3099:1, 3099:14, 3109:6, 3110:3,
3116:9
   **self** [1] - 3080:24
   **self-defeating** [1] - 3080:24
   **send** [7] - 3041:5, 3044:9, 3044:14,
3093:22, 3093:25, 3094:12, 3095:4,
3097:20, 3098:24, 3102:11, 3111:6
   **sending** [1] - 3052:16
   **sends** [1] - 3093:11
   **sent** [25] - 3041:2, 3043:23, 3044:12,
3046:15, 3062:11, 3071:15, 3072:2,
3079:13, 3088:7, 3088:15, 3093:13,
3093:15, 3094:18, 3096:3, 3097:22,
3097:23, 3097:24, 3098:22, 3099:5,
3099:6, 3099:23, 3099:25, 3102:13,
3107:22
   **sentence** [7] - 3031:24, 3032:15,
3032:20, 3032:22, 3057:15, 3087:7,
3091:8
   **sentencing** [1] - 3096:12
   **September** [1] - 3107:11
   **sequence** [1] - 3051:2
   **Serhiy** [2] - 3087:19, 3087:21
   **series** [2] - 3056:5, 3085:12
   **serious** [1] - 3048:23
   **serve** [1] - 3095:24
   **services** [6] - 3088:19, 3093:18,
3093:23, 3094:2, 3095:23, 3096:13
   **Session** [1] - 3023:6
   **SESSION** [2] - 3023:10, 3026:1
   **set** [4] - 3035:9, 3041:9, 3047:5,
3106:25
   **sets** [1] - 3100:13
   **setting** [1] - 3095:22
   **settling** [1] - 3107:1
   **shall** [2] - 3075:24, 3099:18

**share** [1] - 3058:11
**short** [3] - 3083:10, 3109:2, 3109:4
**shorthand** [1] - 3024:5
**shots** [3] - 3043:8, 3043:9, 3043:11
**show** [4] - 3033:2, 3033:24, 3071:9, 3083:22
**shown** [4] - 3030:10, 3030:16, 3031:9, 3032:18
**side** [3] - 3049:19, 3077:23, 3113:4
**sign** [9] - 3062:2, 3062:7, 3062:9, 3062:12, 3062:15, 3063:16, 3085:12, 3094:9, 3101:20
**signal** [1] - 3046:11
**signals** [1] - 3085:10
**signature** [7] - 3063:12, 3064:9, 3064:11, 3095:17, 3095:18, 3103:7, 3103:8
**signed** [15] - 3053:19, 3053:22, 3061:19, 3061:21, 3061:22, 3061:24, 3062:18, 3063:10, 3063:15, 3064:5, 3064:12, 3064:20, 3095:14, 3103:9, 3103:10
**signing** [2] - 3062:14, 3096:23
**similarly** [1] - 3027:20
**simply** [1] - 3107:18
**sincere** [1] - 3112:19
**sit** [4] - 3045:10, 3113:20, 3114:14, 3114:19
**situation** [3] - 3061:3, 3080:22, 3113:9
**six** [1] - 3052:15
**Skadden** [40] - 3030:25, 3031:11, 3031:15, 3032:9, 3035:22, 3039:24, 3052:22, 3053:20, 3053:22, 3054:4, 3055:2, 3063:11, 3065:8, 3066:9, 3068:11, 3068:23, 3071:8, 3072:15, 3077:7, 3077:12, 3077:17, 3077:22, 3077:23, 3079:22, 3083:5, 3084:9, 3089:1, 3089:9, 3089:10, 3089:23, 3090:6, 3091:5, 3093:3, 3097:21, 3103:14, 3103:20, 3104:6, 3105:2, 3106:23, 3108:2
**Skadden's** [3] - 3072:16, 3095:24, 3096:24
**Skudder** [7] - 3053:19, 3053:23, 3054:1, 3054:3, 3054:4, 3054:6
**SL** [3] - 3086:2, 3087:16, 3087:18
**Slattery** [10] - 3065:25, 3066:4, 3066:5, 3072:20, 3074:6, 3074:9, 3074:14, 3075:22, 3076:15, 3078:10
**Sloan** [16] - 3041:2, 3047:18, 3047:21, 3052:5, 3053:4, 3053:8, 3066:4, 3067:16, 3069:9, 3072:4, 3078:13, 3079:4, 3080:16, 3080:20, 3084:8, 3084:10
**Sloan's** [1] - 3053:3
**solve** [1] - 3065:23
**solving** [1] - 3061:15
**someone** [3] - 3073:20, 3077:22, 3085:9
**soon** [2] - 3080:23, 3082:21

**sorry** [12] - 3058:3, 3060:22, 3060:24, 3067:6, 3068:1, 3084:21, 3084:24, 3092:24, 3099:17, 3102:18, 3105:24, 3114:2
**sort** [1] - 3100:21
**sound** [1] - 3111:24
**sounds** [3] - 3053:10, 3057:5, 3062:20
**source** [1] - 3081:9
**SPAEDER** [2] - 3023:20, 3023:24
**speaking** [1] - 3073:11
**Special** [11] - 3028:16, 3029:25, 3030:3, 3030:6, 3033:13, 3036:13, 3036:16, 3037:5, 3037:14, 3038:17, 3039:5
**specialists** [1] - 3105:11
**specific** [3] - 3055:5, 3055:6, 3065:7
**specifically** [4] - 3033:10, 3040:10, 3075:13, 3083:5
**speculation** [2] - 3076:23, 3077:22
**spending** [1] - 3106:8
**split** [1] - 3113:9
**spoken** [1] - 3026:12
**Staff** [1] - 3087:18
**stake** [1] - 3060:1
**stand** [1] - 3026:4
**standpoint** [1] - 3073:6
**start** [9] - 3052:1, 3072:1, 3077:16, 3084:22, 3085:9, 3085:16, 3090:22, 3090:23, 3102:1
**started** [4] - 3034:25, 3060:9, 3088:18, 3111:4
**starting** [1] - 3036:15
**starts** [3] - 3030:15, 3030:16, 3040:15
**state** [1] - 3092:5
**statement** [17] - 3032:25, 3033:1, 3033:3, 3033:5, 3034:4, 3034:5, 3071:6, 3071:7, 3072:7, 3073:8, 3073:18, 3073:22, 3104:8, 3104:20, 3105:14
**statements** [1] - 3028:6
**STATES** [3] - 3023:2, 3023:4, 3023:11
**states** [2] - 3031:1, 3032:11
**stating** [1] - 3096:24
**status** [1] - 3055:12
**stay** [1] - 3050:18
**stayed** [2] - 3050:16, 3050:17
**staying** [1] - 3077:15
**stenotype** [1] - 3024:5
**steps** [2] - 3057:1, 3057:15
**still** [8] - 3038:24, 3063:20, 3081:1, 3082:25, 3083:13, 3109:16, 3110:7, 3114:19
**Stink** [5] - 3077:7, 3079:22, 3083:6, 3084:9, 3093:3
**stop** [3] - 3034:18, 3112:8
**storms** [1] - 3061:9
**straight** [1] - 3035:8
**strategize** [1] - 3058:15
**strategy** [1] - 3056:17

**Street** [3] - 3023:15, 3023:21, 3023:24
**strings** [1] - 3048:17
**Subject** [1] - 3095:2
**subject** [6] - 3055:11, 3072:6, 3082:14, 3085:20, 3085:21, 3088:4
**submission** [1] - 3092:14
**submits** [1] - 3106:24
**submitting** [2] - 3038:1, 3093:13
**substance** [2] - 3050:10, 3100:2
**success** [1] - 3060:1
**successful** [1] - 3062:9
**sufficient** [2] - 3089:9, 3090:5
**suggested** [5] - 3038:13, 3045:7, 3053:4, 3053:8
**suggesting** [1] - 3075:15
**suggestion** [6] - 3053:13, 3053:15, 3053:16, 3053:17, 3107:23, 3115:5
**Suite** [2] - 3023:21, 3023:25
**sum** [1] - 3041:19
**summoned** [1] - 3111:17
**supplement** [4] - 3090:11, 3090:13, 3090:15, 3091:5
**supplemental** [12] - 3088:4, 3088:11, 3088:22, 3089:19, 3092:8, 3097:4, 3097:5, 3097:10, 3098:11, 3100:24, 3101:24, 3108:1
**suppose** [1] - 3062:16
**supposed** [2] - 3046:5, 3048:11
**Supreme** [1] - 3105:18
**surrounding** [1] - 3096:11
**sustained** [1] - 3081:22
**sworn** [1] - 3026:18
**system** [3] - 3059:8, 3065:20, 3097:21

## T

**tab** [1] - 3040:15
**talks** [2] - 3073:22, 3099:16
**task** [2] - 3106:25, 3107:7
**TAYLOR** [29] - 3027:23, 3030:17, 3031:18, 3031:20, 3032:3, 3032:24, 3033:6, 3033:9, 3038:3, 3039:2, 3039:10, 3040:20, 3040:22, 3043:19, 3071:21, 3081:21, 3086:7, 3086:19, 3089:25, 3110:9, 3112:2, 3112:9, 3112:15, 3113:24, 3114:2, 3114:17, 3115:3, 3115:5, 3115:11
**Taylor** [7] - 3023:23, 3026:24, 3037:11, 3038:2, 3038:9, 3038:15, 3059:11
**team** [14] - 3043:10, 3049:17, 3055:2, 3055:20, 3055:24, 3056:21, 3057:1, 3067:5, 3067:11, 3067:12, 3077:19, 3078:5, 3087:9, 3091:9
**team's** [2] - 3058:1, 3058:4
**temporary** [1] - 3052:23
**term** [3] - 3053:3, 3053:9, 3114:4
**terms** [8] - 3044:18, 3047:10, 3050:3, 3061:7, 3088:19, 3090:25, 3105:15, 3106:25

testified [2] - 3026:18, 3036:24
testifying [1] - 3110:7
testimony [3] - 3036:10, 3036:19, 3111:3
THE [96] - 3023:2, 3023:10, 3023:14, 3026:3, 3026:11, 3027:16, 3027:24, 3028:1, 3029:14, 3030:19, 3030:23, 3031:19, 3031:22, 3032:5, 3032:7, 3032:14, 3032:19, 3033:4, 3033:7, 3033:10, 3033:20, 3034:2, 3034:10, 3034:15, 3034:19, 3034:25, 3035:3, 3035:5, 3036:5, 3036:8, 3036:21, 3038:5, 3039:3, 3039:9, 3039:12, 3039:13, 3040:19, 3040:21, 3040:23, 3043:21, 3046:6, 3046:8, 3057:11, 3057:13, 3067:25, 3068:3, 3071:20, 3071:22, 3074:24, 3075:3, 3075:6, 3081:22, 3085:7, 3085:14, 3086:8, 3086:9, 3086:12, 3086:13, 3086:14, 3086:20, 3086:23, 3086:24, 3090:1, 3090:2, 3090:4, 3090:9, 3100:6, 3109:4, 3109:13, 3109:17, 3109:19, 3109:21, 3109:25, 3110:3, 3110:7, 3110:10, 3110:14, 3110:17, 3110:19, 3110:22, 3112:5, 3112:10, 3112:16, 3113:1, 3113:3, 3113:21, 3113:25, 3114:3, 3114:5, 3114:13, 3114:18, 3115:4, 3115:9, 3115:12, 3115:21, 3116:14
the-next-to-last [1] - 3057:15
therefore [2] - 3058:25, 3078:4
thinking [1] - 3072:7
third [12] - 3063:24, 3073:23, 3074:2, 3074:9, 3074:16, 3076:3, 3076:15, 3078:5, 3078:10, 3078:19, 3079:3, 3079:24
third-party [7] - 3063:24, 3074:2, 3076:15, 3078:5, 3078:10, 3078:19, 3079:24
thoroughly [1] - 3111:12
thoughts [1] - 3058:5
threatened [1] - 3065:21
three [8] - 3059:13, 3061:8, 3077:18, 3082:1, 3090:21, 3092:14, 3106:21, 3113:5
Thursday [7] - 3111:7, 3112:14, 3112:15, 3112:16, 3113:16, 3113:17, 3115:1
timetable [1] - 3100:16
timing [1] - 3073:3
tired [3] - 3112:4, 3112:5, 3115:13
today [7] - 3036:20, 3036:25, 3037:12, 3045:10, 3092:12, 3100:11, 3109:18
tolerate [1] - 3113:4
tomorrow [13] - 3049:20, 3093:19, 3094:5, 3095:7, 3110:7, 3110:25, 3111:3, 3112:7, 3112:15, 3112:16, 3116:4, 3116:9, 3116:15
tone [1] - 3081:10
tonight [1] - 3095:6

took [5] - 3028:18, 3028:25, 3037:6, 3051:13, 3051:25
top [14] - 3048:20, 3050:12, 3063:19, 3067:17, 3077:12, 3079:3, 3083:23, 3086:18, 3087:13, 3088:2, 3091:23, 3099:3, 3099:12, 3103:5
topic [4] - 3083:14, 3083:20, 3087:21, 3110:1
topics [2] - 3082:17, 3109:15
total [2] - 3072:14, 3096:15
towards [1] - 3086:18
tracks [1] - 3072:20
training [1] - 3105:12
trains [1] - 3112:2
Transcript [1] - 3024:6
TRANSCRIPT [1] - 3023:10
transcript [1] - 3117:4
transcription [1] - 3024:6
transfer [2] - 3048:22, 3049:8
translation [2] - 3086:3, 3105:16
travel [5] - 3040:5, 3040:11, 3089:9, 3090:6, 3106:16
traveled [2] - 3042:4, 3051:12
traveling [1] - 3044:15
treated [1] - 3058:8
trial [13] - 3027:4, 3027:20, 3028:1, 3028:5, 3049:17, 3051:20, 3052:12, 3066:16, 3094:22, 3096:12, 3104:3, 3104:16, 3113:11
TRIAL [2] - 3023:6, 3023:10
tried [2] - 3034:8, 3104:2
trip [6] - 3040:7, 3041:13, 3041:24, 3051:12, 3106:18, 3106:19
true [17] - 3027:6, 3027:9, 3028:4, 3035:24, 3037:9, 3042:6, 3043:25, 3061:21, 3065:22, 3069:23, 3077:10, 3077:11, 3078:4, 3089:14, 3096:25, 3101:9, 3106:8
trust [1] - 3114:9
truthful [1] - 3029:2
try [5] - 3056:14, 3066:2, 3111:8, 3112:21, 3113:10
trying [5] - 3047:5, 3061:10, 3061:13, 3062:7, 3075:10
Tuesday [7] - 3111:9, 3111:18, 3112:20, 3112:21, 3113:11, 3115:7
turn [1] - 3046:10
turnover [1] - 3077:12
tweaks [1] - 3111:13
twice [1] - 3032:22
two [12] - 3046:24, 3070:6, 3070:12, 3075:3, 3077:19, 3077:20, 3082:1, 3082:17, 3095:7, 3106:21, 3111:20, 3113:1
tying [1] - 3099:2
Tymo's [1] - 3075:21
Tymoshenko [25] - 3051:15, 3058:13, 3058:18, 3058:23, 3059:6, 3061:8, 3065:5, 3066:7, 3066:8, 3066:18, 3067:22, 3068:10, 3068:14, 3068:25,

3074:7, 3079:19, 3096:12, 3096:21, 3103:19, 3104:1, 3104:12, 3104:16, 3105:5, 3106:20
Tymoshenko's [3] - 3065:7, 3065:24, 3070:2
typed [1] - 3107:22
typographical [1] - 3094:11

## U

U.S [3] - 3023:14, 3023:17, 3024:2
Ukraine [55] - 3028:11, 3038:13, 3038:19, 3040:5, 3040:11, 3041:24, 3042:4, 3042:14, 3044:6, 3044:16, 3045:3, 3045:22, 3045:24, 3047:4, 3048:1, 3051:12, 3051:14, 3052:18, 3054:23, 3055:12, 3055:16, 3056:15, 3058:15, 3058:25, 3060:16, 3060:19, 3061:6, 3061:9, 3061:10, 3063:16, 3064:5, 3064:18, 3072:12, 3073:10, 3073:12, 3076:22, 3077:17, 3080:21, 3087:8, 3087:21, 3089:15, 3089:17, 3089:20, 3091:8, 3093:2, 3095:23, 3096:20, 3097:4, 3097:22, 3098:5, 3098:8, 3099:13, 3102:22, 3103:19, 3106:17
Ukraine's [5] - 3037:25, 3054:24, 3060:13, 3077:13, 3105:4
Ukrainian [7] - 3035:22, 3044:24, 3064:21, 3089:1, 3089:7, 3095:7, 3099:19
ultimately [7] - 3041:22, 3042:23, 3061:21, 3065:24, 3067:10, 3074:5, 3101:19
unbelievable [1] - 3115:4
undated [1] - 3099:7
under [1] - 3064:17
underlying [1] - 3036:19
underneath [1] - 3046:1
understood [11] - 3043:15, 3048:24, 3049:1, 3051:3, 3052:18, 3054:22, 3056:2, 3060:12, 3061:6, 3064:21, 3064:25
undertaking [1] - 3100:14
undertook [2] - 3039:19, 3039:23
underway [1] - 3061:9
Union [1] - 3061:11
Unit [1] - 3028:7
UNITED [3] - 3023:2, 3023:4, 3023:11
unless [6] - 3040:8, 3049:19, 3065:22, 3073:1, 3085:9, 3109:25
unlike [1] - 3064:1
unlikely [1] - 3110:23
unqualified [3] - 3087:7, 3091:1, 3091:4
up [27] - 3034:16, 3035:9, 3045:12, 3047:5, 3049:19, 3052:14, 3053:19, 3053:20, 3053:22, 3054:1, 3054:5, 3062:24, 3065:20, 3068:4, 3068:5, 3077:19, 3080:16, 3080:20, 3080:23,

3081:5, 3081:13, 3090:23, 3091:16,
3091:22, 3100:14, 3103:3, 3116:3
**updates** [1] - 3085:19
**Updates** [1] - 3085:21
**urged** [1] - 3074:11
**useful** [1] - 3113:7
**usual** [2] - 3116:6, 3116:15

## V

**van** [9] - 3059:17, 3059:20, 3059:24,
3062:15, 3063:2, 3063:9, 3069:8,
3075:10, 3076:5
**variety** [2] - 3070:8, 3070:11
**verdict** [2] - 3114:9, 3114:23
**version** [1] - 3095:7
**versions** [1] - 3095:6
**vet** [1] - 3053:11
**vetted** [1] - 3111:12
**View** [2] - 3049:10, 3049:14
**viewed** [4] - 3057:2, 3057:20, 3057:23,
3057:24
**views** [1] - 3056:17
**Viktor** [4] - 3047:20, 3048:21, 3049:4,
3082:14
**Vin** [1] - 3037:15
**vis** [4] - 3052:13, 3052:20
**vis-a-vis** [2] - 3052:13, 3052:20
**visited** [1] - 3077:17
**Vlasenko** [12] - 3068:14, 3070:15,
3072:20, 3073:1, 3074:11, 3075:12,
3075:15, 3076:21, 3076:23, 3089:10,
3090:6, 3090:7
**Vlasenko's** [3] - 3071:7, 3078:4,
3089:22
**voided** [1] - 3075:18
**volume** [3] - 3075:3, 3106:4
**voluntarily** [3] - 3079:9, 3079:12

## W

**wait** [2] - 3031:19, 3086:9
**waiting** [1] - 3046:10
**wants** [6] - 3082:21, 3083:25, 3084:6,
3087:8, 3091:8, 3100:16
**Washington** [7] - 3023:7, 3023:16,
3023:18, 3023:25, 3024:3, 3028:18,
3077:19
**waving** [1] - 3034:23
**ways** [5] - 3058:6, 3070:6, 3070:8,
3070:11, 3070:12
**weber** [1] - 3037:11
**Weber** [1] - 3037:15
**Wednesday** [4] - 3094:5, 3111:23,
3113:12, 3113:16
**week** [1] - 3048:24
**weekend** [4] - 3111:4, 3111:5,
3112:19, 3114:20
**welcome** [1] - 3068:3
**West** [3] - 3052:13, 3052:20, 3059:9

**Western** [1] - 3081:1
**Whitney** [2] - 3094:23, 3102:16
**whole** [1] - 3085:12
**William** [2] - 3023:20, 3023:23
**willing** [6] - 3051:18, 3059:25, 3083:9,
3091:5, 3101:5, 3101:15
**window** [1] - 3081:1
**wire** [3] - 3097:13, 3097:16, 3097:18
**witness** [3] - 3032:20, 3032:25, 3033:1
**WITNESS** [14] - 3025:4, 3028:1,
3030:23, 3039:13, 3057:13, 3085:14,
3086:8, 3086:12, 3086:14, 3086:23,
3090:2, 3090:4, 3090:9, 3109:19
**witnesses** [3] - 3110:8, 3110:11,
3110:15
**words** [7] - 3040:12, 3050:10, 3060:4,
3089:5, 3089:6, 3094:23, 3100:2
**works** [3] - 3077:13, 3094:6, 3100:16
**world** [1] - 3061:7
**worried** [1] - 3068:25
**worse** [1] - 3077:25
**write** [7] - 3051:15, 3067:17, 3087:6,
3091:24, 3092:16, 3095:2, 3095:4
**writes** [3] - 3063:9, 3088:6, 3092:13
**writing** [8] - 3052:9, 3054:17, 3056:16,
3058:22, 3068:20, 3081:15, 3087:17

## Y

**year** [1] - 3046:24
**yesterday** [1] - 3042:17
**York** [3] - 3029:7, 3029:23, 3035:16
**yourself** [4] - 3039:3, 3094:19,
3094:24, 3098:22
**Yulia** [1] - 3096:12

## Z

**Zornow** [2] - 3047:17, 3047:21
**ZUCKERMAN** [2] - 3023:20, 3023:24
**Zwaan** [9] - 3059:17, 3059:20,
3059:24, 3062:15, 3063:2, 3063:9,
3069:8, 3075:10, 3076:5