```
1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,      ) Criminal Action
                                      ) No. 19-CR-125
4                      Plaintiff,     )
                                      ) JURY TRIAL
5      vs.                            ) DAY 14
                                      )
6      Gregory B. Craig,             ) Washington, D.C.
                                      ) August 29, 2019
7                      Defendant.     ) Time:  9:30 a.m.
      _____
8
              TRANSCRIPT OF JURY TRIAL - DAY 14
9                     HELD BEFORE
          THE HONORABLE JUDGE AMY BERMAN JACKSON
10             UNITED STATES DISTRICT JUDGE
      _____
11
                   A P P E A R A N C E S
12
      For Plaintiff:     Fernando Campoamor-Sanchez
13                       Molly Gulland Gaston
                         U.S. Attorney's Office FOR THE
14                         DISTRICT OF COLUMBIA
                         555 Fourth Street, NW
15                       Washington, D.C. 20530
                         (202) 252-7698
16                       Email: Fernando.campoamor-sanchez@usdoj.gov
                         Email: Molly.gaston@usdoj.gov
17                       Jason Bradley Adam McCullough
                         U.S. Department of Justice
18                       950 Pennsylvania Avenue, NW
                         Washington, D.C. 20530
19                       (202) 233-0986
                         Email: Jason.mccullough@usdoj.gov
20
      For Defendant:     William James Murphy
21                       William W. Taylor, III
                         Adam B. Abelson
22                       ZUCKERMAN SPAEDER, LLP
                         100 East Pratt Street
23                       Suite 2440
                         Baltimore, MD 21202
24                       (410) 949-1146
                         Email: Wmurphy@zuckerman.com
25                       Email: Wtaylor@zuckerman.com
                         Email: Aabelson@zuckerman.com
```

**Paula M. Junghans**
**Ezra B. Marcus**
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW
Suite 1000
Washington, D.C. 20036
(202) 778-1814
Email: Pjunghans@zuckerman.com
Email: Emarcus@zuckerman.com

_____

Court Reporter:        Janice E. Dickman, RMR, CRR, CRC
                       Official Court Reporter
                       United States Courthouse, Room 6523
                       333 Constitution Avenue, NW
                       Washington, D.C.  20001
                       202-354-3267

                                INDEX
WITNESS:
  Greg Craig
     Cross-Examination (cont.) By Mr. Campoamor-Sanchez...3133
     Redirect Examination By Mr. Taylor...................3235


EXHIBITS:
                            Offered          Received

GX310                        3207             3207
GX402                        3167             3172
GX809                        3204             3205
GX819                        3184             3185
GX822                        3190             3190
GX829                        3193             3194
GX837                        3219             3221


Defendant Rests.........................................3241

                          *   *   *

1      *  *  *  *  *  *  * USA v. GREGORY CRAIG *  *  *  *  *  *  *  *

2              THE COURT:  All right.  Is there anything we need to

3      talk about -- that you all want to talk about before we resume?

4              MR. CAMPOAMOR-SANCHEZ:  No, Your Honor.

5              THE COURT:  All right.  Can I just quickly have

6      counsel at the bench before we bring the jury in and put

7      Mr. Craig back into the stand -- on to the stand?

8              (Bench discussion:)

9              THE COURT:  All right.  It's a party.

10              I just wanted to underscore that I understand that

11     the defendant testified a couple -- more than three hours,

12     maybe less than four hours yesterday, and that you probably

13     have many things you want to ask him.  And that many of the

14     crosses of the government witnesses were longer than the

15     directs.

16              But, I think it bears repeating, for everyone, that

17     we have a jury that seems to be extremely attentive and they're

18     taking notes and they're expressing a desire for expedition

19     that could also reflect frustration with repetition.  And,

20     therefore, I would encourage you to focus sharply on what you

21     think are the most productive and most important areas, rather

22     than every single thing you could ask him, or every single

23     thing that you think might be contradicted by a document,

24     because the documents are in evidence, and you'll be able to

25     argue all of that.

1      And the other thing I would encourage you to do is,

2   if you're going to try to pin him to something he said earlier,

3   the more precise you are about the language, as opposed to

4   paraphrasing, the less quibbling there will be at the bench

5   about whether it's a fair question or not a fair question.

6      And at the end of the day, after you've asked the

7   facts that you want to ask from which you're going to ask the

8   jury to draw an inference or you're going to make an argument,

9   you don't then need to ask him the argument.  Those questions

10   will likely draw objections as being compound or argumentative,

11   and that may very well be correct.  And at the end of the day,

12   you're going to get to make your argument.

13      And I think it also bears on the defense, in terms of

14   making sure that the redirect does not recapitulate his direct.

15   He was quite clear about his testimony.  They know what he

16   thinks.  They know what his story is.  And I don't think it

17   would help anybody if we're still doing this after lunch, I

18   guess, is my basic point of view.

19      MR. CAMPOAMOR-SANCHEZ:  All right.  Understood, Your

20   Honor, and I'll certainly do my best.

21      THE COURT:  All right.

22      MR. CAMPOAMOR-SANCHEZ:  I think it would also help if

23   Mr. Craig actually answers the question.

24      THE COURT:  Well, if he doesn't answer the question,

25   you can ask him the question again and --

 1              MR. CAMPOAMOR-SANCHEZ:  A lot of the questions that I

 2      asked yesterday did call for yes-or-no answers, and, instead, I

 3      got lengthy explanations.

 4              THE COURT:  I guess what -- well, and that's fine,

 5      too, and you can decide whether -- you'll decide whether you're

 6      going to do anything about that.  But, sometimes the length of

 7      the question can be caused by a sort of wiggle word -- the

 8      length of an answer can be controlled by the question.  If you

 9      ask a question that has an adjective in it or an opinion in it,

10      as opposed to a fact in, that's when people are going say,

11      Well, it's not really that; it's this.

12              And so --

13              MR. CAMPOAMOR-SANCHEZ:  Understood.

14              THE COURT:  All right.

15              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

16              MR. MURPHY:  Thank you, Your Honor.

17              THE COURT:  Thank you.

18              (Open court:)

19              THE COURT:  All right.  Mr. Craig, you can resume the

20      stand.

21              (Whereupon the jury enters the courtroom.)

22              THE COURT:  All right.  Good morning.

23              Appreciate, once again, the fact that everyone is

24      here and everyone is on time.  And I assume that everyone has

25      continued to abide by my instructions and that no one has tried

1    to speak to you about the case and you haven't spoken or

2    researched about the case.

3              All right.  With that, Mr. Craig, you're still under

4    oath.

5              Mr. Campoamor-Sanchez, you can proceed.

6              MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

7                     CONTINUING CROSS-EXAMINATION

8    BY MR. CAMPOAMOR-SANCHEZ:

9    Q.  Good morning, sir.

10   A.  Good morning.

11   Q.  I think, yesterday afternoon, we broke after we talked

12   about the two letters that Mr. Manafort asked you to write.

13             Do you recall those?

14   A.  Yes.

15   Q.  All right.  Sir, it is true that you expected significant

16   business from Mr. Manafort in the summer of 2012?

17   A.  I was hoping for it.

18   Q.  And even in 2013, you were still expecting his help to

19   generate business out of Ukraine?

20   A.  I think you may be referring to one my partners in Moscow

21   who was looking for some business in Ukraine and asked me to

22   help to communicate with Mr. Manafort about it.

23   Q.  And my question, sir, is, in 2013, did you not ask

24   Mr. Manafort for help with generating business in Ukraine?

25   A.  I think I did.

1    Q.  And you did that when you were in the process of writing

2    all these letters back to the FARA Unit, correct?

3    A.  That's correct.

4    Q.  All right.  Sir, yesterday Mr. Taylor asked you a number of

5    questions about the rollout of the Report in December.

6            Do you recall those?

7    A.  Yes.

8    Q.  Okay.  Let's go to that.

9            First of all, Mr. Hawker called you on December 6th

10   to let you know that the Report was about to be released?

11   A.  I got an email saying that he'd called me.

12   Q.  And you talked to him?

13   A.  I can't remember whether I talked with him on December 6th

14   or not.

15   Q.  Certainly on December 6th, you had an email sent to your

16   team with the fact that the Report was going to be rolled out?

17   A.  I got another notice that the Report was going to be

18   released.

19   Q.  And my question, sir, was, you notified your team --

20   A.  I did.

21   Q.  -- that the Report was going to be released?

22   A.  Yes, I did.

23   Q.  And, in fact, you gave them a date of when it was going to

24   be released?

25   A.  I think the email has a date in it, yes.

1    Q.  And on December 7th, the next day, you also had a

2    conversation with Mr. Weber, correct?

3    A.  I know there's an email that reflects that Mr. Weber was

4    trying to talk to me and that we talked, and I don't recall the

5    conversation.

6    Q.  Okay.  And you don't recall it, but that was on the 7th,

7    right?

8    A.  I don't know what the date was, but, around that time, I

9    think I had a conversation.  I don't remember the conversation,

10   but the emails reflect, I think, that there was a conversation

11   with Vin Weber.

12   Q.  And Mr. Gates also attempted to reach you on December the

13   7th?

14   A.  That is also something that is reflected by the emails.

15   Q.  And, in fact, you did have a conversation with him?

16   A.  I don't recall a conversation with Mr. Gates.

17   Q.  All right.  Let's move, then, to December 11th.

18   A.  Yes.

19   Q.  Okay.  On December 11th, before there was any contact with

20   Mr. Sanger, you had a communication with Mr. Gates, right?

21   A.  I don't recall that.

22   Q.  Okay.  Let's look at Government's Exhibit 331, that's in

23   evidence.  Should be in your binder, but we'll put it on the

24   screen in front of you as well.

25              THE COURT:  I'm sorry.  What number?

```
1              MR. CAMPOAMOR-SANCHEZ:  331.

2              THE COURT:  Thank you.

3              My screen is not operating yet.  Is anybody else's?

4              All right.

5              There we go.  You got it.

6              Thank you.

7              MR. CAMPOAMOR-SANCHEZ:  You have the document, sir?

8              THE COURT:  You need the jury, too.

9              THE COURTROOM DEPUTY:  Is it on?

10             THE JURORS:  (Thumbs up.)

11             THE WITNESS:  Yes, we had a -- sorry.

12             MR. CAMPOAMOR-SANCHEZ:  One second.

13             THE WITNESS:  Is there a question?

14             THE COURT:  Not yet.

15             MR. CAMPOAMOR-SANCHEZ:  Not yet.

16      MR. CAMPOAMOR-SANCHEZ:

17      Q.  So you had a communication with Mr. Gates on December 11th;

18      is that correct?

19      A.  Turns out.

20      Q.  All right.  And if we look at the very top, where it says

21      3:28 p.m., as we were talking yesterday, the actually time in

22      D.C. was five hours earlier, correct?

23      A.  Yeah.  I'm confused about this dating system, but it says

24      3:28 p.m. on December 11th.

25      Q.  Right.  And so if it was five hours before, that would have
```

1   been 10:28 in the morning, correct?

2   A.   That's five hours before 3:28.

3   Q.   And so Mr. Gates was informing you that they were getting

4   ready to brief the former president of Poland on the Report,

5   correct?

6   A.   Well, he sent me an email at 9:12 a.m., on December 11th.

7   That wasn't the email at 3:28.   The email saying that he was

8   looking for someone to brief Aleksander Kwasniewski is timed at

9   9:12 a.m., on December 11th.

10            Do you see that?

11  Q.   Yeah.   I'm not asking you about the timing now, sir.   I'm

12  just asking you just generally, having read the email, you

13  would agree with me that Mr. Gates was reaching you about the

14  briefing for the former president of Poland?

15  A.   Yeah, that morning.

16  Q.   I that right?

17  A.   Yes.

18  Q.   Okay.   And you told him, "I cannot go to Poland," right?

19  A.   I said, "I cannot go to Poland tomorrow."

20  Q.   So, Mr. Gates responded and said, "I will let the Ministry

21  know and tell them to work with Alex," correct?

22  A.   Yes.

23  Q.   And that's Alex van der Zwaan?

24  A.   Alex van der Zwaan.

25  Q.   Right.   And you knew that was happening on the 11th?

1    A.  I did.

2    Q.  So, let's move, then, to 332, which you were asked some

3    questions about yesterday, also in evidence.

4           And just so that, again, we're clear on the timing at

5    the top, if we're subtracting five hours, there's an email at

6    10:59 in the morning, correct?

7    A.  Five hours, yeah.

8    Q.  So, let's look at the bottom email that Mr. Taylor asked

9    you about.

10   A.  This is 332?

11   Q.  Yes, sir.

12   A.  I'm sorry.  I was at the wrong place.

13          Yeah.

14   Q.  Okay.  And this is the email chain where Mr. Hawker

15   forwards to you his contact with Mr. Sanger, correct?

16   A.  Yes.

17   Q.  All right.  And when you read that, you read that

18   Mr. Hawker promised Mr. Sanger a briefing with you, on an

19   exclusive basis, in the United States, correct?

20   A.  That's what he said in the email.

21   Q.  Right.  And he also said in the email that he was going to

22   arrange for a call with Greg towards the end of the day,

23   correct?

24   A.  That's what he said in the email, yes.

25   Q.  And as you testified yesterday, you did have a phone

1    conversation with Mr. Hawker on December 11 about the contact

2    with Mr. Sanger, correct?

3    A.  He called me and told me he'd been in touch with

4    Mr. Sanger.

5    Q.  Right.  And that's where you testified yesterday, you said,

6    I'll take care of it, or words to that effect?

7    A.  Yes.

8    Q.  And then Mr. Hawker forwards, as we saw in the top, his

9    email communication to you?

10   A.  Right.  He says, "Here's the exchange," and attaches the

11   emails between him and Mr. Sanger.

12   Q.  Okay.  So let's look at Government's Exhibit 350, also in

13   evidence.

14            And this is your actual email to Mr. Sanger, correct?

15   A.  Yes.

16   Q.  And this email is sent, again, at 11:16 in the morning,

17   correct?

18   A.  Well, it says 4:16.  Minus five hours is 11:16, yes.

19   Q.  Right.  That would have been just approximately 17 minutes

20   after Mr. Hawker had forwarded the previous email, correct?

21   A.  It was -- yeah, I think it was almost immediately after I

22   got the email exchange between Hawker and Sanger.

23   Q.  Right.  And you told Mr. Sanger, in this email, "The

24   Ukrainians have determined that you should be given first look

25   at it," right?

3145

```
1    A.  Yes.
2    Q.  And you also told him that you would be happy to get him a
3    copy?
4    A.  If he was interested.
5    Q.  And even happier to talk to him about it, correct?
6    A.  "But, if you are interested, I would be happy to get you a
7    copy, and even happier to talk to you about, if you are
8    interested in it."
9    Q.  That's what you wrote?
10   A.  Yes.  It's right there.
11   Q.  Right.  And you would agree with me that that is -- you
12   offered the Report to him?
13   A.  I'm asking if he's interested, and if he is interested, I
14   would get him a copy, yes.
15   Q.  Right.  And you knew Mr. Sanger, right?
16   A.  I did.
17   Q.  Your kids had gone to school together?
18   A.  No.  They played baseball together in Little League, in
19   Washington, D.C.
20   Q.  I thought they'd gone to community -- some college --
21   A.  Oh, they're also going to college -- we'd just registered
22   at Colorado College that fall, in September, yes.
23   Q.  Right.  And they played in Little League together, right?
24   A.  They did.
25   Q.  All right.  You don't reveal any of your alleged concerns
```

1    here to Mr. Sanger, do you?

2    A.  My alleged concerns?

3    Q.  Yes, sir.  Your concerns about Mr. Hawker, they're not

4    here, right?

5    A.  No.  I don't discuss Mr. Hawker with Mr. Sanger.

6    Q.  Okay.  And then let's look at 351, also in evidence.

7              And that's -- three minutes after you send your email

8    to Mr. Sanger, you forward your email to Mr. Hawker, correct?

9    A.  I did, yes.

10   Q.  And you said just, "FYI"?

11   A.  Right.

12   Q.  Right.  And that's even before Mr. Sanger had responded to

13   your email?

14   A.  That's correct.

15   Q.  And you were actually informing Mr. Hawker of your

16   communication with Mr. Sanger, correct?

17   A.  I was.

18   Q.  All right.  Let's move on, then, to 352.

19             And if you look at the top --

20   A.  I was telling him that I had contacted Mr, Sanger.

21   Q.  Right.  You forwarded the email you sent, right?

22   A.  Right.

23   Q.  Okay.  Let's look at 352, also in evidence:

24             And this is Mr. Sanger's response to the email you

25   had sent a little bit earlier that day, right?

1    A.   Yes, it is.

2    Q.   Right.  And Mr. Sanger writes, in the middle, "And when

3    your associates called last month, or maybe earlier, they were

4    promising to bring a copy over within a day or two.  When they

5    disappeared, I didn't know what to make of it."

6         Did I read that right?

7    A.   The full sentence begins, "It was a bit hard for me to

8    discuss with our foreign desk editors until I have a sense of

9    what the Report says."

10        It begins with that sentence.  And then it says --

11   Q.   It sure does.

12   A.   Then he refers to, "When your associates called last month,

13   or maybe earlier, they were promising to bring a copy over."

14        That's what you were quoting.

15   Q.   And that was in reference to when you put him in contact

16   with Mr. Weber in October of 2012, correct?

17   A.   I'm not sure I knew what he was referring to there.

18   Q.   Okay.  All right.  Let's go to Government's Exhibit 353.

19   And let's start with -- well, let's start with the top two

20   emails.

21        And, again, with the timing convention that we have,

22   now it's 12:32 p.m., on December 11th, correct?

23   A.   Oh, you're talking about the very top?

24   Q.   Yes, sir.

25   A.   Yes.  The one where I say, "We are on it."

1    Q.  Right.  So, and that's a response to Mr. Hawker's email,

2    which reads, "Thank you very much for this.  If you don't hear

3    back from him by 1500" --

4             I take that to mean 3:00 in the afternoon; is that

5    correct?

6    A.  That's right.

7    Q.  -- "it might be best to speak to your *Post* contact, as time

8    is short.  Is that okay with you?"

9             Sir, you had offered up a contact that you had at the

10   *Post* for Mr. Hawker to leak this story to, correct?"

11   A.  No.

12   Q.  He does ask you if that was okay with you, right?

13   A.  He says -- he asks me, "Is that okay with you?

14             Yes, he does.

15   Q.  Right.  And your response is, "We're on it."

16   A.  That was my response.

17   Q.  Right.  You don't say, I don't know what you're talking

18   about, correct?

19   A.  No.  I say, "We are on it."

20   Q.  Right.  You don't deny or express any concerns about his

21   comment about the *Post*, correct?

22   A.  I had no conversation with him about the *Post*, and I wasn't

23   having one with him then.

24   Q.  Okay.  Let's look at 354, top email.

25             And now it's 12:39 in the afternoon, correct?  You

```
 1    subtract five hours.
 2    A.  You're looking at the top email?
 3    Q.  Yes, sir.
 4    A.  Okay.  Yes.
 5    Q.  Okay.  And he thanks you, and then writes, "They are
 6    pressing me for reassurances here, so any update would be very
 7    welcome."
 8              And then he says, "I hope the chat goes well."
 9              You see that?
10    A.  I do.
11    Q.  He's making reference to your chat with Mr. Sanger?
12    A.  I assume so.
13    Q.  All right.  Then let's go onto 355.
14              Now, sir, this email is at 5:46 in the afternoon, and
15    is an email from you to Mr. Sanger, correct?
16    A.  Yes.
17    Q.  Okay.  And you were attempting to send him the Report
18    electronically, correct?
19    A.  Well, I had tried twice, and then I asked Alex Haskell to
20    do it, and I think he did it during the day.
21    Q.  Right.  But, in this email, there is an attachment.  You
22    were trying to send him the electronic copy, correct?
23    A.  Looks as though I was, yes.
24    Q.  Okay.  And then you mentioned to him, or tell him --
25    A.  Oh, I'm sorry.  This is the 11th.  Yes, you're right, this
```

1    is my first effort to deliver it electronically.

2    Q.  Right.  And then you tell him that you will hand deliver a

3    copy of the Report to his home?

4    A.  I do, yes.

5    Q.  Let's go to Government's Exhibit 357, please.

6         And now it's 5:50 in the afternoon on December 11th,

7    correct?

8    A.  That's correct.

9    Q.  And the subject is, "Electronic delivery"; is that right?

10   A.  This is an email to Mr. Hawker, and the subject is,

11   "Electronic delivery," yes.

12   Q.  And you write to Mr. Hawker, "David Sanger has received the

13   Report by email.  I am hand-delivering a hardcopy to his home

14   this evening on my way home.  He will tell us tomorrow if he

15   wants to use it.  He will double check with his deputy foreign

16   editor."

17        And, again, you're keeping Mr. Hawker informed of

18   your efforts with Mr. Sanger, right?

19   A.  Yeah.  I'm telling him what I've done.

20   Q.  Okay.  And you would agree with me that that's informing

21   somebody, right?

22   A.  About what I've done.

23   Q.  Right.

24        All right.  Let's go to 360.  And let's look at the

25   top two emails.

1              And, again, just for timing purposes, we're still on

2      December 11th, and now it's 6:15 p.m.; is that correct, sir?

3      A.  That's the top email, yes.

4      Q.  Right.

5      A.  That's the email from me to -- another email to Hawker.

6      Q.  To Hawker.  And you are responding to an email that

7      Mr. Hawker had just sent you some minutes earlier, correct?

8      A.  His email to me is at 6:10.

9      Q.  Right.  So you're responding to that email from 6:10?

10     A.  Right.  Looks that way.

11     Q.  Okay.  And the email that he sends you, he copied

12     Mr. Gates, correct?

13     A.  Looks that he did.

14     Q.  And he writes to you, "We're both keeping our fingers

15     crossed for David.  And thank you for your efforts here,

16     especially hand-delivering the Report.

17             But, then he talks to you about a concern that

18     Mr. Gates has, correct?

19     A.  "Rick has pointed out that if the meeting in which this is

20     discussed is at 11:00 a.m., it would leave us little time to

21     take the Report to your contact at the *Post*."

22             And that's Rick Gates' concern.

23     Q.  So, "It would leave us little time to take the Report to

24     your contact at the *Post*, or to Al Hunt, if the *Times* decided

25     not to do go with this."

1    A.  Right, that's what it says.

2    Q.  And your response is, "We told Sanger it's his, if he

3    wanted to use it.  He agreed to get back with us with an answer

4    tomorrow.  Tomorrow is not too late for Al Hunt or *The*

5    *Washington Post*."

6    A.  That's what my email says.

7    Q.  Well, that's what you say.

8    A.  Yes.

9    Q.  It your email, right?

10   A.  I said that.

11   Q.  You're not debating your email, right?

12   A.  That is me.  I wrote that, yeah.

13   Q.  Okay.  All right.

14        You do seem to know something about the *Post* and

15   Mr. Hunt, right?

16   A.  Well, they had just mentioned it in the previous email.

17   Q.  Okay.  Let's go to 364.

18        And you were asked some questions yesterday by

19   Mr. Taylor about your conversations with *The Telegraph*.

20        Do you recall that?

21   A.  Yes, I do.

22   Q.  All right.  But, we did not look at this email, so let's

23   look at it now.

24        Mr. Hawker called you -- or, contacted you by email

25   first about the contact from *The Telegraph*, right?

1    A.  I would think that would be around 9:53, maybe 8:53 --

2    Q.  In the morning, correct.

3    A.  -- in the morning.

4    Q.  Now, we're on to December 12th, right?

5    A.  On December 12th.  I'm just getting my orientation on date

6    and time, and five hours before 1:53 would be, what?  8:53 --

7    Q.  That's right.

8    A.  -- a.m.

9    Q.  A.m.

10   A.  8:53 a.m., I get this email from Hawker saying that Tom

11   Parfitt will call very shortly and ask me about the difference

12   between selective and political prosecution.

13   Q.  Right.  So you got an email from Mr. Hawker letting you

14   know that Mr. Parfitt would be calling?

15   A.  Yes.

16   Q.  Before you had any contact with Mr. Parfitt?

17   A.  That's correct.

18   Q.  And you took the call?

19   A.  I did.

20   Q.  Right.  As you described yesterday, right?

21   A.  I did.

22   Q.  Now, you talked to Parfitt on the 12th, right?

23   A.  Yes, the morning of the 12th.

24   Q.  Right.  The Ministry of Justice had not issued a press

25   release at that point, had they, sir?

1     A.  I don't know that.

2     Q.  You don't know that?

3     A.  They may have issued it in advance to certain journalists.

4     They may have given him a copy of a -- I didn't -- you know, a

5     press release.  I didn't know.

6     Q.  You don't know, right?

7     A.  I don't, to this -- at this moment?

8     Q.  Yeah, at this moment, you don't know?

9     A.  I don't know, at this moment, whether at that time he had a

10    copy of the press release.

11    Q.  Right.  But my question was different.

12              You know that the press release was issued on the

13    13th, correct?

14    A.  He might have been given an advance copy.  I know that the

15    press release was released with the Report on the 13th.

16    Q.  Right.  In fact, Mr. Bruce Jackson forwarded you a copy of

17    that release?

18    A.  Yes, he did.

19    Q.  On the 13th?

20    A.  Yes.

21    Q.  Right.  But on the 12th, you don't know whether he had a

22    copy of that or not, correct?

23    A.  What I know is what he quoted to me.  I asked him what

24    the -- the Ukrainian Ministry of Justice was saying about the

25    Report, and he read me a quote from the minister, and I think

1    he read a statement from the release.

2    Q.  So before you -- let me ask you this:  Before the Report

3    was released, you talked to two journalist -- actually, three

4    journalists, correct?

5    A.  Before the Report was released on the 13th, I talked to

6    Parfitt --

7    Q.  Right.

8    A.  -- and I talked to Sanger.

9    Q.  Right.

10   A.  And I talked to --

11   Q.  And you talked to Herszenhorn?

12   A.  Yeah, that's correct.

13   Q.  So, before the Report was released --

14   A.  *The New York Times* and the *Daily Telegraph*.

15   Q.  Those were the two ones that you talked to before the

16   Report was released?

17   A.  That's correct.

18   Q.  All right.  And you, however, had not told Ms. Weiss or

19   anybody from Skadden's press about the fact that the Report was

20   about to be released, correct?

21   A.  I don't recall whether I did or not.

22   Q.  Okay.

23   A.  I recall that I sent an email to the team saying that it

24   was going to be released.  I don't recall whether I told

25   Ms. Weiss.

1   Q.  Okay.  We'll get to that, then, in a second, but let's look

2   first at 375.

3              And that's at 3:36 p.m. on the 12th, correct?

4   A.  3:36 p.m., an email from Jonathan Hawker.

5   Q.  To you.  And he's asking you whether you've heard anything

6   from the *Times*, because they're anxious about the fact that the

7   story is going to be coming out at 3:00 a.m. Eastern tomorrow.

8              Do you see that?

9   A.  Yes.

10  Q.  And they wanted to know, is the *Times* going to publish

11  something before the Report becomes public?

12  A.  I assume that's what they wanted to find out.

13  Q.  Okay.  Let's look at 376.

14             And this is an email on December the 12th at about

15  3:37 p.m., correct?

16  A.  In the afternoon.

17  Q.  Right.

18  A.  The afternoon of the 12th.

19  Q.  And these are the questions that Mr. Herszenhorn sent you

20  about the Report, correct?

21  A.  Yes.

22  Q.  All right.  And if we look at -- let's look at A first,

23  please, just paragraph A.

24             He makes mention of the $12,000 payment, as that

25  being an issue they wanted to ask you about, correct?

1    A.  Yep, the first question is about our fees.

2    Q.  All right.  Let's look at paragraph --

3    A.  C?

4    Q.  Yes, sir.  And the third question was about the selective

5    prosecution, correct?

6    A.  Yes.

7    Q.  And, in fact, *The New York Times* understood very well the

8    difference that your report had made between selective

9    prosecution and a politically motivated prosecution, correct?

10   A.  They certainly did in the article because I told them the

11   difference.

12   Q.  Well --

13   A.  Are you saying --

14   Q.  -- he tells you here.

15   A.  -- this question?

16   Q.  Yeah.  He tells you here in the question, right?  He

17   says -- and I'm reading in the middle "The Report states 'We do

18   not opine about whether the prosecution was politically

19   motivated or driven by improper political motive, i.e., to

20   remove her from political life in Ukraine in the future'";

21   right?

22   A.  Right.

23   Q.  He -- he understood.  He had the Report already, right?

24   A.  Yes.

25   Q.  He had read it, and he's asking you questions about the

1    Report?

2    A.  Right.

3    Q.  Okay.  And then he's also asking you about the fact that

4    your conclusions seem to be opposite to the U.S. Department of

5    State's and Secretary Clinton, correct?

6    A.  It contradicts.

7    Q.  Right.

8    A.  It disagrees with.  I'm not sure I would say the opposite.

9    It's not --

10   Q.  It disagrees, right?

11   A.  We disagreed with -- you know, we didn't find -- we had no

12   opinion of whether it was a political prosecution.  So, I --

13   it's not quite right to say that we disagreed with the State

14   Department.  We -- we did not express a view whether it was

15   politically motivated or not.

16   Q.  Sir, the State Department criticized your report after it

17   was published, did it not?

18               MR. TAYLOR:  Objection.

19               THE COURT:  Sustained.

20               I think the point is, does it contradict the

21   conclusion reached by the State Department?

22               THE WITNESS:  What's the question?

23               THE COURT:  Ask your next question.

24   BY MR. CAMPOAMOR-SANCHEZ:

25   Q.  Sir, your report was contrary to the position of the U.S.

```
 1    State Department, right?

 2    A.  On the issue of whether the prosecution was politically

 3    motivated, we expressed no view.  The State Department had a

 4    view on that.  The State Department's view was that it was

 5    politically motivated.

 6    Q.  Right.

 7    A.  So to the extent that we -- our absence of having a view

 8    disagrees with the State Department, you're right.  But, I

 9    don't think that's a disagreement so much as a -- we didn't

10    have a view; they did.

11    Q.  Well, they certainly did not like your report when it was

12    published?

13              MR. TAYLOR:  Objection.

14              THE COURT:  Can you approach the bench?

15              MR. CAMPOAMOR-SANCHEZ:  Sure.

16              (Bench discussion:)

17              THE COURT:  What's the relevance of that?

18              MR. CAMPOAMOR-SANCHEZ:  The relevance is, they spent

19    a lot of time saying how this report was anti-Ukraine, and how

20    he's trying to talk to reporters to make sure that is

21    anti-Ukraine, when, in fact, it is perceived as being

22    pro-Ukraine, which is why Ukraine was happy about it.

23              MR. TAYLOR:  State Department's opinion is not an

24    issue in this case.  It's entirely irrelevant.

25              THE COURT:  Well, I think --
```

1          MR. TAYLOR:  It's post -- it's post the articles.

2          MR. CAMPOAMOR-SANCHEZ:  It's post-publication of the

3     Report.

4          THE COURT:  He's saying that his understanding, when

5     he was talking to the FARA Unit, was that everything he had

6     done was contrary to the Ukraine's interest.  And Mr. Campoamor

7     is trying to explore the fact that if we're talking about the

8     public view of the Ukraine and the Report, that, then, it

9     wasn't the view.

10          I mean, yes, I agree with you what his state of mind

11     was the day he received these emails doesn't have to do with

12     whether he thought the Report was good for Ukraine or bad for

13     the Ukraine.  But, I think you've made a major theme of your

14     defense that he thought the Report was bad for the Ukraine,

15     period, that it was black and white.  And that that was why he

16     went rogue and had these interviews, acting on his own behalf,

17     contrary to the interest of his client, when he met with the

18     press.  And that's why he thought it was important to emphasize

19     all of that to the FARA Unit.  So if, by the time he met with

20     the FARA Unit, he was aware that there were -- there was a

21     difference of opinion about whether the Report was favorable or

22     unfavorable is not relevant.

23          MR. TAYLOR:  Well, first of all, of course, what the

24     State Department has to say is rank hearsay.  But, secondly,

25     Mr. Campoamor-Sanchez is free, as -- we've both been told to

 1     argue that the Report may or may not have been contrary to

 2     their interest.  But, the fact that somebody else says that it

 3     is, is entirely irrelevant.

 4            THE COURT:  All right.  I think what the State

 5     Department says -- they said this, they said that, they agree

 6     with you -- has a hearsay component to it.  But, I think you

 7     can certainly say, you know, by the time -- after the Report

 8     came out, before the time you sat down with the FARA Unit, you

 9     were aware that some views reported it as favorable to the

10     Ukraine and some viewed it as unfavorable.

11            MR. CAMPOAMOR-SANCHEZ:  Okay.  I'll do it.  That's

12     fine.

13            THE COURT:  All right.

14            (Open court:)

15     BY MR. CAMPOAMOR-SANCHEZ:

16     Q.  We'll try to short-circuit this, Mr. Craig.

17            Between the time that your report was released and

18     the time you met and talked with the FARA Unit, okay, that

19     timeframe --

20     A.  Between December 12th and December -- that would be

21     October 9th, 2013.

22     Q.  Between December 13 through October 9th, 2013.

23     A.  Yes.

24     Q.  That time period.  Okay?

25     A.  Yeah.

 1    Q.  You were aware that there was a lot of criticism of your

 2    report, because some people saw it as pro-Yanukovych?

 3                MR. TAYLOR:  Same objection, Your Honor.

 4                THE COURT:  All right.  Overruled.

 5    A.  I was aware there was controversy about the Report.  I

 6    didn't have an opportunity to talk to anybody in the State

 7    Department because I wasn't talking to government officials

 8    about the Report.  But, there was -- yes, there was some

 9    criticism of the Report, and I thought it was based on a

10    misunderstanding of our conclusions.

11    BY MR. CAMPOAMOR-SANCHEZ:

12    Q.  All right.  Sir, let's take a look, then, at 380, which is

13    also in evidence.

14                And now we're talking about 5:38 p.m. on December the

15    12th; is that right?

16    A.  Yes.

17    Q.  And you did inform Mr. Sanger that the Ministry would

18    release the Report at 3:00 a.m., D.C. time, the next morning,

19    correct?

20    A.  Yes.

21    Q.  And let's go to Government Exhibit 382.

22                And remember I was asking you about whether

23    Ms. Weiss -- you had told Ms. Weiss and Skadden about what was

24    going on?

25                So this is an email now on December 13th -- I'm

1     sorry -- December the 12th at 10:59 p.m.

2              That would be the top one, right?

3     A.   Excuse me.  I'm going to read the whole string, if you

4     don't mind.

5     Q.   Sure.  Go ahead.  Of course.

6     A.   Okay.  Now, what's your question?

7     Q.   So, first of all, this is 10:59 p.m., the top email, right?

8     A.   The top email from Lauren to me --

9     Q.   Yes.

10    A.   -- is 10:59 in the evening --

11    Q.   Right.

12    A.   -- of December 13th, yes.

13    Q.   And Ms. Weiss communicated to you, at the bottom email,

14    that Cliff had let her know that there would be news coming out

15    tonight or tomorrow regarding the MOJ report, right?

16    A.   She sent that to me on December 12th --

17    Q.   Correct.

18    A.   -- at, what, 2:58 in the afternoon the day before, I think.

19    Q.   Actually, sir, it's only --

20    A.   Am I wrong?

21    Q.   We have a stipulation with your counsel, and it's only the

22    top email that has got the time.

23    A.   Okay.  So she sends it to me at 7:58 p.m. on the 12th,

24    which is the day before it was released.

25    Q.   Correct.  And she told you that --

1    A.  And that -- yeah.

2    Q.  -- that Cliff let her know that it was coming out, correct?

3    A.  Yes.

4    Q.  And then she asked you whether there was a contact at the

5    PR firm can direct inquiries to should the calls come in,

6    right?

7    A.  She does.

8    Q.  And you referred her to Jonathan Hawker?

9    A.  I did.

10   Q.  That's who she was to send the contacts to, correct?

11   A.  Right.

12   Q.  And you had not told her that you had had the contacts with

13   *The Telegraph* or with *The New York Times*?

14   A.  I don't think I had at that point.

15   Q.  Right.  And then let's look at 385.  We can look at the top

16   email.

17          And that's December 13th, right?

18   A.  Yes.

19   Q.  And that's in the morning?

20   A.  Yes.

21   Q.  And Mr. van der Zwaan is telling you that his meeting

22   with -- how do you pronounce it, Kwasniewski?

23   A.  Kwasniewski.

24   Q.  He told you the meeting had gone very well, right?

25   A.  Yes, Alex is sending me an email and reporting about his

1      meeting with Kwasniewski.

2      Q.   Okay.  So, then let's look at 396.

3           And Mr. Taylor asked you some questions about that

4      yesterday.

5           Do you recall that?  This is the email from

6      Mr. Manafort to you on December 13th.

7      A.   Yes.

8      Q.   And the subject line is, "Well done," right?

9      A.   That's correct.  From Manafort to me.

10     Q.   Just an email between you and Manafort, correct?

11     A.   It's from Manafort to me.

12     Q.   Right.  And then the subject line is, "Well done"?

13     A.   That's what it says.

14     Q.   Right.  And then it says, "Greg, the pro has emerged,

15     again."

16          Did I read that right?

17     A.   You did.

18     Q.   And it says, "The initial rollout has been very effective,

19     and your backgrounding has been key to it all."

20          Did I read that part right?

21     A.   Yes, you did.

22     Q.   All right.  And your testimony here yesterday, sir, is you

23     don't know why Mr. Manafort said that your backgrounding had

24     been key to it all?

25     A.   I thought my backgrounding had been critical of Ukraine.

```
1              MR. TAYLOR:  May we approach?

2              THE COURT:  Yes.

3              (Bench discussion:)

4              MR. TAYLOR:  I request you give the limiting

5    instruction, again, on the --

6              THE COURT:  Not right now, no.  I did it when it came

7    into evidence.  You're going to just use the words.  I don't

8    think it's appropriate now.  I will give the instruction at the

9    end, but I'm not going to interrupt the cross-examination to do

10   that.  Because all -- he didn't -- he actually asked him, Do

11   you know why he said it?

12             Actually, he didn't even say, Do you know why he said

13   it?

14             MR. CAMPOAMOR-SANCHEZ:  No, I did not.

15             THE COURT:  He said he didn't know why he said it and

16   offered his own answer.  So, no, your request is denied.

17             (Open court:)

18   BY MR. CAMPOAMOR-SANCHEZ:

19   Q.  And he also told you that "Everyone in Kyiv is happy,"

20   right?

21   A.  That's what he wrote in the email.

22   Q.  He wrote to you, "They like the Report and are especially

23   happy with how the media is playing it," right?

24   A.  That's what he wrote.

25   Q.  And he also said, "Alex did a great job in his briefings in
```

1    Warsaw."

2    A.  Yes, I see that.

3    Q.  All right.  And you did respond to this email?

4    A.  I did.

5    Q.  And you talked about the *Kyiv Post*, right?

6    A.  I told him I thought the piece in the *Kyiv Post* was

7    terrific.

8    Q.  And then you said, "I'm glad it went so well."

9    A.  That's what I wrote.

10   Q.  And you also wrote, "Mr. Vlasenko is a very stupid man and

11   does daily damage to his client's case."

12   A.  I believe that to this day.

13   Q.  I'm sure he will be very happy to hear that.

14          And, sir, that was not the only congratulatory email

15   you got from Mr. Manafort, correct?

16   A.  I think he also sent me one later on.

17   Q.  He also --

18          MR. CAMPOAMOR-SANCHEZ:  And, Your, Honor at this

19   point, I would move Government's Exhibit 402 into evidence.

20   It's not in evidence right now.

21          THE COURT:  Can I see it, please?

22          What number did you say, 402?

23          MR. CAMPOAMOR-SANCHEZ:  402.

24          Would you like me to approach?

25          THE COURT:  Yes.  I need to see it.

1          MR. CAMPOAMOR-SANCHEZ:  Okay.

2          THE COURT:  I don't know yet if they object, so we

3    might not need a bench conference.  I just wanted to see it.

4    You can generally just give it.

5          (Bench discussion:)

6          THE COURT:  Do you know which document this is?

7          MR. TAYLOR:  I think it's the one that said "You're

8    the man."  Your Honor has ruled that it's inadmissible.

9          MR. CAMPOAMOR-SANCHEZ:  It was inadmissible when he

10   wasn't on the stand, but he's on the stand.  He can explain it.

11   I want to ask him that he got it and he didn't respond to it,

12   even though he'd gotten the email.  And he's still

13   congratulating him.  And there's no hearsay; it's just adding

14   the -- copying him on all the press releases.

15         THE COURT:  Well, I think for the same reason I

16   admitted the last email we looked at, which is -- showed that

17   Manafort is congratulatory and happy, that it contradicts his

18   theory that by that point, he was acting in a way that was

19   contrary to their interests.  They're still happy with him.

20   And I don't see why the fact that that was said -- I mean, this

21   doesn't say, I'm -- it says, "People in Kyiv are very happy."

22         MR. CAMPOAMOR-SANCHEZ:  Um-hum.

23         THE COURT:  So, there's something of a hearsay

24   component to it.

25         MR. CAMPOAMOR-SANCHEZ:  Your Honor, but it's not

1    necessarily for the truth, but that's what he's been told.  And

2    he's been trying to make this jury believe that he was acting

3    contrary to their interests, that he said terrible things about

4    Ukraine, and that that was his intent.  And yet --

5              THE COURT:  He is still getting congratulated.

6              MR. CAMPOAMOR-SANCHEZ:  Right.

7              THE COURT:  All right.  Well, then, I think -- go

8    ahead.

9              MR. TAYLOR:  If you admit it for that purpose, then

10   you're admitting it for the truth.

11             THE COURT:  Okay.  I want to take out the sentence

12   "People in Kyiv are very happy."  So, you've got "Media update:

13   Greg, here's the coverage.  You're back in the headlines.

14   You're the man, Paul."

15             MR. CAMPOAMOR-SANCHEZ:  Okay.

16             THE COURT:  That has no hearsay, but it makes the

17   point that Manafort is happy and congratulatory without stating

18   what Kyiv is thinking or not thinking.

19             MR. CAMPOAMOR-SANCHEZ:  Okay.

20             MR. TAYLOR:  For that purpose, it's being admitted

21   for the truth.

22             THE COURT:  There's no fact asserted once you take

23   out "People in Kyiv are very happy."  That has to be redacted

24   out.  That is a fact that what somebody else was thinking about

25   which we cannot cross-examine Paul Manafort.  But, the fact

1    that Paul Manafort sent an email, "You are the man" all in

2    caps, it gives rise to the inference that it was Manafort that

3    was quite satisfied with what had happened --

4              MR. TAYLOR:  Right.

5              THE COURT:  -- and I think that that's -- but, that's

6    not the truth of a matter asserted; it's just the fact that he

7    said it has that effect.  So, there is no fact in there to tell

8    them -- there's no fact --

9              MR. TAYLOR:  The fact, Your Honor -- the fact that's

10   being asserted is that Manafort is happy.

11             MR. CAMPOAMOR-SANCHEZ:  He sends him the email that

12   tells --

13             THE COURT:  First of all, he doesn't actually say,

14   I'm happy.

15             MR. TAYLOR:  "You're the man."

16             THE COURT:  If he did, it would be inadmissible.  The

17   fact that he said "You're the man," just the fact that it was

18   said is admissible.  And we can certainly say that this report

19   is -- this email is only coming in for the fact that it was

20   said, because that's all they need it for.  That's all it is.

21             But, I'm happy to have that caveat, and I'm happy

22   to -- we're going to redact the fact asserted that people in

23   Kyiv are happy.  That's a fact and it's coming out.

24             MR. MURPHY:  Your Honor, we had a long discussion

25   about this at the pretrial conference, and you ruled it

1   inadmissible absent the presence of Manafort to explain it.

2          THE COURT:  Right, because it had that sentence in

3   it.

4          MR. MURPHY:  We still don't have Manafort.

5          THE COURT:  Without the sentence --

6          MR. MURPHY:  "You are the man" doesn't speak to

7   the sentence.  What does he mean by that?

8          THE COURT:  Okay.  Well, everybody can try to figure

9   that out.  I don't think we need him here for the fact that he

10   sent it and that he's in a congratulatory mood.  You've made

11   your record.  I'm taking out his representation of a fact.  I

12   don't think this is hearsay, number one.  I think it's been --

13   its relevance has been made clear by the testimony.

14          And, so, what I said earlier, when I excluded it, I

15   excluded the entire thing, and now I'm only permitting it to

16   come in a redacted format.  You don't need to read me back what

17   I said.

18          MR. TAYLOR:  I know that.  But, what I want to say is

19   that this is -- there's allegedly a non-hearsay purpose here,

20   to prove that --

21          THE COURT:  It's not hearsay.  It's not even a

22   question of a non-hearsay purpose.  There is no fact asserted.

23   "You are the man" is not a fact.

24          MR. TAYLOR:  It conveys Mr. --

25          THE COURT:  An emotion.

 1                    MR. TAYLOR:  Your Honor --

 2                    THE COURT:  The fact that it was said.

 3                    I'm not going to stand here anymore and argue.  It's

 4       your point, I think it has been very well made.  It's in my

 5       discretion to admit this, redacted.  I find it to be not

 6       hearsay.  I think the hearsay is being redacted out.  It's

 7       coming in solely for the fact that it was said, and I will give

 8       that instruction, even though I don't believe there are any

 9       assertions of fact in it.

10                    So, you have to make sure that before it gets up on

11       the screen, that's off, and it will be admitted, redacted.

12                    MR. CAMPOAMOR-SANCHEZ:  Yes.

13                    THE COURT:  I believe that the direct testimony drew

14       on what Mr. Manafort said, thought, and told, and what

15       Mr. Craig thought and Mr. Manafort thought in great detail.

16       So, there's that as well.  All right.

17                    MR. CAMPOAMOR-SANCHEZ:  Thank you.

18                    (Open court:)

19       BY MR. CAMPOAMOR-SANCHEZ:

20       Q.  Let us take a look at Government's Exhibit 402, and let's

21       look at another email.

22                    THE COURTROOM DEPUTY:  Has that been redacted?

23                    MR. CAMPOAMOR-SANCHEZ:  It is now in evidence.

24       BY MR. CAMPOAMOR-SANCHEZ:

25       Q.  Is that --

```
1              THE COURTROOM DEPUTY:  It's in evidence?

2    A.  Yes, sir.

3              THE COURT:  Yes.

4    BY MR. CAMPOAMOR-SANCHEZ:

5    Q.  And let's focus on the top, please.

6              THE COURT:  Members of the jury, this is another one

7    of those exhibits which is something that someone said that's

8    not in court that's just being admitted for the fact that it

9    was said.

10   BY MR. CAMPOAMOR-SANCHEZ:

11   Q.  Sir, this is an email that Mr. Manafort sent to you on,

12   now, December 15th, at approximately 11:48 in the morning,

13   correct?

14   A.  Yes, looks that way.

15   Q.  He was forwarding to you what's the rest of the email,

16   which I just -- media updates.  Like, copies of links of

17   articles that had been published about the Report, correct?

18   A.  He says that this is a partial list of coverage.

19   Q.  Right.  And he says, "You're back in the headlines

20   internationally.  Even beat out Susan Rice in several

21   countries.  I thought you would like this fact."

22              And then he says, "You are the man, Paul.'"

23   A.  That's what he says.

24   Q.  Sir, isn't it true that Mr. Manafort was, indeed, very

25   happy with what you did to help out?
```

```
 1                   MR. TAYLOR:  Objection.
 2    A.  I didn't talk to him.
 3                   MR. TAYLOR:  Objection.
 4                   THE WITNESS:  Excuse me.
 5                   THE COURT:  All right.  It's sustained.
 6    BY MR. CAMPOAMOR-SANCHEZ:
 7    Q.  You did have a conversation with Mr. Manafort after this?
 8    A.  I may have.  I don't recall.
 9    Q.  He -- you went out to dinner with him, right?  A
10    congratulatory dinner?
11    A.  I don't think we ever had dinner.  We may have had a lunch,
12    but I don't think we ever had dinner.
13    Q.  Okay.  So -- and in that lunch, he let you know that he was
14    happy with what you had done, right?
15                   MR. TAYLOR:  Objection.
16                   THE COURT:  You can answer.
17    A.  I don't think that was the topic of the lunch.
18    BY MR. CAMPOAMOR-SANCHEZ:
19    Q.  Okay.  So --
20    A.  In fact, I think it was in this cafeteria in this
21    courthouse we had lunch.
22    Q.  Sir, you knew from the moment you accepted this assignment
23    that you were supposed to background critical journalists, did
24    you not?
25    A.  No.
```

1    Q.  Okay.  Let's take a look at Government's Exhibit 530.

2    That's in evidence.

3            If you like, I can show you the original version of

4    that exhibit as well.

5            That's your handwriting, correct?

6    A.  It is, yeah.

7    Q.  You wrote this on April 12th, 2012, did you not, sir?

8    A.  It was one of the first two trips to Kyiv, and I know that

9    because it's the Hyatt Regency.  And it's either the first or

10   the second trip.  Could have been the first trip, but I think

11   it was the second trip.

12   Q.  Right.  And on Point Number 2 you wrote, "PR

13   recommendations," correct?

14   A.  That has to do with finding a firm, helping them identify a

15   firm.

16   Q.  I doesn't ask you what that had to do, but, okay.

17           And you also wrote, sir, "Backgrounding critical

18   journalists," right?

19   A.  Yes.

20   Q.  And you did that on April 2012, correct?

21   A.  I wrote this -- I wrote this note, I think, in April of

22   2012, yes.

23   Q.  And as early as July of 2012, you had had conversations

24   with Mr. Manafort about the media rollout strategy?

25   A.  I asked him, I think in the middle of July, to let me know

1    what the communication strategy was, please.

2    Q.  And, in fact, you got copies of it from him, right?

3    A.  I'm sorry.  I didn't understand the question.

4    Q.  You got copies of the media plan from Mr. Manafort?

5    A.  He sent me -- in response to my request, I think he did

6    send me a copy of the media plan.

7    Q.  Right.  Well, let's take a look at Government's

8    Exhibit 200.

9              You also discussed that yesterday with Mr. Taylor.

10             THE COURTROOM DEPUTY:  Is this in evidence, Counsel?

11             MR. CAMPOAMOR-SANCHEZ:  Yes, it is.

12             THE COURTROOM DEPUTY:  Thank you.

13   BY MR. CAMPOAMOR-SANCHEZ:

14   Q.  And let's look at the email that starts, "Okay."

15             Do you remember discussing that with Mr. Taylor

16   yesterday?

17   A.  This is about the leaks.

18   Q.  Well, let's look at what if says.

19             You are talking about leaks, correct.

20   A.  Which -- there's about three emails.  Which one are you

21   talking about?

22   Q.  The one I have right in front of your screen, which is --

23             THE COURT:  I think he's looking in the book.

24             MR. CAMPOAMOR-SANCHEZ:  Yeah.  First page --

25             THE COURT:  You're allowed to look at either one.

1              MR. CAMPOAMOR-SANCHEZ:  Right.

2     MR. CAMPOAMOR-SANCHEZ:

3     Q.  First page, where it says your email to Mr. Manafort of

4     Monday, July 30th, at 5:51 p.m.

5              THE COURT:  Tell me the exhibit number again.  I'm

6     sorry.

7              MR. CAMPOAMOR-SANCHEZ:  200.

8              THE WITNESS:  It's 200.

9              THE COURT:  All right.  Once we call out the box, I

10    can't see it.

11    BY MR. CAMPOAMOR-SANCHEZ:

12    Q.  Do you recall discussing this with Mr. Taylor yesterday?

13    A.  Yes, I do.  I do.

14    Q.  All right.  And, sir, you wrote, "The worst thing that

15    could happen to the project, to this law firm, to your guy, and

16    to me, would be to have somebody on your side falsely leak a

17    story that 'Skadden finds Tymoshenko guilty.  Report exonerates

18    Ukraine.'  That kind of story would be a disaster.'"

19              You wrote that, right?

20    A.  I did.

21    Q.  And then you said, "We have to join arms to get something a

22    little more nuanced," right?

23    A.  I wrote that.

24    Q.  And by "nuanced," you meant balanced, right?

25    A.  I meant something accurate -- something accurate as to what

1    our report was.

2    Q.  Well, "nuanced" is not "accurate," right?  "Nuanced" is

3    "balanced," right?

4    A.  I don't know that "nuanced" is "balanced."

5    Q.  Well, you wrote this, right, sir?

6    A.  Yes.  I'm telling you what I think I meant.

7    Q.  And you were telling Mr. Manafort that you have to join

8    arms with him to get that nuanced message out.

9    A.  What I was concerned about was a leak that would falsely

10   report in the front pages of the newspapers of the world that

11   Skadden had exonerated Ukraine.  That was going to be a false

12   statement.  When I said to him "We need to join arms to prevent

13   that from happening," that's what I said when I -- that's what

14   I meant when I said "Join arms to get something just a little

15   more nuanced."  That means we want something honest and

16   accurate as to what the Report is going to say.  And we don't

17   want to have a leak, neither you nor I.

18   Q.  Yes.  But, your last sentence, sir, is not about preventing

19   leaks; it's about getting something a little more nuanced

20   correct?

21   A.  Well, joining arms, it's about joining arms.

22   Q.  Right, to get something a little more nuanced?

23   A.  Right, that's what I say.

24   Q.  Right, and if there was a perception, as you say here, that

25   you had exonerated Ukraine, that would be the worst thing that

1    happened to you, right?

2    A.  Well, that was my -- my nightmare was that there would be a

3    false story leaked to the news media that said we had

4    exonerated Ukraine when we hadn't.  That's my nightmare.

5    Q.  That would damage your reputation, right?

6    A.  Well, it would do more than that.  It would falsely

7    represent the work of a great team of lawyers and a great law

8    firm.

9    Q.  Right.  That would be damaging to your law firm, right?

10   A.  It would be damaging to the reputations of the law firm, to

11   mine, to the members of the team, and it would do damage to

12   Ukraine, I think.

13   Q.  Right.  "It would do damage to your guy," which is

14   President Yanukovych, right?

15   A.  When I refer to Paul Manafort's -- yes.

16   Q.  "Your guy" is President Yanukovych, right?

17   A.  Yes.

18   Q.  All right, sir.

19          Let's look at Government's Exhibit 503.  That's also

20   in evidence.

21          And, sir, these are some of the media plans that you

22   received, right?

23   A.  I don't -- I don't know how many of -- what you've got here

24   in this --

25   Q.  Well, these are documents from your hardcopy files,

1    correct?

2    A.   Yes.  Yes, these were in my files.

3    Q.   Right.  These are the documents that you actually either

4    printed or were handed, correct?

5    A.   I think -- I think I asked Catie to print these out for me.

6    Q.   And then you read them, right?

7    A.   I didn't read them all, but I read some of them.

8    Q.   And you annotated it?

9    A.   Yes, I did, in anticipation of a discussion with Cliff.

10   Q.   Okay.  So, if you look at the very first paragraph, at the

11   top, you saw that it read, "The public release of the Report

12   prepared by Skadden will provide a major opportunity for the

13   government to reset the agenda and demand a fresh appraisal of

14   its position regarding the trial and conviction of Yulia

15   Tymoshenko," correct?

16   A.   That's what it says.

17   Q.   And if we go to page 2, where we have that arrow that goes

18   to the top, second bullet point.  It says, "The Report will

19   conclude that the trial was valid and that the crimes were

20   committed by Yulia Tymoshenko, but that some irregularities

21   existed not in line with Western jurisprudence," right?

22   A.   Right.  I made that arrow.

23   Q.   And you said yesterday, that was wrong, right?

24   A.   That was absolutely wrong.

25   Q.   Let's go look at Point Number 6 and down on that page.

1          And you write, sir, here, that it said, "In addition,

2    a small number of international journalists should be briefed

3    in advance of the publication of the Report, under strict

4    embargo, and formally contacted by the MOJ press team with

5    support of the AC team on behalf of the MOJ."

6    A.  Right.

7    Q.  Right?

8          You knew, sir, from the beginning, that the strategy

9    was to leak, to seed this report with journalists, correct?

10   A.  Not from the beginning.

11   Q.  Well, from July of 2012, at least, right?

12   A.  I think that's fair, yes.

13   Q.  And when you saw the background about -- your handwritten

14   note about backgrounding critical journalists, that was in

15   April of 2012, correct?

16   A.  I wrote that handwritten note, backgrounding critical

17   journalists.  That could have been something about other than

18   just this report.  It might have been about Project Two, as

19   well.

20   Q.  And in -- just under 6, there's the initials "BM" and "FH,"

21   right?

22   A.  Yes.

23   Q.  And then you wrote, "Burson" something.

24          What does it say there?

25   A.  It's Burson-MA, probably for Marsteller.

1    Q.  Right.  And then what's the other thing you wrote?

2    A.  Fleisher.

3    Q.  Right.  So those are PR firms, right?

4    A.  They are.

5    Q.  And you knew that when you were reviewing this document?

6    A.  I was trying to figure out who BM and FH were, and that was

7    my guess.

8    Q.  And if you look at page 6 of this report, numbers 5 and 6

9    at the bottom.

10   A.  503006?

11   Q.  Yes, sir.  Yep.  Are you --

12   A.  I'm there.

13   Q.  Page 6?

14   A.  Yes.

15   Q.  Okay.  And you wrote "Okay" next to both of those

16   suggestions, right, in the plan?

17   A.  Would you direct me where my --

18   Q.  Sure.

19   A.  There's a bunch of notations here.

20          Are we talking Number 3?

21   Q.  No.  No.  Page 6.  You're right, 5 and 6.

22   A.  Oh, 5 and 6.

23   Q.  Right.

24          And you wrote "Okay" by both of those, right?

25   A.  I did, that's my handwriting.

```
1    Q.  And that's the one about the embargo of the journalist,

2    right?

3    A.  Which are you talking about?

4    Q.  I'll withdraw the question.

5            Let's go to the next page, at the top, 7.

6    A.  Yes.

7    Q.  And here, you're discussing briefing or an outreach to

8    Ashton, Fule, Schultz.

9            Do you see that?

10   A.  What number are you at?  Tell me the number.

11   Q.  Seven.

12   A.  Yes, I see that at the top.

13           THE COURT:  Well, the document is discussing

14   outreach.

15           MR. CAMPOAMOR-SANCHEZ:  Right.

16           THE WITNESS:  Yeah.  At Number 7, this will include

17   outreach to Ashton, Fule, Schultz --

18   MR. CAMPOAMOR-SANCHEZ:

19   Q.  Right.

20   A.  Stakeholders, think tanks, and interested NGOs.

21   Q.  Right.  And, sir, you had been discussing with

22   Bruce Jackson reaching out to Fule and others at this time,

23   too, right?

24   A.  I don't recall that.  May have.

25   Q.  And so that we're all clear, Fule was the minister of
```

1   European affairs at the time, right?

2   A.  He was in charge of the expansion of the European Union,

3   and was the member of the European government that advised the

4   commission on whether Ukraine should be invited to be an

5   associate in the European Union.

6   Q.  Right.  So, if the association agreement was going to be

7   signed, he was going to be an important person in that process,

8   right?

9   A.  Stefan Fule was an important person in the issue of whether

10  the European Union was going to invite Ukraine to join as an

11  associate of the Union.

12  Q.  So, let's look at --

13          MR. CAMPOAMOR-SANCHEZ:  This is not in evidence, Your

14  Honor, so should not be published just yet; Government's

15  Exhibit 819.

16          Can we display it, just for the Judge?

17          THE COURT:  Or you can just hand her paper copies and

18  she can hand them up to me.  And I can ask if the defense

19  objects, and we don't have to have a bench conference unless

20  they do.

21          MR. CAMPOAMOR-SANCHEZ:  Here.

22          THE COURT:  You don't have another copy for me?  All

23  right.

24          MR. CAMPOAMOR-SANCHEZ:  I thought I did, Your Honor,

25  but, apparently, I do not have that one.  But --

```
 1                    THE COURT:  All right.  I'll wait.  I just thought it
 2       would be faster if you just handed up a paper copy.
 3                    MR. TAYLOR:  No objection.
 4                    THE COURT:  All right.  Then you can admit it.
 5                    MR. CAMPOAMOR-SANCHEZ:  Can we display it, please?
 6                    THE COURT:  So we're -- just 819?  We haven't talked
 7       about 20 yet?
 8                    MR. CAMPOAMOR-SANCHEZ:  Correct.
 9       BY MR. CAMPOAMOR-SANCHEZ:
10       Q.  Sir, Bruce Jackson is a friend of yours, correct?
11       A.  Yes, he is.
12       Q.  And Mr. Jackson was also part of a think tank, right?
13                    THE JURORS:  Are we supposed to see it?
14                    THE COURT:  Yes.  It's been admitted.  They can see
15       it.
16                    Is it on the screen?
17                    THE COURTROOM DEPUTY:  Yes.
18                    THE COURT:  Okay.
19       BY MR. CAMPOAMOR-SANCHEZ:
20       Q.  Mr. Jackson was part of pt/democracy.org, right, at the
21       time?
22       A.  I had known Bruce from working with him on the Committee to
23       Expand NATO.  This was an organization, I think, that came out
24       of that, that had to do with democracy.  I was never familiar
25       exactly with the think tank, but it was that kind of an
```

1    organization.

2    Q.  But, he's a friend of yours, a personal friend?

3    A.  Yes.  We worked together.

4    Q.  And you have vacationed together?

5    A.  We have.

6    Q.  So, Mr. Jackson writes to you on July 19th, and he says,

7    "Dear Greg, As I mentioned to you earlier, I had dinner in

8    Brussels on Tuesday with Stefan Fule, who is the European

9    commissioner for enlargement and neighborhood, and who is

10   responsible for Ukraine and the eastern partnership.  I passed

11   them along the broad outlines of your report as you gave them

12   to me."

13          Sir, you were briefing your friend, Bruce Jackson,

14   about the Report, were you not, as of July 19, 2012?

15   A.  No.  I told him what we were doing.  I described the

16   project that we were engaged in.

17   Q.  And then he continues to write in that, "Stefan may have to

18   comment on his report.  And, anyway, we'll be traveling to

19   Viktor Pinchuk's Yalta Conference in early September.  I

20   thought the two of you should consider exchanging cell phone

21   numbers this summer as a contingency measure," right?

22   A.  He makes that proposal.

23   Q.  In fact, you said, "Good idea.  I don't know when the

24   Report will be released, but it makes sense for Fule to have

25   contact info to me when the moment comes," right?

1   A.  I did, I wrote that.

2   Q.  Okay.

3   A.  And I gave him my cell phone.

4   Q.  Right.  You gave your cell phone so Fule could contact you,

5   correct?

6   A.  That's right.

7   Q.  And, in fact, he passed on to you Fule's information in

8   August of 2012?

9   A.  He may have.

10  Q.  You don't recall?

11  A.  I don't recall.

12  Q.  Okay.

13  A.  I never talked to Fule.

14  Q.  We're going to get to that.

15          Now, you also discussed with Mr. Jackson who should

16  get an advanced copy of your report, did you not, sir?

17  A.  I don't recall that.

18  Q.  And you discussed with him, also, how administration

19  officials in the United States would get an advanced copy of

20  the Report?

21  A.  I don't recall that.

22  Q.  And you gave a copy of the Report to Mr. Jackson in

23  September of 2012, did you not, sir?

24  A.  I don't think so.

25  Q.  Okay.  Let's look at Government's Exhibit 829 [sic].  This

1    is not in evidence.

2              MR. CAMPOAMOR-SANCHEZ:  Your Honor, we would move

3    Government's Exhibit --

4              THE COURT:  Wait a minute.

5              So, it's just the one email from -- okay.  Let me

6    just read it.

7              All right.  So -- all right.

8              What's the defendant's point of view about whether

9    this is admissible?

10             MR. TAYLOR:  No objection.

11             THE COURT:  All right.  You can admit it.

12   BY MR. CAMPOAMOR-SANCHEZ:

13   Q.  Sir, you've been looking at it, right?  You have it your

14   book?

15   A.  Yep.

16   Q.  Okay.  And this is a letter from Mr. Jackson to you on

17   September the 6th, 2012, right?

18   A.  The email to me is September 20th, 8:04 a.m.

19   Q.  I'm sorry.  Sir, are you on 821?

20   A.  829.

21             THE COURT:  821.

22             THE WITNESS:  Oh, I'm sorry.  I'm looking at the

23   wrong --

24             MR. TAYLOR:  He said 829.

25             THE COURTROOM DEPUTY:  You said 829, Counsel.

 1              THE COURT:  Well, anyway, we're looking at 821 at

 2     this point.

 3              So, do you have an objection to 821?

 4              MR. TAYLOR:  It's the same thing I just looked at.

 5              THE COURT:  I think it is.

 6              MR. TAYLOR:  No objection.

 7              THE COURT:  Okay.

 8     BY MR. CAMPOAMOR-SANCHEZ:

 9     Q.  Sorry.  821, sir.

10     A.  821.

11     Q.  Getting my numbers mixed up.

12     A.  Oh, here.  Hold on.

13          Okay.

14     Q.  And if you look at --

15     A.  Jackson to Craig.

16     Q.  Correct, on September the 6th; is that right?

17     A.  August the 8th.

18              THE COURT:  No.

19              THE WITNESS:  Oh, that's 820.  I'm sorry.  I

20     apologize.

21          Got it.  Okay.

22     BY MR. CAMPOAMOR-SANCHEZ:

23     Q.  And, sir, just to orient us, Tony Blinken that you see

24     listed at the bottom here under the people that should get an

25     advance, Tony Blinken was the Deputy National Security Adviser

1    at the time for President Obama, was he not?

2    A.  I think so.

3    Q.  Above that we also have Stefan Fule as somebody who should

4    get a copy of the Report in advance, right?

5    A.  This is an email from Bruce Jackson.

6    Q.  To you?

7    A.  Yes.

8    Q.  Right.  And my question originally was:  You were

9    discussing with him who should get an advance copy of the

10   Report, including people below?

11   A.  I don't recall discussing this with him at all.

12   Q.  Okay.  Then let's look at Government's Exhibit 822, not in

13   evidence.

14          MR. CAMPOAMOR-SANCHEZ:  Your Honor, we would move the

15   admissibility of 822.

16          THE WITNESS:  Is there a question?  I'm sorry.

17          MR. CAMPOAMOR-SANCHEZ:  No.

18          THE COURT:  We're talking about --

19          MR. TAYLOR:  No objection.

20          THE COURT:  All right.  822 will be received in

21   evidence.

22          You can put it on the screen.

23   BY MR. CAMPOAMOR-SANCHEZ:

24   Q.  Yeah.  Let's start with the last email on the top of the

25   second page.

1    A.  The first -- oh, at the top of the second page.  Yes.

2    Q.  Yes, sir.

3           That's an email from Paul Manafort to you -- I'm

4    sorry -- to Mr. Jackson on September 23rd, correct?

5    A.  Yeah.  It starts at the bottom of the previous page.

6    Q.  And --

7    A.  From Manafort to Jackson, September 23rd, yes.

8    Q.  Correct.  And that was the day of the Harvard Club meeting,

9    correct?

10   A.  Yes, it was.

11   Q.  Okay.  And Mr. Manafort wrote, "I asked Greg to call you

12   about the possibility of a private briefing of his report to

13   Fule when he is transiting through Europe.  Does this make

14   sense?"

15          Let me ask you first, sir, you discussed at the

16   Harvard Club meeting whether you would meet with Mr. Fule,

17   correct?

18   A.  We may have.

19   Q.  Okay.  And then let's go to the first page.  The bottom

20   email in response.

21          And Mr. Jackson responded to Mr. Manafort, correct?

22   Do you see that?

23   A.  I do.

24   Q.  And that was the next day, on September the 24th, correct?

25   A.  Right.

1   Q.  All right.  And he writes, "Yes, it makes great sense.  If

2   it all possible, make sure Greg gets there before the Report

3   appears on the street."

4           And then he continues.

5           And then look at the bottom, where it says, "How are

6   you going to get the message to Blinken?  I think that WH" --

7   and that means the White House, right?

8   A.  Yes.

9   Q.  -- "will be easier than state, where Teft has a done a lot

10  of work, and Dan Russell leads towards YT, anyway."

11          That's Yulia Tymoshenko, correct?

12  A.  Yes, I would assume so.

13  Q.  And then he forwards that to you, at the very top.

14  A.  He does.

15  Q.  Right.  Says, "Dear Greg, I have attached my response to

16  Manafort's email this morning below.  If you want to talk, tell

17  me when to call."

18          And then he tells you when Fule is going to be in

19  Brussels, right?

20  A.  He does.

21  Q.  So, sir -- and he forwarded to you the chain that was being

22  exchanged between him and Manafort, right?

23  A.  I see that.

24  Q.  Right.  And, so, sir, you knew that Manafort and Ukraine

25  were going to use the Report to try to brief Blinken, as well

1    as other people, right?

2    A.  I honestly didn't -- I didn't know what he was going to do

3    with the Report on October -- September 24th.  I didn't know

4    what he was going to do with the Report.

5    Q.  Well, certainly the FARA Unit asked you.  That was one of

6    the questions, right?  Like, What will the Ministry of Justice

7    do with the Report, correct?

8    A.  That's correct.

9    Q.  Right.  And certainly your friend Bruce Jackson -- and by

10   the way, Bruce Jackson recommended you to Paul Manafort, right?

11   A.  He may have.

12   Q.  And your friend --

13   A.  I think it was actually Doug Shoen who was the one who

14   selected me for this project.

15   Q.  Right.  I'm not asking you who approached you first.  But,

16   he also recommended you to Manafort, right?

17   A.  He may have.

18   Q.  All right.  I think we get the point.

19           But, let's look now at Government's Exhibit 829, not

20   in evidence.

21   A.  829.  We're back to 829.

22   Q.  Now we're really in 829.

23           THE COURT:  All right.  Don't talk about it yet.

24           MR. TAYLOR:  Can I see 829?

25           (Pause.)

1          MR. TAYLOR:  No objection.

2          THE COURT:  All right.

3          MR. CAMPOAMOR-SANCHEZ:  Is it admitted, Your Honor?

4          THE COURT:  It will be admitted.

5          You can put it on the screen.  You can ask him about

6     it.

7     BY MR. CAMPOAMOR-SANCHEZ:

8     Q.  Sir, let's start at the bottom -- bottom half of the page,

9     where the forwarded message begins.

10          And this is an email from Mr. Jackson to

11    Tony Blinken, right?

12    A.  Yes.

13    Q.  And a J. Smith.

14          Who is J. Smith?  Do you know?

15    A.  I don't.

16    Q.  Okay.  He certainly has a .gov account, right?

17    A.  Well, it looks, to me, like the office of the vice

18    president, if you look at the email address.

19    Q.  Right.

20    A.  Jsmith@officeofvicepresident.executiveofficeofpresident.gov.

21    Q.  Right.  And that email also says -- is discussing whether

22    Senator Durbin has decided to fast track a Magnitsky Act for

23    Ukraine on Tymoshenko, right?

24    A.  This is Bruce Jackson communicating with Tony Blinken and

25    Julie Smith.

1   Q.  Right.  About that issue of Ukraine?

2   A.  That's what it says, yes.

3   Q.  Now, let's -- see next to the tab, where it says, "More to

4   the point," at the very bottom?

5          It says, "More to the point, after we spoke, I had an

6   opportunity to read portions of the Skadden Report, which I

7   will deny having seen.  It is brilliantly written and is

8   devastating to all parties fairly equally.  Durbin and some at

9   state are on very uncertain legal ground.  The White House

10  should not join them.  If you really want to screw Ukraine,

11  let's wait and see if the elections give a clear case."

12         And then he forwards that to you, right?

13  A.  Yes.

14  Q.  He says, "Dear Greg, No doubt you know by now, if you are

15  awake, that the Senate and Ukraine have gotten into a scuffle.

16  Below is my note to Tony."

17         Do you know Mr. Blinken?

18  A.  Do I know Tony Blinken?  Yes.

19  Q.  "I repeat how I regret that your report is not available to

20  cool the hotheads.  I also regret to be wasting what little

21  ammo I have with the White House on endlessly annoying and

22  trivial Ukraine when the Kremlin is the real prize."

23         Sir, you had shared a copy of the Skadden Report with

24  Mr. Jackson in September of 2012?

25  A.  No, I don't think I did.

1   Q.  So, you think that Mr. Jackson was lying when he says he's

2   read portions of the Skadden report?

3   A.  I think that's not true.

4   Q.  And you actually responded right above his email.  And you

5   said, "I cannot get into the Ukraine fracas in the Senate

6   without registering as a foreign agent.  I don't want to do

7   that."

8   A.  Right.

9   Q.  And, again, sir, you knew that Mr. Jackson, using your

10  report, was in contact with members of the U.S. government?

11  A.  I don't think he had access to the Report.  He was

12  obviously saying that he did, and he was in touch with members

13  of the United States government.

14  Q.  Right.  And he said he would deny having seen it.

15            MR. TAYLOR:  Objection.

16            THE COURT:  All right.  I think you're arguing with

17  him at this point.

18            MR. CAMPOAMOR-SANCHEZ:  All right.  All right.  I'll

19  move on, Your Honor.

20            MR. TAYLOR:  I don't think it's a fair question to

21  ask him.

22            THE COURT:  Well, you objected to the question and

23  it's been sustained.

24  MR. CAMPOAMOR-SANCHEZ:

25  Q.  All right.  Let's move on, Mr. Craig.

 1              I think you alluded to this before, but you also, in

 2      addition to the media plan you -- I showed you earlier,

 3      Mr. Sloan also got a copy of it in late August?

 4              Do you recall that?

 5      A.  Yes.  In fact, I received the copy that we were discussing

 6      earlier from Cliff, and Cliff told me that he -- he said, let's

 7      discuss.

 8      Q.  Right.

 9      A.  So, it was in my office that I was reviewing that media

10      plan in preparation of a conversation with Cliff Sloan.  That's

11      why I was reviewing it.

12      Q.  Right.  And Mr. Sloan was concerned about what he saw in

13      the media plan, was he not?

14      A.  I was concerned about it.  I assume he was.  I can't

15      remember a specific conversation.

16      Q.  Well, you certainly had and discussed a copy with Mr. Sloan

17      in that "let's discuss" email of August of 2012.

18      A.  What's your question?

19      Q.  I'll rephrase.

20              You did discuss with Mr. Sloan the media plan in

21      August of 2012, right?

22      A.  I think we had a conversation where we decided that we were

23      not going to comment, amend, make any effort to change the

24      media plan because that would get closer to the line of

25      providing public relations advice, and we didn't want to do

 1    that.

 2    Q.  All right.

 3    A.  So we did not communicate with either Manafort or with

 4    Mr. Hawker about the details --

 5    Q.  You anticipated my next question.

 6         You never complained to Mr. Manafort or Mr. Hawker

 7    about those media plans that you saw, correct?

 8    A.  No.

 9    Q.  And, in fact, Mr. Manafort, in September, before the

10    Harvard Club meeting, also sent you another version of the

11    meeting plan?

12    A.  Well, I --

13         THE COURT:  You need to speak into the microphone.

14         MR. CAMPOAMOR-SANCHEZ:  Sorry.

15         THE WITNESS:  It's hard to hear you.

16         MR. CAMPOAMOR-SANCHEZ:  I apologize.

17         THE COURT:  Thank you.

18    MR. CAMPOAMOR-SANCHEZ:

19    Q.  My question, sir, was:  In September, before the Harvard

20    Club meeting, Mr. Manafort sent you yet another copy of the

21    media plan, correct?

22    A.  I think I asked him what the communication strategy was.  I

23    was interested in knowing, directly, what the communication

24    strategy was.

25    Q.  In fact, Mr. Manafort told you that he wanted your thinking

1    about the media --

2    A.  He was also saying that to me.

3    Q.  Right.  And then, of course, you got the one before the

4    Harvard Club meeting, correct?

5            MR. TAYLOR:  Objection.  I don't think the question

6    is clear.

7            THE WITNESS:  I understand it, I think, Mr. Taylor.

8            THE COURT:  All right.

9    MR. CAMPOAMOR-SANCHEZ:

10   Q.  Then please go --

11           THE COURT:  Did you get another one before the

12   September meeting?

13           THE WITNESS:  Apparently I did, Your Honor, at

14   11:15 p.m., the night before the meeting on Sunday, there was,

15   in my Blackberry, reference to a huge document that had been

16   sent to me, apparently by Mr. Hawker.  I did not read it.  I

17   did not print it out.  I didn't look at it.  But, that was, in

18   fact, a media plan.

19   BY MR. CAMPOAMOR-SANCHEZ:

20   Q.  Right.  So you never looked at it at all?

21   A.  I don't think I ever looked at it at all.

22   Q.  Okay.  All right.

23           You certainly didn't complain about that to anybody,

24   correct?

25   A.  I didn't complain about it?  No, I don't think I ever did.

1    Q.  Okay.  You also were asked some questions yesterday about

2    your communications with Mr. Weber.

3              Do you recall that?

4    A.  Yes, I do.

5    Q.  Okay.  Let's talk about that a little bit.

6              On October the 2nd, sir, you learned that the Report

7    was supposedly going to be released shortly.

8              Do you recall that?

9    A.  Only from the emails.  I think, on October 2nd, I was in

10   Cairo, engaged in this project.

11   Q.  Right.

12   A.  And that was where my mind was and my attention was focused

13   on, what we were doing in the Middle East.

14   Q.  But, you were exchanging emails with Mr. van der Zwaan on

15   October the 2nd, where he informed you, right, that the Report

16   was about to be released?

17   A.  Yes, I think there are emails that show that Alex told me

18   that the plan was to be released in October.

19   Q.  In fact, I think you were happy about that, right?

20   A.  I was disappointed that we had not been able to deliver it

21   during the United Nations General Assembly in September.  So, I

22   was happy to learn that we had a plan for delivering it to

23   Ukraine in October, yes.

24   Q.  In fact, you said words to the effect of, Give Shonka a hug

25   and a kiss for me, right?

1   A.  Did I say that?

2   Q.  Do you recall that?

3   A.  No, I don't.

4   Q.  Okay.

5           Well, you certainly knew that on October 2nd, you

6   were notified the Report was going to be released?

7   A.  I was told by Alex that that was what the plan was.  I was

8   off in Cairo.

9   Q.  Okay.  So let's look at Government's Exhibit 300, please.

10          THE COURTROOM DEPUTY:  This is in evidence, Counsel?

11          MR. CAMPOAMOR-SANCHEZ:  Yes, this is in evidence.

12          THE COURTROOM DEPUTY:  Thank you.

13  BY MR. CAMPOAMOR-SANCHEZ:

14  Q.  And this is an email from Ms. Whitney to you on the 2nd?

15  A.  I'm getting to 300.

16  Q.  Oh, sorry.

17  A.  Yes.  Yes, this is about getting contact info.

18  Q.  Right.  My question is, that -- after the emails you got

19  from Mr. van der Zwaan, you asked Ms. Whitney for Mr. Sanger's

20  contact info, correct?

21  A.  Well, they're not necessarily related.  I think the reason

22  I asked Ms. Whitney to get David Sanger's contact information

23  was because Vin Weber asked me if I knew David Sanger, and

24  could I put him in touch with David Sanger.  And, so, I asked

25  Catie to provide me contact info for David Sanger, which I then

1    gave to Vin Weber.

2    Q.  You made that very clear yesterday, sir.  But, my question

3    is, the very day you learned the Report was going to be

4    released is the day you asked Ms. Whitney to get you the

5    contact information for Mr. Sanger, correct?

6    A.  That may be.  I'm not going to --

7    Q.  Well, you're not sure when you were -- you're not sure

8    October 2nd --

9    A.  No.  I'm not arguing with you.

10   Q.  Okay.  All right.

11   A.  I'm simply saying that what prompted this letter to Catie

12   was my conversation with Vin.

13   Q.  Believe me, we all get clear that that's your testimony.

14   My only --

15               THE COURT:  No comments.  Just ask the next question.

16               MR. CAMPOAMOR-SANCHEZ:  I'm just trying to move on,

17   Your Honor.  Okay.

18               THE COURT:  All right.

19   BY MR. CAMPOAMOR-SANCHEZ:

20   Q.  Also on that date, after you got the info from Ms. Whitney,

21   you contacted Mr. Sanger, right?

22   A.  Yes.  I wrote him an email and asked him to take a call

23   from Vin.

24   Q.  That's Government's Exhibit 301, right?

25   A.  I don't know the number, but -- yes.

1    Q.  It's in evidence.

2    A.  There it is.

3    Q.  And then Mr. Sanger responded to you.  That's 302.

4           And it was clear from the communications that the

5    purpose of this was, you want to talk -- you wanted him to talk

6    to Vin Weber about a report that "we" -- Skadden -- "wrote

7    about the Tymoshenko case," right?

8    A.  I asked him if he would take a call from Vin about a

9    report.

10   Q.  About the Report you wrote --

11   A.  Yes.

12   Q.  -- with your colleagues?

13   A.  Yes.

14   Q.  Right.  And then Mr. Sanger said, "Sure.  Vin knows me,"

15   gave him the cell phone, and then he says where he could be

16   reached, right?

17   A.  Yeah, he -- that's right.

18   Q.  Right.  And then in 304 --

19   A.  Are we at 304?

20   Q.  Yes, sir.

21          -- you then forward that to Mr. Weber; is that right?

22   A.  Yes.

23   Q.  And then if we look at 307.

24          You then ask Ms. Whitney to deliver the Report to

25   Mr. Weber.

```
1    A.  Yes.

2    Q.  And, sir, the Report had not yet been delivered to the

3    client, had it?

4    A.  Well, the first draft of the Report had been given to the

5    client -- or, Mr. Manafort on July 27th.  I thought the final

6    draft -- the Report had been completed in September, and we

7    made that available to the client in September.

8    Q.  Well, my question, sir, is:  No final draft -- or, final

9    report had been delivered yet to the Ukraine at this stage?

10   A.  No.  We tried.  We tried.  It had not happened.

11   Q.  It had not happened, correct?

12   A.  Nope.

13   Q.  Okay.  So, after this, you also had a conversation with

14   Mr. Weber about the Report.

15           Do you recall that?

16   A.  No.

17   Q.  Okay.  Let's take a look at 809.  Not in evidence.

18   A.  Is it in the book?

19   Q.  Yes, sir, it's in the book.

20   A.  Right.

21   Q.  All right.  And that's an email from Ms. Whitney to you?

22   A.  Yes.

23   Q.  About a call on -- about -- from Mr. Weber, correct?

24           THE COURT:  Wait one second.

25           Is there any objection?
```

```
 1              MR. TAYLOR:  No objection.

 2              THE COURT:  All right.

 3              You can put it on the screen.  It will be admitted.

 4    A.  Catie is telling me about a call from Ed Kutler, who I did

 5    not know, but who was, apparently, was calling on behalf of

 6    Vin Weber.

 7    BY MR. CAMPOAMOR-SANCHEZ:

 8    Q.  And the reason is, they want to talk to you about Ukraine,

 9    right?

10    A.  That's what she says to me.  She says, "Ed is supposed to

11    talk to you about the Ukraine," and he gives me Ed's number.

12    Q.  And you did talk to Mr. Weber [sic]?

13    A.  I don't recall talking to Mr. Kutler about the Report.

14    Q.  Okay.  So, sir, you knew Mr. Weber was a lobbyist, right?

15    A.  I knew Mr. Weber was a lobbyist, I did.

16    Q.  And, so, you handed the Report to him before it was

17    publicly available, correct?

18    A.  He was working for Ukraine -- he told me he was working for

19    Ukraine.

20    Q.  But, you handed the Report to him, right?

21    A.  I arranged for it to be delivered to him.  I didn't hand

22    the Report to him.

23    Q.  You're right.  You're being very precise.

24              But, you arranged for it to be delivered?

25    A.  I did.
```

1              Precision is a good thing.

2   Q.  And you've been saying that the Report was finalized; is

3   that right?  You had tried to deliver it.  As of October, the

4   Report was finalized; is that right?

5   A.  What are you referring to?  Make sure I know.

6   Q.  Let me ask you, sir, the Report, your report, was not in

7   final form until late November of 2012; isn't that right?

8   A.  I would disagree with you about that.  We had it in final

9   form in September and had tried to deliver it in final form to

10  Ukraine in September.  And if you look at the Report that is in

11  evidence, it's dated September.

12  Q.  Yeah.  The fact that it's dated doesn't mean it's accurate,

13  does it, sir?

14              MR. TAYLOR:  Objection.

15              MR. CAMPOAMOR-SANCHEZ:  It's a question.

16              THE COURT:  Well, the fact that it has that date on

17  it, does that mean that it was necessarily done that day?

18              THE WITNESS:  If you want my view, my view is that it

19  was done in September.

20  MR. CAMPOAMOR-SANCHEZ:

21  Q.  Okay.  Well, let's take a look at Government's Exhibit 310.

22  In evidence.

23  A.  Oh, it's 310.  Okay.

24  Q.  Yes, sir.

25              And that's an email from you to Mr. Manafort?

```
 1                    THE COURTROOM DEPUTY:  Your Honor, I don't show on

 2        the exhibit list that 310 is in evidence.

 3                    THE COURT:  Government Exhibit 310?

 4                    MR. CAMPOAMOR-SANCHEZ:  I thought it was.  Is it not?

 5                    Well, let's take it down.

 6                    THE COURT:  It may be in evidence -- I ruled it in

 7        evidence.  But it has it been shown previously?

 8                    MR. CAMPOAMOR-SANCHEZ:  My apologize.  I move it in,

 9        then.

10                    THE COURT:  All right.

11                    MR. TAYLOR:  310?

12                    THE COURT:  Government's Exhibit 310.

13                    MR. TAYLOR:  No objection.

14                    THE COURT:  All right.  So, it will be in and it can

15        be shown.

16        BY MR. CAMPOAMOR-SANCHEZ:

17        Q.  This is an email from you to Mr. Manafort?

18        A.  That's correct.

19        Q.  And it's dated November 19th, correct?

20        A.  That's correct.

21        Q.  All right.  Let's look at Point Number 2.

22                    "In the existing transcript, we did refer to the

23        Lavrynovych letter and cited to it.  We will make more specific

24        reference to the fact that the defense counsel introduced this

25        letter and advanced a legal defense.  We will also say that the
```

1    Court did not accept that legal analysis because it represented
2    only a preliminary legal opinion."
3            Those were changes that you were making in November
4    of 2012, correct?
5    A.  That's correct.  I think that was a footnote that we added.
6    Q.  Okay.  And then Number 3.
7            "We have now included the letter from deputy
8    prosecutor general."
9            And then he goes on, right?  That was also a change
10   you were making at the time?
11   A.  Having to do with the same topic, the legal opinion from
12   Lavrynovych.
13   Q.  "Going forward, we will make reference to the prosecutor
14   general's theory, that she entered into the January 19th
15   agreement."
16           It goes on.
17           That was something else that was being added,
18   correct?
19   A.  Yes.
20   Q.  And then you closed by saying, "The final report will be
21   ready for delivery in a few hours."
22   A.  That's correct.
23   Q.  So the final report was actually finished in November of
24   2012, correct, sir?
25   A.  As far as I was concerned, the Report had been completed

1    and final in September.  These additional comments we took in.

2    Yes, they were added.

3    Q.  Okay.  Let's look at 311, then.  Also in evidence.

4         And that's the next day, November 20th, right?

5    A.  Yes.

6    Q.  And you say, "Paul, two things.  As described in my email

7    to you of yesterday, we have responded to the reactions from

8    the Ministry of Justice.  The tweaks have been made, and the

9    final report is ready for delivery."

10   A.  That's what it says.

11   Q.  Okay.  And that's what you meant at the time, right?

12   A.  Yes.

13   Q.  Okay.  And your Point Number 2 is, "We have more than

14   exhausted the retainer.  We are owed another 75,000 in time and

15   expenses."

16        See that?

17   A.  Yes.

18   Q.  All right.  So, as of November 20th, in both expenses and

19   fees, you were just down by 75,000; is that correct?

20   A.  That's what that says.

21   Q.  Right.  Certainly nowhere near the million and a quarter

22   that you were asking about in August of 2012, right?

23   A.  That's correct.

24   Q.  And, sir, after the Report was finalized and delivered,

25   Mr. Manafort gave you one other assignment, right?

1    A.  I don't know what you're talking about.

2    Q.  He gave you assignment of a confidential memo that he

3    wanted you to write.

4    A.  Oh, yes.

5    Q.  He did, right?

6    A.  I didn't think it was confidential.  He asked me to write a

7    memo, yes.

8    Q.  In fact, that memo was just yours; it wasn't the team's,

9    right?

10   A.  That's correct.

11   Q.  It was entirely Greg Craig's?

12   A.  It was my work.

13   Q.  Right.  And in that letter -- or, in that memorandum, you

14   wrote, "The evidence of criminal intent, i.e., that she

15   actually intended to commit a crime, is virtually nonexistent."

16           That's what you wrote to Mr. Manafort, right?

17   A.  Yes, in response to his request to identify the arguments

18   that would be made on behalf of both sides in front of the

19   European Court of Human Rights.  That was what I found to be

20   one of her strongest arguments.

21   Q.  Right.  That's nowhere in your report, is it, sir?

22   A.  I disagree with that.  I think the Report actually reflects

23   that argument.

24   Q.  Did you ever say in your report that the evidence that she

25   actually intended to commit a crime is virtually nonexistent?

 1    Is that anywhere in your report?

 2    A.   That wording is not in the Report, you're right.

 3    Q.   So, sir, we're almost done.

 4         Let's move to your communications with FARA.   Okay?

 5    A.   Yes.

 6    Q.   All right.   Let's look very quickly at Government's

 7    Exhibit 3.

 8    A.   I didn't hear the --

 9    Q.   Three.

10    A.   Number 3?

11    Q.   Three, yes, sir.

12         And let's highlight the second paragraph that starts

13    with, "As you know."

14    A.   Yes.

15    Q.   Okay.   The last full sentence reads, "Recently, she was

16    charged with tax evasion and embezzlement, and she has been

17    named as a suspect in a murder case."

18         The first part of that sentence, the tax evasion and

19    embezzlement, that was Project Number Two, correct?

20    A.   We were serving as consultants on the rule of law with

21    respect to this second prosecution, and we called it Project

22    Two.

23    Q.   Right.   And my question, sir, is a little simpler.

24         When the FARA Unit is making reference to the fact

25    that they have found out that she was recently charged with tax

1     evasion and embezzlement, that is Project Number Two, correct?

2              THE COURT:  The case to which they are referring in

3     this letter is also --

4              MR. CAMPOAMOR-SANCHEZ:  What you knew.

5              THE COURT:  -- the case that was Project Two; is that

6     correct?

7              THE WITNESS:  I think so.  I think so.  I just didn't

8     get the connection.  Yes, I think that the second prosecution

9     of Tymoshenko was the one that our lawyers were working -- the

10    Mike Loucks was working with the procurator general.

11    MR. CAMPOAMOR-SANCHEZ:

12    Q.  Right.  You certainly never identified for the FARA Unit

13    that you were working on this Project Number Two, did you, sir?

14    A.  We said that we were working on rule of law issues in the

15    criminal justice system.  We did not identify Project 2.

16    Q.  Right.  Right.  Now, let's go to Exhibit Number 4, which is

17    the -- your June 3rd response.

18              You discussed this with Mr. Taylor yesterday, right?

19    A.  Yes, we did.

20    Q.  Okay.  And before you send your response to the April

21    letter, you went through a number of drafts, correct?

22    A.  Yeah.  Cliff and I exchanged drafts back and forth.

23    Q.  There were lots of iterations of what became the final

24    letter?

25    A.  I think that's fair to say, yes.

1    Q.  And you're very careful in your work, right?

2    A.  I try to be.

3    Q.  In fact, I believe you mentioned earlier, precision is

4    important, right?  It's one of your answers earlier, right?

5    A.  I think it is.

6    Q.  Right.  In --

7    A.  I don't like to make errors.

8    Q.  I'm sorry?

9    A.  I don't like to make errors.

10   Q.  Okay.

11          In -- let's look at 430, Exhibit 430, which is one of

12   the drafts in this -- in -- to this letter.

13   A.  430?

14   Q.  Yes, sir.

15   A.  Got it.

16   Q.  And that's an email that you sent on May 1st to

17   Ms. Whitney --

18   A.  Yep.

19   Q.  -- where you asked her to "Please put in final form for my

20   signature," right?

21   A.  Yes.

22   Q.  And let's look at page 2.

23   A.  That's the letter or the exhibit?

24   Q.  Page 2 of the exhibit, which is the first page of the

25   letter.

1    A.  First page of the letter.  Yes.

2    Q.  Let's look at Number 1.

3         And this is an answer -- a draft answer to that

4    question of, "To whom, if anyone, did your firm release or

5    distribute the Report?"

6         Do you see that?

7    A.  Oh, we're down to Number 1.  Okay.

8    Q.  Yes, sir.

9    A.  Yes.

10   Q.  And in this draft you wrote, "In addition to giving the

11   Report to representatives of the government of Ukraine, the law

12   firm on December 11th to 12," right?

13   A.  Yes, I see that.

14   Q.  And that got later changed, if you look at 442.

15        Now we're at the end of May, May 28th.

16        Do you see that?

17   A.  What's your question?

18   Q.  I'm first asking you if you've located -- is this -- do you

19   see this document?

20   A.  I'm looking at it.

21   Q.  Yeah.  Is this the final?

22   A.  Yes, it looks like the final.

23   Q.  No.  It's 442.  It's another draft, sir.

24   A.  Oh, it's a draft.  Okay.

25   Q.  Yes, sir.  And it's May 28th.

```
 1                    Do you see that at the top?
 2      A.  Yes, I see that.
 3      Q.  Okay.  And you had asked Ms. Whitney to send it to
 4      Mr. Sloan for a last look-see, right?
 5      A.  Yes.
 6      Q.  Okay.  Let's look at what the letter says as to paragraph 1
 7      and the dates, which is page 3 of the exhibit, or page 2 of the
 8      letter.
 9                    And now, sir, the date has been changed to December
10      12 to 13 on here, right?
11      A.  That's correct.
12      Q.  And let's look at 444, Exhibit 444.  That's an email chain.
13      A.  There's nothing in my 444.  I don't have that exhibit, but
14      I can use the monitor.
15      Q.  Okay.  And you have it on the screen.
16                    And Mr. Sloan responded to your request to
17      Ms. Whitney, right?  And he had a number of suggestions; 1, 2,
18      3, right?
19      A.  We're looking at the bottom of the --
20      Q.  Yes, sir.
21      A.  Yeah.  Cliff to Catie --
22      Q.  Right.
23      A.  -- sends me a note.  Says, "Looks good."
24                    And, yes, 1, 2, 3.
25      Q.  And then --
```

1    A.  And it says, "I assume you're sure about the dates that we

2    provided?"

3    Q.  You anticipated my question.

4         He asked you about the dates, correct?

5    A.  Right.

6    Q.  All right.  And then Ms. Whitney, at the very top, says, "I

7    made other changes, but I'll leave the dates up to you."

8    A.  She did.

9    Q.  Okay.  Now, Mr. Taylor also showed you Government's

10   Exhibit 426 yesterday.  And that was the long email exchange

11   about the articles.  Let's see if you recall that.

12   A.  Yeah.  This was our communications with Lauren in New York

13   about newspaper media outlets --

14   Q.  Right.

15   A.  -- that covered the Report.

16   Q.  Right.  So, let's look at the second page of the exhibit,

17   at your email at the very bottom.

18        So, Ms. Weiss -- now Ms. Malet -- had given you a

19   copy of the *LA Times* article at this point in the chain,

20   correct?

21   A.  And *The National Law Journal*.

22   Q.  Right.  And --

23   A.  She had given us two articles.

24   Q.  Right.  In this email, you bring up for the first time *The

25   New York Times*.  You say, "Thanks, Lauren.  Do you have *The New*

1    *York Times* article about the Report?"

2             Do you see that?

3    A.  That's right.

4    Q.  At that point, Ms. Weiss -- or, Ms. Malet had not said

5    anything about *The New York Times* or provided the article to

6    you, right?

7    A.  No, she had not.

8    Q.  And then in the next email, she responds to that and gives

9    you a copy of *The New York Times* article.

10   A.  Yes.

11   Q.  And then you respond to her, and you say, "It looks like I

12   also gave *The New York Times* a one-sentence statement."

13            And then you say, "Cliff, do you remember that?"

14   A.  Yes.

15   Q.  Sir, did I understand your testimony yesterday that as of

16   April 22nd, 2012, you did not recall your interactions with *The*

17   *New York Times*?

18   A.  I think I did recall my interactions with *The New York*

19   *Times*.

20   Q.  Oh, you did recall them?

21   A.  That's why I asked her to provide us with the article.

22   Q.  Well, you write, "It looks like I also gave *The New York*

23   *Times* a one-sentence statement."

24            So, you did recall, right, in April, your

25   interactions with *The New York Times*, right?

1    A.  I thought that -- I recall that I had interactions with *The*

2    *New York Times*.

3    Q.  Okay.

4    A.  I read *The New York Times*, and I recall that there was a

5    sentence in *The Times* that I had provided them on the record.

6    Q.  So, let me make sure we're all clear on this.

7           So, are you saying that as of April 27, you did not

8    recall reaching out to Mr. Sanger?

9    A.  I didn't say that.

10   Q.  Well, let me ask you.

11          Did you recall on April 22nd, reaching out to

12   Mr. Sanger?

13   A.  I don't know the answer to that.

14   Q.  Do you recall, on April 22nd, driving to his house and

15   dropping off the Report?

16   A.  I think I remember driving and dropping off his report.

17   Q.  At this point, on April 22nd, do you recall informing

18   Mr. Hawker about your communication was Mr. Sanger?

19   A.  I don't think I'd reviewed the emails.  I really hadn't

20   reviewed the emails.

21   Q.  All right.  We're going to get into that in a second, then.

22          But, if you go to the very top, Ms. Weiss asks you,

23   "Might you have worked with Jonathan Hawker, FTI, on that item?

24   I know he was involved in the project generally, but that our

25   team at Skadden did not handle."

1    A.  Right.

2    Q.  Right?  She certainly brought Mr. Hawker to your attention

3    in this email, right?

4    A.  Yes, she did.

5    Q.  Okay.  And you were saying about the emails -- let me ask

6    you, sir, you knew that there were a lot of emails about this,

7    right?

8    A.  I can't recall what I knew or remembered at that moment.

9    Q.  Okay.  You certainly asked, for example, people on your

10   team to collect the emails and have Catie print them out so

11   that you had an accurate record from which to respond to the

12   FARA letter's unit, right?

13   A.  I'm not sure I did that.

14   Q.  Okay.  Let's look at 837.

15            MR. CAMPOAMOR-SANCHEZ:  It's not admitted, Your

16   Honor, and I thought I had my copies here.

17            Can we approach?

18            THE COURT:  Yes.

19            Take it off the jury screen, then.

20            MR. CAMPOAMOR-SANCHEZ:  It's not on the screen.

21            THE COURTROOM DEPUTY:  It's not on the jury screen.

22            THE COURT:  Oh, okay.

23            THE WITNESS:  It's on my screen.

24            THE COURT:  All right.  Well --

25            MR. TAYLOR:  It's not in.

1          MR. CAMPOAMOR-SANCHEZ:  I know.  That's why I want to

2     show it to you, so we can --

3          (Bench discussion:)

4          (Pause.)

5          MR. TAYLOR:  I haven't seen it.

6          THE COURT:  All right.  I think this relates to his

7     asking that emails be collected, but it asks that emails be

8     collected about the back and forth about the agreements.  It

9     doesn't really relate to collecting emails -- all emails about

10    communications with Hawker and Sanger.

11         MR. CAMPOAMOR-SANCHEZ:  Right.  But it shows that he

12    knows exactly how to collect emails, and that is a function

13    that can and should be done when he's trying to answer a

14    question from the FARA Unit.  And this is sent in early

15    January, just literally weeks after this is happening, and

16    there is no such effort to collect the emails about his

17    communications with *The New York Times*.

18         THE COURT:  Okay.  Do you object to the admission of

19    this document, then?

20         MR. MURPHY:  Well, I think it's got to be made clear

21    that what he's asking for here is in response to the very first

22    letter, where the FARA Unit specifically asks for contracts and

23    any proposed contracts.  And, so, he asked Mr. van der Zwaan to

24    gather together all the back and forth --

25         THE COURT:  That's fine.  So, I think your question

 1    is more general.

 2                MR. CAMPOAMOR-SANCHEZ:  Right.

 3                THE COURT:  So, when you put it up there, and you

 4    need to focus in, you used the listed emails on X, Y, and Z.

 5    This shows that.  And then you can ask whether he did it.

 6                MR. MURPHY:  On the other side.

 7                THE COURT:  All right.  All right.

 8                MR. CAMPOAMOR-SANCHEZ:  Then it will be clear that

 9    it's in response to the first letter, where there was a

10    specific request for contractual documents.

11                MR. TAYLOR:  For completeness, I request that he

12    permit Mr. Craig to read each --

13                THE COURT:  He can put the whole thing in, and he can

14    take as much time as he wants before he answers it.

15                (Open court:)

16                THE COURT:  All right.  The exhibit will be admitted.

17                Mr. Craig, you can take the time to review the whole

18    thing.

19                (Pause.)

20                THE WITNESS:  Okay.

21                THE COURT:  Ask the question.

22    BY MR. CAMPOAMOR-SANCHEZ:

23    Q.  So, sir, Exhibit 837 is, you were asking Mr. van der Zwaan

24    to collect emails related to the contractual arrangements you

25    had reached with Ukraine, correct?

1    A.  It was a very specific task that I gave to Alex --

2    Q.  Right.  So this is --

3    A.  -- in responding to the very first inquiry from FARA in

4    that December letter.

5    Q.  From FARA, right.

6    A.  I wanted to get some greater certainty about the email

7    communications that he'd had with Nazar, who was the official

8    in the Ministry of Justice with whom he had been talking about

9    our contractual arrangements in April.

10   Q.  So that we're all clear --

11   A.  So, let me just finish.

12           I was not asking Alex to provide me emails relating

13   to what happened in December.

14   Q.  I've not suggested that, sir.

15   A.  Okay.

16   Q.  In fact, my question said, you had asked Mr. van der Zwaan

17   to collect the emails related to the contractual arrangements

18   between yourselves and Ukraine, correct?

19   A.  That's correct.

20   Q.  And the reason you were asking that is, you wanted to

21   respond to the first FARA letter, correct?

22   A.  This was in response to the first letter.

23   Q.  Right.  And you asked them, "If you can just collect all

24   the emails back and forth between you two at that time.  I just

25   want to make sure that we're solid on all fronts."

1           That's what you wrote.

2    A.  Yes.

3    Q.  And then there's a back and forth about that.

4           And then at the very top, you summarize and said,

5    "Thanks.  It is hard to say what to look for.  So, the easiest

6    thing is, just send Catie the emails to print out.  The reason

7    for this is that we have been asked some questions from USDOJ

8    about the representation and whether we should register under

9    FARA," right?

10   A.  And that was because I was not part of those email

11   exchanges and had no insight as to what was going on between

12   Nazar and Alex.

13   Q.  Right.

14   A.  And I wanted to know that.

15   Q.  But, certainly, sir, when you want to be complete and

16   accurate, you know that it's easy enough to search your emails

17   to make sure the record is complete, right?

18   A.  On this occasion, I asked Alex to do that.

19   Q.  And you know that, generally, right?

20   A.  I'm not going to argue with you.

21   Q.  Okay.  Excellent.

22          Let's go look at Government's Exhibit 6, then.

23          This is in evidence, and this is your email to

24   Mr. Spiegel --

25   A.  Yes.

1    Q.  -- about FARA.  And you said, "Just for the record, Skadden

2    did not disseminate the Report to the news media.  Three media

3    outlets who were not able to obtain a copy of the Report from

4    the Ministry in Kyiv contacted us and asked us to provide them

5    with a copy.  The Report was a public document."

6         That was not true about the *The New York Times*,

7    correct?

8    A.  That's right.  I testified to that.

9    Q.  Right.  And I think --

10   A.  What was specifically not true was that they were -- *The*

11   *New York Times* had not tried to obtain a copy of the Report

12   from the Ministry in Kyiv.

13   Q.  Right.  And the Report was not a public document when you

14   gave it to Mr. Sanger, correct?

15   A.  It was not.

16   Q.  And, Number 2, you said, "At no time did Skadden contact

17   the media.  Quite the contrary.  We were approached by the

18   media, asked for interviews, asked for background commentary,

19   and we did not respond.  The only time we responded was to

20   correct misinformation."

21        Also not accurate as to *The New York Times*, correct,

22   sir?

23   A.  That's not accurate with respect to *The New York Times*.

24   Q.  And that is precisely what you told the FARA Unit in your

25   meeting of October 9th, right?

1   A.  I did not tell them that.

2   Q.  Well, let me ask you, sir, before you went to the meeting

3   with the FARA Unit, you reviewed the draft letter you had sent

4   to Mr. Spiegel, correct?

5   A.  I don't recall doing that, but I don't dispute the fact

6   that IT information reflects that I opened it up.

7   Q.  Right.  So, in fact, we had Mr. Lesser testify about that.

8   A.  Yes.

9   Q.  Okay.  So, let's look at Government's Exhibit 7, then.  And

10  if you look at the bottom -- well, let's look at the top first.

11          This is the email you sent to Mr. Spiegel on -- the

12  next day, right, September 20th?

13  A.  I sent the "Just for the record" email on the 19th.

14  Q.  Right.

15  A.  And I sent the draft --

16  Q.  On the 20th.

17  A.  -- on the 20th, with a note.  "Here's the first shot at

18  it."

19  Q.  Right.

20  A.  And, yes, I sent it to Larry.

21  Q.  And you also sent it to Mr. Kedem, right?

22  A.  Kedem.

23  Q.  Kedem.  Sorry.

24  A.  Yes, I sent it to Allon.

25  Q.  Right.  You did not sent it to Mr. Haskell?

1    A.   No.

2    Q.   But, Mr. Haskell had actually been the person that

3    forwarded the stuff to *The New York Times*, correct?

4    A.   I was the one who asked Alex not only to forward a copy of

5    the Report to Mr. Sanger, but also to forward a copy of the

6    Report to the *Los Angeles Times* journalists.

7    Q.   And he's not copied on this email?

8    A.   He's not.

9    Q.   Let's look at page 1 of your draft letter, at the very

10   bottom.

11            MR. CAMPOAMOR-SANCHEZ:   And, again, if we can

12   highlight that.

13   MR. CAMPOAMOR-SANCHEZ:

14   Q.   That is the same thing you were telling Mr. Spiegel, right?

15   A.   Yeah.   That looks like the same mistake I made in my email

16   to Larry.

17   Q.   Right.   And then if you go to the second page -- or, the

18   next page, I should say.

19            Again, "To my knowledge, no one in this firm

20   initiated any contacts with the media," right?

21   A.   That's what it says.

22   Q.   All right.   And, sir, you remembered your contacts with

23   Mr. Sanger at this point, right?

24   A.   I'm not sure I reviewed emails -- that extensive email

25   record on the 11th and the 12th.   I don't think I'd reviewed

```
 1    those emails.
 2    Q.  Right.  But my question was --
 3              THE COURT:  All right.  Mr. Campoamor, can you just
 4    get a little closer to the microphone?
 5              MR. CAMPOAMOR-SANCHEZ:  Yeah.
 6              THE COURT:  There were some people who didn't hear.
 7              The last question was:  You remembered your contacts
 8    with the media when you wrote this?
 9              Is that what you --
10              MR. CAMPOAMOR-SANCHEZ:  Right.
11    MR. CAMPOAMOR-SANCHEZ:
12    Q.  And that was my question, not whether you reviewed emails,
13    but that you, in fact, remembered that you had contact with
14    Mr. Sanger, correct?
15    A.  I think I got this wrong.  I think I made an error.  This
16    was a mistake.  So, I misremembered.
17    Q.  So, you misremembered contacting him and going to his house
18    and all that?
19    A.  If you're talking about the specifics of this draft letter,
20    I misremembered various aspects of the contacts with *The New*
21    *York Times*, and I jumbled them all together.  Each one of those
22    contacts was different.  They had a different circumstance
23    surrounding it, and I muddled them together.
24    Q.  Because you had not read the emails.
25              Is that what -- is that what you're saying?
```

1    A.  I don't think I'd read the emails in December 11th and

2    12th, no.

3    Q.  Okay.  But, certainly, sir, you drafted the letter, you

4    reviewed the letter before you went to the FARA meeting, and

5    that's what you told the FARA people, right?  That's what you

6    told Ms. Hunt?

7    A.  I don't understand your question.

8            What is it that you're asking me that I told the FARA

9    people?

10   Q.  The same thing you told Mr. Spiegel.

11   A.  No.

12   Q.  The same thing that you wrote in your draft letter.

13   A.  No.

14   Q.  The same draft letter that you reviewed before you went to

15   the meeting that morning, right?

16   A.  If your question is:  Did I tell them -- make the same

17   mistakes that I made in these documents, the answer to that is

18   no.

19   Q.  All right.  Let's look at, then, Government's Exhibit

20   Number 12, the letter of October 10th.

21           Your letter, right?

22   A.  Yes.

23   Q.  Okay.  Let's look at the second paragraph, "As reported."

24           You said, "As reported in earlier correspondence,"

25   right?  That's what you wrote?

1    A.   You're reading it correctly, yes.

2    Q.   Right.  And you're incorporating -- all the other letters

3    and all the other things you'd said, you're incorporating into

4    this letter, right?

5    A.   No.  I'm talking very specifically about what I say.  "We

6    provided a copy of the Tymoshenko Report to certain U.S. media

7    outlets.  That was reported in earlier correspondence."

8              And I said, "We told you that before, we're telling

9    you again, we provided a copy of the Tymoshenko Report to U.S.

10   media outlets."

11             And we'd identified in the first letter and we're

12   identifying in the meeting the media outlets that we provided

13   the Report to.

14   Q.   You said, "This was done in response to requests from the

15   media."

16             That is not true, sir.

17   A.   It is true.

18   Q.   You're now claiming that Mr. Sanger requested the document

19   from you?  That you didn't offer it to him first?

20   A.   It might -- sorry.  I didn't mean to interrupt.

21             But, in my conversation with David Sanger, he asked

22   me to provide him with the Report, and I did.

23   Q.   In your email before the conversation, you offered him the

24   Report, correct?

25   A.   I said if you're interested, I would make the Report

1    available.  In the telephone conversation that I had with him

2    afterwards, he asked me to provide him with the Report.

3    Q.  All right.  Let's look at the last paragraph.

4         You also said that "The law firm did not consult with

5    Ukraine, did not inform Ukraine, did not act under instruction

6    of Ukraine, and in no way was serving as an agent for Ukraine."

7         Sir, you would agree with me, after we just reviewed

8    all these emails before, you did inform Ukraine, right, of what

9    you were doing with Mr. Sanger?

10   A.  You haven't read the full sentence, and I think the full

11   sentence modifies what I'm saying.

12        "In responding to inaccuracies in the U.S. news

13   reports."

14        In other words, in the statements we made to these

15   three media outlets, which were intended to correct

16   misinformation that had been issued by the Ukrainians, we did

17   not consult with Ukraine, we did not inform Ukraine, or act

18   under instruction from Ukraine.

19        I did not run my quotation on the record in *The New

20   York Times* past anybody from Ukraine, either Hawker or

21   Manafort.

22   Q.  And as we read in the earlier paragraph of the same letter,

23   you lump *The New York Times* with everything else, as if you

24   were responding to media requests, right?  You lumped it all

25   together, and that was not accurate?

1    A.  Are you referring to this question about whether we

2    responded to requests from the media?

3    Q.  Yes, sir.

4    A.  Yes.  Each one of those three media outlets had asked us

5    for a copy of the Report.  And in each instance, we supplied a

6    copy of the Report in response to their request.

7    Q.  And this --

8    A.  This has to do with the fact that we did not consult with

9    Ukraine in any way, shape, or form when we made the statement

10   on the record, attributable to me, to *The New York Times* or to

11   *The National Law Journal* or when we had a conversation with --

12   with -- Alex had the conversation with the *Los Angeles Times*.

13   Q.  Sir, it's true, you told the FARA Unit that in your

14   contacts with *The New York Times*, you had not informed Ukraine.

15   That's what it says here, correct?

16   A.  I said, "In responding to inaccuracies in U.S. news

17   reports."

18   Q.  And you had said that *The New York Times*, you were

19   responding inaccuracies --

20            MR. TAYLOR:  Objection.

21            THE COURT:  I think you're arguing with him a little

22   bit here.

23            Just to clarify, the statement on the record that you

24   gave Mr. Sanger, was that the only thing you said to Mr. Sanger

25   or Mr. Herszenhorn?

1          THE WITNESS:  No.  There was -- my testimony is that

2     I told Mr. Herszenhorn, who is the person with whom I had the

3     substantive conversation about the Report, I told him that I

4     thought that the headline of his article should be that we

5     found flaws in the trial process, and that there are violations

6     of her due process rights.  That was what I wanted to convey,

7     and I did.

8     BY MR. CAMPOAMOR-SANCHEZ:

9     Q.  All right.  Sir, I just have a few more questions for you.

10         You never told the FARA Unit that you had given a

11    copy of the Report to Mr. Weber, correct?

12    A.  We said in the letter, responding in April, that we had

13    provided copies to the representatives of Ukraine, and that

14    included Mr. Weber.  We didn't tell them about we provided

15    copies to Mr. Manafort.  We didn't include Mr. Manafort.

16    Q.  My question is very simple, sir.

17         You did not say Mr. Weber, correct?

18    A.  I did not use Mr. Weber's name.  I did inform FARA that we

19    had communicated -- we'd provided reports -- our report to

20    representatives of Ukraine.

21    Q.  You certainly never told FARA that you were aware of all

22    the media plans and how Ukraine intended to use this report,

23    correct?

24    A.  No.

25    Q.  You certainly never told the FARA Unit about the fact that

1    Mr. Hawker and others had asked you to contact *The New York*

2    *Times*, right?

3    A.  I did not inform the FARA Unit about Mr. Hawker, no.

4    Q.  Right.  And you certainly, also, never told the FARA Unit

5    that you had told Mr. Hawker that if Sanger didn't work out,

6    the *Post* was a backup for the --

7    A.  I didn't tell him that.  So, I would not have informed FARA

8    of the fact; it wasn't true.

9    Q.  You certainly never told them that you knew, also, that

10   Al Hunt was being considered as a backup, right?

11   A.  I did not inform FARA about Al Hunt, no.

12   Q.  Right.  And one of the questions that the FARA asked you

13   was if you knew what was going to happen to the Report, right?

14   A.  That's correct.

15   Q.  And you knew what was going to happen to the Report,

16   according to your testimony, based upon what Mr. Hawker was

17   doing, correct?

18   A.  From the beginning of the day of that -- the first day of

19   our project, we were uncertain as to what was going to happen

20   to the Report.  It was only in the first week in December did

21   we really have confidence that they were going to release the

22   Report.

23   Q.  Right.  And you did not tell the FARA Unit, after you had

24   confidence in the release of the Report, that you knew what

25   Ukraine was going to do with the Report, right?

1    A.  Well, yeah, that's correct.

2    Q.  Right.  And you told the ladies and gentlemen of the jury

3    that -- yesterday, that you initially agreed to background

4    journalists at the Harvard Club meeting, right?

5    A.  Well, background journalists, no.  I agreed to respond to

6    inquiries from journalists who had questions about the facts of

7    the case.

8    Q.  Well, the email that you sent said, "I'm going to have to

9    reverse" --

10   A.  Yes.

11   Q.  -- "on backgrounding journalists," right?

12   A.  That was the phrase that they had used.

13   Q.  Right.  And then you said that you thought -- because that

14   was a gray area, you decided to back off from that, right?

15   A.  That's correct.

16   Q.  And, sir, you went back and talked to Mr. Sanger after you

17   claimed that you thought that was too close to the FARA Unit,

18   correct?

19   A.  I went to talk to Mr. Sanger because I was concerned that

20   Ukraine was going to misrepresent what our report was all

21   about, and I wanted to make sure that *The New York Times* got it

22   right.

23   Q.  Mr. Sloan was the one that asked you to reverse course on

24   backgrounding journalists, did he not?

25   A.  I don't think so.

1          MR. CAMPOAMOR-SANCHEZ:  No further questions.

2          THE COURT:  All right.

3          Approximately how long do you think your redirect is

4     going to be?

5          MR. TAYLOR:  Ten minutes.

6          THE COURT:  I'm sorry?

7          MR. TAYLOR:  Ten minutes.

8          THE COURT:  All right.  Do you want to do it before

9     the break?

10         All right.  You can proceed.

11         If somebody else has a problem, let me know.

12         MR. TAYLOR:  Are we good?

13         THE COURT:  All right.  Thank you.

14         Yes, you can proceed.

15                      REDIRECT EXAMINATION

16    BY MR. TAYLOR:

17    Q.  Mr. Craig, Mr. Campoamor-Sanchez asked you questions about

18    what you knew about what you were not being charged with.

19         Do you remember those?

20    A.  I think I know what you're talking about, yes.

21    Q.  And he asked you whether you knew that you were not being

22    charged with certain things.

23    A.  Yes.  Yes.

24    Q.  And do you know whether you were charged with any

25    wrongdoing concerning the contracts with the Ministry of

```
 1    Justice?
 2    A.  I do know that, and I am not.
 3    Q.  Or whether you're being charged with any wrongdoing in
 4    connection with the second contract with the Ministry?
 5    A.  I do know that, and I am not being charged with any
 6    wrongdoing.
 7    Q.  Or whether you're being charged with any wrongdoing in
 8    connection with fees and expenses in connection with this
 9    project?
10    A.  I am not.
11    Q.  Mr. Campoamor asked you about a meeting you had with
12    government attorneys and agents on October 19th, 2017.
13              Do you remember --
14    A.  Yes.
15    Q.  -- that he asked you about that?
16              And do you remember them showing you a media plan?
17    A.  They were asking me questions about one of the media plans.
18    Q.  And what did you tell them about whether your contact with
19    David Sanger was part of the media plan?
20    A.  I told them that it was not part of the media plan.  I told
21    them that -- I told them I had delivered a report to
22    Mr. Sanger, but it was not part of a media plan.
23    Q.  How many times did you meet with government attorneys,
24    Mr. Craig?
25    A.  In 2017 and 2018?
```

1    Q.   Yes.

2    A.   I met once in 2017 and once in 2018.

3    Q.   How long each time?

4    A.   I think that the very first meeting was three to four

5    hours.  The second meeting, in 2018, I think was four or five

6    hours.

7    Q.   Why did you meet with them?

8    A.   They asked me and I agreed to.

9    Q.   Mr. Craig, did you charge the Ministry of Justice for any

10   of the time you spent talking to journalists?

11   A.   No.  I was not working for Ukraine at that moment.

12   Q.   You've seen a couple of emails from Mr. Manafort which

13   appear to be complimenting you or praising you about something.

14   A.   Yes.

15   Q.   Do you recall -- do you recall receiving those emails?

16   A.   I do.

17   Q.   What was your reaction to them?

18   A.   I was surprised and amused more than anything else.  I

19   didn't know why he was sending them to me, to be honest.

20   Q.   And you were -- you were asked whether you had reviewed or

21   seen any media plans by Mr. Campoamor-Sanchez.

22            Do you remember that?

23   A.   Yes.

24   Q.   And did you see some media plans?

25   A.   I did.

1    Q.  Did you agree to participate in any of those media plans?

2    A.  Never.

3    Q.  And you were asked some questions about some email

4    exchanges with Bruce Jackson.

5            Do you remember that?

6    A.  Yes.

7    Q.  Was there any other way Mr. Jackson could get a copy of the

8    Report, other than you?

9    A.  Well, he knew Manafort.  Manafort, at that time, had a copy

10   of the Report.  He might have gotten a copy of that report from

11   Paul Manafort.

12           MR. TAYLOR:  Nothing further.

13           THE WITNESS:  Up until this moment, I hadn't really

14   focused on that, but that's a possibility.

15           MR. TAYLOR:  Nothing further, Your Honor.

16           THE COURT:  All right.  We're going to take our

17   midmorning break at this time.  It may turn out to be a longer

18   break, I don't know yet.  So I'm going to ask you to return to

19   the jury room in ten minutes.

20           And during that point of time, even though it seems

21   like the case is almost over, it has yet to be submitted to

22   you.  So, please don't discuss it among yourselves or with

23   anyone else.

24           You can be excused and be back in ten minutes.

25           (Whereupon the Jury exits the courtroom.)

```
 1              THE COURT:  All right.  Yes, Mr. Craig, you're
 2    excused to return back to counsel table.
 3              Why don't we take our break, and then you can let me
 4    know if anything further is happening on either side, and then
 5    we'll go from there.
 6              But, are we anticipating that we've now heard all the
 7    evidence in this case at this moment?
 8              MR. CAMPOAMOR-SANCHEZ:  We --
 9              THE COURT:  Do you still want to talk among
10    yourselves?
11              MR. CAMPOAMOR-SANCHEZ:  Yes.
12              THE COURT:  All righty.
13              Thank you.  I'll see you in ten minutes.
14              (Recess.)
15              THE COURT:  All right.  Mr. Taylor, when we bring the
16    jury back in, do you intend to introduce any more evidence or
17    do you intend to rest?
18              MR. TAYLOR:  We intend to rest, Your Honor.
19              THE COURT:  All right.
20              What about you?
21              MR. CAMPOAMOR-SANCHEZ:  No rebuttal case.
22              THE COURT:  All right.  So, I think we should bring
23    the jury back in so that you can each do those things.  Then we
24    need to excuse the jury and tell them when to come back.  I
25    believe it's Thursday.  Today, at this moment, it is Thursday.
```

1    It's all a blur.  But, I think that is correct.

2              MR. MURPHY:  Might be five hours off.

3              THE COURT:  That's exactly how I feel.  My head is

4    five hours off.

5              And the jury has already been told that we will not

6    be sitting tomorrow, and we assured them of that when we

7    selected them.  So, we will not.  And, so, they will be told to

8    return on the Tuesday after Labor Day.  But, they need to

9    return after we've had an opportunity to review the jury

10   instructions together, which is not going to happen this

11   afternoon.  And, so, it will happen on Tuesday morning.

12             So, we will convene at 9:30 on Tuesday morning.  And

13   I thought I would ask the jury to be back at 1:00.  My plan

14   would be that we will have time to have a break between our

15   conference and the closings and lunch and all those things.

16   But, if we can get started at 1:00 or 1:30, we will.  If it

17   takes until 2:00, it takes until 2:00.  So, I will tell them to

18   be there at that time.

19             And then, because I believe during jury selection I

20   said -- I gave them a bit of a preview of what would happen in

21   the rest of the week in the unlikely event we were still here

22   after Labor Day, that I should also give them a heads-up as to

23   the rest of the schedule.

24             So, I will tell them all those things.  And -- all

25   right.

1          Let's bring them back.

2              (Whereupon the jury enters the courtroom.)

3              THE COURTROOM DEPUTY:  Everyone is present, Your

4     Honor.

5              THE COURT:  All right.  Everyone can be seated.

6              Mr. Taylor, does the defense have any other evidence

7     it wishes to introduce at this time?

8              MR. TAYLOR:  No, Your Honor.  The defense rests.

9              THE COURT:  All right.  Thank you.

10              Mr. Campoamor-Sanchez, does the government have any

11     other evidence it intends to introduce at this time?

12              MR. CAMPOAMOR-SANCHEZ:  No, Your Honor, we do not.

13              THE COURT:  All right.

14              You have now heard all of the evidence in the case.

15     The next thing that has to happen is that the Court and the

16     parties have to confer about the specific jury instructions

17     that I've been telling you you're going to get that tells you

18     what the law is that's going to apply to your decision.  And

19     that process takes time, and it has to be done thoroughly and

20     properly.

21              You may also recall that when we selected the jury, I

22     promised you that you would not be sitting here on the Friday

23     before Labor Day weekend, and that was taken into consideration

24     when you told me whether you were available to sit or you were

25     not available to sit.  And, therefore, we will not be sitting

1    here on the Friday before Labor Day weekend.

2            So, that means that when I excuse you shortly for

3    this afternoon, I will be excusing you for a nice, long,

4    hopefully sunny weekend, and that you will be returning on the

5    Tuesday after Labor Day.  And I'm going to ask you to be in the

6    jury room and ready to go at 1:00 p.m. on Tuesday, September --

7            MR. MURPHY:  3rd.

8            THE COURT:  -- 3rd, 2019.  At which time you will

9    hear the parties' closing arguments, and you will receive

10   instructions from me, either immediately thereafter or first

11   thing the following morning, depending on how long it takes to

12   hear the closing arguments.

13           That means -- and I cannot underscore this more

14   strongly, notwithstanding the fact that I've told you this 100

15   times before -- you still have not had the case submitted to

16   you to decide.  You can't talk about it to anybody else.  You

17   can't talk about it to each other.

18           You have now heard all of the evidence.  You should

19   not be online looking for more facts that one of you will have

20   and the rest of you won't.  The case is what the witnesses said

21   from the witness stand, what the documents say, not what the

22   lawyers said, not anything that you came into this case

23   knowing, and nothing that you're going to look up this weekend.

24           I want you to put it out of your mind and enjoy what

25   is going to be a very long weekend, when, I guess, you will

1    catch up on everything that you haven't been able to do for the

2    past two and a half weeks.

3            I also told you during jury selection that for

4    reasons that have -- that are unrelated to this case, that

5    there are some time constraints at the end of the week that's

6    going to begin on Tuesday, September 3rd.  And, so, we'll be

7    here Tuesday afternoon.  We'll be here all day Wednesday.  We

8    will be here Thursday morning.  If you have not reached a

9    verdict by this time, at approximately 12:30 or so on Thursday,

10   you're going to, again, be excused for the weekend to come back

11   on Monday, the 9th.

12           So, I think I told you at jury selection that the 5th

13   and 6th we would not be sitting, and we'll now sit half the day

14   on the 5th.  So, you have all that in the back of your mind.  I

15   am confident that you're going to continue to obey the Court's

16   instructions.

17           You are excused now, and have a pleasant weekend.

18           Yes, sir?

19           THE JUROR:  So Tuesday, Wednesday, and Thursday

20   morning?

21           THE COURT:  Correct.

22           THE JUROR:  Thank you, ma'am.

23           THE COURT:  Tuesday afternoon, you'll be here at

24   1:00.

25           THE JURORS:  Tuesday afternoon to Thursday morning.

```
 1                THE COURT:  Correct.

 2                Thank you very much, everybody.  You can leave your

 3      notebooks here.

 4                THE COURTROOM DEPUTY:  Just leave your notebooks on

 5      your chair, please.

 6                (Whereupon the Jury exits the courtroom.)

 7                THE COURT:  All right.  I'll see all of you on

 8      Tuesday morning.  I know that everybody has a lot of work to

 9      do, but I hope everybody gets some well-deserved rest as well.

10                I'll see you then.

11                MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

12                MR. MURPHY:  Thank you, Your Honor.

13                (Recess.)

14                THE COURT:  All right.  I've just been informed that

15      based upon the scheduling information that I had provided the

16      jury at the time of jury selection, one of the jurors made

17      travel plans that include Thursday.  So, that was entirely

18      fair.

19                And, so, what I think we should do is, let that juror

20      know that they can rely on what I previously said.  And then I

21      don't think we need to inform the other jurors at this point.

22      We can just let them know at the close of business on Wednesday

23      that they need to come back the following Monday, instead of

24      the next morning, because a lot of them have gone.  I mean, we

25      could, I suppose, have the jury office inform them, but I just
```

1    don't -- I don't --

2              MR. MURPHY:  Let them know Tuesday morning.

3              THE COURT:  Right.  Right.  We'll let them know

4    Tuesday afternoon -- whenever we see them again.  But, I think

5    there's only one of them who needs to know, and I believe she's

6    here.  And, so, unless you disagree, I think we should live up

7    to what we told them.  And it wasn't really that much time on

8    Thursday, anyway.  So, you know, it's too bad that it's going

9    to be broken up, but it is the way it is.

10             So, that's what I'm going to do.

11             MR. TAYLOR:  Thank you.

12             THE COURT:  All righty.  Thank you.

13             MR. CAMPOAMOR-SANCHEZ:  Thank you, Your Honor.

14             MR. TAYLOR:  Are we excused now?

15             THE COURT:  Yes.  You were excused before.  But, I'm

16   glad that you were still here so that we could resolve it.

17                            *   *   *

18

19

20

21

22

23

24

25

```
1
2                CERTIFICATE OF OFFICIAL COURT REPORTER
3
4
5         I, JANICE DICKMAN, do hereby certify that the above
6    and foregoing constitutes a true and accurate transcript of my
7    stenograph notes and is a full, true and complete transcript of
8    the proceedings to the best of my ability.
9                        Dated this 29th day of August, 2019.
10
11
12                        /s/_____
13                        Janice E. Dickman, CRR, RMR, CRC
                          Official Court Reporter
14                        Room 6523
                          333 Constitution Avenue NW
15                        Washington, D.C. 20001
16
17
18
19
20
21
22
23
24
25
```

## $

**$12,000** [1] - 3156:24

## '

**'Skadden** [1] - 3177:17
**'We** [1] - 3157:17

## /

**/s** [1] - 3246:12

## 1

**1** [6] - 3214:2, 3214:7, 3215:6, 3215:17, 3215:24, 3226:9
**100** [2] - 3133:22, 3242:14
**1000** [1] - 3134:3
**10:28** [1] - 3142:1
**10:59** [4] - 3143:6, 3163:1, 3163:7, 3163:10
**10th** [1] - 3228:20
**11** [1] - 3144:1
**11:00** [1] - 3151:20
**11:15** [1] - 3199:14
**11:16** [2] - 3144:16, 3144:18
**11:48** [1] - 3173:12
**11th** [14] - 3140:17, 3140:19, 3141:17, 3141:24, 3142:6, 3142:9, 3142:25, 3147:22, 3149:25, 3150:6, 3151:2, 3214:12, 3226:25, 3228:1
**12** [3] - 3214:12, 3215:10, 3228:20
**12:30** [1] - 3243:9
**12:32** [1] - 3147:22
**12:39** [1] - 3148:25
**12th** [16] - 3153:4, 3153:5, 3153:22, 3153:23, 3154:21, 3156:3, 3156:14, 3156:18, 3161:20, 3162:15, 3163:1, 3163:16, 3163:23, 3175:7, 3226:25, 3228:2
**13** [2] - 3161:22, 3215:10
**13th** [8] - 3154:13, 3154:15, 3154:19, 3155:5, 3162:25, 3163:12, 3164:17, 3165:6
**14** [2] - 3133:5, 3133:8
**1500** [1] - 3148:3
**15th** [1] - 3173:12
**17** [1] - 3144:19
**1800** [1] - 3134:2
**19** [1] - 3186:14
**19-CR-125** [1] - 3133:3
**19th** [5] - 3186:6, 3207:19, 3208:14, 3225:13, 3236:12
**1:00** [4] - 3240:13, 3240:16, 3242:6, 3243:24
**1:30** [1] - 3240:16

**1:53** [1] - 3153:6
**1st** [1] - 3213:16

## 2

**2** [11] - 3175:12, 3180:17, 3207:21, 3209:13, 3212:15, 3213:22, 3213:24, 3215:7, 3215:17, 3215:24, 3224:16
**20** [1] - 3185:7
**200** [3] - 3176:8, 3177:7, 3177:8
**20001** [2] - 3134:9, 3246:15
**20036** [1] - 3134:3
**2012** [20] - 3138:16, 3147:16, 3175:7, 3175:20, 3175:22, 3175:23, 3181:11, 3181:15, 3186:14, 3187:8, 3187:23, 3188:17, 3195:24, 3197:17, 3197:21, 3206:7, 3208:4, 3208:24, 3209:22, 3217:16
**2013** [2] - 3138:18, 3138:23, 3161:21, 3161:22
**2017** [3] - 3236:12, 3236:25, 3237:2
**2018** [3] - 3236:25, 3237:2, 3237:5
**2019** [3] - 3133:6, 3242:8, 3246:9
**202** [3] - 3133:15, 3133:19, 3134:4
**202-354-3267** [1] - 3134:9
**20530** [2] - 3133:15, 3133:18
**20th** [6] - 3188:18, 3209:4, 3209:18, 3225:12, 3225:16, 3225:17
**21202** [1] - 3133:23
**22nd** [4] - 3217:16, 3218:11, 3218:14, 3218:17
**233-0986** [1] - 3133:19
**23rd** [2] - 3191:4, 3191:7
**2440** [1] - 3133:23
**24th** [2] - 3191:24, 3193:3
**252-7698** [1] - 3133:15
**27** [1] - 3218:7
**27th** [1] - 3204:5
**28th** [2] - 3214:15, 3214:25
**29** [1] - 3133:6
**29th** [1] - 3246:9
**2:00** [2] - 3240:17
**2:58** [1] - 3163:18
**2nd** [6] - 3200:6, 3200:9, 3200:15, 3201:5, 3201:14, 3202:8

## 3

**3** [7] - 3182:20, 3208:6, 3211:7, 3211:10, 3215:7, 3215:18, 3215:24
**300** [2] - 3201:9, 3201:15

**301** [1] - 3202:24
**302** [1] - 3203:3
**304** [2] - 3203:18, 3203:19
**307** [1] - 3203:23
**30th** [1] - 3177:4
**310** [6] - 3206:21, 3206:23, 3207:2, 3207:3, 3207:11, 3207:12
**311** [1] - 3209:3
**3167** [1] - 3134:17
**3172** [1] - 3134:17
**3184** [1] - 3134:18
**3185** [1] - 3134:18
**3190** [1] - 3134:19
**3193** [1] - 3134:19
**3194** [1] - 3134:19
**3204** [1] - 3134:18
**3205** [1] - 3134:18
**3207** [2] - 3134:17
**3219** [1] - 3134:20
**3221** [1] - 3134:20
**331** [2] - 3140:22, 3141:1
**332** [2] - 3143:2, 3143:10
**333** [2] - 3134:8, 3246:14
**350** [1] - 3144:12
**351** [1] - 3146:6
**352** [2] - 3146:18, 3146:23
**353** [1] - 3147:18
**354** [1] - 3148:24
**355** [1] - 3149:13
**357** [1] - 3150:5
**360** [1] - 3150:24
**364** [1] - 3152:17
**375** [1] - 3156:2
**376** [1] - 3156:13
**380** [1] - 3162:12
**382** [1] - 3162:21
**385** [1] - 3164:15
**396** [1] - 3165:2
**3:00** [3] - 3148:4, 3156:7, 3162:18
**3:28** [4] - 3141:21, 3141:24, 3142:2, 3142:7
**3:36** [2] - 3156:3, 3156:4
**3:37** [1] - 3156:15
**3rd** [4] - 3212:17, 3242:7, 3242:8, 3243:6

## 4

**4** [1] - 3212:16
**402** [4] - 3167:19, 3167:22, 3167:23, 3172:20
**410** [1] - 3133:24
**426** [1] - 3216:10
**430** [3] - 3213:11, 3213:13
**442** [2] - 3214:14, 3214:23
**444** [3] - 3215:12, 3215:13
**4:16** [1] - 3144:18

## 5

**5** [3] - 3182:8, 3182:21, 3182:22
**503** [1] - 3179:19
**503006** [1] - 3182:10
**530** [1] - 3175:1
**555** [1] - 3133:14
**5:38** [1] - 3162:14
**5:46** [1] - 3149:14
**5:50** [1] - 3150:6
**5:51** [1] - 3177:4
**5th** [2] - 3243:12, 3243:14

## 6

**6** [9] - 3180:25, 3181:20, 3182:8, 3182:13, 3182:21, 3182:22, 3223:22
**6523** [2] - 3134:8, 3246:14
**6:10** [2] - 3151:8, 3151:9
**6:15** [1] - 3151:2
**6th** [6] - 3139:9, 3139:13, 3139:15, 3188:17, 3189:16, 3243:13

## 7

**7** [3] - 3183:5, 3183:16, 3225:9
**75,000** [2] - 3209:14, 3209:19
**778-1814** [1] - 3134:4
**7:58** [1] - 3163:23
**7th** [3] - 3140:1, 3140:6, 3140:13

## 8

**809** [1] - 3204:17
**819** [2] - 3184:15, 3185:6
**820** [1] - 3189:19
**821** [6] - 3188:19, 3188:21, 3189:1, 3189:3, 3189:9, 3189:10
**822** [3] - 3190:12, 3190:15, 3190:20
**829** [9] - 3187:25, 3188:20, 3188:24, 3188:25, 3193:19, 3193:21, 3193:22, 3193:24
**837** [2] - 3219:14, 3221:23
**8:04** [1] - 3188:18
**8:53** [3] - 3153:1, 3153:6, 3153:10
**8th** [1] - 3189:17

## 9

**949-1146** [1] - 3133:24
**950** [1] - 3133:18
**9:12** [2] - 3142:6, 3142:9
**9:30** [2] - 3133:7, 3240:12
**9:53** [1] - 3153:1
**9th** [4] - 3161:21, 3161:22,

3224:25, 3243:11

## A

**a.m** [10] - 3133:7, 3142:6, 3142:9, 3151:20, 3153:8, 3153:9, 3153:10, 3156:7, 3162:18, 3188:18
**Aabelson@zuckerman.com** [1] - 3133:25
**Abelson** [1] - 3133:21
**abide** [1] - 3137:25
**ability** [1] - 3246:8
**able** [4] - 3135:24, 3200:20, 3224:3, 3243:1
**absence** [1] - 3159:7
**absent** [1] - 3171:1
**absolutely** [1] - 3180:24
**AC** [1] - 3181:5
**accept** [1] - 3208:1
**accepted** [1] - 3174:22
**access** [1] - 3196:11
**according** [1] - 3233:16
**account** [1] - 3194:16
**accurate** [11] - 3177:25, 3178:2, 3178:16, 3206:12, 3219:11, 3223:16, 3224:21, 3224:23, 3230:25, 3246:6
**Act** [1] - 3194:22
**act** [2] - 3230:5, 3230:17
**acting** [3] - 3160:16, 3168:18, 3169:2
**Action** [1] - 3133:3
**actual** [1] - 3144:14
**Adam** [2] - 3133:17, 3133:21
**added** [3] - 3208:5, 3208:17, 3209:2
**adding** [1] - 3168:13
**addition** [3] - 3181:1, 3197:2, 3214:10
**additional** [1] - 3209:1
**address** [1] - 3194:18
**adjective** [1] - 3137:9
**administration** [1] - 3187:18
**admissibility** [1] - 3190:15
**admissible** [2] - 3170:18, 3188:9
**admission** [1] - 3220:18
**admit** [4] - 3169:9, 3172:5, 3185:4, 3188:11
**admitted** [10] - 3168:16, 3169:20, 3172:11, 3173:8, 3185:14, 3194:3, 3194:4, 3205:3, 3219:15, 3221:16
**admitting** [1] - 3169:10
**advance** [6] - 3154:3, 3154:14, 3181:3, 3189:25, 3190:4, 3190:9
**advanced** [3] - 3187:16, 3187:19, 3207:25
**advice** [1] - 3197:25

**advised** [1] - 3184:3
**Adviser** [1] - 3189:25
**affairs** [1] - 3184:1
**afternoon** [14] - 3138:11, 3148:4, 3148:25, 3149:14, 3150:6, 3156:16, 3156:18, 3163:18, 3240:11, 3242:3, 3243:7, 3243:23, 3243:25, 3245:4
**afterwards** [1] - 3230:2
**agenda** [1] - 3180:13
**agent** [2] - 3196:6, 3230:6
**agents** [1] - 3236:12
**agree** [7] - 3142:13, 3145:11, 3150:20, 3160:10, 3161:5, 3230:7, 3238:1
**agreed** [4] - 3152:3, 3234:3, 3234:5, 3237:8
**agreement** [2] - 3184:6, 3208:15
**agreements** [1] - 3220:8
**ahead** [2] - 3163:5, 3169:8
**AI** [4] - 3151:24, 3152:4, 3233:10, 3233:11
**Aleksander** [1] - 3142:8
**Alex** [14] - 3142:21, 3142:23, 3142:24, 3149:19, 3164:25, 3166:25, 3200:17, 3201:7, 3222:1, 3222:12, 3223:12, 3223:18, 3226:4, 3231:12
**alleged** [2] - 3145:25, 3146:2
**allegedly** [1] - 3171:19
**Allon** [1] - 3225:24
**allowed** [1] - 3176:25
**alluded** [1] - 3197:1
**almost** [3] - 3144:21, 3211:3, 3238:21
**amend** [1] - 3197:23
**America** [1] - 3133:3
**ammo** [1] - 3195:21
**amused** [1] - 3237:18
**AMY** [1] - 3133:9
**analysis** [1] - 3208:1
**Angeles** [2] - 3226:6, 3231:12
**annotated** [1] - 3180:8
**annoying** [1] - 3195:21
**answer** [10] - 3136:24, 3137:8, 3152:3, 3166:16, 3174:16, 3214:3, 3218:13, 3220:13, 3228:17
**answers** [4] - 3136:23, 3137:2, 3213:4, 3221:14
**anti** [2] - 3159:19, 3159:21
**anti-Ukraine** [2] - 3159:19, 3159:21
**anticipated** [2] - 3198:5, 3216:3
**anticipating** [1] - 3239:6
**anticipation** [1] - 3180:9
**anxious** [1] - 3156:6
**anyway** [4] - 3186:18, 3189:1,

3192:10, 3245:8
**apologize** [3] - 3189:20, 3198:16, 3207:8
**appear** [1] - 3237:13
**apply** [1] - 3241:18
**appraisal** [1] - 3180:13
**appreciate** [1] - 3137:23
**approach** [4] - 3159:14, 3166:1, 3167:24, 3219:17
**approached** [2] - 3193:15, 3224:17
**appropriate** [1] - 3166:8
**April** [13] - 3175:7, 3175:20, 3175:21, 3181:15, 3212:20, 3217:16, 3217:24, 3218:7, 3218:11, 3218:14, 3218:17, 3222:9, 3232:12
**area** [1] - 3234:14
**areas** [1] - 3135:21
**argue** [4] - 3135:25, 3161:1, 3172:3, 3223:20
**arguing** [3] - 3196:16, 3202:9, 3231:21
**argument** [4] - 3136:8, 3136:9, 3136:12, 3210:23
**argumentative** [1] - 3136:10
**arguments** [4] - 3210:17, 3210:20, 3242:9, 3242:12
**arms** [6] - 3177:21, 3178:8, 3178:12, 3178:14, 3178:21
**arrange** [1] - 3143:22
**arranged** [2] - 3205:21, 3205:24
**arrangements** [3] - 3221:24, 3222:9, 3222:17
**arrow** [2] - 3180:17, 3180:22
**article** [7] - 3157:10, 3216:19, 3217:1, 3217:5, 3217:9, 3217:21, 3232:4
**articles** [4] - 3160:1, 3173:17, 3216:11, 3216:23
**Ashton** [2] - 3183:8, 3183:17
**aspects** [1] - 3227:20
**Assembly** [1] - 3200:21
**asserted** [5] - 3169:22, 3170:6, 3170:10, 3170:22, 3171:22
**assertions** [1] - 3172:9
**assignment** [3] - 3174:22, 3209:25, 3210:2
**associate** [3] - 3184:5, 3184:11
**associates** [2] - 3147:3, 3147:12
**association** [1] - 3184:6
**assume** [6] - 3137:24, 3149:12, 3156:12, 3192:12, 3197:14, 3216:1
**assured** [1] - 3240:6
**attached** [1] - 3192:15
**attaches** [1] - 3144:10
**attachment** [1] - 3149:21
**attempted** [1] - 3140:12

**attempting** [1] - 3149:17
**attention** [2] - 3200:12, 3219:2
**attentive** [1] - 3135:17
**Attorney's** [1] - 3133:13
**attorneys** [2] - 3236:12, 3236:23
**attributable** [1] - 3231:10
**August** [8] - 3133:6, 3187:8, 3189:17, 3197:3, 3197:17, 3197:21, 3209:22, 3246:9
**available** [6] - 3195:19, 3204:7, 3205:17, 3230:1, 3241:24, 3241:25
**Avenue** [3] - 3133:18, 3134:8, 3246:14
**awake** [1] - 3195:15
**aware** [5] - 3160:20, 3161:9, 3162:1, 3162:5, 3232:21

## B

**background** [5] - 3174:23, 3181:13, 3224:18, 3234:3, 3234:5
**backgrounding** [7] - 3165:19, 3165:23, 3165:25, 3181:14, 3181:16, 3234:11, 3234:24
**Backgrounding** [1] - 3175:17
**backup** [2] - 3233:6, 3233:10
**bad** [3] - 3160:12, 3160:14, 3245:8
**balanced** [3] - 3177:24, 3178:3, 3178:4
**Baltimore** [1] - 3133:23
**baseball** [1] - 3145:18
**based** [3] - 3162:9, 3233:16, 3244:15
**basic** [1] - 3136:18
**basis** [1] - 3143:19
**bears** [2] - 3135:16, 3136:13
**beat** [1] - 3173:20
**became** [1] - 3212:23
**becomes** [1] - 3156:11
**BEFORE** [1] - 3133:9
**begin** [1] - 3243:6
**beginning** [3] - 3181:8, 3181:10, 3233:18
**begins** [3] - 3147:7, 3147:10, 3194:9
**behalf** [4] - 3160:16, 3181:5, 3205:5, 3210:18
**below** [3] - 3190:10, 3192:16, 3195:16
**bench** [10] - 3135:6, 3135:8, 3136:4, 3159:14, 3159:16, 3166:3, 3168:3, 3168:5, 3184:19, 3220:3
**BERMAN** [1] - 3133:9
**best** [3] - 3136:20, 3148:7, 3246:8

**between** [13] - 3144:11, 3144:22, 3153:12, 3157:8, 3161:17, 3161:20, 3161:22, 3165:10, 3192:22, 3222:18, 3222:24, 3223:11, 3240:14
**binder** [1] - 3140:23
**bit** [5] - 3146:25, 3147:7, 3200:5, 3231:22, 3240:20
**black** [1] - 3160:15
**Blackberry** [1] - 3199:15
**Blinken** [8] - 3189:23, 3189:25, 3192:6, 3192:25, 3194:11, 3194:24, 3195:17, 3195:18
**blur** [1] - 3240:1
**BM** [2] - 3181:20, 3182:6
**book** [4] - 3176:23, 3188:14, 3204:18, 3204:19
**bottom** [14] - 3143:8, 3163:13, 3182:9, 3189:24, 3191:5, 3191:19, 3192:5, 3194:8, 3195:4, 3215:19, 3216:17, 3225:10, 3226:10
**box** [1] - 3177:9
**Bradley** [1] - 3133:17
**break** [5] - 3235:9, 3238:17, 3238:18, 3239:3, 3240:14
**brief** [3] - 3142:4, 3142:8, 3192:25
**briefed** [1] - 3181:2
**briefing** [5] - 3142:14, 3143:18, 3183:7, 3186:13, 3191:12
**briefings** [1] - 3166:25
**brilliantly** [1] - 3195:7
**bring** [7] - 3135:4, 3147:4, 3147:13, 3216:24, 3239:15, 3239:22, 3241:1
**broad** [1] - 3186:11
**broke** [1] - 3138:11
**broken** [1] - 3245:9
**brought** [1] - 3219:2
**Bruce** [10] - 3154:16, 3183:22, 3185:10, 3185:22, 3186:13, 3190:5, 3193:9, 3193:10, 3194:24, 3238:4
**Brussels** [2] - 3186:8, 3192:19
**bullet** [1] - 3180:18
**bunch** [1] - 3182:19
**Burson** [2] - 3181:23, 3181:25
**Burson-MA** [1] - 3181:25
**business** [5] - 3138:16, 3138:19, 3138:21, 3138:24, 3244:22
**BY** [28] - 3138:8, 3158:24, 3161:15, 3162:11, 3166:18, 3172:19, 3172:24, 3173:4, 3173:10, 3174:6, 3174:18, 3176:13, 3177:11, 3185:9, 3185:19, 3188:12, 3189:8, 3189:22, 3190:23, 3194:7, 3199:19, 3201:13, 3202:19,

3205:7, 3207:16, 3221:22,
3232:8, 3235:16

# C

**cafeteria** [1] - 3174:20
**Cairo** [2] - 3200:10, 3201:8
**Campoamor** [10] - 3133:12,
3134:13, 3138:5, 3160:6,
3160:25, 3227:3, 3235:17,
3236:11, 3237:21, 3241:10
**CAMPOAMOR** [105] - 3135:4,
3136:19, 3136:22, 3137:1,
3137:13, 3137:15, 3138:6,
3138:8, 3141:1, 3141:7,
3141:12, 3141:15, 3141:16,
3158:24, 3159:15, 3159:18,
3160:2, 3161:11, 3161:15,
3162:11, 3166:14, 3166:18,
3167:18, 3167:23, 3168:1,
3168:9, 3168:22, 3168:25,
3169:6, 3169:15, 3169:19,
3170:11, 3172:12, 3172:17,
3172:19, 3172:23, 3172:24,
3173:4, 3173:10, 3174:6,
3174:18, 3176:11, 3176:13,
3176:24, 3177:1, 3177:2,
3177:7, 3177:11, 3183:15,
3183:18, 3184:13, 3184:21,
3184:24, 3185:5, 3185:8,
3185:9, 3185:19, 3188:2,
3188:12, 3189:8, 3189:22,
3190:14, 3190:17, 3190:23,
3194:3, 3194:7, 3196:18,
3196:24, 3198:14, 3198:16,
3198:18, 3199:9, 3199:19,
3201:11, 3201:13, 3202:16,
3202:19, 3205:7, 3206:15,
3206:20, 3207:4, 3207:8,
3207:16, 3212:4, 3212:11,
3219:15, 3219:20, 3220:1,
3220:11, 3221:2, 3221:8,
3221:22, 3226:11, 3226:13,
3227:5, 3227:10, 3227:11,
3232:8, 3235:1, 3239:8,
3239:11, 3239:21, 3241:12,
3244:11, 3245:13
**Campoamor-Sanchez** [6] -
3133:12, 3138:5, 3160:25,
3235:17, 3237:21, 3241:10
**CAMPOAMOR-SANCHEZ** [105]
- 3135:4, 3136:19, 3136:22,
3137:1, 3137:13, 3137:15,
3138:6, 3138:8, 3141:1, 3141:7,
3141:12, 3141:15, 3141:16,
3158:24, 3159:15, 3159:18,
3160:2, 3161:11, 3161:15,
3162:11, 3166:14, 3166:18,
3167:18, 3167:23, 3168:1,
3168:9, 3168:22, 3168:25,
3169:6, 3169:15, 3169:19,

3170:11, 3172:12, 3172:17,
3172:19, 3172:23, 3172:24,
3173:4, 3173:10, 3174:6,
3174:18, 3176:11, 3176:13,
3176:24, 3177:1, 3177:2,
3177:7, 3177:11, 3183:15,
3183:18, 3184:13, 3184:21,
3184:24, 3185:5, 3185:8,
3185:9, 3185:19, 3188:2,
3188:12, 3189:8, 3189:22,
3190:14, 3190:17, 3190:23,
3194:3, 3194:7, 3196:18,
3196:24, 3198:14, 3198:16,
3198:18, 3199:9, 3199:19,
3201:11, 3201:13, 3202:16,
3202:19, 3205:7, 3206:15,
3206:20, 3207:4, 3207:8,
3207:16, 3212:4, 3212:11,
3219:15, 3219:20, 3220:1,
3220:11, 3221:2, 3221:8,
3221:22, 3226:11, 3226:13,
3227:5, 3227:10, 3227:11,
3232:8, 3235:1, 3239:8,
3239:11, 3239:21, 3241:12,
3244:11, 3245:13
**Campoamor-Sanchez...3133**
[1] - 3134:13
**cannot** [5] - 3142:18, 3142:19,
3169:25, 3196:5, 3242:13
**caps** [1] - 3170:2
**care** [1] - 3144:6
**careful** [1] - 3213:1
**case** [18] - 3138:1, 3138:2,
3159:24, 3167:11, 3195:11,
3203:7, 3211:17, 3212:2,
3212:5, 3234:7, 3238:21,
3239:7, 3239:21, 3241:14,
3242:15, 3242:20, 3242:22,
3243:4
**catch** [1] - 3243:1
**Catie** [7] - 3180:5, 3201:25,
3202:11, 3205:4, 3215:21,
3219:10, 3223:6
**caused** [1] - 3137:7
**caveat** [1] - 3170:21
**cell** [4] - 3186:20, 3187:3,
3187:4, 3203:15
**certain** [3] - 3154:3, 3229:6,
3235:22
**certainly** [22] - 3136:20,
3139:15, 3157:10, 3159:11,
3161:7, 3170:18, 3193:5,
3193:9, 3194:16, 3197:16,
3199:23, 3201:5, 3209:21,
3212:12, 3219:2, 3219:9,
3223:15, 3228:3, 3232:21,
3232:25, 3233:4, 3233:9
**certainty** [1] - 3222:6
**CERTIFICATE** [1] - 3246:2
**certify** [1] - 3246:5

**chain** [4] - 3143:14, 3192:21,
3215:12, 3216:19
**chair** [1] - 3244:5
**change** [2] - 3197:23, 3208:9
**changed** [2] - 3214:14, 3215:9
**changes** [2] - 3208:3, 3216:7
**charge** [2] - 3184:2, 3237:9
**charged** [8] - 3211:16, 3211:25,
3235:18, 3235:22, 3235:24,
3236:3, 3236:5, 3236:7
**chat** [2] - 3149:8, 3149:11
**check** [1] - 3150:15
**circuit** [1] - 3161:16
**circumstance** [1] - 3227:22
**cited** [1] - 3207:23
**claimed** [1] - 3234:17
**claiming** [1] - 3229:18
**clarify** [1] - 3231:23
**clear** [13] - 3136:15, 3143:4,
3171:13, 3183:25, 3195:11,
3199:6, 3202:2, 3202:13,
3203:4, 3218:6, 3220:20,
3221:8, 3222:10
**client** [4] - 3160:17, 3204:3,
3204:5, 3204:7
**client's** [1] - 3167:11
**Cliff** [9] - 3163:14, 3164:2,
3180:9, 3197:6, 3197:10,
3212:22, 3215:21, 3217:13
**Clinton** [1] - 3158:5
**close** [2] - 3234:17, 3244:22
**closed** [1] - 3208:20
**closer** [2] - 3197:24, 3227:4
**closing** [2] - 3242:9, 3242:12
**closings** [1] - 3240:15
**Club** [6] - 3191:8, 3191:16,
3198:10, 3198:20, 3199:4,
3234:4
**colleagues** [1] - 3203:12
**collect** [6] - 3219:10, 3220:12,
3220:16, 3221:24, 3222:17,
3222:23
**collected** [2] - 3220:7, 3220:8
**collecting** [1] - 3220:9
**college** [2] - 3145:20, 3145:21
**College** [1] - 3145:22
**Colorado** [1] - 3145:22
**COLUMBIA** [2] - 3133:1,
3133:14
**coming** [6] - 3156:7, 3163:14,
3164:2, 3170:19, 3170:23,
3172:7
**comment** [3] - 3148:21,
3186:18, 3197:23
**commentary** [1] - 3224:18
**comments** [2] - 3202:15,
3209:1
**commission** [1] - 3184:4
**commissioner** [1] - 3186:9

**commit** [2] - 3210:15, 3210:25
**committed** [1] - 3180:20
**Committee** [1] - 3185:22
**communicate** [2] - 3138:22, 3198:3
**communicated** [2] - 3163:13, 3232:19
**communicating** [1] - 3194:24
**communication** [8] - 3140:20, 3141:17, 3144:9, 3146:16, 3176:1, 3198:22, 3198:23, 3218:18
**communications** [7] - 3200:2, 3203:4, 3211:4, 3216:12, 3220:10, 3220:17, 3222:7
**community** [1] - 3145:20
**complain** [2] - 3199:23, 3199:25
**complained** [1] - 3198:6
**complete** [3] - 3223:15, 3223:17, 3246:7
**completed** [2] - 3204:6, 3208:25
**completeness** [1] - 3221:11
**complimenting** [1] - 3237:13
**component** [2] - 3161:6, 3168:24
**compound** [1] - 3136:10
**concern** [2] - 3151:17, 3151:22
**concerned** [5] - 3178:9, 3197:12, 3197:14, 3208:25, 3234:19
**concerning** [1] - 3235:25
**concerns** [4] - 3145:25, 3146:2, 3146:3, 3148:20
**conclude** [1] - 3180:19
**conclusion** [1] - 3158:21
**conclusions** [2] - 3158:4, 3162:10
**confer** [1] - 3241:16
**Conference** [1] - 3186:19
**conference** [4] - 3168:3, 3170:25, 3184:19, 3240:15
**confidence** [2] - 3233:21, 3233:24
**confident** [1] - 3243:15
**confidential** [2] - 3210:2, 3210:6
**confused** [1] - 3141:23
**congratulated** [1] - 3169:5
**congratulating** [1] - 3168:13
**congratulatory** [5] - 3167:14, 3168:17, 3169:17, 3171:10, 3174:10
**connection** [4] - 3212:8, 3236:4, 3236:8
**consider** [1] - 3186:20
**consideration** [1] - 3241:23
**considered** [1] - 3233:10
**constitutes** [1] - 3246:6

**Constitution** [2] - 3134:8, 3246:14
**constraints** [1] - 3243:5
**consult** [2] - 3230:4, 3230:17, 3231:8
**consultants** [1] - 3211:20
**cont** [1] - 3134:13
**contact** [23] - 3140:19, 3143:15, 3144:1, 3147:15, 3148:7, 3148:9, 3151:21, 3151:24, 3152:25, 3153:16, 3164:4, 3186:25, 3187:4, 3196:10, 3201:17, 3201:20, 3201:22, 3201:25, 3202:5, 3224:16, 3227:13, 3233:1, 3236:18
**contacted** [5] - 3146:20, 3152:24, 3181:4, 3202:21, 3224:4
**contacting** [1] - 3227:17
**contacts** [8] - 3164:10, 3164:12, 3226:20, 3226:22, 3227:7, 3227:20, 3227:22, 3231:14
**contingency** [1] - 3186:21
**continue** [1] - 3243:15
**continued** [1] - 3137:25
**continues** [2] - 3186:17, 3192:4
**CONTINUING** [1] - 3138:7
**contract** [1] - 3236:4
**contracts** [3] - 3220:22, 3220:23, 3235:25
**contractual** [4] - 3221:10, 3221:24, 3222:9, 3222:17
**contradict** [1] - 3158:20
**contradicted** [1] - 3135:23
**contradicts** [2] - 3158:6, 3168:17
**contrary** [7] - 3158:25, 3160:6, 3160:17, 3161:1, 3168:19, 3169:3, 3224:17
**controlled** [1] - 3137:8
**controversy** [1] - 3162:5
**convene** [1] - 3240:12
**convention** [1] - 3147:21
**conversation** [21] - 3140:2, 3140:5, 3140:9, 3140:10, 3140:15, 3140:16, 3144:1, 3148:22, 3174:7, 3197:10, 3197:15, 3197:22, 3202:12, 3204:13, 3229:21, 3229:23, 3230:1, 3231:11, 3231:12, 3232:3
**conversations** [2] - 3152:19, 3175:23
**convey** [1] - 3232:6
**conveys** [1] - 3171:24
**conviction** [1] - 3180:14
**cool** [1] - 3195:20
**copied** [2] - 3151:11, 3226:7
**copies** [7] - 3173:16, 3176:2,

3176:4, 3184:17, 3219:16, 3232:13, 3232:15
**copy** [40] - 3145:3, 3145:7, 3145:14, 3147:4, 3147:13, 3149:22, 3150:3, 3154:4, 3154:10, 3154:14, 3154:16, 3154:22, 3176:6, 3184:22, 3185:2, 3187:16, 3187:19, 3187:22, 3190:4, 3190:9, 3195:23, 3197:3, 3197:5, 3197:16, 3198:20, 3216:19, 3217:9, 3224:3, 3224:5, 3224:11, 3226:4, 3226:5, 3229:6, 3229:9, 3231:5, 3231:6, 3232:11, 3238:7, 3238:9, 3238:10
**copying** [1] - 3168:14
**correct** [137] - 3136:11, 3139:2, 3139:3, 3140:2, 3141:18, 3141:22, 3142:1, 3142:5, 3142:21, 3143:6, 3143:15, 3143:19, 3143:23, 3144:2, 3144:14, 3144:17, 3144:20, 3145:5, 3146:8, 3146:14, 3146:16, 3147:16, 3147:22, 3148:5, 3148:10, 3148:18, 3148:21, 3148:25, 3149:15, 3149:18, 3149:22, 3150:7, 3150:8, 3151:2, 3151:7, 3151:12, 3151:18, 3153:2, 3153:17, 3154:13, 3154:22, 3155:4, 3155:12, 3155:17, 3155:20, 3156:3, 3156:15, 3156:20, 3156:25, 3157:5, 3157:9, 3158:5, 3162:19, 3163:17, 3163:25, 3164:2, 3164:10, 3165:9, 3165:10, 3167:15, 3173:13, 3173:17, 3175:5, 3175:13, 3175:20, 3176:19, 3178:20, 3180:1, 3180:4, 3180:15, 3181:9, 3181:15, 3185:8, 3185:10, 3187:5, 3189:16, 3191:4, 3191:8, 3191:9, 3191:17, 3191:21, 3191:24, 3192:11, 3193:7, 3193:8, 3198:7, 3198:21, 3199:4, 3199:24, 3201:20, 3202:5, 3204:11, 3204:23, 3205:17, 3207:18, 3207:19, 3207:20, 3208:4, 3208:5, 3208:18, 3208:22, 3208:24, 3209:19, 3209:23, 3210:10, 3211:19, 3212:1, 3212:6, 3212:21, 3215:11, 3216:4, 3216:20, 3221:25, 3222:18, 3222:19, 3222:21, 3224:7, 3224:14, 3224:20, 3224:21, 3225:4, 3226:3, 3227:14, 3229:24, 3230:15, 3231:15, 3232:11, 3232:17, 3232:23, 3233:14, 3233:17,

3234:1, 3234:15, 3234:18,
3240:1, 3243:21, 3244:1
**correctly** [1] - 3229:1
**correspondence** [2] - 3228:24,
3229:7
**Counsel** [3] - 3176:10, 3188:25,
3201:10
**counsel** [4] - 3135:6, 3163:21,
3207:24, 3239:2
**countries** [1] - 3173:21
**couple** [2] - 3135:11, 3237:12
**course** [4] - 3160:23, 3163:5,
3199:3, 3234:23
**court** [6] - 3137:18, 3161:14,
3166:17, 3172:18, 3173:8,
3221:15
**Court** [6] - 3134:7, 3134:7,
3208:1, 3210:19, 3241:15,
3246:13
**COURT** [133] - 3133:1, 3135:2,
3135:5, 3135:9, 3136:21,
3136:24, 3137:4, 3137:14,
3137:17, 3137:19, 3137:22,
3140:25, 3141:2, 3141:8,
3141:14, 3158:19, 3158:23,
3159:14, 3159:17, 3159:25,
3160:4, 3161:4, 3161:13,
3162:4, 3166:2, 3166:6,
3166:15, 3167:21, 3167:25,
3168:2, 3168:6, 3168:15,
3168:23, 3169:5, 3169:7,
3169:11, 3169:16, 3169:22,
3170:5, 3170:13, 3170:16,
3171:2, 3171:5, 3171:8,
3171:21, 3171:25, 3172:2,
3172:13, 3173:3, 3173:6,
3174:5, 3174:16, 3176:23,
3176:25, 3177:5, 3177:9,
3183:13, 3184:17, 3184:22,
3185:1, 3185:4, 3185:6,
3185:14, 3185:18, 3188:4,
3188:11, 3188:21, 3189:1,
3189:5, 3189:7, 3189:18,
3190:18, 3190:20, 3193:23,
3194:2, 3194:4, 3196:16,
3196:22, 3198:13, 3198:17,
3199:8, 3199:11, 3202:15,
3202:18, 3204:24, 3205:2,
3206:16, 3207:3, 3207:6,
3207:10, 3207:12, 3207:14,
3212:2, 3212:5, 3219:18,
3219:22, 3219:24, 3220:6,
3220:18, 3220:25, 3221:3,
3221:7, 3221:13, 3221:16,
3221:21, 3227:3, 3227:6,
3231:21, 3235:2, 3235:6,
3235:8, 3235:13, 3238:16,
3239:1, 3239:9, 3239:12,
3239:15, 3239:19, 3239:22,
3240:3, 3241:5, 3241:9,

3241:13, 3242:8, 3243:21,
3243:23, 3244:1, 3244:7,
3244:14, 3245:3, 3245:12,
3245:15, 3246:2
**Court's** [1] - 3243:15
**courthouse** [1] - 3174:21
**Courthouse** [1] - 3134:8
**COURTROOM** [13] - 3141:9,
3172:22, 3173:1, 3176:10,
3176:12, 3185:17, 3188:25,
3201:10, 3201:12, 3207:1,
3219:21, 3241:3, 3244:4
**courtroom** [4] - 3137:21,
3238:25, 3241:2, 3244:6
**coverage** [2] - 3169:13, 3173:18
**covered** [1] - 3216:15
**CRAIG** [1] - 3135:1
**Craig** [16] - 3133:6, 3134:13,
3135:7, 3136:23, 3137:19,
3138:3, 3161:16, 3172:15,
3189:15, 3196:25, 3221:12,
3221:17, 3235:17, 3236:24,
3237:9, 3239:1
**Craig's** [1] - 3210:11
**CRC** [2] - 3134:7, 3246:13
**crime** [2] - 3210:15, 3210:25
**crimes** [1] - 3180:19
**Criminal** [1] - 3133:3
**criminal** [2] - 3210:14, 3212:15
**critical** [5] - 3165:25, 3174:23,
3175:17, 3181:14, 3181:16
**criticism** [2] - 3162:1, 3162:9
**criticized** [1] - 3158:16
**Cross** [1] - 3134:13
**CROSS** [1] - 3138:7
**cross** [2] - 3166:9, 3169:25
**Cross-Examination** [1] -
3134:13
**cross-examination** [1] - 3166:9
**CROSS-EXAMINATION** [1] -
3138:7
**cross-examine** [1] - 3169:25
**crossed** [1] - 3151:15
**crosses** [1] - 3135:14
**CRR** [2] - 3134:7, 3246:13

# D

**D.C** [9] - 3133:6, 3133:15,
3133:18, 3134:3, 3134:9,
3141:22, 3145:19, 3162:18,
3246:15
**Daily** [1] - 3155:14
**daily** [1] - 3167:11
**damage** [4] - 3167:11, 3179:5,
3179:11, 3179:13
**damaging** [2] - 3179:9, 3179:10
**Dan** [1] - 3192:10
**date** [7] - 3139:23, 3139:25,
3140:8, 3153:5, 3202:20,

3206:16, 3215:9
**dated** [3] - 3206:11, 3206:12,
3207:19
**Dated** [1] - 3246:9
**dates** [4] - 3215:7, 3216:1,
3216:4, 3216:7
**dating** [1] - 3141:23
**David** [8] - 3150:12, 3151:15,
3201:22, 3201:23, 3201:24,
3201:25, 3229:21, 3236:19
**DAY** [2] - 3133:5, 3133:8
**Dear** [3] - 3186:7, 3192:15,
3195:14
**debating** [1] - 3152:11
**December** [36] - 3139:5,
3139:9, 3139:13, 3139:15,
3140:1, 3140:12, 3140:17,
3140:19, 3141:17, 3141:24,
3142:6, 3142:9, 3144:1,
3147:22, 3150:6, 3151:2,
3153:4, 3153:5, 3156:14,
3161:20, 3161:22, 3162:14,
3162:25, 3163:1, 3163:12,
3163:16, 3164:17, 3165:6,
3173:12, 3214:12, 3215:9,
3222:4, 3222:13, 3228:1,
3233:20
**decide** [3] - 3137:5, 3242:16
**decided** [4] - 3151:24, 3194:22,
3197:22, 3234:14
**decision** [1] - 3241:18
**defendant** [1] - 3135:11
**Defendant** [3] - 3133:7,
3133:20, 3134:22
**defendant's** [1] - 3188:8
**defense** [7] - 3136:13, 3160:14,
3184:18, 3207:24, 3207:25,
3241:6, 3241:8
**deliver** [6] - 3150:1, 3150:2,
3200:20, 3203:24, 3206:3,
3206:9
**delivered** [6] - 3204:2, 3204:9,
3205:21, 3205:24, 3209:24,
3236:21
**delivering** [3] - 3150:13,
3151:16, 3200:22
**delivery** [4] - 3150:9, 3150:11,
3208:21, 3209:9
**demand** [1] - 3180:13
**democracy** [1] - 3185:24
**denied** [1] - 3166:16
**deny** [3] - 3148:20, 3195:7,
3196:14
**Department** [11] - 3133:17,
3158:4, 3158:14, 3158:16,
3158:21, 3159:1, 3159:3,
3159:8, 3160:24, 3161:5, 3162:7
**Department's** [2] - 3159:4,
3159:23
**DEPUTY** [13] - 3141:9, 3172:22,

3253

3173:1, 3176:10, 3176:12, 3185:17, 3188:25, 3201:10, 3201:12, 3207:1, 3219:21, 3241:3, 3244:4

**Deputy** [1] - 3189:25
**deputy** [2] - 3150:15, 3208:7
**der** [8] - 3142:23, 3142:24, 3164:21, 3200:14, 3201:19, 3220:23, 3221:23, 3222:16
**described** [3] - 3153:20, 3186:15, 3209:6
**deserved** [1] - 3244:9
**desire** [1] - 3135:18
**desk** [1] - 3147:8
**detail** [1] - 3172:15
**details** [1] - 3198:4
**determined** [1] - 3144:24
**devastating** [1] - 3195:8
**Dickman** [2] - 3134:7, 3246:13
**DICKMAN** [1] - 3246:5
**difference** [4] - 3153:11, 3157:8, 3157:11, 3160:21
**different** [5] - 3154:11, 3227:22
**dinner** [5] - 3174:9, 3174:10, 3174:11, 3174:12, 3186:7
**direct** [4] - 3136:14, 3164:5, 3172:13, 3182:17
**directly** [1] - 3198:23
**directs** [1] - 3135:15
**disagree** [3] - 3206:8, 3210:22, 3245:6
**disagreed** [2] - 3158:11, 3158:13
**disagreement** [1] - 3159:9
**disagrees** [3] - 3158:8, 3158:10, 3159:8
**disappeared** [1] - 3147:5
**disappointed** [1] - 3200:20
**disaster** [1] - 3177:18
**discretion** [1] - 3172:5
**discuss** [6] - 3146:5, 3147:8, 3197:7, 3197:17, 3197:20, 3238:22
**discussed** [7] - 3151:20, 3176:9, 3187:15, 3187:18, 3191:15, 3197:16, 3212:18
**discussing** [9] - 3176:15, 3177:12, 3183:7, 3183:13, 3183:21, 3190:9, 3190:11, 3194:21, 3197:5
**discussion** [7] - 3135:8, 3159:16, 3166:3, 3168:5, 3170:24, 3180:9, 3220:3
**display** [2] - 3184:16, 3185:5
**dispute** [1] - 3225:5
**disseminate** [1] - 3224:2
**distribute** [1] - 3214:5
**DISTRICT** [4] - 3133:1, 3133:1, 3133:10, 3133:14
**document** [11] - 3135:23,

3141:7, 3168:6, 3182:5, 3183:13, 3199:15, 3214:19, 3220:19, 3224:5, 3224:13, 3229:18
**documents** [6] - 3135:24, 3179:25, 3180:3, 3221:10, 3228:17, 3242:21
**done** [13] - 3150:19, 3150:22, 3160:6, 3165:8, 3165:12, 3174:14, 3192:9, 3206:17, 3206:19, 3211:3, 3220:13, 3229:14, 3241:19
**double** [1] - 3150:15
**doubt** [1] - 3195:14
**Doug** [1] - 3193:13
**down** [5] - 3161:8, 3180:25, 3207:5, 3209:19, 3214:7
**draft** [13] - 3204:4, 3204:6, 3204:8, 3214:3, 3214:10, 3214:23, 3214:24, 3225:3, 3225:15, 3226:9, 3227:19, 3228:12, 3228:14
**drafted** [1] - 3228:3
**drafts** [3] - 3212:21, 3212:22, 3213:12
**draw** [2] - 3136:8, 3136:10
**drew** [1] - 3172:13
**driven** [1] - 3157:19
**driving** [2] - 3218:14, 3218:16
**dropping** [2] - 3218:15, 3218:16
**due** [1] - 3232:6
**Durbin** [2] - 3194:22, 3195:8
**during** [5] - 3149:20, 3200:21, 3238:20, 3240:19, 3243:3

---

## E

**early** [3] - 3175:23, 3186:19, 3220:14
**easier** [1] - 3192:9
**easiest** [1] - 3223:5
**East** [2] - 3133:22, 3200:13
**eastern** [1] - 3186:10
**Eastern** [1] - 3156:7
**easy** [1] - 3223:16
**Ed** [2] - 3205:4, 3205:10
**Ed's** [1] - 3205:11
**editor** [1] - 3150:16
**editors** [1] - 3147:8
**effect** [3] - 3144:6, 3170:7, 3200:24
**effective** [1] - 3165:18
**effort** [3] - 3150:1, 3197:23, 3220:16
**efforts** [2] - 3150:18, 3151:15
**either** [7] - 3175:9, 3176:25, 3180:3, 3198:3, 3230:20, 3239:4, 3242:10
**elections** [1] - 3195:11
**electronic** [1] - 3149:22

**Electronic** [2] - 3150:9, 3150:11
**electronically** [2] - 3149:18, 3150:1
**email** [109] - 3139:11, 3139:15, 3139:25, 3140:3, 3142:6, 3142:7, 3142:12, 3143:5, 3143:8, 3143:14, 3143:20, 3143:21, 3143:24, 3144:9, 3144:14, 3144:16, 3144:20, 3144:22, 3144:23, 3146:7, 3146:8, 3146:13, 3146:21, 3146:24, 3148:1, 3148:24, 3149:2, 3149:14, 3149:15, 3149:21, 3150:10, 3150:13, 3151:3, 3151:5, 3151:6, 3151:8, 3151:9, 3151:11, 3152:6, 3152:9, 3152:11, 3152:16, 3152:22, 3152:24, 3153:10, 3153:13, 3155:23, 3156:4, 3156:14, 3162:25, 3163:7, 3163:8, 3163:13, 3163:22, 3164:16, 3164:25, 3165:5, 3165:10, 3166:21, 3167:3, 3167:14, 3168:12, 3168:16, 3170:1, 3170:11, 3170:19, 3172:21, 3173:11, 3173:15, 3176:14, 3177:3, 3188:5, 3188:18, 3190:5, 3190:24, 3191:3, 3191:20, 3192:16, 3194:10, 3194:18, 3194:21, 3196:4, 3197:17, 3201:14, 3202:22, 3204:21, 3206:25, 3207:17, 3209:6, 3213:16, 3215:12, 3216:10, 3216:17, 3216:24, 3217:8, 3219:3, 3222:6, 3223:10, 3223:23, 3225:11, 3225:13, 3226:7, 3226:15, 3226:24, 3229:23, 3234:8, 3238:3
**Email** [8] - 3133:16, 3133:16, 3133:19, 3133:24, 3133:25, 3133:25, 3134:4, 3134:5
**emails** [37] - 3140:10, 3140:14, 3144:11, 3147:20, 3150:25, 3160:11, 3176:20, 3200:9, 3200:14, 3200:17, 3201:18, 3218:19, 3218:20, 3219:5, 3219:6, 3219:10, 3220:7, 3220:9, 3220:12, 3220:16, 3221:4, 3221:24, 3222:12, 3222:17, 3222:24, 3223:6, 3223:16, 3226:24, 3227:1, 3227:12, 3227:24, 3228:1, 3230:8, 3237:12, 3237:15
**emarcus@zuckerman.com** [1] - 3134:5
**embargo** [2] - 3181:4, 3183:1
**embezzlement** [3] - 3211:16, 3211:19, 3212:1
**emerged** [1] - 3165:14

**emotion** [1] - 3171:25
**emphasize** [1] - 3160:18
**encourage** [2] - 3135:20, 3136:1
**end** [6] - 3136:6, 3136:11, 3143:22, 3166:9, 3214:15, 3243:5
**endlessly** [1] - 3195:21
**engaged** [2] - 3186:16, 3200:10
**enjoy** [1] - 3242:24
**enlargement** [1] - 3186:9
**entered** [1] - 3208:14
**enters** [2] - 3137:21, 3241:2
**entire** [1] - 3171:15
**entirely** [4] - 3159:24, 3161:3, 3210:11, 3244:17
**equally** [1] - 3195:8
**error** [1] - 3227:15
**errors** [2] - 3213:7, 3213:9
**especially** [2] - 3151:16, 3166:22
**Europe** [1] - 3191:13
**European** [7] - 3184:1, 3184:2, 3184:3, 3184:5, 3184:10, 3186:8, 3210:19
**evasion** [3] - 3211:16, 3211:18, 3212:1
**evening** [2] - 3150:14, 3163:10
**event** [1] - 3240:21
**evidence** [39] - 3135:24, 3140:23, 3143:3, 3144:13, 3146:6, 3146:23, 3162:13, 3166:7, 3167:19, 3167:20, 3172:23, 3173:1, 3175:2, 3176:10, 3179:20, 3184:13, 3188:1, 3190:13, 3190:21, 3193:20, 3201:10, 3201:11, 3203:1, 3204:17, 3206:11, 3206:22, 3207:2, 3207:6, 3207:7, 3209:3, 3210:14, 3210:24, 3223:23, 3239:7, 3239:16, 3241:6, 3241:11, 3241:14, 3242:18
**exactly** [3] - 3185:25, 3220:12, 3240:3
**EXAMINATION** [2] - 3138:7, 3235:15
**examination** [1] - 3166:9
**Examination** [2] - 3134:13, 3134:14
**examine** [1] - 3169:25
**example** [1] - 3219:9
**excellent** [1] - 3223:21
**exchange** [3] - 3144:10, 3144:22, 3216:10
**exchanged** [2] - 3192:22, 3212:22
**exchanges** [2] - 3223:11, 3238:4
**exchanging** [1] - 3186:20,

3200:14
**excluded** [2] - 3171:14, 3171:15
**exclusive** [1] - 3143:19
**excuse** [4] - 3163:3, 3174:4, 3239:24, 3242:2
**excused** [6] - 3238:24, 3239:2, 3243:10, 3243:17, 3245:14, 3245:15
**excusing** [1] - 3242:3
**exhausted** [1] - 3209:14
**Exhibit** [29] - 3140:22, 3144:12, 3147:18, 3150:5, 3162:21, 3167:19, 3172:20, 3175:1, 3176:8, 3179:19, 3184:15, 3187:25, 3188:3, 3190:12, 3193:19, 3201:9, 3202:24, 3206:21, 3207:3, 3207:12, 3211:7, 3212:16, 3213:11, 3215:12, 3216:10, 3221:23, 3223:22, 3225:9, 3228:19
**exhibit** [9] - 3175:4, 3177:5, 3207:2, 3213:23, 3213:24, 3215:7, 3215:13, 3216:16, 3221:16
**exhibits** [1] - 3173:7
**EXHIBITS** [1] - 3134:15
**existed** [1] - 3180:21
**existing** [1] - 3207:22
**exits** [2] - 3238:25, 3244:6
**exonerated** [3] - 3178:11, 3178:25, 3179:4
**exonerates** [1] - 3177:17
**Expand** [1] - 3185:23
**expansion** [1] - 3184:2
**expected** [1] - 3138:15
**expecting** [1] - 3138:18
**expedition** [1] - 3135:18
**expenses** [3] - 3209:15, 3209:18, 3236:8
**explain** [2] - 3168:10, 3171:1
**explanations** [1] - 3177:3
**explore** [1] - 3160:7
**express** [2] - 3148:20, 3158:14
**expressed** [1] - 3159:3
**expressing** [1] - 3135:18
**extensive** [1] - 3226:24
**extent** [1] - 3159:7
**extremely** [1] - 3135:17
**Ezra** [1] - 3134:1

# F

**fact** [60] - 3137:10, 3137:23, 3139:16, 3139:23, 3140:15, 3154:16, 3155:19, 3156:6, 3157:7, 3158:3, 3159:21, 3160:7, 3161:2, 3168:20, 3169:22, 3169:24, 3169:25, 3170:6, 3170:7, 3170:8, 3170:9, 3170:17, 3170:19, 3170:22,

3170:23, 3171:9, 3171:11, 3171:22, 3171:23, 3172:2, 3172:7, 3172:9, 3173:8, 3173:21, 3174:20, 3176:2, 3186:23, 3187:7, 3197:5, 3198:9, 3198:25, 3199:18, 3200:19, 3200:24, 3206:12, 3206:16, 3207:24, 3210:8, 3211:24, 3213:3, 3222:16, 3225:5, 3225:7, 3227:13, 3231:8, 3232:25, 3233:8, 3242:14
**facts** [3] - 3136:7, 3234:6, 3242:19
**fair** [6] - 3136:5, 3181:12, 3196:20, 3212:25, 3244:18
**fairly** [1] - 3195:8
**fall** [1] - 3145:22
**false** [2] - 3178:11, 3179:3
**falsely** [3] - 3177:16, 3178:9, 3179:6
**familiar** [1] - 3185:24
**far** [1] - 3208:25
**FARA** [35] - 3139:2, 3160:5, 3160:19, 3160:20, 3161:8, 3161:18, 3193:5, 3211:4, 3211:24, 3212:12, 3219:12, 3220:14, 3220:22, 3222:3, 3222:5, 3222:21, 3223:9, 3224:1, 3224:24, 3225:3, 3228:4, 3228:5, 3228:8, 3231:13, 3232:10, 3232:18, 3232:21, 3232:25, 3233:3, 3233:4, 3233:7, 3233:11, 3233:12, 3233:23, 3234:17
**fast** [1] - 3194:22
**faster** [1] - 3185:2
**favorable** [2] - 3160:21, 3161:9
**fees** [3] - 3157:1, 3209:19, 3236:8
**Fernando** [1] - 3133:12
**fernando.campoamor** [1] - 3133:16
**fernando.campoamor-sanchez@usdoj.gov** [1] - 3133:16
**few** [2] - 3208:21, 3232:9
**FH** [2] - 3181:20, 3182:6
**figure** [2] - 3171:8, 3182:6
**files** [2] - 3179:25, 3180:2
**final** [14] - 3204:5, 3204:8, 3206:7, 3206:8, 3206:9, 3208:20, 3208:23, 3209:1, 3209:9, 3212:23, 3213:19, 3214:21, 3214:22
**finalized** [3] - 3206:2, 3206:4, 3209:24
**fine** [3] - 3137:4, 3161:12, 3220:25
**fingers** [1] - 3151:14

**finish** [1] - 3222:11
**finished** [1] - 3208:23
**firm** [11] - 3164:5, 3175:14,
3175:15, 3177:15, 3179:8,
3179:9, 3179:10, 3214:4,
3214:12, 3226:19, 3230:4
**firms** [1] - 3182:3
**first** [39] - 3139:9, 3144:24,
3150:1, 3152:25, 3156:2,
3156:22, 3157:1, 3160:23,
3163:7, 3170:13, 3175:8,
3175:9, 3175:10, 3176:24,
3177:3, 3180:10, 3191:1,
3191:15, 3191:19, 3193:15,
3204:4, 3211:18, 3213:24,
3214:1, 3214:18, 3216:24,
3220:21, 3221:9, 3222:3,
3222:21, 3222:22, 3225:10,
3225:17, 3229:11, 3229:19,
3233:18, 3233:20, 3237:4,
3242:10
**five** [11] - 3141:22, 3141:25,
3142:2, 3143:5, 3143:7,
3144:18, 3149:1, 3153:6,
3237:5, 3240:2, 3240:4
**flaws** [1] - 3232:5
**Fleisher** [1] - 3182:2
**focus** [3] - 3135:20, 3173:5,
3221:4
**focused** [2] - 3200:12, 3238:14
**following** [2] - 3242:11,
3244:23
**footnote** [1] - 3208:5
**FOR** [2] - 3133:1, 3133:13
**foregoing** [1] - 3246:6
**foreign** [3] - 3147:8, 3150:15,
3196:6
**form** [5] - 3206:7, 3206:9,
3213:19, 3231:9
**formally** [1] - 3181:4
**format** [1] - 3171:16
**former** [2] - 3142:4, 3142:14
**forth** [5] - 3212:22, 3220:8,
3220:24, 3222:24, 3223:3
**forward** [5] - 3146:8, 3203:21,
3208:13, 3226:4, 3226:5
**forwarded** [6] - 3144:20,
3146:21, 3154:16, 3192:21,
3194:9, 3226:3
**forwarding** [1] - 3173:15
**forwards** [4] - 3143:15, 3144:8,
3192:13, 3195:12
**four** [3] - 3135:12, 3237:4,
3237:5
**Fourth** [1] - 3133:14
**fracas** [1] - 3196:5
**free** [1] - 3160:25
**fresh** [1] - 3180:13
**Friday** [2] - 3241:22, 3242:1
**friend** [6] - 3185:10, 3186:2,

3186:13, 3193:9, 3193:12
**front** [4] - 3140:24, 3176:22,
3178:10, 3210:18
**fronts** [1] - 3222:25
**frustration** [1] - 3135:19
**FTI** [1] - 3218:23
**Fule** [13] - 3183:8, 3183:17,
3183:22, 3183:25, 3184:9,
3186:8, 3186:24, 3187:4,
3187:13, 3190:3, 3191:13,
3191:16, 3192:18
**Fule's** [1] - 3187:7
**full** [5] - 3147:7, 3211:15,
3230:10, 3246:7
**function** [1] - 3220:12
**future'** [1] - 3157:20
**FYI** [1] - 3146:10

## G

**Gaston** [1] - 3133:13
**Gates** [9] - 3140:12, 3140:16,
3140:20, 3141:17, 3142:3,
3142:13, 3142:20, 3151:12,
3151:18
**Gates'** [1] - 3151:22
**gather** [1] - 3220:24
**General** [1] - 3200:21
**general** [3] - 3208:8, 3212:10,
3221:1
**general's** [1] - 3208:14
**generally** [4] - 3142:12, 3168:4,
3218:24, 3223:19
**generate** [1] - 3138:19
**generating** [1] - 3138:24
**gentlemen** [1] - 3234:2
**given** [7] - 3144:24, 3154:4,
3154:14, 3204:4, 3216:18,
3216:23, 3232:10
**glad** [3] - 3167:8, 3245:16
**gov** [1] - 3194:16
**Government** [2] - 3162:21,
3207:3
**government** [10] - 3135:14,
3162:7, 3180:13, 3184:3,
3196:10, 3196:13, 3214:11,
3236:12, 3236:23, 3241:10
**Government's** [23] - 3140:22,
3144:12, 3147:18, 3150:5,
3167:19, 3172:20, 3175:1,
3176:7, 3179:19, 3184:14,
3187:25, 3188:3, 3190:12,
3193:19, 3201:9, 3202:24,
3206:21, 3207:12, 3211:6,
3216:9, 3223:22, 3225:9,
3228:19
**gray** [1] - 3234:14
**great** [5] - 3166:25, 3172:15,
3179:7, 3192:1
**greater** [1] - 3222:6

**Greg** [10] - 3134:13, 3143:22,
3165:14, 3169:13, 3186:7,
3191:11, 3192:2, 3192:15,
3195:14, 3210:11
**Gregory** [1] - 3133:6
**GREGORY** [1] - 3135:1
**ground** [1] - 3195:9
**guess** [4] - 3136:18, 3137:4,
3182:7, 3242:25
**guilty** [1] - 3177:17
**Gulland** [1] - 3133:13
**guy** [3] - 3177:15, 3179:13,
3179:16
**GX310** [1] - 3134:17
**GX402** [1] - 3134:17
**GX809** [1] - 3134:18
**GX819** [1] - 3134:18
**GX822** [1] - 3134:19
**GX829** [1] - 3134:19
**GX837** [1] - 3134:20

## H

**half** [3] - 3194:8, 3243:2,
3243:13
**hand** [6] - 3150:2, 3150:13,
3151:16, 3184:17, 3184:18,
3205:21
**hand-delivering** [2] - 3150:13,
3151:16
**handed** [4] - 3180:4, 3185:2,
3205:16, 3205:20
**handle** [1] - 3218:25
**handwriting** [2] - 3175:5,
3182:25
**handwritten** [2] - 3181:13,
3181:16
**happier** [2] - 3145:5, 3145:7
**happy** [21] - 3145:2, 3145:6,
3159:22, 3166:19, 3166:23,
3167:13, 3168:17, 3168:19,
3168:21, 3169:12, 3169:17,
3169:23, 3170:10, 3170:14,
3170:21, 3170:23, 3173:25,
3174:14, 3200:19, 3200:22
**hard** [3] - 3147:7, 3198:15,
3223:5
**hardcopy** [2] - 3150:13,
3179:25
**Harvard** [6] - 3191:8, 3191:16,
3198:10, 3198:19, 3199:4,
3234:4
**Haskell** [3] - 3149:19, 3225:25,
3226:2
**Hawker** [34] - 3139:9, 3143:14,
3143:18, 3144:1, 3144:8,
3144:20, 3144:22, 3146:3,
3146:5, 3146:8, 3146:15,
3148:10, 3150:10, 3150:12,
3151:5, 3151:6, 3151:7,

3152:24, 3153:10, 3153:13,
3156:4, 3164:8, 3198:4, 3198:6,
3199:16, 3218:18, 3218:23,
3219:2, 3220:10, 3230:20,
3233:1, 3233:3, 3233:5, 3233:16
**hawker** [1] - 3150:17
**Hawker's** [1] - 3148:1
**head** [1] - 3240:3
**headline** [1] - 3232:4
**headlines** [2] - 3169:13,
3173:19
**heads** [1] - 3240:22
**heads-up** [1] - 3240:22
**hear** [7] - 3148:2, 3167:13,
3198:15, 3211:8, 3227:6,
3242:9, 3242:12
**heard** [4] - 3156:5, 3239:6,
3241:14, 3242:18
**hearsay** [11] - 3160:24, 3161:6,
3168:13, 3168:23, 3169:16,
3171:12, 3171:19, 3171:21,
3171:22, 3172:6
**HELD** [1] - 3133:9
**help** [6] - 3136:17, 3136:22,
3138:18, 3138:22, 3138:24,
3173:25
**helping** [1] - 3175:14
**hereby** [1] - 3246:5
**Herszenhorn** [4] - 3155:11,
3156:19, 3231:25, 3232:2
**highlight** [2] - 3211:12, 3226:12
**hold** [1] - 3189:12
**home** [3] - 3150:3, 3150:13,
3150:14
**honest** [2] - 3178:15, 3237:19
**honestly** [1] - 3193:2
**Honor** [30] - 3135:4, 3136:20,
3137:15, 3137:16, 3138:6,
3162:3, 3167:18, 3168:8,
3168:25, 3170:9, 3170:24,
3172:1, 3184:14, 3184:24,
3188:2, 3190:14, 3194:3,
3196:19, 3199:13, 3202:17,
3207:1, 3219:16, 3238:15,
3239:18, 3241:4, 3241:8,
3241:12, 3244:11, 3244:12,
3245:13
**HONORABLE** [1] - 3133:9
**hope** [2] - 3149:8, 3244:9
**hopefully** [1] - 3242:4
**hoping** [1] - 3138:17
**hotheads** [1] - 3195:20
**hours** [15] - 3135:11, 3135:12,
3141:22, 3141:25, 3142:2,
3143:5, 3143:7, 3144:18,
3149:1, 3153:6, 3208:21,
3237:5, 3237:6, 3240:2, 3240:4
**house** [2] - 3218:14, 3227:17
**House** [3] - 3192:7, 3195:9,
3195:21

**hug** [1] - 3200:24
**huge** [1] - 3199:15
**hum** [1] - 3168:22
**Human** [1] - 3210:19
**Hunt** [5] - 3151:24, 3152:4,
3152:15, 3233:10, 3233:11
**hunt** [1] - 3228:6
**Hyatt** [1] - 3175:9

**I**

**i.e** [2] - 3157:19, 3210:14
**idea** [1] - 3186:23
**identified** [2] - 3212:12,
3229:11
**identify** [3] - 3175:14, 3210:17,
3212:15
**identifying** [1] - 3229:12
**III** [1] - 3133:21
**immediately** [2] - 3144:21,
3242:10
**important** [5] - 3135:21,
3160:18, 3184:7, 3184:9, 3213:4
**improper** [1] - 3157:19
**IN** [1] - 3133:1
**inaccuracies** [3] - 3230:12,
3231:16, 3231:19
**inadmissible** [4] - 3168:8,
3168:9, 3170:16, 3171:1
**include** [3] - 3183:16, 3232:15,
3244:17
**included** [2] - 3208:7, 3232:14
**including** [1] - 3190:10
**incorporating** [2] - 3229:2,
3229:3
**indeed** [1] - 3173:24
**INDEX** [1] - 3134:12
**inference** [2] - 3136:8, 3170:2
**info** [5] - 3186:25, 3201:17,
3201:20, 3201:25, 3202:20
**inform** [9] - 3162:17, 3230:5,
3230:8, 3230:17, 3232:18,
3233:3, 3233:11, 3244:21,
3244:25
**information** [5] - 3187:7,
3201:22, 3202:5, 3225:6,
3244:15
**informed** [5] - 3150:17,
3200:15, 3231:14, 3233:7,
3244:14
**informing** [4] - 3142:3, 3146:15,
3150:20, 3218:17
**initial** [1] - 3165:18
**initials** [1] - 3181:20
**initiated** [1] - 3226:20
**inquiries** [2] - 3164:5, 3234:6
**inquiry** [1] - 3222:3
**insight** [1] - 3223:11
**instance** [1] - 3231:5
**instead** [2] - 3137:2, 3244:23

**instruction** [5] - 3166:5, 3166:8,
3172:8, 3230:5, 3230:18
**instructions** [5] - 3137:25,
3240:10, 3241:16, 3242:10,
3243:16
**intend** [3] - 3239:16, 3239:17,
3239:18
**intended** [4] - 3210:15,
3210:25, 3230:15, 3232:22
**intends** [1] - 3241:11
**intent** [2] - 3169:4, 3210:14
**interactions** [4] - 3217:16,
3217:18, 3217:25, 3218:1
**interest** [3] - 3160:6, 3160:17,
3161:2
**interested** [8] - 3145:4, 3145:6,
3145:8, 3145:13, 3183:20,
3198:23, 3229:25
**interests** [2] - 3168:19, 3169:3
**international** [1] - 3181:2
**internationally** [1] - 3173:20
**interrupt** [2] - 3166:9, 3229:20
**interviews** [2] - 3160:16,
3224:18
**introduce** [3] - 3239:16, 3241:7,
3241:11
**introduced** [1] - 3207:24
**invite** [1] - 3184:10
**invited** [1] - 3184:4
**involved** [1] - 3218:24
**irregularities** [2] - 3180:20
**irrelevant** [2] - 3159:24, 3161:3
**issue** [5] - 3156:25, 3159:2,
3159:24, 3184:9, 3195:1
**issued** [4] - 3153:24, 3154:3,
3154:12, 3230:16
**issues** [1] - 3212:14
**IT** [1] - 3225:6
**item** [1] - 3218:23
**iterations** [1] - 3212:23

**J**

**JACKSON** [1] - 3133:9
**Jackson** [24] - 3154:16,
3183:22, 3185:10, 3185:12,
3185:20, 3186:6, 3186:13,
3187:15, 3187:22, 3188:16,
3189:15, 3190:5, 3191:4,
3191:7, 3191:21, 3193:9,
3193:10, 3194:10, 3194:24,
3195:24, 3196:1, 3196:9,
3238:4, 3238:7
**James** [1] - 3133:20
**JANICE** [1] - 3246:5
**Janice** [2] - 3134:7, 3246:13
**January** [2] - 3208:14, 3220:15
**Jason** [1] - 3133:17
**jason.mccullough@usdoj.**
**gov** [1] - 3133:19

**job** [1] - 3166:25
**join** [5] - 3177:21, 3178:7, 3178:12, 3184:10, 3195:10
**Join** [1] - 3178:14
**joining** [2] - 3178:21
**Jonathan** [3] - 3156:4, 3164:8, 3218:23
   **Journal** [2] - 3216:21, 3231:11
**journalist** [2] - 3155:3, 3183:1
**journalists** [15] - 3154:3, 3155:4, 3174:23, 3175:18, 3181:2, 3181:9, 3181:14, 3181:17, 3226:6, 3234:4, 3234:5, 3234:6, 3234:11, 3234:24, 3237:10
**Jsmith@**
**officeofvicepresident.**
**executiveofficeofpresident.**
**gov** [1] - 3194:20
   **JUDGE** [2] - 3133:9, 3133:10
   **Judge** [1] - 3184:16
   **Julie** [1] - 3194:25
   **July** [7] - 3175:23, 3175:25, 3177:4, 3181:11, 3186:6, 3186:14, 3204:5
**jumbled** [1] - 3227:21
**June** [1] - 3212:17
**Junghans** [1] - 3134:1
**jurisprudence** [1] - 3180:21
   **JUROR** [2] - 3243:19, 3243:22
**juror** [1] - 3244:19
   **JURORS** [3] - 3141:10, 3185:13, 3243:25
**jurors** [2] - 3244:16, 3244:21
**jury** [27] - 3135:6, 3135:17, 3136:8, 3137:21, 3141:8, 3169:2, 3173:6, 3219:19, 3219:21, 3234:2, 3238:19, 3239:16, 3239:23, 3239:24, 3240:5, 3240:9, 3240:13, 3240:19, 3241:2, 3241:16, 3241:21, 3242:6, 3243:3, 3243:12, 3244:16, 3244:25
   **JURY** [2] - 3133:4, 3133:8
   **Jury** [2] - 3238:25, 3244:6
**justice** [1] - 3212:15
   **Justice** [8] - 3133:17, 3153:24, 3154:24, 3193:6, 3209:8, 3222:8, 3236:1, 3237:9

## K

**Kedem** [3] - 3225:21, 3225:22, 3225:23
**keeping** [2] - 3150:17, 3151:14
**key** [2] - 3165:19, 3165:24
**kids** [1] - 3145:17
**kind** [2] - 3177:18, 3185:25
**kiss** [1] - 3200:25
**knowing** [2] - 3198:23, 3242:23

**knowledge** [1] - 3226:19
**known** [1] - 3185:22
**knows** [2] - 3203:14, 3220:12
**Kremlin** [1] - 3195:22
**Kutler** [2] - 3205:4, 3205:13
**Kwasniewski** [4] - 3142:8, 3164:22, 3164:23, 3165:1
   **Kyiv** [11] - 3166:19, 3167:5, 3167:6, 3168:21, 3169:12, 3169:18, 3169:23, 3170:23, 3175:8, 3224:4, 3224:12

## L

   **LA** [1] - 3216:19
   **Labor** [5] - 3240:8, 3240:22, 3241:23, 3242:1, 3242:5
**ladies** [1] - 3234:2
**language** [1] - 3136:3
**Larry** [2] - 3225:20, 3226:16
**last** [7] - 3147:3, 3147:12, 3168:16, 3178:18, 3190:24, 3211:15, 3215:4, 3227:7, 3230:3
**late** [3] - 3152:4, 3197:3, 3206:7
**Lauren** [3] - 3163:8, 3216:12, 3216:25
   **Lavrynovych** [2] - 3207:23, 3208:12
   **Law** [2] - 3216:21, 3231:11
**law** [9] - 3177:15, 3179:7, 3179:9, 3179:10, 3211:20, 3212:14, 3214:11, 3230:4, 3241:18
**lawyers** [3] - 3179:7, 3212:9, 3242:22
**leads** [1] - 3192:10
   **League** [2] - 3145:18, 3145:23
**leak** [5] - 3148:10, 3177:16, 3178:9, 3178:17, 3181:9
**leaked** [1] - 3179:3
**leaks** [3] - 3176:17, 3176:19, 3178:19
**learn** [1] - 3200:22
**learned** [2] - 3200:6, 3202:3
**least** [1] - 3181:11
**leave** [5] - 3151:20, 3151:23, 3216:7, 3244:2, 3244:4
**legal** [5] - 3195:9, 3207:25, 3208:1, 3208:2, 3208:11
**length** [2] - 3137:6, 3137:8
**lengthy** [1] - 3137:3
**less** [2] - 3135:12, 3136:4
**lesser** [1] - 3225:7
**letter** [33] - 3188:16, 3202:11, 3207:23, 3207:25, 3208:7, 3210:13, 3212:3, 3212:21, 3212:24, 3213:12, 3213:23, 3213:25, 3214:1, 3215:6, 3215:8, 3220:22, 3221:9, 3222:4, 3222:21, 3222:22,

3225:3, 3226:9, 3227:19, 3228:3, 3228:4, 3228:12, 3228:14, 3228:20, 3228:21, 3229:4, 3229:11, 3230:22, 3232:12
**letter's** [1] - 3219:12
**letters** [3] - 3138:12, 3139:2, 3229:2
**letting** [1] - 3153:13
**life** [1] - 3157:20
**likely** [1] - 3136:10
**limiting** [1] - 3166:4
**line** [4] - 3165:8, 3165:12, 3180:21, 3197:24
**links** [1] - 3173:16
**list** [2] - 3173:18, 3207:2
**listed** [2] - 3189:24, 3221:4
**literally** [2] - 3220:15
**live** [1] - 3245:6
   **LLP** [2] - 3133:22, 3134:2
**lobbyist** [2] - 3205:14, 3205:15
**located** [1] - 3214:18
**look** [67] - 3140:22, 3141:20, 3143:8, 3144:12, 3144:24, 3146:6, 3146:19, 3146:23, 3148:24, 3150:24, 3152:22, 3152:23, 3156:1, 3156:13, 3156:22, 3157:2, 3162:12, 3164:15, 3165:2, 3172:20, 3172:21, 3175:1, 3176:7, 3176:14, 3176:18, 3176:25, 3179:19, 3180:10, 3180:25, 3182:8, 3184:12, 3187:25, 3189:14, 3190:12, 3192:5, 3193:19, 3194:18, 3199:17, 3201:9, 3203:23, 3204:17, 3206:10, 3206:21, 3207:21, 3209:3, 3211:6, 3213:11, 3213:22, 3214:2, 3214:14, 3215:4, 3215:6, 3215:12, 3216:16, 3219:14, 3223:5, 3223:22, 3225:9, 3225:10, 3226:9, 3228:19, 3228:23, 3230:3, 3242:23
**look-see** [1] - 3215:4
**looked** [4] - 3168:16, 3189:4, 3199:20, 3199:21
**looking** [10] - 3138:21, 3142:8, 3149:2, 3176:23, 3188:13, 3188:22, 3189:1, 3214:20, 3215:19, 3242:19
**looks** [9] - 3149:23, 3151:10, 3151:13, 3173:14, 3194:17, 3214:22, 3217:11, 3217:22, 3226:15
   **Looks** [1] - 3215:23
   **Los** [2] - 3226:6, 3231:12
   **Loucks** [1] - 3212:10
**lump** [1] - 3230:23
**lumped** [1] - 3230:24

**lunch** [6] - 3136:17, 3174:11, 3174:13, 3174:17, 3174:21, 3240:15
**lying** [1] - 3196:1

# M

**MA** [1] - 3181:25
**ma'am** [1] - 3243:22
**Magnitsky** [1] - 3194:22
**major** [2] - 3160:13, 3180:12
**Malet** [2] - 3216:18, 3217:4
**man** [9] - 3167:10, 3168:8, 3169:14, 3170:1, 3170:15, 3170:17, 3171:6, 3171:23, 3173:22
**Manafort** [52] - 3138:12, 3138:16, 3138:22, 3138:24, 3165:6, 3165:9, 3165:10, 3165:11, 3165:23, 3167:15, 3168:17, 3169:17, 3169:25, 3170:1, 3170:2, 3170:10, 3171:1, 3171:4, 3172:14, 3172:15, 3173:11, 3173:24, 3174:7, 3175:24, 3176:4, 3177:3, 3178:7, 3191:3, 3191:7, 3191:11, 3191:21, 3192:22, 3192:24, 3193:10, 3193:16, 3198:3, 3198:6, 3198:9, 3198:20, 3198:25, 3204:5, 3206:25, 3207:17, 3209:25, 3210:16, 3230:21, 3232:15, 3237:12, 3238:9, 3238:11
**Manafort's** [2] - 3179:15, 3192:16
**Marcus** [1] - 3134:1
**Marsteller** [1] - 3181:25
**matter** [1] - 3170:6
**McCullough** [1] - 3133:17
**MD** [1] - 3133:23
**mean** [8] - 3148:4, 3160:10, 3168:20, 3171:7, 3206:12, 3206:17, 3229:20, 3244:24
**means** [4] - 3178:15, 3192:7, 3242:2, 3242:13
**meant** [5] - 3177:24, 3177:25, 3178:6, 3178:14, 3209:11
**measure** [1] - 3186:21
**media** [40] - 3166:23, 3173:16, 3175:24, 3176:4, 3176:6, 3179:3, 3179:21, 3197:2, 3197:9, 3197:13, 3197:20, 3197:24, 3198:7, 3198:21, 3199:1, 3199:18, 3216:13, 3224:2, 3224:17, 3224:18, 3226:20, 3227:8, 3229:6, 3229:10, 3229:12, 3229:15, 3230:15, 3230:24, 3231:2, 3231:4, 3232:22, 3236:16, 3236:17, 3236:19, 3236:20,

3236:22, 3237:21, 3237:24, 3238:1
**Media** [1] - 3169:12
**meet** [3] - 3191:16, 3236:23, 3237:7
**meeting** [21] - 3151:19, 3164:21, 3164:24, 3165:1, 3191:8, 3191:16, 3198:10, 3198:11, 3198:20, 3199:4, 3199:12, 3199:14, 3224:25, 3225:2, 3228:4, 3228:15, 3229:12, 3234:4, 3236:11, 3237:4, 3237:5
**member** [1] - 3184:3
**members** [4] - 3173:6, 3179:11, 3196:10, 3196:12
**memo** [3] - 3210:2, 3210:7, 3210:8
**memorandum** [1] - 3210:13
**mention** [1] - 3156:24
**mentioned** [4] - 3149:24, 3152:16, 3186:7, 3213:3
**message** [3] - 3178:8, 3192:6, 3194:9
**met** [4] - 3160:17, 3160:19, 3161:18, 3237:2
**microphone** [2] - 3198:13, 3227:4
**middle** [3] - 3147:2, 3157:17, 3175:25
**Middle** [1] - 3200:13
**midmorning** [1] - 3238:17
**Might** [1] - 3218:23
**might** [8] - 3135:23, 3148:7, 3154:14, 3168:3, 3181:18, 3229:20, 3238:10, 3240:2
**Mike** [1] - 3212:10
**million** [1] - 3209:21
**mind** [5] - 3160:10, 3163:4, 3200:12, 3242:24, 3243:14
**mine** [1] - 3179:11
**minister** [2] - 3154:25, 3183:25
**Ministry** [12] - 3142:20, 3153:24, 3154:24, 3162:17, 3193:6, 3209:8, 3222:8, 3224:4, 3224:12, 3235:25, 3236:4, 3237:9
**minus** [1] - 3144:18
**minute** [1] - 3188:4
**minutes** [8] - 3144:19, 3146:7, 3151:7, 3235:5, 3235:7, 3238:19, 3238:24, 3239:13
**misinformation** [2] - 3224:20, 3230:16
**misremembered** [3] - 3227:16, 3227:17, 3227:20
**misrepresent** [1] - 3234:20
**mistake** [2] - 3226:15, 3227:16
**mistakes** [1] - 3228:17
**misunderstanding** [1] -

3162:10
**mixed** [1] - 3189:11
**modifies** [1] - 3230:11
**MOJ** [3] - 3163:15, 3181:4, 3181:5
**Molly** [1] - 3133:13
**molly.gaston@usdoj.gov** [1] - 3133:16
**moment** [10] - 3154:7, 3154:8, 3154:9, 3174:22, 3186:25, 3219:8, 3237:11, 3238:13, 3239:7, 3239:25
**Monday** [3] - 3177:4, 3243:11, 3244:23
**monitor** [1] - 3215:14
**month** [2] - 3147:3, 3147:12
**mood** [1] - 3171:10
**morning** [24] - 3137:22, 3138:9, 3138:10, 3142:1, 3142:15, 3143:6, 3144:16, 3153:2, 3153:3, 3153:23, 3162:18, 3164:19, 3173:12, 3192:16, 3228:15, 3240:11, 3240:12, 3242:11, 3243:8, 3243:20, 3243:25, 3244:8, 3244:24, 3245:2
**Moscow** [1] - 3138:20
**most** [2] - 3135:21
**motivated** [5] - 3157:9, 3157:19, 3158:15, 3159:3, 3159:5
**motive** [1] - 3157:19
**move** [11] - 3140:17, 3143:2, 3146:18, 3167:19, 3188:2, 3190:14, 3196:19, 3196:25, 3202:16, 3207:8, 3211:4
**MR** [164] - 3135:4, 3136:19, 3136:22, 3137:1, 3137:13, 3137:15, 3137:16, 3138:6, 3138:8, 3141:1, 3141:7, 3141:12, 3141:15, 3141:16, 3158:18, 3158:24, 3159:13, 3159:15, 3159:18, 3159:23, 3160:1, 3160:2, 3160:23, 3161:11, 3161:15, 3162:3, 3162:11, 3166:1, 3166:4, 3166:14, 3166:18, 3167:18, 3167:23, 3168:1, 3168:7, 3168:9, 3168:22, 3168:25, 3169:6, 3169:9, 3169:15, 3169:19, 3169:20, 3170:4, 3170:9, 3170:11, 3170:15, 3170:24, 3171:4, 3171:6, 3171:18, 3171:24, 3172:1, 3172:12, 3172:17, 3172:19, 3172:23, 3172:24, 3173:4, 3173:10, 3174:1, 3174:3, 3174:6, 3174:15, 3174:18, 3176:11, 3176:13, 3176:24, 3177:1, 3177:2, 3177:7,

3177:11, 3183:15, 3183:18,
3184:13, 3184:21, 3184:24,
3185:3, 3185:5, 3185:8, 3185:9,
3185:19, 3188:2, 3188:10,
3188:12, 3188:24, 3189:4,
3189:6, 3189:8, 3189:22,
3190:14, 3190:17, 3190:19,
3190:23, 3193:24, 3194:1,
3194:3, 3194:7, 3196:15,
3196:18, 3196:20, 3196:24,
3198:14, 3198:16, 3198:18,
3199:5, 3199:9, 3199:19,
3201:11, 3201:13, 3202:16,
3202:19, 3205:1, 3205:7,
3206:14, 3206:15, 3206:20,
3207:4, 3207:8, 3207:11,
3207:13, 3207:16, 3212:4,
3212:11, 3219:15, 3219:20,
3219:25, 3220:1, 3220:5,
3220:11, 3220:20, 3221:2,
3221:6, 3221:8, 3221:11,
3221:22, 3226:11, 3226:13,
3227:5, 3227:10, 3227:11,
3231:20, 3232:8, 3235:1,
3235:5, 3235:7, 3235:12,
3235:16, 3238:12, 3238:15,
3239:8, 3239:11, 3239:18,
3239:21, 3240:2, 3241:8,
3241:12, 3242:7, 3244:11,
3244:12, 3245:2, 3245:11,
3245:13, 3245:14
    **muddled** [1] - 3227:23
    **murder** [1] - 3211:17
    **Murphy** [1] - 3133:20
    **MURPHY** [10] - 3137:16,
3170:24, 3171:4, 3171:6,
3220:20, 3221:6, 3240:2,
3242:7, 3244:12, 3245:2

**N**

    **name** [1] - 3232:18
    **named** [1] - 3211:17
    **National** [3] - 3189:25, 3216:21,
3231:11
    **Nations** [1] - 3200:21
    **NATO** [1] - 3185:23
    **Nazar** [2] - 3222:7, 3223:12
    **near** [1] - 3209:21
    **necessarily** [3] - 3169:1,
3201:21, 3206:17
    **need** [15] - 3135:2, 3136:9,
3141:8, 3167:25, 3168:3,
3170:20, 3171:9, 3171:16,
3178:12, 3198:13, 3221:4,
3239:24, 3240:8, 3244:21,
3244:23
    **needs** [1] - 3245:5
    **neighborhood** [1] - 3186:9
    **never** [17] - 3185:24, 3187:13,

3198:6, 3199:20, 3212:12,
3232:10, 3232:21, 3232:25,
3233:4, 3233:9, 3238:2
    **New** [29] - 3155:14, 3157:7,
3164:13, 3216:12, 3216:25,
3217:5, 3217:9, 3217:12,
3217:17, 3217:18, 3217:22,
3217:25, 3218:2, 3218:4,
3220:17, 3224:6, 3224:11,
3224:21, 3224:23, 3226:3,
3227:20, 3230:19, 3230:23,
3231:10, 3231:14, 3231:18,
3233:1, 3234:21
    **news** [5] - 3163:14, 3179:3,
3224:2, 3230:12, 3231:16
    **newspaper** [1] - 3216:13
    **newspapers** [1] - 3178:10
    **next** [15] - 3140:1, 3158:23,
3162:18, 3182:15, 3183:5,
3191:24, 3195:3, 3198:5,
3202:15, 3209:4, 3217:8,
3225:12, 3226:18, 3241:15,
3244:24
    **NGOs** [1] - 3183:20
    **nice** [1] - 3242:3
    **night** [1] - 3199:14
    **nightmare** [2] - 3179:2, 3179:4
    **non** [2] - 3171:19, 3171:22
    **non-hearsay** [2] - 3171:19,
3171:22
    **nonexistent** [2] - 3210:15,
3210:25
    **notations** [1] - 3182:19
    **note** [6] - 3175:21, 3181:14,
3181:16, 3195:16, 3215:23,
3225:17
    **notebooks** [2] - 3244:3, 3244:4
    **notes** [2] - 3135:18, 3246:7
    **nothing** [4] - 3215:13, 3238:12,
3238:15, 3242:23
    **notice** [1] - 3139:17
    **notified** [2] - 3139:19, 3201:6
    **notwithstanding** [1] - 3242:14
    **November** [6] - 3206:7,
3207:19, 3208:3, 3208:23,
3209:4, 3209:18
    **nowhere** [2] - 3209:21, 3210:21
    **nuanced** [9] - 3177:22,
3177:24, 3178:2, 3178:4,
3178:8, 3178:15, 3178:19,
3178:22
    **number** [13] - 3139:4, 3140:25,
3167:22, 3171:12, 3177:5,
3181:2, 3183:10, 3202:25,
3205:11, 3211:10, 3212:21,
3215:17
    **Number** [15] - 3175:12,
3180:25, 3182:20, 3183:16,
3207:21, 3208:6, 3209:13,
3211:19, 3212:1, 3212:13,

3212:16, 3214:2, 3214:7,
3224:16, 3228:20
    **numbers** [3] - 3182:8, 3186:21,
3189:11
    **NW** [5] - 3133:14, 3133:18,
3134:2, 3134:8, 3246:14

**O**

    **oath** [1] - 3138:4
    **Obama** [1] - 3190:1
    **obey** [1] - 3243:15
    **object** [2] - 3168:2, 3220:18
    **objected** [1] - 3196:22
    **objection** [19] - 3158:18,
3159:13, 3162:3, 3174:1,
3174:3, 3174:15, 3185:3,
3188:10, 3189:3, 3189:6,
3190:19, 3194:1, 3196:15,
3199:5, 3204:25, 3205:1,
3206:14, 3207:13, 3231:20
    **objections** [1] - 3136:10
    **objects** [1] - 3184:19
    **obtain** [2] - 3224:3, 3224:11
    **obviously** [1] - 3196:12
    **occasion** [1] - 3223:18
    **October** [15] - 3147:16,
3161:21, 3161:22, 3193:3,
3200:6, 3200:9, 3200:15,
3200:18, 3200:23, 3201:5,
3202:8, 3206:3, 3224:25,
3228:20, 3236:12
    **OF** [4] - 3133:1, 3133:8,
3133:14, 3246:2
    **offer** [1] - 3229:19
    **Offered** [1] - 3134:16
    **offered** [4] - 3145:12, 3148:9,
3166:16, 3229:23
    **office** [3] - 3194:17, 3197:9,
3244:25
    **Office** [1] - 3133:13
    **OFFICIAL** [1] - 3246:2
    **Official** [2] - 3134:7, 3246:13
    **official** [1] - 3222:7
    **officials** [2] - 3162:7, 3187:19
    **once** [5] - 3137:23, 3169:22,
3177:9, 3237:2
    **one** [39] - 3137:25, 3138:20,
3141:12, 3147:25, 3148:23,
3163:2, 3167:16, 3168:7,
3171:12, 3173:6, 3175:8,
3176:20, 3176:22, 3176:25,
3183:1, 3184:25, 3188:5,
3193:5, 3193:13, 3199:3,
3199:11, 3204:24, 3209:25,
3210:20, 3212:9, 3213:4,
3213:11, 3217:12, 3217:23,
3226:4, 3226:19, 3227:21,
3231:4, 3233:12, 3234:23,
3236:17, 3242:19, 3244:16,

3245:5
**one-sentence** [2] - 3217:12, 3217:23
**ones** [1] - 3155:15
**online** [1] - 3242:19
**open** [5] - 3137:18, 3161:14, 3166:17, 3172:18, 3221:15
**opened** [1] - 3225:6
**operating** [1] - 3141:3
**opine** - 3157:18
**opinion** [6] - 3137:9, 3158:12, 3159:23, 3160:21, 3208:2, 3208:11
**opportunity** [4] - 3162:6, 3180:12, 3195:6, 3240:9
**opposed** [2] - 3136:3, 3137:10
**opposite** [2] - 3158:4, 3158:8
**organization** [2] - 3185:23, 3186:1
**orient** [1] - 3189:23
**orientation** [1] - 3153:5
**original** [1] - 3175:3
**originally** [1] - 3190:8
**outlets** [7] - 3216:13, 3224:3, 3229:7, 3229:10, 3229:12, 3230:15, 3231:4
**outlines** [1] - 3186:11
**outreach** [3] - 3183:7, 3183:14, 3183:17
**overruled** [1] - 3162:4
**owed** [1] - 3209:14
**own** [2] - 3160:16, 3166:16

## P

**p.m** [14] - 3141:21, 3141:24, 3147:22, 3151:2, 3156:3, 3156:4, 3156:15, 3162:14, 3163:1, 3163:7, 3163:23, 3177:4, 3199:14, 3242:6
**page** [23] - 3176:24, 3177:3, 3180:17, 3180:25, 3182:8, 3182:13, 3182:21, 3183:5, 3190:25, 3191:1, 3191:5, 3191:19, 3194:8, 3213:22, 3213:24, 3214:1, 3215:7, 3216:16, 3226:9, 3226:17, 3226:18
**pages** [1] - 3178:10
**paper** [2] - 3184:17, 3185:2
**paragraph** [8] - 3156:23, 3157:2, 3180:10, 3211:12, 3215:6, 3228:23, 3230:3, 3230:22
**paraphrasing** [1] - 3136:4
**Parfitt** [4] - 3153:11, 3153:16, 3153:22, 3155:6
**parfitt** [1] - 3153:14
**part** [8] - 3165:20, 3185:12, 3185:20, 3211:18, 3223:10,

3236:19, 3236:20, 3236:22
**partial** [1] - 3173:18
**participate** [1] - 3238:1
**parties** [2] - 3195:8, 3241:16
**parties'** [1] - 3242:9
**partners** [1] - 3138:20
**partnership** [1] - 3186:10
**party** [1] - 3135:9
**passed** [2] - 3186:10, 3187:7
**past** [2] - 3230:20, 3243:2
**Paul** [9] - 3169:14, 3169:25, 3170:1, 3173:22, 3179:15, 3191:3, 3193:10, 3209:6, 3238:11
**Paula** [1] - 3134:1
**pause** [3] - 3193:25, 3220:4, 3221:19
**payment** [1] - 3156:24
**Pennsylvania** [1] - 3133:18
**People** [3] - 3168:21, 3169:12, 3169:23
**people** [10] - 3137:10, 3162:2, 3170:22, 3189:24, 3190:10, 3193:1, 3219:9, 3227:6, 3228:5, 3228:9
**perceived** [1] - 3159:21
**perception** [1] - 3178:24
**period** [2] - 3160:15, 3161:24
**permit** [1] - 3221:12
**permitting** [1] - 3171:15
**person** [4] - 3184:7, 3184:9, 3226:2, 3232:2
**personal** [1] - 3186:2
**phone** [5] - 3143:25, 3186:20, 3187:3, 3187:4, 3203:15
**phrase** [1] - 3234:12
**piece** [1] - 3167:6
**pin** [1] - 3136:2
**Pinchuk's** [1] - 3186:19
**pjunghans@zuckerman.com** [1] - 3134:4
**place** [1] - 3143:12
**Plaintiff** [2] - 3133:4, 3133:12
**plan** [19] - 3176:4, 3176:6, 3182:16, 3197:2, 3197:10, 3197:13, 3197:20, 3197:24, 3198:11, 3198:21, 3199:18, 3200:18, 3200:22, 3201:7, 3236:16, 3236:19, 3236:20, 3236:22, 3240:13
**plans** [8] - 3179:21, 3198:7, 3232:22, 3236:17, 3237:21, 3237:24, 3238:1, 3244:17
**played** [2] - 3145:18, 3145:23
**playing** [1] - 3166:23
**pleasant** [1] - 3243:17
**Point** [4] - 3175:12, 3180:25, 3207:21, 3209:13
**point** [21] - 3136:18, 3153:25, 3158:20, 3164:14, 3167:19,

3168:18, 3169:17, 3172:4, 3180:18, 3188:8, 3189:2, 3193:18, 3195:4, 3195:5, 3196:17, 3216:19, 3217:4, 3218:17, 3226:23, 3238:20, 3244:21
**pointed** [1] - 3151:19
**Poland** [4] - 3142:4, 3142:14, 3142:18, 3142:19
**political** [4] - 3153:12, 3157:19, 3157:20, 3158:12
**politically** [5] - 3157:9, 3157:18, 3158:15, 3159:2, 3159:5
**portions** [2] - 3195:6, 3196:2
**position** [2] - 3158:25, 3180:14
**possibility** [2] - 3191:12, 3238:14
**possible** [1] - 3192:2
**Post** [11] - 3148:7, 3148:10, 3148:21, 3148:22, 3151:21, 3151:24, 3152:5, 3152:14, 3167:5, 3167:6, 3233:6
**post** [3] - 3160:1, 3160:2
**post-publication** [1] - 3160:2
**PR** [3] - 3164:5, 3175:12, 3182:3
**praising** [1] - 3237:13
**Pratt** [1] - 3133:22
**precise** [2] - 3136:3, 3205:23
**precisely** [1] - 3224:24
**precision** [2] - 3206:1, 3213:3
**preliminary** [1] - 3208:2
**preparation** [1] - 3197:10
**prepared** [1] - 3180:12
**presence** [1] - 3171:1
**present** [1] - 3241:3
**president** [3] - 3142:4, 3142:14, 3194:18
**President** [3] - 3179:14, 3179:16, 3190:1
**press** [9] - 3153:24, 3154:5, 3154:10, 3154:12, 3154:15, 3155:19, 3160:18, 3168:14, 3181:4
**pressing** [1] - 3149:6
**pretrial** [1] - 3170:25
**prevent** [1] - 3178:12
**preventing** [1] - 3178:18
**preview** [1] - 3240:20
**previous** [3] - 3144:20, 3152:16, 3191:5
**previously** [2] - 3207:7, 3244:20
**print** [4] - 3180:5, 3199:17, 3219:10, 3223:6
**printed** [1] - 3180:4
**private** [1] - 3191:12
**prize** [1] - 3195:22
**pro** [3] - 3159:22, 3162:2, 3165:14

**pro-Ukraine** [1] - 3159:22
**pro-Yanukovych** [1] - 3162:2
**problem** [1] - 3235:11
**proceed** [3] - 3138:5, 3235:10, 3235:14
**proceedings** [1] - 3246:8
**process** [5] - 3139:1, 3184:7, 3232:5, 3232:6, 3241:19
**procurator** [1] - 3212:10
**productive** [1] - 3135:21
**project** [7] - 3177:15, 3186:16, 3193:14, 3200:10, 3218:24, 3233:19, 3236:9
**Project** [7] - 3181:18, 3211:19, 3211:21, 3212:1, 3212:5, 3212:13, 3212:15
**promised** [2] - 3143:18, 3241:22
**promising** [2] - 3147:4, 3147:13
**prompted** [1] - 3202:11
**pronounce** [1] - 3164:22
**properly** [1] - 3241:20
**proposal** [1] - 3186:22
**proposed** [1] - 3220:23
**prosecution** [9] - 3153:12, 3157:5, 3157:9, 3157:18, 3158:12, 3159:2, 3211:21, 3212:8
**prosecutor** [2] - 3208:8, 3208:13
**prove** [1] - 3171:20
**provide** [7] - 3180:12, 3201:25, 3217:21, 3222:12, 3224:4, 3229:22, 3230:2
**provided** [10] - 3216:2, 3217:5, 3218:5, 3229:6, 3229:9, 3229:12, 3232:13, 3232:14, 3232:19, 3244:15
**providing** [1] - 3197:25
**pt/democracy.org** [1] - 3185:20
**public** [6] - 3156:11, 3160:8, 3180:11, 3197:25, 3224:5, 3224:13
**publication** [2] - 3160:2, 3181:3
**publicly** [1] - 3205:17
**publish** [1] - 3156:10
**published** [4] - 3158:17, 3159:12, 3173:17, 3184:14
**purpose** [5] - 3169:9, 3169:20, 3171:19, 3171:22, 3203:5
**purposes** [1] - 3151:1
**put** [11] - 3135:6, 3140:23, 3147:15, 3190:22, 3194:5, 3201:24, 3205:3, 3213:19, 3221:3, 3221:13, 3242:24

## Q

**quarter** [1] - 3209:21
**questions** [18] - 3136:9, 3137:1,
3139:5, 3143:3, 3152:18, 3156:19, 3157:25, 3165:3, 3193:6, 3200:1, 3223:7, 3232:9, 3233:12, 3234:6, 3235:1, 3235:17, 3236:17, 3238:3
**quibbling** [1] - 3136:4
**quickly** [2] - 3135:5, 3211:6
**quite** [4] - 3136:15, 3158:13, 3170:3, 3224:17
**quotation** [1] - 3230:19
**quote** [7] - 3154:25
**quoted** [1] - 3154:23
**quoting** [1] - 3147:14

## R

**rank** [1] - 3160:24
**rather** [1] - 3135:21
**reach** [1] - 3140:12
**reached** [4] - 3158:21, 3203:16, 3221:25, 3243:8
**reaching** [4] - 3142:13, 3183:22, 3218:8, 3218:11
**reaction** [1] - 3237:17
**reactions** [1] - 3209:7
**read** [25] - 3142:12, 3143:17, 3147:6, 3154:25, 3155:1, 3157:25, 3163:3, 3165:16, 3165:20, 3171:16, 3180:6, 3180:7, 3180:11, 3188:6, 3195:6, 3196:2, 3199:16, 3218:4, 3221:12, 3227:24, 3228:1, 3230:10, 3230:22
**reading** [2] - 3157:17, 3229:1
**reads** [2] - 3148:2, 3211:15
**ready** [4] - 3142:4, 3208:21, 3209:9, 3242:6
**real** [1] - 3195:22
**really** [8] - 3137:11, 3193:22, 3195:10, 3218:19, 3220:9, 3233:21, 3238:13, 3245:7
**reason** [5] - 3168:15, 3201:21, 3205:8, 3222:20, 3223:6
**reasons** [1] - 3243:4
**reassurances** [1] - 3149:6
**rebuttal** [1] - 3239:21
**recapitulate** [1] - 3136:14
**receive** [1] - 3242:9
**received** [5] - 3150:12, 3160:11, 3179:22, 3190:20, 3197:5
**Received** [1] - 3134:16
**receiving** [1] - 3237:15
**Recently** [1] - 3211:15
**recently** [1] - 3211:25
**recess** [1] - 3239:14
**Recess** [1] - 3244:13
**recommendations** [1] - 3175:13
**recommended** [2] - 3193:10, 3193:16

**record** [10] - 3171:11, 3218:5, 3219:11, 3223:17, 3224:1, 3225:13, 3226:25, 3230:19, 3231:10, 3231:23
**redact** [1] - 3170:22
**redacted** [6] - 3169:23, 3171:16, 3172:5, 3172:6, 3172:11, 3172:22
**redirect** [2] - 3136:14, 3235:3
**Redirect** [1] - 3134:14
**REDIRECT** [1] - 3235:15
**refer** [2] - 3179:15, 3207:22
**reference** [6] - 3147:15, 3149:11, 3199:15, 3207:24, 3208:13, 3211:24
**referred** [1] - 3164:8
**referring** [5] - 3138:20, 3147:17, 3206:5, 3212:2, 3231:1
**refers** [1] - 3147:12
**reflect** [2] - 3135:19, 3140:10
**reflected** [1] - 3140:14
**reflects** [3] - 3140:3, 3210:22, 3225:6
**regarding** [2] - 3163:15, 3180:14
**Regency** [1] - 3175:9
**register** [1] - 3223:8
**registered** [1] - 3145:21
**registering** [1] - 3196:6
**regret** [2] - 3195:19, 3195:20
**relate** [1] - 3220:9
**related** [3] - 3201:21, 3221:24, 3222:17
**relates** [1] - 3220:6
**relating** [1] - 3222:12
**relations** [1] - 3197:25
**release** [12] - 3153:25, 3154:5, 3154:10, 3154:12, 3154:15, 3154:17, 3155:1, 3162:18, 3180:11, 3214:4, 3233:21, 3233:24
**released** [19] - 3139:10, 3139:18, 3139:21, 3139:24, 3154:15, 3155:3, 3155:5, 3155:13, 3155:16, 3155:20, 3155:24, 3161:17, 3163:24, 3186:24, 3200:7, 3200:16, 3200:18, 3201:6, 3202:4
**releases** [1] - 3168:14
**relevance** [3] - 3159:17, 3159:18, 3171:13
**relevant** [1] - 3160:22
**rely** [1] - 3244:20
**remember** [12] - 3139:13, 3140:9, 3162:22, 3176:15, 3197:15, 3217:13, 3218:16, 3235:19, 3236:13, 3236:16, 3237:22, 3238:5
**remembered** [4] - 3219:8, 3226:22, 3227:7, 3227:13

**remove** [1] - 3157:20
**repeat** [1] - 3195:19
**repeating** [1] - 3135:16
**repetition** [1] - 3135:19
**rephrase** [1] - 3197:19
**report** [38] - 3157:8, 3158:16, 3158:25, 3159:11, 3159:19, 3161:17, 3162:2, 3163:15, 3170:18, 3177:17, 3178:1, 3178:10, 3181:9, 3181:18, 3182:8, 3186:11, 3186:18, 3187:16, 3191:12, 3195:19, 3196:2, 3196:10, 3203:6, 3203:9, 3204:9, 3206:6, 3208:20, 3208:23, 3209:9, 3210:21, 3210:24, 3211:1, 3218:16, 3232:19, 3232:22, 3234:20, 3236:21, 3238:10
  **Report** [110] - 3139:5, 3139:10, 3139:16, 3139:17, 3139:21, 3142:4, 3145:12, 3147:9, 3149:17, 3150:3, 3150:13, 3151:16, 3151:21, 3151:23, 3154:15, 3154:25, 3155:2, 3155:5, 3155:13, 3155:16, 3155:19, 3156:11, 3156:20, 3157:17, 3157:23, 3158:1, 3160:3, 3160:8, 3160:12, 3160:14, 3160:21, 3161:1, 3161:7, 3162:5, 3162:8, 3162:9, 3162:18, 3166:22, 3173:17, 3178:16, 3180:11, 3180:18, 3181:3, 3186:14, 3186:24, 3187:20, 3187:22, 3190:4, 3190:10, 3192:2, 3192:25, 3193:3, 3193:4, 3193:7, 3195:6, 3195:23, 3196:11, 3200:6, 3200:15, 3201:6, 3202:3, 3203:10, 3203:24, 3204:2, 3204:4, 3204:6, 3204:14, 3205:13, 3205:16, 3205:20, 3205:22, 3206:2, 3206:4, 3206:6, 3206:10, 3208:25, 3209:24, 3210:22, 3211:2, 3214:5, 3214:11, 3216:15, 3217:1, 3218:15, 3224:2, 3224:3, 3224:5, 3224:11, 3224:13, 3226:5, 3226:6, 3229:6, 3229:9, 3229:13, 3229:22, 3229:24, 3229:25, 3230:2, 3231:5, 3231:6, 3232:3, 3232:11, 3233:13, 3233:15, 3233:20, 3233:22, 3233:24, 3233:25, 3238:8, 3238:10
  **reported** [4] - 3161:9, 3228:23, 3228:24, 3229:7
  **Reporter** [3] - 3134:7, 3134:7, 3246:13
  **REPORTER** [1] - 3246:2
  **reporters** [1] - 3159:20

**reporting** [1] - 3164:25
**reports** [3] - 3230:13, 3231:17, 3232:19
  **represent** [1] - 3179:7
  **representation** [2] - 3171:11, 3223:8
  **representatives** [3] - 3214:11, 3232:13, 3232:20
  **represented** [1] - 3208:1
  **reputation** [1] - 3179:5
  **reputations** [1] - 3179:10
  **request** [8] - 3166:4, 3166:16, 3176:5, 3210:17, 3215:16, 3221:10, 3221:11, 3231:6
  **requested** [1] - 3229:18
  **requests** [3] - 3229:14, 3230:24, 3231:2
  **researched** [1] - 3138:2
  **reset** [1] - 3180:13
  **resolve** [1] - 3245:16
  **respect** [2] - 3211:21, 3224:23
  **respond** [7] - 3167:3, 3168:11, 3217:11, 3219:11, 3222:21, 3224:19, 3234:5
  **responded** [9] - 3142:20, 3146:12, 3191:21, 3196:4, 3203:3, 3209:7, 3215:16, 3224:19, 3231:2
  **responding** [8] - 3151:6, 3151:9, 3222:3, 3230:12, 3230:24, 3231:16, 3231:19, 3232:12
  **responds** [1] - 3217:8
  **response** [16] - 3146:24, 3148:1, 3148:15, 3148:16, 3152:2, 3176:5, 3191:20, 3192:15, 3210:17, 3212:17, 3212:20, 3220:21, 3221:9, 3222:22, 3229:14, 3231:6
  **responsible** [1] - 3186:10
  **rest** [7] - 3173:15, 3239:17, 3239:18, 3240:21, 3240:23, 3242:20, 3244:9
  **rests** [1] - 3241:8
  **Rests**.......................................
  **..3241** [1] - 3134:22
  **resume** [2] - 3135:3, 3137:19
  **retainer** [1] - 3209:14
  **return** [4] - 3238:18, 3239:2, 3240:8, 3240:9
  **returning** [1] - 3242:4
  **reveal** [1] - 3145:25
  **reverse** [2] - 3234:9, 3234:23
  **review** [2] - 3221:17, 3240:9
  **reviewed** [10] - 3218:19, 3218:20, 3225:3, 3226:24, 3226:25, 3227:12, 3228:4, 3228:14, 3230:7, 3237:20
  **reviewing** [3] - 3182:5, 3197:9, 3197:11

**Rice** [1] - 3173:20
**rick** [1] - 3151:19
**Rick** [1] - 3151:22
**Rights** [1] - 3210:19
**rights** [1] - 3232:6
**righty** [2] - 3239:12, 3245:12
**rise** [1] - 3170:2
**RMR** [2] - 3134:7, 3246:13
**rogue** [1] - 3160:16
**rolled** [1] - 3139:16
**rollout** [3] - 3139:5, 3165:18, 3175:24
  **Room** [2] - 3134:8, 3246:14
  **room** [2] - 3238:19, 3242:6
  **rule** [2] - 3211:20, 3212:14
  **ruled** [3] - 3168:8, 3170:25, 3207:6
  **run** [1] - 3230:19
  **Russell** [1] - 3192:10

**S**

**SANCHEZ** [105] - 3135:4, 3136:19, 3136:22, 3137:1, 3137:13, 3137:15, 3138:6, 3138:8, 3141:1, 3141:7, 3141:12, 3141:15, 3141:16, 3158:24, 3159:15, 3159:18, 3160:2, 3161:11, 3161:15, 3162:11, 3166:14, 3166:18, 3167:18, 3167:23, 3168:1, 3168:9, 3168:22, 3168:25, 3169:6, 3169:15, 3169:19, 3170:11, 3172:12, 3172:17, 3172:19, 3172:23, 3172:24, 3173:4, 3173:10, 3174:6, 3174:18, 3176:11, 3176:13, 3176:24, 3177:1, 3177:2, 3177:7, 3177:11, 3183:15, 3183:18, 3184:13, 3184:21, 3184:24, 3185:5, 3185:8, 3185:9, 3185:19, 3188:2, 3188:12, 3189:8, 3189:22, 3190:14, 3190:17, 3190:23, 3194:3, 3194:7, 3196:18, 3196:24, 3198:14, 3198:16, 3198:18, 3199:9, 3199:19, 3201:11, 3201:13, 3202:16, 3202:19, 3205:7, 3206:15, 3206:20, 3207:4, 3207:8, 3207:16, 3212:4, 3212:11, 3219:15, 3219:20, 3220:1, 3220:11, 3221:2, 3221:8, 3221:22, 3226:11, 3226:13, 3227:5, 3227:10, 3227:11, 3232:8, 3235:1, 3239:8, 3239:11, 3239:21, 3241:12, 3244:11, 3245:13
  **Sanchez** [6] - 3133:12, 3138:5, 3160:25, 3235:17, 3237:21,

3241:10
Sanchez...3133 [1] - 3134:13
sanchez@usdoj.gov [1] - 3133:16
Sanger [49] - 3140:20, 3143:15, 3143:18, 3144:2, 3144:4, 3144:11, 3144:14, 3144:22, 3144:23, 3145:15, 3146:1, 3146:5, 3146:8, 3146:12, 3146:16, 3146:20, 3147:2, 3149:11, 3149:15, 3150:12, 3150:18, 3152:2, 3155:8, 3162:17, 3201:23, 3201:24, 3201:25, 3202:5, 3202:21, 3203:3, 3203:14, 3218:8, 3218:12, 3218:18, 3220:10, 3224:14, 3226:5, 3226:23, 3227:14, 3229:18, 3229:21, 3230:9, 3231:24, 3233:5, 3234:16, 3234:19, 3236:19, 3236:22
Sanger's [3] - 3146:24, 3201:19, 3201:22
sat [1] - 3161:8
satisfied [1] - 3170:3
saw [6] - 3144:8, 3162:2, 3180:11, 3181:13, 3197:12, 3198:7
schedule [1] - 3240:23
scheduling [1] - 3244:15
school [1] - 3145:17
Schultz [2] - 3183:8, 3183:17
screen [13] - 3140:24, 3141:3, 3172:11, 3176:22, 3185:16, 3190:22, 3194:5, 3205:3, 3215:15, 3219:19, 3219:20, 3219:21, 3219:23
screw [1] - 3195:10
scuffle [1] - 3195:15
search [1] - 3223:16
seated [1] - 3241:5
second [17] - 3141:12, 3156:1, 3175:10, 3175:11, 3180:18, 3190:25, 3191:1, 3204:24, 3211:12, 3211:21, 3212:8, 3216:16, 3218:21, 3226:17, 3228:23, 3236:4, 3237:5
secondly [1] - 3160:24
Secretary [1] - 3158:5
Security [1] - 3189:25
see [34] - 3142:10, 3149:9, 3156:8, 3167:2, 3167:21, 3167:25, 3168:3, 3168:20, 3177:10, 3183:9, 3183:12, 3185:13, 3185:14, 3189:23, 3191:22, 3192:23, 3193:24, 3195:3, 3195:11, 3209:16, 3214:6, 3214:13, 3214:16, 3214:19, 3215:1, 3215:2, 3215:4, 3216:11, 3217:2,

3237:24, 3239:13, 3244:7, 3244:10, 3245:4
seed [1] - 3181:9
seem [2] - 3152:14, 3158:4
selected [1] - 3193:14, 3240:7, 3241:21
selection [4] - 3240:19, 3243:3, 3243:12, 3244:16
selective [3] - 3153:12, 3157:4, 3157:8
Senate [2] - 3195:15, 3196:5
Senator [1] - 3194:22
send [8] - 3146:7, 3149:17, 3149:22, 3164:10, 3176:6, 3212:20, 3215:3, 3223:6
sending [2] - 3164:25, 3237:19
sends [4] - 3151:11, 3163:23, 3170:11, 3215:23
sense [4] - 3147:8, 3186:24, 3191:14, 3192:1
sent [28] - 3139:15, 3142:6, 3144:16, 3146:21, 3146:25, 3151:7, 3155:23, 3156:19, 3163:16, 3167:16, 3170:1, 3171:10, 3173:11, 3176:5, 3198:10, 3198:20, 3199:16, 3213:16, 3220:14, 3225:3, 3225:11, 3225:13, 3225:15, 3225:20, 3225:21, 3225:24, 3225:25, 3234:8
sentence [14] - 3147:7, 3147:10, 3169:11, 3171:2, 3171:5, 3171:7, 3178:18, 3211:15, 3211:18, 3217:12, 3217:23, 3218:5, 3230:10, 3230:11
September [25] - 3145:22, 3186:19, 3187:23, 3188:17, 3188:18, 3189:16, 3191:4, 3191:7, 3191:24, 3193:3, 3195:24, 3198:9, 3198:19, 3199:12, 3200:21, 3204:6, 3204:7, 3206:9, 3206:10, 3206:11, 3206:19, 3209:1, 3225:12, 3242:6, 3243:6
serving [2] - 3211:20, 3230:6
seven [1] - 3183:11
several [1] - 3173:20
shape [1] - 3231:9
shared [1] - 3195:23
sharply [1] - 3135:20
Shoen [1] - 3193:13
Shonka [1] - 3200:24
short [2] - 3148:8, 3161:16
short-circuit [1] - 3161:16
shortly [1] - 3153:11, 3200:7, 3242:2
shot [1] - 3225:17
show [4] - 3175:3, 3200:17, 3207:1, 3220:2

showed [3] - 3168:16, 3197:2, 3216:9
showing [1] - 3236:16
shown [2] - 3207:7, 3207:15
shows [2] - 3220:11, 3221:5
sic [1] - 3205:12
sic] [1] - 3187:25
side [3] - 3177:16, 3221:6, 3239:4
sides [1] - 3210:18
signature [1] - 3213:20
signed [1] - 3184:7
significant [1] - 3138:15
simple [1] - 3232:16
simpler [1] - 3211:23
simply [1] - 3202:11
single [2] - 3135:22
sit [3] - 3241:24, 3241:25, 3243:13
sitting [4] - 3240:6, 3241:22, 3241:25, 3243:13
Skadden [10] - 3162:23, 3178:11, 3180:12, 3195:6, 3195:23, 3196:2, 3203:6, 3218:25, 3224:1, 3224:16
Skadden's [1] - 3155:19
Sloan [8] - 3197:3, 3197:10, 3197:12, 3197:16, 3197:20, 3215:4, 3215:16, 3234:23
small [1] - 3181:2
Smith [3] - 3194:13, 3194:14, 3194:25
solely [1] - 3172:7
solid [1] - 3222:25
someone [2] - 3142:8, 3173:7
sometimes [1] - 3137:6
sorry [19] - 3140:25, 3141:11, 3143:12, 3149:25, 3163:1, 3176:3, 3177:6, 3188:19, 3188:22, 3189:9, 3189:19, 3190:16, 3191:4, 3198:14, 3201:16, 3213:8, 3225:23, 3229:20, 3235:6
sort [1] - 3137:7
SPAEDER [2] - 3133:22, 3134:2
specific [5] - 3197:15, 3207:23, 3221:10, 3222:1, 3241:16
specifically [3] - 3220:22, 3224:10, 3229:5
specifics [1] - 3227:19
spent [2] - 3159:18, 3237:10
Spiegel [5] - 3223:24, 3225:4, 3225:11, 3226:14, 3228:10
spoken [1] - 3138:1
stage [1] - 3204:9
stakeholders [1] - 3183:20
stand [7] - 3135:7, 3137:20, 3168:10, 3172:3, 3242:21
start [4] - 3147:19, 3190:24, 3194:8

**started** [1] - 3240:16
**starts** [3] - 3176:14, 3191:5, 3211:12
**State** [11] - 3158:13, 3158:16, 3158:21, 3159:1, 3159:3, 3159:4, 3159:8, 3159:23, 3160:24, 3161:4, 3162:6
**state** [3] - 3160:10, 3192:9, 3195:9
**State's** [1] - 3158:5
**statement** [6] - 3155:1, 3178:12, 3217:12, 3217:23, 3231:9, 3231:23
**statements** [1] - 3230:14
**STATES** [2] - 3133:1, 3133:10
**states** [1] - 3157:17
**States** [5] - 3133:3, 3134:8, 3143:19, 3187:19, 3196:13
**stating** [1] - 3169:17
**Stefan** [4] - 3184:9, 3186:8, 3186:17, 3190:3
**stenograph** [1] - 3246:7
**still** [12] - 3136:17, 3138:3, 3138:18, 3151:1, 3168:12, 3168:19, 3169:5, 3171:4, 3239:9, 3240:21, 3242:15, 3245:16
**stipulation** [1] - 3163:21
**story** [6] - 3136:16, 3148:10, 3156:7, 3177:17, 3177:18, 3179:3
**strategy** [5] - 3175:24, 3176:1, 3181:8, 3198:22, 3198:24
**street** [1] - 3192:3
**Street** [3] - 3133:14, 3133:22, 3134:2
**strict** [1] - 3181:3
**string** [1] - 3163:3
**strongest** [1] - 3210:20
**strongly** [1] - 3242:14
**stuff** [1] - 3226:3
**stupid** [1] - 3167:10
**subject** [4] - 3150:9, 3150:10, 3165:8, 3165:12
**submitted** [2] - 3238:21, 3242:15
**substantive** [1] - 3232:3
**subtract** [1] - 3149:1
**subtracting** [1] - 3143:5
**suggested** [1] - 3222:14
**suggestions** [2] - 3182:16, 3215:17
**Suite** [2] - 3133:23, 3134:3
**summarize** [1] - 3223:4
**summer** [2] - 3138:16, 3186:21
**Sunday** [1] - 3199:14
**sunny** [1] - 3242:4
**supplied** [1] - 3231:5
**support** [1] - 3181:5
**suppose** [1] - 3244:25

**supposed** [3] - 3174:23, 3185:13, 3205:10
**supposedly** [1] - 3200:7
**surprised** [1] - 3237:18
**surrounding** [1] - 3227:23
**Susan** [1] - 3173:20
**suspect** [1] - 3211:17
**sustained** [3] - 3158:19, 3174:5, 3196:23
**system** [2] - 3141:23, 3212:15

---

# T

**tab** [1] - 3195:3
**table** [1] - 3239:2
**talks** [1] - 3151:17
**tank** [2] - 3185:12, 3185:25
**tanks** [1] - 3183:20
**task** [1] - 3222:1
**tax** [3] - 3211:16, 3211:18, 3211:25
**Taylor** [13] - 3133:21, 3139:4, 3143:8, 3152:19, 3165:3, 3176:9, 3176:15, 3177:12, 3199:7, 3212:18, 3216:9, 3239:15, 3241:6
**TAYLOR** [49] - 3158:18, 3159:13, 3159:23, 3160:1, 3160:23, 3162:3, 3166:1, 3166:4, 3168:7, 3169:9, 3169:20, 3170:4, 3170:9, 3170:15, 3171:18, 3171:24, 3172:1, 3174:1, 3174:3, 3174:15, 3185:3, 3188:10, 3188:24, 3189:4, 3189:6, 3190:19, 3193:24, 3194:1, 3196:15, 3196:20, 3199:5, 3205:1, 3206:14, 3207:11, 3207:13, 3219:25, 3220:5, 3221:11, 3231:20, 3235:5, 3235:7, 3235:12, 3235:16, 3238:12, 3238:15, 3239:18, 3241:8, 3245:11, 3245:14
**Taylor...................3235** [1] - 3134:14
**team** [9] - 3139:16, 3139:19, 3155:23, 3179:7, 3179:11, 3181:4, 3181:5, 3218:25, 3219:10
**team's** [1] - 3210:8
**Teft** [1] - 3192:9
**Telegraph** [4] - 3152:19, 3152:25, 3155:14, 3164:13
**telephone** [1] - 3230:1
**ten** [5] - 3235:5, 3235:7, 3238:19, 3238:24, 3239:13
**terms** [1] - 3136:13
**terrible** [1] - 3169:3
**terrific** [1] - 3167:7
**testified** [4] - 3135:11, 3143:25,

3144:5, 3224:8
**testify** [1] - 3225:7
**testimony** [8] - 3136:15, 3165:22, 3171:13, 3172:13, 3202:13, 3217:15, 3232:1, 3233:16
**THE** [171] - 3133:1, 3133:1, 3133:9, 3133:13, 3135:2, 3135:5, 3135:9, 3136:21, 3136:24, 3137:4, 3137:14, 3137:17, 3137:19, 3137:22, 3140:25, 3141:2, 3141:8, 3141:9, 3141:10, 3141:11, 3141:13, 3141:14, 3158:19, 3158:22, 3158:23, 3159:14, 3159:17, 3159:25, 3160:4, 3161:4, 3161:13, 3162:4, 3166:2, 3166:6, 3166:15, 3167:21, 3167:25, 3168:2, 3168:6, 3168:15, 3168:23, 3169:5, 3169:7, 3169:11, 3169:16, 3169:22, 3170:5, 3170:13, 3170:16, 3171:2, 3171:5, 3171:8, 3171:21, 3171:25, 3172:2, 3172:13, 3172:22, 3173:1, 3173:3, 3173:6, 3174:4, 3174:5, 3174:16, 3176:10, 3176:12, 3176:23, 3176:25, 3177:5, 3177:8, 3177:9, 3183:13, 3183:16, 3184:17, 3184:22, 3185:1, 3185:4, 3185:6, 3185:13, 3185:14, 3185:17, 3185:18, 3188:4, 3188:11, 3188:21, 3188:22, 3188:25, 3189:1, 3189:5, 3189:7, 3189:18, 3189:19, 3190:16, 3190:18, 3190:20, 3193:23, 3194:2, 3194:4, 3196:16, 3196:22, 3198:13, 3198:15, 3198:17, 3199:7, 3199:8, 3199:11, 3199:13, 3201:10, 3201:12, 3202:15, 3202:18, 3204:24, 3205:2, 3206:16, 3206:18, 3207:1, 3207:3, 3207:6, 3207:10, 3207:12, 3207:14, 3212:2, 3212:5, 3212:7, 3219:18, 3219:21, 3219:22, 3219:23, 3219:24, 3220:6, 3220:18, 3220:25, 3221:3, 3221:7, 3221:13, 3221:16, 3221:20, 3221:21, 3227:3, 3227:6, 3231:21, 3232:1, 3235:2, 3235:6, 3235:8, 3235:13, 3238:13, 3238:16, 3239:1, 3239:9, 3239:12, 3239:15, 3239:19, 3239:22, 3240:3, 3241:3, 3241:5, 3241:9, 3241:13, 3242:8, 3243:19, 3243:21, 3243:22, 3243:23, 3243:25, 3244:1, 3244:4,

3244:7, 3244:14, 3245:3, 3245:12, 3245:15
**theme** [1] - 3160:13
**theory** [2] - 3168:18, 3208:14
**thereafter** [1] - 3242:10
**therefore** [2] - 3135:20, 3241:25
**thinking** [4] - 3169:18, 3169:24, 3198:25
**thinks** [1] - 3136:16
**third** [1] - 3157:4
**thoroughly** [1] - 3241:19
**three** [10] - 3135:11, 3146:7, 3155:3, 3176:20, 3211:9, 3211:11, 3224:2, 3230:15, 3231:4, 3237:4
**thumbs** [1] - 3141:10
**Thursday** [8] - 3239:25, 3243:8, 3243:9, 3243:19, 3243:25, 3244:17, 3245:8
**timed** [1] - 3142:8
**timeframe** [1] - 3161:19
**timing** [4] - 3142:11, 3143:4, 3147:21, 3151:1
**today** [1] - 3239:25
**together** [10] - 3145:17, 3145:18, 3145:23, 3186:3, 3186:4, 3220:24, 3227:21, 3227:23, 3230:25, 3240:10
**Tom** [1] - 3153:10
**tomorrow** [7] - 3142:19, 3150:14, 3152:4, 3156:7, 3163:15, 3240:6
**tonight** [1] - 3163:15
**Tony** [6] - 3189:23, 3189:25, 3194:11, 3194:24, 3195:16, 3195:18
**took** [2] - 3153:18, 3209:1
**top** [28] - 3141:20, 3143:5, 3144:8, 3146:19, 3147:19, 3147:23, 3148:24, 3149:2, 3150:25, 3151:3, 3163:2, 3163:7, 3163:8, 3163:22, 3164:15, 3173:5, 3180:11, 3180:18, 3183:5, 3183:12, 3190:24, 3191:1, 3192:13, 3215:1, 3216:6, 3218:22, 3223:4, 3225:10
**topic** [2] - 3174:17, 3208:11
**touch** [3] - 3144:3, 3196:12, 3201:24
**towards** [2] - 3143:22, 3192:10
**track** [1] - 3194:22
**transcript** [3] - 3207:22, 3246:6, 3246:7
**TRANSCRIPT** [1] - 3133:8
**transiting** [1] - 3191:13
**travel** [1] - 3244:17
**traveling** [1] - 3186:18
**TRIAL** [2] - 3133:4, 3133:8
**trial** [3] - 3180:14, 3180:19,

3232:5
**tried** [7] - 3137:25, 3149:19, 3204:10, 3206:3, 3206:9, 3224:11
**trip** [3] - 3175:10, 3175:11
**trips** [1] - 3175:8
**trivial** [1] - 3195:22
**true** [11] - 3138:15, 3173:24, 3196:3, 3224:6, 3224:10, 3229:16, 3229:17, 3231:13, 3233:8, 3246:6, 3246:7
**truth** [4] - 3169:1, 3169:10, 3169:21, 3170:6
**try** [5] - 3136:2, 3161:16, 3171:8, 3192:25, 3213:2
**trying** [8] - 3140:4, 3149:22, 3159:20, 3160:7, 3169:2, 3182:6, 3202:16, 3220:13
**Tuesday** [14] - 3186:8, 3240:8, 3240:11, 3240:12, 3242:5, 3242:6, 3243:6, 3243:7, 3243:19, 3243:23, 3243:25, 3244:8, 3245:2, 3245:4
**turn** [1] - 3238:17
**turns** [1] - 3141:19
**tweaks** [1] - 3209:8
**twice** [1] - 3149:19
**two** [12] - 3138:12, 3147:4, 3147:19, 3150:25, 3155:3, 3155:15, 3175:8, 3186:20, 3209:6, 3216:23, 3222:24, 3243:2
**Two** [6] - 3181:18, 3211:19, 3211:22, 3212:1, 3212:5, 3212:13
**Tymoshenko** [9] - 3177:17, 3180:15, 3180:20, 3192:11, 3194:23, 3203:7, 3212:9, 3229:6, 3229:9

## U

**U.S** [9] - 3133:13, 3133:17, 3158:4, 3158:25, 3196:10, 3229:6, 3229:9, 3230:12, 3231:16
**Ukraine** [57] - 3138:19, 3138:21, 3138:24, 3157:20, 3159:19, 3159:21, 3159:22, 3160:8, 3160:12, 3160:13, 3160:14, 3161:10, 3165:25, 3169:4, 3177:18, 3178:11, 3178:25, 3179:4, 3179:12, 3184:4, 3184:10, 3186:10, 3192:24, 3194:23, 3195:1, 3195:10, 3195:15, 3195:22, 3196:5, 3200:23, 3204:9, 3205:8, 3205:11, 3205:18, 3205:19, 3206:10, 3214:11, 3221:25, 3222:18, 3230:5, 3230:6,

3230:8, 3230:17, 3230:18, 3230:20, 3231:9, 3231:14, 3232:13, 3232:20, 3232:22, 3233:25, 3234:20, 3237:11
**Ukraine's** [1] - 3160:6
**Ukrainian** [1] - 3154:24
**Ukrainians** [2] - 3144:24, 3230:16
**Um-hum** [1] - 3168:22
**uncertain** [2] - 3195:9, 3233:19
**under** [7] - 3138:3, 3181:3, 3181:20, 3189:24, 3223:8, 3230:5, 3230:18
**underscore** [2] - 3135:10, 3242:13
**understood** [4] - 3136:19, 3137:13, 3157:7, 3157:23
**unfavorable** [2] - 3160:22, 3161:10
**Union** [4] - 3184:2, 3184:5, 3184:10, 3184:11
**unit** [1] - 3219:12
**Unit** [20] - 3139:2, 3160:5, 3160:19, 3160:20, 3161:8, 3161:18, 3193:5, 3211:24, 3212:12, 3220:14, 3220:22, 3224:24, 3225:3, 3231:13, 3232:10, 3232:25, 3233:3, 3233:4, 3233:23, 3234:17
**UNITED** [2] - 3133:1, 3133:10
**United** [6] - 3133:3, 3134:8, 3143:19, 3187:19, 3196:13, 3200:21
**unless** [2] - 3184:19, 3245:6
**unlikely** [1] - 3240:21
**unrelated** [1] - 3243:4
**up** [16] - 3141:10, 3148:9, 3172:10, 3184:18, 3185:2, 3189:11, 3216:7, 3216:24, 3221:3, 3225:6, 3238:13, 3240:22, 3242:23, 3243:1, 3245:6, 3245:9
**update** [2] - 3149:6, 3169:12
**updates** [1] - 3173:16
**USA** [1] - 3135:1
**USDOJ** [1] - 3223:7

## V

**vacationed** [1] - 3186:4
**valid** [1] - 3180:19
**van** [8] - 3142:23, 3142:24, 3164:21, 3200:14, 3201:19, 3220:23, 3221:23, 3222:16
**various** [1] - 3227:20
**verdict** [1] - 3243:9
**version** [2] - 3175:3, 3198:10
**vice** [1] - 3194:17
**view** [12] - 3136:18, 3158:14, 3159:3, 3159:4, 3159:7,

3159:10, 3160:8, 3160:9,
3188:8, 3206:18
**viewed** [1] - 3161:10
**views** [1] - 3161:9
**Viktor** [1] - 3186:19
**Vin** [9] - 3140:11, 3201:23,
3202:1, 3202:12, 3202:23,
3203:6, 3203:8, 3203:14, 3205:6
**violations** [1] - 3232:5
**virtually** [2] - 3210:15, 3210:25
**Vlasenko** [1] - 3167:10
**vs** [1] - 3133:5

## W

**wait** [4] - 3185:1, 3188:4,
3195:11, 3204:24
**wants** [2] - 3150:15, 3221:14
**Warsaw** [1] - 3167:1
**Washington** [8] - 3133:6,
3133:15, 3133:18, 3134:3,
3134:9, 3145:19, 3152:5,
3246:15
**wasting** [1] - 3195:20
**Weber** [19] - 3140:2, 3140:3,
3140:11, 3147:16, 3200:2,
3201:23, 3202:1, 3203:6,
3203:21, 3203:25, 3204:14,
3204:23, 3205:6, 3205:12,
3205:14, 3205:15, 3232:11,
3232:14, 3232:17
**Weber's** [1] - 3232:18
**Wednesday** [3] - 3243:7,
3243:19, 3244:22
**week** [3] - 3233:20, 3240:21,
3243:5
**weekend** [7] - 3241:23, 3242:1,
3242:4, 3242:23, 3242:25,
3243:10, 3243:17
**weeks** [2] - 3220:15, 3243:2
**Weiss** [8] - 3155:18, 3155:25,
3162:23, 3163:13, 3216:18,
3217:4, 3218:22
**welcome** [1] - 3149:7
**well-deserved** [1] - 3244:9
**Western** [1] - 3180:21
**WH** [1] - 3192:6
**white** [1] - 3160:15
**White** [3] - 3192:7, 3195:9,
3195:21
**Whitney** [11] - 3201:14,
3201:19, 3201:22, 3202:4,
3202:20, 3203:24, 3204:21,
3213:17, 3215:3, 3215:17,
3216:6
**whole** [3] - 3163:3, 3221:13,
3221:17
**wiggle** [1] - 3137:7
**William** [2] - 3133:20, 3133:21
**wishes** [1] - 3241:7

**withdraw** [1] - 3183:4
**WITNESS** [18] - 3141:11,
3141:13, 3158:22, 3174:4,
3177:8, 3183:16, 3188:22,
3189:19, 3190:16, 3198:15,
3199:7, 3199:13, 3206:18,
3212:7, 3219:23, 3221:20,
3232:1, 3238:13
**witness** [2] - 3134:12, 3242:21
**witnesses** [2] - 3135:14,
3242:20
**wmurphy@zuckerman.com** [1]
- 3133:24
**word** [1] - 3137:7
**wording** [1] - 3211:2
**words** [4] - 3144:6, 3166:7,
3200:24, 3230:14
**world** [1] - 3178:10
**worst** [2] - 3177:14, 3178:25
**write** [7] - 3138:12, 3150:12,
3181:1, 3186:17, 3210:3,
3210:6, 3217:22
**writes** [5] - 3147:2, 3149:5,
3151:14, 3186:6, 3192:1
**writing** [1] - 3139:1
**written** [1] - 3195:7
**wrongdoing** [4] - 3235:25,
3236:3, 3236:6, 3236:7
**wrote** [33] - 3145:9, 3152:12,
3166:21, 3166:22, 3166:24,
3167:9, 3167:10, 3175:7,
3175:12, 3175:17, 3175:21,
3177:14, 3177:19, 3177:23,
3178:5, 3181:16, 3181:23,
3182:1, 3182:15, 3182:24,
3187:1, 3191:11, 3202:22,
3203:6, 3203:10, 3210:14,
3210:16, 3214:10, 3223:1,
3227:8, 3228:12, 3228:25
**wtaylor@zuckerman.com** [1] -
3133:25

## Y

**Yalta** [1] - 3186:19
**Yanukovych** [3] - 3162:2,
3179:14, 3179:16
**yes-or-no** [1] - 3137:2
**yesterday** [23] - 3135:12,
3137:2, 3138:11, 3139:4,
3141:21, 3143:3, 3143:25,
3144:5, 3152:18, 3153:20,
3165:4, 3165:22, 3176:9,
3176:16, 3177:12, 3180:23,
3200:1, 3202:2, 3209:7,
3212:18, 3216:10, 3217:15,
3234:3
**York** [29] - 3155:14, 3157:7,
3164:13, 3216:12, 3216:25,
3217:1, 3217:5, 3217:9,

3217:12, 3217:17, 3217:18,
3217:22, 3217:25, 3218:2,
3218:4, 3220:17, 3224:6,
3224:11, 3224:21, 3224:23,
3226:3, 3227:21, 3230:20,
3230:23, 3231:10, 3231:14,
3231:18, 3233:1, 3234:21
**yourselves** [3] - 3222:18,
3238:22, 3239:10
**YT** [1] - 3192:10
**Yulia** [3] - 3180:14, 3180:20,
3192:11

## Z

**ZUCKERMAN** [2] - 3133:22,
3134:2
**Zwaan** [8] - 3142:23, 3142:24,
3164:21, 3200:14, 3201:19,
3220:23, 3221:23, 3222:16